**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | : | CIVIL ACTION |
| | : | (Capital Habeas Corpus) |
| Petitioner, | : | |
| | : | Case No. 2: 19-cv-392 |
| V. | : | |
| | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP–Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
| | : | |
| Respondents. | : | |
| | : | |

———————————————————

**PETITION FOR WRIT OF HABEAS CORPUS**

———————————————————

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

## PRELIMINARY STATEMENT

Petitioner Alfred Bourgeois shall be referred to as Petitioner, Mr. Bourgeois, or, when discussed in conjunction with other members of the Bourgeois family, Alfred. Respondents shall be referred to as the Government. Citations to witness declarations and affidavits shall be referred to as "Dec." and "Aff.," respectively, followed by the name of the relevant witness. Citations to expert reports shall be referred to as "Report," followed by the name of the expert, the date, and the page number. All declarations, reports, affidavits, and other relevant records cited herein are provided in Appendix A filed with this Petition. Cites to pages in Appendix A shall be referred to by the initial "A" and relevant page number.

Relevant transcripts from Petitioner's § 2255 level proceedings are provided in Appendix B filed with this Petition. Cites to pages from the transcript shall be referred to as "Tr.," followed by the relevant date and page number.

All other citations are either self–explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. I

I.      INTRODUCTION ........................................................................................................... 1

II.     PROCEDURAL HISTORY AND STATEMENT OF THE CASE ................................... 3

    A.  Trial and Initial Habeas Proceedings ..................................................................... 3

    B.  *Moore v. Texas* and Petitioner's Motion to File a Successive Habeas Petition in the
        Fifth Circuit................................................................................................................ 7

    C.  Subsequent Developments ...................................................................................... 9

III.    MR. BOURGEOIS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR
        THE DEATH PENALTY UNDER THE FEDERAL DEATH PENALTY ACT AND
        *ATKINS V. VIRGINIA* AND ITS PROGENY. .............................................................. 10

    A.  Introduction............................................................................................................. 10

    B.  Deficits in Intellectual Functioning ........................................................................ 12

        1.  The diagnostic criteria.................................................................................... 12

        2.  Mr. Bourgeois has deficits in intellectual functioning.................................... 14

    C.  Deficits in Adaptive Functioning ............................................................................ 16

        1.  The diagnostic criteria.................................................................................... 16

        2.  The adaptive behavior assessment ................................................................ 17

        3.  Mr. Bourgeois has significant deficits in adaptive functioning. .................... 21

        4.  Formal test of adaptive behavior.................................................................... 36

    D.  Onset Prior to Age Eighteen ................................................................................. 38

    E.  Risk Factors for Intellectual Disability .................................................................. 39

        1.  Child abuse..................................................................................................... 39

        2.  Sexual abuse................................................................................................... 41

        3.  Neglect and impaired parenting ..................................................................... 41

        4.  Low socioeconomic status ............................................................................. 43

        5.  History of learning difficulties......................................................................... 44

        6.  Family heredity risk ........................................................................................ 44

    F.  Conclusion .............................................................................................................. 45

IV.     RELIEF IS APPROPRIATE UNDER 28 U.S.C. § 2241. ............................................. 45

    A.  Petitioner's *Atkins* Claim Relies on Supreme Court Jurisprudence and Diagnostic
        Criteria Not Available to Him in § 2255 Proceedings.............................................. 46

        1.  Background: *Atkins*, *Ex Parte Briseño*, *Moore–I*, and *Moore–II* ........................ 48

        2.  The district court denied Mr. Bourgeois's *Atkins* claim under the same
            unconstitutional standards struck down in *Moore–I* and *Moore–II*..................... 53

        3.  This claim is reviewable under § 2241. ......................................................... 68

ii

    B.  Petitioner's Claim Challenges the Execution of his Sentence, as Well as the Fundamental Legality of that Sentence ........................................................................ 71

REQUEST FOR RELIEF ............................................................................................................ 74

## I.       INTRODUCTION

Alfred Bourgeois, a death–sentenced inmate currently housed at the United States Penitentiary, Terre Haute, is intellectually disabled ("ID"). His execution is categorically barred by the Federal Death Penalty Act ("FDPA") and per se unconstitutional pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny. There is no doubt that Mr. Bourgeois meets the three prongs of the clinical definition of intellectual disability under current clinical definitions: subaverage intellectual functioning, adaptive deficits, and onset before age eighteen. He has been IQ tested twice in his lifetime. His scores of 70 and 75 (corrected under clinically–accepted standards to 67 and 68) each falls within the presumptive range for ID. Standardized testing, clinical evaluation, contemporaneous records, and numerous witnesses attest to his significant adaptive impairments in conceptual, social, and practical skills, any one of which is by itself sufficient to establish adaptive deficits. And Petitioner's lifelong intellectual and adaptive impairments long predate his eighteenth birthday.

The only court to review Mr. Bourgeois's claim of categorical ineligibility for the death penalty applied non–clinical, unscientific standards; relied largely on commonly held, but erroneous stereotypes of intellectually disabled persons; and employed a number of the so–called "*Briseño* factors," which the United States Supreme Court later described as factors "untied" to the "medical community's information" that "creat[ed] an unacceptable risk that persons with intellectual disability will be executed." *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore–I*"). For example, the district judge:

- set aside diagnostic standards and relied on her own armchair assessment of Mr. Bourgeois's conduct to determine that his "true" intellectual functioning did not satisfy the IQ component for intellectually disability, despite the fact that all of his IQ scores fall within the presumptive range for ID;

- found that Mr. Bourgeois's perceived adaptive *strengths* counteracted the evidence of his adaptive *deficits*, despite acknowledging that the medical community focuses strictly on deficits;

- applied unscientific stereotypes of intellectually–disabled persons—including that ID persons look and talk differently than the general population and are incapable of driving or maintaining a job—to support her conclusion that Mr. Bourgeois's adaptive functioning was inconsistent with a diagnosis of ID; and

- treated risk factors and comorbidities as alternate *explanations for* Mr. Bourgeois's deficits, as opposed to *contributors to* his intellectual disability.

The district court's approach was subsequently declared unconstitutional by the United States Supreme Court in *Moore–I* and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore–II*"), which held that courts must apply the medical community's current standards in assessing *Atkins* claims, and which specifically criticized many of the analytical errors that plagued the initial review of Petitioner's claim, including reliance on the *Briseño* factors. Following *Moore–I*, Mr. Bourgeois sought to have his *Atkins* claim reviewed under current constitutional standards, but was denied the opportunity to do so when the Fifth Circuit ruled that additional review under *Moore–I* would amount to an impermissible "second or successive" petition for post–conviction relief under 28 U.S.C. § 2255.

A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013). Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. *See, e.g.*, *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015); *In re Davenport*, 147 F.3d 605, 607–11 (7th Cir. 1998). Section 2241 is also the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence. *See, e.g.*, *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). Mr. Bourgeois's claim relies on the

*Moore–I* and *Moore–II* decisions, which rendered unconstitutional Fifth Circuit precedent rejecting the application of medical standards to *Atkins* claims, as well as newly–adopted diagnostic criteria. Additionally, Mr. Bourgeois challenges the execution of his fundamentally illegal death sentence. The FDPA requires such prospective relief to be available, providing as it does that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c); *see also Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

On July 25, 2019, the Government notified Mr. Bourgeois that his execution has been scheduled for January 13, 2020. Mr. Bourgeois now stands to be among the first individuals executed by the federal government in over fifteen years, even though his scheduled execution is per se unconstitutional, even though no court has ever reviewed his claim of ID under constitutionally–mandated current medical standards, and even though the FDPA specifically prohibits the execution of an intellectually–disabled prisoner. The unique circumstances of the case require this Court's careful review, and thereafter, a grant of habeas corpus under 28 U.SC. § 2241 to prevent Mr. Bourgeois's unlawful execution.

## II.     PROCEDURAL HISTORY AND STATEMENT OF THE CASE

### A.     Trial and Initial Habeas Proceedings

1.     In 2004, Mr. Bourgeois was convicted of capital murder and sentenced to death in the United States District Court for the Southern District of Texas for the 2002 death of his two–year–old daughter, J.G. On August 25, 2005, the Fifth Circuit affirmed Mr. Bourgeois's conviction and sentence on direct appeal. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005). The Supreme Court denied his petition for writ of certiorari on May 15, 2006. 547 U.S. 1132 (2006).

2.     On May 14, 2007, Mr. Bourgeois filed a Motion for Relief Pursuant to 28 U.S.C.

§ 2255 challenging his conviction and sentence of death, including a claim that he is intellectually disabled and his death sentence is unconstitutional pursuant to *Atkins*.

3.       The district court held evidentiary hearings on September 10, 2010, and September 20–24, 2010. Additionally, the parties deposed several witnesses. In support of his *Atkins* claim, Mr. Bourgeois presented testimony from: neuropsychologist Donald E. Weiner, Ph.D.; neuropsychologist Michael Gelbort, Ph.D.; clinical psychologist Victoria Swanson, Ph.D.; and numerous lay witnesses who, collectively, were able to testify to Petitioner's low intellectual functioning in various domains throughout his life. The Government presented testimony from forensic psychologist Roger Bryan Moore, Jr., Ph.D.; neuropsychologist J. Randall Price, Ph.D.; and a small number of lay witnesses, each of whom knew Mr. Bourgeois only in the context of work and only as an adult.

4.       On May 19, 2011, the district court denied Petitioner's § 2255 motion and denied a Certificate of Appealability ("COA") on all claims. *United States v. Bourgeois*, No. C–02–CR– 216, 2011 WL 1930684 (S.D. Tex. May 19, 2011). The Fifth Circuit denied Mr. Bourgeois's request for a COA on August 5, 2013. *United States v. Bourgeois*, 537 F. App'x. 604 (5th Cir. 2013).

5.       In dismissing Petitioner's *Atkins* claim, the district court applied the Fifth Circuit's then–valid precedent, which largely disregarded medical standards governing the diagnosis of intellectual disability. For instance, although both of the leading diagnostic authorities in the field of intellectual disability—the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA")— recognize that an IQ score of 75 or below falls within the presumptive range for intellectual disability, the district court disregarded Mr. Bourgeois's two qualifying scores. Instead, the court

relied on various unscientific stereotypes to determine that Petitioner's "true" intellectual functioning did not satisfy the IQ component of ID. *See id.* at *22–29 (finding Mr. Bourgeois's low intellectual functioning to be belied by the fact that he "answers the questions asked of him, engages in conversation, [and] has logical thoughts"; "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies"; "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances"; had a "well–groomed appearance"; and "otherwise carried himself without any sign of intellectual impairment"); *see also id.* at *27 ("[T]he Fifth Circuit has denied relief when . . . notwithstanding borderline IQ scores, an inmate's intelligence is more consistent with the higher end of the confidence interval.").

6.      The district court also relied on Fifth Circuit precedent for the proposition that there is a "legal" and a "psychological" approach to assessing the adaptive functioning prong of ID, and that "the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals." *Id.* at *32. Applying the "legal" approach, the district court found that Mr. Bourgeois's perceived adaptive strengths counteracted the evidence of his adaptive deficits, despite acknowledging that the medical community focuses strictly on deficits:

> [T]he AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that "within an individual, limitations often coexist with strengths. . . ." The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. . . . [T]he federal inquiry probes more deeply the accuracy of the reported deficiencies and aims to put them into context. . . .

> A broad review of the evidence does not make Bourgeois' claim of adaptive deficits believable. . . . The record shows strengths that more than coexist with weaknesses, they call into question the depth and accuracy of reports of those weaknesses. The Court finds that Bourgeois has not shown substantial adaptive deficits by a preponderance of the evidence.

5

*Id.* \*33–34, 44 (citing, inter alia, *United States v. Webster*, 421 F.3d 308, 313 (2005), another case denying *Atkins* relief under § 2255); *see also id.* at \*42 (disparaging the credibility of defense expert Dr. Swanson because she recognized that Mr. Bourgeois demonstrated certain adaptive strengths, but explained—consistent with diagnostic standards—that these strengths did not "offset the other deficits" that Mr. Bourgeois has in any given area).

  7. Furthermore, as with its assessment of Mr. Bourgeois's intellectual functioning, the court relied upon unscientific stereotypes of persons with ID to support its conclusion that Mr. Bourgeois's adaptive functioning was inconsistent with a diagnosis of ID. For instance, the court noted that Mr. Bourgeois was competent at his job as a truck driver, that "[h]is appearance and grooming were beyond presentable," and that individuals who knew him through his work as a truck driver did not perceive him as intellectually disabled. *Id.* at \*39. Again, this was consistent with Fifth Circuit jurisprudence in 2011, *see, e.g.*, *Webster,* 421 F.3d at 313, but current diagnostic standards make clear that none of these "skills" conflicts with a medical diagnosis of intellectual disability. *See, e.g.*, AAIDD *User's Guide* (11th ed. 2012) ("AAIDD–12") (identifying numerous commonly held but erroneous stereotypes about persons with ID, including that they "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot get driver's licenses, buy cars, or drive cars," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations"); Am. Psychiatric Assoc'n, Diagnostic and Statistical Manual of Mental Disorders—5th Edition ("DSM–5") (explaining that persons with ID can, inter alia, maintain regular employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, and develop a variety of recreational skills").

8.      Other unscientific aspects of the district court's analysis included that the court gave significant weight to its own lay assessment of Mr. Bourgeois's communication skills, which it found incompatible with ID; considered evidence of a deficit to be evidence of a strength so long as Mr. Bourgeois eventually learned to perform the task; and treated risk factors and comorbidities as *alternate explanations for* Mr. Bourgeois's deficits, as opposed to *contributors to* his intellectual disability. In short, practically every aspect of the court's ID analysis violated current clinical standards.

### B.   *Moore v. Texas* and Petitioner's Motion to File a Successive Habeas Petition in the Fifth Circuit

9.      While the district court's approach to analyzing Mr. Bourgeois's *Atkins* claim was consistent with Fifth Circuit precedent at the time, that precedent was abrogated by the Supreme Court's decision in *Moore–I. Moore–I* made clear that courts must apply *Atkins* according to current clinical standards; that adaptive deficits must be analyzed according to a defendant's impairments, not his strengths; that lay stereotypes are an improper and unconstitutional substitute for the scientific evaluation of intellectual disability; and that the *Briseño* factors created an unacceptable risk that ID persons would be unconstitutionally executed.

10.     Following *Moore–I*, Petitioner requested authorization from a panel of the Fifth Circuit to file a successive habeas petition under 28 U.S.C. § 2255(h)(2), which allows for successive motions based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." In his motion, Petitioner argued that *Moore–I* rendered *Atkins* newly available to him by invalidating Fifth Circuit precedent governing such claims at the time of his trial and his initial § 2255 proceedings. In support of his claim, Mr. Bourgeois cited to *Cathey v. Davis (In re Cathey)*, 857 F.3d 221, 232 (5th Cir. 2017), in which the Fifth Circuit held that *Atkins* was "previously

7

unavailable" to a petitioner whose first habeas petition was filed after *Atkins*, but who failed to raise an ID claim because the circuit's pre–*Moore–I* precedent precluded a finding of intellectual disability at the time of the initial habeas petition.[1] The only distinctions between Mr. Bourgeois's application and that of Mr. Cathey were that Mr. Bourgeois was seeking to raise a successive petition under § 2255, as opposed to § 2254, and that Mr. Bourgeois had previously litigated his *Atkins* claim. However, as Mr. Bourgeois argued in his application to the Fifth Circuit, the § 2244(b)(1) re–litigation bar is expressly limited to petitions brought by state prisoners under § 2254. *See* 28 U.S.C. § 2254(b)(1) ("A claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed."). Nor is there any discernable reason that Mr. Bourgeois should be punished for having been *more diligent* than Mr. Cathey in attempting to litigate his *Atkins* claim in earlier proceedings.

11.     Nevertheless, on August 23, 2018, the Fifth Circuit denied Mr. Bourgeois's request on procedural grounds, holding that he was barred from re–litigating his *Atkins* claim under 28 U.S.C. § 2244(b)(1), despite the plain language of the statute limiting its applicability to petitions under § 2254. *In re Bourgeois*, 902 F.3d 446 (5th Cir. 2018). The circuit court did not question Petitioner's argument that *Moore–I* effectively overruled Fifth Circuit precedent that had required the district court to (erroneously) reject Mr. Bourgeois's *Atkins* claim.

---

[1] The Fifth Circuit recently reached the same holding in another case. *See In re Johnson*, No. 19–20552, 19–70013, 2019 WL 3814384, at *5–6 (5th Cir. Aug. 14, 2019) (granting state habeas petitioner's request to file a successive petition to raise an *Atkins* claim because *Atkins* was "unavailable" to petitioner prior to *Moore–I* and the publication of new diagnostic standards that "included significant changes in the diagnosis of intellectual disability").

### C.    Subsequent Developments

12.    On February 19, 2019, the United States Supreme Court issued *Moore–II*, reversing the decision of the Texas Court of Criminal Appeals ("CCA")[2] on remand from *Moore–I*. Specifically, although the state court purported to base its post–*Moore–I* denial of relief on a finding that the State's expert was more credible than those presented by Mr. Moore, the *Moore–II* Court found in the CCA's opinion "too many instances in which, with small variations, it repeats the analysis we previously found wanting, and these same parts are critical to its ultimate conclusion." *Id.* at 670. Because the district court that denied Mr. Bourgeois's initial *Atkins* claim likewise relied on contra–diagnostic criteria in crediting the Government's adaptive–behavior expert over the defense expert, *Moore–II* further strengthened Mr. Bourgeois's claim that he is entitled to *Atkins* relief.

13.    On July 25, 2019, with no prior indication that the Government had adopted revisions to the Bureau of Prisons' Lethal Injection Protocol used to effectuate federal death sentences, the Government notified Mr. Bourgeois that he is scheduled to be executed on January 13, 2020. This petition, seeking review of Mr. Bourgeois's *Atkins* claim under current medical standards under 28 U.S.C. § 2241 follows.

14.    A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality" of his detention or sentence. 28 U.S.C. § 2255(e). The Seventh Circuit has expressly recognized that claims based on legal authority not available at the time of a petitioner's § 2255 proceedings are cognizable under § 2241. *See, e.g.*, *Webster*, 784 F.3d at 1136; *In re Davenport*, 147 F.3d at 609. This includes cases where the district court and appellate panel would have been required by erroneous circuit precedent to deny the § 2255

---

[2] The CCA is Texas's court of last resort in criminal cases. *See* Tex. Const. Art. 5, § 5.

claim. Section 2241 is also available where, inter alia, a petitioner challenges the execution of his sentence, and where a prisoner would otherwise be precluded from obtaining review of a legal theory that addresses the "fundamental legality" of his sentence.

15.     Here, Fifth Circuit precedent erroneously precluded Mr. Bourgeois from successfully challenging his unconstitutional death sentence in his initial § 2255 proceedings. *See infra* Section IV.A.2. And, while Mr. Bourgeois again attempted to raise his *Atkins* claim in a successive § 2255 petition filed after *Moore–I* effectively reversed that precedent, the Fifth Circuit denied him the opportunity to do so, despite acknowledging elsewhere that "new diagnostic guidelines" have brought "significant changes in the diagnosis of intellectual disability" and that "it is correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *In re Johnson*, 2019 WL 3814384, at *5–6. There can be no doubt that § 2255 is "inadequate or ineffective" under these circumstances. Furthermore, this petition is reviewable under § 2241 because Mr. Bourgeois challenges the execution of his fundamentally illegal death sentence. The FDPA requires such prospective relief to be available, providing as it does that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

16.     In light of the foregoing, discussed in detail below, Mr. Bourgeois is: (i) entitled to raise his *Atkins* claim via § 2241; and (ii) entitled to relief from his unconstitutional sentence of death, which is scheduled to be carried out in a matter of months.

## III.     MR. BOURGEOIS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR THE DEATH PENALTY UNDER THE FEDERAL DEATH PENALTY ACT AND *ATKINS V. VIRGINIA* AND ITS PROGENY.

### A.     Introduction

17.     In *Atkins*, the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. As the Court explained:

> Those mentally retarded persons who meet the law's requirements for criminal
> responsibility should be tried and punished when they commit crimes. Because of
> their disabilities in areas of reasoning, judgment, and control of their impulses,
> however, they do not act with the level of moral culpability that characterizes the
> most serious adult criminal conduct.

536 U.S. at 306.[3]

18.    In *Moore–I*, the Court made clear that current, prevailing clinical definitions are binding in the task of determining whether an individual should be exempted from the death penalty under *Atkins*. *See Moore–I*, 137 S. Ct. at 1049, 1052–53. It also identified the two main diagnostic authorities in the field of intellectual disability as the prevailing medical standards: the AAIDD, publisher of the *Intellectual Disability: Definition, Classification, and Systems of Supports Definition Manual* (11th ed. 2010) ("AAIDD–10"); and the APA, which has most recently set forth its definition of intellectual disability in the DSM–5. These current standards, and not outdated standards employed in the past, govern the disposition of Mr. Bourgeois's *Atkins* claim. *See Moore–I*, 137 S. Ct. at 1053.

19.    Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age eighteen ("prong three"). *See* A0075 (DSM–5 at 33); A0088 (AAIDD–10 at 5). As the voluminous evidence summarized below shows, Mr. Bourgeois satisfies these criteria.

---

[3] *Atkins* referred to this diagnosis as mental retardation, which was the name used in the field at the time. Since *Atkins* was decided, the diagnosis of mental retardation has been renamed as intellectual disability. In 2014, the Supreme Court acknowledged this change in nomenclature and adopted the term intellectual disability instead of mental retardation. *Hall v. Florida*, 572 U.S. 701 (2014). Accordingly, this petition uses the term intellectual disability or the abbreviation "ID." However, the terms "mental retardation" or "mentally retarded" are also used in their historic context relevant to this case.

11

B.      **Deficits in Intellectual Functioning**

1.      **The diagnostic criteria**

20.     Under the classification schemes outlined by the APA and the AAIDD, deficient

intellectual functioning is defined as an intelligence quotient of approximately 70 with a

confidence interval derived from the standard error of measurement ("SEM") taken into

consideration. Because a margin for measurement error or "confidence interval" on IQ tests

generally involves a measurement error of five points, at a minimum, scores up to 75 also fall

within the presumptive range for intellectual disability. A0079 (DSM–5 at 37). *See also* A0098

(AAIDD–10 at 36) (finding the consideration of the standard error of measurement or "SEM"

and reporting an IQ score with a confidence interval deriving from the SEM to be critical

considerations in the appropriate use of IQ tests).

21.     Consistent with the AAIDD's and APA's diagnostic criteria, the Supreme Court

held in *Hall v. Florida* that because the SEM is "a statistical fact, a reflection of the inherent

imprecision of the test itself," at a minimum, full–scale IQ scores of 75 or below will establish

the diagnosis of intellectual disability if the other two prongs are met. *Hall*, 572 U.S. at 712, 723;

*see also Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (IQ score of 75 was "squarely in the

range of potential intellectual disability").

22.     In addition, both the AAIDD and the APA have rejected fixed cutoff points for IQ

in the diagnosis of intellectual disability and mandated that any test score be evaluated according

to clinical judgment. In its 2010 Guidelines, the AAIDD specified:

> It is clear from th[e] significant limitations criterion used in this Manual that
> AAIDD . . . *does not* intend for a fixed cutoff point to be established for making
> the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment
> regarding how to interpret possible measurement error. Although a fixed cutoff
> for diagnosing an individual as having ID is not intended, and cannot be justified
> psychometrically, it has become operational in some states [citation omitted]. It
> must be stressed that the diagnosis of ID is intended to reflect a clinical judgment

12

rather than an actuarial determination. A fixed point cutoff score for ID is not psychometrically justifiable.

A0102 (AAIDD–10 at 40) (emphasis in original).

23.     Similarly, the DSM–5 makes clear that "[c]linical training and judgment are required to interpret [IQ] test results and assess intellectual performance" and "clinical judgment is needed in interpreting the results of IQ tests." A0079 (DSM–5 at 37).

24.     IQ scores must also be corrected for the Flynn Effect. The Flynn Effect reflects a well–established finding that the average IQ score of the population increases at a rate of 0.3 points per year or three points per decade. Indeed, the Psychological Corporation, which publishes the Wechsler tests that Mr. Bourgeois was administered, *see infra*, first acknowledged the existence of the Flynn Effect and its inflation rate of 0.3 points per year in 1997. *See* Technical Manual, Wechsler Adult Intelligence Scale, the Psychological Corporation 8–9 (3d ed. 1997).

25.     Accordingly, the AAIDD requires that any IQ score be corrected downwards at a rate of 0.3 points per year since the test was normed.[4] *See* A0099 (AAIDD–10 at 37); A0131 (AAIDD–12 at 23); A170–76 (McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability*, AAIDD (2015) at 160–66 ("AAIDD–15")); A0141–42 (Watson, Dale G. Intelligence Testing, *The Death Penalty and Intellectual Disability*, AAIDD–15 at 118–19). The McGrew article elaborates:

Not only is there a scientific consensus that the Flynn [E]ffect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn [E]ffect, particularly in *Atkins* cases. . . . [Hence,] in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn [E]ffect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high

---

[4] Norming is a statistical term to describe how the creators of a given test are able to assign percentile ranks to given scores.

stakes decisions, the global scores impacted by outdated norms should be adjusted
downward by 3 points per decade (0.3 points per year) of norm obsolescence.

McGrew, *supra* at 162–65.

26.     The APA also recognizes that "[f]actors that may affect test scores include . . . the
'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ
scores be interpreted using clinical judgment and training. A0079 (DSM–5 at 37). Test score
interpretation using clinical judgment includes correction for the Flynn Effect.

27.     The AAIDD and APA also mandate that the spurious inflation of IQ scores
arising from prior administrations of intelligence tests—the "practice effect"—be taken into
consideration when interpreting IQ testing. *See, e.g.*, A0100 (AAIDD–10 at 38); A0079 (DSM–5
at 37).

### 2.     Mr. Bourgeois has deficits in intellectual functioning.

28.     Mr. Bourgeois's IQ has been tested on two occasions. In both instances,
Petitioner's intellectual capacity fell in the intellectually disabled range.

29.     First, one week prior to trial, on February 28, 2004, Mr. Bourgeois was evaluated
by neuropsychologist Dr. Donald E. Weiner. Petitioner obtained a full–scale IQ of 75[5] on this
administration of the Wechsler Adult Intelligence Scale–Revised ("WAIS–R"). *See* Tr. 9/20/10
at 218–19; *see also* A0060 (Dr. Weiner Score Sheet from WAIS–R); A0053–59 (Declaration of
Dr. Donald E. Weiner and Attached Report of 3/03/04). Although Mr. Bourgeois's results on Dr.
Weiner's test administration put him in the range of intellectual disability, his score of 75

---

[5] This score was reported as a 76 in Dr. Weiner's report, however this was a
typographical error. The data sheet has the score as 75. *See Bourgeois*, 2011 WL 193064, at *37,
25 (noting the discrepancy and the fact that Dr. Weiner clarified that the error during the
evidentiary hearing); *see also* Tr. 9/20/10 at 218–19.

*overestimates* his actual IQ due to the Flynn Effect discussed above. Dr. Weiner used the WAIS–R in assessing Mr. Bourgeois's intelligence, despite the availability of the re–normed and updated Wechsler Adult Intelligence Scale–III ("WAIS–III").[6] The WAIS–R was normed in 1978, twenty–six years prior to its administration to Mr. Bourgeois. Accordingly, Dr. Weiner's testing must be "Flynn–corrected." Appropriately adjusted, Mr. Bourgeois's 2004 IQ score is more accurately reflected as a score of 68. *See* Tr. 9/10/10 at 33 (Dr. Gelbort); Tr. 9/20/10 at 222–23 (Dr. Wiener); *id.* at 37 (Dr. Swanson).

30.    Second, in preparation for Mr. Bourgeois's initial habeas petition, neuropsychologist Dr. Michael Gelbort conducted extensive psychological and neuropsychological testing that yielded even further evidence demonstrating Petitioner's intellectual disability. *See* Tr. 9/10/10 at 32–52; *see also* A0039–41 (Declaration of Michael M. Gelbort, Ph.D. – 05/11/2007, ¶ 3). These results include an IQ of 70 (Verbal 67 and Performance 78) on the WAIS–III,[7] which was the then–current version of the test given by Dr. Weiner. *See* Tr. 9/10/10 at 32; *see also* A0039–41 (Gelbort Declaration, ¶ 3). The WAIS–III was normed in 1995–96, eleven years before it was administered to Mr. Bourgeois in 2007, yielding a Flynn–corrected IQ score of 67.

31.    That these IQ tests validly measured Mr. Bourgeois's intellectual functioning is confirmed by the consistency between the full–scale scores he received on each test, as well as

---

[6] Dr. Weiner testified that he employed the older test because he felt that insufficient research had been done on the WAIS–III at the time of his evaluation. *See* Tr. 9/20/10 at 217. The fact that the WAIS–R had been replaced by the WAIS–III at the time of its administration in this case does not make it invalid. Indeed, Dr. Swanson explained that neuropsychologists often use "the Wechsler instruction that has the greatest amount of research associated with it at the time," even if a newer test is available. *Id.* at 37.

[7] The WAIS–III is considered the "gold standard" of IQ tests. *Bourgeois*, 2011 WL 193064, at *25 n.33 (citing *Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009)).

the consistency in the overall pattern of correct and incorrect answers on each test. *See* Tr. 9/10/10 at 32. As Dr. Gelbort explained, it would be very difficult for an individual to "feign bad" in the same way on two tests administered three years apart. *Id.* at 33–35; *see also* Tr. 9/20/10 at 223–25, 229 (Dr. Weiner testifying similarly); *id.* at 31 (Dr. Swanson testifying similarly). Furthermore, the scores are consistent with Mr. Bourgeois's history of impaired functioning, *see infra*, and the manner in which he presented during his clinical interview. *See* Tr. 9/10/10 at 38–39; Tr. 9/20/10 at 264–65. Even Government expert Dr. Price testified that he did not have any evidence that Mr. Bourgeois "malinger[ed]." Tr. 9/23/10 at 258.[8]

32.     In sum, Mr. Bourgeois has scored well within the range of subaverage intellectual functioning on two psychometrically–valid and comprehensive tests of intelligence.[9] He has satisfied prong one of the definition for ID.

C.     **Deficits in Adaptive Functioning**

1.     **The diagnostic criteria**

33.     The AAIDD–10 defines adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives."

---

[8] While Dr. Price opined that Mr. Bourgeois did not try as hard as he could have, that conclusion is inconsistent with other testimony in which Dr. Price stated that Mr. Bourgeois engaged in "adult impression management," "portray[ing] himself with abilities and accomplishments that are exaggerations." Tr. 9/23/10 at 204; *see also* Tr. 9/24/10 at 161–62 (Government expert Dr. Moore similarly testifying that Petitioner "tends to want to make himself look better than he really is").

[9] In his § 2255 proceedings, the district court observed: "IQ testing before trial resulted in low scores, but one expert nonetheless described his intelligence in a manner inconsistent with mental retardation." *Bourgeois*, 2011 WL 193064, *18. While the court provides no citation for this (erroneous) finding, it presumably refers to trial expert Dr. Carlos Estrada's finding that Mr. Bourgeois was of "above average intelligence," a finding which was unsupported by any IQ testing and which Dr. Estrada subsequently retracted. *See* Tr. 9/10/10 (a.m.) at 71; *see also* Tr. 9/24/10 at 48–49 (Dr. Price testifying that Dr. Estrada's conclusion was "clearly wrong").

A0115 (AAIDD–10 at 55). The DSM–5 defines adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." A0079 (DSM–5 at 37).

34.      Both the AAIDD–10 and DSM–5 state that the adaptive deficits prong is satisfied if there is a significant limitation in one of three types of adaptive behavior—conceptual, social, or practical—or in the composite of the individual's adaptive functioning. A0103 (AAIDD–10 at 43); A0079 (DSM–5 at 37).

35.      Skills included in the conceptual realm are: executive functioning (judgment, planning, impulse control, and problem solving), memory, language, functional academic skills, and self–direction. The social realm encompasses skills and characteristics such as: social judgment and competence, interpersonal responsibility, self–esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. The practical realm refers to skills such as: activities of daily living/learning and self–management across life settings, occupational skills, use of money, health and safety, and other self–care skills.

**2.      The adaptive behavior assessment**

36.      Current diagnostic standards specify several parameters to be followed in the process of assessing adaptive behavior.

37.      First, as it is expected that strengths co–exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. As stated in the AAIDD–10, "significant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." A0107 (AAIDD–10 at 47); *see also Moore–I*, 137 S. Ct. at 1050 ("[T]he medical community focuses the adaptive– functioning inquiry on adaptive *deficits*.") (emphasis in original); *Moore–II*, 139 S. Ct. at 670 (CCA erred in relying "less upon the adaptive *deficits* to which the trial court had referred than

17

upon Moore's apparent adaptive *strengths*") (emphasis in original); Tr. 9/10/10 at 43–45, 79; Tr. 9/20/10 at 17–18.

38.     Second, the concept of deficits in adaptive functioning includes both acquisition deficits, or the failure to acquire a skill, and performance deficits, or the failure to perform a skill even though it has been acquired. For this reason, the focus for an individual's adaptive behavior is on an individual's typical level of adaptive functioning rather than maximal functioning or what he or she may be capable of achieving at a given point in time in the future, etc. Therefore, if an individual *can* do something, but typically does not do it, that still constitutes a deficit in adaptive functioning. *See* A0076–77 (DSM–5 at 34–35); A0089 (AAIDD–10 at 27).

39.     Third, the APA warns against the use of prison functioning to assess adaptive behavior, and the AAIDD outright precludes it. *See* A0080 (DSM–5 at 38) ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers)."); A0129 (AAIDD–12 at 20) ("The diagnosis of ID is not based on the person's . . . behavior in jail or prison."); *Moore–I*, 137 S. Ct. at 1050 ("Clinicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." (citing DSM–5 at 38 and AAIDD–12 at 20)); *Moore–II*, 139 S. Ct. at 669 (same).

40.     Fourth, a diagnosis of ID is not a diagnosis of exclusion. Rather, "[c]o–occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population." A0082 (DSM–5 at 40); *see also* A0117–22 (AAIDD–10 at 58–63). Hence, "the existence of a personality disorder or mental–health issue . . . is not evidence" that a person does not also have adaptive deficits. *Moore–I*, 137 S. Ct. at 1051; *see also Moore–II*, 139 S. Ct. at 669 (same). "The diagnosis of intellectual

disability should be made whenever Criteria A, B, and C [i.e., prongs one, two, and three] are met." A0081 (DSM–5 at 39).

      41.    Fifth, and of particular importance to Mr. Bourgeois's case, it is critical to avoid the use of stereotypes in assessing adaptive functioning. *See* A0134 (AAIDD–12 at 26) (identifying "a number of incorrect stereotypes" about ID that "can interfere with justice"); *see also Moore–I*, 137 S. Ct. at 1051–52 (holding Texas's approach to *Atkins* claims unconstitutional because it had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled by laypeople); *Moore–II*, 139 S. Ct. at 671 (faulting CCA for continued "reliance upon what we earlier called 'lay stereotypes of the intellectually disabled,'" such as citing to evidence that Moore had a girlfriend and a job as "tending to show he lacks intellectual disability"). Among the commonly held, but erroneous, stereotypes relating to individuals with intellectual disability are that individuals with ID: "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." A0134 (AAIDD–12 at 26). The DSM–5 confronts several of these stereotypes by expressly recognizing that persons with significant adaptive deficits can, inter alia, have romantic relationships in adulthood, maintain regular employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, arrange for their own transportation and manage money with support, raise a family with support, and develop a variety of recreational skills. *See* A0076–77 (DSM–5 at 34–35).

42.     Sixth, the diagnostician must employ "clinical judgment," which is defined as a "special type of judgment rooted in a *high level of clinical expertise and experience* and judgment that emerges directly from extensive training, experience with the person*,* and extensive data." A0092 (AAIDD–10 at 29). The type of data that should inform clinical judgment includes clinical interviews with third–party reporters, record review, and individually administered and psychometrically sound neuropsychological and achievement testing. A0079 (DSM–5 at 37). The AAIDD–10 further explains that clinical judgment is "characterized by its being systematic (i.e., organized, sequential, and logical), formal (i.e., explicit and reasoned), and transparent (i.e., apparent and communicated clearly)." A0123 (AAIDD–10 at 86).

43.     Finally, the AAIDD warns that persons with mild ID often try to "mask their deficits and attempt to look more able and typical than they actually are." A0111–12 (AAIDD–10 at 51–52); *see also* A0132 (AAIDD–12 at 24) (explaining that an ID individual will commonly attempt to "'fake good' so as to hide their [intellectual disability] and try to convince others that he or she is more competent"); Tr. 9/10/10 at 65 (Dr. Gelbort explaining that ID individuals may try to "steer conversations" to talk about "what they know about or what they think they know about" and hide their deficiencies in other areas); Tr. 9/20/10 at 101–02 (Dr. Swanson testifying similarly). This is in part a symptom of impaired problem solving skills. A0118 (AAIDD–10 at 159). It also results from a history of teasing and maltreatment caused by their impairments. *Id.*; Tr. 9/20/10 at 102 ("When you are functioning at a lower level it probably doesn't bother you, but when you are mild you have enough cognitive ability to recognize the difference, and it's a self–esteem issue. You would like to present better and you would like to be like the other people that you know.").

### 3.   Mr. Bourgeois has significant deficits in adaptive functioning.

44.     In connection with Petitioner's § 2255 *Atkins* claim, clinical psychologist Victoria

Swanson, Ph.D., conducted a broad–based adaptive behavior assessment of Mr. Bourgeois,

considering formal testing; records; third–party interviews with family members, former

neighbors, and former colleagues; testimony; the reports of Drs. Weiner and Gelbort; the reports

of Government experts Dr. Price and Dr. Moore; the video recordings of the evaluations

conducted by Drs. Price and Moore; and her own clinical evaluation of Mr. Bourgeois. *See* Tr.

9/20/10 at 19–21, 82–85. Dr. Swanson, who has spent her career diagnosing and providing

services to intellectually disabled individuals and who served as the President of the National

Psychology Division of the AAIDD from 2003 to 2005, was eminently qualified to conduct this

evaluation. *See* A0001 (Declaration of Victoria Swanson, Ph.D., ¶ 2). Based on her evaluation,

Dr. Swanson concluded that Petitioner suffered from significant adaptive deficits before the age

of eighteen, satisfying the second prong of ID as defined by the AAIDD and the DSM–5. *See* Tr.

9/20/10 at 104. Her conclusions are supported by extensive lay–witness evidence, records, and

formal testing, as detailed below.

#### a.  Conceptual domain

##### i.   Academic functioning

45.     One element of the conceptual domain is academic functioning. Due to Mr.

Bourgeois's age, no records from elementary school are available. Likewise, there is no record of

his achievement on standardized testing.[10] However, family members reported to Dr. Swanson

---

[10] While there are no records that Mr. Bourgeois was ever tested for special education,
neither is there evidence that such services were even available. Indeed, the availability of
services for Mr. Bourgeois is highly doubtful in light of the fact that his older brother Anthony,
who suffered from cerebral palsy, did not receive any services in the state of Louisiana until
2001, when he was middle–aged. *See* Tr. 9/20/10 at 41, 78–79; *see also id.* at 79 (Dr. Swanson

that Petitioner failed a grade in elementary school[11] and participated in speech therapy. *See* Tr. 9/20/10 at 98; A0006 (Swanson Supplemental Report at 3); *see also* Tr. 9/21/10 at 323–24 (cousin Carl Henry testifying that Alfred had to repeat fourth grade and that, unlike other children at his school, he had to stay in the same class all day, which was considered "special education" at the time). "Reporters also advise[d] that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money." *Id.* at 3; *see also* Tr. 9/21/10 at 27, 37–38, 58–59 (older sister Claudia Williams testifying that as a young child, Alfred had trouble with basic things like learning the alphabet and how to count); *id.* at 98–99 (neighbor Beverly Frank testifying that Alfred couldn't count money at the age of nine).

46.     Mr. Bourgeois's Lutcher High School transcript confirms that he was an adolescent with low intelligence who struggled in school. He achieved poor grades across all subjects in high school, with a median score of C to D. In addition, he attended basic level classes. For example, the highest level of math studied was first year algebra. This was only a half credit course taken in his third year of high school, and he obtained a D. *See* A0216 (Lutcher High School Transcript dated 05/24/83).

47.     Non–academic records further corroborate that Mr. Bourgeois struggled in the academic realm. For instance, in 1985, Mr. Bourgeois attempted to qualify for permanent

---

testifying that special education services were not available in the area of southern Louisiana where Mr. Bourgeois grew up prior to approximately 1980). Dr. Swanson also testified that, even if such services were available, the fact that Anthony was severely impaired may have (incorrectly) signaled to Alfred's family members that he was merely slow, but by comparison to Anthony, not intellectually disabled. *Id.* 81–82.

[11] This is confirmed by a subsequent record, albeit not a school record. *See infra*.

employment with the St. John the Baptist Parish Sheriff's Office, but was unable to pass the

necessary examinations. His training instructor, Lt. David M. Wilson, described Mr. Bourgeois's

conceptual difficulties, noting that Mr. Bourgeois was given two opportunities to pass the

firearms test, and he participated in fifty–four hours of training in preparation for the test. In Lt.

Wilson's view, Petitioner's failure on the firearms test, and his "poor performance

scholastically," made further training "unfruitful and unwarranted." *See* A0218 (Letter from Lt.

David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85).

48.     Mr. Bourgeois also underwent a psychological evaluation pursuant to his

application to the St. John the Baptist Parish Sheriff's Office. The resulting report notes that Mr.

Bourgeois had to repeat a grade in school. *See* A0219–22 (Psychological Evaluation by Morris &

McDaniel, Inc., dated 5/22/85).

49.     Finally, Petitioner's results on the Woodcock–Johnson Third Edition Tests of

Achievement ("WJ–III") confirm his low level of academic functioning. Dr. Swanson

administered the WJ–III to Mr. Bourgeois in 2009. Tr. 9/20/10 at 43–44; *see also id.* at 44–46

(explaining that the WJ–III is a "battery of many tests assessing many types of adaptive skills

and then collapsing them into broad areas," revealing scores that indicate an individual's current

academic functioning).

50.     Overall, the achievement testing showed that Mr. Bourgeois's "academic fluency

is at the fifth grade level and his actual ability to apply academics actually is at the third grade

level," which is "consistent with what you would see with a person who has mild mental

retardation." Tr. 9/20/10 at 58. Petitioner's individual achievement test scores on the WJ–III

include: story recall at a kindergarten level; applied problem solving at a second–grade level;

oral comprehension and passage comprehension at a third–grade level; writing samples and

understanding directions at a fourth–grade level; calculation, reading fluency, and writing fluency at a fifth–grade level; and math fluency at a sixth–grade level. *See* A0020 (WJ–III Score Report).

51.     The fact that so many of Mr. Bourgeois's individual scores—as well as his overall "academic fluency" and "ability to apply academics"—fell at or below the sixth–grade level is significant. At the time of Petitioner's § 2255 proceedings, the Diagnostic and Statistical Manual of Mental Disorders—4th Edition, Text Revision ("DSM–IV–TR") provided that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth–grade level." DSM–IV–TR at 43. The current DSM–5 uses no grade–specific cut off in the description of mild ID, and only requires that an individual's functional use of academic skills be impaired for deficits to be present. *See* A0076 –77 (DSM–5 at 34–35).[12] Hence, under current diagnostic standards, Petitioner's achievement scores indicate that he is not just mildly intellectually disabled, but falls within the moderate level of severity.[13]

---

[12] The DSM–5 description for functional academics at *mild* level of ID states: "For school–age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age–related expectations. In adults, abstract thinking, executive function . . ., and short–term memory, as well as functional use of academic skills (e.g., reading, money management) are impaired." A0076 (DSM–5 at 34).

[13] Government expert Dr. Moore disagreed that Mr. Bourgeois's WJ–III scores were low enough to indicate ID. However, Dr. Moore based this conclusion on the "scaled score" column of the test results, rather than the "age and grade equivalent" column, despite agreeing with the proposition that "experienced neuropsychologists would be able to rely on the age and education equivalence" score. Tr. 9/24/10 at 180–85. Furthermore, Dr. Moore conceded that, based on the age and equivalency column, Mr. Bourgeois has "far more grade equivalents below the sixth grade," the grade level which the then–current version of the DSM recognized as attainable for a "person with mild mental retardation." *Id.* at 181–82. And, as mentioned above, the current DSM–5 uses no grade–specific cut off in the description of mild ID, and only requires that an individual's functional use of academic skills be impaired for deficits to be present. *See* A0076– 77 (DSM–5 at 34–35).

52.     Meanwhile, the only tests on which Mr. Bourgeois scored above a sixth–grade level—namely, letter–word identification (eighth grade) and spelling (thirteenth grade)—are tests that implicate mere rote learning, as opposed to any problem solving, analysis, or higher–level thinking. The primary significance of these higher scores, therefore, is that they support Dr. Swanson's conclusion that Mr. Bourgeois was not malingering; he scored well where he could, even if the scores still reflect limited academic functioning for an adult. *See* Tr. 9/20/10 at 57–58.

53.     The validity of Petitioner's achievement testing is further confirmed by the fact that he scored low in areas in which he demonstrated deficits during the Government's experts' clinical evaluations, such as reading comprehension, writing fluency, and abstract reasoning. *Id.* at 47–51, 57–60. Likewise, his overall pattern of scores on the WJ–III mirrored the pattern of scores on the WAIS–R and WAIS–III administered by Drs. Weiner and Gelbort, respectively. *Id.* at 56–58.

### ii.   Executive functioning and self–direction

54.     Along with academic functioning, another element of deficits in the conceptual domain is limited executive functioning and self–direction. In Mr. Bourgeois's case, such deficits were apparent from a very young age. Family members and friends recall that he was slow to learn and comprehend concepts as a child. *See, e.g.*, Tr. 9/21/10 at 13–14, 17 (older sister Claudia Williams testifying that Alfred was "very slow" and "couldn't catch on" when she was trying to teach him things, so she had to "constantly show him . . . over and over what to do"); *id.* at 36 (same); *id.* at 97–98 (childhood neighbor Beverly Frank testifying that Alfred was "slow" and "couldn't grasp the things" that other children his age talked about or the games they played); A0193 (Declaration of Beverly Frank, ¶ 7) ("Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children."); Tr. 9/21/10 at 135 (childhood neighbor Brenda Goodman testifying that Alfred was "slow" as a child); *id.* at 399–400 (cousin

25

Murray Bourgeois testifying that he tried to teach ten–year–old Alfred how to work on cars, but Alfred was "slow to catch on" and the "mechanic thing was like too fast of a pace for him"); *id.* at 324 (cousin Carl Henry testifying Alfred was "slow" and had "trouble catching on to" new games and activities other children would play).

55.     Alfred also had trouble understanding and following directions, even after he had received repeated instructions. *See, e.g.*, Tr. 9/21/10 at 100 (Ms. Frank testifying that her grandmother, with whom Alfred lived for several years as a child, would have to continually re–teach Alfred things like how to button his shirt, even at the age of nine or ten); *id.* at 138 (Ms. Goodman testifying Alfred "could not follow instructions"); A0193 (Frank Declaration, ¶ 8) ("My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks."); A0214 (Declaration of Claudia Williams, ¶ 5) ("He would get beat [by our mother] for the same thing over and over like he just couldn't learn."); A0189 (Declaration of Lawanda Cook, ¶ 4) ("I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.").

56.     These problems continued into adulthood. *See*, *e.g.*, Tr. 9/21/10 at 401 (cousin Murray Bourgeois testifying that, as an adult, Alfred was "slower than most of the guys, you know, catching on to a lot of things"); *id.* at 325–29 (cousin Carl Henry, who worked for the same supermarket as Alfred, testifying that Alfred was slower to advance from warehouse porter to truck driver than other employees because he had difficulty learning the necessary skills for the latter position); *id.* at 371–72 (Donald Reese, a co–worker at a long haul trucking company, describing one occasion when Petitioner was driving and became very lost, taking them some

26

400 miles out of the way, despite Mr. Reese having explicitly given Mr. Bourgeois straightforward directions); A0181–82 (Declaration of Michelle Armont, ¶ 8) ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem."); *id.* ("Things that would be obvious to a normal person were not obvious to Alfred."); A0212 (Declaration of Michelle Warren, ¶ 16) ("It was like [Alfred] had a block and could not reason things out or change his behavior."); A0207 (Declaration of Ivy Thomas, ¶ 4) ("Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

57.     Mr. Bourgeois's decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions. In the words of his half–sister, Michelle Armont, "Alfred could not consider the consequences of his actions." A0181–82 (Armont Declaration, ¶ 8).

58.     The results of the neuropsychological testing performed by Dr. Weiner and Dr. Gelbort confirm these witness reports. Both doctors found that Mr. Bourgeois's ability to process new information and comprehend new topics is significantly impaired. *See* Tr. 9/10/10 at 26 (Dr. Gelbort testifying that Petitioner's "learning is problematic, especially when he has to understand conceptually the information being presented to him"); Tr. 9/20/10 at 238 (Dr. Weiner testifying that Mr. Bourgeois is "likely to have difficulty adjusting to new and unfamiliar situations"). Additionally, testing of his memory shows mild to moderate impairment. More generally, Dr. Gelbort explained that the testing overall demonstrated that Mr. Bourgeois has trouble with "things that are more conceptual[,] that require higher level processing, that require him to think about more things at once and then work with them in a goal–directed fashion." Tr. 9/20/10 at

27

239–40; *see also id.* at 52. Likewise, after reviewing this testing, combined with her "own observations and evaluations," Dr. Swanson concluded that "Mr. Bourgeois is deficient in his ability to absorb and understand information" and "is significantly impaired in his ability to solve problems." A0006 (Swanson Supplemental Report at 3). This testing is further evidence of Mr. Bourgeois's conceptual deficits, and also explains his deficits in other domains as it reflects his inability to make decisions, acquire knowledge, and control his emotions and impulses.

### iii. Communication

59.     An individual's ability to effectively communicate also falls within the conceptual domain. Mr. Bourgeois had difficulty communicating from a young age. According to family members and friends, "when he was much younger he was pretty much silent and non–communicative." Tr. 9/20/10 at 91; *see also* Tr. 9/21/10 at 100 ("[H]e couldn't really explain himself real well. . . . [I]t was a thing of not being able . . . just to explain his self, you know, if he wanted to do something."). Mr. Bourgeois was eventually placed in speech therapy because he spoke with a stutter. Tr. 9/20/10 at 91.

60.     These communication deficits continued into adulthood, as demonstrated by Petitioner's results on the WJ–III, which includes tests for oral comprehension, oral language, and listening comprehension. Tr. 9/20/10 at 58. Mr. Bourgeois's scores in these areas were at the third– and fourth–grade level, or the 9th to 16th percentile. *Id.* at 59. As discussed above, the DSM–5 states that adults whose "functional use of academic skills" is "impaired" have significant conceptual deficits at the mild level of ID. That Petitioner functioned at the third– to –fourth–grade level went far beyond an impairment.

61.     Mr. Bourgeois's communications deficits were also apparent in Dr. Swanson's clinical evaluation of Mr. Bourgeois. *See* Tr. 9/20/10 at 58 (explaining that her "clinical judgment" of Petitioner's communication deficits were "back[ed] up" by his standardized scores

on achievement testing); *id.* at 105 ("He may have good expressive language when he is on a familiar topic but he doesn't have a good underlying understanding.").

### b.  Social domain

62.    Childhood playmates recall Petitioner's difficulties in the social realm. His family and neighbors remember him as a slow and awkward child who had difficulty playing with the other children and "fitting in." *See* Tr. 9/21/10 at 97–98 (Beverly Frank testifying that Alfred could not understand the games played by other children his age); *id.* at 120 (Alfred was "shy in making friends"); A0205 (Declaration of Louis Russell, Jr., ¶ 3) ("Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature."); A0183 (Declaration of Nathaniel Banks, ¶ 3) ("Alfred wasn't any good at sports. He didn't play sports with us.").

63.    Alfred did not handle the rejection of his peers well. *See, e.g.*, Tr. 9/21/10 at 102 ("Alfred was teased a lot. He used to come home crying from school. . . . [H]e used to cry a lot."); A0183 (Banks Declaration, ¶ 3) ("Alfred was a fragile child. He spent a lot of time by himself. People used to pick on Alfred a lot. . . . I just remember Alfred crying at anything. Someone would tease him and he would break down crying."). These witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments seen in persons with mild intellectual disability. *See* A0076 (DSM–5 at 34) (significant deficits in the social domain include "difficulties regulating emotion and behavior in age–appropriate fashion"); Elaine E. Castles, *We're People First: The Social and Emotional Lives of Individuals with Mental Retardation*, at 26 (1996) ("Cognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations.").

29

64.     As described in relation to his conceptual deficits, Mr. Bourgeois also had trouble effectively communicating from a young age. *See, e.g.*, Tr. 9/20/10 at 91 (describing young Alfred as "pretty much silent and non–communicative"); Tr. 9/21/10 at 100 (relaying that as a child, Petitioner could not explain when he "wanted to do something"). Mr. Bourgeois was eventually placed in speech therapy because he spoke with a stutter. Tr. 9/20/10 at 91.

65.     Mr. Bourgeois's ability to communicate was also hindered by his lack of "internal monitor." A0202 (Declaration of Claudia Mitchell dated 9/16/07, ¶ 3). As his half–sister Claudia Mitchell explained, teenaged Alfred "just blurted stuff out and that made him come across as bold but it was really that anything he thought just came out of his mouth." *Id.*

66.     Mr. Bourgeois's social abilities did not improve with age. A psychiatric evaluation conducted in 1985, when Petitioner was twenty–one years old, reported that Mr. Bourgeois had problems in evaluating his self–worth and had low self–esteem, which reflects deficiencies in social adaptive functioning. *See* A0219–22 (Psychological Evaluation). His communication deficits also continued past the developmental period, as demonstrated by Mr. Bourgeois's achievement testing placing him at the third– and fourth–grade level, or the 9th to 16th percentile, in the areas of oral comprehension, oral language, and listening comprehension. *See* Tr. 9/20/10 at 58.

67.     Lastly, Mr. Bourgeois proved unable to maintain a healthy intimate relationship. He was married to four different women. *See* A0046–48 (Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W. – 05/04/2007, ¶¶ 5–12). Consistent with the executive functioning and emotional dysregulation issues discussed above, each marriage was characterized by dysfunction

and ultimately failed. *Id.* Indeed, all of his relationships were "chronically unstable due to his inability to regulate his emotions." *Id.* at ¶ 4.[14]

### c. Practical domain

68.     As noted above, as a child, Mr. Bourgeois proved unable to follow simple directions, which implicates both the conceptual and the practical domain. Reporters also told Dr. Swanson that Petitioner "was delayed compared to his peers in learning simple skills like tying his shoes and counting money," and it "took young Alfred much more time than his peers to learn how to ride a bike." A0007 (Swanson Supplemental Report at 4); *see also* Tr. 9/20/10 at 90–91; Tr. 9/21/10 at 98–100 (Ms. Frank testifying that at the age of nine, Alfred couldn't count money or dress himself; he was always putting on mismatched socks and could not tie his shoes or button a shirt even when he was "really up in age"); *id.* at 137–39 (Ms. Frank's cousin, Brenda Goodman, corroborating Ms. Frank's account of Petitioner's difficulties dressing himself); *id.* at 324, 360 (Alfred's cousin testifying that young Alfred had difficulty learning new games and how to ride a bike). Mr. Bourgeois was generally described as someone who had to rely on family and friends "in order to perform daily life activities." A0005 (Swanson Supplemental Report at 2).

69.     As with the other realms, Petitioner's practical deficits persisted as he grew older. Half–sister Claudia Mitchell, who first met Alfred when he was a teen, explained:

> Alfred stayed with me in Texas for a while. When he got here he was wearing clothes that were too small for him. He could not cook at all. He could not really function on his own so he started to feed off my life. He would ride on my accreditation. I helped him with paperwork. I filled out applications for him. His pattern was to just try to look good and hide his failings, then he could connect

---

[14] Although Ms. Kaib took the stand in Petitioner's § 2255 proceedings, the court would not allow her to testify as to her interviews with Mr. Bourgeois's ex–wives and ex–girlfriends. *See* Tr. 9/20/10 at 383–93.

with someone who could help him function so that he could continue to try and feel less inferior to everyone else. There were other people at other times that filled this role for Alfred.

A0203 (Mitchell Declaration dated 9/16/07, ¶ 7).[15]

70.     Several reporters also recall Alfred's impaired financial abilities. *See* A0181–82 (Armont Declaration, ¶ 8) ("[Alfred] did not understand that he could not afford the things he bought. . . . He just bought things without understanding how hard it would be to make the payments."). Based on her interviews of Petitioner's family, friends, and co–workers, as well as her review of financial records, Dr. Swanson concluded that Mr. Bourgeois had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76.[16]

71.     As with the other realms, his practical deficits persisted through adulthood. Several reporters recall Alfred's impaired financial abilities. *See* A0181–82 (Armont Declaration, ¶ 8) ("[Alfred] did not understand that he could not afford the things he

---

[15] Ms. Mitchell had planned to testify at Petitioner's § 2255 evidentiary hearing, but was unable to do so because her husband suffered a debilitating stroke shortly before the hearing. *See* A0204 (Declaration of Claudia Mitchell dated 8/26/10, ¶¶ 3–6).

[16] In her testimony, Dr. Swanson stated that Mr. Bourgeois has "deficits in the area of conceptual and social," but only referred to "limitations" in the practical realm. Tr. 9/20/10 at 104. Dr. Swanson found that Mr. Bourgeois was someone who had to rely on family and friends "in order to perform daily life activities," A0005 (Swanson Supplemental Report at 2), and who had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76. These limitations would qualify Mr. Bourgeois as someone with adaptive deficits in the practical domain as described in the DSM–5. *See* A0076 (DSM–5 at 34) (individuals with adaptive deficits in the practical domain include those who "need some support with complex daily living tasks in comparison to peers," including in the areas of "banking and money management"). In addition, several deficits relevant to the conceptual and social domains (in which Dr. Swanson found there were "definitely" adaptive deficits), also serve to establish deficits in the practical realm. For instance, his inability to understand and follow directions (conceptual) affects his ability to cook for himself and acquire new vocational skills (practical).  Likewise, his inability to control his emotions and effectively communicate (social) affect all aspects of his daily living, including occupational skills and self–care (practical).

bought. . . . He just bought things without understanding how hard it would be to make the payments."). Based on her interviews of Petitioner's family, friends, and co–workers, as well as her review of financial records, Dr. Swanson concluded that Mr. Bourgeois had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76.[17]

72.     Mr. Bourgeois is also described as oblivious towards safety. Family members and neighbors recall that as a teenager, Alfred drove a four–wheeler "straight into a pole." A0205 (Russell, Jr. Declaration, ¶ 4); *see also* A0214 (Williams Declaration, ¶ 6). An acquaintance later in life, Lawanda Cook, likewise remembers Alfred taking "crazy chances in the truck he drove. . . . [O]ne time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all." A0189 (Cook Declaration, ¶ 3). Donald Reese, Mr. Bourgeois's co–worker at a long haul trucking company, testified about a time when Mr. Bourgeois drove their truck into a ditch along the wall of a mountain and Mr. Reese had to take over and get the truck out. Tr. 9/21/10 at 372–75. After that, Mr. Reese refused to accept jobs that would require him to ride with Mr. Bourgeois. *Id.* at

---

[17] In her testimony, Dr. Swanson stated that Mr. Bourgeois has "deficits in the area of conceptual and social," but only referred to "limitations" in the practical realm. Tr. 9/20/10 at 104. Dr. Swanson found that Mr. Bourgeois was someone who had to rely on family and friends "in order to perform daily life activities," A0005 (Swanson Supplemental Report at 2), and who had "difficulty understanding and managing money." Tr. 9/20/10 at 164–66; 172–76. These limitations would qualify Mr. Bourgeois as someone with adaptive deficits in the practical domain as described in the DSM–5. *See* A0076 (DSM–5 at 34) (individuals with adaptive deficits in the practical domain include those who "need some support with complex daily living tasks in comparison to peers," including in the areas of "banking and money management"). In addition, several deficits relevant to the conceptual and social domains (in which Dr. Swanson found there were "definitely" adaptive deficits), also serve to establish deficits in the practical realm. For instance, his inability to understand and follow directions (conceptual) affects his ability to cook for himself and acquire new vocational skills (practical).  Likewise, his inability to control his emotions and effectively communicate (social) affect all aspects of his daily living, including occupational skills and self–care (practical).

375–76; *see also id.* at 400 (cousin Murray Bourgeois testifying that another of Alfred's co–workers, who was also one of his good friends, warned people not to ride with Alfred because he was so unsafe).

### d.  Masking

73.    Like many individuals with intellectual disability, *see* A0125–27 (AAIDD–10 at 158–59), Mr. Bourgeois tried hard to "mask" his deficits. Indeed, each of the mental health experts that evaluated Mr. Bourgeois in connection with his § 2255 *Atkins* claim found that he actively sought to portray himself as far more gifted, intelligent, and accomplished than the objective evidence showed. *See, e.g.*, Tr. 9/23/10 at 204 (Dr. Price testifying Mr. Bourgeois engaged in "adult impression management," "portray[ing] himself with ability and accomplishments that are exaggerations"); Tr. 9/24/10 at 161–62 (Dr. Moore testifying Petitioner "tends to want to make himself look better than he really is"); Tr. 9/20/10 at 229 (Dr. Weiner testifying that Mr. Bourgeois had a history of "attempting to present himself in a much more favorable light in terms of grades, functioning, than actually was the case"); *id.* at 60 (Dr. Swanson testifying that Mr. Bourgeois "overestimates everything he can do" and "likes to present himself in the best possible manner"); *id.* at 101–02 (very important to Mr. Bourgeois that he appear able to do everything his non–impaired older brother could do); Tr. 9/10/10 (p.m.) at 65 (Dr. Gelbort testifying that Mr. Bourgeois would mask his low intellect by steering the conversation to talk about things he felt he knew about, "rather than just simply answering questions").

74.    Lay witnesses explained that Mr. Bourgeois had been engaged in such masking behavior for most of his life. For instance, cousin Carl Henry testified that Alfred was a "proud guy" who "wanted everybody to feel he was on the same playing field." Tr. 9/21/10 at 339–40; *see also id.* at 329–30 (explaining that Alfred was skillful at soliciting help from others to cover

up his deficits); A0181–82 (Armont Declaration, ¶ 8) ("Alfred wanted to be accepted. Because of

his limitations he tried to gain the acceptance he wanted by getting possessions and by telling

people things he thought would make them like him."). Aunt Elnora Bourgeois McGuffy recalls:

> Alfred was not as smart as [his brother] Lloyd, but he wanted everyone to think
> that he was. Alfred would brag on himself, even when it wasn't true. You never
> know how much Alfred knew about anything because he was always
> exaggerating so much. He had a problem with that. Alfred would try to make
> himself seem like he was doing better that [sic] he was more successful than he
> was and smarter than he was.

A0200 (McGuffy Declaration, ¶ 7). Nathaniel Banks confirms:

> Alfred wanted to impress people. Alfred lied a lot. I remember that Alfred would
> say things that you just knew weren't true. I used to work for the sheriff's office.
> Alfred told people he worked there. He was never a proper deputy. Alfred tried to
> build himself up—present himself as more than he was. I think Alfred lied so
> much he started to believe it.

A0183 (Banks Declaration, ¶ 4).

75.     Even the district court that (erroneously) rejected Mr. Bourgeois's *Atkins* claim in

2011 made observations tending to confirm that, with age, Mr. Bourgeois became masterful at

masking his deficits. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *30 ("Bourgeois' ability to

appear intelligent likely stems from his narcissism and desire to look good."); *id.* at *29 ("While

testimony from various individuals questioned his intellect when younger, those who knew him

as an adult did not suspect that he was mentally retarded."); *id.* at *28 (quoting Government

expert Dr. Price, who testified that Mr. Bourgeois is very good at talking positively about

"himself, his life, his situation," but that when it came to "objective testing," he "kind of shuts

down a little bit"); *id.* at *30 (referring to Dr. Price's opinion that "Bourgeois' verbal abilities

and social skills give off the impression that he is smarter that he is").

76.     Regardless of how successfully Mr. Bourgeois was able to mask his disability, the evidence discussed above demonstrating his significant lifelong intellectual and adaptive deficits is irrefutable.

### 4.     Formal test of adaptive behavior

77.     Adaptive behavior can also be assessed using formal instruments. However, even under ideal circumstances, an adaptive behavior determination is not meant to be based only on adaptive behavior scores. The DSM–5 does not require a particular score on a test of adaptive functioning to establish prong two or identify any range of scores as being in the presumptive range for intellectual disability. A0079 (DSM–5 at 37). The AAIDD–10 provides that scores that are approximately two standard deviations below the mean (70–75) are in the presumptive range for intellectual disability. A0106 (AAIDD–10 at 46). These scores can be on any one of the three domains or the composite score. Nevertheless, the AAIDD acknowledges that formal adaptive behavior testing instruments are generally imperfect, and even fail to assess certain areas of adaptive functioning. *Id.* at 51. These instruments are far less reliable than IQ or neuropsychological tests as they assess a collateral reporter's opinion of the individual's functioning, rather than directly assessing performance in a given task. Moreover, under both the DSM–5 and the AAIDD–10, scores from formal tests of adaptive behavior are intended to be interpreted with clinical judgment and considered alongside other sources of information such as third party interviews, other medical and mental health evaluations, and records review. A0079 (DSM–5 at 37); A0112 (AAIDD–10 at 52).

78.     As one part of her extensive evaluation, Dr. Swanson administered both of the "gold standard" adaptive assessment tests—the Vineland Adaptive Behavior Scales, 2d Edition ("Vineland–II") and the Adaptive Behavior Assessment System, 2d Edition ("ABAS–II")—to Beverly Frank, the granddaughter of a woman with whom Mr. Bourgeois lived as a child for

several years. Dr. Swanson chose Ms. Frank because she fit the description of a "good informant" set forth by the publishers of the Vineland–II and ABAS–II: she knew Mr. Bourgeois well over an extended period and was also able to recall his functioning at a specific point in time (namely, when he was seven years old). Tr. 9/20/10 at 65–66. Furthermore, Ms. Frank observed a full spectrum of Petitioner's abilities, as opposed to a single area such as work. *Id.* at 67, 72. Lastly, Dr. Swanson explained that it was important to use an informant who knew Mr. Bourgeois at a young age, before he developed the ability to mask. *Id.* at 103; *see also infra* Section III.C.3.d (detailing Mr. Bourgeois's long history of hiding his deficits and exaggerating his capabilities and achievements).

79.     Dr. Swanson also explained why she administered both the Vineland–II and the ABAS–II to Ms. Frank, even though she believes the former is a far better test. The ABAS–II is a test that the informant completes alone; there is no interaction between the test–taker and the administrator. By contrast, the Vineland–II employs a semi–structured interview format that allows the administrator to ask follow–up questions to ensure an accurate score is being assigned for each function. Hence, Dr. Swanson used the ABAS–II more as a screening device to confirm that there were no large gaps in Ms. Frank's knowledge of Mr. Bourgeois and, having found this to be true, she then administered the Vineland–II to obtain a better sense of Petitioner's true functioning. *Id.* at 70–73; *see also id.* at 73–74 (explaining she feels the "Vineland is a more accurate estimate of where [Mr. Bourgeois] really is in compared to the ABAS").[18]

---

[18] As Dr. Swanson explained, the differences between the test formats accounts for what the district court described as "inconsistencies" in Ms. Frank's answers. *See* Tr. 9/20/10 at 73–74, 154, 191; *Bourgeois*, 2011 WL 1930684, at *36. Additionally, Dr. Swanson testified that the ABAS–II is less accurate in measuring the functioning of an individual with mild ID, as opposed to someone more profoundly impaired, which explains why the ABAS–II results suggested Mr. Bourgeois is more impaired than did the Vineland–II results. Tr. 9/20/10 at 74–78.

80.     Dr. Swanson's testing indicates profound deficits in adaptive functioning in all three of the domains recognized by the AAIDD–10 and the DSM–5 (conceptual, practical, and social), as well as in the composite score of Petitioner's overall adaptive functioning. In all three of those domains and the composite score, Dr. Swanson's testing returned scores that were more than two standard deviations below the mean[19] and well into the impaired range. As she summarizes in her declaration:

> Mr. Bourgeois scored a 66 on the Vineland–II. On the sub–scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization. These scores place him well within the range of mental retardation in the sphere of adaptive deficits. They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois's relatives and neighbors.

A0002 (Swanson Dec., ¶ 5); *see also* Tr. 9/20/10 at 74–75.[20]

81.     Although these scores are significant, consistent with the directive of the DSM–5 and AAIDD–10 discussed above, Dr. Swanson considered the scores merely as one piece of information among many, including third party interviews, medical and mental health evaluations, neuropsychological testing, and records review. *See* Tr. 9/20/10 at 19–21, 82–85.

**D.     Onset Prior to Age Eighteen**

82.     A diagnosis of intellectual disability requires that the deficits in intellectual functioning and adaptive deficits manifested prior to the age of eighteen.

83.     Evidence of Mr. Bourgeois's intellectual disability has existed since his early childhood. As detailed above, people who have known Mr. Bourgeois since childhood attest that, throughout his youth and into adulthood, he exhibited intellectual and adaptive impairments that

---

[19] The mean is a score of 100 and one standard deviation is fifteen points.

[20] Ms. Frank's testing resulted in a composite score of 42 on the ABAS–II. *See* A0008–19 (Swanson ABAS Score Report).

affected all facets of his life. Furthermore, based on interviews with these people and other sources, Dr. Swanson concluded that "it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood." A0007 (Swanson Supplemental Report at 4); *see also* Tr. 9/20/10 at 104.

### E.    Risk Factors for Intellectual Disability

84.    No etiology is required to establish a diagnosis of intellectual disability, and the majority of intellectual disability diagnoses have no confirmed etiology. *See* A0116–21 (AAIDD–10 at 57–62). Nevertheless, presence of risk factors can corroborate a diagnosis of intellectual disability and explain its origins. A0081 (DSM–5 at 39); A0116–21 (AAIDD–10 at 57–62). Both the DSM–5 and the AAIDD–10 identify risk factors for ID, including biomedical factors that result in direct insults to cognition, as well as environmental risk factors in the social, educational, and behavior domains. *See* A0081 (DSM–5 at 39); A01119 (AAIDD–10 at 60); *see also* Tr. 9/24/10 at 52 (Government expert Dr. Price testifying that "risk factors for intellectual disability can include impaired child giving [sic] interaction, lack of adequate stimulation, family poverty, chronic illness in the family, things of that nature. So environmental factors can contribute to a person's development of [intellectual disability]").

85.    Mr. Bourgeois's diagnosis of intellectual disability is reinforced by the presence of a number of recognized risk factors for intellectual disability in his life history.

### 1.    Child abuse

86.    Witnessing the abuse of others, and being the victim of abuse, increase the risk of intellectual disabilities in children. A0134 (AAIDD–12 at 26); *see also* Tr. 9/20/10 at 89. Mr. Bourgeois experienced both.

87.    Numerous witnesses reported that Petitioner's mother took out her hard life and troubles on her children, with a special focus on Alfred. *See, e.g.*, Tr. 9/21/10 at 13–15 (sister

Claudia Williams testifying that their mother used to beat all of the children, but was particularly abusive toward Alfred, whom she beat "constantly"); *id.* at 78 ("She beat all of us, but she didn't beat us like she beat him."); A0214 (Williams Declaration, ¶ 5) ("Alfred got more whippings than the rest of us. . . . Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat."); Tr. 9/21/10 at 97 (Ms. Frank testifying "Alfred was really mistreated by his mom"); *id.* at 142 (Ms. Goodman testifying Eunice would curse and beat Alfred, and that she "was harder on him than the other kids"); *id.* at 322–23 (cousin Carl Henry testifying that Eunice resented Alfred because her relationship with Alfred's biological father "didn't work out" and she "took the misery of . . . that relationship out on him").[21]

      88.    Eunice's abuse of Alfred was not only more frequent than her abuse of his siblings, but also more violent. As his sister Claudia explained, all of the children would receive "whippings," but Alfred was whipped so hard that he would be "blue black" and have blood coming from his back and legs. Tr. 9/21/10 at 13–15; *see also id.* at 14 (Eunice once used a meat cleaver to cut off the tip of his finger while the family ate dinner); *id.* at 15 (Eunice would lock young Alfred in a closet with no lights on and leave him there).

---

[21] *See also* A0191 (Frank Declaration, ¶ 3) ("Alfred's mother treated him differently than her other children."); A0194 (Declaration of Allen Henry, ¶ 3) ("Eunice used to be rough on Alfred. She used to chastise him more than other kids and used to beat him more than the others. . . . Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him."); A0185 (Declaration of Murray Bourgeois, ¶ 3) ("Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred."); A0198 (Declaration of Yvonne Robinson Joseph, ¶ 3) ("Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him 'little yellow bastard' and slap him for nothing.").

### 2. Sexual abuse

89.    In addition to the parental abuse and neglect Petitioner experienced, he was also a victim of sexual abuse as a child. Specifically, although neighbor Miss Mary's home was intended to be a "safe" place where young Alfred would be spared the abuse from his mother, while there, Alfred was raped over the course of several years by Miss Mary's son. *See* Tr. 9/21/10 at 142–43; Tr. 9/20/10 at 292.

### 3. Neglect and impaired parenting

90.    The AAIDD identifies neglect as a risk factor for ID, and also lists other factors relevant to the types of neglect suffered by Mr. Bourgeois as a child, including impaired child–caregiver interaction, impaired parenting, rejection of parenting, and chronic maternal illness. *See* A0119 (AAIDD–10 at 60).

91.    Alfred was the fifth of seven children born to Eunice Bourgeois. All seven children were born in a time span of under nine years and were conceived by four different fathers. *See* Tr. 9/21/10 at 6–7. Eunice was "overwhelmed" by the number of children in her care. *Id.* at 132–33; *see also id.* at 260–61, 265 (Dr. Mark Cunningham testifying that there were indications that Petitioner suffered psychological damage from being raised in an "overwhelmed family system").[22]

92.    Eunice was chronically depressed by the time Alfred was born. She first became depressed when the father of her first three children suddenly abandoned her. A0200 (Declaration of Elnora Bourgeois McGuffey, ¶ 2); A0196 (Declaration of Jersey Henry, ¶ 3). Her

---

[22] Dr. Cunningham, a forensic psychologist, was retained by trial counsel as a "mitigation expert," but never called to testify. He never evaluated Mr. Bourgeois for ID, but testified in Petitioner's § 2255 proceedings regarding, inter alia, mitigating aspects of Mr. Bourgeois's background that he could have presented if called at trial.

depression worsened when her mother died while Eunice was in the hospital delivering her

fourth son. A0187–88 (Declaration of Wilmer Bourgeois, Sr., ¶ 7). That son, Anthony, was born

severely disabled. Tr. 9/21/10 at 10; A0214 (Williams Declaration, ¶ 3). Subsequently, her first

son Clyde died at the age of twelve when he fell out of a boat and drowned. *See* Tr. 9/21/10 at 6–

7; A0209 (Warren Declaration, ¶ 3); *see also* A0214 (Williams Declaration, ¶ 3) (Alfred's older

sister, Claudia, explaining that these last two factors—Anthony's disability and Clyde's death—

were particularly hard on their mother and took her away from her other children).

93.     Eunice was also an alcoholic. *See* Tr. 9/21/10 at 132–34 (neighbor testifying that

Eunice drank "excessively," getting intoxicated "every day"); *id.* at 397 (relative of Eunice

testifying that she "drank every day").

94.     According to family neighbor Brenda Goodman, Eunice's alcoholism and the

stress of raising so many children on her own caused her to forget what "was important in life

regarding raising her children," including such basic tasks as sending them to school. *Id.* at 132–

33. Family members concurred that Eunice failed to fulfill her role as a parent to Petitioner and

his siblings. *See, e.g.*, A0187(Wilmer Bourgeois, Sr., Declaration, ¶ 4) ("Eunice did not know

how to raise children. She didn't raise them right or teach them the right things. She didn't spend

enough time with her kids. My sister Eunice should have never been a mother."); A0224

(Memoranda Generated by Gerald Bierbaum at 39) (quoting Harry Bourgeois, Eunice's cousin,

as saying: "Alfred's momma didn't do shit for him. . . . All her kids raised they self. . . . It was

like he didn't have no momma."); A0202 (Mitchell Declaration dated 9/16/07, ¶ 2) (Alfred's

half–sister remarking: "His mother had basically just thrown Alfred away.").

95.     Ultimately, Alfred was cast out by his mother, who sent him at the age of seven to

live with an elderly neighbor, Miss Mary Clayton. *See* Tr. 9/21/10 at 93. Even after Miss Mary

died several years later, Alfred still was not welcomed home, but instead had to live with his paternal half–sister, Michelle Armont. *See* Tr. 9/21/10 at 38.

96.     Meanwhile, Petitioner was completely abandoned by his paternal father, Alfred Sterling, who "provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois." A0029 (Declaration of Mark D. Cunningham, Ph.D., ABPP – 05/11/2007, ¶ 19); A0202 (Mitchell Declaration dated 9/16/07, ¶ 2) ("Since [his mother] had rejected him he was looking for a family where he could be accepted. Our father, Alfred Sterling, was not the answer that Alfred was looking for. Alfred tried to make his way into his father's life but Alfred Sterling was a manipulative, mentally abusive man and could not be the father that Alfred wanted and needed.").

### 4.     Low socioeconomic status

97.     Poverty is another risk factor for intellectual disability. *See* A0119 (AAIDD–10 at 60); Tr. 9/20/10 at 89–90. Mr. Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one lane dirt road connecting about twenty homes, representing two or three different family units. Tr. 9/21/10 at 8–9; *id.* at 131; *id.* at 395. A family friend who was raised in the same neighborhood described it as consisting of "[p]oor black families." A0227 (Excerpt from Trial Transcript dated 3/23/04); *see also* Tr. 9/21/10 at 131 ("It was very poor."). The neighborhood was surrounded by sugar cane fields, and hemmed in on one side by the river. Tr. 9/21/10 at 9. The Bend was not connected to a sewage line. *Id.* at 141.

98.     While poverty is itself one social risk factor, low socioeconomic status also signals the presence of others, including malnutrition, educational inadequacy, insufficient stimulation, and deficient medical and/or educational interventions. *See* A0119 (AAIDD–10 at 60). Thus, as explained by Government expert Dr. Price, Alfred's "lack of education, . . .

impoverishment and the lack of cultural enrichment" bore a "relationship to his low

intelligence." Tr. 9/24/10 at 51–52; *see also* Tr. 9/23/10 at 232 (Dr. Price acknowledging that

Petitioner's "cultural, spiritual, [and] economic" impoverishment was relevant to "his cognitive

intelligence").

### 5.      History of learning difficulties

99.      Childhood learning difficulties also constitute risk factors for intellectual

disabilities as they correlate with declines in IQ during the developmental period. As discussed

above, Alfred is reported to have failed a grade in elementary school and required speech

therapy. A0206 (Swanson Supplemental Report at 3); *see also* Tr. 9/21/10 at 323–24. He is also

said to have "had significant problems in learning, and that relatives would spend hours with him

every night reviewing his school work and trying to teach him basic skills." A0206 (Swanson

Supplemental Report at 3); *see also* Tr. 9/21/10 at 27, 37–38, 58–59; *id.* at 98–99.

### 6.      Family heredity risk

100.      Having a parent or sibling with intellectual disability significantly increases the

likelihood of having an intellectual disability. *See* A0081 (DSM–5 at 39) (comprehensive

evaluation for ID involves identification of genetic etiologies, including "three–generational

family pedigree"); A0121 (AAIDD–10 at 62) (same).

101.      Mr. Bourgeois has a family history of intellectual and adaptive impairments. His

older brother, Anthony, was born with cerebral palsy. Tr. 9/21/10 at 10. He was profoundly

disabled, unable to feed, bathe, or dress himself throughout his life. *Id.*; *see also* A0200

(McGuffy Declaration, ¶¶ 2–4) (describing Anthony as afflicted with life–long developmental

problems); *see also* A0214 (Williams Declaration, ¶ 3) ("We lost [brother] Clyde and then our

brother Anthony took a lot of extra care due to his disabilities.").

102.    Additionally, Petitioner's mother, Eunice, was described by her brother as "not that smart and slow in understanding." A0187 (Wilmer Bourgeois, Sr., Declaration, ¶ 3); *see also* A0224 (Bierbaum Memorandum at 39) (quoting Harry Bourgeois, Eunice's cousin, describing Eunice as "half–ass retarded").

### F.    Conclusion

103.    For the reasons set forth above, Mr. Bourgeois has established that he is an intellectually disabled person. He suffers from significant deficits in intellectual and adaptive functioning, which have been present since very early in the developmental period. Accordingly, this Court should find Mr. Bourgeois intellectually disabled and categorically ineligible for execution.

## IV.    RELIEF IS APPROPRIATE UNDER 28 U.S.C. § 2241.

104.    This claim is appropriately brought under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 588 (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). "The essential function [of § 2241] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d at 609 (internal quotations omitted); *Webster*, 784 F.3d at 1136 (same).

105.    Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. *See, e.g.*, *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Davenport*, 147 F.3d at 607–09; *Webster*, 784 F.3d at 1136. The majority of circuit courts of appeal—including the Seventh Circuit—have also expressly recognized that § 2241 is available to petitioners if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time

45

of his § 2255 motion. *See, e.g., Davenport*, 147 F.3d at 611.[23]

106.     Section 2241 is also the appropriate vehicle where a petitioner challenges the execution of his sentence. *Kramer*, 347 F.3d at 217; *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241."). Likewise, § 2255 is "inadequate" when it prevents a prisoner from obtaining review of a legal theory that addresses the "fundamental legality" of a sentence. *Webster*, 784 F.3d at 1124–25.

107.     As detailed below, Mr. Bourgeois's claim that his intellectual disability renders him categorically ineligible for the death penalty fits within the category of claims cognizable under § 2241, as § 2255 was and remains inadequate or ineffective to test the legality of his sentence. That purpose is all the more apt because Congress and the United States Supreme Court have both expressly forbidden the *execution* of any prisoner who is intellectually disabled. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded."); *Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

### A.     Petitioner's *Atkins* Claim Relies on Supreme Court Jurisprudence and Diagnostic Criteria Not Available to Him in § 2255 Proceedings.

108.     As stated above, a federal prisoner may proceed under § 2241 when asserting a habeas claim that relies on a legal or factual basis not available at the time of petitioner's trial or

---

[23] *See also United States v. Barrett*, 178 F.3d 34, 51–52 (1st Cir. 1999); *Triestman v. United States*, 124 F.3d 361, 363 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245, 247–48, 251 (3d Cir. 1997); *United States v. Wheeler*, 886 F.3d 415, 434 (4th Cir. 2018); *Reyes–Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799, 805 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002).

§ 2255 proceedings. *See Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607. For instance, in *Garza*, the § 2241 petitioner challenged his conviction and death sentence based on the issuance of an opinion from the Inter–American Commission on Human Rights, which found his execution would violate international law. *Id.* at 923. Because the opinion upon which the *Garza* petitioner relied could not have been generated until § 2255 proceedings had ended and Mr. Garza's legal claim did not satisfy the conditions necessary for a successive § 2255 petition, the Seventh Circuit found that Mr. Garza's claim was reviewable under § 2241. Similarly, in *Davenport*, the Seventh Circuit reviewed a claim based on a retroactive change in the United States Supreme Court's interpretation of federal statutory law under § 2241, explaining that § 2255 was not available because the Court's decision related to statutory, and not constitutional law. 147 F.3d at 607–11.

109.    In *Webster*, the habeas petitioner had been convicted of federal capital charges and sentenced to death. At his trial, Mr. Webster claimed that he was intellectually disabled and challenged his eligibility for the death penalty under *Atkins*, a claim the trial court rejected. *Webster*, 784 F.3d at 1125–33. Mr. Webster then presented newly discovered evidence of his intellectual disability that could not have been discovered at the time of trial by diligent counsel. *Id.* at 1133. Because Mr. Webster's execution would be constitutionally prohibited if his *Atkins* claim was meritorious and he could not seek review of this evidence under a successor § 2255 petition, the Seventh Circuit ruled that Mr. Webster's renewed *Atkins* claim and the new evidence were appropriately reviewed under § 2241. *Id.* at 1146.

110.    As discussed in detail below, Mr. Bourgeois's *Atkins* claim fundamentally relies on the Supreme Court's decisions in *Moore–I* and *Moore–II*, as well as the current diagnostic manuals that *Moore–I* and *Moore–II* require courts to use in evaluating ID claims. Because

*Moore–I* and *Moore–II* were decided in 2017 and 2019, respectively, they constitute legal bases that were not available at the time of Mr. Bourgeois's initial § 2255 proceedings. Likewise, because the AAIDD–12, AAIDD–15, and the DSM–5 were each adopted after Petitioner filed his 2007 habeas, they constitute new factual bases not available at the time of Mr. Bourgeois's initial § 2255 proceedings. Finally, because the Fifth Circuit denied Petitioner's request to file a second § 2255 petition following *Moore–I*, there is no question that § 2255 is an "inadequate and ineffective" means to challenge Mr. Bourgeois's sentence under these new legal and factual bases. Accordingly, the claim is properly asserted under § 2241.

### 1.    Background: *Atkins*, *Ex Parte Briseño*, *Moore–I*, and *Moore–II*

111.    In *Atkins*, the Supreme Court held that the execution of intellectually disabled individuals violates the Eighth Amendment's prohibition against cruel and unusual punishment, but "left the contours of that new exemption murky." *Bourgeois*, 2011 WL 1930684, at *23. The Court recognized that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self–care, and self–direction that became manifest before age 18." *Atkins*, 536 U.S. at 318 (referring to the then–current diagnostic criteria for intellectual disability). For the most part, however, the *Atkins* Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 317.

112.    The approach that was adopted for determining *Atkins* claim in Texas was first set forth in the case of *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), *abrogated by Moore–I*, 137 S. Ct. 1039. Despite the fact that *Atkins* excluded the "entire class" of intellectually disabled individuals from execution, 536 U.S. at 321, the CCA in *Briseño* explicitly stated that its goal was to "define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death

48

penalty," 13 S.W.3d at 6. The court also opined that the narrow group of individuals who satisfy

this "Texas consensus" may be defined by their "level and degree of mental retardation,"

pointing to the fictional character "Lennie" from John Steinbeck's *Of Mice and Men* as someone

who "might" be considered entitled to *Atkins* relief. *Id.*

113.    To effectuate its goal of limiting *Atkins* to those individuals who would be

considered ID by a consensus of Texas laypersons, the CCA first instructed courts to adopt a

"flexible" approach to prong one, observing that "sometimes a person . . . whose IQ tests below

70 may not be mentally retarded." *Id.* at 7 n.24; *see also id.* at 14 (crediting the trial court's

finding that that petitioner's IQ scores of 72 and 74 "understated [his] intellectual functioning").

With regard to prong two, the CCA held that courts must evaluate adaptive functioning

according to seven non–clinical factors it deemed incompatible with a diagnosis of intellectual

disability.[24] *Id.* at 8–9. Finally, the court held that, "[a]lthough experts may offer insightful

opinions on the question of whether" an individual meets the "diagnostic criteria" for ID, "the

---

[24] These seven factors, commonly referred to in subsequent caselaw and commentary as
the "*Briseño* factors," were:

> (1) Did those who knew the person best during the developmental stage—
> his family, friends, teachers, employers, authorities—think he was mentally
> retarded at that time, and, if so, act in accordance with that determination? (2) Has
> the person formulated plans and carried them through or is his conduct impulsive?
> (3) Does his conduct show leadership or does it show that he is led around by
> others? (4) Is his conduct in response to external stimuli rational and appropriate,
> regardless of whether it is socially acceptable? (5) Does he respond coherently,
> rationally, and on point to oral or written questions or do his responses wander
> from subject to subject? (6) Can the person hide facts or lie effectively in his own
> or others' interests? (7) Putting aside any heinousness or gruesomeness
> surrounding the capital offense, did the commission of that offense require
> forethought, planning, and complex execution of purpose?

*Briseño*, 135 S.W.2d at 8.

ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact." *Id.* at 9.

114.    Yet in 2017, the United States Supreme Court rejected the CCA's approach to *Atkins* claims as unconstitutional. *Moore–I*, 137 S. Ct. at 1044. The Court began by stressing that lower courts do not have "unfettered discretion to define the full scope of the constitutional protection" recognized in *Atkins*. *Id.* at 1052–53. Rather, courts are required to apply the "medical community's *current standards*" when assessing a claim of intellectual disability. *Id.* at 1053. Citing the current manuals from the APA and the AAIDD, the Court explained that "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* (quoting DSM–5 at xli).

115.    The Court went on to conclude that the CCA's disregard of current diagnostic standards created an unconstitutional risk that persons with mild intellectual disability would be executed. *Id.* at 1044, 1053; *see also id.* at 1048 (stressing that "the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled individual" (quoting *Atkins*, 536 U.S. at 321) (emphasis in original)). In reaching this conclusion, the *Moore–I* Court identified several problematic aspects of the Texas approach that are relevant to Mr. Bourgeois's case.

116.    Considering prong one first, the Court faulted the CCA's "flexible" approach to assessing intellectual functioning, rejecting the argument that courts may disregard scores falling in the "lower end of the standard–error range" based on factors "unique" to the petitioner. *Id.* at 1049. Mr. Moore had an IQ score of 74, which, "adjusted for the standard error of measurement, yields a range of 69 to 79." *Id.* Because this score placed him in the range for intellectual disability, the CCA was wrong to conclude that he did not satisfy the first criteria of the

50

definition of ID. *Id.* at 1050. Rather, "where an individual's IQ score, adjusted for the test's

standard error, falls within the clinically established range for intellectual–functioning deficits,"

prong one is established and courts must continue the inquiry on to prong two.

117.    *Moore–I* also rejected the CCA's approach to prong two,[25] criticizing the state

court for the myriad ways its adaptive–functioning analysis disregarded current diagnostic

criteria. First, the Supreme Court concluded that the CCA had "overemphasized Moore's

perceived adaptive strengths"—e.g., he "lived on the streets, mowed lawns, and played pool for

money"—when "the medical community focuses the adaptive–functioning inquiry on adaptive

*deficits*." *Id.* at 1050 (emphasis in original).

118.    Second, the Supreme Court faulted the CCA for finding that risk factors for

intellectual disability somehow "detracted from a determination that [Moore's] intellectual and

adaptive deficits were related." *Id.* at 1051. Contrary to the CCA's findings, the Supreme Court

explained that "[c]linicians rely on such factors as cause to explore the prospect of intellectual

disability further, not to counter the case for a disability determination." *Id.* (citing AAIDD–10 at

59–60).

119.    Third, the Supreme Court reasoned that emphasis on Mr. Moore's conduct while

in confinement was not relevant to an ID determination under the medical standards. *Id.* at 1050.

Specifically, the Court warned that "[c]linicians . . . caution against reliance on adaptive

strengths developed 'in a controlled setting,' as a prison surely is." *Id.* (citing DSM–5 at 38 and

AAIDD–12 at 20).

---

[25] Despite having determined that Mr. Moore failed to satisfy prong one, the CCA went
on to find that "[e]ven if applicant had proven that he suffers from significantly sub–average
general intellectual functioning, his *Atkins* claim fails because he has not proven by a
preponderance of the evidence that he has significant and related limitations in adaptive
functioning." *Ex Parte Moore*, 470 S.W.3d at 520.

120.     Fourth, the Court found that the CCA "departed from clinical practice by requiring Moore to show that his adaptive deficits were not related to 'a personality disorder.'" *Moore–I*, 137 S. Ct. at 1051 (quoting decision below, in which CCA observed that Moore's problems in kindergarten were "more likely cause[d]" by "emotional problems" than by intellectual disability). The Court explained that "many intellectually disabled people also have other mental or physical impairments, for example, attention–deficit/hyperactivity disorder, depressive and bipolar disorders, and autism." *Id.* (citing DSM–5 at 40). "The existence of a personality disorder or mental–health issue, in short, is not evidence that a person does not also have intellectual disability." *Id.*

121.     Finally, the Court held that the CCA's "attachment to the seven *Briseño* evidentiary factors further impeded its assessment of Moore's adaptive functioning." *Id.* at 1051. The Court explained that the *Briseño* factors had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled. *Id.* at 1051–52; *see also id.* at 1053 ("I agree with the Court today that [the *Briseño*] factors are an unacceptable method of enforcing the guarantee of *Atkins*.") (Roberts, C.J., dissenting). The Supreme Court concluded that:

> As we instructed in *Hall*, adjudications of intellectual disability should be "informed by the views of medical experts." That instruction cannot sensibly be read to give courts leave to diminish the force of the medical community's consensus. Moreover, the several factors *Briseño* set out as indicators of intellectual disability are an invention of the CCA untied to any acknowledged source. Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseño* factors "creat[e] an unacceptable risk that persons with intellectual disability will be executed." Accordingly, they may not be used, as the CCA used them, to restrict qualification of an individual as intellectually disabled.

*Id.* at 1044 (internal citations omitted).

122.     On remand following *Moore–I*, the CCA again found insufficient evidence of Mr. Moore's adaptive deficits, purporting to use "current medical diagnostic standards," but

nevertheless crediting the conclusion of the State's expert, Dr. Kristi Compton, that Mr. Moore's "adaptive functioning was too great to support an intellectual-disability diagnosis." *Ex parte Moore*, 548 S. W. 3d 552, 563 (Tex. Crim. App. 2018), *abrogated by Moore–II*, 139 S. Ct. at 672.

123.    The Supreme Court summarily reversed, per curiam, and rejected the CCA's credibility determinations as invalid. *Moore-II* noted that the CCA's determination:

- relied on Mr. Moore's adaptive strengths, rather than focusing on his adaptive *deficits*;

- required Mr. Moore to show that his adaptive deficits were unrelated to emotional problems, in violation of *Moore-I*'s directive that a comorbid mental health issue "is not evidence that a person does not also have ID";

- focused on "adaptive improvements made in prison," which was "difficult to square with [the Supreme Court's] caution against relying on prison-based development"; and

- employed certain *Briseño* factors, despite claiming that it had abandoned reliance on them

*Moore–II*, 139 S. Ct. at 670-72 (citations omitted).

124.    Because the CCA's analysis was inappropriate, the Supreme Court overturned the CCA's credibility determination and found that Mr. Moore was intellectually disabled. *Id.* at 672.

### 2.    The district court denied Mr. Bourgeois's *Atkins* claim under the same unconstitutional standards struck down in *Moore–I* and *Moore–II*.

125.    Prior to *Moore–I*, the Fifth Circuit applied the same contra–diagnostic standards that the CCA had used in analyzing claims of intellectual disability.  For instance, in 2005, the Fifth Circuit upheld the district court's denial of an *Atkins* claim raised by § 2255 petitioner Bruce Webster with the following analysis:

> Looking at all the evidence presented by both sides at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

*Webster*, 421 F.3d at 313. In other words, just like the CCA in the *Ex Parte Moore* decisions, the Fifth Circuit: disregarded clinical standards in assessing Mr. Webster's claim; treated risk factors for ID as alternative explanations for his low functioning, as opposed to contributors to it; used Mr. Webster's perceived adaptive strengths to discount his deficits; and relied on erroneous stereotypes that ID persons look and talk differently from non–ID persons, are completely incompetent, and are unable to acquire social or functional skills.[26]

---

[26] Notably, the Fifth Circuit went on to chastise Mr. Webster for having raised in habeas an *Atkins* claim that had been denied at trial, saying that he could not "continue to litigate this claim hoping that some court eventually will agree with him." *Id.* at 314; *see also id.* ("Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may* be retarded.") (emphasis in original). Yet, as mentioned above, Mr. Webster did relitigate his claim before this Court via a § 2241 petition, and applying current diagnostic standards as required by *Moore–I*, this Court determined him to be intellectually disabled and ineligible for death. *See Webster v. Lockett*, No. 2:12–v–86–WTL–MJD, 2019 WL 2514833 (S.D. Ind. June 18, 2019). While the Court cited to some new evidence not presented to the Fifth Circuit, it also took an entirely different approach to analyzing Mr. Webster's adaptive functioning. For instance, the Court explained that, "in accordance with guidance from the medical community and as instructed by the Supreme Court," its focus was on adaptive deficits over adaptive strengths. *Id.* at *10. Additionally, the Court gave "little weight" to evidence of Mr. Webster's adaptive functioning in prison, citing *Moore–I* for the proposition that "[c]linicians . . . caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is." *Id.* (citing *Moore–I*, 137 S. Ct. at 1050) (internal quotation marks omitted). Likewise, the Court gave "little weight" to the testimony of the Government expert, who relied on such evidence as Mr. Webster's "musical ability, excellent hygiene, ability to drive" and "ability to engage in conversation" to conclude he failed to establish prong two. *Id.* After reviewing this evidence, the Court did not find the "conclusions that [the expert] has drawn to be

126.     While Mr. Webster and Mr. Bourgeois have been the only § 2255 petitioners to raise an *Atkins* claim in the Fifth Circuit pre–*Moore–I*, the circuit court has repeatedly denied relief to Texas prisoners who sought *Atkins* relief under 28 U.S.C. § 2254. *See, e.g.*, *Clark v. Quarterman*, 457 F.3d 441, 445–47 (5th Cir. 2006) (affirming state court denial of *Atkins* relief based on *Briseño*); *Woods v. Quarterman*, 493 F.3d 580, 586–87 (5th Cir. 2007) (same); *Williams v. Quarterman*, 293 F. App'x. 298 (5th Cir. 2008) (same); *Eldridge v. Quarterman* 325 F. App'x. 322, 328–29 (5th Cir. 2009); *Thomas v. Quarterman*, 335 F. App'x. 386, 389–91 (5th Cir. 2009) (same); *Esparza v. Thaler*, 408 F. App'x. 787, 790–96 (5th Cir. 2010) (same).

127.     Citing to the precedent established by *Webster*, as well as the Fifth Circuit's § 2254 jurisprudence, the district court that evaluated Mr. Bourgeois's 2007 *Atkins* claim adopted the same non–clinical approach.

### a.   The district court's erroneous prong–one analysis

128.     As discussed *supra*, an IQ score of 75 or below satisfies prong one of *Atkins*. *Hall*, 572 U.S. at 712, 723. Mr. Bourgeois's only two full–scale IQ scores met this threshold: a 75 on the WAIS–R and a 70 on the WAIS–III. *See* Tr. 9/10/10 at 32; Tr. 9/20/10 at 217–19; *see also* A0060 (Dr. Weiner Score Sheet from WAIS–R); A0053–59 (Declaration of Dr. Donald E. Weiner and Attached Report of 3/3/04); A0039–41 (Gelbort Declaration, ¶ 3). The district court did not "invalidate or ignore Bourgeois' IQ test scores." *Bourgeois*, 2011 WL 1930684, at *31; *see also* Section III.B.2 (discussing various experts' testimony that Mr. Bourgeois did not "feign bad" on his IQ testifying). Nor did the court question that the "psychological profession accepts 75 as a qualifying score for a diagnosis of mental retardation." *Id.* at *25; *see also id.* at *26

---

persuasive." *Id.* at *10, n.21. In short, by applying diagnostic criteria, this Court found Mr. Webster to have significant adaptive deficits based on largely the same evidence that the Fifth Circuit had used to deny his claim pre–*Moore–I*.

("The psychological profession allows any score falling along [the range of 65–75] to qualify for a diagnosis of mental retardation. Accordingly, psychologists generally do not question whether an inmate's true IQ falls in the higher or lower end of that range."). Nevertheless, the court found that "[i]n the *legal context*, whether an inmate had significantly subaverage intellectual functioning is a question of fact that the court decides." *Id.* at *26; *see also id.* (stressing that Fifth Circuit had repeatedly denied relief to inmates who had IQ scores below 70 based on a determination that the inmate's "intelligence is more consistent with the higher end of the confidence interval"); *Briseño*, 135 S.W.2d at 7 n.24, 14 (endorsing a "flexible" approach to prong one, not dependent on IQ scores).

129.    The court, like the CCA in Mr. Moore's case, went on to determine that despite his IQ scores, Mr. Bourgeois's "true" intellectual functioning "does not correspond to a finding of significant intellectual limitations." *Id.* at *26, 31. This finding alone violated *Moore–I*[27] and current diagnostic standards, which *require* that courts find prong one satisfied and proceed to prong two "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual–functioning deficits." *Moore–I*, 137 S. Ct. at 1049-50; *accord United States v. Roland*, 281 F. Supp. 3d 470, 528 n.76 (D.N.J. 2017) ("where the lower end of a defendant's score falls at or below 70—as two of Roland's Flynn-adjusted IQ scores do here—the deciding court must move on to consider the defendant's adaptive functioning."); *United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016) (prong two analysis required "if even one valid IQ test score generates a range that falls to 70 or below"). Furthermore, the district court violated *Moore–I* and current diagnostic standards by relying on

_____

[27] The *Moore–II* Court did not address prong one, as the CCA focused only on prong two in re–evaluating Mr. Moore's claim on remand following *Moore–I*. *See Moore–II*, 139 S. Ct. at 670.

unscientific, erroneous stereotypes of intellectually disabled persons in support of its conclusion that Mr. Bourgeois's "true" IQ did not satisfy prong one. According to the court, the conclusion that "Bourgeois' behavior and characteristics are inconsistent with an IQ that would fall below 70" was demonstrated by the following: Mr. Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation," *id*. at *28; he "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies," *id* at *22; he "worked for many years as a long haul truck driver . . . bought a house, purchased cars, and handled his own finances" *id*. at *29; and "otherwise carried himself without any sign of intellectual impairment," *id*.

130.    Even assuming this testimony accurately represented Mr. Bourgeois—who has a long history of masking his ID[28] and soliciting supports that obscured his deficits[29]—none of the "skills" cited by the court conflicts with a finding of intellectual disability. To the contrary, each one is implicated in the erroneous but commonly held stereotypes identified by the AAIDD–12, as demonstrated in the following chart:

---

[28] *See* Section III.C.3.d (summarizing testimony from experts and lay witnesses describing Mr. Bourgeois's long history of masking his deficits).

[29] *See, e.g.*, Tr. 9/20/10 at 106; Tr. 9/21/10 at 42–43.

| District court findings of "skills" that are inconsistent with ID | Commonly held, but erroneous stereotypes of persons with ID |
|---|---|
| Mr. Bourgeois "answers the questions asked of him, engages in conversation, has logical thoughts, and does not otherwise give any impression of mental retardation." *Bourgeois*, 2011 WL 1930684, at *28. | Persons with ID "look and talk differently from persons in the general population." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "lived a life which, in broad outlines, did not manifest gross intellectual deficiencies." *Bourgeois*, 2011 WL 1930684, at *22. | Persons with ID "are completely incompetent and dangerous," "cannot acquire vocational and social skills necessary for independent living," "cannot do complex tasks," and "are characterized only by limitations and do not have strengths that occur concomitantly with their limitations." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "worked for many years as a long haul truck driver, . . . bought a house, purchased cars, and handled his own finances." *Bourgeois*, 2011 WL 1930684, at *29. | Persons with ID "cannot get driver's licenses, buy cars, and drive cars," "do not (and cannot) support their families," and "cannot acquire vocational and social skills necessary for independent living." A0134 (AAIDD–12 at 26). |
| Mr. Bourgeois "otherwise carried himself without any sign of intellectual impairment." *Bourgeois*, 2011 WL 1930684, at *29. | Persons with ID "look and talk differently from persons in the general population." A0134 (AAIDD–12 at 26). |

131.    The district court's findings that the above–referenced "skills" were inconsistent

with a finding of ID is further contradicted by the DSM–5, which expressly recognizes that

persons with significant adaptive deficits can, among other things, maintain regular employment

in jobs that do not emphasize conceptual skills and function age–appropriately in personal care.

*See* A0076–77 (DSM–5 at 34–35). At the same time, the findings invoke several of the "*Briseño*

factors" struck down by the *Moore–I* Court has having no basis in medicine or law, including:

"Has the person formulated plans and carried them through or is his conduct impulsive?"; "Is his

conduct in response to external stimuli rational and appropriate, regardless of whether it is

socially acceptable?"; and "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" *Briseño*, 135 S.W.2d at 8.

132.    In addition to relying on false stereotypes of ID persons to discount Mr. Bourgeois's IQ scores, the court also placed significant weight on its own lay assessment of Mr. Bourgeois's intellectual functioning. *See Bourgeois*, 2011 WL 1930684, at *30 ("The Court had sufficient interaction with Bourgeois to make a lay assessment of whether he functions at the low level described by his expert witnesses. . . . Based on this Court's own observations, the testimony that Bourgeois has significant intellectual limitations is not credible or persuasive."). But *Moore–I* expressly condemned lay assessments of ID, uninformed by "medical and clinical appraisals," saying such lay diagnoses should "spark skepticism." *Moore–I*, 137 S. Ct. at 1051 (citing, inter alia, AAIDD–12 at 25–27).

133.    Additionally, the court acted contrary to *Moore–I* and current standards in crediting Dr. Price's opinion that Mr. Bourgeois's "inability to test well" could be explained by the fact that he "is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, [and did] not experience things that were intellectually academically enriching." *Bourgeois*, 2011 WL 1930684, at *28. Yet per *Moore–I* and current diagnostic guidelines, Mr. Bourgeois's limited education and stimulation are factors that make intellectual disability *more*, not *less*, likely. *See Moore–I*, 137 S. Ct. at 1044; *cf. id.* at 1049 ("[T]he presence of other sources of imprecision in administering [an IQ] test to a particular individual cannot *narrow* the test-specific standard-error range.") (emphasis in original); *see also supra* Section III.E. And of course, an "inability to test well" is itself something that would be expected of an individual with low intellectual functioning, not a factor that counters a finding of low intelligence.

59

134.    Lastly, the district court's prong–one analysis violated *Moore–I* and diagnostic standards because the court refused to apply the Flynn Effect. *See Bourgeois*, 2011 WL 1930684, at *26 n.37. As discussed above, both the AAIDD–10 and the DSM–5 require that IQ scores be Flynn–corrected. *See* A0099 (AAIDD–10 at 37); A0079 (DSM–5 at 37); *see also* Tr. 9/23/10 at 227 (Government expert Dr. Price testifying that the Flynn Effect "should be considered and noted when you are using a test that's older"); Tr. 9/24/10 at 89, 187 (Government expert Dr. Moore testifying that AAIDD–10 directs that individual scores should be corrected for the Flynn Effect). Yet the district court merely mentioned the Flynn Effect in a footnote, concluding that there was nothing to "require the adoption of the Flynn Effect as a legal method to lower an inmate's Full Scale IQ Score." *Bourgeois*, 2011 WL 1930684, at *26 n.37.

135.    In short, the district court rejected prong one after considering unscientific and erroneous factors that led the court to reach a layperson's conclusion that Mr. Bourgeois's "true" intelligence did not satisfy the IQ component for ID. Furthermore, it rejected a prong–one finding after setting aside the medical diagnostic standards applicable to ID. While consistent with Fifth Circuit jurisprudence upholding *Briseño* that remained good law at the time, such an analysis is utterly at odds with current Supreme Court law and diagnostic criteria.

### b.  The district court's erroneous prong–two analysis

136.    Despite finding that Mr. Bourgeois had failed to satisfy prong one, the district court went on to analyze prong two of his *Atkins* claim, which the court also rejected. In so doing, the court again applied the unscientific standards that the Supreme Court has now identified as unconstitutionally divergent from current clinical criteria. Indeed, the court began its analysis by explicitly dismissing the clinical approach to adaptive functioning, observing: "An examination for mental retardation, and particularly the adaptive–skills component of that inquiry, *involves the subjective evaluation* of skills, aptitudes, and life experiences." *Bourgeois*,

60

2011 WL 1930684, at *24. This view contradicts both the DSM–5 and the AAIDD–10, which require the use of "clinical judgment" in evaluating prong two. A0079 (DSM–5 at 37); A0115 (AAIDD–10 at 55). The AAIDD–10 provides further detail, explaining:

> Clinical judgment is defined as a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data. . . . [It] is characterized by its being systematic (i.e., organized, sequential, and logical), formal (i.e., explicit and reasoned), and transparent (i.e., apparent and communicated clearly). . . . [It] should not be thought of as justification for abbreviated evaluation, a vehicle for stereotypes and prejudice, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems.

A0123–24 (AAIDD–10 at 86–87).

137.     The court further expressed its disregard for diagnostic standards by differentiating between a "legal" and a "psychological" approach to adaptive functioning:

> The mental health community ignores an individual's strengths when looking at adaptive functioning. . . . In fact, the 11th edition of the AAIDD manual has expressly adopted as an underlying "assumption" in the definition of mental retardation that *"within an individual, limitations often coexist with strengths."* The mental health profession looks only at what an individual cannot do, presumably as a function of its role in providing support and services to impaired individuals.

> The Fifth Circuit, however, teaches that the *Atkins* inquiry should not be so narrow as to ignore that which an inmate can do, even if the psychological profession approaches the issue differently. The subjective *Atkins* question is not myopic and must take into account the whole of an individual's capabilities. . . . Accordingly, the federal inquiry into adaptive deficits takes on a much different flavor than that done by mental health professionals.

*Bourgeois*, 2011 WL 1930684, at *32 (citations omitted); *see also id.* at 33 ("The law will compare the deficiencies to positive life skills, presuming that adaptive successes blunt the global effect of reported insufficiencies.").

138.     This approach was expressly discredited by both *Moore–I* and *Moore–II*, in which the Supreme Court rejected the CCA's attempt to make an *Atkins* determination on the

defendant's strengths rather than his or her weaknesses *Moore–I*, 137 S. Ct. at 1050 (CCA erred

by "overemphasiz[ing] Moore's perceived adaptive strengths" because "the medical community

focuses the adaptive-functioning inquire on adaptive *deficits*"); *see also Moore–II*, 139 S. Ct. at

670 (CCA erred in relying "less upon the adaptive *deficits* to which the trial court had referred

than upon Moore's apparent adaptive *strengths*") (emphasis in original). That criticism applies

equally to the district court's prong–two analysis in Petitioner's case, in which the court wrongly

discounted the extensive evidence of Mr. Bourgeois's adaptive deficits and denied relief relying

on the things it found he *could* do.

139.    Similarly to the CCA in *Ex Parte Moore–II*, the court's refusal to follow

diagnostic criteria also caused it to wrongly credit the Government's adaptive–behavior expert,

Dr. Moore, over Dr. Swanson. According to the court, Dr. Moore "took a full range of behavior

into consideration when evaluating informal accounts for adaptive deficits," whereas "Dr.

Swanson lessened her credibility when she only focused on information supporting mental

retardation without giving weight to or reconciling factors that disproved her conclusions."

*Bourgeois*, 2011 WL 1930684, at *42. In fact, Dr. Swanson testified that she "considered the

different *strengths or deficits* that [she] saw . . . when [she] was doing [her] assessment with [

Mr. Bourgeois] and talking to people who knew him growing up." Tr. 9/20/10 at 19; *see also id.*

at 136 ("Overall he functions at about the third or fourth grade level, but he has some other

unique strengths in his ability."). More specifically, Dr. Swanson expressly recognized that: Mr.

Bourgeois "copies very well," *id.* at 34; his adaptive functioning tests revealed that "he does

have some significant strengths," *id.* at 45; there are "things he does actually quite well with

reading," *id.* at 46; "recognizing words. . . is a particular strength for him," *id.*; "he can spell

extremely well," *id.* at 50; and he has a strength in "expressive language," *id.* at 132. But,

consistent with diagnostic criteria, she also explained that these strengths did not "offset the other deficits" the Mr. Bourgeois has in any given area. *Id.* at 159. *Atkins* and current diagnostic standards require prong–two determinations to be made based on what the individual does not do, rather than what he or she can do.  Because the district court focused on what Mr. Bourgeois could do, rather than what he did not do, its determination violated *Moore–I* and *Moore–II* and current diagnostic standards.

140.    In addition to improperly considering Petitioner's perceived adaptive strengths as undermining his adaptive deficits, the court violated the *Moore* decisions and diagnostic criteria by once again resorting to unscientific and outdated stereotypes to determine Mr. Bourgeois's functioning was inconsistent with a diagnosis of ID. For instance, the court supported its conclusion that Mr. Bourgeois did not satisfy prong two by citing to testimony that he was competent at his job as a truck driver, that "[h]is appearance and grooming were beyond presentable," and "none of the Government's witnesses suspected that Bourgeois had mental impairments." *Bourgeois*, 2011 WL 1930684, at *39; *see also id.* at *22 ("Bourgeois had lived a life which, in broad outlines, did not manifest gross intellectual deficiencies.); *id.* at *29 ("[T]hose who knew [Mr. Bourgeois] as an adult did not suspect that he was mentally retarded."); *id.* (citing Dr. Price's opinion that having a job as a long–haul trucker was "inconsistent with mental retardation."); *id.* at *38–39 (describing Mr. Bourgeois's competence at his truck driving job); *id.* at *39 (describing his well–groomed appearance); *id.* (his work as a truck driver belied any intellectual disability).

141.    Just as with its prong–one analysis, none of the "skills" cited in the court's prong–two assessment conflicts with a finding of intellectual disability. Indeed, while the court cites Mr. Bourgeois's "presentable" appearance and grooming as evidence countering a diagnosis of

ID, the DSM–5 expressly states that individuals with significant deficits in the practical domain "may function age–appropriately in personal care." A0076 (DSM–5 at 34). The same is true for the fact that Mr. Bourgeois had a job. Specifically, the DSM–5 states that individuals with significant deficits in the practical domain "*often*" experience "competitive employment . . . in jobs that do not emphasize conceptual skills." *Id.* Truck driving surely falls under this description. Other "skills" cited by the court align directly with many of the erroneous stereotypes of ID identified by the AAIDD. *See* A0134 (AAIDD–12 at 26) (erroneous stereotypes of ID persons include that they "look and talk differently from persons in the general population," "cannot acquire vocational and social skills necessary for independent living," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," and "are completely incompetent and dangerous"); *see also supra* Section III.C.2.

142.    Furthermore, the fact that none of the Government's witnesses described Mr. Bourgeois as ID does nothing to rebut the showing of his many deficits. To be sure, one of the *Briseño* factors expressly struck down by *Moore–I* instructed courts to consider whether the person's "family, friends, teachers, [and] employers" thought he was ID. *Moore–I*, 137 S. Ct. at 1051 (citing *Briseño*, 135 S.W.3d at 8). The *Moore–I* Court singled out this particular factor for criticism, explaining: "[T]he medical profession has endeavored to counter lay stereotypes of the intellectually disabled. Those stereotypes, much more than medical and clinical appraisals, should spark skepticism." *Id.* (citing, inter alia, AAIDD–12 at 25–27).

143.    The district court also inappropriately gave significant weight to its own assessment of Mr. Bourgeois's communication skills, which it found incompatible with ID. *See, e.g.*, *Bourgeois*, 2011 WL 1930684, at *22 (Mr. Bourgeois's trial testimony, colloquies with the court, and writings never called into question his intellectual functioning); *id.* at *28 ("Bourgeois

answers the questions asked of him, engages in conversation, has logical thoughts"); *id.* (Mr. Bourgeois produces "voluminous amounts of writing"); *id.* at *30 ("Bourgeois's extensive writings, while not polished masterpieces, certainly do not contain gross indicia of mental impairment."); *id.* ("During trial, Bourgeois communicated with this Court on several occasions. . . . Bourgeois never gave the Court any impression that he functioned at an intellectual level equal to that of a child."); *id.* at *43 ("Bourgeois can engage in the give–and–take of normal conversation without any hint of impairment."). With this analysis, the district court employed yet another of the *Briseño* factors struck down in *Moore–I*: whether the individual could "respond coherently, rationally, and on point to oral or written questions." *Moore–I*, 137 S. Ct. at 1044, 1046 n.6; *see also* A0129 (AAIDD–12 at 20) (ID determinations should not be based on verbal behavior).[30] Additionally, to the extent it relied on Mr. Bourgeois's "writings," all of which were produced while he was in prison, the district court ran afoul of the prohibition on use of prison behavior as evidence of adaptive functioning. *See* A0129 (AAIDD–12 at 20); A0080 (DSM–5 at 38); *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 139 S. Ct. at 669; *see also* Tr. 9/23/10 at 221 (Dr. Price testifying that relying on an individual's writings is "complicat[ed]" by the fact that he may have received help and we don't know how long the writings took to complete); *id.* ("Yes, it may look good but did they, they have plenty of time, obviously, and did they just spend so much time on this that it looks as good as it is.").

144.    Yet another problem with the district court's analysis is that it considered evidence of a deficit to be evidence of a strength so long as Mr. Bourgeois eventually learned to

---

[30] As Government expert Dr. Moore testified, relying on "verbal behavior" to assess adaptive behavior or intellectual disability is particularly inappropriate in a "case like this" where the person being evaluated "dissimilates" and "tends to want to make himself look better than he really is." Tr. 9/24/10 at 161–62.

perform the task. For instance, while noting that Mr. Bourgeois was slow to learn "his ABCs" as a child, the court stressed that it is a skill at which he now "excels." Bourgeois, 2011 WL 1930684, at *39; *see also id.* at *38 (court observing that Mr. Bourgeois had difficulty "becom[ing] proficient at driving," but was eventually able to do so). However, persons with mild ID, like everyone, can grow and mature. As Dr. Price acknowledged, "if [Mr. Bourgeois] relied on people to teach him things and was able eventually to learn to drive a truck and to . . . handle some financial matters and as an adult to dress himself, that doesn't mean he's not having adaptive deficits as a child. . . pre–18." Tr. 9/23/10 at 284–85; *see also* Tr. 9/20/10 at 104–05 ("[H]e got a lot of supports and he gradually learned to master [certain skills]. . . . [T]hat's not uncommon with people with mild mental retardation, they find people that will help them."). Thus, the question is not whether an individual ultimately acquires a skill, the question is "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." A0079 (DSM–5 at 37). The fact that Mr. Bourgeois was slower than his peers in learning the alphabet is evidence of impaired conceptual functioning as it demonstrated that he needed support "in one of more areas to meet age-related expectations." The fact that he "excels" in "his ABCs" as an adult does nothing to undermine this finding.

145.   Also, as it did in its prong–one analysis, the district court departed from clinical standards by treating risk factors as alternate explanations for Mr. Bourgeois's deficits. Specifically, the court theorized that Petitioner's poor academic performance may have been due to "his unstable home life" or "the hampering effects of a deprived home environment." *Bourgeois*, 2011 WL 1930684, at *41; *see also id.* at *44 ("To the extent that Bourgeois may have had difficulties when younger, the record does not *conclusively link* those problems to

mental retardation rather than a culturally deprived upbringing, poverty, or abuse."). But an unstable home life, deprived upbringing, poverty, and abuse are all risk factors that *support* a diagnosis of intellectual disability. As *Moore–I* explains, an individual's "record of academic failure, along with the childhood abuse and suffering he endured," are "traumatic experiences [that] count in the medical community as '*risk factors*' for intellectual disability." *Moore–I*, 137 S. Ct. at 1051. Accordingly, "clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Id*.

146.    Similarly, the district court treated comorbidities as alternative explanations to Mr. Bourgeois's deficits, rather than supporting evidence of his adaptive deficits, as is appropriate under clinical standards. As noted *supra*, *Moore–I* rejected any requirement that defendants prove that adaptive deficits were not related to other mental health issues as "mental–health professionals recognize [that] many intellectually disabled people also have other mental or physical impairments." *Moore–I*, 137 S. Ct. at 1051; *see also Moore–II*, 139 S. Ct. at 671 (criticizing CCA for determining on remand that Moore failed to show that the "cause of [his] deficient social behavior was related to any deficits in general mental abilities" rather than "emotional problems"). The district court took the opposite approach to comorbidities, minimizing Mr. Bourgeois's poor adaptive behavior because it was "more likely related to his personality disorder, especially his impulsivity and sense of entitlement." *Bourgeois*, 2011 WL 1930684, at *41.

147.    In sum, Mr. Bourgeois has presented overwhelming evidence that he satisfies the criteria for a diagnosis of intellectual disability under current clinical standards, and the district court's 2011 denial of *Atkins* relief carries no weight after *Moore–I* and *Moore–II*.

67

### 3.   This claim is reviewable under § 2241.

148.   The principles from *Moore–I* and *Moore–II* articulated above were not available to Mr. Bourgeois during his initial § 2255 proceedings. In rejecting his *Atkins* claim in 2011, the district court relied on Fifth Circuit jurisprudence, including *Webster*, that was not invalidated until 2017, when the Supreme Court decided *Moore–I*. Accordingly, post–*Moore–I*, Mr. Bourgeois was in the same position as the petitioner in *Cathey*, in which the Fifth Circuit determined that *Atkins* was "previously unavailable" to a petitioner who had filed his first habeas petition after *Atkins* was decided because, under the now–invalidated nonclinical standards applied in the Fifth Circuit at that time, he did not qualify as intellectually disabled. *See Cathey*, 857 F.3d at 233 (an *Atkins* claim was previously unavailable to Mr. Cathey because "a claim must have some possibility of merit to be considered available"). Nevertheless, the Fifth Circuit denied Mr. Bourgeois's attempt to renew his *Atkins* claim via a successive § 2255 petition, relying on procedural grounds unrelated to the merits of his claim. Accordingly, § 2255 is plainly not an effective mechanism by which Mr. Bourgeois can raise his meritorious *Atkins* claim under the new law established in *Moore–I* and *Moore–II*, meaning this court has jurisdiction under § 2241.

149.   Additionally, the new diagnostic criteria cited above from the AAIDD–12, the AAIDD–15, and the DSM–5, each of which was published after the district court denied Mr. Bourgeois's § 2255 petition, constitute new factual bases not available at the time of his § 2255 proceedings. As the Fifth Circuit recently recognized in granting a state habeas petitioner's request to file a successive petition to raise an *Atkins* claim under current standards, the "DSM–5 manual *changed the diagnostic framework* for intellectual disability." *In re Johnson*, 2019 WL 3814384, at *5 (5th Cir. 2019). The court also affirmed that "it is correct to equate legal

68

availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at 6.

150.    Among the specific changes to the diagnostic framework relevant to Mr. Bourgeois's claim is that the DSM–5 makes clear that IQ test scores must be evaluated pursuant to "clinical judgment," not the court's lay assessment of a petitioner's "true" intellectual abilities. A0079 (DSM–5 at 37); *see also In re Johnson*, 2019 WL 3814384, at *5 (noting that the DSM–5 "included significant changes in the diagnosis of intellectual disability, which changed the focus from specific IQ scores to clinical judgment"). Likewise, while the AAIDD mandated application of the Flynn Effect as early as 2007, the APA did not do so prior to the publication of the DSM–5 in 2013, and the AAIDD–15 reiterated the AAIDD's earlier position. *See supra* Section III.B.1.

151.    Furthermore, under prong two, both the AAIDD–12 and the DSM–5 made clear that it is critical to avoid the use of stereotypes in assessing adaptive functioning, specifically identifying a number of the same factors relied upon by the district court in Mr. Bourgeois's case as erroneous misconceptions about persons with ID. *See supra* Section III.C.2; A0134 (AAIDD–12 at 26); A0076–77 (DSM–5 at 34–35).

152.    Another new development relevant to prong two of Mr. Bourgeois's claim is that the DSM–5 now includes descriptors of the typical adaptive functioning for individuals with significant deficits in each of the three domains. *See* A0076–78 (DSM–5 at 34–36).

153.    As discussed above, the DSM–5 also did away with the DSM–IV–TR's provision that, "by their late teens," individuals with mild intellectual disability could "acquire academic skills up to approximately the sixth–grade level." DSM–IV–TR at 43. By contrast, the DSM–5

summarizes the level of functioning necessary for significant impairments in the conceptual

domain as follows:

> For school–age children and adults, there are difficulties in learning academic
> skills involving reading, writing, arithmetic, time, or money, with support needed
> in one or more areas to meet age–related expectations. In adults, abstract thinking,
> executive function . . ., and short–term memory, as well as functional use of
> academic skills (e.g., reading, money management) are impaired.

A0076 (DSM–5 at 34). This difference reinforces the fact that the district court's *Atkins*

determination violates *current* diagnostic standards. The district court relied on the fact that

certain achievement test scores were at the seventh or eighth grade, rather than the elementary

school, level. The DSM-5 does not require elementary school functioning to establish academic

deficits, only that functioning in this area be impaired. As discussed *supra*, the achievement

testing showed that Mr. Bourgeois's academic functioning has more than met this standard.

Moreover, even if Mr. Bourgeois's academic functioning showed no deficits, under current

diagnostic standards, this would do nothing to preclude a finding of ID as academic functioning

is only one aspect of one domain. A relative strength in this area would do nothing to rule-out

deficits in other areas of conceptual functioning or deficits in the social or practical domains. *See*

*supra* Section III.C.2.

154.  As explained above, the Fifth Circuit has afforded petitioners who were in a

nearly identical procedural posture to Mr. Bourgeois the opportunity to pursue *Atkins* relief

through successive habeas petitions. *See In re Cathey*, 857 F.3d at 232; *In re Johnson*, 2019 WL

3814384, at *5–6. It did so *prior to* Mr. Bourgeois's own request to file a successive *Atkins*

claim, finding that *Atkins* was "previously unavailable" to Mr. Cathey because the circuit's pre–

*Moore–I* precedent precluded a finding of intellectual disability at the time of his initial habeas

petition. *In re Cathey*, 857 F.3d at 232. And it did so *since* rejecting Mr. Bourgeois's request to

file a successor, finding that the publication of the DSM–5 had changed the diagnostic landscape

in a manner that rendered *Atkins* "previously unavailable" to Mr. Johnson. *In re Johnson*, 2019 WL 3814384, at *5–6. Mr. Bourgeois's *Atkins* claim relies on *both* legal and diagnostic changes that have occurred since his initial § 2255 petition. Nevertheless, the Fifth Circuit arbitrarily denied him the same opportunity for review that it granted to Mr. Cathey and Mr. Johnson. This disparate treatment starkly demonstrates that § 2241 is the only vehicle through which Mr. Bourgeois may challenge his unconstitutional sentence.

      **B.**     **Petitioner's Claim Challenges the Execution of his Sentence, as Well as the Fundamental Legality of that Sentence.**

155.     As explained above, § 2241 is the appropriate vehicle for claims that challenge the execution of a petitioner's sentence. This use of § 2241 has been explained as follows:

> [F]ederal prisoners challenging some aspect of the execution of their sentence, such as denial of parole, may proceed under Section 2241. This difference arises from the fact that Section 2255, which like Section 2241 confers habeas corpus jurisdiction over petitions from federal prisoners, is expressly limited to challenges to the validity of the petitioner sentence. Thus, Section 2241 is the only statute that confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence.

*Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001); *see also Valona*, 138 F.3d at 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241.").

156.     Here, Mr. Bourgeois is not claiming that his sentence violated *Atkins* at the time it was imposed. Rather, consistent with the Supreme Court's decision in *Moore–I*, he claims that the execution of his sentence would now be unconstitutional under newly recognized legal and diagnostic standards. *See Moore–I*, 137 S. Ct. at 1050–53 (reversing Texas's denial of petitioner's *Atkins* claim, in part, because Texas employed diagnostic standards in effect at the time of petitioner's sentencing, as opposed to those current at the time of post–conviction

review); *see also Atkins*, 536 U.S. at 320 (establishing "categorical rule making [intellectually disabled] offenders ineligible for the death penalty").

157.    Moreover, by its plain language, the FDPA states that "[a] sentence of death *shall not be carried out* upon a person who is mentally retarded." 18 U.S.C. § 3596(c); *see also United States v. Webster*, 162 F.3d 308, 352 (5th Cir. 1998) (finding significant Congress's "placement" of the intellectual–disability exemption among "restriction[s] on who could be executed . . . rather than in the earlier sections" on who could be sentenced to death). And legislative history tends to confirm that Congress understood the placement and language it was importing into the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution. *See* 136 Cong. Rec. S6873–03, S6876, 1990 WL 69446, 101st Cong., 2d Sess. (May 24, 1990) (comments by Sen. Hatch). Accordingly, Mr. Bourgeois's challenge goes to the execution of his sentence, making his claim appropriate under § 2241.

158.    Section 2241 is also the appropriate avenue of relief where the petitioner challenges the "fundamental legality" of his or her sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015). The *Webster* court held that the petitioner had properly filed a § 2241 petition to establish that his intellectual disability made him ineligible for the death penalty. It described the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id*. at 1139. It accordingly recognized that, where a "structural problem" prevents a petitioner from bringing a second § 2255 motion, the petitioner may in some circumstances (there, because of the availability of new facts), bring a § 2241 petition. *Id*. "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth

Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

159.     Under current legal and diagnostic standards, Mr. Bourgeois is an intellectually disabled person. As such, precluding him from raising his *Atkins* claim under § 2241 to challenge the execution and fundamental legality of his unconstitutional death sentence would lead to precisely the "intolerable result" against which the *Webster* court warned.

## **REQUEST FOR RELIEF**

For all of the above reasons, and based upon the full record of this matter, Petitioner

requests that the Court provide the following relief:

A)    That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

B)    That leave to amend this Petition, if necessary, be granted;

C)    That Respondents be Ordered to respond to this Petition;

D)    That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

E)    That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

F)    That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/ Peter Williams
Peter Williams
Victor J. Abreu
Katherine Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

74