## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| | : | |
| ALFRED BOURGEOIS, | : | CIVIL ACTION |
| | : | (Capital Habeas Corpus) |
| Petitioner, | : | |
| | : | Case No. 2:19-cv-392 |
| V. | : | |
| | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP–Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
| | : | |
| Respondents. | : | |
| | : | |

**APPENDIX TO**
**PETITION FOR WRIT OF HABEAS CORPUS**

**APPENDIX A**
**A0001 – A0227**

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

## Index to Appendix A

### Mental Health Expert Reports and Declarations

Declaration of Victoria Swanson, Ph.D. – 06/08/2009...........................................................A0001

Supplemental Report of Victoria Swanson, Ph.D. – 08/12/2010 ...........................................A0004

Dr. Victoria Swanson's ABAS Score Report ..........................................................................A0008

Dr. Victoria Swanson's WJ III Score Report – 08/19/2009 ...................................................A0020

Declaration of Mark D. Cunningham, Ph.D., ABPP – 05/11/2007.......................................A0021

Declaration of Michael M. Gelbort, Ph.D. – 05/11/2007 ......................................................A0039

Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W. – 05/04/2007 ...............................A0045

Declaration of Donald E. Weiner, Ph.D., dated 05/10/2007, and attached Report, dated 03/03/2004. ...........................................................................................................................A0053

Dr. Donald Weiner's Score Sheet from WAIS-R, Administered in 2004 ..............................A0060

### Diagnostic Manuals

Excerpt from Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition - ("DSM-5") ..............................................................................................................................A0061

Excerpt from *Intellectual Disability – Definition, Classification, and Systems of Supports -* AAIDD Definition Manual, 11th Edition ("AAIDD-10")......................................................A0084

Excerpt from *Intellectual Disability – Definition, Classification, and Systems of Supports -* AAIDD User's Guide, 11th Edition ("AAIDD-12 User's Guide")........................................A0127

Excerpt from *The Death Penalty and Intellectual Disability*, ("AAIDD-15"), Chapter 8: Intelligence Testing, by Dale G. Watson ...........................................................A0135

Excerpt from *The Death Penalty and Intellectual Disability*, ("AAIDD-15"), Chapter 10: Norm Obsolescence: The Flynn Effect, by Kevin S. McGrew...........................A0164

**Lay Witness Declarations**

Declaration of Michelle Armont ...................................................................................A0180

Declaration of Nathaniel Banks ...................................................................................A0183

Declaration of Murray Bourgeois .................................................................................A0185

Declaration of Wilmer Bourgeois, Sr. ..........................................................................A0187

Declaration of Lawanda Cook .....................................................................................A0189

Declaration of Beverly Frank .......................................................................................A0191

Declaration of Allen Henry ..........................................................................................A0194

Declaration of Jersey Henry .........................................................................................A0196

Declaration of Yvonne Robinson Joseph ......................................................................A0198

Declaration of Elnora Bourgeois McGuffey ..................................................................A0200

Declaration of Claudia Mitchell (2007) ........................................................................A0202

Declaration of Claudia Mitchell (2010) ........................................................................A0204

Declaration of Louis Russell, Jr. ..................................................................................A0205

Declaration of Ivy Thomas ..........................................................................................A0207

Declaration of Michelle Warren ...................................................................................A0209

Declaration of Claudia Williams ..................................................................................A0214

**Records**

Lutcher High School Transcript – 05/24/1983 ...............................................................A0216

Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson – 05/06/1985 ....................A0218

Psychological Evaluation by Morris & McDaniel, Inc. – 05/22/1985 ...............................A0219

Memorandum of Gerald Bierbaum to John Gilmore and Douglas Tinker, re: Interview of
Harry "Slick" Bourgeois, dated 03/03/2004 ..................................................................A0223

*United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Excerpt from Transcript of Sentencing Hearing: Day 2 – Testimony of Rev. Herman Clayton, Jr. -- 03/23/2004 ......................................................................................A0226

<u>DECLARATION AND AFFIDAVIT OF VICTORIA SWANSON, Ph.D.
PURSUANT TO 28 U.S.C. § 1746</u>

Victoria Swanson, Ph.D., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    I am a clinical psychologist. I obtained my doctorate in school psychology from Louisiana State University in 1999. My primary area of practice is providing psychological services and behavioral consultation to individuals with mental retardation and developmental delays, and to public and private providers of services to this population. I also provide services to children and adolescents with severe behavior disorders and significant academic challenges. I have done this work through my private practice since 2000.

2.    For my entire professional career I have been responsible for identifying and providing services to people with mental retardation. Before I entered into private practice, I served as the Director of Psychological Services at Southwest Louisiana Developmental Center in Iota, Louisiana; in that capacity, I managed the delivery of services to approximately 150 mentally retarded individuals living in publicly funded residential facilities and supportive living placements. I have worked with mentally ill and developmentally delayed individuals since 1973. I have worked as a social worker, a psychological examiner, a school psychologist, and an administrator. From 2003 to 2005, I served as the President of the National Psychology Division of the American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly the American Association on Mental Retardation (AAMR)). I have been qualified as an expert in psychology and as an expert in field of Mental Retardation multiple times in several jurisdictions. Most of my forensic practice centers in Louisiana. However, I have also been qualified as an expert in Alabama, Georgia, and Mississippi. My curriculum vitae is attached.

3.    I was asked by counsel to Alfred Bourgeois to conduct testing to determine his level of adaptive functioning as a child and to discern whether he qualifies for a diagnoses of mental retardation.  To accomplish this task, I have reviewed voluminous background materials about Mr. Bourgeois provided to me by counsel, including reports by psychologists and psychiatrists, affidavits by neighbors and relatives, and intelligence testing by Dr. Weiner and Dr. Gelbort.  The most recent neuropsychological evaluation reveals a full scale IQ of 70 on the WAIS-III, and Dr. Weiner's scoring (adjusted for the Flynn effect) also places him in the range of mental retardation.

4.    After reviewing these materials, in March, 2009, I administered the Vineland-II Adaptive Behavior Scale to Mrs. Beverly Frank.  Based on my review of materials and preliminary interview of Mrs. Frank, I learned that she is the granddaughter of Mary Clayton.  Mary Clayton was not related to Alfred Bourgeois, but was a member of his community and an elder in his family's church.  Due to the mistreatment she witnessed being perpetrated against Alfred at his home, Mrs. Clayton took Alfred into her home and cared for him as if he were her own child.  Mrs. Frank was a young adult at the time and visited her grandmother and Alfred almost daily.  She observed Alfred and several of her nieces and nephews near in age to Alfred, and therefore was able to report both Mr. Bourgeois' adaptive ability and compare his functioning to his peers.  Accordingly, she was a prime subject to whom to administer the Vineland–II instrument.

5.    Mr. Bourgeois scored a 66 on the Vineland- II.  On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization.  These scores place him well within the range of mental retardation in the sphere of adaptive deficits.  They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

6.    Based on my review of the records and my own testing, it is my opinion to a

reasonable degree of psychological certainty that Mr. Bourgeois is an individual with mental retardation.

7.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Victoria Swanson, Ph.D.

DATE: 6/8/09

**SWANSON & SWANSON CONSULTATION**
**P.O. BOX 80966**
**LAFAYETTE, LOUISIANA 70598**

Victoria Swanson, Ph.D.
LA Licensed Psychologist #864
National Health Service Provider in Psychology #50400
Voice: (337) 268-7754    FAX: (337) 232-1688
Email: VSwanson1@aol.com

Terry D. Swanson, M.S.
Examiner, Behavior Analyst
Voice: (337) 268-6099    FAX: (337) 232-1688
Email: TSwanson1@aol.com

August 12, 2010

Elizabeth Larin, Esq.
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
Suite 545 West- Curtis Building
Independence Square West
Philadelphia, PA 19106

                                                    Re Alfred Bourgeois

Dear Ms. Larin:

At your request I write to supplement the declaration I provided you in June, 2009, summarizing my opinion that Alfred Bourgeois is a person with mental retardation. This opinion was based on my testing of Mr. Bourgeois, my review of records and reports regarding Mr. Bourgeois, and my administration of adaptive deficit testing to Beverly Frank, the grand-daughter of Mr. Bourgeois' care giver in childhood.

Based upon my supplemental work on this case, my opinion remains unchanged.[1]

As in my initial declaration, I have used the widely accepted definition of mental retardation that requires significantly sub-average intellectual functioning as measured on individually administered standardized intelligence testing (generally, an IQ no higher than 70-75), significant deficits in adaptive functioning and onset before age 18.

1.    **Significantly Subaverage Intellectual Functioning**

Mr. Bourgeois possesses the intellectual deficits for a diagnosis of mental retardation. His IQ has been tested at a high of 75 (Dr. Weiner) and a low of 70 (Dr. Gelbort). Although Dr. Weiner administered an outdated test (WAIS R), both tests are acceptable for making a diagnosis.[2]

I have reviewed the raw data underlying each test and conclude that each was properly administered and accurately scored. His scores within the margin of error on tests properly administered and accurately scored years apart by two different testers, eliminates any suggestion that these scores are malingered or are in any way unreliable.

---

[1] A comprehensive list of all of my sources is attached.

[2] Although Dr. Weiner's score of 75 placed Mr. Bourgeois within the range of substantial intellectual deficits, I also base my opinion in this regard on the widely accepted and scientifically valid Flynn Effect, under which his score would be adjusted to about an 68.

1

Since it is acceptable to rely on previously administered testing for which I have been provided the underlying raw data, I have not performed additionally testing of Mr. Bourgeois intellectual functioning. I have noted that the Government's experts also have not administered additional IQ testing, despite having had the opportunity to do so.

## 2.    Adaptive Deficits.

In order to meet the second prong of the diagnostic criteria for mental retardation, a person must exhibit significant deficits in functioning in one of the three domains listed by the AAIDD, or in two of the ten domains listed by the APA.

The American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly, the American Association on Mental Retardation) encourages the use of standardized tests to assess adaptive functioning. Accordingly, prior to reaching the opinion set forth in my initial declaration, I administered the Vineland-II test for adaptive deficits to Mrs. Beverly Frank. The Vineland-II is the most reliable tool to measure adaptive functioning, in part because it is given in an interview format, which eliminates some errors that tend to occur with other popular testing instruments. I also administered the ABAS to Mrs. Frank. Results on both tests showed Mr. Bourgeois to have significant adaptive deficits.

The AAIDD also recommends that when making a retrospective assessment, such as in this case, that in addition to standardized testing, the evaluator obtain and consider multiple sources of data. It particularly encourages input from multiple knowledgeable informants. It is especially important that the evaluator attempt to secure such data from people, like Ms. Frank, who were in a position to observe the subject extensively, across multiple settings, over a long period of time. Such informants can also be supplemented with informants who had less ideal opportunities to observe, or who only observed the subject in one setting.

Therefore, since my last report, I have spoken with several such informants. In particular, I have spoken with Claudia Williams (maternal sister), Michelle Armont (paternal sister), Murray Bourgeois (maternal cousin), Carl Henry (maternal cousin and former co-worker), Lloyd Ferdinand (maternal brother), Donald Reese (former co-worker), Gwendolyn Thomas Smith (special education teacher in Lutcher, LA), and Fred Thompkins (former co-worker)

These interviews have given me additional insight into Mr. Bourgeois' functioning, and support my opinion that Mr. Bourgeois exhibited significant deficits in his adaptive functioning throughout his childhood and into adulthood. Mr. Bourgeois is significantly deficient under the rubric adopted by the AAIDD (which requires significant deficits in at least one of the three areas of functioning – conceptual, social, and practical), and under the definition endorsed by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Test Revision (DSM-IV-TR) (which requires significant deficits in two of ten listed skill areas). I have found that Mr. Bourgeois has significant deficits in all three realms listed by the AAIDD, and in at least three of the ten skill areas listed by the DSM (functional academics, health and safety, and social/interpersonal).

In reaching my opinion, I also considered that adaptive functioning means "independent" functioning; i.e. the measurement of adaptive functioning must consider one's functioning without support (such as that provided by family, co-workers, or girlfriends), and must take into account instances where the subject received supports. I also considered that the key inquiry is how the person functions within the community, and not in a structured setting such as a prison.

It is apparent from my interviews with Mr. Bourgeois' family, friends, and co-workers, that Mr. Bourgeois relied on the support of others in order to perform routine daily life activities.

2

A-0005

Conversely, his ability to function independently was significantly impaired.

**Deficits in the Conceptual Domain.** Mr. Bourgeois exhibits significant deficits in the conceptual domain. As demonstrated through the neuropsychological testing and through my own observations and evaluations, Mr. Bourgeois is deficient in his ability to absorb and understand information. He is significantly impaired in his ability to solve problems. He has a primitive understanding of current and historical events. He has difficulty understanding and managing money (a deficit that corresponds with difficulties in both the conceptual and the practical domains of functioning). Accordingly, Mr. Bourgeois is significantly impaired in the conceptual domain of adaptive functioning as described by the AAIDD.

Under the DSM's rubric, Mr. Bourgeois is significantly deficient in **Functional Academics**, a skill area that overlaps with the AAIDD's conceptual domain. Mr. Bourgeois' scores on standardized tests administered by me places him in the deficient range of academic functioning. Mr. Bourgeois was examined with the Woodcock-Johnson Third Edition Tests of Achievement (WJ-III) to determine current academic functioning as well as validate the consistently low academic functioning noted by individuals who knew him well throughout his life. The WJ-III (Mean, 100; SD, 15) is a wide range, comprehensive set of individually administered tests for measuring cognitive abilities, scholastic aptitudes, and achievement. The test assesses a wider range of academic areas at a greater depth than any other standardized, individually administered, academic battery currently available. The WJ-III is nationally standardized on subjects aged 24 months to 95 years of age, and is considered the "gold standard" for assessing academic abilities. Although Mr. Bourgeois attended four years of high school, his scores on the W-J-III are in the range of mental retardation.

Although no school records are available from his elementary years, reports indicate that Mr. Bourgeois failed a grade in early elementary school and that he participated in speech therapy. Reporters also advise that Mr. Bourgeois had significant problems in learning, and that relatives would spend hours with him every night reviewing his school work and trying to teach him basic skills, and that he was delayed when compared to his peers in areas like reading and counting money.

As is typical of individuals with mild mental retardation, Mr. Bourgeois relied on others to help him complete tasks that required functional academic skills. Reporters indicate that he routinely relied on classmates to complete his homework in high school. He completed job applications with the assistance of others. I have also learned that he was provided answers to some written tests required to obtain a drivers license.

Mr. Bourgeois' deficits in functional academics/conceptual skills is further evidenced by his difficulty in understanding and managing money. This is borne out by my interviews with informants and a review of documents regarding his finances.

**Deficits in the Practical Domain.** Mr. Bourgeois' history is significant for profound delays in learning new practical skills. For example, co-workers reveal that while a typical person would require four to six weeks to learn how to drive a commercial truck, Mr. Bourgeois took almost nine months to accomplish this task. He was sheltered at one trucking job by a relative who held a supervisory position, who allowed him the time and opportunity to be trained as a truck driver while under his employ.

However, friends and family report that even after Alfred started driving a truck, he continued to misjudge his surroundings and had many incidents where he ran over mailboxes, frequently got lost while on route to his destination, had multiple speeding tickets, and injured

3

himself on – and off – the job.

It is apparent from my conversations with people who knew Alfred well, that he would ask people to join him on his over the road jobs so that they could help him with directions and other tasks.

The reporters I spoke with noticed deficits in Mr. Bourgeois' practical skills starting at an early age. For example, he was delayed compared to his peers in learning simple skills like tying his shoes and counting money. It took young Alfred much more time than his peers to learn how to ride a bike.

Under the DSM's rubric, one area of deficit in the practical realm where Mr. Bourgeois was deficient was in **Health and Safety**. Multiple informants and documents review provided me with information about Mr. Bourgeois' significant problems staying safe and his lack of regard for safety. For example, he let his thirteen year old son drive his big rig truck on the highway. One informant described an incident in which he stood up and turned around to talk to her, leaving the driver's seat empty as the truck rumbled down the highway. Still another informant revealed a serious near-accident where Mr. Bourgeois drove a semi-trailer off the road. This same reporter told how Mr. Bourgeois became lost on trips.

A review of Mr. Bourgeois' medical records and driving records also reveals the difficulties Mr. Bourgeois had in keeping himself safe. For example, at the age of 20, Mr. Bourgeois drove himself into a pole, causing himself serious injury. The records show several other incidents that very likely were due to his lack of insight and knowledge about health and safety. Two other accidents while driving a truck sent him to the emergency room, once with a broken arm (his arm got stuck in the driving wheel), and once after he was pinned between a truck and a loading dock.

As noted, his driving record shows multiple tickets for speeding and other infractions. He once was disqualified from driving a truck for 60 days due to serious driving infractions.

**Deficits in the Social Domain/ Social/ Interpersonal Skills.** Although Mr. Bourgeois is verbally loquacious, it is clear that he has deficits in social functioning. All of the reporters and affiants I spoke with told me that Mr. Bourgeois was absolutely unable to participate in a two-way conversation. Mr. Bourgeois tended to talk at people instead of with them. My testing as well as the nueropsyhcological testing done by Drs. Gelbort and Weiner indicates that Mr. Bourgeois is significantly impaired in his ability to process and recall information. This helps explain Mr. Bourgeois' habit of dominating conversations and his inability to adequately participate in the give and take of a normal conversation.

Again, Mr. Bourgeois had informal supports to help him initiate and maintain any semblance of relationships. Family tolerated Mr. Bourgeois' odd manner.

In my view, Mr. Bourgeois is significanlty impaired in the social relam of adaptive functioning under both the AAIDD and the DSM rubrics.

3.     **Time of Onset**

Based upon my evaluation of all of these sources, it is absolutely clear that the onset of Mr. Bourgeois' deficiencies in both his intellectual and adaptive functioning began before age 18 and continued into adulthood. Documents, testing and information provided to me all show that the above-described deficits in intellect and functioning are life-long.

Please let me know if I can be of any further assistance.

Sincerely,

Victoria Swanson, Ph.D.

4



**ABAS II**
*Adaptive Behavior Assessment System® II*
SECOND EDITION

Patti L. Harrison
Thomas Oakland

*Retrospective*

# Parent Form

*Ages 5–21*

## CHILD INFORMATION

Child's Name: *Alfred Bourgeois*  7-0-0  Age: _____  Grade: _____
   First     Middle     Last

School: _____  City: *LAPLACE*  State: *LA*

Sex: ☐ Female ☒ Male

| | Month | Day | Year |
|---|---|---|---|
| Today's Date | | | |
| Date of Birth | 6 | 20 | 69 |

Does the child have any disabling conditions? ☐ Yes ☐ No

If yes, please describe: _____

Race/Ethnicity: ☒ African American    ☐ Asian    ☐ Native American

              ☐ Hispanic    ☐ White    ☐ Other: _____

The child has:   ☐ No job    ☐ Part-time job    ☐ Full-time job

## PARENT INFORMATION

Parent's Name: _____  Occupation: _____
   First     Last

Number of siblings the child has at home:

☐ None    ☐ 1    ☐ 2    ☐ 3 or more

Your relationship to the child you are rating:

☐ Parent    ☐ Guardian    ☐ Other: _____



**THE PSYCHOLOGICAL CORPORATION®**

A Harcourt Assessment Company

To order, call 1-800-872-1726

Copyright © 2003, 2000 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.
3  4  5  6  7  8  9  10  11  12  A  B  C  D  E

ISBN 015400461-8



9 780154 004611

A-0008

# Directions

The *Adaptive Behavior Assessment System–Second Edition* is designed to measure important behaviors an individual displays at home, school, work, and other settings. The behaviors included on this scale range from those suitable for young children to those suitable for adults. Some items may seem too difficult for younger children while others may seem too easy for older children. Therefore, your child is likely to display some but not all behaviors included on this scale.

## Please read and answer ALL items

Rate the child according to how often he or she **correctly** performs a behavior, **without help,** when the behavior needs to be displayed. The rating you choose should reflect the frequency with which the child performs the behavior without help, **when it is needed.** Record your response for each item by circling one of the following:

**0**    **Is Not Able**

**1**    **Never** or **Almost Never When Needed**

**2**    **Sometimes When Needed**

**3**    **Always** or **Almost Always When Needed**

Then evaluate whether you have observed the behavior or if you are guessing about the frequency of its occurrence. If your rating is based on a guess, put a check (✓) in the box marked **Check If You Guessed.** If your answer is based on observation or direct knowledge, leave this column blank.

The following example shows how to complete the Rating Form:

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed | Comments |
|---|---|---|---|---|---|---|
| 4. Names 20 or more familiar objects. | 0 | 1 | 2 | ③ | ☐ | ○ |
| 5. Tells parents, friends, or others about his/her favorite activities. | 0 | 1 | ② | 3 | ☐ | ○ |
| 6. Uses sentences with a noun and a verb. | ⓪ | 1 | 2 | 3 | ☑ | ○ |

In the example above, the child being rated **Always** (or Almost Always) names 20 or more familiar objects when needed; **Sometimes** tells parents, friends, or others about his/her favorite activities; and **Is Not Able** to use sentences with a noun and a verb. The ratings of Items 4 and 5 are based on observation or direct knowledge; therefore the **Check If You Guessed** column is left blank. The rater guessed on Item 6, so the **Check If You Guessed** column is marked.

②

**ABAS-II** PARENT (Ages 5–21)

## Summary Page

Patti L. Harrison • Thomas Oakland

*Adaptive Behavior Assessment System® II — SECOND EDITION*

Child's Name: Alfred (First) ___ (Middle) Bourgeois (Last)

Grade: _____  ID: _____

Rater's Name: Beverly Frash

Assessment Professional: J. Swanson

| | Year | Month | Day |
|---|---|---|---|
| Today's Date | 21 | 7 | 20 |
| Date of Birth | 64 | 6 | 20 |
| Age | 7 | 1 | |

### Raw Score to Scaled Score Conversions
(See Table A.5.)

| Skill Areas | | Raw Scores | Scaled Scores | | | |
|---|---|---|---|---|---|---|
| Communication | (Com) | 8 | | | | |
| Community Use | (CU) | 9 | | | | |
| Functional Academics | (FA) | 1 | | | | |
| Home Living | (HL) | 8 | | | | |
| Health and Safety | (HS) | 13 | | | | |
| Leisure | (LS) | 11 | | | | |
| Self-Care | (SC) | 15 | | | | |
| Self-Direction | (SD) | 11 | | | | |
| Social | (Soc) | 8 | | | | |
| (Work) | (WK) | — ( ) | | | | |
| Sums of Scaled Scores | | | | | | |
| Composite | | GAC | CON | SO | PR | |

### Sum of Scaled Scores to Composite Score Conversions
(See Table A.6.)

| Composite | Sum of Scaled Scores | Composite Score | Percentile Rank | Confidence Interval ___% |
|---|---|---|---|---|
| GAC | | | | — |
| Conceptual | | | | — |
| Social | | | | — |
| Practical | | | | — |

### Skill Area Scaled Score Profile

| | Conceptual | | | Social | | Practical | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Com | FA | SD | LS | Soc | CU | HL | HS | SC | WK |

19 18 17 16 15 14 13 12 11 10 9 8 7 6 5 4 3 2 1

### Composite Score Profile

| GAC | CON | SO | PR |
|---|---|---|---|

160 150 140 130 120 110 100 90 80 70 60 50 40

(12)

A-0010

**ABAS–II** PARENT (Ages 5–2'

The following table is provided to further assist you in filling out this form.

| Rating | The child: |
|---|---|
| **0** **Is Not Able** | • cannot perform the behavior, • is too young to have tried the behavior, or • has a physical condition that prevents the behavior. |
| **1** **Never or Almost When Needed** | has the ability to perform the behavior, but • never or almost never does it when needed; or • never or almost never does it on his/her own without being reminded. |
| **2** **Sometimes When Needed** | has the ability to perform the behavior, and • only does it sometimes when needed; • sometimes does it without help, but sometimes needs help; or • sometimes does it on his/her own, but sometimes needs to be reminded. |
| **3** **Always or Almost Always When Needed** | has the ability to perform the behavior, and • displays the behavior most or all of the time without being reminded; or • displayed the behavior at a younger age, but has now outgrown it. |

| Column | Check this column if: |
|---|---|
| **Check If You Guessed** | • your rating was an estimate. • you have never seen the child in a situation in which the behavior is needed. • the child has not had the opportunity to perform the behavior. |
| **Comments** | • you do not understand an item.* • you feel it would be helpful to discuss an item with the assessment professional.* |

*\* You may make a brief note of your concerns in the **Notes** box on page 10 of this Rating Form.*

## Communication

| | Is Not Able | BEHAVIOR FREQUENCY Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Says the names of other people, for example, "Mama," "Daddy," or friends' names. | 0 | 1 | (2) | 3 | ☐ |
| 2. Shakes head or says "yes" or "no" in response to a simple question, for example, "Do you want something to drink?" | 0 | (1) | 2 | 3 | ☐ |
| 3. Says "Hello" and "Good-bye" to others. | 0 | (1) | 2 | 3 | ☐ |
| 4. Names 20 or more familiar objects. | (0) | 1 | 2 | 3 | ☐ |
| 5. Tells parents, friends, or others about his/her favorite activities. | 0 | (1) | 2 | 3 | ☐ |
| 6. Uses sentences with a noun and a verb. | (0) | 1 | 2 | 3 | ☐ |
| 7. Speaks clearly and distinctly. | (0) | 1 | 2 | 3 | ☐ |
| 8. Looks at others' faces when they are talking. | 0 | (1) | 2 | 3 | ☐ |
| 9. Pays attention during family discussions for as long as needed. | (0) | 1 | 2 | 3 | ☐ |
| 10. Answers the telephone appropriately. | 0 | (1) | 2 | 3 | ☐ |
| 11. Listens closely for at least five minutes when people talk. | (0) | 1 | 2 | 3 | ☐ |
| 12. Nods or smiles to encourage others when they are talking. | (0) | 1 | 2 | 3 | ☐ |
| 13. Repeats stories or jokes after hearing them from others. | (0) | 1 | 2 | 3 | ☐ |
| 14. Says irregular plural nouns, for example, *knives* or *mice*. | (0) | 1 | 2 | 3 | ☐ |
| 15. Ends conversations appropriately. | 0 | (1) | 2 | 3 | ☐ |
| 16. Takes turns talking during conversations with people—is not too talkative or too quiet. | (0) | 1 | 2 | 3 | ☐ |

*continued*

(3)

A-0011

**ABAS–II** PARENT (Ages 5–21)

## Communication *continued*

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 17. Gives verbal instructions that involve two or more steps or activities. | 0 | 1 | 2 | 3 | ☐ |
| 18. States his/her own telephone number. | 0 | 1 | 2 | 3 | ☐ |
| 19. Starts conversations on topics of interest to others. | 0 | 1 | 2 | 3 | ☐ |
| 20. Talks about realistic future educational or career goals. | 0 | 1 | 2 | 3 | ☐ |
| 21. Places local telephone calls. | 0 | 1 | 2 | 3 | ☐ |
| 22. States home address, including zip code. | 0 | 1 | 2 | 3 | ☐ |
| 23. Answers complex questions that require careful thoughts and opinions, for example, questions about politics or current events. | 0 | 1 | 2 | 3 | ☐ |
| 24. Uses up-to-date information to discuss current events. | 0 | 1 | 2 | 3 | ☐ |

Total **8** / 72 Total Guessed

## Community Use

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Looks both ways before crossing a street or parking lot. | 0 | 1 | 2 | 3 | ☐ |
| 2. Orders his/her own meals when eating out. | 0 | 1 | 2 | 3 | ☐ |
| 3. Finds the restrooms in public places. | 0 | 1 | 2 | 3 | ☐ |
| 4. Packs his/her own clothing and supplies for overnight trips. | 0 | 1 | 2 | 3 | ☐ |
| 5. Uses the school or local library to check out books, use reference materials, or for other purposes. | 0 | 1 | 2 | 3 | ☐ |
| 6. Follows another's directions to nearby places. | 0 | 1 | 2 | 3 | ☐ |
| 7. Carries enough money to make small purchases, for example, a soft drink. | 0 | 1 | 2 | 3 | ☐ |
| 8. Walks alone to friends' houses in the neighborhood. | 0 | 1 | 2 | 3 | ☐ |
| 9. Mails letters at the postal box or local post office. | 0 | 1 | 2 | 3 | ☐ |
| 10. Finds a specific department in a store or business, for example, customer service department in a bank or laundry supplies in a store. | 0 | 1 | 2 | 3 | ☐ |
| 11. Walks or rides bike alone to locations within a one-mile or five-block radius of home or school. | 0 | 1 | 2 | 3 | ☐ |
| 12. Carries personal identification when traveling to nearby places in the community. | 0 | 1 | 2 | 3 | ☐ |
| 13. States general address of a travel destination, for example, "On Washington Avenue, near Lake Street." | 0 | 1 | 2 | 3 | ☐ |
| 14. Asks other people's advice on where to shop. | 0 | 1 | 2 | 3 | ☐ |
| 15. Finds and uses a pay phone. | 0 | 1 | 2 | 3 | ☐ |
| 16. Asks store clerk for product information before buying an item. | 0 | 1 | 2 | 3 | ☐ |
| 17. Relies on himself/herself for travel in the community, for example, walks or uses public transportation, a bicycle, or a car. | 0 | 1 | 2 | 3 | ☐ |
| 18. Takes other people on trips to nearby places, for example, takes a younger child to a park. | 0 | 1 | 2 | 3 | ☐ |
| 19. Tells others about a store's hours of operation, for example, "10 a.m. to 9 p.m." | 0 | 1 | 2 | 3 | ☐ |
| 20. Shops for friends and family who may be unable to shop. | 0 | 1 | 2 | 3 | ☐ |
| 21. Calls to find out if a repair or order is ready. | 0 | 1 | 2 | 3 | ☐ |
| 22. Calls a repairperson if, for example, the air conditioner or heater is not working. | 0 | 1 | 2 | 3 | ☐ |
| 23. Calls a doctor or hospital when ill or hurt. | 0 | 1 | 2 | 3 | ☐ |

Total **9** / 69 Total Guessed

④

Printed from copy

## unctional Academics

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Reads his/her own written name. | 0 | ① | 2 | 3 | ☐ |
| 2. Writes his/her own first and last name. | ⓪ | 1 | 2 | 3 | ☐ |
| 3. States the days of the week in order. | ⓪ | 1 | 2 | 3 | ☐ |
| 4. States time and day of favorite television shows. | ⓪ | 1 | 2 | 3 | ☐ |
| 5. Reads and obeys common signs, for example, *Do Not Enter, Exit,* or *Stop.* | ⓪ | 1 | 2 | 3 | ☐ |
| 6. Keeps score when playing games. | ⓪ | 1 | 2 | 3 | ☐ |
| 7. Locates important dates on a calendar, for example, birthdays or holidays. | ⓪ | 1 | 2 | 3 | ☐ |
| 8. Reads and follows a daily classroom or work schedule. | ⓪ | 1 | 2 | 3 | ☐ |
| 9. Weighs himself/herself or other objects correctly using a scale. | ⓪ | 1 | 2 | 3 | ☐ |
| 10. Writes his/her own address, including zip code. | ⓪ | 1 | 2 | 3 | ☐ |
| 11. Measures length and height. | ⓪ | 1 | 2 | 3 | ☐ |
| 12. Tells time correctly, using a watch or a clock with hands. | ⓪ | 1 | 2 | 3 | ☐ |
| 13. Gives clerk the necessary amount of money when purchasing items. | ⓪ | 1 | 2 | 3 | ☐ |
| 14. Writes letters, notes, or e-mails. | ⓪ | 1 | 2 | 3 | ☐ |
| 15. Reads menus at restaurants. | ⓪ | 1 | 2 | 3 | ☐ |
| 16. Follows a favorite interest or current event by reading newspapers, books, or other materials. | ⓪ | 1 | 2 | 3 | ☐ |
| 17. Finds somebody's telephone number in the phone book. | ⓪ | 1 | 2 | 3 | ☐ |
| 18. Makes reminder notes or lists. | ⓪ | 1 | 2 | 3 | ☐ |
| 19. Checks for correct change after buying an item. | ⓪ | 1 | 2 | 3 | ☐ |
| 20. Uses a dictionary or encyclopedia to find information. | ⓪ | 1 | 2 | 3 | ☐ |
| 21. Budgets money to cover expenses for at least one week. | ⓪ | 1 | 2 | 3 | ☐ |
| 22. Reads and follows instructions to assemble new purchases. | ⓪ | 1 | 2 | 3 | ☐ |
| 23. Reads classified ads for purchases and services. | ⓪ | 1 | 2 | 3 | ☐ |

Total ___1___ /69 Total Guessed

## Home Living

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Places dirty clothes in the proper place, for example, a hamper or clothesbasket. | 0 | 1 | ② | 3 | ☐ |
| 2. Wipes up spills at home. | 0 | ① | 2 | 3 | ☐ |
| 3. Picks up and throws away trash or paper at home. | 0 | 1 | ② | 3 | ☐ |
| 4. Assists in big clean-up projects at home, for example, spring cleaning or cleaning the garage. | ⓪ | 1 | 2 | 3 | ☐ |
| 5. Puts things in their proper place when finished using them. | 0 | ① | 2 | 3 | ☐ |
| 6. Keeps toys, games, or other belongings neat and clean. | 0 | ① | 2 | 3 | ☐ |
| 7. Wipes wet or dirty shoes before entering a building. | 0 | ① | 2 | 3 | ☐ |
| 8. Clears the table completely after a meal. | ⓪ | 1 | 2 | 3 | ☐ |
| 9. Sweeps floor. | ⓪ | 1 | 2 | 3 | ☐ |
| 10. Cleans room or living quarters regularly. | ⓪ | 1 | 2 | 3 | ☐ |
| 11. Makes his/her own bed. | ⓪ | 1 | 2 | 3 | ☐ |
| 12. Dusts furniture until it is clean. | ⓪ | 1 | 2 | 3 | ☐ |
| 13. Folds clean clothes. | ⓪ | 1 | 2 | 3 | ☐ |

⑤ *continued*

A-0013

**ABAS-II** PARENT (Ages 5–21)

## Home Living *continued*

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 14. Makes simple meals that require no cooking, for example, sandwiches or salads. | ⓪ | 1 | 2 | 3 | ☐ |
| 15. Operates a microwave oven. | ⓪ | 1 | 2 | 3 | ☐ |
| 16. Washes dishes either by hand or by placing them in a dishwasher. | ⓪ | 1 | 2 | 3 | ☐ |
| 17. Takes out trash when can is full. | ⓪ | 1 | 2 | 3 | ☐ |
| 18. Uses small electrical appliances, for example, a can opener or blender. | ⓪ | 1 | 2 | 3 | ☐ |
| 19. Cleans bathroom with proper cleaning supplies. | ⓪ | 1 | 2 | 3 | ☐ |
| 20. Uses a clothes dryer. | ⓪ | 1 | 2 | 3 | ☐ |
| 21. Makes minor repairs to personal possessions, for example, bikes or clothes. | ⓪ | 1 | 2 | 3 | ☐ |
| 22. Cooks simple foods on a stove, for example, eggs or canned soup. | ⓪ | 1 | 2 | 3 | ☐ |
| 23. Uses a washing machine to wash clothes. | ⓪ | 1 | 2 | 3 | ☐ |
| 24. Mixes and cooks fairly complex foods on a stove or oven, for example, cake or brownies. | ⓪ | 1 | 2 | 3 | ☐ |
| 25. Performs minor household repairs, for example, a clogged drain or leaky faucet. | ⓪ | 1 | 2 | 3 | ☐ |

Total  8  / 75  Total Guessed

## Health and Safety

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Swallows liquid medicines if needed for illness. | 0 | 1 | 2 | ③ | ☐ |
| 2. Buckles his/her seat belt in a car. | 0 | 1 | ② | 3 | ☐ |
| 3. Shows caution around hot or dangerous items. | 0 | 1 | ② | 3 | ☐ |
| 4. Follows general safety rules at home. | 0 | ① | 2 | 3 | ☐ |
| 5. Follows general safety regulations at school or other public places. | 0 | ① | 2 | 3 | ☐ |
| 6. Goes to another place when too hot or too cold, for example, finds shade if too hot, goes indoors when too cold. | 0 | 1 | ② | 3 | ☐ |
| 7. Tests hot foods before eating them. | 0 | 1 | ② | 3 | ☐ |
| 8. Follows safety rules at park or playground. | ⓪ | 1 | 2 | 3 | ☐ |
| 9. Carries breakable objects safely and carefully. | ⓪ | 1 | 2 | 3 | ☐ |
| 10. Carries scissors safely. | ⓪ | 1 | 2 | 3 | ☐ |
| 11. Calls for help if someone is hurt at home. | ⓪ | 1 | 2 | 3 | ☐ |
| 12. Follows safety rules for fire or weather alarms at home. | ⓪ | 1 | 2 | 3 | ☐ |
| 13. Cares for his/her minor injuries, for example, paper cuts, knee scrapes, or nosebleeds. | ⓪ | 1 | 2 | 3 | ☐ |
| 14. Uses electrical outlets or sockets safely. | ⓪ | 1 | 2 | 3 | ☐ |
| 15. Asks to see school nurse or other school official when ill or hurt. | ⓪ | 1 | 2 | 3 | ☐ |
| 16. Swallows pills or capsules with water if needed for illness. | ⓪ | 1 | 2 | 3 | ☐ |
| 17. Helps younger children cross the street by taking their hands. | ⓪ | 1 | 2 | 3 | ☐ |
| 18. Maintains safety of bike or car. | ⓪ | 1 | 2 | 3 | ☐ |
| 19. Obeys traffic signals when riding a bike or driving a car. | ⓪ | 1 | 2 | 3 | ☐ |
| 20. Takes temperature with a thermometer when feeling sick. | ⓪ | 1 | 2 | 3 | ☐ |
| 21. Takes prescription medicines by himself/herself. | ⓪ | 1 | 2 | 3 | ☐ |
| 22. Buys over-the-counter medications when needed for illness. | ⓪ | 1 | 2 | 3 | ☐ |

Total  13  / 66  Total Guessed

⑥

A-0014

**ABAS–II** PARENT (Ages 5–2

## Leisure

| | Is Not Able | BEHAVIOR FREQUENCY — Never When Needed | BEHAVIOR FREQUENCY — Sometimes When Needed | BEHAVIOR FREQUENCY — Always When Needed | Check If You Guessed | Comments |
|---|---|---|---|---|---|---|
| 1. Plays with toys, games, or other fun items with other people. | 0 | 1 | (2) | 3 | ☐ | C |
| 2. Plays alone with toys, games, or other fun activities. | 0 | (1) | 2 | 3 | ☐ | C |
| 3. Looks at pictures or reads books or magazines during free time. | 0 | (1) | 2 | 3 | ☐ | C |
| 4. Attends fun activities at another's home. | 0 | 1 | 2 | 3 | ☐ | C |
| 5. Waits for his/her turn in games and other fun activities. | 0 | (1) | 2 | 3 | ☐ | C |
| 6. Invites others to join him/her in playing games and other fun activities. | (0) | 1 | 2 | 3 | ☐ | C |
| 7. Selects television programs or videotapes to keep up with an area of interest, for example, sports, music, or nature. | (0) | 1 | 2 | 3 | ☐ | C |
| 8. Follows the rules in games and other fun activities. | 0 | (1) | 2 | 3 | ☐ | C |
| 9. Listens to music for fun and relaxation. | 0 | (1) | 2 | 3 | ☐ | C |
| 10. Initiates games or selects TV programs liked by friends or family members. | (0) | 1 | 2 | 3 | ☐ | C |
| 11. Invites others home for a fun activity. | (0) | 1 | 2 | 3 | ☐ | C |
| 12. Participates in a specific fun activity on a routine basis, for example, listening to a certain type of music or playing a favorite computer game. | (0) | 1 | 2 | 3 | ☐ | C |
| 13. Invites others to go first in games, play, or other activities. | (0) | 1 | 2 | 3 | ☐ | C |
| 14. Attends fun community activities with others, for example, a movie or concert. | (0) | 1 | 2 | 3 | ☐ | C |
| 15. Participates in an organized program for a sport or hobby, for example, takes a music class or practices basketball. | 0 | (1) | 2 | 3 | ☐ | C |
| 16. Tries a new activity to learn about something new. | (0) | 1 | 2 | 3 | ☐ | C |
| 17. Plans ahead for play or fun activities on free days or afternoons. | 0 | (1) | 2 | 3 | ☐ | C |
| 18. Organizes a game or other fun activity for a group of friends without help from others. | (0) | 1 | 2 | 3 | ☐ | C |
| 19. Plans ahead for leisure activities during school breaks or vacations. | 0 | (1) | 2 | 3 | ☐ | C |
| 20. Has a hobby or creative activity that requires making or building something, for example, sewing, carpentry, or gardening. | 0 | (1) | 2 | 3 | ☐ | C |
| 21. Decides alone to join an organized group, for example, a club, sports team, or musical group. | (0) | 1 | 2 | 3 | ☐ | ○ |
| 22. Reserves tickets in advance for activities, for example, concerts or sports events. | (0) | 1 | 2 | 3 | ☐ | ○ |

Total _____ / 66   Total Guessed

## Self-Care

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed | |
|---|---|---|---|---|---|---|
| 1. Uses restroom at home without help. | 0 | 1 | 2 | (3) | ☐ | ○ |
| 2. Uses a fork to eat solid food. | (0) | 1 | 2 | 3 | ☐ | ○ |
| 3. Washes hands with soap. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 4. Brushes teeth. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 5. Blows and wipes nose with tissue or handkerchief. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 6. Drinks liquids without spilling. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 7. Has pleasant breath. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 8. Buttons his/her own clothing. | 0 | (1) | 2 | 3 | ☐ | ○ |
| 9. Puts shoes on correct feet. | 0 | 1 | (2) | 3 | ☐ | ○ |
| 10. Bathes daily. | 0 | (1) | 2 | 3 | ☐ | ○ |

continued

⑦

A-0015

**ABAS-II** PARENT (Ages 5–21)

## Self-Care *continued*

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 11. Dresses himself/herself. | 0 | (1) | 2 | 3 | ☐ |
| 12. Closes and locks door before using public restrooms. | (0) | 1 | 2 | 3 | ☐ |
| 13. Cleans or brushes himself/herself off if muddy or dirty. | (0) | 1 | 2 | 3 | ☐ |
| 14. Fastens and straightens clothing before leaving restroom. | 0 | (1) | 2 | 3 | ☐ |
| 15. Keeps hair neat during the day by brushing or combing. | (0) | 1 | 2 | 3 | ☐ |
| 16. Ties his/her own shoes. | 0 | (1) | 2 | 3 | ☐ |
| 17. Uses public restroom alone. | (0) | 1 | 2 | 3 | ☐ |
| 18. Washes his/her own hair. | (0) | 1 | 2 | 3 | ☐ |
| 19. Combines hot and cold water for shower or bath. | (0) | 1 | 2 | 3 | ☐ |
| 20. Washes and rinses sink after brushing teeth. | (0) | 1 | 2 | 3 | ☐ |
| 21. Cleans under fingernails. | (0) | 1 | 2 | 3 | ☐ |
| 22. Gets out of bed on time by himself/herself. | (0) | 1 | 2 | 3 | ☐ |
| 23. Cuts meats or other foods into bite size pieces. | (0) | 1 | 2 | 3 | ☐ |
| 24. Cuts or files his/her own fingernails and toenails on a regular basis. | (0) | 1 | 2 | 3 | ☐ |

Total **15** / 72 Total Guessed

## Self-Direction

| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
|---|---|---|---|---|---|
| 1. Works on one home or school activity for at least 15 minutes. | (0) | 1 | 2 | 3 | ☐ |
| 2. Completes routine household tasks within a reasonable amount of time. | 0 | (1) | 2 | 3 | ☐ |
| 3. Stops a fun activity, without complaints, when told that time is up. | 0 | (1) | 2 | 3 | ☐ |
| 4. Works independently and asks for help only when necessary. | (0) | 1 | 2 | 3 | ☐ |
| 5. Controls anger when another person breaks the rules in games and other fun activities. | 0 | (1) | 2 | 3 | ☐ |
| 6. Refrains from telling a lie to escape punishment. | 0 | (1) | 2 | 3 | ☐ |
| 7. Controls temper when disagreeing with friends. | 0 | (1) | 2 | 3 | ☐ |
| 8. Controls feelings when not getting his/her own way. | 0 | 1 | (2) | 3 | ☐ |
| 9. Controls disappointment when a favorite activity is canceled. | (0) | 1 | 2 | 3 | ☐ |
| 10. Works hard on assigned tasks or chores that are not liked. | 0 | 1 | (2) | 3 | ☐ |
| 11. Keeps working on hard tasks without becoming discouraged or quitting. | (0) | 1 | 2 | 3 | ☐ |
| 12. Keeps spending money in pocket, purse, or other safe place. | 0 | 1 | 2 | 3 | ☒ |
| 13. Saves money to buy something special, for example, a birthday present or game. | 0 | (1) | 2 | 3 | ☐ |
| 14. Puts school work over leisure activities. | 0 | (1) | 2 | 3 | ☐ |
| 15. When leaving home, informs others of destination and return time. | (0) | 1 | 2 | 3 | ☐ |
| 16. Completes large home or school projects on time. | (0) | 1 | 2 | 3 | ☐ |
| 17. Routinely arrives at places on time. | (0) | 1 | 2 | 3 | ☐ |
| 18. Gathers all supplies needed before beginning a cleaning or maintenance project at home. | (0) | 1 | 2 | 3 | ☐ |
| 19. Returns on time when requested to be back in one hour. | (0) | 1 | 2 | 3 | ☐ |

*continued*

⑧

A-0016

**ABAS–II** PARENT (Ages 5–2

## lf-Direction *continued*

| | | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed | |
|---|---|---|---|---|---|---|---|
| 20. | Goes out alone unsupervised in daytime. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 21. | Informs teacher in advance, if possible, when absence from school is necessary. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 22. | Cancels fun activity if something more important comes up. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 23. | Makes plans for home projects in logical steps. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 24. | Calls family or others when late. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 25. | Plans ahead to allow enough time to complete big projects. | ⓪ | 1 | 2 | 3 | ☐ | C |

Total 11 / 75 Total Guessed

## Social

| | | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed | |
|---|---|---|---|---|---|---|---|
| 1. | Has one or more friends. | 0 | 1 | ② | 3 | ☐ | C |
| 2. | Has good relationships with parents and other adults. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 3. | Seeks friendships with others in his/her age group. | 0 | ① | 2 | 3 | ☐ | C |
| 4. | Says "Thank you" when given a gift. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 5. | Says when he/she feels happy, sad, scared, or angry. | 0 | ① | 2 | 3 | ☐ | C |
| 6. | Laughs in response to funny comments or jokes. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 7. | Keeps a stable group of friends. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 8. | Stands a comfortable distance from others during conversations (not too close). | ⓪ | 1 | 2 | 3 | ☐ | C |
| 9. | Apologizes if he/she hurts the feelings of others. | ⓪ | 1 | 2 | 3 | ☐ | C |
| . | Moves out of another person's way without being asked. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 11. | Shows sympathy for others when they are sad or upset. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 12. | States when others seem happy, sad, scared, or angry. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 13. | Tries to please others by doing something special or giving them a surprise. | 0 | 1 | ② | 3 | ☐ | C |
| 14. | Offers assistance to others. | 0 | 1 | ② | 3 | ☐ | C |
| 15. | Offers to lend belongings to others, for example, clothes or tools. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 16. | Shows good judgment in selecting friends. | ⓪ | 1 | 2 | 3 | ☐ | C |
| 17. | Places reasonable demands on friends, for example, does not become upset when a friend plays with another friend. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 18. | Congratulates others when something good happens to them. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 19. | Refrains from saying something that might embarrass or hurt others. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 20. | Offers guests food or beverages. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 21. | Compliments others for good deeds or behavior, for example, honesty or kindness. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 22. | Personally makes or buys gifts for family members on major holidays. | ⓪ | 1 | 2 | 3 | ☐ | O |
| 23. | Listens to friends or family members who need to talk about problems. | ⓪ | 1 | 2 | 3 | ☐ | O |

Total 8 / 69 Total Guessed

⑨

A-0017

**ABAS–II** PARENT (Ages 5–21)

## Work

*Complete the* **Work** *skill area if the individual being rated holds a part-time or full-time job.*

| | | BEHAVIOR FREQUENCY | | | |
|---|:---:|:---:|:---:|:---:|:---:|
| | Is Not Able | Never When Needed | Sometimes When Needed | Always When Needed | Check If You Guessed |
| 1. Completes work assignments in required time limits. | 0 | 1 | 2 | 3 | ☐ |
| 2. Cleans up area after completing work. | 0 | 1 | 2 | 3 | ☐ |
| 3. Starts back to work willingly after taking a break or lunch. | 0 | 1 | 2 | 3 | ☐ |
| 4. Respects the property and rights of other workers. | 0 | 1 | 2 | 3 | ☐ |
| 5. Returns tools and other work-related items to their proper location after their use. | 0 | 1 | 2 | 3 | ☐ |
| 6. Helps other workers with their work without interfering with his/her own work. | 0 | 1 | 2 | 3 | ☐ |
| 7. Keeps working quickly and accurately, even with loud noises or distractions. | 0 | 1 | 2 | 3 | ☐ |
| 8. Performs tasks at work neatly. | 0 | 1 | 2 | 3 | ☐ |
| 9. Performs extra work on the job willingly. | 0 | 1 | 2 | 3 | ☐ |
| 10. Seeks help from supervisor, as needed, when work-related problems or questions arise. | 0 | 1 | 2 | 3 | ☐ |
| 11. Changes from one job-related task to another without special instructions from supervisor. | 0 | 1 | 2 | 3 | ☐ |
| 12. Checks his/her own work to determine if improvements are needed. | 0 | 1 | 2 | 3 | ☐ |
| 13. Shows positive attitude towards job. | 0 | 1 | 2 | 3 | ☐ |
| 14. Cares properly for work supplies and equipment. | 0 | 1 | 2 | 3 | ☐ |
| 15. Works quietly and does not disrupt or disturb the work of others. | 0 | 1 | 2 | 3 | ☐ |
| 16. Asks for directions, as needed, before beginning work tasks. | 0 | 1 | 2 | 3 | ☐ |
| 17. Attends work regularly. | 0 | 1 | 2 | 3 | ☐ |
| 18. Chooses work consistent with his/her own skills and abilities. | 0 | 1 | 2 | 3 | ☐ |
| 19. Follows daily work schedule without reminders from supervisor. | 0 | 1 | 2 | 3 | ☐ |
| 20. Works faster on the job as needed, for example, to keep on schedule or meet a deadline. | 0 | 1 | 2 | 3 | ☐ |
| 21. Behaves safely at work so that no one will be harmed. | 0 | 1 | 2 | 3 | ☐ |

Total ___ / 63 Total Guessed

## Notes

⑩

A-0018



## Supplemental Analyses

### Calculate the Skill Area Mean Scaled Scores

| | 9 Skill Areas (GAC) | Conceptual Domain | Practical Domain |
|---|---|---|---|
| Sum of Scaled Scores | | | |
| Number of Skill Areas | ÷ 9 | ÷ 3 | ÷ 4 |
| Mean Scaled Score | | | |

### Determine Strengths and Weaknesses

| Domain | Skill Areas | Skill Area Scaled Score | Mean Scaled Score | Difference from Mean | Critical Value | Strength or Weakness (S) or (W) | Base Rate in Standardization Sample |
|---|---|---|---|---|---|---|---|
| CON | Communication | | | | | | |
| CON | Functional Academics | | | | | | |
| CON | Self-Direction | | | | | | |
| SO | Leisure | | | | | | |
| SO | Social | | | | | | |
| PR | Community Use | | | | | | |
| PR | Home Living | | | | | | |
| PR | Health and Safety | | | | | | |
| PR | Self-Care | | | | | | |

**Comparison Group**
- ☐ GAC Mean
- ☐ Domain Means

**Statistical Significance Level**
- ☐ .15
- ☐ .05

To determine strengths and weaknesses see Table B.8 (GAC Mean), or Tables B.8, B.9, and B.10 (Domain Means).

### Discrepancy Comparisons

| Domain Composite | Score 1 | Score 2 | Difference | Critical Value | Significant Difference (Y) or (N) | Base Rate in Standardization Sample |
|---|---|---|---|---|---|---|
| Conceptual–Social | CON | SO | | | | |
| Conceptual–Practical | CON | PR | | | | |
| Social–Practical | SO | PR | | | | |

**Statistical Significance Level**
- ☐ .15
- ☐ .05

For discrepancy comparisons see Tables B.12 and B.13.



**Percent of cases under portions of the normal curve**

| Percent of Cases | 2.2 | 6.7 | 16.1 | 50 | 16.1 | 6.7 | 2.2 |
|---|---|---|---|---|---|---|---|
| Standard Scores | 70 | 80 | 90 | 100 | 110 | 120 | 130 |
| Qualitative Descriptions | Extremely Low | Borderline | Below Average | Average | Above Average | Superior | Very Superior |
| GAC/Composite Score Ranges | ≤70 | 71–79 | 80–89 | 90–109 | 110–119 | 120–129 | ≥130 |

⑪

## SCORE REPORT

Name: Bourgeois, Alfred  
Date of Birth: 08/20/1964  
Age: 45 years, 0 months  
Sex: Male  
Date of Testing: 08/19/2009  

School: n/a  
Teacher: n/a  
Examiner: Victoria C. Swanson, PhD  

### TABLE OF SCORES
*Woodcock-Johnson III Normative Update Tests of Achievement (Form A)*  
WJ III NU Compuscore and Profiles Program, Version 3.1  
Norms based on age 45-0  

| CLUSTER/Test | Raw | W | AE | EASY to | DIFF (based on age) | RPI | SS (68% Band) | GE |
|---|---|---|---|---|---|---|---|---|
| ORAL LANGUAGE (Std) | – | 494 | 8-6 | 6-5 | 12-9 | 71/90 | 80 (76-85) | 3.1 |
| LISTENING COMP | – | 497 | 9-5 | 7-11 | 11-10 | 43/90 | 85 (83-87) | 4.1 |
| BRIEF ACHIEVEMENT | – | 515 | 11-7 | 10-3 | 13-5 | 16/90 | 85 (83-86) | 6.2 |
| TOTAL ACHIEVEMENT | – | 506 | 10-10 | 9-5 | 12-10 | 32/90 | 81 (80-82) | 5.4 |
| BROAD READING | – | 507 | 11-2 | 9-8 | 13-1 | 22/90 | 83 (81-84) | 5.8 |
| BROAD MATH | – | 497 | 9-5 | 8-6 | 10-9 | 15/90 | 68 (66-71) | 4.1 |
| BROAD WRITTEN LANG | – | 513 | 12-8 | 10-7 | 16-6 | 69/90 | 92 (90-94) | 7.2 |
| BRIEF READING | – | 512 | 11-4 | 10-0 | 13-3 | 19/90 | 85 (83-86) | 5.9 |
| BRIEF MATH | – | 493 | 9-2 | 8-5 | 10-0 | 5/90 | 70 (67-73) | 3.8 |
| MATH CALC SKILLS | – | 507 | 11-1 | 9-7 | 13-5 | 58/90 | 82 (79-85) | 5.7 |
| WRITTEN EXPRESSION | – | 500 | 10-3 | 8-8 | 12-6 | 54/90 | 85 (82-88) | 4.9 |
| ACADEMIC FLUENCY | – | 502 | 10-11 | 8-11 | 13-4 | 54/90 | 83 (80-85) | 5.5 |
| ACADEMIC APPS | – | 489 | 8-7 | 7-10 | 9-8 | 7/90 | 74 (72-76) | 3.2 |
| Letter-Word Identification | 62 | 530 | 13-5 | 11-11 | 15-2 | 23/90 | 90 (89-92) | 8.0 |
| Reading Fluency | 43 | 498 | 10-8 | 8-6 | 12-10 | 30/90 | 81 (78-83) | 5.3 |
| Story Recall | – | 491 | 6-2 | 3-7 | 10-7 | 70/90 | 66 (57-76) | K.9 |
| Understanding Directions | – | 498 | 9-9 | 7-10 | 14-1 | 71/90 | 89 (85-93) | 4.4 |
| Calculation | 20 | 511 | 10-10 | 9-10 | 12-4 | 44/90 | 82 (78-86) | 5.5 |
| Math Fluency | 78 | 504 | 11-9 | 8-10 | 15-8 | 70/90 | 82 (80-84) | 6.3 |
| Spelling | 48 | 539 | 30 | 15-10 | >30 | 89/90 | 99 (97-102) | 13.0 |
| Writing Fluency | 18 | 504 | 10-8 | 9-2 | 12-6 | 61/90 | 89 (85-93) | 5.2 |
| Passage Comprehension | 28 | 494 | 8-10 | 7-11 | 10-5 | 16/90 | 80 (78-83) | 3.5 |
| Applied Problems | 28 | 476 | 8-1 | 7-7 | 8-8 | 0/90 | 63 (60-66) | 2.8 |
| Writing Samples | 14-C | 497 | 9-9 | 8-1 | 12-6 | 46/90 | 85 (82-89) | 4.4 |
| Story Recall-Delayed | – | 483 | 4-3 | <3-5 | 5-9 | 51/90 | 57 (41-72) | <K.0 |
| Oral Comprehension | 18 | 496 | 9-3 | 8-0 | 10-11 | 19/90 | 83 (80-86) | 3.9 |

**DECLARATION OF MARK D. CUNNINGHAM, PH.D.**
**PURSUANT TO 28 U.S.C. § 1746**

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare and certify the following:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in fifteen states including Texas.  I received a Bachelor's degree in Psychology from Abilene Christian College with high honors in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I served as active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981.  I have maintained a private practice in Texas since 1981.  My practice is national in scope.

2.      I am board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP).  This credential signifies the highest level of expertise and practice in forensic psychology.  I have provided forensic evaluation services in over 450 cases.  I have particular expertise in the area of capital sentencing issues, including mitigation and violence risk assessment.  I have testified as a clinical and forensic psychology expert regarding sentencing issues in approximately 75 state capital cases and 50 federal capital cases at trial, and in numerous cases in post-conviction or federal habeas proceedings.  I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in 31 states and Puerto Rico.  I have never been denied qualifications as an expert in clinical or forensic psychology.

3.      I am extensively involved in research and the authoring of scholarly publications relevant to capital sentencing issues and death row populations.  I have authored or co-authored over

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 1 of 18**

30 scholarly and peer-reviewed papers during the past nine years, including six published in 2006 and six others that are currently "in press." I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12 volume *Handbook of Psychology*.

4. I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred Bourgeois, as a clinical and forensic psychology expert in his capital trial proceedings in the United States District Court in the Southern District of Texas, Corpus Christi venue. I have been asked by Mr. Bourgeois' current federal defender counsel to provide this Declaration outlining my knowledge of Mr. Bourgeois and my involvement with his case at the trial level.

5. I was first contacted by Mr. Gilmore on June 30, 2003. At that time, he described that the trial was set for mid-September, and that the defense had "developed very little mitigating evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death penalty if convicted if they were not able to present mitigating evidence. I responded on July 1, 2003, and suggested that the defense hire a mitigation specialist. I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line. My own interviews and evaluation could not reasonably begin prior to this investigation. As neither this investigation nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.

6. Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 2 of 18**

his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

7.    A four-month continuance was obtained, and funding for a mitigation specialist was secured, and then I agreed to participate as an expert. I advised defense counsel that the mitigation investigation would have to proceed very aggressively in order for me to complete my evaluation and meet a disclosure deadline of mid-December. I understood my general role to be the provision of opinions regarding extant mitigating evidence, as well as Mr. Bourgeois' potential to make a positive adjustment to incarceration (also known as a risk assessment) – each of which are routine considerations in federal capital sentencing.

8.    Gerald Bierbaum and Lisa Milstein were retained as the mitigation specialists. I knew each of them and anticipated that, under the direction and coordination of defense counsel, they would be able to gather the records and conduct the types of third-party interviews that I require. However, it became apparent to me that defense counsel was not adequately monitoring and directing the mitigation investigation. On December 1, 2003, my office advised Mr. Gilmore that I had still not received any records, interview summaries, or investigation reports. Mr. Gilmore responded that he was "really not sure how this works," and did not know if he should be providing me with information or if the mitigation investigators should be providing this information to me directly. This again reflected a lack of familiarity with the functions of defense counsel in preparing for capital sentencing. In my experience, the responsibility for a mitigation investigation cannot be "outsourced" by retaining an investigator. I am also aware that defense counsel customarily reviews

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 3 of 18**

A-0023

the information gathered by the mitigation investigator prior to providing it to testifying experts to ensure its relevance, reliability and accuracy.   Though Mr. Gilmore reported that he was seeking another continuance in the face of the mitigation investigators' report to him that the investigation could not be completed by mid-February, he continued to give little indication of appreciating the time requirements of an adequate capital mitigation investigation.

9.	In my subsequent direct telephone contacts with Gerald Bierbaum in December 2003, I expressed my concern that my own evaluation was being critically compromised by the absence of case information. Mr. Bierbaum indicated that Ms. Milstein had been unable to direct her full attention to the case and that he was having to pick up her slack.  Still, interview summaries were not immediately forthcoming. When these summaries were provided and I began to perform my own follow-up interviews by telephone, it quickly became apparent that the history that had been obtained by Ms. Milstein was both inadequate in scope and plagued by fundamental errors of fact. As a result, I could not rely on the investigative memos, and was faced with the necessity of re-interviewing  the identified mitigation witnesses and potentially seeking other sources of information as well. Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner,  and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred.  Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

10.	In addition to conducting interviews and reviewing summaries of interviews, I conducted a clinical interview of Mr. Bourgeois (lasting about 5.5 hours) on February 7, 2004.  I

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 4 of 18**

reviewed documentary background material about Mr. Bourgeois and the offense. I was given reports generated by Dr. Carlos R. Estrada (Government-retained psychiatrist) and the defense-retained neuropsychologist, Dr. Donald E. Weiner. I would add that counsel had trouble scheduling Dr. Weiner's evaluation. I had recommended a neuropsychological evaluation, and I believe Dr. Estrada did as well, as there were many red flags indicative of potential brain damage in Mr. Bourgeois' background. On February 18, 2004, Mr. Gilmore informed me that he was unsure if the neuropsychological evaluation would be completed in time for trial, as testimony was scheduled to begin in early March, 2004. Eventually, Dr. Weiner was able to conduct his assessment and he generated a report dated March 3, 2004. The last-minute nature of this evaluation was a further indication to me that counsels' preparation of the fast-approaching penalty hearing was proceeding haphazardly.

11.    During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.

12.    The trial commenced in February, 2004 and I recall that the penalty phase started in

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 5 of 18**

mid-March.  Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial.  We did plan, however, for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd.  I arrived at my hotel in the mid-afternoon on March 21, 2004.  I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting.  Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions.  Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone.  However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night.  I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.

13.    I attended  the Court proceedings the next day and observed  the Government's examination of Dr. Estrada.  His testimony showed that he recognized that childhood abuse can impact adult behavior.   I was concerned, however, because Dr. Estrada's presentation did not address this question as it related to Mr. Bourgeois specifically.  It also did not address it from a mitigating perspective.  Instead, it focused only on why Mr. Bourgeois' history of abuse made him

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 6 of 18**

a continuing danger.  This turned the mitigating evidence on its head.  Instead of mitigating the offense, Mr. Bourgeois' history of savage abuse was used to aggravate.

14.     On cross-examination the defense did not develop and explain that impact from a mental health perspective.  As I recall, Dr. Estrada's testimony was limited in this regard to stating only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and had exhibited adult conduct that was consistent with such abuse.  I was quite cognizant that testimony elicited from Dr. Estrada was inadequate for the jury to appreciate the mitigating quality of this history of abuse.  Rather, if the jury were to recognize and give informed weight to Mr. Bourgeois' background, it had to hear testimony about these developmental experiences in much greater depth, as well as have the benefit of clear and detailed testimony regarding **why** this history mitigates, including the nexus between this history and Mr. Bourgeois' life adjustment and the instant offense conduct.  Had defense counsel dedicated time to conference with me, I would have advised them to anticipate this application of developmental history by a Government-retained mental health expert. I also would have equipped them with an understanding of scientifically-informed perspectives and data on violence risk assessment that would have equipped them to debunk the future danger implications advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

15.     A second appointment was made to meet with Mr. Tinker after court that day.  Much to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar for about 45 minutes.  Mr. Tinker had a drink.  It was my distinct impression that he was not particularly interested in my analysis of his client's disorders and deficits.  It was obvious from his questions that he had not yet looked at the materials that I sent to him, and he certainly was not familiar with them.  To illustrate, while I was discussing the mitigating evidence, he interrupted me

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 7 of 18**

A-0027

to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series of slides regarding that topic.  This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information.  Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had already provided to him.  When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois.  It was not in the trial notebooks that counsel had on their table.  Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. As evidenced by counsel not having this assessment in their critical records files, they apparently had not reviewed it or appreciated its implications.  Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

16.     In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing.   In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial.  Normally, counsel looks to  me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case.  Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

17.     Despite the brief nature of our hotel-bar "preparations," I was still confident that the

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 8 of 18**

important mitigation and risk assessment perspectives I had developed regarding Mr. Bourgeois would have significant impact on the jury's sentencing determination. Accordingly, I was flabbergasted when, after completing cross examination of Dr. Estrada and after the Government rested, counsel took a break to inform me that they would not be calling me as a witness. This decision was made without consultation or discussion with me.

18.    As noted, there was much to say regarding adverse factors in Mr. Bourgeois' background and the mitigating impact of these factors on his life, the vast bulk of which was not covered by Dr. Estrada.  Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred.  Mr. Bourgeois was raised in a overwhelmed family system.  His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age.  Eunice had seven children by four different men.  One son was profoundly mentally retarded and kept hidden in the home.  One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

19.    The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment.  Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support.  Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock.  Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois.   The effective abandonment by both parents has a significant impact on early child development.  The abandoned child is often unable to trust.  The child may grow up with an intense fear of abandonment and  be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 9 of 18**

20.    Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life.  People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age.  For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

21.    These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses.  Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention.  This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

22.    There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother.  More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois.  Eunice treated Alfred as a scapegoat.  Alfred was blamed when children were hurt in the playing field.  He was beaten more frequently and more brutally than his siblings.  She beat him with belts and extension cords.  These beatings were described as routinely leaving welts and bruises.  Eunice is also described as throwing shoes and other objects at him.  Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

23.    Eunice was also described as emotionally abusing Mr. Bourgeois.  Eunice told Alfred

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 10 of 18**

that he "wasn't worth nothing." Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois. There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes. At age 7-8, Eunice sent Alfred to live with an elderly neighbor, Ms. Mary Clayton. He was as a result excluded from family outings and trips. After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle. This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

24. As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor. While behavioral impacts can vary, all such victims suffer from psychological consequences. They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions. Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly. In Mr. Bourgeois' case the abuse was severe and long lasting. It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

25. Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76. Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an IQ score of 68. I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test). The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 11 of 18**

score of 68 in 2004. Both of these scores are in the range of mild mental retardation.

26.     Unfortunately, I was not provided with the IQ information in time to interview family members regarding ways in which Mr. Bourgeois' deficient intelligence was reflected in his practical functioning and day-to-day activities, i.e., whether he functions with significant adaptive deficits.

27.     Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning.  Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior.  Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

28.     Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage.  His siblings recalled that he had "rage attacks" even in his early childhood.   These attacks worsened in his teenage years.   Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged.  They reported that he would often tremble when angry.  The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation.  He would often have to be physically restrained by others.  After the attack, Mr. Bourgeois would appear exhausted.  He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

29.     The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well.  This includes marked changes in his demeanor, disproportionate responses, inability

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 12 of 18**

to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

30.    The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

31.    As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages. It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter. My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence. This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors. His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control. By any measure, this is mitigating in the context of capital sentencing.

32.    Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts, even though the abuse took place over days and weeks. Due to his deficits, he has

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 13 of 18**

a low tolerance for frustration, which becomes even worse in stressful situations. When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

33. I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently. I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury. Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring. He was able to maintain almost constant, if not steady, employment. He did his best to provide for his children materially and sometimes even emotionally. However, his background and psychological make-up always made him predisposed toward impulsivity and violence. Generally speaking, he was able to keep the lid on the pot. However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct. These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children. They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.

34. At the time of the offense, there were many ingredients simmering in the pressure cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 14 of 18**

35.     During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

36.     I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison.  In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence.  My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department.  The methodology and findings of my research are generally accepted by informed forensic psychologists.

37.     Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community.  Alfred is 39 years old.  Research demonstrates better prison adjustment as inmates get older.  Rates of prison infractions are highest for inmates in their early 20's.  These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

38.      This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard,

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 15 of 18**

however, that despite this suspicion he at times shared a common day room with other inmates. Significantly, Mr. Bourgeois had no disciplinary write-ups during that time. Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

39.     Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison. Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community. He has generally been gainfully employed as an adult. He is involved in an extensive family system. He attended church. He was an involved father. He provided financial support to his children.

40.     My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors. These studies consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

41.     Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education. The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction;  loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 16 of 18**

property; and administrative segregation (solitary confinement).  Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious violence is markedly diminished.

42.     As noted above, I have significant experience with capital trials. Drawing on this fund of experience, Mr. Bourgeois' case stands out for the inaccurate and incomplete portrayal of Alfred Bourgeois' functioning presented to the jury.  I believe trial counsel did not have an adequate understanding of the significance of mitigating evidence.  They did not have a detectable strategy for penalty phase.  They did not consult with me, their primary penalty phase witness, to help them develop a strategy or to explain the factors that had been identified from the limited investigation that time press had allowed.  In my opinion, the information I would have provided the jury could have significantly impacted their deliberations.  Without my testimony, and absent a clear defense strategy at the penalty phase, the jury had virtually no mitigating evidence to consider and no informed mechanism with which to consider his risk of violence in prison in the future.

43.     There is much more detail that I can provide about the facts and opinions expressed in this Declaration.  This Declaration presents my views in broad strokes and I would be happy to provide additional details at the request of the Court.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 17 of 18**

A-0037

I hereby certify that this Declaration is true to the best of my knowledge subject to the penalty for perjury.


Mark D. Cunningham, Ph.D., ABPP

Dated:        May 11, 2007
              College Station, Texas


**Declaration of Mark D. Cunningham, Ph.D.**
**Page 18 of 18**


A-0038

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PURSUANT TO 28 U.S.C. § 1746**

I, Michael Gelbort, Ph.D., do hereby declare and verify as follows:

1.          I am a licensed clinical psychologist, specializing in neuropsychology.  I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology at Texas Tech University in 1984.  I completed a post-doctoral fellowship in neuropsychology and medical psychology at the Rehabilitation Institute of Chicago in Chicago, Illinois, in 1985.  I subsequently served as the Chief Psychologist, then Director of Psychology at the Institute for Rehabilitation and Research in the Medical Center in Houston, Texas.  I was also on staff at Baylor College of Medicine and engaged in private practice, concentrating on psychological and neuropsychological evaluations.  After four years in those endeavors I returned to Chicago to pursue private practice with privileges at several hospitals.  My current practice concentrates on psychological and neuropsychological evaluation and diagnosis.  I also do extensive forensic work in the civil and criminal law fields.  I am licensed to practice in three states and have been qualified as an expert in neuropsychology in courts in many states and federal district courts.

2.          I have been asked by counsel for Mr. Alfred Bourgeois to conduct a neuropsychological evaluation of him in connection with federal capital case.   In preparation for this evaluation, I was provided with and reviewed extensive background materials, including a report of an evaluation conducted on Mr. Bourgeois by Donald Weiner, Ph.D. in 2004.

3.          I met with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana in April 2007.  I administered a number of standardardized intelligence, achievement and neuropsychological tests.  The results of my testing shows the following:

**Wechsler Adult Intelligence Scale III** (age corrected subtest-scaled scores)

1

A-0039

| | | | |
|---|---|---|---|
| Vocabulary | 4 | Picture Completion | 5 |
| Similarity | 4 | Digit Symbol | 11 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 8 | Matrix Reasoning | 5 |
| Information | 4 | Picture Arrangement | 5 |
| Comprehension | 3 | | |

| | |
|---|---|
| Verbal IQ: | 67 |
| Performance IQ: | 78 |
| Full Scale IQ: | 70 |

**Trail Making Test**

| | | |
|---|---|---|
| Part A | 30 seconds with 1 error | (deficient) |
| Part B | 78 seconds with 0 error | (borderline deficient) |

**Lateral Dominance**

Left side dominant with some ambidextrous signs

**Grip Strength**

Essentially equal bilaterally

**Sensory exam**

mild tactile higher level suppressions

**Category Test**

80 errors                              (moderate impairment)

Wide Range Achievement Test - III (standard score followed by percentile)

| | Standard Score | Percentile | Grade Equivalent |
|---|---|---|---|
| Reading | 85 | 16 | High School |
| Spelling | 100 | 50 | High School |
| Arithmetic | 74 | 4 | Grade 5 |

2

A-0040

**Wechsler Memory Scale - III**

Logical Memory I - mild impairment
Visual Immediate Memorization - mild impairment
Verbal Immediate Memorization - mild/moderate impairment
Visual Memory I - moderate impairment
Logical Memory II - mild/moderate impairment
Visual Long-term recall - moderate/severe impairment

**Conclusions and Analysis**

4.          The testing I administered was valid. Mr. Bourgeois gave a sincere effort. His results on my testing are quite similar to the testing administered by Dr. Weiner, indicating no malingering. His pattern of responses on all of the testing I administered are consistent with valid effort. For example, he performed relatively well in the early rounds of the tests, when the principles are very straightforward. As the tests became more difficult, he began to falter. This pattern reflects valid effort.

5.          Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The score of 76 must be understood and considered in perspective and application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration) is utilized to do so. In this instance, the WAIS-R was normed in 1978 and administered in 2004. Therefore, a "deduction" of 7.8 is warranted (26 years x .3 per year = 7.8). As such, the computed score of 76 would actually reflect in intellectual quotient value of 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted IQ score of 68 and the recent measured score of 70 obtained with the current version of the WAIS on my test administration.

6.          I have not formally assessed Alfred Bourgeois' adaptive functioning. However,

3

A-0041

my review of Mr. Bourgeois' history shows many of the tell-tale signs of adaptive skills deficits. For instance, he has had difficulty in maintaining social relationships. He has had difficulty with managing the affairs of everyday life, including money issues. He has a skewed view of himself in relationship to the rest of the world. These reports are indicative of impairment in the social and conceptual realms of adaptive functioning.

7.       Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobe abilities. This is most prominently evidenced by his impaired performance on the Category Test. This test is one of the most sensitive to both whole-brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is also supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

8.       I have reviewed Dr. Weiner's report. While our tests results are, for all intents and purposes, congruent, he concludes that Mr. Bourgeois' brain damage is localized in the posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming, for argument's sake, that Mr. Bourgeois has only damage to his posterior brain, there is still clear evidence of impairment of and impact on his executive functioning. Accordingly, wherever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension, and Trails B, demonstrate that his executive function is impaired.

9.       Executive functions act, in part, as the "brakes" for a person's actions. When there is impaired executive function, the individual may and often acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one

4

A-0042

considers the abusive childhood that he experienced. The adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid with his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

10. I understand that there is some disagreement over the etiology of Mr. Bourgeois' impairments. Dr. Weiner believed that they are due to a motor vehicle accident, and there is some question as to whether Mr. Bourgeois actually suffered a head injury in that accident. In a forensic setting, etiology is sometimes important. For example, in personal injury cases (e.g., subsequent to an auto accident) it is important to know if the damage identified by the neuropsychologist was due to the accident because that determination is relevant to whether the negligent party owes damages. However, in the criminal law setting, what is of significance is whether the deficits predate the event for which the individual has been accused rather than what is the proximate cause of the impairments. To be sure, it is helpful in deciding whether to conduct testing to know whether there are indicators of brain damage, such as child abuse or a head injury. However, neuropsychologoical testing results indicating dysfunction "stands on their own." Even in the absence of a determination of cause, this testing shows whether an individual's brain is intact or impaired. I am confident in stating that Mr. Bourgeois' impairments exist, even if the etiology is not completely clear.

I hereby declare and certify that the above facts and opinions are true and correct under penalty of perjury.

_____
Michael M. Gelbort, Ph.D.

Dated: Chicago, Illinois

11 May, 2007

5

A-0043

May 11, 2007

6

A-0044

DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB, M.S.S., M.L.S.P., L.S.W.
PURSUANT TO 28 U.S.C. § 1746

Kathleen Kaib, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Kathleen Kaib and I am employed as an investigator/mitigation specialist with the Federal Community Defender Office, Capital Habeas Unit. I graduated from Bryn Mawr Graduate School of Social Work and Social Research with a Masters degree in Social Service (equivalent to a Masters in Social Work) and a second Masters in Law and Social Policy. I am a licensed social worker in the state of Pennsylvania, and I am a certified domestic violence counselor. I have been in professional contact with and counseled many woman who have been the victims of domestic violence. I have extensive experience with diagnosing and assessment of mental health disorders, symptomatology and assessment of individuals with mental health deficits, including individuals with Borderline Personality Disorder. I also have significant experience in generating social histories.

2. All of the opinions expressed herein are stated to a reasonable degree of psychological certainly, and all facts are true to the best of my knowledge and recollection.

3. At the request of Alfred Bourgeois' current lawyers, I interviewed the following women about Mr. Bourgeois: Geralyn Dumas, Sheila Bourgeois, Cynthia Bourgeois, Gaynell Collins, Robin Bourgeois, and Ivy Thomas. I also reviewed the notes of an interview with Gaynell Belvin James which was conducted by my colleague Richard Ruffin, MSW, and I have spoken with Mr. Ruffin about his interview with Ms. James.

4. All of these women were either married to Mr. Bourgeois or were romantically

1

involved with him. Common to each of these relationships was that they were extremely intense and unstable. In the beginning of each relationship Mr. Bourgeois idealized each woman, and treated them wonderfully, but he quickly switched to devaluing them and ultimately became quite violent and abusive with them. It was readily apparent to me based upon my interviews, that Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.

5.    Mr. Bourgeois's relationship with Geralyn Dumas was the earliest relationship that I investigated. Geralyn and Mr. Bourgeois began a romantic relationship in 1979 and share a daughter, Bethany. In the beginning of their relationship Mr. Bourgeois was very attentive and kind, but this steadily deteriorated. Eventually Mr. Bourgeois demonstrated enormous rage. Geralyn was engaged to Mr. Bourgeois but never married him because he was constantly cheating on her with other women and he would have uncontrollable outbursts of anger. Geralyn maintained sporadic contact with Mr. Bourgeois long after their romantic relationship ended, because they had a child together. Bethany came home from visiting Mr. Bourgeois and reported that he was having sex with women other than his wife while Bethany was in the house.

6.    Gaynell Belvin James was Mr. Bourgeois's next significant relationship after Geralyn. They met in 1982 and she described that the relationship was tempestuous. Soon after they met she got pregnant with their son Anthony. The relationship was very short lived because Mr. Bourgeois became violent and she could not endure his frequent and dramatic mood shifts.

7.    Mr. Bourgeois next married Sheila Bourgeois in 1987, after only a few months of dating. When the relationship was in the very early stages Mr. Bourgeois confided in her that his mother was extremely cruel to him and would abuse him. The relationship was very good while

2

A-0046

they were dating, but after just a week of marriage he became verbally abusive and violent. Sheila stated that Mr. Bourgeois became extremely jealous and angry. To this day Sheila states that she has no idea how the relationship changed so drastically so quickly. One night Sheila was waiting for Mr. Bourgeois to come home from being out on the road as a truck driver. Mr. Bourgeois walked into the house and immediately began to choke her for no reason, and then just as suddenly as the attack began he walked away and went to sleep. This incident was never acknowledged or explained the next day.

8.    Sheila left Mr. Bourgeois four months after they married because he pushed her over a chair while she was three months pregnant with their daughter, Sherisha. Sheila stated that Mr. Bourgeois cheated on her during their entire marriage, and he did not seem to care about hiding it from her. Sheila stated that Mr. Bourgeois always had to have what his brother Lloyd had even when he could not afford such things. He would spend money on cars, and then they would not have enough money to buy groceries. She stated that he was very reckless with the way he spent money.

9.    In 1991, Mr. Bourgeois married Cynthia Bourgeois. They too only dated for a few months before they were married. During those first few months Mr. Bourgeois "wined and dined her." During this time Mr. Bourgeois confided that his mother physically and verbally abused him. Cynthia never wanted for anything during this period in their relationship and they had a wonderful time together, but after they were married Mr. Bourgeois completely changed. Cynthia said she did not even recognize the man that had, only a few months before, been so good to her. Mr. Bourgeois was extremely verbally abusive to her and he would fly into rages for no apparent reason. When Mr. Bourgeois would start to get upset she could see his eyes

3

A-0047

cloud over and said it was like she was looking at a different person. Their marriage did not last long because of his rages and jealousy.

10.    Mr. Bourgeois was then married to Gaynell Collins from 1993-1995. Once again, they only dated for a few months before they married. During their courtship Mr. Bourgeois treated her very well and took care of all her needs. Shortly after they were married, Mr. Bourgeois became very violent for no apparent reason. Gaynell noted that it was almost like he had a "split personality." During their marriage Gaynell left him about twenty times. Gaynell stated that she always knew when she would have to leave because she would hear a change in his voice. When he was beginning to enter one of his periods of rage his voice became deeper, and he would glare at her.

11.    While Gaynell was gone, Mr. Bourgeois would call her and try to convince her to come home. He would be really sweet for awhile, and would be attentive to her needs. The sweetness didn't last long and he would ultimately fly into one of his unexplained rages which caused her to leave again.

12.    Gaynell stated that Mr. Bourgeois would blame everyone else for his problems, and he would never take responsibility for anything. One time she said he didn't have enough money to pay the mortgage because he had spent the money on other things. He blamed her for not having enough money and wanted her to get another job. During their marriage Mr. Bourgeois cheated on her with a number of people including his next wife, Robin Bourgeois.

13.    Robin became pregnant with Alfredeisha in 1994 while Mr. Bourgeois was still married to Gaynell. Robin describes their relationship as very good in the beginning but soon after that Mr. Bourgeois devolved into periods of violent behavior. Robin stated that sometimes

4

Mr. Bourgeois would be calmly sitting watching television and then he would jump up and beat her. She never knew what sparked these mood changes. These impulsive, aggressive episodes were very common in their relationship.

14.    Robin also stated that Mr. Bourgeois was very jealous. He monitored every move Robin made and would have people spy on her so he would always know what she was doing. Robin stated that Mr. Bourgeois always had to have everything that his brother, Lloyd, had even when he could not afford it. It didn't seem to matter to him that the electricity would be off as long as he had the car he wanted. He was very reckless with money and with regard to his family responsibilities.

15.    While Mr. Bourgeois was married to Robin he was dating Ivy Thomas who lived in Birmingham, Alabama. He met Ivy while he was on the road as an over-the-road-truck driver. Ivy dated Mr. Bourgeois from 1995 until 1997 when she discovered he was cheating on her. Ivy describes their relationship as very good. Mr. Bourgeois showered her with expensive gifts, but he would lie to her as well. Ivy feels that Mr. Bourgeois thought he was telling the truth even when his lies were obvious. Ivy stated that Mr. Bourgeois saw things as all good or all bad and he didn't seem to see gray areas in his relationships with other people.

16.    Ivy recalled that Mr. Bourgeois revealed physical abuse by his mother, and how hurt he was by her. He told her that his mother sent him to live with someone else, and that depressed him. One of the times Mr. Bourgeois came to visit her he sent her out to the truck to get a present. She noticed a picture of a woman and a baby in his truck and asked him about them. Mr. Bourgeois said they were his sister's friends but Ivy confronted him and he ultimately confessed that it was his baby. He stated that he and Robin had a one night stand. Ivy broke up

5

with him because he was unfaithful. Ivy remembered that he called several times to try to win her back but she was adamant she did not want to be with someone who cheated on her.

17.    This history of tumultuous relationships marked by alternating periods of calm and periods of intense violence are indicators of a Borderline Personality Disorder. In these relationships Mr. Bourgeois married the woman only after a courtship lasting a few months. He formed an immediate and intense attachment to each woman. During the short time they dated he adored them but over time he was unable to continue his unabashed devotion. Instead, he entered into dark periods in which he would devalue and degrade them. In each relationship it is clear that Mr. Bourgeois was very impulsive in the areas of sexual relations, which was very damaging to his relationships and played a major role in their dissolution.

18.    Individuals with a Borderline disorder typically display intense and inappropriate anger directed at loved ones. In almost all of the relationships the women describe Mr. Bourgeois's anger as such. Many of the women stated that they never knew what would set Mr. Bourgeois off and make him so angry. Mr. Bourgeois could not control his anger and would lash out at those closest to him. It is very common in those with Borderline Personality Disorder to have a history of broken marriages because of their inability to have a stable relationship.

19.    A history of abandonment and abuse is often associated with Borderline Personality Disorder. Each of the women relate that Mr. Bourgeois described to them his history of childhood abuse and maternal abandonment. Mr. Bourgeois would tell the women very early on in their relationship and become very emotional as he related the story. Mr. Bourgeois told each woman that his mother hated him because he reminded her of his father, who abandoned her. Mr. Bourgeois stated that he was always treated like an outcast and was eventually sent to

6

live with another woman while the rest of his siblings remained at home. Mr. Bourgeois was abandoned by his father and his mother abused him and then ultimately abandoned him.

20.    Individuals with Borderline Personality Disorder typically do not have the capacity to see people as made up of both good and bad qualities. Mr. Bourgeois saw these women as all good and then all bad. All of the women consistently describe how Mr. Bourgeois would suddenly shift from treating them with love and respect to completely devaluing them by cheating on them or becoming abusive to them. Mr. Bourgeois would become angry with them when they would fail to live up to unrealistic expectations. This would leave the women feeling confused because they did not know what angered him and Mr. Bourgeois feeling abandoned by them. Mr. Bourgeois simply does not have the ability to see any of life's gray areas.

21.    Another key feature in individuals with Borderline Personality Disorder is their unstable self image or sense of self. Mr. Bourgeois displayed this through mimicking his older brother Lloyd. Many of the women Mr. Bourgeois was involved with noted that whatever Lloyd had Mr. Bourgeois had to have. If Lloyd bought a pool Mr. Bourgeois would buy a pool or if Lloyd would embark on a new career path than Mr. Bourgeois would follow him. It seemed as though Mr. Bourgeois did not know who he was without Lloyd's life as a template.

22.    Engaging in risky behaviors is often associated with this personality disorder. I also interviewed, Lawanda Cook, who is the cousin of Ivy Thomas. Lawanda related an experience in which she was riding in Mr. Bourgeois's truck and he got up out of his seat while he was driving to come talk to her. Lawanda completely panicked. Mr. Bourgeois told her that the truck would be fine even though there was no one driving it. She was so afraid that she never got into a truck again. This type of reckless conduct is also indicative of a Borderline Personality

7

A-0051

Disorder.

23.    Mr. Bourgeois would also spend money excessively.   He would buy cars that he could not afford, and then need his brother to help him out.  His electricity would frequently be turned off because he spent his money on other things.   One of his wives noted that he would fail to pay the mortgage and then blame others for his inability to pay.  The types of risky behavior recounted above, coupled with the fact that he engaged in frequent sexually risky behaviors, highlights the fact that he is impulsive in extremely self-damaging ways. This is another key feature found in individuals with Borderline Personality Disorder.

24.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Kathleen Kaib, MSS, MLSP, LSW

Dated: 5|4|07

8

A-0052

05/10/2007 10:11 FAX  215 861 3508          CAPITAL HABEAS UNIT                    ☒002/004

## DECLARATION OF DONALD E. WEINER, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Donald E. Weiner, Ph.D. do hereby declare and certify that the following is true and correct.

1.      I am a licensed psychologist with a specialty in neuropsychology. I am licensed to practice in Texas, and I maintain an office in Corpus Christi. I was contacted by trial counsel for Alfred Bourgeois and asked to conduct a neuropsychological test battery on him. I recall that my name was given to these lawyers (Mr. Tinker and Mr. Gilmore) by Carlos R. Estrada, M.D., with whom I have worked in the past.

2.      I also recall that there was great time urgency to their request. I was told that the trial had either started or was about to start and that the testing had to be done immediately. Due to the time constraints, I conducted my testing on a weekend (Saturday February 28, 2004), which is contrary to my custom. I gave priority to this request and generated my report on March 3. A copy of my report is attached to this statement. In more ideal circumstances, I would have perhaps conducted more testing and would certainly have sought outside sources to develop Mr. Bourgeois' psycho-social history. This was impossible given my limited time.

3.      As my report indicates, Mr. Bourgeois was impaired on a number of test instruments. The most notable finding was on the Category Test, which is a sub-test of the well known Halstead-Reitan battery. His score of 94 errors is significantly impaired. This score is notable because it shows deficits in his ability to function with new information and in unfamiliar settings. As I noted in my report, "Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions." In fact, I believe given his results that his judgement was

1

A-0053

significantly impaired. Although I have limited experience with capital sentencing, it would seem to me that this finding is mitigating.

4.      I would also note that Mr. Bourgeois scored a 76 on the WAIS-R IQ test. This places him in range of borderline intellectual functioning and is itself a significant finding.

5.      Although in my view my report presented important findings regarding Mr. Bourgeois' neuropsychological profile, I was not called as a witness at trial. As I understood the situation, the lawyers were concerned that my conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of my report. From a neuropsychological perspective, the **reason** that Mr. Bourgeois' brain is impaired is not nearly as critical as the **fact** that it is impaired. My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage.

6.      Even though Mr. Bourgeois may not have been accurate in his factual reporting, there was no sign that he malingered on the testing. Mr. Bourgeois' pattern of responses on all of his tests demonstrate that he was making a valid effort. This was not a "Fake Bad" result. In fact, I administered a standardized test to detect malingering called the Test of Memory Malingering (or TOMM). This test has two trials with 100 total questions. Mr. Bourgeois scored 47 on the first trial and a perfect 50 on the second. Because the test is essentially an easy set of tasks, and the subject is not told that it tests for malingering, it is expected that even impaired individuals will do quite well. When a person does poorly, malingering can be suspected. His scores of 47 and 50 are well within the standardized range showing that there was **no** malingering. The lawyers did not ask me about the significant finding that he applied a solid effort in the testing.

7.      The fact that Mr. Bourgeois misrepresented his own social history is also significant from a psychological standpoint. First, it is an example of his poor social judgment: lying to a

2

A-0054

05/10/2007 10:12 FAX  215 861 3508        CAPITAL HABEAS UNIT                    ☒ 004/004

defense expert was not in his best interest.  Second, it is possible that Mr. Bourgeois actually believed his own stories.  This would be a significant finding that would impact my diagnosis. Unfortunately, I was not given very much information regarding Mr. Bourgeois' history or personality.  In addition, the time constraints made it impossible for me to do more than administer the battery of neuropsychological tests. I was therefore unable to offer further explanation for Mr. Bourgeois' behavior.

I hereby certify that the above facts and opinions are correct to the best of my knowledge.

_____
Donald E. Weiner, Ph.D.

Dated:        Corpus Christi, Texas
              May 10, 2007

3

A-0055

**DONALD E. WEINER, Ph.D., FICPP, FPPR, P.C.**
Psychologist
5934 South Staples, Suite 206
Corpus Christi, Texas 78413

-

Telephone: (361) 994-0387
Board Certified, Diplomate-Fellow in Psychopharmacology of the
Prescribing Psychologists' Register, Inc. and the International College of Prescribing Psychologists
FACAPP -Founding Fellow of the American College of Advanced Practice Psychologists
FSMI -Board Certified, Diplomate-Fellow in Serious Mental Illness

## NEUROPSYCHOLOGICAL EVALUATION

| | | | |
|---|---|---|---|
| **NAME:** | Alfred Bourgeois | **DATE TESTED:** | 2-28-04 |
| **DOB:** | 6-20-64 | **DATE OF REPORT:** | 3-3-04 |
| **AGE:** | 39 | | |
| **SEX:** | Male | | |

### REASON FOR REFERRAL:
Mr. Bourgeois was referred for a neuropsychological evaluation to determine whether or not he has brain damage.

### BACKGROUND INFORMATION:
Mr. Bourgeois is currently being tried for capital murder. The present evaluation was conducted at the Federal Courthouse. The nature and purpose of the evaluation was explained to Mr. Bourgeois, and he consented to be tested. Mr. Bourgeois grew up in Louisiana. He denies any history of serious illnesses. Injuries include a broken nose when he was in elementary school, a three-wheeler accident in 1984 that resulted in his being in a coma for 1-2 months and being out of work for a year after this accident, and a truck accident in 1989 in which he broke his right collarbone and his left arm. Mr. Bourgeois stated that he became aggravated more easily after the 1984 accident, and this problem has continued up until the present. Mr. Bourgeois is not on any medication at the present time.

Mr. Bourgeois completed high school and about two months of college. He worked as an auxiliary deputy for a sheriff's department, and he has worked as a truck driver for the remainder of his work years. He made B's and C's in high school and was in all regular classes. He has three living brothers, one deceased brother, and two sisters. His parents were never married. He has a son 22 and a daughter 20 by two different woman, a daughter 16 by a previous marriage, and a daughter 9 by his current marriage of 7 ½ years. Mr. Bourgeois is charged with the death of his two-year-old daughter by his present marriage.

## TESTS ADMINISTERED:
Wechsler Adult Intelligence Scale – Revised
Wide Range Achievement Test – Third Edition
Halstead-Reitan Neuropsychological Test Battery for Adults
Test of Memory Malingering
Clinical Interview

## MENTAL STATUS:
Mr. Bourgeois was very cooperative during the testing and he appeared motivated to give his best performance. The present test results are believed to be a valid indication of his current level of neuropsychological functioning. His mood was neutral with appropriate affect. He reports some problems falling asleep. He has a history of migraine headaches. His appetite is poor, and he eats because he has to. He reports a 63-pound weight loss since his arrest 20 months ago. He has stomach cramps and diarrhea at times. He reports some dizziness. He denies any perceptual problems. He did not have problems with concentration in the past, but has had concentration problems since his arrest. He has a history of memory problems. He states that his wife has told him that he has sleep apnea. He describes himself as verbally outspoken when upset. He reports having felt depressed since his wife had an affair. He filed for divorce and then came back to his wife. He has been married four times.

Mr. Bourgeois has suicidal thoughts but states that he would not try to kill himself. He stated that he did attempt suicide 3-4 months after his arrest. He worries about his nine-year-old daughter who is in foster care. He denies any auditory or visual hallucinations but after his arrest for a period of time he heard voices and saw things.

Mr. Bourgeois denies any history of alcohol or drug abuse.

## TEST RESULTS AND INTERPRETATION:

### Wechsler Adult Intelligence Scale – Revised:
Mr. Bourgeois achieved a Verbal IQ of 76, a Performance IQ of 76, and a Full Scale IQ of 76, all of which are in the borderline range of intellectual functioning. His subtest scores are as follows: (note that the age equivalent scores are shown in parentheses after each subtest score)

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 5 (4) | Picture Completion | 4 (6) |
| Similarities | 5 (6) | Digit Symbol | 10 (11) |
| Arithmetic | 6 (6) | Picture Arrangement | 4 (5) |
| Vocabulary | 6 (6) | Block Design | 5 (7) |
| Comprehension | 5 (5) | Object Assembly | 2 (3) |
| Digit Span | 6 (7) | | |

When compared with individuals in his age range on the verbal subtests Mr. Bourgeois

A-0057

exhibited low average abilities in short-term auditory memory and mild deficits in long-range retention for specific facts and information, abstract reasoning, numerical computation, verbal expression, and social judgment. On the performance subtests he exhibited average abilities in visual motor memory and speed, low average abilities in non-verbal concept formation, mild deficits in distinguishing essential from non-essential details and non-verbal visual sequencing, and a significant deficit in assembling an object from its parts.

**Wide Range Achievement Test – Third Revision:**
Mr. Bourgeois achieved the following scores:

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Reading | 96 | high school |
| Spelling | 106 | high school |
| Arithmetic | 81 | sixth |

Mr. Bourgeois is functioning at the expected level for a high school graduate in reading and spelling. Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities.

**Halstead-Reitan Neuropsychological Test Battery for Adults:**
This battery is very sensitive to cerebral dysfunction. It consists of several individual tests which measure the following areas: abstraction and concept formation, motor functions, sensory functions, visual spatial skills, verbal abilities, incidental memory, alertness and concentrated attention, and general indicators of the level of cerebral functioning. A review of Mr. Bourgeois' performance on this battery shows indications of mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex. This cerebral damage is likely due to the injuries sustained in the three-wheeler accident which took place in 1984, resulting in a coma lasting one to two months. Mr. Bourgeois' score of 33 on the neuropsychological deficit scale is in the mild range of impairment. His score of 0.86 on the impairment index indicates that nearly all portions of the battery which contribute to this index were in the impaired range, although some tests were only slightly impaired.

On the Aphasia screening test, Mr. Bourgeois exhibited constructional dyspraxia (having difficulty copying a geometrical design). This is a right cerebral indicator. On the sensory perceptual examination, he made a large number of errors bilaterally on the fingertip number writing perception test. This finding is consistent with bilateral posterior cerebral damage, with greater right posterior cerebral damage, given the fact that he made many more errors with his dominant left hand.

On the strength of grip test, Mr. Bourgeois' grip strength was somewhat weaker than expected with his nondominant right hand. He reports having arthritis in both hands, with more arthritis in his right hand and this finding may be due to his arthritis. His finger tapping speed was adequate bilaterally.

A-0058

Mr. Bourgeois exhibited impairment on the Seashore rhythm test, which measures alertness and concentrated attention for non-verbal auditory stimuli. He exhibited impairment on two tests which serve as general indicators of the overall level of cerebral functioning. His time of one minute and thirty-three seconds on the Trailmaking test, part B is in the brain-damaged range. He had a very poor score of 94 errors on the Category test, which is a measure of learning in a new and unfamiliar learning situation. Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions.

Mr. Bourgeois had significant impairment on the Tactual Performance Test, which is a spatial problem-solving task. His total time of nearly twenty-seven minutes is well into the brain-damaged range. He had a poor score on a test measuring incidental spatial memory. His performance was slower than expected with his dominant left hand, and his poor performance on the Tactual Performance Test combined with adequate performance on the finger-tapping test indicates greater posterior cerebral damage.

**Test of Memory Malingering:**
Mr. Bourgeois' performance was well within normal limits and shows no indications of malingering.

## DIAGNOSTIC IMPRESSION:

Axis I        :        294.9, Cognitive Disorder – Mild cerebral damage with moderate posterior cerebral damage

## SUMMARY AND CONCLUSIONS:
Mr. Bourgeois is a thirty-nine year old male whose overall level of intellectual functioning is in the borderline range. He shows no indications of having any specific learning disabilities. Neuropsychological test results reveal overall mild cerebral impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident which took place in 1984, resulting in a coma lasting 1-2 months. A test of malingering shows no indications that Mr. Bourgeois was malingering, and the present test results are believed to be a valid indication of his overall level of cerebral functioning. Mr. Bourgeois shows some symptoms of depression, including poor sleep, poor appetite with significant weight loss, a previous suicide attempt, and current suicidal thoughts with no active suicidal intention. Mr. Bourgeois stated that he has become aggravated more easily since the 1984 accident, and his performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions.

Don Weiner, Ph.D.
Psychologist

A-0059

# WAIS-R RECORD FORM

WECHSLER ADULT INTELLIGENCE SCALE—REVISED

NAME _AB      22804_

ADDRESS _____

SEX _____ AGE _34_ RACE _____ MARITAL STATUS _____

OCCUPATION _____ EDUCATION _____

PLACE OF TESTING _____ TESTED BY _____

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | 32-33 | (57-61) | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | 11-12 | 23-26 | 28-29 | 48-52 | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | 13 | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | (9-10) | (20-28) | (6-7) | 11-13 | 11-13 | 11-12 | 5-7 | 14-19 | 21-23 | 37-43 | 6 |
| 5 | (6-8) | 8 | 14-19 | 5 | (8-10) | (7-10) | 8-10 | 3-4 | (8-13) | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | (5-7) | (2) | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | (6-8) | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

*Clinicians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to connect them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | | | |
| Date of Birth | | | |
| Age | | | |

### SUMMARY

| | Raw Score | Scaled Score |
|---|---|---|
| **VERBAL TESTS** | | |
| Information | 12 | 5 |
| Digit Span | 10 | 6 |
| Vocabulary | 21 | 6 |
| Arithmetic | 6 | 6 |
| Comprehension | 8 | 5 |
| Similarities | 8 | 5 |
| **Verbal Score** | | 33 |
| **PERFORMANCE TESTS** | | |
| Picture Completion | 7 | 4 |
| Picture Arrangement | 2 | 4 |
| Block Design | 13 | 5 |
| Object Assembly | 7 | 2 |
| Digit Symbol | 58 | 10 |
| **Performance Score** | | 25 |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 33 | 74 |
| PERFORMANCE | 25 | 76 |
| FULL SCALE | 58 | 73 |

THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, INC.

Copyright © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright © 1976 by The Psychological Corporation. No part of this form may be copied by any process without permission. All rights reserved.
Printed in U.S.A.

9-991829

A-0060



# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

### FIFTH EDITION

# DSM-5®

# AMERICAN PSYCHIATRIC ASSOCIATION

A-0061

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

# DSM-5®

A-0062

# American Psychiatric Association

*Officers 2012–2013*
PRESIDENT DILIP V. JESTE, M.D.
PRESIDENT-ELECT JEFFREY A. LIEBERMAN, M.D.
TREASURER DAVID FASSLER, M.D.
SECRETARY ROGER PEELE, M.D.

*Assembly*
SPEAKER R. SCOTT BENSON, M.D.
SPEAKER-ELECT MELINDA L. YOUNG, M.D.

*Board of Trustees*
JEFFREY AKAKA, M.D.
CAROL A. BERNSTEIN, M.D.
BRIAN CROWLEY, M.D.
ANITA S. EVERETT, M.D.
JEFFREY GELLER, M.D., M.P.H.
MARC DAVID GRAFF, M.D.
JAMES A. GREENE, M.D.
JUDITH F. KASHTAN, M.D.
MOLLY K. MCVOY, M.D.
JAMES E. NININGER, M.D.
JOHN M. OLDHAM, M.D.
ALAN F. SCHATZBERG, M.D.
ALIK S. WIDGE, M.D., PH.D.

ERIK R. VANDERLIP, M.D.,
MEMBER-IN-TRAINING TRUSTEE-ELECT

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®



AMERICAN PSYCHIATRIC ASSOCIATION
BENJAMIN RUSH
1844



AMERICAN
PSYCHIATRIC
ASSOCIATION
PUBLISHING

Copyright © 2013 American Psychiatric Association

DSM and DSM-5 are registered trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-554-1 (Hardcover) 2nd printing June 2013

ISBN 978-0-89042-555-8 (Paperback) 4th printing July 2017

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-5. — 5th ed.
    p. ; cm.
DSM-5
DSM-V
Includes index.
ISBN 978-0-89042-554-1 (hardcover : alk. paper) — ISBN 978-0-89042-555-8 (pbk. : alk. paper)
I. American Psychiatric Association. II. American Psychiatric Association. DSM-5 Task Force.
III. Title: DSM-5. IV. Title: DSM-V.
[DNLM: 1. Diagnostic and statistical manual of mental disorders. 5th ed. 2. Mental Disorders—classification. 3. Mental Disorders—diagnosis. WM 15]
RC455.2.C4
616.89'075—dc23

                                                                                2013011061

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Tammy J. Cordova

Manufacturing—LSC Communications

# Contents

DSM-5 Classification............................... xiii

Preface ...........................................xli

## Section I
### DSM-5 Basics

Introduction ........................................5

Use of the Manual ...................................19

Cautionary Statement for Forensic Use of DSM-5............25

## Section II
### Diagnostic Criteria and Codes

Neurodevelopmental Disorders ...........................31

Schizophrenia Spectrum and Other Psychotic Disorders......87

Bipolar and Related Disorders...........................123

Depressive Disorders ..................................155

Anxiety Disorders......................................189

Obsessive-Compulsive and Related Disorders ............235

Trauma- and Stressor-Related Disorders..................265

Dissociative Disorders .................................291

Somatic Symptom and Related Disorders .................309

Feeding and Eating Disorders ..........................329

Elimination Disorders .................................355

Sleep-Wake Disorders..................................361

Sexual Dysfunctions ..................................423

Gender Dysphoria ....................................451

Disruptive, Impulse-Control, and Conduct Disorders . . . . . . . . 461

Substance-Related and Addictive Disorders . . . . . . . . . . . . . . 481

Neurocognitive Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

Paraphilic Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

Other Mental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Medication-Induced Movement Disorders
  and Other Adverse Effects of Medication . . . . . . . . . . . . . . . . 709

Other Conditions That May Be a Focus of Clinical Attention . . 715

## Section III
### Emerging Measures and Models

Assessment Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Cultural Formulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

Alternative DSM-5 Model for Personality Disorders . . . . . . . . . 761

Conditions for Further Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

## Appendix

Highlights of Changes From DSM-IV to DSM-5 . . . . . . . . . . . . . 809

Glossary of Technical Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Glossary of Cultural Concepts of Distress . . . . . . . . . . . . . . . . . 833

Alphabetical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM and ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . 839

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 877

DSM-5 Advisors and Other Contributors . . . . . . . . . . . . . . . . . . 897

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917

# DSM-5 Task Force

DAVID J. KUPFER, M.D.
*Task Force Chair*

DARREL A. REGIER, M.D., M.P.H.
*Task Force Vice-Chair*

William E. Narrow, M.D., M.P.H.,
*Research Director*

Susan K. Schultz, M.D., *Text Editor*
Emily A. Kuhl, Ph.D., *APA Text Editor*

Dan G. Blazer, M.D., Ph.D., M.P.H.
Jack D. Burke Jr., M.D., M.P.H.
William T. Carpenter Jr., M.D.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Jan A. Fawcett, M.D.
Bridget F. Grant, Ph.D., Ph.D. *(2009–)*
Steven E. Hyman, M.D. *(2007–2012)*
Dilip V. Jeste, M.D. *(2007–2011)*
Helena C. Kraemer, Ph.D.
Daniel T. Mamah, M.D., M.P.E.
James P. McNulty, A.B., Sc.B.
Howard B. Moss, M.D. *(2007–2009)*

Charles P. O'Brien, M.D., Ph.D.
Roger Peele, M.D.
Katharine A. Phillips, M.D.
Daniel S. Pine, M.D.
Charles F. Reynolds III, M.D.
Maritza Rubio-Stipec, Sc.D.
David Shaffer, M.D.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.
B. Timothy Walsh, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kimberly A. Yonkers, M.D.
Kenneth J. Zucker, Ph.D.
Norman Sartorius, M.D., Ph.D., *Consultant*

## APA Division of Research Staff on DSM-5

Darrel A. Regier, M.D., M.P.H.,
*Director, Division of Research*
William E. Narrow, M.D., M.P.H.,
*Associate Director*
Emily A. Kuhl, Ph.D., *Senior Science Writer; Staff Text Editor*
Diana E. Clarke, Ph.D., M.Sc., *Research Statistician*

Lisa H. Greiner, M.S.S.A., *DSM-5 Field Trials Project Manager*
Eve K. Moscicki, Sc.D., M.P.H., *Director, Practice Research Network*
S. Janet Kuramoto, Ph.D. M.H.S., *Senior Scientific Research Associate, Practice Research Network*

Amy Porfiri, M.B.A.
*Director of Finance and Administration*

Jennifer J. Shupinka, *Assistant Director, DSM Operations*
Seung-Hee Hong, *DSM Senior Research Associate*
Anne R. Hiller, *DSM Research Associate*
Alison S. Beale, *DSM Research Associate*
Spencer R. Case, *DSM Research Associate*

Joyce C. West, Ph.D., M.P.P.,
*Health Policy Research Director, Practice Research Network*
Farifteh F. Duffy, Ph.D.,
*Quality Care Research Director, Practice Research Network*
Lisa M. Countis, *Field Operations Manager, Practice Research Network*

Christopher M. Reynolds,
*Executive Assistant*

## APA Office of the Medical Director

JAMES H. SCULLY JR., M.D.
*Medical Director and CEO*

## Editorial and Coding Consultants

Michael B. First, M.D.                    Maria N. Ward, M.Ed., RHIT, CCS-P

## DSM-5 Work Groups

### ADHD and Disruptive Behavior Disorders

DAVID SHAFFER, M.D.
*Chair*

F. XAVIER CASTELLANOS, M.D.
*Co-Chair*

Paul J. Frick, Ph.D., *Text Coordinator*          Luis Augusto Rohde, M.D., Sc.D.
Glorisa Canino, Ph.D.                              Rosemary Tannock, Ph.D.
Terrie E. Moffitt, Ph.D.                           Eric A. Taylor, M.B.
Joel T. Nigg, Ph.D.                                Richard Todd, Ph.D., M.D. (*d. 2008*)

### Anxiety, Obsessive-Compulsive Spectrum, Posttraumatic, and Dissociative Disorders

KATHARINE A. PHILLIPS, M.D.
*Chair*

Michelle G. Craske, Ph.D., *Text*          Scott L. Rauch, M.D.
  *Coordinator*                            H. Blair Simpson, M.D., Ph.D.
J. Gavin Andrews, M.D.                     David Spiegel, M.D.
Susan M. Bögels, Ph.D.                     Dan J. Stein, M.D., Ph.D.
Matthew J. Friedman, M.D., Ph.D.           Murray B. Stein, M.D.
Eric Hollander, M.D. (*2007–2009*)         Robert J. Ursano, M.D.
Roberto Lewis-Fernández, M.D., M.T.S.      Hans-Ulrich Wittchen, Ph.D.
Robert S. Pynoos, M.D., M.P.H.

### Childhood and Adolescent Disorders

DANIEL S. PINE, M.D.
*Chair*

Ronald E. Dahl, M.D.                       James F. Leckman, M.D.
E. Jane Costello, Ph.D. (*2007–2009*)      Ellen Leibenluft, M.D.
Regina Smith James, M.D.                   Judith H. L. Rapoport, M.D.
Rachel G. Klein, Ph.D.                     Charles H. Zeanah, M.D.

### Eating Disorders

B. TIMOTHY WALSH, M.D.
*Chair*

Stephen A. Wonderlich, Ph.D.,             Richard E. Kreipe, M.D.
  *Text Coordinator*                       Marsha D. Marcus, Ph.D.
Evelyn Attia, M.D.                         James E. Mitchell, M.D.
Anne E. Becker, M.D., Ph.D., Sc.M.         Ruth H. Striegel-Moore, Ph.D.
Rachel Bryant-Waugh, M.D.                  G. Terence Wilson, Ph.D.
Hans W. Hoek, M.D., Ph.D.                  Barbara E. Wolfe, Ph.D. A.P.R.N.

## Mood Disorders

JAN A. FAWCETT, M.D.
*Chair*

Ellen Frank, Ph.D., *Text Coordinator*
Jules Angst, M.D. *(2007–2008)*
William H. Coryell, M.D.
Lori L. Davis, M.D.
Raymond J. DePaulo, M.D.
Sir David Goldberg, M.D.
James S. Jackson, Ph.D.

Kenneth S. Kendler, M.D.
  *(2007–2010)*
Mario Maj, M.D., Ph.D.
Husseini K. Manji, M.D. *(2007–2008)*
Michael R. Phillips, M.D.
Trisha Suppes, M.D., Ph.D.
Carlos A. Zarate, M.D.

## Neurocognitive Disorders

DILIP V. JESTE, M.D. (2007–2011)
*Chair Emeritus*

DAN G. BLAZER, M.D., PH.D., M.P.H.
*Chair*

RONALD C. PETERSEN, M.D., PH.D.
*Co-Chair*

Mary Ganguli, M.D., M.P.H.,
  *Text Coordinator*
Deborah Blacker, M.D., Sc.D.
Warachal Faison, M.D. *(2007–2008)*

Igor Grant, M.D.
Eric J. Lenze, M.D.
Jane S. Paulsen, Ph.D.
Perminder S. Sachdev, M.D., Ph.D.

## Neurodevelopmental Disorders

SUSAN E. SWEDO, M.D.
*Chair*

Gillian Baird, M.A., M.B., B.Chir.,
  *Text Coordinator*
Edwin H. Cook Jr., M.D.
Francesca G. Happé, Ph.D.
James C. Harris, M.D.
Walter E. Kaufmann, M.D.
Bryan H. King, M.D.
Catherine E. Lord, Ph.D.

Joseph Piven, M.D.
Sally J. Rogers, Ph.D.
Sarah J. Spence, M.D., Ph.D.
Rosemary Tannock, Ph.D.
Fred Volkmar, M.D. *(2007–2009)*
Amy M. Wetherby, Ph.D.
Harry H. Wright, M.D.

## Personality and Personality Disorders[1]

ANDREW E. SKODOL, M.D.
*Chair*

JOHN M. OLDHAM, M.D.
*Co-Chair*

Robert F. Krueger, Ph.D., *Text
  Coordinator*
Renato D. Alarcon, M.D., M.P.H.
Carl C. Bell, M.D.
Donna S. Bender, Ph.D.

Lee Anna Clark, Ph.D.
W. John Livesley, M.D., Ph.D. *(2007–2012)*
Leslie C. Morey, Ph.D.
Larry J. Siever, M.D.
Roel Verheul, Ph.D. *(2008–2012)*

---

[1] The members of the Personality and Personality Disorders Work Group are responsible for the alternative DSM-5 model for personality disorders that is included in Section III. The Section II personality disorders criteria and text (with updating of the text) are retained from DSM-IV-TR.

## Psychotic Disorders

WILLIAM T. CARPENTER JR., M.D.
*Chair*

Deanna M. Barch, Ph.D., *Text Coordinator*
Juan R. Bustillo, M.D.
Wolfgang Gaebel, M.D.
Raquel E. Gur, M.D., Ph.D.
Stephan H. Heckers, M.D.
Dolores Malaspina, M.D., M.S.P.H.
Michael J. Owen, M.D., Ph.D.
Susan K. Schultz, M.D.
Rajiv Tandon, M.D.
Ming T. Tsuang, M.D., Ph.D.
Jim van Os, M.D.

## Sexual and Gender Identity Disorders

KENNETH J. ZUCKER, PH.D.
*Chair*

Lori Brotto, Ph.D., *Text Coordinator*
Irving M. Binik, Ph.D.
Ray M. Blanchard, Ph.D.
Peggy T. Cohen-Kettenis, Ph.D.
Jack Drescher, M.D.
Cynthia A. Graham, Ph.D.
Martin P. Kafka, M.D.
Richard B. Krueger, M.D.
Niklas Långström, M.D., Ph.D.
Heino F.L. Meyer-Bahlburg, Dr. rer. nat.
Friedemann Pfäfflin, M.D.
Robert Taylor Segraves, M.D., Ph.D.

## Sleep-Wake Disorders

CHARLES F. REYNOLDS III, M.D.
*Chair*

Ruth M. O'Hara, Ph.D., *Text Coordinator*
Charles M. Morin, Ph.D.
Allan I. Pack, Ph.D.
Kathy P. Parker, Ph.D., R.N.
Susan Redline, M.D., M.P.H.
Dieter Riemann, Ph.D.

## Somatic Symptom Disorders

JOEL E. DIMSDALE, M.D.
*Chair*

James L. Levenson, M.D., *Text Coordinator*
Arthur J. Barsky III, M.D.
Francis Creed, M.D.
Nancy Frasure-Smith, Ph.D. *(2007–2011)*
Michael R. Irwin, M.D.
Francis J. Keefe, Ph.D. *(2007–2011)*
Sing Lee, M.D.
Michael Sharpe, M.D.
Lawson R. Wulsin, M.D.

## Substance-Related Disorders

CHARLES P. O'BRIEN, M.D., PH.D.
*Chair*

THOMAS J. CROWLEY, M.D.
*Co-Chair*

Wilson M. Compton, M.D., M.P.E., *Text Coordinator*
Marc Auriacombe, M.D.
Guilherme L. G. Borges, M.D., Dr.Sc.
Kathleen K. Bucholz, Ph.D.
Alan J. Budney, Ph.D.
Bridget F. Grant, Ph.D., Ph.D.
Deborah S. Hasin, Ph.D.
Thomas R. Kosten, M.D. *(2007–2008)*
Walter Ling, M.D.
Spero M. Manson, Ph.D. *(2007-2008)*
A. Thomas McLellan, Ph.D. *(2007–2008)*
Nancy M. Petry, Ph.D.
Marc A. Schuckit, M.D.
Wim van den Brink, M.D., Ph.D. *(2007–2008)*

# DSM-5 Study Groups

## Diagnostic Spectra and DSM/ICD Harmonization

STEVEN E. HYMAN, M.D.
*Chair (2007–2012)*

William T. Carpenter Jr., M.D.
Wilson M. Compton, M.D., M.P.E.
Jan A. Fawcett, M.D.
Helena C. Kraemer, Ph.D.
David J. Kupfer, M.D.

William E. Narrow, M.D., M.P.H.
Charles P. O'Brien, M.D., Ph.D.
John M. Oldham, M.D.
Katharine A. Phillips, M.D.
Darrel A. Regier, M.D., M.P.H.

## Lifespan Developmental Approaches

ERIC J. LENZE, M.D.
*Chair*

SUSAN K. SCHULTZ, M.D.
*Chair Emeritus*

DANIEL S. PINE, M.D.
*Chair Emeritus*

Dan G. Blazer, M.D., Ph.D., M.P.H.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.

Daniel T. Mamah, M.D., M.P.E.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.

## Gender and Cross-Cultural Issues

KIMBERLY A. YONKERS, M.D.
*Chair*

ROBERTO LEWIS-FERNÁNDEZ, M.D., M.T.S.
*Co-Chair, Cross-Cultural Issues*

Renato D. Alarcon, M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Javier I. Escobar, M.D., M.Sc.
Ellen Frank, Ph.D.
James S. Jackson, Ph.D.
Spiro M. Manson, Ph.D. *(2007–2008)*
James P. McNulty, A.B., Sc.B.

Leslie C. Morey, Ph.D.
William E. Narrow, M.D., M.P.H.
Roger Peele, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kenneth J. Zucker, Ph.D.

## Psychiatric/General Medical Interface

LAWSON R. WULSIN, M.D.
*Chair*

Ronald E. Dahl, M.D.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Dilip V. Jeste, M.D. *(2007–2011)*
Walter E. Kaufmann, M.D.

Richard E. Kreipe, M.D.
Ronald C. Petersen, Ph.D., M.D.
Charles F. Reynolds III, M.D.
Robert Taylor Segraves, M.D., Ph.D.
B. Timothy Walsh, M.D.

### Impairment and Disability

JANE S. PAULSEN, PH.D.
*Chair*

J. Gavin Andrews, M.D.
Glorisa Canino, Ph.D.
Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Michelle G. Craske, Ph.D.

Hans W. Hoek, M.D., Ph.D.
Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

### Diagnostic Assessment Instruments

JACK D. BURKE JR., M.D., M.P.H.
*Chair*

Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Bridget F. Grant, Ph.D., Ph.D.

Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

## DSM-5 Research Group

WILLIAM E. NARROW, M.D., M.P.H.
*Chair*

Jack D. Burke Jr., M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Helena C. Kraemer, Ph.D.

David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.
David Shaffer, M.D.

## Course Specifiers and Glossary

WOLFGANG GAEBEL, M.D.
*Chair*

Ellen Frank, Ph.D.
Charles P. O'Brien, M.D., Ph.D.
Norman Sartorius, M.D., Ph.D.,
   *Consultant*
Susan K. Schultz, M.D.

Dan J. Stein, M.D., Ph.D.
Eric A. Taylor, M.B.
David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.

# DSM-5 Classification

Before each disorder name, ICD-9-CM codes are provided, followed by ICD-10-CM codes in parentheses. Blank lines indicate that either the ICD-9-CM or the ICD-10-CM code is not applicable. For some disorders, the code can be indicated only according to the subtype or specifier.

ICD-9-CM codes are to be used for coding purposes in the United States through September 30, 2015. ICD-10-CM codes are to be used starting October 1, 2015. For DSM-5 coding and other updates, see the DSM-5® Update on www.PsychiatryOnline.org.

Following chapter titles and disorder names, page numbers for the corresponding text or criteria are included in parentheses.

**Note for all mental disorders due to another medical condition:** Indicate the name of the other medical condition in the name of the mental disorder due to [the medical condition]. The code and name for the other medical condition should be listed first immediately before the mental disorder due to the medical condition.

## Neurodevelopmental Disorders (31)

### Intellectual Disabilities (33)

| | | |
|---|---|---|
| __.__ (__.__) | | Intellectual Disability (Intellectual Developmental Disorder) (33) |
| | | *Specify* current severity: |
| 317 | (F70) | Mild |
| 318.0 | (F71) | Moderate |
| 318.1 | (F72) | Severe |
| 318.2 | (F73) | Profound |
| 315.8 | (F88) | Global Developmental Delay (41) |
| 319 | (F79) | Unspecified Intellectual Disability (Intellectual Developmental Disorder) (41) |

### Communication Disorders (41)

| | |
|---|---|
| 315.32 (F80.2) | Language Disorder (42) |
| 315.39 (F80.0) | Speech Sound Disorder (44) |
| 315.35 (F80.81) | Childhood-Onset Fluency Disorder (Stuttering) (45) |
| | Note: Later-onset cases are diagnosed as 307.0 (F98.5) adult-onset fluency disorder. |
| 315.39 (F80.82) | Social (Pragmatic) Communication Disorder (47) |
| 307.9 (F80.9) | Unspecified Communication Disorder (49) |

A-0074

cians an opportunity to document factors that may have played a role in the etiology of the disorder, as well as those that might affect the clinical course. Examples include genetic disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical conditions such as epilepsy; and environmental factors, including very low birth weight and fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome).

# Intellectual Disabilities

# Intellectual Disability (Intellectual Developmental Disorder)

## Diagnostic Criteria

Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

**Note:** The diagnostic term *intellectual disability* is the equivalent term for the ICD-11 diagnosis of *intellectual developmental disorders*. Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover, a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability*, and research journals use the term *intellectual disability*. Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.

*Specify* current severity (see Table 1):

317 (F70)   **Mild**
318.0 (F71) **Moderate**
318.1 (F72) **Severe**
318.2 (F73) **Profound**

## Specifiers

The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range.

**TABLE 1**  Severity levels for intellectual disability (intellectual developmental disorder)

34

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Mild | For preschool children, there may be no obvious conceptual differences. For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired. There is a somewhat concrete approach to problems and solutions compared with age-mates. | Compared with typically developing age-mates, the individual is immature in social interactions. For example, there may be difficulty in accurately perceiving peers' social cues. Communication, conversation, and language are more concrete or immature than expected for age. There may be difficulties regulating emotion and behavior in age-appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility). | The individual may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child-care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family. |

Neurodevelopmental Disorders

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Moderate | All through development, the individual's conceptual skills lag markedly behind those of peers. For preschoolers, language and pre-academic skills develop slowly. For school-age children, progress in reading, writing, mathematics, and understanding of time and money occurs slowly across the school years and is markedly limited compared with that of peers. For adults, academic skill development is typically at an elementary level, and support is required for all use of academic skills in work and personal life. Ongoing assistance on a daily basis is needed to complete conceptual tasks of day-to-day life, and others may take over these responsibilities fully for the individual. | The individual shows marked differences from peers in social and communicative behavior across development. Spoken language is typically a primary tool for social communication but is much less complex than that of peers. Capacity for relationships is evident in ties to family and friends, and the individual may have successful friendships across life and sometimes romantic relations in adulthood. However, individuals may not perceive or interpret social cues accurately. Social judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions. Friendships with typically developing peers are often affected by communication or social limitations. Significant social and communicative support is needed in work settings for success. | The individual can care for personal needs involving eating, dressing, elimination, and hygiene as an adult, although an extended period of teaching and time is needed for the individual to become independent in these areas, and reminders may be needed. Similarly, participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing supports will typically occur for adult-level performance. Independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from co-workers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management. A variety of recreational skills can be developed. These typically require additional supports and learning opportunities over an extended period of time. Maladaptive behavior is present in a significant minority and causes social problems. |

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Severe | Attainment of conceptual skills is limited. The individual generally has little understanding of written language or of concepts involving numbers, quantity, time, and money. Caretakers provide extensive supports for problem solving throughout life. | Spoken language is quite limited in terms of vocabulary and grammar. Speech may be single words or phrases and may be supplemented through augmentative means. Speech and communication are focused on the here and now within everyday events. Language is used for social communication more than for explication. Individuals understand simple speech and gestural communication. Relationships with family members and familiar others are a source of pleasure and help. | The individual requires support for all activities of daily living, including meals, dressing, bathing, and elimination. The individual requires supervision at all times. The individual cannot make responsible decisions regarding well-being of self or others. In adulthood, participation in tasks at home, recreation, and work requires ongoing support and assistance. Skill acquisition in all domains involves long-term teaching and ongoing support. Maladaptive behavior, including self-injury, is present in a significant minority. |
| Profound | Conceptual skills generally involve the physical world rather than symbolic processes. The individual may use objects in goal-directed fashion for self-care, work, and recreation. Certain visuospatial skills, such as matching and sorting based on physical characteristics, may be acquired. However, co-occurring motor and sensory impairments may prevent functional use of objects. | The individual has very limited understanding of symbolic communication in speech or gesture. He or she may understand some simple instructions or gestures. The individual expresses his or her own desires and emotions largely through nonverbal, nonsymbolic communication. The individual enjoys relationships with well-known family members, caretakers, and familiar others, and initiates and responds to social interactions through gestural and emotional cues. Co-occurring sensory and physical impairments may prevent many social activities. | The individual is dependent on others for all aspects of daily physical care, health, and safety, although he or she may be able to participate in some of these activities as well. Individuals without severe physical impairments may assist with some daily work tasks at home, like carrying dishes to the table. Simple actions with objects may be the basis of participation in some vocational activities with high levels of ongoing support. Recreational activities may involve, for example, enjoyment in listening to music, watching movies, going out for walks, or participating in water activities, all with the support of others. Co-occurring physical and sensory impairments are frequent barriers to participation (beyond watching) in home, recreational, and vocational activities. Maladaptive behavior is present in a significant minority. |

Neurodevelopmental Disorders

# Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype*, which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

others (e.g., San Phillippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. Thus, it is common practice when assessing infants and young children to delay diagnosis of intellectual disability until after an appropriate course of intervention is provided. For older children and adults, the extent of support provided may allow for full participation in all activities of daily living and improved adaptive function. Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

## Risk and Prognostic Factors

**Genetic and physiological.**   Prenatal etiologies include genetic syndromes (e.g., sequence variations or copy number variants involving one or more genes; chromosomal disorders), inborn errors of metabolism, brain malformations, maternal disease (including placental disease), and environmental influences (e.g., alcohol, other drugs, toxins, teratogens). Perinatal causes include a variety of labor and delivery-related events leading to neonatal encephalopathy. Postnatal causes include hypoxic ischemic injury, traumatic brain injury, infections, demyelinating disorders, seizure disorders (e.g., infantile spasms), severe and chronic social deprivation, and toxic metabolic syndromes and intoxications (e.g., lead, mercury).

## Culture-Related Diagnostic Issues

Intellectual disability occurs in all races and cultures. Cultural sensitivity and knowledge are needed during assessment, and the individual's ethnic, cultural, and linguistic background, available experiences, and adaptive functioning within his or her community and cultural setting must be taken into account.

## Gender-Related Diagnostic Issues

Overall, males are more likely than females to be diagnosed with both mild (average male:female ratio 1.6:1) and severe (average male:female ratio 1.2:1) forms of intellectual disability. However, gender ratios vary widely in reported studies. Sex-linked genetic factors and male vulnerability to brain insult may account for some of the gender differences.

## Diagnostic Markers

A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.

## Differential Diagnosis

The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met. A diagnosis of intellectual disability should not be assumed because of a particular

genetic or medical condition. A genetic syndrome linked to intellectual disability should be noted as a concurrent diagnosis with the intellectual disability.

**Major and mild neurocognitive disorders.**   Intellectual disability is categorized as a neurodevelopmental disorder and is distinct from the neurocognitive disorders, which are characterized by a loss of cognitive functioning. Major neurocognitive disorder may co-occur with intellectual disability (e.g., an individual with Down syndrome who develops Alzheimer's disease, or an individual with intellectual disability who loses further cognitive capacity following a head injury). In such cases, the diagnoses of intellectual disability and neurocognitive disorder may both be given.

**Communication disorders and specific learning disorder.**   These neurodevelopmental disorders are specific to the communication and learning domains and do not show deficits in intellectual and adaptive behavior. They may co-occur with intellectual disability. Both diagnoses are made if full criteria are met for intellectual disability and a communication disorder or specific learning disorder.

**Autism spectrum disorder.**   Intellectual disability is common among individuals with autism spectrum disorder. Assessment of intellectual ability may be complicated by social-communication and behavior deficits inherent to autism spectrum disorder, which may interfere with understanding and complying with test procedures. Appropriate assessment of intellectual functioning in autism spectrum disorder is essential, with reassessment across the developmental period, because IQ scores in autism spectrum disorder may be unstable, particularly in early childhood.

## Comorbidity

Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population. The prognosis and outcome of co-occurring diagnoses may be influenced by the presence of intellectual disability. Assessment procedures may require modifications because of associated disorders, including communication disorders, autism spectrum disorder, and motor, sensory, or other disorders. Knowledgeable informants are essential for identifying symptoms such as irritability, mood dysregulation, aggression, eating problems, and sleep problems, and for assessing adaptive functioning in various community settings.

The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder; stereotypic movement disorder (with or without self-injurious behavior); impulse-control disorders; and major neurocognitive disorder. Major depressive disorder may occur throughout the range of severity of intellectual disability. Self-injurious behavior requires prompt diagnostic attention and may warrant a separate diagnosis of stereotypic movement disorder. Individuals with intellectual disability, particularly those with more severe intellectual disability, may also exhibit aggression and disruptive behaviors, including harm of others or property destruction.

## Relationship to Other Classifications

ICD-11 (in development at the time of this publication) uses the term *intellectual developmental disorders* to indicate that these are disorders that involve impaired brain functioning early in life. These disorders are described in ICD-11 as a metasyndrome occurring in the developmental period analogous to dementia or neurocognitive disorder in later life. There are four subtypes in ICD-11: mild, moderate, severe, and profound.

The American Association on Intellectual and Developmental Disabilities (AAIDD) also uses the term *intellectual disability* with a similar meaning to the term as used in this

manual. The AAIDD's classification is multidimensional rather than categorical and is based on the disability construct. Rather than listing specifiers as is done in DSM-5, the AAIDD emphasizes a profile of supports based on severity.

# Global Developmental Delay

## 315.8 (F88)

This diagnosis is reserved for individuals *under* the age of 5 years when the clinical severity level cannot be reliably assessed during early childhood. This category is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning, and applies to individuals who are unable to undergo systematic assessments of intellectual functioning, including children who are too young to participate in standardized testing. This category requires reassessment after a period of time.

# Unspecified Intellectual Disability (Intellectual Developmental Disorder)

## 319 (F79)

This category is reserved for individuals *over* the age of 5 years when assessment of the degree of intellectual disability (intellectual developmental disorder) by means of locally available procedures is rendered difficult or impossible because of associated sensory or physical impairments, as in blindness or prelingual deafness; locomotor disability; or presence of severe problem behaviors or co-occurring mental disorder. This category should only be used in exceptional circumstances and requires reassessment after a period of time.

# Communication Disorders

Disorders of communication include deficits in language, speech, and communication. *Speech* is the expressive production of sounds and includes an individual's articulation, fluency, voice, and resonance quality. *Language* includes the form, function, and use of a conventional system of symbols (i.e., spoken words, sign language, written words, pictures) in a rule-governed manner for communication. *Communication* includes any verbal or nonverbal behavior (whether intentional or unintentional) that influences the behavior, ideas, or attitudes of another individual. Assessments of speech, language and communication abilities must take into account the individual's cultural and language context, particularly for individuals growing up in bilingual environments. The standardized measures of language development and of nonverbal intellectual capacity must be relevant for the cultural and linguistic group (i.e., tests developed and standardized for one group may not provide appropriate norms for a different group). The diagnostic category of communication disorders includes the following: language disorder, speech sound disorder, childhood-onset fluency disorder (stuttering), social (pragmatic) communication disorder, and other specified and unspecified communication disorders.



INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

THE 11TH EDITION OF THE AAIDD DEFINITION MANUAL

aaidd

A-0084

# Intellectual Disability

# Intellectual Disability

## Definition, Classification, and Systems of Supports

*The AAIDD Ad Hoc Committee on*
*Terminology and Classification*

11th Edition



aaidd

American Association
on Intellectual and
Developmental Disabilities

Copyright © 2010 by the American Association on Intellectual and Developmental Disabilities

Published by
American Association on Intellectual and Developmental Disabilities
501 3rd Street, NW, Suite 200
Washington, DC 20001-2760

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Intellectual disability : definition, classification, and systems of supports / The AAIDD
Ad Hoc Committee on Terminology and Classification.—11th ed.
    p. cm.
 Includes bibliographical references and index.
 ISBN 978-1-935304-04-3 (alk. paper)
 1. Mental retardation—Classification.  I. American Association on Intellectual and
Developmental Disabilities.
 RC570.C515 2010
 616.85'88—dc22                                    2009040030

iv

# CHAPTER 1

## DEFINITION OF INTELLECTUAL DISABILITY

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

### OVERVIEW

*Defining* refers to precisely explaining the term and establishing the meaning and boundaries of the term. Significant consequences can result from the way a term is defined. As discussed by Gross and Hahn (2004), Luckasson and Reeve (2001), and Stowe, Turnbull, and Sublet (2006), a definition can make someone eligible or ineligible for services, subjected to something or not subjected to it (e.g., involuntary commitment), exempted from something or not exempted (e.g., from the death penalty), included or not included (as to protections against discrimination and equal opportunity), and/or entitled or not entitled (e.g., as to Social Security benefits or other financial benefits). Our purpose in this chapter is to review briefly the historical approaches to defining *intellectual disability* (ID), present the current definition of ID and the assumptions that are essential to the application of the definition, discuss the historical consistency in regard to the three criteria used to operationally define the construct, and summarize how the boundaries of the construct have been operationalized over the past 50 years.

### HISTORICAL APPROACHES TO DEFINING INTELLECTUAL DISABILITY

Historically, four broad approaches (i.e., social, clinical, intellectual, and dual-criterion) have been used to define the construct now referred to as ID. Remnants of these four approaches are still evident in current discussions regarding who is (or should be) diagnosed as an individual with an ID (see, for example, Switzky & Greenspan, 2006a, 2006b).

### Social Approach

Historically, persons were defined or identified as having ID because they failed to adapt socially to their environment. Because an emphasis on intelligence and the role of intelligent people in society was to come later, the oldest historical definitional approach

# CHAPTER 3

## ROLE OF ASSESSMENT IN DIAGNOSIS, CLASSIFICATION, AND SYSTEMS OF SUPPORTS

> Assessment in the field of intellectual disability is conducted in order to diagnose a disability, classify by disability characteristics, and plan for individualized needed supports. In order to achieve specific assessment purposes, three criteria need to be met: (a) the assessment tools and process should match the purpose for assessment, (b) the assessment findings should be as valid as possible, and (c) the results should be both useful and purposefully applied.

### OVERVIEW

Assessment in the field of *intellectual disability* (ID) involves systematically collecting information for decision making and communication related to three assessment functions: diagnosis, classification, and planning individualized supports. Within each of these functions, professionals conduct assessments for a variety of specific purposes. For example, a diagnosis might determine an individual's eligibility for services or legal protection, or it might establish whether a person could be included in a research sample. Some assessment measures, such as intelligence tests or adaptive behavior measures, are useful for more than one purpose but generally not for all three assessment functions.

This chapter has two purposes: first, to describe a framework for assessing individuals with ID; and second, to review several criteria for high quality assessment. If assessment information is to benefit people with an ID, it is necessary that these criteria be met.

### ASSESSMENT FRAMEWORK

In 2002, AAIDD proposed an assessment framework that was organized around the three functions of diagnosis, classification, and planning supports (Luckasson et al., 2002). An updated version of this framework is shown in Table 3.1. The intent of the framework is to illustrate that assessment tools and results may be useful for some purposes but not other purposes. For example, an earlier AAIDD *Manual* (Luckasson et al., 1992) was

© American Association on Intellectual and Developmental Disabilities                    21

# PART II

## DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

### OVERVIEW

A diagnosis of *intellectual disability* (ID) involves meeting three criteria: (a) significant limitations in intellectual functioning, (b) significant limitations in adaptive behavior, and (c) age of onset before age 18. As discussed more fully in Schalock, Luckasson, and Shogren (2007), there has been considerable consistency in these three criteria—and their operational definitions—for the last 50 years. As discussed more fully in chapters 4 and 5, the operational definitions of the first and second criteria are as follows:

- *Intellectual functioning*: an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations
- *Adaptive behavior*: performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without ID that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills

The third criterion, *age of onset*, refers to the age at which the disability began. The purpose of the age of onset criterion is to distinguish ID from other forms of disability that may occur later in life. Intellectual disability typically originates close to the time of birth—either during fetal development, the birth process, or soon after birth. Sometimes, however, especially when the etiology of the disability indicates progressive damage (such as malnutrition) or damage related to an acquired disease or injury (such as infection or traumatic brain injury), the condition may originate later. Thus, disability does not necessarily have to have been formally identified, but it must have originated during the developmental period. The early onset criterion is apparent in the earliest formulation of

© American Association on Intellectual and Developmental Disabilities

27

PART II: DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

the definition of the disability. As shown in Table 1.2, there has been very little change in the age of onset criterion (generally before age 18) over the last 50 years.

One may analyze the age of onset from both a neurological perspective and a social policy perspective. Neurologically, the primary time of brain development and change is the prenatal, infancy, and childhood years, although considerable change occurs during the teen years and thereafter. Thus, from a neurological perspective, 18 is generous for manifestation. From a social policy perspective, one currently finds both ages 18 and 21 used as the upper limit. Although there is historical consistency in the use of age 18, the criterion of 21 is found in the Developmental Disabilities Act of 1990 (although it too originally used the age of 18; Thompson & Wehmeyer, 2008). Although this discrepancy can cause some confusion, it is our position that 18 is still the best upper limit due to the following: (a) extending to the age of 21 may change the number of people eligible for diagnosis and thus impact prevalence rates because the class would include individuals with other cognitive disabilities (e.g., traumatic brain injury [TBI] and mental illness); (b) extending to age 21 would not be helpful in accurately diagnosing individuals who have not been diagnosed before 18 because any examination would most likely refer to school records to determine how the student was functioning at that time; (c) retaining age 18 is consistent with diagnostic practices in many countries (e.g., throughout Europe and the Pacific Rim); and (d) maintaining the current criterion of "originates before age 18" leaves open the possibility that when an accurate diagnosis of ID was not made during the developmental period, a retrospective diagnosis may be necessary in some situations (see chapter 8).

In the following five chapters, we discuss in detail factors impacting diagnostic best practices. These are an understanding of (a) intellectual functioning and its assessment (chapter 4), (b) adaptive behavior and its assessment (chapter 5), (c) the role of etiological factors in the diagnosis of ID (chapter 6), (d) a multidimensional approach to classification (chapter 7), and (e) the role of clinical judgment in diagnosis, classification, and developing systems of supports (chapter 8). Throughout these five chapters, readers will also find a discussion of best practices guidelines regarding the diagnosis and classification of ID. Chief among these guidelines are the following:

- A diagnosis of ID is based on three criteria: significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical skills, and age of onset before age 18.

- ID is diagnosed using assessment information obtained from standardized and individually administered instruments that assess intellectual functioning and adaptive behavior.

- A valid diagnosis of ID is based on multiple data points that not only include giving equal consideration to significant limitations in adaptive behavior and intellectual functioning but also require evaluating the pattern of test scores and factors that affect the standard error of measurement for the standardized assessment instruments used.

PART II: DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

- If the diagnostic criteria are met, the diagnosis may be applied to achieve several focused purposes, including, but not limited to, establishing the presence of the disability in an individual and confirming an individual's eligibility for services, benefits, and legal protections.
- Information about individuals with ID (or individuals themselves) can be grouped or classified for several purposes, such as providing service reimbursement/funding, developing individualized services and supports, conducting research, and/or communicating about selected characteristics.
- Clinicians and other users of this manual should select among multidimensional classification systems, consistent with a specific purpose. Additionally, one must be careful not to use classification information for inappropriate purposes.
- To prevent unsuitable grouping of individuals with ID, classification system(s) that lead to similar services, placements, or other outcomes for individuals in particular subcategories, must be based on strong evidence that the classification system(s) employed will be beneficial to every person in the group.
- Clinical judgment is essential, and a higher level of clinical judgment is frequently required in complex diagnostic and classification situations in which the complexity of the person's functioning precludes standardized assessment alone, legal restrictions significantly reduce opportunities to observe and assess the person, historical information is missing and cannot be obtained, or there are serious questions about the validity of the data. *Clinical judgment* is defined as a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data. The purpose of clinical judgment and the use of clinical judgment strategies is to enhance the quality, validity, and precision of the clinician's decision or recommendation in a particular case.
- A retrospective diagnosis should be based on multiple data points that not only involve giving equal consideration to adaptive behavior and intelligence but also require evaluating the pattern of test scores and factors that affect scores obtained from the assessment instruments used as the time of the assessment(s). If indicated, it might also be necessary to develop a contemporary assessment in order to show similarities and changes in functioning over the life span.
- If there is inconsistency in data sets or obtained information, clinicians need to explore the possible reasons for these differences, including mistakes, poorly trained examiner(s), improper selection of tests, administration of the same test too close in time, administering different editions of the same test and not using the most recent version, and/or not acknowledging the effects of personal characteristics and environmental factors that can affect test results.

© American Association on Intellectual and Developmental Disabilities

# CHAPTER 4

## INTELLECTUAL FUNCTIONING AND ITS ASSESSMENT

> For purposes of diagnosis, intellectual functioning is currently best conceptualized and captured by a general factor of intelligence. Intelligence is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience. The "significant limitations in intellectual functioning" criterion for a diagnosis of intellectual disability is an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the instruments' strengths and limitations.

### OVERVIEW

The multidimensional model of human functioning presented in Figure 2.1 includes intellectual abilities as one of the five dimensions of human functioning. Intellectual functioning, which is a broader term than either intellectual abilities or intelligence, reflects the fact that what is considered intelligent behavior is dependent upon other dimensions of human functioning: the adaptive behavior that one exhibits, the person's mental and physical health status, the opportunity to participate in major life activities, and the context within which people live their everyday lives. Thus, as discussed throughout this chapter, commonly used measures/indices of intelligence need to be interpreted within a broader context than a single IQ score.

Although the primary focus in this chapter is on intelligence and its assessment, it is important that readers of this manual should note the following implications of intelligence on the multidimensionality of ID:

- Limitations in intelligence should be considered in light of four other dimensions of human functioning: adaptive behavior, health, participation, and context.
- The measurement of intelligence may have different relevance, depending on whether it is considered for purposes of diagnosis or classification.
- Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments.

© American Association on Intellectual and Developmental Disabilities