# CHAPTER 6

## ROLE OF ETIOLOGY IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

> Etiology represents a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time and affect the individual's overall functioning. Diagnostic assessment and classification of the etiology consists of a description of all of the risk factors that are present in a particular individual and that contribute to the individual's present functioning and potential diagnosis of intellectual disability. Genotype-phenotype correlations may be useful, but caution is needed when applying these data to individual circumstances.

## OVERVIEW

In this chapter we describe the multifactorial nature of the etiology of *intellectual disability* (ID) and how etiology is determined and classified based on biomedical, social, behavioral, and educational risk factors. The five sections of the chapter cover (a) the importance of etiology, (b) the multifactorial nature of etiology, (c) etiologic assessment, (d) etiologic diagnosis and classification, and (e) etiology and performance. These five sections incorporate genetic research advances and research about behaviors that are associated with specific etiologies. Additionally, the system for etiologic diagnosis and classification presented in the chapter is consistent with the multidimensional approach to ID presented in this *Manual* and facilitates the design and implementation of strategies for prevention and support (see chapter 10).

## IMPORTANCE OF ETIOLOGY

Consideration of the etiology of ID is important for several reasons. Chief among these are the following:

1. The etiology may be associated with other health-related problems that may influence physical and psychological functioning.

2. The etiology may be treatable, which could permit appropriate treatment to minimize or prevent ID.

3. Accurate information is needed for the design and evaluation of programs to prevent specific etiologies of ID.

4. Comparison of individuals for research, administrative, or clinical purposes may depend on formation of maximally homogeneous groups composed of individuals with the same or similar etiologies.

5. The etiology may be associated with a specific behavioral phenotype that allows anticipation of actual, potential, or future functional support needs.

6. Information about the etiology facilitates genetic counseling and promotes family choice and decision making, including preconception counseling.

7. Individuals and families can be referred to other persons and families with the same etiologic diagnosis for information and support.

8. Knowing the etiology facilitates self-knowledge and life planning for the individual.

9. Understanding the etiology may clarify clinical issues for service providers.

10. Clarification of biomedical, social, behavioral, and educational risk factors that contribute to the etiology offers opportunities for prevention of the disability.

Performing a diagnostic evaluation to determine the etiology may be questioned by some providers. They may argue that the cost of testing is excessive and that the results will not change the individual's treatment. If the parents do not plan to have any more children, they may argue that testing for an inherited disorder is pointless. When the individual with ID is an adult, the parents may no longer have any interest in finding the etiology. Adult service providers may feel that the etiology is irrelevant to the development of the individual's plan of supports and services. These objections can be answered by considering the reasons for establishing the etiology listed earlier, and the cost of diagnostic testing can often be justified in specific situations. For example, knowing that an adult with cognitive decline has Down syndrome should alert the provider to look for hypothyroidism or depression. Knowing that a child with cognitive decline has Angelman syndrome should alert the provider to look for subclinical seizures. Knowing that an individual with new neurological findings has tuberous sclerosis should alert the provider to look for the characteristic brain tumor associated with this diagnosis. Knowing that an adult man has fragile X syndrome should alert the provider to offer genetic testing to the man's sisters who may be carriers and could have affected sons. Knowing that a child has a particular condition allows the family to search the Internet and to contact other families affected by this diagnosis, thereby learning more about it than their health care provider may know. These examples illustrate why testing to establish the etiologic diagnosis may be important for many individuals with ID.

## MULTIFACTORIAL NATURE OF ETIOLOGY

In this chapter we build on the approach to etiology described in previous AAMR *Manuals* (Luckasson et al., 1992, 2002). Etiology is conceptualized as a multifactorial

construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the life of the individual and across generations from parent to child. This construct replaces prior approaches that divided the etiology of ID into two broad types: ID of biological origin and ID due to psychosocial disadvantage (Grossman, 1983). The two-group approach (biological and cultural-familial) was defended on the basis of developmental theory (Hodapp, Burack, & Zigler, 1990). Different developmental pathways were associated with ID due to identified biological disorders compared to ID for which no organic etiology is apparent (due to cultural-familial factors or psychosocial disadvantage). These researchers recommended a biological or genetic classification of etiology, in which there is either a demonstrated biological cause or there is not. This approach is consistent with the approach presented in this chapter. In fact, the risk factor approach can be seen as a fine-tuning of the developmental (two-group) approach. What was called "ID of biological origin" can be seen as involving individuals for whom biomedical risk factors predominate, while "ID of cultural-familial origin" can be seen as involving individuals for whom social, behavioral, or educational risk factors predominate.

The two-group distinction is often blurred in real life, however. The multiple risk factor approach correctly notes that biomedical risk factors may be present in persons with ID of cultural-familial origin, and social, behavioral, and educational risk factors may be present in persons with ID of biological origin. For example, individuals with the same biomedical genetic etiology often vary widely in functioning, presumably as the result of other modifying risk factors. The multiple risk factor approach to etiology thus is the logical extension of previous work in this area and provides a more comprehensive explanation of the many interacting causes of impaired functioning in persons with ID (Chapman, Scott, & Stanton-Chapman, 2008).

There has been an explosion of new genetic information in the past decade (cf. Butler & Meaney, 2005). This explosion has led some to consider the etiology of ID primarily in genetic terms. The recommendations of the American College of Human Genetics for the etiologic evaluation of ID (Curry, Stevenson, Aughton, & Byrne, 1997) emphasized genetic testing, as did the recommendations of the Committee on Genetics of the American Academy of Pediatrics (Moeschl & Shevell, 2006). The Child Neurology Society's practice parameter on the evaluation of children with global developmental delay (Shevell et al., 2003) also emphasized biomedical causes and included evidence-based recommendations for genetic testing. Although in a recent textbook on ID, Harris (2006) mentions AAIDD's multifactorial risk factor approach presented in the 2002 *Manual* (Luckasson et al.), the author discusses in depth primarily genetic and other biomedical causes.

Clearly, genetics cannot explain the cause of ID in every case. Individuals may be born with perfectly normal DNA and still develop ID due to a birth injury, malnutrition, child abuse, or extreme social deprivation. Understanding the cause of ID in these cases requires consideration of other biomedical, behavioral, and social risk factors. The guidelines reviewed above all note that even the most extensive and up-to-date genetic and biomedical testing will identify an etiology in less than half of all cases. Indeed, even if one could measure the entire genome in patients with ID (which should become

PART II: DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

feasible within the next 10 years), the results would not explain the cause when ID is due primarily to social or behavioral risk factors. On the other hand, at least one or more of the risk factors shown in Table 6.1 will be found in every case of ID. Thus a multifactorial approach to etiology (which incorporates all of the above genetic and biomedical testing,

TABLE 6.1

**Risk Factors for Intellectual Disability**

| Timing | Biomedical | Social | Behavioral | Educational |
|--------|-----------|--------|-----------|-------------|
| Prenatal | 1. Chromosomal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to prenatal care | 1. Parental rejection of caretaking<br>2. Parental abandonment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoencephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver interaction<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutionalization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early intervention services<br>4. Inadequate special education services<br>5. Inadequate family support |

Intellectual Disability: Definition, Classification, and Systems of Supports

A-0119

CHAPTER 6: ROLE OF ETIOLOGY IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

as well as consideration of all of the other potential risk factors that might be operative) provides the most thorough way to evaluate the etiology of ID in a particular case.

The multifactorial approach to etiology presented in this chapter expands the list of causal factors in two directions: types of factors and timing of factors. The first direction expands the types or categories of factors into four groupings:

1. *Biomedical*: biologic processes, such as genetic disorders or nutrition
2. *Social*: social and family interaction, such as stimulation and adult responsiveness
3. *Behavioral*: potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse
4. *Educational*: availability of educational supports that promote mental development and the development of adaptive skills

The second direction concerns the timing of the occurrence of causal factors according to whether these factors affect the parents of the person with ID, the person with ID, or both. This aspect of causation is termed *intergenerational* to describe the influence of factors present during one generation on the outcome in the next generation. The modern concept of intergenerational effects must be distinguished from the historical concept that ID was related to "weak genes" due to psychosocial, cultural, or familial factors (Scheerenberger, 1983). This modern concept recognizes that reversible environmental factors in the lives of some families may be related to the etiology of ID and stresses that the understanding of these factors should lead to enhanced individual and family supports. Because of the relationship to prevention and supports, these intergenerational effects are considered further in chapter 10 (see Table 10.1 in particular).

Table 6.1 lists risk factors for ID by category and by the time of occurrence of the risk factor in the life of the individual. Unlike classification systems based primarily on biomedical conditions (such as the *ICD-10* [World Health Organization, 1993]), the classification system outlined in Table 6.1 represents a multifactorial approach to the etiology of ID. It incorporates biomedical risk factors but places them in context by including other risk factors that may be of equal or greater importance in determining the individual's level of functioning. The list of risk factors in Table 6.1 is not exclusive and can be expanded as new risk factors are discovered. Research should result in continual revision and updating of these specific risk factors, but the basic structure of the table should be relevant for the foreseeable future.

Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning. A biomedical risk factor may be present but by itself may not cause ID (as, for example, when a patient with a genetic disorder has average intelligence). Any risk factor causes ID only when it results in impaired functioning sufficient to meet the criteria for a diagnosis of ID as described in this *Manual*. Table 6.1 emphasizes that the impairment of functioning that is present when an individual meets the three criteria for a diagnosis of ID usually reflects the presence of several risk factors that interact over time. Thus, the search for the etiology of ID in a particular individual must consist of a search for all of the risk factors that might have resulted in impaired functioning for that person. This search involves obtaining as much historical medical

information as possible, performing psychological and physical examinations, and pursuing sufficient laboratory investigations to consider reasonable possibilities.

## ETIOLOGIC ASSESSMENT

### Medical History

Diagnostic assessment begins with a complete history and physical examination to uncover all of the potential risk factors that may be present in each of the four categories shown in Table 6.1. The medical history begins at conception and includes detailed information about the prenatal, perinatal, and postnatal periods. Information needed about the prenatal period includes maternal age; parity and health (including maternal infections such as hepatitis, HIV, rubella, cytomegalovirus, group B streptococcus, etc.); the adequacy of maternal nutrition; the amount and quality of prenatal care (including results of prenatal screening, ultrasound examinations, and amniocentesis if performed); maternal use of drugs, alcohol, and other substances; maternal exposure to potential toxins or teratogens (such as lead or radiation); and occurrence of any significant maternal injuries during the pregnancy. Information needed about the perinatal period includes growth status at birth (gestational age at birth, birthweight, length, and head circumference); labor and delivery experiences (including onset, duration, route of delivery, presence of fetal distress prior to delivery, Apgar scores after birth, need for resuscitation); and the occurrence of any neonatal disorders after birth (such as seizures, infections, respiratory distress, brain hemorrhage, and metabolic disorders). Information needed about the postnatal period includes the history of any significant head injuries, infections, seizures, toxic and metabolic disorders (such as lead poisoning), significant malnutrition or growth impairment, and any indication of loss of previously acquired developmental skills that could indicate the presence of a progressive or degenerative disorder or a disorder on the autism spectrum.

A detailed family history is necessary to identify potential genetic etiologies (Curry et al., 1997). A detailed three-generation pedigree is recommended that includes information about the health status, medical and psychological disorders, and level of functioning of all known relatives. In particular, relatives who were affected by conditions that may be associated with ID (such as autism) or who were diagnosed with ID should be noted. Additional records concerning these individuals may be requested to provide further details. The occurrence of ID in other family members does not necessarily imply a genetic mechanism however. Multiple individuals in a family may be affected by fetal alcohol syndrome, for example, or ID in a relative may be due to childhood infections or head trauma. Results of genetic testing performed previously on any relatives should be sought and examined for completeness because testing performed more than 5 to 10 years earlier may have missed conditions diagnosable with current methods.

## Psychosocial Evaluation

The psychosocial evaluation includes detailed information about the individual, family, school or work setting, and community or cultural milieu. Information about the psychosocial environment is needed to evaluate possible social, behavioral, and educational risk factors that may have contributed to the occurrence of ID. When an intergenerational perspective is used, information is needed about the parents' social, educational, and psychological history. Information is also needed about the structure, stability, and functioning of the immediate and extended family of the person with ID. Information about the roles and expectations of the person with ID and relatives within the extended community or culture may also be useful. The sociocultural milieu in which the individual develops is important because it may influence the psychosocial environment, including the local community; the country of origin; and specific ethnic, cultural, or religious factors that may affect environmental experiences and interactions.

The developmental history of the individual with ID includes early milestones, such as the age when the person started walking or talking. The age at entry into the educational system, the adequacy of the educational experience, and the duration of formal education should also be noted. The occurrence of other mental disorders, such as attention deficit/hyperactivity disorder, specific learning disability, or anxiety disorder should be noted because this may provide clues to a behavioral phenotype associated with a specific etiology.

Evaluation of the psychosocial environment may not yield any relevant information about causal factors in a particular individual. Even when the etiology appears straightforward, however, psychosocial factors may prove to be contributory. Reflecting the multiple risk factor approach to causation, known biomedical factors may be affected by social, behavioral, or educational factors. The ultimate etiology of ID in such cases reflects the interaction of all of these factors. For example, whether or not an individual with fetal alcohol syndrome develops ID may be influenced by environmental influences in early childhood, and the individual's level of functioning will likely reflect the adequacy of educational interventions.

## Physical Examination

The physical examination serves several distinct purposes. The usual purpose is to assist in the diagnosis of a medical problem, such as pneumonia or back pain, for which the individual has sought attention and that may require specific medical treatment. The purpose considered in this chapter is to assist in the identification of the etiology of ID. A single physical examination may serve both purposes, but the conceptual distinction between them needs to be retained.

The physical examination may provide evidence of an obvious etiology, such as Down syndrome. More often, however, it will provide only supportive evidence for an etiology suspected from other data (such as spastic diplegia associated with a history of premature birth), or it will not provide any useful information about etiology at all. For most

© American Association on Intellectual and Developmental Disabilities

Fulfilling one's professional responsibilities is among the highest, if not *the* highest, goal of a member of a profession. Being well trained in the current practices of one's profession, maintaining professional standards, and abiding by the code of ethics are all necessary, but not sufficient, in meeting one's professional responsibilities. This is because professionals working in the field of ID frequently encounter situations involving diagnosis, classification, and supports planning that require extensive data obtained from multiple sources, specialized training in assessment and test interpretation, familiarity with public policy and public laws, direct experience with those with whom the professional is working, and specific knowledge of the person and their environment. Additionally, this responsibility typically becomes more apparent where there is a difficult or complex case and when standard professional practices are insufficient. Over the last decade, the term clinical judgment has come to be used to refer to the special type of judgment that is required in such cases both to fulfill one's professional responsibility and to enhance the quality, validity, and precision of the professional's decision or recommendation in that case.

This chapter is focused on clinical judgment and the role that it plays in diagnosis, classification, and developing individualized supports for persons with ID. Our three purposes in this chapter are to (a) define clinical judgment, including its purpose and use; (b) discuss the role of clinical judgment in professional responsibility related to diagnosis, classification, and systems of supports; and (c) outline the parameters of four clinical judgment strategies that are the basis of clinical judgment and that, when used, enhance the validity and precision of the clinician's decision or recommendation. Throughout the chapter we stress the importance of avoiding thinking errors and using critical thinking skills.

## CLINICAL JUDGMENT: DEFINITION, PURPOSE, AND USE

### Definition

As defined by Luckasson et al. (2002) and Schalock and Luckasson (2005), clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data. It is based on the clinician's explicit training, direct experience with those with whom he or she is working, and specific knowledge of the person and the person's environment. Clinical judgment is characterized by its being (a) *systematic* (i.e., organized, sequential, and logical), (b) *formal* (i.e., explicit and reasoned), and (c) *transparent* (i.e., apparent and communicated clearly).

Clinical judgment is a key component—along with best practices in ID, professional standards, and professional ethics—of professional responsibility in the field of ID. Clinical judgment is different from either ethical or professional judgment based on one's professional ethics or standards. Ethical judgment is generally concerned with judgments of value and obligation focusing on justice (treating all people equitably), beneficence (doing good), and autonomy (respecting the authority of every person to control actions that primarily affect him or herself). Professional judgment is a process that follows

CHAPTER 8: ROLE OF CLINICAL JUDGEMENT IN DIAGNOSIS, CLASSIFICATIONS, AND SUPPORTS

general professional guidelines or standards by which a member of that profession collects, organizes, and weighs information. In distinction, clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience. It emerges directly from extensive data and is based on training, experiences, and specific knowledge of the person and his or her environment.

## Purpose

The overall purpose of clinical judgment is to enhance the quality, validity, and precision of the clinician's decision in a particular case. In addition, the use of clinical judgment strategies leads to more transparent analyses and increasingly logical and principled decisions and recommendations. Clinical judgment should not be thought of as a justification for abbreviated evaluation, a vehicle for stereotypes or prejudice, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems.

## Use

Clinical judgment is used in the field of ID for actions related to diagnosis, classification, and/or developing individualized supports. In our judgment, members of a variety of professions, such as psychologists, physicians, diagnosticians, expert educators, special education teachers, and social workers, use clinical judgment in one or more in these three actions. Throughout the chapter this group is referred to as *clinician in ID* if they (a) have relevant training, (b) engage in clinical activities (diagnosis, classification, planning supports), and (c) use professionally accepted best practices, such as those described in this *Manual*.

The specific functions performed by the clinician will be affected by his or her professional roles and responsibilities. For example, some state statutes stipulate that only a licensed clinical psychologist can make a diagnosis of ID; others require a diagnosis by an educational diagnostician. Under the Individuals With Disabilities Education Improvement Act of 2004 (IDEIA), for example, diagnostic flexibility is a team process. Actions related to classification (e.g., grouping for services, communication about selected characteristics, or the person's competency) are frequently prescribed by state and federal statutes, and the planning and the evaluation of individualized supports are frequently conducted through either a transdisciplinary or multidisciplinary team.

Furthermore, the amount of emphasis on clinical judgment exercised will also vary depending on what is expected of the professional within an organization or by his or her professional practice standards. For example, a special education teacher is expected to use cumulative data to evaluate the effectiveness of a particular education or support strategy; the clinical psychologist might be expected to contribute information about the level of assessed support needs in developing the person's individualized plan; the physician is expected to make a diagnosis of fetal alcohol syndrome; or the geneticist is expected to make a diagnosis of Trisomy 21.

© American Association on Intellectual and Developmental Disabilities                                    87

PART III: SYSTEMS OF SUPPORTS

level of people with ID living on their own or with roommates is below the poverty level. "These individuals are simply too poor to afford even the most modest rental housing" (O'Hara & Cooper, 2005, as cited by Stancliffe & Lakin, 2007, p. 436). Although some flexible housing supports exist for people with ID (e.g., rental assistance under Section 8 voucher programs from the Department of Housing and Urban Development), waiting lists are excessive and the application process is particularly challenging to these individuals. In comparison with adults who have disabilities other than ID, people with ID have lower rates of living independently. Although more women with ID who have higher IQ scores live independently than do men in the same category, this finding appears related to a higher marriage rate for these women than for the men (Blackorby & Wagner, 1996; Richardson & Koller, 1996). In other independent living areas, women with ID have less positive outcomes than men in the same category (Rousso & Wehmeyer, 2001).

## Health

People with ID and higher IQ scores tend to have higher rates of obesity, poorer nutrition, and be hospitalized more often for longer periods than are adults with no ID (Stancliffe & Lakin, 2007). Health-related challenges for these individuals include accessing health services, affordability, transportation to services, communicating health problems to medical personnel, identifying their disability and their need for support to follow health treatments, and inadequate or nonexistent medical histories (Spitalnik & White-Scott, 2000). Despite these problems appropriate health supports can make a positive difference in healthy lifestyles (Stancliffe & Lakin, 2007).

## Friendships and Social Behavior

Greater loneliness in adults with ID and higher IQ scores was reported when individuals lived in larger residences and expressed fear about their living condition, whereas less loneliness was reported when people liked where they lived and reported more social contact (Stancliffe et al., 2007). Boys with ID and higher IQ scores have been reported to exhibit antisocial and delinquent behaviors more frequently than do their male peers without ID (Douma, Dekker, Ruiter, Tick, & Koot, 2007). Despite these findings, behavioral interventions for challenging behavior have been demonstrated as being effective with this same group (Didden, Korzilius, van Oorsouw, & Sturmey, 2006).

## Family Well-Being

Similar to their peers without disabilities, a large majority of youth with ID (89%) were reported to be single 2 years after leaving high school (Wagner et al., 2005). Annual incomes of those who were married or living with a partner were $5,000 or less. Few of these people receive the social-sexual teaching that might assist them in their personal lives. Attempts to establish an intimate relationship with another person are often met with restrictions and fear (Walker-Hirsch, 2007).

158            Intellectual Disability: Definition, Classification, and Systems of Supports

A-0125

The vast majority of children and almost half of adults with ID live with their family rather than on their own or with others (Braddock, Emerson, Felce, & Stancliffe, 2001; I. Brown, Renwick, & Raphael, 1999). When they do establish families of their own, it is well-documented that families in which one or both parents have ID/IDD face greater challenges than do other families in raising their children; however, positive outcomes can be enhanced if they receive appropriate supports to navigate adult living; maintain their family; and protect, support, and guide their children (Tymchuk, 2006).

## Rights

The ability to know one's rights and make those rights a reality depends on civic education and access to a stable pool of knowledgeable advocates. Limitations in overall education access described earlier result in many people who never have the opportunity to learn about democracy or personal rights with their classmates. A tendency by these individuals to deny their disability and reject services associated with ID may mean that their rights to supports or to fair treatment are not exercised. Assuring justice in the civil and criminal justice system and educating the police, lawyers, and judges who work with these individuals so that needed accommodations can be made (e.g., fair questioning) has not yet been accomplished (Perske, 2008). Moreover, very few legal resources exist for people with disabilities who do not have the finances or ability to hire a private lawyer.

Poverty and unemployment are realities in the lives of most people with ID who are living independently, with the following goals only rarely met: having a reasonable income and ongoing employment, circumventing the restrictive and potentially stigmatizing regulations for acquiring social services, accessing inexpensive transportation, and obtaining affordable housing.

## Social Judgment

Individuals with ID who have higher IQ scores are vulnerable to risks due to their sometimes inadequate response systems, interpersonal competence, social judgment, or decision-making skills (Greenspan, 2006a, 2006b; Khemka & Hickson, 2006; Nettelbeck & Wilson, 2001; Patton & Keyes, 2006; Spitalnik & White-Scott, 2000). These challenges are linked to reduced intellectual and adaptive abilities that make it difficult to problem solve and to be flexible in thinking; both limitations create a susceptibility to dangers that is shared among members of this group (Greenspan, 2006a). Some have argued that certain aspects of these characteristics may represent a socialization process and may sometimes be viewed as adaptive responses to stigmatizing and deficient environments (Bogdan & Taylor, 1994; Goffman, 1961). It is likely that both reduced abilities and adaptation to one's life circumstances are involved in these susceptibilities and vulnerabilities.

For some people in this group, these social judgment challenges may mask their disability temporarily, but ultimately these characteristics can contribute to their vulnerability. Research supports possible systematic interventions to counter these characteristics,

# USER'S GUIDE

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

11TH EDITION

**aaidd**

A-0127

APPLICATIONS FOR CLINICIANS IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

## TABLE 3.3

### Guidelines for Synthesizing Obtained Information

| | |
|---|---|
| 1. | Show clearly that the obtained information is aligned to the critical diagnostic question: "Does the person meet the three criteria necessary for a diagnosis of intellectual disability?" |
| 2. | Integrate information from multiple data sources (i.e. broad-based assessments and a thorough history). A valid diagnosis of ID is based on multiple data points that not only include giving equal weight to significant limitations in adaptive behavior and intellectual functioning, but also requires evaluating the pattern of test scores and factors that affect the standard error of measurement of the standardized assessment instruments used. |
| 3. | Be aware that some factors might artificially inflate test scores, thus inaccurately suggesting higher scores than the individual's true score. These misleading factors include anomalies in the structural features of the norming sample, gaps in the development of spacing of item difficulties or sub-tests of a comprehensive adaptive behavior measure, and pure error variance (Jacobson & Mulick, 2006). |
| 4. | Be aware of the potential 'false positive' (where the person is diagnosed as an individual with ID but in actuality is not) and 'false negative' (where the person's true ID is not diagnosed as such) (Greenspan, 2006). To overcome a potentially incorrect diagnosis, clinicians need to: (a) equally consider (that is, equate the relative importance of) adaptive behavior and intellectual functioning in making a diagnosis of ID; (b) factor in the standard error of measurement of the assessment instrument as well as other technical properties of the instrument used; and (c) incorporate information from multiple sources, including a thorough history. |
| 5. | When a series of scores differ while purporting to measure the same construct, thoroughly explore and analyze the possible reasons for differences in data. Possible reasons include poorly trained examiner(s), improper generalizations of test scores administered for other purposes, improper selection of tests, making mistakes in scoring, administration of the same test too close in time, using different editions of the same test and not using the most recent version, examiner bias, and so forth. For example, there is evidence that IQ score estimates obtained from the WAIS may not be precisely equivalent to those obtained from the Stanford Binet (Lukens & Hurrell, 1996; Nelson & Dacey, 1999, Silverman et al., (2010). |
| 6. | Consider possible effects of personal characteristics and environmental factors that can affect test results. |
| 7. | In the synthesis of school related factors, determine whether the assessment(s) included classroom functioning and academic performance. |
| 8. | In the synthesis of information related to the evaluation of social competence, the focus should be whether the person: (a) interprets accurately others' emotions and intentions |

© American Association on Intellectual and Developmental Disabilities

19

CHAPTER 3

TABLE 3.3 *(continued)*

| |
|---|
| based on available cues; (b) generates appropriate social strategies in response to social problems, and (c) demonstrates knowledge and use of social skills such as anticipating the consequences of one's behavior or resolving particular social problems in a given social situation. |
| 9. Recognize the impact of practice effects, which refer to gains in IQ scores that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items. In addition, practice effects do not reflect growth or other improvement on the skills being assessed (Kaufman, 1994). |
| 10. Recognize that self-ratings have a high risk of error, since people with ID are more likely to attempt to look more competent and 'normal' than they actually are, as well as frequently exhibit an acquiescence bias. In addition, having ID is often a stigmatizing status that is tied closely to how a person is perceived by peers, family members, and others in the community; therefore, many people with ID and their families attempt to avoid the diagnosis and thus the stigma. |
| 11. Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior. The diagnosis of intellectual disability is based on meeting three criteria: significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age of onset prior to age 18. The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.' |
| 12. Recognize that a number of reasons might explain the lack of an earlier, official diagnosis of ID including: (a) the individual was excluded from a full school experience; (b) the person's age precluded their access to specialized services such as special education programs; (c) the person was given no diagnosis or a different diagnosis for 'political purposes' such as protection from stigma or teasing, avoidance of assertions of discrimination, or because of the potential impact on benefits of a particular diagnosis; (d) the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population; (e) parental concerns to avoid a label; (f) school-based political issues such as availability or non-availability of services and potential funding streams at that time; and (g) the lack of entry referral into the diagnostic-referral process due to cultural and linguistic differences or for other reasons. |

## RETROSPECTIVE DIAGNOSIS GUIDELINES

*The careful synthesis of information is required when a retrospective diagnosis is made.* Such a diagnosis should be based on multiple data points that not only give equal consideration to adaptive behavior and intelligence scores, but also reflect an evaluation of the pattern

20

CHAPTER 3

## FOSTERING JUSTICE WHEN DEALING WITH FORENSIC ISSUES

Clinicians in the field of ID may be involved in forensic issues that arise when persons with ID are involved with the civil or criminal justice system. The more common of these forensic issues center around personal competence, guardianship, property and financial management, victimization in crime, or accusations of committing a crime. This section of the *User's Guide* discusses best practices and clinical judgment guidelines that address how clinicians can foster justice when dealing with these forensic issues. These practices and guidelines relate to: (1) interpreting assessment information, (2) understanding foundational aspects of ID that are critically important in fostering justice for people with ID, and (3) overcoming common stereotypes.

## Interpreting Assessment Information

There are five critical areas involving the valid interpretation of assessment information that have emerged from clinical experiences dealing with forensic issues. These five areas involve understanding the following: (1) the concept of a confidence interval (CI), (2) the concept of a cutoff score, (3) that corrections need to be made in an obtained IQ score if the score was based on aging norms (i.e., the Flynn effect; Flynn, 2006), (4) the influence of practice effects on test results, and (5) the potential effect on test results attributable to faking.

*Confidence interval (CI).* A score obtained on a standardized psychometric instrument that assesses intellectual functioning or adaptive behavior is not absolute because of variability in the obtained score because of factors such as limitations of the instrument used, examiner's behavior and expertise, personal factors (e.g., health status of the person), or environmental factors (e.g., testing environment or testing location). Thus, an obtained score may or may not represent the individual's actual or true level of intellectual functioning or adaptive behavior because of these aforementioned factors. *Standard error of measurement (SEM)*, which varies by test, subgroup, and age group, is used to quantify the variability that is attributable to the test itself and *provides the basis for establishing a statistical CI within which the person's true score is likely to fall.*

- For well-standardized measures of general intellectual functioning, the SEM is approximately 3 to 5 points. As reported in the respective test's standardization manual, the test's SEM can be used to establish a *statistical confidence interval (CI) around the obtained score.* From the properties of the normal curve, a range of confidence can be established with parameters of at least one standard error of measurement (i.e. scores of about 66 to 74, 66% probability) or parameters of two standard error of measurement (i.e. scores of about 62 to 78, 95% confidence).
- For well-standardized measures of adaptive behavior the SEM for obtained scores is comparable to that of standardized tests of intelligence. Thus, the use of plus/minus one standard error of measurement yields a statistical confidence interval (around the obtained score) within which the person's true score will fall 66% of the time; the use of plus/minus two standard error of measurement yields a sta-

tistical confid
fall 95% of th
be considered
accuracy, dep
ing that the p
ing at a rate o
Flynn effect)
between inte
issue with sta
may be speci
viduals may o
behavior. Fo
2002; Greer
against relyir
out a diagno

*Cutoff score.* A cu
icant limitations ir

- For both cr
  below the m
  *interval)* for
  instrument.
- A fixed poir
  is intended

*Flynn Effect.* Th
points per year). T
norms. Both the l
in which a test wi
IQ upward of 3 p
Gresham & Resch
For example, if th
an individual's IQ
it was originally n
(2006), the popu
would be 103 in
approximately 2 :
and not approxir

*Practice effect.*
result from a pe
practice is to avo
vidual because it

22

© American Assoc

ËS

1 persons
n of these
financial
.is section
it address
practices
rstanding
or people

formation
: five areas
rval (CI),
·tained IQ
5), (4) the
est results

nstrument
ise of vari-
nent used,
·erson), or
1 obtained
·tual func-
·rd error of
o quantify
*ablishing a*

he SEM is
lardization
*iterval (CI)*
age of con-
·or of meas-
ters of two
idence).
.ed scores is
the use of
lence inter-
ill fall 66%
yields a sta-

tistical confidence (around the obtained score) in which the person's true score will fall 95% of the time. Thus, an obtained score on an adaptive behavior scale should be considered as an approximation that has either a 66% or 95% likelihood of accuracy, depending on the confidence interval used. There is no evidence suggesting that the population mean on standardized tests of adaptive behavior is increasing at a rate comparable to that observed on standardized tests of intelligence (i.e., Flynn effect). Because of the differences in test construction and administration between intellectual functioning and adaptive behavior, practice effect is not an issue with standardized adaptive behavior scales. One source of measurement error may be specific to measures of adaptive behavior and that is the concern that individuals may exaggerate their adaptive skills when asked to self-report their adaptive behavior. For this reason, numerous sources (e.g. Edgerton, 1967; Finlay & Lyons, 2002; Greenspan & Switzky, 2006; Schalock et al., 2010) have recommended against relying on self-reported measures of adaptive behavior when ruling-in or -out a diagnosis of ID.

*Cutoff score.*   A cutoff score is the score(s) that determines the boundaries of the "significant limitations in intellectual functioning and adaptive criteria" for a diagnosis of ID.

- For both criteria, the cutoff score is approximately 2 standard deviations (SD) below the mean of the respective instrument, considering the SEM (see *Confidence interval*) for the specific instrument used, and the strengths and limitations of the instrument.
- A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.

*Flynn Effect.*   The *Flynn Effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn Effect effects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted (Fletcher et al., 2010; Gresham & Reschly, 2011; Kaufman, 2010; Reynolds et al., 2010; Schalock et al., 2010). For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July, 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, on the basis of Flynn's data (2006), the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.30 = 2.7). Hence, using the significant limitations of approximately 2 SDs below the mean, the Full-Scale IQ cutoff would be approximately 73 and not approximately 70 (plus or minus the SEM).

*Practice effect.*   The practice effect refers to gains in IQ scores on tests of intelligence that result from a person being tested on the same instrument. The established clinical best practice is to avoid administering the same intelligence test within a year to the same individual because it will often lead to an overestimation of the examinee's true intelligence.

© American Association on Intellectual and Developmental Disabilities                23

CHAPTER 3

*Claims of faking.*   Sometimes in a contested legal case an allegation of intentional "faking bad" is made, asserting that the individual is attempting to gain a benefit by deliberately faking a disability. Such claims of faking, when they are made, are usually in cases involving mental disorders because mental illness can have a later-life onset, subjective symptoms, and waxing and waning symptoms.

Allegations that an individual is intentionally faking bad, by faking ID, occur in some legal cases. The cases in which such allegations occur are cases in which rights such as eligibility for financial supports or exemption from the death penalty would come into play if the individual has an ID (Keyes, 2004). The term *malingering* is often used to refer to "faking bad." The *DSM-IV-TR* (APA, 2000) defined malingering as intentionally and purposefully feigning an illness to achieve some recognizable goal or tangible benefit (e.g., feigning ID to be spared the death penalty). Such allegations that a person is faking ID must be analyzed cautiously, however, for several reasons. First, the elements required for a diagnosis of ID must have been present from an early age (ID must originate before the age of 18), so there is almost always a documented lifetime history, usually beginning at birth or early childhood and extending through the school years, of significant limitations in intellectual functioning and adaptive behavior. Second, in cases in which an earlier diagnosis of ID cannot be documented because the individual grew up in another country and/or there are no assessment records, a clinician may conduct or access a current assessment of intellectual functioning and adaptive behavior, including a history, to determine current functioning, and together with clinical judgment make a retrospective diagnosis if indicated. Third, the more common faking direction when an individual with ID attempts to fake is to "fake good" so as to hide their ID and try to convince others that he or she is more competent (Edgerton, 1967).

Claims of faking ID in an individual should be addressed by a clinician in ID conducting a thorough evaluation for ID using the diagnostic and clinical strategies outlined in the 11th edition of the AAIDD manual and in this *User's Guide*. The authors of this *User's Guide* are aware of the concern that some (e.g., Doane & Salekin, 2008) have expressed about the potential to feign deficits on currently used adaptive behavior scales. Clinicians need to be aware of this potential and ensure that they interview multiple individuals who know the person well and who have had the opportunity to directly observe the person engaging in his or her typical behaviors across multiple contexts (i.e., home, community, school, and work).

Clinicians who similarly attempt to use specific "malingering" tests in individuals with ID must use considerable caution because of two factors: (1) the lack of a research base supporting the accuracy of such tests for persons with ID (Hayes et al., 1997; Hurley & Deal, 2006); and (2) the documented misuse of common malingering tests even when the test manual explicitly precludes use with individuals with ID (Keyes, 2004). Standardized assessment instruments used to inform the clinician whether the person is putting forth his or her best effort (i.e., malingering) have not, for the most part, been normed for persons with ID (MacVaugh & Cunningham, 2009). In addition, recent studies have documented unacceptable error rates (i.e., false positive for malingering) when used with persons with IQ scores from 50 to 78 (Dean et al., 2008; Hurley & Deal, 2006). Thus, the assessment of "faking bad" with individuals with low IQs (i.e., below 80) should be conducted with great prudence when relying on standardized measures that are not strictly normed or validated with persons being assessed for ID.

24

**Founda**

Terminol
not under
and misu
cessfully a
foundatio
with ID.
within th
culture. T
typical co
by ability
borhoods
ordinarily

Second
have capa
physical
which the
ID is cha
tive beha
ity origir
disability
processes
manifest
mathema
injury, n
300.8 [1

The fo
ceptually
that man
behavior
presence
scales do
behavior
around l
adaptive
individu
environr

**Overco**

Stereoty
are perce
model o
minolog
moron.

© Americ

tentional "fak-
efit by deliber-
sually in cases
set, subjective

occur in some
hts such as eli-
come into play
used to refer to
entionally and
ngible benefit
erson is faking
nents required
riginate before
ally beginning
nificant limita-
which an ear-
up in another
or access a cur-
ng a history, to
a retrospective
an individual
convince oth-

n ID conduct-
ies outlined in
authors of this
n, 2008) have
behavior scales.
multiple indi-
lirectly observe
cts (i.e., home,

idividuals with
a research base
997; Hurley &
ests even when
;, 2004). Stan-
person is put-
ost part, been
ldition, recent
r malingering)
lurley & Deal,
Qs (i.e., below
lized measures
).

## Foundational Aspects of ID

Terminology and concepts used within one field or profession (such as ID) are frequently not understood clearly by members of another field or profession. As a result, confusion and misunderstanding can occur within the courtroom and impact legal decisions. Successfully addressing forensic issues requires that all key players understand the following foundational aspects of ID that are critically important in fostering justice for people with ID. First, limitations in the individual's present functioning must be considered within the context of community environments typical of the individual's age peers and culture. Thus, the standards against which the individual's functioning are compared are typical community-based environments, not environments that are isolated or segregated by ability or current placement. Typical community environments include homes, neighborhoods, schools, businesses, and other environments in which people of similar age ordinarily live, play, work, and interact.

Second, within an individual, limitations often coexist with strengths. Individuals may have capabilities and strengths that are independent of ID such as strengths in social or physical capabilities, some adaptive-skill areas, or in one aspect of an adaptive skill in which they otherwise show an overall limitation. Third, ID is not the same as an LD. An ID is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18 (Schalock et al., 2010, p. 1). In distinction, a learning disability (LD) is characterized by a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia (34 CFR sec. 300.8 [10]).

The fourth critically important foundational aspect is that adaptive behavior is conceptually different from maladaptive or problem behavior. This is true despite the fact that many adaptive behavior scales contain assessment of problem behavior, maladaptive behavior, or emotional competence. To be specific, (1) there is general agreement that the presence of clinically significant levels of problem behaviors found on adaptive behavior scales does not meet the criterion of significant limitations in adaptive functioning, (2) behaviors that interfere with the person's daily activities, or with the activities of those around him or her, should be considered problem behavior rather than the absence of adaptive behavior, and (3) the function of problem behavior may be to communicate an individual's needs, and in some cases, may even be considered an adaptive response to environmental conditions.

## Overcoming Common Stereotypes

Stereotypes are not unique to persons with ID. Indeed, most individuals or groups who are perceived as different on some basis are stereotyped based on the perceiver's mental model or image of such persons or groups. In reference to persons with ID, historical terminology contributes to stereotyping as reflected in such terms as idiot, imbecile, or moron. Physical appearance can also contribute to stereotypes as reflected in the state-

© American Association on Intellectual and Developmental Disabilities

25

CHAPTER 3

ment that "if you don't have the look (as in Down syndrome) then you are not intellectu-ally disabled." It should be noted that the vast majority of persons with an ID have no dysmorphic feature and generally walk and talk like persons without an ID.

Regardless of their origin, a number of incorrect stereotypes can interfere with justice. These incorrect stereotypes must be dispelled:

- Persons with ID look and talk differently from persons from the general popula-tion
- Persons with ID are completely incompetent and dangerous
- Persons with ID cannot do complex tasks
- Persons with ID cannot get driver's licenses, buy cars, or drive cars
- Persons with ID do not (and cannot) support their families
- Persons with ID cannot romantically love or be romantically loved
- Persons with ID cannot acquire vocational and social skills necessary for independ-ent living
- Persons with ID are characterized only by limitations and do not have strengths that occur concomitantly with the limitations

These incorrect stereotypes are unsupported by both professionals in the field and published literature. Stereotypes are best addressed by understanding the characteristics of persons with ID, and especially those common characteristics of persons with ID with higher IQs that were summarized in Tables 3.1 and 3.2.

26

# The DEATH PENALTY and INTELLECTUAL DISABILITY

## Edward A. Polloway, Editor



**aaidd**

American Association
on Intellectual and
Developmental Disabilities



# 8 | Intelligence Testing

Dale G. Watson

## Nature of the Problem

The evaluation of intelligence is an essential component in establishing the diagnosis of an intellectual disability (ID). Clinical practice and professional standards require that, in high-stakes evaluations, an IQ test score be derived from an individually administered global measure of intellectual functioning. In most instances, this is represented by indexes of general cognitive (thinking) abilities (e.g., the full-scale IQ test score or its equivalent), though in certain circumstances, subcomponent elements or part scores may provide invaluable information.

In selecting a test to measure intellectual functioning or in understanding the adequacy of a test that has been administered, a number of important dimensions must be considered. For example, key considerations include the degree to which an IQ test score is saturated with a general factor of intelligence, known as "g," or is instead, a narrow measure of a more specific ability (e.g., fluid reasoning or crystallized intelligence—see Chapter 7); the number and mixture of specific intellectual abilities assessed by a particular IQ test; the influence of "practice effects" and norm obsolescence (Flynn effect) on the accuracy of the obtained scores (see Chapter 10); foundational psychometric characteristics such as reliability and validity (see Chapter 5); the adequacy of the standardization procedures; and the representativeness of the test norms. Additional issues relate to the use of current instruments, congruence of language between the test and the person to be assessed, the cultural fairness of the instrument, and the level of acculturation of the individual. The information presented in this chapter discusses these important issues related to IQ assessment, particularly as relevant to the diagnosis of ID.

113



114    Intelligence Testing

## Summary of Related Research

There are a multiplicity of definitions of intelligence and continuing debate over the nature of intelligence (Urbina, 2011; VandenBos, 2007). Most definitions recognize intelligence as a combination of cognitive abilities involved in the comprehension of complex ideas, problem solving, learning, reasoning, abstract thinking, and efficient adaptation to the environment (see also Chapter 7). For example, as described in the 11th edition of the American Association on Intellectual and Developmental Disabilities's *Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2010), intellectual functioning is "best conceptualized and captured by a general factor in intelligence. [That is,] intelligence is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience" (Schalock et al., 2010, p. 31).

The general factor of intelligence is correlated with a wide array of important individual characteristics and behavioral outcomes including, but not limited to: academic achievement measured by grade point average (GPA), risk of dropping out, and years of education; occupational achievement; risk for unemployment; risk for delinquency and criminal behavior (Gottfredson, 1997; Jensen, 1998); coping with ordinary life such as using maps, banking, and interpreting news articles; dealings with people (Gottfredson, 1997); biological characteristics including brain size, central nerve conductance velocity (Gignac, Vernon, & Wickett, 2003; Luders, Narr, Thompson, & Toga, 2009; Mackintosh, 2011; McDaniel, 2005), and efficiency of brain glucose metabolism (Haier, 2003); death rates from motor vehicle accidents (O'Toole, 1990); and life expectancy (Hart et al., 2003; Whalley & Deary, 2001; cf. Patja, Iivanainen, Vesala, Oksanen, & Ruoppila, 2000). A higher level of intelligence serves as a protective factor. In contrast, individuals with more limited intellectual resources are increasingly vulnerable to the vicissitudes of life.

IQ test scores, in the form of the composite full-scale IQ in particular, are commonly used to estimate and describe this general factor of intelligence. The dominant and most accepted view is that intellectual abilities are arranged in a hierarchical fashion with the general factor of intelligence at the apex, which in turn subsumes a number of broad intellectual abilities as well as more specific or narrow functions (Buckhalt, 2002; Carroll, 1993; Jensen, 1998; Mackintosh, 2011; Neisser et al., 1996; Schneider & McGrew, 2012; Spearman, 1927; cf. Stankov, 2005; cf. Sternberg & Grigorenko, 2002; see also Chapter 7).

Carroll's (1993) seminal meta-analytic study of the extant literature on the factor structure of intelligence identified the major components of general intelligence. This work was subsequently combined with that of Horn and Cattell to provide a structural model of intelligence termed the Cattell–Horn–Carroll (CHC) theory (Kaufman, 2009; McGrew & Flanagan, 1998; McGrew, 1997, 2005, 2009; Schneider & McGrew, 2012; see also Chapter 7). CHC theory posits a hierarchical structure of intelligence with a *general* ability factor (*g*) at the apex. In this taxonomy, abilities are differentiated at three

different levels (referred to as strata) of generalization or breadth. The most specialized abilities are classified as *narrow* abilities. Narrow abilities, in turn, are subsumed under more *broad* intellectual abilities. All broad abilities are subsumed by the *general* ability of general intelligence (*g*). The broad cognitive ability factors include fluid intelligence (*Gf*), quantitative knowledge (*Gq*), crystallized intelligence (*Gc*), reading and writing (*Grw*), short-term memory (*Gsm*) or short-term working memory (*Gwm*), visual processing (*Gv*), auditory processing (*Ga*), long-term storage and retrieval (*Glr*), processing speed (*Gs*), and decision/reaction time/speed (*Gt*; Flanagan, Ortiz, & Alfonso, 2007; McGrew, LaForte, & Schrank, 2014).

Composite IQ test scores are highly correlated with the general factor of intelligence (Jensen, 1998; National Research Council [NRC], 2002), even though they are only approximate proxy measures for the underlying general dimension (Colom, Abad, Garcia, & Juan-Espinosa, 2002; Fiorello et al., 2007; Mackintosh, 2011; Schneider, 2013a). Full-scale composite IQ scores are derived, in general, from admixtures of tasks more or less saturated with the general factor of intelligence. However, different full-scale IQ scores are also impacted by the specific combination of broad and narrow intellectual abilities measured by different IQ tests (see Chapter 7). To the extent that an IQ test can be judged a valid measure of general intellectual functioning, it must reasonably and accurately measure general intellectual ability rather than isolated specific components of intelligence. The general factor of intelligence is of particular import inasmuch as it has a greater impact on functioning at lower levels of intelligence, whereas factors that are more specific tend to become significant in higher IQ ranges (Detterman & Daniel, 1989; Reynolds, Keith, & Beretvas, 2010; Wechsler, 2008). Moreover, individuals with a mild level of ID perform more poorly on subtests that are better measures of general intelligence (Spitz, 1988) though the presence of "splinter skills" may not be uncommon (Bergeron & Floyd, 2006; Fiorello, et al., 2007; Fiorello, Hale, McGrath, Ryan, Quinn, 2001). In addition, the diagnosis of ID has traditionally focused on composite full-scale IQ scores that serve as proxies for the general factor of intelligence.

The "intelligence" measured by one IQ test is not necessarily the same as that measured by another test (Daniel, 2000; Stankov, 2002, 2005; see Chapter 7). However, although the general factor of intelligence may be "colored" by the specific mixture of broad and narrow abilities measured by different tests, research studies have demonstrated that a similar higher-level general intelligence factor or ability emerges whenever a sufficiently large and diverse array of intellectual abilities are assessed, mostly independent of the specific battery utilized (Carroll, 1993; Floyd, Shands, Rafael, Bergeron, & McGrew, 2009; Jensen, 1980, 1998, 2002; Johnson, Bouchard Jr., Krueger, McGue, & Gottesman, 2004; Johnson, te Nijenhuis, & Bouchard Jr., 2008; Mackintosh, 2011; Thorndike, 1987). Nonetheless, this is not to say that IQ test scores will be identical across tests. IQ tests differ in how and the extent to which they measure general intellectual ability and the component parts of intelligence (see Chapter 7). IQ tests also differ along a number of other important dimensions.

116    Intelligence Testing

### Standards for Educational and Psychological Testing

The American Educational Research Association (AERA), the American Psychological Association (APA), and the National Council on Measurement in Education (NCME), published, in 2014, an updated version of the *Standards for Educational and Psychological Testing* (hereafter *Standards*). The purpose of these standards is "to provide criteria for the development and evaluation of tests and testing practices and to provide guidelines for assessing the validity of interpretations of test scores for the intended test uses" (AERA, APA, & NCME, 2014, p. 1). Standards have been established addressing issues of test construction, evaluation, and documentation; fairness in testing; and testing applications. The standards address issues of validity, reliability, normative standards, and other important criteria for the evaluation of tests. The standards also provide an overarching framework for examining issues relevant to test selection detailed below.

### Normative Standards

IQ test scores reference an individual's relative standing in comparison to a large sample of individuals (the normative sample) selected to be representative of the general population. The IQ test scores obtained from psychometrically sound IQ tests are normally distributed, forming the well-known bell-shaped curve. Composite IQ test scores for all major contemporary IQ tests (see Chapter 7) are reported as standard scores that have a mean (average) of 100 and a standard deviation of 15. Individuals with ID will generally have composite IQ test scores that are approximately two standard deviations or more below the mean of the population on a recently normed test, that is, an IQ standard score of 65 to 75 (70 ± 5) or below, allowing for measurement error (American Psychiatric Association, 2013; Schalock et al., 2010).

IQ test scores are not 100% reliable. The degree of measurement error associated with an IQ test score is based on the reliability of the IQ test score. The standard error of measurement (*SEM*; see Chapter 5) provides a measurement of the degree of error. The *SEM* allows users to place a band of confidence around the obtained IQ test score, most commonly operationalized as ±5 IQ test score points (95% confidence band). The IQ test score criteria for the diagnosis of ID may then include scores of 75 or below, considering the *SEM*.

Normative samples for measures of intelligence typically have exclusion criteria eliminating individuals with sensory-motor impairment; limited English language skills; and histories of severe medical, psychiatric, or neurological dysfunction that might affect cognition. Normative samples must be large enough to provide meaningful stratification of the sample based on the subject characteristics of age, gender, socioeconomic status, levels of education, geographic location, and other variables.

The adequacy and representativeness of an IQ test's normative sample is a critical variable in the selection of an IQ test. The major IQ tests are generally constructed to match the United States Census in terms of key demographic variables including

TABLE 8.1. Normative Sample Sizes for Selected IQ Tests

| Test/Sample Size | WAIS-IV | SB5 | WJ III NU | RIAS |
|---|---|---|---|---|
| Overall Sample Size | 2200 | 4800 | 8782 | 2438 |
| Sample Size (Age > 17) | 2000 | 1200 | 2997 | 1116 |
| Sample Size by Age (Age Range) | 1400 (18:0 – 64:11) | 600 (17:0 – 59:11) | 2530 (18:0 – 59:11) | 982 (17:0-74:11) |
| Intellectually Disabled Comparison Studies Sample Size (Age Range) | 104 (16:0 – 63:11) | 119 (3 – 25) | 93 (< 19) | 26 (18:0 +) |

Note. WAIS–IV = Wechsler Adult Intelligence Scale–IV; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; RIAS = Reynolds Intellectual Assessment Scales. Data are from the respective technical manuals.

gender, race/ethnicity, geographic region, and education (as a proxy for socioeconomic level). The sizes of the normative samples for the major IQ tests are generally considered adequate (see Bridges & Holler, 2007; also Crawford & Garthwaite, 2008). Norm sample sizes, within the relevant adult age groups (approximately 18–60 years old), range from about 600 for the Stanford-Binet 5 (SB5) to about 2500 for the Woodcock-Johnson III (WJ III; see Table 8.1). As also reported in Table 8.1, clinical samples of subjects with ID are sometimes reported in IQ test manuals.

As described in the AERA, APA, and NCME standards, test publishers are responsible for creating tests that provide valid score interpretations across diverse individuals (Standard 3.1):

A test that is fair . . . reflects the same construct(s) for all test takers, and scores from it have the same meaning for all individuals in the intended population; a fair test does not advantage or disadvantage some individuals because of characteristics irrelevant to the intended construct. To the degree possible, characteristics of all individuals in the intended test population, including those associated with race, ethnicity, gender, age, socioeconomic status, or linguistic or cultural background, must be considered throughout all stages of development, administration, scoring, interpretation, and use so that barriers to fair assessment can be reduced. (AERA, APA, & NCME, 2014, p. 50)

Information relevant to these issues is commonly available in the test manual. Further, it is the responsibility of the examiner to determine if the examinee can reasonably be compared to the normative reference group (Standard 10.5). In this context, the adequacy of the individual's English language skills, the presence of sensory and motor limitations (especially hearing and vision), and their level of acculturation should be considered. However, the use of subgroup norms based on other demographic variables, such as gender, race, and education, commonly referred to as demographically adjusted norms (Heaton, Miller, Taylor, & Grant, 2004), while potentially appropriate for neuropsychological evaluation, cannot be used to diagnose ID because the diagnosis is dependent on a comparison to the larger normative reference group.

118    Intelligence Testing

## Standardization

The reliability and validity (discussed below and in Chapter 5) of an assessment for ID requires the use of standardized procedures for the administration and scoring:

> The usefulness and interpretability of test scores require that a test be administered and scored according to the developer's instructions. When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. (AERA, APA, & NCME, 2014, p. 111)

There are a number of other relevant standards that are applicable to the appropriate administration of tests of intelligence. First, certain basic conditions relate to the environment in which the assessment takes place (e.g., quiet and free from distractions, absence of third-party observers, freedom of motion as needed for any task requiring motor movements) and deviations from these conditions should be considered during the interpretative process (Standard 10.8; American Academy of Clinical Neuropsychology [AACN], 2001; Axelrod et al., 2000; Committee on Psychological Tests and Assessment–American Psychological Association, 2007). Second, there is an apparent need for test administration and scoring to be accurate (Standard 9.5; AERA, APA, & NCME, 2014, p. 153). Third, accurate assessment assumes that the testee puts forth adequate effort (AERA, APA, & NCME, 2014, p. 154–155; Bush et al., 2005); this concern is particularly relevant in assessing individuals with ID (Dean, Victor, Boone, & Arnold, 2008; Salekin & Doane, 2009). The American Academy of Clinical Neuropsychology (2007) described relevant techniques for assessing motivation and effort:

> Approaches for assessing motivation and effort include: behavioral observations from interview or testing of behaviors such as avoidance, resistance, hostility, and lack of cooperation; examination of the pattern of performance among traditional neuropsychological measures; identification of cognitive profiles that do not fit with known patterns typical of brain disorder; and consideration of suspect performance on objective measures of effort. Clinicians utilize multiple indicators of effort, including tasks and paradigms validated for this purpose, to ensure that decisions regarding adequacy of effort are based on converging evidence from several sources, rather than depending on a single measure or method. (p. 221–222)

## Reliability

Issues of test reliability are central to the selection of an appropriate test for the measurement of intelligence (see Chapter 5 for an extensive discussion of this issue). Reliability is "the ability of a measurement instrument (e.g., a test) to measure an attribute consistently..." (VandenBos, 2007, p. 786). Reliable tests provide consistent results over

time an
tests ca
reliabili
Inter
homog
fication
or subs
lar and
ity. Stal
whethe
will be
Reli
ligence
to .99.
scores.
ing (Je
2012).
purpo:
of reli
error (
progre
accept
The
than a
relatio
and th
in a sr
retical
2008).
admii
Kaufn
Be
of the
to rec
obtaii
likely
score
appr(
score
posit
the st

time and circumstances (Reynolds & Kamphaus, 2003). The scores obtained from IQ tests can be described by different forms of reliability; indices of internal consistency reliability and stability (or test-retest) reliability are presented here.

Internal consistency reliability addresses the degree to which items or subtests are homogeneous and measuring similar underlying abilities (Henson, 2001). The quantification of internal consistency relies on coefficients of the correlations between items or subsets of items. This type of reliability ensures that what is being measured is similar and provides the basis for valid interpretations of the underlying dimension or ability. Stability or test-retest reliability refers to the consistency of scores over time, that is, whether scores on a second administration of a test to the same group of individuals will be similar.

Reliability coefficients for the composite (full-scale) IQ test scores of the major intelligence tests are generally excellent with average or median coefficients in adults of .97 to .99. Reliability coefficients are generally higher for the full-scale scores than for part scores. Reliability coefficients should be .90 or greater for high-stakes decision making (Jensen, 1980; National Research Council [NRC], 2002; Wasserman & Bracken, 2012). The National Research Council observed, "Instruments used for the high-stakes purposes of diagnosing mental retardation . . . should approximate this minimal level of reliability, recognizing that the inverse of reliability is measurement error and that error only confounds correct decision making" (2002, p. 132). Reliabilities below .97 progressively widen the .95% confidence band beyond the ±5 points generally seen as acceptable for diagnosing ID.

The *SEM* is a more relevant and convenient means of using reliability information than are reliability statistics (AERA, APA, & NCME, 2014). The *SEM* has an inverse relationship with measures of reliability and is computed from the reliability coefficient and the standard deviation of the scale (Roid, 2003b). A more reliable test will result in a smaller *SEM* (Wechsler, 2008). The *SEM* represents the error in estimating a theoretical true score based upon the actual score on a test (VandenBos, 2007; Wechsler, 2008). The true score is the theoretical score that would be found if it were possible to administer the test thousands of times to the same individual (absent practice effects; Kaufman, 2009).

Because all test scores include error, it is critical to be able to quantify the magnitude of the error—*SEM* serves this purpose. Because of measurement error, it is important to recognize that obtained IQ test scores only estimate the theoretical true score; the obtained IQ test score is the approximate midpoint of the range in which a score is likely to fall. For example, with an obtained score of 72 and an *SEM* of 2.12, the true score is likely to fall, with a 68% degree of confidence, within a band of ± 1 *SEM*, that is, approximately 70 to 74. Similarly, with a 95% degree of confidence, using ±2 *SEMs*, the score is likely to fall between 68 and 76. The *Standards* state, "When a test score or composite score is used to make classification decisions (e.g., pass/fail, achievement levels), the standard error of measurement at or near the cut scores has important implications



120    Intelligence Testing

for the trustworthiness of these decisions" (AERA, APA, & NCME, 2014, p. 46). As the United States Supreme Court determined in *Hall v. Florida* (2014), the *SEM* of an IQ test score must be considered when making the diagnosis of ID in capital punishment cases. The use of "bright line" cutoffs for determining whether an individual has ID only reduces the trustworthiness of such decisions. Some instruments, notably the WAIS-IV and the SB5, use the standard error of estimate (*SEE*) instead of the *SEM* to construct confidence intervals. The *SEE* corrects for the probability that true scores are more likely to fall towards the middle of the distribution, i.e., regression to the mean effects. The *SEE* affects extreme scores to a greater extent than scores falling in the middle of the distribution and, thus, provides an asymmetrical confidence band around obtained IQ scores at the extremes (Roid, 2003b).

### Validity

Validity refers to the accuracy with which a test measures the underlying dimension or ability it is designed to assess (AERA, APA, & NCME, 2014; VandenBos, 2007). Validity "is the degree to which all the accumulated evidence supports the intended interpretation of test scores for the proposed use" (AERA, APA, & NCME, 2014, p. 14). It is the interpretation and not the test itself that is valid (AERA, APA, & NCME, 2014).

Validity is supported by different lines of evidence that commonly include data related to test content, response processes, internal structure, relations to other variables and measures, and the consequences of testing (AERA APA, & NCME, 2014; Reynolds & Kamphaus, 2003; see Chapter 5 for a more extensive discussion of these issues). The test manuals for each of the major IQ test instruments provide the specific lines of evidence supporting the interpretations of the test. In general, there is substantial evidence that the major IQ tests discussed in this chapter are valid measures of intellectual abilities. Nonetheless, because these instruments measure (and conceptualize) intelligence in somewhat different ways, differences exist between tests.

Braden and Niebling (2012) have used the previous edition (1999) of the *Standards* to "articulate a framework for judging the validity evidence provided by test developers" (p. 739), specifically as applied to contemporary intelligence tests. The authors have evaluated the validity claims made by the test developers of the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), the SB5, the Woodcock-Johnson III Tests of Cognitive Abilities (WJ III Cog), the Kaufman Assessment Battery for Children, Second Edition (KABC-II), and the Reynolds Intellectual Assessment Scales (RIAS).

### Exchangeability

Exchangeability refers to the degree to which IQs will be reasonably consistent across test batteries (Floyd, Bergeron, McCormack, Anderson, & Hargrove-Owens, 2005; Floyd, Clark, & Shadish, 2008; see also Chapter 7). The common assumption is that an IQ obtained on, for example, the WAIS-IV will be reasonably similar to an IQ obtained on another test. Such exchangeability can be broadly quantified by determining the degree to which the tests are measuring the same underlying abilities, that is, the proportion

**TABLE 8.2.** Select Composite Score Correlation Coefficients and Shared Variance Between IQ Tests

|  | WAIS-IV FSIQ | WAIS-III FSIQ | SB5 FSIQ | WJ III GIA | RIAS CIX |
|---|---|---|---|---|---|
| WAIS-IV |  | 88% | — | — | — |
| WAIS-III | .94 |  | 67% | 45% | 56% |
| SB5 | — | .82 |  | 61%/81% | — |
| WJ III | — | .67 | .78/.90* |  |  |
| RIAS | — | .75 | — | — |  |

*Note.* WAIS-IV = Wechsler Adult Intelligence Scale–IV; WAIS-III = Wechsler Adult Intelligence Scale–III; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; and RIAS = Reynolds Intellectual Assessment Scales. FSIQ = Full-scale IQ; GIA = General intellectual ability; and CIX = Composite Intelligence index.

Data are from each IQ test's technical manuals. Correlation coefficients are displayed below the shaded diagonal line and the percent of shared variance above the diagonal. Data for the WJ III are for the 2001 version rather than the Normative Update. Dashes indicate that data is unavailable in the respective test manuals.

*A study using the same five factors across the SB5 and WJ III Cog found a substantially higher correlation of .90 (Roid, 2003b).

of shared variance. Shared variance is calculated as the square of the correlation coefficients (r) between the measures of global intelligence, multiplied by 100. For example, the SB5 Full Scale IQ (FSIQ) and the WAIS-III FSIQ have approximately 67% shared score variance (r = .82; See Table 8.2). Stankov (2005) has noted that correlations lower than about .60 suggest that two tests are not measuring the same underlying abilities. Because of the magnitude of the typical correlations reported between tests, composite IQ test scores on average can differ between instruments to a significant degree (see Chapter 7 for more detailed discussion). See Table 8.3 for examples of reported IQ test score differences ranging from one to approximately nine points.

**TABLE 8.3.** Example Composite Score Mean Differences Between IQ Tests With Flynn Effect Corrections (Below Diagonal)

|  | WAIS-IV FSIQ | WAIS-III FSIQ | SB5 FSIQ | WJ III GIA | RIAS CIX |
|---|---|---|---|---|---|
| WAIS-IV |  | +2.9 | — | — | — |
| WAIS-III | −.07 |  | −3.6 | −8.5 | −.52 |
| SB5 | — | −1.8 |  | +1.4 | — |
| WJ III | — | −7.6 | +.5 |  | — |
| RIAS | — | +.98 | — | — |  |

*Note.* WAIS-IV = Wechsler Adult Intelligence Scale–IV; WAIS-III = Wechsler Adult Intelligence Scale–III; WJ III NU = Woodcock-Johnson III Normative Update; SB5 = Stanford Binet 5; and RIAS = Reynolds Intellectual Assessment Scales. FSIQ = Full-scale IQ; GIA = General intellectual ability; and CIX = Composite Intelligence index.

Data are from each IQ test's technical manual. The values are presented as *example differences* from single studies and are *not* to be interpreted as the best single estimate of typical score differences between the different IQ tests— estimates that would require the synthesis of all available specific pairs of IQ-IQ test comparison studies. Average differences are displayed above the shaded diagonal and are based on the reported calculations that have subtracted the IQ scores from the test in the left column from the IQ scores in the top row, e.g., the WAIS-III provided higher scores than the WAIS-IV (+2.9) but the WJ III provided lower scores than the WAIS-III (−8.5). Difference scores below the diagonal are Flynn effect adjusted scores (see Chapter 10) providing the difference once Flynn effect adjustments are made. Data for the WJ III are from the 2001 technical manual (McGrew & Woodcock, 2001). Dashes indicate that data was unavailable from the respective IQ test technical manuals used to construct this table.

A-0144

122    Intelligence Testing

IQ test score differences across instruments may stem from a variety of reasons (see Chapter 7 for further discussion). One major reason is that different IQ tests measure different mixes of abilities. The extant IQ-IQ test battery joint factor analysis research (see Keith and Reynolds, 2010) suggests that IQ tests measure somewhat overlapping broad intellectual abilities, but they also do not always measure the exact same set of parallel broad abilities. For example, the WAIS-IV has been found to measure the broad CHC abilities *Gf, Gc, Gv, Gsm,* and *Gs* (Lichtenberger & Kaufman, 2009). In contrast, the WJ III (Woodcock, McGrew, Schrank, & Mather, 2001, 2007) measures seven of the broad intellectual abilities identified by CHC theory (*Gf, Gc, Glr, Gv, Ga, Gs, Gsm, Grw,* and *Gq*; McGrew & Flanagan, 1998). Finally, the SB5 measures *Gf, Gc, Gq, Gv,* and *Gsm* (Keith & Reynolds, 2010; Roid, 2003b; Roid & Pomplun, 2012). Thus, exchangeability may be impacted by the degree to which an IQ test measures similar broad intellectual abilities as well as the balance between general intelligence versus more specific abilities (Floyd et al., 2008). Exchangeability is increased when instruments load highly on the general factor of intelligence (Floyd et al., 2008).

To summarize, despite evidence for a unitary general factor of intelligence across different IQ tests, within adult populations, different IQ tests measure somewhat different mixtures of intellectual abilities. As a result, different IQ tests will not always provide IQ test scores that are precisely the same (Floyd et al., 2008). IQ test scores between instruments are not perfectly "exchangeable." (See below for strategies to resolve apparent discrepancies across test batteries.)

### Practice Effects

Practice effects refer to the potential for inflated IQ scores due to the repeated administrations of the same test to the same individual. Considerations regarding practice effects should play a prominent role in the selection of an appropriate IQ instrument in cases in which the same IQ test (or an earlier version of the IQ test) has previously been administered. When the same tests are administered in close proximity in time, there is likely to be a gain in the obtained IQs on the second administration. Schalock et al. (2010) noted, ". . . established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence" (p. 38).

However, the magnitude of potential practice effects is frequently insufficiently considered. For example, substantial practice effects have been shown to occur on the Wechsler Adult Intelligence Scale–Revised (WAIS-R; Matarazzo & Herman, 1984) and the Wechsler Adult Intelligence Scale–Third Edition (WAIS-III; Basso, Carona, Lowery, & Axelrod, 2002), with an average increase of 6 points on the full-scale IQ over periods ranging from 2 weeks to 6 months. Practice effects for the WAIS-IV have also been reported to be substantial (over 7 points in some populations at a 6-month retest interval; Brooks, Sherman, Iverson, Slick, Strauss, 2011; Brooks, Strauss, Sherman,

Iverson, & Slick, 2009; Estevis, Basso, & Combs, 2012; Wechsler, 2008). Smaller practice effects have been reported for the SB5 (Roid, 2003b) and the RIAS (Reynolds & Kamphaus, 2003).

IQ tests show considerable stability over time at the group level, represented by relatively high stability (test-retest) correlation coefficients. However, considerably less consistency has been reported at the individual level, particularly within low IQ groups (Whitaker, 2008). Considerable caution must be exercised in repeating similar IQ tests or, when interpreting past test findings with lower results, assuming them to be invalid. Practice effects may also be magnified when similar instruments are administered on multiple occasions. This practice can lead to "progressive error" in which subsequent tests become less and less accurate (Kaufman, 2009).

Statistical procedures are available to assist in determining whether subsequent administrations of the same instrument represent real differences or simple statistical artifact. For example, various reliable change indices (RCI), based upon stability coefficients, have been developed that inform the user of the magnitude of change expected to be found on retesting (Basso et al., 2002; Brooks et al., 2009; Brooks et al., 2011; Estevis et al., 2012; Heaton et al., 2001; Lineweaver & Chelune, 2003; Temkin, Heaton, Grant, & Dikmen, 1999). In cases in which the same test has been administered, the application of RCIs adjusted for practice effects may be used to determine whether significant differences actually exist between the obtained scores (Estevis et al, 2012; Heaton et al., 2001; Pearson, 2009; Temkin et al., 1999). As Lineweaver and Chelune (2003) reported,

> . . . one cannot interpret scores from a repeat evaluation in the same manner and with the same meaning as those from an initial evaluation. The systematic bias inherent in retest scores, as well as measurement error, can dramatically alter the magnitude of the scores themselves, rendering them at best questionable and at worst misleading. (p. 332)

For some tests, scoring software is available to facilitate the calculation of RCIs.

Given the magnitude of practice effects, it is critically important to consider carefully the impact of repeat testing with the same test. Schalock et al. (2010) suggested avoiding the administration of the same intelligence test within the same year. However, data are limited as to the magnitude of practice effects over longer periods. Furthermore, retest interval time has not appeared to have a moderating effect across the intervals that have been studied (Basso et al., 2002; Estevis et al., 2012).

*Multiple IQ Scores Over Time*

It is not uncommon for individuals to have been administered multiple IQ tests over time. One might be tempted to simply average these scores to obtain a "true" IQ or conversely to adopt the highest score as the most accurate IQ. However, it is not

124    Intelligence Testing

psychometrically sound to simply average IQ scores in order to form a composite score (Schneider, 2012, 2013a, 2013b). Furthermore, it is inappropriate to simply accept, in a rote fashion, the higher score in the false belief that one can never score higher than their true IQ but can always score poorer in the face of limited effort. Instead, at a minimum, such scores should be examined to determine whether the confidence intervals for the obtained scores overlap or not.

It is also possible, in accordance with reliable scientific methods and professional standards, to combine composite IQ test scores across batteries when the correlations between the instruments can be reasonably determined or estimated and the reliabilities for all test scores are available. When this psychometric information is available for all relevant IQ tests that have been administered, it is then possible to calculate a psychometrically defensible estimated "true" IQ score (Schneider, 2012, 2013a, 2013b; see also *Hall v. Florida*). Such techniques may serve to resolve apparent discrepancies that can occur when different IQ tests have been administered. Further, this procedure allows one to avoid the statistically untenable action of simply averaging scores.

However, this psychometrically sophisticated procedure may not be practical to implement. Frequently, the intercorrelations between all IQ tests administered to the individual are not available in current or old test manuals (e.g., correlation between SB-IV and WAIS-IV) and it would be a daunting task to search the literature for all possible independent research studies to develop a methodologically sound meta-analytic estimate of the various IQ-IQ test correlation combinations. Nonetheless, the procedure outlined and implemented by Schneider (2012, 2013a, 2013b) does allow the software template to substitute reasonable estimates for correlations or reliabilities that are not easily found (or do not exist), but this option should only be used judiciously.

Given problems in locating all necessary input for the Schneider (2012) software, the next best practice for estimating an "average" of multiple IQ test scores is to use the median value of the collection of scores (Sattler, 2001). The use of the psychometric method of Schneider (2012, 2013a, 2013b) or the use of the median score to represent the "average" estimate of collection of scores should only be done when the variability of IQ test scores across time is minimal. Discrepant IQ test scores over time often reflect possible real changes in intelligence and may be due to a variety of factors (see Chapter 7 for discussion of reasons why IQ-IQ test score discrepancies occur). When scientific-based plausible explanations can explain vastly different IQ scores over time, attempting to estimate an "average" score is not recommended. It is only when a collection of IQ scores demonstrates a reasonable degree of convergence (e.g., 95% *SEM* confidence bands for all scores overlap or are not far apart), that estimating a composite IQ test score may be appropriate.

### Norm Obsolescence: The Flynn Effect

The Flynn effect (see also Chapter 10) refers to the phenomenon of steady increases in intelligence levels within populations over time. This phenomenon has been

acknowledged by the major publishers of intelligence tests since the early 1990s and is, in part, the rationale for updating versions of most IQ tests due to norm obsolescence (Wechsler, 1991; Wechsler, 2002a). Although there has been some controversy regarding the application of the Flynn effect in high-stakes evaluations (Hagan, Drogin, & Guilmette, 2010), the scientific and professional consensus is that the Flynn effect is a real phenomenon (Gresham & Reschly, 2011; Hagan et al.; Schalock et al., 2010; Weiss, 2010). Disagreements have centered on the magnitude of the Flynn effect, whether it is disappearing, whether it differentially affects lower and higher IQ groups equally, and whether it should be applied in litigation (Hagan et al.; Trahan, Stuebing, Fletcher, & Hiscock, 2014; Zhou, Zhu, & Weiss, 2010; see Chapter 10 for detailed discussion). Courts have also treated these issues with different outcomes, with some accepting the use of Flynn effect adjustments (e.g., *Ex Parte Eric Dewayne Cathey*, 2012; *People v. Superior Court (Vidal)*, 2005, 2007; *United States v. Davis*, 2009; *United States v. Hardy*, 2010; *United States v. Wilson*, 2013; N. Haydt, personal communication, May 22, 2013) while others have prohibited its use (e.g., *Beckworth v. State*, 2009; *Butler v. Quarterman*, 2008; *Pizzuto v. Blades*, 2012; *Thorson v. State*, 2011; N. Haydt, personal communication, May 22, 2013).

Professional standards require that examiners use up-to-date tests and norms. As the *Standards* indicate, "test publishers should assure that up-to-date norms are readily available or provide evidence that older norms are still appropriate. However, it remains the test user's responsibility to avoid inappropriate use of norms that are out of date and to strive to ensure accurate and appropriate score interpretations" (Standard 5.11; AERA, APA, & NCME, 2014, pp. 104–105). Best practice and professional standards mandate the use of up-to-date versions of individually administered IQ tests. Thus, in order to provide accurate and appropriate test interpretations, test users cannot reasonably rely on norms that are out of date and should acknowledge the potential impact of the Flynn effect in the assessment of intellectual disability (Gresham & Reschly, 2011; Schalock et al., 2007; Schalock et al, 2010; *cf.* Loring & Bauer, 2010).

The procedure for computing an adjustment for the Flynn effect has generally involved calculating the time between the administration of a test and the midpoint of the year(s) of norming (which is often 1 to 4 years prior to publication), multiplying that number by .3 points, and subtracting this amount from the obtained full-scale IQ test score of the test in question. See Table 8.4 for the publication and norming dates required for these calculations.

A recent meta-analysis of the Flynn effect reported a "mean of about 3 and a SEM of about 1 [that] supports the correction and is consistent with the Flynn correction of 3 points per decade" (Fletcher, Stuebing, & Hughes, 2010, p. 472). Another such meta-analysis of the Flynn effect provided similar results (Trahan et al., 2014). Given these findings, calculations of the Flynn effect can reasonably incorporate the 0.30 points annual inflation rate as the appropriate magnitude for the Flynn effect. Norm obsolescence is discussed in greater detail in Chapter 10.

126   Intelligence Testing

TABLE 8.4. Publication and Midyear Norming Dates for Selected IQ Tests

| Test | Publication Date | Mid-Year Norming Dates |
|------|------------------|------------------------|
| Wechsler Adult Intelligence Scale – IV | 2008 | 2007 |
| Wechsler Adult Intelligence Scale – III | 1997 | 1995 |
| Wechsler Adult Intelligence Scale – R | 1981 | 1978 |
| Wechsler Adult Intelligence Scale | 1955 | 1954 |
| Wechsler Abbreviated Scale of Intelligence – II | 2011 | 2010 |
| Wechsler Abbreviated Intelligence Scale | 1999 | — |
| Wechsler Intelligence Scale for Children – IV | 2003 | 2001 |
| Wechsler Intelligence Scale for Children – III | 1991 | 1989 |
| Wechsler Intelligence Scale for Children – R | 1974 | 1972 |
| Wechsler Intelligence Scale for Children | 1949 | 1947–1948 |
| Stanford – Binet 5 | 2003 | 2001 |
| Stanford – Binet 4 | 1986 | 1985 |
| Stanford – Binet LM (Updated Norms) | 1973 | 1972 |
| Stanford – Binet LM | 1960 | 1952 |
| Woodcock – Johnson IV | 2014 | 2010/2011 |
| Woodcock – Johnson III Normative Update | 2007 | 2007 |
| Woodcock – Johnson III | 2001 | 1998 |
| Woodcock – Johnson – Revised | 1990 | 1987 |
| Reynolds Intellectual Ability Scale | 2003 | 2000 |

*Note.* Norming dates were calculated as the mid-year of the normative data collection dates from the respective test manuals and adapted from Flynn (2009). The date provided by Flynn for the norming of the WAIS-IV was corrected to that reported in the *Technical and Interpretive Manual* (Wechsler, 2008). Wechsler scales's publication dates are also, in part, from Coalson and Weiss (2002) and Wechsler (2008). Stanford–Binet publication and norming dates are from Becker (2003) and Roid (2003b). WJ-R, WJ III, and WJ III Normative Update dates are for the adult norms (McGrew, Werder, & Woodcock, 1991; McGrew & Woodcock, 2001; McGrew, Schrank, & Woodcock, 2007). The WJ III NU norms are an updated recalculation of norms originally collected between September 1996 and August 1999. The WJ IV sample was collected between December 2009 and January 2012 (K. McGrew, personal communication, August 21, 2014). Dashes represent data not available.

### g-*ness of IQ tests*

The nature of the general factor of intelligence has remained elusive. Views have ranged from considering $g$ to be an emergent property of the mind (Wechsler cited by Jensen, 1998) to little more than an artifact of factor analysis (Gould, 1996). Recent conceptualizations emphasize "the processes and abilities that define processing efficiency and capacity, such as processing speed, inhibition or control of processing, attention, and working memory" (Demetriou, 2002; *cf.* Detterman, 2002). Others suggest it to be the consequence of neural plasticity (Garlick, 2002), the result of elemental cognitive processes (Kranzler & Jensen, 1991), or the inter-relationships between basic cognitive processes (Detterman, 2002).

In any case, composite IQ test scores may differ in the extent to which they measure the general factor of intelligence and the manner in which they are calculated. For example, the full-scale IQ test scores for the WAIS-IV and the SB5 are derived from

equally weighted subtest
which uses subtests that
gence, is derived from a c
ciple component analysis
consistent with Jensen (1
(McGrew & Woodcock, :

There has additionally
of a particular IQ test b.
within-battery determin:
proportion of variance d
is commonly estimated {
nent in a factor analysis (
Ryan, 2009). However, R
$g$ from the square of the c
to be downwardly biased
nonetheless commonly r
of the SB5 to range from
50% of its variance attrit
versely, Jensen (1998) ar{
the actual $g$ saturation of
the $g$-saturation of the cc

The 'proportion of va
the average of the var
subtests. . . . The $g$ lc
scores), if it could be
without affecting thei
$g$ loadings of the sepa

Completing the calc
1927), each of the majo
than .90 with the WAIS
than .95. However, thou{
are undoubtedly inflated
Maynard et al., 2011). J{
tests to be in the .80s. Ul
mined by cross or joint {
limited, hence, it is diffic
given the apparent diffe{
intelligence is assessed, {
of the $g$-saturation versu

IQ Tests

lid-Year
ıing Dates

2007
1995
1978
1954
2010
—
2001
1989
1972
l7–1948
2001
1985
1972
1952
l0/2011
2007
1998
1987
2000

live test manuals and
rted in the *Technical*
nd Weiss (2002) and
-R, WJ III, and WJ III
; McGrew, Schrank, &
ber 1996 and August
unication, August 21,

s have ranged
:ed by Jensen,
ent conceptu-
ɔfficiency and
ttention, and
:st it to be the
:ognitive pro-
ɪsic cognitive

they measure
ılculated. For
derived from

equally weighted subtest scores. In contrast, the WJ III General Index of Ability (GIA), which uses subtests that are only moderate measures of the general factor of intelligence, is derived from a combination of $g$-weighted subtests determined by a first principle component analysis. Such a procedure, according to the authors of the WJ III and consistent with Jensen (1998), "gives the best statistical estimate of general intelligence" (McGrew & Woodcock, 2001, p. 26).

There has additionally been disagreement as to how to best estimate the $g$-saturation of a particular IQ test battery (Flanagan, McGrew, & Ortiz, 2000). Most commonly, within-battery determination of the $g$-saturation of an instrument is based upon the proportion of variance derived from factor analytic studies. That is, the general factor is commonly estimated from the first unrotated principle factor or principle component in a factor analysis of the test battery (Flanagan et al., 2000; Roid, 2003b; Sattler & Ryan, 2009). However, Roid (2003b) estimated the proportion of variance attributed to $g$ from the square of the overall average $g$ loadings. Though such estimations are known to be downwardly biased and underestimate $g$-loadings (Maynard et al., 2011), they are nonetheless commonly reported. For example, Roid (2003b) estimated the $g$-saturation of the SB5 to range from 56% to 61%. In contrast, the WAIS-III was estimated to have 50% of its variance attributed to the general factor of intelligence (Roid, 2003b). Conversely, Jensen (1998) argued that this methodology would significantly underestimate the actual $g$ saturation of an instrument. Jensen reported that, rather than representing the $g$-saturation of the composite score,

> The 'proportion of variance' attributed to a given factor in this case refers only to the average of the variances (the squared factor loadings) of each of the separate subtests. . . . The $g$ loading of the *composite* score (i.e., the sum of the subtest scores), if it could be included in the same factor analysis with all the subtests without affecting their $g$ loadings, would be much larger than the average of the $g$ loadings of the separate subtests, assuming a fair number of subtests. (p. 103)

Completing the calculations suggested by Spearman (Jensen, 1998; Spearman, 1927), each of the major intelligence batteries have composite IQ $g$-loadings greater than .90 with the WAIS-IV, SB5, and WJ III Extended GIA having $g$-loadings greater than .95. However, though these estimates can provide comparative information, they are undoubtedly inflated due to the presence of correlated group factors (Jensen, 1998; Maynard et al., 2011). Jensen (1998) estimated the average $g$-loadings of standard IQ tests to be in the .80s. Ultimately, the true $g$-ness of composite measures must be determined by cross or joint factor analyses of multiple batteries and such data is currently limited, hence, it is difficult to know what value to place on this research. Nonetheless, given the apparent differences across tests in the degree to which the general factor of intelligence is assessed, consideration may need to be given to the relative importance of the $g$-saturation versus domain specific functions of each instrument.



128    Intelligence Testing

### Domain Specific Abilities and Part Scores

Because the general factor of intelligence is domain neutral (nonspecific), a greater depth of information regarding functioning may be revealed by analyzing the domain-specific patterns of neurocognitive abilities. When these abilities diverge markedly within the individual's profile, differences in functional outcome may be seen (Fiorello et al., 2007; cf. Reynolds & Kamphaus, 2003). That is, patterns of intellectual strengths and weaknesses may best be understood by moving beyond the general factor of intelligence and focusing on the underlying broad intellectual abilities (i.e., Fiorello et al., 2001). However, care must be taken in such an approach, as it has been argued that within-person comparisons at the subtest/factor level may lack reliability or add little to the interpretation of the composite full-scale measure for the Wechsler scales (Canivez, 2013; Lichtenberger & Kaufman, 2009; Watkins & Canivez, 2004; cf. Fiorello et al., 2001). Further, as noted above, IQ tests differ in the factors that they measure.

Two of the CHC broad cognitive ability factors are considered most relevant in the assessment of global intelligence—crystallized intelligence (Gc) and fluid intelligence (Gf). Crystallized intelligence (Gc) refers to primarily verbally mediated abilities reflecting the breadth and depth of culturally specific knowledge and processing abilities related to the use of that knowledge (Flanagan et al., 2007). These abilities, including knowledge of vocabulary, fund of information, and facility with language, are acquired during the course of life and education. In contrast, fluid intelligence (Gf) refers to a type of "on the spot" problem-solving ability that allows one to effectively deal with novel problems that cannot be dealt with routinely (Flanagan et al., 2007). As Jensen (2002) observed, "Gf is aptly defined as what you use when you don't know what to do" (p. 47). This ability includes the recognition of patterns, inferential thought, concept formation, analysis, and problem solving—which is often measured using nonverbal stimuli. These factors appear to have a degree of centrality in relationship to other intellectual abilities and are the broad ability factors most closely associated with the general factor of intelligence. Gf and Gc are measured by each of the major intelligence tests.

However, there may also be value in the extent to which an IQ test measures the broad array of CHC factors both in terms of the impact of such factors on the general factor and in terms of understanding an individual's functioning beyond the molar level represented by the general factor. The WJ III Normative Update (Woodcock et al., 2001, 2007) holds the distinction of measuring seven CHC factors, whereas the WAIS-IV and SB5 each measure five such factors. Brief IQ tests typically only measure two factors beyond the general factor—commonly Gc and Gf.

There has been a long-held view that ID is marked by "flat" cognitive profiles. The prevalence of significant discrepancies between factor scores decreases at lower levels of intellectual ability (Wechsler, 2008). Because of this finding, in instances in which there is "part-score" variability (i.e., significant differences between factor scores), some have asserted this to be inconsistent with the diagnosis of ID (Bergeron & Floyd, 2006).

However, in the f
sociate such that
tual ability (Ande

Initial researcl
necessarily displ;
sures of CHC ab
(Bergeron & Floy
that, in children
(scatter) than in
hesitant to dismi
otherwise meets
the diagnosis of
based on signific;
ecologically valic
indicates genuine
may have broad i

Utilizing a ne
psychometric mo
either a general
ments that funct
and adaptive fur
(2002) used a sys

. . . if a centra
widespread ef
on the central
from a defect
the effect of lc
central proces

By extension, in
cific, modular cc
language functic
alter their develc
ID. In such inst;
meaningful relat
dations for the p
score is question

### Comprehensive

There are only a
general factor of

However, in the face of certain neuropathologies, the domain-specific factors may dissociate such that discrepancies can occur between specific modular aspects of intellectual ability (Anderson & Miller, 1998).

Initial research with the WJ III has demonstrated that individuals with ID do not necessarily display a flat cognitive profile when assessed with comprehensive measures of CHC abilities, particularly when the measures vary in terms of $g$-saturation (Bergeron & Floyd, 2006; see also Van der Molen et al., 2010). These researchers found that, in children with ID, there were significantly greater intra-individual score ranges (scatter) than in average-achieving individuals. Given these findings, one should be hesitant to dismiss the diagnosis of ID because of profile scatter when the individual otherwise meets diagnostic criterion. As Bergeron and Floyd (2006) noted, regarding the diagnosis of ID in children, ". . . failing to make a diagnosis of mental retardation based on significant part score variability may do these children disservice when other ecologically valid evidence of mental retardation (e.g., adaptive behavior skill deficits) indicates genuine need" (p. 429). Therefore, the impact of specific, modular deficiencies may have broad impacts on behavior and adaptation consistent with ID.

Utilizing a neuropsychological model of intellectual functioning, in contrast to a psychometric model, it has been suggested that intellectual disability may arise from either a general deficit in thinking or as the result of more specific, modular impairments that function as gatekeepers to the development of broader intellectual abilities and adaptive functions (Anderson & Miller, 1998; Frith & Happé, 1998). Detterman (2002) used a systems explanation of general intelligence, noting

> . . . if a central process is congenitally weak or has been damaged, it will have a widespread effect on the system because so many other parts of the system rely on the central process. . . . [Deficits in general intellectual functioning may result] from a defect in one or more central processes. The damaged central process has the effect of lowering the efficiency of the entire system. In a sense, the damaged central process sets a limit on performance for the whole system. (p. 235)

By extension, in the case of brain dysfunction or deficiency, impairments in more specific, modular components of, for example, working memory, executive functions, or language functions, may compromise the overall functioning of the individual and alter their developmental trajectory—resulting in deficits in adaptive functioning and ID. In such instances, reliance on part scores may be appropriate when they have a meaningful relationship to the individual's adaptive functioning. Detailed recommendations for the proper use of part scores (when the validity of the full-scale general IQ score is questioned) are discussed in Chapter 7.

## Comprehensive IQ Tests

There are only a limited number of IQ tests available that provide an assessment of the general factor of intelligence as well as multiple broad ability domains. The most widely

130    Intelligence Testing

used instruments, assuming an English-speaking adult without significant sensory or motor impairments, include the SB5 (Roid, 2003a), the WAIS-IV (Wechsler, 2008), and the WJ III (Woodcock et al., 2001, 2007). Clinical practice has generally supported the use of these comprehensive assessment instruments (see also Chapter 7).

### Brief IQ Tests

The rationale for brief IQ tests is based upon the view that it may be most important to evaluate the general factor of intelligence and other central broad abilities, either verbal-crystallized or nonverbal-fluid factors, in terms of differential diagnosis and treatment planning (Glutting, Adams, & Sheslow, 2000). Some have suggested that multidimensional intelligence batteries lack sufficient reliability and validity at the subtest level to justify subtest level interpretation, and that brief measures can determine a full-scale IQ equally well and more efficiently (Canivez & Watkins, 2010; Nelson, Canivez, Lindstrom, & Hatt, 2007). Reynolds and Kamphaus (2003) wrote, "from our research, we have concluded that a strong measure of g coupled with strong measures of verbal and nonverbal intelligence, account for nearly all of the reliable and interpretable variance in the subtests of good intelligence measures" (p. 10). Still others have even questioned the multidimensional nature of tests such as the WAIS-IV as a measure of anything beyond the general factor of intelligence based upon divergent factor structures found with differing factor extraction methods (Canivez & Watkins, 2010).

Brief intelligence tests, such as the RIAS (Reynolds & Kamphaus, 2003), the Wide Range Intelligence Test (WRIT; Glutting et al., 2000), the Kaufman Brief Intelligence Test, Second Edition (KBIT-2; Kaufman & Kaufman, 2004), and the Wechsler Abbreviated Scale of Intelligence-II (WASI-II; McCrimmon & Smith, 2012; Wechsler, 2011), primarily provide evidence of intellectual functioning at the level of general intellectual ability without multidimensional elements of intellectual functioning beyond the broad verbal and nonverbal level. Careful consideration should be given to the role, if any, that such instruments might play in the comprehensive assessment of ID. These brief IQ tests may be most appropriate for screening purposes, to supplement the information from a comprehensive IQ test, or in circumstances in which restrictions to motor movements necessitate a test that has minimal motor demands. Considerable caution should be exercised in the use of brief IQ tests in the evaluation of ID. Because detailed reviews of these briefer tests are beyond the scope of this work, readers are referred to the specific test manuals and secondary works.

### Alternative IQ Tests

Other instruments, focusing on domain-specific measures of intellectual functioning include the BETA-III (Kellogg & Morton, 1999), the Test of Non-Verbal Intelligence-4 (TONI-4; Brown, Sherbenou, & Johnson, 2010), the Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI-2; Hammill, Pearson, & Weiderholt, 2009), the General Ability Measure for Adults (GAMA; Naglieri & Bardos, 1997), and the Raven's

Progressive Matr
dimensional inst
However, such in
or other issues
screeners (NRC,
tion parameters
source of inform

Other instrui
speaking popula
de Inteligencia
2002b), a deriva
Muñoz (Muñoz
Woodcock-Johr
Fernández, & P
Care must be ex
by the examine

### Summary an

The assessment
sis of ID. An ui
intelligence is e
relied upon co
tioning in mak
decision as to
testing, instrun
and specific fa
adequacy of th
tion might aff
Flynn effect to
More speci
For example:

• Is the ins
  measure
• Does the
  opposed
• Are the
  the curr
  ethnicit
• What is
  scores (

Progressive Matrices and related measures (Raven, Raven, & Court, 2000). These uni-dimensional instruments, if not "culture-fair," tend to be somewhat "culture-reduced." However, such instruments should only have a role in circumstances in which language or other issues preclude a comprehensive assessment of intelligence or as cognitive screeners (NRC, 2002). In addition, group IQ tests, because of uncertain administration parameters and limited breadth of coverage, should not be used as the primary source of information in the diagnosis of ID.

Other instruments have been developed to measure intelligence in non-English speaking populations, notably Spanish speakers. These instruments include the Escala de Inteligencia de Wechsler para Adultos–Tercera Edicion (EIWA-III; Wechsler, 2002b), a derivative of the WAIS-III with Puerto Rican norms; Batería III Woodcock-Muñoz (Muñoz-Sandoval, Woodcock, McGrew, & Mather, 2005), an alternative to the Woodcock-Johnson III; and Escalas de Inteligencia de Reynolds (Reynolds, Kamphaus, Fernández, & Pinto, 2009), a European Spanish translation of the RIAS with norms. Care must be exercised in the use of such instruments to ensure that the dialect spoken by the examinee matches that of the normative sample.

## Summary and Conclusion

The assessment of intellectual functioning is the first of the three prongs in the diagnosis of ID. An understanding of the available instruments used for the measurement of intelligence is essential to fairly identifying those with ID. Contemporary practice has relied upon comprehensive, individually administered measures of intellectual functioning in making the determination of possible deficits in intelligence. In making the decision as to which instrument(s) to utilize, or in critiquing the adequacy of prior testing, instruments can be evaluated according to which general intellectual abilities and specific factors are assessed; the psychometric properties of the instrument; the adequacy of the normative sample size; how language, culture, and level of acculturation might affect the findings; and the specific application of practice effects and the Flynn effect to obtained scores.

More specifically, IQ instruments can be evaluated across a number of parameters. For example:

- Is the instrument an individually administered, reliable, and valid comprehensive measure of general intellectual functioning?
- Does the instrument measure at least three or more broad intellectual abilities as opposed to only the general factor of intelligence?
- Are the normative comparison samples large and adequately representative of the current population according to the demographic characteristics of age, race/ethnicity, gender, education, socioeconomic status, and geographic location?
- What is the impact that language and culture might have on obtained IQ test scores (see also Chapter 16)?

132     Intelligence Testing

- Do the interpretive procedures avoid the use of demographically corrected subgroup norms, e.g., norms based on race/ethnicity, gender, and education (excepting age) in the determination of an IQ test score?
- Does the interpretive process allow for the use of composite (full-scale) IQ in order to provide the most reliable and valid information regarding an individual's general level of intellectual functioning as well as the use of subcomponent or part scores that may be of significance when they have meaningful relationships to the individual's adaptive functioning?

It is important to reiterate the fact that obtained IQ scores only approximate an underlying "true" score. Clinical, and now legal, standards emphasize consideration of the *SEM* when making diagnostic conclusions, and attention also should be given to potential practice effects as well as the influence of norm obsolescence in determining the accuracy of a given score. Finally, the results of IQ testing must be meaningfully integrated with the assessment of adaptive functions in order to accurately assess for the presence of ID.



## References

American Academy of Clinical Neuropsychology. (2001). Policy statement on the presence of third party observers in neuropsychological assessments. *The Clinical Neuropsychologist, 15*(4), 433–439. http://dx.doi.org/10.1076/clin.15.4.433.1888

American Academy of Clinical Neuropsychology. (2007). American Academy of Clinical Neuropsychology (AACN) practice guidelines for neuropsychological assessment and consultation. *The Clinical Neuropsychologist, 21*(2), 209–231. http://dx.doi.org/10.1080/13825580601025932

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (2014). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.; *DSM5*). Arlington, VA: American Psychiatric Association.

Anderson, M., & Miller, K. L. (1998). Modularity, mental retardation and speed of processing. *Developmental Science, 1*(2), 239–245. http://dx.doi.org/10.1111/1467-7687.00037

Axelrod, B., Barth, J., Faust, D., Fisher, J., Heilbronner, R., Larrabee, G., . . . Silver, C. (2000). Presence of third party observers during neuropsychological testing: Official statement of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology, 15*(5), 379–380. http://dx.doi.org/10.1093/arclin/15.5.379

Basso, M. R., Carona, F. D., Lowery, N., & Axelrod, B. N. (2002). Practice effects on the WAIS-III across 3- and 6-month intervals. *The Clinical Neuropsychologist, 16*(1), 57–63. http://dx.doi.org/10.1076/clin.16.1.57.8329

Becker, K. A. (2003). *History of the Stanford-Binet intelligence scales: Content and psychometrics.* (Stanford-Binet Intelligence Scales, Fifth Edition Assessment Service Bulletin No. 1). Itasca, IL: Riverside Publishing. http://www.assess.nelson.com/pdf/sb5-asb1.pdf

Beckworth v. State, 2009 Ala. Crim. App. LEXIS 64, 61–62 (Ala. Crim. App. May 1, 2009).

Bergeron, R., & Floyd, R. G. (2006). Broad cognitive abilities of children with mental retardation: An analysis of group and individual profiles. *American Journal on Mental Retardation, 111*(6), 417–432. http://dx.doi.org/10.1352/0895-8017(2006)111[417:BCAOCW]2.0.CO;2

Braden, J. P., & Niebling, B. C. (2012). Using the Joint Test Standards to evaluate the validity evidence for intelligence tests. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (3rd ed., pp. 739–757). New York, NY: Guilford Press.

Bridges, A. J., & Holler, K. A. (2007). How many is enough? Determining optimal sample sizes for normative studies in pediatric neuropsychology. *Child Neuropsychology, 13*, 528–538.

Brooks, B. L., Sherman, E. M., Iverson, G. L., Slick, D. J., & Strauss, E. (2011). Psychometric foundations for the interpretation of neuropsychological results. In M. R. Schoenberg & J. G. Scott (Eds.), *The little black book of neuropsychology* (pp. 893–922). New York, NY: Springer.

Brooks, B. L., Strauss, E., Sherman, E. S., Iverson, G. L., & Slick, D. J. (2009). Developments in neuropsychological assessment: Refining psychometric and clinical interpretive methods. *Canadian Psychology/Psychologie Canadienne, 50*(3), 196–209. http://dx.doi.org/10.1037/a0016066

Brown, L., Sherbenou, R. J., & Johnson, S. K. (2010). *Test of Nonverbal Intelligence, fourth edition (TONI-4).* Austin, TX: Pro-Ed.

Buckhalt, J. (2002). A short history of *g*: Psychometrics' most enduring and controversial construct. *Learning and Individual Differences, 13*(2), 101–114. http://dx.doi.org/10.1016/S1041-6080(02)00074-2

Bush, S., Ruff, R., Troster, A., Barth, J., Koffler, S., Pliskin, N., . . . Silver, C. (2005). Symptom validity assessment: Practice issues and medical necessity–NAN Policy & Planning

134      Intelligence Testing

Committee. *Archives of Clinical Neuropsychology, 20*(4), 419–426. http://dx.doi.org/10.1016/j. acn.2005.02.002

Butler v. Quarterman, 576 F. Supp. 2d 805, 812 (S.D. Tex. 2008).

Canivez, G. L. (2013, May 6). Incremental criterion validity of WAIS-IV Factor Index Scores: Relationships with WIAT-II and WIAT-III subtest and composite scores. *Psychological Assessment.* Advance online publication. http://dx.doi.org/10.1037/a0032092

Canivez, G. L. & Watkins, M. W. (2010). Investigation of the factor structure of the Wechsler Adult Intelligence Scale—Fourth edition (WAIS-IV): Exploratory and higher order factor analyses. *Psychological Assessment, 22*(4), 827–36.

Carroll, J. B. (1993). *Human cognitive abilities: A survey of factor-analytic studies.* New York, NY: Cambridge University Press.

Coalson, D., & Weiss, L. (2002, Spring). The evolution of Wechsler intelligence scales in historical perspective. *Assessment Focus Newsletter, 11*, 1–3. Retrieved May 26, 2013, from http://www. pearsonassessments.com/NR/rdonlyres/6F6A90D0-9EF9-41CC-BF21-EB3FE7E9A5B2/0/ Assess_Focus_Spring_02.pdf

Colom, R., Abad, F. J., Garcia, L. F., & Juan-Espinosa, M. (2002). Education, Wechsler's Full Scale IQ, and *g. Intelligence, 30*, 449–462.

Committee on Psychological Tests and Assessment–American Psychological Association. (2007). *Statement on third party observers in psychological testing and assessment: A framework for decision making.* Retrieved from http://www.apa.org/science/programs/testing/ third-party-observers.pdf

Crawford, J. R., & Garthwaite, P. H. (2008). On the "optimal" size for normative samples in neuropsychology: Capturing the uncertainty associated with the use of normative data to quantify the standing of a neuropsychological test score. *Child Neuropsychology, 14*, 99–117. doi: 10.1080/09297040801894709

Daniel, M. H. (2000). Interpretation of intelligence test scores. In R. J. Sternberg (Ed.), *Handbook of intelligence* (pp. 477–491). New York, NY: Cambridge University Press.

Dean, A., Victor, T., Boone, K., & Arnold, G. (2008). The relationship of IQ to effort test performance. *The Clinical Neuropsychologist, 22*(4), 705–722. http://dx.doi.org/10.1080/13854040701440493

Demetriou, A. (2002). Tracing psychology's invisible giant and its visible guards. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 3–18). Mahwah, NJ: L. Erlbaum Associates.

Detterman, D. K. (2002). General intelligence: Cognitive and biological explanations. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 223–243). Mahwah, NJ: L. Erlbaum Associates.

Detterman, D., & Daniel, M. (1989). Correlations of mental tests with each other and with cognitive variables are highest for low IQ groups. *Intelligence, 13*(4), 349–359. http://dx.doi. org/10.1016/S0160-2896(89)80007-8

Estevis, E., Basso, M. R., & Combs, D. (2012). Effects of practice on the Wechsler Adult Intelligence Scale-IV across 3- and 6-month intervals. *The Clinical Neuropsychologist, 26*(2), 239–254. http://dx.doi.org/10.1080/13854046.2012.659219

Ex Parte Eric Dewayne Cathey, Cause No. 713189-B (Dist. Ct. Harris County, TX 2012).

Fiorello, C. A., Hale, J. B., Holdnack, J. A., Kavanagh, J. A., Terrell, J., & Long, L. (2007). Interpreting intelligence test results for children with disabilities: Is global intelligence relevant? *Applied Neuropsychology, 14*(1), 2–12. doi: 10.1080/09084280701280338

Fiorello, C. A., Hale, J. B., McGrath, M., Ryan, K., & Quinn, S. (2001). IQ interpretation for children with flat and variable test profiles. *Learning and Individual Differences, 13*(2), 115–125. http://dx.doi.org/10.1016/S1041-6080(02)00075-4

Flanagan,
    *theory:*
Flanagan,
    ed.). H
Fletcher, J
    Flynn
    473. ht
Floyd, R. (
    .Are C
    *School*
Floyd, R.
    for pro
    http://
Floyd, R.
    ability
    positic
    org/10
Flynn, J. F
    appro:
Frith, U.,
    develc
    dx.doi
Garlick, J
    indivi
    *109*(1)
Gignac, (
    brain
    *ute to*
Glutting,
    Wilm
Gottfreds
    79–13
Gould, S
Gresham
    penal
Hagan, I
    ing IC
    org/1·
Haier, R.
    neurc
    *R. Jer*
Hall v. J
    opini
Hammil
    *Intell.*
Hart, C.
    *Chilc*
    risk i

Flanagan, D. P., McGrew, K. S., & Ortiz, S. O. (2000). *The Wechsler intelligence scales and Gf-Gc theory: A contemporary approach to interpretation*. Boston, MA: Allyn and Bacon.

Flanagan, D. P., Ortiz, S. O., & Alfonso, V. C. (2007). *Essentials of cross-battery assessment* (2nd ed.). Hoboken, NJ: John Wiley & Sons.

Fletcher, J. M., Stuebing, K. K., & Hughes, L. C. (2010). IQ scores should be corrected for the Flynn Effect in high-stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469–473. http://dx.doi.org/10.1177/0734282910373341

Floyd, R. G., Bergeron, R., McCormack, A. C., Anderson, J. L., & Hargrove-Owens, G. L. (2005). Are Cattell-Horn-Carroll broad ability composite scores exchangeable across batteries? *School Psychology Review, 34*(3), 329–357.

Floyd, R. G., Clark, M. H., & Shadish, W. R. (2008). The exchangeability of IQs: Implications for professional psychology. *Professional Psychology: Research and Practice, 39*(4), 414–423. http://dx.doi.org/10.1037/0735-7028.39.4.414

Floyd, R. G., Shands, E. I., Rafael, F. A., Bergeron, R., & McGrew, K. S. (2009). The dependability of general-factor loadings: The effects of factor-extraction methods, test battery composition, test battery size, and their interactions. *Intelligence, 37*(5), 453–465. http://dx.doi.org/10.1016/j.intell.2009.05.003

Flynn, J. R. (2009). The WAIS-III and WAIS-IV: Daubert motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16*, 98–104. doi: 10.1080/09084280902864360

Frith, U., & Happé, F. (1998). Why specific developmental disorders are not specific: On-line and developmental effects in autism and dyslexia. *Developmental Science, 1*(2), 267–272. http://dx.doi.org/10.1111/1467-7687.00041

Garlick, D. (2002). Understanding the nature of the general factor of intelligence: The role of individual differences in neural plasticity as an explanatory mechanism. *Psychological Review, 109*(1), 116–136. http://dx.doi.org/10.1037//0033-295X.109.1.116

Gignac, G., Vernon, P. A., & Wickett, J. C. (2003). Factors influencing the relationship between brain size and intelligence. In H. Nyborg (Ed.), *The scientific study of general intelligence: Tribute to Arthur R. Jensen* (pp. 93–106). Amsterdam, Netherlands: Pergamon.

Glutting, J., Adams, W., & Sheslow, D. (2000). *WRIT: Wide Range Intelligence Test manual*. Wilmington, DE: Wide Range.

Gottfredson, L. S. (1997). Why g matters: The complexity of everyday life. *Intelligence, 24*(1), 79–132. http://dx.doi.org/10.1016/S0160-2896(97)90014-3

Gould, S. J. (1996). *The mismeasure of man*. New York, NY: Norton.

Gresham, F. M., & Reschly, D. J. (2011). Standard of practice and Flynn Effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131–140.

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010). Science rather than advocacy when reporting IQ scores. *Professional Psychology: Research and Practice, 41*(5), 420–423. http://dx.doi.org/10.1037/a0021077

Haier, R. J. (2003). Positron emission tomography studies of intelligence: From psychometrics to neurobiology. In H. Nyborg (Ed.), *The scientific study of general intelligence: Tribute to Arthur R. Jensen* (pp. 41–51). Amsterdam, Netherlands: Pergamon.

Hall v. Florida, No. 12-10882, slip op. (U.S. May 27, 2014), http://www.supremecourt.gov/opinions/13pdf/12-10882_kkg1.pdf

Hammill, D. D., Pearson, N. A., & Weiderholt, J. L. (2009). *Comprehensive Test of Nonverbal Intelligence—Second Edition (CTONI-2)*. Austin, TX: Pro-Ed.

Hart, C. L., Taylor, M. D., Smith, G. D., Whalley, L. J., Starr, J., Hole, D. J., . . . Deary, I. J. (2003). Childhood IQ, social class, deprivation, and their relationships with mortality and morbidity risk in later life: Prospective observational study linking the Scottish Mental Survey 1932 and

136      Intelligence Testing

the Midspan Studies. *Psychosomatic Medicine, 65*(5), 877–883. http://dx.doi.org/10.1097/01.PSY.0000088584.82822.86

Heaton, R. K., Miller, S. W., Taylor, M. J., & Grant, I. (2004). *Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted neuropsychological norms for African American and Caucasian Adults.* Lutz, FL: Psychological Assessment Resources.

Heaton, R. K., Temkin, N., Dikmen, S., Avitable, N., Taylor, M. J., Marcotte, T. D., & Grant, I. (2001). Detecting change: A comparison of three neuropsychological methods, using normal and clinical samples. *Archives of Clinical Neuropsychology, 16*(1), 75–91. http://dx.doi.org/10.1093/arclin/16.1.75

Henson, R. K. (2001). Understanding internal consistency reliability estimates: A conceptual primer on Coefficient Alpha. *Measurement & Evaluation in Counseling and Development, 34*(3), 177–189.

Iverson, G. L. (2010). Detecting exaggeration, poor effort, and malingering in neuropsychology. In A. M. Horton, Jr. & L. C. Hartlage (Eds.), *Handbook of forensic neuropsychology, second edition* (pp. 91–135). New York, NY: Springer Pub.

Jensen, A. R. (1980). *Bias in mental testing.* New York, NY: Free Press.

Jensen, A. R. (1998). *The g factor: The science of mental ability.* Westport, CT: Praeger.

Jensen, A. R. (2002). Psychometric g: Definition and substantiation. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 39–53). Mahwah, NJ: L. Erlbaum Associates.

Johnson, W., Bouchard, T. J., Jr., Krueger, R. F., McGue, M., & Gottesman, I. I. (2004). Just one g: Consistent results from three test batteries. *Intelligence, 32*(1), 95–107. http://dx.doi.org/10.1016/S0160-2896(03)00062-X

Johnson, W., te Nijenhuis, J., & Bouchard, T., Jr. (2008). Still just 1 g: Consistent results from five test batteries. *Intelligence, 36*(1), 81–95. http://dx.doi.org/10.1016/j.intell.2007.06.001

Kaufman, A. S. (2009). *IQ testing 101.* New York, NY: Springer Pub.

Kaufman, A. S., & Kaufman, N. L. (2004). *Kaufman Brief Intelligence Test* (2nd ed.). Bloomington, MN: Pearson.

Kellogg, C. E., & Morton, N. W. (1999). *Beta III.* San Antonio, TX: The Psychological Corporation.

Keith, T. Z., & Reynolds, M. R. (2010). Cattell–Horn–Carroll abilities and cognitive tests: What we've learned from 20 years of research. *Psychology in the Schools, 47,* 635–650. doi: 10.1002/pits.20496

Kranzler, J. H., & Jensen, A. R. (1991). The nature of psychometric g: Unitary process or a number of independent processes? *Intelligence, 15*(4), 397–422.

Lichtenberger, E. O., & Kaufman, A. S. (2009). *Essentials of WAIS-IV assessment.* Hoboken, NJ: Wiley.

Lineweaver, T. T., & Chelune, G. J. (2003). Use of the WAIS-III and WMS-III in the context of serial assessments. Interpreting reliable and meaningful change. In D. S. Tulsky, D. H. Saklofske, G. J. Chelune, R. J. Ivnik, A. Prifitera, R. K. Heaton, et al. (Eds.), *Clinical interpretation of the WAIS III and WMS III* (pp. 303–337). New York, NY: Academic Press.

Loring, D. W., & Bauer, R. M. (2010). Testing the limits: Cautions and concerns regarding the new Wechsler IQ and Memory scales. *Neurology, 74*(8), 685–690. http://dx.doi.org/10.1212/WNL.0b013e3181d0cd12

Luders, E., Narr, K. L., Thompson, P. M., & Toga, A. W. (2009). Neuroanatomical correlates of intelligence. *Intelligence, 37*(2), 156–163. http://dx.doi.org/10.1016/j.intell.2008.07.002

Mackintosh, N. J. (2011). *IQ and human intelligence* (2nd ed.). New York, NY: Oxford University Press.

Matarazzo, J. D., & Herman, D. O. (1984). Base rate data for the WAIS-R: Test-Retest stability and VIQ-PIQ differences. *Journal of Clinical Neuropsychology, 6*(4), 351–366. http://dx.doi.org/10.1080/01688638408401227

Maynard, J. L., Floyd, R. G., Acklie, T. J., & Houston, L., III. (2011). General factor loadings and specific effects of the Differential Ability Scale, Second Edition composites. *School Psychology Quarterly, 26*(2), 108–118. doi: 10.1037/a0023025

McCrimmon, A., & Smith, A. (2012). Review of the Wechsler Abbreviated Scale of Intelligence, Second Edition (WASI-II). *Journal of Psychoeducational Assessment.* Retrieved from http://jpa.sagepub.com/content/early/2012/12/04/0734282912467756.citation

McDaniel, M. (2005). Big-brained people are smarter: A meta-analysis of the relationship between in vivo brain volume and intelligence. *Intelligence, 33*(4), 337–346. http://dx.doi.org/10.1016/j.intell.2004.11.005

McGrew, K. S. (1997). Analysis of the major intelligence batteries according to a proposed comprehensive Gf-Gc framework. In D. P. Flanagan, J. Genshaft, & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (pp. 151–179). New York, NY: Guilford Press.

McGrew, K. S. (2005). The Cattell–Horn–Carroll theory of cognitive abilities. In D. P. Flanagan & P. L. Harrison (Eds.) *Contemporary intellectual assessment: Theories, tests, and issues* (2nd ed., pp. 136–181). New York, NY: Guilford Press.

McGrew, K. S. (2009). Editorial: CHC theory and the human cognitive abilities project: Standing on the shoulders of the giants of psychometric intelligence research. *Intelligence, 37,* 1–10. doi:10.1016/j.intell.2008.08.004

McGrew, K. S., & Flanagan, D. P. (1998). *The intelligence test desk reference (ITDR): Gf-Gc cross-battery assessment.* Needham Heights, MA: Allyn and Bacon.

McGrew, K. S., LaForte, E. M., & Schrank, F. A. (2014). *Technical manual. Woodcock-Johnson IV.* Rolling Meadows, IL: Riverside.

McGrew, K. S., Woodcock, R. W., & Schrank, K. A. (2007). *Woodcock-Johnson III normative update technical manual.* Rolling Meadows, IL: Riverside.

McGrew, K. S., Werder, J. K., & Woodcock, R. W. (1991). *Woodcock-Johnson technical manual.* Allen, TX: DLM.

McGrew, K. S., & Woodcock, R. W. (2001). *Technical manual. Woodcock-Johnson III Tests of Cognitive Abilities.* Itasca, IL: Riverside Pub.

Muñoz-Sandoval, A. F., Woodcock, R. W., McGrew, K. S., & Mather, N. (2005). *Batería III Woodcock-Muñoz.* Itasca, IL: Riverside Publishing.

Naglieri, J. A., & Bardos, A. N. (1997). *GAMA (General Ability Measure for Adults) manual.* Minneapolis, MN: National Computer Systems.

National Research Council. (2002). *Mental retardation: Determining eligibility for social security benefits* (Committee on Disability Determination for Mental Retardation—D. J. Reschly, T. G. Myers, & C. R. Hartel, Eds.). Washington, DC: National Academy Press.

Neisser, U., Boodoo, G., Bouchard, T. J., Boykin, A. W., Brody, N., Ceci, S. J., . . . Urbina, S. (1996). Intelligence: Knowns and unknowns. *American Psychologist, 51*(2), 77–101. http://dx.doi.org/10.1037//0003-066X.51.2.77

Nelson, J. M., Canivez, G. L., Lindstrom, W., & Hatt, C. V. (2007). Higher-order exploratory factor analysis of the Reynolds Intellectual Assessment Scales with a referred sample. *Journal of School Psychology, 45*(4), 439–456. http://dx.doi.org/10.1016/j.jsp.2007.03.003

O'Toole, B. I. (1990). Intelligence and behaviour and motor vehicle accident mortality. *Accident Analysis & Prevention, 22*(3), 211–221. http://dx.doi.org/10.1016/0001-4575(90)90013-B

Patja, K., Iivanainen, M., Vesala, H., Oksanen, H., & Ruoppila, I. (2000). Life expectancy of people with intellectual disability: A 35-year follow-up study. *Journal of Intellectual Disability Research, 44*(5), 591–599. http://dx.doi.org/10.1046/j.1365-2788.2000.00280.x

Pearson. (2009). *Advanced clinical solutions for WAIS-IV and WMS-IV: Administration and scoring manual.* San Antonio, TX: Author.

A-0160

People v. Superior Court (Vidal), 129 Cal. App. 4th 434, 471 (Cal. App. 5th Dist. 2005)

People v. Superior Court (Vidal), 40 Cal. 4th 999, 1007 (Cal. 2007)

Pizzuto v. Blades, 2012 U.S. Dist. LEXIS 2786, 23–24 (D. Idaho Jan. 10, 2012)

Raven, J., Raven, J. C., & Court, J. H. (2000). *Manual for Raven's progressive matrices and vocabulary scales (including the parallel and plus versions)*. Oxford, England: OP Limited.

Reynolds, C. R., & Kamphaus, R. W. (2003). *RIAS (Reynolds Intellectual Assessment Scales) and the RIST (Reynolds Intellectual Screening Test): Professional manual*. Lutz, FL: Psychological Assessment Resources.

Reynolds, C. R., Kamphaus, R. W., Fernández, P. S., & Pinto, I. F. (2009). *RIAS: Escalas de Inteligencia de Reynolds y RIST: Test de Inteligencia Breve de Reynolds*. Madrid, Spain: TEA.

Reynolds, M. R., Keith, T. Z., & Beretvas, S. N. (2010). Use of factor mixture modeling to capture Spearman's law of diminishing returns. *Intelligence, 38*(2), 231–241. http://dx.doi.org/10.1016/j.intell.2010.01.002

Roid, G. H. (2003a). *Stanford–Binet Intelligence Scales, fifth edition*. Itasca, IL: Riverside Publishing.

Roid, G. H. (2003b). *Stanford–Binet Intelligence Scales, fifth edition, technical manual*. Itasca, IL: Riverside Publishing.

Roid, G. H., & Pomplun, M. (2012). The Stanford–Binet Intelligence Scales, fifth edition. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (pp. 249-268). New York, NY: Guilford Press.

Salekin, K., & Doane, B. (2009). Malingering intellectual disability: The value of available measures and methods. *Applied Neuropsychology, 16*(2), 105–113. http://dx.doi.org/10.1080/09084280902864485

Sattler, J. (2001). *Assessment of children: Cognitive applications* (4th ed.). San Diego, CA: Jerome M. Sattler, Publisher, Inc.

Sattler, J. M., & Ryan, J. J. (2009). *Assessment with the WAIS-IV*. San Diego, CA: Jerome M. Sattler, Publisher, Inc.

Schalock, R. L., Borthwick-Duffy, S. A., Bradley, V. J., Buntinx, W. H., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tasse, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and systems of supports* (11th ed.). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Buntinx, W., Borthwick-Duffy, S., Luckasson, R., Snell, M., Tassé, M. J., & Wehmeyer, M. (2007). *User's guide: Mental retardation: Definition, classification, and systems of supports* (10th ed.). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schneider, W. J. (2012, January 13). *Can't decide which IQ is best? Make a composite IQ score* (Issue brief). Retrieved from http://assessingpsyche.wordpress.com/2012/01/13/cant-decide-which-iq-is-best-make-a-composite-iq-score/

Schneider, W. J. (2013a). What if we took our models seriously? Estimating latent scores in individuals. *Journal of Psychoeducational Assessment, 31*(2), 186–201. http://dx.doi.org/10.1177/0734282913478046

Schneider, W. J. (2013b). Principles of assessment of aptitude and achievement. In D. H. Saklofske, C. R. Reynolds, & V. L. Schwean (Eds.), *The Oxford handbook of child psychological assessment* (pp. 286–330). Oxford: Oxford University Press.

Schneider, W. J., & McGrew, K. (2012). The Cattell-Horn-Carroll model of intelligence. In D. Flanagan & P. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests, and issues* (3rd ed. pp. 99–144). New York, NY: Guilford.

Spearman, C. (1927). *The abilities of man; their nature and measurement.* New York, NY: Macmillan, reprinted by Kessinger Publishing.

Spitz, H. H. (1988). Wechsler subtest patterns of mentally retarded groups: Relationship to *g* and to estimates of heritability. *Intelligence, 12*(3), 279–297.

Stankov, L. (2002). *g:* The diminutive general. In R. J. Sternberg & E. L. Grigorenko (Eds.), *The general factor of intelligence: How general is it?* (pp. 19–37). Mahwah, NJ: L. Erlbaum Associates.

Stankov, L. (2005). *g* factor - Issues of design and interpretation. In O. Wilhelm & R. W. Engle (Eds.), *Handbook of understanding and measuring intelligence* (pp. 279–293). Thousand Oaks, CA: Sage Publications.

Sternberg, R. J., & Grigorenko, E. L. (Eds.). (2002). *The general factor of intelligence: How general is it?* Mahwah, NJ: L. Erlbaum Associates.

Tellegen, A., & Briggs, P. F. (1967). Old wine in new skins: Grouping Wechsler subtests into new scales. *Journal of Consulting Psychology, 31*(5), 499–506. http://dx.doi.org/10.1037/h0024963

Temkin, N. R., Heaton, R. K., Grant, I., & Dikmen, S. S. (1999). Detecting significant change in neuropsychological test performance: A comparison of four models. *Journal of the International Neuropsychological Society, 5*(4), 357–369. http://dx.doi.org/10.1017/S1355617799544068

Thorndike, R. (1987). Stability of factor loadings. *Personality and Individual Differences, 8*(4), 585–586. http://dx.doi.org/10.1016/0191-8869(87)90224-8

Thorson v. State, 76 So. 3d 667, 671-672 (Miss. 2011)

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014, June 30). The Flynn effect: A meta-analysis. *Psychological Bulletin.* Advance online publication. http://dx.doi.org/10.1037/a0037173

United States v. Davis, 611 F. Supp. 2d 472, 488 (D. Md. 2009)

United States v. Hardy, 762 F. Supp. 2d 849, 866 (E.D. La. 2010)

United States v. Wilson, 2013 U.S. Dist. LEXIS 16872, 43-44 (E.D.N.Y. Feb. 7, 2013)

Urbina, S. (2011). Tests of intelligence. In R. J. Sternberg & S. B. Kaufman (Eds.), *The Cambridge handbook of intelligence* (pp. 20–38). Cambridge: Cambridge University Press.

VandenBos, G. R. (2007). *APA dictionary of psychology.* Washington, DC: American Psychological Association.

Van der Molen, M., Huizinga, M., Huizenga, H., Ridderinkhof, K., Van der Molen, M., Hamel, B., . . . Ramakers, G. (2010). Profiling Fragile X Syndrome in males: Strengths and weaknesses in cognitive abilities. *Research in Developmental Disabilities, 31*(2), 426–439. http://dx.doi.org/10.1016/j.ridd.2009.10.013

Wasserman, J. D., & Bracken, B. A. (2012). Fundamental psychometric considerations in assessment. In I. B. Weiner, J. R. Graham, & J. A. Naglieri (Eds.), *Handbook of Psychology, Volume 10: Assessment Psychology.* (2nd ed., pp. 153–229). Hoboken, NJ: John Wiley & Sons.

Watkins, M. W., & Canivez, G. L. (2004). Temporal stability of WISC-III subtest composite: Strengths and weaknesses. *Psychological Assessment, 16*(2), 133–138. http://dx.doi.org/10.1037/1040-3590.16.2.133

Wechsler, D. (1991) *Wechsler Intelligence Scale for Children, third edition (WISC-III): Manual.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2002a). *WAIS-III, Wechsler Adult Intelligence Scale, third edition: WMS-III, Wechsler Memory Scale, third edition: Technical manual. Updated.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2002b). *WAIS-III. Escala de Inteligencia para Adultos de Wechsler—Tercera Edición.* Buenos Aires, Brazil: Paidos.

Wechsler, D. (2008). *WAIS-IV: Technical and interpretive manual.* San Antonio, TX: Pearson.



140     Intelligence Testing

Wechsler, D. (2011). *Wechsler Abbreviated Scale of Intelligence, Second Edition.* San Antonio, TX: NCS Pearson.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment,* 28(5), 482–493. http://dx.doi.org/10.1177/0734282910373572

Whalley, L. J., & Deary, I. J. (2001). Longitudinal cohort study of childhood IQ and survival up to age 76. *British Medical Journal,* 322(7290), 819. Retrieved from http://www.ncbi.nlm.nih.gov/pmc/articles/PMC30556/pdf/819.pdf

Whitaker, S. (2008). The stability of IQ in people with low intellectual ability: An analysis of the literature. *Intellectual and Developmental Disabilities,* 46(2), 120–128. http://dx.doi.org/10.1352/0047-6765(2008)46[120:TSOIIP]2.0.CO;2

Woodcock, R. W., McGrew, K. S., Schrank, F. A., & Mather, N. (2001, 2007). *Woodcock-Johnson III normative update.* Rolling Meadows, IL: Riverside Pub.

Zhou, X., Zhu, J., & Weiss, L. G. (2010). Peeking inside the "black box" of the Flynn Effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment,* 28(5), 399–411. http://dx.doi.org/10.1177/0734282910373340

# The DEATH PENALTY and INTELLECTUAL DISABILITY

## Edward A. Polloway, Editor



American Association
on Intellectual and
Developmental Disabilities

# 10 | Norm Obsolescence: The Flynn Effect

Kevin S. McGrew

## Nature of the Problem

A person's IQ test score is based on the comparison of the person's tested performance to an age-appropriate norm reference group. The *norms* for an IQ test are developed to represent the snapshot of the general U.S. population (at each age level the test covers) at the time the norm or standardization data are collected (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education [AERA, APA, NCME], 1999). (VandenBos, 2007, defines a norm as "a standard or range of values that represents the typical performance of a group or of an individual [of a certain age, for example] against which comparisons can be made" [p. 631]). The person's test performance is compared to this standard reference group. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children ages 6 through 16 from 1971 through 1973 (Wechsler, 1974). (1972 is thus considered the official date of the WISC-R norm/standardization sample.) Thus, a child who is 7 years, 2 months old who was administered the WISC-R in 1974 would have the calculation of his or her IQ test score based on a comparison to the performance of children from ages 7 years, 0 months through 7 years, 3 months in the year 1972. (The WISC-R norm tables are provided in 3 month intervals within each year of age.) If the WISC-R was administered to a child of the same age (7 years, 2 months) in 1984, rather than being compared to other children of the same age in 1984, this child's performance would still be evaluated against similarly aged children from 1972. This second comparison results in a test-date/test-norm *mismatch* of 12 years (1984 − 1972 = 12). As explained next, comparing an individual's performance on an IQ test with outdated test norms results in *a comparison to a historical reference group from the past—not the person's contemporary peers.* This *norm obsolescence* problem is more commonly referred to as the *Flynn effect* (Flynn, 1984,

155

156    Norm Obsolescence: The Flynn Effect

1985, 2000, 2006, 2007a, 2009). The Flynn effect produces inflated and inaccurate IQ test scores.

In simple terms, psychologists and psychological measurement experts typically describe the Flynn effect as the result of a "softening" of IQ tests norms with the passage of time. That is, individuals tested today on an IQ test normed many years earlier will obtain artificially inflated IQ test scores, because the older test norms reflect a level of overall performance that is lower than that of individuals in contemporary society. This is one of the primary reasons why authors and publishers of IQ tests make every effort to periodically provide "freshened" norms by collecting new nationally representative sample data for IQ test batteries. The professional consensus among test developers is that the "shelf life" of an IQ test's norms is approximately 10 years. According to Weiss (2010), Vice President of Pearson Clinical Assessment, the company and division that develops and publishes the various Wechsler IQ batteries, "there is no definition of when a test becomes obsolete. When asked privately, most Flynn effect researchers have 10 years in mind" (p. 492). If new norms are not provided, individuals tested using IQ tests with outdated norms will typically obtain inflated and inaccurate IQ test scores.

The Flynn effect recognizes that the normal curve distribution of intelligence shifts upward over time. Thus, the same raw score performance on an IQ test, when compared to outdated norms, will produce a markedly different IQ score when it is compared to updated norms based on a contemporary sample of abilities for a person of the same age. The person's tested performance (i.e., the number of correct responses across all parts of the IQ test) does *not* change, but the person's relative standing in the distribution of IQ scores across the population *does* change as a function of which norm reference group his or her performance is compared against. The same performance that is considered average in the contemporary norm sample, yielding an IQ test score of 100 in the distribution, will result in a higher IQ test score when using older norms (Schalock, 2012).

As a result of the Flynn effect, it is possible that one or more IQ test scores reported for an individual being considered for a diagnosis of intellectual disability (ID) may be inaccurate and inflated estimates. Given the high-stakes nature of *Atkins*, ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, the impact of the Flynn effect must be recognized and an adjustment to the inflated scores is recommended.

## Summary of Related Research

### Origins of the Flynn Effect

Probably the first widely recognized scholarly report of IQ norm obsolescence was published by Lynn in 1983. Reflecting Lynn's early writings, some intelligence scholars refer to IQ norm obsolescence as the *Lynn-Flynn effect* (Woodley, 2012a). Recently, Lynn

(2013) provided evi
the phenomenon o
(1984). Lynn (2013
should be the "Runc
(based on the custc
the term *Flynn effe*
research and *Atkins*

Seventeen years
in the *American Jou*
*and Developmental*
We Really Have Cr
"adjustment" in the
the "canary in the cc
a significant impac
identified as ID. At
tests norms, althou;
Flynn effect adjustn

Flynn (1985) pro
score of 70 on a "
*criterion for menta*
definition). Then, 1
published there wo
whenever a new IQ
reference IQ test (e.
the new test and tl
to the old cutting l
standard Flynn effe
an individual's total
to a person who w
Flynn's 1985 propo
effect adjustment p

Fifteen years late
sounded the alarm
nosis and classifica

It is certain that
label of mentall
was good or bad
avoided stigma.
and classroom t
needed (p. 197).

(2013) provided evidence that 24 studies, the first being Runquist (1936), reported on the phenomenon of norm obsolescence before the "effect was rediscovered by Flynn" (1984). Lynn (2013) argued that the proper designation of IQ test norm obsolescence should be the "Runquist effect." Although Lynn (2013) provided a compelling argument (based on the customary practices in the history of science for naming phenomena), the term *Flynn effect* is used here given its prominent and frequent use in intelligence research and *Atkins* court cases.

Seventeen years prior to the 2002 *Atkins* decision, Flynn (1985) published an article in the *American Journal on Mental Deficiency* (now the *American Journal on Intellectual and Developmental Disabilities*). This article, titled "Wechsler Intelligence Tests: Do We Really Have Criterion of Mental Retardation?" first raised the issue of a possible "adjustment" in the context of an ID diagnosis. In hindsight, Flynn's 1985 article was the "canary in the coal mine" in that it first demonstrated that the Flynn effect may have a significant impact on the proportion of the population of individuals that would be identified as ID. At that time, Flynn proposed a form of adjusting for the softening of tests norms, although it was in a slightly different form than the current recommended Flynn effect adjustment procedure.

Flynn (1985) proposed that to account for the softening of test norms, an IQ test score of 70 on a "reference" IQ test (i.e., WAIS-R) would be set in as the *absolute criterion for mental retardation* (that is, on the intellectual functioning prong of the definition). Then, to account for norm obsolescence, each time a new IQ test was published there would be a lowering of the MR cutting line. Flynn's 1985 idea was that whenever a new IQ test was published, it would be given together with the established reference IQ test (e.g., WAIS-R) and the average mean IQ test score difference between the new test and the reference test would be used to "derive a new score equivalent to the old cutting line" (p. 243). Although different from what is now considered the standard Flynn effect adjustment approach (i.e., subtracting 3 IQ test score points from an individual's total IQ test score for every 10 years for which the test was administered to a person who was normed prior to the date of individual's testing), conceptually Flynn's 1985 proposal accomplished the same goal as the currently employed Flynn effect adjustment procedure.

Fifteen years later, and still 2 years prior to the *Atkins* decision, Flynn (2000) again sounded the alarm regarding the implication of norm obsolescence related to the diagnosis and classification of mental retardation:

> It is certain that over the past 50 years, literally millions of Americans evaded the label of mentally retarded designed for them by the test manuals. Whether this was good or bad depends on what one thinks of the label. Some will say millions avoided stigma. Others will say that millions missed out on needed assistance and classroom teachers were left unaided to cope with pupils for whom aid was needed (p. 197).

158    Norm Obsolescence: The Flynn Effect

The potential impact of the Flynn effect on other diagnoses was also reported in 2001 and 2003. Truscott and colleagues (Sanborn, Truscott, Phelps, & McDougal, 2003; Truscott & Frank, 2001) reported on the impact of the Flynn effect on learning disability (LD) identification, not identification of individuals with ID. Although these authors did not offer or endorse any IQ test score adjustment procedure, these researchers concluded that

> A critical finding of this study is that the FE probably contributes to misdiagnosis of LD. If this research is combined with previous reports that academic achievement may be unaffected by the FE (Neisser, 1998) it strongly suggests that, over the life of a test version, IQ-achievement discrepancies, the most salient LD criterion, are exaggerated. One potential result of such an exaggeration of IQ-achievement discrepancies would be that, as test norms aged, fewer students would score in the mentally retarded range (Flynn, 2000) and more students would qualify for LD based on inflated severe discrepancies (p. 300).

In conclusion, the recognition of the impact of *norm obsolescence* (i.e., the Flynn effect) on IQ test scores, and more importantly, the potential for misdiagnosis of ID and other conditions (e.g., LD), has been recognized and documented as early as the 1980s. It continued to be discussed prior to and after the 2002 ID-related *Atkins* decision by researchers and professionals who did not anticipate nor were influenced by the 2002 *Atkins* decision. For obvious reasons (i.e., the life-or-death implications of the *Atkins* decision), there has been increased interest in the Flynn effect adjustment procedure since the *Atkins* decision. The facts indicate that the recognition of the impact of norm obsolescence on IQ test scores (and the idea of a norm obsolescence IQ test score adjustment) was established prior to the *Atkins v Virginia* (2002) U.S. Supreme Court decision.

## Scientific Basis of the Flynn Effect

There is a scientific and professional consensus that the Flynn effect is a scientific fact. A complete reading of the extant Flynn effect research literature leads to the conclusion that, despite debates regarding the causes of the Flynn effect, differences in the rate of Flynn effect change in different countries. Whether the Flynn effect has started to plateau in Scandinavian countries or whether the Flynn effect differs by different levels of intelligence and different methodological issues in various studies, *the consensus of the relevant scientific community is that the Flynn effect is real* (Cunningham & Tassé, 2010; Fletcher, Stuebing & Hughes, 2010; Flynn, 2009; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010a, 2010b; McGrew, 2010; Rodgers, 1999; Trahan, Stuebing, Fletcher, & Hiscock 2014; Weiss, 2010; Zhou, Zhu, & Weiss, 2010). The robustness of this conclusion may best be represented by Rogers' (1999) statement where, after raising valid methodological issues regarding various statistical analysis and conclusions across Flynn effect studies, that even with a "healthy dose of

skepticism, the c
have substantive
The research
found over 4,0(
obsolescence re
*Effect Archive*
capital-punishn
190 publication
the current cha
ID diagnosis in
*of Psychoeduca*
scientific conse
Kaufman (201(
interpretation (

> The Flynn el
> now than th
> of increase i
> per decade :

> The consen:
> (Fletcher et al
> 2010a, 2010b;
> Rosenn, 2010;
> obsolescence (
> quotes from r
> opinion regar(

> The Flynn
> decade on
> 2010, p. 49

> The point
> scores as e:
> 3 points pe

> The FE, w!
> ences. Stud
> for a test s
> subtracted

> The Flynn
> increases
> Reschly, 2

ported in
lcDougal,
ı learning
Although
ure, these

ıgnosis
:hieve-
ver the
terion,
rement
core in
lify for

the Flynn
osis of ID
s early as
ted *Atkins*
nfluenced
.cations of
djustment
on of the
solescence
2002) U.S.

·ntific fact.
:onclusion
.n the rate
started to
·rent levels
*consensus*
ingham &
)an, 2006,
; Rodgers,
., & Weiss,
ers' (1999)
; statistical
hy dose of

skepticism, the effect rises above purely methodological interpretation, and appears to have substantive import" (p. 354).

The research literature regarding the Flynn effect is extensive. Trahan et al. (2014) found over 4,000 articles in their comprehensive literature review. (Most all norm obsolescence references and articles can be found at the regularly updated *Flynn Effect Archive Project* [http://www.atkinsmrdeathpenalty.com/2010/01/atkins-mrid-capital-punishment-flynn_11.html]. As of 2014, this archive includes approximately 190 publications.) A thorough treatment of all this research is beyond the scope of the current chapter. Fortunately, key contemporary Flynn effect issues bearing on an ID diagnosis in the *Atkins* context were covered in a special 2010 issue of the *Journal of Psychoeducational Assessment* (*JPA*). A variety of invited scholars confirmed the scientific consensus regarding the validity of the Flynn effect. For example, Dr. Alan Kaufman (2010a), arguably the most prominent scholar on intelligence testing and interpretation of the various Wechsler IQ tests, stated that

> The Flynn effect (FE) is well known: Children and adults score higher on IQ tests now than they did in previous generations (Flynn, 1984, 2007, 2009b). The rate of increase in the United States has apparently remained a fairly constant 3 points per decade since the 1930s (p. 382).

The consensus of almost all authors who contributed to the *JPA* Flynn effect issue (Fletcher et al., 2010; Flynn, 2010; Hagan, Drogin, & Guilmette, 2010a; Kaufman, 2010a, 2010b; Kaufman & Weiss, 2010; McGrew, 2010; Reynolds, Niland, Wright, & Rosenn, 2010; Sternberg, 2010; Weiss, 2010; Zhou et al. 2010) was that IQ test norm obsolescence (i.e., the Flynn effect) is an established scientific fact. The following select quotes from recent peer-reviewed articles capture the essence of the convergence of opinion regarding the validity of the Flynn effect.

> The Flynn effect (FE) is real. The FE has been shown to be nearly 3 points per decade on average across a large number of studies, countries, and tests (Weiss, 2010, p. 491).

> The point is that a person tested on an outdated test will earn spuriously high scores as each year goes by, and the amount of the spuriousness amounts to about 3 points per decade for Americans (Kaufman, 2010b, p. 503).

> The FE, whatever its cause, is as real as virtually any effect can be in the social sciences. Studies have observed an increase of 0.3 points per year in average IQs; thus, for a test score to reflect accurately the examinee's intelligence, 0.3 points must be subtracted for each year since the test was standardized (Reynolds et al., 2010, p. 478).

> The Flynn effect is a well-established psychometric fact documenting substantial increases in measured intelligence test performance over time (Gresham & Reschly, 2011, p. 131).

160    Norm Obsolescence: The Flynn Effect

Since the publication of the 2010 special *JPA* Flynn effect issue, many additional Flynn effect research and commentary articles have appeared (e.g., Battarjee, Khaleefa, Ali, & Lynn, 2013; Baxendale, 2010; Cunningham & Tassé, 2010; Hagan, Drogin, & Guilmette, 2010b; Kanaya & Ceci, 2011, 2012; Lynn, 2013; Nijenhuis, 2013; Nijenhuis, Cho, Murphy, & Lee, 2012; Nijenhuis, Murphy, & van Eeden, 2011; Nijenhuis & van der Flier, 2013; Pietschnig, Voracek, & Formann, 2011; Nijman, Scheirs, Prinsen, Abbink, & Blok, 2010; Rindermann, Schott, & Baumeister, 2013; Rönnlund, Carlstedt, Blomstedt, Nilsson, & Weinehall, 2013; Skirbekk, Stonawski, Bonsang, & Staudinger, 2013; Trahan et al., 2014; Wai & Putallaz, 2011; Woodley, 2011, 2012a, 2012b; Young, 2012). The continued flow of the Flynn effect related to peer-reviewed articles confirms the consensus that the Flynn effect is a scientifically important and studied phenomenon among intelligence scholars.

### Adjusting IQ Test Scores for the Flynn Effect in Atkins Cases Is Best Practice

Not only is there a scientific consensus that the Flynn effect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn effect, particularly in *Atkins* cases. (The use of a Flynn effect correction in clinical settings is less of an issue given that psychologists in such settings typically have more leeway to interpret scores as ranges, invoke clinical judgment, and incorporate information regarding measurement error in interpretation of the scores when making a diagnosis. In contrast, certain high stakes settings [e.g., *Atkins* cases; eligibility for Social Security Disability benefits] may have strict point-specific cut-scores [i.e., "bright line" criteria] where examiners, or the recipients of the scores [e.g., the courts], do not allow for such clinical interpretation. Thus, the Flynn effect adjustment is more relevant, appropriate, and primarily discussed in literature and law dealing with this type of high stakes IQ testing.) The most prominent and relevant professional consensus-based guidelines for ID diagnosis (Schalock et al., 2007, 2010, and 2012) support a Flynn effect adjustment for scores based on obsolete IQ test norms. *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed.; Schalock et al., 2010), based on an expert-consensus process, provides a written guideline that endorses the appropriateness of the Flynn effect adjustment in the diagnosis of ID. (The 11th edition was created using a group-based consensus process conducted by the AAIDD Ad Hoc Committee on Terminology and Classification [Schalock et al., 2010]). AAIDD recommends that psychologists use the most recent versions of IQ tests and, if scores are reported from an IQ test with outdated norms, a correction for the age of norms is warranted (Schalock et al., 2007). The 11th edition states

> As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. (p. 37)

y additional
e, Khaleefa,
, Drogin, &
; Nijenhuis,
is & van der
, Abbink, &
Blomstedt,
)13; Trahan
2012). The
nfirms the
ienomenon

*Practice*

d and real
res derived
ynn effect,
:al settings
ore leeway
iformation
diagnosis.
al Security
e" criteria]
w for such
propriate,
stakes IQ
delines for
stment for
*ssification,*
consensus
the Flynn
; a group-
minology
ogists use
test with
al., 2007).

ie 10th
Flynn
older

As suggested in the *User's Guide to Mental Retardation: Definition, Classification, and Systems of Supports* (Schalock, 2007, pp. 20–21),

> The main recommendation resulting from this work [regarding the Flynn effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted. (p. 37)

The AAIDD's more recent *User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2012) states

> The *Flynn effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn effect affects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of norms is warranted. (p. 23)

A consensus among the professional and scientific community of intelligence and ID scholars has emerged. This consensus is that given the high-stakes nature of *Atkins* ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, *a Flynn effect correction to a person's scores in this setting is now considered best or standard practice.* This conclusion is supported by a significant number of scholars and researchers in the areas of intelligence and ID (Cunningham & Tassé, 2010; Fletcher et al., 2010; Flynn, 2006, 2007b; Flynn & Widaman, 2008; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010b; McVaugh & Cunningham, 2009; Reynolds et al., 2010; Schalock, 2007; Schalock, 2012). One example of this support is the statement of Reynolds et al. (2010) that "as a generally accepted scientific theory that could potentially make the difference between a constitutional and unconstitutional execution, the Flynn effect must be applied in the legal context" (p. 480). Reynolds et al. (2010) go as far as to state that "the failure to apply the Flynn correction as we have described it is tantamount to malpractice. No one's life should depend on when an IQ test was normed" (p. 480).

A minority of scholars have offered a different approach to the issue of correcting IQ test scores due to the Flynn effect. Weiss (2010), while acknowledging the scientific validity of the Flynn effect, advocates that experts should simply inform the fact finder of what the research shows and the trier-of-fact should evaluate and decide if and how to apply it when interpreting individual scores. Hagan et al. (2010b) also agree with the need to consider the Flynn effect in capital cases but their disagreement "lies in how psychologists should convey IQ scores in light of the observation that mean scores drift over time" (p. 420). It is important to note that the more conservative positions of Weiss (2010) and Hagan et al. (2010a, 2010b) represent a minority position in the professional literature. More importantly, they do not argue against the scientific validity of the Flynn

effect or even the need to consider the effect in *Atkins* cases. Rather, their difference of opinion with the majority is only as to whether a specified score adjustment should be made to the original score or whether testifying experts should instead address the Flynn effect in narrative form.

Recently, legal scholars have also supported the application of the Flynn effect correction in *Atkins* cases. Young's (2012) recent law review article ("A More Intelligent and Just *Atkins*: Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation or Intellectual Disability") concluded that

> adjusting for the Flynn effect reflects a practice consistent with both *Atkins* and the known world of IQ measurements. While a freakish strike of lightning is difficult to avoid, the potentially deadly and unconstitutional consequences of refusing to account for the Flynn effect are wholly preventable. Thus, for the intelligent and just enforcement of *Atkins*, courts and juries should adjust IQ score from outdated tests for the Flynn effect. (p. 663)

### What Is the Correct Flynn Effect Adjustment for Norm Obsolescence?

The AAIDDs' *User's Guide* (Schalock, 2012) recommends a Flynn effect correction of 3 points per decade (0.3 points per year). The 3 points per decade rule-of-thumb is consistent with the previously cited comments of Kaufman (2010a, 2010b) and Weiss (2010), and is also consistent with the recommendation of most scholars in the areas of intelligence and ID (e.g., Fletcher et al., 2010; Gresham & Reschly, 2011; Trahan, et al., 2014; Widaman, 2007).

The 3 points per decade rule-of-thumb is based primarily on Flynn's (2009) seminal article where he synthesized the results of 14 estimates of IQ test score gains over time. Flynn reported an average IQ test score change, across the 14 studies, of 0.311 points per year. An average mean score of 0.299 points was reported for the Wechsler comparisons only. Flynn concluded that "the evidence suggests that a rate of 0.30 is about right, and varying it from case to case lacks any rationale" (p. 104).

More recently Fletcher et al. (2010) applied more precise quantitative meta-analytic procedures to Flynn's (2009) data and reported a weighted mean of 2.80 points per decade. After removing two outlier studies, the weighted mean per decade was 2.96. These researchers concluded that "the level of precision we reported of a mean of about 3 and a *standard error of the mean* (SEM) of about 1 supports the correction and is consistent with the Flynn correction of 3 points per decade" (p. 472). In the most comprehensive meta-analysis research synthesis of 285 studies, Trahan et al. (2014) found that for modern intelligence tests the Flynn effect size was a similar 2.93 points per decade. These researchers concluded that their "findings are consistent with previous research and with the argument that it is feasible and advisable to correct IQ scores for the Flynn effect in high-stakes decisions" (p. 22).

The best available research syntheses consistently converge on a Flynn effect rule-of-thumb of 3 IQ test score points per decade (of IQ test norm obsolescence). Although

scientific journals may report Flynn effect results to the second decimal place (e.g., 3.11 per decade or 0.311 per year), the psychometrics of IQ testing and research cannot partition human behavior with such precision. As noted by Widaman (2007), much of the variation between scores from different Flynn effect studies is due to sampling and measurement error. Using Flynn effect adjustment formulae that use numbers to the second decimal place would be akin to slicing butter with a laser beam. Consequently, the current best estimate of IQ norm obsolescence, and the recommended Flynn effect adjustment, is 3 IQ points per decade, or 0.3 points per year.

### Researching the Flynn Effect "Black Box": Implications for Practice

Recently a significant portion of Flynn effect research has shifted from a focus on the secular changes in the global IQ test scores over time to changes on more specific intellectual abilities, possible differential effects by level of intelligence, and a search for the cause of the Flynn effect (Kaufman, 2010a). Zhou et al. (2010) characterized this shift to a focus on the "black box" of the Flynn effect.

   The cause of the Flynn effect. In the context of the special articles in the 2010 *JPA* Flynn effect issue, Weiss (2010) stated that "Except for Flynn, there is general agreement … that we know precious little about the causes of the effect" (p. 487). Explanations and theories have touched on such causative variables as genetics, environmental factors (e.g., nutrition, education, improved public health, increased use of computer games), ethnicity, and different societal risks and benefits associated with different generations (Kaufman & Weiss, 2010; Weiss, 2010). Flynn (2007a), in his book *What Is Intelligence? Beyond the Flynn Effect*, suggests that the effect that bears his name is due to systematic shift in societies from concrete to abstract scientific thinking. Confounding the search for the cause(s) of the Flynn effect has been idiosyncratic and armchair-based speculations (Weiss, 2010).

   In the current context, knowing that the Flynn effect exists trumps a lack of consensus regarding causation. The impact of norm obsolescence on IQ test scores is real and the professional consensus is that it should be accounted for in *Atkins* ID determination. Understanding the "why" of the Flynn effect is beyond the scope of the current chapter and is not necessary for recognizing the scientifically and professionally based consensus that IQ test scores suffering from norm obsolescence need to be adjusted in *Atkins* cases. As stated by Kaufman (2010b), "The Flynn effect is a fact, even if its cause is elusive, and it must be considered carefully when making high stakes decisions such as the death penalty" (p. 503).

   Differential Flynn effects by specific intellectual abilities. The foundation of Flynn's (2007a) theoretical explanation of the Flynn effect is based primarily on the interpretation of differential rates of score changes as a function of different specific intellectual abilities (e.g., smaller gains on verbal and crystallized ability tasks and larger changes on visual-spatial and abstract fluid reasoning tasks—not a singular focus on the global IQ test score). If differential specific ability Flynn effects are eventually found to be valid, the potential implication is that different Flynn effect adjustments

164     Norm Obsolescence: The Flynn Effect

may be recommended for different composite or cluster "part" scores in IQ tests, and not just the global IQ score. This would introduce a new layer of complexity in the interpretation of IQ test scores (and part scores) in *Atkins* cases.

Although the recent methodologically sophisticated attempt by Zhou et al. (2010) to examine differential ability Flynn effects within the Wechsler tests represents an important step forward in this area of inquiry, their research produced inconsistent and contradictory findings. Although differential specific ability Flynn effect findings may eventually be identified, currently the supporting research results are sparse, mixed in results, and suffer from significant measurement and methodological flaws (McGrew, 2010). The foundation of Flynn effect causal theory, which hinges on the presence of differential specific ability Flynn effects, has been questioned on logical, theoretical, measurement and methodological grounds (Kaufman, 2010a, 2010b; McGrew, 2010; Weiss, 2010). Currently the extant research is not mature enough to support differential specific-ability Flynn effect adjustments in clinical or forensic contexts.

**Differential Flynn effects by level of intelligence.** The use of the 3 IQ test score points per decade Flynn effect adjustment rule-of-thumb has been questioned by research suggesting that the Flynn effect may not be uniform across all levels of general intelligence (Kanaya & Ceci, 2007; Kanaya, Ceci, & Scullin, 2003; Sanborn et al. 2003; Zhou et al., 2010). More important has been the suggestion that the Flynn effect may be larger at the IQ score range at the threshold for ID diagnosis. Cunningham and Tassé (2010) have referred to this research as the investigation of the Flynn effect in the "zone of ambiguity" (IQ test scores from 71–80). Studies reviewed by Cunningham and Tassé (2010) report IQ per decade changes ranging from roughly 4 to 5 points in the zone of ambiguity. Zhou et al. (2010) also reported differential Flynn effects by level of intelligence, but the results were inconsistent in the directions of the variation and may differ for different tests or age groups.

Similar to the differential Flynn effect by specific ability research, the ability-specific research has not been fully vetted through a sufficiently large number of studies and has been questioned on methodological grounds (McGrew, 2010; Widaman, 2007; Zhou et al., 2010). As summarized by Weiss (2010), "a small number of studies have suggested differential Flynn effect by ability level, but not enough is known about this at present" (p. 492). Reynolds et al. (2010) reinforce this conclusion, when after commenting on the Zhou et al. (2010 differential Flynn effects by levels of intelligence findings, that the results were inconsistent and "for now, best practice is the application of the Flynn correction as a constant by year across the distribution" (p. 480). Until more studies replicate the possibility of larger Flynn effects near the ID diagnostic threshold, the 3 points per decade Flynn effect rule-of-thumb should be employed across all levels of general intelligence.

## Implications for Practice

The following implications are based on the integration of the content of the current chapter as well as the recommendations from the *User's Guide to the 10th edition*, the *11th edition*, and the *User's Guide to the 11th edition* (Schalock et al., 2007, 2010, 2012):

First,
eliminat
When a
assessme
Assessm
cation of
ferent IQ
of each p
selection

Secon
obsolesce
of ID in
norms sh
norm obs

Third,
*ment = (I*
the date t
administe
Flynn effe
IQ score.
treatment
of "roundi
employed
application
IQ tests or
profession
the contra
should be
across all l

Fourth,
should be i
by assessm

Fifth, th
supporting
as an autho

Sixth, v
reports, leg
of the term
a much mo
Flynn effec

Seventh
difference

**First,** the potential problem of norm obsolescence can be minimized, but not always eliminated, by assessment professionals using IQ tests with the most up-to-date norms. When a new version of an IQ battery is published (e.g., WAIS-IV replaces WAS-III), assessment professionals should use the newest version (WAIS-IV) in *Atkins* cases. Assessment professionals have an ethical responsibility to stay abreast with the publication of new versions of IQ batteries and when the option exists to select among different IQ tests to administer to an individual. The relative degree of norm obsolescence of each possible IQ test should be one important factor incorporated into the IQ test selection decision.

**Second,** in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn effect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence.

**Third,** the recommended formula for the Flynn effect adjustment is: *FE adjustment = (Date test administered – date test was normed) × 0.3.* Stated simply, subtract the date the IQ test was normed (see point seven below) from the date the test was administered to the individual, multiply the obtained difference by 0.3. The obtained Flynn effect adjustment value should then be subtracted from the inflated obtained IQ score. The final Flynn effect adjustment value should be an integer value. Thus, the treatment of decimals in the final value should adhere to standard mathematical rules of "rounding to the nearest integer." The rationale for the particular rounding strategy employed should be described in the report. Current research does not support the application of different Flynn effect adjustment values for different part scores on IQ tests or at different levels of general intelligence. The best scientific evidence and professional consensus is that until sufficient research evidence produces evidence to the contrary, the 3 points per decade (0.3 points per year) adjustment rule-of-thumb should be used only on the global IQ test score and should be employed uniformly across all levels of general intelligence.

**Fourth,** both the original obtained (unadjusted) and Flynn effect adjusted scores should be included in all reports or court related statements or declarations provided by assessment professionals.

**Fifth,** the rationale for employing a Flynn effect correction should be described with supporting references. This chapter is intended to serve this function and can be cited as an authoritative source for the use of the Flynn effect adjustment in reports.

**Sixth,** when writing and discussing the Flynn effect, such as in psychological reports, legal declarations, or expert testimony, professionals should make frequent use of the term *norm obsolescence* when explaining the Flynn effect. Norm obsolescence is a much more descriptive and understandable means for conveying the essence of the Flynn effect.

**Seventh,** the calculation of the years of norm obsolescence should be based on the difference between the year the test was administered to an individual and the best

estimate of the year the IQ test was *normed* (see also Chapters 7 and 8). The data of publication of an IQ test does not accurately capture the time period when the test norm data were gathered. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children from 6 through 16 years of age from 1971 through 1973 (Wechsler, 1974). Thus, the middle most year of the actual norm data collection period is 1972. For the WISC-R, the year 1972 should be subtracted from the date of testing to determine the number of years of norm obsolescence. The test norm years reported for the different IQ tests by Flynn (2009) are recommended for uniformity purposes. For tests not reported in Flynn (2009), professionals need to consult the technical manuals for the IQ test in question and establish the best year estimate that is at the middle of the norm data collection period. If not readily available, professionals should seek the expertise of the test authors, publisher, or other intelligence test experts who may possess this information.

This chapter concludes with an example from an *Atkins* case. In 1998 an individual was administered the WAIS-R and obtained a Full Scale IQ of 80. Despite knowing that the WAIS-R had been revised and published as the WAIS-III in 1997, the psychologist administered the WAIS-R despite 20 years of norm obsolescence. The WAIS-R was published in 1981 and the best estimate of the date the actual test norms were gathered, as per the recommended procedures above, is 1978. Thus, the difference between the date of WAIS-R testing (1998) and date of test norming (1978) was 20 years, Using the 0.3/year Flynn effect adjustment, the best estimate of the magnitude of IQ test score inflation due to norm obsolescence is 6 IQ test score points ($0.3 \times 20 = 6.0$). Thus, this individual's Flynn effect adjusted WAIS-R score is 74 ($80 - 6 = 74$). This example represents one of the most dramatic instances of norm obsolescence (20 years) and also reflects the fact that the examiner did not engage in proper practice by administering the WAIS-III which was available at the time the individual was assessed.

Refere

Americai
  Coun
  *testin*
Atkins v.
Batterjee
  Arabi
Baxendal
  *tal Ne*
Cunning
  ing IC
  413–4
Fletcher,
  in hig
Flynn, J.
  *letin,*
Flynn, J.
  tion?
Flynn, J.
  *Psych*
Flynn, J.
  *Publi*
Flynn, J.
  Unive
Flynn, J.
  *Psych*
Flynn, J.
  appro
Flynn, J.
  datioi
  *revie*
Greensp:
  MR. i
Greensp:
  Moor
Gresham
  penal
  1934
Hagan, I
  the Fl
  474–
Hagan,
  repoi
Kanaya,
  intell
  doi: 1

data of pub-
he test norm
1974 and the
ge from 1971
orm data col-
cted from the
The test norm
ed for unifor-
to consult the
stimate that is
professionals
ce test experts

an individual
: knowing that
e psychologist
: WAIS-R was
were gathered,
e between the
ears, Using the
f IQ test score
) = 6.0). Thus,
. This example
years) and also
· administering
d.

## References

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing*. Washington, DC: American Educational Research Association.

Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).

Batterjee, A. A., Khaleefa, O., Ali, K., & Lynn, R. (2013). An increase in intelligence in Saudi Arabia, 1977–2010. *Intelligence, 41*(2), 91–93. doi: 10.1016/j.intell.2012.10.011

Baxendale, S. (2010). The Flynn effect and memory function. *Journal of Clinical and Experimental Neuropsychology, 32*(7), 699–703. doi: 10.1080/13803390903493515

Cunningham, M. D., & Tassé, M. J. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. *Professional Psychology: Research and Practice, 45*(5), 413–419. doi: 10.1037/a0020226

Fletcher, J., Stuebing, K., & Hughes, L. (2010). IQ scores should be corrected for the Flynn effect in high stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469–473.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95*, 29–51.

Flynn, J. R. (1985). Wechsler Intelligence Tests: Do we really have a criterion of mental retardation? *American Journal of Mental Deficiency, 90*(3), 236–244.

Flynn, J. R. (2000). The hidden history of IQ and special education: Can the problems be solved? *Psychology Public Policy and Law, 6*(1), 191–198.

Flynn, J. R. (2006). Tethering the elephant: Capital cases, IQ, and the Flynn effect. *Psychology, Public Policy, and Law, 12*, 170–189. doi:10.1037/1076-8971.12.2.170

Flynn, J. R. (2007a). *What is intelligence? Beyond the Flynn effect*. New York: Cambridge University Press.

Flynn, J. R. (2007b). Capital offenders and the death sentence: A scandal that must be addressed. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 3–7.

Flynn, J. R. (2009). The WAIS-III and WAIS-IV: *Daubert* motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16*, 98–104. doi: 10.1080/09084280902864360

Flynn, J. R., & Widaman, K. F. (2008). The Flynn effect and the shadow of the past: Mental retardation and the indefensible and indispensible role of IQ. In L. M. Glidden (Ed.), *International review of mental retardation* (Vol. 35, pp. 121–149). Boston, MA: Elsevier.

Greenspan, S. (2006). Issues in the use of the "Flynn effect" to adjust IQ scores when diagnosing MR. *Psychology in Mental Retardation and Developmental Disabilities, 31*(3), 3–7.

Greenspan, S. (2007). Flynn-adjustment is a matter of basic fairness: Response to Roger B. Moore, Jr. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 7–8.

Gresham, F., & Reschly, D. J. (2011). Standard of practice and Flynn effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131–140. doi: 10.1352/1934-9556-49.3.131

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010a). IQ Scores should not be adjusted for the Flynn effect in capital punishment cases. *Journal of Psychoeducational Assessment, 28*(5), 474–476. doi: 10.1177/0734282910373343

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010b). Science rather than advocacy when reporting IQ scores. *Professional Psychology Research and Practice, 41*(5), 420–423.

Kanaya, T., & Ceci, S. J (2007). Mental retardation diagnosis and the Flynn effect: General intelligence, adaptive behavior, and context. *Child Development Perspectives, 1*(1), 62–63. doi: 10.1111/j.1750-8606.2007.00013.x

Kanaya, T., & Ceci, S. J (2011). The Flynn effect in the WISC subtests among school children tested for special education services. *Journal of Psychoeducational Assessment, 29*(2), 125–136. doi:10.1177/0734282910370139

Kanaya, T., & Ceci, S. (2012). The impact of the Flynn effect on LD diagnoses in special education. *Journal of Learning Disabilities, 45*(4), 319–326. doi: 10.1177/0022219410392044

Kanaya, T., Ceci, S. J., & Scullin, M. H. (2003). The rise and fall of IQ in special ed: Historical trends and their implications. *Journal of School Psychology, 41*(6), 453–465. doi:10.1016/j.jsp.2003.08.003

Kaufman, A. (2010a). "In what way are apples and oranges alike?": A Critique of Flynn's interpretation of the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 382–398. doi: 10.1177/0734282910373346

Kaufman, A. (2010b). Looking through Flynn's rose-coloured scientific spectacles. *Journal of Psychoeducational Assessment, 28*(5), 494–505. doi: 10.1177/0734282910373573

Kaufman, K., & Weiss, L. (2010). Guest editor's Introduction to the special issue of JPA on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 379–381. doi:10.1177/0734282910373344

Lynn, R. (1983). IQ in Japan and the United States shows a growing disparity. *Nature, 306*, 291–292.

Lynn, R. ( 2013). Who discovered the Flynn effect? A review of early studies of the secular increase in intelligence. *Intelligence,41*(6), 765–769. doi: 10.1016/j.intell.2013.03.004

McGrew, K. (2010). The Flynn effect and its critics: Rusty linchpins and "lookin' for g and Gf in some of the wrong places." *Journal of Psychoeducational Assessment, 28*(5), 448–468. doi:10.1177/0734282910373347

McVaugh, G. S., & Cunningham, M. D. (2009). Atkins v. Virginia: Implications and recommendations for forensic practice. *The Journal of Psychiatry and Law, 37*, 131–187.

Nijenhuis, J. T. (2013). The Flynn effect, group differences, and g loadings. *Personality and Individual Differences, 55*, 224–228. doi:10.1016/j.paid.2011.12.023

Nijenhuis, J. T., Cho, S. H., Murphy, R., & Lee, K. H. (2012). The Flynn effect in Korea: Large gains. *Personality and Individual Differences, 53*(2), 147–151. doi: 10.1016/j.paid.2011.03.022

Nijenhuis, J. T., Murphy, R., & van Eeden, R. (2011). The Flynn effect in South Africa. *Intelligence, 39*(6), 456–467.

Nijenhuis, J. T., & van der Flier, H. (2013). Is the Flynn effect on g? A meta-analysis. *Intelligence, 41,* 802–807.

Nijman, E. E., Scheirs, J. G., Prinsen, M. J., Abbink, C. D., & Blok, J. B. (2010). Exploring the Flynn effect in mentally retarded adults using a nonverbal intelligence test for children. *Research in Developmental Disabilities, 31*, 1404–1411. doi: 10.1016/j.ridd.2010.06.018

Reynolds, C., Niland, J., Wright, J., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. *Journal of Psychoeducational Assessment, 28*(5), 477–481.

Rindermann, H., Schott, T., & Baumeister, A. (2013). Flynn effect in Turkey: A comment on Kagitcibasi and Biricik (2011). *Intelligence, 41,* 178–180. doi: 10.1016/j.intell.2013.02.003

Rodgers, J. L. (1999). A critique of the Flynn effect: Massive IQ gains, methodological artifacts, or both? *Intelligence, 26*(4), 337–356.

Rönnlund, M., Carlstedt, B., Blomstedt, Y., Nilsson, L. G., & Weinehall, L. (2013). Secular trends in cognitive test performance: Swedish conscript data 1970–1993. *Intelligence, 41*(1), 19–24.

Runquist, E. A. (1936). Intelligence test scores and school marks in 1928 and 1933. *School and Society, 43,* 301–304.

Sanborn, K. J., Truscott, S. D., Phelps, L., & McDougal, J. L. (2003). Does the Flynn effect differ by IQ level in samples of students classified as learning disabled? *Journal of Psychoeducational Assessment, 21*(2), 145–159.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S. A., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's guide to mental retardation: Definition, classification, and systems of supports (10th ed.).* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Borthwick-Duffy, S. A., Bradley, V. J., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tassé, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and systems of supports (11th ed.).* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Luckasson, R., Bradley, V., Buntinx, W. H. E., Lachapelle, Y., Shogren, K. A., Snell, M. E., Thompson, J. R., Tassé, M. J., Verdugo-Alonso, M. A., and Wehmeyer, M. L. (2012). *User's guide to intellectual disability: Definition, classification, and systems of supports.* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Skirbekk, V., Stonawski, Bonsang, E., & Staudinger, U. M. (2013). The Flynn effect and population aging, *Intelligence, 41*(3), 169–177. doi: 10.1016/j.intell.2013.02.001

Sternberg, R. (2010). The Flynn effect: So what? *Journal of Psychoeducational Assessment, 28*(5), 434–440. doi: 10.1177/0734282910373349

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014, June 30). The Flynn effect: A meta-analysis. *Psychological Bulletin.* Advance online publication. http://dx.doi.org/10.1037/a0037173

Truscott, S. D., & Frank, A. J. (2001). Does the Flynn effect affect IQ scores of students classified as LD? *Journal of School Psychology, 39*(4), 319–334.

Wai, J., & Putallaz, M. (2011). The Flynn effect puzzle: A 30-year examination from the right tail of the ability distribution provides some missing pieces. *Intelligence, 39*(6), 443–455. doi:10.1016/j.intell.2011.07.006

Wechsler, D. (1974). *The Wechsler Intelligence Scale for Children—Revised (WISC-R).* San Antonio, TX: Psychological Corporation.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 482–493. doi: 10.1177/0734282910373572

Widaman, K. (2007). Stalking the roving IQ score cutoff: A commentary on Kanaya and Ceci (2007). *Child Development Perspectives, 1*(1), 57–59. doi: 10.1111/j.1750-8606.2007.00011.x

Woodley, M. A. (2011). Heterosis doesn't cause the Flynn effect: A critical examination of Mingroni (2007). *Psychological Review, 118*(4), 689–693. doi: 10.1037/a0024759

Woodley, M. A. (2012a). A life history model of the Lynn-Flynn effect. *Personality and Individual Differences, 53*(2), 152–156. doi: 10.1016/j.paid.2011.03.028

Woodley, M. A. (2012b). The social and scientific temporal correlates of genotypic intelligence and the Flynn effect. *Intelligence, 40*(2), 189–204. doi:10.1016/j.intell.2011.12.002

Young, G. W. (2012). A more intelligent and just *Atkins*: Adjusting for the Flynn effect in capital determinations of mental retardation or intellectual disability. *Vanderbilt Law Review,* 615–755.

Zhou, X., Zhu, J., & Weiss, L. (2010). Peeking inside the "blackbox" of the Flynn effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment, 28*(5), 399–411.

Vandenbos, G. (2007). *APA dictionary of psychology.* Washington, DC: American Psychological Association.

<u>DECLARATION AND AFFIDAVIT OF MICHELLE ARMONT</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Michelle Armont, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Michelle Armont.  Alfred Bourgeois is my brother.  We have the same father but different mothers.

2.      Our father is Alfred Sterling.  Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers.  Our father had many outside children.  I am the oldest of them.  We were not raised by our father and we were not treated the same as the children he had with his wife.  The children by his wife basically look down on us and try to deny that we are even any relation to them.  If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.

3.      Alfred and I both love our father but it is not a nurturing father-child relationship like children need.  He did not acknowledge us until we were almost grown.  He would say "it's their momma's child".  Our father's life has been full of lying, cheating and denial of his children.  He did not pay child support for any of us but the youngest, who is now about 13 years old.  He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old.   When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble.  Being treated like that is hurtful to me and it was hurtful to Alfred.

4.      When the woman that Alfred stayed with died he did not want to go back to live at his mother's house.  He could not live with our father so he came to stay with me.  He had a

A-0180

strong bitterness toward his mother because she treated him so badly. Some days he could not say her name.

5. Alfred had some serious problems. Aside from being almost ignored by his father most of his life, he was abused by his mother. She caused him so much pain that he was a damaged person because of the abuse that he suffered. It was hard for Alfred to talk about the abuse he went through. Alfred had trouble trusting people. Alfred was similar to my nephew that had ADD. They both had tantrums. Alfred would not be himself when he got angry. He looked different. He told me he blacked out sometimes when he got angry.

6. I know Beatrice Bourgeois. She is not a stable person. She was well known in the community for being crazy. Anyone that knew her would not trust her or believe what she said.

7. Robin is a compulsive liar. There was always a lot of drama around Robin and Alfred. I got along with her but if you knew her you knew you could not trust anything she said. I saw Robin and Alfred a couple days before the baby died. They were all lovey-dovey. Robin and I had the kind of relationship that she knew if Alfred gave her any trouble she could come to me and I would help her out

8. Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him. He did not understand that he could not afford the things he bought and he didn't understand that people would know the things he was telling them were not true. Many women were attracted to Alfred but he could not maintain a relationship. He did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem. The same things caused him financial

problems. He just bought things without understanding how hard it would be to make the payments. Alfred could not consider the consequences of his actions. Things that would be obvious to a normal person were not obvious to Alfred.

9. I was only contacted a couple days before Alfred's trial. I tracked down the attorney who was representing Alfred and called him to find out what was going on. Then someone called me. The person who talked to me had me confused with someone else. If they had gotten to know Alfred's family they would have known the difference between his mother's children and his father's children. When I was on the stand I was shown horrible pictures of the baby that died. It was the first time I had seen the pictures and it really shook me up. I wish I had been better prepared.

10. When I saw Alfred in the courtroom he was acting inappropriately. He winked at me during my testimony. He was being very strange.

11. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Armont

Dated: 4/26/07

<u>DECLARATION AND AFFIDAVIT OF NATHANIEL BANKS</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Nathaniel Banks, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.      My name is Nathaniel Banks. I grew up in Paulina, Louisiana. I now live in

Bonner Springs, Kansas. I am juvenile probation officer. I am also a pastor at a

local church in Bonner Springs.

2.      Alfred and I grew up together in Paulina, Louisiana. I know his whole family.

We lived right in the same little area. We are close in age. I am just a little bit

younger. We were in the same ~~class~~ grade 7. 7. in school.

3.      Alfred was a fragile child. He spent a lot of time by himself. People used to pick

on Alfred a lot. Children sometimes do that. I just remember Alfred crying at

anything. Someone would tease him and he would break down crying. People

used to call him names – they called him "white punk". Alfred has a real light

complexion. Kids used the word punk to mean that he was weak. Alfred wasn't

any good at sports. 7/S. He didn't play sports with us. ~~At recess he wasn't good at these games we played outside.~~ In my opinion 7/S

4.      Alfred always looked up to his older brother Lloyd. As an adult Alfred has been

trying to keep up with Lloyd. Lloyd does well for himself. Alfred wanted that for

himself. Alfred wanted to impress people. Alfred lied a lot. I remember that

Alfred would say things that you just knew weren't true. I used to work for the

sheriff's office. Alfred told people he worked there. He was never a proper

deputy. 7/S Alfred tried to build himself up present himself as more than he was. ~~I think Alfred needed to feel important and that is why he lied, to cover up his shortcom~~ings. I think Alfred lied so much he started to believe it.

A-0183

5.    Alfred told me that he was driving an 18-wheeler truck.  I didn't believe him.

When he pulled up to my house in his tractor-trailer I was shocked.  There was no

*N.B. coordination*

way Alfred had the ~~intelligence~~ and skill to drive that thing.  I wondered to myself

who in the world would allow him to drive that truck.

6.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury,

pursuant to 28 U.S.C. § 1746.

Nathaniel Banks

Dated: _5-10-07_

**AFFIDAVIT / DECLARATION OF MURRAY BOURGEOIS PURSUANT TO 28 U.S.C. § 1746**

Murray Bourgeois, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.    I am Alfred Bourgeois' cousin. My father was Harry Bourgeois. He and Alfred's mother, Eunice, were cousins.

2.    My family and Alfred's family lived on Bend Lane in Paulina. My Dad started a car repair business on the Bend and he taught me and Alfred's older brother Lloyd how to repair cars. Lloyd caught on quick and eventually took over the garage. My Dad really helped Lloyd get started and now he is a successful businessman.

3.    Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred.

4.    For a long time, Alfred didn't even live in his Mom's house. He lived down the street with an older lady from church. Miss Mary was the Mother of the Church and didn't have a husband. Alfred's Mom said that he had to stay with her because Miss Mary was frail. Even though Miss Mary treated him better than his own mother, Alfred was hurt by being sent out of the family household. By taking care of Miss Mary, Alfred missed a lot of family outings. He didn't feel like he was a full member of the family and it ate away at him inside.

5.    Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life.

6.    Lloyd was Alfred's idol since Alfred didn't grow up with his own dad. Alfred tried to copy everything that Lloyd did. If Lloyd bought something, then Alfred

would try to buy the same thing. If Lloyd started a business, then Alfred would try to start a business. The only problem was that Alfred was not as smart as Lloyd, so Alfred would fail. Still, Alfred kept trying to be like Lloyd.

7.      Alfred would not talk about his problems directly, but you could see them. He always had something to prove and would try to make people believe that he was better than he was. He became known as a braggart who would exagerate or lie on himself in order to impress everybody. He would cover up his failures by telliing tales that he thought made him look good. We used to say that Alfred would lie faster than a horse could trot. I always thought that Alfred's tall tales were related to him being scared as a child.

8.      No one from Alfred's legal team talked to me at the time of his trial. Someone talked to my Dad, Harry Bourgeois, but not me. If they had spoken to me, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Murray Bourgeois

Dated: May 10, 2007

**AFFIDAVIT / DECLARATION OF WILMER BOURGEOIS, SR
PURSUANT TO 28 U.S.C. § 1746**

Wilmer Bougeois, Sr., pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' maternal uncle. Eunice Bourgeois was my younger sister.

2.      All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

3.      Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

4.      Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

5.      Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her that the boy should not be ripping and running with just anyone.

6.      Lloyd is my sister's olderst living boy. He turned out all right because my daddy, his grandfather, helped raised him. Later, his Uncle Harry taught him about car mechanics. Lloyd was lucky that he had my dad and his uncle around him growing up.

7.      Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward,

A-0187

she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

8.   After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

9.   Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

10.  In later life, Alfred would drop by my house. I didn't enjoy the visits because of the way he talked. He used to exhggerated things and wanted me to think that he was doing really well. I could understand him pretending that he had more than he did because there were so many things that he didn't have as a child. He grew up poor. The talk that I really didn't like was his saying that everyone was trying to do something to him. He was paranoid. He said that people were always doing this or that to him or talking about him. I listened to him and I could understand it because Alfred had a really hard life growing up.

11.  No attorney or investigator representing Alfred ever spoke to me before or during his trial in Texas. If someone from Alfred's defense team had asked, I would have told them about Alfred and his family and would have been willing to testify in court.

12.  I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

*Wilmer Bourgeois*
Wilmer Bourgeois, Sr.

Dated: May 9, 2007

A-0188

## DECLARATION AND AFFIDAVIT OF LAWANDA COOK
## PURSUANT TO 28 U.S.C. § 1746

Lawanda Cook, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Lawanda Cook, and Ivy Thomas is my cousin. I knew Alfred Bourgeois during the time that Ivy and him dated.

2.      From the second I met Alfred I knew that he wasn't right. He always acted crazy and I never could see what my cousin saw in him. You could tell that his mind wasn't all there.

3.      He would take crazy chances in the truck he drove. I remember one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me than he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all.

4.      I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.

5.      I remember one time Ivy was making ox tail for dinner, and Alfred asked us what it was. I thought that was really strange. At first I thought he was kidding us, but it became clear he wasn't joking so I explained to him that ox tail was from a cow. He got all red in the face and looked really upset. Then he asked us well is it an ox or a cow. I was stunned. I kept trying to explain to him that it was the same thing but he insisted that it couldn't be the same.

5.      I always thought that Alfred acted like a child. When Alfred would see something as ordinary as a tree he acted like it was the first time he ever saw it. He had to have seen a tree a million times but he always acted like it was so amazing. It seemed like something a really

young child would do.

6.     No attorney or investigator ever contacted me and asked me about Alfred when he was on trial.  I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

7.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Lawanda Cook_
Lawanda Cook

Dated: _5-1-07_

## DECLARATION AND AFFIDAVIT OF BEVERLY FRANK
## PURSUANT TO 28 U.S.C. § 1746

Beverly Frank, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Beverly Frank. I grew up in Saint James Parish in Louisiana. I lived in Paulina until I was 12 or 13 years old, then my parents moved to Lutcher which is only a mile or so away. I now live nearby in LaPlace, Louisiana. I still have lots of family who live in Paulina.

2. My grandmother was Mary Clayton. She was my father, Herman Clayton, Sr.'s mother. My grandmother raised Alfred Bourgeois from about the age of eight until he was grown. Alfred's mother's name was Eunice Bourgeois. Eunice had several children including Alfred. I know Alfred's older brother, Lloyd, and his older sister, Claudia. I know their father. He played the organ at Evergreen Baptist Church. I know Alfred had a different father than his older brother and sister.

3. Alfred's mother treated him differently than her other children. She talked to Alfred differently and she treated him differently too. I saw her give her other children money and not give Alfred any money. I also saw her give cookies to her other children and not give Alfred any cookies.

4. Eunice whipped all her children. She was a single parent for several years and she disciplined the children herself. Eunice would use a switch or anything else she could get her hands on to whip the children. I know she would whip the children

1

so much that they would have welts on their body. I believe you should never whip a child that much.

5.    My grandmother saw the way that Eunice mistreated Alfred. She took him in because of the terrible way that Eunice treated Alfred. My grandmother had a good sense of right and wrong and she wanted to help Alfred. She believed that every child deserves love.

6.    Eunice used to always mess with Alfred's nose. She would pick his nose and irritate it really bad. I saw Eunice do this to him. She would pick and scratch his nose with her fingernails. I have no idea why she would irritate his nose like that. I never saw Eunice touch her other children's noses. I never saw the other children with irritated noses. Alfred's nose was frequently bleeding. He walked around with cotton or tissue in his nose. Over the years this disfigured Alfred's nose. It wasn't like that when he was little. Alfred would cry a lot and complain that his nose hurt. He wouldn't let anyone touch it. My grandmother used to put Vaseline on his nose to heal it, to soothe it. She did this to offer him some relief. But just as soon as my grandmother had gotten Alfred's nose healed his mother would mess it up again. This upset my grandmother so much. As fast as my grandmother would heal his nose, his mother would mess it up again. That child was afraid to blow his nose. I know that when he was older he had trouble breathing through his nose.

7.    Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in

2

A-0192

little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

8. My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

9. Deep down inside I feel bad for Alfred. I know he suffered hardships as a child. His mother mistreated him and was too harsh in disciplining him. His mother made Alfred feel unwanted within his own family. My grandmother did her best to help Alfred but his mother continued to hurt him.

10. No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

11. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Beverly Frank

Dated: May 9, 2007

3

A-0193

**AFFIDAVIT / DECLARATION OF ALLEN HENRY
PURSUANT TO 28 U.S.C. § 1746**

Allen Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1. I am Alfred Bourgeois' cousin. My mother is cousins with Alfred's mom Eunice. I grew up with him on Bend Lane in Paulina, La..

2. When we were growing up, All of Eunice's boys would rather sleep at other people's houses than their own. They would rather lay on the floor at my house than sleep at home. All the boys would go wherever they wanted to go. When night came, Eunice would not call them home or even call to see where they were. Those kids rambled. One of the boys, Clyde, drown when he was spending the 4th of July away from his family. That is what happens when you ramble from house to house.

3. Eunice used to be rough on Alfred. She used to chastise him more that her other kids and used to beat him more than the others.

4. There was an older lady from church named Miss Mary that lived on the Bend. She lived alone and Eunice sent Alfred to stay with her. After school, Alfred would play with us, but while we were still playing, Miss Mary would be ready to go home and Alfred would have to go with her. He would be sad when he had to leave us to go in early to take care of Miss Mary. It hurt him to have to live outside of his family.

5. Alfred was a clumsy kid growing up. He could barely ride a bicycle and we would tease him about being so awkward.

6. Alfred was kind of dumb, but he tried to hide it by telling tall tales. He would lie to cover up what he didn't know or understand. It was hard to tell exactly what he knew because he exaggerated about himself, but when you really looked into it, the story didn't make any sense. Even though he wasn't smart, he was motivated to measure up to his older brother Lloyd's example. He wanted to be like Lloyd, but couldn't because he just was not bright enough.

7. Alfred wanted everyone to believe that he knew about cars. His brother

A-0194

A-0195

Lloyd was known to be a great mechanic. One time Alfred had a bad engine leak, but still drove the car. We told him that he might hurt the engine, but he drove it anyway. He didn't understand the consequences of the engine problem, but didn't want to admit it.

8.    I was never contacted by Alfred's lawyers or investigator before his trial. If someone had asked, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Henry

Dated: May 10, 2007

A-0195

## AFFIDAVIT / DECLARATION OF JERSEY HENRY
## PURSUANT TO 28 U.S.C. § 1746

Jersey Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' cousin, but he considered me his aunt. I am his mother Eunice's cousin. We lived in Bend Lane in Paulina, La.

2.      My cousin Eunice was a neat freak. She kept her house very clean and you could eat off her floors. Her mother Edna was the same way.

3.      Eunice seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like she was always worried about something. After the divorce, she moved back in with her parents in Paulina.

4.      Eunice let her kids spend time with anyone. She was not discriminating. Her boys would regularly prefer to sleep on the floor in my house than to go home. They would be here late and I was surprised that Eunice never even called to see where they were. Those children rambled from house to house. Clyde was Eunice's son by Ferdinand and he drowned in a spillway when he was out with some people. Eunice was hurt by Clyde's death and I am not sure that she ever recovered from it.

5.      Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it.

6.      Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was be ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids.

A-0196

A-0197

7.     Alfred had a problem with telling the truth. He started lying about things when he was in elementary school. Sometimes it was for attention and sometimes it was to make people think that he was more than he was. When he was young, it was pretty easy to catch him in fibs because some of them were so obviously not true. Telling tales became a habit with Alfred as he got older. I oftern wondered if he started to believe his own tales. It was difficult to know how smart he was because he was always exaggerating.

8.     I would have been willing to testify about all the things in this statement.

9.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jersey Henry

Dated: May 10, 2007

A-0197

## DECLARATION AND AFFIDAVIT OF YVONNE ROBINSON JOSEPH PURSUANT TO 28 U.S.C. § 1746

Yvonne Robinson Joseph, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Yvonne Robinson Joseph. I am Alfred Bourgeois' cousin. My mother, Lovenia Bourgeois Robinson, and his mother, Eunice, were sisters.

2.      I am about eight years older that Alfred. My family lived in Lutcher, but my mother would leave us with the extended family on Bend Road during the day. We spent a lot of time with Alfred's family on Bend Road in Paulina.

3.      Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him "little yellow bastard" and slap him for nothing.

4.      His mother used to mess with Alfred's nose. He always had a big sore on his nose and his mother would put her finger nail on it and make it bleed. Grandfather Isaac used to ask Alfred's mother why she kept messing with that boy's nose. She wouldn't answer.

5      After a while, Alfred lived with an older church lady in Paulina. She took him in because he was being treated so bad by his mother. That old lady treated Alfred better than his own mother.

6.      Even though his mother treated him bad, Alfred was crazy about his momma and always treated her very good.

7.      When I was spending time in Paulina, I thought that Alfred was the nicest one in his family, but I worried about him when he grew up. He was raised around violence and I worried that it might affect him in later life.

A-0198

A-0199

8.      No attorney or investigator for Alfred spoke to me before or during Alfred's trial. If anyone would have asked, I would have told them what I knew about Alfred.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: 5/9/07

A-0199

**AFFIDAVIT / DECLARATION OF ELNORA BOURGEOIS MCGUFFEY PURSUANT TO 28 U.S.C. § 1746**

Elnora Bourgeois McGuffey, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.    I am the maternal aunt of Alfred Bourgeois. His mother Eunice was my younger sister.

2.    Eunice was married to a man named Lloyd Ferdinand and had three children by him. They lived as a family in Lutcher. It seemed like she was happy, but Ferdinand ran around a lot with other women. Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she was never the same after they divorced. It was like she had something on her mind all the time.

3.    After Eunice divorced from Ferdinand, she and her three children moved back into our parent's house on Bend Road in Paulina. She needed extra help with the kids and got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

4.    Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

5.    When he was young, Alfred had a problem with his sinuses. My sister used to pick his nose with her fingernail, causing it to bleed. All of us use to get after her for picking his nose, but she would just ignore us. She sure dealt with his sinus problem in a strange way.

6.    I lived in Baton Rouge and would visit Eunice in Paulina. I was surprised to find that Alfred was not living with his mother. He was staying with an elderly lady from church. Even though the elderly lady needed help, I never undstood why little Afred stayed with her instead of living with his family.

A-0200

7.    Alfred's older brother Lloyd was a role model for him. Lloyd was kind of well off and Alfred would always try to do what Lloyd did. Alfred was not as smart as Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never knew how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that he was, more successfull than he was and smarter than he was.

8.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Elnora Bourgeois McGuffey

Dated: May 9, 2007

A-0201

DECLARATION AND AFFIDAVIT OF CLAUDIA MITCHELL
PURSUANT TO 28 U.S.C. § 1746

Claudia Mitchell, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Mitchell. Alfred Bourgeois and I have the same father but different mothers.

2. Alfred and I were not raised together and neither of us was raised by our father, Alfred Sterling. I didn't meet my brother, Alfred, until we were teenagers. His mother had basically just thrown Alfred away. Since she had rejected him he was looking for a family where he could be accepted. Our father, Alfred Sterling, was not the answer that Alfred was looking for. Alfred tried to make his way into his father's life but Alfred Sterling was a manipulative, mentally abusive man and could not be the father that Alfred wanted and needed.

3. From the first time I met Alfred I did not think there was anything normal about him. He was being introduced to me as my brother and he walked in the house and said, "can I get the keys to the car?" That was very inappropriate when we had just met. As I got to know him better I realized he had no internal monitor. He just blurted stuff out and that made him come across as bold but it was really that anything he thought just came out of his mouth.

4. Alfred was paranoid. He always believed people were doing him wrong. He was a very troubled person.

5. Alfred would get mentally preoccupied. He was there but not there. He would get detached from what was going on around him. Other times he only addressed what was right in front of his face.

6. Alfred was not very smart and did not understand a lot of things. He was limited

A-0202

in reading and writing. He tried to function and tried to look good. He was able to hide a lot of his inadequacies. He had a way of connecting with people and then those people would do stuff for him that he was unable to do for himself.

7.      Alfred stayed with me in Texas for a while. When he got here he was wearing clothes that were too small for him. He could not cook at all. He could not really function on his own so he started to feed off my life. He would ride on my accreditation. I helped him with paperwork. I filled out applications for him. His pattern was to just try to look good and hide his failings, then he could connect with someone who could help him function so that he could continue to try and feel less inferior to everyone else. There were other people at other times that filled this role for Alfred.

8.      At times Alfred let down his guard with me. At those times I could see how really messed up and troubled he was.   He told me once that when he got hurt and angry he could not help but lash out at the person. He said once he hit a person one time he would see darkness and then could not control himself. He was better off when he was off driving his truck by himself. That is why he would stay out on the road for weeks at a time. I told Alfred to get help.

9.      No one working on Alfred's behalf ever asked me about the things in this affidavit prior to Alfred's trial. I would have told them and I would have been willing to testify for Alfred if I had been asked.

10.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: 9/16/07

Claudia Mitchell

A-0203

## DECLARATION OF CLAUDIA (CLOTHILDA) MITCHELL
### PURSUANT TO 28 U.S.C. § 1746

I, Claudia Mitchell, hereby declare that the following is true and correct.

1.    Alfred Bourgeois is my brother.  We share the same father.

2.    In 2007, members of my brother's defense team asked me for information about my brother.  I provided them with the information they requested, and signed a Declaration that summarized the information we had discussed.  The information in that Declaration is true and correct to the best of my knowledge.

3.    My brother's lawyers asked me to testify on behalf of my brother and I agreed.  I planned to attend Mr. Bourgeois' hearing in September, 2010.

4.    Unfortunately, my husband recently suffered a serious stroke.  He was in the Intensive Care Unit until this past week.  He was just released from the hospital, and I am now his primary caretaker.  He is unable to speak or walk.

5.    My husband's stroke has been devastating to me and to our family.  We do not have the resources to hire home health care, and I am in the process of learning how to care for my husband and how to access services to help me care for him.

6.    Because of these recent events, I am unable to travel to Corpus Christi to testify at my brother's hearing.   I am unable to leave my husband for even one day.

I hereby certify and declare under penalty of perjury that the statements contained herein are true.

_Claudia Mitchell_
Claudia Mitchell

Dated:
            August 26, 2010

A-0204

<u>DECLARATION AND AFFIDAVIT OF LOUIS RUSSELL, JR</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Louis Russell, Jr., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.  My name is Louis Russell, Jr. I grew up in Paulina, Louisiana. I now live in Baton Rouge, Louisiana.

2.  My family lived right next door to Alfred Bourgeois, all his brothers and sisters and his mother, Eunice Bourgeois. We are distant relatives.

3.  Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature. At lunch we all tried to make Alfred laugh at the lunch table. We would do it until milk ran out of his nose.

4.  I remember when he was a teenager that he was driving a four wheeler near the sugar cane fields. He drove that four wheeler straight into a pole. The whole neighborhood heard it when he hit the pole. We couldn't believe it. He ended up hurting himself pretty bad. I know an ambulance came and took him away.

5.  Growing up Alfred was someone with a pretty good temper. Alfred had a slow temper but once it boiled over it was hard to cool down. It seemed like Alfred didn't know how to back down. Alfred would be fighting with someone and getting the better of him but keep on hitting the guy. During these instances Alfred was extremely intense. He didn't respond to verbal requests to stop. Short of physical restraint it seemed Alfred would not stop. I never saw an instance where somebody didn't have to pull him off. He was hard to calm down.

A-0205

6.    No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified if I had been asked.

7.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Louis Russell, Jr.

Dated:  5/9/07

A-0206

DECLARATION AND AFFIDAVIT OF IVY THOMAS
PURSUANT TO 28 U.S.C. § 1746

Ivy Thomas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.  My name is Ivy Thomas.  I dated Alfred Bourgeois from 1995 to 1997.

2.  I live in Birmingham, Alabama and I met Alfred at a friend's wedding. We started dating immediately. I would see Alfred about five times every three months.  We would talk on the phone all the time.

3.  When Alfred had a truck load that had to go through Birmingham he would stay with me for a night and some of the next day.  We always had such a good time together. Alfred was always very respectful, and kind to me.

4.  Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.

5.  One time I was frying pork chops, and he asked me what they were.  I was really surprised that someone as old as he was had never heard of a pork chop.  I told him what they were and that it came from a pig.  He seemed really confused about that.  At first I thought it was a cultural thing like they didn't have them in New Orleans, but he didn't even seem to understand how to cook so I know it wasn't just cultural.

6.  I really thought it was strange that he asked so many questions about cooking.  I would think that a grown man would have been around cooking and baking all his life.  His interest in my cooking was very childlike.

7.  Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood.  He told me that his mother kept all his other siblings but gave him away.  Alfred

A-0207

said that his mom treated him differently than all the other kids and it depressed him. His mom said he looked just like his father, and that is why she hated him so much. One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

8.     I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

9.     No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

10.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Ivy Thomas

Dated: __5/1/07__

A-0208

<u>DECLARATION AND AFFIDAVIT OF MICHELLE WARREN
PURSUANT TO 28 U.S.C. § 1746</u>

Michelle Warren, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Michelle Warren.  Alfred Bourgeois is my older brother.  We have the same mother but different fathers.

2.    Our mother had seven children.  Claudia was born first.  Then came Clyde, Lloyd and Anthony.  Alfred had a different father than any of the rest of us.  His father's name is Alfred Sterling.   Our mother was never married to Alfred Sterling.  Keith and I were born after Alfred and we both have the same father, Godfrey Rixner.

3.    Our brother Clyde died when he was just a boy.  He used to spend time with people in Mt. Airy and on the fourth of July he went on a fishing trip with an older man from that area.  He fell out of the boat and drowned.  Our mother felt awful about Clyde for a long time but then she saw him in a dream and after that she got some peace about his death.

4.    Our brother Anthony is handicapped.  He did not learn to walk until much later than normal.  He never learned to say more than a few words.  He always needed a lot of extra care.  He cannot live on his own.  Alfred helped to take care of Anthony and would buy him things.

5.    Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do.  He seemed to need more attention than the rest of us did and sometimes the things he did to get attention just got him in trouble.  Our mother was harder on Alfred than the rest of us.  I remember times I was allowed out but my older brother, Alfred, was not, so I would stay in the house with him.

A-0209

6.      The children in our house, including Alfred, had a lot of chores to do.  Our mother was a fanatic cleaner.  There is a character in a movie, Sleeping With The Enemy, who is a fanatic about his house being in order.   My mother reminded me of that character.  Everything had to be lined up exactly.   The cans in the cupboard had to have labels pointing in the right direction. Glasses had to be perfectly lined up.  We had to get down on our hands and knees and scrub the baseboards.  Every dish that was used had to be immediately washed, dried and lined up where it belonged.  We had to wipe our shoes clean before coming into the house.  Sometimes we got whippings for messing things up.  Other times cleaning was used as a punishment.  Alfred would have trouble listening to directions, so he would mess up more than the rest of us and get beatings more often.

7.      I have the tendency to be a fanatic about my house like my mother was.  I resist the urge because I believe it is more important for my children to be comfortable and happy in my house than for everything to be perfect.   I deliberately put glasses that don't match on one of my shelves so that I won't be like my mother.  Alfred wanted a clean house when he was married and this caused some tension in his relationships.

8.      Our mother used to clean Alfred's nose all the time.  She would stick her fingers deep inside and this caused sores.  She cleaned it so deep, hard and often that the sore wouldn't heal.

9.      Alfred did not play sports in school.  He got teased a lot.  Sometimes it was because of his looks.  He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes".   Alfred could not stand to be teased.  He would get very mad when kids teased him.  I remember telling my older brother Alfred that they were just jealous of his eyes.  When he got older he started to realize that girls were attracted to his looks.

10.     When he was a boy, Alfred went to stay with an older woman. Her name was Miss Mary. She needed someone to be there with her and her own family was not providing the help she needed, so Alfred went to live with her. Because she didn't live far from us we still saw Alfred but he was not really a part of the family when he went to live with her.

11.     Alfred had a couple accidents that I can remember. One was very bad. He was riding a three wheeler and slammed right into a tree. Another time he was out of state driving an 18 wheeler and came home in casts and we had to take care of him.

12.     Sometimes Alfred would just "click out". He would be in his own zone. You couldn't get through to him. He would stare off into space, and would not respond to questions or voices. Then he would suddenly snap out of it.

13.     My oldest brother, Lloyd, worked very hard from the time he was a teenager. While Alfred was spending time with Miss Mary, Lloyd used to spend time with our uncle Harry. Harry had a shop and taught Lloyd a lot at a young age about working and repairing cars. Lloyd was able to succeed in whatever he did. Alfred felt like he was compared to his older brother. Alfred tried to be like Lloyd and wanted to be successful like he was but he just wasn't able to do what Lloyd was able to do. He stressed himself out over trying to be like Lloyd. He wanted Lloyd's approval but always ended up feeling second best. My younger brother, Keith, was not like that. He worked hard and was just happy with whatever he was able to achieve.

14.     Alfred had odd rules around the house. He did not want any lights on in the house during the day. He would not let the air conditioner be turned on.

15.     One Christmas when Alfred was an adult he got upset over something minor with our mother. He went into a rant about how unloved and mistreated he felt as a child. He brought

A-0211

up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him. We all tried to calm him down and told him to just let it go. Our mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

16. When Alfred got something stuck in his mind it was impossible to redirect him. He would come and ask me for advice but then he could not follow any suggestions I made to him. It was like he had a block and could not reason things out or change his behavior. Sometimes in his dealings with Robin the authorities had to get involved because he could not control his behavior. He was unable to calm himself down.

17. My daughter and my niece babysat for Alfred's daughter, Alfredesha. They had a hard time keeping her from doing things that weren't safe. Alfredesha made stuff up about the girls being too hard on her. When Alfred came she had fake tears and a made up story to tell him. Alfredesha knew how to put on a show. He believed everything this little girl told him and yelled at my daughter and my niece. We really didn't want to watch Alfredesha after that.

18. Alfred's wife, Robin, cheated on Alfred while they were married. This really shook my brother up. Alfred just could not handle it. He flipped out. He just kind of went into his own zone. They broke up but then got back together but Alfred could not get over the affair. He thought the second daughter that Robin had was not his. He would bring up the affair over and over. We might be at a family gathering and in front of everyone Alfred would start obsessing about Robin's affair. It would ruin his day and keep the rest of us from having a good time, too. I stopped going to family gatherings because I just didn't want to see Alfred like that.

A-0212

19.     Robin was very smart. She figured out the code to his phone once so she could check his messages. Robin told Alfred that Al, the man she had the affair with, had a plan to kill Alfred. Alfred was afraid to eat food for a while because he thought he might be poisoned.

20.     I spoke to someone working on Alfred's behalf before his trial. I answered any questions they asked me. I was in Corpus Christi while the trial was going on and I was willing to testify but I was never called into the courtroom to be put on the stand. I would have been willing to testify about all the things in this affidavit if I had been given the chance.

21.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Warren

Dated: 4-25-07

A-0213

<u>DECLARATION AND AFFIDAVIT OF CLAUDIA WILLIAMS</u>

<u>PURSUANT TO 28 U.S.C. § 1746</u>

Claudia Williams, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Williams. Alfred Bourgeois is my brother. I am the oldest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. Tragedy hit our family when we were children. Our brother, Clyde, was drowned on the 4th of July when he was a child. His death effected all of us, including Alfred. Even as a child, Alfred could not take pressure. Having our mother and our whole family grieving over losing Clyde added to the pressures in our house.

3. We lost Clyde and then our brother Anthony took a lot of extra care due to his disabilities. Both those things took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.

4. Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.

5. Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

6. When Alfred was a teenager he had a bad accident right there close to our house. He was riding a four wheeler and ran it right into a big pole. He hit his head, was knocked out and then seemed kind of out of it. After that he seemed nervous and unable to sit still.

7. Alfred sometimes went into a rage and he would seem like a different person. His voice would change and his eyes would turn red. Sometimes he would forget what he had just done. His moods would change till you thought he had a split personality.

8. Alfred didn't get any better at dealing with stress when he got older. He was so stressed when he went on that last truck trip that I was very scared for him. He called and said that he was afraid he was going to hurt himself and implied that I might need to get my black dress out for his funeral. I got Robin on the phone and asked her to keep any weapons away from him because he was suicidal. I was concerned that he was so stressed and depressed that he was going to kill himself.

A-0214

A-0215

9. I was called to testify for the prosecution at Alfred's trial. Before I testified they made me look at pictures of the body. I would have testified to the things in this affidavit if I had been asked about them.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Claudia Williams

Dated: 5/10/07

STATE OF LOUISIANA
**DEPARTMENT OF EDUCATION**
BATON ROUGE, LOUISIANA
STATE-APPROVED HIGH SCHOOLS

CERTIFICATE OF
HIGH SCHOOL
CREDITS

| NAME OF STUDENT (Name in full, including middle name) | | | | Date of Birth 7/22/64 | Sex M | Race B | Date of Graduation 5/24/83 |
|---|---|---|---|---|---|---|---|
| Alfred Bourgeois | | | | | | | |

| NAME OF SCHOOL Lutcher High | PARISH St. James | ADDRESS Lutcher, LA | Zip Code 70071 | PHONE NO. 869-5741 |
|---|---|---|---|---|

TO THE PRINCIPAL: Make for each applicant for graduation duplicate certificates (one white, one pink). Seven days prior to graduation, forward both copies to the State Director of Secondary Education. After approval, one copy will be returned. Please use typewriter.

| List each subject separately as indicated in state program of studies giving the (exact title of subject) | | Year Credit Earned | Number of Weeks | Minutes per Week | Mark Received | Unit Credit | Remarks: Enter the names of schools in which outside credits were earned. |
|---|---|---|---|---|---|---|---|
| ENGLISH | ENGLISH I | 1 | 36 | 300 | C | 1 | |
| | ENGLISH II | 2 | 36 | 300 | D | 1 | |
| | ENGLISH III | 4 | 36 | 300 | D | 1 | |
| | ENGLISH ( Speech I ) | 3 | 36 | 300 | C | 1 | |
| | | | | | | | |
| | | | | | | | |
| FREE ENTERPRISE | Free Enterprise | 2 | 18 | 300 | C | ½ | |
| MATH | Math I | 1 | 36 | 300 | C | 1 | |
| | Math II | 2 | 36 | 300 | D | 1 | |
| | Algebra I | 3 | 18 | 300 | D | ½ | |
| | Consumer Math | 4 | 18 | 300 | C | ½ | |
| SOCIAL STUDIES | CIVICS | 1 | 36 | 300 | C | 1 | |
| | AMERICAN HISTORY | 3 | 36 | 300 | C | 1 | |
| | Economics | 2 | 18 | 300 | D | ½ | |
| | Geography | 4 | 36 | 300 | D | 1 | |
| | Afro Am. History | 4 | 18 | 300 | B | ½ | |
| SCIENCE | Gen. Science | 1 | 36 | 300 | C | 1 | |
| | Biology | 3 | 36 | 300 | D | 1 | |
| | | | | | | | |
| | | | | | | | |
| HEALTH AND PHY. ED. | H. & P. E. I | 1 | 36 | 300 | B | 1 | |
| | H. & P. E. II | 2 | 36 | 300 | C | 1 | |
| | H & PE III | 3 | 18 | 300 | C | ½ | |
| | H & PE IV | 4 | 36 | 300 | C | 1 | |
| FOREIGN LANG. | | | | | | | |
| JOURNALISM | | | | | | | |
| SPEECH | | | | | | | |
| AGRICULTURE BUS./OFFICE DIST. ED. HEALTH OCC. HOME ECON. IND. ARTS T. AND I. VOC. TECH. | Agriculture I | 1 | 36 | 300 | D | 1 | |
| | Basic Drafting | 4 | 36 | 300 | C | 1 | |
| | Independent Living | 4 | 18 | 300 | D | ½ | |
| | | | | | | | |
| | | | | | | | |
| ART MUSIC SAFETY AND OTHER ELECTIVES | Beg. Band | 2 | 36 | 300 | B | 1 | |
| | General Music | 3 | 36 | 300 | C | 1 | |
| | Art 1 | 4 | 36 | 300 | D | 1 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | TOTAL UNITS | 22 | |

To the State Director of Secondary Education:
I hereby certify that the above-named student has successfully completed the high school work shown above, and that he has complied with all the requirements prescribed by the State Board of Elementary and Secondary Education for graduation from a State-Approved High School, and that there is now in my office on file a complete record of this student's work, including a cumulative record of attendance and scholarship.

SUBSCRIBED TO THIS 24th DAY OF May 19 83 AT Lutcher LOUISIANA

APPROVED: DIRECTOR OF SECONDARY EDUCATION    SIGNATURE OF SCHOOL PRINCIPAL

A-0216

*We destroy all
Office non-Pertinent
information*

Lutcher High School
P.O. Box 489
Lutcher, Louisiana  70071



Federal Community Defender Office
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA  19106

19106+3302-01 C030

A-0217

*Lloyd B. Johnson*

**ST. JOHN THE BAPTIST PARISH**
**SHERIFF AND EX—OFFICIO TAX COLLECTOR**

**P.O. DRAWER Q**                    **PHONE: 652-9581**

**LA PLACE, LOUISIANA 70069-1116**

May 6, 1985

TO:   Sheriff Lloyd B. Johnson
      P. O. Drawer Q
      LaPlace, Loiusiana      70069

RE:   Recruit Alfred Bourgeois

From:  Lt. David M. Wilson

On May 6, 1985, Recruit Alfred Bourgeois failed to meet the Police Officer Standards and Training (P. O. S. T.) as pertains to firearms qualifications. Mr. Bourgeois has received fifty-four hours of training and instruction in the use of his service revolver. On April 23, 1985, Mr. Bourgeois was given his first opportunity to qualify. In his effort to qualify Mr. Bourgeois failed to fire the 225 point qualifying average. Mr. Bourgeois score was 178.5 out of a possible 300 points. After his failure to qualify Mr. Bourgeois was given eight (8) additional hours of instruction and training in the use of his service revolver. On May 6, 1985, Mr. Bourgeois was again given the opportunity to fire the P. O. S. T. course for score. On this date Mr. Bourgeois fired a 222.75 average out of 300 points. Note: P. O. S. T. requires a 225 or 75% minimum score to qualify. Mr. Bourgeois has as of this date May 6, 1985, fired one thousand one hundred forty (1,140) rounds of ammunition in his practice sessions and attempts to qualify with his service revolver.

In addition to the time spent firing on the range Mr. Bourgeois had been given five examinations. Four of the five examinations pertained to his firearms training and the fifth test to basic police procedures. Of these five examinations given, Mr. Bourgeois has failed to meet a 70% passing score on two of the five examinations.

Due to Mr. Bourgeois not meeting the P. O. S. T. standards for firearms qualifications and due to his poor performance scholastically, it is my belief that further training would be unfruitful and unwarranted.

It is my opinion that Recurit Alfred Bourgeois not be considered for permanent employment with the St. John the Baptist Parish Sheriff's Office at this time.

Sincerly,

Lt. David M. Wilson
P. O. S. T. Firearms
Training Instructor

A-0218



*Morris & McDaniel, Inc.*
MANAGEMENT CONSULTANTS

formerly
THE PSYCHOLOGICAL SERVICE CENTER
OF NEW ORLEANS, INC.

**MAX H. McDANIEL, Ph.D.**
President

**DAVID M. MORRIS, Ph.D., J.D.**
Vice President

**MARILYN K. QUAINTANCE, Ph.D**
Vice President of Marketing
Director of Washington Office

**THOMAS J. HANNIE, Jr., Ph.D.**
Vice President, Clinical Psychology

**JOE F. NASSAR, M.P.A.**
Vice President of Operations

**STAFF CONSULTANTS,**
DOUGLAS A. GREEN, M.S.
SHANE PITTMAN
JAN WALKER, M.S.

2918 NAPOLEON AVENUE, SUITE B
NEW ORLEANS, LOUISIANA 70115
(504) 897-0640

WASHINGTON D.C. OFFICE:
912 PRINCE STREET
ALEXANDRIA, VIRGINIA 22314
(703) 836-3600

JACKSON OFFICE:
741 NORTH CONGRESS
P.O. BOX 104
JACKSON, MISSISSIPPI 39205
(601) 353-0640

May 22, 1985

PSYCHOLOGICAL EVALUATION

Name:                    Alfred Bourgeois

Age:                     20 Years

Evaluation Date:         4/12/85

Evaluated By:            Max H. McDaniel, Ph.D.
                         Douglas A. Green, M.S.

Referred By:             St. John the Baptist Parish Sheriff's Office

Techniques Utilized:     Background Interview
                         Behavioral Observations
                         Psychological/Social History Questionnaire
                         Minnesota Multiphasic Personality Inventory

Background Interview and Behavioral Observations

Mr. Alfred Bourgeois was seen at this office for the purpose of determining his psychological adaptability to work as a sheriff's deputy with St. John Parish Sheriff's office. It was learned in a background interview that Mr. Bourgeois was raised by his mother and describes his childhood as happy. He apparently did not get along well with the father. There were six other children in the family.

Mr. Bourgeois reports he graduated from Lutcher High School in 1983. He rates his intelligence as average, but says he did repeat a grade. He says he got mostly C's and does not remember ever getting in trouble while in school.

Mr. Bourgeois says he grew up in a wealthy family and there was little disagreement in the family about financial matters. He says he currently

p.2          361-882-3635          Gilmore/Tinker/Dickson          Mar 18 04 12:24p          000263

A-0219

makes between $15,000 and $20,000 which is a reduction in income during the past two years.

Mr. Bourgeois is presently unemployed. He worked for several years at Winn Dixie while he was in high school and later worked at Delchamps. After high school he got a job with Louisiana Power and Light Company as a meter reader and was there about five and a half months. At that time he was involved in an accident with a three wheeler and was not able to continue working. He was let go since his six months probationary period was not up. He said he enjoyed his job at LP & L and enjoyed the responsibility he had reporting irregularities to the company.

Mr. Bourgeois says he never used illegal drugs and has never used alcohol. He reports no family history with substance abuse and says that he has never used cigarettes. He reports no past health problems other than the accident he had with the three wheeler where he broke his leg. He is not under a physician's care at the present time and is not taking any medication.

Mr. Bourgeois is single and is presently living with his uncle. His family has helped support him since his unemployment ran out following his lay off from LP & L. He says he has never been married, but is the parent of two children.

Mr. Bourgeois says his interest in police work stems from his belief in right and wrong. He says he likes the social contact in police work and feels very strongly about crime in general.

Mr. Bourgeois was on time for the testing session and cooperated well throughout. He seemed reasonably open in discussing acground kground information and overall made an adequate impression.

Test Results

Results of the Minnesota Multiphasic Personality Inventory indicate for the most part that Mr. Bourgeois' scores fall within the normal or acceptable range with two exceptions. He appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals. He appears to be somewhat anxious and nervous at times and appears to worry excessively. His self-esteem does not appear to be very good. As he indicated during the interview, he presents himself as a very traditional and moralistic individual.

The following rating scales are based on research and standard interpretation of the Minnesota Multiphasic Personality Inventory. These ratings are based on scale elevations and are considered helpful indices when evaluating an applicant's potential occupational adjustment.

000264

A-0220

```
********************************
* Openness to Evaluation *
********************************
```

| Overly Frank | Quite Open | Adequate | Overly Cautious | Guarded | Indeterminate |
|---|---|---|---|---|---|
| | | ——X—— | | | |

```
********************************
*     Social Facility        *
********************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
********************************
* Addiction Potential *
********************************
```

| Low | No Apparent Problem | Problems Possible | Moderate | High | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
********************************
* Stress Tolerance *
********************************
```

| High | Good | Adequate | Problems Possible | Low | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

```
********************************
* Overall Adjustment *
********************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | ——X—— | | |

## Summary and Conclusion

In summary, Mr. Alfred Bourgeois is an individual with a short work experience at Louisiana Power and Light Company as a meter reader who is interested in becoming a law enforcement officer. He shows some borderline tendencies toward problems in the psychological area. He seems to be a rather moralistic individual who believes in right and wrong, however, he shows feelings of inadequacy and problems in evaluating his self-worth. He shows very strong ambition, but is not clear about what he wants or how to get it. These problems are likely to be seem in his behavior as frequent indecision and an inability to work consistently at one thing.

Recommendations

Mr. Alfred Bourgeois is not recommended for a position with the St. John Parish Sheriff's Office at this time.

Max H. McDaniel, Ph.D.
Industrial Psychologist

MHM:

A-0222



# MEMORANDUM

To: John Gilmore, Douglas Tinker, Bourgeois file

From: Gerald Bierbaum

Date: March 03, 2004

Re: Interview of Harry "Slick" Bourgeois

---

Harry is Alfred's mom's cousin. Harry raised Lloyd from about 10 or 12 years old. Harry had a house and a "shop" about 500 yards from the house where Eunice and her children resided.

Harry spoke to me for about forty minutes while we sat on the tailgate of his truck in front of the house he shares with his son. Harry's house is right next to Lloyd's shop. Harry told me the he spends most nights "tending to," his ex-wife [children's mother] in Reserve because she is ill.

Harry "Slick" Bourgeois
78 y.o. - 03/01/04
(225) 869-8143

*Alfred*

"Alfred tell a lie for every word he say." He was a good boy that wasn't violent or drinking or using drugs but he lied about everything. Harry told me that he was standing there while Alfred was talking to some person that was visiting a neighbor. Alfred was telling the man that the people that were working the land next to the neighborhood were "'renting my land over there.' Alfred didn't own that land." Harry also recalled when Alfred "told my ex - old lady I was going with some girl that I didn't even know. . . .He'd pull a lie out of the clear blue."

Harry thought Alfred "wasn't to solid," and tapped his head but Alfred is "a good working fella. . . . He was a good fella and a good hustler."

Alfred was "good to his kids." Harry never saw Alfred beat or mistreat any child. "He treated 'em all good." When asked if Harry ever knew Alfred to beat his kids, Harry replied "Lord no! Never. Never. He loved them children."

Alfred worked and made good money and never bothered anyone other than telling lies.

Alfred always looked up to Lloyd and tried to keep up with his brother. Lloyd got a Jaguar then Alfred did. Lloyd drove a truck, then Alfred drove a truck.

P-Ex61_Page_38

004591



*Eunice and Alfred*

"Alfred's momma didn't do shit for him. . . All her kids raised they self. . . . It was like he didn't have no momma. . . she was half-ass retarded."

Eunice "didn't look out to close for none of them." She would party or run around and never seemed to mind the kids like a mom should. Whenever she was paying attention to Alfred or Lloyd she "was always trying to put a broomstick on his ass or something."

Harry said that he "put shoes on his [Alfred's] feet" because "his momma wouldn't give him shit."

Harry knew that Alfred went to live with Ms. Clayton [about 700 - 1000 yards from mom's home] because "her [mom] and Alfred could never make it." Mom constantly fussed at and beat Alfred. They couldn't get along at all. "She never did treat him right."

"Alfred was like a stray sheep going from place to place, looking for someone to take care of him."

*Eunice*

Eunice "never had a job in her life."

When Lloyd would tell Daddee about Eunice taking money, the minute Daddee turned his back, she would go to beating on Lloyd and calling him "you dirty no good black bastard."

Eunice was so unpredictable and tough on her kids that Harry knew that Lloyd only felt safe when Lloyd was staying with Harry.

Lloyd doesn't like Eunice even though she is his first cousin.

*Lloyd*

Lloyd, as a ten year old child, "used to put his books down and come work with me in the shop 'til 12:00 or 1:00 at night." Lloyd would come right from school to Harry's shop and help him with the cars.

Lloyd was such a hard worker from 9 or 10 years old that every summer, he'd buy himself a brand new bicycle. When Lloyd started helping Harry around the shop; Harry would pay him little bits of money. Lloyd always ran and gave the money to Daddee to hold for him. Lloyd always had enough money buy the summer to buy a new bike. "He was the only kid in the neighborhood with a brand new bike."

Lloyd was also the only kid in the neighborhood that "was a help to me." He was the only kid



willing to get his hands dirty or greasy and help Harry with the mechanic work.

Lloyd loved his mom's dad "Daddee." Mom would occasionally filch change from Daddee's change bag [Daddee was a vegetable merchant and kept a bag of coins to make change when selling vegetables from his cart]. Mom loved to smoke and would take change to buy cigarettes. When Lloyd saw her doing it, he would tell Daddee. "She would go in that sack and take money to buy cigarettes."

When Lloyd started showing up at Harry's shop, Harry's mom would feed him and let him stay with Harry. Harry was a grown man but the house where Lloyd slept was still his mom's.

Harry claims he bought Lloyd the first car Lloyd owned.

P-Ex61_Page_40

004593

A-0225



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          )          CASE NO:   CR-C-02-216(1)
                                   )
               Plaintiff,          )              CRIMINAL
                                   )          Corpus Christi, Texas
      vs.                          )          Tuesday, March 23, 2004
                                   )          ( 8:19 a.m. to  8:29 a.m.)
ALFRED BOURGEOIS,                  )          ( 8:33 a.m. to  9:01 a.m.)
                                   )          ( 9:09 a.m. to 10:09 a.m.)
               Defendant.          )          (10:46 a.m. to 11:14 a.m.)
                                              (12:18 p.m. to 12:22 p.m.)
                                              (12:27 p.m. to  1:12 p.m.)
                                              ( 4:34 p.m. to  4:48 p.m.)

SENTENCING HEARING:   DAY 2

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT COURT JUDGE

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE. GENERAL ORDER 94-16, UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS

EXCEPTIONAL REPORTING SERVICES, INC
3409 BROYLES STREET
HOUSTON, TX 77026
713 670-7774

|  | Clayton - Direct | 121 |
|---|---|---|

DIRECT EXAMINATION

BY MR. GILMORE:

Q    Would you tell us what your name is?

A    Reverend Herman Clayton, Jr.

Q    And Reverend Clayton, how old a man are you?

A    Fifty-two.

Q    Where do you live now?

A    In Paulina, Louisiana.

Q    Is that where you grew up?

A    Not in that borough, but within that area, yes.

Q    Where did you grow up?  What --

A    Renny (phonetic), Louisiana, which is formerly called the Ben Lane (phonetic).

Q    Okay.  Tell -- what is Ben Lane?

A    Ben Lane was a -- is a street that housed about 30 families on one street.

Q    About 30 families on one street?

     The people who grew up -- who lived in that area, can you describe the people that lived there?

A    Poor black families.

Q    Okay.  And do you know Alfred Bourgeois?

A    Yes, I do.

Q    How do you know Alfred Bourgeois?

A    From growing up in that neighborhood and also Alfred growing up in that neighborhood.