## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

_____

|  |  |  |
|---|---|---|
| ALFRED BOURGEOIS, | : | CIVIL ACTION |
| | : | (Capital Habeas Corpus) |
| Petitioner, | : | |
| | : | Case No. 2:19-cv-392 |
| V. | : | |
| | : | **CAPITAL CASE** |
| SUPERINTENDENT, USP–Terre Haute, | : | **EXECUTION SCHEDULED FOR** |
| UNITED STATES OF AMERICA, | : | **JANUARY 13, 2020** |
| | : | |
| Respondents. | : | |

_____

_____

### APPENDIX TO
### PETITION FOR WRIT OF HABEAS CORPUS

### APPENDIX B
### TRANSCRIPTS

_____

Victor J. Abreu
Katherine Thompson
Peter Williams
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West—The Curtis Center
Philadelphia, PA 19106
215–928–0520
Victor_Abreu@fd.org
Katherine_Thompson@fd.org
Pete_Williams@fd.org

Counsel for Petitioner

Dated: August 15, 2019

## Index to Appendix B

1. *United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Evidentiary Hearing: Michael Gelbort - 09/10/2010

2. *United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Evidentiary Hearing: Day 1 – 09/20/2010

3. Excerpt from *United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Evidentiary Hearing: Day 2 - 09/21/2010

4. Excerpt from *United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Evidentiary Hearing: Day 4 - 09/23/2010

5. *United States v. Alfred Bourgeois* – U.S. District Court, Southern District of Texas – Corpus Cristi Division; Partial Transcript of Evidentiary Hearing: Day 5 (Testimony of Jerrilyn Conway Previously Transcribed)  - 09/24/2010

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *    CRIMINAL ACTION
                                   *
          PLAINTIFF,               *    CR-C-02-216(1)
                                   *
VS.                                *
                                   *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *    SEPTEMBER 10, 2010
                                   *    2:49 P.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77002

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)

FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:              MS. KATHERIN HENNIG, PARALEGAL

(The proceedings began at 2:49 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. DOWD:  Mark Dowd for the United States.

MS. SALINAS:  Elsa Salinas for the United States.

MR. WISEMAN:  Michael Wiseman, good afternoon, Your Honor, for Mr. Bourgeois.

THE COURT:  Good afternoon.

MR. WISEMAN:  Along with Elizabeth Larin --

THE COURT:  Hi.

MR. WISEMAN:  -- L-A-R-I-N, my co-counsel.  If it's all right with the Court, our paralegal, Katherin Hennig, would like to sit at counsel table.

THE COURT:  Absolutely.

MR. WISEMAN:  Thank you, Your Honor.

MR. ROBERTS:  Your Honor, we also have Dr. Roger Moore.  He's a psychologist, and he's been working with us in this case.  And if it's all right, we'd like to have him sit at the table as well.

THE COURT:  Any objections?

MR. WISEMAN:  No, not at all.

THE COURT:  Okay.

MR. ROBERTS:  One statement, Your Honor, that Dr. Moore --

THE COURT:  I'm waiting actually for Ms. Scotch to come back in.  She was going to hook in Mr. Bourgeois by telephone.  Does she know where he is?  He's in Houston, I think.

(Court and Clerk conferring off the record.)

THE COURT:  Okay.  Let's see how we're doing on that.

(PAUSE.)

THE CLERK:  It's going to be another three or four minutes.

THE COURT:  Okay.  Ms. Scotch says it will be another three or four minutes, we've been told, to hook up Mr. Bourgeois.

MR. WISEMAN:  Okay.  Your Honor, I thought Mr. Bourgeois was going to be produced in the courtroom.

THE COURT:  Not for this hearing, no.

MR. WISEMAN:  Not for this hearing, but the next time.

THE COURT:  Absolutely.

MR. WISEMAN:  Okay.  I understand.

THE COURT:  He's already as far as Houston, I've been told.

MR. WISEMAN:  Okay.

THE COURT:  And he's supposed to be here -- I don't know if I'm supposed to say.  Marshals?  When are you going to be in town?

MR. WISEMAN:  We'll be here next Friday afternoon.

THE COURT:  Okay.  Then he'll be here apparently Saturday.

MR. WISEMAN:  Oh, excellent.

THE COURT:  I think that's what I've been told.

MR. WISEMAN:  Excellent.

THE COURT:  Mr. Padilla, could you check with the Marshals and ask -- tell them I've already told them that he'll be here Saturday and make sure that he'll, they'll have access to him?  See if there's any problems.  Thanks.

(PAUSE.)

THE COURT:  Anything you all feel comfortable taking up before Mr. Bourgeois is in attendance?

MR. WISEMAN:  If there's something the Court wants to, I have nothing in particular, other than my witness.  If the Government has anything, I'm happy to discuss it.

MR. ROBERTS:  We don't have anything, Your Honor, not that I can think of at this time.  We're not going to deal with evidence, I don't think, until the 20th.

THE COURT:  Well, today, of course.

MR. ROBERTS:  Yes, Your Honor, from the witness.  But

one thing I did want to note is that Dr. Moore will have to leave at 4:00. So if he gets up and leaves, you want me to put that on the record?

THE COURT: He's not leaving till I'm going. So if he gets to go at 4:00, I do too.

MR. ROBERTS: That would be fine with us, Your Honor.

THE COURT: That's fine, Dr. Moore.

MR. ROBERTS: Thank you, Your Honor.

(PAUSE.)

THE COURT: Do you know where the plugs are?

MR. WISEMAN: I'm sorry? Oh, the plugs, yes.

THE COURT: You can lift up those things and just pull out, if you want.

MR. WISEMAN: Ms. Scotch was giving us a tour yesterday. It was very --

THE COURT: And you know, we made a video, too, on the Southern District website --

MR. WISEMAN: Oh.

THE COURT: -- that shows all the Court, all of the electronic equipment and how we use it.

(PAUSE.)

THE COURT: Any exhibits?

MR. WISEMAN: Yes. I have them marked and ready to go.

THE COURT: Do you want to offer them now? Or do you

know if there's a problem?

MR. WISEMAN:  That's fine with me.  I was going to introduce them through Dr. Gelbort.

THE COURT:  Do you want to show them to the Respondent and --

(Counsel conferring off the record.)

(Discussion off the record regarding other matters.)

MR. WISEMAN:  Well, I'm all ready to go.  I guess when the witness takes the stand, I'll just have him identify what it is I'm going to offer.

THE COURT:  That's fine.

MR. WISEMAN:  The Government has seen all these things before.

(PAUSE.)

(Attempting to connect conference call.)

THE COURT:  Is this Lieutenant Hinkel?

THE CLERK:  Not yet.

THE COURT:  Oh.  Sorry.  Just tell me when I'm supposed to say something.

MR. VILLARREAL:  Lieutenant Villarreal.  Hello?

THE CLERK:  Lieutenant Villarreal?

MR. VILLARREAL:  Yes.

THE CLERK:  Okay.  Is Mr. Bourgeois with you yet?

MR. VILLARREAL:  Not yet.  We're getting him out of the cell right now.

THE CLERK:  Please let us know when he's in the room.

MR. VILLARREAL:  Okay.  Stand by.

THE COURT:  Marshal Alvarado, this is Mr. Wiseman.  I don't know if you've met him before.  This is our deputy, head of Marshal Service here.  I went ahead and told him when Mr. Bourgeois would be here because Mr. Wiseman and his group are coming Friday afternoon, and I wanted to make sure -- he will be housed here in the federal courthouse.

MR. ALVARADO:  Oh, he will?  Okay.

THE COURT:  Yes.  So there will be someone here 24/7.  How you contact him, that's -- you'll have to contact Marshal Alvarado and see how to do that.

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.  We can do that.

Because I'm sure they'll want to see him on Saturday and Sunday.

MR. WISEMAN:  Yeah, we'll want to stop in, yeah.  Thank you so much.

THE COURT:  While they're seeing the sights of Corpus.

MR. WISEMAN:  Seen them.

THE COURT:  Five minutes?

MR. WISEMAN:  I've been here a number of times.

THE COURT:  Is that okay?  Did I do anything security

wrong or -- okay.

MR. ALVARADO:  He'll be here some time -- well, if you guys are coming in Friday, by Saturday he'll be here.

MR. WISEMAN:  That's fine.

THE COURT:  Thanks.  Thanks, Mr. Padilla.

(PAUSE.)

(Court and Clerk conferring off the record.)

(Connecting conference call.)

MR. VILLARREAL:  Lieutenant Villarreal.

THE CLERK:  Lieutenant Villarreal, is Mr. Bourgeois there?

MR. VILLARREAL:  Ma'am?

THE CLERK:  Is Mr. Bourgeois there?

MR. VILLARREAL:  He's walking right in.  Stand by. I've got you on speaker phone.  Stand by.

(PAUSE.)

MR. VILLARREAL:  Ma'am, Mr. Bourgeois is here now.

THE COURT:  Okay.  Mr. Bourgeois, can you hear us?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  Go ahead, Mr. Wiseman.

MR. WISEMAN:  Thank you, Your Honor.

Mr. Bourgeois, this is Michael Wiseman, and we're going to be examining Dr. Gelbort.

THE DEFENDANT:  Uh-huh.

MR. WISEMAN:  Okay.  Your Honor, we'll call

Dr. Gelbort to the stand.

THE COURT:  Could you come forward, please, sir.

MICHAEL M. GELBORT, DEFENSE WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Gelbort.

A.   Good afternoon.

Q.   What is your profession?

A.   I'm a clinical neuropsychologist in private practice.

THE COURT:  Could you please state your full name and spell it for the record?

THE WITNESS:  Sure.  Michael M. Gelbort.  The last name is G-E-L-B-O-R-T.

BY MR. WISEMAN:

Q.   And you say you're a clinical neuropsychologist --

THE COURT:  Wait, don't touch the microphone.  Sorry. It hooks right into her ears.  So what you need to do, if you could lean your right arm onto that shelf there, then you're in good shape.  Okay.  Go ahead.

BY MR. WISEMAN:

Q.   Can you tell the Court what your qualifications are?

A.   I went to college at Grinnell College in Grinnell, Iowa.

THE COURT:  Has that been introduced?

MR. WISEMAN:  Not yet, Your Honor.  I'll have him identify it and proceed that way.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort, if you look on the screen in front of you, do you recognize that document?

THE WITNESS:  Can I move this a little bit, Your Honor?

THE COURT:  Pardon?

THE WITNESS:  Can I just tilt this so I can see it better?

THE COURT:  No.  You have to do it blindfolded and backwards.  No, just tilt it anyway you want to.  It's perfectly all right.

THE WITNESS:  Thank you.

THE COURT:  Is that okay?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   That's P-17.  Do you recognize that document?

A.   I do.

Q.   And what is it?

A.   It appears to be a copy of my vitae.

Q.   And is it an up-to-date copy?

A.   Reasonably so.  There's more things that could be added to it, but it's got the gist of my training and experience.

Q.   And can you give the Court a sense of what that training

and experience is?

A.    I went to college in Grinnell, Iowa.  I finished college in three-and-a-half years with a double major, psychology and general sciences, and I graduated with high honors.  I went to a doctoral program, a Ph.D. program in clinical psychology at Texas Tech University.  Went through that program in a fairly standard fashion.  I had a minor in applied human neuropsychology.

I worked on the side.  I was a counselor at a halfway house for criminals transferring back into the community.  I also spent a couple of years working at the medical school performing neuropsychological evaluations for two neurologists and two neurosurgeons.  And I was responsible for running a developmental disability clinic, where we evaluated children pretty much from under one year up to 15 years of age.

I did a predoctoral internship at Milwaukee County Mental Health Complex.  I was working with inpatients and outpatients with severe psychological issues.  I was also administering neuropsychological testing there and actually teaching some of the staff neuropsychology.  And then --

THE COURT:  You know, I read your vitae, and it's great.  Just introduce it.

MR. WISEMAN:  Okay.  Very well.

THE COURT:  But I have a question about this.  I always get confused about neuro, about neuropsychologists.  I

disqualified somebody -- not him -- one time that was a neuropsychologist that wanted to talk about physiology of the brain, and he had never even had high school biology.

Okay, you obviously are not in that category, but when you diagnosed Mr. Bourgeois with organic brain disorder, I thought that physicians do that and not psychologists. So explain to me how that works. I just want to be clear on it.

THE WITNESS: First off, I didn't necessarily make that particular diagnosis. But it could be made --

THE COURT: I thought it was -- I thought there was something in there in his report.

MR. WISEMAN: Oh, I believe he's going to testify that Mr. Bourgeois has organic impairments.

THE COURT: Okay. Good.

THE WITNESS: And to answer your question, though, physicians can make that diagnosis. Neuropsychologists can as well --

THE COURT: Okay.

THE WITNESS: -- based on our training and hopefully experience.

THE COURT: Okay. Are there actual -- I'm going to let him testify. Never mind. I just wanted to be clear.

MR. WISEMAN: I was going to get into all those areas, Your Honor --

THE COURT: Go right ahead.

MR. WISEMAN:  -- right away.

THE COURT:  I just kind of jump into the --

MR. WISEMAN:  You sure do.

THE COURT:  -- the bottom line.

THE WITNESS:  It's a good question, though, and we'll get there, I hope.

THE COURT:  But you know, this other guy had not ever, you know, and he had not -- and he finally admitted that he made up the diagnosis himself because he thought it was good.

THE WITNESS:  That's an interesting --

THE COURT:  It's one of the few, one of the few experts I ever not allowed to testify.  So --

MR. WISEMAN:  All right.  Well, I'm going to offer Dr. Gelbort as an expert in forensic neuropsychology and --

THE COURT:  Any objection?

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Sure.  Have you looked at his CV?

MR. ROBERTS:  Yes, we have, Your Honor.

THE COURT:  Okay.

(PAUSE.)

MR. ROBERTS:  No objection, Your Honor.

MR. WISEMAN:  Thank you.  Dr. Gelbort, in follow-up to the Judge's questions, could you give the Court a working understanding of what a neuropsychologist is and what the

science of neuropsychology is?

THE WITNESS:  Sure.  You know, I think the definition that is most commonly put out there is that neuropsychology is the study of the relationship between the brain and behavior. And neuropsychologists typically look at both emotional functioning as well as cognitive functioning, cognitive being thinking skills.

Sometimes I liken it to the front and back of a mountain, where when we approach people, we see their personality more often than not.  But behind that, and working in consonance with it, would be their cognitive abilities, how intelligent they are, how well they learn, remember, process information, even basic functions, such as do they perceive accurately.

THE COURT:  Do you also evaluate people like with cognizance disorders, for instance, Alzheimer's or frontal lobe problems?

THE WITNESS:  Absolutely.

THE COURT:  And you work with neurologists on that, too, to come up with a plan and that sort of thing?

THE WITNESS:  Neurologists are probably, if not my first -- they're one of my top three referral sources.  I have --

THE COURT:  Sure.

THE WITNESS:  -- eight different neurologists who

send me patients regularly.  And the diagnoses they're concerned about are anything from someone who's suspected of having a dementing illness, Alzheimer's or vascular dementia or the like; people after closed head injuries, car accidents, bicycle accidents, muggings, that sort of thing; people who have seizure disorders.

I'm getting referrals regularly from neurosurgeons who are seeing brain tumors and are concerned about the effects on cognitive abilities as well as the effects of their intervention.  They're asking me, where's language, where is memory?  Because when they go to do surgery, they don't want to disrupt any more language or memory than they need to.

So if you think about a wagon wheel, the neurologist and psychiatrist are probably on one shoulder, and the other shoulder is the neuropsychologist, at least in a hospital, in an office-based practice.  Physiatrists, people who do physical medicine rehabilitation who help people after strokes, after brain injuries are another major source of referrals.

THE COURT:  I'm familiar with your specialty, because I know that a lot of the big teaching hospitals, when you go to be evaluated for cognitive disorders, there's neuropsychological testing, and there's neurologists and there's CAT scans and MRIs and all these things.

THE WITNESS:  In the more sophisticated centers, the neurologists will employ or bring in a neuropsychologist.  The

psychiatrists will oftentimes do their best job of assessing, and when things don't go the way they expect them to, based on their assessment, they'll say, "I may not be seeing everything, and someone else may be able to see something to help, a neuropsychologist."  That's another major source of my referrals.

THE COURT:  And did Mr. Bourgeois -- speaking of just organic things, because you're going to say this part and this part, you know, I assume, via your psychological testing, that you can pinpoint areas of the brain.  But did he ever have MRIs or CT scans or anything like that?

THE WITNESS:  Not that I'm aware of.

THE COURT:  Okay.  Go ahead.

BY MR. WISEMAN:

Q.   Doctor, I was actually going to ask you:  Could you discuss briefly what the nature of neuropsychological testing is and contrast it to the type of neuroimaging that the Court just referred to?

A.   Let me take the second part of the question first, if I can, because I think it helps for an understanding.  The brain, at least to me and people like me, is a very fascinating organism -- organ, and it works in a variety of ways.  You can talk about it in terms of the structure.  And if there's a problem with the structure, such as a lesion, a tumor growing that's putting pressure on it or eating in the tissue, that

Gelbort - Direct                    18

will cause changes in the way the brain functions.  And if it's near the respiratory centers or the centers that control the heart, you could have a problem that way.  But if it's in the cortex area that controls thinking, you may have changes in thinking abilities.  And depending on where it is and what functions are living in those areas, or if it's affecting the whole brain, you'll see changes in the way a person thinks and acts.

THE COURT:  I always think of your specialty and Dr. Moore's as being a more nuanced way of finding, finding things that other people may not, other specialties that are physical specialties may not be able to find.

THE WITNESS:  We may get to a point, and if you look at the literature and read about things like functional MRI, we're moving more in that direction, where, you know, the neuroradiologist looks at the picture, sees the tumor and knows exactly and can measure how many sonometers by how many sonometers.

THE COURT:  Right.  But you can see what it's impacting.

THE WITNESS:  Correct.  And that's really the point, is that the brain is a structural organ.  It also works electrically.  So if you're concerned about electrical dysfunction, you don't do an MRI.  I've been asked that, "Well, why didn't you have an MRI done," for someone who has a seizure

disorder. They have a problem that's affecting the electrical impulses in the brain. And the way to look at that is with an electrical study.

THE COURT: Like an EEG?

THE WITNESS: Exactly right. That's exactly right. And when you're concerned about behavioral changes, you certainly can look at the structure and say, "Well, there's a little tumor over there." But as far as I know in this setting, in a forensics setting, there's no statute that says if you have a tumor, then we do this with you, and if you don't have a tumor, we do that. But rather, in this setting, we're concerned about, I believe the Court's concerned about behavior and can he control his behavior in a normal fashion, or not well as a normal person, but still reasonably well.

THE COURT: I saw that the bottom line in your -- that one of -- not the bottom line. I hate that expression. But one of your conclusions, that he had such a, he had a behavioral disorder where he could not put the brakes on his behavior, that he could not control his behavior.

THE WITNESS: The frontal lobes are sometimes, in a very crass way, talked about as the gas pedal and the brake pedal of behavior. And the frontal lobes, another way to think about them, if you've ever seen the little picture of the homunculus, the little man inside the brain who's controlling the rest of the brain, the frontal lobes are really where the

homunculus lives.

So it's kind of the control center and the central processing center.  And when people have trouble initiating, the couch potato -- first off, they don't, I don't think, end up in court because they sit on the couch and they don't do much and they don't get in much trouble.  That's a problem typically with frontal lobe.

Same token, the ones who have trouble putting on the brakes or put on the brakes too late, quite often that's a frontal lobe problem.

THE COURT:  And that's what you think is part of Mr. Bourgeois' presentation?

THE WITNESS:  There's a very subtle distinction there.  Most neuropsychologists are sensitive to not say there is brain damage.  That's something that should be looked at, should be done --

THE COURT:  Organ -- I got it.

THE WITNESS:  You can talk about organicity, but --

THE COURT:  You don't look at the physical structure. You look at the behavior to try to pinpoint where there may be problem areas.

THE WITNESS:  Back to what you said, the nuance. We're looking at a reflection of the integrity of the nervous tissue.  When the nervous tissue has problems, it gives rise to aberrant or abnormal behaviors.  We can measure that and confer

backwards.  When someone consistently has problems with abilities that arise from frontal lobe, from what research has shown to be frontal lobe functions, then we say this person can't do normal frontal lobe behavior, and hence, more likely than not, there's a frontal lobe abnormality.  But we can't see it, per se.

THE COURT:  Okay.  So you think --

THE WITNESS:  That's where FMRI and PET scan may come in and start saying, there it is.

THE COURT:  The PET scan is pretty good now for doing some Alzheimer's diagnoses, but you can have -- I know this, I should say this, because my brother has Alzheimer's at a very young age.  And he has frontal lobe involvement, frontal lobe dementia, as well as Alzheimer's.  And they've done every possible test that you can, other than biopsy.  That's why I'm familiar, by the way, with your specialty --

THE WITNESS:  Uh-huh.

THE COURT:  -- and your area of expertise, because --

THE WITNESS:  That's too bad.

THE COURT:  That's horrible actually.  It's the worst illness on earth.  But in any event --

THE WITNESS:  I would vote ALS is worse, but that's my personal --

THE COURT:  My aunt had that, so -- and you may be right.

BY MR. WISEMAN:

Q.   Dr. Gelbort, so just to make sure I'm clear now, if a person shows up clean on neural imaging, is it your view that neuropsychology can still identify brain dysfunction?

A.   In the worst case scenario is neuropsychology wouldn't. And I'm harkening back to a study I saw when I was in Medical Center in Houston, an individual who died of traumatic brain injuries in a car accident.  And we couldn't test him because he was dead, but his image, just before he died, the neural imaging was normal.  And you can understand why, if I explain a little bit, you know, why that can happen.

THE COURT:  Well, you know, one of the things -- here I am building your case for you, but, you know, soldiers that are coming back, and I look at this because soldiers that are coming back from war, even though they didn't have a direct hit on their head, have very discrete brain damage that's not, that's behaviorally diagnosed only because of the shaking.  And they may have been half a mile from a rocket.  But just the vibrations alone can cause them discrete brain problems.

THE WITNESS:  And in fact, neuropsychology took off after World War II, when vets were coming back with shell shock, which is what you're talking about.  They were put on the psych units --

THE COURT:  No, this was actually, these people are having dementia.

THE WITNESS:  No, no, that's exactly right.

THE COURT:  Yeah.

THE WITNESS:  But they called it shell shock back then, because they weren't --

THE COURT:  Oh really?  Oh, I see.

THE WITNESS:  They weren't hit by the shells, but they were getting hit by the blast waves of the shell.

THE COURT:  Right.

THE WITNESS:  And they were acting strangely, so they got put on the psychiatric units.  The psychiatrists said there's nothing psychiatrically wrong with them, and they turned it over to the neuropsychologists who these battery of tests said here's the cognitive difficulties that's arising from the impact, the waves, the shock waves that have gone through the air.  Just like the Murrah Federal Building wasn't knocked down by anything that hit it directly, but rather the shock waves of the explosion.  Same concept.

THE COURT:  I'm sorry --

MR. WISEMAN:  Quite all right.

THE COURT:  -- Mr. Wiseman.  You do your case.

MR. WISEMAN:  Okay.

THE COURT:  I shouldn't just be visiting.

BY MR. WISEMAN:

Q.   Doctor, I put up what is marked as Petitioner's 16 and ask if you recognize that document.

A.   It would be helpful to see the top of it.  It looks like it's either the Wechsler Memory Scale or the WAIS-III.  I can't tell from --

Q.   Okay.  I'll move it over a little.

A.   Pull it down, please.

Q.   Oh.

A.   There you go, Wechsler Memory Scale, Third Edition.

Q.   Okay.  And is that the first page of a larger set of documents?

A.   It's part of the test battery that I administered to Mr. Bourgeois.

Q.   Okay.  And so I take it from that answer that you in fact conducted a neuropsychological evaluation of Mr. Bourgeois?

A.   I did.

Q.   All right.  And your notes and data from that are contained in what's been marked as Petitioner's 16?

A.   I believe that's true.  I presented them or gave them to the professionals that you asked me to, and I think they've been collated.  I think you have the packet there.

MR. WISEMAN:  Your Honor, I'm a little unfamiliar with ELMO technology.  Can I show the witness the document so he can just thumb through it to make sure it's the right --

THE COURT:  You just did.

MR. WISEMAN:  Well, I showed him the top page.  This is a 40-page exhibit, and I just want to have the record be

clear that this is --

THE COURT:  Okay.  Didn't he give it to you?  You can go up there.

MR. WISEMAN:  Well, he did.  I just want to --

THE COURT:  Okay.

MR. WISEMAN:  -- cover my bases.

THE COURT:  The only thing you do, you've got to keep the cap on there because of all my electronic equipment here. Actually, it's your electronic equipment, but in between swigs, put a cap on it.  I guess I should say that's Coke, for the record, Coca-Cola.

MR. WISEMAN:  I believe it's Dr. Pepper.

THE COURT:  Okay, Dr. Pepper.

MR. WISEMAN:  Diet Dr. Pepper.

THE WITNESS:  This does appear to be the data for my neuropsychological evaluation.

BY MR. WISEMAN:

Q.   And so the record is clear, when did you conduct your neuropsychological evaluation of Mr. Bourgeois?

A.   It was April 27, 2007.

Q.   And where did that happen?

A.   It was at, I think it's called USP at Terra Haute.

Q.   And what are the components of the neuropsychological evaluation you conducted with Mr. Bourgeois?

A.   The way I've been taught and instructed and choose to

proceed with the neuropsychological evaluation, there's three major components.  One is the testing, per se, formal testing and hopefully a useful battery is employed, one that's valid and reliable and is designed to answer the question that's being presented.

The second part would be the interview, where you actually talk to the patient and see how they look or present, see what they, again, look like, how they sound, how they respond, how quick, how slow.  You check their mood, different things that can contribute to the overall diagnosis and understanding of the patient.

And then finally, I believe you should be looking at historical information, something that is more objective and has a greater time span, something that predates the question that you're being asked to entertain.

And the reason being is that each type of data has merit on its own face, and when you put the three together and you find that they agree, then you have a good firm basis of support for any conclusions you can draw.

THE COURT:  Did you do those tests where you can determine if somebody is making up the answers?

THE WITNESS:  Malingering?

THE COURT:  Yes.

THE WITNESS:  I didn't use any of the tests that are considered to be contrived --

THE COURT:  Okay.

THE WITNESS:  -- where you're oftentimes not telling the patient something that's true.  You're setting them up to do something other than what they might normally do.  And there's a couple of reasons.  Probably the first one is that people in his intelligence range who have subnormal intelligence, the research shows that they're not, those tests are not real valid with them.

THE COURT:  But see, one of the things, you're assuming then that his intelligence is low, when in fact he could be malingering on the intelligence test.  And so then you don't give him the malingering test -- sorry.

MR. WISEMAN:  I was just going to say, Your Honor, I've got a whole section devoted to malingering.

THE COURT:  You got that?  Okay.  Go right ahead.

MR. WISEMAN:  Believe me, I've got it covered.

THE COURT:  I knew you would.

THE WITNESS:  But I want to answer that question.

MR. WISEMAN:  And you'll have your chance, I promise.

THE COURT:  Did you look at his letters and things that he sent me?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort --

MR. WISEMAN:  Is there a way I can move this so I can get more of the document on there?

THE CLERK:  Can I show him?

THE COURT:  You can -- please.

(PAUSE.)

THE COURT:  See?  It's magic.

MR. WISEMAN:  Oh, wow.  That's amazing.  I still use a feather pen, so --

BY MR. WISEMAN:

Q.   So, Dr. Gelbort, I've put up what's been marked as Petitioner's 132 --

THE COURT:  Are you going to offer any of these for admission?

MR. WISEMAN:  I'm going to offer them all, yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's a list of the materials that were provided to me. And it says up at the top, "Background Information."

Q.   Okay.  And did you review some of these materials before your actual meeting with Mr. Bourgeois?

A.   Yes.

Q.   And some of them after?

A.    Correct.

Q.    Okay.  In addition to the materials on that list, did you recently have an opportunity to view videotapes of the Government's expert witnesses evaluating Mr. Bourgeois?

A.    Two different psychologists working with him, yes, I did.

Q.    Okay.  As the Court's already anticipated, you've reached some conclusions to a reasonable degree of neuropsychological certainty.  Why don't you tell us generally what those conclusions are, and then we'll get to the basis for those opinions.

A.    Sure.  You know, the big opinions, or the ones that are further reaching, were that Mr. Bourgeois is of limited intellectual ability.  He comes out -- he tests out pretty much in the borderline to mildly defective range.

He shows indication of difficulties, as we were talking about before, of having frontal lobe impairments, that he did take the tests as requested and put forth good effort.

His learning is problematic, especially when he has to understand conceptually the information being presented to him. So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

He has some relative strengths.  He certainly has adequate or normal spelling abilities, when compared with others in his age bracket.  His basic reading abilities, in other words, his

capacity to look at words and understand what the words are, are fine.

Q.    Okay.  And why don't we jump to the concept of malingering before we discuss your specific test findings.  In a forensic setting, especially a death penalty case, are you particularly on guard with regard to malingering?

A.    I think you have to be.  In fact, I think the concern about the adequacy of the test administration and the adequacy -- let me say it differently.  The way I was taught is there are certain assumptions that need to be met in order to interpret test data.  And one of the assumptions that is very central is that the person put forth reasonable effort.

You don't have to have super human effort.  You don't have to have abnormal effort, but you have to have the person engaged.  So things like, you know, if someone comes in drunk or stoned, you're not going to test them.  They're not going to be able to put forth reasonable effort.

By the same token, if they're not trying, if they're not answering in a way reflective of what they're capable of doing, you're not going to be able to interpret the data properly.  So that's something you have to look at from the get-go.

Q.    And assuming that the person appears to be putting forth reasonable effort, how do you -- with regard to Mr. Bourgeois in particular, how did you know that he wasn't purposely throwing a test?

A.    Well, I'm going to pick on two words.  First off, how did I know?  It's how did I decide.  It wasn't that I knew.

Q.    Okay.

A.    But, you know, looking at the data, I made that decision.  And the other word --

THE COURT:  So what you're saying, this is an educated guess.

THE WITNESS:  Boy, I don't know if I would phrase it quite like that.  There's something --

THE COURT:  Well, it's your opinion.

THE WITNESS:  There's something of a decision tree.

THE COURT:  Okay.

THE WITNESS:  Is there a big book and I can look in the back and find the absolute right answer?  No.  But on the other hand, as I will, I'll try to justify --

THE COURT:  Okay.

THE WITNESS:  -- why I came to the decision I did.

The other thing that, the other word I'll pick on is you said something to the effect of how he looked.  And I'm going to say that how he looks is certainly data.  That's part of the presentation that you look at in the interview.  But it's not just how a person looks or how they strike you, rather how the data lines up.

And some of the malingering tests are designed to collect data specific to malingering.  Before there were the

malingering tests, and there's an industry around the malingering tests, the way the authors of this battery and the way it's been done for a long time is to look within the data for internal idiosyncrasies or the way the data agrees with itself.

And in this case, we have the added luxury of having had two test administrations.  He's taken another battery of tests before, so we can compare test/retest patterns of behavior.

BY MR. WISEMAN:

Q.    And that would be Dr. Weiner's testing?

A.    Correct.

Q.    And did you see consistency in the test/retest analysis?

A.    Yes, very much so.

Q.    All right.  And in particular, why don't we talk specifically about the IQ testing.  What did he score on your IQ testing?

A.    His full scale IQ on my administration of the WAIS-III was a 70.

Q.    And what did he score on Dr. Weiner's administration?

A.    He gave the precursor to the WAIS-III.  He gave the WAIS-R, and Mr. Bourgeois had a 75 Full Scale IQ.

Q.    And at the time that Dr. Weiner administered the WAIS-R, was it the standard test to administer?

A.    It was an outdated test at that point in time.

Q.    All right.  And what do neuropsychologists do when they encounter an IQ that's obtained as a result of the administration of an outdated test?

A.    Well, I think it's more general issue is any time you look at data, you have to understand the adequacies and inadequacies of it.  Using an outdated IQ test has some inherent issues or problems.  Research has shown that the scores will tend to become inflated as time goes on when you're using an old test.  So there's -- formulas have been developed to kind of give you an idea of how much the test score will be inflated or over represent, if you will, the person's ability.

Q.    And does that over-inflation have a name?

A.    It's called the Flynn Effect --

Q.    Okay.

A.    -- when it refers to IQ testing.

Q.    Did you do a calculation applying the Flynn Effect to Dr. Weiner's outdated administration of the WAIS-R?

A.    I did.

Q.    And what does that come to?

A.    If you apply the correction factor, if you will, trying to figure out what the number is more likely to be, it comes out as about an IQ of 68.

Q.    And for purposes of assessing malingering, what does it say to you that someone would have scored a 70 on an IQ test in 2007, and three years earlier score a 68, or even a 75, for

that matter?

A.    Just, you can just say a 75 on the outdated test.  It says that there's good consistency across time.  The importance of that is that if someone is faking or feigning bad in this case -- I guess the best way I can say it is a personal example.  If I was trying to deflate my ability or feign bad on an IQ test and I give them regularly, like every week, I can certainly pull my punch and give you poor answers, and I can probably even get my answers to have the right sort of pattern.

So the tests generally start off easy and get more difficult.  There are certain questions that seem to anecdotally be out of order, so people may miss the earlier ones, even though they're deemed to be or generally construed to be the easier ones.  I could probably get the pattern to pass if someone was reading it blind.  But it would be real tough, two or three years later, to take the test or similar test again and get the same type of pattern and the same type of score.  And that's knowing the test and having hopefully reasonably intellect -- reasonable intellect.

Q.    And the WAIS-III that you administered, does it have a number of subtests to it?

A.    Yes.

Q.    And what's the number?

A.    It's got 14 total, but typically only 11 are used to compute the IQ.

Q.    And did you compare the subscale tests on your WAIS-III to the subscale tests on Dr. Weiner's WAIS-R?

A.    Sure.

Q.    And did you see consistency or inconsistency on that?

A.    The internal pattern, again, the overall flavor and shape of the data was pretty consistent.

Q.    Now, let's look at another test you gave called the Category Test.  And before I ask you questions about it, why don't you give us a working understanding of what the Categories Test asks you to do and what information it provides to the person administering it.

A.    Sure.  The Category Test, based on factoring analytical research has been shown to reflect whole brain functioning.  It focuses more on frontal lobe abilities.  It looks at synthetic reasoning, the ability to generalize from one stimulus situation or configuration to another.  It's typically seen as more of a visual, spatial than a verbal test, but people do it in different fashions, so it really gets at both sides of the equation.

I liken it to Jeopardy, where you're not necessarily saying, "This is what I want you to do," and then have the person answer the questions based on the question asked, but rather they need to find a pattern within the data.  They need to find a way of thinking about the data where they can reason through, based on hypothesis testing, and come up with the

right approach that gives them the right answer.

So the format of the test is forced choice.  There's four answers.  You've got a 25 percent chance of being right just by simply guessing, even if you didn't know what the question was.  Again, there's seven subparts to it.  The first six have one specific concept.  The last one is a summary, so you go back through and you have to remember what you did on prior tests.

The first two subtests are considered gimmes, in that it's hard to get them wrong if you had some sort of working cognitive ability and you don't over think it.  So we look at those, and when people have problems with those or make mistakes, we always wonder why that is.

The third subtest seems to be the most difficult for most people.  The fourth is unique.  Fifth and sixth have the same concept.  And like I said, the seventh is like a review.

It's, to a neuropsychologist, at least to me, it's, I think, a wonderful test in that there's a lot of information when people make mistakes.  When they're on a roll and doing well and then the configuration of the data changes somewhat and they make a mistake, you can kind of see which way they went off the road, either left or right.  So it's a very nice test, in that it gets the higher cognitive abilities, whole brain abilities.  It's interesting to look at.  It's actually fun to give.

Q.   Okay.  I'm going to put up Page 20 from Exhibit P-16 and

ask you if you can describe --

A.    You've got it upside down.

Q.    I've got it upside down.  There you go.  Is that the score sheet for the Halstead?

A.    That's the data sheet for the Halstead Category Test.

Q.    All right.  And you say that it has seven subtests.  And the first two are gimmes.

A.    I call them gimmes.

Q.    Right.  And by that, you mean they're real easy.

A.    So again, there's cards that are being shown one at a time.  The patient is told, "You get one guess or one chance to answer, and I'll tell you right or wrong, and then we'll go on to the next one, and you can't go back."  The concept for the first subtest is Roman numerals.  We don't say the concept is Roman numerals.  Rather, the first one is the Roman Numeral I. It's a black number on a white sheet.  And if the person says, "One," you say, "Correct."  You don't tell them why.  You don't say, "That's right, you guessed it, it's a Roman numeral." They can guess "one" for any reason.  You don't ask them the reason.  The next one is a Roman Numeral III, then you're back to a I, a IV, et cetera.

      So sometimes you'll get someone who I said over thinks, and they look at the Roman Numeral I, and they count the corners, and they may say, "Four," or they count the sides and they may say, "Two."  Quickly, people tend to get that one

correct.

The second subtest is a simple counting task, where there's first one circle, second there's three circles, back to one circle, four, and then it will change.  It will go from circles to squares, for example, or bars or letters or words.  But again, it's a counting test.  Most people get them all correct.  And the check mark on the right means he got the right answer.

Subtest three is where things get very challenging.  On each card in subtest three, there's four items.  And three are the same in some fashion, and the fourth one is different.  So it could be three blue and one white.  It could be three triangles and one square.

What gets challenging is now it's a second order solution, in that it's not just counting, but rather you have to figure out which one is different.  So in the second position, or if it's a white circle, a blue circle, a white circle, a white circle, you have to notice which one is different and then try the hypothesis of naming the second, number two, it's in the second position.

People have trouble with it.  And you can see at the bottom, Mr. Bourgeois made 30 errors out of 40.  So he was performing exactly at chance.

When people are malingering and figure it out and say, "Well, I should be getting a bunch of these wrong," that's when

you start getting things like 38 errors out of 40, which by chance would be very difficult to do.  So he's right in the ball park for someone who just didn't get it and kept guessing, kept working at it, but didn't have an idea.

THE COURT:  But if you're a smart malingerer, it seems like you could do -- you could know, "I'm not going to do 38 out of 40 wrong," because everybody's seen my letters and this kind of thing, so you can say, "I'll do about, you know this percentage."

THE WITNESS:  So --

THE COURT:  I'm just saying.

THE WITNESS:  That's exactly right.  I'm thinking of my brother who, you know, took the SAT and got a 1600, and did it again to see if he could, and did it again.  He could figure that out.  But chances are I'm not looking at him and seeing an academic history with D's and C's and someone who was getting into all sorts of trouble.  I see a very different history.

So when I reconcile the history and the way they present and how they sound and all sorts of other things that predate any concern or reason to come under scrutiny, that's when that three-legged stool, the fact that all three prongs need to kind of line up.

It doesn't make sense to say that this gentleman was so clever as to say, "Ah, you know, it's forced choice.  I need to get 30 errors, so I'll keep count as I go through and make

30 mistakes."  That would be impressive.

THE COURT:  He might be.

MR. WISEMAN:  All right.  Well, let's keep going then.

THE COURT:  Right?

THE WITNESS:  Is it absolutely possible?  Sure.  Just like a meteor may hit us in the next ten seconds.  But I'm not going to worry about that.  And, you know, is it possible?  I would have to say it's possible.  Is it at all likely?  No.

BY MR. WISEMAN:

Q.  And putting it in the province of our profession, do you have a reasonable certainty that, as to whether Mr. Bourgeois was malingering?

A.  I have a reasonable guess and -- or a reasonable opinion. And based on all the data, looking at test/retest over the course of years, looking at the pattern of errors that he's made on various tests, I would say the chance is so slim that it's not really a significant concern at all.  It's not even a concern.

Q.  And what do you take from the fact on the fourth subtest he then only got four errors out of the total?

A.  He got that one.  That one he figured out.

Q.  And if he were malingering, would you expect to see a good score like that?

A.  Well, unless in the course of malingering, he said, "Gee,

I better do well on one of these subtests, otherwise, people will think I'm malingering." At some point, you know, you can come up with -- I can come up with all sorts of hypotheses, and I can over think this, or I can just look at the data and say this comports with someone who -- again, he, I think when he took it for Dr. Weiner, he had like 94 errors, which statistically is in the same ball park as this. He did kind of the same, except for this time he did get number four, whereas on the prior testing, he didn't, as far as I know.

Q.    Okay.  And you mentioned the number of errors that he attained on that test.  What's the cutoff on the Halstead Category Test for a determination of impairment?

A.    The general score, if you have to pick one cutoff, is about 51 errors.

Q.    And what can you conclude from his score of 80 errors on yours and 94 errors on Dr. Weiner's, as to his brain function?

A.    Well, he's clearly into the impaired range.  And impaired doesn't mean he's just not very good.  Impaired means he's, in this case, probably in the bottom one to two percent of the population.  And it may be bottom one percent is more accurate than bottom two percent.

Q.    You gave him something called the Wide Range Achievement Test?

A.    Yes.

Q.    And how did he score on that?

A.    He scored --

Q.    Well, first of all, why don't you tell the Court what that measures?

A.    It's a measure of academic achievement functioning.  It looks at sight reading, not comprehension, but simply can you read words and pronounce them correctly; spelling abilities; and math calculations, using paper and pencil.

Q.    And what were his scores in those three areas on the Wide Range Achievement Test that you administered?

A.    He had a standard score of 85 on the sight reading, a standard score of 100 on the spelling, and a standard score of 74 on the math.  That places him for his age at the 16th percentile, the 50th percentile and the 4th percentile.  The reading and spelling are considered high school level, even though he's at the 16th percentile in the reading, and the math was at a fifth grade level.

Q.    And two sets of questions about that score.  First, what does the disparity between being in the 4th percentile and the 50th percentile tell you about malingering?

A.    In and of itself, I don't know if it says anything about malingering, other than maybe he's a tremendous speller and pulled his punch and went from the 90th percentile down to the 50th, thinking that would make people think that there was something wrong with him.  I don't know.  I don't know how to approach a question like that, other than to say he put forth

adequate effort on spelling, such that he's testing out in the middle of the average range.

Q.   And what does it tell you substantively about his abilities?

A.   His spelling abilities are average.  His ability to sound out or pronounce words are right in the middle of the low average range.  Low average is generally 80 to 89.  His math abilities with a standard score of 74 are in the borderline defective range.  70 to 79 is that level.  It's also consistent, he had said when I took history, that he had always had trouble with math.

Q.   And how do you reconcile a person scoring a 70 on an IQ test and -- well, withdrawn.

     What percentile would a 70 put Mr. Bourgeois in on the IQ testing?

A.   70 is exactly the 2.2 percentile.

Q.   All right.

A.   It's two standard deviations below the mean.

Q.   And how do you reconcile that score with the fact that he was in the 50th percentile in spelling on the WRAT, the Wide Range Achievement Test?

A.   I don't know that there's any reconciliation necessary, other than he's a much better speller than he is intelligent. We all have our strengths and weaknesses.  And, for example, within the subtests, the 70 is computed based on six verbal and

Gelbort - Direct                    44

five performance or visual spatial subtests.  Within those subtests from the IQ, he had strengths and weaknesses.  He was weakest on verbal comprehension and abstract reasoning.  And on that score, that was his lowest score across the battery.

Contrary, on a visual spatial motor speed test, how quickly can he assemble electronic radios, he's one notch above the center of the average range.  So he's good with dexterity tasks, even though he's very poor with comprehension.  That's just the way his brain works.

Q.   And going back to the subtests on the WAIS that you administered, did you see a similar difference between his verbal and performance?  And I'm thinking in particular the digit symbol subtest.

A.   Digit symbol, that's the one I just mentioned that he had good dexterity.  Verbally, he was -- his highest score was an 8 on digit span, which is average to low average.  That's verbal attention and concentration.  I mentioned before the dementias.  Quite often people with dementias have good attention and concentration, but they don't form meaningful or lasting memories.

So if you simply hold a brief conversation with them that's based on working memory, can they focus on what you're saying and respond in kind, they look just, you know, they present, they seem okay.  But if you ask them an hour later what the conversation was about or what the conversation meant,

they have grave difficulties.

So we can have, we all do have strengths and weaknesses. His are in terms of attention and concentration and fine motor speed.  His weaknesses are in terms of comprehension, understanding, appreciating social norms and morays, this sort of thing.  That part of his brain doesn't keep up at all.

THE COURT:  So appreciating social morays, it sounds like, with unable to put the brakes on and control his behavior, it sounds kind of sociopathic.

THE WITNESS:  People who are sociopaths are oftentimes described in the same terms.

THE COURT:  Okay.

THE WITNESS:  The difference would be, you know, when I debrief families, I hold up two index fingers, put them together and say, these look the same, but they're coming from very different sides.  So you can have people who look similar to one another, but they may have that sort of behavior for very different reasons.

People who have dementias may have frontal lobe problems and have trouble putting on their brakes and accuse people of stealing from them.  But in this case, it's because they forgot where they put something.  When they don't have something, they don't say, "Well, maybe I forgot."  They say, "Someone must have taken it."  They're making accusations, not that they're mean-hearted people, necessarily -- some of them

may be -- but because they have memory disturbance.  So you could have someone else who's making accusations because they are a mean-hearted person.  Two people making accusations, but for very different reasons.

THE COURT:  So you could be a mean-hearted sociopath and have this same dynamic?

THE WITNESS:  Have the same presentation.

THE COURT:  Same presentation.

THE WITNESS:  I would actually say the dynamic is different, but the presentation -- the behavior may be similar, but the underlying reason, the etiology could be very different.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Before we leave the Wide Range Achievement Test, were you aware of any testing administered by Dr. Victoria Swanson in 2009?

A.   My understanding is that Dr. Swanson did a Woodcock Johnson, a psycho-educational battery.

Q.   And how does that compare, just test-wise, with the Wide Range Achievement Test?  Is one more comprehensive than the other or gives you different information?

A.   The Woodcock Johnson is quite a bit more comprehensive.  I would suggest that the analogy would be that the Woodcock-Johnson to the WRAT, the Wide Range Achievement Test,

is much like the neuropsychological battery taking many hours, is to a neurologist's mental status or a neurologist's five-minute screening exam.  One is much more in depth and gets at the same stuff, but with a lot more accuracy and validity, because it's looking at a deeper level.

Q.    Okay.  Did you administer a test called Trails?

A.    Yes.

Q.    And describe what that is and how Mr. Bourgeois scored on those.

A.    Trail Making Test is probably one of the most sensitive tests for cognitive dysfunction for the amount of time it takes to administer.  It resembles what we have all done with our children, I suspect, where you connect the dots.  In this case, it's a standard form, circles, 1 through 25.  It's a timed test.  You give a sample first to make sure the person has the concept.  There are very few individuals of age who can't do the test.  And it's also nice in that it works cross culturally, in that it's the numeric system, at least for -- there are certain cultures that use a different numbering system -- but it works pretty well for all sorts of people.

It's, as opposed to a power test, seeing how much the person knows.  It's a speed test; how quickly can they do it and do it accurately.  Mr. Bourgeois took 30 seconds to complete it.  He made one error in so doing.  Any error is considered problematic, because it's such an easy test.  It

normally means that the person, for lack of a better word, got ahead of themselves.  They raced faster than they could actually do the test accurately.

Q.    And I've put up Page 17 from Exhibit P-16.  Does that depict Mr. Bourgeois' administration of the Trails A Test?

A.    Yes.

Q.    And can you point out where the error is that he made?

A.    You can just follow along, 1, 2, 3, 4, 5, 6, 7, 8, 9.  He missed 10.  That didn't get counted.  11, 12, 13, 14 -- you've got to pull it down, please.  15, 16, 17, 18, 19, 20, 21, and then from, he went from 22 right to 25 and then had to go back.  He was corrected.  He missed a number, go back to 22.

Q.    And let me put up, if I --

        THE COURT:  So how many did he miss?

        THE WITNESS:  Just one.  There was one error counted against him.

        THE COURT:  Okay.  So what does that mean?

        THE WITNESS:  It means he was going faster than he could accurately process the information.  That's probably -- in fact, I would say at least --

        THE COURT:  Just missing one?

        THE WITNESS:  You're not supposed to miss any in that.  You're coached to do it accurately, not to make any mistakes.

BY MR. WISEMAN:

Q.   And let me put up the score sheet from Trails B, which is Page 19 of that exhibit.  Did he make any errors in his administration of Trails B?

A.   No, there were no errors counted against him.

Q.   Okay.  And in both Trails A and B, do you derive any information from the amount of time it takes to complete each task?

A.   Sure.  Like I said, it's a timed test, so you're looking, you're comparing the individual versus the normative sample. The cutting scores, again, if you have to pick one cutting score, Trails A, it's 40 seconds.  He took 30.  And when you say 40 seconds, the statistic for the most part is 95 out of 100 people, normal adults, should be able to do the task in under 40 seconds.  Now, if you're at 38 seconds, you know, maybe you're at the 10th percentile, but you're not down at the 5th or below.

Q.   Okay.  And on Trails B, what's the time cut-off?

A.   The cutting score there is 90 seconds.

Q.   And what did he score?

A.   He had 78 seconds, no errors.

Q.   Okay.  And so you were talking about on Trails A that he was sort of getting ahead of himself when he made the error. Is there any information you can take from that and apply it to the other data you have, for instance, the Categories Test?

A.   As the Judge pointed out, "Just one error?"  Well, one

error is considered in the studies and the research to be significant.  And the interpretation is that there's some impulsivity or disinhibition.  You, I would say never, although there are, I see neuropsychologists doing this, but I would say you don't make a conclusion from one piece of data.  Generally, I like to see at least three different bits or types of information to corroborate before I'm willing to draw a conclusion.  But this is one of those things that causes you to raise an eyebrow and say impulsivity, disinhibition, trouble keeping his actions in line with reasonable thoughts, someone who benefits from slowing down.  Oftentimes you find nervous system dysfunction in people who have this pattern.

Q.   Is there any test/retest consistency or inconsistency in Trails A and B, between your administration and Dr. Weiner's administration?

A.   I don't recall his data on that offhand.  I'd have to look back.

Q.   Well, why don't I mark, or not mark, but show you this document.  Does that appear to be Dr. Weiner's raw data, the front page of it?

A.   That's a page from the WAIS-R from Dr. Weiner.

Q.   Okay.  And if I could just approach the witness, so he can go through the document.

A.   Thank you.  Dr. Weiner's Trails A was a score of 32 seconds, zero errors.  And B was 93 seconds, zero errors.  So

the time was pretty similar on Trails A.  On my administration, Mr. Bourgeois made an error.  Trails B, from Dr. Weiner's administration, he was over the cutoff in terms of time, but again, no errors.

Q.   Did you administer a series of memory tests?

A.   Yes.

Q.   And was it part of a battery?

A.   Yes.

Q.   And what's the name of that battery?

A.   Well, the whole battery is the Halstead-Reitan.  Many of these, or most of these tests come from the Halstead-Reitan. The memory test, the major one that was given in this case were portions of the Wechsler Memory Scale-3.

Q.   And did you notice any impairments in any of the subtests of the Wechsler Memory Scale?

A.   Yes.

Q.   And what does that tell you about Mr. Bourgeois' brain and his functioning?

A.   His scores on tests of conceptual learning and memory for both verbal and visual information were very low.  He had a score of 4 on the Logical Memory One and a score of 2 on the Family Pictures.  So verbal and visual memory for more meaningful or conceptual information were significantly suppressed compared with normals or average people.

On the rote memorization portions, both verbal and

visually, he had scores of 7.  So he's low average on those tasks or those abilities.

Q.   And what does it add to the overall picture of Mr. Bourgeois' ability to function?

A.   That's a useful question from a neuropsychological perspective.  The overall picture, what neuropsychologists do is try to look at the whole pattern.  And what diagnosis neuropsychologically, as well as in other fields of medicine, is we're looking for patterns of data.

     What you're seeing or what I'm describing here bit by bit is that things that are more conceptual that require higher level processing, that require him to think about more things at once and then work with them in a goal-directed fashion, as opposed to more concrete tasks or more mechanical tasks, just how quickly he can manipulate objects.  He has trouble on the former.  And those are things that tend to be more frontal lobe related.

     So going back to neuropsychology 101, where you take each of these tasks and you look at the research and you say this one largely arises from left frontal abilities, this one is largely occipital right hemisphere, and you put little stars on a picture of a brain, based on -- or you know, pluses or minuses, based on good or bad behavior, we're seeing a series of minuses in the front portion of this man's brain.

Q.   And did you -- you mentioned you had an opportunity to

watch the video of Mr. Bourgeois being evaluated by the

Government doctors.  I want to particularly draw your attention

to the administration of what's called proverbs by Dr. Price.

I believe that was the last disk.  What did you observe with --

first of all, what are proverbs, in this setting, not the

biblical setting, and what information did you derive from his

performance?

A.    I suspect they're somewhat related, biblical to this

setting, but --

Q.    Okay.  I'll stand corrected.

A.    Essentially, the administration of proverbs in psychiatric

or psychological or neuropsychological assessment is to see if

people can abstract and understand things that are similar or

analogous or representational.  It looks for cognitive

complexity.  It kind of delineates or will show when people are

being very concrete or simply can't think beyond the concrete

meaning of the words.

Q.    Now, let me just ask:  Is the distinction between concrete

and abstract a sign or symptom of frontal lobe impairment?

A.    Abstracting ability is generally attributed to frontal

lobe functions.  So if you're having a tendency to be very

concrete, we would say that your frontal lobes are not doing

what they're supposed to do.  They're not helping you.

Concrete thinking is very useful thinking.  Abstract thinking

is also very useful.  You need both in order to get along in

the world.

People who think out of the box all the time and can't see where the box is have trouble. By the same token, people who are stuck in the box and can't think beyond it have difficulty, too. They have different sorts of problems typically. And we're more likely to see the people with abstracting problems, at least in a clinical practice, than those who are having trouble being concrete. I think there's also more of them.

Proverbs by themselves are kind of a difficult test because there's a confound -- if you've heard a proverb before and had it explained to you, and then someone asked you to explain that one and you're simply doing it based on rote memory, we're not testing your abstracting ability. We're testing your memory ability.

By the same token, if you present proverbs that are so esoteric or idiosyncratic that most people haven't heard them, then you can see if the person can wrap themselves around it and figure it out.

Frankly, I prefer to use things like analogies. I think the Miller Analogy Test is a great way to look at abstract reasoning, rather than explaining proverbs, but --

Q.   Did you make observations as to whether Mr. Bourgeois, number one, was familiar with the proverbs Dr. Price was asking him about, and two, did he -- was he able to interpret them?

A.   He said to most of them that he had not heard them before.

So for the purposes of seeing if he can abstract, that's useful in that he's not just parroting back or repeating something he had remembered from the past, assuming again that he's being straightforward.  And he could have been lying and had heard it and just didn't want to acknowledge that.  I suspect that's not the case.

Based on the ones he said he hadn't heard, he really, he was -- I'm interpreting this, but I would say he was, if not overwhelmed, he wasn't, you know, tearful or anything, but he was like "I have no idea."  He was quite forthcoming, saying, "I really don't know what to do with that.  I don't have any idea what that means."

Q.   And what were just one or two of the proverbs that were administered, just to give the Court a sense of what we're talking about?

A.   Strike while the iron is hot, something like that.  Ones that are somewhat common.  They're not in everyday parlance, but many people certainly of adult age have heard them.

Q.   And the first disk of Dr. Price's evaluation, did you see any type of mental status exam being administered to Mr. Bourgeois?  And if so, what information did you derive from that?

A.   Mr. Bourgeois was asked orientation questions:  "Do you know where you are?"  "Do you know what the date is?"  Various things like that.  He did fine on all those.

Q.    Okay.  And what about the questions in which he was asked, you know, why -- for example, why does the moon appear larger than the stars?  What time of day is your shadow the shortest?  First of all, what are those questions aimed at, and how did he respond?

A.    Most of those are less common, or maybe they're equally common with some of the proverb questions, but they're designed for critical reasoning, critical thinking.  You should be able to figure those out if you have reasonable intellect, if you stop and think about what the question means.  You know, when the flag is blowing to the south, which direction is the wind coming from?  Most people can figure something like that out without too much difficulty.

Q.    And did Mr. Bourgeois perform on those adequately?

A.    No, he didn't.

Q.    And again, does that add information, for your purposes, to how his frontal lobes are functioning?

A.    I would say that that loads largely on intellect.  That that's the first order interpretation, is that those are the responses of someone who's not very bright, assuming they're putting forth reasonable effort.  And the frontal lobes are certainly involved in that sort of problem solving activity.

Q.    All right.  We're getting down towards the end here.  I just wanted to ask you a little bit about the clinical interview you conducted.  Typically, when you interview a

forensic subject, patient, however you want to call it, how much credence or how much do you believe of what that person tells you?

A.    Well, I listen to everything, hopefully, and I also -- and frankly, this applies in my office or in the hospital or a forensic case -- I understand that people are, to the best of their ability, or to less than the best of their ability, trying to give me information relevant to the question I'm asking, as they perceive the question.  Some people are very good -- and this is where concreteness helps the psychologist, because when I'm asking specific questions, I'm looking for specific bits of information.

Personality and cognitive difficulties enter into answering the question, and sometimes the answers are vague, off the point.  Sometimes they're very specific, concrete and accurate.

I appreciate that nobody is giving me an actual accurate history.  Just like a history book doesn't give you an actual accurate history of what had happened, and how it has been shaded or shaped or changed sometimes has information about the person and their cognitive or emotional condition.

Q.    And what did you learn from what Mr. Bourgeois told you about his background and his histories, as he related it?

A.    I asked him certain particular areas.  I'm always interested in medical history, academic history, family

history.  It's evident, from what he's told me, that he had had some injuries that could have had effect on his cognitive abilities.

THE COURT:  Have you seen any of his school records?

THE WITNESS:  I have subsequently, yes.

THE COURT:  Okay.  Where --

THE WITNESS:  Actually, some -- from what I saw, there's not much.  I think I saw a couple of pages.

THE COURT:  What did you see exactly?

THE WITNESS:  I saw a transcript from high school, which was --

THE COURT:  Do you have that with you?

THE WITNESS:  I think I do.

MR. WISEMAN:  If you want to pull it out, that would be great.

THE COURT:  Can I see it?

THE WITNESS:  Yes.

MR. WISEMAN:  Give the Court some background.  We're going to be introducing --

THE COURT:  Do you have any of the elementary school records?

MR. WISEMAN:  That's just what I was about to say.  We have a single page.  That's all we were able to find.

THE COURT:  That's all what?

MR. WISEMAN:  That's all that remain --

THE COURT:  Okay.

MR. WISEMAN:  -- from his history.

THE WITNESS:  May I, Your Honor?

THE COURT:  Sure.

MR. WISEMAN:  Should I mark that, Your Honor, or --

THE COURT:  Sure.  Why don't you do that.  Have you seen them?

No, give them to Mr. Wiseman to mark, please.  Thank you, Ms. Gano.

Is this your only copy or --

MR. WISEMAN:  No.  I just want to --

THE COURT:  Okay.

MR. WISEMAN:  -- make sure I don't mess up our numbering.

MR. ROBERTS:  Can I go over there and look at his table, Your Honor?  It would be easier for us to just look --

THE COURT:  Have you not seen them?

MR. WISEMAN:  I'll put them up in a moment.

MR. ROBERTS:  Yeah, I've seen them, but I want to make sure it's the exact same things we've --

THE COURT:  That's fine.

(Counsel conferring off the record.)

MR. WISEMAN:  Your Honor, this is in our premarked exhibits.  It's 86.

BY MR. WISEMAN:

Q.   Why don't you tell us what information you think is important on that sheet of paper, Doctor.

A.   I, you know, my first reaction is just looking at the grades -- let me back up.  It says in the upper left-hand corner, I think, "Lutcher High."  And it's my understanding that this is his high school, if not transcript, it's a record of how he did.  Along the left, you can see English, Math, I believe that's Social Studies, Science, Health, et cetera.

THE COURT:  Any indication of a prior IQ test of any kind?

MR. WISEMAN:  No, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   And what grades -- I mean, we can read it, but you see basically C's and D's?

A.   By and large.  There's a few B's up there as well.  Down at the bottom, Beginning Band, I think, is a B.  I can't tell in the Health and Phys. Ed. if the first grade is a B or --

Q.   This is a little like an eye test for you, huh?

A.   I'm sorry.  I think Afro-American History looks like a B as well for half a unit credit.  I don't know if that was a smaller course.

Q.   And do you have any familiarity with the school system in Louisiana at about that time?

A.   I have anecdotal familiarity.

THE COURT:  What time is it?

MR. WISEMAN:  I'm sorry, Your Honor.  This would have been in --

THE COURT:  I can't see the top.

MR. WISEMAN:  Yes.  It says 1983 at the top there.

THE WITNESS:  Yeah, I mean, his date of birth is '64.

MR. WISEMAN:  If you look in the upper right, it says, "5/24/83, Date of --" it says, "Date of Graduation."  I'm not offering it for the truth that he graduated.

BY MR. WISEMAN:

Q.   You were about to say, do you have any sense of what the school district was like then?

A.   You know, I used to -- I worked for four years in Houston, and I had some familiarity, but it was case by case.  I can't tell you what the statistics were, so I don't know that I could do anything other than take a guess or speculate.  That's about as --

THE COURT:  So it appears that he graduated from high school.

THE WITNESS:  Yes.

THE COURT:  And he didn't fail anything.

THE WITNESS:  At least not that's on the transcript. You know, I don't know their system.  There are some places where if you fail or withdraw, it doesn't show up on your transcript.  So I don't know that we can --

THE COURT:  Well, we have no indication that that's the case.

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, just so the Court knows, we'll be offering a witness when we reconvene who's going to be able to offer the Court some insight into the school district at that point in time.

THE COURT:  Was it a teacher of Mr. Bourgeois?

MR. WISEMAN:  No, it's not.  It's Dr. Swanson who worked for the State of Louisiana as a school psychologist. And she's familiar with this particular school district and what their standards were and what their practices were.  So you'll have more information on that.

BY MR. WISEMAN:

Q.   So you were starting to say that you want to hear about medical, academic and family history.  What else did you --

THE COURT:  What are his -- do you have elementary school?

MR. WISEMAN:  No.  That's the only page we have.  We have found no other record.  We can -- I don't want to testify here.  We were told by the authorities that everything else was simply lost, you know, flooding, Katrina, a bunch of reasons why they don't have material.  This was the only page we were able to find.

THE COURT: And where did you get that?

MR. WISEMAN: Lutcher High School, I believe? Yes, Lutcher High School had that.

THE COURT: Okay.

MR. WISEMAN: Yeah. After repeated visits, stern visits, I would add.

BY MR. WISEMAN:

Q. What did you learn about his family history from him?

A. He had, other than a typical or average family history, he described physical abuse from his mother. There was description of some sexual abuse he suffered at the hands of one or two men, I believe. He was reared in part by I think it was a neighbor woman, a nice neighbor lady down the street. It sounded like a very difficult upbringing. He didn't highlight it, but it sounded like it was rather challenging.

Q. Was there any consistency between what he told you about his upbringing and other materials that you reviewed?

A. Yes.

Q. Background materials?

A. Well, in fact, I think the other materials, I would say, would amplify that he under-represented the difficult circumstances in which he was reared.

Q. And describe for the Court how he presented himself. How did he speak? How did he appear to the naked eye?

A. If you were a fly on the wall, you would have seen a

fairly talkative gentleman who certainly wasn't shy. He was verbose, forthcoming. I think I was the fortunate one of the psychologists, at least after watching the interview from the other two doctors, that I had much more of a structured interview. Testing is considered a structured interview. And it was easier for me to keep Mr. Bourgeois on track and to get my data. I had more control, because I had questions I had to ask.

He is gregarious. He is somewhat tangential. Some of his spontaneous speech kind of lacks focus, goes off in different directions.

Q.    Did you see any information in the materials you reviewed about his narcissistic tendencies or narcissistic personality disorder?

A.    There was description in various materials of him being rather narcissistic.

Q.    And did you see evidence of that in your interview with him?

A.    I would concur.

Q.    Okay. And so what does that mean in terms of your evaluation of his actual functioning versus the way he presented in that narcissistic sort of way?

A.    Well, concretely, it meant you have to take control of the interview process to keep him focused and to get particular questions answered. More abstractly, I think I had mentioned

before that personality and cognitive abilities interact.

The narcissism oftentimes coupled with what I'm calling low intellect, because that's what I believe is here, you get individuals who are trying to cover or mask or hide their deficiencies. And one of the ways they do that, especially when you have a gregarious narcissistic person who talks a lot, is that they try to steer conversations or they tell you what they want to know, or more often than not, they tell you what they know about or what they think they know about, rather than just simply answering questions.

Q. Did you see Dr. Estrada's report from the time of trial, and in particular, with reference to his assessment of Mr. Bourgeois' intelligence?

A. Yes.

Q. And what did Dr. Estrada say? And why don't you tell us if you agree or not?

A. There was a line in his I believe written report saying that this gentleman was of average or slightly above average intellect, something to that effect.

Q. Now, let me just stop you before you go on. Was there any indication in that report that Dr. Estrada did any type of psychometric testing?

A. No, there wasn't. And he being a psychiatrist, I can't speak directly to it, but typically or rarely would a psychiatrist ever do formal psychometric. I've never seen a

psychiatrist do an IQ test to actually measure it.  Oftentimes they will do --

THE COURT:  I think, I think he has somebody in his office that does testing.

MR. WISEMAN:  Well, he -- Dr. Weiner got involved. That's when Dr. Weiner got involved.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Estrada recommended him, and we'll tie that all together for the Court.

THE COURT:  Okay.

THE WITNESS:  Well, eventually, not in his report, but eventually Dr. Estrada made comment in some subsequent writing saying that he had not been afforded Dr. Weiner's information, so he didn't have the psychometric data at the time that he put together that opinion.

BY MR. WISEMAN:

Q.   Okay.  Needless to say -- I guess it's not needless, but I take it you don't agree with his assessment of a above average intelligence?

A.   Well, I wouldn't argue him out of his opinion.  On the other hand, formal psychometric data, which is the way you assess intellect, says that this man is not of average to above average intellectual abilities.  I'd rather base my opinion on formal testing than interview and -- especially with someone who --

THE COURT:  Mr. Wiseman, can I see you over here just a second?

MR. WISEMAN:  Yes.

(Discussion off the record.)

THE COURT:  In my multitasking, I was looking at -- I pull up my motions as they're being filed, and Mr. Bourgeois filed one for a subpoena for the slides and report for the autopsy.  And -- but he filed it under seal, so I thought it was secret, and I didn't know why it was secret.  And he said no, it wasn't secret.  So is there any opposition to me granting the subpoena?  Have you seen it?

MR. ROBERTS:  Your Honor, we have not seen it.  We were -- the United States was actually contacted and helped him locate where these slides were.

THE COURT:  Okay.

MR. ROBERTS:  So we don't have any opposition to the motion.  And we're trying to help them get the slides ourselves.

MR. WISEMAN:  And I apologize to the Government and the Court.  That was inadvertently filed under seal.  It was our understanding you had no opposition, and we'll certainly get you a copy of that, especially since you don't oppose it.

BY MR. WISEMAN:

Q.   Yes, I was going to ask you, Doctor --

THE COURT:  Sorry, I did -- sorry.

Gelbort - Direct

68

BY MR. WISEMAN:

Q.    Before we wrap up, ask you if you recognize what's been marked as P-15.

A.    That's the first page of my, the declaration I wrote a couple of years ago.

Q.    And let me switch to Page 5.  Is that your signature?

A.    It is.

Q.    Okay.  And it's dated May 11, 2007?

A.    Correct.

Q.    And I just wanted to ask you about one aspect of the declaration.  In Paragraph 10, which is on Page 5, you said, "I understand there is some disagreement over the etiology of Mr. Bourgeois' impairments.  Dr. Wiener believed they were due to a motor vehicle accident.  There's some question as to whether Mr. Bourgeois actually suffered a head injury in the accident."

From a neuropsychological perspective, of what significance is it to your conclusion that Mr. Bourgeois has brain impairments as to what the etiology of those impairments is?

A.    The presence of impairments is objectively found in the data.  There are times when it's important, in legal settings when it's important to understand what caused the impairments and, or the time frame.  So, for example, in a civil case where someone has had, demonstrated cognitive impairments and they've

been involved in a motor vehicle accident, it's pretty important to figure out were the impairments there prior to the motor vehicle accident, or were they caused by the car accident, if they're bringing suit and looking for damages.

In this type of a forensic setting, it seems to be less important to understand what caused them, but rather to understand when they were caused.  If they occurred after someone is charged with a crime, then they weren't present and wouldn't have been affecting the person at the time of the commission, if that's what happened.  Whereas if they were there lifelong or congenital from before birth or at birth, then they would have been on board or having an effect on the person's behavior.

So for my purposes, the first part of the decision tree is:  Is it a normal functioning brain, or are there impairments?  And if you said it's a normal functioning brain, then it doesn't much matter what happened to the person. They're functioning okay, even if they've had bad accidents or injuries or medical problems.

Once you establish that there's a problem there, then it probably is useful to say how long standing have these problems been?  When did they occur?

Q.   And is the fact, or I shouldn't say the fact, would the assumption that Mr. Bourgeois may not have suffered a loss of consciousness in this three-wheeler accident that Dr. Weiner

spoke about, does that in any way affect the validity or the significance of his testing?

A.    The testing doesn't change.  And just to kind of lend some perspective to that, you don't have to have a loss of consciousness to have suffered a traumatic brain injury.  And that's well documented.  There are many people who have mild traumatic brain injuries, and there was no loss of consciousness.

You know, it's easier to talk about it if there, if someone's in a coma.  You know, it's obvious that something has happened.  There's a lot of people who suffer brain injuries in car accidents and they never had a loss of consciousness.  But oftentimes they're described by EMTs as they were walking around dazed and confused.  Well, that's no loss of consciousness, but there's been something that's happened to affect their cognitive functioning.

Q.    And in terms of etiology, in your experience in forensic neuropsychology, is childhood abuse of the type suffered by Mr. Bourgeois the cause at times of the brain impairments that you've seen here?

A.    It's a twofold answer.  You can have people who are struck in the head in the course of child abuse who suffer brain injuries.  And a shaken baby is the more extreme case where people, children die from it.

THE COURT:  Well, how do you know that happened to

him?

THE WITNESS:  I didn't say that it did.

THE COURT:  Oh, okay.

THE WITNESS:  He's just asking -- my understanding of the question was he was just asking is that the sort of thing that can cause.

THE COURT:  Okay.

THE WITNESS:  And yes, it can.

THE COURT:  Is somebody going to testify that happened to him?

MR. WISEMAN:  Well, certainly abuse.  Not specifically shaken baby, I don't think, but abuse, striking about the head, certainly --

THE COURT:  Who's going to testify about that?

MR. WISEMAN:  We're going to have lay folks testify, relatives.

THE WITNESS:  And I'm sorry if I confused it.

THE COURT:  Who?

MR. WISEMAN:  Family and relatives.

THE COURT:  Oh, family and relatives that saw it?

MR. WISEMAN:  Yeah, absolutely.

THE COURT:  Okay.

THE WITNESS:  Yeah.  I'm sorry if I confused it.  I said shaken baby as the extreme example.

MR. WISEMAN:  As an example, right.

THE WITNESS: I didn't, you know, I'm not aware --

THE COURT: I got it. I'm just -- sorry. I wanted to make sure.

BY MR. WISEMAN:

Q. Okay.

A. The second aspect of that, though, is that there's research that's been coming out for several years now showing that the brain development actually changes as a result of abuse or neglect. I don't think it's conclusive, and I think some of the newer types of testing of how the brain functions may well -- we couldn't have done it before these sorts of tests. But they're saying that the brain doesn't develop quite the same way if you're abused at a young age.

Q. Okay. And just two more areas I want to touch upon. Looking at Dr. Weiner's data and adding it to your data, looking at it as one big evaluation, what does his data add to yours, in terms of the opinions you've offered?

A. The data is -- this sounds funny to say it adds something, because it's largely redundant.

Q. Okay.

A. So does it change anything? Does it add any additional or other insights? No. But what it does do is say that at one point in time, with one examination, the patient performed with a certain pattern to his data, a certain footprint. And then a couple of years later, under different circumstances, the same

footprint, by and large, was obtained.  That's probably the strongest indication that the patient was putting forth reasonable effort on both occasions, and that it's actually --

THE COURT:  But these are both post, around, after he's been indicted for capital murder.

THE WITNESS:  Absolutely.

THE COURT:  So it looks like what you're saying is that he presents, not that he is, but he presents with the symptoms of a narcissistic sociopath.

THE WITNESS:  You said narcissistic sociopath.  I --

THE COURT:  You said narcissistic.

THE WITNESS:  I agree with narcissistic.

THE COURT:  And you said a sociopath --

THE WITNESS:  I said --

THE COURT:  He has the same presentation as a sociopath, but a different -- but different origin.

THE WITNESS:  I haven't decided yes or no.  I haven't rendered any opinion about whether or not he's sociopathic or not.  I would absolutely agree that many of the behaviors I've seen described can be caused by sociopathic etiology.  But they can also --

THE COURT:  But he's not -- but your opinion, he's not smart enough to be a sociopath.

THE WITNESS:  Is he smart enough to be?  I would say he's smart -- you know, sociopathic behaviors don't have a

threshold.

THE COURT:  An IQ?  I didn't know.

THE WITNESS:  I mean generally you have people who are of average intellect, but it probably helps if you're being sociopathic to have adequate intellect, because you have to remember things and you have to appreciate, if I do this to this one, you know, I don't want to get caught.  So you have to be able to plan to some degree a little bit more than just the very rudimentary.

THE COURT:  But you did say he did test out as a narcissist, or he presented as a narcissist.

THE WITNESS:  He presents.  I didn't say test.

THE COURT:  And he has the same behavior, many of the same behavioral patterns as a sociopath, but you're not calling him a sociopath.

THE WITNESS:  I would say --

THE COURT:  No brakes on the right and wrong kind of thing and --

THE WITNESS:  He says things to kind of cover for himself at times, from reading the history.  I think more central, I mean, that's a characteristic of people who have sociopathy.  It's also a characteristic, which is I think in this case much more central, to someone who has a borderline personality disorder.

THE COURT:  Okay, neither of which is good.

THE WITNESS:  I don't want them for my neighbor.

THE COURT:  Right.

MR. WISEMAN:  What does it mean "good," Your Honor?

THE COURT:  Pardon?

MR. WISEMAN:  I'm just concerned --

THE COURT:  I guess the point --

MR. WISEMAN:  Good for who and what?

THE COURT:  This is the point.

MR. WISEMAN:  Okay.

THE COURT:  The whole point of this is ineffective assistance of counsel.

MR. WISEMAN:  Sure.

THE COURT:  This is not the kind of testimony one would want to put on as a defense attorney, that he tests as a narcissist.  You don't want him to be living next door, that he's got a borderline personality, he's got tendencies of sociopath, sociopathic behavior.  This presents a future danger to the community.  That's all I'm saying.

MR. WISEMAN:  Okay.

THE COURT:  And this is not, you know, this is not something that I would have expected his attorneys to put on at trial.

MR. WISEMAN:  I'm glad Your Honor has clarified that, because I think that's --

THE COURT:  So now, that's where you need to be

headed.

MR. WISEMAN:  Yeah.  And we're going to get there, I promise you.

THE COURT:  Okay.  But not today.

MR. WISEMAN:  Well, certainly not today, no.

THE COURT:  Okay.

MR. WISEMAN:  We need about two weeks for that, but I'll settle for two-and-a-half more days.  That was said with a smile, for the record.

THE COURT:  Thank you.  I can't have a 2255 longer than the trial, I don't think.

MR. WISEMAN:  I'm just --

THE COURT:  Okay.  Thank you.  You're not being mad at me.

MR. WISEMAN:  No, no, of course not.  Goodness gracious.

THE COURT:  Okay.  I feel better.  I can sleep easier tonight.

MR. WISEMAN:  Just on this sociopathic organic impairment question --

THE COURT:  In just a moment, he's going to say we're all narcissistic sociopaths --

THE WITNESS:  Not unless I'm asked.

THE COURT:  Oh.

THE WITNESS:  No, I wouldn't.

BY MR. WISEMAN:

Q.    Dr. Gelbort, are all sociopaths suffering from organic brain dysfunction?

A.    No.

Q.    And some of them are just plain mean and they do wrong things because they choose to?

A.    Some sociopaths?  Yeah, sure.

Q.    Okay.  And does Mr. Bourgeois, in your view, fit into that category?  Or are there organic explanations for some of his bad conduct?

A.    Well, there certainly are organic issues present, based on the testing and his history.  They are the types of problems and issues that contribute to people having trouble acting in an adaptive, effective, goal-directed and proper fashion.  They make it more difficult for someone who has any sort of emotional disturbance.  It's kind of like the gyroscope that's starting to wobble and now you start shaking the table that it's on.  You've got both things working against him.  These are people that we like to see in our clinic or in the hospital as inpatients when they're in their teens and start them on medications to stabilize the behavior and keep them from wobbling so far out of whack.  It keeps them from having trouble going forward and keeps society from having trouble.

Q.    Okay.  Last thing I wanted to ask you about:  Were you asked by my office to assess Mr. Bourgeois for a formal

diagnosis of mental retardation?

A.    No.

Q.    And nonetheless, in your declaration, Paragraph 6, you say that your review of the history shows many of the telltale signs of adaptive skills deficits.  What did you mean by that?

A.    He's had trouble in areas that overlap or are adaptive skills issues throughout his life, based on the history I've seen and what I've come to understand about him.

Q.    And I take it then that the IQ he scored on your administration of the WAIS was within the range of mental retardation?

A.    There's two prongs to a diagnosis of mental retardation.  The IQ is probably -- I'm going to, because I like to be involved in that part, I think it's the easier one.  And my test administration, as well as the prior test administration, even without any manipulation of the numbers trying to account for Flynn Effect, would qualify him.  You know, the current thinking is that you need 70 or less IQ points to be diagnosed.  But because of measurement error, we can go up to a score of 75 and you can still be included in the definition, in the diagnosis.

        MR. WISEMAN:  Okay.  If I could just consult with my --

        THE COURT:  Don't you look at his adaptive behavior, too, outside?  I mean, having a commercial truck driving

license and, you know, owning a home and balancing a checkbook and all those kind of things is certainly not indicia of retardation, at least in my limited opinion.

THE WITNESS:  That's a great discussion.  And the diagnosis of mental retardation is not based on things that you have accomplished, but rather that you have to have -- the score alone, that's the separate issue, that's the first prong. The second prong is that you have to have, generally the diagnosis is two areas that are suppressed or low or impaired. So you can have lots of things that you can do, but if you have at least two areas that you can't do things, then you're eligible and properly diagnosed with retardation.

THE COURT:  Okay.

THE WITNESS:  Most people who are certainly mildly mentally retarded live in the community, have a job, handle money in some rudimentary fashion, ride a bus.  So if you're looking -- best way I can explain it is if you have a chain with 100 links and you've got 97 good links and three bad ones, what's going to limit your behavior is not the 97 good ones. We can talk about those --

THE COURT:  But the way I understand the case law is he has to have been discovered to have had this mental retardation early in life.

THE WITNESS:  Ah.  There's big discussion now, ever since Atkins --

THE COURT:  Right.

THE WITNESS:  -- when all of a sudden it became important to look back and say was the person -- we didn't used to retrospectively try to diagnose mental retardation. Retardation was diagnosed because people needed adaptations and help to get through, the people who didn't have family to help them.  So if you had a functional family, you know, you were sheltered, your family took care of these things --

THE COURT:  Well, I understand.  But I've got to go by the -- I mean I've got to have --

MR. WISEMAN:  Your Honor.

THE COURT:  -- some indication --

MR. WISEMAN:  Yes.

THE COURT:  -- of earlier established mental retardation.

MR. WISEMAN:  Our view on, we think this is borne out by both the case law as well as the sciences, is that there has to be onset before 18, but not diagnosis.

THE COURT:  So you have to look at that anecdotally and not pure test scores --

MR. WISEMAN:  Exactly.

THE COURT:  -- is what you're saying.

MR. WISEMAN:  I mean, obviously if we had a diagnosis pre-18, then we would present that and be very pleased with that.  But absent a diagnosis, we have to show onset.

THE COURT:  But I want to tell you that when I look at it, it's difficult.  It's difficult to say, okay, suddenly he's tested as mentally retarded after he's convicted or shortly before he's convicted of capital murder.  And so you look at that a little bit more carefully, is all I'm saying --

MR. WISEMAN:  I understand.

THE COURT:  -- than if you have absolute proof of early on before any of these bad things started to happen.

MR. WISEMAN:  Sure.  And we will be presenting evidence on that, but as Dr. Gelbort testified --

THE COURT:  But it will be anecdotal, more than --

MR. WISEMAN:  Well, anecdotal, and it will be professional opinions, based on the anecdotal information.

THE WITNESS:  There's a whole new issue -- we didn't used to do retrospective diagnosis, because no one cared.

THE COURT:  It wasn't necessary, yeah.

THE WITNESS:  The question was never asked, so the answer was never attempted.  Now it is, because of criminal legal cases.  It wasn't an issue 20 years ago.  No one ever tried to say, "Now, was that person retarded back then, and are they retarded now?"  It wasn't an issue.

THE COURT:  The only one I had actually before, before the Supreme Court case, that I granted the habeas corpus, was a capital case, and all they had to do was go a block over here next to the County Courthouse actually, is in

the same block as the Corpus Christi Independent School District. His lawyers only had to walk over there and get the records, and he had --

MR. WISEMAN: Yeah. That was a 2254, if I --

THE COURT: Yes. 54.

MR. WISEMAN: Yeah, yeah, I read it.

THE COURT: But then I got reversed because --

MR. WISEMAN: Procedurally.

THE COURT: Yes, but --

MR. WISEMAN: There was a default issue, if I recall.

THE COURT: So then the Supreme Court, in the interim, came out with this -- and they sent it back to me. I sent it to the State to determine State values of mental retardation. And apparently all, even the State's experts came in and testified that he was mentally retarded.

MR. WISEMAN: Right.

THE WITNESS: There are some slam dunks, and then there are some that are in the gray zone and --

THE COURT: Well, this was very difficult, because this man had killed a police officer, and --

THE WITNESS: It's a terrible thing to try to figure out. And you folks have --

THE COURT: But that was easy, because the records were there.

THE WITNESS: You folks have done it to us. We

didn't used to have to do this.

THE COURT:  This was an ineffective assistance of counsel claim, just like this one here.  And should it have been presented and -- and I thought it should have been.

THE WITNESS:  And for what it's worth, I stayed out of -- well, that question wasn't asked of me, so I didn't have to address it.

MR. WISEMAN:  I have no other questions on direct examination.  Thank you, Doctor.

THE COURT:  Thank you.

MR. WISEMAN:  Should I leave my exhibits at the Bar of the Court?

THE COURT:  Well, you need to offer them, don't you?

MR. WISEMAN:  Oh, yes, absolutely.

THE COURT:  That would be -- I hate to tell you how to do this, but --

MR. WISEMAN:  No, no, I appreciate those kinds of reminders.  Should I name them, or will the record reflect what's been marked already?

THE COURT:  I think you have called the numbers out --

MR. WISEMAN:  I have.

THE COURT:  -- for each one that you've reviewed.

MR. WISEMAN:  Okay.  So --

THE COURT:  So just give me the numbers.

MR. WISEMAN:  Okay.  That will be P-16, 15, 86, 31, 132, and 17.

THE COURT:  And I think there was a -- was his vitae 16?

MR. WISEMAN:  The vitae was 17, is what I have.

THE COURT:  17, okay.  Any objections to the admission of Movant's 15, 16, 17, 31, 86, and 132?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Those are admitted.  Have you given them to Ms. Scotch?

MR. WISEMAN:  I've just handed them.

THE COURT:  Six exhibits.

(Court and Clerk conferring off the record.)

THE COURT:  Oh, yeah.  Okay.  The most recent one that was filed at 3:00 something this afternoon.  Hand that to Mr. Roberts' table.

Would you read that subpoena and make sure that's okay?

MR. ROBERTS:  I'm sorry, Your Honor, read the subpoena and --

THE COURT:  Yeah, just make sure before you do that. I just want to get that subpoena out.

MR. ROBERTS:  Can we take a brief --

MR. WISEMAN:  Oh, that's our subpoena?

THE COURT:  Pardon?

MR. WISEMAN:  Is that the one that we filed?

THE COURT:  Yes.

MR. WISEMAN:  Oh.

THE COURT:  At 3:00 something or other this afternoon.

MR. WISEMAN:  Oh.

THE COURT:  How did you do that?  Do you have somebody else here?

MR. WISEMAN:  Yeah, we have folks in Philadelphia.

THE COURT:  You know, you must have filed it earlier and it just got docketed at 3:50 --

MR. WISEMAN:  People are back at the office.  We have thousands of folks behind us.

THE COURT:  Massive computer networking.

MR. ROBERTS:  Your Honor, could we take a quick recess?

THE COURT:  Sure.  Do you have a flight out?

THE WITNESS:  It just left.

THE COURT:  Well --

THE WITNESS:  But I'd like to use the bathroom, please.

THE COURT:  Yes, after you fasten your seat belt.

(Recess from 4:44 p.m. to 4:52 p.m.)

THE COURT:  The subpoena?

MR. ROBERTS:  Yes, Your Honor.  I have no problem

with the subpoena.

THE COURT:  Okay.  Can I have it back, and let me sign it.  Thanks.

Are you ready?

MR. ROBERTS:  Waiting for Ms. Booth, Your Honor.

THE COURT:  Okay.  Where did she go?

MR. ROBERTS:  We can address, we can address this real quickly.  We're going to offer the two videotapes that was of the interviews from Dr. Price and Dr. Moore as evidence.  And we're going to get those -- we'd like to offer them today so the Court can have an opportunity to view them if the Court desires to do so, since obviously witnesses are talking about what they've observed and their impressions.  So we've spoken to Mr. Wiseman about that.

THE COURT:  Now, these are your witnesses?

MR. ROBERTS:  These are Dr. Moore and Dr. Price --

THE COURT:  Okay.

MR. ROBERTS:  -- that interviewed Alfred Bourgeois at the prison.  I'm going to offer the entire disk.

THE COURT:  After all that dust up, they did it, with the --

MS. BOOTH:  Yes, they did, Your Honor.

THE COURT:  -- video?

MR. ROBERTS:  Yes, Your Honor, and --

THE COURT:  And it turned out to be helpful to you,

you're assuming.

MR. ROBERTS:  Well, we did note that it made a measurable impression on Dr. Price, who was before quite opposed, and perhaps has changed his opinion of this.  So at any rate, we would like to offer --

THE COURT:  Dr. Price has changed his opinion from what to what?

MR. ROBERTS:  If you recall, Dr. Price was the one that was opposed to having the videotaped interview.

THE COURT:  Yes.  I don't know why, though.  I never understood that.

MR. WISEMAN:  Yeah.

MR. ROBERTS:  They still did not do the WAIS-IV, so they did not, they didn't actually present the WAIS-IV because of copyright concerns.

THE COURT:  Okay.

MR. ROBERTS:  But since that's gone, then there's really nothing in there to be concerned about with the copyright side.  And so we were going to offer those today, and then additionally, we did have Dr. Estrada's deposition this morning.  It's been asked for expedited, so that's going to be presented to you, I believe, next week.

THE COURT:  What did he have to say?

MR. WISEMAN:  Oh, very helpful to the Defense.

THE COURT:  To you?

MR. WISEMAN:  Absolutely, yeah.  That's not just my opinion.  That's a fact.

THE COURT:  Ms. Booth is not in agreement.

MS. BOOTH:  I am shocked.  He said the man was of above average intelligence, was not retarded, and was a violent man.

THE COURT:  Well --

MS. BOOTH:  There we go.  I thought it went well for the United States.

THE COURT:  Okay.  There you have it.

MR. WISEMAN:  Well, I guess that's why Your Honor is in the big chair there, because you get to decide what's helpful and to whom.

Regarding the Government's videos, I have no objection to them being offered out of turn.  I would just -- and I know the Court will do this --

THE COURT:  Oh, Mr. Bourgeois, are you still on the phone?

THE DEFENDANT:  Yes, ma'am.

MR. WISEMAN:  I would ask the Court, if you're going to watch them before --

THE COURT:  Tell me.

MR. WISEMAN:  -- our case is complete, that you obviously keep an open mind.

THE COURT:  Would you rather just, that I just saw

them in the case?

MR. WISEMAN:  Well, I would prefer that you hold off watching them until our witnesses have testified about our view of them.

THE COURT:  Okay.

MR. WISEMAN:  Otherwise you're seeing sort of raw data without explanation.  And we have some things we want to point out about them.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  You think you just want to show them as you're going along?

MR. WISEMAN:  Well, we're going to have our own clips that we're going to want to show.  I have no problem at all, obviously if the Court wants to watch all 16 hours of them. I've watched them myself.

THE COURT:  I need to watch 16 hours of them?

MR. ROBERTS:  It's --

THE COURT:  Well, I'll tell you what, probably the only time I have to do that -- because I've got to --

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.

TELEPHONE RECORDING:  If you need help, hang up and then dial your operator.  If you'd like to make a call, please

hang up and try again.  If you need help, hang up and then dial your --

THE COURT:  Could you -- thank you.

THE CLERK:  You want me to try again?

THE COURT:  Yeah, keep trying.

MR. ROBERTS:  We must have lost him.

THE COURT:  We lost him.  Sorry.  But probably the only time I'm going to have to do that is on the weekends, because I've got a jury trial starting Monday.  And then I've got naturalization ceremonies all day Friday, and then we start Bourgeois the next Monday.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  So if I promise not to be prejudiced or preconceived -- you know, the funny thing about being a fact finder is that I watched him, you know, for all these weeks that I had him in trial.

MR. WISEMAN:  Sure.

THE COURT:  I had colloquies with him, so I, you know, I have some basis, too --

MR. WISEMAN:  Yeah.

THE COURT:  -- of coming up with an opinion.  I don't know if it's that good.  But I have to make the fact finding at some point.

MR. WISEMAN:  Yes.

THE COURT:  But I do want the benefit of all this

other information.

MR. WISEMAN:  Right.  And again, we have no opposition to the Court watching them.  We think you should watch them.  You know, there's certain aspects of them that we want to, you know --

THE COURT:  Spin your way, like they want to spin their way.

MR. WISEMAN:  I wasn't going to say spin.

THE COURT:  Sorry.

MR. WISEMAN:  I was going to say elucidate.

THE COURT:  Thank you.

MR. WISEMAN:  And you know, that we think we have some important points about.

THE COURT:  I don't think you all are like Richard Gere in, you know, Chicago, so --

MR. WISEMAN:  My point is made.  Thank you, Your Honor.

MS. BOOTH:  Your Honor, we're going to be asking to admit into evidence the different, the many disks, which we have them marked in our exhibit list as Government's Number 4, 5, 6, 7, 8 --

THE COURT:  Wait a minute.  4, 5, 6, 7, 8 --

MS. BOOTH:  -- 6, 7, 8, 9, 10, 11, 12 and 13 are the videos for the interview conducted by Dr. Price.  And then --

THE COURT:  Any objection?

MR. WISEMAN:  No objection.

THE COURT:  Okay.  4 through 13, Government's Exhibit, are admitted.  We're still trying to get Mr. Bourgeois back.  Is this okay to do this preliminarily?

MR. WISEMAN:  Sure, sure, sure.

THE COURT:  Okay.

MS. BOOTH:  And then Government's 19, 20, 21 and 22, which are the video disks for Dr. Moore's interview.

THE COURT:  Any objection?

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Okay.  19, 20, 21 and 22 are admitted. Would you give them to Ms. Scotch at some point?

MS. BOOTH:  They're being brought over right now.

THE COURT:  Okay.  Now, do you want to examine --

MR. ROBERTS:  Yes, Your Honor, we do have some questions.

THE COURT:  Okay.  Go ahead.

MR. ROBERTS:  Would you like us to wait for Mr. Bourgeois?

THE COURT:  Oh, good point.  We'll wait for Mr. Bourgeois.  Sorry.

(PAUSE.)

THE COURT:  You know, Bureau of Prisons has Mr. Bourgeois on the line in our main line.  Would you go out and -- Mr. Cutler, would you mind telling Ms. Scotch that he's

on one of these lines?

(PAUSE.)

(Court and Clerk conferring off the record.)

THE COURT:  Are you there?

THE DEFENDANT:  (Inaudible.)

THE COURT:  Can you speak up, Mr. Bourgeois?  Are you there?

MR. VILLARREAL:  He's here.

THE DEFENDANT:  Yeah.

THE COURT:  Okay.

THE DEFENDANT:  That's kind of where we got cut off. Right after you asked me if I was on the telephone, it got cut off.

THE CLERK:  We got cut off.

THE COURT:  Okay.  Now we're back.

THE DEFENDANT:  Sorry.  I'm sorry about that.

THE COURT:  That's quite all right.  Now you're back. Are you ready?

THE DEFENDANT:  Yes, ma'am.

MR. ROBERTS:  Yes, Your Honor.  I was going to ask for the exhibits, Your Honor, to be able to reference a couple of them.

THE COURT:  We don't have the CDs?

MR. ROBERTS:  No, we don't, Your Honor.

THE COURT:  Oh, we have these other six right here.

MR. ROBERTS:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Gelbort, as I said before, we're not really, we're not challenging your expertise in this area, but in reviewing through your --

THE COURT:  He's going to say they're challenging your conclusions.  That would be my guess.

THE WITNESS:  I'm on board.

BY MR. ROBERTS:

Q.   What I do have some questions about is through your CV, it appears that maybe it's not completely up to date.  And so I was kind of curious about such things as:  Are you still the Vice Chair of the Brain Injury Association of Illinois?  You've been Vice Chair since 1994?

A.   After, I think it was nine, ten or eleven years, I stepped down as Vice Chair, and now I'm Emeritus or on the Honorary Board.  So I'm still on the board of --

THE COURT:  Where do you live?

THE WITNESS:  In Evanston, outside of Chicago.

THE COURT:  I know where that is.  I was there a couple of months ago.

BY MR. ROBERTS:

Q.   And so there's some other things that are in here that maybe are kind of dated in the same way through your CV?

A.    I don't think there's too much there that -- that, I would agree, is dated, and it doesn't have an end point on that. That's an error.  I haven't been adding presentations and the like that I've done, for several, several years.

Q.    Okay.  Are you still a consultant at Cornerstone Services?

A.    Yes, I am.

Q.    And you still have a private practice?

A.    Yes, I do.

Q.    And then if I understood right, from 2006, you've actually testified in 11 cases and done approximately 24 depositions?

A.    I would be guessing, but I think my office did put together some statistics and forwarded them to someone.  So I don't know the numbers, but --

            THE COURT:  Are you going to ask him if the majority of his income comes from testifying?

            MR. ROBERTS:  Not necessarily, Your Honor, but we can ask that question.

BY MR. ROBERTS:

Q.    Does the majority of your income come from testifying?

A.    Four to six percent of my time and income seems to come from legal cases, criminal and civil.  If you followed me around all week, you'd see me in my office or at the hospital pretty much every day, five or six days a week.  The bulk of the work I do is clinical work.  I'm a clinician.  I'm not an academician.  I'm not a researcher.  I see patients on referral

from neurosurgeons, neurologists, physiatrists, psychiatrists, pediatricians, internists, gerontologists. I do evaluations and then get them reports as to what's right or wrong with their patients and what they should do about it. That's how I make my living.

Q. How did you get into the forensics business?

A. In Houston, when I was Director, I got kind of popular among some of the personal injury attorneys, I think because of my status. The job title I had was Director of Psychology and Neuropsychology at TIRR. And in Chicago, my ex-partner had a friend who would do some criminal work and had the probably bad judgment to get into a staring contest with the Judge and wasn't welcomed back in court. My ex-partner didn't want to do any criminal work, and I was new into the practice, so I got kind of pushed up there. And a couple --

Q. So you started doing criminal work on the forensics side in what year?

A. 1990.

Q. 1990. And during the time that you have been hired in a criminal context, all that work has been on the defense side?

A. I think it's fair to characterize that 98 percent has been for the defense. There have been times when State's attorneys or Government attorneys have asked me to look at a case, and I've given them my opinions or I've told them what I see that's right or wrong. I've been asked by Judges to do some

evaluations as well.  But by and large, most of the work has been done for defense attorneys.

Q.   So this list of cases that you provided to us, you said that was put together by someone in your office?  It wasn't put together by you?

A.   I believe that my assistant went back through my day planner and pulled out cases.  I think the request was for cases I've either testified in in court or by deposition, and I think she just went back through for the past couple of years and pulled out dates where I had been providing testimony. Some of those I'm pretty sure are going to be civil cases as well.  In fact, probably it's the majority, but I couldn't tell you.

Q.   Okay.  And earlier in your testimony, you were talking a little bit about your background.  You mentioned about running a development disabilities clinic.  Were you the actual one running the clinic?

A.   I didn't do the administrative work.  But in terms of doing the evaluations, I was the one, you know, I was doing all the clinical work from the psychological perspective.  I was supervised by my dissertation adviser, Roger Green, at the time.  So I was charged with doing it, and he would oversee what I was doing.

Q.   Wasn't there a professor who was a psychologist that was actually running the clinic, and you were working for him?

A.   I think it's best characterized that I was doing it.  He would -- I would bring back cases to him in his office and discuss them as we were going on.  When we first started, he was there with me.  And after a couple, three months, he said, "You do it.  You're able to do this."  It was a team.  We had, I think, an occupational therapist and speech pathologist.  We would do an evaluation of children, some under a year of age. We would put together the evaluation, talk about it.  I'd take my part back and discuss it with him.  He'd say, "Yep," or "Add this to it," or --

Q.   And for the period of time, you were actually having someone else do the evaluations, and you were then reviewing the information?

A.   Not in the developmental disability clinic.  I was doing the neuropsychs.

Q.   When you testified in 1995 in a case out in Pennsylvania, you actually had testified that someone else was doing the evaluations, and then you were reviewing them.  Did you change that process at some time?

A.   You'd have to show me that testimony, make sure we're talking about the same thing.  I certainly don't recall testimony from 1995.

Q.   Do you recall a case of Harrod versus Ruoff?

A.   No.

Q.   Dr. Paul Ruoff?

THE COURT:  Why don't you just show him.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, I'm not sure what document he's showing him.  Could I see a copy?

THE COURT:  Yes, show it -- look at it, Mr. Wiseman.

MR. WISEMAN:  Thank you.

THE COURT:  And then let him show it to him.

(PAUSE.)

MR. ROBERTS:  It's just a minor point, Your Honor. I'm just going to move on.

BY MR. ROBERTS:

Q.   I was just trying to determine really when he -- when you started, Doctor.  If you could just tell us when you started doing the actual evaluations of individuals you were seeing in a criminal context.

A.   As I said, 1990, I think, was the first case.  It was a 29-year-old young man who got into trouble for sexually accosting his six, seven or eight-year-old stepsister.

THE COURT:  His what?

THE WITNESS:  Six, seven or eight.  I can't remember how young she was, but she was under ten, stepsister.

THE COURT:  Okay.  How old was he?

THE WITNESS:  He was 29, I believe.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.    And in the cases that you've been a part of in a criminal context, have you ever found anyone that you've evaluated to have actually been malingering?

A.    Yes.

Q.    And what case was that?

A.    I don't recall the names.  It's been more than one.  It's been several.  I don't recall the names.

THE COURT:  Well, would it be safe to assume that if you do most of your work for criminal Defendants, that they wouldn't be calling you to testify in those?

THE WITNESS:  Oh, they absolutely didn't call me to testify.

THE COURT:  In the malingering ones.

THE WITNESS:  Absolutely not.

THE COURT:  Okay.  So I think that's what you're -- that's what you need to know.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  That he never came and testified on behalf of a Defendant that this person was malingering.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  So now the next question would be the percentages, malingerers versus nonmalingerers.

THE WITNESS:  The number of malingerers, or the number of people I find that are malingering --

THE COURT:  In the criminal context.

THE WITNESS:  Right.  I would say the percentage is actually fairly small.  There are many people who don't put forth good effort.  And there are those that are overtly malingering, where the data, you look at it and the pattern is all screwed up, it doesn't make sense compared with what we know about how the brain functions --

THE COURT:  Okay.

THE WITNESS:  -- when you're working or not working.  There are more people who don't seem to have put forth as good an effort as they can.  You know, they kind of lighten up.  And in fact, I typically explain to patients in this setting that if you don't put forth good effort, you may have a problem and we'll never know --

THE COURT:  Okay.

THE WITNESS:  -- or we won't be able to talk about it.

THE COURT:  Well, we're talking about criminal Defendants that are going to trial --

THE WITNESS:  Correct.

THE COURT:  -- or after post-conviction problems.  So would it be safe to say then -- I assume this is what you're trying to get at, that the majority of people you examine you do not believe are malingering.

THE WITNESS:  The majority of people, when I examine them, based on my administration of the tests --

THE COURT:  Sure.

THE WITNESS:  -- as well as encouraging them to do what they can, as best as they can, if they want to try to, in effect, help themselves, that not putting forth good effort will ruin the data, and I will have nothing to say.

THE COURT:  Okay.

THE WITNESS:  So based on that set of assumptions and the way I administer the tests, I would say, in my experience, I've had 5 percent, perhaps 4 percent, who were overtly malingering --

THE COURT:  Okay.

THE WITNESS:  -- where just like this person didn't listen at all.

THE COURT:  Okay.

THE WITNESS:  And then there's probably another 10, 15 percent who don't put forth as good an effort as they need to, and the data becomes kind of confused and you can't do anything with it.

THE COURT:  Got it.  That's what you wanted to know?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   Have you ever heard of an article that's entitled Identification of Feigned Mental Retardation Using the New

Generation of Malingering Detection Instruments, Preliminary

Findings?  Have you heard of that?

A.   It's not ringing any bells.

Q.   Do you know of the, a person named Lilly, G-R-A-U-E?  Have

you heard of that name?

A.   G-R-A-U-E?

THE COURT:  Wouldn't it just be better to show it to

him?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And let him look at it and see if he's

familiar with it.

MR. ROBERTS:  May I approach the witness?

THE COURT:  What's the date of the article?

MR. ROBERTS:  The date of the article is 2007.

THE COURT:  Okay.  Do you want to look at it first,

Mr. Wiseman?

MR. WISEMAN:  Yeah, I'd like to see a copy.  I'd

actually like to have a copy, if it's going to be used.

THE COURT:  Do you have a copy?

MR. ROBERTS:  We'll get a copy for him, Your Honor.

THE COURT:  Don't mark on it.

(Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, this one is marked on.

THE COURT:  Who marked on it?

MR. ROBERTS:  Dr. Moore.

THE COURT:  Dr. Moore?

MR. ROBERTS:  Highlighted, Your Honor.  He has a highlight on page, Page 932.

THE COURT:  It's going to make it difficult to copy.

MR. WISEMAN:  I don't have a problem with the -- it's just the highlight.

THE COURT:  If you get the citations, you ought to be able to find it.

MR. WISEMAN:  Yeah, we'll be fine.

THE COURT:  Where was it published?

MR. ROBERTS:  It was published in 2007.

THE COURT:  Where?

MR. ROBERTS:  It was in --

THE COURT:  Readers Digest?

MR. ROBERTS:  Psychology Press, Your Honor.

THE COURT:  Okay.  Have you heard of Psychology Press?

THE WITNESS:  I've heard of it.

THE COURT:  And?

THE WITNESS:  It's not --

THE COURT:  It's not top drawer or anything?

THE WITNESS:  I would tend to agree with that.  It's not citeful or --

THE COURT:  Okay.  I'm just guessing, by your expression.  Okay.

MR. ROBERTS:  I'll show him the article, Your Honor.

(PAUSE.)

BY MR. ROBERTS:

Q.   Doctor, I'm going to refer you to one particular paragraph and ask you if you would agree with this statement.

A.   Forgive me, but procedurally, unless I at least look at the abstract, to take it completely out of context, I mean, you can ask me and I'll say, "I don't know," because that's --

THE COURT:  Is there an abstract printed at the top?

THE WITNESS:  I'm reading the abstract.

THE COURT:  Okay.

THE WITNESS:  I'm halfway through it.

THE COURT:  Okay.  Take all the time you want.

THE WITNESS:  Thanks.

THE COURT:  You're going to be here for the night anyway.

(PAUSE.)

THE COURT:  Is there any way he can get out tonight? Do you have somebody trying to rebook him?

MR. WISEMAN:  Yeah, we tried.  And unfortunately, the last flight out is not that late.  We're here for the night as well.

THE COURT:  Okay.

MR. WISEMAN:  Although we had planned to leave tonight initially.  And I am missing a baseball game tomorrow.

I was going to go watch my New York Mets in New York City.

THE COURT:  That's no big loss.

MR. WISEMAN:  Oh, my.

MR. ROBERTS:  If we're airing out our differences, I had to call in to my colonel and ask permission to show up late for military duty tomorrow morning.

THE COURT:  Oh, my.

MS. BOOTH:  Okay.  It's my husband's birthday, and --

THE COURT:  Is he home?

MS. BOOTH:  -- he's home from Afghanistan.  He's only been here 39 days in two years.

THE COURT:  How long is he here this time?

MS. BOOTH:  He's going to be home for 27 days.

THE COURT:  Congratulations.

MS. BOOTH:  Thank you.

THE COURT:  Anybody else want to chime in?

THE WITNESS:  I'm missing High Holidays with my family in Toronto.  We went up to be with them.

THE COURT:  Oh, this is --

THE WITNESS:  Rosh Hashanah.

THE COURT:  -- Rosh Hashanah.

THE WITNESS:  Yeah.

THE COURT:  Sorry.

THE WITNESS:  It's okay.  They're annoyed, but I said this comes first.

(PAUSE.)

THE WITNESS:  Forgive me, but just procedurally, this is -- Psychology Press is the publisher.  This is actually from the Clinical Neuropsychologist, which is a decent referee journal.

THE COURT:  Oh, that is a good --

THE WITNESS:  Yeah.

MR. ROBERTS:  I'm certainly not an expert in this area.

THE COURT:  There you go, Mr. Roberts.

MR. ROBERTS:  And unfortunately, Dr. Moore did have to leave, so I don't have his expertise to rely upon.  I apologize.

THE WITNESS:  I'll do my best to help you.  I'm trying to be impartial.

So you wanted me to look at one particular --

BY MR. ROBERTS:

Q.   Actually, yes, I think it was Page 932, or 937.  And it's actually highlighted in yellow, and it is with regard to the Malingered Neurocognitive Deficit Percentage or Base Rate.

A.   Did you -- I'm sorry?  Which page did you say?

MR. ROBERTS:  Your Honor, may I approach one more time?

THE COURT:  Sure.

THE WITNESS:  Okay.  Thank you.

BY MR. ROBERTS:

Q.    You see where they said their Base Rate Malingered Neurocognitive Deficit area is 41 percent?

A.    Forgive me, but I'm going to read the whole paragraph, rather than just the one line.

Q.    Very well.

A.    And I'd prefer to read the whole article.

THE COURT:  Do you want to read the whole article?

THE WITNESS:  That's the proper way to do it.

THE COURT:  Why don't you do that.

(PAUSE.)

THE COURT:  Ms. Booth, you had a sealed motion for continuance?

MS. BOOTH:  Yes, ma'am.

THE COURT:  I just granted it.

MS. BOOTH:  Great, great.  And my FBI Agent has been sent to Washington on that.

THE COURT:  Okay.

(PAUSE.)

THE WITNESS:  Are you planning to ask questions just pertaining to that one spot?  I can -- there's a study here which, if you're not going to ask about the results, I won't waste anyone's time and read.

THE COURT:  Well, you can -- what happens is this, he asks the questions, you answer them.  You can confer with

Mr. Wiseman, and he can clear everything up that you really want to say.

THE WITNESS:  I'm just, if he's asking about what's on this page, I don't need to spend our time and read the study and the results of the study.  If he's asking about -- what he pointed to thus far is just some background --

THE COURT:  You can read the whole page.  You can read the whole article.  You decide how you want to do it.  And if --

MR. WISEMAN:  Why don't we see what the questions are, Dr. Gelbort, and if you can answer them, fine; if not, you can keep reading.

THE WITNESS:  Well, I won't be shy, and if you ask a question that's beyond what I've read, I'll say I need to go on reading then, if that's okay.

THE COURT:  Perfect.

BY MR. ROBERTS:

Q.   My question is not going to involve that chart, and so if you could just tell us, that article that you just read indicates that there's a 41 percent base rate in malingering; is that correct, at least with regard to the part that I referred to?

A.   Well, it says 41 percent, but it's talking about cases -- if you go up above, the 41 percent is referring to cases that have to do with "Undergoing neuropsychological testing," I'm

quoting, "in compensation-seeking circumstances."  So it's referring to, I believe, civil cases here.  It's not necessarily applicable, it doesn't necessarily generalize to criminal cases.

Q.    The --

A.    And for what it's worth, the methodology has not been elucidated.  Several other things that they talked about there, they're generalizing from -- they're not generalizing.  They're presenting bits and pieces of data, and one has to be careful not to generalize beyond what they're talking about, which is I think what -- I'm not going to suggest that you're doing that, but you're taking information pertinent to a civil case, a car accident, for example, or someone saying, "I can't think as well, I can't work as well, so you owe me for my lost wages," versus someone who is in a legal proceeding, but different circumstances.

Q.    All right.  Well, I'm not going to get into an argument with you about the --

A.    I won't get into an argument with you at all.

Q.    -- 41 percent, about the -- I'm not going to get into an argument with you about the 41 percent, how it applies.  But the point that they were making is that there is a higher percentage of malingering in general on these kind of tests. And so I would ask you --

A.    Excuse me.  I don't understand.  There's a higher

percentage in general on these tests, compared with what?

Q.   The 4 to 6 percent that you just stated from the witness stand.

THE COURT:  Actually, he -- well --

THE WITNESS:  You're comparing apples and oranges, and I can explain why, if you want to know.

BY MR. ROBERTS:

Q.   Okay.  Well, let me just ask you this.  You've mentioned several times that effort is an important part of evaluating how someone's taking a test.  Is that accurate?

A.   Absolutely.  And it says that in this article as well.  Sure.

Q.   Is malingering, to you, is it an all or nothing, where someone is -- is it, in your concept, is it that someone is malingering all the time on, all the way through the test, or is it possible that they're just malingering at certain points?

A.   It's not even that it's all or nothing at certain times or not at other times, but it's the level of investment a person puts in.  I've already explained that.  I've had people, I said 3, 4, 5 percent, I believe, or 4 or 5 percent that I've tested where they were just out and out malingering the whole time.  Then there's others, I said 10 to 15 percent, I believe, if you were listening, who are not putting forth maximal effort.  And hence, there are data -- there may be something wrong with them, but the data is not interpretable.

Q.   Okay.  You said that you did not use contrived tests and that --

THE COURT:  Does somebody have on a phone that's on, not off?

MS. BOOTH:  Judge, I tried to turn it off, because I went to call Debbie, and I couldn't get it to go off, so I made the noise putting it off again.

THE COURT:  It's off?

MS. BOOTH:  I think it's off.  I've been pressing --

THE COURT:  Ms. Hohle, would you help her?  She's challenged.

MS. BOOTH:  I've been pressing it and pressing it, and it won't go off.

THE COURT:  I would fine you, but I'm too tired.

BY MR. ROBERTS:

Q.   You said you don't use contrived tests?

A.   I prefer not to.

Q.   And these are -- so what tests did you actually use to evaluate whether Alfred Bourgeois was malingering or not?

A.   You want to define tests?

Q.   I'm asking you what did you use at all, whether tests or not.

A.   Okay, what mechanisms.  Tests, I didn't use any formal tests.  Those are the contrived tests.  I did use the tried and true, as I explained before, way that this has been done since

pretty much 1950, when neuropsychologists were working with war vets, where you look at the internal pattern, as well as whether or not the data makes sense based on the person's presentation and their history.  So, and I've already given examples of that.

The pattern on the category tests, where on the easy tests, where people generally get nothing wrong, only patients don't know that, he got nothing wrong.  On the test which is most difficult, he was absolutely at chance level.  He didn't get it.  And rather than doing better or worse than chance, he performed at chance.

When you look at the test data across time, from Dr. Weiner's evaluation to mine, if you laid it out and graphed it and laid one graph over the other, the similarities are striking.  You could almost call it textbook evidence of someone who's putting forth reasonable effort, because over a two to three-year period, the strengths are still the strengths, the weaknesses are still the weaknesses.

For example, on Dr. Weiner's WRAT-3, he found high school level reading, high school level spelling, sixth grade level arithmetic.  Several years later, I find high school level reading, high school level spelling, fifth grade level arithmetic.  The difference is insignificant.  It's shocking how consistent --

Q.    Let me stop you there for just a minute, because you bring

up a good point.

A.    Sure.

Q.    And that is --

MR. WISEMAN:  Well, Your Honor, I'm going to object if the witness was in the middle of his answer or finishing his answer.  I thought he was in the middle of, or completing his answer.

MR. ROBERTS:  I just -- Your Honor, it was fairly narrative, and I just, I asked him a pretty simple question, so I --

THE COURT:  Well, do you want to object to the non --

MR. ROBERTS:  I will object that it was nonresponsive, Your Honor.

THE COURT:  Okay.  That's sustained.  Now you can cut it off, and you can have him testify any way you want to.  Okay?  Because only the questioner can object to nonresponsiveness.  It's true.

MR. WISEMAN:  Okay.

THE COURT:  The nonquestioner objects to narrative, which you're not objecting to.

MR. WISEMAN:  Right.

THE COURT:  He can object to nonresponsiveness.

MR. WISEMAN:  Okay.

BY MR. ROBERTS:

Q.    Dr. Gelbort, there is a -- I'll show you the first page

from Exhibit P-16, so that you know, that's the test that you gave to Alfred Bourgeois. And then I'm going to put back up here the Trail Test that you indicated where he missed one. You gave him this test in 2007. Is that correct?

A.   Yes.

Q.   That's a fairly simple test, is it not?

A.   I describe it as a simple test, yes.

Q.   Okay. Now, for the record, that's Page 17 of this exhibit. And you're aware that Dr. Weiner gave him the WAIS-R in 2004, and it contained this same test. Correct?

A.   I don't know what you mean by the same test.

Q.   Okay. Sorry. The Trail Making Test. And I'm showing you what -- let me show you the front, first page, Exhibit P-31, the test that Dr. Weiner gave to Alfred Bourgeois in 2004, and Page 14 of that test is the exact same Trail Test. Is that correct?

A.   That, for what it's worth, that's not part of the WAIS, either the WAIS-R or the WAIS-III. But it's the same Trail Making Test. I trust that there's been a problem with the copying and that 14 has been, and as well as 12, has been cut off. But yes, it should be the same test.

Q.   Okay. And at the top, it indicates he had zero that he missed. Is that correct?

A.   That's right.

Q.   That's a simple test that he took in 2004. And whether

it's part of the WAIS-IV or WAIS-III, it's part of the exhibit. And this was a test that he was given in 2004 and again when you gave it to him in 2007. And this is an example of a test that he had already taken once?

A.   Yes.

Q.   And then he missed a simple one line, and a few minutes ago in your direct testimony, you mentioned how the one mistake was rather important to you in analyzing his testing ability.

A.   I think if you go back and review what I said, that one instance, I made a point of it, I said I normally like to see three instances of something before I draw a conclusion, but the single instance is something that causes me to raise an eye brow and to look for that type of behavior or be concerned about that type of behavior.

Q.   But something that simple, where someone misses, that's possibly, that could possibly be someone malingering, could it not?

        MR. WISEMAN:  Objection to possible, Your Honor. We're not dealing in possibilities here.  Anything's possible, of course.

        THE COURT:  Overruled.

        THE WITNESS:  Any possibility does exist.  Someone who's malingering can miss one or not miss one.  That in and of itself doesn't indicate malingering or not malingering.

BY MR. ROBERTS:

Q.    Thank you.  Would someone's truthfulness have any impact on your ability to ascertain whether they were malingering?

A.    Whether or not they're being truthful?

Q.    Yes, being truthful --

A.    I mean, malingering -- malingering, by definition, is someone who's not, in a sense, being truthful.

Q.    So when you're evaluating answers to questions, whether it's on the test or whether it's, whether you're asking them direct questions to assess them, make an assessment of them, wouldn't truthfulness be important?

A.    Truthfulness is always important, of course.

Q.    You, in your declaration, you state that you reviewed background material, and you mentioned Dr. Weiner's report. How much of an emphasis did you place on Dr. Weiner's report?

A.    It was a source of data that I reviewed and looked at and thought about in the course of making my own opinions.

Q.    Would you have given a WAIS-R in 2004?

A.    Would I have given a WAIS-R in 2004?

Q.    Yes.

A.    Possibly.

Q.    Even though it was outdated?

A.    I said possibly.

Q.    It's not considered malpractice to give an outdated test?

A.    It's not considered malpractice, no.

Q.    So you would have possibly given a WAIS-R in 2004?

A.    For the third time, possibly I might have.  I probably would have chosen not to, but I possibly could have.  It just depends on the circumstances.

Q.    Were you aware that in Dr. Weiner's report that there, that there was an inaccurate fact from Alfred Bourgeois that Dr. Weiner relied upon when he started talking about the head injury?

A.    I believe that there were some things described or reported that were inaccurate, yes.

Q.    Okay.  Earlier in your direct examination, you mention the fact that there's a difference between someone that might be in a concussion, have a concussion from an injury, you were trying to, it sounded like you were trying to distinguish or say that sometimes people can make a mistake as to whether or not they have a concussion.  It sounds like -- were you aware that Alfred Bourgeois had reported to Dr. Weiner that in 1984 he had a coma lasting one to two months?

A.    I think I read that somewhere.

        THE COURT:  Who?

        MR. ROBERTS:  That Alfred Bourgeois reported to Dr. Weiner before he took -- while Dr. Weiner was doing his report --

        THE COURT:  Okay.

        MR. ROBERTS:  -- that he had had a coma as a result of an accident in 1984.

BY MR. ROBERTS:

Q.    And that played a significant -- that appears to, at least in Dr. Weiner's report, that appears to play a role in his determination that there was a brain injury, does it not?

A.    You'd have to ask Dr. Weiner.

Q.    Okay.  Well, do you recall where Dr. Weiner thought that there was a head injury?  Do you recall if he thought it was frontal or if it was in some other area of the brain?

A.    I don't know that he -- I didn't read it trying to figure -- I can tell you that he was of the opinion that there was more posterior impairment than anterior.  I don't know if he made a correlation between those.  I think he did suggest that one of the proximate causes of his cognitive dysfunction was from the injury he suffered in 1984.

Q.    And were you aware that when confronted with the medical records of that accident, that there was no coma within the medical records?

A.    Who was confronted with them?

Q.    I was asking you if you were aware that when Dr. --

THE COURT:  Actually, apparently the medical records did not reflect he had a coma.

THE WITNESS:  Correct.

THE COURT:  Okay.

THE WITNESS:  Or well, what the medical records reflect is that when he was admitted to the hospital, that he

was alert.  That's what they described in -- it wasn't the EMT.  I think it was the admission note.  For all we know, I suspect not, but for all we know, he certainly could have had a loss of consciousness at the scene and recovered.  That happens quite often.  But in any event, unless it took a long time to transport, which I doubt, he didn't have a loss of consciousness lasting more than, I guess an hour.  And probably didn't have that.

THE COURT:  Well, he didn't have a two-month coma?

THE WITNESS:  No, he did not.

THE COURT:  Okay.

THE WITNESS:  Absolutely not.  In fact, he probably didn't have a coma at all.  That normally would be reported.

BY MR. ROBERTS:

Q.    Doctor, now, I want to go back for a minute to your discussion about the conclusions about Alfred Bourgeois' possible brain -- would you call it damage, brain damage, or just impairment?

A.    I talked about dysfunction or impairment.

Q.    And you say that it was in the frontal lobe?

A.    The tests that show the most consistent pattern of suppression or poor performance are things that are typically attributed to frontal lobe, or largely to frontal lobe functioning.

Q.    So you use the word "attributed."  So is it correct in

layman's terms to say you observe somebody performing a certain way, whether it's in daily activities or taking these tests that you generate, and if they perform a certain way or act a certain way, you then attribute that to some form of brain injury or brain impairment?

A.    Well, you've mixed the metaphors.  When, for example, if you see someone who is having word salad, who is expressing themselves and the words are coming out in a strange way, there's paraphasic errors, paraphasic distortions, you can't understand what they're saying and they're mixing up their words, and you come up with a hypothesis.

It could be a form of schizophrenia.  That would explain that.  That's what you see in some people with schizophrenia. It could be a Wernicke-Korsakoff psychosis, which is an alcohol related problem.  It could be a Wernicke's aphasia, which is a post-central result typically of a stroke.

And then you go ahead and say there is a pattern of dysfunction or deficits, the behavioral presentation, and you try to figure out why that is occurring.  And that's what I do for a living.  I get asked by doctors, you know, what are the problems and what are those correlated with and what do we do about them.

If you have someone who's having trouble getting their words out, now it's again possibly an aphasic disorder, it could be a major depression.  You go through the differential,

and you do testing. This is how diagnosis works.

So that's all we actually did with Mr. Bourgeois is, you know, they ask a question, "Is there something wrong?" We go about testing to see, front to back, side to side, top to bottom, basic abilities --

THE COURT: So you assume something's wrong before you --

THE WITNESS: No. Oh, no.

THE COURT: Okay.

THE WITNESS: The question is, is there something wrong?

THE COURT: Oh, okay. Thank you.

THE WITNESS: And the first part of the decision tree is, did the --

BY MR. ROBERTS:

Q. But you do reach a conclusion?

A. Pardon me?

Q. You do reach a conclusion, based on what you believe is happening inside the brain?

A. No, based on the data, not based on what you assume is happening inside the brain. You keep turning it around.

Q. Well, you know that --

THE COURT: Yeah, but I got it, and I'm the fact finder.

THE WITNESS: But he keeps asking the questions.

THE COURT:  It doesn't matter.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q.    You are aware that Dr. Estrada has written a report where he has found that Alfred Bourgeois suffers from borderline personality disorder.  Correct?

A.    I think I saw that, yes.

THE COURT:  I think he said the same thing actually.  Didn't you say that?

THE WITNESS:  That -- I brought up that borderline -- you were talking about antisocial --

THE COURT:  Right.

THE WITNESS:  -- or sociopathy, and I said borderline is probably more central and first to consider before --

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. ROBERTS:

Q.    And you described this frontal lobe impairment as causing someone to not be able to stop their behavior or hard to put the brakes on, to use your words.

A.    I said frontal lobe impairment can give rise to problems, and I said, you know, using the kind of crass terms, the gas pedal or the brake pedal of behavior, that initiation as well as inhibition is largely rooted in frontal lobe functioning.  And when people have impairments in frontal lobe function,

oftentimes it shows up as difficulty initiating or inhibiting behaviors.

I also said that the people who have trouble initiating, the couch potatoes, tend not to come into court, because they're sitting at home on the couch.  The people who have trouble inhibiting or who are slow to inhibit, who have disinhibition syndromes or frontal lobe syndromes, seem to be over-represented in court.  And that's what the research shows, too.

Q.    And, but that same, the same conduct, where they're, maybe they're in a frustrated situation and they can't stop themselves and they move into a violent conduct, that can also be explained by a borderline personality disorder, could it not?

A.    I think I gave that example, too.  I put up two fingers saying you can have similar behaviors coming from very different quadrants, and that the personality of the person, as well as the cognition interact, and that in fact one can exacerbate the other.

It's like the gyroscope winding out of control.  When you have cognitive difficulties, it's harder to deal with personality issues.  If you have personality issues, it's harder to deal with cognitive dysfunction.

I brought in there, too, I think it's important the support of family can keep these people out of harm's way.  In

fact, when we see people in court, more often than not, it's the confluence of not having enough help from the family, having a cognitive problem, having some personality issues, and then possibly drugs and alcohol.  And that's the common person who ends up in the courtroom.

Q.   Are you -- have you often been hired by defense to come in and evaluate a Defendant before they go into trial?

A.   Often?  Not in my --

Q.   I'm sorry, maybe that's a bad word.  Have you been hired by a defense team to come in and evaluate a particular person accused of a crime before a trial occurs?

A.   I've been asked at the time of original trial to come in and evaluate someone and say, you know, essentially, are there cognitive deficits, and if there are, what are they, and how do they impact the person's behavior?  That's happened, yes.

Q.   And when you give an opinion to the defense attorney, do you expect the defense attorney to rely upon your opinion?

A.   I don't know that I would expect them to rely on it.  I do hope that they listen to it and allow me to educate them and ask enough questions so that they know what they have, from a psychological or neuropsychological perspective, and I expect that they make decisions.  I mean frankly, a third to half the cases I do evaluations, the attorneys say that's not going to help us, and we're not interested, or we're not going to use that information.  That's not uncommon at all.

Q.   If it doesn't help them, they're not going to use it?

A.   If it doesn't contribute the way they say it, to their legal defense, then they say, "Thank you," and that's the end of our association.

Q.   And you are -- did you get a chance, you said that you reviewed a lot of the evidence and information in this case. Is that right?  You reviewed a lot of documents and a lot of transcripts from this case?

A.   I certainly didn't say the evidence, or I forget the other word you just used.  I'm sorry.  I did read -- well, you've got the list.  It was presented first off.

Q.   Well, the list that you, that's been provided to us of what you actually reviewed includes day one through four of the trial testimony.  Did you read all that?

A.   I skimmed through that.

Q.   And it's the penalty phase, and it includes March 24th --

          THE COURT:  I'm sorry.  Did you read all that or skimmed?

          THE WITNESS:  Skimmed it.  I skimmed it.

          THE COURT:  Okay.

BY MR. ROBERTS:

Q.   Did you read -- how many of Alfred Bourgeois' letters that he wrote that were very lengthy, how many of those did you read?

A.   More than I want to think about.  I probably read five or

six of them, and I skimmed most of the other ones.

Q.    Can you give us the context of one of those letters?

A.    There was one where he was telling his wife all the things he had done for her and all the things he had paid for and that things were going to change when he was back on the scene. That would be an example.

Q.    Well, that sounds kind of like a nice letter.  Did it end that way?

A.    I wouldn't characterize it like that.

Q.    Did the letter end that way, where it was going to be all nice and everything's fine when he gets back?

A.    I don't recall it ending with everything's going to be all nice when he gets back.  It was more --

Q.    Do you remember about how many pages that letter might have been?

A.    I don't recall offhand.

Q.    Do you remember how it was written?  Was it written, you know, very clearly and within the lines?  Or was it written all over the place or, can you give us some idea?

A.    I don't know what "all over the place" means.

Q.    Well, I'm just trying -- you tell me.  What did the letter look like?

A.    It looked like a letter, I would say, if I had to characterize the style, it was more of a bullet point or a listing of different --

THE COURT:  That was before she testified?

THE WITNESS:  I'm sorry, I don't recall the time frame on it.

THE COURT:  Well, it makes a difference, huge difference actually.

THE WITNESS:  I just remember it being --

THE COURT:  Okay.

THE WITNESS:  -- an upset letter.  He wanted things different.  He was unhappy -- the summary statement I made is that he was unhappy with the way the relationship had gone and he wanted to straighten things out and do things differently.

BY MR. ROBERTS:

Q.    There's a report that, it says in here that you reviewed, mental health report.  It says you reviewed, from a, it says Neurological Evaluation by Frank Bonikowski.  Who is that, and what was that document?

THE COURT:  Do you have all of these documents?

MR. ROBERTS:  We don't have this one, Your Honor. We're kind of interested in what this might be.

THE COURT:  Okay.

MR. WISEMAN:  It's Petitioner's 113 that was premarked.  You should have it, Mr. Roberts.

THE COURT:  Can you show it to him?  Have you got it?

THE WITNESS:  I think you still have my book that has that.

MR. WISEMAN:  Oh, we took your book from you?

THE WITNESS:  Well, you pulled out the page that had the school record.  I don't think you brought --

THE COURT:  Right, the school record, and didn't give it back.

THE WITNESS:  It's Tab 56, I believe.

(PAUSE.)

THE COURT:  Can I see it, too?  Is that it?

MR. WISEMAN:  Sure.

(PAUSE.)

MS. BOOTH:  Your Honor, while we're waiting, is it all right if I tender to the Court the exhibits that we offered?

THE COURT:  Right.  If you would give them to, just lay them in front of Ms. Scotch.

MR. ROBERTS:  Your Honor, would you like me to wait till you finish?

(PAUSE.)

THE COURT:  Thank you.  Did he ever have the MRI?  Do you know?

MS. LARIN:  Not that we are aware of.  We don't know the answer to that.

THE COURT:  When was the trial?

MR. ROBERTS:  2004, Your Honor.

THE COURT:  So this was after -- this was before the

trial that Bonikowski saw him?

MR. ROBERTS:  Apparently, Your Honor.

MR. WISEMAN:  Your Honor, the history which will hopefully come out through a variety of witnesses is that Dr. Cunningham recommended neurological testing, including neuropsych testing.  Subsequent to that, Dr. Weiner was retained to do the testing, and Dr. Bonikowski also did his neurological evaluation.

THE COURT:  Okay.

MR. WISEMAN:  That's the history.

MR. ROBERTS:  And that was --

THE COURT:  I think I must have signed authorizations for all these things.

MR. WISEMAN:  Oh, I'm sure you did.

THE COURT:  They were probably under seal or something.

MR. WISEMAN:  Yeah, yeah.  And that was done in mid to late February just before trial.

THE COURT:  Right.  Okay.

MR. ROBERTS:  Ready, Your Honor?

THE COURT:  Go ahead.  Thank you.

BY MR. ROBERTS:

Q.   So I was just curious, does that report add or take away anything from your opinion, the report you just read?

A.   It has import in that he underwent what appears to be a

fairly standard neurological examination with EEG.  The EEG

normal awake and asleep was the interpretation, which is a

fairly common or typical suggestion for an MRI and

neuropsychological testing.

So I would suggest or I would say that in a typical

clinical setting, this is a reasonable thing to do.  I think in

a forensic setting or where there's this much on the table,

it's a start.  It's consistent with what I see frequently in

patients who have cognitive dysfunction, but no gross physical

problems or severe impairments.  This is common in what you see

with people who have mild or even mild/moderate impairments.

Q.   So all of this analysis, all of these testings, these

neurological evaluations and everything, it all goes to try to

explain someone's behavior.  Is that right?  I know it goes to

understand how the brain's functioning, but in the context of

the criminal aspect, if someone is coming, approaching you and

saying, "I want you to evaluate this Defendant," they're trying

to understand how someone might have, why they might have done

something.  Is that right?

A.   You keep vacillating between two words, and there's --

they sound like a subtle difference, but to me it's important.

Understand versus explain.  I don't know that you can explain

the behavior, but you can certainly understand that a brain

such as Mr. Bourgeois' that has certain limitations and

impairments is imminently more likely to do things that are

strange, bizarre or out of the norm.

A normal functioning brain, understandably, gives rise to normal behavior.  People who have impairments, and especially if there's other collateral problems or things that exacerbate their cognitive limitations, or their cognitive limitations are exacerbating other emotional or personality disorder issues, they are much more likely to demonstrate odd behaviors.

Some of it never comes to the light of the Court because it's just strange eccentricities and they live their little lives and they may be withdrawn.  They're out there.  There's other people who, because of frontal lobe disinhibition syndromes or rages or whatever, end up in the court system.

What I'm saying is that testing shows abnormalities, that the abnormalities appear to be valid.  But this is not because he's trying to do this.  There's just too much that argues that this is a valid and accurate assessment.  And that people who have this pattern of abnormalities are more likely to be found to behave in ways that are not adaptive, not helpful, not appropriate.

Q.   Are you aware of what he was accused of actually doing?

A.   Yes.  Convicted of it in fact, right?

Q.   Well, yeah.  But at the time before, as we were going towards the trial, I'm just curious if you were aware of the severity of the injuries to the baby.

A.   I, you know, forgive me, but I'd say it's pretty horrible.

Q.   Okay.  Are you also aware that throughout the trial, and even at the end, to the jury, that he continued to profess his innocence, that he said he never committed any of those injuries to the child?

A.   I don't know that that's been consistent, but I've seen that in different places, and I think even subsequent to conviction, he's contended that he wouldn't do such a thing.

Q.   I mentioned a moment ago the transcripts, and you said you skimmed them.  There's one in particular I'd like to know if you had a chance to read, and that's from March 24, where the Defendant, Alfred Bourgeois, actually asked to approach the bench and spoke to the Judge about how he believed his case should have been presented and how he wanted to make a statement to the jury.  And then he ultimately did make a statement to the jury.  Did you get a chance to review how he related to the Court and how he related to the jury?

A.   I skimmed it, and I don't have great recollection.  I'm sorry.

Q.   Do you think that -- I mean, that's a pretty stressful environment, is it not?  You're about to go before a jury and know that someone's going to ask to take your life?

A.   I think it would be for most people.  It probably was for him.

Q.   How he reacted in that situation and his cognitive process through that, don't you think that would have been important to

look at in analyzing whether he's functioning properly?

A.    With all due respect, I missed that class in school.  I never had the class where, when someone's approaching the Judge, how they should or shouldn't, how to assess that.  I just took the ones that had to do with the tests that we use in everyday practice.

I can have my own opinion as to how that affects a person, but when I'm basing an assessment of their intellect, I'm going to use my intellectual tests.

Q.    So you would prefer to use an IQ test over how somebody is --

THE COURT:  How they actually function --

MR. ROBERTS:  Function.

THE COURT:  -- is what he's saying.  Because the Fifth Circuit says you have to look at both.

THE WITNESS:  Well, if I'm asked to assess their IQ level, I'm going to use the IQ test.  And I will take into account collateral behavior, their presentation, which I think the courtroom behavior would be part of that, as well as history.

BY MR. ROBERTS:

Q.    When you gave these tests -- I have Petitioner Exhibit 16 here.  Again, this is your test.  Was there some reason you didn't give him the full test, some reason you didn't require him to answer all of the portions of this test?

A.    Sure.

Q.    There was?

A.    Sure.

Q.    So there was some stuff you just didn't, you didn't think was necessary for him to respond to on this test?

A.    The nature of testing, at least again, the way I was taught, is that every test is designed to answer a question. So --

Q.    I thought it was a standardized test.

A.    It is a standardized test.

Q.    And you've got like, on Page 10, you've got a logical memory test, recognition, that there was no answer at all.  So you didn't think that was pertinent to his, to the evaluation of his IQ?

A.    You're looking at the Wechsler Memory Scale, which doesn't measure IQ.

Q.    Good point.  Not the IQ --

A.    The 11 subtests that are utilized to assess the IQ were all administered.

Q.    And there are some pages that are left blank.  So did you --

A.    Again, are you looking at the Wechsler Memory Scale or the Wechsler Adult Intelligence Scale, Third Edition?

Q.    Well, I'm showing you what's marked as Petitioner Exhibit 16.

A.    And if you look at the top, it says, "Wechsler Memory Scale."

Q.    Wechsler Memory Scale.  And within this document, is Page 10.

A.    That's recognition, logical memory.  I chose not to give that.  That's correct.  That's not part of the IQ test.  It's part of the memory scale.

Q.    Okay.

A.    And --

Q.    You chose not to give that?

A.    That's right.  There's several more parts --

Q.    You also chose not to give this test?

A.    The second part of faces, the long-term recall, that's correct.

Q.    Okay.  No answers on this page either.

A.    That's right.  The second administration of family pictures.  Number one was given.  Number two was not.

Q.    Okay.  So just so I understand correctly, when there are portions of tests that you, as you're testing an individual, you decide that you're just not going to give to that individual?

A.    And there are at least 100 more neuropsychological tests I didn't give either.  Of course.

Q.    Okay.  You mentioned the Flynn Effect briefly.  You didn't really go into it that much, and I'm not going to go into it

much either.  But the Flynn Effect has been used to adjust an IQ score.  Is that an accurate statement?

A.   I wouldn't use the word "adjust."  You might, but I would choose not to.

Q.   Okay.  The -- is it accurate to say the Flynn Effect is generally applied to lower a score?

A.   The Flynn Effect doesn't lower a score, no.  That's not an accurate statement either.

Q.   That's not accurate either.  Okay.  Have you ever used the Flynn Effect on a patient that was not in the courtroom?

A.   I don't think you use the Flynn Effect.  The Flynn Effect is something that has been shown through research to occur and exist.  And it's something that when you understand conceptually as well as practically that it exists and that it occurs, it's something to take into consideration as you interpret data.

Q.   What is the word you would use in applying the Flynn Effect?  Do you have a word?  How can I get -- what word can I use to discuss the Flynn Effect's application with you?

A.   I think you have to pick your own words.  If you want to ask me a question I can, you know, answer, I would be happy to do that.

Q.   Well --

A.   But you might have to not be fishing for an answer.  You might just have to ask me why does it matter or what is the

matter.  Maybe that's the way to do it.

Q.    My question is, is the Flynn Effect applied, used, in any form or fashion, with a patient in a clinical setting, as opposed to in a courtroom?

A.    Well, I don't think it's applied in a courtroom.  The Flynn Effect exists.  It's like gravity.  I'm not applying gravity, but it exists.

Q.    The Flynn Effect exists for the courtroom.  Is that correct?

A.    I don't understand what you're asking.

Q.    Do you use the Flynn Effect in assessing an IQ for any patient that is not involved in a criminal case?

A.    Let me see if I can help you.  The Flynn Effect exists.  And if I have a patient in my office that I have to assess, and all I have is, for example, the WAIS-R, and I need to assess intellect, and I get one chance to do it, I may choose to use the WAIS-R, with the understanding that it's an outdated test.  And it's not malpractice, but it is using a test that doesn't apply specifically.

So it has to be recognized that it's an outdated test, and that the Flynn Effect exists.  So when I get an IQ of 110, I can say, if I had the proper test, an up-to-date test, this patient would probably test out with an IQ of about 100.  So that can happen.

In my office, frankly I don't think we have a WAIS-R on

the shelf any more.  I've got the manual, so I can go back and look at old stuff, but we don't have the test equipment.

Q.    So have you ever applied the Flynn Effect to reduce an IQ for a patient?

A.    I haven't applied it, and I don't reduce IQs.

Q.    Is it true that -- and I think you mentioned this on your direct examination, it was a while ago, but that there are people that present well?  The way that they act and they're adapting to the environment, if someone were to look at them, they would never think that that person was mentally retarded, because of the way they present themselves?

A.    I don't think it applies just to mental retardation.  I see it commonly --

Q.    But that's my question.  My question is with regard to mental retardation, and the question is whether or not it's, the way people present themselves, often in the adaptive nature of how they are dealing with their circumstances.

A.    The adaptive nature?  I think what you can say is that -- first off, you have to recognize that ten people with mental retardation with similar IQ scores are not all going to look exactly the same.

Q.    But some people present so well that there's no -- that someone even of your background, education, experience would look at them and say they're not mentally retarded.  But I know you wouldn't, because you're going to go through all the

testing, but I'm talking about someone of average walk of life.

A.    I think the lay population -- and again, it's my belief, and from I see out around me and what I see in court for that matter, is that people tend to look at folks and make judgments or make decisions.  I've been heard to say that for the most part only dermatologists should be diagnosing based on how a person looks.

That's not entirely true.  For example, Down Syndrome is something that you can have a pretty good accuracy.  You can be pretty accurate in appreciating someone with Down Syndrome, based on their faces, the way they do look.

But mental retardation, if you listen to people who lecture on it, the classic example is they'll show a picture of ten people and say, "Which ones of them are mentally retarded?" and people will say, "Well, that one looks mentally retarded, and that one does.  These people look normal."  Well, in fact, the picture can be all people with mental retardation or all people who are normal.  You can't tell mental retardation based on an appearance or presentation.

Behavior gives you some insight, but typically, it's only if the behavior is really suppressed.  You know, the article you gave me, it talks about just that, that the mildly retarded individuals are most often out in the community working and participating.  But that's -- most people don't understand what mental retardation is.

Q.    The other side of that's true, too, is it not, that there are people that just test poorly, that just, even in taking tests, they get under stress and they just don't test well.

A.    If you test poorly, like you have an IQ of 50, we call that mental retardation.

Q.    So you're just, again, you're just going on the IQ test.

A.    Well, if you have adaptive living skills and there are two or more areas in the impaired range, too, I mean, that's the classification.  The diagnosis is pretty cut and dried.  You read it, you apply it.

Q.    In fact, the DSM-IV speaks to this and says that the measurement of adaptive skills is seen as a check against the over-reliance of IQ scores in a diagnostic -- in the diagnosis of mental retardation.  Does that sound right?

A.    That's right.  I mean, there's been an evolution.  What was it, 35, 40 years ago, you could have an IQ of 85 and be diagnosed with mental retardation.  Conceptually, mental retardation now is seen as something that occurs in the bottom one or two percent of the population, and mild retardation is much more prevalent than moderate, which is more prevalent than severe or profound.  It has to do with people who don't fit into normal society.

     They can go out and be in normal society if they have supports.  And that's kind of the focus of the mental retardation community is to help people adapt.  We talk about

adaptation and providing support so that these people can fit in as best as possible into a normal community.

Q.    Let me ask one more question.  On your report you mentioned that you did not formally assess Alfred Bourgeois' adaptive functioning.  And earlier you said that you weren't even asked to make an assessment of mental retardation.  Those are both accurate statements?

A.    Yes.

Q.    Okay.  So you're not here today to tell us that he's mentally retarded.  You're here today to address his IQ.

A.    I did not perform sufficient evaluation.  I looked at his IQ and measured that, so I can say that based on his IQ score, he qualifies for diagnosis of mental retardation, if he has limitations in the adaptive living skills, and if the onset was before the age of 18.

Q.    Do you think it would be worthwhile to give him a WAIS-IV at this point in time?

A.    As I said before, testing is to answer questions.  If there's a question that can be raised that's relevant that a WAIS-IV would be the answer, then sure.  But if there's not a question that would be addressed by the WAIS-IV, then it's just an academic exercise.

        MR. ROBERTS:  May I have just a moment, Your Honor?

        THE COURT:  Yes, sir.

    (Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, we have no further questions at this time.

THE COURT:  Let me see you up here again.  I forgot to ask a question of you about another deal.

(Discussion off the record.)

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Just a few questions on redirect, Dr. Gelbort.  The Bonikowski report, which is Petitioner's 113, remarked, says at the end that, quote, Further, the patient's neuropsychological study should tell whether there are underlying or predisposing factors that would also explain some of his behavior, especially with regards to prior history of abuse by a parent, closed quote.

From your review of Dr. Weiner's report, do you think Dr. Weiner's testing answered those questions or attempted to answer them?

A.   Answered?  No.  Attempted to, probably in some fashion, but I don't think it was -- it was lacking.

Q.   The report itself was lacking?

A.   The report and the interpretation.  There was more that could have been done with that data, if proper questions had been presented and follow-up had occurred.

Q.   Okay.  If instead of calling Dr. Weiner they had called you, and you did the testing in 2004 that you did in 2007, did

your testing answer the question posed by Dr. Bonikowski?

A.    Oh, I think my testing did, but I don't think it's just a question of me versus Dr. Weiner.  I think other neuropsychologists could have done a better job of interpreting what was there.

Q.    Okay.  Just to be clear, you gave the entire WAIS-III.

A.    No, I didn't give the entire WAIS-III.  There are --

Q.    Oh, that's --

A.    There are extra subtests which do not contribute and are not counted and are not used to calculate the IQ.  There are intended to be six specific subtests from the verbal side and five from the performance side that are used to calculate an IQ.  If you spoil a subtest or don't have equipment, you can use one of the other three, in place of.  And then you still have enough subtests to compute a full IQ.  You can, with less accuracy, extrapolate it.  If you want to give five and four, rather than six and five.  But what was given to Mr. Bourgeois are the six verbal subtests and the five performance that are meant to be used to calculate a full scale and performance and verbal IQ.

Q.    And the test that Mr. Roberts was showing you up on the screen relating to the Wechsler Memory Scale, why is it that you didn't give those particular subtests?

A.    There subtests that provide data that's not very useful or informative.  I mean, as I think I've alluded to,

there are -- when you go to look in the big book of the listing of all the even commonly given psychological or the neuropsychological tests, you know, there are well over a hundred.  Part of the testing process is to construct a battery to answer the question that you're asked.  And just because there may be 15 subtests in the Wechsler Memory Scale doesn't mean all 15 are useful in answering the question.

If you're going to answer the question, "What's his IQ," you need to give those 11 subtests, or you need to try.  The memory scale, I know very few neuropsychologists who ever give the whole thing, in its entirety.  It just provides information that is either irrelevant or not useful.

Q.   Regarding this article about 40 percent of people malingering on neuropsychological testing of some sort, would it be accurate that in your experience and your knowledge of the field that there's not a rate of 40 percent malingering on neuropsychological testing?

A.   I would say that that -- it says 41 percent.  I would say that that's absolutely the truth.

Q.   That what is the truth?

A.   That there's not 41 percent malingering on neuropsychological examinations.

Q.   And would you have a livelihood to go to if almost half the people you tested were malingering?

A.   I might have a different livelihood, but neuropsychology

would be very different than it is today if this was accurate in the clinical population, and even I think in the forensic population. I mean, you have to read the whole article to understand it in context. So, I mean, you can grab that sentence, but I think there's a whole lot more going on than just that one sentence.

Q. And finally, Mr. Roberts was asking you to, whether the impairments explain the offense, that Mr. Bourgeois' impairments explain the offense, and you felt that wasn't quite accurate. In your experience as a forensic neuropsychologist in capital cases, pretrial, who typically makes that ultimate decision about whether the impairments explain the offense in a penalty phase?

A. I don't know -- I'm not sure how to answer that. I think it's the jury and the Judge who get to decide those issues. The neuropsychologist is simply, I believe, helping people understand who they're looking at in terms of their neurocognitive functioning. Rather than relying on, he looks this way, it's like we can do better than that. We can say this is how he tests out on standardized tests that have been shown to indicate in this case intellectual level or frontal lobe functioning or whatever other abilities we're actually able to measure.

Q. And I guess it's obvious, but if that information isn't presented to the jury, they can't make that decision, can they?

A.    Well, I think they're stuck making the decision based on how the patient looks to them, in their eyes, and what they know.

You know, when I lecture, I oftentimes talk about the guy looking for something underneath the street lamp on a dark night, and the second guy comes up and helps and they don't find it.  And the second guy says, "What did you lose?"  And he says, "I lost my glasses."  And, "Are you sure you lost them here?"  He says, "No, I lost them over there.  But it's dark over there.  I can't see.  I'm looking here."

People tend to make decisions based on what they know.  I don't know too many folks who see like my patient who's talking gibberish and say, "Well, I think they're crazy," but of course there's probably ten other diagnoses that I'm not aware of that can cause you to talk gibberish.  Most people don't go outside of the box there.

So most people look at someone, and we're all -- everybody starts as an amateur psychologist and says I think he's this or I think he's that, and very few people say, "And I bet there's a whole bunch of other things he could be that I just don't know about."  So that's why you bring in -- you know, when you go to your doctor, that's what you're doing.  "I think it's this, but I should probably go see my doctor, because they're the ones with tests."

MR. WISEMAN:  Okay.  Thank you.

MR. ROBERTS:  We don't have anything further either, Your Honor.

THE COURT:  All right.  Anything else?

MR. WISEMAN:  Not from Mr. Bourgeois.

THE COURT:  Thank you, sir.  You may stand down.  So this hearing is concluded.  We'll go off the record, and would you hang up the phone.

(Proceedings concluded at 6:28 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    September 16, 2010
Molly Carter                        Date

INDEX

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL M. GELBORT | 10 | 94 | 143 | |

EXHIBITS:                                                ADMITTED

P-15:  5/11/07 DECLARATION OF DR. GELBORT . . . . . . .    84

P-16:  WECHSLER MEMORY SCALE, THIRD EDITION . . . . . .    84

P-17:  CURRICULUM VITAE OF DR. MICHAEL M. GELBORT . . .    84

P-31:  DR. WEINER'S 2004 TESTING OF DEFENDANT . . . . .    84

P-86:  RECORD FROM LUTCHER HIGH SCHOOL  . . . . . . . .    84

P-132:  LIST OF MATERIALS PROVIDED TO DR. GELBORT . . .    84

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,        )      CRIMINAL ACTION
                                 )
            PLAINTIFF,           )      CR-C-02-216(1)
                                 )
VS.                              )      CORPUS CHRISTI, TEXAS
                                 )      SEPTEMBER 20, 2010
ALFRED BOURGEOIS,                )      8:23 A.M.
                                 )
            DEFENDANT.           )
..............................)

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 1
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:                  MR. TONY ROBERTS
                                 MS. ELSA SALINAS
                                 MS. PATTI HUBERT BOOTH
                                 MR. MARK DOWD
                                 ASSISTANT U.S. ATTORNEYS
                                 800 N. SHORELINE, STE 500
                                 CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:                   MR. MICHAEL WISEMAN
                                 MR. VICTOR J. ABREU
                                 MS. ELIZABETH LARIN
                                 MR. JAMES McHUGH
                                 ASSISTANT FEDERAL DEFENDERS
                                 SUITE 545 WEST, CURTIS BUILDING
                                 601 WALNUT STREET
                                 PHILADELPHIA, PENNSYLVANIA 19106

THE COURT RECORDER:              MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

(The proceedings began at 8:23 a.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MR. ABREU:  Good morning, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

Mr. McHugh:  Good morning, Your Honor.  Jim McHugh on behalf of Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts on behalf of the United States, Your Honor.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. DOWD:  Mark Dowd, Your Honor, on behalf of the United States.

THE COURT:  Your expert is back?

MR. ROBERTS:  Yes, Your Honor, we have Dr. Moore at the table.  And I do have one request.  He has a, some information on his laptop and he's got it all silenced and everything but it would be all right for him to keep his laptop on the table?

THE COURT:  Absolutely.

MR. DOWD:  Thank you.

THE COURT:  Everybody can use their laptops here.

MR. ROBERTS:  Thank you.

THE COURT:  As long as they don't make noise.  And the late Mr. Wiseman.

MR. WISEMAN:  Morning, Your Honor, I apologize.

THE COURT:  I started early.  No, I started early. Now, I watched 14 hours of the video over the weekend.  Let me tell you what the, a technical problem is that you labeled Dr. Price 1 and 2 and it turned out to be Moore 1 and 2, so I had two sets of Moore's Exhibits 1 and 2, which cut my viewing time down to 14 hours, so what I need is Dr. Price's 1 and 2.  And then I want to know if I can also watch Dr. Estrada's video on my own, like a night this week.

MR. WISEMAN:  I was going to ask Your Honor --

THE COURT:  And that gives you more courtroom time.

MR. WISEMAN:  Absolutely.

THE COURT:  Because I, that will be 16 hours of courtroom time that we have saved by me watching these videos, another probably two, two-and-a-half, for Dr. Estrada's testimony, and another three-and-a-half from having the expert on that Friday.

MR. WISEMAN:  Yes.

THE COURT:  So we are moving right along.

MR. WISEMAN:  Yes, absolutely, and I appreciate that, thank you.  Perfect, Your Honor.

THE COURT:  Are these exhibits that you offered or were they just for me?

MR. ROBERTS:  We offered them, Your Honor.

THE COURT:  Okay.  Well, they were admitted but just bear in mind that Price 1 and 2 is Moore 1 and 2.

MR. ROBERTS:  We will submit a corrected copy of that exhibit, Your Honor.  Apparently we have it right here, Your Honor.

MS. BOOTH:  We have the -- I would like to substitute --

THE COURT:  Are you sure?  Do you want me, do you want to -- never mind.  I will look at it over lunchtime and make sure, okay?

MR. WISEMAN:  Your Honor, I'm sorry, I was late and I didn't get a chance to introduce you to Mr. McHugh, who is our co-counsel.

THE COURT:  He introduced himself, thank you.

MR. WISEMAN:  He did?  Well, he's an aggressive sort, so I'm not surprised.

THE COURT:  Thank goodness.

MR. WISEMAN:  Okay.

THE COURT:  Ms. Scotch, would you hand this back to Ms. Booth?  That's labeled Price 1 and 2.  That turns out to be Moore 1 and 2, so I got two Moore 1 and 2s.  Good morning, Mr. Bourgeois.

THE DEFENDANT:  Good morning.

THE COURT:  That should say, it should say Price

Exhibits 1, disc 1 and 2, and instead it was Moore 1 and 2, so I had two sets of Moore 1 and 2.  Oh, the exhibits.  Thank you.  All right.  Would you-all like to begin?

MR. WISEMAN:  Yes, Your Honor.  We call Dr. Victoria Swanson.

DR. VICTORIA SWANSON, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE COURT:  Could you tell me how long your experts -- not -- I'm talking about the sentencing experts.

MR. WISEMAN:  Yes.

THE COURT:  The psychologists.  How much time they spent with Mr. Bourgeois?

MR. WISEMAN:  Oh, we will certainly find that out, yes.

THE COURT:  What about the gentleman from the other Friday?

MR. WISEMAN:  Dr. Gelbort?  I believe he testified that he spent between three and four hours.

THE COURT:  Thank you.

MR. ROBERTS:  Your Honor, if I may, before we start, I understand there is another defense witness in the courtroom at the moment and I don't --

THE COURT:  Who do you have?

MR. WISEMAN:  Yes, Dr. Toomer is sitting in the courtroom.  I believe, Your Honor, when we had our April

meeting here you indicated that it would move things along to have experts listening to experts, as they often do.

MR. ROBERTS:  Your Honor, I don't have a problem with their experts listening to our experts testify so that they can respond to them, but I do have a problem with theirs --

THE COURT:  They don't need to be listening to their own experts.

MR. ROBERTS:  To their own experts, yes, Your Honor.

MR. WISEMAN:  Oh, I --

MR. ROBERTS:  I'd move to invoke the rule.

MR. WISEMAN:  I had thought what the Court intended at that time was, for example, Dr. Swanson is going to be talking about mental retardation and Dr. Toomer could also be talking about it at length.  If he listens --

THE COURT:  Talking about what?

MR. WISEMAN:  Mental retardation.  If he listens to Dr. Swanson then we can avoid going through a lot of the same material and move things along.  That's all it's about.

THE COURT:  No.  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  I mean I want to hear their independent --

MR. WISEMAN:  Sure.

THE COURT:  -- testimony.

MR. WISEMAN:  May I proceed?

THE COURT:  Oh, please don't -- be careful of the microphones, please.  Yes, sir, proceed.

MR. WISEMAN:  Thank you.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good morning, Dr. Swanson.  What's your occupation?

A   I'm a licensed psychologist in the state of Louisiana.

Q   And I'm going to put up what has been marked as Petitioner's 36 and ask if you recognize that?

A   Yes.  This is my, this is my curriculum vitae.

Q   Okay.  And it's accurate and up-to-date?

A   Yes.  Yes, that's accurate as of about the end of July.

Q   Okay.  And could you briefly let the Court know what your educational background is and your occupational background?

THE COURT:  Oh, if, you know, why don't you just offer that for admission and then I can read it and you can move on.

MR. WISEMAN:  Oh, okay, very well.  I will offer the CV, Petitioner's 36.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor, and we will --

THE COURT:  Petitioner's 36 is admitted.

      (Defendant's Exhibit P36 admitted into evidence)

MR. ROBERTS:  No objection, and we will stipulate to her expertise and --

THE COURT:   Well, but if he wants it to be --

MR. ROBERTS:  Sure.

THE COURT:  Let me look at it, okay?

MR. ROBERTS:  Okay.

THE COURT:  And if you want to point out particular things like treatises that she has written, that sort of thing, that's fine.

MR. WISEMAN:  That's what I was hoping to do.

THE COURT:  Please.  And I don't want to shorten your testimony.

MR. WISEMAN:  No, I --

THE COURT:  It's just that if I read it, then I will know where she went to school.

MR. WISEMAN:  I appreciate it.

BY MR. WISEMAN:

Q   Dr. Swanson, just tell us briefly where you went to school and what you did immediately after undergraduate school.

THE COURT:  Okay, I don't need to know about the school, I'm reading it.

MR. WISEMAN:  Okay.

THE COURT:  The point is, if you want to tell me about her area of expertise and --

BY MR. WISEMAN:

Q   What is your area of expertise, Dr. Swanson?

        THE COURT:  Thank you.

        THE WITNESS:  My area of expertise is in the field of mental retardation, working with people with developmental disabilities such as autism, mental retardation and learning disorders.

BY MR. WISEMAN:

Q   And for how long have you done that?

A   I've done that for approximately 35 years at a bachelor's, master's and then a doctoral level.

Q   Okay.  And where did you receive your doctorate?

A   I received my doctorate in 1999 from LSU in Baton Rouge, Louisiana.

Q   And prior to receipt of your doctorate, in what capacity were you working with people with developmental disabilities?

A   Prior to receiving my doctorate, for about 10, 14 years I was the senior master's level associate at a large developmental center for people with master's, with mental retardation, and I worked under a licensed psychologist in that capacity.

Q   And in that capacity did you have occasion to administer standardized testing for measurement of adaptive deficits?

A   Yes, I did.  I did it not only in that capacity but prior to that in Louisiana you could do it at a bachelor's level,

so I did it at a bachelor's level as well.

Q    And approximately how many such tests for adaptive deficits have you administered in your career?

A    I would say in my career it's in the area of 10,000.

Q    And similarly with respect to testing, standardized testing of intelligence, did you have occasion to administer IQ tests?

A    Yes, I have.

Q    And approximately how many have you administered in your career?

A    I would say in the thousands.

Q    And what's your current -- well, withdraw it.  Did there come a time when you left your employment with the state?

A    Yes, there was.

Q    And when was that?

A    In 2003.

Q    And what did you do after that?

A    After that I worked solely as a private practitioner.  I also did that part-time while I was working for the state, but I moved into full practice in 2003 when I retired from the state.

Q    Okay.  And what, for what types of organizations or entities do you currently do consulting work?

A    I work for several agencies.  I work for the Office of Citizens with Developmental Disabilities, which is the

Louisiana Office of Mental Retardation.  I am on two regional offices and I do the testing and sit on their eligibility committees to determine, to review records and determine if people are eligible for services.  I work for a mental health center in, a regional mental health center, and do testing there as well.  I work for a charter school and I am in charge of pupil appraisal there and I provide the psychological services there, and then I do all the testing as needs to be done for the special education that's provided there.  I am the director of psychological services at three residential, private residential facilities.  They are on my vitae.  And I also provide the psychological services for several community home chains in Louisiana, and there is approximately 30, about 33 community homes that I go to monthly and provide the annual assessments and then the entry assessments for those homes.  And I also provide consultation for people with developmental disabilities living in apartments, supportive placements.

Q   Okay, thank you.  What age groups do you currently work with or have worked with in your past career?

A   I think right now the oldest person I work with is around 89, late 80s, and I usually start working with people, I usually see them, probably about a year would be the youngest.

Q   Okay.  And have you held any offices that the Court would

be interested in hearing about?

A    Primarily with the American Association of Mental Retardation that is now known as the American Association for Individuals with Developmental Disabilities.  I have been on the state board for a number of years.  I'm currently off the board, but I also held a national position as the president of the psychology division with the national board, and I went off the board I think around 2003, 2004.

Q    And most of what you have described is a clinical practice.  Do you also maintain a forensic practice?

A    I don't consider myself a forensic psychologist other than I sometimes come into court.  I have been doing work forensically only since Atkins, and that would be since 2003, and I only do it in relation to cases such as this, pre-Atkins hearings or post-Atkins hearings.  The only other time I ever go to court is if I have done a test for an agency and I've court-ordered, been, that agency has been court-ordered to do it.  I may have to go to court to explain the test to the judge.

Q    And approximately how many Atkins or how many Atkins hearings or cases have you testified in?

A    Off the top of my head, I would say about 15.

Q    And has that been for the defense or the prosecution?

A    All of those have been for the defense.

Q    Is there a particular reason why you have not worked for

the prosecution?

A    Nobody from the prosecution has ever asked me.

Q    If you were asked, would you do so?

A    Yes.

Q    In your capacity in working with the, for the State of Louisiana, did you have occasion to become familiar with the school districts around the state?

A    Yes.

Q    Do you have any expertise and experience in the area of applied behavioral analysis for people with developmental disabilities, mental retardation and autism?

A    Yes.  That's a specialty that I got at my doctoral level. I also belong to a nationally recognized association for that, and my dissertation was in the area of severe behavior disorders, and applied behavior analysis is the primary treatment that is used with people with developmental disabilities autism.

Q    Okay.  And have you ever been denied qualifications by any court?

A    No.

Q    And have you ever been retained by a defense lawyer and, for an Atkins setting and not found their client to be mentally retarded?

A    Yes.

        MR. WISEMAN:  All right.  Your Honor, at this time I

would offer Dr. Swanson as an expert in clinical and forensic diagnosis and treatment of people with mental retardation and in the area of --

THE COURT:  They have already stipulated to that, so move on.

MR. WISEMAN:  Oh, he stipulated?

THE COURT:  Yes.

MR. ROBERTS:  Your Honor, I stipulated --

THE COURT:  Before you started the whole thing.

MR. ROBERTS:  I didn't know he was going to go into forensics and I believe she just said she doesn't consider herself an expert in forensics.

THE COURT:  Okay.

MR. ROBERTS:  So I would object to that.

MR. WISEMAN:  All right, that's a fair point.

THE COURT:  Sustained.

MR. WISEMAN:  I will withdraw that.

BY MR. WISEMAN:

Q   All right.  Well, then we will move on with you as an expert, Doctor.  I would like to get some definitions established, if we could.  You mentioned the AAIDD.  Could you tell the Court what that is?

A   The AAID is, and most people are more familiar with it as the American Association for Mental Retardation, it is a collection of disciplines of people that work in the field of

mental retardation, psychiatrists, psychologists, doctors, nurses, social workers, occupational therapists, physical therapists, and the charge of this group is to be the cutting edge for the diagnosis and treatment with people with developmental disabilities, and it has been, it has been an organization for over a hundred years.  It has also been the chief organization chose, charged with defining mental retardation, and as such it puts forth a volume approximately every ten years, and it's now in its eleventh edition, where it defines the current research and criteria for the definition of mental retardation.

Q   Okay.  Is it the authoritative organization for the diagnosis and treatment of people with mental retardation?

A   Yes.

Q   And is its manual that you just described the authoritative source for the diagnosis of people with mental retardation?

A   In my opinion, yes, but I would like to, there is another one, which is the Diagnostic Statistics Manual, Fourth Edition, text revised in 2000, and that manual for the last two editions has based its definition on the AAMR definition, so they kind of go side-by-side, so there's two manuals with the DSM citing the AAMR definition.

Q   Okay.  And is there, just to be clear, the AAIDD is the same organization as the AAMR?

A    That's correct.

Q    And the name just changed recently?

A    That's correct.

Q    Okay.  Are you familiar with the Atkins case?  You have mentioned it?

A    Yes.

Q    Does Atkins refer to the AAMR as an authoritative source on these topics?

A    Yes.

Q    All right.  Where do we find the definitions for mental retardation that have guided your work?

A    The two definitions that I went by were the AAIDD Eleventh Edition.  It's often called the Green Book because they change the color by editions.  It just came out this year, in 2010.  The other one that I went by would have been the DS, that I just mentioned, was the DSM-IV TR that came out in 2000.

Q    Okay.  And how does the AAIDD define mental retardation?

A    The AAIDD latest edition, which is the Eleventh, is the, defines it as having concurrent deficits and intellectual and adaptive abilities, with adaptive ability deficits defined either as global adaptive deficits, usually associated with a global score, that's approximately two standard deviations below the mean, or significant deficits in one of three areas, conceptual, practical and social, and the third

criteria is the deficits or the onset should have been evident prior to the age of 18.

Q   And regarding that last criteria, is there any requirement that the onset be diagnosed before 18?

A   No.

Q   And compare that definition to the DSM-IV TR definition.

A   The DSM-IV TR definition is based on the Ninth Edition of the AMR Diagnostic Manual and at that time they -- it also requires concurrent deficits approximately two standard deviations below in intellectual, and then in adaptive it specifies ten areas and there should be deficits noted in at least two of those areas, and I will try to name as many of the ten off as I can --

Q   That's okay.

A   -- but it is communication, self-direction, social or interpersonal relationships, self-direction, health, home living, work, leisure, and I think maybe play and leisure, would be the ten areas.

Q   Okay.  And, under either of the definitions, does the field recognize that a person with mental retardation can have strengths in particular areas?

A   Yes.  Both of them would recognize strengths, specifically in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone

couldn't have a strength as well.

Q    And when you evaluate and when you evaluated Mr. Bourgeois in this case, did you encounter any strengths?

A    Yes, I did.

Q    And when one encounters strengths in a person that they are evaluating for mental retardation, is there a protocol for probing the particular strengths that you are seeing?

A    That's right.  Well, if you see a strength in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a unique opportunity as a child.  For example, if I was working with someone who did really good landscaping work, it might have been he worked with an uncle from a very early age and learned how to do yard work, how to do all these different things, learn things about fertilizer, et cetera, so that by the time he was in his 30s he could own his own landscaping business and do fairly well.  But there would be an explanation of what within the context of his own environment provided the supports for him to learn this despite the cognitive deficits that he had.

Q    And let's begin to apply these definitions and concepts to the work you did in this case.  Have you done a

Swearingen - Direct                 19

comprehensive assessment of Mr. Bourgeois to determine the presence or absence of mental retardation?

A   Yes, I have.

Q   And what did that evaluation consist of?

A   Well, there's two areas, like I said, intellectual and adaptive.  I didn't, intellectual assessments had already been done so I reviewed the intellectual assessments, and then I also considered the different strengths or deficits that I saw there when I was doing my assessment with him and talking to people who knew him growing up.  I looked at school records.  I looked at work records.

Q   Okay.  With regards to records, that's what I was hoping to discuss first.  Let me put up Petitioner's 136 and ask you if you recognize that document?

A   Yes.  I think this document includes the various reports, records that I looked at, medical records, school records, previous reports that had been done with him, testimony that I looked at.

Q   Okay.  And in addition to the materials contained on that exhibit, did you have occasion to watch the 14 hours of Government expert evaluation of Mr. Bourgeois?

A   Yes, I did.

Q   And did you review the Government's exhibits that have been, at least so far been --

        THE COURT:  I'm sorry, which?

MR. WISEMAN:  The evaluations of Dr. Moore and Dr. Price.

THE COURT:  Oh, okay.  Did she watch the video, the 16 hours?

MR. WISEMAN:  I --

THE COURT:  It's 16 hours.  I only got 14.

MR. WISEMAN:  Okay.

THE COURT:  But I'm going to have to get the other two.

MR. WISEMAN:  I won't quibble with that.  Sixteen. It felt like more.

THE WITNESS:  Well, I had two, I had, I saw two discs of Dr. Price and several discs of Dr. Moore, so I think I saw them all, yes.

MR. WISEMAN:  Okay.

THE WITNESS:  And if it's 16, 14 hours, 16 hours, I didn't time them, and I didn't watch them in all one setting.

THE COURT:  No, there are more than, there's more than that.

MR. WISEMAN:  We sent it to her in a different format so.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And did you review the Government's exhibits that have been provided to you?

A    Yes, I did.

Q    And did you review Dr. Moore and Dr. Price's reports?

A    Yes, I did.

Q    And did you review any records with respect to Mr. Bourgeois' brother Anthony?

A    Yes, I did.

Q    And, just briefly, what did those records show you?

A    Well, when I visited his sister Claudia, Anthony lives with Claudia, and there is a personal care attendant who comes in the home and mandated that, to receive that service there has to be a book of records kept in the house, and so I reviewed that record that's kept there for the personal care attendant and it has information regarding his IQ, his adaptive skills, and the specific objectives that the personal care attendant works with him in the home as well as the objectives at the date --

        THE COURT:  So that's the one that Mr. Bourgeois says is retarded?

        THE WITNESS:  That's correct.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q    And what is his IQ, according to those records?

A    Well, his IQ was estimated to be 50, and the reason I say estimated is he has cerebral palsy and many of the tests that you give requires the use of hands, so they are estimating

that because they have had to make adaptations in the test. His adaptive skills are in the profound deficit range.

Q   All right.  So he's pretty severely impaired?

A   Pretty much all of his daily needs are met for him by others.

Q   Okay.  And in addition to the materials that you reviewed did --

THE COURT:  I'm sorry, how is he related exactly to Mr. Bourgeois?  What parent do they share?

THE WITNESS:  They share the mother.

THE COURT:  Okay.

THE WITNESS:  He is actually the fourth child of the four oldest children by the first father.

MR. WISEMAN:  And --

THE COURT:  I'm sorry, say that again?

THE WITNESS:  The first four children shared a common father, I think, and he is one of those first four Ferdinands.

THE COURT:  No, that's not right.

THE WITNESS:  There's a Claudia --

THE COURT:  I don't think that's correct.

THE WITNESS:  -- a Lloyd, a Clyde and Anthony, I think.

THE COURT:  No.  That's, I know that can't be right, because Mr. Ferdinand has a different last name.

(Ms. Larin and Mr. Wiseman conferring off the record)

MR. WISEMAN:  Your Honor, my colleague advises me that Mr. Ferdinand's name is, was not actually Ferdinand, and that may be source of the, of our confusion.  His name was changed at some point to Ferdinand.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   In addition to the materials you have reviewed, did you conduct an interview, a structured interview with Mr. Bourgeois?

A   Yes, I did.

Q   And when did that happen and where?

A   That happened in August of 2009 at Terre Haute at the federal penitentiary.

Q   And approximately how long did you spend with Mr. Bourgeois at that time?

A   I would say approximately four hours.

Q   And as part of that encounter did you administer any tests?

A   Yes, I did.

Q   What did you administer?

A   I administered a standardized test, the Woodcock-Johnson, which is a battery of academic tests, as well as tests for listening comprehension, oral expression, and then I also did informal functional assessments with him regarding various

skills, life skills.

Q    We will discuss those more in detail later, but just give the Court a sense now of what you mean by informal assessments, functional assessments.

A    Okay.  In the best possible scenario when you are assessing a person with mental retardation you actually want to assess those skills in the real environment, so you would like to watch them, possibly, while they cook or doing domestic activities, and this gives you a better measure if there's deficits there of where you would want to start treatment or providing supports.  When a person lives in a restricted setting such as an institution, a lot of times you have to simulate these tasks using different things like pictorial cards or an application, to see if they can fill out an application, for example, things like that.

Q    Okay. And --

A    And it gives you a judge of, well, do they have the basic skills, so if they were living in the community, to apply those.

Q    These informal probes, are they ones that you got out of a book or are they ones that you have derived over your years of experience?

A    They are just ones that I have derived over my years of experience.

Q    In addition to -- well, withdraw it.  Did you also

administer a mental status exam?

A    Yes, I did.

Q    And in addition to the testing that you did and the interviewing, did you have occasion to interview other individuals who knew Mr. Bourgeois throughout his life?

A    Yes, I did.

Q    And were they people who knew him through a range of adaptive domains?

A    Yes.

Q    Did you have occasion to administer any formal standardized testing to any of the people you interviewed?

A    Yes.

Q    And we will talk more about them later in specifics.  Why didn't you, generally though, why didn't you test everyone that you interviewed?

A    Well, there are certain standards in the manuals of these standardized assessments as to who makes a good informant or doesn't make a good informant, so when you start about doing one of these you talk to the person to see how well they know them, and they need to meet certain requirements and if they don't meet those then the standardized assessment is not appropriate to be administered to that person.

Q    As a result of all the work you have done in this case, did you reach a conclusion to a reasonable degree of psychological certainty about Mr. Bourgeois?

A    Yes, I did.

Q    And what is that conclusion?

A    It was my conclusion that he met all three criteria for a diagnosis of mental retardation.

Q    For purposes of your testimony let's, it's complicated enough, let's use the AAIDD definition as we go forward.

A    Okay.

Q    To explore the basis for your conclusions.  Let's discuss intellectual functioning first.  Did you see -- well, before I ask you about the test, tell us what one needs to qualify as, to have a significant intellectual deficit for purposes of this diagnosis?

A    When you are saying significant you are looking at two standard deviations below the mean for that test, and that generally now is a mean of 100, a standard deviation of 15, so for a score of approximately 70.  You need to take into account the standard error of measurement of that test and for that score there is a confidence interval and we can be reasonably sure within that confidence that that score falls, his true score, true ability falls within that confidence interval, and for Atkins hearings that's generally plus or minus five, so you are looking at approximately a score of 70 plus or minus five points, so a 65 to a 75.

Q    And did the Atkins decision endorse that standard error of measurement?

A   Yes, it did.

Q   And does the DSM also endorse the standard error of measurement?

A   Yes, it does.

Q   And how about the AAIDD?

A   Yes.

Q   And what are the criteria, when you are looking at records, in determining whether a particular IQ test is an acceptable one for making this diagnosis?

A   Well, within the field there is an accepted gold standard for intellectual tests and that gold standard would be any of the Wechsler tests and any of the Stanford-Binet tests. Other tests have inherent weaknesses that you, that wouldn't meet quite that standard. You are also looking for a full-scale administration of the test. Abbreviated administrations, prorated administrations, would not be meeting the standard. There are also tests that can be group administered, paper-and-pencil tests that might give you very broad estimate, and it might be helpful to look at it but it would not meet the standard that's required in an Atkins hearing.

Q   Does, do achievement tests meet that standard?

A   Achievement tests aren't used for diagnosing mental retardation. They could possibly be used for determining adaptive deficits. They are really looking more at that

criteria we mentioned earlier of conceptual. So they are not actually used to diagnose the test, they are just corroborating evidence of adaptive deficits.

Q   Were any such tests that qualify contained in the records you reviewed?

A   Yes.

Q   And could you tell the Court which ones you saw and their significance?

A   The ones that I saw was a Wechsler Adult Intelligence Scale, Revised, that was administered about the time of his trial, and the other one was a Wechsler Adult Intelligence Scale, Third Edition, which I think was administered in 2007.

Q   And just for identification purposes, the earlier one was administered by Dr. Weiner?

A   That's correct.

Q   And the more recent one by Dr. Gelbort?

A   Yes.

Q   And what were the IQ scores recorded in each test?

A   I'm flipping to make sure I don't enter any wrong scores into, and I'm looking -- the first one, the WAIS-R, got a full-scale IQ of 75, and the second one got, the WAIS-III in 2007, got a full-scale IQ of 70.

Q   Did my office provide you the data underlying those two IQ tests?

A   Yes.

Q    And did you have an opportunity to review it?

A    Yes.

Q    Did you reach any conclusion as to the accuracy of the administration and scoring of those two tests?

A    That's, I saw no scoring area -- errors.  If I remember correctly, nothing on their actual protocol where you scored the items.  There might have been a place on, where you take the cumulative scores and add them, they had left a blank, but they got the total correct.  That particular test seemed to have been computer scored and they might have been transcribing scores over.  But as far as the actual administration of the test, there were no errors that I could see.

Q    Did you have occasion to review Dr. Weiner's report?

A    Yes.

Q    And did you notice any error with regard to the report?

A    It seems in the report there might have been a transcription error there from one of the scores being transcribed to the report.

Q    Did you review the -- you have already indicated you reviewed the reports of Dr. Moore and Dr. Price.  Did they, in your view, identify any errors with respect to the scoring or the administration of those IQ tests?

A    I don't remember any errors that they identified.

Q    Did Dr. Gelbort or Dr. Weiner comment in their reports

about the issue of malingering?

A   They noticed no signs of malingering and they felt he had put forth good effort.

Q   And did Dr. Weiner in particular administer any testing for malingering?

A   Yes.  As I remember, I know, I'm fairly certain he administered a TOMMs, which is one of the instruments that has some reliability with people with mental retardation. It's a test for malingering and he passed that test.

Q   And again, referring to Dr. Moore and Dr. Price, did you see any reference in their reports with respect to malingering?

A   No.

Q   I am going to put up for you now what's been marked as Petitioner's 155 and ask you if you can, do you recognize that document and what is it?

A   This document is all the scores of the subtests -- I'm going to get to the microphone -- all the scores of the subtests that were administered in 2004 as well as 2007, and then it also shows you the performance IQ and the full-scale IQ for, and the verbal IQ for both sets of tests.  So what you are looking at here, for example, the vocabulary subtest was administered in 2004 and he made a six, and in 2007 the WAIS-III version of the vocabulary test was administered and he made a four on that same subtest.

Q    Okay.  And what data or what conclusions can you draw from what's on this chart?

A    Well, in the field of mental retardation, I think if you look at the AAIDD guidelines, one of the things that's pointed out is numerous administrations, when you compare them, is often a better measure of malingering or reliability than some of the malingering tests that are not normed for people with low cognitive functioning.  In this particular case what you are looking at are the scores hanging together and where we see strengths in one subtest do we see strengths on the second administration, where we see a weakness do we see it on the second administration.  These two tests were administered four years apart and it would be very hard to malinger, to deliberately give the wrong answer on one version of the test and then to know, well, I really need to score about the same way four years later on a newer version of the test.  So I think if you look there, and specifically what I noted is if you look at the digit symbol, that was a strength for him.  On the subtest the mean is 10, the standard deviation is three, so 10 is considered in the average range.  He scored a 10 the first time, he scored an 11 the second time.  When you look in another area, let's look at, say, similarities, he scored a five the first time and a four the second time, so those scores are fairly consistent across administrations.  Some of the subscales,

subtests on the WAIS-R were not carried over to the WAIS-III and the WAIS-III introduced some new subtests, so sometimes you can't get that comparison.

Q    And that would be the matrix reasoning, object assembly?

A    That's correct.

Q    Now, the, I take it from your testimony that one doesn't expect identical scores in various administrations?

A    No.

Q    And is that related to the whole concept of a standard error of measurement?

A    Not only that, but in this particular case there could be more than one thing.  The first time he was given the test, and we believe that was the first time it was given, every subtest was novel.  The second time he was given the test he might have had some memory.  In my own experience, after giving lots of these, whenever I pull out the red and white blocks, if they have ever had the test before that's a reminder to them, oh, yeah, I've had this test before.  The coding is another one that a lot of times they remember.  A lot of times when you give an intelligence test, what you are doing is you are giving a test that you hope is truly novel and you are explaining something they have never done before, and part of the test is how quickly can they assimilate the instructions and perform the task, and that kind of drives how well they do.  When they have had a little familiarity

with it, they might do a little better the next time.

Q    The --

A    But I think overall these scores show consistency across administrations.

Q    And the overall IQ of 70 and 75 fall within each other's standard error of measurement?

A    That's correct.

Q    Did you recall anything in Dr. Price's report with regard to an observation of unusual scatter in these subtests?

A    What I recall is that the scatter of the subtest he thought was not typical for a person with mental retardation. I think that's what was, the gist of what was said in the report.

Q    And do you see any scatter?  Well, first of all, what is scatter and did you see any?

A    What you are looking at as scatter is how far the scores deviate, and the way I would do that is you get an average, you add up all the subtests so you kind of know what the average subtest is, and if there is a deviation, for example, in digit symbol, there is a 10 and 11 and that's significantly different than the average for all the others, and I gather that's what he was saying is you don't particularly see that large of a scatter in a mental, person with mental retardation.

Q    And what's your explanation, if you have an explanation,

for the sort of different performance on that particular test from the other tests?

A   Well, I have seen scatter like that before in people with mild mental retardation, so I did not make that observation that he did.  Digit symbol is a copying test and he copies very well.  It's trying to write spontaneously that you watch him markedly slow down.  So that's actually one of his strengths and I saw him do that informally when I assessed him as well, and it's not atypical for a person with mental retardation to have a strength, and I have tested other mentally retarded people that do well in one area, so the fact that he had a strength doesn't rule that out.  In my opinion, when you make that statement you are looking more at a discrepancy between verbal and performance being statistically significant and I didn't see that in this test.

Q   We have already heard a bit about the Flynn Effect n this case.  Could you tell the Court where you stand on that topic?

A   Okay.  The Flynn Effect is an accepted statistical phenomenon in the literature, and what we find is that over time norms get soft.  We give a test and over time, when we give the test at the end of that test life the scores tend to go up.  There have been group studies that have been done across tests to show this and these group studies make an estimate of overall what's the average that a score goes up

over a period of ten years. Some of the earlier tests when they came out stayed out as long as 30 years between administrations, so when you go back and look at these, that's where they started basing this estimate. But it's done on group studies, it's not done on individual studies. But we do know that if a test is normed, you do it on the year the test was normed, not the year the test was published. So the WAIS-R was published in '81 but they started collecting normative data in '78, so when this test was given in 2004 you are looking at a normative table that was 26 years old, so his scores are being compared to norms that are 26 years old. The norms were soft and therefore you could expect the score to be a little bit higher. But the way you explain this in the literature is that you have a confidence interval, so it's most likely that his score is at the lower end of that confidence interval because it's been inflated by the age of the norms of the test. On the second test, which was the WAIS-III, that test was also old, the WAIS-IV came out in August of 2008, so the norms for the WAIS-III, they started collecting those in '95, so you are also getting a little bit of a Flynn Effect. I don't think it's an issue in this case because the scores are there. I mean, they are the scores we are looking for in an Atkins case. So we can discuss Flynn if we want to, but in this particular case I don't know if we need a big debate on it

because it's not relevant.

Q    Okay.  Just bear with me one more moment then before we move on from it.  Part of the dispute or the debate in the literature in the community seems to be whether you adjust the score or explain the Flynn Effect.  How would you express the effect of the Flynn Effect in this case, the impact?

A    There's two large schools of thought on that.  The American Association of Individuals with Developmental Disabilities, most of the folks in the American Psychological Association Division 33, which is the specific division for individuals with developmental disabilities, say you should adjust the individual score.  The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet.  I think what both sides are saying is when you come into court, the court needs to clearly understand what the Flynn Effect is and what age of the norms when those scores were adjusted and the concept of a standard error of measure and a confidence interval and where you would look at that score in relation to its confidence interval.

Q    So applying all that you just said and looking at the two IQ scores we have, the 70 and the 75, and the age of the norms at the time they were administered, how would you express the IQ that you think most accurately reflects Mr. Bourgeois' intellectual ability?

A    In my opinion, his scores at the time they were obtained on those normative tables, I would, and considering the confidence interval, I would say his true score probably falls somewhere between 68 and 70.

Q    The WAIS-R that was given when it was no longer the test that was -- well, let me start over.  When the WAIS-R was given it was an older test.  Would you discount it or would you still consider it despite the fact that its norms were that old?

A    I think what we are specifically saying is at the time the WAIS-R was given the WAIS-III was already available to be used and the examiner didn't use it.  I see that quite frequently in all the records I have reviewed through the years when a neuropsychologist is doing a battery of tests. They tend to want to use the Wechsler instrument that has the greatest amount of research associated with it at that time. When you come between tests, the new test doesn't have that accumulation.  A lot of times what a neuropsychologist is looking for is brain dysfunction, and so they are looking at correlating different subtests of this with other tests that they administer, so I believe that's the reason the neuropsychologists, or in the past that has been my experience of why they would have chosen the older test.  I wouldn't discount the data.  I would put more, actually I would weigh more heavily towards the WAIS-III, which is what

Swanson - Direct    38

should have been administered the first time, but I think that test should be looked at because the subtests do vary consistently with the WAIS-III.

Q   And let's go back to this comparative chart between the two administrations.  To my lay eye it looks like his scores went down a bit from the WAIS-R to the WAIS-III with regard to verbal but they went up a bit with regard to performance.  Do you have an explanation for that?

A   Not really, other than, as I said, the performance items are the items you see the most practice effect with because people tend to remember the blocks, they tend to remember the coding test, they don't have to listen as closely for the instructions, their mindset is ready for the response.  But generally there is not a real big statistical, the difference between these are not statistically significant, so I wouldn't put a lot of bearing on that at all.

Q   Let me ask you a hypothetical.  You have done a number of these cases.  If you were hired by a lawyer at the time of a capital trial and you were given an IQ test with a 75, or even a 76 taking into account Dr. Weiner's error in transcription, on a WAIS-R, would you have any recommendations for that lawyer?

A   Yes.  I would recommend that you pursue a full evaluation for mental retardation.

Q   And what is your view of Mr. Bourgeois' intellectual

functioning even aside from the question of whether he has adaptive deficits or not?

A    I think these tests clearly show that Mr. Bourgeois is, functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely low cognitive ability. That criteria I think is clearly met.

Q    And what would his percentile ranking be in terms of IQ among the general population with a 68 to a 70?

A    Oh, with a 68 to a 70 you are looking at approximately a two percentile, so 98 percent of the people in the United States perform better than he does on this test.

Q    All right.  Let's now focus on the question of adaptive deficits, and let me put up for you a slide which is marked as Petitioner's 160.  First of all, what's that first page?

A    That's the first page of the AAIDD Eleventh Edition and it's also known as the Green Book.

Q    Okay.  And it is in fact green.

A    It is in fact green, that's right.

Q    And I am going to turn to page 43 of that volume, and do you see a definition there?  It's a little hard to read on the big screen.

A    Yes.  This is the AAIDD definition of adaptive behavior and I think I mentioned it earlier as a collection of

conceptual, social and practical skills that have been learned and performed by people in their everyday lives.

Q    And this was the definition that guided your assessment?

A    Yes.

Q    How do you assess whether a person in a typical case has adaptive deficits, significant adaptive deficits?

A    Okay.  In a typical case you are trying to make a diagnosis based on their current functioning that day, that time, in their own environment.  You have their care providers that are there, their mother, their father, their brother, their sister.  If I'm doing it in a community home, I have the people that are actually providing care there.  I also have the settings where they typically perform these skills, so if I have any questions I could go and observe those as well.  And then one of the things that you want to look at when you are doing these is the context or the environment in which they are performing these skills on a typical day.  There are cultural expectations of maybe their neighborhood but there are also sometimes hidden supports that guarantee that they do well, and one of the questions you are going to be asking is if those supports weren't there would you still see that same level of performance.

Q    And how does the, what you have described as a typical adaptive deficit assessment differ in the Atkins setting?

A    Well, in the Atkins setting you are always looking back

retrospectively because you are trying to determine if there was evidence of mental retardation prior to the age of 18. Even at the time of the offense we are looking back probably 20, 25 years in time to see what was the functioning at that time and would it meet these criteria adaptively.

Q   All right.  Now, in this case we are not going back to the time of the offense quite that far, but the point is the same, you are looking at his pre-18 functioning?

A   His pre-18 functioning, that's correct.

Q   And are there special guidelines applicable to a retrospective evaluation that you have just described?

A   Yes.  I mean retrospective evaluations were being done prior to Atkins because we frequently have people who come to agencies as adults and we have to determine are they eligible for services.  For example, Mr. Bourgeois' brother didn't access services in the state of Louisiana until 2001 and he was middle-aged at least by then, and so then the agency is charged to go back and see is there evidence that these deficits were there prior to the age of 18.  And you often have to look for records, you have to look for people who knew him at that time, you would need to be able to look at the environment, like I said, as much as possible that he lived in and start trying to tease out, well, what were the supports that he had in place, when he did well, to do well.

Q   Did you administer standardized tests in order to

determine adaptive deficits in this case?

A    Yes, I did.

Q    And let me put up for you two different exhibits.
Petitioner's 34 is a two-page exhibit.  Do you recognize it?

A    Yes.  This is a Vineland-II that I did, it's a Vineland
Adaptive Behavior Scale, Second Edition.  And we mentioned
gold standards earlier.  The two gold standards for adaptive
assessments are the Vineland Adaptive Behavior Scale, Second
Edition, I call it the VABS-II, and the Adaptive Behavior
Assessment System, Second Edition, we call that the ABAS-II,
and this is one of your gold standard standardized
assessments of the test, it's the VABS-II.  I administered
this with Ms. Franks and I administered it retrospectively
and we looked at him as he was at about the age of seven when
we did this.

Q    We are going to get to the specifics of the test.

A    Yeah.

Q    I just want to identify your data for now.  Next, I'm
going to put up --

        THE COURT:  I'm sorry, how did, how did they, I'm
sorry, I'm not understanding this.  She administered
something that had to do with Mr. Bourgeois when he was
seven?

        MR. WISEMAN:  Yes, Your Honor.  We are going to
explore that and explain the reasoning.

THE COURT:  That would be good.

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q   Next I am going to put up a Petitioner's 35, which is a 94-page exhibit, and just the top sheet, do you recognize what that is?

A   Okay, that is the ABAS-II.  I administered this same form with Ms. Franks.  It should say five to 21 there.

Q   It's got off track.

A   It's the parent form that I administered with the same informant.  It's just the other gold standard test that I mentioned earlier.

Q   Okay.  And, more broadly, does this exhibit contain all of your data --

A   Yes.

Q   -- for Mr. Bourgeois' evaluation?

A   Yes.  Right there, that's the mental status exam directly behind it I guess.

Q   All right.  So you, this packet contains the rest of your data in the case?

A   It should.  It should contain the Woodcock-Johnson, it should contain the two standardized assessments and then the mental status exam that I give.

Q   Okay.  And we are going to go through that in some detail.  Let's talk first about the Woodcock-Johnson, and

tell the Court initially what is the Woodcock-Johnson, what does it seek to determine and how did Mr. Bourgeois do on it?

A   Okay.  The Woodcock-Johnson is, when we talked, we have talked about gold standards in different types of tests, the Woodcock-Johnson would meet the gold standard of an academic achievement test.  It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas.  The, it is better than say a screening test such as the WRAT which is only assessing one area of reading.

Q   Right, and for the record, the WRAT is the W-R-A-T?

A   Yeah, the WRAT.  The WRAT is a Wide Range Achievement Test, it's now in its fourth edition, I think in this case there were third editions administered, and it's a brief screening instrument.  By brief, you can give it in about 20 minutes, and it gives you a broad indication.

Q   And I am putting up on the screen right now page 13 from Exhibit 35, which is the bigger packet of data, and ask you if you can explain and interpret that particular sheet?

A   Okay.  If I could, I'll just kind of go through the sheet for the Court.

Q   Sure.  And if you want to touch the screen, you can even highlight things.

A   Oh, I can, okay.  If you look right there where it says "Cluster," these are the different tests I give.  At the very

bottom down here are the specific tests that I give and then those are broken down or added together and become the cluster scores that are mentioned in this top section right here. For example, if you look down here you have letter word identification, reading fluency, story recall, and then down here there is a passage comprehension right about there. Those collapse into your broad reading score, which is here. Now, when you look at something like reading, there's actually many skills that are involved in reading. The WRAT primarily looks at word recognition, which is this one here, and if you look at his word recognition it's actually pretty good. The scores that are most relevant to the Court, in my opinion, are these scores right there which are the age equivalent scores, so he is performing in these areas similar to a person who is this age. This score right here that says "SS," that's the standard score he actually obtained on these. And over here is the grade equivalent score for each one of those tests. I think the grade equivalent score is particularly relevant to this because if you look at the DSM-IV, what experts in the field have said is most people with mild mental retardation, we expect them to function overall at about as high as a sixth grade level, which is consistent with where he is functioning here, and he does have some significant strengths and some significant weaknesses. But as I was saying earlier, going back to the first column,

those specific tests are the tests that I looked at for reading, and if we can we will talk about it, and I think when you look at the videos you will see problems that he has with reading and things that he does actually quite well with reading. The next broad area would be broad math.

Q    Could we talk about it now?

A    Uh-huh. Sure.

Q    I mean it seems like a good time. What, you mentioned that he has a relative strength in terms of his word recognition, and what test is that that shows that?

A    That's the letter/word identification on which he made a 90 and he's functioning at about the eighth grade level there. And I think on the WRAT he scored much higher than that even. I mean they score him much, a higher grade level than that.

Q    That would have been the reading score of a high school level?

A    I think so.

Q    Okay.

A    And letter/word recognition is not phonetic decoding, it's recognizing words, it's having the ability to look at words over drill over a long period of time and possibly in more complicated words identifying the root words and then guessing from that or the context of the sentence what the word is, and this is a particular strength for him.

Q    And compare that to his ability to understand what he is reading, to comprehend what he is reading.

A    Well, his passage comprehension, which is that last little orange dot I have down there, he's more at the third grade level there, so he can read something.  And if you look at the next one, reading fluency, he's also fairly good at that.  He reads fluently at about the fifth grade level.  But when he has to break down what he reads and remembers it, then you start having problems.  The more particular problem for him is the third one there which is story recall, and in story recall you are reading him stories and then you are immediately asking him to tell you back what he just heard and that's where he really breaks down, so he, it's the more immediate reading that he has problems with in remembering.

Q    And what does the "K" there, is the "K" kindergarten?

A    Kindergarten.

Q    Okay.

A    That's right.  So if he reads something repetitively over time he's going to remember it, but it's going to take him longer to do this.  And I think specifically in the video, and I don't think the Judge saw Dr. Price's video, but if you look at Dr. Price's video there's a place where he is getting him to read the consent form and --

Q    At the beginning of the evaluation?

A    At the beginning of the evaluation.  I even timed, and

since the Judge hasn't watched it she can do the same thing
when she watches it, how long it takes him to read it, if you
watch his finger, because he is asked to comprehend it and
understand it, so --

Q   Okay, let me just stop you.  He's reading this to
himself?

A   Well, he reads it out loud, so you can kind of see him,
and he moves his finger along and then he stops and he asks a
question, and I timed it and it was, it took him an excessive
amount of time to read that for comprehension.

Q   Do you have the amount of time it took to read?

A   Huh?

Q   Do you have that handy?

A   I wrote it down.  Let me see, I think I have it somewhere
handy.  Let me see.  Without flipping, oh, no.  No, I don't,
I don't have that handy.

Q   You don't have any -- okay, well.  Let me just, let's see
if I can clarify one point.  Dr. Price, did Dr. Price ask him
to read it aloud or did he just give it to him and say, "Read
this"?

A   He said to, "Read it and make sure you understand it,"
and then he had to read it and understand it to sign it, and
that was the instruction and that's the approach or the
response style that Mr. Bourgeois used.  I thought it was
very interesting when Dr. Moore gave it to him, Dr. Moore

Swanson - Direct                    49

asked him to read to him and he fluently read it.

Q    Okay.

A    But then at the end when he started asking questions Mr. Bourgeois got flustered because he couldn't remember what he read.  He's a fluent reader is what, the point I am trying to make, but he doesn't read with good comprehension.  And it was just interesting in watching the two videos, I remember immediately thinking, well, that's exactly what I saw in my Woodcock.  And so, anyway, those four tests are what makes up his overall broad reading which is about the fifth grade level, an 83 percentile, and an 83 percent -- I mean a standard score of 83, and that percentile score would probably be somewhere around 9 or 11 percentile, which would mean about 90 percent of the people his age in the United States read better than he does.

Q    And --

A    Which to me that would show functional academic deficits consistent with a person with mild mental retardation in reading.

Q    And how does that 9th or 10th percentile compare with the 2nd percentile that we typically see with MR, mentally retarded scoring?

A    Well, and I would refer the Court directly to the DSM. It breaks down the different categories and what the academic expectations would be for mild as opposed to moderate, severe

or profound.  But what we usually find with people with mild mental retardation is early on they have significant academic deficits compared to the same age peers but over time they can make up for these and we generally see a raw functioning somewhere around the sixth grade level by the time they reach adulthood, which this is consistent with what we see here.

Q    Okay.

A    But, anyway, if you go through this, for example, with going back to this section, in here you have a broad math and a broad written language and those are broken down in different categories.  The thing that I found most interesting next to the reading with him was his broad written language ability.  His overall ability is at the seventh grade level but this is primarily helped by his very high spelling score, which if you look down here is at the 13th grade equivalency, and this is his most unique strength.  For some reason he can spell and he can spell extremely well.  Where he breaks down is if you look down here under writing samples and writing fluency, he's much slower there on those tests.  So when he has to write quickly or he has to write spontaneously, it's much harder for him.  And you also get a chance to see that in the videos with Dr. Price for sure, and I do have one of those that I had saved.  There is a paragraph I think that he gets him to write and it's a very brief paragraph and I timed it at six minutes and 11 seconds,

and, about 14 words per minute to write that.

MR. ROBERTS:  Your Honor, the witness is holding up a document.  I'm not sure what she's referring to.

MR. WISEMAN:  Yeah, why don't we put it up on the screen.

THE WITNESS:  Okay.

MR. ROBERTS:  She has also done a number of documents --

THE WITNESS:  I'm sorry, I'm sorry.  There you go.

MR. ROBERTS:  She also has a number of documents in front of her, Your Honor, and I just don't know what she's referring to.

THE COURT:  Have you seen them?

MR. ROBERTS:  I haven't seen, I don't know what she's looking through.

THE COURT:  Okay.  Well, why don't we take a minute and let him look through the documents that you are using?

THE WITNESS:  Okay, sure.  Most of these, actually I'm looking at Dr. Price's document.  I think Dr. Price did a beautiful job of breaking down the adaptive skills and --

MR. ROBERTS:  Your Honor, may I approach?

THE WITNESS:  You can approach and look.

MR. ROBERTS:  May I approach the witness, Your Honor?

THE WITNESS:  Sure.  That's Dr. Price's raw data.  I

really had this open to Dr. Price's report because he did a really good job with that I thought.  And these are some of my report and you can just thumb through.  I will get this out for you.

MR. ROBERTS:  I don't want to ask questions here, Your Honor, but there's a lot of information here, I don't know --

MR. WISEMAN:  Well, Your Honor, I can tell the Court that the materials the Doctor has is her raw data which was turned over to the Government pursuant to the Court's direction, so I mean there's nothing new in there.  If Mr. Roberts wants to look through it he's welcome to.

THE WITNESS:  You're welcome -- it's Doctor, I can go by tabs and just identify it for you very quickly.  This is a copy of my declaration, the first two pages.  This is a sentence from the raw data of Dr. Price.  This is that score sheet we are looking at on the board right now, the Woodcock-Johnson.  This is my Woodcock-Johnson data that you-all have a copy of.  This is the response sheet.  You-all have a copy of that as well.  It's a response booklet and the scoring sheet for that.  This is the score sheet for the ABAS-II that I administered.  This is a letter to the editor from Dr. Moore to the APA, Division 33, on the Flynn Effect which I thought was very interesting.  This is a report from Dr. Price.  There's more, this is like a, there's two reports

for Dr. Moore, there's a supplemental report and an initial report. Let's see. This I think is Dr. Moore's ABAS data, it's all kind of clipped together. That's his data. And these are just different affidavits or declarations that I was given by the defense. That's a declaration, that's probably family members. (noise) When I'm talking, I have a hard time, I'm just trying to understand which one is Henry --

THE COURT: Please be careful of the microphone.

THE WITNESS: Okay, I'm sorry. So these are different family members right here, as best as I could understand it when I'm reading through when someone identifies themself as Isaac Henry, III, this one was Isaac, II, and so these are scribbles trying to figure out is it his mother's first cousin or his first cousin. If you have read through the declarations you might understand. That was my best guess when I was reading these declarations. This I think we have already looked at, that's my Vineland-II. And this is some kind of something that came out of this previous report or hearing. There you go. And that's it.

BY MR. WISEMAN:

Q   Okay.

A   Excuse me, I have to get this down.

Q   I --

A   Wait, just give me just a minute so I can slide this in

here without hitting that microphone.

Q    I have put up and marked the page that you were discussing just a moment ago and called it Petitioner's 159. Why don't you describe what this is and what significance it has for you.

A    Well, I just really, when I was watching the video, I had also worked with Mr. Alfred Bourgeois in the same setting and done similar things with him.  I had given him a sentence that I dictated to him, it was a nine-word sentence.  I also had him writing things for me on these different tests, and you have copies of my raw data.  And Dr. Price got him to write this and so I just timed it as we went because that was my same impressions when I worked with him.  He copies very quickly but when he has to write spontaneously it takes him much longer to write that.  Also, when I was there with him, there's multitudes of examples of his own written work in various documents that were given with him and I wanted to know how long does it take him to write something like that, and he told me sometimes when he produces a one-page document he may write it and copy it over and over again and it takes him a very long time.  And I just found this very unique because I didn't administer this but when I watched it that is about the same kind of performance that I showed with him.

Q    Okay.  Let me just ask you, the scribbles or the calculations, excuse me --

A    Okay.

Q    -- that are contained down there, are those yours?

A    Those are definitely scribbles, and I was just counting real quickly how many words did we have.  It took approximately six minutes and 11 seconds is what I timed it at, at six words a minute, if I did my math correct.  I figured about 14 words a minute, which is extremely slow.  And when you watch him, he's just extremely slow to write spontaneously and very quick to copy, so copying is a strength for him, writing spontaneously is not.  So that's why when we were talking earlier, and I think we got off on this or I got off on this, talking about his written expression, and I thought that was very interesting.  There actually is one more example that the prosecution just looked at and he asked him to write a sentence and it was, "I'm going to the gym and work out in about an hour," and that took him one minute.

Q    Could I see what you have?  Okay.

A    And I will show you that one, too, and this is in the rough data, the raw data provided by the prosecution's experts.  And I just thought that was interesting because it validated what I had seen as well as the problems that he shows in written expression.

Q    Let me, let me put that up so the Court can see what you were looking at.  I'm calling this Petitioner's 161.  160 had

already been taken.  So how long did it take Mr. Bourgeois to

write that sentence?

A    One minute and 16 seconds is what I timed it at when I

was watching it.

Q    And what was --

A    And he just --

Q    What was the task asked of him at that point?

A    I think he was just asked to write a sentence.

Q    About anything?

A    Or anything that he wanted to, any thought that he had,

and it took him that long to come up with the sentence and

that was how long it took him to write it, and I felt that

was consistent with a person that would have the academic

deficits that I noted on the Woodcock.

Q    Now, looking at the various strengths and weaknesses

reflected on the Woodcock, do you see consistencies with the

WAIS administrations that you have reviewed?

A    Yes.

Q    And what are those consistencies?

A    Between my Woodcock and the WAIS?

Q    And the WAIS.

A    Well, as I mentioned, the thing that I saw that was the

most significant on the WAIS as far as his strength was his

ability to copy those symbols.  And I find that as long as

it's right there in front of him he does extremely well and

his copying skills are very good.  The problem for Mr. Bourgeois was when he has to spontaneously think things through.  Also, when you give him a word, vocabulary he does a little bit better, but when you start having him analyze something, for example, in similarities, you generally watch him slow down.  There are examples of that on the video and I think it's Dr. Price gives him proverbs, very simple proverbs, and I also gave him proverbs on my mental status exam, but I think the only one he got, he had a lot of trouble trying to analyze these, I think he only got one of them right and they were just basic simple proverbs that we all see.  One of the ones I used is what does it mean you can't see the forest for the trees.  He can't break that down in the abstract, the underlying meaning of that.  And I thought the video displayed that extremely well because he is talking very fluently, he's expressing himself, and then they switch to that and he doesn't have a clue of how to answer.

Q    And to the consistencies you have observed between the WAIS-R, the WAIS-III, the Woodcock-Johnson, the proverbs on the videotape, the writing and reading skills and deficits, those consistencies, do they also give you information with respect to malingering?

A    Well, yes, because when you are looking at all of this, if he had done extremely well in something I need to know, well, why does he do well and what is there about that.  For

example, he is an extremely good speller and I thought that was very interesting because he doesn't phonetically decode so where is he at that, but he has some ability to do that and that's a unique strength for him.

Q    And finally, before we leave the Woodcock, you mentioned earlier that people with mental retardation can have strengths.  Does the fact that he spells at a 13th grade level preclude a diagnosis of mental retardation?

A    No.

Q    And did you use your Woodcock administration to determine whether or not Mr. Bourgeois meets any of the adaptive deficit domains under the AAIDD?

A    Yes.  I used them in two areas.  One of them was for -- and both of them under conceptual.  In conceptual, one of the areas you are looking for is functional academics, and I think I've given a pretty broad explanation or specific explanation of how I probe for that, and overall he's functioning somewhere 5-8, 4-1 and 7-2 as far as his broad areas in broad reading, broad math and broad written language.  His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation.  I also, in that test you give them oral comprehension and other tests that probe for oral language and listening comprehension.  On

the sheets you had up earlier that was the first two broad cluster scores. And his scores in those were at the third grade level and the fourth grade level. Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual. So I felt, when you are doing this it is kind of nice to have some standardized scores to back up your own clinical judgment that you make in looking through records and talking to people, and I felt we had two standard scores there for conceptual.

Q   Okay. Let's talk briefly about the informal functional assessments that you had mentioned earlier. Tell the Court what precisely you administered and what conclusions you reached.

A   Okay. Well, it's very interesting to do standardized assessments, but what we really need to know is how this person can take his academic skills and function in the real community. I bring maybe a copy of a newspaper article, which most newspapers are written about the sixth grade level, if this person is going to function in the community, and I get them to read that. I want to know how many words per minute it takes for him to read it, and when he gets through can he answer some basic questions about that. I found my reading probes with him were about consistent with the standardized assessments, but I think these video

examples that the Judge can actually look at are even better than the ones I can provide narratively. I got him to write some things for me as well on these different tests. I asked him about the things he can do well. Mr. Bourgeois is, quite frankly, very difficult to interview. He overestimates everything he can do and you have to talk to him an extremely long time before you start finding inconsistencies, and you need to have done a lot of homework before you go in there because he likes to present himself in the best possible manner. So a lot of times what I would say, well, I understand that, now here's some things, can you show me how you would have done that with this. One of the things I really probed was, for example, he said he did a lot of housekeeping and that he knew how to wash his own clothes, but when you really pressed him, these are things that he got girlfriends to do, his wife to do or he left with other people, but then he immediately tells, assures you he knows how to do them. So I have different cards that I use over time in trying to start where I am going to train somebody and so I would get him, okay, well, you explain to me on that shirt, which of these labels would explain, would it be a perma-press shirt, would it be this, so it's the ability to read his label, his ability to determine which wash cycle or which dry cycle to use that, which kind of detergents he would use with different things. When you start pressing him

with those things he cannot give you the answers.

Q    Did you show him any maps?

A    Yes, I did.

Q    And what did you show him a map of?

A    Well, the maps to bring into Terre Haute for me, it might have been different for other folks but I had to bring maps that had no relation to Indiana or pretty much the state of the United States or they wouldn't let me bring them in, so I brought a map of Oslo, where I had been recently, and I brought a map of Hawaii, and specifically also the island of Maui, and so we just worked with those maps because the guard let me get those maps in.  And so we, I tried to get with concepts of east and west and if you were here, you're going there, and what direction would you tell someone to go on different places, and I didn't find he was able to do that on those maps.  If you have good map skills you ought to be able to get a map if you travel to Oslo and figure out where to go and be able to get directions from that map.

Q    And you weren't asking him to interpret -- what language do they speak in Oslo?

A    Norwegian.

Q    Norwegian, okay, you weren't --

A    No, I wasn't asking him to do that.  I was really asking him more things like there's a compass on the map and how would you use that and how does that identify north, south

and east and west, and when you press Mr. Bourgeois he always tells you that what, you just get on the interstate and you follow the signs, and he can identify the colors of the signs, the type of the signs, he can identify which was a U.S. sign as versus an interstate sign, and he relies a lot on that.  He quickly tells you he didn't have to use maps anymore after that because he had a GPS system and the GPS system would tell him, and if he got lost he could always call back to the dispatcher at the trucking station that he worked for and she would give him more specific directions. And he also admitted that he frequently had somebody with him that would help guide his way.

Q   Now, did you see Dr. Price also show some maps to Mr. Bourgeois?

A   Yes.

Q   And those were maps of the United States, weren't they?

A   Yes.

Q   And what did you observe with respect to Mr. Bourgeois' ability to get from, I think it was Louisiana to Chicago?  Do you recall that?

A   It seemed to me he just immediately identified the interstates and just kind of went from there on up.

Q   Okay.

A   I know when I verbally tried to get him to describe how he would get to Kansas or how he would get somewhere, he

always told me he would go up to an interstate and then come over and then come back down.  That wouldn't necessarily be the fastest way there but it would be the way that he would go.

Q   And this sort of inability, as you have described, for him to use the directions on the maps you showed him, was that consistent with anything you saw in the video when Dr. Price was asking him about orientation?

A   Yes.

Q   And describe that for the Court.  The Court will watch it if she hasn't, but just give us your interpretation of what you saw.

A   Well, what I think Dr. Price was trying to get Mr. Bourgeois to do, and Mr. Bourgeois is extremely hard to interview, is he was trying to get him to explain some kind of directionality or orientation, because if you are a truck driver we are going to assume that you know something about directions and how to get from point A to B, north, south, east, west, some direction where the moon would be.  He was asking him a lot of different probes and I thought that was what he was trying to get, get some sense of with Mr. Bourgeois.  Mr. Bourgeois gives some fairly long-winded answers and I don't know if he got that, what he was looking for.

Q   All right.  And particularly, were there questions about

where a shadow would be cast based on where the sun is and if a flag were blowing one way which way is the wind coming?

A    That's correct.

Q    All right.

A    Because, you know, if you don't really know east or, you know, some people have practical knowledge that they have learned in life so if you don't know it as far as east, north, if you haven't learned it in school, possibly you have learned that from a practical experience.  There's people who have never gone to school and who can go out in the woods and hunt and come home very quickly, so maybe there were some other skills that he had learned that give him his sense of direction that were not academic, and I thought that's where Dr. Moore was going with that.

Q    Dr. Price?

A    But I don't know that Mr. Bourgeois --

Q    You said Dr. Moore, I think that was Dr. Price.

A    Dr. Price.

Q    Okay.  And was Mr. Bourgeois able to answer any of those orientation questions?

A    I think he got confused, as I remember the video.

Q    All right.  Is there anything else about your informal assessment, functional assessment, that you want to bring up, or should we move on to standardized testing?

A    No, not really.  I brought a dictionary, some practical

things that I wanted him to see, and he does have dictionary

skills and he has learned these skills, so just functional

everyday things that you would use, so I don't really think

there was anything else that really I recall to mind.

Q   All right.  And overall did you draw any conclusion about

his functional skills on those informal assessments and how

they relate to your other adaptive testing?

A   Well, what the literature tells us I think is pretty

consistent with Mr. Bourgeois.  All the family members report

deficits in his early years.  I think over time there may be

some deficits still in the area of conceptual and social, but

in practical skills he has made the most mastery, and he

demonstrated fairly good knowledge of practical skill areas.

Q   Okay.  Let's now talk about the standardized testing that

you administered to the third-party informant, Beverly Frank.

First off, why did you select her as opposed to any of the

other people you interviewed?

A   Well, the manual gives specific guidelines on who is a

good informant.

Q   And which manual are we talking about?

A   We are talking about both manuals.

Q   Okay

A   The VABS-II and the ABAS-II, and it specifies who would

be a good informant and who to look for, and you are looking

for someone that knew him well over an extended period of

time and you are looking for someone that can, when you are doing something retrospectively can identify a specific point in time when they knew him well. Because there are some skills you would not expect, say, a seven-year-old to know that you would expect a 16-year-old to know, and even someone with mild mental retardation may not be able to do something at seven and have mastered it at 16. So you can't float along the continuum, you need to get that person, when you are doing it retrospectively, to be able, I clearly remember that point in time when I knew him well and this is where he was. Some of the people that I interviewed, for example, siblings, had also left the home at an early age and really couldn't pinpoint a time for me. They could give me general recollections across the spectrum of time but not anything specific. And Ms. Franks could specifically remember the time when he came to live with his grandmother. We had almost an hour --

Q    I'm sorry, what --

A    With her grandmother, I'm sorry.

Q    All right.

A    And we had an almost hour-long conversation where we talked about his skills in different times and then we finally finished down to that was the time she clearly knew him well, so when I administered it we only talked about what he could do at that point in time and in answer to any other

question it was always, are you sure he could do that at seven or was that something that you saw later, and if it was we didn't score it that way.

Q   And what do these manuals tell you about the need for an interview before the administration of the test?  I mean do you just walk up to people and say "Take this test" or do you --

A   Well, you have to establish really good rapport first, so, you know, it involves a point of getting a conversation. I feel that's more important in retrospective because you have to really feel comfortable and confident that you are getting good and unbiased answers of the person that you are interviewing.  It also requires that they really do know across the whole spectrum of the test because you are looking, as we talked about, across maybe ten areas, so they need to know about each of the ten areas.  And if there is a frequent, if they don't -- well, they know, for example, I interviewed people that knew about work but that's all they knew about, so they wouldn't have been a good respondent for the whole scale because they really didn't know about these other areas, they only knew about his work skills.

THE COURT:  Okay.  Well, how did Ms. Frank know about him?

THE WITNESS:  Ms. Frank was the granddaughter of Mrs. Taylor, Mary Taylor, we talk about a Miss Mary.

THE COURT:  Right.  Did she live with her grandmother?

THE WITNESS:  No, one of her jobs, there were family members, Ms. Taylor had family members that came by daily to check on her and that was one of her things.  She was older than Mr. Bourgeois and she came in daily to check with her grandmother.  She sometimes stayed at night with her grandmother.  And Anthony stayed there with her grandmother from the time he was seven until the time of her death.

BY MR. WISEMAN:

Q   I'm sorry, you said Anthony?

A   Not Anthony, excuse me.  Mr. Bourgeois stayed there with them from the time he was seven until the time of Miss Mary's death.

Q   And let me just ask you, you mentioned a Ms. Taylor --

THE COURT:  So Ms. Frank didn't live with her grandmother?

THE WITNESS:  No.  Well, she stayed there with her sometimes, she stayed with her in the summer, but she did not live with her.

THE COURT:  But she didn't live with the grandmother?

THE WITNESS:  No.

BY MR. WISEMAN:

Q   Did she live in proximity to the grandmother?

A    Yes.

Q    And about, you know, was she in the same community?

A    Yes, that's what I understood.

Q    And what's the name of this community that these folks lived in?

A    Okay.  This particular community that Mr. Bourgeois and Miss Mary lived in is called The Bend.

Q    Okay.

A    And it was a lot of land that an ancestor had bought and different family members had come to live on and then I think Miss Mary's family had bought some land there.  She wasn't directly related to Mr. Bourgeois.  And it is in the general area of a very small community in that parish known as Paulina, and the next real city that is of any mention is probably Lutcher.  So it's a very small rural community in Louisiana that immediately borders the Mississippi River north of Louisiana, I mean New Orleans, maybe 30 miles north of New Orleans.

Q    All right.  And I have put up the first page of Exhibit 35 which is, says "parent form," it's a little cut off there, and I think you mentioned this earlier, it says his age is five to -- what's the actual age?  I'm not --

A    Twenty-one.

Q    Twenty-one.  That's cut off, so it's not ages five to two.  And why did you use the parent form in administering

this test to Ms. Frank?

A    Well, the ABAS-II is different from the Vineland in that it has multiple forms, and when they are under the age of 16 -- the adult form starts at 16 -- so when they are under the age of 16, there's forms for under the age of five, I think three to five, there's another form for teachers, but for the child himself at the age of seven and someone that's giving knowledge on the home, this is the only form you can use.

Q    And after you interviewed -- well, why don't you describe how the ABAS is administered and its strengths and weaknesses.

A    Okay.  The ABAS and Vineland are administered in two separately different ways.  The ABAS-II you give to the person, the person reads the instructions and scores them. You ask them to score every single item from the very first item to the end of, to the last item on every subtest.  If there are items to deal with work, we scratch those out if work doesn't apply.  You read them the instructions and there is also a little template at the very front that specifies the different scores, and the person may get a zero, a one, a two, a three or a four I think it goes up to.

Q    Let me just --

A    Yeah.

Q    Let me just put up a representative page.  This is page 4

of Exhibit 35 and --

A    Can you show me the top of that page?

Q    Sure.

A    And that's exactly what I'm looking for, I think, that specifies the different levels.  So you can't read it quite as well but there is a zero, a one, a two, a three and a four, and it specifies with each little bullet, you know, more examples of which each one of those are.  And then if you look at the lower right-hand bottom where the zero, one, two and three is, then that's where you would give those scores there, so those are smaller captions of the top ones.  So there is four possible scores you can give, zero, one, two or three, and if you don't know then you can either mark you don't know or you can leave it blank or you can check that you guessed, which is what the box is for the side.  So when the person gives this test they are asked to give, to answer every single item starting from the first item to the last item of that subtest and they read it to themselves.

        THE COURT:  All right.  So you, this is the test that Ms. Frank took about Mr. Bourgeois?

        THE WITNESS:  That's correct, that's one of them.

        THE COURT:  Even though she never lived with him and wasn't related to him and didn't go to school with him?

        THE WITNESS:  That's correct.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q   Did you in your interview determine whether Ms. Frank had ample knowledge to complete the form?

A   Yes.  That was one of the things I did, as I said, when we started the first hour of the interview in determining that.  Her grandmother, Miss Mary, Mary Clayton (sic), was elderly and I think used a walker to get about and she came over every day to help her grandmother, and frequently Miss Mary asked her to help with Mr. Bourgeois because there were things that he needed to be done with him, or she got to observe her grandmother as she was working with him, so she had direct knowledge on a daily basis of how he met these different skills.

THE COURT:  Now, how old is she in relationship to Mr. Bourgeois?

THE WITNESS:  Judge, I am going to make a guess at this point but I would say six, seven, like when he was six she was a teenager, I think, you know, as I recall.

BY MR. WISEMAN:

Q   And what domains does the ABAS cover?

A   Okay.  The ABAS collapses into conceptual, practical and social, and it gives you a global general adaptive composite, so it gives you a general score and then the three scores that we were speaking of earlier, and you get these three scores based on ten subtests that collapse into this.

Q    Okay.  And how did the administration of the ABAS come out with Ms. Frank?

A    Okay.  And I want to clarify this at the point as the reason I give the ABAS.

Q    Okay.

A    I had a lot of concerns on whether Ms. Franks was a good informant or not and how much she would remember, so when I gave her the ABAS we had a long conversation, we probed all the different areas and then I gave her the ABAS, and my major purpose in giving her the ABAS, after I explained it to her, was I was interested in learning how much she didn't know about him, how many blanks did she leave, how many guesses did she give, because then that generally showed me there was no point in proceeding with the standardized assessment because she didn't have the knowledge skills that I needed.  And when I finished administering the ABAS and I looked at it, she had marked everything, she didn't leave any blanks, and so then I turned around and I administered the Vineland in a semi-structured interview.  And that's my preference of the test to administer because you get to probe each item more and you get to ask them are you sure he couldn't do that at that age, are there things that you could put in place that he would accomplish it, and so actually I gave him the, her the Vineland in a semi-structured interview and scored that.  I feel the Vineland is a more accurate

estimate of where he really is in compared to the ABAS.  The other thing about the ABAS is it has what we call a higher floor.  The Vineland goes all the way down to the profound deficit range and the ABAS stops at a moderate range, so you don't have as many items on the lower end of that, and I just feel the Vineland gives a better estimate of a person who is functioning in the mild deficit range.  There's more items at the lower end of the test to help judge where he is.

Q   The structured interview that was part of the Vineland, is that something that the Vineland manual tells you to do?

A   Yeah, and it's called a semi-structured interview.

Q   Semi-structured.

A   And the reason it's semi-structured is you try to keep it as conversational as possible but you move along topics with the person, and you are asking the specific questions that are on the protocol but at any time you can stop and give more information.  So if they say the person couldn't make a bed, for example, you might say, well, tell me what they did, did they pull the sheets up, and so you can ask a lot more questions about that and in asking the questions you may see that the person really does deserve a one rather than a zero because he can do some of the skills with supports.

Q   How, excuse me, how did Ms. Frank score on the Vineland compared to the score on the ABAS?

A   Okay.  As I remember, on the Vineland we got scores in

the mild deficit range, if I remember correctly.

Q    Would you like me to put it up for you?

A    Yes, would you please?  We're having to hunt it up.  Yes.
So if you look at this, pretty much in communication he got a
69, a 66, a 68, and these skills are in the mild deficit
range.  And we are looking at a child who is seven years old.
This is the age he was when he came to live with his
grandmother and where his skills were at that time.

        THE COURT:  It's not his grandmother.

        THE WITNESS:  I mean with her grandmother, I'm
sorry.  With Miss Mary.

        THE COURT:  I'm concerned about your information.

        THE WITNESS:  Okay.  It's with Miss Mary Taylor, the
grandmother of Ms. Franks and the lady that Mr. Bourgeois
came to live with when he was about seven years of age.

BY MR. WISEMAN:

Q    And how did that scoring compare to the scoring on the
ABAS?

A    It was higher than the ABAS.

Q    All right.  So he scored in a less impaired way on the
Vineland?

A    That's correct.

Q    Than on the ABAS?

A    That's correct.

Q    What --

THE COURT:  I'm sorry, which one did you give to the to Ms. Frank?

THE WITNESS:  I gave both of these to Ms. Franks.

THE COURT:  Okay.  So he didn't score anything, Ms. Frank scored.

THE WITNESS:  That's correct

THE COURT:  I mean let's really keep that straight when you are talking about it, Mr. Wiseman.

MR. WISEMAN:  Sure, that's my --

THE COURT:  Because this is getting to be a little strange.  Keep going.

BY MR. WISEMAN:

Q   The scores that were recorded on each of the instruments you administered to Ms. Frank, were they both in the impaired range, significantly impaired range?

A   Yes.

THE COURT:  Did you give her any test to see how impaired she was?

THE WITNESS:  No, but I --

THE COURT:  Okay.

THE WITNESS:  -- I talked to her.

BY MR. WISEMAN:

Q   Is it typically required or even called for to do such a thing?

A   No.

Q    All right.  And the, both manuals require an interview to see if the person is a reliable informant?

A    Yes.

Q    And a person who has a basis for knowledge for the information they are providing to you?

A    Yes.

THE COURT:  How much time did you spend with Mr. Bourgeois?

THE WITNESS:  About four hours.

THE COURT:  Did you ever ask him if he remembered that lady, Ms. Frank?

THE WITNESS:  Yes.

THE COURT:  And?

THE WITNESS:  Well, he remembered her and we, actually I think the reason I keep her calling her grandmother, he calls Ms. Taylor grandmother, so that's why I keep slipping up.

THE COURT:  Well, in the interviews I saw he called her the old lady.

THE WITNESS:  Well, that's what he called her to me. But he does remember her and he remembers all the people in that community, that community of The Bend.

BY MR. WISEMAN:

Q    And you have talked about how the structured, semi-structured interview of the Vineland is preferable in your

view.  Does it have particular strengths in a retrospective evaluation?

A   I would think it does because it allows you to keep calling the person's attention back to the age at which you are interested in determining how that person was functioning.  When you are dealing with it retrospectively, they tend to bounce across the time they have known the person and if you would allow them they would give you answers of how they were when they were in high school or whatever, so in a semi-structured interview you always get that point to clarify, okay, this is what I think I've heard you say, and remember we are talking at seven, are you certain this is what he could do at the age of seven.

Q   Did you observe in Dr. Moore's report any critique of the scores that were recorded with respect to the administration to Ms. Frank?

A   Yes.

Q   And what was that, generally what was that criticism?

A   As I remember his criticism, I think the major criticism was the difference in the scores, that one was low and the other one was higher and it showed a specific bias.

Q   And did he make any observation with respect to what state or what condition Mr. Bourgeois would have been in if those were his true scores and whether he would have accessed services?

A    Oh, I remember that part.  It was more along the lines of the way a person functions with scores in the 40 is that person would more likely be institutionalized and need, wouldn't be able to function out in the community even with supports.

Q    And did you, are you familiar with the state of services for people with developmental disabilities in that part of Louisiana during the early 1970s?

A    Yes.

Q    And describe it for the Court, as well as your basis for knowing it.

A    Okay.  Well, I have always worked for the division of state government that provides services to people with developmental disabilities, not only in developmental centers, which are the institutions, as well as other types of facilities.  In that particular area, in South Louisiana, people tend to keep their children at home.  There were no services available in the community prior to about 1980 and so they lived at home if they were allowed to go to school.  If they were toilet-trained they would go to school.  If not, up until the time of special education, services were provided in the home.  And there really weren't any personal care attendants or things like that that you get services for to come help you in your home.

Q    And the fact that his brother Anthony, Mr. Bourgeois'

brother Anthony didn't receive services until 2001 as an adult, did that factor into your assessment of the services available at that time?

A    Well, that's consistent with that, because I think that's about the time his mother passed and his sister Claudia assumed some responsibility for his services, and she worked or the family members worked and they were looking for someone that could help provide him services during the day. Even Claudia mentioned the family didn't want to institutionalize him because they had managed to keep him in the community all of this time.  And the services he gets now is the opportunity to go to a day program during the day and then have some people come in and help him, help her with the bathing and the physical lifting, et cetera.

Q    And did you have an opportunity to speak with a woman named Gwendolyn Thomas Smith about services in that part of Louisiana at that time?

A    Yes.

Q    And who is she and what did she describe?

A    Gwendolyn Thomas Smith was an educator in St. James Parish, which is the parish he went to school in.  She always worked in the field of special education, but prior to special education, formal federally funding, funded special education coming to Louisiana, she worked under the Title I program, the ESEA program.  It was a federally funded program

to provide assistance to low-income students and they had reading labs. It was the early, early stages of special education in rural areas in Louisiana. So she gave me some history of where the school system was in regard to special education and special education services at the time Mr. Bourgeois was in school.

Q   And did the information she provide you add anything to your evaluation in particular with respect to the fact that Mr. Bourgeois apparently didn't receive any services?

A   Well --

Q   Let me ask it a different way. Was there a reason for his not receiving services other than the fact that he may not have been mentally retarded?

        MR. ROBERTS:  Your Honor, I would object, that calls for speculation.

        THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Using Anthony's brother, Mr. Bourgeois' brother Anthony as a comparison, did the fact that there was a profoundly impaired person in the home, in your view, impact the information you were getting from the family?

A   In my opinion it does, and I have seen this with another, in other families. When you have someone with Anthony's impairment, for that family that becomes the definition of mental retardation, and so even though they may have other

children that are struggling academically or also have deficits, that person is far superior to the benchmark person or family member they are looking at and so they wouldn't put him in the same category.  In their opinion Mr. Bourgeois might have been slow in certain areas but he wasn't mentally retarded, Anthony was mentally retarded and there was no way they were the same.

Q   Let's talk now about your other interviews and review of collateral data and let's talk about the data first.  Did you have a lot of collateral data as far as Mr. Bourgeois' background to review in this case?

A   Not very much school information at all.  There were people still living in the community that I could talk to. There were some efforts he had made to make employment with sheriff's departments that I could look at.  And his first long-term employment was with a place named Schwegmann's and there were people there that I could talk to, and I was kind of familiar with that organization.

Q   All right.  So, in addition to talking to Ms. Frank and administering these two tests to her, how many other folks did you talk to?

A   Okay.  Amongst family members I spoke with Claudia, which is an older sister, Claudia Ferdinand.

          MR. ROBERTS:  Your Honor, could, I just want to get a time frame for when she was actually speaking with these

individuals because I think it matters with regard to her report and when she did her report.

THE COURT:  When did you talk to them?

THE WITNESS:  Okay.  Ms. Franks was in the spring of 2009, I want to say April, about, maybe March.

BY MR. WISEMAN:

Q   Before your report?

A   Before my report, yes.  Let's see, did I talk to any -- I know I talked to Claudia Ferdinand in the last three months, is off the top of my head.  I talked to -- and that was in person.  I talked to Michelle Armont, who is a half-sister on the father's side of the family.  I talked to her in the last three months.

THE COURT:  After your report was written?

THE WITNESS:  Yes.  Let's see, who else did I talk to?  I talked, I'm trying to think of family members.  I talked to Murray Bourgeois, and he is a, I think, if I've got it correct, he is a cousin of the mother, although I think he refers to Mr. Bourgeois as his cousin.  I talked to him in the last three months.  I, by, I had a phone conversation with Carl Henry, who is a cousin and also was a work supervisor at Schwegmann's.  I talked, I talked to a brother, his brother Lloyd Ferdinand, and that's been fairly, I had a very hard time tracking down Mr. Ferdinand and that's been probably in the last 30 days that I spoke with him.

THE COURT: Where did you find Mr. Ferdinand?

THE WITNESS: I had phone numbers that I kept leaving messages at. And I talked to him once at a place he said was his, a workplace of his, and then he terminated the conversation and then he called me back later that night, and then I had to return him back on his cell phone, so it was always on different, different phone lines that I was talking to him, and I gathered from the phone calls he was traveling about. I talked to, I'm trying to remember everybody here, I talked to people that worked with him at Schwegmann's. I talked to a Donald Reese who was a truck driver that worked with him at Schwegmann's and later was a tandem truck driver with him, they went on the same truck route together in the same truck. I talked --

MR. ROBERTS: Your Honor, if I may interject again, she's starting to list the people without giving us when. I think --

THE WITNESS: Okay, and I would say that's in the last three months. I'm sorry.

MR. ROBERTS: -- most have been within the last three months, right?

THE WITNESS: The last three months.

BY MR. WISEMAN:

Q   With respect to when you spoke to these folks, I want to put up what's been marked as Petitioner's 33, and do you

recognize that?

A    Yes.

Q    And is that your report or your supplemental report in this case?

A    It think that's my supplemental report right there, yes.

Q    Okay.  So you issued a report in 2009?

A    That's correct.

Q    And you did additional interviewing?

A    Yes.

Q    And you issued a supplemental report?

A    That's correct.

Q    And the supplemental report contains the result of your, the interviews you have just described?

A    That's correct.  Now, when I did my initial report and my initial interview, I asked to talk to a lot of different folks, and the legal team was cooperative in trying to find these people for me and to give me phone numbers, et cetera. There was, the last name I was going to mention, and it has been in the last three months, is Fred Tompkins who was a senior truck driver at Schwegmann's that knew Mr. Bourgeois. I also spoke with him.

Q    What, we will get to specific things that were told to you but what generally did you learn about Mr. Bourgeois' background from the various folks that you talked to?

A    Okay.  And starting with family members that I --

Q    Sure.

A    -- spoke to that knew him during the developmental period, there was a history of physical abuse and emotional abuse that he sustained throughout his years.  I think that's well documented in the records.

THE COURT:  Well, it's all by Mr. Bourgeois.

THE WITNESS:  By his mother towards Mr. Bourgeois?

THE COURT:  No, I meant the documentation is all by Mr. Bourgeois after his trial.

THE WITNESS:  Oh, that's right, I guess so.

THE COURT:  Okay.

THE WITNESS:  But, and the people I talked to, they all agreed that that occurred.  Anyway --

THE COURT:  Who agreed that that occurred?

THE WITNESS:  First of all his sister Claudia.

THE COURT:  Okay.

THE WITNESS:  Who is about six years older than he is.  And she'd give instances of when he was beaten by the mother.  Not only was his nose disfigured, and this was a constant thing, he was beaten by the mother with extension cords, belts, things were thrown at him.  She told the story of a meat cleaver that the mother brought down one time and removed the tip of a finger.  She told the story of him being beaten in a bathtub so profusely that blood was running in the bathtub.  And she confirmed that he had, he was treated

differently than all the other siblings in the family.

BY MR. WISEMAN:

Q    In addition to Ms. Williams, did you hear any abuse
stories from Mr. Henry?

        THE COURT:  Mr. who?

BY MR. WISEMAN:

Q    Henry, Carl Henry?

A    Carl Henry, yes.  Carl Henry was a cousin and later was
his, a supervisor of his at Schwegmann's, and he frequently
came back to The Bend, which was where his family was, and he
played, you know, with all the children in The Bend, and he
remembered that Mr. Bourgeois was emotionally and physically
abused by his mother.

Q    In addition to the, to the abuse you heard from those
folks, did you hear anything relevant to the mother's
household while Mr. Bourgeois was a child?

A    Well, I heard more than one thing, but one thing about
the mother was she was a fastidious cleaner, she was an
obsessive compulsive person.

        MR. ROBERTS:  Your Honor, I'm going to object unless
they can lay a foundation of who she is hearing this from.

        MR. WISEMAN:  Oh, sure.

        MR. ROBERTS:  Because it's just so generic, we don't
have any idea where this information is, the source of the
information.

BY MR. WISEMAN:

Q   Yeah, Why don't, why don't we -- that's a fair point. Why don't we go through some specific folks.  Let's talk about Claudia first.

A   Okay.

Q   Claudia Williams.

THE COURT:  Are these people going to be here?

MR. WISEMAN:  Yes.

THE COURT:  Can't we just hear from them?

MR. WISEMAN:  Sure, but then I'm afraid that I will be confronted with not having had the expert talk about it. I am happy to not talk about it with the expert --

THE COURT:  Well, what can she say other than that she talked to these people and he was abused?

MR. WISEMAN:  All right.  Well, I mean, I just had an objection from Mr. Roberts it's not specific.  If Your Honor wants to overrule that, I will move on.

THE COURT:  No, I want --

MR. WISEMAN:  I'm happy to have her talk generically.

THE COURT:  I was kind of hoping that we could just move on from the hearsay stuff to something that she knows. You know, test results and that sort of thing.

MR. WISEMAN:  Oh, sure, sure.

BY MR. WISEMAN:

Q   Well, Doctor, do people in your line of work rely on third-party reports in assessing whether there is an abuse history?

A   Yes, you have to rely on third-party reports in gathering the evidence in a retrospective diagnosis to see if you have met the criteria prior to the age of 18.

Q   And what relationship is there and why is an abuse history relevant to whether or not Mr. Bourgeois is mentally retarded?

A   Well, it could have been the abuse might be the underlying etiology of the mental retardation.  It could have been because of the abuse he developed certain patterns of emotional behavior that kept him from learning.  And then in this particular case there is a secondary issue of another diagnosis that he most likely has of a personality disorder, and a history of abuse is primary, in my opinion, of giving a personality, the type of personality disorder diagnosis that has been given to him.

Q   And what relevance does an impoverished upbringing have to whether or not Mr., and by impoverished I mean materially impoverished, have with respect to whether he's mentally retarded?

A   Well, some people that come from impoverished environments such as that have the lack of opportunity to

learn, so what you are trying to tease out is was it the lack of opportunity that caused him to be the way he was or was it low cognitive ability and not having any opportunity, he didn't get the supports he needed to achieve at the highest level.

Q   And what relevance, if any, is there to whether Mr. Bourgeois was teased as a child have to your determination of whether he is mentally retarded?

A   Well, it was what he was being teased about, I think was the most important, and he was being --

THE COURT:  Where did you get that information?

THE WITNESS:  I got that from Murray Bourgeois, the cousin.  I got that from my conversation with Lloyd, with Carl, with Claudia and, primarily those.  The other sister that knew him that I talked to that I don't think we have discussed yet knew him more as a teenager.

BY MR. WISEMAN:

Q   And same question for whether or not there was the presence of motor deficits as a child.

A   That's right.

Q   And who did you hear it from and what did you hear?

A   I heard it primarily from Carl, Lloyd and Murray, along the lines of he was much, it took him much longer to learn how to ride a bike, he was not as good as the other children, he was made fun of because he was clumsy and couldn't keep up

in the games, and then even later when he was able to do some of these things he had a harder time remembering the rules for the games.

Q    And same set of questions for the presence or absence of poor social relationships as a child.

A    Well, that's correct.  It was just harder for him to -- he was, when he was much younger he was pretty much silent and non-communicative, and then later on when he grew older he really didn't know how to socially interact with the kids and he was frequently teased or made fun of.

        THE COURT:   Did you know he had a stutter?

        THE WITNESS:  Yes, he had speech therapy when he was young, as I understand it, for stuttering, and -- yes.

BY MR. WISEMAN:

Q    Were you, did you learn from these various interviews whether he ever lived alone for any significant periods of time as a young man?

A    No, I didn't discern where he had ever lived alone. There was one time, according to his sister Claudia, that he lived in a trailer right behind her house, but even then he could rely on her for cooking and washing his clothes and things such as that.

Q    And is that relevant to the assessment of whether his home living, ability to adapt to home living is present in this case?

A    That's right, and it gives you the fact that this person had some knowledge of his home living skills at that age in his life.

Q    Did you notice in Dr. Moore's report his reliance on a fellow named Ralph, Claudia Williams' husband?

A    Yes.

Q    And did you meet Ralph?

A    Yes, I met Ralph.

Q    Describe for the Court what you, how Ralph behaved.

A    Well, when I met Ralph he was pretty disoriented, he appeared to be --

MR. ROBERTS:  Judge, could we find out when she met Ralph and again the context?

MR. WISEMAN:  You know, Your Honor, I'm not sure why this isn't proper cross.  If he keeps interrupting the witness, I'm not sure what the --

THE COURT:  Well, if you want me to get a picture, I'd really like to know when she met him.

MR. WISEMAN:  Oh, well, that's a different matter then.

THE WITNESS:  It's been in the last three months.

THE COURT:  So it's after you wrote your report?

THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q    Before your supplemental report?

A    Yes.

Q    Okay.

A    And it was when I specifically had gone to the Williams home to interview Claudia Williams, he was there.  He appeared intoxicated and he was very disoriented and he kept interrupting the conversation.

Q    What time of day was it that you were there, roughly?

A    Roughly, I'd say around 3:00 o'clock in the afternoon. So if Claudia and I were talking about Mr. Bourgeois, he would become confused and thinking I was talking about something else and then sidetracked me, and so finally, I was there with a member of the legal team and she steered him to another room and kind of kept him busy so I could conclude my conversation with Ms. Williams.

Q    Did you learn from any of these particular folks about whether Mr. Bourgeois got jobs on his own or whether he got jobs with assistance?

A    Early on he got jobs with assistance.  One of the first jobs that he was able to obtain was at a Market Basket which was a, is a grocery store in Louisiana, a chain, and, as I was told, Miss Mary was able to get him that job because she knew the manager, and he worked there and I think at another grocery store.  He later had relatives that worked with the sheriff's department and he tried to get a job there.  And he went to work at Schwegmann's and he had a relative that

worked there. Once he established skills at Schwegmann's, he met truck drivers, and when they would move on to another company he would move with them.

Q And let's talk about Schwegmann's. You indicated that you had some independent knowledge of what type of company Schwegmann's is. Could you tell the Court what you know about it --

A Well, my --

Q -- and how you know?

A Okay. Well, my independent knowledge about Schwegmann's is because Mr. Schwegmann, who is now dead, founded this large supermarket chain in New Orleans and he had a handicapped child, a child that was mentally retarded, and so therefore he was pretty influential in the community in trying to get supports for folks, and he had a policy at his chain that he would hire any handicapped person that would want to work and he would work with the, he would have supports there to work with the person, so I knew a lot of people who had worked with Schwegmann's that I later worked with. And at one time I worked in New Orleans at Magnolia School, which is a private school, and a lot of the folks that resided at that facility worked at Schwegmann as bag boys or stockers or whatever. His in-service training actually had a way of working with disabled people that couldn't read or write very well and teaching them how to do

these basic manual tasks.

Q   And when you talked to the gentleman, Fred Tompkins, did you learn facts about Schwegmann's from him that were consistent with what you just described?

A   Yes.  Mr. Tompkins, at the time he worked there, he worked up to the point of being the senior driver, and Mr. Tompkins stated that Mr. Schwegmann was one of the first employers in New Orleans that would hire black men who couldn't read and write.

        MR. ROBERTS:  Your Honor, I'm going to object to the relevance of this going down --

        THE COURT:  What's the relevance?

        MR. WISEMAN:  Well, the relevance is that the very first trucking job Mr. Bourgeois had was in a place that specifically recruited and supported people with disabilities.

        THE COURT:  Okay.  Do you have any reason to think, to know, any personal knowledge of the fact that Mr. Bourgeois was recruited because he was mentally handicapped?

        THE WITNESS:  No, Mr. Bourgeois --

        THE COURT:  Just, this is a yes or no.

        THE WITNESS:  No.

        THE COURT:  Okay.  Then let's move from something else.

BY MR. WISEMAN:

Q    Okay.  How about whether Schwegmann's supported Mr. Bourgeois while he was working?

THE COURT:  Okay, that, the issue is move on from this.  If she has no personal knowledge that Schwegmann's hired him because --

MR. WISEMAN:  But she does.

THE COURT:  She just told me she didn't.

MR. WISEMAN:  No, but she has knowledge of the supports that were in place.  The Government is arguing he was an accomplished truck driver.  Our view is that he was given supports in the very first place he worked so that he could drive a truck, so he could learn the various skills that were needed.  If he were not given those supports, our position is he would not have achieved those things.  It's highly relevant to whether he was mentally retarded.

THE COURT:  Do you have personal knowledge that he received special supports to become a truck driver?  Personal knowledge?

THE WITNESS:  I only have the knowledge that I obtained in interviewing his supervisor and two of his co-workers.

THE COURT:  That's okay.  Are they going to come testify?

MR. WISEMAN:  Mr. Henry will be here, yes.

THE COURT:  Okay.  Then let him talk about that, okay?

MR. WISEMAN:  Okay.  Can I just ask the question?

BY MR. WISEMAN:

Q   Did he receive supports, to your knowledge?

A   Yes.

Q   Okay.

A   And I think Mr. Reese will be here.

Q   Yes.

A   Okay.  And so I interviewed three and two of them will be here and the Court could hear from them.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q   Very good.  What did you learn from Michelle Armont relative to your assessment?

A   Michelle Armont, he, Mr. Bourgeois --

THE COURT:  Now, is that his, that's his sister Michelle?

MR. WISEMAN:  Yes, half-sister.

THE COURT:  All right, thank you.

THE WITNESS:  His half-sister.  His half-sister by the father.  He came to live with Ms. Armont in his teenage years after Miss Mary died and he lived with her while he attended high school.

BY MR. WISEMAN:

Q    And what did she tell you about his ability to function?

A    When he came to live with her, at the time he was living with her, she was the one who was responsible for taking care of his clothes.  He didn't have any cooking skills.  He continued to have problems with interpersonal social relationships.  He would have girlfriends and they would frequently have spats.  And he had trouble in school.  She tried to help him in school, she tried to get some other folks to work with him, and he frequently had girlfriends that came over and helped him work on academic subjects.

Q    And let's talk about the one page of school records that we were able to provide you.  Did you see anything in there that supported your conclusion about his deficits in academic areas?

A    Well, other than I think he was approximately 20 when he graduated from high school.  We only have verbal reports of Mr. Bourgeois and family members that we believe he was retained.

Q    What do you mean by retained?

A    Well, he failed certain grades.

Q    Okay.  He was left back?

A    Left back, yes.  And then there was, there is a report, and possibly I think Mr. Henry also has knowledge of this, of him failing a grade and then making the grade up by going to

summer school.  Let's see.  The curious thing for me is nobody remembers him graduating, and when you talk to family members they are certain he didn't graduate, but the document says that he does.  I don't know if he accrued them after the time and then it was awarded.  At that time in Louisiana you graduated from high school strictly on the determination of the principal and you could leave school and come back and get the principal to look at your record and determine that you had met the requirements that were needed at that time, and that might have been what he did.

Q   Okay, so --

A   We just don't know.

Q   So that we are clear, there was no standardized method by which one graduated at that time?

A   At that time, no.

Q   Did you learn anything about -- you may have noticed on the tapes of the Government's evaluation of Mr. Bourgeois his claim to being able to fix lawnmowers and cars and things of that nature.  Did you receive contrary information from others that went into your, the formulation of your opinion?

A   Yes, I did, and particularly in talking to Murray Bourgeois.  Is he coming?

Q   Yes.

A   Before I take up too much time.

Q   Yes, he's coming.

A    I think he could address this specifically.  He is a mechanic and that's where his brother learned to do mechanics and that's where Mr. Bourgeois claims he learned, and Mr. Bourgeois can address that in his testimony.

Q    Okay.  And with respect to Carl Henry with the same proviso, that he's coming and he can talk in greater length, did you learn anything from him with respect to how long it took Mr. Bourgeois to learn to drive different types of trucks?

A    Yes.  He, the procedure there is you had to learn to drive five types of trucks before you could make truck driver, and you did this on-the-job training and it took a regular driver two weeks per truck and it would take Mr. Bourgeois maybe six months per truck, and sometimes they had to back him up to other tasks because he couldn't master the second type of truck.  So it took him much, much longer than it did the typical person.

Q    Okay.  And that was at Schwegmann's?

A    And that was at Schwegmann's.

Q    Now, we talked quite a bit about the tapes and we have talked about your interactions with Mr. Bourgeois.  How would you describe the way that he presents himself in the tapes and in your, from a clinical perspective how he presents, presented to you?

A    Well, I think I mentioned that earlier.  He tends to

overestimate his abilities.  He speaks untruths, quite frankly, about things that he can do, and sometimes when you are talking to them you know they are untruths because they don't match other things that you have seen.  But he wants to present well, he presents very well.  I think a recurrent theme in all of this is he tends to want to do as well as his brother did and he tends to try to steer you in the direction of Lloyd did this and I can do it, too.

Q    And is there a concept in the field of developmental disabilities called masking?

A    Yes.

Q    And just describe that for the Court, what that is, and --

A    Well, masking is something that people, particularly people with mild mental deficits do so that you don't recognize, to mask the fact that they are mentally retarded. They may parrot something that they have heard before or they may maintain they can do a skill that they can't do.  And they also just may redirect you so that when you answer (sic) a question, if they don't know it they very quickly start talking about something else in trying to get you distracted to another topic.  And the Judge has looked at a lot of videos and I think she can see that in the videos.

Q    And what's the explanation in your field for why people mask who have mild mental retardation?

A    Well, quite frankly, most people would prefer not to be mildly mentally retarded.  When you are functioning at a lower level it probably doesn't bother you, but when you are mild you have enough cognitive ability to recognize the difference, and it's a self-esteem issue.  You would like to present better and you would like to be like the other people that you know.

Q    And combining that -- well, did you think Mr. Bourgeois was engaged in masking during the videos and your interactions?

A    Yes.

Q    And combining that masking with what you know about his personality disorders, particularly the narcissistic personality disorder and the grandiosity that accompanies it, do you, what's your opinion as to how difficult it is to assess a person with that constellation of problems?

A    Okay, so we are moving into the area of personality disorders?

Q    Yeah, yeah.

A    And more away from the areas in mental retardation. Personality disorders are a pervasive pattern of behavior that you learn through childhood up into early adulthood and so it becomes the way that you behave, the way you act.  It's a maladaptive pattern, but it's also personality traits that you have developed over time because of the way you were

raised and the things you were exposed to.  And I think, for sure there has been some discussion, I think some people put him personality disorder NOS, some put him narcissistic and some people put him borderline.  I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they have and there is definitely mood problems there, there's self-esteem problems there, and this is some of the same problems you have with a person who is mildly mentally retarded as well.

Q   And so I guess my question was does that make it difficult to assess somebody like Mr. Bourgeois who is psychologically invested in looking good?

A   That's correct, but I think what you have to center on on a case like this is was there evidence of that at a younger age, at seven, at eight or at ten, because personality disorders aren't in place there.  They are being exposed to the things that perform that pattern.  So, yes, there is evidence as an adult he has a disorder, but there is also evidence that as a child and going up to the developmental period that he had cognitive and adaptive deficits as well that he was masking even then.

Q   We are almost to the end here.  You reached a conclusion with respect to Mr. Bourgeois' adaptive deficits?

A   Yes.

Q   And what conclusion did you reach?

A    I thought there was clear evidence that there was adaptive deficits prior to the age of 18, which would confirm a diagnosis of mental retardation.

Q    And --

A    The --

Q    Go ahead, I'm sorry.

A    Okay.  The issue with the Court, I think, today is do those adaptive deficits persist into adulthood.

Q    All right.  Before we get to that question, which we are going to get to, could you tell us in what areas you found these deficits?

A    Oh, under the age of 18 I definitely feel he has deficits in the area of conceptual and social.  And there are some practical limitations as well, but I felt the deficits were there in the area of practical and social.

Q    Okay.  And now taking the next question about post 18-and up to the time of the offense, do you have any opinion as to whether any of those deficits continued?

A    I think in early adulthood they continued and he got a lot of supports and he gradually learned to master.  It would be my opinion, I think, and it's only just an opinion, that by the age, the time of the offense, I don't think there were as, there were problems in his practical skill but I don't think there were significant deficits that would qualify in the area of practical.  There are still social limitations,

particularly in the area of interpersonal relationships, that show a lot of deficits in the area of social. I think it could be argued, well, these are elements of his personality disorder as well. I think it could reflect both. I think he has both a personality disorder and he has social deficits. And I definitely think conceptual still persists. So to my, in my opinion we can be fairly, there's firm evidence of conceptual deficits persisting into adulthood, and this would be deficits in communication that he has. He may have good expressive language when he is on a familiar topic but he doesn't have a good underlying understanding. There's problems with self-direction and there's problems in interpersonal relationships.

Q   Now, you --

A   And functional academic skills.

Q   Both you and I have used the term supports. By supports do you necessarily refer to formal state-implemented supports, a home health aide, someone to help him with his functioning, or are you talking about something else?

A   Well, you can have all kinds of supports. You know, in the ideal world you have supports that are being given by an agency to make sure this person reaches their maximum potential. Those weren't there for Mr. Bourgeois at all. Sometimes there are supports within the environment. I think Miss Mary gave him some supports that helped him do better.

I think if he had stayed in his home with his mother he wouldn't have done as well.  But Mr. Bourgeois has the ability to solicit supports, and that's not uncommon with people with mild mental retardation, they find people that will help them.  And I think when you talk tomorrow to Mr. Henry he can give you examples of things that Mr. Bourgeois did when he worked at Schwegmann's to guarantee success as he became a delivery man and started working at the different stores.

Q    Did you read in Dr. Moore and Dr. Price's reports, I will paraphrase here, sort of chalking up Mr. Bourgeois adaptive deficits to the presence of these various personality disorders?

A    Yes.

Q    And what's your view of that?

A    Well, as I remember them they are saying it could be one or the other, and I am just saying it could be both, I mean he could have both of these.  There is nothing to say that a person with mental retardation cannot also have a personality disorder.  A person with mental retardation can also have an Axis 1 diagnosis, a bipolar, schizophrenia or whatever, and I just think what you are looking at is a characteristic that is related to both.

Q    And is another way of expressing that that mental retardation is not a diagnosis of exclusion?

A    Well, that's right.  If you look at the DSM, it specifically states that there is no exclusionary diagnosis for a, for mental retardation.  A lot of them will say when you cannot diagnose this, if there is also a co-existing disorder of such-and-such, and the specific section of the DSM I'm speaking about, it even mentions in there you could have mental retardation and also have a diagnosis of a learning disorder.  Just having one does not preclude the fact with mental retardation, and what you are looking for is do these significant deficits exist and were they there prior to the age of 18.

Q    And there's something in the latest manual of the AAIDD that addresses the concept of problem behaviors and how they relate to a diagnosis.  Could you explain what a problem behavior is and whether or not that impacts your opinion that Mr. Bourgeois has mental retardation?

A    Okay.  I think that's most specifically addressed in the ninth and the tenth version, I think Dr. Moore mentions it in his report, and in that particular section what they are talking about, there are certain problem behaviors, disorders, behavior disorders that are common to people with mental retardation, self injurious behaviors, for example, or repetitive rocking or hand mouthing or things such as this, and that particular section cites various people who are well known in the field, applied behavior analysis, and when one

of these problem behaviors occur then eliminating that problem behavior might improve their adaptive skills.  For example, if someone is always mouthing their hands to the point that they are calloused and they are hard to move, they may not have good fine motor skills.  If you can eliminate the fine motor, get mobility back in the hands, the fine motor skills are going to go up.  And so that's the particular area of the AAIDD manual that I am familiar with, what you are talking about.  Another way of looking at that that I think they went into more detail in the Eleventh is problem behavior or maladaptive behavior and adaptive behavior are really two different continuums.  Adaptive behavior are the skills that we have been talking about all day.  Maladaptive behaviors may be problem behaviors that you see but it's a separate continuum.  People have a tendency, who don't know a lot about mental retardation, to think, well, this is adaptive behavior and maladaptive behavior is at the low end of the adaptive behavior, and they caution you need to look at them at two different continuums.  For example, you could have a conduct disorder and also have mental retardation, but they are two separate disorders and you need to diagnose and assess them at separate continuums.

Q   Okay, I think I'm fresh out of questions.  Thanks very much.

A   Could I have --

THE COURT:  Then we will take a 15-minute break and then continue on cross-examination.  Thank you.

(Recess at 10:40 a.m. until 10:58 a.m.)

THE COURT:  Begin the cross-examination.

MR. WISEMAN:  Your Honor, before that, if I might, could I move in the exhibits that I have marked or used during the examination?

THE COURT:  Exhibits number?

MR. WISEMAN:  That would be 33, 136, 155, 159, 160, 161, and I believe 34 and 35, and Your Honor --

THE COURT:  I think I admitted 36.

MR. WISEMAN:  That was the CV, that's right.

THE COURT:  Right.

MR. WISEMAN:  Okay.

THE COURT:  Any objections?

MR. ROBERTS:  No objections, Your Honor.

THE COURT:  Those exhibits are admitted.

(Defendant's Exhibits P33, P34, P35, P136, P155, P159, P160 and P161 admitted into evidence)

THE COURT:  Would you give those to Ms. Scotch, please?

MR. ROBERTS:  And, Your Honor, may I, I would like to utilize them.

THE COURT:  Yes, fine.

MR. ROBERTS:  Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q   Good morning, Dr. Swanson.  I'm Tony Roberts.  I represent the United States.  And I wanted to start with the last series of questions that Mr. Wiseman was asking you because he asked you a question very specifically, if it's difficult to assess a person who has things such as narcissism and borderline personality disorders, and you kind of bounced around the question, you didn't actually answer it.

MR. WISEMAN:  Objection, Your Honor.

BY MR. ROBERTS:

Q   And so --

THE COURT:  What's the legal objection?

MR. WISEMAN:  It's a conclusion and I think it's --

THE COURT:  Overruled.

BY MR. ROBERTS:

Q   I just wanted, I mean it seemed like to me when you got to the end, when you said he still had deficits, was your answer that even though he still has deficits it is difficult to assess someone as complicated or maybe, or somebody that has the personality-type disorders that Alfred Bourgeois has?

A   I think I understood his question different than the way you are asking.  I thought we were --

Q   Okay.  Well, I wrote, I wrote down --

A    I thought the question --

        THE COURT:  Wait a minute.

        THE WITNESS:  This is what I thought, was, is it difficult to assess an adult who might be mentally retarded and have a personality disorder.  I thought that was the question.

BY MR. ROBERTS:

Q    Okay.  Well, let me ask you straight.

A    Okay, ask me your way, please.

        THE COURT:  I'm sorry?

        THE WITNESS:  I asked, if he will ask me the question the way he wants it answered.

        THE COURT:  Okay, this is the way this goes.

        THE WITNESS:  Okay.

        THE COURT:  He asks the questions, you answer.

        THE WITNESS:  Okay.

        THE COURT:  Okay.  There's nothing in between.

        THE WITNESS:  Okay.

        THE COURT:  Okay?  Go ahead.

BY MR. ROBERTS:

Q    It is correct, is it not, to say that in this particular individual and the personality disorders that he has and the deficits that you claim to have observed that it is difficult even for an expert of your caliber to make this assessment?

A    I think it would be a difficult assessment, yes.

Q    Okay.  And so in a trial setting, before we go to a trial, if a trial team goes out and finds a psychologist and obtains a psychiatrist to conduct tests and those psychiatrists or psychologists give advice to the defense counsel on a very difficult assessment, wouldn't it be logical for the defense counsel to rely upon the advice of those experts?

A    Yes.

Q    Particularly when you are dealing with a very difficult assessment?

A    Yes.

Q    Okay.  I want to briefly touch on your report in June. On June 8th of 2009 is when your report is signed.  It's a three-page report, it has seven paragraphs, and I believe -- actually I'm not sure that it was offered.  I'm not sure it was offered into evidence yet but the, you did complete a report in June of 2009?

A    Yes.  Could I have a copy of that report to look at, please?  I didn't bring any of my report.  I don't think I brought that one with me, or not to the stand.

    (Off the record discussion at counsel table)

        MR. ROBERTS:  May I approach the bench, Judge?

        THE COURT:  Yes, sir.

        MR. ROBERTS:  Sorry, Your Honor, if I might have just a moment.  The defense has decided not to offer this so

the United States is going to offer this.

            THE COURT:  All right.

       (Off the record discussion at counsel table)

            MR. ROBERTS:  May I approach the witness, Your

Honor?

            THE COURT:  Yes.  Well, just, look, this is the way

this works, put it on the overhead document camera and move

on, please.

BY MR. ROBERTS:

Q    Dr. Swanson, I have what I've marked as Government

Exhibit 175.

A    And could I see the second page?

Q    Yes.

A    I had that in front of me but I lost the second page when

we were shuffling them, because that goes 1 through 6 and the

third page starts maybe with number 7?  Yes, and that's --

Q    The second page that I have starts with 3 --

A    Okay.  I don't have -- okay.

Q    Paragraphs 3, 4, 5 and 6.

A    And the last one goes on to 7 --

Q    And the last paragraph --

A    -- and signed 6-8-09, yes.

Q    Okay.

A    I may have to ask to see page 2 from time to time.  I

have page 1 and 2 in front of me.

Q   I understand.  But you do recognize this document?

A   Yes.

Q   What is this document?

A   Okay.  This was an initial declaration that I wrote after I had done my initial assessment which was in the spring of 2009.  I had looked at some records, I had talked to Ms. Franks at that time, and --

Q   Okay.  I have one question with regard to this document. Did you make an assessment under adaptive functioning --

A   Could you --

Q   -- in regard to Mr. Bourgeois?

A   Would you, would you put 2 up there?  I hadn't made an adaptive assessment with Ms. Frank.

Q   Well, let me, let me draw your attention to page 3.

A   Okay, I've got that one.

Q   Which is the end of paragraph 6.  Did you make, my question is not what you -- my question is did you make a mental retardation assessment based on --

A   I made a mental retardation assessment on what I had available at that time, yes.

        MR. ROBERTS:  Your Honor, we would move this exhibit into evidence, offer it.

        MR. WISEMAN:  No objection, Your Honor.

        THE COURT:  And it is number what?

        MR. ROBERTS:  175, Your Honor.

THE COURT:  175.  And that is labeled Defendant's 175?

MR. ROBERTS:  It's --

MR. ROBERTS:  Or respondent's, I'm sorry, or movant's 175, petitioner?

MR. WISEMAN:  No, it's the Government's exhibit.

THE COURT:  Government's Exhibit 175 is admitted.

(Government's Exhibit 175 admitted into evidence)

MR. ROBERTS:  Yes, Your Honor, thank you.

BY MR. ROBERTS:

Q   Now, Dr. Swanson, as I said, as we noted, this is an assessment that you made in June of 2009 and you have already, at that point in time you have found that Mr. Bourgeois is an individual with mental retardation?

A   At that point in time, based on the information I had there, I had found that, yes.  I subsequently did other evaluations as well.

Q   We will come back to that in a few minutes, but the -- now, were you aware, and I know that you testified in Louisiana in June of 2010, this year, in a case of Joseph Smith?

A   Yes.

Q   And you went through a lot of, in that case, your adaptive functioning assessment was challenged pretty hard by the United States in that case, wasn't it?

A    Yes, it was.

Q    In fact, you had spoken to three family members of the defendant Joseph Smith and they challenged your methodology, really, and how you did your adaptive functioning in that, didn't they?

A    Yes.  They challenged how I had marked the protocols, yes.

Q    Okay.  And that was in June of 2010.  Were, you are aware, are you not, that Dr. Moore had gone out to New Orleans to try to locate family members and conduct an adaptive functioning of certain individuals in July of this year?

A    I knew he was there during the summer.

Q    Okay.  In fact, the, you are aware that the defense showed up when he went to interview Michelle Armont, are you not?

A    I was told that.

Q    Okay.  And there was a list of people that the United States were, that Dr. Moore was going to contact.  Do you know who those individuals were?

A    That Dr. Moore was going to contact?

Q    Yes.

A    No, I --

Q    That Dr. Moore was going to interview.

A    No.

Q   So you weren't aware that Dr. Moore was, had planned on interviewing the exact same people that are listed on page 3 of your, of Plaintiff Exhibit 136, the interviews that you completed within the last three months?

A   No, but I'm not surprised because those are the people that live in that community.  He interviewed other folks as well that I didn't interview.

Q   And then in August, and I will show you again Petitioner's Exhibit 33, that is a supplemental report, your supplemental report dated August 12th, 2010.

A   Yes.

Q   This year.

A   Yes.

Q   In which you, on page 2, claim, in the paragraph, let's see, it's under paragraph, section 2 under adaptive deficits, it's the one, fourth paragraph down where you list a bunch of individuals that you spoke to as informants.

A   Yes.

Q   And again, prior to that you had already made an assessment of mental retardation on behalf of Alfred Bourgeois?

A   Well, I had made an assessment based on what I had, but I had asked to see more people.  That was all that was --

Q   But you didn't see more people at that time, did you?

A   There wasn't anybody else for me to see at that

particular point in time.

Q   You spoke with Ms. Frank.

A   Uh-huh.

Q   You did an adaptive functioning assessment by giving her the ABAS and the Vineland?

A   And I interviewed her as well.

Q   And you interviewed her, and you made your assessment that Alfred Bourgeois was mentally retarded in 2009 based on Beverly Frank's information, and other information you saw but based on Beverly Frank's information, that's where you got your adaptive functioning assessment?

A   Well, that and the adaptive functioning information that I got from records that I looked through.

Q   As I have mentioned, I have, I know that you were, you testified in June 2010 in Louisiana.  I know also that you have testified several times in various courts and you were involved in a case in Mississippi involving William Lee Wiley?

A   Yes.

Q   And so we know you are an expert in this area.  What I am curious about is, is there a national organization for psychologists?

A   Yes, American Psychological Association, and then every state has its local chapter as well.

Q   But you are not a member of the American Psychological

Association?

A   I'm not a member of the national one.  I am a member of my own state one.

Q   Okay.  And then you were, the organization of AAMR, that's what you have referenced a couple times, American Association on Mental Retardation, that was, you said that's the name of the organization that -- what was its role, why did it come into being?

A   It's a collection of professionals that work with people with mental retardation, and it came into being to advocate for better diagnosis, better treatment, and to do research in the field to improve the treatment for folks with --

Q   So you would agree it is a kind of an advocacy, it fulfills an advocacy role?

A   It fulfills an advocacy role, yes.

Q   And in that role it filed an amicus brief.  I guess actually before it filed the amicus brief it changed its name, the name was changed, is that correct?

A   It --

Q   They changed it to an AAIDD?

A   I think it's had three or four names through its hundred plus years of existence and the most recent one is AAIDD.

Q   So they moved away from the mental retardation label?  Is that fine, can we use the word label?

A   That's correct.

Q    Okay.  Moved away from the concept of mental retardation as a label and they are adopting a new or advocating for a new label or terminology, and what is that new terminology that they are trying to apply?

A    It's the American Association for Individuals with Developmental Disabilities.

Q    Okay.

A    And most professional organizations --

Q    Let me just stop you there for a minute because you said individual.  Is it actually, is that the name?

A    Intellectual development.

Q    Intellectual.

A    Yeah.

Q    I think several times in your testimony you said individual and development.  Did you mean every time you mentioned that that it was actually intellectual and developmental?  You were talking about the same AAIDD --

A    Yes, intellectual.

Q    -- throughout your testimony, right?

A    Yes, yes.

Q    Okay.  There's not some other organization called the American Association for Individual and Developmental Disabilities, is there?

A    No, and, but I think I frequently referenced individuals with developmental disabilities as well.

Q   Okay.  So the goal or the advocacy is moving towards renaming this to Intellectual and Developmental Disabilities?

A   Well, in an international code it has already been renamed and that is the term that's used in Europe and other countries, and the American Psychological Association has also renamed its division that a way, and I've recently seen a proposal that's being put forth to the Federal Register that Social Security and the Government is also looking at changing the name to be in accordance with all the different codes.

Q   Okay.  And in this advocacy role for the AAIDD, are you aware that they've filed an amicus brief in the Atkins case?

A   Yes.

Q   Okay.  Do you know what the position of the association was?

A   The association was against the death penalty for individuals with mental retardation.

Q   Okay.  How much of your time do you think in the last -- well, how much of your professional time do you deal with being, testifying in criminal cases now?

A   I would estimate ten percent, just off the top of my head.

Q   Okay.  I think earlier you had testified that you thought maybe you had been involved in about 15 cases where you had been asked to come in and do an Atkins type assessment for a

Swanson - Cross                                            122

defendant, but --

A    Yeah, I think I've gone to court approximately 15 times.

Q    Okay.  In June 2010, the Joseph Smith case, if you said that you had been, I mean if you said you had been in about 18 or 19 hearings, do you think that would be more accurate?

A    It might be.

Q    Okay.  And you also said earlier that every time you have been called in to make an assessment on a defendant you have found that the defendant is mentally retarded except for one case.

A    Every time I've gone to court.  In those cases that I mentioned, yes.

Q    Okay.  So if it was 19 times then you have got, 18 out of those 19 you have made a finding that the defendant is mentally retarded?

A    That's correct.

Q    And you are doing so in all of those cases in the same way that you approached your assessment in this case?

A    I would say so.  You know, since Atkins came out it's been an evolving science and there has been a lot of research and a lot of guidelines written, and I tried to follow the guidelines that were in existence at that time.  In that June case you mentioned I think I did the interviews in early 2006, which was prior to some of the latest manuals coming out in the ABAS and Vineland, and so therefore when I

administered that I didn't have those manuals, you know,

those guidelines available, and that was some of the

discussion we were having in that hearing.  They have come

out, they came out in 2008.

Q   Okay.  Let's talk just for a minute about this standard,

the mental retardation standard.  I think you addressed this

on direct but I just want to cover it real quickly.  Mental,

the diagnosis, or the assessment of someone who is mentally

retarded is not just based on IQ scores, is that correct?

A   That's correct.

Q   Would you also agree, though, that some people just don't

do well on tests?

A   Yes.

Q   Okay.  Adaptive functioning is an important part of this

analysis, is it not?

A   Of a diagnosis of mental retardation, yes.

Q   Yes, okay.  If someone scored, just hypothetically, if

somebody scored a 50 on an IQ test, that would, that would

still not qualify them as mentally retarded unless they are

also significantly impaired in the adaptive functioning, is

that correct?

A   That's correct.

Q   Okay.  And, again, it has to be onset by the age of 18,

so that's also an important part of the analysis, right?

A   That's correct.

Q   So even if someone scored 50 and they, there was evidence that they were significantly impaired in the adaptive functioning as an adult, unless there is some evidence that this onset before the age of 18, they would not be diagnosed as mentally retarded?

A   There would have to be evidence of onset prior to the age of 18.

Q   Okay.

        THE COURT:  Prior to the age of what?

        THE WITNESS:  Prior to the age of 18.

        THE COURT:  Eighteen, thank you.

BY MR. ROBERTS:

Q   In this case obviously there was a WAIS-IV done, a WAIS-R done by Dr. Weiner, and do you remember what year he did the, that evaluation?

A   I'm fairly certain it's 2004.

Q   You are correct, 2004.  What year was the WAIS-III brought in, what year was it?

A   I'm desperately turning, but I think it was 2007.

Q   You think that the WAIS-III --

A   Oh --

Q   -- became the valid test in 2007?

A   I think 2007 was --

Q   You are guessing what question I am going to ask because you are thinking I am asking about Dr. Gelbort's test.

A    Oh, okay, I'm sorry.

THE COURT:  Okay, wait a minute.  Let her finish answering the question.  So go ahead, thank you.

THE WITNESS:  I'm going to let you restate the question --

MR. ROBERTS:  Okay, because I wasn't --

THE WITNESS:  -- because I got confused there.

BY MR. ROBERTS:

Q    Yes.  My question didn't deal with Dr. Gelbort's testing yet.

A    Okay.

Q    I said Dr. Weiner gave a test in 2004 and it was the WAIS-R.

A    Okay.

Q    What year did the WAIS-III become the normative test, when should he?  When did the WAIS-III come in and the WAIS-R was no longer supposed to be given?

A    As I remember, the WAIS-III was published and available for use in 1997.

Q    '97.

A    Yes.

Q    And Dr. Weiner gave the WAIS-R in 2004.

A    That's correct.

Q    Is that something you would have done?

A    No, I wouldn't have done that.  But I don't do neuropsych

Swanson - Cross                                              126

testing either, I primarily do mental retardation testing,

and I want the most current test available.

Q    You said in your direct examination that if you had had

the information that Dr. Weiner had with regard to the score

on the WAIS-R that you would have suggested to the defense

counsel that it should pursue mental retardation and do more

testing.  Is that an accurate summary of what you said?

A    I thought what I had said was that I felt there was

justification to pursue an Atkins claim, to continue an

evaluation to see if this individual did qualify for a

diagnosis of mental retardation.  Low IQ scores are good

indications.

Q    Have you ever advised a defense counsel that -- you said

there was one case that you decided that wasn't mentally

retarded.  Can you, do you recall the name of that case?

A    Willie Tart.

Q    And did you advise the defense counsel that there wasn't

a mental retardation issue there?

A    It's a very complicated case, and once again I was only

there for the adaptive component of that, but there's other,

there's other problems with brain injury and epileptic

seizures, et cetera.  I don't want to go into it but --

Q    Now, Dr. Gelbort has already told us a lot about that,

so.

A    Yeah.

Q   But one question I have is that if you give that advice to defense counsel, wouldn't you as the expert expect them to rely upon your expertise?

A   Yeah.  In this particular case there is clear evidence he scored in the mental retardation range prior to the age of 18 due to testing that was done.

Q   Which case are you talking about?

A   Excuse me?  The Willie Tart --

Q   You said this particular?

A   The Willie Tart case.

Q   Oh, thank you, okay.

A   And so really I'm just trying to explain, I'm only in one phase of that, and so that's the only case that's listed that I actually went to court on.

Q   Okay.  Do you know what the American Psychological Association says in their ethical guidance with regard to giving or to using the most current test?

A   Yes, you --

Q   What do they say?

A   You should always use the most current test.

        THE COURT:  Should always use the what?

        THE WITNESS:  The, you should try to use the most current test that --

        THE COURT:  Okay, thank you.

        THE WITNESS:  -- you need for that particular

assessment, what's recommended in the field.

BY MR. ROBERTS:

Q   And in 2004 that would have been the WAIS-III?

A   That's correct.

Q   You have done a lot of evaluations, that's clear from your CV, and I think you told us earlier most of what you do is clinical, you are really not in the forensic area that often?

A   That's correct.

Q   Okay.  And in doing evaluations on people, like maybe when we were talking gaining information from raters, what kind of things do you do to seek, to assure that you are getting objective and neutral information from the people that you have decided are raters on the adaptive functioning?

A   On a standardized assessment is what we are talking about here?

Q   I am just curious about your approach.

A   Okay.

Q   What do you do?

A   If I'm doing a standardized assessment, like I say, for adaptive behavior where what you are really doing is an interview, with the Vineland, as I mentioned, you are doing a semi-structured interview, and you are trained to give this in such a way that you can revisit items going forward and backward, and so if a person says someone can't do something

Swanson - Cross                                129

and then later on when you're in a conversation it appears they can, you get to go back and challenge that, give additional probes, et cetera, so in that particular case you have that option.  The way the ABAS-II is set up, it's set up for the person to indicate by checking off things that they are unsure about, and when you finish administrating it you can sit down and say, well, I notice you didn't know a lot about this area or that area and can you explain to me why you were uncertain on this item or another item.

Q    Okay.  You would agree, though, that people closest to a defendant or somebody that's either about to be sentenced or is already sentenced to death, you would agree that they have a vested interest in the diagnosis of mental retardation?

A    Whenever I am doing an adaptive assessment for an eligibility determination or an Atkins, whoever I am interviewing usually has a vested interest, be it a parent who is interested in their child getting Social Security or someone who is interested in getting services, an apartment, entering a community home, there is a vested interest to show that that person does well, so that's why you need to be very careful when you give them.  I give a lot of Vinelands really, though, for treatment as well.  I have to give them every year on the people that I provide treatment for.

Q    I guess I was kind of asking more generally, and that is that people that are close to a defendant have vested

interests in the outcome of the diagnosis?

A    Yes.

Q    Okay.  You mentioned that you viewed the videotapings of, by Dr. Moore and Dr. Price, and looking at your information here it looks like you say that you have viewed a lot of the evidence in this case.  Did you review the extensive handwritings that Alfred Bourgeois wrote and that were offered in his trial?

A    Yes.  As I remember, the Government provided some that I reviewed and there were other ones that I reviewed as well. I don't know that, it seems like there were other ones at other places as well.

Q    Did --

A    There was numerous documentations of things he's written and then there were things that he had written on that were in his briefcase I think.

Q    And you were aware that he wrote a number of things while he was in, while he was being confined before trial and during trial?

A    Yes.

Q    And you read those?

A    Yes.  I think I read those, yes.

Q    To your knowledge, was anybody around to help him write those or help him figure out the thought process?

A    Not that I'm aware of, no.

Q    Did you read all the transcripts in the case?

A    I read, I don't know that I read every transcript in this case but I read a lot of transcripts.  I read a lot of testimony by different witnesses and there was like four or five days of testimony of different witnesses in the penalty phase that I read.

Q    There's one I'm particularly interested in knowing whether you read and that is on March the 24th when Alfred Bourgeois approached the Judge at the bench and discussed his concerns and wanted to speak to the jury.  Do you remember reading that one?

A    If that's in that same stage there is a long statement in there where he makes a statement, yes, I remember.

Q    Well --

        THE COURT:  Well, not the one to the jury but the one to me.

        THE WITNESS:  I don't recall.  Can I see it to see if it's something I read or not?

BY MR. ROBERTS:

Q    Sure, I can give you a copy of it so --

A    I remember some testimony between where the Judge talks to him and then there is a discussion and he also speaks to the jury, and I don't know if that's the same one or not.

Q    Okay.  Well, generally I was just trying to see if you had read that and --

Swanson - Cross                              132

A    Does that sound like the same one?

Q    It's close.  But what my question really goes toward is that you said that he has a hard time engaging in conversations in your supplemental report, that he has a hard time being a part of a conversation, and so I am just curious whether you observed him in a conversation with the Judge during that particular part of the trial?

A    I did read, I think, I'm pretty certain that I read that testimony.

Q    And he was very capable of discussing with the Judge what he wanted to do and listening to Judge Jack and what she said that, you know, and her questions back to him, wasn't he?

A    Yes, and that's kind of like expressive language and that's more of his strength in communication, yes.

Q    Okay.  Did you also listen to telephone calls that were recorded from jail that went to certain members of his family?

A    I didn't listen to the phone calls but I read numerous phone calls to a Mr. Banks, there were some to his brother Lloyd, there were some to some cousins, there were some to --

Q    Do you remember the one to Uncle --

A    -- Robin Bourgeois' uncle.

Q    Uncle Dumas?

A    Yes, yes.

Q    You only read the transcript, you didn't actually listen

to the conversation?

A   I don't think I had that conversation, no.

Q   Would it be help-, I mean wouldn't it be helpful when you are making an assessment of someone to listen to their voice inflection and how they are interacting with the individual?

A   I guess so.  I didn't get that.  I didn't -- did you provide it, did I overlook it?

Q   I am just asking if it would help, if it would be more helpful to hear the conversation rather than just reading it off a transcript.  I mean you are making a mental retardation assessment and you are helping, you are trying to help the Court understand whether Alfred Bourgeois is mentally retarded, and I'm asking you if you, this was a piece of evidence, did you get a chance to listen to it?

A   I did not listen to it.

Q   Okay.  And so you didn't listen to the one with Nate Banks either?

A   No, I read that one.

Q   Did you look over all the testimony about how he ran his business, his trucking business?

A   Yes.

Q   Did you --

A   I think I did.

Q   Do you remember when he was talking to Dr. Moore on the tape about how he would perceive of a good opportunity to

maybe open a loading opportunity or maybe start another business in different areas and how he thought that would be a good financial opportunity and a good business?  Did you hear him discussing that with Dr. Moore?

A    I heard him discussing that.

Q    Doesn't that show a deliberative process, an understanding of business acumen?  I mean doesn't that tell us that he has some ability to comprehend his surroundings in a working environment?

A    I, you know, I listened to that and he could describe it. He talked about things he was, he could, he wanted to do or he could do.  I don't know if he could do those things.  But I think what you are talking about is his ability to communicate the thought?

Q    Part of that, yes.

A    Yes, I think he demonstrated the ability to communicate the thought.

Q    I think also his ability to understand the basic concepts of business and how a business opportunity can present itself and how someone could go and grab hold of that.

A    Yes.

Q    The, how, just offhand, how quickly do you think he would be able to do a simple two-digit math problem?

A    Well, he did simple two-digit math problems for me.  When he's doing them on paper he does a little better because they

are there.  They are much harder for him to do in his brain.

So if you asked to subtract 20, 17 from 25, it takes him much

longer if you give him the same problem to work on.  And if

you look at my Woodcock-Johnson he actually did some for me.

Q    Let me ask you about this.  This is Petitioner's Exhibit

159, the statement that he asked to write.  Does that look

like a statement that somebody that only has a third grade

ability could write?

A    (Noise)  I'm so sorry, excuse me.

        THE COURT:  Please.  Okay, the reason that we are so

careful is that goes directly into her ears.

        THE WITNESS:  I am so sorry.

        THE COURT:  And it's very painful on her hearing.

        THE WITNESS:  Okay.  I'm just going to put my

glasses over here.

        THE COURT:  So be especially careful, please.

        THE WITNESS:  And so they're just out of the way.  I

think that's consistent with his abilities, and I think I

tried to point out that overall he has some strengths.  His

spelling ability is much higher than that.  So, you know,

you're judging this.  Overall he functions at about the third

or fourth grade level, but he has some other unique strengths

in his ability.  His spelling is much better.

BY MR. ROBERTS:

Q    So in answer to my question, this would be above and

beyond a third grade ability to write, correct?

A   There are words in here that would be difficult for a third grader to know, but I think that the overall grammar and syntax of it would be similar to someone who is third grade.

Q   Okay.  Again, kind of going to the aspect of that this assessment is difficult in this scenario, right?  You also mentioned this one sentence.  Did the -- I was just curious, is that one minute and 16 seconds?

A   Yeah, one --

Q   That's --

A   One --

Q   That's listed.  I'm sorry, this is Petitioner's Exhibit 161 that was presented to you and he has got one sentence here, "I am going to the gym and work out in about an hour," and you said it took him one minute and 16 seconds.

A   Yeah, I had started timing it when he started and, writing it, and when he finished.

THE COURT:  Now, those are the things that can be faked.

THE WITNESS:  I guess they could be faked, that's right.  But it was consistent with what I saw on the Woodcock as well.

BY MR. ROBERTS:

Q   Did the timing --

THE COURT: Well, the reason I, the reason I mention that is that there was a really interesting thing when Dr. Price was giving him some tests and it was very, you know, he was to circle, read through and circle, and then Dr. Price had to go to the bathroom, so he went outside and Mr. Bourgeois is taking the test and he is flying through it. Dr. Price comes back in and it's like in fourth-time slow motion that he begins, he continues to take the test. I don't know if you-all noticed that on the test or not, but those are things that leapt out to me when I was looking through the tapes.

BY MR. ROBERTS:

Q   Dr. Swanson, did you see that?

A   I remember him going to the bathroom. I don't know that I recall that or not, no.

THE COURT: I was so surprised how quickly he was circling those answers and then when Dr. Price came back in, I mean he slowed down like at least four times --

THE WITNESS: Uh-huh.

THE COURT: -- the speed. It was very, very striking.

BY MR. ROBERTS:

Q   You didn't make that observation, Dr. Swanson?

A   I didn't make that observation, no.

Q   You did watch the video?

A    Yeah, I watched the video.

Q    How about while he was talking with Dr. Moore, there were several times that he talked about how he had learned things from other people, do you remember that?

A    I think so, yes.

Q    And I think you have said that he has a hard time learning in a social setting, is that right?

A    I think he does best -- there's ways that you can kind of guarantee more success with him and I think, and I didn't get a chance to address this and possibly you could address this with Mr. Henry, he learns best when he can work with somebody and watch what they do.  He learns best from a visual model.

Q    Okay.  Such as when he was learning how to cook these wild animals that he was talking about?

A    Yes.

Q    Okay.  But he also said that he had to mow the yard and keep up with the yard at the house, didn't he?

A    Yes, I heard him say that.

Q    And remember when Dr. Moore mentioned that he lived in North Carolina and you remember Alfred Bourgeois being able to quickly recall that North Carolina had hills and he remembered Raleigh and do you remember that as well?

A    Yes, I do remember that.

Q    Does that kind of go along with his ability to recall things?

A    Yes.

Q    You said you spoke to Lloyd on the telephone?

A    Yes.

Q    And do you remember what Lloyd's relationship is to Alfred Bourgeois?

A    He's his older brother.

Q    Okay.

A    And it would be his half-brother.  They have different fathers, same mother.

Q    And --

        THE COURT:  And that's Lloyd Ferdinand?

        MR. ROBERTS:  Lloyd Ferdinand.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q    Do you know what Lloyd Ferdinand says about whether Alfred Bourgeois was slow or not slow as a child?

A    I know what's, there are some declarations where he addressed that with me in the declarations, and the way he explained it to me he moved from the home, he also moved from the home, he, Claudia and Mr. Bourgeois all left at an early age, a child age, and lived with other relatives, so he didn't have any personal knowledge in the home of Mr. Bourgeois other than what he saw in The Bend, because they all lived in different houses from the mom.

Q    So you are saying that Lloyd had no personal knowledge

and had no ability to say whether or not Alfred Bourgeois was slow or not slow but Beverly Franks did?

A    Well, Beverly Franks was frequently in the home where he lived and Mr. Ferdinand moved in with an uncle and an aunt.

THE COURT:  Well, the reason he's asking you that is that it's so ridiculous that you rely, frankly, maybe, seems to be ridiculous to rely on Ms. Frank when Lloyd Ferdinand and Claudia and Ms. Frank all lived in different houses than Mr. Bourgeois and Mr. Bourgeois said frequently he looked up to Mr. Ferdinand and saw him frequently as well as Claudia as well as these other people, and so you picked one to rely on and not the others, so that's the point he's making.

THE WITNESS:  Okay.  I --

THE COURT:  Is that right, Mr. Roberts?

MR. ROBERTS:  I was going to make that later, Your Honor, but, in my closing argument.

THE COURT:  Move on.

THE WITNESS:  To clarify, I never could get a face-to-face interview with Mr. Ferdinand, even though I asked frequently and we tried to arrange it, and I got brief phone calls because he kept hanging up and then I had to --

THE COURT:  It's a simple question, did you talk to him about it?

THE WITNESS:  I don't think so.

THE COURT:  Thank you.

THE WITNESS:  I don't we ever had a conversation long enough, no.

THE COURT:  Move on, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q   We'll move to the, to some of these scoring.  You mentioned in the digit symbol, you said it was like a copying.  Isn't the digit symbol more of a learning and kind of how quickly somebody can do the task more than just copying?

A   Yes, but by copying I meant the symbols are at the top of the column and so they are still there, and the idea is you learn the task and you can look at the top and put it to the bottom, so the immediate memory, it's always there, you don't have to put it in your head and remember it in your head without having knowledge of the code.  The code is always present in front of you.

Q   This is Petitioner's Exhibit 155.  The WAIS-R that Dr. Weiner gave, he scored a 76 on the verbal and on the WAIS-III a 67.  That's an astounding drop in the verbal IQ, isn't it?

A   It's ten points, approximately, nine points.  It's statistically significant at 15, I would think.

Q   So you don't think it's significant, a significant drop unless it's 15 points?

Swanson - Cross                                    142

A    Well, within the test one standard deviation is 15, but you are looking at two different tests which aren't necessarily the same items and tests, two different tests normed at different times.  So if I was looking at a WAIS-III and a WAIS-III, I would probably give it a little more significance than looking at a WAIS-R and a WAIS-III, is all I was saying.

Q    Isn't it more significant since he also went up two points on the performance IQ?

A    I think I got asked that before.  I didn't see the, I didn't find it statistically significant, no.

Q    If I understand right and this term significant deficit with regard to these two standard deviations below the mean, does that basically mean that like a score of 70 on a standardized test, a 70 would fall at two standard deviations?

A    If the standard deviation is 15 and the mean is 100, exactly two standard deviations would be a 70.

Q    Okay.  And is that, is that the case with regard to the, in the Woodcock where you scored the, you referenced one and I'm looking for their, the -- this is my copy of it.  I'm not finding their exhibit exactly.  Let me just show you my copy of this, the score report.  Does that look, does that look like the test we were talking about earlier?

A    Yes.

Q   Okay.  I've got a couple of areas highlighted there because of, he did poorly on broad math but he did well on calculation, 82.  He did poor on story recall and poor on story recall delay, and I'm looking at these numbers over here.  What's the significance of the SS again?

A   That's the standard score.

Q   Okay.

A   That he obtained on that test, compared to other individuals that were in his age range of 45.

Q    And on a standard score, again, we are looking at two deviations.  Wouldn't we expect, if one were analyzing this, that the score would be around 70 if it was a standard deviation and he was scoring in the, in a deficient way on these?

A   Not necessarily, no.  There are people with mild retardation that would score in that range.

Q   Okay.  But in here, the oral language he gets 80, the listening comp he's got an 85, and he's got a number of 80s, and he's got a 68 there but then he gets 92 on the broad written language, 85, 70 on the brief math but 82 and 85 on the math calc skills and written expression.  He's got a lot of 80s on there, doesn't he?

A   That's correct.

Q   And then even down here he's got several that are 89, 99 on the spelling.  You said he was really good in spelling?

Swanson - Cross                                        144

A    That was his significant strength I thought on that test.

Q    And then even on the letter/word identification he's got a 90.

A    Yes.  That's his significant strength in reading, yes.

Q    So he actually scored really well in a lot of areas, didn't he?

A    Yes.

Q    I want to go back for a minute to what makes a good informant.  You talked about this retrospective assessment of adaptive functioning, and in June of 2010 you testified about that a lot, didn't you?

A    Yes.

Q    There were some statements that you were asked about with regard to a, I believe it was a, the publication was Applied Neuropsychology.  Do you recall a, well, it was a Dr. Tassy that they had --

A    Okay.

Q    -- that was being referenced and they, you were asked to agree with or disagree with several quotes.  Do you remember that?

A    Dr. Tassy published an article in a neuropsych journal in January of 2009, I think.

Q    Okay.

A    And it specifically addresses adaptive behavior in Atkins cases.

Q    Okay.  And during that trial you were specifically asked to either agree with or disagree with several statements that were put up on the, I guess an overhead where, or maybe you were shown statements.  What I want to do is read the statement and ask you if you agree with it or not.

A    Okay.

Q    "The adaptive functioning tests were not normed using retrospective memories of adaptive behavior."

A    That's true, I agree with that.

Q    "The reliability and validity of the adaptive functioning measures is unknown."

A    The reliability.  In retrospective, yes.

Q    In retrospective?

A    In retrospective, yes.

Q    Sorry.  In context --

A    I agree with that.

Q    In context, everything that I am going to read is with regard to retrospective.

A    I agree with that statement.

Q    "Results from a retrospective evaluation should be interpreted with caution."

A    Yes.

Q    "In the context of a retrospective assessment of adaptive behavior, the rater must answer questions about how the defendant functioned at some time in the past, usually around

the time of the crime."

A    Not, I -- that might have been taken out of context.

Q    Okay.

A    I mean, to me it should be about prior to the age of 18 but you might ask, you might want to do an assessment at about the time of the crime because that's the only person, the time that person knew them.  I don't think the article was quite written that way, I think it's, they've taken something out of context there.

Q    In fairness, they did, the next dialog between you and the prosecutor at the time was a discussion that it's only important at the time of the crime if the age is under, 18 or under, and so there was a focus back on this occurring when it would be under the age of 18 or lower.  So let me ask you, let me go on to the next quote, and that is, "The validity of these ratings depends upon the accuracy of the respondent's memory.  This retrospective use of adaptive behavior scales is not the way that the tests were standardized."

A    That's correct.

Q    And so, again, those that are using retrospective assessments have to be very, very cautious about relying too heavily upon them?

A    Not only that, they need to do them exactly the way the authors of the test told them to do them, yes.

Q    In your report in the William Wiley case, you wrote a

detailed report, you discussed this retrospective assessment. If I correctly read that, there were two things that stood out to me.  One was you agree that multiple sources are very important, is that correct?

A   Yes.

Q   And then you also agree that you should assess the individual as near the age of 18 as possible.

A   Yes.

Q   But in this case you went to Beverly Frank and you asked her to look back 38 years and assess Alfred Bourgeois at the age of seven.

A   I picked the time she could best answer my questions and remember him clearly.

THE COURT:  What time was that, what are you talking about?

THE WITNESS:  Seven.  Seven.

THE COURT:  She was 13, he was seven?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q   And you asked her to give an assessment of how he functioned by reflecting back 38 years?

A   Yes.

Q   And you expected her to be able to identify exactly what he was doing when he was seven in order to answer these

questions?

A    Yes.

Q    You said on your direct testimony that you had concerns about the reliability of her.

A    Of --

Q    Of Beverly Frank.

A    -- Ms. Franks?  In testimony I said that today?

Q    You did.

A    Yes, and that was when I was talking about, that's why I give the ABAS-II first to see how clearly, if there were areas she didn't know, because she was in and out of the house and I wanted to be sure she was aware of all the areas. And that's an easy one to give her where she checks off what she doesn't know or she's unsure about, so that's why I administered it.

Q    You said in the William Wiley case that you should use multiple sources.  The AAIDD suggests using more than one rater.

A    Yes.

Q    But you used only one rater in this case.

A    I could only identify one person that could give me a clear time when they knew something well.  The only other one that would have been good was his sister Michelle, his half-sister, and Dr. Moore did her so there was no use doing her over.

Q    And Dr. Moore, so you are aware that Dr. Moore attempted to interview Michelle Armont?

A    Yes.

Q    And that's the one where the defense counsel showed up before, actually was present before the interview even took place?

A    I don't know the con- -- I was aware that the defense counsel was there.

Q    Let me ask you a question.  If you had gone to interview Beverly Frank and an attorney from the other side showed up and wanted to sit in on the interview, would that affect your, would that raise any concerns for you with being able to get a reliable information from the individual?  Is it possible?

A    I wouldn't want the person sitting by me or whatever, I would want her positioned somewhere else, but if she was in the area, could hear what was going on and wasn't interfering, wasn't sitting between us or interfering with the interview, I wouldn't have any concerns with someone listening or being at the other, in another room.

Q    Well, the goal of, the goal of these assessments is to get an objective input from the individual, right?

A    That's correct.

Q    You are not there, hopefully the person is not giving you one side or trying to support one side or the other, correct?

A    That's correct.

Q    I mean if they are there to give you, to support one side of a case, you are not going to get very reliable information, are you?

A    That's correct.  If I had concerns, I just either wouldn't do it or I would ask the person to leave.  I mean, I didn't have those concerns with my person, so I guess --

Q    Because we didn't, the Government didn't show up when you got ready to interview Beverly Franks, right?

A    No.

Q    Okay.

A    But if you had, I would have asked you to sit in the other room, and if you didn't interfere I wouldn't have had any problem with you listening in.

Q    Okay.  Let me ask you a few things.  And I was looking at the defense exhibit, I'm sorry, the Petitioner's Exhibit 35, which is the ABAS, and what I really wanted to do is compare some of Ms. Frank's answers on the Vineland and on the ABAS but what I found out a little bit, a little while ago was that apparently there's some, this is a very thick exhibit and the Vineland, Petitioner's 34, only has two pages, so I believe what I have been told, the Vineland was much thicker than that, is that correct?

A    I thought I furnished the Vineland protocol.

Q    I think you did and so --

MR. WISEMAN:  Your Honor, just for clarity, the Vineland --

MR. ROBERTS:  -- what I was going to clarify --

THE COURT:  I'm sorry, just a moment.

MR. WISEMAN:  The Vineland protocol was provided for the Government in the fatter packet of exhibits, the, I believe it's 35.  Petitioner's 35 has what Mr. Roberts is referring to.

MR. ROBERTS:  That's correct, Your Honor.  I was about to clarify --

MR. WISEMAN:  Dr. Swanson didn't compile the exhibits.

THE COURT:  So what are you interrupting for?

MR. WISEMAN:  To make a point of clarification.

THE COURT:  Okay, thank you.

BY MR. ROBERTS:

Q    And, Dr. Swanson, what I was about to clarify is that I wanted to compare questions from the Vineland and the ABAS but because of the way the exhibit is set up, I was going to hand it to you and ask you to look at the questions, but let me try to do it this way and see if you -- if you can follow me in this, that's fine.  If you need to look at the document I will give it to you, but it's going to be a little more difficult to go back and forth.  You might be able to figure it out better than I can because you deal with these all the

time.

THE COURT:  Well, how about we do this question and answer.

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q   Do you recall, do you -- there are parts in both the ABAS and the Vineland in which Ms. Franks responded inconsistently, is that correct?

A   That's correct.

Q   Okay.  In the ABAS, on page 7, item number 2, she was asked, she responded that Alfred Bourgeois was not able to use a fork to eat solid foods.  So if she answered on the Vineland on page 10, number 23, that he is able to correctly hold a fork, a spoon, fork or knife, that would be inconsistent, wouldn't it?

A   Did she, did I give him a two, a one or a zero on that?

Q   You'll have to --

A   I'm sorry.  Because there's different levels, and so she might have scored he couldn't and when I probed her she might have said he did it sometimes, you know, that's the only reason I ask, so where it may appear a difference, there's two scoring systems between the two that may lead you to think they scored differently.

Q   This is a, I'm going to, I'm going to go -- this is page 3 of the ABAS?

A    Uh-huh.

Q    Question number 6, "Uses sentences with a noun and a verb."  What did Ms. Franks say with regard to Alfred Bourgeois' ability to use sentences with a noun and a verb?

A    On that one there was no conversation, she just circled it herself as she read them, so she didn't say anything at that point.  If I probed that, I probed that on the Vineland, so I would see the Vineland protocol, that's where we had the discussion.  This is the ABAS where she marked it herself.

Q    Well, is it accurate that she said --

A    Oh --

Q    -- she marked it as a zero and said he's not able --

A    That's correct.

Q    -- use sentences with a noun and a verb?

A    That's correct, and if you look at the top it gives you a better explanation of what a zero is.

Q    Okay.  Well, I'm going to show you the Vineland.  This is the page from the Vineland?

A    Uh-huh.

Q    It's page 6, question number 18, "Uses phrases with a noun and a verb, for example, Katy stay, go home, et cetera," she gave him a two.

A    Uh-huh.

Q    What does that mean?

A    That means that in my interview with her she said he

could do that, and when I ask the question I generally give examples like that and we talk about the kind of conversation he has and different kinds of sentences that he could say and she indicated that he could do it.

Q   Well, when you get inaccurate or inconsistent answers on these tests like that, I mean doesn't that start to make you wonder about the reliability of the person taking the test?

A   I think I testified earlier with the ABAS-II is I don't find that it's a good instrument to give retrospectively because you are trying, I always try to center, look, remember we are talking about the time when he first moved to your grandmother's house, blah, blah, blah, blah, blah, and then we center in on that.  On the ABAS-II they seem to lose track of that to me because they are independently going through, you know, a couple of hundred items.  That's why I said I did the Vineland after I ascertained with the ABAS that she was maintaining that there was no area she didn't have any knowledge of.

Q   Okay.  I guess I can agree that it would have been more reliable to use more than just one rater?

A   I would have preferred to have more than one rater, yes.

Q   Okay.  And we can also, do you also agree that it would be more reliable to use people that knew him across a variety of settings and yet had no vested interest in the outcome, you could use those kind of people?

A    That would have been nice if I could have had a teacher or someone that would have known him prior to the age of 18, yes, that would have been great.

Q    Well, not just nice but more reliable, wouldn't it?

A    It would have been more reliable.

Q    And it would have been helpful to have ratings based on more recent contact with Alfred Bourgeois, too, wouldn't it?

A    Well, yeah.  More recent contact prior to the offense, yes.

Q    And it would have been useful to discuss the, or take these tests or at least utilize someone that might have focused or known him closer to the age of 18, wouldn't it?

A    Yes, but we have Dr. Moore's report because he did Michelle Armont and -

Q    We'll get to --

A    -- he lived with her around the age of 18.

Q    Yeah.  But you didn't do Michelle Armont?

A    I didn't do Michelle Armont.

Q    And you made a mental retardation assessment based on Beverly Frank's information, that's the only rater you used when you made your assessment?

A    Based on a rating and then when I do interviews with people I do follow the protocol and ask similar questions through there, so I also interviewed Ms. Williams but I asked her questions about the time he lived with her, which was

from 16 to about the age of 18.

Q   Okay.

A   Or 20.

Q   I want to address some issues in your supplemental report from August 12.  First, I just want to, I just want to touch on the Flynn Effect for a minute because you put a footnote in your report, note 2, addressing the widely accepted and scientifically valid Flynn Effect.  Do you apply the Flynn Effect in your clinic to patients?

A   I think the way I explained that is I implied within the confidence interval and in the narrative to make certain that whoever I am writing the report for understands the age of the norms on which I am basing this score.

Q   And, but is it accurate to say that most of the associations that touch on the Flynn Effect and, that it's primarily used in a courtroom setting?

A   The term Flynn Effect is primarily used in a courtroom setting I would say.

Q   Okay.  In your report, can you just real quickly for me cover the ten, tell me the ten areas where you say that someone in order to be adaptively deficient, what are the ten areas?

A   The ten areas that you are speaking of are those that were listed in the DSM-IV TR, and that was based on the 1992 definition of AAIDD and that would be communication,

functional academic, self-direction, social skills, leisure, self-care, home living, community use, health and safety and work.

Q    Okay.  And in your report you've got the, under the adaptive deficits you mention the Vineland and the, that you used on Beverly Frank, and then you have this paragraph that I referenced earlier where you say you have spoken with several informants and the people were Claudia Williams, Michelle Armont, Murray Bourgeois, Carl Henry, Lloyd Ferdinand, Donald Reese, Gwendolyn Thomas Smith and Fred Tompkins.  Was your first report insufficient?

A    I think the first report didn't include the information I had gathered from that second group of people, and I don't think I had all the records in 2009 that I had available by August.

Q    Okay.

A    I asked for more records.

Q    And, again, you did this after testifying in June 2010 and after learning that Dr. Moore had gone out and interviewed people, that's when you went and contacted these individuals, correct?

A    I did contact them after the June testimony and after Mr., Dr. Moore was there, yes.

Q    Okay.  At the bottom of the page 2, Petitioner's Exhibit 33, bottom of page 2, there's a statement in here where you

say that, "It is apparent from my interviews of Mr. Bourgeois' family, friends and co-workers that Mr. Bourgeois relied on support of others in order to perform routine daily life activities." You, do you remember in the video where he talked about how he had to help Miss Mary getting in and out of the bathtub?

A    Yes, I do remember that.

Q    Do you remember how he talked about being able to cook all this wildlife stuff and how he learned how to cook from her?

A    Yes.

Q    And then he would prepare stuff, and he talked repeatedly about how he had to help Miss Mary, didn't he?

A    I remember that.

Q    Let's look at the third page of your report, under the deficits in conceptual domain. First paragraph, you say, "Mr. Bourgeois is deficient in his ability to absorb and understand information." Do you think, do you think that someone that can understand the criminal process and advance their own belief in what kind of defense they should present has the ability to absorb and understand information?

MR. WISEMAN: I'm going to object, Your Honor, on a legal point. He is essentially asking the witness if a person with mental retardation is in and of himself, or in and of itself not competent to proceed. I think the law is

clear that a person with mental retardation can be competent

to proceed, so therefore the question is legally irrelevant.

MR. ROBERTS:  Your Honor, all I am asking her is

whether or not someone that has demonstrated on a record,

transcript, his ability to understand the charges he has been

presented with and able to articulate how he thinks his

counsel should be fighting his case better would fit within

the deficiency of the ability to absorb and understand

information.

THE COURT:  Go ahead.

THE WITNESS:  Okay.  I think that is one, one

example that would fall under there, yes.

BY MR. ROBERTS:

Q   So if he is able to understand that and, understand the

criminal process and understand how he wants to proceed in

the case, that that would still be deficient, his ability to

absorb and understand information?

A   I think we spoke earlier that you may have some strengths

and you may have weaknesses.  That doesn't offset the other

deficits that he has in that area.

Q   How about the ability to write 16-page letters that

contain thoughts about how an individual is upset, about what

he believes or perceives his wife and family to be doing to

him?  I mean you read the letters that Alfred Bourgeois

wrote?

A    Yes.

Q    Are you telling us that in those letters that he demonstrates an inability to absorb and understand information?

A    I think that when he writes those letters it takes him much longer than it does someone else of normal intelligence.

Q    Well, you don't know how long it took him to write those letters.

A    I know how long it takes him to write things for me.

THE COURT:  When you were looking at him.

THE WITNESS:  Yeah, when I'm looking at it I have no idea how long it took him.  I think that's an example, if you want -- would you repeat the question so I can say yes or no, please?

BY MR. ROBERTS:

Q    Well, the question is if you look at the letters that he wrote and the train of thought in the letters and the way he applied the grammar and the concepts that existed in those letters, that doesn't support your conclusion that he's, that he has a, that he is deficient in his ability to absorb and understand information.

A    I think that's an example that does not support my conclusion, yes.

Q    I am on this paragraph where it starts, we are still on page 3, "As is typical of individuals with mild mental

retardation," you mention down at the bottom that you have learned that he was provided answers to some written tests required to obtain a driver's license. Who did you learn that from?

A    Donald Reese, and he'll be testifying tomorrow.

Q    And what answers was he provided?

A    This is a specific kind of test, it's the truck driver's license test that you have to pass to get an endorsement on your regular driver's license in the state of Louisiana, it's a written test, and there's, if you fail it the first time you get to take the alternate form, and over a period of time these truck drivers had figured out the answers, and so you go in and you flunk it, then you go back the next day and you literally know to mark an A, a B, a C or a D.

THE COURT:  What are you talking about?

THE WITNESS:  It's a written test that was given at that time to get a truck driver's endorsement on your driver's license.

THE COURT:  For the hazardous materials?

THE WITNESS:  Huh?

THE COURT:  For the hazardous materials?

THE WITNESS:  No, it's not the -- there's a different one for the hazardous materials.

THE COURT:  Oh, okay.

THE WITNESS:  But just to drive a large truck at

that time, in the 1980s, you had to take a written test. It's different now, there's different federal regulations that have gone in place. And that's how he got his truck driver endorsement and some of the other people in Schwegmann's. Earlier we, I wasn't supposed to testify to this so that's why that didn't come out earlier. And you could get the information from Mr. Reese.

Q   So Mr. Reese has told you that Alfred Bourgeois was given answers and then was able to pass the driver's license test?

A   That's right.

Q   And Mr. Reese had knowledge of that, according to what he told you?

A   Yes.

Q   Okay. You said that --

THE COURT:  You mean to get a commercial driver's license?  I don't know what you are talking about.

THE WITNESS:  You can get a driver's license in Louisiana and at that time to be, to drive certain types of trucks you had to have an A, B, C or D, you know, endorsement, so you had to go back and take an additional written test on how to drive vehicles that had more than one axle. For example, you take a test to be a school bus driver but then to drive an 18-wheeler it's a different test, and that's how they did it in the 1980s at that time.  And then later on you were grandfathered in if you had already passed

it at the earlier time when new regulations changed.

THE COURT:  I remember he said he was grandfathered for something.

THE WITNESS:  That's right.

THE COURT:  I thought it was a commercial driver's license.

THE WITNESS:  Now, Mr. Reese also was at the same, they were tandem drivers at the hazardous truck driving place, which is the test you are talking about, and he also had to pass that test that Mr. Bourgeois passed, and he can give you some direct information about that since I think it was decided I wasn't supposed to.

BY MR. ROBERTS:

Q   Well, let me ask you about this, your statement that he has difficulty in understanding and managing money.  You saw his -- have you seen his bank account?

A   Yes.

Q   You saw how he managed his bank account?

A   Yes.

Q   You saw the documents from his briefcase?

A   Yes.

Q   And you listened to him talk to Dr. Moore about the, how he would go about being able to run a business, charge a certain amount and only charge the people that were unloading trucks less so he would make money?

A    Yes.

Q    And so your conclusion that he had difficulty understanding and managing money you say is borne out by your interviews with informants and a review of documents regarding his finances.  Which informants?

A    When I, particularly his brother Lloyd provided him a lot of assistance in financial matters.  He had signed a lease that had put him in considerable debt on this truck that he had.  He had fallen behind on paying on his house.  He owed money on credit cards --

Q    Who is telling you all this information?

A    This was in talking to Lloyd.  And it was also, I thought, apparent in the different testimony that, I mean the different records that I reviewed about how far behind he was.  I also --

Q    So when you say informants here, you are just referring to Lloyd?

A    Not only Lloyd but then I also, and Mr. Henry will be here tomorrow and that's what he does is supervise truck drivers, so I asked him to explain this lease to me and the way as I understand it he signed it, it's, you have to, they take out of your earnings money so he's always running behind.  If he's running late, his gasoline comes out it, the maintenance on the truck, et cetera, so you have to --

Q    I'm not actually asking --

A   -- if you sign one of these you need to be a really good business manager or by the time the time is up you still owe almost the total price of the truck.

MR. ROBERTS:  Your Honor, I'm going to object to non-response, I'm just trying to get the names of --

THE COURT:  Sustained.

MR. ROBERTS:  -- people.

THE WITNESS:  Okay, I'm sorry.

MR. ROBERTS:  So the informants --

THE WITNESS:  So Corey --

THE COURT:  So listen, wait a minute, listen to the question, he's going to ask you a question, pay attention to the question and just answer the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q   When you said the informants, this is borne out by my interview with the informants, you said Lloyd and who else did you talk to?

A   Corey Henry and Donald Reese because of knowledge they had about truck driving and these truck driving leases.

Q   And you say, "A review of documents regarding his finances."  Which documents?

A   Primarily the one about the lease that --

Q   So one document?

A   -- that they showed.  That's the primary one that comes

to mind at this time, yes.  Yes.

Q   On the deficits in practicum domain, you say,

"Mr. Bourgeois' history is significant for profound delays in

learning new practical skills, for example, co-workers

revealed," who are the co-workers?

A   That was Donald Reese and Mr. Tompkins and Mr. Henry.

Q   Then you say he was sheltered at one trucking job by a

relative who held a supervisory position.  Who was that

relative?

A   That was Mr. Henry.

Q   Next paragraph, you say, "However, friends and family

report that even after Alfred started driving a truck he

continued," and you talk about him having misjudgments and

accidents and tickets.  What friends and family told you

that?

A   The mailbox one I think is particularly from Mr. Murray

Bourgeois who reported that.  The speeding tickets and those

incidents, I think Michelle Armont discussed those with me,

Murray Bourgeois discussed those with me, Claudia had

knowledge of some of those, and so did Lloyd Ferdinand.

Q   Turn to page 4.  You talk about deficits in the social

domain.  You indicate that one of the reasons that you found

this was, "He is absolutely unable, absolutely unable to

participate in two-way conversations."

            THE COURT:  What do you mean by that?  I talked to

him several times back and forth.

THE WITNESS:  And what I was talking about was --

THE COURT:  And we understood each other I thought extremely well, I have to say.

THE WITNESS:  And if you, you will have family members here and you will have Mr. Reese here and he was an incessant talker who pretty much wouldn't let you interrupt is the way that they described him, and Mr. Reese can tell you information as regard to when they drove a truck together and not only did he talk the whole time he drove, when Mr. Reese would try to lay down he talked again and it was, he didn't really want a two-way conversation, he was mainly imparting his own, his own conversation.  Mr. Bourgeois, Murray Bourgeois pointed out that the family had pretty much learned the best thing to do was just let Alfred talk and not interrupt him and not upset him, so that was kind of like the way they, in a way I think they enabled him within his own family by allowing, by never challenging some of the things that he said.

BY MR. ROBERTS:

Q   So this is the basis for your decision or your conclusion that he has deficits in the social domain?

A   That was one of the things, yes.

Q   Now, Dr. Swanson, you have testified in somewhere between 15 and 19, you have been involved in somewhere between 15 and

19 cases, I don't know, have you testified in every single one of those cases where you have given an opinion, an <u>Atkins</u> hearing type opinion?

A    Yeah, I've only listed the ones that I actually went to court for.  I may have done other assessments but people didn't use my work.

Q    You are an extremely experienced psychologist, you know the process for adaptive functioning, and yet you used one individual under the adaptive functioning and asking her to reflect back on 38 years.  Do you --

MR. WISEMAN:  Objection, asked and answered and argumentative.

THE COURT:  Move on.

BY MR. ROBERTS:

Q    Who asked you to go back and do the, your August 12th, 2010 report?

A    I asked to interview more people when I went in the spring of 2009 because there was only one available.  There were actually three or four scheduled but when I went those people were not able to see me due to various things that were happening in their lives, so I asked at that time that more people be found.  And at that time I knew he worked at Schwegmann's and, as I mentioned earlier, I was familiar with Schwegmann's, and I specifically --

MR. ROBERTS:  Objection, Your Honor, nonresponsive.

THE COURT:  Please listen carefully to what he's asking.

THE WITNESS:  Okay.

THE COURT:  Just repeat the question again and listen to the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q   Who asked you to go back and contact these individuals after July 2010?

A   I asked to interview more people and I was notified that there would be people available but I couldn't see them until after Dr. Moore saw them, we couldn't be there at the same time.

Q   When did you ask that question?

A   When did I ask to see more people?

Q   Yes.

A   I asked to see more people in the spring of 2009.

Q   And you weren't given any more information until sometime after July 2010?

A   As I remember what happened, I asked to see more people, by the time they had gathered people for me to interview Dr. Moore was already scheduled to go and they asked me to wait until after he had had a chance to interview everybody he wanted to see.  I had a hearing, as we are talking about, in June and I was out of the state in January, I mean in July

on vacation, so I wasn't available again until August to go and do these.

Q    So is it your professional opinion that your report from 2009 in this case, your declaration, is sufficient to be an assessment of mental retardation?

A    I didn't intend it to be that way, no.

Q    Okay.

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Yes, sir.

MR. ROBERTS:  We have nothing else at this time, Your Honor.

THE COURT:  Thank you.  We will break for lunch then for, come back at 1:15.

MR. WISEMAN:  Thank you, Your Honor.

(Lunch recess at 12:21 p.m. until 1:06 p.m.)

(Off the record discussion at counsel table)

THE COURT:  Is Mr. Roberts with us today?

MS. BOOTH:  Yes, Your Honor, they are.

THE COURT:  He threw you under the bus, huh?

MS. BOOTH:  Ms. Salinas went out to call to get everybody here.

THE COURT:  Any luck, Ms. Salinas?

MS. SALINAS:  Mr. Roberts is on his way, Your Honor, I am not sure where the other two are.

THE COURT:  Mr. Wiseman, I think you were

redirecting, is that right?

          MR. WISEMAN:  Yes.

          THE COURT:  Thank you, you may proceed.

          MR. WISEMAN:  Okay, thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   Dr. Swanson, I want to show you the one page of school

records we previously marked as, moved in as Exhibit 86, and

direct your attention to the part where my finger is.  Do you

see independent living there?

A   Yes, I do.

Q   And what grade did he achieve in that?

A   A D.

Q   Okay.  And did you --

          THE COURT:  And I have already seen all these.

          MR. WISEMAN:  You have.  I just wanted to --

          THE COURT:  Right, okay.

          MR. WISEMAN:  -- the witness to comment on it.

          THE COURT:  Those are the only school records she

had to look at.

          MR. WISEMAN:  Correct, that's right.

BY MR. WISEMAN:

Q   And did the fact that he scored a D in home living

influence your opinion as to his adaptive deficits?

A   I thought it was indicative of adaptive deficits, yes.

Q   Mr. Roberts was asking you about the line in your report about his ability, Mr. Bourgeois' ability to handle money.  I wanted to show you -- he asked you if you saw bank accounts, do you recall that?

A   Yes.

Q   I'd like to display for you, if I could, what has been previously marked as Defendant's 59 which is a set of financial records, and it's a large document, it's got 71 pages.  Does this look like the materials that you reviewed?

A   Yes, it does.

Q   Okay.  I am going to ask you some questions about these particular items.  On the first page, when you wrote in your report that he had difficult, a difficult time handling money, were you considering this unpaid, or I should say this lien placed on him by the State of Louisiana for $500 and change?

A   Yes.

Q   Okay.  And did you --

          THE COURT:  Was that Ms., was that Robin Bourgeois' --

          MR. WISEMAN:  The name on it is Alfred Bourgeois, Your Honor.

          THE COURT:  And what was that for?

          MR. WISEMAN:  It says "Motor vehicle sale tax period ended 6/00," and it's got, the amount of the lien is $503.69.

BY MR. WISEMAN:

Q   Did you similarly consider, in regard to his ability to handle money, his wife's income tax or a statement sent to his wife showing an overpayment of $4500 and change in the year 2001 with an income of $39,374?

A   Yes.

Q   And does that seem to you, in your experience, the kind of mismanagement of resources that --

        MR. ROBERTS:  Your Honor, I will object to her, unless she has got some --

        THE COURT:  Do you have some financial expertise?

        THE WITNESS:  No.

        THE COURT:  Okay, then she's not going to be testifying about that.

BY MR. WISEMAN:

Q   If a person making $39,000 overpays their taxes by --

        THE COURT:  Mr. --

        MR. WISEMAN:  -- 4,000 --

        THE COURT:  You are not going to be talking about that.  Go to another subject.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Did you consider this March 2nd, I am sorry, March 27th, 2002 notice from the Monogram Credit Card Bank of Georgia indicating that they were closing his account on account of

Simmons - Redirect                    174

past due amounts?

A    Yes, I did.

Q    And did you consider the May 17th, 2002 letter from Hibernia Bank indicating that they were calling in the promissory note on his home?

        MR. ROBERTS:  Object, Your Honor, that --

        THE COURT:  That was from Ms. Bourgeois.

        MR. ROBERTS:  Yes.

        MR. WISEMAN:  Well -- well, fine.  I think it's relevant, Your Honor, it's a husband and wife.

        THE COURT:  Well, he's, he, the videos I looked at he got, he said he got in financial trouble because Robin Bourgeois overspent without his authority and without his direction, and he started getting collection notices, never had those problems.

        MR. WISEMAN:  That's fine.

        THE COURT:  And so I don't know what that would have to do with him exactly.

        MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q    Well, how about this credit card statement from Citgo dated August of '02 -- actually that's not a good example.  I will withdraw that one.  And did you see material relevant to a -- well, could I have the computer put on -- relevant to a lease on a 2001 Ford Expedition vehicle?

A    I think I did.  Yes, I looked at this.

Q    Okay.  This is incredibly tiny print so I am going to put it up on the other -- but just for purposes of the record this is page 59 of Exhibit 59.  It's obviously too small to read, so --

THE COURT:  Actually, there is a zoom on there that makes it very easy.

MR. WISEMAN:  I tried that.  I have a, I have it on the computer.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    Let me show it to you on the computer.  That's the same page.  Does it appear that this was a, the lease we were talking about, $476 monthly payment, 35 months, for a total of $17,157.96 with $9,000 down.  Did you consider that Mr. Bourgeois put down or committed to paying on a 36-month lease $26,000 of a $40,000 vehicle?

A    Yes, I looked at this document and I considered this.

Q    Okay.  And did you also consider --

THE COURT:  Have you looked at -- I am sorry.  You don't know anything about, you are not an expert on finances?

THE WITNESS:  I think I am just being asked if I looked at it and if I considered it and this was what I did.

THE COURT:  Okay.  Well, how did you, how would you have considered if you don't, if you are not an expert on

Swanson - Redirect                                    176

finances?

MR. WISEMAN:  Your Honor, may I respond to --

THE COURT:  No, I am asking her.

THE WITNESS:  I guess, I think, I thought what he was addressing was someone said what financial records did you look at and I knew we did, and he said which ones were they and I think we were going through the ones that I looked at, and that's all I think I am doing.

THE COURT:  Okay.  So you didn't use that in coming up with any of your opinions?

THE WITNESS:  I wrote a statement in my report that I looked at these.

THE COURT:  Because you would have had to look at all of his records, all of his tax returns and all these other things.  You didn't do that.

THE WITNESS:  The statement in the report that said I looked at records, these are the records, financial records I looked at, and I, that's --

THE COURT:  Did you use his financial records in any opinion that you came up with?

THE WITNESS:  I, I felt they give evidence of poor management.  He has --

THE COURT:  Did you look at -- okay.

THE WITNESS:  -- basic money skills but the ones I looked at I thought showed that --

THE COURT:  But you didn't look at the overall picture, his trucking records, you know, he had a trucking company?

MR. WISEMAN:  Your Honor, he did not have a trucking company.

THE COURT:  Okay.  He said he did even in the examination about a --

MR. WISEMAN:  Well, he says a lot of things.  He did not have a trucking company.

THE COURT:  Okay.

MR. WISEMAN:  And I think the point from our perspective is that --

THE COURT:  Did you look at his tax returns, has anybody looked at his tax returns?

MR. WISEMAN:  We don't have his tax returns.

THE COURT:  Okay.  Well, I mean, that would give us a better picture, wouldn't it?

MR. WISEMAN:  Well, it would give you a better picture, Your Honor, but I think this is still relevant information.

BY MR. WISEMAN:

Q   And my question, Doctor --

THE COURT:  Well, if I am the fact finder --

MR. WISEMAN:  You are.

THE COURT:  -- then I get to determine that, so

let's move on to something else.

MR. WISEMAN:  Well, but relevance is a legal issue.

THE COURT:  Let's move on, please.

MR. WISEMAN:  I have a question for the witness regarding expert reliance on such information, if I could ask the question to complete the record.

THE COURT:  Okay.

BY MR. WISEMAN:

Q  Dr. Swanson, do people assessing MR typically look at financial records as part of the determination of a person's ability to handle money?

THE COURT:  Mr. Wiseman, I will stipulate that that is correct.

MR. WISEMAN:  Okay.  Well then --

THE COURT:  But the point is she didn't look at all of his financial records.

MR. WISEMAN:  Well, that's true, that's true.

THE COURT:  And you take a little bit out of context and it makes no sense, is all I am saying.  So if I am the fact finder, we need to move on to a different subject, one more time.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q  Just one quick point.  Your CV, which has been received as --

THE COURT:  Exhibit 36.

BY MR. WISEMAN:

Q    36, yes.  I count 15 cases on there, is that accurate?

A    That's accurate, and there would actually be a 16th that I did in August.

Q    Okay.  The Judge has asked questions of you with respect to Mr. Bourgeois' communication with the Court during the trial proceedings, and I wanted to show you a page from the Green Book, this would be page 102, and what would your opinion be as to the statement in there that says, "Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having ID."  There's a citation.  "Discuss two reasons for this guideline, there was not enough available information and there is a lack of normative information."  First of all, do you agree with that statement?

A    Yes, I do.

Q    And how does it relate to Judge Jack's communication with Mr. Bourgeois and whether that speaks to the question of adaptive deficits?

A    I think what that citation is stating, that you can't use an instance of criminal behavior or one comment or one conversation to infer and make a total global assessment of somebody's adaptive abilities.

THE COURT:  But do you understand that he had, we

had several conversations with Mr. Bourgeois and it wasn't a single comment?

THE WITNESS:  And I really, I am just addressing that citation in my testimony.

THE COURT:  Okay, but you just, you actually, you, in contrast to that sentence you used other people's opinions of whether or not he could communicate because he displayed the behavior he wouldn't ever be quiet, he just kept talking and talking, which is also synonymous with a narcissistic person, is it not?

THE WITNESS:  That would be a feature of a narcissistic person.

THE COURT:  And I guess, I don't know if you heard what the last psychologist that Mr. Bourgeois had hired said, that his behavior, his presentation was also symptomatic of a narcissistic, sociopathic person, different etiology but that's what he said, and he also said he wouldn't want him living next door to him.

THE WITNESS:  I understand.  I wasn't aware of all that, no.

THE COURT:  Would you disagree with that?

THE WITNESS:  I think I testified earlier that --

THE COURT:  Just that, what I said --

THE WITNESS:  Borderline is what I would say he was more.

THE COURT:  Would you disagree with what he said?

MR. WISEMAN:  I'm sorry, Your Honor, which part?

THE WITNESS:  I do disagree because I think he's more of a borderline personality disorder than narcissistic.

THE COURT:  Okay.

THE WITNESS:  Borderline have narcissistic features but they are another similar classification under Cluster B.

THE COURT:  And he testified, because he's a forensic psychologist or a neuropsychologist, that he had, he couldn't put the brakes on his behavior, which is also symptomatic of a sociopath.  Did you know that?

THE WITNESS:  Uh --

THE COURT:  Did you know he testified like that?

THE WITNESS:  I haven't, that was in his testimony?

THE COURT:  Yes.

THE WITNESS:  Recently or --

THE COURT:  A week ago.

THE WITNESS:  Oh, well, nobody gave me any testimony from a week ago.

THE COURT:  Okay, thank you.

BY MR. WISEMAN:

Q    And one could be a sociopath that you wouldn't want living next door to you and be mentally retarded?

A    Yes.

THE COURT:  So he could be a narcissistic sociopath

and borderline retarded?

THE WITNESS:  And mildly retarded.

THE COURT:  Mildly.  Mildly retarded, sorry.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q   When I asked you earlier about MR not being a diagnosis of exclusion, could you explain how that relates --

THE COURT:  Would you say that again?

BY MR. WISEMAN:

Q   Mental retardation --

THE COURT:  Okay.

BY MR. WISEMAN:

Q   -- is not a diagnosis of exclusion.  Can you explain again to the Court how that relates to the questions the Court just asked you about the co-morbidity --

THE COURT:  Well, what the point was, you wanted to say you can have all that and still be --

MR. WISEMAN:  Of course, of course.

THE COURT:  Well, we already did that.

MR. WISEMAN:  What's that?

THE COURT:  Don't assume that I also am -- that I cannot, that I don't have basic cognitive understanding of what you are talking about.

MR. WISEMAN:  Oh, Your Honor, your cognitive --

THE COURT:  So please move on.

MR. WISEMAN:  Your cognitive understanding is abundantly apparent.

THE COURT:  So please move on.

MR. WISEMAN:  Okay, I will move on.  I thought the Court needed further clarification.

THE COURT:  I don't think so.

MR. WISEMAN:  Okay, I am happy to move on.

BY MR. WISEMAN:

Q   Mr. Roberts questioned you about page 13, your Woodcock scores?

A   Yes.

Q   And you see where I am putting my finger on the scale scores and he pointed out a bunch of 80s.  My question is, is that 80 out of 100 or is that 80 on a bell curve?

A   That's 80 on a bell curve.  And the SS stands for standard scores.

Q   Standard scores.

A   Eighty on a bell curve and that would be approximately 1.5 standard deviations below the mean.

Q   Okay.  So that doesn't mean he's scoring --

A   Or one and a third.

Q   -- like a B student would score on these tests because he got the 80?

A   No, no, no.  You are looking at the bell curve and you are looking at below the mean, somewhere between one and two

standard deviations below the mean.

Q   Judge Jack observed that on the video Mr. Bourgeois appeared to speed up his responses to one of the psychological tests, and I haven't watched that myself yet, I haven't seen that part, or I haven't noticed that, I should say, but assuming that Judge Jack has told us what she saw, I wanted to ask you about a portion of Dr. Moore's report, I'm sorry, of Dr. Price's report, and I will mark this as Petitioner's 162.  Is this --

            THE COURT:  Do you want to offer that?

            MR. WISEMAN:  Eventually, yes.  Yeah, I will offer it now, sure.

            THE COURT:  Well, I mean I am looking at it, so you want to --

            MR. WISEMAN:  Yeah, yeah.  Yeah, I am offering it all.

            THE COURT:  Okay.  Petitioner's 162 is admitted.

       (Defendant's Exhibit P162 admitted into evidence)

            MR. WISEMAN:  We have nothing to hide, Your Honor.

            THE COURT:  Well, I realize that.

BY MR. WISEMAN:

Q   Is this Dr. Price's report that you reviewed?

A   Yes, it is.

Q   Okay.  Now, I just want to read you a sentence out of it on page 6, under the Personality Assessment Inventory, PAI.

Are you familiar with that test?

A   I am familiar with it, yes.

Q   Okay.  It says, "This administration of the PAI resulted in an invalid profile with no clinical interpretation possible.  The potential reasons for this pattern include reading difficulties, careless or random responding, marked confusion or failure to follow the test instructions," close quote.

THE COURT:  Is that what I was just talking about?

MR. WISEMAN:  Yeah, yeah.

THE COURT:  I wondered why he was zipping through it so quickly, so that would give me an indication, too, that he was doing it on purpose.

MR. WISEMAN:  Well, that may be --

THE COURT:  Because he was very careful when he, when Dr. Price came back into the room to be very slow and deliberate.

MR. WISEMAN:  Right.

BY MR. WISEMAN:

Q   And my, the point of my question is, did the testing catch, assuming he purposely sped up, that he gave an invalid profile?  I mean the test caught that?

A   The test, the test was deemed invalid by the examiner so it must have caught that he sped up.  I am inferring from that that he could have been doing careless or random

responding.

Q   Okay.  And let's assume that he purposely sped up.  Would that also be consistent with a mentally retarded person's masking?

A   It would if he felt he was going too slow on the test, yes.

THE COURT:  You really ought to look at that video.

MR. WISEMAN:  Oh, I'm --

THE COURT:  I mean he was zipping through it.  I didn't think I could have read it that quickly.

MR. WISEMAN:  Okay.

THE COURT:  So that explains it better to me.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Now, just a few more questions.  We had this little examination, cross-examination about whether it's difficult for an expert to make a determination in this case because of Mr. Bourgeois' overall sort of grandiose presentation and all that.  Actually, the question I was interested and which I thought I was asking was does it make it difficult for lay people to judge mental retardation in a person like Mr. Bourgeois?

A   Yes, it does.

Q   And, obvious, his presentation is better than the substance, to put it in layman's terms, he presents better

than he is?

A    He presents better than he is.

THE COURT:  Isn't that one of the tests, though, of retardation is not just how he tests but how he presents?

THE WITNESS:  Well, I am not clear on that question.

THE COURT:  Okay.

MR. WISEMAN:  Well, if I can take a stab at it, is it that as an examiner --

THE COURT:  Are you going to testify?  Why don't you just tell me.

MR. WISEMAN:  I'd love to.  But I think I have to have the witness tell it.

THE WITNESS:  He's trying to get -- I think I don't understand the question.

MR. WISEMAN:  Yeah, let me try to ask the question another way.

THE WITNESS:  To reword it for me?

THE COURT:  And I thought the Fifth Circuit law is that you look not just at their test scores but their adaptive behavior, and when you are saying he looks better than he is, to me that's adaptive behavior and how he does things like running a trucking, you know, driving around, running a business, keeping his bank records.  He said in the video he had a tax consultant.  And he's bought a house, he has these cars, he makes these financial arrangements, and --

THE WITNESS:  Uh-huh.  And I think when you said presentation, and what I was kind of thinking was, he tries to overrepresent his abilities and hide from you what supports he got to make those decisions.  And, as I understood, and I don't know a lot of legal issues, but the issue that the courts have to address is when you don't have standardized assessments, is make a real close look at adaptive behavior and see does it meet a deficit, and if it's there, if it appears to be a strength, is there anything that's supporting him that makes it look like a strength when it's not.

THE COURT:  Thank you.

THE WITNESS:  Okay.

BY MR. WISEMAN:

Q   Let me put up Petitioner's 155 again for you. Mr. Roberts was asking you if you thought it was an extraordinary jump from a 76 verbal to a 67 verbal, and that's a nine point difference in the two tests?

A   Yes.

Q   Okay.  And I don't know if you actually did the Flynn calculation or if you have seen one, but can you explain to the Court what the Flynn calculation would be in this instance --

A   Okay.

Q   -- on an IQ score?

A    The Flynn calculation, based on group statistics, is that you would anticipate that the score goes up .3 points per year --

THE COURT:  Up?

THE WITNESS:  -- over the age of the normative test.

THE COURT:  Okay.

THE WITNESS:  So like if we're looking at, this is 26 years or 24 years, multiply that times .3, and what that's telling you is most people who took the test in 2004, a test that's based on norms from '78, in group statistics that's how much it went up.  That's an average.  So we really don't know how much his score went up, we just know it went up.  It could have gone up .3 --

MR. WISEMAN:  I think we're --

THE WITNESS:  -- a year or it could have gone more.

MR. WISEMAN:  Let me ask a clarifying question.

THE COURT:  But his didn't go up at all.

BY MR. WISEMAN:

Q    Now when you say go up --

THE COURT:  It went down.

BY MR. WISEMAN:

Q    -- you mean the norms go up?

A    Elevated the score, so you really Flynn adjust it down, yes.

Q    Exactly.  So if you did the Flynn adjustment down of 26

years times .3, my arithmetic says 7.8.

A    That's correct.

Q    Okay.  So --

A    A Flynn, you can anticipate a Flynn as much as eight points, or on the average of eight points, that's right.

Q    Okay.  So if you were to apply, if you were to apply, and I will put apply in quotes, Flynn to the verbal score in this test, he is pretty spot on, isn't he?

A    Pretty much.

Q    From a 76 to a 67 verbal.

A    That's correct, if there is -- there could be an increase because of aging norms and it might be that much, yes.

Q    Is the ability to mask an adaptive deficit or an adaptive strength?

A    It's just a characteristic, I think, that's common of people with mental retardation to try to hide what they don't know and to present it in a better light, and there are several different ways that it's commonly done.

Q    There has been a lot of questions put to you about who you chose to give a standardized test to and who you chose not to.  Did you, were you aware at the time you were deciding this question that Mr. Ferdinand, Mr. Bourgeois' brother, had been accused of making threats during the time of the trial proceeding or being involved in threats against witnesses?

A    I read phone calls, transcripts and testimony and a lot of things that indicated that, yes.

Q    All right.  And did that knowledge influence your willingness to rely on him as an informant?

A    I certainly brought that into account, but one of my biggest problems with Mr. Ferdinand is just trying to get him to talk to me.  I couldn't arrange it in 2009 and I had to really work hard to get some conversations with him 2010.

Q    Mr. Roberts used the term inconsistent responses with regard to Beverly Frank's reporting on the ABAS that Mr. Bourgeois couldn't use a fork and on the Vineland that he sometimes could use a fork.  Did you see that as inconsistent?

A    No, it's just the way that, the different ways that they are scored, and that's one of the problems I think with the ABAS is you don't get every time to ask that, where when someone is doing an interview with you I can ask, well, you are saying he never did it or did he sometimes do it, or had he started to learn or did it take a prompt to get him to do it, so you get, to me you get a better answer, particularly on a retrospective diagnosis, on the Vineland than you would on an ABAS.

Q    Now, Dr. Moore -- Dr. Price didn't do any standardized testing of adaptive deficits to your knowledge?

A    No.

Q    Okay.  Dr. Moore did some, do you recall that?

A    Yes.

Q    Okay.  Do you recall if he did any, used any informant who knew Mr. Bourgeois in multiple domains?

A    He did.  The sister.

Q    Michelle Armont?

A    Michelle Armont, and --

Q    Okay, stop.  Stop right there.

A    Okay.

Q    How did Michelle Armont's testing come out in Dr. Moore's testing?

A    In Dr. Moore's testing it came out showing he was deficient.

Q    Okay.  The other people Dr. Moore gave the ABAS-II to were people who knew Mr. Bourgeois from work?

A    Yes.

Q    And a person who knew him during childhood?

A    Yes.

        THE COURT:  Aren't all these tests designed, the tests that you are talking about that you gave to Ms. Frank, these are designed to get community help for someone who is mentally retarded, they are not determined, they are not designed to go back in time to determine if somebody was mentally retarded to get the death penalty?

        THE WITNESS:  I think what you are asking is they

are designed to determine eligibility right now.

THE COURT:  Right now, for --

THE WITNESS:  And they are also designed to do treatment, and the authors of both tests have published how to use them retrospectively.  The Vineland did that in 2008 --

THE COURT:  But none of them were designed to do --

THE WITNESS:  They weren't designed to do that.

THE COURT:  -- do what you are doing now?

THE WITNESS:  That's right.

THE COURT:  Okay.  I just want to make sure.

THE WITNESS:  But they are recommended by experts in the field.

BY MR. WISEMAN:

Q   Although they weren't initially designed, is --

THE COURT:  They are not now designed for it, is what she just said.

MR. WISEMAN:  Well, I think that's, if I can clear that up.

BY MR. WISEMAN:

Q   When you say the authors have published, does the Vineland now have an addendum to the manual regarding retrospective administration of it?

A   Yes, when they published the expanded manual in 2008 they devoted a whole section on how to use it retrospectively.

Now, I want to be clear. The normative data is not that based on retrospective but they do, they tell you how to do it and to interpret with caution and to make sure people know that that's the way you did it, which I think is what Dr. Moore and I did.

THE COURT: But it's not be used in this context. The whole thing was developed for community services in another context. Is that not right?

THE WITNESS: That's correct.

THE COURT: Okay. Move on.

MR. WISEMAN: Yes, ma'am. Yes, Your Honor.

BY MR. WISEMAN:

Q   When did the Flynn Effect first become published or present in the literature, was it before or after Atkins?

A   Oh, it was before Atkins.

Q   By a good ten years?

A   Yeah, I would say in the 1980s is when you first started seeing the term and the, associated with Dr. Flynn.

Q   Okay. You watched the tape where Mr. Bourgeois talked about how he was an amazing cook and did all this cooking for Miss Mary when he lived with her and other times. Did you actually hear him --

THE COURT: I think he said he learned from her.

MR. WISEMAN: Right, okay.

BY MR. WISEMAN:

Q   With that correction, did you actually hear him describe how to cook anything?

A   He talked about things he could cook.  I think someone specifically asked him how to treat the game meat and he gave a method that he said she used and that's what he used.  I didn't hear any steps or any recipes.  He certainly couldn't demonstrate that skill to me when I worked with him, and then when I quizzed him --

        THE COURT:  Well, did you give him a raccoon to cook?

        THE WITNESS:  No.  No, Your Honor, I didn't.

        THE COURT:  Okay.  I'm just curious.

        THE WITNESS:  Okay.  But we did go over some recipes and we did talk about different things you do and how you brown and how you fricassee and what you do to dice and different things like that.

        THE COURT:  I don't think he did that.  What I saw in the video is he was just talking about boiling up a raccoon or a deer --

        THE WITNESS:  Yeah.

        THE COURT:  -- or squirrel meat, and what you put in it to make it tender and you boil it until you can stick a fork in it and it's tender.

        THE WITNESS:  That's right.

THE COURT: It sounded all pretty forthright to me.

THE WITNESS: That's right. That's what I remember him saying, yes.

THE COURT: So I didn't ask if you, I don't, I'm not going to ask if you duplicated this recipe, I just want to know if there is any exception you take from this recipe.

THE WITNESS: Oh, from him saying how --

THE COURT: Yes.

THE WITNESS: And I don't have any --

THE COURT: Okay.

THE WITNESS: I don't, quite frankly, Your Honor, I don't know how to soften up a raccoon at all.

THE COURT: I would prefer not to learn, actually, but.

THE WITNESS: It may be the way you do it and it may not be the way you do it, I don't know.

THE COURT: But we don't, you and I don't have anything to say that that's not correct, we don't have any information.

THE WITNESS: Yeah, we have no expertise in raccoon cooking, that's true.

THE COURT: Thank you. Anything in psychology or law that would tell us?

THE WITNESS: No, I hope not.

THE COURT: Okay.

MR. WISEMAN:  Can I be heard about this?

THE COURT:  Go right ahead.

MR. WISEMAN:  I'm just --

THE COURT:  Have you done it, Mr. Wiseman?

MR. WISEMAN:  Okay.  I think that's all.  Thank you again, Doctor.

THE COURT:  I think they get one more, I'm sorry.

THE WITNESS:  You see I'm trying to run.

THE COURT:  Have you got your water?

THE WITNESS:  I just knew I wouldn't need it this time.  I have got it over there.  I'm fine, though.

THE COURT:  Mr. Roberts, anything?

MR. ROBERTS:  I don't think so, Your Honor.

THE COURT:  Now you can go.  Is she excused or do you want her to stay?

MR. WISEMAN:  Yes, she's excused, Your Honor.

THE COURT:  Any, Mr. Roberts?

MR. ROBERTS:  She can be excused as far as we are concerned, Your Honor.

THE COURT:  You might just want to leave them some contact information.

THE WITNESS:  Okay.  And thank you so much.  And I apologize profusely about, I must be losing my peripheral vision in my old age because I just don't see that microphone that I keep bumping into.

THE COURT:  It's very difficult but we have a different kind of court reporting than probably what you are used to.

THE WITNESS:  Uh-huh.

THE COURT:  It's a digital recording.

THE WITNESS:  Uh-huh.

THE COURT:  So the sound goes into Ms. Gano's ears.

THE WITNESS:  And I apologize.  Every time I did it I just cringed.

THE COURT:  And every time I do it, she jumps out of the chair, and I am, unfortunately --

THE WITNESS:  And I want to apologize for that again.

THE COURT:  That's quite all right.  Would you call your next witness, please, sir?

MR. WISEMAN:  Yes, Your Honor.  Dr. Weiner.

THE COURT:  Could you come forward, please, sir? Would you administer the oath?

THE CLERK:  Yes, Your Honor.

DR. DONALD WEINER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Weiner.  What do you do for a living?

A   I am a licensed psychologist in private practice.

Q    And --

          THE COURT:  Would you ask him for his full name,
please, sir?

          MR. WISEMAN:  Oh, I'm sorry.

BY MR. WISEMAN:

Q    Full name, please?

A    Donald Edward Weiner.

Q    Okay.  And why don't you spell your last name so it's
clear for the record?

A    W-E-I-N-E-R.

Q    And do you have any particular specialty?

A    One specialty area I have is the area of neuropsychology.

Q    And I want to put up on the overhead for you what I have
marked as Petitioner's 29A and ask you if that's your vitae?

A    Yes, it is.

Q    Okay.

          MR. WISEMAN:  Can I hand this up to the Court?

          THE COURT:  Wait, wait, wait.  You can offer it and
let me just look at it, okay?

          MR. WISEMAN:  Okay.  Can I offer this in evidence
then, Your Honor?

          THE COURT:  Sure.  The number is?

          MR. WISEMAN:  29A.

          THE COURT:  29A is admitted.

     (Defendant's Exhibit P29A admitted into evidence)

200

BY MR. WISEMAN:

Q   Could you briefly, the Court can see where you went to school and all that, but why don't we focus in particular on how you developed an expertise in neuropsychology.

A   I began getting -- excuse me -- interested in neuropsychology during a pre-doctoral clinical psychology internship and more interested during a post-doctoral fellowship I did at the University of Texas Medical Branch at Galveston.  And following that I have been to a number of trainings over the years with Dr. Ralph Raytan, who is one of the world authorities in neuropsychology.

THE COURT:  Okay.  Do you have any training in neurology?

THE WITNESS:  I am not a medical doctor but I have had training in neurophysiology through -- I am board certified by the professional, what's it called, licensed prescribing psychologist register, and I have taken about 350 hours of training and some of that was specific to brain and brain function and brain physiology.

THE COURT:  Well, how much of that specific for --

THE WITNESS:  Oh, I'd probably say maybe 40 hours of that.

BY MR. WISEMAN:

Q   In your --

THE COURT:  Okay, wait a minute.  You are not board

certified by any neuropsychology organization?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.  Didn't we have somebody in here that was a neuro, the other guy that was --

MR. WISEMAN:  Dr. Gelbort was also not board certified.

THE COURT:  But he had extensive training in -- actually, never mind.

MR. WISEMAN:  Well, if I could ask some more questions about that?

THE COURT:  Never mind, that's okay.

MR. WISEMAN:  Okay.

BY MR. WISEMAN

Q   In your current practice, approximately how many times a month do you administer neuropsychological tests?

A   Oh, it's probably, averages three times a month or so.

Q   And has that been pretty consistent over the course of your career?

A   Yes.

Q   So you have administered hundred of batteries?

A   Yes, I have.

Q   And --

THE COURT:  Say that again.

MR. WISEMAN:  Hundreds of batteries of tests.

THE COURT:  For neuropsychology?

MR. WISEMAN:  Neuropsychology, yes.

BY MR. WISEMAN:

Q   And your answer for that is?

A   Yes.

Q   And have you testified in courts in Texas as an expert in neuropsychology?

A   Yes, I have.

Q   Approximately how many times?

A   Oh, I'd say probably 40 to 50 times.

Q   And has that been in the State Courts as well as the Federal Courts?

A   Yes.

Q   And have you ever been denied qualifications by any judge?

A   No.

Q   What is the percent of your practice that's devoted to clinical treatment and diagnosing of patients?

A   Well, actually, about 100 percent is clinical direct services, treatment, diagnosis, evaluation, diagnosis and treatment.

Q   Okay.  And, well, I guess then the question is how much of your time do you spend doing forensic work?

A   At any given time I may have about 10 to 15 percent of my caseload involved in forensics cases, but generally with those it's someone that I either do a one-time evaluation of

or it's someone I am doing ongoing treatment that they need and then I am asked to provide expert testimony.

Q    And amongst the forensic cases that you do, how much of it is criminal law cases?

A    A very small percentage.  I'd say less than five percent.

MR. WISEMAN:  Your Honor, at this time I would offer the witness as an expert in neuropsychology.

MS. SALINAS:  I'm not in opposition, Your Honor.

THE COURT:  Sorry?

MS. SALINAS:  I am not opposed to that, Your Honor.

THE COURT:  Thank you.  Then he will be recognized as.

BY MR. WISEMAN:

Q    I want to direct your attention to 2004.  Did you do any work in the case of the United States versus Alfred Bourgeois?

A    Yes, I did.

Q    And how did that come about?  What were you asked to do and who asked you?

A     I was contacted, I believe it was by Mr. Tinker, in February of 2004 and asked to do a neuropsychological evaluation of Mr. Bourgeois.

Q    And I want to put up for you an order signed by Judge Jack, it's Exhibit P157, and it appears that on February 13th, 2004, Judge Jack signed an order appointing you to do

work on this case?

A    That's correct.

Q    And do you recall how much before that day that
Mr. Tinker would have contacted you?

A    It was probably at most a couple of weeks before I
actually did the evaluation.

THE COURT:  What was the date on it again?

MR. WISEMAN:  February the 13th, 2004.

THE COURT:  Thank you.  And he started, when did we
start trial?

MR. WISEMAN:  The jury was sworn on February 25th.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    So you said that Mr. Tinker asked you to do, what, a --

A    A neuropsychological evaluation.

Q    And do you recall the circumstances that you were asked
to perform this evaluation under?

A    Well, there was a very tight time line and my schedule
was already pretty booked, and so normally I don't do work on
the weekends but I did agree to do this evaluation on a
Saturday.

Q    And where did the evaluation take place?

(Banging noise)

THE COURT:  Oh.

THE WITNESS:  I'm sorry.

THE COURT:  Okay.

THE WITNESS:  I apologize.

THE COURT:  Okay, nobody gets on the stand anymore from either side that is not instructed to be very careful of the microphone.

MR. WISEMAN:  I'm so sorry.

THE COURT:  Don't touch it.

THE WITNESS: I apologize.  I apologize, Your Honor.

THE COURT:  Don't touch it, don't move it, don't touch it.  Thank you.

THE WITNESS:  The evaluation was done February 28th of 2004.

BY MR. WISEMAN:

Q   And you recall that was a Saturday?

A   Yes.

Q   And where did the evaluation take place?

A   Oh, where did you say?

Q   Where?

A   At the federal courthouse.  He was being held here.

Q   Okay.  This building?

A   Yes.

Q   Okay.  I want to put up for you what's been marked as Petitioner's 29 and ask you if you recognize that?

A   Yes, that's my report based on my neuropsychological evaluation.

Q    And what do you make of the date of the report being 3-3 with the evaluation having been that Saturday?

A    Well, normally, like I said, I don't do work on a weekend and so the earliest date I was able to actually complete the report was on March the 3rd.  It was definitely a rush job.

Q    Okay.  And did you, were you provided by Mr. Tinker or anyone working with him any records with regard to Mr. Bourgeois?

A    No, I was not.

Q    Not a single piece of paper?

A    No.

Q    Is that unusual in a neuropsychological evaluation?

A    Well, particularly in forensic cases it's extremely desirable to have whatever medical records, school records that may be available in aid, and the conclusions based on the testing.

Q    I'd like to put up for you Petitioner's 81, which is a thick packet of records.  Do you recognize those?

A    Well, I'm not sure what is inside the packet.

Q    Right.  Does it look like a packet you have reviewed?

A    Hunter Medical Records.  I don't believe I have received any package --

Q    Well, would it be helpful for me to hand it you to --

A    Yes.

Q    -- look through it?

A    I did receive -- I did not receive any medical records on Mr. Bourgeois until the ones you provided me in 2007 and then the additional ones that I was recently provided, but this --

THE COURT:  Sorry, what, medical records you are talking about?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    And I guess my question is, is the packet you are currently holding are Mr. Bourgeois' medical records?

A    Yes.

Q    And they were provided to you by my office?

A    Yes.

Q    Not by Mr. Tinker's office?

A    That's correct.

THE COURT:  Now, you are not a medical doctor?

THE WITNESS:  No, I am not.

THE COURT:  Okay.  And you haven't had pre-medical courses, chemistry, biology?

THE WITNESS:  I have had -- no, I have not had --

THE COURT:  Okay.

THE WITNESS:  Did not take pre-medical courses.

BY MR. WISEMAN:

Q    I want to turn to a particular page in these records and ask you what relevance, if any, they would have for a person

doing a medical, a neuropsychological study, and this is page 12 of the exhibit and it's a little hard to read.  I know you have read it.

A    Yes, I can see it there.

Q    Okay.  Can you tell the Court what that line that I pointed to says?

A    It looks like the admission notes and it said, "Restrained driver of 18-wheeler survived and hit another, swerved," I'm sorry, "and hit another 18-wheeler.  Hit head on steering wheel.  Complained of left shoulder, left neck, left," I believe, "upper neck.  No loss of consciousness.  Complained of dizziness."  And I'm not sure what the abbreviations are after the --

        THE COURT:  It's "Complained of left and right" -- let me see it.  If you zoom it up I will read it for you.

        THE WITNESS:  Okay.

        THE COURT:  This is why I don't want a psychologist reading or interpreting medical records.  He is not qualified to do that, Mr. Wiseman.  It's not going to happen.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q    Is a report of a head injury something that a neuropsychologist would typically want before doing a battery?

A    Yes.

THE COURT: Now, a bump on the head is not a head injury, is it?

THE WITNESS: Well --

THE COURT: You cannot tell from that that there was any head injury.

THE WITNESS: Well, all I could tell from that is that his head apparently struck --

THE COURT: Right, but you can't read any of those medical records to determine there was a head injury?

THE WITNESS: Not the severity.

THE COURT: Okay.

THE WITNESS: Just the blow to the head.

THE COURT: Is this the one that, are you the one that Mr. Bourgeois said he had been in a coma for three months?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. WISEMAN:

Q   Were you --

THE COURT: And if you had been called to testify, you would have had to tell the jury that, wouldn't you?

THE WITNESS: Yes.

BY MR. WISEMAN:

Q   Would you, if you had been provided with these records -- well, let me withdraw that. What relevance to your

evaluation was Mr. Bourgeois' report that he had been in a coma?

A   Well, at the time it appeared to be the likely cause of the impairment that was evident in the testing.

Q   Okay.  And if you had been provided with these records, would you have seen anything about the coma?

A   If I had been provided with records which I received several years later, I would have been aware that there was no head injury in the 1984 accident that he was referring to.

Q   The coma accident?

A   Correct.

Q   Okay.  But you would have seen that there was another entry regarding striking his head in an 18-wheeler accident?

A   Yes.

Q   And would that also have had relevance to your report if you had been provided the records?

A   It would have been something that definitely would have been noted in the report.

Q   All right.  And if you had had the records in your possession at the time of your evaluation of Mr. Bourgeois, would you have asked him about his claim of a coma?

A   I absolutely would have.

Q   And you would have --

            THE COURT:  Well, you asked him anyway, didn't you?

            THE WITNESS:  Yes, I asked him if he had a history,

as is a routine part of the evaluation, have you ever had any

serious illnesses or injuries.

THE COURT:  And he claimed as a part of this

whatever it was that he was in a coma for three months.

THE WITNESS:  Yes, he did.

THE COURT:  That turned out to be not correct.

THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q   All right.  And if you had these records with you, would

you have showed him the record relevant to the alleged coma

and said, "Well, hold it a second, that doesn't show up

here"?

A   Yes, I would have.

Q   Okay.

THE COURT:  And what would that, what would that

tell us?

BY MR. WISEMAN:

Q   Well, would you have put in your report that he had

suffered a coma if you had the medical records that said he

didn't suffer a coma?

A    No, I would have put that he initially reported but the

medical records showed that that was not the case, and then I

would have put whatever he said in response to me asking

about it.

Q    But you would have put also that there was a subsequent

potential head injury from striking his head in another automobile or truck accident?

THE COURT:  Well, not a subsequent, that's what he's talking about.

MR. WISEMAN:  I'm sorry?

THE COURT:  What do you mean a subsequent report?

MR. WISEMAN:  Another car accident, another truck accident.

THE COURT:  When was there another truck accident?

MR. WISEMAN:  That's my point, Your Honor, that's what I was trying to show the witness.

THE COURT:  When did he claim he was in a coma?

THE WITNESS:  From the 1984 accident.

THE COURT:  The one you are talking about right here?

THE WITNESS:  I believe that I am being asked about a separate accident which took place in 1993.

MR. WISEMAN:  There's one accident without a coma and there's a second accident with the head striking.

THE COURT:  Okay, but we don't know what kind of head injury that was?

MR. WISEMAN:  No, we don't know that.

THE COURT:  And no way of knowing and he's not qualified to do it.

MR. WISEMAN:  No, I just want to establish the date

of that other accident.

BY MR. WISEMAN:

Q   And the date would be July 7th of '93?

A   Yes.

Q   Okay.  So if counsel had provided you these records, you would have been armed with more information relevant to a potential etiology of the head injury?  Of any organic brain damage, excuse me.

A   Yes.

Q   Okay.  Now, to be clear, the information about the 1993 truck accident wouldn't necessarily account for Mr. Bourgeois' deficits which we'll talk about in a little while?

A   That's correct.

Q   Okay.  There could have been other reasons for his deficits?

A   That's correct.

Q   Okay.  One more thing I want to ask you about, and I know that this isn't something you have seen before but these records appear to have gotten to John Gilmore, who was co-counsel.  Do you remember his name?

A   Yes.

Q   Okay.  They got to him on 2-20-04 invoice date?

A   Yes.

Q   Or thereabouts.  Okay.  And your --

THE COURT:  Can I see, let me see that.  What was the date?

MR. WISEMAN:  2-20-04.

THE COURT:  Okay, I know, but keep going at the bottom.  I'm sorry.

MR. WISEMAN:  Where would you like --

THE COURT:  What, where, what records are we talking about?

MR. WISEMAN:  These are the medical records.  These are --

THE COURT:  From what -- from what, the '94 incident?

MR. WISEMAN:  This is all of Mr. Bourgeois' medical records that Mr. Gilmore obtained.

THE COURT:  Okay, can I look?  Keep going to the middle.  Okay.  See, it says 7-9-64?

MR. WISEMAN:  That's his date of birth.

THE COURT:  That's his birth date?  Okay.

MR. WISEMAN:  I am going to offer these if Your Honor wants to look at them more closely.

THE COURT:  Okay.  And the other medical record that you showed me is the one from the same place?

MR. WISEMAN:  Yes.

THE COURT:  Okay.

MR. WISEMAN:  These all came in the same packet.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  And Mr. Gilmore had them?

MR. WISEMAN:  Mr. Gilmore had them.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Weiner did not.

BY MR. WISEMAN:

Q   Do you recall, did you read any of the transcripts of the trial proceedings in this case?

A   I did review all the records you provided for me, which included the trial transcripts.

Q   And do you recall a portion on the March 24th, 2004 proceedings where Judge Jack was talking to Mr. Bourgeois?

A   Yes, I do recall reading that section.

Q   Okay.  And do you recall Judge Jack saying in effect that Dr. Weiner did an evaluation and he had all this collateral information about you?

A   Yes.

Q   All right.  And with all respect, of course, to the Court, that wasn't in fact the case?

A   That is correct.

Q   You had no information?

A   Yes, I just had --

THE COURT:  What was I talking about, do you know?  What was the context of that?

MR. WISEMAN:  I think the context of it was you were trying to express to Mr. Bourgeois that you had given his lawyers much, many resources to pursue his defense.

THE COURT:  I had, and I saw that Mr. Bourgeois had said that at one point Mr. Gilmore told him that the Court was out of money.  I don't recall ever having represented that to anybody.  I gave him every possible expert known to man.

MR. WISEMAN:  And our complaint, Your Honor, is --

THE COURT:  Everything that was requested.

MR. WISEMAN:  Yeah, our complaint is certainly not with the Court funding the defense.

THE COURT:  Okay.

MR. WISEMAN:  We agree that it was well funded. Unfortunately, from our perspective --

THE COURT:  It's what they did with it that you are complaining about?

MR. WISEMAN:  Precisely, precisely.

THE COURT:  Okay, I got it.

 BY MR. WISEMAN:

Q   Let's talk about your actual evaluation, Dr. Weiner.

A   Okay.

Q   What did it consist of, given that you didn't have any records to look at?

A   I did a clinical interview with Mr. Bourgeois and then I

administered several tests, the Wechsler Adult Intelligence Scale Revised, the Wide-Range Achievement Test, Third Edition, the Halstead-Raytan neuropsychological test battery for adults, and the Test of Memory Malingering.

Q   Okay.  And this has already been received in evidence as Petitioner's 30.  Why don't we zoom that out a little bit. Oops.  Is this the packet that contains your raw data?

A   Yes.

Q   Okay.  There has been a lot of discussion outside your presence in the court about why you chose to administer the WAIS-R at a time when it was outdated, and I'd like you to tell the Court why you did that.

A   Yes.  The WAIS-R is the test that was used and a lot of the normative data from Dr. Raytan and a scale that he developed called the neuropsychological deficit scale specifically was done with the WAIS-R, and in training workshops that I went to with Dr. Raytan he was still using this test even after the WAIS-III came out because he didn't feel there had been enough research on the WAIS-III at that time to warrant using it.

Q   Okay.

THE COURT:  It had been out for like seven years when you were using the, an older test?

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q    Now that the WAIS-IV is out, do you currently use the WAIS-IV?

A    Now I have been using the WAIS-III because there has been enough research on that one, and I am going to wait on using, I do have the WAIS-IV but I am going to wait on using that until there has been enough documented research that it is useful in conjunction with the Raytan battery.

Q    Now, you have mentioned the neuropsychological deficit scale as a measure used in the Halstead-Raytan battery.  I'd like you to explain to the Court what the Halstead-Raytan battery is and what the neuropsychological deficit scale is.

A    Yes.  The Halstead-Raytan battery is a collection of several tests, and I don't know if you want me to go through them and describe them or --

Q    I don't think that's necessary --

A    Okay.

Q    -- just yet, but --

A    But it's used to answer questions of if an individual has brain damage, if so, is it mild, moderate, severe, is one side of the brain more affected than the other, and are there specific parts of the brain that are more affected.

Q    And how did Mr. Bourgeois score on that administration of the WAIS-R?

A    On the WAIS-R?

Q    Yes.

A    He had a verbal IQ of 76, a performance IQ of 76, and my report has a typo, it should have said a full-scale IQ of 75, all of which are in the borderline range.

Q    All right.  And your report, I think you just said, incorrectly listed a 76 full-scale IQ?

A    That's correct.

Q    And how do you account for that error?

A    Well, the, this report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.

Q    Okay.  Did you administer, I think you mentioned the TOMM test.  What is the TOMM test, how does it work and what information does it give you?

A    It is, it stands for the Test of Memory Malingering. It's a test in which the individual is shown a series of simple pictures for three seconds each, 50 pictures, and then they are shown pages that have two pictures on each page and on each page one of the pictures is one they saw before and

the other they haven't seen, and they are asked to point to the one they saw before and then give immediate feedback if they are correct or incorrect.  There is an initial trial administered, the 50 pictures are shown once again and then a second trial is given, and normally on the second trial, unless someone is malingering, they make very few errors.

Q   And I take it, to be effective, the person is not alerted that this a test to detect malingering?

A   That's correct.

Q   All right.  So for all they know it's just another test in the battery?

A   Yes.

Q   Okay.  And how did Mr. Bourgeois score on the TOMM test?

A   He had, his score was, it showed no indications of malingering.  I believe he had only three errors on the initial trial, which is a very good score, and on the second trial he didn't make any errors, he made a perfect score.

Q   And the page I have up on the screen, page 28 of the exhibit, is the first trial you just spoke of?

A   That's correct.

Q   And so he got 47 out of 50?

A   Correct.

Q   And the second trial he got 50 out of 50?

A   That's correct.

Q   So this score of 97 out of 100 you say doesn't show

malingering.  Is that instrument normed to determine when, what number of errors is malingering or potential malingering?

A    It's, yes, and I don't have the manual with me but if you, particularly on the second trial, make more than a certain number of errors, then the odds are very high that the person is malingering.  And the research on the test was done with different populations, including brain damage populations, and people asked to simulate malingering, so.

Q    I notice you didn't administer the third trial.  Was there a reason for that?

A    The third trial was optional and I would only give that if there was just, if it was questionable from the second trial you couldn't quite be sure it was in the -- because you can get results that are in the range of questionable validity but you wouldn't conclude malingering from it.

Q    I want to show you another exhibit, this would be 154. What is this document?

A    This is a document that shows how scores on the WAIS-III would compare with, for the same person, if they were given the WAIS-IV.

Q    All right.  Now, Mr. Bourgeois scored a 75 on your WAIS-III so there's no --

A    Well, actually mine was a WAIS-R.

Q    I'm sorry, I'm sorry, WAIS-R, my mistake.  He scored a

75, so there's no precise number there for 75.

A    Well, in the --

Q    Oh, I'm, sorry, I have the wrong one up.

A    Yeah.

Q    Okay.  I'm going to withdraw that for now.

A    I think I have the page that --

Q    Yeah, I've got -- okay, here's the correct exhibit.  I'm going to show you 158.  And this is from, where is this document from?

A    This is from the manual for the WAIS-III.

Q    Okay.  So the WAIS-III manual tells you that if a person scores a 70 on the WAIS-R, right, and we recognize he scored a 75 --

A    Yeah.

Q    -- on your WAIS-R, that that would translate to a full-scale IQ of somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And what does that chart tell you in terms of interpreting your administration of the WAIS-R when the norms were no longer the norms, when the WAIS-IV was available, I'm sorry, the WAIS-III was available?

A    Well, it says that the, that his actual level of intellectual functioning is lower than that score would indicate since that WAIS-R has older normative data.

Q    Okay.

A    That his true IQ is probably four or five points lower than that.

Q    Let me go back to the other exhibit that I mistakenly put up.  This is 154.  Where is this chart from?

A    This is from the WAIS-IV manual and it shows how the IQ scores would differ if someone were administered the WAIS-III as compared to the WAIS-IV.

Q    Okay.  And again, Dr. Gelbort's administration of the WAIS-III was a 70?

A    Yes.

Q    Okay.  And that would translate on the WAIS-IV to somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And again, what does that tell you about Mr. Bourgeois' actual intellectual functioning?

A    That it's in the mentally deficit range.

Q    And that would be below 70?

A    Yes.

Q    You have done a comparison between your subscales and Dr. Gelbort's subscales?

A    Yes.

Q    Do you see a consistency or inconsistency between them?

A    There's a great deal of consistency between scores.

Q    Okay.  And does that add to your view as to malingering?

A    It adds to the view that it does not appear that there

was malingering.

Q   A hard question --

THE COURT:  When was that?  When did you think there wasn't malingering?

THE WITNESS:  Oh, I didn't think there was malingering when I gave it.

THE COURT:  Right.

THE WITNESS:  But if --

THE COURT:  But you don't know about the second time?

THE WITNESS:  Well, maybe I will let you, maybe you need to rephrase your question.

MR. WISEMAN:  Sure.

THE COURT:  No, I am just asking you, can you tell, though, if there was malingering the second time when you didn't administer it?

THE WITNESS:  Oh.  Well, I couldn't just based on looking at the sheet.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Can you look at Dr. Gelbort's data and its consistency with what you scored or what you administered and detected no malingering and derive some view as to whether there was malingering on the WAIS administration given by Dr. Gelbort?

A   Yes.  I would say, and I don't know about the other tests

but for this particular test it would be very unlikely that there was malingering and for the results to be so close to the ones that were found when I administered the test.

THE COURT:  Well, I thought they weren't close, I thought they were --

THE WITNESS:  Oh.

THE COURT:  -- far apart.

THE WITNESS:  I'm sorry, Your Honor, they are very similar.  Do you have the --

MR. WISEMAN:  May I approach the witness, if I can put this chart up?

THE WITNESS:  (Noise)  I'm sorry, Your Honor.  I will scoot back here.

BY MR. WISEMAN:

Q   This has been previously marked as --

THE COURT:  Right.

MR. WISEMAN:  -- 154 --

THE COURT:  How is that similar with the verbal IQs?

THE WITNESS:  The, there is a margin of error for each of these and --

THE COURT:  What is it?

THE WITNESS:  Well, I have to pull out the comparison here.  One moment, Your Honor.  The, there's a difference of approximately four points or so from the verbal IQ on the WAIS-R to the WAIS-III, and that 76 actually should

have been a 75, which would bring it down --

THE COURT:  Okay.  So what you are saying, it could be actually the difference between 79 and 63, which would be a big difference, if you do, if you do the four points on the top and four points on the bottom.

THE WITNESS:  Oh, no.  Well --

BY MR. WISEMAN:

Q   Well, is that how you do it?

A   Well, let me explain.  No, the, and I realize this can be pretty confusing, what this table that you had up a minute ago that compares the WAIS-R scores to the WAIS-III scores -- and maybe it would be helpful if you could put that back up.

Q   Sure.

THE COURT:  I'm just --

THE WITNESS:  The scores --

THE COURT:  I'm just trying to compare the two tests that were actually done, not a hypothetical one that was not done.

THE WITNESS:  Right.  So we are, that's what I am trying to explain.

THE COURT:  So that you did the WAIS-R and there was a WAIS-III?

THE WITNESS:  Correct.

THE COURT:  So I am just, I am just asking to compare those two.

THE WITNESS: Yes, Your Honor. The scores for the verbal IQ --

BY MR. WISEMAN:

Q    I am going to put this chart back up so you can --

A    Okay. The scores for the verbal IQ on the WAIS-III are expected to be approximately four points lower than the same person taking the WAIS-R, so --

Q    And that would put it at as high as a 71?

A    Correct, because that 76, that's my typo in there, it should have been --

Q    Well, that's your verbal IQ.

A    Oh, I'm, I apologize, so take it, that would put it to about 72.

Q    Okay.

A    And there is also a margin of error --

THE COURT: No, I am talking about -- oh, never mind. I just wanted you to compare the two tests that were given.

MR. WISEMAN: Well, that's what we are trying to do here.

THE COURT: Okay.

MR. WISEMAN: We have the WAIS-R on the left, the WAIS-III on the right. Let's focus first --

THE COURT: Well, there's a nine-point difference in the verbal IQ, or an eight-point difference.

MR. WISEMAN:  Right, and I am going to address that right now.  The verbal IQ --

THE COURT:  An eight-point difference in the verbal IQ.

THE WITNESS:  Yes, the raw, the actual, and what I am trying to explain, perhaps not very clearly, is that 76, if you use the tables in the WAIS-III manual, a 76 verbal IQ in the WAIS-R is the same as a 72 verbal IQ on the WAIS-III, so if you were going to do that you would have a 72 versus a 67, and then --

THE COURT:  No, you'd have a 72 versus a 72.

THE WITNESS:  No, you only take the points off the older one to see what it would have been on the newer one.

BY MR. WISEMAN:

Q   All right, so the 76 on the WAIS-R would be a 72, and that's within the margin of error of five points which gets exactly 67?

A   That's correct.  But there's, for any score on this --

THE COURT:  Or 77.

MR. WISEMAN:  Well, sure, we're dealing with statistics.

THE WITNESS:  Right.

THE COURT:  Well, I mean that's the unfortunate thing about statistics is that they are maneuverable for anybody to say anything they want them to say, almost.

MR. WISEMAN: Well, you know, I don't want to argue with that old adage but I think there is a lot of science here.

BY MR. WISEMAN:

Q   I guess the question I am asking you is the fact that this all falls within the statistical range that's spot-on, what does that tell you about malingering? How hard would it be for a person to take these tests three years apart and score within a statistical range on purpose?

A   I think it would be virtually impossible, particularly if you look at the subtest scores which are very close to each other. I don't know, I couldn't possibly pull that off and I have been giving these IQ tests for a very long time.

Q   Did you make any observations with respect to whether Mr. Bourgeois appeared to be invested in looking good in his interview with you?

A   It appeared, especially after I was able to get data that I had not available at the time, input from other people, input from school records, that Mr. Bourgeois was attempting to present himself in a much more favorable light in terms of grades, functioning, than actually was the case.

Q   And with regard to school grades, what did he tell you and what did you put in your report about how he did in school?

A   He told me that he made Bs and Cs in school and that he

had gone to college for two months.

Q    And when you reviewed the school records, school record, I should say, the one page we provided to you, did you see Bs and Cs or did you see something else?

A    A preponderance of Cs and Ds.

Q    And did he appear invested in looking good in any other ways?

A    He didn't tell me anything about -- let me look at my report here.  He didn't recount any of the abuse that was documented by several sources in the records that I was recently given.

Q    Anything else that comes to mind?

A    Well, he didn't tell me about his problems that I had learned about in the records.  When he was a truck driver he apparently had a lot of difficulty learning how to do that and had a lot of accidents and --

Q    Dr. Price's report, did you review that?

A    Let's see.  I reviewed so many.  Which one was that?

Q    Would be 162, Petitioner's 162.

A    Can you show me the next page or the report itself?  Yes, I did review that.

Q    And do you recall seeing in there Dr. Price making reference to --

         THE COURT:  I'm sorry, I didn't see that.

         MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  Would you show that again, please?

BY MR. WISEMAN:

Q    Not necessarily on this page but did you see in the report reference to unusual scatter on the WAIS testing?

A    Yes.

Q    And do you agree that there was scatter on this testing?

A    Well, the --

Q    Either yours or Dr. Gelbort's?

A    The only significant scatter was I believe he did within normal limits on digit symbol and all the other scores were very consistent, so I would in no way call his subtest scores a significant amount of scatter.

Q    Let's talk about the Halstead-Raytan battery.  You indicated that it is comprised of a number of different tests?

A    Yes.

Q    All right.  Rather than go through them and then list how he performed, why don't we talk about how he performed as we list them.  On the aphasia screening test, tell the Court briefly what that is and how did he score?

A    Okay, let's find it here.  That is a set of very simple tasks.  The person is shown simple pictures, asked to copy them, identify what they are, spell them, read very simple single words and sentences, repeat words spoken, do simple arithmetic problems, and normal individuals tend not to make

errors or very few errors on that, so if someone does make an error we have our jargon, it's called pathignomonic.  In other words, it's a finding that's not typically found in a normal individual that is generally associated with brain damage, and on --

Q    And how did Mr. Bourgeois score on that?

A    On the aphasia screening test he exhibited something called constructional dyspraxia, he had difficulty copying a geometrical figure, and this points to problems on the right side of the brain.

Q    All right.  And with regard to the category test, what is it and how did he score?

A    This is a, basically a concept formation test where an individual is shown a series of pictures and they are told that each picture will remind them of a number, one, two, three or four, and they have immediate feedback if they are correct or incorrect based on their response.  And there are seven subtests, I believe there's about 208 items, and making 50 errors or more than 50 errors is considered to be in the brain damage range, and Mr. --

Q    And how did Mr. Bourgeois perform on that test?

A    He made 94 errors, which is an extremely poor score.

Q    All right.  And did you administer something called finger tapping?

A    Yes.

Q   And what is it and how did he do?

A   He did adequately on that one.  Finger tapping is there is a little device with a little lever and the person is tapping with the index finger on their dominant hand in ten-second trials and then the same with their non-dominant hand, the index finger for ten-second trials, and his performance was adequate on the finger tapping.

Q   All right.  And you administered something called grip strength?

A   Yes.

Q   And how did he do on that?

A   His grip strength was adequate with his dominant hand. It was, he was weaker than expected with his non-dominant right hand, because normally the non-dominant hand should be about ten percent weaker than the non-dominant hand and there was a bigger discrepancy than that.

Q   Okay.  And did you see any explanation for that deficiency in that performance?

A   Yes, Mr. Bourgeois reported arthritis in both hands with more in his right, so I noted in my report that discrepancy was likely due to arthritis rather than reflecting impairment in that area of brain function.

Q   And on the seashore rhythm test, what is it and how did he do?

A   This is a test where the person listens to a series of

sounds, and there's two groups of sounds, and they are asked to write down whether the two sounds sound the same or different and there's 30 pairs, and Mr. Bourgeois made nine errors, which is in the impaired range.

Q   Okay.  And there's a series of tests called the sensory perceptual examination test?

A   Yes.

Q   And is that comprised of additional subtests?

A   Yes.

Q   What are they, how did he do and what did you make of it?

A   Well, the first section is, the person is presented with bilateral sensory stimulation, so he has his eyes closed, his hands are in front of him, I tell him I am going to touch your right hand or your left hand, tell me which one, without ever telling them in advance sometimes I touch both, and if you don't perceive both and make an error that's called a suppression.  He didn't make any suppressions.  I touched one hand, the opposite side of the face, a series of trials, didn't make any errors.  I do it with auditory function, make sounds behind each ear, no errors.  The visual part, no errors.  But when it came to -- oh, in tactile finger recognition he has his eyes closed and I tell him I am going to touch one of your fingers, one, two, three, four and five, tell me which one, he made no errors.  But when we got to fingertip number writing in which he has his eyes closed and

I tell him I am going to write a number on his fingertip, it will be upside down to him, tell me which one, he had very poor performance on both sides, making a significant number of errors.

Q   Speech sounds perception, how did he do on that?

A   He made nine errors, which with Raytan's newer normative data is actually within normal limits with the -- so he did okay on that.

Q   Okay.  And tactile performance?

A   Tactual performance?

Q   I'm sorry, tactual performance.

A   That is -- do you want me to describe what it is?

Q   Yeah, please.

A   This is a test where he's blindfolded and he's told I am going to, in front of you there's board and there's a series of blocks that go on the board.  He's allowed to feel the board with one hand and then he's asked to place the blocks into the board, it's like a puzzle with ten pieces, first with his dominant hand which for him is his left hand, then with his non-dominant hand and then with both hands.  And then without any advance warning the board is taken away, the blindfold is removed, he's asked to draw the board from memory and put the blocks where they go and he's scored on how many shapes he can remember and how many he gets in the correct location.

Q    Are the initial portions of that subtest timed?

A    Yes.

Q    And how did he do on that?

A    He had a very poor score of almost 27 minutes total time and making, having a score of more than 15 point something minutes is considered to be in the brain damage range, so that was very, very poor.

Q    Okay.  And we have heard about the Trail-making test from Dr. Gelbort.  You administered trails A and B?

A    Yes.

Q    And was he impaired on either of those?

A    He was impaired on the Trail-making test Part B.  His score was in the brain damage range.

Q    Okay.  Now, I want to ask you, you know, about your conclusions regarding that test, but before I do, is the Halstead-Raytan regarded as the gold standard test for neuropsychologists?

A    Yes, at least by many neuropsychologists.  It's had more research by a huge amount than any other neuropsychological test or battery.

Q    And you had mentioned earlier the neuropsychological deficit scale.  Explain how that scale translates all this test information and how Mr. Bourgeois did.

A    Yes.  The neuropsychological deficit scale was developed by Dr. Raytan and it takes the scores on pretty much all of

the parts of the neuropsychological battery and each section is given a score anywhere from zero to three, zero, one if its normal, two or three if its in the brain damage range, and then you get a total score, and if you have more than 26 points on there it's considered to be in the brain damage range and Mr. Bourgeois' total score was 33.

Q   All right.  And just to go back to the reason you gave the WAIS-R, it's, was it because it was normed to this neuropsychological deficit scale?

A   Yes, the neuropsychological scale specifically was researched with the WAIS-R and so a portion that contributes to the total score is based on WAIS-R scores and not from the different IQ tests, even a newer one.

Q   Is there an alternative way of scoring how one would turn out on or how one performed, I should say, on the Halstead-Raytan battery?

A   Well, there's another index called the impairment index which was an older index developed by both Doctors Raytan, Halstead and Raytan, and this takes seven portions of the battery and there is a cutoff score and if a person scores beyond that cutoff score, each test that does that, that would be like one point towards that, so of the seven, let's say someone has five of the seven parts impaired, then their impairment index would be five-sevenths converted to a decimal.

Q   Okay.  And how did Mr. Bourgeois score on the impairment index?

A   His impairment index was .86.

Q   And that's basically seven divided into six impaired tests?

A   Six, right six-sevenths.  Right, seven into six, correct.

Q   Right, okay.  Confusing me.  And is that considered in the impaired range?

A   Yes.

Q   Now, you mentioned he scored particularly poorly on the category test.  Did you make a special note in your report of the implications of that for his legal situation?

A   Well, I made the same observation in my report I would have made with anyone who had an impaired score in the category test and that is to say that someone that has a score similar to Mr. Bourgeois' is likely to have difficulty adjusting to new and unfamiliar situations and may exhibit inappropriate behavior under stressful circumstances without necessarily being aware of the inappropriateness of their actions.

Q   And just to put the final point on that, this is the last page of your report where you actually make that statement?

A   Yes.

Q   Okay.  Well, my colleague points out that you said it in two places, so I guess it was important.  Is it --

THE COURT:  He really, really meant it.

MR. WISEMAN:  What's that, he really meant it?

THE COURT:  He really, really meant it.

MR. WISEMAN:  That's right.

THE WITNESS:  That's in case somebody doesn't want to read my report and they just want to get to the --

BY MR. WISEMAN:

Q   Okay.  So what were your overall conclusions about your testing Mr. Bourgeois?

A   That the test results were valid, that they revealed overall mild cerebral impairment with moderate cerebral damage in the back portion of the brain, the posterior portion of the cerebral cortex.  That there was no evidence of malingering.  That he showed some signs of depression.  And, again, what I said about the category test, about the likelihood of exhibiting inappropriate behavior.

Q   And just to give us a proper perspective, when you use the term mild it doesn't sound so bad, what does mild brain dysfunction mean?

A   Well, there's a range of problems and, again, it's based on the overall results on the neuropsychological deficit scale, and mild impairment is going to cause someone problems.  His impairment on the category test in particular is not mild, it's very significant, but the overall, to kind of put everything together, overall his brain is functioning

in the mild range with some areas that have more impairment than that.

Q   Now, if you were testifying about this at the time of trial, would you have been able to offer any opinions with regard to the impact of the type of brain dysfunction you found in Mr. Bourgeois on issues of cognition?

A   Can you be more specific what you mean by cognition?

Q   His intellectual ability.  His ability to perceive and process information.

A   Yes, that he may at times perceive things in a distorted way and act in an inappropriate manner.

Q   And how would his brain damage affect his ability to control his emotions?

A   Well, brain damage at times can impair a person's ability to deal with emotions and it just depends on what part of the brain has been injured.

Q   And how about impulse control?

A   Same with that.

Q   Okay.  And ability to make judgments?

A   Yes.

Q   And how about judging future consequences of one's actions?

A   Yes, there could also be impairment in that.

Q   Now, I take it at the time of your evaluation you were not able to make any judgment as to whether Mr. Bourgeois

displayed these particular deficits because you didn't have data given to you?

A   I'm sorry, didn't have?

Q   You weren't given any collateral information?

A   Yes, that's correct.  I only knew what he told me.

Q   All right.  Now that you have received a lot of data, I assume --

A   Yes.

Q   -- from my office --

A   Yes.

Q   -- are you able to see a larger picture of how Mr. Bourgeois' brain dysfunction impacts on his actual day-to-day living in the world?

A   Yes.

Q   And tell the Court something about that.

A   Well, there appears to be a long history, from viewing the extensive records, of difficulties with impulse control, poor judgment, not thinking about consequences of actions --

THE COURT:  Such as?

THE WITNESS:  Well, such as not -- throughout his file there were several people that evaluated him and he consistently told them he was in a coma for three months, so that suggested either he believes this or, its poor judgment to, someone that had better judgment would realize that experts hopefully are going to have access to medical records

and would see that that was not the case, and that would not be something that would serve Mr. Bourgeois' situation to make up something like that.

BY MR. WISEMAN:

Q   You were not asked at the time of trial to do any sort of mental retardation evaluation?

A   No, I was not.

Q   And you were not asked by my office to do that?

A   I was not.

Q   When you saw the IQ score of 75, or with the transcription error of 76, why didn't you tell the lawyers, hey, this guy is in the borderline range of mental functioning on an outdated test, I think you should think about whether he is mentally retarded?

A   Well, I really had very little opportunity to talk to the lawyers and the communication I had, which was after they received my report, was that because Mr. Bourgeois had given me incorrect, inaccurate and not factual information about the coma, they felt that my report would not be useful and weren't going to use it in any way.

Q   All right.  Now, let's talk about that conversation.  Was it a face-to-face or a phone call?

A   A phone call.

Q   And do you recall if it was, what the duration of the phone call was?

A     It was very brief.

Q     Okay.  Five minutes, less, more?

A     It may have been less than five minutes.

Q     Okay.  I'm going to mark, I should say display for you Exhibit 156, ask you if you recognize what it is?

A     Yes.

Q     Okay.  And that's initially an invoice you submitted?

A     That's correct.

Q     And is this overall, if I flip through it, your file that you provided to my office?

A     Yes, that's from my file, that's correct.

Q     Okay.

        MR. WISEMAN:  If I could approach the witness and ask the witness to look through this short packet?

BY MR. WISEMAN:

Q     Do you see anything in that file documenting any contact with counsel subsequent to your report?

A     No, and I clearly recall the phone call but because it was so brief, it's nothing that I would have sent a bill for, and, as far as I knew, I was not going to have any further involvement, so I just sent my bill off and filed the chart away.

Q     And did that, did the -- do you remember which lawyer called you?

A     I am not positive.  I think it was probably Mr. Tinker,

but I couldn't say for sure.

Q   All right.  Let's assume for argument's sake it was Mr. Tinker.  Did he, did you perceive it as a discussion as to the meaning of your report, the significance of your report, or was it a statement from Mr. Tinker?

A   It was more of a statement.

Q   That you are not going to be used?

A   Yes.

Q   Okay.  Did he ask you what impact the alleged lie about the three-wheeler coma had on your results?

A   No.

Q   And what would you have told him if he asked you that?

A   I would have said that the actual test results appear to be valid and that there was no evidence of malingering and that the results showed that there was brain damage which was not caused, at the time I didn't know because I thought he had been in a coma, that regardless of what the cause was he has some brain damage.

Q   In your work do you ever see patients who have had -- well, let me withdraw that.  What's a traumatic brain injury?

A   A brain injury that's caused by a blow to the head or --

Q   And --

A   -- the head striking something.

Q   And can a, have you seen in your experience people with traumatic brain injuries who do not suffer losses of

consciousness?

A   Yes, many times.

Q   All right.  If Mr. Tinker had asked you about the -- first of all, if he had provided you with the medical records about the 1993 instance when Mr. Bourgeois apparently hit the --

        MS. SALINAS:  Objection, leads to speculation, Your Honor.

        THE COURT:  Sustained.

        MR. WISEMAN:  Your Honor, I have an obligation to prove counsel's deficiencies and I have to ask hypothetical questions to do that.  It wasn't provided to him.  I have to ask the witness what would you have done if it were provided.  So that's speculation, it's my burden.

        THE COURT:  Well, the reason that it's speculation is, I have already gone over, he can't interpret those medical records, and that didn't mean there was any kind of a head injury but a grazing even, you know, that's the point.

        MR. WISEMAN:  Well, okay --

        THE COURT:  So I don't know how he could have changed, if he couldn't interpret the records how he could have changed his opinion, but you can ask him.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Would you have told Mr. Tinker, if you had the medical

records, that the --

THE COURT:  He couldn't even read them.

MR. WISEMAN:  I'm sorry?

THE COURT:  He couldn't even read them, but that's okay.

BY MR. WISEMAN:

Q   Well, did you read the part about striking his head against the steering wheel?

A   Yes.  The part I, I didn't know those one initial abbreviations were in there.  I was able to read the rest of it.

Q   Okay.  And from your perspective, if you had known about a striking of a head in a truck accident on the steering wheel, would you have told -- what would you have told Mr. Tinker about that?

A   I would have said that it's possible that that could cause brain damage consistent with what my testing showed.

Q   Okay.  And if you had been given more time than you had and if you had been given any records about Mr. Bourgeois and about his deficits and impairments, could you have offered to Mr. Tinker a psychological explanation for this "lie," quote/unquote, about the coma?

A   If I had had an opportunity, yes.  If I had more information available to me and had the opportunity to do more testing, I could have.

Q    After that phone call with, presuming it was Mr. Tinker, when was the next time you discussed this case?

A    I believe it was with you or Ms. Larin in 2007.

Q    And since that time have you met with us on a number of occasions?

A    I believe a total of three times.

Q    All right.  And I take it you didn't come to Philadelphia?

A    No.

Q    Okay.  At least for that purpose.

A    Beautiful city, but no.

Q    Okay.  All right.  I have nothing else.  Thank you, Dr. Weiner.

        THE COURT:  Thank you.  Ms. Salinas?

        MS. SALINAS:  Yes, Your Honor.

        THE COURT:  You may proceed.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q    Good afternoon, Dr. Weiner.

A    Good afternoon.

Q    Back in 2002 when you were contacted to, I mean 2004 when you were contacted to perform a neuropsychological examination on Mr. Bourgeois, did you know Mr. John Gilmore?

A    I don't believe so.

Q    Did you know Mr. Douglas Tinker?

A    Just of him.

Q    Of him, okay.  Had you ever done any work before for Mr. John Gilmore?

A    Not that I can recall.

Q    Had you done any psychological evaluations for Mr. Douglas Tinker?

A    I can't recall if I did.  If I did it would have been some, probably quite a number of years prior to this one, but I don't recall.

Q    Okay.  And you were referred, Mr. Gilmore and Mr. Tinker were referred to you by Dr. Estrada?

A    That's my understanding, yes.

Q    Did you and Dr. Estrada discuss the case before you contacted Mr., or Mr. John Gilmore or Mr. Douglas Tinker contacted you?

A    No.

Q    Who contacted you?

A    I believe it was Mr. Tinker.

Q    Okay.  Now, you stated that you have conducted several, or hundreds of psychological evaluations, is that correct?

A    Yes.

Q    And do you, have you performed some of these evaluations for court settings in State Court?

A    You mean court-ordered or have they been used in cases that end up in State Court?

Q    Both.

A    I don't think I have done any neuropsychological evaluations at the request of the court for a State Court.  I have done many of them for personal injury cases, either being hired by the plaintiff or the defense attorneys, that were State Court cases.  I don't think I've ever --

Q    Okay.  Have you ever stated, testified in State Court for criminal cases?

A    I believe I have, but it has just been a very small number.

Q    Okay.  Now, and, Dr. Weiner, isn't it fair to state that attorneys, whether they are plaintiff attorneys or in civil cases, when they come to you they are employing you because of your expertise in the field of neuropsychology?

A    If, I mean I've been engaged by attorneys for other kinds of cases but more often it's for cases involving neuropsychology.

Q    Okay.  And when you were contacted back in 2004, what were you told by whom you believe was Mr. Tinker about this case?

A    Just that it was a capital murder case that was coming up for trial and that they needed a neuropsychological evaluation and that it was needed very quickly.

Q    Okay.  So you knew what your report was going to be used for?

A    Yes.

Q    Okay.  And we have been shown your psychological evaluation -- well, let me go back.  You were -- you stated that, and I am not quite sure whether I understood your explanation, you stated that when you gave the defendant the neuropsych evaluation back in 2004 you used the WAIS-R?

A    Yes.

Q    And your explanation, again, Dr. Weiner, was, why did you perform a WAIS-R when the WAIS-III had been out for approximately seven years?

A    Because Raytan's research with the neuropsychological deficit scale specifically called for the WAIS-R and the research had been done with that, and in the trainings that I went to, in fact in the initial trainings that I went to starting in the, this was back in the late '70s, he was, for neuropsychs he was saying that people should use the WAIS, even though the WAIS-R had been out for a while, just for that same reason.

Q    And, Dr. Weiner, would you not agree, though, that the protocol is to use the most current examination?

A    Well, I would not agree if specific research in a case like this specifies using that test.  If -- and at the time I did this report I believed that I was going to be called to testify and I would have explained this is the reason I used this one.  And I have the WAIS-III and I was giving the WAIS-

III to non-neuropsych kinds of situations at the time, but that's why I specifically chose the older WAIS-R.

Q    Though the protocol out there really does say that you should use, one should use the most current?

A    Well, again, Dr. Raytan, who is the inventor of this battery, was calling for the WAIS-R to be used.

Q    Okay.  When did you quit using the WAIS-R?

A    It was probably, maybe three years ago.

Q    And did you report anywhere in your report that you were using the -- well, let me retract that.  And in your report that you prepared back in March of 2004, the reason for the referral, you write in your report, was to determine whether or not the defendant had brain damage?

A    Correct.

Q    And when you spoke to Mr. Tinker, was there any indication to you from Mr. Tinker that there might be some suspect that he had some brain damage?

A    I just recall being asked to do an evaluation to determine whether or not he might have brain damage.  I don't remember him telling me whether he suspected it or not.

Q    And you don't recall that Dr. Estrada might have told you that he suspected that there might be or might not be any brain damage?

A    I have not had any communication with Dr. Estrada about this case.

Q    Prior to you conducting the examination?

A    Well, prior or after, other than what I have read from the reports that I was provided.

Q    Okay.  Now, you stated that you conducted a series of examinations on Mr. Bourgeois back in March, I'm sorry, February of 2008, 2004?

A    Yes.

Q    And you were asked about, in particular about the category test, do you recall that?

A    You mean just a little while ago?

Q    Right.

A    Yes.

Q    About his performance on the category test?

A    Yes.

Q    And I believe in your report you state that, "His performance on the category test suggests that he may exhibit inappropriate behavior under stressful circumstances."  Do you recall that?

A    Yes.

Q    And isn't it true, though, the Halstead-Raytan, the category test is a test that is considered the battery's most effective test for detecting brain damage but does not help to determine where the problem is occurring, and --

A    The category test in some specific cases can specifically point to the presence of frontal lobe damage, but barring

that, what it tells you is that there is damage present somewhere and then you have to look at the results to see where it appears that that might be.

Q   And the test also evaluates abstract ability or the ability to draw specific conclusions from general information?

A   Not the category test.  It does involve abstract reasoning but you may be thinking of, I saw in someone's report them saying that about the comprehension subtest of the WAIS.

Q   So you don't agree with that as far as the category test, that it, that the test evaluates abstract ability or the ability to draw specific conclusions from general information?

A   Well, I would say that that second part is a very vague description.  I mean it is a concept formation test and the information is just the feedback on the pictures that they are getting.

Q   Okay.  And that generalization or that description of the Halstead-Raytan battery exams doesn't say anything, does it, about inappropriate behavior under stressful circumstances?

A   That comes directly from Dr. Raytan.  In several of the workshops that I went to that's what he said about the category test.

Q   Okay.  Now, when you are asked to prepare to evaluate an

individual, you give your battery of examinations to the individual and I assume you take some time to read the results and then you prepare your final product, is that correct, which is a report?

A    That's correct.

Q    And when you give this report to the individuals who have requested this from you, they are relying on your expertise?

A    Yes.

Q    And you gave your report after you evaluated Mr. Bourgeois and had gone through the series of examinations?

A    Yes.

Q    And would it be fair to say then that both Mr. Tinker and Mr. Gilmore relied on your report?

A    Well, I can't say that they relied on it because they didn't use it.

Q    Would have relied on it?

A    I don't understand.

Q    Well, you gave them a report.

A    You mean if they had used it would, do I believe they would have relied on it?

Q    Yes.

        THE COURT:  What you can't assume is that they didn't use it for their own strategic reasons.

        THE WITNESS:  Oh, okay.

        THE COURT:  So be careful how you answer.

THE WITNESS:  Okay.  I'm sorry, can you please rephrase your question?

BY MS. SALINAS:

Q   Well, let me ask you this way:  In your -- you had a later conversation, once you gave the report to Mr. Tinker or Mr. Gilmore you had a conversation with them, correct?

A   They, one of them called me after they had received the report.

Q   Okay.  And they informed you why they weren't going to be using your report?

A   Yes.

Q   So you could assume, could you not, that they in fact read your report and knew what your report stated about a coma?

MR. WISEMAN:  Objection to an assumption, Your Honor.

THE WITNESS:  I would hope that they read my report.

MR. WISEMAN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Again, I believe that they surely must have read my report.

BY MS. SALINAS:

Q   And that's what your report is for, for them to read and to rely on it?

A   Yes.

Q    Okay.  And you wouldn't expect anything else other than
that for them to rely on it?

A    Yes, I would not expect them to do anything else but to
take into consideration that information.

Q    Right, okay.  Now, when you were evaluating the
defendant, you, there was nothing told to you about an
incident that occurred back in 1994 as far as an accident was
concerned?

A    Are you talking about that accident that was in 1993
or --

Q    1993, excuse me.

A    Yes, I was not -- no, I was not told about that.

Q    Okay.  And so there was nothing to relate back to saying,
hey, get me some records for a 1993 accident?

A    That's correct.  I didn't know of the existence of that
accident.

Q    Okay.  And going back to the defense exhibit, Plaintiff's
Exhibit 154, that was the chart regarding -- oh, I'm sorry,
Plaintiff's Exhibit 158.  Do you recall this chart?

A    Yes.

Q    And you were asked some specific questions about the
difference and the comparisons between the test that you gave
in 2004 and the WAIS-III that was given in 2007.  Do you
recall those questions?

A    Yes.

Q    And isn't it true that on the verbal skills or verbal performance or verbal test you would normally see in the WAIS-III, you would expect to see no more than a one-level drop?

A    I don't know what you mean by one level.

Q    Well, you would expect the verbal to be lower by about one point?

A    That's not correct.

Q    Okay.

A    There's a range here, for instance, for a WAIS-R score of 70 on the verbal you would expect the score on the WAIS-III to be as low as 66.

Q    But I'm talking about the level, the drop, the not lower than one point.

A    I don't know where you are seeing that.

Q    Well, you know the difference or what kind of variance you should see between a WAIS-R exam and a WAIS-III exam and what the charts would show?

A    Yes.

Q    And isn't it true that on a WAIS-III you would expect to see in verbal only a decrease of one level, whereas the, Mr. Bourgeois had a drop of nine levels?

A    Are you talking about level points?  You are saying one level, I don't, there's no psychological term for --

Q    Level points.

A    This chart, what this chart shows is that on, let's take a WAIS-R verbal IQ of 70, that on the WAIS-III the score could be as low as 66 or it could be as high as 70, so there could be a four-point discrepancy.

Q    Okay.  And it is still your testimony that on performance, when you are comparing a WAIS-III to a WAIS-R that WAIS-III you would expect to see a lowering of no more than four levels?

A    For that score that would be, that would be the expected range, yes.

Q    But, and you are aware that in the performance from Mr. Bourgeois when comparisoned from the 2004 to the 2007 performance actually increased by two levels?

A    Yes, he did do better on, I believe better on -- let me see, do you have the scores there on the --

Q    I need Defense 155.  I've put on the screen Plaintiff's Exhibit 155, and on his performance he had a 76 on the WAIS-R and it increased by, actually by two points in the 2007 exam.

A    Yes.

Q    And that's not what you would normally, the charts that you were shown would normally show?

A    Well, there is a margin of error for test scores so if you, even on the same test, you could give the same test to a person, let's say six months to a year apart, their score could be three points higher, it could be three points lower,

so there could be a range of six points even on the same test, so those two scores are not statistically significantly different from each other.  You really can't draw any meaningful conclusion, particularly since the table that shows the difference for performance IQ shows it could be as few as two points lower, which would make that a 74, but that 74 could correspond to a, what we call the true score, in other words if you test them on different dates, anywhere from a 71 to a 77.  The same with that 78, could be anywhere from a 75 to an 81.  So because there's an overlap there, you really can't conclude anything other than they are in the same ballpark as each other.

Q   So to you they are in the same ballpark.  This falls within the charts that we had seen earlier?

A   Yes.

Q   Okay.  And you stated earlier that, when you were testifying you mentioned some, the defendant had been in several wrecks and that he had, you had seen his driving records.  What are you, what did you see, what did you view?

A   These were I guess collateral statements from people that knew Mr. Bourgeois and one of them I remember was describing that where most people took four to six weeks to learn how to be a --

THE COURT:  Did you talk with these people?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Where --

THE COURT:  So where did you get the information?

THE WITNESS:  These were from extensive files that Mr. Wiseman provided to me that I reviewed that I guess they are a collection of all the different people that were interviewed about Mr. Bourgeois.

BY MS. SALINAS:

Q   Do you know if they were family members that were saying that?

A   I probably could find it if you'd give me a few minutes but they -- I am not sure who said that but what I do recall from that is that that person reported that Mr. Bourgeois took, I think, about six months to learn --

Q   Well, I'm, let me just stop you.

A   Okay.

Q   But you were talking about his driving record, that he had lots of accidents and he had gotten several tickets?

A   Yes.  I was basing that on the statement that I reviewed.

Q   A statement you reviewed?

A   Yes.

Q   Whose statement was that?

A   Well, you'll have to give me a few minutes to look through and tell you that.

Q   Go ahead.

THE COURT: Go ahead.

THE WITNESS: Okay. Okay, this was in a letter to Ms. Larin dated August 12th, 2010 by Victoria Swanson, it's a report, and --

BY MS. SALINAS:

Q   By Dr. Swanson?

A   Yes.

Q   So you are relying on Dr. Swanson's report?

MR. WISEMAN: Your Honor, I am going to object. Dr. Weiner did not rely on it. He didn't comment on it in his direct exam, direct examination.

THE COURT: I'm sorry, but this is getting a little far afield. He didn't hear the people say it, he didn't interview them.

MR. WISEMAN: I agree. I didn't ask him about it.

THE COURT: So I don't know why she's doing it either.

MR. WISEMAN: Okay.

THE COURT: But there you have it.

MS. SALINAS: We'll move on, Your Honor.

THE WITNESS: Okay.

THE COURT: Oh, he relied on, I thought he said he relied on this for his answer, but nonetheless.

MS. SALINAS: Okay.

BY MS. SALINAS:

Q   And, Dr. Weiner, in your report you state that the defendant had cerebral damage?

A   Yes.

Q   He had brain damage?

A   Yes.

Q   And in your report you actually state that the brain damage was likely due to the injuries sustained in the three-wheel accident that took place in 1984?

A   Yes.

Q   Okay.  Which resulted in a coma lasting one to two months?

A   Yes.

Q   And you further state that you believe that the damage he had was to the posterior portion of the cerebral cortex?

A   That it was more significant there, yes.

Q   Okay.  And the 1993 accident that you talked about or testified earlier, that would have put the defendant at what age?

A   Let's see.  '93.  Approximately 29.

Q   And the 1984 accident would put the defendant at what age?

A   Twenty.  Approximately 20.

Q   And, Dr. Weiner, after you interviewed the defendant and you wrote your report, your report that you sent to both

Mr. Gilmore and Mr. Tinker, you did not tell those attorneys

that the defendant was mentally retarded?

A    No, I did not.

        MS. SALINAS:  May I have a moment, Your Honor?

        THE COURT:  Yes.

        MS. SALINAS:  I pass the witness, Your Honor.  I

have no further questions.

        THE COURT:  Go ahead.

                    REDIRECT EXAMINATION

BY MR. WISEMAN:

Q    A little bit of follow-up, Dr. Weiner.  You didn't tell

the lawyers Mr. Bourgeois was mentally retarded why?

A    I wasn't asked to do an assessment for mental

retardation.

Q    And did you --

        THE COURT:  What were you asked to do?

        THE WITNESS:  To see if he had brain damage or not.

BY MR. WISEMAN:

Q    And what's the difference between those two tasks?

A    Well, just to establish the presence of brain damage.  To

do a neuropsychological evaluation to determine whether or

not someone is mentally retarded, you would also have to do a

measure of adaptive functioning.

Q    The brain damage you identified in Mr. Bourgeois, leaving

aside the motor vehicle accidents or accident in his

background, could there have been other causes for his brain

damage, based on material that you have now reviewed?

A    Yes.

Q    Such as?

A    Apparently a long history of physical abuse.

Q    The childhood abuse?

A    Yes.

Q    Okay.  What is the --

THE COURT:  Did you ask him if he had any abuse?

THE WITNESS:  No, Your Honor, I did not.

THE COURT:  Okay.

MR. WISEMAN:  I'm sorry, the question was did you

ask him?

THE COURT:  I did.

MR. WISEMAN:  Okay.

THE COURT:  That's what I asked him.

BY MR. WISEMAN:

Q    What's the phrase convergence of data mean to a

psychologist?

A    I'm sorry, what is --

Q    Convergence of data.

A    Different sources of input are all helping to arrive at

the same conclusion.

Q    Okay.  And so, when we look at Mr. Bourgeois' performance

on these two tests we see a low and we see a high, we can put

in a margin of error into those scores, so how does a neuropsychologist or any psychologist figure out where the truth is in that range?

A    Well, first of all, we want to see does it look like the results are reliable, and reliable means you are going to get similar performance across test administration, and in this case there were different versions of the same test but when you take that into consideration the scores are within, pretty much in the range of the margin of error, which shows that the results were consistent, which would make them appear to be reliable and valid.

Q    All right.  And just to put a finer point on it, the --

THE COURT:  I'm sorry, wait.  What were you comparing just then?

THE WITNESS:  The scores on the WAIS-R and the WAIS-III --

THE COURT:  Okay.

THE WITNESS:  -- were pretty similar to each other.

THE COURT:  But when you took the scores yourself you did not say anything about mental retardation or --

THE WITNESS:  No.

THE COURT:  Okay.  Why is that?

THE WITNESS:  Why when I administered it did I not say anything about mental retardation?

THE COURT:  Yes.

THE WITNESS:  Well, first of all, I was not asked to do an evaluation for mental retardation so it would not have been possible.  Even if I had found that he had had an IQ of 60 on the IQ test, I could not have concluded that he was mentally retarded without also administering adaptive behavior instruments, which I was not asked to do.

BY MR. WISEMAN:

Q   And would you have had time to do it at that point?

A   I would not have had time to do it.  And I would have needed input from other sources, especially now that I know that I was not given actual, factual information from Mr. Bourgeois about his past.

Q   If counsel had sat down with you and discussed, or even stood up and discussed with you the implications of these scores, would you have explained to them the meaning of a 75 IQ in relation to mental retardation?

A   Yes, and I would have explained, as it states in the diagnostic DSM manual, that you can have a diagnosis of mental retardation with an IQ score as high as 75, because of the margin of error on tests, as long as there is significant deficits in adaptive functioning.

Q   Now, getting back to --

THE COURT:  Such as?

THE WITNESS:  Such as what kind of deficits, is that what you are asking?

THE COURT:  Right.

THE WITNESS:  Impairment in communications skills, impairment in social skills, impairment in --

THE COURT:  Well, you talked to him, didn't you?

THE WITNESS:  I did talk to him, yes.

THE COURT:  Did you see that he had any of those?

THE WITNESS:  Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

BY MR. WISEMAN:

Q   Getting back to the concept of convergence of data, if we put the margin of error on the 70 and it goes down to 65 and if we go on the other end, put the margin of error of five points on the 75, we have a range of 65 to 80, and so I guess my question is, looking at a 65 to 80 with a margin of error, how do you as a psychologist know where the truth lies?

A   Well, if I were doing a mental retardation evaluation, I

would recognize that the 75 on my test would actually correspond more likely to a score of around 70 on the WAIS-III and now you tack on the margin of error and you have got 65 to 75.  And, as I stated, this comes straight from the DSM manual that the diagnosis of mild mental retardation can be made specifically for that reason, that there is a margin of error, as long as there's documentation of adaptive deficits.

MR. WISEMAN:  Your Honor, I am through with my questioning.  I would like to move my exhibits, which I have as, these are the ones that have not been previously moved, 154, 156, 29A the Court's already admitted, and 29.

THE COURT:  Any objection?

MS. SALINAS:  No, Your Honor.

THE COURT:  Those are admitted.  Thank you.

(Defendant's Exhibits P29, P154 and P156 admitted into evidence)

MR. WISEMAN:  Thank you as well, Dr. Weiner.

THE WITNESS:  Do you need this that you handed me?

MR. WISEMAN:  Yes, don't leave with any exhibits.

THE COURT:  Ms. Salinas, anything further?

MS. SALINAS:  Judge, can I have just a quick moment?

THE COURT:  Yes, ma'am.

MS. SALINAS:  No more questions, Your Honor.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you, Your Honor.

MR. WISEMAN:  Could we have a few minutes before our next witness, Your Honor?

THE COURT:  Oh, do you want to take a break?

MR. WISEMAN:  Yes, if that's all right.

THE COURT:  Two or three minutes?

MR. WISEMAN:  Thirty seconds.

MS. BOOTH:  How about five minutes?

THE COURT:  How about 15?

MS. BOOTH:  Okay.  Sold.

(Recess at 3:11 p.m. until 3:24 p.m.)

THE COURT:  Would you administer the oath, Ms. Casey, please?

THE CLERK:  Yes, Your Honor.

DR. JETHRO TOOMER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  Please be seated, sir.  Thank you.

THE WITNESS:  Good afternoon, Judge.

THE COURT:  Good afternoon, sir.

MR. WISEMAN:  Dr. Toomer, I asked you before you took the stand and I will remind you, do not touch the microphone.

THE COURT:  Thank you very much for that.

MR. WISEMAN:  That's all right.  I feel like I'm personally responsible now.  Could you --

THE COURT:  Well, we all are.  I mean, I think they are losing hearing from this kind of stuff.

MR. WISEMAN:  No, I fully understand, believe me.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q    Could you state your full name for the record, please?

A    Jethro W. Toomer.  J-E-T-H-R-O,  W. Toomer, T-O-O-M-E-R.

Q    And what is your occupation, Dr. Toomer?

A    Presently I am engaged in the private practice of clinical and forensic psychology.

Q    And I am putting up on the overhead your, a document, Petitioner's 28.

A    Yes.

Q    Could you identify it?

A    Yes, that's a copy of my resume.  There has been a slight change since this.

Q    Okay.  Would you tell us what that change is?

A    Since this was done I have retired from the teaching faculty at Florida International University and I am now a consultant with the Florida International University Law School in forensic mental health.

Q    All right.

MR. WISEMAN:  I would offer Dr. Toomer's CV, Your Honor, for the Court.

THE COURT:  Number?

MR. WISEMAN:  28.

MR. DOWD:  No objection, Your Honor.

THE COURT:  28 is admitted.

(Defendant's Exhibit P28 admitted into evidence)

BY MR. WISEMAN:

Q   Dr. Toomer, the Judge can read about your education and such but could you --

THE COURT:  Where is Florida International University?

THE WITNESS:  In Miami.

THE COURT:  Thank you, sir.

BY MR. WISEMAN:

Q   Could you --

THE COURT:  Where is it located in Miami, where?

THE WITNESS:  I beg your pardon?

THE COURT:  Where in Miami?

THE WITNESS:  It's located southwest of Miami en route to the Florida Keys.

THE COURT:  Thank you.

THE WITNESS:  We are due east -- University of Miami is east, we are west.

THE COURT:  Okay, thanks.

BY MR. WISEMAN:

Q   Why don't you tell us a little bit about your background and credentials as it relates to forensic mental health evaluations?

A   I have a bachelor's, master's and PhD degree in

psychology.  I am a, my bachelor's degree is from Morehouse College in Atlanta, Georgia and my master's and PhD degrees are from Temple University in Philadelphia.  I completed a year's post-doc residency at Albert Einstein Hospital in Philadelphia.  I am a diplomate of the American Board of Professional Psychology, a diplomate of the American Board of Forensic Examiners, and I have been engaged in the private practice of clinical and forensic psychology for approximately 30 years.  And, as I have indicated, I recently retired from the teaching faculty in mental health counseling at Florida International University and I now consult in forensic mental health at the Law School at Florida International University.

Q    And what's the breakdown in your practice between clinical and forensic work?

A    Clinical and forensic work, it really depends on the time of the year.  Approximately 50, perhaps 50 percent to 60 percent of my practice is forensic.  The other part of my practice is involved in my private practice.  I am regional treatment consultant for the National Football League and I am regional treatment consultant for the National Basketball Association, so my work --

THE COURT:  Well, you are what for the National --

THE WITNESS:  I beg your pardon?

THE COURT:  What did you say you were?

THE WITNESS:  I am the regional treatment consultant for the National Basketball Association.

THE COURT:  What does that mean, what do you do?

THE WITNESS:  That means I deal with --

THE COURT:  If they've got sports block or something?

THE WITNESS:  Well, yeah, that and when they get in trouble, substance abuse --

THE COURT:  Oh.

THE WITNESS:  -- domestic violence, all those kinds of issues, they have to see me.

THE COURT:  Okay.

THE WITNESS:  And --

THE COURT:  And then you clear them to whatever?

THE WITNESS:  Right, according to the, there's a collective bargaining agreement that sets the criteria in terms of treatment and how long they have to receive treatment before they have a clean slate, so to speak.

THE COURT:  Is it graded for what kind of problems they have, I mean a year for this, two years for that, six weeks for this?

THE WITNESS:  What, no, what, generally what happens is that two years is the period, but it can be adjusted depending upon whether the person does exceptionally well, whether there are periods of relapse or what have you, so

there are adjustments made depending upon the nature of the offense.

THE COURT:  Did you play basketball, too?

THE WITNESS:  Beg your pardon?

THE COURT:  Did you play basketball?

THE WITNESS:  No, I did not.

THE COURT:  Okay.

THE WITNESS:  Not in college or anything like that, no.

BY MR. WISEMAN:

Q   Oh, come on now, Jethro.

A   Huh?  No.

Q   Is the work with the NBA and the NFL the reason for the seasonal adjustment and how much of your practice is clinical?

A   That is correct.

Q   Tend to have a busy time?

A   Yeah, when the season is over things get kind of busy.

Q   Okay.

MR. WISEMAN:  Your Honor, at this time I would offer Dr. Toomer as an expert in clinical and forensic psychology.

MR. DOWD:  No objection, Your Honor.

THE COURT:  He's accept- --

MR. WISEMAN:  Uh --

THE COURT:  I'm sorry?  I didn't hear you.

MR. DOWD:  Oh, I'm sorry, Judge.  I said no objection, Your Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q   Dr. Toomer, you do a lot of work for defense counsel in criminal cases?

A   Yes, I do.

Q   And capital cases in particular?

A   Yes, I do.

Q   And you have done quite a bit of work with my office?

A   That's correct, yes.

Q   And do you have any particular philosophical reason why you work for the defense or is it just who calls you on the phone?

A   I, it's who calls me.  I don't solicit business or anything like that and my philosophy in terms of what I do is guided by the principals of the profession, so it doesn't really matter who calls me, I perform my activities in the same way.

Q   Okay.

THE COURT:  Well, have you testified as the, in similar circumstances has the Attorney General's Office called you?

THE WITNESS:  No, I haven't been called by the Attorney General's Office.  I do, in the Eleventh Judicial

Circuit in Florida I testify for the state in cases of

competency, sanity and the like.

THE COURT:  Okay, but not for the federal government

ever?

THE WITNESS:  Yes, but not for the federal

government, no.

BY MR. WISEMAN:

Q   Did you conduct a forensic evaluation of Mr. Bourgeois at

my request?

A   Yes, I did.

Q   And what exactly did that evaluation consist of?

A   That consisted of the administration of several protocols

as well as an extensive what we call clinical assessment or

psycho-educational assessment.

Q   And did you review any records either before or after you

met Mr. Bourgeois?

A   Yes, I did.  There were numerous documents that were

reviewed, roughly about 58 separate documents, and they

included prior evaluations that had been conducted, trial

transcripts and records, examinations that had been conducted

by other experts and a variety of --

Q   Okay.  And let me draw your attention --

A   Yes.

Q   -- to the document that's on the screen.  Is that, it's

Petitioner's 137, is that a list of the materials you

reviewed?

A    That is correct, yes.

Q    And it's two pages?

A    That's correct.

Q    Actually it's three pages, excuse me.

A    Three pages, yes.

Q    And you relied, reviewed and relied on a number of declarations from lay witnesses?

A    That is correct, yes.

Q    And did you in addition have an opportunity to speak to a number of lay witnesses?

A    I did, yes.

Q    All right.  And would that have been face-to-face or over the telephone?

A    All by telephone.

Q    And, of course, you reviewed all the expert reports on the third page of this document?

A    Yes, I did.

Q    And when and where did you meet with Mr. Bourgeois?

A    At the detention center in Terre Haute.

Q    Okay.  Terre Haute, Indiana?

A    That's correct.

Q    Do you recall approximately when that was?

A    That was on May 2nd of 2007.

Q    And how much time did you spend with him at that point?

A    I believe about four-and-a-half to five hours.

Q    And is that typical for that type of an evaluation?

A    That's about standard.

Q    Okay.

A    Standard time, yes.

Q    And what did you do in that evaluation, did you talk to him?

A    Yes.  The process involves, we mentioned earlier what we call a clinical assessment, clinical evaluation, which is, which involves taking of a developmental history, trying to determine and get some idea as to how the person has evolved from, really from birth up to the particular point in time, and then there is the administration of certain protocols that are designed to assess things such as personality functioning, whether or not, personality functioning, screening for the likelihood of some underlying neurological impairment, academic assessment, substance abuse history and those kinds of things.

Q    And the, you keep referring to protocol --

A    Tests.

Q    Tests, okay.

A    Tests, yes.

Q    And what tests did you administer, what psychological tests did you administer?

A    I administered the Bender-Gestalt designs, which is a

test that's utilized as a screening instrument to point out and to suggest whether or not there might be some problem or some difficulties in terms of, in terms of underlying neurological, neurological, they might have that as their basis, some underlying neurological involvement.  Brain damage, if you will.

Q    Right.

A    It also is a screening instrument as to whether or not there might be some underlying thought process deficiencies and the like.

Q    And in particular did you administer a test called the MCMI?

A    Yes, that's the Milan Clinical Multiaxial Inventory, Third Edition.

Q    And describe for the Court briefly what that test requires of the subject.

A    The Milan Clinical Multiaxial Inventory is an instrument that's designed to assess areas of personality functioning, areas of personality deficits, and the individual is instructed to respond to a series of items that assess various dimensions of functioning.  It assesses, for example, as an example of certain areas of functioning, interpersonal relationships, current and historical mental status functioning, family relationships, substance abuse history, all of those areas and others are covered, in addition to

assessing the person's beliefs regarding religion, regarding, regarding interpersonal interaction with others and the like.

Q   And how does the test get administered?  What does the person do and what do you do?

A   The person, it is a true/false design in terms of how the person responds, and the person is given a booklet and the booklet has a number of items that are listed and the person is to respond according to whether or how the item relates to them as to whether it's true or whether it's false.

Q   Okay.  And then when you get -- how many questions, roughly, are there?

A   There are about, there are approximately, I believe 300 and some items I believe on the --

Q   And --

A   I'm sorry, there are approximately, I believe 170 some items on the instrument, yes.

Q   Okay.  And how does it get scored?

A   It's scored by computer.

Q   Okay.

A   It's a computer-scored protocol that is scored and the results are returned to us.

Q   All right.  And what form do the results take, is it a report?

A   It gives a report and it indicates whether or not and to what degree -- first of all, it describes whether or not the

protocol was valid, in other words, whether the person was responding in a truthful and consistent manner.  And then given that, the next part of the report stipulates whether or not and to what degree there might be some deficiencies in terms of personality functioning or overall functioning.

Q   And if a person malingers on that test, is that reported by the computer?

A   It would be reported and would be reported in that section that I alluded to earlier in terms of whether or not the person responded in a truthful manner.

Q   And --

A   Truthful and consistent manner.

Q   -- in conducting your evaluation would you ever rely just on the results of the Milan?

A   No.

Q   One piece of data in a larger --

A   No.  The overall process in terms of conducting an evaluation requires that you consider all possible, all possible sources of data that are available, so in addition to the evaluation that is conducted face-to-face, you have the protocols, the tests that are administered.  And you also rely upon accounts of individuals who have knowledge of the person for as long as possible, you rely on those reports. And then you also rely on collateral, rely upon collateral data, school records.  If the person has been involved in any

other system, school system, criminal justice system, hospitals or whatever, you rely on that particular source of documentation also.  So all of that goes into the rendering of whatever the opinion happens to be.

Q   And in this instance what did the Milan report back about Mr. Bourgeois' personality?

A   Well, it, the Milan reported and indicated that there, that Mr. Bourgeois suffered the effects of a major personality disorder.

Q   And any in particular that are notable?

A   Well, the test itself reported the existence of deficits which were consistent with the diagnosis of a personality disorder.  There was indicated in the report results a schizoid-type personality disorder and also there were, there was evidence of a narcissistic disorder, there were elements or traits of those particular disorders, so all of those were indicated as part of the test results.

Q   And let me just ask, the --

A   Yes.

Q   Were the test results valid, did it detect any malingering?

A   No.  The test results, the results were considered to be valid and it was based, and based upon the results Mr. Bourgeois responded in an organized fashion and also responded in a truthful and consistent fashion.

Q    Now --

THE COURT:  You didn't test for mental retardation, you just tested for personality problems?

THE WITNESS  I just tested for the personality, yes.

BY MR. WISEMAN:

Q    The, does the Milan give you any information regarding Axis I major mental disorders?

A    Yes, it provides the, it provides a breakdown in terms of disorders that the individual manifests with respect to Axis I and Axis II.

Q    And with regard to Axis I, what information did the report provide you about anything on Axis I?

A    The report reflected that the major issue with regard to functioning had to do with the Axis II diagnosis.

Q    Right.  I am looking at -- well, perhaps I should put it up for you.

A    Yes, uh-huh.

MR. WISEMAN:  And I apologize, Your Honor, I accidentally marked the copy.  I will offer the Court a clean copy.

BY MR. WISEMAN:

Q    But let me show you first the top page.  Does that appear to be your declaration in this case?

A    That is correct.

Q    And that's Petitioner's 26.

A    That's correct.

Q    I want to direct your attention to page 2, and those lines up there are my markings.

A    Correct.

Q    It says here that, "Psychological testing suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder."

A    That's correct, yes.

Q    Okay.  So what does that mean?  Is it diagnosing that or is it giving you information relevant to those conditions?

A    It's saying that with regard to the test results that his, his results are consistent with an individual who is diagnosed as suffering from those particular, those particular disorders, that is, a delusional paranoid disorder and post-traumatic stress disorder.  When we talk about Axis I, what we are talking about and what is reflected on Axis I are disturbances in functioning that differ from action, from Axis II diagnosis in terms of manifestation and in terms of time.  Axis I diagnoses tend to be those diagnoses where, for example, there is a time frame.  In other words, there is, when you talk to individuals, when you look at the individual's functioning, you can say at this particular point in time seems to be when the symptom etiology began to manifest itself in some prominent fashion.

THE COURT:  When was that?

THE WITNESS:  Beg your pardon?

THE COURT:  When did it begin?

THE WITNESS:  The disorders?

THE COURT:  Right.

THE WITNESS:  The post-traumatic stress disorder and the paranoia, and the delusional paranoia disorder?

THE COURT:  Yes, sir.

THE WITNESS:  Early on individuals began to describe what they considered to be --

THE COURT:  Did you talk to the individuals?

THE WITNESS:  I talked to two of them and I had knowledge through their affidavits and statements from others, yes.

BY MR. WISEMAN:

Q   Dr. Toomer, let me just ask you, in addition to the materials that we put up earlier that you reviewed --

A   Yes.

Q   -- did you watch videos of the Government's experts' evaluation of Mr. Bourgeois?

A   Yes, I observed Mr., Dr. Moore, I believe it is.

Q   Okay.

A   Dr. Moore's interview.

Q   And did you review their reports?

A   Yes, I did.

Q   Dr. Moore and Dr. Price?

A    Yes, I did.

Q    All right.  And did you have an opportunity to speak with Kerry Brown?

A    Yes, I did.

Q    I should say Kerry Brown, Esquire?

A    Esquire, yes.

Q    Okay.  And that was a phone call you had with him?

A    Yes.  By telephone, yes.

Q    And that was recently?

A    That was recently, yes.

Q    Okay.

        THE COURT:  Before or after your report?

        THE WITNESS:  After my report.

BY MR. WISEMAN:

Q    Now, we are going to get more into the, you know, the, what the Milan is showing, but I just want to ask you initially, as a result of all these materials you reviewed and your evaluation and testing, did you reach conclusions about Mr. Bourgeois to a reasonable degree of psychological certainty?

A    Yes, I did.

Q    All right.  I am going to break this down into several categories and I'd like to first talk about the history you reviewed that's relevant to the formation of those opinions. What did you see in Mr. Bourgeois' history that you thought

was noteworthy?

A    I think the one thing that stands out in terms of history is the fact that there was consistency among the informants with respect to their observations.  Those informants described the individual's, the turbulence that characterized his developmental history, and they --

THE COURT:  Who did you talk to about that?

THE WITNESS:  I talked to, well, I saw all of the affidavits that I mentioned before --

THE COURT:  Besides the affidavits, who did you actually talk to about this?

THE WITNESS:  I spoke with, I spoke with Ms. Claudia Williams and I spoke with Mr. Wilmer Bourgeois.

BY MR. WISEMAN:

Q    And Mr. Kerry Brown?

A    And Mr. Kerry Brown, right, the attorney.

Q    All right.  And what were the informants and the declarations consistent with respect to?

A    They all described a turbulent developmental history characterized by fragmentation, if you will, and problems in the familial unit overall, and in addition to that described a pattern of instability, a pattern of abuse and a pattern of neglect that was consistent, that was persistent, and that was reflected upon by individuals who had contact with the family unit and particularly with the mother of

Mr. Bourgeois.

Q    And what did you learn about the mother's ability to sort of cope and the stressors that may have been on her while Mr. Bourgeois was a child?

A    The, Mrs. Bourgeois' ability to nurture as a parent was called into question by the informants that, whose accounts I considered.  There apparently was a great deal of stress that she experienced that was manifested in terms of how she interacted or did not interact with her children.  She was, she had given birth to five children, I'm sorry, to seven children who had four different fathers from the period of roughly '59 through '67 in terms of years.  Mr. Bourgeois' father, a Mr. Sterling, whom she had hoped to marry, was already married at the time that they were, that they were seeing each other, and then at some point he simply left and abandoned that particular unit.

Q    Did you learn anything about how many children Mr. Sterling had fathered?

A    Yes.  I believe he had like around 20 children or something like that.

Q    From different women?

A    Else-, from different women elsewhere.

Q    And did his abandonment of Mr. Bourgeois' mother have an impact on Mr. Bourgeois?

A    Yes, I think his abandonment and the abandonment that he

experienced in the family unit by the mother had significant effect and impact on his overall functioning. He described to me and also to others the fact that the mother basically indicated to him that he would be no good, that he was no good because he was like his father, and in doing so, and given the dynamic that I mentioned earlier in terms of what was going on in the family unit, you had that compounded with other dimensions of abuse, emotional abuse as well as physical abuse, and the abuse that Mr. Bourgeois suffered, especially with regard to abandonment, was probably of the most severe kind.

Q   All right. And let's talk about the abandonment for a moment. I think I know what you are referring to but what do you mean when you say he was abandoned?

A   Abandonment has to do with a withdrawal or an absence of nurturing and support over time and the abandon- -- it's difficult in a way to describe because I don't want to say that one type of abandonment is better than another, but if abandonment occurs, the idea is that the abandonment should be quick, clean and it should be conclusive. In other words, the person who is the nurturer, the giver of aid, should just leave and no longer be in the picture. The devastation is compounded if you have abandonment and the individual who is the source of the abandonment is still seen, is still observed, there may even be some limited contact. That is

even a more devastating form of abandonment than the previous one that I described.

Q    And we are talking about the latter abandonment in this case?

A    That's correct, yes.

Q    All right.  And factually what was, what leads you to conclude that the abandonment was not clean?

A    Because Mr. Bourgeois has a knowledge that, he believed that his mother did not care for him, wanted to get rid of him, sent him to live with a person by the name of Miss Mary in the neighborhood, and even though that had occurred he still had contact with his mother, visually and otherwise, so she was still around except that he was not part of that, part of that unit.

Q    And when you talk about the devastating impact of that type of abandonment or any abandonment, for that matter, what's going on there, why does, I mean it may seem obvious but why, why is that so devastating to a child?

A    In order for, in order for an individual, any individual, to develop the skills that are necessary in order to function in a structured, organized and productive fashion, in order for an individual to do that, that individual must have, early on, structure, security, saneness, predictability and nurturing.  Without those factors we can almost guarantee that you are going to have an individual who will be impaired

in terms of later functioning.

Q   Now, let me just ask you about that.  You can guarantee almost impairment in function?

A   Yes.

Q   Are you saying that everybody whose mother abandons them turns out to commit murders or leads a criminal life or --

A   No.

Q   You are shaking your head and I think --

A   No, I am not.  No, I am not.

Q   Okay.  Explain, you know, what goes on that causes some people to have more extreme impairment than other people.

A   What goes on is, one, the nature of the dysfunction that we described that we just talked about.  Another factor has to do with the onset.  Another factor has to do with the consistency and the persistence of those particular deficits that we have alluded to in terms of how it occurs, whether it is consistent over time, whether there is any intervention, whether there are any other individuals who are there to counter those particular developmental deficits.  Those are the kinds of factors that go into play that impact on what happens subsequently.  Then you can also have other factors that come into play which may be reflected in issues such as mental illness, other kinds of trauma that the individual may experience, and as a result the, what occurs or what results is going to be impacted upon by those.

Q    Did you see in the materials any reference to any sexual abuse?

A    There was one instance where Mr. Bourgeois indicated that he had been sexually abused by a neighbor.

Q    And was this in your interview with him?

A    Yes, uh-huh.

Q    Okay.

A    And also I believe in the interview with Dr. Moore.

Q    Okay.

A    Where he indicated --

THE COURT:  Who, did he say specifically who it was?

THE WITNESS:  No, he did not.  He did say that he went to his mother to report what had transpired and instead of being supportive he was beaten by his mother and accused of not telling the truth.

BY MR. WISEMAN:

Q    And, again, it may be obvious, what's the impact of something like that happening?

A    What --

Q    First the abuse itself --

A    Yes.

Q    -- and then the reaction to the report of the abuse?

A    What you have here is an exacerbation of the impact of the abuse because what you have now is another example of the abandonment, another example of the isolation, another

example of the nurturer's deprivation and another example of the, another example of the absence of any kind of support mechanisms within that particular, within that particular environment.

Q   And you have talked about the impact of abuse, is there a distinction to be made when the abuser is a caregiver or a parent as opposed to a stranger?

A   The impact in terms of abuse by a caregiver or by a parent is, warrants consideration, because with respect to the parent the impact is devastating because the parent is supposed to be the source of nurturing, is supposed to be the source of stability and predictability and saneness, and when that is absent it simply makes that particular process even that much more difficult to navigate for a youngster, given all of the factors that come with it.

Q   All right.  And abuse such as the type, the severity, the frequency, persistence that you saw in Mr. Bourgeois' history, does that have an impact on, or did it have an impact on his ability to form relationships?

A   Oh, by all means.  The things that we often take for granted that we are able to do in terms of forming positive relationships, in terms of being able to weigh alternatives and project consequences as part of our decision making, in terms of our being able to navigate our environment, in terms of our being able to cope with stressors and to deal with

setbacks, those kinds of skills don't just come by magic, they don't just appear as an individual ages. They come about as a result of, one, an individual being exposed to a nurturing, caring and supportive environment; they come, two, by individuals having examples that they can follow in this particular regard; and three, by that environment helping to forge a sense of self-worth and self-esteem in the individual. So when those things are missing, the individual is incapable of and does not have the wherewithal to be able to develop appropriately in terms of the skills that are needed to function later in life, and that's why they have problems in terms of interpersonal relationships and in terms of other aspects of functioning. There is another factor that comes into play and that is that when an individual experiences the trauma from those deficiencies that we have outlined, what happens is that the individual, as I have indicated, is ill-equipped in terms of navigating life and the events that come, and so what happens is when the individual encounters situations that remind him or her or that serve at catalysts or cues for unresolved emotional issues linked to the aforementioned deficits, it creates a process whereby the individual begins to act impulsively and all of those deficits that we talked about earlier in terms of weighing alternatives, projecting consequences and what have you, all of those particular deficits come to the fore.

Q    Your administration of the Milan identified some paranoia.

A    Yes.

Q    And I wonder if the abuse you have talked about has an impact on a person's ability to trust?

A    Oh, by all means.  If you look at the trauma, if you look at the dynamic that we have described, what you see is a basic scenario where trust is never, trust is never reflected in terms of interaction, very likely trust is never modeled, and as a result the individual, especially growing up in an environment where there is very little in terms of reward, where there is nurturance deprivation, there will be no, the individual has never learned to trust, and the individual, in addition to not learning to trust at a very basic level, remains very suspicious about situations and about people with whom he comes in contact.

Q    You used the term modeled.

A    Yes.

Q    What does that mean in this context?

A    Modeled is, the term modeled in this context goes back to a basic principle.  Most people believe that with children, that children develop and are nurtured by our teaching them directly, you know, you do this, you do that, you do that, you do that and you don't do that.  That's not true. Children learn mainly vicariously.  They learn by what they

observe, they learn by what they see modeled.  They learn to deal with stress by how they see their parents deal and cope with stress.  Men learn how to treat women based upon how their father treats their mother.  So it's a process of modeling and that is how individuals learn, not so much by direct teaching but by what they see modeled.

Q    And are you aware of any correlation between the kind of abuse you have identified in this case with development or brain impairments?

A    Yes.

Q    Explain that.

A    The research shows that individuals do not have to necessarily be traumatized, and when I say, physically traumatized by a blow to the head or what have you. Individuals who are exposed, and when I say exposed I mean they live in an environment that is characterized by unpredictability, instability and the like, where things are precarious, where things are capricious, where you never quite know what's going to happen from one day to the next, where you are never quite sure whether the caregiver today is going to be there tomorrow, individuals who grow up in that type of environment and where they, for example, observe violence, where there is violence going on around them, whether they are the victims or not, what tends to happen is that living in that particular environment over a period of

time causes actual physiological changes in the brain which show up on scans and other types of, other types of assessment tools designed to measure brain functioning.

Q   Okay.  Now, all these things you just told us about the impact of the kind of abuse Mr. Bourgeois suffered, is this some newfangled theory or is this well established in the field, is it controversial?

A   No, it's well established in the field, has been for quite some time.

Q   Now, I want to move from the history to the presence of some of these Axis II disorders that you have already discussed a bit.  First of all, define for the Court what a personality disorder is generally.

A   When we talk about a personality disorder we are talking about an enduring pattern of thinking, feeling, perceiving and behaving with respect to our environment and with respect to the things around us.  With the borderline disorder that we have alluded to here, this is reflected further in an instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image.  So we have this particular phenomenon manifesting itself and it affects all aspects of an individual's functioning.

Q   And what is the notable pattern in a borderline personality disordered person with regard to relationships?

A    Instability, inconsistency are the most prominent factors, and that inconsistency is further exacerbated by the fact that the individual tends to operate along a continuum and that continuum in terms of interpersonal relationships, that continuum begins on the one hand with what we call valuation, on the other hand we call devaluation, where the individual is idealized and then subsequent to that the individual is devalued, and so you kind of, you get that kind of vacillation, that instability along that particular continuum which reflects and which characterizes the interpersonal relationships or the quality of the interpersonal relationships of the individual.

Q    There is a phrase in your declaration at paragraph 6 that I wanted you to discuss.  You indicate, where my finger is, these relationships, meaning those of a borderline --

A    Yes.

Q    -- have a saw-tooth quality.

A    Yes.

Q    Explain what you meant by that?

A    It means that it goes back and forth, where initially it's smooth but then it's raw.  So as you go back and forth like the teeth on a saw, if you go in one direction it's smooth, when you come back in the opposite direction it's rough, and that's the nature of the interpersonal relationships, they vacillate, and they reflect the

instability, the overall instability of the personality functioning.

Q   Now, what's the origins of the name borderline?  What is the reference there to, of the actual word borderline?

A   The borderline personality disorder that we are talking about used to be described as mini-schizophrenia.

Q   Now, just stop right there.  Schizophrenia is a major mental illness?

A   Schizophrenia is a major mental illness.

Q   Axis I?

A   Axis I, characterized by significant deficits in terms of cognitive behavior and psychological functioning that's manifested in a variety of contexts.

Q   All right.  And is it an illness that involves psychosis?

A   Yes.

Q   Breaks with reality?

A   Breaks with reality, psychosis, dissociative behavior and the like, yes.

Q   And so what's the difference then between a borderline personality disorder and the major mental illness of schizophrenia or psychosis?

A   The major difference has to do with what we would call, for want of a better term, consistency.  With a schizophrenic what you have is you have this behavior over time, you have the deficits in terms of functioning, cognitive deficits,

behavioral deficits, emotional deficits that are over time.

Q   And how about the psychosis, does that last --

A   The psychosis, that's over time also.  With the borderline what you basically have is what we indicated in the description, it's instability, which is the characteristic which is the cornerstone of the borderline personality disorder where you have the individual in essence vacillates along a continuum which goes from the one end of the continuum which you call the borderline personality disorder all the way to the other end of the continuum which is the full-blown psychosis.  The borderline vacillates up and down the particular continuum, at times even manifesting what is referred to as and what is described as what are called mini-psychotic episodes, M-I-N-I.  And what we are talking about here is that there are oftentimes brief and reversible periods where the individual loses contact with reality much as a psychotic might do, but the difference is that in the borderline you have, you have the reintegration, which is what you don't have when you are dealing with schizophrenia.

Q   Okay.  And what does the field recognize as one of the -- well, withdrawn.  I take it not all borderlines have these mini-psychotic states?

A   No, because, remember, we have the continuum.

Q   Okay.

A    And the individual vacillates along the continuum.

Q    Okay.

A    From the personality disorder all the way over to
psychosis or to the major mental disorder at that end of the
continuum.

Q    And for those borderlines that do have these mini-
psychotic episodes, what is recognized as a major cause of
them?

A    The major cause tends to be, one, stress or stressors.  A
second major cause is the existence of cues in the
environment that serve as catalysts for unresolved emotional
or dormant emotional issues that have not been addressed that
are the result of the deficient social environment that we
have described.

Q    Did you see evidence in the materials you reviewed and
the people with whom you spoke, the lay witnesses, that is
consistent with Mr. Bourgeois having undergone such mini-
psychotic states throughout his life?

A    Yes.  There were individuals, for example Michelle was
one, who described, for example, the mood lability reflected
in Mr. Bourgeois' behavior --

          THE COURT:  You talked to her personally?

          THE WITNESS:  Beg your pardon?

          THE COURT:  I want to make sure, you talked to her
personally?

THE WITNESS:  No, I saw her statement.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   That would be Michelle Armont?

A   That's correct, yes.

THE COURT:  Could we stick to ones that he actually talked to?

MR. WISEMAN:  Oh, sure.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Did you see any evidence from the people you spoke with, Claudia Williams, Mr. Murray Bourgeois, Kerry Brown, that would support your conclusion that you saw evidence of mini-psychotic states?

A   The individuals that I spoke with, such as Ms. Claudia Williams, describes the abuse, the physical, emotional and verbal abuse that was inflicted on her son --

Q   I'm sorry, you said her son?

A   I'm sorry.  I'm sorry, that was inflicted upon Mrs. Bourgeois' son, Alfred.

THE COURT:  Who told you that?

THE WITNESS:  This is Ms. Claudia Williams.

THE COURT:  And you talked to her?

THE WITNESS:  Yes, I did.

THE COURT:  Okay, thank you.

THE WITNESS:  And she talked about the fact that, she talked about and described the abuse that the individual suffered at the hands of his mother.  Mr. Wilmer Bourgeois talked about the fact that he believed that the behavior of Mr. Bourgeois' mother, the neglect specifically, had a profound effect on Alfred's overall behavior throughout most of his life.

MR. DOWD:  Judge, I would object to that judgment coming from a non-professional.

THE COURT:  Sustained.

MR. DOWD:  Thank you, Your Honor.

BY MR. WISEMAN:

Q   Did Ms. Williams tell you anything relevant to rages that Mr. Bourgeois may have manifested as a young man?

A   Yes, the fact that, the notion of, without necessarily provocation, adequate provocation, there would be mood swings where the individual would become angry or hostile without provocation or without any identifiable event taking place that would be proportionate to the kind of behavior that was manifested.

Q   All right.  And did she relate to any physical changes she observed during these periods of rage?

A   What she described as blanking out or not appearing to be aware of what is going on and not remembering afterwards what

had transpired.

Q    All right.   And are those consistent, those observations

consistent with what you have called a mini-psychotic state?

A    Yes.

Q    Okay.   Would a person like Mr. Bourgeois who has this

personality disorder and his history of trauma as you have

described, would you consider that person to be significantly

impaired?

A    Oh, most definitely, yes.

Q    Okay.   And was that the only set of mental health issues

that confront Mr. Bourgeois that you have reviewed?

A    No.

Q    Okay.   So when you say he would be significantly

impaired, I know you have kind of touched upon it but just

give us a sense in what, we're talking only now about the

trauma history and the development of the borderline

personality, how would he, or how was he or is he impaired as

a result of those two factors?

A    Well, he would be impaired in terms of one that we

mentioned in terms of his inability to form significant

lasting interpersonal relationships.   He would also be

impaired in terms of his own, the management and navigation

of his own environment as reflected in, you know, his mood

instability, the adverse impact in terms of that particular

phenomenon, in terms of his own self-image and self-worth, in

terms of how he functioned, in terms of how he was able or unable to manage some of the regular or normal activities of daily living.  All of those dimensions would be adversely impacted by his, the history that we described.  And as we, you know, as we mentioned earlier, what happens is that when an individual is exposed to that particular climate, environment and set of factors, what occurs is that the, is that the stability and predictability necessary for acquiring a consistent pattern of behaving and thinking is nonexistent. As a result, you have an individual who has significant deficiencies in terms of mastering their environment, reflected in deficits with respect to long-term planning, deficits in terms of consequential thinking, deficits in terms of managing conflictive data, weighing alternatives, all of those particular factors that are so necessary in order to manage effectively and to navigate our environment, all of those are missing, all of those factors are missing.

Q    Did you have occasion to speak with a mitigation specialist named Kathleen Kaib?

A    Yes, I did.

Q    And what if anything did she add to your understanding of Mr. Bourgeois and the personality disorder that you have identified?

A    She described her interactions with individuals, females, who were previously married to Mr. Bourgeois.

THE COURT:  Does she work for you or where did she come into this?

MR. WISEMAN:  She works for my office, she's a mitigation specialist.

THE COURT:  Are we going to hear from her?  Why are we hearing from her from --

MR. WISEMAN:  Well, Dr. Toomer relied on her, and so I --

THE COURT:  He didn't say that.

BY MR. WISEMAN:

Q   Well, did you rely on her?

A   Yes, she provided information that was useful.

THE COURT:  Okay.

THE WITNESS:  In this regard.

BY MR. WISEMAN:

Q   And without going into exquisite detail because it is not firsthand, what did she in sum tell you about her interaction with these women that Mr. Bourgeois was married to?

A   The, what stood out was the fact that at least on two occasions to his wives he had acknowledged that, he had acknowledged a history of abuse at the hands of his mother, and this --

Q   And this would have been pre-offense?

A   Yes, uh-huh.

Q   Okay.  Go ahead.

A     And --

THE COURT:  I'm sorry, who did he, who, I'm sorry, what do you mean, what's pre-offense?

MR. WISEMAN:  The acknowledgement of his abuse history.

THE COURT:  From whom?

MR. WISEMAN:  Well, why don't you answer the Judge's question instead of me.

THE WITNESS:  He acknowledged or he indicated or reported to his wives that he had a history of abuse at the hands of his mother.

THE COURT:  Well, did you talk to any of these wives?

THE WITNESS:  No, I did not.  This was --

THE COURT:  Okay, this is really getting far afield, so we are not going to go there.

MR. WISEMAN:  Okay.

THE COURT:  Okay.

BY MR. WISEMAN:

Q     Dr. Toomer --

A     Yes?

Q     -- do people, professionals like yourself, rely on reports from mitigation specialists?

A     Yes, we do all the time.

Q     And do those reports at times contain descriptions of

their interactions with other people?

A   Yes.

Q   And was Ms. Kaib's report at all out of the ordinary in that regard?

A   No.

THE COURT:  Well, does she work with you?  I mean can you vouch for her work?

MR. WISEMAN:  She works for my office, Your Honor.

THE COURT:  I understand that but I'm, I am not understanding this.  I can see relying on mitigation experts if they are somebody you have worked with and you know them.

THE WITNESS:  Yes, I have worked with her in the past, yes.

THE COURT:  Okay, then go ahead.

MR. WISEMAN:  All right.  I was done with Ms. Kaib for now.

BY MR. WISEMAN:

Q   I wanted to go to the next area of impairment.  Did you review the reports of Dr. Gelbort and Dr. Weiner?

A   Yes.

Q   All right.  And what did you learn from those reports?

A   They reported intellectual, on intellectual deficits reflected in their assessment of the defendant.

Q   And when you say intellectual deficits, give us a little more flavor.

A   They assessed his IQ, intellectual functioning.  I believe in 2004 he was administered the WAIS-R, the Wechsler Adult Intelligence Scale, Revised, and he earned an IQ of 76.

MR. DOWD:  Judge, I would object to the cumulative.

MR. WISEMAN:  All right.  You know what, I think --

MR. DOWD:  We stipulate to the test results.

MR. WISEMAN:  That's fine, that's fine.  We can move on.  He --

THE COURT:  Okay.  I would rather that you didn't bring in eight million experts to testify about what all the others have said, and you are getting way into that.

MR. WISEMAN:  Yeah, I totally, totally agree.

BY MR. WISEMAN:

Q   He had a low intelligence?

A   Yes.

Q   Okay.  And did you learn anything about brain dysfunction?

A   Yes, I did.

Q   All right.  They identified organic brain dysfunction?

A   That is correct, yes.

Q   Okay.  So what I want you to do is I want you to now add on to the deficits you have already described which you already said were, would cause significant disturbance in his functioning, add on to that organic brain dysfunction, low intelligence.  How does that add to the mix?

A    You, when you have those particular elements in addition to what we've indicated earlier, what you have is really a compounding of deficiencies that render the individual even more deficient in terms of trying to cope, in terms of trying to navigate his world, his environment, and to engage in the normal activities of daily living that are required in order to function effectively.

Q    And we have heard the term used prior to your testimony about these dysfunctions somehow inhibiting the brakes that Mr. Bourgeois can put on his behavior.

A    Uh-huh, yes.

Q    How does that add to a person who already has those impairments, the impulsivity, the lack of judgment?

A    Well, it makes that, the situation, the situation is even, is worse as a result of that, because one of the things that you learn, as I mentioned before, in terms of learning how to manage your environment, in terms of learning how to deal with things in your, you know, in your world, weighing alternatives, projecting consequences, all those kinds of behaviors, one of the other things that you learn is you learn emotional modulation, what we call the modulation of emotional expression, which means that we are able to respond affectively, affectively, i.e., emotionally, in appropriate manners, appropriate to the particular situation or appropriate to the precipitating event.  When you have these

deficits that we have described, that particular, that particular process, that particular ability is basically nonexistent, and so what you have is an unpredictability in terms of functioning that is manifest.

Q   Now, when a person with this, you know, the personality disorders, the trauma history, the brain damage, the low IQ, would they be impaired in their functioning in a calm environment?

A   Would they be impaired in a calm environment?

Q   Yes.

A   What would happen is that the individual in that particular environment would function only to the point that stressors, real or imagined, or catalysts were encountered that, as we indicated before, serve as a reminder of the repressed, unresolved emotional issues that are left over from a traumatic past.

Q   Okay.  And that's the last area I want to go into with you.  Let's add stress to Mr. Bourgeois' many deficits.

A   Yes.

Q   Did you learn about various stressors in his life?

A   Yes, I did.

Q   And why don't you describe the most prominent ones, and focus particularly at the time leading up to the offense, what did you know and how do you know it?

A   I spoke with Attorney Brown, who was Mr. Bourgeois'

attorney and had known Mr. Bourgeois for approximately a year-and-a-half prior to the incident and had worked with him on a number of issues.  Prior to this, Mr. Bourgeois was experiencing numerous stressors.  There were financial stressors related to the ownership of his house, there were issues in regard to child custody --

THE COURT:  Sorry, who told you about the ownership of the house?

THE WITNESS:  Attorney Brown.  He was Mr. Bourgeois' attorney.

THE COURT:  For during the divorce?

MR. WISEMAN:  He will be testifying.

THE COURT:  I mean, are we talking about during the divorce, what are you talking about?

MR. WISEMAN:  Well, I think --

THE WITNESS:  These were all stressors --

MR. WISEMAN:  Why don't you --

THE WITNESS:   These were all stressors that Mr. Bourgeois was experiencing prior to the particular incident at hand.

MR. WISEMAN:  I think the Judge is --

THE COURT:  What incident at hand are you talking about, the murder of the child?

THE WITNESS:  The crime, yes.  The murder of the child, yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   I think, what I understood the Judge's question to be was at what point and in what different matters was Mr. Brown representing Mr. Bourgeois?

THE COURT:  Yes.  Thank you.

THE WITNESS:  He was representing him in terms of custody, he was representing him in terms of financial issues related to his home --

THE COURT:  Well, what financial issues are you talking about?

THE WITNESS:  In terms of the possible foreclosure or relating to payment of mortgage on his home.

BY MR. WISEMAN:

Q   All right.  And was --

THE COURT:  And custody issues, are we talking about Ja'Karenn, the baby that was killed?

THE WITNESS:  Yes, yes.

THE COURT:  So we are going to hear from him and so there will be no attorney/client privilege on that?

MR. WISEMAN:  Oh, no, there won't be any.

THE COURT:  Okay.

MR. WISEMAN:  We will be hearing from him and there's no privilege issues.

BY MR. WISEMAN:

Q   Did Mr. Brown tell you, Attorney Brown tell you that he was offering Mr. Bourgeois advice with regard to financial matters and --

A   Yes.

Q   Did you learn anything from Mr. Brown or from others relevant to the difficulties Mr. Bourgeois reported having with his wife at the time, Robin Bourgeois?

A   Yes, one of the major stressors, the major stressor that Mr. Bourgeois was experiencing at the time was the disruption of the marital relationship and the infidelity of his wife at the time.

Q   Now, you used the term at the beginning of this section real or perceived stressors.

A   Yes.

Q   And I'm wondering how the perceived part relates to the infidelity?

A   Well, the, Mr. Brown indicated that Mr. Bourgeois was obsessed with the infidelity, that it permeated every aspect of his functioning, that he was unable to focus, his work suffered, in other words, the work that he was trying to do at the time suffered, and that he was in essence preoccupied with this particular phenomena and betrayal, if you will, that had occurred at this time.

Q   And what does the fact that Mr. Bourgeois himself was

having infidelity, does that add at all to the, to his

perception of the stress?

A    I'm sorry, repeat that again for me, please?

Q    Yeah, I, you know, as a layman I think, you know, he's,

you know, what's he so upset about, he's doing the same

thing.  From a psychological perspective, though, why is that

either valid or not valid?

A    Well, if you look at the total picture, the totality of

the picture, and focus on the individual, the fact that he

may have been doing it himself is not the issue.  The issue

is that it serves as a catalyst for dormant, unresolved

emotional issues left over from a traumatic past.

Q    Okay.  And would --

A    Once again betrayal, abandonment, all of these are

issues, clinical issues and real issues that influence

behavior.

Q    Regarding the financial issues, was Mr. Bourgeois,

according to Mr. Brown, having to pay legal fees that he

couldn't particularly afford?

A    Correct, yeah.  There were legal fees involved, yes.

Q    And did that --

         THE COURT:  Because of what?

         MR. WISEMAN:  Legal fees that he could not afford.

         THE COURT:  Because of?

         MR. WISEMAN:  Because of --

THE WITNESS:  Because of the divorce.

THE COURT:  What divorce?

THE WITNESS:  His divorce.  Reconciliation.

THE COURT:  Did they file for divorce?

MR. WISEMAN:  There was a divorce proceeding that had been started and ended.

THE WITNESS:  There was also, there was also an issue with regard to legal charges involving the third party, Mr. Thibeau, and damage that was done to a, to his property, I believe a limo.

BY MR. WISEMAN:

Q   Was there any stress related to the possibility Mr. Bourgeois was going to lose his house at about that time?

A   Yes, all of that, the foreclosure, possibility of foreclosure, all of those were stressors that impacted him at that particular time.

Q   Now, you read portions of the trial record?

A   Yes, I did.

Q   Okay.  And you are aware that the injuries to the deceased were inflicted over many weeks?

A   Yes.

Q   Okay.  How do you reconcile that with the overall explanation you are offering for Mr. Bourgeois' behavior?  I mean when you talk about mini-psychotic episodes, one thinks of a quick incident, yet this is happening over a period of

time.

A    Because what transpires is that, as we indicated earlier when we talked about the vacillation, what transpires is stressors that occur impact on individual, the individual's functioning, and as a result you have the maladaptive acting-out behavior, you have the mood swings, go from one extreme to the other, and so this particular process in terms of the individual's maladaptive functioning is a continuing process. It occurs, it takes place over time.  Anybody clinically who would have been involved would have said that this is a time bomb waiting to happen.

THE COURT:  Do you do a lot of testing on people on death row?

THE WITNESS:  Yes, I do.

THE COURT:  Have you ever seen one that wasn't in this kind of situation with, that was maladaptive and dangerous and --

THE WITNESS:  That wasn't like this?

THE COURT:  Yes.

THE WITNESS:  Yes, I have.

THE COURT:  Is this --

THE WITNESS:  I have seen those who are not like that.

THE COURT:  Okay.  Is this not unusual for somebody on death row to be in this kind of situation mentally, a time

bomb waiting to happen?

THE WITNESS:  Is it unusual for them not to be?

THE COURT:  No.  You said he was a time bomb waiting to happen.  Is that --

THE WITNESS:  No, what I was saying was if at some point that was, that we are talking about in terms of abuse occurring over time, if someone had gotten involved earlier or at that particular point in time clinically, what have you, they would have been able to predict that this was a time bomb waiting to happen if they had taken into account history and what have you.

THE COURT:  Well, so you are testifying that he was at the time of the murder a time bomb waiting to happen?

THE WITNESS:  And what I mean by that is that you had all of these factors impacting on his functioning.

BY MR. WISEMAN:

Q   Now, Dr. Toomer --

A   Yes?

Q   -- you do a lot of work with capital cases and you are familiar with theories of mitigation?

A   Yes, I am.

Q   And what's typically offered in cases such as this?

A   Yes.

Q   Okay.  Do you have a mental health explanation for why Mr. Bourgeois was this time bomb waiting to happen?

A    Yes.

Q    Okay.  And you have described it for the last hour or so.

A    I described it, yes.  That's what I have been describing, yes.

Q    Okay.  And is it a controversial mental health position you are taking?

A    No, it's very --

Q    Did you read Dr. Moore's report and Dr. Price's report?

A    Yes.

Q    And did they dispute your conclusions in that regard?

A    No.

Q    You take 99 out of 100 psychologists, they are all going to agree time bomb waiting to happen?

A    Yes.

Q    Okay.  And because of that, is this the type of information that in your experience is offered to capital jurors?

A    Oh, by all means, definitely, to help them understand the dynamics that are influencing behavior.

          THE COURT:  Well, how else does somebody, I'm sorry, but how else does someone commit murder as he was convicted of, six weeks of torture, a two-year-old child, and then killing her, how else could you be described but other than a time bomb waiting to happen?

          THE WITNESS:  Well, I'm, that's what I'm saying, I'm

saying if you --

THE COURT:  How is that mitigating?

THE WITNESS:  It's mitigating because the behavior is not necessarily premeditated but is a function of the deficiencies --

THE COURT:  He --

THE WITNESS:  -- that we have described.

THE COURT:  Okay, but how do you put that on when there is evidence of six weeks of torture leading to death? Six weeks of torture leading to death.  I am not understanding how you put that on, what --

MR. WISEMAN:  Okay.  Let me see if I can ask --

THE COURT:  -- how that mitigates.

BY MR. WISEMAN:

Q   If I could ask the question, Dr. Toomer.  You reviewed the penalty phase transcripts?

A   Yes, I did.

Q   All right. Was the Government's position with regard to this offense is that Mr. Bourgeois is an evil man who did dastardly things?

A   Yes.

Q   Okay.  Does a psychological explanation for why those things happen mitigate in your experience?

A   Yes.

MR. WISEMAN:  Your Honor, I would just point out

that a number of Your Honor's questions, I mean I think Dr. Toomer can answer the psychological ones but a number of your questions, while I think are --

THE COURT: Good.

MR. WISEMAN: -- highly relevant, they are really legal issues.

THE COURT: Okay. I just --

MR. WISEMAN: And we're certainly going to present that authority.

THE COURT: But that's what you are using him to do is say that they should have put this information on. I --

MR. WISEMAN: Well, from a psychological perspective it's mitigating.

THE COURT: I just can't see how that would be beneficial.

MR. WISEMAN: Yeah, well, you know, the Supreme Court has said it's beneficial in five cases over the last nine years.

THE COURT: Not in this circumstance.

MR. WISEMAN: Oh, yes, absolutely. In circumstances worse than this. I have done some of them --

THE COURT: Where there was torture for six weeks?

MR. WISEMAN: Oh, yes.

THE COURT: And then --

MR. WISEMAN: In fact, when it's more horrible the

need to explain it is greater, because if you don't explain it the person looks like they are an animal, and there is an explanation for why he is not an animal. And that's my job, to convince you, and it was Mr. Tinker and Mr. Gilmore's job to convince this jury, and they failed miserably, and that's our case, and we'll prove it to you.

BY MR. WISEMAN:

Q   Dr. Toomer, I just wanted to, for the record, get some of the larger conclusions out. Did you draw a conclusion as to whether Mr. Bourgeois, as a result of all you have testified about, has an impaired capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law?

A   Yes.

Q   And what is that opinion?

A   He does.

Q   Okay. And --

THE COURT: Sorry, he has an impaired?

MR. WISEMAN: Impaired.

THE COURT: Which is the same as a sociopath, isn't it?

THE WITNESS: No.

THE COURT: Doesn't a sociopath also have a problem conforming their behavior to the normal?

THE WITNESS: Right, but it doesn't, we aren't

talking about sociopathy here.

THE COURT:  Why?

THE WITNESS:  Because we are talking about the borderline personality disorder as it reflects, as it has been manifested in Mr. Bourgeois' history.  His, what has happened to him and his history and the totality of the data is consistent with a diagnosis of a borderline personality disorder, it is not consistent with a diagnosis of sociopathy.

BY MR. WISEMAN:

Q   And, Dr. Toomer, in your review of the records have you seen any diagnosis of Mr. Bourgeois as a sociopath?

A   No, I have not.

Q   Sociopaths are often described as people without conscience?

A   Yes.

Q   Do you see that as the root of Mr. Bourgeois' behavior?

A   No, I do not.

Q   The last thing I want to talk to you about is this question of mental retardation.  You opine in your declaration that Mr. Bourgeois meets the criteria as you saw it when you conducted your evaluation?

A   Yes.

Q   Okay.  Was that a provisional observation in any respect?

A   That was a provisional observation based upon what I did

as part of my evaluation.  I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion, and then we subsequently discussed an expert being retained for that purpose.

Q    Okay.  So let's just break it down now.  You saw the IQ scores.  They qualified, in your view?

A    Yes.

Q    Okay.  And you reviewed the background material and you thought he manifested adaptive deficits in the relevant domains?

A    I did, yes.

Q    Okay.  And you saw onset before 18?

A    I did, yes.

Q    Okay.  And in your subsequent discussions with my office about your further role with regard to mental retardation, what was your understanding?

A    Well, that that was going to be done by someone else who was specializing in that particular area.

Q    Okay.  And geographically?

A    And geographically, yes, who was closer to be able to do that.

Q    Okay, I think I am done.  Thank you very much, Doctor.

        THE COURT:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Yes, thank you.

CROSS-EXAMINATION

BY MR. DOWD:

Q   Dr. Toomer, my name is Mark Dowd.  I am going to ask you a few questions --

A   I'm sorry, your last name?

Q   Dowd, D-O-W-D.

A   D-O-W-D, yes.

Q   Now, let me nail down the chronology of your interviews. You -- because you indicated that there was two different time frames.  I understood from your report that you relied in your background evaluation by speaking with Claudia Williams, Mr. Bourgeois' older sister, and is it Wilmer Bourgeois?

A   Wilmer Bourgeois, yes.

Q   Wilmer?

A   My understanding it's Wilmer.

Q   Wilmer, okay.

A   W-I-L-M-E-R, yes.

Q   Okay.  And then I heard discussion about a Carrie Wilson and then a Murray Bourgeois.  What was the chronology of your background investigation?

A   I'm sorry, would you give me those, the names again?

Q   Well, I understood from your report that you gathered

your background information from Claudia Williams, Mr. Bourgeois' older sister.

A    That's correct, yes.

Q    And Wilmer Bourgeois.

A    Correct, uh-huh.

Q    Okay.  So that was -- then I heard you discussing a Carrie Wilson and Murray Bourgeois.  That wasn't part of your background investigation?

A    That wasn't me, no, no.

Q    Okay.  All right.  So you relied strictly on Claudia Williams and Wilmer, is that right?

A    Yes.

Q    Okay.  Is there any reason that you limited your background -- oh, and that was by telephone?

A    I spoke with them both, I spoke with them by phone, yes.

Q    You called them on the phone?

A    Yes.

Q    Is there any reason you limited your background investigation to just those two sources?

A    I had access to statements that were provided by informants that I utilized as part of my evaluation.

Q    And those informants were gathered by Mr. Bourgeois' team, defense team?

A    That is correct, yes.

Q    Okay.  And they simply sent those to you?

A    They provided those to me, yes, as part of my evaluation.

Q    Okay.  Did you ask for those particular individuals or did they decide which statements and individuals to send to you?

A    I asked for all information with respect to informants, all information with regard to the particular defendant's background and history.  I did not request specific persons.

Q    Okay.  You asked for all information, the good, the bad and the ugly, whatever?

A    As is the case.

Q    Whatever they had gathered on Mr. Bourgeois?

A    Yes.

Q    And the background?

A    Background information, yes.

Q    And those are the ones they sent you?

A    Yes.

Q    Okay.  But you will agree that the wider range of your sources gives you a wider range of information and probably more accurate information as well, more reliable information?

A    You try to access as much information as possible, yes.

Q    All right.  And is there any standard in which you are warned to be careful about relying solely on partial informants, people that are partial to the subject?

A    Oh, I mean we always are aware of that, but from the, in terms of what we do, in addition to trying to utilize as much

information as possible we also look for corroboration among all sources of the data, that is, the informant's background data, affiliation with other agencies or institutions, be they criminal, be they correctional, be they mental health, hospital, whatever, so we look for corroboration among all sources of the data, which is a psychological standard in terms of, you know, in terms of rendering an opinion.

Q   All right.  And you had indicated that based on your discussion with Claudia Williams and -- do you remember how long those telephone calls were?

A   I would say roughly 35 minutes, 35 to 45 minutes, something like that.

Q   All right.  And is there a format to this conversation or is it just an informal discussion with them?

A   No, it's not -- if by format you mean like a written format or anything like that?

Q   Uh-huh.

A   No, there's not a written format, but it's not also, but it also is not an unstructured process.  What we are looking for is, one, obviously we have this information, we have the relationship, we are looking at the term of the relationship, we are looking for specific information regarding what the individual was able to observe regarding the defendant in terms of the defendant functioning in that environment and with other individuals in that environment in this case, his

mother and others.  So it's not like there is a structured test or anything but it is not unstructured either.

Q   All right.  And as a result of that you decided, you indicated in your report and you said baseline.  Is that like the bottom line, baseline childhood sexual and physical abuse, even said savage, right, savage?

A   I'm sorry, where are you reading now?

Q   Oh --

        MR. WISEMAN:  Here's the exhibit.

BY MR. DOWD:

Q   Well, anyway, you found, you found -- I want to make sure that's not my word -- you found, you determined that he had suffered childhood sexual and physical abuse on the basis of your reports from Williams?

A   Right, the data that was collected.  Yes.

Q   And that this produced organic brain damage?

A   Well, it didn't necessarily produce organic brain damage, it contributed to that particular, to that particular phenomena, yes.

Q   All right, so explain that.  You had indicated that, I thought I understood your testimony to be that the childhood abuse in itself can actually cause defects in the brain?

A   Changes in the structure of the brain.

Q   Okay.

A   Yeah, that is, that's what happens, yes.

Q    And is that the --

A    So that --

Q    Go ahead.

A    So the, what the person experiences in terms of what we have described, the lack of structure, the lack of nurturants, the turmoil, the capriciousness, all the instability, the characteristic instability --

Q    All those --

A    -- is what produces the changes in the brain, yes.

Q    All of those factors you described?

A    All of those factors, yes.

Q    And did I understand you to say that these, that these defects in the brain on the basis of this child abuse will actually show up --

A    Yes.

Q    -- in brain scans?

A    Yes, yes.

Q    They will actually, they are manifested?

A    Yes.

Q    Identifiable?  Do you know why no brain scan -- do you know if a brain scan was attempted on Mr. Bourgeois?

A    I don't know.

Q    Would that be something that you would have done?

A    That I would have done?

Q    Or recommended?

A    That a brain scan be done?

Q    Yes.

A    I believe that there was, I don't know of any brain scan being done except that I believe that there was one done in, as part of his incarceration, but I don't, I don't know of any other having been done.

Q    Okay.  But that will actually show up on a brain scan?

A    Yes.

Q    You can demonstrate brain damage --

A    Yes.  The research --

Q    -- from childhood abuse on a brain scan?

A    Yes.  The research that has been done shows that if you take an individual who has been exposed to an environment characterized by the instability and the factors that we have described --

Q    And is the --

A    -- over time, and you take that person's brain and you do a scan and you compare it to a child who has not been in that environment, there are significant differences in the brain.

Q    And this signature on this brain scan will be different than if the --

A    The shape.

Q    -- injury was caused by trauma or impact or something like that?

A    Or direct, a direct blow?

Q    Yes.

A    Well, no, there may be some similarity, but the point is that there is a difference in the --

Q    Okay.  And it's identifiable?

A    -- in the brain that can be identified.

Q    All right.  And you -- now, as far as all this abuse, are you aware of any official corroboration of anything, that, you know, he was found with bruising at school or that he reported the sexual assault to the authorities?  I mean is there anything that comes other than from the background informants?

A    I don't recall, if you are speaking specific, of whether there was something reported at school or something of that nature, I don't have any record of that, of anything like that, you know, something being reported at school or an injury being reported at school or anything like that.

Q    All right.  Now, the, you indicated that he was, on the Axis II that he was a combination of schizoid, paranoid and personality, borderline personality disorders?

A    Correct, yes.

Q    Okay.  Now, does the schizoid finding, does that conflict with the borderline personality disorder finding?

A    No, the schizoid finding, the schizoid, once again, as we mentioned before, when you talk about schizoid what you are really talking about is a splitting, in other words, where

there is a process whereby the individual is detached or separated from reality, he is not able to process, to process reality.  The schizoid phenomena tends to be a long-term process.  It tends to be something that lasts when you have that kind of process.

Q   And what are --

A   With the borderline you get the vacillation, and that's a major difference.

Q   Let me stop you there and I'll let you get back to borderline.  What are some of the symptoms or dynamics of a schizoid personality?  How do they display them?  How is that displayed in a personality, in a person's behavior?

A   Well, when a person is schizoid, one of the first things that you observe is that there is a certain detachment, if you will, or lack of congruence between what we call ideation and affect, and what happens is a person who is schizoid can do things like the following:  They can talk about things that are highly emotional, that are emotionally charged, that would be considered emotionally devastating to a particular individual, to a particular individual, and they can talk about it without appropriate affect.

Q   All right.

A   One of the criteria for normalcy is that there is some congruence between our cognition, how we think, our behavior and our affect or our emotions, so if I am talking about

something sad that has occurred, the loss of a loved one,

that would be reflected in my behavior, it would be reflected

in how I talk, it would be reflected in my observable

emotional behavior.  When someone is schizoid, all of that is

disrupted.

Q   Let me ask you a couple of symptomatic questions.  Is it

true that people with schizoid personality disorder, that

they shun close relationships, even family relationships?

A   They can, yes.

Q   They would normally like to live alone?

A   They would, right, yes.

Q   And they wouldn't be interested in any close relationship

with say a woman or a family?

A   That's not necessarily a pattern, a pattern of theirs,

no.

Q   Okay.  Are they normally not interested in sexual

relationships?

A   That can vary.  In my clinical experience that can vary.

Q   And they would normally shun like amusement parks and

theme parks and things like that, is that fair to say?

A   Perhaps.  The way I have heard it described, or the way I

have seen it described by theorists and others is that

individuals who are schizoid tend not to derive satisfaction

from the kinds of things that would ordinarily give the bulk

of the population satisfaction.  Like you were talking about

going to a park, I think you would probably get agreement from a lot of people that yes, that's an enjoyable kind of thing. Well, someone who is schizoid might not find that enjoyable.

Q   Going to the beach or pool parties, things like that, that would not be consistent with a schizoid?

A   Perhaps, yeah. It would really depend, but generally it would not.

Q   Do they, are they also indifferent to praise and criticism?

A   No, not always. Not always, no.

Q   All right. And I didn't want to cut you off. If you wanted to finish your statement about --

A   Yes.

Q   -- how that relates to his borderline personality, go ahead.

A   Yes. No, the way it relates is that you have this schism, if you will, and you have the same kind of schism or a type of schism with the borderline. The borderline on one day is composed, calm, if you will, for want of a better term, and at the drop of a hat can become angry, aggressive. That's a split because there's not, you don't have that congruence that comes with normalcy. Well, the schizoid is also a split. It's a different qualitative split but it's a split nevertheless between what should be two congruent

aspects of personality functioning.

Q   All right.  Now, let me explore this rage reaction that you found.  You have indicated that this rage reaction would be consistent with his personality disorders.  Is that fair to say?

A   Well, it's consistent with the personality disorder and it comes about as a result of, as we mentioned before, one, stressors, real or imagined, real or perceived, and also by incidents or issues or situations that serve as a catalyst for unresolved emotional issues that have not been addressed.

Q   But the rage reaction would serve to provide an explanation for Mr. Bourgeois' murder of his daughter, is -- I mean that's, that would be, that's the point of your testimony, that this rage reaction is the explanation for the murder of his daughter, is that right?

A   Well, I am saying he's capable of that.

Q   Okay.

A   And I'm saying that he's capable of that particular phenomena and that that is one way to account for his behavior in terms of how he has functioned over time.

Q   And that's the point of your testimony, that this explanation just provides one explanation for his, for, if Mr. Bourgeois, if that's what you are trying not to say, if Mr. Bourgeois engaged in a rage reaction and killed his daughter?

A    Right, I'm saying that his, the combination of the factors that we have described, the mental health issues related to his overall functioning are consistent with that type of behavior, yes.

Q    All right.  Now, set aside Mr. Bourgeois' IQ --

A    Uh-huh.

Q    -- for a minute.  All this information you gathered, the abusive childhood, the sexual assault, the abandonment, all those factors that you listed, if that's all you knew, would you draw the same conclusions, that these, that this background has produced in Mr. Bourgeois this personality disorder and, with the potential for these rage reactions?

A    And what are leaving out, what did you say?

Q    We are leaving out the IQ.

A    Yes.

Q    So independent of the IQ information you would make the same finding?

A    Yes.

Q    Okay.  And those, that background information and his developed personality disputes would explain those rage reactions?

A    Yes, yes.

Q    Okay.  Whether he was a genius or whether he is mentally retarded?

A    Yes.

Q   Okay.  I want to ask you about this rage reaction or these mini-psychotic episodes.

A   Yes.

Q   They are described in similar terms by different experts in the same case but it's basically the same thing, right?

A   Yes.

Q   Okay.  Now, you are suggesting that he actually, during this mini-psychotic episode he actually doesn't know what he's doing, is that fair to say?

A   No, in, no, in -- with mini-psychotic episodes it is, it's a psychotic, it is a psychotic break.

Q   Okay.

A   The difference is, as I have indicated, the difference is that in a full-blown psychosis it remains.  In other words, the break persists, the break continues.

Q   Uh-huh.

A   The only difference here is that the individual reintegrates.  It's reversible --

Q   And --

A   -- in this particular instance.

Q   And are these more or less spontaneous events?

A   What do you --

Q   In other words, something, you talked about the stressors --

A   Uh-huh.

Q    -- something happens to trigger Mr. Bourgeois and he goes off like that?

A    Oh, yes, yes.

Q    And I'm, you know, imagining, you know, the type of thing like, you know, the shaken baby syndrome where, you know, for a few seconds he shakes the baby and then he realizes what he's doing and he, you know, sets the baby down but it's too late.  Is --

A    Well, I don't know about the example that you are using but I'm --

Q    It's just an example, it has nothing to do with this case.

A    Right, but I'm just saying that what you have is what you have described, that it can be a stressor, it can be a comment, it can be something that is seen and perceived in a particular way that may be different from how everybody else sees and perceives.  It could be a comment that everybody considers to be innocuous, the person may see it in a different way.  That's all it takes.

Q    Right, and he goes --

A    And that's what you --

Q    And normally how, I don't mean to cut you off but normally how long would you extend this episode, would you expect this episode to last?

A    Which episode now?  You mean --

Q    This psychotic rage reaction, psychotic episode.

A    It varies, it varies in terms of the individual, in terms -- there's no particular time limit but it's not prolonged, you are not talking about hours or days --

Q    All right, but --

A    -- in terms of, because when you get over into that arena then you are talking about a full-blown psychosis.

Q    Okay.  And you don't find him in that category?

A    No, I do not.

Q    Okay.  So you would expect the period to be within a few seconds or --

A    I --

Q    -- less than a minute?

A    I, well, I can't say a few seconds or less than a minute, but I am saying that what happens is that it is, the literature uses the term consistently, brief and reversible periods.

Q    All right.

A    That's how the literature describes it.  Now, that can, you know, that can cover a period -- like I said earlier, I would not, I would not consider an hour to be part of that. If you are psychotic for an hour or more you are, that's full-blown psychosis that we are dealing with, yeah.

Q    All right.  Okay.  So, and Mr. Bourgeois, he is capable of doing bad things without having, in other words, when he's

rational, is he not?

A    Oh, sure.

Q    Like any --

A    I'm sure he is.

Q    Like any --

A    I'm sure we all are.

Q    Like any of us.

A    Yeah.

Q    Right.

A    Yes.

Q    And so just because he does something violent or, you know, something bad doesn't necessarily mean that it was the result of his personality disorders?

A    I can't say that, no.

Q    You can't say that?

        THE COURT:  You mean every time he gets mad or angry it's the result of a psychosis?

        THE WITNESS:  No, he -- would you repeat the question again?

BY MR. DOWD:

Q    Well, I will just defer to the Judge.  Every time he gets mad, is it the result of a psychosis?

A    No, I can't, that's why I answered, I said I can't say that, no.

Q    Oh, okay.

THE COURT:  I thought you said no.

BY MR. DOWD:

Q   You agree with that?

A   No, I said I, right, I said, no, I was saying I --

Q   You agree with that?  Okay.

A   Yes.

Q   And --

THE COURT:  Okay, do you agree with that statement?

THE WITNESS:  Yes, I said I can't say that, yes.  I am agreeing with that statement, yes.

THE COURT:  Okay.

BY MR. DOWD:

Q   Just to make it clear, Mr. Bourgeois is capable of --

THE COURT:  You have been up there a long time.

BY MR. DOWD:

Q   Mr. Bourgeois is capable of, you know, violence which is not the result of his personality disorders?

A   Yes, I am sure that he is.

Q   Okay.  All right.

A   And we all are.

Q   Okay.  So the mini-psychotic episodes could explain an instantaneous action, perhaps a short beating, but it wouldn't explain, let's say, a plan to kill witnesses or the prosecutor, you know, a long, you know, planning that went for weeks and involving other people, that wouldn't be the

result of any psychotic episode?

A   No, I don't see his behavior as being premeditated, you know, I am saying generally.  Most of his behavior, at least according to the records that I have reviewed, most of his behavior appears to be motivated by his own deficiencies.

Q   In other -- most of what behavior?

THE COURT:  I am not understanding that.  What do you mean by that?

BY MR. DOWD:

Q   Yeah, I missed that.

A   It means that when you do something it's not, you aren't -- under ordinary circumstances we say if somebody is going to make, is at a decision point, we say that the person is going to weigh all the alternatives, going to look at possible options --

THE COURT:  Did you read the trial transcript?

THE WITNESS:  Yes, uh-huh.

THE COURT:  Did you read where people testified, I think it was his wife, that he didn't want to pay child support for Ja'Karenn and he wasn't going to bring her back alive and that he was actually going to leave her, if he didn't do what he did he was going to just leave her in a bayou in Louisiana for the alligators?

THE WITNESS:  Yeah, I remember all of that there.

THE COURT:  Isn't that premeditated?

THE WITNESS:  I think --

THE COURT:  You wouldn't call that premeditated?

THE WITNESS:  No, I'd call that someone acting out of --

THE COURT:  Well, he did act out and she died.

THE WITNESS:  Well, I am saying -- no.

THE COURT:  She did.

THE WITNESS:  With regard to the statement.

THE COURT:  Okay.

THE WITNESS:  I'm talking about the statement.  With regard to the statement, his behavior is a reflection of his deficiencies in terms of --

THE COURT:  Isn't that the way we all are, though, our behavior is a reflection of our deficiencies or our assets?

THE WITNESS:  Not always.  Only in some cases.

THE COURT:  Well, how do you, how do we get our behavior if it's not motivated by some lack that we have or some positive, some negative or positive?

THE WITNESS:  Well, I think the point with Mr. Bourgeois is that that is characteristic of his overall behavior over time, not just in one instance as it is with some of us, you know, where we do --

THE COURT:  Did you know how, do you know how long this child was tortured?

THE WITNESS:  Yes.

THE COURT:  That her skin turned to leather over six weeks?

THE WITNESS:  Yeah, that was an extended period, yes.  I am aware of that, yes.

THE COURT:  None of that was premeditated?

THE WITNESS:  No, what, I think the point I am making here with this particular disorder is that, you know, when you have the mini-psychotic episodes that we have talked about, we have one, in one instance we have a situation where the individual is motivated by his deficiencies, impairment in thought, other kinds of things, but let me --

THE COURT:  Well, which of those things were motivated by his deficiency?

THE WITNESS:  Well, first of all --

THE COURT:  Which of the six weeks events were motivated by deficiencies?

THE WITNESS:  I think his overall behavior is motivated by his deficiencies.  I think the things that happened during the six-week period, during that six-week period, may have been the result of the mini-psychotic episodes that we have talked about.

THE COURT:  While he was driving the truck the whole time?

THE WITNESS:  I'm sorry, I don't, I don't follow

you.

THE COURT:  He was truck-, he was on the road.

THE WITNESS:  No, what I'm saying --

THE COURT:  So he was psychotically operating the vehicle?

THE WITNESS:  No, no, I am, I am not following you in terms of --

THE COURT:  Well, we are not communicating so I am going to let Mr. Dowd do it.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  He will figure it out.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q   Doctor, the record demonstrates that the child had a number of injuries, I don't know if it's over 100 but probably well over 100 during the six-week period, and would the psychotic episodes explain each of those -- oh, 300 and, I am told it's 360 injuries.

A   Okay

Q   Maybe multiple injuries in each episode, but would, could mini-psychotic episodes explain all of those injuries over a six-week period?

A   I can't say that mini-psychotic episodes can explain all of those.  What I can say is that he is subject to, has been subject to mini-psychotic episodes that have characterized

his behavior over time.

Q   All right.   And the benefit or the point of this mitigation evidence that you are describing would be to show the jury that the murder was the result of one of these rage events?

A   I believe that there is, yes, that there is a mental health basis for Mr. Bourgeois' behavior.

Q   All right.   And, as the Court indicated, there was testimony that Mr. Bourgeois had actually planned the murder and I think he, there was testimony, if I am not mistaken, that he told his sister to get her black dress ready and he was going to get rid of the child and what not.   I mean doesn't that, I mean doesn't that demonstrate that this was a planned event and not the result of some psychotic episode?

A   I think that, you know, that one could make the statement or make the case that this was a planned event.   When I look at the totality of the data, not just one particular incident or one particular statement, when I look at the totality of the data, this is an individual who is impaired, who is significantly impaired psychologically, and this impairment has influenced his behavior for most of his life and continues to do so.

Q   Well, but --

THE COURT:  I guess my question is, is there anybody that you have examined on Terre, on death row --

THE WITNESS:  Yes.

THE COURT:  -- in the federal system that is not significantly impaired psychologically?

THE WITNESS:  Yes, I think there are variations because that's a continuum, and there are some who are less so, yes.

THE COURT:  But they all have some psychological impairment?

THE WITNESS:  Yeah, some impairment, yes.

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. DOWD:

Q    And what about the fact that there was no evidence of any abuse or any rage event against his seven-year-old daughter, is that Alfredsha, did I --

A    Alfredesha.

THE COURT:  Alfredesha.

BY MR. DOWD:

Q    Alfredesha?

A    Yes.

Q    I mean, what about that factor?  Doesn't that also suggest that the rage event is not an explanation for the murder since he never abused his other daughter?

A    No, I think what it suggests --

THE COURT:  Actually, that's not what the trial

testimony showed.

MR. DOWD:  Oh, well, I stand corrected, Your Honor. I was --

THE COURT:  So, I mean, I can't forget the times that the mother of Alfredesha testified that though she was not sleeping with her husband that he consistently took Alfredesha to bed at night and locked the bedroom door.

MR. DOWD:  Oh, okay.  I got this secondhand, Your Honor, I apologize.

THE COURT:  Is that not what the testimony showed?

MR. ROBERTS:  There was testimony to that extent, Your Honor, but obviously we had no evidence about what happened behind the door, nor do we offer any.

THE COURT:  I understand that.

BY MR. DOWD:

Q   And --

THE COURT:  But, in any event, that's not a usual kind of thing, is it?

THE WITNESS:  No.

THE COURT:  Okay.  It would cause you concern, would it not?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. DOWD:

Q   And the Judge made the point about the fact that

Mr. Bourgeois was on the road driving, you know, a cross-country 18-wheeler driver, and there is no evidence that he ever had a rage event relating to that activity, which, you know, I just drove down here from Houston and I was ready to run somebody off the road.  I mean, if he's going cross-country over a six-week period --

THE COURT:  Will you help him, please?

MR. DOWD:  Light counseling is all I need.

BY MR. DOWD:

Q   Wouldn't you think that if Mr. Bourgeois was subject to these rage events that they would manifest themselves in his cross-country driving or in other life stress, stresses, but did you find any evidence in the record that he had these rage events in other, you know, in other areas of his life?

A   I recall an incident where he was driving his truck and he attempted to, he left the truck, I mean the truck was driving itself.

Q   Oh, he stepped away from the wheel?

A   While he was, while he was involved with someone else in the front seat of the truck.

THE COURT:  Where did you find out about this?

THE WITNESS:  If you'll give me just a moment.  That was from Lawanda Cook, and she said she never got in the truck again after that.

THE COURT:  Did you talk to her?

THE WITNESS:  No, I didn't talk with her, just from her statement.

THE COURT:  Okay.  Be real careful about that.

THE WITNESS:  Okay, I'm just, he asked --

THE COURT:  Also, Mr. Wiseman, I want to make sure, since I misunderstood about your mitigation person, that he should be able to testify if he used that information.

MR. WISEMAN:  Yes, she's the next witness.

THE COURT:  Okay.  But I mean if you want anything from him that's fine, also.

MR. WISEMAN:  Okay.

THE COURT:  Okay.  I was mistaken.

MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q    The, well, that wasn't a rage event, he just stepped away from the wheel to talk to her and he maybe was showing off, showboating in his truck.  That was a safety event, wasn't it?

A    Well, I'm just trying to, I'm responding to the issue of his lack of judgment, lack of premeditation, if you will.

THE COURT:  He was talking about rage.  He said very specifically do you have any other instances besides this Ja'Karenn of rage.

BY MR. DOWD:

Q    Where he would go off on somebody.

A    No.  Only in terms of the emotional anger that individual has indicated but not in terms of actual violence.

Q    All right.

THE COURT:  But, now, in the trial there was the incident where his son, was it his son or a nephew that testified that he hung him upside down by the ankles from a bridge over a river?  Son, nephew?  Nephew.  Did you read about that one?

THE WITNESS:  I don't recall that, no, I don't.

BY MR. DOWD:

Q    In these, in talking to the background -- and I'm going to skip around a little bit, I'm sorry, I took some notes here.  In talking about the background information you had, people had indicated that he had mood swings, angry, hostile?

A    Yes.

Q    And was this, would this have been prior to his abandonment?

A    When you say prior to his abandonment in terms of?

Q    In other words, he was sent to live with Miss Mary?

A    Miss Mary, yes.

Q    And was this mood swings, angry, anger and hostility that Bourgeois exhibited, was that prior to his being sent off to live with Miss Mary?

A    That was across his whole, his whole life in terms of how he has functioned.

Q    Oh.  Even before the abandonment?

THE COURT:  Well, I don't think that anybody has testified that the abandonment occurred at seven years old.

MR. DOWD:  Okay.

THE COURT:  He is talking about, I think you talked about how it's cleaner to have abandonment real quickly?

THE WITNESS:  Yes, uh-huh.

THE COURT:  And his, what the others have testified, that it was over a long period of time, it wasn't just at seven, it was before then.

MR. DOWD:  Yes, Your Honor.

THE COURT:  That he says he was abused from the time he could remember.

MR. DOWD:  Okay.

THE COURT:  And that's certainly a form of abandonment, isn't it?

THE WITNESS:  Yes.

BY MR. DOWD:

Q    All right.  And weren't other siblings also sent away to live with relatives?

A    Yes, I believe that other siblings went to different places to live, reflecting the instability that was characteristic of that environment at the time.

Q    All right.  And you would expect the same type of abandonment reaction by them?

A    Not necessarily, because you would have to have the similar types of dynamics, and from all I can gather from the documents and what have you, Mr. Bourgeois was the subject of more abuse than anyone else in the family, as reflected by his sisters or his siblings.

Q    So it aggravated the abuse?

A    I'm sorry?

Q    It aggravated the abuse, the abandonment?

A    No, no.  He was, that he was the subject of more abuse --

Q    Right.

A    -- than anyone else.

Q    Right.  You said that when you gave him a test he understood 170 questions and responded consistently?

A    No, I was saying that his responses --

Q    Oh.

A    -- on the instruments reflected that he understood and that he responded in a consistent fashion.

Q    And he understood the instructions on the test?

A    Well, I gave it to him.  I was there, yes.

Q    All right, but he followed your instructions and he appeared to understand what you were directing him to do --

A    Yes.

Q    -- in taking the test?

A    Yes.  And I answered any questions that he had, yes.

Q    And how many pages was that test?

A    It's on front and back so it's about, it's three pages.

Q    Okay.  All right.  Now, the, I guess, you know, we are evaluating the performance of the trial lawyers here and why they didn't use mitigation testimony as you have offered here to assist him, but did you understand that Mr. Bourgeois told the psychological expert, Dr. Estrada --

THE COURT:  The psychiatrist.

BY MR. DOWD:

Q    The psychiatrist, Dr. Estrada, that he had an idyllic childhood, that there was no abuse, everything was wonderful? Were you aware of that?

A    No, I wasn't aware of that but I am not surprised by it.

Q    Okay.  So at that point --

THE COURT:  But at this point, after he gets capital punishment, then he comes forward and tells everybody about the abuse.  I'm just saying that it makes, you know, it's a hard, it's hard, you know?  So it's hard to say the lawyers were incompetent because they went with what they had, you know, they had a psychologist and they had a psychiatrist.

THE WITNESS:  But also I noticed, Your Honor, that, for example, in reviewing some of the, also the later tapes, he was --

THE COURT:  After the conviction?

THE WITNESS:  After, yes, after.

THE COURT:  Right.

THE WITNESS:  That he has done the same thing.  He has, for example, in the tape with Dr. Moore he is very grandiose, he is very expansive, he --

THE COURT:  I agree with you a hundred percent.

THE WITNESS:  Uh-huh.

THE COURT:  But I am just saying if you are the lawyer and you are making a tactical decision, how many different experts do you get for him to say the same thing to before you just have to go with that?  You see what I mean?

THE WITNESS:  Yeah, I understand what you're saying.  I am not --

THE COURT:  And that's the difficult.  I don't think, for, it doesn't mean it didn't happen, that the abuse didn't happen or that the other things didn't happen, but the question here for us today really is ineffective assistance of counsel, and post-conviction things that are discovered are a little bit, a little bit different.  And that's not questioning any of the things you have to say.  You understand?

THE WITNESS:  I understand what you're saying, yes.

BY MR. DOWD:

Q   If --

MR. WISEMAN:  Your Honor, I would just point out as a point of clarification that the Government argued that Mr. Bourgeois was abused for their risk assessment, counsel

argued Mr. Bourgeois was abused, so it wasn't that counsel didn't want to offer it, they just didn't support it with evidence.

THE COURT:  Well, that's the problem, because they didn't have evidence.

MR. WISEMAN:  Oh, they did.

THE COURT:  Actually -- well, oh, then they have, and I will hear that coming up.

MR. WISEMAN:  Yes, you will.

THE COURT:  But I am just saying if you have the psychiatrist and the psychologist and nobody brings it to the attorney's attention, it's difficult.

BY MR. DOWD:

Q   Doctor, in addition to this risk assessment --

THE COURT:  And I don't think Mr. Fernand was available to testify.

MR. WISEMAN:  Mr. Ferdinand.

MR. DOWD:  Ferdinand?

THE COURT:  Ferdinand.

BY MR. DOWD:

Q   You also did an adaptive functioning evaluation of Mr. Bourgeois in 2007?

A   No.  I rendered an opinion, I didn't do --

Q   Oh.

A   I didn't, no, I did not.

Q   Okay.  But you gave an opinion about his adaptive functioning?

A   Yes, uh-huh.

Q   Okay.  And again you relied on the affidavits or the declarations provided to you by Mr. Bourgeois' attorneys and you also went back and relied upon the background information you gathered from, what's her name, Claudia Williams and --

A   Yes.

Q   -- Wilmer Bourgeois?

A   Wilmer Bourgeois, yes.

Q   Okay.  And you concluded from that information that he couldn't follow simple rules from childhood through adulthood?

A   I, I, in terms of the opinion that I rendered --

Q   Uh-huh.

A   -- I based that on the documentation that I had that suggested that he had impairment in those areas, as reflected in such things as poor financial management and an inability to manage some of the normal expectations of daily life.

Q   Well --

A   As I indicated, I did not do an adaptive functioning evaluation.

Q   Not a complete evaluation.

A   Yes.

Q   But you gave your opinion on his adaptive functioning.

A    Opinion, right, yes.

Q    And you indicated that he couldn't follow simple rules from childhood through adulthood, and I guess I'm asking was this your conclusion or was this a conclusion that was provided to you?  Did you take that conclusion from the psychologists' reports that were provided to you and --

A    You mean his inability in terms of managing his functioning?

Q    That he couldn't follow simple rules from childhood through adulthood.

A    Where are you, which --

Q    I thought I got that from your conclusions here, and if I paraphrased that I apologize.  Let's see.  Is that in your report of May 9th --

A    Of May --

Q    -- 2007, the adaptive functioning opinion, was that in your original report?

A    With regard to what, his following the rules?

Q    Your, yeah, yes.

A    I don't recall.  That's why I wanted to --

Q    But your adaptive functioning opinion is contained in your original report?

A    Oh, yes, yes.

Q    Okay.

A    Yes, that's contained in the original report, yes.

Q    Well, maybe I can find it real quick.

A    Yes.

Q    Well, I'm not going to waste the Court's time.  Let me go on.  Do you believe that that is the case, from your background evaluation and from reading the statements that were provided and the psychologists', the other psychologists' reports you read?

A    Do I believe that what is the case?

Q    That he couldn't follow simple rules?

A    I'm not, I'm not sure.

Q    Okay.

A    I need to take a look at that because, that he couldn't follow simple rules?

Q    Uh-huh.

A    I was, I think, my opinion as I have expressed it was that he had difficulty managing various aspects of his life.

Q    Okay.

A    And that's reflected in those particular adaptive functioning deficits, yes.

Q    Okay.  And you knew that Mr. Bourgeois was an over-the-road truck driver?

A    That's correct, yes.

Q    Would often be on the road for weeks at a time?

A    Yes.

Q    And often by himself?

A    Yes.

Q    And he would have to negotiate his way from Florida to California and back to North Carolina or wherever his routes took him?

A    Yes.

Q    All right.

A    If he was --

Q    And he'd have to make deliveries?

A    If he was an over-the-road driver he would have to do that, yes.

Q    And arrange pickups, comply with all the Department of Transportation requirements, all the safety rules, all the driving rules?

A    I don't know all of those but I will accept those if that's what you say.  I don't know that.

Q    It's not just a cross-country jaunt, it's a fairly complicated occupation.

A    I assume that there was, there were things that were involved in terms of doing that, that it's not a simple task, yes.

Q    Well, with all his deficits, how was he able to do those things by himself?

A    I don't know that he did them by himself.

        THE COURT:  Do you know that he did not?

        THE WITNESS:  I don't know that he, I --

THE COURT:  Okay.

THE WITNESS:  I am aware of the fact that he had indicated that oftentimes he had people with him because he did not like to be by himself, but I don't know that he was always alone when he navigated those particular, those particular trips that he did.

THE COURT:  Well, being alone and getting help are two different things.  Do you have any, any indication that he had help from other people when he was on the road?

THE WITNESS:  I don't have indication that he had help --

THE COURT:  All right.

THE WITNESS:  -- from people while he was on the road but --

THE COURT:  Thank you.

THE WITNESS:  -- with Dr. Moore he indicated that he had people --

THE COURT:  He did.

THE WITNESS:  -- who taught him how to --

THE COURT:  Because he said he didn't have any support early so he went to people for advice about how to keep records and how to --

THE WITNESS:  Right.

THE COURT:  -- do his tax, he had a tax consultant --

THE WITNESS:  That's what he said.

THE COURT:  -- and he had, you know, these various and other, sundry other people that helped him learn life skills.

THE WITNESS:  That's what he reported, yes.

BY MR. DOWD:

Q   Let me just conclude.  Dr. Toomer, even if there is evidence that the defense attorneys had some indication of childhood abuse or whatever it might be, if they also had the information from Dr. Estrada that Mr. Bourgeois claimed to have an idyllic childhood and also that the one head injury that they had information about, the 1984 accident --

A   Uh-huh.

Q   -- you know, which Dr. Weiner was advised by Mr. Bourgeois about and that turned out to be false, certainly the defense attorneys would have a mixed picture about the viability of putting on some type of mitigation testimony?

MR. WISEMAN:  I am going to object to Dr. Toomer's ability to speak for why the lawyers did or did not do something.

MR. DOWD:  Well, I'm, from a psychological standpoint, Your Honor, I'm just asking if it was a mixed picture.

THE COURT:  If you can answer, that's fine.

THE WITNESS:  Okay.

BY MR. DOWD:

Q   Would you consider that to be a mixed picture?  On the one hand they have their experts providing information that Mr. Bourgeois had an idyllic childhood and the one head injury that they had they learned was false, that it was a made-up story by Mr. Bourgeois, if that was presented, don't you think that's a mixed psychological picture that they would have, psychological evidence to present?

A   Well, if we're talking about suppositions I would say yes, but that's not what I see as being an accurate account of what has existed.

Q   Okay.

MR. DOWD:  Judge, I will pass the witness with that last tortured question.

THE COURT:  Thank you.  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   Dr. Toomer, why aren't you surprised that Mr. Bourgeois reported an idyllic childhood to at least Dr. Estrada?

A   Because oftentimes what you have with this particular disorder is what we call grandiosity where individuals exaggerate certain circumstances, situations and what have

you for a number, a number of reasons.

Q   All right.  And is one of the reasons the concept of denial?

A   Yes.

Q   And just explain briefly what that is and how it applies?

A   Well, the notion is that the individual does not want to acknowledge the reality of what has transpired and in terms of carrying that forth, in carrying that out, what you tend to get is a rejection of the reality in terms of what has taken place and what has occurred, and so you oftentimes get this kind of phenomena occurring and it continues in terms of how the individual presents, how he is capable of managing situations and what situations happen to be.

Q   And an adult survivor of childhood abuse who engages in denial, is an aspect of that related to their management of the psychological pain that the abuse causes them?

A   Sure.  Denial is a useful phenomena.  It has been found to be very useful in terms of individuals protecting themselves from the effects of trauma that they have been exposed to, and it has been found to be a ready, it has been found to be a device that is readily available to the individual in terms of trying to cope with the variety of stressors that he may have encountered or might be encountering at the time.

Q   And finally with regard to denial, from the perspective

of a forensic expert hired by the defense, when you encounter denial and you suspect that there's abuse, how do you break through that?

A   Well, one of the ways that you try to break through that is by getting corroboration of versions of events from a variety of sources and we rely on corroboration as part of the clinical assessment.

Q   Mr. Dowd asked you questions about Mr. Bourgeois' facility with taking the MCMI instrument?

A   Yes, yes.

Q   Is the MCMI a test for mental retardation?

A   No.

Q   And would you ever use it to diagnose the presence or absence?

A   No, you wouldn't.

Q   Do you derive any useful information from the fact that he took the test and it was a valid administration?

A   No.

Q   Mr. Dowd asked you about other siblings who also had abandonment issues in their lives.  Are you aware of any of the other siblings, whether they suffered organic brain dysfunction or a low IQ?

A   No, I am not.

Q   And could those additional factors in Mr. Bourgeois explain why his life might have taken a different course?

A    Yes, you would have to consider the totality of the data with regard to each one.

Q    Mr. Dowd, who I am certainly not going to get next to on the road any time soon --

THE COURT:  Are you driving back to Houston?

MR. WISEMAN:  My son just moved there so I might be someday.

BY MR. WISEMAN:

Q    But the, I think the point of Mr. Dowd's questions was, well, why wasn't he stressed out by someone, you know, cutting him off on the highway or, you know, why didn't he act out then, and I want to read you a couple of sentences from the DSM-IV TR, page 707, which is the section on borderline, and ask you to agree or disagree.  Quote, "The anger of the borderline is often elicited when a caregiver or a lover is seen as neglectful, withholding on caring or abandoning.  Such expressions of anger are often followed by shame and guilt and contribute to the feeling that they have of being evil.  During periods of extreme stress, transient paranoid ideation or dissociative symptoms may occur."  So why doesn't Mr. Bourgeois go into a rage when he gets cut off but he goes into a rage when he thinks his wife is being, is cheating on him?

A    Because, as we indicated before, the event that creates the disruptive behavior is the event that serves as a

catalyst to remind the individual of the unresolved emotional issues that come from his having been brought up in a dysfunctional and traumatic environment.

Q   You were asked whether you saw other instances of violence in his background.  I would ask you about the, and Ms. Kaib is going to be testifying as soon as you are done, did you see violence reported from the women that he was married to?

A   Yes, I did.

Q   Violent rages?

A   Yes.

Q   Followed by periods of tenderness?

A   Yes.

Q   And a cycle that repeated?

A   The cycle was repeated, yes.

Q   You mentioned that brain scans can show the damage that can be caused by the type of abuse Mr. Bourgeois suffered. My question is would it necessarily show up on a brain scan?

A   It doesn't always have to, but it does.

Q   And what types of scans are we talking about here, x-rays, PET scans, functional MRIs, what are we --

A   We're talking about MRIs.

Q   Okay.

A   Yes.

Q   Last, when you talked to Claudia -- withdrawing.

Mr. Dowd asked you about this incident with Claudia Williams getting a phone call about put your black dress on, you know, suggesting that that was evidence of premeditation.  Did you learn anything else about that phone call?

A   I don't recall offhand.

Q   Okay.  You have recalled quite a bit, so I will give you a --

A   Yes.

Q   I'll give you a pass on that one.

A   I don't recall offhand, no, not regarding that.

Q   That's all I have.  Thanks very much.

        THE COURT:  Thank you, sir.

        THE WITNESS:  Thank you.

        THE COURT:  I think you have got round three coming up here.

        MR. DOWD:  Your Honor, I just have a few follow-up questions.

        THE COURT:  Okay.

                RECROSS-EXAMINATION

BY MR. DOWD:

Q   Doctor, I may not have been fair earlier, I asked you about some factors of schizoid personality disorder.

A   Yes, uh-huh.

Q   And I want to show you something here.  Are you aware, are you familiar with Mental Retardation Definition,

Classification and Systems of Support, Ninth Edition,

American Association of Mental Retardation?

A    Yes, that's the --

Q    Okay.

A    That's not the latest edition, is it, because the name,

the nomenclature has been changed.

MR. DOWD:  Your Honor, may I have just one second?

THE COURT:  Yes.

(Mr. Dowd and Mr. Roberts conferring off the record)

BY MR. DOWD:

Q    All right, let me correct myself.  I am going to show you

what has been marked as part of the DSM-IV, and that

describes -- I hope, this is not a real good copy -- and it's

marked as Government Exhibit Number 201.  I think this is

going to be a court demonstration exhibit, but it shows --

let me see if I can bring this up.  It shows some of the

factors that the DSM-IV describes as typical of the schizoid

personality disorder.

A    Yes.

Q    Do you agree with those?  Do you recognize those as --

A    I recognize these, yes.

Q    -- the accepted --

A    Yes.

Q    -- tendencies of that disorder?

A    These are some of them, yes.

Q    All right.  And you had indicated earlier that, I think on several of those, at least you said not necessarily or --

A    Correct, yes.

Q    But these are actually the accepted tendencies of this disorder, correct, in your field?

A    Well, here's the situation:  Yes, the DSM-IV TR is designed to provide a basis for individuals across mental health professions to communicate with one another.

Q    Uh-huh.

A    But you have to also keep in mind that the DSM-IV TR does not deal with the etiology of the mental illness, it does not deal with the theory of the mental illness --

         THE COURT:  Well, doesn't it have to do with the symptoms?  That's the presentation, I think that's what he's talking about.

         MR. DOWD:  Yes, Your Honor.

         THE WITNESS:  Well, he asked me did I agree with all of them.

         THE COURT:  Well, any of them?

         THE WITNESS:  Because I said, because I said yes and maybe to some of them.

         THE COURT:  Got it.

         THE WITNESS:  And so I am explaining why I said yes and maybe to some of his answers, some of his questions.

BY MR. DOWD:

Q   All right, but those, that presentation that's described there, that's actually the accepted presentation of that disorder?

A   Those are some of the accepted issues --

Q   Okay.

A   -- with respect to that particular disorder.

THE COURT:  Is that going to be admitted?

MR. DOWD:  Your Honor, I'm just going to use it as a trial exhibit, it's Exhibit Number 201.

THE COURT:  Well, are you going to read them off?

MR. DOWD:  Okay.

THE COURT:  I mean shouldn't it be admitted?

MR. DOWD:  I will offer it, Your Honor.  Just --

THE COURT:  Never mind.

MR. DOWD:  It's a sectional thing, I can just offer this one page.  We would offer Government's Exhibit Number 201 so I don't have to read it.

MR. WISEMAN:  No objection.

THE COURT:  Government Exhibit 201 is admitted.

(Government's Exhibit 201 admitted into evidence)

THE COURT:  And, Mr. Wiseman, I don't think you admitted the one you read off also about -- well, yes, you did because you read it, you read it in.

MR. WISEMAN:  We will get you a copy of it as well.

THE COURT:  That's okay, you read it in.

MR. WISEMAN:  Okay.

THE COURT:  It was one of those do you admit or not, do you agree or not agree.

MR. WISEMAN:  Okay.

BY MR. DOWD:

Q   And then, Doctor, you indicated that the MRI was the test that could --

A   It's one, yes.

Q   Oh.  What other tests can they use to demonstrate brain damage on the basis --

A   They could do a --

Q   -- of child abuse?

A   They could do a scan or whatever but the MRI, apparently, that's not a specialty of mine but my understanding from experts that I have spoken with, that the MRI tends to provide the greatest clarity in terms of, in terms of designating areas of change.

Q   All right.  And what is the actual brain structure that is changed or is different in someone with brain damage from child abuse?

A   Oh, it depends on the particular, on the particular individual, but the, my understanding is, from the research that I have read, that the portion of the brain is the, is the portion of the brain that is involved with areas such as

impulse control, frontal, you know, frontal lobe kinds of issues and what have you.

Q   Well, I am really asking more structurally how it appears, what parts of the brain appear to be changed.  I am not talking about how it's developed in, or how it results in behavior change, I am talking about the actual structure of the brain.

MR. WISEMAN:  Your Honor, I am going to object.  I think Dr. Toomer has said he may be at the limit of his expertise, he's read some literature on it.  I don't know that he can really answer those questions.

THE COURT:  Well, let's see if he can.

MR. WISEMAN:  Okay.

THE COURT:  If he can't, if you don't, if you can't answer these, don't answer.

THE WITNESS:  Yeah, I can't answer the question.

THE COURT:  Okay.

BY MR. DOWD:

Q   And so you don't know if there's tests or scans that can be done to determine whether or not there's brain damage on the basis of child abuse?

THE COURT:  I thought you said earlier, I thought he said something earlier it would show up on an MRI or a PET scan or a CAT scan or something.

THE WITNESS:  Yes, yes.

THE COURT:  Okay.  Is that what you asked before?

MR. DOWD:  But, Your Honor, I am trying to figure out the level, his, the level of his limitation.

BY MR. DOWD:

Q   You are convinced that there are tests that do that but you just don't know all the --

A   Oh, no, this is, I think I was misunderstood.  What I am saying is that if you expose an individual, an individual who was exposed to that particular kind of traumatic, erratic, unpredictable environment, that individual lives in a state of hyper-vigilance constantly.  As a result of that, being exposed constantly on an ongoing basis, that results in certain physical changes to the brain --

THE COURT:  That's what I understood you to say.

THE WITNESS:  -- that show up on an MRI.

THE COURT:  Yeah, that's what he said.

BY MR. DOWD:

Q   Right.  That show up on a -- right.

A   But it's, but I don't know of individuals who would use that just to see if someone had been abused as a child.

THE COURT:  The doctor that testified, I don't know about the abuse but the doctor that testified the Friday before said that he worked with neurologists and the like because they would find the lesion and he would say or he would help them determine where the lesion was --

THE WITNESS:  Where the lesion was, yes.

THE COURT:  -- based on various testing.

THE WITNESS:  Exactly, yes.

THE COURT:  So I assume that you would work together with someone like that?

THE WITNESS:  Yes.

MR. DOWD:  That's all I have, Your Honor.  We'll pass the witness.

MR. WISEMAN:  Nothing further.

THE COURT:  Thank you, sir.  Now you can go.

THE WITNESS:  Thank you, Judge.

THE COURT:  How late do you-all want to go?  You want to call your next witness?

MS. LARIN:  We have one more witness.

MR. WISEMAN:  Yeah, that would be helpful.

THE COURT:  Good.  Go right ahead.

MR. WISEMAN:  Tomorrow is a busy day.

THE COURT:  Pardon?  Is it?

MR. WISEMAN:  Oh, yes.

THE COURT:  Okay.  Who is the next witness?

MS. LARIN:  She's coming, Your Honor.  Her name is Kathy Kaib.  She's the mitigation expert.

THE COURT:  Oh, okay.  That works in your office?

MS. LARIN:  Yes.

THE COURT:  Okay, thanks.

MS. LARIN:  And if you don't mind, I am going to use my computer.

THE COURT:  That's why the podium is there.

MS. LARIN:  Okay, great.

THE COURT:  And there's an electrical outlet there also and a modem.

MS. LARIN:  I won't be here that long.  Hopefully we can just rely on the battery and I will be done.

THE COURT:  Okay.  How many more experts did you want to testify today, do you know?

MS. LARIN:  This is it.

THE COURT:  This is it?  Okay, good, so we're on schedule.

MS. LARIN:  Yes.

THE COURT:  Okay.

MS. LARIN:  We're on schedule for a long day.

THE COURT:  Pardon?

MS. LARIN:  For a long day.

THE COURT:  No, no, I want to make sure that we've got the time that we've given you, all the time you need.

MS. LARIN:  We're working on it.

THE COURT:  How many tomorrow witnesses do you have?

MS. LARIN:  Wait a minute, we've got it.  We have Dr. Cunningham.  We have Dr. Cunningham.  We have many family members.

THE COURT:  Okay.

MS. LARIN:  Probably about eight family members.  Dr. Cunningham.

MR. ABREU:  Elizabeth Johnson is scheduled to testify tomorrow.  Dr. Dailey.

THE COURT:  Could you come forward, please, ma'am.

THE CLERK:  Please raise you right hand.

THE COURT:  How late do you-all want to go tonight?  You want to finish this witness?

MR. WISEMAN:  I think we can finish her.

THE COURT:  Anybody else?

MS. LARIN:  No one else.

MR. WISEMAN:  No, no.

THE COURT:  Okay.

KATHLEEN KAIB, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  And I gave the Government a day and a half?

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Yes.

THE COURT:  But I read, you know, tonight I will do the other two hours of Price 1 and 2.  And would you-all, somebody offer me the Estrada deposition so I can --

MR. WISEMAN:  Yes, we'll do that as soon as Ms. Kaib is done with it, we'll admit that.

THE COURT:  Okay, thanks.

DIRECT EXAMINATION

BY MS. LARIN:

Q    Good evening, Ms. Kaib.  Can you please state your name for the record?

THE COURT:  Finally.

MS. LARIN:  I am a beginner so I do these things.

THE WITNESS:  Kathleen Kaib, K-A-I-B.

BY MS. LARIN:

Q    And, Ms. Kaib, what is your occupation?

A    I am an investigator and a mitigation specialist with the Federal Defender, Capital Habeas Unit in Philadelphia.

Q    And that means you work in my office?

A    Correct.

Q    And how long have you been working there?

A    For seven years, since 2003.

Q    And prior to that where did you work?

A    I worked at the Women's Law Project, which, as a social worker, which is an agency that deals mostly with domestic relations issues such as helping women with domestic violence, child support, divorce issues.

Q    Okay.  And can you just tell us briefly your education history?

A    I have a master's in social work from Bryn Mawr and I also have a master's in law and social policy from the same institution.

THE COURT:  From where?

THE WITNESS:  Bryn Mawr.

THE COURT:  Okay, thank you.

BY MS. LARIN:

Q   And are you a licensed social worker?

THE COURT:  Oh, you know, after all the problems with the microphones, could you actually use a, move a little closer?  Sometimes I find that if you put your right arm on the shelf there it leans you into the microphone.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

BY MS. LARIN:

Q   I am doing the same thing with it.  Would you like me to repeat anything?

A   No.

Q   Okay.

A   I am licensed in the state of Pennsylvania.

Q   As a social worker?

A   Yes.

Q   Okay.  And can you please identify this document?  It's marked as, it will be marked as P24.

MS. LARIN:  I think I do need a marker.

MR. WISEMAN:  I know.

THE COURT:  Do you have a marker for her, Ms. Scotch?

BY MS. LARIN:

Q    This is marked as P24.  Can you identify this?

A    That's my CV.

        THE COURT:  Do you want to offer it?

        MS. LARIN:  I would like to offer her CV and I would --

        THE COURT:  Any objections?  Sorry.

        MR. ROBERTS:  No objections, Your Honor.

        THE COURT:  P24 is admitted.

    (Defendant's Exhibit P24 admitted into evidence)

        THE COURT:  I'm sorry I interrupted you.

        MS. LARIN:  No, thank you.

BY MS. LARIN:

Q    And in addition to your years of experience do you regularly attend trainings in the field of social work?

A    Yes, as well as mitigation training.

Q    Okay.  And have you presented at any conferences about mitigation?

A    I have.

Q    And have you testified in court before?

A    Yes, both in State and Federal Court.

Q    And have you been qualified as a mitigation specialist and as a social worker?

A    Yes.

Q    Or in the field of social work I guess.

MS. LARIN:  Your Honor, I would like to offer Ms. Kaib as an expert in forensic social work and as a mitigation specialist.

THE COURT:  What is -- I don't know what that means, but is there any objection?

MR. ROBERTS:  Yes, Your Honor.  I'm not sure she is qualified to be a forensic anything at this point.

MS. LARIN:  You know, this came up before.  How about just in the field of social work?

THE COURT:  Could you, as a social, as a field of social work --

MS. LARIN:  And as a mitigation specialist.

THE COURT:  Any objection?

MR. ROBERTS:  To social worker, no, Your Honor.

THE COURT:  Okay.  I don't know about mitigation because I don't know what that means.  I mean I know what it means but I don't know if she's -- visit with Mr. Wiseman just for a second.

MS. LARIN:  Okay, thank you.

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  How about we --

THE COURT:  Why don't I accept her as a social worker and then you can talk to her about mitigation and see what --

MS. LARIN:  Okay.

THE COURT: So then you can help me.

MS. LARIN: Okay.

BY MS. LARIN:

Q    Maybe we can start there.  Can you please tell us, Ms. Kaib, briefly what is, what does a mitigation specialist do?

A    A mitigation specialist is usually part of the defense team and their job is to, different things but to collect records and things of that nature on the client's life, spend time with the client so they can tell you about their life history, and then go talk to the family members, teachers, and other important people in their life to begin to gather a social history that can be presented to the defense team that can then be given to other experts such as psychologists, psychiatrists and neuropsychologists.

Q    And on that note, are you familiar with Dr. Toomer?

A    Yes, I have worked with him several times.

Q    And has he relied on your work before?

A    Yes.

Q    And you have collaborated together in developing a social history?

A    Yes, several times.

Q    And at our request did you conduct an interview of Mr. Bourgeois' ex-wives and ex-girlfriends?

A    I did.

Q    And what was the purpose of those interviews?

A    Basically to gather, to do a mitigation interview, and what that entails is to ask questions about family violence, childhood functioning, adult functioning, mental health issues, any issues of childhood abuse or childhood neglect, and just daily functioning and also just a general social history.

Q    Okay.  And what in general did you learn from these women?

A    I learned that he had, he had volatile relationships with these women, they --

MR. ROBERTS:  Your Honor, I am going to object. It's hearsay and she's an investigator, she's a member of the trial team.

THE COURT:  Sustained.

MS. LARIN:  Your Honor, if I could just respond. One of the issues of this case is about ineffective assistance of counsel and whether they used their mitigation experts, so in part I would like to present Ms. Kaib to present what she could have provided trial counsel if they had utilized their mitigation experts.  And then the point is you take that information and you follow up and you provide it to a mental health expert.  So it's kind of hard to get that information and if we can't, so maybe it's something like, you know, not offering it necessarily for the substance

but for the process that she went through.

MR. ROBERTS:  Your Honor, she basically went around and interviewed a bunch of witnesses and now she wants to come here and tell the Court what she found out in her investigation and it's all hearsay and it's unreliable and we've got, or at least one of the affidavits that they submitted we found out is not reliable and we are going to be presenting evidence with regard to that, so I would object to her entire testimony.

MS. LARIN:  Can I respond just one more time?

THE COURT:  Okay, let me think, let me think --

MS. LARIN:  Okay.

THE COURT:  -- how to do this.  It's late, I'm tired.

MS. LARIN:  Yeah, I know.

THE COURT:  Okay, so let me think.

MS. LARIN:  I do have one more thing to add, if you --

THE COURT:  Okay, let me think about this, because I understand that -- I wonder if she could just say, if she can form an opinion.

MS. LARIN:  Well, she is a social worker and she did do interviews.  We could go two ways.  She's a social worker, she did interviews, she has been accepted as a social worker and that's what they do, or we could say it's not being

offered for the truth. therefore it's not really hearsay.

THE COURT:  The -- whatever I --

MS. LARIN:  So it's, both accomplish something in this case.

THE COURT:  Whatever I allow in from her I am going to balance it with this:  There was quite a bit of information that several of these witnesses were frightened to come forward at the time of trial that I think was very reliable.

MS. LARIN:  Yes.

THE COURT:  And so if they have something positive to say about Mr. Bourgeois, I am going to view it in that light.  Do you understand?

MS. LARIN:  Yes.  And on the same note, it's another reason why we would rely on Ms. Kaib to present whatever information for whatever value it is rather than asking them to come in today to testify.

THE COURT:  I don't understand why you wouldn't ask them to come in and testify.

MS. LARIN:  Why I would?

THE COURT:  Why you would not.

MS. LARIN:  Well, I thought you just said that they were, might be fearful and --

THE COURT:  Well, are they still fearful?

MS. LARIN:  I don't know.  I was just following up

with you.

THE COURT:  But I mean is this something new that I didn't know at time of trial?  Or that the lawyers would not have known at time of trial, because I knew --

MS. LARIN:  No, the lawyers could have known this. And I think when you hear --

THE COURT:  I mean if I knew it --

MS. LARIN:  -- when you hear --

THE COURT:  -- they had to have known it, right? Because that's where I would have gotten it.

MS. LARIN:  Really, what this, there's many reasons that we wanted Ms. Kaib to testify but part --

THE COURT:  What would they, tell me what the value of it would have been?

MS. LARIN:  Well, one is as an example of what, how a lawyer could have used a mitigation expert, and in this case --

THE COURT:  Tell me how.  Just, why don't you make an argument about it.

MS. LARIN:  Okay.  So Dr. Toomer --

THE COURT:  If she testifies hypothetically the following --

MS. LARIN:  Yes.

THE COURT:  -- that there was a lot of abuse with the girlfriends --

MS. LARIN:  Right.

THE COURT:  -- and the ex-wives --

MS. LARIN:  And it supports a finding of borderline.

THE COURT:  -- what would that mean?  It would what?

MS. LARIN:  It supports Dr. Toomer and Dr. Estrada's testimony about borderline personality disorder.

MR. ROBERTS:  Your Honor, we don't have any problem with borderline personality disorder.

MS. LARIN:  It's not the only evidence, but --

MR. ROBERTS:  In fact, we have acknowledged that that exists, so this is cumulative if that's the purpose of it.

THE COURT:  Then I will accept that proffer.  Is that all right?

MS. LARIN:  Can I just consult with counsel?

THE COURT:  Would you talk with Mr. Wiseman?

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  Thank you.  He missed the whole thing.

MR. WISEMAN:  I'm sorry, Your Honor.

MS. LARIN:  He was so busy thinking, he missed what you said.

THE COURT:  What I, she has been objected to because of hearsay.  I don't have experience with mitigation experts.

MR. WISEMAN:  Right.

THE COURT:  So I don't know if there's a science

that qualifies them to do that.  I don't know if that's a recognized science or if it's a recognized area of expertise.  It seems like a recognized area of kind of hearsay.  So my suggestion to your, for your client was that I would hear a proffer from Mr. Bourgeois that corresponds to what I understood at the trial time that these, that she would testify, if allowed to testify, that these girlfriends and ex-wives would testify about domestic abuse from Mr. Bourgeois.

MS. LARIN:  And volatile relationships.

THE COURT:  And volatile relationships, which I think I know from him and I think I know from the trial.

MR. WISEMAN:  Yes.

THE COURT:  So I will accept that proffer.

MR. WISEMAN:  Okay.  And that's fine.  I would just point out that --

THE COURT:  And that, and the whole reason, then you can argue in your closing arguments what that would have done to benefit Mr. Bourgeois at time of trial.  Isn't that the point of this?

MS. LARIN:  Yes.  I mean there's a little bit more information that she --

THE COURT:  Tell me what it is.

MS. LARIN:   She also --

THE COURT:  What do you want her to say?

MS. LARIN: -- as a proffer, she was also going to testify that some of these women told her that Mr. Bourgeois told them, pre-trial and pre-offense, that he was abused as a child. And also, in her interviewing she noted some evidence of some adaptive deficits that she then brought back to us and encouraged us to retain a mental, an expert in mental retardation. So there were two other areas.

THE COURT: Any objection to this proffer?

MR. ROBERTS: The first part I don't have a problem with, Your Honor. The second part with regard to her having, coming back and giving them information for adaptive functioning, I have a, I do have an objection to, Your Honor.

MR. WISEMAN: And, again, Your Honor, it's not being offered for the truth, this is how mitigation specialists work. They come back -- you look at the ABA guidelines, they say you have a mitigation specialist --

THE COURT: Okay, okay, look, I am just going to accept this proffer as some information that she received, truth or not truth --

MS. LARIN: Right.

THE COURT: -- of the information.

MS. LARIN: Exactly.

THE COURT: That you think that her trial attorney should have found out with proper investigation.

MS. LARIN: Exactly.

THE COURT:  That that's what this is for.

MS. LARIN:  That's exactly what it's for.

THE COURT:  Not for the truth of the matter asserted or that she's an expert in mental health or advising you on whether to get mental health evaluations.

MR. WISEMAN:  Well, I, not to put too fine a point on it but I would quibble a little bit with the last part because in Wiggins v Smith, a 2003 Supreme Court case, they, the Supreme Court relied on and acknowledged the testimony of a mitigation specialist and that was being offered for the truth.  There is an emerging, I should say it's emerged, doctrine that allows such folks to testify.

THE COURT:  Well, okay, let's say, let's say this, that she may be qualified to say to you, "This looks, I have a pretty good suspicion that this may involve some mental retardation."

MR. WISEMAN:  Absolutely.

THE COURT:  And that's what tipped you off.

MR. WISEMAN:  There you go.

THE COURT:  I am just going to accept that.

MS. LARIN:  One of the many things.

MR. WISEMAN:  Okay.

MS. LARIN:  Okay.

MR. WISEMAN:  That's great.

THE COURT:  And then if they want to quibble at a

later date that she's not qualified to do that.  But I really think that each one of us would be qualified to do that.  I am not sure that that's an area of expertise.  I mean having represented almost 150 criminal defendants myself, I was pretty --

MS. LARIN:  And she just gets paid for it.

THE COURT:  I figure I was pretty clever about finding out who I thought was mentally retarded and who ought to be examined.

MS. LARIN:  Uh-huh.

THE COURT:  Or certainly who had a mental health issue as well, so I don't think that that's an unusual thing.

MS. LARIN:  I guess the point is, you know, they had a mitigation expert that they could have relied on if they were helping, if they were working together, and --

THE COURT:  But did they have a mental -- I don't remember saying, authorizing a mitigation expert.

MR. ROBERTS:  Yes, you did, Your Honor.

THE COURT:  I did?

MR. ROBERTS:  You did, Your Honor.

THE COURT:  Well, thank goodness.

MR. ROBERTS:  It's on the record.

MS. BOOTH:  Mr. Bierbaum.

THE COURT:  There you have it.  So I gave them everything they asked for, whatever it was.

MR. ROBERTS:  In fact, Your Honor --

THE COURT:  Even a jury consultant.

MS. BOOTH:  Yes.

THE COURT:  But I kept thinking, gosh, she looks so mature, so she comes up at the end of her thing and said she wanted to talk to me, that she, that her mother went to high school with me and I thought, oh, great.  That was a kick.  Anyway.

MS. LARIN:  So, I am not quite sure how to proceed.

THE COURT:  I think you may be done.

MS. LARIN:  I'm done, okay.

THE COURT:  That would be my guess.  What do you think?

MS. LARIN:  So my proffer was sufficient, is that -- okay.  Thank you very much, Your Honor.

THE COURT:  That was excellent.

MS. LARIN:  Good job, Ms. Kaib.  Glad we flew you down here.  And I think we are done for the day.

THE COURT:  Because I --

MR. WISEMAN:  Your Honor, we're done for the day.  We would offer up the tape of the Dr. Estrada deposition.  Do you want a transcript as well -- we have that -- or just the tape?

THE COURT:  Could I have the transcript?

MR. WISEMAN:  Oh, absolutely.

THE COURT:  I think I am so tired of the videos.  I spent the whole weekend with the videos and I was so glad that there was a mistake with two of the hours.

MR. WISEMAN:  For the record, though, perhaps we should offer the videotape and Your Honor --

THE COURT:  Absolutely.  I think that I would rather -- is it on a CD?

MS. LARIN:  Yes.

THE COURT:  Let me tell you the problem with the CDs.

MS. LARIN:  I think it's on a CD.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  What I had with the CDs for the Government, I had to get our systems people to come over to my house Saturday.

MS. LARIN:  We had similar problems.

THE COURT:  Yeah, and she, you know, downloaded an application so I could watch it.  I don't want that problem again, I'd rather just read it.

MS. LARIN:  Yeah.  So, I think he's looking for the transcript right now, but we have the, we have it all.

THE COURT:  And we can, I certainly will admit the video.

MS. LARIN:  Okay.

THE COURT:  Is there any objection?

MR. ROBERTS:  None whatsoever, Your Honor.

MR. WISEMAN:  Your Honor, I am going to mark then as --

MS. LARIN:  I have no idea.

THE COURT:  Do you know what number we might be up to?

MS. LARIN:  163?  163.

MR. WISEMAN:  Okay.  I'm going to mark as 163 two DVD discs which comprise the deposition of Dr. Estrada, and I want to extend my thanks to the Government for accommodating that, 160 --

MS. LARIN:  Three.

MR. WISEMAN:  163.  And 164 I will mark as the transcript of his deposition.

THE COURT:  Do you-all ever take cases from your office of the actual trials or do you always do the 2255s?

MR. WISEMAN:  We do post-conviction with a limited exception.

THE COURT:  Okay.

MR. WISEMAN:  We can occasionally.

MS. LARIN:  Very limited.

MR. WISEMAN:  Although I am rather busy at the moment.

THE COURT:  You did the video also?

MR. WISEMAN:  Yes, the video and the deposition.
And the transcript.

THE COURT:  163?

MS. LARIN:  163 and 4.

THE COURT:  Petitioner's 163 and 164 are admitted.

(Defendant's Exhibits P163 and P164 admitted into
evidence)

MR. WISEMAN:  Thank you, Your Honor.

(Off the record discussion at counsel table)

THE COURT:  And I will read Dr. Estrada's deposition
tonight, but I would rather not be expected to do the other
two hours of Price tonight.

MS. LARIN:  That is at your leisure, Your Honor.

THE COURT:  Well, I want to do it before he
testifies.  If you can give me sort of a heads up when you
expect.

MR. ROBERTS:  Your Honor, I think Dr. Price is not
going to be on until Wednesday, so, I mean, depending on what
their, the way their case goes, obviously it's not going to
be, we won't be putting our case on --

THE COURT:  What, when do you think you will be
finished?

MR. WISEMAN:  Well, we will probably be finished at
noon on Wednesday and that's what we're shooting for, so
tomorrow's a busy day --

THE COURT:  Do I tell them now?

MR. WISEMAN:  I'm sorry?  Uh-oh.  Tell them about what?  There's something.

THE COURT:  She won't let me tell you, so.  We may have found an extra day.

MR. WISEMAN:  Oh, all right.

THE COURT:  But that doesn't mean you can slow up.

MS. LARIN:  Don't worry.

MR. ROBERTS:  Your Honor, there's also the issue of --

THE COURT:  Or an extra half a day anyway.

MR. ROBERTS:  We might ask to have Dr. Senn taken out of order and --

THE COURT:  Doctor who?

MR. ROBERTS:  Dr. Senn.  He testified at trial.  He was the forensic odentologist.

THE COURT:  Oh, right.

MR. ROBERTS:  And the defense this last couple of weeks had sent us a number of odentology documents.  I had exported those in and all of a sudden Dr. Senn is available, so he is actually going to be present when Dr. Bowers and Dr. Dailey testify.

THE COURT:  When are they going to be testifying?

MR. ROBERTS:  Our understanding was that it would be --

MR. WISEMAN:  Tomorrow.

MR. ABREU:  Tomorrow, Your Honor.

MR. ROBERTS:  And so we would like, if possible and Dr. Senn makes it through this storm, we would ask that he be --

THE COURT:  It's nowhere but right here.

MR. ROBERTS:  We would just ask if there would be an opportunity to take him out of order so he can respond.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  And we will take, I will take that out of their day-and-a-half at the end.

MR. WISEMAN:  Oh, okay.

THE COURT:  If you let your odentologist testify tomorrow --

MR. WISEMAN:  Your Honor, I --

THE COURT:  Then Dr. Senn.  That's what you want to do?

MR. WISEMAN:  I think we have some separate objections to Dr. Senn relating to a rather late disclosure.

THE COURT:  Tell me.

MR. WISEMAN:  Well, we --

THE COURT:  Do you not want to talk about it now?

MR. WISEMAN:  Well, we certainly can.  I mean I thought we agreed that we were going to give 30 days notice

of experts and exchange Rule 26 disclosures and we found out about, Dr. Senn is not the Government's witness list, we've gotten no disclosure, we obviously know who he is but we weren't prepared for him, and then I think on Friday we got an email, an updated witness list, and Dr. Senn was on it.

THE COURT:  Okay, well, give me, if you got more tomorrow, because my initial thinking is it seems a matter of fundamental fairness to let the Government expert respond.  I don't know if that's true or not, I have to think about it.

MR. WISEMAN:  Okay.

THE COURT:  Because what your experts are attacking is his testimony at trial by saying, defense counsel, you should have known what they are going to testify to already.

MR. WISEMAN:  And we wouldn't have had a problem with him testifying, it's just that we, you know, we prepared and didn't know he was going to testify.  Mr. McHugh, who is as diligent as the day is long, is staying up nights preparing for him and I just don't know that he's going to be ready to the level that he is used to, so.

MR. McHUGH:  And, Your Honor, they have known about Dr. Bowers and Dr. Dailey for years and they never noticed Dr. Senn as testifying in this hearing until Thursday at the end of the day, and that's when they sent us an updated witness list, at the very end of it was Dr. Senn.  Over the weekend is when we got, Mr. Wiseman got the Rule 26

compliance, which I don't know is even compliant.

THE COURT: Well, you know what, I can think of a punishment to do then. You put on one odentologist, Dr. Senn goes next and you save your best shot to attack whatever he says newly.

MR. McHUGH: Well, we only have one odentologist.

THE COURT: Oh, okay.

MR. McHUGH: That's Dr. Bowers. Dr. Dailey is an odentologist but he was a fact witness at the time of trial that was contacted by the Government and gave an opinion that they could not exclude or include either of the, any of the three. Our odentologist is Dr. Bowers that was retained by the defense for the purposes of this hearing. Dr. Dailey will be brief. The Government is aware of his affidavit, they have had that for years, and he will testify to his opinion, but the Government got that opinion from him. He wasn't retained by us, he was retained by the Government. Dr. Bowers is our one odentologist.

THE COURT: Well, then it might be appropriate to put Dr. Senn before your odentologist.

MR. WISEMAN: Well, Your Honor, that raises some logistical issues. We've got an, tomorrow is the longest day for us, we've got oral all-day witnesses, we have Dr. Cunningham, Dr. Johnson, Kerry Brown, Professor Holden, Bowers and Dailey, so I mean we've got, I don't know how

we're going to get them all in to begin with and --

MR. ROBERTS:  Your Honor, this has kind of gotten out of proportion here.  Dr. Senn's only purpose in being here is to respond or rebut anything Dr. Bowers says about him.  He has been --

THE COURT:  Well, that's fair.

MR. ROBERTS:  He submitted --

THE COURT:  I am just giving you an option of when to, you know, if they don't want to take him out of order, if they're not going to let you take him out of order, I can tell you that you can take him out of order.

MR. ROBERTS:  And there's nothing --

MR. McHUGH:  And, Your Honor, if I may --

MR. ROBERTS:  If I can finish, just briefly.

MR. McHUGH:  Sorry.

MR. ROBERTS:  There's nothing substantive new that Dr. Senn is going to bring in.  We have --

THE COURT:  Well, that's good.

MR. ROBERTS:  We brought, we gave his report, we submitted the report, the April 20th statement, and that's his report.

THE COURT:  Okay.

MR. ROBERTS:  And so he's just here in case Dr. Bowers says something that he needs to rebut, particularly from a professional standpoint.

MR. McHUGH:  But, Your Honor, Dr. Senn and the Government has had Dr. Bowers' report talking about Dr. Senn for a couple of years and on Thursday night they tell us they are calling Dr. Senn.  And over the weekend they provided us with what they purport to be Rule 26.  It has no listing of any of his testimony in the last four years, which I understood was the Court's order.

THE COURT:  It is.

MR. McHUGH:  And I have not got that, and I am supposed to cross-examine Dr. Senn, even though they have had Dr. Bowers' compliance with Rule 26.

THE COURT:  And looked up all the depositions and all the other things.

MR. McHUGH:  Exactly.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, that's not exactly correct.  Dr. Senn's CV, his biography that lists all the cases he's testified on, all that was given to them.  They are in exhibits that we have given to the other side, we sent them those, and the only reason --

THE COURT:  When did you send them those?

MR. ROBERTS:  It would have been, it was last week. But the only reason this all came up was because we were given about ten exhibits within the last two weeks that dealt with odentology and when we started looking through them, I

sent them to Dr. Senn and said, "What are these?"

THE COURT:  Is this right?

MR. McHUGH:  Your Honor, what those exhibits are, are articles that Dr. Bowers will be testifying to that were cited in his report.  These are, some of the articles are new that were provided to the Government.

THE COURT:  Okay, everybody's doing new stuff, Dr. Senn is going to testify, get ready.

MR. McHUGH:  I understand that but, Your Honor, his CV, I don't have it.  It's not marked as an exhibit for this hearing, as far as I can see, from the Government.  I have not had any opportunity to review any of his transcripts.  They have had years to prepare for Dr. Bowers.  So I bring that to the Court's attention on Thursday night and now they are asking to take him out of order.

THE COURT:  We are not going to take him out of order.  He will go with the Government's time, so you have time to prepare.

MR. McHUGH:  Thank you, Your Honor.

THE COURT:  Are there new updates to his CV?

MR. McHUGH:  I don't know what CV they are talking about because it's not listed as an exhibit of the, that the Government has provided us, as far as I know.

THE COURT:  Okay, hold on.

MR. ROBERTS:  Dr. Senn's CV is at Government Exhibit

173.  Dr. Senn's biography is at 174.  We did provide an additional Rule 26 just to show what information he reviewed in order to get ready for his report but, again, he wasn't being offered as a new witness, and that was in Government Exhibit 171.  So 171, 172 was his report that we offered in April, and then 173 is his CV and 174 is his biography that -- and within that information is listed the cases that he has testified.  And I can go back and pull the emails if the Court's really concerned about when all this information came out, but there's nothing the Government did --

MR. McHUGH:  I have not received them.  I have no, if the emails were sent but I personally did not receive these emails, I don't know when they were sent.  I mean they noticed him Thursday night, so it wasn't sent subsequent to Thursday night?

MR. ROBERTS:  Yes, it was.

MR. McHUGH:  And we traveled on Sunday.

THE COURT:  Don't you travel with your email?  I never go anywhere, I never go anywhere without it.

MR. McHUGH:  It's, the email has been a little spotty because of the storms, I believe, but --

THE COURT:  No.

MR. McHUGH:  If we got it --

THE COURT:  No.

MR. McHUGH:  Well, what I am saying, Your Honor, is

to give me their, his prior testimony, I am preparing for my witnesses and to give me his prior testimony and give me Friday, well, we didn't get it until the weekend.

THE COURT:  When did you send it to them?

MR. ROBERTS:  Your Honor, I am going to have to pull the email up but it was, we sent it to Michael Wiseman and --

MR. McHUGH:  On Saturday.

MR. ROBERTS:  And it was not on Saturday.  It was, the documents were sent --

MR. WISEMAN:  My head's spinning.  I think it was Friday or Saturday, I don't remember exactly.

THE COURT:  Okay.

MR. WISEMAN:  I mean the point is, is that it's been within the last couple of days.  And, you know, I forwarded it to Mr. McHugh and I don't know if he --

MR. McHUGH:  And to be able to pull testimony in that short a time is just not possible.  I respect the Court's ruling that he will not be taken out of order and I will do the best job I can if he's called within the Government's case.

THE COURT:  What is his recent testimony?  What's he done?

MR. ROBERTS:  In fact, Your Honor, most of it's, he travels around teaching and he's not really in court that often.

THE COURT: Well, what cases has he done since he testified in here?

MR. ROBERTS: I'm going to have to look it up, Your Honor, I don't have it with me. At page 19 on his CV, which again is Exhibit 173, he lists Texas versus Comorna in April of '08. He's got a case in October of '07, Texas versus, that's a lot of names. And then Texas versus Villa in January of '06.

THE COURT: Okay, Mr. Roberts, let's see, this is Monday night, you put somebody on that all day tomorrow to get that testimony. It's easier for you to get it, I think, than the petitioner. It should be all transcribed somewhere with some district attorney, don't you think?

MR. ROBERTS: I would think, Your Honor. Again, he's not coming in to give substantive testimony.

MR. McHUGH: Your Honor, he's testifying --

THE COURT: Please, don't argue. We are all on the same page. Take a deep breath, and he's going to get the testimony. Maybe. What else?

MR. WISEMAN: That's all, I think.

THE COURT: Thank you all very much, you are excused.

(The proceedings adjourned at 6:11 p.m., continued to 9-21-10)

INDEX


WITNESSES
FOR PETITIONER/DEFENDANT:

|                       | Direct | Cross | Redirect | Recross |
|-----------------------|--------|-------|----------|---------|
| Dr. Victoria Swanson  | 7      | 110   | 171      |         |
| Dr. Donald Weiner     | 198    | 247   | 263      |         |
| Dr. Jethro Toomer     | 270    | 325   | 364      | 369     |
| Kathleen Kaib         | 379    |       |          |         |

EXHIBITS

|                                                                      | Admitted |
|----------------------------------------------------------------------|----------|
| Petitioner/Defendant's:                                              |          |
| P24   CV of Kathleen Kaib                                            | 381      |
| P28   CV of Dr. Toomer                                              | 271      |
| P29   Report of Dr. Weiner, 3/3/04                                 | 268      |
| P29A  CV of Dr. Weiner                                              | 199      |
| P33   Supplemental Report, Dr. Swanson, 8/12/10                    | 109      |
| P34   Raw Data, Dr. Swanson, 3/25/09                               | 109      |
| P35   Additional Raw Data, Dr. Swanson                             | 109      |
| P36   CV of Dr. Swanson                                             | 7        |
| P136  Materials Relied Upon, Dr. Swanson                           | 109      |
| P154  Chart of Ranges for WAIS-IV/WAIS-III                         | 268      |
| P155  Comparative Chart IQ Testing, Dr. Weiner/ Dr. Gelbort        | 109      |
| P156  Dr. Weiner's File                                             | 268      |
| P159  Phrase written by Mr. Bourgeois dictated timed by Dr. Swanson | 109      |
| P160  Intellectual Disability, Definition, Classification and Systems of Support, p43 | 109 |
| P161  Phrase written by Mr. Bourgeois prompted by Dr. Swanson      | 109      |
| P162  Report of Dr. Price                                          | 184      |
| P163  Oral and Videotaped Deposition of Dr. Estrada               | 396      |
| P164  Transcript - Deposition of Dr. Estrada                      | 396      |
|                                                                      |          |
| Respondent/Government's:                                            |          |
| 175   Swanson Report                                               | 115      |
| 201   Diagnostic Criteria for 301.20 Schizoid Personality Disorder | 372      |

408

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


    /s/ Judith M. Garcia                    November 5, 2010

3

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     SEPTEMBER 21, 2010
                                   *     8:00 A.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 2

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             MR. MARK MICHAEL DOWD
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:              MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

(The proceedings began at 8:00 a.m.)

(Call to Order of the Court.)

THE COURT:  Thank you.  You may be seated.  Are you all ready?

MR. WISEMAN:  Yes, Your Honor.

MS. LARIN:  Good morning, Your Honor.

MS. BOOTH:  I'm having trouble with him, Your Honor.

THE COURT:  I knew you were going to have trouble with him.

MS. BOOTH:  Yeah.

THE COURT:  Ready?

MS. LARIN:  Good morning, Your Honor.  I'd like to call Claudia Williams, please.

THE COURT:  Okay.  Could you come forward, please, ma'am.

CLAUDIA WILLIAMS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Ms. Williams, can you please state your name for the record?

A.   Claudia Williams.

MS. LARIN:  Should she lean forward?

BY MS. LARIN:

Q.   Can you just lean a little forward?  But be careful not to touch the microphone.

A.   Yes.

Q.   And if, maybe if you put your right arm and just lean a little bit.  Okay.

THE COURT:  Thank you, ma'am.

THE WITNESS:  Thank you.

MS. LARIN:  I stole your line.  Sorry.

THE COURT:  Perfect.

BY MS. LARIN:

Q.   And how are you related to Mr. Bourgeois?

A.   That's my brother.

Q.   Are you older or younger than him?

A.   I'm older.

Q.   And how many siblings do you have?

A.   Seven.

Q.   There's seven children?  There's seven of you?

THE COURT:  Are there eight of you altogether is what you're saying?

THE WITNESS:  Seven.  My mom had seven children.

THE COURT:  Okay.  You said, "How many siblings?"

MS. LARIN:  Yeah.

THE COURT:  Never mind.

MS. LARIN:  So to clear that up, I have put together this little demonstrative aid.  It's parked P-166.  And I don't think the Government has an objection.

MS. BOOTH:  No, we don't, Your Honor.

MS. LARIN:  And it might just help things move along.

BY MS. LARIN:

Q.   So Claudia, I understand you're the oldest sibling?

A.   Yes.

Q.   Your mother's first child?

A.   Yes.

THE COURT:  Please refer to people by their last names.

MS. LARIN:  Oh, I'm sorry.

BY MS. LARIN:

Q.   Okay.  Let's just go through this quickly.  Ms. Williams, you were born in 1959?

A.   Yes.

Q.   And you have two other brothers by the same father?

A.   Yes.

Q.   Clyde and Lloyd?

A.   Yes.

Q.   Clyde, you're not sure of his date of birth, and we couldn't find any records of his date of birth, but Lloyd is 12/14/1960?

A.   Yes.

Q.   Anthony is also your brother, who has taken your last name, but his father is actually someone named Mr. Baker?

A.   Yes.

Q.   And he was born in 1962?

THE COURT:  We're having trouble hearing you.

THE WITNESS:  Oh, okay.

THE COURT:  Could you speak up or lean into the microphone more.

THE WITNESS:  Okay.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   Then there's Alfred, the Defendant, the Petitioner.  And then Michelle Rixner-Warren and Keith Rixner.  And Michelle -- they both have the same father, correct, Godfrey Rixner?

A.   Correct.

Q.   Michelle was born in 1966, and she's recently passed away?

A.   Correct.

Q.   And Keith Rixner was born in 1967?

A.   Correct.

Q.   So as I understand this birth order, Alfred was the fifth child, and he's born, your mother had five children in five years, or maybe close to six years.

A.   Correct.

Q.   Is that correct?

A.   Correct.

Q.   Thank you.  I'm going to put this away, unless -- or one other thing.  In around, you think, 1972, July 4th, 1972, your brother Clyde was drowned.  Is that correct?

A.   Correct.

Q.   He died by drowning?

A.   Correct.

MS. LARIN:  I'm going to move on from this.

THE COURT:  Now, did you have the same mother and father as Mr. Bourgeois?

THE WITNESS:  No, no, ma'am.

THE COURT:  Different father?

THE WITNESS:  Yes, ma'am.

THE COURT:  And your whole, the siblings that you have that are the same father and mother are the first three, you and Mr. -- and the Clyde Ferdinand and Lloyd Ferdinand?

THE WITNESS:  Correct.

THE COURT:  Okay.  And did Anthony Ferdinand have the same father as you?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

BY MS. LARIN:

Q.   And Alfred's father was someone named Alfred Sterling?

A.   Correct.

Q.   Okay.  So there's seven children, but by four different fathers?

A.   Correct.

Q.   Okay.  I'm going to move on.  When did your mother pass --

THE COURT:  Would you offer that so I can have it?

MS. LARIN:  Oh, yes.  I'm sorry.  The Petitioner -- I

mean the Government has no objection, I think, so I'd like to offer that.

THE COURT:  What is the number?

MS. LARIN:  It's Petitioner's Exhibit 166.

THE COURT:  That's admitted.  Thank you very much.

MS. LARIN:  Thank you very much.

BY MS. LARIN:

Q.   And when did your mother pass away?

A.   It's been about five years now.

Q.   Okay.  And can you tell me where you all grew up?

A.   In Paulina, Louisiana.

Q.   And was there a more specific name or neighborhood of where you lived?

A.   It was down Bend Lane.

Q.   Bend Lane.  Is that B-E-N-D?

A.   B, as in boy.

Q.   B as in boy, E-N-D, as in --

THE COURT:  Around the bend.

BY MS. LARIN:

Q.   -- dog.  Around the bend?

A.   Right.  Bend Lane.

Q.   A bend in the river?

A.   Right.  Right.

Q.   Okay.  And can you describe that briefly, that neighborhood?

A.    A very good neighborhood, quiet, people get along, you know, everybody communicate with one another.  Very good neighborhood.

Q.    Are you all related in some way, the families that live there?  How many families live there?

A.    About two sets of families.

Q.    Two --

THE COURT:  About what?

THE WITNESS:  About two.

THE COURT:  Two families?

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

BY MS. LARIN:

Q.    Two sets of families?

A.    Uh-huh.

Q.    And Bend Lane is actually a lane, like one street.

A.    Right.

Q.    Correct?

A.    Right.  Correct.

Q.    And what surrounds Bend Lane?

A.    You have fields, cane fields on one side.

Q.    Okay.

A.    Mostly cane fields.

Q.    And then the river on the other?

A.    Right, uh-huh.

Q. And can you tell me about your brother, Anthony Ferdinand, Anthony Baker Ferdinand?

A. Okay. He born -- he has cerebral palsy. He born like that.

Q. Okay. And he's had this problem his entire life. And can you tell me some of how that affects him, what is he able to do or not do because of his cerebral palsy?

A. The only thing he can do is feed his self, but he can't bathe his self, he can't put his clothes on --

Q. Okay.

A. -- stuff like that.

Q. Can he walk?

A. He can walk.

Q. How old was he when he learned how to walk?

A. Well, when he was small, he couldn't walk. My mother used to, like drag him, because he was, he --

MS. BOOTH: I hate to interrupt, Your Honor. I'm just wondering about the relevance of this line of questioning.

THE COURT: Could you move along, please?

MS. LARIN: Okay. It is very relevant, though, Your Honor. I'll get to that.

BY MS. LARIN:

Q. And who supported Anthony through his childhood? Did he receive any assistance?

MS. BOOTH: And again, my objection, Your Honor, is

to the relevance of this line of questioning.

THE COURT:  Could you respond to that?

MS. LARIN:  Could I respond?  The relevance is two things, the overwhelmed nature of the situation when his mother was also trying to take care of Alfred, and also the comparative disabilities.  And third, the fact, as you will find out, even Anthony wasn't receiving services through his childhood.

THE COURT:  But we know that.  He didn't start receiving services till 2001.

MS. LARIN:  Right.  Okay.  I felt like we had to, you know, support the things the doctor relied on.  But if we can move on from those things, that's fine.

MS. BOOTH:  Well, Your Honor, I think there's an assumption here that just because you don't go to the state or the government to pay for something for you, that needs are not being addressed.  That seems to be the assumption, that just because Anthony wasn't getting state supported help, that he wasn't being taken care of, which --

MS. LARIN:  That's not my assumption.

THE COURT:  Was he being taken care of?

MS. LARIN:  Of course he was being taken care of.

THE WITNESS:  My mother was taking care of him.

MS. LARIN:  Yes.

THE WITNESS:  She's the one who took care of him.

MS. LARIN:  But the point is to help me explain why Alfred was not identified as someone with special needs, as far as we can tell, by the government.

THE COURT:  By the government?

MS. LARIN:  Or by the school.  I mean, even Anthony wasn't identified, so --

THE COURT:  Was there any question in your mind that there was something wrong with Anthony?

THE WITNESS:  He was born (inaudible), he was retarded.

THE COURT:  I mean, I'm not understanding -- she said he was born with cerebral palsy, he was retarded.

MS. BOOTH:  So he was identified by the family.

THE COURT:  So the point is?

MS. LARIN:  I thought the Government was making allegations that Alfred didn't have delays, and part of their proof was that he wasn't identified by the government or the school system.  And I feel like this is evidence --

THE COURT:  They're not proving anything.

MS. LARIN:  Okay.

THE COURT:  You're supposed to be proving that he's mentally retarded.

MS. LARIN:  Okay.  We will move on.

THE COURT:  They've already been through the trial.

MS. LARIN:  Okay.  We will move on.

THE COURT:  Thank you.

MS. LARIN:  Although, I would like to go more into depth about the overwhelmed nature of the early childhood.  Is that okay?

THE COURT:  Why don't you just ask questions --

MS. LARIN:  Okay.

THE COURT:  -- about Mr. Bourgeois.

BY MS. LARIN:

Q.   So was it hard to care for Anthony as a child?

A.   Yes, ma'am.

THE COURT:  Could you please just go into Mr. Bourgeois?

MS. LARIN:  Okay.

BY MS. LARIN:

Q.   What was it like in your mother's home as a child?

A.   It was not good.

Q.   Can you describe that a little bit?

A.   My mother was a person, my mama was a person, she used to treat Alfred real bad.  She abused him real bad.  She used to, she used to -- excuse me -- Alfred was a child, he didn't listen or nothing like that.  I noticed Alfred had problems. He was very slow.  And my mother used to whip him so bad.

I remember when I was small, she took him in the bathroom and took all his clothes off, and she whipped him so bad.  She whipped him with an extension cord.  And she whipped him so

bad, and I walked in the bathroom, I asked my mama what she was doing. She said, "I'm whipping him." I said, "Well, why are you whipping him?" She said, "Because he don't listen." I said, "Well, he didn't do anything."

And she whipped him so bad, I have never seen that before. She whipped him, he was blue black. And I remember the blood was coming from the side of his legs and his back and stuff like that. And I was fussing with her, and I said, "Mama, don't do that." And of course, she knocked me out of the bathroom, told me to get out of the bathroom. My mother was, she was a disturbed person, to me.

Q.    And did this sort of thing only happen one time, or did it happen more often?

A.    Constantly, when I was small, I remember that. Constantly. She used to whip him --

Q.    Can you describe some other things that your mother would do to Alfred?

A.    I remember one night, we was eating supper, and Alfred didn't want to eat the food. And she said, "Why you not eating?" And Alfred say, "I don't like that. I don't like what you cook." And she say, "Yeah, you're going to eat it." And I remember, he ate a little bit and he spit it out. And he had his hand on the table, and she took a meat cleaver and went down on his hand. And she cut the tip of it. My mother did Alfred some wrong things, bad things.

Q.   Can you describe any more things that she did to Alfred?

A.   I remember one time she locked him in the closet.  And he had no lights in there, and it was in a closet, and she left him in there a while.  I remember those three things.

Q.   Did that happen just three times?  Or for example, was he locked in a closet one time or more than one time?

A.   She used to do it most of the time.  She would always abuse him, the time that I could remember.

Q.   So at some point, you moved out of your mother's home. Correct?

A.   Yeah.  Correct.

Q.   Do you know around what age you were when you moved out?

A.   About nine, about nine.

Q.   And you moved to two places.  Right?

A.   Correct.

Q.   When you were nine, you started staying where?

A.   First, I started living with Ms. Mary.  That was the lady down the street.

Q.   And so during that time, you were still spending some time at your mother's --

A.   Right.

Q.   -- and seeing Alfred?

A.   Right.  Correct.

Q.   And then around -- where did you move next?

A.   Then after that, I moved with my grandmother in Lutcher.

Q.    And where does your grandmother live?

A.    She used to stay in Lutcher.

Q.    Which is the next town?

A.    Correct.

Q.    And how old were you when you moved there?

A.    About 12.  About 12 years old.

Q.    Okay.  And you are, let me look at my chart, you are about, almost eight years -- oh, no, I'm sorry -- almost six years older than Alfred.  Correct?

A.    Correct.

Q.    So when you moved away to Paulina, Alfred was about six.

A.    Correct.

Q.    So are you saying that most --

        THE COURT:  Was that your maternal grandmother or your paternal grandmother?

        THE WITNESS:  That was my maternal grandmother.

BY MS. LARIN:

Q.    That was your father's mother or your mother's mother?

        THE COURT:  Mother's.

        THE WITNESS:  My father.

        THE COURT:  Oh, I thought you said "maternal."

        THE WITNESS:  I'm sorry, father.  My father's mother.

        THE COURT:  Your paternal.  Okay.

BY MS. LARIN:

Q.    And so around -- when you saw these beatings and the abuse

by your mother, how old was Alfred?  Was it when you were living at home or in, on the Bend?  Is that when you saw it?

A.    Yeah, I was living at home.

Q.    So Alfred was under the age of six?

A.    Correct.

Q.    You mentioned that Alfred was slow.  Can you describe what you mean by that?

A.    Like learning ability.  You used to show him things, like he couldn't catch on.  He was slow.  You had to constantly show him, you know, over and over what to do.

THE COURT:  Like what?

THE WITNESS:  Like doing his homework, he had problem with his homework.

THE COURT:  Well, you moved out before he started school.

BY MS. LARIN:

Q.    Well, you moved to Ms. Mary's.

A.    I was by Ms. Mary, living with Ms. Mary, but I was back and forth.  But Ms. Mary living, going back to my mother house.

Q.    Where was, just so --

THE COURT:  So you didn't move out completely?

THE WITNESS:  Well --

MS. LARIN:  Can I clarify, Your Honor?

THE COURT:  No, I'd like her to clarify it.

MS. LARIN:  Oh, you'd like to do it.  Okay.

THE COURT:  I think that would be best.  So you didn't move out completely?

THE WITNESS:  Well, what I used to do, we used to stay by Ms. Mary.  Like on the week, during the weekends, we would go back to my mother house, because I was like going to school, living with Ms. Mary.  But I was, like I said, I was back and forth.

THE COURT:  You lived with Ms. Mary?

THE WITNESS:  Uh-huh, I did too, uh-huh.

THE COURT:  Okay.  You didn't live with your grandmother?

THE WITNESS:  After I got 12 years old, then I moved to Lutcher with my grandmother.  I started going to school in Lutcher, uh-huh.

THE COURT:  And where was that in relationship to Ms. Mary?

THE WITNESS:  Well, the grandmother wasn't relation, but my grandmother, that was my daddy grandmother.  Ms. Mary just was a cousin to us, and we went and lived with her.  She was an old lady, and we went and lived with her for a while.

THE COURT:  When did you live with her?

THE WITNESS:  I was around about, about -- I guess it be about ten, ten, eleven years old, we started living with her.

THE COURT:  Who's "we"?

THE WITNESS:  Well, there was another girl, we used to go live with her.  The girl that I went with, that was her grandmother we went and stayed with.

THE COURT:  Who is that?

THE WITNESS:  Her name is Veranice (phonetic) Batiste.  That was her grandmother.

THE COURT:  Okay.

THE WITNESS:  And we lived there.

THE COURT:  And that's -- who all was living in the house while you were there.

THE WITNESS:  It was me, Veranice and -- it just was me and her.  But Alfred was there first before us.  Alfred had been living with her first.

THE COURT:  But if you were ten or eleven --

THE WITNESS:  Uh-huh.

THE COURT:  -- and he was six years younger, so he went, started living there at three or four?

THE WITNESS:  Your Honor, I'm not good with dates and numbers.

THE COURT:  Well, this is kind of important.

MS. LARIN:  Can I --

THE WITNESS:  Right.

THE COURT:  That's what you're here to tell us.

THE WITNESS:  I understand.

THE COURT:  I want to know how it is you observed

Mr. Bourgeois in school if you weren't living with them, all those kind of things. And this is not making a whole lot of sense.

THE WITNESS: Well, I mean, I lived --

THE COURT: You don't appear to be a great historian.

THE WITNESS: I understand. When I lived with my mother, you know, when I was younger, as a child, you know, and I --

THE COURT: Well, how old were you when you moved out from your mother's? And you moved out for school purposes?

THE WITNESS: Yes, uh-huh.

THE COURT: So --

MS. LARIN: That's actually a question.

THE COURT: Pardon?

MS. LARIN: That's actually, I would like to hear why she --

THE COURT: You want to --

MS. LARIN: Sorry.

THE COURT: I'm just -- I'm sorry. It's never a good idea --

MS. LARIN: To interrupt. I'm sorry.

THE COURT: -- to interrupt the Judge. Never good.

So you moved out to start school someplace else?

THE WITNESS: Well, Your Honor, the reason why I moved out with my mother, because I wasn't comfortable living

with my mother.

THE COURT:  Okay.

THE WITNESS:  And I wanted to go stay with Ms. Mary, when I was smaller.  And then that --

THE COURT:  How old were you when you moved to Ms. Mary's?

THE WITNESS:  I was, I had to be around about, about ten, I think.

THE COURT:  About ten?

THE WITNESS:  About ten.

THE COURT:  So Mr. Bourgeois was four?

THE WITNESS:  Uh-huh, I guess.

THE COURT:  Okay.  So you moved in with Ms. Mary when you were ten.

THE WITNESS:  Uh-huh.

THE COURT:  And then when did you move in with your grandmother?

THE WITNESS:  I had to be around about 12.

THE COURT:  Okay.

THE WITNESS:  I started to going to school in Lutcher, in Lutcher, uh-huh.

THE COURT:  Okay.  Did you go to school when you lived with Ms. Mary?

THE WITNESS:  I did, elementary, yes, uh-huh.

THE COURT:  Okay.

THE WITNESS:  Yes, ma'am.

THE COURT:  And then so you really just lived with Mr. Bourgeois for four years or so at the beginning of his life?

THE WITNESS:  Yeah, you could say that.

THE COURT:  No, you say that.  You tell me.

THE WITNESS:  Yeah.  When I was, like I said, when I was coming up small, you know, I remember the things that used to go on in the house and stuff like that, because I was the oldest, you know.

THE COURT:  So he was about birth to four when this stuff was going on.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So he was not in school.

THE WITNESS:  Not at four, no.

THE COURT:  Okay.

THE WITNESS:  Not at four years old.

THE COURT:  So you say you came back from time to time on the weekends to your mother's house?

THE WITNESS:  Yes, ma'am, I came back on the weekends, uh-huh, with my mom.  I came back on weekends to come home.  Because like I was the oldest.

THE COURT:  What does that mean?

THE WITNESS:  I mean, me being the oldest, you know, like I had things I had to do, chores my mother say I had to

do, stuff like that.

THE COURT:  What did you do?

THE WITNESS:  Like clean up the house, cook sometime, fix up beds, stuff like that.

THE COURT:  Okay.  Go ahead.

MS. LARIN:  Thank you.

THE COURT:  Your turn.

MS. LARIN:  Thank you.  I'm sorry for interrupting you, Your Honor.

THE COURT:  That's all right.  It's a good lesson.

BY MS. LARIN:

Q.   Can you tell us how far away Ms. Mary's house was from your mother's house?

A.   From here to, just say like from where the water is out there, right there, walking distance.  It wasn't that far.

Q.   And it was on the same street?

A.   Yes, on the same street, uh-huh.

Q.   Okay.  And so would you see Alfred while you were staying at Ms. Mary's house?

A.   Correct, yes, ma'am.

Q.   About how often would you see him?

A.   When I used to go to Ms. Mary, he used to be back there, I used to go see him.  And like I said, we was back and forth. He used to come home to my mother --

Q.   I meant when you were living at Ms. Mary's house.

A.    Uh-huh.

Q.    Did you go back to your mother's house, or did he come see you at Ms. Mary's house?

A.    I used to go --

Q.    When you were about nine, ten, eleven.

A.    I used to go --

Q.    I mean ten, eleven, twelve.  I'm sorry.

A.    Okay.  Yeah, I used to go back there to, where I was living at with Ms. Mary --

Q.    Uh-huh.

A.    -- and he used to come see us.  We was like back and forth.

Q.    Okay.

A.    Uh-huh.

Q.    And then you moved to your grandmother's house.

A.    Yes.

Q.    And you would still come home to your mother's house?

A.    Right, on weekends.

Q.    And you would see Alfred.

A.    Right.  Correct.

Q.    And at some point Alfred moved into Ms. Mary's house.  Is that correct?

A.    Correct.

Q.    And do you know about how old he was?  If you don't know, that's fine.

A.   I'd say he had to be about seven, about seven years old.

Q.   Okay.

THE COURT:  And who was living at Ms. Mary's house then when Mr. Bourgeois moved in?

THE WITNESS:  Yes, ma'am.

THE COURT:  Who was living there when he moved in?

THE WITNESS:  It was Vera, she was living there, and like I said, I was there, too.  And then Alfred, you know, he came.  Ms. Mary, like, was taking care of us.

THE COURT:  Okay.  But you moved out of Ms. Mary's when you were 12.

THE WITNESS:  Right.

THE COURT:  To your paternal grandmother.

THE WITNESS:  Uh-huh.

THE COURT:  And that's when Mr. Bourgeois moved in apparently.

THE WITNESS:  Okay.

THE COURT:  No, I'm not saying -- I'm asking you.

THE WITNESS:  It's just dates, Your Honor, I'm not good with dates and time too good, you know.

THE COURT:  Well, you said and he said --

THE WITNESS:  Right.

THE COURT:  -- apparently, at least I've heard him say that he moved in with Ms. Mary when he was about seven.

THE WITNESS:  Okay.

THE COURT:  So you were at your maternal grand, paternal grandmother's by then.  Is that right?

THE WITNESS:  Uh-huh.

THE COURT:  So do you know who was living in Ms. Mary's house when Mr. Bourgeois was living there?

THE WITNESS:  Like I said, Vera.  Vera was there.  She was living there with us, Vera.  Her name was Vera.

THE COURT:  Well, you weren't living there when Mr. Bourgeois was there.

THE WITNESS:  No, not at the time, because like I said I had to be about 12 --

THE COURT:  Okay.

THE WITNESS:  -- when I went back over there.  But Vera was there, because that was her grandmother.

THE COURT:  Okay.

THE WITNESS:  She was there first.  And then Alfred.

THE COURT:  And her name is?

THE WITNESS:  Vera.

THE COURT:  Last name?

THE WITNESS:  Batiste.

THE COURT:  Batiste?

THE WITNESS:  Uh-huh.

THE COURT:  And that's who was, when Mr. Bourgeois was living at Ms. Mary's, Ms. Batiste was living there, and Ms. Mary was living there, and Mr. Bourgeois?

THE WITNESS:  Yes, ma'am.

THE COURT:  Anybody else?

THE WITNESS:  That's all.  That's all I remember.

THE COURT:  Thank you.  Go ahead.

BY MS. LARIN:

Q.   Okay.  You described Alfred, you were describing Alfred as slow, and I was wondering if you could give some examples about that.

A.   All I know is when I tried to help him with his homework --

Q.   And so, just to pause, this is where we got sidetracked before.  When would you help him with his homework?  Were you living -- where were you living and where was he living that you would have, you would have helped him with his homework?

A.   At the time he was by Ms. Mary.  I used to go back there and help him with his homework.

Q.   Okay.

A.   And I used to try to help him do his homework, but I seen, what I seen about Alfred, he was very slow.  You had to constantly show him what to do and how to do it.

THE COURT:  What school did you go to?

THE WITNESS:  I went to Lutcher High School.

THE COURT:  Well, what about elementary school did you go to?

THE WITNESS:  I went to, it was Lutcher Elementary.

THE COURT:  Is that where Mr. Bourgeois went?

THE WITNESS:  I'm trying to remember the school.  I think Alfred went to Paulina's school.  I think, I'm not sure, but I think it was Paulina's school, because they had different schools.  But by me moving to Lutcher, I had to go to Lutcher Elementary.

THE COURT:  Right.

THE WITNESS:  It was Paulina.

THE COURT:  So who was living in Lutcher when you started first grade?  Where were you living when you started first grade in Lutcher?

THE WITNESS:  Where was I living?

THE COURT:  Uh-huh, yes, ma'am.

THE WITNESS:  First grade, I'm trying to remember, Your Honor.  First grade, okay, when I was in first grade, I was living with my mama.  It was at Paulina School that first year.

THE COURT:  Okay.

THE WITNESS:  Okay.  It was St. Martin, used to call it St. Martin School, right, because that was first grade.  Right.  Okay.  I was living at my mother at the time when I was going to first grade, because it was called St. Martin Paulina School.  That's where I used to go.

THE COURT:  Okay.  So what grades did you make in elementary school?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  What grades did you make in elementary school?

THE WITNESS:  B's, B's and C's.

THE COURT:  And in high school?

THE WITNESS:  B's and C's.

THE COURT:  Go ahead.

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Is there any other examples that you could tell the Judge about things that Alfred was slow at as a child?

A.   I remember I used to tell him to do things, like one time I told him to go clean up in the bathroom, clean the tubs, the toilets and stuff, and he would go in there.  And I'd say, "Alfred, did you clean up?"  He'd say, "Yes."  I'd say, "Well, it don't look like it, because the bathtub's still dirty."  And he said, "Well, I did it."

THE COURT:  See, my husband does that.

THE WITNESS:  And he say he did it.

THE COURT:  I don't know if that's qualified as slow.

THE WITNESS:  Comprehension, it's just repeating it.

THE COURT:  I see what you mean.

THE WITNESS:  You understand?

BY MS. LARIN:

Q.   Any other examples --

MS. BOOTH:  Excuse me, Your Honor, I'm going to object for the record.  In any way implying that a 7-year-old boy that doesn't clean up the bathroom after he's been asked to do it by his sister is any indication of any kind of mental disability.

THE COURT:  Well, I think --

MS. LARIN:  What age -- I don't know that she's necessarily talking about age.

MS. BOOTH:  I'm taking the youngest possible age it can be, you know, or even younger than that.  But that's no indication of any kind of mental disability.

MS. LARIN:  Why does that --

BY MS. LARIN:

Q.   Okay.  So what age do you think you were trying to ask him to wash the bathroom?

A.   Well, I know he was young.  I can't remember the age.  I'm not good with age.

Q.   Did he seem too young that he shouldn't --

THE COURT:  Were you still living at the house when you did that?

THE WITNESS:  Yeah, because -- yes, at the time.

THE COURT:  So he would have been four or three?

THE WITNESS:  About four or five, I guess.

THE COURT:  About four.

THE WITNESS:  Uh-huh.

THE COURT: Okay. Moving on.

BY MS. LARIN:

Q. Okay. When you asked -- did you ever -- there were other children in your home. Correct? There was Michelle, for example.

A. Correct.

Q. Were you around when Michelle was young?

A. Correct. Yes, I was.

Q. So how -- you weren't living there, but you saw Michelle often?

A. Correct.

Q. And if you asked Michelle to do -- was there -- could you compare what Michelle could do to what Alfred could do?

MS. BOOTH: Your Honor, I'm going to object. She's asking for some kind of retroactive interpretation of a 12-year-old, that's how old she would have been, comparing the difference between two children that were four and six. I mean, how can that be -- first of all, how can that be relevant to what we're talking about here? How can she make, how can she make that opinion? I mean, it's ludicrous, a 12-year-old, from the eyes of a 12-year-old, and what is she now? At least 39.

THE COURT: Well, where were you when we were talking about the 13-year-old taking an IQ test for Mr. Bourgeois?

MS. BOOTH: Exactly, Your Honor.

THE COURT:  Okay.

MS. LARIN:  Can I clarify?

THE COURT:  If you can answer that, fine.  If you don't remember, move on.

BY MS. LARIN:

Q.  Were you 12 years old, when we're talking about -- did you at any point ever stop having a relationship with your younger siblings?  Did you ever stop seeing them altogether?

A.  No.

Q.  How often would you see them?

A.  On a regular basis, you know.

Q.  When you were at your grandmother's, living in Lutcher, how often would you spend time at your mother's house?

A.  We would come home for the weekends and like --

Q.  Every weekend?

A.  Every weekend.

Q.  And you would live at your mother's house, and you said you had chores at your mother's house on the weekends.

A.  Correct, uh-huh.

Q.  And so you saw Alfred, Michelle, Keith and Anthony and Lloyd throughout their childhood?

A.  Correct.

Q.  Into adulthood?

A.  Correct.

Q.  Okay.  Let's pick a time.  Let's say you are 16 years old.

A.    Uh-huh.

Q.    You're living at your grandmother's house.

A.    Okay.

Q.    Alfred is 10.

A.    Okay.

Q.    Michelle is 8.  Can you give us a comparison?  Alfred is 10 years old.  Can you have that picture in your head?

A.    Okay.

Q.    Alfred was living at Ms. Mary's house.

A.    Correct.

Q.    He would also be home with the mother on weekends often?

A.    Some --

Q.    Or you would -- would you see him at Ms. Mary's house?

        THE COURT:  Sometimes?

        THE WITNESS:  Sometime.  Not often.  Because like he was living with Ms. Mary.

BY MS. LARIN:

Q.    By that time?

A.    Right.

Q.    By age ten?

A.    Right.

Q.    Okay.  Would you see him at Ms. Mary's house?

A.    Correct, yes.

Q.    Okay.  Can you offer us any examples from that age when he was living at Ms. Mary's that he seemed slow to you compared to

other children around his age?

A.    Yes.

Q.    Can you please tell the Judge?

THE COURT:  Do you have specific memories of the dates and the ages?

THE WITNESS:  I'm not good with dates.

MS. LARIN:  We're on age ten here.

THE COURT:  Just please --

MS. LARIN:  Okay.  I did it again.

THE COURT:  Don't interrupt me, please.  You said you had trouble with ages, and she's telling you what happened when he was ten.

THE WITNESS:  Right.

THE COURT:  Do you even, are you able to set that in your mind?

THE WITNESS:  Your Honor, I can remember when Alfred was that age, my mother abused him so much.

THE COURT:  Well, he was ten, so he was living with Ms. Mary.

THE WITNESS:  Yeah, but I'm just saying, you know, when he, he still used to go back and forth.  And you know, when we was there sometime, we used to see him still.  She used to abuse him and whip him a lot, and we used to see that.  And I used to ask her why she whipping him, and it's for nothing, for no reason.  I used to ask her that.  And of course, she'll

go off on me. And that's why he didn't want to live with her, because she used to abuse him so bad.

THE COURT: Well, I understand that.

THE WITNESS: Uh-huh, and that's why he didn't feel comfortable --

THE COURT: Did your mother work outside the home?

THE WITNESS: No, ma'am.

THE COURT: How did she live?

THE WITNESS: Well, she was married. She was married to my dad, but they divorced. And then after, she remarried Michelle and Keith daddy.

THE COURT: She what?

THE WITNESS: She remarried.

THE COURT: Okay.

THE WITNESS: And then after that, well, he left, so she was on her own.

THE COURT: How old were you when your stepfather left?

THE WITNESS: I was a little older then. I had to be -- trying to think. I had to be around about -- I was like in, had to be around about 20 or something.

THE COURT: Okay.

THE WITNESS: Because I was a little older. Yeah, I was older.

THE COURT: Okay.

THE WITNESS:  But I remember that.

THE COURT:  So Counsel was asking you to compare the abilities of Mr. Bourgeois with your sister, Michelle.

THE WITNESS:  Uh-huh.

THE COURT:  Can you do that?  And can you remember a specific age for each of them when you're doing that?

THE WITNESS:  All I remember, like I say, to me, Alfred was a person you could try to explain things to him, you know, and show him things, but like to me, he had a comprehension -- he couldn't pick up right away, to me, from what I see.  You had to, you know, constantly show him and explain to him just how this go, and you do it this way, you know.

THE COURT:  Like cleaning the bathroom?

THE WITNESS:  No, not just cleaning the bathroom. I mean like his homework and -- mostly like his homework.  I noticed he had problem in his homework.  He couldn't understand certain things.  You know, you had to constantly show him, you know, what to do and how to do it.  And then --

THE COURT:  So when he started school at six, you were twelve and in, living in another community?

THE WITNESS:  Yeah.  But like I said, when I come home, when I used to come home --

THE COURT:  On the weekends.

THE WITNESS:  -- sometime on the weekends, uh-huh,

and --

THE COURT:  He did homework on the weekends in first grade?  When did you first, in that elementary school, when did you first start doing homework?  I know I was, didn't do much homework at all in elementary school, but --

THE WITNESS:  It was mostly like writing, you know, like you write -- they had them writing, writing their ABC's, stuff like, tracing stuff like that.

THE COURT:  When did you start doing homework?  Can you remember?

THE WITNESS:  When I start doing homework?  Like for myself, you mean?  Well, I mean, when you're in kindergarten, they teach that, you know, you have to do -- not homework, but you have to do like try to learn how to write your name, stuff like that.  Stuff like that, you know.

THE COURT:  Well, he writes very well, Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  I've seen his writing.

THE WITNESS:  Uh-huh.

THE COURT:  He spells well and writes well.

THE WITNESS:  Okay.

THE COURT:  So when did you -- so when you were there on the weekends, what homework was he trying to do and what age are we talking about?

THE WITNESS:  Mostly letters, like that I could

remember, letters, like --

THE COURT:  Writing his letters?

THE WITNESS:  Yeah, like the teacher have like the letter's already there, and you just have to trace it, something like that.

THE COURT:  You're supposed to, okay, or copy it?

THE WITNESS:  Yes, ma'am.  Yes, ma'am.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

BY MS. LARIN:

Q.  Okay.  We're going to fast-forward a few years.  Do you know, how long -- when did Alfred stop living with Ms. Mary?  What happened?  Did he ever stop living with Ms. Mary?

A.  As he got older.

Q.  At some point, Ms. Mary passed?

A.  Yes, ma'am.

Q.  And do you know where he moved after Ms. Mary passed?

A.  I think he went and stayed with his sister, Michelle.  Michelle Omar.

Q.  His sister, not by your mother.

A.  No, not by my mother.

Q.  Okay.

THE COURT:  Who, Michelle was --

THE WITNESS:  Michelle Omar.  That was his stepsister.  That was Alfred daddy child.

THE COURT:  Okay.  Did you know her?

THE WITNESS:  Yes, ma'am.

BY MS. LARIN:

Q.    And then at some point did Alfred stay with you?

A.    Yes, ma'am.

Q.    Can you remember about what age he was when he lived with you?

A.    He had to be a little older.  Alfred had to be a little older.  I'm trying to think of the age.  He had to be probably about 18 or 19, something like that.

Q.    Okay.  When Alfred lived with you, was he able to take care of himself?

A.    No.

Q.    Meaning, you know, did he cook his own food?

A.    No.

Q.    Who cooked for him?

A.    I did.

Q.    And how do you know he couldn't cook for himself?

A.    He thought he could cook.

THE COURT:  What does that mean?

THE WITNESS:  He tried to cook, but it wasn't eatable.  You couldn't eat it.

THE COURT:  Did he eat it?

THE WITNESS:  No.  No.  He tried, but he --

THE COURT:  Well, I hate to say this, but you know,

bad cooking is not a sign of retardation.

THE WITNESS:  Uh-huh.

MS. LARIN:  Well, according to the green book, it actually -- self-care and home living.

THE COURT:  Self-care is something different.  He bathed himself and dressed himself, all those things?

THE WITNESS:  Yeah, he bathed his self and dressed his self.

THE COURT:  Dressed himself?

THE WITNESS:  Uh-huh.

THE COURT:  No trouble with brushing his teeth?

MS. LARIN:  Your Honor --

THE WITNESS:  I'm sorry?

THE COURT:  No trouble with brushing his teeth?

THE WITNESS:  No, not when he was older.

THE COURT:  Now, how many of us here are great cooks?

MS. LARIN:  Could I just --

THE COURT:  There.  Mr. Wiseman.

MS. LARIN:  He is a great cook.  I hear from him all the time that he's a great cook.

MR. WISEMAN:  And a little narcissistic.

MS. LARIN:  Your Honor --

THE COURT:  Mr. Roberts --

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  -- are you a good cook?

MR. ROBERTS:  I am not a good cook, but I have a great wife who's a good cook, Your Honor.

THE COURT:  Is it edible, your food?

MR. ROBERTS:  The food that I cook?  I wouldn't eat it, Your Honor.

THE COURT:  Okay.

(Counsel conferring off the record.)

THE COURT:  I heard him talk about on the video that I saw, Mr. Bourgeois, talk about how he cooked deer meat and raccoons and squirrel.

THE WITNESS:  Uh-huh.

THE COURT:  He learned that from Ms. Mary?

THE WITNESS:  I don't know.  Wildlife?  I don't know.

THE COURT:  Sounded kind of bad to me.

THE WITNESS:  Wildlife, I don't know where that one came --

BY MS. LARIN:

Q.   Okay.  Can you tell us who did Alfred's laundry?

A.   I did.

Q.   And after Alfred moved -- did Alfred leave your house at some point?

A.   Yes, he did.

Q.   And where did he move?

A.   Like I said, he had moved in with Michelle, his other sister.

Q.   Right.  Then he moved with you?

A.   Right.

Q.   And what happened next after --

A.   And then after he got older, I think he moved away to LaPlace.

Q.   Did he ever live in a mobile home?

A.   Oh, yes, he did, yeah.

Q.   And where was that mobile home?

A.   It was in the same yard that my trailer was.

Q.   So about how many feet away?

A.   Like just in the backyard.

Q.   Like from me to you, or a little further?

A.   From here to the hallway out there, you could say. Because it was in the same yard.

Q.   Okay.  And at that time did Alfred cook for himself, as far as you know?

A.   No, not that I know of.

Q.   Who would feed him?

A.   Well, I would cook.

Q.   Okay.

A.   And bring him the food.

Q.   And the same for his laundry?

A.   Yes, ma'am.

Q.   Do you remember at all any of the jobs Alfred had at that time?

A.    I remember --

Q.    Around, you know, the time he was living with you and in the mobile home in your yard.

A.    Winn-Dixie, he used to work at Winn-Dixie.  I remember that.

Q.    Okay.  And what else?  Anything else?

A.    And Schwegmann he used to work, and then Imperial Sugar.

Q.    Imperial Sugar?

A.    Yes, ma'am.

Q.    What did he do there?  Do you know?

A.    Little packing little sugar.

Q.    Do you know how he got that job?

A.    My husband help him got that job.

Q.    Okay.  Do you know any other jobs he had, like who helped him get other jobs?

A.    No, I don't know who help him.  I can't remember that.

Q.    Okay.  Fast-forward again.

A.    Okay.

Q.    Now you testified at this trial, at your brother's trial.  Correct?

A.    Correct.

Q.    And in that testimony, you talked about a conversation you had with Alfred about a phone call you had with him when he was on the truck.

A.    Uh-huh.  Correct.

Q.  Can you describe that conversation, please?

A.  When we was talking, I noticed Alfred, like he was disturbed.  He was nervous.  And I talked to him and I asked him how he was doing, and he say he was tired.  It was stressful.

And he said, "I don't know what I'm going to do."

I said, "What you mean?"

He said, "I don't know what I'm going to do, Sis."

I said, "Alfred," I said, "I don't know what you're going to do," I say, "but don't do nothing to hurt yourself or hurt your family."  I say, "Don't kill yourself."  I told him that.

And I said, "Give Robin the phone," and I talked to Robin.  And I asked her what was going on, and she just say, you know, "Everything is all right."  But I could tell in her voice there was something wrong.

Q.  And what did you think he meant?

A.  Well, when he told me that, I said, "Lord," the first thing, I said, "Lord, my brother going to kill his self."  That's what I felt.

Q.  And you also -- I'm going to mark something.  Oh, I'm going to mark Petitioner's Exhibit 56.  This has been previously provided.  Provide it again.  And, Ms. Williams, do you recognize this?

A.  Yes, ma'am.

Q.  And I'm going to turn the page to -- is that your

signature?

A.   Yes, ma'am.

Q.   Okay.  In this -- what is this?

A.   I'm sorry?

Q.   In your own words, what is this piece of paper we're looking at?

A.   That's the family, our family.

Q.   Do you see that -- do you know, do you remember how this document came about?  Did someone from my office come talk to you?

A.   Yes, ma'am, Miss Pam.

Q.   Miss Pam.  Okay.  And did you talk to her about Alfred and Alfred's background?

A.   Yes, ma'am.

Q.   And did she write this up and bring it back to you for you to read over?

A.   Correct.

Q.   And is everything in this document true and correct, to the best of your knowledge?

A.   Yes, ma'am.

Q.   Okay.  And in this document, you talk about how sometimes Alfred would go into a rage.

A.   Correct.

Q.   Can you describe that a little bit?

A.   Alfred used to get temper fits.  He used to get angry.

Like he'd turn red.  His features would change.  And he was, like to me, he would, like he just would go in a bad, bad rage. And I think Alfred was like that because how my mother used to treat him, the abuse that, how she used to whip him and stuff like that.  And I think that affect him a lot.

Q.   And was this, would this happen when he was an adult?

THE COURT:  The whippings or the rages?

MS. LARIN:  The rages.  I mean -- sorry.  Thank you.

BY MS. LARIN:

Q.   Would he have these rage episodes -- how old was he when these things would happen?

A.   Well, when he was young, when my mother was abusing him, I remember --

Q.   He would --

A.   -- he had -- yes.

Q.   And then how about when he was older, did it ever happen when he was older?

A.   Yeah, when he was older, yeah.

Q.   Okay.  Now --

MS. LARIN:  Could I have one minute, Your Honor?

THE COURT:  Pardon?

MS. LARIN:  Could I have a minute?

THE COURT:  Yes, ma'am.

MS. LARIN:  Thank you.

(PAUSE.)

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.  Ms. Williams.

A.  Yes, ma'am.

Q.  Do you remember before your brother's trial talking to an investigator for, who worked for Mr. Bourgeois's lawyers?

A.  Correct.

Q.  Can you tell me, can you describe him to -- where did you talk to him?  On the phone?  In person?  Do you remember?

A.  Who?

Q.  The investigator for Mr. Bourgeois.  His name was Mr. Bierbaum.  Do you remember speaking to a Gerald Bierbaum?

A.  Okay, yeah.

Q.  You do remember that?

A.  Uh-huh.

Q.  And do you remember if you told him that your brother was abused by his mother?

A.  Yes, I did.

Q.  You did tell him?

A.  Yes, ma'am.

Q.  And if the lawyers had asked you to testify about your child, your brother Alfred's childhood, would you have done so?

A.  Yes, ma'am.

Q.  And you would have answered as you did today about the abuse that you witnessed?

A.    Yes, ma'am.

Q.    And his slowness?

A.    Yes, ma'am.

       MS. LARIN:  Thank you, Your Honor.  I have no further questions.

       THE COURT:  Thank you, ma'am.  Ms. Booth?

       MS. BOOTH:  Yes, Your Honor.

                       CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good morning, Ms. Williams.

A.    How you doing?

       THE COURT:  Just a second.  What do you need?

       MS. LARIN:  I'm sorry.  I didn't offer the affidavit.

       THE COURT:  Number what?

       MS. LARIN:  It's number, Petitioner's Number 56, Your Honor.

       THE COURT:  Any objection?

       MS. BOOTH:  No, Your Honor.

       THE COURT:  Petitioner's 56 is admitted.

BY MS. BOOTH:

Q.    Ms. Williams, this is not the first time that you've testified in the case involving your brother, is it?

A.    Yes, ma'am.

       THE COURT:  I'm sorry?

       THE WITNESS:  Yes, ma'am.

THE COURT:  Is it -- no, you testified at trial, didn't you?

THE WITNESS:  At the trial, I did.

THE COURT:  Right.

MS. BOOTH:  Uh-huh.

THE COURT:  So you've testified twice in this courtroom.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you, ma'am.

BY MS. BOOTH:

Q.   And you were interviewed by Mr. Bierbaum, you testified a minute ago, and you were talked to by the FBI.  Do you remember talking to the FBI?

A.   Yes, ma'am.

Q.   In fact, then you talked to Dr. Moore.  Isn't that right?

A.   The guy right there?

Q.   Yes.

A.   Okay, yes, ma'am.

Q.   And in fact, when you talked to Mr. Bierbaum, you talked to him more than one time, didn't you?  Didn't you talk to the Defendant's investigator more than one time, maybe two or three times?  Do you remember?

A.   Two or three times?  I'm trying to --

Q.   Yeah.  Well, do you remember if you were interviewed on November the 25th of 2003?  And then again on February the 25th

of 2004?

A.    Okay.

Q.    And again on March the 2nd of 2004?

A.    Okay.

Q.    And that was by the Defense.  Is that correct?

A.    Uh-huh, correct.

Q.    Okay.

THE COURT:  Can you hear her, Ms. Gano?  She said, "Correct."  You need to speak up, please, ma'am.

THE WITNESS:  Oh, okay.

THE COURT:  Thank you.

THE WITNESS:  Okay.

MS. BOOTH:  Judge, do you think it would help if I moved the microphone up just a little bit?

THE COURT:  Let Ms. Gano do it.

MS. BOOTH:  Okay, because it's kind of slumped down, so she has to bend.

THE WITNESS:  Thank you.

THE COURT:  People before you were fiddling with it and moving it around, so --

THE WITNESS:  Oh, okay.

THE COURT:  Okay.  That should be better.

BY MS. BOOTH:

Q.    So we have those three dates before and during the trial that you spoke to the investigators of the Defense.  Now, I

want to ask you if you ever told them that Mr. Bourgeois was

hit with a meat cleaver on his hand by his mother.  Did you

ever tell that story to them?

A.    Not at the time, I didn't.

Q.    All right.  Did you tell them -- and I know these are

horrible memories, Ms. Williams.

A.    Oh, yes, ma'am.

Q.    Did you tell them that he was whipped in the tub and that

there was blood in the water?

A.    No, not at the time I didn't.

Q.    Okay.  And basically what you told them is that your, like

you did in, when you were interviewed by the investigator that

came for this case, the Government -- I mean Defendant's

Exhibit that was just admitted that you were speaking about,

when you talked to them, you told them that Alfred got

whippings, more whippings than the rest of the kids in the

family.  Is that right?

A.    Correct.

Q.    And, but you didn't go into, even in this affidavit that

you gave on May the 10th of '07, you didn't say anything about

the meat cleaver on the hand, did you?

A.    Well, Ms. Patti, the reason why I didn't say, because it

was sad.  I was ashamed of my mother.

Q.    Right.

A.    I was --

Q.    And during the time of the trial, your mother was alive, wasn't she?

A.    Yes, ma'am.

Q.    And during the time of the trial, your mother, didn't you tell me your mother said that he was no good, and she knew this was what was going to happen with him?

A.    Well, I don't remember saying that he, that that was going to happen to him.  I don't remember my mother --

Q.    What did you tell me that your mom said?

THE COURT:  Was this in the trial?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

THE WITNESS:  I'm sorry.  Repeat yourself, Ms. Patti.

BY MS. BOOTH:

Q.    During the period of the trial, your mother was still alive, wasn't she?

A.    Yes, ma'am.

Q.    And so you didn't tell these three stories that you've now disclosed at that time.  Right?

A.    Yes, uh-huh.

Q.    And in fact, most of the family were very closed about the abuse of your mother, of your mother to Alfred during that time.  Isn't that right?

A.    Correct.  Correct.

Q.    So if this horror information was not given to the

investigator, then it couldn't have gotten to the attorneys. Correct?

A.   Correct.

THE COURT:  Speak up, please.

THE WITNESS:  Correct.

MS. LARIN:  Objection, Your Honor.  She can't know what the lawyers knew or didn't know.

THE COURT:  Well, she's just finding out.  That's the point, isn't it?  Overruled.

BY MS. BOOTH:

Q.   And Ms. Williams, coming into this case and testifying against your brother was a very difficult thing, wasn't it?

A.   Yes, ma'am.

Q.   Because you were the last person from the family that spoke to Mr. Bourgeois and to Robin before JG1999 was murdered, weren't you?

A.   Yes, ma'am.  Yes, ma'am.

Q.   All right.  Now, in the statement that you gave to the FBI on September the 4th of 2002, I believe you were talking -- do you remember Ms. Beckett, the FBI Agent, Ms. Beckett, Megan?

A.   Yeah, correct.  I remember.

Q.   All right.  And do you remember talking to her?

A.   Yes, ma'am.

Q.   And do you remember telling her that you had seen bruises on Robin, and that you knew that Robin was very afraid --

A.    Yes.

Q.    -- of Alfred?

            THE COURT:  You need to speak up.

            THE WITNESS:  Yes.  Yes, ma'am.

BY MS. BOOTH:

Q.    And that you knew that he had abused children that belonged to other wives that he had had.

A.    Yes, ma'am.

Q.    And that you knew that he was capable of this kind of violence.

A.    I wouldn't say capable.

Q.    Did you tell him that -- did you tell the FBI Agent that you often thought that Robin's life was in danger when Robin was with Alfred?

A.    Yes.

Q.    All right.  And that Williams also stated, and that's you, that you were pretty sure that your brother was capable of killing Robin.  Do you remember making that statement?  I have your 302, if you'd like to --

A.    Okay.

            THE COURT:  Would you like to look at it?

            THE WITNESS:  No, I don't have to look at it, Your Honor.

            THE COURT:  Okay.

BY MS. BOOTH:

Q.   And you told Megan Beckett at that time that Alfred knew the difference between right and wrong, and he made the choice to kill JG1999.  Do you remember making that statement?

A.   I don't remember saying he made a choice.  I don't remember that.

Q.   Would you like to see your --

A.   No, ma'am.  I don't have to -- I don't have to see it.

Q.   Do you just not remember making the statement?  Or are you saying --

A.   Some things I --

Q.   -- that you didn't make the statement?

A.   Some things I don't remember, but I don't have to see it.

Q.   All right.  Now, when you -- and I want to draw you back in time now when you were a child with your brother.  And from zero to four, y'all lived together in your house with your mother and the rest of your siblings that were born at that time.  Right?

A.   Yes, ma'am.

Q.   And when he was four, that's when you moved to Ms. Mary's, which was right down the street.  Correct?

A.   Correct.

Q.   So you were, if you were six years older, you were ten when you were at Ms. Mary's.  Right?

A.   Correct.

Q.   Now, how long did you stay at Ms. Mary's?

A.   Till I got older, till, like I say, I got 12, and then I moved into Lutcher with my grandmother.

Q.   Now, let's talk about Ms. Mary.  Was Ms. Mary a person that had some type of disability with one of her legs?

A.   Yes, ma'am.

Q.   And when you moved in with Ms. Mary, wasn't it part of your living there that you were going to help her with a few things?  Did you help her there at the house?

A.   With a few things.

Q.   Yeah.  Did she need help, a little bit of help getting around?

A.   Yes, ma'am.

Q.   And did she bake and make cookies and things that she would sell in the community?

A.   Yes, ma'am.

Q.   And did you help with that?

A.   No, not help -- no.  She used to do that herself.

Q.   Okay.  And were there great big pans that were used to make these cookies and these different things that she would sell?  Do you remember that?

A.   Yes, ma'am.

Q.   All right.  And so did Ms. Mary have any boys?  Did she have male children?

A.   Oh, yeah, she did have a lot of children, a lot of older, yeah, she did.

Q.   Okay.  And was there any particular male child that would come and stay at Ms. Mary's house?

A.   Not to stay.  I don't remember that.

Q.   Like would come and spend the night or anything like that?  You don't remember that happening?  I mean, I'm just asking you.

A.   Yeah, I know --

Q.   I don't know the answer to the question.

A.   I understand.  I'm trying to remember.

Q.   Yes, ma'am.

A.   One time Ms. Mary had her son came, Leroy.  He came, stayed one time I think.

Q.   When you were there?

A.   I think so, uh-huh.

Q.   Was Leroy ever inappropriate with you, sexually?  And I realize that's a really blunt question, but --

A.   Not to me.

Q.   Okay.  Now, when you were there with Ms. Mary, you were going to Paulina School.  Is that correct?

A.   Yes, ma'am.

Q.   And what grade did -- do you remember what grade Alfred went to school?  Was he four or was he five when he went to school?  Or six or seven?  Did they have kindergarten in Paulina?

A.   Yeah, at the time they did.

Q.    Okay.  And what grade was it?  Do you remember what grade kindergarten was?

THE COURT:  What what?

BY MS. BOOTH:

Q.    I mean, do you remember --

MS. BOOTH:  Gah, I'm sorry, Judge, I've kind of lost my mind.

BY MS. BOOTH:

Q.    Do you remember how old the -- because some kindergartens start at four, some kindergartens start at five.

A.    Right, correct.  Probably five, because like I -- I think five.  I'm not sure.

Q.    Okay.  So at five, you would have been -- if he would have been five and going to kindergarten, you would have been eleven.

A.    Uh-huh.

Q.    Is this the period of time when you were 11 that you were tutoring Mr. Bourgeois?

A.    Yeah, trying -- yes, ma'am.

Q.    All right.  Now, tell me what subjects you were tutoring him in.

A.    Mostly like reading, reading.

Q.    With a five-year-old program, you were tutoring in reading?

A.    Mostly like, like I say, it was mostly like letters and

stuff I used to help him with, trace his name and stuff like that.

Q.   Okay.

A.   I remember.

Q.   And he was five years old, and he was having a little difficulty with that?  Is that what you --

A.   For what I see, yeah.

Q.   Okay.  What other subject did you tutor him in?

A.   Like numbers, like counting.

Q.   Okay.

A.   Okay.

Q.   And this was in the five-year-old program?

A.   Yes, ma'am.

Q.   Okay.  Now, when was the next time, if there was a next time that you tutored him, and in what subject?

A.   As go on, it was like math, and then I remember like tests, he try -- I tried to, like for the tests he had to study for, I tried to help him.

Q.   Uh-huh.

A.   Like I would, I would like --

Q.   What test?  What subject?

A.   Okay, like math.

Q.   Okay.  And what -- where were you living when you tutored him?

A.   Okay, I was at -- I was at my mother at the time.  Okay.

Q.   Okay.  So you were living with your mother when you were tutoring him.

A.   Well, like I said, we was back and forth with my mother, then after that, you know, I was living with Ms. Mary.

Q.   Right.

A.   Uh-huh.

Q.   But you went to Ms. Mary when you were ten years old.

A.   Okay.

Q.   So at nine years old, you were tutoring your brother?

A.   Yeah, trying to help him with his homework.

Q.   Okay.  So he would have been three at that time.  So you were tutoring your brother when he was three?

A.   No, not three.

Q.   Okay.

A.   He had to be, like I said, like five or something.

Q.   Right.  So that would have put you at 11, and you would have been at Ms. Mary's.

A.   Right.  Right.

Q.   Okay.  So when you left to go live in Lutcher?

A.   Yes, ma'am.

Q.   How far is Lutcher from Paulina?

A.   About a 15-minute drive.

Q.   15-minute drive.  And when you moved, you moved and you went to school in Lutcher.  Did you, when you were 12, have a driver's license or --

A.   No, ma'am.

Q.   Or a car or anything?

A.   No, ma'am.

Q.   So you didn't -- to get back to Paulina, you would have had to have been driven.  Is that correct?

A.   Correct.

Q.   Okay.  So did you -- you're saying that you came home every weekend?

A.   Yeah, every weekend just about.

Q.   Okay.  And who brought you home?

A.   My daddy was living at the time.  My daddy used to take me some time, come get me.

Q.   Okay.  And he would take you where?

A.   To my mother.

Q.   To your mother.  And that was during the period of high school.  Is that correct?  Middle school through high school?

A.   Yeah, middle -- yeah, middle school.

Q.   Middle school through high school.  And when you were living in Lutcher, were you tutoring your brother?

A.   When I used to come home?

Q.   Uh-huh.

A.   Yeah.  Like I say, for the weekend, I used to help him with his homework and stuff like that.

Q.   Okay.  So, but you said that was letters and some math.  So as you got older, what were you working with him in?

A.    What you mean?  Oh, what you mean at the time?

Q.    Well, when you were living in Lutcher.

A.    Well, like I said, when I used to come home, I used to help him with his homework, you know --

Q.    In what?

A.    Reading, math, stuff like that.

Q.    Okay.  Now, you said your grades were B's and C's.  Were they B's and C's and D's?

A.    I had a few D's.  A few F's, too.

Q.    And a few F's.

A.    I'm not ashamed to say it.

Q.    And did you know that your brother didn't have any F's --

A.    No.

Q.    -- in high school?  Did you know that Mr. Bourgeois had no F's in high school?

A.    I didn't know that, Your Honor.

Q.    Okay.  So you had B's and C's and D's and F's in high school.

A.    Uh-huh.

Q.    Okay.  All right.  Now, on from that, you said that he had difficulty, you would explain things.  Besides cleaning the bathroom, what is it that he had difficulty understanding?

A.    Comprehension.  Like you try to explain to him something, directions like on a paper, to me he was, he couldn't catch it fast, to me.

Q.   And in what time period was this that you're talking about?

A.   Constantly, from what I see.  You know, from what I could see, I was trying to help him to do.

Q.   Okay.

A.   To me, he just was slow in some things.

Q.   And did you ever mention that when you were interviewed on the 25th of 2003, on the 25th of 2004, on March the 2nd of 2004, in September of 2003?  Did you ever mention any of that to anybody that spoke to you?

A.   What you mean?  What do you mean, "anybody"?

Q.   Did you mention that to anybody that spoke to you?

A.   I let them know that, you know, my brother was slow and he had problems in learning, you know.

Q.   And when was it that you mentioned that?  Wasn't that when you spoke to the investigator from the Public Defender's Office that's here now in May of 2007?

A.   I did what?  I'm sorry.

Q.   In May of 2007, didn't you tell them then, did you tell them then?

A.   Tell them what, Ms. Patti?

Q.   That he was having trouble in school.

A.   I think I did.

Q.   Or maybe you didn't.

A.   I don't remember them asking me about that.

Q.   Okay.  Now, when he lived in the trailer behind you, do you remember how old he was?

A.   He was a little older.  I'm not --

Q.   Was he still in school?

A.   No, he wasn't in school, not at the time.

Q.   He was out of school.  Okay.  And let me ask you this, do you have -- do you do the laundry for your husband?

A.   Do I do laundry for my husband?

Q.   Uh-huh.

A.   Yeah, uh-huh.

Q.   All right.  And do you cook for your husband?

A.   Yes, ma'am.

Q.   Okay.  And when there are family gatherings, do the women cook pretty much and control how things are going to happen --

A.   No, we all --

Q.   -- in your family?

A.   We all do.

Q.   Now, did you ever -- I want to jump ahead now.

A.   Uh-huh.

Q.   After you talked about the job that your brother, I mean your husband secured for Alfred, did he have other jobs after that that you didn't have anything to do with him getting?

A.   Yeah.

Q.   Do you know if he worked for R. E. Garrison?

A.   No.  I don't know.  I don't know all the jobs he had.  I

don't know that.

Q.   Okay.  So after that initial job that your husband got for him, or helped him get --

A.   Yes, ma'am.

Q.   The jobs after that, did anybody from your family get those jobs for him?  Or did he get them for himself?

A.   No, people helped him get jobs, that I know.  I know my husband helped him get the job at Imperial Sugar.

Q.   Okay.  Did you help him get the job at R. E. Garrison?

A.   No.

Q.   All right.  And was there a time that he moved away from the trailer that was there and he actually purchased a house?

A.   Yeah.

Q.   And did you ever visit his house?

A.   Yes, I did.

Q.   And where was his house?

A.   It was in Reserve.

Q.   Okay.  And was it a nice house?

A.   It was nice.

Q.   How many bedrooms did it have?

A.   Three.

Q.   How many bathrooms did it have?

A.   Two.

Q.   And did he have a pool?

A.   Yeah, a round pool, uh-huh.

Q.   And did you go to parties at his house?  Barbecues?

A.   Yeah, sometime.

Q.   And did Mr. Bourgeois enjoy having these parties and inviting his family?

A.   Yes.

Q.   And at these parties, would he barbecue?

A.   He try.

Q.   Okay.  So he's not a very good cook?

A.   Not to me.

Q.   Okay.  But he did barbecue for you.  Right?

A.   He try.

Q.   And would he have drinks there, and would he have -- and not necessarily alcoholic, but there was alcohol there, wasn't there?

A.   Yes, ma'am.

Q.   And would people bring different dishes?  Or did he provide all the food when you would go over to his house?

A.   No, he didn't provide that, no.  We used to bring some things down.

Q.   Okay.  And did he have a video camera?

A.   I'm not sure now.  I don't remember a video camera.

Q.   Do you ever remember being at a party and him going around and videoing everybody?

A.   Okay, I remember -- yes, ma'am.

Q.   And he was running the video camera, walking around,

talking to everybody?

A.    I remember having a video camera, but you know, I can't remember, you know, what all he did with it.

Q.    And when you would go there, did y'all enjoy going and being with the family and letting the kids swim and eating barbecue?

A.    Did we enjoyed it?

Q.    Uh-huh.

A.    Yes, ma'am.

Q.    All right.  And did Mr. Bourgeois seem to enjoy being the host?

A.    Not really a host, you could say.  You know --

Q.    What do you mean?

A.    I mean, you know, to me, you know, when we would be with Alfred, he -- I don't know, he was just -- it was like a, I don't know, a distance between him.  You know, he was, I don't know, it's kind of hard to explain.  But you know, he treat us well.  You know, but you could see like his mind was, you know.

Q.    Okay.  Now, so he would invite you over for barbecues, and everybody's kids would swim.

A.    Uh-huh.

Q.    And did he have a motorcycle?  Did he have a three-wheeler?  Did he have things that the kids, he would take them rides on?

A.    He had a motorcycle, uh-huh.

Q.   Uh-huh.  And would he take the kids out and ride them around for fun?

A.   Where?  At the house?

Q.   Just around the neighborhood.  Just around the neighborhood.  Do you remember that?

A.   Well, I never seen him took the children when we were there, you know, to ride on the thing, you know.

Q.   Uh-huh.  Have you ever seen him ride his motorcycle?

A.   Yeah, one time.

Q.   Okay.

A.   When he had that accident, yeah.  He was on that four-wheeler.

Q.   On a four-wheeler.  But I'm talking about his motorcycle that he had there at the house.

A.   Okay.

Q.   Did you ever see him ride his motorcycle?

A.   Yeah, I seen him a couple of times.

Q.   And sometimes when he'd ride his motorcycle, he'd even have his dog on his lap, or carrying his dog.  Right?

A.   I didn't seen all that.  I don't know all that.

Q.   Okay.  Now, the three-wheeler accident, let's talk about that.  That wasn't when he had his house, was it?  When did the three-wheeler accident happen?

A.   I don't remember if he had the house.  I can't remember that.

Q.   Okay.  So, but he was older when he had the three-wheeler accident?

A.   Yeah, he was older.

Q.   All right.  And -- okay.  Now, did you ever see him drive a great big truck?

A.   Yeah.

Q.   A great big 18-wheeler.  Did you ever see him, did he ever drive up to your house or drive up to anything that y'all were having where you would see him actually driving this great big truck?

A.   Yes, ma'am.

Q.   And did you know that he was a cross-road, cross-country driver for probably 15, 17 years?

A.   Yes, uh-huh.

Q.   And did you ever go with him on any of these cross-country trips?

A.   No, ma'am.

Q.   All right.  Do you know, did you ever speak to any of his employers and hear what they had to say about his ability or about his job performance or anything?

        MS. LARIN:  Your Honor, we're going really far afield of time frame we were talking about on direct, and I don't know that she has any basis --

        THE COURT:  Overruled.

BY MS. BOOTH:

Q.   Did you ever talk to any of his employers?

A.   What, drives -- huh-uh, no.

Q.   After all, even through all of this, is it -- it's fair to say, Ms. Williams, isn't it, that you love your brother, you love your sister-in-law, Robin, that you don't have any -- that you love AB1994 and his other daughter AB2001?

A.   Correct.

Q.   Have you had any contact with them since this has been over?

A.   No.  No.

Q.   All right.  Now, I want to go back to, skip back again in time when you were young.  I believe that you made the statement in a couple of your statements that Mr. Bourgeois would not mind your mother.

A.   I'm sorry?

Q.   Mr. Bourgeois would not, your brother, Alfred, would not mind, and so he would get himself in trouble.  And it didn't take much to set your mother off with him.  Is that correct?

A.   What you mean "in trouble"?  I mean, explain yourself.

Q.   Well, that he would get whippings because he wouldn't mind.  Like he refused to eat, so he got in trouble.  The punishment as you say, it was way out of line, but that he was an average child that just would refuse or be insolent and --

A.   No.

MS. LARIN:  Objection, Your Honor, to the word

"average."

THE WITNESS:  He's not -- to me, what I see, he was not an average child.  The way my mother used to abuse him, how she used to whip him, that would cause any child to be insane, to me.

BY MS. BOOTH:

Q.  All right.

A.  And that's how I feel.  I mean, I seen my mom, how she used to treat him.

Q.  Uh-huh.

A.  And that, to me, being a child seeing this young, if you had a mother who would whip you and abuse you like my mother did, that's enough to make anybody insane.

Q.  Right.  But you never --

A.  That's how I feel.

Q.  -- told that to anybody.

A.  Well, no, I know I never told that --

Q.  Yes.

A.  -- because I was --

MS. LARIN:  Objection, Your Honor.  We already went through that she did in fact --

THE COURT:  Overruled.

MS. LARIN:  -- tell people.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  That's all right.

BY MS. BOOTH:

Q.   Now, you were -- I believe we've had conversations about this many years ago.  You were very proud of what your brother, Lloyd and your brother Alfred were able to accomplish when they started these, either a trucking company or staying employed. Lloyd seemed to do a little better financially, but Alfred was able to buy a house and a car and a motorcycle.  And at one point, did you know whether or not he purchased his own truck and was trying to start his company that way?

A.   I don't know that.  I don't know that.

Q.   All right.  But you assumed that he was doing well because of the house that he purchased --

MS. LARIN:  Objection, Your Honor, to "assume."

THE WITNESS:  I'm not going to assume that, because I don't know that.

THE COURT:  Sorry?

MS. LARIN:  Objection to, she's asking her to find out what she assumed.

MS. BOOTH:  Several years ago --

THE COURT:  Overruled.

BY MS. BOOTH:

Q.   -- weren't you, didn't you tell me that you had been proud of the fact that he had been able to do so well, coming from the background that he had come from, that he had been able to buy a house, and those things you were proud of for him?

MR. WISEMAN:  Your Honor, I'm going to object to this.

THE COURT:  Excuse me.  This is not your witness. Sit down.

MR. WISEMAN:  Oh, I'm sorry, Your Honor.

THE COURT:  Yes, sir.

BY MS. BOOTH:

Q.   Were you proud of your brother when he was able to maintain a job and have a home?

A.   I was glad for him.

Q.   Okay.  And you had told that to the prosecution team years ago, hadn't you?

MS. LARIN:  Your Honor, could I object?  She's really testifying about the things that she heard.

MS. BOOTH:  This is cross-ex.

THE COURT:  This is cross-examination.

MS. LARIN:  You can testify about what you heard as a witness?

THE COURT:  Overruled.

BY MS. BOOTH:

Q.   Now, I need just a second.

A.   Okay.

Q.   Now, let's talk about the fact that at Ms. Mary's house again that the person that would come and stay was Leroy.  Is that right?  Leroy.  And what was his last name?  Was it

Taylor, like Ms. Mary's name?

A.   Clayton.  Clayton.

Q.   Clayton.  Oh, I'm sorry, Clayton.  That's right, Ms. Mary Clayton.

A.   Yes, ma'am.

Q.   And do you know whether or not Leroy was a pedophile?

A.   A what?

Q.   A pedophile.  Abused children.

A.   I don't know that part.  I don't know that.

Q.   Okay.  Do you know whether or not he would go there and rape your brother when your brother was staying there?

A.   I don't know that.

Q.   Okay.  You've never heard that?

A.   No, not that -- no, I never heard that of him.

Q.   All right.  During this period of time when Mr. Alfred Bourgeois lived with Ms. Mary, and you say the reason that he left Ms. Mary was because he got older?  Is that what you testified to?

A.   As far as I know, that's what I think, but I don't know.

Q.   Okay.  You think it was because he got older.  And the older -- okay.  I forgot where I was going.  That happens sometimes.  And so the -- during this period of time when Mr. Bourgeois lived with Ms. Mary, were y'all attending a certain church?

A.   Yes, ma'am.

Q.   Okay.  And what church was that?

A.   Evergreen Baptist Church.

Q.   Evergreen Baptist Church.  Who was the choir teacher or the choir master for that church?

A.   At the time?

Q.   Uh-huh.  Do you remember?

A.   I think it was a lady named Brenda, and Ms. Liddy, I think.

Q.   Oh, okay.  So it wasn't a male that was the leader.

A.   We had male Sunday school teachers.

Q.   Male Sunday school teachers.

A.   Yeah.

Q.   And who taught Sunday school?

A.   They had this guy, Raymond Adam.  I remember him.

Q.   Raymond Adam.

A.   Uh-huh.

Q.   And did he teach Mr. Bourgeois?

A.   Yeah.

Q.   Okay.  And was he raping Mr. Bourgeois?

A.   I know he was a faggot.

Q.   Okay.  But did you ever hear that he raped Mr. Bourgeois?

A.   Yes, I did.

Q.   Where did you hear that?

A.   After, I heard.

Q.   Okay.  After -- I'm sorry.  You're going to have to give

me better than "after."

THE COURT:  After the trial?

THE WITNESS:  It was before then I had heard.

THE COURT:  From whom?

THE WITNESS:  It was from a family member.

BY MS. BOOTH:

Q.   Which family member?  Who told you that Mr. Raymond was --
was it that you found out that he was a faggot -- I'm using
your words, not mine --

A.   I understand.

Q.   -- okay, or that you found out that he was raping
Mr. Bourgeois?

A.   I didn't know if he was raping him, but I know, like I
say, he was a Sunday school teacher, and he used to teach those
little boys.  I remember that in Sunday school.

Q.   Okay.  He taught the little boys, but do you have any
other knowledge about this?

A.   About him raping Alfred?

Q.   Uh-huh.

A.   No, not, you know, not that he raped him, no.  I'm not
sure.

Q.   Was this guy a violent man?  Do you know if he had a gun?

A.   No, he wasn't violent.

Q.   Okay.

A.   But he was disturbed, for what I see.

Q.    Okay.

A.    He had problems.  He had issues, for what I see, going to Sunday school.

Q.    Okay.  And how old were you when you saw these issues?

A.    Oh, going to Sunday school?  We was young.  Like nine, ten years old we used to go to Sunday school.

Q.    Okay.  So you were nine or ten.  You were nine or ten, so that made Mr. Bourgeois four, or even less.  Three.  So was he going to Sunday school at three?

A.    No, not at three.

Q.    Okay.

A.    It was, like I say, he would have to be a little older.

Q.    Okay.

A.    But we all used to go to Sunday school together.

Q.    Okay.  So when you lived in Lutcher, did you go to Sunday school with Mr. Bourgeois?

A.    Yeah, I used to come up here and go to our church, yeah.

Q.    Oh, okay.  So it was Mr. Raymond that we're talking about.  Raymond -- and what was his name?  I'm sorry.  I didn't write it down right.

A.    His name Raymond Adam.

Q.    Adam?

A.    Yes, ma'am.

Q.    Okay.  So Raymond Adam and Leroy Clayton.  Okay.  Now, let's talk about, you were talking about some, where he would

get really mad and his face would get really red.  Okay.  Do you remember the first time you saw him get a really red face and get really mad?

A.   When my mother abused him.

Q.   Okay.  Now, your other brothers and sisters, isn't it true that she also beat all of y'all?

A.   She beat all of us, but she didn't beat us like she beat him.

Q.   Okay.  But she was physically abusive with everybody --

A.   Not with everybody.

Q.   -- and he was the worst.

A.   No, ma'am, I have to correct, not with everybody.

Q.   Okay.  So who did she leave out?

A.   With the whippings?

Q.   Uh-huh.

A.   Well, she --

Q.   Who did she not whip?

A.   Well, my little brother Anthony, because he was retarded. She didn't whip him.

Q.   Okay.  So if you're retarded, you don't get whipped. Okay.  What else?

A.   Well, all us got whipped.

Q.   Okay.

A.   But Alfred got the most of it.

Q.   He got the most?

Williams - Cross                                    79

A.   The most abused, yeah.

Q.   Right.  Okay.  And when the others would get whipped, did people's faces get red and they get all upset about it?

A.   If you had a mother like I did whip you, you would make faces too.

Q.   And please don't think I'm being disrespectful about your abuse.

A.   Oh, I'm just telling you how I feel, though.

Q.   I know.  I know.

A.   I'm just telling you how I feel.

Q.   I know, and please do.

A.   And how it is.  Oh, I don't have a problem with it.

Q.   I'm sorry.  I know this is painful.

A.   I'm just telling you the truth.

Q.   I know.

A.   Okay.  Very painful.  I don't even like to think about it.

Q.   So, but did everybody that got whipped like that get red in the face?  Did everybody that got whipped -- I mean, I realize, we'll pull aside the fact that his was much more stringent discipline, but didn't everybody get red in the face and upset when they would get whipped?

A.   Yeah, because of how my mama used to whip us.

Q.   Right.

A.   Anything, broom, her hand, anything she put her hand on. Extension cord, yeah.  Belts, buckles.

Q.   Did she ever burn y'all with anything?  Would she burn you?

A.   I don't know about burning us, no.

Q.   Okay.  Now, these rages, were they the same all the way through, the way that he would react to anger?  Now, knowing that you only got to see him on the weekends, okay, but did you notice any change, or did he always react the same to anger or to situations like abuse?

A.   What I noticed -- like I say I'm the oldest.  We was coming up, my brother, to me, for what I see how my mother used to treat him, to me he got that way, how she used to do him --

Q.   Okay.

A.   -- for what I see.

Q.   Ms. Claudia, how -- I mean, Ms. Williams.

A.   Uh-huh.

Q.   I'm sorry, Mrs. Williams, how many of Alfred's wives were also friends with you?

A.   Friends?

Q.   That would come and talk to you.

A.   We used to talk, uh-huh.

Q.   Yeah.  And so the first wife was whom?

A.   Sheila was the first one.

Q.   All right.  And would Sheila complain to you that he was mean to her?

A.   Not all the time.  Not all the time.

Q.   But sometimes she would tell you that he was mean to her?

A.   Sometime.

Q.   Okay.

A.   Not all the time.

Q.   And did he ever hit Sheila, do you know?  Did Sheila ever tell you that?

A.   Yeah.

Q.   Was she afraid of him?

A.   No, she wasn't afraid of him.  I don't think she was afraid of him, no.

Q.   But he hit her?

A.   Every now and then.  My husband hit me.  The honest truth. I mean, you know, not hard, but --

Q.   Yeah, and you don't have to take that either.

A.   No, it's not to kill me.  You know, sometime we get in it, you know, and --

Q.   Yeah, but you don't have to take that.

A.   Well, I know that.

Q.   You realize that.

A.   I know that.  But it happens.  I think every marriage you might have a little issues going on, but it happens.

Q.   All right.  Now, his second wife, did she come and talk to you?  Who was his second wife?  Was that Gaynell?

A.   I think so, yeah.

Q.   And did Gaynell tell you that he hit her?

A.    No.  She never told me that.

Q.    Okay.  Was Gaynell afraid of him?

A.    No.

Q.    Did Gaynell leave him constantly?

A.    I don't know if she constantly leave.  I don't know that.

Q.    Okay.

A.    I don't know that.

Q.    And what was the third wife?  Do you know who the third wife was?

A.    Robin, I think.

Q.    All right.  And Robin confided in you.  Is that correct?

A.    Yeah, uh-huh.

        MS. LARIN:  Objection, Your Honor.  This is getting really beyond the scope, and none of this is in dispute.

        MS. BOOTH:  Your Honor, my contention is that he is a sociopath.  And in that way, I'm trying to give a different take on why he acted the way he did.  They're trying to prove that there's some, he's not responsible for any of his actions because he was hurt as a child.  And although I agree he was hurt as a child, I have a different take and a different theory that I'd like to put before the Court, number one, and that's our response.

        MS. LARIN:  I think, Your Honor, that should really come through an expert witness.  The fact that these women had, that there was a volatile relationship and violent relationship

with the wives and girlfriends is already --

THE COURT:  Overruled.

MS. LARIN:  -- in the record.

THE COURT:  Overruled.

BY MS. BOOTH:

Q.    The three-wheeler accident, did his rages get any worse after the three-wheeler accident?  Did they get any less?  Or was there no change at all?  Or it just wasn't any milestone at all?

A.    To me, after the accident, look like he got worser to me, for what I see, you know, after he -- after he had injured his self real bad.

Q.    Uh-huh.

A.    Yeah.

MS. BOOTH:  Could I have just a second, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

BY MS. BOOTH:

Q.    When Mr. Bourgeois was in the hospital with the three-wheeler accident, did you go and visit him?

A.    A couple times.

Q.    Okay.  And when you went to visit him, if I remember correctly, the injuries were a broken leg, I think, and a ripped scrotum.  Is that right?

A.    I don't remember all, you know, all was wrong with him,

but I know that --

            THE COURT:  For who?  I'm sorry.

            MS. BOOTH:  Mr. Bourgeois.

            THE COURT:  Okay.

            MS. BOOTH:  On the three-wheeler.

BY MS. BOOTH:

Q.   And when you went to -- did you go right after it

happened?

A.   When he got in the accident?

Q.   Yes, sir -- yes, ma'am.

A.   Well, when he got hurt, when he first did it, I was there

on the scene.

Q.   Oh, okay.

A.   Before the paramedics get there.

Q.   Okay.

A.   I had seen it.

Q.   Okay.

A.   I was there first.  Because I thought he was dead.

Q.   And did he appear to be in a lot of pain?

A.   Oh, he was uncon -- I thought he was dead.

Q.   Okay.

A.   Because I tried to, you know, I was trying to wake him up,

but he was unconscious.

Q.   Okay.

A.   And I said, I just thought --

Q.    Now, let me ask you that.

A.    Yes, ma'am.

Q.    He was unconscious.  Did you ever tell anybody that?

A.    Yeah, I did.

Q.    Who did you tell?  Did you tell some of the investigators over here?

A.    What, on this side?

Q.    Yes, ma'am.

A.    Uh-huh.  And your side, too, I had told them that.

Q.    Who did you tell?

A.    One of the ladies.  They came and asked me about the accident.  I think it was --

Q.    When was this?  This was after the trial.  Correct?

A.    Yeah, I think so.

Q.    Okay.  So after the trial is when you first told that you were on the scene and that you had to shake him.  Is that right?

A.    Yeah, to try to wake him up.

Q.    Now, did he wake up when the ambulance drivers got there?

A.    Not for what I see, because he was unconscious.

Q.    Okay.  And so when you got to the hospital, was he in a coma for one or two weeks, or three weeks?

A.    I didn't go to the hospital right away.

Q.    Okay.

A.    You know.  I don't know that part.

Q.   Okay.  So when did you go to the hospital?

A.   It had to be probably three or four days after I went and seen him in the hospital.

Q.   Okay.  And how was he doing?

A.   Not good to me, from what I seen.

Q.   Okay.  So what do you mean?  What do you mean he wasn't doing good?

A.   He was in a lot of pain.  Like he was in and out of it, you know, he --

Q.   And so you were talking to him?

A.   No, there wasn't no talking, because he was in a lot, you know, he was in a lot of pain.

Q.   Okay.  So they were giving him pain medication?

A.   Yeah, and he was hook up to a lot of tubes and stuff.

Q.   Uh-huh.  And they had to operate on his leg?

A.   I think so, ma'am.

Q.   Okay.  But he was not in a coma?

A.   Well, when I talked in there, like I say, he was unconscious.  He's, you know, he wasn't talking or nothing when I seen him, when I went and looked at him.

         THE COURT:  Well, was he asleep or in a coma?

         MS. LARIN:  Objection, Your Honor.

         THE COURT:  To my question?

         MS. LARIN:  Oh, I -- I think that it's pretty clear that she said she (sic) was unconscious, so whether it's asleep

or in a coma, all she saw was that he was not responsive.

THE COURT:  Do you know whether he was asleep or in a coma?

MS. LARIN:  She's not a doctor.

THE WITNESS:  From what I see, he was out.

THE COURT:  Okay.

THE WITNESS:  What I see.

BY MS. BOOTH:

Q.  When, were you ever -- you spoke to Mr. Bourgeois about the fact that he was beating Robin, didn't you?

A.  I did.

Q.  You talked to him and tried to smooth things over with him, didn't you?

A.  What you mean, Ms. Patti?

Q.  I mean, you had conversations with, after Robin told you that and showed you bruises on different occasions, that he had made on her body, you knew that he was beating her.  Right?

A.  Sometime.

Q.  And you had conversations with him about that, didn't you?

A.  No, not -- to him?  To Alfred?

Q.  Uh-huh.

A.  No.

Q.  Didn't you ever try to calm him down when he was upset? Didn't you have conversations with him?

A.  Yeah, talking to him, you know.

Q.    Okay.

A.    Like try to talk.

Q.    And was he ever sorry?  Did he ever show any lack of, I mean, did he ever show any remorse about hitting Robin?

A.    Yeah, he showed it, yeah.

Q.    What would he say?

A.    He didn't say.  He just was, like I say, he had a rage about his self.  You know, he didn't say too much.

Q.    Okay.

A.    And I say, "Alfred," you know, I know you got problems with Robin.  Y'all need to communicate and try to talk," you know, like that.

Q.    Uh-huh.

A.    Try to talk to him.

Q.    Right.  Okay.  And his relationship with AB1994, did you ever see him go into a rage about AB1994?  Or how did he treat AB1994?

A.    I never seen him whip AB1994.  He used to fuss at her when she was real bad.

Q.    Now --

        MS. BOOTH:  I guess that's all I have, Your Honor. Thank you.

        THE COURT:  Thank you.  Anything further?

        MS. LARIN:  Just one question, Your Honor.

        THE COURT:  Go right ahead.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One question, Mrs. Williams.

A.   Okay.

Q.   On February 25th, you were interviewed by, over the phone, by Mr. Bierbaum.

A.   Uh-huh.

Q.   And I'd like to just show this.  This is Petitioner's 57, and this is, Mr. Bierbaum wrote notes about his conversation with you.  In that conversation, he asked you whether Alfred was abused.

A.   Yes, he did.

Q.   Do you recall having a conversation that he asked you whether Alfred was abused?

A.   Yes, I remember.

Q.   And you told him, as is shown in these notes, that Alfred got the most beatings.

A.   Yes, ma'am.

Q.   Do you remember that conversation?

A.   Yes, ma'am.

          MS. LARIN:  Okay.  Thank you, Your Honor.  I have no further questions.

          THE COURT:  Thank you.

          MS. BOOTH:  Well, Your Honor --

                    RECROSS-EXAMINATION

BY MS. BOOTH:

Q.   I think this is a wonderful exhibit, because you also say there that he was hard-headed, that he didn't listen.  Isn't that correct?

A.   Ma'am, that --

Q.   I know, but didn't you say that?

A.   I'm going to answer your question.

THE COURT:  No, no.

THE WITNESS:  Oh, I'm sorry.

BY MS. BOOTH:

Q.   Did you, didn't you say that?

THE COURT:  This is the way it goes.  He asked -- just a moment.

THE WITNESS:  Okay.

THE COURT:  She asks questions, and you answer.

THE WITNESS:  Okay.  Yes, ma'am.  I'm sorry.

BY MS. BOOTH:

Q.   And in that, when you said he got the most whippings, then you said, "And he was hard-headed and he didn't listen."  Isn't that also what you said?

A.   But ma'am, that's not a cause for your mama to whip you like my mother did.  There's no reason for any mother -- I have kids, and I don't whip my children like that.  And that's how I feel about it.  There's a way to whip a child.  My mother didn't have no compassion against my brother.  And that's the

honest truth.

Q.   Or any compassion against the rest of you, except for the one that was mentally retarded.

A.   That's not true.

Q.   Correct?

A.   That's not true.  That's not true.

Q.   Well, the only one that didn't get whippings was the one that was mentally retarded.  Correct?

A.   Yeah, all us got whipping, but we didn't get whipped --

Q.   You all got whippings, except for Anthony.  Right?

A.   Right, because he was retarded.

Q.   That's right.

          MS. BOOTH:  That's all I have, Your Honor.

          THE COURT:  Anything further?

          MS. LARIN:  No.  No, Your Honor.

          THE COURT:  Thank you, ma'am.  You may stand down.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Call your next witness.

          MS. LARIN:  The next witness would be Ms. Beverly Frank.

          BEVERLY FRANK, PETITIONER'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MS. LARIN:

Q.   Just be careful about the microphone.  Okay.  Good morning, Mrs. Frank.

A.    Good morning.

Q.    Can you please state your name for the record?

A.    Beverly Clayton Frank.

Q.    And are you related to Mr. Bourgeois?

A.    No, I'm not.

Q.    How do you know him?

A.    My grandmother raised, helped raise Alfred.

Q.    Can you please move forward a little into the microphone?

A.    Sure.

Q.    Okay.  How do you know Mr. Bourgeois?

A.    My grandmother helped raise Alfred.

Q.    Okay.  And where was this?

A.    This was in Paulina, Louisiana.

Q.    And where exactly in Paulina?

A.    The Bend Lane, they call it.  It's a small community.

Q.    Okay.  Where did your mother live in comparison to Alfred's mother?

A.    My grandmother?

Q.    Your grandmother.  I'm sorry.

A.    My grandmother lived about maybe four houses from Alfred mom.

Q.    And did you live on Bend Lane?

A.    Yes.

Q.    When did you live there?

A.    As a child I lived there, until I was a teenager.

Q.   Okay.  Let's backtrack.  Can you tell us what year you were born?

A.   I was born in 1948.

Q.   1948.  And so you moved off of Bend Lane probably around, when do you think, '63?  '64?

A.   Yes.  I was in high school.

Q.   Okay.  And where did you move?

A.   To Lutcher, Louisiana.

Q.   Okay.  And this was all basically before Alfred was born?

A.   Correct.

Q.   Okay.  How often did you visit your grandmother?

A.   At least about two or three times a week, and sometimes on weekends.

Q.   And was there a time that Mr. Bourgeois moved in with your grandmother?

A.   He was about seven years old when he moved in with my grandmother.

Q.   Okay.  And how often would you see him there?

A.   Basically two or three times a week, because that's when I would go to my grandmother and run errands for her, go and see her, check on her.

Q.   Okay.  And about how much time did you spend with Alfred there?

A.   I would be at my grandmother all day, because she was the type of person if you go and visit her, she didn't like an hour

visit, she would make you stay, tell you, "Well, you don't need to go right now."  You know, "You stay here.  Keep me company," or whatever.  So I was practically there all day when I would go.

Q.  And about how old were you at this time?

A.  I was, I would say, just before maybe my teenage years.  I had started seeing, well, seeing Alfred around that time.

Q.  Okay, wait.  Backtrack.  You -- Alfred was seven years old when he moved in with Ms. Mary.  Correct?

A.  Yes.

Q.  So he, that would have been about 1971, '72.

A.  Correct.

Q.  '71.  So how old were you then?

A.  I was --

Q.  Sorry to make you do math.  It seems like you would have been about 23 or 24 years old.

A.  I was 23.  I'm about to say that.  I was 23.  I had just gotten married, and I was between jobs, so I used to go to my grandmother a lot during that time, because I was job hunting.

THE COURT:  What time period?  What time period was that?

THE WITNESS:  I'm trying to think.  I was 23 years old --

BY MS. LARIN:

Q.  When did you get married?  When did you get married?

A.    Twenty-three.

Q.    What year was that?

A.    1971.

Q.    Okay.

A.    Uh-huh.

Q.    And --

THE COURT:  So how long were you out of a job?

THE WITNESS:  For several months.

THE COURT:  Okay.  So during that period, you were there more?

THE WITNESS:  Yes, because I ran --

THE COURT:  Was it over the winter or the summer or --

THE WITNESS:  I'm trying to think.  It was more the summer, because I got married in August of '71, and going into the fall, in other words.

THE COURT:  So he was at school during the days?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MS. LARIN:

Q.    Okay.  So I'm going to try to focus you on that time.

A.    Uh-huh.

Q.    There's a lot of markers for that time.  You got married, Alfred moved into your grandmother's house.

A.    Right.

Q.   And you were spending more time than usual at your grandmother's house around that time.

A.   Yes, because I wasn't working.  I was out of work.

Q.   But even throughout your life, it sounded like you spent, you were at your grandma's house on a very regular basis.

A.   We were very close, my grandmother and I.

Q.   Okay.

A.   Very, very close.

Q.   Okay.

        THE COURT:  Was there another granddaughter living with her?

        THE WITNESS:  Brundrick (phonetic), yes, she was there for a while.

        THE COURT:  Okay.  And how old was she when Mr. Bourgeois was there.

        THE WITNESS:  I don't remember at the time exactly the age she was, but she was there.

        THE COURT:  Okay.

BY MS. LARIN:

Q.   Was she actually living there, or was she around a lot, or you don't --

A.   She was actually, my grandmother help raised her, because my aunt work in New Orleans, and my grandmother helped raise her also.

Q.   Okay.

THE COURT:  Was she older than Mr. Bourgeois?

THE WITNESS:  Yes, she was a little older.

THE COURT:  How much older?  Do you know?

THE WITNESS:  No, I don't.

THE COURT:  Okay.

BY MS. LARIN:

Q.   Is she younger or older than you?

A.   She's younger than me.

Q.   Okay.  And can you describe some of the impressions you had of Alfred when he was around age seven spending time at your grandmother's house?

A.   Alfred -- my grandmother took Alfred under her wing, and she treated Alfred like she treated us, her grandkids, and she doted over her grandkids, all of her grandkids.  She loved all of us.  And she treated him no differently.  But she brought Alfred in more or less because Alfred was really mistreated by his mom.  We saw a lot of abuse.  And my grandmother just took him under her wing to stay with her.

Alfred played with my little cousins, and he was slow.  He couldn't grasp the things, like talking about, like games they played, but they took a lot of time with him.  She made sure of that.  And we just took time with him, as an individual, you know, and she treated him like he was one of us.

Q.   Okay.  Can you tell us about, other than games, is there anything else that you noticed that he was slow at for his age?

Frank - Direct                98

A.   He, at the age of about nine, he couldn't count money. And I realized that.  My grandmother sold candy for a little vendor, and she made freeze cups, what we call, like little frozen cups.  She would sell them.  And when she would ask Alfred to go and get a freeze cup for one of the kids in the neighborhood or some of the kids that would come there to spend their little change, he would -- he couldn't count the money back.  So it was always --

MS. BOOTH:  Your Honor, I'm sorry, I'm just going to interrupt just for a second, because I need to know a time frame on this.

THE COURT:  What time are we talking about?

MS. BOOTH:  What are we talking about, as far as age and counting money?

MS. LARIN:  She said age nine.

THE WITNESS:  I said age nine.  Age nine.  He couldn't count -- that's when I realized he couldn't count money, because he would go and get the candy, and my grandmother would either, she would tell me, "Watch the change, you know, count the change for him.  He can't count."  And she would ask us to try and help him to understand how to count the money back to the individual if they were giving change.  He couldn't count.  And you know, he just couldn't.  And we would try very hard to help him in every way that we could, you know, to understand.

BY MS. LARIN:

Q.   Is there any other examples you can think of of areas of his life that he had difficulty or seemed slow?

A.   Dressing himself, it was always an issue of dressing himself when I was there.  He was putting on the wrong color socks, I mean, you know, mismatched socks, or he couldn't tie his shoes at all, you know.  It was -- I don't know if he -- he must have been up in, really up in age when he learned to tie his shoes, because I can remember he never learned how to tie his shoes.  And buttoning his shirt, it always would be like one, one would be the opposite and wouldn't be, like, you know, the top button wouldn't be matching with the other one.

Q.   Uh-huh.

A.   And she'd make him take it a-loose.  You know, she would have that patience.  She would make him take it a-loose, or she would ask us to take it a-loose, let him start again.  Let him learn how to button his shirt.

Q.   Uh-huh.

A.   Put his belt on right, and missing the holes in the belt, you know, putting the belt on.

Q.   So let's break this down.  With the difficulties with dressing, the buttons and the belt, do you know around what age he was when he had this trouble?

A.   He was young.  He was, starting at about seven, he really couldn't dress himself.  I was mean, I was there.  I noticed

Frank - Direct                          100

it, he couldn't dress himself --

Q. Do you know if he --

A. -- properly.

Q. -- ever did learn? Do you know when he learned how to --

A. I saw it at the age of nine and ten, and he still was having difficulties dressing himself.

Q. Okay. And you said that your grandmother would make him, you said, take it a-loose. You mean do it again?

A. Undo it and, or either she would make us undo his shirt and tell him, "Now, do it again."

Q. Uh-huh.

A. "And start again, buttoning your shirt," you know. My grandmother went to church a lot, so you know, it was a thing of him getting dressed, you know, and on his own. And she tried to make him, teach him how to do it on his own.

Q. Okay. And did she have to do that with other areas of his life, really kind of have him repeat things?

A. Yes.

Q. Can you think of some of those things?

A. Well, it was, like explaining himself, he couldn't really explain himself real well. And she would tell him, you know, "Take your time." You know, but it was a thing of not being able -- he stuttered a lot, and it was a thing of not being, just to explain his self, you know, if he wanted to do something.

Q.    Uh-huh.

A.    But she had that patience.  She sat and she actually would tell him, "Take your time.  You know, go slow.  You can do it."  And he still would have difficulties.  But she never held that against him.

Q.    And did Alfred help your grandmother around the house?

A.    Yes, she did.  My grandmother was crippled in one leg, and she had to walk with a cane.  And there was no, per se, running water to a tub.  It was a galvanized tub, and she would heat the water like on a stove or whatever.  And she would have him to put -- she would put the cold -- hot water in.  She would have him help maybe put the cold water in.  Poor thing, he would waste it all over the floor, so it was a thing of mopping it up after, you know.

But she would, he would -- and even if she sent him to the kitchen to get something, she had to explain to him, "Alfred, go to the kitchen, go to the cabinet, go to the right-hand side of the cabinet.  You're going to see a box of crackers.  Please get it for me."  He didn't know his right from his left.  So it was like, "Go to this side and get the box of crackers."  And sometimes he would come back with the wrong thing, and she would say, "That's not right.  Go back.  And the box is yellow," or whatever.  Or explain to him what he had to look for.  But sometime he had difficulty, so we just would get up and go get it.

Q.    Uh-huh.  And your grandmother had some sort of disability?

A.    Yes, she did.

Q.    So was he there to help her in any way with the disability or --

A.    Oh, yes.  Yes.  I mean, some days my grandmother, it would be hard for her to get up and walk because of the arthritis in her legs.

Q.    Uh-huh.

A.    So he would, you know, she would ask him to get a glass of water for her.

Q.    Uh-huh.

A.    Get her medicine off the kitchen table, things of that nature.

Q.    Okay.

A.    Things like that.  He helped her a lot.

Q.    Do you remember if Alfred was teased as a child by the other children?

A.    Alfred was teased a lot.  He used to come home crying from school, being teased by the kids at school a lot, because he couldn't grasp the, like the games or other things that was going on around him, you know, with his classmates.  And he used to cry a lot.  Some of the kids in the neighborhood, one or two of them would tease him, but not -- but because of a close-knit neighborhood, they knew that he was pretty slow and that they would take, some of them, most of them would take

time with him.

Q.   Okay.  And did anyone from the Defense team, from Mr. Bourgeois's Defense team, an investigator or a lawyer, talk to you before his trial?

A.   Before today?

Q.   Yeah, before his actual trial, which was in 2004.

A.   No.

Q.   Did anyone come and --

A.   No.

Q.   -- talk to you?  You're aware your brother was a witness at trial?

A.   Yes, Herman Clayton.

Q.   But they never came and talked to you?

A.   No.

Q.   If they had come and talked to you, would you have given them this information, and would you have been willing to testify at his trial?

A.   Oh, yes, I would.

Q.   Okay.  And I'm going to mark this document as Petitioner's 45.  Can you see this?

A.   I need my glasses.

Q.   I can hand you a copy.  I'm sorry, I don't have another copy right now.  Can you -- do you recognize this document?

A.   Yes.

Q.   I'll show you, it's three pages.  And at the bottom is --

oops, sorry.  Is that your signature?

A.   Yes, it is.

Q.   Okay.  And can you tell us what this is?

A.   Declaration/Affidavit of Beverly Frank.  It's exactly the statement that I made.

Q.   And you were interviewed by someone from my office?

A.   Yes.

Q.   Do you know who that was?

A.   I can't recall the name right now.

Q.   A woman or a man?

A.   It was a lady.

Q.   A lady.  Okay.  And you told her about this information?

A.   Yes.

Q.   Then she came back and showed you this document, and you read it over?

A.   Correct.

Q.   And is everything in this document true and correct, to the best of your knowledge?

A.   Yes, it is.

        MS. LARIN:  I'd like to offer this declaration, Petitioner's 45, Your Honor.

        THE COURT:  Ms. Booth.

        MS. BOOTH:  It's cumulative, Your Honor, but --

        MS. LARIN:  The doctors relied on it, so that's why I'd like to offer it.

MS. BOOTH:  I don't know that that makes it admissible, Your Honor, but -- just the fact that somebody else relied on it.  She's testified to the things that are in there.  It seems like to me that it's just redundant.

THE COURT:  So your objection is?

MS. BOOTH:  Why would you -- I really don't have one.  You know what I mean?

THE COURT:  There you go.

MS. BOOTH:  There we go.

MS. LARIN:  Thank you.

THE COURT:  Petitioner's 45 is admitted.

MS. BOOTH:  I can be led, Your Honor.  I can be led.

MR. WISEMAN:  I like that objection.

THE COURT:  If you would have said hearsay, I might have thought about it.

MS. BOOTH:  Yeah, well, she's already testified to the hearsay anyway.

MS. LARIN:  That's not quite -- I'm sorry.  Almost.

THE COURT:  I know that.  It's quite all right.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  You all tell me when you're ready for a break also.

MS. LARIN:  I'm skipping a lot of things.  I think we've covered a lot of things already.  So I'm going to --

BY MS. LARIN:

Frank - Direct                                      106

Q.   Can you just tell us briefly, what do you do for a living?

A.   Can I tell you what?

Q.   What you do for a living.  What is your occupation?

A.   I've just recently retired in March.

Q.   And what were you -- what was your --

A.   I was an administrative assistant for St. John Parish
President's Office.

Q.   Okay.

     MS. LARIN:  One second, Your Honor.

     THE COURT:  Yes.

(PAUSE.)

BY MS. LARIN:

Q.   How long were you working in the county government?

A.   Twenty-two years.

Q.   Okay.

     MS. LARIN:  Thank you, Your Honor.  I have no more
questions.

     THE COURT:  Thank you, ma'am.  Do we want to take a
break now before the cross?

     MR. WISEMAN:  Oh, that's fine with us.

     THE COURT:  Ms. Booth?

     MS. BOOTH:  No.

     THE COURT:  You want to go ahead?

     MS. BOOTH:  Yeah.  But I'll stop --

     THE COURT:  Okay.

MS. BOOTH:  You know --

THE COURT:  No, you tell me.

MS. BOOTH:  No, I'm ready to go, Judge.

THE COURT:  Well, go then.

MS. BOOTH:  Yes, ma'am.

CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good morning, Ms. Frank.

A.   Good morning.

Q.   I wanted to ask you about some time frames here and some about your family relationships.  Do you know a person by the name -- well, let me ask you, your father was Herman Clayton. Is that correct?

A.   That's correct.

Q.   And did he have any brothers?

A.   Yes, he did.

Q.   And what were their names?

A.   We had Esau, Jacob, John, Harry, James, and their sister Frances.

Q.   Now, during the time period that Mr. Bourgeois was living at your house, at your grandmother's house, did any of those men come regularly to the house?

A.   Her sons visited her often, yes.

Q.   All right.  And were any of them raping Mr. Bourgeois?

A.   I don't have knowledge of that.  I don't know.  I wouldn't

know.

Q.    Okay.    So you've never heard that one of your uncles was coming every day and sexually assaulting Mr. Bourgeois at your grandmother's house.

A.    I have no knowledge of that, no.

Q.    Okay.

          THE COURT:    Well, have you ever heard that one of them was a pedophile?

          THE WITNESS:    I knew that one of them was living a gay life.

          THE COURT:    Was gay?

          THE WITNESS:    Yes.

          THE COURT:    Well, but does that make him a pedophile?

          THE WITNESS:    I -- I don't know.

BY MS. BOOTH:

Q.    Does that make him a child molester?

A.    Not really.    Not to me.

Q.    Okay.

          THE COURT:    Which one was that?

          THE WITNESS:    Jacob Clayton.

          THE COURT:    Okay.    But not -- never mind.    Go ahead.

BY MS. BOOTH:

Q.    Okay.    And so you never heard that.    All right.

A.    No.

Q.    Now, let's go on.    Now, when he came to live with your

grandmother, he was seven.

A.    Uh-huh.

Q.    And you've testified earlier that at seven, he had a difficult time getting himself dressed neatly.

A.    Yes.

Q.    But he put on his own underwear.  Right?

A.    Yes.

Q.    And he put on his own blue jeans.

A.    Yes.

Q.    And he put his socks and shoes, although the socks didn't match, he put on his socks and shoes, and he put on a shirt, although he didn't button it correctly.  Right?

A.    Uh-huh.

Q.    And so basically your complaint is to the neatness of the dressing, not the fact that he could dress himself.

          MS. LARIN:  Objection, Your Honor --

BY MS. BOOTH:

Q.    Is that right?

A.    No.

          MS. LARIN:  -- she's not complaining about anything.

          THE WITNESS:  There, at times --

BY MS. BOOTH:

Q.    Your observation, I'm sorry, not complaint.  Excuse me.

A.    Okay.  No --

          THE COURT:  Is that better?

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Okay.

THE WITNESS:  It wasn't a neatness thing, it was a thing of him doing it right, not be able to understand how it's properly done.  He might have had a jacket --

BY MS. BOOTH:

Q.   Well, that's your interpretation --

A.   Yes.

Q.   -- of a little --

THE COURT:  Don't interrupt her, please.

MS. BOOTH:  I'm sorry.

BY MS. BOOTH:

Q.   But that's your interpretation of a seven-year-old boy buttoning his shirt.  Right?

A.   Buttoning his shirt, putting on his clothes.

Q.   Now, you said that during a period of time you didn't have a job.  How long a period of time was it that you were spending a lot of time at your grandmother's house?

A.   Well, it was -- I was out of a job for several months.

Q.   Okay.

A.   So I went up there at least three, three times a week, sometime on weekends, because I would run errands for her.

Q.   Okay.

A.   I had free time.  I would run errands and go to the store.

Q.   So we would say that five times -- let's just give it a

big number.  So maybe five times a week, for how many months?
Several months?  Three?

A.    Yes.

Q.    So that's three times -- five times four would be twenty,
and three times twenty would be sixty.  So during a three-month
period, you may have been at your mother's house -- your
grandmother's house sixty times.  Right?

A.    That's about right.

Q.    And then after that, you were employed.  And obviously you
had a very important job, and you were employed full-time.  Is
that right?

A.    Well, at that, when I -- I was working that job, it wasn't
with the Parish.  It was with Shell Oil Company.

Q.    Oh, okay.  And so that was a full-time job.  Correct?

A.    That's correct.

Q.    And you worked all day long.

A.    Yes.

Q.    And you were married then.  That was --

A.    Correct.

Q.    You had just gotten married.  And where did you live?  How
far did you live from your grandmother?

A.    Hmm, I would say about several miles from my grandmother.
Maybe about ten miles.

Q.    Okay.

A.    At the most.

Q.    So then after those, that three-month period, then how often do you think that you may have visited your grandmother?

A.    About three times a week.

Q.    Okay.  And what --

A.    In the afternoons.

Q.    In the afternoons.

A.    Uh-huh.

Q.    And so that would be at periods of time, like when you're talking -- what do you mean in the afternoons?

A.    I would get off at 4:30 in the afternoon.

Q.    Okay.

A.    And about 6:00 o'clock, I would go and visit my grandmother.

Q.    Okay.

A.    And I did that because I was at home by myself.  My husband was working night shifts, strictly night shifts.

Q.    Okay.  And that went on for about how long?

A.    Hmm, that went on for quite a while.  I would say maybe a couple of years I used to do that.

Q.    Okay.  So then we get up to two years.  And then after two years, did you have -- I mean, this may sound presumptuous, but were there any children involved with your life then?

A.    No.  I adopted my son, it might have been three or four years after I was married.

Q.    Okay.

A.    Uh-huh.

Q.    So for two years, you were going pretty often to --

A.    Yes.

Q.    -- your -- and then what happened after that?  Did you change jobs or your --

A.    I worked with Shell for about 13 years.

Q.    Uh-huh.

A.    And then I was out of work for a little while, for a couple of months, and then I went to work for the Parish.

Q.    Okay.

A.    And I worked for them 22 years.

Q.    And so is it -- it's fair to say, isn't it, that after the first three months, and then maybe a couple of years, so that would have been about two-and-a-half years, then your contact over at your grandmother's house got a little less than what it had been.  Isn't that --

A.    Yes.

Q.    That's -- okay.  So basically, from about seven to about nine-and-a-half, you would have had contact, more contact with Mr. Bourgeois?

A.    I did.

Q.    Okay.  And then after nine-and-a-half, it kind of changed.

A.    I saw him very little after that.

Q.    Okay.  Very little after that.

A.    Uh-huh.

Q.    So basically your exposure to him was from seven to nine-and-a-half.

A.    Yes.

Q.    And during that period of time, there was time for your grandmother to work her magic from seven to nine-and-a-half. Right?

A.    Well, she took time with him.

Q.    And in your observation, did Mr. Bourgeois return the affection that he had for your mother?

A.    Yes, he did.  It was like a safe haven for him at my grandmother's house, because he was mistreated at his mom's house.  So that was a safe haven.  She was the one that, that did the hugging and the, you know what I'm saying, and the loving.  And she treated him just like she treated us.  He was no different.  It was like he was her grandchild.

Q.    So if he were to have said, if there's a recording of him talking about Ms. Mary and saying that while he lived for (sic) her, that she was disabled, and that he would help her take a bath, and that he would help her get around --

A.    He didn't help her take a bath.  He only helped her put the water in the tub.

Q.    Okay.  Well, but I'm telling you, if he said that he helped her take a bath, helped her get around.  He didn't wipe her butt -- and I'm using his words, okay -- but that he did pretty much everything else for her, that she cooked and that

he learned to cook from her, and that she used great big

pans --

A.    Uh-huh.

Q.    -- that he would have to carry around or help her with,

that he went outside and would take the stuff that had to be

sold, he would take that.  That's fair, right?

A.    Yes.

Q.    That he would do the yard work at her house, that he mowed

her lawn, that he kept the area outside of the house.  Okay.

And do you know that he continued through high school while he

lived with your grandmother?

A.    The times that I went, he was there, and off and on that I

would see him.  And he would still do a lot of things around

the house to help her.

Q.    Right.  And do you know why he left Ms. Mary's house and

why he didn't live there any more?

A.    I don't really know why he left.  I never questioned it,

why he left.  All I know, you know, he had gotten older, and he

was spending time at his mom's house more, started spending

time there, and I really don't know.

Q.    All right.  So the arrangement that they had, Ms. Mary

loving him, and he being helpful to Ms. Mary, was a very good

arrangement.  Is that correct?

A.    Yes.  Yes.

Q.    Okay.  Now, after that time, have you had any contact with

him?

A.    After that time, when he got older, we had family functions and he was at all of our family functions, whether it was a birthday party or picnic or death in the family, he was there.

Q.    All right.  And did you know by then that he had become an over-land, cross-country truck driver?

A.    I knew he was a truck driver, yes.

Q.    And did you know that he bought a home and that he had married several times?

A.    I knew he had bought a house, but you know, it was later on when I found that out, that he had bought a house.

Q.    Okay.  And so when did you find that out?  Was that before or after the trial?

A.    No, that was before the trial.

Q.    Oh, okay.

A.    Yeah.

Q.    Okay.  And did you know that he had purchased a vehicle, that he had purchased cars?

A.    No.

Q.    That he owned a motorcycle?

A.    No.

Q.    Did you know his children's names?

A.    No.  I knew of them, but I didn't know his kids' names.

Q.    All right.  Did you know what his job, what his employers

or the companies that he worked for, what they thought of him?

A.    No.

Q.    All right.  So basically, your contact that you could testify to just goes straight to seven to nine-and-a-half?

A.    Uh-huh, yes.

Q.    And then as, when he got older, coming to some of the family, or coming to the family gatherings.

A.    Yes.

Q.    All right.  And I guess it would be fair to say that you were very proud of what your grandmother had accomplished, in that he was a truck driver now, he had a way to support himself.  Were these things that you were proud of?

A.    I was proud that he had made a life for himself, yes.

Q.    All right.  And was he the only child from that family to come and live with your grandmother?

A.    He was the only one out of that household, yes.  I don't remember any other that came there, only him.

Q.    You didn't know that Claudia Williams lived with your grandmother?

A.    Well, Claudia I knew was there off and on.  And I didn't have much contact with Claudia --

Q.    Okay.

A.    -- as I did with Alfred.

Q.    So you weren't visiting your grandmother during the period of time that Claudia was living there?

A.    Claudia was there, but it wasn't -- in other words, I didn't come in contact with Claudia a whole lot.

Q.    Okay.

A.    I know she used to sleep there sometimes, but I didn't come in contact with her as much.

Q.    Now, would you say that his relationship with your grandmother was good?

A.    Very good.

Q.    Would you say that his relationship with you is good?

A.    Yes, it was, pretty much.

Q.    And did you ever bring over your new husband to your grandmother's house?  I was just wondering.

A.    My husband worked at night, and he didn't visit that much during that time.

Q.    Did your mama ever come over to the house?

A.    Yes.

Q.    And how was your mama with him?

A.    Very fine.  Very good.

Q.    Okay.  And so you think your relationship with his, with your mama was good?

A.    Yes.

Q.    Okay.  And did, when you would do things, when your mother -- when your grandmother, I'm sorry, would do things for him, did he seem appreciative?

A.    Very.

Q.   And so would he hug her and say, "Thank you," or in his way -- is that what would happen?

A.   He would hug her, just like we would, all of us would.

Q.   Okay.  And did he say -- did he actually say the words, "Thank you"?

A.   He would tell her "Thank you."  And sometime he would forget and she would remind him what you're supposed to say.  That's my grandmother.

Q.   Did he ever, did he ever tell your grandmother or did your grandmother ever tell you, did he ever say, "I'm lonely.  I'm sad.  I'm happy"?

A.   No.

Q.   "I'm --"

A.   Sometime he would hug her, he would hug her, go up to her and hug her, and she would hug him back.  And she would just tell him, "You're going to be all right.  It's going to be okay."  Especially if he had visited his mom, and quite -- sometime he would go and visit his mom, and when he would come back, he would be sort of in a depressed mood.

Q.   Uh-huh.

A.   And he would hug my grandmother.  And she'd hug him back and kiss him back.

Q.   Do you know whether or not he considered like Michelle and Lloyd and Claudia, his siblings, his friends?

A.   I would think he would.

Q.   And did you find that during the period of time that you had to observe him, that seven through nine-and-a-half, that he was consistent with the friendship or the feeling that he had with that group of his friends?

A.   Just as I said, Alfred was pretty slow in grasping things, as far as games, and he was kind of shy in making friends.  But with my siblings, in other words, my cousins, they took time with him to share things with him, to teach him how to do things.

Q.   Uh-huh.

A.   And it was just a close-knit, you know, of being there and holding him out a hand to try and show him, you know, "This is how it goes.  This is what to do."  But that's the way we were raised --

Q.   Right.

A.   -- as kids.  My grandmother and my parents, that's the way they raised us, not to look down on a person, but to help him. And that's what we did.

Q.   Did you, would he -- did he enjoy when y'all would be together?  Did y'all ever tease him lightly or make jokes and --

A.   That was a no-no.

Q.   I mean, not teasing, no.  Say things that were funny, watch cartoons, or do anything that --

A.   We would watch, yeah, they would watch television.  Yes,

he would watch, my little cousin and them, with all of us, he would watch.

Q.   And what was good during that time?  Mighty Mouse?  Or am I too old?  I mean, you know, whatever.

A.   I don't remember --

Q.   Yeah.

A.   -- during that time.

Q.   Yeah, but did he enjoy --

A.   Watching cartoons.

Q.   Could he laugh at the cartoons and, you know --

A.   Yes.

Q.   -- enjoy things like that?

A.   Yes.

Q.   Now, did you ever see him, during that period of nine, seven to nine-and-a-half, if Ms. Mary got up and she maybe needed a little assistance, or she wobbled or anything like that, was he ever attentive to her, like if she needed assistance or something?

A.   Well, if she would get up and she would, just as I said, she walked with a cane, and sometimes she would tell him, "I need help."

Q.   Okay.

A.   Especially if she sit too long and arthritis would set in --

Q.   Uh-huh.

A.    -- she would tell him, "Alfred, I need help."  And he would get up to help her.

Q.    Uh-huh.  Did he, did he ever get to the point during that period of time where you would come to the house and he would say, "Hey, you want some water," or "We have cookies"?  Did he ever get to that point?

A.    No.  No.

Q.    Okay.  I guess he didn't -- he didn't ever have any money or anything.

A.    No more than change that my grandmother would give him. Because just as I said, she sold candy, and she sold like freeze cups, and she would put money in his pocket, especially on Sundays to go to church.

Q.    Uh-huh.

A.    Because she believed in putting money in church.  And if you were with her, you put money in church.  So she would make sure before she would leave home, she would put change into his pocket and tell him, "Alfred, don't forget, you have to put --" sometimes she would have to remind him, take the money out of his pocket, put it in church in the basket.

Q.    Now, let's talk about church.  Did you go to the same church they went to?

A.    I was Catholic, but my dad was Baptist, and I went to the same church.  I would go to church quite often with my grandmother.  I was the one that followed her to church a lot.

Q.   Okay.  So you went to Evergreen?  Is that it?

A.   Ever -- my family belonged to Evergreen Baptist Church.  But just as I said, my mother's kids were Catholics.  My daddy was a Baptist.  And he belonged to Evergreen Baptist Church.  He was the director of the youth choir, my dad.

Q.   Oh.

A.   And my grandmother was the mother of the church.  And by that I mean she was the oldest member of the church.

            THE COURT:  Is that where Mr. Bourgeois went?

            MS. BOOTH:  Your Honor, I'm going to need a break.

            THE COURT:  All right.

            MS. BOOTH:  I need to take a break.

            THE COURT:  Well, then, I guess we'll just take a break.  We'll take a 15-minute break.  Thank you.  You can stand down.

            THE WITNESS:  Okay.

      (Recess from 10:08 a.m. to 10:09 a.m.)

            MS. BOOTH:   -- that Mr. Bourgeois is saying is her father that sexually assaulted him (inaudible.)

            MS. LARIN:  Not saying that.  Her father is not Raymond Adam.

            MS. BOOTH:  I know her father is not Raymond Adam, but I know that her father is the youth, is the choir director.  And I think that I remember him saying that the choir director --

MS. LARIN:  No, it was the Sunday school teacher.

MS. BOOTH:  Well --

THE COURT:  I thought he said Sunday school teacher. But ask her.

MS. BOOTH:  But it was at different places, Your Honor.  And that's the problem, that he's made different statements about who abused him.  Sometimes he said the choir director.

THE COURT:  I understand.  I don't --

MS. BOOTH:  Sometimes he said that --

THE COURT:  I don't know.  All I saw in the videos, and I haven't seen Price 1 and 2 --

MS. BOOTH:  Right.

THE COURT:  -- he said Sunday school teacher.  I don't know about choir directors.

MS. LARIN:  And the last witness said Sunday school teacher too.

MS. BOOTH:  Well, I know, but she didn't say that was the one that -- I mean, I have heard him say that it was his choir director also, in another statement.  And I just have to figure out which statement that is.  And I don't want to hurt this -- to ask that question of this woman, Your Honor, unless I --

THE COURT:  Well, I figured that's why you wanted a break, but I can't help you there.

MS. BOOTH:  I know you can't.  I'm just telling you why I wanted a break.

MS. LARIN:  So I -- are you trying to prove that he was sexually abused?

MS. BOOTH:  No.  I'm trying to prove that he's said it now after he's been convicted.

MS. LARIN:  Right, but --

MS. BOOTH:  That's what I'm -- that's where I'm going with this, is not that it's true, but that he said it after he got convicted.

MS. LARIN:  Okay.  So he said it was Raymond Adam.

MS. BOOTH:  No, he says that there were two people.  One of them was Ms. Clayton's son.

MS. LARIN:  Right.

MS. BOOTH:  And one of them was, at one point, one statement he said that it was the choir director.  In another statement he said that it was the Sunday school teacher.  And my question is --

MS. LARIN:  Okay.  Well, I never heard the choir director.

MS. BOOTH:  Okay.  Well, I have.  And that's why I just, because I --

THE COURT:  Well, you just need to ask her.

MS. BOOTH:  Okay.  I figured there's been so much ugly, I didn't want to spread any more around, Judge.

THE COURT:  Well --

MS. BOOTH:  Yeah.

THE COURT:  Now we're off the record.  Wait -- yes, sir?

MR. ABREU:  I was just trying to figure out how long our break was, Your Honor.

THE COURT:  You're down to about two minutes now, I know.

MR. ABREU:  There you go.  All right.

(Recess from 10:11 a.m. to 10:25 a.m.)

THE COURT:  Y'all can be seated.  Could the witness -- could you come back to the stand, please, ma'am?  Y'all can be seated.

MS. BOOTH:  (Clearing throat.)  That didn't sound good.

THE COURT:  No.

BY MS. BOOTH:

Q.   We were talking about the Evergreen Baptist Church, and you were telling me that your father was the choir director.

A.   He was over the youth choir for a while.

Q.   Youth choir.  And did the youth choir practice?

A.   Yes.

Q.   And were you part of the youth choir?

A.   No.

Q.   Okay.  Did you ever go to any of the practices?

A.    Maybe one or two.

Q.    Do you know whether or not Alfred Bourgeois was in the youth choir?

A.    I don't remember.

Q.    Now, your father didn't also teach Sunday school, did he?

A.    No, huh-uh.

Q.    Okay.  And do you know who taught Sunday school?

A.    No, I don't recall at the time.

Q.    Have you ever heard that Alfred claims that he was being sexually assaulted during choir practice by the -- by his Sunday school teacher?  That this was actually going on during choir practice?

A.    I have no knowledge of that, no.  I don't know anything about it.

Q.    During that period of time, from seven to nine-and-a-half with your grandmother, did you see any changes in Mr. Bourgeois as far as his, you know -- and I know you're not a doctor, but I'm just, as a mother, could you look at him and say, maybe his happiness level went up a little when he was with your grandmother?

A.    My grandmother house was a safe haven for him, because he was abused by his mother.  I mean, I actually saw him getting spankings, whippings with a belt.  I saw where she had actually sit and just picked at his nose until it bleed.  I mean, these were things that I witnessed myself.

Q.    And so your grandmother's house was a safe haven.

A.    Yes.

Q.    If you heard that Mr. Bourgeois said that he was being raped nightly in your grandmother's house, what do you have to say about that?  Have you ever heard that?

A.    I never heard it.

Q.    All right.

          THE COURT:  Who was it that was, he says was doing that?

          MS. BOOTH:  Mrs. -- he didn't say the first name, but it was Ms. Mary Clayton's son.  And as she testified, there were many different sons.

BY MS. BOOTH:

Q.    So you never heard that?

A.    No.

Q.    Do you know who lived across the street from your grandmother's house?

A.    I can't recall at the time and remember.  I remember Miss, a lady they called Miss Mud (phonetic) that lived right in front of her.  And across the street, I can't remember who was the family that was across the street.

Q.    Do you think if your grandmother would have thought that Alfred was being raped in her very house, that she would object to that?

A.    Oh, yes, she would.  Oh, yes.

MS. BOOTH:  I pass the witness, Your Honor.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One more question.

A.   Okay.

Q.   Or one more group of questions.  You were asked on cross about what age Alfred had trouble putting his clothes on and doing it right.  And when you observed Alfred, were you also observing other children around the same, that were around the same age as Alfred?

A.   My little cousins and them were there all the time.  My grandmother had a house full all the time, you know, cousins coming in and out.  And they can do things on their own, dress themselves, comb their hair, put their shoes on, tie their tennis shoes, but he couldn't do it.

Q.   And you had noticed that Alfred couldn't?

A.   He struggled.

Q.   Even compared to his peer group.

A.   He struggled.

MS. LARIN:  Okay.  That is my last question, Your Honor.

THE COURT:  Thank you, ma'am.

MS. LARIN:  Thank you.

THE COURT:  Anything further, Ms. Booth?

MS. BOOTH:  No.  No, ma'am.

THE COURT:  Thank you, ma'am.  You may stand down.

THE WITNESS:  All right.

MS. LARIN:  We'll call Brenda Goodman, Your Honor.

BRENDA GOODMAN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good morning, Ms. Goodman.

A.   Good morning.

Q.   Can you please state your name for the record?

A.   Brenda Clayton Goodman.

Q.   Can you spell your last name, please?

A.   G-O-O-D-M-A-N.

Q.   Okay.  And it sounds like your voice is being picked up by the mike, which is good.  Just be careful not to lean, touch the microphone.  Okay?

And are you related to Alfred Bourgeois?

A.   I'm not.

Q.   How do you know him?

A.   My grandmother.

Q.   Who is that?

A.   Mary Clayton.

Q.   What about your grandmother?

A.   My grandmother raised Alfred.

Q.   Okay.  And can you just tell us what year you were born?

THE COURT:  Her full name again?

MS. LARIN:  Oh, the grandmother's full name?  What was your --

THE COURT:  This lady.

THE WITNESS:  Brenda Clayton Goodman.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   And can you please tell us what year you were born?

A.   1952.

Q.   Which would make you about 12 years older than Mr. Bourgeois, Alfred Bourgeois.  And did you live on the Bend?

A.   Yes, I did.

Q.   Can you just briefly describe the Bend for us?

A.   The Bend is basically a one-way street.  Everyone that lives there is basically related or some sort of way intertwined.  We all kind of grew up together.  It was very poor.  Farming.  As a girl, you attended school, and in the evening, your chores was either to clean what they call shallots, it's green onions, or strip tobacco, go in the fields, then you go into school, come back and basically everybody kind of played together.

Q.   Okay.  And when you say "one-way street," do you mean a one-lane street?

A.   One-lane.

Q.   Because the cars actually went two different ways, but --

A.    Two different ways, yes.

Q.    But it's a small street?

A.    It was a very small street, uh-huh.

Q.    Did you know what house Alfred Bourgeois's mother lived in?

A.    Yes.

Q.    And can you kind of describe it for us?

A.    A very small three bedroom home, living room, one bath, a little small concrete front porch, but it was a screened-in back porch.

Q.    Okay.  And when you say "small," is there any way you could -- I mean, you realize there were seven children living in that home.

A.    Right.

Q.    Did that size house seem like it would be crowded?

A.    It was crowded.  The whole house wasn't big as this courtroom.

Q.    Okay.  And can you tell us a little bit about Alfred's mother, please?

A.    Eunice, she had, I know, five kids maybe back to back. She had a lot of children.  Growing up, every time I saw her, she was pregnant.  She dranked.  She drank excessively.  She dranked a lot.

Q.    Okay.

A.    Dranked excessively.  She would curse the kids all the

time.  She was overwhelmed, frustrated all the time.  She couldn't remember things.

Q.   What do you mean by that?

A.   Like if you would say, you know, Eunice, such-and-such about the kids or whatever, she couldn't remember.  And I don't know, I guess it was contributed to her drinking, because she just really was forgetful.  And I could remember my mom and my grandmother having to remind her of stuff all the time.

Q.   Like what kind of things?  Do you know?

A.   "Make sure you send the kids to school.  Make sure," you know, just things that was important in life regarding raising her children.  They would have to remind her.

Q.   So in your small community, did she kind of stand out in these ways?

A.   I think, when you say "stand out," I think everybody kind of supported the fact that she had all these babies and they had to help her with these babies.

Q.   Okay.

A.   And the drinking.

Q.   Do you know what she drank?

A.   Beer.

Q.   Mostly beer?

A.   Uh-huh.

Q.   Would you see, did it seem like she would get intoxicated?

A.   Yes.

Q.   Do you know how often she would drink?

A.   Every day.

Q.   Did you know Anthony Ferdinand, the fourth child, Eunice's fourth child?

A.   NeNe?  Yes.

Q.   Is that what you called him, NeNe?

A.   Uh-huh.

Q.   And can you describe how Eunice took care of him?

A.   Well, taking care of NeNe for Eunice was very overwhelming.  The kids would -- basically Alfred would have to like pitch in.  She would make him sit there and watch him.  He couldn't walk, and it was a child that just sat in the middle of the floor.  He could not talk, couldn't do anything for himself.  And so basically everybody had to watch him, change his diapers.  If you went over to visit, that was part of your job as well, to help groom, take care, do whatever you could do while you was there, pick up clothes, do whatever.  Because it was overwhelming.  She had all these children.

Q.   Uh-huh.

A.   And NeNe, of course, was an exceptional child, retarded, couldn't walk or talk.

Q.   Right.  He had -- it's already on the record that he had cerebral palsy.

A.   Well, yeah.  We didn't know.  That's what we called it.

Q.   Okay.  What did you call it?

A.   Retarded.

Q.   Retarded.  Okay.  So did you notice anything special about Alfred and his functioning?

A.   Alfred was slow and --

MS. SALINAS:  Your Honor, I'm going to object.  She's asking, she's not putting a time frame as to when this would have occurred.  If she could set the timing.

MS. LARIN:  Okay.

THE COURT:  What are you -- yes, just do the timing.

MS. LARIN:  Let's step back.  Okay.

THE COURT:  Thanks.

BY MS. LARIN:

Q.   So you were born in 1952.  Alfred was born in 1964.  So you guys are 12 years apart.

A.   Uh-huh.

Q.   Did you always live on the Bend?

A.   Yes.

Q.   Was there --

A.   My grandmother raised -- yes.

Q.   Was -- so explain that.  You lived on the Bend.  Did you ever move out of the Bend?

A.   Yes, I did.

Q.   When did you --

A.   When my mom -- at 13.

Q.   Okay.

A.    Thirteen, between thirteen and fifteen, but it was -- I moved when my mom got married, but it was back and forth.  And our family is very close, so it was an everyday thing.  We'd come to see our grandma every day.  We all went to the same church.  On weekends, it was at my grandma's house.  On Fridays, at grandma's house.  So it was, you moved, but it was never a leaving.

Q.    Right.

A.    And then grandma and Alfred would come and spend time at my mom's house.

Q.    Okay.  When he was older.  I mean --

A.    Right.  Well, growing up, yeah.

Q.    Okay.  So let's get a time frame then.  You lived in the community until you were about 13, when about Alfred was born, and as a baby.  And then you moved to Lutcher, but you were still in the community every weekend at least, and most days.

A.    Right.

Q.    Is that what you're saying?

A.    Right.

Q.    Okay.  Just establishing when you had the chance to observe Alfred.

A.    Right.

Q.    So let's talk about, you said that you thought Alfred was slow.  Can you pick a time, an instance that you could say, you know, an example, and we'll try to see about how, what age he

was for that example.

A.   Between six, seven years old.

Q.   So pick something that you thought he was slow at.

A.   Putting his shoes on the right feet.

Q.   Okay.

A.   He would always have his shoes on the wrong foot.  Not tying his shoes.  She had to say, "Alfred, where is your --" you know, you had to remind him to put his socks on with his shoes, if, you know --

Q.   And this was when he was living with your grandmother?

A.   Right.  And growing up, we didn't have very much, and so you had dress socks and you had school socks.

Q.   Uh-huh.

A.   And so you would tell Alfred to go put on his socks, and so he couldn't distinguish the dress socks from the school socks.  He would just go put on a pair of socks.  And, you know, "No, that's your dress socks."  He'd put the dress socks on with tennis shoes.

Q.   Right.

A.   Right, so --

Q.   Do you know about what age that was happening?

A.   It had to be around eight-ish, nine-ish.

Q.   Okay.  So you see the problem -- what you did is exactly right.  We need to keep going back to what age things happened at.

A.    Right.

Q.    Were there any other examples of things that he had difficulty with?

A.    If my grandma would say, "Alfred, go in the room and get such-and-such.  Go in the room and get such-and-such."  And he would repeat, "Go in the room and get such-and-such."  "Yeah, Alfred."  And he just standing there.  "Alfred, get such-and-such."  "Where is it?"  You couldn't say, "Turn to your right."  You had to say, "Go on the side where the bed is.  Look to this and get this."

Q.    Uh-huh.

A.    You had to just really spell it all the way out, until he had his hands on it.  "Okay.  Bring me that."

Q.    Uh-huh.

A.    And that's how --

Q.    And would he be able to do that, follow those directions?

A.    Right.  He was just -- he was always preoccupied, just could not follow instructions.

Q.    Okay.  And what, around what age was that?

A.    Eight-ish, nine-ish, ten-ish.

Q.    So let's just narrow it down.  It seems like around eight to ten, when Alfred was around eight to ten, that's when you have the clearest memory of this time.  Right?

A.    Of -- yeah.

Q.    So let's just keep talking about age eight to ten for now.

A.    Okay.  Well -- okay.

Q.    No, we can broaden it out.  Let's keep talking.  What else did he have some difficulties with?

A.    I could remember him being smaller, and we would go to grandma's.  Everybody would eat out of a plate, but he had a tin plate, and it was because like just taking his plate from wherever to the table, sometimes he would let the plate fall, and it would break.  So she had him conditioned to eat out of a tin plate --

Q.    Okay.

A.    -- where it wouldn't break.

Q.    And did she have to do that with the other children?

A.    No.

Q.    Did you ever see if he had any problems expressing himself or communicating?

A.    Yes.  He stuttered.  Is that a term?

Q.    Yes.

A.    Yeah, he stuttered.  Okay.

Q.    Did he have any problems grooming himself?

A.    Yes.  He did have problems grooming his self.  You would say, "Alfred, put your shirt on."  Alfred may button his shirt, but the first button was the third hole.  He would put the third hole on the first button, something of that nature.  And you know, the shirt just wasn't even or level.

Q.    Right.

A.   Or whatever.  He don't put all the belt in all the loops --

Q.   Uh-huh.

A.   -- you know, of his pants.  Never, you know, you'd tell him, "Alfred, put your shirt in your pants," or whatever.  "Alfred, you forgot to put your T-shirt on.  Put your T-shirt on before you put your --"

Q.   Right.  And what would your grandmother do when she saw --

A.   Just show, try to help him do it, show him how to do it.

Q.   And did Alfred have chores at your grandmother's house?

A.   Yes.

Q.   Can you tell me what type of things she would have Alfred do?

A.   Well, back in the late '60s, the early '70s, after --

Q.   Okay.  Let's see.  Okay.  He moved into Ms. Mary's house around '71, we think.

A.   It was after a hurricane.  I know it was after one of the hurricanes.

Q.   Okay.  Okay.

A.   Because we lost our house on two hurricanes.  My grandma lost her house on two hurricanes.

Q.   Uh-huh.

A.   And this last hurricane, and that's why I say it was around the '70s somewhere.

Q.   Yeah.

A.    And they rebuilt their house because they couldn't -- it didn't have a sewer.  So he was responsible for taking the pot that you do your waste or whatever in, to the outhouse.

Q.    Okay.

A.    He was responsible for -- she -- well, she was crippled. She really couldn't get, you know, in a tub, per se.  But the tub we had was like a foot, it was a long, oblong tub.  He was responsible for filling that up with water, helping her take her bath.  And then when she finished taking her bath, he had to take bath in the same water, then throw the water out, because there was no sewer.

Q.    Right.  Okay.  And so he would fill the tub with water?

A.    Right.

Q.    Did he ever have any difficulties with any of his chores?

A.    Yes.  He would spill water on the floor, and you know, that was a problem, because she had to, they had to mop it up and what have you.  Every night it was, you know, the same thing, until they got money enough and my uncles had money enough to hook the sewer.  Because we were poor.  We didn't have no sewer.

Q.    Uh-huh.

A.    And this was like in the '70s.

Q.    Okay.  Were you aware of the abuse that Alfred suffered as a child?

A.    Yes.

Q.   And you touched on this briefly, but can you talk a little bit more about how Eunice treated Alfred?

A.   Eunice would curse Alfred.

Q.   Uh-huh.

A.   She would beat him.  She picked in his nose.  His nose would stay bloody all the time.  Now, I don't understand why, you know, but she would just pick in his nose till it would just bleed all the time.

Q.   And did he --

A.   And she was more harder on him than the other kids.  I don't know why, but she would just excessively curse him out all the time.  And that was, I think, why my grandmother felt the need to have to do something to help.

Q.   And did Alfred ever tell you about any other abuse that he suffered?

A.   Yes.

Q.   Can you tell us about that?

A.   My grandmother youngest son was a twin, and Alfred told me that my uncle, who loved, you know, we loved him, but my family never accepted the fact that my uncle was homosexual.

Q.   Uh-huh.

A.   And my uncle raped Alfred.  Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him.

Q.   Okay.

A.   And I had to take care of him.  I was the one that was taking care of the uncle with the AIDS.

THE COURT:  When in time did he tell you this?

THE WITNESS:  Ma'am?

THE COURT:  When did Mr. Bourgeois tell you this?

THE WITNESS:  I can't remember age, but I do remember when I discovered my uncle had AIDS was in the late '80s.  And when I had to take him home to take care of him was in '92.  He contracted pneumonia, and he had -- they was letting him out of Charity Hospital, and they sent him home with an open tube.  And so I had to be educated on how to take care of him, because my daughter, she was born in '92, and she wasn't a year old yet when I had to bring her home to my two-bedroom apartment.  And so I had to give him, me and my children had to sleep in one room.  I have another son, had to sleep in one room, and the uncle, I had to put him in the room.  Well, Alfred would come to see about him, because Alfred, they all raised him.

MS. LARIN:  Uh-huh.

THE WITNESS:  And so then there was this dark thing, and I couldn't tell my family, because I was already dealing with how to educate these older people on the uncle had AIDS, and his partner had died of AIDS a couple of months before they discovered he had the AIDS.  And so that's what I was dealing with.  So I just said, "Okay, Alfred."  You know, it was too

much for me.  But he did --

BY MS. LARIN:

Q.   It was around that time that he told you?

A.   Right.  Right.

        MS. LARIN:  One moment, Your Honor.  I have no
further questions, Your Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q.   Good morning, Ms. Goodman.

A.   Good morning.

Q    Beverly Franks, what is her relationship to you,
Ms. Goodman?

A.   Cousin.

Q.   Cousin?

A.   Cousin.

Q.   Cousin.  And you stated, I believe you testified that you
grew up in the Bend.

A.   Uh-huh.  Yes, ma'am.

Q.   And when did you leave -- you moved when you were 13 years
old.

A.   See, you all calling it "move."  My mom got married when I
was 13 years old.  And she moved to Lutcher, Louisiana.

Q.   Okay.

A.   And that's about maybe ten or eleven, twelve at the most

miles.  And so I stayed with my grandmother a while, and when I wanted to have my way, to get things done, I moved with my mother.

Q.    Okay.

A.    But it wasn't a move like -- I'm in both places.

Q.    Well, where did you go to school when you were 13 years old?

A.    Had to be right, what ninth grade?  Cypress Grove.

Q.    In Lutcher?

A.    That's in Lutcher.  But it wasn't no restrictions.  You can catch the bus.

Q.    Okay.  But you went to school at Lutcher when you were 13.

A.    Yes, ma'am.

Q.    You weren't there at the Bend going to school in that area, where the school is there.

A.    There was no school in the Bend.  There was never a school.

Q.    In Paulina?

A.    I didn't go to Paulina Elementary.  During the time I went to school, there was St. Martin.  There was no -- it was a little room that we went to school in St. Martin as for elementary school.

Q.    Okay.  So before the age of 13, where did you attend school?

A.    A little while at St. Martin and a little while at Cypress

Grove Elementary.

Q.   And you were living with whom when you, up until the age of 13?

A.   My grandmother.

Q.   You lived in Ms. Mary's house, Mary Clayton's house?

A.   That's where I was raised.

Q.   You lived there.  Do you know Beverly Franks?  You said you know Beverly Franks.

A.   Yeah, Beverly is my cousin.  That's my grandmother's son's daughter.

Q.   And did she live with Ms. Mary?

A.   She lived with her parents, who live at the head of the street, at the head of the Bend Lane.

Q.   Okay.

A.   But living was like, if dark caught you -- I mean, if it was dark and it was -- she slept there.  I mean, we all lived together.  You have to understand --

Q.   Okay.  Let me --

A.   -- the family tradition.

Q.   And, Ms. Goodman, you're telling me that Ms. Franks is, she is -- Ms. Clayton is her grandmother as well.

A.   Yes, she is.

Q.   And in Ms. Clayton's house, up until the age of 13, who besides yourself was living in Ms. Mary's house?

A.   My mother.

Q.    And who is that?

A.    Frances Clayton Sanders.

Q.    Okay.  And who else?

A.    My Uncle Jake when he came.

Q.    I'm sorry, who?

A.    Jake Clayton.

Q.    Jay (sic)?

A.    That's -- yeah.  Esau, when he came, everybody.

Q.    And Jay (sic) Clayton is your grandmother's --

A.    My brother, Leroy Shiloh.

Q.    Leroy?

A.    Uh-huh.

Q.    That's your what, your brother?

A.    My brother.  Yeah, he went off to -- my brother is about eight or -- between -- he may be ten years older than me.  So like when he finished school, he went off to Arizona State.  So I don't remember after that.

Q.    Now, Leroy is older than you or younger than you?

A.    Older.

Q.    Older.  So Jay (sic) Clayton is your brother as well?

A.    No.

Q.    Jay (sic) Clayton is Ms. Mary's son.

A.    A twin, yeah.  That's the baby boy.

Q.    He's a twin to whom?

A.    Esau.

Q.   He's Ms. Mary's twin?

A.   No.

Q.   Okay.  Who is Ms. -- who is Jay (sic) Clayton?

A.   Mary's son, baby son.

Q.   Okay.  I thought you said a twin.

A.   He is a twin.

Q.   And who's the twin?

A.   Esau.

Q.   Esau.  Okay.  And Leroy -- and Jay (sic) and Esau, are they older than you?

A.   Uh-huh, yes, ma'am.

Q.   Go in the family order of your siblings for me, would you, please?

A.   I don't have but one brother.  That's Leroy.

            THE COURT:  She said --

            MS. SALINAS:  Okay.

            THE COURT:  Just start at the oldest child, I think.

            THE WITNESS:  For Ms. Mary?

            THE COURT:  Please.

            THE WITNESS:  Okay.  Charles Clayton; Harry Clayton, deceased; Frances Clayton Sanders, that's my mother; then Herman Clayton is Beverly's father; Ernest Clayton, deceased; I don't know who is the oldest between James and John, but there is a John Clayton and James Clayton.

BY MS. SALINAS:

Q.   Okay.  Now, up until the time --

A.   Have you got nine names?

Q.   Oh, I'm sorry.

A.   How many names have you got?

Q.   Three, four, five, six, seven.

A.   Seven, okay.  You got James, John, Herman, Harry, Ernest -- have you got Ernest?

Q.   Yes.

A.   There's nine of them, eight boys and one girl.

Q.   Okay.  And these are Ms. Clayton's sons -- I mean family members.

A.   Yes, ma'am.

Q.   Her children.

A.   Yes, ma'am.

Q.   And up until the age of 13, you said that you, along with your mother, Frances, and whom else were living with Ms. Mary?

A.   Leroy was raised in the house, and then he went off to school.

Q.   Okay.  Is that it?

A.   In between times, if my Uncle Jake didn't have a place, he was there.  But he lived in New Orleans.

Q.   Okay.

A.   But if he was -- didn't have a place to live.

Q.   Okay.  And that was it?

A.   Yeah.  My grandma house was, it wasn't a big house, but it

Goodman – Cross                    150

was the big house.  Everybody lived there.

Q.    How many bedrooms did it have?

A.    There was a living room, two bedrooms, a bath in between, a kitchen.

Q.    Okay.  Now --

A.    Front porch.

Q.    Okay.

A.    We slept on the front porch, too.  It was a closed-in front porch, so you could sleep on the front porch.

Q.    Okay.  And you stated that Mr. Bourgeois came to live at your grandma's house when he was how old?

A.    Had to be between -- he had been coming around since he was about -- she took up with him, he had to be about five or six.

Q.    You think he was five or six?

A.    Yeah.  I mean --

Q.    Okay.  And Beverly Franks, did she spend time with -- did she live in the house, Ms. Mary's house?

A.    Okay, ma'am, she lived with her parents.

Q.    Uh-huh.

A.    Which was at the head of the street.

Q.    Right.

A.    And then other uncles lived behind, and we all lived on the same street.

Q.    Okay.

A.    And so if dark caught you there, you slept there.  If it was raining -- but she didn't, she had to go and see about every day if she had to take her to the store or whatever, because she was driving.  She would drive, so she helped take her to the store, help her get groceries.  Everybody had their own little chores to do for grandma.  Somebody had to iron.  Somebody had to do, you had your chores.  You grew up -- we grew up being responsible.  And that's how she taught us to be responsible, because we had to do things for her.  She was the chief.

Q.    Okay.  But let me go back.  But what I wanted to make clear with you is that Ms. Franks didn't live in the house for any period of time for more than if she got caught in the middle of the night.

A.    Right.

Q.    Is that correct?  Is that your answer?

A.    Right.  Right.  Or you know, if you wanted to stay at grandma two, three, four days, that was fine.  Not just her.  There were other cousins.  There was 80 or something of us.

Q.    Okay.

A.    You know, and if 20 felt like staying there overnight, that's what happened.

Q.    Okay.  But I'm trying to get you -- I'm asking you if you knew at any point in time when she lived for an extended period of time other than for an overnight stay or two or three days,

did she ever stay for an extended period of time, for months at

a time, at your grandma's house that you're aware of?

A.    Not that I'm aware of.

Q.    Okay.

A.    But I still don't think you understand what "staying" is.

Q.    Okay.  And you testified earlier that you could see -- let

me ask you this before I ask you anything else.  You said you

all actually left your grandma's house when you were about 13

years old.

A.    My mom got married.

Q.    Right.  And you and your mom --

A.    And I was both places, my mom, my grandma, my uncle.  We

was just one big family.  But then eventually --

Q.    But you had a place where you had a bed, where you had

your clothes, where you would stay.  Where was that, when you

were 13?

A.    Both places.  Both places.

Q.    Well, you went to school in Lutcher, though.

A.    That was okay.

Q.    Okay.  Did you stay there at Lutcher for five days, and

then you came home on the weekends to your grandma's house?

Are you saying, are you testifying that you did that every day?

A.    Right.  It just depends on where I wanted to stay at the

time.  I catched the bus and go to Paulina and the Bend Lane,

or I stayed at my mom and walked down the street to school.  It

just depends.

Q.   Okay.

A.   If you tell me what you're trying to get to, I can try to help you a little bit better.

          THE COURT:  Okay, listen.  The way this works -- if you don't understand the question, that's okay.  But if you can't answer the question, that's okay.  But she asks the questions, and you answer them.  It's not that she's trying to get at anything.  Okay?

          THE WITNESS:  Okay.

BY MS. SALINAS:

Q.   Okay.  And when your mother married and you left the house for a while from Ms. Mary's, did Leroy go with you?

A.   No, ma'am.  He was already gone.

Q.   Leroy was gone, okay.

     (Counsel conferring off the record.)

BY MS. SALINAS:

Q.   Now, you mentioned that -- you were asked about, to describe instances when the Defendant, Mr. Bourgeois, was slow. Do you recall that question?

A.   Yes, ma'am.

Q.   And you said that, well, he couldn't -- he had trouble putting on his shoes when he was six years old.

A.   Yes, ma'am.

Q.   So where were you when you were 18 years old?

A.    Eighteen years old, back and -- Southern University at one time, at one point.  Community Action --

Q.    And Southern University is where?

A.    Baton Rouge.  But I was home every day, and then I worked for St. James Parish Community Action.

Q.    Okay.  So you're saying that when you were in college you would come back to Ms. Mary's house?

A.    Or my mom.  I didn't stay on campus.

Q.    Okay.

THE COURT:  How far was it from your school to your home?

THE WITNESS:  From Paulina to Baton Rouge, maybe 30, 35 miles.

THE COURT:  Thank you.

THE WITNESS:  It was a bus that would take us.

THE COURT:  Well, that was convenient.

THE WITNESS:  Yes, ma'am.

THE COURT:  You could study both ways.

THE WITNESS:  Yes, ma'am.  We leave home like 5:00 o'clock in the morning and come back in the evening to school -- from school.

BY MS. SALINAS:

Q.    So you went 5:00 in the morning to 8:00?

A.    No, not 8:00.  Huh-uh.  The bus would get back to Lutcher around -- it was still daytime.  In the fall, it may be getting

dark.  But it was still like 6:00, 5:30, 6:00 o'clock.

Q.   Okay.  So you were gone from the house from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.   Right.

Q.   And -- okay.  So during that time frame, you obviously didn't get to see the Defendant.

A.   Not while I was in school, no.

Q.   Okay.

A.   But when I worked for Community Action, I would check in on my grandmother.  I did like outreach social work for Community Action.

Q.   And what year was that?

A.   That was in '70, '71, '72.

Q.   '72?

A.   '71 through '72.  From '70, because I, at one point I stopped going to school all day, and then I would take some evening classes, where I would catch a ride to school.

Q.   Okay.

A.   And I was working during the day.

Q.   Now, you mentioned that the Defendant had some problems with grooming himself.  Was he able to put on his under clothing by himself?  He was able to put on his underwear by himself?

A.   I assume so, yes.

Q.   Well, you lived in the house.  I'm asking you.

A.    My grandmother -- my grandmother would supervise, making sure he had on everything that he was supposed to have on. I --

Q.    But as far as you know, he could put on his under clothing, he could put on his socks.  Correct?

A.    You had to tell him to put his socks on.  The shoes wouldn't be on the right foot.

Q.    Okay.

A.    Wouldn't be tied.  We help him -- now, I can remember helping him, everybody pitched in helping him try to tie his shoes, teaching him how to tie his shoes.

Q.    Let me ask you something.  Going back to you when you first testified, you stated -- you were talking about the Defendant's mother.  You mentioned that she drank, and that she drank a lot, and that she was intoxicated every day.  Do you recall that?

A.    Yes, ma'am.

Q.    And you said that as far as Anthony was concerned, everybody that went over there had to do something, had to help out.

A.    Yes, ma'am.

Q.    And at that time, the Defendant, Mr. Bourgeois, was living with his mother, was he not?

A.    Yes, ma'am.

Q.    And he would help out, too, wouldn't he?

A.    As far as making sure he -- because --

Q.    Like picking up trash or helping get the diapers for the baby.  He would do stuff like that.

A.    Yes.

Q.    Okay.  And --

A.    Whatever you tell him to do.  He -- Alfred was a person you had to tell him what to do.  It just wasn't -- he wouldn't just like pick up on his own and --

Q.    And that's when he was six years old.

A.    Right.

Q.    You would have to direct him to pick this up or put the sock on this other foot.  Correct?

A.    Yes, ma'am.

Q.    Okay.  But Alfred did that.

A.    Yes, ma'am.

Q.    He could get it accomplished.

A.    Yes, ma'am.

Q.    Okay.  And you gave -- you were interviewed by individuals from Mr. Bourgeois's legal team.  Correct?

A.    Yes, ma'am.

Q.    And you were interviewed, and you gave them a statement?  You talked to them?

A.    Yes, ma'am.

Q.    And in your statement, you told them that in your opinion that all of Eunice's children were slow.

A.    Yes, ma'am.

Q.    Including Claudia Williams?

A.    Yes, ma'am.

Q.    Lloyd Ferdinand?

A.    Yes, ma'am.

Q.    And who are his siblings?  Can you rattle off who the Defendant's siblings are?

A.    I had more contact with Claudia, Lloyd, Alfred.  I kind of vaguely remember Claude.  Claude was drowned.  I don't remember a whole lot.  But I remember Claudia.  I remember NeNe.

Q.    Okay.

A.    And I remember, of course, Alfred.

Q.    Did Claudia ever live with Ms. Mary?

A.    No, ma'am.

Q.    Never?

A.    Not that I recall.  But every --

Q.    Okay.  I'm just asking you if you recall.

A.    No, ma'am.

Q.    And now when the Defendant lived with your, Mr. Bourgeois lived with your grandmother, grandmother, he -- you testified earlier that he would do things like help her with her bath.  Right?

A.    Yes, ma'am.

Q.    He would get the bath water and take it to the tub and pour it into the tub?

A.    Yes, ma'am.

Q.    And he would help her get out of the tub?

A.    Yes, ma'am.

Q.    And your grandma helped him to learn how to cook?

A.    I don't know about that cooking stuff.  No.

Q.    You don't know whether or not she taught him to cook?

A.    Huh-uh.

Q.    You never saw him cook at your grandma's house?

A.    I never saw him cook, no.

Q.    But you're 12 years older than Mr. Bourgeois.  Correct?

A.    Yes.  That's the age.

Q.    And you basically left when you were 13, so he was still a baby.  So, and then you went off to college.

A.    I didn't go off to college.

Q.    Well, you went to college.  You were in school from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.    For about a semester, yeah.

Q.    Okay.  Your grandma used to make candy and stuff --

A.    Yes, ma'am.

Q.    -- for the neighborhood and she would sell that?

A.    Pies, uh-huh.

Q.    And the Defendant, Mr. Bourgeois would help her with preparing those candies and fixing the pans and --

A.    Right.  Yeah, that was something all of us liked to do.  So all of us kind of grew up putting the flour in the pan.

Q.    Okay.

A.    She may have let us roll the dough out, because you have to roll the dough to put the --

Q.    Right, and do that.  And Mr. Bourgeois would help do that, too, wouldn't he?

A.    I never saw it.

Q.    Okay.

A.    You know, like she would give you the pan to eat the cake mix.  That was a big deal.  Whoever got there first --

Q.    Got to lick the spoon?

A.    To eat the -- yeah, to lick the spoon and get the cake mix.  That part.  I think the older ones, we did more of the rolling the dough and the flour or whatever.  He might have just stood by playing.

Q.    And you saw the Defendant, he would help your grandma, and he would keep the grass, yard clean for Ms. Mary?

A.    I don't know.  The grass was more raking the yard.  There was more dirt than grass.

Q.    Okay.  But keeping up the outside?

A.    You had to keep the trash --

Q.    Keeping track of the yard, Mr. Bourgeois would do that for Ms. Mary?

A.    I don't recall.

Q.    You don't recall if he would do that?

A.    Huh-uh.

Q.   Okay.  Now, did you ever attend church when you were living at Ms. Mary's house?

A.   Yes, ma'am.  There was just one --

Q.   What church did you attend?

A.   Evergreen Missionary Baptist Church.

Q.   Did Mr. Bourgeois go with you to that church, attend church with you?

A.   He didn't go with me, but he attended church.

Q.   Okay.  Do you know whether or not he went to Sunday school?

A.   That was a must.  We all went all day.

Q.   When did you quit having contact with your grandma?

A.   I never quit having contact with my grandmother.  I moved to Florida in about '72, because they was asking for students to go to University of Florida, black students, so I moved there to try to get into the University of Florida.

Q.   Okay.

A.   But I would come home holidays, during the summer, and Alfred was there.

Q.   Okay.  He would be there at your grandmother's house?

A.   Yes, ma'am.

Q.   Did you -- you said it was, the community was a big community there, big -- and everybody would play together out in the street?

A.   It's not a big community.

Q.   Well, it's a small community --

A.   But -- yeah.

Q.   -- few houses there in this acre of land or two acres of land.  Everybody would play out in the streets?

A.   Yes, ma'am.

Q.   And Mr. Bourgeois would play out in the streets with his siblings?

A.   Yes, ma'am.

Q.   Did Mr. Bourgeois go back and forth between his mom's house and your grandma's house?

A.   Yes, ma'am.

Q.   Okay.  And was that on a daily basis?

A.   I would assume.  I mean, I couldn't say every day --

Q.   Well, you lived in the house until you were 13.?

A.   Yeah.

Q.   And then you said you moved out, and coming back and forth until the time you went to college.

          THE COURT:  How much older are you than Mr. Bourgeois?  Do you know?  How old are you?

          THE WITNESS:  I'm 57.  And he is --

          MS. SALINAS:  I believe she's 12 years older.

          THE COURT:  Okay.

BY MS. SALINAS:

Q.   And did you ever see Mr. Bourgeois playing in the playground or out in the street with his siblings?

A.    Yeah, I've observed him playing.

Q.    Okay.  Let me get this straight.  When you were 13 and you and your mom, your mom got married, you moved a little bit -- you were still back and forth between your grandma's, but you weren't actually in the house every single day.  Is that correct?

A.    Just about every day, because we would make sure we saw her every day.

Q.    Okay.

A.    But whether I slept there every day or slept at my mom's every day, that's what -- I can't tell you.  I can't remember.  I can't tell you how many days at my mom and how many days.  But you know, there was both houses.

Q.    When you left to go to college, how old was Mr. Bourgeois?  Do you recall?

A.    Huh-uh.

Q.    Okay.

A.    He was young.

Q.    How young?  You said you left to Florida back in 1972?

A.    However old that would make him be.

Q.    Okay.  So he was about eight years old, is the last time that you actually had day-to-day contact with him?

A.    No.

Q.    Between the hours of 5:00 in the morning to 6:00 in the afternoon?

A.    Maybe.  But I would still come back home back and forth.
Somebody die, you come home.

Q.    Right.  But it wasn't on a --

A.    Come holidays --

Q.    Okay.  But Ms. Goodman, what I'm giving you is that when
he was eight years old, you were in Florida, University of
Florida.  Correct?

A.    Yeah.

Q.    And you were in school between the hours of 5:00 and 6:00
p.m., 5:00 a.m. in the morning to 6:00 p.m.

A.    In Florida?  Or in Baton -- in Louisiana?

Q.    Well -- okay.  When you were in Florida, what were your
school hours?

A.    Well, in Florida, I didn't get into the University of
Florida until I started working for Legal Services.  And that's
how I got in there doing some training through Legal Services
in the paralegal studies.

Q.    Okay.  Before you went to Florida, you said you were in
Baton Rouge?

A.    Right.

Q.    University of Baton Rouge?

A.    Right.

Q.    And that was in what year?

A.    In '70.

Q.    In 1970.

A.    Right.  And I went there a semester on the bus every day, then I started working in 1970 as well for St. James Parish Community Action.

Q.    Okay.  And then you left in '72 to Florida?

A.    Yes, ma'am.

Q.    Okay.  So when you were at Baton Rouge, the Defendant was six.  And when you left to University of Florida, the Defendant was eight.

A.    Yes.

Q.    So you had that contact.  You kind of had some loss of contact between six and eight.  And then thereafter, after eight.

A.    There was never a loss of contact.

Q.    Okay.  Daily contact, you know, 24 hours.  Not like the way it was when you were living there, from the time you were born till the age of 13.

A.    Yes, ma'am.

Q.    That's what I'm trying to get at.

A.    Yes, ma'am.

Q.    Okay.  And in your statement that you gave, you were visited by the legal defense team back in 2007.  Do you recall that?

A.    Yes, ma'am.

Q.    And you signed a declaration.

A.    Yes, ma'am.

Q.   And you were asked to describe the Defendant's behavior and everything you observed about the Defendant.  Correct?

A.   Yes, ma'am.

Q.   And in your statement, did you ever tell anybody about the sexual abuse of Alfred Bourgeois?

A.   Not until recently.

Q.   But you didn't -- when the legal team went and they had you fill out and sign declaration, you didn't tell them about the sexual abuse?

A.   I don't recall.  Is it on the statement?

Q.   It's on the statement.

A.   Okay.

Q.   Would you like to see the statement?

A.   No, ma'am.

          THE COURT:  Would it help you to refresh your memory if you saw it?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Would you hand it to her, please?

          MS. SALINAS:  Yes, Your Honor.

          THE WITNESS:  Thank you.

     (PAUSE.)

          THE WITNESS:  You said it was on the statement?

          MS. SALINAS:  I'm sorry?

          THE WITNESS:  It's on here?

BY MS. SALINAS:

Q.   It's not on there?

A.   No.

Q.   No, you didn't tell them about it.

A.   No.

Q.   And you knew at that time when they visited you that they wanted you to tell them everything about the Defendant, they were investigating, trying to get some mitigation evidence for Mr. Bourgeois?

A.   Repeat that.  I'm sorry.

Q.   That they were trying to find out if anything had been going on in his background, if he was suffering an abuse.  They asked you about those questions, did they not?

A.   Yes.  Yes.

Q.   And you didn't tell them about sexual abuse.

A.   No.

Q.   This is the first time you've told them about the sexual abuse?

A.   You mean today or --

Q.   Yes.

A.   No.  I -- we discussed it.

Q.   When the legal team, the defense legal team went to go talk to you back in 2007, you told them --

A.   I don't recall if I did in 2007.  I don't recall.

Q.   When you --

         MS. SALINAS:  We offer into evidence Government's

Exhibit Number 202, Your Honor.

THE COURT:  Any objections?

MS. LARIN:  Well, what's the basis, Your Honor?

THE COURT:  I'm sorry, I can't hear you.

MS. LARIN:  What is the basis of --

THE COURT:  I can't hear you.

MS. LARIN:  Oh, I'm sorry, Your Honor.  What is the basis of offering it into evidence?

THE COURT:  What is your objection?

MS. LARIN:  I think that her testimony is --

THE COURT:  What is your legal objection?

MS. LARIN:  Our legal objection is it would be hearsay, and she testified.

THE COURT:  Sustained.

BY MS. SALINAS:

Q.   Ms. Goodman, when exactly did you tell the legal defense team that Mr. Bourgeois had been sexually abused by one of your relatives?

A.   I don't recall the date and time.

Q.   Well, was it a month ago?  Was it two months ago?  Was it a year ago?

A.   It wasn't a year ago.

MS. LARIN:  Objection, Your Honor.  This has been asked and answered.  She says she doesn't recall if she told --

MS. SALINAS:  Your Honor, I'm trying to get --

THE COURT:  Overruled.

MS. SALINAS:  A time frame.

THE WITNESS:  I don't recall.

THE COURT:  Was it before or after his, Mr. Bourgeois's conviction?

THE WITNESS:  Before or after -- I don't recall.

THE COURT:  Okay.

THE WITNESS:  It wasn't before the conviction, because I wasn't even involved before the conviction.

BY MS. SALINAS:

Q.   So do you think it would have been more than a year ago that you told them that?

A.   Ma'am, no disrespect, I just do not recall.

Q.   Okay.  So --

A.   I mean --

Q.   All right.  Now, you talked about the chores that the Defendant would do.  One of them was filling the tub, when you were living there, and you said something about you all had a second house that didn't have any plumbing, and that occurred in the early '70s.  Do you recall that?

A.   Uh-huh.

Q.   And so that would make Mr. Bourgeois about six years old.

A.   Uh-huh.

Q.   So you're complaining that he was spilling water --

THE COURT:  I'm sorry.  You have to answer with

words.

THE WITNESS:  Yes, ma'am.

BY MS. SALINAS:

Q.   So your main complaint about that he wasn't doing chores completely or doing them right was that he was spilling water on the floors.

A.   Yes, ma'am.

Q.   Okay.  And did that upset you?

A.   No.

Q.   Would you expect that a six-year-old would not be able to be very careful when they're pouring water into a tub?

A.   Yes, no, yes.

Q.   Okay.  Do you know about Mr., where Mr. Bourgeois went after he left your grandma's house?

A.   When she died?  Or --

Q.   How old was he when she died?

A.   I don't know how old he was when she died.

Q.   What year was that?

A.   She died in '82 or '83, because my son was like around six-ish.  Six-ish.  Around six.

Q.   So he was about 18 years old?

A.   Yes.

Q.   And where did he go after that?  Do you know?

A.   I don't know where he went as a permanent address.  I know he would be to my Uncle Jake's sometimes.  He would be to my

Uncle Esau in New Orleans sometimes.  But what was his permanent address, I don't know.  But he would stay with different relatives.

MS. SALINAS:  Your Honor, I again would like to reoffer Ms. Goodman's statement.  The purpose of us offering this is not the truth of the matter, but in fact to show instead that she did not mention the sexual abuse in the statement.  It's to impeach her testimony, Your Honor.  It's offered to show conflict.

MS. LARIN:  Object.  Can I respond, Your Honor?

THE COURT:  Yes.

MS. LARIN:  What might be in the statement, she says she doesn't recall what she told the investigator, if she told or not.  So just because whether it's in the statement or not doesn't mean that's the, it represents everything --

THE COURT:  I'm sorry.  Which investigator is this? Yours?

MS. LARIN:  My investigator.

THE COURT:  Okay.  Well, surely your investigator would have written it down if she had said it.

MS. LARIN:  Well, apparently it was missed, if it was said at all, so --

MS. SALINAS:  Your Honor, their whole premises of this case or this trial is to show that the Defendant was sexually abused by not only one, but two individuals.  That's a

very important piece of information.  And also it asked her to certify that the facts are true and correct.  And it's not in here.  And it's not hearsay, Your Honor.

MS. LARIN:  So you're using -- can I respond?

THE COURT:  Yes.

MS. LARIN:  Using the statement to prove something that wasn't said is a little --

THE COURT:  Tell me what your objection is.

MS. LARIN:  It's hearsay.  It's a negative hearsay, what she didn't say hearsay.

MS. SALINAS:  Well --

THE COURT:  Overruled.  Thank you.  It's admitted. Number what?

MS. SALINAS:  202, Your Honor.

THE COURT:  202's admitted.

MS. SALINAS:  May I have just a moment, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

MS. SALINAS:  No further questions, Your Honor.

THE COURT:  Anything further?

MS. LARIN:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   There were some conversations about conversations you had with Alfred's lawyers or defense teams.  Do you recall if you

had any contact or conversation with anyone that was working to represent Alfred Bourgeois prior to his trial in 2004?

A.    No, ma'am.

Q.    No one contacted you?

A.    No, ma'am.

COURT RECORDER:  I can't hear her.

THE WITNESS:  No, ma'am.

THE COURT:  She said "no."

THE WITNESS:  No, ma'am.

BY MS. LARIN:

Q.    And if someone had contacted you and interviewed you, would you have testified consistent to what you are testifying to today?

A.    Yes, ma'am.

Q.    One other question, Your Honor -- I mean, Mrs. Goodman.

THE COURT:  You can question me if you want.

BY MS. LARIN:

Q.    There were some questions about what chores he had, Mr. Bourgeois had, and what he was able to do.  Did you ever have the opportunity to observe Mr. Bourgeois in comparison to other children his age?

A.    Yes, ma'am.

Q.    Who were those -- I mean, you don't need to name them all, but what children would you compare him with?

A.    Cousins, people in the neighborhood, because my

grandmother was like a neighborhood big mama.

Q.   Uh-huh.

A.   So everybody played in the yard.  Everybody played in the house.  And so -- and Alfred went through a period of even just being in the house, you know, he just sometimes couldn't interact.

Q.   With the other children?

A.   Yes, ma'am.

Q.   And why wouldn't he be able to interact?  What do you mean by that?

        MS. SALINAS:  Calls for speculation, Your Honor.  Objection.

BY MS. LARIN:

Q.   What did you observe?  What do you mean when you say he wasn't able to interact?

A.   Like to play, you know, like kids was playing certain games that might have required an intelligence of instructions or doing things.  He just couldn't get it, something like that.

Q.   So in comparison to other children his age, what would you say his functioning was?

A.   Question again?

        MS. SALINAS:  Objection, Your Honor.  She's not an expert in this field.

        MS. LARIN:  When you -- I can withdraw that question and restate it.

THE COURT:  Go ahead.

BY MS. LARIN:

Q.   When you observed him and you could see what he could do and what other children could do, did you notice a difference?

A.   Yeah.  Yes, ma'am.

Q.   And what was that difference?

A.   Just take a simple thing as riding a bike.  I don't even know if he ever learned how to ride a bike, from when I was around.

THE COURT:  Well, he drove a truck later on, so --

THE WITNESS:  Right.  But a bike, you know, certain things --

BY MS. LARIN:

Q.   As a child, he couldn't do --

A.   Right.

MS. LARIN:  Okay.  I have no more questions, Your Honor.

MS. SALINAS:  I have a few.

REDIRECT EXAMINATION

BY MS. SALINAS:

Q.   Mrs. Goodman, are you telling me that if you would have testified in court back in 2004, you would have told them about the sexual abuse of Mr. Bourgeois?

A.   I would have.

Q.   But you didn't mention it in your 2007 statement.  You

didn't tell anybody about, when they interviewed you in 2007?

MS. LARIN:  Objection.

THE WITNESS:  Maybe in our culture, that was a dark thing.

BY MS. SALINAS:

Q.   So the answer is you wouldn't have testified to it then.

A.   I would have testified, yes, ma'am.

Q.   You would have testified at Court, but you wouldn't put it in your statement.

MS. LARIN:  Objection.

THE COURT:  I guess the point is, you had to tell somebody first before you would be called to testify.  And it's something you didn't want to talk about.  Is that right?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MS. SALINAS:

Q.   And you just mentioned that the Defendant couldn't ride a bike.  Do you know if anybody spent any time trying to teach Mr. Bourgeois to ride a bike?

A.   Well, it definitely wasn't my grandmother, because she was crippled.  She couldn't even teach me how to ride one.

Q.   Right.  And if his family members weren't helping him, it takes a while before a child learns how to ride a bike.  Wouldn't you agree with that?  You've got to spend time.  Someone's got to be behind you.  Someone's got to be walking

behind you.  Mr. Bourgeois did not have that, did he?

A.   No.

Q.   So it's not really surprising that he didn't know how to ride a bike, is it?

A.   Is that a --

Q.   Is it?

A.   Would that be a surprise?

Q.   Yes, if no one is teaching you how to do that at the age of five?

A.   I guess I don't know how to answer your question.

Q.   Okay.  Well, then I'll move on if you don't know how to answer that question.  Do you realize that Mr. Bourgeois, when he was -- later on in life was able to buy his own house?  Were you aware of that?

A.   No, ma'am.

Q.   Do you know he was able to purchase vehicles on his own?

A.   No, ma'am.

Q.   You didn't know that?  Did you know his house had a swimming pool?

A.   No, ma'am.

        MS. LARIN:  Objection, Your Honor.

BY MS. SALINAS:

Q.   Okay.  Do you know that he was able to --

        THE COURT:  Just a moment.

        MS. SALINAS:  I'm sorry, Your Honor.

MS. LARIN:  This is all very far beyond the scope of the examination.

MS. SALINAS:  Well, Your Honor, it goes to the things that he can do.  She's implying that he couldn't do anything as a child.  I'm just asking her what she knows about him as an adult.

MS. LARIN:  This is as an adult, and --

THE COURT:  Overruled.

MS. LARIN:  -- nothing was discussed --

THE COURT:  Thank you.

BY MS. SALINAS:

Q.   Do you know that he was able to get jobs when he left Ms. Mary's house?

A.   I know he drove truck.

Q.   You knew he drove an 18-wheeler.  Do you know that that in itself is a difficult thing to do?  Would you agree that driving an 18-wheeler and being able to maneuver an 18-wheeler is a difficult job?

MS. LARIN:  Objection, this calls for speculation.

BY MS. SALINAS:

Q.   Okay.  You don't know?

A.   No, I don't know.

Q.   Do you know he had a motorcycle and could drive a motorcycle?

A.   No, ma'am.

Q.   Okay.

MS. SALINAS:  I have no further questions, Your Honor.

MS. LARIN:  No further questions, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

MR. WISEMAN:  Your Honor, we're going to call Dr. Mark Cunningham.

THE COURT:  Thank you.  What do you want?

MR. WISEMAN:  I'm just saying that Dr. Cunningham at some point later in his testimony is going to want to show something from his computer, so I'm just wondering if we should plug it in now or wait for the lunch break.  I doubt we'll get to it before lunch.

THE COURT:  What do you think?  Let's wait.  We can set it up now.  Okay.

(Witness sworn.)

MR. ROBERTS:  Your Honor, I just want to note that Dr. Cunningham has apparently taken a whole stack of stuff with him to the stand.  I kind of just --

THE COURT:  Have you seen everything he's using there?

MR. WISEMAN:  I don't know if Mr. Roberts can answer that, but I can tell the Court that everything Dr. Cunningham has has been provided to the Government.

THE COURT:  Okay.  Thank you very much.

MR. WISEMAN:  Dr. Cunningham, just one -- oh, don't touch the microphone.  That's what I was about to tell you.

THE COURT:  Please don't --

MR. WISEMAN:  I was about to tell him.

THE COURT:  Ms. Gano, why don't you fix it.  I can see he's going to have to -- he's going to fiddle with it.

MR. WISEMAN:  He's a fiddler.

THE WITNESS:  Thank you.

MR. WISEMAN:  I was about to tell you, Dr. Cunningham, please be mindful of the microphone.

THE WITNESS:  Yes, sir.

MR. WISEMAN:  Because it goes into Ms. Gano's ears and causes her quite a bit of discomfort.

THE WITNESS:  Yes.

MARK CUNNINGHAM, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Can you state your name for the record, please?

A.   Mark Douglas Cunningham.

Q.   All right.  And I'm putting up on the overhead projector a document marked P-7.  And do you recognize that?

A.   Yes, sir.  That was my curriculum vitae as of July 19th, 2010.

MR. WISEMAN:  Your Honor, I would offer the curriculum vitae into evidence.

THE COURT:  Number?

MR. WISEMAN:  P-7.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-7 is admitted.

BY MR. WISEMAN:

Q.  Dr. Cunningham, what we've been doing, as the Judge is obviously now going to look at your CV, so rather than go through the more obvious stuff, I'm going to ask you some particular things about your background.  You're a psychologist?

A.  That's correct.

Q.  And do you have a specialty in psychology?

A.  Yes, sir, clinical and forensic psychology.

Q.  And in that field of forensic psychiatry, do you have a further specialty?

A.  Within the field of forensic psychology, I have a specialization in capital sentencing determinations, including mitigation and violence risk assessment for prison.

Q.  Okay.  And with respect to each of those two subspecialties --

THE COURT:  I'm sorry.  That was P-7 or P-12?

MR. WISEMAN:  P-7.

THE COURT:  P-7 is admitted.  Thank you.

BY MR. WISEMAN:

Q.   Within the two subspecialties you just mentioned, do you, have you lectured widely on both those topics?

A.   Yes, sir.

Q.   And would that be to professional organizations?

A.   Yes, sir.

Q.   Universities?

A.   Yes, sir.

Q.   Have you published articles in peer-reviewed journals on those two topics?

A.   Extensively.

Q.   And have you published chapters in books --

A.   Yes, sir.

Q.   -- on those subjects?

A.   Yes, sir.

Q.   Have you testified as an expert in capital sentencing in state courts?

A.   Yes, sir.

Q.   Approximately how many times?

A.   Approximately 100 times.

Q.   And would that be trial level courts?

A.   Yes, sir, in sentencing phase.  I've also testified in post-conviction and federal habeas in addition to that.

Q.   Okay.  And approximately how many times have you testified about these matters in federal court?

A.   Approximately 60 federal capital sentencing proceedings.

Q.   And between trial and post-conviction, what would the breakdown be?  What's the percentage of your court work is trial and what percentage is post-conviction?

A.   All of the cases that I described were at trial.  Perhaps 10 percent, 15 percent of my work is in post-conviction or federal habeas.

Q.   As a forensic specialist in capital sentencing, do you make it your business to read and keep up with the United States Supreme Court and Circuit Court decisions with respect to the psychological aspects of mitigation evidence?

A.   Yes, sir.

MR. WISEMAN:  Your Honor, I would offer Dr. Cunningham as an expert in forensic psychology and in the psychological aspects of capital case mitigation, including the standard of care, from a psychological perspective, not a legal perspective.

THE COURT:  Any objection?

MR. ROBERTS:  That's a long statement, Your Honor. I'm trying to process it.  I know he's an expert in --

THE COURT:  What do you mean standard of care?

MR. ROBERTS:  Yes.

MR. WISEMAN:  Perhaps if I ask the witness, he can describe that.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.    Doctor, when I just used the phrase "standard of care," what does that mean to you in your specialty?

A.    Well, it has two relevant meanings.  One of those is a best practices standard.  Another is what is considered to be customary and adequate at a capital sentencing.

Q.    And when you say "adequate," again, you mean from a psycho-legal, as opposed to a legal perspective.  You're not here as an expert in the law.

A.    That's correct.

        MR. WISEMAN:  With that qualification, I'll renew my offer.

        MR. ROBERTS:  I object to that, him being qualified as a standard of care, Your Honor.  Every case is different.  There's no way you can have a standard of care in a case process.

        MR. WISEMAN:  Your Honor, the ABA guidelines as the Supreme Court has endorsed would differ with Mr. Roberts.  There's very much a standard of care.  It's published by the ABA.  The Supreme Court has endorsed it numerous times in Wiggins, Rampilla (phonetic), more recently in Van Hook.

        THE COURT:  Tell me again what standard of care is, Dr. Cunningham.

        THE WITNESS:  Yes, ma'am.  The standard of care has two definitions, as I would understand it.

        THE COURT:  Okay.

THE WITNESS:  One of them is a best practices recommendations.  In other words, there's not a --

THE COURT:  Meaning in what?  Best practices in psychology or --

THE WITNESS:  Yes, ma'am, best practices for mental health evaluations.

THE COURT:  Okay.

THE WITNESS:  That phase.  There's not a published standard of care by the American Psychological Association.  There are best practices that have been articulated in the scholarly literature.  There is also what is regarded as customary, necessary, as reflected in trainings for psychologists and for attorneys.

THE COURT:  I don't -- this is the deal.  I don't think it matters whether I qualify him, accept him as a best practices.  He can testify about it.

MR. ROBERTS:  Okay.

MR. WISEMAN:  Well, I --

THE COURT:  Is that all right?

MR. WISEMAN:  As long as we can have opinions on --

THE COURT:  So he can be an expert forensic psychologist.

MR. WISEMAN:  That works for me.

THE COURT:  Okay.

MR. WISEMAN:  With that --

THE COURT:  Since I'm not familiar with it, I'm sorry.

MR. WISEMAN:  Oh, no.  That's quite all right.

THE COURT:  Okay.

MR. WISEMAN:  I hope by the end of his testimony you will be.

THE COURT:  I will be.  Thank you.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Dr. Cunningham, I want to direct your attention to June 30th, 2003, and ask you if you were contacted with respect to the United States of America versus Alfred Bourgeois.

A.   Yes, sir, I was.

Q.   And by whom were you contacted?

A.   I received an e-mail from John Gilmore on that date.

THE COURT:  What date?

THE WITNESS:  June the 30th, 2003.  8:20 p.m.

BY MR. WISEMAN:

Q.   I'm putting up on the overhead a packet of 38 pages in length.  It's Exhibit P-8, and ask you if you, at least for the moment, recognize that top page.

A.   Yes, sir, I do.

Q.   Okay.  And what do you recognize it as?

A.   This is the e-mail that I received from John Gilmore in the evening of June 30th, 2003.

Q.   And just to be clear, because we're going to be referring to a number of e-mails in your testimony, this e-mail did not come from you to me.  I mean, I didn't get these e-mails from you, is your understanding?

A.   That's correct.

Q.   All right.  Where do you understand I got them from?

A.   It's my understanding that you got those from Mr. Gilmore.

Q.   Okay.  And why is it that, or do you have your own access to e-mails relevant to this case?

A.   No, sir.

Q.   Okay.  Now, what, in essence, is Mr. Gilmore asking you in this e-mail?  What was your understanding of the request?

A.   He is inquiring about whether I could be retained to assist the Defense in providing capital sentencing evaluation of Alfred Bourgeois.

Q.   And --

          THE COURT:  Are you going to offer this so it can be part of the record?

          MR. WISEMAN:  Oh, absolutely.  Yes.

          THE COURT:  What's the number?

          MR. WISEMAN:  It is P-8.

          THE COURT:  P-8.  Any objection?

          MR. ROBERTS:  No, Your Honor.

          THE COURT:  P-8 is admitted.

          MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  I want to direct your attention to the --

THE COURT:  I'm just worried when I'm looking at them that somebody's going to forget to offer it.

MR. WISEMAN:  Oh, no.

THE COURT:  Okay.

MR. WISEMAN:  I hope I don't.

BY MR. WISEMAN:

Q.   Where I put my finger, it says, "I have requested" --

THE COURT:  Can you zoom, can you zoom into that a bit, please, sir?

MR. WISEMAN:  Sure.  Is that better?

THE COURT:  Thank you very much.

BY MR. WISEMAN:

Q.   Okay.  Where it says, "I have requested" --

A.   Yes, sir.

Q.   What is he asking you if you're able to do?

A.   He is inquiring whether I could accept an appointment as a mitigation expert, with a fee that would potentially be in the $25,000 range.

Q.   Okay.  And does he offer you any information about the current, the then current state of the mitigation case?

A.   Yes, sir, he does.

Q.   And what is he telling you?

A.   He describes, four lines from the bottom of that

paragraph, "We do not expect to be successful, mainly because we have developed very little mitigating evidence."

Q.   Okay.

A.    "It's a catch-22 situation.  We don't get a mitigation expert unless they seek the death penalty.  We don't have much mitigation evidence to dissuade the council because we don't have anyone trained to do it."

Q.   Okay.  And when he used --

THE COURT:  I'm sorry, but I think he was talking about then, persuade the Attorney General's council.

MR. WISEMAN:  That was my next question.

THE COURT:  Not to -- that was my understanding of where they were at the time.

MR. WISEMAN:  That was my very next question.

THE COURT:  They wanted information to send -- everybody has to file all these briefs, as you know.

MR. WISEMAN:  To the committee in Washington.

THE COURT:  With the Attorney General in Washington.

MR. WISEMAN:  Right.

THE COURT:  Whatever their council is.  And he wanted to head off the death penalty --

MR. WISEMAN:  Exactly.

THE COURT:  -- before it got to the death penalty.

MR. WISEMAN:  Precisely.

BY MR. WISEMAN:

Q.    And is that your understanding of what he meant by council, Dr. Cunningham?

A.    Yes, sir.

Q.    Okay.

        THE COURT:  Okay.  So we're all on the same page.

        MR. WISEMAN:  Absolutely.  Not only on the same page, the same sentence.

        THE COURT:  Thank goodness.

        MR. WISEMAN:  Okay.

        THE COURT:  Paragraph, page.

BY MR. WISEMAN:

Q.    Now, does he also tell you that he, "As it stands now, my client will receive the death penalty if convicted"?

A.    That's what he says.

Q.    Okay.  Did you respond to that e-mail?

A.    Yes, sir, I did.

Q.    All right.  And I'm going to turn the page to the -- turn the exhibit to the next page.

        THE COURT:  And that is Exhibit Number.

        MR. WISEMAN:  P-8.

        THE COURT:  Any objection to the admission of P-8?

        MR. WISEMAN:  I think we already did that.

        THE COURT:  We did that?

        MR. WISEMAN:  Yeah.

        THE COURT:  P-8 is admitted.  Thank you.

MR. ROBERTS:  Your Honor, apparently, I mean it's an exhibit that's got multiple documents within it.  It's one --

THE COURT:  Oh, okay.

MR. WISEMAN:  Yes.

THE COURT:  That, okay, the e-mail and the response are one, P-8.

MR. WISEMAN:  Right.  There's 30 --

THE COURT:  Sorry.

MR. WISEMAN:  Just to be clear for the record, there are --

THE COURT:  Thirty pages?

MR. WISEMAN:  -- 38 pages to this exhibit.

THE COURT:  Thank you.  Go ahead.  I'm slow myself sometimes, so --

MR. WISEMAN:  That's -- I'll leave that alone.

THE COURT:  You're a smart man.

MR. WISEMAN:  Sometimes.

BY MR. WISEMAN:

Q.    Did you respond to him on July the 1st?

A.    Yes, I did.

Q.    Okay.  And that would be the e-mail from Mark Cunningham, time 8:57 a.m.?

A.    That's correct.

Q.    Okay.  Why don't you tell us -- actually, because of its significance, why don't you read to us what your response was,

starting at the beginning.

A.    Yes, sir.  7/1/03.  "Mr. Gilmore, Thank you for your interest in retaining me in U.S. v. Alfred Bourgeois.  While I would be quite willing to consult with you regarding mitigation, my schedule would not allow me to adequately perform this evaluation and prepare my testimony by mid September, given the status of the mitigation case, as it appears from your description.  I do not know how far along you are in investigating and developing a comprehensive psychosocial history."

Q.    Why don't you stop there.  I want to ask you a question about what you mean there.  What is, in our, in your field, I should say, what is the -- is a comprehensive psychosocial history a term of art?

A.    Yes, sir.

Q.    And what does it mean in your field?

A.    That means that historical information is gathered that would allow the identification of a broad spectrum of potential adverse developmental factors.  That investigation would take a history back to the grandparents on either side of the family and include all the aunts and uncles and all the first cousins. It would include -- and with the history taken on those individuals, it would include exploration of relationship stability, psychological disorders, substance abuse histories, domestic violence, family dysfunction, child neglect, children

out-of-wedlock, any processes that would identify generational family dysfunction, pathological scripts or life patterns within the family system, genetic predispositions for personality disorder or psychological disorder, genetic predispositions for substance abuse issues.

Q.   So I guess the word "comprehensive" then has a significant meaning in this context.

A.   Yes, sir, it does, as well as a very extensive developmental history, and history of relationships and interactions and influences that were on the Defendant's life in terms of his immediate family and his personal experience, as well as this family constellation.

Q.   Okay.  And included in the development of that comprehensive psychosocial history, does that require the gathering of pertinent records?

A.   Yes, sir, it does.  An attempt is made to gather virtually every piece of paper that was created in the Defendant's life.

Q.   Okay.  Why don't you then continue reading.  You stopped at "comprehensive psychosocial history."

A.   "Typically, a specialized mitigation investigator/social worker is appointed to collect medical, school, social service, mental health, juvenile, military and other records.  This investigator also intensively interviews immediate and extended family, as well as friends, teachers, co-workers and other third parties.  The investigator provides summaries of the

third party interviews and develops" -- it says "of," it should be "a" -- "time line of events regarding the Defendant.  As a psychologist, I would then analyze these records and conduct more strategic interviews in person or by telephone with the parties, the mitigation investigator has interviewed.  If this comprehensive mitigation investigation has been completed, please advise me, as this will impact on my availability."

Q.   All right.  Why don't you stop there and let me ask you a couple of questions.  Are you drawing a distinction in that part you just read between the role of the mitigation specialist and the consulting psychologist?

A.   Yes, sir, I am.

Q.   Okay.  And correct me if I'm wrong, just to move this along, the mitigation specialist does the initial interviews, gathers the pertinent records, gives them to you as the psychologist.  You evaluate them and decide on what further steps should be taken?

A.   That's correct.  Then there is a continuing interaction. As I review those and begin my own interviews, I will have suggestions about additional persons that need to be interviewed or additional investigations that need to be undertaken.  The investigator finds those people, seeks those records, comes back to me.  So there is a reciprocal -- there is a feedback loop that's going on as this mitigation psychosocial history is being developed.

Q.    Okay.  And is the paradigm you've just laid out here with regard to the role of the mitigation specialist and the psychologist and the feedback and the sort of relationship, is that endorsed in the literature, as well as in the ABA standards?

A.    Yes, sir.

Q.    I should say the ABA guidelines, to be more precise.

A.    Yes, sir.

Q.    Why don't you read that last paragraph, and then we'll move on.

A.    "If such a comprehensive mitigation investigation has not been completed, then I would suggest that you seek a continuance, particularly in light of the recent Wiggins decision.  Because the relevant records are often time consuming to identify and retrieve.  And because conducting the third party interviews are similarly time consuming, the investigation alone cannot typically be performed in the time between now and trial.  This investigation needs to be completed before the psychologist begins the large part of his/her evaluation."

Q.    All right.  I think we can stop there.  The remainder you're offering to suggest mitigation specialists to Mr. Gilmore?

A.    That's correct.

Q.    Okay.  Now, just so we're clear here, you're saying that

the time between July 1st and what was then the mid September trial date, two-and-a-half months, was inadequate, in your view, to start and complete both the mitigation investigation as well as for you to perform your role.

A.    That's correct.

Q.    And was there any way, in your view, that that, those functions could be performed in anywhere near two-and-a-half months?

A.    No, sir.

Q.    And in fact, how much time would you ordinarily -- and I realize things can be fluid -- but in the ordinary course, how much time would you like to have in order to see this process play out?

A.    I think I requested at least six months and said that if the mitigation investigation was undertaken aggressively, that I could be ready with my part by January.  It is often impossible to do an adequate mitigation investigation in six months because of difficulties with retrieving records and that sort of thing.  So it's not uncommon for there to be at least a year between the beginning of the mitigation investigation and the trial.

Q.    Okay.  And if you look at what I've put up now rather crooked, this is Page 4 of Exhibit 8, and actually it starts on Page 3 -- no, I'm sorry.  Where does it start?  There's no date to this e-mail, it seems, is the problem.  But you're

responding at the top there, says, "I could be ready for trial beginning in mid January, assuming an investigator began aggressively working on the social history."

A.    Yes, sir, that's in response to his e-mail below, who's asking me when I might be available.

Q.    That's quite right.  Okay.  So again, so the record's clear, what you're telling Mr. Gilmore here is that you'd be happy to do the job.  You would require till mid January, but only if a mitigation specialist was aggressively investigating Mr. Bourgeois's background.

A.    That's correct.

Q.    All right.  I want to bring to your attention Page 11 of this exhibit.  And could you just summarize what you're telling Mr. Gilmore in this July 9th, 2003, e-mail?

A.    Yes, sir.  This is in response to his July 9th inquiry that is just below my own.  It's shown at the very bottom of the screen, original message, John Gilmore.  He's asking for suggestions for an investigator.  He says, "We have an investigator working on guilt/innocence, and I would prefer someone specialized in developing mitigation evidence."

      I then provided him with six individuals that I knew of with federal capital case experience and five individuals with state capital case experience.

Q.    Okay.  And one of them is Lisa Milstein?

A.    That's correct.

Q.   Okay.  And she ultimately, to your knowledge, was retained through the Court's appointment process by Mr. Gilmore and Mr. Tinker?

A.   That's my understanding, yes.

Q.   Okay.  I don't see Gerald Bierbaum on this list.  Do you know how he ultimately came to be involved in the case?

A.   It's my understanding he had some professional affiliation with Lisa Milstein, but I don't know apart from that.

Q.   Okay.  I want to show you -- take this exhibit off for a moment, and put up what's been marked as Petitioner's 151, that's 1-5-1, and ask you if you recognize this document.

A.   Yes, sir.  That is the billing statement of my work in this case.

Q.   All right.  And for the record, it's five pages in length. Does that billing statement represent -- I'm going to use the word "significant" -- activities you performed in this case?

A.   Yes, sir.

Q.   Is it a contemporaneous record that you maintained in the course of your work in this case?

A.   Yes, sir.  I maintain production sheets each day that I am completing as the day proceeds, or if I'm in the midst of travel, at least that evening.

          MR. WISEMAN:  Excuse me for a moment, Your Honor.

          THE COURT:  Certainly.

     (PAUSE.)

BY MR. WISEMAN:

Q.    I want to show you another exhibit that's been marked as P-167.

MR. WISEMAN:  By the way, Mr. Roberts, I incorrectly told you that was 166.  It's 167.

BY MR. WISEMAN:

Q.    Do you recognize this document?

A.    Yes, sir, I do.

Q.    And I'm just going to turn the page, and it's got a second sheet that says, "Bourgeois relevant Daily Messages"?

A.    Yes, sir.  Those are two different documents.

Q.    Okay.  And why don't you explain what each of them are.

A.    My office began using in 2004 a contact management software called ACT!, A-C-T-exclamation point.  My administrative assistant staff would make entries into ACT! under the case, the relevant case.  Actually, I think it's keyed to the primary attorney in the case.  And these reflect a printout of those ACT!-related entries that were made in this case.

Q.    Okay.  And Your Honor, I would offer at this time --

THE COURT:  Any objection?

MR. ROBERTS:  Your Honor, I'd like to know a little bit more, because it looks like a computer-generated document. I have no idea of the reliability --

THE COURT:  Would you like to take him on voir dire

for a moment?

MR. ROBERTS:  Yes, Your Honor.

VOIR DIRE EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document --

THE COURT:  Would you stand by the microphone, please.

MR. ROBERTS:  Sorry, Your Honor.

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document is -- actually came into your presence.

A.   Yes, sir.  My office uses a computer software program called ACT! to manage contacts and our interactions with those contacts.

Q.   Who produced this document?

A.   This is produced by my administrative staff at that time. The very first entry that has the initials MBC would have been completed by my wife, Melinda Britain Cunningham.  The second entry that's initialed TL, that stands for Tammy Lam.

Q.   That's one problem I have with the document.  There's nothing on there that would differentiate this from any document that someone sat down and typed out.  So how am I supposed to be able to determine that this is accurate and this is all of the notes that came out of your computer?

A.   I requested that my staff -- I didn't think about ACT!

until yesterday.  I requested of them, "Retrieve any entries out of ACT! that we may have regarding the Bourgeois case."  This was e-mailed to me.

Q.   So you didn't even produce this yourself.

A.   No, sir, I don't interact with the ACT! software.  That's done by my administrative staff.

Q.   And the document on the second page that has a list of messages and references, do you know how that was produced?

A.   Yes, sir.  Each day my office provides me with summary information of the day's activities.  We call that Daily Messages.  I'm often out of town, and that's a way of me keeping up with what's happening in the office.

Also yesterday I requested of my staff to go back through Daily Messages that we may still have in our Outlook files from that period of time.

Q.   So they could have actually missed some of the messages?  They just sent you the messages they could find?

A.   They retrieved the messages that they could find.

MR. ROBERTS:  Your Honor, I don't know that it's accurate.  I mean, I'm not going to -- I don't have any problem with him testifying to it, but I'm a little concerned of the authenticity of the information on it, so, and as far as it being complete information.

MR. WISEMAN:  Let me ask a couple of follow-up questions, if I might.

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Dr. Cunningham, when you received this document, did you sort through it and remove any information from it?

A.   No, sir, I did not.

Q.   Does your staff routinely and in the regular course of your business maintain these types of documents?

A.   Yes, sir, they did, and they advise me --

THE COURT:  Well, Page 1 they just created.

MR. WISEMAN:  Well, they maintained it in the computer, I think, is what he said.

THE WITNESS:  Page 1 is a printout.  It's a document that exists in the computer.  This is just a printout of all the notes under ACT! for this case.

BY MR. WISEMAN:

Q.   Are they altered in any way from the way they appear on the computer?

A.   No, sir.

Q.   Other than the way they're laid out on the page?

A.   No, sir.

MR. WISEMAN:  Your Honor, I think this is, it's a business record.  It's a contemporaneous record.

THE COURT:  It's not really contemporaneous.  I'm not understanding.

MR. WISEMAN:  Well, it's contemporaneous at the time

it was made.  I mean, obviously the printout happened yesterday.

THE COURT:  Well, the search was made.

MR. WISEMAN:  Correct, and was printed out yesterday. But when it's put into the computer, it's put in as a contemporaneous record.  I think Mr. Roberts --

THE COURT:  How do you know that?

MR. WISEMAN:  He just told us.

THE COURT:  Okay.

MR. WISEMAN:  And I think Mr. Roberts' position really goes to a question of weight, not admissibility.

THE COURT:  I think you're right.  P-167 is admitted.

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  Don't say that.

MR. WISEMAN:  Oh, okay.

THE COURT:  That's all right.

MR. WISEMAN:  It's a bad habit.

THE COURT:  Well, I know.  I wish you lawyers would never say that.

MR. WISEMAN:  Your Honor, I understand the point.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   Dr. Cunningham, between P-151 and P-167, and I'm going to ask you this with a qualification, I mean, I expect you've thought thoughts about this case, you may have, you know,

written a note some place or another, but do these two documents reflect the significant, substantial tasks and actions you took in regard to your involvement in this case? Long question.

A.   The billing statement, the notations in ACT!, the notations in Daily Messages were contemporaneously prepared at that time, indicating significant contacts.  There are other contacts, in terms of brief phone calls, that sort of thing that occurred, that did not make it onto the billing statements, for example, that are alluded to in the Daily Messages or in ACT!, for example.

Q.   And so let me just ask, a quick phone call about what time should I be there, that's not going to make it on the billing statement?

A.   Yes, sir, that's correct.  It could be longer than that. It could be three or four minutes, and I simply didn't bill for that time.

Q.   Okay.  So then your answer, with that qualification, is "yes" or "no" to my question?

A.   Yes, sir, that's correct.  That is my best recollection of the substantial activities that occurred.

Q.   Okay.  I want to now show you an entry from the Court's docket --

          MR. WISEMAN:  Your Honor, I --

          THE COURT:  You know, we're at 12:00 o'clock.

MR. WISEMAN:  Oh.

THE COURT:  Is this a good time to break?

MR. WISEMAN:  Oh, sure, if the Court likes, we can do that.

THE COURT:  We'll do that.  Would you call the next case, please?

THE CLERK:  Yes, Your Honor.

THE COURT:  1:00 o'clock.

MR. WISEMAN:  1:00 o'clock.

THE COURT:  Is that all right?

THE CLERK:  Yes.

THE COURT:  1:00 o'clock.

(Recess from 12:02 p.m. to 1:02 p.m.)

THE COURT:  Okay.  Good to go.

MR. WISEMAN:  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.  Dr. Cunningham, when we broke, I was about to ask you about an entry on the Court's docket.

MR. WISEMAN:  And Your Honor, for purposes of this examination, I'm going to be referring to certain entries in the Court's docket that we printed out on September 15th of this year, just for some historical perspective.  The docket --

THE COURT:  You want documents to be printed out?  Or what are you --

MR. WISEMAN:  I just printed it out for my purposes.

THE COURT:  Okay.

MR. WISEMAN:  I can mark it.  I assume there's no need to do that, since -- unless you want it.

THE COURT:  No.

MR. WISEMAN:  No?  Okay.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.  Dr. Cunningham, the document reflects that on --

THE COURT:  I was just going to show you how to do it.

MR. WISEMAN:  Oh, no, no.  We're very good with PACER.

BY MR. WISEMAN:

Q.  September -- I'm sorry -- July 16, 2003, Docket Entry 74 reflects that Ms. Booth for the Government announced that the Government will seek the death penalty.  And then two days later, September (sic) 18th, there's a scheduling order, and it's Docket Entry 76, setting trial for February 16th, 2004.  I just want you to keep those dates in mind.

A.  I'm sorry, can you tell me again when the case was set for trial in February?

Q.  Sure.  February 14th it was set for trial.  And that happened on July the 18th --

A.  Yes, sir.

Q.    -- 2003.

A.    Yes, sir.

Q.    I seem to have misplaced the marked exhibit.

        MR. WISEMAN:  Your Honor, I seem to have misplaced the marked exhibit of P-8, which is the e-mails.  With the Court's permission, I'm going to use my copy, which unfortunately is marked up, but I'll --

        THE COURT:  P-8?

        MR. WISEMAN:  P-8.

        THE COURT:  It was admitted.  Do you have it, Ms. Scotch?

        MR. WISEMAN:  Oh.  Oh, we found it.  Thank you.

BY MR. WISEMAN:

Q.    Page 4 of P-8 -- I'm sorry -- all right, Page 15 of P-8, I'm going to put that up on the screen.  And I want to direct your attention to the e-mail dated 7/25/2003.  And is Mr. Gilmore giving you some advice with respect to this, your involvement in this case?

A.    Yes, sir.

Q.    And what is he telling you?

A.    He's advising me that there is a reciprocal discovery that has had a deadline identified for mid December --

Q.    Okay.

A.    -- to disclose my information.

Q.    And before that, he's telling you that the Judge has

agreed, Judge Jack agreed to appoint you to the case, trial was reset for February 2004.  And of course, we just went through the docket which indicated that it's February 14th.  And he advises you the reciprocal discovery date in December?

A.    Yes, sir.  He has a -- also identifies he has a call in to Charlotte Holdman, who is a mitigation investigator.  We're now 25 days into the correspondence that I had with him on July the 1st, indicating that if the mitigation investigation proceeded aggressively and immediately, I could be ready in January.  So we've already lost 25 days, and there's not yet apparently an, a mitigation investigator on board.

Q.    Okay.  I want to take you back then to your invoice.  By the way, your invoice is dated April 30th, 2007.  Can you explain that date?

A.    Yes, sir.  That's the date that this copy was printed. The nature of the software is that when you go in and print a bill, it prints it with that date, not the date of the original billing.

Q.    Okay.  And I want to direct your attention to between July the 9th, 2003, and January 22nd, 2004.  The invoice reflects what activity during that period of time?

A.    There's no activity that I billed for.  There were some brief telephone conferences that occurred, but there was no billable activity.

Q.    And I want to take that exhibit off and put back up 167,

and I want you to focus on the entry --

THE COURT:  Could you zoom that so we can all read it?

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q.   -- the entry that's dated 11/17/03.  Can you read that to the Court?

A.   Yes, sir.  "Called Douglas Tinker.  He said they have a few investigators working on getting information.  Will send records to us sometime in December, hopefully no later than mid December.  Attorneys are aware of the previous time line and are working with Judge to get a continuance/extension."

Q.   Okay.  Now, there's a few things in that I want to cover. The previous e-mail advised you there would be a reciprocal discovery deadline of mid December, and this document is telling you that Mr. Tinker said he's hoping to get you records in December.  Would that have been, in your view, a sufficient amount of time to process the records, do what you need to do, and produce a report for discovery?

A.   No, sir.

Q.   Were you under the impression, in reading this, that a continuance at that point from what is now the February 2004 trial date was likely?

A.   Yes, sir.

Q.   And why in that e-mail did you make note that the

attorneys are aware of the previous time line you had provided

to them that you required for your work?

A.    I don't understand the question.

Q.    Sure.  In this note, you say that attorneys are aware of

the previous time line.

A.    This is a note that was created by Tammy Lam, my

administrative assistant.

Q.    Okay.

A.    This is a call she initiated, and she is simply reporting

the contents of that.  And as we have a case file, we identify

deadlines that may be present so that we're keeping up with

those.  So that's part of why she's initiating this call, is

that deadline is rapidly approaching, and we have received

nothing at all at that point.

Q.    Now, up to that point, and by "that point" I mean the last

date we were talking about, which was 11/17/03, had you yet met

Mr. Bourgeois?

A.    No, sir.

Q.    And had you, as yet, engaged in any interviewing the

potential witnesses?

A.    No, sir.

Q.    Processing any information relevant to the case?

A.    No, sir.

Q.    And why, for all three of those things, why weren't you

doing anything?

A.    I had received no records from Defense Counsel or from the mitigation investigators.  I had received no summaries of mitigation investigation interviews.  I had no psychosocial history that would provide a narrative summary of the mitigation themes that had been developed of Mr. Bourgeois's background.  I had no detailed and annotated time line to orient me to the case.  I was delaying my own interviews of Mr. Bourgeois and third parties until I had receipt of those materials, so that those interviews could progress in the most efficient and effective fashion.

Q.    So basically, you had nothing to do at that point.

A.    I suppose I could have initiated an interview of Mr. Bourgeois in the absence of having any background information whatsoever.

Q.    And would that be your standard practice?

A.    No, sir.

Q.    And is that an advisable practice?

A.    It's not the best practice.

Q.    And why not?

A.    The more information that the psychologist has in advance, the better able the psychologist is to detect if the report that the Defendant is giving is discrepant with other records or with other reports, either that the Defendant is exaggerating background factors, which happens less often, or is providing a, an overly sanitized and positive report of his

family experiences and background, which occurs more often.

If I already know the history that's been provided by records and by other interviews, then as I ask the questions, I know what to zero in on, what to obtain more information about. I'm better able to challenge discrepancies as they occur.

Q.   Let's now look at Page 20 of the e-mail packet, P-8.  And I want you to read for the Court that e-mail dated December 1st, 2003, 12:36 p.m.

A.   "Dear Mr. Gilmore:  Could you please kindly provide update to the above case, as I am in the process of reviewing and scheduling Dr. Cunningham's trial reports, time line and travels.  Thank you, and kind regards, Tammy."  That's Tammy Lam, who is my administrative assistant.

Q.   Okay.  And I'm going to turn to the previous page, which is 19, and ask you to read Mr. Gilmore's response, which came about 14 minutes after the first e-mail.  That will be right there.

A.   "Dear Mr. Gilmore:  Thanks for the update.  We will pencil into our calendar --"

Q.   You know what, let me stop you, because I've been reading this out of order, and that's my fault.  Oh, I see what it is. Okay.  I want you to read the e-mail that starts December 1st, 2003, 12:43 p.m., which actually is contained on the next page right there, "I am trying."

A.   Yes, sir.  "I am trying to get a continuance.  The case is

currently set for trial on February 16th. However, the mitigation investigators say that they will not be finished by then."

Q.   Okay. And finally with this section, if you could tell us what Ms. Lam then replies to Mr. Gilmore, and that would be the 12:50 response.

A.   "Dear Mr. Gilmore: Thanks for the update. We'll pencil into our calendar and would appreciate further update to this case. FYI, we have yet to receive any records/information/ materials for Dr. C to begin working on the report. Thank you and regards, Tammy."

Q.   Okay. So we are now at December 1st of 2003, and I take it from that exchange that you still have nothing.

A.   That's correct.

Q.   I'm going to put up for you a document which is marked Defendant's P-140 -- I'm sorry -- Petitioner's 144, which is a motion that was docketed in this court on December 9th, 2003. It's captioned "Motion for Continuance." I want to read the operative portion of the two sentences and ask you a question.

On the first page, it says, "Defendant's Attorney, John Gilmore, has been informed by the mitigation investigators, Lisa Milstein and Gerald Bierbaum, that they cannot properly complete their investigation of this case until August 2004."

And my question to you, sir, is were you consulted by Mr. Gilmore as to the actual filing of this motion? I know he

told you he was thinking about asking for a continuance.  Did he call you up and say, "I'm filing this motion, and we're asking for August"?

A.    Not that I recall.

Q.    Now, I want to show you another motion that was docketed or filed in this court -- it doesn't have a docket stamp on it, but it's dated December 16th, 2003.  It's Petitioner's 72, and it says, "Motion to Withdraw, Motion for Continuance."

And what it says in the operative portion on Page 1 is that the Defendant filed a motion for continuance alleging that the mitigation investigators could not complete their investigation till August of '04.  Defendant -- Attorney Gilmore contacted the investigators Bierbaum and Milstein -- I'm paraphrasing -- informed them the Court would not extend the deadline.

"The investigators informed Gilmore that they would suspend work on their other investigations and concentrate on completing their investigation on this case.  The investigators have assured Counsel that their work will be completed in time for the February trial setting," closed quote.

And my question to you is were you consulted on whether at that point you could be ready for trial in February and the December discovery deadline, given the then current state of the mitigation investigation?

A.    No, sir.

Q.    And did Mr. Gilmore call you up and say, "I'm filing this motion to withdraw the motion for continuance, and can you be ready?"

A.    Not that I recall.  I don't have a recollection of being informed that there was a motion to withdraw the request for continuance.

THE COURT:  Could you have been?

THE WITNESS:  It's conceivable.  I remember becoming increasingly concerned and panicked in December and January about the absence of any materials in my possession.  So I can't imagine that I would assure them, yes, I can be ready, when I had nothing in my possession as of the 1st of December.

BY MR. WISEMAN:

Q.    I want to put up for you again, and hopefully that will assist with your response to the Court's last question.  This is 167.  It's your, the first page of your ACT! sheet, A-C-T.  Is there any indication that you received such a call from Mr. Gilmore or Mr. Tinker in December of '03, other than the one of 12/1 indicating the trial set for 2/16?

A.    No, sir.  I might also -- I don't have a copy of this in front of me.  I might also look at the daily messages calendar.

Q.    I'm going to give you that next.

A.    Yes, sir.

Q.    And in fact, on 12/1/03, Mr. Gilmore's e-mail indicated to you, the trial was still proceeding in February, according to

the sheet.

A.    Yes, sir, but they're working on getting a continuance.

Q.    Working with the Judge, I think, was the --

A.    Yes, sir.

Q.    And do you see anything in the relevant daily messages -- there's nothing from December of '03.  Is that right?

A.    That's correct.  I think that's a function, though, that as far as we could go back in our system was January.

Q.    Oh, is that right?

A.    Yes, sir, in terms of retrieving Outlook messages.

Q.    I'm glad you clarified that.  Thank you.

      All right.  I want to bring you back to your invoice and ask you if you can tell the Court the date on which you, if you can tell the Court, and if so, what date that you first received any mitigation information in this case.

A.    January 31st, 2004.

Q.    And how do you know that?

A.    I billed for 80 minutes for review of mitigation interview summaries.  At that time I was, as I have said, extremely concerned about the receipt of those.  And my recollection is I reviewed them immediately upon receipt.

Q.    Okay.  And can you make any determination -- that doesn't say what you received or, you know, what type of information, but can you make any judgment from the fact that you billed for 80 minutes as to the number of interview summaries that were

sent to you?

A.   It certainly would have been more than three or four.  I'm not only reviewing these, but I am trying to analyze and understand their significance as well.  You know, in 80 minutes, given the very brief nature of many of these summaries, I anticipate that I could have gotten through ten or twelve of them.

Q.   Okay.  So anywhere from three to a dozen, depending on which ones they were and the information in them?

A.   Yes, sir, that's correct.

Q.   Okay.  Now, this is at this point about two weeks before the initial start of trial, 2/14.

A.   Yes, sir.

Q.   Of course, trial started a little later than that, but at that point, it was still set for 2/14.  I take it from your prior testimony that two weeks is not an adequate amount of time for you to begin to do what you needed to do?

A.   That's correct.

Q.   And was it even a close call?

A.   No, sir.

Q.   I'm going to show you a new document.

        MR. WISEMAN:  Your Honor, I'm going to offer these, subject to -- well, initially I'm just going to ask for him to look at it, but I'm telling the Court that I'll offer these eventually through Mr. Bierbaum or Mr. Gilmore.

BY MR. WISEMAN:

Q.    These are e-mails that came from Mr. Bierbaum's file, and they are to you and other people involved in the case.  It's marked at Petitioner's 60.  And for the record, it is 16 pages in length.

I want to direct your attention to this first one, which is dated January 30th, 2004.  And if you'll just read us where it says, "Dear Dr. Cunningham."

A.    Yes, sir.  "Here's a bunch of material from Bourgeois's case.  Please call me when you get a minute so we can set up a meeting between you, Dr. Holden, Mr. Tinker and Mr. Gilmore.  I'll send this in sections so it won't clog up your e-mail server.  Some of these are in WP, Word Perfect.  Let me know if you can't convert them, and I'll do it here."

So I stand corrected.  I received those on January the 30th.  I reviewed them on January 31st.

Q.    Okay.  Do you have any independent recollection of why you didn't review them the minute you got them?

A.    No, sir.  I would have to go back and look at the day sheet from that day to see what other tasks I was involved in or if I was even in town.

Q.    I'm going to put up another document now which is marked as Petitioner's 165.  Have you seen this document before?

A.    Yes, sir, I have.

Q.    And can you describe what it is?

A.    Yes, sir.  This is a chronological listing of the mitigation investigation interviews that were conducted by Lisa Milstein and Gerald Bierbaum.  The date in the left-hand margin reflects either the date that the interview content specifies the interview was done, or it specifies the date that the interview summary was typed up, because a number of those interview summaries only have the date that the summary is prepared, do not have the date of the actual interview.

Q.    Are you confident that the date column does not reflect the date you received these things?

A.    Yes, sir.

Q.    Is there any error?  And in particular I want to refer to the very first entry, 10/23/2002.

A.    Yes, sir.  That wasn't in 2002.  That was in 2003, as I understand it.

Q.    All right.  So the summary itself was incorrectly dated?

A.    That's correct.

Q.    Okay.  Now, did you compile this document?

A.    No, I did not.

Q.    All right.  Did I provide it to you -- it's three pages in length -- and ask you to compare it with the interview summaries that you may have had in your possession?

A.    Yes, sir, you did.

Q.    Okay.  And when I say "in your possession," I mean ones that were sent to you.

A.    That's correct.

Q.    Are there any on this list that you determined from a review of your file that you have not, that you never received from trial counsel or his mitigation specialists?

A.    Yes, there are.

Q.    And which three are those?

A.    Well, there are two of those.

Q.    I'm sorry, two.

A.    There is the Gaynell Collins, dated 1/15/04.  I don't find that in my files.  And there is Gaynell James and Anthony Belvin, dated 1/16/04.  I don't find that one in my files.

Q.    So that's two people on one summary?

A.    Yes, sir.

Q.    Okay.  Other than that, though, does this document, is it an accurate summary of what you received, from who you received it -- I should -- withdraw that.  What you received, who conducted the interview, and either the date of the interview or the transcription of the interview?

A.    Yes, sir.  This is consistent with what's on those documents that I was provided.

Q.    Okay.  Thank you.  Now, let me put this back up.  I took it away a little too soon.  I want to draw your attention to Page 2, and in particular, ask you to look above the date of 2/3/04.  So that would be starting at 1/29/04.  And tell the Court if this is the totality of what you had received by, at

most that you received by January 31st of 2004.

A.    Yes, sir.  That reflects the most that I could have received if every interview that had been done prior to that time I was provided by Gerald Bierbaum.

Q.    And you have no way of determining if you actually received all of these things before 2004?

A.    That's correct.

Q.    I'm sorry, before January 30th of 2004.

A.    I don't know that I received all of these documents in that first shipment on January the 30th, 2004.

Q.    Okay.  And again, your invoice reflecting 80 minutes makes you think you received somewhere between three and a dozen of them?

A.    Well, there were certainly more than three.  I would anticipate in the neighborhood of eight to fourteen --

Q.    Okay.

A.    -- for that amount of time.

Q.    All right.  So --

A.    I don't think I could have gotten through all of these in 80 minutes.

Q.    Okay.  "All of these" meaning all of the ones from before?

A.    The ones that had been done up to January the 30th.

Q.    All right.  Now, I want you to put on your standard of care hat and ask you, with trial two weeks away, can you describe the state of the mitigation investigation and your

ability to perform your role, given the most you could have had as of January 31st, 2004?

A.    The state of the investigation was abysmal.  The summaries that I was provided were in most instances superficial and incomplete, reflecting little generational family history and little in the way of development of information.

For example, the summary that I was provided, based on the interview of his mother, was about two-thirds of a page, and that's not single-spaced.  That's almost as if every sentence is a separate paragraph.

Q.    And who --

A.    And so it's the most fragmented of information.

Q.    Who conducted that interview, according to the summary that was provided to you?

A.    That was conducted by Lisa Milstein.

Q.    Okay.  As you began to review these and start to compare them to each other and begin to make some inquiries of your own, did you notice errors within the summaries that were provided to you?

A.    Yes, sir, I did.

Q.    And give the Court an example or two of what you were finding that caused you to conclude that there were some errors.

A.    The interview that Ms. Milstein did of Lloyd Ferdinand, Jr., who's a maternal half-brother, the interview summary is

dated November 25th, 2003, reported that their stepfather, Godfrey -- this says "Godfer Rickson," which is also incorrect -- was killed in a motor vehicle accident while intoxicated.

That simply is not part of the history of this case. There are subsequently other individuals who refer to him still being alive, that he separated from Eunice but is still living.

THE COURT:  This is the person you recommended?

THE WITNESS:  It was one of the names that I provided, yes, ma'am.

BY MR. WISEMAN:

Q.   That's a pertinent question, Dr. Cunningham.  Did you subsequently come to learn of certain difficulties Ms. Milstein was having in her personal life at this time?

A.   I was advised of that by Gerald Bierbaum.

Q.   And we're going to have Mr. Bierbaum here, and he can certainly be cross-examined, and we won't offer this for the truth, but just to give the Court a sense of where we're going. What did you learn?

A.   My recollection was he described that she was having difficulties with cocaine abuse.

Q.   And you didn't know that at the time, I take it?

A.   No, sir.

Q.   Can you think of any other errors that you began to see in that material?

A.    Yes, sir.  There was an interview that was done of Michelle Warren, who is a maternal half-sister, on February the 3rd, 2004, reporting an incident when Michelle was age 16 that Alfred lost it and was hitting her over and over.  I interviewed Michelle Warren, and she advised me that he only hit her a single time.

There was a interview summary that was done by Gerald Bierbaum of Alfred Sterling, who's the biological father.  This is a March the 2nd, 2004 interview that reported that Alfred Sterling, Sr. had 25 years of service in the U.S. Army. Actually, it's his son, Alfred Sterling, Jr. who has 25 years of service in the military.  Again, a pretty significant error as we're talking about a critical individual in Alfred Bourgeois's life, his biological father.

Q.    All right.  Now, let me ask you, as you began to use these materials and discovered certain errors in them, what did that do to your ability to rely on them and how did it affect your schedule?

A.    Well, I was already concerned about the inadequacy of detail and development of history in these interviews.  Now there are also fundamental errors of fact, so that I have -- my confidence that I could independently rely on these was significantly reduced.  Both because of that inadequacy of depth, as well as fundamental errors, I realized that I was going to have to interview individuals and primarily rely on my

own findings, that I couldn't rely on the history that they provided.

Even things like, there was another one, an interview of Keith Rixner, who is a maternal half-brother, they describe Keith as listing his siblings in order.  The order is wrong that the siblings are in.  And so I --

THE COURT:  Did you point that out to the attorneys?

THE WITNESS:  Did I not have contact with the attorneys.  I told Gerald Bierbaum early on --

THE COURT:  Okay, well, this is --

THE WITNESS:  -- that I was greatly alarmed.  And when I came out from my interviews --

THE COURT:  Well, this seems to be a failure of the mitigating investigators, not the attorneys.

MR. WISEMAN:  Well, Your Honor, I think we're going to tie that together, and I think you'll --

THE COURT:  Rather quickly.

MR. WISEMAN:  Well, absolutely.

THE WITNESS:  All right.  Let me clarify.  My recollection is that I advised the attorneys of this when I came out to meet with them --

BY MR. WISEMAN:

Q.    That was my next topic.

A.    -- in early February, when I came out to interview Alfred Bourgeois, that I was concerned about the reliability of the

interviews that Lisa had done.

THE COURT:  Did you say exactly why?

THE WITNESS:  My recollection is that I gave details about that.  I know that I told Gerald Bierbaum that.

THE COURT:  Is there some indication on your ACT! that you did that?

THE WITNESS:  No, ma'am.  The ACT! are not entries that I make.  Those are entries that my assistants make.

THE COURT:  Okay.  So you could receive phone calls without having it entered.  Is that right?

THE WITNESS:  That's correct.

THE COURT:  Okay.  I just want to make sure. Everything is not recorded there, which is why Mr. Roberts was objecting to it.

MR. WISEMAN:  Yeah, and we, I think, qualified initially that it doesn't have every single phone call.

BY MR. WISEMAN:

Q.   Let me ask you this, Dr. Cunningham.  If an entry involved a phone call of some substance, 20 minutes, 30 minutes, would you have indicated that on your invoice?

A.   Typically.

Q.   Okay.  I mean, you don't work for free, but it's a matter of some degree of time.

A.   That is correct.

Q.   On the contrary, a quick phone call is not going to get

reflected.

A. It may. A phone call of greater length is almost certain to be reflected. But briefer phone calls, even ten minutes, I might not make note of.

Q. Okay. I want to, in response to the Judge's question about advising the attorneys and your response that you didn't have much contact with them, I want you to look back at 167, and it's the entry dated 2/3/04. And I'll zoom it so we can see it better. All right. And it's the 2/3/04 entry. And what does that say?

A. 2/3/04. "Bourgeois: Bierbaum wants MDC to come for team meeting. Looking at 2/12 or 2/13." That's a follow-up from an earlier attempt to schedule a team meeting about 12 days earlier.

Q. Okay. And that would be the --

A. Ten days earlier.

Q. -- 1/21 entry?

A. Yes, sir.

Q. Why don't you read that for the Court?

A. "Bourgeois: Provided Bierbaum 1/26 as the date for MDC to be in Corpus Christi for a one-day team meeting. However, he came and indicated that date is not good for the attorneys; therefore, he would have to come back to us an alternate date."

Q. Okay. I'm going backwards here. Why don't you read the one above that, which is the initial e-mail about a team

meeting.

A.    "Bourgeois:  Gerald Bierbaum called.  He's trying to schedule a team meeting for next week.  He wants MDC to be in Corpus Christi sometime next week for a one-day team meeting.  Voir dire begins February 8th, evidence on March 8th or 10th, MDC to testify about March 15 for one day."

Q.    Now, if -- well, let me ask you this.  Prior to this, these three entries you just read, is there anything in your, either of these exhibits that reflects an attempt on the part of the lawyers to conduct a team meeting?

A.    No, sir.

Q.    All right.  And did you in fact have any type of a team meeting with any of the lawyers up until the date of these entries?

A.    No, sir.

Q.    Given the state of the investigation, did you go through any type of decision-making process as to what your alternatives were, given the situation you were in?

A.    Yes, sir.

Q.    And tell the Court what that process was.

A.    My thought process was that there were no, there were no good alternatives, that if I withdrew because we're now on the eve of trial, that I would be abandoning this case.  On the other hand, if I proceeded, this was exactly what I was trying to avoid in the beginning when I declined a retention, unless

there was a period of time that would allow it to be done

correctly.  And so my perception was that there was no good

alternative and that I did not, I didn't feel like it was

appropriate to abandon Mr. Bourgeois.  The last communication

that I had had was that this trial date could not be moved.

Q.   Did you, after making a decision to stick with the case,

despite your concerns, what was the next thing that you did of

any consequence in the case?

A.   Schedule an interview trip --

Q.   All right.

A.   -- to come into Corpus to interview Mr. Bourgeois and meet

with the attorneys.

Q.   Do you recall when that interview happened?

A.   Yes, sir.  That interview occurred on February the 7th,

2004.

Q.   I want to show you Page 2 of Petitioner's 151, which is

your invoice.  And is that activity reflected on your invoice?

A.   Yes, sir, it is.

Q.   All right.  And so it appears that you traveled on 2/6,

and on 2/7 you got to Corpus Christi.  Describe the events of

that day, as you recall them.

A.   I'd been advised that Mr. Bourgeois would be available for

me to begin my interview process early that morning of February

the 7th, and so came to the courthouse for that purpose.  I was

advised that he was not here but was en route.  I then went

back to the hotel and began to do telephone interviews of third parties, so as to make use of that block of time.

I did that up until the conclusion of my interview of Lloyd Ferdinand, Jr., the half-brother. I finished with him at about 11:15 in the morning, as I recall. The next -- I started my interview of Mr. Bourgeois at 2:10. And so between the hours of 11:15 and 2:10, I went to the attorney's office, met with them. I think that we went to lunch. Then I went back to the --

Q. Let's stop at that meeting --

A. Yes, sir.

Q. -- for a moment, just so I can ask you about the meeting. That was the first time you met either of the lawyers face to face?

A. That's correct.

Q. Were you able to have a substantive conversation about the case at that point in time with them?

A. I wouldn't describe it as substantive, in that I did not yet have a lot of information. I had not yet met Mr. Bourgeois. I had very little in the way of records and had only fragmented and inadequate mitigation interview summaries that had been provided to me. So I had an emerging hypothesis. I was in a position to describe the nature of the things that I usually will look at and how that will be presented, either in mitigation or in terms of violence risk assessment. But case

specific information was limited.

Q.    Okay.  And let me just ask you, if you had gotten these, what you've described as inadequate interview summaries 90 days earlier, so let's say instead of January 30th, you would have gotten them November 30th -- is that 90 days?  Let's say November 30th.  Would you have been able at that point to make known to the mitigation specialist, this is not adequate, I need this, I need that, I need more, I need more depth?  Could you have corrected the problem?

A.    Yes, sir.  You're describing a 60-day period of time.

Q.    Sixty-day, right.

A.    If I had gotten it 60 days, then yes, sir.  As I looked at that, I would have described the inadequacy that it represented.  Again, when the summary of the interview with mother is like half a page, that is on its face inadequate.  But I did communicate to Gerald Bierbaum my concern with the depth of the interviews, as well as how few there were.

Q.    All right.  And that would have been at that point into early February?

A.    Yes, sir.

Q.    Okay.  So you met Mr. Bourgeois then for the very first and only time, I take it, on February 7th, 2004?

A.    That's correct.

Q.    And we're now a week before the then set date for trial?

A.    That's correct.  I interviewed him for five-and-a-half

hours.

Q.    And subsequent to your interview, did you send a communication to Mr. Gilmore or Tinker with regard to aspects of that interview?

A.    Yes, sir, I did.

Q.    Let me put up for you what's been marked as Petitioner's Exhibit 1, ask you if you recognize that.

A.    Yes, sir, I do.

Q.    And what is that?

A.    This is a letter dated February the 10th, 2004, which is three days following my interview of him.  This describes my recommendations for a neurological evaluation, as well as a neuropsychological evaluation of him.

Q.    Okay.  Let me just ask you, while we've got you here, what's the distinction, in your mind, between a neurological evaluation and a neuropsychological evaluation?

A.    Yes, sir.  A neurological evaluation is one that's performed by a neurologist, by a physician who specializes in neurology.  And it would be focused on looking at the physical integrity and status of the patient's nervous system, reflexes and that sort of thing.

      The neuropsychological evaluation is done by a neuropsychologist.  That's a psychologist with specialized training in neuropsychology or brain behavior relationships.  And the neuropsychologist uses standardized assessment

techniques that measure this person's functioning, their brain expression in visual spatial memory concentration, executive functioning and judgment, compares it against a normative sample, so that you're able to identify what practical deficits are present in this person's brain functioning as it's expressed in capabilities that are determined or mediated by the brain.

Q.   And one more question on that.  Is it, in your experience and knowledge, possible to see dysfunction in neuropsychological testing that would not appear in a neurological evaluation?

A.   Yes, sir, that's correct.  You can have deficits that appear in the neuropsychological assessment that are not apparent in that gross physical examination that's done by a neurologist.

In other words, as you think about a neurological evaluation, that has several components to it.  One is the physical examination and history taking that's done by the neurologist.  Another component is for there to be imaging studies that are done of the brain, either CT scans or MRIs that look at the anatomical structure of the brain, or EEGs that look at the electrical output of the brain, or PET scans that look at the metabolism of the brain as it's engaged in various tasks.

Those are all different components of a neurological

evaluation, distinct from a neuropsychological assessment.  And each of those may show deficits that are not apparent in one of the other assessments.

Q.    Okay.  That's satisfactory.  Thank you.  Now, in this letter that you sent on February 10th, 2004, what are the reasons that you cite for the need, in your view, to have a neurological and neuropsychological evaluation done of Mr. Bourgeois?

A.    There were several rationales.  Those that are specific to him include what was described to me as a significant head injury that occurred in approximately 1984, when a 3- or 4-wheeler that he was driving collided with a telephone pole.

The second aspect was a history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage.

Then there's also significant literature that identifies that there is a disproportionate incidence of neurological insults, neurological examination findings and neuropsychological deficits among violent offenders.  And so as a broad principle, these sorts of assessments are recommended in capital cases.

In his case, there were particular factors present from the interview that I did and from the third-party interviews

that I thought made that particularly indicated in his case.

Q.   Did you warn Counsel in regard to this evaluation that Mr. Bourgeois is not or was not, in your view, a reliable historian?

(PAUSE.)

Q.   Let me, while you're looking at that, let me show you an e-mail.  Let me show you an e-mail.  I think I may have been confused as to where that warning would have been.  I'm going to show you -- I'm going to show you Page 21 of Exhibit P-8.  Was this the e-mail that covered the letter that you just identified as P-1?

A.   Yes, sir, that's correct.

Q.   Okay.  And why don't you read that to the Court.

A.   "John," referring to John Gilmore, "please find attached in Word my rationale, recommendations for a neurological workup on Alfred Bourgeois.  Please emphasize to the neurologist and neuropsychologist who may be retained to perform these evaluations that Alfred is not a reliable historian regarding his medical or psychological, parenthesis, rage, parenthesis, history.  Accordingly, they may wish to contact his older sister Claudia for this information.  Please advise me if you require additional input or assistance on this issue."

Q.   Okay.  And my question then is what did you base your -- I'm calling it a warning -- but your suggestion that Mr. Bourgeois is not, in your view, at the time a reliable

historian?

A.    There were several features of the interview with him that caused me to think he was not a reliable historian.  He described to me regarding the 3-wheeler accident that he had an initial loss of consciousness for a couple of hours, and then was in a coma in the hospital for several months.  Then he revised that to being in a coma for one month.

When I interviewed family members about this, Claudia specifically, she recalled that he had a loss of consciousness but was not in a coma in the hospital.  In a --

Q.    Let me just ask you, when you conducted your interview of Mr. Bourgeois on February 7th of 2004, had you been provided with any hospital records with regard to any aspect of Mr. Bourgeois's life?

A.    Not that I recall.

Q.    Keep going.

A.    Regarding an injury to his nose, in his February 4th interview with Gerald Bierbaum and Mr. Tinker, he said his nose had been injured when his mother slapped him off the swing. And then the mother told the doctor that he had hurt himself playing.

When I interviewed him three days later, he told me that his nose was broken when his mother hit him with a mop handle for lying in telling her of the sexual abuse that he said was perpetrated by Jacob Clayton, who he identified --

MR. ROBERTS:  Your Honor, may I just inquire what the witness is reading from?  I can't --

THE COURT:  What are you reading from?

THE WITNESS:  This is a summary of those discrepancies that I prepared.

THE COURT:  Since when?

THE WITNESS:  About four days ago.

MR. WISEMAN:  Why don't you show it to Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Please be careful of the microphone.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  Second page?

THE WITNESS:  Yes, sir.

MR. ROBERTS:  Can we get a copy of this?

MR. WISEMAN:  Absolutely.

BY MR. WISEMAN:

Q.   Did you prepare those documents for purposes of your testimony today?

A.   Yes, sir, I did.

Q.   Have you provided me with a copy of them?

A.   Yes, I have.

Q.   You have?

A.   Well, we discussed them.  I don't recall if I gave you a copy of them or not.

Q.   I'd love to have a copy.

MR. WISEMAN:  Does the Court want us to get a copy now, or can we keep going and get it for cross?

THE COURT:  Do whatever you want to do.

MR. WISEMAN:  Okay.  Why don't we keep going and we'll make a copy for Mr. Roberts for his cross-examination, if that's all right.

BY MR. WISEMAN:

Q.  Why don't you give us another example of why you believed he was not an accurate historian.

A.  I was describing the February 7th --

Q.  Yes, that's right.

A.  As I interviewed him about how his nose came to be injured, he said that his mother hit him with a mop handle for lying in telling her about the sexual abuse he said was perpetrated by Jacob Clayton, who he identified as a gay son of Mary Clayton, the woman, elderly woman that he had gone to live with.

He described that his mother told the doctor that he had fallen off a swing, when he said they didn't even have a swing.  About three days before, he said that his mother had slapped him off the swing.  And then that he had injured himself playing is what she had said.

In that same interview on February the 7th, he described that he played high school football in ninth and tenth grades.  When I asked him if he lettered, he did not understand that

concept of what that meant to letter, which suggested to me someone who in fact had not been involved in high school athletics. Michelle, his maternal half-sister, did not recall him playing sports in school or football in high school.

My interview, he told me that he had never touched a drop of alcohol. He had never tasted alcohol. When I responded a little incredulous at that, that he had never even tasted it, he then modified it that in 1994 he drank a daiquiri a month, but then modified that to say, so that was like two or three times in his life, and then that he drank amaretto and pineapple twice in 2000.

Q.    So let me ask you, as a general matter, when you see these type of discrepancies -- and let's take the biggest one, the alleged coma that I think we all agree didn't occur, do you chalk that up to the subject being a liar, a malingerer, or something else?

A.    There can be a lot of reasons why the person doesn't give you a correct report. The bottom line is I can now not rely on the things that he tells me, without corroboration, because now I don't know which part of that is an accurate report and which part may not be correct.

Q.    Let me ask you a more precise question then. There's been some suggestion in these proceedings that Mr. Bourgeois's report of his coma was a malingering attempt to exaggerate his, you know, potential deficits or reasons why he'd have deficits.

Cunningham - Direct                                    240

Did you necessarily conclude, when you learned that there was

no coma --

          MR. ROBERTS:  Your Honor, I'm going to object.  I

don't remember any testimony that has gone that direction.

          MR. WISEMAN:  Well, that's not the Government's

position?  Your Honor, I think the Government's position is

that he lied about the coma to make up about a brain injury he

didn't have.  If that's not their position, I would be happy to

move on.  I'm assuming that combined with the Court's concerns

about malingering that we need to address that issue.  And I

think this expert can shed some light on whether it's

necessarily a sign of malingering.

          MR. ROBERTS:  I certainly don't have any problem with

him testifying about whether he believes that would be a sign

of malingering or not, but the qualifying question or the way

that he phrased the question I object to again.

          MR. WISEMAN:  Well, I'll ask it more simply.

BY MR. WISEMAN:

Q.    Do you think that that necessarily is a sign of

malingering?

A.    No, sir, not -- not in the broader context.  He was

describing a history of himself as being unimpaired.  He's

describing things like playing football in high school, being

highly coordinated.  His presentation generally was

representing that he was highly competent and capable and

socially adept.  He didn't report that he was having rage attacks.  He was denying that he had temper-related problems.

And so his, his reports are fanciful in some respects. They generate additional attention for him.  They may have some additional drama associated with them, but they, they do not appear to be connected to any representation of himself as being impaired.

Q.   And how does one in your position then try to get to the bottom of what is the truth about a person who tells you something like that, that isn't necessarily corroborated?  What do you do with that information?  How do you proceed?

A.   I may describe that history in my testimony, with the caution that this is solely relying on his self-report.  And he has told me other things that are not true, when I try to compare them.  I wasn't there.  I don't know what happened. But this incident is, in this case, it's clearly inconsistent with the medical records that I eventually reviewed that talk about him being awake and alert in the hospital, following his surgery for this accident.

So I may say I can't corroborate it.  I may limit my testimony to what I can obtain from third parties or only the part that third parties could also corroborate.

Q.   Okay.  Before I ask the next question, I just want to note that Docket Entry Number 196 of 2/25/2004 indicates that jury selection is completed and the jury is sworn.  It says, "Jurors

sworn," to be more precise.

So on that date, 2/25/04, what was the state of the mitigation investigation?  Had it progressed?  And if so, to what degree and -- well, why don't you see if you can answer that much.

A.    Well, it was still in a very rudimentary position.  At this point, I had at least interviewed him.  I had recommended neurological and neuropsychological assessment, although the findings of those were not yet available to me.  I had performed some interviews myself of third parties and more interviews were being provided to me by the mitigation investigator.  So it was progressing, but it was still painfully inadequate.

Q.    Had you at that time, as of 2/25/04 received a comprehensive social history, as you had indicated initially would be required?

A.    I received it at about -- well, I received a chronology and social history at about that time, because I have a note on my bill that I reviewed mitigation interview summaries and chronology on February 27th, 2004.

Now, the narrative summary that I was provided was just over half a page in length.  And the chronology that I was given only had one, two, three, four, five entries up to his graduation from high school.

Q.    And --

A.   So it starts at his birth, and there are five entries from birth to graduation from high school.  It contains no generational history whatsoever, and only the most fragmented chronology in terms of the critically important first 18 years of his life.

Q.   And did you -- how much time did you spend reviewing those materials on February 27th, 2004?

A.   I spent 18 minutes.  That likely included interview summaries in addition to the chronology and narrative summary.

Q.   So my initial question was had you received a comprehensive social history, and what would your answer to that be?

A.   I had not yet reviewed it.  It would have been received close to that --

Q.   Well, did you consider the materials you received on February 27th to be a comprehensive social history?

A.   No, sir.  It was a chronology entitled "Narrative Summary."  It was not a comprehensive summary.

Q.   Okay.  From the time of your first contact with Mr. Gilmore on June 30th of '03, until the time the jury was sworn on February 25th, '04, had you had any discussions with Counsel about the direction that the mitigation investigation was taking or your ideas about what direction it should take?

A.   I don't recall that I had up to that time.

Q.   Okay.  And so the February 7th meeting in their office

does not meet that description?

A.    No, sir.  That would have involved the most rudimentary of discussions, in that I had relatively little information at that time and had not yet seen him myself.  I would have discussed violence risk assessment perspectives with them at that time, because that information is primarily demographic in nature, in terms of the factors that are associated with violence in prison.

I would have described to them emerging themes from the limited mitigation investigation interviews that I had, but would not have been in a position at that point to have described in a definitive way the direction that I would identify mitigations proceeding.

Q.    And same question with regard to the mitigation specialists.  From the time that they first became involved in the will time the jury was sworn, had you had any face-to-face meetings with them?  I know there was discussion about a team meeting.  Did you ever sit down with them and say, "What have we got?  Where are we going?  What do we need to do?"

A.    No, sir.

Q.    Did you do that on the phone?

A.    There were telephone conferences.  They were of limited duration.

Q.    Is this lack of contact and -- well, withdraw that.  Would you agree that this was a lack of coordination between the

members of the defense team?

A.    Yes, sir.

Q.    And is that lack of contact and coordination a departure, in your experience, from the standard of care in capital mitigation?

MR. ROBERTS:  Objection, Your Honor.

MR. WISEMAN:  I'll withdraw the standard of care.

BY MR. WISEMAN:

Q.    Is it at variance with your experience in regards to the proper preparation of a capital mitigation investigation?

MR. ROBERTS:  Objection, Your Honor.  I'm not sure there's a -- I mean, in his opinion -- again, it goes back to the fact that every case is different in how a case is proceeded.  So I don't have a problem with his expertise in mitigation, but I do have a problem with this question.

MR. WISEMAN:  Your Honor, I thought we had agreed, or you had ruled, I should say --

THE COURT:  Overruled.

MR. WISEMAN:  Thank you, Your Honor.  Oh, I'm sorry.  I said it again.  I'm learning.  It's hard to teach an old dog new tricks.

THE COURT:  Tell me about it.

THE WITNESS:  This did not reflect good practice, in my view.

BY MR. WISEMAN:

Q.   And when you train people and lecture on these topics, do you lecture them about the need for coordination?

A.   Yes, sir.

Q.   And is that consistent with the ABA guidelines?

A.   Yes, sir.

Q.   And with Supreme Court precedent?

A.   Yes, sir.

Q.   I want to show you the two reports which you provided to Counsel in this case.  First one is P-2.  It's dated February 25th, '04.  Do you recognize that as the first report you provided?

A.   Yes, sir, I do.

Q.   Okay.  And I'm going to turn the page, and I'm going to -- it's a two-page report?

A.   Yes, sir.

Q.   Okay.  And is a sparse -- oh, that's my characterization.  Is a report of that size typical for your practice?

A.   This is shorter than the typical report would be.

Q.   And what was the reason that it was short?

A.   My own investigation was still at a rudimentary stage.

Q.   And you provided a second report also dated February 25th, and is P-3 that report?

A.   Yes, sir.

Q.   And what does that address?

A.   This addresses the violence risk assessment for prison.

Q.   And I want to turn your attention now to the neurological,
or I should say the neuropsychological evaluation you had
requested.  Did you eventually receive a report by a
Dr. Weiner?

A.   Yes, sir, I did.

Q.   Doctor, I'm showing you what's been already admitted
before the Court as Exhibit P-29.  Is that the cover page of
the neuropsychological evaluation done by Dr. Weiner of
Mr. Bourgeois?

A.   Yes, sir, it is.

Q.   And the date of the report is March the 3rd?

A.   Yes, sir.

Q.   And showing you again your invoice, you reviewed that
report on March the 4th, 2004?

A.   That's correct.

Q.   Now, the docket reflects that March the 4th, 2004, was the
third day of trial.  And that's Docket Entry 213.  Did you
consider the information contained in Dr. Weiner's report to be
of value for mitigation case?

A.   Yes, sir.

Q.   And just, we've heard a lot about neuropsychological
reports and evaluations.  Why don't you just give us a real
brief reason for why you thought it had value as mitigating
evidence?

A.   Yes, sir.  It describes his general intelligence as being

deficient. It also describes cerebral dysfunction. It describes that cerebral dysfunction would result in his handling stress more poorly. From a -- in terms of its evidentiary value that Alfred Bourgeois has something wrong with his brain that would result in his having poor judgment and poor response to stress or could contribute to rage attacks, is a very important alternative explanation for his conduct, as opposed to his having a malignantly evil heart.

Q. And in your experience in capital mitigation preparation and presentation, is evidence of that type offered in capital cases?

A. Yes, sir.

Q. Has the Supreme Court endorsed that concept?

A. Yes, I understand.

Q. And do you teach that concept?

MR. ROBERTS: Your Honor, I'm just -- just one question. I mean, he's not a legal expert. He said in his statements, he's not an attorney.

THE COURT: Sustained. Keep away from those statements, Counsel.

MR. WISEMAN: Sure, Your Honor.

BY MR. WISEMAN:

Q. Did you subsequently -- well, withdraw that. Did you prepare a PowerPoint presentation that you had hoped to show to the jury in this case?

A.   Yes, sir, that would accompany my testimony in this case.

THE COURT:  When did you prepare that?

THE WITNESS:  That preparation began on about March the 15th.  It was --

THE COURT:  Of what year?

THE WITNESS:  2004.  And was revised up to --

THE COURT:  After the trial?

THE WITNESS:  Well, yes, ma'am.

MR. WISEMAN:  Your Honor --

THE WITNESS:  March the -- I prepared my report on February the 25th.  I was noticed that I was being called to testify imminently, and so I then prepared demonstrative exhibits to accompany my anticipated testimony.  As I recall, the first presentation, and I may have --

BY MR. WISEMAN:

Q.   Well, let me put it up for you.

A.   Let me refer to my bill, and it will likely reflect when I began to do that.

Q.   Why don't you do that.

THE COURT:  Okay.  When were you told you were not going to be called?

THE WITNESS:  I was told on the day of trial.  I was here in court, and the second day, I observed the testimony all day Monday.  Tuesday, about midday, after the Government rested, I was advised that I would not be called.

THE COURT:  And who told you that?

THE WITNESS:  Both Defense Counsel were present, along with Gerald Bierbaum.

THE COURT:  And why did they tell you you weren't going to be called?

THE WITNESS:  The -- they said that they thought the information had been provided by Dr. Estrada, and they were concerned with what might be put on in rebuttal.

MR. WISEMAN:  In regards to rebuttal --

THE COURT:  So what day were you told that?

THE WITNESS:  I was told that on March the 23rd, 2004.

THE COURT:  All right.  Thank you.

BY MR. WISEMAN:

Q.   With regard to being told about rebuttal, were you advised that the Government had had Mr. Bourgeois evaluated by a neuropsychologist?

A.   I was not.

Q.   And were you advised by Counsel that the Government had had him evaluated by any other mental health professional other than Dr. Estrada?

A.   I was not.

Q.   Did you -- were you provided any detail about this purported rebuttal evidence?

A.   No, sir.

Q.   I wanted to --

A.   It was not a discussion.  They simply advised me, "We've decided we're not going to call you."

Q.   Okay.  What I put up now is marked as P-4.  Do you recognize the cover sheet of that?

A.   Yes, sir, I do.

Q.   And what is it?

A.   This is the printed paper copy of the slides that I prepared to accompany my testimony, as well as draft questions that the attorneys could utilize to elicit the information on those slides.

Q.   Okay.  For the record, this is a 26-page exhibit.

A.   Yes, sir.  This one refers to the adverse developmental factors or mitigating factors.

Q.   I want to put up another larger PowerPoint, which is marked as Petitioner's 5.  Do you recognize that document?

A.   Yes, sir.  This is another PowerPoint file that I created to accompany my testimony regarding violence risk assessment for prison, and it also is accompanied by draft questions that I could be asked.

Q.   And for the record, this is a 65-page PowerPoint presentation.  So you provided to Counsel two PowerPoints, along with suggested questions for your examination.

A.   That's correct.

Q.   Did you annotate additionally those slides --

THE COURT:  Are you going to offer those?

MR. WISEMAN:  Oh, yes.  Yes.  We're going to go through them in a moment.  I'll offer them right now --

THE COURT:  Why don't you offer them now as we go along.

MR. WISEMAN:  Sure.  I'd offer 4 and 5.

THE COURT:  P-4 and 5?

MR. ROBERTS:  Your Honor, I know that Dr. Cunningham -- we're not going to object to them, but I wanted to clarify.  I know that Dr. Cunningham had two different presentations.  One was a very long one.  I think it was about eight hours.  And another one was a shorter one, about four hours.  And I didn't know if these were the two of those or if they were two separate ones.  I don't remember.

BY MR. WISEMAN:

Q.   Are these the two PowerPoints you prepared for Counsel in this case?

A.   Yes, sir, they were.

Q.   Did you prepare other ones other than these two?

A.   No, sir.  I updated the mitigation slides, even after I got here to Corpus Christi, as I continued to work on them.  But that is what was provided to Counsel.

Q.   Okay.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  Sorry.  P-4 and 5 --

MR. WISEMAN:  P-4 and 5.  P-4 is --

THE COURT:  -- are admitted.

MR. WISEMAN:  -- is the mitigation one, and P-5 is the risk assessment one.

BY MR. WISEMAN:

Q.  By the way, did you anticipate that they were going to take 12 hours to go through the two of them?

A.  No, sir.

Q.  I want to show you another document.  This is P-9.  Do you recognize that?

A.  Yes, sir, I do.

Q.  And what is that document?

A.  That's a qualifying examination that -- a draft qualifying examination that I prepared for Counsel should they decide to use it to orient them to my qualifications.

Q.  Okay.  And for the record, this is 16 pages in length.

MR. WISEMAN:  I would offer that as well, Your Honor.

THE COURT:  P?

MR. WISEMAN:  P-9.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-9 is admitted.

BY MR. WISEMAN:

Q.  All right.  I want to talk now about what the Judge started to question you about, and that is your actual arrival in this courthouse, or in this city back in March of '04.  What

day did you arrive in Corpus Christi?

A.   I actually arrived on March the 21st, 2004.

Q.   And what day of the week was that?

A.   Sunday.

Q.   I'm sorry?

A.   Sunday.

Q.   And what did you do when you got here?  You checked into the Omni?

A.   Yes, sir.

Q.   And Bayfront or Marina?

A.   I don't recall.

Q.   Okay.

A.   But the receipts --

Q.   There are differences.

A.   The receipts are on the bill.

Q.   And --

        THE COURT:  You couldn't get in there?

        MR. WISEMAN:  Oh, no, we did.  It's actually a lovely, lovely place.  I'm enjoying a good night's sleep the four hours I'm there.

BY MR. WISEMAN:

Q.   What did you do when you finished checking in?

A.   I called Mr. Tinker on his cell phone to leave a message that I was in town and was available to meet with him.  I then left my hotel room and took my cell phone with me.

Q.   And where did you go?

A.   I went to a fitness center in the hotel to work out.

Q.   And --

A.   I assumed he was interviewing other witnesses, since a voice mail picked up my message.

Q.   Okay.  And did you hear back from him subsequent to leaving that message?

A.   Yes, sir, I did.

Q.   And when did you hear from him?

A.   When I came back to my hotel room, the message light was blinking on the hotel phone.  It was a message from him indicating that since I had not been in my room when he called, that he was going to his residence outside, some distance from Corpus Christi, and would not be meeting with me that day.

Q.   Had you anticipated a meeting that day to begin to prepare?

A.   Yes, sir.

Q.   When is the next time you saw or spoke to either lawyer?

A.   I next came to court on Monday morning.

Q.   And what did you do in court?

A.   I observed the Government's case and indicated my availability for conference.

Q.   And in particular, did you observe Dr. Estrada's direct examination?

A.   Yes, I did.

Q.    And after court that day, what did you do?

A.    I met with Mr. Tinker.

Q.    And what was the purpose of that meeting?

A.    To prepare my testimony.

Q.    And where did the meeting take place?

A.    The meeting took place in the hotel bar.

Q.    At the Omni?

A.    Yes, sir.

Q.    And approximately how long did the meeting last?

A.    About 45 minutes.

Q.    And --

      THE COURT:  Or how many drinks?

      THE WITNESS:  I had no --

      THE COURT:  I'm just kidding.  Just kidding.

BY MR. WISEMAN:

Q.    And what did you discuss with Mr. Tinker?  Or what observations did you make as well?

A.    Mr. Tinker seemed completely unfamiliar with the PowerPoint files that had been provided to him.  For example, as I was going over the mitigation adverse development related materials, he said, "Well, what about the violence risk assessment?  Are you not going to testify about that?"  And I said, "Yes, sir, there is a whole section of the binder that you've been provided that reflects slides addressing that and the direct exam -- suggested questions for direct exam that

Cunningham - Direct                                          257

would elicit that testimony."  That was an indication to me that he had not gotten that far in the materials I provided to even know what I was prepared to address.

Q.   And were you present in court on the 23rd at about 8:19 a.m. when Mr. Tinker addressed the Court with respect to your testimony?

A.   I don't recall.

Q.   Well, let me read you what he said and ask you if it refreshes your memory.  This is at Page 4, starting at Line 20.

     Mr. Tinker:  "Your Honor, it's my attitude, not necessarily the rest of our group, that we're going to rest, depending on how Dr. Estrada goes when we question him.  I started to say I'm going to pass him" --

     Your Honor says, "You're on the record.  You want to go off the record?"

     Mr. Tinker says, "That's all right.  No, that's all right."

     And he continues to say, "And so I'm going to -- and that's not the consensus particularly of Dr. Cunningham, and I don't think that's maybe of John" -- I presume meaning Gilmore -- "or Mr. Bourgeois.  What I'd like to have to do is to take after, after they rest -- they say they're going to rest after Estrada -- I think it would just save a whole lot of time if we could convince them what to do, and because I don't think we ought to go forward just because stuff is lying

around."

And just skipping down a few lines, the Court says, "Mr. Tinker, you have to evaluate the pros and cons of what goes into that."

And he responds, "That's right.  For instance" -- and he says, "Let me talk," which I mean someone must have been interrupting him.  He said --

THE COURT:  That would have been Ms. Booth.

BY MR. WISEMAN:

Q.   He said, "He would say things," referring to you, Dr. Cunningham, "he would talk about how many people in the penitentiary, are in the penitentiary, and that there are only 10 percent commit murders."  And that's the end of the -- oh, and then he says, "Well, I think, why the hell would I want the jury to know that?"

So does it appear to you from that passage I read that Mr. Tinker was particularly familiar with your mitigation presentation?

A.   No, sir.  That doesn't reflect that he was familiar with the mitigation presentation or the actual content of the risk assessment information that I was prepared to provide.  I don't recall hearing that discussion in the courtroom.

Q.   Okay.  And I take it from your answer that you had -- that he somewhat mischaracterized your risk assessment presentation?

A.   Yes, sir, he did.

Q.   I'd like to now, if we could, go through not both presentations, but I'd like to quickly go through the mitigation presentation, which is the 26 slide one, and just -- the Court's heard a lot about concepts that are in there from other witnesses.  So I just want you to highlight for the Court what you would have said had you been called.

A.   Yes, sir.  If we proceed through it briefly, then that will be an abbreviation of what I would have said.

Q.   I fully appreciate -- believe me, I'd love to hear it all, and I'd like to hear it twice.  But we, you know, we have other witnesses we have to get to.

A.   Yes, sir.  Could I have the screen, please?

          THE COURT:  It's that right there.

          THE WITNESS:  Yes, ma'am, I was waiting for the exhibit to come up.

          MR. WISEMAN:  I think you have to --

          THE COURT:  You're supposed to do that yourself.

          THE WITNESS:  I did that earlier.  I can certainly do it again.

     (PAUSE.)

          THE WITNESS:  Can you send it again?

          THE COURT:  Try F3.

          THE CLERK:  Yes.

          THE COURT:  Okay.

          THE WITNESS:  Should I proceed?

BY MR. WISEMAN:

Q.   Yes.  Why don't you proceed at your pace, and if I have any questions, I'll jump in.

A.   Yes, sir.  In this case, I identified several of what I would characterize as adverse developmental factors or damaging factors, in other words, factors that injured him psychologically or in terms of his brain functioning.

The first was an overwhelmed family system that he was a part of.  And in looking at that system, Eunice, his mother, and Lloyd Ferdinand, who is the biological father of his oldest three siblings, had three children then divorced.  Soon after, Eunice had Anthony by another man.

THE COURT:  You don't need to read it to us.

THE WITNESS:  Yes, ma'am.

MR. WISEMAN:  Yeah, you know.

THE COURT:  I mean, I can read this myself.

BY MR. WISEMAN:

Q.   We've heard this history.  Why don't we -- why don't you just give us a quick summary of what's on each slide.  For example, here you could say, "An overwhelmed family system."

A.   Yes, sir, Eunice was --

THE COURT:  Why don't you move on to the next one.  I just read it.

BY MR. WISEMAN:

Q.   Okay.  The Court's read it.

A.    He was abandoned by his father.

THE COURT:  I read that one.

THE WITNESS:  He had no significant --

THE COURT:  Okay.  Next.  Okay.

BY MR. WISEMAN:

Q.    And let me stop you at this point.  What would you have been saying about these features that you identify as an overwhelmed family system and --

A.    I would have described these things in anecdotal detail to educate the jury about the family system and the nature of the stresses that were impinging on it and how that impacted on the quality of nurturing and care that he received.  He's a product of this family system and the quality of childhood nurturance that he receives depends on who these people are who are his parents.  That has genetic implications, modeling implications and psychological experience implications.

Q.    All right.  Why don't you go to the next slide?

THE COURT:  So what does that mean?  It doesn't sound good to me.  Mischievous and sneaky, didn't listen --

THE WITNESS:  No, ma'am.

THE COURT:  -- couldn't focus, always got into things, impulsive, took things from store, got in trouble at school, frequent fights, tantrums when whipped, fabricated stories, rage attacks.  So next, next, you're going to explain all this.  Right?

BY MR. WISEMAN:

Q.    Yeah, could you tell the Court why that's mitigating?

A.    Yes, sir.  These are indications that he was psychologically damaged from an early age.

THE COURT:  Well, is there any way you're going to fix that?  Is there any way to treat that or fix it?

THE WITNESS:  Yes, ma'am.  You can treat that by providing a highly structured environment.

THE COURT:  Like prison.

THE WITNESS:  Like prison.  You can also treat that, depending on the nature of the disorder that's identified, by anticonvulsant medications that may have an anti-rage effect, by --

THE COURT:  Well, you're not a physician or a neuropsychologist, are you?

THE WITNESS:  No, ma'am, I'm a clinical and forensic psychologist.

THE COURT:  Okay.

THE WITNESS:  I'm familiar with ADHD.  That's a part of clinical psychology, as are the treatment modalities.  In this case, this isn't just ADHD, but instead is a broader inhibition difficulty that he has.

BY MR. WISEMAN:

Q.    And let me ask you, as opposed to offering a treatment for these problems, does it offer the jury a psychological

explanation to the offense?

A.    Yes, sir, it does.  And it identifies that these are characteristics that are even part of his nervous system and neuro development from an early age, that this isn't just a function of somebody with intact capabilities who makes an evil choice to sadistically abuse a child, that this is somebody who's had historical psychological and developmental problems that are even reflected in behaviors that connect to brain functioning.

Q.    And is this the type of material that you train people to consider presenting in capital mitigation?

A.    Yes, sir.

Q.    All right.  Why don't you go to the next slide.

A.    This is part of the implication of these things.  Whether you're talking about neurobehavioral disinhibition or attention deficit hyperactivity disorder.  These, the symptoms that are being described by the family have implications for both of those.

Q.    Okay.  Go on.

A.    He was also subjected to emotional rejection and abuse.

Q.    And by that you mean the abuse history that you discovered?

A.    That's correct.

Q.    And we've heard a lot about this, so --

A.    And this being the emotional aspect of that, not physical

abuse at this point, but emotional abuse, which is as injurious or does greater psychological damage to the child than the whelps or bruises on their skin.

Q.    Okay.  Go on.

A.    He was in fact subjected to physical abuse as well.  And these are a few of the anecdotal expressions of that.  There is a literature that describes a significantly increased likelihood of criminal violence from individuals that are maltreated as children.  It's a longitudinal study published by Witham and colleagues, that identifies that children with histories of maltreatment are three times as likely to be arrested for violence as adults.

There's also a longitudinal study published by Thorndike under sponsorship of the U.S. Department of Justice that identifies a markedly increased violent outcome as the types of violence within a family increase.

Of those types, there's spouse abuse, child abuse, and a climate of violence and hostility.  As each type is added on, the percentage of kids who end up being violent themselves steadily increases.

Q.    And --

A.    So this helps make the nexus of that "so what" question. So he was mistreated as a child, so what does that have to do with his being violent as an adult?  And that research establishes that nexus.

Q.    And in offering this type of evidence, in your experience, is there a connection between this and an attempt to reduce the Defendant's moral culpability for his crime?

A.    Yes, sir.  Moral culpability from a psychological standpoint being based on the idea of what raw materials did you bring to your choices.  The greater the psychological or neurological damage or deficient intelligence, then the materials that this person brought to his or her choices are reduced, and their moral culpability is correspondingly lessened, for the same action.

Q.    Okay.  Why don't you go on.

A.    There is also historical susceptibility to rage attacks, and these are some of the descriptions that were provided by the family members.  In other words, the abuse of this child and the rage that those injuries reflect wasn't restricted just to this relationship but in fact has a long-standing history to it and also has implications that suggest some neurological substrate to it.

Q.    Okay.  Why don't you go on.

A.    This is a metaphor or a model that I developed to try to explain the interaction of these factors.  As I viewed Alfred Bourgeois, he was like a pressure cooker.  And within that pressure cooker, there is this history of an overwhelmed family system, observed domestic conflict, physical abuse, father abandonment and emotional rejection.  Those are all the legacy

of this childhood that he's carrying with him.

Now, he keeps a lid on this most of the time, and that lid is comprised of some pro-social related things of being a hard worker and maintaining steady employment, being involved with his children, being a caring uncle.

Now, even in the presence of those things, when under stress, when you heat this up a little bit, particularly the --

THE COURT:  Did you know about -- were you told about the nephew he dangled over the, by his feet over the bridge?

THE WITNESS:  I saw that in the transcript, Your Honor.  I did not have knowledge of that otherwise.

THE COURT:  Okay.

THE WITNESS:  In the heat of a relation --

THE COURT:  Do you think it might have looked bad with your "caring uncle" comment?

THE WITNESS:  Well, it isn't that he is either a caring uncle or he's not.  There's both things.  There are many witnesses that described him exhibiting caring behaviors toward them.  There are also reports of his terrifying these children and doing things that put them at risk, or even other reports of prior abuse.

Both of those things are Alfred Bourgeois.  It isn't that one is true and one is false.  They both reflect ways of his dealing with his nieces and nephews.

THE COURT:  Does this look like the same symptoms as

a sociopath?

THE WITNESS:  No, ma'am.  Someone who's a sociopath tends not to maintain long -- well, "sociopath" is an antiquated term.  We now use the term "psychopath."

THE COURT:  Psychopath, fine.  Same thing, right?

THE WITNESS:  Well, it is somewhat different in its development, but they reflect somewhat the same concept.  Somebody who's psychopathic tends to maintain a parasitic lifestyle.  In other words, they are living off of and exploiting others.  Alfred Bourgeois has maintained employment.

They tend to drift from place to place, without roots and relationships, almost like a carny.  Now, Alfred Bourgeois has short-term relationships.  He has trouble sustaining them, but he does sustain relationships.  He has maintained some degree of involvement with children, as opposed to just fathering them, moving across the country and going on.

Now, there are --

THE COURT:  Which children did you think he maintained a relationship, besides the one he murdered?

THE WITNESS:  Well, his daughter Bethany described feelings of attachment to him and recalled positive experiences with him.  As I recall, his son AW1988 described that.

THE COURT:  And you talked to them or --

THE WITNESS:  Yes, ma'am.  I talked to Bethany --

THE COURT:  Okay.

THE WITNESS:  -- about her experiences with him, as well as nieces and nephews of his.  And the aunts and uncles that also describe, or his siblings that also described him having good relationships with many of the children in the family.

BY MR. WISEMAN:

Q.  Dr. Cunningham, let me ask you --

THE COURT:  Did you know about the trial testimony of AB1994 and her mother, about how Robin Bourgeois and Mr. Bourgeois did not share a bed together, but he shared a bed with AB1994 and would lock the door every night to go in and sleep with her?

THE WITNESS:  I have read that.  I was not aware of that at the time of my testimony.  I've read that since.

BY MR. WISEMAN:

Q.  Well, at the time of your nontestimony?

A.  My nontestimony.  At the time of my --

THE COURT:  Well, I know, but these are, these are -- anyway, these are things that might be used to call into question his --

MR. WISEMAN:  Oh, sure.

THE COURT:  - his --

MR. WISEMAN:  And if he had --

THE COURT:  You know, when lawyers make a tactical decision sometimes, it doesn't mean that -- you had to know

Mr. Tinker.  When he said they were going to testify that 10 percent of people in there being murderers, he was, he was probably -- Ms. Booth, you know this -- making an excuse to me about why he wasn't going to call somebody that we had spent a lot of money on.

MR. WISEMAN:  Your Honor, I did not --

THE COURT:  That does not mean he hadn't read the report.  It did not mean that he had disregarded what Mr. Cunningham said.  He probably saw the substantial pitfalls in putting on this type of testimony.

MR. WISEMAN:  Well, Your Honor, we're going to certainly cover that in Mr. Gilmore's testimony.

THE COURT:  I expect that quickly.

MR. WISEMAN:  In Mr. Gilmore's testimony.

THE COURT:  I expect you to move right along here.

MR. WISEMAN:  Oh, absolutely.

THE COURT:  Move beyond the pressure cooker.

MR. WISEMAN:  You don't want the pressure cooker?

THE COURT:  I'm a little tired of the pressure cooker.

MR. WISEMAN:  I thought it was a square head with small ears.

THE COURT:  I really appreciate that.  I thought it was a king.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Dr. Cunningham, we're going to have to move beyond the pressure cooker.  Do you have other slides relevant to --

THE COURT:  Apparently he's got 12 hours' worth.

MR. WISEMAN:  No, he doesn't.

THE COURT:  Oh, okay.

MR. WISEMAN:  He said it was considerably less.  And I think --

THE COURT:  How many hours does he have?  How many slides do you have?

BY MR. WISEMAN:

Q.   How many more?

A.   There are about three or four more regarding mitigation, and then there is a separate file regarding violence risk assessment.  Violence risk assessment file is about 50 or so slides.  This --

Q.   Why don't we move on with the -- and finish up the mitigation PowerPoint and then move to risk assessment briefly.

A.   Yes, sir.

Q.   Do you have any more mitigation slides that are not using the pressure cooker metaphor?

A.   Yes, sir.  There is also some research that I retrieved regarding the extent of domestic and child abuse, including fatal child abuse in our society and also risk factors for that and how those match up against Alfred Bourgeois.

Q.    Okay.

A.    This describing the very large number of women who seek assistance --

THE COURT:  What does that have to do with this case?

THE WITNESS:  To the extent that Mr. Bourgeois is someone who batters and that he is among millions of men in the United States who engage in that conduct, then his singular malevolence in terms of making him a candidate for the death penalty is somewhat reduced by a recognition, at least in terms of domestic violence, that this is a widespread, tragic but widespread dysfunction in our society.

BY MR. WISEMAN:

Q.    Dr. Cunningham, I want to ask you a question about this --

THE COURT:  I can see -- I'm sorry, Mr. Wiseman -- why that slide would not have wanted to, Mr. Tinker would not have wanted that particular slide to reach the jury.

MR. WISEMAN:  Your Honor, I don't have the benefit of knowing Mr. Tinker.

THE COURT:  No, I'm talking about that.  That would have probably offended most people on the jury, I have to tell you.  Ms. Booth, what do you think?

MS. BOOTH:  I think it's horrible.  I can't believe -- I can't believe an expert would even speak like that.

THE COURT:  I can't either.  So move on to this next

category.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, the information that you were seeking to offer about Mr. Bourgeois's positive relationships, were you seeking to offer that as evidence of the positive relationships per se or as a way to explain how he kept himself --

THE COURT:  Could you let him testify, Mr. Wiseman?

BY MR. WISEMAN:

Q.    -- intact?

THE COURT:  Just ask him why he was going to do that.

BY MR. WISEMAN:

Q.   Okay.  Why were you going to do that, Dr. Cunningham?

A.   The graphic was identifying how he kept a lid on --

Q.   Okay.

A.   -- in his attempts to proceed with his life in ways that did not -- to try to keep a lid on the issues that he's carrying.

Q.   Okay.  I have another question now.  Your testimony is somewhat divergent.  On the one hand, you're telling us that this mitigation case was a disaster.  You didn't have the time to work it up in the way that you thought it needed to be, you didn't have the materials.  And yet you were coming to court prepared to offer what you could.  How do you reconcile what appear to me at least to be somewhat divergent views of this

case?

A.    I don't understand the question.

Q.    You didn't have enough time to do the case.

A.    That's correct.

Q.    Yet you were purporting to have valuable --

THE COURT:  To be fully prepared.

BY MR. WISEMAN:

Q.     -- valuable information to provide.

A.    Yes, sir.  It wasn't -- it's not a function of either having nothing, no observations, or being fully prepared.  I was partially prepared, and gathered information to describe this.

THE COURT:  Twelve hours of prepared.

THE WITNESS:  No, ma'am.

THE COURT:  That's pretty prepared.

THE WITNESS:  No, ma'am.  I never represented that my testimony would take 12 hours.

MR. WISEMAN:  Mr. Roberts said that, Your Honor. Dr. Cunningham never said that.

THE COURT:  Oh, okay.  I thought he said there was six hours of one and four of another.

MR. WISEMAN:  No, no.  How many hours --

THE COURT:  And I thought actually you said the same thing.

MR. WISEMAN:  Oh, no.

THE COURT:  That you weren't actually going to put on -- or eight hours in one and four of another.

MR. WISEMAN:  No, what I was saying was that Mr. Roberts' suggestion that it was that long is ridiculous, and I would never think that I was going to get 12 hours from Your Honor to put on a PowerPoint, nor do I think Dr. Cunningham thought that.

THE COURT:  Well, how much time would it have taken to put all of your evidence on that you had?

THE WITNESS:  Two to three hours.

THE COURT:  Okay.

THE WITNESS:  As I was -- as I was --

THE COURT:  With 50 slides, you could put 50 slides on in --

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Many of them are graphic models that are --

THE COURT:  Okay.

THE WITNESS:   -- slides that proceed pretty rapidly. As I would be meeting with -- my hope was to meet with Mr. Tinker.  These are proposed exhibits.  This is proposed information.

THE COURT:  Thank you.

THE WITNESS:  If there's a slide that doesn't, that he thinks is not going to be information he wants to present to the jury, if he doesn't want them to have information about the

extent of domestic violence or child abuse, then that slide would not be included in the testimony. That's a function of what we would be meeting about. Let's talk about -- these are the things that I could potentially speak to. Is that testimony that you desire to elicit?

BY MR. WISEMAN:

Q. And in your experience in presenting these types of presentations to Counsel, do you typically sit down with them and have a discussion about it? Do they ask you questions about it? Do they, you know, engage in a deliberative process with you about what to present and what not to present?

A. Yes, sir. It begins before I ever arrive. These materials were provided to him in advance, so that there could be consideration and discussion about them before I ever came. Certainly, there was lots of time on Sunday to talk about those, or early Monday morning, or Monday evening to go over these slides and discuss them and identify what were concepts that were consistent with the mitigation themes that he was emphasizing and which were not.

Q. Okay. And I take it that discussion never happened.

A. That's correct.

Q. Now, the PowerPoint with regard to risk assessment's now in evidence. Could you just summarize for us -- and I know that's hard on such a complex topic -- but do the best you can to, you know, what would you have told the jury about risk

assessment?

A.    I would have told them that risk assessments for prison are best based on this person's personal track record in confinement and on group statistical data on how capital offenders and murderers and inmates behave in prison.

In terms of that latter approach, that group statistical data, the research demonstrates that the seriousness of the offense that sends someone to prison is not a good predictor of who is seriously violent in prison and that the overwhelming majority of capital murderers, if sentenced to life in prison, never engage in serious violence.

And so that typical assumption that a murderer must be worse in prison is not supported by the data.

THE COURT:  Well, if we have data about how he behaved in the local jail, would that give us some indication?

THE WITNESS:  Yes, ma'am, if we look at his personal track record, either in terms of personally perpetrated misconduct in jail -- I was provided with no disciplinary write-ups that were made against him.

THE COURT:  Were you provided with the information that he allegedly tried to hire a hit man to kill several of the witnesses?

THE WITNESS:  Yes, ma'am.  That's another part of the risk assessment that I was prepared to address.  There's one part that addresses the likelihood that he will personally be

violent against inmates or staff in prison.  That's one assessment.  A second assessment involves his risk of ordering violence in the community from prison.  And then there's a third component which are what interventions are available within the Bureau of Prisons, either to limit his ability to personally perpetrate violence against inmates and staff or to order violence in the community.  And those are all areas that I was prepared to address.

BY MR. WISEMAN:

Q.   And were you going to address the differences between the Nueces -- I'm not sure I'm pronouncing that correctly.

THE COURT:  You did.

MR. WISEMAN:  Okay.

THE COURT:  It's Spanish.

BY MR. WISEMAN:

Q.   Okay -- County Jail and the Federal Bureau of Prisons?

A.   Yes, sir.

Q.   And their ability to maintain a safe environment?

A.   Yes, sir.

THE COURT:  Well, he got a guard to carry messages, allegedly, back and forth between himself and an alleged hit man.  Are you aware of that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Are you aware that on, actually on death row in Terra Haute that he did the same thing?

THE WITNESS:  I've read a report describing not that he was hiring a hit man --

THE COURT:  No, no, no.

THE WITNESS:  -- from Terra Haute, but that he had --

THE COURT:  He had schmoozed a guard and --

THE WITNESS:  Yes, ma'am.  As I understand it, the guard was approaching inmates.  But there was a relationship that developed where she was carrying messages --

THE COURT:  For him.

THE WITNESS:  -- to family members away from the prison.

THE COURT:  Right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, we're almost to the end here.  I wanted to ask you if my office provided you from 2007 onward with additional materials about the case.

A.   Yes, sir.

Q.   And did those additional materials add to your, what would now be your presentation of the case?  Or let me ask it differently.  If you had these materials back in 2004, could you have incorporated them and added to your conclusions and your mitigating opinions?

A.   Yes, sir.  They would have supported additional adverse developmental factors in his background.

Q.   All right.  Can we just tick them off rather quickly --

Cunningham - Direct

THE COURT:  You may.

BY MR. WISEMAN:

Q.    -- and if I have any questions about them, I'll jump in?

A.    Yes, sir.  A genetic predisposition to personality disorder; corruptive paternal modeling of promiscuity and reproductive irresponsibility; corruptive maternal modeling of neglect, abuse and scapegoating; borderline personality features; deficient intelligence and potential mental retardation; mother's inadequacy and potentially deficient intellect; inadequate primary attachment; rejection by the legitimate paternal siblings; peer rejection and isolation; additional information regarding maternal rejection and expulsion, expulsion; additional information regarding emotional neglect and particularly supervisory neglect.

Q.    Okay.  And I take it from your response that those are all additional mitigating features that help to reduce, in your view, moral culpability?

A.    That's correct.

Q.    I wanted to ask you two more things, and I think I'll be done.  We had a witness this morning, Claudia Williams, testify that she had related some stories of abuse to the trial investigators, Mr. Bierbaum, I believe, but that she held back on relating other ones, because it was a difficult topic for her to discuss.

THE COURT:  And I think she said because her mother

was still alive, which was a big thing.

MR. WISEMAN:  Yeah, yeah.

BY MR. WISEMAN:

Q.    And when a mitigation investigation is done properly and extensively and thoroughly, how does it try to overcome that type of a problem?

A.    The mitigation investigator spends a good deal of time in person with the family, which works to develop trust and rapport with them, and increases their ability to disclose sensitive information.  That's a time-intensive process of developing that relationship.  It's not one that can typically be achieved over the phone or on brief interview.

Q.    Okay.  And we also had another witness this morning, Brenda Goodman, who testified to an admission -- I don't know if that's the right word -- but a statement Mr. Bourgeois made to her before the offense that he had been raped by a man.  And she didn't reveal -- she wasn't spoken to at the time of trial. She revealed it to our investigator -- I'm sorry, I'll take that back -- she didn't apparently reveal it to our investigator in 2007, but she talked about it on the witness stand.

How do you get through to people and get them to open up about that type of information?

MR. ROBERTS:  Your Honor, I think I -- I'm going to object in a general nature.  I mean, I think he, as a

psychologist, he's going to have to say he has to talk to an individual and figure out what that individual does.  So I would object to him being able to describe how to get through people in general.

THE COURT:  Go ahead.

THE WITNESS:  The capabilities and experience of the examiner have something to do with it, the interviewer, in terms of instilling trust in the people that you're talking to. Part of it is in that time to build rapport.  Some of it comes from interviewing other individuals and learning about it from them, so that when you then make inquiry of this person, you already know something about it.

THE COURT:  Do you, would you consider that Mr. Wiseman's office has a very good mitigation investigator?

THE WITNESS:  I would assume so.  I don't know her personally, or him personally.

MR. WISEMAN:  You know, Your Honor, I --

THE COURT:  I mention that, because even yours didn't get that information.

MR. WISEMAN:  Yeah, and you know what I was going to say in response?

THE COURT:  Tell me something.

MR. WISEMAN:  Not that I'm a witness, but we had this case with four months left to go on the statute of limitations. And I felt at the time that our investigation wasn't as strong

as it ought to have been.

THE COURT:  Could have been.

MR. WISEMAN:  And we've since tried to beef it up, but I think it's regrettable that the amount of time he had to spend with Ms. Goodman in 2007 didn't elicit that important information.  And as the chief --

THE COURT:  Well, I mean, here we are in 2010, and this is the first time she's ever mentioned it.

MR. WISEMAN:  No, it wasn't the first time.  She's told us about it since.  It's not in her declaration.  But as the chief of the unit, I take some personal responsibility that when I signed on to this case and agreed like Dr. Cunningham did to do it on the quick, that we miss some stuff.  And I regret that.

THE COURT:  Well, you've been on it for three years, so I don't think you've been forced to do it quickly.

MR. WISEMAN:  No, but the filing of the petition --

THE COURT:  Okay.

MR. WISEMAN:  -- and getting the affidavits was done, and that's our trial date.  The limitations date is our trial date.  Have to have everything done by then.

Dr. Cunningham, I think I --

THE COURT:  Well, you've done a wonderful job.

MR. WISEMAN:  Well, I appreciate that, Your Honor, but --

THE COURT:  It's the truth.

MR. WISEMAN:  -- but you know, we're human beings, and we make mistakes, you know.

Dr. Cunningham --

THE COURT:  Well, I think that's what this is all about.

MR. WISEMAN:  What's that?

THE COURT:  I think that's what this issue is, is what I was saying.

MR. WISEMAN:  Well, that's true.

Dr. Cunningham, I'm done.  Thank you very much.

THE WITNESS:  Thank you.

MR. ROBERTS:  May we have a brief break, Your Honor?

THE COURT:  Yes.

MR. WISEMAN:  And I'm going to want to offer my exhibits, the ones that weren't.  Let me pull that together.

THE COURT:  We'll do that right now.  Or you want to do it when we come back?

MR. WISEMAN:  Let me do it after the break.

THE COURT:  Okay.

MR. WISEMAN:  So we can pull it together.

THE COURT:  Fifteen?

MR. ROBERTS:  Great, Your Honor.

(Recess from 2:54 p.m. to 3:11 p.m.)

MR. WISEMAN:  Your Honor, if I could -- my intention

was to offer everything that I used.  So let me just list the numbers, and if anything hasn't been formally offered, I'll offer it now.

THE COURT:  Okay.

MR. WISEMAN:  P-1, 2, 4 and 5, 7, 8, 9, 10, 60 --

THE COURT:  16?

MR. WISEMAN:  60, 6-0.  That's the Bierbaum e-mails. 72, 144, 167.

THE COURT:  167's in.  So is 8.

MR. WISEMAN:  Okay.

THE COURT:  And so is 7.

MR. WISEMAN:  151.

THE COURT:  So is 9.

MR. WISEMAN:  165, and 130.

THE COURT:  Any objections, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  P-1, 2, 4, 5, 7, 8, 9, 10, 60, 72, 144, 151, 165 and 130 are admitted.  Go ahead, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE CLERK:  What about 167?

THE COURT:  I didn't -- yeah, 167.

THE CLERK:  Okay.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Good afternoon, Dr. Cunningham.

A.    Good afternoon.

Q.    It's been six years, and you're finally getting to testify in this case.

A.    I will come to the stand and testify when I'm called, sir. It's not that I have an agenda, but I'm available if I'm called.

THE COURT:    I think he was making a little joke.

THE WITNESS:    Yes, ma'am.

THE COURT:    Lighten up.

BY MR. ROBERTS:

Q.    We know it's a serious situation, but there are, I just want to say that as I've listened to your testimony, it strikes me as you're very, very focused when you get called to a case. Would that be correct?

A.    Yes, sir, I think that it is.  I'm concerned with doing a good job.

Q.    You've been an expert in this field, you've been testifying in federal courts for a long time.  Is that right?

A.    Yes, sir, 15 years.

Q.    What drew you in to becoming an expert in this field that you're in now?

A.    I was called about providing testimony in a case in Texas. It was a case having to do with violence risk assessment, which is a special issue here in Texas.  I did a literature search on the methodology of how you go about a scientifically grounded

risk assessment and began to retrieve base rate data, which is the group data that identifies rates and correlates of violence in prison, and applied that methodology in a capital case.

I then began to get called by other cases to make similar application of that science. I then began to do research in that area. And so essentially, it grew as I did research and published and as I was called upon to do work in other cases. It was not by design. It simply occurred as a growth from that area of practice.

Q. And the growth has occurred really on the defense side. You've testified almost exclusively for the defense. Is that correct?

A. I've never been called by the prosecution in a capital case.

Q. That's kind of a roundabout way of answering my question. But I mean, the fact is that you spend -- about 75 percent of your income is derived from doing these kind of cases. Is that right?

A. In any given year, someplace between 60 and 75 percent of my income is derived from capital cases at one stage or another.

Q. Okay. And you're quite experienced in how -- you're quite experienced in watching cases go forward. And I think you, I believe you've done well over 450 forensic evaluations for cases. Is that what your resumé says?

A.   The resumé doesn't describe that, I don't think.  My total forensic experience in terms of number of cases is probably in excess of 500.  I've testified in about 160 trial level capital cases.  I may have been involved in as many as 100 more, where I was not called to testify, either it pled out along the way, or for whatever reason I was not called.

Q.   But you're not a legal scholar.  Correct?  You didn't go to law school?

A.   I did not go to law school.  I am a forensic psychologist, and I'm a student of case law and psycho-legal conceptualizations.  So I know a lot more about it than a layman, and even than a general psychologist.  But I did not go to law school.

Q.   And do you spend time reading the ABA Journals and the things that are produced by the American Bar Association?

A.   As they relate to capital cases, I do.  And as landmark case law or important case law regarding capital litigation is published, I try to keep up with that.

Q.   Now --

A.   Again, likely not as thoroughly as an attorney, but I try to attend to that.

Q.   You said you've been doing this for about 15 years, you've been a forensic evaluator in courts, mostly, I mean, all for the defense, as far as your record goes.  But --

A.   No, sir.  That mischaracterized my experience.  I've been

involved in capital cases for 15 years.  I've been doing forensic-related cases for about 30 years.  Didn't do a capital case until 15 years ago.  I've been called by the defense and the state in other cases.  I've only been called by the defense in capital cases.

Q.    Thanks for clarifying that.  I guess my question was really getting to, it's my understanding that for years you were called because of a head injury being involved in the case.  Is that -- it is my understanding that if there was a head injury and there was some possibility that the head injury contributed somehow to the behavior of an individual, that Dr. Cunningham was the person to call.  Is that inaccurate?  You're shaking your head no.

A.    No, sir, that's inaccurate.  I don't know that I have ever been called in a case, in a civil case, for example, that involved a head injury and the implications that that had.

Q.    And let me reclarify.  I didn't say civil.  I just said -- and in fact, I was specifically referencing criminal defense cases, where you were called because someone had a head injury and you were going to tie that into some type of imperfect brain or some kind of brain defect.  Is that not accurate?

A.    No, sir, that's not accurate.  I don't know that I have addressed head injuries apart from a mitigating factor in capital cases, and that typically accompanied by a neuropsychological evaluation.

Q.   Okay.  In this case, there was, at least at first, there was a Dr. Weiner who thought there was a head injury, and you discussed that at length with Mr. Wiseman earlier.  You were present when Dr. Estrada testified.  Correct?

A.   Yes, I was.

Q.   And you were aware that the United States was prepared to cross you when you took the stand for the defense if they in fact called you, were you not?

A.   The Government always cross-examines.  Well, there was one case where they said, "Pass the witness" this last year.  But otherwise, the Government -- I'm always cross-examined.  That's not a new thing.

Q.   I guess my question is, were you aware that we had a psychiatrist and a psychologist standing by to address issues of mitigation when you -- in rebuttal?  Were you aware of that?

A.   No, sir.

Q.   Were you aware -- do you remember the name John Shaw?

A.   I do know the name of John Shaw.  He's an administrator with the Bureau of Prisons and on occasion is called --

Q.   Were you aware that in 2000 --

A.   -- as a rebuttal witness.

Q.   I'm sorry.  Were you aware in 2004 that he had created a PowerPoint slide and that we were going to address many of the issues you discussed about the murders in prisons after you testified?  Were you aware of that?

A.    I had not seen his 2004 slide presentation.

Q.    Well, my question is whether you were aware that we were going to use John Shaw and his presentation in response to your testimony.

A.    I don't recall seeing John Shaw here or knowing who the Government had retained.

Q.    Okay.  Fair enough.  You were on the witness stand actually in this case in this courtroom on March 22nd, 2004, where there was a discussion between you and the Judge, Defense Counsel and myself with regard to what portion of the PowerPoint you were actually going to present.  Do you recall that discussion?

A.    No, sir.

Q.    You don't?  I only have a portion of the transcript.  The proceedings began that day at 8:30 in the morning.  But when you were on the witness stand --

        MR. WISEMAN:  What page are you on, Mr. Roberts?

        MR. ROBERTS:  It's on page, it's the first page -- it's actually Page 2, because the first page is the caption of the case.  But it's the Transcript of Sentencing Hearing, Day 1, March 22nd, 2004.

BY MR. ROBERTS:

Q.    And Mr. Tinker was telling the Court that when he had talked with you outside, that you said that the direct would only be a couple of hours, maybe a little longer.

And then the Court says, "Okay.  So it's not a point -- or are you doing a PowerPoint?"  And she asked you the question directly.

And you said, "Yes, ma'am, I would intend to."

So you don't have a recollection of that discussion or being on the witness stand?

A.   No, sir.  I may have been in the gallery when the Court inquired, but I don't recall taking the stand.

Q.   Actually, this Court usually doesn't question people from the gallery, but --

A.   It's conceivable that I was called to the stand.  I don't recall being sworn or being on the stand in that case.

Q.   Okay.

MR. WISEMAN:  Your Honor, the record should reflect that he was not sworn.

MR. ROBERTS:  And I don't have a problem with that, Your Honor.  There was just a --

BY MR. ROBERTS:

Q.   Let me just ask you that if you were on the witness stand and if the record, the transcript reflected that in the discussion with me that Judge Jack indicated that we would be able to impeach you by bringing in our expert about Bureau of Prisons, rather than excluding your testimony about the Bureau of Prisons, would you have recalled that discussion?

A.   I might or might not.  I wouldn't have regarded that as

unusual for the Government to call Mr. Shaw or someone else from the Bureau of Prisons about their experience of violence in prison or other issues.

Q.    And in fact, Mr. Shaw often -- or Mr. Shaw is known to testify about the number of murders that take place in prison; is he not?

A.    He has provided that testimony.

Q.    Okay.  So if you took the stand, regardless of what percent, whether it was 2 percent or 10 percent or Mr. Tinker was incorrect, you're aware that if we had brought John Shaw in, more than likely we would have been addressing how many murders take place in the prison facility.

A.    Yes, sir.  We both would have addressed that and would have been using the same statistics.  That rate is about five per hundred thousand inmates annually in the Bureau of Prisons. If you go to the U.S. Penitentiaries and you do a three or four-year average, which he might be speaking to, then your rate's going to be about twenty to twenty-five per hundred thousand inmates per year.

Q.    And that's your opinion.  You don't know whether or not that coincides with what Mr. Shaw would say, do you?

A.    Well, actually I have some familiarity with that.

            THE COURT:  Well, he just said he looked it up.  I mean, surely you look it up at the same place, wouldn't you think?

THE WITNESS:  Yes, ma'am.  And I've read transcripts of his testimony.

BY MR. ROBERTS:

Q.   Okay.  So earlier, you heard the state -- Mr. Wiseman read from a transcript that Mr. Tinker was concerned that the jury would hear that 10 percent or some number like that, that the jury would hear that 10 percent or less people in jail actually still commit murders.  And he was concerned about the jury hearing that.

THE COURT:  I thought he was talking about 10 percent of people in prison are murderers.

MR. ROBERTS:  Well --

THE COURT:  I probably misunderstood that.

BY MR. ROBERTS:

Q.   Either way, you heard that Mr. Tinker was concerned about the jury hearing about murders in relation to confined facilities, did you not?

A.   I heard that he was talking about a 10 percent number, which is at least ten-fold higher than the actual incidence on a lifetime basis.

THE COURT:  He's not talking about -- I thought he was talking about the number of murderers in prison.

THE WITNESS:  Yes, ma'am.  But state prison, it's going to be about 12 percent.  And then federal prison has a lower percentage, because of the different mix of offenses.

But there are people convicted of murder in prison.

BY MR. ROBERTS:

Q.    And there are also people in prison that commit murders while they're in prison, are there not?

A.    Yes, sir.  That's that rate that's about five per hundred thousand inmates annually for the Bureau of Prisons as a whole. It occurs, but it's extraordinarily infrequent.

Q.    And it happens in high security and medium security, low security and minimum security; does it not?

A.    I don't know that there are reports in minimum security. It may be on occasion that's occurred.  Most of the murders occur in medium or high security.

Q.    So if Mr. Tinker was concerned that they would hear that a certain percentage of inmates continue to commit murder, would that be something that you expect Mr. Shaw might have testified about?

A.    Well, it would have been a very important issue to clarify for the jury.  Research shows that jurors think there's about a 50 percent likelihood that their capital offender will kill again in prison.  The follow-up data says that's an overestimate by 50 to 250-fold.  So it's critically important that the jury hear the actual number, so as to dispel the very gross exaggeration that they have in their mind upon being confronted with this particular offender.  That's some of the information I would have liked to have clarified and explained

to Mr. Tinker had we had more than 40 minutes and he have some familiarity with the information that I had.

THE COURT:  Well, you don't know that he didn't have familiarity with your information.  You had sent it to him in advance.

THE WITNESS:  Well, yes, ma'am.  He asked me, "Are you going to testify anything about violence risk assessment?"  He had in his possession in that notebook 60 slides with direct.  When I turned to it in his notebook, he looked surprised, as if this is the first he had seen of it.  So in fact, it was very clear that he was unfamiliar with it.

BY MR. ROBERTS:

Q.    How many times have you testified in federal capital cases now?

A.    About 60.

Q.    How many current cases are you handling?

A.    I don't know the answer to that.

Q.    You don't know the number of cases you currently have?

A.    No, sir.  Sometimes I'll be contacted when a case could be two years ago, and they say, "We'd like for you to work on this," and then I never hear anything again, and we telephone them, and they say, "Oh, we settled that a year ago.  Sorry we didn't call you."

And so I may have a case that we've started a case sheet on that I get no, there's no subsequent follow-up on.  They're

just trying to save a place in line.

Q.   So if they don't follow up with you, then you turn around and follow up with them?

A.   After a while, yes, sir.

Q.   After a while.

A.   If there's a trial date that we have, then we're going to follow up with them as we see that, you know, coming within being months and months away.  They may not have a trial date. And so then we may only contact them, you know, six months might go by between contacts, because there wasn't a trial date that was set.

Q.   We saw the e-mails earlier on your direct examination with regard to your being contacted initially, and then you turn around and telling them, telling the defense team that they hadn't submitted stuff to you yet.  When you get involved in a capital case, you take on a very important role.  Is that correct?

A.   Potentially, yes, sir, depending on the role that I'm assigned within that case.  But any consultation in a capital case is important.

Q.   Well, in your statement, you talk about how important it was for Mr. Tinker and Mr. Gilmore to pretty much follow your advice.  I mean, you say in Paragraph 4 that you were retained by Mr. Gilmore and Tinker, that you were first contacted on June 30th, 2003.  You testified to that already.  Correct?

A.    Yes, sir.

Q.    That you responded on July 1st, 2003, and that's when you suggested that the defense hire a mitigation specialist.  Is that correct?

A.    Yes, sir.  That's correct.  I have no expertise in gathering records.  And it's much too expensive to have me out in the field trying to chase people down.

Q.    Are you aware of exactly when Mr. John Gilmore was actually appointed to start handling Alfred Bourgeois's case?

A.    No, sir.

Q.    If the record of the trial reflected December 20th, 2002, would you have any issue with that date?

A.    I have no knowledge one way or the other.  I don't know whether to have issue or not.  I simply don't know when he was appointed.

Q.    But you do know that he contacted you on June the 30th, 2003.

A.    That's correct.

Q.    Do you know when the United States issued a notice that it would be proceeding with the death -- with making this a capital case and pursuing the death sentence?

A.    Only from what Mr. Wiseman described sometime in mid June that a notice was provided.

Q.    I think it would --

A.    I mean, mid July, rather.

Q.   July 25th, 2003.  Does that ring a bell?

A.   I don't have documentation of that.  That would simply be from his reference.

Q.   Okay.  So let's assume for the sake of this discussion that you were contacted June 30th of the sentence of, or that the United States notice occurred on July 25th, less than a month later.  And do you know when Doug Tinker was actually appointed to begin assisting in this case?

A.   No, sir.

Q.   Let's assume for the sake of the record, and I think the record will reflect this, that it was July 25th, 2003, the same day the notice for the pursuit of the sentence of death was issued.

          MR. WISEMAN:  Your Honor, I'm sorry to interrupt Mr. Roberts, but I think it's important to be accurate with the dates here.  The docket of the Court says the notice of intent to seek the death penalty was formally filed July 23rd.  However, the Government announced before Your Honor in open court on July the 16th, Docket Entry 74, that they would be seeking the death penalty.  They had been authorized to seek it.  Your Honor told them to file a formal notice.  And that marks the date when the Court indicated you would start to gear up the case as a capital one.

          MR. ROBERTS:  That's fine, Your Honor.

BY MR. ROBERTS:

Q.    The point is that all this occurred right around the time that you were actually contacted on June the 30th, 2003.  So you're telling us you were not aware that your contact was almost simultaneous with the case, the United States beginning to seek the sentence of death?  You were not aware of that?

A.    Well, yes and no.  The initial correspondence with Mr. Gilmore indicated his expectation that this was a capital case, that discussions had been occurring with your office or with Justice about whether it would go capital.  He anticipated that under the current status of the case that Mr. Bourgeois would receive the death penalty.

The timing of the formal notice that was announced in court or that your office provided, I don't have knowledge of when that occurred, except by what you've just described.

Q.    Okay.  Well, you do have knowledge of when you suggested that Ms. Milstein be contacted.  And when did you suggest that again?

A.    I provided a list of about 11 individuals on July the 9th, 2003, at Mr. Gilmore's request.  She was among the 11 individuals, in the second tier, next to the last.

Q.    I'm showing you what's been marked as Petitioner's Exhibit 165.

A.    Yes, sir.

Q.    Can you read for us what happened on October 23rd, 2002?

A.    That indicates first interview in person Alfred Bourgeois

conducted by Milstein and Bierbaum.

Q.    So it appears that someone by the name of Milstein and Bierbaum interviewed Alfred Bourgeois as early as October 23rd, 2002.

A.    No, sir.

Q.    Do you know whether that's the same Milstein?

A.    I believe that that date is in error.  I think that date should actually reflect 2003, not 2002.  And that was clarified by Mr. Wiseman in my direct exam.

Q.    Okay.

A.    Since she was not involved in the case in 2002, and I'm -- she's one of the names that I provide, I don't know how she could get there with Bierbaum to be doing an interview in October of 2002.

Q.    I was kind of curious about that myself.  And I didn't hear the clarification, so I stand corrected.

       Let me refer you to another exhibit.  Actually it is your exhibit.  This is Petitioner's Exhibit 8.  And this is the list of e-mails that you had discussed earlier.  Correct?

A.    That's correct.

Q.    I'm turning to what appears to be Page 15 at the bottom on this exhibit.

A.    Yes, sir.  Let me turn to that.  I have that.

Q.    Okay.  I believe you've already read this, but I just want to, I want to ask you about another response here, and that is

July 25th, 2003, it says -- this is John Gilmore responding to you and saying, "The Judge has agreed to appoint you in our case."

So when you talked about the dates a while ago about the dates of when the notice to proceed with the seeking the death sentence was issued, and it was in, towards the end of July 25th.  So John Gilmore actually has informed you on July 25th, 2003, that the Judge has finally appointed you to the case.

So that's the first time that you were officially, at least with regard to the Court having appointed you, that's the first time that you were officially working on the case.  Is that correct?

A.    That's correct.

Q.    You made several statements -- I want to get back to another statement here, but I want to just -- on your declaration to this Court in 2007, you made a statement about your concerns about John Gilmore not really knowing how to proceed with the mitigation expert.  Do you remember making comments to that extent?

A.    You may need to direct me to a paragraph.

Q.    I will.

A.    Yes, sir.  That's in Paragraph 8, based on a December 1st, 2003, communication.  It's an e-mail that he had with our office.

Q.    Looking at your statement, your --

THE COURT:  Can you zoom that up?  I can't see it.

MR. ROBERTS:  Oh, Your Honor, this is not, we're not -- I'm going to refer to another page here, but I'm actually looking at his declaration which has not been offered yet.

BY MR. ROBERTS:

Q.   And it's an 18-page -- you gave a declaration on May -- you signed it on May the 11th, 2007.  It's an 18-page document.

A.   That's correct.

Q.   Okay.  And in that statement, you're referring to Paragraph 8, where you talked about Mr. Gilmore responding about how he was not really sure how this thing works and did not know if he should be providing me with information or if the mitigating investigators should be providing this information to me directly.

And you said, "This again reflected a lack of familiarity with the functions of Defense Counsel in preparing for a capital case."

Is that your opinion?

A.   For capital sentencing.  Yes, sir, that did point to a lack of familiarity.

Q.   Let me --

A.   And I'd be glad to explain --

Q.   Well, let me invite you to --

A.   -- why I made that assumption.

Q. Let me have you look at an e-mail, another e-mail correspondence between you, Mr. Gilmore and your office actually. Referencing again the Petitioner's Exhibit 8. And I'm referring to the middle. This is Page 19 of this exhibit --

A. Yes, sir.

Q. -- where on December the 1st, 2003, John Gilmore e-mailed to Tammy Lam -- and you said Tammy Lam is a member of your office?

A. She's an administrative assistant in my office. That's correct.

Q. And she is the person that you trust to e-mail and correspond with attorneys on cases you're assigned to?

A. To do status checks in terms of where we are with deadlines and update them with materials and that kind of thing. Not to handle matters of substance.

Q. Okay. But here is an e-mail that John Gilmore had sent to Tammy. And read what that is. What is John Gilmore asking her?

A. He said -- this was in response to her e-mail saying, "We have yet to receive any records, information, materials for Dr. C to begin working on this report."

MR. ROBERTS: Objection, nonresponsive, Your Honor.

THE COURT: Sustained.

BY MR. ROBERTS:

Q.   I ask you to read the portion of what John Gilmore is asking.

A.   Yes, sir.  It says, "Tammy, I'm not -- I'm really not sure how this works.  I've worked with mitigation experts before, but never with dedicated mitigation investigators.  Do they provide information to Dr. Cunningham, or do I?  My understanding was that Lisa Milstein and Gerald Bierbaum were to generate the basis for the doctor's report.  Let me know if you need something from me."

Q.   Did Tammy respond to him?

A.   She did.

Q.   She responded to Mr. Gilmore?

A.   No, she responded to me.

Q.   She forwarded it to you.

A.   There's an e-mail to me.

Q.   She forwarded the e-mail to you.

A.   That's correct.

Q.   And asked you to -- and asked whether you would like to respond to this or whether she should follow up with Gilmore and asked you to advise.

A.   That's correct.

Q.   These are your documents and your e-mails.  Where's the e-mail that responds to John Gilmore with regard to his question about who should provide the investigators with information?  Where is that e-mail?

A.    I don't have any of the e-mails from that era in my files.
There's apparently not an e-mail of response in John Gilmore's
file.

Q.    So in December the 1st at least, John Gilmore asked your
office who's supposed to be coordinating with the two
investigators, and who's supposed to -- at least it appears
that he thought the investigators were supposed to be
coordinating directly with you, doesn't it?

A.    Yes, sir.  That's part of his lack of familiarity with
capital case preparation.

        THE COURT:  Well, did you write to him back and tell
him who was going to be doing it?  That's the question.

        THE WITNESS:  I don't recall, ma'am.

        THE COURT:  Well, that's kind of a biggy, isn't it?

        THE WITNESS:  Not necessarily, ma'am.  It's not my
job to determine whether the attorney knows about how a capital
case works or not.  I'm retained by him to provide a function,
not to direct the case or to ensure its quality control.

BY MR. ROBERTS:

Q.    That's interesting.  You're not to direct the case.  Well,
why in your declaration do you state, in Paragraph 5, "I
explained that the performance of an adequate forensic
psychology evaluation required a comprehensive" -- and you go
on and you basically tell them that you're outlining how
they're supposed to take care of the case, in your statement

and here in this court.  And now you're telling us that that's not your role?

THE COURT:  And he prepared all the questions to be asked by the attorneys.

MR. ROBERTS:  Thanks, Your Honor.  I was getting there.  I was getting there, Your Honor.

THE COURT:  Sorry.

BY MR. ROBERTS:

Q.  I mean, Dr. Cunningham, you're the expert.  You're the person that they went to --

THE COURT:  I think I got it, unless you need something more on the record.

MR. ROBERTS:  No, Your Honor, I'll move to something else.

THE WITNESS:  I'll be glad to respond, if that's a question.

BY MR. ROBERTS:

Q.  Do you know how many capital trials that Mr. Gilmore had been involved in?

A.  I do not know.

Q.  Do you know how many capital trials Doug Tinker had been involved in?

A.  No, sir.

Q.  Did you ask?

A.  No, sir.

Q.    Did you know Mr. Bierbaum?

A.    I did.

Q.    You did.  You knew of him?

A.    Yes, sir.

Q.    Does he do an adequate job on investigating cases?

A.    I only have limited familiarity.  This was one of the last cases that I worked on him with.  I did not think this job was adequate.

Q.    You didn't think he did an adequate job on this case.

A.    That's correct.

Q.    So he failed the Defense Counsel in this case, did he not?

        MR. WISEMAN:  He wasn't Defense Counsel, Your Honor.

        THE COURT:  That isn't what he said.  Do not comment unless it's by way of an objection, please.

        MR. WISEMAN:  That was an objection.  I thought he said --

        THE COURT:  That is not what he said.

        MR. WISEMAN:  Then I stand corrected.

        THE COURT:  Yes, you do.  And you should sit that way as well.  Thank you.

        THE WITNESS:  I would ask, I guess answer that question yes and no.  The responsibility for the mitigation case does not reside with the mitigation investigator.  It resides with Defense Counsel, who's responsible for all areas of the case strategy and preparation.

BY MR. ROBERTS:

Q.   In your opinion.  Correct?

A.   Yes, sir.  That's my understanding and my opinion.  And if --

Q.   They -- did the --

A.   That's a function that is continuously monitored by Defense Counsel.

Q.   In your opinion.

A.   Yes, sir.  So that when you get to that --

Q.   But didn't the Defense Counsel hire you to assist them --

          THE COURT:  I got that.  I got that.  This is --

          MR. ROBERTS:  Yes, Your Honor.

          THE COURT:  I got this figured out, I think.

          MR. ROBERTS:  All right, Your Honor.

BY MR. ROBERTS:

Q.   I just want to comment, in your statement you also say -- you also comment on the fact that the defense were having a problem arranging the evaluation with Dr. Weiner.  You comment that they were having a problem with Dr. Weiner.  And I can refer you to that paragraph, too, if you'd like.

A.   In Paragraph 10, Mr. Tinker had, or Mr. Gilmore had described that they were having difficulty scheduling that.

Q.   With Dr. Weiner?

A.   That's correct.

Q.   And that was one of the experts they were relying on also.

Correct?

A.    That's correct.

MR. ROBERTS:  Your Honor, I just need to take a moment.  I'm going past some of the questions because I understand you already understand some of the issues I was going to cover.

BY MR. ROBERTS:

Q.    Let me move to your Paragraph 14 in your statement, where you liken Alfred Bourgeois's psychological makeup to a pressure cooker, kind of the same thing that you put on your screen -- on your PowerPoint.  Do you see that?

A.    Please direct me to a paragraph.

Q.    It's Paragraph 14.

A.    You'll have to direct me to pressure cooker.  I don't see that in the paragraph.

(PAUSE.)

Q.    I'm sorry, it's Paragraph 33.  You were prepared to analogize Mr. Bourgeois's functioning for the jury in order to help them understand, appreciate what made him behave violently and believe Mr. Bourgeois's psychological makeup can be likened to a pressure cooker.  That's your opinion.  Correct?

A.    Yes, sir.  I believe that's an analogy that is descriptive.

Q.    Okay.  Lower down, you said that his -- just a few sentences down from that, you say, "However, his background and

psychological makeup always made him predisposed toward impulsivity and violence."  That's your opinion?

A.    Yes, sir, if at large in the community.

Q.    That's what you were going to tell the jury?

A.    Yes, sir.  And that's reflected in his history, that there were recurrent instances of impulsive violence in the community and other impulsive decisions as well.

Q.    You were actually, to use your word on Page 9 of your statement, you were actually flabbergasted when they told you they were not going to use you as an expert.  Is that correct?

A.    I was very surprised.  You'll have to point out "flabbergasted" to me.

Q.    Page 9, Paragraph 17.

A.    Oh, page -- Paragraph 17.  I'm sorry.  I was looking at Paragraph Number --

Q.    I said -- no, I said Page 9.  Sorry.

A.    Yes, I was flabbergasted that they would not be calling me as a witness.

Q.    And it never occurred to you that Mr. Tinker might not want the jury to know this pressure cooker information or that people might be actually still committing murders while they're in jail?

A.    No, sir.  That's -- I think that's not a correct characterization.  I have prepared many perspectives --

Q.    I just asked you a question about whether you, that ever

occurred to you.

A.    It never occurred --

MR. WISEMAN:  Who cares if it occurred to him? Objection, Your Honor.  It doesn't -- it's irrelevant.

THE COURT:  What's the legal objection?

MR. WISEMAN:  It's irrelevant whether it occurred to him.

THE COURT:  Overruled.

BY MR. ROBERTS:

Q.    You were --

A.    Yes, sir, I was flabbergasted that he would not be calling a mental health expert to describe the developmental history and the relationship that developmental history had to violent behavior, including the nature of the behavior involved in this offense.  I was flabbergasted that the jury was not going to hear that capital offenders are not more violent in prison than other offenders, and that the Bureau of Prisons has significant capability to restrain those individuals.

MR. ROBERTS:  Object to that --

THE WITNESS:  I was very surprised that --

MR. ROBERTS:  -- as nonresponsive, Your Honor.

THE COURT:  Sustained.  I think we should make note that this witness seems to be very angry.

MR. ROBERTS:  Yes, Your Honor.  May I have just a moment --

MR. WISEMAN: Your Honor, I take issue with that characterization.

THE COURT: I do not. I'm the fact finder, and I'm going to make a record of it.

MR. WISEMAN: Right, and I think --

THE COURT: So you can sit down, and you can continue.

MR. WISEMAN: I thought he said he was finished.

MR. ROBERTS: Your Honor, can I just have a moment with Counsel?

THE COURT: Yes.

MR. ROBERTS: Thank you.

(Counsel conferring off the record.)

MR. ROBERTS: Your Honor, I have one more question, maybe two.

BY MR. ROBERTS:

Q. Dr. Cunningham --

A Yes, sir.

Q -- do you know what the defense was at trial? What was their theory?

A. My understanding is he was asserting his innocence at trial.

Q. And do you think that all of the information that you were providing with regard to him, why he committed such a heinous act, would be inconsistent with a defense of innocence?

A.   Yes, sir, it's inconsistent with his -- well, it's -- it explains his other conduct prior to this.

Q.   But you would agree it's inconsistent with a defense of innocence.

A.   Yes, sir.  If the defense is attempting to hold to an assertion that he is innocent of this offense, then they would not want to put on any information at all from any source, including Dr. Estrada or anybody else that he had anything damaging in his background at all.  Now, that's a high, extremely high risk decision to make, in light of the jury's verdict and in light of the evidence in this case.

Q.   You have some familiarity with the legal process.  Do you -- are you aware that it's the Defendant's right to decide whether he wants to plead guilty or innocent?  Were you aware of that?

A.   Yes, sir.  I understand that a Defendant has a right to plead.

        MR. ROBERTS:  Thank you, Your Honor.  We have nothing else.

        MR. WISEMAN:  Your Honor --

        THE COURT:  You may proceed.

        MR. WISEMAN:  Yes, Your Honor.  I have an application before I proceed.  Your Honor's obviously the fact finder --

        THE COURT:  Mr. Wiseman, ask questions, or this will be concluded.

MR. WISEMAN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Dr. Cunningham, have you testified before in capital cases in mitigation where the Defendant has maintained his innocence?

A.   Yes, sir.

Q.   How many times?

A.   I can't give you a number.  Many cases had a sentencing phase, I mean a guilt phase characterized by the defense asserting innocence at the guilt phase, followed by a sentencing phase that accepted the jury's verdict and provided mitigation and violence risk assessment perspectives.

Q.   So testifying in a case where the Defendant maintains his innocence is not unusual in your field?

A.   That's correct.

Q.   It's common?

A.   Yes, sir.

Q.   I want to refer you back to P-8 that Mr. Roberts may have inadvertently misrepresented what was going on there.  This is an e-mail of February 18th.  This is Page 28 of the exhibit. It says, "Dear Dr. Cunningham:  The Judge has ordered disclosure in the form of a written report of every matter we intend to have you testify to."

     It goes on to talk about the report.  It says, "We're having problems scheduling the neuropsychologist.  We had it

set up, but the Marshals didn't follow through.  Now it looks

as if it may not get done.  We are making a record and

objecting."

A.    Yes, sir.

Q.    Does that comport with your recollection of what happened?

A.    Yes, sir.

Q.    It wasn't Dr. Weiner's fault, as far as you know?

A.    No, sir.

Q.    Mr. Roberts asked you -- Mr. Roberts asked you about your

declaration and your, in particular, Paragraph 5, that you

believed that Mr. Gilmore was inexperienced with regard to

working in this setting with mitigation specialists.  And you

gave an opinion in response to that, that I think Mr. Roberts

said, "That's your opinion, that Counsel is responsible."

      My question is, what's the basis for your opinion?

A.    My understanding of the ABA standards and guidelines, that

Defense Counsel is responsible for the orchestration and

presentation at all stages of trial.

Q.    When we first talked about this e-mail packet, I thought

it was your testimony that you don't have access to any of the

e-mails from this period of time.

A.    That's correct.

Q.    Explain to the Court why that is.

A.    In the last six years, there have been a number of

instances where there was a change in computers, that the

Outlook files were not transferred, as well as a theft of a

computer, that deprived me of access to historical Outlook

files.

Q.    So is, in your view, the absence of an e-mail responding

to Mr. Gilmore in regard to his December 1st, 2003, "How does

this work?" e-mail, does that mean that you didn't respond, or

you don't see a response in this packet?

A.    I don't see a response in that packet.  If Mr. Gilmore's

files are intact, then -- his Outlook files, then I would

expect that the response would be there.  I don't have any way

of knowing the completeness of his files.

Q.    Mr. Roberts asked you about being impeached by Mr. Shaw.

Did Mr. Tinker ever, or Mr. Gilmore ever say to you, "They're

going to bring in this Shaw guy.  What would you say in

response to his impeachment?"

A.    No, sir.

Q.    The Government has talked about some phantom psychologist

and psychiatrist they had at the ready to rebut whatever it is

you were going to say.  Did Mr. Gilmore or Mr. Tinker ever

discuss that with you and say, "What could they possibly say,

and what would you respond?"

A.    No, sir.

        MR. WISEMAN:  Your Honor, at this time I would ask

for disclosure, which has yet to occur, of the names of the two

mental health people the Government says they had, what they

knew, what they were going to say, so I can have a proper opportunity to examine this witness as to what his response would be.  I'm actually somewhat surprised that I'm hearing about this for the first time at this late date.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Yes, Your Honor.  We had given Doug Tinker and John Gilmore a lengthy resumé from Park Dietz, about 65 pages, that we were going to bring Park Dietz in.  And there was another member of his -- there was a female, I can't remember her name actually, but we had contacted her and she was prepared to come in, depending on where the evidence went with regard to a brain defect.  So we had given that information to Doug Tinker and John Gilmore.  It was -- it should have been contained within the information, particularly the lengthy CV, within this information they got.  Obviously, we weren't planning on bringing that in here, so it had no basis for this --

MR. WISEMAN:  Your Honor, I would ask for further disclosure as to what information the Government provided to Park Dietz and this other person as to, you know, whether they did any evaluations, whether they reviewed materials.  I mean, just invoking the name Park Dietz is not a strategic reason for not calling an expert in the case.  I need to know what he knew, what was told to Counsel, and if Counsel acted on it.

THE COURT:  Well, you -- I thought you had all of

Tinker and Gilmore's files.

MR. WISEMAN:  I have not seen anything relevant to Park Dietz or --

THE COURT:  You didn't see the 65-page --

MR. WISEMAN:  I do not recall seeing it.  There's no material --

THE COURT:  Are you saying you don't have it or you don't recall it?

MR. WISEMAN:  I don't recall it.  There's 12,000 pages, so I guess it's possible it's in there.

THE COURT:  Well, I mean, that's --

MR. WISEMAN:  But even if the resumé is in there, my point is still that just invoking the name is not, would not provide Counsel with a strategic reason for not calling an expert.  We need to know if this expert Park Dietz reviewed anything, if he had any opinions.  Because then Counsel should have said to Mr., Dr. Cunningham, "Look, they're going to bring in Park Dietz, and he's going to say X, Y and Z.  What are you going to say about that?"  And without that information, I think it's a red herring.  And it's extra red, and it's a rather large herring.

MR. ROBERTS:  Your Honor, all I -- I mean, we spent some time on the phone.  We e-mailed them the information that we had with regard to the case.  We sent that to Park Dietz.  And all I can tell you is that we informed that it was

rebuttal, so there was no report.  There was nothing that was -- we just told them that if they got into the area of trying to limit his violent nature, that we would be, you know, we would be prepared to rebut if they got into that area.

MR. WISEMAN:  Your Honor, Federal Rule 12.2, Federal Rule of Criminal Procedure requires in a capital case that if the Government is engaging in any type of mental health evaluations or analysis that they not only disclose it to the defense, but they have to segregate the prosecution team from that information, because the case might not ever get to a penalty phase.

So what we have here is a situation where the Government is violating that rule.  We have a very serious matter.  I think I have to get Mr. Dietz, Dr. Dietz in here, and whoever else he was working with, find out what they were told, what they told the Government.  For all we know, they gave the Government opinions that were improperly provided.  And this opens up a rather large can of worms.

Now, of course, if the Court wants to find that Counsel did not rely on this abstract invocation of Park Dietz's name --

THE COURT:  Well, I thought you were going to have Mr. Gilmore in here.  You can find that out yourself.

MR. WISEMAN:  Well, I'll find out what Mr. Gilmore knows about it, but that doesn't mean that the Government told

Mr. Gilmore everything they knew.  And it doesn't mean the Government didn't violate 12.2.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, there was no, there was no -- there was simply a communication made on the United States' part, with Park Dietz asking what, if anything, that they would comment on if Dr. Cunningham presented the evidence that we thought they were --

THE COURT:  Well, apparently Mr. Tinker and Mr. Gilmore were satisfied --

MR. ROBERTS:  We told, we gave them --

THE COURT:  -- with that representation.

MR. ROBERTS:  Yes, Your Honor.  We gave them the CV and said, "Look, depending on what he says, we're going to bring this person in to rebut."

THE COURT:  "And this is what he's going to say."

MR. ROBERTS:  And we thought that there was going to be some argument about the brain injury, was one of the -- was the primary area we were going to get into, was the fact that he had lied already and that we didn't have a brain injury.  But it was my understanding that some of the brain injury defect issue was going to go towards the future dangerousness issue.  We brought Dr. Estrada in.  There was no witness.  There was no due process violation.  It was simply a decision that Doug Tinker and John Gilmore made with regard to what's

the best way to proceed in the case.

THE COURT:  Okay.

MR. WISEMAN:  It's actually an Eighth Amendment violation and rule of criminal procedure violation.

THE COURT:  Okay.

MR. WISEMAN:  But that's beside the point.

THE COURT:  You're overruled.  Continue on with your questioning, please.

MR. WISEMAN:  Actually, I'm done with my questioning. Thank you, Your Honor.

THE COURT:  Thank you, sir.  Anything further, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may stand down. Call your next witness.

MS. LARIN:  Your Honor, I call Carl Henry, please.

CARL HENRY, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good afternoon, Mr. Henry.

A.   Good afternoon.

Q.   Would you please state your name for the record?

A.   Carl Kevin Henry.

Q.   And I know you have a plane to catch, so I'm going to try my best to talk fast.  Okay?

A.    Okay.

Q.    How do you know Mr. Bourgeois?

A.    He's a relative, first cousin of mine.

Q.    And did you grow up with him on Bend Lane?

A.    Yes, I did.

Q.    And what is your date of birth?

A.    August the 8th, 1963.

Q.    So you are a little less than a year older than him.

A.    Yes.

Q.    About the same age.  Can you briefly just describe what you observed about Mr. Bourgeois's family life as a child?

A.    Well, he wasn't had, afforded a -- I can't find the word for it -- but as most kids, as I had growing up, you know, trips and things like that, that I had the pleasure of doing with my parents.  His family did, but he didn't have the luxury of taking part in some of the family outings that was, that his family took part in.  And in some ways, he was, you know, left behind on a lot of things.

Q.    And why, why do you think that is?

A.    Well, his mother had a resentment from him, due to his father and her and a relationship that was a one-night relationship, and it didn't work out.  And you know, she kind of held him, you know, took the misery of her, that relationship out on him.

Q.    Did you see any evidence of abuse by her, by his mother to

Alfred?

A.   Yes, I did.

Q.   What did you observe about Mr. Bourgeois's school achievement as a child?  How did he do in school?

A.   Well, he didn't -- he wasn't on the average, like the other kids.  He had -- the other kids had several classes that they would go to, you know, as part of their schooling.  But you know, and a lot of kids would tease him because he had, he stayed in this one class all day.  You know, it was considered -- it's called Title I now, but it's just another, sort of say upgrade name for special education.

Q.   Okay.  And do you have any knowledge whether he ever failed any grades?

A.   Yes.

Q.   And what --

A.   I think it was the third grade he failed.  He went to summer school that year.  He advanced -- through summer school, he advanced to fourth grade.  And he failed again in the fourth grade.  And his mother didn't let him go to summer school this time.  He stayed back.

Q.   So he had to repeat the fourth grade?

A.   The fourth grade, yeah.

Q.   And you went to the same school as he did?

A.   No.

Q.   You did not go to the same school?

A.    No, I didn't go to the same school.

Q.    So how do you know this information?

A.    Well just, I spent most of my weekends, and he and I, we talked.  You know, we're relatives, but we were like brothers, we were like two brothers, because we shared a lot of time together during the summers.  And on summers, when I would go out there, the first time he was in summer school, and I asked him, I said, "Are you going to go to" he said, "No, my mom told me I can't go."  She said, "I failed.  I'm going to have to take my punishment.  That's being kept back.  I'm not going to go forward."

Q.    Okay.  Did you notice any other problems, any other areas where Mr. Bourgeois was not able to achieve, as a child?

A.    Well, he was slow when -- bicycle riding, board games that we would play.  A lot of activities that we played, you know, he was a little slow, you know, as far as like when new games would come out and we'd play them, you know, he would have a little trouble catching on to it.  You know, and bicycle riding, you know.

Q.    Uh-huh.  Okay.  Quickly moving forward, moving on, did you have any part to play in Mr. Bourgeois later becoming a truck driver?

A.    Yes, I did.

Q.    And can you please describe that for us?

A.    Okay.  At the time when Alfred was hired at Schwegmann

Supermarket, I was the dispatcher, dispatcher in charge. And he, once he got hired, he came over and he informed me, he said he had just got a job on, and he liked the big trucks, and he wanted to drive it. At that time he was hired as a porter in the warehouse department, and I instructed him, I said, "Well, you need a little time on the job, and you know, I'll put your name on the list, and just do what you got to do, stay out of trouble, work hard, come to work every day, and you know, when something comes available, you'll get that shot."

Q.    Okay. And so then he moved over to the trucking end?

A.    Yeah, we had an opening came about, and at that time I became assistant manager over transportation. We had, an opening came for the buggy, what we call our buggy truck. And that position was given to him to be a buggy, buggy retriever.

Q.    Can you tell me -- do you know another word for "buggy"?

A.    Basket, shopping cart.

Q.    Okay.

A.    Okay.

Q.    So what was the buggy truck?

A.    Okay. The buggy truck, that person, their job was every morning, they would go out, they would be assigned a store, one of the stores. They would check in with that store manager. That store manager would then take one of his employees from within the store to accompany Mr. Bourgeois. They would canvas the neighborhood with a trailer on the back of the truck,

picking up baskets.  That's all they would do, just canvas the neighborhood.

Some residents would call in and say, "I got one of your shopping carts on my street.  I need you to come and get it."  That's what they would do.  And he would -- him and the person from the store would ride around, and when they get a load, they'll go bring it back to the store and go out again.  That was his job throughout the day.  And at the end of the day, he would come back in.

Q.   Okay.  And can you tell a little, tell us a little bit about the process of training Alfred to promote through the trucks and learn how to drive the trucks?

A.   Okay.  The first position, the entry position was, like I said, the buggy truck.  That was basically a Ford, Chevy, just a standard pickup truck, long bed pickup truck, automatic transmission.  You would just drive around canvassing the neighborhoods.  And then from that we put you onto what's called a bobtail truck, which is a van, a van truck, some of them refrigerated, where you would go from the warehouse to a store delivering goods.

We started him on that position, and he had a few problems, so we brought him back to the buggy position.  And the person that was on the buggy truck, we moved him forward, and I gave him some personal insight as to what he needed to do in order to excel at that position.

When the position became available again, we put him on it again, and we let him rode with somebody so he can get the full understanding as to how that position operates, where you go from the warehouse to the store, get the merchandise, bringing it back and forth.

So he rode with somebody for -- I'm trying to -- he rode with somebody for a while, a Mr. Andrew Jefferson for a while, till he was the senior buggy -- senior stake driver.  He rode with him a while till Mr. Jefferson felt he was comfortable with him doing it.  So that's when we released him.  But he mainly drove from the warehouse to the store, back to the warehouse, from the warehouse to a store, back to the warehouse.

Q.   Now, this method of letting him move onto the next truck and then having to bring him back, was that, was that a sign to you that he was having some difficulties learning?

A.   Yeah.  Whenever, when we put somebody on a particular truck, if the instructor said, that's training them, said, "Okay, they're able to go," we'll put them on a trial period.  And you know, being in the grocery business, we have a time frame, and we need to get goods from Point A to Point B in a timely manner.  And if it's a problem where you're having a little trouble, you know, understanding and getting the freight moved, the goods moved, then we, you know, my manager said, "Hey, we're having problems.  You know, it's taking too long to

get this there," or "Where is he at?"  You know, so we brought him back, put him on the buggy truck, let him did that. Because after he got that down, he was good at it.  And he had somebody there with him constantly to help him, you know, with the neighborhood and everything like that.

So we brought him back.  And when the position came open again, we put him back on the truck again, and we trained him with somebody, and we said, we want him to specifically learn to go from Point A to Point B, Point A to Point B, and just show him.  And that's what we did.

Q.  Okay.  And did it take Alfred longer to learn how to drive?  Is what you're telling us, is that a longer process --

A.  Yes.

Q.  -- than what other people took --

A.  Yeah.

Q.  -- to learn how to drive?

A.  On average, once you move from the buggy truck to the van truck, you know, it usually takes a week to two weeks to grasp the concept.  It took him, you know, it took him longer than that.  Matter of fact, like I said, we brought him back to the buggy truck, and then we reintroduced it to him later.  At a later time --

Q.  Okay.

A.  -- we introduced it to him again.

Q.  And were there any other limitations to what, in Alfred's

job performance?  Did he have some other problems on the job that you recall?

A.   Well, we had forms that had to be filled out, where you, when you go to the store, you know, the managers and everybody, the clerks would have to sign off on what you're bringing them. And from time to time, we would have signatures that, you know, was left out.  Mileages on the fuel report at the end of the day, maintenance sheets, you know, he required extra help with that.

     You know, when he fuel up his truck in the evening, you know, he would sometimes forget to put the mileage, how much fuel he put in there, you know.

Q.   And who would give him that extra help?

A.   I would help him.

Q.   And what exactly did you do to help him with those forms?

A.   What I did, I made him a master sheet.  I said, "Okay, this is your master sheet.  Before you bring the paperwork to me, I want you to make sure your sheet has something on every line that I gave you."

Q.   Okay.  And you had mentioned that you had had him go from Point A to Point B --

A.   Yeah.

Q.   -- point A to Point B.  Why did you have to do that?  What do you mean by that?

A.   Well, we had -- we had three trucks, and we had three of

those type trucks. And some of the trucks may leave in the morning, and we wouldn't see them till the end of the shift. Those were the more seasoned drivers that we felt comfortable with. We just let them run from store to store.

We also had one truck, the truck that Mr. Bourgeois drove. We had that one scheduled to come back so that we can give specific instructions as to what we want him to do, so we can, you know, being that we had problems with him grasping the system, we wanted to closely monitor and observe what he's doing to make sure that we get what we wanted done, properly and in a timely manner.

So we would basically send him to the store, have him come back. You know, when he get to the store, he would call us, "I'm here. This is what I -- I'm finished this. What y'all want me to do?"

"Come on back to the warehouse."

Q.   Okay.

A.   "Call me when you get to the warehouse."

Q.   Did you ever try to give him a task that was more than Point A to Point B and have him, you know, do three or four things in sequence? Was he able to do that?

A.   It was tried a couple of times. But we had, you know, problems with the wrong merchandise being delivered to the wrong store, you know, so we went to the one -- we put him back on the, just straight A, Point A to Point B.

Henry - Direct                                                   331

Q.   So if he's making these sorts of mistakes, why didn't Mr. Schwegmann just say, "Let him go"?

A.   That's not the way Mr. Schwegmann operates.

Q.   Can you tell us a little bit about how Mr. Schwegmann operated?

A.   Mr. Schwegmann was one, he had himself a brother that was mentally handicapped, and he had -- he felt he had an obligation to help someone that needed help that was willing to work and willing to learn and just at least show the initiative that they wanted to do good.  And he was willing, you know, he was willing to give that extra training.  He didn't want us to fire somebody.  He wanted us to spend that extra time to try and help them, so that they can, you know, succeed in that job.

You know, when he hired truck drivers, he didn't want the truck drivers that had been out there driving 10, 15 years.  He wanted somebody that never drove.  Everybody he hired, from the manager, meat cutter, anybody, he trained them how to do that position.  He didn't hire anybody -- none of his managers were hired off the street.  They all went through the ranks.  I started out at Schwegmann in high school working part-time and just moved up the ranks.  That was his philosophy.

Q.   And were there other drivers there that had limitations in some way?

A.   We had some older drivers that had, you know, limitations, and we did pretty much the same thing with them, because they

had -- some of them had been there since the company started. They couldn't read well. They couldn't write well. So you know, we reached out and we tried to help everybody. That's just the way he wanted us to do it.

Q.    Okay. So when Alfred moved on to the bigger trucks, he had to do more paperwork, I would imagine.

A.    That's correct.

Q.    Did he receive help from anyone else in those areas?

A.    When Alfred, when he got ready to train on the big trucks, we assigned him to the senior driver, Mr. Calvin Cryer. He's deceased now. But Calvin Cryer was one of the drivers that started out with Schwegmann. Didn't have much education, couldn't read well, and he took Alfred in and he trained him how to do things the way he did it. And one of the reasons why we assigned him to Mr. Cryer, because we know Mr. Cryer, they could work together because they was pretty much on the same, same level as far as communicating. They communicated well. When Alfred was on the flat, the van truck, he and Calvin would talk, and Calvin would take up a little time with him, and he would kind of -- Calvin understood what he was going through, because Calvin was pretty much limited himself. So he took Alfred in and he trained him on the trucks. And it took him a little longer to get the training, and Calvin didn't turn him loose till he felt he was confident enough to handle the truck safely.

Q.   And how about when he got to the stores, did he need help on the other end?

A.   When he got to the stores, being that he worked with Mr. Calvin, Mr. Calvin had a philosophy, the way he did business --

MS. BOOTH:  Your Honor, I'm going to object, because I don't think he could testify to what happened at the other stores unless he was there.  That, I mean, we're getting really far away, and we're talking about, in response to the question, Mr. Calvin's philosophy.  And the question was asked what happened at the other stores.  So there's my objection.  It's too far, Your Honor.

THE COURT:  Would there be a legal objection in there?

MS. BOOTH:  It would be a legal objection as to him speculating as to what would have happened at the other places when they got there, and he wasn't there.

MS. LARIN:  Could I lay a foundation, Your Honor?

THE COURT:  Yes.

BY MS. LARIN:

Q.   Did you ever see Alfred at the other end at the stores?

A.   I've had opportunities to go to some of the other stores and observe him at the store.  I've talked with some of the shipping clerks at the store that informed me of, you know, because we as managers, we have to go out and do random

observations of the employees as to what they're doing and ask

questions.  And I've had the opportunity to go to some of the

other stores.  That's where I learned the concept that he was

doing was the concept --

Q.    That you would like to talk about.

A.    -- that Mr. Calvin was doing.

Q.    Okay.

A.    It was the same -- it was identical.

Q.    And what was that?  What would they do at the stores?

A.    Mr. Calvin, what he did, because he was limited, he made

everybody like him.  He made everybody love him.  And by that,

whenever he would go to a store, if it was the shipping

clerk's, if it was her birthday, he would bring her a cupcake,

he would bring her breakfast, or he would bring her lunch.  And

when he came, he got royal treatment, because he would bring

them a gift, or if it was their birthday, he would bring them a

card, you know.

Q.    And when you say "royal treatment," what do you mean?

What would they do?

A.    When he pulled up, he didn't have to do anything.  They

made sure his paperwork was correct.  They made sure his loads,

everything was taken off properly.  He didn't even have to

unload his truck.  They got one of the dock hands to unload his

truck for him.  And they would make sure if he had something to

pick up, it was on the truck, the truck was properly loaded, it

was sealed, decaled and everything.

Q.   And was this the same for Alfred, Alfred did this?

A.   Yeah.

Q.   Was Alfred ever a dispatcher at Schwegmann's?

A    No.

THE COURT:  Could you call people by their last names, please?

MS. LARIN:  I'm sorry.  I'm so used to -- I'm sorry.

BY MS. LARIN:

Q.   Was Mr. Bourgeois ever a dispatcher as Schwegmann's?

A.   No.

Q.   And why not?

A.   That wasn't his job function.  The way dispatchers were chosen, they chose them by their leadership quality, their motivation and they're able to interact with the employees, to lead them.

Q.   And would Alfred have qualified for that job at that time?

A.   No.

Q.   Do you know where Alfred went in his career after he left Schwegmann's?

A.   After he left Schwegmann, he went to work for Matlack.

Q.   And after that, did you keep track of Alfred's career in any way?

A.   Not during the time, during his tenure at Matlack, I didn't keep track of his career.  The last company he worked

for, U.S. Express, you know, I had the chance to spend some time with him, and you know, take a trip with him to the company headquarters one time.

Q.    And when was that, approximately?

A.    I want to say 2002.  I'm not sure.  I don't want to --

Q.    Okay, but --

A.    I don't want to say, give a date and it's not the correct date, but --

Q.    Okay.

A.    -- we had, I had the opportunity -- he was with U.S. Express, and he wanted me to join their team, and he asked me to take a ride with him to Birmingham to company headquarters. I said, "Well, I just can't up and go like that."  He called the people and they said, "Yeah, bring him."

Q.    Okay.

A.    So I traveled with him to Birmingham, to their regional -- I think that was their regional headquarters.

Q.    And you think this was some time around 2002?

A.    Yes.

Q.    And you drove with him in the truck?

A.    He drove to Hattiesburg, and at that point, from Hattiesburg, I drove into Birmingham for him.

Q.    Okay.  And did that truck have any special technology?

A.    The truck had one of the newly installed, it's a QUALCOMM satellite system that's used to track trucks and to keep in

contact with them.  He had one of those systems in his truck.

Q.    And were you able to watch Alfred use that system?

A.    Yeah, if you call it --

Q.    Can you describe that, please?

A.    We were driving, right before I took over driving for him, we were driving into, I think that was Hattiesburg where I took over.  And the red light came on, and I said, "The red light came on."  He said, "Oh, they trying to reach me."  I said, "Well, are you going to" -- he said, "No, it don't come on while you're driving.  You have to pull over."  I said, "Are you going to pull over?"  He said, "No, I'm not going to pull over.  When I let you drive, I'll pull over and see what they want."

So when we pulled over at the truck stop, I said, "I want to see how this thing works.  This is something new.  It's nice, computer in the truck."  He said, "I'm not going to use that.  I'm going to go call them."  And that's what he did.  He went and called the dispatcher.

Q.    Okay.

A.    And they wanted to find out if he wanted to take another run, but he told them that, "No, I'm coming in with my cousin."  He told them, "Y'all are supposed to talk with him, and then I'm supposed to have another load going back to Louisiana."  And that was that, you know.

Q.    Uh-huh.  When you -- did you have any interaction with any

other people that worked at that company when you got to Alabama?

A.    Yeah.  We got to Alabama, we got there early that morning, so they hadn't got there yet, and around 8:00 o'clock, we went there, and I met with the officials there.  There was an orientation class.  I took the orientation class.  And right after the orientation, when they broke for lunch, Alfred asked me to come with him to join him for lunch.  He was taking a couple of the dispatchers out to lunch, you know, for being nice to him and, you know, that was his -- he was treating them to lunch.  So we took them out to lunch.

Q.    And when you say, "for being nice to him," what do you mean by that?

A.    Helping him -- he said they help him out with his paperwork, you know, keep him on, you know, making sure that, you know, he had the loads that he wanted and that, you know, they made sure his paperwork, if there was a problem or anything, they interceded for him.

Q.    So Alfred is what they call an over-the-road trucker?

A.    Yes.

Q.    And do you know what kind of routes -- I always say the word wrong.

A.    Routes.

Q.    -- routes he drove?

A.    He ran a dedicated route.

Q.    What is a dedicated route?

A.    A dedicated route is, for instance, you would go -- his route that he had, he would go to Chalmette, Louisiana, to Domino Amstar Sugar Refinery, pick up liquid material to make Coke, Coca-Cola beverages, and go to Atlanta, to their -- to their manufacturing warehouse, just drop that off.  And then just back and forth.

Q.    So that's an example of a dedicated route?

A.    That's a dedicated route.  You run that route.  That's the only thing he does.

Q.    Okay.  And so your, that's your understanding of most of his career, he was driving dedicated routes.

A.    Yes.

Q.    Would Alfred ever admit he was having any difficulties to you?

THE COURT:  Please call him by his name.

MS. LARIN:  I'm so sorry.  Would Mr. Bourgeois -- it's been a long day, Your Honor.

BY MS. LARIN:

Q.    Would Mr. Bourgeois ever admit to having any difficulties or weaknesses to you?

A.    No, not really.  He was pretty much a proud guy.  And he wanted everybody to feel he was on the same playing field that he was on.  Now, you know, when I would get the paperwork, and if something wasn't right, I would call it to his attention.

He said, "Oh, man, I forgot.  I was thinking about this.  I was, you know, you know, trying to get off, you know, and tie," you know, but he wouldn't just come out to me and say, "Hey man, I have a problem.  Can" -- you know.  He wanted to be independent, you know, be on the same level as the other drivers.

Q.   Okay.  And what is your profession right now, your occupation right now?

A.   Okay.  I'm employed with RSC Equipment Rental.  I'm the inside sales manager.  My job title is inside sales.  I also do all the training for the employees.  I'm the defensive driving training.  I also train all employees and potential and current customers how to drive scissorlift, forklifts, manlift.  Anything that we have, I have to train new employees how to operate it and certify them that they can operate it before we allow them to operate them on their own.

Q.   And you testified at the penalty phase of Mr. Bourgeois's trial?

A.   Yes, I did.

Q.   And it came out at trial that you had a prior conviction, or some prior convictions?

A.   That's correct.

Q.   And had you told trial counsel or anyone from the defense team about those prior convictions before you testified?

A.   On initial visit when they came to visit me on my job, I

asked them would that be a problem with me going, because of that. And they told me, "Hey, it's been a while. You've fulfilled all your obligations. You haven't had any problems with the law. You know, you've been an upstanding citizen. You know, everybody's entitled to one mistake, you know, and it's evident that you, you know, you've made your corrections and you're doing what you have to do." It wouldn't be a problem.

Q.   Okay. Who was it that you talked to about this?

A.   Mr. Bierbaum.

Q.   And when you said he came out to your job, this was in Louisiana?

A.   He actually came and visited me --

Q.   Okay.

A.   -- on my place of employment --

Q.   Okay.

A.   -- when he came to talk to me about the trial.

        MS. LARIN:  No more questions, Your Honor.

        THE COURT:  Thank you, ma'am.

              CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Hello, Mr. Henry.

A.   Hi.

Q.   You have been consistently here for Alfred, haven't you?

A.   Yes.

Q.   You came and you got beat up the last time because of your convictions.  Right?

A.   That's correct.

Q.   And, but didn't you testify that your convictions were expunged?  Isn't that what you told the Court?

A.   I was misinformed when I told them that.  That was in error.

Q.   Okay.  But hadn't you told the Defense Counsel that your criminal history had been expunged?

A.   No.  When Mr. Bierbaum came, I told -- when he came to my job, I informed him that I had the convictions --

Q.   Uh-huh.

A.   -- and that I fulfilled all my obligations to the Court.

THE COURT:  Well, why did you say you were misinformed about them being expunged?

THE WITNESS:  Well, I was in the process, and they told -- what the Court had told me, that once I complete my probation and everything, that it would -- the interpretation they gave me, that it would automatically be expunged, under -- I can't think of the plea agreement that they did.

THE COURT:  Okay.  So you thought they were expunged?

THE WITNESS:  Yes.  Yes, ma'am.  I thought they were expunged.

BY MS. BOOTH:

Q.   All right.  And you had told that to Mr. Tinker, hadn't

you?

A.    I can't remember Mr. Tinker.

Q.    Do you remember --

THE COURT:  Well, one of the lawyers for Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  Do you remember telling him that?

THE WITNESS:  No.  The only person I talked to, I told Mr. Bierbaum --

THE COURT:  Okay.

THE WITNESS:  -- that -- he and I had talked in detail about that when he came to my job.

THE COURT:  And you told him they had been expunged.

THE WITNESS:  And I told -- yeah.  I said, "I fulfilled my obligations, and that upon completion of my probation and everything, my court obligation, that it would be expunged."

THE COURT:  Thank you, sir.

BY MS. BOOTH:

Q.    And that's exactly what you testified to in the courtroom the last time.  And you were the police officer that had the three convictions for fraud.  Right?

A.    Insurance fraud, that's correct.

Q.    Insurance fraud.  Okay.  Now, but back to what I was talking about, you have been consistently there for your

cousin, haven't you?

A.   Him and all my employees.

Q.   All right.  But I mean you are -- so you were born in 1965?

A.   1963.

Q.   '63.  And he was born in 1964.  So y'all are about a year apart.  Right?

A.   Okay.

Q.   Okay.  And when you were growing up, did you live in The Bend?

A.   On the weekends and during the summer.

Q.   Okay.  And when is it that you first met Alfred?  How old was he?  Was he living at his mom's house, or was he living somewhere else?

A.   Well, I'm not going to say when I first met him, because I've known him all my life.

Q.   Okay.

A.   So I can't say when I first met him.

Q.   So you knew him, and y'all were, I guess you were friends --

A.   Peas in a pod.

Q.   Peas in a pod, that's good, when he was living with his mother.

A.   That's correct.

Q.   And do you remember if he moved somewhere else?

A.    Yes.

Q.    And where did he move to?

A.    He moved with Ms. Mary Clayton.

Q.    All right.  Now, I believe you testified before that, I mean about that before, and why was it that Alfred ended up over at Ms. Mary's?

A.    Alfred ended up with Ms. Mary because as a child in the community she observed, seen and was privy to the abuse that he was subjected to with his parents.

Q.    Uh-huh.

A.    So she took him in.

Q.    Now, do you remember testifying about this before?

A.    Yeah.

Q.    All right.  And do you remember saying that, yes, when someone, when Mr., I believe it was Mr. Gilmore asked you, "Do you recall a time when he went to live with someone else?" That was the question.

      Do you remember saying, "Yes, as there was an elderly lady in the community.  She goes by the name of Ms. Mary Clayton. When she got up in age, she couldn't care for herself.  So at that point in time, she asked Eunice, could one of her daughters come and live with her to help her, help assist her, and you know, bathing and making sure that she took her medicine and eating and stuff like that.  And none of the daughters wanted to go.  So Alfred's mother, Eunice, insisted

that he go.  So you know" -- and then you went on to tell how,

at 5:00 in the evening, when the other kids were out playing or

doing stuff, Alfred was stuck over at Ms. Mary's helping her.

A.    Yeah.

Q.    Now, is that true?

A.    That's correct.

Q.    Okay.  And when he was -- did you ever visit him at

Ms. Mary's?

A.    Uh-huh.

Q.    Okay.  Do you know how old he was when he went to

Ms. Mary's?

A.    I think seven.

Q.    Okay.  So he was seven, and he was put over at Ms. Mary's

house to take care of an elderly lady.

A.    To assist her.

Q.    To assist her, right.

A.    Yeah.

Q.    Did she have any problems with any of her legs?

A.    Yeah, one of -- she damaged -- one of her legs was injured

in a car accident.  On her way to church, she was sitting on

the tailgate of the truck.  A guy made a sudden stop, and she

damaged her leg.  And she didn't want to go to the doctor.  And

as a result, she had trouble with one of her legs.

Q.    All right.  And so in this house where he lived starting

at seven, did they have running water?  Or did they have to

bring water in to take a bath?

A.   I can't -- I can't answer that, because I can't be for sure.  I mean, that was a while back.

Q.   Right.  Right.  You were, like what, eight years old --

A.   Eight years old.

Q.   -- when he moved there?

A.   Yeah.

Q.   So you two guys are first graders.

A.   Yeah.

Q.   And you're visiting on the weekends and in the summers.  Right?

A.   Yes.

Q.   And so what are the things that he would do?  You said that he would make sure that she got her medicine?

A.   Yeah.

Q.   And make sure that she ate?

A.   She had her food there, and he would make sure that she had her food.  He didn't cook.

Q.   Uh-huh.

A.   He didn't say, "Okay, you need to take two prescriptions of this."

Q.   Uh-huh.

A.   He would make sure -- she would say, "Get that pill bottle there for me," and he would do it in that sense.

Q.   Okay.

A.    He didn't -- when I said "care" --

Q.    Uh-huh.

A.    -- he was there, more or less there.  If she fall, she had somebody there to get help.

Q.    Okay.  And did he help her to take her to the bathroom so she could bathe?

A.    No.  To my knowledge, no.

Q.    Okay.  All right.  So bathing and making sure she took her medicine.  So you didn't -- okay.  But you did testify to that earlier.

A.    When I said "bathing," he may have ran her water.

Q.    Okay.

A.    You know, that's -- typically, that can be described as assisting her taking a bath.

Q.    Right.  Right.  Now, did Ms. Mary cook?

A.    To my knowledge, yeah.  She baked pies, she baked cakes. I mean, she was the baker lady.

Q.    All right.  Did she sell things out in the community?

A.    Yeah.

Q.    And did Alfred help her take those things out there and sell them?

A.    He would carry the bags that she had the pies in, and when she get to the church, some of the church sisters would help her with the pies and everything.

Q.    Okay.  And how about her house, who kept her yard?  Isn't

that something that Alfred did?

THE COURT:  Please call him by his last name.

MS. BOOTH:  I'm just as bad --

THE WITNESS:  Ms. Clayton.

BY MS. BOOTH:

Q.   Isn't that something that Mr. Bourgeois did?

A.   As he got older.

Q.   Uh-huh.

A.   As he got older, we all did.  We cut grass, you know, and stuff like that.

Q.   Right.  Normal stuff that boys do?

A.   Yes.

Q.   Cut the grass, take out the trash.  Right?

A.   Yeah.

Q.   Now, Alfred has beautiful green eyes, doesn't he?

A.   Well, I'm a man --

Q.   Oh, okay.

A.   -- I'm not going to say he got beautiful green eyes.

Q.   As Alfred got older, he was an attractive male to the girls, wasn't he?

A.   Well, I'm going to let you say that.

Q.   So as -- sorry.  You got me there.  I have to back up a little.

A.   Take your time.

THE COURT:  You got her all flustered there.

MS. BOOTH: I'm all flustered.

BY MS. BOOTH:

Q. Okay. Now, when he was young, seven and eight, and you were his buddy, and you were talking about the school situation, you didn't go to the school he went to, did you?

A. No.

Q. All right. And you never helped him with his homework or anything like that. Seven- and eight-year-old boys don't get together to tutor, do they?

A. No.

Q. No, didn't think so. Now, as he got older and you were working for Schwegmann's, and you actually got him the job. Right?

A. No, he got the job himself. I --

Q. He got the job by himself? Okay.

A. He was hired -- he went, put the application in, to my knowledge. Got hired as a porter.

Q. Okay.

A. And he wanted to get on the trucks. He was fascinated by it.

Q. Okay. Now, do you know how old he was when he did this? Was he still in high school when he did this?

A. No, because you had to be at least 18 -- I think it's 21 now -- but back then, before they grandfathered everybody in, you had to be at least 18 to hold a chauffeur's license.

Q.    Okay.

A.    To my knowledge.

Q.    And so if I had an application that he filled out and it said that he started there in '85, in, you know, June of '85, that would have made him probably about 19.  Was that about the time you remember him working there?

A.    Could be.

Q.    Okay.  And how long did you -- did you work there the whole time that he worked there?  Or did you move on to another job?

A.    I think he left before I did.

Q.    Okay.  And when you were -- and if I have a thing that says here that he worked there for about five years, that would have been to about 24, would you have any problem with that estimation?  So from 19 to 24, he worked at Schwegmann's?

A.    Okay.

Q.    Okay.  And during that period of time, 19 years old, you start him driving the -- what was it called, the buggy car?

A.    Well, he didn't start --

Q.    No, he started as a porter, right?

A.    As a porter, yeah.

Q.    But when you got him to the buggy, to the buggy, that was just a pickup with a trailer on it?

A.    With a trailer on the back, yeah.

Q.    Okay.  So he was driving a pickup truck that had a

trailer.

A.    Yeah.

Q.    And he had a driver's license to do that?

A.    Driver's license, yeah.

Q.    Wow.  And driving a trailer is not as easy as it sounds, is it?  Because you have to maneuver one vehicle while you're anticipating the moves of another part of that vehicle.  Isn't that correct?

A.    Yeah.

Q.    Okay.  Now, so then he moved up to a van.  Is that what you called it?

A.    Yes.

Q.    And is that -- when you say a van, is that like a minivan, a van like that?  Or are we talking about like an 18-wheeler?

A.    It's not an 18-wheeler.

Q.    It's a little bit --

A.    It's pretty much like a stake body truck --

Q.    Okay.

A.    -- with a closed body on it.

Q.    All right.  And then you put everything in the back.

A.    Put everything in the back.

Q.    Okay.  And that was -- how old would he have been when he started doing that?  Twenty?  Twenty-one?

A.    Twenty, twenty-one maybe.

Q.    Okay, 21.  And then he -- and you said that he did that

for about five years, and working with Mr. Calvin, and he learned how to schmooze the girls, right, with the cupcakes and the birthday remembrances. Right? So we have Alfred pulling into these --

THE COURT: He's shaking his head yes. He's not responding, but --

BY MS. BOOTH:

Q. Right. So we have Alfred with these pretty green eyes going into these, going into the different --

THE COURT: Mr. Bourgeois.

MS. BOOTH: Mr. Bourgeois. I'm sorry.

BY MS. BOOTH:

Q. -- with these pretty green eyes, driving into the stores to make deliveries, with cupcakes, remembering birthdays, and so he's having an easier time with his loading and unloading. Right?

A. That's right.

THE COURT: Sorry?

THE WITNESS: That's correct.

THE COURT: Okay. Can you hear him, Ms. Gano?

COURT RECORDER: Just barely, Your Honor.

THE COURT: Okay. Can you move up, please?

THE WITNESS: Sure.

THE COURT: Put your right arm on the shelf in front of you.

THE WITNESS:  Okay.

THE COURT:  And it makes you go right into the microphone.

THE WITNESS:  Oh, okay.

THE COURT:  Thank you, sir.

THE WITNESS:  How's that?

THE COURT:  Perfect.

BY MS. BOOTH:

Q.   That's good.

A.   Okay.

Q.   Now, did you help him get a job with Poole Trucking Lines?

A.   No.

Q.   All right.  Now, Poole Trucking Lines, that's the big 18-wheelers.  Right?

A.   Yeah.

Q.   All right.  And you didn't help him.  He got that all by himself.

A.   To my knowledge.  I didn't -- the last company, like I said earlier, that I know he worked with was Matlack, and after that was U.S. Express.

Q.   Right.  Did you know that he also got a job at Eagle Motor Lines?

A.   No.

Q.   All right.  Did you know that he had -- you said that he had a designated route there to Birmingham.  Right?

A.    That's with U.S. Express.

Q.    With U.S. Express.  Do you know that he traveled all over the United States?  In fact, he fathered the child that was murdered down in Livingston, Texas.  Did you know that?

A.    I didn't know where that -- you know, at that point I kind of lost contact with him, because I had moved on and he had moved on.  I was spending less time in the country because I was doing things in New Orleans, so I kind of lost track with him for a while.

Q.    Yeah.  Well, he seemed to be doing pretty well, didn't he?

A.    Well, I can't answer that because, like I said, I had lost contact with him, you know.

Q.    Did you ever visit the home that he bought?

A.    I visited the home -- I think that was the home, for a bachelor party for one of his brothers.  I think that was the home.  It was a home in LaPlace.  I know that.

Q.    A home in LaPlace.  Did he have a swimming pool when you were there?

A.    I don't know.  I didn't go in the backyard.

Q.    So you didn't know he had a swimming pool?

A.    No.

Q.    All right.  Did you know that he owned a motor bike?

A.    I heard.

Q.    Okay.  Did you know -- and he rode that thing around.  Did you hear about that?

A.    I heard.

Q.    Okay.  And he had a sports car at one point, didn't he?

A.    I don't know about that.

Q.    Did you hear about that?  Okay.  So when is the last time really, Mr. Henry, that you really had any good contact with him?  Was it like up to Schwegmann, and then y'all kind of lost contact?

A.    When he left Schwegmann, you know, he pretty much went on his own and was doing his thing, and I was pretty much doing my thing.  And we kind of connected back.  I mean, we would see each other occasionally at church, because you know, if he was home, he was at church on Sundays.  So we got the chance to talk, you know, on Sundays at church, you know briefly, you know, but it was never nothing about business or anything or what you're doing.  It was just casual conversation.  You know, we'd talk, we'd be talking about, and we kind of connected back when he was with U.S. Express.

Q.    Okay.  And let me -- and so at that point, he was trying to get you a job.  Right?

A.    Yeah.

Q.    Okay.  Now, Jacob Clayton, do you know who that is?

A.    A lot of the Claytons -- like you called him Jacob Clayton.  I may not know him by Jacob Clayton.  You got -- he has a nickname.  All of them have nicknames, so you've got to give me the nicknames, because I was real small when they were

pretty much around.

Q.   Okay.  And how were Ms. Clayton's family?  Were they nice to you?  Were they a nice group of people?

A.   The daughters.  I didn't meet many of her sons.

Q.   Okay.  Now, did you -- you said you were at church.  Did you go to Evergreen Baptist Church?

A.   That's correct.

Q.   Okay.  And did you go to Sunday school?  Because y'all are about the same age.

A.   That's correct.

Q.   Did you sing in the choir?

A.   Sang in the choir.  Still do.

Q.   Okay.  And did Mr. Bourgeois sing in the choir?

A.   For a time, yeah.

Q.   All right.  Now, do you have good memories of the time that you spent at Evergreen Baptist Church?

A.   Fond memories.

Q.   Fond memories.  Would you consider that place a safe place to go to?

A.   I consider every church a safe place to go to.

Q.   Okay.  So if I told you that your Sunday school teacher was raping Alfred, what would you say about that?

A.   Well, it didn't happen at church.

Q.   Okay.  What if I told you he said it happened during choir practice?

A.   Well, I would have to -- I don't know.  But I'm saying it didn't happen, you know, during Sunday school.  Choir rehearsal, that's something else.  But it didn't happen during Sunday school.

Q.   Okay.

MS. BOOTH:  You know, Judge, could I just have a minute?  I don't think I have much more.

THE COURT:  Yes, ma'am.

(PAUSE.)

MS. BOOTH:  I have nothing further, Your Honor.

THE COURT:  Thank you.  Anything further?

MS. LARIN:  Very briefly.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   In part, just to clarify the record, you trained Mr. Bourgeois, or you saw Mr. Bourgeois being trained at Schwegmann's, and what -- can you just tell us, he started on the buggy truck, and then did he learn all the trucks?

A.   He went on the buggy truck.  Like I said, he, we moved him up to the bobtail truck, we called it, the bobtail truck.  He didn't do well on that.  We put him back on the buggy truck.  Then we moved him to the -- when another position came available, we tried him again on the bobtail truck, and we kept him on Point A to Point B, Point A to Point B.

Q.   And then did he eventually learn how to drive an

18-wheeler while he was at Schwegmann's?

A.    Yeah, Mr. Calvin, we put him under the tutelage of Mr. Calvin, and he trained him how to drive the tractor-trailers.

Q.    Okay.  And there was a brief mention about a license.  And at the time that Mr. Bourgeois was learning how to drive trucks, what type of license was required?

A.    It was a chauffeur's driver's license.

Q.    And that's not the same thing as a CDL today.  Correct?

A.    No.  It was before the CDL license was introduced.  A chauffeur's license was something that was done on a statewide level.  And after so many accidents and everything, the federal government learned that drivers were going, if they get a DWI in Louisiana, they would drive 40 miles into Mississippi and get another driver's license.  And they would continue their career.  So that's brought on the concept we're going to make it so we can track all these drivers, make sure that they all was on the same playing field.  So they made -- that's how the CDL came about.

Q.    Okay, great.  And there was one other mention that, talking about yard work and stuff, and talking about what all the normal kids did in the neighborhood.  Would you have characterized Mr. Bourgeois as normal as far as his abilities when he was a child?

A.    No.

Q.   And what would you say?

A.   Well, he, you know, he didn't learn how to, when most kids were learning to ride a bike, he still hadn't grasped the concept.  My parents bought us a bike.  It was a bike with two seats, so on weekends, me and Alfred, we would ride that bike, you know, because he would always ride on the back with me.  And we would, it made him seem normal, he was all with the other kids riding.  But because he didn't, he was still yet hadn't learned how to fully ride the bike by himself.

MS. LARIN:  Okay.  Thank you.  No further questions.

THE COURT:  Thank you.

MS. BOOTH:  I don't have anything further, Your Honor.

THE WITNESS:  Thank you all.

MS. LARIN:  Thank you.

THE COURT:  Thank you, sir.  Call your next witness.

MR. McHUGH:  Donald Reese.

MR. WISEMAN:  Your Honor, while we're waiting for the witness, could I advise the Court that during this last witness's testimony, I conducted a computer search of the file that was provided to us by Mr. Gilmore, and there is no resumé or CV from Park Dietz in it.  Moreover, there's no communication in it that I could find from the Government with regard to --

THE COURT:  So you're complaining that the Government

failed an obligation during the trial?

MR. WISEMAN:  Well, I have two complaints, or two issues.  One is I don't know what the Government told Mr. Gilmore or Mr. Tinker with regard to Park Dietz.  If there was a written communication of some sort, I would like to receive it.

My second complaint, which may or may not be one --

THE COURT:  Well, if there's a written communication, you got it in Tinker and Gilmore's file.

MR. WISEMAN:  Well, that's what I'm saying --

THE COURT:  If it's not there, then it wasn't a written communication.

MR. WISEMAN:  Well, that's my request, is there a communication that the Government might have that -- you know, I don't know that Mr. Gilmore's file is in perfect shape.  I mean, it was given to us.  We scanned it, and I don't know that it has everything.  So if they have a communication, I would ask that it be produced so I can see what they told him.

My other complaint, which is a possible one, it's not an actual one yet, is this question about Rule 12.2, but that depends on what they had Park Dietz do.  And I don't know that either at this point.  So I don't actually have a complaint.  But I'd like to see what they told Mr. Gilmore at this point.

THE COURT:  Okay.  Now, I'm just going to suggest for everybody here, I think we're all aware that Mr. Bourgeois is

fighting for his life, and we all recognize the solemnity of these matters and the advocacy of both sides. I suggest, however, that you make a conscious effort to do this as smoothly as possible. To be disrespectful to the Court never advances the cause of your client. So be very careful with that.

So call your next witness.

MR. McHUGH: Donald Reese, Your Honor.

(Witness sworn.)

MR. McHUGH: Good afternoon, Mr. Reese. I just want to caution you at the outset, please do not touch the microphone.

THE WITNESS: Okay.

MR. McHUGH: You can lean into it with your right hand --

THE COURT: But you probably should lean up just a little bit more, so we can hear you better. Actually, I haven't heard you at all, but --

THE WITNESS: How is that?

THE COURT: You might want to lean your right arm on the shelf, and then you're right there in the microphone. Is that going to be uncomfortable for you?

THE WITNESS: I can deal with it, I think.

THE COURT: All right. Thank you, sir. Go ahead.

DONALD REESE, PETITIONER'S WITNESS, SWORN

                          DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Can you state your name for the record?

A.   Donald Howard Reese.

Q.   Mr. Reese, how old are you?

A.   Forty-nine.  I just made a birthday.  I'm sorry.

Q.   Okay.  And where do you reside?

A.   In New Orleans.

Q.   Okay.  And how are you presently employed?

A.   As a driver, truck driver.

Q.   Okay.  And for what company?

A.   A company called Neff Rentals.

Q.   Okay.  And --

          MS. SALINAS:  I'm sorry.  I couldn't hear him, Your
Honor.

          MR. McHUGH:  I'm sorry.

          THE WITNESS:  A company called Neff Rentals.

BY MR. McHUGH:

Q.   Okay.  So you drive a truck for Neff Rentals.  Is that
right?

A.   Yes.

          THE COURT:  N-E-F-F?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Thank you, sir.

BY MR. McHUGH:

Q.   Okay.  Do you know the Defendant, Mr. Alfred Bourgeois?

A.   Yes.

Q.   Okay.  And how did it happen that you came to first meet him?

A.   Employed at Schwegmann's.  That's where I came to know Mr. Bourgeois.

Q.   Okay.  And where is Schwegmann's located?

A.   St. Rose, Louisiana.

Q.   Okay.  And what type of company is that?

A.   It's a -- well, now it's -- it was a chain grocery store that's no longer in existence.  It went under.

Q.   What type of position did you have with Schwegmann's?

A.   I drove trucks there.

Q.   Okay.  And how about Mr. Bourgeois?

A.   He was also employed as a driver.

Q.   Okay.

A.   When I knew him.

Q.   So would it be fair to say you guys were co-workers?

A.   Yes.

Q.   Okay.  Now, did there come a time when you were working at Schwegmann's and Mr. Bourgeois was working at Schwegmann's where there was a change in the rules concerning taking a test for a commercial driver's license?

A.   Yes.  While I was employed there, the federal government employed CDL, commercial driver's license.  Anyone driving had

to have a CDL.  Prior to it, basically anyone who wanted to drive a truck just had to apply for a chauffeur's license.

Q.   Okay.  And so to get the CDL, what did you have to do?

A.   Take the test that they came out with.

Q.   And did that apply to all of the drivers at Schwegmann's?

A.   Yes.  Yes, it did.

Q.   Okay.  And do you recall, can you recall an incident or a time where prior to the taking of the test that yourself, other employees, including Mr. Bourgeois, received copies -- received a copy of the test prior to the test being taken?

A.   Yes.  Yes, they --

Q.   Can you describe that for Her Honor?

A.   Well, basically when the system was employed, they wanted everyone to make sure that they complied with the changes.  And in order to do so, we had some people that, you know, management felt kind of iffy if they would be able to adhere to the new regulations by passing, you know, the new test.  So it was a test that was floating around that everybody just knew that this was copies of the original test --

Q.   Okay.

A.   -- that you had to take.

Q.   When you say "they were concerned," who is "they"?  The company?

A.   The supervisor.  I can't say the company as a whole, but you know, the management who was over us, you know, was

concerned about he had to fill voids if all these drivers didn't pass this test.

Q.   Okay.  And did the drivers talk among themselves --

A.   Yes.

Q.   -- about how to get a copy of this test?

A.   Yes.  Yes, sir.

Q.   And do you recall that Mr. Bourgeois was part of those conversations?

A.   Well, he was part of the employment there with us, and everybody was there, you know, including myself, so --

Q.   Okay.  Now, moving on from that incident, did you eventually leave Schwegmann's?

A.   Yes, I did.

Q.   Okay.  And where did you go?

A.   I went to a company called Matlack.

Q.   Okay.  And what did you do for Matlack?

A.   Drove trucks.

Q.   Okay.  And while employed at Matlack, did Mr., did you again run into Mr. Bourgeois?

A.   Yes, I did.

Q.   Okay.

A.   Yes.

Q.   And by the way, are you friends with Mr. Bourgeois, or were you co-workers?

A.   Just co-workers.

Reese - Direct                                                367

Q.   Okay.  And so how did you run into him at Matlack?

A.   Unbeknowing to me, I'm thinking Alfred had to leave before I did and went over there.  I didn't know he had left.  But in the system, I found out that the guys at Matlack told me, "Okay, well, I see you have one of your co-workers over here." I'm like, "Well, who is that?"  And they say, "Alfred Bourgeois"  I say, "Oh, okay, Bourgeois."  I said, "Okay."  And so I found out, that's how I found out.  He didn't tell me that he was going over there.

Q.   So it was a coincidence --

A.   Exactly.

Q.   -- that you both ended up at the second company, Matlack.

A.   Right.

Q.   Is that right?

A.   Right.

Q.   Okay.  And did there come a point when you were employed at Matlack where you actually worked closely with Mr. Bourgeois?

A.   Yes.  They actually put us together as a team, and I guess that the reason why, because he and I both came from the same place, and we ended up at the same place.  But you know, it was just a coincidence.

Q.   Now, when you say "a team," did they have a term for that, as far as what you --

A.   "Team drivers," that's it.

Q.    So it was called "team drivers"?

A.    Yes.

Q.    So were you both driving the same truck?

A.    Yes.  We were both assigned to the same truck.

Q.    Okay.  And I want to focus you in on that part of your employment with Matlack when you were working with Mr. Bourgeois.  Do you recall an incident where Mr. Bourgeois had trouble with the console of the truck, as far as the buttons?

A.    Yes.  The very first day he and I were assigned to the truck, I thought it odd, for me, you know -- this is the first time that I really came that close with him as a working, you know, partner, companion, well, whatever you call it.  And he was just in the truck just clicking buttons, you know, like click, click, wonder what happens if I do this, do this, do this.  And I just thought it was odd.  And he hit a switch for something that's called a brake retarder.  I found out after he hit the switch what it was.  I didn't know prior to.  And he couldn't, you know, explain or tell me exactly what it was he had done.  And I wasn't watching him, so I didn't know what it was that he did.  And so I'm figuring, okay, something's wrong with the truck, we done did something, and I thought we got it out of whack or tored up or something.  So I said, "Well, let's -- since it is driveable, let's drive it to the mechanic shop and ask them to take a look at it."  And on our way over

there, he kept, you know, he finally told me, "Well, I kept messing with the buttons over there, so I'm going to just start doing this, doing this, doing this."  And so eventually, he hit the right button, and the truck, you know, began to drive properly again.

Q.   Was the truck able to drive properly after he had hit the button the first time?

A.   Well, if you knew what it was that he had done, once you engaged this button, well, then you have to change your procedure of the way you drive the truck, okay.  And I didn't know that the truck was, you know, equipped with this button. He didn't know it.  So I guess we both trying to figure out what's going on.  But at this particular time, he was in the driver's seat, and I was like in the back.  So I didn't know what was going on.  So I said, "Okay, well, you get out of the seat.  I'll take over, and I'll drive it to the maintenance shop," which is right there in the yard, you know, so -- but in the process of doing that, he was like, "Well, I know I kept doing some of these buttons here, you see," and so that's what he just, I guess just kept messing with it.

I kept saying, "Well, leave them alone.  Let's get to the shop."  But he apparently hit the right button and the truck started driving like it was supposed to.  I went to the maintenance shop anyway and asked the mechanics, you know, there what took place, what happened when he was hitting these

series of buttons.  And that's when the mechanic explained to me about the engine retarder button that he had hit.

Q.   Okay.  And after you finally get out of the, you get on the road, you're driving with him now as a team driver, did you consider Mr. Bourgeois someone who talked a lot?

A.   Yes, extremely.

Q.   Can you describe that for Her Honor?

A.   Well, for me, it's like this is my first experience as a team driver.  And the way it was explained to me in the process of the short training period, that while I'm behind the wheel, well, the guy that's working with you should be in the bunk resting, so that when you get tired, he should be fresh to go behind the wheel.  Bourgeois just kept talking, you know.  I'm like, "Well, man, I need you to, you know, go to sleep, you know, do something.  You know, take a nap."  But he just constantly kept talking.  I said, "Well, if you're not ready to rest, I'll let you drive, okay, and I'll go to sleep."  Okay?  And so we did that.  So I let him drive.  But when I get behind the wheel, he still wants to talk.  So you know, it's like -- eventually he would nap in the passenger's seat.  But as far as to stretch out and actually rest like he should, you know, to be fresh as a fresh driver, he didn't really do that, per se.

Q.   And where would you normally stretch out?  Would it be in the passenger's seat or somewhere else?

A.   No, in the -- I'm sorry -- in the back.  There was like a

sleeping, little couch I guess you could say, bed, bunk, in the, behind the seat where you could stretch out the length of the truck. As far as length-wise, it would be from the driver's seat all the way over to the door of the passenger's seat. But it would be behind the little wall that would give you some kind of semi-privacy.

Q. And so are you saying that he would not go back there, he would just sit in the passenger's seat?

A. For most of the time, yes, he would be in the passenger's seat.

Q. And he would keep talking until he fell asleep?

A. He would keep talking. And when he realized he was not talking, he would wake up and talk some more.

Q. Okay. So I guess you would characterize this as he was talking a lot more than normal?

A. Yeah.

Q. Constantly talking?

A. Yeah, yeah, yeah.

Q. Okay. Now, did there come a time that you got lost when Mr. Bourgeois was driving on a trip to Canada?

A. Well, yes. This happened so long ago. Basically, we were supposed to be going to Canada, okay. And the last I can remember is telling him, "Okay, Bourgeois, when we get here, we go north on 75." Okay. And so I took it that he understood what was going on. I mean, you know, I just figured, hey, this

is Bourgeois.  You know, he's a full grown man, and I just told him, "Okay, we're going north."  So I go to sleep --

Q.    And where would 75 have taken you if you had --

A.    Oh, I'm sorry, it would have taken us up through Michigan all the way up to Canada.

Q.    Okay.

A.    Okay, where we would finish our, you know, that particular leg of that run.

Q.    Okay.

A.    But for whatever reason, I woke up and I'm like, I'm getting up out of a daze, and I didn't really, you know, let him know that I was really awake at that time, and I looked and I'm saying, wait a minute.  It's 56 miles from New York.  I said something's wrong with this.  So I asked him, "Where are we at, Bourgeois?"  And he kind of like grumbled, "I don't know.  I don't know."

I'm like, "What you mean you don't know, man?  You're driving.  You've got to know where we're at."

And so at this time I fully awoke and found out that we had passed up I-75.  So I said, "Now we got to turn around, okay, and make up ground."  We went, I mean, just using for instance, if I went 200 miles out of the way, now I got to go back another 200.  So that's 400 miles.  We should have been at our destination by then.  You know?  And that was like one of the first incidents that I had that kind of -- well, actually

the second one.  The one in the yard I really didn't, you know,

count that one, but --

Q.   Okay.  And then did there come another time, another

incident with, where he was driving where you were asleep and

you woke up and found yourself in a situation?

A.   Yes.  That's -- I guess that was the straw that broke the

camel's back for me.  I mean, it's like -- I was in the sleeper

again, letting Bourgeois drive, you know, by himself while I'm

supposed to be asleep.  And I woke up to -- I don't know if

everyone in here is familiar with bulk trailers at that time.

It was like a big old bore, or imagine like a two liter

Coca-Cola bottle, okay, that half full, okay.  And if you shake

it, it creates a slosh.

Q.   You're talking about the load in the back?

A.   The load in the back of the trailer that we were carrying.

Q.   Okay.

A.   And I say that so that, to let you know that if you come

to a red light and if you stop, okay, all of a sudden, well,

the slosh of that liquid product is going to rush up against

the front part of the trailer, okay, the container, and it's

going to make you have a hard bump, boom, like somebody run

into the back of you if you're sitting at a red light.

     So, well, I'm in the sleeper asleep, and all of a sudden

it's like I get this big old hard ba-bump, and it like throws

me forward.  So I'm asleep, and I think, okay, well, we're at a

red light.  So all of a sudden, we get another one.  And it's like boom, and now it's knocking me back the other way.  I'm saying, wait a minute, what's going on.  So I asked Alfred, "What's going on, man?"  And again, I get this grumbling noise, okay.

So another ba-bump comes, so now I'm saying this is not fair to me.  So I say, "Okay, hold up."  I stick my head out the little curtain so I could see where we're at --

Q.   Now, when you say "the little curtain," are you in that sleeping compartment?

A.   I'm in the sleeping compartment, yes, that separates us, you know, the little resting area.

Q.   So you're looking into the cab of the truck now?

A.   Yeah, yeah.  I'm in the little resting area.  So I'm like I'm peeping through the curtain.  And if you look a certain height, you can peep out, and I can look in both mirrors to see exactly what he's looking at from the driver's seat in both mirrors.  So I look to the right, and I'm like, that's not good.  It's odd.  You know, I'm like, why are we so close to the grassy area here?

So I said, "What's going on, Bourgeois?"

Then he finally say, "Okay, I'm stuck."

So I said, "Well, put the truck in park.  Let me see what's going on."

So I get out, look and I shake my head, and I say, "Oh

Lord," to myself. And I look in the back, I get out, and I walk around the truck. Okay. I looked in the inside of the, well, Tennessee, it was in Tennessee -- and I know a lot of people say the hills of Tennessee, but it looked like a mountain to me. It was a mountain. This is how scared I was. And the rear part of the trailer, okay, was in the ditch, okay, along the wall of the mountain. I walk across the street, and I look across the top of the street, and I see nothing but pine trees, the top of pine trees, and I said to myself, I can't -- I can't do this no longer, you know. This is the last -- and from that point, every time I got the telephone, I started whining to the dispatcher or crying, and you know, telling him "Hey, you know, I need to go home, I need to do this, I need to get out." I just, you know, I didn't want to put the bad mouth on Alfred. I didn't want to tell them why I wanted to get out of this truck. I didn't want this man to lose his job, you know, because of, you know, the incident that took place while I was with him.

Q. So in other words, you get out of that situation where the truck is hanging on the cliff of a --

A. Yes, yes.

Q. -- of a hill, the hill --

A. I got out and I took over, and I maneuvered the truck to get it out of the situation and --

Q. And then did you drive the truck all the way home?

A.    No.  We drove, drove to the plant and made the delivery, where the dispatcher had told me to get out of the truck.

Q.    And then how did you get home?

A.    Well, what happened, I asked Bourgeois, I said, "Bourgeois, the dispatcher's going to call," I said, "but you tell them I left the plant walking."

Okay.  And what happened was I got out of the plant, and from that point, Bourgeois took the truck.  And I went to a little corner grocery store, called my wife and told her I needed to get me a Western Union to the nearest bus station, Greyhound bus station.  And I called the bus station, and that was the last I saw of Alfred.  I hadn't seen him since.

Q.    And that was decades ago?

A.    Oh, yes.  That was a long time ago.

Q.    And that's the last time you've ever seen him?

A.    Right.

Q.    And so you took a bus home, rather than ride in the truck with him?

A.    Yes.  I took a Greyhound bus home.

Q.    Okay.  And this particular time frame that we're talking about, the incident in the lot of the company, the incident driving to Canada by way of New York, and the incident where you're hanging over the edge of the hills in Tennessee, how long a time frame are we talking that you --

A.    Approximately about three weeks, a three-week time frame,

yes.

Q.    So this all occurred within three weeks?

A.    Oh, yes.

Q.    And then by that point, you'd had enough.

A.    That was it.

Q.    And one final question, or one final area, I should say.
Did you ever notice during this three-week time frame when you
would go out on the road whether Mr. Bourgeois prepared
properly or was able -- prepared properly for more than one day
out on the road, if you guys were going for a couple-day trip?

A.    Well, to me, it was like no, he didn't, because the stuff
he carried was in like a little bitty small, I guess at this
time it would be the equivalent of like a little bitty Wal-Mart
bag.  And to me, that wasn't --

Q.    And when you say "the stuff he carried," what do you mean?

A.    Just whatever his items were, his toiletries, whatever he
had in his bag, I mean, you know --

Q.    Did he bring enough clothes?

A.    Not to me, no.  To me, he didn't.  Compared to me, I
came -- I would come on with a carry-on suitcase and my little
overnight bag for my toiletries and all that stuff.

Q.    And would you prepare the amount of clothes you'd bring --

A.    Yes, I would.

Q.    -- in conjunction with --

A.    I mean, I would take at least a week's supply of clothes,

I mean, because that's -- they told us, you know, in training, you know, you always -- you never know how long you're going to be out there, so you always be prepared to be gone for a while.

Q.   And did you believe that Mr. Bourgeois was also doing that, or was he doing something different?

A.   I believe he was doing something different, because I never saw a suitcase.  I mean, you know, I figure, hey, we're in the truck together, so I bring my suitcase in, where's yours, you know?  And all he had was a --

THE COURT:  Well, what was he doing?

THE WITNESS:  He had a little -- I'm sorry?

THE COURT:  What was he doing?

THE WITNESS:  He just had a little bag, as far as --

BY MR. McHUGH:

Q.   When you say "a little bag," do you mean like a little plastic shopping bag, something like that?

A.   Basically that's all I can remember, yeah.  That's all I can remember, just a little bitty plastic like Wal-Mart bag or something like that.

MR. McHUGH:  If I could just have a moment, Your Honor.

(PAUSE.)

MR. McHUGH:  That's all I have, Your Honor.

THE COURT:  Thank you.  Ms. Salinas.

MS. SALINAS:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. SALINAS:

Q.   Good afternoon, Mr. Reese.

A.   How you doing?

Q.   You stated that you worked with the Defendant over at Schwegmann's.  Is that correct?

A.   Yes, ma'am.

Q.   How long did you stay at Schwegmann's?

A.   How long did I stay there?

Q.   Uh-huh.

A.   Approximately five to seven years I did.

Q.   Do you know how long Mr. Bourgeois stayed at Schwegmann's?

A.   No, I do not.

Q.   Okay.  So how long of a time were you with Mr. Bourgeois at Schwegmann's?

A.   I could say maybe in the neighborhood of two to three years.

Q.   Two to three years?  Okay.  And Mag Light (sic), you said you went from Schwegmann's, you then moved on to Mag Light -- or I don't know if I'm pronouncing it correctly.

A.   Yes.  Matlack, yes.

Q.   And for you, would you say that was kind of a step up in your career, moving on to Mag Light?

A.   Well, it was an attempt for me to step up, yes, it was.

Q.   Okay.  Because they paid better, they had better benefits

and stuff like that?

A.    They had the benefits, but the pay wasn't as great.  The pay was about equal.

Q.    The pay was equal.  So then why would you say this was a move up for you or a step up for you?

A.    Because at that time I was having additions to my family. I knew at Schwegmann's that they had already told me what the pay scale was, so I was looking for other opportunities to increase my pay scale.  By going to Matlack, I was supposed to obtain better pay, but which, you know, it really didn't.

Q.    Okay.  And as a matter of fact, I think you testified that Mr. Bourgeois actually beat you along the career move.  He was at Mag Light before you were.

A.    Well, according to what I remember about the so-called union thing, okay, they told me that Bourgeois had one day seniority over me.  And in order to get one day seniority over me, that mean he had to start before I did, you know.  So --

Q.    Well, Schwegmann's is not -- is it connected to Mag Light?

A.    No, it's not.

Q.    So you could go to any other company you wanted to go to. You could apply for any other company as a truck driver.

A.    Yes, I could, yeah.

Q.    Okay.  And so Mr. Bourgeois moved on before you did.

A.    I would say.  I'm guessing.  You know.

Q.    Well, when you got to Mag Light, didn't you testify that

Mr. Bourgeois was already there?

A.    I testified that Mr. Bourgeois had one day seniority over me, yes.

Q.    At Mag Light?

A.    Yes.

Q.    Okay.  So he was there.  And you said that they put you all to drive together.  So when you're describing this incident about you all being in the truck and he's pushing the buttons, you didn't know the buttons, and Mr. Bourgeois had only one day prior to you of knowing what the buttons were.  Correct?

A.    Yes.  But what it was is -- I can't testify to him being in this particular truck before me, but it was my first time in the truck, and --

Q.    Okay.  So both of you had had approximately one day in the truck.  He may have had two days in the truck.

A.    No.  The truck was just, say okay, all right, this was a Freightliner truck.

Q.    Uh-huh.

A.    The truck that I was trained in was a Mack truck.

Q.    The truck that you were trained in when you were at Mag Light, or are you talking about --

A.    At Matlack.

Q.    Okay.

A.    At Matlack.  We're talking about Matlack now.

Q.    Right.

A.    It was a Mack truck.

Q.    Okay.

A.    Okay.  So they put us in the truck together.

Q.    Right.

A.    Okay, at the same time.

Q.    Right.

A.    So they trained us on a Mack truck, but they put us in a Freightliner truck.

Q.    Okay.

A.    Okay.  Basically it's like, okay, this is the truck you all are going to be driving.

Q.    Okay.  So you were both unfamiliar with the buttons that were in the Freight (sic) truck.

A.    I can't say we were both.  I can say I was unfamiliar.

Q.    Okay.  But I just want to make clear what you said that Mr. Bourgeois had only been there a day more than you had been.

A.    According to the --

Q.    Okay.

A.    -- guy that they told me about the seniority, yeah.

Q.    Okay.  So that's all I was saying is that you would agree that the buttons were pretty familiar -- were pretty unfamiliar to both of you.

A.    Well, I can say they weren't familiar to me.

Q.    Okay.  That's all right.  And matter of fact, he got that problem fixed out in a few minutes.  Right?  You said he hit

the right button and it got straightened out?

A.   I guess after I chastised him, well, yes, if you want to say something like that.

Q.   Okay.  And kind of like when you get a new car and you're pushing all the buttons to figure out how things work?

A.   No, I don't do that for a new car.

Q.   Oh, not for you.  I was just saying --

A.   Okay, yeah.

Q.   -- Mr. Bourgeois's behavior was like people when they get a new car --

A.   Well, people I don't know --

Q.   -- trying out the buttons?

A.   I don't know that.  I mean --

Q.   That's not unheard of.  Right?  You've heard of people doing that, playing with the buttons, saying, "Hey, let me see what this one does, and let me see what that one does."

A.   Not with that expensive vehicle, no.

Q.   No?

A.   No.  I mean, you don't just go around pressing buttons on $100,000 vehicle without knowing what they're for.

Q.   Okay.  Okay.  But that's one way to find out how they do.  Right?

A.   Like I said --

Q.   Well, you said that after --

A.   I wouldn't do it.  I wouldn't do it.

Q.    Okay.

A.    In other words, before I knew or tampered with something, I would like to know what it is I'm tampering with.

Q.    Okay.  But you would agree that everybody has their own way of learning how to handle things or how to learn things.  Correct?

A.    Sure, people do things different from what you do, yes.

Q.    Right.  Not everyone does things the way you do.

A.    Right.

Q.    Doesn't mean that they're doing it wrong or incorrectly?

A.    It doesn't mean that they're doing it right either.

Q.    Right.  Now, you stated that he talked a lot, he liked to talk a lot.  Is that correct?

A.    Yes.

Q.    But when he was behind the wheel, you never said anything, or according to your testimony that I heard when you were asked about his behavior when he was driving, you never, you didn't describe any instance when he fell asleep when he was driving.  Correct?

A.    I was asleep myself, so I never knew what was going on.  That's why I was scared.

Q.    Okay.  But certainly if he had fallen asleep, you would have felt the jerking movement --

A.    I can't say that, ma'am.  I mean, you know --

Q.    Okay.

A.    -- people nod off, you correct yourself, you wake, I don't know.

Q.    And, but you're driving an 18-wheeler.  Correct?

A.    I'm not -- at that time I wasn't driving.  I was asleep.

Q.    The vehicle you were in, Mr. Reese, with Mr. Bourgeois was an 18-wheeler.

A.    Yes.

Q.    And you can feel the maneuvers in an 18-wheeler.

A.    Not necessarily.  You can go off the line and not know it.

Q.    Okay.

A.    You can get behind the wheel and go off the line and not know it, and you're driving.

Q.    Okay.

A.    It depends on the road.

Q.    Where were you all going when you were driving for Matlack?

A.    Jesus, that was over 20 years ago.  I really couldn't tell you.

Q.    So it wasn't --

A.    All I can tell you the specific incident, because it was like, hey, a slap in the face.

Q.    Well, let me ask you this, were you traveling all over the United States?

A.    We didn't have enough time.  Only had three weeks.  I mean, we were obligated with the company because they told us,

yes, you will be going all over the United States.  And in that three-week period of time frame, I said I could not go do that.

Q.    Okay.  And you've already said that, so just listen to my question.

A.    Okay.

Q.    In the three weeks that you were driving with Mr. Bourgeois, where did you all go?

A.    That was over 20 years ago, I really couldn't tell you.  I really couldn't.

Q.    Did you go out of state?

A.    We went to Canada once that I can remember, because we finally did get to Canada.  I think we may have went into -- I really can't tell you.  Chicago maybe.  I don't know.  At this point I would be guessing.

Q.    So it wasn't, they weren't the same, you weren't making the same trip back and forth.

A.    No.  Oh, no, no, no, no, no, no.

Q.    Okay.

A.    It wasn't dedicated, no.

Q.    Okay.  And you were describing something about when you're in Tennessee, and I don't know if I can draw on this board, but you mentioned you were talking about how the tractor was on the -- the trailer was on the side of the road, the cliff?

A.    Yes.  It was somewhere in Tennessee, yes, it was.

Q.    Okay.  And I don't know -- so there's a road -- let me

see.  There's a mountain.  Right?

A.    Okay.

Q.    And then there's a road where you drive.  Right?

A.    I'm listening, yes.

Q.    And then there's more mountains as you go in Tennessee.

A.    Okay.

Q.    And you said that the trailer was on the side of the mountain.  And then you walked over and you could see the trees.

A.    Yes, the top of the trees, yes.

Q.    So it wasn't really hanging off the cliff.  You were over here in the ditch, you said.

A.    Exactly.  In the ditch, and the tractor was headed toward the cliff, yes.

Q.    Okay.  So now when you all are truck drivers, there are numerous truck stops throughout the United States, right, where truck drivers stop, they get refreshment, they can take a shower?

A.    Yes.

Q.    That kind of stuff?

A.    Yes.

Q.    And you can actually even wash your clothes at some of these truck stops?

A.    Yes, you can.  Yes.

Q.    And did y'all do that?

A.   I didn't, no.  I didn't.  I mean, because what I would do, I would take ample enough clothes that I would hope that I wouldn't run out, okay.

Q.   Okay.

A.   But in the event that I did, now, I guess you can say eventually I would.  But I think that I can remember.  I can't say I did, no.

Q.   Okay.

A.   I can't say I did.

Q.   And that's because that's how you prepare.  You like to take a lot of clothes just in case.

A.   Yes.

Q.   Like I pack.  Just in case.

A.   I don't know how you pack, but that's how I do.

Q.   Okay.  And there are some people, who Mr. Bourgeois may not have wanted to be a big packer like you, and a washateria at a truck stop would take care of his problem, wouldn't it?

A.   I guess.  I don't know.

        MS. SALINAS:  Okay.  I have no further questions for this witness, Your Honor.

        THE COURT:  Thank you.  Anything further, sir?

        MR. McHUGH:  Just briefly.  But the training that had --

        THE COURT:  Could you come to the microphone --

        MR. McHUGH:  Oh, I'm sorry.

THE COURT:  -- please, sir?

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   But the training that you had with this company was to bring more than one night's worth of clothing.  Is that fair to say?

A.   Yes.  In other words, the guy that trained me told me, "Hey, when you guys hit the road, you never know how long you're going to be gone, so you need to bring ample enough stuff with you."

Q.   Okay.  So by Mr. Bourgeois bringing a plastic bag with a small amount, one set of clothes, is that --

MS. SALINAS:  I'm going to object to that.  He never said he had one set of clothing, Your Honor.  He just said he had a small bag and never testified to how much was in that bag.

THE COURT:  Sustained.

BY MR. McHUGH:

Q.   Could you tell how much clothes he had?  Did he have four nights' clothing like you?

A.   He -- no.  Basically if I had -- well, I know for a fact that we had to stay in the hotel one time, and he kind of like, to me, I thought it was gross, but he washed his underwear, you know, with just regular hand soap and just like hung them out over the room.  So I just took for granted that the only thing

he had in the bag was underwear.

MR. McHUGH: Thank you. I have nothing further.

MS. SALINAS: I have a few more questions.

RECROSS-EXAMINATION

BY MS. SALINAS:

Q. Mr. Reese, do you know whether or not Mr. Bourgeois had the kind of money you did or whether or not he didn't have enough money to --

MR. McHUGH: Objection, beyond the scope.

THE COURT: Overruled.

BY MS. SALINAS:

Q. -- to be carrying all that clothes?

A. No, I do not know.

Q. Okay. And I want to go back to something I had forgotten about. You were talking about the fact that the drivers at Schwegmann somehow got the answers to the driving test.

MR. McHUGH: Objection, Your Honor, beyond the scope.

MS. SALINAS: Your Honor --

THE COURT: Overruled.

BY MS. SALINAS:

Q. Do you remember that?

A. Would you ask the question again?

Q. You talked about that the drivers somehow got information, the answers to the test so they could pass and get their CDL's.

A. Yes.

Q.    And --

A.    Okay.  It was -- in other words, when I got the information, it was supposedly an alleged test that if you take this piece of paper here and just remember these questions, this will be the test, so you don't have to worry about what the test is, just remember the answers.

Q.    Did you do that?  Did somebody give you the answers?

A.    I seen the paper, yes, I did.

Q.    Did you do that?

A.    No, I didn't --

Q.    Did you memorize the answers?

A.    -- because that had no significance to me because of the fact that at that point what I was doing with my chauffeur's license, the test wouldn't help me at all.

Q.    Okay.  So do you know whether or not Mr. Bourgeois at that time had the chauffeur's license?

A.    Strongly I would say yes.

Q.    He had his license --

A.    I would say yes.  In order for you to drive a truck at Schwegmann, you had to have a chauffeur's license, yes.

Q.    So he already had that test.

A.    I'm sorry?  I thought you said chauffeur's license.

Q.    He had already taken -- so then he had to take the test to get the CDL.  Is that what you're saying?

A.    In order for him to move on, yes.

Q.   Okay.  And you're saying it was the answers to that test that everybody had.

A.   I -- all right.  I'm not exactly sure.  All I know is that the test that was presented to me was floated around the shop. Everybody had it, you know, everybody had to get it, this, that and the other.

Q.   Oh, okay.  So let me get this straight.  So you can't tell the Court that Mr. Bourgeois did what you described.

A.   I can't tell that he didn't.  Are you saying --

Q.   You can't tell this Court --

THE COURT:  Did he -- what she's asking you is do you have any information that Mr. Bourgeois got the answers in advance to any test he took?

THE WITNESS:  Yes.  I would say he did.

THE COURT:  How do you know that?

THE WITNESS:  Well, because everybody did.

THE COURT:  Well, do you have personal knowledge that Mr. Bourgeois did that?  Did you see him with them?

THE WITNESS:  Personal knowledge?

THE COURT:  Yes.  That's what -- that's the only thing you can testify to.

THE WITNESS:  No, no.  I can't really personally say that yes --

THE COURT:  Thank you.

MS. SALINAS:  I have no further questions, Your

Honor.

THE COURT:  Anything further?

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You may -- I'm sorry.  I can't hear you.

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  You stand up -- you all have a little problem on this side.  Stand up when you address the Court, please.

MR. McHUGH:  I apologize, Your Honor.  Nothing further.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MS. LARIN:  Your Honor, we would call Mr. Murray Bourgeois.

MR. ROBERTS:  Your Honor, just for the record, I'm going to hand Mr. Wiseman Park Dietz's CV, John Shaw's CV, and a presentation that John Shaw had prepared for us at trial that we never used.

THE COURT:  Do you have a copy?

MR. ROBERTS:  I'm giving him a copy -- I'm giving them the -- oh, a copy for the Court?

THE COURT:  No, I meant for you.

MR. ROBERTS:  We've got copies electronically, Your

Honor.

THE COURT:  Okay.

MURRAY BOURGEOIS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good afternoon, Mr. Bourgeois.

A.   Good afternoon.

Q.   Can you please state your name for the record?

A.   Murray Bourgeois.

Q.   And can you tell us what year you were born?

A.   1952, September 7th.

Q.   And are you related to Mr. Bourgeois?

A.   Yes, I am, second cousin.

Q.   To Mr. Alfred Bourgeois?

A.   Second cousin.

Q.   Second cousin.  What does that mean?  Who's related to who?

A.   That means that his mother and my daddy was first cousins. His mother daddy and my daddy's daddy were brothers.

Q.   Okay.  And did you grow up on The Bend?

A.   All my life.

Q.   And can you describe The Bend to us?

A.   I guess you could say one of these places that --

THE COURT:  Is he going to have a different description than everybody else?

MS. LARIN: Well, I'm trying to get -- I'll try to move on.

THE COURT: Okay.

MS. LARIN: Thank you, Your Honor.

BY MS. LARIN:

Q. Can you tell us the families, how the families were related on The Bend?

A. Well, I guess you could say there was kind of like maybe two or three families that was kind of like closely related.

Q. Okay, and --

A. But they was more or less, they controlled the whole Bend Lane.

Q. Okay. And are the houses on The Bend, are they old?

A. Oh, yeah.

Q. How old?

A. All of them. For example, the house I was born and raised in, I'm 58, so that house got to be 120 years old at least.

Q. When you say "born," you mean born in --

A. I was born in the house.

Q. Okay. And would it be safe to say that some of these, that these families have been living together on The Bend all the way back to slave time?

A. Right, all their lives.

Q. All, I mean, all the generations have been living back --

A. Right, uh-huh.

Q.   Okay.  And you lived on The Bend, and at some point, were you a part of the Armed Services?

A.   Yeah, United States Marine Corps.

Q.   And when was that?

A.   From December 29th, 1971, to January 21st, 1974.

Q.   And did you serve overseas?

A.   Yeah.  The last of the Vietnam Conflict.

Q.   So in '71 when you left, Mr. Alfred Bourgeois would have been about seven, turning seven, or six -- six to seven?

A.   Somewhere around in there.

Q.   And when you came back, he was about ten.

A.   Uh-huh.

Q.   All right.

        THE COURT:  You have to answer with words, sir.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Thank you.

BY MS. LARIN:

Q.   And do you have any recollection of Mr. Bourgeois when he was age six and under, before you left to go in the Marines?

A.   Yeah.  Well, he was a kid that was a lot younger than me. But from time to time we would go by their house, playing ball in the yard, and you know, I would see him.

Q.   And was there anything that stood out to you about him?

A.   Yeah, he got mistreated, treated different more than the rest of his sisters and brothers.

Q.   And how did you --

     THE COURT:  Did you see that?

BY MS. LARIN:

Q.   Did you see that?

     MS. LARIN:  Thank you.

     THE COURT:  I'm sorry.

     THE WITNESS:  Yes, ma'am.

     MS. LARIN:  I'm slowing down.  Sorry.

     THE COURT:  I'm sure that was going to be next.

     THE WITNESS:  Yes, ma'am, I did.  Well, from time to time, you would see, you know, after he would have gotten a beaten or whatever, he would have red -- he light complected already, he would have red whelps on him.

BY MS. LARIN:

Q.   This is what you saw on Alfred?

A.   Oh, yeah, yes, ma'am.

Q.   And why do you think it was more significant abuse than what might have been happening to his brothers and sisters?

A.   I don't know really all the details, but I know for sure he was always treated different.  He was always treated different.  And he was abused more than the rest.

Q.   Okay.  And do you recall his mother, Ms. Eunice Bourgeois?

A.   Yeah.

Q.   And are you aware if she tended to drink alcohol?

A.   Yes, ma'am.  She drank every day.

Q.    Okay.  So let's fast-forward to when you returned from your time in the service.

A.    Uh-huh.

Q.    This time Alfred is about ten years old.  Did you move back to The Bend?

A.    Yeah, I moved back home.  I was back home.

Q.    Okay.  And did you have that opportunity to observe Alfred in those years after your return?

A.    Yes, ma'am.  He was kind of hanging around the shop doing, helping, you know, with mechanic work, trying to do mechanic work like Lloyd and myself and my dad.

Q.    Okay.  So "the shop," you mean a mechanic shop?

A.    Yeah, mechanic shop.

Q.    Okay.  And you worked, you spent time at least and worked on cars in this mechanic shop?

A.    Right.

Q.    And who else spent time there?

A.    Lloyd.

Q.    Lloyd is --

A.    And -- Lloyd is Alfred's brother.

Q.    Okay.

A.    And Alfred, you know.  He was there sometimes.

Q.    Okay.  So why was Lloyd -- what relationship did you have with Lloyd that's different than everybody else?

A.    Well, Lloyd looked up on me almost like a big brother

image.

Q.   And did Lloyd move into your family's house at some point?

A.   Yeah.  When I had to go to the service, Lloyd moved in with my grandparents and my mother and dad.

Q.   Okay.  And so your father was in the mechanic shop?

A.   Right.

Q.   And Lloyd, and you would spend some time there, and you would see Alfred there.

A.   Right.

Q.   Okay.  And were you trying to teach Alfred how to work on cars?

A.   Yeah.  Every time we'd get some project going on, we would try to, you know, fill him in on it to try to teach him a few things.  But he couldn't grasp none of that.

Q.   Okay.  What do you mean -- well, give us some examples of, you know, what would he not be able to do to help.

A.   Well, if we was working on taking a starter off a car, and I told him, say, "Go catch me that 9/16 wrench" or "that half-inch socket," he didn't know what I was talking about.

Q    And then if you showed him, the next day would he know?

A.   Hmm, not really.  He'd forget.

Q.   Okay.  So do you know, was this for any lack of interest on Alfred's, Mr. Bourgeois's part?

A.   Well, he was trying to, you know, he would try, but he was slow to catch on.  This mechanic thing was like too fast of a

pace for him.

Q.   Okay.  Even -- when you say "this mechanic thing," even the identification of different tools.

A.   Right.  Right.

Q.   So you were not talking about, you know, taking apart an engine and putting it back together again.

A.   Oh, that would never happen.

Q.   Okay.  That would never happen?

A.   No.

Q.   Okay.  Were you aware when Mr. Bourgeois started driving an 18-wheeler?

A.   Well, I wasn't around when he first started.  Later on when he started coming around.  But when he first started, he was having a lot of trouble.

Q.   And --

A.   Because one of his good friends, Wardell, used to ride with him.  He used to come back and tell us stories, how "Man, you don't want to ride with Alfred.  When Alfred make a right-hand turn, everything on the corner come with him, garbage can, trees, stop sign, the front of somebody car, he going to hit it."

Q.   But it's your understanding as he grew older and had more experience, he improved as a driver?

A.   Somewhat, you would say.

Q.   Okay.  Was there anything -- and you did have some contact

with Alfred in his adult years?

A.    Yeah.

Q.    About how often would you see him, do you think?  This is, you know, twenties, thirties.

A.    Oh, not too often, because he worked a lot.  I worked a lot.  Because he used to like to wrestle.

Q.    Oh, really?

A.    Yeah.

Q.    Okay.  Was there anything unusual you noticed about Alfred in those years?

A.    Well, that he -- well, he was slower than most of the guys, you know, catching on to a lot of things.  So you know, well, and like I mentioned to him all the time how some people --

      MS. BOOTH:  Your Honor, I've got to object.  I'm sorry.  Yes, sir, I'm sorry, I didn't mean to be disrespectful to a Marine, but there's been a lot of testimony here, and there's no time period.  I need a time period what we're talking about.

      THE COURT:  Can you do that, please?

      MS. LARIN:  Yes.  All I did narrow it down to was like when he was in his twenties and thirties, but --

      THE COURT:  When who was --

      MS. LARIN:  If you could narrow it down more than that, that would be helpful.

Murray Bourgeois - Direct                                                402

THE COURT:  When who -- "he," who's the "he"?

MS. LARIN:  Mr. Bourgeois.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  Twenties and thirties?

MS. LARIN:  When he was an adult, is what I meant.

THE COURT:  Okay.

BY MS. LARIN:

Q.   But if you could narrow it down to a time that you're speaking about, that would be very helpful.

A.   The time that --

Q.   You said it struck you that he seemed slow, even as an adult.

A.   Right.  But well, I would consider him a young man at the time.  I wouldn't know no specific age.  Maybe early twenties, something like that, that you know, he was slower than most people.  You know, he couldn't grasp things like other people did.  You know, kind of uncoordinated.  He used to try to do things like we'd do, like ride motorcycles and stuff like that, but he couldn't catch on to that.

Q.   Do you remember a time, any trouble specifically that he had in riding his motorcycle?

A.   Well, he had one particular incident that he borrowed this guy 3-wheeler, and he told the guy he could ride it.  Well, the guy that -- told him, said, "Look, man, I don't think so."

"Oh, man, I can ride it.  I can ride it.  I can ride it."

    He took off going down the street.

Q.    This is Bend Lane?

A.    Down Bend Lane.

Q.    Uh-huh.

A.    And ran smack into a telephone pole.  They had to take him to the hospital.

Q.    Is there --

A.    Yeah, he got seriously hurt.

Q.    And would you have -- is it pretty hard to run into a telephone pole?

A.    Well, the part of the 3-wheeler he didn't know is like the steering is not really so much in the steering.  It's kind of like -- excuse my French -- the cheek of your butt, that's part of your steering.  And he didn't know that.  Something that slow.  I mean, he wasn't used to riding it.  He wasn't familiar with it.  And if you'll just turn your, you know, shift your weight, that would steer the bike.

Q.    And he just --

A.    But he didn't know that.

Q.    Okay.

A.    He just took for granted, he saw other people doing it, I'd do it, Lloyd do it, and the other guys do it, and it looked simple.  It looks simple if somebody else is doing it.  But if you try it, it ain't that simple.

Q.   Okay.  And --

            MS. LARIN:  One second, Your Honor?

            THE COURT:  Yes, ma'am.

      (PAUSE.)

BY MS. LARIN:

Q.   So do you have any information, do you think Mr. Bourgeois could fix a lawn mower?  Was he able to do that when you were working with him in the mechanic shop?

A.   Absolutely not.  No, ma'am.

Q.   Why are you so sure?

A.   I think he would try and try to make an attempt, but he just didn't have the mechanical skills to do that.

            MS. LARIN:  Okay.  Okay, thank you, Your Honor.  I have no more, no further questions.

            THE COURT:  Thank you, ma'am.

                          CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good afternoon.  My name is Patti Booth, and I just want to get the time line kind of --

A.   Okay.

Q.   -- a little clearer for me.  First of all, Mr. Murray, you were born in '52.  Is that correct?

A.   Yes, ma'am.

Q.   So you are 12 years older than Mr. Bourgeois, Mr. Alfred Bourgeois.

A.    Uh-huh.

Q.    All right.  And do you know if he always lived with his mother or if he lived with someone else when he was growing up?

A.    No, as a kid growing up, he used to live with Ms. Mary Clayton, that used to live in the back of the land, an elderly lady.

Q.    Okay.  And Ms. Clayton, I think you gave a statement on it.  Why is it that Mr. Alfred Bourgeois went to live with Ms. Mary?

A.    I'm not really sure.  I believe because of the environment that he was in, and they was really trying to get him -- Ms. Mary really felt sorry for him, and she was trying to get him out of that environment.  He was, you know, by being abused and I guess she feel, felt like she could give him a better home.

Q.    And was Ms. Mary frail?

A.    Ma'am?

Q.    Was Ms. Mary frail?

A.    Frail?

Q.    Frail.  That's what's in your statement, "frail," that Ms. Mary was frail.  Do you remember giving this statement?

A.    Ms. Mary was kind of handicapped because she had --

Q.    Okay.  So frail isn't your word --

A.    Yeah.

Q.    -- right?

A.    No, she was --

Q.    Okay.

A.    -- I guess you would say handicapped, because she walked with a stick.

Q.    Right.

A.    Kind of limped.

Q.    But I have a declaration in front of me that you signed. I think --

      MS. BOOTH:  Could I approach the witness, Your Honor, and just show it to him?

      THE COURT:  You want to show him --

      MS. BOOTH:  Oh, this is going to be hard.  You know I'm challenged here.  Is it okay if I just show him his --

      THE COURT:  Yes.  It may be quicker.

      MS. BOOTH:  Thank you, Judge.  Yes, it will be.

BY MS. BOOTH:

Q.    Is this your pretty handwriting right there?

A.    That's it.

Q.    All right.  And do you recognize this document?

      THE COURT:  But you have to question from the podium.

      MS. BOOTH:  Yes.  Yes, sir -- yes, ma'am.

      THE COURT:  Please.

BY MS. BOOTH:

Q.    And do you recognize that you signed an affidavit, a declaration for the Public Defenders?

A.   Yes, I did.

Q.   Okay.  But the word "frail" was not your word?

A.   My -- maybe they might have misunderstood me.  "Frail," what would I be -- because it actually, what type of person is Ms. Mary?

Q.   Uh-huh.

A.   Ms. Mary was an elderly lady.  She was, I would say handicapped maybe you would say.

Q.   Did she have any problem with her legs?

A.   She was crippled.

Q.   Okay.

A.   Well, I don't know what happened to her leg, but she used to walk with a stick, with a limp.

Q.   All right.

A.   So that was her condition.  But I mean, she got around everywhere she wanted to go.

Q.   And do you remember telling the Public Defenders that Ms. Mary was the mother of the church?

A.   Right.

Q.   And that she didn't have a husband?

A.   Right.

Q.   And that Alfred's mom said that he had to stay with her because Ms. Mary was frail -- or your word is "handicapped" now.  Right?

A.   That's right.

Murray Bourgeois - Cross                            408

Q.   Okay.  So did you ever visit with Alfred when he was at the home of Ms. Mary?

A.   No, I didn't.

Q.   Okay.  Now, if you said that you went to serve in Vietnam in 1971 and you didn't come back till 1974, about 1971 is when Alfred would have been about six.  Do you know when Alfred went to live with Ms. Mary?

A.   I couldn't say specifically.  All I knew, it was when he was a young kid.  I couldn't give you no age time frame.  I couldn't really say for sure.

Q.   Okay.  But you were living in LaPlace, or I mean -- excuse me -- you were living on The Bend when he was living with Ms. Mary?

A.   Yes, ma'am.

Q.   All right.  And now you talked about the fact that he would come to the shop and y'all would try to include him --

A.   Uh-huh.

Q.   -- in repairing cars.  Was this before or after you went to Vietnam?

A.   Before and after.

Q.   Before and after.  So when he was coming in the shop, he was about five years old?

A.   Yeah.

Q.   And you were trying to teach him tools and things?

A.   Uh-huh.

Q.   Okay.  And he was having a difficult time with it?

A.   Well, you're not really expecting him to fix something.

Q.   Right, oh, no.

A.   No.

Q.   Just go get that.  Right?

A.   Yeah, "I need you to go get this," "Go get that."  You know, like the first stage of learning.

Q.   Right.  And so at five years old, he was having a difficult time remembering tools.  And those are -- would you agree with me that being -- that it is a gift to be able to work in mechanics, that not everybody has it?

A.   Yeah.

Q.   And are you, is your testimony that Mr. Bourgeois did not have that particular gift?

A.   Right, because he was kind of slow of learning.  Well, you wouldn't judge that when he was five years old.

Q.   Uh-huh.

A.   You would kind of give him that judgment on that later on in life --

Q.   Okay.

A.   -- when he's still trying to do the same thing, you know, and he really can't achieve it.

Q.   Okay.  So when you came back from Vietnam, he was around ten.

A.   Uh-huh.

Q.   And --

THE COURT:  You have to answer with words.  I'm sorry, sir.

THE WITNESS:  I'm sorry, ma'am.  Yes, ma'am.

BY MS. BOOTH:

Q.   Okay.  And so did you, did he come to the shop then when he was ten?

A.   Yes, ma'am.

Q.   All right.  And you said that Lloyd was better at it, but do you know how much older Lloyd is than Mr. Alfred Bourgeois?

A.   I'm not really sure, but he's older.

Q.   Yes, sir.  If I told you it was about four or five years --

A.   Yeah, that sound about right.

Q.   And so it might make a difference that Mr. Bourgeois having a little more trouble, and if he didn't have the gift, and you compare that to somebody that's five years older and somebody -- did Lloyd have the gift?

A.   Lloyd, he learned along the way.

Q.   Uh-huh.

A.   I mean, he didn't know mechanic work.  He was like, you know, he came up working with my dad, working with myself.

Q.   Uh-huh.

A.   And he learned along the way.  But he learned at a young age, you know, as he came along.

Q.   And it seems like you're very proud of Lloyd and all that he's accomplished.

A.   Yes, ma'am.

Q.   All right.  And now with Alfred, do you know what age he was when he moved away from Ms. Mary?

A.   I'm not specifically sure.

Q.   Did you know that he had to live here and live there and really didn't have any support system, any clear support system when he was still in high school?

A.   No, I'm not aware of that.

Q.   Okay.  Did you know that he got his first job over at -- and I'm going to mispronounce it -- Swaggart's, Swiggerd's?

A.   Schwegmann's.

Q.   Schwegmann's, Schwegmann's -- by going in and applying and getting the job himself?  Did you know that?

A.   I knew he worked at Schwegmann's.  I didn't know all the details.  I knew he worked there, though.

Q.   All right.  And did you know that he worked his way up from a buggy driver -- and I said it wrong.  It's a buggy -- buggy, buggy truck, buggy something, to driving the big truck?  Did you know that he worked his way up when he worked at that store, or worked for that company?

A.   I'm not really sure.

Q.   Okay.  Did you know that he got his CDL and he began to be an over-the-road trucker and that he would drive as far up as

Murray Bourgeois - Cross                                412

Canada and down through Texas and Birmingham, and he's been all over the United States driving a great big truck?

A.   Well, I knew he, that's what he did for a living, more or less.  But I couldn't say, you know, how far he went --

Q.   Okay.

A.   -- how far he drove.

Q.   But you knew that he did that for a living.

A.   Right.

Q.   Now, you testified earlier, which -- about his wreck on a 3-wheeler.  He was 19 when that happened.  Right?

A.   I'm not really sure what his age was.  I wouldn't be so sure.

Q.   Okay.

A.   But he was a teenager, early twenties for sure.

Q.   Okay.  And he had never been on a 3-wheeler, had he, when he took this little drive?

A.   I don't know the whole story.  I know he -- well, he asked the guy to take a ride.  He told the guy that he could ride it.

Q.   Uh-huh.

A.   But that was the detail that came back to me.  So I said, "Well, he told you he could ride it?"  I say, "I never saw him ride a 3-wheeler before."

Q.   Okay.  So he just was pretty adventurous and took a ride on this 3-wheeler and didn't know to move his --

A.   Yeah.

Q.    -- back side.  Right?

A.    Right.

Q.    Okay.  So, and you testified that it's harder than it looks to do that.  Right?

A.    No, it's not that simple.

Q.    Okay.

A.    But if you did it once, you could do it a thousand times.

Q.    Okay.  But if you hadn't done it before, you could end up on a telephone pole.  Right?

A.    You're in a world of trouble.

Q.    All right.  So when he was with Ms. Mary, was that a good time for him?  Do you think that she treated him properly?  Or you don't know?

A.    I couldn't say for sure, but I mean, just looking at the situation, I would say it was a good time for him.

Q.    Okay.

A.    It seemed to be.

Q.    Did you go to the Evergreen Baptist Church?

A.    Do I ever go?

Q.    Did you go during that period of time when he was younger, when you were back from Vietnam?

A.    No, very seldom.

Q.    Okay.  So you didn't know the Sunday school teacher there or anything, did you?

A.    Most of the Sunday school teacher was -- well, some of the

people that was living the land, like this girl, Vanessa Scott, and people like that, and I knew that from hearing them talk about it.  Going out there often, I wasn't one of the members.

Q.    Okay.  Did you know Ms. Mary's sons, Jacob --

A.    Yeah.

Q.    -- different --

A.    Yes, ma'am.

Q.    Okay.  And did Alfred tell you that Ms. Mary's sons were raping him every day?

A.    I never heard that one.

Q.    Okay.  Did he ever tell you that the Sunday school teacher raped him at church during the choir meetings?

A.    I didn't know that either.

        MS. BOOTH:  Okay.  That's all I have, Your Honor.

        THE COURT:  Anything further?

        MS. LARIN:  Yes.  Your Honor, I would like to mark Petitioner's statement marked P-40 and admit it into evidence, if there's no objection.

        THE COURT:  It's already marked, isn't it?

        MS. LARIN:  It is marked.  I'd like to offer it.

        THE COURT:  Okay.  Then you want to offer it?

        MS. LARIN:  Yes.

        MS. BOOTH:  I have no --

        THE COURT:  P-40?

        MS. BOOTH:  Is that the --

MS. LARIN:  P-40, Petitioner's 40 is the --

MS. BOOTH:  It has two pages.

MS. LARIN:  It is.  I lost --

MS. BOOTH:  That's fine.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, I hate to be fussy, but --

THE COURT:  Since when?

MS. BOOTH:  Yeah.  It's, he's -- it's just cram-packed with hearsay, even hearsay from the legal team.  I mean, you know, it's --

THE COURT:  So that's your objection?

MS. BOOTH:  That's my objection.

THE COURT:  Sustained.

MS. LARIN:  Could I respond?

THE COURT:  Sure.

MS. LARIN:  We would like to offer it because the doctors did rely on it when they were making their opinion, so --

THE COURT:  Sustained.

MS. LARIN:  Okay.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   And one other question, following up on the legal team, did anyone from Mr. Bourgeois's legal team, defense team, prior to the trial in 2004 approach you and talk to you about

Mr. Bourgeois's background?

A.   No, ma'am.

Q.   That's a very long question.  Did you speak to anyone from Mr. Bourgeois's legal team in 2004?

A.   No, ma'am.

Q.   Or 2003?

A.   No, ma'am.

Q.   All right.  Is the first time you talked about Mr. Bourgeois's background in relation to his case when people from my office approached you?

A.   Yes, ma'am.

Q.   Okay.  If trial counsel, as we call it, if the legal team at trial had spoken to you in 2004, would you have testified at his trial if they had asked?

A.   Restate that for me.

Q.   Sorry.  I'm so not speaking well right now.  If they had asked you to testify at his trial, consistent to what you did today, would you have testified at Mr. Bourgeois's trial?

A.   Yes, I would have.

        MS. LARIN:  Okay.  Thank you.  I have no further questions.

        THE COURT:  Thank you.  Anything further?

        MS. BOOTH:  No, Your Honor.

        MR. McHUGH:  Dr. Dailey.

        MR. ROBERTS:  Your Honor, can we take a brief recess?

Case 2:19-cv-00392-JMS-DLP   Document 1-4   Filed 08/15/19   Page 979 of 1316
PageID #: 1288

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL ACTION |
| | ) | |
| PLAINTIFF, | ) | CR-C-02-216(1) |
| | ) | |
| VS. | ) | CORPUS CHRISTI, TEXAS |
| | ) | SEPTEMBER 23, 2010 |
| ALFRED BOURGEOIS, | ) | 8:53 A.M. |
| | ) | |
| DEFENDANT. | ) | |
| ..............................) | | |

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 4
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:               MR. TONY ROBERTS
                             MS. ELSA SALINAS
                             MS. PATTI HUBERT BOOTH
                             MR. MARK DOWD
                             ASSISTANT U.S. ATTORNEYS
                             800 N. SHORELINE, STE 500
                             CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:                MR. MICHAEL WISEMAN
                             MR. VICTOR J. ABREU
                             MS. ELIZABETH LARIN
                             MR. JAMES McHUGH
                             ASSISTANT FEDERAL DEFENDERS
                             SUITE 545 WEST, CURTIS BUILDING
                             601 WALNUT STREET
                             PHILADELPHIA, PENNSYLVANIA 19106

THE COURT RECORDER:           MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

wanted to ask if it was okay with defense if Dr. Moore stays in.  If not, we'll just have him leave.

MR. WISEMAN:  Oh, yeah, that's totally fine.

THE COURT:  Okay.  Would you administer the oath.  Thank you.

THE CLERK:  Yes, Your Honor.

J. RANDALL PRICE, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

THE COURT:  You may proceed.

MR. DOWD:  Thank you, Your Honor.  Dr. Price, be very, very careful with the microphone, please, especially with the --

THE COURT:  I think he has been in here listening to that.

MR. DOWD:  Okay.  I just want to be off the hook.

DIRECT EXAMINATION

BY MR. DOWD:

Q   All right.  Now, would you state your full name for the record and spell your last name, please?

A   Yes.  My full and legal name is Jack Randall Price, P-R-I-C-E.

Q   All right.  And how are you employed, Dr. Price?

A   I am a clinical and forensic psychologist and neuropsychologist.

Q   All right.  And how long have you done that work?

A    I have been teaching psychology since 1972 and I have been in the independent practice of psychology and neuropsychology since 1983.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 2 and ask if you can recognize -- did you have a chance to look through this multipage document prior to your testimony today?

A    I did.

Q    All right.  And what is this?

A    It's the most recent copy of my curriculum vitae.

Q    Okay.  Does this accurately reflect your history and your achievements?

A    Yes.

Q    All right.

MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 2 into evidence.

MR. WISEMAN:  No objection.

THE COURT:  Government's Exhibit 2 is admitted.

(Government's Exhibit 2 admitted into evidence)

BY MR. DOWD:

Q    All right.  And if you could give us the highlights of your, just brief highlights of your education, any professional organizations you belong in, any board certifications you enjoy, how long you have been practicing. I'll just let you fill that in.

A    Okay.  I have a bachelor's, a master's and a PhD in psychology from the University of North Texas in Denton, Texas, a post-doctoral internship at the Baylor Institute for Rehabilitation, a post-doctoral fellowship from the University of Kentucky.  I am board certified in forensic psychology.  I am board certified in the field of neuropsychology.  I have been in practice since 1983.  I am licensed to practice psychology in the state of Texas and the state of Oklahoma.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 3.

THE COURT:  Where are you teaching?

THE WITNESS:  I am on the faculty at the University of Texas Southwestern School of Medicine as a clinical professor of psychiatry.  I am also a, I have a position on the faculty of the School of Law at Southern Methodist University as a lecturer in law where I team-teach a class in psychiatric and psychological evidence.

BY MR. DOWD:

Q    All right.  And, sir, would you look at the overhead and I'll ask you if you can identify it as Government Exhibit Number 3?

A    I can.  It is a list of all testimony that I have given since 1997 when I began to keep such a file.

Q    All right.  And you reviewed this multipage document

prior to your testimony?

A    I did, yes.

MR. DOWD:  Your Honor, we would offer Government Exhibit Number 3 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry?

MR. WISEMAN:  No objection.

THE COURT:  Government's 3 admitted.

(Government's Exhibit 3 admitted into evidence)

BY MR. DOWD:

Q    And in connection with your past testimony, did you, were you the expert, were you qualified as an expert witness in the Valdez case here in Corpus Christi, the state case that the Court referred to earlier?

A    I was.

Q    And what role did you play in that case?

A    I conducted an evaluation of the defendant at the request of his attorneys and testified in the state case and also in the, in the habeas proceeding after that.

Q    In this court?

A    It was not in this court, as I recall.  But it was, it was on appeal and I testified, but --

Q    Was Judge Jack the judge, presiding judge?

A    I, no, it was a male judge, I know that, and --

Q    Okay.

A    But I don't recall his name.

Q    All right.

THE COURT:  In this case?

MR. DOWD:  In the Valdez case, the state case.

THE COURT:  Oh, sorry.

MR. DOWD:  The state case that the Court had referenced earlier.

THE COURT:  Oh, I had that.  What happened with that case, as you know, it went up, I said it was ineffective assistance of counsel because he was mentally retarded.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And there was no research, no mitigation, no nothing.  So Fifth Circuit reversed me but in the interim the Supreme Court came out with the Atkins case, so, and that case said it should be decided state-by-state, so it went, I think it either went back to me or I sent it over to the State Court to determine the state requirements for mental retardation.  And in fact, everybody's expert apparently testified in that case that he was mentally retarded.

THE WITNESS:  That's correct.

THE COURT:  Including the Government's witnesses.

MR. DOWD:  Yes, Your Honor.  And was --

THE COURT:  So there you have it.

BY MR. DOWD:

Q    Was that the proceeding that you were referring to when you said you testified?

A    It was, yes.

Q    All right.

THE COURT:    But it wasn't a male judge, it was actually Judge Sandra Watts.

MR. DOWD:    Oh, Judge Watts, okay.

BY MR. DOWD:

Q    And, in addition, did you also testify in the Penry case, a significant case in Texas?

A    I did.

Q    All right.  And in what role did you testify in the Valdez and the Penry cases?

A    As an expert in psychology and the evaluation of mental retardation at the request of the defense.

Q    And what would you estimate your practice is, give me a ratio between your work for the prosecution and your work for the defense.

A    Since 1997 it's approximately 55 percent at the request of the defense and 45 percent at the request of the state.

Q    All right.  And how many times have you testified as an expert in neuro and forensic psychology?

A    A total, in the last 13 years since I have kept a file on this, 237 times.

Q   All right.

          MR. DOWD:  Your Honor, we would proffer Dr. Price as an expert in neuro and forensic psychology.

          THE COURT:  Any objection?

          MR. WISEMAN:  Just one question on voir dire, if I may?

          THE COURT:  Sure.

                    VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q   Dr. Price, did I hear you say you are a professor of psychiatry or did I mishear that?

A   No, you didn't mishear that.

Q   Okay, you are a professor of psychiatry?

A   Yes, it's, because that's the department at medical school.

Q   I see, okay.

A   And then there is a division of psychology that's under the psychiatry department there.

Q   Okay.  Do you actually teach psychiatry?

A   Well, I don't, no, I teach the field of psychology and forensic psychology, and in the fellowship program for forensic psychiatrists, I've taught classes in that to psychiatrists.

Q   I see.

          MR. WISEMAN:  No objection, Your Honor.

THE COURT:  All right, then he will be admitted.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Accepted for that.

MR. DOWD:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUES

BY MR. DOWD:

Q    In connection with your duties, Dr. Price, did you have occasion to do a psychological evaluation of Mr. Alfred Bourgeois in this case?

A    I did.

Q    All right.  And in connection with that did you prepare a report?

A    I did.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 1 and ask if you can identify this?

A    Yes.  That is a copy of my report of psychological evaluation in this matter.

Q    All right.  Your Honor, we would -- and is this report accurate, accurately reflect your conclusions and findings?

A    It does.

MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 1 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 1 is admitted.

(Government's Exhibit 1 admitted into evidence)

MR. DOWD:  Thank you, Your Honor.

THE COURT:  You-all have got to stop that.

MR. DOWD:  Don't say thank you?

THE COURT:  Yes.

MR. DOWD:  Yes, Your Honor.

THE COURT:  You're welcome.

BY MR. DOWD:

Q   Dr. Price, let me start with the concept of malingering. Explain what is meant by the psychological term malingering as relates to testing and evaluations.

A   It's defined as intentionally feigning or grossly exaggerating an illness for an external incentive such as compensation, to, possibly to avoid punishment or to lessen punishment in a criminal case, so it's the intentional feigning or gross exaggeration of the disorder.

Q   All right.  And can there be degrees of malingering or feigning?

A   Sure.

Q   All right.  And what is the TOMM test or the Test of Memory Malingering?

A   It is a test that is designed and has been studied to detect or to check to see if someone is feigning amnesia of a type or feigning the poor ability to recall certain kinds of data or information that pertained to them or some event.

Q    So it's designed to see if someone is faking amnesia?

A    Right.

Q    Okay.  And is it a fail-safe method to expose a malingerer in other psychological tests or evaluations?

A    No.  It is a test of effort and it's a very, if a person is faking on that test, it's a pretty good sign that they may be faking in areas other than the memory process, but it's designed to see if they are faking as it relates to their ability to recall information.

Q    All right.  And if someone was found not to be malingering as a result of the TOMM test, would that be proof certain that there is no malingering going on?

A    No.

Q    Why is that?

A    Well, it's one test and to, it's ideal to have several tests that would look at different areas of faking.  It's, it's a pretty transparent test, some people can see through it.  It's very, very easy, and if a person scores much less than chance, they are trying to get the incorrect answer.  So, it's a, it has a, it has a kind of a floor effect that it's for gross exaggeration.

Q    All right.  And as far as obtaining aberrant information or untrue information, is the choice of sources who are providing background history, can that be a further reason for giving an aberrant history of someone?

A    Well, it's a good idea in any forensic evaluation to have collateral information either from the records, if they are, if it's possible to have those, or from talking to other people who are acquainted with the person that you are evaluating to corroborate and to get real world information about how they behave such as, in a case like this, with adaptive behavior.

Q    All right.  And is there a danger or a risk if you limit your background informants to friends and family members?

A    Sure.

Q    And what is that risk?

A    Well, it's common that friends and family have a bias and want to try to help the person, and it can be intentional or it can be just a mindset or response style that they have. Ideally, the people that you talk to as informants are collateral sources, ought to be as objective of individuals as you can find that don't have a reason or don't have the mindset or the response style that can flavor their answers to your questions.

Q    All right.  And if you were told that in Mr. Bourgeois' interview with Dr. Weiner that he had concocted a story about having a head injury from a three-wheeler accident in 1984 which resulted in a coma for one to two months and that his sister, Claudia Williams, corroborated the story and reported to Dr. Weiner that, or, you know, indirectly to Dr. Weiner

that he had been knocked unconscious in that accident and remained in a coma for one to two weeks and only came out of the coma after doctors operated on him, would that suggest an attempt to malinger on the part of Mr. Bourgeois?

MR. WISEMAN:  Your Honor, I'm going to object to the hypothetical as the facts show that Dr. Weiner did not speak with any collateral sources, so it's a hypothetical based on an improper fact or an inaccurate fact.

MR. DOWD:  Your Honor, I said indirectly and it showed up in Dr. Weiner's report.

THE COURT:  Overruled.

THE WITNESS:  Yes, that would be of concern.  In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information.  And it could be a sign that they are trying to present in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

BY MR. DOWD:

Q   All right.  And would that be consistent, would the

ability to make up a story like that and coordinate its telling with another party like his sister, would that be consistent with a diagnosis of mental retardation?

MR. WISEMAN:  Objection to leading, Your Honor.

THE COURT:  Overruled.

MR. DOWD:  Thank you, Your Honor.  Yes, Your Honor.

THE WITNESS:  It would be inconsistent with mental retardation but consistent with a personality disorder or with someone who is attempting to manipulate the results of the evaluation.

BY MR. DOWD:

Q    And what significance would that be as relates to that individual's level of intellectual functioning or adaptive functioning?

A    Well, if it's an informed story or concoction including an accident that resulted in a coma which could be a, certainly a coma for that time period would be a very significant event in a neuropsychological evaluation, because a coma for that long would have a very high probability of ending up in the person having damage to the brain.

Q    All right.  But that, you are assuming that the coma was a reality, that it actually occurred?

A    Right.  And having some knowledge base that that would be interpreted like that would be atypical for someone with low intelligence.

Q    In other words, to understand the effect of the story on the professionals that would hear it?

A    Yes.

Q    Okay.  Now, you also gave Mr. Bourgeois the Mini-Mental Status Examination, the MMSE-II, is that correct?

A    Yes.

Q    And what was his, what was the results of that test?

A    It was a 28 out of a total possible of 30.

Q    And how would you gauge that score as far as his level of intellectual functioning?

A    Well, it's not a test of intellectual functioning.  It's a test of their ability to respond appropriately to questions, they're, if they are in touch with what's going on, if they are alert, if they are oriented, so it doesn't correlate too well with overall intelligence.  The reason for having such a test at the start of an evaluation is to see if they can respond to other things that you're going to do and questions that you're going to ask them.  It's a starting point.

Q    All right.  And what conclusions, if any, did you draw from that test result?

A    Well, that I could proceed with the interview and that he was, he was alert, he was oriented, he could follow directions, instructions, he could respond to questions, he could concentrate, he could pay attention.

Q    All right.  And what was his level of attention and concentration?

A    It was good.  He was certainly -- that he could think about his answers.  He had what I would refer to as a sustained attention and concentration.  The first day was over five hours, the second day close to three hours, and he was there with me mentally the whole time.

Q    All right.  And what conclusions, if any, would you be able to draw from this duration of attention and focus that Mr. Bourgeois demonstrated?

A    Well, he was able to do it.  He was intellectually cognitively able to do that.  He had a lot of energy.  He could persist in being responsive to questions.  And that length of time, to be able to concentrate would be inconsistent with mental retardation.

Q    Okay.  And did you also draw some conclusions regarding his abstract thinking and conceptualization during the interview?

A    During the interview?  Yes.  He was able to conceptualize and to think abstractly about himself, about his legal situation, about his past, present and future, and that was obvious from the interview.

Q    And then, can you compare that to his testing regarding abstraction and problem solving?

A    I can.  In any kind of formal testing, when it was about

something that wasn't personal to him, he was much more concrete in his thinking.  On, proverbs is a part of a mental status exam that we typically give, he was not, he did not give very abstract responses to those, they were concrete. He tended, on questions that were obviously cognitive questions he responded slower, he was more concrete.  He was fairly quick to say that he didn't know, that he had never heard of that.  So novel tasks to him, he was a lot more concrete than as it applied to his own life and his own past, present and future, he was more abstract

Q    And what, if anything, is significant about this inconsistency?

A    Well, it's just good to note that he, like a number of different kinds of people, doesn't test well.  I mean he doesn't, it's harder to get him involved in objective testing.  It's very easy to get him involved in talking about himself, his life, his situation.  It's easy to engage him there.  It's even difficult to, to at times to disengage him from doing that.  But objective testing, he kind of shuts down a little bit.

Q    All right.  Did he discuss the loss of his daughter, the victim in this case?

A    He did.

Q    And what, if anything, did he say about that?

A    Well, he said that it was, it was very sad to him, that,

he told me that he loved her with all of his heart and that he was very upset that she died on his watch. And he commented that, you know, throughout the interview that, you know, he certainly proclaimed that he was not responsible for it and said that if he did something he did it and that he wasn't going to run away from his responsibility but he didn't in this case. And that was kind of the flavor of a lot of the interview, to continue to return to the reasons that he was innocent and who was responsible for this, et cetera.

Q    Did he talk about his behavior as a parent?

A    He did.

Q    And what was his reaction with that?

A    Well, he, he said he was a good parent, that he never would abuse any child and he had never abused any child and that he, that his, all of his children, he was close to them and it was very important to him.

Q    And what, if any, significance did you attach to Mr. Bourgeois' discussion of his family and his deceased daughter?

A    Well, and, you know, I can understand his position in this at this time, that he was really, spent a lot of time attempting to portray himself as a good person, and he -- as it related to parenting, as it related to his job, as it related to his spirituality, I mean there was a lot of what I

would refer to and what we call an adult impression management.

Q   Explain to the Judge what you mean by that?

A   Well, he wanted to make a good impression on me.

Q   Okay.

A   And he's, you know, he's very talkative and verbal, as other people have testified to, and he has a certain amount of charm, and he was very cooperative and very pleasant with me the whole, the whole time.

Q   All right.  And is there any, I mean is that consistent with any personality disorders or other psychoses or other --

A   Well, it could be consistent with a lot of things.

Q   Okay.

A   I think that in his case it's, you know, it's kind of a notch above that in that he really portrays himself as a victim and portrays himself as being kind of a special person with a sense of entitlement and with probably, he portrays himself with abilities and accomplishments that are exaggerations.

Q   Okay.  And any conclusions you can draw from that?

A   Well, it, I mean to, you know, to get ahead of your questioning here somewhat I think, but I mean he certainly impresses as having a personality disorder that's longstanding and pervasive.  It has several different features, borderline, antisocial, narcissistic, a certain

amount of paranoia about the legal system, et cetera, that isn't as predominant and is, in my experience, pretty common with a lot of people who are incarcerated.  So, his style in the interview was consistent with that of a personality disorder that's longstanding and pervasive.

Q   All right.  And is this, can you say whether or not this, that presentation is consistent with mental retardation?

A   Well, it is -- his presentation was not consistent with mental retardation.  The most similar thing to that that is talked about in the literature often is this idea of the cloaking of competence or masking where a person with limited intellectual abilities will say they can do things that they can't.  His, in my opinion, really exceeded that and had a different flavor to it in that it was, I mean he would admit when he couldn't do something but he certainly wanted to impress.  And his history and the records, I see that that's been a style of his, to impress others that he's very successful and has been -- even though he has been occupationally.  It was, it went beyond the cloaking of competence.

Q   All right. Did he admit to you that he was an impulsive person with a bad temper?

A   Yes, he did.

Q   And what's the significance of that?

A   Well, you know, even though he wanted to make a good

Bridges - Direct

impression and he was, you know, had that sort of self-entitlement and grandiosity at times, he also in this interview had times when I thought he was, had some insight into himself and he was being honest.  And he would say things that certainly wouldn't help him in this situation that he's in but he'd say, "Yeah, I am, I am impulsive." He'd say, "You know, I want what I want when I want it." That is how he phrased it.  And he said, "You know, there's a lot of things that make me really angry.  When somebody calls me stupid, when I hear anything about child sexual abuse, I just go off, and I do have that problem."  So, he was variable in that.

THE COURT:  Okay.  I listened to every bit of his interview.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Right?

MR. DOWD:  Yes, Your Honor.

THE COURT:  So why don't we just get to what the problem is.

MR. DOWD:  Get down to the main point?  Okay, Judge.

BY MR. DOWD:

Q    Is that consistent with, that level of introspection consistent with mental retardation?

A    No, it's not.

Q    His relationship with women, sex, what did you draw from,

what conclusion did you draw from that?

A    Well, I think it's part of his personality disorder, that it was narcissistic, it's manipulative and antisocial to a certain extent.

Q    All right.  And as relates to his educational background, did Mr. Bourgeois indicate that he was kind of a self-made man as far as doing schoolwork, things like that?

A    Yes, he, he commented on that he didn't have any help when he was a kid, he had to get it on his own, and, you know, he was proud of that.

Q    Now, he was, he was, do you know if he was ever identified in, as mentally retarded in Louisiana?

A    I found no indication that he was identified as a pupil with mental retardation.  He did receive services that would fall under special education, at least it was in the records from others and he said that he received some speech therapy, so he was identified as needing services but I saw no indication that he was identified as having mental retardation.

Q    All right.  And what about his ability to maintain his finances?  Did he indicate to you he had a secret savings account in Memphis?

A    He did.

Q    And what conclusions, if any, do you draw from that?

A    Well, I mean he was trying to hide some of his funds from

his wife and, who he claimed was the over spender in the family that had caused their financial problems, and so it's, I mean, you know, it was deceitful to her to hide those funds.

Q   Is that consistent with mental retardation?

A   I wouldn't think so, no.

Q   Now, you have touched a little bit about his driving, his work record, and have you thought about that, is his work record consistent with someone with mental retardation?

A   No, it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation.

Q   All right.  Now, you gave him also the Personality Assessment Inventory, the PAI?

A   Yes.

Q   Okay.  But you indicate that this was an invalid profile?

A   Yes.

Q   And why is that?

A   Well, it came out that it was invalid in the scoring due to something, that he didn't pay attention to the items closely, and that gave on the computer interpretation several possibilities, that he didn't understand, that he was confused or disoriented, that he couldn't read the level that's required for the test or that he was careless, and my opinion is that it was carelessness and not paying enough

attention.  He had produced valid personality inventories in the past.  I saw those in the record.  His reading ability is certainly high enough that he could read it.  I timed the test or I went back and analyzed that and he had times that he would speed up and times that he would slow down.  At the first, at the very start of the test, usually people go slower at the very start because they are figuring out kind of how this works with the false, somewhat true, mainly true, true, and they usually go slower as they're figuring that out and getting accustomed to it.  I gave it to him and had to go to the restroom and when I watched the tape he was going very fast at the start.

Q    While you were absent from the room?

A    Right.  He slowed down some but then he sped up at other times, and overall he --

Q    While you were in the room?

A    Yes, yes.

Q    So he was going slow and fast?

A    Yes.  Yeah, he --

Q    Throughout the testing?

A    It was variable but --

Q    Okay.

A    Overall, he only spent an average of seven seconds per item, which just is not paying careful attention to the item and what it's asking you.

Q    All right.  If Dr. Swanson testified that his speeding up on the PAI when you left the room to use the bathroom was evidence of masking, do you concur with that evaluation?

A    No.  I mean he sped up when I was in there, too.  I mean it's -- and he had the ability to read and to respond to those, but for some reason he didn't when I administered this.

Q    Do you attribute that to malingering on his part?

A    The test did indicate that, you know, there were a lot of his answers were on negative impression management, but I don't, I would not say that it's malingering.  I would say that it's not putting forth full effort and carelessness. You know, if he had tried to malinger a mental disorder on the test, it wouldn't look like his did.

Q    Okay.  So you think it's more carelessness and lack of effort?

A    Yes, sir.

Q    All right.  If the test had been performed successfully, what would it have been able to tell you?

A    Well, it would have pointed to if there was a mental disorder such as anxiety, depression, phobias, schizophrenia, and there's personality disorder scales on the PAI --

Q    Okay.

A    -- that could have been, it could have shown or added or taken away evidence from that.

Q   Okay.  Now, you watched all of the, I know you were present when you evaluated and interviewed Mr. Bourgeois, but you went back and watched the video of it?

A   I did, yes.

Q   All right.  Are there any, any segments of the video that you think are significant as far as assisting you in evaluating Mr. Bourgeois?

A   No, I wouldn't point to any particular parts.  I know the, one thing, just his style of interacting at the beginning and then at the end, and I know that when I came back the second day that he had thought about something that I had said and he commented on that and --

Q   Explain that to the Judge.

A   -- I thought it was significant.

Q   Explain that incident to the Judge.

A   Well, the first day I had said something in the interview, that I had seen some testing in the file and that he was a pretty good reader, and he and I discussed, and this was interesting, too, the Bible.  I've had a lot of inmates tell me that they spend a lot of time reading the Bible and I usually ask them questions about that, which I did with Mr. Bourgeois, and he answered them.  He and I talked about how the Bible is organized and the Old Testament and the New Testament and his plan for and how much time he spent on it.  Some of the books of the Bible he quoted some scripture, gave

me the reference.  I checked them that night and he was correct.  He and I talked about the difficulties that both he and I have had with the King James version and how there's versions that are much easier to understand.  So, you know, he had been reading the Bible.  So I --

Q    And comprehending it and remembering it?

A    Yes.

Q    All right.

A    So I commented on that I had seen the test scores, that he was a pretty good reader, and so the next day he commented on that and he had thought about that, that he wasn't really that good of a reader, that it was difficult and that he also wanted me to understand that he had to have help on things at times, had to have help from his brother on projects.  He, when he was going to buy a house or a car he would take somebody or ask somebody to explain things about the financing, or he would take them to help him to understand the contract that he was going to sign.  So he wanted to make sure that I understood that and I wrote that down and --

Q    Did you find that significant, that he would come back the next day and correct any compliments that you gave him?

A    Yes, I did.  It was a, it was a very positive -- I thought, and I believe he did, too, that the first five hours that I spent with him, it went really well except for him being careless on the PAI.  I mean he responded to my

questions.  We, I thought it was a good interview.

Q    Uh-huh.

A    And I did throw in a couple of things like that about the reading, and I think he started thinking about it and when I came back the second day he seemed a little down at first and I asked him, "What's the matter," and, you know, he said he hadn't slept and he had, you know, he didn't like, you know, he didn't like doing this, and that, you know, he, I think he had thought about it and what the purpose of it was and I think it flavored his view of it for a while.  But then, you know, he became engaged again on the second day and we finished up and he was very cooperative and pleasant and got very talkative again.

Q    What, if anything, did you think he was trying to accomplish when he corrected you about his good reading the next day?

A    Well, I think he understands what this is about and was, you know, that he would slip and talk about things that he had done and what he understood and he wanted me to make, I think that he wanted to make sure that I understood that he had to have help on things and he wasn't, you know, as intelligent or accomplished as maybe I thought that he was.

Q    All right.  Now, you also reviewed the WAIS-R that was administered by Dr. Weiner on February 28th of '04, is that right?

A    I did, yes.

Q    All right.  And you, in your report you comment that there was some scatter.  First of all, what is scatter -- among the subtests.  First of all, what is scatter and how is that significant?

A    Well, I did comment in the report there was scatter on the subtests of the WAIS-R.  There is also scatter in the other neuropsychological tests that were administered in 2004.  There are some very low scores, and if we kind of keep this to, either to percentiles or what we refer to as standard scores and you can see, but if you look at the subtests on page 6 of the report, he had some subtests where he scored at the first percentile.  That would mean that 99 percent of the people in the normative samples scored higher than he did.

Q    Uh-huh.

A    And on other subtests he's at the 16th percentile and even the 63rd.  With mental retardation there tends to be more of a flat profile.  While, of course, people with mental retardation can have strengths and weaknesses, on cognitive testing there tends to be a flatter profile.  Comparing, again with the scatter idea, in comparing his performance on the IQ test of 2004 with the other tests that he took, especially those of abstract thinking, his abstract thinking, his ability to plan and think ahead was higher, according to

my analysis of the data.  I used more current norms than were used in 2004 by Dr. Weiner, who used some very outdated norms on interpreting that.  I used the norms that had been more recently published that break it down to age and education. So if you compare him to people of his age and education, his performance on those tests, the category test, the trails test, it's not, not deficient, in fact it's average to low average on those, which is higher than his IQ.  He has the ability to think and cognitive abilities that exceed his intelligence as it's measured here.

Q    Okay.  And did you make the same observation in analyzing the WAIS-III that was administered by Dr. Gelbort in 2007?

A    Yes, and you see the same thing, that there are, tend to be lower scores.  It's a newer test.  He scores lower on verbal tests or subtests than on those that weren't so verbal.  His deficient performance was on the verbal subtests and, but you see the scatter from the 1st percentile to the 63rd and the 25th and 16th, and, again, in comparing his performance on the IQ test with the neuropsychological tests that were scores of 85 and 101.  So, when you are comparing apples and apples here, his cognitive abilities exceed his measured cognitive intelligence.

Q    All right.  And again, is that consistent with mental retardation?

A    It's inconsistent with mental retardation where you would

see more even cognitive abilities across the board.  What it's consistent with is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation.

Q   All right.  Did you compare Dr. Weiner's trailmaking test in 2004 with that given by Dr. Gelbort in 2007?

A   I did.

Q   And do you have any, did you find anything significant about those, the different score he received?

A   No.  They're at the same level.  Again, transferring those to standard scores where the average is 100, so that we can keep this straight, and of course abilities, et cetera, at the mentally retarded level or the impaired level are below 70.  The trails test that he took in '04, the standard scores were in the 90s and in '07 it was at 101.  Those are equivalent, at the same level, at the average level.

Q   All right.  And what about whether or not that suggests, his score suggests organic brain dysfunction?

A   Well, those kind of scores do not suggest organic brain dysfunction.

Q   Or any frontal lobe deficit?

A   No.  Even though there's not really a true

neuropsychological test that isolates the frontal lobe of the brain, some people say that the category test does but it's, it involves all areas, the overall integrity of the brain, as does the trails, but they have been talked about as being mainly frontal lobe controlled.  But his performance, compared to people of his age and education, is low average.

Q    So if we heard testimony that a test can actually suggest to the doctor what part of the brain is suffering the deficit, you are saying that that's not settled science?

A    Well, I was taught that in the '80s and there was a lot of effort put on what we refer to as localization, to take different scores and be able to correlate those to different areas of the brain, but since then we have kind of given up that task in neuropsychology.  Part of the reason is it just didn't hold up scientifically, and there's better ways to localize things in the brain with new medical techniques that can image the brain and that's what they're working on at this time, and people in my field don't turn to the neuropsychological tests except for gross things like language, non-verbal abilities and the two hemispheres of the brain.

Q    But not behavioral?

A    Not the anterior part of the parietal area.  It just hasn't held up.  And for most of the tests we have it requires the whole brain or many parts of the brain.  They

don't isolate.  Our tests require complex abilities that is mediated by the overall integrity of the brain.

Q   All right.  So whether Dr. Gelbort localized the deficit in the frontal lobe and Dr. Weiner localized the deficit in the posterior lobe, your testimony is that you can't localize it anywhere?

A   That's correct.

Q   All right.  Now, you also, you didn't do a complete adaptive functioning evaluation, did you, Doctor?

A   No.

Q   But you did make some observations on adaptive functioning from -- how many hours have you spent with Mr. Bourgeois?

A   Well, approximately eight to nine, although a lot of my observations about adaptive functioning came from the records.  We split up the duties in this case and mine was mainly to look at the cognitive and the neuropsychological aspects.  The adaptive behavior evaluation was to be done by Dr. Roger Moore.  So mine come from the observations in the interview that I conducted and the records as well.

Q   All right.  I'm just going to ask you just a couple of points.  You indicated that, "The mental retardation is not necessarily a life-long disorder.  His adaptive skills may develop to where the subject may no longer have the level of impairment required for a diagnosis of mental retardation,

especially in cases of mild mental retardation." Explain to the Court what you meant by that.

A    Well, it's really important to look at adaptive behavior, everyday tasks, completion of things to adapt to the environment, to live independently at different ages. The reason this is so important is that it used to be not such a part of the definition of mental retardation and so children were identified as mentally retarded on the basis of an IQ score alone. When -- that related so much to their academic abilities and their cultural deprivation, but you put them in their environment that they were used to, that they had to live in, and they didn't have the problems there, they only had the problems in school. And so that really became a social issue to not over identify culturally deprived children as mentally retarded, instead to look at their day-to-day functioning as well, and it continues to be a huge part of the diagnosis of mental retardation to look at adaptive behavior.

Q    All right. And what observations can you make in this case regarding any, in the duration of any adaptive functioning deficits on the part of Mr. Bourgeois?

A    Well, my evaluation of him, I didn't find any significant deficits or impairments in any adaptive behaviors at this time or the time just before he was incarcerated. I mean he certainly, I didn't see any problems with communication,

either verbal or written, with care of himself, personal hygiene, clothing, et cetera, taking care of house and home. With his social skills he's, he has really well developed social skills. We have heard from people that have interacted with him outside of an evaluation, too.

Q    Did you read any of his writings?

A    I did.

Q    What type of writings did you read?

A    I had a lot of letters, some legal documents that he prepared.

Q    Did you look at those today?

A    I did.

Q    I mean you've seen them before but did you look at them again today?

A    I did, yes.

Q    Is that Government's 23 through 26?

A    Yes. And they are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes. He can express himself in complete thoughts, and very detailed complete thoughts.

Q    Did you, did you -- I didn't mean to cut you off but did you also ask him to write a statement on, during the interview?

A    I did, yes.

Q    All right.  Let me show you what's been marked as Government's Exhibit Number 14 and ask if you can identify that?

A    Yes.  That's the paragraph that he wrote when I evaluated him.

Q    All right.  And did you draw any conclusions from watching him write this?

MR. DOWD:  Judge, we would offer 14 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 14 admitted.

(Government's Exhibit 14 admitted into evidence)

THE WITNESS:  Yes.  That, part of the reason for me to do that is that in doing evaluations with individuals who are incarcerated and there's writings in those case files a lot of the time, and the complicating factor that you have to look at is did they have help and how long did it take them.  Yes, it may look good but did they, they have plenty of time, obviously, and did they just spend so much time on this that it looks as good as it is.  So, I mean, I thought that he wrote that in a normal amount of time.  His handwriting is good.  It looks, I'm not a handwriting expert but it appears to me to be similar style to the other writings and letters that I examined.  And it's inconsistent with mental retardation to me.

Q    All right.  And how many letters did you read authored by Mr. Bourgeois?

A    I didn't count them.  A lot, though.

Q    A lot?

MR. DOWD:  Judge, we would offer Exhibits 23 through 26, which were the, referenced by the Doctor, the legal writings he reviewed to make his decision.

MR. WISEMAN:  No objection.

THE COURT:  Government's 22 through 26 are admitted.

MR. DOWD:  23, Your Honor.

THE COURT:  I'm sorry, through 23.

MR. DOWD:  23 through 26.  23, 24, 25, 26.

THE COURT:  23 through 26.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Admitted.

   (Government's Exhibits 23 through 26 admitted into
    evidence)

MR. DOWD:  Thank you.  Yes, Your Honor.

BY MR. DOWD:

Q    And can a low score or a low performance in one of these adaptive skill sets be the result of a character trait not related to his level of intellect?

A    Sure.  There's many things that can cause a person, that can lead or be associated with an adaptive deficit. Certainly individuals with a mental illness have problems

with living independently at times.  Certain, as you said, character traits or personality traits by their very nature in a personality disorder are maladaptive.  It's not in the best interest of the person to run up credit cards and to impulsively buy things but that doesn't, that's not, that's a personality disorder trait or it's a maladaptive personality trait in this case and others, in my opinion.

Q   What about impulsivity in general, is that consistent with mental retardation?

A   It can be.  Yes, it can.

Q   Can it be, is that consistent with a number of issues, personality disorders?

A   It sure is.  It's one of those traits or findings that, it can be associated with many things, with mental illness, with personality disorders.  Some individuals with mental retardation are impulsive and aggressive, but that doesn't, it's not exclusive to them by any means.

Q   All right.  Now, Dr. Gelbort has attributed his impulsivity to an organic deficit within Mr. Bourgeois' frontal lobe, Dr. Weiner attributes it to organic brain damage in his posterior lobe, and you are suggesting that it's the result of a, his personality disorder?

            MR. WISEMAN:  Objection to leading, Your Honor.

            MR. DOWD:  This is all in the record, Judge.

            MR. WISEMAN:  Still leading.

THE COURT:  Overruled.

BY MR. DOWD:

Q   That's the million dollar question, Doctor, how can we determine what the source, whether this impulsivity is a symptom of mental retardation or it's the result of a personality disorder?

A   Well, you take all the information into consideration, of course, and you look at, if it's an organic problem, if it's brain dysfunction, at least impulsivity, the impulsivity shows up in many areas of their life.  They walk off of jobs, they spend too much money, they get in fights with people, they get mad at people on the highway, they steal things that they want, and it's not, it's discretionary or discriminated in certain areas of their life.  The same with mental retardation, it's going to go to a lot of impulse control problems, not controlling themselves in a wide variety of areas.  You know, his impulsivity relates to certain issues in his life, to the sexual abuse that he experienced, to his problems with women, and so it's, it relates to personality issues.  He has problems, to be sure, and it's related to those but they are personality trait issues, not organic brain dysfunction or retardation.

Q   Okay.  Now, Dr. Gelbort indicated he gave the Halstead category test where Mr. Bourgeois got 30 of 40 wrong which is, he scored at chance, because it's a four-choice multiple

choice test, and he suggested that that was demonstrating that Mr. Bourgeois was not malingering because he scored exactly at chance. Is that, do you agree with that assessment?

A   Well, it's an unusual way to put that. If someone, if the mistakes they make on a test exceed chance, in other words, that's really evidence that they are intentionally trying to get things wrong, that's malingering, so I would agree with him on that, but scoring at chance is associated with careless, sub optimal effort, not putting forth good effort, with not trying hard.

THE COURT: Malingering. Malingering.

THE WITNESS: Well, except it's not intentionally trying to get the wrong answer on easy things, it's just not trying, and so it's a form of malingering.

THE COURT: Okay.

BY MR. DOWD:

Q   Now, the WAIS-R was developed in the 1980s, is that right?

A   The WAIS-R was normed in 1978, '79, published in 1981.

Q   Okay. When did it become outdated?

A   In 1997 the WAIS-III was published and so certainly by that time.

Q   And why are new tests or newer editions of the test created?

A    Well, things change in our society and updated tests not only are more appealing to people, it gets their interest, but we have discovered that the norms on tests become outdated.  It's happened on the SAT, on the GRE, where they have to come in every so often and re-center it or update it. And it's the same thing here, that older tests, the norms tend to become outdated and inflate the score that the person, or that it might -- it inflates the scores of the group.

Q    All right.

A    That's pretty well established.  Which, as to whether or not it inflates that individual's score or not, there's a lot of people in the group and you don't know that.  But the norms, the way to make them accurate is to --

Q    Revise the test periodically?

A    -- is to revise the test and to re-norm the test.

Q    And would you ever give an outdated WAIS test, the WAIS-R or WAIS-III?

A    I can't think of a reason to do that.

Q    And why is that?  What would be the impact of giving an outdated test?

A    Well, it might affect the results.  It might inflate the results.

Q    All right.  Explain, short version, the Flynn Effect to the Court.

A    That's, actually it's part of what I'm talking about here.  The Flynn Effect is named for actually a political science professor in New Zealand who has studied this inflation of IQ scores over time and has found that in large groups of people on various IQ tests that there has been a relatively consistent trend for the inflation of the IQ in the group to be about three points for ten years after the norming.  So we need, even though it hasn't been consistent on all IQ tests, like the WAIS-III it wasn't consistent, and it's, some have written that it may not continue to do this, they don't know the reasons for it.  I mean, I don't think it's very evident.  In society, I'm not sure that I've noticed that people are smarter than they used to be but IQs, the measurement of intelligence as it's measured on IQ tests, have this trend with outdated --

Q    Are going up?

A    -- norms, yes.

Q    All right.  And do you believe that it should ever be applied in evaluating someone's IQ?

A    Well, I think it should be considered and noted when you are using a test that's older.

Q    Uh-huh.

A    To recognize that that score might be inflated.

Q    May not be reliable.  All right.

A    There is a controversial application that where, that

PageID #: 1331                                            228
                          Brice - Direct

some people are advocating, especially in high-stakes decisions like this, to actually recalculate that individual's IQ score using the Flynn Effect and how long ago the test was norm.  That's controversial, it's not used other places, others say it's not the standard of practice to change somebody's IQ score, but I think we should consider that and note it in the interpretation of an old IQ score.

Q    All right.  But as far as the actual mathematical formula in which you reduce it according to the number of years the test has been, become outdated, you're saying that's a controversial theory to apply that formula?

A    That's correct, and at this time is not the standard of practice, but it's controversial and some think that it should be, especially in cases like this.

Q    How much credence would you -- you are familiar with Dr. Estrada?

A    Yes.

Q    The psychiatrist, a local psychiatrist here that evaluated Mr. Bourgeois for competence and insanity prior to the trial?

A    Yes.

Q    And you have read his material?

A    Yes.

Q    All right.  And you, he had indicated that he thought Mr. Bourgeois was above average intelligence.  Would you --

but he didn't give any IQ test.  Would you discount Dr. Estrada's opinion or how much credence would you give to Dr. Estrada's opinion?

A    Well, I don't think that he's of above average intelligence, but his clinical presentation, you talk to him and he can come across that way.  His expressive vocabulary, his verbal abilities, his ability, his social skills, et cetera, he certainly comes across as being more intelligent than his cognitive IQ scores show him to be.

Q    All right.  Dr. Weiner concluded from his, from the category test that, a test for new and unfamiliar learning situation, that Mr. Bourgeois' 94 errors, which he characterized as a very low score, indicates a tendency to exhibit inappropriate behavior under stress.  Did you review that finding?

A    I did.

Q    Okay.  And are you, do you concur with that?

A    No, I don't.  His category score, when compared to people similar to him, is equivalent to a score of 78.  Not a good score but not impaired in the borderline range.  But I don't know, I have never seen that interpretation of the category test, that under stress that it can affect a person's behavior like that.  It's a test that can be stressful.  It's something a person has likely never seen before.  It requires abstract thinking.  It requires the ability to problem solve.

It is not an easy test by any means, one of the harder tests that we give in neuropsychology. But as far as its extrapolation to everyday life, I think it relates more to cognitive intellectual abstract thinking as opposed to the person's day-to-day function.

Q    And do you agree with Dr. Toomer's evaluation that Mr. Bourgeois suffers from a schizoid personality disorder?

A    No, I don't agree with that.

Q    Why is that?

A    I, the only place I saw any indication of that was that he was given an MCMI, which is another personality test, and it suggested that. Where that came from, I don't know. Any mental health professional that talks to him, he seems to me to be the opposite of a schizoid. A schizoid is kind of a loner, quiet, doesn't like social interaction, uncomfortable with other people, far from the way Mr. Bourgeois is.

Q    And Dr. Toomer's evaluation that Mr. Bourgeois suffers rage reactions, acting out mini-psychotic episodes, secondary to his borderline personality disorder, and Dr. Cunningham referring it to his impulsive attacks of rage, do you agree with those assessments?

A    I agree that he has features of a borderline personality disorder, which is an unstable personality.

Q    Uh-huh.

A    I agree that some people with unstable personalities act

out in angry and aggressive ways that are not normal, and I

believe Mr. Bourgeois has done that.  I don't, it isn't,

though it's directed at certain things it doesn't appear to

be, to come out like on the highways, et cetera, just in --

so, you know, I don't think it's organic but I do think it is

associated with his unstable personality.

Q   All right.  And finally, would the, Mr. Bourgeois' plan,

long-term plan to have witnesses or agents involved in the

case killed over a period of time and take steps to attempt

to carry that out, would that be consistent with suffering

from a rage disorder or a mini-psychotic episode?

A   No, I think that would be consistent with antisocial

psychopathic traits and features.

Q   All right.

        MR. DOWD:  Judge, I -- oh, one moment, Your Honor.

Pass the witness, Your Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Price.

A   Good afternoon.

Q   Where did Mr. Bourgeois get his unstable personality?

A   I think it came from his early childhood experiences.

Q   His abuse?

A   That's usually -- personality disorders start early in

life.  Borderline personality disorder traits are oftentimes associated to childhood abuse.

Q   Neglect?

A   Yes.

Q   His deprivations?

A   Yes.

Q   His abandonment?

A   Yes.

Q   His poverty?

A   Could be.

Q   His impoverishment, cultural, spiritual, economic?

A   That more to his cognitive intelligence, but in general childhood abuse and neglect and abandonment are typically associated with a borderline personality disorder.

Q   So you agree then with Dr. Toomer, Dr. Cunningham, Doctor, I can't remember all the doctors, about those features, about that fact, that his borderline personality derives from his abusive childhood?

A   I do.

Q   I want to actually start at the beginning.  You have given us a lot of information here and I'm trying to organize it in my own mind.

        THE COURT:  I'm sorry, are you eating something?

        THE WITNESS:  It's a throat lozenge.

        THE COURT:  Okay.  Well, why don't we just wait

until he finishes chewing and we will continue.

THE WITNESS:  I'm sorry.  Okay.

BY MR. WISEMAN:

Q   Sir, as part of your Mini-Mental Status Exam you asked Mr. Bourgeois to draw a geometric figure?

A   Yes, that's correct.

Q   All right.  And the instructions from the data say, "Display intersecting pentagons," and those are the two printed pentagons?

A   Yes.

Q   And it says, "Tell the subject to please draw this design, please copy this design," and it says, "Score one point if the drawing consists of two five-sided figures that intersect to form a four-sided figure."  And I just want to, I sort of highlighted all of that.  I myself got outside the lines.  But you will agree that what Mr. Bourgeois drew was a five-sided figure?

A   Yes, it looks like it is a five-sided figure, yes.

Q   So you should have scored him at a zero for that?

A   Probably so.  It did intersect but it does look to be a five-sided figure.

Q   Okay.  And on the score sheet here we can see that you have in fact scored him one.  It should have been a zero?

A   I'll agree with that.

Q   Okay.  Do you have an explanation for that error?

A    No.

Q    You explained to Mr. Bourgeois at the beginning of your evaluation that you were here on behalf of the Government and you basically Mirandized him, as psychologists do in these settings, is that right?

A    Informed consent, yes, sir.

Q    Okay.  And as part of that you started to tell him that if he were to reveal to you any abuse that he committed against others that you would have to be, you were obligated under the ethics of your profession to report that to law enforcement?

A    Yes.

Q    Did he --

A    If it hadn't been previously investigated.

Q    Right.  And he didn't understand that, did he?

A    He had questions about that part, yes, sir.

Q    Okay.  He didn't understand it?

A    Well, I think he came to understand it but he didn't, he had questions about it.

Q    Did he come to understand it because you took some time explaining it to him?

A    I think so, yes.

Q    All right.  But basically when you told him that you would have to report his abusive conduct that was previously undisclosed, he thought you were talking about his abuse, him

being abused as a child?

A   Yes, as I recall, he did, and we discussed that.  And it would have been that, too, I mean, but he did think it was about his abuse as a child and he was explaining that he had told people about it.

Q   Why isn't that in your report?

A   I, after explaining it to him I thought that he understood it.

Q   I want to play an excerpt from your evaluation.  Easier said than done for me.

        THE COURT:  What are you -- are you trying to play a part of the video?

        MR. WISEMAN:  Yes, Your Honor.  I am not sure how to get this thing started up.  I'm sorry, I just put a DVD in.

    (Off the record discussion at counsel table)

        THE COURT:  I still haven't watched Price 1 and 2.

        MR. WISEMAN:  Well, this is from Price 1 and 2 so you might find it --

        THE COURT:  I didn't have time to do it last night.

        MR. WISEMAN:  Well, you might find this interesting.

        THE COURT:  But I will do it.

        MR. WISEMAN:  No doubt.

    (Mr. Wiseman conferring off the record with clerk)

        MR. WISEMAN:  Now, watch this closely.

    (Video playing)

DR. PRICE:  "If there's any discussion or if you were to provide any information about any elder or child abuse that hasn't been previously talked about that was new information, then I would have to report that if it hadn't been investigated already.

MR. BOURGEOIS:  "When you say investigated, you mean prior to trial or after trial?

DR. PRICE:  "Either one.

MR. BOURGEOIS:  "Okay.

THE COURT:  "Either one.  If it was something that there wasn't anybody ever heard of it, you know, and it was new, then I'd have to report it.  Of course, it's going to be on tape anyway, if that were to come up.

MR. BOURGEOIS:  "Okay.  Well, so far as the child abuse, it wasn't reported because the trial counsel that I had, they never talked to me about any of this, you know.  All of this is new.  Now, the counsel that I have now of record, when they came down it was a whole different ball" --

(Video stopped)

MR. WISEMAN:  All right.  I --

THE COURT:  I have to tell you, I didn't understand it that way.  I understood that he might be talking about any child abuse, from Mr. Bourgeois or perpetrated by Mr. Bourgeois.

MR. WISEMAN:  And you are the fact finder.

THE COURT: I didn't understand it. I may have missed the beginning but I just, I under- --

MR. WISEMAN: Well, Your Honor can watch.

THE COURT: Okay.

MR. WISEMAN: And I think that the Doctor has already agreed that he misunderstood the question initially, or the advisement.

BY MR. WISEMAN:

Q   Regrettably, I didn't include your next comments but Her Honor can watch it. If I told you that you gave him no further explanation but simply moved on, would you agree that as it stood there he didn't know what you were talking about?

A   No, I wouldn't agree with that.

Q   All right. What part did he understand?

A   Well, I think he was applying it to his trial and that, to his attorney's not investigating his child abuse and presenting that at his trial.

Q   Right, that's clear, but what you were talking about was if he had committed any unprosecuted or uninvestigated abuse, you would be required to report it to the authorities, if he discussed it with you, as a part of your ethical obligation, isn't that right?

A   Yes.

Q   Okay. So he didn't, he didn't get that?

A   Well, he applied it to himself and --

Q   Right.

A   -- I thought he understood the idea that --

Q   Really?

A   Yeah, I did.

Q   Okay.

A   I did.

Q   All right.  Fair enough.

        MR. DOWD:  Your Honor, may we ask that the witness be permitted to finish his answer?

        THE COURT:  Yes.

        MR. WISEMAN:  I apologize.

BY MR. WISEMAN:

Q   Were you completed?

A   I thought he understood the idea.

Q   I think in your report you indicate that Mr. Bourgeois' IQ testing is in the borderline to mild mentally retarded range of intellectual functioning?

A   Yes.

Q   And his scores of 70 and 75 put him in that range?

A   Yes.

Q   So, leaving aside the controversy between the parties here as to whether Mr. Bourgeois is entitled to a formal diagnosis of mild mental retardation, you would agree that at best he is borderline deficient in his intellectual functioning?

Price - Cross                         239

A   That's the best measurement of his cognitive IQ that we have.  I agree with that, yes.

Q   Okay.  And I don't see in your report any criticism of the adminis- -- you read the data from both doctors?

A   Yes.

Q   Gelbort and Weiner?

A   Yes.

Q   And I don't see any report or critique in your report that they administered the test incorrectly or that they scored it incorrectly?

A   That's correct.

Q   All right.  Aside from the one point of contention about whether Dr. Weiner should have administered the WAIS-R when it was outdated, you would agree that that result still has value in this, in resolving these questions?

A   I do.

Q   So, we have got a person who you would agree suffered from, could we call it a horrific childhood?  Abandonment, abuse, impoverishment, deprivation?

A   Well, I'd rather use those words to describe it, the abandonment, the abuse of several kinds.

Q   All right.

A   Yeah, it was, that's the way it's been presented to me, that's the kind of childhood he had.

Q   And that person also is functioning in the borderline, at

best, the borderline range of intellectual functioning?

A   That's correct.

Q   And that's important in terms of Mr. Bourgeois' ability to manage his personality disorders, right?  I mean being a little smarter can help you maybe navigate some of the aspects, the negative aspects of the personality disorder?

A   It could, yes.

Q   So he really has two strikes against him in his life coming up, he's got the abuse, he's got the low intelligence?

A   I would agree with that.  He had a lot to overcome there.

Q   Okay.  Now, I was impressed with your credentials, your experience, forensic psychologist.  In fact, you co-authored an article in 2003 called Applications of Neuropsychology in Capital Felony Death Penalty Defense in the Journal of Forensic Neuropsychology.  Do you recall that article?

A   Yes.

Q   And who did you write it with?

A   I know Cecil Reynolds, who was at A&M at the time.  John Niland was another of the co-authors.

Q   I want to cover a couple of aspects of that article as they relate to this case.  You say in that article that there is a high incidence of central nervous system dysfunction present in this population, and I think in context you are referring to capital defendants.

A   That's correct.

Q    And why is there such a high incidence of -- what do you mean by central nervous system, for layman's terms, brain damage, organic dysfunction?

A    Yes, that's right.

Q    Okay.  And why, in your view, is there such a high incidence of brain damage, if you will, in this population?

A    That I think that having lower cognitive abilities that are associated with brain dysfunction, having lower intelligence in general is associated with more aggressive criminal actions.

Q    And that is due, possibly, there are a lot of factors but you would agree that one of the associated factors is brain damaged people have a hard time making proper judgments, right?

A    Judgment.  Impulse control can be a factor.

Q    Or impulsivity as we have been discussing it here?

A    Right.  Sure, I agree with that.

Q    And you also said in this article that -- well, withdraw it.  I think the point of the article, and you correct me if I'm getting this wrong, is that in capital litigation, whatever stage it's at, presentation of these types of, of this type of information is critically important, would you agree?

A    I think anything about the person's mental, personality, mental illness present, could be very important, yes.

Q    And in fact you say, quote, "The defense team must present the jurors with an explanation for the client's actions."  You go on to say that the neuropsychologist can, quote, "help the trial team and the jury understand the issue of moral culpability," close quote.  What do you mean there?

A    Well, I didn't write that part.

Q    Well, your name is on the article, right?

A    Well, that's true, but I didn't write every sentence in the article.  That's why there are so many --

Q    Okay.  So, is there anything in this article you disagree with?

A    Well, I didn't like the use of trial team and defense team.  I have always maintained that as an expert you answer questions but you are not part of the team, you are not part of the defense team, you are not part of the prosecution team, you don't, that the most important thing is objectivity and not being part of the adversarial team, and I didn't like the use of that term, but.

Q    You didn't file a dissent to the article, did you?

A    Oh, I wrote a part of that article about the use of neuropsychology.

Q    Okay.  But leaving that use of the word team, let's take the word team out and say the trial lawyer, the defense should present this type of evidence to help the jury understand the issue of moral culpability, that's really the

Price - Cross                                    243

part I'm interested in, what did you mean by that?  How does presentation of these kinds of issues, Mr. Bourgeois' abusive childhood, his low intelligence, how does that help the jury understand his moral culpability?

A   Well, an expert in psychology or in neuropsychology, if they possess valid data and information about that person's mental abilities and personality traits and disorders, that the jury might find that to be something that would lessen their view of the blameworthiness of the person.

Q   Okay.  Well, I guess the reason that I am asking these questions is Her Honor has asked a number of questions of various witnesses that preceded you, I won't be as eloquent but in effect that, you know, why would you want to tell the jury that this guy can't control his impulses, why would you want to tell the jury that he can't control his relationships because, you know, even if it's due to all this stuff, and that was far less eloquent than the Judge put it, but you understand the point?  I mean why do you, why do you in this article and why do your colleagues around the country do this work and present this evidence to juries in capital cases?

A   Well, because we are asked to do an evaluation and present our findings and the attorney decides if the mitigating aspects of it outweigh the aggravating aspects, and with certain things such as brain dysfunction it can be a double-edged sword, and that's the attorney's decision at

Price - Cross                                    244

that point, not mine.

Q   All right.  At page 92 of the article, and I guess I don't know which of the three of you wrote this part but we will assume you had some say in it, "The Federal Courts have ruled repeatedly that since the invocation of the death penalty is qualitatively different from any other potential sentence, potentially mitigating factors must be admitted into evidence and considered by the judge or jury.  All of the authors of this article have worked on death penalty appeals that were successful because the evidence of the defendant's brain injury or other central nervous system compromise was not presented to the jury during punishment hearing."  And in the next paragraph you say, "Various court rulings would seem to argue the defense is compelled to identify and put forward such evidence."  I take it since you, we have all three of you, you agree with that, that statement?

A   Oh, that's my understanding of the law, yes.

       THE COURT:  Is there, do you have any evidence that he had a brain injury?

       THE WITNESS:  No.

       THE COURT:  Do you have any evidence that he is mentally retarded?

       THE WITNESS:  No.

       THE COURT:  Okay.

BY MR. WISEMAN:

Q    Well, let's define some terms here.  When we say brain injury, I'm, that would be a traumatic blow to the head, a hard injury?

A    It could be an illness that still would be a --

Q    A disease process?

A    Right.

Q    Okay.  But you would agree that he could have organic brain dysfunction and not fall into those categories?

A    Well, there has to be a reason for it and --

Q    Oh, undoubtedly.

A    And sometimes that's not easy to find, and sometimes just looking at the neuropsychological scores is not enough reason to say, because there can be low scores for a lot of reasons that have to be ruled out, especially in the absence of a defining event, a traumatic blow to the head.

            THE COURT:  Can I ask you --

            MR. WISEMAN:  Yes, Your Honor.

            THE COURT:  Mr. Wiseman, you, there may or may not have been blows to the head.  Your experts relied on blows to the head but it appears to be not any real evidence that there was unconscious things, except his sister testified after the three-wheeler, but let me ask you this:  Your, I understand your evidence to be that he has had this whatever it is since he was little, so that a blow to the head or lack

of a blow to the head hasn't changed him at all.

MR. WISEMAN:  Oh, I agree.

THE COURT:  Okay, so --

MR. WISEMAN:  I think it's Your Honor who asked about a --

THE COURT:  Okay, so we don't need to mess with the blows to the head.

MR. WISEMAN:  If Your Honor wants to forget about it, I'm happy to forget about it.

THE COURT:  Okay, we will move on from there and just talk about, because your effort has been to show that whatever has happened, he has been like this since he was --

MR. WISEMAN:  Yeah, I think --

THE COURT:  Early on.

MR. WISEMAN:  Yeah.  Let me just explain briefly why this, the blow-to-the-head part is significant.  When counsel failed to get the hospital records, in our view, in a timely way, they also failed to see that in 1993 he struck his head on a steering wheel.  Forget the coma from the three-wheeler.  In our view, that is a red flag that requires counsel to then have this person seen by a neuropsychologist.

THE COURT:  Well, he was seen by a neurologist.

MR. WISEMAN:  Well, right, but that was a week before trial started.

THE COURT:  Okay, but, I understand that but --

MR. WISEMAN:  Okay?  And that's another one of our points.

THE COURT:  But apparently, whatever your red flag is, it wouldn't have made any difference about the blow to the head because your case is that he, that something was wrong with him from the time he was little all the way up.

MR. WISEMAN:  I understand.  It's part of the counsel's deficient performance that they failed to get the record timely, they failed to look at it.  Had they looked at it --

THE COURT:  But it wouldn't have made any difference.

MR. WISEMAN:  It would have made a difference because had they looked at it and gotten Dr. Weiner's evaluation done in a timely way, they would have seen that he had a 75 IQ on an outdated test and, as has been testified to by experts, they would have submitted him to a, would have started an MR investigation, and they would have presented to the jury evidence that he had borderline intellectual functioning at a minimum, but counsel didn't have that information until trial had started, and I could rattle off a half dozen Supreme Court cases that say that's deficient performance.  Don't ask me to do it because I'm a little punchy, but I could if you dare me to.

THE COURT:  Why are you punchy?  I mean you-all are

taking turns, I'm up here the whole time.

MR. WISEMAN:  You are superhuman is all I can say.

THE COURT:  You have just made up for all your deficient --

MR. WISEMAN:  All my abrasiveness?

THE COURT:  All your abrasive comments.

MR. WISEMAN:  I'm sweet as pie, Your Honor.

THE COURT:  We are just starting over.

MR. ROBERTS:  May we respond, Your Honor?

BY MR. WISEMAN:

Q   Dr. Price, you heard what I just said to the Judge.

THE COURT:  You want to outdo Mr. Wiseman?

MR. ROBERTS:  I don't know, let me think about that.

THE COURT:  I guess I'm not getting the point about the head thing.

MR. WISEMAN:  The head thing is a red flag.  It doesn't matter whether he had a coma, it was a reason to get --

THE COURT:  Okay, it doesn't mean he had anything wrong, that he had an injury to his brain.  You're --

MR. WISEMAN:  Oh, he may have or he may not have, not have.

THE COURT:  Okay.  But it doesn't matter if he did or he didn't, what you are saying is that just the fact that he hit his head should have started some other investigation?

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  That's the point.

THE COURT:  Even if it didn't come up with anything --

MR. WISEMAN:  Right.

THE COURT:  -- it should have started an investigation.

MR. WISEMAN:  Now, to be clear, I'm not suggesting, necessarily, that he didn't have a traumatic brain injury.

THE COURT:  I understand, but just for argument's sake let's assume he never had a traumatic brain injury; nonetheless, when they saw, your point is when they saw that he struck his head on the steering wheel, even if it was just like this, and I'm hitting my head, that should have been a red flag for them to look further?

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  All right.

THE COURT:  So you are not saying, you are not necessarily saying he had to have had a brain injury at that time for anything to have changed?

MR. WISEMAN:  Correct.

THE COURT:  I finally got it.  Okay.

MR. WISEMAN:  Okay, good.  Well, I'm glad we had

this talk.

THE COURT:  I am so glad we did, too.  Go right ahead.

BY MR. WISEMAN:

Q    Dr. Price, do you agree with the proposition that if you as a consulting neuropsychologist saw a hospital record of a motor vehicle accident of an 18-wheeler where the admission note said, "Struck head on steering wheel in an accident," that that would be a red flag worthy of investigation, knowing nothing else about the case?

A    Well, I'm not an attorney but from a neuropsychological standpoint I think it would be significant.

Q    Okay.  And --

THE COURT:  Well, if you just asked your client if anything happened and he said no, then what?

THE WITNESS:  If the client said that he didn't hit his head?

THE COURT:  Well, no, if he said it was just a nothing event.

THE WITNESS:  Then, if there wasn't at least an alteration in consciousness --

THE COURT:  Okay.

THE WITNESS:  -- it would be probably an insignificant --

THE COURT:  A non-event?

THE WITNESS:  Yes.

THE COURT:  Okay.  So we don't know if they asked him, right?

MR. WISEMAN:  Well, they didn't have --

THE COURT:  I don't think anybody asked Mr. Gilmore.

MR. WISEMAN:  They didn't have the records until trial had started.

THE COURT:  Nonetheless, they could have still said, We are going to, we ask you, Mr. Bourgeois, and if so we'll go in and ask for a continuance if there is this issue.

MR. WISEMAN:  Well, the truth of the matter is, is that counsel had him evaluated by a neuropsychologist.  Our point is, it was --

THE COURT:  Well, they went to a, took him to a neurologist.

MR. WISEMAN:  Well, to my mind that's almost irrelevant.  The --

THE COURT:  See, I don't think so.

MR. WISEMAN:  Okay.  But neurologists squeeze heads, neuropsychologist gives tests, all right, and that's the difference.

THE COURT:  Yeah, but I heard from your excellent witness that Friday --

MR. WISEMAN:  Dr. Gelbort, right.

THE COURT:  -- about how neurologists work with

neuropsychologists.

MR. WISEMAN:  Uh-huh.

THE COURT:  That they can find, that the neurologist can find if there is anything wrong with the brain but that the neuropsychologist can further hone it down to exactly where the injury is.

MR. WISEMAN:  Precisely.

THE COURT:  But they have to start with an injury.

MR. WISEMAN:  Or a reason to be inquiring.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And my next question, Dr. Price, is in the absence of a formal report of a head injury, is being subjected to a pervasive pattern of childhood abuse reason enough to inquire about cerebral dysfunction, if you're getting beat in the head as a child?

A   If there was trauma to the head as part of the child abuse --

Q   Right.

A   -- and not just trauma in general?

Q   Right.  Okay.

A   Well, if there was evidence of trauma to the head that resulted in at least an alteration of consciousness, then I would say as a neuropsychologist it would be a red flag to investigate.

Q   Okay.  And you would agree that in cases of pervasive childhood abuse such as the one we have here that it's not at all uncommon for the child to receive blows to the head?  I mean people who beat their children don't discriminate necessarily as to where they're beating them?

THE COURT:  Well.

MR. WISEMAN:  In your experience?

THE COURT:  My father did, so.  Not that it was beating but there are some parents from another generation --

MR. WISEMAN:  Yeah.

THE COURT:  -- that whipped just on the rear end and that was it.

MR. WISEMAN:  Okay.  Well, we're not talking about that.

THE COURT:  All right, but let me ask you this: What I need to hear from you, in cross-examination or direct, is to -- what I heard from your witnesses is that they were unwilling to talk about it at the time, what the mother did to Mr. Bourgeois.

MR. WISEMAN:  Well, some of them, and some of them talked about it anyway.

THE COURT:  Some of them -- they didn't really. Like the one gentleman that testified at trial and testified again here, what he said, "I knew it was happening because I saw the bruises on him," but he never saw, he never said that

he saw the mother beating him.  But the ones that have come forward now, the family members that say, "This is what happened to him," they were not going to talk about it before the trial while the mother was still alive.  So I don't really hear that all the mitigation in the world would have found this out until at this point.

MR. WISEMAN:  Well, we are turning --

THE COURT:  I'm concerned about that.

MR. WISEMAN:  We're turning this into an argument rather than an examination, but let me respond and tell you our view on that.

THE COURT:  That's what I'm asking you.

MR. WISEMAN:  Yeah, yeah.  Mr. Bourgeois himself told Mr. Bierbaum in an earlier interview that he had been abused as a child, and --

THE COURT:  Yes, but what they told, what they, what the witnesses told Mr. Bierbaum, besides what Mr. Bourgeois said -- and he didn't say about his mother either, he didn't say the whole deal that we know now, or at least that he is saying happened now -- what we know is that he was the one who was picked on more than the other children.  That was the story that was given of the abuse from the witnesses before trial.  Now that he has gotten the death sentence, they have come back with an entirely different story.

MR. WISEMAN:  You know --

THE COURT:  And the mother is dead and they are willing to talk about it.

MR. WISEMAN:  I think, Your Honor, that we would not agree with that.  You know, obviously you will make your findings but our --

THE COURT:  No, I want you to point that out whenever.

MR. WISEMAN:  Yeah, and I think we can --

THE COURT:  I want you to go through the record and point out --

MR. WISEMAN:  We can do that, we can do that.  I mean I can't do it this moment but we have --

THE COURT:  No, I know that, but I'm telling you as we are going along.

MR. WISEMAN:  That's what you want to know, I understand.

THE COURT:  Not arguing with you, in spite of what you think.

MR. WISEMAN:  All right.

THE COURT:  I want to tell you what my thoughts are so you can address them cogently --

MR. WISEMAN:  No, I --

THE COURT:  -- in final arguments or --

MR. WISEMAN:  I appreciate that.

THE COURT:  A post submission, post-hearing

submission, something along those lines.

MR. WISEMAN:  No, I appreciate that and we will certainly endeavor to do that.

THE COURT:  See, you are starting over again.  After you had a clean slate not ten minutes ago.

MR. WISEMAN:  What did I do?  I said we'll do it. I'm saying we'll listen to you.

THE COURT:  Go right ahead.

MR. WISEMAN:  You know, Your Honor, I have to say sometimes I feel like I can't win for losing here, you know?

THE COURT:  I know, I know.  It's sad.

BY MR. WISEMAN:

Q   All right.  So, I'll move on then from this article which, you know, is chock full of stuff about how you are supposed to present the stuff.  Let me ask you one more question before I do that.  You have a line in here that says the neuropsychologist can educate the trial lawyers about what they are discovering and how it fits into the picture. Would you agree, and maybe it's an obvious proposition, that you can't educate a lawyer about this stuff who won't sit down with you and discuss it?  You guys don't do telepathy or anything like that, right?  You've got to have a discussion.

A   Or a report or something.  I mean there's no secrets in the way we can do that, it has to be communicated and --

Q   Right, okay.  And --

A    They have to read it or hear it or something.

Q    I mean a report was written in this case.  I guess my question about that is, you know, the communication, I mean you didn't just give your report to these folks at the table and not talk to them about it, did you?  You had a discussion, you prepped with them, you met with them, isn't that right?

A    Right, I explained my findings and what I thought, yes.

Q    Yes.  All right.  So that's what I mean, you can't educate the lawyers, us dummies, about this important complicated stuff without sitting down and having a discussion about it?

A    That's typically the case, yes.

Q    I want to address this question of malingering that keeps popping up.  I mean you wrote a report in this case.  It's not the longest report I've ever seen, it's not the shortest.  It's shorter than Dr. Moore's, if you guys are in any kind of competition.  But you wanted to include the salient highlights of your findings, is that right?  I mean you are not holding back stuff?

A    I don't think so, no.

Q    Okay.  You have expressed a couple of times here some thoughts about, you know, the possibility that Mr. Bourgeois was malingering.  I actually didn't see the word malinger or malingering in your report.

A     Yeah, I don't think he is malingering.  I think there are some issues about effort, full effort.

Q     Effort.

A     But I didn't put that word in there because I don't have evidence that he's malingering.

Q     Okay.  And I guess the reason I'm asking that is the Court, when you were --

THE COURT:  I used the word.

MR. WISEMAN:  I'm sorry?

THE COURT:  I used the word to ask him.

MR. WISEMAN:  You used the word, right.

BY MR. WISEMAN:

Q     And it was in regard to a lack of effort.

A     Yes.

Q     And I just want to be clear, lack of effort is different than intentional malingering.

A      It's a response style that can invalidate the results. It's more difficult to assess.  It's less severe.  It's present in a lot of cases for a lot of reasons other than the intentional --

Q     Right.

A      -- feigning or gross exaggeration of a condition for an external incentive.

Q     Right, so we are not dealing --

THE COURT:  You know, I guess, I guess when I asked

him that I thought he said it was, it could be a type of malingering.

MR. WISEMAN:  Well, that --

THE COURT:  So I don't know if you're clarifying that part or not.

MR. WISEMAN:  Well, that's what I'm trying to clarify.  I was happy with his answer until you jumped in.

THE COURT:  Sorry.  That's what stuck in my mind.

MR. WISEMAN:  Yeah.

THE COURT:  So you may want to make him take that back or whatever.

MR. WISEMAN:  Yeah.  Well, that's what I'm trying to do.

BY MR. WISEMAN:

Q   Do you know the exchange we're talking about?

THE COURT:  Are you taking that back?

BY MR. WISEMAN:

Q   Take it back, make it easy, it's getting late.

A   Effort and response style are on a continuum.  At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive.  At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be.

Q   Okay.

Price - Cross                    260

A    So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end, whether malingering comes closer to that.  Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

Q    Right, okay.  And just to be clear, there's not a degree of intentionality in poor effort that there is in malingering, so it's a lower intent, if you will?

A    That's, I would agree with that.

Q    The Personality Assessment Inventory that you gave that was invalid because of the poor response style, that test permits a finding of malingering.  I mean, in other words, I'm looking at this -- let's just put this up, it will be easier than me characterizing it.  Let me get this guy off. I am not -- let me just -- I got it, I got it.  All right. So this is the report, the computer-generated validity report, and you would agree that it says at the top that such factors for the invalid, invalidity of the test, could include a failure to complete items, carelessness, reading difficulties, confusion, exaggeration, malingering, all right?  And then it goes to say what happened in this case and it doesn't identify malingering.  It identifies confusion, possible reading difficulties.  And in that regard, what grade level is this test geared to?

A    The fifth or sixth grade level.

Price - Cross                                                    261

THE COURT:  I am having problems with this, the concept of the test versus his functioning, the detailed letters and the spelling, and maybe some syntax problems but they're, they were, you know, he uses, and he used, when he talked to you or either Dr. Moore the word hypothetical and, you know, it seemed very sophisticated and very specific in his writing.  So when you talk about reading at a fifth grade level you've got to realize that he's writing normally.

THE WITNESS:  Yes.

THE COURT:  On what someone else called a twelfth grade level.

THE WITNESS:  I don't think it was his lack of reading ability that invalidated that test, I think it was carelessness.  He spent on average seven seconds per item.

THE COURT:  Okay.

THE WITNESS:  I couldn't complete it in that kind of time period in a careful fashion.

BY MR. WISEMAN:

Q   And, sir, I'm putting up --

THE COURT:  But if he can read well then what does that tell you?

THE WITNESS:  That he didn't pay attention, he didn't try hard on that test, he just --

THE COURT:  So what would you call that?  I mean I wouldn't call that, I mean that seems kind of intentional to

me.  If he can do it and didn't.

MR. WISEMAN:  Your Honor, could I ask a follow-up on that?

THE COURT:  No, wait a minute, I'm asking him this.

THE WITNESS:  Well, not trying hard has intention involved.  If he were malingering he could have tried to, tried --

THE COURT:  To give a wrong answer?

THE WITNESS:  Yes, or answers that would make him appear more disturbed than he is or something.

THE COURT:  Okay.  But he just --

THE WITNESS:  He just didn't try.

THE COURT:  So he intentionally didn't try?

THE WITNESS:  Right.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And my follow-up to that is, a child who has ADHD who can't tend to a task, would you say that they intentionally aren't tending to the task or do you say they have a psychological impairment that's impacting their ability to attend to the task?

A   Well, of course it would be that, if they have ADHD and can't pay attention, then you wouldn't say they were trying to feign that test.  If a person is able to pay attention, they can sustain attention for five or six hours to other

things, they can read, but they just didn't try on that test, then it invalidates that test.  And tests are not as good as day-to-day real life observations of the person and other forms of data.  That's why we look at everything.

Q   Right.  And you'd certainly agree that Mr. Bourgeois can talk very expressively, very extensively, and he doesn't seem to have trouble saying things?

A   I think that's a very true statement.

Q   Okay.  And --

THE COURT:  Okay.  Is there any, do you have indication that he's got ADD or ADHD?

THE WITNESS:  No.

THE COURT:  Okay.

MR. WISEMAN:  I was using that as an example, Your Honor.

THE COURT:  Okay.  Well, then -- okay.

BY MR. WISEMAN:

Q   All right.  So, if as a result of his personality disorders and his impulsivity he has a hard time tending to written tasks in this setting, that would not, that's analogous, sort of, to the ADHD example I gave, right? There's a psychological explanation for why he is not necessarily tending to the written task in the way that he's able to stay with you verbally?  Would you agree?

A    If I understand the question, you are saying his

impulsivity invalidated the test, that's your hypothesis that you're asking me?

Q   Well, I, yeah, I guess that's a more refined way of putting it.  I'm just wondering, is there a potential psychological reason that you are aware of in this case that could explain his lack of, or his impairment in sitting through the task short of intentionally not wanting to tend to it?

A   You know, his impulsivity is selective.  It doesn't pervade all areas of his life.  He can discuss things with, and stay on task.  For the most part he can write and stay on task.  If it's about him and things he knows about, that's not going to be that.  But, you know, he, my analysis of how long it took him to do this, in observing him, is that he sped through it, and that's as psychological as I can get about it.

Q   All right.

A   He didn't get involved in taking the test.  He didn't want -- he intentionally didn't get involved in taking the test.

Q   All right.  We will leave that area.  The Court seems to have directed a number of questions to a variety of our expert witnesses, and I'm again going to just paraphrase, you know, how come he can do some stuff and can't do other stuff, you know, he's so verbal, he can write these long letters

which while not perfect in syntax communicate ideas, and yet we are claiming he can't do other things.  And to try to answer that I have put up the score sheet from Dr. Swanson's Woodcock-Johnson.  And before I ask you about the specific findings, you would agree that the Woodcock-Johnson is the, is one of the best, most reliable tests of functional achievement, I mean it's sort of the gold standard test?

A    It is one of the better tests of academic functioning, yes.

Q    Okay.  And it far surpasses the Wide-range Achievement Test in terms of its sophistication and the richness of the data you get from it?

A    Yes.

Q    All right.  Now, let's assume for purposes of going through this that these are valid results.  We have no reason to think they aren't.  I mean look at his grade equivalencies in spelling, he's at a 13th grade level, he's a college level speller.  And he's in kindergarten on story recall.  He's in third grade, he's in third grade in other things.  I mean this is a man who clearly has strengths and clearly has weaknesses, isn't that right?

MR. DOWD:  Your Honor, could I just ask that the exhibit be identified?

BY MR. WISEMAN:

Q    Oh, I'm sorry.  This is Exhibit 35, page 13.  I believe

it's in evidence.

A   Well, there were several things in your question.

Q   All right.  There usually are.

A   Sorry.  I would agree that he is a person with strengths and weaknesses.  I don't know about the level of effort that was involved in this administration of the Woodcock.

Q   Okay.  Well, let's compare spelling on the Woodcock to, you are familiar on the WRATs, with the Wide-range Achievement Test he took with Weiner and with Gelbort, in both of those he scored also high, in the high school range, on spelling and reading?

A   Yes. that's correct.

Q   Okay, so that's consistent, and I think your article says consistency in psychometric testing indicates validity, isn't that right?

A   Well, it's one factor in looking at validity.

Q   And -- I'm sorry, go ahead.

A   It's one factor, yeah.

Q   Okay.

A   If you find convergence of test data, that increases your confidence in it.

Q   Right.  So if he's taking an IQ test in 2004 and has a statistically identical margin of error three years later on a different test, that tells you that that's likely where his IQ falls, and that's why you said he's at best in the

borderline range of intelligence?

A   Yes, that's, that is correct.  There are other factors but I think as far as the measured cognitive IQ, having two tests three years apart increases your confidence in it.

Q   All right.  So, getting back to this thing, then, the fact that we see patterns in this testing that are quite similar to the WRAT testing given again in 2004, 2007, his same, his same strengths and weaknesses seem to keep coming up whenever he's tested, right?

A   Well, I'm looking at this.

Q   Okay.

A   And if you can make that a little larger for me for just a second.

Q   Sure.  You know, it's on the screen in front of you.

A   Oh, I'm sorry.

Q   Which, you know, I can make a larger image.

        THE COURT:  Could you zoom it up just a little bit, though?

        MR. WISEMAN:  Center it?

        THE COURT:  Zoom it just a little bit.

        THE WITNESS:  Yeah, I'm, I can see it here fine.

BY MR. WISEMAN:

Q   I don't want to lose the information, I don't want to lose the data.

A   His, I'd say this pattern is similar, yes, that the

letter word identification has a standard score of 90 and on the two administrations of the WRAT, the same kind of test was a 96 and an 85.  That's, that seems to be consistent.  His math is the lowest, it looks like.  I don't know about the story recall delayed as being as low as it is.  And understanding directions has an 89.  You know, I don't have anything to compare that to except that he seemed to be able to follow --

Q   Right.  You know, and I guess the reason I think, well, I think it's important, let's see if you do, is that we have had a number of lay witnesses come into court today, people who have known Mr. Bourgeois, and they are all sitting up there saying, "This guy is fine, he can talk a blue streak, he's charming, he's gregarious."

        THE COURT:  And use the computer.

BY MR. WISEMAN:

Q   He can use the computer.  He can do all these things.  You would agree that lay people can't just look at somebody who presents well and make a determination that he's not mentally retarded?  That's why we have tests, right?

A   Well, I think a lay person can tell you information about their adaptive functioning, and my observation of him as well, and looking at everything, is that if it's day-to-day practical stuff that he's familiar with and interested in, he has learned how to do it and can do it.  School related

academic formal testing he doesn't do as well on.  He has strengths and weaknesses there, but his adaptive behavior is the key here.

Q   Right, the key to the adaptive behavior pronged with mental retardation?

A   That's correct.

Q   But let's expand the universe a little bit because I, my concern is, as counsel, is that these folks have come in and not only say he has adapted well but they are basically saying he's just like you and me.  "He's the best driver I ever had, he's a genius."  He's got a 70 IQ, right?

A   Well, I --

Q   They are not seeing the full picture, wouldn't you agree?

THE COURT:  Well, may I, you are talking about a 70 IQ and if you talk about the range of error from one to another, that may not be exactly correct.  And also, I guess I am concerned about these IQ tests that say he understands instructions very well, he has a high reading level and a spelling level, so on the other parts how could he be doing poorly?  Does that not tell us something?

THE WITNESS:  It does.

THE COURT:  What does it tell us?

THE WITNESS:  Well, it's very unusual to have --

THE COURT:  Isn't it?

THE WITNESS:  Yes, it's very unusual to have --

THE COURT:  So what could that mean?

THE WITNESS:  It could mean effort.  I could mean general cultural deprivation about --

THE COURT:  It could be a low effort on that scale?

THE WITNESS:  It could be, yes.

BY MR. WISEMAN:

Q   Sir, if he were giving low effort, would you expect to see a consistency and a pattern like you see in this case?  I mean if he just wasn't taking these tests with any kind of effort, I mean they'd be all over the place.  We wouldn't see the same WRAT scores.  We wouldn't see the statistically identical WAIS scores.  We wouldn't see the Woodcock-Johnson looking just like the WRATs.  We'd see a mess.  It would be all over the place.  Don't you agree with that?

A   Well, I do see a mess.

Q   You do see a mess?

A   I do see a mess.

Q   In what way?

A   The neuropsychological test scores compared to the IQ score and academic, having academic achievement scores higher than the IQ scores is very unusual.

Q   Not out of the question, though?

A   No, obviously -- (noise).  Oh, I'm so sorry.  I'm so sorry.

THE COURT:  Apologize to Ms. Gano.

THE WITNESS:  I am so sorry.

THE COURT:  Thank you, sir.  That's my concern.
When I looked at those things, I didn't understand how
that -- you can do a lack of, an intentional lack of effort
on the areas you know that you can get away with, just
hypothetically, and not on these other ones where you know
you can read the instructions, you've got a good reading
skill.  It just looked like a red flag to me more than --

THE WITNESS:  You know, I see a mess that it's
variable effort and it's variable cognitive ability.  How can
he score as high as he does on the academic test and the
neuropsychological test and not on the IQ.

BY MR. WISEMAN:

Q   All right.

A   It's difficult to explain.

Q   Yeah, it's, I think you said it was unusual but I guess,
you know, we're in a capital proceeding where, you know,
every witness who testified today said, "We couldn't believe
what happened here, this man was a totally different person."
We are dealing with an unusual circumstance so I guess, given
that premise -- you're shaking your head yes.

A   Yes.  It is unusual.

Q   Yes.  So given that premise, I think we have to think,
you know, think about that a little.  No report you have
read -- I mean Mr. Bourgeois has so far, to my knowledge,

been evaluated in 1985 for the sheriff's department, by Dr. Estrada, Dr. Weiner, Dr. Gelbort, Dr. Cunningham, Toomer, Sadoff, Swanson, Moore.  Sounds like a law firm.  Has any of them ever said he's a malingerer?  No.  Have you seen the word malingering in any of those things?

A    I don't recall seeing the word.

Q    It's not there, trust me.  I wouldn't ask the question if it was there.

THE COURT:  If you didn't know the answer.

MR. DOWD:  Your Honor, I would ask that the witness be permitted to finish his answer.

THE COURT:  Did you have something more to say?

THE WITNESS:  Well, there is some consistency to what all the mental health experts have to say in this case, though.

BY MR. WISEMAN:

Q    Yeah, and that consistency is that he suffers from debilitating personality disorders, a history of child abuse and low IQ.

A    But not mental retardation.

Q    Well, you know, we're talking about a lot of issues here today, all right, and I'm focusing right now on --

THE COURT:  Do you have much more to do?

MR. WISEMAN:  Oh, I do.  You know, I was concerned about the start time, you know, and that wasn't my doing,

that was the Government's, but I think I'm asking reasonable questions here.

THE COURT:  Twenty-five more minutes and then we will take it up in the morning?

MR. WISEMAN:  That's fine with me.  I mean, I --

THE COURT:  How much time do you think you will need in the morning?  Because I imagine it will be the same with Dr. Moore.

MR. WISEMAN:  Yeah.

THE COURT:  I want to make sure they get their witnesses on.

MR. WISEMAN:  All right.

THE COURT:  And you still have rebuttal from 4:00 to 6:00.

MR. WISEMAN:  Yeah.  I mean, I can tell the Court I don't think we are going to have rebuttal.  If we do it will be five minutes, so, yeah.

THE COURT:  Okay.  So then we ought to be okay? Continue on and I will not interrupt you one more time.

MR. WISEMAN:  I appreciate -- well, you can interrupt me any time you want.

THE COURT:  No, no.  You are very kind.

BY MR. WISEMAN:

Q   Your report does not diagnose Mr. Bourgeois as being, having an antisocial personality disorder, isn't that right?

A    That's correct.

Q    All right.  The only mention of sociopathy or psychopathology is you had one mention in your report and I think one mention in your testimony that he has some sociopathic features?

A    That's correct.

Q    All right.  Now, you administered the Structured Interview for DSM-IV Personality?

A    Yes, that's correct.

Q    All right.  And that test has a section that addresses the question of whether a person has sociopathic tendencies?

A    Or antisocial personality disorder, right.

Q    Right.  And Mr. Bourgeois did not come out on that test as presenting sociopathic or antisocial tendencies?

A    He did not, based on his self-report.

Q    Well, you --

A    Which is what this is based on.

Q    All right.

A    He did not.

Q    It's your test, right, you administered it and, I assume, think it has some value, that's why you give it?

A    Sure.

Q    Okay.  He came up clean on sociopathy?

A    On the antisocial personality disorder.

Q    I'm sorry I keep using that word.  I've read Hare and

Psychopaths Among Us.  And again, all those doctors who have ever evaluated him, no one has ever even used the word antisocial.  You are the only one.  This is the first time I have seen that word applied to Mr. Bourgeois as a diagnostic term.  Do you agree?  I mean did you see that in any of the other reports?

MR. DOWD:  Your Honor, I believe, wasn't there some testimony by Dr. Gelbort that he has antisocial --

MR. WISEMAN:  He's not getting paid so why should --

THE COURT:  Yeah, he said that he presented, now, he did his fingers like this, but he, together, and for the record the two index fingers together, that he presented, it's true that he had the symptoms of a sociopath or a psychopath, a narcissistic sociopath or psychopath, but that, he opined that they may have different etiologies than other types of psychopaths.

MR. WISEMAN:  Right.  I mean I took his testimony to mean that he wasn't saying that he was psychopathic or antisocial but that --

THE COURT:  Well, he, I took it --

MR. WISEMAN:  -- there's some overlap in the symptoms.

THE COURT:  I took it that he, that's the way he presented but that he opined that it was a different, that it was a different etiology.

MR. WISEMAN:  Well, I --

THE COURT:  That it was an organic brain etiology or some other etiology.

MR. WISEMAN:  Right.  It's a different diagnosis, I think is the salient point.

BY MR. WISEMAN:

Q   So you gave him, you know, this test, he comes up clean on it -- well, I guess I don't have any other questions about that.  But you agree, you didn't see any other mention in any of the other reports?

A   I don't recall any in the reports.  And, as I said, I think it's part of a disordered, personality disorder, antisocial traits and features, but I did not diagnose him with antisocial personality disorder.

Q   And in fact the Structured Interview for DSM-IV Personality came up with borderline, with I think paranoid ideation.  Or maybe I should be more precise.

A   And some narcissistic.

Q   Ah, narcissistic.  Thank you.  You know, in getting back to the response style, let's talk about the verbal response style.  I mean you would agree that there were times during your interview with him where he was really trying to answer your questions, right, the verbal part?

A   Yes.

Q   Okay.  So, for example, when you asked him how many

stripes there were on the flag -- I didn't know the answer to this myself, actually, I actually had to ask my colleague -- and he said, "I don't know," but he then offered you how many stars there were, right, I mean that's an example of him trying to put forward good effort in his encounter with you?

A    I would agree with that.

Q    Okay.  And that's, at least verbally he was trying to present well and do his best?

A    Well, on that item, and that's, that is an example of something that's really an educational cultural exposure, to know the number of stripes in the flag.

Q    Right, and I'm not asking you about whether he was right or wrong or what that means, I'm just looking at the effort question.  I mean he offered you an alternative, he said, "Look, I don't know that but I know this."

A    Yeah, on that item I agree with that, yes.

Q    Okay.  And that's part of his overall attempt to, what did you call it, manage his image, right, or manage his -- go ahead.

A    It's impression management.

Q    Impression management, thank you.  He wants to look good, right?

A    Yes.

Q    And that's probably what was going on, in your view, when he told Dr. Estrada, at the time of his trial evaluation,

that he had an idyllic childhood, right, he's trying to look good?

A    I think you could fit that in there.  He was trying to put best foot forward at that time.

Q    And that's part of his response style, he wants to look good?

A    I would agree with that.

Q    All right.  Now, you said on your direct examination that you didn't think this was masking, you didn't think that this effort to look good was part of the cloak of competence that people with mental retardation sometimes put out there?

MR. DOWD:  Judge, I don't think that's a correct rendition of the testimony.  The masking I think related to Dr. Swanson's opinion about him speeding up when Dr. Price went to the bathroom during the PAI test, unless I --

MR. WISEMAN:  I think the witness was about to answer yes.

THE COURT:  Well, he's going to remember what it was, I assume, so go ahead.

THE WITNESS:  As I recall, it was when I was discussing the PAI that, but I brought up the impression management as his response style in the interview and his attempts to look good and I said it exceeded that that they discuss the concept of the cloak of competence when somebody tells you they can do something that they can't.  His is

telling you, you know, it's just trying to look good in general about everything.

BY MR. WISEMAN:

Q   Right.  Right, and that was my question, his positive attempt to manage his presentation.

A   It's positive and negative.  I mean it's, for a lot of the time it's so positive that it's narcissistic.

Q   Right.

A   And then at times he certainly wants you to know that he's a victim and that he has been --

Q   Well, hasn't he been a victim?

MR. DOWD:  Judge, I would ask that the witness be allowed to finish his answer.

MR. WISEMAN:  I apologize.

THE COURT:  Please, sir, go ahead and finish.

THE WITNESS:  Yes, but a victim of the legal system? I don't know.

BY MR. WISEMAN:

Q   Right.

A   I wouldn't think, and that's a --

Q   When we talk about victimization, I mean you would agree that given his childhood that he was a victim in his own right?

A   That's what he appears to be, based on what he's saying, yes.

Q    And what others are saying?

A    Yes.

Q    And so I guess what I'm wondering is, why couldn't it be that we are dealing here with both a need to positively manage his presentation as well as a cloak of competence? Why couldn't it be one exacerbating the other?  Why is it one or the other?

A    There's no reason that it couldn't be both.  It seemed in excess of what I would see with a person that's mentally retarded hiding a weakness.  He's going far beyond that.

Q    Right.  I mean it's, you would expect to see it above and beyond because if it's exacerbating, if you have someone who has got a cloak of competence and a narcissistic need to present well, it's doubled.

A    I have just never seen that.

Q    Well, again, we are dealing with an unusual set of circumstances here.

A    And the term cloak of competence and masking is associated with retardation.

Q    Right.  And I know you don't think he's mentally retarded but, you know, that's what in controversy here.  So, you know, we are really dealing with a person who has got both features going on.

        THE COURT:  Just stick to questions and answers, please, Mr. Wiseman.

MR. WISEMAN:  Yes, Your Honor.

BY MR. WISEMAN:

Q    This whole idea that he is one thing or the other, you would agree that the DSM says that mental retardation is not a diagnosis of exclusion?

A    I would agree.

Q    Okay.  And so that means that you don't say, well, we have to first determine whether he's a borderline personality disordered individual before we can -- you don't have to rule anything out before we say he's mentally retarded?  If he meets the diagnostic criteria for mental retardation.

A    You'll have to repeat that question, I'm sorry.

Q    Sure.  The DSM, when it lists its diagnostic criteria for, you know, all of its illnesses, sometimes it says don't call it this if it could be that, right?  That's a diagnosis of exclusion.  Okay?  When you look at the diagnostic criteria for mental retardation, you don't see that.  Correct?

A    That's correct.

Q    Okay  So if he's got significantly sub-average intelligence and significant adaptive deficits, onset before 18, you stop, correct?

A    Yes, that's --

Q    So --

A    That's correct for this diagnosis, yes, that's correct.

Q   Okay.  So he could be borderline personality disorder, narcissistic personality disorder, brain damage, childhood abuse, all of those things, and he could be mentally retarded?

A   He could.

Q   And the DSM says that, right?  I mean there's a whole section on associated conditions and syndromes and illnesses and he could be a lot of those things and mentally retarded?

A   Certainly mental retardation is not a preventative situation for other things.  They can get sick, they can be depressed, they can be mentally ill, they can have a personality disorder.

Q   Let me ask you just about your report.  I notice that in discussing the definition you cite to the DSM and you cite to the AAMR Tenth Edition.  Is there a reason you didn't use the or cite to the Eleventh Edition of the AAMR which is now the American Association of Intellectual Developmental Disabilities?

A   No, and it's, it's a restatement of the same thing with the collapse of the categories of adaptive behaviors and, but there's, you know, I don't see significant differences.

Q   Right, and -- right.  And so, when we talk about the Green Book, the Eleventh Edition, it's the same as the Red Book in the material aspects of these issues?

A   Could you repeat that?  I'm sorry.

Q    Yeah, you know what, I'll withdraw that.  It's a silly question.  The Red Book, the Eleventh Edition, is the authoritative manual now for dealing with MR issues?

A    It is an authoritative book about MR from the AAMR, but so is the DSM about the diagnostic criteria.

Q    And, you know, I think it was Mr. Dowd who was questioning one of my witnesses about, you know, the AAMR being an advocacy group and there was sort of a hint of like, you know, they are these bomb throwers or something.  I mean, they are a reputable organization?

A    Yeah, it's a reputable organization.  It is an advocacy group but that's not --

Q    Right.

A    It's not a bad thing.

Q    Right, nothing wrong with that, right?

A    Well, no, I mean it's -- no, I don't think there's anything wrong with that at all.

Q    Now, you would agree, I think it's pretty plain, that the diagnostic criteria in the DSM called for two of ten domains of adaptive deficits to qualify for the diagnosis?

A    Yes.

Q    So let's look at those now.  I mean -- the ten of them are listed on page 49.  Let me put it up.  And I know you don't think he has any of these, all right, but let's just go through them.  He could be a good communicator, he could be

good in self-care, home living, social, interpersonal, use of community resources, self-direction, functional academic skills, but he could be deficient in, and I'm just saying hypothetically, work and leisure, and he could be fine in everything else and he would meet the diagnostic criteria under the DSM?

A    Yes, that's correct.

Q    And it doesn't matter, he could be wonderful in everything else, he could be the best truck driver that has ever lived, but if he can't take care of himself at work -- at leisure, or if his self-direction or his use of community resources, if two of those other categories are significantly impaired, he meets the qualifications?

A    Yes, that's correct.

Q    Or I should say the criteria.  You know, we have had some evidence and we may have more about how he learned to drive a truck, started out slow, improved over time, and my question is, isn't the treatment modalities for a person with mental retardation is that nowadays you offer them supports to try to eliminate the adaptive deficits?

A    That's correct.

Q    That's the whole goal of the AAMR, right?

A    Yes.

Q    And so Mr. Bourgeois never had any formal supports that we know of but he, our view, our evidence is that he relied

on folks, so if he relied on people to teach him things and was able eventually to learn to drive a truck and to, you know, handle some financial matters and as an adult to dress himself, that doesn't mean he's not having adaptive deficits as a child, does it, pre-18?  I mean that's the whole point, that we want people to improve, right?

A    That's correct, if they improve, if a person, hypothetically, is mentally retarded, adaptive behavior deficits, with the appropriate supports improves and no longer has the adaptive behavior deficits, they would not be mentally retarded any longer.

Q    Any longer?

A    That's correct.

Q    Okay.  But, that doesn't mean that he wasn't or this hypothetical person wasn't mentally retarded earlier in life?

A    That could be, yes.

Q    Now, you worked on Penry.  I didn't know that.

A    Yes.

Q    Let's assume for our discussion that for Judge Jack to award relief on this claim that he's got to be mentally retarded today.

        MR. WISEMAN:  That's not our view, Your Honor, just to be clear, but let's assume it hypothetically.

        THE COURT:  That he has to be what?

        MR. WISEMAN:  Mentally retarded today, or at the

time of the offense.  Our view is any diagnosis of mental retardation is sufficient to preclude the imposition of the death penalty, but that's a legal argument we can have.  I just want to ask a hypothetical.

THE COURT:  You -- okay.

BY MR. WISEMAN:

Q   And so my hypothetical is, if we had proof at the time of trial that Mr. Bourgeois was mentally retarded as a child but has developed out of it through supports, through prolonged learning processes, would you still consider that to be mitigating evidence to present to a jury in a capital case, that he grew up as a mentally retarded child?

MR. DOWD:  Judge, I would object.  I don't think the Doctor has been qualified as an expert in presentation of mitigating evidence in a trial.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Would you in such a circumstance write in your report --

THE COURT:  In what circumstance?

MR. WISEMAN:  The one I just went through.

THE COURT:  The one I just sustained the objection to?

MR. WISEMAN:  Well, I'm asking a different question about that circumstance.  I'm not asking him to talk about trial strategy.

BY MR. WISEMAN:

Q   Would you tell the lawyer that you were working for that, "In my view," I mean you wrote an article on it, "this is mitigating evidence"?

A   No, I would just tell him what my opinion was about the psychological issues and it would be up to the attorney to decide if he thought that the mitigating aspect of my opinion would help his client.

Q   All right.  I want to shift gears a little bit.  You worked on a case called Eddie Fields, United States versus Eddie Fields?

A   Yes.

Q   And that's out of the Eastern District, I think, of Oklahoma?

A   Yes.

Q   And by coincidence I am involved in that matter as well so we have some common ground here.  Do you recall when you did your evaluation for the Government in that case that -- well, let me withdraw that.  When you did your evaluation for the Government, did you engage in discussions with the trial team of United States Attorneys or did you deal with a segregated team of United States Attorneys?

A   It was, I think they called it a firewall attorney or something like that, that after I finished the evaluation I didn't have any other contact with the attorney for the

United States that had retained me until I showed up to testify. As I remember it, I think that's what happened.

Q    Yeah.  No, I think that comports with my recollection. And in your article, at page 118, you have got a series of recommendations and you talk about the report that's done in a capital case and it says, "The report is sealed until the defense calls its examining witnesses and it is then given to the state and to the defense."  Next bullet point, "There is no communication between the state and its expert about the exam or any conclusions that were drawn from the exam until the defense witness testifies.  And that's an analogous firewall type situation as you just described in the Fields case?

A    That's the way it was in the Fields case.  I don't recall that part of that article --

Q    Okay.

A    -- but I trust that you're reading that accurately and completely.

        MR. DOWD:  Your Honor, may I inquire into the relevance of those questions?

        MR. WISEMAN:  Sure.  It's relevant because I take it the Government is going to argue that counsel made a strategic decision not to present some of this mitigating evidence because of the invocation of the name of Park Deets, and my position is that that's, that was improper, and this

is an expert witness who can tell you from a psychological or an expert witness perspective that's not the way it's done in those cases, and that's the relevancy.

MR. DOWD:  I didn't understand the firewall with the prosecution.  I didn't follow that.  Maybe it's just me.

MR. WISEMAN:  No, I mean, you know, we could go back and forth.  It's in the law, it's in the rule.

THE COURT:  You know what, just ask him questions.

MR. WISEMAN:  Okay.

THE COURT:  Because you've got three minutes left tonight.

MR. WISEMAN:  Oh.

BY MR. WISEMAN:

Q   You testified that there was no evidence that he was a student -- that as a student he received any, he wasn't identified as being mentally retarded?

A   I didn't see any evidence of that.

Q   Okay.  I mean, you saw the one page of school records, right?

A   Yes, that's correct.

Q   I mean that's, it's not like there's a big stack of records that you looked through on that?

A   I saw that and I asked him what kind of services he received and that's --

Q   Right, right.

A    That's the extent of my information.

Q    All right.  Are you familiar with the level of services that were available in the 1960s and '70s in that part of Louisiana that he's from?

A    No.

Q    I mean he grew up in a poor area?

A    That's my understanding.

Q    Are you aware that his brother Anthony is profoundly mentally retarded and has cerebral palsy?

A    No.

Q    If I told you that his brother Anthony who has those two diagnoses didn't receive services until he was an adult living in that same area, would that change your reliance on the lack of evidence that Mr. Bourgeois didn't receive services to support your opinion he's not mentally retarded?

          MR. DOWD:  Judge, I --

          THE COURT:  Just a moment.

          MR. DOWD:  I would object.  I think that's a stretch because Anthony --

          THE COURT:  Sustained.  If you want to qualify that. See, there's no indication that anybody requested services. I think that's the problem.

          MR. WISEMAN:  Okay.  All right, fair enough.

          THE COURT:  Because I think what Ms. Booth or someone was pointing out at the time, that if you are cared

for at home and you don't think you need services and you can do, you know, whatever you think is necessary.  But he started receiving services in 2001, I think.

MR. WISEMAN:  Right.

THE COURT:  But I think that was, his mother got ill or something?

MR. WISEMAN:  Yes, yes.

THE COURT:  So.

MR. WISEMAN:  Well.

THE COURT:  If you want to change it around and qualify it, it will be okay.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q   If a child is -- well, children are required to go to school in all the states of the Union, is that right?

A   That's my understanding.

THE COURT:  You know, I don't know anymore.  What is this about home schooling, and I don't even know what all this means.

MR. WISEMAN:  That's fair enough.  They are required to get an education.

THE COURT:  I guess.

MR. WISEMAN:  I don't think Eunice was home-schooling Anthony.

THE COURT:  Pardon?

MR. WISEMAN:  I don't think Eunice was home-schooling Anthony.

THE COURT:  No, no, but I'm asking, it's just such a strange thing.  I don't understand who checks on that kind of thing anymore.

MR. WISEMAN:  Yeah.  That may be a whole other discussion but --

THE COURT:  When I was a kid we had truancy officers that were running around, literally.

MR. WISEMAN:  Yeah.

THE COURT:  I don't know where they are now.

MR. WISEMAN:  In Philadelphia they fine the parents if you --

THE COURT:  And that's fair.  We always get blamed for the kids anyway, right?

MR. WISEMAN:  So -- you're just trying to distract me.

THE COURT:  I am not.  I'm going to give you another three minutes tonight, I'm sorry.

MR. WISEMAN:  Okay.  So --

THE COURT:  Kids are required to go to school.

BY MR. WISEMAN:

Q   Kids are required to go to school.  So, you know, if Anthony was going to school with these conditions and there were any services available, he would have been, he would

have been identified as a profoundly mentally retarded person and given services, right?  I mean.

A    You know, I don't know any of this.  I don't have any other information.  If that's a hypothetical --

Q    Yeah.

A    -- then I would say if a child that was profoundly retarded was going to school, I mean, I would think that they would give him services.

Q    All right.

A    I don't know about that area, that time, or anything about Anthony.

Q    Okay, so that's fair enough.  And I guess the point then is that you can't put a whole lot of stock in the fact that you didn't see evidence that Mr. Bourgeois didn't get services in rendering your conclusion that he's not mentally retarded.  That's the whole point here.  Do you agree with that?

A    Well, I think it's a factor.

Q    Right.  That, I --

A    That he was identified for speech services but he says that's what it was and I don't have any indication.

Q    Well, I mean, we don't have to have a big fight about this.  You would agree that it's not a big factor, it's a small factor.  It's a small, tiny, infinitesimal, insignificant, irrelevant, silly factor.  You can pick any

one of those.

THE COURT:  Or none at all, none of the above.

MR. WISEMAN:  Your Honor, I think maybe this would be a good time to break.

THE COURT:  Might be a good time, I agree with you. We will get our thoughts together tomorrow.  What time?

MR. WISEMAN:  I think early may be better than late, just because we want to get this all done.

THE COURT:  8:00 or 8:30?

MR. ROBERTS:  8:30 should be fine, Your Honor.

THE COURT:  Okay.  All right, then I will see you then tomorrow.  Thank you, sir.

MR. ROBERTS:  I was just going to say, for the Court, we're looking at our witness list and we may have some cuts on it.

THE COURT:  Okay.

(The proceedings adjourned at 6:04 p.m. until 9-24-10)

5

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
        PLAINTIFF,               *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 24, 2010
                                 *    8:26 A.M.
        DEFENDANT.               *
                                 *
* * * * * * * * * * * * * * * * * *


     PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 5
   (TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED)

         BEFORE THE HONORABLE JANIS GRAHAM JACK
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:            MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
       CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

APPEARANCES:   (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                            MR. MICHAEL WISEMAN
                            MS. ELIZABETH A. LARIN
                            OFFICE OF THE FEDERAL PUBLIC DEFENDER
                            601 WALNUT STREET
                            THE CURTIS CENTER, SUITE 545
                            PHILADELPHIA, PENNSYLVANIA 19106

                            MR. JAMES McHUGH
                            FEDERAL COMMUNITY DEFENDER OFFICE
                            FOR THE EASTERN DISTRICT OF
                            PENNSYLVANIA
                            601 WALNUT STREET
                            THE CURTIS CENTER, SUITE 540
                            PHILADELPHIA, PENNSYLVANIA 19106

MR. WISEMAN:  I took so much time preparing it.

THE COURT:  I'm sorry.

MR. WISEMAN:  Your Honor, we have moved to strike a -- thank you, Mr. Roberts.  Your Honor, Mr. Roberts has been kind enough to give me a copy to hand up to the Court.

(PAUSE.)

THE COURT:  I thought you brought up with the cross-examination about the organic --

MR. WISEMAN:  Yes, and my application is limited to portions of his -- well first of all, it was the direct examination --

THE COURT:  You're the one who brought it up.

MR. WISEMAN:  No, no, it was the direct examination of Dr. Price --

THE COURT:  Okay.

MR. WISEMAN:  -- in which he commented on two tests and appeared to apply some norms that none of that was in his report.  He doesn't mention the word "brain damage."  There was nothing in his report about these norms.

THE COURT:  Okay.

MR. WISEMAN:  And I'm simply unprepared to confront him on those issues.  It's very complicated.  I don't even know what he's talking about.  And I would need to -- you know, our experts are long gone.  We tried to reach them last night, were unsuccessful.  And I think this is exactly a paradigmatic

example of what the rule is designed to prevent. Our witnesses are gone, and he's giving an opinion I can't confront. And again, it's limited to just those two areas, categories --

THE COURT: Mr. Dowd?

MR. DOWD: Your Honor, the -- obviously Counsel was aware that this was an issue. His experts testified that Mr. Bourgeois suffered from organic brain damage, and they were relying on the psychological testing to do that. So obviously this is not a surprise for the Defense. That's the point of their case. Dr. Price is merely critiquing their experts' claims about the basis and the reliability of their testimony.

Now, Dr. Price, a complaint is made that he didn't describe the norms that he used to critique that Dr. Gelbort's conclusions, but he's here for cross-examination, and he's already been cross-examined on that. So I don't see any surprise to the Defense since it was part of their case in chief.

MR. WISEMAN: Your Honor, I was dumbfounded, befuddled, completely surprised by that testimony. The word "brain damage" does not appear in his report. He doesn't discuss it. He discusses his IQ. He discusses his personality disorders. He discusses adaptive deficits. That's all he discusses. Obviously, brain damage is an issue in this case, and had we been aware that he was going to critique those tests, we would have been prepared to confront him on it. I am

not.  I can't ask him questions about it, because I don't know, I don't know what he's talking about.  I'm not an expert in that particular area.  Or I'm not expert, I should say, in that particular area.

So I am truly at a loss to confront this witness on those two discrete issues.  Now, if it gets --

THE COURT:  I don't know why, though, because you put on your own experts about it.

MR. WISEMAN:  But they didn't put on any testimony about norms.  They applied a different set of norms than the ones he's talking about, and it's a complicated --

THE COURT:  Well, just ask him about the norms.

MR. WISEMAN:  But I don't know what to ask him even.  I mean, I could say, "What norms did you apply?"  But then when he gives me an answer, I have no way to test that answer.  You know, I'd have to go to the books and the literature.  I'd have to see what he's talking about.

You know, I would think at a minimum, and I hate to go to the well too often here, but I think --

THE COURT:  One more deposition?

MR. WISEMAN:  Well, you know, on those two discrete issues at some point, I think, would be fair.  I can't imagine it would be very long, but I think that would be appropriate and by video.

THE COURT:  Okay.

MR. WISEMAN:  All right, thank you.

THE COURT:  Go ahead.

RANDALL PRICE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Good morning again, Dr. Price.  I want to talk a little bit with you initially about borderline personality disorder. I'm going to try -- I'm not going to try.  I'm not going to intentionally repeat myself from yesterday.

You would agree that a borderline personality disorder is, manifests in instability in relationships and marked impulsivity?

A.   I would.

Q.   And the person with the borderline personality disorder is driven by a real or a perceived need to avoid abandonment?

A.   Yes.

Q.   And the origins of borderline is quite often because the person, him or herself was abandoned in childhood?

A.   Yes.

Q.   And that's what happened to Mr. Bourgeois?

A.   Yes.

Q.   It could also be caused by a trauma history like the one Mr. Bourgeois has.

A.   Yes.

Q.   And the impairments in the relationships typically cause a

fluctuation between idolization and demonization of the particular person with whom the subject's in relationship with.

A.    Yes.

Q.    And under stress, significant stress, those with a borderline personality disorder can compensate into dissociative states.  Do you agree with that?

A.    Yes, it's possible.

Q.    Okay.  And under that stress, they can also undergo psychotic episodes?

A.    Yes, it's possible.

Q.    And in fact, the concept of borderline, or the origins of the diagnosis were that it used to be considered borderline schizophrenic, hence the name borderline.

A.    I would have a different explanation for the word, the reason it's called a borderline.  But it does border on psychotic disorders, as well as other kinds of disorders.

Q.    Now, the Government brought in a number of lay witnesses, as I mentioned yesterday, that testified that they knew Mr. Bourgeois for years, and he never seemed to, you know, have that fluctuation.  He was always just a real gregarious, pleasant fellow.  You would agree that the rages and the dissociation and the psychosis that the DSM talks about with respect to borderline personality disorder are manifested in the relationships that the subject has with intimate people in his life?

A.    Yes.

Q.    Like wives?

A.    Yes.

Q.    Girlfriends?

A.    Yes.

Q.    Lovers?

A.    Yes.

Q.    Okay.  So it's not inconsistent with a borderline personality disorder that Mr. Bourgeois presented well to nonintimate people he knew.

A.    It is not inconsistent.

Q.    On your administration of the DSM structured interview, he responded to a number of questions in which he endorsed borderline questions.

A.    Yes.

Q.    All right.  So for example, you asked him, "Do you do -- do things seem strange to you when you're under stress?"  And he said, quote, Like a circus in my head, closed quote.  Would you consider that an endorsement of a borderline symptom?

A.    Yes.  I don't remember the word "circus."  Is that what you said?

Q.    Yeah, yes, "Like a circus in my head."  That's how I heard it.  I have to admit I had a hard time with the dialects and accents.  But that's how I made it out.  Does that have a dissociative flavor to it?

A.    I don't know.  It has a decompensation flavor to it, under stress.

Q.    Okay.  It's certainly on a continuum towards dissociation, wouldn't you agree?

A.    You know, I don't recall that comment.

Q.    Well, assume it's there.

A.    And it was that it's like a circus in his head?

Q.    "In my head," when he's under stress.

A.    I don't know that I would say that's an indication of a dissociation.  But it's an indication of disturbance in thinking under stress.

Q.    Okay.  And you would agree that it's on a continuum towards dissociation; may not be quite there, but it's heading in that direction?

A.    I don't know.  I wouldn't conceptualize it like that.

Q.    Okay.  You also endorsed that he has suffered black-outs under stress?

A.    Yes.

Q.    And is that consistent with dissociation?

A.    Yes.

Q.    Why don't you explain to the Court briefly what dissociation is.

A.    It's where the person is out of touch with reality.  They -- it's like they see themselves behaving, kind of looking down at themselves, they're not aware of their surroundings as

much as if they were in an intact mental state at the time.

Q.   And it's not psychosis.  Correct?

A.   No, it's not psychosis.

Q.   But it shares at least the feature of being out of touch with reality?

A.   Yes.

Q.   And he also endorsed the concept that he is paranoid while under stress.

A.   Yes.

Q.   But in that section, he denied suicidality or self-harm. Right?

A.   Yes.  As I recall, if you could direct me to the section --

Q.   Oh, okay.

A.   -- that you're talking about.

Q.   It should be in your data.  You know, I think I may have gotten it off the tape, but I -- Page 8 or 9 of your, let's see, of that instrument.

     Well, let's assume, for purposes of the question, that he said that to you in that section that's reflected on the tape. I mean, I don't have the reference right here.  If I'm wrong about that, Her Honor will certainly know that.

     I want to talk about the MMPI that was administered to him in 1985 when he applied for the Sheriff's Department job.  Do you recall that document?

A.    Yes, I do.

Q.    I'll put it up on the screen.  It's Petitioner's 58.  It's dated May 22nd, 1985.  And in fact, Mr. Bourgeois was administered an MMPI when he applied for that job.  Is that right?

A.    That's correct.

Q.    And an MMPI is probably the most long-standing and reliable of the paper and pencil personality tests?

A.    Yes, that's correct.

Q.    And it's over 500 questions?

A.    Yes.

Q.    And significantly, it contains, is it three or four validity scales?

A.    Well, there are now more than that.  At the time this was administered, there were at least three.  There were others that were used.  But there were three main ones, yes.

Q.    All right.  So the point being that the test is designed then and now to sort out people who are exaggerating symptoms?

A.    Yes.

Q.    And it's considered quite reliable in that respect?

A.    Yes, it is.

Q.    In fact, some people use it as a malingering tool, among other things.

A.    Well, it has validity scales that allow us to tell if the person is trying to look bad or look good.

Q.    Okay.

A.    And so it's used for that, as well as personality.

Q.    Okay.  And in regard to personality, it's got, I think --
I don't know what it had then, but somewhere in the
neighborhood of nine or ten personality scales?

A.    Yes.

Q.    Hypochondriac, depressed, paranoid.  Right?

A.    There were nine primary clinical scales.

Q.    Okay.  And one of those clinical scales is, reflects
sociopathic behavior.

A.    Um --

Q.    Scale 6.  Right?

A.    Actually it's Scale 4.

Q.    4?  Okay.  I'm sorry.

A.    But yes, there is one --

Q.    Okay.

A.    -- that does reflect that.

Q.    And you've seen the report of the administration of the
MMPI that's contained in this document.  There's no indication
that either Mr. Bourgeois malingered on this test?

A.    There is no indication that he malingered.  That's
correct.

Q.    And there's no report that he presented at all elevated on
the antisocial scale?

A.    Not in the interpretation that's given.  I didn't see

the --

Q.   The data?

A.   -- the actual test, but not in --

Q.   We don't have the data, so we're left with the report.  It does indicate moderate -- possible problems, I should say, in social facility, possible problems in overall adjustment, and possible problems in stress tolerance.  Correct?

A.   In his interpretation of the MMPI, it does reflect that, yes.

Q.   Were these computer-scored back then?

A.   Could be.

Q.   This is on Page 2.  It says, "He," Mr. Bourgeois, "appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals.  He appears to be somewhat anxious and nervous at times and appears to worry excessively. His self-esteem does not appear to be very good, as he indicated during the interview he presents himself as a very traditional and moralistic individual."

     Now, what I wanted to ask you about that is we've heard testimony, I think you heard it yesterday, that he was very ambitious at his jobs?

A.   Yes.

Q.   Okay.  So that's consistent with what the MMPI is reporting.  It also says, "He lacks the ability to achieve some goals."  Is that consistent, using your phrase, with a

diagnosis of mental retardation, inability to achieve goals?

A.   Well, sure, depending on what the goals are, yes.

Q.   Okay.  His anxiety and nervousness and excessive worry are all consistent with an adult survivor of childhood abuse.

A.   Among other things, yes.

Q.   Okay.  And low self-esteem is also consistent with an adult survivor of childhood abuse.

A.   Among other things, yes.

Q.   So if this document were presented to you pretrial in a capital case with this document and those reports of anxiety and inability to achieve goals and excessive worry, would that pique your interest in exploring the origins for those conditions?

A.   Yes.

Q.   Okay.  You'd want to look into it.

A.   I think it would be something, as a psychologist, that I would want to look into.

Q.   On the next page, in the Summary and Conclusions section, it says, "He seems to be a rather moralistic individual, who believes in right and wrong; however, he shows feelings of inadequacy and problems in evaluating self-worth.  He shows very strong ambition, but it is not clear what he wants or how to get it."

     And again, those observations are, the inadequacy is consistent with childhood abuse?

A.    Well, it's not inconsistent with childhood abuse.  That wouldn't alert me to childhood abuse from that summary and conclusion.

Q.    You'd want to look into why he feels inadequate.  Could be a lot of explanations, one of which is childhood abuse.

A.    That's correct.

Q.    And in combination with the things we just talked about on the previous page, it certainly presents a curious package of symptoms you'd want to explore.

A.    Yes.  He was found by this industrial psychologist to not be suitable to be a police officer.  I think I would want to find out why.

Q.    Okay.

        MR. WISEMAN:  Your Honor, I'm not sure we've offered this, but I would offer it at this time, P-58.

        THE COURT:  Any objection?

        MR. DOWD:  No, Your Honor.

        THE COURT:  P-58 is admitted.

BY MR. WISEMAN:

Q.    By the way, Dr. Price, were you ever permitted to review Dr. Moore's report --

A.    Yes.

Q.    -- in this case?

A.    Yes.

Q.    Okay.  Now, leaving aside the question that Her Honor has

indicated we can take a deposition on, there are a few things in your report that -- I'm sorry -- a few things in your testimony yesterday on direct that weren't exactly in your report.  Is that right?

A.    That's correct.

Q.    Okay.  And I take it that your testimony about those things that aren't in your report came up as a result of your meeting with Government Counsel, going through your report and discussing it.

A.    They, those things came up with my review of the work of the neuropsychologist in this, in continuing to analyze all the information in this case, not as a result of meeting with --

Q.    Okay.

A.    -- the Government.

Q.    I misunderstood.  I probably didn't phrase that well.

MR. DOWD:  Your Honor, I'd ask that the witness be permitted to finish his answer.

THE COURT:  Go ahead, sir.  Complete your answer.

THE WITNESS:  I was just clarifying that those opinions did not come as a result of meeting with the Government's attorneys.

BY MR. WISEMAN:

Q.    And I didn't mean to suggest that they did.  My question, inartfully posed, was the way in which you were able to testify about it is you told the Government lawyers in meetings that

you had this additional information to offer.  Didn't just spontaneously appear.  Right?  You said to them, "Hey, I could talk about some other things that aren't in my report."

A.    Well, I was asked questions about --

Q.    Okay.

A.    -- those things, and I had developed it.  And at some point, I told them what I thought of the neuropsychological data.

Q.    Yeah.  I'm not even talking about that at this point.  I'm just talking about generally.  So the point of my question here is that you sat down and you had a long conversation with the Government attorneys -- on more than one occasion?

A.    Well, yes.

Q.    How many times did you meet with them?

A.    I had a long -- excuse me?

Q.    How many times did you meet with them?

A.    Well, the discussion of that --

Q.    I'm not talking about neuropsychology.  I'm just talking about generally, how long did you -- how many times did you meet with the Government attorneys about your findings in this case?

A.    I had one telephone conversation.

Q.    How long did that last?

A.    Between two and three hours.

Q.    Okay.  And how long did the personal meetings last?

A.   On Tuesday evening, maybe a half hour.  Wednesday evening, again, maybe that long or an hour.

Q.   Okay.  So you altogether communicated either in person or on the phone about five hours with the Government lawyers?

A.   I think that would be approximate, yes.

Q.   Your article that we talked about yesterday says, quote, Every capital defense should begin with a biopsychosocial history, closed quote.  And that's on Page 116.  What does that mean?

A.   A complete life history should be conducted by someone to begin an investigation into the records that could be obtained.

Q.   And sources of information in addition to records? Individuals?

A.   Yes.

Q.   And is it important, in your view, to have that biopsychosocial history early in the development of the mitigation case?  The earlier the better?

A.   Well, I think that's true about any information, yes.

Q.   Yeah, okay.  I mean, as a consulting forensic psychologist, you wouldn't be pleased to receive this information two weeks before a trial started, would you?

A.   I would not.

Q.   How long do you think you'd need, or what do you typically require in terms of receiving this type of information? Four-and-a-half months?  Five months?  Three months?

A.    I don't have a certain time frame, just --

Q.    Okay.

A.    I mean, every case is different.

Q.    Okay.  You've heard me rattling off all those reports of abuse in that document that I just read to Judge Jack.  If you were provided information like that by a mitigation specialist, would you recommend a neuropsychological battery?

A.    Well, if there was other information, possibly.  But just from what you read, I certainly would recommend a psychological evaluation by someone who was an expert in child abuse.  I didn't hear anything in that, in those documents that you read, about a head injury.  But certainly the abuse would be investigated.

Q.    Okay.  Do you agree that brain dysfunction can be caused by severe and prolonged childhood abuse, even in the absence of a blow to the head; just the stress caused by that kind of abuse?

A.    You know, I do not at this time.  That is an area of some research of late, but I don't think, in my opinion, we're at the place to say that stress in childhood -- or in adulthood -- there's also the idea that individuals with PTSD, that it may alter brain functioning.  But I think that's in the beginning of the research, and I wouldn't ascribe that that was what was going on at this time.

Q.    And if you were provided information about abuse that

contained information about blows to the head, would that cause you to recommend a neuropsychological battery?

A.    Yes.

Q.    You testified on direct examination that you, that Mr. Bourgeois gave concrete responses to a number of the proverbs you administered.

A.    Yes.

Q.    And to be clear, the purpose of administering proverbs in a, in this setting, is to measure abstract thinking versus concrete thinking.

A.    Yes.

Q.    And so a concrete person has trouble interpreting the proverbs.

A.    That's correct.

Q.    All right.  And abstract thinking is a frontal lobe function, isn't it?

A.    Yes, pretty much.

Q.    And to be more precise, when you said he had trouble with them, he really gave no responses at all to any of them, except "Don't count your chickens before they hatch," and "I'll cross that bridge when I get to it."  Do you remember that?  Any other ones he was dumbfounded by.  He didn't respond.

A.    That's correct.

Q.    So he was pretty impaired on proverbs, wasn't he?

A.    He was very quick to say he had no idea what they meant.

Q.   In your experience as a clinician and as a forensic psychologist, could you tell the Court why survivors of abuse or witnesses of childhood abuse within the family are sometimes reluctant to disclose it?

A.   Well, it's especially true with sexual abuse, and they feel often that they were compliant and that in some way they caused it, they allowed it to happen, they were a confederate in the instances, and they're ashamed of it.

Q.   And that's true to some degree as well with regard to physical abuse?

A.   Yes.

Q.   People are ashamed.

A.   Yes, often.

Q.   And they want to deny that they were abused.

A.   Yes.

Q.   And it's often painful for people, witnesses as well as victims, to discuss it.

A.   That's correct.

Q.   Psychologically painful.

A.   Yes.

Q.   It causes distress.

A.   Yes.

Q.   Now, as a practitioner, how do you break through that reluctance?  What do you do?  When you're sitting down with someone that you suspect is abused, how do you get them to open

up?

A.    Development of rapport, trust, showing signs of acceptance, indicating that if it did happen, that you wouldn't blame them for it.  The trust and rapport.

Q.    Okay.  And that's a time-consuming process, I take it?

A.    It can be.

Q.    Okay.  It doesn't often happen on the first visit or the second visit?

A.    Well, I wouldn't say that.  But it, you know, sometimes with some individuals it takes time.  Sometimes it's relatively quick, if you -- if it's the right situation, the right person.

Q.    Okay.  It can go either way.

A.    Yeah.

Q.    Okay.  Now, in your clinical practice, do you, have you ever treated someone who was the survivor of childhood abuse?

A.    Yes.

Q.    And do you have any experience where, you know, I gather 45-minute sessions are typical and 50-minute sessions that you have with folks?

A.    What's the question?  I'm sorry.

Q.    When you sit down with a clinical patient, in a therapy session, is it typically 45, 50 minutes?

A.    Yes.  I don't do treatment at this time, but I understand that's still kind of the standard.

Q.    You used to do treatment, though.

A.   Yes.

Q.   Okay.  And in your experience, have you had patients who took several of those sessions to finally open up and discuss it?

A.   I have had that experience, yes.

Q.   Now, I take it that a psychologist is far more skilled, in theory -- I'm sure you are, but I'm just saying hypothetically -- than a mitigation specialist to go through that process.  You have the expertise.

A.   Well, I mean, I think there's a lot of people able to do that.  A lot of people that I've worked with that were mitigation specialists were trained as psychiatric social workers.  They were quite, quite capable of that as well.

Q.   Okay.  But as a general proposition, you would agree that a licensed, trained psychologist, who teaches psychology to psychiatrists, like yourself, is probably better skilled to get the person to open up.

A.   Well, as a generalization, psychologists with that kind -- with experience in doing that are likely pretty good at doing that.

Q.   Now, you know Mark Cunningham, don't you?

A.   Yes.

Q.   And you've been on both sides of cases with him?

A.   Yes.

Q.   Okay.  Do you think he's skilled in the ability to, you

know, break through and open up people who might be reluctant

to talk about abuse?

MR. DOWD:  Your Honor, can we narrow down the, what

the doctor's basis for this opinion would be?

MR. WISEMAN:  Well, if you know.

MR. DOWD:  Knowing him and working with him, I don't

know the extent of his contact and knowledge of

Dr. Cunningham's abilities.

MR. WISEMAN:  Yeah, and that's a fair point, Your

Honor.

BY MR. WISEMAN:

Q.   If you know, Doctor.  And if you do, tell us how you know.

A.   Well, I do know.

Q.   Okay.

A.   And I have worked with him, as you said, on the same side

and opposite side.  I've reviewed his work on many occasions

and have conducted evaluations with him.  So I do know.  And he

is a person that is skilled in that area.

Q.   And I'm sure there are occasions when you don't agree with

his views in a particular case, but as a general proposition,

he's a practitioner with integrity?

A.   Yes.

Q.   And honesty?

A.   Yes.

Q.   Have you ever known him to get angry?  Over a case, that

is.

A.   Frustrated, a little impatient, like maybe all of us have been, but I've never seen him angry.

Q.   You've never refused to work with him because he's an angry guy?

A.   No.

THE COURT:  Who are we talking about?

MR. WISEMAN:  Dr. Cunningham.

THE COURT:  Were you in here when he testified?

THE WITNESS:  I was.

THE COURT:  Pardon?

THE WITNESS:  I was.

THE COURT:  What do you think?

THE WITNESS:  I think he got frustrated.  I think he was upset.  And I think he has been in this case, from what I have heard and read.

BY MR. WISEMAN:

Q.   In what respect?

A.   Well, that he thought he should have testified.

Q.   Because he had something to say.

A.   That's what he thought, yes.

Q.   When you were given Mr. Bourgeois his mental status exam, I think you started out by explaining to him that it was a means of taking his temperature.  You remember that?

A.   Yes.

Q.    And what did he respond?

A.    That he didn't understand what -- I was saying, I just want to see if you're all right to be here.  It's kind of like taking your temperature.  And he thought it was going to be some kind -- or he said that he didn't want any kind of medical procedure, like a shot.

Q.    Well, actually, that's pretty close.  I have -- I noted that he said -- and the Court, of course, will review the tape. He said, "There won't be any needles, will there?"  You remember that?

A.    Okay.  I said "shot."  He said "needles."

Q.    Yeah, okay.

A.    Yeah.

Q.    So the point being, he totally missed the boat on that. Right?  He didn't catch your meaning?

A.    Right.

Q.    Okay.  You used a metaphor, and he interpreted it about as concretely as a person could?

A.    That's correct.

Q.    And you said yesterday that he doesn't test well.  You remember that?

A.    Yes.

Q.    Okay.  So this is an example where we're not talking about testing.  Right?  You're just talking to the guy, and he gives a response that's as concrete as any of the proverbs that you

tested him on.  Right?

A.    Yes.

Q.    So you can derive from that concrete response that his performance on proverbs isn't because he doesn't test well, it's because he's concrete.

A.    I would say that he's concrete, yes.

Q.    He talked about the anniversary of the death of his daughter.  Do you remember that?  Getting upset at that time.

A.    Yes.

Q.    I think he said it's like a few days away.

A.    Yes.

Q.    Do you remember him saying that in a few days, it's going to be the four-year anniversary?

A.    Well, I don't remember the number of years.

Q.    Okay.  Again, the tape will decide.  But assuming he said four years, that would put the death at 2006.  And of course, the death was in 2002.  Is that some evidence of his mental functioning, that he would be off on such an -- a fact that's so important to him by double?

A.    And evident of my dysfunction, because I didn't pick up on that.

Q.    You didn't pick up on it.  All right.  Well, if the psychological shoe fits.

      Did you notice on the tape at the beginning that he seemed rather interested in communicating to you that he wasn't --

that the crime, to the extent it occurred, didn't happen on the Naval Air Base?

A.    Yes.

Q.    Do you remember when he said he doesn't understand why he's being charged with this by the State of Texas?

A.    No, I don't remember that.

Q.    Well, assume that's what he said, because it's on the tape.  I mean, obviously, he's not being charged by the State of Texas.  He's being charged by the United States of America.  Is that right?

A.    That's correct.

Q.    Okay.  So that kind of fundamental misstatement of who the folks who are prosecuting him now eight years into this case again shows a level of impairment and dysfunction.  He's wrong about a very important fact in his life.

A.    Well, he's wrong.  Not every error that someone makes is a sign of some kind of global impairment.  I mean --

Q.    No, of course not.

A.    -- we all make errors.  And if -- and that is a mistake in his thinking if he thinks --

Q.    Okay.

A.    -- that the State of Texas is prosecuting him.

Q.    Now, getting back to this idea that he doesn't test well, would you agree it's possible that he doesn't test well because he's got all the deficits we've been discussing, the low

intelligence, the impulsivity, the borderline personality disorder?  I mean, can't those all contribute to his inability to test well?

A.    Yes.

Q.    So inability to test well is not an excuse for a practitioner to throw out all this psychological, neuropsychological testing.  Right?

A.    No.  I don't think you should throw out the testing.  I think that you'd put it in context and compare it to other information that you have about the person's life, and you do look at effort.

      And I think a person with poor educational experiences, you start bringing out tests, and sometimes that, they just think, "Oh, this is like when I was back in school, and I never liked taking tests then," and so that contributes to it as well.

Q.    Okay.  You mentioned that he has an easier time -- and I'm paraphrasing here -- talking about himself than taking the tests.  Is that right?

A.    Yes.

Q.    Okay.  Now, you would agree that he told you a lot of information during your nine hours that you absolutely have no way to verify, one way or the other.

A.    I have no way to verify some of the things he said.  That's correct.

Q.    So for instance, when he says he had a big gumbo pot, you don't know if that's true.

A.    Right.

Q.    You don't know if he can cook gumbo.

A.    That's correct.

Q.    You don't know if he can cook a Pop Tart.

A.    I don't know.

Q.    Okay.  And you have no way of determining whether he had a secret bank account in Memphis to hide money from his wife. You've never seen bank records for that, have you?

A.    No.

Q.    All right.  So when you've got a person who puffs and exaggerates and wants to look good, and you have no collateral information to verify his claims, you sort of have to rely more on testing than when you have a reliable accurate historian, don't you?

A.    Well, and collateral information that is available and information from other people and from records, et cetera, all of that.  Yes, you do.  I think the point is, to me, as a forensic evaluator, that you don't want to rely solely on self-report.

Q.    Right.  Especially with Mr. Alfred Bourgeois.

A.    And he's one of the ones I would not want to rely solely on self-report.  I could say that as a generalization, that I am uncomfortable with relying on self-report.  I just evaluated

someone that had a doctorate that didn't tell me some very significant information.

Q.   Okay.  Yeah.  And so when Dr. Estrada reported that Mr. Bourgeois reported that he had an idyllic childhood, I mean, in a case like this, you wouldn't just say, "Well, okay, that's the beginning and end of, you know, what his childhood was like."  I mean, you'd want to look past that.

A.   Yeah, I would want to have other information in any forensic evaluation, other than self-report.

Q.   Now, you said yesterday something like when he came back on the second day, he seemed interested in telling you that he really doesn't read as well as he may have indicated the day before.  And I think you described that as he was trying to fix a slip that he had made, words to that effect.

A.   Well, I think he had thought about that and wanted to clarify what he thought I thought.

Q.   Okay.  And you would agree, of course, as we discussed, that if you want to use the phrase "slipped," I mean, he slipped quite a bit in this, in terms of giving you information that made him look good.  I think you testified that he wanted to look good.

A.   Oh, what's the question?  I'm sorry.

Q.   Sure.  If you want to use the term "slipped," to describe Mr. Bourgeois's comments to you on that day, you would agree that he slipped quite a bit in this interview, because he

disclosed lots of information that made him look really good.

A.    And information that made him look bad, too.

Q.    Right.  He gave you a bunch of information, some good and some bad.

A.    That's correct.

Q.    Okay.

        (Counsel conferring off the record.)

BY MR. WISEMAN:

Q.    Dr. Estrada reported that Mr. Bourgeois has above average intelligence, and I think you indicated that -- well, he, do you recall that he reported that, above average intelligence?

A.    I do.

Q.    And there was no indication that any psychological, psychometric testing was done to provide him a basis for that opinion.

A.    That's correct.

Q.    Because he didn't wait to see what Dr. Weiner's results of the IQ testing were.  He just kind of made an assess, a clinical assessment in that setting and arrived at that conclusion.

A.    Yes.

Q.    Okay.  And I think you agree that he was clearly wrong in that regard.  Right?  I mean, Mr. Bourgeois is nowhere near above average intelligence.

A.    That's correct.

Q.    He's not average.  He's not low average.  He's either borderline or mild mentally retarded.

A.    Yes, that's --

Q.    On IQ testing.

A.    Yes, that's correct.

Q.    Now, you don't teach your psychiatrists to opine about intelligence in a death penalty case without psychometric testing, especially when a subject, who we all agree is, presents far better than he actually is.  That's not good practice, is it?

A.    No, it's not good practice.

Q.    You were discussing his facility and familiarity with the Bible.  Do you recall that?

A.    Yes.

Q.    Were you aware that Judge Jack, from the time of this trial, has put in place a communication limitation order, and as a result of that, Mr. Bourgeois is not permitted phone calls or mail communication with anyone but his legal team?

A.    I am aware of that.

Q.    We get all those long letters now.  And that as a result, he doesn't have access to funds and such, other than what his legal team might be able to provide.

      If the Bible is the only thing, the only book he has to read, does that -- and he's in isolation pretty much 24 hours a day, seven days a week, would you agree that his familiarity

with the Bible, with a sixth grade reading level, which is what I think he has, based on the testimony, that it doesn't add a whole --

MR. DOWD:  Your Honor, I think Counsel's testifying.

MR. WISEMAN:  I'm sorry, you're right.

MR. DOWD:  That's not in the record.  I would ask that that --

MR. WISEMAN:  I withdraw that.  I withdraw it.  I went too far there.

BY MR. WISEMAN:

Q.    The point being, if all he's doing is reading the Bible, you would agree that his facility, his familiarity with it doesn't really, isn't really inconsistent with mental retardation.  He's sitting with this book day after day, reading it over and over again.

A.    Well, I think that it's inconsistent with mental retardation, to be able to read and understand and conceptualize some of the things that he was able to talk about, yes.

Q.    You said that he wrote his paragraph for you in a, quote, normal amount of time.  You would agree that there's no -- you weren't using any standardization when you opined that it was normal.  I mean, you don't have a chart that says this is how long it should take a person to write a paragraph.

A.    No, I don't.  That was a subjective interpretation on my

part.

MR. WISEMAN:  All right.  I think that's all I have, Your Honor.  Thank you, Dr. Price.

THE COURT:  Thank you, sir.  Anything further?

MR. WISEMAN:  Oh, you know what, Your Honor?  I missed one question.  I'm sorry.

THE COURT:  Go right ahead.

MR. WISEMAN:  I reminded myself.

BY MR. WISEMAN:

Q.   You talked about his lack of adaptive -- to the extent you agree there's any lack of adaptive skills, they may be better attributed or caused by his cultural deprivation, something like that.

A.   I believe I testified that some of the problems that had been interpreted as being adaptive behavior deficits, in my opinion, are consistent with a personality disorder rather than mental retardation.

Q.   Right.  I get that.  But I thought you also said that some of these deficits could be attributable to a cultural deprivation, his impoverishment, his poverty, his lack of education, things like that.

A.   Well, as I recall, when you and I were discussing the impoverishment and the lack of cultural enrichment, that was in relationship to his low intelligence.

Q.   I thought you had said it on direct.  But in any event,

you would agree that according to the 11th edition of the AAIDD manual, that risk factors for intellectual disability can include impaired child giving (sic) interaction, lack of adequate stimulation, family poverty, chronic illness in the family, things of that nature.  So environmental factors can contribute to a person's development of MR.

A.   Yes.  And it's, that's -- I think what I was saying, it said there that intellectual deficits can be attributed to that.

Q.   Okay.

A.   And I totally agree with that.

Q.   Okay.

A.   Absolutely.

MR. WISEMAN:  All right.  That's all.  Thank you, sir.

MR. DOWD:  Your Honor, I don't have any redirect, but I did want to clarify with Dr. Price, for purposes of Mr. Wiseman's motion for deposition, what norms he did use to evaluate Dr. Weiner and Gelbort's evaluation of the Trail Making Test in 2004 and 2007, as well as the category, his evaluation of Dr. Weiner's conclusions based on the category test.  And I would just like to clarify that for the record.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. DOWD:

Q. What were the norms that you employed in evaluating those opinions by Dr. Gelbort and Dr. Weiner regarding the Trail Making and the Category Test?

A. Yes. They are the published age and education norms for neuropsychological tests, compiled by Dr. Robert Heaton, H-E-A-T-O-N.

Q. All right. For both analyses?

A. Yes.

MR. DOWD: That's all I had, Your Honor. I just wanted to clarify that.

MR. WISEMAN: I have nothing further, Your Honor.

THE COURT: Thank you, sir. You may stand down. Call your next witness.

MR. DOWD: May Dr. Price be released, Your Honor?

THE COURT: Any objection?

MR. WISEMAN: I'm sorry, I didn't hear that.

MR. DOWD: I asked if Dr. Price could be released.

MR. WISEMAN: Oh, absolutely.

MR. DOWD: Thank you, Your Honor. We call Jerrilyn Conway, Your Honor.

MS. BOOTH: And Judge, while we're waiting for the witness to come in, a little earlier from a Defense Exhibit -- I mean Petitioner's Exhibit Number 61, when you asked Mr. Wiseman to read from the reports to talk about the abuse that was stated, I feel like I need to add a line or two --

THE COURT: Go ahead.

MS. BOOTH: -- to where he was reading. He read off of Petitioner's Number 61 that "Mom never bought Alfred any" --

MR. WISEMAN: What page, please?

MS. BOOTH: That is Page 2. "Mom never bought Alfred" -- and this is Alfred speaking to the --

MR. WISEMAN: Page 2 of where?

MS. BOOTH: Of 61.

MR. WISEMAN: I know, but there's a lot of Page 2s. It's a compilation of --

MS. BOOTH: Well, I'm reading, okay, 004582, your Bates stamp.

MR. WISEMAN: Okay.

MS. BOOTH: And he read that "Mom never bought Alfred any toy or new toys or anything. 'When I was with her, I didn't know what a new toy was. Mom just wouldn't buy me anything. I don't remember Mama never buying me anything.' He never had any new clothes during the time he lived with his mother. His brothers got the new clothes. He got the hand-me-downs. And he used to sneak clothes from his brothers outside and change after he had left for school. His mom wouldn't let him wear anything nice, so he would have to leave the house, then change into his brother's clothes. 'I was the black sheep of the family.' Alfred thought his mom treated him like a girl regarding chores or household duties. Alfred was

the only boy that mom made wash the dishes after supper or help put all the clothes on wash day.  Alfred often had to do the girls' chores when his brothers were never made to do the girls' chores.  'I got treated like a girl.'"

MR. DOWD:  Your Honor, may I step out for about two minutes while Mrs. Booth is conducting --

THE COURT:  You all can keep going in and out, as long as somebody's here from each side.

MS. BOOTH:  Okay.  I just wanted to add that to the reading, Your Honor.

MR. WISEMAN:  And I have no objection to that.  In fact, I would renew my offer to just let the Court have the packet, and you can read it at your leisure and --

THE COURT:  Okay.  Any objection to --

MS. BOOTH:  Not at all, Your Honor.

THE COURT:  What's it called?

MR. WISEMAN:  61A.

THE COURT:  P-61A is admitted.

MS. BOOTH:  It's Alfred Bourgeois's statement.  So it's --

THE COURT:  Is it labeled on there that it's his statement?

MR. WISEMAN:  Well, there's a number of statements, as I read to the Court, including his.

THE COURT:  Oh, okay.  Okay.  That's a packet of

statements.

MR. WISEMAN:  A packet of statements.

THE COURT:  Got it.  Okay.

MR. ROBERTS:  Your Honor, just so -- excuse me -- so I can clarify, we had a whole list of exhibits that we were going to put into evidence with Dr. Oliver.  They are obviously now, we're not going to offer them, so our exhibits are going to, just so the record's clear, we're going to have some that are -- we do have some that are listed in the high numbers of the 100s and 200s -- and the low numbers of the 200s.  And there's going to be a big gap between some of our exhibits. But we would have the opportunity to put those on, if necessary, on the deposition --

THE COURT:  Yes.

MR. ROBERTS:  -- if necessary?  Thank you, Your Honor.  And the next witness is -- Mark Dowd.

(Witness sworn.)

MR. DOWD:  Ms. Conway, do not touch the microphone.

THE WITNESS:  Thank you.

(Stopping at 9:38:05 a.m.)

(TESTIMONY OF JERRILYN CONWAY PREVIOUSLY TRANSCRIBED.)

(Beginning at 12:13:00 p.m.)

MR. ABREU:  Your Honor, may I offer Petitioner's Exhibits?  There are one or two that I needed to make a copy of, and I'll provide to Ms. -- they were -- oh, I'm sorry.

Petitioner's 179, Your Honor.

THE COURT:  Any objection?

MR. DOWD:  179, no objection, Your Honor.

THE COURT:  P-179 is admitted.

MR. ABREU:  And I do have a motion, Your Honor, with regard to this particular claim, whenever the Court's ready.

THE COURT:  Which claim?

MR. ABREU:  The alleged semen claim.

THE COURT:  Okay.

MR. ABREU:  As Your Honor is aware -- or I don't know if Your Honor is aware -- but there's been some back and forth regarding what documents were produced at what time in regards to time of trial.  This document, Petitioner's 179, which I questioned Ms. Conway about, is a document, as I've noted before, I had never seen before.

Certainly, there was no testimony at the time of trial regarding very weak, very weak, or weak.  And certainly Mr. Tinker didn't ask any questions reflective of the fact that he had that particular document at the time.

THE COURT:  Well, you don't have any evidence that he didn't.

MR. ABREU:  No, no, I'm not saying that yet.

THE COURT:  Okay.

MR. ABREU:  We're trying to figure this out right now.  And Ms. Johnson did not have that particular document at

the time, as she testified.  She had no information regarding the strength of the tests.

My understanding is that the Government went back and did a review of -- let me just also say, to preface that, that I have searched all of our 12,000 pages that we received from trial counsel, which we then re-provided to the Government.  I have searched those 12,000 pages for this one document, and this one document does not exist in those 12,000 pages.  That still leaves a possibility that it somehow got removed between the time it got from trial counsel to us.

My understanding is that the Government has gone back and reviewed how these files came into existence.  Apparently, the FBI sent them to the Government back at the time of trial. The Government then produced three copies, one of which was sent to trial counsel, which is the one that we eventually ended up with, I presume, because it's not in that one either, and --

MR. DOWD:  Which one?

THE COURT:  Wait a minute.  So P-179 trial counsel had at the time of trial.

MR. ABREU:  No.  We don't know that yet.  And, but let me say this.

THE COURT:  I thought you said --

MR. ABREU:  No.

MR. DOWD:  I can clarify, Your Honor.

THE COURT:  Okay, Mr. Dowd.

MR. DOWD:  This is what I understand happened.  I wasn't here at the trial time, but the FBI shared their entire lab file with the Government.

THE COURT:  Okay.

MR. DOWD:  We took that and made three copies.  One copy we sent to Mr. Tinker.

THE COURT:  Okay.

MR. DOWD:  Two copies, we kept.  One just as a standby copy.  The other is part of the working file.  We've gone back, once this came up yesterday, we went back and looked at our original FBI file, the one that was provided to the Government, and this document, P-179, is in there.

THE COURT:  Okay.

MR. DOWD:  We went to the next copy of our FBI file, which is the copy we're preserving, and it's in that copy as well.  We went, then went to the third copy, which is the, or what was part of our working file, and it's not contained in that working file.  Other documents are contained in there.  There's several other documents from the FBI file which are also not contained in that third working file.

So what I believe -- what I believe is that we made the copies of the original FBI file.  That document was in there, because it's in one of our copies.

THE COURT:  Okay.

MR. DOWD:  One of our copy files.  So that's why I believe it went to Mr. Tinker, because if the copier made one copy, then it would have made the three copies.  If two pages stuck together, we wouldn't have any copies of this page in any of our copied files.  So it's our position that Mr. Tinker got it, on that basis.

MR. ABREU:  Are you finished?

MR. DOWD:  I'm finished.

MR. ABREU:  And our contention, Your Honor, is that there is a working copy that does not contain this particular document, and that the files that were sent to Mr. Tinker could just have easily have come from that particular copy that didn't contain this, and that the evidence presented at trial, and Mr. Tinker's questioning at the time of trial, which the Court can go back and take a look at, is reflective of him not having received this, in conjunction with the testimony of Ms. Johnson.

So our motion, Your Honor, is to amend the claim as currently written to include a component alleging the violation of Brady versus Maryland for the Government's failure to disclose this particular document, P-179, Your Honor.

THE COURT:  Okay.  And that's the evidence that you've got to support that?

MR. ABREU:  Well, there's more in the record, which we'll cite to you when we come back and address this in

argument or in, I mean, I can make other -- I just don't know the entire record cold of every question Mr. Tinker asked, and I would like to show that to the Court at some point.

MR. DOWD:  Judge, I have one more clarification.

THE COURT:  Yes, sir.

MR. DOWD:  Actually, the file that was digitized and sent to the present defense team, unfortunately, was made from --

THE COURT:  The working file.

MR. DOWD:   -- our working file.

THE COURT:  Okay.

MR. DOWD:  And I can verify that that's the file that was used unfortunately to --

THE COURT:  And you got your working file from the original one that had it in there?

MR. DOWD:  We got the working file from the original one that had it in there, but unfortunately people have gone in and placed documents in there that shouldn't be in there and have removed documents that should be in there.  So we have a secondary copy file, which is complete, and it mirrors the original FBI file.  And that document is in our --

THE COURT:  And that's the one you used to make the extra copies?

MR. DOWD:  No.  We used the working file to provide the Public Defender with the FBI file.  That's why it's not in

their file.

THE COURT:  No, no, I'm talking about the trial team.

MR. DOWD:  Oh, the trial team --

THE COURT:  What file did you use?

MR. DOWD:  We took the original FBI file and we made three copies.  We sent one copy to Mr. Tinker.  We kept one, and we kept that one in pristine condition.

THE COURT:  Okay.

MR. DOWD:  That one contains this document.

THE COURT:  Okay.

MR. DOWD:  That's why I believe Mr. Tinker got his.

MR. ABREU:  Your Honor, our contention is that in the context of the questions that Mr. Tinker was asking -- and Your Honor can go back and look at the transcript.

THE COURT:  I have looked at that.

MR. ABREU:  Oh, I'm sorry.  And if you look at all the questions he's asking all the witnesses, for somebody who's trying to disprove that this is a positive test for p30 and semen, it would seem obvious to me that if he had this document, he would then be arguing that it was very weak, very weak, or weak, and bringing that out with the witnesses.  And in fact, if he did not -- if he had, if he had that particular document and didn't use it, that would only strengthen our ineffectiveness claim.  So it's either a Brady claim or it's an ineffectiveness claim.  Either way, Your Honor.  But I would

say it's good evidence of a Brady claim.

THE COURT:  I'm not going to allow you to amend for the Brady claim, because I think that's futile.  There's no evidence that they didn't get it.  In fact, there's evidence that they did.  But if you want to use it for ineffective, you can use it for ineffective.

Okay.  Move along.

MR. ABREU:  I'm just going to take a second to collect my documents here, Your Honor.

THE COURT:  You all want to have lunch?  Okay.  Oh, we've got noon settings.  Sorry.

Okay.  So we're going to break for lunch, come back at 1:30.  How many more witnesses?

MR. ROBERTS:  Well, Your Honor, we were going to offer a bunch of documents.  And if those documents came in, we would only have one more witness.

THE COURT:  Dr. Moore?

MR. ROBERTS:  Yes.

THE COURT:  Okay.

MR. ROBERTS:  But if they don't just allow it in, we've got to offer them through the witness, Your Honor.

THE COURT:  Well, talk to them over the lunch time.  Y'all share lunch and visit.

MR. ROBERTS:  Yes, Your Honor.

(Recess from 12:21 p.m. to 1:35 p.m.)

THE COURT:  Thank you.  You may be seated.  Would you call your next witness.

MR. ROBERTS:  Yes, Your Honor.  Before we do that, there's a couple of evidentiary issues.

THE COURT:  Okay.

MR. ABREU:  Your Honor, there actually are a couple.  And if I may, may I ask a point of clarification of the Court's earlier ruling --

THE COURT:  No.

MR. ABREU:  -- regarding -- a point of clarification?

THE COURT:  No.  Go ahead and -- what else do you have?

MR. ABREU:  There's another matter, Your Honor.

MR. ROBERTS:  I believe the Defense wanted to offer an exhibit.

MR. McHUGH:  Your Honor, yes.  I would ask that -- there's a Government Exhibit that was marked as Government Exhibit 169 prior to the -- I'm sorry -- prior to the hearing, and I'd be asking if -- the Government has indicated they're not offering as part of their case in chief, and I'd be asking if we could have it moved in as a Defense Exhibit.  Our next Number would be 182.  It's a document provided to us from the Government.  It's a letter from Ms. Patti Booth to the Texas Board of Pardons and Paroles.  It's relevant to our Brady claim concerning Mr. Longoria.

MS. BOOTH:  Your Honor, there is no evidence to proceed on that.  And I did provide it to them.  And we intended, if we had to defend that issue, we were going to defend it.  It wasn't addressed.

THE COURT:  So their objection -- your objection?

MS. BOOTH:  Is that their case is closed, Your Honor.

THE COURT:  Sustained.

MS. BOOTH:  Thank you.

MR. ROBERTS:  Your Honor, I have several Government exhibits that I'd like to offer at this time, and I've already showed it to the Petitioner.  That would be Government Exhibit 27, which is a letter by --

THE COURT:  Just call them out.

MR. ROBERTS:  Okay, Your Honor.  Government Exhibit 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41 and 43.

MR. WISEMAN:  And we have no objection.

THE COURT:  I'm sorry, after 39 there was what?

MR. ROBERTS:  I'm sorry, Your Honor.  39, 40, 41, we're skipping 42, but we have 43.

THE COURT:  43.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Government's Exhibits 2 through 41 are admitted -- 27 through 41 are admitted, and 43.

Call your next witness.

MR. ROBERTS:  Your Honor, the United States calls Dr. Moore.

THE COURT:  Could you come forward, please, sir.

(Witness sworn.)

MR. ROBERTS:  And Dr. Moore, you've been present throughout these proceedings.  So, Your Honor, I can assure you that he's more afraid of touching your mike than anything else.

THE COURT:  Good.

MR. ROBERTS:  And we've talked about it several times.  So you've been warned, Dr. Moore.

ROGER BYRON MOORE, JR., GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Moore, could you state your full name for the record, please?

A.   Roger Byron Moore, Jr., Ph.D.

Q.   Can you tell us the city and state where you reside?

A.   Cary, North Carolina.

Q.   What is your role, what is your role here in this case?

A.   I am a clinical and forensic psychologist who was asked to do an evaluation in relation to mental retardation with Mr. Bourgeois.

Q.   Did you prepare a curriculum vitae and provide that to the United States?

A.   Yes, sir.

Q.   I'm showing you what's been marked as Government Exhibit 17, and I'll ask --

THE COURT:  Any objection?

MR. WISEMAN:  No objection to it being moved in.

THE COURT:  Government's Exhibit 17 is admitted.  You can still refer to it if you want.

BY MR. ROBERTS:

Q.   Also, did you prepare a list of your history of testimony and depositions since January of 2006?

A.   Yes, sir.

Q.   I'm showing you what's marked as Government Exhibit 18. Do you recognize that?

A.   Yes, sir.

Q.   Is that what you prepared?

A.   Yes, sir.

MR. ROBERTS:  I offer that, Your Honor.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry, Number what?

MR. ROBERTS:  It's Government Exhibit 18.

THE COURT:  Government's 18 is admitted.

MR. ROBERTS:  Your Honor, I'm going to go ahead and hand the CV to the -- I'll hand it in so the Court has a copy of that.

BY MR. ROBERTS:

Q.   Dr. Moore, can you tell us, what is your area of

expertise?

A.    It's clinical and forensic psychology.

Q.    And how did you come to be experienced in that area?

A.    Through education and experience.  I have two master's, a Ph.D. and two post-docs.

Q.    Tell us what those degrees are in.

A.    My bachelor's degree is in psychology.  My first master's is in mental retardation and developmental disabilities.  My second master's is in clinical, and my doctorate is in clinical.  The two post-docs are in, one's in cognitive research and therapy and the other is, was a behavioral sciences fellowship.  Basically it's behavioral medicine.

Q.    And do you have a subspecialty?

A.    Well, I work with mental retardation, clinical issues and forensics.  Within my general practice, I see a wide range of patients.

Q.    You mentioned several areas that you, in your education. Do you have a specific education that you, that would qualify you as an expert in the mental retardation assessments?

A.    Yes, sir.

Q.    What would that be?

A.    I have a master's degree in mental retardation and developmental disabilities, and I have additional training and work experience in working with a population of -- with mental retardation, referred to as intellectual disabilities now.

Q. Could you please tell Judge Jack what your experience is with IQ testing?

A. My experience with IQ testing goes back to the earliest stages of my master's training. So I guess we began being trained in intellectual assessment back in about '85, '86, somewhere along there.

THE COURT: Where is East Carolina University?

THE WITNESS: It's in Greenville, North Carolina, ma'am.

THE COURT: Thank you.

BY MR. ROBERTS:

Q. What about your experience in assessing adaptive functioning?

A. That, too, began back in that program at East Carolina. But the training in assessment has continued throughout the training programs noted here. That was ongoing at the time of my training.

Q. How many times have you testified in any kind of hearing?

A. In any kind of hearing, it would be over a thousand.

Q. And I know you have some experience in, I think you called it the Panel of Medical Experts that is ran through the Office of Hearings and Appeals?

A. Yes, sir. I'm on the Panel of Medical Experts that's maintained by the Office of Hearings and Appeals with the Social Security Administration.

Q.    Does that have any relevance to mental retardation or assessment?

A.    It does.  The Social Security Administration has a couple of programs, Title 2 and Title 16, which are disability programs.  And people can apply for funding basically under that, receive disability payments.  And one of the areas under which they can obtain disability is mental retardation.

Q.    In the criminal context, now I'm going to move to the criminal context and ask you, have you testified for both Defense and Government in the criminal context for forensic psychology with mental retardation as the focus?

A.    Yes, sir.

Q.    And how many times do you think, in the criminal context, that you testified in a case either for the Government or the Defense?

A.    In the criminal context, it's probably been about a dozen or so.  And then there have been some civil cases as well.

Q.    And is there a percentage that you can break down of how many times you've been asked by a Defense to assist their trial team versus how many times you've been asked by the Government to assist their trial team?

A.    I would say at this point the ratio is probably 80/20.  About 80 percent of the time or so, I've been with the Government, and about 20 percent of the time with the Defense.  But then again, as we get into civil cases, those numbers

switch a bit.

Q.   Tell us what the numbers are for civil cases.

A.   Probably closer to 70/30.

Q.   And what is the focus of those civil cases?  Is it obtaining benefits and services?

A.   No, sir.  That would be cases where, for example, somebody has been in an automobile accident and there's post-traumatic stress from that, or there were a number of cases where persons with intellectual disabilities, the contention had been that they had been abused within an institutional setting, and I was helping to establish evidence that they had experienced emotional trauma from that.

Q.   In the cases that you've testified in, have you been qualified as an expert in clinical and forensic psychology and also in mental retardation assessments?

A.   Yes, sir.

Q.   Have you ever been denied qualifications as an expert in those instances?

A.   No, sir.

        MR. ROBERTS:  Your Honor, we would proffer Dr. Moore as an expert in clinical and forensic psychology and in the field of mental retardation assessment.

        MR. WISEMAN:  May I inquire, Your Honor?

        THE COURT:  I'm sorry?

        MR. WISEMAN:  May I inquire?

THE COURT: About?

MR. WISEMAN: Qualifications.

THE COURT: Oh, on voir dire. You can take him on voir dire, sure.

VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q. Good afternoon, Dr. Moore.

A. Good afternoon.

Q. I noticed on your curriculum vitae on Page 4 that you list as a publication "Modification of Individual Scores, IQ Scores" -- that says "in," I guess that should be "is" -- "Not Accepted Professional Practice." And that's a publication that you did in psychology of mental retardation and developmental disabilities. What's that article about, briefly? I mean, what --

A. I'm sorry, I don't have that publication in front of me. But that's not a peer-reviewed article. Let me be clear about that. When I list publications, I just simply have listed articles or things that have been written, some in peer-review journals, some not. But in case, in this context someone needs to be able to pull out things that I've written. That was a letter to the newsletter that is put out by the Division 33 from the American Psychological Association, which is the division on intellectual disabilities, and the letter had to do with my disagreement in applying the Flynn Effect modification

to the actual scores on IQ tests.

Q.    And is this the letter?  My scratch is on there, but is that the letter to the editor?

A.    Yes, sir, it is.

Q.    Did you have anything to do with the submission of these photographs in that particular publication of Division 33?

A.    No, sir.

Q.    How about those?

A.    Did I have anything to do with the submission of the photographs?

Q.    Yeah.  I mean, you submitted a letter to the editor.  I wondered if you sent any pictures.

A.    Oh, no, sir.

Q.    Oh, okay.  Just the letter.

A.    Yes, sir.

Q.    Okay.  Did I hear you say that you've testified about post-traumatic stress disorder from automobile accidents?

A.    Yes, sir.

Q.    And finally, when was the last time you were retained by Defense Counsel in an Atkins situation?

        THE COURT:  So what does this have to do with the qualifications?

        MR. WISEMAN:  You know what, you're right.  It doesn't.

        THE COURT:  Thank you.  Would you proceed.

MR. ROBERTS:  May he be accepted as an expert in these fields, Your Honor?

THE COURT:  Any objection?

MR. WISEMAN:  No objection.

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

DIRECT EXAMINATION (Continued)

BY MR. ROBERTS:

Q.   Dr. Moore, did you prepare a report about everything that you did in this case?

A.   Yes, sir.

Q.   Does your report accurately reflect your analysis and your conclusions from this case?

A.   Yes, sir.

Q.   Have you had a chance to review that report?

A.   Yes, sir.

Q.   In fact, you made several corrections, typographical errors and other things a couple of times in putting this particular report together.  Is that correct?

A.   Yes, sir.

Q.   Okay.  I'm showing you what's marked as Government Exhibit 15.  Does that look like the first page of your forensic psychological evaluation?

A.   Yes, sir.

MR. ROBERTS:  This is a 21-page document, Your Honor.

I would offer Government Exhibit 15.

MR. WISEMAN:  Your Honor, I would have no objection if the witness could identify the places where he's made changes, because it's a long document.  And although Mr. Roberts provided it to me, I haven't had a chance to figure out what's different.

MR. ROBERTS:  It might be easier, Your Honor, just to have him testify about what changes you made.

BY MR. ROBERTS:

Q.   Were they substantive changes or just typographical errors?

A.   Typographical errors in general.  There was one place where I had misworded where the phrase was "at least two standard deviations below the mean," which was a phrase we're very, it's been very commonly used throughout the statistics work that I've done and whatnot.  And I needed to change that to "approximately two standard deviations below the mean."  So literally it was a single word change.  I did that in two places, where I --

MR. WISEMAN:  With that, I have no objection, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. ROBERTS:  May the exhibit be admitted, Your Honor?

THE COURT:  Exhibit Number?

MR. ROBERTS:  15, Government Exhibit 15.

THE COURT:  Government's 15 is admitted.

BY MR. ROBERTS:

Q.   Dr. Moore, did you also have to prepare an addendum to your exhibit?

A.   Yes, sir.

Q.   To your report?  Why did you have to prepare an addendum?

A.   The report was due on a Friday, and about a little after 9:00 o'clock the preceding night before it was due, but after the report had been written, I received about 95 pages worth of materials from Dr. Swanson, which I had not seen before.  And so I didn't have time to review those and integrate them into the report.  It was due the next day.

Q.   Show you again Government Exhibit 15, your report.  Is that noted on this report anywhere?

A.   Yes, sir, it is.

Q.   Where is it noted?

A.   It was a footnote.  Off of the date of the report, there's a footnote sign at the bottom.  It indicates the reasons that the addendum would be submitted.

Q.   You're referencing Footnote 1?

A.   Yes, sir.

Q.   Where it says, "The current author received 95 pages of materials," and then it continues?  And did you have a chance to review all those documents, and does the addendum that you

prepared accurately reflect your review and your analysis and your conclusions of the documents you received from Dr. Swanson?

A.   Yes, sir.

Q.   I'm showing you what's marked as Government Exhibit 16, Forensic Psychological Report Addendum.  Is that the document you prepared?

A.   Yes, sir.

Q.   It is a one, two, three-page document.  Is that your signature on the last page?

A.   Yes, sir.

          MR. ROBERTS:  Your Honor, I'd offer the addendum, Government Exhibit 16 at this time.

          THE COURT:  Any objection?

          MR. WISEMAN:  Your Honor, I'm not sure.  The addendum I have is on letterhead, and the document Mr. Roberts put up is not.  I'm assuming it's the same document.  I'm not sure it is, though.

          MR. ROBERTS:  I'll give it to Defense Counsel to review, Your Honor.

     (PAUSE.)

          MR. WISEMAN:  What Mr. Roberts just handed me is what I previously had, but I'm not sure that's what he put up on the screen.  So if he's offering what's marked as 16, I have no objection.

THE COURT:  Which are you doing?

MR. ROBERTS:  Your Honor, I'm going to substitute the -- it was my copy that I had put the evidentiary mark on, so I'm going to substitute that and ask Dr. Moore if he can --

THE COURT:  Okay.

MR. ROBERTS:  -- see this.  And I will change the exhibit number.

BY MR. ROBERTS:

Q.   Doctor, as Mr. Wiseman correctly pointed out, the one I put up did not have a letterhead on it.  This document has a letterhead on it.  Is that from your business?

A.   Yes, sir.

Q.   And is this addendum, the one with the letterhead on it, is it the exact, as the copy that you reviewed earlier?

A.   Yes, sir.

Q.   And again, it's a three-page document, with your signature on the last page?

A.   Yes, sir.

Q.   And that signature is the exact same as, and as far as the date and the signature block area?

A.   Yes, sir.

MR. ROBERTS:  Your Honor, at this time I would offer the corrected addendum with the letterhead.

MR. WISEMAN:  No objection.

THE COURT:  Government's 16 is admitted.

BY MR. ROBERTS:

Q.   Dr. Moore, did you also have an opportunity to interview Alfred Bourgeois at the end of June 2010?

A.   Yes, sir.

Q.   The Government has offered and the Court has accepted Government Exhibits 19, 20, 21 and 22.  They are purported to be videotapes of your interview with Alfred Bourgeois.  Have you had a chance to observe those?

A.   Yes, sir.

Q.   Are they accurate and depict the interview you had with Mr. Bourgeois?

A.   Yes, sir.

Q.   Do you recall when you were first contacted in this case?

A.   I believe it was in July of 2009.

Q.   Do you recall the context in which you were contacted and what you were asked to do?

A.   I believe it was you, Mr. Roberts, who contacted me by telephone to talk a little bit about the matter at hand, perhaps about my availability, but I think even more so just asking a little bit about these types of situations.

Q.   What was your understanding at that time as to why you were being asked to evaluate the evidence in this case?

A.   To see, or to obtain my take on whether there was evidence that Mr. Bourgeois was mentally retarded, at a sort of a first glance level, if you will.

Q.   Do you recall, I mean, obviously you accepted the opportunity to review the evidence in this case.  Do you recall what we sent to you?

A.   There was a CD that had a substantial amount of material, trial data, declarations, testing, et cetera.

Q.   Government's Exhibit 15 has a list of the materials that you reviewed on the first page.  I ask you just to glance down that real quick.  And I'll also ask you to look at the second page.  It says, "Materials Reviewed Continued."

A.   Yes, sir.

Q.   Did you actually review all that information?

A.   Yes, sir.

Q.   Did you read all the transcripts?

A.   Yes, sir.

Q.   After you read all the transcripts, do you recall having additional conversations with myself or other members of the trial team?

A.   Yes, sir.

Q.   And what exactly did we ask you to perform, as far as your role in this case?

A.   In general, you asked for me to perform an assessment of whether Mr. Bourgeois was mentally retarded or not.  And as we went further in the case, my role became somewhat more refined.

Q.   Did we ask -- you heard Dr. Price testify a little earlier about splitting up of duties.  Can you tell the Court kind of

how that came about?

A.    Yes, sir.  There were two of us who had been contacted on the case who had expertise in this area, and determined that it would be beneficial to divide the duties to be able to take care of them more efficiently.  And so Dr. Price did more of the intellectual component, and I focused more on the adaptive functioning component.

Q.    I want to talk to you about some general terms and concepts first.  Obviously I'm not going to waste the Court's time going into detail about every concept in this, but there are some things that are important, so let me draw your attention on your, in your report.  You did two addendums, did you not -- or appendixes, didn't you?

A.    Yes, sir.

Q.    Do you recall what Appendix A and Appendix B are?

A.    Yes, sir.

Q.    Can you briefly summarize for the Court what addendum -- what Appendix A, the importance of Appendix A?

A.    Yes, sir.  There are two definitions of mental retardation that are primarily described at this point in time, one of them from the DSM-IV-TR, the Diagnostic and Statistics Manual, the other which has been promulgated by the AAIDD.

And it was my understanding -- one of the first questions always asked or that I always ask in these types of matters, because the definition of mental retardation under Atkins was

left to the states, is what's the prevailing definition?  And

my understanding was that with current case law in this matter,

it would be the definition that's currently denoted in the

DSM-IV-TR.  And so I wrote my report based on that, but

included as Appendix A how the data would be interpreted under

the definition that's currently put forth by AAIDD.

Q.   Yeah, we've heard some testimony earlier, I'm showing you

now what is Page 20, what is Page 20 of Government Exhibit 15.

And I'm going to ask you, draw your attention to -- we heard

testimony from Dr. Swanson and I asked her some questions about

the different categories of domains and the ten domains.  You

say in your letter here that the DSM-IV focuses on deficits in

two or more of ten specified domains, whereas the AAIDD focuses

on three broad domains.  Is that what you mean when you say

there's actually two different kind of competing definitions

for what we define in the area of adaptive functioning for

mental retardation?

A.   Yes, sir.  Yes, sir.

Q.   So if someone reads this Appendix A, they would be able to

understand kind of how the definition of mental retardation is

kind of working its way out in your professional capacity and

in the legal setting?

A.   Yes, sir.

Q.   You had an opportunity to review Dr. Swanson's adaptive

deficit analysis.

MR. ROBERTS:  And if I could retrieve Petitioner's

Exhibit 33.

(PAUSE.)

BY MR. ROBERTS:

Q.   I'm showing you what's Petitioner's Exhibit 33,

Ms. Swanson's consultation.  It's dated August 12, 2010.  Did

you have an opportunity to review this document?

A.   Yes, sir.

Q.   And you were sitting in here for Dr. Swanson's testimony?

A.   Yes, sir.

Q.   And in general, I don't want to get into the details of

her conclusions yet, but in general, with regard to the two

areas, these two separate areas of the DSM-IV and the AAIDD's

definitions, I'm showing you on Page 3 of her report, which of

those two definitions did she apply in her analysis?

A.   It appears that she applied the one of three, the three

broad domains, but she also included bold and underlined

sub-domains, if you will, from the two of ten.  So the two of

ten is somewhat noted in there, but it appears that she's

broken down her report in general by the three broader domains.

Q.   Can you tell from her report which of the two definitions

she's actually relying upon?

A.   I believe she's relying on, or it appeared to me, from her

report, that she was relying on the one of three.

Q.   I want to talk for just a minute about intellectual

functioning.  And we know that Dr. Price pretty much covered that area.  But do you have any significant expertise or experience with the Flynn Effect?

A.    Yes, sir.

Q.    Tell the Court a little bit about your understanding of the Flynn Effect.

A.    The Flynn Effect is based on a collection of research studies that Dr. Flynn had pulled together where he had made the observation that when newer tests are normed and there's reliability checks with previous versions of the same test or groups are tested over time with the same test, that there are changes in the population means on those.

And in general, through the 20th century, those population means tended to rise.  And so at a general level, the Flynn Effect refers to changes at a population level on -- in performance on IQ measures over time.  By and large, they have been in an upward direction, not exclusively.  They've fallen over a relatively wide range.

He then took the next step and said if there is -- let's just for ease sake say that there is a three-point rise, and there were ten years between when one test was standardized and the other test was standardized, then divide the three points by ten, and it would be approximately three points per year that the population performance is changing.

There is a controversy over whether that's exactly what it

means.  What we do know is that the farther a test gets from its norming date, the less reliable the standardization is, because populations change in various ways.

The contention that it's a steady rise or that it is at a specific rate would certainly be -- that it's a steady rise would be controversial.  That it is at exactly the same rate I think would be extremely controversial, because we see very different rates when different tests are compared to each other.

Q.   Let me ask you if you wrote about that in your report, and --

THE COURT:  Okay.  So it's like almost comparing apples and oranges then to compare one test with another test?

THE WITNESS:  Yes, ma'am.  The rise of, or the change in scores has been shown to differ by test, subtest, population, age, culture --

THE COURT:  Okay.

THE WITNESS:  -- intellectual level.

BY MR. ROBERTS:

Q.   In that regard, first of all, did you -- I'm showing you what's marked Government Exhibit 15.  It's Page 8 of your report.  And it appears to me that you wrote a good bit on that, of the Flynn Effect aspect in your report.

A.   Yes, sir.

Q.   Okay.  I want to show you what is marked only for

Moore - Direct

identification purposes as Government Exhibit 207.  At the top of this, it's convergent evidence for the WAIS-III.  You gave me this document.  It's out of what publication?

A.    The WAIS-III manual.

Q.    Okay.  Does this document help you in any way describe some of the concerns about the Flynn Effect?

A.    Yes, sir.

Q.    Okay.  Can you please describe that for us?

A.    Well, for example, on this document, this is the type of data that Flynn uses to describe -- as support for his effect. And what's happened here is this is a reliability study.  So whenever a new IQ test comes out, one of the things that's done is to compare it with existing IQ tests as a check of its validity.  And so the new test and the old test are administered to people in a counter-balanced manner, and then the scores compared to look for a convergence of data, if you will.  And this would be the exact data that Flynn used.

      And in this particular case, the part that he would use would be the full scale IQ, under the WAIS-R, of 105.8, and the --

Q.    Where exactly is that on the document?  You can actually touch the screen and it will make some marks.

A.    Well, right here is the --

Q.    You can also erase it by going down to the bottom right corner.

A.    I tell you what, how about if I just -- it's right here. I'm sorry, ma'am.  That part that it says "clear"?  Oh, gotcha. Bottom left corner.  I gotcha.

So if we look right here at this line, which says "Full Scale IQ Score," we've got the full scale IQ score for the WAIS-R population right here, and we've got the full scale IQ score for the WAIS-III right here.  That's right here.  And so at 105.8 on the WAIS-R, 102.9 on the WAIS-III.  And so what Flynn would do is subtract 102.9 from 105.8, and then he would divide that by the number of years between when the WAIS-R was standardized and the WAIS-III was standardized, and that's where he would get his rate.  In this particular case, it winds up being about .171 points per year.

Q.    And you heard Dr. Gelbort's testimony.  What rate did he apply?

A.    He applied .3.

Q.    And how is that different from what you were saying?

A.    Well, the rate of change is somewhat in contention. The .3 is often cited.  AAIDD actually notes .33.  The actual rate is, again, it varies across any number of different aspects.  In fact, Flynn has testified that it may be 2.5 or .3.  There's been, again, variability around the particular number to be applied.

Q.    Let me ask you -- I want to remove Government Exhibit 207 for identification and ask you, have you ever seen scores

adjusted, in a clinical setting, to account for the Flynn Effect?

A.   No, sir.

Q.   You are aware of my questioning of Dr. Gelbort with regard to applying or using the Flynn Effect in a court only.  Have you read that testimony?

A.   Yes, sir, I have.

Q.   Because you weren't actually present for his testimony. It was on earlier this month.

A.   That's correct.

        MR. WISEMAN:  Your Honor, I think the record would reflect that Dr. Moore was present for a good part of Dr. Gelbort's testimony.

        MR. ROBERTS:  That's correct.

BY MR. ROBERTS:

Q.   Let me just clarify.  You had to leave early.  You were not able to hear the end of his --

        THE COURT:  He left at 4:00, and we finished about 6:40 that night.  And we started at --

        MR. WISEMAN:  3:00 o'clock.

        THE COURT:  -- I think about 3:00 o'clock.  So he was here for just a fragment of his testimony, less than a third.

BY MR. ROBERTS:

Q.   And were you able to hear my interaction with him about his application of or using the Flynn Effect?

A.    I read it.  It was after I had left.

Q.    My question to you is, he seemed to have some problem with my use of the term "applying" or "using" as it related to the Flynn Effect.  And my question to you is, was I misusing the terms with regard to the Flynn Effect?

A.    No, sir.  Those were the appropriate verbs to use.  "Did you apply it?"  "Did you utilize it?"  "Did you correct the scores for it?"  Those are the verbs that would be used.

Q.    Okay.  Let me ask you this.  Is the Flynn Effect a concept that is widely accepted across the psychological field?

A.    I think it depends what you mean by the Flynn Effect.  If what you mean by the Flynn Effect is that the norming, the reliability of the norming tends to decrease over time, I think that's widely accepted, and was I think widely accepted before Flynn came along, but he certainly has brought it onto the fore.

     If you're referring to whether scores should be adjusted based on the Flynn Effect, that would be significantly controversial.

Q.    In fact, you made a comment about that on Page 8.  I'm showing you what's Government Exhibit 15, Page 8, and I'm pointing right in the middle of the page, where it says, "In sum, it is not professionally accepted practice to alter obtained IQ scores for the Flynn Effect or any other factors."

     That's still your belief?

A.    That's correct.  When we obtain IQ scores, we report the scores that are obtained, and then in our narrative indicate if there are factors that would affect the validity or the reliability of those scores.

Q.    Now, the Petitioner did a very nice chart comparing Dr. Weiner's scores in the WAIS-IV -- I'm sorry -- the WAIS-R that he applied in 2004 or gave in 2004, and the WAIS-III that Dr. Gelbort gave in 2007.  So I'm showing you what's marked as Petitioner's Exhibit 155.  And we've heard testimony and noted the differences on the scoring.  What I wanted to ask you is in your assessment of all of the data that you've seen in this case, what is the significance of the decrease on the verbal IQ of Dr. Gelbort's versus the increase on performance in Dr. Gelbort's testing?

A.    What was notable to me about this -- and in just a moment I'm going to ask you, can you put the other chart back up on to the screen, but just for a moment, if we'll look at here in the verbal, we've got a 76 versus a 67.  So on the WAIS-R, he scored a 76, and on the WAIS-III, a 67.  And down here, he scored a 76 on the performance and a 78 on -- I'm sorry -- a 76 on the performance of the WAIS-R and a 78 on the performance of the WAIS-III.  And then a five point difference down here, the full scale.

      So he went down by nine points on the verbal, up by two points on the performance.  And then overall, down five points

on the full scale.

If you could put that other chart up for me.

Q.    Would it be this chart?

A.    Yes, sir.

Q.    Okay.  You can clear those dots.  Government Exhibit 207 I'm showing you again, which is marked for identification only, and how does that chart help you in explaining his scoring?

A.    Well, what was striking to me is that his verbal IQ dropped by nine points.  But if we look in general, when one compares the WAIS-R to the WAIS-III, we'd only expect about a point drop.  And when we look at the performance, his score went up by two.  But what we would have expected, in general, in a population level, would have been for it to drop by about four points.

So the difference of five points versus an expected difference on the full scale of three points or so, that's not so striking to me, when it got collapsed.  But what was really strange to me was when we would have expected the verbal to have gone down a tad, it went down a lot.  And we would have expected the performance to have gone down a moderate amount, but it went up a bit.

So there are two things about that that stood out to me.  First of all, this is one of the reasons that we don't apply something like the Flynn correction to individual scores, because we see right here his very performance on the verbal

and performance aspects are different from the trends that we would expect.

The second part that was striking to me about it is the one thing that I think everyone would agree on is that his verbal skills are his strength.  And to have them drop by nine points, that's a significant drop.  That's a notable drop.

Q.   Again, and that's, when you say nine points, you're talking about the 67 he scored when Dr. Gelbort gave him the WAIS-III versus the 76 he scored when Dr. Weiner gave him the WAIS-R?

A.   Yes, sir.

Q.   Now, what may be a little confusing, and it was to me, I know, when we first started discussing this, is that you're actually still using the WAIS-R to some extent, and yet it's your professional opinion that the WAIS-R should have never been given.  Is that right?

MR. WISEMAN:  Objection to leading, Your Honor.

MR. ROBERTS:  It's just a foundation question, Your Honor.

THE COURT:  Overruled.

BY MR. ROBERTS:

Q.   So you really -- so I guess my question is, why would you continue to point to the scoring on the WAIS-R if, in your opinion, and you've said so in your report, the WAIS-R is really invalid as a scoring mechanism?

A.    I was very struck by the use of the WAIS-R at that time.
The WAIS-III had been out for about six years at that point.

Q.    But in answering my question, though, why would you
continue to point to the scoring and the actual testing that
underlies the score if you think a test is invalid?  Does it
help us in any way assess his --

MR. WISEMAN:  Objection to "invalid," Your Honor.  I
don't think there was testimony it's invalid.  And if there
isn't, he's leading the witness.

THE COURT:  Sustained.

THE WITNESS:  The scores --

MR. WISEMAN:  It's sustained, sir.

MR. ROBERTS:  Let me ask you the question.

THE COURT:  That's the difference, isn't it?  Okay.

MR. WISEMAN:  I thought your words meant something,
but that might just be me.

BY MR. ROBERTS:

Q.    My question is with regard to -- do you think it was
appropriate for Dr. Weiner to give the WAIS-R in 2004?

A.    I don't think that it was appropriate for him to give the
WAIS-R in 2004.

Q.    And you commented on that in your report, did you not?

A.    Yes, sir.

Q.    What did you say in your report?  I'm having a hard time
finding it.  Do you remember?

A.    Well, in sum, I thought that it was, that it was inappropriate to have given a test that was that far out of date.  What I actually say is, it's on Page 7, "At the time that Dr. Weiner conducted the assessment, the new edition of the Wechsler scale has been published and in use for over six years.  It's unclear why such an outdated test was utilized."

Q.    Let me just stop you for a second, because I did find Page 7, and I want to zero in, and which sentence were you reading?  Can you point us to the sentence?

A.    Yes, sir.  I started right here.

Q.    Where -- that's where it says, "95 percent confidence intervals" --

A.    No, sir, I mean right there where that "at" is, "at the time" --

Q.    Where the "at" -- okay.  Go ahead.  Tell us what you were saying about Dr. Weiner's use of this test.

A.    So I pick up at, "in use for over six years."

        MR. WISEMAN:  Your Honor, I'm going to object to this testimony.  Dr. Weiner is a neuropsychologist who provided a neuropsychological reason for his administration of the WAIS-R, and that explanation was that it is norm for the neuropsychological deficit scale, the Halstead-Reitan battery, and this witness has not been qualified as a neuropsychological expert, and I don't think he's qualified to offer an opinion on that explanation by Dr. Weiner.

MR. ROBERTS:  Your Honor, I'd be happy to let him question him on his neuropsychological expertise.

THE COURT:  Go ahead.  Would you like to take him on voir dire on that?

MR. WISEMAN:  Well, I didn't hear an offer.

THE COURT:  I didn't either.  Do you want to offer him for that and lay a, you know, ask him the questions?

MR. ROBERTS:  Your Honor, I just actually was asking him his opinion of Dr. Weiner's testimony.  I wasn't really asking him within his expertise.

THE COURT:  Okay.

MR. WISEMAN:  And I was really just objecting.

THE COURT:  Uh-huh, and -- okay.  So --

MR. ROBERTS:  What I'll do --

BY MR. ROBERTS:

Q.   Let me ask you, what -- the question that I began this with is why would someone in your position, with the mental retardation assessment experience that you have, still consider a test, the testing scores, when it was given at a time when it's outdated?  And I meant the testing scores, I meant the underlying testing data versus --

A.   The data is data from a test that had been administered. My concern with it is simply the lowered reliability and validity of the scores.

Q.   Okay.  Let me ask you this, were there any other

achievement testing that Mr. Bourgeois participated in that gives you any insight into his intellectual functioning?

A.   Yes, sir, there was additional achievement tests that would give me an insight into his cognitive functioning.

Q.   What was that?

A.   He was given Wide Range Achievement Test, WRATs, by Dr. Weiner and Dr. Gelbort, and he was given a Woodcock-Johnson by Dr. Swanson.

Q.   And in your report, do you reference where he would score at the grade -- well, let me just show you.  On Page 7 of your report, Government Exhibit 15 again, you note that, at the end of the first full paragraph, on the 2007 achievement testing, Mr. Bourgeois scored at the grade equivalent of high school in reading and spelling, and at the fifth grade level in arithmetic.  What significance is that statement in your report?

A.   That's based on the WRATs that had been administered to Mr. Bourgeois, and it showed a level, particularly in regards to his reading and spelling, that were certainly very strong in regards to the IQ testing, but particularly with the verbal IQ testing.

Q.   I want to move now to the area of malingering, because that's been mentioned quite a bit this week.  Tell us how, in your understanding, how a psychologist attempts to detect malingering when they're giving tests.

A.    Well, there are a number of different ways.  We certainly, you know, watch for physical or behavioral signs that an individual may display, but we also look for patterns in the testing, and we also administer different types of measures that would be suitable to hopefully detect malingering.

Q.    We've heard a little bit of testimony about TOMM.  Is that T-O-M-M?

A.    Yes, sir, the Test of Memory Malingering, the TOMM, created by Dr. Tom Tombaugh.

Q.    And can you tell us a little bit of how easy or hard the TOMM is?

A.    No, the TOMM is a very, very simple test.

Q.    Can you give us an example of some of the questions that might be asked?

A.    Well, it's not so much that there are different questions.  The way the TOMM is set up is that it's based on visual memory.  And so an individual would be shown one at a time about 50 line drawings, like a wheelbarrow or a bucket or whatnot.  And then they would be shown pairs of line drawings, one which they had seen before and one which they had not, and they're asked to identify which one they've seen before, with corrective feedback given.

Q.    And that's just one example --

A.    Yes, sir.

Q.    -- or is that how the whole test is administered?

A.    That's how the whole test is administered.  There are a couple of trials to it.

Q.    And there's been some testimony with regard to areas of which Alfred Bourgeois is unable to perform or perhaps has some deficiencies in these areas.  What was your opinion about his ability to comprehend -- he was given a TOMM in this case, wasn't he?

A.    Yes, sir.

Q.    What was your opinion about his ability to perform on that test?

A.    He did well on the TOMM.  He made 47 of 50 on the first trial and 50 of 50 correct on the second trial.

Q.    So that --

THE COURT:  So what does that mean?

THE WITNESS:  That means that he was correctly, on the second trial, he was correctly identifying each object that he had seen before.  And so it would indicate that -- well, there would be no indication of significant malingering on that test, or there's no indication of malingering.  I'll take the "significant" out.  There's no indication of malingering on that test, on that administration of it.

THE COURT:  So what is it -- so what did he -- what did that measure?

THE WITNESS:  Well, it is an effort test, and one of the things that, one of the characteristics of malingering is

that it's not necessarily a universal phenomenon.  First of all, it's not necessarily a longstanding characteristic.  But also malingering, the symptoms that an individual malingers depend in part on what they're attempting to malinger.  So, for example, if someone is attempting to malinger a psychosis, they might perform well on a test of memory malingering, for example.

And so what this indicates is that in regards to a test of whether he was malingering a memory dysfunction, there didn't appear to be evidence of that.

BY MR. ROBERTS:

Q.   But does that test also show you anything about his ability to understand or follow directions?

A.   Well, it shows his ability to follow directions on it as well.

Q.   You mentioned this idea of not trying hard enough.  So let me ask you, there was a -- when Dr. Price was testifying, Judge Jack had a question to him about what would happen if someone's just not trying hard enough.  I think that was the Judge's words.  When you look at his IQ testing and the questions, the raw data, is there any evidence that you see in there that would communicate to you that Alfred Bourgeois may be -- may not have been trying hard enough in this particular case on the IQ testing?

A.   I have looked and looked at the intellectual

neuropsychological data in this case, and they're puzzling to me.

MR. WISEMAN:  Your Honor, I'm going to object.  He's talking about neuropsychological data.  If he wants to talk about the IQ test, I have no objection.

BY MR. ROBERTS:

Q.   I guess I'm not smart enough, Dr. Moore, to know the difference between the two of them.

A.   There's sort of a blend.

Q.   I do want to -- I do want to get to the -- I believe there are some -- you've indicated that there are some answers that were on the WAIS-R that you found puzzling to you.  Can you give us some specific examples of where you, where there was a question he was asked on the WAIS-R, where you would have thought he should have gotten it correct and he didn't?

A.   Yes, sir.  In looking just at the WAIS-R, there were a couple of items that stood out to me.  Just thinking of a few examples, one would be on the information test.  One of the very early items is "In what direction does the sun rise?"  And I think Mr. Bourgeois answered, "Up in the sky."  And, but --

Q.   Is that a verbal test, or is that a multiple choice test?  How is that --

A.   It's a verbal, it's a verbal test, so --

Q.   In what way?  Is a question posed and someone answers it?  Is that how --

A.    Yes, sir.

Q.    Okay.

A.    And that answer was a bit striking to me, because Mr. --

Q.    Well, that answer is actually correct.  I mean, it's in the sky.  So did he get it right or wrong?

A.    He got it incorrect.

Q.    Why is that?

A.    The correct answer would be "The sun rises in the east."

Q.    And so why is that striking to you with regard to this case and Alfred Bourgeois?

A.    Because Mr. Bourgeois was a long-distance truck driver, driving a route that went from New England to California.  And so driving into the sun, the sun in your eyes, either in the morning or the evening, depending on whether you were driving east or west, that would seem to have been an answer that he would have known more readily than that.

Q.    Was there any other question that just stands out in your mind about, that you thought was a little strange in the answer?

A.    Another one was to name four men that had been President of the United States since, I believe since 1952.  And he provided four names, one of them incorrect, but he didn't name the current or even the most recent President.  It would have been an easy, an easier item than when the test had been normed, because we had had a few more administrations,

governmental administrations, presidential administrations by then. But he missed the question. It was a little striking to me that some of the easiest answers would have been the current or past President. And those weren't included.

Q. Do you remember which ones he included?

A. I think Nixon was in there. I think Roosevelt was in there. I don't recall whether Kennedy was, and then George Washington was.

Q. And the question again was to name them, the Presidents since a certain time?

A. Any four men who had been President of the United States since that time.

Q. Since what time? What year?

A. I think it was 1952. It's been a while since I've administered a WAIS-R.

Q. Let me move on to the adaptive functioning area. In your report, on Page 8, you begin discussing adaptive functioning. Does your report on that page -- can you show us on that page where you actually attempt to define "adaptive functioning"?

A. Yes, sir, right here.

Q. Okay. Let me ask you about a sentence before that, where you state that intellectual testing seeks to measure what a person has the potential to do, whereas assessment of adaptive functioning seeks to measure what a person typically does. Tell me what exactly you mean by that.

A.    The intellectual functioning is, I guess, seen as a testing of the limits, if you will, how far can a person stretch, how well can they, how well can they maximally do, what's their maximal performance, whereas adaptive functioning is based on what does a person generally do.  That's one of the reasons why in adaptive functioning measures we don't generally come in and give a person items to do, because the contention there would be that the issue is less what they're able to do in a particular setting than what do they generally do in their daily life.

Q.    And when you, the place where you put the dot -- I'm going to move that.  It starts, it's actually the line before that, that says, "According to the DSM-IV."  So is this definition, "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in a particular age group, sociocultural background and community setting."  That's straight out of the DSM-IV?

A.    Yes, sir.

Q.    Is that the definition that you use when you're doing an adaptive functioning assessment?

A.    Yes, sir.

Q.    When you're doing, preparing to assess adaptive functioning, what type of data do you consider?  How do you go about deciding what it is you're going to consider?

A.    I try to get as many records as I can, because I'm trying to get a snapshot of -- actually not a snapshot, an overview of what this person's functioning is like and has been like.  So I'd seek to get employment records, hospital records, if there's been disability applications, school records, whatever records that I can.

Q.    And we heard about -- we've heard testimony about an ABAS and a Vineland.  Are those instruments commonly used in adaptive functioning assessments?

A.    Yes, sir.

Q.    How do you go about selecting the individuals that you might decide to interview?

A.    Well, at a most basic level, we want to have people who know the individual well and across a variety of settings. Certainly, we want to be aware of whether the person has a vested interest in the outcome.  So we want to make sure we get good and objective data.  And in a forensic setting, that becomes even more of a challenge.

Q.    When you're trying to -- is there a specific word that you use -- or let me just show you, on Page 15, Page 9 of Government Exhibit 15, this is right after, on Page 8, where you were defining "adaptive functioning," you mention a concept of a significant deficit and how it's generally taken to be approximately two standard deviations below the mean.  Is that something you're looking for when you're assessing the testing

of individuals in adaptive functioning?

A.    Yes, sir.

Q.    Can you expound on that a little bit more and help us understand about this two standard deviations below the mean, why that's important?

A.    Most naturally occurring phenomenon fall on a bell-shaped curve of frequency.  So the curve, the frequency curve looks like a bell, and the average is right in the middle, and that's the most common score.  More people have that score than any other.  But most people don't have that score.  Most people differ from the average.

And one standard deviation, or a standard deviation is the average amount that people differ from the average by.  And the bell-shaped curve has some very specific characteristics related to standard deviations in the frequency distribution.

So about 34 percent of the population falls between the mean and positive one standard deviation, and about 34 percent of the population falls between the mean and minus one standard deviation.  So about 68 percent of the population falls between plus and minus one standard deviation.

Another 14 percent fall between one standard deviation and two standard deviations, and about 14 percent between minus one and minus two.  So then about 96 percent of the population falls between minus two standard deviations and positive two standard deviations.

And we consider a person to be significantly subaverage when they are approximately two standard deviations or more below the mean.  In other words, when they're at about the second percentile or below.

Q.   Can you put that in some kind of layman's terms so I can understand?  I mean, is there a numerical value that you can apply to help us understand standard deviations?

A.   I think that's one of the biggest challenges in bringing data into the courtroom is because, as statisticians -- I used to teach statistics -- as statisticians, we get used to weaving all in and out.  To me, I try to keep it a little bit simple.

If we'll think in standard scores, standard scores have a mean of 100 and a standard deviation of 15.  So that's where the IQ of approximately 70 comes into play.  And when we look at other measures that have been standardized on that type of distribution, we can look at scores of about 70 as being our key number.

MR. ROBERTS:  I need to retrieve Petitioner's Exhibit 170.

(Counsel conferring off the record.)

MR. ROBERTS:  Could I have just a moment, Your Honor? Seems like there's one exhibit that none of the parties have in order.

THE COURT:  Sure.

(Counsel conferring off the record.)

BY MR. ROBERTS:

Q.   Well, I can't find the exhibit right now, but let me ask you if you recall when I was talking to Dr. Swanson and there was a chart that listed the raw data for Beverly Franks.  And it had a bunch of numbers of her -- it had "SS" at the top of the document.  I believe it was Petitioner's Exhibit 171, for identification.  But they said they didn't offer it, so --

         MR. WISEMAN:  Mr. Roberts, I think it's a different document.  I can provide it to you.

         MR. ROBERTS:  Actually, it's Petitioner's Exhibit 35.  I couldn't find it.  Page 13.

         MR. WISEMAN:  I hope the record is reflecting just how overly cooperative I'm being, Your Honor.

         THE COURT:  I will make that reflection.

         MR. WISEMAN:  Okay, thank you.

         THE COURT:  Nothing unusual about it, Mr. Wiseman.

         MR. WISEMAN:  I certainly appreciate that.

         MR. ROBERTS:  And I will acknowledge it as well, Your Honor.

BY MR. ROBERTS:

Q.   Do you recall when I was speaking, asking Dr. Swanson about the scores that are over here under the SS?

A.   Yes.

Q.   And when we were talking about the scoring, and I had asked her a question, what is your opinion on Alfred

Bourgeois -- well again, let me take this away for a minute, and let's talk about this just a minute. There's a little confusion about the ABAS and the Vineland, because these are individuals that are taking the test, but they're taking it about someone else. Is that right?

A. Yes, sir.

Q. Okay. So this raw data that we're looking at in relation to Beverly Franks' testing, these are actually the scores --

MR. WISEMAN: Your Honor, I would --

MR. ROBERTS: I'm sorry.

BY MR. ROBERTS:

Q. I'll ask you. You tell me, what does "raw data" mean?

A. This is actually from the Woodcock-Johnson, not from the Vineland or the ABAS. So this is his achievement testing, not his adaptive functioning testing.

Q. Okay. I had asked you earlier about achievement testing. Is there anything significant about the scores under the SS that help us understand anything about Alfred Bourgeois?

A. Yes, sir. I believe there is. Again, what we're looking at is in comparison to the general population, a person with mental retardation is significantly impaired. Generally about two standard deviations below the mean. And the standard scores here have a mean of 100 and a standard deviation of 15. So two standard deviations below the mean or significantly impaired would be a score of about 70 or below.

Moore - Direct                    109

And what we see on here is, as we follow down this --

Q.   And you're drawing a line there between --

A.   This line of standard scores --

Q.   Let me just comment for the record, you're drawing a line between the RPI line and -- list, and the SS list?

A.   Yes, sir.

THE COURT:  We're just looking at the SS list of things that may be under 70.  Right?

THE WITNESS:  Yes, ma'am.  I'll take the line off then.  Yes, ma'am.  And so we see the majority of those scores are of 80 or above.  A couple of exceptions, but by and large he's scoring 80 or above on the particular subtests.

BY MR. ROBERTS:

Q.   Does that tell us anything about Alfred Bourgeois's abilities?

A.   Well, it appears that at a global level he is functioning in this test of academic achievement.  By and large, he's functioning in the lower part of the low average range, with a couple of areas that he was significantly below in.

Q.   Okay.  We're going to -- we'll get more into those in a few minutes.  We'll go back now to your selection of individuals.  Is there anything about the relationship that plays a role in your determination of who you're going to interview?

A.   Yes, sir.  We want to try to find folks who know the

individual well, but we also need to find folks who don't have a vested interest in the case, or are as neutral as possible. And oftentimes that is a significant challenge. The better that a person knows someone, the more likely they are either in a positive or negative way to have a vested interest. And the less vested interest that they have, the likelihood is perhaps the less well that they know the person. And so we're looking at trying to create an optimal balance between those two factors.

Q. Did you select a number of people to interview in this case?

A. Yes, sir.

Q. I'm showing you what's Page 2 of Government Exhibit 15, and it has a list there of interviews conducted. Are those the individuals that you interviewed in this case?

A. Yes, sir.

Q. Which of those did you interview with regard to trying to make you, help you with your adaptive functioning assessment?

A. All of them were in an effort to help with the adaptive functioning assessment, although there were, a subset of those were actually administered adaptive functioning measures to, and those would be Danny Clark, Michelle Armont, Nathaniel Banks, and Rhonda Davis.

Q. When did you schedule your interviews? Do you recall what month and year?

A.    I think it was in -- I think they were actually scheduled in late June of this year and took place in mid July of this year.

Q.    What states did you go to, did you travel to to interview?

A.    Louisiana and Alabama.

Q.    On Page 10 of your report -- I'll show you what's marked as Page 10, or what is Page 10 of Government Exhibit 15, ask you to look, ask you to look over this paragraph, top paragraph and tell me if that is some of the discussion of the people you interviewed in your efforts to do an adaptive functioning assessment.

A.    Yes, sir.

Q.    Who was the first person that you interviewed?

A.    On that trip?

Q.    On that trip.

A.    Michelle Armont.

Q.    All right.  Describe for the Court what happened when you -- how did you arrange this interview, and what happened when you showed up?

A.    The interview had been arranged through the Attorney General's Office, I believe.

Q.    The Attorney General's Office?  Or would it be United States Attorney's Office?

A.    United States Attorney's Office.

Q.    That's all right.  It happens sometimes.

A.    Yeah, I'm sorry.

MR. WISEMAN:  I thought Mr. Holder was involved.

THE COURT:  Definitely.

MR. ROBERTS:  Yes.

THE WITNESS:  I beg your pardon.  Y'all's office.

BY MR. ROBERTS:

Q.    Okay.  That's a good southern expression.  So tell us what happened when you -- you said that our office helped arrange the interview, called ahead.  So what happened?  Did you get a scheduled date for that interview?

A.    Yes, sir, we did.  I think the interview was scheduled for 9:00 or 9:30 in the morning, and at Ms. Armont's house.  And when we arrived at her house, there were already a couple of other individuals present.

Q.    Do you know who those individuals were?

A.    Yes, sir.  I didn't know at the time who they were, but I've come to understand it was Ms. Larin and --

Q.    The co-counsel for the Petitioner?

A.    Yes, sir.

Q.    And who else?

A.    And their investigator.  I'm sorry, I'm not sure what her name is.

Q.    Okay.  And did they, did they explain to you their purpose for being there?

A.    They --

Q.    I'm just asking you, without them telling you, did they explain to you why they were there?

A.    They were I think more explaining to Ms. Hohle from your office --

Q.    You're talking about Debbie Hohle from our office?

A.    Debbie Hohle, yes, from y'all's office.

Q.    Spoke with her?

A.    About why they were there.

Q.    Okay.  I guess my question for you is, did their presence concern you at all about your ability to get an accurate assessment from Michelle Armont?

A.    Yes, sir.  I've never been in a situation before, in all the forensic evaluations that I did, where opposing counsel or an investigator were there unexpectedly.  There's only one situation I ever had where opposing counsel was even there, and it had to do with a very elderly witness, where it was agreed upon in advance that both parties would be there, because we didn't want to unduly burden.

Q.    Do you know what Debbie Hohle -- you said, you mentioned Debbie Hohle's name.  Do you know what her role is at the U.S. Attorney's Office?  Is she an attorney?

A.    No, sir, I don't believe that she is.

Q.    Okay.  Do you know what --

A.    No, sir, she's not.  She seems to make all the travel arrangements and to take care of everything, it seems.

MR. ROBERTS:  Let the record reflect, Your Honor, that --

THE COURT:  That she's fantastic?

MR. ROBERTS:  Yes, Your Honor.  Thank you.  Can I say "thank you" in that instance, Your Honor?

THE COURT:  You can.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   What was her role in being with you at the actual interviews?  Do you have any -- was she, did she have any role that you know of, other than to --

A.   She had no role in the interviews.  In fact, in all the other interviews that I conducted, she wasn't even present.  They would drop me off at the house.  She and Mr. Dan Smith was driving us.

Q.   And Dan Smith is -- what agency is he with?

A.   He's with the FBI.

THE COURT:  So somebody showed up at his interview?

BY MR. ROBERTS:

Q.   Can you tell her who showed up?

A.   They were there when I got there.

THE COURT:  And you made an appointment with her?

THE WITNESS:  Yes, ma'am.

THE COURT:  To see -- that's Mr. Bourgeois's sister?

THE WITNESS:  Yes, ma'am.

THE COURT:  Did they say what they were doing there?

THE WITNESS:  The indication that I had was that Ms. Armont had contacted the investigator and had asked did she need to have Counsel present, or I'm not sure exactly what it was that was said, and so Ms. Larin was called in, was present to be there.

THE COURT:  So did you get to do your interview?  Or did that compromise it?

THE WITNESS:  Could I have C, both of the above?

THE COURT:  Yes.

THE WITNESS:  I did it.  I was there.  And it certainly gave me significant concerns about the interview. And as we were leaving, we had a whole series of interviews scheduled.  I was doing about five or six.  And the indication to us was that we would be seeing them throughout the day.

And so we made a couple of schedule adjustments, and then wound up going to Alabama to do a different set of interviews.

BY MR. ROBERTS:

Q.   And again, your goal in going out there was what?  Your goal in going to Louisiana to do this interview with Michelle Armont, what was your -- what were you attempting to do?

A.   I was attempting to do an interview with her in regards to Mr. Bourgeois's adaptive functioning and perhaps to administer an ABAS, if I deemed that appropriate.

Q.    And did you actually get to administer the ABAS?

A.    I did.

Q.    Tell, please inform Judge Jack of who was present throughout that interview, and what if any actions they took while they were, while the interview was ongoing.

A.    Well, while the interview was ongoing, we were around a table in her, in her dining room area, me at one end, the investigator at the other, Ms. Larin on one side of the table and Ms. Armont on the other.

And throughout the interview at various points -- Ms. Armont clearly was unsure whether, you know, kind of what the situation here was, if she had somehow done something wrong.  And I think everyone was trying to assure her that she was okay.  But she was certainly, you know, glancing back and forth at the, Ms. Larin.  The investigator was taking notes throughout, and Ms. Larin had a computer and at various points would type in regards to different comments that Ms. Armont made.

And for me, that's a bit of a -- there's a bit of a challenge with that.  Your Honor may have noticed in the interview that I did with Mr. Bourgeois that I wrote virtually the whole time.  And the reason that I do that is whenever I'm taking notes with someone --

THE COURT:  So that he doesn't think that one thing is significant and something else is insignificant.

THE WITNESS:  Yes, ma'am.

THE COURT:  So you keep writing all the time.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   In your report, I'm showing you your report on Page 11, Government Exhibit 15, there's a sentence at the top there. Does that relate to the results of the testing of Ms. Armont and your conclusion as to whether they're reliable or not?

A.   Well, certainly the presence of --

Q.   What I'm referring to right now --

MR. ROBERTS:  I'm sorry, Your Honor.  I'm going to interrupt for a minute.

BY MR. ROBERTS:

Q.   What I'm referring you to right now is just this question. Does this sentence at the top, the very top sentence, does that refer to your -- what does that refer to, this sentence at the top that starts with, "As such," and ends in "validity."

A.   In looking at the results of the ABAS that Ms. Armont had completed, there were significant questions about validity of that measure.  I had concerns while she was taking it, but in looking at the results, those concerns were certainly verified.

Q.   Okay.  Can you explain to the Judge what those concerns are?

A.   Well, during the actual administration of the ABAS -- actually, let me take one step before that.  During the

interview, Ms. Armont seemed to be very tuned in to the issue of mental retardation as a key issue.

Q.   What do you mean by that, she tuned in to the issue?

A.   Well, for example --

THE COURT:  Well, she had been previously coached, is what you're saying?

MR. WISEMAN:  Your Honor, I respectfully object to that characterization that I coached a witness.

THE COURT:  Is that the characterization?

THE WITNESS:  It appeared to me that she was well aware that mental retardation was the issue at hand.

THE COURT:  Okay.  So somebody had told her.

THE WITNESS:  She was aware.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   So, and we're going to -- you've got, on Page 12 of your report, you've got a list of some of the scores.  I'm going to get to that in a minute.  But I want to ask you before we go to that, did you speak to any other family members of Alfred Bourgeois in an attempt to get them to complete any of the ABAS testing?  And if so, what happened?

A.   Yes, sir.  I also went to the home of Ms. Claudia Williams.  She and her --

Q.   Let me stop you there.  Was that prearranged also?  Did you call ahead of time, or did you just show up?

A.   We -- I believe that we called ahead of time.  We were doing -- we did the interview out of order with what had been anticipated.

Q.   Why did y'all decide to do that?

A.   We were seeking -- I was seeking to be able to have an interview with the Respondents without opposing counsel present to be able to do a clinical interview in the way that I generally do a clinical interview.

Q.   And did you get an opportunity to speak with Ms. Claudia Williams?

A.   Yes, sir, I did.

Q.   Were you able to do a, complete an ABAS test with her?

A.   No, sir, I didn't.  We spoke for a while, and I had the ABAS out in front of, or had it there, and Ms. Williams looked through it and very much struggled in terms of, of whether to complete it or not.  She asked --

Q.   I'm sorry.  Did you say "struggled"?

A.   Struggled emotionally in terms of -- I say emotionally, because she sort of teared up.  It was clear in talking about Mr. Bourgeois, it certainly is an emotional situation for her. And she asked, did she have to complete the form.  And I told her, "Of course not."  That was certainly at her option, and she declined to complete the ABAS because she indicated she didn't want to do anything that could be potentially of harm to her brother.

Q.   You mentioned earlier you had also given an ABAS to Danny Clark, Rhonda Davis and Nate Banks.  I want to ask you about your Appendix B to your report.  Please inform the Judge what exactly Appendix B is and why you had to add that.

MR. WISEMAN:  Your Honor, I'm going to object, although it might be premature, to any reference to Mr. Banks' ABAS.  He, in a sense, has given statements to the Government psychologist.  He's not here for us to examine him as to the veracity of his responses.  I think it's a denial of our right to confront what is in effect a witness against us.

THE COURT:  Who are you talking about again?

MR. WISEMAN:  I'm sorry?

THE COURT:  Who are you talking about again?  Say it again.

MR. WISEMAN:  That would be Mr. Banks.  He's not being produced by the Government as a witness in this case, and I would like an opportunity to ask him about his responses, which the Court permitted us to do with the other ABAS Respondents.

MR. ROBERTS:  Well, Your Honor, my only response to that is that we're going to compare the scores.  We're not going to get into the actual questions of Nate Banks.  But I will get into what his focus was on his test and how those test results affected the assessment.

MR. WISEMAN:  Your Honor, the scores and responses

are based on questions, and I have a right to probe why he gave certain responses, as I did with the other witnesses, when Your Honor approved the bathtub questioning.  I don't see how this is any different.

MR. ROBERTS:  Your Honor, we turned over all the raw data to the Defendant, to the Petitioner, and they have all the information.  And these -- Nate Banks' responses are in the report that is already in evidence.  And the report discusses his scores, and we're not going to get into any actual hearsay. There's nothing going to be offered for the truth of what's asserted, other than to show the same assessment that they've submitted through Beverly Franks, that we've submitted through Armont, Clark and Davis.  So it's really peculiar that they pick Nate Banks out of the whole mess to say they're objecting to his response.

MR. WISEMAN:  Well, he's the only one who's not here. I didn't object to the others.  It is hearsay.  It is being offered for the truth.  If Mr. Banks says Mr. Bourgeois, you know, always grabs hot dogs off of grills or not, I have a right to probe that, and --

THE COURT:  Sustained.

MR. WISEMAN:  I would assume, Your Honor, that portion of the report, referring to Mr. Banks, would also be stricken?

THE COURT:  No.  It's already been admitted.

MR. WISEMAN: I'm sorry?

THE COURT: It's already been admitted.

MR. WISEMAN: Okay.

MR. ROBERTS: Well, Your Honor, may I just have a point of clarification?

THE COURT: No.

BY MR. ROBERTS:

Q. Can you explain for us, Dr. Moore, Appendix B?

A. Yes, sir. We've been, or y'all have been referring to Banks. This was actually in regards to Danny Clark, the Appendix B. I administered the ABAS to Mr. Clark, and I interviewed him as well. In fact, I had spoken with him on the phone as well as spoken with him that day. And after I left with the ABAS, he was on a work break and had kindly agreed to meet us. We had a relatively short period of time.

And so after we had left, I looked at his responses and his scores, and they were at odds with how he had described Mr. Bourgeois to me. And --

Q. I'm going to stop you for a minute, because it says at the top, "Results from Invalid ABAS." What does that actually mean? You may be getting there, but --

A. Well, as directed by the ABAS manual, when there is a disparity between the scores obtained and the other information, for instance, interview information you get from someone, you need to determine why. And in speaking to

Mr. Clark, it became apparent that he had not fully understood the instructions for the ABAS, and thus had completed the form in a manner that invalidated the scores.

Q.    What did you do in regards to this invalid test result?

A.    I asked him if he would be willing to complete a new ABAS.

Q.    Was he willing to do so?

A.    Yes, sir.

Q.    And did he?

A.    Yes, sir.

Q.    What happened with that test result?

A.    He completed the ABAS.  The problem with the first ABAS, the reason it was invalid was that if he had to guess on an item, that he generally just simply checked a 2.  He checked that he had guessed, but he assessed the level of proficiency at a 2.

Q.    Well, help me understand, what is 2 in the range of the answer?

A.    A 2 would mean that an individual wasn't able to do the item, needed help in doing the item or wasn't -- was able to do it some of the time independently.

Q.    Okay.  Give us one example of an item so we can use that as our point of contact as we discuss this.

A.    Is able to pack clothes independently for an overnight trip.

Q.    So if someone, if he was asked this question on that, if

Mr. Clark was asked this question on that test and his response was what?

A.    He put a 2 and indicated that he had guessed.

Q.    Okay.  And that was on the second test that he took?

A.    That was on the first one.

Q.    Okay.  And why was that, why did you ultimately determine it was invalid?

A.    Because based on the information that he had shared with me, Mr. Bourgeois would have been able to do that type of behavior independently.  The way the measure is set up, you either get a zero, or you can score a 1, 2 or 3.  And some people tend to gravitate, if they don't know an item, to the middle.  "Well, I'll just, I'll give them a 2 on that.  I'm not quite sure."  But the instructions are, based on what you know of the individual, if you have to guess on the item, based on what you know of them in other situations, how would you estimate that he would do, based on that knowledge.

Q.    What is the importance of that column for them checking off "guessing"?

A.    Guessing let's one know that they may not have had the opportunity to specifically observe the individual.  And so that item is an estimate or guess.

Q.    And then Mr. Clark completed the second form, and was that one completed correctly?

A.    No, sir.

Q.    What happened with that?

A.    He went through and he checked the items that -- he filled it out, except the items that he guessed at, he didn't put a numeric score on.  So I contacted him again and said, "Those items where you have checked that you guessed, we actually need for you to make an estimate on there of what your assessment would be."  And so he completed it there.

Q.    Okay.  And I'm showing you what is Page 11 of Government Exhibit 15.  And I believe the second paragraph that starts, "In the assessment of Mr. Banks' adulthood adaptive functioning, Mr. Clark completed two," does that paragraph explain what you were just describing to the Court?

A.    Yes, sir.

Q.    And ultimately, when he completed the second one, after the second contact with him, did you determine whether his scores could be used in the assessment in a way that was reliable?

A.    Yes, sir, it appeared so.

Q.    Because of the objection, I'm not going to go into the specifics of the next paragraph, but that paragraph does refer to Nathan Banks and what, some of the information he gave you.  Is that correct?

A.    Yes, sir.

Q.    What about Rhonda Davis', what was -- was there anything about her testing that was interesting?

A.    Yes, sir, there was to me.  I think she was in perhaps even -- she was certainly a very fastidious, perhaps over-cautious, in endorsing guessed items.  But she made seemingly, was vigilant to, if she didn't see it happen, that she checked a guess on there.  So there was certainly a lot of guessed responses on there, and she appeared to be, again, taking that, you know, very much tuned into that issue.

Q.    Did you ask her about that?

A.    I didn't ask her about that specifically.  She actually made comments as she went along that let me know kind of how she was doing that.  "Oh, that applies here," or, "Well, he could do such-and-such here."

Q.    Okay.  I'm going to show you again what's Page 11, Government Exhibit 15.  I want to draw your attention to a phrase that you use, and that is, in the last paragraph on that page, you say, "As such, one looks for a convergence of data." Do you see that where you included that in?

A.    Yes, sir.

Q.    Third line down, at the end of the third line.

A.    Yes, sir.

Q.    "Convergence of data."  What exactly are you trying to convey with that phrase, "convergence of data"?

A.    That the more that data from different sources comes together to reflect the same level of functioning, the more confidence that we can have that that data accurately reflects

a valid assessment.

Q. Now, I've -- as you sat through the trial, did you hear some of the individuals that took these tests, particularly Danny Clark and Rhonda Davis, when they were on the stand, they were questioned about the guessing block. You've mentioned guessing. Is that -- tell us, I mean, is that part of the test, or is that something that's really peculiar for someone to check guessing?

A. It certainly is a part of the test. People are instructed to complete every item, and some items they may not have had the opportunity to observe. So they're instructed to indicate if they guessed.

In the administration of the ABAS and the manner that it was standardized, a high number of guesses would be a bit of a flag, because we're looking at, for someone who knows a person across a variety of settings and has ongoing contact with them.

The challenge, again, in a forensic setting and particularly one where there's been some degree of time that's passed is that balance between how much ongoing contact the person has versus the vested interest in the case.

And so in a typical assessment where the ABAS would normally be used, a high number of guesses would be somewhat of a red flag. In this particular case, it's not unexpected because of the circumstances of the evaluation.

Q. I'm going to show you what's Exhibit -- Page 12 of

Government Exhibit 15.  And there's a chart here that has the, it's got "Sub-domain," and then it's got "Communication, Community Use, Functioning Academics, Home Living, Health and Safety, Leisure."  What are these categories over here under Sub-domain?

A.    The ABAS-II is broken up in ten sections, and those ten sections correspond to the domains of adaptive functioning identified, for example, by the DSM-IV-TR in regards to the key areas of assessment.  So these are subsections within the ABAS.

Q.    Okay.  Before you, before that table on Page 11 -- and again the table's on Page 12, but at the bottom of Page 11 of Government Exhibit 15, draw your attention to this statement, the very last sentence on this page, "Significantly subaverage functioning would be a score of 4 or below."  Describe for us what that means in relation to the chart that you have on Page 12.

A.    On the chart on Page 12 --

Q.    And I'm putting the chart on Page 12 back up.

A.     -- the scoring for those ten sub-domains has a mean or average of 10 and a standard deviation of 3.  And so a score of 4 would fall at two standard deviations below the mean.  So "significantly below the mean" would be scores of 4 or below.

Q.    And so what does -- you've got this sub-domain you said on this side, and then you've got four names of individuals with years beside them.  What are those names, and what do the years

beside them mean?

A.    The names are the individuals who completed the ABAS, and these are their scores from that ABAS.  And the years beside of them, that's how old Mr. Bourgeois was at the time of their last contact with him upon which the, they were completing the ABAS.

Q.    Okay.

A.    So what I had done was ask them to remember back to his age or remember back to the last time they had ongoing contact with him and to assess his functioning as of that time.

Q.    Now briefly, just so I can understand, I'm going to take that one away.  We're going to come back to that and talk about that, but on Appendix A, you've got an entirely different chart, and it's got different categories over here.  Tell us why you did a different chart on Appendix A.  And Appendix A again is -- well, you tell us why you did a chart, a different chart on this one?

A.    Well, Appendix A is utilizing the AAIDD definition of adaptive functioning deficits.  And so it uses the categories of conceptual, social and practical skills.  In this case, with the standard scores, they have an average of 100 and a standard deviation of 15.  So "significantly below the mean" would be scores of 70 or below.

Q.    Let's go back to the ten sub-domain categories, and tell us what, if anything, is significant about the scoring of these

four individuals as they rated Alfred Bourgeois's performance.

A.    Well, there's pretty close agreement between Davis and Clark, and relatively good agreement with Banks as well.

MR. WISEMAN:  Objection to the reference of Banks, Your Honor.

THE COURT:  Sustained.

BY MR. ROBERTS:

Q.    Okay.  Just go ahead and reference the two that are not there, I mean the other two, Davis and Clark.  We'll just stick with them for now.

A.    Okay.  So there is -- there is significant convergence overall between Davis and Clark.  The agreements were pretty close across domains.

Q.    And versus Armont, tell us about why your, why that one's so different.

A.    Well, the scores that she -- the responses that she gave resulted in extremely low scores, certainly far at odds with that of Ms. Davis and Mr. Clark.

Q.    And again, what is the significance -- on the page prior to this, you said something about the significance of the scoring of 4.  What does a scoring of 4 tell us again?

A.    A score of 4 would be approximately two standard deviations below the mean.

Q.    Same question with regard to this one.  Can you do the comparison between Armont, Davis and Clark?  And tell us what

that information tells us under the AAIDD's definition of adaptive functioning.

A.   Yes.   Again, the scores between Davis and Clark are relatively consistent.   Certainly when you look at the global adaptive composite right here, where one has an overall as a 108, and one -- and the other is a 105, and that's sort of all of it collapsed together, all the domains collapsed together, so it's a global assessment.   And Ms. Armont's scores, or the results from the administration to Ms. Armont was significantly below that, significantly different from that.   He was in the, basically in the average range, average to slightly above average on the conceptual, social, practical and global for Davis and Clark.   He was in the significantly impaired range for Ms. Armont.

Q.   And in the same way, you've reviewed the information from Dr. Swanson with regard to Beverly Franks?

A.   Yes, sir.

Q.   And do you recall -- well again, I'm going to show you Dr. Swanson's report again, on Page 3, where she begins with the deficits in the conceptual domain.   Does she tell us where the scoring is on this page for Beverly Franks?   Does she give us a numerical number?

A.   I don't see so.

Q.   Do you recall what her data reflected?

A.   On the ABAS for Ms. Frank, the scores were extremely low.

And the ABAS has what's called a high floor, which means that even if you scored -- if I may, a different analogy.  The Wechsler scales also have a very high floor, which means if you missed all the items, you would still wind up with an IQ score in the 40s.  So it doesn't measure all the way down, if you will.  And it's similar with the ABAS.

So her scores were almost as low as you can get.

THE COURT:  So what does that tell you?

THE WITNESS:  It certainly gave me pause on the -- well, that in and of itself raised a question of is he functioning that -- you know, is that really an accurate reflection of his functioning?

THE COURT:  Was it, in your opinion?

THE WITNESS:  No, ma'am, I don't believe so.

THE COURT:  Do you see any evidence, in the hours you've spent on this case reviewing the documents, everything, that Mr. Bourgeois is mentally restarted?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   There was -- earlier there was testimony about you actually contacting people that he worked with and telephone conversations.  Did your conversations with those individuals play any role in your assessment on his adaptive functioning?

A.   Yes, sir.

Q.   Okay.  And you're well aware, he's a truck driver.  Does his truck driving abilities tell us anything about his adaptive functioning?

A.   Well, they certainly feed into that, yes, sir.  Certainly in regards to work-related functioning, but I think even more broadly, the nature of the job itself.  This isn't a simple repetitive job that he went to in a factory putting lids on widgets, but a job that had him going out and around the country, living, at least driving independently, picking up loads, taking care of his self-care during that period, interacting with people across a lot of different certainly social styles, as we move across the country.

Q.   Your report on Page 2, Government Exhibit 15, indicates at the bottom of materials reviewed "contents of briefcase belonging to Mr. Bourgeois."  You had an opportunity to review the contents of the briefcase?

A.   Yes, sir.

Q.   Did you actually see the briefcase, the briefcase itself?

A.   Yes, sir.

Q.   And Government Exhibit 28 is a pretty thick package.  It's 177 pages.  I'm showing you that exhibit, just the first page of that exhibit, Government Exhibit 28.  And it says, "First American Bank."  What was your understanding of -- or did you find this document inside that briefcase?

A.   Yes, sir.

Q.   All 177 pages of it?

A.   I think what I actually found in the briefcase was the items that are photocopied onto that document.

Q.   Let me ask you -- before you testified, I asked you to look through this document and mark certain areas.

A.   Yes, sir.

Q.   So I'm going to refer to the pages that you marked and ask you why you marked those pages.  This would be Page 19 of Exhibit -- Page 19 of Exhibit 28.

A.   I checked that --

Q.   Why did you mark that page?

A.   I'm sorry, sir?

Q.   Why did you mark that page?

A.   I marked that for the notation on there, just as an example, on the outside of each of the envelopes, there was -- or on many, there was this type of notation.  "Checked out and okay by Alfred."

Q.   And do you recognize the handwriting?

A.   That looks like the left-handed slant of Mr. Bourgeois, although I'm not a handwriting expert.

Q.   How would you know that?

A.   I'm sorry?

Q.   How would you know that?

A.   I've seen many of his letters.

Q.   What letters are you referring to?

A.    There were letters to his wife, letters to Mr. Gilmore. There have been many different letters that he's written that I've seen.

Q.    What's the -- what, in your opinion, what is the significance of this notation on this page, this exhibit?

A.    It appears that he's gone through and checked through the canceled checks that have been sent to him from First American Bank that covered the periods that are noted up top.  And one of the other things that makes me think that this may have been Mr. Bourgeois's handwriting is in his writing, one of the things he tends to do is use the word T-O-O.  This is spelled T-O-O instead of T-O.  So when he had "8/29/2000 too 9/27/2000," the spelling error that he makes, or the spelling error he makes is consistent with what I've seen in other places.

Q.    Bear with me for just a minute.  I have some of these turned upside down.  I'm going to show you what's Page 13 of Exhibit 28.

A.    Yes, sir.

Q.    What do you see on that page?

A.    Again, they were okayed and checked by him.  I'm not sure whether that's his handwriting there or not.  I can't quite tell.  There's a left-handed slant.  The typo, the "to" is spelled correctly there, so I'm not sure whether that's his handwriting or not.  But someone seems to be indicating that he

had checked and okayed them.

Q.    You marked this page, which is Page 25.  I'll have to zoom out on that.  Page 25, what's significant on this page?

A.    I marked this page because it was just an example of, that he actually appears to be writing a number of the checks.  Again, the distinctive slants.  Not all of these are his.  You can see handwriting in the other direction on some, but some of these are.  I can't quite see on here.  Either on this or some of the other pages, it will actually indicate --

Q.    I can zoom in.

A.    -- accounts that he's writing to.  Right, like I believe this is --

Q.    Tell me which check number.  I'll just go down -- do you have anything --

A.    Well, right here, right here, it looks like an account number on the top at Hibernia Mortgage, for example.  So he's being, he's going through, he's writing a check, and then certainly noting on there a complete, a pretty complete record for himself, what the account is and which payment it is.

Q.    Let me ask you, was there any documents in the briefcase with regard to Hibernia Mortgage?

A.    Yes, sir.

Q.    For the record, I would -- I'm showing you what's been marked as Government Exhibit 34, Government Exhibit 34, and ask you if you recognize that document and the check that was

attached.

A.    I recognize the check.  I'm not sure whether the document was one of the ones that was in that pack.  I mean, I saw hundreds of pages in there.

Q.    Let me move to another, the next document you checked. You've only got a couple more of these, so --

          MR. WISEMAN:  Your Honor, I'm going to object to the cumulative nature of this.  I mean, it's apparent that these all show some action on the checking account, which presumably was Mr. Bourgeois, and I don't know what the point in continuing through them is.

          MR. ROBERTS:  Your Honor, three more tabs.

          THE COURT:  How many more?

          MR. ROBERTS:  Just three.

          THE COURT:  Okay.  Do them a little quickly.

          MR. ROBERTS:  Yes, Your Honor.

          THE COURT:  Or quicker.

BY MR. ROBERTS:

Q.    I'm showing you Page 35, Government Exhibit 28.  What's significant on this page?  Why don't you mark that?

A.    Again, just all check out and okay, so indicating that he appears to have gone through them and been doing some sort of double-checking, whether it's balancing, whether it's confirming against another record or whatnot, I'm not sure. But all checked out and okay.

Q.    One more, Page 55 of Government Exhibit 28.

A.    The same there.  I think there's one more where you actually see check marks on the checks themselves.  That let me know it appears he's going by and actually checking off against a record.

Q.    Let me show you that one real quick, and I'll be done with this exhibit.  Show you what's marked as Government Exhibit -- Page 57 of Government Exhibit 28.  And it's a list of checks and the check marks.  How do you know that's his check mark?

A.    I don't know for certain that that's his check mark, but again, it's a left-handed check mark.

Q.    You mentioned that you had read his letters --

            THE COURT:  Are you going to offer any of those?

            MR. ROBERTS:  I'm sorry, Your Honor?

            THE COURT:  Are you going to offer any of those?

            MR. ROBERTS:  These are Government Exhibit 28.

            THE COURT:  They're already admitted?

            MR. ROBERTS:  They're already in, yes, Your Honor.

            THE COURT:  Okay.

BY MR. ROBERTS:

Q.    You mentioned that you have read his letters.  Do you know how many of his letters you've read?

A.    No, sir, I'm not sure.  But I would think, my estimate would be perhaps a dozen or two, at least.

Q.    And what were the majority that were -- explain to the

Judge the majority of the letters that you reviewed before coming into court.

A.    There were, I think one of them was a letter to Her Honor or to a Judge indicating the need to be able to be in contact with some folks around some of the legal issues that he had going on with the foreclosure of his house.  There were letters to his wife.  There are certainly letters to Mr. Gilmore that we've seen.

Q.    You observed the letters here in court to Mr. Gilmore --

A.    Yes, sir.

Q.    -- that were offered earlier, Government Exhibits 178 through 200?  What, if anything, could you discern with regard to his adaptive functioning from reviewing his letter writing?

A.    Well, I think that there are a couple of things.  He certainly appears to be able to use written communication effectively.  He seems to write in the manner that he speaks.  In other words, the style.  There are some grammatical errors in there, but if you'll read them, hear his voice on the inside, it's literally as if he's writing, speaking as he's reading.  But the language is -- certainly the vocabulary is good.  The ideas are complex.  The sentences are often compound.  He's able to follow a flow of thought, communicate his ideas effectively.  He certainly seems to be a vigilant record keeper, well aware of dates and perhaps locations.

Q.    One more question with regard to Dr. Swanson --

THE COURT:  He also, when I saw you interviewing him, he seemed to be a very good historian.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   Were there anything else -- what were your general impressions about him when you interviewed him with the Government Exhibits 19 through 22 that reflect your interview? Were there anything in particular that stood out that you thought were, that was specifically relevant to your adaptive functioning assessment?

A.   Well, he was certainly highly verbal.  The fact that he was able to recall specific details both back from apparently his work history -- I don't know that all that he told me was true.  There are times that it appears that he exaggerates or dissimilates, but he certainly provided details around pay rates and things like that that appear to have been confirmed later on by others.

Certainly his ability to follow a flow of thought, his ability to be redirected, his interpersonal skills were notable in terms of how he began very quickly relating things to where I was from.  He asked early on where I was from, and then would relate back to that, in North Carolina.  He called me by name quite a bit throughout, and Dr. Price, remembering back to him.

The level of language that he used, the words that, you know, literally we're talking about the words and concepts,

whether we were talking about things like escrow or people being manipulative or something being deficient or -- you know, he has certainly a notable vocabulary that is generally accurately used.

Q.   And one more question with Dr. Swanson's testing.  You reviewed her raw data, and you heard her testimony.  What is your opinion about how she administered and interpreted the tests that she applied with regard to Beverly Franks?

A.   Well, I think the issue is less with how she administered it, per se, than there was no acknowledgment of the significant violation of the standardization norm, so that the scores would be of highly questionable validity and reliability.  And that part wasn't acknowledged at all.

Q.   And she -- that's the test where she had Beverly Franks refer back to when Alfred Bourgeois was seven.  Did you find anything interesting about her selection of the age of seven?

A.   I did.  If you're going back and interviewing somebody retrospectively, as she noted, one of the challenges is how do you keep them focused on a specific age.  And I think that's a noteworthy challenge.  And in fact, what I do whenever I'm giving an ABAS and have to go back in time or need to, is I have them choose or base it on the last time they saw the individual, instead of trying to pick out a particular age. I've got two children, and if someone were to ask me how were they, how is one of them functioning at age eight, I would have

a tremendously difficult time picking out their functioning at exactly that age, versus if they said, you know, let's say one had left home for college and I had not seen them after that. I could go back to that last point in time.

So to me, that's one of the challenges to it.  She chose seven, which apparently was when he first began to live with Ms. Mary.  So she would have been newly getting to know him, and it wouldn't have been the last time that she saw him or the more recent time that she saw him.  So we would have wanted to not stretch the memory back as far as possible.  We want to try to keep that as close in time, and also to be able to have a specific, a good specific marker for when that time would be.

Also in regards to this, that time point would have been one where he's coming right out of a highly, what seemed, what apparently was a highly dysfunctional family situation.  And we would expect there to be all sorts of factors that could be affecting his presentation.

Q.   Let me ask you quickly about Dr. Estrada's testimony, because you were present for the deposition.  Was there anything in particular that struck you about Dr. Estrada's testimony that you think is helpful for the Judge in assessing the mental retardation issue that's before her?

A.   Well, he certainly seemed to be tuned into kind of the mixture of data.  But the thing, I think, that struck me most with Dr. Estrada is that as a psychologist, I know that the

testing component, the IQ component can be, there is a significant part of the diagnosis of IQ, and that psychiatrists generally don't do IQ testing.

And so we get used to, when they talk about the IQ part of it, then they're sort of shooting off the cuff, if you will, I guess with no disrespect --

THE COURT:  Stepping in your field.

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Well, stepping in our field without perhaps a good knowledge base underneath that.  And my ears certainly pricked up very hard when I realized that Dr. Estrada has a master's in psychology and had administered the IQ test before, so had a --

THE COURT:  And I think he does them in his office also.  He has someone there who administers them, and he reviews them as well.

THE WITNESS:  So that was striking to me.

THE COURT:  At least I've seen him do that on other cases.

BY MR. ROBERTS:

Q.   And that was striking in what way?

A.   It led some, to me, it led some credibility to his observations, because as he noted, the issue with an IQ test is it's a snapshot in time versus the assessment or impression one can get over a longer period of interaction.

Q.   I want to touch just briefly also on his diagnosis of

borderline personality disorder.  In your report, you agree with him --

A.   Yes.

Q.   -- that that's a valid assessment is -- and the reason I want to touch on that, I want to go back to, I want to take that information and ask you about Dr. Gelbort and Dr. Swanson's assessments with regard to how -- did they pay attention to borderline personality disorder and the possibility of it affecting their assessments?  Did I not ask the question artfully?

     Let me just ask you this way.  If a psychologist is trying to assess someone for mental retardation and they're doing, whether they're doing IQ testing or adaptive functioning, to what extent should they be paying attention to reactions or -- in their assessment, if someone has borderline personality disorder or other disorders?

A.   Well, I think you have to keep your radar up whenever you're doing an assessment to look for factors that can be affecting functioning or performance in whatever manner.  So is it at a personality level?  Is it at a general health level that day?  Is there a depression or some sort of other Axis I disorder?  So we have to be able to look carefully at other factors that provide a context for understanding the performance that we're getting.

Q.   Now, let's go to the last prong of the mental retardation

test, and that's the onset before the age of 18.  In your opinion, does this record, the record in this case, contain sufficient evidence for you to conclude that Alfred Bourgeois was mentally retarded prior to the age of 18?

A.    No, sir.

Q.    You heard evidence about an alleged head injury that may have happened in '84 or may have happened in '93.  I just want you to quickly, if you could inform the Judge at least with regard to if Alfred Bourgeois even had those head injuries resulting from those accidents in those years, what significance would that be in assessing mental retardation in this case?

A.    One of the implications here, and one can certainly argue over the IQ scores themselves specifically and whether they should, would be adjusted or modified or whatever the circumstance would be.  But the implication seems to be that the IQ scores obtained in the 2004 and 2007 assessments can be extrapolated back to prior to the age of 18, because all things left the same, the IQ is relatively stable across the life span.  But in this particular case there is the contention that there were two significant injuries, two significant head injuries, one of which purportedly led to a behavioral change. And to me, that would create a snag or a difficulty to being able to extrapolate those scores back.  We don't know whether those head injuries would have led to a decrease in his IQ

functioning.  And in fact, if they were significant and led to behavioral change, it's likely that they could have led to a change.  So I can't take the scores of the present and simply extrapolate them back and say there's been no change in intellectual functioning.

Q.   And what, in your recollection of the evidence in this case, what age was he when the 1984 accident allegedly happened?

A.   I think he was -- I think it was just after his 20th birthday.  It was right around his 20th birthday.

Q.   Judge Jack asked you this already, but I want to reference this on your report.  Page 17 of the Government's Exhibit 15, you give your conclusion of the, it's a short one.  Would you just read that for the record?

A.   Yes, sir.  "Based on an extensive records review, multiple interviews, and formal assessment of adaptive functioning, it is my opinion, to a reasonable degree of psychological certainty, that Alfred Bourgeois does not meet the diagnostic criteria for mental retardation as that term is defined by prevailing federal law or by current professional standards."

Q.   Final question.  You've been in this -- you've seen the entire trial.

         MR. WISEMAN:  Hearing.

BY MR. ROBERTS:

Q.   Good point.  You've been present in the entire hearing.

A.   Yes, sir.

Q.   You've actually seen additional evidence since you've been here.  Has your opinion changed at all since you observed all of this in the last week?

A.   Not in regards to my conclusions.

Q.   Your conclusions with regard to --

A.   The paragraph that I just read.

THE COURT:  What's the significance -- you remember yesterday when the lady was testifying how much she cared about him?  The one from Birmingham, Alabama, and how friendly he was and you know, I mean, she kind of teared up thinking that he had gotten himself into this horrible situation, that Mr. Bourgeois never looked at her or met her eyes, contact or anything.  What does that mean?  I was interested in that. Didn't acknowledge her in any way, when she couldn't really say enough good things about him.

THE WITNESS:  My hypothesis on that would be that it may be a reflection of the -- I have two hypotheses.  One is that it may be part of the borderline functioning, where she's gone from being a really close friend who's now turned on him perhaps.  It may be that the emotional flood is so big, I mean, they clearly had a close relationship, and he just sort of shut the emotion out --

THE COURT:  Okay.

THE WITNESS:  -- and sort of dissociated that, or you

know, split off.  Not dissociated, but just sort of, you know, just shut off that emotional side.

THE COURT:  "Dissociative" has another psychiatric or psychological meaning.

THE WITNESS:  Ma'am?

THE COURT:  I said the word "dissociative" has another meaning than what you were saying.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

MR. ROBERTS:  I have no other questions, Your Honor.

THE COURT:  Thank you.  Go ahead, Mr. Wiseman.

MR. WISEMAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Moore.

A.   Good afternoon.

Q.   We're at the home stretch.

A.   Yes, sir.

Q.   I'm going to try to be as quick as I can.  It's getting late, and I know we're all beat.

Judge Jack asked you a question, and you responded, I think you said, "There is no evidence of mental retardation." Is that what you said?  "No evidence of mental retardation"?  I mean, we could read it back.  I wrote it down.

THE COURT:  I thought that's what he said.

MR. WISEMAN:  Yeah, okay, so let's assume --

THE COURT:  I said, "Do you find any evidence of mental retardation in all your interviews," et cetera, et cetera?  And he said, "None" or "No."

BY MR. WISEMAN:

Q.   You would agree that's somewhat of an inaccurate statement.  There is in fact some evidence.

A.   Yes, sir.  My understanding wasn't -- she was asking it at a global level, that did I assess him, did I feel there was --

THE COURT:  And I guess, I guess what you're asking, I'm wondering if he was differentiating between in his mind credible evidence and evidence.

MR. WISEMAN:  Oh, that may be.  That may be.

THE COURT:  And the reason I asked that is he was tearing apart all of those --

MR. WISEMAN:  I just, as I'm sure the Court agrees, we need to be precise here.  So --

THE COURT:  Yes.

BY MR. WISEMAN:

Q.   So we're not dealing with no evidence, we're dealing with some evidence, and you don't think it makes it all the way across the goal line, to use a bad metaphor.

A.   I'll roll along with your metaphor, sir.

THE COURT:  I asked about credible evidence because it seemed to me you were not believing some of these test

results.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  You did not find that credible.

THE WITNESS:  That's correct, ma'am.

THE COURT:  Okay, the WAIS-R and the WAIS-III, or something along those lines.

THE WITNESS:  Well, the WAIS-R and WAIS-III, the issue with those is that they have to be considered, for there to be a diagnosis of mental retardation with IQ scores in that range, there has to be significant deficits in adaptive functioning.

THE COURT:  Okay.

MR. WISEMAN:  So Dr. Moore --

THE COURT:  So that's what you're getting to.

MR. WISEMAN:  Correct.  That's what I --

THE COURT:  Got it.

MR. WISEMAN:  That's what I was wondering about.

BY MR. WISEMAN:

Q.   As Mr. Roberts brought out, you've been here for the whole, the whole thing.  And you've heard all the witnesses, at least all the witnesses related to the mental health issue.  Is that right?

A.   Yes, sir.

Q.   Okay.  And you were here on Tuesday, September 21st, at about 9:35, at least by my estimate, when Ms. Booth stood up

and said the Government concedes that Mr. Bourgeois was abused as a child. Did you hear that?

A. Yes, sir.

Q. And you agree with her. Right?

A. I agree that she said and the Government conceded there was abuse of a child.

Q. Okay. And you think that's an accurate concession on the Government's part, based on the entire record you've reviewed?

MR. ROBERTS: Objection, Your Honor, relevance.

MR. WISEMAN: Relevance?

MR. ROBERTS: I don't know what his, whether he agrees with our concession or not, I don't know that that has any relevance.

BY MR. WISEMAN:

Q. Well, I'm asking you if you think the record of this case shows that Mr. Bourgeois was abused as a child.

MR. ROBERTS: That's a different question, Your Honor.

BY MR. WISEMAN:

Q. I think you can answer.

A. Yes, sir, I think the -- I'm sorry, I wanted to make sure --

THE COURT: I got it.

THE WITNESS: Okay.

THE COURT: Go ahead. You can answer.

THE WITNESS:  Yes, sir, I think the record does show that.

BY MR. WISEMAN:

Q.   Okay.  And do you agree with the statement that was made at about 9:50 by Ms. Booth that Mr. Bourgeois's a sociopath?

THE COURT:  That what?

MR. WISEMAN:  That Mr. Bourgeois is a sociopath, antisocial.

THE COURT:  Who made that statement?

MR. WISEMAN:  Ms. Booth.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, I'd object that Ms. Booth wasn't a witness in this case, and --

MR. WISEMAN:  Exactly.

THE COURT:  I think actually Mr. Wiseman and Ms. Booth have been witnesses in the case, one way or the other.

MR. WISEMAN:  You've got to throw Mr. McHugh in there, too.

THE COURT:  Oh, definitely.  I don't want to leave him out.

BY MR. WISEMAN:

Q.   Okay.  My point being, sir, you don't think Mr. Bourgeois, based on everything you've seen, is a sociopath.

A.   I don't diagnose him as a sociopath.

Q.    Okay.

A.    I assume that when you say "sociopath," you're referring to antisocial personality disorder.

Q.    Antisocial personality disorder.

A.    I don't think that he meets the diagnostic criteria for antisocial personality disorder.

THE COURT:  What is that?  What is the diagnosis?  I just, see, I'm the one misunderstanding it, because I used that, remember, with the doctor on Friday?

MR. WISEMAN:  No, I remember quite well, yes.  Yes.

THE COURT:  I thought it was somebody -- when he was saying that he didn't have any moral brakes, I thought that's what that meant.

MR. WISEMAN:  I think he said behavioral brakes. There's a difference.

THE COURT:  Well, he couldn't put the brakes on his behavior.

MR. WISEMAN:  Correct.

THE COURT:  I assumed that that meant morally.

MR. WISEMAN:  I --

THE COURT:  As well as rage and all kinds of other things.

MR. WISEMAN:  Right.

THE COURT:  And it was me that first used that term.

MR. WISEMAN:  Correct.

THE COURT:  And I've misused it, apparently.

MR. WISEMAN:  That would be our view with --

THE COURT:  That's fine.

MR. WISEMAN:  -- with respect.

THE COURT:  So what does that mean when they -- were you here when he testified?  Actually, you were not here.  You had already gone.  But I said that behavior, when he says he can't put the brakes on his behavior, I said, "Well, that sounds like a sociopath."  He said, "Yes, it's the same presentation, but a different etiology."  So what does that mean?  If I'm misusing the word wrong, I've got to erase it from my mind quickly.

THE WITNESS:  Well, diagnostically we talk about an antisocial personality disorder.  So I get much more used to talking about, you know, from a clinical perspective, so there's a common term that one is agreeing on.

THE COURT:  Well, I think of a sociopath who has no sense of right and wrong, who is a con person as well, and who has no moral compass.

THE WITNESS:  Yes, ma'am, one who is focused on getting their needs met, with no concern about --

THE COURT:  Well, the doctor did say he tested out as a narcissist, the one from the Friday --

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So what does that mean?  I don't

mean the narcissist.  I know what that means.  But the sociopath.  He's not a sociopath, in your opinion?

THE WITNESS:  I don't think that he meets well --

THE COURT:  Or am I saying, using it differently than the right way?

THE WITNESS:  Well, I think you're using the term "sociopath," and I'm not sure how you define that.  I talk in terms of antisocial personality disorder.

THE COURT:  Okay.  I'll tell you where I -- when I was in nursing school, we went to the Patuxent Institute, which was the housing, before the Supreme Court said you can't let -- you've got to evaluate people regularly.  And they had the most brilliant sociopaths in this place that I've ever seen.  Beautiful artists.  They were very talented people.  And they had all been diagnosed as sociopaths.  And so that was my background.  That's why I use the word.

THE WITNESS:  I think in general, when we're talking about a sociopath -- and again, that gets into, I think the definition becomes looser, because it begins to be used by the lay public.  But basically we're talking about somebody who doesn't have a development of conscience.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.  And Mr. Bourgeois is driven in his conduct by other factors other than a lack of a conscience.

A.    I believe so.

Q.    And that would be his borderline personality disorder primarily?

A.    Yes, sir.

Q.    And you agree -- I don't want to go through all the stuff I went through yesterday with Dr. Price, but you heard me -- or was that today?  It felt like yesterday.  You heard me go through all the borderline criteria and what it means, and you don't have any quarrel with Dr. Price on any of his testimony with respect to Mr. Bourgeois's borderline personality and what it means.

A.    Not at a global level.  We certainly parse out some details around the psychotic piece of it --

Q.    Okay.

A.    -- and where the definition specifically came from, but no, sir, in general, I don't.

THE COURT:  Did you have an expert testify, Mr. Wiseman, that he was not a borderline --

MR. WISEMAN:  I do not believe so.

THE COURT:  Okay.

MR. WISEMAN:  We've been consistent.

THE COURT:  Has anybody testified to that, that he was not?

MR. WISEMAN:  Um --

MR. ROBERTS:  Not to me knowledge, Your Honor.

THE COURT:  Okay.

MR. WISEMAN:  Maybe we've proven something.

THE COURT:  No, I think you've done an excellent job.

BY MR. WISEMAN:

Q.   I see that you've relied on the DSM-IV-TR as your authoritative source for this evaluation.  Is that right?

A.   Yes, sir.

Q.   Now, you heard Dr. Price talk about the 11th edition of the AAIDD manual, also known as the green book.  You would agree that that's likewise authoritative?

A.   I don't use it for diagnostic purposes, in a clinical sense, but I believe it is an authoritative manual.

Q.   Okay.  And the DSM-IV-TR came out in 2000.  Correct?

A.   Yes, sir.  I'm sorry.

Q.   And that's before the Atkins decision?

A.   That's correct.

Q.   And the green book came out in 2010.  Correct?

A.   Yes, sir.

Q.   All right.  After Atkins, obviously.

A.   Yes, sir.

Q.   And it addresses some of the issues raised by Atkins cases, and by that I mean the retrospective nature of some of these evaluations.

A.   Yes, sir.

Q.   And the DSM just doesn't deal with that.  There's nothing

in the DSM about retroactive or what test to use for it or how

to approach them or anything like that.

A.    The DSM doesn't tell how to evaluate.  It tells what the

diagnostic criteria would be.

Q.    But for purposes of how to evaluate that, you would agree

that as we stand here today, the green book is the

authoritative source for how to evaluate.

A.    I think it's a good source.

Q.    Okay.  Well, you've cited its predecessors.  You've cited

the 10th edition, you've cited the 9th edition.  Is there

something about the 11th edition that you don't like, or is

it --

A.    Oh, no, sir.  I simply mean by that that I think the blue,

the red, the green books, you know, are certainly important

sources, but that there may be other sources of information in

the field about how to go about the assessments that would be

important as well.

Q.    I'm going to be jumping around here.  I'm trying to be

organized, but there's a lot of information.  You say in your

report that Mr. Bourgeois went to college.  Other than his

self-report, you've seen no document that says he went to

college.

A.    While I've not seen any document from a college, at least

one of the people that I interviewed indicated that he had been

to the community college.

Q.   And who was that?

A.   And --

Q.   Who was that?

A.   Ms. Armont.

Q.   Okay.

A.   And I believe that it may have been indicated on his application perhaps at the Sheriff's Department.  I'm not certain about that.  It seems that there was an application, and it indicated he had had some, he began at the college.

Q.   Now, your report at Page 6 says that the Bureau of Prisons records on Mr. Bourgeois say they gave him a preliminary diagnosis of intermittent explosive disorder, follow-up screening and monthly mental health reviews, noted that there is no evidence of mental illness or distress.  He seems to function adequately.

A couple of questions about that.  Intermittent explosive disorder, you would agree, is -- cannot be diagnosed if the conduct is better accounted for by a borderline personality disorder?

A.   Um --

Q.   Page 667 of the DSM-IV.

A.   I don't have the DSM-IV memorized.

Q.   Well, lucky for you, I happen to have one.

A.   But I certainly wouldn't --

Q.   Let's just --

A.    I wouldn't argue or contend that it doesn't say it.  I'm just trying to in my own head figure out where the rule outs on there are.

Q.    Yes.  It's a big book.  Nobody can remember all of it.  I'm putting up for you the diagnostic criteria for intermittent explosive disorder, and you'll see the aggressive episodes are not better accounted for by another mental disorder, and it gives examples, including borderline personality disorder.

A.    Yes, sir.

Q.    Okay.  So the BOP got that wrong.  Right?  It would seem.

A.    I believe they got it wrong because I think he has borderline.  They may say that I was wrong, but I would believe that they would be incorrect with that.

Q.    And you heard me questioning Dr. Price about the people with whom a borderline is most likely to act out in a rageful or violent way would be intimate folks.  Right?

A.    In general.

Q.    Yeah.

A.    And --

Q.    Now, you know --

A.    Far more than in general.  Yes, they would -- I mean, I can certainly, I'm sure, think of exceptions to that, but by and large, it's about people they're in a relationship with.

Q.    Close relationship.

A.    Yes, sir.

Q.    Now, you heard me talk with Dr. Price about

Mr. Bourgeois's conditions of confinement at the Terra Haute

Penitentiary.  Doesn't seem likely he's got too many intimate

folks with whom to act out in those conditions, locked in a

cell all day, seven days a week?

A.    I would agree with that, sir.

Q.    Do you agree with the proposition that one should not

infer the absence of adaptive deficits by one's verbal ability?

In other words, if someone presents verbally well, you can't

put too much stock in that when assessing about the deficits.

A.    One wouldn't base their entire assessment on verbal

presentation.

Q.    I've got a white version of the green book.

A.    How did you do that?  Oh, I'm sorry.

Q.    That's all right.  Oh, it's the ABAS manual.

      Now I've got the dark version.  I've highlighted a portion

of Page 102.  It says, "Do not use past criminal behavior or

verbal ability to infer level of adaptive behavior or about

having ID," which is their term for MR, mental retardation.

      There's a cite, "Discuss two reasons for this guideline.

There is not enough available information, and there is a lack

of normative information."  Do you agree with that proposition

out of the green book?

            MR. ROBERTS:  I just ask you what page that is.

            MR. WISEMAN:  I'm sorry, Page 102.

THE WITNESS:  While I agree with that proposition, there are certainly caveats that I would put with that.

BY MR. WISEMAN:

Q.   I mean, and the reason I ask is that, you know, as I went through with Dr. Price, we've got a lot of folks, lay people coming in, and to some degree I think the Court, saying, "Well, he talks so well."  That's of limited use in making this assessment.  Do you agree?

A.   It certainly doesn't capture the entire picture.

Q.   And that's especially true in a case like this, where the person we're dealing with is narcissistic, and I think you used the word "dissimilates," which means he tends to want to make himself look better than he really is.

A.   Yes, sir.

Q.   You heard me discuss with Dr. Price the notion that MR is not a diagnosis of exclusion, that it can become morbidity, with many conditions including borderline personality disorder. You don't have any quarrel with that, do you?

A.   No, sir.

Q.   And you also agree with the proposition that weaknesses can coexist with strengths.

A.   Yes, sir.

Q.   And under your definition, the two of ten definition, he can be strong in eight areas, weak in two, and we win.  Yes?

A.   I'm not sure about the "we."

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   Well, we prove our case.

MR. ROBERTS:  Your Honor, I object to a legal conclusion.

BY MR. WISEMAN:

Q.   He's mentally retarded.

A.   If a person --

THE COURT:  If you do what?  Say it again.

MR. WISEMAN:  Prove two of ten.

THE COURT:  Two of ten what?

MR. WISEMAN:  Of adaptive deficits.

THE COURT:  Okay.

MR. WISEMAN:  We -- he's mentally retarded.

MR. ROBERTS:  Technically, Your Honor, they still have the third prong they'd have to prove.

MR. WISEMAN:  True.

BY MR. WISEMAN:

Q.   Assuming the other prong is met.

A.   The question is long.  May I repeat my understanding of your question?

Q.   Let me rephrase it.  A person can be mentally retarded and be quite strong in eight of the ten areas, have significant deficits in two of the ten areas, and therefore be diagnosed as

mentally retarded, assuming the first and third prongs are present.

A.    Yes, sir.

Q.    I'm going to put up an exhibit we produced, which I shared with the Government yesterday.  Hmm, this is going to be tough.  I wasn't prepared for this technology when we prepared this.

You've had a chance to go through this chart, when it was given to you yesterday?

A.    Yes, I have.

Q.    All right.  And for the record, this is marked as Petitioner's 177.  Does it accurately reflect the number of guesses each of the ABAS Respondents recorded in your testing?

A.    In my testing, yes.  Ms. Banks, I mean, Ms. Franks is not there, but yes.  Yes, sir.

Q.    And it -- we rounded the percentages, but the percentages are approximately correct.  Is that right?  Do you have any quarrel with the arithmetic on this?

A.    No, sir.  I haven't gone through the specific arithmetic, but I don't have a quarrel with that.  I believe that y'all --

Q.    Now, the column that says "Average Number" refers to the table in the ABAS manual that reflects what the mean number of guesses were in each of the scale areas on the ABAS?

A.    Yes, sir.

Q.    Okay.  And are any of them, aside from work, are any of them above one guess per skill area?

A.    No, sir.

Q.    All right.  So when they normed this test, the norm of guesses was .1 in communication, .16 in community use.  So people essentially weren't guessing a whole lot in a normative process for this test.

A.    That's correct.

Q.    Okay.  Now, comparing that to your respondents, we see guesses as high as 100.  So Mr. Davis -- I'm sorry, Ms. Davis guessed 100 percent of the time with respect to leisure, 54 percent with respect to community use.  Home living, 70 percent.  Health and safety, 70.  And I could go on.  The point here is that there's a lot of guesses in your ABAS administration.

A.    Yes, sir.

Q.    And what does the manual say is the number of guesses that should cause the practitioner to be concerned in each skill area?

A.    If the ABAS were being administered in concordance with how it had been standardized, being a contemporaneous administration, one would have a concern with more than, I believe it's four guesses per.

Q.    And after your concern, you're supposed to go back and determine why that person is guessing so much.

A.    Yes, sir.

Q.    Okay.

MR. WISEMAN:  Your Honor, I'd offer this document, 177.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-177 is admitted.  I can read your mind, Ms. Booth.

MR. WISEMAN:  What's she saying?

THE COURT:  I think -- I'm not going to say, because if I'm wrong, I don't want to give anybody a hint of something.  Okay?

BY MR. WISEMAN:

Q.  All right.  I shared this document with you as well yesterday, Petitioner's 176, and this is a --

THE COURT:  Could you zoom it in just a tad?  Thank you, sir.

BY MR. WISEMAN:

Q.  Declaration of Thomas Oakland, Ph.D.  Did you have a chance to review this?

A.  Yes, sir.

Q.  Okay.  And tell the Court who Mr. Oakland is.

MR. ROBERTS:  Your Honor, I object to this statement.  It's hearsay.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q.  Is Mr. Oakland an authority --

THE COURT:  Would you mind taking it down?

MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Dr. Oakland is an authoritative source?

A.   On?

Q.   On?

THE COURT:  I just sustained the objection.

MR. WISEMAN:  I put the document down.  I'm asking a separate question about Dr. Oakland.

THE COURT:  An authoritative source on what?

MR. WISEMAN:  On the administration of the ABAS.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q.   Okay.  He wrote the manual.

A.   Yes, sir.

Q.   He designed the test.

A.   I believe one of the folks who designed the test.

Q.   One of two people.  Right?

A.   Yes, sir.

Q.   Okay.  And he -- would you consider him authoritative in the manner in which the test should be applied?

A.   Yes, sir.

MR. WISEMAN:  Your Honor, I would submit to the Court that this is an authoritative source.

THE COURT:  I have already ruled on this.

MR. WISEMAN:  All right.  I was just trying to lay a foundation.

THE COURT:  So please move on.

MR. WISEMAN:  Okay.

THE COURT:  And a foundation for his declaration you have not done.  So move on.  It's not like it's a learned treatise.  Are you finished?

MR. WISEMAN:  Am I finished?

THE COURT:  Yes.

MR. WISEMAN:  With the exam?

THE COURT:  Yes.  Well, you walked away, so I --

MR. WISEMAN:  Oh, no, no.  I was just putting the exhibit down.

THE COURT:  Oh, okay.

MR. WISEMAN:  Goodness gracious, no.

THE COURT:  I was just hopeful.  Are you going to have rebuttal, by the way?

MR. WISEMAN:  I don't think so.

(Counsel conferring off the record.)

THE COURT:  Yes?

MR. WISEMAN:  Well --

THE COURT:  I just want to make time, make sure you have time to do that.

MR. WISEMAN:  Yeah, I mean, we don't have a witness here.  I would like to present Dr. Oakland in rebuttal, but

he's, you know, an elderly fellow who's out of the country, and you know --

THE COURT:  Did you try to take his deposition?

MR. WISEMAN:  Well --

THE COURT:  I'm not going to let you do it now.

MR. WISEMAN:  Well --

THE COURT:  I'm just curious as to why you didn't beforehand.

MR. WISEMAN:  No, we didn't.  I frankly thought his learned --

THE COURT:  Does he live outside the country?

MR. WISEMAN:  No -- no, ma'am.  He lives in Florida.

THE COURT:  Well, that's part of this country.

MR. WISEMAN:  I didn't say he was out of the country. I said he was --

THE COURT:  I thought you said he was out of the country.

UNIDENTIFIED SPEAKER:  He's in Thailand right now.

MR. WISEMAN:  He's out of the country at the moment. He lives in Florida.  He traveled.

THE COURT:  Okay.  But I thought you were saying -- so the reason I asked was that the assumption is that he's too elderly to travel here.

MR. WISEMAN:  No, no, Your Honor.

THE COURT:  And instead, he's out of the country.

MR. WISEMAN:  He's recently retired from his teaching duties at the University of Florida, Tallahassee.

THE COURT:  Well, how elderly is elderly?  I have to get this straight.

MR. WISEMAN:  Significantly older than any of us.

THE COURT:  Uh-huh.

MR. WISEMAN:  Your Honor, I honestly thought a treatise from the -- or a declaration from the person who wrote the manual would be accepted by the Court as an authoritative source.

THE COURT:  Not unless he's -- no.

MR. WISEMAN:  I was wrong.

THE COURT:  If you want to introduce the manual, that's fine.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.    The manual says that you should mention in whomever you're reporting about your evaluation --

THE COURT:  Do you have the manual there?

MR. WISEMAN:  Oh, sure.

THE COURT:  Okay.

MR. ROBERTS:  I guess we should clarify what manual, Your Honor.

THE COURT:  What manual is it?

MR. WISEMAN:  I'm sorry.  Let me start over.  I've

been thrown for a loop here.

BY MR. WISEMAN:

Q.   The ABAS manual says that when you have a high number of guesses, four or more, you ought to provide that information with an explanation for its significance to the person to whom you're reporting, in this case the Court.  Do you agree with that?

A.   I'd like to -- I don't have the manual memorized.

THE COURT:  The expert, when I asked your expert on this, Mr. Wiseman --

MR. WISEMAN:  Yes, ma'am.

THE COURT:  Because I understood that none of these tests were designed for what they're being used for in this case.

MR. WISEMAN:  That's right.

THE COURT:  Is that right, Dr. Moore?

THE WITNESS:  Yes, ma'am.

THE COURT:  Pardon?

THE WITNESS:  Yes, ma'am, that's correct.

MR. WISEMAN:  Our view is you don't therefore depart from the manual.  You do the best you can.  And I think my question will make that clear.  At least I hope it will.

THE COURT:  It will.

BY MR. WISEMAN:

Q.   I'm on Page 23 of the manual.  The part that I've

highlighted says, it's regarding scoring of checking.

THE COURT:  Can you read that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.    It says, "Most respondents in the standardization sample guessed three or fewer times.  For each scale area if the respondent guesses four or more items, interview the respondent to determine the reason.  If you decide to continue scoring and interpretation with the current respondent, report the higher number of guesses in all reports, multidisciplinary team discussions, and other venues in which the score may be used to make decisions of the individual."

And my question is, did you in your report make any comment about the high number of guesses?

A.    While I didn't make any comment about the high number of guesses, I tried to highlight the reduced validity and reliability.  To the degree that that should have been in there, I would apologize to the Court and will make sure that those are always in reports in the future.  But I thought the focus on the reduced reliability and validity in noting that we were trying to do a retrospective analysis or assessment kind of made clear that --

Q.    Well, you're relying on your ABAS testing to some degree, aren't you?  I mean, I know you think it's got some flaws, but

you're considering it and relying on it and using it.

A.   Yes, sir.

Q.   And you would agree that it's not entirely forthcoming to not report to the Court, to us -- I mean, you didn't think I was getting your data, and you didn't think it was important to tell me that there was that number of guesses in these, in these administrations?

A.   I would take a bit of umbrage at the implication that I was attempting to mislead you or the Court.  I was entirely aware and certainly confident that the data I obtained would be turned over to your experts, who would be able to make a full assessment of the responses contained therein.

Q.   How did you go about picking your informants for the ABAS testing?

A.   I spoke with, I guess Mr. Bill Shotts initially, who provided me with names of various folks who knew Mr. Bourgeois for, over a long period of time or knew him.  And then I called them individually, and in my conversations attempted to get a bead on who would have known him, both -- as well as possible and across a broader number of situations, recognizing that none of them lived with him or saw him socially, and attempted to balance that out with the possibility of family members.  Although in this context, where I'm working for the Government, that can be a challenging situation for two reasons.  One is sometimes they are reluctant to speak with me, and the second

one is I feel a real difficult challenge asking a family member to complete a measure that could actually come back around and be --

THE COURT:  Harmful to the family member.

THE WITNESS:  Yes, ma'am.

BY MR. WISEMAN:

Q.   Okay.  I guess I really was looking for some different information.  That's my fault.  Once you sat down with a person you identified as a potential informant, how did you make the determination as to whether to administer the ABAS?  You didn't give the ABAS to everybody you talked to.  Right?

A.   No, sir.

Q.   Okay.  So how did you determine if you thought the person was sufficiently reliable to administer the ABAS?

A.   If they had known Mr. Bourgeois over a fairly extended period -- in this case, I was trying to look for, you know, a number of years -- and they had been able to spend social time with him, had seen him on a more casual basis, so that I could get a bit of an idea of how he functioned specifically -- not specifically in the workplace, but at least more casually if they were spending the night in a terminal, or with Ms. Davis, where it appeared that she and her family had known him for many, many, many years, but also she talked about some of the times that they had talked when her mom brought meals in and things like that.

So we tried to, I tried to get folks who knew him a little bit more broadly than someone like Mr. Shotts, for example, who knew him more in a boss/worker relationship, but didn't really, it seemed, sit down to eat with him or spent the night with him at a terminal or whatever.

Q.   Okay.  And so I would take it then that you're looking at two things.  One is the sort of opportunity to observe, as well as the person's apparent reliability as a historian.

A.   Yes.

Q.   You know, if they remember things, things like that.

A.   Yes, sir.

Q.   Now, when you called Ms. Armont up, did you make the call to schedule the appointment, or did someone from the Government's office do that?

A.   Someone from the Government's office did.  I don't believe I spoke with them.

Q.   So someone from the United States Attorney's Office who's trying to defend this capital conviction called --

          MR. ROBERTS:  Objection, Your Honor, to the argument nature of his question with regard to --

          MR. WISEMAN:  All right.  That's fair.

          THE COURT:  Well, it's just us.  It's not a jury.  It doesn't -- he can say whatever he wants pretty much.

          MR. WISEMAN:  Oh, really?  Just opened some doors.

          MR. ROBERTS:  I just have to defend my office, Your

Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.    Well, I mean, the point is you had someone from the prosecution call this woman up and say, "We want to come talk to you."  Right?  Something like that.  Okay.

A.    Yeah -- sure.

Q.    Did that person say that an FBI --

THE COURT:  You could just call them "the Respondent."

BY MR. WISEMAN:

Q.    Did someone from the FBI, did you inform or anyone inform Ms. Armont that an FBI Agent was going to be showing up as well?

A.    I'm not sure what Ms. Armont knew in terms of who would be there, but it was my understanding that she had spoken with Mr. Smith on occasion before, and his take on it was that she had been comfortable with him.

Q.    Okay.  So your view then is that Beth Larin, all five-foot-two of her showed up, and that somehow skewed the evaluation, but the agent, who I presume brought his gun, didn't have any effect on the evaluation or couldn't conceivably have had an effect on the evaluation?

A.    The pleasantness --

Q.    Is that your point?

A.    The pleasantness of Ms. Larin or her relatively small stature weren't factors in this.  The FBI Agent stayed outside the door.  He wasn't even in the house.  The issue had to do with the very clear and ongoing display that it was an adversarial process, and again the issue of inadvertent reinforcement of response to --

THE COURT:  I think we can all figure this out.

THE WITNESS:  Thank you, ma'am.

BY MR. WISEMAN:

Q.    Okay.  I just wanted that point to be clear.  It is an adversarial process, and you were there for the adversary.

THE COURT:  Mr. Wiseman, no one has criticized you for having a lawyer there.

MR. WISEMAN:  Okay.  Well, that was not the tenor of the questioning, I thought.

THE COURT:  No.  You have every right to have somebody there.

MR. WISEMAN:  Thank you.

THE COURT:  There's no -- but the question is, and I agree with him, if he says it affected the validity of his testing.

MR. WISEMAN:  Okay.

THE COURT:  And that's okay.

MR. WISEMAN:  Okay.

THE COURT:  It doesn't -- it's neither here nor there

really.

MR. WISEMAN:  Well, and I guess the last question --

THE COURT:  I think you had the right to do that, too.

BY MR. WISEMAN:

Q.    Okay.  The last question I would have is, wouldn't you think the presence of an armed FBI Agent could have an effect on the testing?

A.    It would --

THE COURT:  Well, he said that FBI Agent was outside.

MR. WISEMAN:  Well, Your Honor, inside, outside, the point is he's standing there, he's armed, he's an FBI Agent. You don't think that can have an effect?

THE COURT:  Well, how about affecting the testing of somebody that's on death row?

MR. WISEMAN:  That's the question for the expert.  I mean --

THE COURT:  I know, but I mean all of these things affect the validity of testing, I would assume.  Is that right?

THE WITNESS:  Yes, ma'am.

MR. WISEMAN:  Now --

THE COURT:  I mean, when you're fighting for your life and your defense is mental retardation.

MR. WISEMAN:  That's one of his defenses.

THE COURT:  One of the defenses, and you're being

tested for it after the fact, that would certainly affect -- it

could affect the validity of the testing, could it not?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   I want to talk a little bit about -- just one more

question about the respondents.  Did you try to talk to Beverly

Frank?

A.   No, sir.  I --

Q.   She's the one who came in and testified and to whom

Dr. Swanson administered the Vineland and the ABAS.

A.   Just to be clear in my answer to you, I think she was on

the list of folks that we were going to interview over those

days, but we adjusted the interview schedule.

Q.   Okay.  Did you have any information that -- well, let me

back up a moment.  You understood that Ms. Armont had called my

office and asked for us to be there?  Is that your

understanding of why Ms. Larin and the investigator showed up?

THE COURT:  That was what I understood him to say.

MR. WISEMAN:  Yeah, okay.

BY MR. WISEMAN:

Q.   Did you ask similar information that Ms. Frank had done

the same thing?  I mean, did you expect we were going to be

there, too?  Did you think we were going to be everywhere?

A.   Yes, sir, based on a comment that --

THE COURT:  It's a conspiracy.

THE WITNESS:  -- Ms. Larin had made to Ms. Hohle before we left, along the line, they were speaking, "I guess we'll be seeing you over the, later on today," or whatnot.  We took that to mean that perhaps additional interviews that we would be at, they would also be there.

THE COURT:  I was joking about the conspiracy, by the way.

MR. WISEMAN:  I know.

THE COURT:  Okay.

MR. WISEMAN:  The record should reflect there's been a lot of friendly banter.

THE COURT:  Thank you.

MR. WISEMAN:  Does Your Honor agree?

THE COURT:  I do.  Thank you.

MR. WISEMAN:  I just wanted the record to be clear.

THE COURT:  Without sacrificing the purpose of the hearing.

MR. WISEMAN:  Of course.

BY MR. WISEMAN:

Q.   So as I understand your criticism of Dr. Swanson's interpretation of the Woodcock, which I put up Petitioner's 35 at Page 13, is that you think the Scaled Score column is the relevant one and not the one she relied on, Age and Grade Equivalent.  Is that right?

A.    I think in terms of looking at the definition of mental retardation in terms of two standard deviations below the mean, that is the most relevant number to look at, because that gives us a comparison to his same age to peers.

Q.    Okay.  And two standard deviations below the mean in this case would be 70 or below?

A.    Yes, sir.

Q.    In regard to the Woodcock?

A.    Yes, sir.

Q.    And I think your testimony, which I wrote down was, you said a couple, as in two, of his scores were two standard deviations.  I just want to be clear on this.  We see he's got a 68 in Broad Math.  He's got a 70 in Brief Math.  He's got a 66 in Story Recall.  He's got a 63 in Applied Problems, and a 57 in Story Recall Delay.  So in fact, there are five of his scores that are two standard deviations below the mean.  Is that right?

A.    Yes, sir.  That would be true.

Q.    And if one -- well, let me ask you this, what does the DSM say is the rough grade equivalent for a person with mild mental retardation?  Sixth grade?

A.    The -- I'm sorry.  I didn't mean to interrupt you.

Q.    I interrupted you, but I'll keep going.  It's sixth grade is roughly the upper grade level for a person with mild mental retardation.

A.    I think the way it says it is that folks with mild mental retardation may reach up to about the sixth grade level.  Yes, that's correct.

Q.    Okay.  So when we look at the grade equivalency levels, we see 3.1, 4.1.  We've got one above 6, the 6.2, 5.4, 5.8, 4.1, 7.2.  I mean, going down the line, he's got far more grade equivalents below the sixth grade, doesn't he?

A.    While it's true that he does, I think what's most striking is that with those standard scores, it would also mean that about 10 to 12 percent of the population would have scores, grade equivalents that low as well.

Q.    You're familiar with Muriel Lezak's Neuropsychological Assessment, Fourth Edition?

A.    Yes, sir.

Q.    It's an authoritative source?  It's the bible of neuropsychology?

A.    A bible in what?

        THE COURT:  He said it was a bible of neuropsychology.

BY MR. WISEMAN:

Q.    It's got all the tests, everything in there.

        THE COURT:  Is that right?  That's what you said?

        THE WITNESS:  I didn't think I was allowed to talk about neuropsychology.

        MR. ROBERTS:  Your Honor, is the witness going to be

allowed to talk about neuropsychology now?

MR. WISEMAN:  No, he's going to be able to talk about, if I'm permitted, the Woodcock-Johnson --

THE COURT:  You shouldn't have said that.  Go ahead.

MR. WISEMAN:  -- the Woodcock-Johnson, which is a test he's commented on.

THE COURT:  Thank you.

MR. WISEMAN:  Just have a moment to find the page.

BY MR. WISEMAN:

Q.   I'm going to put up for you -- this book is a little bulky.  I'm going to make Ms. Larin carry it back to Philadelphia.  You see here on Page 665 is the Woodcock-Johnson?

A.   Yes, sir.

Q.   Right?  That's what we're talking about.  And over in the right column, this is at Page 665, there's a discussion about age and education equivalence provided in the test record booklet?

THE COURT:  Could you push it down a little bit --

MR. WISEMAN:  Sure.

THE COURT:  -- so that it's more -- no, I meant flatten it.

MR. WISEMAN:  Oh, flatten it.  It doesn't fit on the ELMO.

THE COURT:  Okay.  It's hard to read the words when

it's not flat.

MR. WISEMAN:  Yeah, I got you.  Okay.

THE COURT:  Well, maybe if you zoom it in a bit, it would be easier.

MR. WISEMAN:  How is that?

THE COURT:  Better.  Much better.  Thank you.

BY MR. WISEMAN:

Q.   It says, "Age and education equivalence are provided in the test record booklet.  Age and education ranges vary from test to test," and it talks about all that.  And down at the bottom here, the part I want to draw your attention to, it says, "Of course, when using the test selectively, scores requiring combinations and comparisons of discrete test scores cannot be obtained.  For most purposes experienced neuropsychologists would be able to rely on the age and education equivalence."  Do you see that?

A.   Yes, sir.

Q.   So isn't Lezak there essentially saying that what's important for assessment purposes are age and grade equivalence, and not standard scores or scaled scores, for experienced folks?

A.   Well, I think it would depend on the context within which the information is being utilized.

Q.   Okay.  But I mean, let's just say, focus on what Muriel Lezak says.  She says that, for experienced practitioners, it's

age and it's grade equivalency that are the most relevant of these measures.

MR. ROBERTS:  Objection, asked and answered.

THE COURT:  It's okay.

THE WITNESS:  Again, I think it has to do with the context.  If the issue were about trying to determine where a person's reading level's set for education and habilitation purposes, I think the grade equivalent would be an appropriate place to be putting the focus.

BY MR. WISEMAN:

Q.   So you agree, disagree with Lezak on that point.  Let's move on to --

MR. ROBERTS:  Your Honor, can the witness be allowed to answer?  He was not --

THE COURT:  Go ahead.

THE WITNESS:  Again, I think it depends on the context.

BY MR. WISEMAN:

Q.   Okay.  Let's move on to the Flynn Effect.  And I don't want to get into a whole big fight about the Flynn Effect, because we could be here, and I do have to get home, as we all do.  I think --

THE COURT:  Are you planning on leaving tonight?

MR. WISEMAN:  Tomorrow.

THE COURT:  Okay.

MR. WISEMAN:  I hope.

BY MR. WISEMAN:

Q.   I'm going to try to characterize the dispute.  You tell me if I'm doing it right, just so we can sort of set the terms.  As I understand the dispute, there's this recognized phenomena that norms get outdated, IQ scores tend to drift up a little bit and over-reflect people's true abilities if the norms are kind of old.

A.   Globally, that's correct, with a recognition that in some of the studies that have been used in Flynn, some of the ones in Scandinavian countries, but ones that he's talked about particularly earlier on being some of the most robust data for the Flynn Effect have reversed.  But in general, I would accept that as a baseline --

Q.   Okay.

A.   -- field.

Q.   All right.  And then the dispute, if you will, seems to be between folks, who I gather you're one of, who say, "Well, you know, you don't adjust the score.  You simply make it known that the outdated -- that the score obtained on the outdated test, or the one with the older norms, may be an overestimate of true ability."  Is that the position that you sort of take?

A.   I would say that would be an unreliable, a less reliable estimate.

Q.   Less reliable.  Okay.  And the other side of that

controversy says you actually make an arithmetic adjustment and adjust down the score.

A.   Yes, sir, that's correct.

Q.   Okay.  I want to draw your attention to the green book. At Page 37, weighs in on this controversy.  It says, "Best practices require recognition of potential Flynn Effect when older editions of an intelligence test with corresponding older norms are used in the assessment and interpretation of IQ scores.  Then it refers to the user's guide from 2007.  The user's guide in that context is the user's guide to this manual.  Yes?

A.   Yes, sir.  I'm sorry.

Q.   And it then quotes the user's guide and says, "The main recommendation resulting from this work regarding the Flynn Effect is that all intellectual assessments must use a reliable and appropriately individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norm should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted," closed quote.

So the green book, the most current authoritative post-Atkins statement on Flynn, from this organization, says, "Correct," Doesn't it?

A.   The AAIDD, without doubt, proposes to correct for Flynn, in fact, uses a correction number higher than I see in

virtually any other place.  And the AAIDD espouses how to score a correct IQ test I have a bit of an issue with.  I think they can tell us a lot, a tremendous amount about the diagnosis of mental retardation.  But in terms of how to administer or score an IQ test or what to do with those scores, I have more difficulty with that.

Q.   Okay.  So you disagree with the eleventh edition, the most current authoritative post-Atkins source on assessment of, or application of the Flynn Effect.

A.   Yes.

Q.   I mean, it's not, it's nothing to be ashamed of --

A.   Yes.

Q.   -- but that's your position.

A.   Yes, sir.

Q.   I didn't see anything in your report other than the criticism of Dr. Weiner's using the WAIS-R.  I didn't see any criticism about the way in which it was scored or administered.  I mean, you have no quarrel with that?  Did he make any mistakes?

A.   Right.  Other than that, which I think actually the mistake that I noted in there actually was acknowledging or pulling the score down --

Q.   Oh, really?

A.   -- by a point.  I think it went from a --

Q.   Do tell.

A.    -- a 76 to a 75.

Q.    Oh, okay.  That was the transcription error between the report --

A.    Yes.

Q.    -- and the data.

A.    But there had been the contention in some places, and they couldn't tell where that error was, whether it really should have been a 76 or a 75.  And I believe it should have been a 75.

Q.    Now, you've testified that one of the problems in using these standard measures for assessing adaptive deficits is that there were not norms out there for the application of these tests in a retroactive adaptive deficit situation.  Is that -- am I understanding that?

A.    Yes, sir.

Q.    Okay.

        (PAUSE.)

            MR. WISEMAN:  Your Honor, you know, I'm missing a document and --

            THE COURT:  What you need to do -- oh, you -- okay.

            MR. WISEMAN:  I could also use a five-minute break.  I don't want to keep people waiting.

            THE COURT:  Okay.  Five minutes.

            MR. WISEMAN:  Thank you.

            THE COURT:  Ten minutes.

(Recess from 4:42 p.m. to 5:11 p.m.)

THE COURT:  Thank you.  You may be seated.  You may proceed.

MR. WISEMAN:  Thank you, Your Honor.

MS. BOOTH:  Your Honor, before we start, if it's okay, my case agent, Megan Beckett, would it be okay if she left at 5:30?  Could she be released?  Is there any problem with that?

THE COURT:  I've been surprised she was here the whole time.

MS. BOOTH:  She's under two weeks before her due date.  We want to get her back to Philadelphia.

MR. WISEMAN:  I thought I would be done before then.

THE COURT:  Where are you living now?

MS. BECKETT:  Las Vegas, ma'am.

MS. BOOTH:  Oh, okay.

THE COURT:  Oh.

MS. BECKETT:  I have a little bit of a flight tonight.

THE COURT:  You better get on the way before they don't let you fly.

MS. BECKETT:  Yes, ma'am.

THE COURT:  Well, it's good to see you again.

MS. BECKETT:  You too, Judge.  Thank you.

THE COURT:  Bye-bye.

MR. WISEMAN:  And Your Honor, just so the Court and the Court staff know, I don't expect to be more than 30 minutes.

THE COURT:  Thank you.

MR. WISEMAN:  I thought you'd appreciate that.

CROSS-EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   When we broke, Dr. Moore, I was asking you about your concern that there aren't any formal instructions for how to proceed in a retrospective adaptive deficit evaluation.  I just put up on the screen here, just for identification, a document called the Vineland II, Expanded Interview Form Manual, a Revision of the Vineland Social Maturity Scale, and it's got the author's name.  Are you familiar with this document?

A.   Yes, sir.

Q.   Okay.  And this is like -- and you would agree this is an up-to-date addendum to the Vineland II Manual?

A.   Yes, sir.

Q.   And you agree that it's got a chapter on retrospective interviews?

A.   Yes, sir.

Q.   So in fact, there is guidance from the test designers as to how to proceed in a retrospective setting.

A.   I'm not sure that I testified there was no guidance on how to proceed in a retrospective setting.  I think my testimony

was that the tests weren't normed for that situation.

Q.   I'm sorry, I didn't hear the last part.

A.   I don't believe the tests were normed or standardized for that situation.

Q.   But the folks who designed the tests are putting out instructions about how to use them in a retrospective setting.

A.   Yes, sir.

Q.   You saw Claudia Williams testify in the court that first -- she was our first witness, I think, the first witness on the second day.  It's all running together.  But you saw her.  Right?

A.   Yes, sir.

Q.   Okay.  And you asked her to take the ABAS, and she declined.

A.   Yes, sir.

Q.   Okay.  And I presume you interviewed her prior to asking her to take the ABAS, as part of the protocol requires, you interview the person to see what their basis of knowledge is and whether they're a good, reliable informant.

A.   Yes, sir.

Q.   Okay.  And after watching her testimony, did you think she would have been a suitable ABAS informant, in terms of her ability to recall dates?  I thought she said several times to Judge Jack, "I'm not real good with dates.  I can't remember dates."

THE COURT:  I thought she was a poor historian.

MR. WISEMAN:  Yes, that's my point.

BY MR. WISEMAN:

Q.    Did you, do you agree with Judge Jack?

A.    Yes, sir.  Certainly.

Q.    Smart man.  And so Judge Jack had criticized, I think, Dr. Swanson for choosing Beverly Frank over Michelle, over Claudia Williams, and I think you'd agree that Ms. Frank was a much better historian, in fact a pretty good historian in her ability to recall specifics.

A.    She seemed to be a good historian.

Q.    And I thought you had some criticism of Dr. Swanson's going back to age seven, and I thought there were a couple of reasons, but the one I wanted to ask you about was in doing a retrospective analysis, it's important to be able to keep the informant focused on a specific time in order to ensure reliability.  You agree with that?

A.    Yes, sir.

Q.    And so I think with one of your informants, you chose graduation from high school as a point.

A.    With -- that's correct.  With my informants, what I had them utilize was the last date that they had ongoing contact --

Q.    Okay.

A.    -- with the individual, so that it was firmly established for them.

Q.    Okay.

A.    We knew they were giving me the maximal level of advancement that the person had reached.

Q.    All right.  And you'd agree that Dr. Swanson essentially did the same thing when she said to Ms. Frank, "Let's focus on when Alfred came to live with you.  What could he do then?"  And that's similar to what you did, in the sense of pinpointing a specific time frame.

A.    Well, there's a similarity in terms of pinpointing a time frame.  The difference for me is that we know there is the end point.  So whatever it was they did, that by the end point they knew how to do that.  In other words, it's their highest level of functioning, versus reaching back to this particular date where she would have had interactions with him perhaps after that as well, and maybe even before then.  I'm not sure whether, why they chose exactly seven.

Q.    And I thought, you know, the record will reflect it, but I thought that Dr. Swanson testified that that was the last date that Ms. Frank had a recollection of Mr. Bourgeois, from around the time that he came to live with her grandmother.

A.    That's not my understanding, sir.  I thought that she said that she knew him from about the age of seven till he was about nine.

Q.    I see.  So given that Ms. Frank hadn't seen Mr. Bourgeois from age nine till she came into this courtroom, you would

agree that that is consistent with -- well, withdraw that.

What's your basis for thinking she's biased?  Or do you think she has a bias for Mr. Bourgeois?

A.    The concern that I had -- well, there are two pieces.  My issue in terms of, or my struggle with Ms. Frank had to do more with the comparison of the Vineland to the ABAS in general, where some of the responses or numbered responses were different.  But secondly, that level of adaptive functioning that she described on the ABAS was --

Q.    Seemed low?

A.    -- seemed low.

Q.    Okay.  But didn't you hear Dr. Swanson testify that's why she followed up with the Vineland, which provides the evaluator an opportunity to clarify and understand responses?

A.    Yes.

Q.    That's a feature of the Vineland that's not present in the ABAS.

A.    Yes, sir.

Q.    All right.  And when she clarified and asked probative questions and clarified questions, in fact, Ms. Franks' ratings went up, still in the significantly deficient range, but they did go up.

A.    Oh, yes, sir.

Q.    And you didn't do that with your ABAS's, because they don't, it doesn't permit it.  It's not part of the test.  You

don't get to clarify and say, "What did you mean by this" and "What did you mean by that?"

A.    That's correct.

Q.    Now, in doing this retrospective analysis, you didn't interview anyone -- you didn't -- well, I'll take that back.  I guess with Ms. Davis, she knew him a little bit before age 18, although it was unclear, I think, how much before 18.  But no other -- I'm getting punchy.  Right, you didn't administer the ABAS to anybody who knew Mr. Bourgeois pre-18 is the point I was trying to ask you about.

A.    It seems like --

        MR. ROBERTS:  Your Honor, I would ask the witness be permitted to speak about Mr. Banks, because he's just asked him --

        THE COURT:  Yeah, go ahead.

        THE WITNESS:  I administered it to Mr. Nathaniel Banks, who was a childhood friend of Mr. Bourgeois and knew him throughout his childhood up to the point that they graduated from -- well, knew him throughout his life, but had ongoing contact with him until he was about 18.

BY MR. WISEMAN:

Q.    Right.  But I thought the date that you asked him to pinpoint was when Mr. Bourgeois was 18, not pre-18.  Did you ask him to recall "What was Mr. Bourgeois like the last day you saw him," which was after his 18th birthday?

A.   My understanding on the dates of that was that it was -- I think it actually wound up being May of that year.  I believe it was just prior to 18.

Q.   We're going to check on that, and I'll move on to something else for now.  But you would agree that it would be helpful in this setting to administer a test to somebody who knew Mr. Bourgeois before he was 18, in meeting the onset criteria.

A.   Well, sir, actually the way that I've addressed this in the past --

Q.   Okay.

A.   The way that I've addressed this in the past, again, the struggle with the adaptive functioning measures in an adult is the farther you go back, the less reliable the information is. So what's happened in cases where I've worked with is if their adaptive functioning were in the significantly impaired range, in adulthood, and they had significant deficits in intellectual functioning, et cetera, and there was other ancillary data that reflected that the impairment had began before the age of 18, then my recommendation in those cases has been that while it can't be firmly established as an onset prior to the age of 18, it appears from the data that we have that it's likely, you know, the person is currently mentally retarded, and it appears that that's been a condition that had an onset prior to the age of 18.  So I wouldn't have necessarily had to have gone back

and, you know, I certainly don't require IQ testing that sometimes isn't even available in someone prior to the age of 18. And adaptive functioning measures, again, I don't necessarily have an adaptive functioning measure that's completed prior to the age of 18.

Q. Now, I'm putting back up 177, which is the chart outlining the guesses of the respondents. You would agree that with the exception of Mr. Banks, the people who knew Mr. Bourgeois in the work setting guessed zero times. That would be Clark and Davis -- Clark's valid one -- and those two folks guessed far more often in the other areas.

A. Yes, sir, that's correct.

Q. And it's important in doing this assessment to select informants who have good information, good source for information in more than one skill area.

A. Yes, sir.

Q. So you wouldn't want to give it to someone who only knows the subject in terms of home living.

A. Yes, sir, that's correct.

Q. Okay. And yet you'd agree that Davis and Clark really are guessing pretty extremely, except in the one domain where they knew Mr. Bourgeois, which was work.

A. They guessed more in those domains than in the work setting. I would certainly agree with that. I think that their knowledge of him in different settings was such that they

may not have seen him engage in a specific behavior, but from what they knew of him, felt confident in their rating.

For example, Ms. Davis' estimate that he would be able to find a restroom in a public area, that he would appropriately find the restroom, well she said he could, she thought he would be able to consistently do it independently, but she guessed.

Q.    Now, I thought your view was that Mr. Clark checked guesses because -- I'm sorry -- Ms. Davis checked guesses because she didn't actually see him do things, and you thought that was somewhat improper under the protocols.

A.    I'm sorry, I didn't mean to interrupt you.

Q.    Yeah.

A.    Would you say that again?

Q.    Sure.  I thought you were saying that Ms. Davis, her completion of the test, she guessed improperly sometimes because she was interpreting it to mean that if she didn't see him do something, she had to guess.  And you don't agree with that.

A.    Oh, no, sir, I would disagree with your contention there.

Q.    Oh.

A.    I think she absolutely did it correctly.  I think that she was just extremely vigilant to, "If I didn't lay my eyes on him to do it," then she would check a guess.

Q.    Right, okay.

A.    I think she did it appropriately.  I think that most

people completing that form might have been a little less, you know, hyper vigilant to that.

Q.    But you would agree that the instructions said that you should check guess if you've never seen the individual in a situation in which the behavior is needed.

A.    Oh, absolutely.

Q.    What?

A.    I don't think that she mischecked.  I don't think she was in error.  I think she was being very vigilant.

Q.    Okay.  So the point is, is if you don't see the person do something, you're not supposed to speculate.  You just say you guessed.

A.    You are supposed to speculate.

Q.    Right.

A.    You're supposed to speculate and say --

Q.    But you're supposed to check that you guessed.

        THE COURT:  Let him finish answering.

BY MR. WISEMAN:

Q.    I'm sorry.

A.    You are supposed to speculate, but you're supposed to indicate that that speculation, being based on your knowledge of the individual in other situations, was in fact a guess or an estimate.

Q.    Are you familiar with this volume, the ABAS-II, clinical use and interpretation by Thomas Oakland and Patty Harrison?

A.   Yes, sir.

Q.   Okay.  And this is a -- those are the authors of the ABAS test, correct?

A.   Yes, sir.

Q.   And this volume came out, published in 2008?

A.   Yes, sir.

Q.   There's a chapter here on the use of the ABAS in adult forensic settings.  Are you familiar with that, Chapter 20?

A.   I would certainly appreciate the prompts.  Oh, yes.

Q.   You see that?

A.   Yes.  Yes, sir.

Q.   Okay.  In that -- excuse me -- in that chapter, at Page 389, says, "If the focus of adaptive behavior is work, the informant may be a former employer or co-worker, he or she will provide useful information by completing only the work adaptive skill area."  Do you agree with that?

A.   I agree that if they only knew them in work, then in a general guideline, that would be a reasonable contention.  I think the nature of Mr. Bourgeois's work and the nature of the contacts that he had with the informants that were utilized was appropriate because they had somewhat broader contact.

Q.   All right.  Well, let's take Mr. Clark.  I mean, Mr. Clark, I thought his testimony was quite -- oops, I'm sorry -- Mr. Clark's testimony was quite clear that he, you know, other than an occasional meal every other week or so, he

had no other contact with Mr. Bourgeois.  He saw him

occasionally in terminals, they'd go out for a bite.  So he

really had no -- I mean, would you agree with that

characterization?

A.   I would agree that that was the way the testimony was

elicited here.  In my interview with him, he indicated they did

runs together, they would stay in the terminal spending the

night, you know, where everybody would be there in the

terminals every night, so he had seen him in that type of

circumstance.  They would do cookouts together sometimes there,

they would go to the store to buy items, sometimes splitting up

when they got there to buy various items, and when they would

cook out, sometimes Mr. Bourgeois would do the grill, and

sometimes others.  It appeared that there was much more of a

social basis, and sometimes after hours they would help other

truckers with things, they'd hang out, maybe go work on a CB

radio, those types of things.  So --

Q.   So he -- I'm sorry.  Go ahead.  Finish.  I'm sorry.

A.   So what he described to me in the interviews that I had

with him was a broader degree of social contact.

Q.   Okay.  So you were told one thing, and Judge Jack was told

another thing with respect to the frequency of his contacts and

the setting of his contacts.  Would you agree that there's some

difference?

A.   I would agree that the interview that I had with him and

the information I got was more broad-based than what he shared here.

Q.   Okay.  And wouldn't you agree that the number of times he's guessing, like for example on every question in leisure, he guessed 100 percent of the time, suggests that he really wasn't a good informant for that skill area?  He just didn't know Mr. Bourgeois in leisure.

A.   That's Ms. Davis, sir.

Q.   Oh, you're right.  Well, let's pick a different one.  Home living, 61 percent guesses.  I mean, that means he didn't know Mr. Bourgeois in home living.

A.   While it indicates he doesn't know him in home living, it doesn't mean that the foundation upon which he was making the guesses were that extreme.  For example, one of them was packing for an overnight trip.  He said, "I saw him and his truck, how things had been packed.  I knew that he was able to pack his own stuff when we were on the road.  I presumed that he was able to pack himself at home, but I didn't actually lay my eyes on him to do so."  So it was a guess, but it certainly appeared to be an informed guess.

Q.   The same section of the ABAS-II book I was just reading to you also -- well, I'll put it up.  It says, "Some informants" -- oops, that's terrible.  "Some informants may have known a Defendant's functioning well in one setting and may be able to provide useful anecdotes, yet not enough is

known to complete all sections of the ABAS-II." Do you agree with that?

A.   That some informants may not have known an individual enough to be able to, to be able to talk about all settings?

Q.   Right.

A.   Yes, sir.

Q.   Okay.  But they can provide useful anecdotes is what this says.

A.   Yes, sir.

Q.   Okay.  Now, in terms of bias, did you see any bias at all with regard to Donald Reese, who hasn't seen Mr. Bourgeois in 20 years, knew him for two weeks?

A.   He didn't seem --

Q.   He was the guy who was hanging over the cliff in Tennessee?

A.   Yes, sir.  He didn't seem to have the highest opinion of Mr. Bourgeois.

Q.   Okay.  So if anything, he was biased against him.

A.   Yes, sir.  He didn't seem overly impressed with him.

Q.   Okay.  And so that set of anecdotes he related about how Mr. Bourgeois, when he started to drive a new kind of truck, couldn't figure it out that well.  Right?

A.   There was a button that he pushed --

Q.   Right.

A.   -- that he didn't understand what it was the button did.

And then as I understand it, a couple of minutes later, he pushed a button that undid the thing.  So I don't know whether the characterization that he wasn't able to drive the truck well or didn't understand about it was --

Q.    What about the part where they stopped and all the liquid sloshed and Mr. Reese was thrown out of his sleeper compartment and got out of the truck and saw they were in a ditch?

A.    They had run into -- I'm not sure how much you've driven through the mountains of Tennessee or North --

Q.    Never.

A.    To run into the ditch on a mountain in that regards, the way those roads are cut in, is not a real surprising thing. They're fairly narrow, and there's a sharp dropoff on one side. And while I wasn't in that particular site, as he noted, he could look off to the one side and you could see the top of the pine trees.  It's a little disconcerting to drive in those.

Q.    Are you seeking to explain away behavior suggestive of an adaptive deficit?  I mean, the man ran an 18-wheeler off the road.  You don't think that's --

        MR. ROBERTS:  Your Honor, that's argumentative.

BY MR. WISEMAN:

Q.    Do you think that's --

        MR. ROBERTS:  Object.

BY MR. WISEMAN:

Q.    -- significant information?

A.   Do I think the fact that a person in, on mountain roads in that type of an area drove an 18-wheeler into a ditch or went off of the road into a ditch is a sign of an adaptive deficit? That would be an anecdote --

Q.   Some evidence?  Would it be some evidence?

A.   That the man drove the 18-wheeler, or rolled into a ditch on a mountain road like that would be an anecdote.  When we look at adaptive functioning, we're looking far more broad-based than that.  I think that the population of people who have driven off of the road into a ditch would be fairly broad.

Q.   Okay.  Well, you know, maybe it's my fault we're taking this in isolation, but I mean, this man drove tandem for two weeks with Mr. Bourgeois and basically testified he was terrified and got out of the truck and took a bus home.  I mean, that's more than one incident anecdote, isn't it?  They had gotten lost --

A.   He related three.  He said there was --

Q.   Got it.

A.   I'm sorry.  He related three.

Q.   Right.

A.   The one with the button where they had, apparently just learning the truck, the place where he had over shot the highway and was going down a different -- was not taking the road, the highway they were supposed to take, and the episode

in the ditch.

Q. Right. And the overall flavor to him was, "Oh, my God, I've got to get out of this truck."

A. Yes.

Q. Okay. So that's more than just an incident. It's more than just running off the road. It's a pattern of behavior when Mr. Bourgeois first started driving these trucks that caused this man to be afraid of his ability.

A. I think he was not only afraid of him. It sounded like that Mr. Bourgeois with his excessive verbalizations was problematic for him as well. He sounded, he sounded irritated with him --

Q. All right, so --

A. -- to me as well.

Q. How many in-person meetings have you had with the Government lawyers in this case?

A. How many in-person meetings?

Q. Yeah.

A. Prior to this week?

Q. Yeah, prior to this week.

A. Can I carry it back one more and say prior to last week when we were up here for that deposition as well?

Q. Sure.

A. Okay. I think I was only here once --

Q. Okay.

A.    -- prior to that.

Q.    And how long did you meet with them?

A.    I think I flew in on a Wednesday evening, and we met on Thursday and part of Friday.

Q.    A day-and-a-half.

A.    Yes, sir.

Q.    Okay.  And I think we, you and I bumped into each other when we were checking in for the Gelbort and Estrada portions of these proceedings.  Right?

A.    Yes, sir.

Q.    So you were here a good day ahead of the start of those proceedings.  Right?  I think that was a Wednesday, and you met with the Government on that Thursday.

A.    Yes, sir, that's correct.

Q.    Okay.  So you spent a day-and-a-half before then, spent, I assume, another day with them before the Gelbort, Estrada deposition -- proceedings.

A.    Yes, sir.

Q.    Okay.  And I don't want to -- it's getting late.  I don't want to go through every one of them, but I would assume you've had quite a number of phone calls with the Government, other than logistical phone calls, substantive discussions on the telephone?

A.    I think substantive phone calls, and I would need to check my records on that, but would be three.

Q.    Three.  How many hours or minutes?

A.    Oh, those phone calls would have been an hour.

Q.    An hour, okay.  So sounds like you spent about six, seven hours talking with the Government about the substantive -- did I say six?  My God -- a couple of days and then six or seven hours of phone calls?  Three hours of phone calls.

A.    No, sir.  I thought I said three --

Q.    Three, three.

A.    -- phone calls of an hour --

Q.    That's right.

A.    -- a piece.

Q.    Okay.  I guess the point I'm making, rather clumsily, is you've devoted a lot of time educating the Government lawyers about what you've got to say.  Right?

A.    I don't think that I've spent nearly as much time teaching them about what I have to say than trying to help them understand about the mental retardation issues in general.  And then a reasonable part of that time, particularly while I was on site, was them looking at or dealing with other types of issues as well.  And then if I could be of consultative help with them, then I would.

Q.    And you heard Dr. Weiner's testimony about the amount of time trial counsel spent with him?

A.    I don't recall what that time -- I was in here for it, but I don't recall.  That was not a particular feature I tuned

into.

Q.    I think it was zero.

A.    Okay.

Q.    All right.  So --

A.    Shows why I missed it.

Q.    I just want to cover this chart for a moment.  And I have a feeling it may be too late in the day for me to make any sense of this, but my question -- that's my writing on there, or my scribbles, but my question is, what was the date on which this study was conducted?  The year, not the day, but I mean -- this is comparing WAIS-R with WAIS-III scores.  Right?

A.    Yes, sir.  That's from the WAIS-III handbook.  So the WAIS was published in 1997.  And so the correlational studies probably would have been being done in probably '95 to '97.  I think.  And that's my best guess.  That's when they were norming the test, I believe.

Q.    Okay.  I was just curious about that, because it wasn't apparent on the chart.

     You expressed shock or that you thought it was striking the drop in Mr. Bourgeois's performance on the verbal IQ between the WAIS-R and the WAIS-III.  Do you recall that?

A.    Yes, sir.  I thought that was a notable drop.

Q.    Okay.  Could part of that drop be attributable to the -- by the time he was taking the WAIS-III, he had been on death row for about three years, without appropriate stimulation,

things to challenge his mind?

A.    While that's an interesting hypothesis, I wouldn't particularly ascribe to it.  And I would think that it would be a little notable that his performance would have gone up over that same period and under those same conditions.

Q.    Well, but isn't -- you would agree that Mr. Bourgeois generally performs better on the performance tasks than he does on the verbal.  That's one of his strengths.  Right?  Well, not a strength, but he's relatively better in performance than he is in verbal?

        MR. ROBERTS:  Your Honor, could I have the record reflect that the witness was very puzzled by that question.

        MR. WISEMAN:  I think the witness can say if he's puzzled.  I mean, if he's puzzled, he can say.

        THE WITNESS:  Well, I think that when we think about verbal versus performance, in general, his verbal skills, we look, for example, at the academic functioning.  His verbal skills are a very strong component.  In the testing, the 1994 testing, the --

BY MR. WISEMAN:

Q.    What 1994 testing?

A.    I'm sorry.  Wow, it has been a long day.  The 2004 testing, the verbal and performance were approximately even.  And then there had been the split on the 2007.  In general, it seems to be that his verbal skills, whether spoken or written,

are one of his notable strengths.

Q.   All right.  Leaving aside that disagreement, I mean, verbal skills are going to deteriorate if they aren't used, aren't they?  I mean, if you don't read, if you don't think, if you don't --

A.   While it may --

Q.   -- stimulate your mind, you're going to lose some of that, aren't you?

A.   While it may be that that -- there could be some degree of deterioration over time, I don't believe that he was not speaking at all during that period.  He certainly seemed to be reading the Bible.  A comment that he made in my interview with him that Her Honor would see in the videotape was that he was referring to a new car that had come out that he had seen in the paper.  So it looks like he's got some sort of stimulation, verbal type of stimulation, language stimulation on board.  I wouldn't have expected to see that type of drop.  In fact, vocabulary is one of the most robust measures of intelligence, or aspects of intelligence.

Q.   When Dr. Price -- or withdrawn.  You thought it was notable that when he said the sun rises in the sky that that seemed like a, something he should have gotten --

A.   It was a concrete answer.  And there was an aspect to it that certainly he's concrete.  There are probably better examples than I could have chosen on the fly with that.  Up

in --

Q.   You anticipated my question, which was that's very consistent with his performance on proverbs, his performance on the orientation questions asked by Dr. Price.  Right?

A.   I wouldn't disagree with that.

Q.   Okay.  You said that getting recent Presidents was easy. I mean, it's easy for you, it's easy for me, but it's not necessarily easy for a person who has, at best, a borderline IQ.  Right?

A.   I didn't testify to that.  You did right here, if that's your contention.

Q.   No, I thought I heard you say that you were, noted his failure to cite the Presidents, and you thought that was easy.

A.   My point being --

Q.   It was your word.

A.   I'm sorry.  My point being that you were saying that would be more difficult for a person with borderline.  My contention would be that the current Presidents would be more likely to be learned or seen, because they would be information around them, whether on TV, in conversation, et cetera.  It would have been --

Q.   So he should have named Jimmy Carter over George Washington?  Is that what you're --

A.   Or Bill Clinton.

Q.   What's that?

A.   Or Bill Clinton.  Or George Bush.

MR. WISEMAN:  If I might have a moment, Your Honor.

THE COURT:  Yes, sir.

(Counsel conferring off the record.)

BY MR. WISEMAN:

Q.   Ms. Larin's making me ask you another question.

A.   It's probably because of that whole thing with the interview.

Q.   You would agree, sir, that the DSM clearly requires the administration of a recognized intelligence test to diagnose MR?

A.   Yes, sir.

Q.   Okay.  And achievement tests are not diagnostic in that setting --

A.   Yes.

Q.   -- in that sense.

A.   That's correct.

Q.   All right.  I think I'm done.  Thank you.

A.   You're welcome.

THE COURT:  Thank you.  Anything further?

MR. ROBERTS:  Your Honor, I have just a couple of quick questions, I think.

(Counsel conferring off the record.)

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.    I'm showing you what is Petitioner's Exhibit 177.

MR. ROBERTS:  Your Honor, I would ask that since Banks is listed on this document and they put in this information, that we be allowed to go into the information about Banks on Dr. Moore's report.

MR. WISEMAN:  Your Honor, that chart only talks about guesses.  It doesn't talk about any of the substance of his responses, other than the guessing.  And so I have no objection to them questioning about guessing, but I do object to anything beyond that.

MR. ROBERTS:  I would add two points, Your Honor. One, they mentioned, they asked -- on cross, they asked if he had informed anyone or spoken to anyone with regards to high school information, and they also asked about whether he had administered the test to anyone prior to the age of 18.  And I think the information contained in his report clearly shows that Banks and Alfred Bourgeois went to high school together, and he certainly fits in that category.  I believe they opened the door.

THE COURT:  Yes, sir.

MR. ROBERTS:  Thank you, Your Honor.  I need to retrieve Government Exhibit 15.

BY MR. ROBERTS:

Q.    Dr. Moore, I believe in your report -- showing you Page 10 of Government Exhibit 15.  But you refer to Nathaniel Banks --

I have my finger here on the first full paragraph, about seven lines up from the bottom of the paragraph, where it mentions Nathan Banks is the fourth rater. Why did you choose Nathan Banks as one of the people, as a rater?

A. Because the -- I had heard the trans -- I'm sorry, I heard a recording of the telephone call between Mr. Bourgeois and Mr. Banks where it seemed clear that they knew each other well, that they had a good friendship, but also that Mr. Banks seemed willing to ask his friend about inconsistencies, and seemed to be really trying to get a bead or understanding about what had happened.

Q. Was there anything that Nathan Banks had a base knowledge of that the other raters that you spoke to did not?

A. He had a base knowledge of his functioning prior to the age of 18.

Q. In your statement here, you said that he indicated that he grew up with Mr. Bourgeois and knew him from first grade through high school. Did he tell you anything about their relationship, how often they were together?

A. He said they were friends. They saw each other daily, or virtually daily. They played together.

Q. When you gave the ABAS to Mr. Banks, did you ask him to focus on the -- when did you, what did you ask him to focus on?

A. I asked Mr. Banks when it was that he had had last ongoing consistent contact with Mr. Bourgeois. He indicated that it

was basically just right at the end of high school.  Then after that, they had gone their separate ways.  So I had him to focus on the last dates that they really had close contact, which was at that point near the end of their high school career.

Q.   I'm showing you what's Page 11 of Government Exhibit 15, and I'm referring to the third full paragraph of this document, where it mentions that -- it mentions Nathan Banks again.  And the sentence right here says, "Functioning at approximately the age of 18 was assessed by childhood friend Nathan Banks."  What exactly does that sentence mean?

A.   I believe the date that he was focusing on was May of Mr. Bourgeois's -- May of the year that he turned 18 in June.  So it was just prior to when he turned 18.

Q.   And why was he focusing on that date?

A.   That was the last time that they had had significant ongoing contact.

Q.   And did he tell you -- it says here that he indicated that he knew Mr. Bourgeois well and had strong relations.  Did he talk to you about the -- did he talk to you about how much relations they had?

A.   Recollections?

Q.   His, yes, what their relationship was.

A.   He said that they were really good friends, close friends.  They played together a lot, and that later on after he had moved away, they would see each other.  He came back for

special occasions or graduations.  They'd see each other at times like that.  It sounded like they had a good, close friendship.

Q.   I'm going to show you again the chart that's on Page 12 of your report, Government Exhibit 15.  And now I'm going to ask you to consider Banks' scores and ask you how that affected your assessment of adaptive functioning in this case.

A.   Again, I was looking for data to see if there was convergence.  What's interesting here is Mr. Banks, on assessment, and most of the domains is a little bit lower than Ms. Davis or Mr. Clark.  It appears that Mr. Bourgeois may be on an upward course of improvement in adaptive functioning. But more importantly, all of the measures -- the question at hand is, are his, is his adaptive functioning significantly below the mean.  And what this says is that those three raters, all would note that his adaptive functioning was above that level, that it was in the below average or higher level.

In fact, Mr. Banks had two where he was below average. Other than that, it was average or higher in every domain.

Q.   Now, compared to the -- we also have Ms. Armont's information on there, on that chart.  You make a comment here on Page 10, in Government Exhibit 15, about Ms. Armont's testing.  You mention that many of her responses reflected a degree of impairment notably at odds with established functional abilities.  What did you mean by that, compared to

the other tests that you have?

A.    There were responses that she gave indicating that he had an inability to do certain behaviors that the record seemed to clearly indicate that he had the ability not only to do, but to do well.

For example -- and she's assessing him at the age of 31, I believe, and indicated that he would have rarely independently been able to engage in, even when needed, would have rarely independently been able to engage in naming 20 or more familiar objects, telling parents or friends about his favorite activities, relying on himself for travel in the community, such as using a car, writing his own address, including ZIP code, planning ahead for fun activities, having one or more friends, starting back to work willingly after taking a break. It appeared that the functioning that she described was significantly at odds with a multitude of information that I was getting from other sources.

Q.    If Ms. Armont's calculations were correct, what type of mental retardation would we be looking at here with regard to Alfred Bourgeois, just taking her in a vacuum?

A.    Just taking her in a vacuum would have put him, well, certainly into the mild to moderate range.  In fact -- well, in the upper moderate to low mild range of retardation, as it was -- as it used to be denoted.

Q.    And compared to the other information that you got from

the other raters that you got, including Mr. Banks, how did

Ms. Armont's testing compare to the others?

A.   Significantly lower.

Q.   Now, you were given a -- the exhibit I put on, that the

Petitioner gave you, 177, you were given that document earlier

today, were you not?

        MR. WISEMAN:  I believe it was yesterday,

Mr. Roberts.

        MR. ROBERTS:  I'm sorry?

        MR. WISEMAN:  It was yesterday.

        MR. ROBERTS:  It was yesterday.  Sorry.

BY MR. ROBERTS:

Q.   When you received that document, did you note that someone

was missing from that with regard to the ABAS?

A.   There was one more person who an ABAS had been

administered.

Q.   Who was that?

A.   That was Ms. Franks.

Q.   And then did you take this, the document that the, that

Mr. Wiseman gave to the United States and then add some numbers

to it?

A.   Yes, sir.

Q.   I'm showing what's been marked as Government Exhibit 208,

and I'll ask you if that is your handwriting.

A.   Yes, sir.

Q.    And were those the numbers that you added?

A.    Yes, sir.

        MR. ROBERTS:  Your Honor, I would offer this into the evidence right now, Government 208.

        MR. WISEMAN:  No objection.

        THE COURT:  Government's 208 is admitted.

BY MR. ROBERTS:

Q.    What is the significance of you adding Franks and all the indicators underneath her, Franks' name?

A.    Those are the number of guesses that Ms. Franks had on the ABAS.  And so if we look at her data, she didn't indicate that she had guessed on any items on the entire measure.

Q.    And did Ms. Franks know -- what did she do with regard to work?

A.    Because of the -- because of his age at when she was filling it out, that was nonapplicable.  It doesn't have a work section.

Q.    Okay.  And to your knowledge, was she around him during his functional academics?

        MR. WISEMAN:  Your Honor, objection.  That's a mischaracterization of the skill area.

        MR. ROBERTS:  The skill level, it's the third one on the left.

        MR. WISEMAN:  No, it's a mischaracterization by saying was she around for his skill, his functional academics.

It's not an event.  It's not like you're going to work.

MR. ROBERTS:  I'll withdraw the question.

BY MR. ROBERTS:

Q.   With regard to any of these areas where she felt, she says she didn't guess at all, what is most striking to you about the fact that she would be able to answer questions without guessing, with regard to Ms. Franks?  Anything?

A.   It was surprising to me that she was able to recall back to that age and not guess on anything.  But what was more striking to me was when Dr. Swanson administered the Vineland to her, there were a number of items -- we've gone through a few of them -- but a number of items where she changed what her assessment was.  And to me, it stood out that here is an individual who's indicating that they're quite sure, they're not needing to guess on any items, and yet when an interview is conducted, we see that their recollection actually changes significantly.

Q.   What about Ms. Armont, with regard to the number of guesses?  There's only one category here where she has guessed at all.  Is there any area in particular with regard to Ms. Armont that is striking in the fact that she says she didn't have to guess in order to answer the questions?

A.   I thought it was striking that she had no guesses in the work domain.

Q.   Why is that?

A.    I don't believe that he and Ms. Armont worked together.

Q.    What does the fact that there are no guesses or very few guesses on one of these ABAS's, when you -- how does that affect your consideration and reliability of the test and the outcome?

A.    Well, what was striking to me about this is the contention has been that if we had a respondent with a high number of guesses, that it renders the assessment invalid.  And my reply to that would be that in general, when we're looking for how an ABAS is generally given, how it's standardized, then that would be a red flag.

But then in this retrospective assessment, we would expect there to be some guesses.  And ironically the two people who have no guesses, which by the manual would have indicated that that was the most reliable data, are actually the two folks where the data appears to be notably unreliable; Ms. Franks because of -- at least the data on the ABAS, Ms. Franks because her assessment changes when she does the Vineland, and Ms. Armont where there were many items that her assessment was well at odds with, again, a plethora of data to the contrary.

So while they may have not guessed, the accuracy of their -- that doesn't appear to be an appropriate reflection of the reliability of their data.

Q.    Now, Mr. Wiseman asked you about the people that you used

as raters and the need to get people from more than one skill

area.  The list of people that you intended to interview when

you first went to New Orleans, did those include a cross-mix of

skill area?

A.    They did.

Q.    And had you been able to interview those people without

feeling that the interviews were compromised, would you have

been able to get people from across skill area?

A.    I would have had the opportunity to assess whether it

appeared that they had a reasonable degree of neutrality and

would have made good respondents in terms of both neutrality

and depth of knowledge.

Q.    There was some discussion on cross-examination about the

decrease in the verbal scores and the concern that Mr. Wiseman

had about Mr. Bourgeois being in jail for several years and

maybe his vocabulary decreasing.  Did you make a note as you

watched --

        MR. WISEMAN:  Your Honor, I didn't say anything about

vocabulary.  I said his verbal skills.

        MR. ROBERTS:  Excuse me.  I stand corrected.

BY MR. ROBERTS:

Q.    About his verbal skills decreasing, did you make any

notations as you watched him during the interview about certain

vocabulary words that he used that you thought were

interesting?

A.   He did.  He certainly was a highly verbal individual, and his vocabulary was notable:  Escrow, manipulative, deficient.  There were many words -- and Her Honor will certainly, I'm sure, note that as she views the tapes, but there were many concepts and -- both concepts and vocabulary words that were used that were notable in their complexity.

Q.   I'm going to put this back up one more time and ask again, these are the ten -- this is Government Exhibit 208 again.  And on the far left side, the list of the -- is that the list of the ten sub-domains?

A.   Yes, sir.

Q.   And my last question to you, Dr. Moore, is, in this case, did you find Alfred Bourgeois significantly deficient in any two of these sub-domains for adaptive functioning assessment?

          MR. WISEMAN:  Asked and answered.

          THE COURT:  Sustained.  I'm sorry.  You know what, ask it one more time, because I don't remember whether he said it or not.  I'm sorry.

          MR. WISEMAN:  Believe me --

          MR. ROBERTS:  Your Honor, I didn't ask it that -- I didn't ask it that precisely.  I asked him before if he had a general opinion --

          THE COURT:  Okay.  Well, ask him -- I've already said you can do it.  Just ask him.

          MR. ROBERTS:  I don't even know if I can restate the

question, Your Honor.  I'll try.  It's getting late.

BY MR. ROBERTS:

Q.    In the ten sub-domains that the -- what's the book?

THE COURT:  You said the ten sub-domains of whatever that thing was --

MR. ROBERTS:  Yes, that's about as accurate --

THE COURT:  -- that Mr. Wiseman was talking about.

MR. ROBERTS:  It's the DSM --

THE COURT:  The testing --

MR. ROBERTS:  The DSM-IV.

THE COURT:  The testing --

MR. ROBERTS:  No, Your Honor.  I'm actually talking, focusing on the ten areas --

THE COURT:  Did you find him mentally deficient in any of those ten categories that are used to do adaptive, or is it --

MR. ROBERTS:  Functioning, yes, Your Honor.

THE COURT:  -- functioning adaptation?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.

MR. ROBERTS:  That's all I have, Your Honor.

THE COURT:  I think that was sort of the question.

MR. ROBERTS:  That was the effort, yes.

THE COURT:  Mr. Wiseman.

MR. WISEMAN:  Yes, Your Honor.  I'll be brief.

RECROSS-EXAMINATION

BY MR. WISEMAN:

Q.   Did you find any basis for concluding in your review that Beverly Franks or Brenda Goodman were in any way biased towards Mr. Bourgeois?

A.   I'm sorry, sir, would you recollect -- refresh my recollection of who Brenda Goodman is?

Q.   Brenda Goodman was the woman who testified here.

THE COURT:  I know, but which --

MR. WISEMAN:  She was the woman from Florida.  I'm sorry?

THE COURT:  He doesn't remember who she was.  And you know what, I don't either.

MR. WISEMAN:  She was another granddaughter of Ms. Mary, from Florida.

THE COURT:  Right.

MR. WISEMAN:  Testified here, legal services background.

THE COURT:  Right.  None of them were the granddaughter -- let me make sure I've got this right.  The granddaughter who was living there didn't testify.

MS. LARIN:  She has passed away.

THE COURT:  Oh, I'm sorry.  But then she -- that answers my question.

MS. LARIN:  Oh, wait.  The grandmother.  The

grandmother.

THE COURT:  No, the granddaughter that was living with Ms. Mary when --

MS. LARIN:  Do you know, I'm not quite --

THE COURT:  -- Mr. Bourgeois's sister Claudia and Mr. Bourgeois were living there, she wasn't here.

MS. LARIN:  I don't know who that is, because I thought she said Brenda, and I think they might have been talking about the one who was on the stand who was like living in two different homes.

MS. BOOTH:  Wasn't that Vera?

MS. LARIN:  I'm not sure.  Yeah, Vera.

THE COURT:  I thought it was Vera.

MS. LARIN:  I don't know who that was.

MS. BOOTH:  It was Vera.  It was Vera.

THE COURT:  I thought there was a Vera.  I wrote down "Vera."

MS. LARIN:  I don't know who that is, honestly, Your Honor, so --

THE COURT:  Because I thought --

MS. LARIN:  I had never heard that before.

THE COURT:  Okay.  Well, I thought Mr. Bourgeois mentioned a Vera, or I could have misspoken for Mary --

MS. LARIN:  It could be Brenda.

THE COURT:  -- when Dr. Moore talked to him on the

video.  I wrote down a Vera.  But it could have been Mary.

MS. LARIN:  And you know, if I may, Your Honor --

THE COURT:  Please.

MS. LARIN:  One problem is that it seems like a lot of people have nicknames, too.  So that's my best guess is that that might be Brenda, who was in and out of the house.  But I --

THE COURT:  No, it was Claudia Williams said there was someone there, her age, a granddaughter within a year or two of her age --

MS. LARIN:  Yeah, I --

THE COURT:  -- that was living in the house with Ms. Mary when she was living there, when Claudia Williams was living there.

MR. ROBERTS:  Your Honor, I'm just going to say, if all of us are having this many problems figuring it out, I don't think Dr. Moore will be able to --

MS. LARIN:  That is one person who might have possibly been a good respondent that we have not --

THE COURT:  Okay.

MR. WISEMAN:  And the point of my question is --

THE COURT:  Moving along.

BY MR. WISEMAN:

Q.  Beverly Frank took the Vineland after she took the ABAS. I mean, she hasn't seen Mr. Bourgeois since he was nine years

old.  There's no bias in her responding.  I mean, there's no basis for you to conclude that she's biased, or is there?

A.  I would certainly say there could be a hypothesis to that.  It's a close knit community.  He was a grandson-like individual.

Q.  Close knit like the trucking community and Ms. Davis?

THE COURT:  And they were related somehow.  Miss --

MR. WISEMAN:  No, they weren't related.  They weren't related.

THE COURT:  Oh, I'm sorry.  I thought Ms. Mary was a cousin.

MR. WISEMAN:  No, no, no, Beverly -- Beverly Frank was the granddaughter of Ms. Mary.  All right?

THE COURT:  I know that, but I thought --

MR. WISEMAN:  Not related to Mr. Bourgeois.

THE COURT:   -- Ms. Mary was related, a cousin or something, to Mr. Bourgeois's mother.

MS. LARIN:  No.

MR. WISEMAN:  No.

MS. LARIN:  As far as we can tell, back in the family tree, there might, generations ago, be some relation, but that would be like five plus.

THE COURT:  Do you know who was living in the house?  A woman named somebody Batiste.

MR. WISEMAN:  I really don't know who was living in

the house.

THE COURT:  It was a Ms. Batiste.

MR. WISEMAN:  All right.  I'll move on.

THE COURT:  Because I remember the name because I --

I just remember the name.

MS. LARIN:  Yeah, right, Judge.

MR. WISEMAN:  I'll move on.

THE COURT:  And we didn't hear from that woman.

MR. WISEMAN:  Correct.

BY MR. WISEMAN:

Q.  Dr. Swanson, in her initial report in 2009, did not rely
on Ms. Franks' administration of the ABAS.  Correct?

A.  Yes, sir.

Q.  She relied on the Vineland?

A.  That's -- that's correct.

Q.  Okay.  So when you were responding to questions for
Mr. Roberts just now about the ABAS and Ms. Franks and reliance
on it, I mean, Dr. Swanson did not rely on that test.  In fact,
she had problems with that test.  Right?  She thought it wasn't
the way it should be.

A.  She certainly seemed to have more confidence in the
Vineland, yes, sir.

Q.  Okay.  Now, back to this 2008 ABAS book, Chapter 20, Page
390 -- maybe I'll put it up so you can read along --

THE COURT:  Claudia Williams said that Ms. Mary was a

cousin to her.

MS. LARIN:  I think that might be -- I don't know what the --

THE COURT:  But that doesn't make her related -- I'm getting this -- I'm getting an e-mail from my law clerk.

MS. LARIN:  I think it's like a saying, as --

THE COURT:  Claudia Williams said that Ms. Mary was a cousin to her, and Claudia Williams is the sister of Mr. Bourgeois.

MS. LARIN:  That's true.

THE COURT:  So I'm just saying, I remembered somehow --

MS. LARIN:  Someone said that.

THE COURT:  -- there was a relationship --

MS. LARIN:  Someone did say that on the record.  I stand corrected.

BY MR. WISEMAN:

Q.   I see you're reading ahead of us.  Let me read it for the record.  "Although the scale may be administered over the telephone or by having the informant read and complete the items, it is preferable to administer the scale in person, in a setting in which the informant is comfortable, such as his or her own home.  First discuss the purposes of the interview, the scoring criteria, the need for accurate information.  Continue by asking the respondent to describe the Defendant's behavior

at home, school, work, a particular age.  The discussion may

provide a general understanding of the Defendant's adaptive

skills and behavior at that time.  The examiner should continue

by reading the items aloud while the informant answers the

questions, assisted by knowing the four response options stated

above.  Providing these options on a separate card or providing

another ABAS grading form may also clarify the items and

scoring."

     Now, with respect to Mr. Banks, you mailed it to him.

Right?

A.    That's correct.

Q.    You didn't read it to him?

A.    That's correct.

Q.    You weren't there when he took it?

A.    I wasn't there while he took it.  I was available by

telephone.

Q.    And the same is -- and in fact, you didn't read the ABAS

to any of the respondents you interviewed.

A.    That's correct.

Q.    And so that's in conflict with the preference of this

article.

A.    With that article.  I was following the directions of the

ABAS manual itself.

Q.    Okay.  Which you acknowledge isn't appropriate necessarily

in full, in regard to retrospective.  Right?  I mean, this

chapter is about retrospective.

A.    We've now mixed apples and oranges together, but sure.

Q.    On the next page, it says, "This approach provides" -- "this approach" meaning the reading -- "provides some assurance that the informant understands each item and does not fall into a response bias, e.g. giving the same answer to nearly every item.  Items should be read as they appear, and they may be repeated to assure understanding.  If the informant does not understand the wording, it is permissible to re, paraphrase the item.  However, it is essential not to change the meaning.  A clarification is helpful, but coaching in any form is not permissible."

Again, you didn't assure understanding, because you didn't read it to the person and gauge their response.  You just let them take it.

A.    I administered it as directed by the administration manual.

Q.    Okay.  Well, you keep up on this stuff.  Right?  You're involved in a lot of Atkins cases.  Right?

A.    Sure.

Q.    And you know about this book?

A.    Yes, sir.

Q.    And you know about the chapter that talks about retrospective?

A.    Yes, sir.

Q.   And it's by the authors who designed the test?

A.   Not -- well, that particular chapter has other authors.

Q.   Not that chapter, but the people who edited this book are, you know --

A.   Yes, sir.

Q.   -- Dr. Oakland and Dr. Harrison.

A.   Yes, sir.

Q.   Okay.  So, I mean, their word is more than just another article out there.  They endorsed this stuff.  They say in a retrospective, you've got to read it.  Right?

A.   Yes, sir.

Q.   Okay.  I just want to be clear on one thing.  When we talk about someone being verbal, talking a lot, saying a lot and sounding like they know something, that's different than having good verbal performance on an IQ test, isn't it?

A.   I'm sorry, did you say "that's different from"?

Q.   Yeah.

A.   Yes, sir.

Q.   Okay.  And so the fact that Mr. Bourgeois has, as I think someone put it, has the gift of gab -- I think maybe that was you.  Was it you or Dr. --

A.   Sounds like something --

Q.   I'm sorry?

A.   Sounds like something I'd say.

Q.   Okay.  The fact that he has the gift of gab doesn't mean

his verbal performance and IQ testing is the same.

A.    While that's true, I think we look at the quality of the

gab that he has the gift of.

Q.    Okay.  All right.

MR. WISEMAN:  That's all.

MR. ROBERTS:  Nothing further, Your Honor.

THE COURT:  No.

MR. ROBERTS:  Nothing further.

THE COURT:  Okay.  Thank you.  You may stand down.

Now, how do you all plan on concluding?

MR. WISEMAN:  Well, we've got our couple of depositions.

THE COURT:  Okay.

MR. WISEMAN:  And we'll have them submitted to the Court by November 15th, as per your instructions.

THE COURT:  You want to do -- you want to do arguments, or do you want to do submission briefs, or how would you prefer to do this?

MR. WISEMAN:  I guess our preference would be briefing followed by an argument.

THE COURT:  We could do the argument by telephone, if you want.

MR. WISEMAN:  Oh, no.

THE COURT:  Okay.

MR. ROBERTS:  We can visit.

THE COURT:  You miss us all here too much?

MR. WISEMAN:  You know what, I don't do well on the phone.

THE COURT:  Okay.

MR. WISEMAN:  I really don't enjoy those times when we've talked on the phone.  I mean not personally for us, but I just feel like the --

MR. ROBERTS:  In that case, Your Honor, I prefer the phone.

THE COURT:  That's fine.

MR. WISEMAN:  Yeah, I don't --

THE COURT:  I was just trying to make it easy on you.

MR. WISEMAN:  No, and I appreciate it.  I know that's what Your Honor meant.  No, I think we'd rather be here for something like that.

THE COURT:  Okay.

MR. WISEMAN:  I think we can excuse Mr. Bourgeois.

THE COURT:  Well, let's wait until -- file the objections.  Also, if you're taking depositions and you have any problems with objections or something, just call me.

MR. WISEMAN:  Okay, as opposed to preserving them on the record.  Okay.

THE COURT:  Yeah, because it just -- if it's something really contentious, let me deal with it.

MR. WISEMAN:  Okay.

MR. ABREU:  And Your Honor, if I may, another housecleaning matter.  As Your Honor recalls, there was the claim related to jurisdiction in this case, whether the murder occurred on the military base or not.

THE COURT:  Right.  I didn't want to hear any --

MR. ABREU:  That's correct.

THE COURT:  -- evidence about that.

MR. ABREU:  That's correct.  At the --

THE COURT:  I had forgotten, however, that I didn't, until Mr. Wiseman told me.

MR. ABREU:  But at the April 20th hearing, Your Honor indicated that we could.  You actually said, "It's absurd, but I understand you have a job to do, so I will let you" --

MR. WISEMAN:  I would have left that out.

MR. ABREU:  I know.  I just wanted to get it in --

THE COURT:  As if I hadn't already made up my mind on that issue.

MR. ABREU:  I wanted to put it in context, though. "I will let you proffer two affidavits from your doctor.  How is that?"

THE COURT:  From the --

MR. ABREU:  "From a doctor, on the issue of where the cause of death, what the fatal blow was and the timing."

THE COURT:  I said that?

MR. ABREU:  Yes, Your Honor, whether the timing --

I'll direct you to some pages.  The discussion started on Page 42 of that transcript, and then it ends for a little while. Then it picks back up I think around 53 or 54.  Then on 55 --

THE COURT:  Well, do you have the affidavits?

MR. ABREU:  I want to explain why that is.  Towards the end of that transcript, at the very last page, Your Honor says the following:  "May I -- I'm going to make one requirement about the proffer from your expert that wants to talk about the cause of death and the time of death."

"Yes?"

"That he must review both Koufle's (phonetic) testimony, as well as the emergency room doctor."

Immediately upon that, I hired a new expert, who is actually the person who wrote the book called Forensic Neuropathology.  I sent him all the testimony.  He reviewed it. He then got back to me and said, "You know what, I really want to look at the autopsy slides before I make a decision in this case."

THE COURT:  No, this is the time to do it.  It's --

MR. ABREU:  Well, Your Honor, last week -- let me just explain why it's not happened yet.  Mr. Roberts attempted to locate the autopsy slides for some time, and it's not his fault, but he couldn't get in touch with Dr. Rouse.  He finally got in touch with Dr. Rouse some time in August.  He then notified us where the autopsy slides were.  We then filed a

motion with the Court asking for a subpoena for the autopsy slides.

THE COURT:  I did that.

MR. ABREU:  Your Honor just recently signed the subpoena to send the autopsy slides --

THE COURT:  Well, I signed it as soon as you filed it.

MR. ABREU:  That's correct.  The autopsy slides are still being awaited to arrive at our expert's location.  So what I'm saying is that we will endeavor, by the same date, November 15th, to supply those affidavits regarding that issue.

THE COURT:  No, if we're going to do that, we're going to depose them.

MR. ABREU:  That's fine with me, Your Honor.  I want him to look at the slides.  He wants to look at the slides as well.

THE COURT:  I mean, you know, Mr. Bourgeois testified that she fell out of the truck on the Navy Base and died from that.  AB1994 testified that he picked her up and smashed her head against the window, and there was blood, I think, on the inside of the car where that occurred.

MR. ABREU:  And those are certainly issues and --

THE COURT:  So you know, you can re -- I'm just telling you.

MR. ABREU:  I understand.

THE COURT:  I had the advantage of hearing all this before.

MR. ABREU:  I understand.

THE COURT:  And so I'm not going to let them do that without a deposition.

MR. ABREU:  That's fine, Your Honor.

THE COURT:  One more.

Look, this is -- I know that it's difficult for the U.S. Attorney's Office, but this is somebody who's really, you know -- like in the trial, when y'all groaned when I sustained every objection of the Defense --

MS. SALINAS:  Every --

MS. BOOTH:  Every.

MR. ROBERTS:  Your Honor, we never groaned out loud.

THE COURT:  It was like Ms. Booth throwing her head on the table.

MR. ROBERTS:  Oh, Ms. Booth.  I'm sorry.  I'm sorry, we can't help Ms. Booth.

THE COURT:  I mean, I struck every juror that the Defendant wanted to strike, and I don't want to leave -- I don't want to leave anything unturned, any stone unturned in this last effort that he's going to have to present this information, possibly.

MR. WISEMAN:  And Your Honor, on --

THE COURT:  And then from here it goes up, obviously,

to the Fifth Circuit and then the Supreme Court.

MR. WISEMAN:  Do you think the Government will appeal?

THE COURT:  Pardon?

MR. WISEMAN:  You think the Government's going to appeal?

Your Honor, on that note, I do want to thank the Court on behalf of all the folks who have attended on our side, Mr. Bourgeois, and thank the Court staff, who have been incredibly --

THE COURT:  They're great.

MR. WISEMAN:  You've been incredibly courteous, and we appreciate it.

THE COURT:  You're very kind, Mr. Wiseman.  And really, I really enjoy your advocacy.

MR. WISEMAN:  Why, thank you.  Not always evident, but thank you.

     (Proceedings concluded at 6:22 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    November 5, 2010
Molly Carter                       Date