# Attachment A

CLOSED, APPEAL, APPEAL_NAT

**U.S. District Court**
**SOUTHERN DISTRICT OF TEXAS (Corpus Christi)**
**CRIMINAL DOCKET FOR CASE #: 2:02-cr-00216-ALL**

**Case Title:** USA v. Bourgeois                           **Date Filed:** 7/25/2002
**Other court case number(s):** None
**Magistrate judge case number(s):** 2:02-mj-00264

---

**Assigned to:** Judge Janis Graham Jack
**Referred to:**

**Defendant**
----------------------

**Alfred NMI Bourgeois (1)**                    represented by   **Adrienne Urrutia Wisenberg**
*TERMINATED: 3/23/2004*                                         Barnes & Thornburg LLP
                                                                1717 Pennsylvania Ave
                                                                Ste 500
                                                                Washington, DC 20006
                                                                202-371-6377
                                                                Email: awisenberg@btlaw.com
                                                                *TERMINATED: 7/3/2006*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: CJA Appointment*

                                                                **Joel Douglas Tinker**
                                                                Attorney at Law
                                                                P O Box 276
                                                                Corpus Christi, TX 78403
                                                                361-882-4378
                                                                Fax: 361-882-3635
                                                                Email: douglastinker@hotmail.com
                                                                *TERMINATED: 3/23/2004*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*
                                                                *Designation: CJA Appointment*

                                                                **John S Gilmore, Jr**
                                                                Attorney at Law
                                                                622 S Tancahua
                                                                Corpus Christi, TX 78401
                                                                361-882-4378
                                                                Fax: 361-882-3635
                                                                Email: gilmorelaw@msn.com
                                                                *TERMINATED: 3/23/2004*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

*Designation: CJA Appointment*

**Jose I Gonzalez-Falla**
Office of Federal Public Defender
606 N Carancahua
Ste 401
Corpus Christi, TX 78476-0401
361-888-3532
Fax: 361-888-3534
Email: Jose_Gonzalez-Falla@FD.org
*TERMINATED: 10/2/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Keith Hampton**
Attorney at Law
1103 Nueces
Austin, TX 78701
512-476-8484
*TERMINATED: 10/16/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Clark Gross**
Attorney at Law
106 S St Mary's Street
Ste 260
San Antonio, TX 78205
210-354-1919
Fax: 210-354-1920
Email: lawofcmg@flash.net
*TERMINATED: 10/16/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Wiseman**
Office of the Federal Public Defender
601 Walnut Street
The Curtis Center, Suite 545
Philadelphia, PA 19106
US
215-928-0520
Fax: 215-928-0826
Email: Michael_Wiseman@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Victor Julio Abreu**

USCA5 2

Federal Community Defender
Capital Habeas Corpus Unit
601 Walnut Street
Ste 545 West
Philadelphia, PA 19106
215-928-0520
Fax: 215-928-0826
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**

----------------------

Did knowingly and willfully and with malice aforethought kill J.G. while within the Special Maritime and Territorial Jurisdiction of the United States: 18 USC 7 and 1111. Date of Offense: June 27, 2002. PENALTY: Any term of imprisonment up to life, a fine of up to $250,000, not more than 5 years SRT, and a $100 special assessment.
(1 )

Did knowingly and willfully and with malice aforethought, kill J.G. while within the Special Maritime and Territorial Jurisdiction of the United States- 18 USC 7 and 1111. Date of Offense: 6/27/02. PENALTY: By Death or imprisonment of life, a fine of up to $250,000, not more than 5 years SRT, and a $100 special assessment.
(1s )

Did knowingly and intentionally and with premeditation and malice aforethought, kill a girl child, J.G., through physical assault while within the Special Maritime and Territorial Jurisdiction of the United States; 18 USC 7 and 1111 and 18 USC 3591(a)(2)(A)(B)(C) and (D); and 18 USC 3592(c)(6)(9) and (11). Date of Offense: 6/27/02. PENALTY: Sentence of death.
(1ss )

Did knowingly and intentionally physically assault and cause serious bodily injury to J.G., a minor child, while on land acquired for use by the United States of America; Texas Penal Code 22.04. Date of Offense: June 27, 2002. PENALTY:

**Disposition**

----------------

Sentence of Death.

Imprisonment for five to ninety-nine years, a fine of up to $10,000, not more than 5 years SRT and a $100 special assessment. (2 )

Did knowingly and intentionally physically assault and cause serious bodily injury to J.G., a minor child, while on land acquired for use by the United States of America- Texas Penal Code 22.04. Date of Offense: 6/27/02. PENALTY: Imprisonment for five to niney-nine years, a fine of up to $10,000, not more than 5 years SRT, and a $100 special assessment. (2s )

**Highest Offense Level (Opening)**
-----------------------------------------

Felony

| **Terminated Counts** | **Disposition** |
| ------------------------ | ---------------- |
| None | |

**Highest Offense Level (Terminated)**
---------------------------------------------

Felony

| **Complaints** | **Disposition** |
| ------------------------ | ---------------- |
| Did within the special maritime and territorial jurisdiction of the United States did commit Murder by the unlawful killing of a human being, to wit, BOURGEOIS' minor child, with malice aforethought. [ 2:02-m -264 ] (0 ) | |

**Interested Party**
-----------------------

**Tim Allen**

**Plaintiff**

USCA5 4

----------------------

**USA**                                              represented by **Financial Litigation**
U S Attorney's Office
Southern District of Texas
P O Box 61129
Houston, TX 77208
713-567-9000
Fax: 713-718-3391 fax
Email: flu.usatxs-@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Marshal - CC**
1133 North Shoreline, Room 109
Corpus Christi, TX 78401
361-888-3154
Fax: 361-888-3174
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Pretrial Svcs-CC**
1133 N Shoreline Blvd
Rm 114
Corpus Christi, TX 78401
361-888-3411
Fax: 361-888-3419 fax
Email:
txsptdb_corduty@txspt.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Probation - CC**
1133 North Shoreline Blvd, Room 124
Corpus Christi, TX 78401
361-888-3518 fax
Fax: 361-888-3518 fax
Email:
TXSPdb_CorDuty@txsp.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Elsa Salinas**
Office of the U S Attorney
800 N Shoreline Blvd
Ste 500
Corpus Christi, TX 78401
361-888-3111
Fax: 361-888-3200
Email: elsa.salinas@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James L Turner**
US Attorneys Office
919 Milam
Suite 1500
Houston, TX 77002
713-567-9361
Fax: 713-718-3302
Email: jim.turner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Patricia Hubert Booth**
United States Attorneys Office
800 N Shoreline
Ste 500
Corpus Christi, TX 78401
361-888-3111
Fax: 361-888-3200
Email: Patti.Booth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula C Offenhauser**
US Attorneys Office
PO Box 61129
Houston, TX 77208-1129
713-567-9364
Fax: 713-718-3302
Email: paula.offenhauser@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tony R Roberts**
Office of the US Attorney
PO Box 61129
Houston, TX 77208
713-567-9810
Email: tony.roberts@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellate Division**
U.S. Attorney's Office
Southern District of Texas
PO Box 61129
Houston, TX 77208-1129
US
Email: usatxs.appellate@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mark Michael Dowd**
Office of the US Attorney
P. O. BOX 61129
Houston, TX 77208
713-567-9368
Fax: 713-718-3302
Email: mark.dowd@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Filing Date | # | Docket Text |
|---|---|---|
| 6/28/2002 | | ARREST of Alfred NMI Bourgeois [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 6/28/2002 | | COMPLAINT as to Alfred NMI Bourgeois , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 6/28/2002 | | Initial appearance as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill ;Preliminary Examination set for 2:00 7/2/02 ;Detention Hearing set for 2:00 7/2/02 Ct Reporter: Linda R. Smith digital 3:11:18-3:21:14 App: Mark Patterson, Patti Hubert Booth f/govt; Dft appeared without counsel; Dft requests appointed counsel (approved JC-H); Order appointing FPD; Govt motion for detention without bond; (Defendant informed of rights.); Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 6/28/2002 | | CJA 23 FINANCIAL AFFIDAVIT by Alfred NMI Bourgeois , filed. (approved JC-H) [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 6/28/2002 | | ORDER Appointing Federal Public Defender for Alfred NMI Bourgeois . Attorney Jose I Gonzalez-Falla added. ( Appointed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 6/28/2002 | | ORDER OF TEMPORARY DETENTION AND HEARING as to Alfred NMI Bourgeois Detention Hearing set for 2:00 7/2/02 ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/1/2002) |
| 7/2/2002 | | Detention hearing as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 2:21:42-3:39:21 App: Patti Hubert Booth f/govt; Jose Gonzalez-Falla f/dft; Govt wit #1. Govt rests. Dft rests. Court heard arguments. Court grants Govt motion for detention. Court to enter Order of Detention. Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/3/2002) |
| 7/2/2002 | | Preliminary Examination as to Alfred NMI Bourgeois held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital |

**USCA5 7**

| | | |
|---|---|---|
| | | 2:21:42-3:39:21 App: Patti Hubert Booth f/govt; Jose Gonzalez-Falla f/dft; Dft appeared with counsel; Court finds probable cause. Dft remanded. , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/3/2002) |
| 7/2/2002 | | ORDER OF DETENTION PENDING TRIAL as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/11/2002) |
| 7/22/2002 | | MOTION by Alfred NMI Bourgeois for protective order , filed. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/24/2002) |
| 7/23/2002 | | ORDER granting [0-1] motion for protective order as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. [ 2:02-m -264 ] (kbledsoe) (Entered: 7/24/2002) |
| 7/25/2002 | 1 | INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1, 2 ,filed. (kbledsoe) (Entered: 7/25/2002) |
| 7/26/2002 | 2 | MOTION by Alfred NMI Bourgeois to continue arraignment , filed. (kbledsoe) (Entered: 7/26/2002) |
| 7/26/2002 | 3 | NOTICE of Setting : set Arraignment for 2:00 7/29/02 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties ntfd. (lsmith) (Entered: 7/29/2002) |
| 7/29/2002 | 4 | NOTICE of Setting : reset Arraignment for 2:00 8/5/02 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties ntfd. (lsmith) (Entered: 7/29/2002) |
| 7/31/2002 | 5 | ORDER granting [2-1] motion to continue arraignment as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 8/1/2002) |
| 8/1/2002 | 6 | Excludable Delay Worksheet XG start 7/26/02 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 8/1/2002) |
| 8/5/2002 | 7 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 2:08:09-2:14:54 App: Jon Muschenheim f/govt; Jose Gonzalez-Falla f/dft; Alfred NMI Bourgeois (1) count(s) 1, 2 , filed., Plea of Not Guilty: count(s) 1, 2 Dftappeared with counsel. Dft waived the reading of the Indictment. Dft remanded. (kbledsoe) (Entered: 8/6/2002) |
| 8/5/2002 | 8 | SCHEDULING ORDER setting Pretrial Conference for 8:30 9/30/02 for Alfred NMI Bourgeois ; Jury Trial for 8:00 10/2/02 ; Jury Selection for 8:00 10/2/02 ; Plea Agreement Due 9/30/02 before Judge Janis Graham Jack ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 8/6/2002) |

USCA5 8

| 8/20/2002 | 9 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Preliminary Examination and Detention Hearing for dates of July 2, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 8/20/2002) |
|---|---|---|
| 9/5/2002 | 10 | MOTION by Alfred NMI Bourgeois exparte , and SEALED , filed. (kbledsoe) (Entered: 9/6/2002) |
| 9/13/2002 | 11 | SEALED ORDER as to Alfred NMI Bourgeois granting [10-1] motion exparte , granting [10-2] motion SEALED ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 9/13/2002) |
| 9/16/2002 | 12 | MOTION by Alfred NMI Bourgeois exparte , and SEALED , filed. (kbledsoe) (Entered: 9/17/2002) |
| 9/18/2002 | 13 | ORDER granting [12-1] motion exparte as to Alfred NMI Bourgeois (1), granting [12-2] motion SEALED ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 9/18/2002) |
| 9/26/2002 | 14 | MOTION to quash subpoena as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 9/26/2002) |
| 9/26/2002 | 15 | JOINT MOTION by Alfred NMI Bourgeois, and USA to continue final pretrial conference and trial , filed. (kbledsoe) (Entered: 9/26/2002) |
| 9/27/2002 | 16 | ORDER striking [14-1] motion to quash subpoena as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 9/27/2002) |
| 9/27/2002 | 17 | MOTION by Alfred NMI Bourgeois exparte , and to seal , filed. (kbledsoe) (Entered: 9/27/2002) |
| 9/30/2002 | 18 | MOTION by Alfred NMI Bourgeois exparte , and to seal , filed. (kbledsoe) (Entered: 10/1/2002) |
| 9/30/2002 | 19 | Pre-trial conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:39-8:45 App: Patti Booth f/govt; Jose Gonzalez-Falla f/dft. Dft appeared with counsel. Parties are not ready for trial. Joint mtn for continuance. Court grnats mtn for continuance until Friday March 14, 2003 8:00 am. FPTC at 3/13/02 8:30 am. Dft mtn exparte under seal discussed. Mtn to withdraw by Jose Gonzalez-Falla filed. Court will appoint atty in a few days. , filed. (kbledsoe) Modified on 06/23/2003 (Entered: 10/1/2002) |
| 9/30/2002 | 20 | ORDER granting [17-1] motion exparte as to Alfred NMI Bourgeois (1), granting [17-2] motion to seal ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/1/2002) |

USCA5 9

| | | |
|---|---|---|
| 10/2/2002 | 21 | ORDER granting [15-1] joint motion to continue final pretrial conference and trial as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/4/2002) |
| 10/2/2002 | 22 | SEALED ORDER as to Alfred NMI Bourgeois granting [18-1] motion exparte , granting [18-2] motion to seal ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/7/2002) |
| 12/18/2002 | 23 | NOTICE of Setting : set hearing on Deft's letter for 8:00 12/20/02 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/18/2002) |
| 12/20/2002 | 24 | Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:26-8:41 App: Patti Booth f/govt; John Gilmore f/dft. Dft says he is satisfied with Mr. Gilmore, who remains as atty. Court advises atty is to meet with client here. USM advised they need a day in advance to have dft here. Court inquires about DNA testing. AUSA Booth requests they need more time due to the length of time DNA test results take. AUSA Booth announces to the Court that one of thewitnesses in this case was murdered last night and has received information as to the dft threatening other witnesses. Court limits dfts ability to communicate with others; dft must do so through his atty. Status conference is set for 2/12/03 1:00 pm. Court adjourned. (kbledsoe) (Entered: 12/20/2002) |
| 12/20/2002 | 25 | Excludable Delay Worksheet XT start 9/30/02 as to Alfred NMI Bourgeois , filed. (ysanchez) Modified on 06/23/2003 (Entered: 6/23/2003) |
| 1/8/2003 | 26 | MOTION by USA as to Alfred NMI Bourgeois for clarification of court order and request for hearing , filed. (lrivera) (Entered: 1/9/2003) |
| 1/8/2003 | 27 | Motion clarifying Court's Order Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Tape Number: Digital: 3:41-4:05 App: Patti Booth f/govt; John Gilmore f/deft. Case called. Mr. Bourgeois and Honorable Judge Janis Graham Jack by telephone conference. Ms. Booth advises Court about the reason for the emergency motion. Mr. Gilmore informs he received letters (3) during his visit to Mr. Bourgeois on January 2, 2003. He was informed by USM office to pick up letters. Court inquires about leters being appropriate enough to be sent. Mr. Gilmore explains one letter to Atty in Louisiana is not appropriate. Patti Booth informs there are two additional letters on hold by USM unopened. The intercepted letters were sent to FBI by their recipients. Playback of oral order on Dec 20, 2002. Court informs the intention of order was not to put Mr. Gilmore in position of screening letters. All communication, both by mail or telephone has to be made through Mr. Gilmore. Court instructs Ms. Booth to |

USCA5 10

| | | provide unopened letters to Mr. Gilmoe. Court will enter order clafifying original oral order. Order will be signed by fax but will be considered as original. Ms. Booth explains charge in superseding indictment could be as to subsequent crimes. Court inquires to Mr. Bourgeois about hearing the proceedings clearly, he replied affirmative. No further matters on either side. Court adjourns. (lrivera) (Entered: 1/9/2003) |
|---|---|---|
| 1/8/2003 | 28 | ORDER CLARIFYING PRIOR ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 1/9/2003) |
| 2/6/2003 | 29 | Docket Entry as to Alfred NMI Bourgeois , filed. Spoke to Patti Booth today and explained that the scheduled status conference in the above stated matter has been moved up from 1:00 pm on 2/12/03 to 12:30 same day. Spoke to John Gilmore's office today, stated to Tina, Mr. Gilmore's secretary of said change. In addition, I told them both that a written notice would follow by fax with mentioned setting. (kbledsoe) (Entered: 2/7/2003) |
| 2/6/2003 | 30 | NOTICE of Setting : reset status conference for 12:30 2/12/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 2/7/2003) |
| 2/12/2003 | 31 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lori Cayce digital 12:53-1:01 App: Patti Booth f/govt; John Gilmore f/dft. Case called; appearance of counsel. Mr. Gilmore requests funds for Dr. White's review. Court instructs Mr. Gilmore to do request in writing. Court advises attorney and dft of previous order on contacting anyone. Mr. Gilmore request continuance until the end of March. Court sets FPTC 3/20/03 8:30 am; Jury Selection &Trial 3/21/03 8:00 am. Court inquires as to the child in courtroom. Ms. Patti Booth states she came to see courtroom. Court excuses attorneys. Court adjourns. (kbledsoe) (Entered: 2/13/2003) |
| 2/19/2003 | 32 | MOTION by Alfred NMI Bourgeois for Government funds for an Expert Witness, Pathology Field, and for Investigator , filed. (kbledsoe) (Entered: 2/19/2003) |
| 2/19/2003 | 32 | MEMORANDUM by Alfred NMI Bourgeois to [32-1] motion for Government funds for an Expert Witness, Pathology Field, and for Investigator , filed. (kbledsoe) (Entered: 2/19/2003) |
| 2/23/2003 | 33 | ORDER granting [32-1] motion for Government funds for an Expert Witness, Pathology Field, and for Investigator as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/24/2003) |
| 3/7/2003 | 34 | AGREED MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 3/7/2003) |

| 3/10/2003 | 35 | ORDER granting [34-1] motion for continuance as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/11/2003) |
|---|---|---|
| 3/18/2003 | 36 | Excludable Delay Worksheet XT start 3/11/03 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/19/2003) |
| 3/19/2003 | 37 | Pre-trial conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:27-9:23 App: Patti Booth f/govt; John Gilmore f/dft. Mr. Gilmore states all issues worked out and requests funds for investigator. Ms. Booth has given exhibits to Mr. Gilmore. Ms. Booth to provide the court with a charge agreed to by both parties as to count 2 injury to a child. Ms. Booth states many exhibits will be graphic. Ms. Booth will make animation exhibit available to Mr. Gilmore. Court adjourns. , filed. (kbledsoe) (Entered: 3/20/2003) |
| 3/25/2003 | 38 | APPLICATION by USA as to Alfred NMI Bourgeois for writ of habeas corpus ad testificandum , filed. (kbledsoe) (Entered: 3/26/2003) |
| 3/25/2003 | 39 | WRIT of Habeas Corpus ad Testificandum issued for Orlando Campos on 4/14/03 in case as to Alfred NMI Bourgeois . (kbledsoe) Modified on 03/27/2003 (Entered: 3/27/2003) |
| 4/3/2003 | 40 | UNOPPOSED MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) Modified on 04/07/2003 (Entered: 4/4/2003) |
| 4/8/2003 | 41 | Motion for Continuance Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:19-1:25 App: Patti Booth f/govt; John Gilmore f/dft. Case called; appearance of counsel. Mr. Gilmore is abandoning mtn for continuance. Attys to work on stipulation of evidence. Trial set 4/14/03. Court adjourns. (kbledsoe) (Entered: 4/9/2003) |
| 4/8/2003 | 42 | MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 4/9/2003) |
| 4/9/2003 | 43 | SUPERSEDING INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1s, 2s , filed. (kbledsoe) (Entered: 4/9/2003) |
| 4/10/2003 | 44 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Linda Smith digital 10:57:59-11:01:36 App: Patti Hubert Booth f/govt; John Gilmore f/dft. Alfred NMI Bourgeois (1) count(s) 1s, 2s , filed., Plea of Not Guilty: count(s) 1s, 2s Dft appeared with counsel. Dft advised his true name. Dft waived the reading of the Indictment. Pretrial Order dates to be determined by District Court at status conference to be held instanter. Dft remanded. (kbledsoe) (Entered: 4/11/2003) |
| 4/10/2003 | 45 | |

| | | |
|---|---|---|
| | | Status conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 11:06-11:18 App: Patti Booth f/govt; John Gilmore f/dft. Dft has been re-indicted. Both counsel do not waive 30 days for trial. Case is set for FPTC 5/8/03 8:30 a.m. and Jury Selection with Trial to follow 5/20/03 8:00 a.m. Motion deadline is 5/5/03. Court adjourns. , filed. (kbledsoe) (Entered: 4/11/2003) |
| 4/10/2003 | 46 | SCHEDULING ORDER setting Pretrial Conference for 8:30 5/8/03 for Alfred NMI Bourgeois ; Jury Trial for 8:00 5/20/03 ; Jury Selection for 8:00 5/20/03 ; Plea Agreement Due 5/20/03 before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 4/11/2003) |
| 4/25/2003 | 49 | CJA 21 (SEALED), filed. (per Case Manager Sylvia Syler on 6/11/03). (kbledsoe) Modified on 06/11/2003 (Entered: 5/2/2003) |
| 4/30/2003 | 47 | MOTION by Alfred NMI Bourgeois to continue jury selection/jury trial , filed. (shytnen) (Entered: 4/30/2003) |
| 5/1/2003 | 48 | NOTICE of Setting : set Motions hearing for 1:30 5/6/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 5/2/2003) |
| 5/1/2003 | 58 | ORDER granting [47-1] motion to continue jury selection/jury trial as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/7/2003) |
| 5/5/2003 | 50 | MOTION by Alfred NMI Bourgeois for Rule 16 discovery , and Request for Disclosure of Under Brady/Agurs/Giglio and Jencks Act , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 51 | MOTION by Alfred NMI Bourgeois to determine admissibility of defendant's statements , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 52 | BRADY MOTION by Alfred NMI Bourgeois for discovery of all favorable evidence , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 53 | MOTION by Alfred NMI Bourgeois for jury questionnaire and memorandum of authorities in support thereof , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 54 | MOTION by Alfred NMI Bourgeois to compel Government to specify evidence to be used at trial , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 55 | MEMORANDUM OF POINTS AND AUTHORITIES by Alfred NMI Bourgeois in support of [50-2] motion to compel Disclosure of exculpatory evidence , filed. (kbledsoe) (Entered: 5/5/2003) |
| 5/5/2003 | 56 | |

USCA5 13

| | | |
|---|---|---|
| | | MOTION by Alfred NMI Bourgeois for Government funds for Expert Witness , filed. (SEALED by Court's instructions) (kbledsoe) Modified on 02/29/2004 (Entered: 5/5/2003) |
| 5/6/2003 | 57 | ORDER granting [50-1] motion for Rule 16 discovery as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/6/2003) |
| 5/6/2003 | 59 | Status Conference to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:26-2:20 App: Patti Booth f/govt; John Gilmore, Douglas Tinker f/dft. Case called; appearance of counsel. Ms. Booth states she has given open file and exhibit list. Ms. Booth states she has a proposed witness list. Discussion of psychologist. Ms. Booth will advise the court 5/25/03 regarding death penalty. Discussion of jury selection in July and September. Court sets jury selection ifcase is non-death penalty on 7/2/03 8:00 a.m. and if case proceeds as death penalty the case will be set 9/15/03 8:00 a.m. Court advises Mr. Booth she is the attorney in charge in this case. Court sets deadline for disclosures on 6/18/03 and if caseproceeds as death penalty the deadline is 8/4/03. Discussion of jury questionaire. Court advises attys they can agree on a questionaire. Court sets status conference for 6/19/03 9:00 a.m. Court grants motion for favorable discovery. Court to hear issue of jury questionaire and motion of admissibility of dft's statement's on 6/19/03 9:00 a.m. Court adjourns. (kbledsoe) (Entered: 5/7/2003) |
| 5/6/2003 | 60 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/7/2003) |
| 6/10/2003 | 61 | MOTION by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 6/10/2003) |
| 6/13/2003 | 62 | SEALED ORDER as to Alfred NMI Bourgeois granting [61-1] motion SEALED ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 6/16/2003) |
| 6/18/2003 | 63 | RESET NOTICE of Setting : reset status conference for 2:30 6/26/03 for Alfred NMI Bourgeois before Judge Janis Jack , filed. Parties ntfd. (kbledsoe) (Entered: 6/19/2003) |
| 6/19/2003 | 64 | SEALED CJA 21 (Signed by Judge Janis Graham Jack ) , entered. (kbledsoe) (Entered: 6/19/2003) |
| 6/23/2003 | 65 | Excludable Delay Worksheet XT start 2/12/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 6/23/2003) |
| 6/23/2003 | 66 | Excludable Delay Worksheet XE start 4/8/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 6/23/2003) |
| 6/23/2003 | 67 | Excludable Delay Worksheet XT start 4/14/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 6/23/2003) |

USCA5 14

| 6/23/2003 | 68 | Excludable Delay Worksheet XT start 5/6/03 as to Alfred NMI Bourgeois , filed. (ysanchez) (Entered: 6/23/2003) |
|---|---|---|
| 6/26/2003 | 69 | Status Conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lisa Hardwick digital 2;28-2:57 App: Patti Hubert Booth, Elsa Salinas-Patterson f/govt; John Gilmore f/dft. Case called; appearance of counsel. Discussion on status of death penalty question. Mtn for reciprocal discovery by Govt, no objection by dft. Court grants motion. Discussion on number of jurors to be brought in. Mr. Gilmore requests keeping the September date of trial whether death penalty or not. Court sets motions hearing for 8:00 a.m. 7/16/03. Court adjourned. (kbledsoe) (Entered: 6/30/2003) |
| 6/26/2003 | 70 | NOTICE of Setting : reset motions hearing/status conference for 8:00 7/16/03 for Alfred NMI Bourgeois before Judge Janis Jack , filed. Parties ntfd. (kbledsoe) (Entered: 6/30/2003) |
| 6/30/2003 | 71 | SEALED ORDER as to Alfred NMI Bourgeois granting [56-1] motion as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 7/2/2003) |
| 7/7/2003 | 72 | SEALED CJA 21 as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. (kbledsoe) (Entered: 7/8/2003) |
| 7/11/2003 | 73 | MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 7/11/2003) |
| 7/16/2003 | 74 | Motions/Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:55-3:43/4:07-4:49 App: Patti Booth, Elsa Salinas-Patterson, Tony Roberts f/govt; Douglas Tinker, John Gilmore f/dft. Case called; appearances of counsel. The Court distributes notebooks to the attys of record. Ms. Booth announced that the govt will seek the death penalty. The AUSA will file notice ot the court. The Court officially appoints Mr. Tinker as co-counsel to Mr. Gilmore. Discussion of FBI report from AUSA. AUSA offers GX#1. No objections by Mr. Tinker. Exhibit #1 admitted. Discussion of jury and trial issues. Court discusses sequestering the jury. Mr. Tinker request that Mr. Bourgeois be isolated in Nueces County Jail. The Court schedules the following dates. Court adjourned. (kbledsoe) (Entered: 7/21/2003) |
| 7/16/2003 | 75 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 7/21/2003) |
| 7/16/2003 | 84 | CJA 30 Appointment and Authority to Pay Court appointed Counsel (Douglas Tinker) , filed. (kbledsoe) (Entered: 8/5/2003) |
| 7/18/2003 | 76 | SCHEDULING ORDER setting Jury Trial for 8:00 2/16/04 for Alfred NMI Bourgeois ; before Judge Janis Graham Jack ( Signed by |

USCA5 15

| | | |
|---|---|---|
| | | Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 7/21/2003) |
| 7/21/2003 | 77 | CJA 20 as to Alfred NMI Bourgeois : Appointment of Attorney Douglas Tinker ( Appointed by Judge Janis Graham Jack ) , entered. (kbledsoe) (Entered: 7/21/2003) |
| 7/22/2003 | 78 | SECOND SUPERSEDING INDICTMENT as to Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) Modified on 08/13/2003 (Entered: 7/24/2003) |
| 7/23/2003 | 79 | NOTICE of Intent to seek the Death Penalty by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 7/24/2003) |
| 7/23/2003 | 80 | NOTICE of Setting : Arraignment for 11:00 7/25/03 for Alfred NMI Bourgeois before Magistrate Judge Jane Cooper-Hill , filed. Parties ntfd. (kbledsoe) (Entered: 7/24/2003) |
| 7/25/2003 | 81 | Arraignment held before Magistrate Judge Jane Cooper-Hill Ct Reporter: Kendra Bledsoe digital 11:03:37-11:07:05 App: Patti Hubert Booth f/govt; John Gilmore f/dft. Alfred NMI Bourgeois (1) count(s) 1ss , filed., Plea of Not Guilty: , count(s) 1ss Deft and Deft Atty John Gilmore both have copies of the 2nd Superseding Indictment and the Notice of Intent to Seek the Death Penalty. Deft waived the reading of the Indictment. The existing Scheduling Order entered by District Judge Janis Graham Jack will stand with no objections by any party. Dft remanded. (kbledsoe) (Entered: 7/25/2003) |
| 7/25/2003 | 82 | Excludable Delay Worksheet XT start 7/16/03 as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 7/25/2003) |
| 7/28/2003 | 83 | ORDER appointing co-counsel to represent Defendant Alfred Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 7/29/2003) |
| 7/30/2003 | 85 | CJA 30 Appointment and Authority to pay Court Appointed Counsel (John Gilmore) , filed. (kbledsoe) (Entered: 8/5/2003) |
| 8/4/2003 | 86 | AMENDED ORDER APPOINTING CO-COUNSEL to represent Defendant Afred Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 8/5/2003) |
| 8/5/2003 | 87 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Initial Appearance dates of June 28, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 8/8/2003) |
| 8/5/2003 | 88 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Arraignment for dates of April 10, 2003 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Kendra Bledsoe) (kbledsoe) (Entered: 8/8/2003) |

USCA5 16

| | | |
|---|---|---|
| 8/5/2003 | 89 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Arraignment Hearing for dates of August 5, 2002 before Judge Jane Cooper-Hill , filed. ( Court Rptr: Linda Smith) (kbledsoe) (Entered: 8/8/2003) |
| 8/11/2003 | 90 | NOTICE of Setting : set status conference for 8:00 10/24/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 8/11/2003) |
| 8/12/2003 | 91 | MOTION by Alfred NMI Bourgeois EXPARTE , and SEALED , filed. (kbledsoe) (Entered: 8/12/2003) |
| 8/12/2003 | 92 | MOTION by Alfred NMI Bourgeois Re: Teeth Impression , filed. (kbledsoe) (Entered: 8/12/2003) |
| 8/13/2003 | 93 | NOTICE of Setting : Motion hearing set for 2:00 8/14/03 as to: Alfred Bourgeois, re: (91-1) before Judge Janis Graham Jack , filed. Parties ntfd. (shytnen) (Entered: 8/13/2003) |
| 8/14/2003 | 94 | SEALED ORDER as to Alfred NMI Bourgeois granting [91-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [91-2] motion SEALED as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 8/14/2003) |
| 8/14/2003 | 95 | SEALED minute sheet as to Alfred NMI Bourgeois , filed. (shytnen) (Entered: 8/15/2003) |
| 8/14/2003 | 96 | SEALED EXHIBIT LIST as to Alfred NMI Bourgeois , filed. (shytnen) Modified on 02/29/2004 (Entered: 8/15/2003) |
| 8/14/2003 | 97 | Motion Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Digital 3:25-3:48 App: Patti Booth & Elsa Salinas Patterson f/govt; Doug Tinker f/deft. Telephone conference on Motion Hearing. - (DE #92 ) Case called. Appearances made. Discussion regarding extra set of teeth impressions. There are 2 sets of teeth. Ms. Booth states the second set is not as reliable as the 2nd set. Ms. Booth states that there is only one real set. Ms. Booth believes that the molds are destroyed in the making of the sets. Court suggests that Mr. Tinker can send expert to the teeth for inspection. Court states that Mr Tinker can take the deposition of the expert. The Court will authorize this expense. The expert that is being used is Dr. David Senn, he lives in Durango Co. The other Doctor is Dr. Oliver who had enhanced photographs. Ms. Booth is to provide the names, addresses, and phone numbers of the forensic odentologists. Hearing for tomorrow is canceled. Parties excused. Court adjourned. (shytnen) (Entered: 8/15/2003) |
| 8/14/2003 | 98 | ORDER granting [92-1] motion Re: Teeth Impression as to Alfred NMI Bourgeois (1) Teeth impressions taken from deft, his wife and daughter be made available to deft's experts for examination, |

USCA5 17

| | | |
|---|---|---|
| | | however the impressions are to remain in the possession of the United States at all times. United States to supply deft with copies of any and all photographs of any skin impressions made during the investigation of the bite marks in this case. United States to supply deft with copies of the field notes, work sheets or any other item or report made by any expert who has viewed the teeth impressions or attempted to identify the person who made the bite impressions on the deceased. United States to provide deft with phone numbers and addresses of the two forensic odontologiest who have examined the teeth impressions. ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 8/15/2003) |
| 8/15/2003 | 99 | ORDER vacating [94-1] sealed order ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (shytnen) (Entered: 8/15/2003) |
| 8/22/2003 | 100 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 8/26/2003) |
| 8/28/2003 | 101 | CJA 31 as to Alfred NMI Bourgeois : Request for Authorization and Voucher Expert and other Services (Death Penalty Proceedings) (Issued to Attorney John Gilmore) , entered. (kbledsoe) (Entered: 8/29/2003) |
| 8/29/2003 | 102 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Hearing for dates of January 8, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-17) (kbledsoe) Modified on 09/02/2003 (Entered: 9/2/2003) |
| 8/29/2003 | 103 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motion Hearing/Letter Hearing for dates of December 20, 2002 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-12) (kbledsoe) Modified on 09/02/2003 (Entered: 9/2/2003) |
| 8/29/2003 | 104 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motion Hearing/Continuance Hearing for dates of April 8, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-5) (kbledsoe) Modified on 06/23/2004 (Entered: 9/2/2003) |
| 8/29/2003 | 105 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Criminal Docket Hearing for dates of September 30, 2002 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-6) (kbledsoe) (Entered: 9/2/2003) |
| 8/29/2003 | 106 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Final Pretrial Conference Hearing for dates of March 20, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (pgs 1-39) (kbledsoe) (Entered: 9/2/2003) |
| 9/2/2003 | 107 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Conference Hearing for dates of February 12, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Lori Cayce) (1-8) (kbledsoe) |

|  |  | (Entered: 9/4/2003) |
|---|---|---|
| 9/2/2003 | 108 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Hearing Hearing for dates of April 10, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-9) (kbledsoe) (Entered: 9/4/2003) |
| 9/2/2003 | 109 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Hearing Hearing for dates of May 6, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-41) (kbledsoe) (Entered: 9/4/2003) |
| 9/2/2003 | 110 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Status Conference Hearing for dates of June 26, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Lisa Hardwick) (1-25) (kbledsoe) (Entered: 9/4/2003) |
| 9/2/2003 | 111 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Motions/Status Conference Hearing for dates of July 16, 2003 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-108) (kbledsoe) (Entered: 9/4/2003) |
| 9/26/2003 | 112 | MOTION by Alfred NMI Bourgeois EX PARTE , filed. (kbledsoe) Modified on 09/29/2003 (Entered: 9/26/2003) |
| 9/28/2003 | 113 | ORDER granting [112-1] motion EX PARTE as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 9/29/2003) |
| 10/8/2003 | 114 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE #194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/8/2003) |
| 10/8/2003 | 115 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE#194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/8/2003) |
| 10/8/2003 | 116 | MOTION by Alfred NMI Bourgeois EXPARTE , and TO SEAL , filed. (2/25/04-pursuant to DE #194, motion is hereby unsealed). (kbledsoe) Modified on 02/29/2004 (Entered: 10/8/2003) |
| 10/14/2003 | 117 | NOTICE of Setting : Motion hearing, set for 10:00 10/20/03 as to: Alfred Bourgeois, re: (116-1), (116-2), (115-1), (115-2), (114-1), (114-2) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 10/16/2003) |
| 10/15/2003 | 118 | DESIGNATION OF GOVERNMENT'S EXPERT WITNESSES by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 10/16/2003) |
| 10/20/2003 | 119 |  |

USCA5 19

| | | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Lori Cayce Digital: 10:07-10:23. (lrivera) (Entered: 10/21/2003) |
|---|---|---|
| 10/20/2003 | 121 | SEALED ORDER as to Alfred NMI Bourgeois granting [115-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [115-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/20/2003 | 122 | SEALED ORDER as to Alfred NMI Bourgeois granting [116-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [116-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/21/2003 | 120 | SEALED ORDER as to Alfred NMI Bourgeois granting [114-1] motion EXPARTE as to Alfred NMI Bourgeois (1), granting [114-2] motion TO SEAL as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 10/21/2003) |
| 10/21/2003 | 123 | SEALED EXPARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) Modified on 10/21/2003 (Entered: 10/21/2003) |
| 10/23/2003 | 124 | MEMORANDUM Regarding Sequestration of the Jury by USA as to Alfred NMI Bourgeois to , filed. (kbledsoe) (Entered: 10/23/2003) |
| 10/24/2003 | 125 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/24/2003) |
| 10/24/2003 | 126 | ORDER OF CONFINEMENT ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 10/24/2003) |
| 10/24/2003 | 127 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:54-9:56 Appearances: Patti Booth, Elsa Salinas-Patterson, Tony Roberts f/govt; Doug Tinker f/dft. Case called. Appearances made. Court states that Government filed a motion to oppose the sequestration of the jury. Court states that the Court won't do it. Ms. Booth states that she is more concerned with witness tampering instead of jury tampering. Mr. Tinker discusses expert witnesses and notes. Ms. Booth states that she will provide experts notes to Mr. Tinker. Court instructs Mr. Tinker to have his experts maintain all notes, records and log notes. Ms. Booth states that the teeth molds have not been made available to the Defendant. Court states that the molds are to be made available to the Defendant. Ms. Booth states that she has an initial report from Dr. Senn indicates that he can exclude Robin and Alfredesha as the biter but cannot exclude Mr. Bourgeois as the biter. Mr. Tinker is requesting the reports and worksheets from |

experts. Court orders Ms. Booth to provide information by noon next Friday. Mr. Tinker is asking if any of the witnesses had had a polygraph test administered. Mr. Tinker is asking for the questions that was asked of Robin Bourgeois. Mr. Tinker would like permission to speak with polygrapher. Court Orders Ms. Booth to think about giving the name of the polygraph administrator to Mr. Tinker. Court believes that there may be different ways for a polygraph to be administered and read, and the Court wants expert testimony that all polygraphs look a like and are administered the same. Court instructs Ms. Booth to give the questions and answers of polygraph. Court orders for the questions and answers be given to Mr. Tinker by noon, next Friday. Mr. Tinker states that it will take 6 months to complete report the mitigation experts investigation. Discussion regarding expert disclosure. Court states that the experts must be ready for trial. Mr. Tinker states that the DNA and teeth experts still are unable to go to work. Discussion regarding DNA. Ms. Booth states that the teeth are at UTSA. Court asks about anonymity of the jurors. Ms. Booth states that the AUSA is goingto ask for anonymity of the jurors. Mr. Tinker is asking about not even knowing the jurors names. Mr. Tinker objects. Mr. Tinker wants to know the names ofthe jurors. Court needs to hear on the record the reason why to empanel an anonymous jury . Ms. Booth states that she has not disclosed to the Defense the names of the witnesses. Ms. Booth states that the witnesses are afraid and asks for anonymity be put off as long as possible. Mr. Tinker is asking who the witnesses are afraid of. Ms. Boothstates that Mr. Bourgeois claims to have family members that are going to take care of witnesses. Ms. Booth states that there are several inmates that witness. And that Mr. Bourgeois went into detail about torturing a witness. Also, he has said thisto several people. Ms. Booth has spoken to family members. Court asked if a witness had been murdered. Ms. Booth states that the mother of the baby that was murdered, Katrina Harrison, was murdered. After an interview, Katrina was murdered. The man that murdered her was immediately incarcerated and then he killed himself. Ms. Booth states that Mr. Bourgeois claims to be a member of a prison gang. Mr. Tinker states that he has no evidence. AUSA has no evidence. Ms. Booth states that Mr. Bourgeois has been writing letters. Ms. Booth states that there are telephone calls from the jail, but she does not know the date of the phone calls. Discussion regarding letters. Mr. Bourgeois is inciting family against Robin. AUSA states that there was a burglary of the home while Robin was here. AUSA offers exhibits 1 and 2. For the purpose of these proceedings, Mr. Tinker has no objections. Court admits exhibit 1 and 2 are admitted for the purposes of this hearing. The letters refer to Lloyd. AUSA states that Lloyd is his brother. Discussion regarding writing materials. AUSA states that he is probably getting trustees to get things in and out of jail. Court states that the letters are trying to tell what people are to say. Mr. Bourgeois states that he will not write anymore letters. Mr. Bourgeois states that he has not made phone calls. Ms. Booth states that he has called to Uncle of his wife, Ms. King, and Lloyd. Ms. Booth states that she is going to pick up paperwork regarding phone calls. Court Orders Mr. Bourgeois can only call his attorney. Court

USCA5 21

| | | |
|---|---|---|
| | | has instructed defendant to not call or write anyone other than his attorneys. Court admonished Mr. Bourgeois in regards to his writing. Mr. Tinker states that Ms. Booth has provided thename and phone number of the polygraph operator. Ms. Booth will provide the questions and answers. Court reviews scheduling order. Court does not have a problem with providing names and addresses to the attorneys. Court believes that Mr. Bourgeois should have pen and paper to write things to his lawyers and mitigating experts. Court asks if Mr. Bourgeois is in solitary confinement. Court states that Mr. Bourgeois will have no free time except for 1 hour a day, which is supervised, and he will not have any contact with other inmates. Ms. Reddell will provide copy of the order to the jail. Ms. Booth states that there is blood that can be tested out of the truck. Court adjourned. Parties excused. (kbledsoe) (Entered: 10/29/2003) |
| 10/24/2003 | 128 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 10/29/2003) |
| 12/4/2003 | 129 | MOTION by Alfred NMI Bourgeois for Government Funds for Expert Witnesses with Memo of Law , filed. (kbledsoe) (Entered: 12/5/2003) |
| 12/5/2003 | 130 | MOTION by Alfred NMI Bourgeois for Psychiatric Exam , filed. (shytnen) (Entered: 12/8/2003) |
| 12/8/2003 | 131 | RESPONSE by USA as to Alfred NMI Bourgeois in opposition to [129-1] motion for Government Funds for Expert Witnesses , filed. (shytnen) (Entered: 12/8/2003) |
| 12/9/2003 | 132 | RESPONSE by USA as to Alfred NMI Bourgeois to [130-1] motion for Psychiatric Exam , filed. (kbledsoe) (Entered: 12/9/2003) |
| 12/9/2003 | 133 | NOTICE of Setting : Motion hearing, set for 10:00 12/10/03 as to: Alfred Bourgeois, re: (130-1), (129-1) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/9/2003) |
| 12/9/2003 | 134 | MOTION by Alfred NMI Bourgeois for continuance , filed. (kbledsoe) (Entered: 12/9/2003) |
| 12/10/2003 | 135 | Motions Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 10:08-11:04 Appearances: Patti Booth/Elsa Salinas-Patterson/Tony Roberts f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding competency issues. AUSA has no objections as long as the trial is not delayed. Discussion regarding investigators. Parties agree using Dr. Estrada. Court instructs parties to submit an agreed order this afternoon. AUSA states that Dr. Estrada is a possible witness. Court will not deprive AUSA of their witness. Court denies Defendants motion for continuance. Discussion regarding statements made by Defendant. Discussion regarding witness statements. Court states that AUSA can show |

USCA5 22

witness statements with redacted names. Defense is requesting mental health documentation on the child. AUSA states that there is a psychological report on the child. AUSA will submit the report to the Court under seal. Court orders that the witness statements are to be made available this afternoon; the documents are to be redacted so the persons and/or any indicia of identification cannot be determined. Discussion of defendants motion for expert witness in jury. Mr. Tinker states that he intends to file a motion to quash the jury list from which the jury panel will be chosen because the jurors are selected from the voter registration and does not include driver's license. Court states that the Southern District of Texas jury plan has been held as constitutional. Defense requests a copy of the jury plan and a list of names in the jury wheel. Court provides a copy of the jury plan. Court will allow a demographics expert as long as Defense will have a report within 30 days. Court states that the Court will not grant a continuance in this case and any experts that are appointed must be ready by trial date. Mr. Tinker also requests a jury selection expert. Discussion regarding a jury selection expert. AUSA opposes jury selection expert. Court is asking for the amount expert will charge. Court states that no one but attorneys will have access of the jury list. Court is requesting an estimate on experts fees for jury selection. AUSA suggests that an expert may be needed for jury selection, as well. Discussion regarding jury wheel - demographics, driver's license - statistics. Court states that the parties are to submit an agreed order on psychiatrist. If the parties cannot agree on a psychiatrist then theCourt will appoint BOP psychiatrist for the AUSA and a psychiatrist of Defense's choice. Defense is to notify case manager to verify that they have reviewed witness statements. Discussion regarding representation of the child. AUSA states that Pam Garcia was appointed to represent the child in state proceedings. Parties excused. Court adjourned. (kbledsoe) (Entered: 12/11/2003)

| Date | No. | Entry |
|------|-----|-------|
| 12/10/2003 | 136 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 2:49-3:43 (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | 137 | SEALED Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 | 138 | SEALED Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/11/2003) |
| 12/10/2003 |  | ORAL ORDER as to Alfred NMI Bourgeois denying [134-1] motion for continuance ( Entered by Judge Janis Graham Jack ) (kbledsoe) (Entered: 12/11/2003) |
| 12/12/2003 | 139 | MOTION and RESPONSE by Alfred NMI Bourgeois Concerning Law and Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors for Cause , filed. (kbledsoe) (Entered: 12/12/2003) |

| 12/12/2003 | 140 | MOTION AND MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois regarding Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors "For Cause" , filed. (kbledsoe) (Entered: 12/15/2003) |
|---|---|---|
| 12/14/2003 | 141 | ORDER granting [130-1] motion for Psychiatric Exam as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/15/2003) |
| 12/15/2003 | 142 | NOTICE of Setting : set status conference for 1:30 12/16/03 for Alfred NMI Bourgeois before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 12/15/2003) |
| 12/15/2003 | 143 | MOTION by Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 12/15/2003) |
| 12/16/2003 | 144 | SEALED OPPOSITION by USA as to Alfred NMI Bourgeois to [143-1] motion SEALED , filed. (kbledsoe) (Entered: 12/16/2003) |
| 12/16/2003 | 145 | MOTION by Alfred NMI Bourgeois to withdraw Motion for Continuance , filed. (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 146 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 1:26-3:07 (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 147 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 12/18/2003) |
| 12/16/2003 | 148 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/18/2003) |
| 12/19/2003 | 149 | AGREED ORDER COMMITTING DEFENDANT FOR EXAMINATION TO DETERMINE MENTAL COMPETENCY ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 12/19/2003) |
| 12/22/2003 | 150 | MOTION by USA as to Alfred NMI Bourgeois for leave to file Late Motion and Ask Permission to Notice the Court of an Additional Expert Witness , filed. (kbledsoe) (Entered: 12/23/2003) |
| 1/10/2004 | 151 | NOTICE of Setting : Motion hearing set for 2:00 1/16/04 as to: Alfred Bourgeois, re: (150-1) before Judge Janis Graham Jack , filed. Parties ntfd. (kbledsoe) (Entered: 1/12/2004) |
| 1/16/2004 | 153 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano Digital: 1:58-3:14 Appearances: Patty Booth, Tony Roberts, and Elsa Salinas-Patterson f/govt; Doug Tinker and John Gilmore f/deft. Discussion regarding corrections to the jury instructions. Discussion regarding experts. DNA expert. Court approves Defendant's expert |

USCA5 24

| | | |
|---|---|---|
| | | for jury selection at $50 per hour. Discussion regarding Daubert motions. Defense does not intend to file any daubert motions. Defense is proved list of persons with relevant knowledge to the Court by February 2, 2004. Parties agree to stipulate that Defedant is over 18 years of age. Court grants motion for leave to designate an expert witness. Expert testimony motions are to be filed by Friday, January 23, 2004. Discussion regarding jury panel on February 9th. Court sets scheduling conference on Thursday, January 29, 2004 at 1:30 pm. (amireles) (Entered: 1/21/2004) |
| 1/16/2004 | 154 | ORDER Set status conference for 1:30 1/29/04 for Alfred NMI Bourgeois before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (amireles) (Entered: 1/21/2004) |
| 1/16/2004 | 155 | ORDER granting [150-1] motion for leave to file Late Motion and Ask Permission to Notice the Court of an Additional Expert Witness as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (amireles) (Entered: 1/21/2004) |
| 1/16/2004 | 156 | REQUEST by USA as to Alfred NMI Bourgeois for corrections/deletions/additions to court's proposed trial and sentencing instructions and voir dire (tabs a through g) , filed. (amireles) (Entered: 1/21/2004) |
| 1/20/2004 | 152 | Forensic Psychiatric Report (SEALED) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 1/20/2004) |
| 1/21/2004 | 157 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. Copy of order mailed to Gerald Bierbaum by regular and certified mail. (kbledsoe) (Entered: 1/23/2004) |
| 1/21/2004 | 158 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 1/23/2004) |
| 1/21/2004 | 159 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 2:57-3:18/3:47-3:59 Appearances: Booth, Tony Roberts, Elsa Salinas-Patterson f/govt; Doug Tinker, John Gilmore f/dft. Case called. Appearances made. Discussion regarding Dr. Estrada's report. Discussion regarding witnesses names. Court instructs Defense to reveal the names of both the witnesses and their attorneys to Defense. Court orders for deadline for reciprocal discovery on guilt and innocense phase is due on Friday, January 30, 2004. Discussion regarding report from Dr. Estrada. Discussion regarding statements made by mitigating investigator, Gerald Bierbaum. Court instructs defense to have Mr. Bierbaum appearin court via telephone. Discussion regarding exchange of sentencing witnesses. Discussion regarding to redacting Dr. Estrada's report. Gov't is to provide the redacted report to the Court. Recess. Resume. Court recalls case. Investigator Gerald Bierbaum appears by phone. Mr. Bierbaum sworn. Discussion regarding statements made by investigator |

| | | |
|---|---|---|
| | | Bierbaum. Court orders Mr. Bierbaum not to tell anyone that he is court appointed to investigate this case. Mr. Bierbaum will not invoke the name of the Court. Mr. Bierbaum states that his address is 1744 Norfolk, Houston , Texas 77098; phone 713 572-2333. Court admonishes Mr. Bierbaum. Court provides copy of Dr. Estrada's report to Defense. Dft remanded. (kbledsoe) (Entered: 1/24/2004) |
| 1/26/2004 | 160 | MOTION by Alfred NMI Bourgeois in limine , filed. (kbledsoe) (Entered: 1/27/2004) |
| 1/29/2004 | 161 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 1/29/2004) |
| 1/29/2004 | | Per Deanne with John Gilmore's office, DE #161 does not need to be sealed. (kbledsoe) (Entered: 1/29/2004) |
| 1/29/2004 | 162 | AGREED MOTION by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 1/29/2004) |
| 1/29/2004 | 163 | ORDER granting [161-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 1/29/2004) |
| 1/29/2004 | 164 | SEALED ORDER as to Alfred NMI Bourgeois granting [162-1] motion SEALED ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 03/12/2004 (Entered: 1/29/2004) |
| 2/3/2004 | 165 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/3/2004) |
| 2/4/2004 | 166 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/4/2004) |
| 2/4/2004 | 167 | COMMENTS ON JURY QUESTIONAIRE by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/4/2004) |
| 2/4/2004 | 168 | MOTION AND RESPONSE by USA as to Alfred NMI Bourgeois SEALED , filed. (kbledsoe) (Entered: 2/4/2004) |
| 2/5/2004 | 169 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 2/5/2004) |
| 2/5/2004 | 170 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/6/2004) |
| 2/5/2004 | 171 | APPLICATION by USA for Writ of Habeas Corpus ad Testificandum as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/6/2004) |

| | | |
|---|---|---|
| 2/9/2004 | 172 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 2/9/2004) |
| 2/9/2004 | 173 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/9/2004) |
| 2/9/2004 | 174 | WRIT of Habeas Corpus ad Testificandum issued for Adam Longoria on 2/16/04 in case as to Alfred NMI Bourgeois . (kbledsoe) Modified on 02/09/2004 (Entered: 2/9/2004) |
| 2/9/2004 | 175 | Jury Qualification as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 7:59-8:39/ 8:59-10:28/10:36-10:46/11:22-11:25/11:30-11:32/ 1:41-2:58/3:41-4:10/4:33-4:37/4:38-4:44 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding jury qualification. Discussion regarding challenges for cause and peremptory challenges. If both sides strike, the Court will consider that a joint strike and will not count against the peremptory challenges. Court conducts Jury Qualification. Discussion regarding jurors that were excused. Jurors instructed to complete questionnaire. Recess. Discussion regarding notes from prospective jurors. Resume. Court begins afternoon Qualification. Discussion regarding jurors that were excused. Jurors instructed to complete questionnaire. Parties excused. Court Adjourned. (kbledsoe) (Entered: 2/13/2004) |
| 2/9/2004 | 184 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/17/2004) |
| 2/10/2004 | 176 | Instanter Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 11:43-11:46 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding responses in questionnaire no. 43. Court collects all copies of questionnaire no. 43. Parties excused. Court adjourned. (kbledsoe) (Entered: 2/13/2004) |
| 2/10/2004 | 177 | Jury Qualification as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 1:45-1:48 Appearances: Patti Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Court explains to counsel that the jury was released. Court will reset jury service. Parties excused. Court adjourned. (kbledsoe) (Entered: 2/13/2004) |
| 2/11/2004 | 178 | Docket Entry as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 02/13/2004 (Entered: 2/12/2004) |
| 2/12/2004 | 179 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) Modified on 02/13/2004 (Entered: |

USCA5 27

| | | |
|---|---|---|
| | | 2/13/2004) |
| 2/12/2004 | 180 | ORDER granting [176-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 02/13/2004 (Entered: 2/13/2004) |
| 2/12/2004 | 181 | CORRECTIONS TO TAB G-JURY INSTRUCTIONS by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 02/13/2004 (Entered: 2/13/2004) |
| 2/13/2004 | 182 | EX PARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (3/1/04-Refer to DE#185) (kbledsoe) Modified on 03/01/2004 (Entered: 2/13/2004) |
| 2/13/2004 | 183 | EXPARTE ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (3/1/04-Refer to De#185) (kbledsoe) Modified on 03/01/2004 (Entered: 2/13/2004) |
| 2/16/2004 | 185 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:25-9:15/9:35-10:42/ Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding Defendants Motion in Limine. Court in Limines testimony in the guilt and innocence phase except the allege confession to the inmate. Court will grant in Limine on everything else and will consider the testimony out of the presence of the jury. Discussion regarding experts testifying. Court instructs parties to provide summaries on anticipated expert testimony. Discussion regarding EEG. Court provides a copy of the report from Dr Cunningham that was filed with the Defense's exparte order. Defense had agreed to not seal exparte orders. Court instructs Defense to obtain a complete report from Dr. Cunningham. Court reviews expert testimony rules under 702, 703, and 705 - regarding summary, basis and reason of opinions. Court sets deadline for summaries to be exchanged no later than the time the final juror is selected. Discussion regarding belt on Defendant. Recess. Resume. Qualification of jury. Discussion regarding jurors excuses. Jurors instructed to complete questionnaire. Recess. Resume. Court instructs parties to submit agreed strikes on first 75 jurors. Discussion regarding questions that the prospective jurors may have. Court reviews excused jurors. Parties excused. Court Adjourned. (kbledsoe) (Entered: 2/18/2004) |
| 2/16/2004 | 186 | SECOND MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 2/18/2004) |
| 2/17/2004 | 187 | THIRD MOTION by USA as to Alfred NMI Bourgeois for Reciprocal Discovery , filed. (kbledsoe) (Entered: 2/18/2004) |
| 2/19/2004 | 188 | |

| | | |
|---|---|---|
| | | Status Conference & Jury Selection-Day 1 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:11-9:32/11:13-12:47/1:07-4:06 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Discussion regarding general voir dire. Discussion having Dr. Winer conducting exam on Defendant. Discussion regarding medical situation on Defendant. Court states that the juror information forms will be available at the podium during individual voir dire. Court reads into the record numbers of jurors that were excused from the afternoon because of their names being called out in the atrium. Court excuses juror 203. Jury Selection continued. Jurors in. Jurors present are the following: 1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 21, 27, 28, 30, 33, 34, 37, 44. Jurors sworn. Small group voir dire. Individual voir dire. Recess. Resume. Continue individual voir dire. Juror no. 7 is selected. Recess. Resume. Continue individual voir dire. Juror 11 and 21 are selected. Recess. Resume. Continue individual voir dire. Parties excused. Court adjourned. (kbledsoe) Modified on 02/24/2004 (Entered: 2/22/2004) |
| 2/19/2004 | 189 | JOINT MOTION by USA and Alfred NMI Bourgeois regarding Agreed Strikes for Cause , filed. (kbledsoe) (Entered: 2/22/2004) |
| 2/19/2004 | | Voir dire begun as to Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 2/24/2004) |
| 2/20/2004 | 190 | Status Conference & Jury Selection-Day 2 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:25-10:14/10:31-12:12/1:14-3:03 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Court grants strike for cause on juror no. 44. Discussion regarding challenges for cause. Jury selection continued. Jurors in. Jurors present are the following: 20, 23, 29, 36, 38, 40, 41, 42, 46, 47, 49, 50, 51, 54, 56, 57, 58, 64, 65, 66, 69, 70, 72, 74, 76, 77, 79, 80, 81. Jurors sworn. Court conducts small group voir dire. Jurors excused. Court conducts individual voir dire. Recess. Resume. Juror nos. 40, 57, and 64 are selected. Recess. Resume individual voir dire. Juror no. 76 selected. Discussion regarding child protective services records. Court states that the from CPS are to be submitted to the Court for in-camera inspection. Discussion regarding making witness statements available to the Defense. Parties excused. Court adjourned. (kbledsoe) Modified on 02/24/2004 (Entered: 2/22/2004) |
| 2/22/2004 | 191 | ORDER granting [189-1] joint motion regarding Agreed Strikes for Cause as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/24/2004) |
| 2/23/2004 | 192 | Jury selection-Day 3 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:22-10:19/10:44-12:10/1:32-3:24/3:41-5:23 Appearances: Patty Booth/Tony Roberts/Elsa Salinas Patterson f/govt; Doug |

USCA5 29

| | | Tinker/John Gilmore f/dft. Case recalled. Court explains that the CPS records have been released to the Court. CPS workers, Chuck Thompson and Tabitha Palmroy, sworn. Court questions CPS workers as to the true and correct copy of the documents. CPS workers excused. Jury in. Jurors present for voir dire are the following: 17, 22, 32, 59, 71, 82, 83, 87, 89, 92, 93, 95, 96, 99, 100, 101, 102, 103, 105, 106,107,109,110,111, 112, 113, 115, 118, 120, 121, 123, 124, 126, 129, and 130. Jurors sworn. Court conducts small group voir dire. Jurors excused. Court conducts individual voir dire. Recess. Resume. Parties agree to select 4 alternates. Juror 96 is selected. Recess. Resume. Juror no. 105, 115 and 124 selected. Dft remanded. Parties excused. Court adjourned. (kbledsoe) (Entered: 2/24/2004) |
| --- | --- | --- |
| 2/23/2004 | 195 | EX PARTE SEALED DOCUMENTS (5 volumes) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/27/2004) |
| 2/24/2004 | 193 | Jury selection-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:24-10:27/10:43-12:18/1:36-3:05/3:35-5:16 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case recalled. Council present. Court announces that parties are allowed 5 strikes each for alternate jurors. Jury selection continued. Prospective jurors in. Jurors present are the following: 94, 98, 14, 125, 131, 132, 133, 134, 136, 137, 139, 140, 142, 143, 145, 146, 147, 148, 149, 150, 152, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163, 166, 169, 171, 175. Jurors sworn. Juror no 133 selected. Recess. Resume. Juror voir dire continued. Parties excused. Court adjourned. (kbledsoe) (Entered: 2/25/2004) |
| 2/25/2004 | 194 | ORDER granting [187-1] motion for Reciprocal Discovery as to Alfred NMI Bourgeois (1) set status conference for 10:00 1/27/04 before Judge Janis Graham Jack ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 2/25/2004) |
| 2/25/2004 | 196 | Jury selection-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:24-8:25/8:49-10:27/11:00-12:15 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft.Case re-called. Council present. Discussion regarding the alternate jurors. Jury selection continued. Prospective jurors in. Jurors present are the following: 156, 177, 179, 181, 182, 184, 185, 187, 188, 192, 193, 195, 196, 200, 202, 213, 215, 216, 218, 219, 221, 222, 224, 225, 228, 233, 234, 235, 239, 241, 246. Jurors sworn. Juror nos 156, 188, 192 are selected as alternates. Discussion regarding jury charge. Discussion regarding reports from experts. Court sets deadline for Friday, at 10:00 am for reports from experts. Dr. Winers report due Wednesday at noon. Court asks parties if there is any reason why this jury cannot be seated. No objections by either sides. Court allows opening arguments 30 minutes for each side. Discussion regarding reports, CV, and publications of experts. Court sets Daubert hearing on Friday, February 27, 2004, at 10:00 am. |

USCA5 30

| | | Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 2/29/2004) |
|---|---|---|
| 2/25/2004 | 197 | SEALED Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack digital 8:25-8:49 (kbledsoe) (Entered: 2/29/2004) |
| 2/25/2004 | 198 | Court's Exhibit (SEALED) as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/29/2004) |
| 2/26/2004 | 199 | APPLICATION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 2/29/2004) |
| 2/27/2004 | 200 | WRIT of Habeas Corpus ad Testificandum issued for Travis Bowser on 3/1/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 2/29/2004) |
| 2/27/2004 | 201 | MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois in Opposition to Introduction of Expert Evidence on Premeditation , filed. (kbledsoe) (Entered: 2/29/2004) |
| 3/1/2004 | 202 | MOTION by USA as to Alfred NMI Bourgeois in limine regarding reference to punishment while questioning witnesses and regarding the health of witness Karen Jackson , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/1/2004 | 203 | Daubert and Exhibits Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano 8:22-10:13/11:42-11:54/1:16-1:27/2:42-3:02 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Court requests from Defense case law on premeditation. Court states that experts cannot testify on premeditation. Mr. Tinker offers exhibits 1 and 2. Court admits exhibits 1 and 2. Defense calls George W. Holden. Witness sworn. Direct. Cross. Re-direct. Mr. Tinker and Ms. Booth agreed that they have reviewed the CPS records that were filed under seal. Re-cross. Discussion regarding rule 704b. Expert cannot testify as to premeditation. Witness excused. Defense calls Dr. Joseph Rupp. Sworn. Direct. Court sustains daubert challenge. Cross. Witness excused. Discussion regarding Govts motion in Limine. Deft does not oppose the motion in Limine. Court grants govt's motion in Limine. Court advises that Mr. Bourgeois can add another attorney at anytime. Recess Resume. Government offers the following exhibits. 1, 2, 3, 4, 5, 6-30, 31, 32, 60, 67, 68-78, 79-90, 91-102, 103-112, 113-121, 122-136, 137 -145, 225-302, 304, 310-313, 315-318, 319-326, 342, 350-356, 357. Court admits govt exhibits 1, 2, 3, 4, 5, 6-30, 31, 32, 60, 67, 68-78, 79-90, 91-102, 103-112, 113-121, 122-136, 137-145, 225-302, 304, 310-313, 315-318, 319-326, 342, 350-356, 357. Parties are to give exhibits to clerk. Recess. Resume. Govt offers 327, 328. Exhibits 327, 328 admitted. Govt offers 334, 343, 344, 345, 346, 347, 348, 349. Court |

USCA5 31

| | | |
|---|---|---|
| | | admits 334, 343, 344, 345, 346, 347, 348, 349. Discussion regarding CPS records. Court allows both parties to review CPS reports regarding Robin Bourgeois. Discussion regarding TRO's filed by wife. Court will in Limine TRO's until items become relevant. Recess. Resume. Discussion regarding letters from Robin. Discussion regarding with opening statements. Court states that eachside is allowed 30 minutes for opening arguments with a 2 minute warning. Discussion regarding 302's on witnesses. Discussion regarding jury charge. Court will resume at 8:00 am tomorrow. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/7/2004) |
| 3/1/2004 | 204 | Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/1/2004 | 205 | Exhibit list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/1/2004 | 206 | Jury list as to Alfred NMI Bourgeois , filed. 12 jurors and 4 alternates selected. (kbledsoe) (Entered: 3/7/2004) |
| 3/1/2004 | 207 | ORDER granting [202-1] motion in limine as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/7/2004) |
| 3/2/2004 | 208 | Witness list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/2/2004 | 209 | Jury trial-Day 1 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:02-8:09/8:18-10:21/10:38-12:15/1:12-3:23/3:50-5:51 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft., filed. Case re-called. Counsel present. Discussion regarding exhibits. Discussion regarding substituting pictures for the tangible evidence at the end of the trial. Jury in. Jury sworn. Opening statements. Govt calls witness #1Karen Ann Jackson. Sworn. Direct. Cross. Redirect. Excused. Govt calls witness #2 - Gladysbell Barreto. Sworn. Direct. Cross. Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #3 - Beth Lewis. Direct. Cross. Excused. Govt calls witness # 4 - Nena Mennor. Sworn. Direct. Cross. Govt calls witness #5 - Hal Frederick Resides. Sworn. Direct. Govt offers no. 358. No objections. Govt exhibit no. 358 admitted. Cross. Govt calls witness #6 - Carl Mead Arnoux. Sworn. Direct. Govt offers no. 359. No objections. Govt exhibit no. 359 admitted. Cross. Re-direct. Re-cross. Excused. Govt calls witness #7. - Karen Krueger. Sworn. Direct. Jury out. Recess. Resume. Jury in. Witness #7-recalled. Cross. Re-direct. Re-cross. Govt calls witness #8- Joni Dee Parker. Sworn. Direct. Cross. Excused. Govt calls witness #9- Timothy Darr. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #10 - John Burgess. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness #11 - David Paoletti. Sworn. Direct. Cross. |

USCA5 32

| | | |
|---|---|---|
| | | Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #12 - Michael Brozgal. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #13 - Michael Boyd. Sworn. Direct. Cross. Excused. Govt calls witness #14 - William Smith. Sworn. Direct. Cross. Excused. Govt calls witness #15 - Craig Rudolf. Sworn. Direct. Cross. Excused. Govt calls witness #16 - Robin Bourgeois. Sworn. Direct. Jury out. Court advises witness #16 - Robin Bourgeois, right to an counsel. Ms. Bourgeois states that she does not request an attorney. Recess. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/7/2004) |
| 3/3/2004 | 210 | Jury trial-Day 2 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:15-10:26/10:47-11:46/12:52-1:16/1:44-3:45/4:14-5:23 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. , filed. (Terminated motions - ) Case re-called. Counsel present. Discussion regarding testimony of Robin Bourgeois. Witness Robin Bourgois takes stand. Court advises Ms. Bourgeois of her right to an attorney. Ms. Bourgeios waives her right to remain silent and waives right to attorney. Court has Atty, Hector Del Toro, on standby for witness Robin Bourgeois. Govt offers exhibit no 361. No objections. Govt exhibit no. 361 admitted. Jury in. Testimony of govt witness #16 - Robin Bourgeois continues. Govt offers exhibit no. 314. No objections. Govt exhibit no. 314 admitted. Jury out. Court excuses Atty Hector Del Toro. Recess. Resume. Govt offers exhibits no. 308, 309. No objections. Exhibits no. 308, 309 are admitted. Govt offers exhibits no. 305, 306, 307. No objections. Exhibits no. 305, 306, 307 are admitted. Govt offers exhibit no. 303. No objection. Govt exhibit 303 is admitted. Jury in. Direct Testimony continues on Robin Bourgeois. Jury out. Recess. Resume. Discussion regarding exhibits. Govt offers exhibits 360, 330, 333. No objections. Govt exhibits 360, 330, 333 admitted. Govt offers 332, 362, 363. No objections. Govt exhibts 332, 362, 363 admitted. Govt offers 364, 365, 366, 367. No objections. Govtexhibits 364, 365, 366, 367 are admitted. Jury in. Govt offers exhibits 329, 330, 332. No objections. Govt exhibits 329, 330 332 admitted. Defense moves for a mistrial. Court denies motion. Defts offer exhibits 1-5. No objections. Defts exhibits 1-5are admitted. Direct continues on Robin Bourgeois. Deft withdraws exhibit no. 1. No objection. Defts exhibit no.1 withdrawn. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/7/2004) |
| 3/3/2004 | 211 | Exhibit list by Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/4/2004 | 212 | MEMORANDUM OF LAW by USA as to Alfred NMI Bourgeois regarding alleged Prejudicial Testimony about a polygraph test and Response to Defendant's Motion for Mistrial , filed. (kbledsoe) (Entered: 3/7/2004) |
| 3/4/2004 | 213 | |

USCA5 33

| | | |
|---|---|---|
| | | Jury trial-Day 3 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:19-8:22/8:30-10:35/11:00-11:55/1:06-3:14/3:41-5:38 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft., filed. (Terminated motions - ) Case called. Counsel present. Defense re-offers defendants exhibit no. 1. No objections. Court admits Defts exhibit no. 1. Witness #16 - Robin Bourgeois retakes stand. Cross. Re-direct. Re-cross. Jury out. Recess. Resume. Discussion regarding testimony of Robin Bourgeois. Excused. Govt calls witness #17 - Joe Merced Suarez. Sworn. Direct. Cross. Excused. Jury out. Recess. Resume. Jury in. Govt calls witness #18 Adolfo Yzaguirre . Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #19 - Julie Ann Bissell. Sworn. Direct. Cross. Re-direct. Govt calls witness #20 - Amy Ford. Direct. Govt offers exhibit 369. No objections. Govt exhibit 369 is admitted. Govt offers exhibits 370 and 371. No objections. Govt exhibits 370 and 371 are admitted. Govt offers exhibit 372. No objections. Govt exhibit 372 is admitted. Cross. Defense offers exhibits 6-31. No objections. Defts Exhibits 6-31 are admitted. Re-direct. Deftoffer exhibit no. 32. No objections. Deft exhibit no. 32 admitted. Re-cross. Excused. Govt calls witness #21 - Anthony Dumas. Sworn. Direct. Govt offers exhibits 373. No objections. Exhibit 373 admitted. Cross. Re-direct. Excused. Jury out. Jury in. Govt calls witness #22 - Andrew Udinsky. Sworn. Direct. Re-direct. Cross. Excused. Govt calls witness #23 - Robert Patterson. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness #24 - AB-1994. Sworn. Direct. Jury out. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/7/2004) |
| 3/5/2004 | 214 | Jury trial-Day 4 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:32-8:32/8:37-10:29/10:45-12:54 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft., filed. (Terminated motions - ) Case continued. All counsel present. Direct testimony continues on AB-1994. Cross. Re-direct. Govt calls witness #25 - Dr. Scott Benton. Sworn. Direct. Govt offers exhibits 375 and 376. No objections. Exhibits 375 and 376 are admitted. Cross. Excused. Govt calls witness #26 - Caroline Zervos. Sworn. Direct. Jury out. Discussion regarding chain of custody of evidence. Jury in. Direct continues on witness #26. Cross. Govt calls witness #27 - Tony Onorato. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness #28 - Audrell Leonard. Sworn. Direct. Cross. Re-direct. Re-cross. Re-direct. Excused. Govt calls witness #29 Stacy Williams. Sworn. Direct. Cross. Govt calls witness #30 - Jason Dumas. Sworn. Direct. Excused. Jury instructed to report at 8:30 am on Monday morning. Jury out. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/7/2004) |
| 3/5/2004 | 215 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/7/2004) |
| 3/5/2004 | 216 | |

USCA5 34

| | | |
|---|---|---|
| | | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Defendant's Opening Statement for dates of 3/2/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-7) (kbledsoe) (Entered: 3/7/2004) |
| 3/8/2004 | 217 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Questioning of Juror No. 14 for dates of 2/19/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (kbledsoe) (Entered: 3/9/2004) |
| 3/8/2004 | | Text not available. (Entered: 3/11/2004) |
| 3/8/2004 | | Text not available. (Entered: 3/11/2004) |
| 3/8/2004 | 218 | Jury trial-Day 5 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:07-9:16/9:26-10:35/10:51-12:18/1:17-3:11/3:28-4:48/ 5:00-5:45 Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; DougTinker/John Gilmore f/dft. , filed. (Terminated motions -, ) Case continued. Counsel present. Discussion regarding exhibits. Govt calls Dr. William Oliver. Sworn. Direct. Govt calls Carol McLaughlin. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Dr. Ronald Richard Kuffel, Jr. Sworn. Direct. Govt offers exhibit 378. No objections. Court admits Govts exhibit no. 378. Witness Excused. Discussion regarding testimony of Dr. Elizabeth Rouse. Jury out. Govt calls Dr. Elizabeth Rouse. Sworn. Direct. Cross. Govt offers exhibits 148, 149, 35, 49, 46, 40, 53, 42, 43, 33, 52, 38, 51, 63, 61, 62, 58, 57, 55, 56, 59,41. Defense objects on the basis of the inflammatory nature of the photos. Court admits Govt exhibits 148, 149, 35, 49, 46, 40, 53, 42, 43, 33, 52, 38, 51, 63, 61, 62, 58, 57, 55, 56, 59, 41. Govt offers exhibits 150-224. Defense objects on the basis of the inflammatory nature of the photos. Court admits Govt exhibits 150-224. Jury in. Direct continues. Cross. Excused. Jury out. Recess. Resume. Jury in. Govt calls Dr. William Oliver. Sworn. Direct. Cross. Re-direct. Excused. Govt offers exhibits no. 379, 380, and 381. No objections. Court admits govts exhibits 379, 380, 381. Govt calls Dr. David Senn. Sworn. Direct. Cross. Re-direct. Re-cross. Govt calls Dr. Brian Chrz. Sworn. Direct. Jury out. Recess. Resume. Jury in. Direct continues. Jury out. Discussion regarding next witness Sheretta Collins. Court sustains objections. Parties excused. Court adjourned. (kbledsoe) (Entered: 3/11/2004) |
| 3/9/2004 | 219 | Jury trial-Day 6 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:16-8:26/8:33-10:04/ Appearances: Patty Booth/Tony Roberts/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. , filed. (Terminated motions -, [186-1] motion for Reciprocal Discovery (1), motion for Travel Authorization (1), [168-1] motion SEALED , [160-1] motion in limine , [156-1] motion for corrections/deletions/ additions to court's proposed trial and sentencing instructions and voir dire (tabs a |

USCA5 35

through g) , [143-1] motion SEALED , [139-1] motion Concerning Law and Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors for Cause , [140-1] motion regarding Capital Questions in Proposed Juror Questionaire and Issues regarding Disqualification of Jurors "For Cause" , [129-1] motion for Government Funds for Expert Witnesses , [73-1] motion for continuance , [54-1] motion to compel Government to specify evidence to be used at trial , [53-1] motion for jury questionnaire , [51-1] motion to determine admissibility of defendant's statements , [50-2] motion Request for Disclosure of Under Brady/Agurs/Giglio and Jencks Act , [42-1] motion for Reciprocal Discovery, ). Case continued. All counsel present. Discussion regarding potential witnesses. Witness Bryan Chrz re-takes stand. Jury in. Cross. Re-direct. Re-cross. Re-redirect. Excused. Jury out. Govt calls Dr. Noorullah Akhtar. Sworn. Direct. Cross. Excused. Govt calls Nathaniel Banks. Sworn. Direct. Govt offers exhibit 384. No objections. Govts exhibit 384 is admitted. Cross. Govt calls Dana Banks. Sworn. Direct. Excused. Jury out. Recess. Resume. Discussion regarding testimony of witnesses. Govt calls Shereta Collins. Sworn. Direct. Excused. Govt calls Claudia Williams. Sworn. Direct. Excused. Govt calls Mike Harris. Sworn. Direct. Excused. Jury out. Jury in. Govt calls Darrick Bernard Moore. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Orlando Campos. Sworn. Direct. Cross. Re-direct. Excused. Jury out. Recess. Resume. Jury in. Govt calls Wiley Taylor. Sworn. Direct. Cross. Re-direct. Excused. Govt calls Megan Beckett. Sworn. Direct. Cross. Excused. Defense moves for instructed verdict insufficient in finding of guilt in particular first degree murder and premeditation. Court finds that there is evidence to support the finding of premeditation. Court denies motion. Parties excused. (kbledsoe) (Entered: 3/11/2004)

| 3/9/2004 | 220 | ORDER Allowing Travel Expense ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/11/2004) |
| --- | --- | --- |
| 3/10/2004 | 221 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/11/2004) |
| 3/11/2004 | 222 | ORDER granting [221-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/11/2004) |
| 3/11/2004 | 223 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Claudia Williams for dates of 3/9/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-14) (kbledsoe) (Entered: 3/12/2004) |
| 3/11/2004 | 224 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Dr. Elizabeth Rouse for dates of 3/8/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (1-68) (kbledsoe) (Entered: 3/12/2004) |

USCA5 36

| | | |
|---|---|---|
| 3/12/2004 | 225 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 226 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 227 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 228 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 229 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 230 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 231 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 232 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 233 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge B. J. Ellington ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 234 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. Copies provided to counsel. (kbledsoe) Modified on 03/12/2004 (Entered: 3/12/2004) |
| 3/12/2004 | 235 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 236 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 237 | ORDER granting [236-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |

USCA5 37

| | | |
|---|---|---|
| 3/12/2004 | 238 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/12/2004 | 239 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 3/12/2004) |
| 3/14/2004 | 240 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 241 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial Day 2 Hearing for dates of March 3, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 242 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial Day 3 Hearing for dates of March 4, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 243 | ORDER granting [240-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 244 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Testimony of Robin Bourgeois Hearing for dates of March 2-3, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 245 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Transcript of Testimony of AB1994 Hearing for dates of March 4-5, 2004 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (lrivera) (Entered: 3/15/2004) |
| 3/14/2004 | 246 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 247 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 248 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 249 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |

| | | |
|---|---|---|
| 3/14/2004 | 250 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 251 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 252 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 253 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) Modified on 03/17/2004 (Entered: 3/16/2004) |
| 3/14/2004 | 254 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 255 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 256 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 257 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 258 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 259 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 260 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/16/2004) |
| 3/14/2004 | 261 | Jury trial-Day 7 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:34-9:47/10:17-10:41/1:11-2:03/2:20-2:25 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. , filed. (Terminated motions -, ). Case continued. Counsel present. Discussion regarding testimony of Alfred Bourgeois. Jury in. Defense calls Alfred Bourgeois. Sworn. Direct. |

USCA5 39

| | | |
|---|---|---|
| | | Cross. Jury out. Defense moves for a mistrial. Objection to video tape. Court denies motion for mistrial. Jury in. Cross continues. Witness stands down. Defense rests. Jury out. Recess. Resume. Discussion regarding evidence. Govt re-calls Megan Beckett. Direct. Excused. Govt calls Cort Scharn. Sworn. Direct. Excused. Govt closes. Defense closes. Jury instructed to return at 8:30a.m. tomorrow. Discussion regarding alternate jurors. Discussion regarding jury charge. Mr. Tinker moves for an instructed verdict or moves for an acquittal. Court denies motion. Recess. Resume. Court provides copy of charge to parties. No objections to charge or verdict form. Discussion regarding closing arguments and time warnings. Parties excused. Court adjourned. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 262 | Jury trial-Day 8 as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gnao digital 8:25-10:30/10:42-10:49/12:18-12:37 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. , filed. (Terminated motions - ). Case continued. All counsel present. No objections to charge and jury form. Discussion regarding alternate jurors. Jury in. Closing arguments. Court charges jury. Alternate jurors are excused to a separate jury room. Jurors deliberate. Recess. Jury note no.1 "We have reached a unanimous verdict." Resume. Jury in. Jurors polled. Defendant is found guilty on Count One of the Indictment. Court instructs the jury to return at 8:30 am Thursday. Jurors excused. Alternate jurors advised to return at 8:30 on Thursday. Alternate jurors excused. Discussion regarding Defense witnesses to be present on Friday. Discussion regarding evidence. Juror note no. 2 regarding jurors trip. Court responds to jury note. Discussion regarding preliminary charge. Court sets hearing for March 16, 2004 at 3:00 pm. Parties excused. Court adjourned. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 263 | Court's Instructions to the Jury as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 264 | JURY VERDICT as to Alfred NMI Bourgeois Guilty: Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 265 | Jury note #1 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 266 | Jury note #2 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 267 | ORDER to provide meal for jurors ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 268 | TRANSCRIPT filed in case as to Alfred NMI Bourgeois for Jury Trial-Day 7 (partial transcript of proceeding- testimony of Alfred Bourgeois) for dates of 3/15/04 before Judge Janis Graham Jack , filed. ( Court Rptr: Velma Gano) (79 pgs.) (kbledsoe) (Entered: |

USCA5 40

| | | 3/17/2004) |
|---|---|---|
| 3/15/2004 | 269 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 270 | ORDER granting [269-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 271 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Magistrate Judge Jane Cooper-Hill ), entered. Parties ntfd. (kbledsoe) (Entered: 3/17/2004) |
| 3/15/2004 | 272 | MOTION by Alfred NMI Bourgeois for Travel Authorization , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 273 | PETITION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 274 | WRIT of Habeas Corpus ad Testificandum issued for Celso Ramos, Jr. on 3/17/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 275 | AMENDED PETITION by USA for Writ of Habeas Corpus ad testificandum in case as to Alfred NMI Bourgeois , filed. (kbledsoe) Modified on 03/17/2004 (Entered: 3/17/2004) |
| 3/16/2004 | 276 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 277 | WRIT of Habeas Corpus ad Testificandum issued for Celso Ramos, Jr. on 3/18/04 in case as to Alfred NMI Bourgeois . (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 278 | ORDER granting [276-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/17/2004) |
| 3/16/2004 | 279 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/18/2004) |
| 3/16/2004 | 283 | Status Conference Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 3:44-5:05 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case continued. All counsel present. Discussion regarding instructions to jury and verdict form regarding sentencing phase. Discussion regarding type of evidence that will be presented. Discussion regarding reports from experts. Discussion regarding Dr. Cunningham. Court is asking for |

|  |  | documents, raw data and standardized testing that was used for conclusions from Dr. Winer. Govt is requesting a neuro-psychological exam of Deft. Defense objects to more testing of Deft. Further, Defense requests that if tests are ordered, then, Defense objects going forward with case until the results of the tests are known. Govt requests a delay of the sentencing phase. No objections by Defense. Discussion regarding schedule of the sentencing phase. Discussion regarding reports of experts. Discussion regarding a pre-sentence investigation report to be used in rebuttal. Discussion regarding telephone calls. Court instructs clerk to have jurors to report on Monday, March 22, 2004 at 8:30 am. Court sets hearing at 9:00am on Friday, March 19, 2004, regarding reliability and admissibility of testimony. Court instructs parties to go through documents one more time. Court sets hearing regarding Dr. Winer and the testing. Court sets hearing on Thursday, March 18, 2004, at 2:00 pm unless the govt informs the court that the hearing is not needed. Court provides video tape to the parties. Parties excused. Court adjourned. (kbledsoe) (Entered: 3/21/2004) |
| 3/16/2004 | 284 | ORDER appointing standby counsel for witness (Atty Hector Del Toro for witness Robin Bourgeois) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/21/2004) |
| 3/16/2004 | 286 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/17/2004 | 280 | MOTION by Alfred NMI Bourgeois for subpoena(s) under Rule 17(b) , filed. (kbledsoe) (Entered: 3/18/2004) |
| 3/17/2004 | 281 | ORDER granting [280-1] motion for subpoena(s) under Rule 17(b) as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/18/2004) |
| 3/18/2004 | 282 | SEALED EXPARTE ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/19/2004) |
| 3/18/2004 | 285 | MEMORANDUM by USA as to Alfred NMI Bourgeois in opposition to Expert Testimony regarding Violence Risk Assessment , filed. (kbledsoe) (Entered: 3/21/2004) |
| 3/18/2004 | 287 | Status conference as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 9:00-10:25/11:03- Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case called. Appearances made. Discussion regarding instructions to the jurors. Court requests the catch-all mitigating documents. Discussion regarding testimony of inmates. Discussion regarding letters written by Deft. Govt calls Cynthia Bourgeois. Sworn. Direct. Cross. Witness stands down. Defense objects to the statements as the incident was remote and hearsay. Court tests reliability. Court |

USCA5 42

| | | |
|---|---|---|
| | | overrules objection. Govt calls Adam Longoria. Sworn. Direct. Cross. Recess. Resume. Discussion regarding 16 yr old boy. Defense objects to remoteness. Court overrules objection. Discussion regarding Veronica Batiste. No objection. Discussion regarding Gaynell James. Defense objects to remoteness and not relevant. Court states that she can testify. Court overrules objection. Discussion regarding Sheila Bourgeois, Gaynell James. Court will allow witnesses to testify. Discussion regarding Gerilyn Dumas. Defense objection as to not relevant to jury in this proceeding. Court will need to test reliability of witness. Discussion regarding Deputy Marshal Alfredo Lujan and Agend Rob Andrews. Court will allow to testify. Deft's cousin is allowed to testify. Discussion regarding letter to Anthony Dumas. Court will allow Robin Bourgeois after Longoria testifies. Discussion regarding video tape. Court states that the tape is admissible where Deft is at beach with children. Recess. Resume. Parties agree that 10 minutes would be enough time for opening statements. Discussion regarding offering exhibits for sentencing phase. Parties excused. Court adjourned. Dft remanded. , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/21/2004 | 288 | Sentencing Phase-Day 1 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:30-10:29/10:46-11:46/12:50-3:36 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker / John Gilmore f/dft. Case continued. All counsel present. Discussion regarding testimony of Dr. Cunningham. Jury in. Govt offers all evidence and testimony offered in the guilt and innocense phase of the trial. Court instructs jury regarding sentencing phase. Opening statements by Govt. Govt calls witness no. 1 - Veronica Batiste. Sworn. Direct. Govt offers exhibit no. 390. No. objections. Govt exhibit no 390 is admitted. Govt offers exhibit no. 387,388,389, 391. No. objections. Govt exhibit no 387, 388, 389, 391 are admitted. Cross. Re-direct. Excused. Govt calls witness no. 2 - Anthony Woods Batiste. Sworn. Direct. Cross. Excused. Govt calls witness no. 3 - Sheila Bourgeois. Sworn. Direct. Cross. Re-direct. Excused. Govt calls witness no. 4 - Cynthia Bourgeois. Sworn. Direct. Cross Govt calls witness no. 5 - Gaynell James. Sworn. Direct. Jury out. Discussion regarding testimony. Recess. Resume. Jury in. Govt calls witness no. 6 - Gaynell Collins Bourgeois. Sworn. Direct. Cross. Re-direct. Re-cross. Excused. Govt calls witness no. 7 - Deputy Marshal Alfredo Lujan. Sworn. Direct. Cross. Govt calls witness no. 8 - Isaac Bourgeois, III. Sworn. Direct. Redirect. Excused. Govt calls witness no. 9 -Beatrice Bourgeois. Sworn. Direct. Cross. Govt calls witness no. 10 - Special Agent Rob Andrews. Sworn. Direct. Excused. Jury out. Discussion regarding stipulation. Recess. Resume. Discussion regarding exhibits. Jury in. Govt calls witness no. 11 - Adam Longoria. Sworn. Direct. Cross. Re-direct. Govt offers exhibits 413 and 414. No objections. Govts exhibits 413 and 414 are admitted. Govt offers exhibits 412 a, b, c, and d. No objections. Govts exhibits 412 a, b, c, and d are admitted. Jury out. Recess. Resume. Jury in. Testimony continues Cross. Redirect. Excused. Govt calls witness no. 12 - Robin Bourgeois. Sworn. Direct. Govt offers exhibit 392. No objections. Govts exhibit no. 392 |

USCA5 43

| | | |
|---|---|---|
| | | admitted. Cross. Redirect. Excused. Govt calls witness no. 13 - Carolyn Ann Jackson. Sworn. Direct. Govt offers exhibits 393 and 394. Defense objects - prejudice of content. Court admits exhibits 393 and 394. Govt offers exhibits 395-411. Defense objects to exhibits 403, 409-411. Court admits exhibits 395-411. Jury out. Recess. Resume. Jury in. Witness Carolyn Jackson, excused. Govt calls witness no. 14 - Megan Beckett. Sworn. Direct. Govt calls witness no. 15 - Dr. Carlos Estrada. Sworn. Direct. Jury out. Recess. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/24/2004) |
| 3/21/2004 | 289 | Witness list by USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/22/2004 | 290 | Sentencing Phase-Day 2 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:19-9:01/9:09-10:09/10:46-11:14/12:18-12:22/ 4:24-4:48 Appearances: Patty Booth / Tony Roberts / Elsa Salinas Patterson f/govt; Doug Tinker/John Gilmore f/dft. Case called. Appearances made. Govt witness no. 15 - Dr. Carlos Estrada takes the stand. Cross continues on Dr. Estrada. Jury out. Discussion regarding testimony. Recess. Resume. Jury in. Cross continues on Dr. Estrada. Re-direct. Discussion regarding. Recess. Resume. Mr. Tinker objects to the comparing people. Mr. Tinker moves for a mis-trial. Court carries the motion. Jury in. Govt calls witness no. 16 - Orlando Campos. Sworn. Direct. Excused. Govt calls witness no. 17 - Wiley Taylor. Sworn. Direct. Cross. Re-direct. Govt calls witness no. 18 - Darrick Moore. Sworn. Direct. Excused. Govt rests. Jury out. Recess. Resume. Jury in. Defense calls witness no. 1- Michelle Armant. Sworn. Direct. Cross. Excused. Defense calls witness no. 2 - Carl Henry. Sworn. Direct. Cross. Excused. Defense calls witness no. 3 - Rev. Herman Clayton. Sworn. Direct. Cross. Defense rests. Govt closes. Defense closes. Jury out. Recess. Resume. Discussion regarding charge. Discussion regarding motion for mistrial. Court re-plays testimony of Dr Estrada. Court denies motion for mistrial without prejudice. No objections to the charge. Parties excused. Court adjourned. Dft remanded. (kbledsoe) (Entered: 3/24/2004) |
| 3/22/2004 | 291 | SEALED DOCUMENT as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/22/2004 | 292 | ORDER ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 293 | ORDER to provide meal for jurors ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 294 | Court's Instructions to the Jury-Sentencing Hearing as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 295 | Jury note #1 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: |

USCA5 44

| | | |
|---|---|---|
| | | 3/24/2004) |
| 3/23/2004 | 296 | RESPONSE to Juror Note #1 in the Sentencing Matter as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 297 | Jury note #2 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 298 | Jury note #3 filed as to Alfred NMI Bourgeois (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 299 | SPECIAL FINDINGS FORM as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 300 | JUDGMENT as to , Alfred NMI Bourgeois (1) count(s) 1ss ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/24/2004) |
| 3/23/2004 | 301 | Sentencing Phase-Day 3 held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 8:20-10:58/11:07-11:07/ 1:25-1:28/1:35-1:38/1:40-1:41/1:55-1:56/3:40-3:40/4:19-4:28 Appearances: Patty Booth/Tony Robert/Elsa Salinas-Patterson f/govt; Doug Tinker/John Gilmore f/dft. Alfred NMI Bourgeois (1) 1ss. Case continued. All counsel present. Court advises that Deft has the right to speak. Court states that Deft can speak before arguments begin. Jury in. Deft makes a statement to the jury. Closingarguments. Court charges jury. Court releases alternates to alternate jury room. Jury out. Clerk and counsel confirm that all exhibits are present. Court instructs clerk to take exhibits to the jury room. Resume. Jury note no. 1. Court responds to question no. 1. Recess. Resume. Jury note no. 2. Court responds to question no. 2. Recess. Resume. Jury note no.3. Jury in. Court asks that foreman return the special findings form for publication. Court reads special findings form. Jurors recommend by unanimous vote that Deft be sentenced to death. Jurors polled. Jurors released. Court imposes sentence. Parties excused. Court adjourned. Dft remanded. (kbledsoe) Modified on 03/26/2004 (Entered: 3/25/2004) |
| 3/24/2004 | 302 | Sentencing Phase-Day 4 Hearing as to Alfred NMI Bourgeois held before Judge Janis Graham Jack Ct Reporter: Velma Gano digital 9:06-9:12 Appearances: Tony Roberts f/govt; John Gilmore f/dft. Case called. Appearances made. Court vacates judgment signed on March 24, 2004. Deft advised of appeal rights. Court advises that the court will enter a new judgment. Court advises defendant that if a notice of appeal is filed, then court will appoint Mr. Gilmore and Mr. Tinker to represent the Deft. Partiesexcused. Court adjourned. Dft remanded. (kbledsoe) Modified on 03/26/2004 (Entered: 3/25/2004) |
| 3/24/2004 | 303 | JUDGMENT as to Alfred NMI Bourgeois (1) count(s) 1ss ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 3/25/2004) |

USCA5 45

| 3/28/2004 | 304 | NOTICE OF APPEAL of Judgment by Alfred NMI Bourgeois (1) count(s) 1ss , filed. (kbledsoe) (Entered: 3/30/2004) |
|---|---|---|
| 3/29/2004 | | Notice of appeal and Copy of docket for Alfred NMI Bourgeois transmitted to USCA: [304-1] appeal . Parties ntfd. (kbledsoe) (Entered: 3/30/2004) |
| 3/29/2004 | | Transcript forms mailed to John Gilmore. (kbledsoe) (Entered: 3/30/2004) |
| 4/8/2004 | 305 | WRIT of Habeas Corpus ad Testificandum executed for Adam Longoria in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 4/13/2004) |
| 4/8/2004 | 306 | WRIT of Habeas Corpus ad Testificandum executed for Celso Ramos, Jr. in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 4/13/2004) |
| 4/8/2004 | 307 | WRIT of Habeas Corpus ad Testificandum executed for Celso Ramos, Jr. in case as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 4/13/2004) |
| 4/26/2004 | 308 | Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/5/2004 | 309 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 5/12/2004) |
| 5/5/2004 | 310 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 5/12/2004) |
| 5/5/2004 | 311 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) Modified on 05/12/2004 (Entered: 5/12/2004) |
| 5/5/2004 | 312 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/5/2004 | 313 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/5/2004 | 314 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/5/2004 | 315 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/5/2004 | 316 | |

USCA5 46

| | | |
|---|---|---|
| | | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 317 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 318 | Amended Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 319 | MOTION by Alfred NMI Bourgeois to unseal (Motions hearing 8/14/03) , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 320 | MOTION by Alfred NMI Bourgeois to unseal (Motions hearing 12/10/03) , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 321 | MOTION by Alfred NMI Bourgeois to unseal (Jury Qualification(s) 2/9/04), filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 322 | MOTION by Alfred NMI Bourgeois to unseal (Jury Qualification(s) 2/10/04) , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 323 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 3 on 2/23/04), filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 324 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 4 on 2/24/04) , filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/10/2004 | 325 | MOTION by Alfred NMI Bourgeois to unseal (Jury Selection Day 5 on 2/25/04), filed. (kbledsoe) (Entered: 5/12/2004) |
| 5/14/2004 | 334 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Arraignment Hearing for dates of 7/25/03 before Judge Jane Cooper-Hill , filed. Ct Reporter: Kendra Bledsoe (6 pgs) (kbledsoe) Modified on 05/20/2004 (Entered: 5/20/2004) |
| 5/14/2004 | 333 | Transcript requested in appeal as to Alfred NMI Bourgeois [304-1] appeal , filed. (kbledsoe) (Entered: 5/20/2004) |
| 5/16/2004 | 326 | ORDER granting [319-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 5/16/2004 | 327 | ORDER granting [320-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 5/16/2004 | 328 | ORDER granting [321-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |

| | | |
|---|---|---|
| 5/16/2004 | 329 | ORDER granting [322-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 5/16/2004 | 330 | ORDER granting [323-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 5/16/2004 | 331 | ORDER granting [324-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 5/16/2004 | 332 | ORDER granting [325-1] motion to unseal as to Alfred NMI Bourgeois (1) ( Signed by Judge Janis Graham Jack ), entered. Parties ntfd. (kbledsoe) (Entered: 5/19/2004) |
| 6/4/2004 | 334 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection Hearing for dates of 2/19/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (255 pgs) (kbledsoe) (Entered: 6/7/2004) |
| 6/4/2004 | 335 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 1 Hearing for dates of 3/2/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (367 pgs) (kbledsoe) (Entered: 6/7/2004) |
| 6/7/2004 | 339 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 8 Hearing for dates of 3/16/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (92 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/7/2004 | 340 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing Hearing for dates of 3/17/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (69 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/7/2004 | 341 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing-Day 2 Hearing for dates of 3/23/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (137 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/7/2004 | 342 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing Hearing-Day 3 Hearing for dates of 3/24/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (121 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/7/2004 | 343 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Continuation of Sentencing Hearing-Day 4 for dates of 3/25/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (8 pgs) (kbledsoe) (Entered: 6/9/2004) |

USCA5 48

| | | |
|---|---|---|
| 6/8/2004 | 336 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 2 Hearing for dates of 3/3/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (115 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/8/2004 | 337 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 3 Hearing for dates of 3/4/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (303 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/8/2004 | 338 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 7 Hearing for dates of 3/15/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (122 pgs) (kbledsoe) (Entered: 6/9/2004) |
| 6/10/2004 | 344 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 6 Hearing for dates of 3/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (297 pgs) (kbledsoe) (Entered: 6/14/2004) |
| 6/10/2004 | 345 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 5 Hearing for dates of 3/8/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (360 pgs) (kbledsoe) (Entered: 6/14/2004) |
| 6/10/2004 | 346 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Trial-Day 4 Hearing for dates of 3/5/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (178 pgs) (kbledsoe) (Entered: 6/14/2004) |
| 6/10/2004 | 347 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing for dates of 3/19/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (122 pgs) (kbledsoe) (Entered: 6/14/2004) |
| 6/10/2004 | 348 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Sentencing Hearing-Day 1 for dates of 3/22/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (294 pgs) (kbledsoe) (Entered: 6/14/2004) |
| 6/14/2004 | 349 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/20/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (273 pgs) (kbledsoe) (Entered: 6/15/2004) |
| 6/14/2004 | 350 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Pretrial Conference & Daubert Hearing for dates of 3/1/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (139 pgs) (kbledsoe) (Entered: 6/16/2004) |
| 6/14/2004 | 351 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Status Conference Hearing for dates of 10/24/03 before Judge Janis |

| | | |
|---|---|---|
| | | Graham Jack , filed. Ct Reporter: Velma Gano (46 pgs) (kbledsoe) (Entered: 6/16/2004) |
| 6/14/2004 | 352 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification Hearing for dates of 2/10/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (7 pgs) (kbledsoe) (Entered: 6/16/2004) |
| 6/14/2004 | 353 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification Hearing for dates of 2/16/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (118 pgs) (kbledsoe) (Entered: 6/16/2004) |
| 6/21/2004 | 354 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/23/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (350 pgs) (kbledsoe) (Entered: 6/22/2004) |
| 6/21/2004 | 355 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/24/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (342 pgs) (kbledsoe) (Entered: 6/22/2004) |
| 6/21/2004 | 356 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Selection for dates of 2/25/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (149 pgs) (kbledsoe) (Entered: 6/22/2004) |
| 6/21/2004 | 357 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Motion Hearing/Ex-Parte for dates of 8/14/03 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (15 pgs) (kbledsoe) (Entered: 6/23/2004) |
| 6/21/2004 | 358 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Motions Hearing for dates of 12/10/03 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (103 pgs) (kbledsoe) (Entered: 6/23/2004) |
| 6/21/2004 | 359 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification-Held in the Courtroom for dates of 2/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (84 pgs) (kbledsoe) (Entered: 6/23/2004) |
| 6/21/2004 | 360 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Jury Qualification-Held in Jury Assembly Room for dates of 2/9/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (167 pgs) (kbledsoe) (Entered: 6/23/2004) |
| 6/21/2004 | 361 | TRANSCRIPT as to Alfred NMI Bourgeois Re: [304-1] appeal Hearing for dates of 2/10/04 before Judge Janis Graham Jack , filed. Ct Reporter: Velma Gano (9 pgs) (kbledsoe) (Entered: 6/23/2004) |

USCA5 50

| | | |
|---|---|---|
| 6/22/2004 | 362 | MOTION by Alfred NMI Bourgeois to vacate Order , filed. (kbledsoe) (Entered: 6/23/2004) |
| 6/23/2004 | | Copy of DE #362 provided to AUSA, John Gilmore and US Marshal. (kbledsoe) (Entered: 6/23/2004) |
| 7/1/2004 | 363 | Docket Entry as to Alfred NMI Bourgeois , filed. The following original exhibits have been substituted with digital photographs: 1-15, 60, 291-296, 298-299, 312-324, 326-328, 342, 355, 357, 393-408, 410-411. Exhibit nos. 297 and 300 are substituted with original photos. Agreed to by: Elsa Salinas-Patterson and John Gilmore. (kbledsoe) (Entered: 7/2/2004) |
| 7/2/2004 | | Certified and transmitted record on appeal consisting of 5 volumes of the record, 52 volumes of transcripts, 74 sealed envelopes, 1 box of trial exhibits (Government & Deft), and 8 envelopes of exhibits to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 7/2/2004) |
| 7/2/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (containing DE #363) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 7/2/2004) |
| 7/7/2004 | 364 | RECEIPT for Withdrawal of Exhibits for USA as to Alfred NMI Bourgeois , filed. (kbledsoe) (Entered: 7/8/2004) |
| 7/12/2004 | 365 | Letter MOTION by Alfred NMI Bourgeois for new trial , filed. (kbledsoe) (Entered: 7/13/2004) |
| 7/23/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (containing DE #364 & DE #365) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) (Entered: 7/23/2004) |
| 8/6/2004 | 366 | Letter MOTION by Alfred NMI Bourgeois for new trial , filed. (kbledsoe) (Entered: 8/10/2004) |
| 9/1/2004 | | Certified and transmitted supplemental record on appeal consisting of 1 volume of the record (DE #366) to U.S. Court of Appeals as to Alfred NMI Bourgeois : [304-1] appeal . Circuit No. 04-40410. Parties ntfd. (kbledsoe) Modified on 09/01/2004 (Entered: 9/1/2004) |
| 9/13/2004 | | Fifth Court of Appeals LETTER of acknowledgement of supplemental record consisting of de# 366 - 1 volume as to Alfred NMI Bourgeois ( USCA No: 04-40410) ,filed.(amireles, ) (Entered: 9/20/2004) |
| 4/6/2005 (p.85) | 367 | Writ of Habeas Corpus ad Testificandum Returned Executed in case as to Alfred NMI Bourgeois, filed. (kbledsoe, ) (Entered: 4/8/2005) |

USCA5 51

| | | |
|---|---|---|
| 4/6/2005 (p.87) | 368 | Writ of Habeas Corpus ad Testificandum Returned Executed for Orlando Campos on 3/3/05. in case as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 4/11/2005) |
| 10/3/2005 (p.89) | 369 | MOTION to Withdraw as Attorney for Handling a Writ of Certiorari to Supreme Court & a Sec. 2255 Motion in Trial Court, by John Gilmore, for Alfred NMI Bourgeois, filed. (glerma, ) Additional attachment(s) added on 10/4/2005 (glerma, ). (Entered: 10/4/2005) |
| 10/5/2005 (p.93) | 370 | JUDGMENT of USCA Fifth Circuit (certified copy) 8/25/05; Issued as Mandate 9/29/05; Affirming the judgment of the district court as to Alfred NMI Bourgeois as to [304] Notice of Appeal - Judgment and Sentence Alfred NMI Bourgeois (1) Count 1ss USCA No. 04-40410. ,filed.(srussell, ) (Entered: 10/5/2005) |
| 10/13/2005 (p.119) | 371 | AMENDED MOTION FOR LEAVE to Withdraw as Counsel by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(srussell, ) (Entered: 10/14/2005) |
| 10/17/2005 | | Attorney update in case as to Alfred NMI Bourgeois. Attorney Keith Hampton for Alfred NMI Bourgeois, Adrienne Urrutia for Alfred NMI Bourgeois added. (amireles, ) (Entered: 10/18/2005) |
| 10/18/2005 (p.129) | 372 | ORDER granting [369] Motion to Withdraw as Attorney. as to Alfred NMI Bourgeois (1)Alfred NMI Bourgeois (1); granting [371] Motion to Withdraw as attorney and Order appointing Keith S. Hampton and Adrienne Urrutia. as to Alfred NMI Bourgeois (1)Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 10/18/2005) |
| 2/3/2006 (p.130) | 373 | Appeal Record Returned from the USCA Fifth Circuit as to Alfred NMI Bourgeois re [304] Notice of Appeal - Judgment and Sentence consisting of 56 volumes-51 transcripts (vol #23 missing), 5 volumes of record, 2 boxes of exhibits (returned to exhibit room),, file reassembled and forwarded to fileroom, sealed pleadings forwarded to vault, (USCA No:04-40410) ,filed.(amireles, ) (Entered: 2/7/2006) |
| 5/22/2006 (p.131) | 374 | WRIT OF CERTIORARI Issued by US Supreme Court as to Alfred NMI Bourgeois re [304] Notice of Appeal - Judgment and Sentence,filed. Petition for a writ of certiorari is denied.(glerma, ) (Entered: 5/25/2006) |
| 6/14/2006 | 375 | EXPARTE MOTION To Substitute by Alfred NMI Bourgeois, filed. (glerma, ) (Entered: 6/14/2006) |
| 6/15/2006 (p.133) | 376 | ORDER striking [375] Exparte Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 6/16/2006) |
| 6/16/2006 (p.134) | 377 | Appeal Record Returned from the USCA Fifth Circuit as to Alfred NMI Bourgeois re [304] Notice of Appeal - Judgment and Sentence |

|  |  |  |
|---|---|---|
|  |  | consisting of 1 transcript (vlm 23 - dkt #358), file reassembled and forwarded to fileroom, sealed pleadings forwarded tovault, (USCA No:04-40410), filed.(kwallace, ) (Entered: 6/16/2006) |
| 7/1/2006 (p.135) | 383 | CJA 20 as to Alfred NMI Bourgeois: Appointment of Attorney Michael Clark Gross for defendant, ( Signed by Judge Janis Graham Jack ). Parties notified. (lrivera, ) (Entered: 1/10/2007) |
| 7/3/2006 | 378 | SEALED ORDER as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ). Parties notified. (amireles, ) (Entered: 7/7/2006) |
| 7/3/2006 |  | Attorney update in case as to Alfred NMI Bourgeois. Attorney Michael Clark Gross for Alfred NMI Bourgeois added. Attorney Adrienne Urrutia Wisenberg terminated. (amireles, ) (Entered: 7/7/2006) |
| 9/25/2006 | 379 | SEALED MOTION by Alfred NMI Bourgeois, filed. (amireles, ) (Entered: 9/25/2006) |
| 10/16/2006 (p.138) | 380 | ORDER granting [379] Sealed Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 10/17/2006) |
| 10/16/2006 |  | Attorney update in case as to Alfred NMI Bourgeois. Attorney Victor Julio Abreu for Alfred NMI Bourgeois, Michael Wiseman for Alfred NMI Bourgeois added. Attorney Michael Clark Gross and Keith Hampton terminated. (kwallace, ) (Entered: 10/17/2006) |
| 10/16/2006 |  | Minute Entry for proceedings held before Judge Janis Graham Jack :Telephone Conference as to Alfred NMI Bourgeois held on 10/16/2006. Discussion regarding Exparte Motion. Appearances:Michael Gross, Keith Hampton, Victor Julio Abreu, Michael Wiseman.(Digital # 9:13-9:24)(ERO:l cayce) , filed.(sscotch, ) (Entered: 10/17/2006) |
| 10/19/2006 (p.139) | 381 | MOTION and Order for Michael Wiseman to Appear Pro Hac Vice by Alfred NMI Bourgeois, filed. Clerk notes: Document appears to be redacted due to grey shading in document, not redacted by clerk. (amireles, ) (Entered: 10/19/2006) |
| 10/19/2006 (p.140) | 382 | MOTION AND ORDER for Admission Pro Hac Vice for Michael Wisemand to proceed as counsel as to Alfred NMI Bourgeois.( Signed by Judge Janis Graham Jack ). Parties notified. (kwallace, ) (Entered: 10/26/2006) |
| 1/10/2007 |  | Attorney Gross called and requested a CJA form, he was appointed 7/3/06 and never received a form, as to Alfred NMI Bourgeois:, filed. (lrivera, ) (Entered: 1/10/2007) |
|  | 384 |  |

USCA5 53

| | | |
|---|---|---|
| 2/13/2007 (p.141) | | MOTION to Unseal Transcripts by Alfred NMI Bourgeois, filed. (Attachments: # (1) proposed order)(lrivera, ) (Entered: 2/13/2007) |
| 2/14/2007 (p.145) | 385 | ORDER granting [384] Motion Unseal Transcripts as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(lrivera, ) (Entered: 2/14/2007) |
| 3/28/2007 (p.146) | 386 | TRANSCRIPT as to Alfred NMI Bourgeois re: Ex Parte Motion Hearing held on 10/20/03 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (kwallace, ) (Clerk instruced by V. Gano that this transcript is not to be sealed) (Entered: 3/29/2007) |
| 3/28/2007 (p.162) | 387 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference held on 12/16/03 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (Attachments: # (1) Conclusion of Transcript) (kwallace, ) (Entered: 3/29/2007) |
| 3/28/2007 (p.233) | 388 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference held on 01/16/04 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (Attachments: # (1) Conclusion of Transcript) (kwallace, ) (Entered: 3/29/2007) |
| 3/28/2007 (p.291) | 389 | TRANSCRIPT as to Alfred NMI Bourgeois re: Status Conference held on 01/21/04 before Judge Janis Graham Jack. Court Reporter: V. Gano. Transcript is available for viewing in the office of the clerk, filed. (kwallace, ) (Entered: 3/29/2007) |
| 4/4/2007 (p.320) | 390 | MOTION Completion of Record *Petitioner's Motion To Complete Record and Consolidated Brief in Support* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 4/4/2007) |
| 4/5/2007 (p.327) | 391 | MOTION to Unseal Document *Motion to Unseal and Inspect Records* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 4/5/2007) |
| 4/6/2007 (p.331) | 392 | ORDER re: [391] Motion to Unseal Document as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(dperez, ) (Entered: 4/6/2007) |
| 4/9/2007 (p.332) | 393 | Unopposed MOTION to Produce United States Marshall Service Records *and Proposed Order* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 4/9/2007) |
| 4/9/2007 | | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 4/9/2007 regardind Motion to Complete Record and Consolidate Breif in Support (DE 390). Appearances: Patricia Hubert Booth, Michael Wiseman.(Digital # 8:35-8:45)(ERO:v gano), filed.(sscotch, ) |

| | | |
|---|---|---|
| | | (Entered: 4/9/2007) |
| 4/20/2007 (p.336) | 394 | ORDER granting [393] Motion to Produce United States Marshal Service Records as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 4/20/2007) |
| 4/20/2007 (p.337) | 395 | Receipt from USM re: DE 394 as to Alfred NMI Bourgeois, filed.(amireles, ) Additional attachment(s) added on 2/14/2008 (amireles, ). (Entered: 4/23/2007) |
| 5/9/2007 | | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 5/9/2007. Discussion regarding USM records. Appearances: Victor Julio Abreu, Patricia Hubert Booth.(Digital # 1:24-1:31)(ERO:v gano), filed.(sscotch, ) (Entered: 5/9/2007) |
| 5/14/2007 (p.338) | 396 | MOTION to Vacate under 28 U.S.C. 2255 by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 5/14/2007) |
| 5/14/2007 | | Civil Case number assigned C-07-223 as to Alfred NMI Bourgeois: re 5/14/07 2255 Motion, filed. (amireles, ) (Entered: 5/17/2007) |
| 5/15/2007 (p.475) | 397 | NOTICE *Petitioner's Notice of Filing of Appendix in Support of Section 2255 Motion* of Notice of Filing Appendix in Support of Section 2255 Motion by Alfred NMI Bourgeois, filed. (Attachments: # (1) Appendix Volume I# (2) Appendix Volume II# (3) Appendix Volume III)(Wiseman, Michael) (Entered: 5/15/2007) |
| 6/4/2007 (p.916) | 398 | MOTION to File Memorandum In Support of Motion by Alfred Bourgeois, filed. (mserpa, ) Initially filed & docketed in 2:07cv223. Motion re-docketed in CR case by deputy clerk. (Entered: 7/20/2007) |
| 7/19/2007 (p.921) | 399 | ORDER granting [398] Motion for leave to file a memorandum of law in support of 2255 motion as to Alfred NMI Bourgeois (1). Petitioner may file a memorandum of law in support of 2255 motion on or before September 28, 2007. Respondent shall answer the motion on or before January 28, 2008. Petitioner may reply to the government's response on or before March 28, 2008.(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 7/20/2007) |
| 7/19/2007 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Alfred Bourgeois Responses (re: memorandum in support of 2255 motion) due by 9/28/2007. Response to Motion due by 1/28/2008, Reply to Response to Motion due by 3/28/2008. (mserpa, ) (Entered: 7/20/2007) |
| 9/28/2007 (p.923) | 400 | MOTION for Extension of Time to File *Petitioner's Motion for One Business Day Extension of Time to File Memo of Law* Memorandum |

| | | |
|---|---|---|
| | | of Law by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 9/28/2007) |
| 9/28/2007 (p.927) | 401 | ORDER granting [400] Motion for Extension of Time to File to file Memorandum in Support of Section 2255 Motion as to Alfred NMI Bourgeois (1). Petitioner is granted an extension to Friday, Oct. 5, 2007, to file his Memorandum of Law in Support of his Section 2255 Motion.(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 9/28/2007) |
| 10/5/2007 (p.928) | 402 | TRIAL BRIEF as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Appendix Petitioner's Supplemental Appendix in Support of 2255 Motion)(Wiseman, Michael) (Entered: 10/5/2007) |
| 1/15/2008 (p.1166) | 403 | Unopposed MOTION for Extension of Time to File Response/Reply as to [399] Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1))(Roberts, Tony) (Entered: 1/15/2008) |
| 1/15/2008 (p.1173) | 404 | ORDER granting [403] Unopposed MOTION for Extension of Time to File Response/Reply as to [399] Order on Motion for Miscellaneous Relief, as to Alfred NMI Bourgeois. The United States is ORDERED to file an Answer by 4/28/2008. Petitioner may reply toGovt's Response by 07/30/08. ( Signed by Judge Janis Graham Jack ) Parties notified. (kwallace, ) (Entered: 1/16/2008) |
| 1/16/2008 (p.1174) | 405 | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0869 5940 re: [404] Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 1/16/2008) |
| 1/16/2008 (p.1175) | 406 | Document(s) Sent by certified mail to Victor Julio Abreu; Tracking Number 7003 3110 0002 0869 5957 re: [404] Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 1/16/2008) |
| 1/16/2008 (p.1176) | 407 | Document(s) Sent by certified mail to James L Turner; Tracking Number 7003 3110 0002 0869 5964 re: [404] Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (kwallace, ) (Entered: 1/16/2008) |
| 1/16/2008 (p.1177) | 408 | Document(s) Sent by certified mail to Tony Roberts; Tracking Number 7003 3110 0002 0869 5988 re: [404] Order,, Set Deadlines,, Set Deadlines/Hearings,, filed. (amireles, ) (Entered: 1/16/2008) |
| 1/22/2008 (p.1178) | 409 | Certified Mail Receipt Returned regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/18/08, filed. (vrios, ) (Entered: 1/25/2008) |
| 1/22/2008 (p.1179) | 410 | Certified Mail Receipt Returned from AUSA regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/17/08, filed. (vrios, ) (Entered: 1/25/2008) |
| | 411 | |

| | | |
|---|---|---|
| 1/22/2008 (p.1180) | | Certified Mail Receipt Returned from James L. Turner regarding Order (de# 404) as to Alfred NMI Bourgeois, executed on 1/17/08, filed. (vrios, ) (Entered: 1/25/2008) |
| 1/28/2008 (p.1181) | 412 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois, executed on 1/23/08 re: [405] Document(s) Sent to Michael Wiseman RE: DE #404, filed. (srussell, ) (Entered: 1/30/2008) |
| 2/5/2008 (p.1182) | 413 | MOTION Amendment of Court's Order Regarding Communications *Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit Prior Court Ordres Regarding Communications)(Wiseman, Michael) (Entered: 2/5/2008) |
| 2/6/2008 (p.1191) | 414 | ORDER granting in part [413] MOTION Amendment of Court's Order Regarding Communications *Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications* as to Alfred NMI Bourgeois ( Signed by Judge Janis Graham Jack ) Parties notified. (amireles, ) (Entered: 2/6/2008) |
| 2/6/2008 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Alfred NMI Bourgeois Response to Motion due by 3/6/2008 (amireles, ) (Entered: 2/6/2008) |
| 2/19/2008 (p.1193) | 415 | Second MOTION for Extension of Time to File Response/Reply as to [404] Order,, Set Deadlines,, Set Deadlines/Hearings, [399] Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1))(Roberts, Tony) (Entered: 2/19/2008) |
| 2/19/2008 (p.1201) | 416 | ORDER as to Alfred NMI Bourgeois granting [415] Second MOTION for Extension of Time to File Response/Reply as to [404] Order,, Set Deadlines,, Set Deadlines/Hearings, [399] Order on Motion for Miscellaneous Relief, Answer due by 7/21/2008 Alfred NMIBourgeois Replies due by 10/20/2008....( Signed by Judge Janis Graham Jack ) Parties notified. (lcayce, ) (Entered: 2/19/2008) |
| 2/22/2008 (p.1202) | 417 | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0872 8327 re: [416] Order,, filed. (lcayce, ) (Entered: 2/22/2008) |
| 2/22/2008 (p.1203) | 418 | Document(s) Sent by certified mail to Tony Roberts; Tracking Number 7003 3110 0002 0872 8358 re: [416] Order,, filed. (lcayce, ) (Entered: 2/22/2008) |
| 2/22/2008 (p.1204) | 419 | Document(s) Sent by certified mail to James L Turner; Tracking Number 7003 3110 0002 0872 8341 re: [416] Order,, filed. (lcayce, ) (Entered: 2/22/2008) |
| 2/22/2008 (p.1205) | 420 | Document(s) Sent by certified mail to Victor Julio Abreu; Tracking Number 7003 3110 0002 0872 8334 re: [416] Order,, filed. (lcayce, ) |

| | | (Entered: 2/22/2008) |
|---|---|---|
| 2/28/2008 (p.1206) | 421 | Certified Mail Receipt Returned as to AUSA James L. Turner RE: DE #416 Order granting Second Motion for Extention of Time as to Alfred NMI Bourgeois, executed on 2/26/08, filed. (srussell, ) (Entered: 2/28/2008) |
| 2/28/2008 (p.1207) | 422 | Certified Mail Receipt Returned from Michael Wiseman regarding document #[416]) as to Alfred NMI Bourgeois, executed on 2/25/08, filed. (gchavez, ) (Entered: 2/28/2008) |
| 2/28/2008 (p.1208) | 423 | Certified Mail Receipt Returned as to AUSA Tony Roberts RE: DE #416 Order granting Second Motion for Extention of Time as to Alfred NMI Bourgeois, executed on 2/26/08, filed. (srussell, ) (Entered: 2/28/2008) |
| 3/4/2008 (p.1209) | 424 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois re: [420] Document(s) Sent, filed. (vrios, ) (Entered: 3/4/2008) |
| 3/6/2008 (p.1210) | 425 | RESPONSE by USA as to Alfred NMI Bourgeois re [414] Order, *Regarding Defendant's Motion to Amend Order Limiting Correspondence*, filed. (Attachments: # (1) # (2))(Booth, Patricia) (Entered: 3/6/2008) |
| 3/17/2008 (p.1237) | 426 | NOTICE OF SETTING as to Alfred NMI Bourgeois..... Telephone Conference set for 3/19/2008 at 01:10 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 3/17/2008) |
| 3/19/2008 | | Minute Entry for proceedings held before Judge Janis Graham Jack : Telephone Conference as to Alfred NMI Bourgeois held on 3/19/2008. Discussion regarding [413] MOTION Amendment of Court's Order Regarding Communications Petitioner's Unopposed Motion to Amend Court's Order Limiting Mr. Bourgeois' Communications. Appearances: Victor Julio Abreu, Patricia Hubert Booth, Tony R Roberts, Michael Wiseman.(Digital # 1:14-1:35)(ERO:v gano), filed.(sscotch, ) (Entered: 3/21/2008) |
| 6/25/2008 (p.1238) | 427 | MOTION to Unseal Document *Forensic Psychiatric Evaluation* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Patterson, Elsa) (Entered: 6/25/2008) |
| 6/26/2008 (p.1241) | 428 | ORDER granting Government's [427] Motion to Unseal Document as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(kwallace, ) (Entered: 6/26/2008) |
| 7/11/2008 (p.1242) | 429 | Third MOTION for Extension of Time to File Response/Reply as to [416] Order, [399] Order on Motion for Miscellaneous Relief, by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Roberts, Tony) (Entered: 7/11/2008) |
| | 430 | |

| | | |
|---|---|---|
| 7/11/2008 (p.1249) | | ORDER granting [429] Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 7/11/2008) |
| 7/11/2008 | | Document(s) Sent by certified mail to Victor Abreau; Tracking Number 7003 3110 0002 0872 9652 re: [430] Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 7/11/2008) |
| 7/11/2008 | | Document(s) Sent by certified mail to Michael Wiseman; Tracking Number 7003 3110 0002 0872 9669 re: [430] Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 7/11/2008) |
| 7/11/2008 | | Document(s) Sent by certified mail to James L. Turner; Tracking Number 7003 3110 0002 0872 9683 re: [430] Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 7/11/2008) |
| 7/11/2008 | | Document(s) Sent by certified mail to Tony R. Roberts; Tracking Number 7003 3110 0002 0872 9676 re: [430] Order on Motion for Extension of Time to File Response/Reply, filed. (amireles, ) (Entered: 7/11/2008) |
| 7/11/2008 | | Set/Reset Deadlines/Hearings as to Alfred NMI Bourgeois: Answer due by 9/19/2008 Alfred NMI Bourgeois Responses due by 12/19/2008 (amireles, ) (Entered: 7/11/2008) |
| 7/18/2008 (p.1250) | 431 | Certified Mail Receipt Returned RE: DE #430 Order as to Alfred NMI Bourgeois, Received by AUSA James L Turner, executed on 7/16/08, filed. (srussell, ) (Entered: 7/18/2008) |
| 7/18/2008 (p.1251) | 432 | Certified Mail Receipt Returned RE: DE #430 as to Alfred NMI Bourgeois, Received by AUSA Tony R Roberts, executed on 7/16/08, filed. (srussell, ) (Entered: 7/18/2008) |
| 7/21/2008 (p.1252) | 433 | Certified Mail Receipt Returned as to Alfred Bourgeois, executed on 7/18/08 re: Document(s) Sent, filed. (mserpa, ) (Entered: 7/21/2008) |
| 7/21/2008 (p.1253) | 434 | Certified Mail Receipt Returned as to Alfred NMI Bourgeois, executed on 7/21/08. [430] Addressed to Victor Julio Abreu, filed. (lsmith, ) (Entered: 7/22/2008) |
| 7/31/2008 (p.1254) | 435 | Opposed MOTION to Compel *Trial Defense Counsel to file responsive affidavits* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Appendix Petitioner's Letter to Trial Defense Counsel, # (2) Proposed Order)(Roberts, Tony) (Entered: 7/31/2008) |
| 8/8/2008 (p.1263) | 436 | MOTION for Extension of Time to File Response/Reply *to Government's Motion Seeking Order for Affidavit from Defense* |

| | | |
|---|---|---|
| | | *Counsel* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 8/8/2008) |
| 8/13/2008 (p.1269) | 437 | RESPONSE in Opposition by Alfred NMI Bourgeois re [435] Opposed MOTION to Compel *Trial Defense Counsel to file responsive affidavits*, filed.(Wiseman, Michael) (Entered: 8/13/2008) |
| 8/28/2008 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 8/28/2008 regarding affidavits and interrogatories. Appearances:John Gilmore, James McHue, Patricia Hubert Booth, Elsa SalinasPatterson, Tony R Roberts, Michael Wiseman.(Digital # 8:29-8:46)(ERO:l cayce), filed.(sscotch, ) (Entered: 8/28/2008) |
| 8/28/2008 (p.1279) | 438 | ORDER granting [435] Motion Seeking Order for Affidavit from Defense Counsel to Enable Respondent to Adequately Respond to Petitioner's Secton 2255 Motion as to Alfred NMI Bourgeois (1). Court ORDERS Mr. Tinker and Mr. Gilmore to respond to the allegations of ineffective assistance to the best of their ability. Mr. Gilmore will prepare an affidavit on or before Sept. 12, 2008. United States will prepare the first set of questions for Mr. Tinker by Sept. 5, 2008. Mr. Tinker's responses to the questions will be filed with the Court. Mr. Gilmore will file written notice with the Court if Mr. Tinker cannot complete his answers by Sept. 22, 2008. Bourgeois will submit any further questions for Mr. Tinker within ten days after the initial responses are filed with the Court. (Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 8/28/2008) |
| 8/28/2008 | | Set/Reset Deadlines in case as to Alfred NMI Bourgeois [396] MOTION to Vacate under 28 U.S.C. 2255. Responses due by 10/15/2008 (mserpa, ) (Entered: 8/28/2008) |
| 9/19/2008 | 439 | Sealed Event, filed. (Entered: 9/19/2008) |
| 9/22/2008 | 440 | Sealed Event, filed. (Entered: 9/22/2008) |
| 10/2/2008 | | Clerk provides copies to de #'s [439] and [440] to Michael Wiseman, Victor Abreu, Patti Hubert Booth, Elsa Salinas-Patterson, Tony Roberts, and James Turner as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/2/2008) |
| 10/14/2008 (p.1281) | 441 | NOTICE *of Service of Interrogatories Directed to Douglas Tinker, Esq.* by Alfred NMI Bourgeois re [438] Order on Motion to Compel,,,, filed.(Wiseman, Michael) (Entered: 10/14/2008) |
| 10/15/2008 | 442 | Sealed Event, filed. (With attachments) (Entered: 10/15/2008) |
| 10/15/2008 | 443 | |

| | | |
|---|---|---|
| | | Sealed Event, filed. (With attachments) (Entered: 10/15/2008) |
| 10/29/2008 (p.1283) | 444 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 10/30/2008 at 09:00 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 10/29/2008) |
| 10/30/2008 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 10/30/2008. Appearances: Patricia Hubert Booth, Elsa Salinas Patterson, Tony R Roberts, Michael Wiseman.(Digital # 9:00-9:14)(ERO:v gano), filed.(sscotch, ) (Entered: 10/30/2008) |
| 12/17/2008 (p.1284) | 445 | AO 435 TRANSCRIPT ORDER FORM This is to order a transcript of Telephone Conferences on 3/19/2008; 8/28/2008; and 10/30/2008 before Judge Janis Graham Jack Court Reporter/Transcriber: Velma Gano, filed. (lsmith, ) (Entered: 12/22/2008) |
| 1/6/2009 (p.1285) | 446 | Unopposed MOTION for Extension of Time to File Response/Reply *Brief in Support of Section 2255 Motion* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 1/6/2009) |
| 1/12/2009 (p.1289) | 447 | ORDER granting [446] Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1). Petitioner shall file his Reply Brief in Support of his Section 2255 Motion on or before April 15, 2009.(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 1/12/2009) |
| 1/16/2009 | 452 | Sealed Event, filed. (Entered: 3/27/2009) |
| 1/16/2009 | 453 | Sealed Event - This document replaces DE 452 (incomplete image)., filed. (Entered: 3/27/2009) |
| 1/20/2009 (p.1290) | 448 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 03/19/08 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 1/20/2009) |
| 1/20/2009 (p.1311) | 449 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 08/28/08 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 1/20/2009) |
| 1/20/2009 (p.1329) | 450 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 10/30/08 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/20/2009., filed. (mocarter, ) (Entered: 1/20/2009) |
| | 451 | |

| | | |
|---|---|---|
| 1/20/2009<br>(p.1345) | | Notice of Filing of Official Transcript as to [450] Transcript, [448] Transcript, [449] Transcript. Party notified, filed. (vgano, ) (Entered: 1/20/2009) |
| 4/8/2009<br>(p.1346) | 454 | Unopposed MOTION for Extension of Time to File Response/Reply *Brief in Support of Section 2255 Motion* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 4/8/2009) |
| 4/8/2009<br>(p.1351) | 455 | ORDER granting [454] Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1). Bourgeois shall file his reply brief on or before June 15, 2009. (Signed by Judge Janis Graham Jack.) Parties notified.(dperez, ) (Entered: 4/8/2009) |
| 4/8/2009 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Reply Brief due by 6/15/2009 (dperez, ) (Entered: 4/8/2009) |
| 4/9/2009 | 456 | Sealed Event, filed. (Entered: 4/9/2009) |
| 6/12/2009<br>(p.1352) | 457 | MOTION for Extension of Time to File Reply Brief by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 6/12/2009) |
| 6/12/2009<br>(p.1355) | 458 | ORDER granting [457] Motion for Extension of Time to File Reply Brief in Support of Section 2255 Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(dperez, ) (Entered: 6/12/2009) |
| 6/12/2009 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Reply Brief due by 6/26/2009 (dperez, ) (Entered: 6/12/2009) |
| 6/26/2009<br>(p.1356) | 459 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re [396] MOTION to Vacate under 28 U.S.C. 2255, filed. (Attachments: # (1) Appendix Second Supplemental Appendix, pages 1-50, # (2) Appendix Second Supplemental Appendix, pages 51-100, # (3) Appendix Second Supplemental Appendix, pages 101-150, # (4) Appendix Second Supplemental Appendix, pages 151-200, # (5) Appendix Second Supplemental Appendix, pages 201-250, # (6) Appendix Second Supplemental Appendix, pages 251-end)(Wiseman, Michael) (Entered: 6/26/2009) |
| 7/1/2009<br>(p.1756) | 460 | MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery*, MOTION for Discovery by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 7/1/2009) |
| 7/2/2009<br>(p.1768) | 461 | PROPOSED ORDER re: [460] MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 7/2/2009) |
| | 462 | |

| | | |
|---|---|---|
| 8/12/2009 (p.1769) | | ORDER for Govt to respond to Deft. motion as to Alfred NMI Bourgeois Responses due by 9/11/2009.(Signed by Judge Janis Graham Jack) Parties notified. (lsmith, ) (Entered: 8/12/2009) |
| 8/28/2009 (p.1770) | 463 | MOTION for Discovery by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Patterson, Elsa) (Entered: 8/28/2009) |
| 9/4/2009 (p.1773) | 464 | RESPONSE in Opposition by Alfred NMI Bourgeois re [463] MOTION for Discovery *Petitioner's Answer in Partial Opposition to Government's Motion for Discovery*, filed.(Wiseman, Michael) (Entered: 9/4/2009) |
| 9/8/2009 (p.1780) | 465 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 9/9/2009 at 10:15 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 9/8/2009) |
| 9/9/2009 (p.1781) | 466 | ORDER as to Alfred NMI Bourgeois. At the conference, the Court ordered that within sixty days Bourgeois will submit to the Government any documents that are relevant and which they can agree to turn over without compromising Bourgeois' attorney/client privilege. Bourgeois will submit the remainder of the records to the Court under seal for in camera inspection. Court recommends that Bourgeois Bates stamp the sealed material.(Signed by Judge Janis Graham Jack) Parties notified. (mserpa,) (Entered: 9/9/2009) |
| 9/9/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 9/9/2009 Appearances:John Gilmore. Patricia Hubert Booth, Elsa Salinas Patterson, Tony R Roberts, Michael Wiseman.(Digital # 10:26-10:36)(ERO:v gano), filed.(sscotch, ) (Entered: 9/12/2009) |
| 9/21/2009 (p.1782) | 467 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on September 9, 2009 before Judge Janis Graham Jack (original). Court Reporter/Transcriber: Transcriber, filed. (grogan, ) (Entered: 9/22/2009) |
| 10/12/2009 (p.1783) | 468 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 09/09/09 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 1/11/2010., filed. (mocarter) (Entered: 10/12/2009) |
| 10/13/2009 (p.1792) | 469 | Notice of Filing of Official Transcript as to [468] Transcript. Party notified, filed. (vgano, ) (Entered: 10/13/2009) |
| 11/9/2009 (p.1793) | 470 | NOTICE *Petitioner's* of Notice of Compliance with Discovery Request by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 11/9/2009) |

| | | |
|---|---|---|
| 11/9/2009 | 471 | Sealed Event, filed. (With attachments) (Entered: 11/9/2009) |
| 11/24/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MINUTE ENTRY re: EXPARTE HEARING as to Alfred NMI Bourgeois held on 11/24/2009 Appearances: M Wiseman(Digital # 5:08-5:24)(ERO:v gano), filed.(sscotch, ) (Entered: 12/14/2009) |
| 12/9/2009 (p.1796) | 472 | MOTION for Inspection of Outgoing Mail by Defendant In Camera by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 12/9/2009) |
| 12/10/2009 (p.1800) | 473 | RESPONSE to Motion by Alfred NMI Bourgeois re [472] MOTION for Inspection of Outgoing Mail by Defendant In Camera, filed.(Wiseman, Michael) (Entered: 12/10/2009) |
| 12/11/2009 (p.1805) | 474 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 12/14/2009 at 01:15 PM before Judge Janis Graham Jack, filed. (lsmith, ) (Entered: 12/11/2009) |
| 12/14/2009 (p.1806) | 475 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Telephone Conference set for 12/14/2009 at 01:15 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 12/14/2009) |
| 12/14/2009 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING - TELEPHONE CONFERENCE as to Alfred NMI Bourgeois held on 12/14/2009 re: [472] MOTION for Inspection of Outgoing Mail by Defendant In Camera. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas Patterson, Michael Wiseman.(Digital # 1:16-1:38)(ERO:v gano), filed.(sscotch, ) (Entered: 12/14/2009) |
| 12/15/2009 (p.1807) | 476 | ORDER RE: [472] Government's Motion for In Camera Inspection of Outgoing Mail by Defendant to an Individual Other Than His Attorney of Record as to Alfred NMI Bourgeois. Government is Ordered to file a status update in this case within 30 dayswhich outlines which issues need to be set for a hearing.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 12/15/2009) |
| 12/16/2009 | 477 | Sealed Event, filed. (With attachments) (Entered: 12/16/2009) |
| 12/17/2009 | 478 | Sealed Event, filed. (With attachments) (Entered: 12/17/2009) |
| 12/21/2009 (p.1808) | 479 | ORDER denying [463] Motion for Discovery as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(srussell, ) (Entered: 12/21/2009) |
| | 480 | |

| | | |
|---|---|---|
| 12/24/2009<br>(p.1809) | | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re [460] MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery *regarding Evidentiary Hearing and Discovery issues*, filed. (Attachments: # (1) Proposed Order)(Roberts, Tony) (Entered: 12/24/2009) |
| 1/8/2010<br>(p.1820) | 481 | MOTION for Extension of Time to File Response/Reply as to [480] Response to Motion, by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 1/8/2010) |
| 1/11/2010<br>(p.1824) | 482 | ORDER as to Alfred NMI Bourgeois Granting [481] MOTION for Extension of Time to File Response/Reply as to [480] Response to Motion, ( Replies due by 1/11/2010).(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 1/11/2010) |
| 1/11/2010<br>(p.1825) | 483 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re [460] MOTION for Hearing *Petitioner's Motion for an Evidentiary Hearing and Discovery* MOTION for Discovery, filed.(Wiseman, Michael) (Entered: 1/11/2010) |
| 3/8/2010<br>(p.1846) | 484 | Unopposed MOTION to Compel by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 3/8/2010) |
| 3/8/2010<br>(p.1855) | 485 | Corrected MOTION to Compel by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 3/8/2010) |
| 3/18/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 3/18/2010. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 4:31-4:50)(ERO:v gano)Deft remanded to custody, filed.(sscotch, ) (Entered: 3/19/2010) |
| 3/19/2010<br>(p.1864) | 486 | SCHEDULING ORDER as to Alfred NMI Bourgeois Oral argument to discuss issues that will be developed in an evidentiary hearing set for 4/20/2010 at 01:30 PM before Judge Janis Graham Jack;Evidentiary Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack. (Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 3/19/2010) |
| 3/19/2010<br>(p.1865) | 487 | ORDER granting [485] Motion to Compel as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(lrivera, ) (Entered: 3/19/2010) |
| 4/19/2010<br>(p.1867) | 488 | NOTICE of Supplemental Authority by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit US v Johnson, # (2) Exhibit US v Sinisterra)(Wiseman, Michael) (Entered: 4/19/2010) |
| 4/20/2010 | | |

| | | |
|---|---|---|
| | | Minute Entry for proceedings held before Judge Janis Graham Jack: HEARING re: 2255 issues as to Alfred NMI Bourgeois held on 4/20/2010. Govt offers exhibit no. 1. ADMITTED. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 1:26-2:51)(ERO:v gano), filed.(sscotch, ) (Entered: 4/25/2010) |
| 4/20/2010 (p.1886) | 491 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) REDACTED - Report)(sscotch, ) (Additional attachment(s) added on 4/27/2010: # (2) UNREDACTED - Report) (sscotch, ). (Entered: 4/27/2010) |
| 4/21/2010 (p.1893) | 489 | ORDER as to Alfred NMI Bourgeois. Govt to submit notes taken by Elsa Salinas Patterson and Patricia Hubert Booth, Govt to submit draft protective order and Attorney's for Bourgeois to turn over to the Govt psychological data underlying mental retardation testing due by 4/27/2010.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 4/21/2010) |
| 4/26/2010 (p.1895) | 490 | AO 435 TRANSCRIPT ORDER FORM by K. Hennig. This is to order a transcript of Oral Argument held on 4/20/10 before Judge Janis Graham Jack Court Reporter/Transcriber: Garcia Services, filed. (mserpa, ) (Entered: 4/27/2010) |
| 4/27/2010 (p.1896) | 492 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 4/27/2010) |
| 4/27/2010 | 493 | Sealed Event, filed. (With attachments) (Entered: 4/27/2010) |
| 4/27/2010 | 494 | Sealed Event, filed. (With attachments) (Entered: 4/27/2010) |
| 4/27/2010 (p.1902) | 495 | PROTECTIVE ORDER as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 4/28/2010) |
| 5/4/2010 (p.1904) | 496 | TRANSCRIPT as to Alfred NMI Bourgeois re: Hearing held on 4/20/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 8/2/2010., filed. (judgarcia, ) (Entered: 5/4/2010) |
| 5/5/2010 (p.1972) | 497 | Notice of Filing of Official Transcript as to [496] Transcript. Party notified, filed. (dterrell, ) (Entered: 5/5/2010) |
| 5/6/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 5/6/2010 regarding videotaping examination and discussion regarding Final Hearing Order. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # |

| | | 1:09-1:36)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 5/6/2010) |
|---|---|---|
| 5/6/2010 (p.1973) | 498 | ORDER Re: Telephone Conference orders as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (srussell, ) (Entered: 5/7/2010) |
| 5/10/2010 (p.1974) | 499 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Phone Conference held on 5/6/10 before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 5/11/2010) |
| 5/25/2010 (p.1975) | 500 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 05/06/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 8/23/2010., filed. (mocarter) (Entered: 5/25/2010) |
| 5/25/2010 (p.1997) | 501 | MOTION for Reconsideration re [498] Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 5/25/2010) |
| 5/26/2010 (p.2009) | 502 | Notice of Filing of Official Transcript as to [500] Transcript. Party notified, filed. (vrios, ) (Entered: 5/26/2010) |
| 5/29/2010 (p.2010) | 503 | RESPONSE to Motion by Alfred NMI Bourgeois re [501] MOTION for Reconsideration re [498] Order *Petitioner's Response in Opposition to Government's Motion to Reconsider*, filed. (Attachments: # (1) Exhibit Price Report, Excerpt, USA v Fields, # (2) Exhibit Transcript Excerpt, USA v Hammer, # (3) Exhibit Government's Motion, USA v Nelson, # (4) Exhibit Opinion, Excerpt, Commonwealth v DeJesus, # (5) Exhibit Complaint, Texas v Denkowski, # (6) Exhibit Marberry Letter, 5-07-2010, # (7) Exhibit Order, Trentadue v FBI)(Wiseman, Michael) (Entered: 5/29/2010) |
| 6/7/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 6/7/2010. Discussion regarding [501] Motion for Reconsideration and [503] Response. Telephone Conference set for 6/9/2010 at 12:00 PM (Central Time) before Judge Janis Graham Jack. Appearances: Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 2:57-3:25)(ERO:v gano), filed.(sscotch, ) (Entered: 6/8/2010) |
| 6/9/2010 (p.2053) | 504 | ORDER denying [501] Motion for Reconsideration as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 6/9/2010) |
| 6/9/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING regarding [501] Motion to Reconsider as to Alfred NMI Bourgeois held on 6/9/2010. Govt witnesses: Hector Joyner, Roger B Moore, Jr., Ph.D., J Randall Price, Ph.D. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R |

| | | Roberts, Michael Wiseman.(Digital # 2:05-1:10)(ERO:v gano, d perez), filed.(sscotch, ) (Entered: 6/13/2010) |
|---|---|---|
| 6/9/2010 | | **Terminate Deadlines and Hearings as to Alfred NMI Bourgeois: (sscotch, ) (Entered: 6/20/2010) |
| 6/13/2010 (p.2055) | 505 | NOTICE OF SETTING as to Alfred NMI Bourgeois. Evidentiary Hearing set for 9/10/2010 at 09:00 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 6/13/2010) |
| 6/14/2010 (p.2056) | 506 | NOTICE of Psychological Testing by USA as to Alfred NMI Bourgeois re [498] Order, filed.(Dowd, Mark) (Entered: 6/14/2010) |
| 6/17/2010 (p.2059) | 507 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on 06/07/10 before Judge Janis Graham Jack, filed. (lcayce, ) (Entered: 6/18/2010) |
| 6/17/2010 (p.2060) | 508 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Telephone Conference held on 06/09/10 before Judge Janis Graham Jack, filed. (lcayce, ) (Entered: 6/18/2010) |
| 6/29/2010 (p.2061) | 509 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 6/7/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 9/27/2010., filed. (judgarcia, ) (Entered: 6/29/2010) |
| 6/29/2010 (p.2087) | 510 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 6/9/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Grcia Services. Release of Transcript Restriction set for 9/27/2010., filed. (judgarcia, ) (Entered: 6/29/2010) |
| 6/30/2010 (p.2137) | 511 | Notice of Filing of Official Transcript as to [510] Transcript, [509] Transcript. Party notified, filed. (dterrell, ) (Entered: 6/30/2010) |
| 7/2/2010 | | Writ of Habeas Corpus ad Testificandum Issued as to Alfred Bourgeois for September 20, 2010 at 8:30 a.m. in case as to Alfred NMI Bourgeois ( Signed by Judge Judge Janis Graham Jack), filed. (lsmith, ) (Entered: 7/2/2010) |
| 7/2/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Evidentiary Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack (lsmith, ) (Entered: 7/2/2010) |
| 8/6/2010 (p.2138) | 512 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 8/6/2010) |

| | | |
|---|---|---|
| 8/6/2010 (p.2145) | 513 | Agreed MOTION for Protective Order by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 8/6/2010) |
| 8/6/2010 (p.2151) | 514 | ORDER granting [513] Motion for Protective Order as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 8/6/2010) |
| 8/16/2010 (p.2153) | 515 | MOTION For Additional Court Days to Present Case by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit Exhibit A -- Witness List, # (2) Exhibit Exhibit B -- Index to Hearing Exhibits)(Wiseman, Michael) (Entered: 8/16/2010) |
| 8/18/2010 (p.2165) | 516 | ORDER denying [515] Motion for Additional Court Dates to Present His Evidence as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(bcortez, ) (Entered: 8/18/2010) |
| 8/24/2010 (p.2166) | 517 | Unopposed MOTION to Withdraw Document *Trial Exhibits* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 8/24/2010) |
| 8/25/2010 (p.2171) | 518 | ORDER granting [517] Motion to Withdraw Document as to Alfred NMI Bourgeois (1). The Government will provide copies of the exhibits to counsel for Bourgeois. The Court ORDERS the Government to return the original trial exhibits to the Court after they are copied.(Signed by Judge Janis Graham Jack.) Parties notified.(bcortez, ) (Entered: 8/25/2010) |
| 8/25/2010 (p.2172) | 520 | RECEIPT FOR WITHDRAWAL OF EXHIBITS by Alfred NMI Bourgeois, filed. (bcortez, ) (Entered: 8/26/2010) |
| 8/26/2010 (p.2174) | 519 | MOTION Phone Conference *to Address Witness Unavailability* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 8/26/2010) |
| 8/27/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Evidentiary Hearing set for 9/10/2010 at 09:00 AM before Judge Janis Graham Jack (sscotch, ) (Entered: 8/27/2010) |
| 8/27/2010 (p.2180) | 522 | Receipt for Exhibits as to Alfred NMI Bourgeois, filed.(bcortez, ) (Entered: 8/31/2010) |
| 8/30/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING held on 8/30/2010 re: [519] Motion Phone Conference to Address Witness Unavailability as to Alfred NMI Bourgeois. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman.(Digital # 5:09-5:13)(ERO:v gano), filed.(sscotch, ) (Entered: 9/2/2010) |
| 8/31/2010 (p.2182) | 521 | ORDER granting [519] Motion Phone Conference to Address Witness Unavailability as to Alfred NMI Bourgeois (1).(Signed by |

| | | Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 8/31/2010) |
|---|---|---|
| 9/2/2010 | 523 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 524 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 525 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 526 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 527 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 528 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 529 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 530 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 531 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 532 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 533 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/2/2010 | 534 | Sealed Event, filed. (With attachments) (Entered: 9/2/2010) |
| 9/3/2010 | 535 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 (p.2183) | 536 | NOTICE of Notice of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 9/3/2010) |
| 9/3/2010 | 537 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 538 | Sealed Order, filed. (Entered: 9/3/2010) |

USCA5 70

| 9/3/2010 | 539 | Sealed Order, filed. (Entered: 9/3/2010) |
|---|---|---|
| 9/3/2010 | 540 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 541 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 542 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 543 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 544 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 545 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 546 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 547 | Sealed Order, filed. (Entered: 9/3/2010) |
| 9/3/2010 | 548 | Sealed Event, filed. (With attachments) (Entered: 9/3/2010) |
| 9/3/2010 | 549 | Sealed Event, filed. (With attachments) (Entered: 9/3/2010) |
| 9/3/2010 | 552 | Sealed Event, filed. (Entered: 9/7/2010) |
| 9/3/2010 | 553 | Sealed Event, filed. (Entered: 9/7/2010) |
| 9/7/2010 | 550 | Sealed Event, filed. (With attachments) (Entered: 9/7/2010) |
| 9/7/2010 (p.2185) | 551 | NOTICE *Corrected Notice* of Deposition by Alfred NMI Bourgeois re [536] Notice (Other), filed.(Wiseman, Michael) (Entered: 9/7/2010) |
| 9/7/2010 | 554 | NOTICE OF ATTORNEY APPEARANCE Michael Wiseman appearing for AFPD as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 9/7/2010) |

USCA5 71

| | | |
|---|---|---|
| 9/9/2010 (p.2187) | 555 | NOTICE OF RESETTING as to Alfred NMI Bourgeois. Evidentiary Hearing set for 9/10/2010 at 03:30 PM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 9/9/2010) |
| 9/10/2010 (p.2188) | 556 | Corrected MOTION to Correct [550] Sealed Event filed by Alfred NMI Bourgeois by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order, # (2) Subpoena)(Wiseman, Michael) (Entered: 9/10/2010) |
| 9/10/2010 (p.2197) | 557 | ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM IN ADVANCE OF HEARING as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (amireles, ) (Additional attachment(s) added on 9/13/2010: # (1) MAIN DOCUMENT) (amireles, ). (Entered: 9/13/2010) |
| 9/10/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/10/2010. Witness: Michael Gelbort.,Ph. d. Defense exhibits: 15,16,17,31,86,132 - Admitted. Govt exhibits: 4-13,19-22 - Admitted. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Elizabeth Larin.(Digital # 2:49-4:44/4:52-6:27)(ERO:v gano), filed.(sscotch, ) (Entered: 9/19/2010) |
| 9/14/2010 (p.2199) | 558 | AO 435 TRANSCRIPT ORDER FORM by Elsa Salinas, AUSA. This is to order a transcript of Evidentiary Hearing held on 9/10/10 before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 9/14/2010) |
| 9/15/2010 (p.2200) | 559 | Writ of Habeas Corpus ad Testificandum Issued as to Timothy Lynn Allen for 9/20/10 at 8:30 a.m. in case as to Alfred NMI Bourgeois ( Signed by Judge Judge Janis Graham Jack), filed. (vrios, ) (Entered: 9/16/2010) |
| 9/15/2010 | | ***Set/Reset Hearings as to Alfred NMI Bourgeois: Hearing set for 9/20/2010 at 08:30 AM before Judge Janis Graham Jack (vrios, ) (Entered: 9/16/2010) |
| 9/16/2010 (p.2201) | 560 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing held on 09/10/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 12/15/2010., filed. (mocarter) (Entered: 9/16/2010) |
| 9/17/2010 (p.2350) | 561 | Notice of Filing of Official Transcript as to [560] Transcript. Party notified, filed. (dterrell, ) (Entered: 9/17/2010) |
| 9/20/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/20/2010. Witnesses: Victoria Swanson, Donald Weiner, Jethro Toomer, Kathleen Kaib. defts exhibits 36, 33, 136, 155, 159, 160, 161, 34, 35, 154, 156, 29a, 29, 28, 24, 163, 164 - ADMITTED. Govt |

| | | |
|---|---|---|
| | | - 175, 201. - ADMITTED. Govt substitutes exhibits 4 and 5 which were admitted on 9/10/10 - (DVDs did not work). Appearances:Michael Wiseman, Victor Julio Abreu,Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, (Digital # 8:23-10:40/ 10:58-12:21/1:06-3:11/3:24 -6:11)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/5/2010) |
| 9/21/2010 (p.2351) | 562 | MOTION Additional Court Time *Renewed Motion for Additional Court Time to Present Evidence* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 9/21/2010) |
| 9/21/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/21/2010. Witnesses: Claudia Williams, Beverly Frank, Brenda Goodman, Mark Cunningham, Carl Henry, Donald Reese, Murray Bourgeois, Jon Curtis Dailey. Deft Exhibits 1, 2, 4, 5, 7, 8, 9, 10, 56, 60, 72, 130, 144, 151, 165, 166, 167, 98, 139, 140 - ADMITTED. Govt Exhibits 202, 71, 72, 172, 173, 174 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin,James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, (Digital # 8:00-10:11/10:25-12:02/1:02-2:54/3:11-6:38)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/5/2010) |
| 9/22/2010 (p.2356) | 563 | NOTICE *Petitioner's Objection to Court's Comment Regarding the Demeanor of Mark Cunningham, Ph.D.* of Petitioner's Objection by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 9/22/2010) |
| 9/22/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/22/2010. Witnesses: Elizabeth Johnson, George Holden, Jennifer Valdez, Michael Bowers, John Gilmore, Kerry Brown, Tim Allen, Gerald Bierbaum, Alan Keel. Court appoints Fred Jimenez to represent Tim Allen (witness). Deft Exhibits 93, 168 91, 92, 21, 18a, 18, 19, 20, 96, 116, 82, 83, 81, 90, 157, 158, 3, 88 - ADMITTED. Govt Exhibits 204, 172a, 178-200, 73, 176, 177 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas. (Digital # 9:25-12:09/1:13-4:48/5:05-7:14/7:18-8:34)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) Modified on 10/5/2010 (sscotch, ). (Entered: 10/5/2010) |
| 9/23/2010 (p.2359) | 568 | MOTION to Strike *For Violation of Fed.R.Civ.P. 26* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 9/23/2010) |
| 9/23/2010 | 569 | (Court only) Subpoena Returned Executed on 9/14/10 as to Alfred NMI Bourgeois, filed. (bcortez, ) (Additional attachment(s) added on 9/24/2010: # (1) Unredacted Subpoena) (bcortez, ). (Entered: 9/24/2010) |

| Date | No. | Entry |
|---|---|---|
| 9/23/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/23/2010. Witnesses: Danny Clark, Robert Patterson, William Shotts, Christopher Key, Rhonda Davis, Randall Price. Deft Exhibits 171,141,152,178(sealed) - ADMITTED. Govt Exhibits 1,2,3,14,23-26 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 8:53-9:52/11:23-12:30/1:14-2:59/3:27-6:04)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/5/2010) |
| 9/24/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 9/24/2010. Witnesses: Randall Price, Jerrilyn Conway, Roger Moore. Deft Exhibits 58, 61a, 179, 177 - ADMITTED. Govt Exhibits 63-65, 205, 206, 27-41, 43, 15-18, 208 - ADMITTED. Appearances:Michael Wiseman, Victor Julio Abreu, Elizabeth Larin, James McHugh. Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 8:26-10:48/11:18-12:21/1:35-4:42/5:41-6:22)(ERO:v gano) Deft remanded to custody, filed.(sscotch, ) (Entered: 10/5/2010) |
| 9/24/2010 (p.2363) | 573 | EXHIBIT LIST by Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/6/2010) |
| 9/24/2010 (p.2376) | 574 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 10/6/2010) |
| 10/4/2010 (p.2391) | 570 | AO 435 TRANSCRIPT ORDER FORM by Kathrid Hennig. This is to order a transcript of Evidentiary Hearing held on 9/20/10-9/24/10 before Judge Janis Graham Jack (Original). Court Reporter/Transcriber: V. Gano, filed. (bcortez, ) (Entered: 10/5/2010) |
| 10/5/2010 (p.2392) | 571 | AO 435 TRANSCRIPT ORDER FORM by Kathryn Hennig. This is to order a transcript of Testimony of Keel, Johnson, Conway held on 9/22/10 and 9/24/10 before Judge Janis Graham Jack Court Reporter/Transcriber: Molly Carter, filed. (lcayce, ) (Entered: 10/6/2010) |
| 10/5/2010 (p.2393) | 572 | CJA 20 for Fred Jimenez to represent Tim Allen in case as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (lsmith, ) (Entered: 10/6/2010) |
| 10/12/2010 (p.2395) | 575 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Evidentiary Hearing - Day 3 (Testimony of Elizabeth Ann Johnson and Charles Alan Keel) held on 09/22/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Releaseof Transcript Restriction set for 1/10/2011., filed. (mocarter) (Entered: 10/12/2010) |

USCA5 74

| | | |
|---|---|---|
| 10/12/2010 (p.2569) | 576 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Evidentiary Hearing - Day 5 (Testimony of Jerrilyn Conway) held on 09/24/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 1/10/2011., filed. (mocarter) (Entered: 10/12/2010) |
| 10/12/2010 (p.2665) | 578 | AO 435 TRANSCRIPT ORDER FORM by K. Hennig. This is to order a transcript of Evidentiary Hearing held on 9/20/10 - 9/26/10 (except for Keel, Johnson & Conway testimonies) before Judge Janis Graham Jack, filed. (mserpa, ) (Entered: 10/13/2010) |
| 10/13/2010 (p.2666) | 577 | Notice of Filing of Official Transcript as to [575] Transcript, [576] Transcript,. Party notified, filed. (vrios, ) (Entered: 10/13/2010) |
| 10/21/2010 (p.2667) | 579 | MOTION Petitioner's Opposed Motion to Take Brief Deposition of Dr. Michael Gelbort *and Certificate of Service* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 10/21/2010) |
| 10/25/2010 (p.2671) | 580 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 10/25/2010) |
| 10/25/2010 (p.2673) | 581 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 10/25/2010) |
| 10/26/2010 (p.2675) | 582 | ORDER denying [579] Motion to Take Brief Deposition of Dr. Michael Gelbort as to Alfred Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 10/26/2010) |
| 10/26/2010 (p.2676) | 583 | Agreed MOTION To Withdraw Trial Exhibits To Copy for Use in Depositions by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 10/26/2010) |
| 10/26/2010 (p.2680) | 584 | ORDER granting [583] Motion release certain trial exhibits temporarily to the Govt. as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.)(Order referred to case manager) Parties notified.(lsmith, ) (Entered: 10/27/2010) |
| 10/27/2010 (p.2681) | 585 | RECEIPT FOR WITHDRAWAL OF EXHIBITS by Alfred NMI Bourgeois, filed. (Signed by AUSA Patti Hubert Booth and Case Mgr. Sondra Scotch)(lsmith, ) (Entered: 10/27/2010) |
| 10/27/2010 (p.2682) | 586 | MOTION (Second) To Withdraw Trial Exhibits to Copy for Deposition by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Salinas, Elsa) (Entered: 10/27/2010) |
| 10/27/2010 (p.2686) | 587 | Certificate of Conference by USA as to Alfred NMI Bourgeois *(Amended) RE: Document #586*, filed. (Salinas, Elsa) (Entered: 10/27/2010) |

| 10/27/2010 (p.2688) | 588 | MOTION (Amended) Second Motion To Withdraw Trial Exhibits by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Salinas, Elsa) (Entered: 10/27/2010) |
|---|---|---|
| 10/27/2010 (p.2692) | 589 | ORDER granting [588] Motion to withdrawn govt exhibits 35, 125-149, 375, 376, 388 and 391 as to Alfred NMI Bourgeois (1). Exhibits are to be returned.(Signed by Judge Janis Graham Jack.) Parties notified.(lsmith, ) (Entered: 10/28/2010) |
| 10/27/2010 (p.2693) | 590 | RECEIPT FOR THE RETURN OF EXHIBITS by USA as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 10/28/2010) |
| 10/28/2010 (p.2694) | 591 | RECEIPT FOR WITHDRAWAL OF EXHIBITS (35, 125-145, 146, 147-148, 149, 375-376, 388, 391) by USA as to Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 10/28/2010) |
| 10/28/2010 (p.2695) | 592 | RECEIPT FOR RETURN OF EXHIBITS by USA as to Alfred NMI Bourgeois, filed. (bcortez, ) (Entered: 10/28/2010) |
| 11/2/2010 (p.2696) | 593 | NOTICE of Deposition by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 11/2/2010) |
| 11/5/2010 (p.2698) | 594 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 1 held on 9/20/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 2/3/2011., filed. (judgarcia, ) (Entered: 11/5/2010) |
| 11/5/2010 (p.3106) | 595 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 4 held on 9/23/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Garcia Services. Release of Transcript Restriction set for 2/3/2011., filed. (judgarcia, ) (Entered: 11/5/2010) |
| 11/5/2010 (p.3402) | 596 | Notice of Filing of Official Transcript as to [594] Transcript, [595] Transcript. Party notified, filed. (vgano, ) (Entered: 11/5/2010) |
| 11/5/2010 (p.3403) | 597 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 2 held on 09/21/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/5/2010) |
| 11/5/2010 (p.3849) | 598 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 3 held on 09/22/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/5/2010) |
| 11/5/2010 (p.4171) | 599 | TRANSCRIPT as to Alfred NMI Bourgeois re: Evidentiary Hearing - Day 5 held on 09/24/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 2/3/2011., filed. (mocarter) (Entered: 11/5/2010) |
| | 600 | |

| 11/5/2010 (p.4416) | | Notice of Filing of Official Transcript as to [598] Transcript, [599] Transcript, [597] Transcript. Party notified, filed. (vgano, ) (Entered: 11/5/2010) |
|---|---|---|
| 11/15/2010 (p.4417) | 601 | DISCOVERY NOTICE by Alfred NMI Bourgeois *Notice of Discovery Compliance*, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4419) | 602 | MOTION Motion to Take Deposition *of Bill May and Adam Longoria* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4424) | 603 | Unopposed MOTION For Admission of Hearing Exhibit P-180 by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4427) | 604 | Unopposed MOTION to Continue Time for Taking a Deposition *of Dr. Leestma* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit Note Taken By AUSA Roberts)(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4436) | 605 | MOTION to Amend by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit A, # (2) Exhibit B, # (3) Exhibit D)(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4471) | 606 | NOTICE of Filing of Exhibit C to Motion to Amend by Alfred NMI Bourgeois re [605] MOTION to Amend, filed.(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4488) | 607 | NOTICE of Filing of Exhibit C, Part 2, to Motion to Amend by Alfred NMI Bourgeois re [606] Notice (Other), filed.(Wiseman, Michael) (Entered: 11/15/2010) |
| 11/15/2010 (p.4506) | 608 | LETTER MOTION New Counsel by Alfred NMI Bourgeois, filed. (lsmith, ) (Entered: 11/16/2010) |
| 11/17/2010 (p.4513) | 609 | NOTICE of Filing of Trial Depositions by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit Oliver Deposition, # (2) Exhibit Schenk Deposition)(Wiseman, Michael) (Entered: 11/17/2010) |
| 11/17/2010 (p.4722) | 610 | ORDER granting [603] Motion as to Alfred Bourgeois (1); striking [605] Motion to Amend as to Alfred Bourgeois; striking [606]; and striking [607]. The Government will respond to motion [602] within ten (10) days from the entry of this Order. Court ORDERS Bourgeois to refile [605] [606] and [607] as one pleading. The Government will file a response to that pleading within ten (10) days of its filing. (Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 11/17/2010) |
| 11/18/2010 (p.4723) | 611 | MOTION to Amend *and Supplement Claim IV* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit, # (2) Exhibit, # (3) |

| | | |
|---|---|---|
| | | Exhibit, # (4) Exhibit, # (5) Exhibit)(Wiseman, Michael) (Entered: 11/18/2010) |
| 11/29/2010 (p.4793) | 612 | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re [604] Unopposed MOTION to Continue Time for Taking a Deposition *of Dr. Leestma*, [602] MOTION Motion to Take Deposition *of Bill May and Adam Longoria*, filed. (Attachments: # (1) Proposed Order)(Roberts, Tony) (Entered: 11/29/2010) |
| 11/29/2010 (p.4805) | 613 | RESPONSE to Motion by USA as to Alfred NMI Bourgeois re [611] MOTION to Amend *and Supplement Claim IV*, filed. (Attachments: # (1) Proposed Order, # (2) Affidavit)(Dowd, Mark) (Entered: 11/29/2010) |
| 12/2/2010 (p.4838) | 614 | ORDER denying [602] Motion to Take Deposition as to Adam Longoria as to Alfred NMI Bourgeois (1); granting in part [604] Motion to Continue Time for Taking a Deposition of Dr. Leestma as to Alfred NMI Bourgeois (1)( Hearing for Oral Arguments set for 1/13/2011 at 08:00 AM before Judge Janis Graham Jack); denying as moot [608] LETTER MOTION for New Counsel as to Alfred NMI Bourgeois (1); granting [611] Motion to Amend as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/2/2010) |
| 12/2/2010 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Advisory due by 12/3/2010 noon. (amireles, ) (Entered: 12/2/2010) |
| 12/2/2010 (p.4840) | 615 | AO 435 TRANSCRIPT ORDER FORM by Aaron Butler. This is to order a transcript of Telephone Conference held on December 1, 2010 before Judge Janis Graham Jack (original). Court Reporter/Transcriber: Typist, filed. (grogan, ) (Entered: 12/2/2010) |
| 12/2/2010 (p.4841) | 616 | NOTICE of Status and Location of Brain Slides by USA as to Alfred NMI Bourgeois re Set/Reset Deadlines, filed.(Roberts, Tony) (Entered: 12/2/2010) |
| 12/3/2010 (p.4845) | 617 | MOTION for Subpoenas at Govt Expense *Petitioners Unopposed Motion for Issuance of Subpoena Duces Tecum in Advance of Hearing* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 12/3/2010) |
| 12/6/2010 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 12/6/2010 regarding [616] Status and location of slides. Appearances: Patricia Hubert Booth, Tony R Roberts, Elsa Salinas, Victor Julio Abreu.(Digital # 8:54-9:01)(ERO:v gano), filed.(sscotch, ) (Entered: 12/6/2010) |
| 12/8/2010 (p.4855) | 618 | Unopposed MOTION for Subpoenas at Govt Expense *Regarding Brain Slides* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 12/8/2010) |

USCA5 78

| 12/9/2010 (p.4863) | 619 | NOTICE of Filing of Video Depositions by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/9/2010) |
|---|---|---|
| 12/9/2010 (p.4865) | 620 | ORDER granting [618] Motion for Subpoenas as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/9/2010) |
| 12/9/2010 (p.4867) | 621 | NOTICE of Filing of Deposition by Alfred NMI Bourgeois, filed. (Attachments: # (1) Exhibit)(Wiseman, Michael) (Entered: 12/9/2010) |
| 12/9/2010 (p.4955) | 622 | *USM-285 for Kristine McAshan* as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/9/2010) |
| 12/9/2010 (p.4956) | 623 | *USM-285 for Dr. Jennifer Rulon* as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/9/2010) |
| 12/20/2010 (p.4957) | 624 | STATUS REPORT *Petitioner's Status Report on Production and Delivery of Autopsy Slides to Dr. Jan Leestma* by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/20/2010 (p.4961) | 625 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order, # (2) USM 285, # (3) Subpoena)(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/20/2010 (p.4967) | 626 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order, # (2) USM 285, # (3) Subpoena)(Wiseman, Michael) (Entered: 12/20/2010) |
| 12/21/2010 (p.4973) | 627 | ORDER granting [625] Motion Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/21/2010) |
| 12/21/2010 (p.4974) | 628 | ORDER granting [626] Motion Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/21/2010) |
| 12/28/2010 (p.4975) | 629 | MOTION Motion for Issuance and Service of Witness Subpoena by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order, # (2) USM-285, # (3) Subpoena)(Wiseman, Michael) (Entered: 12/28/2010) |
| 12/28/2010 (p.4981) | 630 | ORDER granting [629] Motion for Issuance and Service of Witness Subpoena as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 12/28/2010) |
| 12/29/2010 (p.4982) | 631 | TRANSCRIPT as to Alfred NMI Bourgeois re: Telephone Conference held on 12/01/10 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction |

| | | |
|---|---|---|
| | | set for 3/29/2011., filed. (mocarter) (Entered: 12/29/2010) |
| 12/30/2010 (p.5020) | 632 | Notice of Filing of Official Transcript as to [631] Transcript. Party notified, filed. (vgano, ) (Entered: 12/30/2010) |
| 1/4/2011 (p.5021) | 633 | Joint MOTION to Continue Hearing and Argument by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 1/4/2011) |
| 1/4/2011 (p.5026) | 634 | PROPOSED ORDER re: [633] Joint MOTION to Continue Hearing and Argument as to Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 1/4/2011) |
| 1/6/2011 (p.5030) | 635 | NOTICE OF SETTING as to Alfred NMI Bourgeois - regarding [633] Joint MOTION to Continue Hearing and Argument. Motion Hearing set for 1/7/2011 at 09:30 AM before Judge Janis Graham Jack, filed. (sscotch, ) (Entered: 1/6/2011) |
| 1/7/2011 (p.5031) | 636 | NOTICE of Notice of Deposition of Jan Leestma, MD by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 1/7/2011) |
| 1/7/2011 (p.5033) | 637 | ORDER denying [633] Motion to Continue as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 1/7/2011) |
| 1/7/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: MOTION HEARING as to Alfred NMI Bourgeois held on 1/7/2011 regarding [633] Motion for Continuance. Appearances:Elizabeth Larin, Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 9:22-9:26)(ERO:v gano), filed.(sscotch, ) (Entered: 1/10/2011) |
| 1/7/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois held on 1/7/2011 regarding deposition of expert witness. Appearances: Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas, Michael Wiseman, Victor Julio Abreu.(Digital # 3:11-3:16)(ERO:v gano), filed.(sscotch, ) (Entered: 1/10/2011) |
| 1/11/2011 (p.5034) | 638 | MOTION To Allow Dr. Rouse to Testify on January 13, 2011 by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 1/11/2011) |
| 1/11/2011 (p.5040) | 639 | RESPONSE in Opposition by Alfred NMI Bourgeois re [638] MOTION To Allow Dr. Rouse to Testify on January 13, 2011 *Response in Partial Opposition to the Testimony of Dr. Rouse*, filed.(Wiseman, Michael) (Entered: 1/11/2011) |
| 1/11/2011 (p.5044) | 640 | ORDER granting [638] Motion To Allow Dr. Rouse to Testify on January 13, 2011 as to Alfred NMI Bourgeois (1). (Signed by Judge Janis Graham Jack.) Parties notified.(amireles, ) (Entered: 1/12/2011) |

USCA5 80

| | | |
|---|---|---|
| 1/12/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: Telephone Conference as to Alfred NMI Bourgeois regarding expert reports held on 1/12/2011. Appearances:Elizabeth Larin, Mark Michael Dowd, Tony R Roberts, Michael Wiseman, Victor Abreu.(Digital # 11:20-1142)(ERO:v gano), filed.(sscotch, ) (Entered: 1/12/2011) |
| 1/12/2011 (p.5045) | 641 | NOTICE of Notice of Filing Deposition of Jan Leestma, M.D. by Alfred NMI Bourgeois, filed. (Attachments: # (1) Transcript, # (2) Exhibit Exhibit 1, # (3) Exhibit Exhibit 2, # (4) Exhibit Exhibit 2a, # (5) Exhibit Exhibit 3, # (6) Exhibit Exhibit 4,# (7) Exhibit Exhibit 5, # (8) Exhibit Exhibit 6)(Wiseman, Michael) (Entered: 1/12/2011) |
| 1/12/2011 (p.5218) | 642 | NOTICE of Notice of Filing of Points and Authorities by Alfred NMI Bourgeois, filed.(Wiseman, Michael) (Entered: 1/12/2011) |
| 1/13/2011 | | Minute Entry for proceedings held before Judge Janis Graham Jack: EVIDENTIARY HEARING as to Alfred NMI Bourgeois held on 1/13/2011. Witnesses: William May, James Sales, Debra Hohle, Patti Booth, Dr. Elizabeth Rouse. Govt exhibits 1-5 Admitted. Defense exhibts P104, P187-P190 - Admitted. Appearances:Elizabeth Larin, Jame McHugh, Michael Wiseman, Victor Julio Abreu, Patricia Hubert Booth, Mark Michael Dowd, Tony R Roberts, Elsa Salinas.(Digital # 7:55-10:07/10:27-11:55/12:51-4:16)(ERO:v gano), filed.(sscotch, ) (Entered: 1/17/2011) |
| 1/13/2011 (p.5223) | 643 | EXHIBIT LIST by USA as to Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 1/17/2011) |
| 1/13/2011 (p.5224) | 644 | EXHIBIT LIST by Alfred NMI Bourgeois, filed. (sscotch, ) (Entered: 1/17/2011) |
| 1/13/2011 | | **Terminate Misc Hearing as to Alfred NMI Bourgeois: - (sscotch, ) (Entered: 1/20/2011) |
| 1/19/2011 (p.5225) | 645 | AO 435 TRANSCRIPT ORDER FORM by Kathrin Hennig. This is to order a transcript of Hearing/Argument held on 1/13/11 before Judge Janis Graham Jack (copy). Court Reporter/Transcriber: Molly Carter, filed. (vrios, ) (Entered: 1/20/2011) |
| 1/27/2011 (p.5226) | 646 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Miscellaneous Hearing (Testimony of Dr. Rouse and Arguments) held on 01/13/11 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 4/27/2011., filed. (mocarter) (Entered: 1/27/2011) |
| 1/28/2011 (p.5446) | 647 | Notice of Filing of Official Transcript as to [646] Transcript,. Party notified, filed. (vgano, ) (Entered: 1/28/2011) |
| | 648 | |

| | | |
|---|---|---|
| 2/1/2011 (p.5447) | | MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction* by Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Wiseman, Michael) (Entered: 2/1/2011) |
| 2/1/2011 (p.5453) | 649 | TRIAL BRIEF by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 2/1/2011) |
| 2/4/2011 (p.5487) | 650 | Unopposed MOTION for Extension of Time to File Response/Reply as to [649] Trial Brief by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 2/4/2011) |
| 2/7/2011 (p.5492) | 651 | ORDER GRANTING EXTENSION OF TIME as to Alfred NMI Bourgeois granting [650] Unopposed MOTION for Extension of Time to File Response/Reply as to [649] Trial Brief ( Responses due by 2/16/2011).(Signed by Judge Janis Graham Jack) Parties notified. (lsmith, ) (Entered: 2/7/2011) |
| 2/15/2011 (p.5493) | 652 | Unopposed MOTION for Extension of Time to File Response/Reply as to [649] Trial Brief by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Dowd, Mark) (Entered: 2/15/2011) |
| 2/15/2011 (p.5500) | 653 | ORDER granting [652] Motion for Extension of Time to File Response/Reply as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(lsmith, ) (Entered: 2/15/2011) |
| 2/15/2011 | | Set/Reset Deadlines as to Alfred NMI Bourgeois: Responses due by 2/18/2011 (lsmith, ) (Entered: 2/15/2011) |
| 2/18/2011 (p.5501) | 654 | RESPONSE by USA as to Alfred NMI Bourgeois re [649] Trial Brief, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 2/18/2011) |
| 2/22/2011 (p.5579) | 655 | TRANSCRIPT as to Alfred NMI Bourgeois re: Partial Transcript of Miscellaneous Hearing (Portions not Previously Transcribed) held on 01/13/11 before Judge Janis Graham Jack.Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 5/23/2011., filed. (mocarter) (Entered: 2/22/2011) |
| 2/23/2011 (p.5697) | 656 | Notice of Filing of Official Transcript as to [655] Transcript,. Party notified, filed. (dterrell, ) (Entered: 2/23/2011) |
| 2/23/2011 (p.5698) | 657 | REPLY TO RESPONSE to Motion by Alfred NMI Bourgeois re [648] MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction Reply to Government's Response to Petitioner's Post-Argument Submission and Opposition to Motion to Reopen Evidentiary Hearing*, filed.(Wiseman, Michael) (Entered: 2/23/2011) |

| | | |
|---|---|---|
| 2/28/2011 (p.5727) | 658 | RESPONSE by USA as to Alfred NMI Bourgeois re [657] Reply to Response,, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 2/28/2011) |
| 3/1/2011 (p.5731) | 659 | RESPONSE to Motion by Alfred NMI Bourgeois re [648] MOTION Reopen Hearing *Petitioner's Motion to Reopen Hearing with Respect to Court's Lack of Jurisdiction Response in Opposition to Government's Motion to Strike Reply*, filed.(Wiseman, Michael) (Entered: 3/1/2011) |
| 5/19/2011 (p.5735) | 660 | ORDER DENYING [396] MOTION to Vacate under 28 U.S.C. 2255 as to Alfred NMI Bourgeois (1); denying without prejudice [362] Motion to Vacate; denying without prejudice [365] Motion for New Trial as to Alfred NMI Bourgeois (1); denying without prejudice [366] Motion for New Trial as to Alfred NMI Bourgeois (1); denying without prejudice [648] Motion as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) (Attachments: # (1) Continuation pgs 41-80, # (2) Continuation pgs 81-120, # (3) Continuation pgs 121-160, # (4) Continuation pgs 161-200, # (5) Continuation pgs 201-225) Parties notified.(sscotch, ) (Entered: 5/19/2011) |
| 5/19/2011 (p.5960) | 661 | FINAL JUDGMENT as to Alfred NMI Bourgeois.(Signed by Judge Janis Graham Jack) Parties notified. (sscotch, ) (Entered: 5/19/2011) |
| 5/26/2011 (p.5961) | 662 | MOTION to Correct *The Court's Memorandum* by USA as to Alfred NMI Bourgeois, filed. (Attachments: # (1) Proposed Order)(Booth, Patricia) (Entered: 5/26/2011) |
| 5/26/2011 (p.5965) | 663 | ORDER granting [662] Motion to Correct as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 5/26/2011) |
| 6/1/2011 (p.5966) | 664 | Agreed MOTION Entry of Judgment by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 6/1/2011) |
| 6/16/2011 (p.5969) | 665 | MOTION to Alter Judgment *Petitioner's Motion Pursuant to F.R.Civ.P. 59e to Alter or Amend Judgment* by Alfred NMI Bourgeois, filed. (Wiseman, Michael) (Entered: 6/16/2011) |
| 6/17/2011 (p.6062) | 666 | ORDER denying [665] Motion to Alter Judgment as to Alfred NMI Bourgeois (1).(Signed by Judge Janis Graham Jack.) Parties notified.(mserpa, ) (Entered: 6/17/2011) |
| 8/15/2011 (p.6063) | 667 | NOTICE OF APPEAL to US Court of Appeals for the Fifth Circuit by Alfred NMI Bourgeois,filed.(Wiseman, Michael) (Entered: 8/15/2011) |
| 8/16/2011 (p.6065) | 668 | Notice of the Filing of an Appeal as to Alfred NMI Bourgeois. DKT13 transcript order form was mailed to appellant two copies. Fee status: IFP. COA denied. The following Notice of Appeal and |

| | | |
|---|---|---|
| | | related motions are pending in the District Court: [667] Notice of Appeal - Judgment and Sentence,filed.(amireles, ) (Entered: 8/16/2011) |
| 9/6/2011 (p.6149) | 669 | DKT-13 TRANSCRIPT ORDER FORM by Victor Abreu. This is to order (original) transcripts of the following proceedings: Ex Parte Hearing held on 11/24/2009 before Judge Janis Graham Jack; Telephone Conference held 12/14/2009 before Judge Janis Graham Jack; and Telephone Conference held 12/06/2010 before Judge Janis Graham Jack. Transcripts are already on file in Clerk's Office. In addition, this order form also relates to the following (copies): [598] Transcript, [468] Transcript, [500] Transcript, [450] Transcript, [631] Transcript, [510] Transcript, [509] Transcript, [655] Transcript, [560] Transcript, [496] Transcript, [667] Notice of Appeal - Judgment and Sentence, [646] Transcript, [594] Transcript, [448] Transcript, [599] Transcript, [595] Transcript, [449] Transcript, [597] Transcript,filed.(abenavidez, ) (Entered: 9/7/2011) |
| 9/26/2011 (p.6151) | 670 | TRANSCRIPT as to Alfred NMI Bourgeois re: TELEPHONE CONFERENCE held on 12/14/09 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 12/26/2011., filed. (mocarter) (Entered: 9/26/2011) |
| 9/26/2011 (p.6176) | 671 | TRANSCRIPT as to Alfred NMI Bourgeois re: TELEPHONE CONFERENCE held on 12/06/10 before Judge Janis Graham Jack. Court Reporter/Transcriber Molly Carter. Release of Transcript Restriction set for 12/26/2011., filed. (mocarter) (Entered: 9/26/2011) |
| 9/27/2011 (p.6183) | 672 | Notice of Filing of Official Transcript as to [670] Transcript, [671] Transcript. Party notified, filed. (vgano, ) (Entered: 9/27/2011) |
| 9/27/2011 | | ADDED USAAPPDIV. (amireles, ) (Entered: 9/27/2011) |

USCA5 84

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION



| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| vs. | § | CRIMINAL NO. C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |
| | § | |

## WRIT OF HABEAS CORPUS AD TESTIFICANDUM

TO:   Warden, Garza East Unit
      Texas Department of Criminal Justice
      4304 Hwy. 202, Beeville, Texas
      (361) 358-9880

TO:   United States Marshal, Southern District of Texas, or any
      authorized United States Marshal

GREETING:

We command that you have the body of **TRAVIS BOWSER, TDCJ#326729,** now duly

committed to the custody of the Warden, Garza East Unit, Texas Department of Criminal Justice,

Beeville, Texas, under safe and secure conduct before the United States District Court for the

Southern District of Texas, Corpus Christi Division at Corpus Christi, Texas, before the U.S.

District Judge Janis Graham Jack, on the 1st day of March, 2004 at 8:00 A.M. there and at that

time to testify in the case of the United States of America v. Alfred Bourgeois, and, after having

so testified and been duly discharged by the Court, to return TRAVIS BOWSER to the custody

of the Warden, Garza East Unit, Texas Department of Criminal Justice, Beeville, Texas, under

safe and secure conduct, and have you then and there this Writ.

USCA5 85

WITNESS the U.S. District Judge, United States District Court for the Southern District of Texas, and the seal of said Court at the City of Corpus Christi, Texas, on this _____ day of February, 2004.

UNITED STATES DISTRICT JUDGE

SUBJECT APPEARED AS ORDERED.

Deputy U.S. Marshal

3 - 3 - 05
Date

USCA5 86

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA

vs.

ALFRED BOURGEOIS

United States Courts
Southern District of Texas
FILED

APR - 6 2005

Michael N. Milby, Clerk of Court

§
§
§
§
§

CRIMINAL NO. C-02-216

### WRIT OF HABEAS CORPUS AD TESTIFICANDUM

TO:    Warden, Byrb Unit
       Huntsville, Texas
       (936) 295-5768

TO:    United States Marshal, Southern District of Texas, or any
       authorized United States Marshal

GREETING:

We command that you have the body of ORLANDO CAMPOS, TDC # 1150730, now duly

committed to the custody of the Senior Warden, Byrb Unit, Huntsville, Texas, under safe and secure

conduct before the United States District Court for the Southern District of Texas, Corpus Christi

Division at Corpus Christi, Texas, before the U.S. District Judge, on the 14th day of April, 2003 at 8:00

a.m. there and at that time to testify in the case of ALFRED BOURGEOIS, and, after having so testified

and been duly discharged by the Court, to return ORLANDO CAMPOS to the custody of the Senior

Warden, Byrb Unit, Huntsville, Texas, under safe and secure conduct, and have you then and there this

Writ.

WITNESS the U.S. District Judge, United States District Court for the Southern District of

Texas, and the seal of said Court at the City of Corpus Christi, Texas, on this _26th_ day

of March, 2003. .

_____
UNITED STATES DISTRICT JUDGE

USCA5 87

SUBJECT APPEARED AS ORDERED.

_James Jones_
Deputy U.S. Marshal

3-03-05
**Date**

USCA5 88

United States Courts
Southern District of Texas
FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

OCT 0 3 2005

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ¤ | |
| | ¤ | |
| v. | ¤ | **Docket No. C-02-216** |
| | ¤ | |
| ALFRED BOURGEOIS, Defendant | ¤ | |

### MOTION FOR LEAVE TO WITHDRAW AS COUNSEL

Comes now the defendant's attorneys and ask for leave to withdraw as the attorneys of record in this cause of action; as grounds for said request, counsel states:

1. This is a capital murder case in which the defendant has been found guilty and sentenced to death.

2. Counsel represented the defendant at trial and on direct appeal where the conviction and sentence was affirmed.

3. Counsel has a private practice that requires many hours of attention to the problems of many criminal clients. Counsel does not have adequate time to devote to this very important, death penalty matter.

4. The federal public defender is much better equipped and funded for handling a writ of certiorari to the United States Supreme Court and a Section 2255 motion in the trial court.

5, The administration of justice and the effective assistance of trial counsel

USCA5 89

requires appointment of the Federal Public Defender and the withdrawal of the undersigned counsel.

WHEREFORE, the undersigned trial and appellate counsel asks leave to withdraw.

Respectfully submitted,

**JOEL DOUGLAS TINKER**, Attorney at Law

**JOHN GILMORE**, Attorney at Law

**JOHN GILMORE**
Admission No. 18181
**JOEL DOUGLAS TINKER**
Admission No. 20056000
Attorneys at Law
622 S. Tancahua
Corpus Christi, TX 78401
(361) 882-4378 (phone)
(361) 882-3635 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I, **JOHN GILMORE**, certify that today, ___October 3___, 2005, a copy of the

foregoing motion was served upon **JAMES L. TURNER**, Assistant United States

Attorney, Appellate Division Chief, 910 Travis, Suite 1500, P.O. Box 61129,

Houston, Texas 77208.

_____
**JOHN GILMORE**
Attorney at Law

**USCA5 91**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA     ¤

                           ¤

        **v.**                  ¤      **Docket No. C–02-216**

                           ¤

ALFRED BOURGEOIS, Defendant     ¤

## O R D E R

On the _____ day of _____, 2005, the Court

considered the foregoing Motion to Withdraw as Attorney of Record and is of the

opinion that all relief requested therein should be **GRANTED**.

**IT IS THEREFORE ORDERED, ADJUDGED and DECREED**

that John Gilmore and Joel Douglas Tinker be discharged as attorneys of record in

this cause of action for Alfred Bourgeois, Defendant herein.

**SIGNED AND ENTERED** this _____ day of _____,

2005.

_____

JUDGE PRESIDING

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2005

Charles R. Fulbruge III
Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

No. 04-40410

_____

D.C. Docket No. 2:02-CR-216-1

United States Courts
Southern District of Texas
FILED

OCT - 5 2005

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA

      Plaintiff - Appellee

    v.

ALFRED BOURGEOIS

      Defendant - Appellant

Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi.

Before JOLLY, WIENER, and DENNIS, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the sentence and conviction of the District Court are affirmed.

ISSUED AS MANDATE: SEP 2 9 2005

A true copy
Test
Clerk, U. S. Court of Appeals, Fifth Circuit

By_____
                    Deputy

New Orleans, Louisiana SEP 2 8 2005

USCA5 93

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 25, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-40410

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee

versus

ALFRED BOURGEOIS,

Defendant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before JOLLY, WIENER & DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Alfred Bourgeois was convicted of murdering his two-year-old daughter ("JG") and sentenced to death under the Federal Death Penalty Act ("FDPA"). Bourgeois challenges his conviction and sentence on grounds that (1) the government failed to charge any aggravating factors in the indictment, (2) the FDPA statutory-intent factor that renders a defendant with a reckless state of mind eligible for the death penalty violates the Eighth Amendment, (3) the district court erred when it delegated to the Director of the Federal Bureau of Prisons supervision over Bourgeois's execution, and (4) the aggravating factors used in his

1

USCA5 94

sentencing were vague and ambiguous.

## I. FACTS AND PROCEEDINGS

### A.    JG's Life Before Bourgeois

JG was born to Katrina Harrison in October, 1999. For the first two and one-half years of her life, JG lived with her mother and grandmother in Livingston, Texas. In April of 2002, Harrison petitioned a local court to have JG's paternity determined. The paternity test showed that Bourgeois, of LaPlace, Louisiana, was JG's biological father. At the time, he was married to Robin Bourgeois, with whom he had two children ("AB1994" and "AB2001"). Bourgeois also had a child from a previous marriage to whose mother he was paying child support.

In May of 2002, Bourgeois appeared in Texas for a child-support hearing regarding JG. He brought his niece to Texas with him with the intention of telling the judge that she was his daughter and had kidney problems in the event that the court ordered high child support payments. Bourgeois, however, was not allowed to take his niece (or any other family member) into the hearing with him. At the conclusion of the hearing, the court ordered Bourgeois to pay Katrina Harrison $160 per month in child support for JG. The court also granted Bourgeois's request for visitation rights with JG for the ensuing seven weeks, and he took custody of JG that afternoon. When JG left her mother and grandmother, she was in good health and free of injuries.

2

USCA5 95

## B.    The Final Weeks of JG's Life

Initially, JG lived with the Bourgeois family at their home in LaPlace, where they remained until May 28, 2002.  After that, JG accompanied the family on Bourgeois's long-haul trucking route, residing with the other four in his 18-wheel tractor/trailer until her death, approximately one month later.  From the outset, Bourgeois systematically abused and tortured his two-year-old daughter in several ways.  For example, Bourgeois became fixated on JG's toilet training.  Her training potty became JG's primary seat during the day, and Bourgeois even forced her to sleep on it when they were traveling at night.  When she had "accidents," Bourgeois would strike JG and then tell his older daughter, AB1994, that it was her fault.

In addition, Bourgeois constantly beat and otherwise assaulted JG.  He punched her in the face with enough force give her black eyes.  He whipped her with an electrical cord, and he beat her with a belt so hard that it broke.  Bourgeois hit JG in the head with a plastic baseball bat so many times that her head "was swollen like a football."  Later, when he was in jail, Bourgeois laughed to a fellow inmate that "[t]hat f---ing baby's head got as big as a watermelon."  There was also evidence that, before the Bourgeois family left LaPlace, Bourgeois had thrown JG against the wall of the master bedroom.  He scratched and pulled her ears, bit her hands, feet, and forehead, and burned the bottom of her foot with

3

USCA5 96

a cigarette lighter.  Bourgeois's wife, Robin, and others noticed that bruises and other injuries appeared on JG's body shortly after she came to stay with the Bourgeois family, and that, between the middle and end of May, JG's hands and feet had become extremely calloused and swollen.  When others tried to clean the sores on JG's feet, Bourgeois would stop them and jam his dirty thumb into the wounds, then force JG to walk on her injured feet.

In addition to physically torturing JG, Bourgeois traumatized her emotionally. For example, on one occasion, Bourgeois decided that it was time for JG to learn how to swim, despite her tender years and fear of the water.  Bourgeois picked up the two-year-old and tossed her several feet in the air and into a swimming pool. He allowed her to sink for several seconds before pulling her out, then repeated the "lesson" for thirty minutes while JG choked and gasped for air.  Similarly, when the family visited a California beach on Bourgeois's long-haul trucking route, he forced JG into the ocean even though she was terrified of the water, holding her under the water and letting the waves roll over her.  By the time they left the beach, JG had swallowed so much salt water that she had difficulty walking and was ill with a swollen stomach.

There was also evidence of sexual abuse.  When the family was staying in LaPlace in May, Bourgeois slept in the master bedroom with JG and AB1994 behind a locked door, while Robin slept in a different bedroom.  Late that month, a family friend noticed blood in JG's diaper and convinced Bourgeois and Robin to take JG to

4

USCA5 97

Louisiana Child Protective Services ("CPS") for an evaluation. There, the examining physician concluded that the source of the blood was external irritation to JG's genitalia. Although the doctor determined that the cause of the injury was inconclusive, he noted that it could have been the result of vaginal trauma. The same doctor examined JG after her death and found a similar but more severe irritation to JG's genitalia, this time concluding that the irritation was likely caused by vaginal trauma. Furthermore, after JG's death, rectal swabs revealed the presence of semen.

**C.    Concealed Abuse; Planning for JG's Death**

Bourgeois actively tried to conceal the evidence of his continuous abuse. For example, he covered JG's injured feet with socks, made her wear sunglasses to hide her battered face, and told people that she had been in a terrible car accident to explain her swollen head.

Around the time that the blood appeared in JG's diaper, Bourgeois reported to Texas CPS that JG had been abused while living with Katrina, that Katrina was living with a convicted sex offender, and that the house was unsuitable for a child. CPS investigated Bourgeois's complaint and concluded that it was not only untrue, but also was made "in bad faith." Similarly, Bourgeois told friends along his trucking route that JG's mother had neglected and abused JG and that she had been sexually molested with a finger.

5

USCA5 98

Furthermore, Bourgeois fostered the misleading appearance that everything was fine by sending postcards to Katrina, stating that JG was well and having fun on the trucking route/family vacation, and that they had visited, <u>inter alia</u>, Disneyland and the Elvis Presley Museum.  Bourgeois signed the postcards "JG."  None of the information on the postcards, however, was true.

In stark contrast to these postcards' Rockwellian portrayals, Bourgeois told little JG that she made him want to kill her.  When Robin asked him what he would do if he killed JG, Bourgeois replied unhesitatingly that he would throw her out of the truck, and they would concoct a story for the police.  Specifically, he said that they would stop at a rest stop, where Robin would take the children into the bathroom and then come out and claim that someone had kidnapped JG.  Bourgeois added that Robin would then call 911 to report the "kidnapping," and the police would blame the phantom kidnapper for JG's death.  Similarly, AB1994 recalled that her father had said that if JG died, he would take her into the swamp and leave her there.  On June 23, 2002 — four days before JG's death — Bourgeois called his sister and said, "You get your black dress out.  I'm going through a lot.  I don't know what I'm going to do."

**D.    The Murder**

On July 26, 2002, the Bourgeois family stopped by their home in LaPlace get their mail and check on their house.  Bourgeois

6

USCA5 99

found a court order directing him to remit $519.99 in child support to his ex-wife.  During the brief visit, Bourgeois made JG wait for them in the hot cab of the truck.

Later that afternoon, the family continued on Bourgeois's trucking route, arriving the next morning at the Corpus Christi Naval Air Station to deliver a shipment.  While Bourgeois was backing his truck up to the loading dock, JG was sitting on her training potty.  When she wiggled and the potty tipped over, Bourgeois became angry and started yelling at JG and spanking her bare bottom.  He then grabbed her by her shoulders and slammed the back of her head into the front and side window area around the dashboard four times.  Meanwhile, warehouse personnel who were standing in the trailer felt shaking coming from within the cab of Bourgeois's truck.

Robin awakened shortly after this beating and immediately noticed that JG's body was limp, her eyes were closed, and her heart was racing.  Robin attempted unsuccessfully to revive JG by administering CPR, then told Bourgeois that the child needed emergency medical attention.  Bourgeois replied that he would take JG to the emergency room after he finished unloading his truck. Robin insisted that JG needed help immediately, handing JG to Bourgeois and telling him to get her help.  Bourgeois responded that they would just say that JG slipped while following AB1994 out of the truck.  Bourgeois then left the cab with JG.  After Robin got dressed, she opened the passenger-side door to exit the cab and

7

USCA5 100

there, on the ground, lay JG. Robin again tried CPR while a passer-by called 911. After that, Bourgeois came running from behind the truck, asking what happened.

When the ambulance arrived, Bourgeois and Robin told the driver, then told both CPS workers and the FBI agent, that JG had fallen out of the truck. At the hospital, Dr. Noorullah Akhtar examined JG and concluded that her brain had hemorrhaged and was swollen. The doctor ventured that JG's injuries were equivalent to those of a person who had fallen out a car traveling on the Interstate. All of this occurred on June 27, 2002. The doctors sustained JG on life support until her mother could get to the hospital, where the baby died in her mother's arms the next day.

**E.    The Post-Mortem Investigation**

After JG's death, Dr. Elizabeth Rouse, the medical examiner, conducted an autopsy which she described as one of the most involved of her career. This, she explained, was because of the sheer number and extent of the injuries to JG's body. Dr. Rouse observed, <u>inter alia</u>, that JG had (1) a bruised shoulder, (2) human bite marks on her back and arm, (3) scratch marks and injuries to her ears, (4) loop marks on her body consistent with an electrical cord, and (5) a circular hole a quarter of an inch deep on the bottom of one foot. When she opened JG's torso for examination, Dr. Rouse observed deep tissue bruising in every area of JG's body.

USCA5 101

All in all, JG exhibited 25 or 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 or 10 abrasions or excoriations, 7 to 9 healing ulcerations, and 3 lacerations.  On the basis of JG's injuries, Dr. Rouse concluded that JG was a chronically abused or battered child. She determined that the ultimate cause of death was an impact to the head resulting in a devastating brain injury.  The location of the fatal injury was consistent with Bourgeois's holding JG by the shoulders and slamming the right side and back of her head against the window and dashboard of the truck cab.

Just under one year after JG's death, the government filed a second, superseding indictment against Bourgeois.  It charged him with unlawfully killing JG with premeditation and malice aforethought by physically assaulting her on June 27, 2002 and causing the injuries from which she died on June 28, 2002.  The Grand Jury's indictment specially charged, inter alia, the following FDPA statutory intent factors: (1) Bourgeois intentionally killed JG, (2) Bourgeois intentionally inflicted serious bodily injury that resulted in JG's death, and (3) Bourgeois intentionally engaged in an act of violence, knowing that the act created a grave risk of death to JG and constituted reckless disregard for human life, and JG died as a result of the violent act.  The indictment also charged the following FDPA statutory aggravating factors: (1) Bourgeois committed the offense in an especially heinous, cruel and depraved manner in that it

9

USCA5 102

involved torture or serious physical abuse to JG, (2) Bourgeois committed the offense after substantial planning and premeditation, and (3) JG was especially vulnerable because of her youth or infirmity.  In its notice of intent to seek the death penalty, the government listed all the FDPA intent and aggravating factors from the second, superseding indictment, plus two non-statutory aggravating factors: (1) On the basis of his record of violence, Bourgeois is likely to commit future acts of violence and pose a threat to the lives and safety of others, and (2) JG's murder caused her family severe emotional suffering and irreparable harm.

After a two-week trial, the jury found Bourgeois guilty of murder.  The district court then conducted the sentencing hearing, at which Bourgeois presented nine mitigating factors for the jury's consideration.  Six jurors found by a preponderance of the evidence that Bourgeois was under stress from family and economic factors, and all 12 jurors found by a preponderance of the evidence that Bourgeois was driving across the country with three children and one other adult in the cab of an 18-wheel tractor-trailer.  No juror found that Bourgeois established any of the other mitigating factors by a preponderance of the evidence.  The jury unanimously found the above-listed FDPA intent factors and aggravating factors beyond a reasonable doubt.  The jury also unanimously found the non-statutory aggravating factors beyond a reasonable doubt. Finally, the jury unanimously found that the aggravating factors outweighed the mitigating factors, and unanimously recommended that

USCA5 103

the district court sentence Bourgeois to death, which it did.

We have jurisdiction over Bourgeois's appeal of his judgment of conviction and sentence under 18 U.S.C. §§ 3595, 3742(a), and 28 U.S.C. § 1291.

## II. ANALYSIS

### A.  Standard of Review

Bourgeois raised none of the constitutional challenges in the district court that he now raises on appeal.  Accordingly, we review them for plain error.[1]  Thus, we shall determine (1) whether there is an error, (2) if so, whether the error is plain, (3) if it is, whether it affects the defendant's substantial rights, and (4) if so, whether it seriously affects the fairness and integrity of the district court proceedings.[2]

### B.  Sufficiency of the Indictment

To render a criminal defendant eligible for the death penalty under the FDPA, the government must prove, beyond a reasonable doubt, any one of the statutory intent factors provided in section 3591(a)(2) and any one of the statutory aggravating factors provided in section 3592(c).  Once the defendant is proved to be

---

[1]U.S. v. Miranda, 248 F.3d 434, 443 (2001).  Bourgeois argues that he is entitled to a more stringent standard of review of the constitutional sufficiency of the indictment, citing Sitrone v. U.S., 361 U.S. 212 (1960).  We expressly rejected the same argument in U.S. v. Robinson, 367 F.3d 278, 286 (5th Cir. 2004).

[2]Miranda, 248 F.3d at 443.

11

eligible for the death penalty, the government may present non-statutory aggravating factors, such as victim impact, to argue for the death penalty.[3]  The FDPA requires the government to file a notice of intent to seek the death penalty, informing the defendant of the factors on which the government intends to rely in seeking that penalty.[4]

The FDPA does not expressly require the government to charge any of the statutory factors in the indictment.  In Ring v. Arizona,[5] however, the Supreme Court held that when the finding of an aggravating factor renders a defendant eligible for the death penalty, it is "the functional equivalent of an element of a greater offense."[6] Consequently, the government is required by the Sixth Amendment to prove the aggravating factor to the jury beyond a reasonable doubt.[7]  Although the Supreme Court has yet to hold that, under the Indictment Clause of the Fifth Amendment, the government must charge the aggravating factors in the indictment, we have interpreted Ring to apply with equal force at the indictment stage of the proceedings.[8]  Accordingly, we require the

--------

[3]18 U.S.C. § 3593(a).

[4]Id.

[5]536 U.S. 584 (2002).

[6]Ring, 536 U.S. at 609.

[7]See id.

[8]Robinson, 367 F.3d at 284.

12

USCA5 105

government to charge the statutory factors of the FDPA in the indictment, and we consider the failure to do so to be constitutional error.[9]

Bourgeois contends that the government erred in this case because it failed to charge the statutory and the non-statutory aggravating factors in the indictment.  As for the statutory aggravators, he is simply wrong:  They are expressly charged in the second, superseding indictment.  As for the non-statutory aggravators, he is correct in stating that they were not contained in the indictment, but neither we nor any other circuit court of appeals has ever held that non-statutory aggravating factors must be set forth in the indictment.  As the Supreme Court's decision in Ring and our decision in Robinson highlight, the critical issue is whether a factor will expose a criminal defendant to the death penalty.  Only a factor that renders the defendant eligible for the death penalty must be charged in the indictment.

Significantly, non-statutory aggravating factors do not render a criminal defendant eligible for the death penalty.  As the Supreme Court explained in Jones v. U.S., the findings of the statutory factors of intent and aggravation specified in the FDPA comprise the eligibility phase of death sentencing.[10]  As such, only

_____

[9]Id.

[10]527 U.S. 373, 377 (1999)(explaining that the jury's finding of the statutory intent and statutory aggravating factors under the FDPA comprises the eligibility phase of sentencing).

13

USCA5 106

the FDPA's statutory factors expose a criminal defendant to the death penalty. Alone, non-statutory aggravating factors cannot make a defendant eligible for the death sentence. This is because the jury proceeds to consider non-statutory aggravating factors only _after_ the defendant is determined to be death-eligible.[11] Accordingly, it was neither constitutional nor statutory error for the non-statutory aggravating factors to be omitted from the indictment.[12]

### C.    Constitutionality of FDPA Section 3591(a)(2)(D) under the Eighth Amendment

Bourgeois asserts that FDPA section 3591(a)(2)(D) violates the Eighth Amendment by permitting the imposition of the death penalty on a murderer who acts with only a reckless state of mind. The Eighth Amendment prohibits "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged."[13] Therefore, the punishment imposed must be

---

[11]_See id._ (explaining that once the defendant is death eligible, the jury may consider non-statutory factors in making the "selection decision," i.e., the decision whether to recommend a punishment of life imprisonment or death). _See also U.S. v. Jones_, 132 F.3d 232, 240 (5th Cir. 1998)(noting that the jury may consider non-statutory aggravating factors only after finding the existence of statutory aggravating factors).

[12]_See also U.S. v. Higgs_, 353 F.3d 281, 298 (4th Cir. 2003), _cert. denied_, 125 S.Ct. 627 (2004)(holding that the Fifth Amendment does not require the government to charge non-statutory aggravating factors in the indictment because "[t]he finding of a non-statutory aggravator alone will not support imposition of the death penalty").

[13]_Enmund v. Florida_, 458 U.S. 782, 788 (1982)(internal quotations omitted).

14

USCA5 107

proportionate to a defendant's culpability.  Significantly, in Tison v. Arizona, the Supreme Court held that "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death presents a highly culpable mental state... that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."[14]  In other words, the Eighth Amendment is not a per se bar to imposition of the death penalty when the murderer possessed only a reckless state of mind.[15]

When a criminal defendant's state of mind was reckless, the Eighth Amendment inquiry hinges on the degree of his participation in the acts that ultimately led to death.  As we explained in U.S. v. Webster, the sentencer must examine "the defendant's 'own personal involvement in the crimes.'"[16]  A reckless defendant who is heavily involved in acts that led to the victim's death is sufficiently culpable to be sentenced to death without violating the Eighth Amendment.[17]  In contrast, under the Eighth Amendment, a reckless defendant who is only tangentially involved in the acts

_____

[14]481 U.S. 137, 157-58 (1986).

[15]See U.S. v. Webster, 162 F.3d 308, 322 (5th Cir. 1998)(observing that the FDPA imposes the death penalty only on defendants with sufficient culpability, including those who act in "reckless disregard for human life").

[16]Id.

[17]See id. See also Tison, 481 U.S. at 153 (noting that "the greater the defendant's participation in the felony murder, the more likely he acted with reckless indifference to human life").

15

USCA5 108

that led to the victim's death is not sufficiently culpable be sentenced to death.[18]

In this case, Bourgeois has demonstrated sufficient culpability to permit the imposition of the death penalty under the Eighth Amendment, even if his _mens rea_ were only reckless disregard and not specific intent. Bourgeois was, after all, the _sole_ participant in the acts that directly caused JG's death, making tangential participation a logical and legal impossibility. Bourgeois's "reckless" state of mind is thus sufficient to render him eligible for the death penalty without implicating the strictures of the Eighth Amendment. As the Supreme Court noted in _Tison_, "some nonintentional murderers may be among the most dangerous and inhumane of all — the person who tortures another not caring whether the victim lives or dies" is among them.[19]

**D.    The Place, Manner, and Means of Execution**

Bourgeois contends that the district court erred when it delegated to the Director of the Federal Bureau of Prisons the power to determine the place, manner, and means to be used in carrying out his execution, because Congress did not delegate any of its power to the judicial branch to make those determinations. Bourgeois is correct that no provision of the FDPA delegates any such power to the Third Branch. This is of no consequence,

---

[18]_Tison_, 481 U.S. at 148.

[19]_Id._ at 157.

16

USCA5 109

however.  In §§ 3596(a) and 3597(a) of the FDPA, Congress expressly delegated such power to the Executive Branch, specifically the Department of Justice in the person of the Attorney General. Section 3596(a) provides that when the death sentence is to be imposed under the FDPA, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  Section 3597(a) authorizes the United States marshal to employ the use of state and local officials and facilities to carry out the execution.  Accordingly, Bourgeois's argument that Congress did not delegate any power to the district court to determine the mode of carrying out a death sentence misses the mark:  All that the district court did was to acknowledge that Congress had validly delegated the requisite authority to the Department of Justice, of which the Federal Bureau of Prisons is an agency.

Furthermore, to the extent that Bourgeois challenges the district court's acknowledgment of the authority of the Director of the Federal Bureau of Prisons to determine the particulars of Bourgeois's execution, his argument is without merit.  Section 3596(a) specifies that Bourgeois's execution is to take place "in the manner prescribed by the law of the State in which the sentence is imposed."[20]  Texas effects the death penalty "by intravenous

---

[20]18 U.S.C. § 3596(a).

17

USCA5 110

injection of a substance or substances in a lethal quantity sufficient to cause death until such convict is dead, such execution procedure to be determined and supervised by the Director of the institutional division of the Texas Department of Criminal Justice."[21] Here, the district court ordered that the execution be carried out by lethal injection and acknowledged the authority of the Attorney General, through the auspices of the Director of the Federal Bureau of Prisons, to designate the place of execution and the substances to comprise Bourgeois's lethal injection.

Bourgeois fails to demonstrate that the district court's order is inconsistent with Texas law. The only difference between the Texas law and the district court's acknowledgment is that the district court recognized Congress's delegation to the Department of Justice when the court turned over Bourgeois to the Director of the Federal Bureau of Prisons and not to the Director of the Institutional Division of the Texas Department of Criminal Justice. There is nothing before us, however, to suggest that the Director of the Federal Bureau of Prisons is not the equivalent of (1) the Attorney General, (2) the Department of Justice, or (3) the Director of the Institutional Division of the Texas Department of Criminal Justice. Therefore, even if the district court's purported "delegation" of power to the Director of the Federal Bureau of Prisons were error (which it was not), such error would

---

[21]TEX. CRIM. PROC. CODE § 43.14 (Vernon 2005).

18

not have been plain.  Furthermore, there is nothing before us to indicate that the difference affects Bourgeois's substantial rights.

**E.    The Statutory and Non-Statutory Aggravating Factors**

Bourgeois asserts that all five of the aggravating factors used in his sentencing are vague and overbroad.  As the Eighth Amendment prohibits the arbitrary imposition of the death penalty,[22] an aggravating factor must meet two distinct thresholds to pass constitutional muster.[23]  First, the factor must not be so broad that it could apply to every murderer potentially eligible for the death penalty.[24]  This is because an overbroad aggravator could invite arbitrariness into the capital sentencing decision, in violation of the Eighth Amendment.[25]  Consequently, the factor "must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry."[26]

---

[22]Jones, 527 U.S. at 381.

[23]Tuilaepa v. California, 512 U.S. 967, 972 (1994).

[24]Id.  See also Jones, 527 U.S. at 402 (noting that an aggravating factor is unconstitutionally overbroad if a jury could consider it to apply to every defendant who is eligible for the death penalty).

[25]See Tuilaepa, 512 U.S. at 973 (noting that the underlying principle in making the capital sentencing decision is that "[t]he State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision").

[26]Jones, 527 U.S. at 381.

19

USCA5 112

Second, an aggravating factor must have "some 'common-sense core of meaning...that criminal juries should be capable of understanding.'"[27] Simply put, an aggravating factor cannot be unconstitutionally vague. "[V]agueness review is quite deferential ...and [the Supreme Court has] found only a few factors vague."[28] As we explain below, none of the aggravators targeted by Bourgeois in this appeal is either vague or overbroad. Thus, the aggravators are valid under the Eighth Amendment.

    i.    Victim Impact and Victim Vulnerability

Bourgeois insists that the victim impact and victim vulnerability aggravators are unconstitutionally overbroad because they could apply to any murderer.[29] The Supreme Court has, however, held otherwise. Specifically, the Court has explained that "though the concepts of victim impact and victim vulnerability may well be relevant in every case, evidence of victim vulnerability and victim impact in a particular case is inherently individualized."[30] Accordingly, these aggravating factors are not overbroad.

---

[27]Tuilaepa, 512 U.S. at 973 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976)).

[28]Id. at 973-74.

[29]The victim impact aggravator states that JG's murder caused her family "extreme emotional suffering, and [her] family has suffered severe and irreparable harm." The victim vulnerability aggravator states that JG "was particularly vulnerable due to her youth." The vulnerability aggravator is based on the FDPA section 3592(c)(11).

[30]Jones, 527 U.S. at 401 (emphasis in original).

20

USCA5 113

Bourgeois also asserts that the victim impact and victim vulnerability aggravators are unconstitutionally vague. Again, Bourgeois's argument fails. The jury could have had no difficulty understanding that it was directed by the victim impact aggravator to consider the particular effect of JG's murder on her family.[31] Neither could the jury have had difficulty understanding that the victim vulnerability aggravator directed it to consider whether JG was especially vulnerable to Bourgeois's attack because she was only two years old and under his care, custody, and control by virtue of court order.[32] The victim impact and victim vulnerability aggravators are not unconstitutionally overbroad or vague.

    ii.   Heinous, Cruel, or Depraved Manner of Committing Offense

Bourgeois likewise contends that the aggravating factor that he "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture and serious physical abuse to JG" is overbroad and vague. This factor is based on the language of § 3592(c)(6) of the FDPA, which we have consistently

---

[31]See id. (holding that a victim impact aggravator was not unconstitutionally vague because it directed the jury to consider, inter alia, "the effect of the crime on [the victim's] family").

[32]See id. at 400 (holding that a victim vulnerability aggravator that provided that the adult victim was especially vulnerable to attack because of, inter alia, her slight stature and her youth was not unconstitutionally vague because "the jury should have had no difficulty understanding that [the factor] was designed to ask it to consider whether the victim was especially vulnerable to petitioner's attack").

21

USCA5 114

upheld against such attacks.[33]  We have so held because the factor indisputably narrows the class of murderers who are eligible for the death penalty and is sufficiently specific to pass constitutional muster.

iii.  Substantial Planning and Premeditation

Bourgeois also asserts that the substantial planning and premeditation aggravators are unconstitutionally overbroad and vague.  These factors are based on FDPA section 3592(c)(9), and they obviously narrow the class of murderers who could be eligible for the death penalty because not every murder involves substantial planning or premeditation.  Furthermore, we have explicitly held that these aggravators are not unconstitutionally vague.[34]

iv.  Future Threat

Finally, Bourgeois urges that the future-threat aggravator — that, based on his personal history of violence, he "is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others" — is unconstitutionally overbroad and vague.  It is neither.  It is axiomatic that not every murderer will pose a serious continuing threat to society.  Furthermore, like the victim-vulnerability and

---

[33]U.S. v. Hall, 152 F.3d 381, 414 (5th Cir. 1998)(upholding the factor against a challenge that it was both unconstitutionally overbroad and vague), abrogated on other grounds by U.S. v. Martinez-Salazar, 528 U.S. 304, 316 (2000)(peremptory challenges); Jones, 132 F.3d 232 (upholding the factor against a challenge that it was unconstitutionally vague).

[34]Webster, 162 F.3d at 354 n.70.

22

USCA5 115

victim-impact aggravators, the future-threat aggravator used here channeled the jury's attention to the specific facts of the case, i.e., Bourgeois's individual history of systematic violence.[35] This factor is inherently individualized and thus is not unconstitutionally overbroad.[36]

Neither is the future-threat aggravator unconstitutionally vague. A jury would easily understand that it is directed by this aggravator to consider whether Bourgeois will pose a danger to society in the future. In _Jurek v. Texas_, the Supreme Court reviewed, _inter alia_, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[37] In his concurring opinion, Justice White concluded that the factor has "a common-sense core of meaning and that criminal juries should be capable of understanding [it]."[38] The future-threat aggravator here is substantially similar to the one construed in _Jurek_, and our

---

[35]_Cf. Jones_, 527 U.S. at 401 (holding that the victim impact and victim vulnerability aggravators were not overbroad and explaining that "though the _concepts_ of victim impact and victim vulnerability may well be relevant in every case, _evidence_ of victim vulnerability and victim impact in a particular case is inherently individualized").

[36]_See Nguyen v. Reynolds_, 131 F.3d 1340, 1354 (10th Cir. 1998)(holding with little discussion that the Oklahoma future dangerousness aggravator was not applicable to every murderer and therefore was not unconstitutionally overbroad).

[37]428 U.S. 262, 277 (1976)(White, J., concurring).

[38]_Jurek_, 428 U.S. at 279.

23

USCA5 116

conclusion is no different than Justice White's conclusion in

<u>Jurek</u>:  The factor is constitutionally sound.

### III.  CONCLUSION

This is not a close case.  Bourgeois fails to prove that there was any error, much less plain error, in any aspect of his trial. Bourgeois's conviction and sentence are, in all respects, AFFIRMED.

USCA5 117

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**CHARLES R. FULBRUGE III**
**CLERK**

TEL. 504-310-7700
600 CAMP STREET
NEW ORLEANS, LA 70130

September 29, 2005

United States Courts
Southern District of Texas
FILED

OCT - 5 2005

Michael N. Milby, Clerk of Court

Mr Michael N Milby, Clerk
Southern District of Texas, Corpus Christi
United States District Court
1133 N Shoreline Boulevard
Corpus Christi, TX 78401

No. 04-40410 USA v. Bourgeois
USDC No.  2:02-CR-216-1

Enclosed, for the district court only, is a certified copy of the judgment issued as the mandate.

Enclosed, for the district court only, is a copy of the court's opinion.

Record/original papers/exhibits to be returned.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: _____
Dawn D. Victoriano, Deputy Clerk
504-310-7717

cc: (letter only)
    Honorable Janis Graham Jack
    Mr John S Gilmore Jr
    Mr Tony Ray Roberts

MDT-1

USCA5 118

United States Courts
Southern District of Texas
FILED

OCT 1 3 2005

Michael N. Milby, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA          ¤
                                  ¤
v.                                ¤          **Docket No. C–02–216**
                                  ¤
ALFRED BOURGEOIS, Defendant       ¤

## AMENDED MOTION FOR LEAVE TO WITHDRAW AS COUNSEL

Comes now the defendant's attorneys and ask for leave to withdraw as the attorneys of record in this cause of action; as grounds for said request, counsel states:

1. This is a capital murder case in which the defendant has been found guilty and sentenced to death.

2. Counsel represented the defendant at trial and on direct appeal where the conviction and sentence was affirmed.

3. Counsel has a private practice that requires many hours of attention to the problems of many criminal clients. Counsel does not have adequate time to devote to this very important, death penalty matter.

4. The federal public defender is much better equipped and funded for handling a writ of certiorari to the United States Supreme Court and a Section 2255 motion in the trial court.

USCA5 119

5. The administration of justice and the effective assistance of trial counsel requires appointment of the Federal Public Defender and the withdrawal of the undersigned counsel.

6. Counsel would recommend that Mr. Keith S. Hampton, an attorney in Austin, Texas or Ms. Adrienne Urrutia, an attorney in San Antonio, Texas be appointed in this case. The resumes of both are attached hereto for the Court's consideration.

**WHEREFORE**, the undersigned trial and appellate counsel asks leave to withdraw.

Respectfully submitted,

JOEL DOUGLAS TINKER, Attorney at Law

JOHN GILMORE, Attorney at Law

JOHN GILMORE
Admission No. 18181
JOEL DOUGLAS TINKER
Admission No. 20056000
Attorneys at Law
622 S. Tancahua
Corpus Christi, TX 78401
(361) 882-4378 (phone)
(361) 882-3635 (fax)

USCA5 120

# KEITH S. HAMPTON
1103 Nueces Street
Austin, Texas 78701
(512) 476-8484; (512) 476-0953 fax
hamplaw@swbell.net

## BIOGRAPHICAL INFORMATION

### BOARD CERTIFICATION

Criminal Law, Texas Board of Legal Specialization, conferred December 1995

### EDUCATION

B.A., University of Texas at Austin, 1984
J.D., St. Mary's University School of Law, San Antonio, Texas, 1989

### LICENSES

Texas, 1989
United States Supreme Court, 1994
U.S. Fifth Circuit Court of Appeals, 1996
Western District of Texas, 1991
Northern District of Texas, 1994
Eastern District of Texas, 1994

### EMPLOYMENT

Private Practice of Law, September 1990 to present, Austin, Texas
Briefing Attorney, the Honorable Judge Sam Houston Clinton, Judge,
    Texas Court of Criminal Appeals; 1989-90

### PROFESSIONAL ACTIVITIES

Lobbyist for the Texas Criminal Defense Lawyers Association 1995 - present
Amicus Committee, Texas Criminal Defense Lawyers Association, 1992 - 1995
Legislative Committee, Texas Criminal Defense Lawyers Association, 1993 - 2003
Austin Criminal Defense Lawyers Association, 1992 - present
National Association of Criminal Defense Lawyers, 1992-present

### ARTICLES AND PAPERS

USCA5 121

Articles include *Stranded in the Wasteland of Unregulated Roadway Police Powers: Can "Reasonable Officers" Ever Rescue Us?*, 35 St. Mary's L. J. 499 (2004); *Children in the War on Crime: Texas Sex Offender Mania and the Outcasts of Reform*, 42 S.Tex.L.Rev. 781 (2002) and *The Parole Law Instruction and Jury Misconduct*, 23 Tex.Tech.L.Rev. 773 (1993) and some of which have been cited in such journals as Harvard Journal on Legislation, Oklahoma Law Review, and Vanderbilt Law Review.

## PUBLISHED OPINIONS (partial)

Appellate counsel in over 30 published cases

*Dyar v. State*, No. 1794-01 (Tex.Crim.App. 2003)
*Ex parte Tuley*, No. 74,364 , (Tex.Crim.App. 2002)
*State v. Parrick*, 86 S.W.3d 592 (Tex.Crim.App. 2002)
*Wiley v. State*, 74 S.W.3d 399 (Tex.Crim.App. 2002)
*Ex parte Gethen*, 28 S.W.3d 553 (Tex.Crim.App. 2000)
*Carmona v. State*, 941 S.W.2d 949 (Tex.Crim.App. 1997)
*Zinger v. State*, 932 S.W.2d 511 (Tex.Crim.App. 1996)
*Edmonson v. State*, 943 S.W.2d 211 (Tex.App. — Austin 1997)
*Francis v. State*, 877 S.W.2d 441 (Tex. App. — Austin 1994, *pet. ref'd*)
*Ortega v. State*, 860 S.W.2d 561 (Tex.App. — Austin 1993)
*Jackson v. Sharp*, 846 S.W.2d 144 (Tex.App. — Austin 1993)
*Wincott v. State*, 59 S.W.3d 691 (Tex.App. – Austin 2001, *State's pet. ref'd*)
*State v. Laird*, 38 S.W.3d 707 (Tex.App. – Austin 2000, *State's pet. ref'd*)
*Frost v. State*, 25 S.W.3d 395 (Tex.App. – Austin 2000, *no pet.*)
*State v. Read*, 965 S.W.2d 74 (Tex.App. — Austin 1998)

## AWARDS

Named one of the "Best Lawyers in America" 2005-2006
Texas Criminal Defense Lawyers Association President's Award 2005
Named a "super-lawyer" *Texas Monthly* and *Law and Politics Magazine* since 2003
Texas Criminal Defense Lawyers Association President's Award 2002
Texas Criminal Defense Lawyers Association President's Award 1999
Austin Criminal Defense Lawyer Association Ambassador Award 1999
Texas Criminal Defense Lawyers Association President's Award 1993 ,
Fellow, Texas Bar Foundation
Highest Martindale-Hubbell Rating

**Capital Presentations**

*The Thinking Lawyer's Voir Dire — Countering the "Woodshed Effect" and Other Thoughts on an Effective Capital Voir Dire,* Second Annual Texas Capital Defense Conference (October 10-13, 2002)

*Capital Voir Dire,* Life in the Balance, TCDLA Capital Seminar (September 15, 2003)

*Wiggins v. Smith for Judges,* Center for American and International Law Capital Seminar (August 9, 2004)

*Cross-Examination of the State's Shrinks,* TCDLA Capital Seminar (February 25, 2005)


**Capital Experience**

Handled state death penalty cases at all stages in both state and federal court.

USCA5 123

ADRIENNE URRUTIA
12011 Huebner Road, Suite 201
San Antonio, Texas 78230
(210) 690-1790

**Education:**

Juris Doctor; St. Mary's University School of Law, San Antonio, Texas
May 1989

Bachelor of Arts, Journalism, Trinity University, San Antonio, Texas
August 1986

**Experience:**

Attorney and Sole Proprietor, Law Office of Adrienne Urrutia, San Antonio, Texas;
August 1998 to present

   Selected as one of "San Antonio's Best Lawyers" (Appellate Law)
   *Scene in SA Magazine*, August 2004 and August 2005

Assistant Federal Public Defender, Office of Lucien B. Campbell, Federal Public
Defender, Western District of Texas, San Antonio, Texas
May 1992 to August 1998

Adjunct Professor/Lecturer, St. Mary's University, Department of Public Justice, San
Antonio, Texas
August 1994 to December 1997

   Outstanding Public Justice Faculty Award, St. Mary's University Public Justice
   Students' Association; April 1995.

Attorney, Law Office of Adrienne Urrutia, San Antonio, Texas
June 1990 to May 1992

Briefing Attorney, Texas Court of Criminal Appeals, Hon. (Late) M.P. Duncan, III,
Austin, Texas
September 1989 to May 1990

Adjunct Professor, St. Edward's University, Austin, Texas
Spring 1990

1

USCA5 124

**Specialization:**

Board Certified—Criminal Law, Texas Board of Legal Specialization; December 1996
Approved for Recertification; December 2001

**Professional Licenses:**

State Bar of Texas, 1989
U.S. District Court for the Western District of Texas, 1990
U.S. Court of Appeals for the Fifth Circuit, 1991
U.S. Supreme Court, 1992
U.S. District Court for the Southern District of Texas, 2001

**Papers, Presentations & Publications:**

"Representing Non-Citizens Under the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996," presented at Winning Strategies in Federal Criminal Cases
Seminar
San Diego, California, June 1997
Philadelphia, Pennsylvania, August 1997
New Orleans, Louisiana, October 1997

"Immigration-Related Criminal Offenses, Sentencing Guidelines, and Appellate
Issues," presented at "Minimizing the Effect of Criminal Conduct on a Client's
Immigration Status"
San Antonio, Texas, November 1996
ABA Mid-Year Conference, Immigration Law Section, San Antonio, January 1997.

"Combating DNA Evidence," Criminal Defense Lawyers Project, Course
Materials, Author and Lecturer
McAllen, Texas, April 1990

"DNA Evidence in Criminal Cases," *Voice for the Defense*, March 1989

**Other Activities:**

Scholarship Recipient and Attendee, 10th Annual National Habeas Corpus Seminar,
Pittsburgh, Pennsylvania, August 2005

Fellow, Texas Bar Foundation, 2005

Scholarship Recipient and Attendee, 8th Annual National Habeas Corpus Seminar,
Chicago, Illinois, August 2003

2

USCA5 125

Scholarship Recipient and Attendee, 7th Annual National Habeas Corpus Seminar, Nashville, Tennessee, August 2002

Participant, Young Jewish Leadership Development Program, The Jewish Federation of San Antonio, 2001 to 2002

Member and Exhibitor, Texas Hunter Jumper Association, 1997 to present

Member and Exhibitor, United States Equestrian Federation, 1992 to present

3

USCA5 126

## CERTIFICATE OF SERVICE

I, **JOHN GILMORE**, certify that today, September 13, 2005, a copy of the foregoing motion was served upon **JAMES L. TURNER**, Assistant United States Attorney, Appellate Division Chief, 910 Travis, Suite 1500, P.O. Box 61129, Houston, Texas 77208.

**JOHN GILMORE**
Attorney at Law

USCA5 127

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ¤ | |
| | ¤ | |
| **v.** | ¤ | **Docket No. C–02-216** |
| | ¤ | |
| **ALFRED BOURGEOIS, Defendant** | ¤ | |

## O R D E R

On the _____ day of _____, 2005, the Court

considered the foregoing Motion to Withdraw as Attorney of Record and is of the

opinion that all relief requested therein should be **GRANTED**.

### IT IS THEREFORE ORDERED, ADJUDGED and DECREED

that John Gilmore and Joel Douglas Tinker be discharged as attorneys of record in

this cause of action for Alfred Bourgeois, Defendant herein.

**IT IS FURTHER ORDERED** that _____

_____ be appointed at attorney of

record for Alfred Bourgeois, Defendant herein.

**SIGNED AND ENTERED** this _____ day of _____,

2005.

_____
JUDGE PRESIDING

USCA5 128

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| vs. | § | Docket No. C-02-216 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Defendant. | § | |

**ORDER**

On the 17th day of October, 2005, the Court considered the foregoing Motion to Withdraw as Attorney of Record and is of the opinion that all relief requested therein should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that John Gilmore and Joel Douglas Tinker be discharged as attorneys of record in this cause of action for Alfred Bourgeois, Defendant herein.

IT IS FURTHER ORDERED that Keith S. Hampton and Adrienne Urrutia be appointed as attorneys of record for Alfred Bourgeois, Defendant herein.

SIGNED and ENTERED this 17th day of October, 2005.

_____

Janis Graham Jack
United States District Judge

USCA5 129

# United States Court of Appeals

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**CHARLES R. FULBRUGE III**
**CLERK**

TEL. 504-310-7700
600 CAMP STREET
NEW ORLEANS, LA 70130

February 1, 2006

Mr Michael N Milby, Clerk
Southern District of Texas, Corpus Christi
United States District Court
1133 N Shoreline Boulevard
Corpus Christi, TX 78401

No. 04-40410 USA v. Bourgeois
USDC No.   2:02-CR-216-1

The following is (are) returned:

Original Record on Appeal, ( 57 ) Vols.   *5 6 Acid*

Supplemental Record, ( 3 ) Vols.

Original Exhibits, ( 2 ) Boxes (1 Sealed — *Sealed documents / exhibit*
*1 of exhats gov (205) 3/1/04; 10/24/03 (128); 7/14/03*

Sincerely,   *dy 3/3/04 (211); 3/1/04 (204)*

*51 transcripts*
*5 vol rec*

*volume #23 missing (transcript)*

CHARLES R. FULBRUGE III, Clerk

By: _____
Shawn D. Henderson, Deputy Clerk
504-310-7668

REC-3

USCA5 130

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

---

NOTICE: The clerk's office is moving permanently to 600 S. Maestri Place, New Orleans, LA 70130 in **June, 2006**. All correspondence expected to arrive at the court on or after **April 24, 2006** must be sent to this address.

---

May 19, 2006

Mr Michael N Milby, Clerk
Southern District of Texas, Corpus Christi
United States District Court
1133 N Shoreline Boulevard
Corpus Christi, TX 78401

United States District Court
Southern District of Texas
FILED

MAY 2 2 2006

MICHAEL N. MILBY, CLERK

No. 04-40410 USA v. Bourgeois
USDC No.  2:02-CR-216-1

Enclosed is a copy of the Supreme Court order denying certiorari.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: *Charlene A Vogelaar*
Charlene Vogelaar, Deputy Clerk
504-310-7648

MDT-1

USCA5 131

**Supreme Court of the United States**
**Office of the Clerk**
**Washington, DC  20543-0001**

William K. Suter
Clerk of the Court
(202) 479-3011

May 15, 2006

Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130

U.S. COURT OF APPEALS
**FILED**

MAY 1 9 2006

CHARLES R. FULBRUGE III
CLERK

Re:  Alfred Bourgeois
     v. United States
     No. 05-8657
     (Your No. 04-40410)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

William K. Suter, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CR. NO. C-02-216(1) |
| | § | |
| ALFRED BOURGEOIS | § | |

## ORDER STRIKING PLEADING(S)

The Clerk has filed your <u>Ex Parte Motion to Substitute Counsel</u>_____,
however, the pleadings are deficient in the area(s) checked below:

1. ___ Pleading is not signed. (LR 11.3)

2. ___ Pleading is not in compliance with LR 11.3.A.

3. ___ Caption of the pleading is incomplete. (LR 10.1)

4. ___ No certificate of service or explanation why service is not required. (CrLR12.4)

5. ___ No statement regarding conference with opposing counsel. (CrLR12.2)

6. ___ Separate proposed order not attached. (CrLR12.2)

7. ___ Motion to consolidate is not in compliance with LR 7.6.

8. _X_ Other: <u>Submit order with correct spelling of Judge's name</u>_____

The Clerk is hereby ORDERED to strike the above instrument(s) from the record and
notify counsel of such action.

Dated: ___6-15-06___                    _____
                                        UNITED STATES DISTRICT JUDGE

USCA5 133

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

---

NOTICE: The clerk's office is moving permanently to 600 S. Maestri Place, New Orleans, LA 70130 in **June, 2006**. All correspondence expected to arrive at the court on or after **April 24, 2006** must be sent to this address.

---

June 12, 2006

**United States Courts**
**Southern District of Texas**
**FILED**

JUN 1 6 2006

Michael N. Milby, Clerk of Court

Mr Michael N Milby, Clerk
Southern District of Texas, Corpus Christi
United States District Court
1133 N Shoreline Boulevard
Corpus Christi, TX 78401

        No. 04-40410 USA v. Bourgeois
            USDC No.  2:02-CR-216-1

The following is (are) returned:

Original Record on Appeal,  ( 1 ) Vols. (Volume 23 only)

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: _____
        Timothy E. Phares, Jr., Deputy

        504-310-7665

*(handwritten: 1 Transcript Ckt 353)*

Clerk

REC-3

USCA5 134

CJA 30 APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL

| 1. CIR./DIST./DIV. CODE | 2. PERSON REPRESENTED | | VOUCHER NUMBER |
|---|---|---|---|
| TXS | Bourgeois, Alfred | | |

| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|
| | 2:02-000216-001 | | |

| 7. IN CASE/MATTER OF (Case Name) | 8. TYPE PERSON REPRESENTED | 9. REPRESENTATION TYPE |
|---|---|---|
| U.S. v. Bourgeois | Adult Defendant | Appeal of Other Matters |

**10. OFFENSE(S) CHARGED** (Cite U.S. Code, Title & Section) If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 1111.F -- MURDER, FIRST DEGREE

**11. ATTORNEY'S NAME** (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS

GROSS, MICHAEL C.
106 S. St. Mary's Street
Suite 260
SAN ANTONIO TX 78205

Telephone Number: ___(210) 354-1919___

**13. NAME AND MAILING ADDRESS OF LAW FIRM** (only provide per instructions)

**12. COURT ORDER**

☒ O Appointing Counsel     ☐ C Co-Counsel
☐ F Subs For Federal Defender     ☐ R Subs For Retained Attorney
☐ P Subs For Panel Attorney     ☐ Y Standby Counsel

Prior Attorney's Name: _____
Appointment Date: _____

(A) Because the above-named person represented has testified under oath or has otherwise satisfied this court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 11, who has been determined to possess the specific qualifications required by law, is appointed to represent this person in this case.

(B) The attorney named in Item 11 is appointed to serve as: ☒ LEAD COUNSEL  ☐ CO-COUNSEL
Name of Co-Counsel or Lead Counsel: _____
Appointment Date: _____

(C) If you represented the defendant or petitioner in any prior proceeding related to this matter, attach to your initial claim a listing of those proceedings and describe your role in each (e.g., lead counsel or co-counsel).

☐ (D) Due to the expected length of this case, and the anticipated hardship on counsel in undertaking representation full-time for such a period without compensation, interim payments of compensation and expenses are approved pursuant to the attached order.

*Linda D. Rivera*
Signature of Presiding Judicial Officer or By Order of the Court

___07/03/2006___
Date of Order     Nunc Pro Tunc Date

(E) Repayment or partial repayment ordered from the person represented for this service at time of appointment.     ☐ YES     ☐ NO

**14. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 15 was performed even if the work is intended to be used in connection with a later stage of the proceeding CHECK NO MORE THAN ONE BOX   Submit a separate voucher for each stage of the proceeding.

CAPITAL PROSECUTION
a ☐ Pre-Trial
b ☐ Trial
c ☐ Sentencing
d ☐ Other Post Trial
e ☐ Appeal
f ☐ Petition for the U S Supreme Court
  ☐ Writ of Certiorari

HABEAS CORPUS
g ☐ Habeas Petition
h ☐ Evidentiary Hearing
i ☐ Dispositive Motions
j ☐ Appeal
k ☐ Petition for the U S Supreme Court
  ☐ Writ of Certiorari

OTHER PROCEEDING
l ☐ Stay of Execution
m ☐ Appeal of Denial of Stay
n ☐ Petition for Writ of Certiorari to the U S Supreme Court Regarding Denial of Stay
o ☐ Other

| 15. CATEGORIES (Attach itemization of services with dates) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH ADJUSTED HOURS | MATH/TECH ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|
| a. In-Court Hearings (Rate per Hour = $      ) | | | | IN COURT TOTAL (Category a) | IN COURT TOTAL (Category a) |
| b. Interviews and Conferences with Client | | | | | |
| c. Witness Interviews | | | | | |
| d. Consultation with Investigators and Experts | | | | | |
| e. Obtaining and Reviewing the Court Record | | | | | |
| f. Obtaining and Reviewing Documents and Evidence | | | | OUT OF COURT TOTAL (Categories b - j) | OUT OF COURT TOTAL (Categories b - j) |
| g. Consulting with Expert Counsel | | | | | |
| h. Legal Research and Writing | | | | | |
| i. Travel | | | | | |
| j. Other (Specify on additional sheets) | | | | | |
| Totals: Categories b thru j (Rate per hour = $      ) | | | | | |
| 16. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | | | |
| 17. Other Expenses (other than expert, transcripts, etc.) | | | | | |

**18. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE**
FROM _____ TO _____

**19. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION**

**20. CASE DISPOSITION**

**21. CLAIM STATUS** ☐ Final Payment   ☐ Interim Payment Number _____   ☐ Supplemental Payment
Have you previously applied to the court for compensation and/or remimbursement for this case?   ☐ YES   ☐ NO   If yes, were you paid?   ☐ YES   ☐ NO
Other than from the court, have you, or to your knowledge has anyone else, received payment (compensation or anything or value) from any other source in connection with this representation?   ☐ YES   ☐ NO   If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.

Signature of Attorney: _____     Date: _____

| 22. IN COURT COMP. | 23. OUT OF COURT COMP. | 24. TRAVEL EXPENSES | 25. OTHER EXPENSES | 26. TOTAL AMT.APPROVED |
|---|---|---|---|---|
| | | | | |

| 27. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER | DATE | 27a. JUDGE CODE |
|---|---|---|
| | | |

USCA5 135

## Notice to CJA Panel Attorneys

Please submit vouchers for payment no later than 45 days after the final disposition of the case, unless good cause is shown. *Guide to Judiciary Policies and Procedures*, Vol. VII, Chap. II, Pt. C, Sec. 2.21. Vouchers submitted after the expiration of the 45-day period must include a statement explaining the reason(s) for the delay.

Delayed vouchers adversely affect the CJA budgeting process. Failure to timely submit vouchers for payment may result in delay or denial of payment.

You <u>MUST</u> submit vouchers with expense worksheets. You can download the worksheets from <u>www.txs.uscourts.gov</u> - go to District Court, then under the Miscellaneous Links/Documents section, click on CJA Appointment Information. The Expense Worksheet is located in the Forms section.

Effective 7/24/06, the **original** CJA voucher will <u>NOT</u> be mailed to the appointed attorney. The copy of the voucher, which you received by either email or fax, is sufficient for processing.

USCA5 136

# CJA Quick Reference

- CJA San Antonio phone number- (210) 301-6325
- USDC website for CJA information
  http://www.txs.uscourts.gov/attorneys/cja
- CJA 20 current In/Out of Court rate is $92.00 per hour
- CJA 20 maximum voucher prior to Circuit approval is $7,000 and requires letter from Attorney
- Current mileage rate is $.445 per mile
- For Representation other than a Criminal Case, such as Supervised Release, Probation Revocation and Material Witness, the local maximum before Circuit approval is $1,500
- If an Attorney represents more than one Material Witness on the same case they are allowed $1,500 per representation
- CJA 21 maximum before Circuit approval for Expert Services is $1,600
- CJA 31 maximum before Circuit approval for Expert Services in a Death Penalty case is $7,500
- A copy of the Order and Invoice are required for Expert Services
- CJA 30 current In/Out of Court rate is $163.00 per hour
- CJA 30 vouchers are allowed Interim Payments without a Judges' Order
- CJA 30 maximum before Circuit approval is $50,000
- If Interim Payments are allowed, 33% of In and Out of Court fees are withheld. All expenses are paid in full. The withheld funds are released only when the Final payment is submitted.
- Receipts are required for any one expense that exceeds $50
- Time is claimed in hours and minutes to the **tenth** of an hour. Round down if hours are given in the hundredth of an hour
- Any work submitted prior to the Appointment date can not be allowed unless a Nunc Pro Tunc date is established

USCA5 137

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|                          |   |                               |
|--------------------------|---|-------------------------------|
| UNITED STATES OF AMERICA, | § |                               |
|                          | § |                               |
|                          | § |                               |
|                          | § |                               |
| vs.                      | § | Criminal Docket No. C-02-216  |
|                          | § |                               |
| ALFRED BOURGEOIS,        | § |                               |
|                          | § |                               |
| Defendant.               | § |                               |

**ORDER**

On this day the Court held a telephone conference in the above-styled action. At the conference, the Court made the following orders:

1. The Court hereby APPOINTS Michael Wiseman and Victor J. Abreu, of the Capital Habeas Corpus Unit of the Federal Defender's Office in Philadelphia, Pennsylvania, as attorneys of record for Defendant Alfred Bourgeois ("Defendant") in this cause.

2. The Court conditionally discharges Keith Hampton and Michael C. Gross as attorneys of record for the Defendant. If in the course of representing the Defendant, Mr. Wiseman and Mr. Abreu determine that they are in need of Mr. Hampton's and Mr. Grossman's expertise, the Defendant may file a motion seeking their reappointment to the case.

SIGNED and ENTERED this 16th day of October, 2006.

_____
Janis Graham Jack
United States District Judge

USCA5 138

**UNITED STATES DISTRICT COURT**          **SOUTHERN DISTRICT OF TEXAS**

United States District Court
Southern District of Texas
FILED

OCT 1 9 2006

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

Michael N. Milby, Clerk of Court

| Corpus Cristi | | CR-C-02-216 |
|---|---|---|
| United States of America | | |
| | | |
| Alfred Bourgeois, Defendant. | | |

This lawyer, who is admitted either to the State Bar of Texas or to another federal district court:

Michael Wiseman
Federal Community Defender for the
   Eastern District of Pennsylvania
Suite 545-West, The Curtis Center
Philadelphia, PA 19106
215-928-0520
Pennsylvania Bar #75342, Admitted
to United States District Court,
Eastern District of Pennsylvania

Seeks to appear as the attorney for this party:

| Alfred Bourgeois | |
|---|---|
| Dated: October 18, 2006 | Signed:  |

---

### ORDER

This lawyer is admitted *pro hac vice.*

Signed on _____, _____.    _____

                          **United States District Judge**

SDTX (d_prohac.ord)
02/03/98

USCA5 139

**UNITED STATES DISTRICT COURT**        **SOUTHERN DISTRICT OF TEXAS**

United States District Court
Southern District of Texas
FILED

### MOTION AND ORDER
### FOR ADMISSION *PRO HAC VICE*

OCT 1 9 2006

Michael N. Milby, Clerk of Court

| | Corpus Cristi | | CR-C-02-216 |
|---|---|---|---|
| | United States óf America | | |
| | | | |
| | Alfred Bourgeois, Defendant. | | |

This lawyer, who is admitted either to the State Bar of Texas or to another federal district court:

Michael Wiseman
Federal Community Defender for the
  Eastern District of Pennsylvania
Suite 545-West, The Curtis Center
Philadelphia, PA 19106
215-928-0520
Pennsylvania Bar #75342, Admitted
to United States District Court,
Eastern District of Pennsylvania

Seeks to appear as the attorney for this party:

Alfred Bourgeois

Dated: October 18, 2006    Signed: _____

### ORDER

This lawyer is admitted *pro hac vice.*

Signed on ___10-24___, _06_ .        _____
                                    United States District Judge

SDTX (d_prohac.ord)
02/03/98

USCA5 140

United States Courts
Southern District of Texas
FILED

FEB 13 2007

Michael N. Milby, Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,  :  No. Cr-C-02-216

Respondent,  :

:  Honorable Janis Graham Jack,
:  U.S.D.J.

-against-  :

:  **This is a Capital Case**

ALFRED BOURGEOIS,  :

:

Petitioner.  :

:

### PETITIONER'S MOTION TO UNSEAL TRANSCRIPTS

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby moves to unseal three previously sealed transcripts and in support, states as follows.

1.     Petitioner was convicted before this Court for a violation of 18 U.S.C. § 1111 and was sentenced to death.  Petitioner's conviction and death sentence were affirmed on direct appeal. United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005), cert denied, Bourgeois v. United States, 126 S.Ct. 2020 (May 15, 2006).  Petitioner was represented by Joel Douglas Tinker, Esq. and John S. Gilmore Jr., Esq. at trial and on direct appeal.

2.     On October 16, 2006, this Court granted Mr. Bourgeois' Motion and appointed undersigned counsel (document # 380).  On October 19, 2006 the Court granted counsel Wiseman's motion for admission *pro hac vice* in these section 2255 proceedings (document # 382).

3.     In order to fulfill his duty to his client and the Court to prepare a professional and proper section 2255 motion, counsel must review transcripts of all prior proceedings in this matter. Counsel has obtained the files of all prior counsel in this case, however, the transcripts of a number

1

USCA5 141

of record proceedings are not included in the files he has obtained. Counsel has made arrangement with Court Reporter Velma Gano to obtain most of the missing transcripts. However, Ms. Gano has advised counsel that a number of these proceedings were sealed pursuant to this Court's order. In particular, counsel learned that pre-trial proceedings conducted on October 20, 2003, December 16, 2003 and February 25, 2004 were and remain sealed. Accordingly, Petitioner respectfully requests that this Court unseal those previously sealed transcripts.

4.     Ms. Gano further advised counsel that her records reflect that Petitioner and his trial defense counsel were present at each of these proceedings. Accordingly, counsel does not foresee any prejudice to the Government in having them unsealed for current counsels' review. However, as undersigned counsel was not present at the time the transcripts were sealed, if cause exists for them to remain sealed, counsel would wish to be heard on that question. Counsel would be amenable to the entry of a protective order, if necessary, prohibiting counsel from disclosing the content of the proceedings to any person outside of the litigation.

5.     Counsel Abreu attempted to contact Assistant United States Attorney Patricia Hubert Booth, Esq., to obtain the Government's position on Petitioner's motion, but has not been able reach Ms. Booth.

2

USCA5 142

WHEREFORE, Petitioner respectfully requests that this Court grant his *Motion to Unseal Transcripts*. A proposed Order is attached.

Respectfully Submitted,

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Signing for Wiseman and Abreu
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:    February 12, 2007
          Philadelphia, Pennsylvania

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 12th day of February, 2007, I caused the foregoing *Petitioner's Motion to Unseal Transcripts* to be served upon the following person in the manner indicated below:

BY OVERNIGHT MAIL

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

Dated: February 12, 2007
       Philadelphia, PA

3

USCA5 143

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| Respondent, | : | Honorable Janis Graham Jack, U.S.D.J. |
| -against- | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| Petitioner. | : | |

## ORDER

And now, this _____ day of _____, 2007 upon consideration of *Petitioner's Motion to Unseal Transcripts*, it is hereby ORDERED that Petitioner's Motion is GRANTED. Accordingly, transcripts of the proceedings on October 20, 2003, December 16, 2003 and February 25, 2004 are hereby unsealed and shall be made available to counsel for Petitioner, Alfred Bourgeois.


_____
Janis Graham Jack, USDJ

USCA5 144

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-00216 |
| | § | |
| ALFRED NMI BOURGEOIS, | § | |
| | § | |
| Defendant. | § | |

## ORDER

On this day came on to be considered Petitioner's Motion to Unseal Transcripts.

Petitioner's Motion to Unseal Transcripts is GRANTED.  Accordingly, transcripts of the

proceedings on October 20, 2003, December 16, 2003, and February 25, 2004, are hereby

unsealed and shall be made available to counsel for Petitioner Alfred Bourgeois.

ORDERED this 14th day of February, 2007.


Janis Graham Jack
United States District Judge

1 / 1

USCA5 145

United States Courts
Southern District of Texas
FILED

MAR 2 8 2007

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          *      CRIMINAL ACTION
                                   *
          PLAINTIFF,               *      CR-C-02-216(1)
                                   *
VS.                                *
                                   *      CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *      OCTOBER 20, 2003
                                   *      10:07 A.M.
          DEFENDANT.               *
                                   *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


               TRANSCRIPT OF EX PARTE MOTION HEARING

            BEFORE THE HONORABLE JANIS GRAHAM JACK
                   UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE DEFENDANT:            MR. JOHN S. GILMORE, JR.
                             MR. JOEL DOUGLAS TINKER
                             ATTORNEYS AT LAW
                             622 SOUTH TANCAHUA
                             CORPUS CHRISTI, TEXAS 78401


COURT RECORDER:              MS. LORI CAYCE



     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
      TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
         CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY
AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED
REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST
COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
COPY AT THE OFFICIAL RATE. GENERAL ORDER 94-15,
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF TEXAS

USCA5 146

(The proceedings began at 10:07 a.m.)

(Call to Order of the Court.)

THE COURT:  C-02-216, United States of America versus Alfred Bourgeois.  I have some -- may I have appearances, please?  This is an ex parte motion.

.          MR. TINKER:  Yes, Your Honor.  Douglas Tinker and John Gilmore for Mr. Bourgeois.

THE COURT:  I signed them all, and then I got the last one, and I thought I better, ought to have a hearing on it, because --

MR. TINKER:  That's the polygraph?

THE COURT:  Yes.  So if you could just give me kind of a threshold showing for both the --

MR. TINKER:  Well, on the polygraph?

THE COURT:  All the experts.

MR. TINKER:  Well, in the first place, Your Honor, the DNA, first, there's no question as to the qualifications of this lady, doctor.  We've attached a curriculum vitae.  And the main thing we want to do with her, I will tell the Court, is get the work of the Government's DNA expert and show it to her. I have talked to her.  Interestingly enough, she's the lady who was the person that caused the Crime Lab in Harris County to come under suspicion.  She was working there and said that they weren't doing their work right.  And she ended up getting fired and ended up filing a lawsuit as a whistle blower and was

USCA5 147

successful in that.  But her qualifications are outstanding.

And what she says, the thing that worries us most about the DNA is where they say, the conclusion that they found seminal fluid on the cotton swab from this baby, and they now say they don't have enough to retest.  She says that she wants to look at their work, because she, her personal opinion is that if they don't have enough for more than one test there, they did not perform the test correctly.  But they're not, they're never to use up the test.

And so we would just like to have her get the copies of the worksheets and things from the Government and let her look at those and then see if she finds any fault with it.  If she does, then we've discussed filing a motion to quash the finding that there was seminal fluid taken.

THE COURT:  How much time is it going to take for her to do that?

MR. TINKER:  Your Honor, I talked to -- I haven't gotten the stuff from Patti Booth, and I --

THE COURT:  How do you get it from her?  I mean, this is ex parte.  How are you going to get it without her knowing that there's an expert?

MR. TINKER:  Well, I think we're entitled to their reports, and I think we're entitled to their --

THE COURT:  Oh, sure.  But I mean, I'm talking about lab, I'm sure they've got lab slides, those kind of things.

USCA5 148

4

MR. TINKER:  Well, they, what they, it's been a while since I've tried a DNA case, but they've got autorads usually. They've got their worksheets and show what the prevalence of this.  They'll have reports about why --

THE COURT:  Okay.

MR. TINKER:  But let me tell the Court this.  I've talked to Ms. Booth about that, and she says that she doesn't think I'm entitled to those worksheets.  So that may be an issue that we're going to have to take up.

THE COURT:  It will be.

MR. TINKER:  Okay.  So I just wanted the Court to know that I've requested that, and she said we're not entitled to it.  The --

THE COURT:  I don't -- we'll have to have a hearing on it, because I don't know what they are.

MR. TINKER:  I understand.  And I'm not trying to get you to make a decision about it now.

THE COURT:  Okay.

MR. TINKER:  But she says all I'm, we're entitled to is conclusions that the, or the report that they filed.

THE COURT:  No, I'm sure that there's slides or whatever else they use.  I don't know.

MR. TINKER:  All kinds of stuff.  All kinds of stuff. And what their method --

THE COURT:  But my point is, if I should allow that

USCA5 149

in the future, that you have access to all those slides and whatever, then we're going to have to come up with some way, I mean, I don't know how your expert will be unknown at that point.

MR. TINKER:  I understand that.  At some -- well, if they give it to us --

THE COURT:  Well, you know that's not --

MR. TINKER:  I don't even care if she's unknown --

THE COURT:  Okay.

MR. TINKER:  -- frankly.

THE COURT:  All right.

MR. TINKER:  I think the polygraph, and I know we want to discuss that, would be the one we would want to be unknown for sure.

THE COURT:  Well, let me -- let's go to the -- all right.  Let's talk about the polygraph.  How do you keep that unknown?

MR. TINKER:  I just think we can do it, we can just, if some, somebody from the Marshal Service tells them to let them do it.

THE COURT:  Brings him over here.

MR. TINKER:  No, I think they can just do it in the jail.

THE COURT:  Okay.

MR. TINKER:  They have, you know, in the old days,

USCA5 150

6

they had, the polygraph was all on the table and you had these charts. They actually have portable equipment now, and computerized equipment that they use. And they've done it, we recently, John and I -- not John and I -- Jimmy Granberry and I have a case, it's a capital murder case in Corpus, I mean, in State Court, and we had a polygraph operator come over and do that at the jail.

THE COURT: Okay. But I probably, we need to talk this through about if you end up wanting to use this, you know, there will be a Daubert hearing, which is, you're entitled, they're entitled to have probably. But I suppose that if you got, let's just, I'm trying to think it through every possible ramification. If I grant the polygraph and it's favorable to you, to your client, then you would get, give notice that you would want to use this in trial, and then we'd have to have a Daubert hearing.

MR. TINKER: Yes.

THE COURT: Then I would think that the U.S. Attorney could say, in the alternative, we want our own examiner to examine this gentleman. Does that sound like something that might happen?

MR. TINKER: They, I guess it could happen, Your Honor. And then Your Honor would have to decide whether they're entitled to that.

THE COURT: Okay. Well, if it turns out to be

USCA5 151

admissible and it goes through the requirements of a Daubert hearing --

MR. TINKER:  Yes.

THE COURT:  And I don't, never understood why more people don't ask for them actually -- well, yes, I do.  But anyway, I guess I do.  Is this something that it's your position would not be discoverable under reciprocal discovery?

MR. TINKER:  I'm convinced it would not.

THE COURT:  Well, what happens if somebody in the jail tells the U.S. Attorney that, by the way, that polygraph guy was over here?

MR. TINKER:  That --

THE COURT:  That's not -- surely that happens.

MR. TINKER:  It might.  Somehow I would not expect it to happen, but I guess that's a chance we have to take.

THE COURT:  Okay.

MR. TINKER:  That doesn't mean we have to reveal the results of it anyway.  You know, that's my view of it.  And I guess that would be a decision, if they started complaining about that, that Your Honor would have to decide abcut.

THE COURT:  What if, I suppose that it would be a question then of the U.S. Attorney wanting to get the results, if they're not favorable to your client, and wanting to introduce them into evidence.

MR. TINKER:  Your Honor --

USCA5 152

THE COURT:  Then what the argument would be --

MR. TINKER:  If they wanted to do it, surely you wouldn't let them.

THE COURT:  Pardon?

MR. TINKER:  If they wanted to do it, surely you wouldn't let them.

THE COURT:  Well, I think we can just rule on that without benefit of another party.

All right.  So I'll appoint -- so what else?  Tell me what else you want to, is your thinking on the polygraph?

MR. TINKER:  Well, first I think it's an investigative aid for us, help us understand the facts a little better.  And you know, and again, it may be, if he passes it, we will again file a motion requesting -- there are some courts that are permitting qualified experts to introduce the polygraph.

THE COURT:  Well, the Fifth Circuit said it's reasonable if it goes through the Daubert and comes out the other end.  Nine-and-a-half years ago, I think.

MR. TINKER:  Yeah, it's been --

THE COURT:  But your client, I think, would have to testify, wouldn't he?

MR. TINKER:  To make it admissible?  I guess.  But Your Honor, I really hadn't thought it that far through.  And at least some, I guess the jury would have to know what it is

USCA5 153

9

he was asked, through some source.  But I guess the polygraph operator, it seems like to me, could talk about the questions that were asked and the answers that were given.

THE COURT:  I don't know.  I haven't thought it through.  But I would think that if that's your client testifying through a polygraph, then he has to testify regularly.  I don't know.

MR. TINKER:  Well, I don't either, Your Honor.  And I guess --

THE COURT:  Something we need to think about, though.

MR. TINKER:  Well, that doesn't affect my desire for the polygraph.

THE COURT:  All right.  Then I'll grant that motion.

MR. TINKER:  I started to say that, well, as Ted Kennedy said, we'll cross that bridge when we come to it.

THE COURT:  Don't do that.  Not here.  Okay.  The next one is Mark Cunningham and Lisa Milstein and Gerald Bierbaum.

MR. GILMORE:  I believe that's a revised order, Judge.

THE COURT:  That we did before.  Right?

MR. GILMORE:  Dr. Cunningham has already been appointed.  But I believe with Lisa Milstein and Bierbaum, we had --

MR. TINKER:  That's the mitigation?

USCA5 154

MR. GILMORE:  Mitigation people.  We had like a figure put in there, and I think the Court wanted them to bill the Court, rather than have a set --

THE COURT:  I don't want them to bill me exactly.

MR. GILMORE:  Well, bill --

THE COURT:  Have you all turned in your interim fees? I haven't seen anything come by.

MR. TINKER:  I have not, and I have asked -- I've got it, and I've asked my legal assistant to work it up, and she hasn't done it.  She's been busy.  But we'll get it to Your Honor.

THE COURT:  Well, it's very important, because a month ago when I, when we, I had y'all called about this, they were running out of funds.  And I wanted you all to get interim funds as we're going along.

MR. TINKER:  Can I tell Tina Morales that you have ordered her to --

THE COURT:  I will.

MR. TINKER:  Okay.

THE COURT:  She's not going to thank me for that.

MR. TINKER:  No.  No, she'll do it, Judge.  She just --

THE COURT:  Because I --

MR. TINKER:  -- has other things that are --

THE COURT:  I did an amended order on you,

Mr. Tinker, making it retroactive, because I knew you had been in the case earlier, and I didn't want your fees to just start accumulating on the day of the appointment.  And, Mr. Gilmore, you've put in a lot of work, and I need to get some interim.

MR. GILMORE:  Okay, Judge.

THE COURT:  In fact, every time I see both of you, I ask you.

MR. TINKER:  We'll get it out before the end of the week.

THE COURT:  I just don't want it to run out of money, without getting that, some, not having to wait forever to get it.

Okay.  The last one is George W. Holder.  Can you tell me about that, please?

MR. TINKER:  Is that the battered baby?  No, let me -- yes, Your Honor.  That is something that we're requesting perhaps for two purposes.  The, you know, what little I understand about, you know, people who injure the babies, many times the reason for it is, has nothing to do with the child. I think that testimony from an expert like this explaining to the jury why it is that people do, commit these kinds of acts, that are really unrelated to wanting -- I had a -- actually, Dr. Rupp testified in a case where a child was killed, in State Court, that they didn't intend to, there was no intention usually in these kind of cases for the child to die.  That

USCA5 156

might affect whether we get a lesser included.  And I was looking at mitigation, in my opinion.

THE COURT:  You know --

MR. TINKER:  For instance, an expert may say, well --

THE COURT:  This reminds me, I think I probably need to get a deadline for expert designation in.

MR. TINKER:  That's -- Your Honor, that's okay.  I mean, right now, I talked to Ms. Booth last week, late last --

THE COURT:  We're set for, what, February?

MR. GILMORE:  End of February -- well, middle of February.

THE COURT:  Middle of February.

MR. TINKER:  But Ms. Booth says that she still doesn't have the report on the bite marks.  And I'm, you know, you had said that we could take the depositions of bite mark experts.  And what Ms. Booth says is that they've had phone conversations about what the conclusions are, but I don't see, if they can take this long to have their experts do things, and it seems like that we may want to delay it more.

THE COURT:  Well, report or not, I don't see why you can't take their deposition.

MR. TINKER:  Your Honor, my -- I have reluctance to take the deposition, because your order also said that it would, in the form that would be admissible at the trial of the case.  And I feel like I would be making a record for the

USCA5 157

13

Government, in doing that.

THE COURT:  I understand that.

MR. TINKER:  And I still, and I'm not --

THE COURT:  That's kind of the problems with depositions in criminal cases anyway.

MR. TINKER:  In the Branch Davidian case, they made us take depositions of some of the people because they were going to go back to England, when, before we even knew what the case was about.  I mean, we hadn't even gotten discovery.  They were making us take depositions of people who they were going to let go back to -- I didn't know what question to ask that early in the thing.

But what I had not given up, Your Honor, and I will continue, and I guess this ought to be something with Ms. Booth here, to request that we have, that we have the teeth and run our own test.  I understand that you think that maybe this deposition will do.  I understand, from a verbal conversation with Ms. Booth, that the conclusion of the last expert that they have says that they can, that one of the bite marks was the child itself.  But that there's one bite that they can rule out the stepmother and the 13-year-old daughter.  I forget the name right now.

MR. GILMORE:  7.

MR. TINKER:  Huh?

MR. GILMORE:  7.

USCA5 158

14

MR. TINKER:  Yeah, 7.  That they can rule out those two people, as far as some of the bite marks are concerned, but cannot rule out Mr. Bourgeois, which is, of course, telling the jury that if they can't rule him out, he must have been the one that did it, because the only other two people -- and I have not and will continue to request that we have our own -- surely they're through by now with the teeth that they have, the molds that they took.  And I'm still requesting that we have an opportunity to have an expert do that, on our own.

THE COURT:  I've never denied that.

MR. TINKER:  You've asked, well, could we do it this way.  She keeps saying that --

THE COURT:  I've never denied that.  But you're going to have to take your expert to the teeth marks, I mean, to the teeth mold.  Because apparently it's one of a kind.  They've only got -- the backup ones aren't any good, and they've got, they're one of a kind, and they don't want to ship them around.

MR. TINKER:  But they've shipped them to two different experts of their own, so why can't we have them?

THE COURT:  I'm not saying you can't have them.

MR. TINKER:  Okay.

THE COURT:  You've just got to send your expert up there.  And if they're through with them, I suppose you could.  But I don't know when, if they're, how they'd ever be through with them if they're going to be using them at trial.

USCA5 159

15

MR. TINKER:  Well, I don't know that you have to have the teeth to have, to draw the conclusions.  But in any event, I think Ms. Booth ought to be here when we talk about that part.

THE COURT:  Yes.  All right.  I've granted all your motions.

MR. GILMORE:  Thank you, Judge.

THE COURT:  Thank you all.  Is there anything further?

MR. TINKER:  Not at this time, Your Honor.

THE COURT:  By way of ex parte?

MR. TINKER:  We know there are other deadlines.  And I'll contact these folks today or tomorrow.

THE COURT:  Thank you very much.

MR. TINKER:  Sure.

THE COURT:  You're excused.

MR. GILMORE:  Thank you, Judge.

(Proceedings concluded at 10:23 a.m.)

USCA5 160

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.



Molly Carter

3/28/07
Date

USCA5 161

United States Courts
Southern District of Texas
FILED
MAR 2 8 2007
Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,    *    CRIMINAL ACTION
                             *
        PLAINTIFF,           *    CR-C-02-216(1)
                             *
VS.                          *
                             *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,            *    DECEMBER 16, 2003
                             *    1:26 P.M.
                             *
        DEFENDANT.           *
                             *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS-PATTERSON
                           MR. TONY ROBERTS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

FOR THE DEFENDANT:         MR. JOHN S. GILMORE, JR.
                           MR. JOEL DOUGLAS TINKER
                           ATTORNEYS AT LAW
                           622 SOUTH TANCAHUA
                           CORPUS CHRISTI, TEXAS 78401

ALSO PRESENT:              MS. MARTHA WELU, JURY CLERK, HOUSTON
                           MS. LINDA RIVERA, JURY CLERK
                           MS. MEGAN BECKETT, FBI CASE AGENT
                           MR. ALFREDO LUJAN, U.S. MARSHAL
                           MR. CARLOS TREVISO, U.S. MARSHAL

COURT RECORDER:            MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY
AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED
REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST
COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
COPY AT THE OFFICIAL RATE. GENERAL ORDER 94-15,
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF TEXAS

USCA5 162

(The proceedings began at 1:26 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action 02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. TINKER:  Douglas Tinker and John Gilmore for Mr. Bourgeois.

THE COURT:  You've got a Motion to Withdraw Motion for Continuance, but you put in the order a recusal.

MR. GILMORE:  I'm sorry, Judge.  That's not --

THE COURT:  The order is a recusal order.

MR. GILMORE:  I'm sorry, Judge.  That order shouldn't be attached.

THE COURT:  Okay.  Do you have an order for the Motion to Withdraw Motion for Continuance?  You had notified the Court, Mr. Gilmore --

MR. GILMORE:  Yes, Your Honor.

THE COURT:  -- the day after the last hearing that you were going to withdraw that motion.

MR. GILMORE:  Yes, Your Honor.

THE COURT:  And I asked Ms. Scotch to tell you to please put it in writing.

MR. GILMORE:  I prepared one, but apparently the wrong one got attached to the --

USCA5 163

THE COURT: All right.

MR. GILMORE: I'll submit one before the day's out.

THE COURT: All right. There was a motion to recuse filed yesterday. I don't think that there's any, there's anything I can do to act on a recusal of the U.S. Attorney's Office. You didn't have any law on that.

MR. GILMORE: There is no law.

THE COURT: So I don't think that's in the jurisdiction of the Court. Now, the other, the motion to recuse me, though, I looked up the cases last night. I didn't get any particular cases out of the U.S. Attorney's response, but I found about ten cases of motions to recuse that were or were not acted on. I don't think it's anybody's burden to do that. I think it's in the discretion of the Court. I think it's a court, I can do it sua sponte, I can do it at any time.

It seems to me to turn on -- have you read U.S. versus Greenblatt? It's a Tenth Circuit case.

MR. TINKER: Mr. Gilmore prepared the motion, Your Honor. I have not.

THE COURT: Okay.

MR. GILMORE: No, I haven't, Judge.

THE COURT: Okay.

MR. ROBERTS: Your Honor, are you referring to U.S. -- this is Tony Roberts for the United States. Are you referring to U.S. v. Greenspan?

THE COURT:  Greenspan, sorry.

MR. ROBERTS:  Greenspan.  Yes, I've read that case, Your Honor, and I think it's extremely distinguishable from the case we have at hand.

THE COURT:  I think it may be.  And I think the issue may turn on this.  I actually never took the threat as being serious, even if it was, even if it was what, even if that's what he said.  I don't think anybody's taking it seriously.  Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  Can I hear evidence about whether it's been taken seriously by any government agency?  I think, Mr. Gilmore -- and your motion is well taken.  It has not upset me in the least.

MR. GILMORE:  Okay, Judge.

THE COURT:  I don't want you to think that.  I don't want your client, if I deny it, to think that he's suffered any --

MR. GILMORE:  That's our concern is if the Court takes it seriously, and if the Prosecution takes it seriously, then it might --

THE COURT:  Do you agree that's what it turns on?

MR. GILMORE:  It does, Judge.

THE COURT:  Okay.

MS. BOOTH:  But, Judge, you know what is frightening

here?  What's frightening to me is that by making any kind of threat like this, the Defendant becomes in control of --

THE COURT:  Well --

MS. BOOTH:  -- the time table of the trial, who hears his case and who prosecutes his case.

THE COURT:  I'm not entertaining any motion to disqualify, you know, the FBI agent or the U.S. Attorney.  I think it should focus solely on whether or not I'm disqualified and whether I, whether a reasonable person would view it. Looking at the case law, it looks like to me that it would be appropriate to have some determination or some recommendation from one or the other of you about whether this threat should be taken, if there is a threat, whether it should be taken seriously.

Many of -- the Greenspan case had a case where a Judge did not recuse.  And the facts are this, since you've not, you're not familiar with it, Mr. Gilmore.  It's a Tenth Circuit case, Second Circuit kind of mentioned it in passing, that we agree with that that this case is distinguishable.  A cocaine case, or marijuana case.  Marijuana case, I think.  I can't remember what it is, some drug case, a person is pulled over.  The police officers say, "We smell marijuana."  They get consent to search.  There's a motion to suppress.  And somewhere around the motion to suppress, there's a recusal filed on the Judge, I think, based on the rulings, based on

USCA5 166

6

some rulings and some comments in court.

The person ends up entering a guilty plea and, a conditional plea. They could still appeal the ruling on the motion to suppress, which was denied. Between the plea and the sentencing, the FBI comes to the Judge and says, "We have uncovered a rather large conspiracy that involves people in multiple states, involves already payments of large sums of money," for an alleged hit on the Judge and the Judge's family.

The Judge goes to sentencing. The Defense reurges the motion for recusal. The Judge, according to this case, makes some statements, actually moved up the sentencing, after finding out about this, made a comment that "I want to do this quickly. I want to get this person in the Bureau of Prisons so they can be closely monitored." And even though Defense Counsel was appointed two days prior to sentencing, refused a motion to continue, seemingly, the inference was because he wanted the person in the Bureau of Prisons because of the threats.

So with those circumstances, and the Tenth Circuit was very particular in this opinion to say these are, this is a very limited fact specific case. In this circumstance, the overall circumstances make it appear that the Judge should have recused under.

MR. GILMORE:  28 --

THE COURT:  450 --

USCA5 167

MR. GILMORE:  144.

THE COURT:  Yes.

MR. GILMORE:  28, 144.

THE COURT:  Yes.  And so it was reversed only for sentencing, because the events occurred between the plea and the sentencing, I think.

Every other case has been distinguished from that circumstance.  And that Greenspan talked about the seriousness of the case and differentiated between if a defendant stands up in court and says, "I'm going to kill you, Judge," that's a totally different kettle of fish, apparently.  That can never be grounds for recusal.  But if information comes from another source, like when I told, when I called you all back together and said, this was, this information was brought to me by the Marshal Service, I gave you every bit of information that I had.  It has not been assessed, as far as I know, and I've had no ex parte communications with the FBI or the Marshal Service since then, except for the Marshal Service came by today and says it didn't look like a real deal.  I did not take it seriously when it occurred.

So that case kind of turned, to me, on first differentiating between a defendant standing up in open court, which you can clearly infer from that that they want a continuance or they want to forum shop, they want another Judge.  But when it comes from another circumstance and there

isn't any clear indication that the Defendant meant the Judge to find out about this, then you look to whether it's a serious threat.

Now, I don't take it seriously. Do you all have any information that it -- and I'm not going to ask the Defendants to put on evidence that the threat is serious, but is there any indication to you that I should treat this as a serious matter? Mr. Gilmore?

MR. GILMORE:  Let me consult with Mr. Tinker.

THE COURT:  Okay.

(Counsel conferring off the record.)

THE COURT:  Is that putting you in a Catch-22?

MR. GILMORE:  It kind of does.  We are kind of --

THE COURT:  Let's just say that one believes everything that was said by the FBI agent, which was all hearsay through the inmate.  I thought, if it's all true, that the comments about the FBI agent and Ms. Booth and I were kind of an extraneous matter.  Just if you're not too busy, go ahead -- I don't take that as a serious threat of any kind.

MR. GILMORE:  One of the concerns we have is that because of that, the Court moved Mr. Bourgeois to a remote location.

THE COURT:  I have to do what the Marshals do because of the witness threats.  Now, we have always had a concern about the witness threats.  I have shared those with you from

9

day one.  You remember, Mr. Gilmore, I stopped his communication with anyone other than you.

MR. GILMORE:  I remember.

THE COURT:  Before Mr. Tinker was in the case.  And asked you to bring to my attention if that in any way compromised your defense.  This has been an ongoing concern.  I did not, in any way, feel that there was actually a threat to me.

MS. BOOTH:  He actually put the addresses of the witness, of the witness that he knew, on the document.

THE COURT:  I -- that's different.

MS. BOOTH:  That is different.

THE COURT:  The threats to the witnesses I put in an entirely different category than, even if it's all true, than the, oh, and by the way, if you get a chance, do this to the following.

MR. TINKER:  Our position, assuming that it's concluded by the Court and Prosecution that the threat to you two was not serious, then we would request alternative that the Court find that it was not serious and that the jury not be permitted to hear about it during the trial of this case.

THE COURT:  I can tell you this.  I have already, as soon as I brought it to your attention, determined that it will never reach the jury.  Now, it may very well reach the jury if we get to that part about the witnesses.  But because I thought

USCA5 170

10

it was such a sensitive issue, it seemed very peculiar for me to preside over a case where someone might be talking about a threat to the Judge.  I don't know about Ms. Booth or the FBI agent, but it's something that I would not allow in a sentencing issue in this case, any discussion about a -- this is a closed hearing.  All right.  Is there anybody here that --

             MR. TINKER:  We -- excuse me, Your Honor.

             THE COURT:  And following along that line -- there's not anybody here, is there?

             Okay.  Following those lines, that exact line of thought, you filed, when you filed your motion to recuse yesterday, you didn't put it under seal, and I immediately sealed it.  I don't want any, any possibility of this reaching a jury pool.  So it was sealed.  The response actually was filed sealed.  So I don't think we have to worry about that.  But I think it, I think that any vague mention of threats on a Judge would be dilatorious, even if it was another Judge to come into this case.  If there were past threats on several, you know, another Judge, I don't think it would be an appropriate thing to bring into the case, let alone something that may or may not be correct about me.

             So you all tell me how you want to proceed with this.  Do you want me to hear evidence about whether the FBI considers it a serious threat?  Because I don't.  But I'm not, may not be a reasonable person.

USCA5 171

11

MR. TINKER:  We will accept the statement from the Court and from the Prosecution, at least as far as those two entities are concerned, and --

THE COURT:  Ms. Booth --

MS. BOOTH:  Judge --

THE COURT:  -- I'll tell you this.  Mr. Johnson from the FBI came to meet with me today.

MS. BOOTH:  Uh-huh.

THE COURT:  And I wouldn't see him about the case, because I don't want to hear anything about what anybody's doing at all.

MS. BOOTH:  And Your Honor --

THE COURT:  But we did talk about some liens that were filed that had to do with another case entirely.

MS. BOOTH:  Your Honor, they asked me, the Marshal Service called and they came and they asked me if I felt like I needed protection.  You know, I have --

THE COURT:  I'm not talking about that with me.

MS. BOOTH:  No.

THE COURT:  I'm not going to discuss that.

MS. BOOTH:  No, but I did not feel -- and I told them no.  I mean, I did not feel that I was in a situation of peril. And nor did I feel the Court was or Megan Beckett.

THE COURT:  Should we hear from --

MS. BOOTH:  But the witnesses --

THE COURT:  -- one of the --

MS. BOOTH:  -- I've always feared.

THE COURT:  That's a different thing entirely.

MR. TINKER:  We do not --

THE COURT:  But the issue on recusal has to do with me in particular.

MR. TINKER:  We do not accept the threats as true in our conversations here.  However, we do accept the response from the Prosecution and the Court that you do not consider it a threat, a legitimate threat, to each of you, and then would just request a ruling of the Court.  We don't need any evidence is my point.

THE COURT:  Okay, if you want.  I mean, I don't know what the investigation is showing as to anything else.  But I, and I don't know whether it shows whether this is a threat.  But I have told the Marshal Service today, at noon, that I do not consider this a serious threat, period.

And I'll tell you this, Mr. Tinker, I have had lots of death threats, and I don't ever pay any attention to them.  But I had many more when I was doing family law than when I was sitting on the bench.

MR. TINKER:  Isn't that interesting?

THE COURT:  So I consider this a much safer occupation.

MR. TINKER:  I've been threatened myself, Your Honor,

USCA5 173

13

to the point that I've tried to get my wife to drive my car.

THE COURT:  Is this why you no longer have a wife, Mr. Tinker?

MR. TINKER:  Your Honor, we just request a ruling. We accept that --

THE COURT:  Well, if you'd like any other kind of record, I'm not really familiar with how to do this.  I know that --

MR. GILMORE:  We're not either, Judge.  I've never filed a motion to recuse a Judge before, so --

THE COURT:  And I do want you to know that it has not, that it would not in any way, the fact that you filed the motion, influence me one way or the other.  In fact, I thought about it before you did it and thought about if I were in your position, how would I proceed.  And I think that you have to at least file a motion to recuse, to see how, from what I've read of the case law, to see whether anyone considers this a serious threat.  And if it's not a serious threat, I don't think it's grounds for recusal.  And Mr. Gilmore has agreed to that.  And I guess I also look at the timing of the threat.  But under Greenspan I'm not sure if the timing is important if it comes from somebody else, if the information comes from somebody else.  I don't know when the threat occurred.  It was unclear from the information, if any.  So I'll make the finding that I don't take it seriously.  Mr. Gilmore and Mr. Tinker have

USCA5 174

assured me that that's sufficient for their purposes and they're not going to proceed with the motion to recuse.  Is that correct?

MR. TINKER:  That's true, Your Honor.  But we do want the Court to go ahead and state, as far as its ruling is concerned, that --

THE COURT:  Didn't I?

MR. TINKER:  Well no, that you also, because you don't consider it a threat, that the jury will not be able to hear about it.

THE COURT:  They will not hear about any threat on my life, if any.

MR. TINKER:  Or the Prosecution or the --

THE COURT:  I'm not going to make that ruling, because I'm not -- it seems to me -- let's talk about that when we get to it.  But I can assure you, they're not going to hear about any threat on my life.  Threats on the other witnesses may come in.

Ms. Booth, do you intend to, if you get to that phase, to put on evidence about the U.S. Attorney and the -- if you don't take it seriously, I wouldn't think you'd want to put on that evidence.

MS. BOOTH:  Well, Your Honor, I just have to say that during this whole process, since his indictment and his assignment to this Court, this Court has given every single

USCA5 175

leeway to the Defendant as far as time, as far as experts, as far as having two attorneys, as two investigators.  The Court has bent over backwards to provide for the defense of the Defendant.  And I would be shocked -- I was shocked that he, that this was even said.

THE COURT:  Well, I'm not.  And I'm not -- I wouldn't in any way think that anyone less than a good advocate would not at least bring this to the Court's attention.

MS. BOOTH:  Oh, no, no.  The recusal motion I would have filed myself had I been on the other side.  But it would be easy, by looking back at the record in the Magistrate's Court and here why the Defendant might have some animosity toward the Government.  But my main concern, Judge, and what I intend on using if we get to that point, are the threats against my witnesses.

THE COURT:  Okay.

MS. BOOTH:  The serious threats against my witnesses.

THE COURT:  And I think we have an understanding on that, Mr. Tinker.

MR. TINKER:  Your Honor, we have an understanding about the Court's ruling.  But Mr. Gilmore, neither one of us will withdraw the motion.  We just request you rule on it.

THE COURT:  Oh, the motion to recuse?

MR. TINKER:  Yes.

THE COURT:  I understood that you all said if I had a

USCA5 176

finding that it was not a serious threat, that that would be sufficient. I am denying the motion to recuse, and I understand that as well, that you want me to rule one way or the other. And I should. But we started off --

MR. TINKER: We need no evidence, is what we --

THE COURT: Okay. We started off with this motion with Mr. Gilmore saying the issue turned on whether or not it was a serious threat. Then we went to the fact, and I said I didn't take it seriously. That is not to say I don't take the witness threats seriously. But I did not take any possible threat against my life as serious. And Ms. Booth has said she didn't take one, take it as serious either. Ms. Beckett?

MS. BECKETT: No, ma'am.

THE COURT: Did you take it as a serious threat against you?

MS. BECKETT: No.

THE COURT: Did you put it in a different category than you put the threats, any possible threats against the witnesses?

MS. BECKETT: Yes, definitely. They have much more access to the witnesses than they do us.

MR. ROBERTS: Your Honor, could I just add something?

THE COURT: Yes, sir.

MR. ROBERTS: I mean, I researched this as much as possible, and there's obviously, there's no cases directly on

USCA5 177

point.  There's a couple of unpublished opinions particularly out of the Fifth Circuit.

THE COURT:  I saw the unpublished opinions.  I found about ten.

MR. ROBERTS:  There were some that were kind of dancing around the issue.  And I guess the concern that the Government would have, particularly in light that this, you know, it's almost assured that if, in fact, a conviction is found in this case, this issue will definitely be addressed on appeal.  And one of the concerns that I would have is that you're limiting yourself in your ruling to a subjective view.  And that is one aspect.  But I think it's quite clear, at least in the cases that have addressed Section 455, which really is what their issue goes to, it's objective.  It's an objective standard from someone that's fully informed, and that is observing this without any, any, basically any stake in the issue.  And so your motion, I mean, your view on the issue, while it's pertinent, the subjective --

THE COURT:  Well, that's the deal, because I asked if they wanted to hear some evidence, because hearing me say it, it assumes that it's a reasonable person standard, and it's not.  That's my personal opinion that I didn't take it seriously.  Now, if we want some evidence on whether there was any agency that took it as a serious threat, we can do that.

MR. ROBERTS:  And I think the seriousness, though, of

USCA5 178

18

the threat is only one aspect of the analysis.  And certainly, I mean, if there's no contentiousness or there's no, no one's contending with whether it was taken seriously by the Court or by the other Prosecutor --

THE COURT:  Or whether a reasonable person would consider it to be serious.  Mr. Gilmore has assured the Court, if I don't think it's serious, that's all he needs to hear, and Ms. Booth, that's all they need to hear.  No further evidence.  And they want to make sure that it has not been dealt with as a serious threat.  That is not to say that somebody's not investigating the other parts of the threats.

MR. ROBERTS:  I would just add, Your Honor, that, I mean, although I respectfully disagree with the Court's position that there's no burden here, certainly the Court could sua sponte, if it determined that there were issues --

THE COURT:  Well, I have an ongoing obligation.

MR. ROBERTS:  Exactly.

THE COURT:  As you know.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  As everybody knows, to keep examining my role, make sure that there's no appearance of partiality or impropriety of any kind, or that there's no prejudice to either side.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And make sure that I have an ongoing duty

USCA5 179

to do that.

MR. ROBERTS:  And I just feel the duty, from the Government's perspective, to note that many of the cases address the proof that is required when someone's trying to recuse.  And it certainly implies that there's a burden on the party, if the Defendant is bringing it --

THE COURT:  Some of the cases do.  Some say that the burden shouldn't be on either side, that it's a matter for the Judge to decide, with or without evidence.  I'll be glad to take evidence.  Mr. Tinker and Mr. Gilmore have said there's no need, that all they need is the assurance from the Court and from Ms. Booth, and now Ms. Beckett, that no one has treated this, or at least us individually, have not treated this as a serious -- no one has treated it as a serious threat.

That's not to say that the Marshal Service or that the FBI are not continuing an investigation.  You know, how they may look at it is certainly different.  I mean, their obligation on investigating, if you want to hear what they've done, I would be glad to call them as witnesses.

MR. ROBERTS:  Well, and Your Honor, I guess for purposes of the issue before the Court, that's certainly sufficient for your ruling.  However, for future reference, so that we can protect the record and if, you know, in case the Appellate Court looks at it and says, well, the Court applied the wrong standard, subjectiveness --

20

THE COURT:  No.  This is an objective standard.

MR. ROBERTS:  And I just wanted to make sure that that was --

THE COURT:  I think Mr. Gilmore, it's Mr. Gilmore's motion, brought on behalf of his client.  And you agree that that's the standard, isn't it?

MR. GILMORE:  That is, Judge.

THE COURT:  But you agreed, however, that my representations to you were sufficient.

MR. GILMORE:  That's correct, Judge.

THE COURT:  Okay.  So that's about, I mean, that's about all I have to say on it.

MR. ROBERTS:  Okay.

THE COURT:  And I think everybody here knows that it's a reasonable man objective standard.  But Mr. Gilmore has said this satisfies him that it's not being taken seriously and that he requires, that this is what the motion turns on, was whether it was taken by any of us as a serious threat.  And if I -- and I agree with Mr. Gilmore.  I think if I were frightened for my life, I think a reasonable person could question the Court's prejudice.  But I think that Mr. Gilmore has assured me that he's satisfied with my findings.  And they've not withdrawn the motion.  I didn't expect them to withdraw a motion.  But they have agreed on what the standard is and how we're going to proceed.  Is that right, Mr. Gilmore?

USCA5 181

21

MR. GILMORE:  That's correct, Judge.

THE COURT:  If anything else comes to your attention that you want to point out, this -- I'll be glad to reconsider at any point.

MR. GILMORE:  Yes, Your Honor.

THE COURT:  Anything else, Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  And again, I don't see how anybody could have a burden of proof on this particular thing.  It would put the Defendants at a burden of proof of showing that the threat was other than what we've determined it to be.

Okay.  So are we done with this issue for now, Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  We are, Judge.

MR. TINKER:  Yes, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  And Your Honor, at this time I would like to -- the Court requested last week that I tender a copy of the psychological evaluation to the Court --

THE COURT:  Yes.

MS. BOOTH:  -- on the child --

THE COURT:  And in that issue, let me --

MS. BOOTH:  -- witness.

THE COURT:  Let me make sure that we're on the same page, Mr. Tinker, Mr. Gilmore.  May I have it?

USCA5 182

22

MS. BOOTH:  Yes, Your Honor.

THE COURT:  That I am to look through this psychological report and look for any evidence of a faulty memory?

MR. TINKER:  Any evidence that you feel would be important to a defense during the cross-examination of that witness.

THE COURT:  Of the child.

MR. TINKER:  Of the subject of the report.

(PAUSE.)

THE COURT:  I'm not going to be able to do this.

MR. TINKER:  I'm sorry?

THE COURT:  I don't know what some of these words mean.

MR. TINKER:  Your Honor, you're a medical professional.

THE COURT:  I know, but this is a new one.

I'll just summarize it for you, and you tell me what's important.  The child was in second grade, not in special education.  She's in foster care.

MR. TINKER:  And may the record reflect the name of the child, for the purpose of --

THE COURT:  I think we do initials for children under, at that age.

MR. TINKER:  No, that's fine.

USCA5 183

THE COURT:  AB.  And that she presented because of this instant issue, that is, the death of her sister and the incarceration of her father.  And that she had symptoms of a fear of being away from her parents, victim of abuse, worrying, crying easily, family problems, all of which you could presume.

(PAUSE.)

THE COURT:  There's a long, there's no -- apparently they didn't, this psychologist or mental healthcare worker did not meet with family to verify any information, so there's no family history available.  All that's in the developmental family history is when your client picked up this two-year-old child, and on and on.  That has nothing to do with, certainly not admissible evidence of any kind or cross-examination evidence.  I don't know where they got this.  Oh, they got it from the Protective and Regulatory Services.

MR. TINKER:  You say the source was not the child.

THE COURT:  No.  All of this information.

(PAUSE.)

THE COURT:  Does she have a witness statement?  The child?

MS. BOOTH:  She has a -- right after it happened, Your Honor, they took her to the Child Advocacy Center, I think, and they asked her questions on videotape, and the worker there, it was with a male worker.

THE COURT:  Have you all seen that?  Has that been

USCA5 184

24

made available to the Defense?

          MR. TINKER:  I have not, Your Honor.  I don't know whether --

          MS. BOOTH:  We've had it available, Your Honor.  I don't know that Mr. Tinker has seen it.

          MR. TINKER:  I'm meeting at 1:00 o'clock with them tomorrow, Your Honor, and I would request that that be made available at that time.  I have not seen it.  I don't know whether Mr. Gilmore has or not.

          MR. GILMORE:  I believe I may have seen it, Judge.

          THE COURT:  Okay.

     (PAUSE.)

          THE COURT:  She had some tests, sentence completion blanks that showed attachment to her father, as well as a fear of the dark.  She had an increased lie index, meaning not that she was lying, but that she was minimizing her symptoms.  It was a personal index about her symptoms.

          MR. TINKER:  May I inquire in that regard, Your Honor?  Is that a, some sort of testing that was done, when they say a lie index?

     (PAUSE.)

          THE COURT:  It's thought to be possible that she could have been abused herself and not talking about it.  I'm trying to see where I saw this.  This is under "Emotional Assessment."  Just says, "Indicating that she was likely

25

minimizing some of her symptoms."  I don't know if there was a special test for this or not.  She does relate to the psychologist, or whoever this is, the incident in question.

MS. BOOTH:  I believe there is a reference that she answered some questions or something.

THE COURT:  She initially didn't speak to the examiner about the incident with JG1999 -- how do you pronounce the name?

MS. BOOTH:  JG1999.

THE COURT:  JG1999.  Stating, "The man told me I didn't have to talk about it any more."

(PAUSE.)

THE COURT:  She related, she denied physical or sexual abuse, and that she'd had one whipping from her father, but that JG1999 had had more.

I think it may be relevant, Ms. Booth, what the child told the examiner about the incident.  Do you object to that?

MS. BOOTH:  Just that part about -- and she had already spoken to the, to Megan Beckett, the FBI, and gone into greater detail about what had happened.

THE COURT:  Okay.

MS. BOOTH:  And what she told --

THE COURT:  Well, this was certainly not the reason for her evaluation.

MS. BOOTH:  Oh, no.  No.

USCA5 186

26

THE COURT:  And, you know, who knows whether it's transcribed properly or not.

MS. BOOTH:  Right.  We were concerned she, you know, about her being sad.  I think that's what they were --

THE COURT:  There's an overwhelming sense of sadness that she portrays to the examiner apparently, sad that her father's in jail, sad that this incident occurred, trouble sleeping, that sort of thing.  But I'm going to read this.

"During the evaluation, she was asked to draw a picture of her family.  She included JG1999 in the drawing."  And said she initially didn't speak to the examiner about the incident.  "She stated that her father was making a delivery and JG1999 was placed on the pot inside the toilet to defecate.  AB1994 stated that JG1999 was messing around and it spilled.  Daddy got mad.  He can't control his self sometimes.  She reported her father was in the driver's seat.  She, AB1994, was in the passenger's seat.  JG1999 was on the pot.  Her mother and baby sister were in the bed at the rear of the cab of the truck.  AB1994 included the following words in a bubble over the drawing of her father on a picture that she drew of the incident."  J-U -- I think it looks like a typo.

MS. BOOTH:  Well, they call her JG1999.  JG1999 was the little girl's --

THE COURT:  "JG1999 are in so much trouble.  AB1994 stated that her father became angry and began to hit JG1999."

JG1999?

MS. BOOTH:  JG1999.

THE COURT:  JG1999.  "But then she fainted and stopped breathing, so Daddy gave her to Mommy.  Initially, AB1994 reported that her mother was asleep in the rear of the cab and didn't hear the incident with JG1999."

That's all I can find of any significance in here.

MR. TINKER:  My question, Your Honor, is there any, is there any reason why the report cannot be redacted and permit us to see the entire report?  And what my question is, what damage or harm does it do to the child involved or the prosecution's case to permit us to see that report?

THE COURT:  There's some personal symptoms that she's having that I think are inappropriate for cross-examination.

MR. TINKER:  We may not use it at all for cross-examination.  But I would just like it available in case there is a portion that we do feel is important.

MS. BOOTH:  Oh, she's very sensitive about that.

THE COURT:  Yes.  So I'm not going to make that part available to you.

MR. TINKER:  Your Honor, the report does not include the picture they say the child drew?

THE COURT:  No, sir, it doesn't.

MR. TINKER:  And I would just request that if Your Honor is not going to give us the report --

USCA5 188

THE COURT:  I'm going to make this paragraph available to you about what she said to the examiner.  And it's difficult to decide now whether to let you cross-examine her with it, because I don't know if it's, if this is what she really said.  You know, sometimes people dictate a few days later, and they kind of paraphrase.  And I'm sure you'll treat this child with kindness.

MR. TINKER:  We're not, we're not --

THE COURT:  But that, to me, looks like the only important thing of this entire --

MR. TINKER:  We're, of course, not requesting the Court to make a decision today about what it will or will not be used for cross-examination.

THE COURT:  No.

MR. TINKER:  But if that's the extent of the report that we're going to receive, I further ask that the Court be provided the drawings that, I don't know whether the Government has those or whether --

THE COURT:  Are they available?  Do you know?

MS. BOOTH:  They are in the psychologist's file, I'm sure, but we don't have them.

THE COURT:  Why don't we get those.

MR. TINKER:  I would request that they be given also to the Court.  Sometimes a child, when making those kind of drawings, will make notations, may -- you can see from the

29

drawings maybe how the child feels.  And I just want that part of what Your Honor reviews in making a decision about whether we get --

THE COURT:  I think, make the drawings available.

MR. TINKER:  And for the record, Your Honor, I don't require -- I understand the Court's not going to give us the report.  After you see the drawings, I don't need to be present on that occasion.  If you decide that they are something that we should be able to see, then I'd request Your Honor to make that ruling.  I would like, if Your Honor's not giving us either one, that they be given a Exhibit Number for the in-camera and be attached to the record so, if necessary, some Appellate Court will know what it is you reviewed.

THE COURT:  Did you get the definition of that word?

(Court and clerk conferring off the record.)

THE COURT:  Oh.  That's what I thought it might be.

(PAUSE.)

THE COURT:  Well, this is what she probably wouldn't want you to know.  It's a personal symptom.

MR. TINKER:  Well --

THE COURT:  That would be inappropriate for any kind of cross-examination.

MR. TINKER:  But that is in the report that I've requested Your Honor give an Exhibit Number then.

THE COURT:  Why don't you come up here and look at

USCA5 190

this and see what it is you think you ought to have.  You can read right here.

(PAUSE.)

MR. TINKER:  May I respond just briefly, Your Honor?

THE COURT:  Yes, sir.  You've read the entire report now?

MR. TINKER:  I have, Your Honor.  There are a few things I believe that would be --

THE COURT:  Tell me.

MR. TINKER:  -- important.  One, depending on what she testifies to, if she testifies --

THE COURT:  I agree.

MR. TINKER:  If there's any variance between --

THE COURT:  Okay.  I guess you better go to the podium so you can be in front of the microphone.  Yes, sir.

MR. TINKER:  Her description of the incident, Your Honor, may or may not be important --

THE COURT:  I agree with you.

MR. TINKER:  -- at the time she testifies.  There's also testimony concerning her love for her father.

THE COURT:  Yes, sir.

MR. TINKER:  The Defendant in this case.  Those things, I believe, would be important if we get to punishment phase in this case, that, so the jury may know that affection she has and perhaps why.

USCA5 191

31

Secondly, there are some statements concerning the difficulty she may have as far as her testimony is concerned.

THE COURT: Where's that? What are you talking about?

MR. TINKER: At the last page. There's a possibility that if AB1994 would be brought before the Court regarding her eyewitness of the event which resulted in the death of her half sister, it is my professional opinion, given her relationship with her father, her current age, and her emotional functioning, if AB1994 was to be asked to sit on the witness stand with her father present, she would likely have great difficulty describing the incident. This experience would likely" --

THE COURT: Well, that has nothing to do with cross-examination. That's an obvious finding. Even I can figure that one out. That has nothing to do with cross-examination, unless you were cross-examining the psychologist.

MR. TINKER: That's the other thing. And I guess this Chuck Thompson, Thomasson is the Texas Department of Protective Services --

THE COURT: This may be an extraneous issue, though.

MR. TINKER: I understand. But those are the kinds of things I'm finding, though, that would assist us in preparing the defense in the case.

THE COURT: I understand that. You've got that

USCA5 192

32

information.

MR. TINKER:  I know.  What I would like to do, Your Honor, now that Your Honor has agreed to give it to us, is have a time when I could sit down in the Prosecutor's office, which I'm going to be there tomorrow at 1:00 o'clock, and just dictate those things on a tape, so I will not forget.

THE COURT:  You've got them.  That's it.  You've got the information.  And if that psychologist comes to testify, you can have that for cross-examination.  I'll let you refresh your memory if the child comes and testifies about what statements she may or may not have made to a psychologist.  I'm not even sure that's admissible.  But you can certainly have it back then.

MR. TINKER:  May I approach the Court?

THE COURT:  Yes, sir.  But that certainly has nothing to do with cross-examination, the psychologist's diagnosis or saying that she may have difficulty testifying against her father.  You know, I'm sure the jury's going to be able to figure that one out.

MR. TINKER:  Well, you know, of course, as a defense lawyer, I might interpret that to mean she'll have a difficulty telling the truth about the incident.  And that may be important.

THE COURT:  I don't see the connection.  But you can certainly explore that with her on cross-examination, whether

**USCA5 193**

33

or not she's telling the truth.

MR. TINKER:  And the other request I make, Your Honor, is that the drawings --

THE COURT:  You want the drawings.  I'll make those available to you.

MR. TINKER:  That's all.

THE COURT:  In the office of the U.S. Attorney, not necessarily give you copies, but you can look at them.

MR. TINKER:  And the exhibits themselves will be given as an Exhibit Number for --

THE COURT:  I'm going to make this part, I'll make the Psychological Evaluation Government's Exhibit 1 for the purposes of this hearing.

MR. TINKER:  That's good.

THE COURT:  Is that all right?

MR. TINKER:  That's good.

THE COURT:  And make it part of the record.

MR. TINKER:  That's good.  Ms. Scotch, would you label that Government's Exhibit 1?

THE CLERK:  Yes, Your Honor.

THE COURT:  And it's under seal.

THE CLERK:  Yes, Your Honor.

MR. TINKER:  That's all I have with regard to this issue, Your Honor.

THE COURT:  Okay.  I've given you -- I don't expect

USCA5 194

34

you to read it now.  I've given you -- I'm trying to write down every possible thing I can say so you can add or subtract or object in advance.  The way I understand the way we're going to do this is that we're going to bring all the, the entire panel in for one day to fill out the jury qualification form, the jury questionnaire form.

So first I have to do is qualify them, which I'll do my usual qualifications.  It's written down word for word in there.  Second, I'm going to, after they're qualified, I'm going to give them some introductory remarks about the type of case, why we're doing the questionnaire, how important it is for the jury selection.  I've got every word written down in that.

"A" is the remarks on juror qualifications.  "B" is the general statement of the Court prior to questionnaire.  Most of these I think that you agreed on.  I don't think you've seen the jury qualifications, but you've both been here for jury qualifications.  Nobody's ever objected to it.

And then I've got a proposed juror questionnaire.  I added some questions, the things that I usually take so much time with the big panel, from what you all suggested.  I did more on the presumption of innocence, some other things.  Every, I incorporated everything that the Defense requested, in addition to everything the U.S. Attorney requested.

I took out, Ms. Booth, of your request, even though

they weren't objected to, I'll be glad to put them back in, but what was the verdict on the criminal cases, because I didn't think we ever asked that.

MR. TINKER:  I don't have any objection to the asking of that question, Your Honor.

THE COURT:  Okay.  Then I'll put it back in.  On the criminal case, and I think on the civil case also.  Then I added in some things that I always ask, like you or your spouse serving on juries, any specialized medical training or medical, legal or chemist, chemical training, chemistry training.  Anyway, you can look over these at your leisure, and we'll have another status conference so you can agree or not agree.

I have a general voir dire in here also that -- okay, qualification, filling out the questionnaire.  I anticipate that you all will look at all those questionnaires.  I'm trying to figure out a way to give the jurors letters or numbers, instead of names, having one part of the questionnaire that has the usual juror information, like phone number.  I took out social security numbers.  I'm not going to do that.  Phone numbers, business phone numbers, spouses, spouse occupations, and work address, home address, and have -- and that will be on one little sheet of paper that only the lawyers get.  And then you'll match that -- those will have numbers that correspond to the big questionnaires that don't have anything but a ZIP code on them and a Juror Number.  So you get all the information,

USCA5 196

36

but it just won't be on the same page, because I'm going to collect up those right away. That is, the really personal information, how to locate the jurors, that kind of thing, and make it still be part of the record, but you won't be taking it home, the juror questions -- the main questionnaire forms, of course, you'll need to spend time with.

And I anticipate those will all be done in one day. I'll give you each a set. We'll meet back the next day or the day after that and determine if there are any jurors that you all can agree to strike. Obviously, we can't just take their answers on the questionnaires, some kind of disqualifying event. But if you get together and determine that you can agree that these jurors should be struck, we'll do all that. Then we'll come back in for the regular voir dire.

I'll do a general voir dire, very minimal actually, and then we'll have, schedule jurors in like groups of twelve, to come in like the first group from 9:00 to 11:00, and the next group from 11:00 to 1:00, and on and on and on, until we get a jury. And those, however, we'll do individual voir dire. Right?

MS. BOOTH: Yes, ma'am.

THE COURT: And do mostly those important questions then. I guess we'll use the questionnaires to do that. I anticipate not doing that much in that, but letting you all do that, going over their questionnaires and asking them

USCA5 197

37

questions.  So what do you think about that procedure?

MR. TINKER:  I think that's an appropriate procedure, Your Honor.  But I do hope that you will give us a day once they fill out the forms, because it's going to be, there's going to be a volume of things for us to go over, and also to get the proper --

THE COURT:  Well, tell me -- you just need to tell me how much time you need, and I'll pick a time to bring in the jury.

MS. BOOTH:  How many forms, how many people did we decide you were going to bring in, Judge?  Over a hundred.  Correct?

THE COURT:  Well, I have the jury clerk who's doing the -- oh.  What about your request?  I gave you the jury plan.  Right?

MR. TINKER:  Yes.

THE COURT:  And what else did you ask for?

MR. TINKER:  May I address the Court with regard to those issues?  Your Honor, I asked for a jury expert, selection expert.  And since I was here, I mentioned a person I knew by the name of Hirschhorn.

THE COURT:  Yes, sir.

MR. TINKER:  And I did not have his qualifications.  And I talked to his office, talked to him and another lady by the name of Nona Dodson.  During the period of time they will

USCA5 198

38

be needed, Mr. Hirschhorn will not be available, but Ms. Dodson will be. And I've tendered to the Court, as just an exhibit for the purpose of, or an attachment to my motion, her qualifications. I think that's one thing that you said you would like to have.

THE COURT: Yes, sir.

MR. TINKER: Okay. And I don't know what my Exhibit Number --

THE COURT: And what an estimated cost would be.

MR. TINKER: Yes. And the cost, Your Honor, in talking with them, they said they would charge just what the Criminal Justice -- you know, he said, "How much are you getting?" And I said, "$90 an hour." He said, "That's what we would charge," which seems reasonable to me, Your Honor. It's not like -- and I think that the most they would do would help us go over the juror's lists and maybe --

THE COURT: So maybe like three days or something?

MR. TINKER: Yeah, I think that's it.

THE COURT: Okay.

MR. TINKER: And so --

THE COURT: One person?

MR. TINKER: I'm sorry?

THE COURT: One person?

MR. TINKER: One person, yeah, not both of them.

THE COURT: Okay.

USCA5 199

MR. TINKER:  But I will tender to the Court, at the top of the thing is a --

THE COURT:  Have you seen this, Ms. Booth?

MS. BOOTH:  Yes, Your Honor.  He showed it to me before the hearing.

THE COURT:  Any objections?

MS. BOOTH:  No --

THE COURT:  Have you all got somebody?

MS. BOOTH:  -- well, just my regular objection.

THE COURT:  The regular objection that it's --

MS. BOOTH:  That he doesn't need a jury selection expert.

MR. TINKER:  And you will note on the document there are some experiences in capital murder and death issues that she's had some experience in, according to her, the information that she provided.  Is $90 an hour right, Your Honor?

THE COURT:  I don't remember.

MR. TINKER:  I hope it's more than that.  Whatever it is --

THE COURT:  What are we paying?  What do we pay?

MR. TINKER:  I don't know whether it's different in capital murder.

THE COURT:  Ms. Scotch?

MR. TINKER:  I'm told $90 an hour in court.

THE COURT:  I don't think that there's a limit.

USCA5 200

40

We'll just tell them $90 an hour, and that's fine.  But I'm not sure that there's a limit on capital cases.

MR. TINKER:  Well, anyway.  Good.

THE COURT:  Okay.  But we're not having Mr. Hirschhorn, so I don't need him.  We're having Ms. Dodson.  Is that right?

MR. TINKER:  Yeah.  Yes.  And they work in the same office, and I've actually talked to both of them.  And actually he said the CJA rate he thought was $120 an hour, and I said well -- then he said, "What are you making?"  And my recollection, at least in a non-capital --

THE COURT:  Well, I thought -- every juror, every juror selection person that I've ever seen has at least a Ph.D. in psychology, or something other than an undergraduate degree in English and psychology.

MR. TINKER:  I guess she's had a lot of on-the-job training.  She's been hired in a number of cases, as you will see.

THE COURT:  By herself?  Do you know that?

MR. TINKER:  The truth is, I guess you could compare --

THE COURT:  Because she's got, she's got the same cases listed as Hirschhorn, who does have a jurisprudence doctorate.

MR. TINKER:  Yes.  I don't think they are all the

USCA5 201

41

same, Your Honor.  I was looking --

THE COURT:  Well, but they're each of them partial listed, partial listings.

MR. TINKER:  Jose DeLeon is a capital murder.

THE COURT:  I'm just not sure if somebody without a postgraduate degree is worth $90 an hour.

MR. TINKER:  I'm sorry?

THE COURT:  I don't think -- I'm not sure that anybody without a postgraduate degree or any specialized training in this field is worth $90 an hour.

MR. TINKER:  Well, that's what I was told they would charge.

THE COURT:  The juror experts that I know have, the two that I have known, met, have Ph.D.s and JDs.  And Hirschhorn has a JD.  And the lady that you've got here doesn't have any postgraduate education.  So $90 an hour is stretching that one.  And I would like a revised CV that says which of these she did all by herself.

MR. TINKER:  Okay.

THE COURT:  But again, I'll authorize her, if you think she's satisfactory, for $50 an hour.

MR. TINKER:  I will ask her if she'll do it for that, Your Honor.  And actually it was Hirschhorn I talked to who can't do it because he's got other commitments, that -- and I'll call, can I report that back through, without a court

USCA5 202

42

appearance, Your Honor?

THE COURT:  You can.  You can just put it in a motion that you want, you know, that this is the minimum that she says, or --

MR. TINKER:  I'll do that, Your Honor.

THE COURT:  And maybe that's insufficient.  I guess paralegals, I've seen paralegal bills for 75 an hour that I've disallowed.

MR. TINKER:  Court reporters are the ones that are just outrageous, Your Honor.

THE COURT:  How much are they?

MR. TINKER:  I don't know.  They charge $3 a page when they're transcribing in state court at least, and then they make you take two copies.  But anyway -- may I address the Court on another matter?

THE COURT:  Yes, sir.

MR. TINKER:  Another issue, I think, concerning the jury selection.  I've asked for a demographics person.  And since that time, I know that Your Honor suggested that Mr. Bezdek would not be somebody --

THE COURT:  Well, he may be perfect.

MR. TINKER:  I talked to him today.  I just wanted to let the Court know, and he --

THE COURT:  What did he think?

MR. TINKER:  He was -- I talked to him.  He says he's

USCA5 203

willing to do it.  He kind of wanted to know what we needed. He felt like he could do it for us.  And he was going to give a, either take a test or give one, Your Honor, at the -- he teaches at the university, as you know.

THE COURT:  Right.

MR. TINKER:  And he said he would get back, he gave me his home phone, and I'm supposed to contact him either later today or --

THE COURT:  Well, has he ever done that before?

MR. TINKER:  He has not, but he did say that he's done that kind of analysis before.  He also said that he, there was a professor at a university in the valley that he might contact that may be better qualified to do that kind of work. So I just wanted to know that that's going, ongoing.

THE COURT:  Okay.  Just make sure it gets done, if you need it, before --

MR. TINKER:  We need it fairly quickly.

THE COURT:  -- before the trial.

MR. TINKER:  I understand that.

THE COURT:  And I need some estimate of how much that cost is going to be.

MR. TINKER:  Let me see if I have a note in that regard.  No, I don't.

THE COURT:  Now, you asked for a copy of the jury wheel or something last time?

USCA5 204

MR. TINKER:  Well --

THE COURT:  What was it that you wanted?

MR. TINKER:  A copy of the list of those jurors that the jurors in this case will be summoned from, from the wheel. And I don't know whether that's doable or not, but I would think it would be.  The main thing -- I don't know whether he'll need that.

THE COURT:  I've asked -- the jury clerk from the Southern District of Texas from Houston is here.  Right?  And your name is?

MS. WELU:  Yes, Your Honor.  Martha Welu.

THE COURT:  How big is the jury wheel?  It's for the whole Southern District?

MS. WELU:  It's for the whole Southern District.  And then each Division has their own jury wheel.  We have a whole set of jury wheels.

THE COURT:  How big is the Corpus Christi Division jury wheel?

MS. WELU:  About 70,000.  Of those at this time, Your Honor, we have 3500 that are qualified jurors.  We are constantly sending out qualification questionnaires, to keep that wheel built up.  But at this time, we have 3500 names.

THE COURT:  For the Corpus Christi Division?

MS. WELU:  For the Corpus Christi Division.

MR. TINKER:  May I make one inquiry?  Is that the

USCA5 205

3500 are used repeatedly?  I mean, they're, the jurors are summoned from those 35?  And they've been on the list for a number of --

THE COURT:  No.  We get a new wheel -- tell him how we do this.

MS. WELU:  Yes.

THE COURT:  You've got the whole jury plan.

MR. TINKER:  Would you like -- would you like her to come forward so she'll be speaking into the microphone?

THE COURT:  You decide.

MS. WELU:  The wheel's rebuilt every four years, following the election of a president.  And we carry those names forward, and we decide at the beginning of the wheel exactly how many jurors we will need to cover the needs of the Court for the four years.

MR. TINKER:  So since, the jurors that we have are jurors who have been on the list, 3500 --

MS. WELU:  Uh-huh.

MR. TINKER:  -- since George Bush was elected.

MS. WELU:  Yes.  Shortly after he was elected.

MR. TINKER:  And they've been used by --

MS. WELU:  No, they've never been used.  We use them one time.  We send out what we order, about, I believe your wheel had 111,000.  I'm speaking off the top of my head, Your Honor.  It could be a little off.

USCA5 206

THE COURT:  Could you move closer to the microphone, please?

MS. WELU:  111,000 approximately.  Then out of that, we draw constantly, the Judges are giving orders that we need to draw from the master wheel.

THE COURT:  See, there's a giant master wheel that has 100 and whatever thousand names, for the Corpus Christi Division.  We reconstitute the pool about every six months or so.

MR. TINKER:  And the pool contains the 3500, Your Honor?

MS. WELU:  Out of those, at this time you have 3500 jurors that are qualified.

THE COURT:  And we, what that means is that we send them, we authorize more pooling off the jury wheel, which is all at random.  It's in the Southern District Jury Plan that I gave you.

MR. TINKER:  I remember reading it, Your Honor, last time.

THE COURT:  And so Judge Head or I, whoever's miscellaneous Judge of the month, and they need some more jurors, pull those 3500 off, or you know, 3800 or 3600, send out the jury qualification forms.  And they come back, and then that's our jury wheel for a limited amount of time.  We don't ever reuse the jurors.

USCA5 207

MS. WELU: In that four years.

THE COURT: And there are some Divisions that do that, though. There are some that actually have one juror serving on three juries at a time. But ours are not like that.

MR. TINKER: My request, Your Honor, and I appreciate you coming, is that after I talk to Mr. Bezdek again, I will ask him what he thinks he would need to do, give his opinions about what you would have gotten, had the -- our complaint is that, so the record will be clear, is they're not using driver's licenses.

THE COURT: That's true.

MR. TINKER: And there are a lot of -- that's a main issue. And how we prove what, first, how many jurors, qualified jurors that, I mean, qualified voters there are and how many actually register, and how many you would have that are the different kind of jurors you would have if you had taken them from the driver's licenses.

THE COURT: Okay.

MR. TINKER: That's the kind of thing we want to prove.

THE COURT: Okay.

MR. TINKER: Whether he would need this list that she's discussed, I don't know.

THE COURT: I don't think the list would do you any good, because it wouldn't tell you any demographics. It

USCA5 208

wouldn't tell you what the ethnic origin is, it doesn't tell you the age.  I don't think that would be helpful.  I think what you need to know are the big, that Dr. Bezdek may know, that there are, say, in the Corpus Christi Division, the ten-county area, just making this up, the 250,000 people that are qualified to vote, 18 or over, of those, X number are African American, X are Mexican American.  The demographics are this.  They live in this part of town or that part of town. And then in fact, when you get your panel here, your 300, then you can apply those demographics to that panel.  I mean, I don't want to tell you how to do your job, but I would think --

MR. TINKER:  I understand, Your Honor.  And he may not need that.  I'm saying that, so I'm not requesting, but could I inquire how difficult would it be to get the 3500 names?

THE COURT:  Well, I'm not going to give you the names.  So that's how difficult it would be.

MR. TINKER:  That sounds impossible, Your Honor.

THE COURT:  Because, first of all, you're not going to get anything from those 3500 names, because they haven't -- well, those 3500 have filled out their jury qualification forms, but some of those have already been used on panels.  So they're excluded for this panel.  You're going to get a whole new list of names that have not been on a panel.

MR. TINKER:  Some of the 3500 have already been used

USCA5 209

49

and would not be some for this --

MS. WELU:  This 3500 are what we call your master wheel.  And out of the master we send out questionnaires.  And if you're qualified, then you are actually in a qualified wheel.

MR. TINKER:  All right.  So how many are in the qualified wheel?

MS. WELU:  Right now, at this time there's 3500.  But there's constantly questionnaires being mailed out and returned every day.

MR. TINKER:  How, if I may ask, how difficult would it be to give us a list, just the names, of those who are qualified at this time that have not been used?

MS. WELU:  The names are sealed.  I cannot give you the names.

MR. TINKER:  And they're unsealed when there's a request from a Court for a panel?  That's the only time?

MS. WELU:  Yes, that's right, about the names.

THE COURT:  Then when you come in to select your jury, they're unsealed and given to you.

MR. TINKER:  Your Honor, that's -- right now, that's all I have --

THE COURT:  Okay.

MR. TINKER:  -- with regard to this issue.  And I will notify the Court in writing whether there's, he can do it

USCA5 210

50

without the request that I've made.

THE COURT:  Okay.

MR. TINKER:  If he agrees to do it, since he is a Ph.D., Your Honor, can he get $90 an hour?

THE COURT:  I'm sure he could.

MR. TINKER:  All right.

THE COURT:  Okay.  Have you all agreed to the evaluation for Mr. Bourgeois?  Who's going to do it?  What doctors?

MR. GILMORE:  Dr. Estrada, I believe.

MS. BOOTH:  Dr. Estrada, Your Honor.

THE COURT:  Well, y'all never got me an order.  Wasn't I supposed to order it?

MS. BOOTH:  We'll get you an order, Your Honor.

THE COURT:  You were supposed to get it to me on the 11th, I think.

MS. BOOTH:  I don't know how I missed --

MR. GILMORE:  I think it's in -- I remember reading the order today, Judge.  We had gotten it faxed over to us today.  I just assumed that --

MS. BOOTH:  Okay.  I --

MR. GILMORE:  I just assumed she was going to do it.

MS. BOOTH:  I'm sorry.  I didn't even see it, Judge. I guess I missed it.

THE COURT:  Okay.  He's not going to be out of town

USCA5 211

for any length of time over the time that we need him to be here?

MS. BOOTH:  No, Your Honor.  I think he's -- in fact, I was just looking at the order.  I -- I'm sorry.  We didn't get, I didn't get this this morning.  I will call and do the order and submit it.

THE COURT:  Okay.  All right.  I'm granting your Motion to Withdraw Motion for Continuance.

MR. GILMORE:  I'm sorry, Your Honor?

THE COURT:  I'm going to grant your Motion to Withdraw Motion for Continuance.  But I need you to get me -- actually, I'll just do one myself.  It's no big deal.

MR. GILMORE:  I can do it, Judge.  I can have it over --

THE COURT:  It's no big deal.  I just thought you were trying to trick me.

MR. GILMORE:  Yeah, we are, Judge.

(Court and clerk conferring off the record.)

THE COURT:  When this is finished, by the way, the table of contents for everything on jury -- and I need to do a charge also, but when we're finished with this and we come to an agreed format for all of these things, I'll just make it part of the, an exhibit for the record.

MR. TINKER:  That's fine, Your Honor.

THE COURT:  Okay.  I have an agenda, but I left it on

USCA5 212

52

my desk.  So I'll get right back.  Anything to take up while we're here, before I bring in my memo that's got the agenda on it?

MR. TINKER:  We have nothing at this time, Your Honor.

(PAUSE.)

(Court and clerk conferring off the record.)

THE COURT:  So I guess I really still have not ruled on your motion.  I stayed it the last time, your motion for jury selection expert.

MR. TINKER:  You have not ruled on that, Your Honor.

THE COURT:  Okay.  Well, I'm going to let you have one, as long as it's reasonably priced.  And I want that CV of the lady, exactly how many she's done all by herself.

MR. TINKER:  I'm going to find that out, Your Honor.  I have a note to do so.

THE COURT:  And what her usual and customary fees are on the ones she's done by herself.  And I understand that you, along with withdrawing your motion for continuance, that you have not, you're not tendering your experts today, your mitigation experts in support of any continuance.  I understand from your motion that they're able to get their work done, as long as they concentrate 100 percent on this case.

MR. GILMORE:  That's correct, Your Honor.

THE COURT:  Okay.  We've done the mental health

USCA5 213

report on the child, except we're missing the drawings.  And they will be made available to you, in the office of Ms. Booth.

What about the witness statements?  You had, Ms. Booth, I put in the order, the last order, that Ms. Booth has made several references throughout these proceedings since the beginning of this matter to witness statements about threats that Mr. Bourgeois has made.

MR. TINKER:  And she, we're meeting tomorrow at 1:00 o'clock, Your Honor.  We were going to try to look at them in court, but I have another thing I have to do.  But we have an appointment tomorrow to look at that, look at the videos, whatever else, and now the drawings that are available.  There's a video in the swimming pool, and there's one that was mentioned today that John said he's seen, but I haven't, of the child.

THE COURT:  Well, I'm talking about witness statements.  I'm going through the list of the last order, the things that were to be made available to you by December the 11th at 12:00 noon.  And those were redacted witness statements, I think?

MS. BOOTH:  Well, Judge, they were available then, but we just had --

THE COURT:  Oh, okay.

MS. BOOTH:  -- scheduling problems.

MR. TINKER:  Yeah, we --

USCA5 214

54

MS. BOOTH:  No, they were available.

THE COURT:  So we're all right on that?

MR. TINKER:  I'm all right with that, Your Honor.

THE COURT:  Okay.  All right.  I'd like to set another scheduling, another status conference of this.  And in regards to your ongoing, which I've told you that you can bring up at any time in the future the motion to recuse, and of course not to mention my own examining and evaluating daily. You're certainly welcome to talk to the FBI, who would be investigating these things.

Could Ms. Beckett make herself available if anything changes?

MS. BECKETT:  Yes, ma'am.

THE COURT:  Okay.  And to the Marshal Service, because they just came and told me, right before we came in here, that their evaluation looked good.  And I said, "Well, what does that mean exactly?  What do you anticipate as good?" And what they meant was no threat.  And that's the only sentence conversation that we've had about the case.  And that's Ms. Wanda Price, sitting in the back of the courtroom. Would you stand up, Ms. Price?  She is the head of the Southern District Marshal Security and does the evaluations.  And I think she came down here to visit with me about that.  It's not happened, because I said I wouldn't be talking to them about the case.

USCA5 215

55

So if you want to, Ms. Price, if you could make yourself available and give Mr. Tinker, Mr. Gilmore your card. And I actually, I don't know if I can give you the authority, but it sure wouldn't bother me at all if your assessment changes at any point, you're welcome to visit with these people.  Is that all right, Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  Yes, Your Honor.

THE COURT:  Is there anything else I can do in regard to those concerns?  Are your concerns allayed?

MR. GILMORE:  We're satisfied, Judge.

THE COURT:  Okay.  When would be a good time to meet -- I'd kind of like to get these comments and the initial things set up on the jury, this deal, this packet I've given to you about jury, the jury questionnaire form.  And as I say, the other Judges I've talked to who have done these cases suggest that the jury questionnaire form be done in the courtroom setting.  We'll do them in the Central Jury Room, now that we have one, and that it not be done, mailed out and brought back in, so that it can have a little bit more solemnity.

MR. TINKER:  And that's better, because it's the juror themselves who have filled it out, not their wives or husbands or something.

THE COURT:  Exactly.  And they can understand how important it is.

MR. TINKER:  Sure.

USCA5 216

56

THE COURT:  Ms. Salinas-Patterson, were you about to say something?

MS. SALINAS-PATTERSON:  No, Your Honor.

THE COURT:  Fixing your collar?

MR. TINKER:  I would like to say something.  I forgot, I hope you will tell the jury, when you ask them about the questionnaires, that the personal information, like their names and address and phone numbers, if those are there, will not, will be used for limited purpose and be returned to the Court and not displayed to the public.  I mean, I just, I guess you'll tell them that.  I think it will make them more comfortable in answering the questions.

THE COURT:  I will.  I'm not sure I've got it written exactly like that in there, but we'll make, please just, if you want to make copies of that when you get back to your office or at some other time, interlineate any changes you think should be made.  That's Ms. Booth, Ms. Salinas-Patterson, Mr. Roberts and Mr. Gilmore and Mr. Tinker.  And then we can all sit down together, maybe in an informal session, and try to get these in a mutually agreed form.

I think we were kind of hurried doing these over the weekend.  I could tell from your submissions that you all hadn't had a whole lot of time.  So -- and it's very important. But I needed to get something to start, to start this work.  So if you could give me a proposed time we can meet back here on

USCA5 217

57

these jury matters?

MR. TINKER:  Almost any time, except I have a planned holiday trip between the 28th and the 2nd of January.

THE COURT:  Okay.  Then we do it before -- let's pick a date before Christmas then.  Ms. Booth, what's wrong?  Were you going to go some place?

MS. BOOTH:  No, Your Honor.  I'm not going anywhere.

MR. TINKER:  I don't see why early January wouldn't be --

THE COURT:  Well, when is -- pardon?

MR. TINKER:  I would recommend early January, because I think, you know, Ms. Booth's got family, and if they're doing anything -- actually, Friday's rolling around, the 19th.

THE COURT:  What's happening on the 19th?

MR. TINKER:  Well, I'm just saying Friday is the 19th.  I just remember that.  I don't remember when Christmas is.  I'm just saying it's coming, Christmas is rushing in on people and they're shopping and starting to do Christmas things.  That's just my observation.

MR. GILMORE:  Thank you for that.  You can sit down.

THE COURT:  Every day is a reminder I haven't done my Christmas shopping.

MR. TINKER:  If you have few friends, it makes it easier, Judge.

THE COURT:  I've been paring down.

USCA5 218

58

MR. TINKER:  I'm talking about me.

THE COURT:  I've been paring down myself, believe me. So you think this Friday's too soon?

MR. TINKER:  I'm having some minor surgery on Friday, Your Honor.

THE COURT:  Okay.

MR. GILMORE:  I'm going to be in trial Friday, Judge. I start a trial tomorrow, and it's going to last through the week.

THE COURT:  Okay.  January 16th?

MR. TINKER:  I'm sure that's fine with me, Your Honor.

THE COURT:  I'm going to do it in the afternoon, one -- what's wrong?  Ms. Scotch, is that all right?  2:00 o'clock in the afternoon?

MR. TINKER:  That's fine, Your Honor.

THE COURT:  And then --

MS. BOOTH:  Now, do we still have our -- I take that back.

THE COURT:  Okay.  When are we set for --

MS. BOOTH:  I got the dates messed up, Judge.  It's January the 16th.

THE COURT:  Okay.  We've got jury selection on the 16th of February.  So we need -- is that when we're bringing them in to do the form?  Is that the beginning?  Or are we

USCA5 219

starting before then?

MS. BOOTH:  No, February the 9th, I thought.

THE COURT:  February 9th, okay.  Have you all disclosed all your experts?

MS. BOOTH:  If you're speaking to the Government, Your Honor, we filed, we were supposed to file something back, I think October the 15th.  We did a disclosure of all of our experts.

MR. TINKER:  They have --

THE COURT:  Have you got reciprocal, have you asked for reciprocal discovery?

MS. BOOTH:  No, we haven't, but they've invited us over to the office so that we might look at their things and not copy it.  We have reciprocal discovery.

MR. TINKER:  Redacted some portions, of course.

MS. BOOTH:  Yes.

THE COURT:  Yes, sir.

MS. BOOTH:  And, Your Honor, tomorrow I'd like to file a motion for leave to file two, we have two additional experts that we would like to designate.

MR. TINKER:  And we still have Dr. Estrada in the wings.

THE COURT:  Well, they've designated, the U.S. Attorney has designated him as an expert.

MR. TINKER:  I'm just observing that he hasn't done

USCA5 220

whatever --

MS. BOOTH:  No.  We asked him, because we, the Defense had not filed anything as far as -- in fact, they had said that they didn't need a mental examination.  So we had asked if he would sit in the courtroom and be available --

THE COURT:  Right.

MS. BOOTH:  -- to testify to his --

THE COURT:  Well, he's still your expert.

MS. BOOTH:  Right.

THE COURT:  Apparently, you all have agreed, however, in spite of that, that the Defendants agree to submit to have --

MS. BOOTH:  To be --

THE COURT:  -- to examine for competency or insanity.

MR. TINKER:  That wasn't, I wasn't complaining about lack of notice.  I'm just saying that his reports haven't been --

MS. BOOTH:  No, he is --

THE COURT:  Well, I mentioned that because I wanted to remind you all that January 5th, I know the deadline is coming up --

MS. BOOTH:  For the Daubert hearing.

THE COURT:  -- for the Daubert challenges.

MR. TINKER:  I understand.

THE COURT:  And --

USCA5 221

MR. TINKER:  And I will tell the Court that there are two experts that the Court has given us that at this time I'm not going to mention what kind, but I have contacted both of those and was trying to get it stirred.

THE COURT:  I think you've -- I think you've made those public.

MR. TINKER:  Well, I don't know.  Anyway.

THE COURT:  I think.  I haven't.  But I think they were mentioned in the last hearing.

MR. TINKER:  Maybe so.  But anyway, I'm stirring that to get them to get it done.

THE COURT:  Okay.  The 9th then is when the jurors come in for the questionnaires, February 9th at 8:00 a.m., which means we need one more date.  February the 12th, I think we've got that set somewhere, at 8:00 a.m.  And I'll probably make that in the afternoon.  No, it won't -- it won't matter. Mr. Treviso?

MR. TREVISO:  Yes, ma'am.

THE COURT:  Will he be here then?  Or do you need consideration for going back and forth?

MR. TREVISO:  He'll be here on the 12th.

THE COURT:  Already I mean?

MR. TREVISO:  Yes.

THE COURT:  Okay.  So the 12th then at 8:00 o'clock where we convene in a courtroom and let me hear any agreed, if

USCA5 222

you can agree to not call certain of the witness -- certain of the jurors, so we'll know exactly who to call back on the 16th or who to cancel on the 16th.

And how big a panel are we bringing in?

MS. RIVERA:  150, Your Honor.

THE COURT:  Is that enough?  You all said it was enough last time, but it --

MR. TINKER:  How many?

MS. BOOTH:  150.

MR. TINKER:  I don't have any idea.

THE COURT:  We talked about this another time and set it at 150.  But do you want to make 200?  I mean --

MR. TINKER:  Whatever the Court decides.

THE COURT:  No, you tell me.  Because though there hasn't been any pretrial publicity, there was publicity --

MR. TINKER:  It would be all right with us if it was less than twelve, Your Honor.

THE COURT:  We just take the first twelve that show up?

MR. TINKER:  I assume you're going to pick alternates, Your Honor?

THE COURT:  Let's talk about that.  Didn't we agree on how many alternates before, because it was how many could sit up in here?

MS. BOOTH:  Your Honor, four alternates.

USCA5 223

THE COURT: Four alternates? It seems like we chose the number of alternates based on the number of seats that we could add onto the jury deal. Do you remember, Ms. Scotch?

THE CLERK: I'm going to pull that up, because I don't know.

THE COURT: Okay.

(PAUSE.)

THE COURT: Ms. Gano says it's four. Is that enough, Mr. Tinker?

MR. TINKER: It seems like it should be, Your Honor, but I really don't know. I mean, I haven't tried one in federal court. If the jurors are, you know, we'll have an idea once we see the questionnaires and the attitudes about the issues.

THE COURT: Well no, the alternates we need to kind of know now how many --

MR. TINKER: You know, the truth is, if you take more, if you have more than enough, you're more likely to excuse people that need to be excused, not worry about running out.

THE COURT: And then we don't worry about it. So let's have --

MR. TINKER: You don't --

THE COURT: Okay. So let's get 200. Y'all came up with 150, I promise you. Let's get 200 jurors in. We can fit

64

them in the jury assembly room.

MR. GILMORE:  I recall saying 250, Judge.  That's --

THE COURT:  You said 250?

MR. GILMORE:  I believe so, Judge.

THE COURT:  250.  150 sounded awfully little.  I thought we agreed on whatever it was.  So let's do 250.  And they all need to fit into that jury room to do their -- yes.  Okay, 250.  And then twelve jurors, four alternates.

Did you agree with the Government's brief, Mr. Gilmore, Mr. Tinker, on how you do challenges for cause, the requirements?

MR. TINKER:  Your Honor, my response was that generally, that the rules are, but they're so fact based that it's -- I mean, we agree to those rules, but what jurors say is always so different.

THE COURT:  I know.

MR. TINKER:  And yes, yes, and I, in writing, have agreed generally that that is the law.

THE COURT:  Okay.

MR. TINKER:  You know, Witherspoon deals with the death penalty and that sort of thing.

THE COURT:  Well, I've never done one.  I just want to do it right.

MR. TINKER:  And I'll just voice this again.  Last time we talked about restraint as far as Mr. Bourgeois is

USCA5 225

65

concerned, and I'm going to object to any restraint. I just wanted to let, give the Court head up there. I look around -- first, the record reflects that he has never, in the courtroom, caused any problems. He's always been gentle and --

THE COURT: Well, he's always had shackles on, too.

MR. TINKER: I understand that. And I look around the courtroom, and there are one, two, three, four, five, there must be ten law, you know, Marshals or law enforcement. And if that can't, if that doesn't do it, there's something wrong. And I'm just letting the record reflect that he's never been disruptive. And yeah, he does have shackles on, I recognize that. And I don't expect he'll be disruptive, and I don't think that he should be restrained while he's in the courtroom for his trial.

THE COURT: I'm not going to have any restraint on him. I'm going to do what the Marshals said in that stun deal, and that's no kind of restraint. And it only is used if he makes a run for it. All I can do is do what the Marshals suggest. And I do not want it to appear in front of the jurors that he's restrained in any way. And the way I understand that -- would you explain that, Marshal Treviso?

MR. TREVISO: He's wearing it right now. He's got the stun belt on. It's a battery pack --

THE COURT: Did you know it? Did you know that, Mr. Tinker?

USCA5 226

MR. TINKER:  No, Your Honor.

THE COURT:  Okay.  It's not -- if you want to stand up, Mr. Bourgeois, I don't want you to respond to anything, but it's not at all visible.

MR. TREVISO:  Don't touch that thing.

MR. GILMORE:  Then turn around sideways so we can see.  There's a big battery, looks like a big battery pack on the back, Judge.

MR. TREVISO:  If the Defendant's going to wear a coat, Your Honor --

THE COURT:  Well, make sure he has a coat.

MR. TREVISO:  -- there's no way that they can see it.

THE COURT:  Make sure he has a coat.  You have coats down there if he doesn't have any?

MR. TREVISO:  Yes, Your Honor.

THE COURT:  They're still down there.  Right?

MR. TREVISO:  They're still there.

THE COURT:  Okay.  So there's a selection of coats, Mr. Tinker, that will cover up that battery pack that's in his back.  And I don't think that's -- it's not visible to me.  It wasn't visible to you all.  And I don't want him to be restrained in any way in front of the jury, and I agree with you 100 percent.  And I don't think the Marshals consider that a restraint.

MR. TINKER:  Mr. Bourgeois does.

USCA5 227

67

THE COURT:  Well, does it limit --

MR. TINKER:  Anyway, I just wanted to make a record --

THE COURT:  Okay.

MR. TINKER:  -- in advance, that I will complain about that.

THE COURT:  Well, is it limiting his ability to, in any way to confer with you or --

MR. TINKER:  It hasn't yet, Your Honor.

THE COURT:  Pardon?

MR. TINKER:  It hasn't yet.

THE COURT:  Okay.

MR. TINKER:  I haven't really tried to confer with him today.

THE COURT:  Well, if it causes any problems, let me know.

MR. TINKER:  And Your Honor, that's the point.  I'm complaining now, so if something happens, then I've complained.

THE COURT:  Okay.

MR. TINKER:  And that's what --

THE COURT:  I mean, it doesn't go off without -- how does it work exactly?

MR. TREVISO:  Mr. Lujan is, Deputy Lujan is the one that's certified in it, Your Honor, and he can explain it to you a whole lot better.

USCA5 228

68

THE COURT:  Explain it to me, Deputy.

MR. LUJAN:  Your Honor, the way it works is there's going to be three deputies who are going to have hands on the inmate.  Once the inmate, prior to having the belt put on, he's going to be instructed not to tamper with the device, not to make any threat to anyone, including the deputies, to follow the deputies' instructions.  If he doesn't give, if he does not stop those actions, what happens, a tone, somebody, one of the deputies that's certified will be controlling the remote.  The remote's good for 100 feet.  The remote will give a audible tone, loud tone.  After --

THE COURT:  It's a warning.

MR. LUJAN:  Yes, ma'am.  If the Defendant doesn't stop, it gives 50,000 volts electricity to his left kidney, which will either cause self-defecation, take him down to the ground, or possible self-urination.  After the 8 seconds, approximately 8 seconds, the device will automatically shut off.

THE COURT:  Okay.  And it was used --

MR. LUJAN:  We used it in Victoria, Your Honor, with Judge Rainey.

THE COURT:  All I can tell you is that I respect your opinion about this.  I'm not going to have him restrained, in any conventional restraints.  I don't know if that's classified as a restraint.  I'm not going to have him appear in manacles

USCA5 229

69

or shackles in any way in front of the jury. And I have to respect the Marshal's decision on when to use these type of devices. So I'm going to go with them, because they have the ultimate responsibility in the safety of both the Court, the Court personnel, and most particularly, the Defendant. And you never want a misunderstanding to occur between the Marshals and the Defendant that might somehow end up in harm, for either the Defendant or the Marshals. So I have to respect their evaluation of safety issues and go with whatever they recommend. As long as, again, it is not obvious to the jury, there's no way they can see that. And so that's the way we're doing it. In fact, we talked about that the last time, I guess, or time before last or something like that.

And again, for the record, before any threat was mentioned to anyone other than the witnesses, that was a decision that was made.

Anything else you all can think of while we're here?

MR. TINKER: I have nothing further at this time, Your Honor.

THE COURT: Well actually, I have written down here six alternates.

MR. TINKER: That's fine.

THE COURT: Twelve jurors, six alternates. I think we had a GSA up here to see how many extra seats they could build, and six was the maximum. I'd rather have more than

USCA5 230

less.  So let's do the six alternates, twelve -- I think the way I read these notes, the jury, the minutes, is that you all agreed to 20 strikes, peremptory strikes each.  And then each of you will get ten more strikes for the alternates.  I assume that that was agreed upon.  That was back in July.

MR. TINKER:  I don't -- Your Honor, I don't know.  I don't have a recollection from reading it, but I know, I knew that was in one of your --

THE COURT:  All right.

MR. TINKER:  In the blue notebook you gave us.  My recollection is that the Prosecution always gets less strikes than the Defense.

THE COURT:  That's true, but I thought that we had agreed to that.  If the record is something -- Mr. Gilmore, that may have been before Mr. Tinker was in the case.

MR. GILMORE:  I don't have an independent recollection.

THE COURT:  I don't either.  But I'll listen to the tape and see what was said.

Anything else?

MR. TINKER:  No.  With that said, Your Honor, I may want to complain about that, but --

THE COURT:  You can.

MR. TINKER:  -- it doesn't have to be dealt with today.

USCA5 231

71

THE COURT:  It would be unusual for you not to, Mr. Tinker.  I would be disappointed.

MR. TINKER:  That's all that we have, Your Honor.

THE COURT:  All right.  Anything further?

MR. TINKER:  We have nothing further.

THE COURT:  All right.  Thank you all very much for your appearances.  You're excused.

(Proceedings concluded at 3:07 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Molly Carter                        Date

3/28/07

USCA5 232

United States Courts
Southern District of Texas
FILED

MAR 2 8 2007

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIMINAL ACTION |
| | * | |
| PLAINTIFF, | * | CR-C-02-216(1) |
| | * | |
| VS. | * | |
| | * | CORPUS CHRISTI, TEXAS |
| ALFRED BOURGEOIS, | * | JANUARY 16, 2004 |
| | * | 1:58 P.M. |
| DEFENDANT. | * | |
| | * | |

* * * * * * * * * * * * * * * * *


TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS-PATTERSON
                             MR. TONY ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

FOR THE DEFENDANT:           MR. JOHN S. GILMORE, JR.
                             MR. JOEL DOUGLAS TINKER
                             ATTORNEYS AT LAW
                             622 SOUTH TANCAHUA
                             CORPUS CHRISTI, TEXAS 78401


COURT RECORDER:              MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY
AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED
REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST
COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
COPY AT THE OFFICIAL RATE. GENERAL ORDER 94-15,
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF TEXAS

USCA5 233

2

(The proceedings began at 1:58 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action 02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MS. BOOTH:  Judge, we have --

MR. GILMORE:  John Gilmore for Mr. Bourgeois.

MS. BOOTH:  I'm sorry.

MR. TINKER:  And Douglas Tinker for Mr. Bourgeois, who isn't here yet.

THE COURT:  Oh, I beg your pardon.  I didn't realize he wasn't in.  Okay.  Mr. Bourgeois has just entered.  You have what?

MS. BOOTH:  Excuse me, Your Honor.  Ms. Salinas-Patterson is running over here.  We have some additions and some deletions that we'd like on the things that you --

THE COURT:  On the jury questionnaire?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

MS.. BOOTH:  And we are just finishing up.

THE COURT:  I thought we'd probably take that up first.

MR. TINKER:  That's fine with us, Your Honor.

USCA5 234

THE COURT:  Do you have additions?

MR. TINKER:  No, Your Honor.

THE COURT:  Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  No, Your Honor.

THE COURT:  I had a couple -- well, how about the, you've got a copy of my remarks on juror qualifications that I'm going to make when they come in to do the jury questionnaires.  Any additions, deletions, Mr. Tinker?

MR. TINKER:  No, Your Honor.

THE COURT:  Ms. Booth?

MS. BOOTH:  We don't have any on A, Your Honor.

THE COURT:  And that's on the qualification.  And then -- I'm sorry.  Then B.  What about B?

MS. BOOTH:  We have several on the general statement of the case, Your Honor.  And they were being copied at five, at ten till 2:00.  So she should be here any second.

THE COURT:  She called the case manager yesterday and wanted another copy of my handout.

MS. BOOTH:  Right.  We --

THE COURT:  So I said to the case manager, just tell them to make their own copy.  I've already given you three.

MS. BOOTH:  Yes, Your Honor.  We thought it was a different place than where it was.  But last night we got in, we had asked for some help from another jurisdiction, and they sent it to us last night, and we've been working with some

USCA5 235

things that we got in last night.

THE COURT:  Okay.  So B is on hold.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Right?

MS. BOOTH:  Yes, Your Honor.  Actually, she's coming with it in just one second.

THE COURT:  All right.  C is the questionnaire.  And I know that I've got some additions.  I'm just trying to do as much of the general voir dire that I usually do and put it in the questionnaire.  And then I thought we could take those responses and do it for the individual voir dire.  Right?

MR. TINKER:  That's fine.

THE COURT:  Does that sound all right, Mr. Tinker?

MR. TINKER:  That's fine, Your Honor.

THE COURT:  Ms. Booth?

MS. BOOTH:  That's fine, Your Honor.

MR. TINKER:  We haven't seen their, you know, their full changes, of course, but --

MS. BOOTH:  Right.

THE COURT:  Well, I was going to remove, I thought everybody agreed to remove spouse's employer from the general questionnaire.  Because it's going to be on this one that has the name.  And then the other one is going to have the number.  So we were going to take off place of employment for the juror, supervisor, that's Question Number 5 and part of 6, and remove

USCA5 236

spouse's employer.  And just keep spouse's job title or description.

Now, I took out, and apparently you all want back in -- do you have your --

MR. TINKER:  I didn't bring it, Your Honor.  I thought those things had been resolved.  I apologize to the Court.

THE COURT:  Okay.  Well, there's a Question 84 that asks if you or your spouse have ever been a juror in a criminal trial, and I took out, "What was the verdict?"  And you all had agreed to put that in there.

MR. TINKER:  And Your Honor, I think as a general rule, to ask what the verdict was is not appropriate.  And are you taking it out or leaving it in?

THE COURT:  I had taken it out.  You all gave me an agreed set of things --

MR. TINKER:  I'd like to have it in there, but --

THE COURT:  -- and you left it in.  I took it out.

MR. TINKER:  So where are we now?  Are we going to put it back in?

THE COURT:  Which do you want?

MR. TINKER:  I'd like it in.

THE COURT:  You want it in?

MR. TINKER:  Yes.

THE COURT:  I'll put it in.

USCA5 237

6

MR. TINKER:  In State Court we'd ask them that, and we weren't supposed to ask them.  Then we'd ask them other questions, and we'd find out what the verdict was.

THE COURT:  Ms. Booth wanted it in, too, so it's in.

MR. TINKER:  All right.

THE COURT:  I hated to tell you that, Mr. Tinker, before you told me what you wanted.

Then I wanted to modify, there's a Question Number 91 that talks about, "Do you or any of your immediate family work for the United States Government?"  I wanted to ask some subparts that.  There's a subpart, "Have you or your immediate family ever worked in the United States Attorney -- for the United States Attorney for the Southern District of Texas?"  I want to modify that from now or in the past, and then I wanted to kind of add the agencies.  Is there anything other than FBI agency?

MS. BOOTH:  Yes, Your Honor.  It's NCIS.

THE COURT:  What's that?

MS. BOOTH:  That's Naval Criminal Investigation Service.

MR. TINKER:  And I don't mind if we have a general question about any agency with the Government that involved law enforcement.

THE COURT:  I think I've got that in there, any law enforcement.  "Have you, your spouse or relative, close friend,

presently or in the past been a member or employee of a law enforcement agency or organization?"  But I wanted to subpart it again further down about these particular agencies, Naval Criminal Investigation Services and the FBI.

MS. BOOTH:  Yes, Your Honor.  DPS did some analysis at their laboratory for us, but that would be --

THE COURT:  Okay.  I'll put that in, too.  Anything else, Mr. Tinker, Mr. Gilmore, that you can think of?

MR. TINKER:  No, Your Honor.

MS. BOOTH:  Your Honor, if we're dealing with, about questions, we were hoping to delete Questions 38, 39 and 40, because we don't believe that mental retardation or learning disabilities has anything to do with this case.  Page 8.

THE COURT:  Well, I don't know where I got that, but you're right.  But I'll leave in 39 and 40 for now, because of the upcoming examination.

MS. BOOTH:  Yes, Your Honor.

MR. TINKER:  I was going to suggest that.  We don't know the results of that yet.

THE COURT:  All right.  I'll leave in 38, 39 and 40, subject to the evaluation.

MR. TINKER:  And I, for the record, I agree, Your Honor, depending on the results, if it doesn't show any of those issues, to leave them out.

THE COURT:  Okay.  Probably 41 also.  38 through 41.

USCA5 239

MS. BOOTH:   38 and 41?

THE COURT:   38 through 41.   I'll leave in 42.   But the others will be subject to the further matters.   What have you got?

MS. BOOTH:   For the record, Your Honor, we've tendered to opposing counsel our changes that we would like made, and we're going to be filing this with the Court --

THE COURT:   Why don't you do that.

MS. BOOTH:   -- in one second.

THE COURT:   Should we go back to B then?   I'm going to have to do this, by the way, bring in 300 jurors in two separate 150 group, Mr. Tinker, Ms. Booth.

MS. BOOTH:   Yes, Your Honor.

THE COURT:   If I say everything the same, it ought not to make a difference, for the questionnaires.

MR. TINKER:   I think that's good, Your Honor.

THE COURT:   Our Central Jury Room will, at tops, hold 200, so I think I'll just split it equally at 150 and 150. Also, somebody will be interested to know, Mr. Tinker and Ms. Booth, somebody actually called up and wanted to know why we were having jury selection on President's Day, which was a holiday.   And I hesitated to tell them that we had all agreed to do that so we didn't start on Friday the 13th.   So I guess they think we're working too hard, do you think?

MR. TINKER:   Could we know which juror that was?

USCA5 240

9

THE COURT:  It was someone sitting on the back row, to your right.  But I don't remember exactly who it was.  But I couldn't talk to him directly, so I wanted to respond to his issue.  Okay.  We're on B, replace Paragraph 5?

MS. BOOTH:  Your Honor, if it's all right with the Court, I'm going to ask Mrs. Salinas-Patterson to answer the Court on these.

THE COURT:  Ms. Salinas-Patterson, the request to change --

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  You want me to, starting at, "The only purpose of this questionnaire," on Page 2?

MS. SALINAS-PATTERSON:  Yes, to start it with, "If the jury returns," to replace Paragraph 5 and 6.  And then the remaining --

THE COURT:  Wait a minute.  What page are you on?

MS. SALINAS-PATTERSON:  I'm on Page 5, Tab B -- or are you looking at mine, Your Honor?

THE COURT:  I was looking at yours.

MS. SALINAS-PATTERSON:  Mine is --

THE COURT:  Page 5?

MS. SALINAS-PATTERSON:  Yes.

THE COURT:  "If the Defendant is found guilty of the offense"?  Where?  I'm looking at yours and looking at mine.  Where do you want yours to substitute for mine?

USCA5 241

MS. SALINAS-PATTERSON: Okay. Well, if we're at Tab B -- let me get my motions right. We're in Tab B.

THE COURT: Tab B.

MS. SALINAS-PATTERSON: Okay. So in yours, where I wanted to start making changes was in Page 5 of yours.

THE COURT: Okay.

MS. SALINAS-PATTERSON: And that would correspond to Page 1 of mine, at the very bottom, starting actually with Page 2, insert all of Page 2.

THE COURT: Okay. Where?

MS. SALINAS-PATTERSON: Right where Paragraph 5 is, in Page 5 of yours.

THE COURT: One, two, three, four, five. "At the separate hearing"?

MS. SALINAS-PATTERSON: Actually, the one before. "If the Defendant's found guilty."

THE COURT: "If the Defendant's found guilty." Do you want that language to stay or to go?

MS. SALINAS-PATTERSON: To go.

THE COURT: You didn't like it at all. So you want to add Page 2?

MS. SALINAS-PATTERSON: Yes, Your Honor. And part of Page 3, the first paragraph on Page 3 of mine. All that to replace that paragraph of yours that starts with, "If the Defendant is found guilty."

USCA5 242

11

THE COURT:  Okay.  Take all of -- take all of that out through, "If the Defendant is found guilty," at the bottom of Page 5.

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  And where do I delete the rest?

MS. SALINAS-PATTERSON:  All of Page 6.

THE COURT:  Okay.

MS. SALINAS-PATTERSON:  And the first line at Page 7 and the first paragraph at Page 7.

THE COURT:  "The Court will sentence the Defendant according to the decision of the jury"?

MS. SALINAS-PATTERSON:  That paragraph to be removed.

THE COURT:  Okay.  Then you want to substitute in -- I wasn't really fond of that language anyway.  We'll just see what Mr. Tinker and Mr. Gilmore think.  But this is your submission.

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  Is your Page 2.

MS. SALINAS-PATTERSON:  Yes.  And then pick up with yours, Page 7, where it says, "You may now continue working," we'll leave that in there.

THE COURT:  You like that?

MS. SALINAS-PATTERSON:  I like that.

THE COURT:  I think their language is better than mine.

USCA5 243

MR. GILMORE:  This appears to be correct, Judge.

THE COURT:  Okay.  Now, we're going to go on to the questionnaire?

MS. SALINAS-PATTERSON:  Yes, Your Honor.  Tab C.

THE COURT:  C, everywhere there's spouse, add "or significant other."

MS. SALINAS-PATTERSON:  Correct, Your Honor.

THE COURT:  Any objection?

MR. TINKER:  No.

MR. GILMORE:  No, Your Honor.  I thought that may be a more appropriate way to respond.

THE COURT:  No, it was just fine.  Thank you.

MR. TINKER:  Here in deep trouble with your own co-counsel, so --

THE COURT:  He's an apologist for you?

MR. TINKER:  In enough trouble already.

THE COURT:  Okay.  That's Questions 3, 4, 6, 7, 8, 9.

MS. SALINAS-PATTERSON:  No, no, Judge.  Those are pages.  The questions are right behind --

THE COURT:  Oh, I'm sorry.  Questions -- well, I'll just do it, all of those.  And Ms. Salinas-Patterson, before you came in, everybody agreed to take out 38 through 41.

MS. SALINAS-PATTERSON:  Okay, Your Honor.

THE COURT:  Subject -- they're going to stay in actually, subject to the further evaluation.

USCA5 244

13

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  And if the evaluation brings up any of those issues, I'll leave them in.  If there are no issues brought up, I'll take out 38 through 41.

MS. SALINAS-PATTERSON:  Very good, Your Honor.

THE COURT:  Are we still on the questionnaire?

MS. SALINAS-PATTERSON:  We are -- it gets to capital punishment, death penalty, on Page 25, but we're still under Tab C.

THE COURT:  Okay.  Can we say in paragraph, in Question 130, on paragraph, I'm sorry, Page 18, I always -- I never like to say potential witnesses, but persons, possible persons with relevant knowledge, something like that, so it doesn't identify who the witnesses are, I mean --

MS. SALINAS-PATTERSON:  That would be fine.

THE COURT:  -- who has what witnesses.  Persons with possible relevant knowledge.  Now, do you have your list of persons ready to add to this?  Mr. Tinker, Mr. Gilmore?

MR. TINKER:  You're talking about the experts or --

THE COURT:  Anybody.

MR. TINKER:  We do not --

THE COURT:  Persons with possible relevant knowledge.

MR. TINKER:  Other than those that are, we already know about or they already know about.  We have a couple of witnesses who may or may not be witnesses, who are still, who

USCA5 245

14

are considered experts, who haven't concluded their work.

THE COURT:  Okay.  Well, what other names?  Can I add those people on here?  What are the names?

MR. TINKER:  I'm hesitating to -- I don't think -- if we're not going to call them -- for instance, the Court permitted us to have a DNA expert, who has sent us no written report.  I've talked with her, and I'd like to take her issue up at some point today.

THE COURT:  Very well.

MR. TINKER:  But without revealing who it is, because I don't know what the report's going to be.

THE COURT:  Okay.  But at some point before the questionnaire goes, we need whatever people you want identified.

MR. TINKER:  I understand that, Your Honor.

THE COURT:  But you don't have to disclose it at this moment.  Is there a better way to identify these people in the questionnaires?  For instance, some of these are entities, like Cellular Wireless Bell South.

MS. BOOTH:  Your Honor, sometimes they wait to designate who their custodian of records is going to be, so --

THE COURT:  Well, but, "Do you know any of these persons?  Louisiana State University in New Orleans and Shreveport and Eunice."  Should we break that out into entities versus people?  "Are you associated, affiliated, employed by

USCA5 246

15

one of the following?"

MS. SALINAS-PATTERSON:  That would be fine, Your Honor.

THE COURT:  And then we'll take the entities out and put them in another question.  And then if so, "If yes, please explain."

MS. SALINAS-PATTERSON:  That would be good.

THE COURT:  Okay.  Where are we now?  Are we down to Page 25, did you say?

MS. SALINAS-PATTERSON:  Yes.  Yes, Your Honor.  And in this, most of the corrections have to do with, some of these have "a certain of the charges," so we're just making them singular towards --

THE COURT:  Change the death penalty as one of the possible sentences?

MS. SALINAS-PATTERSON:  "For a person convicted of a certain of the charges."  So all we're going to do is insert "For a person convicted of the charge."

MR. TINKER:  We have no objection to that.

THE COURT:  The charge contained in the indictment?

MS. SALINAS-PATTERSON:  Correct, Your Honor.

THE COURT:  Okay.

MS. SALINAS-PATTERSON:  And then the next charge -- change is in Paragraph 4.  And that's, again, it's just modifying some of the words in there because it says "of an

USCA5 247

offense," and you know it's singular, so that one's going to read if the Defendant -- the way it presently reads is if the Defendant --

THE COURT:  Just tell me what you want it to say.  If the Defendant is found guilty of the offense --

MS. SALINAS-PATTERSON:  Charged in the indictment.

THE COURT:  Of the offense charged in the indictment.

MS. SALINAS-PATTERSON:  Comma, the Court will conduct a second, comma, separate hearing.

THE COURT:  Before the jury.

MS. SALINAS-PATTERSON:  To determine, yeah, to determine whether or not the death penalty should be imposed.

THE COURT:  Okay.  Any objection?

MR. TINKER:  No, Your Honor.

THE COURT:  Thank you.  You didn't need an interpreter that time.  Okay.  Paragraph 5?

MS. SALINAS-PATTERSON:  Yes, Your Honor.  It starts with, "At this separate hearing."  We're going to replace it with all that's on Page 4 of the Government's motion.  That's Item Number 3.

THE COURT:  How far down on my page do you delete?

MS. SALINAS-PATTERSON:  I go all the way to, let's see, replace all of --

THE COURT:  All the rest of 25?

MS. SALINAS-PATTERSON:  Yes.

USCA5 248

17

THE COURT: Okay. And --

MS. SALINAS-PATTERSON: And --

(Counsel conferring off the record.)

MS. SALINAS-PATTERSON: I made a booboo. Let me see.

THE COURT: Just take all of mine out, on the top, except for the last sentence on 26?

MS. SALINAS-PATTERSON: I think that's correct, Your Honor.

THE COURT: Okay.

MS. SALINAS-PATTERSON: And all I did on 26 on the first line, I took the word "charges" and just made it "of the charge."

THE COURT: Well, but -- okay. But you've got it all here. Right?

MS. SALINAS-PATTERSON: No.

THE COURT: What do I leave out on my Page 26?

MS. SALINAS-PATTERSON: On your Page 26, Your Honor, actually it does, it does replace all of the top 26, Your Honor.

THE COURT: Except for the last sentence, "The Court will sentence the Defendant according to the decision of the jury."

MS. SALINAS-PATTERSON: Well, actually no, because the last sentence of mine, Your Honor, it says, "If the jury unanimously" --

USCA5 249

THE COURT:  I got that.  You're right.  That goes. Do you object to those changes, Mr. Tinker, Mr. Gilmore?

MR. TINKER:  We do not, Your Honor.

THE COURT:  Okay.  Now, where's the next change? Where it says this is true?

MS. SALINAS-PATTERSON:  The next change is Page 26 --

THE COURT:  That's the one I'm on.

MS. SALINAS-PATTERSON:  Oh, okay.

MS. BOOTH:  It's the first sentence.

MS. SALINAS-PATTERSON:  Oh, right, I know.  Okay.  I did this real quick, Your Honor.  Let me get my breath here.

(Counsel conferring off the record.)

MS. SALINAS-PATTERSON:  I think my 26 correction, Your Honor, I'm going to omit that.

THE COURT:  Okay.

MS. SALINAS-PATTERSON:  Because it's, it should be taken all --

THE COURT:  Because I can't find it.

MS. SALINAS-PATTERSON:  It should be all taken care of.

THE COURT:  Okay.  Page 29, Question 149.

MS. SALINAS-PATTERSON:  It should read, what I want you to insert is, replace "guilty of a capital count," "guilty of the crime charged in the indictment."

THE COURT:  Okay.

USCA5 250

MS. SALINAS-PATTERSON:  The same with 150.

THE COURT:  Any objection?

MR. TINKER:  No, Your Honor.

THE COURT:  Same change in 150?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  151, same thing?

MS. SALINAS-PATTERSON:  Same thing, Your Honor.

THE COURT:  Question 155?

MS. SALINAS-PATTERSON:  Basically the same thing, Your Honor.

THE COURT:  157?

MS. SALINAS-PATTERSON:  The same thing with the third line, "capital offense" replaced with "crime charged in the indictment."

THE COURT:  But there are two crimes in the indictment.

MS. SALINAS-PATTERSON:  No, Your Honor.  The superseding has just --

THE COURT:  Oh, the superseding does not have the assimilated deal?  Okay.

MS. SALINAS-PATTERSON:  No, Your Honor.

THE COURT:  Sorry.  158, the same thing?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  159 the same thing?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

USCA5 251

20

THE COURT:  160, same thing?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  162, same thing?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  Okay.  That's it for the questionnaire?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  Mr. Tinker, Mr. Gilmore, do you agree to those changes?  I obviously wrote in thinking that there were still the two instead of the one.

MR. TINKER:  We do, Your Honor.

THE COURT:  Okay.  Then you don't object.

MR. TINKER:  We do not object.  We agree.

THE COURT:  Okay.  What about any proposed additional questions that you all can think of?

MR. TINKER:  As to the defense, there are none.

THE COURT:  Ms. Seaman, can you give me a deadline about when we need to get these printed up so I can tell Mr. Tinker when he needs to furnish the rest of the names?

MS. SEAMAN:  I'm sorry, Your Honor.  Printed up?  I apologize.

THE COURT:  We need to print up these questionnaires. Right?

MS. SEAMAN:  Yes.

THE COURT:  And the jury is going to come in on the 9th?

USCA5 252

THE CLERK:  On the 9th.

THE COURT:  The 9th.  Hopefully we can do 150 in the morning and 150 in the afternoon.

MS. SEAMAN:  Yes.  That's correct.

THE COURT:  And when do you need to get those printed up?  What's the deadline for submitting these names?  Do we know?

MS. SEAMAN:  I'm sorry, Your Honor.  I -- submitting the names to --

THE COURT:  I need to know when you need, the deadline that you need to take this to the printer.

MS. SEAMAN:  We're going to print them here, Your Honor, with copiers.

THE COURT:  Well, how long is it going to take?

MS. SEAMAN:  I believe we could do the 150 that morning and the 150 that afternoon, Your Honor.

THE COURT:  Well no, we're not printing them up the morning that they're filling them out.

MS. SEAMAN:  I apologize, Your Honor.  They will be filled out -- when I could get them to the attorneys, Your Honor?

THE COURT:  No.  Are we sending these out to be printed, to make up these jury questionnaires?

MS. SEAMAN:  No, Your Honor.

THE COURT:  This is before anybody fills them out.

USCA5 253

22

We're talking about apples and oranges.

MS. SEAMAN:  The blank ones, I'm sorry.  The blank ones.  No, Your Honor, we can print those up here.

THE COURT:  How long is it going to take you?  You want five days?

MS. SEAMAN:  Five days, Your Honor.

THE COURT:  Is that enough?

MS. SEAMAN:  Yes, Your Honor.

THE COURT:  Okay.  February 2nd, Mr. Tinker?  That gives them five business days, by noon.

MR. TINKER:  And you're talking about to submit any witness names.  Is that correct?

THE COURT:  Yes, sir.  And any names that you want.  And if you want to overdo --

MR. TINKER:  That will be fine.  There may be an emergency that we don't know about --

THE COURT:  Well, what I'm saying is, I don't see -- the way I remember it, the U.S. Attorney -- the media is not here any more, but the U.S. Attorney knows all the names of your mitigation people.  If we put them down as people with possible relevant knowledge, you can add everybody you want and never call them, unless there's some surprise that, you know, you don't want to talk about.

MR. TINKER:  Well, the only, my only answer to, with regard to experts, they're still doing the work, and we don't

know what their conclusions are going to be.

THE COURT:  When are they going to be done?

MR. TINKER:  I'm going to need the Court's help today, and I'll --

THE COURT:  Okay.  Then let's get through this business.  No change to -- we're fine with the general voir dire.  Is that all right?

MS. SALINAS-PATTERSON:  Yes, Your Honor.

MS. BOOTH:  The only problem I perceive, Your Honor, is that I believe that the order for Dr. Estrada said that his report would be ready by February the 2nd.  And if his report were ready by February the 2nd, then if we wanted to delete those questions, I guess it's 37, 38, 39, that would be --

THE COURT:  Okay.

MS. BOOTH:  I can inquire of Dr. Estrada if he could have his report ready sooner.

THE COURT:  See if we can get it the Friday before.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Let's leave the order the way it is.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.  No problems with all the rest of the stuff.  Individual voir dire?  Nothing else?  No other objections?

MS. SALINAS-PATTERSON:  Tab E, Your Honor, we do have some corrections, or additions, I should say.

USCA5 255

THE COURT:  Okay.

MS. SALINAS-PATTERSON:  That would be beginning with the last paragraph.

THE COURT:  Take out "during the sentencing hearing" of mine.

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  That whole paragraph.

MS. SALINAS-PATTERSON:  That whole paragraph.

THE COURT:  Over on Page 2.

MS. SALINAS-PATTERSON:  All of Page 2.

THE COURT:  All of Page 2?

MS. SALINAS-PATTERSON:  All of Page 2, and all of Page 3.

THE COURT:  Well, at least I got us started.

MS. SALINAS-PATTERSON:  Thank you, Your Honor.  One of the things we did include, Your Honor, on Page 8 of the Government's, where it says first -- I think the instructions doesn't have anywhere, any mention of having to find the Defendant at least 18 years of age before they can impose --

THE COURT:  I don't have a jury charge yet.

MS. SALINAS-PATTERSON:  Okay.  So --

THE COURT:  I've got some instructions, but we need to put those in.  That he was over 18?

MS. SALINAS-PATTERSON:  Right.  Unless -- we can take it out if the parties agree to stipulate that he is in fact 18

USCA5 256

25

years of age.  But we just have to, one way or the other --

MR. TINKER:  Your Honor, we see no reason to make his age an issue, since it's obvious that he's over 18.  If that's a question.

THE COURT:  Okay.  Apparently they're stipulating that he's over 18, which takes us back to another change.  I think you have the over 18 someplace else as well.

MR. GILMORE:  I don't see why it couldn't be in the questionnaire anyway, unless you --

THE COURT:  I think that this is the better statement of the law, though, that the Government has proposed.

MR. GILMORE:  That's what I'm -- I think we can just leave it the way --

THE COURT:  And we'll leave out the 18 and keep in all the rest of your instructions.

MR. TINKER:  Your Honor, I, and it's picky, but on Page 7 of their, I guess, proposed changes, it says, "During the sentencing hearing, you must" -- and I think we ought to have, "if any."

THE COURT:  If any.  I'll be glad -- tell me where that is.

MR. TINKER:  Well, it's on -- as I say, I didn't bring the whole, all our questionnaires.

THE COURT:  I got it.

MR. TINKER:  But on their Page 7, Your Honor, "During

USCA5 257

the sentencing hearing, comma, if any," at the bottom of Page 7.

THE COURT:  Got it.

MR. TINKER:  And any time, there may be other places where you talk about --

THE COURT:  I'm going to put any time there's a mention of sentencing hearing.  Okay.  All right.  We're finished with Tab --

MS. SALINAS-PATTERSON:  Your Honor, just for clarification purposes, or per request of the Defense, since statutorily the imposition of the death penalty is only upon a finding of the Defendant at least 18 years of age or older, can we get that in writing, so that we have that, in case --

THE COURT:  Well, I think what happened was that the parties just stipulated that he is over 18, and it will not be a jury issue.  Is that right, Mr. Tinker?

MR. TINKER:  Yes, Your Honor.

THE COURT:  Mr. Gilmore?

MR. GILMORE:  That's correct, Your Honor.

MR. TINKER:  I don't mind if it's in writing, if that's what they want.

THE COURT:  Put it in writing, and then we'll do --

MS. SALINAS-PATTERSON:  Putting it in writing will be great, because we still have to prove that.

THE COURT:  So it still has to be in the charge?

USCA5 258

MS. SALINAS-PATTERSON:  Yes, Your Honor.

MR. TINKER:  I think they have too many lawyers on their side.

THE COURT:  I think so.  We need to add some more to your side.  Or just start deleting.  Okay.  So we're okay then with Tab E?  F?

MS. SALINAS-PATTERSON:  F is good.

THE COURT:  And G.

MS. SALINAS-PATTERSON:  G?  Your Honor --

THE COURT:  I don't have the first element that he's over 18 in the instructions.

MS. BOOTH:  Your Honor, we're going to be, although today we're not ready to do so, as we go through this, we're going to have to supplement our proposed changes, especially to the jury instructions.

MS. SALINAS-PATTERSON:  For example, Your Honor, Page 14, G, it has some specific statutory and nonstatutory aggravating factors.  And I don't recall that these were tailored to our specifics.  So we're going to have to --

THE COURT:  I did actually.

MS. SALINAS-PATTERSON:  Well, just like E, mental evaluation may change depending on what happens and other stuff.

THE COURT:  Well, but you've designated Carlos Estrada as your expert, and he needs to be on this list, by the

way.  Is he on there?

(Counsel conferring off the record.)

MS. SALINAS-PATTERSON:  Yeah, Dr. Carlos Estrada is Number 72 on Page --

THE COURT:  Okay, sorry.  I didn't remember.  All right.  So right now, these are the only changes that everybody's agreed to that everybody wants.  At some point, we're going to have to go over the jury charge another time.  But I suspected when I gave it to you that y'all would submit your changes, soon.  I want them before the beginning of the jury selection.

MS. SALINAS-PATTERSON:  Yes, Your Honor.

THE COURT:  All right.  Now, we have the Government's motion for leave to file late motion and ask permission to notice the Court of an additional expert witness.  Who's the witness?

MS. BOOTH:  It is a Dr. Chrz, Your Honor.  And I've provided -- well, yesterday Mr. Tinker and I both were in San Antonio speaking to Dr. Senn, who is our forensic odontologist.  Dr. Senn, when he did his evaluation, without request from the Government, he told us yesterday that the proper protocol, when you do an evaluation of those teeth marks, is to have -- the bite marks, is to have another colleague either confirm or not your findings.

THE COURT:  So you found out he had another

colleague.

MS. BOOTH:  Right.  He had another colleague that he sent it to, and that colleague made a finding.  And so we are asking the Court to be able to designate him also.

THE COURT:  What's his name?

MS. BOOTH:  Dr. Chrz.

THE COURT:  Oh, the one DDS, Perry, in Perry, Oklahoma?

MS. BOOTH:  He is in -- yes, Your Honor.

THE COURT:  What were his findings?  Do you have a copy of the findings, Mr. Tinker?

MS. BOOTH:  Yes, Your Honor.  I have a copy of the findings, and we gave them --

THE COURT:  Have you given them to Mr. Tinker and Mr. Gilmore?

MR. TINKER:  We got it yesterday, when we were up there at the doctor --

MS. BOOTH:  The doctor gave both of us a copy of what Dr. Chrz had said.  And I pronounce it Chrz, but it's C-H-R-Z.

MR. TINKER:  Well, for the Court, we have no objection to adding the expert.

THE COURT:  All right.  Then we'll add him to the list.

MR. TINKER:  But it seemed like it must be some other expert.  She filed the motion to add one before we knew, I

USCA5 261

mean, she knew -- are there others, I guess, is my question.

MS. BOOTH:  The only other possible situation we had -- and Your Honor, there was a specialist that looked at some of the body parts, especially the eyes, of JG1999 and made some findings as to her eyes, and that doctor was from Wilford Hall Medical Center.

THE COURT:  May I ask one thing, for benefit of my clerk and my staff?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Do you have the proposed changes that you have on a disk?

MS. SALINAS-PATTERSON:  I have them -- I can get them on a disk.

THE COURT:  Is there any problem with doing that?

MS. SALINAS-PATTERSON:  No, Your Honor.

THE COURT:  Okay.  It would be easier for us to insert them that way as changes without --

MS. SALINAS-PATTERSON:  I can do that.

THE COURT:  Thank you.

MR. TINKER:  We have no objection to them --

THE COURT:  With Dr. Chrz.

MR. TINKER:  -- adding experts.  I guess my question is, are there others?

THE COURT:  Are there others?

MS. BOOTH:  No.  Your Honor, since the first day,

USCA5 262

October the 15th, when we were supposed to designate our experts, we designated a physician at Wilford Hall Medical Center in San Antonio.  We have not been able to find the name of that doctor.  And we continue --

THE COURT:  What did he do?  What's the person, he or she?

MS. BOOTH:  Well, he was a specialist that looked at the eyeballs of the baby.  Her pupils were blown.  And although we have our forensic odontologist, I mean, our forensic pathologist that will testify that that was, that the blow to the head caused those pupils to burst, and we have a pediatric specialist who will testify that, the impact you'd have to have to have those eyeballs burst like that, I mean, those pupils burst like that, but we wanted the specific specialist who spoke to our forensic pathologist about it.

THE COURT:  Well, did you ask your forensic pathologist?

MS. BOOTH:  I have left messages, Your Honor, and I have not gotten -- and I've been, we've been looking since October the 15th to try to find this person.  And I know that we're going to find that person, and that's why I designated that the way I did.

MR. TINKER:  And we're not going to have any objection to them adding --

THE COURT:  Okay.

USCA5 263

MR. TINKER:  -- that expert, as soon as they get it. If they will orally or with a fax let us know, we have no objection, as soon as they have it.  We're admittedly going to be a little late with maybe a couple of ours that we're still waiting on reports.  So --

THE COURT:  Okay.

MR. TINKER:  Maybe they'll be softhearted when we try to do it, too.

THE COURT:  So how are you doing with your experts?

MR. TINKER:  Well, a couple of things, Your Honor. The DNA expert, I've talked to her a couple of times.  She requests, and the Court will recall at some prior hearing, we asked that our expert be permitted to run tests.  She would like the cotton swabs so she could retest, or test those.  In the past, the Government has said --

THE COURT:  I thought we already said there weren't any, the Government said.

MR. TINKER:  Well, they said that.  But according to my expert, after reading the records, she said there were three swabs of the anal orifice that were used.  There were, there was one that was never even tested.  There were two that were tested for one purpose and not others.  And so her conclusions from the report she had, that there are swabs still available, and she'd like those to do her testing.  And she referred to it as a couple of tests.  One is the, her conclusions, from

USCA5 264

reading the reports, are that there were no, there was no effort to find sperm in the, what they apparently conclude was seminal fluid that was discovered. Also she says that there was a, there's a P30 test that she would like to run on those swabs, to see if it is, the origin of the, this substance is in fact male. She asked me, as a matter of fact, inquired whether or not our client had a vasectomy, and he, we discovered he has not. And so the reports that she has seen, that we had received from the Government, said that they didn't ever look for spermatozoa. And so she'd just like to have those, and that's my request here, so she can conclude her investigation.

MS. BOOTH: I don't know what Mr. Tinker is saying. Of course they report, Your Honor. And we sent it to two labs, sent it to an additional lab so we could try and isolate it.

THE COURT: Well, he's talking about spermatozoa.

MS. BOOTH: Right. They said they could not find any.

MR. TINKER: Maybe there are different tests you run, and she didn't, maybe the one that she --

THE COURT: Well, did you --

MS. BOOTH: Well if she, there's still a -- I understand that there is still a small piece of what was used to test, and you know, we could --

THE COURT: Well, when could that get to Mr. Tinker's expert?

34

MS. BOOTH:  As soon as possible, Your Honor.  As soon as we know who it is, we'll -- I think probably, I think they send it by registered mail or maybe there will even be an FBI agent that will deliver it over there.

MR. TINKER:  I will, with the Court's permission, Your Honor, and hopefully this afternoon, I'll contact the witness and have her do what is necessary to let them know where to send it or to --

THE COURT:  Okay.

MR. TINKER:  I don't know how they do it.  Okay.  The last time we had a meeting, it was my understanding, from the Prosecutor's statement, that they claimed that there weren't anything to continue testing.  If there are some, we'll just, we'll work through that.  And I don't think it takes long to do the testing, although they took a long time before we got the results.

THE COURT:  What else?  What other experts?

MR. TINKER:  That, with regard to that, that's what this witness is requesting.  And if they're going to do it, I'll, I guess I can report back early next week to see, you know, how long it's going to take.  I guess it depends on how long it takes to get the substance to her.

MS. BOOTH:  We'll get it to them fast, Your Honor, as soon as we figure out who it is and where it's going.

MR. TINKER:  That's my response, though.  As soon as

USCA5 266

she gets it and has an opportunity to test it, and I think she'll be pretty prompt.  She's been good about talking to me about issues.

THE COURT:  Okay.  Well, are you going to have her get in touch with Ms. Booth or --

MR. TINKER:  I'm going to call her and ask her, see what her preference is.

THE COURT:  Okay.

MR. TINKER:  Then I will, either we will or she'll get, if Ms. Beckett is preferable, then that will be fine.

THE COURT:  Somebody may want to just take it personally.

MR. TINKER:  I understand.

THE COURT:  Can you give a geographic area of where your expert is?

MR. TINKER:  Yeah, she's in California.

THE COURT:  California?  Southern or northern?

MR. TINKER:  Your Honor, I --

THE COURT:  It may depend on which FBI agent they send.

MR. TINKER:  Oh, and the one other issue with regard to experts, it's not a witness expert, but while I'm thinking about it, the expert concerning jury selection that we've had discussion about, Your Honor made a request that she --

THE COURT:  Yeah, I wanted to hear more about her CV,

36

because I didn't see how she had anywhere near the experience that you and Mr. Gilmore had.

MR. TINKER:  Well, every time we're in here, you're talking about our experience.  I'm going to deny all of that, because I don't want the record to, I don't want the Court, the record to reflect that I agree with the Court's comments or Counsel's comments.

THE COURT:  Well see, I keep saying you're an excellent attorney with lots of experience.

MR. TINKER:  But in any event --

THE COURT:  Do you want to take exception to that?

MS. BOOTH:  Well, Your Honor, I'd even go further, as he testified he was brilliant yesterday, with the forensic odontologist.  And I understand that he was the very first Prosecutor in the State of Texas to get a conviction with bite mark evidence, Your Honor.

MR. TINKER:  That was before I have the integrity I have today.

THE COURT:  Yes, sir.  I appreciate that.

MR. TINKER:  No, Your Honor.  You asked first, you said because she did not have a doctor's degree or a law degree --

THE COURT:  I didn't think she was -- I wouldn't ordinarily set her fee the same as a lawyer.

MR. TINKER:  Well --

USCA5 268

37

THE COURT: You know, I'm thinking about somebody like Lisa Blue, who has a Ph.D. and a JD and some of the other --

MR. TINKER: Well anyway, you had asked me --

THE COURT: Yes.

MR. TINKER: -- if she would do it for $50 an hour, and she said she will.

THE COURT: I figured.

MR. TINKER: Okay. And then, and also you asked --

THE COURT: I'll authorize that.

MR. TINKER: I'm sorry?

THE COURT: I'll authorize that.

MR. TINKER: Oh, okay. So she will be helping us. Her name is Nona Dodson, and she's with Hirschhorn. It's actually Cathy Bennett & Associates. And she did say also, you asked me how many of those cases that were on her resumé were ones that she had done herself, without Hirschhorn's involvement or Cathy Bennett's involvement. And she sent me a fax and I thought I had it, and all but two of those she did on her own, for whatever that's worth to the Court. But I know you've made your decision. So that's that issue.

THE COURT: No, I approve her, for your expert for jury selection. Ms. Booth, will you --

MR. TINKER: And we went through, for the purposes of Daubert, if you want to talk about other things.

USCA5 269

38

THE COURT: Sure.

MR. TINKER: And we don't intend to file any Daubert motions. That doesn't mean that everything these witnesses say we're going to agree they can say it. For instance, we do, with regard to the opinion, I will say, to, of Dr. Senn, the odontologist, whatever, that some of his opinions, I mean, there's a standard of reasonable medical certainty that we're all familiar with, but he also talks about possibilities. And so I don't want the Court to think since we're not filing Daubert that we're not going to object on what level he can testify. For instance, we do plan to file an in-limine motion with regard to him saying, well, it's possible or probable. But that's not Daubert. I don't want to mislead the Court that we may object to some of the things that their experts say. But it will be on a legal standard, not on their expertise.

THE COURT: Well, that's what a Daubert is. I mean, if you're saying --

MR. TINKER: The Daubert, Daubert --

THE COURT: If you're saying that they're not qualified to hypothecate --

MR. TINKER: No. They're qualified to hypothecate, Your Honor. And I'm convinced, for instance, from talking to Dr. Senn, that he is well qualified to testify to a reasonable medical probability as to the bite marks. But I don't think that he should be permitted to say, well, it's possible that

USCA5 270

39

that's his bite, because that's not the level that would be required.  But I don't consider that Daubert.  I thought I'd just --

THE COURT:  I actually do.  I usually do consider that, that there's just, that that's not an appropriate place -- the objection is it's not an appropriate expert testimony.  And I take that up in Daubert.

MR. TINKER:  Let me give you an example, if I may.

THE COURT:  You have, and a good example.  Could you possibly just, if you don't want to file a Daubert motion, could you do a motion in limine?

MR. TINKER:  I intend to do that.

THE COURT:  And visit with the Government on that.  But they need to have fair notice of this, because they need to go back to their experts and see if they do have some qualifications to say whatever it is you don't want them to say.

MR. TINKER:  No, no, no.  Please understand.  Let's say I take the position that an expert is qualified to give opinions.  But there has to be some level.  I mean, the jury should not get, be permitted, just because the doctor's, the doctor, let's say, is qualified to say in all reasonable medical probability this bite mark was made by this person.  Okay, that's one thing.  But there's still some things he should not get to say.  And that is that this bite mark over

USCA5 271

40

here might have been so-and-so.

THE COURT:  That's, I'm telling you, that's the subject of a Daubert.  That's what I consider a Daubert motion, that this expert may be qualified in this area, but not to testify to these facts and events.

MR. TINKER:  Well, I intend to file a motion in limine, and that's why I'm mentioning it today.

THE COURT:  Okay.  You can call it Daubert, a motion in limine, any way you want to, but you've got to give the Government notice, at least two weeks before we start jury -- well, we're --

MR. TINKER:  Oh, I can do that, by Friday will be enough.  The motions in limine, I intend to do that.

THE COURT:  Next Friday is fine.

MR. TINKER:  Well, for instance, I don't think that -- well, maybe I won't give that for instance, because they're not designated as experts.  I don't think that a witness should be permitted to say, and there will be in-limines that unless they're shown to be an expert, that his reaction to the death of this child was inappropriate.  I think you have to have expertise in that regard.  We all react to death in different ways.  And so those, that's one of the things that will be in a motion in limine.

THE COURT:  Who would be testifying to that?  Just a mental healthcare --

USCA5 272

MR. TINKER:  Some of the people who took him to the hospital who said that they didn't think, that they thought it was funny because he didn't act this way or did act that way.

MS. BOOTH:  Well, he didn't want to go to the hospital.  He wanted to unload his load, Judge, and made statements about how he played football at LSU and --

THE COURT:  Well, I think that what Mr. Tinker is saying, that there's no problem with them testifying to those facts, that when he learned of the death of his daughter, he didn't want to go, or the injury, he didn't want to go to the hospital.  He wanted to unload his load, that he played football for LSU or whatever, but not to surmise then from those, that information, that it was an inappropriate reaction.  That's something that Mr. Tinker is saying belongs to the jury and not for a lay witness to say --

MR. TINKER:  Yeah.

THE COURT:  -- "I thought his actions were inappropriate."

MR. TINKER:  But I will have, I will file by Friday --

THE COURT:  That's what you're saying --

MR. TINKER:  -- motions in limine in that regard.

THE COURT:  Is that a fair enough assessment of that?

MR. TINKER:  Yes, that is.  That's perfectly --

THE COURT:  Okay.

USCA5 273

42

MS. BOOTH:  They can testify to their observations.

MR. TINKER:  Sure.

MS. BOOTH:  That they were surprised --

MR. TINKER:  No, surprise --

MS. BOOTH:  No, they can testify they were surprised at what they saw, not that it was inappropriate, but they were surprised that he wanted to stay down in McDonalds and not go see his dying baby.

MR. TINKER:  Well, that's an issue -- Your Honor, we don't have to decide that now.  Let me file the motions, and I'll do it in the next week, and then we can take up these issues.  I just, there will be issues like that, and I will get those in.

THE COURT:  Okay.  We'll talk about it, because "I was surprised" might be different than "I believe."

MR. TINKER:  Why were you surprised?  You were surprised because of your experience and your expertise about how people should act.  And that's not --

THE COURT:  Well, I'm not sure that that is a common -- that is not, that may not be an area for an expert testimony.  So let's get to that when we get to it.

MR. TINKER:  I understand.  We'll take that up some other time.

THE COURT:  We'll take it up.  Okay.  Now, let's set a time, we have a competency hearing set for Friday, February

USCA5 274

43

the 13th.  And we don't have a time down.

MS. BOOTH:  Could we move that up, Judge?

THE COURT:  When?

MS. BOOTH:  That competency hearing, from February the 13th, up?

MR. TINKER:  We can't have it before we get the report from Dr. Estrada.

MS. BOOTH:  Right.  And Dr. Estrada, if we can get his report, Your Honor --

THE COURT:  You want to call, have somebody go out and call Dr. Estrada's office and see when he -- has he been examined?

MS. BOOTH:  Yes, he has.

THE COURT:  When?

MS. BOOTH:  He was examined December the 26th, in this -- the Marshals made arrangements to have him brought here.  Nobody was here.

MR. GILMORE:  I can tell you, Dr. Estrada is way behind.  He's been ill, and he's been out of work for a while.  I've got another report that's due from him, and he's --

THE COURT:  Well, this won't work.  I mean, we have to have this one in.  So why don't we, why don't you send somebody out right now to give a call to Dr. Estrada and see when that report's going to be in.  It cannot be in later than the 2nd.  It must be -- we want to see how early it can be in.

USCA5 275

44

MR. TINKER:  But he's got a stack, my understanding, of materials that he's also going through, other than the examination.

THE COURT:  Of course.

MR. TINKER:  And we have given him, and maybe the Government has, copies of letters, I believe so, that were sent prior to the arrest and that sort of thing.  And I think they may have submitted those since the arrest.

MS. BOOTH:  We submitted the letters that he wrote after he was arrested.

MR. TINKER:  But anyway, there's lots of material for him to read in addition to examining someone and seeing if they --

THE COURT:  Well nonetheless, I did this with the understanding it would be done by the 2nd, and that was the commitment we got from somebody.

MR. TINKER:  Well, that's fine.  But soon after that -- we set the hearing soon after that, and --

THE COURT:  All right.  Let's hold off on that agenda item then.  I understand that there's no objection to me impaneling what some scholars have called an innominate jury, instead of an anonymous jury, that we're going to keep the names separate, and as they're impaneled, they will be numbered.

MR. TINKER:  You're correct, Your Honor.

USCA5 276

THE COURT:  Okay.  Ms. Booth?

MS. BOOTH:  That is correct, Your Honor.

THE COURT:  Do you think I need to make any other findings on that, other than the parties agreed that it's an appropriate measure in this particular case?

MS. BOOTH:  No, Your Honor.

THE COURT:  Mr. Gilmore?

MR. GILMORE:  No, Your Honor.

THE COURT:  Okay.  So we're going to do the questionnaires on the 9th, and 150 in the morning and 150 in the afternoon, starting at 8:30 in the morning for the morning group, 1:00 p.m. for the afternoon group.

Okay.  Now, we have decided that after the questionnaires come in on the 9th, that we're going to separate the names and addresses from the questionnaires.  You all will have access to those here at the courthouse.  The jury questionnaires, you will be able to review those with your clients.  And you want two days to review those questionnaires, and we want to, we're meeting back at 8:00 a.m. on the 12th to see if you all can agree to certain jurors that we will not have back on the 16th.  Is that right?

MR. TINKER:  That's right, Your Honor.  That is in your trial, pretrial order.

THE COURT:  And then I'm not sure we've talked exactly about how the twelve jurors and six alternates are

USCA5 277

46

going to be physically selected.  We've decided that we're going to have twelve jurors, six alternates.  On the twelve jurors, each side has 20 peremptory challenges.  That's statutory.  We couldn't remember how we got it last time.  Statutory.  And then for the six alternates, I'm going to give you each ten, ten strikes, for the six alternates.

So we need to qualify at some point, we need to start somewhere, have 78 jurors.  But -- and we're going to bring them in on the 16th in groups of twelve.  Now, can you suggest a procedure from that first, in the groups of twelve, how we go about selecting those jurors?

MS. BOOTH:  I'm sorry, Your Honor.  I don't understand the question.

THE COURT:  I don't either.  I wanted to start on the 16th with a group of twelve.  Now --

MS. BOOTH:  Are you talking about instead of individual voir dire --

THE COURT:  No, I'm not talking about the impaneled jury.  I'm talking about when we select the jury --

MS. BOOTH:  Right.  But I was wondering, there's individual voir dire, when you bring them in one at a time and speak to them.

THE COURT:  Some Judges don't do individual voir dire.

MS. BOOTH:  Right.  And then there's --

USCA5 278

THE COURT: So I'm asking you all if you want individual voir dire, we'll do individual voir dire.

MS. BOOTH: Or a small group, which is twelve.

THE COURT: I can do a small group, or I can do individual voir dire, or I can take a small group and do general, some more general questions that you may suggest to me, and then we can do one at a time.

MR. TINKER: Well, we would prefer the individual voir dire.

THE COURT: All right.

MR. TINKER: Primarily, if someone --

THE COURT: It doesn't mess the other --

MR. TINKER: -- talks about hearing about it, and then the rest of them hear --

THE COURT: It doesn't bleed over into the rest of the pool. But if you want me to do something particular with the twelve, groups of twelve as they come in, some general questions, I can do that as well.

MR. TINKER: Would the Court permit us to -- I can't think right now what you, other than just say here we are and telling them what we're going to do. But would you permit us to respond to that at our next meeting about if there's something we want -- before we just start in one at a time?

THE COURT: Yes, sir.

MR. TINKER: Another question I have, do we

48

exercise --

THE COURT: As you go along? That's what I wanted to ask you, too.

MR. TINKER: -- strikes as you go along? It's my -- I haven't done this in federal court. In state court, you do it as you go along.

THE COURT: Shouldn't we do it as we go along? Isn't that the most efficient way?

MR. TINKER: That's the way I've always done it.

MS. BOOTH: Yes.

THE COURT: How else do we know what we need?

MS. BOOTH: Right.

THE COURT: Till we've gone through 200 and found out we could have done the first, you know, settled for the first 50.

MS. BOOTH: Right. And then you can't remember who it was anyway.

THE COURT: I think we need to do them as we go along.

MS. BOOTH: Until we get the number we need.

THE COURT: Until we get 18 jurors. And I would like you all to come in, when we, those two days that you're looking at the jury questionnaires, if there's any question of a shuffle for anybody, I want to know about it really quickly. Before really the 16th, certainly, because -- actually before

then, because -- let me know about any potential shuffle issues when we come back on the 12th.  So we'll have time to redesignate who comes in in the first group of twelve, the second, third, fourth and on down through the day.  I don't think anybody's entitled to a shuffle as a matter of law.  But if there's an issue, I want to be able to address it.  I never have figured out what happens, because I used to ask for them, what happens as a, if the Defendant asks for them, and then it gets all done up, and then the Government asks for one.

MR. TINKER:  State court, the rule is that you only get one --

THE COURT:  Only the defense?  One shuffle?

MR. TINKER:  One shuffle.

THE COURT:  I don't know if there's a federal court rule on that or not.

MR. TINKER:  I don't either, Your Honor.

THE COURT:  Have you got, have you had anybody contact Estrada's office?

MS. SALINAS-PATTERSON:  Yes, Your Honor.  I contacted them.  They said that the report should be out by Monday.

THE COURT:  Wow.

MS. SALINAS-PATTERSON:  They're going to work this weekend on it.

THE COURT:  All right.  Then let's talk about modifying the schedule.  We may not need a competency hearing,

USCA5 281

but let's assume we do and set a time earlier than the 13th. Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  Well, I've blocked out my schedule from the 9th on.

THE COURT:  From now on?

MR. GILMORE:  No, not from now on.  From the 9th on, Judge.

THE COURT:  From the 9th on?  What about the 6th?  If we're about to get a report, could we do it as early as the 6th?  That way we don't have a questionnaire problem.

Oh, that's right.  I'm sorry.  I'm not going to be here.  Today is the 17th.  If we get it out, if we get the report published, let's say, by the 21st -- no, today is the 16th.  Sorry.  I've been misdating everything all day.  Today is the 16th.  If we get it, if we get, all get the report on the 21st, what if we try to do it the last week in January?

MR. GILMORE:  I'm scheduled for a murder trial that week with Judge Watson.  But it should be through by Wednesday, I believe, Wednesday.

THE COURT:  I've got the 30th as a docket call, but I wonder if we could do it on the 29th then, in the afternoon of the 29th.

MR. GILMORE:  That looks safe, Judge.

THE COURT:  Ms. Booth, your group?

MS. BOOTH:  For this case, Judge, I'm free.

USCA5 282

THE COURT:  Okay.  Let's make it January 29th.  And then we'll get all the issues decided about questionnaires or whether we're going to have a trial by that time.

MR. TINKER:  That's in the afternoon, Your Honor, you're saying?

THE COURT:  Yes, sir.  Let's make it 1:30.  January 29th, 1:30.  Now, we are agreed, are we not, that when we meet on the morning of Thursday, the 12th, to review the questionnaires, that I can't do any strikes for cause unless they're by agreement.  The people have to be physically interviewed and, you know, but this is just to see if you all can narrow down the list of people that come in the following week.

Do we need any other hearings between now and the 29th?  Do you want to just do a quick hearing for any reason?

MS. BOOTH:  I'm sorry?

THE COURT:  To talk about experts?  How about we talk about experts.

MS. BOOTH:  On the 29th, Your Honor?

THE COURT:  No -- let's do that on the 29th also.  Is that soon enough?

MR. TINKER:  That is for me, Your Honor.

THE COURT:  Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Anything else to bring up at all?

USCA5 283

52

Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  No, Your Honor.

MR. TINKER:  Not at this time, Your Honor.

THE COURT:  Ms. Booth?

MS. BOOTH:  Your Honor, did you give us a deadline for the jury instructions to go back over those?

THE COURT:  Now, we're not going to have that -- the 12th.  February 12th.  Because I've taken off the hearing for the 13th.

MS. SALINAS-PATTERSON:  Of February?

THE COURT:  February 12th.  And I've never done this before, but I understand we have to have two separate jury charges.  I can give them part of the first one that has the general stuff about credibility of witnesses, for both cases, for both -- if there is both a sentencing and a guilt or innocence phase.  But they're two separate jury instructions.  Right?

MR. GILMORE:  There are two phases of the trial, so there's a jury instruction for the guilt or innocence, and then for punishment, that's --

MR. TINKER:  That's my experience.

THE COURT:  Okay.

MR. TINKER:  Do you, Your Honor, do you actually send the instructions to the jury so they can have it to read during the --

USCA5 284

53

THE COURT:  Oh, I always do.  Absolutely.

MR. TINKER:  I want the record to reflect I'm going to request that you give them 16.

THE COURT:  I would be glad to.  I'm not going to give them 16, I'm going to give them 12, because we're not going to have those other six.

MR. GILMORE:  When they go back there.

MR. TINKER:  Oh, that's right.  They'll be gone.  You're right.  Well, give them 16 anyway.

THE COURT:  All right.  I'll give you six, them twelve.

MR. TINKER:  Okay.

THE COURT:  Anything else?

MR. GILMORE:  That's all we have, Judge.

THE COURT:  I don't send the indictment back.  I do send the jury charge back.  And I'd be glad to do 16.

Do we need to talk about note taking by the jurors right now?  This might be a good time to take care of that issue.  I'm trying to anticipate any possible -- surely it will be a one-week trial, guilt or innocence.

MS. BOOTH:  Probably, Your Honor, about a week.

THE COURT:  Note taking?  I have an instruction that I give about note taking.

MR. TINKER:  I would rather they didn't do it at all.  And the alternative is, if they do it, and it's probably what

USCA5 285

54

you're, that they don't get to take it with them?

THE COURT:  I give a very careful, what I think is a careful instruction, because usually the concern about any attorney is that someone will share those notes with someone else, either while they're doing it or at time of deliberations.  So I give them an instruction that if you elect to take notes, these are the pitfalls.  This is what you guard against.  But the bottom line is you may not share these notes with any other juror at any time.

MR. TINKER:  For the record, I object to any note taking --

THE COURT:  Okay.

MR. TINKER:  -- during the trial, and certainly taking them back with them to the jury room.

THE COURT:  Well, you know what, I can just wait until they ask, which is usually when it comes up.

MR. TINKER:  Many times, they don't ask.  They just bring notepads with them.

THE COURT:  And then what?

MR. TINKER:  Well then, my objection is, if they're doing it, you say, take it away from them.  And they don't do it.

THE COURT:  I'll just say, "Mr. Tinker says you can't take those notes."

MR. TINKER:  That's all right.

USCA5 286

55

THE COURT:  I think we'll just take it up then, Mr. Tinker, and Ms. Booth, if and when it becomes an issue.

MR. TINKER:  There's another issue, Your Honor, and I will talk about it.  It's going to be my position or our position that, okay, let's say we've talked to one juror, and now it's passed for challenges, that they not only have to make their peremptory challenges ahead of us, but they have to make their challenges for cause ahead of us.  I just want to let the Court know that's going to be my position.  They have to do both before we have to make a decision.  I mean, they don't have to do both, but if they have either challenge, that they have to do it before we have to do it.

THE COURT:  Ms. Booth?

MS. BOOTH:  I really don't understand -- well, I understand why he wanted to do that.

THE COURT:  Were you objecting?

MS. BOOTH:  Yes, I was objecting.

THE COURT:  Okay.  This is the deal.  You can do them simultaneously.  Hand them to me in writing.  Any time you have the exact same challenge for cause or peremptory challenge, I will consider it a half of a challenge for each of you.

MR. TINKER:  Your Honor, again, my position is that they are required --

THE COURT:  What's the law on that?

MR. TINKER:  In state court, it is -- I don't really

USCA5 287

56

know in federal court.  I have not picked a capital murder jury --  .

THE COURT:  Well, we probably better look it up.

MR. TINKER:  Okay.  And that's why I'm talking about it now, so we give people a heads up.

THE COURT:  As a last resort, we'll look at the law.

MR. TINKER:  Or ask the Judge.  Last resort is ask the Judge.

THE COURT:  I haven't thought about this issue, Mr. Tinker, since I went to baby judge school ten years ago. It was suggested that it would be, that it be done anonymously, as you go through each juror.  And that if you both strike the same juror, then you either get that challenge back, or you divide it in some fashion.  Now, it may have changed, the suggestions, in ten years, because I haven't dealt with the issue.  But I remember that it was discussed at that time.

MR. TINKER:  It may be a different rule with regard to peremptory challenges and challenges for cause.  It's my belief that the Prosecution always has to go first with the challenge, peremptory challenge.  But anyway, that will be the issue --

THE COURT:  I'll look it up.

MR. TINKER:  And that's all we have at this time.

THE COURT:  Anything else you all can think of?  From the Government?

USCA5 288

57

MS. BOOTH:  No, Your Honor.

THE COURT:  Mr. Roberts, do you know anything about that?

MR. ROBERTS:  Your Honor, I believe there is a rule, but I'm going to have to go and do a little research on it. And I really don't think I've ever seen any case law that's required the Government to conduct their peremptory challenges prior to the Defense doing --

THE COURT:  But your cause challenges, yes.

MR. ROBERTS:  -- for cause.  Yes, Your Honor.

THE COURT:  Strikes for cause, yes.

MR. ROBERTS:  I believe that's correct.

THE COURT:  Okay.

MR. ROBERTS:  But as far as the peremptory going, the Government's peremptories before the Defense's challenges for cause, generally the rules that I remember, the rules of procedure require that all challenges for cause go first, and then peremptories are exercised.  But I'll check into that, and we'll present something to the Court if we find anything definitive.

THE COURT:  Thank you.  Thank you very much for your appearances and all the work you've put in on this matter. You're excused.

(Proceedings concluded at 3:14 p.m.)

USCA5 289

58

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.



Molly Carter

3/28/07
Date

**USCA5 290**

United States Courts
Southern District of Texas
FILED

MAR 2 8 2007

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          *      CRIMINAL ACTION
                                   *
          PLAINTIFF,               *      CR-C-02-216(1)
                                   *
VS.                                *
                                   *      CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *      JANUARY 21, 2004
                                   *      2:57 P.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS-PATTERSON
                             MR. TONY ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

FOR THE DEFENDANT:           MR. JOHN S. GILMORE, JR.
                             MR. JOEL DOUGLAS TINKER
                             ATTORNEYS AT LAW
                             622 SOUTH TANCAHUA
                             CORPUS CHRISTI, TEXAS 78401

COURT RECORDER:              MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY
AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED
REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST
COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
COPY AT THE OFFICIAL RATE. GENERAL ORDER 94-15.
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF TEXAS.

USCA5 291

2

(The proceedings began at 2:57 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action 02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. TINKER:  Douglas Tinker and John Gilmore for Mr. Bourgeois.

THE COURT:  Well, I'm sorry to have y'all over again so quickly, but I got the report back.  Ms. Booth had called the case manager and said that Dr. Estrada's report was ready, and she wanted to go pick it up, so I thought I ought to send a Marshal, get it filed, look at it, and see how to go about disclosing it.

When I read the report -- do you have it?  I noticed that the U.S. Attorney had provided, had provided to Dr. Estrada all the witness statements.  And so Dr. Estrada put in the report that these witnesses, inmate such-and-such, inmate so-and-so said the following.  So I ordered it to be filed, brought right back up to the courtroom.  And inadvertently, the clerk sent out both copies in the mail.  We were able to get to the post office last night, retrieve them.

And so what I wanted to do in open court was give Ms. Booth a copy of this.  You can see that there may be a problem.  By the way, the bottom line was that he was

USCA5 292

3

competent, et cetera, et cetera, according to Dr. Estrada.  But what I wanted to do in open court was give Ms. Booth a copy of this report and give her the opportunity to redact those names.  Is that all right, Mr. Tinker?

MR. TINKER:  It's really not.  I think it's about time we know the names of the witnesses and --

THE COURT:  When is this going to -- these are people that are in custody.  And they're vulnerable, as your client is, as well.

MR. TINKER:  The problem is, I've read so many cases that say that the lawyer's incompetent if he doesn't at least make an attempt to interview witnesses before trial.

THE COURT:  Yes.  Yes.

MR. TINKER:  We certainly can't do it if we don't know who they are.  And so --

THE COURT:  Ms. Booth?

MS. BOOTH:  I --

MR. TINKER:  I meant, last time we were here, to ask --

THE COURT:  Ms. Scotch, would you give that to her, please?

MR. TINKER:  -- that they tell us who they are and where they are, make them available to us.

MS. BOOTH:  No, we're not going to --

MR. TINKER:  Well, I guess the Judge will decide

USCA5 293

4

whether it's a no or yes, but --

THE COURT:  So when are you going to do that?

MS. BOOTH:  When you order me to, Judge.  I was hoping to wait till the very last minute.

THE COURT:  Well --

MR. TINKER:  So we won't have any chance to talk to them.

THE COURT:  Okay.  This is the deal.  I mean, you need to make plans, because I'm going to do it this week.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  I'll let you redact that out now.  But at some point very quickly, Mr. Tinker and Mr. Gilmore need to have those names.

MS. BOOTH:  But we will not make those witnesses available for them, as we don't -- we don't make any witness available for them.  You know --

THE COURT:  Well, but you're not going to have any control of that.  Because what happens is, Mr. Tinker can go to the jail and ask to speak to them, or can contact the lawyers of these inmates.

MS. BOOTH:  Right.

THE COURT:  And say, "I want to speak to them," which might be better.

MS. BOOTH:  Right.

THE COURT:  And either the lawyers make them

USCA5 294

available, or they don't.  And I'm of a mind to do that and not say where they are.  But I want to give you a heads up enough time so you can place them wherever you'd like to place them and not make their presence, I'm sorry, their location available.  But I wanted to make their names and their attorneys available to Mr. Tinker and Mr. Gilmore.  And that's, it's going to have to happen.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Because Mr. Bourgeois is entitled to test the accuracy of those statements, to try to get any information to impeach possible, because he needs to see the statements soon.

MS. BOOTH:  Well, they've read them.  We've had them over, and we let them --

THE COURT:  Well, okay.

MS. BOOTH:  We let them read everything.  We just didn't tell them who said it.

THE COURT:  Okay.  But he needs to be able to put the name with the statement and try to figure out when these events occurred and see if there were other inmates in the cell that may have something different to say.

MR. TINKER:  And we, it's my view that we --

THE COURT:  And time is running out on doing that.

MR. TINKER:  It's my view they're also required, I think now, to reveal whatever criminal records that these

6

witnesses have.

MS. BOOTH:  Certainly.

THE COURT:  They certainly do.

MS. BOOTH:  Uh-huh.

THE COURT:  I don't know when that has to happen, but they have to give them to you before trial.

MS. BOOTH:  We will do that.

MR. TINKER:  May I ask about when that might happen? I'm just --

THE COURT:  Usually what happens, it happens at the final pretrial conference.  You tell me what -- of course, you want --

MR. TINKER:  I just, you know, I would say within ten days of trial, or something like that.

THE COURT:  Okay.

MR. TINKER:  I mean, that's standard.

THE COURT:  Okay.

MR. TINKER:  I just, I don't want to wait till they put them on, and then they say, "Hey, here's the criminal record of this witness."

THE COURT:  Well, I think that's fair.

MS. BOOTH:  And we'd like to have his witness list, too, Judge.

THE COURT:  When are you going to provide those?

MR. TINKER:  By next week, I think we could.

USCA5 296

THE COURT:  Well then, shall I make the deadline the same for both sides?

MR. TINKER:  I think they might know who the DNA expert is, because I think they mailed --

THE COURT:  Well, do you have other witnesses besides the experts?

MR. TINKER:  I'm sure we will, Your Honor.

THE COURT:  Well, I'm going to make the date the same for both, so you pick.

MR. TINKER:  That's fine.

THE COURT:  You tell me when you're going to make those available.  And I'll order that the inmates' names and --

MR. TINKER:  Let me consult with co-counsel.

THE COURT:  -- and attorneys be available.

(Counsel conferring off the record.)

MR. TINKER:  Mr. Gilmore says he thinks by the end of next week.  And primarily, he's been talking with some of the investigators more than I have.  That's why I'm asking him.

THE COURT:  So shall I make it reciprocal disclosure then next Friday?  Is that all right, Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  Yes, Your Honor.  We're talking about guilt-innocence witnesses?

THE COURT:  Guilt and innocence, yes.  And when, what do I do about the sentencing?

MS. BOOTH:  And if that is true --

USCA5 297

8

THE COURT:  I must say, if we're talking only about that, these inmates, I'm sure -- I'm not 100 percent sure, but I, from all we've talked about, they're going to be on the sentencing phase, if we get to that point.

MS. BOOTH:  That's exactly right.  So should I have to disclose them at this point?

THE COURT:  No, you don't.  I'm doing reciprocal discovery --

MS. BOOTH:  Right.

THE COURT:  -- the same time.  Guilt or innocence, a week from Friday.  And when do you think it's fair to do the sentencing portion?  Mr. Gilmore, you give me a date.

(Counsel conferring off the record.)

MR. GILMORE:  We're still working on --

THE COURT:  See how much trouble Mr. Tinker can get you in?

MR. GILMORE:  I know, Judge.  We're still in the process of investigating mitigation evidence, Judge.

THE COURT:  Well, I need --

MR. GILMORE:  And I expect a report back --

THE COURT:  I need to get the time for you when it's appropriate, because I would imagine that these are about, all the sentencing witnesses that they've got are the ones that Dr. Estrada listed in this report.

MR. TINKER:  You know, the only thing is, we don't

have the final report from the mitigating experts, so it would be difficult for us to get them all.  But by next Friday, we could contact them and say we need to get them in here.

THE COURT:  Okay.

MR. TINKER:  That's on the punishment phase part.

THE COURT:  If any.

MR. TINKER:  If any.

THE COURT:  So let's, let me make sure I've got the dates correct.  We start picking a jury on the 9th --

MR. TINKER:  Yes.

THE COURT:  -- of February.  So the guilt or innocence phase, you're telling me, you could have the witnesses exchanged by the 30th?

MR. TINKER:  Yes, Your Honor.

THE COURT:  All right.  Then are any of those, have you looked at that list of people?

MS. BOOTH:  Of their list?

THE COURT:  No.  I'm talking about on Dr. Estrada's report.

MS. BOOTH:  Judge, I haven't even looked at it yet. I'm sorry.

THE COURT:  It's on a page all together.  Why don't you look at it and tell me if there are any people on there that are on the guilt or innocence phase.

(Counsel conferring off the record.)

USCA5 299

MS. BOOTH:  A couple of these will be, Your Honor, and they are --

THE COURT:  I know what, you've got the one -- okay. I've got the right copies.  This was the one that was going to go in your box.  That one went in the mail.

MS. BOOTH:  Yes.  Some of these are --

(Court and Clerk conferring off the record.)

THE COURT:  Okay.

MS. BOOTH:  And Judge, some of these are our rebuttal witnesses.

THE COURT:  Well, if you know about them now, everybody's rebuttal witnesses need to be disclosed, if you're aware of their existence.

MS. BOOTH:  Okay.  Everybody's.

THE COURT:  And that's on January 30th.  Everyone.

MS. BOOTH:  All right.

(Court and Clerk conferring off the record.)

MS. BOOTH:  Many of these, Judge, are guilt-innocence.  But he's got some -- I've got to go back.  I think he couldn't read our writing or something, or he's got some typos in here.  And some of the names are, I'm not --

(Counsel conferring off the record.)

THE COURT:  Ms. Booth, your conversations with your co-counsel are picking up on the record.  See that microphone right in front of you?

USCA5 300

11

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

(Counsel conferring off the record.)

MS. BOOTH:  Judge, can we have an opportunity to mark through some, you know, just to take out some of the names of some of our witnesses?

THE COURT:  Well, that's what I'm trying to tell you. That's why I brought you over here.

MS. BOOTH:  Okay.  So we --

THE COURT:  And I'll redact them --

MS. BOOTH:  All right.

THE COURT:  -- Xerox the page, and give -- I want to give the report to Mr. Tinker and Mr. Gilmore.

MS. BOOTH:  Right.

MR. TINKER:  But I, and I've been eavesdropping a little.  It seems like to me what they're doing is they're going to, that they're saying that some of the things that Dr. Estrada wrote were wrong.

THE COURT:  No.

MS. BOOTH:  No.  We've got a couple of misspellings.

THE COURT:  Apparently, he's got the names, he's got some misspelling on names.

MR. TINKER:  Well, if he made mistakes in his report, they ought to still be in there when we get to see it.

MS. BOOTH:  Sure.

USCA5 301

12

MR. TINKER:  I don't want them going back and say, "Dr. Estrada, you called this witness so-and-so, when it's really so-and-so."  If he wasn't accurate enough to get the names right, I think we have a right to know that, in case he's a witness in the case.  And I'm going to object to them going back and having him correct anything in his report.

MS. BOOTH:  Judge, typing errors have nothing to do with his evaluation of the Defendant's competency or sanity.  I bet you a million dollars he didn't type it.

MR. TINKER:  He may not have even dictated it.  I --

THE COURT:  He's your witness, Mr. Tinker.

MR. TINKER:  That was facetious.  I know.  But what I'm saying is if he makes mistakes in his reports, I think we ought to get to see the ones he made mistakes in.  And if they go correct it, then we'll --

THE COURT:  You're going to get everything he -- when you leave here today, you're going to have everything he's got but some names.

MR. TINKER:  All right.  But somewhere, I want a report, so if he testified, just like the one we have in court today, before there's any corrections, because I think it's the names that they're saying he got wrong.  And if they're leaving out the names, then we're not going to know that, if we don't -- if the original report is not preserved.

MS. BOOTH:  Sure.

USCA5 302

THE COURT: Okay. Go ahead. What names do you want? Just -- just put a dot by them. Hand it to me. I'll take off the names, but not the description, like, comma inmate.

(Counsel conferring off the record.)

MS. BOOTH: Judge, could we just have 30 minutes? Because those names might be reflected somewhere else in the report, and it would --

THE COURT: You mean that he already knows about?

MS. BOOTH: No, that the doctor may have used somehow. I don't know because I haven't read it yet.

THE COURT: Well, all I was thinking about were the inmates. The inmates are not listed anywhere --

MS. BOOTH: Right. That's the name -- okay. Because I haven't read the report.

THE COURT: You're welcome to read it through, if you need that time. I don't think they're anywhere but --

MS. BOOTH: If we could just step out for a few minutes.

THE COURT: Yes, ma'am.

(Counsel conferring off the record.)

THE COURT: I mean, that is the only place that any inmates are referenced.

MR. TINKER: I don't mind if they, since they're permitted to redact things, I don't mind if they do that and then fax them to us this afternoon at the office. I don't

USCA5 303

14

know --

THE COURT: You don't think you need to be here? I just wanted to give you the reports within minutes of when they had it.

MR. TINKER: Any time today is all right.

THE COURT: Okay.

MR. GILMORE: Judge, I'm going to be here anyway on the next case.

THE COURT: Okay. The diagnosis, by the way, is, "Axis 1: Adjustment disorder with anxiety and depression. 2, Axis 2: No diagnosis. Axis 3: No diagnosis. Axis 4: Severe stress. Axis 5, GAF 65, best GAF last year 70. It's my conclusion the Defendant is capable to stand trial, based on the fact he's fully acquainted with the charges against him, the evidence that he will face against him, the consequences of being found guilty, the legal process. He has a good relationship with his defense attorneys, trusts them in his plea of not guilty. It's my opinion the Defendant's mental capacity at the time of the offense was normal and not insane. Opinion is based on the fact the Defendant was very clear recollection of the events before, during and afterwards. He was able to remember and describe the details and postulate alternative theories for his defense, none of which involved disturbed mental status."

And then he mentions descriptions of witnesses

USCA5 304

regarding his mental status and demeanor at the time of the incident.  And finally, review of taped telephone conversations he's had from jail with his family.

MR. TINKER:  Well, as Mr. Gilmore said, he's going to be here anyway, so --

THE COURT:  So I'll be glad to let you all be excused.  Mr. Bourgeois is excused.  And what I'll do is I have your report right here that I'm going to give you, and as soon as they let me know, if that's all right, if that procedure is all right with you, I'll let them hand me that one sheet of paper that has the names of the people that he took statements from at the top, redact those names, Xerox that page, give that to you and your report, and I'll give it to Mr. Gilmore this afternoon.

MR. TINKER:  Your Honor, the procedure is fine.

THE COURT:  And I don't mean for you --

MR. TINKER:  I still have my objection to not knowing the names.

THE COURT:  Yes, but now I need a --

MR. TINKER:  But the procedure is okay.

THE COURT:  I want a date from you all.  Do you have one now to give me about the exchange of sentencing witnesses?  And I want to make it clear that I am including in guilt or innocence rebuttal witnesses for both sides.

MS. BOOTH:  Also, Your Honor, I wanted to bring up

one thing.  We had some calls from some witnesses where the investigator that has been, that's been utilized by the Defense has been going around and telling people that they have to talk to him, and that he was hired by the Court, and that they must speak to him.

THE COURT:  Mr. Tinker, Mr. Gilmore, do you know anything about that statement?

MR. GILMORE:  First time I've heard anything --

THE COURT:  Where is your investigator, as we speak?

MR. GILMORE:  They may be in Louisiana, Judge.  But -- we're talking about the mitigation investigator?  Or are we talking about our guilt or innocence investigator?

MS. BOOTH:  Bierbaum.

MR. GILMORE:  Bierbaum.  He's mitigation.  I believe they may be in Louisiana, Judge.

THE COURT:  Okay.  I want you to go right now and reach him and tell them that they're not to make those statements, if they've made the statements, ever again.

MR. GILMORE:  Yes, Your Honor.

MS. BOOTH:  We've had a witness call us and say that they did not want to speak to the Defense.  But when the man kept saying, told them that, "Look, I was hired by the Court."

THE COURT:  You know what, maybe I better have Mr. Bierbaum in here in court tomorrow by 9:00 o'clock and speak with him and give him an order, so that any violation

would put him in possible afoul of the law.

MS. BOOTH:  And I think he was the investigator that took letters over to the doctor's office and took -- they submitted things also, Your Honor, for examination.  And it says here, and the Investigator, United States Attorney, is Gerald Bierbaum.

THE COURT:  Who wrote that?

MS. BOOTH:  I don't -- Judge, that's what's on the front page of the report.

THE COURT:  Well, I saw that.

MS. BOOTH:  And --

THE COURT:  You can contact Dr. Estrada and see what's happening with that, but that is entirely inappropriate.

MR. GILMORE:  Yes.

THE COURT:  And I will not, I will not stand for any witness being pressured or misrepresented in that fashion, if it's true.

MR. TINKER:  Again, she hasn't stated the source of this information.  I just -- I guess we'll try to find him.

MR. GILMORE:  I'll try to find him, Judge.

THE COURT:  I'll be glad to have a telephone conference with him, if you'll set it up.

MR. GILMORE:  That's fine, Judge.

THE COURT:  If you can do it before the day is out, even better.  Do you have a cell phone for him?

USCA5 307

MR. GILMORE:  I have phone numbers for him, Judge. I'll have to call my office.

THE COURT:  All right.

MR. GILMORE:  I'll do that, Your Honor.

THE COURT:  Thank you.  You're excused.

(Recess from 3:18 p.m. to 3:47 p.m.)

THE COURT:  Mr. Gilmore, thank you very much for moving so quickly with this.

MR. GILMORE:  Yes, Your Honor.

THE CLERK:  You want me to call the case?

THE COURT:  Please.

THE CLERK:  The Court calls Criminal Action, re-calls Criminal Action 02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. GILMORE:  John Gilmore for Mr. Bourgeois.

THE COURT:  Ms. Booth brought up at the last when we were here just 45 minutes ago that the investigator was holding himself out as to be the Court's investigator, and that witnesses had to speak to him, even though they did not, and according to Ms. Booth, they did not want to speak to the Defendants.

So Mr. Gilmore was good enough to get Mr. Bierbaum on the phone long distance, and he is with us as we speak.  So if you would place him under oath, Ms. Scotch.

USCA5 308

THE CLERK:  Mr. Bierbaum.

MR. BIERBAUM:  Yes, ma'am.

THE CLERK:  I'm going to swear you under oath.

THE COURT:  Ask him to raise his right hand.

THE CLERK:  Please raise your right hand.

(Mr. Bierbaum sworn.)

THE COURT:  All right.  Mr. Bierbaum, it's come to my attention that you may have represented to some potential witnesses for the Government that you were court appointed, and that you are the Court's investigator.  Is there anything ringing true in that statement?

MR. BIERBAUM:  We did tell them that we are court appointed, and we are appointed by the Court.  We also told them, though, that we were preparing information --

THE COURT:  Actually, you're not appointed by the -- you are not court appointed, and you're not to leave the impression with anyone that you are the Court's investigator in any way.  I appointed, granted a motion from the Defendants to give them a, an investigator.  You are not my investigator.  You are not to leave that impression.  And with whom have you spoken to that you have made some comment that you're the Court's investigator?

MR. BIERBAUM:  I have never left the impression with anyone that I'm the Court's investigator.  I told each person that we interviewed that we'll be sharing your information with

USCA5 309

John Gilmore and Doug Tinker.

THE COURT: Did you tell anybody that you were appointed by the Court to investigate this matter?

MR. BIERBAUM: Yes, ma'am.

THE COURT: Who did you tell that? To whom did you speak that comment to?

MR. BIERBAUM: Veronica Batiste and Audrell and Donna Leonard.

THE COURT: And what did you say to Dr. Estrada?

MR. BIERBAUM: Dr. Estrada?

THE COURT: Did you speak with Dr. Estrada in any way?

MR. BIERBAUM: Yeah, I provided him with the summary of some letters that we decided that he should look at. And no, I told him that I was working with John Gilmore and Doug Tinker. I made it clear to him who I was working with.

THE COURT: All right. You are not to, in the future, you are ordered not to tell anyone that you are court appointed to investigate this case. If you do so, it may result in contempt sanctions against you. Do you understand that?

MR. BIERBAUM: Yes, ma'am.

THE COURT: Now, you have been told, I understand, from Ms. Booth, by some of the witnesses that they did not want to talk to you until you told them, in fact, that you were

USCA5 310

appointed by the Court to investigate this matter.  Do you understand that?

MR. BIERBAUM:  I'm sorry, I've been told not to -- I understand I've been told not to tell anyone I'm court appointed.

THE COURT:  Okay.  Have you in the past, when meeting with these people, when they have told you they did not want to speak with the Defense, have you then told them that you were appointed by the Court to investigate this matter, and that they needed to speak with you?

MR. BIERBAUM:  Absolutely not.

THE COURT:  Okay.  What did you tell them by way of the Court having anything to do with you being on this case?

MR. BIERBAUM:  We, when we introduced ourselves, I told them that we were appointed by the Court to prepare information --

THE COURT:  Who is we?  I'm sorry.  Who is we?

MR. BIERBAUM:  Lisa Milstein and I interviewed Ms. Batiste and both Ms. Leonards, Ms. Audrell and Donna.

THE COURT:  All right.  Well, that's -- Mr. Gilmore, do you have any response to this?  Do you think that that is an appropriate way to approach the witnesses that they've been appointed by the Court to investigate this?

MR. GILMORE:  Well, Your Honor, I can see why Mr. Bierbaum would have done that, because we requested an

investigator, and the Court gave us funding for an investigator.  So I can see where he may have misunderstood.  I'm sure he did not do that intentionally, Judge.

MS. BOOTH:  The way the witnesses -- and Your Honor, we had -- one of the witnesses he has not mentioned.  One of them he has.  We got two calls.  One of them was from the family of the Defendant's wife, and one of them, another call was from the Defendant's family, a family member who called and said that Mr. Bierbaum had represented that he was hired by the Court.

MR. BIERBAUM:  I've never said that.

THE COURT:  Well, if you told them you were appointed by the Court, that's the same thing.  So let's not quibble about semantics, Mr. Bierbaum.  Don't conduct yourself in this manner in the future.  Are we clear on this?

MR. BIERBAUM:  Yes, Your Honor.

THE COURT:  And if they don't want to talk to you, you will not invoke the name of the Court to make them talk to you.  Do you understand?

MR. BIERBAUM:  Yes, Your Honor.

THE COURT:  Now, has anybody said they didn't want to talk to you until you told them that you were court appointed for this?

MR. BIERBAUM:  Nobody has said, "I don't want to talk to you."  Nobody has told me, "Go away, I don't want to talk to

USCA5 312

23

you," other than Ms. Collins, and I went away and left her alone.

MS. BOOTH:  Well, I didn't even know that he had spoken to Ms. Collins.  But there was another person, there were two that called me, not me, that called the FBI agent and said that, and they were two different people that do not have any contact with each other, and they both gave the same story, that he came, he represented that he was hired by the Court, and one of them I know did not want to speak with him, and told him that she didn't want to, but because she feared that it was from the Court, that she needed to speak to them, so she did.

THE COURT:  And who was that?

MS. BOOTH:  That was Veronica Batiste.

THE COURT:  Do you remember speaking to Ms. Batiste?

MR. BIERBAUM:  Yes, Your Honor.  We spoke to Ms. Batiste for a couple of hours.

THE COURT:  And did she tell you she was reluctant to speak to you?

MR. BIERBAUM:  She said that she wanted to call the FBI.  She called the FBI, while we were waiting in her home. She continued to talk to us.  Somebody from the FBI called back.  I spoke to that person.  And then Megan called Ms. Batiste back later while we were still there.  She willingly spoke to us for well over two hours.  She never said, "I don't want to talk to you," or "Leave me alone."

USCA5 313

24

MS. BOOTH:  Your Honor, when she called the FBI, the agent was not there, so she didn't have anybody to speak to. And so, and not knowing if she could refuse to speak to someone hired by the Court, she, you know, she did.  She didn't want to be in contempt of court.

THE COURT:  Mr. Gilmore, anything else that you can think of to clear up this matter?

MR. GILMORE:  No, Your Honor.  I think Mr. Bierbaum understands the Court's instructions, and I think he'll proceed according to the instructions.

THE COURT:  Would you state your full name, Mr. Bierbaum?

MR. BIERBAUM:  Gerald J. Bierbaum.

THE COURT:  And your address and phone number, please?

MR. BIERBAUM:  1744 Norfolk, in Houston, Texas, 77098.

THE COURT:  And your phone number?

MR. BIERBAUM:  (713)572-2333.

THE COURT:  All right.  Is there anything else, Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  And Mr. Gilmore -- anything else, Mr. Gilmore?

MR. GILMORE:  No, Your Honor.

USCA5 314

THE COURT:  All right.  Mr. Bierbaum, I authorized your hiring by the Defense because of your credentials, and I expect you to continue to work diligently on behalf of the Defendant, but do not invoke the Court or any indication that you were appointed or hired by the Court to do this, and that people must speak to you.  Do you think we're clear on this?

MR. BIERBAUM:  Yes, Your Honor.  And I just want to add that I never told anybody they have to speak to me.

THE COURT:  All right.  I appreciate that.  Thank you very much.  You're excused.

MR. BIERBAUM:  Thank you.

THE COURT:  I can understand, though, that people might think that they had to, under that representation.  And literally, Mr. Bierbaum is correct.  But if there's some problems and complaints, then we probably need to clarify that issue.  Is that all right, Mr. Gilmore?

MR. GILMORE:  That's fine, Judge.

THE COURT:  All right.  Anything further?

MS. BOOTH:  No, Your Honor.  I have tendered to your clerk --

THE COURT:  Oh, let me see it right now while Mr. Gilmore's here.

MS. BOOTH:  -- the report.  And I put a mark, I think, by four names.  And in reviewing the report, I --

THE COURT:  Okay.  This is -- wait a minute.  This is

26

your report.  No, leave that one sealed.  And now, do we
have -- bottom line dates, by the way, for guilt or innocence,
both case-in-chief and rebuttal witnesses, that anyone, of
which anyone is aware at this time are to be disclosed by 10:00
o'clock, January 30th.  Do we have a date for the guilt -- for
the sentencing, if any?

MR. GILMORE:  Mr. Bierbaum has assured me that he
could have those witnesses by January the 30th, Judge, which is
the same date.

THE COURT:  Of the guilt or innocence?

MR. GILMORE:  Yeah.  They are continuing their
investigation, though, Judge.  The investigation is not fully
completed yet.

THE COURT:  Well, when will it be complete?  Do you
know?

MR. GILMORE:  I anticipate they're going to be
working, because of the deadline, Judge, they're going to be
working up until the time that we start voir dire.  But we will
make the witnesses known as they --

THE COURT:  I understand.

MR. GILMORE:  -- come available, Judge.

THE COURT:  All right.  Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Anything further?

MS. BOOTH:  No, Your Honor.

USCA5 316

THE COURT:  Okay.  Ms. Scotch, would you please take this one -- now, Ms. Booth, this is yours back.  Come up here so I don't get them confused.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  There are four names, and the very, the fourth one that's marked out, Mr. Gilmore, is a name I recognize, and it's spelled correctly, by the way.

MR. GILMORE:  Okay.

THE COURT:  So --

MS. BOOTH:  There's two names that are misspelled, Your Honor.

THE COURT:  AB1994?

MS. BOOTH:  Oh, no.  I didn't even --

THE COURT:  I thought she had an E in there.  Would you look at that?

MS. BOOTH:  I didn't even check that.  I was just reading -- there are several names misspelled that we did not mark out.

THE COURT:  This should be -- this page needs to be Xeroxed and substituted for this page and given to Mr. Gilmore.  Any of the names that you marked out, were they misspelled?

MS. BOOTH:  Yes.  Two of them were misspelled.

THE COURT:  Okay.

MS. BOOTH:  And knowing that the judge, I mean, that the doctor dictated this into a Dictaphone and then it was

USCA5 317

28

transcribed --

THE COURT:  Wait a minute.  What have you got in your hands?

MS. BOOTH:  I've got the one that had the marks on it.

THE COURT:  Then what's this?

MS. BOOTH:  This is, I was given two copies.  I was handed two copies.  And I imagine, because when I looked at these, that one was for the Defense and one was for me.  This is how I got this right, you know, this a little earlier.

THE COURT:  All right.  I'm going to keep the two copies with you.

MS. BOOTH:  Okay.  Yes, Your Honor.

THE COURT:  Otherwise I'll get confused.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  I've got a copy under seal, and I'm getting another copy right now for you, Mr. Gilmore.

MR. GILMORE:  Yes, Your Honor.  I'll wait out in the audience for that.

THE COURT:  All right.  Thank you.  Anything further?

MR. GILMORE:  That's all we have, Judge.

MS. BOOTH:  No, Your Honor.

THE COURT:  Okay.  All witnesses, guilt or innocence, and sentencing, by 10:00 a.m., January 30th.

MR. GILMORE:  Are we going to appear in court, or are

USCA5 318

29

we just to give them to Ms. Booth?

THE COURT:  I expect y'all to make an exchange with that and not appear in court.  Is that all right?

MR. GILMORE:  That's fine, Judge.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.  And that will give you time, Ms. Booth --

MS. BOOTH:  Yes, Your Honor.

THE COURT:  -- to protect any inmates.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Or anybody else.  And the inmates, you're not to give them the location, again, but to give them their name and their attorney's name.

MS. BOOTH:  Yes, Your Honor.

(Proceedings concluded at 3:59 p.m.)

.

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____        _____
Molly Carter                            Date    3/28/07

USCA5 319

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ────────────────────── | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | Electronically Filed |
| Petitioner. | : | |
| ────────────────────── | : | |

**PETITIONER'S MOTION TO COMPLETE RECORD
AND CONSOLIDATED BRIEF IN SUPPORT**

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby moves to complete

the record.  As shown below, Petitioner's counsel are busily preparing Mr. Bourgeois' section 2255

Motion, but they currently are without a number of critical pieces of the historical record of this case.

As also shown below, these missing pieces are essential to a full and fair evaluation of the prior

proceedings in this Court and, in particular, an evaluation of trial counsels' performance.

Specifically, Petitioner requires the Court's intervention to obtain photo-quality copies of all autopsy

photos in the Government's possession, and all audio recordings of statements made by Petitioner.

In support of this *Motion*, Petitioner states as follows.

1.      Petitioner was convicted before this Court for a violation of 18 U.S.C. § 1111 and was

sentenced to death.  Petitioner's conviction and death sentence were affirmed on direct appeal.

United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005), cert denied, Bourgeois v. United States,

126 S.Ct. 2020 (May 15, 2006).  Petitioner was represented by Joel Douglas Tinker, Esq. and John

1

USCA5 320

S. Gilmore Jr., Esq. at trial and on direct appeal.  On October 16, 2006, this Court granted Mr. Bourgeois' Motion and appointed undersigned counsel (document # 380).  On October 19, 2006 the Court granted counsel Wiseman's motion for admission *pro hac vice* in these §2255 proceedings (document # 382).  Mr. Bourgeois' petition for a writ of habeas corpus is currently due on or before May 14, 2007.

2.    Since their appointment, counsel have been gathering and reviewing the record and conducting investigation based upon that review.  While counsel have obtained the bulk of the record from prior counsel and the Court, there remain a number of items that are in the sole possession of the United States Attorney, and which the Government has refused to provide.

3.    As part of their efforts to complete the record, on February 27, 2007 counsel traveled to Corpus Christi to review the trial exhibits, all of which were made available for inspection by the Court.  At that time, the Court directed case manager, Sandra Scotch, to assist counsel with our review and/or copying of trial exhibits and Ms. Scotch courteously complied.  Those exhibits included multiple autopsy photos and two audio recordings of Mr. Bourgeois' pre-trial phone conversations.

4.    On that same day, counsel met with Assistant United States Attorney, Patricia Booth, Esq., and inquired whether the Government possessed a computer disk or color copies of the autopsy photographs admitted at trial.[1]    Ms. Booth advised counsel that the Government possessed additional autopsy photographs and audio recordings of Mr. Bourgeois' phone conversations which were not admitted at trial.

-----

[1]Counsel has contacted Case Manager Sandra Scotch for assistance in obtaining copies of the autopsy photographs admitted at trial.

2

USCA5 321

5.      Counsel has not seen in prior counsels' files such other photos, or recordings or transcripts of recordings, which were not admitted at trial. Knowing that such materials should have been provided to trial counsel upon request, pursuant to Fed.R.Crim.P. 16,[2] counsel requested that the Government produce those autopsy photographs and audio-recordings. The Government advised counsel on March 13, 2007 that it would not produce these items.

6.      The Government's refusal to provide these documents, photographs and recordings, render it impossible for counsel to conduct a full evaluation of whether trial counsel rendered effective assistance of counsel. Trial counsels' apparent failure to secure that discovery that was due

---

[2]F.R.Crim.P. 16 states in relevant part:

(a) Government's Disclosure.

(1) Information Subject to Disclosure.

(B) Defendant's Written or Recorded Statement. Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
(i) any relevant written or **recorded statement** by the defendant if:
• the statement is within the government's possession, custody, or control: and
• the attorney for the government knows – or through due diligence could know – that the statement exists. . .

(E) Documents and Objects. Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, **photographs**, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
(i) the item is material to preparing the defense. . . .

(F) Reports of Examinations and Tests. Upon a defendants request, the government must permit a defendant to inspect and to copy or photograph the results or report of any physical or mental examination if:
(iii) the item is material to preparing the defense. . . .

3

to them under Rule 16 may have caused Petitioner prejudice – prejudice being an essential element of a post-conviction claim of counsel ineffectiveness. Strickland v. Washington, 466 U.S. 668, 694 (1984) (Counsel is ineffective when his or her performance falls below objective standards of reasonableness, and that as a result of that deficiency, a defendant suffers prejudice.) Current counsel cannot assess whether trial counsels' failure to secure the discovery in fact caused prejudice until they are able to review the materials that trial counsel did not obtain.

7.     The American Bar Association's GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, Guideline 10.15.1 (E) (4) (Duties of Post-Conviction Counsel), require current counsel to "continue an aggressive investigation of all aspects of the case."[3] As the *Commentary* to this Guideline states, **"collateral counsel cannot rely on the previously compiled record** but must conduct a thorough, independent investigation in accordance with Guideline 10.7 (Investigation)." Accordingly, in order to facilitate counsels' conduct of a thorough investigation required by the Sixth Amendment and the ABA Guidelines, and in particular to explore whether trial counsel performed effectively, counsel requires that the Court allow him to complete the record by having access to the requested materials.

---

[3]The ABA Guidelines have been cited repeatedly by the Supreme Court as guides to "what is reasonably" expected of capital counsel. See Rompilla v. Beard, 545 U.S. 374, 387 (2005) citing, Wiggins v. Smith, 539 U.S. 510, 524 (2003), and Strickland, 466 U.S. at 688.

4

USCA5 323

WHEREFORE, Petitioner respectfully requests that this Court grant his *Motion to Complete*

*Record*.  A proposed Order is attached.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:  April 4, 2007
        Philadelphia, Pennsylvania

USCA5 324

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 4th day of April, 2007, I caused the foregoing *Petitioner's Motion to Complete Record* to be served upon the following person in the manner indicated below:

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

/s/ Michael Wiseman

Michael Wiseman

**USCA5 325**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| _____ | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | |
| Petitioner. | : | |
| _____ | : | |

**ORDER**

And now, this _____ day of _____, 2007 upon consideration of *Petitioner's Motion to Complete Record*, and the Government's response, it is hereby ORDERED:

1.     Petitioner's Motion is GRANTED.

2.     Within 10 days of the date of this ORDER , the Government shall make available, for inspection and copying, all photographs taken of the deceased before her death, after her death but before the autopsy, and at her autopsy, by the NCIS, hospital pathologist, county medical examiner, or any other person(s) employed by either law enforcement agencies or medical authorities; and all recordings of Petitioner's phone conversations in its possession, custody, or control.

_____
Janis Graham Jack, USDJ

USCA5 326

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | Electronically Filed |
| Petitioner. | : | |
| | : | |

**PETITIONER'S MOTION TO UNSEAL AND INSPECT RECORDS**

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby moves to unseal

and inspect the Child Protective Service (hereinafter "CPS") records, which were made available to

counsel at the time of trial, and are currently in the Court's custody, and in support, states as follows.

1.    Petitioner was convicted before this Court for a violation of 18 U.S.C. § 1111 and was

sentenced to death.  Petitioner's conviction and death sentence were affirmed on direct appeal.

United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005), cert denied, Bourgeois v. United States,

126 S.Ct. 2020 (May 15, 2006).  Petitioner was represented by Joel Douglas Tinker, Esq. and John

S. Gilmore Jr., Esq. at trial and on direct appeal.  On October 16, 2006, this Court granted Mr.

Bourgeois' Motion and appointed undersigned counsel (document # 380).  On October 19, 2006 the

Court granted counsel Wiseman's motion for admission *pro hac vice* in these section 2255

proceedings (document # 382).  Mr. Bourgeois' petition for a writ of habeas corpus is currently due

on or before May 14, 2007.

1

USCA5 327

2.      Since their appointment, counsel have been gathering and reviewing the record and conducting investigation based upon that review.  In reviewing the record, counsel learned that CPS records relating to Petitioner's wife, Robin Bourgeois, were made available by the Court, at the time of trial, for inspection by counsel for the defense and the government.  NT 3/1/04 at 113-15.  At that time, the Court reasoned that the CPS records were reviewable because they might contain impeachment evidence which could be used against Ms. Bourgeois or other information relevant to the offense.  Id.  As the Court stated: "It occurs to me that you all both ought to be able to look through those to see if there are any prior inconsistent statements or any other mention of the incident."  Id.  All counsel agreed and the records were reviewed in the Court's chambers.  Id.; NT 3/1/04 at 131.

3.      On April 4, 2007, counsel spoke with Case Manager, Sondra Scotch, and learned that Ms. Bourgeois' CPS records were still in the Court's custody and under seal.  These records are contained in five separate envelops in the Court's "vault".  Counsel respectfully requests that the Court unseal the CPS records and make them available for inspection.  As are counsel's efforts to complete the record, see documents #384 and #390 (motions to unseal transcripts and complete the record), counsel's review of the CPS records is essential to a full and fair evaluation of the prior proceedings in this Court and, in particular, an evaluation of trial counsels' performance.

4.      Moreover, as the record reflects that defense counsel and counsel for the government were given access to the CPS records at the time of trial, counsel does not foresee any prejudice to the government in having the CPS records unsealed for current counsels' review.  Counsel would also be amenable to the entry of a protective order, if necessary, prohibiting counsel from disclosing, without the Court's consent, the content of the CPS records to any person outside of the litigation.

2

USCA5 328

WHEREFORE, Petitioner respectfully requests that this Court grant his *Motion to Unseal*

*an Inspect Records*.  A proposed Order is attached.

Respectfully Submitted,

\s\ Michael Wiseman

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Signing for Wiseman and Abreu
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:  April 5, 2007
Philadelphia, Pennsylvania

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 5th day of April, 2007, I caused
the foregoing *Petitioner's Motion to Unseal and Inspect Records* to be served upon
the following person in the manner indicated below:

BY OVERNIGHT MAIL

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

\s\ Michael Wiseman

3

USCA5 329

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____    :
                                     :
UNITED STATES OF AMERICA,            :          No. Cr-C-02-216
                                     :
                    Respondent,      :      Honorable Janis Graham Jack,
                                     :               U.S.D.J.
          -against-                  :
                                     :      **This is a Capital Case**
ALFRED BOURGEOIS,                    :
                                     :
                    Petitioner.      :
_____    :

**ORDER**

And now, this _____day of _____, 2007 upon consideration of *Petitioner's Motion to Unseal and Inspect Records*, it is hereby ORDERED that Petitioner's Motion is GRANTED. Accordingly, the Child Protective Service ("CPS") records, currently in the Court's custody are hereby unsealed and shall be made available for inspection by counsel for Petitioner, Alfred Bourgeois.


                                   _____
                                   Janis Graham Jack, USDJ


**USCA5 330**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | Criminal Action |
| v. | § | No. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On this day came on to be considered Petitioner's Motion to Unseal and Inspect Records (D.E. 391). Accordingly, the Child Protective Service ("CPS") records currently in the Court's custody are hereby unsealed for the sole purpose of inspection by counsel for Petitioner Alfred Bourgeois. It is ORDERED that counsel for Petitioner shall not disclose any information contained in the above-referenced records without permission of the Court, except to prosecute any post-conviction remedies in this case.

SIGNED and ENTERED this 6th day of April, 2007.

_____
Janis Graham Jack
United States District Judge

USCA5 331

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | Electronically Filed |
| Petitioner. | : | |
| | : | |

**PETITIONER'S UNOPPOSED MOTION FOR PRODUCTION OF
UNITED STATES MARSHAL SERVICE RECORDS**

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby moves for production of Mr. Bourgeois' United States Marshal Service records, and in support, states as follows.

1.      Petitioner was convicted before this Court for a violation of 18 U.S.C. § 1111 and was sentenced to death.  Petitioner's conviction and death sentence were affirmed on direct appeal. United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005), cert denied, Bourgeois v. United States, 126 S.Ct. 2020 (May 15, 2006).  Petitioner was represented by Joel Douglas Tinker, Esq. and John S. Gilmore Jr., Esq. at trial and on direct appeal.  On October 16, 2006, this Court granted Mr. Bourgeois' Motion and appointed undersigned counsel (document # 380).  On October 19, 2006 the Court granted counsel Wiseman's motion for admission *pro hac vice* in these section 2255 proceedings (document # 382).  Mr. Bourgeois' petition for a writ of habeas corpus is currently due on or before May 14, 2007.

1

USCA5 332

2.      Since their appointment, counsel have been gathering and reviewing the record and conducting investigation based upon that review.  On April 4, 2007, counsel's office was informed by Public Affairs Officer, Supervisory Deputy United States Marshal Carlos Trevizo, that a Court order would be required to obtain Mr. Bourgeois' U.S. Marshal Service records.  Counsel's review of these records is essential to a full and fair evaluation of the prior proceedings in this Court and, in particular, an evaluation of trial counsels' performance.  Accordingly, Counsel respectfully requests that the Court issue an order directing the U.S. Marshal to provide counsel with all records including, transportation, housing, medical and psychological records,  pertaining to Mr. Bourgeois.

3.      On April 9, 2007, counsel for the Government, Patricia Hubert Booth, Esq., indicated that she was not opposed to this motion.

WHEREFORE, Petitioner respectfully requests that this Court grant his *Unopposed Motion for Production of United States Marshal Service Records*.  A proposed Order is attached.

Respectfully Submitted,

\s\ Michael Wiseman

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Signing for Wiseman and Abreu
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org
Victor_Abreu@fd.org

Dated:  April 9, 2007

2

USCA5 333

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 9th day of April, 2007, I caused the

foregoing *Petitioner's Unopposed Motion to for Production of United States Marshal Service*

*Records* to be served upon the following person in the manner indicated below:


BY REGULAR MAIL

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401


\s\ Michael Wiseman

USCA5 334

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____ :
                           :
UNITED STATES OF AMERICA,      :        No. Cr-C-02-216
                           :
          Respondent,      :    Honorable Janis Graham Jack,
                           :            U.S.D.J.
       -against-             :
                           :      **This is a Capital Case**
ALFRED BOURGEOIS,           :
                           :
          Petitioner.       :
_____ :

**ORDER**

And now, this _____day of _____, 2007 upon consideration of *Petitioner's Unopposed Motion for Production of United States Marshal Service Records*, it is hereby ORDERED that Petitioner's Motion is GRANTED. Accordingly, the United States Marshal Service shall provide counsel for Petitioner, all records including but not limited to, transportation, housing, medical and psychological records, pertaining to Mr. Bourgeois.

_____

Janis Graham Jack, USDJ

USCA5 335

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :
                                    :
UNITED STATES OF AMERICA,           :          No. Cr-C-02-216
                                    :
              Respondent,           :       Honorable Janis Graham Jack,
                                    :               U.S.D.J.
        -against-                   :
                                    :          **This is a Capital Case**
ALFRED BOURGEOIS,                   :
                                    :
              Petitioner.           :
_____     :

**ORDER**

And now, this 20ᵗʰ day of April , 2007 upon consideration of *Petitioner's*

*Unopposed Motion for Production of United States Marshal Service Records*, it is hereby

ORDERED that Petitioner's Motion is GRANTED. Accordingly, the United States Marshal Service

shall provide counsel for Petitioner, all records including but not limited to, transportation, housing,

medical and psychological records, pertaining to Mr. Bourgeois.

_____
Janis Graham Jack, USDJ

USCA5 336

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 338 of 2008
PageID #: 2228
Case 2:02-cr-00216    Document 394    Filed 04/20/2007    Page 1 of 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,          :

               Respondent,          :

       -against-          :

ALFRED BOURGEOIS,          :

             Petitioner.          :

:          No. Cr-C-02-216

:          Honorable Janis Graham Jack,
:          U.S.D.J.

:          **This is a Capital Case**

**ORDER**

And now, this _20th_ day of _April_, 2007 upon consideration of *Petitioner's Unopposed Motion for Production of United States Marshal Service Records*, it is hereby ORDERED that Petitioner's Motion is GRANTED. Accordingly, the United States Marshal Service shall provide counsel for Petitioner, all records including but not limited to, transportation, housing, medical and psychological records, pertaining to Mr. Bourgeois.

Janis Graham Jack, USDJ

SOUTHERN TEXAS

07 APR 20 PM 2: 51

RECEIVED

USCA5 337

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| Respondent, | : | Honorable Janis Graham Jack, U.S.D.J. |
| -against- | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : |  |
| Petitioner. | : |  |

## PETITIONER'S MOTION FOR RELIEF PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
       May 14, 2007

USCA5 338

## PRELIMINARY STATEMENT

Petitioner was charged with the 2002 beating death of his daughter, JG-1999.  On March 16, 2004 he was convicted by a jury of one count of first-degree premeditated murder (18 U.S.C.A. § 1111(a)).  Following a sentencing hearing, the jury returned a verdict of death.  Petitioner was formally sentenced to death by this Court on March 24, 2004.

In this *Motion*, Mr. Bourgeois moves to set aside his conviction and death sentence as each was obtained in violation of the United States Constitution and federal law in multiple respects.

References to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation.  Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation.  The opinion of the United States Courts of Appeals rendered on direct appeal is reported at United States v. Bourgeois, 423 F.3d 501 (August 25, 2005).  It will be cited as Bourgeois.

Mr. Bourgeois is filing an *Appendix* with this *Motion* containing documents relevant to the claims contained herein.  The Appendix will be referred to as *Petitioner's Appendix*, and will be cited as *PA* followed by a number assigned to each document.

Alfred Bourgeois will be referred to by name, or as Petitioner.  The United States will be referred to as the Government.

All other citations are either self-explanatory or are explained.  All emphasis is provided unless otherwise noted.

## STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT

In accordance with Rule 2 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, the *Motion* sets forth only the facts and claims entitling Mr. Bourgeois to relief.  It does not

i

USCA5 339

contain legal argument or citation.  Petitioner will shortly file a separate motion seeking permission

and a schedule by which to file a *Memorandum in Support* of the *Motion*.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim I.      Petitioner is a Person with Mental Retardation.  Accordingly, his
              Execution is Prohibited by the Eighth Amendment.  Trial Counsel
              Ineffectively Failed to Present this Claim to the Court . . . . . . . . . . . . . . . . . . . . . . 3

       A.     Mental Health Evaluations Demonstrating Petitioner's
              Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     Mr. Bourgeois' Adaptive Functioning Is Significantly Impaired and His
              Mental Retardation Was Manifest Prior to Age 18 . . . . . . . . . . . . . . . . . . . . . . . 7

              i.     Defining "Adaptive Functioning" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
              ii.    Lay Evidence Demonstrating Mental Retardation . . . . . . . . . . . . . . . . . . . 9
              iii.   Documentary Evidence Corroborates Petitioner's
                     Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       C.     Counsels' Ineffective Failure to Present Petitioner's Mental
              Retardation to the Court and Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       D.     Even if Counsel is Found to not Have Been Ineffective, the Eighth
              Amendment Prohibition Against Executing Petitioner Cannot be
              Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

USCA5 340

Claim II.        Counsel Provided Ineffective Assistance During the Penalty Phase . . . . . . . . . . 18

    A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.      The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            i.      Government Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            ii.     The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    C.      The Unpresented Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            i.      Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
            ii.     Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    D.      Counsels' Deficient Performance and Ensuing Prejudice . . . . . . . . . . . . . . . . . . 53

Claim III.       No Reasonable View of the Evidence Existed upon Which a
                 Reasonable Fact Finder Could Conclude That the Fatal Injuries Were
                 Inflicted Within the Special Maritime and Territorial Jurisdiction of
                 the United States in Violation of Due Process. Furthermore, Counsel
                 Were Ineffective for Failing to Present Readily Available Evidence
                 to Rebut this Element of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Claim IV.        Trial Counsel Were Ineffective for Failing to Present Available
                 Expert Testimony That Would Have Undermined the Government's
                 Assertion That Petitioner's Semen Was Found in JG-1999's Anus, in
                 Violation of Mr. Bourgeois' Rights under the Sixth and Eighth
                 Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 62

    A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    B.      The Testimony and Arguments Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . . 63

    C.      Trial Counsel's Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    D.      Petitioner Was Prejudiced by Counsel's Ineffectiveness . . . . . . . . . . . . . . . . . . 74

Claim V.         Trial Counsel Rendered Ineffective Assistance by Failing to Litigate
                 a Daubert Motion Challenging the Scientific and Technical
                 Reliability of the Opinions of Dr. Senn and Dr. Chrz Concerning the
                 Bite Mark Evidence and for Failing to Rebut this Evidence Once it
                 Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

USCA5 341

A.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . . 78

B.    The Opinions of Dr. Senn and Dr. Chrz Were Utterly Unreliable . . . . . . . . . . . 83

C.    Trial Counsel Inexplicably Failed to Rebut the Bite Mark Testimony Despite Being Aware of an Expert Report That Directly Contradicted Dr. Senn and Dr. Chrz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85

D.    Petitioner Was Prejudiced by Counsels' Failures . . . . . . . . . . . . . . . . . . . . . . .  88

Claim VI.    Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Litigate a Daubert Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Oliver Concerning the Digitally Enhanced Autopsy Photographs and for Failing to Object to Their Admissibility and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . . 92

B.    Trial Counsel Inexplicably Failed to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and Failed to Rebut this Testimony Once it Was Admitted at Trial . . . . . . . . . 96

C.    Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim VII.    The Government Violated its Obligations under Brady v. Maryland by Failing to Disclose to Petitioner Information Material to His Ability to Prepare and Present a Defense at Trial and Sentencing Denying Petitioner His Rights under the  Fifth, Sixth and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . 98

A.    Adam Longoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

B.    Orlando Campos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

C.    Wiley Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

D.    Darick Moore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

E.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

iv

Claim VIII.    Petitioner Is Entitled to Relief from His Conviction and Sentence
Because Trial Counsel Labored under a Conflict of Interest That
Adversely Affected Their Representation of Petitioner at Trial and
Sentencing, in Violation of Petitioner's Sixth Amendment Right to
Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Claim IX.    Prosecutorial Misconduct in Closing Argument at Both the
Guilt/Innocence and Penalty Phases Denied Petitioner His
Constitutional Right to Due Process and His Rights under the Sixth
and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . 112

A.    The Prosecutor Engaged in Misconduct by Referring to Mr.
Bourgeois as "That Thing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

B.    The Prosecutor Engaged in Misconduct by Improperly Appealing to
the Jury's Sense of Civic Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

C.    The Prosecutor Engaged in Misconduct by Making a Knowingly
False Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

D.    The Prosecutor Engaged in Misconduct by Repeatedly Making
Improper Biblical References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

E.    The Prosecutor Engaged in Misconduct by Improperly Injecting
Personal Information about Herself as Part of the Jury's Deliberations
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

F.    The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois
as a "Dog" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

G.    The Prosecutor Engaged in Misconduct by Improperly Disparaging
Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

H.    The Prosecutor Engaged in Misconduct by Making a Knowingly
False Argument Regarding Government Witness Orlando Campos . . . . . . . . . 118

I.    The Prosecutor Engaged in Misconduct by Improperly Disparaging
and Diminishing the Jury's Consideration of Petitioner's Proffered
Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

J.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

USCA5 343

Claim X.       Trial Counsel Was Ineffective for Failing to Rebut the Evidence of
               Petitioner's Indifferent Demeanor at the Guilt Stage of Trial with
               Mental Health Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Claim XI.       Petitioner Was Denied His Sixth Amendment Right to a Trial and to
               Counsel When the Government's Mental Health Expert Relied Upon
               his Interactions with Defense Counsel During the Trial to Formulate
               Adverse Opinions About Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Claim XII.     Appellate Counsel Were Ineffective in Various Respects . . . . . . . . . . . . . . . . . 123

     A.        This Court Improperly Admitted Inflammatory and Prejudicial
               Photographs During Both the Guilt/Innocence and the Penalty Stages
               of Trial.  Direct Appeal Counsel Ineffectively Failed to Raise this
               Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

     B.        Petitioner's Eighth Amendment Right to Individualized Sentencing
               Was Violated When Testimony Was Elicited That Compared His
               Background to the Psycho-social Histories of Others Who Have Been
               Sentenced to Death. Counsel Was Ineffective for Failing to Properly
               State the Objection at Trial, and for Failing to Raise this Claim on
               Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

     C.        Counsel Ineffective Failed to Raise All Record Based Errors, Even if
               they Were not the Subject of a Proper Objection or Where Otherwise
               Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Claim XIII.    Petitioner is Entitled to Relief Based Upon the Cummulative Impact
               of the Constitutional Violations Described Herein . . . . . . . . . . . . . . . . . . . . . . 127

Claim XIV.     Petitioner is Entitled to an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . 127

Claim XV.      The Manner in Which the Government Would Carry Out Petitioner's
               Execution Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . 128

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

USCA5 344

## JURISDICTION

1.      This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241.

## PROCEDURAL HISTORY

2.      Petitioner was charged in the United States District Court, Southern District of Texas, Corpus Christi, with the June 27-28, 2002 beating death of his infant daughter, JG-1999.

3.      Following a jury trial before the Honorable Janis Graham Jack (U.S.D.J.) on March 16, 2004 he was convicted of one count of first-degree premeditated murder (18 U.S.C.A. § 1111(a)).  Following a sentencing hearing, the jury returned a verdict of death on March 24, 2004 and he was  formally sentenced to death by this Court on the same date.[1]

4.      Petitioner filed a direct appeal to the United States Court of Appeals for the Fifth Circuit.  On August 25, 2005 the Court affirmed Petitioner's conviction and sentence in all respects. Bourgeois.

5.      A timely *Petition for a Writ of Certiorari* was filed in the United States Supreme Court on January 9, 2006.  Alfred Bourgeois v. United States, 05-8651.

6.      The *Petition* was denied on May 15, 2006.  Bourgeois v. United States, 126 S.Ct. 2020 (2006).

7.      Petitioner was initially represented by the Federal Public Defender for the Southern District of Texas.  The Public Defender was removed owing to a conflict of interest.  Subsequently, and throughout the trial, Petitioner was represented by appointed counsel, John  S. Gilmore, Jr., Esq.

---

[1]Due to a procedural irregularity that is immaterial to any claim made herein, Petitioner's sentence was vacated and reimposed on March 25, 2004.

USCA5 345

and Joel Douglas Tinker, Esq.  The Government was represented throughout the trial proceedings by Patti Hubert Booth, Esq., Elsa Salinas-Patterson, Esq. and Tony Roberts, Esq.

8.    Petitioner was represented on direct appeal by Mr. Gilmore and Mr. Tinker.  The Government was represented by Mr. Roberts and James Lee Turner, Esq.

9.    Petitioner was represented on certiorari proceedings by Adrienne Urrutia Wisenberg, Esq. and Keith Hampton, Esq. and the Government was represented by the Office of the Solicitor General, Robert J. Erickson, Esq., Deputy Solicitor General.

10.    Petitioner was initially represented in these proceedings by Mr. Hampton and Michael Gross, Esq.

11.    On October 16, 2006, this Court granted Mr. Bourgeois' Motion and appointed undersigned counsel Abreu and Wiseman, and relieved Mr. Gross and Mr. Hampton (document # 380).[2]

12.    Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #98911-079).

## GROUNDS FOR RELIEF

13.    Petitioner herein alleges that his conviction and death sentence were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.  These violations relate to ineffective assistance of counsel,  due process of law, and Petitioner's right to be free of cruel and unusual punishment.  Additionally, his judgment of conviction and sentence must be vacated in view of the newly discovered evidence discussed herein.

---

[2]Wiseman and Abreu have been assisted in preparing this *Petition* by their colleagues in the Capital Habeas Unit, James McHugh, Esq. and Elizabeth Larin, Esq.

2

USCA5 346

14.     Petitioner moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Petitioner's claims are not cognizable under section 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241,which is an instrument for relief as to any claim for which section 2255 is not an effective or adequate mechanism to test the legality of his detention and sentence.

CLAIMS FOR RELIEF

**CLAIM I.     PETITIONER IS A PERSON WITH MENTAL RETARDATION. ACCORDINGLY, HIS EXECUTION IS PROHIBITED BY THE EIGHTH AMENDMENT. TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT THIS CLAIM TO THE COURT.**

15.     Alfred Bourgeois is a person with mental retardation. Accordingly, his execution is prohibited by the Eighth Amendment to the United States Constitution and by the FDPA. His deficits in intellectual functioning are apparent and have been apparent his entire life. Prior counsel were ineffective for failing to bring Petitioner's deficiency to the attention of the Court and jury.

16.     Mental retardation is characterized by: a) significantly subaverage intellectual functioning; b) significantly subaverage adaptive functioning; and c) onset of these limitations before age 18. Mr. Bourgeois meets all three of these criteria. As demonstrated below, the evidence establishes Mr. Bourgeois' mental retardation under any constitutionally acceptable burden and under any professionally acceptable definition.

17.     Mr. Bourgeois' mental retardation disqualifies him from his sentence of death. In support of this claim, Petitioner alleges the following facts, in addition to those that will be presented at an evidentiary hearing.

3

USCA5 347

A. **Mental Health Evaluations Demonstrating Petitioner's Mental Retardation.**

6. Petitioner's IQ has been tested on two occasions. In both cases, Petitioner's intellectual capacity tests in the mental retardation range.

7. All accepted definitions of mental retardation require "significantly subaverage intellectual functioning." American Association on Mental Retardation (AAMR), *Mental Retardation: Definition, Classification, and Systems of Supports,* at 51 (10th ed. 2002) (hereafter *AAMR's Mental Retardation*).[3] This criteria is measured by the administration of appropriate intelligence tests by qualified professionals. In order to meet the requirements for a diagnosis of mental retardation, an individual's intellectual functioning as recorded through an appropriate instrument must be "approximately two standard deviations below the mean, considering the SEM [standard error of measurement] for the specific assessment instruments used and the instruments' strengths and limitations." The AAMR and the United States Supreme Court conclude that this measure is approximately 70 to 75 or below. *AAMR's Mental Retardation*, at 58-59; accord Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002) ("IQ between 70 and 75 or lower, ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition") (citing B. Sadock & V. Sadock, Comprehensive Textbook of Psychiatry 2952 (7th ed. 2000)); American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 41-42 (4th ed. text rev. 2000) (hereafter "DSM-IV-TR").

8. One week prior to trial, on February 28, 2004, Petitioner was evaluated by Dr. Donald

---

[3] The *AAMR's Mental Retardation* defines "mental retardation" as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." See *AAMR's Mental Retardation* at 1.

4

USCA5 348

E. Weiner, a neuropsychologist who practices in Corpus Christi.  Petitioner obtained a full-scale IQ

of 76 with a Verbal score of 76 and Performance score of 76 on this administration of the WAIS-R.[4]

See Dr. Weiner's Report of March 3, 2004, attached to his current Declaration, and WAIS score

sheet, *PA* documents # 16 & 15, respectively.

9.      Similarly, in preparation for the instant Petition, Dr. Michael Gelbort recently

conducted extensive psychological and neuropsychological testing that yielded even further evidence

demonstrating Petitioner's mental retardation, including an IQ of 70 (Verbal 67 and Performance 78)

on the WAIS-III, which is the current version of the test given by Dr. Weiner.

10.      Although Mr. Bourgeois' results on Dr. Weiner's test administration put him in the

range of Mental Retardation, this score overestimates his actual IQ.  Dr. Weiner used the WAIS-R

in assessing Mr. Bourgeois' intelligence, despite the availability of the re-normed and updated

WAIS-III.[5]  The WAIS-R was normed in 1978.[6]  Because the WAIS-R was normed 26 years prior

to its administration to Mr. Bourgeois, Dr. Weiner's evaluation must be adjusted to take into account

---

[4]Dr. Weiner's March 3, 2004 report states that Mr. Bourgeois' IQ tested at a 76.  However, a review of his raw data reveals that he actually recorded the IQ as a 75, but apparently made an error in transferring the score to his report.  Whether Mr. Bourgeois' IQ actually should be reflected as a 75 or a 76 is actually not important in this case, as Dr. Weiner's scores must only be considered after making a  downward adjustment to compensate for the phenomenon of "IQ gains over time" (discussed below). Either result properly reflects Mr. Bourgeois' significantly subaverage intellectual functioning.

[5]The fact that the WAIS-R had been replaced by the WAIS-III at the time of its administration in this case, does not make it invalid.  Rather, the testing was valid but the scoring should have been modified in accordance with the Flynn Effect, described below.

[6]Norming is a statistical term to describe how the creators of a given test are able to assign percentile ranks to given scores.

USCA5 349

the fact that the population as a whole experiences gains in IQ testing over time.[7]

11.     When Dr. Weiner's scores are adjusted to correct for the IQ gains over time, Mr. Bourgeois' IQ is more accurately reflected by the score of 68.[8]  This result is both congruent with and corroborative of the results of Dr. Gelbort's testing.

12.     Other aspects of Mr. Bourgeois' neuropsychological testing further support a diagnosis of mental retardation.  Both Dr. Gelbort and Dr. Weiner note that Mr. Bourgeois' ability to process new information and comprehend new topics is significantly impaired. Testing of his memory shows mild to moderate impairment. Results on the Halstead-Reitan test battery reveal overall brain impairment.  These results are consistent with mental retardation in that they confirm Mr. Bourgeois' impaired ability to comprehend and process information.  See Declaration of Dr. Gelbort, *PA*, document # 8, and Declaration of Dr. Weiner, *PA*, document # 16.

13.     Jethro Toomer, Ph.D., has had the opportunity to review the available reports by family members, friends and neighbors regarding Mr. Bourgeois' adaptive functioning and behavior. He has also reviewed the results of the neuropsychological testing.  As a result, Dr. Toomer believes

---

[7]The phenomenon of gains in IQ scores over time was first discovered and reported by Dr. James R. Flynn.  For this reason, this phenomenon is also known as the "Flynn Effect."  Put simply, the intellectual functioning of the entire nation drifts upward over time.  As a result, IQ test scores rise over time.  In order to accurately reflect the test scores in comparison to the entire population, and to maintain a score of 100 as the mean score, all IQ scores must be adjusted 0.3 points downward for every year that has passed since the test was first "normed."  See "Tethering the Elephant," J. of Psychology, Public Policy and Law, 2006, Vol. 12, No. 2, 170-189; see also Declarations of Jethro Toomer, Ph.D., *PA*, document # 14; Michael M. Gelbort, Ph.D., *PA*, document # 8; and Mark D. Cunningham, Ph.D., *PA*, document # 6.

[8]According to Dr. Gelbort, "The 76 score must be reduced by application of the Flynn effect formula (whereby 0.3 is deducted for each year between the time that the test was normed and the date of administration).  In this instance, the WAIS-R was normed in 1978 and it was administered in 2004.  Therefore, a deduction of 7.8 is required (26 years x .3 per year = 7.8).  Therefore, the 76 is really a 68."  See Gelbort's declaration at ¶ 5.

USCA5 350

Mr. Bourgeois is mentally retarded:

> A diagnosis of mental retardation can be made when an individual has substandard IQ testing (which Mr. Bourgeois has) that is accompanied by significant limitations in adaptive functioning. Mr. Bourgeois meets the adaptive deficit criteria. Background information that has been provided to me indicates that Mr Bourgeois has deficient functioning in all three realms of adaptive behavior: conceptual, social, and practical.

See Declaration of Dr. Toomer, ¶10, *PA*, document # 14.

14.    Mental health experts, then, agree that Alfred Bourgeois tests in the Mental Retardation range of intellectual functioning. Dr. Toomer has reviewed the available evidence and concludes that Mr. Bourgeois is in fact mentally retarded, due to both his subaverage intellectual functioning and his poor adaptive functioning.

### B.    Mr. Bourgeois' Adaptive Functioning Is Significantly Impaired and His Mental Retardation Was Manifest Prior to Age 18.

15.    Evidence of Mr. Bourgeois' retardation has existed since his early childhood. Interviews of people who have known Mr. Bourgeois since childhood reveal that, throughout his youth and into adulthood, Mr. Bourgeois exhibited intellectual and adaptive impairments that affected all facets of his life. He was intellectually impaired and exhibited significant deficits in all three realms of adaptive functioning: conceptual, social and practical. Mr. Bourgeois' mental retardation has been palpable from his childhood years and has remained consistently evident throughout his life.

### i.    Defining "Adaptive Functioning"

16.    The critical components of mental retardation in all recognized definitions involve intellectual deficits combined with adaptive impairments which manifest during the development period. "Adaptive behavior is the collection of conceptual, social, and practical skills that have been

7

USCA5 351

learned by people in order to function in their everyday lives." *AAMR's Mental Retardation*, at 73.

The definition contained in the DSM-IV-TR, elaborates:

> Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

DSM-IV-TR at 42.

17.    "People with mental retardation achieve cognitive milestones at a later age than their normally developing peers, and they are unlikely to ever reach the intellectual level of typical adults."  Elaine E. Castles, We're People First: The Social and Emotional Lives of Individuals with Mental Retardation, p. 26 (1996).  These cognitive delays also directly affect social, emotional, and life-skills development.  Id. p. 27-28.  "[A]lthough people with mental retardation must cope with many of the same issues faced by their chronological age-mates, they often have limited cognitive and social resources for confronting these normal development tasks."  Id., p. 35-36.

18.    Skills included in the conceptual realm are: language; reading and writing; money concepts; and self-direction.  Individuals with significant problems in communication, academics, or handling money, in other words, have deficiencies in their conceptual abilities.  *AAMR's Mental Retardation*, at 82.  The social realm encompasses skills and characteristics like: interpersonal; responsibility; self-esteem; gullibility; naiveté; following rules; obeying laws; and avoiding victimization. For example, individuals for whom self-awareness, social relationships, and comprehending and following rules are a serious struggle have deficits in the social facet of adaptive functioning.  Id.  The practical realm refers to skills such as: activities of daily living; instrumental activities of daily living; occupational skills; and maintaining safe environments.  Individuals with

8

difficulty in self-care, job skills, and making safe decisions have deficiencies in the practical aspects of adaptive functioning.  Id.

19.    Assessment of adaptive deficits typically comes from interviews with third party reporters familiar with the individual being assessed, rather than from the individual's own self-reports.  *AAMR's Mental Retardation* at 85.  The AAMR cautions against relying solely on reports of the individual being assessed in order to determine adaptive behavior limitations, as mentally retarded individuals are poor sources of information.  A User's Guide for AAMR's 2002 Definition, Classification, and Systems of Supports: Applications for Clinicians, Educators, Disability Program Mangers, and Policy Makers (2006), at 30 (hereinafter *AAMR User's Guide*).

### ii.    Lay Evidence Demonstrating Mental Retardation.

20.    Witnesses who have known Petitioner throughout his life describe intellectual and adaptive impairments demonstrating mental retardation.

21.    Even as a small child, Alfred exhibited symptomotology consistent with mental retardation.  Family members recall that Alfred was slow to learn and comprehend concepts as a child. He had trouble understanding and following directions.  See Petitioner's Declaration of Michelle Warren, *PA*, document # 39, ¶ 5 ("Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do."); Id. ¶ 6 ("Alfred would have trouble listening to directions, so he would mess up more than the rest of us [his siblings] and get beatings more often."); Declaration of Lloyd Ferdinand, *PA*, document # 25, ¶ 8 ("Alfred was always slow.")

22.    Alfred's neighbor Beverly Frank describes Alfred as a child who could not "catch on to things" and "who had to have the rules explained to him over and over again.":

Growing up, Alfred wasn't a bright child.  His grasp of learning was weaker than the

9

rest of the children.  People would notice this in conversations with him, in little things he would say.  Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

My grandmother used to sell things out of her house, including candy and frozen treats.  Alfred tried to help her make change.  He had a lot of trouble counting the change.  My grandmother ended up doing that herself.  My grandmother had a lot of patience with Alfred.  She tried to teach him to cook simple things, like frying an egg or frying toast.  He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up.  She was really patient with him.

Declaration of Beverly Frank, *PA*, document #26,  ¶¶ 7-8

23.     His sister Claudia Williams recalls that Alfred "couldn't learn," no matter that his

slowness would get him a beating:

[Alfred] didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble.  He would get beat for the same thing over and over like he just couldn't learn.  Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Declaration of Claudia Williams, *PA*, document # 40, ¶ 5

24.     These observations of Alfred's early childhood by neighbors and family members

indicate significant adaptive deficits in the practical and conceptual realms – he could not

comprehend instructions and new ideas, had difficulty learning simple cooking tasks, and had trouble

handling and understanding money.

25.     Childhood playmates recall Alfred Bourgeois' difficulties in the social and practical

realms.  His family and neighbors remember Alfred as a slow and awkward child who had difficulty

playing with the other children and "fitting in."  See Declaration of Lloyd Ferdinand, *PA*, document

# 25, ¶ 8 ("Alfred was always slow.  He had slow reactions."); Declaration of Louis Russell, Jr., *PA*,

document # 37, ¶ 3 ("Growing up Alfred had a hard time.  He was a big and awkward kid.  We

10

would all laugh at how he played sports.  He had big feet that he was always falling over.  Alfred always tried to fit in with other kids.  Alfred has always had an awkward nature."); Declaration of Nathaniel Banks, *PA*, document # 18, ¶ 3 ("Alfred was a fragile child.  He spent a lot of time by himself.  People used to pick on Alfred a lot... I just remember Alfred crying at anything.  Someone would tease him and he would break down crying. ... Alfred wasn't any good at sports.  He didn't play sports with us.").

26.     Witness reports of crying inappropriately and uncontrollable behavior are evidence of adaptive impairments consistent with mental retardation.  See Castles, We're People First, supra at 87 ("[c]ognitive disabilities may [] affect an individual's ability to cope with emotional discomfort and stressful interpersonal situations").  In addition, Mr. Bourgeois' early childhood experience of enduring constant teasing about his impairments laid the foundation for his future life of lying and masking to hide his deficiencies.

27.     Thus, consistent with the expert evidence proffered by Petitioner, the lay witness testimony provides significant and compelling evidence of the requisite intellectual and adaptive impairments characteristic of mental retardation and clearly demonstrates that those impairments existed long before Petitioner reached 18 years of age.

28.     Alfred Bourgeois' intellectual and adaptive deficits persisted through adulthood. Mr. Bourgeois' ability to competently function in the world was significantly hampered by his difficulties in all three realms of adaptive functioning as identified by the AAMR.  Multiple witnesses report Mr. Bourgeois' inability to understand and handle money.  In addition, his ability to interact appropriately with others, respond to social cues, and process new information was significantly impaired.  Mr Bourgeois also demonstrates difficulties in understanding and following rules and

11

laws, including safety rules attached to his job as a truck driver.

29.    Witnesses report that Alfred has significant problems comprehending and problem solving.  See Declaration of Michelle Armont, *PA*, document # 17, ¶ 8 ("[Alfred] did not have the ability to think of different ways to solve problems with his wives and girlfriends.  His mind just did not work that way.  He could not reason through a problem."); Id. ("Things that would be obvious to a normal person were not obvious to Alfred."); Declaration of Michelle Warren, *PA*, document # 39, ¶ 16("It was like [Alfred] had a block and could not reason things out or change his behavior."); Declaration of Lawanda Cook, *PA*, document # 22, ¶ 4 ("I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him."); Declaration of Ivy Thomas, *PA*, document # 38, ¶ 4 (Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.").

30.    Mr.  Bourgeois' decreased ability to comprehend and problem solve meant that he was destined to repeat mistakes and was unable to learn from his actions.  In the words of his half-sister, Michelle Armont, "Alfred could not consider the consequences of his actions."  Declaration of Michelle Armont,  ¶ 8.  See also Declaration of Lloyd Ferdinand, ¶ 2 ("Alfred has always had a hard time with life. He has tried to do many things, but everything he tried seemed to fail.")

31.    Several reporters recall Alfred's terribly impaired financial abilities. See Declaration of Michelle Armont ¶ 8 ("[Alfred] did not understand that he could not afford the things he bought... He just bought things without understanding how hard it would be to make the payments."); Declaration of Lloyd Ferdinand,  ¶ 8 ("[Alfred] would buy cars he could not afford.  He would buy

12

cars for other people that he could not afford to pay for.  I helped him with car notes sometimes.  I would try and help him but sometimes he got himself in so deep that it was impossible to get him out of the mess he had made."); Id. ("One time [Alfred] signed an agreement with a trucking company that resulted in him working for them and making money for them but not getting paid himself for months.  When I looked at the agreement I could tell right off that it was a bad deal for him and I don't even read that well.").

32.     Mr. Bourgeois' deficiencies in social functioning are patent.  His inability to control his impulses, problem-solve, and predict the consequences of his actions is demonstrated by his constant philandering and impulsive extra-marital forays with women.  Alfred was notorious for his inability to control both his passion and his rage around women.  He was unable to maintain a healthy intimate relationship.  Declaration of Lloyd Ferdinand,  ¶ 2 ("He was never able to maintain healthy relationships with women.  His marriages always failed."); See also Declaration of Kathleen Kaib, *PA*, document # 12, ¶ 4 ("Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.").

33.     Mr. Bourgeois' limitations in practical functioning likewise followed him into adulthood. Family members and neighbors recall that as a teenager, Alfred drove a four-wheeler "straight into a pole."  Declaration of Louis Russell, Jr., ¶ 4.  See also Declaration of Claudia Williams, ¶ 6.  Alfred's oblivious attitude towards safety was obvious even to more recent acquaintances.  For example, Lawanda Cook remembers Alfred taking "crazy chances in the truck he drove...one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me then he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all."  Declaration of

13

Lawanda Cook, ¶ 3.

34.     Like many individuals with mental retardation, Mr. Bourgeois tried hard to "mask" his deficits. These efforts were obvious to observers. As his brother Lloyd explains, "He tried hard to make it look like he was a success." Declaration of Lloyd Ferdinand, ¶ 8. Mr. Bourgeois was would lie to cover up his limitations; he didn't want to be revealed as slow or stupid. See Declaration of Michelle Armont ¶8 ("Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him."). Aunt Elnora Bourgeois McGuffy recalls:

> Alfred was not as smart as [his brother] Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never know how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that [sic] he was more successful than he was and smarter than he was.

Declaration of Elnora Bourgeois McGuffy, *PA*, document #33, ¶ 7. Nathaniel Banks confirms:

> Alfred wanted to impress people. Alfred lied a lot. I remember that Alfred would say things that you just knew weren't true. I used to work for the sheriff's office. Alfred told people he worked there. He was never a proper deputy. Alfred tried to build himself up – present himself as more than he was. I think Alfred lied so much he started to believe it.

Declaration of Nathaniel Banks, ¶ 4.

35.     These efforts to "mask" his deficits are a trademark characteristic of mental retardation. Individuals with mental retardation are known to try to hide their deficiencies rather than ask for help. This is in part a symptom of impaired problem solving skills. However, it also results from a history of teasing and maltreatment caused by their impairments. Mentally retarded individuals "are more likely to attempt to look more competent and 'normal' than they actually are," a common phenomena with the mildly mentally retarded which is often referred to as "masking" or

14

USCA5 358

the "cloak of competence."  AAMR, User's Guide, supra, at 30.  See also The Cloak of Competence,

by Robert B. Edgerton (revised & updated ed.) (Univ. of CA Press 1993).

36.     As the above-described witness evidence demonstrates, Petitioner is mentally

retarded and the onset of his retardation occurred well before the age of 18.

### iii.     Documentary Evidence Corroborates Petitioner's Mental Retardation

37.     In addition to the expert evaluations and witness evidence, educational, employment

and court records further corroborate and demonstrate Petitioner's mental retardation.

38.     Mr. Bourgeois' Lutcher High School transcript reveals a child with low intelligence

who struggled in school.  He achieved poor grades across all subjects in high school, with a median

score of C to D.  In addition, he attended basic level classes.  For example, the highest level of math

studied was first year algebra.  This was only a half credit course taken in his 3rd year of high school,

and he obtained a D score.  See attached transcript, *PA*, document # 54.

39.     Due to Mr. Bourgeois' age, no records of elementary school are available. Likewise,

there is no record of his achievement on standardized testing.  Mr. Bourgeois was raised by a very

poor family in a small rural town in Louisiana.  There are no records that he was ever tested for

special education, or whether such services were even available.

40.     Records from Petitioner's interactions with employers and the court system as an

adult also provide indicia of  intellectual, emotional, and adaptive deficits.

41.     Mr. Bourgeois' job history corroborates his mental retardation. In 1985, Mr.

Bourgeois attempted to qualify for permanent employment with the St. John the Baptist Parish

Sheriff's Office, but was unable to pass the necessary examinations.  His training instructor, Lt.

David M. Wilson, described Mr. Bourgeois' difficulties with practical skills, noting that Mr.

15

Bourgeois was given two opportunities to pass the firearms test, and he participated in fifty-four hours of training in preparation for the test. In Lt. Wilson's view, Alfred's failure on the firearms test, and his "poor performance scholastically," made further training "unfruitful and unwarranted." See attached letter, *PA*, document # 55.

42. Mr. Bourgeois also underwent a psychological evaluation pursuant to his application to the St. John the Baptist Parish Sheriff's Office. The resulting report points to Mr. Bourgeois' mental retardation. Mr. Bourgeois reported at that time (1985) that he had to repeat a grade in school. The examiner noted that Mr. Bourgeois had problems in evaluating his self-worth and had low self esteem, consistent with deficiencies in social adaptive functioning. See attached 1985 psychological evaluation, *PA*, document # 56.

43. Mr. Bourgeois had several legal difficulties that demonstrate his adaptive deficits. For example, Mr. Bourgeois was sued for failing to comply with the terms of a lease he had made with the Ford Motor Credit Company. In an illustration of his inability to understand his finances, Mr. Bourgeois agreed to lease a $40,000 Ford Explorer. In addition to the price tag being well beyond his means (as evidenced by his default on the agreement and ensuing law suit), the lease agreement shows that he agreed to put down over $9,000 **on a lease**, and with his monthly payments, he would have paid a total of over $26,000 only to return the vehicle after three years. Similarly, in 2002, the State of Louisiana enacted a lien on Mr. Bourgeois for nonpayment of his 2000 taxes. See attached lease agreement and law suit, *PA*, document # 59.

44. These records provide compelling evidence of Petitioner's adaptive and intellectual deficits and that these deficits had manifested in childhood and continued through the present, including the time of Petitioner's offense, arrest, and trial in this case.

16

**C.     Counsels' Ineffective Failure to Present Petitioner's Mental Retardation to the Court and Jury.**

45.     At the time of Petitioner's trial, the law was clear that a person with mental retardation was not eligible for the death penalty.  This prohibition was contained in the Federal Death Penalty Act and in Supreme Court case law.  Counsel should have been alert to the significance of Dr. Weiner's testing.  Such alertness would have caused counsel to explore this issue, and to present it to the Court and, if need be, the jury.[9]

46.     Moreover, had counsel been alert to this issue, and had it been determined that Petitioner was not mentally retarded, his status as a person in the borderline of mental retardation would have constituted significant mitigation evidence.   This point is discussed in Claim II, below.

**D.     Even if Counsel is Found to not Have Been Ineffective, the Eighth Amendment Prohibition Against Executing Petitioner Cannot be Waived.**

47.     Petitioner appreciates that this is a legal issue, but he wishes to preserve for future briefing in this Court his contention that Petitioner's status as a person with mental retardation cannot be waived.  Even if this Court finds that trial counsel were not ineffective, his ability to prove mental retardation in these post-convictions proceedings would preclude his execution even if the issue was waived by trial counsel.

---

[9]In a pre-trial appearance before the Court to discuss juror questionnaires, defense counsel inexplicably agreed with the Government that the Court could delete questions regarding mental retardation or learning disability because "they don't have anything to do with this case" PTT 1/16/04, 7.  Notably, this concession was made two months before Dr. Weiner's testing was completed.

17

USCA5 361

**CLAIM II.**     **COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE.**

> *I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. I do not come to this conclusion lightly. But, he was presented only as an unrepentant and evil man. While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions. Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.*

Declaration of Government and Court expert witness Carlos R. Estrada, M.D., dated May 14, 2007 (copy contained in *PA*, document # 7), at ¶ 18.

### A.     Introduction.

48.     As the above excerpt from the recent declaration of Dr. Estrada shows, the jury in this case was not provided with the true, accurate and available mitigating evidence regarding Mr. Bourgeois' mental health. Dr. Estrada's views in this regard should be accorded great weight. After all, he was the Government's expert, and for at least some of the proceedings, he functioned as the Court's expert (i.e., for competency to proceed and sanity), and therefore there can be no challenge to his bias or his credibility.

49.     As set forth in the remainder of Dr. Estrada's declaration, and in the remaining mental health evidence discussed below, Mr. Bourgeois' "mental health profile" shows him to be a highly disturbed and impaired individual. Although a smattering of evidence was presented to the jury showing that Mr. Bourgeois was abused as a child (evidence that was disputed by the Government), the overwhelming bulk of the abuse evidence was not presented. The jury never heard first hand and detailed accounts of how young Alfred Bourgeois was subjected to merciless, chronic and long-standing physical abuse. The jury never heard how he was subjected to sexual abuse. And, perhaps more importantly, the jury was never provided with any mental health testimony about how such

18

abuse caused psychological damage to Mr. Bourgeois as he grew into adulthood and governed his adult behavior. This unpresented evidence is discussed below.

50.     In addition to not having heard about how the type of abuse suffered by Mr. Bourgeois can damage an individual, the jury similarly did not hear about the actual mental health conditions from which he suffers. Petitioner herein presents the near-unanimous mental health opinions of a number of experienced and skilled forensic evaluators (including Dr. Estrada) who believe that the offense in this case was a direct product of Petitioner's Borderline Personality Disorder, which, as the experts opine, can cause psychotic breaks when the individual experiences sufficient stressors, such as those experienced by Mr. Bourgeois in the weeks leading up to the death of his daughter.

51.     In addition to his impaired psychological makeup, the jury was also not presented with the available evidence showing that Mr. Bourgeois suffers from significant cognitive impairments (i.e., brain damage). Testing available at the time of trial conducted by Dr. Donald Weiner shows that Petitioner has at best an IQ that is in the range of borderline mental retardation. As discussed above in Claim I, Petitioner is mentally retarded and therefore may not be put to death consistent with the Eighth Amendment to the Constitution. However, should this Court find that Petitioner is not mentally retarded, there can be no question but that he is in the borderline range of mental retardation – itself a highly mitigating fact.

52.     In addition to this low IQ, Petitioner also suffers from organic brain deficits that impact upon his ability to control his impulses and engage in executive decision making. Dr. Weiner said so at the time of trial, he repeats his opinion now, and it is supported by the recent neuropsychological testing conducted by Dr. Michael Gelbort.

19

53.     This Court provided defense counsel with the tools to present all of the above

information to the jury.  Yet, for reasons that defy understanding, and in advocacy that fell far below

what is expected of counsel in capital sentencing, trial counsel ineffectively failed to present this

evidence.  As shown below, it was available and it was powerful.  It was the kind of mitigating

evidence that counsel is required to present, yet counsel, without sound tactic or strategy, failed to

present it.  Counsel were ineffective in violation of Petitioner's right to counsel secured by the Sixth

Amendment to the United States Constitution.

**B.      The Penalty Phase.**

**I.      Government Presentation.**

54.     The Government presented a parade of Petitioner's ex-wives, girlfriends,

acquaintances, children and jail-house informants to testify to his abusive and violent history.  This

cavalcade of aggravation went on for over two hundred transcript pages.  TT 3/22/04, 25-250; TT

3/23/04, 81-87.

55.     The Government capped its presentation with Dr. Carlos R. Estrada.  He was

accepted as a Government expert in psychiatry.  TT 3/22/04, 269.  He told the jury that he had

observed the entire trial, had observed Mr. Bourgeois throughout, and had conducted an evaluation

of him.  Id., at 252, 272.

56.     Dr. Estrada conducted a risk assessment in an attempt to gauge whether Petitioner

would pose a risk of future violence.  Id., at 278-286.  He opined that Petitioner "has a much higher

tendency toward violence than an ordinary person."  Id., at 285.  He stated:

> [H]e meets a number of specific items that have been found associated with violence,
> and they include items in his background that we found, sadly enough, repeatedly
> occurring in children, and then leading to violence as adults.  Particularly, **we've**

USCA5 364

**found that being a subject of rejection, neglect, and abandonment, being the survivor of actual physical or sexual or emotional abuse have a very high predisposition for violence as adults**.

Id., at 281.  He further opined, using slang, that Petitioner was a "rageaholic," i.e., a person who would be enraged at "minor provocations" or who would have difficulty controlling his impulses. Id., at 283.  He was not asked why this was so, even though the Eighth Amendment requires an answer to that question.

57.    Dr. Estrada went on to diagnose Petitioner as having a Narcissistic Personality Disorder, which is present in "an individual whose basic motivation in life is the aggrandizing of his self-esteem."  Id., at 284.

58.    Following an overnight continuance, defense counsel was afforded an opportunity to cross examine Dr. Estrada.  Prior to the commencement of the cross examination, counsel told the Court:

> It's my attitude, and not necessarily the rest of our group, that we're going to rest depending on how Dr. Estrada goes when – when we question him. . . that's not the consensus, particularly of Dr. Cunnigham, and it's – and it's I don't think maybe of John [Gilmore] or Mr. Bourgeois. . . I met with Dr. Cunningham last night and kind of hinted around, and or course that's what he does and so he wants to do it.

TT 3/23/04, 4-5.  This Court, of course not knowing the background regarding counsels' nascent decision not to call Dr. Cunningham, appropriately observed: "you have to evaluate the pros and cons" of calling Dr. Cunningham.  Id., at 5.  As the following discussion shows, there were no "pros and cons" to evaluate and the "decision" not to call Dr. Cunningham was uninformed and in the context of this case, disastrous.

59.    Counsel started out his cross examination well enough.  He elicited from Dr. Estrada that Mr. Bourgeois was not completely truthful in his responses during his evaluation regarding

21

USCA5 365

whether he was abused as a child,  TT 3/23/04, 17, 22, which, he explained is not unusual for a

victim of abuse.  Id., at 23.  He then elicited from Dr. Estrada that Petitioner suffered childhood

abuse, neglect and rejection.  Id., at 23-24.

60.     The Government then objected, seeking clarification as to the sources of Dr. Estrada's

information regarding Petitioner's abuse.  Id., at 25.  When Dr. Estrada indicated that he was relying

on information obtained by Dr. Cunningham and Dr. Weiner, the Court conducted a side bar

conference and an examination of Dr. Estrada outside the jury's presence.  Id., at 25-31.  The Court

explained to Dr. Estrada that: "what's come up . . . is that no witness here has testified that Mr.

Bourgeois was sexually – physically abused or neglected in any way, so we want to know where –

where you got that information exactly, and where you got Dr. Cunningham's information."  Id., at

27-28.  When Dr. Estrada began to respond that he had heard some witnesses discussing these topics,

the Court emphatically and accurately corrected him: "No. You didn't hear that – you didn't hear that

here" Id., at 28-29.  When Dr. Estrada indicated that he may have read it in Dr. Weiner's report, the

Court correctly pointed out that Dr. Weiner and his report had been "excluded for all purposes" Id.,

at 29.[10]  After further discussion, defense counsel advised the Court that "None of my questions will

be asking [Estrada] to discuss Dr. Cunningham or Dr. Weiner's reports."  Id. 31-32.  The Court

pointed out that there was no reason why Dr. Estrada could not at that point refer to Dr.

---

[10]The record is not clear as to why counsel made a "decision" not to call Dr. Weiner.  In a
discussion conducted before the Court following the guilty verdict but prior to the start of the penalty
hearing, the Government asked to be provided with Dr. Weiner's test data.  The Court ordered that
it be turned over and scheduled a hearing to determine the nature of Dr. Weiner's testing.  The
hearing did not take place because counsel apparently decided not to call this witness.  Since counsel
did not turn over the test data, did not produce their witness at the hearing, and announced that they
would not be calling him, the Court excluded the witness and his report.  See generally TT 3/17/04,
24-49; TT 3/19/04, 14-16.

22

Cunningham's report (id., at 33), but counsel, perhaps thinking that he was not going to call him as a witness, did not further reference Cunningham through Estrada. When Dr. Estrada responded that he still thought he had heard about abuse from a witness, both the Court and Government quickly corrected him. Id., at 32 (Mr. Roberts: "There's nothing"; The Court: "There was nothing about his childhood at all from anybody.").

61.    Despite the Court and Government's recognition that there "was nothing" about childhood abuse before the jury, counsel ineffectively failed to move to strike Dr. Estrada's opinion regarding risk assessment, as it was based largely on Petitioner's status as a victim of abuse. TT 3/22/04, 281.

62.    Without any recourse to elicit through this witness that Petitioner was abused, counsel was left only asking whether "people who commit that kind of offense [referring to Petitioner's murder conviction] generally were abused themselves." TT 3/23/04, 35. See e.g. id., at 39 ("common profile of characteristics of abusive parents"); 47 ("the way we discipline our children is highly determined by the way we were disciplined ourselves when we were raised as children"); 48 (that Petitioner was harshly disciplined is "one of my impressions").

63.    Counsel also tried to challenge Dr. Estrada's conclusions about his risk assessment of Petitioner by noting that his history of violence was directed toward family members. Id., at 49-51. Dr. Estrada concluded that whether he would be violent in the future would depend greatly on the circumstances of his incarceration. Id., at 50-51 ("whether he would act or not on that violence depends on the circumstances that he would find himself in. And I cannot predict what circumstances he is going to find himself in. The prison circumstances vary very much from time to time and setting to setting, and I wouldn't be able to express a definite opinion one way or another

USCA5 367

without knowing those details.").

64.     On re-direct examination, the Government immediately challenged the basis for Dr. Estrada's impression that Petitioner had an abusive childhood.  The Government elicited that Petitioner had not made any prior report of his being abused; that he told Dr. Estrada that he was well cared for; and that his father was quite involved with his life (Id., at 54-7).  Moreover, the Government did not at any time concede that Petitioner had suffered from an abusive childhood. Rather it argued to the contrary.  See TT 3/24/04, 68 (Government arguing that there was no "direct evidence" produced that Petitioner was abused).

65.     In addition, the Government elicited that not every person who is the victim of abuse goes on to become an abuser.  Id., at 57.

66.     The Government elicited that sometimes prisoners escape from prison, that Petitioner could manipulate others while in prison and that he might view other prisoners as "family, and therefore more likely to abuse them."  Id., at 60-61.

**ii.     The Defense Case.**

67.     Following Dr. Estrada, the defense put on its penalty phase case, such as it was.  The case was notable for its brevity.  Michelle Armont testified on direct for just 8 transcript pages (TT 3/23/04, 94-102).  Two pages into her testimony she indicated that she knew Petitioner, who is her brother.  Id., at 96.  She described how she and Petitioner shared the same father, who had altogether fathered 22 children; how they came to have a relationship after finding out that they shared a father (id., at 97-98).  She provided no information about Petitioner's childhood abuse, but stated only that she was aware that Petitioner and his mother had a "conflict . . . they didn't have a good relationship."  Id., at 99.  Counsel then elicited that this witness had seen Petitioner get mad: "I've

24

seen him get mad . . . he has a temper . . . he gets red in his face.  Usually I can calm him down.  Id.,

at 100.  She related that  she had observed the same type of behaviors in her nephew with Attention

Deficit Disorder as she observed in Petitioner. Id., at 101.

68.    Ms. Armont was then cross-examined for about 10 pages regarding her knowledge

of how Petitioner was abusive and violent towards his wives, girlfriends and children.  Id., at 102-

111.  Clearly, the Government obtained more aggravating facts from this witness then the defense

obtained mitigating facts.

69.    The defense then called Carl Kevin Henry.  He testified for 5 pages (TT 3/23/04, 111-

116).  He is Petitioner's cousin (id., at 112).  They grew up together (id., at 113).  He observed the

"relationship" between Petitioner and his mother, which he described as not the "normal

mother/daughter relationship" [sic].  He pointed out that Petitioner suffered abuse at his mother's

hand and when asked to describe what he witnessed he could only relate that Petitioner's mother

"had a tendency" to clean his nose with her "long fingernails" which led to the development of a

"real bad sore."  Id., at 113-114.  He also described one instance in which his mother beat him with

an extension cord after he was caught stealing cucumbers from a neighbor's field, id., at 114, and

another where she hit him with the receiver from a phone, id., at 115.  The remainder of his direct

testimony discussed  how Petitioner came to live with the elderly neighbor, Miss Mary.

70.    Counsel was not aware that this witness had prior convictions involving dishonesty

and the Government fully exploited that in cross examination.  Id., at 117-120.

71.    The third and final defense witness was the Reverend Herman Clayton, Jr. who

provided 5 more pages of direct testimony (TT 3/23/04, 121-126).  He grew up with Petitioner, and

he was the grandson of Miss Mary, with whom Petitioner went to live (Id., at 122).  Based upon what

USCA5 369

he had learned from his grandmother, aunts and uncles, he testified that Petitioner was abused as a

child (Id., at 123).  He related that he never saw Petitioner's mother abuse him or any of her children,

but he had heard that she did from Petitioner and his siblings (id., at 125).

72.    On cross-examination, the Government elicited that Petitioner wanted to live with

Miss Mary and she provided him a "loving home." Id., at 126-27.  The Government then sought to

minimize the already sparse abuse-testimony by obtaining admissions from this witness that he two

had been "whipped" a "couple of times" as a child for things that he did not do (id., at 127-28).

73.    That was all there was.  Despite, as shown below, having at their disposal opinions

and lay witnesses who could have put Petitioner's violent background into a mitigating context,

counsel rested after putting on a mere **18 pages of direct testimony**.  The penalty phase was quite

literally an unmitigated disaster.

## C.    The Unpresented Mitigation.

### i.    Lay Witnesses.

74.    There was a mitigating story to tell about the life of Alfred Bourgeois through a large

number of lay witnesses.

75.    Petitioner was an out-of-wedlock child born to an overwhelmed mother.  As recalled

by Elnora Bourgeois McGuffey, Petitioner's maternal aunt:

> Eunice was married to a man named Lloyd Ferdinand and had three children by him.
> . . It seemed like she was happy, but Ferdinand ran around a lot with other women.
> Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she
> was never the same after they divorced.  It was like she had something on her mind
> all the time.
>
> After Eunice divorced from Ferdinand, she and her three children moved back into
> our parent's house on Bend Road in Paulina. She needed extra help with the kids and
> got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and

26

USCA5 370

while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

Declaration of **Elnora Bourgeois McGuffey**, ¶¶ 2-4 (contained in *PA*, document # 33); see also,

Declaration of **Claudia Williams** (Petitioner's sister) ¶ 3 (contained in *PA*, document # 40) "We lost

[brother] Clyde and then our brother Anthony took a lot of extra care due to his disabilities." );

Declaration of **Jersey Henry**, Petitioner's cousin, ¶ 3 (contained in *PA*, document # 28) "Eunice

seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like

she was always worried about something." Declaration of **Wilmer Bourgeois**, Petitioner's maternal

uncle,  ¶¶ 2, 3, 7, 8, 9 (contained in *PA*, document # 21) :

All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward, she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a

USCA5 371

rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

76.    Petitioner's mother took out her hard life and troubles on her children, with a special focus on Petitioner. There is no question she physically assaulted her children, but had a special fixation on Mr. Bourgeois. See Declaration of **Allen Henry**, Petitioner's cousin, ¶ 3, (contained in *PA*, document # 27): "Eunice used to be rough on Alfred. She used to chastise him more than other kids and used to beat him more than the others"; **Beverly Frank**, granddaughter of Miss Mary, ¶¶ 3-4 (contained in *PA*, document # 26):

> Alfred's mother treated him differently than her other children. She talked to Alfred differently and she treated him differently too. I saw her give her other children money and not give Alfred any money. I also saw her give cookies to her other children and not give Alfred any cookies.
>
> Eunice whipped all her children. She was a single parent for several years and she disciplined the children herself. Eunice would use a switch or anything else she could get her hands on to whip the children. I know she would whip the children so much that they would have welts on their body. I believe you should never whip a child that much.

**Claudia Williams** further recounts:

> Both those things [sic] [losing one child to drowning and having a second who was disabled]took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.
>
> Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.
>
> Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like

28

the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

Williams Declaration at ¶¶ 3-5.  See also Declaration of **Lloyd Ferdinand**, Petitioner's brother, ¶¶ 4-5 (contained in *PA*, document # 25): "Maybe it was because of who his father was, but our mother was more brutal to Alfred than the rest of us.  She gave all of us whippings but  Alfred got more whippings than the rest of us.  She would pick on Alfred more and grab the belt quicker for him.  She would beat him for the slightest thing or for no good reason.  Her beatings of Alfred got so bad that he went to live with a very old neighbor, Miss Mary."; **Isaac Bourgeois III**, Petitioner's cousin, at ¶ 3 (contained in *PA* at document # 19): "Eunice was so abusive to Alfred that he was sent to live with a neighbor"; **Jersey Henry** Declaration at ¶ 3 " Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it."; Declaration of **Murray Bourgeois**, Petitioner's cousin, ¶ 3 (contained in *PA*, document # 20) "Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred."; Declaration of **Wilmer Bourgeois**, ¶¶ 4-5:

> Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

> Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her

29

USCA5 373

that the boy should not be ripping and running with just anyone.

See, Declaration of **Yvonne Robinson Joseph**, Petitioner's cousin, at ¶ 3: " Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him 'little yellow bastard' and slap him for nothing."

77.    The abuse and family dysfunction took a toll on Petitioner as a child. Alfred Bourgeois was scape-goated as a child because of his status as an "outside child," his fair skin and lack of intellectual prowess, as the following declarations demonstrate:

> Our father is Alfred Sterling. Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers. Our father had many outside children. I am the oldest of them. We were not raised by our father and we were not treated the same as the children he had with his wife. The children by his wife basically look down on us and try to deny that we are even any relation to them. If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.
>
> Alfred and I both love our father but it is not a nurturing father-child relationship like children need. He did not acknowledge us until we were almost grown. He would say "its their momma's child". Our father's life has been full of lying, cheating and denial of his children. He did not pay child support for any of us but the youngest who is now about 13 years old. He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old. When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble. Being treated like that is hurtful to me and it was hurtful to Alfred.

Declaration of **Michelle Armont**, Petitioner's sister, ¶¶ 2-3 (contained in *PA*, document # 17). See also Declaration of **Michelle Warren**, Petitioner's sister, at ¶ 9 (contained in *PA*, document # 39): "Alfred did not play sports in school. He got teased a lot. Sometimes it was because of his looks. He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes". Alfred could not stand to be teased. He would get very mad when kids teased him." Declaration of

30

**Nathaniel Banks**, Petitioner's childhood friend and current juvenile probation officer, ¶ 3 (contained in *PA*, document # 18) "Alfred was a fragile child.  He spent a lot of time by himself.  People used to pick on Alfred a lot.  Children sometimes do that.  I just remember Alfred crying at anything.  Someone would tease him and he would break down crying.  People used to call him names – they called him "white punk".  Alfred has a real light complexion.  Kids used the word punk to mean that he was weak.  Alfred wasn't any good at sports.  He didn't play sports with us."; Declaration of **Lloyd Ferdinand**,¶ 6: "Things were no better at school.  The school was also rough, and Alfred got picked on and teased a lot because of his light complexion and green eyes.  They said he was a white boy with green eyes.  They beat him up and he was helpless.  Michael Clayton, one of Miss Mary's relatives, beat him up repeatedly.  Alfred was a coward and all he could do was cry when they picked on him.  My uncle told me that I should deal with it so I taught him how to fight back."  His cousin, **Murray Bourgeois** also observed the results of this abusive and dysfunctional life: "Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life." Murray Bourgeois Declaration at ¶ 5.

78.    This history of abuse also had an obvious emotional toll as Petitioner grew into adulthood:

> One Christmas when Alfred was an adult he got upset over something minor with our mother. He went into a rant about how unloved and mistreated he felt as a child.  He brought up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him.  We all tried to calm him down and told him to just let it go.  Our

31

USCA5 375

mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

Declaration of **Michelle Warren**, ¶ 15; Declaration of Alton Preston, Petitioner's friend (who has a Master's Degree in Divinity), at ¶ 2 (contained in *PA*, document # 34):

> Alfred talked to me about his childhood from time to time. Alfred told me that his mother, Miss Eunice Bourgeois, mistreated him. Alfred told me that his mother didn't treat him the same way she treated her other kids. Eunice saw Alfred as an unwelcome reminder of his father. Alfred said that Eunice used to whip him very badly. He told me she beat him for no reason and that it happened quite frequently. Alfred said that he received more whippings than any of his brothers or sisters. Alfred confided in me about his childhood before he was arrested in this case. We talked about this many years ago.

His girlfriend, Ivy Thomas, also tells of how Alfred's childhood haunted him in later years:

> Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood. He told me that his mother kept all his other siblings but gave him away. Alfred said that his mom treated him differently than all the other kids and it depressed him. His mom said he looked just like his father, and that is why she hated him so much. One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

> I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

Declaration of **Ivy Thomas**, Petitioner's one-time girl friend, at ¶¶ 7-8 (contained in *PA*, document # 38); see also Declaration of **Jersey Henry** at ¶ 6: "Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids."; Declaration of **Michelle Armont**, ¶¶ 2-3: " He had a strong bitterness toward his mother because she treated him

32

USCA5 376

so badly.  Some days he could not say her name.  Alfred had some serious problems.  Aside from being almost ignored by his father most of his life, he was abused by his mother.  She caused him so much pain that he was a damaged person because of the abuse he suffered.  It was hard for Alfred to talk about the abuse he went through.  Alfred had trouble trusting people."

79.    All of these witnesses whose declarations are cited or quoted were available to testify at trial.  Some were interviewed by the defense and/or Government and some were not.  Some testified for the Government and some for the defense.  Some were even summoned by the defense to Corpus Christi, and were present in the courthouse.  However, most were never called and the three who were did not provide the information described above.  All were available to speak with Dr. Cunningham.

### ii.    Expert Witnesses.

80.    Trial counsel had consulted with three expert witnesses related to Petitioner's mental health: Mark D. Cunningham, Ph.D; Donald E. Weiner, Ph.D; and George W. Holden, Ph.D.  As the record shows, none of these witnesses were called at the penalty hearing, yet each could have provided significant and non-cumulative mitigating evidence.

81.    Dr. Weiner was hired at the suggestion of both Dr. Cunningham and Dr. Estrada (see Declarations of Dr. Cunningham at ¶ 10 and Dr. Estrada at ¶ 17) because each perceived indications of potential brain damage in their evaluations of Petitioner.  Dr. Weiner conducted neuropsychological testing of Mr. Bourgeois, albeit on the eve of trial.  Nonetheless, his findings were important in two respects.  First, he found that Petitioner had an IQ of 75 or 76.[11]  This score

---

[11]His trial report (attached to his Declaration, *PA*, document # 16) indicates a 76, however, his score sheet from the IQ test shows a 75 (*PA*, document # 15).

USCA5 377

placed Petitioner in the borderline to mild mentally retarded range of intelligence. This is a mitigating fact, and if Petitioner is mentally retarded, he cannot be executed. See Claim I, above.

82.    Second, he found that Petitioner scored in the impaired range on neuropsychological test batteries, and in particular scored in the significantly impaired range in tests effecting his ability to control his impulses and to make decisions. These results are set forth in both Dr. Weiner's trial report, and in his recent post-conviction declaration. See *PA*, document # 16.

83.    Dr. Weiner's testing finds support in the testing recently conducted by Michael Gelbort, Ph.D. He is a psychologist who specializes in neuropsychological testing. His declaration points out that Dr. Weiner's testing shows both mental retardation and frontal lobe impairments:

> Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The 76 score must be reduced by application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration). In this instance, the WAIS-R was normed in 1978 and it was administered in 2004. Therefore, a deduction of 7.8 is required (26 years x .3 per year = 7.8). Therefore, the 76 is really a 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted score of 68 and the score of 70 on my testing.

> Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobes. This is most prominently evidenced by his very impaired performance on the Category Test. This test is one of the most sensitive to both whole brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

Declaration of Michael M. Gelbort, Ph.D. (contained in *PA*, document # 8), ¶¶ 5 & 7.

Dr. Gelbort also explains the behavioral impact of his testing:

> While our tests results are for all intents and purposes congruent, he [Dr. Weiner] concludes that Mr. Bourgeois' brain damage is localized in [the] posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming for argument's sake that Mr. Bourgeois has only damage

34

USCA5 378

to his posterior brain, there is still clearly an impact on his executive function. Such impact would be due to his brain's impaired ability to transfer information from the posterior to the frontal. Accordingly, where ever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension and Trails B, demonstrate that his executive function is impaired.

Executive functions act as the "brakes" for a person's actions. When there is impaired executive function, the individual acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one considers the abusive childhood that he experienced. The adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid with his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

Id., at ¶¶ 8-9.

84.    As this Court knows, counsel had arranged to have Dr. Mark Cunningham testify, but at the last minute, counsel decided not to call him. Yet, Dr. Cunningham could have provided the jury with critical information that was not presented through Dr. Estrada's testimony. Rather than guessing, assuming or having impressions about Mr. Bourgeois' life – as Dr. Estrada did – Dr. Cunningham was prepared to set forth a thoughtful, comprehensive and verified history demonstrating the most salient points about Petitioner's abusive background and how they mitigate. Dr. Cunningham arrived at his conclusions after evaluating Mr. Bourgeois, conducting interviews of 14 people familiar with his childhood and upbringing and reviewing scores more interviews conducted by others associated with the defense. He states:

Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred. Mr. Bourgeois was raised in an overwhelmed family system. His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age. Eunice had seven children by four different men. One son was profoundly mentally retarded and kept hidden in the home. One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

35

USCA5 379

The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment. Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support. Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock. Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois. The effective abandonment by both parents has a significant impact on early child development. The abandoned child is often unable to trust. The child may grow up with an intense fear of abandonment and be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life. People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age. For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses. Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention. This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother. More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois. Eunice treated Alfred as a scapegoat. Alfred was blamed when children were hurt in the playing field. He was beaten more frequently and more brutally than his siblings. She beat him with belts and extension cords. These beatings were described as routinely leaving welts and bruises. Eunice is also described as throwing shoes and other objects at him. Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

Eunice was also described as emotionally abusing Mr. Bourgeois. Eunice told Alfred that he "wasn't worth nothing." Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois. There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes. At age 7-8, Eunice sent Alfred to

USCA5 380

live with an elderly neighbor, Ms. Mary Clayton. He was as a result excluded from family outings and trips. After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle. This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

Cunningham Declaration at ¶¶ 18-23, (contained in *PA*, document # 6).

85.    Dr. Cunningham would have explained to the jury the uncontestable point – and one

that did not get made through the testimony of Dr. Estrada – that a history of abuse, such as that

suffered by Mr. Bourgeois, has a "profound impact" on behavior:

> As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor. While behavioral impacts can vary, all such victims suffer from psychological consequences. They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions. Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly. In Mr. Bourgeois' case the abuse was severe and long lasting. It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

Cunningham Declaration at ¶ 24.

86.    Dr. Cunningham could have explained to the jury how Mr. Bourgeois' behavior was

severely impacted by his low IQ and brain damage:

> Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76. Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an IQ score of 68. I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test). The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ score of 68 in 2004. Both of these scores are in the range of mild mental retardation.
>
> Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning. Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in

37

understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior. Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage. His siblings recalled that he had "rage attacks" even in his early childhood. These attacks worsened in his teenage years. Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged. They reported that he would often tremble when angry. The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation. He would often have to be physically restrained by others. After the attack, Mr. Bourgeois would appear exhausted. He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well. This includes marked changes in his demeanor, disproportionate responses, inability to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

Cunningham Declaration at ¶¶ 25, 27-29.

87.    As Dr. Cunningham further explains, the jury was already made aware of Mr. Bourgeois' explosive nature, and the Government tried to present this as simply the result of his being "an angry person" (TT 3/23/04, 54). In reality, Mr. Bourgeois' "anger" or rage, was the product of the volatile combination of his psychological scars and brain damage:

The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

38

> As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages.  It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter.  My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence.  This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors.  His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control.  By any measure, this is mitigating in the context of capital sentencing.
>
> Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts,  even though the abuse took place over days and weeks.  Due to his deficits, he has a low tolerance for frustration, which becomes even worse in stressful situations.  When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

Cunningham Declaration at ¶¶ 30-32.

88.     And, Dr. Cunningham was prepared to provide the jury with analytical tools to help them understand and apply the concepts about which he was prepared to speak, and to provide an overarching understanding about why this offense occurred:

> I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently.  I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury.  Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring.  He was able to maintain almost constant, if not steady, employment.  He did his best to provide for his children materially and sometimes even emotionally.  However, his background and psychological make-up always made him predisposed toward impulsivity and violence.  Generally speaking, he was able to keep the lid on the pot.  However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct.  These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children.  They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.
>
> At the time of the offense, there were many ingredients simmering in the pressure

39

USCA5 383

cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

Cunningham Declaration at ¶¶ 33-35.

89.    Dr. Cunningham would have also been able to rebut Dr. Estrada's risk assessment which Dr. Estrada admitted was uncertain because he did not know much about the circumstances under which Petitioner would be incarcerated (TT 3/23/04, 49-51).[12]  Dr. Cunningham, on the other hand, has studied this question, and was prepared to explain to the jury the likely circumstances under which Petitioner would be incarcerated and how these circumstances reduced the chance that he would commit future acts of violence:

I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison. In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence. My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department. The methodology and findings of my research are generally accepted by informed forensic psychologists.

Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his

---

[12]Dr. Estrada specifically noted that his risk assessment was dependent on a "long term prediction . . . which has a very low degree of certainty" because he did not know under what conditions Mr. Bourgeois would be incarcerated. TT 3/23/04, 50.

40

behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community.  Alfred is 39 years old. Research demonstrates better prison adjustment as inmates get older.  Rates of prison infractions are highest for inmates in their early 20's.  These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

 This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard, however, that despite this suspicion he at times shared a common day room with other inmates.  Significantly, Mr. Bourgeois had no disciplinary write-ups during that time.  Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison.  Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community.  He has generally been gainfully employed as an adult.  He is involved in an extensive family system.  He attended church.  He was an involved father.  He provided  financial support to his children.

My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors.  These studies  consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education.  The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction; loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of property; and administrative segregation (solitary confinement).  Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious

41

USCA5 385

violence is markedly diminished.

Cunningham Declaration at ¶¶ 36-41.

90.     When trial counsel alerted the Court that they were considering not calling Dr.
Cunningham this Court expressed an appreciation that counsel had to weigh the "pros and cons" of
doing so.  TT 3/23/04, 5.  After the decision was made, this Court expressed a view that counsel had
gotten a great deal of benefit from their cross examination of Dr. Estrada (TT 3/23/04, 76 ("I don't
think, Mr. Tinker, you could have hired a better witness for your defense than Dr. Estrada"); id., at
135 (noting that counsel "succeeded in getting not only Dr. Cunningham's report in, but Dr.
Weiner's")).  Petitioner respectfully submits that the facts show differently.

91.     Dr. Cunningham has opined that Dr. Estrada's testimony failed to even begin to
address the mitigating points that he was to make.  Moreover, in Dr. Cunningham's view, Dr.
Estrada's abuse testimony was used to aggravate (showing that Petitioner fit the profile of a
dangerous man because of the abuse) rather than to mitgate:

> I attended  the Court proceedings the next day and observed  the Government's
> examination of Dr. Estrada.  His testimony showed that he recognized that childhood
> abuse can impact adult behavior.  I was concerned, however, because Dr. Estrada's
> presentation did not address this question as it related to Mr. Bourgeois specifically.
> It also did not address it from a mitigating perspective.  Instead, it focused only on
> why Mr. Bourgeois' history of abuse made him a continuing danger.  This turned the
> mitigating evidence on its head.  Instead of mitigating the offense, Mr. Bourgeois'
> history of savage abuse was used to aggravate.
>
> On cross-examination the defense did not develop and explain that impact from a
> mental health perspective.  As I recall, his testimony was limited in this regard to
> stating only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and
> that his adult conduct was consistent with such abuse.  I was quite cognizant that
> testimony elicited from Dr. Estrada was inadequate for the jury to appreciate the
> mitigating quality of this history of abuse. Rather, if the jury were to recognize and
> give informed weight to Mr. Bourgeois' background, it had to hear testimony about
> these developmental experiences in much greater depth, as well as have the benefit

USCA5 386

of clear and detailed testimony regarding **why** this history mitigates, including the nexus between this history and Mr. Bourgeois' life adjustment and the instant offense conduct. Had defense counsel dedicated time to conference with me, I would have advised them to anticipate this application of developmental history by a Government-retained mental health expert. I also would have equipped them with an understanding of scientifically-informed perspectives and data on violence risk assessment that would have equipped them to debunk the future danger implications advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

Cunningham Declaration at ¶¶ 13-14.

92.    Indeed, **Dr. Estrada himself**, who observed the entire evidentiary presentation,

believes that his testimony was too limited in scope and consequently he does not believe that the

jury received a full and accurate picture of Mr. Bourgeois. Dr. Estrada now has more information

than he had at the time of trial. This information confirms some of his earlier "suspicions" and

"impressions" and accordingly has had an impact on his opinion:

> I have now been provided with a wealth of information by Mr. Bourgeois' current counsel. This information includes declarations from those who witnessed his abuse; other mental health reports; and the transcripts of the penalty phase during which short testimony was provided by lay witnesses about the abuse. Based upon what I now know to be the truth of his upbringing, it is evident that in my interview with him, he created an elaborate fantasy life to replace the painful memories of his childhood. In this fantasy world he presents as being far more successful, wealthier and happier than he is in reality. This fantasy presentation, in which he has exaggerated his status, was at the core of my trial-diagnosis that he suffered from a Narcissistic Personality Disorder. Such a disorder is marked by the need of an individual to seek out special attention for achievements in order to compensate for obvious shortcomings. However, now that I know more about Mr. Bourgeois, I can state that this diagnosis, while accurate, failed to reflect the real and mitigating facts about his life.

> As noted, Mr. Bourgeois' current counsel have provided me with additional background information about him. I have reviewed the recent declarations of psychologists Jethro Toomer, Ph.D., Michael Gelbort, Ph.D., and Donald Weiner, Ph.D. I have also reviewed the declarations of additional lay witnesses regarding Mr. Bourgeois' childhood and early adult life and the report of social worker Kathleen Kaib reviewing his relationships with ex-wives and girlfriends.

43

USCA5 387

> **This new information confirms what I strongly suspected at the time of the trial – namely that Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments.** This new information presents a picture of a man who cannot establish and maintain stable relationships. This history (referenced primarily in the declaration of Kathleen Kaib) is consistent with Borderline Personality Disorder. This diagnosis, which supplements my earlier diagnosis of Narcissistic Personality Disorder, captures Mr. Bourgeois' tumultuous and violent relationships with the many women he befriended and, in some cases, married. In classic Borderline fashion, each new relationship was marked by extreme highs followed by devastating lows. As people with Borderline Personality Disorder are wont to do, Mr. Bourgeois became infatuated over new relationships, only to reject each person as his level of stress or frustration heightened, or as he perceived that he was going to be abandoned. In his case, owing to his status as a victim of abuse, along with his cognitive deficits, the rejection of each relationship was unfortunately marked by violence.

Estrada Declaration at ¶¶ 7-9.

93.     Dr. Estrada now believes that Petitioner suffers from a Borderline Personality Disorder, which he explains is a "debilitating" condition that can cause the type of conduct that was at the core of Petitioner's offense:

> Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic-like states. Indeed, the name of the Disorder derives from an earlier belief that such patients were "Borderline Schizophrenics." While I have no direct evidence that Mr. Bourgeois has experienced psychotic states, I am confident in stating that the nature of the offense where he first abused and then killed his infant daughter is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Mr. Bourgeois at the time of the offense.[13]

---

[13]Dr. Estrada's opinion regarding Petitioner's Borderline Personality Disorder is shared by two other mental health professionals. Petitioner has been evaluated by Robert Sadoff, M.D. and Jethro Toomer, Ph.D. Each conclude that he displays classic symptoms of a Borderline Personality Disorder; that this disorder has its origins in his abusive childhood, during which he was abandoned by his mother; and that the offense was the likely result of a psychotic break secondary to the stresses that Petitioner was subjected to. See Declaration of Jethro Toomer, Ph.D. (contained in *PA*, document # 14) at ¶ 7:

44

USCA5 388

Estrada Declaration at ¶ 10.

94.    Dr. Estrada also shows that although there was a smattering of evidence at the penalty

hearing about whether Petitioner was abused, there was **no evidence presented** explaining why this

was at all important:

> Although I testified at trial that I suspected that he was abused as a child, neither I,
> nor any other expert, testified about the **significance** of childhood sexual and/or
> physical abuse from a mental health perspective. Yet, it is not disputed in the mental
> health field that the significance is profound. Childhood physical or sexual abuse can
> leave durable psychological scars. Abused children often grow into adults who are
> significantly impaired. Such individuals have great difficulty establishing and
> maintaining healthy relationships. They have difficulty trusting others. They also
> have difficulties making judgments and controlling impulses. These impairments are
> greater when the abuser was known to the child, and even greater still when the
> abuser was a parent or care giver. This is because the child's trust is profoundly
> violated when a parent – who is naturally supposed to care for the child – instead
> engages in acts that harm the child.
>
> When a child is abused by a parent, it also has the effect of normalizing the behavior.
> That is, the child sees the behavior as acceptable, and develops a far greater
> likelihood of becoming an abuser. This appears to have been the case with Mr.
> Bourgeois. He saw his abuse of his children as a tool in child rearing, such as when

> When the borderline individual is seeking to avoid such abandonment, and is under
> great stress, they can experience mini-psychotic episodes. In Mr. Bourgeois' case,
> it is my opinion that his abusive conduct toward the victim, as well as his other
> relationships occurred during such mini-states. The only thing that separates Mr.
> Bourgeois from a full blown psychotic disorder is that he is able to reintegrate
> himself very quickly after the onset of these mini-episodes.

Declaration of Robert Sadoff, M.D. (contained in *PA*, document # 13) at ¶ 9:

> Mr. Bourgeois manifests many of the deficits shown by those who have been abused
> as children. He has debilitating personality disorders, including a Borderline
> Personality Disorder. This is a significant disorder in the context of this offense. By
> their nature, those with Borderline Personality Disorders are impaired in forming
> stable relationships. They can decompensate into psychotic states when under
> significant stress. People with Borderline Personality Disorder can have dissociative
> experiences, where they are not consciously aware of their actions or their
> surroundings, and may not recall various behaviors when dissociating.

45

USCA5 389

he "taught" the victim toileting skills.

Childhood abuse fills the abused child with rage, anger and terror. In many instances, the abused child develops into an adult who turns that rage, anger and terror outward. Many adults with abuse histories go through life with their rage and anger on a hair trigger. When such survivors of abuse are subjected to stressors and/or reminders of the abuse they have experienced, the likelihood of their turning their rage outward dramatically increases. This is especially true with survivors of sexual abuse. Those who have been sexually abused as children will frequently come to associate sexual gratification with violence and aggression. As noted, given Mr. Bourgeois' history of such sexual aggression, I strongly suspected that he was sexually abused as a child. When sex abuse survivors, like Mr. Bourgeois, are sexually aroused they will often react by replicating the abuse that they have suffered.

In addition, in Mr. Bourgeois' case the issue of abandonment must be considered. He was not just the victim of abuse, but he was abandoned by his mother when he was made to live with an elderly neighbor. This abandonment multiplied the already significant psychological effects of the abuse that he suffered.

Estrada Declaration at ¶¶ 11-14.

95.     The jury was required to weigh mitigating and aggravating evidence in this case, and that weighing was unquestionably effected by its perception of "why" Petitioner killed. Again, Dr. Estrada explains that the Government's explanation of motive was "simplistic" and failed to address the psychological reasons for Petitioner's conduct:

In this case, there was no apparent motive for the killing. While the Government theorized that Mr. Bourgeois killed the child in order to avoid the financial responsibilities that she represented, I find this explanation wanting from a mental health perspective. If a person wishes to kill a child for financial reasons, there are far more efficient and less gruesome ways to accomplish the task. There are many alternative ways to kill a child that would increase one's chances of "getting away with it." I believe that the Government's proffered motive was, respectfully, somewhat simplistic. As noted, the brutal and bizarre manner in which death was caused, along with Mr. Bourgeois' background and mental health deficits, make another explanation far more satisfactory. This was purely a rage killing. The rage was born of Mr. Bourgeois' own lifetime experience, the psychological effects of those experiences and his cognitive deficits. Added to these historical factors is that Mr. Bourgeois, like many borderline personalities, can decompensate into rageful outbursts in the face of frustration.

46

Estrada Declaration at ¶ 15.

96.    Now that Dr. Estrada is able to rely on the neuropsychological data generated by Dr.

Weiner and confirmed by Dr. Gelbort, he can explain how Mr. Bourgeois' organic impairments

impacted on his behavior – a highly mitigating explanation:

> To be sure, not all abused children grow into abusive adults.  However, the chances
> that the cycle of abuse will continue dramatically increases if the individual has
> organic brain deficits.  Although I was aware at the time of my testimony that Mr.
> Bourgeois has both organic brain deficits and a low IQ (tested at the time of trial at
> 76 and retested now at 70), I was not able to include these facts in my opinion
> because the neuropsychological testing conducted on Mr. Bourgeois by Dr. Weiner
> was not admitted in evidence.
>
> I sat through the entire trial at the request of the prosecution.  I was quite involved
> with and made appropriate recommendations to both sides of the case.  For instance,
> I strongly urged the defense to have Mr. Bourgeois undergo a thorough battery of
> neuropsychological testing, and suggested Donald. E. Weiner, Ph.D. to conduct this
> testing.  I have worked with Dr. Weiner on many occasions and have found him to
> be a reliable, knowledgeable and skilled practitioner.  I was surprised that the defense
> decided not to call him as a witness, and I was concerned that I could not reference
> his important findings in my testimony.  Had I been able to do so, I would have
> explained to the jury that Mr. Bourgeois' cognitive deficits were important factors
> that mitigate the offense and which went far toward explaining and understanding his
> violent behavior.

Estrada Declaration at ¶¶ 16-17.  This opinion certainly responds to the Government's redirect

question of Dr. Estrada that sought to make the point that not all abused children go on to become

abusers or killers.  TT  3/23/04, 57.

97.    There is no serious question but that the jury did not receive a full, accurate and

mitigating explanation for Petitioner's actions.  Dr. Estrada says so:

> Having sat through the testimony in this case, and knowing what I now know, and
> previously suspected, I do not believe that the jury in this case was provided with an
> accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come
> to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.
> While his actions were unquestionably "evil," it is equally unquestionable that there

47

exists a reasonable and not particularly controversial mental health explanation for his actions.

Moreover, Dr. Estrada would have provided all of this information during his testimony: "Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration." Estrada Declaration at ¶ 18.

98.    Counsel also failed to take advantage of other mitigating evidence that was under their noses. The Court will recall that trial counsel proffered the report of University of Texas Psychology Professor George W. Holden. His report was to address an ultimate issue as to whether Petitioner killed with premeditation. The defense proposed to offer this opinion during the guilt phase. See PTT 3/1/04, 1-72. The Court denied this application. However, the Court left open the possibility that Dr. Holden would be admissible in the penalty phase of trial. Id., at 74.[14]

99.    While what defense counsel wished to do with Dr. Holden was inadmissible in the guilt phase, as his current Declaration shows, this witness could have provided valuable penalty phase information about the dynamics of abusive family situations. This testimony could have either stood on its own or complimented the unpresented testimony of Dr. Cunningham and Dr. Weiner. Here is what Dr. Holden could have told the jury:

> I am a tenured full professor of Psychology at the University of Texas at Austin where I have taught and conducted research since the mid-1980s. I received a Bachelor's degree from Yale University in 1977, a Master's degree in Psychology from the University of North Carolina, Chapel Hill in 1982, and a Ph.D. in Psychology from the same institution 1984. My research and teaching focuses on family violence and parent/child relationships. I have published extensively in these fields.
>
> In late 2003 I was retained by John Gilmore and Douglas Tinker, defense counsel for

---

[14]Even before the hearing, counsel alerted the Court that he was considering using Dr. Holden in the penalty phase. See PTT 10/20/03, 11-12.

48

USCA5 392

Alfred Bourgeois, to testify at his capital murder trial in the federal court in Corpus Christi. I understood that my role was to provide the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter. It was proposed that I offer this opinion during the guilt phase of trial.

In reaching my conclusions, I studied the record of the case up to that date, including many reports produced by law enforcement authorities, autopsy materials, and other documents provided by the Government to defense counsel. The pattern of abuse that I saw reflected in these materials did not strike me as unusual for a case of severe childhood abuse. I applied my knowledge of the research in the field of family violence to my review of these documents, and concluded that while brutal, Mr. Bourgeois' actions leading to the death of his daughter were not premeditated. I set forth my opinion in a letter to counsel dated December 19, 2003, supplemented by a letter of February 25, 2004.

I was summoned to court in Corpus Christi on March 1, 2004, as part of a pretrial conference to determine the admissibility of my opinion that Mr. Bourgeois did not premeditate. I was sworn as a witness at this conference, and tried to explain the basis for my views. As I recall the proceedings, the judge repeatedly made the point that I was not permitted under the law to express an opinion on an issue that ultimately had to be decided by the jury, i.e., whether Mr. Bourgeois premeditated. I also recall that the judge asked whether in reaching my conclusions I made the assumption that Mr. Bourgeois committed the actual killing.

I am not a forensic psychologist and have appeared in court on only one other occasion. Therefore, my experience in such matters is quite limited. Nonetheless, I was quite surprised that Mr. Bourgeois' lawyers did not alert or prepare me for questions about my assumption that Alfred Bourgeois had committed the crime, which based on the judge's questions, seemed rather important. Nor did Mr. Tinker seem to have much of a response to the judge's question about whether I could give an opinion on the question of premeditation.

I recall that at the conclusion of the hearing, after the judge ruled that I could not testify about premeditation in the guilt phase, she mentioned that perhaps Mr. Tinker could call me as a witness in the punishment phase of trial, if Mr. Bourgeois was ultimately convicted of capital murder. Although Mr. Bourgeois was convicted, Mr. Tinker did not ask me to testify at the punishment phase.

I have now been asked by Mr. Bourgeois' current counsel to set forth what I could have testified about had I been called as a witness at the penalty phase of trial. The following opinions are expressed to a reasonable degree of psychological certainty.

49

USCA5 393

As I did in preparing my opinion for my aborted guilt phase testimony, I would have drawn on the extensive research that exists on child fatalities. This research reveals that the majority of "filicides" (death of a child at the hands of a parent) occur at the end of a disciplinary incident. In most cases, the parent does not intend to kill the child.

The pattern of abuse in this case and the ultimate act of violence that led to Ja'Karenn's death fits a pattern described in research about unintended filicide. In this case, the final fatal blow was administered as an act of punishment when the victim spilled the contents of a potty. From a psychological perspective, this was likely a disproportionate rage reaction resulting from stress and frustration.

In my opinion, it's likely that Mr. Bourgeois was in a violent rage during this incident. This rage likely stemmed from three sources: 1) his pathological child rearing; 2) the stressors, both immediate and distal, that he was suffering at the time; and 3) his organic deficits and impaired cognitive functioning. The research indicates that abusers often view violent acts as appropriate disciplinary techniques. I understand that Mr. Bourgeois came from an abusive background, and therefore the violent acts were normative. In other words, he saw what we would consider abuse to be just another tool in a parent's child rearing arsenal.

The final act of abuse in this case centered around a common child rearing incident, that of toilet training. Abusive parents mistakenly believe they are doing the right thing by hitting with the intent to hurt the child in order to teach him or her a lesson. Often, the child's continued failure to "learn the lesson" is perceived as repeated misbehavior, and the severity of the punishment will escalate. Further accidents then lead to increasingly more severe corporal punishment, and, in some cases to serious injury or death.

As noted, most cases of filicide occur in reaction to stressors both immediate and distal. The immediate stressors in this situation stemmed from the victim's potty training accident, along with the close quarters in the truck, Bourgeois' getting lost when trying to deliver a load to the Navy base, and his truck battery dying, making him concerned that he would be late for his scheduled deliveries.

Distal stressors are those more removed from the situation, but still pressing on the actor. At the time of the abuse, the materials reveal that Mr. Bourgeois was feeling overwhelmed by financial stressors. He was behind on his bills, he was engaged in a trucking contract that did not meet his financial needs, and he had two new babies to support (one of which, the victim, he had just learned of a few months prior). His recent discovery of his spouse's affair with another man also weighed heavily on him and raised the specter of yet another failed relationship.

50

USCA5 394

As in some other filicide cases with which I am familiar, Mr. Bourgeois did not have the psychological resources to deal with these stressors. Instead, he reacted to a small event with an overwhelming and disproportionate amount of rage.

Bourgeois' current counsel have provided me with additional information that Mr. Bourgeois was abused as a child, and attesting to his impaired psychological and neuropsychological functioning.

That Mr. Bourgeois was himself abused is far from surprising. The offense itself stands as mute testimony to the fact that Mr. Bourgeois experienced violence, most likely by one or more care-givers, as a young child. Usually, abusive parents were at one time abused children. As noted, abused children accept violence as normative. Again, based on the pattern and type of abuse he visited upon his child, it is highly likely that Mr. Bourgeois was raised in and lived in a subculture that accepted a significant level of violence towards children.

Further, information provided to me by current counsel indicates that Mr. Bourgeois suffers from severe personality disorders that are frequently seen in abusers who were abused as children. Clinical psychologists have reported that he has a Borderline Personality Disorder. The disorder is characterized by intense rage episodes and a pathological inability to form healthy attachments to others. In addition, his social history reveals that he was not only an abused child, but that he was also an abandoned/rejected child. Childhood rejection makes it even more difficult for an adult to form healthy bonds, and predicts tumultuous relationships. Psychologically, our ability to form bonds with intimate partners is linked to our ability to form bonds with children. In Bourgeois' case, the ability to relate with others, especially intimate partners and children, is seriously damaged.

Even more significant in this case, it seems that Ja'Karenn became a scapegoat for Mr. Bourgeois. This is a common phenomenon in pathological family relations, where one child is unreasonably blamed by a parent for the family's problems and must suffer the brunt of that parent's rage and frustration. It is likely that Mr. Bourgeois was unable to bond with Ja'Karenn, and she therefore filled the role of scapegoat.

In addition, I have read the declarations of Dr. Gelbort and Dr. Weiner. They report that Mr. Bourgeois has serious neuropsychological deficits. He has a very low IQ (bordering between the mentally retarded and borderline retarded range). His low IQ means that he is less able to effectively problem solve. In addition, he appears to be damaged in those areas of the brain that impact his executive functioning. This testing and the opinions of Dr. Gelbort's and Dr. Weiner's show that he has an impaired ability to control himself and make sound judgments, particularly when under stress.

51

The reports of neuropsychological impairments are not surprising given Mr. Bourgeois' history of childhood abuse. Research shows that the trauma and stress experienced by the abused child can literally rewire the brain. The brain of a victim of severe abuse responds differently to stress, danger, and frustration with consequent deficits in making judgments, forming relationships and controlling impulses.

My testimony could have helped the jury understand that Mr. Bourgeois behavior, sadly enough, fits a common pattern of abuse. The pattern of abuse revealed in Ja'Karenn's autopsy can more readily be interpreted as fitting a pattern of mis-guided parenting than a case of premeditated torture. For example, Ja'Karenn was burned, bitten, hit, and whipped. These acts of violence, although cruel, are actually common in cases of severe child abuse. Often, they mirror the perpetrator's own experience of abuse as a child. In addition, they are often seen as corrective measures or used as instruments in a distorted understanding of "teaching" the child. For example, burning is often mistakenly used to teach the child to avoid hot surfaces. Biting is often intended to teach the child not to bite. Even the final blow that killed Ja'Karenn was in the course of a disciplinary act, where Mr. Bourgeois lost control of his own rage and slammed Ja'Karenn's head against a hard surface.
My testimony at the sentencing phase of trial could have served two purposes. First, it could have helped the jury place this awful crime in the context of family violence. It would have helped mitigate the image of Mr. Bourgeois as a sadistic monster intent on torturing and then murdering his child. Instead, I could have explained family violence as a phenomenon that is unfortunately tied up in our culture, and a pattern that sadly repeats itself through generations. I could have reviewed for the jury research about how difficult it is to break the cycle of family violence. Certain factors have been proven to help mitigate this cycle, including: high intelligence, therapy, and supportive functional (not enabling) spouses. Mr. Bourgeois did not benefit from any of these positive influences. Second, I could have reviewed for the jury the neuropsychological and psycho-social factors that pre-disposed Mr. Bourgeois to violence against children.

Had I been called at the sentencing phase, and provided with the information that I now have, I would have provided an opinion that the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions. These factors had an additive impact: i.e., each alone would have impaired Mr. Bourgeois, but taken together they likely overwhelmed him. I would have been able to provide this opinion, even if I did not state what I still believe to be true in this case, that this was not a premeditated case of murder. Instead, Mr. Bourgeois' actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control.

Declaration of George W. Holden, Ph.D. (contained in *PA*, document # 11) ¶¶ 1-23.

52

USCA5 396

100.    Counsels' failure to utilize this available expert (who the Court had already paid to reach an opinion) was ineffective.  There could have been no tactic or strategy for not calling this witness who could have provided yet another humanizing face on what was otherwise an unmitigated and brutal offense.

### D.    Counsels' Deficient Performance and Ensuing Prejudice.

101.    It is hard to fathom that counsel had a sound tactical or strategic reason for not putting on the unpresented mitigating evidence described above.  To be sure, counsel articulated that they were making a decision, but that decision cannot be considered sound.

102.    Dr. Cunningham's declaration provides some insight into what may have occurred. He notes that from his first contact with counsel they appeared not to appreciate either the complexity of their task, or some of the substantive issues related to it:

> I was first contacted by Mr. Gilmore on June 30, 2003.  At that time, he described that the trial was set for mid-September, and that the defense had "developed very little mitigating evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death penalty if convicted if they were not able to present mitigating evidence. I responded on July 1, 2003, and suggested that the defense hire a mitigation specialist. I explained that the performance of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that this mitigation investigator would gather all available records regarding the defendant's history, identify relevant family and other third parties such as teachers and coworkers, interview these individuals, and provide me with interview summaries and a life event time line. My own interviews and evaluation could not reasonably begin prior to this investigation. As neither this investigation nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.
>
> Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the

USCA5 397

professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

Cunningham Declaration at ¶¶ 5-6.

103. That counsel did not appreciate their task is confirmed by the fact that they only managed to arrange Dr. Weiner's evaluation of Petitioner at the very last minute – on the eve of trial. See Weiner Declaration at ¶ 2.

104. It also appears that counsel were not particularly attentive to the materials forwarded to them by Dr. Cunningham. Counsel never had any telephonic or other contact with Dr. Cunningham (prior to or during trial) prior to his arrival in Corpus Christi to discuss the substance of his opinions. As he relates, this was far different from what he was used to in federal capital trials:

> During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.

> In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing. In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial. Normally, counsel looks to me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case. Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

54

Cunningham Declaration, ¶¶ 11 & 16.

105.   As Dr. Cunningham also relates, this lack of attention to the details of the mitigation case carried over to the time that he appeared for trial.  It was apparent to him that counsel was not familiar with the materials he had earlier provided and that they did not seem particularly interested in preparing:

> The trial commenced in February, 2004 and I recall that the penalty phase started in mid-March.  Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial.  We did plan however for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd.  I arrived at my hotel in the mid-afternoon on March 21, 2004.  I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting.  Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions.  Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone.  However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night.  I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.
>
> *                                    *                                    *
> A second appointment was made to meet with Mr. Tinker after court that day [Monday].  Much to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar for about 45 minutes.  Mr. Tinker had a drink.  It was my distinct impression that he was not particularly interested in my analysis of his client's disorders and deficits.  It was obvious from his questions that he had not yet looked at the materials that I sent to him, and he certainly was not familiar with them.  To illustrate, while I was discussing the mitigating evidence, he interrupted me to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series

55

of slides regarding that topic.  This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information.  Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had  provided to him. When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois.  It was not in the trial notebooks that counsel had on their table.  Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. Further, as evidenced by counsel not having this assessment in their critical records files, counsel apparently had not reviewed it or appreciated its implications.  Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

Cunningham Declaration, ¶¶ 12 & 15.

106.    When Mr. Tinker alerted the Court prior to his cross examination of Dr. Estrada, that he was considering not calling Dr. Cunningham, he told the Court that he had "hinted" at it during his meeting the night before with Dr. Cunningham.  TT 3/23/04, 4-5.  Given that this was the first substantive discussion between counsel and his expert (and that it took place over just 45 minutes in a bar), it would thus appear that Mr. Tinker made his decision without benefit of knowing the scope of his expert's testimony.  This is further evidenced by his response to the Court's statement that he had to weigh the "pros and cons" of calling this witness.  Id.  Mr. Tinker referred only to his discussion with Dr. Cunningham about risk assessment and said nothing about the mental health-related mitigating evidence that he was prepared to discuss:

**The Court:**    But you have to evaluate the pros and cons of what that goes into.

**Mr. Tinker:**    That's right.  And I – for instance, let me talk.  He would – he would say things – he would talk about how many people are in the penitentiary and how – and that there are only 10 percent commit murders.  Well, I think why the hell would I want the jury to know that?

**The Court:** [Indiscernable]

**Mr. Tinker:** I know. That's just a poor example. Maybe it's 3 percent. But still . . .

Id., at 5-6. Mr. Tinker of course had it wrong. Dr. Cunningham was not prepared to testify that 10 percent or 3 percent of people in prison commit murders. Rather, Dr. Cunningham was prepared to testify, *inter alia*, that: "Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois was only 2%.") (Cunningham Declaration, ¶ 37). But this error was the least of Mr. Tinker's oversights. He apparently failed to appreciate any of the mitigating evidence that Dr. Cunningham could have marshaled and discussed for the jury.

107.   Petitioner will brief the prejudice prong of this ineffectiveness claim in his to-be-filed *Memorandum of Law*. Safe to say at this juncture, that prejudice in this case is not a close question. Dr. Estrada's Declaration is the beginning and end of this discussion. When the Government's own expert witness tells a court that the fact finder was not given a full and accurate picture of a capital defendant's mental health, prejudice is firmly established.[15]

---

[15]The jury was instructed that it could find as many as nine mitigating factors: 1) Petitioner's capacity to appreciate the wrongfulness of his conduct was significantly impaired; 2) he acted under duress; 3) he had no significant prior criminal history; 4) he suffered from extreme mental or emotional disturbance; and 5) any other aspect of his character or circumstances of the offense, including, but not limited to a) he was abused as a child; b) other culpable individuals were not punished; c) he was under stress from family and economic factors and d) he was driving cross county in a truck with four other individuals. TT 3/24/04, 93-95. The only mitigation found was that he was under stress from family and financial matters (six jurors found); and all jurors found that he was driving cross country in the cab of the truck. Id., at 115.

The fact that the jury found no abuse, and no mental-health related mitigating factor is additional significant evidence that counsels' performance caused Petitioner prejudice.

57

**CLAIM III.**    **NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A REASONABLE FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS. FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

108.    The Due Process Clause of the Fifth Amendment requires the Government to prove every element of the offense charged beyond a reasonable doubt.  In this case the Government had the burden of proving the element that the fatal injuries were inflicted "within the special maritime and territorial jurisdiction of the United States."[16]  Thus, the Government had the burden of proving that the murder took place on the grounds of the Corpus Christi Naval Air Station.  No reasonable view of the Government's evidence existed upon which a reasonable factfinder could conclude that the fatal injuries were inflicted on the Air Station grounds.  Accordingly, this court must vacate the judgement of conviction.

109.    Moreover, trial counsel were ineffective for failing to gather and present readily available evidence to rebut the Government's proof of this element of the charge and to rebut the Government's theory of how the crime took place.  Petitioner was prejudiced and his judgment of conviction must be vacated.

110.    Under the Government's theory of the case, Petitioner was only on the grounds of the Naval Air Station for a short time (less than 1 ½ to 2 hours) before the decedent was discovered on the pavement outside the truck at the loading dock area of building 1218.  It was also the Government's theory that the fatal injuries were inflicted after the decedent tipped over her potty while Petitioner was driving the truck on the grounds of the Naval Air Station heading towards the

---

[16]18 U.S.C. §1111(b).

58

USCA5 402

loading dock of building 1218.  TT 3/2/04, 37-38.  According to the Government's theory, after the potty was tipped over, Petitioner became enraged and banged the decedent's head against the interior front windshield a number of times, eventually causing her death.  The only witness to this alleged fatal act was AB-1994 the seven year old daughter of Petitioner – Robin, the only other adult in the truck, was allegedly asleep. Id.  AB-1994, however, never specifically testified that Petitioner beat the decedent while on the grounds of Naval Air Station.

111.     Dr. Elizabeth Rouse, MD, performed the autopsy and testified at Petitioner's trial. TT 3/8/04, 2-67.  She testified that she performed the autopsy two days after the alleged assault in the truck.  She found that the cause of death was closed head injury, which she termed a subdural hematoma, on the right side of the head.  Incredibly, she was never asked to testify to the age of this fatal injury. Id. at 22-23.  Instead she testified, in response to a question by the prosecutor, that there were "recent" scalp wounds on the decedent –  but Dr. Rouse stated very clearly that these scalp wounds were **not the fatal injuries**. TT  3/8/04, 10-20.

112.     Dr. Rouse testified that she sent the sections of the brain tissue (where the fatal subdural hematoma was found) to a neuropathologist. Id. at 59.  Yet neither the Government nor trial counsel questioned her about the results of the neuropathologist's analysis.  In fact, trial counsel's cross-examination of Dr. Rouse took up less than three pages of transcript.  How could the Government fail to ask the doctor who performed the autopsy the time of the infliction of the fatal wound, when it knew it had to prove the murder took place on the grounds of the Naval Air Station? The answer is: the Government had in its file scientific evidence showing that the fatal wound occurred **a minimum of 10 days prior to the autopsy of the decedent.**  The scientific evidence was dispositive: this murder *did not* take place on the Naval Air Station and it *did not* take place in the

59

manner that AB-1994 described.

113.    The neuropathologist's report (summarized in the autopsy report, *PA* document #52) clearly and unequivocally found that the fatal injuries to the brain were at a minimum **over 10 days old at the time of the autopsy** – long before Petitioner was alleged to have fatally assaulted the decedent in the truck and long before he was on the Naval Air Station grounds and long before he was even in the state of Texas.  Specifically, the neuropathologist, Kathleen Kagan-Hallet, MD, examined microscopically the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately *ten days old* and the injury to the rest of the brain (cerebral white matter) was over 7 days old.   (Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50).  This scientific evidence prepared at the request of the Government's own expert Dr. Rouse –  had it been presented to the jury – would have devastated the Government's theory of its case against Petitioner.

114.    Dr. Werner Spitz, a forensic pathologist with over 54 years of experience, examined the autopsy and the autopsy photographs and concluded that the fact that the fatal injuries were a week or more old calls into question the causation of the injuries and the timing of the fatal injuries. (Declaration of Werner Spitz, MD dated 5/10/07 attached hereto as PA #53).  Dr. Spitz further concluded that the autopsy results and the neuropathology report do not comport with the testimony of AB-1994. Id.

115.    Trial counsel never even attempted to cross-examine Dr. Rouse on this critical element of the Government's case.  Had counsel either called Dr. Kagan-Hallet to the stand or retained a forensic pathologist, they could have shown the jury the fatal flaw in the Government's theory of the case.  Counsel was ineffective; Petitioner was prejudiced. The judgment of conviction

60

USCA5 404

must be vacated.

116.    Trial counsel also failed to present readily available evidence through either cross-examination or through the presentation of live witnesses of the bad character and reputation in the community of Robin and AB-1994 for being truthful and honest.  The credibility of these witnesses was critical to the Government's case – simply put, if the jury believed either of these witnesses Petitioner was going to be convicted.  (Declaration of Anita Ferdinand, *PA* document # 24; Declaration of Michelle Armont, *PA*, document # 17; Declaration of Michelle Warren, *PA*, document # 39).

117.    Both Robin and AB-1994 had given a number of different accounts as to what transpired on the day in question.  Robin's final version of events is highly questionable – she slept through the infliction of the fatal injuries and then awoke just in time to perform CPR on the decedent in an attempt to save her life.  Under Robin's version of events, could Petitioner really have had enough time to concoct a story (that the decedent accidentally fell out of the truck) and share that "story" with Robin and AB-1994, before the discovery of the decedent on the ground outside the loading dock of building 1218?

118.    The veracity of Robin and AB-1994 was critical to the outcome of this case.  Yet, counsel made no effort to present witnesses who could have testified that both Robin and AB-1994 had a reputation for not being truthful and for being manipulative and dishonest.  Counsel was ineffective, Petitioner was prejudiced and the judgement of conviction must be vacated.

61

USCA5 405

CLAIM IV.    TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, IN VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

A.    **Introduction**.

119.    At trial, the Government presented expert testimony and prosecutorial argument that Petitioner's semen was detected during the post-mortem rectal examination of JG-1999.   The Government used this evidence, as well as evidence of alleged trauma to JG-1999's vagina, to argue that Petitioner sexually abused JG-1999.  Despite the extremely inflammatory and prejudicial nature of this evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and penalty phases of trial, defense counsel failed to present readily available expert testimony that would have completely undermined the Government's evidence that semen was present and JG-1999 was sexually abused.

120.    As set forth below, at the time of trial, counsel could have presented expert testimony indicating that there was no basis for the testimony of Dr. Scott Benton, Caroline Zervos and Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.  Counsel could have presented expert testimony indicating that if the substance recovered from the rectal swab of JG-1999 was semen, sperm should have been observed.  Despite multiple tests, no sperm were ever observed in this case. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, false positives are not uncommon in the test used by the Government to allegedly identify the substance as semen.  Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to identify the alleged semen, has been detected in multiple male and female bodily fluids.  Additionally,

62

USCA5 406

Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, there was no evidence of trauma to the vagina of JG-1999.

121.   Trial counsel, however, failed to present any of this available expert testimony. Trial counsel were ineffective and their deficient performance severely prejudiced Mr. Bourgeois at trial and at sentencing, in violation of his rights under the Sixth and Eighth Amendments to the United States Constitution. Mr. Bourgeois is entitled to a new trial and/or sentencing hearing.

### B.   The Testimony and Arguments Presented at Trial.

122.   The Government first set forth the evidence of the alleged semen detected in JG-1999's rectum in its opening statement to the jury. The prosecutor stated:

> Also, there will be testimony that a swab was taken from the bottom, from the rectum of the baby, and that swab, even though it was taken two days after this incident occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will testify that that swab showed that there was seminal fluid in the rectum of the baby.

TT 3/2/04, 42.

123.   In keeping with its promise to the jury, the Government presented the testimony of Dr. Scott Benton, who was qualified at trial as an expert in child sexual assault. Dr. Benton testified that child sexual abuse was difficult to detect because children seek to avoid disclosure of the abuse; perpetrators purposefully try to avoid injury to the child; and the vagina, anus and mouth of a child heal rapidly. TT 3/5/04, 18. Thus, according to Dr. Benton, it is not unusual to see a child who has been sexually abused display no physical signs of trauma. Id. at 19.

124.   However, Dr. Benton testified that evidence of sexual assault by a male can also be determined through forensic testing and the detection of semen. Id. at 22. He defined semen as the "product of the prostate gland of men. . . composed of water and various proteins and enzymes. . .

USCA5 407

meant to be a vehicle for sperm during ejaculation." Id. at 49.  Dr. Benton also testified about the

different forensic tests used for the detection of semen:

> The two main tests used for that are acid phosphatase, which is produced predominantly in the prostate of men, and with ejaculation or even pre-ejaculation, that can be deposited either on the skin or in the vagina or the anus or mouth of the victim.
>
> **And a more specific or confirmatory test is called prostatic specific antigen, also known as P30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, except in male prostate, and with one exception, human breast milk.**
>
> The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quick enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which will tell you that there was the presence of male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible.
>
> So those are the main trace evidence that we look for, the biological evidence and the physical evidence that we look for to help establish whether or not a sexual assault took place.

Id. at 22-23.  In further delineating the P30 assay, Dr. Benton noted that the test is designed to

specifically confirm the presence of the P30 protein, which, according to him, is found only in the

male prostate gland (where semen is produced) and the lactating breast of women.

> The P30 is a protein, and we call it the prostate specific antigen.  That's what I was talking about sort of earlier.  It exists or is produced in the human prostate and in the lactating breast of women.  People who are breast-feeding, it can be found in breast milk.  So from the prostate, we know acid phosphatase and P30 can be done.  So I order the acid phosphatase, and then we refer on – because crime labs can do more expensive tests, to do the P30 test. . . . **It is the confirmatory test for the presence of the prostatic specific antigen, also known as PSA or P30**.  These are synonymous terms.  And that's what it tests for.

Id. at 53.

125.    In addition, on cross-examination, Dr. Benton stressed the reliability of the P30 test,

USCA5 408

over other tests, in determining the presence of P30 and semen.

> We then move to the P30 test.  This is the second group of tests.  Just to reiterate, there's two types of tests.  There's a screening test, and there's a confirmatory test.  The acid phosphatase is in the screening group.  We want to know, is there a possibility that there's semen there, even if it's erroneous.  The confirmatory test is different, **The confirmatory test is we don't want to make any mistakes**.  We want the most specific test possible.  And frequently, it's also a more expensive test.  You use the cheapest test you can for screening, because you're doing it to a lot of people.  But the P30, you want to put your best stuff on it.
>
> So in confirmatory tests, the profile, the statistical profile of it is that it has the lowest false positive rate of any test. . . .**We know with the acid phosphatase that it's accuracy can sometimes be off, but it's still very good.  With the P30, very low levels of false positives are ever reported.**  And there's multiple different ways to test for the P30, just to confirm that it is really there.  I think that answers your questions.

Id. at 54-55.

126.    According to Dr. Benton it was not unusual to identify semen where no sperm are detected, id. at 23, in part because of the low survivability and rapid degradation of sperm.

> Sperm's survivability usually is only in the cervix or in the womb, the uterus of the woman.  In the vagina itself, it usually doesn't live more than 24-48 hours.  In a little girl, prepubertal girl, it doesn't live very long, hours.  So they will die.  They'll lose their little tails.  And once they lose their tails, they're very difficult to find, on a rape kit or trace forensic evidence.  You'll find evidence of semen much easier than you'll find sperm.  Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing.  So the sperm can be destroyed in those environments, and you could still detect semen, but not find sperm.  So those would be the conditions in which you could see semen, but not sperm.[17]

Id. at 51-52.

127.    Dr. Benton also testified that his review of the autopsy photographs, and in what in his opinion was blood outside of blood vessels, JG-1999 suffered trauma to her vagina.  Id. at 44-46.

128.    The Government also presented the testimony of FBI forensic serologist, Caroline

---

[17]Dr. Benton also opined that semen with no sperm was not uncommon in pre-ejaculate fluid, men with vasectomies and men with "Azoospermia" – low sperm count.  TT 3/5/04, 50-51.

Zervos. Ms. Zervos testified that as part of the FBI's protocol, when sample sizes permit, two tests, presumptive and confirmatory, are usually performed to determine the presence of semen or other serological substances. Id. at 63-64. Ms. Zervos testified that in this case, only a confirmatory test for the presence of semen was conducted on the evidence labeled Q5-Q7, the post-mortem rectal swabs taken from JG-1999. Id. at 86. She testified that only the confirmatory test was used in order to avoid the false positives sometimes associated with presumptive tests. Id. at 87. Ms. Zervos also testified that in this case, a P30 test was the confirmatory test used on the rectal swabs, and that it was positive for the presence of semen. Id.[18]

129.    On cross-examination, Ms. Zervos testified that the P30 protein could also be found in male blood and male urine, and thus tests of those substances could also result in a positive P30 test. Id. at 103-04. However, according to Ms. Zervos, no female fluids contain the P30 protein. Id. at 105

130.    The Government also presented the testimony of FBI forensic DNA examiner Anthony Onorato. Mr. Onorato testified the only DNA present on the rectal swabs, Q5-Q7, was female and belonged to JG-1999. Id. at 118. He also testified that it was not uncommon to have semen where male DNA is not detected. Id.; 127-28.[19] On cross-examination, Mr. Onorato testified that the only place, outside of male semen, where the P30 protein can be found, is the blood of a male with prostate cancer. Id. at 128.

---

[18]Ms. Zervos also testified that testing for the presence of semen on four oral swabs of JG-1999 was negative. TT 3/5/04, 87.

[19]Mr. Onorato also testified that an additional test for the presence of male DNA, performed by Orchid-Cellmark Laboratories, on behalf of the FBI, in this case, was also negative. TT 3/5/04, 132-04.

USCA5 410

131.   During closing arguments of the guilt/innocence phase of trial, the Government seized

upon the testimony of Dr. Benton, Ms. Zervos and Mr. Onorato.  The prosecutor argued:

The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them.  There was semen in that baby's bottom.  But the swabs were taken at the autopsy and the autopsy was done on June 29th.  The baby was thrown on the side of the truck on June 27th and died on the 28th, two days.  Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly.  But when you get a confirmatory test for semen, you've got semen.  It's an ejaculate from a man, not from a woman, from a man from sexual arousal.  And that's what we know.

The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and no show.  You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes?  I said, wt (sic) that Vaseline?  No, we don't have Vaseline in the truck.  What is so bad about having Vaseline?  I thought that was interesting.  It's a lubricant.  Why would you have to deny that?

TT 3/16/04, 19-20.[20]

132.   Despite the testimony of the Government witnesses that semen was found, and

understanding the extremely prejudicial nature of the evidence, in his closing argument, trial counsel

attempted to argue that no evidence of semen or sexual abuse existed.

They say sexually abused.  **And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital.**

\*                              \*                              \*

First you learned about DNA, some of you may already have learned a lot about DNA.  I know I don't know much about DNA but that you can prove who didn't do something but it's not a sure thing who did it.  We learned that.

Secondly, with regard to DNA, we learned that there was a test which was found

---

[20]The Government's argument regarding petitioner's use of Vaseline to sexually abuse JG-1999 is based on Dr. Benton's testimony that with lubrication, the rectum of a child is sufficiently flexible to withstand the trauma an adult male penis, and quickly heal.  TT 3/5/04, 36-39.

USCA5 411

positive for semen and that the expert who had examined that and talked freely about (inaudible) protein. **He said that there was a better test and so he sent the semen off for a better test. And that test was negative. That test was negative, the better test**. And that was the testimony from the witness.

\*                                              \*                                              \*

And I suggest to you, if that's going on, that should have no reliability as far your decision making in this case because you'd have none. And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call, was negative. **There's no evidence of semen, I suggest to you, being found on this child.**

TT 3/16/04, 24; 41-42; 43. However, because no evidence was presented to support his argument

that there was no semen found, and based on the allegedly positive P30 test indicating semen was

found, an objection to defense counsel's argument was sustained .

133.    Indeed, counsel's argument prompted the following exchange, during which this

Court relied on the allegedly positive test:

Ms. Booth:    Your Honor, I have to object. That is a mischaracterization of the evidence.

The Court:    That is sustained.

Mr. Tinker:    The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth:    I have to object, your Honor.

Mr. Tinker [sic]:    Let me see counsel at side bar.

(Begin bench conference at 9:40 a.m.)

The Court:    **The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was** –

Mr. Tinker:    (Inaudible)

68

USCA5 412

The Court:    It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child. it was –

Mr. Tinker:   (Inaudible).

The Court:    **That is what the expert testified to, there was seminal fluid found in her anus.  What they couldn't identify because it was degraded, was the DNA.  There was no question of the expert testified.  They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:   I didn't do that on purpose – we got over here and I said, I object. And you said, why do you –

The Court:    What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA.  It was too degraded.

Mr. Tinker:   You said, why do you object that it was negative and so I said, okay, it was negative.  But I didn't know (inaudible).  Well anyway, I'm just saying –

The Court:    (Inaudible) that there was DNA that came back no – they couldn't find DNA.  They could only find JG-1999's DNA.

Mr. Tinker:   But I didn't do that on purpose, Judge.

The Court:    But you've said it several times (inaudible) that there was another test they could have done to identify the seminal fluid.

Mr. Tinker:   (Inaudible).

The Court:    Don't put emphasis on it because they don't have to believe what the experts say.

(Bench conference ends at 9:42 a.m.).

TT 3/16/04, 43-45.

134.    Subsequently, during its penalty phase closing argument, the Government used the alleged semen evidence as a basis for urging the jury to sentence Mr. Bourgeois to death.

69

USCA5 413

> Was he laughing when he beat JG-1999 to death?  Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body?**
>
> *                              *                              *
>
> Let's talk about lack of remorse.  The Defendant spoke to you.  Was there remorse in his voice?  Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him?  No, he didn't.  Not ever.  He murdered this baby.  **His signature with his teeth marks and his semen is all in that baby**.

TT 3/24/04, 70; 75-76.

### C.    Trial Counsel's Deficient Performance.

135.    Although counsel failed to present the evidence, at the time of trial, expert testimony was readily available which would have supported his arguments and completely undermined the Government's allegations that semen was found and that JG-1999 was sexually abused.

136.    Indeed, on October 8, 2003, counsel filed an *ex parte* motion for the appointment of Dr. Elizabeth Johnson as a defense DNA expert.[21]  PA, document # 46.  On October 20, 2003, this Court granted that motion. PA, document # 47.  On January 16, 2004, counsel informed the Court that contrary to the Government's assertion that all samples had been consumed during prior testing, Dr. Johnson had identified an additional biological sample which was available for serological and DNA testing.  TT 1/16/04, 32-34.  With the assistance and consent of the Government, the remaining sample was sent to Dr. Johnson.  Id. at 34-36.

137.    On February 25, 2004, after counsel had failed to provide the Government with a report from Dr. Johnson and several other defense experts, this Court issued an Order indicating that all expert reports, including Dr. Johnson's, must be turned over by February 26, 2004.  PA,

---

[21]A copy of Dr. Johnson's curriculum vitae is included as an exhibit to this *Motion*. See PA, document # 49.

USCA5 414

document # 48.; TT 2/25/04, 130-48.  If not provided, counsel would be precluded from presenting the testimony of Dr. Johnson.  Id.

138.    On March 1, 2004, Dr. Johnson provided trial counsel with a two page summary of the testimony she could provide if called to testify.  Regarding the Government's conclusion that semen was detected on the rectal swab taken from JG-1999, Dr. Johnson concluded:

- The FBI did not test the rectal swab with AP reagent or do a sperm search.  They only did a P30 test with the ABA card and a DNA test.  The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction;

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

PA, document # 49.  Dr. Johnson also provided counsel with documentation of the bodily fluids, other than male semen, where the presence of the prostatic specific antigen (PSA) has been detected, including: amniotic fluid, breast milk, saliva, female urine and female serum.  Id.  Dr. Johnson, however, was never called to testify at Petitioner's trial.

139.    Dr. Johnson was not alone in her view.  Trial counsel could also have presented additional expert testimony which would have supported the conclusions of Dr. Johnson and counsel's argument that no semen was found, and would have further undermined the testimony of Dr. Benton, Caroline Zervos and Anthony Onorato.

140.    Indeed, undersigned counsel has consulted with Dr. Edward T. Blake and Alan Keel

71

of Forensic Science Associates who have determined that:[22]

- There is no basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.

- Contrary to the testimony at trial, the P30 test is not a stand alone confirmatory test for the presence of semen. Because of the hyper-sensitivity of the P30 assay, false positives are not uncommon. For example, the P30 assay is so sensitive that positive results have been identified in semen free female urine. Thus, contrary to the testimony at trial, the P30 protein has been identified in body fluids other than semen, male blood, and male urine. Without the presence of acid phosphatase and/or sperm, the P30 assay is not and should not be considered a stand alone confirmatory test.

- The presence of sperm is the only confirmatory test for semen. Even then, if there is a low number of sperm, the test may not be confirmatory. There are many scenarios which might lead to the presence of sperm in a substance which is not semen. Finding a low number of sperm does not necessarily mean that there was ejaculate at that location. In this case there were no sperm identified in any of the tests which were performed. Moreover, in this case, if the substance identified by the P30 assay was semen, sperm should have been identified. Because of the high unit volume of sperm in semen the finding of sperm is more sensitive than the P30 assay.

- Dr. Benton's testimony defining semen as the water and protein containing substance which is produced in the prostate gland is incomplete if not erroneous. See TT 3/5/04, 49. Semen is the combination of the secretions of the testes, seminal vesicles, prostate, bulbourethral glands and sperm. Moreover, Dr. Benton's testimony regarding the survivability of sperm is completely irrelevant. Indeed, the more important issue is the persistence of sperm. Thus, even if sperm lose their tails or die as easily as Dr. Benton describes, they do not degrade easily or rapidly and DNA from those sperm cells can be identified and extracted for decades. Again, in this case, no

---

[22]Dr. Blake and his Forensic Science Associates in Richmond, California, are nationally renowned. Dr. Blake's curricula vitae is included as an exhibit to this *Motion* (*PA*, document # 41). Dr. Blake and his firm provide criminalistic and forensic serology services to law enforcement, prosecuting agencies, attorneys, insurance companies and private individuals. As a doctoral student, Dr. Blake assisted in discovering, isolating and identifying the P30 protein. He was also the first scientist in the United States to use polymerase chain reaction (PCR) based DNA testing. Petitioner's allegations are based upon his recent communications with Dr. Blake, and he will shortly be providing a Declaration from Dr. Blake.

USCA5 416

sperm were ever identified.

• Dr. Elizabeth Johnson's pre-trial conclusions, contained in her March 1, 2004 summary to trial counsel, are accurate and there is no scientific basis for counsel's failure to present her testimony at trial.

141. Additionally, trial counsel failed to challenge Dr. Benton's testimony that the autopsy of JG-1999 revealed vaginal trauma. See TT 3/5/04, 44-46. While counsel argued that the autopsy of JG-1999 revealed no vaginal trauma, he failed to present any evidence to support his argument.

142. Government witness Dr. Elizabeth Rouse testified that during her autopsy she performed a sexual assault examination on JG-1999. TT 3/8/04, 59-60. In her autopsy report, Dr. Rouse concluded that, "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**." See Autopsy Report of Dr. Elizabeth Rouse, PA, document # 52, p. 3. Dr. Rouse, however, did not testify about the results of that examination, id., and counsel failed to elicit the results during cross-examination. Id. at 65-67.

143. Dr. Rouse's autopsy report does not stand alone in demonstrating the unreliability of Dr. Benton's testimony regarding alleged trauma to JG-1999's vagina. Indeed, undersigned counsel has consulted with renowned forensic pathologist Dr. Werner U. Spitz, who has determined that:

> With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had what appeared to be inflammatory changes in the genital area, some six weeks before her death and evidence of apparent bruising at the time of the postmortem examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse who performed the autopsy specifically describes on page three of her report, at the end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down in the same paragraph, the autopsy report continues "on the upper left buttock, there is hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in much better position to determine if a bruise was

73

present.  She examined the entire area, described it, and determined it was normal.

Declaration of Werner U. Spitz, M.D., PA document # 53, ¶ 15.

144.    Counsel's performance in failing to present available expert testimony to rebut the Government's allegation that semen was found in JG-1999's rectum and that she was sexually abused was deficient.  Counsel's performance in failing to present available expert testimony to rebut the testimony of Government witnesses Dr. Scott Benton, Caroline Zervos and Anthony Onorato was deficient.  Additionally, counsel's performance in failing to elicit and present expert testimony that there was no trauma to JG-1999's vagina was deficient.

145.    Trial counsel could have had no reasonable tactical or strategic reason for failing to present expert testimony to challenge the Government's extremely prejudicial evidence of sexual abuse.  Indeed, counsel argued that there was no semen detected and that there was no evidence to support sexual abuse but failed to present any of the readily available evidence to support his argument.  Counsel was ineffective.

## D.    Petitioner Was Prejudiced by Counsel's Ineffectiveness.

146.    As a result of trial counsel's ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted.  This unrebutted evidence impacted the guilt/innocence and penalty phases of Mr. Bourgeois' trial.

147.    Because Mr. Bourgeois was alleged to have been the only person who could have donated the alleged semen, the unrebutted evidence of semen and sexual abuse was directly relevant to the identity of the killer and severely undermined Mr. Bourgeois' defense that he was not JG-1999's killer.  Indeed, any argument that Mr. Bourgeois was not the person who killed JG-1999 was apt to carry significantly less weight when the jury was told, without evidence to the contrary, that

USCA5 418

his semen was present in her rectum and her vagina was traumatized.  In addition, the prejudice to Petitioner's defense was compounded by the flawed bite mark evidence counsel ineffectively failed to rebut.  See Claim V, above.  Had counsel acted effectively, he could have supported his argument that no semen was found and that JG-1999 was not sexually abused and his argument that Mr. Bourgeois was not JG-1999's killer would have been profoundly more convincing. Petitioner was prejudiced.

148.    The unrebutted evidence of semen and sexual abuse was presumably admitted in support of the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner.  18 U.S.C. § 3592(c)(6).  As set forth above, this evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**.").   Unquestionably, this flawed and extremely prejudicial evidence erroneously skewed the jury's deliberative weighing process in favor of death.  Indeed, as a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die.  As a result of trial counsel's ineffectiveness, the jury that sentenced Petitioner to death was unable to find a redeeming quality in Mr. Bourgeois or a reason to spare his life.  Instead, as a result of counsel's ineffectiveness, the jury that convicted Mr. Bourgeois of murder and sentenced him to death believed that he was the worst of all people – the cruel and calculating, child molesting murderer of his own two year old daughter.    Petitioner was prejudiced.

149.    Mr. Bourgeois' rights under the Sixth and Eighth Amendments of the United States Constitution were violated.  He is entitled to a new trial and a new sentencing hearing.

USCA5 419

**CLAIM V.**    **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

150.    Petitioner's right to effective assistance of counsel, guaranteed by the Sixth Amendment to the United States Constitution, was violated when trial counsel failed to challenge via a Daubert motion,[23] and Federal Rule of Evidence 702,[24] the admissibility of the bite mark testimony and opinions of Dr. Senn and Dr. Chrz on the grounds that it was not technically or scientifically reliable.   Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury.

151.    Dr. Senn and Dr. Chrz testified as Government witnesses using digital enhancements of the autopsy photographs of bite marks on the right arm and lower back of the decedent.   TT

---

[23]It is well settled that Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993) and Federal Rule of Evidence 702 require a trial judge to act as a gatekeeper, excluding expert scientific and technical opinions/methods that lack sufficient reliability.  The court must determine at the outset whether the reasoning or methodology underlying the expert testimony is scientifically valid.  Simply put, evidentiary reliability is based upon scientific or technical validity.  In performing this gatekeeper function, a trial court should apply the following factors in determining whether proffered testimony is scientifically or technically valid: 1) whether the theory or technique can be or has been tested, 2) what the known or potential rate of error is, 3) whether standards controlling the technique's operation exist and are maintained, 4) whether the theory or technique is generally accepted within the relevant scientific or technical community, and 5) whether the theory or technique has been subjected to peer review and publication.  The reliability requirements of Rule 702 and  Daubert apply not only to novel scientific techniques but to well established propositions as well.

[24]Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

76

USCA5 420

3/8/04, 251-52, 282, 310.  Both Dr. Senn and Dr. Chrz concluded that Petitioner could not be excluded or included as the possible biter of the right arm.  TT 3/8/04, 279, 300.   Dr. Chrz concluded that Petitioner was "the probable biter" for the bite mark on the lower back of the decedent and Dr. Senn concluded that Petitioner could not be "excluded" as the biter for this injury.  TT 3/8/04, 279, 311, 349.  Based on this expert testimony the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent.  TT 3/24/04, 76.

152.    Dr. Senn further concluded the decedent had a "probable bite mark" on the right hand and that the marks on the left hand and the left foot of the decedent are "possible" bite marks.  TT 3/8/04, 283.  Dr. Chrz did not offer an opinion as to the origin of these additional injuries.

153.    The digital enhancements that both Dr. Senn and Dr. Chrz used in their presentations to the jury were created by Dr. William Oliver.  TT 3/8/04,  14, 249, 299.

154.    The methods used by Dr. Oliver to enhance the original autopsy photographs were scientifically and technically invalid for use in a capital trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community. Consequently, the analysis and conclusions drawn by Dr. Senn and by Dr. Chrz were scientifically and technically invalid and should not have been admissible at Petitioner's trial.  Furthermore, even without the enhanced images, the bite mark testimony and opinions rendered by Dr. Senn and Dr. Chrz were scientifically and technically unreliable, inaccurate and inadmissable.  Trial counsel was ineffective for failing to move to preclude this evidence.

155.    Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury.  Specifically, trial counsel had a duty to rebut it with expert

USCA5 421

testimony of its own. Trial counsel – despite repeated representations to the court that it was intending to retain a bite mark expert – never retained or presented such a witness at Petitioner's trial. Furthermore, trial counsel was well aware of the fact that the first bite mark expert that the Government consulted *did not* find that Petitioner was the biter, yet trial counsel inexplicably failed to present this witness on behalf of the Petitioner. Instead, trial counsel sat back and allowed this inaccurate and highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and uncontradicted. Trial counsel's performance was deficient.

156. There can be no question that the inflammatory and highly inaccurate bite mark evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements. TT 3/2/04, 31-31, 34, 42, TT 3/16/04, 19-20, 48-49 (The bite mark experts did not exclude "that *thing* [Petitioner] that's sitting right there.") The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death. TT 3/24/04, 37, 41, 70, 76. ("His signature *with his teeth marks* and his semen is all in that baby.") Petitioner was clearly prejudiced by trial counsel's failure to preclude and/or rebut this evidence and a new trial and sentencing proceeding are mandated.

**A**.    **Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.**

157. Trial counsel was on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and was provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images ("I want to see how its done"; "I don't understand it"; "I've never seen it"), counsel

78

never even looked at the enhancements until mid-trial, and just moments before Dr. Oliver was going to testify before the jury.  TT 3/8/04, 15, 18.

158.    Incredibly, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements.  TT 3/8/04, 14-15.   The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value.  Id. at 30. This objection was denied and Dr.  Oliver was permitted to testify.  TT 3/8/04, 30.

159.    The original autopsy photographs were taken with a 35mm camera.  Dr. Oliver testified that there are two broad categories of image processing techniques: those that attempt to bring out features that are not visible in the original image and those that *actually change* the relative value or prominence of features in the image.  TT 3/8/04, 15-18.  Dr. Oliver employed the second type of image processing and actually modified the original 35mm autopsy photographs.  Id. Specifically, he employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method.  Id. at 19.  Dr. Oliver admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

160.    Dr. Oliver also admitted that it was very important when analyzing the newly created images  to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  Dr. Oliver emphasized that valid conclusions require "going back to the original image."   TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit onto the PowerPoint.  Id. at 19.  In his presentation to the jury and in reaching his conclusions he never went back to the original 35 mm photograph but instead he called the digitized image the "original."  Id. at 26.  In describing his

USCA5 423

ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

161.    Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc. These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

162.    Specifically, the digitized/scanned images were found to be "distorted" "inaccurate" "incomplete" and "over-reaching alterations." Report of Mark Cherry and Manfred Schenk, MAC (*PA*, document # 43).   Specifically, Dr. Oliver's method of converting the original 35mm photographs into digital images with a 600 dpi scanner instead of a 3600 dpi scanner created digital images that had a much narrower color spectrum than the original photographs.  Additionally, the images themselves were distorted (from a 35 mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used JPEG, a lossy not a lossless compression program.  The images were then further distorted and further detail was lost when Dr. Oliver converted them to PowerPoint.

163.    The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere" Id.   The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of "Bayer Pattern Nearest- Neighbor Coloration" or "interpolation."   This problem occurs when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image into a number of smaller ones.  Interpolation is apparent throughout all of Dr. Oliver's

80

enhanced images.  Id.

164.    One could not imagine a more prejudicial and inaccurate enhancement technique when looking for "unseeable" and "unphotographable" injuries than a technique like CLAHE that allows images to draw colors and shapes from neighboring images.

165.    The methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of Daubert:

I.    The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

ii.    Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

iii.    The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

iv.    The digital images presented as "original images" were compressed and therefore they lacked original detail.

v.    There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

vi.    You cannot substitute enhancement for details that were lost during the digital conversion.  The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

vii.    The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

PA, document # 43.

166.    Werner Spitz, MD a forensic pathologist with 54 years of experience and the author

81

of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition was also retained by undersigned counsel.  Dr. Spitz reviewed the enhanced autopsy images including those of the bite marks.  Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate the findings, and produce artifacts."  Spitz Declaration, *PA*, document # 53.  He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties . . . [and were] without scientific merit."  Id.   Dr. Spitz also noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*." Id.

167.    Undersigned counsel also provided the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models to Dr. C. Michael Bowers, DDS, JD a board certified forensic odontologist and expert in the area of forensic dental digital imaging.  *PA*, document # 42.  Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " **the most overly 'enhanced' images I have ever seen used in actual casework**." Id.  Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver produced "uncontrolled digital noise . . .  into the computer-manipulated image that does not reflect the original state of the picture." Id.

168.    Dr. Bowers found that the "ruler" and "injury pattern" in the enhanced bite mark images had "undergone considerable alteration [and] . . . change."  Specifically, "contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradation of color in the bruise (indicating either less or more pressure by the biter) are lost." Id.

169.    Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation.  Specifically, Dr. Bowers found that the methods of enhancement

82

**USCA5 426**

utilized by Dr. Oliver did not comport with Daubert:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . . The Government has no data as to known or potential error rate . . . of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

*PA*, document # 42.

170.   Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable. They would have litigated a Daubert motion and Dr. Oliver's enhanced images as well as the conclusions of Dr. Senn and Dr. Chrz would likely have been precluded.

### B.   The Opinions of Dr. Senn and Dr. Chrz Were Utterly Unreliable.

171.   Both Dr. Senn and Dr. Chrz relied upon the enhanced images created by Dr. Oliver in presenting their opinions to the jury. For this reason alone, their bite mark opinions were scientifically and technically invalid and should have been precluded. However, even if the significant inaccuracies of the enhanced images are ignored, the opinions of Drs. Senn and Chrz fail to meet the Daubert standards for valid science.

172.   The Government experts' conclusions that Petitioner was the "probable biter" and the prosecutor's argument that Petitioner was the "probable biter" (3/16/04, 49) and had left his "signature" (3/24/04, 76) in the form of his teeth marks on the decedent went well beyond the boundaries of accepted and valid bite mark identification. Dr. Bowers noted that "the validity,

83

USCA5 427

reliability and accuracy of bite mark identification have not improved to the point where it should be used as the sole means of identifying the biter." *PA*, document #42. Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or 'probably the biter' via teeth marks are not rendering a reliable opinion." Id.

173. Dr. Spitz agrees with Dr. Bowers that "Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as DNA or at least blood type verification." *PA*, document # 53.

174. In this case that is exactly what occurred. The Government specifically did not ask AB-1994 if she saw Petitioner bite the decedent on the lower back despite questioning her extensively about Petitioner's biting of the decedent. The Government also did not ask Robin to identify Petitioner as the biter of the decedent's lower back. When all was said and done the Government relied solely (and improperly) on expert testimony to argue that Petitioner had left his "signature" on the decedent's body in the form of his "teeth marks."

175. Dr. Bowers, a diplomate of The American Board of Forensic Odontology ("ABFO"), notes that this scientific community "has minimal scientific research supporting reliable positive identifications from bite marks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy." He also noted that the Bite Mark Standards and Guidelines of the ABFO do not delineate a threshold for bite mark evidence below which an opinion may not be rendered. *PA*, document # 42.

176. An ABFO study completed in 1999 found that the examiners were wrong nearly half the time they tried to identify the source of a bite mark and 63.5% of the examiners committed false positives in some of the test cases. Id. The examiners who participated in this study were not

84

novices but diplomates of the ABFO – the most accomplished in the field. Id. Thus viewed, bite mark evidence is not more reliable than flipping a coin.

177. A second study was conducted in 2001 and the results were published in the Journal of Forensic Science. This study – which again included experienced examiners – involved pattern detail that exceeded that found in actual bite mark casework, and allowed for controls of variables that are uncontrolled in actual casework. The results showed a significant error rate of 15.9%.

178. These recent studies, the lack of scientific research supporting reliable positive identifications from bite marks in skin, and the failure of the ABFO to delineate a threshold for bite mark evidence below which an opinion may not be given, render bite mark evidence scientifically and technically invalid. Counsel was ineffective for failing to litigate a Daubert challenge to *all aspects* of the bite mark identification evidence in this case.

> **C**. **Trial Counsel Inexplicably Failed to Rebut the Bite Mark Testimony Despite Being Aware of an Expert Report That Directly Contradicted Dr. Senn and Dr. Chrz.**

179. Counsel acknowledged months before trial that rebutting the bite mark evidence was critical to Petitioner's defense. Specifically, counsel acknowledged that retaining a bite mark expert was essential to rebut this highly inaccurate and inflammatory evidence. PTT 6/26/03, 8-10, 22-23. In fact on numerous occasions counsel assured the Court that they intended to retain a bite mark expert. PTT 7/16/03, 47-50; PTT 10/20/03, 13-14; PTT 10/24/03, 6-7. Counsel, however, never retained an expert and the highly inflammatory and inaccurate bite mark evidence was presented to the jury unrebutted.

180. Incredibly, some eight months before trial the Government provided counsel with not one **but two** expert reports prepared by United States Army Colonel J. Curtis Dailey, DDS, which

**USCA5 429**

completely rebutted the findings of Drs. Senn and Chrz. (Copies of these reports are contained in *PA*, document # 44). Colonel Dailey examined actual excised skin of the bite mark, the original autopsy photographs as well as Dr. Oliver's enhanced images. Dr. Dailey then compared this evidence to the stone dental casts of Petitioner, Robin and AB-1994. PTT 3/20/03, 14. Colonel Dailey concluded that neither Robin, AB-1994 nor Petitioner could be **included or excluded** as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the bite marks, 3) the ruler was in a different spatial plane than the mark being photographed, and 4) the very similar metric and spatial pattern relationships between the three individual's dentition. *PA*, document # 44.

181. Thus, Dr. Dailey directly refuted Dr. Senn and Dr. Chrz. Had trial counsel simply called Dr. Dailey as a witness, his testimony would have carried great weight with the jury since he was an active-duty United States Army Colonel at the time he examined the bite marks, and was called upon initially by the Government. Furthermore, he had the actual excised skin of the bite marks (in addition to the enhanced images) and yet he was still unable to exclude or include any of the potential biters. His testimony also would have been extremely persuasive with the jury since he was the first expert the Government consulted – and presumably the most qualified in the eyes of the Government. Dr. Dailey's findings (that Robin could not be excluded) also directly support the defense theory that Robin (the step-mother) was the abuser of the child and not Petitioner (the natural father).

182. Furthermore, had counsel taken the time to interview Dr. Dailey they would have learned from him that AUSA Patti Booth became irate when Dr. Dailey informed her that he could not single out Petitioner as the biter. Specifically, when Dr. Dailey informed AUSA Booth of his

USCA5 430

conclusions she angrily told Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she would go out and find an expert who could. AUSA Booth then hung up the phone on Colonel Dailey. *PA*, document # 45. This testimony from Dr. Dailey could have refuted AUSA Booth's misleading argument that the only child (AB-1994) whose bite was analyzed was excluded and that the jury did not "hear" any evidence of forum shopping for experts. TT 3/16/04, 19-20. AUSA Booth knew well when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had *not excluded* AB-1994 as a possible biter. Nonetheless, she was able to make this argument that the jury did not "hear" this evidence because counsel inexplicably failed to present the testimony of Colonel Dailey, DDS, or even consult with this witness.

183.     Dr. Bowers, the Board certified forensic odontologist retained by undersigned counsel, reviewed the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models. In addition to concluding that the enhanced images were inaccurate and unreliable, Dr. Bowers concluded that neither Robin, AB-1994 nor Petitioner could be excluded or included. *PA*, document # 42. Dr. Bowers' opinions concurs with those of Dr. Dailey.

184.     Specifically, Dr. Bowers found that Drs. Chrz and Senn's methods and conclusions that Petitioner was the biter of the injury on the lower back of the decedent were erroneous.

> Bite mark B is located in a curved area next to the iliac crest (hip). This degree of tissue flexibility in this area is considerable. The evidence of "Langer lines " in the autopsy photograph indicates this flexibility. The static posture of the body on the autopsy table does not mimic, in the least, the posture of the child during life This means that, in this anatomic location, the shape Bite mark B <u>should not be assumed to be</u> the same shape as during biting. No one knows what position the child was in during biting.  We can safely say, though she wasn't in the position seen in the morgue. This fact of postural change altering the bite mark shape is uncontrollable. The odontology literature supports this opinion. For this and other reasons stated

87

above, the methods applied by the Government's dental experts are inapplicable for this case.

*PA*, document # 42.

185.    Dr. Bowers also reviewed the injuries to the decedent's left hand that Dr. Senn opined were "probable" bite marks and the injuries to the left foot and hand that Dr. Senn opined were "possible" bite marks. Dr. Bowers concluded again that Dr. Senn's conclusions were inaccurate and unreliable. Specifically, Dr. Bowers found that these injuries "are lacking any dental information. They are ambiguous and indeterminable as to any opinion to cause of origin." *PA*, document # 42.

186.    Had counsel adequately prepared for trial he could have easily marshaled all of the above described evidence and presented a compelling rebuttal to the Government's bite mark evidence. Counsel, however, despite numerous representations to the contrary made to this Court, never retained a bite mark expert and this inaccurate, invalid and highly inflammatory evidence was submitted to the jury unchallenged, unrebutted and uncontradicted.

### D.    **Petitioner Was Prejudiced by Counsels' Failures.**

187.    There can be no question that the bite mark evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements. TT 3/2/04, 31-31, 34, 42, TT 3/16/04, 19-20, 48-49. The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death. TT 3/24/04, 37, 41, 70, 76. Petitioner was clearly prejudiced by trial counsel's deficient performance, and a new trial and sentencing proceeding are mandated.

88

USCA5 432

188.    The importance of Petitioner being the "probable" biter of the lower back bite mark was not lost on the prosecutor at the guilt phase of the trial. ("You have a bite mark identifying that he is the probable biter and Robin is not.") TT 3/16/04, 49.  In her closing argument she showed the photograph of this bite mark to the jury and described it as follows "There is one piece of physical evidence in this case. That is not testimony.  It is not documents.  But it's a physical piece of evidence . . . and it's a bite mark. . . .  who did they not exclude . . . that *thing* [Petitioner] over there." TT 3/16/04, 48-49.  The prosecutor also emphasized the bite mark evidence in urging the jury to consider Petitioner's brutality: "[t]hey had never seen a bite mark like this before.  They had never seen a bite mark with *such force behind it* that would leave this imprint" "the bite is so *incredibly intense*, the force behind the bite is so remarkable . . . this just doesn't happen, except, when you have someone that's so wants to cause the victim so much pain, *wants to see her suffer*."
Id.

189.    The Government also recognized the importance of the bite mark evidence at the penalty phase.  In support of the argument that the murder was committed in a heinous, cruel or depraved manner, and that it involved torture and serious physical abuse to the decedent, the prosecutor in her closing arguments referred to the bite mark no fewer than *four* times, and misleadingly argued that the Petitioner's "signature with his teeth marks and his semen is all in that baby."   TT 3/24/04, 37, 41, 70, 76.   Needless to say, the bite mark evidence affected the jury's weighing of the aggravating and mitigating evidence.

190.    Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinions of Dr. Oliver, Dr. Senn and Dr. Chrz

on the grounds that it was not technically or scientifically reliable.  Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury. Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VI.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS AND FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

191.    Petitioner's right to effective assistance of counsel was also violated when his trial lawyers failed to challenge via a Daubert motion the scientific and technical reliability of the testimony and opinions of Dr. Oliver.  Trial counsel was also ineffective for failing to object to the admissibility of this testimony and for failing to rebut this evidence once it was admitted at trial and heard by the jury.

192.    As described in the preceding claim, Dr. Oliver testified as a Government witness using digital enhancements of the autopsy photographs. TT 3/8/04, 15-18, 183-231.  Utilizing these enhancements, Dr. Oliver identified the following injuries on the decedent:  "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations." TT 3/8/04, 226.  The majority of these injuries were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy.  Based directly on Dr. Oliver's testimony (and his image enhancements) the prosecutor argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since, she claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to

90

accumulate that number of injuries.  TT 3/24/04, 73.

193.    The methods used by Dr. Oliver to enhance the original autopsy photographs were scientifically and technically invalid for use in a capital trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community.  Trial counsel was ineffective for failing to move to preclude this evidence.

194.    Trial counsel was also ineffective for failing to object to the admissibility of the enhanced images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and for failing to rebut this evidence once it was admitted at trial and heard by the jury.  Specifically, trial counsel had a duty to rebut it with expert testimony of  its own.  Instead, trial counsel sat back and allowed this inaccurate and highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and uncontradicted.  Trial counsel's performance was deficient.

195.    There can be no question that this inflammatory and highly inaccurate evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial.  The prosecutors urged the jury to convict Petitioner of first degree murder describing the vast number of injuries as evidence establishing – "a systematic execution" "a systematic dehumanization" and "a systematic degradation."  TT 3/16/04, 13,16,46, 48, 54.  The prosecutors also utilized this evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.  Petitioner was clearly prejudiced by trial counsel's failure to preclude and/or rebut this evidence and a new trial and sentencing proceeding are mandated.

USCA5 435

**A.      Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.**

196.    As alleged earlier with respect to Claim V, trial counsel were on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and was provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14.  Despite being unfamiliar with digitally enhanced images, counsel never even looked at the enhancements until moments before Dr. Oliver testified.  TT 3/8/04, 15, 18.

197.    Incredibly, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements.  TT 3/8/04, 14-15.   The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value.  Id. at 30. This objection was denied and Dr. Oliver was permitted to give highly inflammatory testimony in painstaking detail (taking up over 44 pages of transcript), showing the jury the huge number of alleged injuries his enhancements had uncovered.  TT 3/8/04, 30.  Trial counsel's cross-examination of Dr. Oliver took up just three pages of transcript. Id. at  227-230.

198.    The original autopsy photographs were taken with a 35mm camera.   As also described in Claim V, Dr. Oliver employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method, which actually change the original 35 mm photographs. Id. at 19.  Dr. Oliver admitted that he picked the range of parameters to be used to redistribute the colors and he chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

199.    Dr. Oliver also admitted that it was very important when analyzing the newly created images  to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized

USCA5 436

the original 35mm photographs and then downsized them to fit onto the PowerPoint. Id. at 19. In his presentation to the jury and in reaching his conclusions he erroneously considered digitized images as the "original." Id. at 26. In describing his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

200. Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc. These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

201. Specifically, the digitized/scanned images were found to be "distorted" "inaccurate" "incomplete" and "over-reaching alterations." *PA*, document # 43. Dr. Oliver's method of converting the original 35mm photographs into digital images created digital images that had a much narrower color spectrum than the original photographs. Additionally, the images themselves were distorted (from a 35mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used JPEG, a lossy not a lossless compression program. The images were then further distorted and further detail was lost when Dr. Oliver converted them to PowerPoint.

202. The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere" Id. The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of Bayer Pattern nearest-neighbor coloration or "interpolation." This problem arises when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image

93

USCA5 437

into a number of smaller ones.  Interpolation is apparent throughout all of Dr. Oliver's enhanced

images.  *PA*, document # 43.

203.    One could not imagine a more prejudicial and inaccurate enhancement technique

when looking for "unseeable" and "unphotographable"  injuries than a technique like CLAHE  that

allows images to draw colors and shapes from neighboring images.[25]

---

[25]As also alleged in Claim V, and repeated here, the methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of the Daubert:

i.     The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

ii.    Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

iii.   The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

iv.    The digital images presented as "original images" were compressed and therefore they lacked original detail.

v.     There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

vi.    You cannot substitute enhancement for details that were lost during the digital conversion.  The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

vii.   The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

*PA*, document #43.

94

204.    Undersigned counsel also provided the enhanced images to Dr. C. Michael Bowers, DDS, JD a board certified forensic odontologist and expert in the area of forensic dental digital imaging. *PA*, document # 42. Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " the most overly 'enhanced' images I have ever seen used in actual casework." Id. Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver produced "uncontrolled digital noise . . . into the computer-manipulated image that does not reflect the original state of the picture." Id.

205.    Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation. Specifically, Dr. Bowers found that the methods of enhancement utilized by Dr. Oliver did not comport with the Daubert:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . . The Government has no data as to known or potential error rate . . . of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

Bowers Declaration, *PA*, document # 42.

206.    Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable. They would have litigated a Daubert motion and Dr. Oliver's testimony and his PowerPoint presentation with the enhanced images would have been precluded by this court.

USCA5 439

**B**.     **Trial Counsel Inexplicably Failed to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and Failed to Rebut this Testimony Once it Was Admitted at Trial.**

207.     It is well settled that Federal Rules of Evidence 901, 1001 and 1002 require the authentication of evidence, and in the case of photographs the original is required to prove its contents.   Dr. Oliver's scanned digital images and his enhanced images were significantly inaccurate, incomplete and overreaching alterations of the original 35mm autopsy photographs. These images  were not and could not be properly authenticated and were not and could not be considered admissible copies of the original photographs.  Counsel, however, failed to object to the admission of these altered images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and the court admitted this evidence.   Counsel was ineffective.

208.     Counsel also failed to retain any type of expert to review these images and to rebut their accuracy and admissibility.   Dr. Werner Spitz, MD a forensic pathologist with 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition was retained by undersigned counsel.  Dr. Spitz reviewed the autopsy report, the enhanced autopsy images, the photographs taken at the time of autopsy, as well as the testimony of Dr. Rouse and Dr. Oliver.   Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate[d] the findings, and produce[d] artifacts."  Spitz Declaration, *PA*, document # 53.  He also noted that if "the documentation of bruises is at issue, the pathologist performing the autopsy can use their scapel for such documentation and study." Id.  He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties in so far as the findings in the enhancements were not present at the autopsy table."  Dr. Spitz found that the enhancements . . . are none other than inflammatory, without scientific merit."  Id.   Dr. Spitz also noted that "[d]ark

96

skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*."

Id.

209.    Had counsel adequately prepared for trial he could have made the relevant objections and he could have easily marshaled the above described evidence and presented a compelling rebuttal to Dr. Oliver's findings.  Counsel, however,  never retained an expert and this inaccurate, invalid and highly inflammatory evidence was submitted to the jury unchallenged, unrebutted and uncontradicted.

### C.    Petitioner Was Prejudiced.

210.    There can be no question that Dr. Oliver's findings were devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder.   TT  3/16/04, 13, 16, 46, 48, 54.  The prosecutors also utilized these findings in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.  Petitioner was clearly prejudiced by trial counsel's deficient performance, and a new trial and sentencing proceeding are mandated.

211.    The Government used the sheer number of injuries found by Dr. Oliver to support its case at the guilt phase of the trial.  "You heard Dr. Oliver testify that she had over 300 injuries on her body.  So you know  . . .  to do that kind of damage, you've got to make at least ten injuries a day.  Ladies and gentlemen, ten injuries a day, a systematic execution of a baby.  And that's what it was.  A systematic execution.  A systematic dehumanization.  A systematic degradation of that child." TT 3/16/04, 13-14.

212.    The importance of the sheer number of injuries found by Dr. Oliver was emphasized

97

by the prosecutor again at the penalty phase of the trial.  The prosecutor argued:

> [T]he injuries to the baby's body, the 360-some injuries on that baby's body, and we knew from the guilt/innocence phase that he was with that child for 36 days , that's when we think the abuse started. So in 36 days we got 360 marks.  That means that we have to do 10 a day.  That means that you would have to . . . 10 hours is longer than what we work a day.  So you're going to have to start before work starts, and you're going to have to work through lunch to get an abuse in every hour; and that doesn't count the abuses that are on top of the abuse.  And so you just count that as one of 360.

TT 3/24/04, 73.

213.    Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinion of Dr. Oliver.  Dr. Oliver's testimony was not scientifically reliable.  Trial counsel was also ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury. Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VII.    THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

214.    The Due Process Clause of the Fifth Amendment to the United States Constitution states that no person may be deprived of life, liberty or property without due process of law.  The Clause requires that a federal prosecutor disclose favorable evidence that is material to either guilt or sentencing.[26]

_____

[26]The  prosecution's duty to disclose evidence favorable to a defendant is of course most prominently associated with the Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963).  Because this is not a legal brief, but a factual petition, Mr. Bourgeois does not cite legal authority.  Nonetheless, the undisclosed and exculpatory evidence discussed herein, will be referred

USCA5 442

215.    The Government failed to disclose extremely powerful impeachment evidence concerning the four jailhouse informants who testified against Petitioner at his trial.  Specifically, the Government failed to disclose promises and understandings of favorable treatment concerning the informants' underlying cases that it had with these witnesses prior to their testimony in front of Petitioner's jury.  Each one of these witnesses – after testifying against Petitioner – in fact received benefits both in the cases that were pending at the time of their testimony and in sentences that they were serving at the time of their testimony against Petitioner.  Furthermore, each one of these witnesses testified falsely – in response to questions posed by the prosecutor – concerning their understanding of future favorable treatment.   The Government's failure to disclose these understandings and its elicitation of the false testimony violated every aspect of its duty under Brady and its progeny.

### A.    Adam Longoria.

216.    Adam Longoria was a jailhouse informant who testified for the Government and against Petitioner at the penalty phase of the trial. TT 3/22/04, 144-187.  Specifically, Mr. Longoria told the jury that, while he was incarcerated with Petitioner in the Nueces County Jail, Petitioner asked him to kill three female witnesses that were going to testify against him in this murder trial – Robin Bourgeois (wife), Lisa Moore (cousin) and Gaynell Collins (ex-wife).  Id at 155-62. Longoria also told the jury that in return for these murders Petitioner offered to give him an 18 wheeler truck worth $100,000 and drug contacts so he could make drug runs for extra money.  Id. at 157.  Mr. Longoria also told the jury that Petitioner admitted to him that he had beaten the decedent with a bat and extension cord and had thrown these items out the window of the truck,

---

to by the common usage, Brady material.

USCA5 443

before he got to the Naval Base.  Id. at 163-66.

217.   This testimony was devastating to the defense at the sentencing stage of this trial. What could be worse for a jury to hear when deciding whether a defendant's life should be spared than the fact that he was trying to have family members killed **while incarcerated**.  The impact of this evidence was not lost on the Government and they made sure to remind the jury of it in their penalty phase closing argument.  TT 3/24/04, 70.

218.   Mr. Longoria also testified on direct examination that he had not been promised anything in return for his testimony against Petitioner.  TT 3/22/04, 166-67.  In order maximize the dramatic effect of the testimony the prosecutor made this issue the very last thing she covered on direct examination:

> Q.   Okay.  Now, do you and I . . . have I promised you *anything* to come in here to testify?
>
> A.   No, ma'am *not a thing*.
>
> Q.   And you understand that there's no way that I can help you in your state case.
>
> A.    I understand fully.
>
> Q.   And I've told you that.
>
> A.    Yes ma'am you have.
>
> Q.    I pass the witness, Your Honor.

3/22/04, 167.

219.   Furthermore, on two separate occasions prior to Longoria's testimony, the Government – in response to questions from this Court with defense counsel present – represented that Mr. Longoria was getting nothing in return for his testimony.  On March 9, 2004 the

100

USCA5 444

Government assured this Court and defense counsel that Mr. Longoria was promised nothing: "Adam Longoria is a state prisoner. We are giving him nothing. And he knows that we can't give him anything." Id. at 7. Then on March 19, 2004 the Government again assured the Court and trial counsel that nothing had been offered to Longoria: "There's no promises, nothing." Id. at 23.

220.    On cross-examination Mr. Longoria stuck with his story and again insisted he had no understanding or expectations of favorable treatment from the Government – in his words "none whatsoever." TT 3/22/04, 186. And on re-direct the Government again asked Longoria "And, you know you're not going to get anything for this, right?" and he responded in the affirmative. Id. at 187. This testimony was false. Mr. Longoria understood that he would receive favorable treatment in his open cases in return for his testimony against Petitioner.

221.    At the time he testified against Petitioner, Mr. Longoria was facing significant amounts of jail time. He was awaiting trial for a May 30, 2003 arrest for bank robbery (03-CR-1884-E) where he was charged as an habitual offender (a charge which carried a mandatory 25-99 year sentence.) He was also facing the potential violation of a ten year probation sentence he had just received 3 months before the arrest on the bank robbery – for a felony charge of evading arrest as well as endangerment to a child (02-CR-3585-E). In the evading arrest case, Mr. Longoria had avoided a possible mandatory 25 to 99 year sentence when he pled the case out for 10 years' probation on February 4, 2003. The bank robbery charge was Mr. Longoria's second possible mandatory 25 to 99 year sentence in less than 3 months – not to mention that a conviction would also be a  violation of the 10 year probation sentence. Mr. Longoria knew this time the 25-99 year requirement would be applied.   In effect, Mr. Longoria was looking at life imprisonment. Yet, Mr. Longoria told Petitioner's jury he did not expect any help on these pending matters.

101

USCA5 445

222.    In fact, Mr. Longoria did expect favorable treatment and for good reason.  When he met with AUSA Booth, prior to his testimony against Petitioner, he asked for favorable treatment and was told she could not help him now, but after he testified against Petitioner she would help him. Mr. Longoria recalls this conversation as follows: "I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole." (Declaration of Adam Longoria dated 4/24/07, contained in *PA*, document # 31).  Mr. Longoria also advised AUSA Booth that he was taking anti-psychotic drugs at the time he was housed with Petitioner and at the time he testified against him.  Id.

223.    Mr. Longoria's counsel on the robbery charge and the probation violation was Bill May.  At some point in the winter or spring of 2004 Mr. Longoria advised Mr. May that he was cooperating in the Bourgeois case.  Longoria also told Mr.May that he had spoken to AUSA Booth and was expecting she would help him after his testimony against Petitioner.  Mr. May, with this conversation in mind, then filed a continuance of Mr. Longoria's robbery trial and probation violation until after he testified against Petitioner.

224.    Mr. Longoria testified against Petitioner on March 22, 2004.   On May 5, 2004 his bank robbery case and probation violation were listed for trial/disposition in the Nueces County Court.  Mr. May asked the state prosecutor Jimmy Sales if he (Sales) had spoken to AUSA Patti Booth.  Mr. Sales advised him that in fact had spoken with her and Sales then dropped the habitual offender mandatory sentence provisions and offered Mr. Longoria a plea agreement on his robbery case *and* his probation violation for **7 years' total incarceration**.  Mr. May knew that Longoria was facing his second mandatory 25-99 year sentence in a little over a year and  he knew Longoria would

102

USCA5 446

never have received such a lenient disposition if it had not been for his testimony against Petitioner. The main reason Mr. Sales dropped the habitual offender mandatory aspects of the case was because of his (Sales') conversation with AUSA Booth.  (Declaration of Bill May dated 5/1/07, contained in *PA*, document # 32)

225.    The favorable treatment did not stop there.  Since being sent to prison to serve his 7 year sentence, AUSA Booth has written a letter on behalf of Mr.Longoria to the Texas Parole Board, and in it she mentioned his cooperation and testimony in the Bourgeois trial.  (Longoria Declaration) In a May 10, 2007 telephone conversation with undersigned counsel, AUSA Booth admitted that she wrote such a letter on behalf of Mr. Longoria.

226.    The understanding of favorable treatment and the favorable treatment actually bestowed on Mr. Longoria should have been disclosed to Petitioner and his trial counsel. Additionally, trial counsel should have been told that Mr. Longoria was on anti-psychotic medication at the time he was housed with Petitioner and at the time he testified against him.  Brady has been violated and a new sentencing proceeding is mandated.

### B.    Orlando Campos.

227.    Orlando Campos was a jailhouse informant who testified against Petitioner at both the guilt/innocence and penalty stages of trial.  At guilt/innocence Mr. Campos told the jury that he had been incarcerated with Petitioner in the Bee County Jail and during that time Petitioner admitted to him that he had beaten the decedent, killed her and then told his wife to lie about it.  He also told the jury that Petitioner spoke with "pride" about beating his wife.  TT 3/9/04, 218-20.  At the penalty stage of the trial he told the jury that Petitioner admitted to beating his wives and girlfriends, admitted he was going to kill his wife when he got out and admitted to being involved in drug

103

trafficking.  TT 3/23/04, 81.    This testimony was also highly prejudicial to the defense at both stages of this trial.

228.    At the time he testified against Petitioner, Mr. Campos was serving a 12 year sentence from Bee County that he had received after numerous violations of probation and parole.  (B-99-2055-0-CR-B)

229.    On two occasions AUSA Booth assured the court and counsel that Orlando Campos had been promised nothing in return for his testimony against Petitioner.  On March 9, 2004 AUSA Booth assured trial counsel and the court that "we are giving him nothing."  TT 3/9/04, 7.  Then again on March 17, 2004 AUSA Booth stated " I have promised him nothing."  TT 3/17/04, 57.  In front of the jury Mr. Campos repeatedly told the jury that no promises had been made to him.  Upon questioning by AUSA Booth, Mr. Campos stated that he understood the United States had no power in state court to reduce his sentence and that he hoped that the prosecutor would relay to the authorities that he testified and that he has not been promised anything for his cooperation against Petitioner.  TT 3/9/04,  216.

230.    On cross-examination he stuck with this story and stated that AUSA Booth told him they could not reduce his time.  Id. 224.  Finally, on redirect he reiterated that AUSA Booth told him there was nothing she could do for him except tell the authorities he testified – and was testifying against Petitioner because he should be held accountable.  Id. at 225-26.

231.    Mr. Campos' testimony was false.  In fact prior to testifying against Petitioner he had asked for help in reducing his 12 year sentence.  Either AUSA Booth or FBI Agent Beckett told him that they could not help him at that time but promised to help him with his sentence after the trial was over.  (Declaration of Kathleen Kaib dated 5/14/07, contained in *PA*, document # 30)    Mr.

104

Campos was paroled after serving less than 3 years of his 12 year sentence.  Id.

232.    The promise of favorable treatment and the favorable treatment actually bestowed on Mr. Campos should have been disclosed to Petitioner and his trial counsel.  Brady has been violated and a new trial and sentencing proceeding are mandated.

**C.    Wiley Taylor.**

233.    Wiley Taylor testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both phases of trial.  See generally TT 3/9/04, 227-46; TT 3/23/04, 82-86.

234.    During the guilt/innocence phase of trial, Mr. Taylor testified that, while incarcerated with Petitioner at the Bee County Jail, Mr. Bourgeois told him that his wife, Robin, had broken an agreement to say that JG-1999 died falling out of a truck.  TT 3/9/04, 230.  Mr. Taylor testified that Mr. Bourgeois told him he beat his wife.  Id.   He testified that Mr. Bourgeois referred to JG-1999 as "that fucking baby" or "the baby that died."  Id. at 231.  Mr. Taylor also testified that Mr. Bourgeois' story constantly changed and he later said that JG-1999 died after he spanked her at Robin's request, id. at 239; that Robin killed JG-1999 with a hairbrush, id. at 239-40; and that JG-1999 died during a fight between Petitioner and Robin where he was "beating that bitch [Robin] down real good." Id. at 241-42.   Mr. Taylor also gave extremely prejudicial testimony that: Mr. Bourgeois told him that he was worried about the DNA evidence, id. at 243;  Mr. Bourgeois asked for advice on how to get around evidence of extension cord marks and internal bleeding in JG-1999, id. at 245; and that Mr. Bourgeois laughed when he told him that JG-1999's head got as big as a watermelon after a fall.  Id. at  246.

235.    At the penalty hearing, Mr. Taylor testified that Mr. Bourgeois told him he beat all

105

USCA5 449

his wives and girlfriends.  TT 3/23/04 at 82.  He testified that Mr. Bourgeois swore to him he was going to have his wife Robin killed.  Id. at 82-83.  Mr. Taylor also testified that Mr. Bourgeois told him that he and his brother transported illegal drugs and illegal aliens, who Bourgeois called "wetbacks," across the border from Mexico.  Id. at 83.

236.    Not surprisingly, the Government seized upon Mr. Taylor's highly incriminating testimony to argue in favor of a conviction:

> **He called it 'it'.  The kid that died.  The fucking kid** and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

TT 3/16/04, 17.  The Government did the same in the penalty hearing:

> **When was the other time he laughed?  He laughed when he was – and excuse my language – when he was talking, he said – Wiley Taylor, and he said, "Yeah, that baby's fucking head swelled up like a watermelon, and he laughed."**
>
> **Was he laughing when he beat JG-1999 to death?  Was he laughing** when he bit her, or he burns her, or he put his filthy semen in her little body?

TT 3/24/04, 70.

237.    At the time he testified on behalf of the Government, Mr. Taylor was facing a twenty year prison sentence for drug trafficking.  TT 3/9/04 at 235.  He testified that he was "hoping" to get a seven year sentence after cooperating with Ms. Booth in several drug cases and Mr. Bourgeois' case.  Id. at 228, 231, 234-35.[27]

238.    However, at the time of his testimony, Mr. Taylor was more than "hoping" for assistance with the Government.  Indeed, he had already agreed to assistance from the Government

---

[27]Ms. Booth was the same prosecutor handling Mr. Wiley's drug charges.  See TT 3/9/04, 8 ("Ms. Booth: Okay.  But I do want to annotate to that, your Honor, that Wiley Taylor was indicted, I was the prosecutor on that case, on a methamphetamine conspiracy.  He came in, he pled guilty, and he cooperated on that case.").

106

USCA5 450

and knew he would be getting a sentence reduction.  In fact, Mr. Taylor got more than he was "hoping" for and on April 12, 2004, was sentenced to sixty (60) months incarceration.  The Government violated its obligation under Brady and its progeny.

**D.    Darick Moore.**

239.    Like Mr. Taylor, Darrick Moore testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both the guilt/innocence and penalty phases of trial.  See generally TT 3/9/04, 200-215; TT 3/23/04, 86-87.

240.    During the guilt/innocence phase of trial, Mr. Moore testified that while they were both incarcerated at the Nueces County Jail, Mr. Bourgeois first told him that JG-1999 died after getting hit on the head during a fight between Mr. Bourgeois and his wife, Robin.  TT 3/9/04, 204.  Mr. Moore testified that Mr. Bourgeois told him that JG-1999 was a bad child and would shake her butt like an adult. Id. at 205-06.  He testified that Mr. Bourgeois told him that he whipped JG-1999 with shower shoes, brushes and extension cords.  Id. at 206.  He also testified that before Mr. Bourgeois got comfortable in the jail dorm, he originally told Mr. Moore that his wife Robin, killed JG-1999.  Id.  Darick Moore also testified that Mr. Bourgeois told him that the injuries to JG-1999's ears were caused by his finger nails while the Government thought they were teeth marks.  Id. at 207.  According to Darick Moore, Mr Bourgeois told him that he caused those injuries by picking JG-1999 up by here ears.  Id.  He also testified that Mr. Bourgeois told him that the injuries to JG-1999's feet were caused by a cigarette lighter.  Id. at 207-08.

241.    At the penalty phase, Mr. Moore testified that Mr. Bourgeois told him he beat his wives; that Mr. Bourgeois said his wife Robin, would "get what she had coming"; and that Mr. Bourgeois said he ran drugs from New Orleans to Miami with his brother.  TT 3/23/04, 87.

USCA5 451

242.    Again, like the testimony of Wiley Taylor and the other informants, the Government

seized upon Mr. Moore's highly incriminating testimony to argue in favor of a conviction and a

death sentence.

> In this case we have a perfect victim.  We have a baby.  But you heard testimony that,
> from Darick Moore, the Defendant said the baby was bad, was a bad baby, acted like
> an adult, would wiggle its bottom.  I think the evidence supports here, believe the
> evidence supports here that this was an unlawful, unjustified killing.

TT 3/16/04, 8-9.

> What do we know from the witnesses about Alfred Bourgeois, the real Alfred
> Bourgeois?  We know that he beats, abuses, all of his wives and brags about it.

TT 3/24/04, 69.

243.    At the time he testified on behalf of the Government, Mr. Moore believed he was

facing a five to twenty year prison sentence for possessing 8.5 grams of crack cocaine with intent to

sell.  TT 3/9/04 at 208-09.  He, like Mr. Taylor, testified that he was "hoping" to get a downward

departure after cooperating with the Government against Mr. Bourgeois. Id. at 203.  Again, however,

like Mr. Taylor, Mr. Moore was not merely "hoping" for a reduced sentence, he knew he would be

getting a reduced sentence.  Additionally, at the request of the Government, Mr. Moore gave

testimony about Mr. Bourgeois that he specifically knew to be false.  Consistent with his known

agreement, although he was facing 151-188 months in prison, Mr. Moore was originally sentenced

to 65 months incarceration, but that sentence was later reduced to 50 months.  See Darrick B. Moore,

Transcript of Sentencing, 4/22/04, contained in *PA*, document # x61; Judgment of Sentence, 4/22/04,

*PA*, document # 62; Amended Judgment of Sentence, 12/27/04, *PA*, document # 63.  The

Government violated its obligation under Brady and its progeny.

108

USCA5 452

### E.  Materiality.

244.  Since this is a fact pleading and not a legal brief, Petitioner will not provide the Court with legal argument and authority showing that these due process violations were material to guilty and punishment.  At this juncture, Petitioner is simply make the allegation that each of these due process violations singularly, and certainly in combination, were material to guilt, and to punishment and require vacation of the judgment of conviction.

**CLAIM VIII.  PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

245.  The constitutional right to counsel carries with it the right to representation that is free from conflicts of interest.  The right to conflict-free counsel applies regardless of whether counsel is appointed by the Court or selected by the defendant.  Representation of a criminal defendant entails certain basic duties.  Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest. Undivided allegiance and loyalty are the hallmark of the Sixth Amendment right to counsel.

246.  Because the duty of loyalty is so fundamental, and because it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, prejudice is presumed when the duty of loyalty is breached. A violation of the duty of loyalty, resulting in the deprivation of the defendant's Sixth Amendment right to counsel, occurs when there exists an actual conflict of interest that adversely affected the assistance of counsel.

247.  From the very beginning of this case, Petitioner was deprived of his right to counsel acting in his interest.  Petitioner was represented at trial, and on direct appeal, by Mr. Tinker and Mr.

109

Gilmore.   Trial counsel had irreconcilable conflicts from the start of this capital case.   These conflicts adversely affected counsel's performance, depriving Petitioner of a fair trial, a fair sentencing and violating his Sixth Amendment right to counsel. A new trial and sentencing are mandated.

248.   Prior to and during Petitioner's trial, Mr. Gilmore represented an individual by the name of Ross Griffin.  Mr. Griffin was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana.  Mr. Griffin was housed with Petitioner in the Nueces County Jail along with Mr. Adam Longoria[28] and Mr. Darrick Moore.[29]  Mr. Griffin was cooperating with AUSA Patti Booth as a jailhouse informant against Petitioner.  (FBI 302 dated 7/1/03 contained in *PA*, document # 60)  Had trial counsel not been laboring under a conflict of interest they could have interviewed/investigated Mr. Griffin and learned that he had been offered favorable treatment to cooperate against Petitioner and had been provided information about Petitioner's case.  Mr. Griffin could have been called as a witness for Petitioner to testify to these facts and to the fact that the other jailhouse informants that he knew (Longoria and Moore) had received similar treatment in return for cooperating against Petitioner.  Because counsel was laboring under a direct conflict of interest he could not and did not conduct such an interview/investigation and Mr. Griffin was not called as a witness on behalf of Petitioner.

249.   Mr. Gilmore also was laboring under a conflict of interest with regards to jailhouse

---

[28]Mr. Longoria was a jailhouse informant who testified for the Government and against Petitioner at the penalty phase of the trial.

[29]Mr. Moore was a jailhouse informant who testified for the Government and against Petitioner at both the guilt/innocence and penalty phases of the trial.

110

informant Adam Longoria. Prior to Petitioner's trial Mr. Gilmore had actually called Mr. Longoria as a witness on behalf of another one of Mr. Gilmore's clients who had been housed at the Nueces County Jail. Mr. Longoria was called – by Mr. Gilmore in Mr. Gilmore's other trial – to testify to matters he had heard while in the same jail (Nueces County Jail) and same cellblock as Petitioner. Furthermore, the prosecutor in this "other" case was the same prosecutor (Jimmy Sales) who offered Mr. Longoria a radically reduced sentence six weeks after he testified against Petitioner – despite Mr. Longoria's testimony to Petitioner's jury that Sales "hates me now." TT 3/22/04, 186. Having used Mr. Longoria as a witness to give sworn testimony as to matters he observed in prison on behalf of a client (not Petitioner) Mr. Gilmore was conflicted and prevented from fully and effectively confronting Mr. Longoria on cross-examination at the penalty phase of Petitioner's trial. TT 3/22/04 179-80, 186.

250. Mr. Gilmore was also laboring under a conflict of interest with regards to jailhouse informant Orlando Campos. Mr. Campos testified as a jailhouse informant for the Government and against Petitioner at both the guilt/innocence and penalty stages of trial. Prior to Petitioner's trial, Mr. Gilmore represented Roel "Dody" Contreras, a co-defendant of Mr. Campos in a Bee County capital murder case. Mr. Campos originally agreed to testify against Mr. Contreras in return for a plea to reduced charges and a probation sentence. However, after originally testifying against Mr. Contreras (while Mr. Gilmore represented Mr. Contreras) and after receiving his drastically reduced sentence, Mr. Campos changed his mind and attempted to disavow his prior testimony against Mr. Contreras. Given this change of events, Mr. Gilmore was conflicted and prevented from fully and effectively confronting Mr. Campos on cross-examination at the guilt/innocence and penalty phases of Petitioner's trial. TT 3/9/04, 221-223, 3/23/04, 81.

111

USCA5 455

251. For all of these reasons Petitioner's trial counsel were laboring under an actual conflict of interest prior to and during their representation of Petitioner and Petitioner was denied his Sixth Amendment right to counsel. As a result of these conflicts, counsel's performance was adversely affected. Petitioner is entitled to a new trial and sentencing proceeding.

**CLAIM IX. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

252. A prosecutor's duty is not merely to seek a conviction, but to seek justice. Part of the duty to seek justice requires a prosecutor to avoid improper argument. The prosecutor's duty to avoid improper argument arises, in part, because prosecutorial comments are cloaked in his or her role as representative of the government, and consequently jurors are predisposed to defer to his or her words. As a result, improper prosecutorial arguments are apt to carry much weight against the accused when they should properly carry none. For this reason, misconduct by the prosecutor must be scrutinized carefully. Moreover, the prosecutor's obligations and the court's scrutiny are never greater than in capital proceedings.

253. During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial and a reliable capital sentencing verdict

254. The prosecutor's actions, both individually and cumulatively, amounted to prosecutorial misconduct. To the extent that trial counsel failed to object to any of these comments and arguments or request a curative instruction, they were ineffective. Appellate counsel was also

USCA5 456

ineffective to the extent they failed to litigate these issues on appeal. Petitioner was denied his rights

under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

### A.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing."

255.    The prosecutor engaged in misconduct by improperly referring to Mr. Bourgeois as

"that thing." During the guilt/innocence phase closing argument, the prosecutor stated:

> The doctors told you they did a test bite mark. And they did a test bite mark that went away in 24 hours. I'm showing you now what's Government's Exhibit 97 and you're going to have all these photos back there. And they told you they analyzed this bite mark. And they did the best they could to determine – to exclude, their goal was to see who they could exclude. And they excluded Robin. But who did they not exclude? They didn't exclude this man, **that thing that's sitting right there**.

TT 3/16/04, 48-49. This comment was highly improper. The Constitution requires that the life or

death decision of a capital sentencing jury be based on a reasoned moral response to the aggravating

and mitigating evidence presented at trial. The dehumanizing comment in this case – labeling Mr.

Bourgeois a "thing" – was solely intended to inflame the passions and prejudices of the jury and

distract them from their proper sentencing role.

### B.    The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility.

256.    During the Government's penalty phase closing argument, the prosecutor engaged

in misconduct by improperly appealing to the jury's sense of civic responsibility. The prosecutor

stated:

> The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen. The

113

arrogance of his cruelty.

Id. at 17-18.  Appeals to a jury's sense of civic responsibility are improper.  In this case, the

prosecutor's argument improperly urged the jury of U.S. citizens to sentence Mr. Bourgeois to death,

not because of the evidence, but because of their civic responsibility to another U.S. citizen.  This

was highly improper.

### C.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument.

257.    The prosecutor engaged in misconduct by making an argument she knew to be false.

In her guilt/innocence phase closing argument, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks.  You didn't hear that.  The only child whose bite was analyzed was excluded.  He told you that there was forum shopping by the united States on our experts and what did you hear.  We sent our teeth to Dr. Senn.  Dr. Senn made his analysis and sent it for a second opinion.  In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion.  Is that expert shopping or is that just making sure?

Id. at 19-20.  This argument was false and highly improper.  Indeed, the Government had engaged

in "forum shopping" for favorable bite mark evidence.  As fully set forth in claim V, before trial, the

Government consulted with United States Army Colonel J. Curtis Dailey, M.D., who was unable to

provide them with favorable bite mark evidence.  Indeed, Dr. Dailey could not single out Petitioner

as the alleged biter of JG 1999.  Thereafter, when Dr. Dailey informed AUSA Booth of his

conclusions, AUSA Booth angrily told Dr. Dailey that Petitioner was a "very bad man" and if he

could not help her by finding a match she would go out and find an expert who could.  AUSA Booth

then hung up the phone on Colonel Dailey, MD.  See *PA*, document # 45.  Thus, contrary to her

argument to the jury, the Government did "forum shop" and the prosecutor's argument was patently

114

USCA5 458

false.

**D.     The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References.**

The prosecutor engaged in misconduct by repeatedly making improper biblical references during the guilt/innocence closing argument.  The prosecutor stated:

> Now you've all heard of the Proverb that pride comes before the fall.  With your permission I would like to just change the Proverb just a little bit and speak to arrogance before the fall.

\*                                                    \*                                                    \*

> He called it 'it'.  The kid that died.  The fucking kid and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

\*                                                    \*                                                    \*

> And Ms. Booth, when she got up here she mentioned a Proverb that talks about pride going before the fall.

TT 3/16/04, 11, 17, 46.  These comments were highly improper.   References to biblical passages introduce extraneous factors for the jury to consider in violation of the Eighth Amendment.  Moreover, the jury's exposure to improper influences from outside sources violates due process and is especially prejudicial because the jury's receipt of such information is not accompanied by procedural safeguards.

258.    The prosecution's duty to refrain from inflaming the passions of the jury is particularly important in the penalty phase of a capital case. The Eighth Amendment's requirements of heightened reliability in the determination that death is the appropriate punishment in a specific case and that the sentencing process must minimize the risk of wholly arbitrary and capricious action

115

by the sentencing jury, require that special scrutiny be given to prosecutorial argument in the penalty phase. In this case, the prosecutor repeatedly crossed the line of permissible prosecutorial argument.

> **E.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations.**

259.    The prosecutor engaged in misconduct when she improperly told the jury that she had five children, has buried family and that her youngest brother was in Iraq. During the penalty phase closing argument, the prosecutor stated:

| | |
|---|---|
| Ms. Booth: | Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death. And he's very wrong. **I've raised five children, I've buried family** – |
| Mr. Tinker: | She's outside the record here, your Honor, and I just – |
| Ms. Booth: | Judge I'm responding to – he opened the door. |
| Mr. Tinker: | About how many kids she's got doesn't have anything to do with the trial in this case. |
| The Court: | Go ahead, Ms. Booth |
| Ms. Booth: | **My baby brother is in Iraq serving his country**. Things are hard, and this is the hardest thing that I have ever done in my life. |

TT 3/24/04, 66-67. Although defense counsel previously stated that seeking death may be easy for Ms. Booth, id. at 64, the prosecutor's response was highly improper. If defense counsel's comments were improper, the prosecutor should have objected and requested a curative instruction from the Court. Instead, the prosecutor improperly diminished the jury's sense of ultimate responsibility for their life or death decision by telling them that she personally believed death was the appropriate sentence, even though seeking death was more difficult than raising five children, coping with the death of family members and living with the constant fear and insecurity of having her youngest

116

USCA5 460

brother in a Middle Eastern war zone.

**F.      The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog."**

260.    The prosecutor engaged in misconduct when she improperly described Mr. Bourgeois

and his brothers as "attacking like a bunch of dogs."

> You know he was emboldened by the legal system not working.  You know it.  He abused women, he abused – abused babies, and nothing ever happened.  Temporary restraining orders were filed, but he got his wife to pull those back.  Charges were filed on him for taking a gun and putting it in the face of his aunt, widowed aunt, with a dying son inside, pointing guns and saying, "I'm going to kill you," **and biting his cousin and attacking like a bunch of dogs, his brothers.**

Id. at 71-72.  This was extremely improper.  Comparison of the Petitioner to an animal has no place

in our criminal justice system.  An Assistant United States Attorney who has taken an oath to uphold

the laws of the United States and who has been vested with the powers of the federal government

and prosecution must never be allowed to resort to such malicious and unseemly name calling.

These dehumanizing comments served one purpose: to inflame the passions of the jury, which was

about to embark on the most serious of duties – deciding the life or death of the Petitioner.  They

were improper and they cannot be condoned.

**G.      The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel.**

261.    The prosecutor engaged in misconduct by improperly disparaging opposing counsel.

During its penalty phase closing argument, the prosecutor stated:

> And do you know why I bring that up, ladies and gentlemen?  Because we brought people in here that were in prison with the defendant; we brought them in here and we didn't bring them in a suit.  We told you right off the bat, they've done bad things, they're convicted.  But that's not what the defense did.  Marched them in here in suits to testify, didn't mention he was a fired policeman, convicted at least three times for fraud.

117

USCA5 461

Mr. Tinker:    Your Honor, we have no control of what a witness shows up wearing when they're subpoenaed to be here and I object to that line of argument, that we had something to do with that.

\*                                      \*                                      \*

You know, and I think that maybe even the Defendant has convinced and said it so many times to his Defense counsel, that the baby was an it, because Mr. Gilmore said, "Well, he was happy about it."

Id. at 72-73, 77.    These comments are inappropriate because they divert the jury from its proper sentencing role and prejudice and inflame the passions of the jury against Petitioner.

## H.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos.

262.    The prosecutor engaged in misconduct by falsely arguing that Government witness Orlando Campos testified on behalf of the prosecution solely out of a sense of justice.  During its penalty phase closing argument, the prosecution argued:

> The Defense talked about how you shouldn't believe these guys, these prisoners, because, you know, they're all in here, to be paid.  I just want to bring one person to your memory.  Remember Orlando Campos?  He was the second prisoner we brought in.  He was the State – had been convicted on state charges and he told you that he knew that the Government couldn't really help him much. He hoped that we would tell the State prosecutor something and maybe he would get lesser but what did he really tell you.  Why did he tell you he came in here?  He told you he came in here because the Defendant confessed, said, I killed that child.  I can tell God because God will forgive me but I ain't never going to tell a jury – or a judge, he said.  One of his letters, one of the defendant's letters talks about the fact that he has given this up to God.  But what's really important is Orlando Campos told you the reason he came in here is not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man should be held accountable.

Id. at 57-58.  The prosecutor, however, knew this argument was false.  The use of false, inaccurate or misleading prosecutorial testimony deprives a defendant of a fair trial if the false testimony could in any reasonable likelihood have affected the judgment of the jury.  In this case, Orlando Campos more than "hoped" he would be getting a sentence reduction for his cooperation with the

118

USCA5 462

Government, he <u>knew</u> he would be getting a deal. <u>See</u> Claim VII. Accordingly, the prosecutor's argument that Mr. Campos was cooperating solely because he thought Mr. Bourgeois should be held accountable was false and improper. There is a more than reasonable likelihood that this false and improper argument impacted the decision of the jury.

### I. The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation.

263. In a capital case, the fundamental respect for humanity underlying the Eighth Amendment to the United States Constitution requires that the sentencer be allowed to hear and consider any mitigating evidence that the defendant proffers as a basis for a sentence less than death. In this case, the prosecutor flouted this fundamental Eighth Amendment principle by improperly disparaging and diminishing the mitigation proffered on behalf of Mr. Bourgeois. The prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers the aggravating factors that he's alleged to, and they are that he was under substantial duress, that he was – that he was driving in an 18- wheeler with three children, that he had family and economic pressures. You know and I thought, "Oh, well, that's just life, that's not mitigation."

<u>Id.</u> at 74. While the jury in this case was certainly free to decide that the mitigation proffered on behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument that Mr. Bourgeois evidence "was not mitigation," improperly prevented the jury from considering the mitigating evidence. Thus, the jury's weighing process was improperly skewed in favor of death.

### J. Conclusion.

264. The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess. Individually and cumulatively the prosecutor's comments so

USCA5 463

infected the trial with unfairness as to make the conviction a denial of due process.

265.    Moreover, the Court took no steps to cure these errors.  The Court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and enhances the constitutional violations.

266.    Counsel's failure to object, request a limiting instruction, or raise and preserve these issues at trial or on appeal denied Petitioner his right to effective assistance of counsel. These errors undermined the reliability of the verdict determination and deprived Petitioner of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.  Petitioner is entitled to a new trial and/or sentencing hearing.

**CLAIM X.**     **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REBUT THE EVIDENCE OF PETITIONER'S INDIFFERENT DEMEANOR AT THE GUILT STAGE OF TRIAL WITH MENTAL HEALTH EVIDENCE.**

267.    At trial, the Government elicited testimony from several witnesses to show Petitioner's indifferent demeanor to the injuries and death of his daughter.  This evidence was very prejudicial, as it indicated a callous and cruel heart on the part of the Petitioner.  Petitioner's demonstrated lack of feeling about the events of the day could even be seen by the jury as evidence of guilt.  The Government used this evidence to bolster their case against Petitioner.

268.    Indeed, the Government referred to Petitioner's indifferent attitude during opening statements.  TT 3/2/04, 39-41.  AUSA Patti Booth told the jury, "you're going to hear about the callous statements of the Defendant." Id. at 41:

> You'll hear the people testify about the demeanor of the Defendant.  You'll hear how when the ambulance came, it was Robin that went with the child to the hospital at Driscoll.  You're going to hear a Mr. Smith come and testify that he offered to take Mr. Bourgeois to the hospital, and he was more concerned about getting his load than he was about going to the hospital with his child, who is obviously not resuscitating.

120

Id. at 40.

269.    Multiple witnesses testified that they were surprised by Petitioner's lack of emotion on the day of his daughter's injuries. See e.g. Testimony of Hal Resides, TT 3/2/04, 122-24; Karen Kruger, TT 3/2/04, 158-162; Joni Dee Parker, TT 3/2/04, 202-204; Timothy Darr, TT 3/2/04, 225-227, 236, 239; David Paolette, TT 3/2/04, 276; Michael Brozgal, TT 3/2/04, 289; Michael Guy Smith, TT 3/2/04, 318, 323-4, 330.

270.    Unquestionably, this testimony and the Government's argument about this testimony had an impact on the jury that could easily have been mitigated by defense counsel. Mr. Bourgeois suffers from several mental disorders that explain his demeanor on that day. First, Mr. Bourgeois is mentally retarded. See Claim I, above. This combined with his other neuropsychological deficits inhibit his ability to process new information, especially in stressful situations. See Claim II, above. Finally, Mr. Bourgeois is known to suffer from Borderline Personality Disorder. This disorder further damages his ability to react to attachment and loss in a normal manner. Borderline Personality Disorder can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress. This sort of "spacing out" is not volitional, but is tied up with the disorder. The loss of a family member was likely more than Mr. Bourgeois could handle, given his impaired cognitive and emotional functioning.

271.    As demonstrated in Claims I and II, defense counsel had this information at its fingertips and could have presented it at guilt phase to rebut evidence regarding Mr. Bourgeois' demeanor. In this way, the demeanor evidence, rather than pointing to Mr. Bourgeois' guilt and hardness of heart, could have humanized the defendant in the eyes of the jury. This information, in the event Mr. Bourgeois was found guilty, could also have tied into the potential penalty phase

121

USCA5 465

presentation and sentencing.  An understanding of Mr. Bourgeois' mental health would have provided the jury with a more mitigating, coherent story of both the offense and the actor they believe committed it.

**CLAIM XI.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A TRIAL AND TO COUNSEL WHEN THE GOVERNMENT'S MENTAL HEALTH EXPERT RELIED UPON HIS INTERACTIONS WITH DEFENSE COUNSEL DURING THE TRIAL TO FORMULATE ADVERSE OPINIONS ABOUT HIM.**

272.    During his penalty phase testimony, Dr. Carlos Estrada opined that Petitioner presented a danger of future violence, he had a Narcissistic Personality Disorder, and he was manipulative of others.  This opinion was based on a number of factors, including the following response to the Government's question about whether Dr. Estrada had an opportunity to observe Mr. Bourgeois during the trial proceeding:

> I would say that in my opinion, Mr. Bourgeois attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim.  He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.
>
> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him.  And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

TT 3/22/04, 286.

273.    Defense counsel did not object to this testimony.

274.    The Government's reliance on a mental health opinion that was based upon Petitioner's participation as "part of the defense team" violated Petitioner's right to participate in his trial and to assist counsel.  In effect, Petitioner was penalized by invoking and exercising these fundamental rights.  Trial counsel ineffectively failed to object to this testimony, or to raise it on

122

direct appeal. There was no tactic or strategy dictating not raising this obvious claim.

275.    This error is structural as it implicates fundamental rights to counsel and to a trial.

Accordingly, this error must result in the granting of a new trial.

**CLAIM XII.    APPELLATE COUNSEL WERE INEFFECTIVE IN VARIOUS RESPECTS.**

276.    Appellate counsel failed to raise a number of the record-based claim for relief raised

herein. As counsel could not have had a sound tactic or strategy for not having raised these claims,

they rendered ineffective assistance.

277.    Appellate counsel is ineffective when he fails to raise a claim for relief that is obvious

in the record and which, if raised, would have resulted in a successful appeal.

> **A.    This Court Improperly Admitted Inflammatory and Prejudicial Photographs During Both the Guilt/Innocence and the Penalty Stages of Trial. Direct Appeal Counsel Ineffectively Failed to Raise this Error.**

278.    The admission of highly inflammatory photographs at both the guilt/innocence and

penalty phases of trial denied Petitioner his right to a fair trial and warrants both a new trial and a

new sentencing hearing.

279.    Throughout the trial, the jury viewed multiple inflammatory photographs of the

victim. At the guilt stage, the jury was made to view **color** photographs of the victim's autopsy,

including a slide show of autopsy pictures **enhanced** to emphasize the victim's injuries. The primary

purpose of these pictures was to upset and inflame the jury. The use of color autopsy photos,

including pictures of JG1999's skin peeled away from her skull, was not necessary to prove the

elements of the Government's case. See e.g. TT 3/8/04, 22-24. Without a doubt, however, they did

leave a lasting impression on the jurors' consciousness and prejudiced them against the Defendant.

Further, photographs (Exhibits 150-224) were enhanced to show the victim's injuries in greater

123

relief.  While the use of these enhanced photos raises separate constitutional concerns (see Claim V

and VI, above), they should not have been admitted as their prejudice outweighed their probative

value.

280.    These pictures were also incorporated into the penalty phase of trial, although they

were even less relevant at that stage.  TT 3/22/04, 13.  Additional inflammatory photographs were

introduced at penalty phase for the first time, including 17 pictures of the young victim from when

she lived with her mother and grandmother.  Two of these pictures seem especially inappropriate:

Exhibit 410, a picture of the young victim's dead body in her casket and Exhibit 411, a picture of

the decedent's grave.  TT 3/22/04, 223-241.

281.    The prejudice of the disturbing and gruesome pictures clearly outweighed their

probative value.   Cumulatively, these pictures could not but help to shock the jurors to their core.

282.    Trial counsel rightfully objected to the admission of all of these photographs. See e.g.

TT 3/1/04, 102; 3/8/04, 1-8.  However, Counsel's failure to raise this issue on direct appeal was

ineffective.  The admission of overly prejudicial photographs denied Petitioner due process.  Relief

should be granted in the form of both a new trial and a new sentencing phase.

**B.      Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-social Histories of Others Who Have Been Sentenced to Death. Counsel Was Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal.**

283.    The right to individualized sentencing in capital cases is protected by the Eighth

Amendment, and has been repeatedly upheld by the United States Supreme Court.

284.    Petitioner's right to individualized sentencing was violated when the Government

elicited testimony from Dr. Estrada, their mental health expert at penalty phase, a comparison

124

between Mr. Bourgeois' history of childhood abuse with the histories of other convicted murderers

on Death Row:

> **Q:**   Do you know much about the background of people that have actually murdered somebody and been given the death penalty?  Do you know much about any of that?
>
> **A:**   Unfortunately I have been involved in a number of those cases.
>
> **Q:**   And there are – are there people that have been abused as children that were ultimately sentenced to death because of their actions?
>
> **A:**   Not the majority.
>
> **Q:**   Okay.  But some have been?
>
> **A:**   Yes.

TT 3/23/04, 57.

> 285.   At trial, defense counsel attempted to object to this testimony and asked for a mistrial:

> Mr. Tinker:   Your Honor, during cross-examination of Dr. Estrada, Mr. Roberts asked him about –
>
> *                                            *                                            *
>
> Mr. Tinker:   Asked him if there were other people who were accused of causing the death of  – in the battery of a child causing the death who had received the death penalty.  I didn't object at that time because I didn't want it to disrupt the flow, but I do object at this time and –
>
> *                                            *                                            *
>
> Mr. Tinker:   I do object at this time.  By comparing – by comparing our client and the facts in this case with some other cases in which somebody got the death penalty is prohibited under the law in my view, and I think it's a violation of the Eighth Amendment of the Constitution.  I don't think any instruction can cure it, and I do ask for a mistrial at this time.  Does the Court recall the testimony?
>
> The Court:   I do.
>
> Mr. Tinker:   You shouldn't ever be able to compare – Mr. Gilmore says Eighth

125

**USCA5 469**

and Fourteenth Amendments –[30]

The Court:   Let's get all the Amendments in there.

Mr. Tinker:   Yes, your Honor.  But anyway, that's my objection and I request a ruling from the court.

The Court:   Response?

Mr. Roberts:   Well, your Honor, it was – it was not comparing the circumstances of this case to any other case, it was merely asking – there was quite a bit of information about whether someone who had gone through abuse and whether those people are going to be able to – you know, whether those people should basically be allowed to just carry out their life in – life imprisonment.  And that was simply – just asked the Doctor if he was aware of anyone that had that kind of background.

The Court:   I don't know the case law, Mr. Tinker.  I'll just have to carry it forward at this point.  I'll do some work on it.

TT 3/23/04, 74-78.

286.    The Government's elicitation of evidence that compared Mr. Bourgeois to other individuals who had been convicted and sentenced to death was unconstitutional because it deprived him of his Eighth Amendment right to an individualized sentence.  The jury was allowed to reason that other individuals who had been abused as children had been sentenced to death, so Mr. Bourgeois could be as well.  It also unfairly lessened the mitigating impact of Mr. Bourgeois' childhood trauma and denied him the right to individualized sentencing.

287.    Mr. Tinker's confusion about the testimony to which he was objecting, and his inability to state a well formed objection prejudiced Mr. Bourgeois.  Further, and more importantly, counsel's failure to raise this meritorious claim at all on appeal denied Mr. Bourgeois his right to

---

[30]Mr. Gilmore's reliance on the Fourteenth Amendment was obviously misplaced as it has no application in a federal criminal prosecution.

126

USCA5 470

effective assistance of appellate counsel.

**C.      Counsel Ineffective Failed to Raise All Record Based Errors, Even if they Were not the Subject of a Proper Objection or Where Otherwise Waived.**

288.     Under the federal "plain error" rule appellate counsel is obliged to raise all record-based claims, even if the question was not properly raised and preserved at trial.

289.     Appellate counsel in this case were ineffective for failing to raise all of the record-based claims discussed herein, which were not properly raised or objected to at trial.

**CLAIM XIII.  PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS DESCRIBED HEREIN.**

290.     Each of the above-described claims of constitutional error stand on their own and independently require relief.  However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cummulative impact of the constitutional violations.

291.     Petitioner will brief for this Court the concept that such violations must be viewed in such cummulative fashion.  For now, Petitioner alleges that the cummulative impact of the errors requires a new trial and sentencing hearing.

**CLAIM XIV.  PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING.**

292.     Petitioner has obviously alleged many facts, and he strongly suspects that the Government will not be in complete agreement with these allegations.  Should the Government contest any material fact, Petitioner is entitled to an evidentiary hearing in order to prove these facts. Although analysis of the scope of such a hearing will have to await the Government's responsive filings, at this juncture and to avoid any claim of waiver, Petitioner requests that he be afforded a hearing on any disputed fact, which, if proven individually or in combination with other facts, would

USCA5 471

entitle him to relief.

### CLAIM XV.  THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.

293.    Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution.  This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

294.    While Petitioner's belief that the execution under the current Bureau of Prison protocols would violate the Eighth Amendment, he believes that for two reasons this challenge is not appropriate at this time, or in this pleading.

295.    First, since Petitioner's execution is far from imminent, the question is not yet ripe.

296.    Second, since the Supreme Court's decision in Hill v. McDonough, 126 S.Ct. 2096 (2006), a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983.

297.    Petitioner will be happy to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate.  It would seem like a waste of resource to litigate it at this time, inasmuch as Petitioner believes he will not be executed, but instead he is entitled to relief.  Petitioner nonetheless raises the claim herein to avoid a later claim of waiver, and he will amend it should either the Court or Government believe it should be litigated now.

128

**REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution, Petitioner,

respectfully requests that the Court provide the following relief:

A.  That Petitioner be permitted to file a Brief in Support of this Petition within 120 days;

B.  That the Government be required to answer this Petition and file a responsive Brief;

C.  That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motion for Discovery;

D.  That upon such discovery litigation, that Petitioner be permitted to Amend this Petition;

E.  That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

F.  That the Court permit oral argument as appropriate and required;

G.  That at the conclusion of the proceedings that the Court vacate Petitioner's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted.

USCA5 473

Respectfully Submitted,

/s/    Michael Wiseman

_____

Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

*Co-Counsel of Record for Petitioner Alfred Bourgeois

Dated: Philadelphia, Pennsylvania
May 14, 2007

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 14th day of May, 2007, I caused the foregoing to be served upon the following person by United States Mail, First Class Postage prepaid, and by e-filing:

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

_____    /s/    Michael Wiseman____

_____

Dated: May 14, 2007
Philadelphia, PA

130

USCA5 474

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____ :
                                  :
UNITED STATES OF AMERICA,         :         No. Cr-C-02-216
                                  :
            Respondent,           :      Honorable Janis Graham Jack,
                                  :              U.S.D.J.
        -against-                 :
                                  :      **This is a Capital Case**
ALFRED BOURGEOIS,                 :
                                  :
            Petitioner.           :
                                  :
_____ :

**PETITIONER'S NOTICE OF FILING OF
APPENDIX IN SUPPORT OF SECTION 2255 MOTION**

   **Please Take Notice** that Petitioner, Alfred Bourgeois, hereby files the attached three

volume *Appendix in Support of his Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in*

*the Alternative Pursuant to 28 U.S.C. 2241*.

/s/ Michael Wiseman


_____
 Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
       May 15, 2007

**USCA5 475**

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 15th day of May, 2007, I caused the foregoing to be served upon the following person by United States Mail, First Class Postage prepaid, and by e-filing:

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

/s/      Michael Wiseman

Dated: May 15, 2007
Philadelphia, PA

USCA5 476

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| Respondent, | : | Honorable Janis Graham Jack, |
| -against- | : | U.S.D.J. |
| ALFRED BOURGEOIS, | : | **This is a Capital Case** |
| Petitioner. | : |  |

**PETITIONER'S APPENDIX IN SUPPORT OF
MOTION FOR RELIEF PURSUANT TO
28 U.S.C. SECTION 2255
OR IN THE ALTERNATIVE
PURSUANT TO 28 U.S.C. 2241**

MAUREEN KEARNY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
May 14, 2007

USCA5 477

**Index to Appendix**

Document     Description
Number

Mental Health Expert Reports and Declarations
1.    Interview Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/10/04
2.    Mitigation Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/25/04
3.    Risk Assessment Letter Report of Mark D. Cunningham, Ph.D., ABPP dated 2/25/04
4.    Mitigation PowerPoint by Mark D. Cunningham, Ph.D., March 2004
5.    Risk Assessment PowerPoint by Mark D. Cunningham, Ph.D., March 2004
6.    Declaration of Mark D. Cunningham, Ph.D., ABPP dated 5/11/07
7.    Declaration of Carlos R. Estrada, M.D. dated 5/14/07 and Curriculum Vitae
8.    Declaration of Michael M. Gelbort, Ph.D. dated 5/11/07
9.    Letter Report of George W. Holden, Ph.D. dated 12/19/03
10.   Letter Report of George W. Holden, Ph.D. dated 2/25/04
11.   Declaration of George W. Holden, Ph.D. dated 5/13/07
12.   Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W.
13.   Declaration of Robert L. Sadoff, M.D. dated 5/12/07
14.   Declaration of Jethro W. Toomer, Ph.D. dated 5/9/07
15.   Dr. Weiner's Score Sheet from WAIS-R Administered in 2004
16.   Declaration of Donald E. Weiner, Ph.D. dated 5/10/07 and attached Report of 3/3/04

Lay Witness Declarations
17.   Michelle Armont
18.   Nathaniel Banks
19.   Isaac Bourgeois, III
20.   Murray Bourgeois
21.   Wilmer Bourgeois, Sr.
22.   Lawanda Cook
23.   Anthony Dumas
24.   Anita Ferdinand
25.   Lloyd Ferdinand
26.   Beverly Frank
27.   Allen Henry
28.   Jersey Henry
29.   Yvonne Robinson Joseph
30.   Kathleen Kaib (re: Orlando Campos)
31.   Adam Longoria
32.   Bill May
33.   Elnora Bourgeois McGuffey
34.   Alton Preston
35.   Jevona Jeanette Rixner
36.   Keith Rixner
37.   Louis Russell, Jr.
38.   Ivy Thomas
39.   Michelle Warren
40.   Claudia Williams

USCA5 478

Forensic Expert Reports, Declarations, Curricula Vitae, and Related Court Documents

41.   Curriculum Vitae of Edward T. Blake
42.   Report of Charles Michael Bowers, D.D.S., J.D. dated 5/11/07
43.   Report of Michael Cherry and Manfred Schenk, MAC dated 5/11/07
44.   Letter Reports of Colonel Jon Curtis Dailey, D.D.S. dated 9/29/02 and 7/14/03
45.   Declaration of Colonel Jon Curtis Dailey, D.D.S. dated 5/4/07
46.   Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* dated 10/8/03
47.   Order Granting Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* 10/20/03
48.   Order dated 2/25/04 requiring Defense to provide the Government with written summaries of expert witnesses Rupp, Holden, and Johnson
49.   Report of Elizabeth A. Johnson, Ph.D. dated 3/1/04
50.   Report of Kathleen S. Kagan-Hallet, MD
51.   Curriculum Vitae of Charles Alan Keel
52.   Autopsy Report of Elizabeth Rouse, Maj., USAF, MD, FS dated 1/10/03
53.   Affidavit of Werner U. Spitz, MD dated 5/10/07 and Curriculum Vitae


Records

54.   Lutcher High School Transcript dated 5/24/83
55.   Letter from Lt. David M. Wilson to Sheriff Lloyd B. Johnson dated 5/6/85
56.   Psychological Evaluation by Morris & McDaniel, Inc. dated 5/22/85
57.   Louisiana Motor Vehicle Lease Agreement dated 1/10/01
58.   Notice of State Tax Assessment and Lien dated 12/4/02
59.   *Ford Motor Credit Company vs. Alfred Bourgeois* Suit on Net (Closed End) Lease filed 4/25/03
60.   FBI-302 Investigation Report dated 7/1/03 regarding Interview of Ross Griffin on 6/30/03
61.   Transcript of Sentencing in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 4/22/04
62.   Judgment of Sentence in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 4/22/04
63.   Amended Judgment of Sentence in *U.S. v. Darrick B. Moore* in CR-C-03-075(1) dated 12/27/04

USCA5 479

1

USCA5 480

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958

02-10-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: U.S. v Bourgeois

Dear Mr. Gilmore:

As you are aware, this past Saturday I spent 5.5 hours interviewing your client, Mr. Alfred Bourgeois. In the past several days I have also conducted extended telephone interviews of Mr. Bourgeois' older siblings. In the course of these interviews, a significant neurological history in Mr. Bourgeois has been identified. This history is outlined below:

1. In approximately 1984, Mr. Bourgeois suffered a serious head injury when a 3-wheeler he was driving collided with a telephone pole. Mrs. Claudia Williams, Mr. Bourgeois' older sister, reported that he was unconscious for a number of hours following this accident – not regaining consciousness until after hospitalization and surgery. Mrs. Williams reported that Mr. Bourgeois "was not the same person" following this injury. She described that since this injury he has been more "nervous," "can't stand too much excitement," and "shakes" when angry.

2. Mrs. Williams and her husband of 20+ years also described Mr. Bourgeois as experiencing recurrent "rage" episodes. These were observed from his early childhood, but worsened in severity following the above described head injury. Mr. and Mrs. Williams described that during these rages Mr. Bourgeois becomes flushed, "gets a different look in his eyes," and "doesn't seem to hear" attempts to calm him. These rages have been accompanied at times by assaults involving repeated punching and other physical violence, as well as verbal aggression – all well in excess of the provocation. Following these rages, Mr. Bourgeois is reportedly exhausted. Further, Mr. and Mrs. Williams described that while Mr. Bourgeois can typically recall the provoking stimulus, he has fragmented or no memory of his conduct during the rage attack. A very similar description has been

USCA5 481

**U.S. v Bourgeois**
**Cunningham, 02-10-04**

independently provided to a defense investigator by another of Mr. Bourgeois' siblings.

3.  According to family members, these rages are quite out of character from Mr. Bourgeois' typical personality, demeanor, and interaction style.

Given the rage implications of the offense that Mr. Bourgeois has been charged with, a neurological basis for rage symptoms could be of significant explanatory value and mitigating impact.

More broadly, there is a growing body of psychological, psychiatric, and neurological literature which identifies that brain damage has a disproportionately high incidence among violent offenders. To illustrate a portion of this literature, Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that one in three killers exhibited clinically significant neuropsychological impairment.  Lewis et al. (1986) in a study of 15 death row inmates identified that all 15 had histories of severe head injury.  Martell (1992) in a study of 50 randomly selected mentally disordered offenders found at least one indicator of potential brain dysfunction in 84% of the subjects.  In those subjects where an organic brain disorder was diagnosed, 75% had been charged with murder, manslaughter, or attempted murder.  The remaining 25% had been charged with violent sex offenses.  Blake et al. (1995) reviewed the medical records of 31 individuals awaiting trial or sentencing for murder and found abnormal EEG's in 8 of 20 subjects, abnormal MRI's in 9 of 19, evidence of frontal lobe dysfunction in 64%, and evidence of temporal lobe dysfunction in 29% of the subjects. These references are by no means exhaustive of the literature on this subject.

In light of Mr. Bourgeois history as well as research findings demonstrating an association between neurological dysfunction and violent offending, I am strongly recommending that comprehensive neurological and neuropsychological evaluation of Mr. Bourgeois be obtained.

1.  Neurological evaluation: Such neurological evaluation should include an EEG, as well as other studies as indicated to illuminate any neurological contributions to Mr. Bourgeois' rage episodes and associated behavioral dyscontrol.

2.  Neuropsychological evaluation: Neuropsychology is a sub-specialty within clinical psychology requiring advanced specialized training.  Referral to a psychologist specializing in neuropsychological assessment is emphasized.

Finally, I am concerned that medical records that might provide a more definitive description of Mr. Bourgeois' head injury and treatment have not been received. Your efforts to expedite the retrieval of these records would also be much appreciated.

2

USCA5 482

**U.S. v Bourgeois**
**Cunningham, 02-10-04**

Please advise me if I can provide any additional information. Thank you for you consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP (forensic)

3

USCA5 483

2

USCA5 484

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas
972 459 0658     Fax:  972 459 0958

02-25-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: U.S. v Bourgeois

Dear Mr. Gilmore:

You have requested that I summarize my findings and opinions to date regarding my
capital sentencing evaluation of Mr. Alfred Bourgeois relative to the presence of any
factors that might be considered mitigating. These findings and opinions are based on
interview of Mr. Bourgeois, telephone interview of family members, review of limited
records, review of investigation summaries, and review of scholarly literature. I am
continuing to actively seek and interview third parties regarding Mr. Bourgeois and his
history, and accordingly my findings and conclusions may be modified by additional
information that may be made known to me.

Mr. Bourgeois' history includes a number of adverse developmental factors that singly
and collectively increased the likelihood of an adverse and/or criminally violent outcome
in adulthood. These include:

    Abandonment of biological father during much of his childhood
    Emotional rejection and abuse
    Physical abuse
    Death of older brother in childhood
    Significant head injury and subsequent rage attacks

Mr. Bourgeois also exhibited a number of pro-social patterns and positive relationship
behaviors during his adulthood:

    Maintained continuous employment and was regarded as responsible and
        hardworking
    Was an involved father who provided economic support as well relationship to his
        children
    Displayed an ongoing interest in and was a constructive influence on his nieces
        and nephews

USCA5 485

**U.S. v Alfred Bourgeois**
**Capital mitigation – Mark D. Cunningham, Ph.D., ABPP**

Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

2

**USCA5 486**

3

USCA5 487

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas
972 459 0658    Fax:  972 459 0958

02-25-04

Mr. John Gilmore, Esq.
Attorney at Law
622 South Tancahua
Corpus Christi, Texas 78401

Re: U.S. v Bourgeois

Dear Mr. Gilmore:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Alfred Bourgeois relative to the likelihood that he would commit an act of serious violence while confined for life in the federal Bureau of Prison. These findings and opinions are based on interview of Mr. Bourgeois, telephone interview of family members, review of limited records, and review of investigation summaries. I have relied extensively on scholarly publications regarding violence risk assessment and associated group statistical data. My findings and conclusions may be modified by additional information that may be made known to me.

The first analysis of risk is directed to the likelihood that Mr. Bourgeois would personally assault an inmate or staff member during a capital life term. This assessment is most reliable when based on Mr. Bourgeois pattern of adjustment to confinement to date, and the application of group statistical data. Regarding his adjustment to confinement to date, it is my understanding that Mr. Bourgeois has not engaged in any assaults on inmates or staff and further that he has received few if any disciplinary write-ups. It is further notable that this positive initial response to confinement has occurred in contexts where Mr. Bourgeois has shared a common dayroom or group cell.

A number of group statistics are relevant to Mr. Bourgeois's likelihood of serious violence during a capital life term. First, there is research on the prison adjustment of commuted capital offenders that is informative in evaluating Mr. Bourgeois's risk of committing serious violence in prison. More specifically, multiple group statistical studies indicate that the majority of individuals convicted of capital murder do not represent a disproportionate risk of violence while confined in prison. Second, group statistical analysis also reveals rates of disciplinary infractions and violence in prison are negatively correlated with age, even when the offense of conviction was committed at an older age. Third, long-term inmates have lower rates of disciplinary infractions than short-term inmates. Similarly, recent group statistical data identifies life without parole

USCA5 488

U.S. v Alfred Bourgeois
Capital risk assessment – Mark D. Cunningham, Ph.D., ABPP

inmates as representing better institutional assault risks than inmates serving parole eligible terms.

Utilizing studies of death-commuted and life-sentenced capital offenders as anchors regarding the probability of a serious act of prison violence from a capital offender, there is a 20-30% likelihood of a capital offender committing an act of assautive violence at some time across his capital prison term. There is an approximately 8-10% likelihood that a capital offender would present a more chronic violence problem. Applying group statistical data from an exceptionally large (N=6,390) study of assaultive conduct by convicted murderers in state prison, an offender matching the offense characteristics, demographic features, and incarceration history of Mr. Bourgeois would have the following probabilities of serious institutional violence across a capital life term: 2% any serious assault, less than 1% aggravated assault on staff, and less than .2% homicide of an inmate. Mr. Bourgeois possesses none of the risk enhancing factors identified in this study, but does possess a significant risk reducing characteristic of being over age 35 at the outset of his prison term. A risk scale based on 3,013 inmates who were confined at the Potosi Correctional Center at some time 1991-2002 indicated that the comparison inmate group most similar to Mr. Bourgeois, should he be sentenced to life-without-parole, (over age 30, LWOP sentence, high school equivalency) had a 7.9% prevalence rate of assautive misconduct – the third lowest risk group. The likelihood of homicide of a correctional staff member in BOP is less than 1 per 500,000 inmates annually. Additional characteristics that increase his likelihood of a positive adjustment to prison, and reduce the likelihood of perpetrating a serious institutional assault, include his history of gainful employment in the community and his continuing relationships with family members.

As risk of violence is always a function of context, the above estimates of the risk of serious violence could be markedly reduced by ultra-secure confinement such as in ADX Florence. Should Mr. Bourgeois be identified as suffering from a seizure disorder or other neurological dysfunction that would contribute to explosive violence, medications are available that treat and limit such responses.

A second context of risk involves the likelihood that Mr. Bourgeois could effect violence in the community from prison. It is my understanding that allegations to this effect have been made based on reports of jail informants. It is additionally my understanding that the credibility of these reports has not been determined. Evaluation of the risk of ordering violence in the community from prison involves consideration of whether Mr. Bourgeois has either the economic resources to contract such violence and/or a criminal organization that is responsive to his bidding. Mr. Bourgeois appears to possess neither of these. His pre-arrest occupation was an over the road truck driver, and there is no indication that he had any ties to organized crime or even any regular association with criminal elements. Mr. Bourgeois is apparently without significant financial means of his own. The brother that he allegedly identified as the funding source for the ordered violence is reported to be a law-abiding citizen, whose cooperation in such a scheme would seem improbable. Finally, should the Department of Justice conclude that there is good cause to fear Mr. Bourgeois' violent reach, special conditions of confinement can

2

USCA5 489

**U.S. v Alfred Bourgeois**
**Capital risk assessment – Mark D. Cunningham, Ph.D., ABPP**

be brought to bear that would restrict and monitor his communications so that the risk would be negligible.

Please advise me if additional information is desired. Thank you for your consideration.


Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

3

USCA5 490

4

USCA5 491

# U.S. v Alfred Bourgeois

## Capital Sentencing – Mitigation

## March 2004

USCA5 492

USCA5 493

Damaging Factors
_____

• Overwhelmed family system

Dr. Cunningham, did you investigate Alfred's formative years?

Dr. Cunningham, if you accept the jury's verdict that Alfred is guilty of this offense, are there any factors in his formative years that could help us understand how this tragic offense occurred?

What is the first factor that you identified?

2

## Overwhelmed Family System

- Eunice and Lloyd Ferdinand had three children and then divorced.

- Soon after Eunice had Anthony by another man — Anthony was mentally retarded and hidden in the home.

- Alfred was father in illicit relationship with Alfred Sterling, who abandoned them and provided no support.

- Two more children were born to Eunice and Godfrey Rixner.

- Eunice and Godfrey had weekend conflicts associated with his drinking.

- Eunice hit Godfrey on occasion.

- Older brother Clyde drowned at age 12.

- Claudia sent to live with her maternal grandmother for two years. Alfred sent to live with an elderly woman in the neighborhood.

Dr. Cunningham, please explain this factor — how was the family system that Alfred grew up in overwhelmed?

How does that impact on a child that grows up in a family system that's overwhelmed?

3

USCA5 494

Damaging Factors

- Overwhelmed family system

- Abandoned by father

Dr. Cunningham, what's the next factor that you identified?

4

USCA5 495

5

## Abandoned by Father

- Alfred Sterling was married and had a family when involved with Eunice.

- In response to request from Eunice's father, Alfred broke off contact.

- Alfred Sterling provided no child support and made no effort to exercise any relationship.

- Alfred Bourgeois sought out his father in adolescence.

Please describe how that occurred and what contact Alfred had with his father growing up.

How does that impact on a child – to grow up without a father?

5
USCA5 496

USCA5 497

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

Dr. Cunningham, what was the next problematic factor that you identified in Alfred's background?

6

USCA5 498

---

### Childhood Problems
### Putting on the Brakes

- Mischievous and sneaky.
- Did not listen.
- Constant movement – could not sit still and watch television.
- Jumped from one toy or activity to another.
- Always got into things.
- Took things from store.
- Got in trouble at school – frequent fights.
- Tantrums when whipped – reactive and defiant.
- Rage attacks.
- Inferred mental processing deficits in childhood from current neuropsychological testing.

---

Dr. Cunningham, can you give some examples of the sort of behavior that your talking about when you say that he had problems "putting on the brakes"?

7

**Neurobehavioral disinhibition:**

- Difficult temperament in early childhood
- Symptoms of conduct disorder, oppositional defiant disorder, and ADHD
- Teacher ratings of disruptive behavior
- Cognitive testing measuring executive functioning

**Attention Deficit Hyperactivity Disorder**

- Excessive motor activity
- Impulsivity
- Inattention

American Psychiatric Association (1994). DSM-IV. Author.

Tarter, R.E., Kirisci, L., Mezzich, A., Cornelius, J.R., Pajer, K., Vanyukov, M., Gardner, W., Blackson, T., & Clark, D. (2003). Neurobehavioral disinhibition in childhood predicts early age at onset of substance use disorder. American Journal of Psychiatry, 160:6, 1078-1085.

Dr. Cunningham, are there any symptom complexes or diagnoses that these sorts of behaviors in childhood fall under?

8

USCA5 499

---

## Damaging Factors

- Overwhelmed family system

- Abandoned by father

- Childhood problems putting on the brakes

- Emotional rejection and abuse

---

Dr. Cunningham, what was the next damaging factor in Alfred's development?

9

USCA5 500

## Emotional Rejection and Abuse

- Eunice treated Alfred different from other children – he was her scapegoat.
- Appeared to direct her resentment regarding his father toward Alfred.
- Alfred was blamed when children were hurt in playing games.
- Alfred caught more whoppings than the other children.
- Eunice told Alfred that he "wasn't worth nothing."
- Eunice took the other children to the doctor, but refused to seek medical attention for Alfred's nose.
- Sent to live with Ms. Clayton at age 7-8.
- Not allowed to go on family trips or outings.

In what ways was Alfred emotionally rejected and abused?

How does emotional abuse and neglect affect a child?

10

USCA5 501

Damaging Factors

• Overwhelmed family system

• Abandoned by father

• Childhood problems putting on the
  brakes

• Emotional rejection and abuse

• Physical abuse

Dr. Cunningham, was there any other kind of maltreatment that Alfred received?

11
USCA5 502

USCA5 503

## Physical Abuse

- Eunice whopped Alfred with belt or extension cord.

- Routinely left welts and bruises.

- Eunice threw shoe or other objects at Alfred when he disturbed her television programs.

- Eunice insisted on cleaning Alfred's nose so that it chronically bled.

Please describe his experiences of physical abuse.

12

Damaging Factors
─────────────────────

• Overwhelmed family system

• Abandoned by father

• Childhood problems putting on the brakes

• Emotional rejection and abuse

• Physical abuse

• Neuropsychological deficits

Dr. Cunningham, what other problematic factors are part of Alfred's background?

### Neuropsychological Deficits

- Moderate cerebral dysfunction

- May exhibit inappropriate behavior when stressed

- Prone to rage attacks

What do you mean by neuropsychological deficits?

Dr. Cunningham, is it customary for clinical and forensic psychologists to rely on the reports from specialized consultants such as neuropsychologists?

What brain processing problems were revealed by that testing and by the history that you obtained from Alfred's family?

14

USCA5 505

USCA5 506

Damaging Factors
_____

• Overwhelmed family system

• Abandoned by father

• Childhood problems putting on the
  brakes

• Emotional rejection and abuse

• Physical abuse

• Neuropsychological deficits

• Susceptibility to rage attacks

In fact, Dr. Cunningham, are these rage attacks the next factor that you identified?

15

## Susceptibility to Rage Attacks

- Rage attacks observed by siblings from his early childhood.

- Worsened in severity in teens.

- Becomes flushed, "gets a different look in his eyes," and "doesn't seem to hear" attempts to calm him.

- Trembled when angry

- Accompanied at times by assaults involving repeated punching and other physical violence, as well as verbal aggression – all well in excess of the provocation.

- Would have to be pulled off by others.

- Afterwards appears exhausted.

- Could typically recall the provoking stimulus, but had fragmented or no memory of his conduct during the rage attack.

Please describe what you learned about these attacks from Alfred's siblings.

16

USCA5 507



Dr. Cunningham, have you prepared a model that illustrates how these damaging factors are related to the offense that he has been convicted of?

Please describe this model.

USCA5 508



USCA5 509



Dr. Cunningham, in terms of your model, how did Alfred function in most areas of his life?

USCA5 510



So what's the problem – how did these factors relate to any violent conduct?

USCA5 511



USCA5 512



USCA5 513



Dr. Cunningham, I want you to assume that there have been instances where Alfred was violent with his domestic partners -- how do you account for that in your model?

USCA5 514



Dr. Cunningham, these are instances of periodic violence against a domestic partner – did you get any indication from anyone of his ever having been abusive of a child?

What happen here then?

How did Alfred handle learning that Robin had been involved in an affair?

Dr. Cunningham, Alfred wasn't being faithful to Robin was he?   Why was he so disturbed by her affair?

USCA5 515

27



Did anything else happen that added flame to this pressure cooker?

Please explain the financial pressures that Alfred faced.

USCA5 516



Was there any other heat that was added to Alfred's pressure cooker?

What happened in the face of this?

USCA5 517

5

USCA5 518

*U.S. v Alfred Bourgeois, March 2004*

---

## U.S. v Alfred Bourgeois

### Violence Risk Assessment

#### Capital Sentencing

March 2004

---

•Now Dr. Cunningham, let me turn your attention to another arena — and that is how Robert is likely to adjust to a life term in the federal Bureau of Prisons.

•Are there factors that would illuminate this question for us — that would help us know what to expect from him in prison?


•Is this based on scientific methodology and research data?

•Has that methodology and research been subjected to peer review?

•Does much of the research data comes from the United States Justice Department or other credible sources such as state correctional agencies?

•Are this methodology and associated research findings and statistical data generally accepted by informed forensic psychologists?

•Are you familiar with this scientifically sound methodology and research? In fact, aren't some of your peer-reviewed publications regarding this very subject?

*1*

USCA5 519

*U.S. v Alfred Bourgeois, March 2004*

---

*Why Alfred Bourgeois is likely to make a positive prison adjustment:*

➢ Age

➢ Behavior in pre-trial custody

➢ Continuing relationship and contact with family and friends

➢ History of community stability

---

What is your conclusion regarding the likelihood that Alfred will make a positive adjustment to a life sentence in the federal Bureau of Prisons?

What factors did you consider that lead you to that conclusion?

*2*

**USCA5 520**

*U.S. v Alfred Bourgeois, March 2004*

Age:

➢ 39 years old

Dr. Cunningham, how old is Alfred?

Why do you consider Alfred being 39 years old as an important factor in Alfred being likely to make a positive adjustment to prison?

*3*

**USCA5 521**

*U.S. v Alfred Bourgeois, March 2004*



*Graph reproduced in:*

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

Is there any research demonstrates better prison adjustment as inmates get older?

Before you describe this graph, what does the references at the bottom of this slide mean? What is this page taken from?

Please explain this graph.

Why is this area of the graph circled?

*4*

**USCA5 522**

*U.S. v Alfred Bourgeois, March 2004*



Is there any national research that demonstrates the effects of aging on prison misconduct?

Dr. Cunningham, have you ever heard the saying: "You can prove anything with statistics"?  Where did these statistics come from?

*5*

**USCA5 523**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, Alfred has been convicted of committing offenses in his late 30's – doesn't that make him an exception to this aging trend that you are describing?

Is there any research that supports this conclusion?

Please describe this study.

Do you know how Flanagan –the author of this study – accounts for why the inmates who committed more serious offense in the community and then received long-term sentences have lower rates of discipline problems in prison?

*6*

**USCA5 524**

*U.S. v Alfred Bourgeois, March 2004*

---

**Behavior in 20 months of pre-trial confinement:**

➤ 4 different facilities

➤ At times sharing common dayroom

➤ No disciplinary write-ups

---

Dr. Cunningham, you identified Alfred's pre-trial behavior in jail as a factor?

Why is his past behavior in confinement relevant to his future adjustment to federal prison?

Please describe his jail adjustment?

7

**USCA5 525**

---

## Continuing Relationships with Family and Friends

➢ Mother

➢ Father

➢ Siblings

➢ Children

---

Dr. Cunningham, does Alfred have any relationships that have continued in spite of his confinement?

Who does he have continuing contact with?

How is this related to prison adjustment?

*8*

**USCA5 526**

*U.S. v Alfred Bourgeois, March 2004*

**Community Stability**

➤ Continuous community
employment

➤ Involved with extended family

➤ Involved as a father

➤ Financially supported children

Dr. Cunningham, you had identified "community stability" as a factor that predicted positive adjustment to prison – what do you mean by community stability in Alfred's history?

What is the relationship between these community stability factors and positive prison adjustment?

*9*

**USCA5 527**

*U.S. v Alfred Bourgeois, March 2004*

---

## Risk Assessment Scale for Prison

N = 3,013
Violent misconduct 1991-2002
Maximum security prison

| Predictor variable | Weight Assigned |
|---|---|
| Death or LWOP Sentence | -1 |
| Marital Status=Married | -1 |
| Education=high school or equivalent | -1 |
| Prior Imprisonment | 1 |
| Age | |
|    Less than 25 | 2 |
|    Age 25-29 | 1 |
|    Age 30-39 | 0 |
|    Age 40 and over | -1 |

Range = –4 to +3; Average = 0

---

Dr. Cunningham, have you been involved in any research that examines the likelihood of violence among inmates in a maximum security prison setting?

Please describe this research study.

*10*

USCA5 528

*U.S. v Alfred Bourgeois, March 2004*

## Risk Assessment Scale for Prison

### Violent Acts

| Risk Level | Prevalence | Average | N size |
|---|---|---|---|
| -4 | 0.0% | .000 | 16 |
| -3 | 3.3% | .047 | 150 |
| -2 | 7.9% | .138 | 340 |
| -1 | 11.5% | .325 | 667 |
| 0 | 14.9% | .462 | 747 |
| +1 | 21.4% | .716 | 627 |
| +2 | 26.9% | .872 | 428 |
| +3 | 28.9% | 1.105 | 38 |
| Total | 15.9% | .491 | 3013 |

Where would Alfred fall on this scale?

What was the incidence of prison violence among this third lowest risk group?

*11*

USCA5 529

*U.S. v Alfred Bourgeois, March 2004*

## Risk Components

**Will there be violence?**
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

**Will this driver have an accident?**
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what locale?

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16*, 71-95.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior.*

In evaluating the likelihood that Alfred will or will not engage in violence in prison, are there some essential questions to ask?

What are these?

Are these questions unique to violence risk assessment?

How does the automobile insurance industry use these questions?

*12*

**USCA5 530**

*U.S. v Alfred Bourgeois, March 2004*

---

## Risk Assessment Techniques

*More Scientific*

1. **Group Statistical**

   (insurance company method)

2. **Pattern**

   (using <u>patterns</u> of how the individual behaved in
   the past to estimate behavior in <u>similar</u> situations)

3. **Intensive clinical evaluation**

   (inferring violence risk from personality
   characteristics — notoriously unreliable in
   forecasting long-term violence)

4. **Hypothetical inference**

   (seeing animals in the stars)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research (Vol. 6)* (pp.1-50). Chicago: University of Chicago Press.
Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

---

Are some risk assessment techniques more scientific or more reliable than others?

Please explain these different ways of doing a violence risk assessment

How would you go about using the insurance company method?

The greater reliability of pattern and group statistical approaches - is this just your pet theory or is this assessment the conclusion of researchers in your field?

*13*

**USCA5 531**

*U.S. v Alfred Bourgeois, March 2004*

---

## Outcome Rates Relevant to Likelihood of Violence in Prison

1.  Capital offenders and murderers in the general prison population

2.  Assaults by inmates in Federal prisons

3.  Homicide of inmates or staff in state and Federal prison

4.  Disciplinary infractions of short-term and long-term inmates

5.  Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.
Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.
Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

---

What outcome rates or group statistics are relevant to a violence risk assessment of Alfred across a life term in the federal Bureau of Prisons?

*14*

**USCA5 532**

---

### Why capital offender violence rates apply to capital inmates in BOP

➤ Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.

➤ Prison facilities and procedures have broad similarity.

➤ Consistency of findings
  diverse geographic regions
  diverse time periods
  diverse prison settings
  diverse capital statutes
  diverse capital offense characteristics

➤ Peer reviewed acceptance of broad applications

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29,* 512-537.

---

Dr. Cunningham, many of your statistics are drawn from research on inmates outside of the federal Bureau of Prisons - If they aren't from BOP, then how are they relevant to Alfred Bourgeois?

As you have followed this research literature – has there ever been a peer reviewed assertion that these base rates from other prisons were not relevant to capital defendants in federal prison?

*15*

**USCA5 533**

*U.S. v Alfred Bourgeois, March 2004*



Furman Commutees:
## Serious Rule Violations Across 15 years

-533 former death row inmates nationwide
- prison behavior over a 15 year period after removal from death row

1 violation    2 violations    3+ violations

69.5%
No Serious Violations

Marquart, J. & Sorensen, J. (1989). A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders. *Loyola of Los Angeles Law Review,* 23 (5), 5-28.

What is the first study that provides base rates about the follow-up of capital offenders?

Who were the Furman commutees?

What did this study do? Is this what is called a natural experiment? What is a natural experiment?

Let me see if I understand, there were 533 inmates on death row in 1972? They had their death sentences removed and were placed in the general prison population? Then after 15 years their disciplinary records were reviewed?

How many of these commuted capital offenders did not exhibit serious violations in the general prison population?

What other findings were there?

*16*

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, isn't it possible that the reason that most of these former death row inmates were not violent is prison is because they had been sentenced to death and that got their attention in a big way – like a life changing experience?


Who was in this study?


Why were rapists included among the life-sentenced inmates?


How did they compare?

*U.S. v Alfred Bourgeois, March 2004*



Has these finding been confirmed in more recent research?

*Interrupt*

**You collected this research yourself?**

Please describe.

*18*

**USCA5 536**

*U.S. v Alfred Bourgeois, March 2004*



*Prison violence rates:*

**How Do Capital Inmates Compare to General and High Security Inmates?**

Dr. Cunningham, have there been any studies on how the violence rates of capital inmates compare to non-capital inmates?

What was this study measuring?

What did that include?

What groups were compared?

(*interrupt*)

What is the number in parenthesis?    Thanks, please continue.

What were the results?

So, if I'm reading this graph correctly - the capital offenders rather than being more likely to commit serious violence in prison had only a fraction of the rate of violence of those inmates around them?

*19*

*U.S. v Alfred Bourgeois, March 2004*

---

*More about the capital inmates in this study*

## Most adjusted positively

➢ 2/3 of both groups have never been in solitary confinement (punishment for serious disciplinary infractions).

➢ 90% of both the former death row inmates and the life sentence inmates held trustee status.

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review*, 23(3), 449-468

---

How did most of the capital inmates in this study adjust to prison?

What is a trustee? What is the risk assessment significance of being a trustee?

*20*

**USCA5 538**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, isn't a defendant who is sentenced to life just bound to be violent in prison because he has nothing to lose?


Have there been any studies that speak to that question?


Who did this study compare?


Were the life-with-parole inmates less violent than the other two groups?


How many of these inmates were violent?



Dr. Cunningham, if given a capital life term, Alfred will still be in prison 20-30-even 40 years from now if he lives that long, how do we know that these numbers will remain predictive over time?

Isn't that almost exactly the same results as the Missouri study that compared the LWOP, Life with, and death row inmates?

22

**USCA5 540**

*U.S. v Alfred Bourgeois, March 2004*



BOP Assaultive Infractions
## Capital Defendants Convicted and Sentenced to Life

- 1995-1998
- 25 capital inmates reported
    - 2 inmates - aggravated assaults (8%)
    - 2 inmates - simple assaults (8%)
    - 1 inmate - weapons contraband charges (4%)

- 11 inmates had no disciplinary write-ups of any sort

*Source of data:* Correspondence of Miles Harer, BOP, 12-14-98

Dr. Cunningham, has there been any follow-up of federal capital offenders who the jury sentenced to life without parole rather than death?

Where did this data come from?

What were the findings?

Did this follow-up include the "Poison Clan" of four drug dealers convicted of multiple murderers in Richmond?

What was their conduct in prison?

*23*

**USCA5 541**

*U.S. v Alfred Bourgeois, March 2004*

## Incarcerated Murderers

Study of 6,390 murderers:

- Admitted to prison between 1990-1998
- Frequency of serious violent offenses in prison reviewed
- Likelihood of a murderer exhibiting a serious act of prison violence across a 40-year capital life term extrapolated.

**Findings:**

Overall risk 16.4%

Incremental increases or decreases in risk relative to the overall risk rate:

| | |
|---|---|
| • Robbery/burglary in capital offense | +7.4% |
| • Multiple murder victims in capital offense | + 5.6% |
| • Attempted murder/assault in capital offense | + 4.0% |
| • Prison gang membership | +10.4% |
| • Prior prison term (unless non-violent record) | + 5.3% |
| • Age less than 21 | + 5.5% |
| • Age 26-30 | - 7.2% |
| • Age 31-35 | -12.3% |
| • Age over 35 | -14.4% |

Risk of aggravated assault on a correctional officer = 1%
Risk of inmate-on-inmate homicide = .2% (2 per thousand)

Sorensen, J. & Pilgrim, R. (2000). An actuarial risk assessment of violence posed by capital murder defendants. *Journal of Criminal Law and Criminology.*

Dr. Cunningham, have there any large research studies that looked at inmates convicted of murder to see how they behave in prison?

Please describe this study.

*24*

**USCA5 542**

*U.S. v Alfred Bourgeois, March 2004*

> ## The Relationship of Offense History to Prison Adjustment
>
> - Past violence in the community is not strongly or consistently associated with prison violence.
>
> - Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.
>
> - Severity of offense is not a good predictor of prison adjustment.
>
> Alexander, J. & Austin, J. (1992). *Handbook for Evaluating Objective Prison Classification Systems.* San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.
>
> National Institute of Corrections, U.S. Department of Justice. (1992) *Jail Classification System Development: A Review of the Literature, revised edition.*

Dr. Cunningham, what about Aaron's past violence in the community or the fact that he has been convicted of such a severe offense – doesn't that point to his making a poor prison adjustment?

What support do you have for that opinion?

These conclusions come from the U.S. Department of Justice?

What are those Department of Justice conclusions?

*25*

**USCA5 543**



Have you prepared a model that demonstrates how factors that
resulted in someone being violent in the community aren't the same
in prison?

Please describe this model.

**USCA5 544**

*U.S. v Alfred Bourgeois, March 2004*



How would Alfred's conduct in this offense fit this model?

**USCA5 545**

*U.S. v Alfred Bourgeois, March 2004*



How could we expect these elements to be different in prison?

**USCA5 546**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, is the likelihood of a serious assault in federal prison the same as the likelihood of a minor assault?

Please explain this.

*29*

**USCA5 547**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, do you have any information on the frequency of assaults in U.S. Penitentiaries?

Where did you obtain this data?

Please explain this pie chart.

*30*

**USCA5 548**

*U.S. v Alfred Bourgeois, March 2004*

## Rates of Inmate and Staff Homicide

**Inmate-on-inmate homicide**
    Federal  =  6    per 100,000 inmates (2000, 2001)
    State    =  5.6 per 100,000 inmates (1997)

**Inmate-on-staff homicide**
    Federal       =  1 per 500,000 inmates
                        (last in 1997)
    State         =  1 per 1,000,000 inmates

**Comparison** ( Murder & Non-negligent homicide- 2001):
    United States        =    5.6 per 100,000
    Texas                =    6.2 per 100,000
    Corpus Christi       =    6.7 per 100,000
    Houston              =    13.4 per 100,000

*Source of data:*
Maguire, K. & Pastore, A.L.,eds. (2002). Sourcebook of Criminal Justice
    Statistics – (1999). U.S. Department of Justice, Bureau of Justice Statistics.
    Washington,D.C.
Corrections Compendium, June 1998
U.S. Bureau of Prisons (January 2002)

What about the possibility of a capital inmate killing someone in prison, are there any group rates that assist us in determining that possibility?

First, in terms of one inmate killing another -- how often does that happen?

Can you put those rates in some kind of perspective?

So the rate of homicide is lower in prison than in the general community?

What about an inmate killing a staff member -- how often does that occur?

*31*

**USCA5 549**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, how do you account for the rates of lethal violence in prison being so low – particularly with so many violent felons being concentrated there?

*32*

**USCA5 550**



*33*
**USCA5 551**

## Summary of Prison Violence Base Rate Findings

- Capital inmates have low rates of violence in the general prison population
- Seriousness of offense does not predict prison violence.
- Infraction rates are progressively lower as an inmate ages. This is consistent with multiple studies which demonstrate markedly decreasing rates of criminality and violence with aging.

Anchoring Base Rates (Across capital life sentence):

- Assault = 20 - 30% (+ incremental)
- Repetitive assault = 10%
- Aggravated assault on staff = 1%
- Homicide of inmate = .2 - 1%
- Homicide of staff = 1 per 1,000,000 annual

Can you summarize this these base rate findings regarding prison violence?

*34*

**USCA5 552**

*U.S. v Alfred Bourgeois, March 2004*



Relative to these group rates, what factors would we use to individualize these numbers to Alfred?

*Interrupt*

What do you mean – relative to base rates?

What factors would increase his risk as compared to the group rates you just described?

What factors would decrease his risk as compared to the group rates?

On balance, would Alfred's risk of personally enacted violence be above or below that of the anchoring capital offender base rates that you have been discussing?

**USCA5 553**

*U.S. v Alfred Bourgeois, March 2004*

> Individualized Actuarial Likelihood of
> Alfred Bourgeois Exhibiting  Severe
> ~~Violence in Prison~~
>
> - 6,390 murderers convicted 1989-1999
> - Followed an average of 4.55 years
> - Rates of serious violence* extrapolated for life
>   sentence
>
> |       |                                   |
> |-------|-----------------------------------|
> | 16.4  | Base rate of serious violence     |
> | [7.4] | *Robbery*                         |
> | [5.6] | *Multiple murder victims*         |
> | [4.0] | *Attempted murder in capital offense* |
> | [5.3] | *Prior prison term*               |
> | [10.4]| *Prison gang membership*          |
> | -14.4 | Age over 35                       |
>
> 2 %  Overall risk rate
>
> *Homicide, attempted homicide, assault with a weapon, fight with a
>  weapon, sexual assault, robbery on inmate. Aggravated assault on
>  correctional officer.
>
> Sorensen J.R. & Pilgrim, R.L. (2000).  Actuarial assessments of future dangerousness in
> the punishment phase of capital trials. Journal of Criminal Law & Criminology

Are there any studies that provide a basis for individualizing the assessment on
strictly statistical factors?


Please describe the basis of this study?


Please describe the findings, individualizing them to Alfred Bourgeois.


So if we do this strictly by the numbers, there is an 98% likelihood of Alfred
adapting to prison without serious violence?

*36*

*U.S. v Alfred Bourgeois, March 2004*

---

Individualized Actuarial Likelihood of Alfred
Bourgeois Exhibiting Severe Violence in Prison:

### *Lifetime risk*

- Any serious violence = 2%

- Aggravated assault on staff = 1%

- Homicide of inmate = .2 %


### *Annual risk*

- Homicide of prison staff = 1 per 500,000

---

Dr. Cunningham, can this strictly statistical risk assessment be broken down
further regarding the risk of particular acts?


What are those more specific percentages?

*37*

**USCA5 555**

*U.S. v Alfred Bourgeois, March 2004*

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary  Marion (high security)

U.S. Penitentiary (high security)
   Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

•Dr. Cunningham, are you familiar with the different levels of custody in the federal Bureau of Prisons?

•What are those levels of custody?

*38*

**USCA5 556**

## Indicators of Security Level

- Nature of outer wall or fence

- Towers and external patrols

- Perimeter detection devices

- Concentric layers of security

- Type of housing

- Control of movement of inmates

- Intensity of staffing and supervision

Dr. Cunningham, what features distinguish these levels of custody from each other?

*39*

**USCA5 557**

*U.S. v Alfred Bourgeois, March 2004*



**Custody Options**
(Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security) general population

U.S. Penitentiary, Marion (high security)

U.S. Penitentiary (high security)
    Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

At what level is an capital inmate housed if sentenced to life
without parole?

*40*

*U.S. v Alfred Bourgeois, March 2004*

> " A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived."
>
> *Security Designation and Custody Classification Manual (5100.07, p. 4)*

Dr. Cunningham, is there a regulation that you are relying on in stating the custody level that a life without parole capital inmate is held at?

What does that regulation state?

*41*

**USCA5 559**

*U.S. v Alfred Bourgeois, March 2004*

## U.S. Penitentiaries

| Unit | Census |
|------|--------|
| USP Allenwood | 1104 |
| USP Atlanta | 2246 |
| USP Atwater | 1389 |
| USP Beaumont | 1438 |
| USP Coleman | 1614 |
| USP Florence | 932 |
| USP Leavenworth | 1840 |
| USP Lee | 1418 |
| USP Lewisburg | 1208 |
| USP Lompoc | 1426 |
| USP Pollock | 1429 |
| USP Terre Haute | 1163 |
| USP Marion (mid-level) | 424 |
| | 17,631 |

(12% of BOP inmate population)

Dr. Cunningham, can you identify the U.S. Penitentiaries in the Bureau of Prisons and their approximate census?

Please describe these.

*42*

**USCA5 560**



Cell at USP Florence

Source: Bureau of Prisons, Department of Justice

Dr. Cunningham, do you have a diagram of a typical cell in a U.S. Penitentiary?

What is the source of this diagram?

Please describe this diagram.

**USCA5 561**

*U.S. v Alfred Bourgeois, March 2004*

---

## Available Measures to Control Disruptive or Violent Inmates

**Treatment**
- Counseling
- Medication
- Education

**Discipline**
- Cell restriction
- Loss of privileges: visitation, commissary, job, recreation
- Fines and loss of property
- Administrative segregation

**Security**
- Move to higher security facility
- Secure Housing Unit (SHU)
- USP Marion
- ADX Florence
- Control Unit, ADX Florence

---

Dr. Cunningham, are there mechanisms available in the Bureau of Prisons to control disruptive or violent inmates?

Are you familiar with those mechanisms?

Please describe these.

*45*

**USCA5 562**

## Common Features of Security Measures

- Single celled

- Very limited movement (23 & 1)

- Meals in cell

- Handcuffed and escorted movement

- Solitary or small group recreation

- Frequent inmate searches

Dr. Cunningham, if an inmate requires greater security than the general population of a U.S. Penitentiary, what are some of the common features of this increased security?

*46*

USCA5 563

*U.S. v Alfred Bourgeois, March 2004*

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security) general population

U.S. Penitentiary Marion (high security)

U.S. Penitentiary (high security)
Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

•Dr. Cunningham, could we return to the chart of custody options available in the Bureau of Prisons.

•Who determines whether a capitally convicted inmate is placed in a higher level of custody than the general population of a U.S. Penitentiary?

•So if the Bureau of Prisons determined that Alfred Bourgeois represented a disproportionate risk to staff, or other inmates, or the community outside of prison they could escalate the security that he is held at?

•What is ADX Florence?

•Have you toured this facility? When was the last occasion that you had such a tour? What did this tour involve? Are these tours routinely available to the public?

•Do you have photographs of ADX?

•Do these accurately depict the facility?

•Would showing these facilitate your description and increase the jury's understanding of your testimony?

*49*

**USCA5 564**



What does this slide depict?

USCA5 565

*U.S. v Alfred Bourgeois, March 2004*



What does this slide depict?

**USCA5 566**



What are we looking at here?

Do you have a diagram that reflects the units that spoke off of this central picket or bubble?



Please describe this diagram.

USCA5 568



What are we looking at here?

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, do you have a diagram of a typical cell at ADX?

Please describe this diagram and some of the security procedures that are applied in ADX.



What does this diagram depict?

**USCA5 571**



Do you have photographs of a typical cell at ADX as well?

Please describe this photograph and the various features of the cell.

*57*

USCA5 572

*U.S. v Alfred Bourgeois, March 2004*



What is this view?

I notice that there is a slot in the sliding grate door — what is the function of this slot?



What does this photograph depict?

Please what the officer in the shirt and tie is carrying?

What is the function of this baton?

*U.S. v Alfred Bourgeois, March 2004*



What does this photograph depict?

*60*

*61*



What are we looking at here?

Please describe the covering over this area and its function.

USCA5 576

*U.S. v Alfred Bourgeois, March 2004*

### Assaults in ADX Florence

| Offense | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| *Assaults* | | | | | | | |
| On Inmate w/ weap | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| On Inmate | 5 | 3 | 4 | 3 | 2 | 2 | 2 |
| On Staff w/ weap | 1 | 0 | 2 | 2 | 3 | 0 | 3 |
| On Staff | 25 | 12 | 18 | 13 | 23 | 11 | 39 |
| Total | 27 | 16 | 24 | 18 | 28 | 13 | 44 |
| *Homicides* | | | | | | | |
| Homicide of inmate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide of staff | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Escapes* | | | | | | | |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ave daily census | 342 | 377 | 410 | 371 | 342 | 372 | 412 |

Dr. Cunningham, does violence still occur at ADX?

Do you have statistics regarding the rate of this violence?

*69*

**USCA5 577**

*U.S. v Alfred Bourgeois, March 2004*

---

ADX Florence
General Population and Step-Down Unit Operations

**General Population Units**

restraints and two officer escorts when removed from cells
12 hours weekly of out of cell exercise in small groups
meals in cell, shower in cell
*12 month minimum*

**Intermediate Unit**

restraints and two officer escorts when removed from cells
several hours daily out of cell on ranges
meals in common area on range
out of cell exercise in large outside rec. yard / gymnasium
*7 month minimum*

**Transitional Unit**

escorted off unit unrestrained in small groups to
        programming areas
*5 month minimum*

**Pre-Transfer Unit**

unrestrained when out of cells and when escorted
employed in UNICOR for half the day
meals in institutional dining hall
*12 month minimum*

---

Dr. Cunningham, is ADX intended to be a permanent placement for all of the inmates who are sent there?

Please describe what programs the facility has to attempt to return inmates to U.S. Penitentiaries.

*68*

**USCA5 578**

*U.S. v Alfred Bourgeois, March 2004*



What is shown in this photograph?

> **PS5212.06 Control Unit Programs**
>
> **541.40, 1.a.**  In an effort to maintain a safe and orderly environment within its institutions, the Bureau of Prisons operates control unit programs intended to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution.

Is there even a higher level of security within ADX?

What is the control unit?

Is there an instruction that addresses the purpose and operation of the Control Unit?

Please describe this purpose as stated in 541.40, 1.a

*63*

**USCA5 580**

*U.S. v Alfred Bourgeois, March 2004*

**541.41, 5.b.** The Warden shall consider the following factors in a recommendation for control unit placement:

(1) Any incident during confinement in which the inmate has caused injury to other persons;

(2) Any incident in which the inmate has expressed threats to the life or well-being of other persons;

(3) Any incident involving possession by the inmate of deadly weapons or dangerous drugs;

(4) Any incident in which the inmate is involved in a disruption of the orderly operation of a prison, jail, or correctional institution;

(5) An escape from a correctional institution;

(6) An escape attempt;

(7) The nature of the offense for which committed [considered only in combination with other factors of this section].

Dr. Cunningham, is there an instruction that delineates what factors go into the consideration of whether to place an inmate on the Control Unit?

Have you placed this instruction on a slide?

What does this instruction state?

*64*

**USCA5 581**

---

## ADX Control Unit

- in cell 23 hours a day

- sliding outer steel door, sliding inner bar door

- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved

- triple escort when out of cell

- 7 hours out-of-cell solitary exercise weekly

- meals taken in cell

- *duration:*
  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution (CFR 541.50)*

---

Please describe the basic security procedures of the Control Unit.

How long might an inmate remain on the Control Unit?

USCA5 582

*U.S. v Alfred Bourgeois, March 2004*

December 1994 to June 2001
## Assaults on Staff in ADX Control Unit

**14 minor assaults on staff:**
- 9 throwing unknown liquid/feces or spitting in face of officer
- 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
- 1 pulling away and then throwing ice tray full of water and carton of milk at officer
- 1 throwing head back against officer's face
- 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's hand
- 1 grabbing officer's shirt and pulling him into the bars

**3 attempted/threatened minor assaults on staff:**
- 2 attempting or threatening to throw liquid
- 1 attempted head-butt

**10 of the above 17 involved a single inmate**
 **6 total inmates involved**

What about on the Control Unit – do you have information regarding the frequency of assaults by inmates on the Control Unit?

What is the source of this information?

To help understand these numbers, about how many inmates are on the Control Unit at ADX?

So there are 2-3 of these a year involving 6 total inmates, and two thirds of them from one inmate?

*70*

**USCA5 583**

*U.S. v Alfred Bourgeois, March 2004*



Dr. Cunningham, is there an even higher level of security than the Control Unit at ADX?

Please describe these capabilities and how these cells operate.

Conclude

USCA5 585

6

USCA5 586

**DECLARATION OF MARK D. CUNNINGHAM, PH.D.
PURSUANT TO 28 U.S.C. § 1746**

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare and certify the following:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in fifteen states including Texas.  I received a Bachelor's degree in Psychology from Abilene Christian College with high honors in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I served as active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981.  I have maintained a private practice in Texas since 1981.  My practice is national in scope.

2.      I am board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP).  This credential signifies the highest level of expertise and practice in forensic psychology.  I have provided forensic evaluation services in over 450 cases.  I have particular expertise in the area of capital sentencing issues, including mitigation and violence risk assessment.  I have testified as a clinical and forensic psychology expert regarding sentencing issues in approximately 75 state capital cases and 50 federal capital cases at trial, and in numerous cases in post-conviction or federal habeas proceedings.  I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in 31 states and Puerto Rico.  I have never been denied qualifications as an expert in clinical or forensic psychology.

3.      I am extensively involved in research and the authoring of scholarly publications relevant to capital sentencing issues and death row populations.  I have authored or co-authored over

**Declaration of Mark D. Cunningham, Ph.D.
Page 1 of 18**

USCA5 587

30 scholarly and peer-reviewed papers during the past nine years, including six published in 2006

and six others that are currently "in press." I am first author of the chapter on forensic psychology

evaluations in death penalty cases in the well-regarded 12 volume *Handbook of Psychology*.

4. I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred

Bourgeois, as a clinical and forensic psychology expert in his capital trial proceedings in the United

States District Court in the Southern District of Texas, Corpus Christi venue. I have been asked by

Mr. Bourgeois' current federal defender counsel to provide this Declaration outlining my knowledge

of Mr. Bourgeois and my involvement with his case at the trial level.

5. I was first contacted by Mr. Gilmore on June 30, 2003. At that time, he described that

the trial was set for mid-September, and that the defense had "developed very little mitigating

evidence." Mr. Gilmore further reported that he had no doubt his client would receive the death

penalty if convicted if they were not able to present mitigating evidence. I responded on July 1,

2003, and suggested that the defense hire a mitigation specialist. I explained that the performance

of an adequate forensic psychology evaluation required a comprehensive psycho-social investigation

of adverse developmental and other mitigating factors by a mitigation investigator. I outlined that

this mitigation investigator would gather all available records regarding the defendant's history,

identify relevant family and other third parties such as teachers and coworkers, interview these

individuals, and provide me with interview summaries and a life event time line. My own interviews

and evaluation could not reasonably begin prior to this investigation. As neither this investigation

nor my own subsequent evaluation could be performed in the 10 weeks remaining before trial, I told

Mr. Gilmore that I could only participate if a continuance and mitigation specialist were obtained.

6. Both Mr. Gilmore's lack of familiarity with the role of a mitigation investigator and

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 2 of 18**

USCA5 588

his initial expectation that my evaluation of mitigating factors could be accomplished in less than three months made it apparent that the defense had little appreciation for the requirements of an adequate mitigation investigation in a capital case, or the professionals required to perform such an evaluation. Mr. Gilmore agreed to request funding from the Court to employ such specialists.

7.      A four-month continuance was obtained, and funding for a mitigation specialist was secured, and then I agreed to participate as an expert. I advised defense counsel that the mitigation investigation would have to proceed very aggressively in order for me to complete my evaluation and meet a disclosure deadline of mid-December. I understood my general role to be the provision of opinions regarding extant mitigating evidence, as well as Mr. Bourgeois' potential to make a positive adjustment to incarceration (also known as a risk assessment) – each of which are routine considerations in federal capital sentencing.

8.      Gerald Bierbaum and Lisa Milstein were retained as the mitigation specialists. I knew each of them and anticipated that, under the direction and coordination of defense counsel, they would be able to gather the records and conduct the types of third-party interviews that I require. However, it became apparent to me that defense counsel was not adequately monitoring and directing the mitigation investigation. On December 1, 2003, my office advised Mr. Gilmore that I had still not received any records, interview summaries, or investigation reports. Mr. Gilmore responded that he was "really not sure how this works," and did not know if he should be providing me with information or if the mitigation investigators should be providing this information to me directly. This again reflected a lack of familiarity with the functions of defense counsel in preparing for capital sentencing. In my experience, the responsibility for a mitigation investigation cannot be "outsourced" by retaining an investigator. I am also aware that defense counsel customarily reviews

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 3 of 18**

USCA5 589

the information gathered by the mitigation investigator prior to providing it to testifying experts to ensure its relevance, reliability and accuracy.   Though Mr. Gilmore reported that he was seeking another continuance in the face of the mitigation investigators' report to him that the investigation could not be completed by mid-February, he continued to give little indication of appreciating the time requirements of an adequate capital mitigation investigation.

9.      In my subsequent direct telephone contacts with Gerald Bierbaum in December 2003, I expressed my concern that my own evaluation was being critically compromised by the absence of case information. Mr. Bierbaum indicated that Ms. Milstein had been unable to direct her full attention to the case and that he was having to pick up her slack.  Still, interview summaries were not immediately forthcoming. When these summaries were provided and I began to perform my own follow-up interviews by telephone, it quickly became apparent that the history that had been obtained by Ms. Milstein was both inadequate in scope and plagued by fundamental errors of fact. As a result, I could not rely on the investigative memos, and was faced with the necessity of re-interviewing the identified mitigation witnesses and potentially seeking other sources of information as well. Given the eleventh-hour realization of this problem, occasioned by defense counsel not providing me with reliable investigation data in a timely manner,  and the simultaneous demands of other professional obligations, I did not conduct as many interviews as needed to be accomplished, and the ones that I did conduct were not as comprehensive as I would have preferred.  Given more time, and more reliable reports of preliminary interviews, I believe I would have been able to find even more psychologically significant information.

10.     In addition to conducting interviews and reviewing summaries of interviews, I conducted a clinical interview of Mr. Bourgeois (lasting about 5.5 hours) on February 7, 2004.  I

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 4 of 18**

USCA5 590

reviewed documentary background material about Mr. Bourgeois and the offense. I was given reports generated by Dr. Carlos R. Estrada (Government-retained psychiatrist) and the defense-retained neuropsychologist, Dr. Donald E. Weiner. I would add that counsel had trouble scheduling Dr. Weiner's evaluation. I had recommended a neuropsychological evaluation, and I believe Dr. Estrada did as well, as there were many red flags indicative of potential brain damage in Mr. Bourgeois' background. On February 18, 2004, Mr. Gilmore informed me that he was unsure if the neuropsychological evaluation would be completed in time for trial, as testimony was scheduled to begin in early March, 2004. Eventually, Dr. Weiner was able to conduct his assessment and he generated a report dated March 3, 2004. The last-minute nature of this evaluation was a further indication to me that counsels' preparation of the fast-approaching penalty hearing was proceeding haphazardly.

11.     During the course of my evaluation and testimony preparation, I provided trial counsel with two reports and two PowerPoint presentations to use in conjunction with my testimony. The first PowerPoint presentation focused on mitigating evidence. The second addressed violence risk assessment (i.e., probability of making a nonviolent adjustment to prison). I also suggested possible questions for use during direct examination regarding each PowerPoint slide. These PowerPoint presentations and suggested questions were offered to provide counsel with the results of my evaluation in a clear and efficient way. I also provided defense counsel with two reports summarizing the results of my evaluation. I produced these materials both with an eye toward their use at trial, and to educate defense counsel about the issues and areas that would be most profitable to Mr. Bourgeois' penalty phase presentation.

12.     The trial commenced in February, 2004 and I recall that the penalty phase started in

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 5 of 18**

USCA5 591

mid-March.  Much to my surprise, defense counsel did not discuss the substance of my opinions with me prior to my arrival in Corpus Christi for trial.  We did plan, however, for me to arrive in Corpus Christi on the afternoon of Sunday, March 21, 2004, with my testimony to take place on Tuesday the 23rd.  I arrived at my hotel in the mid-afternoon on March 21, 2004.  I immediately called Mr. Tinker and left a message on his cell phone to let him know that I had arrived and would be available to meet to discuss my findings and testimony, and that he should call me on my cell phone to coordinate our meeting.  Again, based on my experience, this conference was critically important for a number of reasons: to prepare my testimony, to orient defense counsel to mitigation themes that could be detailed in opening arguments, to discuss the potential testimony and associated cross-examination of the Government-retained mental health expert, and to identify information that would be brought out through defense witnesses to support and illustrate my own findings and conclusions. Assuming that he was presently occupied preparing other witnesses, I took my cell phone with me when I left the hotel room. Mr. Tinker did not call me on my cell phone.  However, when I got back to my room there was an internal hotel phone message from him that he had stopped by the hotel and, not finding me in my room, left the City to return home, and did not wish to meet that night. I was quite concerned about the loss of this critically important conference on the literal eve of the sentencing phase, but I had no choice in the matter.

13.     I attended  the Court proceedings the next day and observed  the Government's examination of Dr. Estrada.  His testimony showed that he recognized that childhood abuse can impact adult behavior.   I was concerned, however, because Dr. Estrada's presentation did not address this question as it related to Mr. Bourgeois specifically.  It also did not address it from a mitigating perspective.  Instead, it focused only on why Mr. Bourgeois' history of abuse made him

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 6 of 18**

USCA5 592

a continuing danger.  This turned the mitigating evidence on its head.  Instead of mitigating the

offense, Mr. Bourgeois' history of savage abuse was used to aggravate.

14.      On cross-examination the defense did not develop and explain that impact from a

mental health perspective.  As I recall, Dr. Estrada's testimony was limited in this regard to stating

only that he "suspected" that Mr. Bourgeois had an abusive upbringing, and had exhibited adult

conduct that was consistent with such abuse.  I was quite cognizant that testimony elicited from Dr.

Estrada was inadequate for the jury to appreciate the mitigating quality of this history of abuse.

Rather, if the jury were to recognize and give informed weight to Mr. Bourgeois' background, it had

to hear testimony about these developmental experiences in much greater depth, as well as have the

benefit of clear and detailed testimony regarding **why** this history mitigates, including the nexus

between this history and Mr. Bourgeois' life adjustment and the instant offense conduct.  Had

defense counsel dedicated time to conference with me, I would have advised them to anticipate this

application of developmental history by a Government-retained mental health expert. I also would

have equipped them with an understanding of scientifically-informed perspectives and data on

violence risk assessment that would have equipped them to debunk the future danger implications

advanced by Dr. Estrada through cross-examination or in their sponsoring of my testimony.

15.      A second appointment was made to meet with Mr. Tinker after court that day.  Much

to my surprise, instead of retiring to a quiet office for a night of preparation, we went to the hotel bar

for about 45 minutes.  Mr. Tinker had a drink.  It was my distinct impression that he was not

particularly interested in my analysis of his client's disorders and deficits.  It was obvious from his

questions that he had not yet looked at the materials that I sent to him, and he certainly was not

familiar with them.  To illustrate, while I was discussing the mitigating evidence, he interrupted me

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 7 of 18**

to ask if I had anything to say about risk assessment – thereby indicating that he was unaware that a whole section of the trial notebook I had prepared for him was dedicated to this issue, including a separate PowerPoint series of slides regarding that topic. This was not the first indication to me that counsel had not reviewed materials I had provided to them or other important case information. Previously, Mr. Tinker had raised potential Government objections that, in fact, were answered by a peer-reviewed article I had already provided to him. When I referenced this article in our discussion, he requested that I send it to him, unaware that it was already in the trial notebook that I had sent to him. Similarly, when we were in court Mr. Bierbaum saw that I had a copy of a 1985 psychological assessment done on Mr. Bourgeois. It was not in the trial notebooks that counsel had on their table. Mr. Bierbaum expressed frustration that he had neither seen this report nor been able to locate and interview the psychologist who had performed this assessment. As evidenced by counsel not having this assessment in their critical records files, they apparently had not reviewed it or appreciated its implications. Since I had obtained this report from the defense, I was at a loss as to how it or its implications could have escaped counsels' attention.

16.     In the typical case, I would have expected to be in early and consistent communication with defense counsel prior to sentencing. In most cases, my evaluation of the defendant assists defense counsel in preparing for both the guilt and the sentencing phases of trial. Normally, counsel looks to me to assist them in developing a theory of the case that is consistent with the defendant's psychological make-up, as well as integrating his life history into the theory of the case. Not only did this early preparation not occur, but it was abundantly clear to me that counsel was neither prepared nor equipped to embark on the demanding task of mitigating a capital offense.

17.     Despite the brief nature of our hotel-bar "preparations," I was still confident that the

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 8 of 18**

important mitigation and risk assessment perspectives I had developed regarding Mr. Bourgeois would have significant impact on the jury's sentencing determination. Accordingly, I was flabbergasted when, after completing cross examination of Dr. Estrada and after the Government rested, counsel took a break to inform me that they would not be calling me as a witness. This decision was made without consultation or discussion with me.

18.     As noted, there was much to say regarding adverse factors in Mr. Bourgeois' background and the mitigating impact of these factors on his life, the vast bulk of which was not covered by Dr. Estrada. Several factors in Mr. Bourgeois' formative years could have helped the jury understand how the tragic offense occurred. Mr. Bourgeois was raised in a overwhelmed family system. His mother, Eunice, was unable to provide the nurturing that he needed and sent him away to be raised by a third party at a tender age. Eunice had seven children by four different men. One son was profoundly mentally retarded and kept hidden in the home. One son drowned at age 12, when Mr. Bourgeois was still a young boy. Eunice's relationship with the father of her youngest children (Godfrey) was unstable, plagued by violence triggered by Godfrey's alcohol abuse.

19.     The impact of the overwhelmed family system on Mr. Bourgeois was compounded by his father's abandonment. Alfred was born from an illicit relationship with Alfred Sterling, who abandoned him and provided no support. Sterling reportedly had at least 22 children, 12 of whom were born out of wedlock. Sterling provided no support and made no effort to exercise any sort of relationship with Mr. Bourgeois. The effective abandonment by both parents has a significant impact on early child development. The abandoned child is often unable to trust. The child may grow up with an intense fear of abandonment and be unable to build healthy attachments to people. The abandoned child often feels a need to exert control over his or her adult relationships.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 9 of 18**

20.     Mr. Bourgeois also had a whole set of neuro-behavioral deficits that affected his ability to cope with the problems in his childhood and throughout his life.  People who knew him as a child consistently reported that he had difficulty controlling his impulses from an early age.  For example, they reported that as a child he was unable to sit still; jumped from one toy or activity to another; could not focus on one activity for very long; always got into things; was impulsive and did things "off the top of his head"; got in trouble at school for frequent fighting; was very reactive and defiant; had temper tantrums and "rage attacks" even as a child; and continued to be "hyper" as an adult.

21.     These reports point to Mr. Bourgeois suffering from a type of brain dysfunction that makes it hard for him to control his impulses.  Additionally, these symptoms are consistent with Attention Deficit Hyperactivity Disorder, with its associated excessive motor activity, impulsivity, and inattention.  This disorder is an important mitigating factor that helps explain Mr. Bourgeois' judgment deficits and his impulsive reactivity, and should have been presented to the jury.

22.     There are also reports that Mr. Bourgeois suffered physical abuse at the hands of his mother.  More specifically, she appeared to direct her resentment regarding Alfred Sterling towards his son, Alfred Bourgeois.  Eunice treated Alfred as a scapegoat.  Alfred was blamed when children were hurt in the playing field.  He was beaten more frequently and more brutally than his siblings.  She beat him with belts and extension cords.  These beatings were described as routinely leaving welts and bruises.  Eunice is also described as throwing shoes and other objects at him.  Eunice became fixated on Mr. Bourgeois' nose, and insisted on cleaning it so intensely that it chronically bled.

23.     Eunice was also described as emotionally abusing Mr. Bourgeois. Eunice told Alfred

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 10 of 18**

USCA5 596

that he "wasn't worth nothing."  Although Eunice took the other children to the doctor, she refused to seek medical treatment for Mr. Bourgeois.  There are accounts that as a child, Mr. Bourgeois was teased by other children because he was slow, and because of his light complexion and green eyes.  At age 7-8, Eunice sent Alfred to live with an elderly neighbor, Ms. Mary Clayton.  He was as a result excluded from family outings and trips.  After Miss Mary died, Mr. Bourgeois still was not welcomed home, but instead had to live with his paternal half sister, Michelle.  This sort of abandonment, constant teasing and rejection played a critical role in the development of his identity.

24.    As I would have related to the jury, there is no debate in the mainstream of the mental health professions that childhood abuse can have a profound impact on the behavior of the survivor.  While behavioral impacts can vary, all such victims suffer from psychological consequences.  They often have difficulty in forming and maintaining relationships; lack trust; tend to be impulsive, and may have difficulty in assessing the consequences of their actions.  Depending on the severity of the abuse and the victim's pre-morbid psychological makeup, the impacts can vary significantly.  In Mr. Bourgeois' case the abuse was severe and long lasting.  It was also coupled with abandonment and deficits in Mr. Boureois' neurological functioning.

25.    Neuropsychological testing available at the time of trial reveals that Mr. Bourgeois has a significantly sub-average IQ and may be mentally retarded. Testing at the time of trial using the outdated WAIS-R instrument revealed a Full Scale IQ score of 76.  Adjusting the score using the well-accepted Flynn Effect, which compensates for the use of older test norms, would result in an  IQ score of 68.  I also understand that Mr. Bourgeois was recently tested by Michael Gelbort, Ph.D., and obtained a Full Scale IQ score of 70 on the WAIS-III (the current and most recent standardization of this test).  The recent Full Scale IQ score is consistent with his Flynn-adjusted IQ

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 11 of 18**

USCA5 597

score of 68 in 2004. Both of these scores are in the range of mild mental retardation.

26.     Unfortunately, I was not provided with the IQ information in time to interview family members regarding ways in which Mr. Bourgeois' deficient intelligence was reflected in his practical functioning and day-to-day activities, i.e., whether he functions with significant adaptive deficits.

27.     Dr. Weiner's neuropsychological testing shows notable impairments in tests that measure executive functioning. Again, these results are consistent with Dr. Gelbort's current testing. These neuropsychological impairments are important in understanding the impact of Mr. Bourgeois' abusive upbringing on his behavior. Put simply, Mr. Bourgeois lacks an intact brain with which to handle the psychological wreckage of his early life.

28.     Observers report that Mr. Bourgeois had difficulty in controlling his impulses and sometimes suffered from attacks of rage. His siblings recalled that he had "rage attacks" even in his early childhood. These attacks worsened in his teenage years. Witnesses described that Mr. Bourgeois "gets a different look in his eyes" and "doesn't seem to hear" attempts to calm him down when he is enraged. They reported that he would often tremble when angry. The rages would be accompanied at times with assaults involving repeated punching and other physical violence, as well as verbal aggression-- all well in excess of the provocation. He would often have to be physically restrained by others. After the attack, Mr. Bourgeois would appear exhausted. He could typically recall the provoking stimulus, but had a fragmented or no memory of his conduct during the rage attack. These behaviors are consistent with an Intermittent Explosive Disorder, a condition that often has a neurological basis.

29.     The descriptions of Mr. Bourgeois' rages, as described above, have a dissociative quality as well. This includes marked changes in his demeanor, disproportionate responses, inability

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 12 of 18**

to discontinue the attack, and an inability to recall his rage behaviors. These features are consistent with dissociation, and point to Mr. Bourgeois having had deficient volition or awareness of his actions during these periods. This history and accompanying dissociation perspectives could have had significant explanatory and mitigating impact had the jury been informed of them.

30.    The emotional instability, relationship devaluation, and rage that almost certainly accompanied Mr. Bourgeois' conduct in the instant offense are also consistent with Borderline Personality Disorder, as is his developmental history. He possesses the classic ingredients of childhood trauma and abandonment, as well as textbook manifestations of the unstable relationships experienced by persons suffering from this personality pathology.

31.    As I understood the evidentiary presentation, the jury was made aware of Mr. Bourgeois' rages. It heard from a number of women who were on the receiving end of his outbursts, and of course the jury had found him guilty of the brutal killing of his young daughter. My testimony was necessary to explain to the jury that there was a mental health-related grounding to his violence. This was a critical counterpoint to the Government's theory that his violence and offense-conduct was the product of his wholly volitional choices arising from his malignantly evil heart. The jury did not have the benefit of contrasting scientifically-informed perspectives that Mr. Bourgeois' behavior was the product of the interaction of numerous adverse and damaging factors. His childhood abuse coupled with abandonment, and his organic deficits and low IQ, contributed to his enraged acting out and diminished his self-control. By any measure, this is mitigating in the context of capital sentencing.

32.    Mr. Bourgeois' abusive behavior towards his daughter is consistent with recurrent impulsive acts, even though the abuse took place over days and weeks. Due to his deficits, he has

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 13 of 18**

USCA5 599

a low tolerance for frustration, which becomes even worse in stressful situations. When triggered by stress, frustration, and perceived abandonment, he tends to react violently.

33.    I was prepared to analogize Mr. Bourgeois' functioning for the jury in order to help them understand and appreciate what made him behave violently. I believe Mr. Bourgeois' psychological make-up can be likened to a pressure cooker, and I was prepared to use this analogy for the jury. Typically, Mr. Bourgeois was able to keep a tight lid on the damaging factors from his history and his neuro-behavioral hard-wiring. He was able to maintain almost constant, if not steady, employment. He did his best to provide for his children materially and sometimes even emotionally. However, his background and psychological make-up always made him predisposed toward impulsivity and violence. Generally speaking, he was able to keep the lid on the pot. However, sporadically, over the years, there were releases of steam, in rage attacks and other impulsive misconduct. These releases were manifested by his violence toward women with whom he had relationships and sometimes toward his children. They were manifested by his on-going extramarital and extra-relationship affairs, which in context were also impulsive.

34.    At the time of the offense, there were many ingredients simmering in the pressure cooker that was Alfred Bourgeois. He feared abandonment due to the infidelity of his wife Robin, which he had recently discovered. He was on a cross-country trip in a confined place with four other people including the young victim. He was under crushing financial stress. I have recently been informed that Mr. Bourgeois had just learned of the tragic loss of his family home to a fire. His own childhood abuse and maltreatment left personality dysfunction and pathological reaction tendencies. All of these ingredients were existing in a base of his damaged psychological makeup, which itself was due to his history of abuse and abandonment.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 14 of 18**

USCA5 600

35.    During those hot and chaotic days in the truck the lid repeatedly blew from the pressure cooker. His immersion in this highly pressurized environmental and psychological context, history of rage attacks, and the nature of the injuries to the victim point to Mr. Bourgeois being in a state of extreme emotional distress at the time of these attacks. This has implications for diminished appreciation of his conduct and reduced ability to conform his conduct to the requirements of the law.

36.    I was also prepared to testify at the sentencing phase of trial regarding the risk of Mr. Bourgeois participating in future violent acts if sentenced to a life term in federal prison.  In my professional opinion, Mr. Bourgeois would likely make a positive adjustment to a life sentence.  My opinion is based on scientific methodology and data that has been subjected to repeated peer review. Much of my research data comes from the United States Justice Department.  The methodology and findings of my research are generally accepted by informed forensic psychologists.

37.    Several factors predict Mr. Bourgeois' positive adjustment in prison: his age, his behavior in custody pre-trial, his continuing relationship with family and friends, and his history of employment and stability in the community.  Alfred is 39 years old.  Research demonstrates better prison adjustment as inmates get older.  Rates of prison infractions are highest for inmates in their early 20's.  These rates fall by half by age 30 and continue to decline as inmates age. Applying a study of the prison behavior of convicted murderers, the projected 40-year risk of serious prison violence among the group of inmates sharing predictive characteristics with Mr. Bourgeois is only 2%.

38.    This assessment acknowledges that there were allegations that Mr. Bourgeois had threatened to kill others during his 20 months of confinement pre-trial. It is notable in this regard,

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 15 of 18**

USCA5 601

however, that despite this suspicion he at times shared a common day room with other inmates. Significantly, Mr. Bourgeois had no disciplinary write-ups during that time. Instead, Mr. Bourgeois showed, consistent with his psychological make-up and low IQ, that he responds well to the structured environment of prison.

39.     Finally, Mr. Bourgeois' history of employment and constructive involvement in the community points to his likely positive adjustment to life in prison. Throughout his life, Alfred has proven himself to be an active, and in several ways, positive contributing member of his local and family community. He has generally been gainfully employed as an adult. He is involved in an extensive family system. He attended church. He was an involved father. He provided financial support to his children.

40.     My testimony at Mr. Bourgeois' penalty phase would have described the findings and data from several peer reviewed studies, evaluating various risk factors. These studies consistently point to Alfred Bourgeois having a very low risk of committing serious violence in prison.

41.     Because risk of violence in prison is always a function of the context of confinement, in my risk assessment testimony I would have informed the jury of mechanisms available in the Federal Bureau of Prisons to control disruptive or violent inmates. According to federal regulations, if sentenced to life in prison without parole, Alfred would be housed in a high security level institution (i.e., U.S. Penitentiary). The Bureau of Prisons has a full range of mental health interventions available to respond to symptoms or misconduct involving a psychological disorder. These interventions include counseling, medication and education. The Bureau of Prisons also has a full complement of disciplinary tactics to control behavior, including: increased supervision; cell restriction; loss of privileges like commissary, visitation, recreation, and/or job; fines and loss of

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 16 of 18**

USCA5 602

property; and administrative segregation (solitary confinement). Finally, if the Bureau of Prisons determines that an inmate is a disproportionate risk of violence in prison, that inmate can be assigned to ADX Florence (i.e., super-maximum custody) where any opportunity to engage in serious violence is markedly diminished.

42. As noted above, I have significant experience with capital trials. Drawing on this fund of experience, Mr. Bourgeois' case stands out for the inaccurate and incomplete portrayal of Alfred Bourgeois' functioning presented to the jury. I believe trial counsel did not have an adequate understanding of the significance of mitigating evidence. They did not have a detectable strategy for penalty phase. They did not consult with me, their primary penalty phase witness, to help them develop a strategy or to explain the factors that had been identified from the limited investigation that time press had allowed. In my opinion, the information I would have provided the jury could have significantly impacted their deliberations. Without my testimony, and absent a clear defense strategy at the penalty phase, the jury had virtually no mitigating evidence to consider and no informed mechanism with which to consider his risk of violence in prison in the future.

43. There is much more detail that I can provide about the facts and opinions expressed in this Declaration. This Declaration presents my views in broad strokes and I would be happy to provide additional details at the request of the Court.

**Declaration of Mark D. Cunningham, Ph.D.**
**Page 17 of 18**

USCA5 603

I hereby certify that this Declaration is true to the best of my knowledge subject to the penalty for

perjury.

Mark D. Cunningham, Ph.D., ABPP

Dated:          May 11, 2007
                College Station, Texas

**USCA5 604**

7

USCA5 605

## DECLARATION OF CARLOS R. ESTRADA, M.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Carlos R. Estrada, M.D., hereby declare that the following is true and correct.

1.      I am a medical doctor who is board certified in psychiatry and neurology. I am licenced to practice psychiatry in the State of Texas. I maintain a clinical and forensic practice in Corpus Christi, Texas. I have appeared as an expert witness in numerous state and federal court criminal proceedings on behalf of the Government, the defense and as a Court expert.

2.      I was retained by the United States as a forensic expert in the case of United States v. Alfred Bourgeois, No. Cr-C-02-216 (S.D. Texas), and was so qualified during Mr. Bourgeois' trial. I understand that Mr. Bourgeois was convicted of capital murder and was sentenced to death related to the killing of his infant daughter on the grounds of the Corpus Christi Naval Air Station. I have been asked by Mr. Bourgeois' current defense counsel to complete this declaration regarding my involvement with this case. All opinions herein are stated to a reasonable degree of psychiatric certainty. All factual assertions are true to the best of my knowledge.

3.      Subsequent to being retained by the Government, I was asked by the Court to conduct a forensic examination of Mr. Bourgeois to determine his competency to proceed and his sanity at the time of the offense. I understood that the defense did not object to my acting as a Court expert in this capacity even though I had already been retained by the

Declaration of Carlos R. Estrada, M.D.<br>Page 1 of 9

USCA5 606

Government. After my evaluation of Mr. Bourgeois, I opined that he was both competent to proceed and was not insane at the time of the offense. Following this evaluation, I resumed my duties as a Government expert. However, with the knowledge and consent of the Government, I communicated with Mr. Bourgeois' defense counsel throughout the pre-trial and trial proceedings.

4.    As part of my duties as an expert witness, I reviewed all of the available information regarding the offense. It was readily apparent to me that this was not a "typical" killing. The offense was bizarre in its brutality, savagery, and perversity. This lead me to strongly suspect that Mr. Bourgeois has suffered significant childhood physical and sexual abuse. However, in my clinical interview with Mr. Bourgeois he denied that he suffered abuse of any sort as a child. He presented a rather idyllic vision of his early life, and tried to mask any apparent abnormalities. For instance, he spoke of his father as quite involved in his life and as being emotionally and financially supportive. He denied that his being made to leave home and live with an elderly woman in the neighborhood was the result of any family dysfunction.

5.    I strongly suspected at the time, and now know based on additional materials that I have reviewed, that these representations by Mr. Bourgeois were merely rudimentary attempts at masking what was in reality a highly dysfunctional, clinically significant, and painful history of childhood abuse and family dysfunction. It is not uncommon for even adult victims of childhood abuse to "deny" that they were abused. This "denial"

Declaration of Carlos R. Estrada, M.D.
Page 2 of 9

USCA5 607

phenomenon is largely a psychic defense put up by the victim to normalize the horrors that they suffered. The existence of this phenomenon also makes it particularly important for the mental health practitioner to not rely only on self reports, particularly in the forensic setting.

6.    At the time that I wrote my report (in January, 2004), I did not have any collateral information about Mr. Bourgeois' background. When I received the defense report (written by Dr. Cunningham in February 2004), I finally had some confirmation of my suspicion of abuse. However, I was not permitted to rely on Dr. Cunningham's report during my testimony because of a ruling from the Court. Therefore, I was left to testify only regarding my suspicions regarding his horrific childhood.

7.    I have now been provided with a wealth of information by Mr. Bourgeois' current counsel. This information includes declarations from those who witnessed his abuse; other mental health reports; and the transcripts of the penalty phase during which short testimony was provided by lay witnesses about the abuse. Based upon what I now know to be the truth of his upbringing, it is evident that in my interview with him, he created an elaborate fantasy life to replace the painful memories of his childhood. In this fantasy world he presents as being far more successful, wealthier and happier than he is in reality. This fantasy presentation, in which he has exaggerated his status, was at the core of my trial-diagnosis that he suffered from a Narcissistic Personality Disorder. Such a disorder is marked by the need of an individual to seek out special attention for achievements in order to compensate for obvious shortcomings. However, now that I know more about Mr.

Declaration of Carlos R. Estrada, M.D.
Page 3 of 9

USCA5 608

Bourgeois, I can state that this diagnosis, while accurate, failed to reflect the real and mitigating facts about his life.

8.    As noted, Mr. Bourgeois' current counsel have provided me with additional background information about him. I have reviewed the recent declarations of psychologists Jethro Toomer, Ph.D., Michael Gelbort, Ph.D., and Donald Weiner, Ph.D. I have also reviewed the declarations of additional lay witnesses regarding Mr. Bourgeois' childhood and early adult life and the report of social worker Kathleen Kaib reviewing his relationships with ex-wives and girlfriends.

9.    This new information confirms what I strongly suspected at the time of the trial – namely that Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments. This new information presents a picture of a man who cannot establish and maintain stable relationships. This history (referenced primarily in the declaration of Kathleen Kaib) is consistent with Borderline Personality Disorder. This diagnosis, which supplements my earlier diagnosis of Narcissistic Personality Disorder, captures Mr. Bourgeois' tumultuous and violent relationships with the many women he befriended and, in some cases, married. In classic Borderline fashion, each new relationship was marked by extreme highs followed by devastating lows. As people with Borderline Personality Disorder are wont to do, Mr. Bourgeois became infatuated over new relationships, only to reject each person as his level of stress or frustration heightened, or as

Declaration of Carlos R. Estrada, M.D.
Page 4 of 9

USCA5 609

he perceived that he was going to be abandoned. In his case, owing to his status as a victim of abuse, along with his cognitive deficits, the rejection of each relationship was unfortunately marked by violence.

10.    Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic-like states. Indeed, the name of the Disorder derives from an earlier belief that such patients were "Borderline Schizophrenics." While I have no direct evidence that Mr. Bourgeois has experienced psychotic states, I am confident in stating that the nature of the offense where he first abused and then killed his infant daughter is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Mr. Bourgeois at the time of the offense.

11.    Although I testified at trial that I suspected that he was abused as a child, neither I, nor any other expert, testified about the significance of childhood sexual and/or physical abuse from a mental health perspective. Yet, it is not disputed in the mental health field that the significance is profound. Childhood physical or sexual abuse can leave durable psychological scars. Abused children often grow into adults who are significantly impaired. Such individuals have great difficulty establishing and maintaining healthy relationships. They have difficulty trusting others. They also have difficulties making judgments and controlling impulses. These impairments are greater when the abuser was known to the child, and even greater still when the abuser was a parent or care giver. This is because the

Declaration of Carlos R. Estrada, M.D.
Page 5 of 9

USCA5 610

child's trust is profoundly violated when a parent – who is naturally supposed to care for the child – instead engages in acts that harm the child.

12. When a child is abused by a parent, it also has the effect of normalizing the behavior. That is, the child sees the behavior as acceptable, and develops a far greater likelihood of becoming an abuser. This appears to have been the case with Mr. Bourgeois. He saw his abuse of his children as a tool in child rearing, such as when he "taught" the victim toileting skills.

13. Childhood abuse fills the abused child with rage, anger and terror. In many instances, the abused child develops into an adult who turns that rage, anger and terror outward. Many adults with abuse histories go through life with their rage and anger on a hair trigger. When such survivors of abuse are subjected to stressors and/or reminders of the abuse they have experienced, the likelihood of their turning their rage outward dramatically increases. This is especially true with survivors of sexual abuse. Those who have been sexually abused as children will frequently come to associate sexual gratification with violence and aggression. As noted, given Mr. Bourgeois' history of such sexual aggression, I strongly suspected that he was sexually abused as a child. When sex abuse survivors, like Mr. Bourgeois, are sexually aroused they will often react by replicating the abuse that they have suffered.

14. In addition, in Mr. Bourgeois' case the issue of abandonment must be considered. He was not just the victim of abuse, but he was abandoned by his mother when

Declaration of Carlos R. Estrada, M.D.
Page 6 of 9

USCA5 611

he was made to live with an elderly neighbor. This abandonment multiplied the already significant psychological effects of the abuse that he suffered.

15.    In this case, there was no apparent motive for the killing. While the Government theorized that Mr. Bourgeois killed the child in order to avoid the financial responsibilities that she represented, I find this explanation wanting from a mental health perspective. If a person wishes to kill a child for financial reasons, there are far more efficient and less gruesome ways to accomplish the task. There are many alternative ways to kill a child that would increase one's chances of "getting away with it." I believe that the Government's proffered motive was, respectfully, somewhat simplistic. As noted, the brutal and bizarre manner in which death was caused, along with Mr. Bourgeois' background and mental health deficits, make another explanation far more satisfactory. This was purely a rage killing. The rage was born of Mr. Bourgeois' own lifetime experience, the psychological effects of those experiences and his cognitive deficits. Added to these historical factors is that Mr. Bourgeois, like many borderline personalities, can decompensate into rageful outbursts in the face of frustration.

16.    To be sure, not all abused children grow into abusive adults. However, the chances that the cycle of abuse will continue dramatically increases if the individual has organic brain deficits. Although I was aware at the time of my testimony that Mr. Bourgeois has both organic brain deficits and a low IQ (tested at the time of trial at 76 and retested now at 70), I was not able to include these facts in my opinion because the neuropsychological

Declaration of Carlos R. Estrada, M.D.
Page 7 of 9

USCA5 612

testing conducted on Mr. Bourgeois by Dr. Weiner was not admitted in evidence.

17.    I sat through the entire trial at the request of the prosecution. I was quite involved with and made appropriate recommendations to both sides of the case. For instance, I strongly urged the defense to have Mr. Bourgeois undergo a thorough battery of neuropsychological testing, and suggested Donald. E. Weiner, Ph.D. to conduct this testing. I have worked with Dr. Weiner on many occasions and have found him to be a reliable, knowledgeable and skilled practitioner. I was surprised that the defense decided not to call him as a witness, and I was concerned that I could not reference his important findings in my testimony. Had I been able to do so, I would have explained to the jury that Mr. Bourgeois' cognitive deficits were important factors that mitigate the offense and which went far toward explaining and understanding his violent behavior.

18.    Having sat through the testimony in this case, and knowing what I now know, and previously suspected, I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. I do not come to this conclusion lightly. But, he was presented only as an unrepentant and evil man. While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions. Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Declaration of Carlos R. Estrada, M.D.
Page 8 of 9

USCA5 613

I hereby certify and declare under penalty of perjury that the statements contained

herein are true.

Carlos R. Estrada, M.D.

Dated:    Corpus Cristi, Texas
May ___, 2007

Declaration of Carlos R. Estrada, M.D.
Page 9 of 9

USCA5 614

8

USCA5 615

## DECLARATION OF MICHAEL M. GELBORT, PH.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Michael Gelbort, Ph.D., do hereby declare and verify as follows:

1.          I am a licensed clinical psychologist, specializing in neuropsychology. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology at Texas Tech University in 1984. I completed a post-doctoral fellowship in neuropsychology and medical psychology at the Rehabilitation Institute of Chicago in Chicago, Illinois, in 1985. I subsequently served as the Chief Psychologist, then Director of Psychology at the Institute for Rehabilitation and Research in the Medical Center in Houston, Texas. I was also on staff at Baylor College of Medicine and engaged in private practice, concentrating on psychological and neuropsychological evaluations. After four years in those endeavors I returned to Chicago to pursue private practice with privileges at several hospitals. My current practice concentrates on psychological and neuropsychological evaluation and diagnosis. I also do extensive forensic work in the civil and criminal law fields. I am licensed to practice in three states and have been qualified as an expert in neuropsychology in courts in many states and federal district courts.

2.          I have been asked by counsel for Mr. Alfred Bourgeois to conduct a neuropsychological evaluation of him in connection with federal capital case. In preparation for this evaluation, I was provided with and reviewed extensive background materials, including a report of an evaluation conducted on Mr. Bourgeois by Donald Weiner, Ph.D. in 2004.

3.          I met with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana in April 2007. I administered a number of standardardized intelligence, achievement and neuropsychological tests. The results of my testing shows the following:

**Wechsler Adult Intelligence Scale III** (age corrected subtest-scaled scores)

1

USCA5 616

| Vocabulary | 4 | Picture Completion | 5 |
|---|---|---|---|
| Similarity | 4 | Digit Symbol | 11 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 8 | Matrix Reasoning | 5 |
| Information | 4 | Picture Arrangement | 5 |
| Comprehension | 3 | | |

| Verbal IQ: | 67 |
|---|---|
| Performance IQ: | 78 |
| Full Scale IQ: | 70 |

**Trail Making Test**

| Part A | 30 seconds with 1 error | (deficient) |
|---|---|---|
| Part B | 78 seconds with 0 error | (borderline deficient) |

**Lateral Dominance**

Left side dominant with some ambidextrous signs

**Grip Strength**

Essentially equal bilaterally

**Sensory exam**

mild tactile higher level suppressions

**Category Test**

80 errors                              (moderate impairment)

Wide Range Achievement Test - III (standard score followed by percentile)

| | Standard Score | Percentile | Grade Equivalent |
|---|---|---|---|
| Reading | 85 | 16 | High School |
| Spelling | 100 | 50 | High School |
| Arithmetic | 74 | 4 | Grade 5 |

2

**USCA5 617**

**Wechsler Memory Scale - III**

Logical Memory I - mild impairment
Visual Immediate Memorization - mild impairment
Verbal Immediate Memorization - mild/moderate impairment
Visual Memory I - moderate impairment
Logical Memory II - mild/moderate impairment
Visual Long-term recall - moderate/severe impairment

**Conclusions and Analysis**

4.        The testing I administered was valid. Mr. Bourgeois gave a sincere effort. His results on my testing are quite similar to the testing administered by Dr. Weiner, indicating no malingering. His pattern of responses on all of the testing I administered are consistent with valid effort. For example, he performed relatively well in the early rounds of the tests, when the principles are very straightforward. As the tests became more difficult, he began to falter. This pattern reflects valid effort.

5.        Mr. Bourgeois' full scale IQ is in the range of mental retardation. It is consistent with his 2004 score of 76 on a WAIS-R. The score of 76 must be understood and considered in perspective and application of the Flynn effect formula (whereby .3 is deducted for each year between the time that the test was normed and the date of administration) is utilized to do so. In this instance, the WAIS-R was normed in 1978 and administered in 2004. Therefore, a "deduction" of 7.8 is warranted (26 years x .3 per year = 7.8). As such, the computed score of 76 would actually reflect in intellectual quotient value of 68. For diagnostic purposes there is essentially no difference between the Flynn-adjusted IQ score of 68 and the recent measured score of 70 obtained with the current version of the WAIS on my test administration.

6.        I have not formally assessed Alfred Bourgeois' adaptive functioning. However,

3

USCA5 618

my review of Mr. Bourgeois' history shows many of the tell-tale signs of adaptive skills deficits. For instance, he has had difficulty in maintaining social relationships. He has had difficulty with managing the affairs of everyday life, including money issues. He has a skewed view of himself in relationship to the rest of the world. These reports are indicative of impairment in the social and conceptual realms of adaptive functioning.

7.      Mr. Bourgeois' neuropsychological profile shows deficits in the frontal lobe abilities. This is most prominently evidenced by his impaired performance on the Category Test. This test is one of the most sensitive to both whole-brain and frontal lobe impairment. My conclusion that there is frontal lobe impairment is also supported by his rather poor performance on the Matrix reasoning and Comprehension subtests of the WAIS-III. These subtests are particularly sensitive to executive function, which is controlled by the frontal lobes.

8.      I have reviewed Dr. Weiner's report. While our tests results are, for all intents and purposes, congruent, he concludes that Mr. Bourgeois' brain damage is localized in the posterior portion of the brain. While I disagree with this aspect of his report, this is largely an academic disagreement. Assuming, for argument's sake, that Mr. Bourgeois has only damage to his posterior brain, there is still clear evidence of impairment of and impact on his executive functioning. Accordingly, wherever one localizes the damage, his performance on Categories, Matrix Reasoning, Comprehension, and Trails B, demonstrate that his executive function is impaired.

9.      Executive functions act, in part, as the "brakes" for a person's actions. When there is impaired executive function, the individual may and often acts impulsively and without forethought. Mr. Bourgeois' impairment in this realm is significant, particularly when one

4

USCA5 619

considers the abusive childhood that he experienced. The adult survivors of childhood abuse

often suffer from impulse control difficulties. When this psychological damage is overlaid with

his organic deficits, Mr. Bourgeois' ability to modulate his conduct is quite impaired.

10.             I understand that there is some disagreement over the etiology of Mr. Bourgeois'

impairments. Dr. Weiner believed that they are due to a motor vehicle accident, and there is

some question as to whether Mr. Bourgeois actually suffered a head injury in that accident. In a

forensic setting, etiology is sometimes important. For example, in personal injury cases (e.g.,

subsequent to an auto accident) it is important to know if the damage identified by the

neuropsychologist was due to the accident because that determination is relevant to whether the

negligent party owes damages. However, in the criminal law setting, what is of significance is

whether the deficits predate the event for which the individual has been accused rather than what

is the proximate cause of the impairments. To be sure, it is helpful in deciding whether to

conduct testing to know whether there are indicators of brain damage, such as child abuse or a

head injury. However, neuropsychologoical testing results indicating dysfunction "stands on

their own." Even in the absence of a determination of cause, this testing shows whether an

individual's brain is intact or impaired. I am confident in stating that Mr. Bourgeois'

impairments exist, even if the etiology is not completely clear.

I hereby declare and certify that the above facts and opinions are true and correct under

penalty of perjury.

Michael M. Gelbort, Ph.D.

Dated: Chicago, Illinois

11 MAY, 2007

5

USCA5 620

9

USCA5 621



DEPARTMENT OF PSYCHOLOGY
THE UNIVERSITY OF TEXAS AT AUSTIN

*Seay Building • 512-471-1157 • SPB 4.212 • 108 E. Dean Keeton • Austin, Texas • 78712 • A8000*

December 19, 2003

Douglas Tinker, Esq.
Attorney at Law
622 S. Tancahua
Corpus Christi,
TX  78401

Dear Mr. Tinker:

I've now had a chance to go through the box of material regarding the **Alfred Bourgeois** case. From what was sent, there was only a limited amount of useful information for me to form an impression of the case. In particular, the documents that gave me a (limited) sense of the psychological aspects of the case were a) the Grand Jury synopsis labeled "SPECIAL" and dated 7/15/02; b) the FBI memo concerning the lab report dated 9/03/02; c) the Neuropathology Consultation, dated 9/17/02; and d) the Autopsy Examination Report, dated 1/10/03.

Let me summarize the case as I understand it based on those documents. Mr. Bourgeois took over the custody of the J.G. (Jakereen [Ja'Karenn] Gunter, born on 10/5/99) around May 15th, 2002 following a custody and child support hearing. It was determined that J.G. was Mr. Bourgeois' biological child from a brief affair he had with Katrina Harrison. He had met her in Houston, TX while on the road trip for the trucking company he worked for.

J.G. died on June 28, 2002 from a closed head injury. Based on his wife's (Robin Bourgeois) interview, Alfred became physically abusive to J.G. within days of taking over custody. Some of the abuse was also witnessed by Robin's uncle (who lived with them in La Place, Louisiana) and a friend of hers. Reports of physical abuse also came from the 7-year-old daughter. Mr. Bourgeois denied all abuse.

Here is my analysis. There is no question that J.G. was seriously and repeatedly physically abused. Interview reports revealed the child was repeatedly "slapped," "whipped," and 'beaten." The autopsy report indicated five bite marks, marks from electric cord and belts, bruises and scars, and seven brain hemorrhages. However, there was no evidence of sexual abuse.

The homicidal incident apparently occurred on June 27th. According to the 7-yr-old daughter, J.G. accidentally spilled the contents of her potty in the cab of the truck. Mr. Bourgeois became irate, pulled J.G. over his lap, and repeatedly hit her. One could suppose that he certainly wasn't intending to kill her. Rather he was very upset by the mess and he wanted to punish her and (in a misguided way) to teach

USCA5 622

2

her a lesson so she wouldn't spill the contents of her potty in the future.
Apparently, Mr. Bourgeois frequently "beat" J.G. several times a day over potty-
training problems, according to the uncle. So his behavior, while probably extreme
in reaction to this incident, was his standard way of reacting to potty-training
problems.

His degree of upset should be recognized in light of his profession. Mr. Bourgeois
was a long distance truck driver and literally lived (part time) in his truck. He
drove a 1999 Peterbilt cab, one of the nicer trucks made, and to have a child soil the
cab with the contents of her potty (was it just urine?), would be very upsetting to
someone who cared about his truck.

In addition, he was probably quite tired that morning after driving some 10 hours (is
that legal or did Robin do some of the driving?) and arrived at the delivery site of
the naval base at 2:30 a.m. His fatigue and lack of sleep probably contributed to his
overreacting and being especially brutal to J.G.

More generally, Mr. Bourgeois was "stressed" by traveling in a confined space with
four other people, including three young children. In his words it is "hard to watch
three kids." That understatement also speaks to his frame of mind in dealing with
the children.

Another important factor that apparently contributed to the homicide of this young
child was his lack of attachment to her. Mr. Bourgeois was probably surprised to
learn that he had fathered B.G. and likely had little, if any, contact with her for her
first 2 1/2 years of life. So it appears he did not develop feelings of love for the
child. Subsequently, he was court ordered to pay child support and take over
custody (at least temporarily). He did not have a prior history with the child and
did not have the opportunity to become attached to her. Rather, he was
unexpectedly saddled with dealing with a third young child. Further evidence of his
lack of attachment can be found in the reports of this FBI interview. He made the
statement regarding J.G.'s critical care in the hospital that he "did not want *it* to
suffer" (italics added). Even more incredibly, he asked the interviewing FBI agent
what the child's name was. All of this leads one to suspect that he felt no
attachment to his daughter.

It appears that at least some (if not much or most) of the abuse resulted from toilet
training incidents. This is a very common "cause" of physical abuse. As
mentioned above, abusive parents mistakenly think they are doing the right thing by
hitting the child to teach them a lesson. When the child continues to have toileting
problems, the parent then thinks he needs to hit the child harder so the child
remembers better not to have a toilet training accident.

In sum, although this is evidently a case of horrible child physical abuse, it appears
to be largely understandable and not uncommon—just a more extreme case with a
tragic end.

USCA5 623

3

I have a number of questions that might be helpful to have answered. For example, what kind of childhood did Alfred Bourgeois experience with regard to punishments and abuse. My guess is that he was physically abused as a child and learned that slapping, whipping, etc. is the way a parent punishes a child for misbehavior (e.g., toilet training accidents), and it is the way to teach a child right from wrong. Given that people use terms quite loosely, I would want to know exactly what was meant by such terms as "whipping," and "beating." How did he treat the two other children, the 7 year old daughter (is she his biological daughter?) and the one year old, Alfredesha (I presume Alfred's biological child)? How did he treat his wife, Robin? What was his record as an employee of the trucking firms that he had worked for. What was his driving record? It appears he was conscientious in his job and concerned that he get his truck back after the FBI interview in order to pick up the next load and deliver it to Miami. Did he have a criminal record for aggressive behavior?

I will be out of town from December 25th until January 6th. Please let me know what the next step in this case will be.

Sincerely yours,

George W. Holden, Ph.D.
Professor

USCA5 624

10

USCA5 625



DEPARTMENT OF PSYCHOLOGY
THE UNIVERSITY OF TEXAS AT AUSTIN

Seay Building • 512-471-1157 • SPB 4.212 • 108 E. Dean Keeton • Austin, Texas • 78712 • 8000

Via fax on February 25, 2004

Douglas Tinker, Esq.
Attorney at Law
622 S. Tancahua
Corpus Christi,
TX 78401

Dear Mr. Tinker:

This is an addendum to my letter of Dec. 19, 2003 regarding the Alfred Bourgeois case.

You asked me about my opinion regarding the issue of premeditation. In cases where a parent has killed a child, something we label "filicide," there are a number of different "types" of fatalities. Those types can be linked to different motives. In many cases, the homicide is clearly intentional and premeditated. For example, some parents intentionally kill their newborns ("infanticide") because the child was unwanted. Other parents intentionally kill their children as a way of retaliating against another spouse (called the "Medea syndrome"). Still other parents have psychiatric illnesses and they thought about, and clearly intended to kill their children (e.g., Andrea Yates).

On the other hand, other types of filicides are evidently not intentionally or premeditated. This occurs sometimes when child neglect leads to filicide. It can also happen in the course of disciplining a child. A parent may fly into a rage, get carried away in terms of the force they use, and accidentally end up killing the child. For instance, in a relatively large and comprehensive study of filicide, Wilczynski (1997), found that when a parent murders a child while disciplining him/her, parents typically reported they had not meant to inflict serious harm.

The way the child died is another factor in assessing the underlying motive. If a child is held under water and drowned or shot in the head with a gun, there is little question about whether the parent intended to kill the child. However when a child dies during the course of discipline, then it is much more likely that the parent did not intend to seriously injure—let alone kill the child.

This, in my view, is what happened in the Alfred Bourgeois case. It is highly unlikely that Mr. Bourgeois had decided to (or thought about) killing JaKarenn Gunter prior to that incident. Instead, what probably happened was that in a fit of rage over the spilled potty, he lost control of himself and in the course of administering physical discipline, fatally injured JaKarenn.

Please let me know if you would like additional information.

Sincerely,

George W. Holden, Ph.D.
Professor

USCA5 626

11

USCA5 627

### DECLARATION AND AFFIDAVIT OF GEORGE W. HOLDEN, PH.D. PURSUANT TO 28 U.S.C. § 1746

I, George W. Holden, Ph.D., do hereby declare and verify as follows:

1.    I am a tenured full professor of Psychology at the University of Texas at Austin where I have taught and conducted research since the mid-1980s. I received a Bachelor's degree from Yale University in 1977, a Master's degree in Psychology from the University of North Carolina, Chapel Hill in 1982, and a Ph.D. in Psychology from the same institution 1984. My research and teaching focuses on family violence and parent/child relationships. I have published extensively in these fields.

2.    In late 2003 I was retained by John Gilmore and Douglas Tinker, defense counsel for Alfred Bourgeois, to testify at his capital murder trial in the federal court in Corpus Christi. I understood that my role was to provide the jury with insight about dynamics of family violence as they related to Mr. Bourgeois' intent and state of mind at the time of the death of his infant daughter. It was proposed that I offer this opinion during the guilt phase of trial.

3.    In reaching my conclusions, I studied the record of the case up to that date, including many reports produced by law enforcement authorities, autopsy materials, and other documents provided by the Government to defense counsel. The pattern of abuse that I saw reflected in these materials did not strike me as unusual for a case of severe childhood abuse. I applied my knowledge of the research in the field of family violence to my review of these documents, and concluded that while brutal, Mr. Bourgeois' actions leading to the death of his daughter were not premeditated. I set forth my opinion in a letter to counsel dated December 19, 2003, supplemented by a letter of February 25, 2004.

Declaration of George W. Holden, Ph.D.<br>
Page 1 of 7

USCA5 628

4.      I was summoned to court in Corpus Christi on March 1, 2004, as part of a pretrial conference to determine the admissibility of my opinion that Mr. Bourgeois did not premeditate. I was sworn as a witness at this conference, and tried to explain the basis for my views. As I recall the proceedings, the judge repeatedly made the point that I was not permitted under the law to express an opinion on an issue that ultimately had to be decided by the jury, i.e., whether Mr. Bourgeois premeditated. I also recall that the judge asked whether in reaching my conclusions I made the assumption that Mr. Bourgeois committed the actual killing.

5.      I am not a forensic psychologist and have appeared in court on only one other occasion. Therefore, my experience in such matters is quite limited. Nonetheless, I was quite surprised that Mr. Bourgeois' lawyers did not alert or prepare me for questions about my assumption that Alfred Bourgeois had committed the crime, which based on the judge's questions, seemed rather important. Nor did Mr. Tinker seem to have much of a response to the judge's question about whether I could give an opinion on the question of premeditation.

6.      I recall that at the conclusion of the hearing, after the judge ruled that I could not testify about premeditation in the guilt phase, she mentioned that perhaps Mr. Tinker could call me as a witness in the punishment phase of trial, if Mr. Bourgeois was ultimately convicted of capital murder. Although Mr. Bourgeois was convicted, Mr. Tinker did not ask me to testify at the punishment phase.

7.      I have now been asked by Mr. Bourgeois' current counsel to set forth what I could have testified about had I been called as a witness at the penalty phase of trial. The following opinions are expressed to a reasonable degree of psychological certainty.

8.      As I did in preparing my opinion for my aborted guilt phase testimony, I would have

**Declaration of George W. Holden, Ph.D.**
**Page 2 of 7**

USCA5 629

drawn on the extensive research that exists on child fatalities. This research reveals that the majority of "filicides" (death of a child at the hands of a parent) occur at the end of a disciplinary incident. In most cases, the parent does not intend to kill the child.

9.    The pattern of abuse in this case and the ultimate act of violence that led to Ja'Karenn's death fits a pattern described in research about unintended filicide. In this case, the final fatal blow was administered as an act of punishment when the victim spilled the contents of a potty. From a psychological perspective, this was likely a disproportionate rage reaction resulting from stress and frustration.

10.    In my opinion, it's likely that Mr. Bourgeois was in a violent rage during this incident. This rage likely stemmed from three sources: 1) his pathological child rearing; 2) the stressors, both immediate and distal, that he was suffering at the time; and 3) his organic deficits and impaired cognitive functioning. The research indicates that abusers often view violent acts as appropriate disciplinary techniques. I understand that Mr. Bourgeois came from an abusive background, and therefore the violent acts were normative. In other words, he saw what we would consider abuse to be just another tool in a parent's child rearing arsenal.

11.    The final act of abuse in this case centered around a common child rearing incident, that of toilet training. Abusive parents mistakenly believe they are doing the right thing by hitting with the intent to hurt the child in order to teach him or her a lesson. Often, the child's continued failure to "learn the lesson" is perceived as repeated misbehavior, and the severity of the punishment will escalate. Further accidents then lead to increasingly more severe corporal punishment, and, in some cases to serious injury or death.

12.    As noted, most cases of filicide occur in reaction to stressors both immediate and

**Declaration of George W. Holden, Ph.D.**
Page 3 of 7

**USCA5 630**

distal. The immediate stressors in this situation stemmed from the victim's potty training accident, along with the close quarters in the truck, Bourgeois' getting lost when trying to deliver a load to the Navy base, and his truck battery dying, making him concerned that he would be late for his scheduled deliveries.

13.    Distal stressors are those more removed from the situation, but still pressing on the actor. At the time of the abuse, the materials reveal that Mr. Bourgeois was feeling overwhelmed by financial stressors. He was behind on his bills, he was engaged in a trucking contract that did not meet his financial needs, and he had two new babies to support (one of which, the victim, he had just learned of a few months prior). His recent discovery of his spouse's affair with another man also weighed heavily on him and raised the specter of yet another failed relationship.

14.    As in some other filicide cases with which I am familiar, Mr. Bourgeois did not have the psychological resources to deal with these stressors. Instead, he reacted to a small event with an overwhelming and disproportionate amount of rage.

15.    Bourgeois' current counsel have provided me with additional information that Mr. Bourgeois was abused as a child, and attesting to his impaired psychological and neuropsychological functioning.

16.    That Mr. Bourgeois was himself abused is far from surprising. The offense itself stands as mute testimony to the fact that Mr. Bourgeois experienced violence, most likely by one or more care-givers, as a young child. Usually, abusive parents were at one time abused children. As noted, abused children accept violence as normative. Again, based on the pattern and type of abuse he visited upon his child, it is highly likely that Mr. Bourgeois was raised in and lived in a subculture that accepted a significant level of violence towards children.

**Declaration of George W. Holden, Ph.D.**
Page 4 of 7

USCA5 631

17.     Further, information provided to me by current counsel indicates that Mr. Bourgeois suffers from severe personality disorders that are frequently seen in abusers who were abused as children. Clinical psychologists have reported that he has a Borderline Personality Disorder. The disorder is characterized by intense rage episodes and a pathological inability to form healthy attachments to others. In addition, his social history reveals that he was not only an abused child, but that he was also an abandoned/rejected child. Childhood rejection makes it even more difficult for an adult to form healthy bonds, and predicts tumultuous relationships. Psychologically, our ability to form bonds with intimate partners is linked to our ability to form bonds with children. In Bourgeois' case, the ability to relate with others, especially intimate partners and children, is seriously damaged.

18.     Even more significant in this case, it seems that Ja'Karenn became a scapegoat for Mr. Bourgeois. This is a common phenomenon in pathological family relations, where one child is unreasonably blamed by a parent for the family's problems and must suffer the brunt of that parent's rage and frustration. It is likely that Mr. Bourgeois was unable to bond with Ja'Karenn, and she therefore filled the role of scapegoat.

19.     In addition, I have read the declarations of Dr. Gelbort and Dr. Weiner. They report that Mr. Bourgeois has serious neuropsychological deficits. He has a very low IQ (bordering between the mentally retarded and borderline retarded range). His low IQ means that he is less able to effectively problem solve. In addition, he appears to be damaged in those areas of the brain that impact his executive functioning. This testing and the opinions of Dr. Gelbort's and Dr. Weiner's show that he has an impaired ability to control himself and make sound judgments, particularly when under stress.

Declaration of George W. Holden, Ph.D.<br>Page 5 of 7

USCA5 632

20.    The reports of neuropsychological impairments are not surprising given Mr. Bourgeois' history of childhood abuse.  Research shows that the trauma and stress experienced by the abused child can literally rewire the brain.  The brain of a victim of severe abuse responds differently to stress, danger, and frustration with consequent deficits in making judgments, forming relationships and controlling impulses.

21.    My testimony could have helped the jury understand that Mr. Bourgeois behavior, sadly enough, fits a common pattern of abuse. The pattern of abuse revealed in Ja'Karenn's autopsy can more readily be interpreted as fitting a pattern of mis-guided parenting than a case of premeditated torture.  For example, Ja'Karenn was burned, bitten, hit, and whipped.  These acts of violence, although cruel, are actually common in cases of severe child abuse.  Often, they mirror the perpetrator's own experience of abuse as a child.  In addition, they are often seen as corrective measures or used as instruments in a distorted understanding of "teaching" the child.  For example, burning is often mistakenly used to teach the child to avoid hot surfaces.  Biting is often intended to teach the child not to bite.  Even the final blow that killed Ja'Karenn was in the course of a disciplinary act, where Mr. Bourgeois lost control of his own rage and slammed Ja'Karenn's head against a hard surface.

22.    My testimony at the sentencing phase of trial could have served two purposes. First, it could have helped the jury place this awful crime in the context of family violence. It would have helped mitigate the image of Mr. Bourgeois as a sadistic monster intent on torturing and then murdering his child.  Instead, I could have explained family violence as a phenomenon that is unfortunately tied up in our culture, and a pattern that sadly repeats itself through generations. I could have reviewed for the jury research about how difficult it is to break the cycle of family violence.

Declaration of George W. Holden, Ph.D.
Page 6 of 7

USCA5 633

Certain factors have been proven to help mitigate this cycle, including: high intelligence, therapy, and supportive functional (not enabling) spouses. Mr. Bourgeois did not benefit from any of these positive influences. Second, I could have reviewed for the jury the neuropsychological and psycho-social factors that pre-disposed Mr. Bourgeois to violence against children.

23.    Had I been called at the sentencing phase, and provided with the information that I now have, I would have provided an opinion that the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions. These factors had an additive impact: i.e., each alone would have impaired Mr. Bourgeois, but taken together they likely overwhelmed him. I would have been able to provide this opinion, even if I did not state what I still believe to be true in this case, that this was not a premeditated case of murder. Instead, Mr. Bourgeois' actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control.

I hereby certify that the above facts and opinions are true and correct.

George W. Holden, Ph.D.

Dated: Austin, Texas
May _13_, 2007

Declaration of George W. Holden, Ph.D.
Page 7 of 7

USCA5 634

12

USCA5 635

<u>DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB, M.S.S., M.L.S.P., L.S.W.</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Kathleen Kaib, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.     My name is Kathleen Kaib and I am employed as an investigator/mitigation

specialist with the Federal Community Defender Office, Capital Habeas Unit.  I graduated from

Bryn Mawr Graduate School of Social Work and Social Research with a Masters degree in

Social Service (equivalent to a Masters in Social Work) and a second Masters in Law and Social

Policy.  I am a licensed social worker in the state of Pennsylvania, and I am a certified domestic

violence counselor.  I have been in professional contact with and counseled many woman who

have been the victims of domestic violence.  I have extensive experience with diagnosing and

assessment of mental health disorders, symptomatology and assessment of individuals with

mental health deficits, including individuals with Borderline Personality Disorder.  I also have

significant experience in generating social histories.

2.     All of the opinions expressed herein are stated to a reasonable degree of

psychological certainly, and all facts are true to the best of my knowledge and recollection.

3.     At the request of Alfred Bourgeois' current lawyers, I interviewed the following

women about Mr. Bourgeois: Geralyn Dumas, Sheila Bourgeois, Cynthia Bourgeois, Gaynell

Collins, Robin Bourgeois, and Ivy Thomas.   I also reviewed the notes of an interview with

Gaynell Belvin James which was conducted by my colleague Richard Ruffin, MSW, and I have

spoken with Mr. Ruffin about his interview with Ms. James.

4.     All of these women were either married to Mr. Bourgeois or were romantically

1

USCA5 636

involved with him. Common to each of these relationships was that they were extremely intense and unstable. In the beginning of each relationship Mr. Bourgeois idealized each woman, and treated them wonderfully, but he quickly switched to devaluing them and ultimately became quite violent and abusive with them. It was readily apparent to me based upon my interviews, that Mr. Bourgeois's relationships were chronically unstable due to his inability to regulate his emotions.

5.      Mr. Bourgeois's relationship with Geralyn Dumas was the earliest relationship that I investigated. Geralyn and Mr. Bourgeois began a romantic relationship in 1979 and share a daughter, Bethany. In the beginning of their relationship Mr. Bourgeois was very attentive and kind, but this steadily deteriorated. Eventually Mr. Bourgeois demonstrated enormous rage. Geralyn was engaged to Mr. Bourgeois but never married him because he was constantly cheating on her with other women and he would have uncontrollable outbursts of anger. Geralyn maintained sporadic contact with Mr. Bourgeois long after their romantic relationship ended, because they had a child together. Bethany came home from visiting Mr. Bourgeois and reported that he was having sex with women other than his wife while Bethany was in the house.

6.      Gaynell Belvin James was Mr. Bourgeois's next significant relationship after Geralyn. They met in 1982 and she described that the relationship was tempestuous. Soon after they met she got pregnant with their son Anthony. The relationship was very short lived because Mr. Bourgeois became violent and she could not endure his frequent and dramatic mood shifts.

7.      Mr. Bourgeois next married Sheila Bourgeois in 1987, after only a few months of dating. When the relationship was in the very early stages Mr. Bourgeois confided in her that his mother was extremely cruel to him and would abuse him. The relationship was very good while

2

USCA5 637

they were dating, but after just a week of marriage he became verbally abusive and violent.

Sheila stated that Mr. Bourgeois became extremely jealous and angry. To this day Sheila states

that she has no idea how the relationship changed so drastically so quickly. One night Sheila was

waiting for Mr. Bourgeois to come home from being out on the road as a truck driver. Mr.

Bourgeois walked into the house and immediately began to choke her for no reason, and then just

as suddenly as the attack began he walked away and went to sleep. This incident was never

acknowledged or explained the next day.

8.      Sheila left Mr. Bourgeois four months after they married because he pushed her

over a chair while she was three months pregnant with their daughter, Sherisha. Sheila stated

that Mr. Bourgeois cheated on her during their entire marriage, and he did not seem to care about

hiding it from her. Sheila stated that Mr. Bourgeois always had to have what his brother Lloyd

had even when he could not afford such things. He would spend money on cars, and then they

would not have enough money to buy groceries. She stated that he was very reckless with the

way he spent money.

9.      In 1991, Mr. Bourgeois married Cynthia Bourgeois. They too only dated for a few

months before they were married. During those first few months Mr. Bourgeois "wined and

dined her." During this time Mr. Bourgeois confided that his mother physically and verbally

abused him. Cynthia never wanted for anything during this period in their relationship and they

had a wonderful time together, but after they were married Mr. Bourgeois completely changed.

Cynthia said she did not even recognize the man that had, only a few months before, been so

good to her. Mr. Bourgeois was extremely verbally abusive to her and he would fly into rages

for no apparent reason. When Mr. Bourgeois would start to get upset she could see his eyes

3

USCA5 638

cloud over and said it was like she was looking at a different person. Their marriage did not last long because of his rages and jealousy.

10.    Mr. Bourgeois was then married to Gaynell Collins from 1993-1995. Once again, they only dated for a few months before they married. During their courtship Mr. Bourgeois treated her very well and took care of all her needs. Shortly after they were married, Mr. Bourgeois became very violent for no apparent reason. Gaynell noted that it was almost like he had a "split personality." During their marriage Gaynell left him about twenty times. Gaynell stated that she always knew when she would have to leave because she would hear a change in his voice. When he was beginning to enter one of his periods of rage his voice became deeper, and he would glare at her.

11.    While Gaynell was gone, Mr. Bourgeois would call her and try to convince her to come home. He would be really sweet for awhile, and would be attentive to her needs. The sweetness didn't last long and he would ultimately fly into one of his unexplained rages which caused her to leave again.

12.    Gaynell stated that Mr. Bourgeois would blame everyone else for his problems, and he would never take responsibility for anything. One time she said he didn't have enough money to pay the mortgage because he had spent the money on other things. He blamed her for not having enough money and wanted her to get another job. During their marriage Mr. Bourgeois cheated on her with a number of people including his next wife, Robin Bourgeois.

13.    Robin became pregnant with Alfredeisha in 1994 while Mr. Bourgeois was still married to Gaynell. Robin describes their relationship as very good in the beginning but soon after that Mr. Bourgeois devolved into periods of violent behavior. Robin stated that sometimes

4

USCA5 639

Mr. Bourgeois would be calmly sitting watching television and then he would jump up and beat her. She never knew what sparked these mood changes. These impulsive, aggressive episodes were very common in their relationship.

14. Robin also stated that Mr. Bourgeois was very jealous. He monitored every move Robin made and would have people spy on her so he would always know what she was doing. Robin stated that Mr. Bourgeois always had to have everything that his brother, Lloyd, had even when he could not afford it. It didn't seem to matter to him that the electricity would be off as long as he had the car he wanted. He was very reckless with money and with regard to his family responsibilities.

15. While Mr. Bourgeois was married to Robin he was dating Ivy Thomas who lived in Birmingham, Alabama. He met Ivy while he was on the road as an over-the-road-truck driver. Ivy dated Mr. Bourgeois from 1995 until 1997 when she discovered he was cheating on her. Ivy describes their relationship as very good. Mr. Bourgeois showered her with expensive gifts, but he would lie to her as well. Ivy feels that Mr. Bourgeois thought he was telling the truth even when his lies were obvious. Ivy stated that Mr. Bourgeois saw things as all good or all bad and he didn't seem to see gray areas in his relationships with other people.

16. Ivy recalled that Mr. Bourgeois revealed physical abuse by his mother, and how hurt he was by her. He told her that his mother sent him to live with someone else, and that depressed him. One of the times Mr. Bourgeois came to visit her he sent her out to the truck to get a present. She noticed a picture of a woman and a baby in his truck and asked him about them. Mr. Bourgeois said they were his sister's friends but Ivy confronted him and he ultimately confessed that it was his baby. He stated that he and Robin had a one night stand. Ivy broke up

5

USCA5 640

with him because he was unfaithful. Ivy remembered that he called several times to try to win her back but she was adamant she did not want to be with someone who cheated on her.

17.     This history of tumultuous relationships marked by alternating periods of calm and periods of intense violence are indicators of a Borderline Personality Disorder. In these relationships Mr. Bourgeois married the woman only after a courtship lasting a few months. He formed an immediate and intense attachment to each woman. During the short time they dated he adored them but over time he was unable to continue his unabashed devotion. Instead, he entered into dark periods in which he would devalue and degrade them. In each relationship it is clear that Mr. Bourgeois was very impulsive in the areas of sexual relations, which was very damaging to his relationships and played a major role in their dissolution.

18.     Individuals with a Borderline disorder typically display intense and inappropriate anger directed at loved ones. In almost all of the relationships the women describe Mr. Bourgeois's anger as such. Many of the women stated that they never knew what would set Mr. Bourgeois off and make him so angry. Mr. Bourgeois could not control his anger and would lash out at those closest to him. It is very common in those with Borderline Personality Disorder to have a history of broken marriages because of their inability to have a stable relationship.

19.     A history of abandonment and abuse is often associated with Borderline Personality Disorder. Each of the women relate that Mr. Bourgeois described to them his history of childhood abuse and maternal abandonment. Mr. Bourgeois would tell the women very early on in their relationship and become very emotional as he related the story. Mr. Bourgeois told each woman that his mother hated him because he reminded her of his father, who abandoned her. Mr. Bourgeois stated that he was always treated like an outcast and was eventually sent to

6

USCA5 641

live with another woman while the rest of his siblings remained at home. Mr. Bourgeois was abandoned by his father and his mother abused him and then ultimately abandoned him.

20.    Individuals with Borderline Personality Disorder typically do not have the capacity to see people as made up of both good and bad qualities.  Mr. Bourgeois saw these women as all good and then all bad.  All of the women consistently describe how Mr. Bourgeois would suddenly shift from treating them with love and respect to completely devaluing them by cheating on them or becoming abusive to them.   Mr. Bourgeois would become angry with them when they would fail to live up to unrealistic expectations. This would leave the women feeling confused because they did not know what angered him and Mr. Bourgeois feeling abandoned by them.  Mr. Bourgeois simply does not have the ability to see any of life's gray areas.

21.    Another key feature in individuals with Borderline Personality Disorder is their unstable self image or sense of self.  Mr. Bourgeois displayed this through mimicking his older brother Lloyd.   Many of the women Mr. Bourgeois was involved with noted that whatever Lloyd had Mr. Bourgeois had to have.  If Lloyd bought a pool Mr. Bourgeois would buy a pool or if Lloyd would embark on a new career path than Mr. Bourgeois would follow him.  It seemed as though Mr. Bourgeois did not know who he was without Lloyd's life as a template.

22.    Engaging in risky behaviors is often associated with this personality disorder. I also interviewed, Lawanda Cook, who is the cousin of Ivy Thomas.  Lawanda related an experience in which she was riding in Mr. Bourgeois's truck and he got up out of his seat while he was driving to come talk to her.  Lawanda completely panicked.  Mr. Bourgeois told her that the truck would be fine even though there was no one driving it.  She was so afraid that she never got into a truck again.  This type of reckless conduct is also indicative of a Borderline Personality

USCA5 642

Disorder.

23.    Mr. Bourgeois would also spend money excessively.  He would buy cars that he could not afford, and then need his brother to help him out.  His electricity would frequently be turned off because he spent his money on other things.  One of his wives noted that he would fail to pay the mortgage and then blame others for his inability to pay.  The types of risky behavior recounted above, coupled with the fact that he engaged in frequent sexually risky behaviors, highlights the fact that he is impulsive in extremely self-damaging ways. This is another key feature found in individuals with Borderline Personality Disorder.

24.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Kathleen Kaib, MSS, MLSP, LSW

Dated: 5|4|07

8

USCA5 643

13

USCA5 644

## DECLARATION OF ROBERT L. SADOFF, M.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Robert L. Sadoff, M.D., hereby certify and declare that the following is true and correct.

1.      I am board certified in Psychiatry and have been since 1966.  I graduated from University of Minnesota School of Medicine in 1959.  I am a medical doctor and have been Board Certified in Psychiatry since 1966, and in Forensic Psychiatry since 1979.  Although I previously practiced clinical and treatment psychiatry, I have exclusively practiced forensic psychiatry since 1982.  I maintain my primary office in suburban Philadelphia, Pennsylvania, although my forensic practice is national in its reach.  I am licensed in four states (Pennsylvania, New York, Minnesota and California).  During my forensic career I have evaluated innumerable individuals charged with a variety of offenses, including many charged with homicide and capital offenses.  I have testified for both the prosecution and defense in all types of criminal matters, and have been a court expert as well.  I have authored a great number of articles, reviews and book chapters.  I have had academic and hospital appointments, lectured in psychiatry and related forensic areas  and have been a consultant to government and institutions.

2.      I have been requested by counsel for Mr. Alfred Bourgeois to conduct a forensic psychiatric evaluation of him.  As part of this evaluation, I reviewed a substantial body of background information, including documents related to Mr. Bourgeois' capital trial in the federal court in Corpus Christi, Texas.  I have reviewed psychological and neuropsychological reports.  I also conducted a clinical interview with Mr. Bourgeois at the United States Prison at Terre Haute, Indiana on April 23, 2007.  Based upon this review, I have reached a number of opinions and conclusions which are set forth below.  I hold each opinion to a reasonable degree of medical and

**Declaration of Robert L. Sadoff, M.D.**
**Page 1 of 5**

USCA5 645

psychiatric certainty.

3.    Mr. Bourgeois has four prominent features affecting his ability to function in the world. First, he has a history of significant childhood abuse. Possibly as a result of this abuse, Mr. Bourgeois suffers from significant personality disorders, is brain damaged, and has an IQ of 70, in the range of mild mental retardation.

4.    Materials that I have reviewed confirm what I was able to draw out of him on interview about his childhood: he was beaten brutally by his mother while a small child, and he was sexually abused by at least two individuals. In addition to the abuse, he appears to have grown up in a dysfunctional family unit in which his mother had multiple off-spring by a number of men. Mr. Bourgeois' own father is reported to have had as many as 22 children by different women. Mr. Bourgeois' father played no role in his early years. In addition, Mr. Bourgeois was sent from the family home to live with an elderly neighbor. This is perceived by Mr. Bourgeois as an act of abandonment by the mother that has significant mental health consequences.

5.    Childhood abuse and abandonment such as Mr. Bourgeois suffered leave psychological scars. A child who was abused like Mr. Bourgeois will often develop an inability to trust or make sound judgments. This is particularly so because the abuse was visited upon him by a caregiver (his mother), and was unpredictable as to when it would occur. Children who undergo such abuse may develop extremely impulsive conduct, and their ability to form healthy attachments, especially intimate relationships, is often impaired. I observed all of these scars in Mr. Bourgeois.

6.    The exposure to violence and abuse as a child has a physiological as well as a psychological impact on the brain. The abused child may be unable to react normally to stress, but will often hyper-react and have difficulty controlling these reactions. This sort of trauma may also

**Declaration of Robert L. Sadoff, M.D.**
**Page 2 of 5**

USCA5 646

lead to increased impulsive behavior. These children may become both over-reactive and hyper-vigilant.

7.      Alfred's self-reports of childhood abuse have been inconsistent. His tendency to deny or misremember the trauma he experienced as a child is psychiatrically significant – it is a telltale sign of chronic traumatic events. Trauma often affects the brain in profound ways and may disrupt the way the victim processes information. Often the individual is unable to handle the stressors and instead relies on survival techniques, including psychological numbing. Mr. Bourgeois' inconsistent self reports reveal this sort of reaction.

8.      Severe childhood abuse and neglect, of the sort experienced by Mr. Bourgeois, is associated with a wide range of psychological and psychiatric difficulties, including depression, anxiety, impaired self esteem, poor social functioning, self-destructive behavior, and impaired personality development.

9.      Mr. Bourgeois manifests many of the deficits shown by those who have been abused as children. He has debilitating personality disorders, including a Borderline Personality Disorder. This is a significant disorder in the context of this offense. By their nature, those with Borderline Personality Disorders are impaired in forming stable relationships. They can decompensate into psychotic states when under significant stress. People with Borderline Personality Disorder can have disocciative experiences, where they are not consciously aware of their actions or their surroundings, and may not recall various behaviors when dissociating.

10.     Reports by family, ex-wives, girlfriends, and neighbors reveal that Mr. Bourgeois has a pathological inability to make and maintain healthy relationships, especially intimate relationships. His relationship history follows a characteristic Borderline Personality pattern, in which each

Declaration of Robert L. Sadoff, M.D.<br>Page 3 of 5

USCA5 647

relationship starts with idealization of the new partner, fluctuates between the extremes of passionate love and passionate hate, and eventually ends with intense rage and disillusionment. Mr. Bourgeois was a jealous and controlling partner, while at the same time engaging in numerous extra-marital and extra-relationship affairs. This inconsistency is also classic in a Borderline Personality Disorder.

11.     In addition, neuropsychological testing confirms that Mr. Bourgeois suffers from clinically significant organic brain damage. This testing confirms what we already know from his psycho-social history: that he has significantly impaired judgment and has difficulty controlling his impulses.

12.     Neuropsychological testing also reveals that Mr. Bourgeois has a very low IQ, and psychometrically is mentally retarded. This finding is mitigating as it reflects his difficulties and impairments in problem solving and making judgments.

13.     His organic brain impairment is important as it exacerbates Mr. Bourgeois' already pathological limitations in making judgments, controlling his impulses, or trusting others.

14.     Impairments such as Mr. Bourgeois' worsen during times of stress. At the time of the crime for which Bourgeois was convicted, he was under a great deal of stress: in an example of impaired decision-making, Mr. Bourgeois chose to "vacation" with his family (his recently estranged wife and three daughters: Alfredesha, age 7; Ja'Karen, age 2.5; and Alfreda, age 1), by driving cross country in the cab of a tractor trailer. Sharing these close quarters with a family of five, including two children still in diapers, created a constantly stressful situation for Mr. Bourgeois. He was undergoing financial stress and was having trouble keeping up with payments on his home and his car. Mr. Bourgeois was also stressed by his wife's recent infidelity. Consistent with his history of childhood abuse and abandonment, and his Borderline Personality Disorder, the troubles in his

**Declaration of Robert L. Sadoff, M.D.**
**Page 4 of 5**

**USCA5 648**

marriage likely "triggered" Mr. Bourgeois to make him even more hyper-vigilant and over reactive.

15.    It is clear that as a result of this combination of severe psychosocial stressors and neuropsychological deficits, Mr. Bourgeois has great difficulties coping and he responded with repeated impulsive acts that eventually led to the tragic death of his daughter.

16.    Based on my findings, it is my opinion that Mr. Bourgeois has an extreme mental or emotional disturbance and that his illness renders him substantially impaired in his ability to conform his conduct to the requirements of the law. Additionally the available information about Bourgeois' family life and childhood, as well as his impaired intelligence, constitute significant mitigating factors that should have been considered by the jury.

I hereby declare and certify that the above facts and opinions are true and correct under penalty of perjury.

Robert L. Sadoff, M.D.

Dated: Jenkintown, PA
       May 12, 2007

**Declaration of Robert L. Sadoff, M.D.**
**Page 5 of 5**

USCA5 649

14

USCA5 650

## DECLARATION OF JETHRO TOOMER, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

Jethro Toomer, Ph.D. hereby declares and certifies that the following is true.

1.      My name is Jethro Toomer. I am clinical and forensic psychologist. I am licensed to practice psychology in the State of Florida. I graduated from Temple University in Philadelphia, Pennsylvania with a Ph.D. in Psychology in 1972. I have been retained as an expert by the defense and prosecution, and have been selected as a court expert in a variety of criminal law matters in state and federal courts across the Nation. I am a professor of psychology at the Florida International University and have been since 1980. All opinions set forth in this Declaration are stated to a reasonable degree of psychological certainty. All facts set forth are true to the best of my knowledge.

2.      I have been asked by counsel for Mr. Alfred Bourgeois to conduct a forensic psychological evaluation of him with respect to his capital murder conviction and death sentence arising out of the United States District Court in the Southern District of Texas. In order to prepare for the evaluation and to generate this report, I have reviewed hundreds of pages of records regarding the offense, trial and appeal, as well as numerous background declarations, mental health reports and hospital records. I also conducted a clinical interview with Mr. Bourgeois at the United States Penitentiary at Terre Haute, Indiana on May 2, 2007. During this interview I spent about 4.5 hours with Mr. Bourgeois, which included the administration of psychological personality testing. As a result of my overall evaluation, I have a number of opinions about Mr. Bourgeois.

3.      Mr. Bourgeois is a deeply troubled and impaired individual. He has precarious psychological functioning. His precarious state and deficits are due to a constellation of events and conditions. I will review those in detail, however in sum, he suffers from the lasting impact of

**Declaration of Jethro Toomer, Ph.D.**
**Page 1 of 7**

USCA5 651

savage childhood sexual and physical abuse. He has impaired intelligence (IQ scores in the mentally retarded range). He has organic brain impairments which particularly impact on his ability to control impulses, make judgments and predict the consequences of his actions. His psychological functioning deteriorates dramatically from his already deficient baseline during times of stress. Psychological testing (MCMI) suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder. On Axis II, he suffers from a combination of schizoid, paranoid and borderline personality disorders. It is my opinion that when he has acted in a rageful manner, he is likely acting out of mini-psychotic episodes secondary to his borderline personality disorder. I will now review the history and testing that supports these conclusions.

4. My review of the background materials and interview reveal that Mr. Bourgeois suffered from clinically significant childhood physical abuse and sexual abuse. The materials present a consistent picture of abuse at the hands of his mother, and sexual abuse at the hands of at least one individual in his neighborhood. He described for me maternal abuse that was notable for its severity and random nature. His mother beat him with skillets and broom handles, and did so for no reason, or even when the "provocation" was minimal. While clinically this abuse is of great significance, it was exacerbated by his effective abandonment by his mother. This occurred when he was made to leave the family home to live with an elderly neighbor, Miss Mary. Although it may be intuitive that being removed from mother's home and abuse would be a relief, in reality, it heightened his psychological trauma. It is not disputed within the mental health field that even abused children still cling to the love that they perceive and desire from their parents. Thus, regardless of the significant abuse that he received from his mother, Mr. Bourgeois unquestionably felt that being made to live with Miss Mary was a profound act of abandonment.

**Declaration of Jethro Toomer, Ph.D.**
**Page 2 of 7**

USCA5 652

5. His abandonment was not just physical, but emotional as well. He related one incident to me when he reported to his mother that he was sexual molested by a man in the neighborhood at about age 7. Instead of protecting and nurturing her child, his mother chastised him for lying about this incident and beat him with the skillet and an extension cord. The psychological impact of this event is hard to overstate. At this point, when he quite naturally turned to his mother to protect him and provide succor, she failed to do so, and instead caused him further physical and psychological pain.

6. The combination of abuse and abandonment have an exponential impact on a child. Each are bad singularly – in combination they cause severe psychological impairments. The effects on Mr. Bourgeois' adult behavior from this combination are evident. His history is consistent with that of a Borderline Personality Disorder. This disorder is marked by instability in relationships and impulsive behaviors. There is no question but that Mr. Bourgeois fits this bill. The Kaib declaration lays out a classic pattern of borderline-type relationships. These relationships have a saw-tooth quality. They begin with great highs, only to dip to great depths when the borderline perceives a slight or frustration with the object of his affection, or when he perceives that he will be abandoned. In Mr. Bourgeois' case his multiple marriages and relationships have witnessed these highs and lows. In addition, his impulsive conduct is noted in a variety of spheres including with regard to his purchase of material possessions well beyond his means and his extra-marital affairs.

7. In the classic borderline personality like Mr. Bourgeois, the individual makes every effort to avoid abandonment, whether it is real or imagined. Significantly to this case, the perception of abandonment can cause severe behavioral reactions. The individual will go to extremes to avoid the abandonment that has caused him such great pains in his own past. They fear loss of control and

**Declaration of Jethro Toomer, Ph.D.**
**Page 3 of 7**

USCA5 653

will go to extremes to forestall it. When the borderline individual is seeking to avoid such abandonment, and is under great stress, they can experience mini-psychotic episodes. In Mr. Bourgeois' case, it is my opinion that his abusive conduct toward the victim, as well as his other relationships occurred during such mini-states. The only thing that separates Mr. Bourgeois from a full blown psychotic disorder is that he is able to reintegrate himself very quickly after the onset of these mini-episodes.

8.       I also believe that Mr. Bourgeois suffers from a schizoid-type personality disorder. This disorder is marked by the same disruption in interpersonal relations as the borderline disorder, but it different in that it also encompasses gross perceptual and cognitive distortions. My review of the historical record reveals that Mr. Bourgeois has constructed an entire fantasy world to replace the one in which he actually lives. Mr. Bourgeois readily acknowledges the traumas that he has suffered in his life. Yet, despite their obvious impact, he denies that they have effected his life or mental health. Such detachment from traumatic events is typical of a schizoid personality. Similarly, he confabulates and simply makes up much about his life and background. For instance, while admitting that his mother beat him, he maintains that he had a "normal" and "loving" childhood. There exists a profound disconnect between what he has experienced and what he makes of those experiences. Many lay people would label Mr. Bourgeois a liar because of this disconnect. In reality, however, his lies and puffing have a deeply rooted psychological base.

9.       I understand that Mr. Bourgeois scored a 76 in a standardized IQ test at the time of his trial. This test, the WAIS-R was administered in 2004 – at a point in time when it was outdated and had been replaced by the WAIS-III. The intelligence testing community recognizes that as IQ tests approach the end of their useful life, the population as a whole begin to score higher. In effect,

Declaration of Jethro Toomer, Ph.D.<br>
Page 4 of 7

USCA5 654

the population becomes "smarter" on these tests. This effect, known as the Flynn Effect, is widely recognized. Under it, scores are adjusted based on the age of the test that is given. When the Flynn Effect is applied to Mr. Bourgeois' score of 76 in 2004, it should be adjusted down to a full scale IQ of 68, which is within the mentally retarded range. I understand that in recent testing given to Mr. Bourgeois by Dr. Gelbort, he scored a 70 on the current WAIS-III test. This score too is in the range of mild mental retardation.

10.    A diagnosis of mental retardation can be made when an individual has substandard IQ testing (which Mr. Bourgeois has) that is accompanied by significant limitations in adaptive functioning. Mr. Bourgeois meets the adaptive deficit criteria. Background information that has been provided to me indicates that Mr Bourgeois has deficient functioning in all three realms of adaptive behavior: conceptual, social, and practical.

11.    His deficits seem most profound in the social realm. His inability to maintain healthy relationships indicates a significant deficit in his interpersonal functioning. In addition, his wildly inconsistent stories about himself and his own history reveal a deficit in his self-esteem. He has demonstrated difficulty in following simple rules from childhood through adulthood, another aspect of impaired social functioning.

12.    Mr. Bourgeois' history reveals deficits in the conceptual and practical realms as well. Specifically, he has difficulty understanding money concepts. He has a long history of living beyond his means and seems unable to understand simple concepts in his monetary transactions. In the practical realm, Mr. Bourgeois seems especially weak in maintaining his personal safety and maintaining safe environments. Multiple reports show that he had a very weak understanding of safety. He reportedly would turn around while at the wheel of the truck, and did not keep his eyes

**Declaration of Jethro Toomer, Ph.D.**
**Page 5 of 7**

USCA5 655

on the road. His hospital records also report multiple MVA's, a sign that he was unable to maintain safety while driving.

13.     I have reviewed the neuropsychological testing done in 2004 and 2007. The results of these batteries demonstrate that Mr. Bourgeois is impaired in the areas of the brain that control impulses and executive decision making. His impaired scores in the Category test in particular demonstrate such impairments.

14.     When Mr. Bourgeois' organic brain impairment and mental retardation are added to his already precarious psychological state, the resulting combination creates a highly volatile personality. Even without his organic deficits and low IQ, Mr. Bourgeois would have a difficult time managing his emotions and behavior. When his low IQ and organic deficits are added, his ability to maintain control drops further. When this individual is placed under stress, such as the type that he was under at the time of the offense, is it no wonder that he lashed out in a such a rageful manner.

15.     There is no question but that Mr. Bourgeois suffers from significant mental health deficits and disturbances. These disturbances significantly impact on his ability to appreciate the criminality of his conduct and to conform his behavior to the requirements of law. Based upon my forensic criminal law experience, these deficits are of the type that would routinely be presented in the mitigation phase of a capital trial. I have reviewed the transcripts of Mr. Bourgeois' trial, and it is safe to say that with the exception of some testimony that he was subjected to childhood abuse, there was scarcely a flavor presented to the jury as to his overall deficits and impairments.

16.     This Declaration contains only a summary of my opinions and findings, and is not exhaustive in that regard.

**Declaration of Jethro Toomer, Ph.D.**
**Page 6 of 7**

USCA5 656

I hereby certify that certify that the opinion and facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jethro Toomer, Ph.D.

Dated:      Miami, Florida
            May 9, 2007

**Declaration of Jethro Toomer, Ph.D.**
**Page 7 of 7**

USCA5 657

15

USCA5 658

# WAIS-R RECORD FORM

WECHSLER ADULT
INTELLIGENCE SCALE—
REVISED

NAME AB  228.04

ADDRESS

SEX _____ AGE 34 RACE _____ MARITAL STATUS _____

OCCUPATION _____ EDUCATION _____

PLACE OF TESTING _____ TESTED BY _____

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | 32-33 | 57-61 | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | 11-12 | 23-26 | 28-29 | 48-52 | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | 13 | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | 9-10 | 20-28 | 6-7 | 11-13 | 11-13 | 11-12 | 5-7 | 14-19 | 21-23 | 37-43 | 6 |
| 5 | 6-8 | 8 | 14-19 | 5 | 8-10 | 7-10 | 8-10 | 3-4 | 8-13 | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | 5-7 | 2 | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | 6-8 | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

cians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to
iect them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

|  | Year | Month | Day |
|---|---|---|---|
| Date Tested | | | |
| Date of Birth | | | |
| Age | | | |

### SUMMARY

| | Raw Score | Scaled Score |
|---|---|---|
| **VERBAL TESTS** | | |
| Information | 12 | 5 |
| Digit Span | 10 | 6 |
| Vocabulary | | 6 |
| Arithmetic | | |
| Comprehension | 8 | 5 |
| Similarities | 8 | 5 |
| **Verbal Score** | | 32 |

| | Raw Score | Scaled Score |
|---|---|---|
| **PERFORMANCE TESTS** | | |
| Picture Completion | 2 | 4 |
| Picture Arrangement | 2 | 5 |
| Block Design | | |
| Object Assembly | | |
| Digit Symbol | 58 | 10 |
| **Performance Score** | | 25 |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 32 | 76 |
| PERFORMANCE | 26 | 76 |
| FULL SCALE | 58 | 75 |

THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, INC.

ght © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright ©
by The Psychological Corporation. No part of this form may be copied by any process without
permission. All rights reserved.
Printed in U.S.A.

9-991829

USCA5 659

16

USCA5 660

## DECLARATION OF DONALD E. WEINER, PH.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Donald E. Weiner, Ph.D. do hereby declare and certify that the following is true and correct.

1.    I am a licensed psychologist with a specialty in neuropsychology. I am licensed to practice in Texas, and I maintain an office in Corpus Christi. I was contacted by trial counsel for Alfred Bourgeois and asked to conduct a neuropsychological test battery on him. I recall that my name was given to these lawyers (Mr. Tinker and Mr. Gilmore) by Carlos R. Estrada, M.D., with whom I have worked in the past.

2.    I also recall that there was great time urgency to their request. I was told that the trial had either started or was about to start and that the testing had to be done immediately. Due to the time constraints, I conducted my testing on a weekend (Saturday February 28, 2004), which is contrary to my custom. I gave priority to this request and generated my report on March 3. A copy of my report is attached to this statement. In more ideal circumstances, I would have perhaps conducted more testing and would certainly have sought outside sources to develop Mr. Bourgeois' psycho-social history. This was impossible given my limited time.

3.    As my report indicates, Mr. Bourgeois was impaired on a number of test instruments. The most notable finding was on the Category Test, which is a sub-test of the well known Halstead-Reitan battery. His score of 94 errors is significantly impaired. This score is notable because it shows deficits in his ability to function with new information and in unfamiliar settings. As I noted in my report, "Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions." In fact, I believe given his results that his judgement was

1

USCA5 661

significantly impaired. Although I have limited experience with capital sentencing, it would seem to me that this finding is mitigating.

4.    I would also note that Mr. Bourgeois scored a 76 on the WAIS-R IQ test. This places him in range of borderline intellectual functioning and is itself a significant finding.

5.    Although in my view my report presented important findings regarding Mr. Bourgeois' neuropsychological profile, I was not called as a witness at trial. As I understood the situation, the lawyers were concerned that my conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of my report. From a neuropsychological perspective, the reason that Mr. Bourgeois' brain is impaired is not nearly as critical as the fact that it is impaired. My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage.

6.    Even though Mr. Bourgeois may not have been accurate in his factual reporting, there was no sign that he malingered on the testing. Mr. Bourgeois' pattern of responses on all of his tests demonstrate that he was making a valid effort. This was not a "Fake Bad" result. In fact, I administered a standardized test to detect malingering called the Test of Memory Malingering (or TOMM). This test has two trials with 100 total questions. Mr. Bourgeois scored 47 on the first trial and a perfect 50 on the second. Because the test is essentially an easy set of tasks, and the subject is not told that it tests for malingering, it is expected that even impaired individuals will do quite well. When a person does poorly, malingering can be suspected. His scores of 47 and 50 are well within the standardized range showing that there was no malingering. The lawyers did not ask me about the significant finding that he applied a solid effort in the testing.

7.    The fact that Mr. Bourgeois misrepresented his own social history is also significant from a psychological standpoint. First, it is an example of his poor social judgment: lying to a

2

USCA5 662

defense expert was not in his best interest.  Second, it is possible that Mr. Bourgeois actually believed his own stories.  This would be a significant finding that would impact my diagnosis. Unfortunately, I was not given very much information regarding Mr. Bourgeois' history or personality.  In addition, the time constraints made it impossible for me to do more than administer the battery of neuropsychological tests. I was therefore unable to offer further explanation for Mr. Bourgeois' behavior.

I hereby certify that the above facts and opinions are correct to the best of my knowledge.

Donald E. Weiner, Ph.D.

Dated:        Corpus Christi, Texas
              May 10, 2007

3

USCA5 663

**DONALD E. WEINER, Ph.D., FICPP, FPPR, P.C.**

Psychologist
5934 South Staples, Suite 206
Corpus Christi, Texas 78413
-
Telephone: (361) 994-0387
Board Certified, Diplomate-Fellow in Psychopharmacology of the
Prescribing Psychologists' Register, Inc. and the International College of Prescribing Psychologists
FACAPP -Founding Fellow of the American College of Advanced Practice Psychologists
FSMI -Board Certified, Diplomate-Fellow in Serious Mental Illness

## NEUROPSYCHOLOGICAL EVALUATION

**NAME:** Alfred Bourgeois     **DATE TESTED:** 2-28-04
**DOB:** 6-20-64     **DATE OF REPORT:** 3-3-04
**AGE:** 39
**SEX:** Male

### REASON FOR REFERRAL:
Mr. Bourgeois was referred for a neuropsychological evaluation to determine whether or not he has brain damage.

### BACKGROUND INFORMATION:
Mr. Bourgeois is currently being tried for capital murder. The present evaluation was conducted at the Federal Courthouse. The nature and purpose of the evaluation was explained to Mr. Bourgeois, and he consented to be tested. Mr. Bourgeois grew up in Louisiana. He denies any history of serious illnesses. Injuries include a broken nose when he was in elementary school, a three-wheeler accident in 1984 that resulted in his being in a coma for 1-2 months and being out of work for a year after this accident, and a truck accident in 1989 in which he broke his right collarbone and his left arm. Mr. Bourgeois stated that he became aggravated more easily after the 1984 accident, and this problem has continued up until the present. Mr. Bourgeois is not on any medication at the present time.

Mr. Bourgeois completed high school and about two months of college. He worked as an auxiliary deputy for a sheriff's department, and he has worked as a truck driver for the remainder of his work years. He made B's and C's in high school and was in all regular classes. He has three living brothers, one deceased brother, and two sisters. His parents were never married. He has a son 22 and a daughter 20 by two different woman, a daughter 16 by a previous marriage, and a daughter 9 by his current marriage of 7 ½ years. Mr. Bourgeois is charged with the death of his two-year-old daughter by his present marriage.

USCA5 664

## TESTS ADMINISTERED:
Wechsler Adult Intelligence Scale – Revised
Wide Range Achievement Test – Third Edition
Halstead-Reitan Neuropsychological Test Battery for Adults
Test of Memory Malingering
Clinical Interview

## MENTAL STATUS:
Mr. Bourgeois was very cooperative during the testing and he appeared motivated to give his best performance. The present test results are believed to be a valid indication of his current level of neuropsychological functioning. His mood was neutral with appropriate affect. He reports some problems falling asleep. He has a history of migraine headaches. His appetite is poor, and he eats because he has to. He reports a 63-pound weight loss since his arrest 20 months ago. He has stomach cramps and diarrhea at times. He reports some dizziness. He denies any perceptual problems. He did not have problems with concentration in the past, but has had concentration problems since his arrest. He has a history of memory problems. He states that his wife has told him that he has sleep apnea. He describes himself as verbally outspoken when upset. He reports having felt depressed since his wife had an affair. He filed for divorce and then came back to his wife. He has been married four times.

Mr. Bourgeois has suicidal thoughts but states that he would not try to kill himself. He stated that he did attempt suicide 3-4 months after his arrest. He worries about his nine-year-old daughter who is in foster care. He denies any auditory or visual hallucinations but after his arrest for a period of time he heard voices and saw things.

Mr. Bourgeois denies any history of alcohol or drug abuse.

## TEST RESULTS AND INTERPRETATION:

### Wechsler Adult Intelligence Scale – Revised:
Mr. Bourgeois achieved a Verbal IQ of 76, a Performance IQ of 76, and a Full Scale IQ of 76, all of which are in the borderline range of intellectual functioning. His subtest scores are as follows: (note that the age equivalent scores are shown in parentheses after each subtest score)

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 5 (4) | Picture Completion | 4 (6) |
| Similarities | 5 (6) | Digit Symbol | 10 (11) |
| Arithmetic | 6 (6) | Picture Arrangement | 4 (5) |
| Vocabulary | 6 (6) | Block Design | 5 (7) |
| Comprehension | 5 (5) | Object Assembly | 2 (3) |
| Digit Span | 6 (7) | | |

When compared with individuals in his age range on the verbal subtests Mr. Bourgeois

USCA5 665

exhibited low average abilities in short-term auditory memory and mild deficits in long-range retention for specific facts and information, abstract reasoning, numerical computation, verbal expression, and social judgment.  On the performance subtests he exhibited average abilities in visual motor memory and speed, low average abilities in non-verbal concept formation, mild deficits in distinguishing essential from non-essential details and non-verbal visual sequencing, and a significant deficit in assembling an object from its parts.

### Wide Range Achievement Test – Third Revision:
Mr. Bourgeois achieved the following scores:

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Reading | 96 | high school |
| Spelling | 106 | high school |
| Arithmetic | 81 | sixth |

Mr. Bourgeois is functioning at the expected level for a high school graduate in reading and spelling.  Arithmetic is an area of weakness for him, but he does not have any specific learning disabilities.

### Halstead-Reitan Neuropsychological Test Battery for Adults:
This battery is very sensitive to cerebral dysfunction.  It consists of several individual tests which measure the following areas: abstraction and concept formation, motor functions, sensory functions, visual spatial skills, verbal abilities, incidental memory, alertness and concentrated attention, and general indicators of the level of cerebral functioning.  A review of Mr. Bourgeois' performance on this battery shows indications of mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex.  This cerebral damage is likely due to the injuries sustained in the three-wheeler accident which took place in 1984, resulting in a coma lasting one to two months.  Mr. Bourgeois' score of 33 on the neuropsychological deficit scale is in the mild range of impairment.  His score of 0.86 on the impairment index indicates that nearly all portions of the battery which contribute to this index were in the impaired range, although some tests were only slightly impaired.

On the Aphasia screening test, Mr. Bourgeois exhibited constructional dyspraxia (having difficulty copying a geometrical design).  This is a right cerebral indicator.  On the sensory perceptual examination, he made a large number of errors bilaterally on the fingertip number writing perception test.  This finding is consistent with bilateral posterior cerebral damage, with greater right posterior cerebral damage, given the fact that he made many more errors with his dominant left hand.

On the strength of grip test, Mr. Bourgeois' grip strength was somewhat weaker than expected with his nondominant right hand. He reports having arthritis in both hands, with more arthritis in his right hand and this finding may be due to his arthritis. His finger tapping speed was adequate bilaterally.

USCA5 666

Mr. Bourgeois exhibited impairment on the Seashore rhythm test, which measures alertness and concentrated attention for non-verbal auditory stimuli. He exhibited impairment on two tests which serve as general indicators of the overall level of cerebral functioning. His time of one minute and thirty-three seconds on the Trailmaking test, part B is in the brain-damaged range. He had a very poor score of 94 errors on the Category test, which is a measure of learning in a new and unfamiliar learning situation. Individuals who make a large number of errors on this test may have a tendency to exhibit inappropriate behavior under stress circumstances, without always being aware of the inappropriateness of their actions.

Mr. Bourgeois had significant impairment on the Tactual Performance Test, which is a spatial problem-solving task. His total time of nearly twenty-seven minutes is well into the brain-damaged range. He had a poor score on a test measuring incidental spatial memory. His performance was slower than expected with his dominant left hand, and his poor performance on the Tactual Performance Test combined with adequate performance on the finger-tapping test indicates greater posterior cerebral damage.

**Test of Memory Malingering:**
Mr. Bourgeois' performance was well within normal limits and shows no indications of malingering.

## DIAGNOSTIC IMPRESSION:

Axis I          :          294.9, Cognitive Disorder – Mild cerebral damage with moderate posterior cerebral damage

## SUMMARY AND CONCLUSIONS:
Mr. Bourgeois is a thirty-nine year old male whose overall level of intellectual functioning is in the borderline range. He shows no indications of having any specific learning disabilities. Neuropsychological test results reveal overall mild cerebral impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident which took place in 1984, resulting in a coma lasting 1-2 months. A test of malingering shows no indications that Mr. Bourgeois was malingering, and the present test results are believed to be a valid indication of his overall level of cerebral functioning. Mr. Bourgeois shows some symptoms of depression, including poor sleep, poor appetite with significant weight loss, a previous suicide attempt, and current suicidal thoughts with no active suicidal intention. Mr. Bourgeois stated that he has become aggravated more easily since the 1984 accident, and his performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions.

Don Weiner, Ph.D.
Psychologist

17

USCA5 668

<u>DECLARATION AND AFFIDAVIT OF MICHELLE ARMONT
PURSUANT TO 28 U.S.C. § 1746</u>

Michelle Armont, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Michelle Armont. Alfred Bourgeois is my brother. We have the same father but different mothers.

2.    Our father is Alfred Sterling. Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers. Our father had many outside children. I am the oldest of them. We were not raised by our father and we were not treated the same as the children he had with his wife. The children by his wife basically look down on us and try to deny that we are even any relation to them. If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.

3.    Alfred and I both love our father but it is not a nurturing father-child relationship like children need. He did not acknowledge us until we were almost grown. He would say "it's their momma's child". Our father's life has been full of lying, cheating and denial of his children. He did not pay child support for any of us but the youngest, who is now about 13 years old. He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old. When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble. Being treated like that is hurtful to me and it was hurtful to Alfred.

4.    When the woman that Alfred stayed with died he did not want to go back to live at his mother's house. He could not live with our father so he came to stay with me. He had a

USCA5 669

strong bitterness toward his mother because she treated him so badly. Some days he could not say her name.

5.    Alfred had some serious problems. Aside from being almost ignored by his father most of his life, he was abused by his mother. She caused him so much pain that he was a damaged person because of the abuse that he suffered. It was hard for Alfred to talk about the abuse he went through. Alfred had trouble trusting people. Alfred was similar to my nephew that had ADD. They both had tantrums. Alfred would not be himself when he got angry. He looked different. He told me he blacked out sometimes when he got angry.

6.    I know Beatrice Bourgeois. She is not a stable person. She was well known in the community for being crazy. Anyone that knew her would not trust her or believe what she said.

7.    Robin is a compulsive liar. There was always a lot of drama around Robin and Alfred. I got along with her but if you knew her you knew you could not trust anything she said. I saw Robin and Alfred a couple days before the baby died. They were all lovey-dovey. Robin and I had the kind of relationship that she knew if Alfred gave her any trouble she could come to me and I would help her out

8.    Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him. He did not understand that he could not afford the things he bought and he didn't understand that people would know the things he was telling them were not true. Many women were attracted to Alfred but he could not maintain a relationship. He did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem. The same things caused him financial

USCA5 670

problems. He just bought things without understanding how hard it would be to make the payments. Alfred could not consider the consequences of his actions. Things that would be obvious to a normal person were not obvious to Alfred.

9.      I was only contacted a couple days before Alfred's trial. I tracked down the attorney who was representing Alfred and called him to find out what was going on. Then someone called me. The person who talked to me had me confused with someone else. If they had gotten to know Alfred's family they would have known the difference between his mother's children and his father's children. When I was on the stand I was shown horrible pictures of the baby that died. It was the first time I had seen the pictures and it really shook me up. I wish I had been better prepared.

10.      When I saw Alfred in the courtroom he was acting inappropriately. He winked at me during my testimony. He was being very strange.

11.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Armont

Dated: 4/26/07

18

USCA5 672

<u>DECLARATION AND AFFIDAVIT OF NATHANIEL BANKS</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Nathaniel Banks, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.    My name is Nathaniel Banks. I grew up in Paulina, Louisiana. I now live in

Bonner Springs, Kansas. I am juvenile probation officer. I am also a pastor at a

local church in Bonner Springs.

2.    Alfred and I grew up together in Paulina, Louisiana. I know his whole family.

We lived right in the same little area. We are close in age. I am just a little bit

younger. We were in the same ~~class~~ grade *NB ?* in school.

3.    Alfred was a fragile child. He spent a lot of time by himself. People used to pick

on Alfred a lot. Children sometimes do that. I just remember Alfred crying at

anything. Someone would tease him and he would break down crying. People

used to call him names – they called him "white punk". Alfred has a real light

complexion. Kids used the word punk to mean that he was weak. Alfred wasn't

any good at sports. *NB – He didn't play sports with us.* ~~At recess he wasn't good at those games we played outside.~~ *In my opinion NB*

4.    Alfred always looked up to his older brother Lloyd. As an adult Alfred has been

trying to keep up with Lloyd. Lloyd does well for himself. Alfred wanted that for

himself. Alfred wanted to impress people. Alfred lied a lot. I remember that

Alfred would say things that you just knew weren't true. I used to work for the

sheriff's office. Alfred told people he worked there. He was never a proper

deputy. *NB Alfred tried to build himself up present himself* ~~I think Alfred needed to feel important and that is why he lied, to cover~~

*as more than he was.* ~~up his shortcomings.~~ I think Alfred lied so much he started to believe it.

USCA5 673

5.    Alfred told me that he was driving an 18-wheeler truck.  I didn't believe him.

When he pulled up to my house in his tractor-trailer I was shocked.  There was no *N.B. coordination* way Alfred had the ~~intelligence~~ and skill to drive that thing.  I wondered to myself

who in the world would allow him to drive that truck.

6.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury,

pursuant to 28 U.S.C. § 1746.

Nathaniel Banks

Dated:  5-10-07

USCA5 674

19

USCA5 675

<u>DECLARATION AND AFFIDAVIT OF ISAAC BOURGEOIS III</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Isaac Bourgeois III, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.      My name is Isaac Bourgeois III.  Alfred Bourgeois is my cousin.  My father, Isaac

Bourgeois, Jr. and Alfred's mother, Eunice, are brother and sister.  Their father was Isaac

Bourgeois, Sr.

2.      Isaac Bourgeois, Sr. left land to the family when he died.  Issues about the land

have never been formally settled and sometimes it causes problems among the descendants of my

grandfather.  We did not always see eye to eye with Alfred's mother, Eunice.  I've had my

troubles with Alfred but I do not want to see him executed.

3.      Alfred's mother used to pick at his nose until it was disfigured and one side was

bigger than the other.  Eunice was so abusive to Alfred that he was sent to live with a neighbor

lady, Miss Mary. *Out of all her kids, Alfred was the only one that she abused. I don't know why this was so.* JBIII

4.      Alfred used to be very close to my brother, Wardell.  Alfred and I used to hang out

together too.  Unfortunately we lost Wardell to cancer.

5.      I did not want to testify against Alfred.  My mother and I were given subpoenas

and told we had to leave right away for Corpus Christi.  I told the people prosecuting my cousin

USCA5 676

about the abuse he suffered.  Alfred's attorneys never talked to me or I would have told them

about the abuse just like I told the people working against Alfred.

6.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.

Isaac Bourgeois

Dated:  5-10-07

USCA5 677

20

USCA5 678

## AFFIDAVIT / DECLARATION OF MURRAY BOURGEOIS
## PURSUANT TO 28 U.S.C. § 1746

Murray Bourgeois, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' cousin. My father was Harry Bourgeois. He and Alfred's mother, Eunice, were cousins.

2.      My family and Alfred's family lived on Bend Lane in Paulina. My Dad started a car repair business on the Bend and he taught me and Alfred's older brother Lloyd how to repair cars. Lloyd caught on quick and eventually took over the garage. My Dad really helped Lloyd get started and now he is a successful businessman.

3.      Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred.

4.      For a long time, Alfred didn't even live in his Mom's house. He lived down the street with an older lady from church. Miss Mary was the Mother of the Church and didn't have a husband. Alfred's Mom said that he had to stay with her because Miss Mary was frail. Even though Miss Mary treated him better than his own mother, Alfred was hurt by being sent out of the family household. By taking care of Miss Mary, Alfred missed a lot of family outings. He didn't feel like he was a full member of the family and it ate away at him inside.

5.      Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life.

6.      Lloyd was Alfred's idol since Alfred didn't grow up with his own dad. Alfred tried to copy everything that Lloyd did. If Lloyd bought something, then Alfred

USCA5 679

would try to buy the same thing. If Lloyd started a business, then Alfred would try to start a business. The only problem was that Alfred was not as smart as Lloyd, so Alfred would fail. Still, Alfred kept trying to be like Lloyd.

7.      Alfred would not talk about his problems directly, but you could see them. He always had something to prove and would try to make people believe that he was better than he was. He became known as a braggart who would exagerate or lie on himself in order to impress everybody. He would cover up his failures by telliing tales that he thought made him look good. We used to say that Alfred would lie faster than a horse could trot. I always thought that Alfred's tall tales were related to him being scared as a child.

8.      No one from Alfred's legal team talked to me at the time of his trial. Someone talked to my Dad, Harry Bourgeois, but not me. If they had spoken to me, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: May 10, 2007

Murray Bourgeois

USCA5 680

21

USCA5 681

## AFFIDAVIT / DECLARATION OF WILMER BOURGEOIS, SR
## PURSUANT TO 28 U.S.C. § 1746

Wilmer Bougeois, Sr., pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' maternal uncle. Eunice Bourgeois was my younger sister.

2.      All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

3.      Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

4.      Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

5.      Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her that the boy should not be ripping and running with just anyone.

6.      Lloyd is my sister's olderst living boy. He turned out all right because my daddy, his grandfather, helped raised him. Later, his Uncle Harry taught him about car mechanics. Lloyd was lucky that he had my dad and his uncle around him growing up.

7.      Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward,

USCA5 682

she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

8. After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

9. Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

10. In later life, Alfred would drop by my house. I didn't enjoy the visits because of the way he talked. He used to exhggerated things and wanted me to think that he was doing really well. I could understand him pretending that he had more than he did because there were so many things that he didn't have as a child. He grew up poor. The talk that I really didn't like was his saying that everyone was trying to do something to him. He was paranoid. He said that people were always doing this or that to him or talking about him. I listened to him and I could understand it because Alfred had a really hard life growing up.

11. No attorney or investigator representing Alfred ever spoke to me before or during his trial in Texas. If someone from Alfred's defense team had asked, I would have told them about Alfred and his family and would have been willing to testify in court.

12. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Wilmer Bourgeois, Sr.

Dated: May 9, 2007

USCA5 683

22

USCA5 684

<u>DECLARATION AND AFFIDAVIT OF LAWANDA COOK</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Lawanda Cook, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Lawanda Cook, and Ivy Thomas is my cousin. I knew Alfred Bourgeois during the time that Ivy and him dated.

2.    From the second I met Alfred I knew that he wasn't right. He always acted crazy and I never could see what my cousin saw in him. You could tell that his mind wasn't all there.

3.    He would take crazy chances in the truck he drove. I remember one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me than he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all.

4.    I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.

5.    I remember one time Ivy was making ox tail for dinner, and Alfred asked us what it was. I thought that was really strange. At first I thought he was kidding us, but it became clear he wasn't joking so I explained to him that ox tail was from a cow. He got all red in the face and looked really upset. Then he asked us well is it an ox or a cow. I was stunned. I kept trying to explain to him that it was the same thing but he insisted that it couldn't be the same.

5.    I always thought that Alfred acted like a child. When Alfred would see something as ordinary as a tree he acted like it was the first time he ever saw it. He had to have seen a tree a million times but he always acted like it was so amazing. It seemed like something a really

USCA5 685

young child would do.

6.      No attorney or investigator ever contacted me and asked me about Alfred when he was on trial.  I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

7.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Lawanda Cook

Dated: 5-1-07

USCA5 686

23

USCA5 687

## <u>DECLARATION AND AFFIDAVIT OF ANTHONY DUMAS</u>
## <u>PURSUANT TO 28 U.S.C. § 1746</u>

Anthony Dumas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.    My name is Anthony Dumas.  Robin Bourgeois is my niece.  My sister, Veronica

Batiste, is Robin's mother.  I lived with Robin and her husband,  Alfred Bourgeois, prior to his

arrest.

2.    I had to live with Robin and Alfred because Veronica had put me out of our

mother's house.  Veronica Batiste had gotten our mother to sign some papers when she was not

in her right mind.  Those papers allowed Veronica to take our mother's house right out from

under me.  Veronica did a wrong thing when she did that and it hurt me a lot that my own sister

would pull something like that.

3.    Besides living with Alfred and Robin I also went on trips in Alfred's truck with

him.  I had a nice time with Alfred on his truck, but I could also sense that something was wrong

with Alfred.  I was around when he got the letter saying that he had another daughter.  It was very

hard for Alfred to understand that letter.  I paid a lot of attention to him around that time.  He

went into a state of depression.

4.    Alfred would just go off sometimes.  I have seen him go into a frenzy.  He would

pull at his head like he was pulling his own hair out.  Only thing was that he had a shaved head.

There was no hair there to pull but he kept tugging at something only he could feel.  He would

mutter and not be able to answer me or hear me when I spoke to him.  He talked nonsense.  He

was very agitated and his movements were jerky.  At those times it was like something satanic

got hold of him.  He was not Alfred at those times.   Nothing I would do or say would calm him

**USCA5 688**

down.  I left him alone, but I kept an eye on him when he was like that until he snapped out of it.

5.      I spoke with the FBI and testified at Alfred's trial.  I would have been willing to talk to Alfred's attorneys and testify about the things in this affidavit if I had been asked.

6.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Anthony Dumas

Dated: 5/9/7

USCA5 689

24

USCA5 690

## DECLARATION AND AFFIDAVIT OF ANITA FERDINAND
## PURSUANT TO 28 U.S.C. § 1746

Anita Ferdinand, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Anita Ferdinand. I am married to Alfred Bourgeois' brother, Lloyd. I have known Alfred for over ten years.

2.      Alfred's mother, Eunice, was not the kind of mother who upheld her kids when others accused them of something. She told me if she whipped the wrong one she just figured they probably deserved it anyway.

3.      Alfred acted oddly in regards to money matters. It was weird how he could be very generous and then incredibly tight with money. I remember the last family Christmas we had with him. He was the most generous one there. He gave every person a present. He gave the girls perfume. He gave his brothers boots. He gave me a "worry box" with angels on it.

4.      But then at home Alfred would put a lock on the thermostat so it could not be changed. He would mark the mileage in the car so he would know exactly how much it had been driven. He was very concerned with money but then he would imitate what Lloyd and I had. When we got a pool he got a pool. When we got a jacuzzi, he got a jacuzzi. He would buy a big Ford Expedition and then the electricity would be turned off at his house. It was like he did not understand the relationship between spending too much money and then not having enough to pay bills.

5.      When Alfred got that baby, Robin told my daughter that she was not going to do anything for her and she was not happy to have two babies that were not toilet trained.

6.      The FBI spoke to me and when they found out I worked in Ochsner they said I

USCA5 691

must know Robin because she was a nurse there. I told them she was not a nurse. She was a nursing assistant and should not have been representing herself as a nurse. Robin was bold. She was also a liar. One time Lloyd and Alfred's sister Michelle and I were at their house and just remarked about a chair we liked. Robin had a whole story about this chair. When Alfred walked in the room and we said something about it he gave a whole different story about the same chair.

7.    The FBI talked to me, but nobody working on Alfred's behalf ever spoke to me before his trial. I went to Corpus Christi with Lloyd, and since I was not subpoenaed to be a witness, I went to go into the courtroom. Patti Booth stopped me and told me I was not allowed in the courtroom. After a while we were told by someone on the defense team that we should leave, so we went back to Louisiana. Then we got a call to come back and we were threatened with a bench warrant if we didn't return all the way to Corpus Christi right away. We went back but we were still not allowed in the courtroom and Lloyd was never called to testify.

8.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Anita Ferdinand

Dated:   5 / 8 / 07

USCA5 692

25

USCA5 693

## DECLARATION AND AFFIDAVIT OF LLOYD FERDINAND
## PURSUANT TO 28 U.S.C. § 1746

Lloyd Ferdinand, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Lloyd Ferdinand.   Alfred Bourgeois is my younger brother.  I have been asked by his lawyers to tell them what I know about Alfred's life.

2.     Alfred has always had a hard time with life.  He has tried to do many things, but everything he tried seemed to fail.  He was never able to maintain healthy relationships with women.  His marriages always failed.  He has gone from job to job and had many financial problems.

3.     Alfred and I have the same mother but different fathers.  My sister Claudia and I have the same father, Lloyd Ferdinand, Sr.  Our brother Anthony has a different father.  His father was Mr. Baker.  Anthony is seriously handicapped and has never been able to live on his own.  Alfred has a different father than any of the rest of us.  Keith and Michelle were my mother's children born after Alfred. Their father is Godfrey Rixner.

4.     Maybe it was because of who his father was, but our mother was more brutal to Alfred than the rest of us.  She gave all of us whippings but  Alfred got more whippings than the rest of us.  She would pick on Alfred more and grab the belt quicker for him.  She would beat him for the slightest thing or for no good reason.

5.     Her beatings of Alfred got so bad that he went to live with a very old neighbor, Miss Mary.  I'm not sure how this happened, but I think she was aware of how terrible it was for Alfred in our home and she reached out to protect him.  Once he moved in with her we would see

1

USCA5 694

him on the way to or from school but he missed being part of our family and didn't get to go on family outings with us. Alfred had no rules and no discipline at Miss Mary's. His father had no involvement with him as a boy.

6.      Things were no better at school. The school was also rough, and Alfred got picked on and teased a lot because of his light complexion and green eyes. They said he was a white boy with green eyes. They beat him up and he was helpless. Michael Clayton, one of Miss Mary's relatives, beat him up repeatedly. Alfred was a coward and all he could do was cry when they picked on him. My uncle told me that I should deal with it so I taught him how to fight back.

7.      In later years I came to know that the violence he suffered and his separation from the family had a bad effect on Alfred. One time, as adults, we were at my sister's house and Alfred let loose with all the things that our mother did to him and how miserable he was being apart from us. It was obvious that Alfred was deeply troubled by all the bad things that happened to him as a kid.

8.      Alfred was always slow. He had slow reactions. He was late doing things. He was not good at riding a bike. Alfred always wanted to be like me. My Uncle Harry took me under his wing and taught me a lot of things that helped me become a success. Alfred did not have anyone to do that for him. He over-stressed himself trying to have what I had. He was competitive with me. But he was not able to do what I could do. He tried hard to make it look like he was a success. He would buy cars he could not afford. He would buy cars for other people that he could not afford to pay for. I helped him with car notes sometimes. I would try and help him but sometimes he got himself in so deep that it was impossible to get him out of the

2

USCA5 695

mess he had made.  He made a mess out of everything he ever tried.  One time he signed an agreement with a trucking company that resulted in him working for them and making money for them but not getting paid himself for months.  When I looked at the agreement I could tell right off that it was a bad deal for him and I don't even read that well.

9.    The more Alfred struggled, the deeper in trouble he got.  He wanted to be the model family man.  As each relationship failed, he would hook up with another woman.  The kids and relationships mounted along with the financial strains.  So, the more he tried to look like a normal family man, the farther he got from that.  He was just unable to make things work.

10.    Alfred had a lot of pressure on him by the time he found out that he had another child he hadn't even known about.  He had pressure trying to keep his house, problems making child support payments, his wife, Robin, had an affair with another man, and he wasn't even getting paid regular pay checks.  Everything was coming crashing down on him.

11.    When Robin found out that Alfred was getting the baby for a lengthy visit she told my step-daughter that she wasn't happy that she would have two babies in diapers to care for.  She said she was not going to do anything for that baby.  My step-daughter told Robin that it wasn't right for her take it out on the baby.

12.    I could have helped Alfred deal with the reality of his situation prior to trial if I had been able to meet with him face to face.  I could have had a heart to heart talk with him and he would have listened to me.  I would have told him he had to tell the truth and take the consequences of his actions.  I am the one person that could have been helpful in getting him to understand the reality of his situation and that a plea resulting in a life sentence would have been a much better thing than risking his life like he did.  His attorneys were working to get me a visit

3

USCA5 696

with my brother but at the last minute it was stopped. That visit could have saved so much trouble and pain for everyone involved.

13. I told Alfred's attorneys that we could bring a bus load of people from our church to Corpus Christi for Alfred's trial. They did not want me to arrange that. I thought it would have helped to have people there that cared about Alfred and wanted to support him.

14. Before his trial, a woman who was working on Alfred's behalf came and talked to me at the McDonald's in La Place. She asked me a few questions about Alfred and talked a lot about what a good time she had on Bourbon Street in the French Quarter of New Orleans the night before. She really enjoyed her trip to Louisiana.

15. My wife and I made the trip to Corpus Christi to be there for Alfred's trial. I was willing to testify for my brother but they never permitted me to testify. At one point they told us to go home so we did. Then they told us to turn around and get back to Texas. We did what they asked but they never asked me to get on the stand.

16. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Lloyd Ferdinand

Dated: 5-8-07

4

26

USCA5 698

<u>DECLARATION AND AFFIDAVIT OF BEVERLY FRANK</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Beverly Frank, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1. My name is Beverly Frank. I grew up in Saint James Parish in Louisiana. I lived

   in Paulina until I was 12 or 13 years old, then my parents moved to Lutcher which

   is only a mile or so away. I now live nearby in LaPlace, Louisiana. I still have

   lots of family who live in Paulina.

2. My grandmother was Mary Clayton. She was my father, Herman Clayton, Sr.'s

   mother. My grandmother raised Alfred Bourgeois from about the age of eight

   until he was grown. Alfred's mother's name was Eunice Bourgeois. Eunice had

   several children including Alfred. I know Alfred's older brother, Lloyd, and his

   older sister, Claudia. I know their father. He played the organ at Evergreen

   Baptist Church. I know Alfred had a different father than his older brother and

   sister.

3. Alfred's mother treated him differently than her other children. She talked to

   Alfred differently and she treated him differently too. I saw her give her other

   children money and not give Alfred any money. I also saw her give cookies to her

   other children and not give Alfred any cookies.

4. Eunice whipped all her children. She was a single parent for several years and she

   disciplined the children herself. Eunice would use a switch or anything else she

   could get her hands on to whip the children. I know she would whip the children

1

USCA5 699

so much that they would have welts on their body. I believe you should never whip a child that much.

5. My grandmother saw the way that Eunice mistreated Alfred. She took him in because of the terrible way that Eunice treated Alfred. My grandmother had a good sense of right and wrong and she wanted to help Alfred. She believed that every child deserves love.

6. Eunice used to always mess with Alfred's nose. She would pick his nose and irritate it really bad. I saw Eunice do this to him. She would pick and scratch his nose with her fingernails. I have no idea why she would irritate his nose like that. I never saw Eunice touch her other children's noses. I never saw the other children with irritated noses. Alfred's nose was frequently bleeding. He walked around with cotton or tissue in his nose. Over the years this disfigured Alfred's nose. It wasn't like that when he was little. Alfred would cry a lot and complain that his nose hurt. He wouldn't let anyone touch it. My grandmother used to put Vaseline on his nose to heal it, to soothe it. She did this to offer him some relief. But just as soon as my grandmother had gotten Alfred's nose healed his mother would mess it up again. This upset my grandmother so much. As fast as my grandmother would heal his nose, his mother would mess it up again. That child was afraid to blow his nose. I know that when he was older he had trouble breathing through his nose.

7. Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in

2

USCA5 700

little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

8. My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

9. Deep down inside I feel bad for Alfred. I know he suffered hardships as a child. His mother mistreated him and was too harsh in disciplining him. His mother made Alfred feel unwanted within his own family. My grandmother did her best to help Alfred but his mother continued to hurt him.

10. No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

11. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Beverly Frank_
Beverly Frank

Dated: _May 9, 2007_

3

USCA5 701

27

USCA5 702

## AFFIDAVIT / DECLARATION OF ALLEN HENRY
## PURSUANT TO 28 U.S.C. § 1746

Allen Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' cousin. My mother is cousins with Alfred's mom Eunice. I grew up with him on Bend Lane in Paulina, La..

2.      When we were growing up, All of Eunice's boys would rather sleep at other people's houses than their own. They would rather lay on the floor at my house than sleep at home. All the boys would go wherever they wanted to go. When night came, Eunice would not call them home or even call to see where they were. Those kids rambled. One of the boys, Clyde, drown when he was spending the 4th of July away from his family. That is what happens when you ramble from house to house.

3.      Eunice used to be rough on Alfred. She used to chastise him more that her other kids and used to beat him more than the others.

4.      There was an older lady from church named Miss Mary that lived on the Bend. She lived alone and Eunice sent Alfred to stay with her. After school, Alfred would play with us, but while we were still playing, Miss Mary would be ready to go home and Alfred would have to go with her. He would be sad when he had to leave us to go in early to take care of Miss Mary. It hurt him to have to live outside of his family.

5.      Alfred was a clumsy kid growing up. He could barely ride a bicycle and we would tease him about being so awkward.

6.      Alfred was kind of dumb, but he tried to hide it by telling tall tales. He would lie to cover up what he didn't know or understand. It was hard to tell exactly what he knew because he exaggerated about himself, but when you really looked into it, the story didn't make any sense. Even though he wasn't smart, he was motivated to measure up to his older brother Lloyd's example. He wanted to be like Lloyd, but couldn't because he just was not bright enough.

7.      Alfred wanted everyone to believe that he knew about cars. His brother

USCA5 703

Lloyd was known to be a great mechanic. One time Alfred had a bad engine leak, but still drove the car. We told him that he might hurt the engine, but he drove it anyway. He didn't understand the consequences of the engine problem, but didn't want to admit it.

8.    I was never contacted by Alfred's lawyers or investigator before his trial. If someone had asked, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Henry

Dated: May 10, 2007

USCA5 704

28

USCA5 705

## AFFIDAVIT / DECLARATION OF JERSEY HENRY
## PURSUANT TO 28 U.S.C. § 1746

Jersey Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.     I am Alfred Bourgeois' cousin, but he considered me his aunt. I am his mother Eunice's cousin. We lived in Bend Lane in Paulina, La.

2.     My cousin Eunice was a neat freak. She kept her house very clean and you could eat off her floors. Her mother Edna was the same way.

3.     Eunice seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like she was always worried about something. After the divorce, she moved back in with her parents in Paulina.

4.     Eunice let her kids spend time with anyone. She was not discriminating. Her boys would regularly prefer to sleep on the floor in my house than to go home. They would be here late and I was surprised that Eunice never even called to see where they were. Those children rambled from house to house. Clyde was Eunice's son by Ferdinand and he drowned in a spillway when he was out with some people. Eunice was hurt by Clyde's death and I am not sure that she ever recovered from it.

5.     Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it.

6.     Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was be ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids.

USCA5 706

7.      Alfred had a problem with telling the truth. He started lying about things when he was in elementary school. Sometimes it was for attention and sometimes it was to make people think that he was more than he was. When he was young, it was pretty easy to catch him in fibs because some of them were so obviously not true. Telling tales became a habit with Alfred as he got older. I oftem wondered if he started to believe his own tales. It was difficult to know how smart he was because he was always exaggerating.

8.      I would have been willing to testify about all the things in this statement.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jersey Henry

Dated: May 10, 2007

USCA5 707

29

USCA5 708

<u>DECLARATION AND AFFIDAVIT OF YVONNE ROBINSON JOSEPH
PURSUANT TO 28 U.S.C. § 1746</u>

Yvonne Robinson Joseph, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.　　My name is Yvonne Robinson Joseph. I am Alfred Bourgeois' cousin. My mother, Lovenia Bourgeois Robinson, and his mother, Eunice, were sisters.

2.　　I am about eight years older that Alfred. My family lived in Lutcher, but my mother would leave us with the extended family on Bend Road during the day. We spent a lot of time with Alfred's family on Bend Road in Paulina.

3.　　Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him "little yellow bastard" and slap him for nothing.

4.　　His mother used to mess with Alfred's nose. He always had a big sore on his nose and his mother would put her finger nail on it and make it bleed. Grandfather Isaac used to ask Alfred's mother why she kept messing with that boy's nose. She wouldn't answer.

5　　After a while, Alfred lived with an older church lady in Paulina. She took him in because he was being treated so bad by his mother. That old lady treated Alfred better than his own mother.

6.　　Even though his mother treated him bad, Alfred was crazy about his momma and always treated her very good.

7.　　When I was spending time in Paulina, I thought that Alfred was the nicest one in his family, but I worried about him when he grew up. He was raised around violence and I worried that it might affect him in later life.

USCA5 709

8.      No attorney or investigator for Alfred spoke to me before or during Alfred's trial. If anyone would have asked, I would have told them what I knew about Alfred.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: 5 / 9 / 07

USCA5 710

30

USCA5 711

DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB
PURSUANT TO 28 U.S.C. § 1746

1.      My name is Kathleen Kaib, and I am employed as an investigator/mitigation specialist with the Community Defender Office.

2.      I interviewed Orlando Campos on May 7th, 2007 from 9:05 a.m. - 10:15 a.m. along with James McHugh, Esq. at North Texas Intermediate Sanction, in Fort Worth, Texas.

3.      On May 27, 1999, Mr. Campos pled guilty in Bee County to burglary of a habitation (2d degree) (B-99-2-055-CR-B.)  On January 23, 2003 his probation was revoked due to a delivery of cocaine case (B-02-2-114-0-CR-B) and was sentenced to twelve years incarceration.

4.      Mr. Campos was sent to Bee County Jail in 2002 where he was housed with Alfred Bourgeois and Wiley Taylor.  They were housed on a very small pod.

5.      At some point while he was incarcerated with Wiley,  Wiley told him he had spoken to the FBI about Bourgeois and they were going to help him (Taylor) with his case.

6.      Mr. Campos was interviewed telephonically on December 20th, 2002 by FBI agent, Megan Beckett.  He told Beckett about his conversations with Bourgeois.  Sometime thereafter Campos met with Beckett and Patti Booth in person prior to the trial.

7.      Mr. Campos asked AUSA Booth or FBI Agent Beckett if they could help him by writing a letter to the parole board.  They told him they could not help him now but they could after the trial.

1

USCA5 712

8.    Campos testified against Bourgeois in both phases of the trial.  Campos served

his sentence and missed his first parole date.  He then asked his mother to call Patti Booth to see

if she had written the letter she had promised.

9.    Mr. Campos did make parole on his second date in October, 2005 less than three

years into his 12 year sentence .  He is currently serving sixty days in jail for a parole violation

and traffic offense.

10.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.

Kathleen Kaib

Dated:  5/14/07

2

USCA5 713

31

USCA5 714

<u>Affidavit of Adam Longoria</u>

1) I Adam Longoria hereby declare and swear as follows:

2) I was a witness against Alfred Bourgeois in his federal capital case.

3) I met Alfred while in the Nueces County JAIL.

4) I was in jail because I had a robbery case and a probation violation for evading the police.

5) My original attorney was Mickey Kolpack but he died. Then I was represented by attorney Jerry Gonzales. After that I was represented by Bill May.

6) I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial. She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole.

7) My original offer was 35 years for my robbery case and probation violation.

8) I eventually pled guilty and recieved a 7 year sentence for both my robbery case and probation violation

USCA5 715

9.) Since the Bourgeois trial Patti Booth has written a letter on my behalf to the parole board and she mentioned in that my cooperation in the Bourgeois trial.

10.) At the time I was housed with Bourgeois and at the time I testified against Bourgeois I had post traumatic stress disorder and was on medication for this. These were anti-psychotic drugs and Paxil. Patti Booth knew about the medications I was on.

11.) I hereby swear that all of the above is truthful.

#1233335

Stiles Unit

3060 F.M. 3514

Beaumont, Tx.

77705 7635

April 24, 2007

This sworn statement was written and the signature witnessed by James McHugh this date: 4/24/07

The writing & signing of This statement was witnessed by Victor J. Abreu This date: 4/24/07

USCA5 716

32

USCA5 717

AFFIDAVIT/DECLARATION OF BILL MAY
PURSUANT TO 28 U.S.C. §1746

I, Bill May, hereby declare and swear as follows:

1.      I am presently retired from the practice of law and residing in Corpus

Christi, Texas. In 1978 I was admitted to practice law in the state of Texas.

2.      From 1978 to 1980 I was in private practice. From 1980 to 1989 I was an

Assistant District Attorney for the county of Nueces in the state of Texas. For the last four years,

I was the First Assistant District Attorney. During my time in the District Attorney's office, I

personally prosecuted and won convictions in capital murder cases. Also, while at the District

Attorney's Office, I personally drafted and developed the written plea agreement form that is still

being used in Nueces County for pleas of guilty with agreements.

3.      In 1989, I left the District Attorney's Office and went into private practice.

My practice consisted primarily of criminal defense in both state and federal court. I retired from

the practice of law in 2006.

4.      On November 13, 2003, I entered my appearance on behalf of Mr. Adam

Longoria. Mr. Longoria was in custody in Nueces County Prison charged with aggravated

robbery (F1) habitual felony offender. This charge arose from a bank robbery which had taken

place on May 30, 2003. On that charge alone, Mr. Longoria was facing a mandatory sentence of

twenty-five years to ninety-nine years. This case was No. 03-CR-1884-E.

5.      Mr. Longoria, at the time of the robbery offense, was three months into a

ten year probation sentence arising in Nueces County from a plea of guilty to evading arrest or

detention using vehicle and for endangering a child. This case was No. 02-CR-3585-E. This

probationary sentence resulted *only* after the state had agreed to waive the habitual offender

B.M.                                    Page 1 of 3

USCA5 718

mandatory sentencing enhancement.

6. I knew, based on these two cases, that Mr. Longoria was facing a life
sentence or the equivalent if he was convicted of bank robbery.

7. Mr. Longoria's defense to the bank robbery was that he did it - but was
forced to do it by members of the gang he had belonged to, Texas Syndicate. I knew this would
be a *very* difficult defense to prevail upon in front of a jury

8. At some point in the winter or spring of 2004, Mr. Longoria advised that he was
considering cooperating with the FBI against Mr. Alfred Bourgeois in his federal capital case.

9. I then recall receiving a telephone call from A.U.S.A. Mrs. Patty Booth.
She asked if it would be ok to speak with Mr. Longoria and I granted her permission to do so.

10. Some time after that phone call with Mrs. Booth, Mr. Longoria told me
that he had in fact spoken with Mrs. Booth. He was expecting that she would help him after his
testimony in the Bourgeois case. I told him that in my experience, if he testified well in the
Bourgeois case, he could expect to get some type of benefit in his Nueces County cases.

11. Mr. Longoria testified against Mr. Bourgeois in his federal capital case in
March 2004.

12. On April 19, 2004, I appeared in Nueces County Court. Mr. Longoria's robbery
case (No. 03-CR-1884-E) and his probation violation case (No. 02-CR-3585-E) were lifted for
disposition that day. I spoke with the state prosecutor, Jimmy Sales and asked him if he had
spoken with Mrs. Patty Booth. He told me that he had spoken to her. Assistant District Attorney
Sales dropped the habitual offender mandatory aspects of the robbery case and offered Mr.
Longoria a seven year sentence on the robbery case and a seven year sentence on the probation

B.M.                                  Page 2 of 3

USCA5 719

violation case. These sentences were to run concurrently. He also offered to reduce the sentence *fully*

even further to 5 years if Mr. Longoria ~~corroborated with him~~ *cooperated as a witness in a state case* in the next thirty days.

13.     The main reason for Mr. Sales dropping the habitual offender mandatory

aspects of the robbery case and offering Mr. Longoria a total of 7 years incarceration was because

of his conversation with Mrs. Patty Booth and his testimony in the Bourgeois case.

14.     I hereby certify that the facts set forth above are true and correct to the best of

my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

Bill May

Dated: *May 1, 2007*

B.M.                                        Page 3 of 3

USCA5 720

33

USCA5 721

## AFFIDAVIT / DECLARATION OF ELNORA BOURGEOIS MCGUFFEY
### PURSUANT TO 28 U.S.C. § 1746

Elnora Bourgeois McGuffey, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.       I am the maternal aunt of Alfred Bourgeois. His mother Eunice was my younger sister.

2.       Eunice was married to a man named Lloyd Ferdinand and had three children by him. They lived as a family in Lutcher. It seemed like she was happy, but Ferdinand ran around a lot with other women. Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she was never the same after they divorced. It was like she had something on her mind all the time.

3.       After Eunice divorced from Ferdinand, she and her three children moved back into our parent's house on Bend Road in Paulina. She needed extra help with the kids and got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

4.       Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

5.       When he was young, Alfred had a problem with his sinuses. My sister used to pick his nose with her fingernail, causing it to bleed. All of us use to get after her for picking his nose, but she would just ignore us. She sure dealt with his sinus problem in a strange way.

6.       I lived in Baton Rouge and would visit Eunice in Paulina. I was surprised to find that Alfred was not living with his mother. He was staying with an elderly lady from church. Even though the elderly lady needed help, I never undstood why little Afred stayed with her instead of living with his family.

USCA5 722

7.      Alfred's older brother Lloyd was a role model for him. Lloyd was kind of well off and Alfred would always try to do what Lloyd did. Alfred was not as smart as Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never knew how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that he was, more successfull than he was and smarter than he was.

8.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Elnora Bourgeois McGuffey

Dated: May 9, 2007

USCA5 723

34

USCA5 724

<u>DECLARATION AND AFFIDAVIT OF ALTON PRESTON</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Alton Preston, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.      My name is Alton Preston.  I live in LaPlace, Louisiana.  I work at Winn-Dixie.  I

have been there over 30 years.  I have a Bachelor's Degree from Southern

University in Business Administration.  I also have a Master's Degree in Divinity.

Alfred Bourgeois and I have been close friends for over 20 years.

2.      Alfred talked to me about his childhood from time to time.  Alfred told me that

his mother, Miss Eunice Bourgeois, mistreated him.  Alfred told me that his

mother didn't treat him the same way she treated her other kids.  Eunice saw

Alfred as an unwelcome reminder of his father.  Alfred said that Eunice used to

whip him very badly.  He told me she beat him for no reason and that it happened

quite frequently.  Alfred said that he received more whippings than any of his

brothers or sisters.  Alfred confided in me about his childhood before he was

arrested in this case.  We talked about this many years ago.

3.      Alfred also told me that he was raised by
an older lady in the community. Alfred also
told me that his mother burned him with
cigarettes. Alfred talked to me about being mistreated
several times while were discussing our families. He
was definitely hurt by it.

USCA5 725

4.     I would have testified for Alfred if I had been asked.

5.     I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury,

pursuant to 28 U.S.C. § 1746.

Alton Preston

Dated: 5/1/07

USCA5 726

35

USCA5 727

<u>DECLARATION AND AFFIDAVIT OF JEVONA JEANETTE RIXNER
PURSUANT TO 28 U.S.C. § 1746</u>

Jevona Jeanette Rixner, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name Jevona Jeanette Rixner. My husband, Keith Rixner, and Alfred Bourgeois are brothers. They have the same mother but different fathers.

2.      I knew Alfred's wife, Robin, from high school. We were in the same grade in East St. John High School. Robin and I got along well. Because we both married into the family we could share our thoughts about our husbands and their families. We used to have what I call "out of family talks" since we were both kind of outsiders. It was a bond we shared.

3.      Alfred clowned around with me a lot. He was very good to my middle son, who is not my husband's child. One Christmas a cousin forgot to get my son a present. Alfred just went in his pocket and gave him $50.00.

4.      My husband, Keith, was his mother's favorite. She spoiled Keith. Alfred did more for his mother though, he gave her money for trips and bought her things. Keith was favored by her just for being Keith but Alfred kept trying to earn her favor.

5.      My mother-in-law was very concerned about keeping her house neat. Nothing could be out of place or she would be upset. Even on wash day everything was neat.

6.      One Christmas Alfred's mother nitpicked with him about why the gathering was not at his house. She was teasing him but he took her seriously and was very hurt over her comments.

7.      Just days before the baby died Robin and Alfred were at our house. I saw Alfredesha and Alfreda but did not see the baby. I asked about her and was told she was in the

USCA5 728

truck, which was parked at the end of the road.    They all came and visited and had lunch and didn't seem concerned about the baby.  Robin and I went to the store and we passed right by the truck and I asked her if we could give the baby some food or something to drink and she said no. I tried everything I could think of to get Robin to let me see the baby but she kept me from the truck.  Robin said she would figure a way out.  I did not know what she meant by that.

8.    Someone called Keith and spoke to him on the phone about Alfred.  I told him he shouldn't talk to someone on the phone like that because he did not really know who it was. Someone was talking to people trying to help Alfred and I kept waiting on them to call me but nobody ever tried to talk to me about Alfred and the things in this affidavit before Alfred's trial. I would have met with them and I would have been willing to testify for Alfred if I had been asked.

9.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jevona Jeanette Rixner

Dated: x5 / 10 / 07

USCA5 729

36

USCA5 730

DECLARATION AND AFFIDAVIT OF KEITH RIXNER

PURSUANT TO 28 U.S.C. § 1746

Keith Rixner, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Keith Rixner. Alfred Bourgeois is my brother. I am the youngest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. One of our brothers, Clyde, died at an early age. Clyde loved music. Even though he was just a boy he had decided he wanted to be an undertaker. He used to have pretend funerals for animals. It was very hard on all of us when Clyde died in an accident in a lake.

3. Alfred didn't stay with us growing up. I was so young that I couldn't understand why he wasn't living with us. He stayed with an elderly lady, Miss Mary. We called Miss Mary the mother of the church because she was the oldest woman in the congregation. Alfred had to be in the house with her early because she went to bed early. When we used to go to Baton Rouge to visit our Aunt Dorothy, Alfred couldn't go because he had to take care of Miss Mary. He was really disappointed when he couldn't go with us.

4. Alfred's dad was not around when he was growing up. He had to go looking for him when he was in high school. Alfred saw my dad spending time with me and that made him feel even worse about not having a father in his life.

5. Our family home burnt down shortly before Alfred got in this trouble. Our mother was living there with our brother, Anthony. Anthony always had to live with our mother because he had disabilities. It was also the house that our grandparents had lived in and there were a lot of family pictures and things that brought back memories in that house. When it burnt down everything was lost. Alfred asked us not to bulldoze it until he could come back and take a last look at the family home.

6. I met with someone that was working with Alfred's attorneys before his trial. We just met at the McDonalds in La Place and I wasn't really comfortable talking about personal things in a public place like that.

7. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Keith Rixner_

Keith Rixner

Dated: _5/9/07_

USCA5 731

37

USCA5 732

## DECLARATION AND AFFIDAVIT OF LOUIS RUSSELL, JR
## PURSUANT TO 28 U.S.C. § 1746

Louis Russell, Jr., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Louis Russell, Jr. I grew up in Paulina, Louisiana. I now live in Baton Rouge, Louisiana.

2.    My family lived right next door to Alfred Bourgeois, all his brothers and sisters and his mother, Eunice Bourgeois. We are distant relatives.

3.    Growing up Alfred had a hard time. He was a big and awkward kid. We would all laugh at how he played sports. He had big feet that he was always falling over. Alfred always tried to fit in with other kids. Alfred has always had an awkward nature. At lunch we all tried to make Alfred laugh at the lunch table. We would do it until milk ran out of his nose.

4.    I remember when he was a teenager that he was driving a four wheeler near the sugar cane fields. He drove that four wheeler straight into a pole. The whole neighborhood heard it when he hit the pole. We couldn't believe it. He ended up hurting himself pretty bad. I know an ambulance came and took him away.

5.    Growing up Alfred was someone with a pretty good temper. Alfred had a slow temper but once it boiled over it was hard to cool down. It seemed like Alfred didn't know how to back down. Alfred would be fighting with someone and getting the better of him but keep on hitting the guy. During these instances Alfred was extremely intense. He didn't respond to verbal requests to stop. Short of physical restraint it seemed Alfred would not stop. I never saw an instance where somebody didn't have to pull him off. He was hard to calm down.

USCA5 733

6.    No attorney or investigator ever contacted me and asked me about Alfred when he was on trial.  I would have answered any questions by Alfred's attorney and I would have testified if I had been asked.

7.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Louis Russell, Jr.

Dated: 5/9/07

USCA5 734

38

USCA5 735

<u>DECLARATION AND AFFIDAVIT OF IVY THOMAS</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Ivy Thomas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Ivy Thomas.  I dated Alfred Bourgeois from 1995 to 1997.

2.      I live in Birmingham, Alabama and I met Alfred at a friend's wedding. We started dating immediately. I would see Alfred about five times every three months.  We would talk on the phone all the time.

3.      When Alfred had a truck load that had to go through Birmingham he would stay with me for a night and some of the next day.  We always had such a good time together. Alfred was always very respectful, and kind to me.

4.      Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.

5.      One time I was frying pork chops, and he asked me what they were.  I was really surprised that someone as old as he was had never heard of a pork chop.  I told him what they were and that it came from a pig.  He seemed really confused about that.  At first I thought it was a cultural thing like they didn't have them in New Orleans, but he didn't even seem to understand how to cook so I know it wasn't just cultural.

6.      I really thought it was strange that he asked so many questions about cooking.  I would think that a grown man would have been around cooking and baking all his life.  His interest in my cooking was very childlike.

7.      Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood.  He told me that his mother kept all his other siblings but gave him away.  Alfred

USCA5 736

said that his mom treated him differently than all the other kids and it depressed him.  His mom said he looked just like his father, and that is why she hated him so much.  One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

8. I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

9. No attorney or investigator ever contacted me and asked me about Alfred when he was on trial.  I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Ivy Thomas

Dated: __5/1/07__

USCA5 737

39

USCA5 738

<u>DECLARATION AND AFFIDAVIT OF MICHELLE WARREN
PURSUANT TO 28 U.S.C. § 1746</u>

Michelle Warren, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Michelle Warren.  Alfred Bourgeois is my older brother.  We have the same mother but different fathers.

2.      Our mother had seven children.  Claudia was born first.  Then came Clyde, Lloyd and Anthony.  Alfred had a different father than any of the rest of us.  His father's name is Alfred Sterling.   Our mother was never married to Alfred Sterling.  Keith and I were born after Alfred and we both have the same father, Godfrey Rixner.

3.      Our brother Clyde died when he was just a boy.  He used to spend time with people in Mt. Airy and on the fourth of July he went on a fishing trip with an older man from that area.  He fell out of the boat and drowned.  Our mother felt awful about Clyde for a long time but then she saw him in a dream and after that she got some peace about his death.

4.      Our brother Anthony is handicapped.   He did not learn to walk until much later than normal.  He never learned to say more than a few words.  He always needed a lot of extra care.  He cannot live on his own.  Alfred helped to take care of Anthony and would buy him things.

5.      Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do.  He seemed to need more attention than the rest of us did and sometimes the things he did to get attention just got him in trouble.  Our mother was harder on Alfred than the rest of us.  I remember times I was allowed out but my older brother, Alfred, was not, so I would stay in the house with him.

USCA5 739

6.       The children in our house, including Alfred, had a lot of chores to do.  Our mother was a fanatic cleaner.  There is a character in a movie, Sleeping With The Enemy, who is a fanatic about his house being in order.   My mother reminded me of that character.  Everything had to be lined up exactly.   The cans in the cupboard had to have labels pointing in the right direction. Glasses had to be perfectly lined up.  We had to get down on our hands and knees and scrub the baseboards.  Every dish that was used had to be immediately washed, dried and lined up where it belonged.  We had to wipe our shoes clean before coming into the house.  Sometimes we got whippings for messing things up.  Other times cleaning was used as a punishment.  Alfred would have trouble listening to directions, so he would mess up more than the rest of us and get beatings more often.

7.       I have the tendency to be a fanatic about my house like my mother was.  I resist the urge because I believe it is more important for my children to be comfortable and happy in my house than for everything to be perfect.   I deliberately put glasses that don't match on one of my shelves so that I won't be like my mother.  Alfred wanted a clean house when he was married and this caused some tension in his relationships.

8.       Our mother used to clean Alfred's nose all the time.  She would stick her fingers deep inside and this caused sores.  She cleaned it so deep, hard and often that the sore wouldn't heal.

9.       Alfred did not play sports in school.  He got teased a lot.  Sometimes it was because of his looks.  He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes".   Alfred could not stand to be teased.  He would get very mad when kids teased him.  I remember telling my older brother Alfred that they were just jealous of his eyes.  When he got older he started to realize that girls were attracted to his looks.

USCA5 740

10.    When he was a boy, Alfred went to stay with an older woman. Her name was Miss Mary. She needed someone to be there with her and her own family was not providing the help she needed, so Alfred went to live with her. Because she didn't live far from us we still saw Alfred but he was not really a part of the family when he went to live with her.

11.    Alfred had a couple accidents that I can remember. One was very bad. He was riding a three wheeler and slammed right into a tree. Another time he was out of state driving an 18 wheeler and came home in casts and we had to take care of him.

12.    Sometimes Alfred would just "click out". He would be in his own zone. You couldn't get through to him. He would stare off into space, and would not respond to questions or voices. Then he would suddenly snap out of it.

13.    My oldest brother, Lloyd, worked very hard from the time he was a teenager. While Alfred was spending time with Miss Mary, Lloyd used to spend time with our uncle Harry. Harry had a shop and taught Lloyd a lot at a young age about working and repairing cars. Lloyd was able to succeed in whatever he did. Alfred felt like he was compared to his older brother. Alfred tried to be like Lloyd and wanted to be successful like he was but he just wasn't able to do what Lloyd was able to do. He stressed himself out over trying to be like Lloyd. He wanted Lloyd's approval but always ended up feeling second best. My younger brother, Keith, was not like that. He worked hard and was just happy with whatever he was able to achieve.

14.    Alfred had odd rules around the house. He did not want any lights on in the house during the day. He would not let the air conditioner be turned on.

15.    One Christmas when Alfred was an adult he got upset over something minor with our mother. He went into a rant about how unloved and mistreated he felt as a child. He brought

USCA5 741

up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him. We all tried to calm him down and told him to just let it go. Our mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

16.    When Alfred got something stuck in his mind it was impossible to redirect him. He would come and ask me for advice but then he could not follow any suggestions I made to him. It was like he had a block and could not reason things out or change his behavior. Sometimes in his dealings with Robin the authorities had to get involved because he could not control his behavior. He was unable to calm himself down.

17.    My daughter and my niece babysat for Alfred's daughter, Alfredesha. They had a hard time keeping her from doing things that weren't safe. Alfredesha made stuff up about the girls being too hard on her. When Alfred came she had fake tears and a made up story to tell him. Alfredesha knew how to put on a show. He believed everything this little girl told him and yelled at my daughter and my niece. We really didn't want to watch Alfredesha after that.

18.    Alfred's wife, Robin, cheated on Alfred while they were married. This really shook my brother up. Alfred just could not handle it. He flipped out. He just kind of went into his own zone. They broke up but then got back together but Alfred could not get over the affair. He thought the second daughter that Robin had was not his. He would bring up the affair over and over. We might be at a family gathering and in front of everyone Alfred would start obsessing about Robin's affair. It would ruin his day and keep the rest of us from having a good time, too. I stopped going to family gatherings because I just didn't want to see Alfred like that.

USCA5 742

19.      Robin was very smart.  She figured out the code to his phone once so she could check his messages.  Robin told Alfred that Al, the man she had the affair with, had a plan to kill Alfred.  Alfred was afraid to eat food for a while because he thought he might be poisoned.

20.      I spoke to someone working on Alfred's behalf before his trial.  I answered any questions they asked me.  I was in Corpus Christi while the trial was going on and I was willing to testify but I was never called into the courtroom to be put on the stand.  I would have been willing to testify about all the things in this affidavit if I had been given the chance.

21.         I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Michelle Warren_
Michelle Warren

Dated: _4-25-07_

USCA5 743

40

USCA5 744

DECLARATION AND AFFIDAVIT OF CLAUDIA WILLIAMS

PURSUANT TO 28 U.S.C. § 1746

Claudia Williams, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Williams. Alfred Bourgeois is my brother. I am the oldest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. Tragedy hit our family when we were children. Our brother, Clyde, was drowned on the 4th of July when he was a child. His death effected all of us, including Alfred. Even as a child, Alfred could not take pressure. Having our mother and our whole family grieving over losing Clyde added to the pressures in our house.

3. We lost Clyde and then our brother Anthony took a lot of extra care due to his disabilities. Both those things took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.

4. Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.

5. Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

6. When Alfred was a teenager he had a bad accident right there close to our house. He was riding a four wheeler and ran it right into a big pole. He hit his head, was knocked out and then seemed kind of out of it. After that he seemed nervous and unable to sit still.

7. Alfred sometimes went into a rage and he would seem like a different person. His voice would change and his eyes would turn red. Sometimes he would forget what he had just done. His moods would change till you thought he had a split personality.

8. Alfred didn't get any better at dealing with stress when he got older. He was so stressed when he went on that last truck trip that I was very scared for him. He called and said that he was afraid he was going to hurt himself and implied that I might need to get my black dress out for his funeral. I got Robin on the phone and asked her to keep any weapons away from him because he was suicidal. I was concerned that he was so stressed and depressed that he was going to kill himself.

USCA5 745

9. I was called to testify for the prosecution at Alfred's trial. Before I testified they made me look at pictures of the body. I would have testified to the things in this affidavit if I had been asked about them.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Claudia Williams

Dated: 5/10/07

USCA5 746

41

USCA5 747

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 749 of 2008
PageID #: 2639

## CURRICULUM VITAE

# Edward T. Blake

- Employment
- Education
- Professional Affiliations
- Publications

- Presentations
- Honors
- Personal
- Contact Information

## EMPLOYMENT

Paul L. Kirk & Associates, 1969-1970.

Contra Costa County Sheriff's Office Criminalistics Laboratory, intern, 1971-1972.

Teaching Assistant, Forensic Science Program, University of California, Berkeley, 1971-1972.

Graduate Research Fellow, University of California, Berkeley, 1973-1975.

Research Assistant, University of California, Berkeley, 1975-1977.

Consultant in Forensic Biology, 1975-present.

## EDUCATION

Bachelor of Science [Criminalistics], University of California, Berkeley, 1968.

Doctor of Criminology [Forensic Science], University of California, Berkeley, 1976.

## PROFESSIONAL AFFILIATIONS

California Association of Criminalists

Sigma Xi [Research Society of North America]

USCA5 748

American Society of Human Genetics

American Association for the Advancement of Science

New York Academy of Sciences

American Academy of Forensic Sciences

Northwest Association of Forensic Scientists

## PUBLICATIONS

Blake, Edward T., Cashman, Paul J., and Thornton, John I., **Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative.** Anal. Chem., 45:2, 1973, 394-395.

Blake, Edward T., and Dillon, D. J., **Microorganisms and the Presumptive Tests for Blood.** J. Pol. Sci. Admin., 1:4, 1973, 395-400.

Caldwell, Kevin, Blake, Edward T., and Sensabaugh, G. F., **Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man.** Science, 191, 1976, 1185-1187.

Blake, Edward T., and Sensabaugh, George F., **Genetic Markers in Human Semen: A Review.** J. For. Sci., 21:4, 1976, 784-796.

Blake, Edward T., and Sensabaugh, G. F., **Protein and Enzyme Polymorphisms in Human Semen.** For. Sci., 6, 1975, 108, [Abstract]; International Microform J. Leg. Med., 10, 1975, 21, [Text].

Blake, Edward T., and Sensabaugh, G. F., **Esterase D Typing in Bloodstains.** For. Serol. News, No. 5, 1975, 1-4.

Blake, Edward T., **Genetic Markers in Human Semen**, Doctoral Dissertation, University of California, Berkeley, 1976; University Microfilms International, #77-15, 567, Ann Arbor.

Blake, Edward T., and Sensabaugh, G. F., **Expression of Genetic Variation in Human Semen.** Am. J. Hum. Genet., 29, 1977, 24A, [Abstract].

Blake, Edward T., and Sensabaugh, G. F., **Genetic Markers in Human Semen: Quantitation of Polymorphic Proteins.** J. For. Sci., 23:4, 1978, 717-729.

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 751 of 2008
PageID #: 2641

Blake, Edward T., and Sensabaugh, G. F., **Haptoglobin Typing of Bloodstains: Electrophoresis of Immunoprecipitated Haptoglobin.** J. For. Sci. Soc., 18, 1978, 237-244.

Katz, David F., Blake, Edward T., Mills, Ross N., and Fatt, Irving, **A Microliter Oxygen Electrode System for Sperm Suspensions.** Fertil. Steril., 30:6, 1978, 691-695.

Sensabaugh, G. F., Blake, E. T., and Northey, D. H., **Genetic Markers in Human Semen: III. Alteration of Phosphoglucomutase [PGM] Isozyme Patterns in Semen Contaminated with Saliva.** J. For. Sci., 25, 1980, 470-478.

Sensabaugh, George, Blake, E. T., and Bashinski, Jan, **Acid Phosphatase Assay of Vaginal Swabs.** Proceedings of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence, U.S. Dept. of Justice, July, 1983, 146-148.

Graves, Howard C. B., Sensabaugh, George F., and Blake, Edward T., **Postcoital Detection of a Male-Specific Semen Protein, Application to the Investigation of Rape.** N. Engl. J. Med., 312, 1985, 338-343.

Sensabaugh, George F., Bashinski, Jan, and Blake, Edward T., **The Laboratory's Role in Investigation of Rape.** Diag. Med., 8:3, 1985, 46-53.

Blake, E. T., Cook, Jr., C. E., and J.S. Bashinski, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** J. For. Sci., 32:4, 1987, 888-899.

Blake, E. T., **Progressive Desialidation of Human Transferrin.** J. For. Sci., 32:5, 1987, 1342-1347.

Blake, Edward T., **Scientific and Legal Issues Raised by DNA Analysis.** in Banbury Report 32: Technology and Forensic Science, J.Ballantyne et al., Eds., Coldspring Harbor Laboratory Press, 1989, 109-115.

Higuchi, Russell, and Blake, Edward T., **Applications of the Polymerase Chain Reaction in Forensic Science.** in Banbury Report 32: Technology and Forensic Science, J.Ballantyne et al., Eds., Coldspring Harbor Laboratory Press, 1989, 265-281

Von Beroldingen, Cecilia H., Blake, E. T., Higuchi, R., Sensabaugh, G. F., and Erlich, Henry, **Applications of PCR to the Analysis of Biological Evidence,** in PCR Technology: Principles and Applications for DNA

USCA5 750

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 752 of 2008
PageID #: 2642

Amplification, Erlich, Henry A., Ed., Stockton Press, 1989, 209-223.

Erlich, Henry A., Higuchi, Russell, Von Beroldingen, Cecilia H., and Blake, Edward, **The Use of the Polymerase Chain Reaction for Genetic Typing in Forensic Samples.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 93-101, U.S. Government Printing Office, Washington, D.C.

Blake, E. T., Paabo, S., and Stolorow, M. D., **DNA Amplification and Typing from Aged Biological Evidence.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 267-268, U.S. Government Printing Office, Washington, D.C.

S. Walsh, Higuchi, R., and Blake, E., **PCR Inhibition and Bloodstains.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 281-282, U.S. Government Printing Office, Washington, D.C.

Helmuth, Rhea, Fildes, Nicola, Blake, Edward, Luce, M. C., Chimera, J., Madej, Roberta, Gorodezky, C., Stoneking, Mark, Schmill, Norma, Klitz, William, Higuchi, Russell, and Erlich, Henry A., **HLA-DQa Allele and Genotype Frequencies in Various Human Populations Determined by Using Enzymatic Amplification and Oligonucleotide Probes.** Am. J. Hum. Genet., 47, 1990, 515-523.

Sensabaugh, G. F. and Blake, E. T., **Seminal Plasma Protein p30: Simplified Purification and Evidence for Identity with Prostate Specific Antigen.** Journal of Urology, 144, 1990, 1523-1526.

Reynolds, Rebecca, Sensabaugh, George, and Blake, Edward, **Analysis of Genetic Markers in Forensic DNA Samples Using the Polymerase Chain Reaction.** Anal. Chem., 63, January, 1991, 2-15.

Gibson, D. R., Guydish, J. R., Wraxall, B. D. G., Blake, E. T., G. Clark, and P. Case, **Using Forensic Techniques to Verify Self-Reports of Needle-Sharing.** AIDS, 5:9, 1991, 1149-1150.

Blake, Edward, Mihalovich, Jennifer, Higuchi, Russell, Walsh, P. Sean, and Erlich, Henry, **PCR Amplification and HLA-DQa Oligonucleotide Typing on Biological Evidence Samples: Casework Experience.** J. Forens. Sci., 37:3, 1992, 700-726.

Sensabaugh, George F. and Blake, Edward T., **DNA Analysis in**

USCA5 751

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 753 of 2008
PageID #: 2643

**Biological Evidence: Applications of the Polymerase Chain Reaction.**
Chapter 7 in Handbook of Forensic Sciences, ed. R. Saferstein, Prentice-Hall, New Jersey, in press.

Castro, R. C., Troup, G., Blake, E., Wheeler, C., Apple, R., and Erlich, H. A., **Analysis of HLA-Class II Alleles by PCR/Oligo Typing in Various Native American Populations.** Abstract #784, Am. J. Hum. Genet., 53:3, 1993.

Waye, J. S., Newall, P., Blake, E. T., Williamson, J. M., and Bing, D. H., **A Review of the DNA Evidence in the Case of Guy Paul Morin.** Abstract, Can. Soc. Forens. Sci. J., 28:4, 1995, 255.

---

## PRESENTATIONS

Blake, Edward T., and Dillon, D. J., **Microorganisms and the Presumptive Tests for Blood.** Presented at the 38th Semiannual Seminar of the California Association of Criminalists, October, 1971.

Blake, Edward T., Cashman, Paul J., and Thornton, John I., **Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative.** Presented at the 39th Semiannual Seminar of the California Association of Criminalists, May, 1972.

Blake, Edward T., Lofgren, Donald L., and Sensabaugh, G. F., **Distribution of Acid Phosphatases in Human Tissues.** Presented at the 43rd Semiannual Seminar of the California Association of Criminalists, May, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Esterase D Polymorphism in Bloodstains.** Presented at the 44th Semiannual Seminar of the California Association of Criminalists, October, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Protein Polymorphisms in Human Semen.** Presented as Part of a Symposium on Rape Investigation at the 44th Semiannual Seminar of the California Association of Criminalists, October, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Differential Expression of Amylase Loci [Amy1 and Amy2] in Human Body Fluids and Secretions.** Presented at the 46th Semiannual Seminar of the California Association of Criminalists, October, 1975.

USCA5 752

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 754 of 2008
PageID #: 2644

Blake, Edward T., and Sensabaugh, G. F., **Protein and Enzyme Polymorphisms in Human Semen.** Presented at the Seventh International Meeting of Forensic Sciences, Zurich, Switzerland, 1975.

Caldwell, Kevin, Blake, Edward T., and Sensabaugh, G. F., **Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man.** Presented at the 46th Semiannual Seminar of the California Association of Criminalists, October, 1975.

Blake, Edward T., and Sensabaugh, G. F., **The Biochemical Genetics of Semen and the Investigation of Rape.** Presented at the Western Regional Meeting of the American Chemical Society, October, 1975.

Blake, Edward T., and Sensabaugh, G. F., **Expression of Genetic Markers in Human Semen.** Presented at the American Academy of Forensic Sciences, Washington, D.C., February, 1976.

Blake, Edward T., and Sensabaugh, G. F., **Haptoglobin Typing of Bloodstains by SDS Gel Electrophoresis of Immunoprecipitates.** Presented at the 49th Semiannual Seminar of the California Association of Criminalists, May, 1977.

Blake, Edward T., and Sensabaugh, G. F., **Genetic markers in Human Semen: Quantitative Levels of Polymorphic Proteins.** Presented at the American Chemical Society, Chicago, August, 1977.

Blake, Edward T., and Sensabaugh, G. F., **Genetic Markers in Human Semen: III. Expression of Glyoxalase Activity in Seminal Plasma and Sperm.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Sensabaugh, G. F., Blake, E. T., and Northey, D., **Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Blake, Edward T., and Sensabaugh, G. F., **Synthesis and Clean-up Procedures for 4-Methylumbelliferone Phosphate.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Sensabaugh, G. F., Blake, E. T., and Northey, D., **Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva.** Presented at the American Academy of Forensic Sciences, Atlanta, February, 1979.

USCA5 753

Case 2:19-cv-00392-JMS-DLP     Document 10-1     Filed 10/18/19     Page 755 of 2008
PageID #: 2645

Blake, Edward T., **Concurrent Typing of Gc and Tf on Agarose Gels.**
Presented at the 54th Semiannual Seminar of the California Association of
Criminalists, October, 1979.

Blake, Edward T., and the Northern California Biology Study Group,
**Human Hair Comparison: A Blind Trial Experiment.** Presented at the
54th Semiannual Seminar of the California Association of Criminalists,
October, 1979.

Inman, Keith E., Sensabaugh, G. F., and Blake, E. T., **The Genetic
Relationships of the Prostatic, Seminal, and Vaginal Acid
Phosphatases.** Presented at the American Academy of Forensic Sciences,
Atlanta, February, 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Rates of Drying
of Vaginal Swabs.** Presented at the 55th Semiannual Seminar of the
California Association of Criminalists, May 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Titers of ABH
Blood Group Substances in Human Semen.** Presented at the 55th
Semiannual Seminar of the California Association of Criminalists, May,
1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Survival of
Markers in Preserved Semen Samples.** Presented at the 55th Semiannual
Seminar of the California Association of Criminalists, May, 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Rates of Drying
of Vaginal Swabs: An Update.** Presented at the 56th Semiannual Seminar
of the California Association of Criminalists, November, 1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Levels of
Genetic Markers in Vaginal Fluids.** Presented at the 56th Semiannual
Seminar of the California Association of Criminalists, November, 1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **A Systematic
Approach to the Analysis of Semen Evidence.** Presented at the 56th
Semiannual Seminar of the California Association of Criminalists,
November, 1980.

Gibbons, Mary, Blake, E. T., Sensabaugh, G. F., and Bashinski, Jan, **A
Systematic Approach to the Analysis of Semen Evidence: Case
Reports.** Presented at the 56th Semiannual Seminar of the California
Association of Criminalists, November, 1980.

Blake, Edward T., and Sensabaugh, G. F., **A Systematic Approach to the Analysis of Semen Evidence.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Titers of ABH Blood Group Substances in Human Semen.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Levels of Genetic Markers in Vaginal Fluids.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Acid Phosphatase Stability in Dried Semen Stains is a Function of Stain 'Dryness'.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Rates of Drying of Vaginal Swabs.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **The Quantitative Acid Phosphatase Test: An Indicator for Decision Making in the Analysis of Semen Evidence.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Barnett, Peter D., Blake, E. T., and Ogle, R. R., **The Role of the Independant Expert: Several Case Examples.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., **Recent Research in the Forensic Analysis of Semen.** Presented at the Northwest Association of Forensic Scientists, Missoula, March, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Considerations on the the Analysis of Semen Swab Evidence.** Presented at the Canadian Society of Forensic Sciences, Toronto, August, 1981.

Blake, Edward T., Kearney, James, Stolorow, Mark, and Wraxall, Brian [panelists], **Serology Panel Discussion,** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Harmor, Gary, Wraxall, Brian, and Blake, E. T., **Multisystem Approach**

USCA5 755

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 757 of 2008
PageID #: 2647

**to Red Cell Black Population Markers: Group IV.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Purification and Serological Studies on Two Lectin Specificities from Ulex europeus Seeds: A Preliminary Report.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Comparative Stabilities of Markers in Semen.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Population Survey and Stability Studies of p30 in Semen.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Sensabaugh, George F., Graves, Howard, Blake, E. T., and Bashinski, Jan, **Development of an Elisa Assay for Human Seminal p30.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Comparative Stabilities of Markers in Semen.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., Gibbons, Mary, Sensabaugh, G. F., and Bashinski, Jan, **Population Survey and Stability Studies of p30 in Semen.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., **Progressive Desialidation of Human Transferrin.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento, November, 1982.

Blake, Edward T., **Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento,

USCA5 756

Case 2:19-cv-00392-JMS-DLP     Document 10-1     Filed 10/18/19     Page 758 of 2008
PageID #: 2648

November, 1982.

Gibbons, Mary, Blake, E. T., and Sensabaugh, G. F., **Lewis A and B Levels in Vaginal Fluid: A Preliminary Study.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento, November, 1982.

Blake, Edward T., **Progressive Desialidation of Human Transferrin.** Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood.** Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Biochemical Analysis of Sexual Assault Evidence: Current State of the Art.** Guest Lecture, Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Comparative Stability of Semen Proteins and Other Genetic Markers.** Guest Lecture, Presented at the Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

Blake, Edward T., Work Shop Instructor, **Prostate Antigen/p30 and Prostatic Acid Phosphatase.** Presented at the Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

Blake, Marty, Bashinski, Jan, and Blake, E. T., **Serology Hanging by a Thread.** Presented at the American Academy of Forensic Sciences, Anaheim, February, 1984.

Blake, Edward T., Cook, Jr., Charles E., and Bashinski, Jan, **PGM Survival in Actively and Passively Dried Vaginal Swabs: Studies on Case Specimens.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Distribution of Amylase Activity in Vaginal Swabs: Studies on Case Samples.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

USCA5 757

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 759 of 2008
PageID #: 2649

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Semen and Saliva Revisited: Reversal of PGM Degradation in Mixtures by Reducing Agent.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Bashinski, Jan, Blake, E. T., and Cook, Jr., C. E., **The Detection of Spermatozoa on Vaginal Swabs from Victims of Sexual Assault: The ER versus the Crime Lab.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Bashinski, Jan, Blake, E. T., and Cook, Jr., C. E., **A Profile of the Medical Case Histories of Sexual Assault Victims in Oakland.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., **Detection of Antisperm Antibodies: A Case Report.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **A Gram Modified Christmas Tree Stain.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., **Desialidation of Gc Variants.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., **Detection of Antisperm Antibodies: A Case Report.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., Cook, Jr., C. E. and Bashinski, Jan, **Inter- and Intra-Individual Variation in the Levels of ABO Blood Group Substances in Human Semen.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 760 of 2008
PageID #: 2650

Blake, Edward T., Cook, Jr., C. E. and Bashinski, Jan, **Inter- and Intra-Individual Variation in the Levels of Acid Phosphatase and p30 in Human Semen.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., **Sexual Assault Evidence: The State of the Art.** Guest Lecture, Presented at the International Association of Forensic Sciences, Vancouver, August, 1987.

Blake, Edward T., **Serology Evidence Collection and Technique.** Guest Lecture, Presented at the National Association of Medical Examiners, San Francisco, September, 1987.

Blake, Edward T., **Scientific and Legal Issues Raised by DNA Analysis.** Guest Lecture, Presented at the DNA Seminar, California Association of Crime Laboratory Directors, November, 1987.

Blake, Edward T., **Use of PCR/Dot Blot for Dried Stain and Hair Analysis.** Guest Lecture, Presented at the DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

Blake, Edward T., **Reporting of Data to the Forensic and Legal Communities.** Panel Discussion on Formulation and Design of National DNA Data Bases and Information Management, Guest Lecture, Presented at the DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

Blake, Edward T., **DNA Amplification and Typing from Aged Biological Evidence.** Presented at the An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

Madej, R., Helmuth, R., Louie, P., Horn, G., Blake, E. T., and Erlich, Henry, **HLA DQa Allele Frequencies Determined by PCR and Nonradioisotopic Dot-Blot ASO Analysis.** Presented at the An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

Blake, Edward T., Guest Lecture, Presented at the Symposium on Forensic DNA Analysis, National Association of Criminal Defense Lawyers, Washington, D.C., March, 1990.

Blake, Edward T., **Experience with PCR Analysis in Criminal Investigation.** Guest Lecture, Presented at the DNA and the Law, State University of New York at Stony Brook, April, 1990.

USCA5 759

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 761 of 2008
PageID #: 2651

Sims, Gary, Gima, Lance, Konzak, Kenneth, Super-Mihalovich, Jennifer, and Blake, Edward T., **The Recovery, Amplification, and DQa Typing of DNA from Partially Cremated Human Remains.** Presented at the 75th Semiannual Seminar of the California Association of Criminalists, May, 1990.

Blake, Edward T., **A Worldwide Map of the DQa Gene.** Presented at the 83rd Semiannual Seminar of the California Association of Criminalists, May, 1994.

Blake, Edward T., **The Role of DNA Evidence in Defense of the Wrongly Convicted.** Guest Lecture, Presented at the International Symposium of the Association in Defense of the Wrongly Convicted, May 4-6, 1995, Toronto.

Mihalovich, Jennifer S. and Blake, Edward T., **Quantitative Determination of Non-Sperm DNA in the Semen of Aspermic Males and It's Potential Use as a Genetic Marker in Sexual Assault Investigation.** Presented at the 85th Semiannual Seminar of the California Association of Criminalists, May 9-13, 1995.

Mihalovich, Jennifer S. and Blake, Edward T., **PCR Based DNA Diagnostic Analysis of Familial Dysautonomia [FD] from Hair.** Presented at the 85th Semiannual Seminar of the California Association of Criminalists, May 9-13, 1995.

Waye, John S., Newall, Pamela, Blake, Edward T., Williamson, Janice M., and Bing, David H., **A Review of the DNA Evidence in the Case of Guy Paul Morin.** Presented at the Canadian Society of Forensic Science, September 29, 1995, Toronto, Canada.

Blake, Edward T., **Molecular Genetics and Violent Crime.** Guest Lecture Presented at the Neyman Seminar, Department of Statistics, University of California, Berkeley, October, 1995.

Blake, Edward T., **The Application and Development of PCR in Forensic Science as Illustrated by the Case of Armando Quintanilla.** Guest Lecture, Presented at the Northern California American Society for Microbiology, November 16, 1996, San Jose, CA.

Blake, Edward T., Guest Panelist, **Is Something Wrong? Judge for Yourself: An Interactive Panel Discussion on the O.J. Simpson Case.** Presented at the 90th Semiannual Seminar of the California Association of Criminalists, October 8-11, 1997.

USCA5 760

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 762 of 2008
PageID #: 2652

Blake, Edward T., Guest Witness, Crown Commission on Proceedings
Involving Guy Paul Morin, Toronto, November, 1997.

## HONORS

Graduate Research Fellowship [2 years], NILE & CJ, Department of
Justice. Grant #75-NI-99-0036. Grant Title: Determination of Genetic
Markers in Human Semen.

Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic
Markers in Human Semen: Application to Analysis of Semen Evidence in
Sexual Assault Case Material, 1979-1981.

Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic
Markers in Human Semen: Resolution of Some Current Issues Affecting
the Interpretation of Semen Evidence in Sexual Assault Cases, 1983-1986.

Service Awards, California Association of Criminalists: 1976, 1977, 1984.

Distinguished Member Award, California Association of Criminalists,
1985.

## PERSONAL

Born July 31, 1945, Honolulu, Hawaii.

## CONTACT INFORMATION
Edward T. Blake
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806
1-510-222-8883 voice
1-510-222-8887 fax
Email: ed *at* fsalab *dot* com

### Other Forensic Science Associates' Pages

| | | |
|---|---|---|
| FSA Home Page | Introduction | Staff Curriculum Vitae |
| Interesting Cases | | Useful Forensic Links |

USCA5 761

42

USCA5 762

*Dental and Forensic Services*
C. Michael Bowers DDS, JD
2284 South Victoria Ave., Suite 1-G
Ventura, CA 93003
805-642-0381
805-656-3205 fax
805-701-3024  cell

email: cmbowers@aol.com
web: http://firms.findlaw.com/cmbowers


May 11, 2007


TO:    James McHugh Jr.
       Assistant Federal Defender
       Suite 545 West – The Curtis Center
       601 Walnut Street
       Philadelphia, PA 19106


RE:    U.S. v. Bourgeois

Dear Mr. McHugh,

I have received documents from your office regarding the forensic odontology evidence from this case. I have reviewed the following material:

1. One CD containing Drs. Senn and Chrz' Powerpoint exhibits from the trial.
2. One CD containing digital autopsy images of V/Gunter.
3. Bourgeois trial transcripts of Drs. Oliver, Senn and Chrz.
4. Three sets of stone dental models labeled Alfred Bourgeois, Alfredesha Bourgeois and Robin Bourgeois.
5. Written reports of Drs. Senn and J. Curtis Dailey.
6. A CD titled "U.S. v. Alfred Bourgeois  Enhanced Photos" which contained 78 digital images recorded in .jpeg format.

**Overview of Physical Evidence**

The victim has two human bitemark injuries. One is on an arm (A) and another is on the back (B), at the level of the left hip.

**Identification Value of the Bitemark Evidence**

Bitemark A is of no use for biter identification purposes because of insufficient detail. The physical details of the biting teeth are only reflected by diffuse bruising and are not clearly present. The bruising is generalized in nature and possesses poor edge detail.

1

USCA5 763

**Photographic Issues**

The physical details of bitemarks A and B are only reflected by bruising and are not clearly present. The bruising is generalized in nature and possesses poor edge detail. The original image of bitemark B is poorly illuminated. The low light conditions when the picture was taken significantly impeded analysis by the Government's dental experts, since both dentists resorted to using various "enhancement" methods on the original image. The anatomical location of B is a curved surface. A large portion of the bruise is not in the same "plane" nor "parallel" to the camera. This creates "off angle" distortion of the pattern seen on the skin. The Government's experts used this area of distortion in their direct comparison. The only remedy was to have the original evidence photographed in sections with a ruler in place. This opportunity was obviously lost after the child left the autopsy suite.

**Computer Enhancement Issues**

A new concept in forensic science is "No bad evidence photograph can avoid being digitally enhanced." Computer enhancement of sub-quality pictures is a heavy foundation in Dr. Senn's methods and conclusions. In his words, digital enhancement "just makes that area that we're dealing with stand out a little bit better and makes it easier to analyze the image" (TT 3/8/04, 240). This is an understatement of the reality of the "enhanced" bitemark image. Both Government dental experts used the "enhanced" image from Dr. Oliver. Dr. Chrz used it in his court presentation but said he didn't use it in his analysis. I have not been able to find any articles supporting Dr. Oliver's methods that relate to testing of his methods. I have not even seen any record of what methods he used. Whatever means he used, his results produced the most overly "enhanced" images I have ever seen used in actual casework.

 The underlying issue with his method is the uncontrolled digital "noise" that is produced. "Noise" is an artifact(s) introduced into the computer-manipulated image that does not reflect the original state of the picture. This noise is considered a main problem in medical imaging enhancement. In forensic applications, there are no base upper limit (or lower limit for that matter) thresholds to control what can be done with a computer program. What the Government in <u>Bourgeois</u> describes is actually excessive manipulation. In <u>Bourgeois</u>, Dr. Oliver's manipulation produced visual "evidence" that appeals to the operator, but is untested. Dr. Senn offered "proof" of no harm by directing the jury to look at the ruler seen in both the "original" and the manipulated images. His claim that the ruler was the same is not accurate. The enhanced ruler has undergone considerable alteration. The injury pattern has also undergone considerable change. Its contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradations of color in the bruise (indicating either less or more pressure by the biter) are lost.

2

USCA5 764

**Admissibility of "Enhanced" Images Used in <u>U.S. v. Bourgeois</u>**

Dr. William Oliver, M.D. "enhanced" the images used by Dr. Senn for his analysis and partially used by Dr. Chrz. The defense did not provide its own expert to counter Dr. Oliver's claims on the subject of enhancement.

The Government's position lacked any explanation by Dr. Oliver as to how he tested and proved his method's reliability **prior** to its use in <u>Bourgeois</u>. It is my understanding that the introduction of novel scientific evidence (or technical evidence) into the <u>Bourgeois</u> trial by the Government activates a necessity for special court proceedings established by *Daubert v. Merrell Dow Pharmaceuticals, Inc* [1] and *Kumho Tire Co., Ltd. v. Carmichael* [2] to establish empirical and theoretical underpinnings of the Government's proposal of admissibility for these extraordinarily over-enhanced digital images.

It is my understanding that the *Daubert/Kumho Tire* holdings require that the scientific truth be separated from assumption and supposition by careful attention to following criteria:

(1) Whether the theory or technique can be (and has been) tested;
(2) Whether the theory or technique has been subjected to peer review and publication (to subject the data and methods to peer review for weakness and/or poor analysis);
(3) The known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and
(4) "General acceptance" of the method or technique by the relevant forensic community.

Categories (1), (2), (3) and (4) are the requisite foundation for the admissibility of scientific and technical evidence. No such foundation exists for Dr. Oliver's analysis and presentation.

Category (1) requires substantial testing proof to underpin a method's admissibility in court as a valid and applicable use.  As I have stated *supra*, there are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard.

Category (2) requires peer review of the forensic imaging applications used by Dr. Oliver. The record is silent regarding this data.

The Government has no data as to the known or potential error rate (Category 3) of their enhancement method due to their failure to satisfy Category (1).

---

[1] 509 U.S. 579 (1993).
[2] 526 U.S. 137 (1999).

3

USCA5 765

Category (4) clearly requires that the appropriate scientific or technical community accept what Dr. Oliver digitally produced and then presented in <u>Bourgeois</u>. There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used in Bourgeois.[3]

The scientific and technical methods utilized by Dr. Oliver were not valid. However, there are published cautions that must be exercised in the use of both basic and advanced digital enhancement. They are described in the next section.

**Traditional Enhancement Techniques**

Traditional enhancement techniques are techniques that have direct counterparts in traditional darkrooms. They include brightness and contrast adjustment, color balancing, cropping, and dodging and burning. These traditional and acceptable forensic techniques are used to achieve an accurate recording of an event or object.

Brightness adjustment is used when the image is too bright or too dark. **If the image is made too bright, there is a risk of loss of detail in light areas. If the image is made too dark, there is a risk of loss of detail in the dark areas** (emphasis added)**.**

Color balancing is the adjustment of the color components of an image. **The purpose of color balancing is to render the colors in the scene faithfully** (emphasis added). Improper color balance adjustment can render colors inaccurately, and objects will appear to have the wrong color when compared to the actual subject.

---

[3] Scientific Working Group Imaging Technology (SWIGIT), Version 1.1 2004.03.04 (draft). The necessity for proper documentation of basic digital image manipulation is stressed in this document.   Acceptable and unacceptable digital methods are listed within this document. Prohibited imaging tools are listed as: "Tools prohibited for use on Working Images are those that add or delete content from the image. These include, but are not limited to, Rubber Stamp, Airbrush, Paintbrush, Paint Bucket, Eraser and Blur." Advanced enhancement techniques (used to extract information) are described: "Advanced image enhancement techniques are techniques applied to images for the purposes of extracting information. **These techniques may or may not improve** (emphasis added) the overall appearance of the image. The techniques include but are not limited to:
_ Frame averaging
_ Fourier Analysis (FFT)
_ Deblur
_ Noise reduction
_ Image restoration
_ Color channel selection and subtraction
_ Perspective control/geometric correction
_ Advanced sharpening tools (such as unsharp mask).

4

USCA5 766

Contrast adjustment is used when the image lacks sufficient contrast. **If the image contrast is increased too much, there is a risk of loss of detail in both light and dark areas** (emphasis added)**.**

Cropping is used to remove that portion of the image that is outside the area of interest.

Dodging and burning have the same effect as brightness adjustment but are used in localized areas.

Spotting traditionally has been used to remove artifacts due to dust and scratches on the negatives, but it is not considered to be an acceptable practice on any forensic image. [4]

**Nontraditional Enhancement Techniques**

Some nontraditional image enhancement processes are used and accepted by a variety of scientific fields such as medicine, aerospace, and cartography. These processes have no direct counterpart within traditional silver-based photography. In fact, only recently have they been applied within the forensic environment; therefore, their general acceptance may be subject to challenge. Examples of nontraditional processes discussed here are color processing, linear filtering, nonlinear contrast adjustments, pattern noise reduction, and random noise reduction.

Color processing includes color space transformations, pseudocoloring, and hue and saturation adjustments. These techniques can be used to modify the color characteristics of objects within an image. **Caution: Application of these techniques can compromise the color fidelity of the image** (emphasis added).

Linear filtering techniques include sharpening, deblurring, edge enhancement, and deconvolution. They are used to increase the contrast of small detail in an image. If a low degree of enhancement is used, the image will remain an accurate representation of the scene. **If a high degree of enhancement is used, the image may no longer be an accurate representation of the overall scene, though still may be useful as an adjunct for interpretation of small details. Caution: A high degree of enhancement can also increase the visibility of existing noise and artifacts** (emphasis added)**.** [5]

---

[4] Recommendations and Guidelines for the Use of Digital Image Processing in the Criminal Justice System. Scientific Working Group on Imaging Technologies (SWGIT) Version 1.2, June 2002

[5] Id.

USCA5 767

Dr. Oliver's expertise and methods were not scientifically or technically validated and did not meet any of the criteria of *Daubert/Kumho Tire Co.* Consequently, Drs. Senn and Chrz's reliance on Dr. Oliver's enhancements undermine and invalidate their analysis and conclusions.

**Anatomical Considerations**

Bitemark B is located in a curved area next to the iliac crest (hip). The degree of tissue flexibility in this area is considerable. The evidence of "Langer lines" in the autopsy photograph indicates this flexibility. The static posture of the body on the autopsy table does not mimic, in the least, the posture of the child during life. This means that, in this anatomic location, the shape Bitemark B <u>should not be assumed to be</u> the same shape as during biting.  No one knows what position the child was in during biting. We can safely say, though, she wasn't in the position seen in the morgue. This fact of postural change altering the bitemark shape is uncontrollable. The odontology literature supports this opinion. For this and other reasons stated above, the methods applied by the Government dental experts are inappropriate for this case.

Dr. Senn also stated there are: (1) a probable bitemark on the right hand, (2) a possible bitemark on the left hand, and (3) a possible bitemark on the left foot. In my opinion, the characteristics in these patterned injuries are lacking any dental information. They are ambiguous and indeterminable as to any opinion to cause of origin.

**Methods of the Government experts Dr. Senn and Dr. Chrz**.

Ignoring the use of Dr. Oliver's images, both experts otherwise adhere to the general rules and methods of their forensic board, the ABFO.[6] The acceptability of methods does not impact, however, on analytical judgment and interpretation of the evidence. In my opinion, the limits of the bitemark evidence in <u>Bourgeois</u> have been ignored by both of my colleagues.  The methods they used are inappropriate and not relevant to the injuries on the child's body.

**Report of Dr. J. Curtis Dailey**

The <u>Bourgeois</u> bitemark evidence is indicative of violence perpetrated on the unfortunate child. That is its only value.  I cannot include or exclude, using the evidence I have reviewed, any of the three parties examined by Drs. Senn and Chrz as biters of the child. This opinion concurs with the reports of Dr. Dailey written before Bourgeois was tried and convicted.

---

[6] The American Board of Forensic Odontology.

USCA5 768

**Issues Regarding Admissibility of Bitemark Evidence.**

The validity, reliability and accuracy of bitemark identification have not improved to the point where it should be used as the sole means of identifying a biter. This is in spite of the judicial history of its admissibility. The serious deficiencies of the "science" of bitemarks make its use as an identifier of a single perpetrator a very dangerous proposition.[7] In the last few years the advent of DNA analysis has begun to provide an independent source of identification information in cases containing bitemarks.[8] In my opinion, the recent DNA cases provide definitive proof of the unreliability/inconclusive nature of bitemark   identification evidence. In short, the odontologist identifying a specific biter or "probably the biter" via teeth marks is not rendering a reliable opinion. Recent court cases prove the risks of bitemark misidentification.[9]

It is important to consider the history of bitemark evidence as a forensic process used to identify a specific criminal perpetrator. Admission of bitemark evidence by the courts seems to have convinced some forensic odontologists that, despite doubts expressed in the 1960's and 70's in the scientific and legal literature, they are able to perform positive (i.e., "with medical/dental certainty; probable, or possible") bitemark identifications. This same community has minimal scientific research supporting reliable positive identifications from bitemarks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy.

The Bitemark Standards and Guidelines of the American Board of Forensic Odontology do not delineate a threshold for bitemark evidence below which an opinion may not be rendered. Drs. Senn, Chrz, Dailey and I are all ABFO members. The divergence of opinion between the Government's dental experts in Bourgeois is another anecdotal indicator of the weak reliability and foundation of bitemark identification. The judicial record elsewhere is replete with similar dental expert contradiction and controversy. [10]

---

[7] Forensic Dental Evidence: An Investigator's Handbook. CM Bowers, page. 91, Elsevier Academic Press, 2004.

[8] Id. Page 112.

[9] See *New Scientist*; 15 March 2004. Discussion of the bitemark misidentification in State v. Krone. An excerpt states "There is also the compounding factor that forensic odontologists generally know which set of teeth belongs to the main suspect. This might make them more likely to come up with a positive match for that person." The article's writers interviewed two dental examiners who conducted a recent study regarding the accuracy of bitemark opinions using experimental bitemarks. The writers stated neither examiner would reveal the error rate of their study. An excerpt from the article elaborates: "What's more, in some cases the experts excluded the correct cast, saying they were certain it could not have made the mark. And there were examples where they assigned the wrong cast to a mark, a false match which in a real case could have led to a miscarriage of justice. Gould and Cardoza would not tell New Scientist how many of these errors there were."  url: http://www.newscientist.com/news/news.jsp?id=ns99994758

[10] See Chicago Tribune article from October 19, 2004.  "From the Start – A Faulty Science." URL: http://www.chicagotribune.com/news/specials/chi-0410190150oct19,1,3259394.story?coll=chi-

7

USCA5 769

A 1999 study completed by a portion of volunteering ABFO members regarding the reliability of bitemark identification evidence produced data on the accuracy of results in forensic bitemark identification.  These results contradict years of assured self-confidence by dentists testifying on bitemark evidence. This study, called the ABFO Bitemark Workshop No. 4, underscores the gap between the optimistic assumptions odontologists bring to court and their ability to correctly identify a defendant as the creator of a bitemark.  In this experimental study with bitemarks of significant detail, the median overall error rate is 12.5% – out of a maximum possible error rate of 27%. Thus, they were wrong nearly half the time they tried to identify the source of a bitemark.

More specifically, it is their false positive error rate – the tendency to conclude that an innocent person's dentition matches the bitemark – that accounts for the bulk of that overall error rate.  On average, 63.5% of the examiners committed *false positive errors* in some of the test cases.[11]  If this reflects their performance in actual cases, then inculpatory opinions by forensic dentists are more likely to be wrong than right. They were, however, much less likely to overlook a true biter – reflected in a median *false negative error* rate of 22%. The persons who performed these tests are not novices; these are diplomates, the most accomplished members of the field. But experience provided no assurance of accuracy. The demography of the test takers failed to disclose any correlation between years in forensic practice casework and correct results.

Therefore, the reliability of dental opinion is based on intuition derived from the expert's "experience," not scientific data. The constant use of "experience" is a substitute for databased studies to determine the frequency of occurrence of dental features seen in the human dentition and bitemarks. The likelihood of a "chance" match to an innocent person's teeth to a bitemark injury has never been established.   A forensic dentist's credibility with the judge or jury generally is based on factors present in the dentist's testimony other than underlying science. These factors include years of experience, demeanor on the witness stand, proper use of terminology, meticulous adherence to procedures (e.g., not forgetting to bring his/her notes), and compelling personal demeanor.

More recently, other authors have studied inter-examiner reliability and accuracy of experimental bitemark identification. Drs. Pretty and Sweet published

_____

news-hed. An excerpt states "A Tribune examination of criminal cases in which bitemarks played a key role illustrates why credibility is a concern. The survey involved 154 cases, mostly murders and rapes, that reached appeals courts in state and federal jurisdictions around the country--just a sampling of the hundreds of times odontologists have testified. Though not comprehensive, the survey found a disturbing pattern. In more than a quarter of those cases, the prosecution and defense offered forensic dentists who gave diametrically opposed opinions."

[11] See Attachment No. 1. Ch. 30, page 634 Table 2. Error Rates of Forensic Odontology Diplomates on the Four Test Cases. Identification from Bitemarks, in Modern Scientific Evidence, Faigman et. al., West Publishing 2006.

8

USCA5 770

results concerning this in the Journal of Forensic Sciences in 2001.[12] They used high quality three-dimensional evidence of post-mortem bitemarks made in pigskin to test three groups of dental examiners (N=30). The ABFO examiners were a subset of the total participants (N=10). Performance differences between the groups were nil. The pattern detail tested exceeded actual bitemark casework and allowed for control of bitemark variables that are uncontrolled in actual casework. The mean false positive rate was 15.9% with a range of from 0 to 45.5%. The mean accuracy (right or wrong in decision making) of all examiners was 83.2% with a range of 65.0 to 100%.  The overall accuracy of ABFO members was 78.5% when two outlier participants were removed from the sample.[13] The mean accuracy result for all examiners was 77.9%.[14] Commenting on the results, the authors in an earlier draft stated that the inter-examiner scores, i.e. how much the odontologists agreed with each other, was rated as only moderate, and the intra-examiner agreement, as fair.  The authors' final remarks in the published paper were: "the variation in individual performance of odontologists is of concern."[15]

---

[12] Pretty, IA, Sweet, DJ. Digital Bitemark Overlays-An Analysis of Effectiveness. J Forensic Sciences, 2001; 46 (6): pp 1385-1391.
[13] Id. Page 1390.
[14] Id. Page 1389.
[15] Id. Page 1390.

USCA5 771

**Conclusion**

It is my opinion that the photographic enhancement and the bitemark evidence in this case is scientifically and technically invalid for use to identify Alfred Bourgeois as either a "possible", "included" or "probable" biter of the victim.  It is further my opinion that the injuries to the decedent's left hand, left foot, and right hand are ambiguous and indeterminable as to any opinion to cause of origin.  All of the opinions contained herein are given with a reasonable degree of dental/medical certainty.


*C. Michael Bowers*


C. Michael Bowers DDS JD
Diplomate, American Board of Forensic Odontology

10

USCA5 772

# MODERN SCIENTIFIC EVIDENCE
## *The Law and Science of Expert Testimony*



DAVID L. FAIGMAN

DAVID H. KAYE

MICHAEL J. SAKS

JOSEPH SANDERS

EDWARD K. CHENG

## FORENSICS
### 2006 – 2007 Edition

## Volume 4

USCA5 773

# MODERN SCIENTIFIC EVIDENCE

## The Law and Science of Expert Testimony

---

### Volume 4

By

**DAVID L. FAIGMAN**
*University of California
Hastings College of the Law*

**DAVID H. KAYE**
*Arizona State University
College of Law*

**MICHAEL J. SAKS**
*Arizona State University
College of Law*

**JOSEPH SANDERS**
*University of Houston
Law Center*

**EDWARD K. CHENG**
*Brooklyn Law School
Law Center*

**THOMSON**

**WEST**

*For Customer Assistance Call 1-800-328-4880*

Mat #40417722

USCA5 774

§ 38:12                                                    MODERN SCIENTIFIC EVIDENCE

Table 2 summarizes the results of the study. It is important to say something, first, about the meaning of the data and the way they are presented. Suppose one were told that the overall accuracy rate for a test case was 85%. One might conclude from that number that the examiners were doing reasonably well—not as well as one might hope from a forensic science that claims the ability to connect crime scene bitemarks to suspects "to the exclusion of all others in the world," but not terrible either. In truth, however, the performance is far more troubling than is apparent. What is not made evident by that number is the fact that the poorest level of performance that examiners could achieve in this study—if they got every single answer as wrong as they could get it—would still make them appear to be accurate 71% of the time. That is because if an examiner failed to match a bitemark with the correct dentition (one error) and linked it instead with the dentition of an innocent suspect (second error) he still gets the remaining five dentitions "right" by not erroneously inculpating them.[1]

### Table 2
### Error Rates of Forensic Odontology Diplomates on the Four Test Cases

|  | Overall Error Rate (maximum possible error rate = 27%) | False Positive Errors as Percentage of Examiners Offering Opinions | False Negative Errors as Percentage of Examiners Offering Opinions |
|---|---|---|---|
| Case 1 | 14% | 62% | 38% |
| Case 2 | 7 | 42 | 4 |
| Case 3 | 12 | 65 | 15 |
| Case 4 | 13 | 65 | 27 |
| Medians | 12.5% | 63.5% | 22% |

Accordingly, Table 2 seeks to convey a more meaningful idea of how well examiners did by relating their performance to how well they could have done—or more to the point, how poorly they did in relation to how poorly

---

[Section 38:12]

[1] Once one set of dentition is linked (correctly or incorrectly) to a bitemark, the others are not linked, and therefore are scored as "correct." In other words, given the test design, an examiner could never make more than two mistakes, and all remaining dentitions are scored as "correct." If instead of providing a set of seven dentitions from which to choose, there had been 100, then the overall accuracy rate, using this seemingly straightforward method of counting, could never be lower than 98% correct—one false positive inculpation of an innocent suspect, one overlooked guilty suspect, and 98 remaining dentitions that get scored as "correct." And, thus, the poorest possible performance would be "2% error."

USCA5 775

43

USCA5 776

**Cherry Biometrics Inc.**
**51 Saddle River Road**
**Woodcliff Lake, NJ 07677**
**201 513-8300**
**http://www.cherrybiometrics.com/**

May 11, 2007

James McHugh Jr.
Assistant Federal Defender
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia , PA 19106

RE: United States v. Alfred Bourgeois

Dear Mr. McHugh,

At your request I have reviewed the following materials in the above captioned matter:

**A.** **Direct Appeal Opinion**

**B.** **Testimony**
Dr. Elizabeth Rouse
Dr. William Oliver
D. Dr. David Senn
Dr. Bryan Chrz

**C.** **Reports**
Forensic Odontology Report of Dr. Senn – PowerPoint included on CD
Forensic Odontology Report of Dr. Chrz – PowerPoint included on CD
Autopsy Examination Report by Dr. Rouse
NCIS Report on Photographic Coverage of Autopsy

**D.** **Images, Photographs and PowerPoint Presentations**
Dr. Senn PowerPoint
Dr. Chrz PowerPoint
Scanned and Digitized Autopsy Images
Original 35m photographs
Enhanced images

1

USCA5 777

## Introduction

Dr. Oliver utilizing the Contrast-Limited Adaptive Histogram Equalization contrast enhancement method created digital images of numerous autopsy photographs including the bite marks on the decedent's body. Dr. Oliver then utilized these images that he created to identify "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations."

In creating the images Dr. Oliver chose colors that he then assigned to the injuries – that were not visibly present in the original photographs nor testified to by the doctor who had performed the autopsy –  but that he (Dr. Oliver) determined existed. He assigned orange for contusions, yellow for whip marks and light blue for scars. Dr. Oliver chose the range of parameters to be used to redistribute the colors in the images. Dr. Oliver conceded that the accuracy of his analysis – and the numerous injuries he allegedly discovered – required comparison to the original photographs. Dr. Oliver, however, did not compare the enhanced images to the original photographs instead he compared them to the digitized images he had scanned, compressed and then converted to PowerPoint. Drs. Senn and Chrz relied upon Dr. Oliver's enhanced images of the bite marks in their analysis and testimony before the jury.

Dr. Oliver started with high quality 35mm photographs and then he digitized (scans) them using a low 600 dot per inch (dpi) resolution creating small computer images that are no longer accurate in color or clarity (detail) He then alters some of these images using his version of the Contrast-Limited Adaptive Histogram Equalization Method. The logic flaw in his approach is his reliance on small incomplete computer images. Once information is lost or distorted it is lost or distorted and no amount of enhancement can accurately bring it back, even when he chooses the range of parameters to be used to redistribute the colors in the images.

## Original Evidence

Dr. Oliver took the original 35 mm autopsy photographs (the scientific and technical best evidence) and then converted these photographs into inaccurate digital images using a substandard 600 dots per inch (dpi) scanner. Dr. Oliver then mislabeled the newly formed digital images as "Original Evidence." His approach introduces at a minimum, the following problems:

1.     Photographic information is lost as an accurate digital representation of a 35mm photograph requires at least 3600 dpi.

2.     Colors are no longer accurate as any conversion to digital forces a much narrower color spectrum. The colors the jury viewed in the newly created originals were only approximations.

3.     The photographic information is distorted as the digitized image shape (aspect ratio) is

2

USCA5 778

shifted from 35mm photograph shape 3x2 to a digital display of either  4x3 CRT( monitor screen) or 16x9 (flat panel screen).

4.      The photographic information is lost as the images are compressed (made smaller) using glossy JPEG, instead of lossless compression e.g. TIFF.

5.      The digital image detail is lost and likely distorted when digital images are subsequently converted to PowerPoint as they were in this case for presentation to the jury. Since PowerPoint was the program used by Dr. Oliver in the courtroom, the scanning should have been directly into PowerPoint without intermediary steps. Every automatic image conversion into a program that has its own display and scaling capabilities e.g. Microsoft Word, Adobe Acrobat, etc. causes information loss and distortion.

If the true original photographs were shown side-by-side or even one after the other along with Dr. Oliver's so called enhancements; the jury would have been able to discern the extent of Dr. Oliver's over-reaching alterations. This comparison was never done despite Dr. Oliver's testimony that it was essential to the accuracy of his analysis.  Dr. Oliver's improperly labeled originals shared many of the same inaccuracies found in Dr. Oliver's enhancements.

## Enhanced Evidence

Image enhancement is another way of saying image alteration. Dr Oliver's enhanced autopsy images are clearly inaccurate. Misplaced color is everywhere in almost all of Dr. Oliver's images.  A perfect example of this misplaced color can be easily seen when one compares images numbered 156 and 157.  In image number 157 it is obvious that the skin of the attendant holding the deceased in place is a sickly and very blotchy with red and white colors. The same skin of the attendant looks healthy and slightly tanned in the unenhanced image number156.

Furthermore, in image number 157 the edge of the fabric touching the right leg has a false aqua coloration and the right leg has a false magenta coloration. The right leg has picked up the color of the glove touching it.

A major reason for this problem is the well known concept of Bayer Pattern nearest-neighbor-coloration. Image elements look to their nearest neighbors, to determine their color and sometimes their shape. The technical term to describe this is interpolation and it is often responsible for getting wrong color and wrong shape. It becomes far more pronounced when an enhancement technique (contrast enhancement) logically breaks a large image into a number of smaller ones and then operates against each smaller image separately. In addition many more colors are needed.  A perfect example of interpolation at work in Dr. Oliver's enhancements can be seen in image number 150.  Government image number150 uses 102,813 individual colors Dr. Oliver's enhanced image number 151 uses 305,761 individual colors. Essentially Dr. Oliver's enhancement utilized almost three times the amount of colors as his "original" images.

3

USCA5 779

Many of the enhanced images show both a ruler and an evidence tag. Dr. Oliver's enhancement technique makes the writing on the evidence tags easier to read, almost as good as the original photograph. On the other hand his technique shifts the ruler from excellent in original image to blurry and somewhat distorted after his enhancement.

**Daubert/Kumho Tire**

It is my understanding that utilization of scientific or technical methods in the forensic area must conform with the Daubert/Kumho Tire factors. I understand these factors to be: 1) can and has the theory or technique been tested, 2) the known or potential rate of error, 3) existence and maintenance of standards controlling the technique's operation, 4) is the theory or technique generally accepted within the relevant scientific or technical community, and 5) whether the theory or technique has been subjected to peer review and publication.

For the following reasons Dr. Oliver's methods and techniques fall far short of the Daubert/Kumho Tire  requisite standards.

1.      The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

2.      Lossless compression of forensic evidence is the scientific and technical standard. In this instance it was not used, Lossy compression was used instead.

3.      The 35 mm pictures should have been presented as original evidence. They were the "Best Evidence." The technique of not using "Best Evidence" is not generally accepted in the scientific/ technical community.

4.       The digital images presented as "original images" were compressed and therefore they lacked original detail.

5.      There are no standards controlling the technique, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

6.      You cannot substitute enhancement for details that were lost during the digital conversion. The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

7.      The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

4

USCA5 780

**<u>Conclusion</u>**

The original autopsy photographs should have been used by Dr. Oliver when he conducted his comparisons. Dr. Oliver's enhancements distort almost everything in the newly created image. There is no way to know whether his enhancements distorted the areas he claims he improved. Therefore his enhanced images cannot be used as a fair and accurate building block to analyze bite marks or "injuries" that were not visibly present in the original autopsy photographs. Larger computer images should have been used in order to improve image accuracy without resorting to image alteration/enhancement. The methods and techniques utilized by Dr. Oliver are not scientifically and technically valid and the conclusions he reached are not scientifically or technically reliable. All of the opinions and conclusions in this report are given to a reasonable degree of scientific and technical certainty.

Michael Cherry
*Michael Cherry*

President, Cherry Biometrics Inc.

Manfred Schenk
*Manfred Schenk* MAC

Senior Scientist, Cherry Biometrics Inc.

**USCA5 781**

44

USCA5 782

## FORENSIC ODONTOLOGY REPORT

29 September 2002

SA Thomas F. Brady
NCIS/FCU
3740 St. Johns Bluff Road
Suite 4
Jacksonville, Florida, 32224

Reference:    [CCN: 27JUN02-GCCC-0033-7HJF]

Special Agent Brady,

Per your office's request, I have examined the following evidence related to the bites photographed on the body of V/Gunther.

I.    One (1) FedEx Envelope shipped by SA Thomas F. Brady, containing:
   a.  A three (3) page document from the U.S. Naval Criminal Investigation Service (NCIS) Entitled: S/BOURGEOIS, ALFRED/CIV
         Subtitled: Investigative Action: Photographic Coverage of Autopsy
                   [CCN: 27JUN02-GCCC-0033-7HJF]
         In the body of this document it relates the photographs to the autopsy of V/GUNTER (2yrs, 8mnths)

   b.  Thirty (30), five (5) inch by seven (7) inch color photographs labeled:
         i.   Q through Z
         ii.  AA through LL
         iii. PP through WW

II.   One cardboard box shipped by Dr. Elizabeth Rouse containing:
   a.  A one page letter from the Federal Bureau of Investigation to Dr. Rouse with a file number (70A-HO-60227)

   b.  Three sets of stone dental casts (maxillary and mandibular dental arches) in individual boxes labeled for:
         i.   Alfred Bourgeois
         ii.  Robin Bourgeois
         iii. Alfredesha Bourgeois

I have examined the evidence provided. During my analysis I made wax bite registrations of the dental arches for each named individual and made several measurements of the dentition represented on the stone dental casts. I scanned all three sets of stone dental models and wax bit wafers into Adobe® Photoshop® 7.0 I also imported several of the photographs provide into Adobe® Photoshop® 7.0, in an effort to enhance the images of the bite marks in the photographs

**USCA5 783**

Continued:  Forensic Odontology Report [CCN: 27JUN02-GCCC-0033-7HJF]

in a search for additional photographic evidentiary detail that would not otherwise be easily ascertainable to the human eye.

Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:

1. The diffuse presentation of the bite marks in all of the photographs.
2. The distorted position of the marks, in some of the photographs, at the time of photography.
3. The ruler/scale being in a different spatial plane than the mark being photographed. [However, it must be noted that the photographic evidence provide was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the last seventeen years.]
4. The very similar metric and spatial (pattern) relationships between the three individual's dentition.

Finally, the age of these marks cannot be determine from the photographs. Dailey and Bowers, in an article published in the Journal of Forensic Sciences (Vol. 42, #5, pp. 792 – 795, September 1997), discuss this issue and list the factors related to the appearance of patterned injuries with time.

USCA5 784

## FORENSIC ODONTOLOGY REPORT

14 July 2003

SA Thomas F. Brady
NCIS/FCU
3740 St. Johns Bluff Road
Suite 4
Jacksonville, Florida, 32224

Reference:     [CCN: 27JUN02-GCCC-0033-7HJF]

Special Agent Brady,

Today I received 4 CD-ROMs from Dr. William Oliver, along with a note explaining the labeling of the images from Dr. Oliver. The CDs were labeled:
1.  drake 1 tgas – containing 20 (.tga) images
2.  drake 2 tgas - containing 20 (.tga) images
3.  drake 1 tifs - containing 20 (.tif) images
4.  drake 2 tgas (however this should have been labeled drake 2 tifs) – containing 20 (.tif) images

I had selected four (4) photographs [from the thirty (30) photographs originally sent to me last year for evaluation] for Dr. Oliver to enhance. These were photographs S, U, DD, and KK. Of all the photographs originally provided, I felt these four (4) offered the best potential for image enhancement.

I have examined the enhanced bite mark photographs provided by Dr. Oliver, and I can discern no additional information that would allow me to change the opinions I provided in my Forensic Odontology Report dated 29 September 2002. Again, that report stated:
"Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:
1.  The diffuse presentation of the bite marks in all of the photographs.
2.  The distorted position of the marks, in some of the photographs, at the time of photography.
3.  The ruler/scale being in a different spatial plane than the mark being photographed. [However, it must be noted that the photographic evidence provide was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the last seventeen years.]
4.  The very similar metric and spatial (pattern) relationships between the three individual's dentition.
Finally, the age of these marks cannot be determined from the photographs. Dailey and Bowers, in an article published in the Journal of Forensic Sciences (Vol. 42, #5, pp. 792 – 795, September 1997), discuss this issue and list the factors related to the appearance of patterned injuries with time."

1

USCA5 785

Continued:    Forensic Odontology Report [CCN: 27JUN02-GCCC-0033-7HJF]

Please do not hesitate to contact me should you have any questions. I can be reached at:
jcd4n6dds@aol.com
jon.dailey@se.amedd.army.mil
706-650-9616 (H)
706-787-5204 (W)


J. Curtis Dailey, DDS

2

USCA5 786

STATEMENT OF CHARGES
28 OCTOBER 03

*Now 13 April 07*
*I have No record of*
*ever being paid*

AUSA Patti Booth

Ref:    Supplies for Forensic Odontology Consultation

Ms. Booth,

Now that you no longer require my consultation services, please process my claim for the consumable supplies I required in order to evaluate the above referenced case. The total due is $204.94 Since I am a Forensic Odontology consultant to the Armed Forces Institute of Pathology and a U.S. Government employee, and the referral agency for this case is the Navy, there is no charge for the many hours I have spent reviewing the materials you asked me to look at during the past several months.

Expenses (supplies purchased at OfficeMax):
HP Inkjet Printer Cartridges
|  |  |
|---|---|
| Black: | $54.99 |
| Tri-Color: | $29.99 |
| HP Premium Plus Inkjet Photo Paper: | |
| 2 packages @ $19.99 per package: | $39.98 |
| 50 pack CD-R: | $8.99 |
| FedEx Services (package to Dr. Bill Oliver): $39 | |
| USPS Fees (package to Dr. Bill Oliver) | **$6.15** |
| | |
| TOTAL | $204.94 |

Thank you in advance for your attention to this statement and insuring prompt payment.

Sincerely,

J. Curtis Dailey, D.D.S., DABFO
COL, DC, USA *(Retired)* *now*

4504 Guildford Court      *old address*
Evans, GA, 30809

706-650-9616
~~Jed4n6dds@aol.com~~
~~jon.dailey@se.amedd.army.mil~~

*Now*        *cdailey @ pc hc bangor.org*

USCA5 787

45

USCA5 788

## DECLARATION AND AFFIDAVIT OF JON CURTIS DAILEY
## PURSUANT TO 28 U.S.C. § 1746

Jon Curtis Dailey, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Jon Curtis Dailey, D.D.S.

2. I am presently employed at the Penobscot Community Health Center as the Chief Dental Officer in Bangor, Maine.

3. From 2003 to the present I have served as a Forensic Odontology Consultant to the Armed Forces Institute of Pathology in Washington, DC.

4. I am presently an Adjunct Professor at University of North Carolina School of Dentistry, the Boston University School of Dentistry and the University of Iowa College of Dentistry.

5. I presently serve as the Chairman of the Bitemark and Patterned Injury Committee of the American Board of Forensic Odontology.

6. I graduated from the Ohio State University College of Dentistry in 1978.

7. I served in the United States Army from January 1980 to December 31, 2004. I was assigned to the Dental Corps branch. I retired with the rank of Colonel.

8. From 2002 to 2003 I participated in a one year General Dentistry Residency as the Chief of Prosthodontic Services and Prosthodontic Mentor in Fort Jackson, South Carolina.

9. From 2003 to 2004 I participated in a Prosthodontic Residency as Assistant Director in Fort Gordon, GA.

USCA5 789

10.        I am board certified in the area of Prosthodontics and Forensic
Odontology. I have been previously qualified as an expert witness in the area of
Forensic Odontology. I have testified for both the government and the defense.
The majority of my testimony has been for the government and I have testified for
the government in capital cases.

11.        I have published numerous scholarly articles in the area of Forensic
Odontology and specifically in the area of bitemark comparison. I have also
lectured extensively in this area.

12.        In the summer of 2002 I was contacted by Naval Criminal Investigative
Service regarding the Alfred Bourgeois case. I was contacted pursuant to my
position with the Armed Forces Institute of Pathology. I examined photographs,
dental casts and other related documents in the case of the United States v. Alfred
Bourgeois. Specifically I examined three sets of stone dental casts and was asked
to compare them with photographs of bitemarks on the decedent's body. I
performed this comparison and concluded that I could not rule in or rule out any
of three individuals as the possible biter.

13.        Specifically, I was unable to rule in or rule out any of the three individuals
as the possible biter because: 1) the diffuse presentation of the bite marks in all of
the photographs, 2) the distorted position of the marks, in some of the
photographs, at the time of the photography, 3) the ruler/scale being in a different
spatial plane than the mark being photographed, and 4) the very similar metric and
spatial (pattern) relationships between the three individual's dentition.

14.        I provided a detailed written report of my review and conclusions to

USCA5 790

Special Agent Thomas F. Brady, Naval Criminal Investigative Service, on September 29, 2002.

15.    On July 13, 2003, I received from Dr. William Oliver additional materials to review in this case. Specifically, I received photographs of bitemarks on the decedent's body that I had previously reviewed, however, these photographs had been digitally enhanced by Dr. Oliver.

16.    Upon this additional review, I discerned no additional information that would allow me to change the opinions provided in my Forensic Odontology Report dated September 29, 2002. Upon examination of the enhanced bitemark photographs provided by Dr. Oliver my findings remained the same: I was unable to rule in or rule out any of the three individuals as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the marks, in some of the photographs, at the time of the photography, 3) the ruler/scale being in a different spatial plane than the mark being photographed, 4) the very similar metric and spatial (pattern) relationships between the three individual's dentition.

17.    I provided a second written report to Special Agent Thomas Brady dated July 14, 2003, wherein I again stated that I was unable to rule in or rule out any of the three individuals as the possible biter even with the additional digitally enhanced photographs provided by Dr. William Oliver.

18.    After I submitted the second report I recall receiving a telephone call from Assistant United States Attorney Patti Booth. I recall I was teaching a forensic dentistry course for the Army in Colorado Springs and I was on my lunch break. I

had spoken to Ms. Booth approximately three or four times prior to this phone call concerning my work on the Bourgeois case. In this particular telephone call Ms. Booth was very irate. As I recall, she told me that the defendant, Alfred Bourgeois, was a really bad man. As I recall, I told her that whether he was a bad man or not was irrelevant to my bitemark analysis and conclusions. I told her I can only evaluate the evidence and I again told her that I could not include or exclude any of three individuals as the possible biter. As I recall, she then told me that if I could not help her she would go out and find an expert who could help her. She then hung up the telephone on me. I remember this telephone call because I had never dealt with someone with that sort of hostility.

19.    At the time of my involvement on the Bourgeois case on behalf of the government, I had examined over 150 bitemark cases during my career as a Forensic Odontologist.

20.    I was never called as a witness in the case of United States v. Alfred Bourgeois by the defense or the prosecution. Had I been called I would have testified consistent with the conclusions and analysis described in my two written reports and this affidavit.

21.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

John Curtis Dailey

Dated:    04 May 07

USCA5 792

46

USCA5 793



COPY

United States Courts
Southern District of Texas
FILED

OCT 0 8 2003

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA     §

§

V.                           §     CASE NO. CR-C-02-216

§

ALFRED BOURGEOIS            §

## MOTION OF DEFENDANT ALFRED BOURGEOIS FOR FOR GOVERNMENT FUNDS FOR EXPERT WITNESS
### *EX PARTE, SEALED*

**TO THE HONORABLE JANIS GRAHAM JACK, UNITED STATES DISTRICT JUDGE, FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION:**

**COMES NOW,** Alfred Bourgeois, indigent Defendant in the above-styled and numbered cause, by and through his attorneys of record, Douglas Tinker and John Gilmore, pursuant to the **5th. 6th, 8th,** and **14th Amendments** to the U. S. **Constitution** and other authority cited herein, and moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding in support of the Defendant's right to defend against the penalty of death sought by the government, and in support thereof, Defendant would show:

1. The defendant is charged with 1st degree Murder;

2. The defendant is indigent and without funds to assist the undersigned counsel with expenses for experts necessary to his defense in this case.

3. The funding requested will provide counsel with essential tools to defend against the indictment returned and the penalty sought by the government. The Defendant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a significant factor at trial. **Ake v. Oklahoma,** 470 U.S. 68, 108 S. CT. 1087 (1985).

**USCA5 794**

4. This motion is made *ex parte.* It would be fundamentally unfair to require this indigent Defendant to divulge to the prosecution the nature of this motion for funding which will necessarily inform the Government of defensive theories in this case. If the undersigned counsel were retained by the accused, there would be no requirement that the Government be notified of the retention of expert assistance. Accordingly, counsel moves that the Court's Order, finding that a threshold showing of necessity has been made, also contain the following language:

THIS ORDER, AND THE DEFENDANT'S *EX PARTE* MOTION FOR FUNDING, SHALL BE SEALED IN THE RECORD AND PLACED IN AN ENVELOPE IN THE RECORD AND SHALL BE SEEN BY AND DISTRIBUTED TO DEFENSE COUNSEL AND THIS COURT ONLY.

**WHEREFORE PREMISES CONSIDERED**, Defendant prays that upon evidentiary hearing, this Court will: (1) Find that a threshold showing has been made that a DNA expert is an essential tool in the presentation of a defense against the indictment returned and the penalty sought; (2) Enter an order authorizing the undersigned counsel to engage Elizabeth A. Johnson, Ph.D., as an expert DNA witness for the defense and direct the United States to pay the expert witness' fee in addition to out of pocket expenses; (3) Order that this motion and the Court's

**USCA5 795**

Order be sealed as prayed for herein; and (4) that Defendant have such other and

further relief as he may show himself to be justly entitled.

Respectfully submitted,

_____
John Gilmore, Attorney

_____
Douglas Tinker, Attorney

**JOHN GILMORE**
Attorney for Defendant
State Bar No. 07958500
Admission No. 18181
622 S. Tancahua/P.O. Box 276
Corpus Christi, TX 78403
(361) 882-4378 (phone)
(361)882-3635 (fax)
jsgilmor@swbell.net (e-mail)

**DOUGLAS TINKER**
Attorney for Defendant
State Bar No. 20056000
Admission No. 956
622 S. Tancahua/P. O. Box 276
Corpus Christi, Texas 78403
(361) 882-4378 (phone)
(361) 882-3635 (fax)
dougtinker@hotmail.com

**USCA5 796**

OCT-5-2003  14:33  FROM:ELIZABETH A JOHNSON  805-553-0487  TO:13618823635  P.2

# Resume

## Elizabeth A. Johnson, Ph.D.
### 1534 N. Moorpark Road, No. 364
### Thousand Oaks, CA 91360
*telephone* 805-553-0445
*facsimile* 805-553-0487
*circej@earthlink.net*

## EDUCATION

College
BS Chemistry, cum laude
Department of Chemistry
Wofford College, Spartanburg, SC
1978-1982

Graduate
Ph.D. -- conferred July, 1987
Department of Microbiology and Immunology
Medical University of South Carolina, Charleston, SC
August 1982 - July 1987

Dissertation
*Production and characterization of a monoclonal antibody to an antigen present on subsets of natural killer cells and human tumor cells.*

## POSITIONS HELD

Private Forensic Consultation May, 2003 - present

Senior Forensic Scientist
Technical Associates, Inc.
4125 Market Street, Suite #3
Ventura, CA 93003
February 1997 -- May, 2003

Director
DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
September 1993 - December 1996

Supervisor
DNA Laboratory / Serology Section
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
April 1993 - September 1993

Assistant Toxicologist
DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
November 1991 - April 1993

Post-doctoral Fellow
Department of Molecular Hematology
Advisor: Albert Deisseroth, M.D., Ph.D.
Chairman, Department of Hematology
M.D. Anderson Cancer Research Hospital
Houston, TX 77030
October 1988 - November 1991

USCA5 797

Department of Microbiology and Immunology
Advisor: Alfred Tsang, Ph.D.
Medical University of South Carolina
Charleston, SC
September 1987 - September 1988

## CONTINUING EDUCATION - FORENSICS

### CLASSES and WORKSHOPS

Expert Witness Workshop, Southwestern Working Group on DNA Analysis Methods (SWGDAM), January, 2000.

Mitochondrial DNA Workshop, International Symposium on Human Identification, September, 1999.

FBI/SWGDAM STR Workshop, Austin, TX, 1998.

Statistics Workshop, International Symposium on Human Identification, September, 1996, 2002.

STR Workshop, The Promega Corporation, May, 1995.

Roche Amplitype Workshop, Roche Molecular Systems, December, 1992.

Armed Forces Institute of Pathology DNA Identification Laboratory, visiting scientist to learn methods of mitochondrial DNA sequencing on aged remains, October, 1992.

Advanced Aspects of Forensic DNA Analysis (courtroom testimony), FBI Academy, June, 1992.

### CONFERENCES

The Future of DNA Technology, Washington, DC, 1996.

CODIS Software Symposium, Quantico, VA, 1995.

International Symposium on Human Identification 1992, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2002, 2003.

Advances in DNA Technology, Bethesda, MD, 1992.

American Academy of Forensic Sciences 1992, 1993, 1994, 1995, 2001.

## OTHER INFORMATION

### CERTIFICATIONS

Certification of Qualification as Laboratory Director in Forensic Identity by the State of New York Department of Heath, issued August 12, 2002; expires August 12, 2004

### PROFESSIONAL SOCIETIES

Member of American Academy of Forensic Sciences

Association of Forensic DNA Analysts and Administrators (AFDAA)
(formerly Southwest Working Group on DNA Analysis Methods)

USCA5 798

<u>INVITED LECTURES</u>

Invited speaker, Washington State Bar Association, "The Fundamentals of DNA Testing", September, 2003.

Invited speaker, Texas Criminal Defense Lawyers Association, "Forensic DNA Testing", August, 2003.

Invited speaker, Utah Criminal Defense Lawyers Association meeting, "Forensic DNA: Testing the Right Way and Recognizing the Wrong Way", April, 2003.

Invited panelist, The Innocence Project, "Case Screening and Junk Science", March, 2003.

Invited speaker, Second Annual Texas Capital Defense Conference, "DNA Protocols and Laboratory Standards-Testing the Right Way and Recognizing the Wrong Way", October, 2002.

Guest lecturer, University of Texas Law School, Advanced Criminal Defense class, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002.

Invited speaker, California Public Defenders Association (CPDA), The Advanced Trial skills Institute, "Understanding & Challenging DNA" January, 2001.

Invited speaker, Texas Criminal Defense Lawyers Association (TCDL) "Forensics and Habeas" seminar, October, 1997.

Invited speaker, Arizona Public Defenders Seminar, April, 1997.

Invited speaker on forensic DNA, The Amersham Corporation, April, 1996.

Invited speaker, multi-departmental seminar, College of the Mainland, April, 1995.

Invited speaker, spring meeting of Southwest Association of Toxicologists, May, 1993.


## BIBLIOGRAPHY

<u>PUBLICATIONS</u>

1.    Taylor, M.S., A. Challed-Spong, and E.A. Johnson.  Co-amplification of the HLA DQα and amelogenin genes: optimization and validation. *J. Forensic Sciences*, 42 (1), 1997.

2.    Johnson, E., W. Henzel, and A. Deisseroth.  An isoform of protein disulfide isomerase isolated from chronic myelogenous leukemia cells alters complex formation between nuclear proteins and regulatory regions of interferon-inducible genes. *J. Biol. Chem.*, 267:14412-14417, 1992.

3.    Seong, D., S. Sims, E. Johnson, J. Lyding, A. Lopez, M. Garovoy, M. Talpaz, H. Kantarjian, G. Lopez-Berestein, C. Reading, and A. Deisseroth.  Activation of class I HLA expression by TNF-alpha and gamma-interferon is mediated through protein kinase C - dependent pathway in CML cell lines. *British Journal of Haematology*, 78:359-367, 1991.

4.    Deisseroth, A., O.M.Z. Howard, A. Wedrychowski, D. Seong, N. Paslidis, M. Romine, S. Sims, C.V. Herst, T. Yuan, K. Wu, T. Lopez and E. Johnson.  Summary and Future Directions, in *Chronic Myelogenous Leukemia: Molecular Approaches to Research and Therapy*; A. Deisseroth and R. Arlinghaus, eds., 1991, pp.469-475.

5.    Wedrychowski, A., D. Seong, N. Paslidis, E. Johnson, O.M.Z. Howard, S. Sims, M. Talpaz, H. Kantarjian, J. Hester, J. Turpin, G. Lopez-Berestein, J. Gutterman, E.J. Freireich and A. Deisseroth.  Characterization of nuclear proteins which bind to interferon-inducible transcriptional enhancers in hematopoietic cells. *J. Biol. Chem.*, 265:21433-21440, 1990.

USCA5 799

OCT-3-2003  14:54  FROM:ELIZABETH H JOHNSON  805-553-0487    TO:13618823635    P.5

6.   Deisseroth, A., C.V. Herst, A. Wedrychowski, S. Sims, D. Seong, E. Johnson, T. Yuan, M. Romine, N. Paslidis, P. Gao, L. Huston, D. Claxton, S. Kornblau, H. Kantarjian, M. Talpaz and C. Reading. Future directions in molecular and genetic therapy of leukemias and solid tumors. *M.D Anderson Cancer Bulletin*, 1990.

7.   Seong, D.C., S. Sims, E. Johnson, O.M.Z. Howard, J. Hester, M. Talpaz, H. Kantarjian and A. Deisseroth. A phosphatase activity present in peripheral blood myeloid cells of CML patients but not normal individuals alters nuclear protein binding to transcriptional enhancers of interferon-inducible genes. *J. Clin. Invest.*, 86:1664-1670, 1990.

8.   Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia and K.Y. Tsang. Specificity of anti-lymphocyte antibodies in sera from patients with AIDS-related complex (ARC) and healthy homosexuals. *Clin. and Exp. Immunol.*, 73:68-73, 1988.

9.   Tsang, K.Y., E.A. Johnson and M.F. LaVia. Anti-p24 antibody reactivity in Acquired Immunodeficiency Syndrome (AIDS) related complex patients treated with Isoprinosine. *Annals of Internal Medicine*, 107:595, 1988.

10.  Johnson, E., L. Miribel, P. Arnaud and K.Y. Tsang. Purification of IgM monoclonal antibody from murine ascitic fluid by a two step column chromatography procedure. *Immunol. Lett.*, 14:159-165, 1987.


ABSTRACTS

1.   Ballard, K.D., R.S. Orkiszewski, P.R. DeForest, M.S. Taylor, E.A. Johnson, and L. Ragle. EDTA testing in forensics: direct derivatization for GC-MS/MS analysis and the quantity of dried bloodstain analyzed. *Proceedings of the 45th ASMS Conference on Mass Spectrometry and Allied Topics*, Palm Springs, California, June 1-5, 1997, p. 54.

2.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. DNA typing and the determination of EDTA in forensic samples by GC-MS/MS. Presented at the Seventh International Symposium on Human Identification, Scotsdale, AZ, 1996.

3.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. Determination of EDTA in forensic samples by capillary GC-MS and GC-MS/MS. Presented at the 44th ASMS Conference on Mass Spectrometry and Allied Topics, Portland, Oregon, 1996.

4.   Stacy, T., E.A. Johnson, J. Krebsbach, S. Bowne, and R. Cotton. Chemiluminescence of forensic casework: a comparison of the hybridization and detection methods of three independent laboratories. Presented at the Sixth International Symposium on Human Identification, Scotsdale, AZ, 1995.

5.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-α utilizing the Amplitype reaction mix and amplification protocol. Presented at the Fifth International Symposium on Human Identification, Scotsdale, AZ, 1994.

6.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-α utilizing the Amplitype reaction mix and amplification protocol. Presented at the California Association of Criminalists spring meeting, Los Angeles, CA, 1994.

7.   Johnson, E., and M. Pennington. Use of alkaline phosphatase-labeled probes and chemiluminescence detection methods for establishing an RFLP data base and analysis of forensic cases. Presented at the Fourth International Symposium on Human Identification, Scotsdale, AZ, 1993.

8.   Johnson, E., W. Henzel, and A. Deisseroth. Elevated levels of phospholipase C alpha are associated with alteration of complexes formed between interferon-inducible transcriptional

USCA5 800

enhancers and nuclear proteins in cells of interferon resistant chronic myelogenous leukemia (CML) patients. Presented at the annual meeting of the American Society for Hematology, Denver, CO, 1991.

9.  Johnson, E., D. Seong, A. Wedrychowski, S, Sims, M. Romine, L. Huston, R. Luttrell and A. Deisseroth. A cytoplasmic phosphatase which is elevated in CML myeloid cells alters the binding of nuclear proteins to interferon-inducible transcriptional enhancers. Presented at the annual meeting of the American Society for Hematology, Boston, MA, 1990.

10. Tsang, K.Y., E.A. Johnson, L. Bishop, M.F. La Via H.H. Fudenberg and M.Arlen. Monoclonal antibodies to human colon carcinoma-associated antigen(s). FASEB, Washington, DC (abstract no.4322), 1987.

11. Trojanowska, M., K.Y. Tsang, E.A. Johnson, L. Bishop, M. Christian and R.Q. Warren. Expression of *c-myc*, *c-myb* oncogenes and interleukin-2 receptor in human peripheral blood mononuclear cells after treatment with an immunopotentiator (isoprinosine). FASEB, Washington, DC (abstract no. 850), 1987.

12. Johnson, E.A., J. Minowada, M.F. La Via, and K.Y. Tsang. A monoclonal antibody to human NK cells is reactive with various tumor cell lines. Federation of American Societies of Experimental Biology (FASEB), Washington, DC (abstract no. 956), 1987.

13. Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia, M.E. Christian and K.Y. Tsang. Analysis of anti-peripheral blood mononuclear cell (PBMC) antibodies in sera from AIDS, ARC, and healthy homosexuals. First Annual Conference of Clinical Immunology Society, Baltimore, MD, 1986.

14. Johnson E.A., B. Koger, M. La Via and K.Y. Tsang. A shared antigen between human natural killer (NK) cells and various tumor cells is recognized by an anti-NK monoclonal antibody. First Annual Meeting, Clinical Applications of Flow Cytometry, Charleston, SC, 1986.

15. Johnson, E.A., K.Y. Tsang, B. Koger, B. Ward, R.Q. Warren, M. La Via and H.H. Fudenberg. Production of a monoclonal antibody reactive with human natural killer cells. Federation Proceedings, 44, No. 4, 1330, 1985.

USCA5 801

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA §

§

V. § CASE NO. CR-C-02-216

§

ALFRED BOURGEOIS §

## CERTIFICATE OF NON SERVICE

I, Douglas Tinker, do hereby certify that a true and correct copy of the foregoing Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* has been presented to the Court. A copy of the same was not furnished to the Government.

_____
DOUGLAS TINKER

USCA5 802

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. CR-C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

## ORDER

On this day, the foregoing Motion of Defendant Alfred Bourgeois for
Government Funds for Expert Witness *Ex Parte, Sealed* having been considered by
this Court,

**IT IS HEREBY ORDERED THAT**:

_____ The foregoing motion is **GRANTED** and the following expert is
appointed by the Court:

_____.

_____ The foregoing motion is **DENIED.**

**SIGNED** and **ORDERED ENTERED** this _____ day of

_____, 2003.


_____
UNITED STATES DISTRICT JUDGE

USCA5 803

47

USCA5 804

United States Courts
Southern District of Texas
ENTERED

OCT 2 1 2003

IN THE UNITED STATES DISTRICT COURT Michael N. Milby, Clerk of Court

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. CR-C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

### ORDER

On this day, the foregoing Motion of Defendant Alfred Bourgeois for

Government Funds for Expert Witness *Ex Parte, Sealed* having been considered by

this Court,

**IT IS HEREBY ORDERED THAT:**

_____✓_____ The foregoing motion is **GRANTED** and the following expert is

appointed by the Court:

_____ Elizabeth A. Johnson Phd. _____.

_____ The foregoing motion is **DENIED.**

**SIGNED** and **ORDERED ENTERED** this _____20th_____ day of

_____October_____, 2003.

UNITED STATES DISTRICT JUDGE

USCA5 805

48

**USCA5 806**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
ENTERED

FEB 2 5 2004

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA     §

vs.     §     Crim. No. C-02-216(1)

ALFRED BOURGEOIS     §

## ORDER

On February 25, 2004, a status conference was held in the above-styled action. The Court ORDERS the following:

1. The Government's Third Motion for Reciprocal Discovery is GRANTED as follows:

   The Defense must provide the Government with written summaries of its expert witnesses Dr. Rupp, Dr. Holden, and Dr. Johnson by Thursday, February 26, 2004 at 10:00 a.m. These summaries must be in compliance with Federal Rule of Criminal Procedure 16 by describing the opinions that will be offered, the basis and reasons for those opinions, and the witness's qualifications including a current curriculum vitae listing publications. The Defense must provide the Government with the written summary for its expert witness, Dr. Weiner by Wednesday, March 3, 2004 at 12:00 noon.

2. All sealed motions for designation of experts expected to testify that contain relevant curricula vitae are hereby unsealed.

3. The Defense must submit to the Court proposed changes to the jury charges regarding lesser included offenses by Friday,



USCA5 807

February 27, 2004 at 10:00 a.m.

4.   All Daubert challenges must be made by Friday, February 27,
     2004 at 10:00 a.m.

5.   The next conference in this case will be held Friday, February
     27, 2004 at 10:00 a.m.   The Court will address jury charges
     and Daubert motions at that time.   The Court will also pre-
     admit any exhibits to which the Parties have not objected.

SIGNED and ENTERED this the _____ day of February, 2004.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

2

USCA5 808

49

USCA5 809

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
Thousand Oaks, CA  91360

Phone 805-553-0445          *circej@earthlink.net*          Fax 805-553-0487

3/1/04                                                        ①

To Doug Tinker
    Fax - 361-882-3635
    Re. Bourgeois

Doug -
    I'm in colorado so hope you can read my
writing. Issues for cross exam of FBI
witnesses (both Carolyn & Anthony)

1) FBI did not test the rectal swab with AP
   reagent or do a sperm search. They
   only did a P30 test with the ABA card
   and a DNA test. The ABA card was
   positive but there is <u>no</u> indication of
   male DNA found either in the non-sperm
   or the sperm fraction.

2) We did do an AP test (negative) and
   a P30 test (weak positive) and a
   microscopic sperm search (negative for sperm)

3) The P30 positive (weak on our test) test
   could be a false positive due to bacterial
   proteins found on the rectal swab.
   If there was actually sperm on the
   swab, they should be observed

USCA5 810

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
Thousand Oaks, CA 91360

Phone 805-553-0445          *circej@earthlink.net*          Fax 805-553-0487

Bourgeois continued                                    ②

if the P30 test is positive from semen:

Calculations:

a.  Sensitivity of the ABA card = 4 ng/ul PSA

b.  Semen contains a mean of  800,000 ng/ml PSA

c.  $\frac{800,000}{4}$ = 1/200,000 dilution of semen should be
        detectable

d.  Semen contains on average 100 million sperm per
      ml of semen

e.  A 1/200,000 dilution of semen would then be
     expected to contain 500 sperm
     $$\left[ \frac{100 \times 10^6 \text{ sperm}}{200,000 \text{ dilution}} = 500 \text{ sperm} \right]$$

f)  500 sperm is enough to observe even if a
     small portion is used to make a slide, and
     500 sperm is plenty to get a DNA result
     (which they did not find male DNA).

Hope this helps I'll be back Wednesday.

                              Libby Johnson

USCA5 811

100 µL of serum was mixed with 100 µL of HEPES (0.24 %, pH 7.2) to facilitate absorption, and added to the membrane. Blood samples from four nursing mothers were collected and dried on DNA cards. The bloodstains were extracted in 1 mL HEPES for two hours. The stains were centrifuged in Spin-Ease and 200 µL of extract was added to Seratec PSA *Semiquant* Kits.

Results of the Seratec PSA *Semiquant* Kits were read after ten minutes

**Results and Discussion**

It is now quite clear that the term prostatic specific antigen (PSA) is a misnomer. Although present in great amounts in seminal plasma, its presence has been detected in a variety of other body fluids (Table 1). The greatest concentrations of PSA outside of semen have been in breast milk and amniotic fluid. Generally, the forensic biologist does not encounter these fluids, however, one unusual case of the detection of PSA in a diaper originating from the colostrum in breast milk from a nursing child has been reported [20].

| Fluid | Concentration PSA (ng/mL) | Reference |
|---|---|---|
| Semen | 200,000 to 5.5 million | Sensabaugh [3] |
| Semen | 820,000 (mean) | Lovgren, et.al [21] |
| Amniotic fluid | 0.60 (avg.) 8.98 in one case | Lovgren, et.al [21] |
| Breast milk | 1 (avg.) 2100 in one case | Lovgren, et.al [21] |
| Breast milk | Majority < 1.0; > 100 in one case | Filella, et.al. [22] |
| Breast milk | 0.47 (median) | Yu and Diamandis [9] |
| Saliva | None | Lovgren, et.al [21] |
| Female urine | 3.72 (mean) | Breul, et.al. [11] |
| Female urine | 1.73 (mean) | Breul, et.al. [12] |
| Female urine | 0.12 – 1.06; 0.29 mean | Schmidt, et.al. [13] |
| Female serum | 0.53 (mean) | Breul, et.al. [11] |
| Female serum | Majority < 0.01 | Yu and Diamandis [14] |
| Female serum | Majority < 0.1 | Diamandis and Yu [23] |

**Table 1. Concentration of PSA in various body fluids (liquid).**

Substantial levels of PSA have been found in amniotic fluid and breast milk. Cases involving lactating or pregnant women should be treated with due caution.

Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present or the survivor is menstruating, blood may be present on vaginal swabs or on stains in underwear. When an extract is prepared from a stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the stain is from female urine or serum?

The Abacus Diagnostics *OneStep ABAcard p30 Test* is used quite extensively throughout forensic laboratories in the United States. It has a listed sensitivity of 4 ng PSA/mL.

2

USCA5 812

50

USCA5 813



The University of Texas
Health Science Center at San Antonio
Mail Code 7750
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

Graduate School of Biomedical Sciences                                   (210) 567-4000
Department of Pathology

## NEUROPATHOLOGY CONSULTATION

### FOR THE BEXAR COUNTY FORENSIC SCIENCES CENTER

**DATE CUT** 7/1/02    **PROSECTOR** Dr E Rouse    **ACCESSION #** 02-CX-235

**HISTORY:** J.G. was a 2-and-a-half- year-old hispanic female toddler who sustained head trauma initially blamed on a "fall from the cab of a 18-wheeler". Her step-mother called the EMS and at the health care facility where she was seen, a lumbar puncture showed subarachnoid hemorrhage, and no skull fractures. She died at 11 AM the next day. Subsequently it became apparent that the child has been physically abused. At autopsy there was subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin.

**GROSS OBSERVATIONS:** There is mild to moderate cerebral edema,and a accompanying portion of dura showed a thin subdural hematoma. There is patchy subarachnoid hemorrhage. Coronal sections show fairly normal ventricular size ,no intraventricular blood, and no herniation hemorrhages, including no brainstem (Duret) hemorrhages. No gross abnormalities of the cortical ribbon or deep white matter are noted.–no midline (deep grey nuclear, callosal ) petechiae, tears but small areas of white matter softening and greyish discoloration (no xanthochromia) are seen.. Sections through lower brainstem and cerebellum are unremarkable.



**MICROSCOPIC FINDINGS & COMMENTS:**
Sections of dura show mostly recent hemorrhage trapped among the arachnoid granulations. The "oldest" areas in these dural sections show a thin membrane (upper photo), histolog-ically consistent with a few weeks' duration. Sections of cerebral deep white matter (centrum semiovale) show, interestingly, prominent myelin tearing, foamy macrophages between the groups of disrupted white matter tracts ( top photo, next page, arrows, luxol fast blue/H&E stain). An ubiquitin stain of this particular section show prominent axonal swellings (inset, arrows) which could even be found on routine sections on other slides of similar areas. A few areas show contusion-infarcts in a stage of early organization (sheets of foamy macrophages consistent with at least a weeks' duration. Older, gliotic or cystic lesions are not identified. Focally severe acute neuronal hypoxic changes are also seen.

USCA5 814

02-CX-235                                                                                          2

Myelin tearing and axonal bodies are easily found in
these sections but as you know the presence of <u>abundant</u>
axonal bodies cannot be reliably used to either precisely
"date" an injury or provide evidence of more than one
episode of head trauma.



**NEUROPATHOLOGIC DIAGNOSIS:**
Child's brain, representative sections: history of
head trauma)

Cerebral edema, mild to moderate
      Hemorrhagic necrosis of cerebellar
      tonsillar tips
(Right) subdural hematoma, mostly recent, min-
imal organization (approximately 10 days' duration)

Cerebral white matter: Organized contusion infarcts (7+
days' duration), myelin tearing and axonal bodies

*Kathleen K Ulh*
**KATHLEEN S KAGAN-HALLET MD**
**DEPARTMENT OF PATHOLOGY**
**ASSOCIATE PROFESSOR OF PATHOLOGY**
**(PEDIATRIC PATHOLOGY/ NEUROPATHOLOGY)**

DATE 09/17/02

**USCA5 815**

51

USCA5 816

Case 2:19-cv-00392-JMS-DLP  Document 10-1  Filed 10/18/19  Page 818 of 2008
PageID #: 2708

## CURRICULUM VITAE

# Charles Alan Keel

- Employment
- Education
- Professional Affiliations

- Presentations
- Personal
- Contact Information

## EMPLOYMENT

Criminalist, North Louisiana Crime Lab, Shreveport, Louisiana 1982-1984

Criminalist III, Oakland Police Department, Oakland, California 1984-1993

Consultant in Forensic Science, Shreveport, Louisiana, 1994-1996 Death Investigator, Caddo Parish Coroner's Office, Shreveport, Louisiana, 1994-1996

Criminalist, Tulsa Police Department, Tulsa, Oklahoma, 1996

Criminalist, San Francisco Police Department, San Francisco,California, 1996-1999

Criminalist/Consultant in Forensic Science, Forensic Science Associates, Richmond, California, 1999-present

## EDUCATION

Bachelor of Science (Zoology), Texas A & M University, CollegeStation, 1978

Graduate Course Work, Texas A & M University, College Station, 1978-80 in Food Science and Technology/Human Physiology

Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS

The American Academy of Forensic Sciences

http://www.fsalab.com/cakcv.html

05/10/2007

USCA5 817

The American Board of Criminalistics
- Diplomate in General Criminalistics, 1991
- Fellow in Molecular Biology, 1994

DNA Technical Leader/Manager pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred December, 1999

## PRESENTATIONS

*A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

*A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

*Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

*Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

## CONTINUING EDUCATION

Recombinant DNA Technology, University of California Extension,Berkeley, 1986

Forensic DNA Analysis, University of California Extension, Berkeley, 1989 The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

Instrumental STR Analysis, Perkin-Elmer/Applied Biosystems, Foster City, 1996 Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, 1996

USCA5 818

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 820 of 2008
PageID #: 2710

## PERSONAL

Born July 5, 1956 in Lyons Georgia.

## CONTACT INFORMATION

Alan Keel
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806
1-510-222-8883 voice
1-510-222-8887 fax
Email: akeel *at* fsalab *dot* com

FSA Home Page            Introduction            Staff Curriculum Vitae
Interesting Cases                                Useful Forensic Links

USCA5 819

52

USCA5 820



# ARMED FORCES INSTITUTE OF PATHOLOGY
### Office of the Armed Forces Medical Examiner
1413 Research Blvd., Bldg. 102
Rockville, MD 20850
1-800-944-7912



## AUTOPSY EXAMINATION REPORT

Name: Gunter, Jakerenn
SSAN: 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
Date of Birth: 05 Oct 99
Date/Time of Death: 28 June 02, 1105

Date/Time of Autopsy: 29 June 02, 1330

Date of Report: 10 January 03

Autopsy No.: A02-42
AFIP No.: 2846051
Rank: Civilian
Place of Death: Driscoll Children's
Hospital, Corpus Christi, TX
Place of Autopsy: Driscoll
Children's Hospital, Corpus Christi

**Circumstances of Death:** This 2 year old civilian African American female child was found unresponsive 27 June 02 on the grounds of the Corpus Christi Naval Air Station outside the cab of a tractor trailer while in the care of her biological father and stepmother. She was taken to Driscoll Children's Hospital where she was found by head CT to have severe brain edema and interventricular and subarachnoid hemorrhage, and on retinal exam to have bilateral retinal hemorrhage consistent with abusive head trauma. An antemortem skeletal survey was normal. She was subsequently declared brain dead, and she died the following day following the withdrawal of life support.

**Authorization for Autopsy: The Armed Forces Medical Examiner, IAW 10 USC 1471. Civilian jurisdiction released to Federal.**

**Identification: Visual**

**CAUSE OF DEATH: Closed Head Injury with Subdural Hematoma**

**MANNER OF DEATH: Homicide**

**FINAL AUTOPSY DIAGNOSES:**

I.   Closed Head Injury
     A. Multiple areas of subgaleal hemorrhage, occipital and right frontal scalp
          i. Ten impact sites identified
     B. Right subdural hematoma, recent, with minimal organization
     C. Subarachnoid hemorrhage over brain
     D. Cerebral edema with hemorrhagic necrosis of the cerebellar tonsillar tips
     E. Parenchymal cerebral brain inury (microscopic)
          i. Cerebral white matter organized contusion infarcts

USCA5 821

AUTOPSY REPORT A02-42                                                           2
GUNTER, Jakarenn

      ii. Prominent myelin tearing, axonal swelling and axonal bodies
present
  F. Bilateral retinal hemorrhage, recent, consistent with non-accidental trauma
      i. Bilateral intraretinal and subretinal fresh hemorrhage
      ii. Hemorrhage within the nerve fiber layer above the optic nerve
head
      iii. Bilateral optic nerve hemorrhage within the perineural,
subarachnoid and subdural space
      iv. Focal hemorrhage within the left anterior chamber
      v. No evidence of intraocular foreign bodies, tumor or sympathetic
ophthalmia
  G. Bilateral periorbital ecchymoses

II. Additional Injuries Indicative of Chronic Abuse (Battered child)
  A. Multiple patterned linear elliptical skin contusions and abrasions of
varying ages, consistent with looped electrical cord impact on chest,
abdomen, left shoulder, legs, and buttocks
      i. Fourteen total patterned imprints identified
      ii. Multiple ill-defined linear healing scars and pigmentation changes
  B. Healing arched contusions with teeth imprints, consistent with bite marks
on right forearm and left flank
  C. Multiple healing crusted abrasions on hands and feet
      i. Healing circular crusted skin ulcer on the sole of the right foot
  D. Healing tears of upper and lower frenulums of mouth
  E. Soft tissue hemorrhage of bilateral buttocks, upper right back, and left
shoulder
  F. Resolving soft tissue hemorrhage of the thoracolumbar region

III. No evidence of pre-existing natural disease
  A. Acute pneumonia, consistent with hospital colonization and respirator
dependence

IV. Toxicology (AFIP) negative for ethanol and substances of abuse

USCA5 822

AUTOPSY REPORT A02-42                                                                    3
GUNTER, Jakarenn

## EXTERNAL EXAMINATION

The body is that of a well-developed, well-nourished African American female child clad in a blue and white hospital gown and a clean diaper.  The body is 88 cm in height, appears consist with the reported weight of 15 kg, and appears compatible with the reported age of 2 1/2 years.  The body is cold.  Rigor is present to an equal degree in all extremities. Lividity is present and fixed on the posterior surface of the body, except in areas exposed to pressure.

The scalp hair is dark and wavy, measuring 12.5 cm in length, and is pulled into multiple small twisted braids secured with black bands. The scalp beneath the hair is flakey. The irides are brown.  The corneae are clear.  The conjunctivae are pale and free of petechiae.  The sclerae are white.  The ears are normally formed and normally placed with the appropriate amount of cartilage. There is a single pierced hole in each earlobe, and there is a small, yellowed colored metallic post earring in the right earlobe. The external auditory canals, external nares and oral cavity are free of foreign material and abnormal secretions. The nasal skeleton is palpably intact.  The teeth are natural and in good condition with moderate amounts of calculus formation (tarter). The palate is intact and normally formed.

Examination of the neck revealed no evidence of injury.  The chest is symmetrical. Breast buds are palpable. The abdomen is flat and soft. The pigmentation of the skin over the chest and abdomen is variably mottled, with focal ill-defined darker and lighter areas. The extremities bilaterally are symmetrical and normally formed with all digits present and normally formed. Palmar creases are unremarkable. The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight, and the anus is unremarkable and atraumatic. On the upper left buttock, there is a hyperpigmented macule, 1.0 x 0.6 cm, consistent with a café au lait spot.

## EVIDENCE OF THERAPY

There is a nasogastric tube and an endotracheal tube in the mouth, secured with white tape extending over the checks. There are intravenous catheters in the left antecubital fossa secured with white tape and in the left radial wrist secured with tape and sutures. There are multiport intravenous catheters in the bilateral inguinal regions, secured with clear tape. There is a urinary catheter in place, and there is a multicolored bandaid just below the left knee, covering a needle puncture mark.

## EVIDENCE OF INJURY

On the upper central forehead, just beneath the hairline, there is a healing irregular 1.2 x 0.6 cm pale scar with central crust. Over the mid forehead, there are numerous fine, linear pale healing scars, up to 1 cm in length. There is ill-defined ecchymoses surrounding both eyes, involving both the upper and lower lids bilaterally. On the mid right cheek, there is a faint 2.0 x 1.2 cm contusion. On the lower right cheek, near the chin, there is a healing 0.4 x 0.2 cm scar. Beneath the chin, on the upper left neck, there is a cluster of small, healed pale scars, 3 x 2 cm in aggregate. On the back of the left ear, there is a vertically oriented 0.5 x 0.2 cm linear scar. Upon examination of

USCA5 823

AUTOPSY REPORT A02-42                                                          4
GUNTER, Jakarenn

the mouth, there are healing tears of both the upper and lower frenulums; the upper laceration measuring 0.9 x 0.6 cm, and the lower laceration measuring 0.4 x 0.3 cm.

On the upper right chest, there is a well-healed 1.0 x 0.3 cm scar. On the chest and abdomen, there are three patterned, healing areas of linear pigmentation alteration, all consistent with wire loop imprints. On the mid anterior left chest, there is a healing "U" shaped elliptical curvalinear dark mark, 2.4 x 0.2 cm, 0.9 cm in total width, oriented with the open, noncontinuous end superior and laterally. On the lower right abdomen, there is an inverted "U" shaped, healing dark linear mark, 2.5 x 0.2 cm, 2 cm in total width. On the lower left abdomen, there is inverted "U" shaped, healing dark linear mark, 1.8 x 0.2 cm, 1 cm in total width.

On the back of the lateral left shoulder, there is a "U" shaped patterned linear mark, consisting of two fine parallel abrasions with surrounding thin contusion, 5 x 0.3 cm, 3 cm in total width, consistent with a looped double corded electric cord. On the mid lower left back, there are two vertically oriented curvalinear contusions with tooth imprints, consistent with a healing bite mark, 2.9 cm in vertical dimension, 0.4 cm in individual width, and 4.5 cm in total width. On the lower lateral right back, there is a faint, inverted "U" shaped curvalinear hyperpigmented mark, 4 x 3 cm, oriented with the noncontinuous end inferior and laterally. On the lower left buttock, there is an inverted "U" shaped hyperpigmented scar, 5 x 3.5 cm, oriented with the noncontinuous end inferior and laterally. Over both buttocks, there are numerous punctate and small irregular pale scars. On the right buttock, there are numerous curvalinear hyperpigmented marks and scars are identified, up to 3 cm in length.

On reflection of the skin of the torso, there are areas of recent subcutaneous and deep soft tissue hemorrhage of the lateral left shoulder, measuring 4 x 2.5 cm; of the mid medial right back, measuring 1 x 0.5 cm; of the left buttock, measuring 3.5 x 2.8 cm; and of the right buttock in a patchy and less well defined distribution. There is an irregular 9 cm diameter region of resolving soft tissue hemorrhage with brown and yellow discoloration in the mid thoracolumbar region.

On the back of the upper left arm, there is a 2 x 0.1 cm scar. On the back of the left hand and on the back of the fingers, there are multiple punctate, healing pale scars, up to 0.2 cm. On the back of the left hand, there are central 0.6 cm and 0.3 cm diameter healing pale scars with central crusted abrasions, and laterally, an irregular healing pale 1 x 0.4 cm scar. On the back of the of the middle left finger, just beneath the fingernail, there is a crusted healing 0.7 x 0.4 cm abrasion; and on the back of the left ring finger, just beneath the fingernail, there is a 0.8 x 0.5 cm crusted healing abrasion. On the palmar aspect of the middle finger of the left hand, at the distal interphalangeal joint, there is a horizontal healing, linear 0.3 x 0.2 cm crusted wound with peeling skin; and on the palmar aspect of the middle finger of the left hand, at the proximal interphalangeal joint, there is a healing 0.5 x 0.4 cm scar with peeling skin.

On the back of the right elbow, there are multiple healed, hypopigmented scars, 2 x 1 cm in aggregate, and there is a 1 cm diameter healing pale scar with a central pink area. On the back of the right forearm, there are two curvalinear dark, healing hyperpigmented marks, nearly horizontally oriented, 3.5 x 3.2 cm with faint apparent teeth marks, consistent with a remote bite mark. The skin of the back of the right hand is diffusely thickened, hyperpigmented, and indurated. Within this area, there is a cluster of discernable vertically oriented, dark, parallel linear marks, and a cluster of diagonally oriented, dark, parallel linear

USCA5 824

AUTOPSY REPORT A02-42                                                                                  5
GUNTER, Jakarenn

marks. There is a central 2.8 x 2 cm pale scar and numerous small pale scars over the back of the right hand and on the back of the fingers of the right hand. Upon incising the skin of the back of the right hand, there is irregular deep and resolving soft tissue hemorrhage. On the back of the middle finger of the right hand, just beneath the fingernail, there is a 0.9 x 0.5 cm healing, crusted abrasion. On the back of the index finger of the right hand, there are numerous pale scars, and just beneath the fingernail, there is a 0.4 x 0.2 cm healing, crusted abrasion. On the palm of the right hand, there is an irregular 1 x 0.5 cm area of peeling skin. On the palmar aspect of the fingers of the right hand, there are contusions and areas of hyperpigmentation along the proximal interphalangeal joints. Upon incising the skin, there is underlying soft tissue hemorrhage of the proximal interphalangeal joint of the middle right finger.

On the lateral aspect of the upper left thigh, there are two overlapping diagonally oriented "U" shaped, dark, curvalinear parallel abrasions, consistent with looped wire imprints. One is oriented with the noncontinuous end superior and posteriorly, and measures 4.5 x 0.2 cm, 2.0 cm in total width. The second is oriented with the noncontinuous end superior and anteriorly, and measures 6.5 x 0.2 cm, 2.9 cm in total width. On the back of the left thigh, there are numerous faint, curvalinear abrasions and contusions, up to 3 cm in length. On the medial aspect of the left calf, there is an inverted "U" shaped dark., curvalinear mark, consistent with a looped wire imprint, measuring 4.8 x 0.2 cm, 2.9 cm in total width. On the lateral aspect of the left calf, there are two overlapping horizontally oriented "U" shaped dark, curvalinear marks, consistent with loop wire imprints, 6.0 x 3.9 cm in aggregate. On the medial aspect of the top of the left foot, there is an irregular 4 x 1 cm healing scar with central crusted abrasion and underlying induration. On the medial heel of the left foot, there are multiple small healing crusted abrasions, 1.5 x 1 cm in aggregate.

On the medial aspect of the upper right thigh, there are two, slightly overlapping "U" shaped dark, linear marks, consistent with looped wire imprints; the upper measuring 5.0 x 0.2 cm, 2.5 cm in total width, and the inferior medial one measuring 6.0 x 0.2 cm, 2 .0 cm in total width. On the back of the right thigh, there is a similar "U" shaped dark, curvalinear mark, consistent with a looped wire imprint, 5.5 x 0.2 cm, 2.5 cm in total width. There are multiple faint linear imprints over the medial and lateral aspects of the back of the right thigh, up to 4 cm in length. On the top of the right foot and extending up the first toe, there are multiple irregular healing scars, 5 x 2.5 cm in aggregate, with focal crust formation. On the bottom of right foot, near the heel, there is a healing, deep circular skin ulcer with central crust formation and marked skin induration.

A lumbar puncture reveals the cerebrospinal fluid (CSF) to be thick and hemorrhagic.

Upon reflection of the scalp, there are two discrete areas of recent subgaleal hemorrhage in the right frontal scalp, one 2.5 x 2.2 cm just above the lateral aspect of the right eyebrow, and slightly superior and medially, a second area 3.5 x 3.5 cm. Across the occipital scalp, there are a total of eight discrete areas of recent subgaleal hemorrhage. Just behind the left pinna, there is a 1.5 x 1.5 cm area. In the mid left occipital region is an inferior 1.5 x 1.0 cm area of hemorrhage, and superiorly, a lateral 1.5 x 0.6 cm area and medially a 1.3 x 1.1 cm area. In the right occipital scalp, there is an inferior lateral 3.2 x 2.2 cm area, a mid lateral 2.0 x 1.2 cm area, a mid medial 1.5 x 1.0 cm area, and a superior 1.5 x 0.5 cm area of recent hemorrhage. All of the areas of subgaleal hemorrhage are distinct and separate, and all are bright red in color.

USCA5 825

AUTOPSY REPORT A02-42                                                                6
GUNTER, Jakarenn

Upon removal of the calvarium of the skull and reflection of the dura, grossly there is a right-sided thin film of semisolid subdural hematoma, measuring approximately 2 ml. over the right occipital region. There is patchy subarachnoid hemorrhage over the brain. Upon removal of the orbital plates, there is diffuse hemorrhage surrounding the optic nerves bilaterally. The eyes and brain are fixed prior to further examination.

## INTERNAL EXAMINATION

### BODY CAVITIES:

The body is opened by the usual thoraco-abdominal incision and the chest plate is removed. No adhesions are present in any of the body cavities. There is approximately 30 ml of clear serosanguinous fluid within each pleural space, and there is approximately 50 ml of yellow fluid with small blood clots within the peritoneal cavity. All body organs are present in the normal anatomical position. The subcutaneous fat layer of the abdominal wall is 1.5 cm thick.

### HEAD: (CENTRAL NERVOUS SYSTEM)

The scalp is reflected. The calvarium of the skull is removed. The dura mater and falx cerebri are intact. The leptomeninges are thin and delicate. The cerebral hemispheres are edematous and symmetrical. The brain weighs 1000 grams and is fixed prior to further examination (see "Neuropathology Report"). The eyes are removed and fixed prior to further examination (see "Ophthalmologic Pathology Report").

### NECK:

Examination of the soft tissues of the neck, including strap muscles, thyroid gland and large vessels, reveals no abnormalities. The hyoid bone and larynx are intact. A posterior neck dissection reveals no evidence of hemorrhage or trauma.

### CARDIOVASCULAR SYSTEM:

The pericardial surfaces are smooth, glistening and unremarkable; the pericardial sac is free of significant fluid or adhesions. The coronary arteries arise normally, follow the usual distribution and are widely patent. The chambers and valves exhibit the usual size-position relationship and are unremarkable. The myocardium is dark red-brown, firm and unremarkable; the atrial and ventricular septa are intact. The foramen ovale is appropriately membrane protected. The aorta and its major branches arise normally, follow the usual course and are widely patent. The ductus arteriosus is anatomically and functionally closed. The venae cavae and its major tributaries return to the heart in the usual distribution and are free of thrombi. The heart weighs 56 grams. The left ventricle is 1.3 cm in thickness, and the right ventricle is 0.3 cm in thickness. The cardiac valve measurements are as follows: the aortic valve 3.4 cm, the pulmonary valve 3.2 cm, the mitral valve 4.7 cm, and the tricuspid valve 4.2 cm.

### RESPIRATORY SYSTEM:

The upper airway is clear of debris and foreign material; the mucosal surfaces are smooth, yellow-tan and unremarkable. The pleural surfaces are smooth, glistening and

USCA5 826

AUTOPSY REPORT A02-42                                                                    7
GUNTER, Jakarenn

unremarkable bilaterally. The pulmonary parenchyma is red-purple, exuding slight amounts of bloody fluid; no focal lesions are noted. The pulmonary arteries are normally developed, patent and without thrombus or embolus. The right lung weighs 269 grams; the left 220 grams.

## LIVER & BILIARY SYSTEM:

The hepatic capsule is smooth, glistening and intact, covering dark red-brown, moderately congested parenchyma with no focal lesions noted. The gallbladder contains approximately 2 ml. of green-brown, mucoid bile; the mucosa is velvety and unremarkable. The extrahepatic biliary tree is patent, without evidence of calculi. The liver weighs 505 grams.

## ALIMENTARY TRACT:

The tongue exhibits no evidence of recent injury. The esophagus is lined by gray-white, smooth mucosa. The gastric mucosa is arranged in the usual rugal folds and the lumen contains a small amount of fluid. The small and large bowel are unremarkable. The pancreas has a normal pink-tan lobulated appearance, and the ducts are patent. The appendix is present and unremarkable.

## GENITOURINARY SYSTEM:

The renal capsules are smooth and thin, semi-transparent and strip with ease from the underlying smooth, red-brown cortical surfaces. The cortices are sharply delineated from the medullary pyramids, which are red-purple to tan and unremarkable. The calyces, pelves and ureters are unremarkable. The urinary bladder is empty, the mucosa is gray-tan and unremarkable. The uterus and bilateral ovaries are infantile, normally formed, and unremarkable. The right kidney weighs 62 grams; the left 63 grams.

## RETICULOENDOTHELIAL SYSTEM:

The spleen has a smooth, intact capsule covering red-purple, moderately firm parenchyma; the lymphoid follicles are unremarkable. The regional lymph nodes appear normal. The thymus is tan-pink and unremarkable. The spleen weighs 51 grams.

## ENDOCRINE SYSTEM:

The pituitary, thyroid and adrenal glands are unremarkable. The right adrenal gland weighs 5 gms; the left adrenal gland weighs 7 gms.

## MUSCULOSKELETAL SYSTEM:

Muscle development is normal. No bone or joint abnormalities are noted.

## MICROSCOPIC EXAMINATION:

Heart: Sections of the myocardium reveal intact striated muscle fibers. There is no evidence of atrophy, hypertrophy, or endocardial thickening.

Lungs: The alveolar spaces and small air passages are expanded and focally contain moderate amounts of edema fluid. Focally, there is acute pneumonia with accumulations of neutrophils filling the alveolar spaces. The alveolar walls are thin and focally

USCA5 827

AUTOPSY REPORT A02-42                                                          8
GUNTER, Jakarenn

congested. The arterial and venous vascular systems are normal. The peribronchial lymphatics are unremarkable.

Liver and gallbladder: The hepatic architecture is intact. The portal areas show no increased inflammatory component or fibrous tissue. The hepatic parenchymal cells are well preserved with no evidence of cholestasis, fatty metamorphosis, or sinusoidal abnormalities. The gallbladder mucosa shows the usual postmortem mucosal autolysis and bile staining. The fibromuscular wall of the gallbladder is not thickened. There is no evidence of acute or chronic cholecystitis.

Pancreas: The pancreas has the usual lobular architecture with moderate autolysis. The acini, islets of Langerhans', and ducts are unremarkable.

Spleen: The capsule and white pulp are unremarkable. There is minimal congestion of the red pulp.

Adrenal Glands: The cortical zones are distinctive and well supplied with lipoid. The medullae are not remarkable.

Kidneys: The subcapsular zones are unremarkable. The glomeruli are mildly congested without cellular proliferation, mesangial prominence, or sclerosis. The tubules are well preserved. There is no interstitial fibrosis or significant inflammation. There is no thickening of the walls of the arterioles or small arterial channels. The transitional epithelium of the collecting system is normal.

Skin:  Multiple sections of the skin of the hands and feet show varying stages of healing, with well-developed granulation tissue and scar formation, focal acute hemorrhage, crust formation, and epidermal hyperplasia. There is no evidence of deep infection or abscess formation. Sections of the subcutaneous tissue of the scalp show acute hemorrhage.

Brain and Eyes: See "Neuropathology Report" and "Ophthalmologic Pathology Report".

**OTHER PROCEDURES:**

1. Blood, vitreous, CSF, pleural fluid, peritoneal fluid and tissue samples were submitted for toxicologic examination.
2. Tissue was retained for possible histologic examination and DNA identification.
3. Documentary photographs were taken..
4. Fingerprints were taken.
5. The dissected organs were returned to the body.
6. Personal effects were released to NCIS agents.
7. The brain was submitted to the University of Texas Health Science Center at San Antonio for a Neuropathology consultation.
8. The eyes and optic nerves were submitted to Brook Army Medical Center for a Ophthalmologic Pathology consultation
9. Full body radiographs were obtained and reflect the injuries described above.

USCA5 828

AUTOPSY REPORT A02-42                                                          9
GUNTER, Jakarenn

**OPHTHALMOLOGIC PATHOLOGY REPORT** (Wilford Hall Medical
Center/Brooke Army Medical Center, San Antonio, Texas)

Gross Observations:  The right globe measured 21 x 20 x 21 mm. There are no obvious
signs of remote globe surgery. The cornea measured 10 x 9.5 mm. The pupil is round at 6
mm, and the iris is brown. The optic nerve segment was 15 mm. The proximal portion of
the optic nerve adjacent to the globe was thickened and pigmented. The globe was
opened in the equatorial plane to facilitate inspection of the posterior pole. On inspection
there appear to be fixed retinal folds with numerous dot and blot retinal hemorrhages.

    The left globe measured 19 x 20 x 22 mm. The cornea was 10.5 x 10 mm. The
pupil was 4 mm and round, and the iris is brown. The optic nerve segment was 10 mm
and there was a pigmented swelling to the proximal portion of the nerve. The globe was
opened to the equatorial plane and on examination there were multiple dot and blot
retinal hemorrhages.

Microscopic Findings: A sections of the right optic nerve discloses a healthy optic nerve
surrounded by fresh hemorrhage. This hemorrhage is both within the subarachnoid and
subdural space.

    A section of the posterior eyewall of the right eye discloses normal appearing
sclera. The choroid is congested with hemorrhage and contains a mild amount of acute
inflammation. Intraretinal and subretinal fresh hemorrhage is present. Hemorrhage within
the nerve fiber layer atop the optic nerve head is also present.

    A section of the anterior portion of the right globe discloses an unremarkable
cornea. The anterior chamber on one side appears to have been recessed from a blunt
trauma. There is fresh hemorrhage near the face of the tear in the ciliary muscle. The iris
leafs are unremarkable. The eye is phacoic and the lens is not discolored. Lange's folds
are present in the peripheral retina and subretinal blood is also seen in this area.
Neurofibrillary is also present within the retina.

    A section of the left proximal optic nerve again discloses fresh hemorrhage within
the perineural space.

    A section of the posterior eyewall of the left eye again shows perineural
hemorrhage that is present both in the subdural and subarachnoid space.

    A section of the anterior globe of the left eye reveals an unremarkable cornea.
Small foci of hemorrhage are present within the anterior chamber. The angle appears
recessed in this eye as well. The eye is phacoic and the lens is not dislocated. Again, a
Lange's fold is identified and there is intraretinal hemorrhage present.

Diagnosis Comment: There were no signs of intraocular foreign bodies, tumors or
sympathetic ophthalmia. This constellation of gross and microscopic findings in an
infant's eye are most consistent with non-accidental trauma.

**NEUROPATHOLOGY REPORT** (University of Texas Health Science Center at San
Antonio, Accession # 02-CX-235, Dr. Kathleen S. Kagan-Hallet)

USCA5 829

AUTOPSY REPORT A02-42                                                    10
GUNTER, Jakarenn

Gross Observations: There is mild to moderate cerebral edema, and a accompanying portion of dura showed a thin subdural hematoma. There is patchy subarachnoid hemorrhage. Coronal sections show fairly normal ventricular size, no intraventricular blood, and no herniation hemorrhages, including no brainstem (Duret) hemorrhages. No gross abnormalities of the cortical ribbon or deep white matter are noted- no midline (deep grey nuclear, callosal) petechiae or tears, but small areas of white matter softening and greyish discoloration (no xanthochromia) are seen. Sections through lower brainstem and cerebellum are unremarkable.

Microscopic Findings: Sections of dura show mostly recent hemorrhage trapped among the arachnoid granulations. The "oldest" areas in these dural sections show a thin membrane, histologically consistent with a few weeks duration. Sections of cerebral deep white matter (centrum semiovale) show prominent myelin tearing, foamy macrophages between the groups of disrupted white matter tracts. A ubiquitin stain of this particular section shows prominent axonal swellings which could even be found on routine sections on other slides of similar areas. A few areas show contusion-infarcts in a stage of early organizaion (sheets of foamy macrophages consistent with at least a weeks' duration) Older gliotic or cystic lesions are not identified. Focally severe acute neuronal hypoxic changes are also seen. Myelin tearing and axonal bodies are easily found.

Neuropathologic Diagnosis:
  I.      Cerebral edema, mild to moderate
          a.  Hemorrhagic necrosis of cerebellar tonsillar tips
  II.     Right subdural hematoma, mostly recent, minimal organization
          (approximately 10 days duration)
  III.    Cerebral white matter: Organized contusion infarcts (7+ days duration),
          myelin tearing and axonal bodies.

OPINION: This 2 1/2 year old female battered African American child, died of an acute closed head injury with a subdural hematoma. There are multiple recent impact sites on the child's head with subgaleal scalp hemorrhage, subdural and subarachnoid hemorrhage, bilateral retinal and optic nerve hemorrhage, and organizing contusions and myelin tearing within the brain tissue. In addition, the child shows chronic abuse with evidence of having been beaten with an electric cord and having had blunt force impacts to the left shoulder, back, and buttocks. There are two bite marks present, numerous linear electrical cord marks, multiple bruises and deep contusions of varying ages over

USCA5 830

AUTOPSY REPORT A02-42
GUNTER, Jakarenn                                                           11

the child's body, unexplained healing circular wounds of the hands and feet, and microscopically, on neuropathologic consultation, evidence of prior head trauma. The manner of death is homicide.

ELIZABETH A. ROUSE, Maj, USAF, MC, FS
Assistant Medical Examiner
Office of the Armed Forces Medical Examiner

53

USCA5 832

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,      )
                               )        Cause No: CR-C-02-216 (1)
            Plaintiff,         )
                               )
v.                             )
                               )
ALFRED BOURGEOIS,              )
                               )
            Defendant.         )

---

## AFFIDAVIT OF WERNER U. SPITZ, M.D.

1.    I received my M.D. degree in 1953 and am licensed to practice medicine. I am certified by the American Board of Pathology in Anatomic and Forensic Pathology.

2.    I have spent 54 years of my medical career in the practice of pathology and forensic pathology. My curriculum vitae is attached.

3.    For the purpose of formulating the following opinions I reviewed:

4.    The autopsy report, including the transcript of neuropathology consultation.

5.    Forensic odontology reports of Drs. Senn and Chrz.

6.    The transcript of the jury trial, including testimony of: AB1994, EMT John

1

USCA5 833

Burgess, Nurse Carol McLaughlin, FBI Agent Megan Beckett, Drs. Scott Benton, Ronald Kuffel, Elizabeth Rouse (who performed the autopsy), William Oliver, David Senn, Bryan Chrz and Noorullah Akhtar.

7.    Several CDs with body photographs and their enhancements of 2 years and 8 months old, African American, deceased minor, **Jakerenn Gunter**.

8.    The actual color and black and white photographs, which I reviewed are of acceptable and satisfactory quality to render an opinion.

9.    The enhancements are misleading, confusing, exaggerate the findings, and produce artifacts.

10.    If the documentation of bruises is at issue, the pathologist performing the autopsy can use their scalpel for such documentation and study.

11.    Enhancing the photographs introduces new dimensions, new colors, new uncertainties, in so far as the findings in the enhancements were not present at the autopsy table.

12.    The enhancements, in my opinion, are none other than inflammatory, without scientific merit.

2

USCA5 834

13.	Dark skinned individuals frequently have variations of skin pigment and tones often mistaken for injuries.

14.	Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as, DNA or at least blood type verification.

15.	With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had what appeared to be inflammatory changes in the genital area, some six weeks before her death and evidence of apparent bruising at the time of the postmortem examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse who performed the autopsy specifically describes on page three of her report, at the end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down, in the same paragraph, the autopsy report continues "on the upper left buttock, there is a hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in a much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

USCA5 835

16. The neuropathology report by Dr. Kathleen Kagan-Hallet indicates mild to moderate cerebral edema with hemorrhagic necrosis of cerebellar tonsilar tips, subdural hematoma of approximately 10 days duration and organized contusion infarcts of 7+ days duration as well as, myelin tearing and axonal bodies. The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts. I disagree with the witness testimony (AB1994) whereby the child's head was struck multiple times on the interior of the vehicle. I am also surprised to see what appear to be fresh bruises of 1 or 2 days in the scalp, while the subdural bleed and contusion infarcts in the white matter show evidence of organization compatible with a week or longer. The findings place in question causation of the injuries and their timing. The scalp injuries in and of themselves would not have been life threatening and there is a question as to the life threatening nature of the cerebral injuries.

17. I further find it questionable how mild to moderate cerebral edema without other manifestations of brain swelling would cause cerebellar herniation and explain the death. The brain weighed 1000 grams when weighed at the autopsy. This is not a weight that would imply severe brain swelling.

18. The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts.

19. All opinions rendered in this affidavit are within a reasonable degree of medical and scientific certainty.

4

USCA5 836

20.    My textbook, MEDICOLEGAL INVESTIGATION OF DEATH, 4th edition,

published by Charles C. Thomas, Springfield, Illinois, 2005 discusses in greater

detail many of the issues discussed in the affidavit.

FURTHER AFFIANT SAYETH NAUGHT.

Werner U. Spitz, M.D.

On this 10TH day of May, 2007 before me

personally appeared **Werner U. Spitz, M.D.**

To me known to be the person who executed the

forgoing instrument, and acknowledged that he

executed the same as his free act and deed.

Sworn and subscribed to before me:

Diane L. Lucke, Notary Public
County of Monroe, State of Michigan
Acting in Macomb County
My Commission Expires: October 20, 2011

5

USCA5 837

# WERNER U. SPITZ, M.D.

## *Forensic Pathology and Toxicology*
23001 Greater Mack
St. Clair Shores, Michigan  48080-1996

Phone:  (586) 776-2060  ■  Fax:  (586) 776-8722

**Diane L. Lucke, B.S.**
**Administrative Assistant/Office Manager**

**E-mail:**
**wuspitz@aol.com**

Date of Preparation: March, 2007

Home:  850 Lakeshore
         Grosse Pointe Shores, MI 48236

Telephone:  (313)  884-0501

## PERSONAL DATA:

Born:  August 22, 1926
         Stargard/Pomerania
         Germany

Fluent: English, German and French

## EDUCATION:

| | |
|---|---|
| Geneva University Medical School Geneva, Switzerland | 1946-1950 |
| Hebrew University, Hadassah Medical School - Jerusalem M.D. from same | 1950 - 1953 |

## TRAINING:

| | |
|---|---|
| Internship and residency in Pathology and Forensic Pathology Hadassah Medical School | 1953 - 1959 |
| Research Fellow, Forensic Pathology University of Maryland Baltimore, Maryland | 1959 - 1961 |

## FACULTY APPOINTMENTS:

| | |
|---|---|
| Assistant, Dept. of Forensic Pathology Free University of Berlin, West Germany | 1961 - 1963 |

USCA5 838

| | |
|---|---|
| Assistant Professor of Pathology<br>University of Maryland<br>School of Medicine | 1966 - 1969 |
| Associate Professor, Forensic Pathology<br>Department of Public Health Administration<br>Johns Hopkins University<br>Baltimore, Maryland | 1967 - 1972 |
| Clinical Associate Professor of Pathology<br>University of Maryland<br>School of Medicine | 1969 - 1972 |
| Membership on the Graduate Faculty<br>University of Maryland<br>College Park, Maryland | 1970 - 1972 |
| Professor, Department of Pathology<br>Wayne State University<br>School of Medicine | 1973- |
| Adjunct Professor of Chemistry<br>University of Windsor<br>Ontario, Canada | 1978- |

## HOSPITAL OR OTHER PROFESSIONAL APPOINTMENTS:

| | |
|---|---|
| Associate Medical Examiner, Maryland<br>Medical-Legal Foundation<br>Baltimore, Maryland | 1963 - 1965 |
| Pathologist, Mount Wilson State Hospital<br>for Chest Diseases, Maryland | 1964 - 1972 |
| Assistant Medical Examiner<br>State of Maryland<br>Baltimore, Maryland | 1965 - 1969 |
| Lecturer in Forensic Pathology<br>Department of Public Administration<br>Johns Hopkins University<br>Baltimore, Maryland | 1966 - 1969 |
| Deputy Chief Medical Examiner<br>State of Maryland<br>Baltimore, Maryland | 1969 - 1972 |
| Director of Research and Training<br>Maryland Medical-Legal Foundation<br>Baltimore, Maryland | 1967 - 1972 |

Chief Medical Examiner, County of Wayne

**USCA5 839**

Detroit, Michigan                                    1972 - 1988

Pathologist and Chief Medical Examiner
County of Macomb, Michigan                          1972 - 2004

**MAJOR PROFESSIONAL SOCIETIES:**

Michigan Association of Medical Examiners
Member Executive Committee, [1986 - Present]
Wayne County Medical Society

Michigan Society of Pathology,
Chairman, Forensic Pathology Committee

College of American Pathologists, Fellow

American Society of Clinical Pathologists, Fellow

National Association of Medical Examiners,
Board of Directors

American Academy of Forensic Sciences, Fellow,
Pathology and Biology Section, Past Chairman,
Nominating Committee, 1977; Secretary/Treasurer, 1980,
Chairman, 1981

World Congress of Legal Medicine, Vice President, 1986

Detroit Academy of Medicine, Fellow

## LICENSURE:

License to practice medicine, member countries
of the European Union                               1960

Maryland Board of Medical Examiners                 1964

Virginia Board of Medical Examiners                 1965

Washington, D.C., Commission on Licensure
to Practice the Healing Art                         1971

Michigan Board of Registration in Medicine          1972

## SPECIALTY BOARDS:

Certification by The American Board of Pathology:

Pathologic Anatomy              1961

Forensic Pathology              1965

## HONORS/AWARDS:

**USCA5 840**

American Physicians Fellowship Inc., August, 1967

Northern Virginia Arson Seminar - Certificate of Recognition of Attendance, December 2, 1967

National Association of Medical Examiners - Certificate of Membership, 1972
North End Detroit Lions Club - Certificate of Service, March 5, 1974

International Association of Bomb Technicians and Investigators - Certificate of Appreciation, May 24, 1978

The International Reference Organization in Forensic Medicine - for Continuous Support of INFORM and outstanding Contributions to Forensic Medicine, August 1, 1979

The Arizona Department of Public Safety - Certificate of Appreciation, December 7, 1979
University of Detroit - Certificate of Appreciation, February 26, 1981

Kiwanis Club of New Center, Detroit - Certificate of Appreciation, June 17, 1981

Latin American Association of Legal Medicine, May 20, 1982 - Honorary Member

Mid Atlantic Forensic Pathology Association Certificate of Recognition May 2, 1983

The American Academy of Forensic Sciences, February 15, 1983

American Medical Association - Certificate of Member in good Standing, 1984

Crockett Vocational/Technical Center - Certificate of Appreciation, May 15, 1985

Michigan Ontario Identification Association - Certificate of Appreciation, May 17, 1985

British Academy of Forensic Sciences Medicolegal and Odontological Society of Mexico, Honorary Member, 1986

Founder's Award, Michigan Eye Bank and Transplantation Center, June 15, 1986

EL Instituto Politecnico Nacional, 1986

Crockett Vocational/Technical Center - Certificate of Appreciation, June 10, 1987

Resolution for Outstanding Service, handling mass disaster, Northwest Flight 255 plane
crash, City of Romulus September, 1987

Award from Wayne County for handling of Northwest Flight 255 Plane Crash, October, 1987

Michigan Police Chaplains Association - Certificate of Appreciation, March 14, 1988

Wayne County Medical Society - Resolution for Outstanding Service, August 24, 1988

USCA5 841

New York State Police - Certificate of Appreciation, October 5, 1988

New York State Police - Certificate of Appreciation, November 8, 1990

International Symposium on Forensic Techniques - Certificate of Appreciation, June 6, 1991

New York State Police - Certificate of Appreciation, October 2, 1991

American Board of Forensic Examiners - Recognizes for High Level of Professional Scientific involvement, December 12, 1994

Special Opportunities for Amputee Rehabilitation - Acknowledgment for Sponsoring an Amputee, 1994

Wayne County Medical Society - Certificate of membership in Good Standing, 1994

New York State Police - Certificate of Appreciation, September 28, 1994

Sterling Heights Citizen's Police Academy - Certificate of Appreciation, March 22, 1995

New York State Police - Certificate of Appreciation, September 20, 1995

American Society of Clinical Pathologists  January 11, 1996

New York State Police - Certificate of Appreciation, October 3, 1996

American Medical Association - Certificate of Member in Good Standing, 1996

Medicolegal Investigation of Death - Certificate of Participation, March 6 & 7, 1997

Investigation for Identification - Certificate of Completion, October 31, 1997

National Association of Medical Examiners - Certificate of Membership, 1999

Turning Point SANE Program - Recognition and Appreciation of Outstanding Effort, June 24,          1999

Dean's Award for 24 years of dedicated service to the medicolegal community and Wayne                     community and Wayne State University School of Medicine, March 6, 1997

National Association of Medical Examiners - Certificate of Membership, 2000

Indiana Division International Association for Identification - Certificate of Appreciation, 11th Annual    Annual Indiana IAI Conference

## SERVICE:

Consultant - Johns Hopkins University, Applied Physics Laboratory, Silver Spring, Maryland, 1968-1972

USCA5 842

Consultant - Veterans Administration Hospital
     Allen Park, Michigan, 1972

Consultant - Rockefeller Commission on CIA activities
     within the United States, investigating the
     circumstances surrounding the assassination of
     President John F. Kennedy, 1975
Member - Forensic Pathology Panel, Select Committee on
     Assassinations, U.S. House of Representatives,
     Washington, D.C.,  1978

Consultant - Michigan Department of Labor, Silicosis
     and Dust Fund, 1977-1980

Consultant - Pan American Health Organization, November, 1978

Consultant, U.S. Borax and Chemical Company, Los Angeles, California, October
1984-                    Present

Consultant - NBC News for the OJ Simpson Trial, 1994-1995

Editor - Journal of Legal Medicine, Heidelberg,
     Germany, New York

Member - Editorial Board, American Journal of Dermatopathology

Member - Editorial Board, Journal of Forensic Sciences

Member - Editorial Board, Excerpta Medica, [Holland],
     Forensic Sciences

Member - Editorial Board, Forensic Science, Copenhagen
     Denmark, Biomedical Division - Elsevier Science
     Publishers, B.V.

Member - Editorial Board, The American Board of
     Dermatopathology, Masson Publishing USA, Inc.

Member - Test Committee, American Board of Pathology,
     1974-1979

Member - Public Health Committee, Claims Review
     Committee, Wayne County Medical Society, 1979

Member - Probus Award Selection Committee, 1979

Listed - American Men and Women of Science, 12th Edition

Listed - Who's Who in America (Life member, 2000)

**TEACHING:**

USCA5 843

| | |
|---|---|
| 28 years Professor, Department of Pathology<br>Wayne State University<br>School of Medicine | 1973 - |
| 2 years Assistant, Dept. of Forensic Pathology<br>Free University of Berlin, West Germany | 1961 - 1963 |
| 3 years Assistant Professor of Pathology<br>University of Maryland<br>School of Medicine | 1966 - 1969 |
| 5 years Associate Professor, Forensic Pathology<br>Department of Public Health Administration<br>Johns Hopkins University<br>Baltimore, Maryland | 1967 - 1972 |
| 3 years Clinical Associate Professor of Pathology<br>University of Maryland<br>School of Medicine | 1969 - 1972 |
| 2 years Membership on the Graduate Faculty<br>University of Maryland<br>College Park, Maryland | 1970 - 1972 |
| 21 years Adjunct Professor of Chemistry<br>University of Windsor<br>Ontario, Canada | 1978 - |

## GRANT SUPPORT:

U.S. Government (HEW) Institute of Maternal Health, $ 800,000 Grant for Research and Counseling of Sudden Infant Death.  1975-1985.

Grant from Eli Lilly for a study of propoxyphen.  $ 2,500. 1985.

State of Michigan, Office of Substance Abuse Services, Designer Drug grant, $ 3,000.  1986-1987.

Participated in a combined study with Michigan Department of Health, Detroit Health Department to determine the frequency of AIDS in medical examiner cases.  approximately $ 2,000.  1987.


## TESTIMONY IS NOT INCLUDED: LIST IS AVAILABLE UPON REQUEST


## PUBLICATIONS:

1.  A Contribution to Pulmonary Acariasis in Imported
    Rhesus Monkeys.
    *Bull. Res. Council of Israel* **6E** (2):  119-122, (1957).

**USCA5 844**

Spitz, W.U.

2.    Mycetoma Pedis.
      *A.M.A. Arch. Dermat.* **75**: 855-863, (1957).
      Ziprkowski,L., Altmann,G., Dalith,F. and Spitz,W.U.

3.     Mechanism of Death in Fresh-Water Drowning.
      *A.M.A. Arch. Path.,* **71**: 661-668, (1961).
      Spitz, W.U. and Blanke, R.

4.    *Increase of Body Weight as an Additional Criterion in*
      *Establishing the Diagnosis of Fresh Water Drowning.*
      Newsletter - Am. Acad. Forensic Sci., March-April, 1961.
      Spitz, W.U. and Fisher, R.S.

5.    Physical Activity Until Collapse Following Fatal Injury
      by Firearms and Sharp Pointed Weapons.
      *J. Forensic Sci.,* **6**, (3): 290-300, (1961).
      Spitz, W.U., Petty, C. and Fisher, R.

6.    Subdurale Blutungen aus isolierten Verletzungen von
      Schlagadern an der Hirnoberflache durch stumpfe Gewalt.
      *Virchows Arch. Path. Anat.* **336**: 87-98, (1962),
      Krauland, W., Mallach, H.J., Missoni, L. und Spitz, W.U.

7.    Diagnose des Ertrinkungstodes durch den Diatomeen-Nachweis
      in Organen.
      *Dtsch. Z. ges. gerichtl. Med.* **54**: 42-45, (1963).
      Spitz, W.U.

8.    Recovery from Drowning.
      *Brit. Med. J.,* **5364,** 1678, (1963).
      Spitz, W.U.

9.    The Significance of Diatoms in the Diagnosis of Death
      by Drowning.
      *J. Forensic Sci.,* **9**, (1): 11-18, (1964).
      Spitz, W.U. and Schneider, V.

10.   Befunde bei vorubergehender Wiederbelebung nach
      Elektrounfall.
      *Munch. Med. Wchschr.* **106.**Jg., (11): 495-498, (1964).
      Spitz, W.U.

11.   Untersuchungen von Luftfiltrationsstreifen aus
      verschiedenen Gebieten der Bundesrepublik auf ihren
      Diatomeengehalt. - Ein Beitrag zum Beweiswert von
      Diatomeen fur die Diagnose des Ertrinkungstodes. -
      *Dtsch. Z. ges. Gerichtl. Med.* **56**: 116-124, (1965).
      Spitz, W.U., Schmidt, H. and Fett, W.

12.  Techniques of Identification Applied to 81 Extremely
     Fragmented Aircraft Fatalities.
     *J. Forensic Sci.*, **10,** (2): 121-135 (1965).
     Fisher, R., Spitz, W.U., Breitenecker, R. and Adams, J.

13.  Hemorrhagic Pancreatitis Following a Kick in the
     Abdomen - Report of a Case.
     *J. Forensic Med.,* **12** (3): 105-107, (1965).
     Spitz, W.U.

14.  Ultrastructural Alterations in Rat Lungs. - Changes
     After Intratracheal Perfusion with Freshwater and
     Seawater.
     *A.M.A. Arch. Path.* **81:** 103-111, (1966).
     Reidbord, H. and Spitz, W.U.

15.  Ultrastructural Alteration in Rat Lungs. - Changes
     Following Asphyxiation.
     *A.M.A. Arch. Path.* **82:** 80-84, (1966).
     Reidbord, H. and Spitz, W.U.

16.  Weitere Untersuchungen Zur Diagnostik des
     Ertrinkungstodes durch Diatomeennachweis.
     *Dtsch. Z. ges. gerichtl. Med.*, **58**: 195-204, (1966).
     Spitz, W.U. and Schmidt, H.

17.  Enzymologic Approach to the Diagnosis of Death by
     Drowning - Preliminary Report.
     *Am. J. Clin. Path.*, **47** (6): 704-708, (1967).
     Spitz, W.U., Burfitt,H., Freimuth,H. and Michaelis,M.

18.  *Reconstruction of Accidents: Integration of
     Pathological Findings and Roadside Evidence.*
     Proceedings of the International Conference on
     Accident Pathology, June 6-8, 1968, Washington, D.C.
     U.S. Government Printing Office.
     Brinkhous, K. (Editor) and Spitz, W.U.

19.  Enzymatic Changes in Asphyxia, Experimental
     Pulmonary Edema and Drowning.
     *Am. J. Clin. Path.,* **51** (1): 102-106, (1969).
     Spitz, W.U., Hebel, R. and Michaelis, M.

20.  Drowning: Principles of resuscitation differ according
     to whether drowning takes place in fresh water or salt
     water. (Its Pathogenesis, Clinical and Post Mortem
     Aspects). *Hospital Medicine*, **5** (7): 8-18, (1969).
     Spitz, W.U.

21.  Rikoschett - oder KontaktschuBverletzung.

USCA5 846

*Dtsch. Z. ges. gerichtl. Med.*, **66**: 153-160, (1969).
Spitz, W.U.

22.  Histochemical Changes in Experimental Drowning,
     Pulmonary Edema and Asphyxia.
     *J. Forensic Med.,* **16** (3): 79-85, (1969).
     Spitz, W.U., Silverman, B., Michaelis, M.

23.  Does Illness Cause Crashes?
     3rd. Triennial Congress of Motor Vehicle Accidents,
     New York, June, 1969,
     *JAMA,* **208** (12): 2257, (1969).
     Baker, S. and Spitz, W.U.

24.  Stud Gun Injuries.
     In: *Internan. Microfilm Journal,* **4** (4) and *J. Forensic
     Med.* **17** (1): 5-11, (1970).
     Spitz, W.U. and Wilhelm, R.

25.  Age Effects and Autopsy Evidence of Disease in Fatally
     Injured Drivers.
     *JAMA* **214** (6):  1079-1088, (1970).
     Baker, S. and Spitz, W.U.

26.  *Laboratory Diagnosis of Drowning.* - Werner U. Spitz.
     Chapter in - LABORATORY DIAGNOSIS OF DISEASES CAUSED
     BY TOXIC AGENTS, Editors - Sunderman and Sunderman,
     Warren H. Green, St. Louis, Missouri, 1970.

27.  Post Mortem Changes of pH in Rabbits' Vitreous Body
     Compared with Brain and Liver.
     *Invest. Opthal.* **9**:  158, (1970).
     Spitz, W.U., Hebel, R. and Michaelis, M.

28.  Injury by Birdshot.
     *J. Forensic Sci.*, **15** (3):  396-402, (1970).
     Di Maio, V. and Spitz, W.U.

29.  Essential Post Mortem Findings in the Traffic Accident
     Victim.
     *A.M.A. Arch. Path.*, **90**:  451-457, (1970).
     Spitz, W.U.

30.  Medicolegal Investigation of a Bomb Explosion in an
     Automobile.
     *J. Forensic Sci.*, **15** (4): 537-552, (1970).
     Spitz, W.U., Sopher, I. and Di Maio, V.

31.  An Evaluation of the Hazard Created by Natural Death at
     the Wheel.
     *New Eng. J. Med.*, **283** (8):  405-409, (1970).
     Baker, S. and Spitz, W.U.

32.  *Traffic Deaths Due to Blunt Abdominal Trauma.*
     Proceedings of the 14th Annual Conference, AAAM,
     Ann Arbor, Michigan, November, 1970.
     Baker, S., Gertner, H., Rutherford, R. and Spitz, W.U.

33.  Melanosis of the Prostate Gland.
     *Am. J. Clin. Path.*, **56** (6):  762-764, (1971).
     Gardner, W., Jr. and Spitz, W.U.

34.  Exanguinating Hemoptysis due to Ruptured Syphilitic
     Aneurysm.  A Case Report
     *J. Forensic Med.*, **18** (3):  118-121, (1971).
     Sopher, I. and Spitz, W.U.

35.  Endodermal Inclusions of the Heart - So-Called
     "Mesotheliomas of the Aerioventricular Node".
     *A.M.A. Arch. Path.*, **92**: 180-186, (1971).
     Sopher, I. and Spitz, W.U.

36.  Fatally Injured Drivers: Clues from Medical Examiners,
     Police and DMV.
     *Police*, July-August, 67-72, (1971).
     Baker, S. and Spitz, W.U.

37.  Tattoos, Alcohol and Violent Death.
     **J. Forensic Sci.**, **16** (2): 219-225, (1971).
     Baker, S., Robertson, L. and Spitz, W.U.

38.  Problems Encountered in Dental Identification of a
     Mutilated Body.
     *JADA*, **83**:168-169, (1971).

39.  Evaluation of the Management of Vehicular Fatalities
     Secondary to Abdominal Injury.
     *Trauma*, **12**: 425-431, (1972).
     Gertner, H., Baker, S., Rutherford, R. and Spitz, W.U.

40.  Variations in Wounding Due to Unusual Firearms and
     Recently Available Ammunition.
     *J. Forensic Sci.*, **17** (2): 377-386, (1972).
     Di Maio, V. and Spitz, W.U.

41.  *Variations of Shotgun Injuries - An Experimental
     Study.*  Abstracts, 6th International Meeting,
     Forensic Sciences, Edinburgh, September, 1972,
     pp. 88-89.
     Spitz, W.U. and Lipkovic, P.

42.  **MEDICOLEGAL INVESTIGATION OF DEATH - Guidelines
     for the Application of Pathology to Crime
     Investigation.**  Spitz, W.U. (Editor) and Fisher, R.

USCA5 848

(Co-Editor). Springfield, Illinois, Charles C. Thomas, 1973.

43. Peculiarities of Certain .22 Caliber Revolvers (Saturday Night Specials).
*J. Forensic Sci.*, **19** (1): 48-53, (1974).
Schmidt-Orndorff, H., Reitz, J.A., and Spitz, W.U.

44. *Determination of Narcotics in Homicides in Detroit.*
Abstracts, 26th Annual Meeting, American Academy of Forensic Sciences, Dallas, Texas, February, 1974.
Monforte, J. and Spitz, W.U.

45. *Hit and Run, Gold Award Exhibit.*
Annual Scientific Exhibit of the American Society of Clinical Pathologists and the College of American Pathologists, Washington, D.C., 1974.
Spitz, W.U.

46. Narcotic Abuse Among Homicide Victims in Detroit.
*J. Forensic Sci.*, **20** (1): 186-190, (1975).
Monforte, J. and Spitz, W.U.

47. Accidental Death with a Tear Gas Pen Gun. A Case Report.
*J. Forensic Sci.*, **20** (4): 708-713, (1975).
Smialek, J. Ratanaproeksa, O. Spitz, W.U.

48. Short Range Ammunition: A Possible Anti-Hijacking Device.
*J. Forensic Sci.*, **21** (4): 856-861, (1976).
Smialek, J. and Spitz, W.U.

49. Important Considerations in the Management of Drowning Victims.
*Hospital Medicine*, June, 1976.
Spitz, W.U.

50. Drug Deaths Involving Propoxyphene - An Assessment in Metropolitan Detroit.
*Preventive Medicine*, **5:** 573-576, (1976).
Monforte, J. and Spitz, W.U.

51. Accidental Bed Deaths in Infants due to Unsafe Sleeping Situations.
*Clin. Pediatrics,* **16** (11):  1031-1036, (1977).
Smialek, J., Smialek, P. and Spitz, W.U.

52. Methadone Deaths in Children.
*JAMA,* **238**:  2516-2517, (1977).
Smialek, J., Monforte, J., Aronow, R. and Spitz, W.U.

53. Rupture of a Subclavian Artery Aneurysm in a Heroin
    Addict.  Report of a case.
    *J. Legal Medicine*, J.F. Springer - Munich, **81**:
    147-149, (1978).
    Whayne, N. and Spitz, W.U.

54. Death Behind Bars - The Jail Scene.
    *JAMA*, Special Communication, **240**: 2563-2564, (1978)
    and The Texas Lawman, 48: 9, (1979)
    Smialek, J. and Spitz, W.U.

55. Cyclohexamine [Rocket Fuel] - Phencyclidine's Potent
    Analog.
    *J. Analytical Toxicology*, **3**: 209-212, (1979).
    Smialek, J., Monforte, J., Gault, R. and Spitz, W.U.

56. *The Gunshot Victim.*
    Annual Scientific Exhibit of the American Society of
    Clinical Pathologists and the College of American
    Pathologists, Las Vegas, 1979.
    Smialek, J. and Spitz, W.U.
    Louisiana, February, 1980.
    Smialek, J., Merchant, M. and Spitz, W.U.

57. The Medicolegal Autopsy.
    *Human Pathology*, **11** (2): 105-112, (1980).
    Spitz, W.U.

58. Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
    Guidelines for the Application of Pathology to Crime
    Investigation.** Second Edition, Spitz, W.U. (Editor). Springfield,
    Illinois, Charles C. Thomas, 1980.

59. *An Analysis of Sudden and Unexpected Deaths in Young
    Adult Females Living in a Metropolitan Area.*
    In Proceedings of the 32nd Annual Meeting of the
    American Academy of Forensic Sciences, New Orleans.

60. Automobile Cigarette Lighter Burns.
    *J. Forensic Sci.*, **25**: 631-633 and 704, (1980).
    Smialek, J., Spitz, W.U. and Sacra, E.

61. Ethanol in Intracerebral Clot - Report of Two
    Homicidal cases with Prolonged Survival After Injury.
    *Am. J. of Forensic Medicine and Pathology*, **1** (2):
    149-150, (1980).
    Smialek, J., Spitz, W.U., and Wolfe, J.

USCA5 850

62.  Shotgun Wounds - Homicide or Self-Inflicted?
     *Michigan Police Officer,* **8:** (3), 24-27, (1980).
     Spitz, W.U.

63.  Heroin Culture.
     *Michigan Police Officer*, **8:** (4), 23-27, (1980).
     Spitz, W.U.

64.  Secondary Intracranial Subarachnoid Hemorrhage Due
     to Spinal Missile Injury.
     *J. Forensic Sci*, **26** (2): 431-434, (1981).
     Smialek, J., Chason, J., Kshirsager, V. and Spitz, W.U.

65.  Concentration of Alcohol in Delayed Subdural Hematoma.
     *J. Forensic Sci.*, **28** (4): 1013-1015, (1983).
     Cassin, B. and Spitz, W.U.

66.  Modernization of a Large Metropolitan Autopsy
     Facility. *Lipshaw Lab Leader*, **1** (2), (1984).
     Spitz, W.U.

67.  Suicidal Electrocution in a Bathtub.
     *Am. J. For. Med. and Path.*, **6** (3): 276-278, (1985).
     Lawrence, R., Spitz, W.U. and Taff, M.

68.  Intrapleural Golf Ball Size Loose Body:  An
     Incidental Finding at Autopsy.
     *Am. J. For. Med. and Path.*, **6** (4): 329-331, (1985).
     Spitz, W.U. and Taff, M.

69.  Sudden Prisoner Deaths and 'Capture Myopathy'. [Letter]
     *JAMA*, **253** (1) 13: 1934, (1985).
     Spitz, W.U.

70.  System for Deodorizing and Decontaminating Autopsy
     Rooms.  UNITED STATES PATENT number 4,600,557
     Date of Patent:  July 15, 1986.

71.  The Amino Acid Sequence of Human Cardiac Troponin-C.
     *Muscle and Nerve*, **9**:  73-77, (1986).
     Romero, A., Lieska, N. and Spitz, W.U.

72.  A Case of Suicidal Hanging in an Automobile.
     *Am. J. For. Med. and Path.*, **6** (4): 362-364, (1986).
     Hardwicke, M.B., Taff, M. and Spitz, W.U.

73.  A Work-Related Death Due to a Penetrating Chest
     Injury.
     *Am. J. For. Med. and Path.*, **7** (2): 163-164, (1986).
     Katanick, D., Taff, M. and Spitz, W.U.

74. Sudden Death Resulting from Chicken Bone Perforation
of Esophagus.
*Am. J. For. Med. and Path.*, **7** (3): 263-265, (1986).
Russo, S., Taff, M., Ratanproeksa, O. and Spitz, W.U.

75. Fatal Thyrotoxic Crisis:  A Case Report. *Am. J. For. Med.
Path.*, **7** (2): 174-176, (1986). Herman, G., Kanluen, S.,
Monforte, J., Husain, M., and Spitz, W.U.

76. An Unusual Case of Compression Asphyxia and Smothering.
*Am. J. For. Med. and Path.*, **7** (4), (1986).
Wolodzko, A., Taff, M., Ratanaproeksa, O. and
Spitz, W.U.

77. Syncope and Sudden Death Caused by Mitral Valve Myxomas.
*Am. J. For. Med. and Path.*, **7** (1): 84-86 (1986).
Puff, M., Taff, M., Spitz, W.U. and Eckert, W.

78. Scald Burns Complicated by Isopropyl Alcohol
Intoxication:  A Case of Fatal Child Abuse.
*Am. J. For. Med. and Path.*, **7** (1): (1986).
Russo, S., Taff, M., Mirchandani, H., Monforte, J. and
Spitz, W.U.

79. Resuscitation and Petechiae.
*Am. J. For. Med. and Path.*, **9** (1): 35-37, (1988).
Hood, I., Ryan, D. and Spitz, W.U.

80. Determining Gender:  Examination of Hair. [Letter]
*JAMA*, **260** (6): 851, (1988).
Spitz, W.U.

81. Award Citation:  A Tribute to the Late Russell S. Fisher.
*Am. J. For. Med. and Path.*, **9** (4): 355-356, (1988).
Spitz, W.U.

82. The Case of the Sitting Corpse:  Accident of Homicide.
*Am. J. For. Med. and Path.*, **10** (3): 242-244, (1989).
Spitz, W. U.

83. Necrotizing Fasciitis: A Fatal Outcome Following Minor
Trauma.
*Am. J. For. Med. and Path.*, **10** (3): 239-241, (1989).
Wojno, K. and Spitz W. U.

84. Fatal Accidents and Blood Ethanol Levels in Adolescents
and Adults - The Wayne County Experience 1978-1988.
*Am. J. For. Med. and Path.*, **10** (3): 187-192, (1989).
Hain, J.R., Ryan, D.M. and Spitz W. U.

85. Postmortem Cerebrospinal Fluid Pleocytosis.
*Am. J. For. Med. and Path.,* **10** (3): 209-212, (1989).

Platt, M.S., McClure, S., Clarke, R., Spitz W.U., and
Cox, W.

86.  Killer Pop Machines.
     *J. Forensic Sci.*, **35** (2): 490-492, (1990).
     Spitz, D. J. and Spitz W. U.

87.  Gastrointestinal Hemorrhage from an Internal Jugular
     Abscess in an Intra-venous Drug Addict.
     Ippolito, S. F. and Spitz, W. U.

88.  *The Traffic Accident Victim* - Werner U. Spitz.
     Chapter in - **HANDBOOK OF FORENSIC PATHOLOGY.**
     Published by: College of American Pathologists.
     Expected publication date is January 1990.
89.  Sudden Death of an Elderly Man with Multiple
     Malignant Neoplasms.
     *Am. J. For. Med. and Path.*, 12 (3): 265-271, (1991).
     Hardwicke, M.B., Taff, M., Spitz, W.U. and Gordan, R.

90)  Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
     Guidelines for the Application of Pathology to Crime
     Investigation.** Third Edition, Spitz, W.U. (Editor). Springfield,
     Illinois, Charles C. Thomas, 1993.

91.  Spitz, W.U.: **Excited Delirium vs. Positional Asphyxia**,
     Michigan Association of Medical Examiners Cross Section,
     Summer, 2000.

92.  Spitz, W.U.: **FORENSIC PATHOLOGY**,CD-ROM, Universal Multimedia, Inc.,
     Costa Mesa, CA, 2000.

93)  Spitz, W.U.: **Don't Be Intimidated,**
     Michigan Association of Medical Examiners Cross Section,
     Summer, 2000.

94.  Spitz and Fisher's **MEDICOLEGAL INVESTIGATION OF DEATH,
     Guidelines for the Application of Pathology to Crime
     Investigation.** Fourth Edition, Spitz, W.U. (Editor). Springfield,
     Illinois, Charles C. Thomas.

## PRESENTATIONS:

Guest Lecturer - Armed Forces Institute of Pathology
     Annual course of forensic pathology - 1970 - 1991

Guest Lecturer - Louis Phillippe Mousseau Memorial
     Lecture, Edmonton, Alberta, Canada
     October 16, 1974

**USCA5 853**

Guest Lecturer - Israel Association of Forensic Sciences
 Reconstruction of the events surrounding the
 assassination of President John F. Kennedy as
 feasible by analysis of his wounds
 Tel Aviv, Israel, March, 1980
Guest Lecturer - Asociacion Mexicana de Medicina Legal,
 Quinto Symposium International de Graduacion
 en Medicina Legal, Mexico City, August 28-30,
 1980

Guest Lecturer - Sixth South African International
 Conference of Legal Medicine, Johannesburg,
 South Africa, March 17-21, 1981

Guest Lecturer - First Pan American Symposium of Legal
 Medicine, Mexico City, Mexico, May 22-28, 1982

Guest Lecturer - Sociedad Mexicana de Medicina Forense,
 Criminologia y Criminalistica, A.C.
 Estados Unudos de America, Mexico
 July 21 - 27, 1985

Guest Lecturer - Edwin C. Yoder Honor Lecture
 Tacoma, Washington, November 15, 1985

Guest Lecturer - El Instituto Politecnico Nacional
 Mexico City, Mexico, October 12-15, 1986

Guest Lecturer - Primer Curso Internacional De Medicina
 Legal en La Mitad Del Mundo, Quito, Ecuador
 July 18 - 22, 1988

Guest Lecturer - Michigan Insurance Adjusters, Detroit,
 February 18, 1985

Lecturer - University of Windsor, Chemistry Department,
 March 15, 1985

Guest Lecturer - Beaumont Hospital, Royal Oak, Michigan
 March 29, 1985

Guest Lecturer - St. Johns Hospital, Detroit, Michigan
 April 12, 1985

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
 April 30, 1985

Chairman - Annual seminar - Wayne State University Continuing
 Education - Medical Legal Investigation of Death
 seminar.  May 9 - 11, 1985

Guest Lecturer - Detroit Police Seminar, Detroit, Michigan

USCA5 854

May 17, 1985

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
    October 15, 1985

Lecturer - Wayne County Judges, Detroit, Michigan
    November 8, 1985

Lecturer - University of Windsor Law School, Windsor, Canada
    December 4, 1985

Lecturer - Detroit College of Law School, Detroit, Michigan
    Full day - January 15, 1986

Guest Lecturer - Grace Hospital, Detroit, Michigan
    April 12, 1986

Guest Lecturer - Ontario Coroners Association, Niagara on the
    Lake, Canada  April 10-11, 1986
Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
    April 29-30, 1986

Guest Lecturer - Michigan Prosecutors Coordinating Council,
    Shanty Creek, Michigan  May 3, 1986

Chairman - Annual seminar - Wayne State University Continuing
    Education - Medical Legal Investigation of Death
    seminar.  May 8 - 10, 1986

Guest Lecturer - Michigan Insurance Adjusters Assn.,
    Southfield, Michigan  May 13, 1986

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
    Michigan  November 8, 1986

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
    April 27, 1986

Chairman - Annual seminar - Wayne State University Continuing
    Education - Medical Legal Investigation of Death
    seminar.  May 7 - 9, 1987

Guest Lecturer - Michigan/Ontario Identification Association,
    Windsor, Canada  June 30, 1987

Guest Lecturer - Glessner Lee Seminar, Baltimore, Maryland
    September 14, 1987

Chairman - Illinois Coroner's Association Seminar, Matoon,
    Illinois  October 19-20, 1987

Lecturer - St. Clair Medical Examiners, Port Huron, Michigan

USCA5 855

September 26, 1987

Guest Lecturer - Insurance Adjusters Assn., Detroit,
        Michigan  November 16, 1987

Guest Lecturer - America Society of Clinical Pathologists
        Seminar,  Chicago, Illinois  December 1, 1987.

Lecturer - Life, Accident and Health Claim Association,
        Detroit, Michigan  January 19, 1988

Lecturer - Police Department Chaplains Assn., Farmington,
        Michigan  March 14, 1988

Guest Lecturer - Wayne County Medical Society, Disaster
        Planning Seminar, Detroit, Michigan  April 7, 1988.
Guest Lecturer - Michigan Trial Lawyers Association Seminar,
        Southfield, Michigan  May 21, 1988.

Guest Lecturer - Wayne County Sheriff's School, Disaster
        Planning Seminar, Romulus, Michigan  June 28-30,
        1988.

Guest Lecturer - Dearborn Elks Loge 1945, Dearborn,
        Michigan  July 27, 1988

Guest Lecturer - New York State Police Annual Seminar,
        Albany, New York  October 4, 1988.

Lecturer - Michigan Association of Medical Examiners,
        Midland, Michigan  October 14-16, 1988

Guest Lecturer - Douchess County Seminar, New York
        November 12-14, 1988

Guest Lecturer - Michigan Trial Lawyers Association,
        Southfield, Michigan  November 15, 1988.

Lecturer - Bon Secours Hospital Staff, Grosse Pointe,
        Michigan  February 27, 1989

Guest Lecturer - Defense Attorneys Seminar, Lansing,
        Michigan  April 21, 1989

Guest Lecturer - Seminar in Homicide Investigation,
        Baltimore, Maryland  May 2, 1989

Guest Lecturer - Kiwanis Lecture, Westland, Michigan
        May 15, 1989

Guest Lecturer - Macomb County Community College,
        June 14, 1989

USCA5 856

Guest Lecturer - Pathology Review Course, Lisle, Illinois
September 17-18, 1989

Guest Lecturer - New York State Police Academy, Albany,
New York  September 20-22, 1989

Lecturer - Michigan Association of Medical Examiners,
Midland, Michigan  September 29 to October 1, 1989

Guest Lecturer - Illinois State University, Accident Investigation,
Normal, Illinois  October 5-7, 1989

Guest Lecturer - American Society of Clinical Pathologist
December 4, 1989

Lecturer - St. John Hospital Emergency Room Staff, Detroit,
Michigan  February 28, 1990

Lecturer - University of Windsor, Chemistry Students,
Windsor, Canada  March 9, 1990

Guest Lecturer - Douchess County Seminar, New York
April 9-10, 1990

Guest Lecturer - University of North Florida, Accident Investigators,
Jacksonville, Florida April 17, 1990

Guest Lecturer - Colorado Institute of Criminal Justice,
Medical Legal Investigation of Death Seminar,
Denver, Colorado  April 19-20, 1990

Guest Lecturer - Michigan State Police Arson Investigation,
Tuskin, Michigan  April 23, 1990

Guest Lecturer - Federal Bureau of Investigation, Detroit,
Michigan  April 25, 1990

Guest Lecturer - Ohio Academy of Trial Lawyers, Toledo, Ohio
April 28, 1990

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  May 17 - 19, 1990

Guest Lecturer - University of Michigan, Pathology Course,
Ann Arbor, Michigan  September 11, 1990

Guest Lecturer - Michigan State Police Arson Investigation for Prosecutors,
Tuskin, Michigan  October 15, 1990

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 859 of 2008
PageID #: 2749

Guest Lecturer - University of North Florida, Accident
        Reconstruction, Jacksonville, Florida
        October 22-23, 1990

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
        Michigan  November 3, 1990

Lecturer - St. John Hospital Staff, Detroit, Michigan
        November 29-30, 1990

Guest Lecturer - 9th Annual Advanced Homicide Investigators
        Seminar, Toronto, Canada, February 12, 1991

Guest Lecturer - Macomb Bar Association, February 21, 1991

Guest Lecturer - 6th Medicolegal Investigation of Death Seminar
        Morgantown, West Virginia, April 6, 1991

Lecturer - Federal Bureau of Investigation's Third Annual Violent
        Crime Seminar, Ann Arbor, Michigan, April 24, 1991
Lecturer - Macomb Emergency Response Group, St. Clair Shores,
        Michigan, April 25, 1991

Lecturer - Michigan State Police's Third Annual Prosecutors
        School (Fatal Fire Investigation), Tustin, Michigan,
        April 29, 1991

Guest Lecturer - Grosse Pointe Jewish Council, Grosse Pointe,
        Michigan, April 30, 1991

Guest Lecturer - Michigan Probation Officers, Frankenmuth,
        Michigan, May 23, 1991

Lecturer - Institute of Police Technology and Management,
        Meriden, Connecticut, June 11, 1991

Lecturer - Pathology Review Course, Columbus, Ohio, May 27, 1991

Lecturer - St. John Hospital Emergency Room Physicians, Detroit,
        Michigan, May 29, 1991

Lecturer - Spectrum 91 International Symposium on Forensic
        Techniques, Detroit, Michigan, June 3, 1991

Lecturer - Institute of Police Technology and Management,
        Hartford, Connecticut, June 11, 1991

Guest Lecturer - University of Michigan Pathology Residents,
        Ann Arbor, Michigan, September 24, 1991

Lecturer - 1991 NYPD Colonel Henry F. Williams Homicide Seminar,
        Albany, New York, September 29, 1991

USCA5 858

Guest Lecturer - Michigan Corrections Association 59th Annual
        Conference, Mackinac Island, Michigan, October 2, 1991

Lecturer - Illinois State University, Accident Reconstruction
        Conference, Bloomington, Illinois, October 10, 1991

Lecturer - Institute of Police Technology and Management,
        Baltimore, Maryland, October 14, 1991

Guest Lecturer - 8th Israel Medical Week, Jerusalem, Israel,
        November 5, 1991

Lecturer - University of Windsor, Chemistry Students,
        Windsor, Canada, November 22, 1991


Guest Lecturer - Pontiac General Hospital Surgical Grand Rounds,
        Pontiac, Michigan, December 9, 1991

Lecturer - St. John Hospital Staff, Detroit, Michigan
        January, 31, 1992

Lecturer - Federal Bureau of Investigation's Fourth Annual Violent
        Crime Seminar, Ann Arbor, Michigan, April 15, 1992

Guest Lecturer - Wayne County Medical Society, Detroit, Michigan,
        May 5, 1992

Chairman - Annual seminar - Wayne State University Continuing
        Education - Medical Legal Investigation of Death
        seminar, Romulus, Michigan, May 13 and 14, 1992

Lecturer - 1992 NYPD Colonel Henry F. Williams Homicide Seminar,
        Albany, New York, September 20, 1992

Lecturer - 1er Congreso Nacional De Ciencias Periciales En El
        Estado De Mexico, Mexico, September 21 to 23, 1992

Guest Lecturer - Macomb Emergency Response Group, St. Clair
        Shores, Michigan, October 8, 1992

Lecturer - Michigan Association of Medical Examiners, Midland,

Michigan, October 17, 1992

Lecturer - Simposium Internacional De Medicina Legal 92,
        Guayaquil, Ecuador, October 30, 1992

Lecturer - Harper Hospital Pathology Residents, Detroit,
        Michigan, November 11 and 18, 1992

USCA5 859

Guest Lecturer - General Motors Research Chapter of Sigma Xi,
Warren, Michigan, December 8, 1992

Lecturer - University of Windsor, Chemistry Students,
Windsor, Canada, February 12, 1993

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
Monterey, California, February 13, 1993

Lecturer - St. John Hospital Staff, Detroit, Michigan
March 29, 1993

Lecturer - Federal Bureau of Investigation's Fourth Annual Violent
Crime Seminar, Ann Arbor, Michigan, April 20, 1993

Guest Lecturer - Wayne County Medical Society, Detroit, Michigan,
April 21, 1993
Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Detroit, Michigan, April 22 and 23, 1993
Guest Lecturer - Criminal Defense Attorneys, Southfield,
Michigan  April 24, 1993

Guest Lecturer - New York Society of Forensic Sciences, Lehman
College, Bronx, New York, April 28, 1993

Lecturer - Grace Hospital Staff, Detroit, Michigan
May 18, 1993

Lecturer - Pathology Review Course, Chicago, IL, May 24, 1993

Lecturer - Traffic Crime Seminar, Toronto, Canada, June 1, 1993

Lecturer - Medicolegal Investigation of Death Seminar, Grand
Junction, Colorado, August 26 to 28, 1993

Lecturer - 1993 NYPD Colonel Henry F. Williams Homicide Seminar,
Albany, New York, September 18, 1993

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
Monterey, California, February 19, 1994

Lecturer - Detroit Academy of Medicine, March 8, 1994

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar, Detroit, Michigan, March 24 and 25, 1994

Lecturer - Harper Hospital Staff, Detroit, Michigan
March 31, 1994

Lecturer - Detroit Riverview Hospital, Detroit, Michigan

USCA5 860

April 15, 1994

Lecturer - Pathology Review Course, Cincinnati, Ohio, May 24, 1994

Guest - CNN, Larry King Live, O.J. Simpson, June 29, 1994

Guest - David Newman Show, WHYZ, Detroit, Michigan  July 6, 1994

Lecturer - CPDA Homicide Seminar, Napa Valley, California,
        August 27, 1994

Guest Lecturer - City of Southfield, Emergency Management
        Director, Southfield, Michigan, September 8, 1994

Lecturer - 1994 NYPD Colonel Henry F. Williams Homicide Seminar,
        Albany, New York, September 27, 1994

Lecturer - 1994 New York Police Department, Pokeepsie, New York,
        October 6 and 7, 1994

Lecturer - Michigan Association of Medical Examiners, Midland,
        Michigan, October 29, 1994

Lecturer - St. John Hospital Staff, Detroit, Michigan
        December 8, 1994

Lecturer - Macomb County Prosecutors and Police, Mt. Clemens,
        Michigan, January 19, 1995

Lecturer - CACJ/CPDA Death Penalty Defense Seminar,
        Monterey, California, February 19, 1995

Lecturer - Medical Transcriptionists Assn., Bloomfield Hills,
        Michigan, March 11, 1995

Chairman - Annual seminar - Wayne State University Continuing
        Education - Medical Legal Investigation of Death
        seminar, Detroit, Michigan, March 23 and 24, 1995

Lecturer - Pathology Review Course, Baltimore, Maryland,
        April 2, 1995

Lecturer - Federal Bureau of Investigation's Sixth Annual Violent
        Crime Seminar, Ann Arbor, Michigan, April 11, 1995

Lecturer - Pathology Review Course, Chicago, Illinois
        May 7, 1995

Lecturer - ASCP, Williamsburg, Virginia, June 21, 1995

Lecturer - 1995 NYPD Colonel Henry F. Williams Homicide Seminar,
        Albany, New York, September 17, 1995

USCA5 861

Lecturer - Sterling Heights Citizens Police Academy, Sterling
     Heights, Michigan, October 5, 1995

Lecturer - Wayne County Judges, Detroit, Michigan, October 8, 1995

Guest Lecturer - Criminal Defense Attorneys, Traverse City,
     Michigan, November 3, 1995

Lecturer - Medical Examiner's staff, Big Rapids, Michigan,
     November 4, 1995

Lecturer - Detroit College of Law, Detroit, Michigan, November 15,
     1995

Member - Organ Donation Panel, Lansing, Michigan, November 19,
     1995

Lecturer - Grand Rapids Airport Personnel, Grand Rapids, Michigan,
     December 4, 1995

Lecturer - Beaumont Hospital Staff, Royal Oak, Michigan  January
     24, 1996

Chairman - Annual seminar - Wayne State University Continuing
     Education - Medical Legal Investigation of Death
     seminar, Detroit, Michigan, March 21 and 22, 1996

Lecturer - Flight Nurses Assn., Midland, Michigan, March 29, 1996

Lecturer - Pathology Review Course, Chicago, Illinois
     May 13, 1996

Lecturer - Carteret County Medical Society, North Carolina
     May 16, 1996

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
     Michigan, May 28, 1996

Lecturer - Criminal Defense Attorneys, Lima, Ohio, September 20,
     1996

Lecturer - 1996 NYPD Colonel Henry F. Williams Homicide Seminar,
     Albany, New York, September 29, 1996

Guest Lecturer - Forense' 96, International Congress, Sao Paulo,
     Brazil, October 6 to 12, 1996
Lecturer - Death Investigation Seminar, Springfield, Illinois
     October 15-16, 1996

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
     Michigan, November 5, 1996

USCA5 862

Lecturer - St. Clair County Medical Examiner's staff, Port Huron,
    Michigan, February 25, 1997

Chairman - Annual seminar - Wayne State University Continuing
    Education - Medical Legal Investigation of Death
    seminar, Detroit, Michigan, March 6 and 7, 1997

Guest Lecturer - Rush Presbyterian - St. Luke's Medical Center,
    Department of Pathology, March 24, 1997

Guest Lecturer - Criminal Defense Attorneys, Novi, Michigan
    April 4, 1997

Lecturer – Grosse Pointe Woods Counsel, May 15, 1997

Lecturer – Oakland ANA ER Nurses, May 8, 1997

Lecturer – City of Grosse Pointe Woods Department of Public Safety,
    June 19, 1997

Lecturer – Oakland County Emergency Nurses Association,
    October 8, 1997

Lecturer – Wayne State University Health Center – ER Residents,
    November 20, 1997

Lecturer – Sex, Science and Criminal Defense: A Medical-Legal Seminar –
    Ohio Association of Criminal Defense Lawyers,
    March 27, 1998

Lecturer – Medicolegal Investigation of Death Seminar -
    Robert C. Byrd Health Sciences Center of West Virginia,
    April 25, 1998

Lecturer – Death Penalty Seminar, Ohio, May 14, 1998

Lecturer – Osler Toledo, May 16, 1998

Lecturer - Wolfreiser, June 18, 1998

Lecturer – Collinsville, Illinois, August 24-26, 1998

Lecturer – University of Michigan Department of Pathology,
September 22, 1998

Lecturer – Macomb County – Traffic Evidence, October 6, 1998

Lecturer – Michigan State Police Forensic Science Laboratory,
    October 21, 1998

Lecturer – Michigan Association of Medical Examiners Annual Conference,

USCA5 863

October 23-25, 1998

Lecturer - Pattern Injury – Nurse Examiner Conference, June 28, 1999

Lecturer – Criminal Advocacy Program, September 10, 1999

Lecturer – New York State Police – Colonel Henry F. Williams
    Homicide Seminar, September 18, 1999

Lecturer – Chicago, September 25, 1999

Lecturer – Forensic Investigation: Blueprint for Failure –
    Techniques & Strategies in Forensic Investigation –
    27th Annual Florida Medical Examiners & 7th Annual
    Investigation for Identification Combined Educational Conference,
    October 1, 1999

Lecturer – Port Huron, Michigan, October 19, 1999

Lecturer – Advocates Polish American Bar Association, October 21, 1999

Lecturer – GPJC Adult Cultural October Doubleheader, October 27, 1999

Lecturer – Erie County Bar Association, Sandusky, Ohio, December 10, 1999

Lecturer – American Academy of Forensic Science – Odontology Section,
    February 25, 2000

Lecturer – 17th Annual Emergency & Critical Care Conference –
    Survival Flight – University of Michigan Flight Nurses, March 10, 2000

Lecturer – Life in the Balance 2000: Defending Death Penalty Cases,
    March 25-28, 2000

Lecturer – Cases & O.J. Simpson, Port Huron, Michigan, May 16, 2000

Lecturer – St. John Hospital, November 1, 2000

Lecturer – National Seminar on Forensic Evidence and the Criminal Law –
    Philadelphia, Pennsylvania, November 2-5, 2000

Lecturer – University of Michigan – Department of Pathology,
    December 5, 2000

Lecturer – Balistics & Trauma – St. John Surgical & ER Physicians,
    January 18, 2001

Lecturer – Criminal Defense Attorneys of Michigan – Doubletree Hotel,
    Novi, Michigan March 1-3, 2001

Lecturer – Life in the Balance 2001: Defending Death Penalty Cases –
    National Legal Aid & Defender Association, March 3-6, 2001

**USCA5 864**

Lecturer – Expert of All Sorts seminar – Ohio Association of Criminal
    Defense Lawyers, May 4, 2001

Lecturer – Famous Medical Mysteries – The Mamonides Society,
    February 28, 2002

Lecturer – Michigan Funeral Directors – Frankenmuth, Michigan, March 7, 2002

Lecturer – 18th Annual Emergency & Critical Care Conference –
    Survival Flight – University of Michigan Flight Nurses, March 8, 2002

Lecturer – National Legal Aid & Defender Association – Kansas City,
March 12, 2002

Lecturer – Federal HAT Counsel – New Orleans, April 12, 2002

Lecturer – SANE Nurses – Macomb Community College, May 8, 2002

Lecturer – MESI Class – West Branch, Michigan, May 10, 2002

Lecturer – Bluewaterland Emergency Care Conference – Sarnia,
    Ontario, Canada, May 31, 2002

Lecturer – Montpelier, France, September 2 - 7, 2002

Lecturer – Henry F. Williams Homicide Seminar – Albany, New York,
    September 22, 2002.

Lecturer – Jahrestagung Deutsche Gesellschaft fur Rechtsmedizin – Ronstock,
    Germany, September 24 - 25, 2002.

Lecturer – Advocates, Polish American Bar Association – Hamtramck,
    Michigan, February 13, 2003.

Lecturer – 19th Annual Emergency & Critical Care Conference – University of
    Michigan Survival Flight Nurses, March 21, 2003.

Lecturer - Medical Examiners Investigators Training -
    Genesee & Lapeer County, Michigan, April 14, 2003.

Lecturer - Indiana State Coroner's Association -
    Clarksville, Indiana, June 23, 2003.

Lecturer - Accident Reconstruction, Sterling Heights, Michigan,
    October 3, 2003.

Lecturer - Osler - Chicago Lecture, November 2, 2003.

Lecturer - Turning Point's Forensic Nurse Examiner Program, -
    Macomb County Community College, January 20, 2004.

USCA5 865

Lecturer - Funeral Directors Meeting, Patterns of Injury - Frankenmuth,
      Michigan, March 11, 2004.

Chairman - Annual Seminar 28th year - Wayne State University
      Continuing Education - Medical Legal Investigation of Death seminar.
      April 21-23, 2004.

Lecturer - Colonel Henry F. Williams Homicide Seminar -
      Albany, New York, October 4, 2004.

Lecturer - Medical Examiners Investigators Training -
      Port Huron, Michigan, October 6, 2004.

Lecturer - Indiana Division of the International Association for
      Identification - Fort Wayne, Indiana, October 19, 2004

Lecturer - Saint Mary's Emergency Trauma Conference -
      Saginaw, Michigan, October 22, 2004.

Lecturer - Turning Point's SANE nurses seminar, Macomb County
      Community College, November 12, 2004.
Lecturer - Survival Flight - 21 Annual Emergency and Critical Care Conference,
      University of Michigan, March 17, 2005.

Lecturer - Interpretation of injuries - 19th Medicolegal Investigation of Death Seminar,
      University of West Virginia in Morgantown, West Virginia, April 2, 2005.

Lecturer - Wayne State  Wayne State University Continuing
      Education - Medicolegal Investigation of Death
      seminar, Detroit, Michigan, April 20-22, 2005.

   Lecturer - Wisconsin Coroner and Medical Examiner Association, Wisconsin - key
note
      speaker for Medical Examiner and Coroners in significance of Forensic
Pathology.
      June 6-7, 2005

Lecturer - New York State Police HFW Seminar - 18th Annual Colonel Henry F.
      Williams Homicide Seminar, Albany, New York, September 18, 2005

Lecturer - 11th Annual Investigation for Identification Educational Conference -
      Patterned Injuries, Tall Tales - Pensacola, Florida, September 30, 2005

Lecturer - Turning Point's SANE nurses seminar, Macomb County
      Community College, November 4, 2005
Lecturer - Survival Flight - 22nd Annual Emergency and Critical Care Conference,
      University of Michigan, March 26, 2006.

Lecturer - Wayne State, Wayne State University Continuing
      Education - Medicolegal Investigation of Death
      seminar, Detroit, Michigan, April 26-28, 2006.

USCA5 866

Lecturer – Henry Ford Academy, Introduction to Forensic Investigation, October 30, 2006.

Lecture - Wayne State  Wayne State University Continuing
Education - Medicolegal Investigation of Death
seminar, Las Vegas, Nevada, November 29-December 1, 2006.

Lecture - Survival Flight - 23rd Annual Emergency and Critical Care Conference,
University of Michigan, March 22, 2007.

## COURSES TAUGHT AT WAYNE STATE (1988 to PRESENT)

Chairman - Annual seminar - Wayne State University Continuing
Education - Medical Legal Investigation of Death
seminar.  2005 is the 29th year.

1988   October 5, 12, 19 and 26
November 2, 9, 16, 23, and 30
December 7 and 14
Forensic Pathology course for Pathology Residents

1988   November 4 and 7
Forensic Pathology course for Sophomore Medical
Students

1988   November 3
Forensic Pathology course for Sophomore Medical
Students

1990   October 26
Forensic Pathology Course for Sophomore Medical
Students

1991   October 9
Forensic Pathology course for Pathology Residents

1991   October 16
Forensic Pathology course for Pathology Residents

1991   October 23
Forensic Pathology course for Pathology Residents

1991   October 25
Forensic Pathology Course for Sophomore Medical
Students

1992   October 23
Forensic Pathology Course for Sophomore Medical
Students

1993   March 31
Forensic Anthropology

USCA5 867

1994   April 21
       Forensic Anthropology

dk:kb:curriculumv.wpd

USCA5 868

54

USCA5 869

CERTIFICATE OF HIGH SCHOOL CREDITS

STATE OF LOUISIANA
DEPARTMENT OF EDUCATION
BATON ROUGE, LOUISIANA
STATE-APPROVED HIGH SCHOOLS

| NAME OF STUDENT (Name in full, including middle name) | | | Date of Birth | Sex | Race | Date of Graduation |
|---|---|---|---|---|---|---|
| Alfred Bourgeois | | | 7/22/64 | M | B | 5/24/83 |

| NAME OF SCHOOL | PARISH | ADDRESS | Zip Code | PHONE NO. |
|---|---|---|---|---|
| Lutcher High | St. James | Lutcher, LA | 70071 | 869-5741 |

TO THE PRINCIPAL: Make for each applicant for graduation duplicate certificates (one white, one pink). Seven days prior to graduation, forward both copies to the State Director of Secondary Education. After approval, one copy will be returned. Please use typewriter.

| (List each subject separately as indicated in state program of studies giving the exact title of subject) | | Year Credit Earned | Number of Weeks | Minutes per Week | Mark Received | Unit Credit | Remarks: Enter the names of schools in which outside credits were earned. |
|---|---|---|---|---|---|---|---|
| ENGLISH | ENGLISH I | 1 | 36 | 300 | C | 1 | |
| | ENGLISH II | 2 | 36 | 300 | D | 1 | |
| | ENGLISH III | 4 | 36 | 300 | D | 1 | |
| | ENGLISH ( Speech I ) | 3 | 36 | 300 | C | 1 | |
| FREE ENTERPRISE | Free Enterprise | 2 | 18 | 300 | C | ½ | |
| MATH | Math I | 1 | 36 | 300 | C | 1 | |
| | Math II | 2 | 36 | 300 | D | 1½ | |
| | Algebra I | 3 | 18 | 300 | D | ½ | |
| | Consumer Math | 4 | 18 | 300 | C | ½ | |
| SOCIAL STUDIES | CIVICS | 1 | 36 | 300 | C | 1 | |
| | AMERICAN HISTORY | 3 | 36 | 300 | C | 1 | |
| | Economics | 2 | 18 | 300 | D | ½ | |
| | Geography | 4 | 36 | 300 | D | 1 | |
| | Afro Am. History | 4 | 18 | 300 | B | ½ | |
| SCIENCE | Gen. Science | 1 | 36 | 300 | C | 1 | |
| | Biology | 3 | 36 | 300 | D | 1 | |
| HEALTH AND PHY. ED. | H. & P. E. I | 1 | 36 | 300 | B | 1 | |
| | H. & P. E. II | 2 | 36 | 300 | C | 1 | |
| | H & PE III | 3 | 18 | 300 | C | ½ | |
| | H & PE IV | 4 | 36 | 300 | C | 1 | |
| FOREIGN LANG. | | | | | | | |
| JOURNALISM | | | | | | | |
| SPEECH | | | | | | | |
| AGRICULTURE BUS./OFFICE DIST. ED. HEALTH OCC. HOME ECON. IND. ARTS T. AND I. VOC. TECH. | Agriculture I | 1 | 36 | 300 | D | 1 | |
| | Basic Drafting | 4 | 36 | 300 | C | 1 | |
| | Independent Living | 4 | 18 | 300 | D | ½ | |
| ART MUSIC SAFETY AND OTHER ELECTIVES | Beg. Band | 2 | 36 | 300 | B | 1 | |
| | General Music | 3 | 36 | 300 | C | 1 | |
| | Art 1 | 4 | 36 | 300 | D | 1 | |
| | | | | TOTAL UNITS | | 22 | |

To the State Director of Secondary Education:
I hereby certify that the above-named student has successfully completed the high school work shown above, and that he has complied with all the requirements prescribed by the State Board of Elementary and Secondary Education for graduation from a State-Approved High School, and that there is now in my office on file a complete record of this student's work, including a cumulative record of attendance and scholarship.

SUBSCRIBED TO THIS 24th DAY OF May 19 83 AT Lutcher LOUISIANA

APPROVED: DIRECTOR OF SECONDARY EDUCATION

SIGNATURE OF SCHOOL PRINCIPAL

USCA5 870

55

USCA5 871

# Lloyd B. Johnson

**ST. JOHN THE BAPTIST PARISH
SHERIFF AND EX—OFFICIO TAX COLLECTOR**

P.O. DRAWER Q                                   PHONE: 652-9581

LA PLACE, LOUISIANA 70069-1116

May 6, 1985

TO:  Sheriff Lloyd B. Johnson
     P. O. Drawer Q
     LaPlace, Loiusiana      70069

RE:  Recruit Alfred Bourgeois

From:  Lt. David M. Wilson

On May 6, 1985, Recruit Alfred Bourgeois failed to meet the
Police Officer Standards and Training (P. O. S. T.) as pertains
to firearms qualifications. Mr. Bourgeois has received fifty-four
hours of training and instruction in the use of his service revolver.
On April 23, 1985, Mr. Bourgeois was given his first opportunity to
qualify. In his effort to qualify Mr. Bourgeois failed to fire the
225 point qualifying average. Mr. Bourgeois score was 178.5 out of
a possible 300 points. After his failure to qualify Mr. Bourgeois
was given eight (8) additional hours of instruction and training in
the use of his service revolver. On May 6, 1985, Mr. Bourgeois was
again given the opportunity to fire the P. O. S. T. course for score.
On this date Mr. Bourgeois fired a 222.75 average out of 300 points.
Note: P. O. S. T. requires a 225 or 75% minimum score to qualify.
Mr. Bourgeois has as of this date May 6, 1985, fired one thousand
one hundred forty (1,140) rounds of ammunition in his practice sessions
and attempts to qualify with his service revolver.
     In addition to the time spent firing on the range Mr. Bourgeois
had been given five examinations. Four of the five examinations
pertained to his firearms training and the fifth test to basic police
procedures. Of these five examinations given, Mr. Bourgeois has failed
to meet a 70% passing score on two of the five examinations.
     Due to Mr. Bourgeois not meeting the P. O. S. T. standards for
firearms qualifications and due to his poor performance scholastically,
it is my belief that further training would be unfruitful and unwarranted.
     It is my opinion that Recurit Alfred Bourgeois not be considered
for permanent employment with the St. John the Baptist Parish Sheriff's
Office at this time.

                                        Sincerly,

                                        Lt. David M. Wilson

                                        Lt. David M. Wilson
                                        P. O. S. T. Firearms
                                        Training Instructor

USCA5 872

56

USCA5 873



## Morris & McDaniel, Inc.
### MANAGEMENT CONSULTANTS

formerly
THE PSYCHOLOGICAL SERVICE CENTER
OF NEW ORLEANS, INC.

2918 NAPOLEON AVENUE, SUITE B
NEW ORLEANS, LOUISIANA 70115
(504) 897-0640

WASHINGTON D.C. OFFICE:
912 PRINCE STREET
ALEXANDRIA, VIRGINIA 22314
(703) 836-3600

JACKSON OFFICE:
741 NORTH CONGRESS
P.O. BOX 104
JACKSON, MISSISSIPPI 39205
(601) 353-0640

MAX H. McDANIEL, Ph.D.
President

DAVID M. MORRIS, Ph.D., J.D.
Vice President

MARILYN K. QUAINTANCE, Ph.D
Vice President of Marketing
Director of Washington Office

THOMAS J. HANNIE, Jr., Ph.D.
Vice President, Clinical Psychology

JOE F. NASSAR, M.P.A.
Vice President of Operations

STAFF CONSULTANTS:
DOUGLAS A. GREEN, M.S.
SHANE PITTMAN
JAN WALKER, M.S.

May 22, 1985

### PSYCHOLOGICAL EVALUATION

Name:                 Alfred Bourgeois

Age:                  20 Years

Evaluation Date:      4/12/85

Evaluated By:         Max H. McDaniel, Ph.D.
                      Douglas A. Green, M.S.

Referred  By:         St. John the Baptist Parish Sheriff's Office

Techniques Utilized:  Background Interview
                      Behavioral Observations
                      Psychological/Social History Questionnaire
                      Minnesota Multiphasic Personality Inventory

### Background Interview and Behavioral Observations

Mr. Alfred Bourgeois was seen at this office for the purpose of determining his psychological adaptability to work as a sheriff's deputy with St. John Parish Sheriff's office. It was learned in a background interview that Mr. Bourgeois was raised by his mother and describes his childhood as happy. He apparently did not get along well with the father. There were six other children in the family.

Mr. Bourgeois reports he graduated from Lutcher High School in 1983. He rates his intelligence as average, but says he did repeat a grade. He says he got mostly C's and does not remember ever getting in trouble while in school.

Mr. Bourgeois says he grew-up in a wealthy family and there was little disagreement in the family about financial matters. He says he currently

USCA5 874

makes between \$15,000 and \$20,000 which is a reduction in income during the past two years.

Mr. Bourgeois is presently unemployed. He worked for several years at Winn Dixie while he was in high school and later worked at Delchamps. After high school he got a job with Louisiana Power and Light Company as a meter reader and was there about five and a half months. At that time he was involved in an accident with a three wheeler and was not able to continue working. He was let go since his six months probationary period was not up. He said he enjoyed his job at LP & L and enjoyed the responsibility he had reporting irregularities to the company.

Mr. Bourgeois says he never used illegal drugs and has never used alcohol. He reports no family history with substance abuse and says that he has never used cigarettes. He reports no past health problems other than the accident he had with the three wheeler where he broke his leg. He is not under a physician's care at the present time and is not taking any medication.

Mr. Bourgeois is single and is presently living with his uncle. His family has helped support him since his unemployment ran out following his lay off from LP & L. He says he has never been married, but is the parent of two children.

Mr. Bourgeois says his interest in police work stems from his belief in right and wrong. He says he likes the social contact in police work and feels very strongly about crime in general.

Mr. Bourgeois was on time for the testing session and cooperated well throughout. He seemed reasonably open in discussing acground kground information and overall made an adequate impression.

Test Results

Results of the Minnesota Multiphasic Personality Inventory indicate for the most part that Mr. Bourgeois' scores fall within the normal or acceptable range with two exceptions. He appears to be an individual with high ideals and goals, but lacks the ability to achieve these goals. He appears to be somewhat anxious and nervous at times and appears to worry excessively. His self-esteem does not appear to be very good. As he indicated during the interview, he presents himself as a very traditional and moralistic individual.

The following rating scales are based on research and standard inter-pretation of the Minnesota Multiphasic Personality Inventory. These ratings are based on scale elevations and are considered helpful indices when evaluating an applicant's potential occupational adjustment.

USCA5 875

```
*****************************
* Openness to Evaluation *
*****************************
```

| Overly Frank | Quite Open | Adequate | Overly Cautious | Guarded | Indeterminate |
|---|---|---|---|---|---|
| | | —X— | | | |

```
*****************************
*    Social Facility    *
*****************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | —X— | | |

```
*****************************
*  Addiction Potential  *
*****************************
```

| Low | No Apparent Problem | Problems Possible | Moderate | High | Indeterminate |
|---|---|---|---|---|---|
| | | | —X— | | |

```
*****************************
*   Stress Tolerance   *
*****************************
```

| High | Good | Adequate | Problems Possible | Low | Indeterminate |
|---|---|---|---|---|---|
| | | | —X— | | |

```
*****************************
* Overall Adjustment *
*****************************
```

| Excellent | Good | Adequate | Problems Possible | Poor | Indeterminate |
|---|---|---|---|---|---|
| | | | —X— | | |

## Summary and Conclusion

In summary, Mr. Alfred Bourgeois is an individual with a short work experience at Louisiana Power and Light Company as a meter reader who is interested in becoming a law enforcement officer. He shows some borderline tendencies toward problems in the psychological area. He seems to be a rather moralistic individual who believes in right and wrong, however, he shows feelings of inadequacy and problems in evaluating his self-worth. He shows very strong ambition, but is not clear about what he wants or how to get it. These problems are likely to be seem in his behavior as frequent indecision and an inability to work consistently at one thing.

USCA5 876

Recommendations

Mr. Alfred Bourgeois is not recommended for a position with the St. John
Parish Sheriff's Office at this time.

Max H. McDaniel, Ph.D.
Industrial Psychologist

MHM:

USCA5 877

57

USCA5 878

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 880 of 2008   PageID #: 2770



Louisiana
Motor Vehicle Lease Agreement

1-800-727-7000

Lessee (and Co-Lessee) – Name and Address (including Zip)
ALFRED BOURGEOIS
3192 BEND LANE
PAULINA, LA 70763  ST JAMES
Lessor – Name and Address
LAMARQUE FORD, INC
3101 WILLIAMS BLVD
KENNER, LA 70065

"Ford Credit" is Ford Motor Credit Company. The "Holder" is FORD CREDIT and its assigns.
By signing "You" (Lessee and Co-Lessee) agree to lease this Vehicle according to the terms on the front and back of this lease.

| New/Used/Demo | Mileage at Delivery | Year Make/Model | GVW if Truck (lbs.) | Vehicle ID # | Vehicle Use |
|---|---|---|---|---|---|
| NEW | 25 | 2001 FORD EXPEDITION | | 1FMRU17L61LA66100 | P |

SIGNATURES AND IMPORTANT NOTICES

Lessee: Alfred Bourgeois
Lessee: Alfred Bourgeois
Lessor: LAMARQUE FORD, INC

FC-18725-P  NOV 00
Previous editions may NOT be used.
Questions? Contact Ford Credit at 1-800-727-7000 or www.fordcredit.com
NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION

USCA5 879

## VEHICLE MAINTENANCE, INSURANCE AND USE

17. VEHICLE USE AND SUBLEASING  You will not use, or permit others to use the Vehicle (a) in violation of any law, (b) contrary to the provisions of any insurance policies covering the Vehicle, (c) outside the state where the titled or registered for more than 30 days without Ford Credit's written consent, (d) outside the United States, except for less than 30 days in Canada or (e) as a private or public carrier. You will keep the lease and Vehicle free of all liens and encumbrances. You will not assign or sublease any interest in the Vehicle or lease without Ford Credit's written consent.

18. VEHICLE MAINTENANCE AND OPERATING COSTS  Proper Vehicle maintenance is Your responsibility. You must maintain and service the Vehicle at Your own expense, using materials that meet the manufacturer's specifications. This includes following the owner's manual and maintenance schedule, documenting maintenance performed, and making all needed repairs. You are also responsible for all operating costs such as gas and oil. Lessor will provide the service(s), if any, identified in the Lessor Services section under the terms of a separate agreement. The manufacturer will invalidate warranty coverage on parts affected by a failure to maintain the Vehicle as required by the manufacturer. (See Lessor Services on the front of lease)

19. DAMAGE REPAIR  You are responsible for repairs of All Damage which are not a result of normal wear and use. These repairs include, but are not limited to, those necessary to return the Vehicle to its preaccident condition, including repairs to Exterior Sheet Metal and Plastic Components, and to Vehicle Safety Systems, including air bag, seat belt and bumper system components. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts or those of equal quality. Discuss this requirement with Your insurance company prior to signing a collision repair estimate or before authorizing any collision repair work.

If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

20. VEHICLE INSURANCE  You must insure the Vehicle during this lease. This insurance must be acceptable to Ford Credit and protect You and Holder with (a) comprehensive fire and theft insurance with a maximum deductible of

amount of $_____ (b) collision and upset insurance with a maximum deductible of $_____ and (c) automobile liability insurance with minimum limits for bodily injury or death of $10,000 for any one person and $20,000 for any one accident, and $10,000 for property damage. If the state in which You title/register the Vehicle establishes or changes the minimum automobile liability insurance limits greater than those listed above for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by the state. These amounts may not be sufficient to cover all Your liabilities. You may wish to consult Your insurance advisor about obtaining additional coverage. You will list the loss payee and additional insured as requested by Lessor. You must give Ford Credit evidence of this insurance.

You authorize Ford Credit, on Your behalf, to receive and endorse checks or drafts, and settle or release any claim under the insurance related to Holder's ownership of the Vehicle. You also assign to Holder any other insurance proceeds related to this lease or Holder's interest in the Vehicle.

If You or Ford Credit obtain a refund for amounts paid to third parties for insurance, service contracts, or any other amount paid to a third party included in the Gross Capitalized Cost of this lease, You must pay to the Holder the entire amount of the refund and You authorize the Holder to subtract the refund from the amount You owe under this lease.

### LESSOR IS NOT PROVIDING VEHICLE INSURANCE OR LIABILITY INSURANCE

YOU ARE REQUIRED TO OBTAIN AND MAINTAIN VEHICLE INSURANCE IN CONNECTION WITH THIS LEASE. YOU MAY PROVIDE THE REQUIRED COVERAGE THROUGH EXISTING POLICIES OF INSURANCE, COVERAGE OR THROUGH ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN LOUISIANA.

If You title/register the Vehicle in, or change the garage location of the Vehicle, to a state where Ford Credit has established minimum automobile liability insurance limits greater than those listed above for bodily injury or death and property damage insurance, You must insure the Vehicle and the Holder at the higher minimum limits established by Ford Credit.

## ENDING YOUR LEASE

21. TERMINATION  This lease will terminate (end) upon (a) the end of the term of this lease, (b) the return of the Vehicle to Lessor, and (c) the payment by You of all amounts owed under this lease. Ford Credit may cancel this lease if You default.

22. RETURN OF VEHICLE  If You do not buy the Vehicle, at lease end You must return it to Lessor unless Ford Credit specifies another place. If You fail to return the Vehicle, You must continue to pay the monthly payments plus other damages to Ford Credit, including amounts payable under default. Payment of these amounts will not allow You to keep the Vehicle.

23. STANDARDS FOR EXCESS WEAR AND USE  You are responsible for all repairs to the Vehicle, that are not the result of normal wear and use. These repairs include, but are not limited to those necessary to repair or replace: (a) Tires which are unmatched, unsafe or have less than 1/8 inch of remaining tread in any place; (b) Electrical or Mechanical defects or malfunctions; (c) Glass, Paint, Body Panels, Trim and Grill Work that are broken, mismatched, chipped, scratched, dented, cracked, or if applicable, dented or rusted; (d) Interior rips, stains, burns or worn areas; and (e) All Damage which would be covered by collision or comprehensive insurance whether or not such insurance is actually in force. Replacement of Sheet Metal must be made with Original Equipment Manufacturer Sheet Metal. All other repairs must be made with Original Equipment Manufacturer parts or those of equal quality. Your use or repair of the Vehicle must not invalidate any warranty.

If You have not had the repairs made before the Vehicle is returned at the scheduled end of this lease, You will pay the estimated costs of such repairs, even if the repairs are not made prior to Holder's sale of the Vehicle.

24. ODOMETER STATEMENT  Federal law requires You to complete a statement of the Vehicle's mileage at the end of this lease.

25. VOLUNTARY EARLY TERMINATION AND RETURN THE VEHICLE  You may terminate this lease early, if You are not in default, by returning the Vehicle to Lessor and paying the following: (a) an early termination fee of $200, plus (b) the difference, if any, between the Unpaid Adjusted Capitalized Cost and the Vehicle's Fair Market Wholesale Value, plus (c) all other amounts then due under this lease. You will never pay more than the sum of the remaining unpaid lease payments, plus any excess wear and use and mileage charges, and all other amounts then due under this lease.

VOLUNTARY EARLY TERMINATION AND PURCHASE THE VEHICLE  You may purchase the Vehicle from Lessor at any time for the sum of the remaining payments, less any unearned Rent Charge, plus the purchase option price and all other amounts then due under this lease.

Unpaid Adjusted Capitalized Cost is reduced on each payment due date. It is calculated by reducing the Adjusted Capitalized Cost each month by the difference between the Base Monthly Payment and the part of the Rent Charge earned in that month on an actuarial basis. Rent charges are earned when due. Lessor or Ford Credit will provide You with a written explanation of the actuarial method upon Your request.

Fair Market Wholesale Value, at Your option, will be: (a) an amount agreed to by You and the Lessor, or (b) the value which could be realized at the wholesale sale of the Vehicle, as determined by a professional appraisal obtained by You at Your expense within 10 days from termination from an independent third party agreeable to Ford Credit, or (c) if not established by agreement or appraisal, the net amount received by Ford Credit upon the sale of the Vehicle at wholesale.

Please contact Ford Credit at 1-800-727-7000 or www.fordcredit.com if You have any questions regarding terminating Your Red Carpet Lease.

## DEFAULT AND LOSS OF VEHICLE

26. DEFAULT  You will be in default if (a) You fail to make any payment when due, or (b) a bankruptcy petition is filed by or against You, or (c) any governmental authority seizes the Vehicle and does not promptly and unconditionally release the Vehicle to You, or (d) You have provided false or misleading material information when applying for this lease, or (e) You fail to keep any other agreement in this lease.

If You are in default, Ford Credit may either accelerate the lease payments or cannot this Lease and take back the Vehicle as allowed by law. If Ford Credit accelerates the lease payments, You must pay at once (a) the remaining Total of Monthly Payments less any rebate required under Louisiana law, plus (b) all other amounts then due under this Lease. Upon full payment of all accelerated lease payments and other amounts due, You may retain the Vehicle until the end of the Lease. If Ford Credit cancels this Lease, You must return the Vehicle, within five days of the mailing of the notice of cancellation, to the Lessor's address shown on the front or to such other place as Ford Credit may direct. In addition to returning the Vehicle, You shall pay at once (a) liquidated damages in the amount of the difference, if any, between the Unpaid Adjusted Capitalized Cost (see Voluntary Early Termination) and the value which could be realized at the sale of the Vehicle, plus (b) all other amounts then due under this Lease. The value which could be realized at the sale of the Vehicle at Your option

will be: (a) Did not amount received by Ford Credit upon the sale of the Vehicle at wholesale, or (b) as determined by a professional appraisal obtained by You at Your expense within 10 days from default, from an independent third party agreeable to Ford Credit. Ford Credit may sell the Vehicle at public or private sale with or without notice to You. You must also pay all expenses, including actual and reasonable attorneys fees not in excess of 25% of the unpaid obligation at the time of default, payable by Ford Credit to obtain, hold and sell the Vehicle, collect amounts due and enforce Holder's rights under this Lease. You authorize Ford Credit to cancel Your insurance and apply any proceeds to Your obligation. Ford Credit also shall have the right to all other remedies permitted by law.

27. LOSS OR DESTRUCTION OF VEHICLE  If the Vehicle is stolen or destroyed, You will pay to Ford Credit (a) the Unpaid Adjusted Capitalized Cost, plus (b) all other amounts then due under this lease, minus (c) any insurance proceeds received by Ford Credit. See Waiver. If You had to about the insurance required under this lease and Ford Credit receives the full proceeds, You will pay to Ford Credit: (a) any past due monthly lease payments, plus (b) the amount of the applicable insurance deductible, plus (c) all other amounts then due under this lease. Even if the Vehicle is insured, until Ford Credit receives the appropriate amount above, You are responsible for the scheduled monthly payments.

## ADDITIONAL INFORMATION

28. ASSIGNMENT AND ADMINISTRATION  When You and Lessor sign this lease, Lessor will assign it to Holder. Ford Credit or a substitute will administer this lease. You must then pay all amounts due under this lease to Ford Credit.

If Ford Credit is not the Holder of this lease, Holder has appointed Ford Credit as its agent. As agent for Holder, Ford Credit has the power to act on Holder's behalf to administer, enforce, and defend this lease. If Lessor has agreed to repair or maintain the Vehicle, obtain any insurance or perform any other service, You will look only to the Lessor for these services.

29. TAXES  You will promptly pay all fees, charges, and taxes relating to the lease or Vehicle (except for Lessor's or Holder's income taxes). You will pay these amounts even if they are assessed after lease end.

30. TITLING  The Vehicle will be titled in the name of Holder. You will register the Vehicle as directed by Ford Credit. You will pay all license, title and registration costs.

31. LIFE INSURANCE  If Ford Credit receives the benefits paid under any life insurance described on the reverse side, this lease will continue if there is a Co-Lessee. Any Co-Lessee will pay when due all amounts not paid by

the insurance. If there is no Co-Lessee, Ford Credit will accept a reasonable replacement designated for You, or create who agrees in writing to perform Your obligations not covered by the insurance.

32. INDEMNITY  You will indemnify and hold harmless Lessor, Ford Credit and Holder and their assigns from any loss or damage to the Vehicle and its contents and from all claims, losses, injuries, expenses and costs relating to the use, maintenance, or condition of the Vehicle. You will promptly pay all fines and tickets imposed on the Vehicle or its driver. If You do not pay, You will reimburse Ford Credit and pay a $20 administration fee, unless prohibited by law, for every such fine, ticket, or penalty that must be paid on Your behalf.

33. SECURITY DEPOSIT  Your security deposit may be used by Ford Credit to pay all amounts that You fail to pay under this Lease. You will not receive any interest, profits or other earnings on Your security deposit.

34. GENERAL  Except as otherwise provided by the law of the state where You reside, the law that will apply to this lease is the law of the state where the Lessor's place of business is, as set forth on the front of the lease. If that law does not allow any of the agreements in this lease, the ones that are not allowed will be void. The rest of this lease will still be good.

FG - 18728-P  NOV 00
Previous editions may NOT be used.

NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION

USCA5 880

58

USCA5 881



118589

9052-L (12/98)

State of Louisiana
Department of Revenue
P. O. Box 201
Baton Rouge, Louisiana 70821-0201

## Notice of State Tax Assessment and Lien

| Parish | | Date |
|---|---|---|
| St. James | | 12/4/02 |

Serial number 110206041

For use by recording office

Alfred Bourgeois
3192 Bend West
Pauling, LA 70763

118589

:ation address

:ount number    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

s document is recorded in accordance with the provisions of Title 47, Chapter 18, Part III, particularly :tions 1577 and 1578 of the Louisiana Revised Statutes of 1950, as amended, and by virtue of its recorda-, notice is hereby given to all persons that the taxes, interest, penalties, and attorney's fees owed by the debtor operate as a judgment on all property of the tax debtor, both movable and immovable.

| Kind of tax | Tax period ended | Interest date | Unpaid balance of assessment | For optional use by recording office |
|---|---|---|---|---|
| Motor Vehicle Sales | 06/00 | 12/4/02 | $ 503.69 | Entry # _____ Original no. _____ Bundle no. _____ MOB _____ FOLIO _____ Trans. no. _____ Date _____ Filing fee _____ |
| | | TOTAL | $ 503.69 | |

:rest as provided by R.S. 47:1601 will continue to accrue on the unpaid tax from the dates listed above until paid. All costs of recording : lien are also due.

Baton Rouge, Louisiana. __December, 4__    __2002__
                                                                            Year

Secretary of Revenue
State of Louisiana

By    Sam Losavio, Director

SL:RW:db

794

Taxpayer Services Division

KEPT BY RECORDING OFFICE

USCA5 882

59

USCA5 883

FORD MOTOR CREDIT COMPANY

FILED FOR RECORD
_____ PARISH, LA.

03 APR 25 PM 12: 08

VERSUS

EDWARD E. KAHLER, JR.
CLERK OF COURT

ALFRED BOURGEOIS

**28927**

NUMBER _____ DIV. "____"

23RD JUDICIAL DISTRICT COURT

PARISH OF ST. JAMES

STATE OF LOUISIANA

**SECTION "E"
HON. ALVIN TURNER, JR.
(225) 621-8500**

### SUIT ON NET (CLOSED END) LEASE

The petition of **FORD MOTOR CREDIT COMPANY**, a foreign corporation authorized to do and doing business in the State of Louisiana, with respect represents that:

1.

Defendant, ALFRED BOURGEOIS, Social Security No 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, of the lawful age of majority, is presently domiciled in the Parish of St. James, State of Louisiana.

2.

ALFRED BOURGEOIS, made defendant herein, is justly and truly indebted unto FORD MOTOR CREDIT COMPANY, in the full sum of $5,060.19, together with legal interest from    until paid, together with attorney's fees in the amount of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

3.

On January 10, 2001, a Net (Closed End) Lease was entered into between the defendant and the named dealer/vendor, whereby defendant leased, with option to purchase, one certain vehicle more particularly described, and on such terms and conditions as set forth in said Lease, a copy of which is attached hereto and made part hereof by reference.

4.

Said Net (Closed End) Lease was assigned to FORD MOTOR CREDIT COMPANY, plaintiff herein, as shown on the Lease. Said assignment transferred to plaintiff all rights, privileges and remedies available to the original vendor assignor. Lessee, defendant herein, had knowledge of this assignment as evidenced by the Lease.

5.

According to its stated terms, the Net (Closed End) Lease terminates after either a fixed period of time from the date of the Lease if Lessee fails to timely exercise the purchase option, or, upon default of the terms of the Lease. Defendant did not exercise the purchase option and this contract terminated by default.

6.

Despite amicable demand, defendant failed, neglected and refused to make timely payments under this obligation, and the installments are contractually past due, necessitating the placing of this agreement in the hands of an attorney for collection.

7.

Said Net (Closed End) Lease provides that upon default, Lessee, the defendant herein, agreed to "Pay all expenses paid by the Lessor to enforce the Lessor's rights under this Lease, including reasonable attorney's fees as permitted by law..." Reasonable attorney's fee for collection herein is stated to be twenty-five (25%) percent of the principal and interest due and owing.

**USCA5 884**

8.

There is currently due and owing on said account, pursuant to the acceleration clause contained in the Lease, the principal balance of $5,060.19, which may include one or more of the following charges: excess mileage, collision damage, excess wear, unpaid lease payments, unpaid late charges, and/or repossession expenses. All proper credits have been applied for security deposit, sales proceeds (if applicable), and unapplied credits and/or rebates, if any.

9.

Plaintiff further alleges that, to its knowledge, defendant IS NOT now in the military service of the United States government, including the Army, Navy, Air Force, Marine Corps or Coast Guard; nor is defendant believed to be an officer of the Public Health Service detailed with either the Army or Navy, and therefore, defendant is NOT entitled to any of the benefits of the Soldier's and Sailor's Relief Act of the Congress of the United States of America.

WHEREFORE, plaintiff prays for judgment in favor of **FORD MOTOR CREDIT COMPANY**, and against defendant, **ALFRED BOURGEOIS, Social Security No. 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**, in the full sum of $5,060.19, plus legal interest from   until paid, together with attorney's fees in the sum of twenty-five (25%) percent of the principal and interest due and owing, and for all costs of these proceedings.

Plaintiff further prays for all other just and equitable relief as allowed by law.

By Attorneys:

**SHOWS, CALI & BERTHELOT, L.L.P.**
644 St. Ferdinand Street
P.O. Drawer 4425
Baton Rouge, LA  70821-4425
Telephone: (225) 346-1461

By: _____
        E. Wade Shows, #7637

**PLEASE SERVE DEFENDANT:**

Alfred Bourgeois
3192 Rev Doc Samuel Jones St
Paulina, LA  70763
Social Sec. # 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

THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

USCA5 885

60

USCA5 886

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/01/2003

        Ross Griffin, date of birth 08/03/1962, was interviewed,
per his request, at the Nueces County Jail Annex, Corpus Christi,
Texas, where he is currently incarcerated. Also present during the
interview was Assistant United States Attorney (AUSA), Patti Hubert
Booth. After being advised of the identity of the interviewing
parties, Griffin provided the following information:

        John Gilmore was Griffin's attorney on a federal
marijuana case in which he had recently been sentenced. Back in
December of 2002, Griffin was in a federal courthouse holding cell
with a man named Alfred Bourgeois. Griffin was awaiting a hearing
about a plea agreement Gilmore had arranged for him. While in the
holding cell, Bourgeois began telling Griffin that he was accused
of murdering his child when in fact, his girlfriend accidentally
killed the child. Bourgeois told Griffin that he was unloading his
tractor trailer when his girlfriend, with whom he was traveling,
dropped his daughter out of the cab of his truck. Bourgeois said
his daughter hit her head and died. Bourgeois also mentioned
something about bite marks on the child.

        Griffin and Bourgeois were eventually taken from the
holding cell to the courtroom where attorney John Gilmore spoke to
both of them before the start of proceedings. Griffin, who was
unhappy with the representation he was receiving, engaged in a
heated discussion with Gilmore. Bourgeois, overhearing the
conversation, told Griffin that he was not happy with Gilmore
either. In fact, Bourgeois said he was in court that day because
he had written a letter to the judge regarding Gilmore's poor
representation. Angry, Bourgeois told Griffin that he (Bourgeois)
killed his daughter, but could have already been out of jail if
Gilmore would have done what he was supposed to do in the
beginning. Bourgeois explained that he hated the mother of the
child and did not want to pay her child support for the rest of his
life. Bourgeois said the reason he hated his ex-wife was because
she claimed he physically abused her. Bourgeois told Griffin that
he killed his daughter with a blow to the back of her head with a
hairbrush. Bourgeois said that the child was always crying and the
noise frustrated him. Bourgeois stated that his girlfriend was
also frustrated by the child's crying and she once tried to choke

Investigation on    06/30/2003    at  Corpus Christi, Texas

File #  70A-HO-60227                            Date dictated    07/01/2003

by    Megan Kathleen Beckett

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; USCA5 887
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

70A-HO-60227

Continuation of FD-302 of ____Ross Griffin_____ , On _06/30/2003_ , Page __2__

the child.  Bourgeois said that originally he was able to convince his girlfriend to take the rap for the child's death, but she eventually cracked under pressure from police and admitted that she did not do it.  Now, even though they were afraid of him, both his ex-wife and his girlfriend were going to testify against him.

Bourgeois told Griffin that he was furious at his ex-wife and if he ever got out of this mess, he would make her pay. Griffin thought Bourgeois told him that his ex-wife lived in Louisiana.  Bourgeois said he was going to get his girlfriend too and indicated that anyone who testified against him would pay for it.  Bourgeois was outgoing and friendly to the other guys in the jail, but Griffin felt that Bourgeois had major problems and that his threats were valid.  Griffin did not think Bourgeois should ever be allowed to walk the streets again.

USCA5 888

61

USCA5 889

COPY

United States Courts
Southern District of Texas
FILED

IN THE UNITED STATES DISTRICT COURT      MAR 2 7 2007
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION          Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIMINAL ACTION |
| | * | |
| PLAINTIFF, | * | CR-C-03-075(1) |
| | * | |
| VS. | * | |
| | * | CORPUS CHRISTI, TEXAS |
| DARRICK BERNARD MOORE, | * | APRIL 22, 2004 |
| | * | 11:03 A.M. |
| DEFENDANT. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:        MR. LANCE G. DUKE
                          MR. MARK W. PATTERSON
                          OFFICE OF THE U.S. ATTORNEY
                          800 NORTH SHORELINE, SUITE 500
                          CORPUS CHRISTI, TEXAS 78401

FOR THE DEFENDANT:         MR. RICHARD W. ROGERS, III
                          ATTORNEY AT LAW
                          1756 SANTA FE
                          CORPUS CHRISTI, TEXAS 78404

ALSO PRESENT:              MS. MICHELLE MORGAN, U.S. PROBATION

COURT RECORDER:            MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 890

(The proceedings began at 11:03 a.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-03-075S, United States of America versus Darrick Moore.  May I have appearances, please?

MR. DUKE:  Lance Duke on behalf of the United States.

MR. ROGERS:  Rick Rogers for Mr. Moore.

THE COURT:  Would you administer the oath, please.

THE CLERK:  Yes, Your Honor.

(Defendant sworn.)

THE COURT:  Your full name, please, sir?

THE DEFENDANT:  Darrick Bernard Moore.

THE COURT:  Are you the same Darrick Moore who entered a guilty plea to Count 1 of this indictment, possession with, distribution of approximately 1.39 grams of cocaine base?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Are you ready for sentencing, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Has anything changed in your mental or physical condition since you entered your plea?

THE DEFENDANT:  No, Your Honor.

THE COURT:  I asked you at the time of your plea if you thought you were mentally competent to proceed, and you told me that you were.  Do you remember that?

THE DEFENDANT:  Yes, Your Honor.

USCA5 891

THE COURT:  Are you still of the opinion that you're mentally competent to proceed?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Rogers, do you share that opinion?

MR. ROGERS:  I do.

THE COURT:  Have you received, Mr. Moore, a copy of your Presentence Investigation Report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Well, I know you've had it for at least 35 days, but I'm going to ask you anyway.  Have you had it for at least 35 days?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you discussed it completely with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Has he answered all your questions?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Does he still come to see you in jail and take your phone calls when you need to talk to him?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you still satisfied with the advice and efforts of your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Is he following your instructions?

THE DEFENDANT:  Yes, Your Honor.

USCA5 892

THE COURT: And there are no objections filed, Mr. Rogers?

MR. ROGERS: No, Your Honor. The only thing we filed was something called a clarification, just to Paragraph 27 and Paragraph 56, that talked about two non-scoreable offenses. One of them, well actually one of them did score, and it was called a prison escape, and the Defendant absconded from a work-release program. And I just wanted to point out the question of degree as to what he had done.

Then also it mentions in Paragraph 56 a carjacking, and it infers that perhaps he did receive some kind of court action on it, but --

THE COURT: It just says, "Other Arrests."

MR. ROGERS: Yes, ma'am. I know. But he just, he did feel it was important to come forward. And on that one, he said that he was vindicated. They came and he was not identified, and it never went to court. He never went into the system, other than an arrest. But other than that, we have no objections. And those aren't objections.

(PAUSE.)

THE COURT: Any objections, Mr. Duke?

MR. DUKE: No, Your Honor.

THE COURT: Mr. Moore, you're really best situated of anyone here to tell me if there are any mistakes anywhere in this report, and this is the time for you to tell me.

USCA5 893

THE DEFENDANT:  No, Your Honor.

(PAUSE.)

THE COURT:  Well, according to the Presentence Investigation Report, the Total Offense Level is 29, with Criminal History Category VI.  There's a range of imprisonment from 151 to 188 months, three years supervised release range, 15,000 to $1 million fine range, and a $100 special assessment. Is that correctly calculated, Mr. Rogers?

MR. ROGERS:  Yes, Your Honor.

THE COURT:  Mr. Duke?

MR. DUKE:  Yes, Your Honor.

THE COURT:  As far as you know, are these numbers correct, Mr. Moore?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And what are you recommending?

MR. DUKE:  Your Honor, the Government is moving for a downward departure, pursuant to Sentencing Guideline Section 5K1.1.  Mr. Moore has cooperated in two significant cases.  The first case dealt with another crack distributor by the name of Victor Friar, who was previously before this Court.  Mr. Moore, upon his arrest, began immediately cooperating with the authorities.  He enabled the authorities to do a controlled purchase of crack cocaine from Mr. Friar.  Mr. Friar was subsequently arrested, prosecuted and convicted and sentenced before this Court.  Mr. Friar (sic) made telephone calls on

USCA5 894

behalf of DEA agents in the case against Mr. Friar, and also provided his vehicle to help further the transaction to go along, and he also provided sort of the modus operandi for how Mr. Friar and Mr. Moore had conducted business in the past, which led to the successful purchase of crack cocaine from Mr. Friar.  And I believe, if I recall correctly, Mr. Friar received a 10-year sentence for that case.

Additionally, Mr. Moore cooperated with the Government against Mr. Alfred Bourgeois.  Mr. Bourgeois, as the Court I'm sure remembers, was prosecuted for capital murder. He was ultimately convicted and given the death penalty. Mr. Moore testified at the case-in-chief against Mr. Bourgeois, and then also testified at his sentencing.

In speaking to Ms. Patti Booth, who handled the Bourgeois case --

THE COURT:  Well, I saw his testimony, and I thought it was very valuable.

MR. DUKE:  She also --

THE COURT:  And I thought it was, that he was a credible witness.

MR. DUKE:  Ms. Booth also agrees with that.  She also wanted me to point out to the Court that Mr. Moore received a great deal of coercion and harassment by his fellow inmates for testifying on behalf of the Government.  Each and every time he left the cell to meet with witnesses, or excuse me, meet with

the attorneys or agents to help assist in the prosecution, he was harassed by his fellow inmates, in particular, because of the fact that Mr. Moore and Mr. Bourgeois are both African American. And so he, his cooperation in that case was particularly difficult.

And so along those lines, for consideration of both cases, I have received permission to request a 50 percent reduction. And I am therefore recommending a sentence of 75 months.

THE COURT: Mr. Rogers?

MR. ROGERS: Your Honor, we would add to that, Mr. Moore has been incarcerated in our county jails down here for 14 months, and by his own choice, to stay here and give testimony under subpoena. The conditions there were probably not the same as if he had gone to a federal facility. He had difficulty, I think, at some of these facilities, in addition to the fact of his testimony. But he was very stoic about it.

Additionally, his record is lackluster, to say the least, but in dealing with him, he's a very easy person to deal with. His record seems totally inconsistent to the kind of person that I've dealt with throughout his case, where his intentions, I think, have been honorable in all his cooperation. And I've met his grandfather, who's here in court, and his fiancee, and they all speak very highly of him.

We would ask the Court if we -- the 75-month

USCA5 896

8

recommendation is more than fair, but we would like to ask for a departure to 60 months.  He's never been incarcerated for more than 30 months.  He's never had any drug treatment.  We feel that his problems are drug related, and that with his maturity and the 14 months he's already spent in, and the opportunity for drug classes, a 60-month sentence would be fair.

(PAUSE.)

THE COURT:  Mr. Moore, this is your opportunity to tell me anything you'd like to tell me before I sentence you.

(Defendant and Counsel conferring off the record.)

THE DEFENDANT:  I'd like to apologize to the Court, and I'd like to apologize to the peoples of Aransas Pass, and I'd like to apologize to my grandfather, because it's making it hard for me being locked up.  And I know I've been, I've been like in trouble in the past with the authorities, and I did time for it.  My record is bad and everything, but deep down inside, I'm a good person and everything.  And now that I got a little son, I just want to, you know, go up there and get my life together and get back out there and be a father figure to my son.

(PAUSE.)

THE COURT:  Mr. Moore --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- I think you did a good job on your

USCA5 897

testimony --

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  -- in that trial.  And I wouldn't imagine that that would be very easy to do.  So I'm going to grant the motion for downward departure to 65 months, followed by three years supervised release.  Downwardly depart to a $100 fine -- a $50 fine, I'm sorry, and a $100 special assessment.

Standard terms and conditions of supervised release, along with firearm prohibition, nighttime restriction of 12:00 midnight to 6:00 a.m.  Drug surveillance, drug and alcohol treatment, mental health care, anger management.  The last four you have to pay for based on ability to pay as determined by the Probation Department.  And zero alcohol.

MR. ROGERS:  Your Honor, could we also ask the Court to recommend that he be allowed to stay in Texas?  He does have a wife and newborn.

THE COURT:  I'll make that recommendation.  Does he also want a recommendation for drug treatment?

MR. ROGERS:  Yes, he does.  He very much would --

THE COURT:  Is that right, Mr. Moore?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I'll make a recommendation for drug and alcohol, the intensive drug treatment program in the Bureau of Prisons.

Do you have the $150 for your fine and special

USCA5 898

10

assessment?

THE DEFENDANT: No, Your Honor.

THE COURT: You want to pay it out of your Inmate Trust Account?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Starting 60 days after placement in the Bureau of Prisons, no more than 20 percent of your Inmate Trust Account, until first the special assessment is paid, and then the fine. In any event, if it's not paid during the term of incarceration, then you can pay it out over supervised release at $25 a month, starting 30 days after placement on supervised release. Is that all right, Mr. Moore?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I got your last communications, and hopefully you can be placed quickly by the Marshal Service and designated to a Bureau of Prisons.

I adopt the Presentence Investigation Report as the findings of the Court. Order the report sealed. Access allowed Defense Counsel, but not to the recommendation, absent a further hearing.

It's hereby ordered that the Defendant is sentenced as stated and committed to the custody of the United States Marshals.

Thank you for your appearance, Mr. Rogers, Mr. Duke. You're excused.

USCA5 899

11

Do you have another count to dismiss?

THE DEFENDANT: Thank you, Your Honor.

MR. DUKE: Yes, Your Honor. The Government moves to dismiss Count 2 --

THE COURT: Just a moment.

MR. DUKE: -- and 3.

THE COURT: Dismissing Counts 2 and 3 of the indictment. If you could run an order through Mr. Rogers, you don't have to file a motion.

MR. DUKE: I will, Your Honor.

THE COURT: Thank you for your appearances. Good luck to you, Mr. Moore.

THE DEFENDANT: Thank you, Your Honor.

(Proceedings concluded at 11:19 a.m.)

(Court re-calls case at 3:06 p.m.)

THE COURT: Mr. Moore, I didn't give you your appellate rights today, and that's in Cause Number --

THE CLERK: Cause Number C-03-075.

THE COURT: And Mr. Rogers is here for Mr. Moore, Mr. Patterson is here for the U.S. Attorney.

Mr. Moore, you have a right to appeal the sentence of this Court by filing a written notice of appeal within ten days of today's date. If you cannot afford an attorney, one will be appointed to represent you. Are you appointed, Mr. Rogers?

MR. ROGERS: Yes, Your Honor.

USCA5 900

12

THE COURT:  Then you don't have to fill out the form again under oath as to your assets and liabilities.  Do you understand this right to appeal, sir?

THE DEFENDANT:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  Thank you very much.  You're excused.

(Proceedings concluded at 3:07 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____          3|27|07
Molly Carter                               _____
                                           Date

USCA5 901

62

USCA5 902

AO 245B    (Rev  3/01) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Southern District of Texas

Holding Session in Corpus Christi

**United States District Court**
**Southern District of Texas**
**ENTERED**

## APR 2 8 2004

**Michael N. Milby, Clerk of Court**

UNITED STATES OF AMERICA

v.

## DARRICK MOORE

## JUDGMENT IN A CRIMINAL CASE

(For Offenses Committed On or After November 1, 1987)

Case Number:  **2:03CR00075-S-001**

☐   See Additional Aliases sheet.

**THE DEFENDANT:**

Richard W. Rogers, III
Defendant's Attorney

☒   pleaded guilty to count(s)      1 on 04/30/2003

☐   pleaded nolo contendere to count(s)
which was accepted by the court.

☐   was found guilty on count(s)
after a plea of not guilty.

**ACCORDINGLY**, the court has adjudicated that the defendant is guilty of the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of 1.39 Grams of Cocaine Base | 01/16/2003 | S1 |

☐   See Additional Counts of Conviction.

The defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant has been found not guilty on count(s) _____

☒   Count(s) S2 and S3 _____    ☐  is  ☒  are  dismissed on the motion of the  United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 08/14/1971

Defendant's USM No.:    19499-179

Defendant's Residence Address:

6440 Everhart, #F4

Corpus Christi, TX  78413

Defendant's Mailing Address:

6440 Everhart, #F4

Corpus Christi, TX  78413

April 22, 2004
Date of Imposition of Judgment

Signature of Judicial Officer

**JANIS GRAHAM JACK**

**UNITED STATES DISTRICT JUDGE**
Name and Title of Judicial Officer

4-25-04
Date

**USCA5 903**

AO 245B     (Rev 3/01) Judgment in a Criminal Case
            Sheet 2   Imprisonment

Judgment -- Page 2 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of _____ 65 months. _____
It is the order of the Court that the PSI in this case is for use by the Bureau of Prisons employees only and **shall not** be
further disclosed to any other party (other than defendant), agency or individual without written permission of this Court, except in
instances of escape or failure to surrender, when the report is needed by the U.S. Marshals.

☐   See Additional Imprisonment Terms.

☒   The court makes the following recommendations to the Bureau of Prisons:
    That the defendant participate in a comprehensive drug treatment program while incarcerated.
    That the defendant be placed in a facility in Texas as long as the security needs of the Bureau of Prisons are met.

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ on _____
    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 pm on _____
    ☐   as notified by the United States Marshal.
    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____
at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL

By   _____
     DEPUTY UNITED STATES MARSHAL

USCA5 904

AO 245B    (Rev. 3/01) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

Judgment -- Page 3 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of __3 year(s).__

☐    See Additional Supervised Released Terms Sheet.

    The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

    The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

    ☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

☒    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

☐    See Additional Mandatory Conditions Sheet

    If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

    The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒    See Special Conditions of Supervision.

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USCA5 905

AO 245B    (Rev. 3/01) Judgment in a Criminal Case
           Sheet 3    Continued 2    Supervised Release

Judgment -- Page 4 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

## SPECIAL CONDITIONS OF SUPERVISION

**DRUG SURVEILLANCE:** The defendant shall submit to periodic urine surveillance and/or breath saliva and skin tests for the detection of drug abuse as directed by the probation officer. The defendant will incur costs associated with such detection efforts based on ability to pay as determined by the probation officer.

**DRUG TREATMENT:** The defendant shall participate in a program, inpatient or outpatient, for the treatment of drug and/or alcohol addiction, dependency or abuse which may include, but not be limited to urine, breath, saliva and skin testing to determine whether the defendant has reverted to the use of drugs and/or alcohol. Further, the defendant shall participate as instructed and as deemed necessary by the probation officer and shall comply with all rules and regulations of the treatment agency until discharged by the Program Director with the approval of the probation officer. The defendant shall further submit to drug-detection techniques, in addition to those performed by the treatment agency, as directed by the probation officer. The defendant will incur costs associated with such drug/alcohol detection and treatment, based on ability to pay as determined by the probation officer.

**MENTAL HEALTH:** The defendant is required to participate in a mental health program as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such a program, based on ability to pay as determined by the probation officer.

**NIGHTTIME RESTRICTION:** Throughout the period of supervised release, the defendant shall be restricted to his home each night from 12 midnight to 6 am, unless other specific arrangements are made with the probation officer.

**ALCOHOL ABSTINENCE:** The defendant shall abstain from the use of alcohol during the term of supervision.

**ANGER MANAGEMENT:** The defendant is required to participate in anger management counseling as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

USCA5 906

AO 245B   (Rev 3/01) Judgment in a Criminal Case
          Sheet 5, Part A   Criminal Monetary Penalties

Judgment -- Page 5 of 6

DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 50.00 | $ |

☐   See Additional Terms for Criminal Monetary Penalties Sheet.

☐   The determination of restitution is deferred until _____. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.

☐   The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
|  |  |  |  |

☐   See Additional Restitution Payees Sheet.

| **TOTALS** | $0.00 | $0.00 |  |

☐   If applicable, restitution amount ordered pursuant to plea agreement   $_____

☐   The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒   The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☒   the interest requirement is waived for the ☒ fine and/or ☐ restitution.

☐   the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

☐   Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

USCA5 907

AO 245B    (Rev 3/01) Judgment in a Criminal Case
Sheet 5, Part B    Criminal Monetary Penalties

Judgment -- Page 6 of 6

DEFENDANT:   DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐    Lump sum payment of _____ due immediately, balance due

   ☐    not later than _____, and/or
   ☐    in accordance with ☐ C, ☐ D, and/or ☐ E, below; or

B ☒    Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ E below); or

C ☐    Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐    Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E ☒    Special instructions regarding the payment of criminal monetary penalties:
   Make all payments payable to: U.S. District Clerk, 1133 N Shoreline Blvd Ste 208, Corpus Christi, TX 78401.

   Payments are to begin 60 days from the date of placement at the Bureau of Prisons at a rate of no more than 20 percent of funds in his inmate trust fund. The balance is to be paid at a rate of $25.00 per month beginning 30 days after commencing supervised release.

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

| Case Number (Including Defendant Number) | Defendant Name | Joint and Several Amount |
|---|---|---|
| | | |

☐    See Additional Defendants Held Joint and Several sheet.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

☐    See Additional Forfeited Property Sheet.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

USCA5 908

63

USCA5 909

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 1                                                                              (NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### Holding Session in Corpus Christi

UNITED STATES OF AMERICA                    **AMENDED JUDGMENT IN A CRIMINAL CASE**
V.
## DARRICK MOORE

CASE NUMBER: **2:03CR00075-S-001**

☐ See Additional Aliases.                   USM NUMBER:  19499-179
**Date of Original Judgment:**    April 22, 2004    Patrick McGuire*
(or Date of Last Amended Judgment)          Defendant's Attorney

**Reason for Amendment**

☐  Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))    ☐  Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))

☒  Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))    ☐  Modification of Imposed Term of Imprisonment for Extraordinary and
                                                                                      Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐  Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))    ☐  Modification of Imposed Term of Imprisonment for Retroactive Amendment(s)
                                                                                      to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐  Correction for Clerical Mistake (Fed. R. Crim. P. 36)    ☐  Direct Motion to District Court Pursuant to  ☐  28 U.S.C. § 2255 or
                                                                 ☐  18 U.S.C. § 3559(c)(7)
## THE DEFENDANT:                           ☐  Modification of Restitution Order (18 U.S.C. § 3664)

☒  pleaded guilty to count(s)    S1 on April 30, 2003

☐  pleaded nolo contendere to count(s)  _____
   which was accepted by the court.

☐  was found guilty on count(s)  _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of 1.39 Grams of Cocaine Base | 01-16-03 | S1 |

☐  See Additional Counts of Conviction.

The defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s) _____

☒  Count(s) S2 and S3 _____    ☐ is  ☒ are  dismissed on the motion of the  United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

December 23, 2004
Date of Imposition of Judgment

_____
Signature of Judge

**JANIS GRAHAM JACK**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

12-27-04
Date

USCA5 910

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 2 -- Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 2 of 6

DEFENDANT:   **DARRICK MOORE**
CASE NUMBER:   **2:03CR00075-S-001**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a

total term of _____ 50 months.* _____

It is the order of the Court that the PSI in this case is for use by the Bureau of Prisons employees only and **shall not** be further disclosed to any other party (other than defendant), agency or individual without written permission of this Court, except in instances of escape or failure to surrender, when the report is needed by the U.S. Marshals.

☐   See Additional Imprisonment Terms.

☒   The court makes the following recommendations to the Bureau of Prisons:
That the defendant participate in a comprehensive drug treatment program while incarcerated.
That the defendant be placed in a facility in Texas as long as the security needs of the Bureau of Prisons are met.

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐   before 2 p.m. on _____ .

☐   as notified by the United States Marshal.

☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

USCA5 911

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
           Sheet 3 -- Supervised Release                                                (NOTE: Identify Changes with Asterisks (*))

                                                                                        Judgment -- Page 3 of 6

DEFENDANT:  **DARRICK MOORE**
CASE NUMBER:  **2:03CR00075-S-001**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  3 year(s).

☐  See Additional Supervised Release Terms.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. *(for offenses committed on or after September 13, 1994)*

    ☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

☒  See Special Conditions of Supervision.

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**USCA5 912**

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
           Sheet 3C -- Supervised Release                                      (NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 4 of 6

DEFENDANT:   DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

# SPECIAL CONDITIONS OF SUPERVISION

**DRUG SURVEILLANCE:** The defendant shall submit to periodic urine surveillance and/or breath saliva and skin tests for the detection of drug abuse as directed by the probation officer. The defendant will incur costs associated with such detection efforts based on ability to pay as determined by the probation officer.

**DRUG TREATMENT:** The defendant shall participate in a program, inpatient or outpatient, for the treatment of drug and/or alcohol addiction, dependency or abuse which may include, but not be limited to urine, breath, saliva and skin testing to determine whether the defendant has reverted to the use of drugs and/or alcohol. Further, the defendant shall participate as instructed and as deemed necessary by the probation officer and shall comply with all rules and regulations of the treatment agency until discharged by the Program Director with the approval of the probation officer. The defendant shall further submit to drug-detection techniques, in addition to those performed by the treatment agency, as directed by the probation officer. The defendant will incur costs associated with such drug/alcohol detection and treatment, based on ability to pay as determined by the probation officer.

**MENTAL HEALTH:** The defendant is required to participate in a mental health program as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

**NIGHTTIME RESTRICTION:** Throughout the period of supervised release, the defendant shall be restricted to his home each night from 12 midnight to 6 am, unless other specific arrangements are made with the probation officer.

**ALCOHOL ABSTINENCE:** The defendant shall abstain from the use of alcohol during the term of supervision.

**ANGER MANAGEMENT:** The defendant is required to participate in anger management counseling as deemed necessary and approved by the probation officer. The defendant will incur costs associated with such program, based on ability to pay as determined by the probation officer.

USCA5 913

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
           Sheet 5 -- Criminal Monetary Penalties                                    (NOTE: Identify Changes with Asterisks (*))

                                                                                     Judgment -- Page 5 of 6
DEFENDANT:  DARRICK MOORE
CASE NUMBER:  2:03CR00075-S-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|----------------|----------|-----------------|
| TOTALS | $100.00        | $50.00   |                 |

☐  See Additional Terms for Criminal Monetary Penalties.

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal payees must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|-----------------|-------------------------|----------------------------|
|                   |                 |                         |                            |

☐  See Additional Restitution Payees.

| TOTALS | $    0.00 | $    0.00 |
|--------|-----------|-----------|

☐  Restitution amount ordered pursuant to plea agreement $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☒  the interest requirement is waived for the  ☒ fine      ☐ restitution.

   ☐  the interest requirement for the  ☐ fine      ☐ restitution is modified as follows:

☐  Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

USCA5 914

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 6 -- Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

Judgment -- Page 6 of 6

DEFENDANT:   DARRICK MOORE
CASE NUMBER:   2:03CR00075-S-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A ☐ Lump sum payment of $ _____ due immediately, balance due

☐ not later than _____ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C,   ☐ D, or ☒ F below); or

C ☐ Payment in equal _____ installments of $ _____ over a period of_____ , to commence _____ days after the date of this judgment; or

D ☐ Payment in equal _____ installments of $ _____ over a period of_____ , to commence _____ days after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ days after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:
Make all payments payable to: U.S. District Clerk, 1133 N Shoreline Blvd Ste 208, Corpus Christi, TX 78401
Payments are to begin 60 days from the date of placement at the Bureau of Prisons at a rate of no more than 20 percent of funds in his inmate trust fund. The balance is to be paid at a rate of $25.00 per month beginning 30 days after commencing supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

**Case Number**
**Defendant and Co-Defendant Names**
**(Including defendant number)**          **Total Amount**     **Joint and Several Amount**     **Corresponding Payee, if appropriate**

☐ See Additional Defendants and Co-Defendants Held Joint and Several.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

☐ See Additional Forfeited Property.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

USCA5 915

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 2:07-cv-00223 |
|  | : |  |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : |  |
|  | : | Electronically Filed |
| Petitioner. | : |  |
|  | : |  |

**PETITIONER'S MOTION FOR OPPORTUNITY
TO FILE MEMORANDUM OF LAW IN SUPPORT
OF SECTION 2255 MOTION**

Petitioner, Alfred Bourgeois, hereby moves for an opportunity to file a memorandum of law in support of his previously filed *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. Section 2241* (hereafter, *2255 Motion*). In support of this *Motion*, he states the following.

1.      Petitioner is a federal prisoner who was sentenced to death in this Court under docket number Cr-C-02-216. His conviction and sentence were affirmed by the Court of Appeals. U.S. v. Bourgeois, 423 F.3d 501 (5th Cir. 2005).

2.      On May 14, Petitioner, through undersigned counsel, filed his *2255 Motion*. In his request for relief contained on page 129 of the *2255 Motion*, he requested that he be afforded 120 days in which to file a *Memorandum in Support*.

3.      Rules 4 and 5 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255 requires the Government to file a responsive pleading if ordered to do so by the Court. Petitioner

1

USCA5 916

believes based upon the complexity and number of disputed issues of material fact, that the Court will and should require the Government to file a response. Working on the assumption that the Government will be required to file a response, Petitioner believes that it would make more sense to permit him to file a *Memorandum of Law* setting forth the points and authorities that support his entitlement to relief on each claim. In counsels' experience, it more efficient to permit a petitioner to file a legal memorandum to support his claims prior to having the Government file its responsive pleading, as such a memorandum tends to highlight the legal issues presented by the petition, and overall streamlines the litigation.

4.       In view of the complexity and number of issues raised in the *2255 Motion*, counsels' ongoing responsibilities in other capital post-conviction litigation and to accommodate summer vacation schedules, counsel request that they be provided 120 days (until September 28, 2007) to file this Memorandum.

5.       Undersigned counsel have communicated with Assistant United States Attorney, Tony R. Roberts regarding the Government's position with respect to this request. Mr. Roberts indicates that the Government is opposed to the filing of a memorandum, however, in the event that Court grants the request, the Government is not opposed to the time requested by Petitioner to file it. While the Government presumably will amplify its position in an answer to this *Motion*, Mr. Roberts indicates that the Government wishes to avoid "piecemeal" filings in death penalty cases, particularly when the proposed filing is to be made after the expiration of the one year statute of limitations.

6.       However, Petitioner is aware of no authority requiring legal memoranda to be filed within the one year limitations period contained in section 2255. Indeed, the limitations period

2

contained in section 2255 by its terms applies only to a "motion" for relief. Absent compelling

authority to the contrary, this Court is obliged to give this term its plain meaning.[1]

7.     If the Court requires the Government to file an answer, but does not permit Petitioner

the opportunity to file a supporting memoranda, then it would be in the unenviable position of having

to decide a number of complex procedural and substantive issues without benefit of briefing. On

the other hand, if the Court wishes to hear from Petitioner on the legal issues, it would make more

sense to permit Petitioner the opportunity to file his memorandum prior to the Government's

response.

8.     Counsel would further suggest that the Court set a date for the Government to respond

to the *2255 Motion* and *Supporting Memorandum*. Once the Government has filed its responsive

pleadings, Petitioner should be afforded the opportunity to file a reply, as envisioned by Rule 5d,

RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255. Petitioner would request that the

he be afforded 60 days following the filing of the Government's responsive pleading for him to file

his *Reply*.

9.     Finally, Petitioner submits that it might make sense to convene the parties for a

scheduling conference to work out these issues, and other issues such as additional motions

Petitioner may wish to file (e.g. discovery, motion for evidentiary hearing). Absent such a

---

[1]Even if the Government was correct that a supporting memorandum is governed by the limitations period, it would still be timely if it related back to the issues addressed in the Petition. In Mayle v. Felix, 545 U.S. 644 (2005) the Court held that a timely section 2254 petition could be amended after the expiration of the limitations period, so long as the amendments "relate back" to the claims in the initial timely petition. Since Petitioner only wishes to discuss the points and authorities supporting his already pled claims, obviously this discussion would relate back to those claims, and the memoranda would be timely and proper.

USCA5 918

scheduling conference, or order, Petitioner will continue to move ahead in preparing additional

motions as he deems appropriate.

Respectfully Submitted,

s/      Michael Wiseman
_____
Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

*Co-Counsel of Record for Petitioner Alfred Bourgeois

Dated:  Philadelphia, Pennsylvania
        June 4, 2007

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 4th day day of June, 2007, I caused the foregoing to be served upon the following person by United States Mail, First Class Postage prepaid, by e-filing and e-mail:

| | | |
|---|---|---|
| Patricia Hubert Booth | Tony R. Roberts | James L. Turner |
| United States Attorney's Office | United States Attorney's Office | United States Attorney's Office |
| 800 North Shoreline, Suite 500 | PO Box 61129 | PO Box 61129 |
| Corpus Christi, TX 78401 | Houston, TX 77208-1129 | Houston, TX 77208-129 |
| Patti.Booth@usdoj.gov | Tony.Roberts@usdoj.gov | jim.turner@usdoj.gov |

/s/ Michael Wiseman
_____
Michael Wiseman

4

USCA5 919

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 2:07-cv-00223 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | |
| Petitioner. | : | |

_____

**ORDER**

AND NOW, this ____ day of _____, 2007 upon consideration of Petitioner's *Motion for Opportunity to File Memorandum of Law in Support of Section 2255 Motion*, it is hereby ORDERED:

Petitioner's Motion is GRANTED.

Petitioner shall file a memorandum in support of his *2255 Motion* on or before September 28, 2007;

The Government shall file its responsive pleading and memorandum on or before _____;

Petitioner shall file a reply within 60 days of the date that the Government files its responsive pleading and memorandum.

_____
Janis Graham Jack, U.S.D.J.

USCA5 920

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent, | § | |
| | § | Criminal Action No. 2:02cr216 |
| v. | § | No. 07cv223 |
| ALFRED BOURGEOIS, | § | |
| | § | |
| Petitioner, | § | |

## Order

Petitioner Alfred Bourgeois was convicted of first degree premeditated murder under 18 U.S.C. § 1111(a) and sentenced to death.  On May 14, 2007, he filed a motion for relief under 28 U.S.C. § 2255.  On June 4, 2007, he filed a motion for leave to file a memorandum of law in support of his § 2255 motion.  The government has not responded to the motion.

Rule 4(b) of the Rules On Motion Attacking Sentence Under Section 2255 directs the judge receiving a § 2255 motion to order the government to answer the § 2255 motion if the motion is not subject to immediate dismissal.  Rule 5(a) provides that the government is not required to answer unless ordered to do so. Recognizing that his motion raises numerous complex issues, Bourgeois requests that, if this Court intends to order an answer, it also grant leave to Bourgeois to file a memorandum of law setting forth the points and authorities on which he bases

USCA5 921

his claims for relief.

A memorandum of law will assist both this Court and the government to fully and accurately understand the specific grounds on which Bourgeois seeks relief. Accordingly,

IT IS ORDERED THAT Petitioner's Motion For Opportunity To File Memorandum Of Law In Support Of Section 2255 Motion (Docket Entry 3) is **Granted**;

IT IS FURTHER ORDERED THAT Petitioner may file a memorandum of law in support of his § 2255 motion on or before September 28, 2007;

IT IS FURTHER ORDERED THAT Respondent shall answer the motion on or before January 28, 2008; and

IT IS FURTHER ORDERED THAT Petitioner may reply to the government's response on or before March 28, 2008.

SO ORDERED

JANIS GRAHAM JACK
United States District Judge

Corpus Christi, Texas
July 19, 2007

USCA5 922

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                              :
UNITED STATES OF AMERICA,           :            No. Cr-C-02-216
                                              :            No. Cv-07-223
             Respondent,            :       Honorable Janis Graham Jack,
                                              :            U.S.D.J.
      -against-                     :
                                              :       **This is a Capital Case**
ALFRED BOURGEOIS,                   :
                                              :        Electronically Filed
             Petitioner.            :
_____   :

**PETITIONER'S MOTION FOR EXTENSION OF TIME OF
ONE BUSINESS DAY TO FILE MEMORANDUM IN
SUPPORT OF SECTION 2255 MOTION**

Petitioner, Alfred Bourgeois, through undersigned counsel hereby moves for an extension

of time of one business day to submit his Memorandum of Law in Support of his Section 2255

Motion.  In support, he states the following.

1.      On May 14, 2007 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C.

Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* challenging his convictions and

sentence of death related to the 2002 beating death of his daughter, JG-1999.

2.      On July 19, 2007 the Court granted Petitioner's motion requesting an opportunity

to file a memorandum of law in support of the *Motion*, and ordered Petitioner to file on or before

September 28, 2007 (document # 399).

3.      Counsel have been diligently completing their Memorandum, however, they are

unable to complete it by the end of today.  The Memorandum addresses a large number of

complex and lengthy issues.  Counsel wish to provide the Court with as helpful a memo as

possible and it has taken somewhat longer than anticipated.  Counsel are confident that they will

USCA5 923

be able to file the Memo on Monday, October 1, and can guarantee the Court that no further

requests will be made for this purpose.

    4.    This Motion is made in good faith and is based on the specific needs of this

complex capital case.  It is not made for the purpose of delay.

    WHEREFORE, counsel for Petitioner request that the Court extend his time to file the

Memorandum of Law for one business day, until October 1, 2007.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:  Philadelphia, PA
        September 28, 2007

USCA5 924

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 28th day of September, 2007, I caused the foregoing upon the following person in the manner indicated below:

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401

/s/ Michael Wiseman

Michael Wiseman

Dated: Philadelphia, Pennsylvania
September 28, 2007

USCA5 925

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                              :
UNITED STATES OF AMERICA,                     :          No. Cr-C-02-216
                                              :          No. Cv-07-223
                    Respondent,               :      Honorable Janis Graham Jack,
                                              :               U.S.D.J.
        -against-                             :
                                              :      **This is a Capital Case**
ALFRED BOURGEOIS,                             :
                                              :
                    Petitioner.               :
_____     :

**ORDER**

        AND NOW this ___ day of _____, 2007 upon the Motion of Petitioner for an extension of time of one business day to file his Memorandum of Law in Support of his Section 2255 Motion, it is hereby Ordered:

        Petitioner's motion is granted.  He may file his Memorandum of Law on or before October 1, 2007.


                                        _____
                                        Honorable Janis Graham Jack
                                        USDJ


USCA5 926

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS, | § | |
| | § | |
| Defendant. | § | |

## ORDER ON PETITIONER'S MOTION FOR EXTENSION OF TIME OF ONE BUSINESS DAY TO FILE MEMORANDUM IN SUPPORT OF SECTION 2255 MOTION

On this day came on to be considered Petitioner's Motion for Extension of Time of One Business Day to File Memorandum in Support of Section 2255 Motion. Petitioner's motion is GRANTED and Petitioner is granted an extension to Friday, October 5, 2007, to file his Memorandum of Law in support of his Section 2255 Motion.

SIGNED and ORDERED this 28th day of September, 2007.

Janis Graham Jack
United States District Judge

1 / 1

USCA5 927

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : |  |
|  | : | Honorable Janis Graham Jack |
| -against- | : | U.S.D.J. |
|  | : |  |
| ALFRED BOURGEOIS, | : | **This is a Capital Case** |
|  | : |  |
| Petitioner. | : |  |
|  | : |  |

### PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR RELIEF PURSUANT TO
### 28 U.S.C. SECTION 2255
### OR IN THE ALTERNATIVE
### PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNEY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
        October 5, 2007

**USCA5 928**

### PRELIMINARY STATEMENT

On May 14, 2007 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* (hereafter, *Motion*) challenging his convictions and sentence of death related to the 2002 beating death of his daughter, JG-1999.

On July 19, 2007 the Court granted Petitioner's motion requesting an opportunity to file a memorandum of law in support of the *Motion*, and ordered Petitioner to file on or before September 28, 2007 (document # 399).   On September 28, 2007 the Court extended Petitioner's time to file until October 5, 2007 (document # 401).

As in the *Motion*, references to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript), followed by the date of the proceedings and a page citation.  Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation.  Petitioner's *Motion* will be cited as *Motion* followed by a page or paragraph number. The opinion of the United States Courts of Appeals rendered on direct appeal is reported at United States v. Bourgeois, 423 F.3d 501 (August 25, 2005).   It will be cited as Bourgeois.

Mr. Bourgeois filed an *Appendix* with his *Motion* which contained documents relevant to his claims.   Along with this *Memorandum*, he is filing additional documents in a *Supplemental Appendix*, which will be numbered sequentially from the *Appendix*.  References to documents from the Appendix and Supplemental Appendix will be referred to as *PA* or *SPA*, followed by the number assigned to each document.

Alfred Bourgeois will be referred to by name, or as Petitioner.  The United States will be referred to as the Government.

All other citations are either self-explanatory or are explained.  All emphasis is provided unless otherwise noted.

i

USCA5 929

TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Review of Claims Due to Counsels' Ineffectiveness . . . . . . . . . . . . . . . . . . . . . 1

      B.    Review of Claims Under United States Treaty Obligations . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Claim I.    Petitioner's Execution is Prohibited by the Eighth Amendment and
the Federal Death Penalty Act Because He Is a Person with Mental
Retardation.  Trial Counsel Were Ineffective for Failing to Present
this Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Petitioner Meets the Definition for Mental Retardation under Atkins
and its Progeny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           1.    The Definition of Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . 7
           2.    Application of the Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Trial Counsels' Failure to Investigate, Prepare, and Present this Claim
to the Court Constitutes Ineffective Assistance of Counsel . . . . . . . . . . . . . . . 11

      D.    This is a Non-Waivable Claim: This Court's Finding that Petitioner
is a Person with Mental Retardation Would Preclude Execution Even
if Counsel were not Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.    Because of Petitioner's Chronic and Severe Mental Illness, His
Execution Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . 14

Claim II.    Counsel Provided Ineffective Assistance During the Penalty Phase . . . . . . . . . 17

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    The Defense Case at Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

USCA5 930

C.    The Unpresented Evidence ........................................ 20

D.    Deficient Performance ........................................... 22

E.    Prejudice .................................................... 24

F.    Counsel Ineffectively Failed to Move to Strike Dr. Estrada's Opinion
      that Petitioner Posed a Risk of Future Dangerousness ................... 25

Claim III.    No Reasonable View of the Evidence Existed upon Which a Rational
              Fact Finder Could Conclude That the Fatal Injuries Were Inflicted
              Within the Special Maritime and Territorial Jurisdiction of the United
              States in Violation of Due Process.  Furthermore, Counsel Were
              Ineffective for Failing to Litigate this Claim and to Present Readily
              Available Evidence to Rebut this Element of the Offense ................ 26

      A.    The Government Failed to Prove by Legally Sufficient Evidence That
            the Fatal Injury was Inflicted on the Grounds of the Corpus Christi
            Naval Air Station ............................................ 28

      B.    Counsel Were Ineffective for Failing to Prove that the Fatal Blows
            Were Inflicted Days Before the Victim's Death ...................... 29

Claim IV.    Trial Counsel Were Ineffective for Failing to Present Available
             Expert Testimony That Would Have Undermined the Government's
             Assertion That Petitioner's Semen Was Found in JG-1999's Anus, in
             Violation of Mr. Bourgeois' Rights under the Sixth Amendment to
             the United States Constitution ................................... 32

      A.    Introduction ................................................ 32

      B.    The Testimony and Arguments Presented at Trial and at the Penalty
            Hearing .................................................... 33

      C.    Trial Counsels' Deficient Performance ............................ 40

      1.    Counsel Ineffective Failed to Counter the Government's Contention
            that Petitioner's Semen Was Found on the Victim ..................... 42
      2.    Counsel Ineffectively Failed to Counter the Government's Evidence
            of Sexual Trauma ............................................ 46

      D.    Petitioner Was Prejudiced by Counsel's Ineffectiveness ................ 49

USCA5 931

Claim V.    Trial Counsel Rendered Ineffective Assistance by Failing to Litigate a Daubert Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Senn and Dr. Chrz Concerning the Bite Mark Evidence and the Digital Enhancements of the Bite Mark Photographs and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    A.    The Admissibility of Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    B.    Counsel's Duty to Investigate Related to Mounting a Daubert Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    C.    Strickland Deficient Performance: Counsel Failed to Mount a Pretrial Challenge to the Bite Mark and Photographic Enhancement Evidence and Failed at Trial to Rebut this Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    1.    The Enhanced Images of the Bite Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    2.    The Government's Bite Mark Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    3.    Counsels' Failure to Use the Exculpatory Opinion of a Government Expert Who was not Called by the Government . . . . . . . . . . . . . . . . . . . . . . . . . 60

    D.    Strickland Prejudice: Counsels' Deficient Performance Caused Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    1.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable . . . . . . . . . 65
    2.    The Opinions of Dr. Senn and Dr. Chrz Were Also Unreliable . . . . . . . . . . . . . 70

Claim VI.    Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Litigate a Daubert Motion Challenging the Scientific and Technical Reliability of the Opinions of Dr. Oliver Concerning the Digitally Enhanced Autopsy Photographs, for Failing to Object to Their Admissibility, and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    A.    Counsel Were Ineffective for Failing to Mount a Pretrial Daubert Challenge to the Photographic Enhancement Evidence . . . . . . . . . . . . . . . . . . 74

    B.    Trial Counsel Were Ineffective for Failing to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and for Failing to Rebut this Evidence Once it Was Admitted at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    C.    Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

USCA5 932

Claim VII.   The Government Violated its Obligations under Brady V. Maryland by Failing to Disclose to Petitioner Information Material to His Ability to Prepare and Present a Defense at Trial and Sentencing Denying Petitioner His Rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    B.   The Relevant Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    1.   The Prosecutor's Due Process Duty to Disclose Favorable Evidence . . . . . . . . 81
    2.   Brady Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    C.   The Improper Suppression of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    1.   Adam Longoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    2.   Orlando Campos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
    3.   Darrick Moore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

    D.   The Suppressed Evidence Should Have Been Disclosed and Was Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

    E.   The Government Knowingly Permitted the Use of False Testimony . . . . . . . . 100

    F.   Trial Counsel Were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Claim VIII.   Trial Counsel Labored under a Conflict of Interest That Adversely Affected Their Representation of Petitioner at Trial and Sentencing, in Violation of Petitioner's Sixth Amendment Right to Counsel . . . . . . . . . . . 105

    A.   Government Witness, Ross Griffin, Was Represented By Petitioner's Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

    B.   Government Witness, Adam Longoria, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client . . . . . . . . . 108

    C.   Government Witness, Orlando Campos, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client . . . . . . . . . 109

USCA5 933

Claim IX.    Prosecutorial Misconduct in Closing Argument at Both the Guilt/Innocence and Penalty Phases Denied Petitioner His Constitutional Right to Due Process and His Rights under the Sixth and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . 110

    A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    B.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    C.    The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    D.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    E.    The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

    F.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

    G.    The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

    H.    The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    I.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos . . . . . . . 120

    J.    The Prosecutor Engaged in Misconduct by Improperly Disparaging and Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

    K.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

USCA5 934

Claim X.  Trial Counsel Were Ineffective for Failing to Rebut The Evidence of Petitioner's Indifferent Demeanor at the Guilt Stage of Trial with Mental Health Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

    A.  The Testimony and Arguments Presented at Trial . . . . . . . . . . . . . . . . . . . . . . 124

    B.  Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

    C.  Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Claim XI.  Petitioner Was Denied His Sixth Amendment Right to a Trial and to Counsel When the Government's Mental Health Expert Relied Upon his Interactions with Defense Counsel During the Trial to Formulate Adverse Opinions About Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Claim XII.  Appellate Counsel Were Ineffective in Multiple Respects . . . . . . . . . . . . . . . . 132

    A.  General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

    B.  Failure to Raise Record-Based Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

    C.  This Court Improperly Admitted Inflammatory and Prejudicial Photographs During Both the Guilt/Innocence and the Penalty Stages of Trial.  Direct Appeal Counsel Ineffectively Failed to Raise this Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

    D.  Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-Social Histories of Others Who Have Been Sentenced to Death.  Counsel Were Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Claim XIII.  Petitioner is Entitled to Relief Based Upon the Cumulative Errors Identified Above . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Claim XIV.  Petitioner is Entitled to an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . 140

Claim XV.  The Manner in Which the Government Would Carry Out Petitioner's Execution Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . 141

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

USCA5 935

**STANDARD OF REVIEW**

28 U.S.C. § 2255 requires that a federal conviction and sentence be vacated if they were obtained in violation of the Constitution or laws of the United States.

Petitioner alleges, inter alia, violations of the right to the effective assistance of counsel at trial and on direct appeal, secured by the Sixth Amendment (trial) and the equal protection component of the due process clause of the Fifth Amendment (direct appeal).

**A.    Review of Claims Due to Counsels' Ineffectiveness.**

Petitioner's claims are reviewable under the following standards governing claims of ineffective assistance of counsel.  Such claims are governed by Strickland v. Washington, 466 U.S. 688 (1984).  Counsel is ineffective where, as here: 1) his or her performance falls below objective standards of reasonableness, and 2) as a result of that deficiency, the petitioner suffered prejudice. Strickland, 466 U.S. at 694.  Prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).  Such a probability can be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.

Claims of ineffective assistance of counsel are properly pursued in a section 2255 proceeding and are not waived even though they were not presented on direct appeal.  United States v. Massaro, 538 U.S. 500, 509 (2003) ("failure to raise an ineffective-assistance-of-counsel claim on direct

1

USCA5 936

appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.")

In many of his ineffective assistance of counsel claims, Petitioner will refer to GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, American Bar Association, Revised Edition, February 2003 (hereinafter, "Guidelines"), as embodying what is expected of capital trial and appellate counsel – indeed,  the Supreme Court has repeatedly cited these standards as a measure of the whether capital counsels' performance was reasonable.  See, e.g. Wiggins, 539 U.S. at 523 ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred as 'guides to determining what is reasonable'") (citing  Strickland and Williams v. Taylor, 529 U.S. 362 (2000)).[1]

## B. Review of Claims Under United States Treaty Obligations.

Petitioner submits that all of his claims are reviewable even if they were not presented at trial and/or on direct appeal based upon counsels' ineffectiveness, described herein.  However, even if the Court were to find that counsel were not ineffective for failing to raise or litigate any of the claims addressed herein, the Court would still be obliged to consider these claims on their merits because of United States treaty obligations.

United States international treaty obligations foreclose the application of any procedural rule as a basis to deny substantive review of an alleged federal constitutional violation in a death penalty case.  In its ratification of the International Covenant on Civil and Political Rights ("ICCPR"), 128

---

[1] The Guidelines are published, 31 Hofstra L.Rev. 913 (2003), and are available on-line at www.ABAnet.org.  Petitioner also makes reference to the 1989 edition of the Guidelines, also available at ABAnet.org.

2

Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992), the United States Senate indicated that:

> [T]he United States considers itself bound by Article 7[2] to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eight, and/or Fourteenth Amendments to the Constitution of the United States.

*U.S. Reservations, Declarations, and Understandings, International Covenant on Civil and Political Rights* ("ICCPR"), Part I(3), 128 CONG. REC. S4781-01 (daily ed. Apr. 2, 1992).

In its advice and consent on the ICCPR, the Senate further reserved the right under the ICCPR to impose the death penalty provided it was applied "subject to [United States] Constitutional constraints" upon persons "duly convicted" of capital offenses. Id. at Part I(2).  The Senate also declared nations party to the Covenant "should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant." Id. at Part III(2).

Similarly, in ratifying the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Senate in giving its advice and consent declared:

> [T]he United States considers itself bound by Article 16[3] to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eight, and/or Fourteenth Amendments to the Constitution of the United States.

*U.S. Reservations, Declarations, and Understandings, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Part I(1), CONG. REC. S17486-01 (daily ed. Oct.

---

[2]  Article 7 contains the ICCPR proscription against "cruel, inhuman or degrading treatment or punishment."  The Senate accepted without reservation the ICCPR proscription against arbitrary deprivation of life.  ICCPR, Article 6, ¶ 1 ("Every human being has the inherent right to life. . . . No one shall be arbitrarily deprived of his life.").

[3]   Article 16 contains the Torture Convention's proscription against cruel, inhuman or degrading treatment or punishment.

3

USCA5 938

27, 1990).

Moreover, the Senate expressed its understanding that the Torture Convention does not "restrict or prohibit the United States from applying the death penalty consistent with the Fifth . . . and/or Fourteenth Amendments to the Constitution of the United States." Id. at Part II(4).

In ratifying these treaties, the Senate agreed that under its international human rights obligations, the United States was bound under the treaties to ensure death sentences were not imposed or carried out in contravention of the substantive standards embodied in the Fifth and Eighth Amendments. Procedural rules are not substantive constitutional standards. On the contrary, they are by definition technical hurdles that prevent consideration and application of the very substantive constitutional standards that the United States treaty obligations require courts to apply. Application of technical procedural bars (such as waiver or procedural bar) to block the merits review of Petitioner's claims would violate the international human rights mandate that the death penalty may be administered only if it satisfies substantive constitutional standards. It also violates the Senate's clear declaration that the United States should "refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant." See also ICCPR, art. 2 ¶ 3.

Finally, a party to a treaty may take no actions in derogation of its treaty obligations. On the contrary, "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." Vienna Convention on the Law of Treaties, art. 26;[4] see also Judge v. Canada, CCPR/C/78/D/829/1998 ¶ 10.4. The application of a procedural doctrine to foreclose judicial review of an international human rights treaty obligation is in derogation of the treaty obligation. E.g.,

---

[4] 1155 U.N.T.S. 33, entered into force January 27, 1980.

4

USCA5 939

LeGrand Case (Germany v. United States of America), 2001 I.C.J. 104 (27 June 2001) (United States violated ICCPR obligations when it interposed procedural default doctrine to prevent review of international treaty claim); see also Case Concerning Avena and Other Mexican Nationals (Mexico v. United States), 2003 I.C.J. No. 128, *Order re:  Request for Indication of Provisional Measures* (5 Feb. 2003) (granting "provisional measures" – the international equivalent of a preliminary injunction – against application of "various [procedural] rules of United States municipal law" that render ineffective enforcement of human rights treaty obligations in the domestic courts of the United States).

Thus, United States courts may not impose any procedural rule as a basis to deny review of any of the substantive claims presented on behalf of Mr. Bourgeois in these proceedings.  Moreover, the appointment of ineffective counsel to Mr. Bourgeois during the penalty phase of his capital trial also violates the United States' international human rights treaty obligations, customary international law, and peremptory international human rights norms.

USCA5 940

**ARGUMENT**

**CLAIM I.        PETITIONER'S EXECUTION IS PROHIBITED BY THE EIGHTH AMENDMENT AND THE FEDERAL DEATH PENALTY ACT BECAUSE HE IS A PERSON WITH MENTAL RETARDATION. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT THIS DEFENSE.**

The Eighth Amendment prohibits the execution of a person with mental retardation. Atkins v. Virginia, 536 U.S. 304 (2002). Even before Atkins, the Federal Death Penalty Act (FDPA) prohibited the execution of mentally retarded offenders in federal prosecutions: "A sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596©.

Because Petitioner is a person with mental retardation, he may not be executed and is entitled to vacation of his death sentence under Atkins and the FDPA.

**A.        Background.**

Atkins set forth two justifications for the death penalty – retribution and deterrence of future capital crimes – that are not met by the execution of mentally retarded individuals. Regarding retribution, the Court wrote:

> With respect to retribution – the interest in seeing that the offender gets his 'just deserts' – the severity of the appropriate punishment necessarily depends on the culpability of the offender... If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution.

Atkins, 536 U.S. at 319.

In regard to deterrence, the Court reasoned:

> The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable– for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses– that also make it less likely that they can process

6

USCA5 941

the information of the possibility of execution as a penalty and, as a result control their conduct based upon that information.

Id. at 320.

The Court's second reason for prohibiting the execution of the mentally retarded – the reduced capacity of mentally retarded offenders – further supports its application in this case. As observed by the Supreme Court, mentally retarded individuals are less able "to make a persuasive showing of mitigation" and "to give meaningful assistance to their counsel." Id. at 320-21. Moreover, their "demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. In other words, Mr. Bourgeois, as a mentally retarded individual, "face[d] a special risk of wrongful execution" because of his mental retardation. Id

Mr. Bourgeois' mental retardation places him in the narrow category of prisoners who cannot constitutionally be executed. Because his execution would not further the penological goals of the death penalty, it would merely be an exercise of "purposeless and needless suffering." Id. at 319 ("Unless the imposition of the death penalty on a mentally retarded person measurably contributes to one of both of these goals, it is nothing more that the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment.") Congruently, Mr. Bourgeois' limitations put him in that class of capital defendants who are less able to advocate for and defend themselves in a criminal trial, warranting added protections against the imposition of a death sentence.

> **B.      Petitioner Meets the Definition for Mental Retardation under <u>Atkins</u> and its Progeny.**
>
> > **1.      The Definition of Mental Retardation.**

In barring the execution of mentally retarded individuals, the Supreme Court left to individual jurisdictions the task of developing appropriate ways to determine the presence of mental retardation

7

in a capital defendant.  Atkins, 536 U.S. at 317.   However, the Court endorsed the overlapping

definitions for mental retardation propagated by the American Association on Mental Retardation[5]

("AAMR") and the American Psychiatric Association.[6]  The AAMR definition states:

> Mental retardation refers to substantial limitations in present functioning. It is
> characterized by significantly subaverage intellectual functioning, existing
> concurrently with related limitations in two or more of the following applicable
> adaptive skill areas: communication, self-care, home living, social skills, community
> use, self-direction, health and safety, functional academics, leisure, and work. Mental
> retardation manifests before age 18.  Mental Retardation: Definition, Classification,
> and Systems of Supports 5 (9th ed.1992).

Atkins, 536 U.S. at 309 n. 3  The American Psychiatric Association's definition is similar:

> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant limitations
> in adaptive functioning in at least two of the following skill areas: communication,
> self-care, home living, social/interpersonal skills, use of community resources, self-
> direction, functional academic skills, work, leisure, health, and safety (Criterion B).
> The onset must occur before age 18 years (Criterion C).  Diagnostic and Statistical
> Manual of Mental Disorders 41 (4th ed.2000).

Id.[7]

---

[5]  The AAMR has since changed its name to the American Association on Intellectual and
Developmental Disabilities (AAIDD).

[6]  The definitions are "essentially congruent." United States v. Nelson, 419 F.Supp.2d 891,
895 (E.D. La. 2006).

[7]  Atkins relied on the AAMR 9th edition's definition of mental retardation.  However, in
May 2002, the AAMR released a slightly modified definition:  "Mental retardation is a disability
characterized by significant limitations both in intellectual functioning and in adaptive behavior as
expressed in conceptual, social, and practical adaptive skills. This disability originates before age
18." *American Association of Mental Retardation, Mental Retardation: Definition, Classification,
and Systems of Support* 1 (10th Ed.2002).  This new definition does not mark a substantive change:
"the ten skills contained in the DSM-IV-TR represent a more specific breakdown, or subset, of the
broader categories contained in the [10th edition of] the AAMR... the definitions are consistent, and
in fact, the current DSM-IV-TR definition is identical to the 1992 AAMR definition." United States
v. Nelson, 419 F. Supp. 2d 891, 895 (E.D. La. 2006).

8

USCA5 943

The federal courts in Texas have adopted the AAMR and the APA definition of mental retardation referred to in <u>Atkins</u>.  The Fifth Circuit has noted repeatedly: "[m]ental retardation is a disability characterized by three criteria: significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18." <u>In re Mathis</u>, 483 F.3d 395, 397 (5th Cir. 2007) (internal quotations omitted); <u>In re Salazar</u> 443 F.3d 430, 432. (5th Cir. 2006) (same); <u>United States v. Webster</u>, 421 F.3d 308, 313  n.14 (5th Cir. 2005) (same); <u>Morris v. Dretke</u>, 413 F.3d 484, 490 (5th Cir.2005) (applying the AAMR standard to a section 2254 <u>Atkins</u> claim).

### 2.    Application of the Standard.

The facts proffered by Petitioner meet the definition of mental retardation.  Mr. Bourgeois has completed intelligence testing on two occasions.  One week prior to trial, on February 28, 2004, Petitioner was evaluated at defense counsels' request by Dr. Donald Weiner, a neuropsychologist who practices in Corpus Christi.  Petitioner obtained a full scale IQ score of 75[8] on Dr. Weiner's administration of the WAIS-R (Wechsler Adult Intelligence Scale-Revised) .  For reasons explained more fully in the *Motion*, this score is actually a 68.[9]  Three years later, in preparation for this *Motion*, Mr. Bourgeois was evaluated again, this time with the WAIS-III (Wechsler Adult

---

[8]  This score was reported as a 76 in Dr. Weiner's report, however this was a typographical error.  The data sheet has the score as  75.

[9]   As explained in his *Motion*, Mr. Bourgeois' score on the WAIS-R significantly overestimates his actual IQ.  At the time of this administration, the WAIS-R had been replaced with the re-normed and updated WAIS-III.  Because the WAIS-R had been normed in 1978, twenty-six years prior to Mr. Bourgeois' evaluation, Mr. Bourgeois' scores must be adjusted under the well-recognized and accepted Flynn effect, to correct for the IQ gains over time achieved by the entire population.  This is explained in the *Petition* at ¶10, note 7.

9

Intelligence Scale-III)[10] instrument, and he achieved an IQ of 70.[11]  Having demonstrated that he has "significantly subaverage general intellectual functioning," scoring at least two standard deviations below the mean, Petitioner *a fortiori* has established "subaverage general intellectual functioning" under Atkins.

Mr. Bourgeois has also alleged facts demonstrating that he has significant limitations in adaptive skill areas across a broad range of domains, including communication, self-care, home

---

[10]  The WAIS-III "is considered the 'gold standard' of IQ tests and is considered to be the most reliable means of assessing a person's intellectual capacity." Rivera v. Dretke, 2006 WL 870927 (S.D. Tex. March 31, 2006).

[11]  It is important to keep in mind that all IQ scores are properly read as estimates.  See e.g. Rivera v. Dretke, 2006 WL 870927 (S.D. Tex.) ("No IQ score is black and white... An IQ score is really more indicative of an estimated range.").  The 2002 American Association on Mental Retardation (AAMR), *Mental Retardation: Definition, Classification, and Systems of Supports,* at 51 (10th ed. 2002) (hereafter *AAMR's Mental Retardation*) explains:

> An obtained IQ standard score must always be considered in terms of the accuracy of its measurement.  Because all measurement, and particularly psychological measurement, has some potential for error, obtained scores may actually represent a range of several points... Errors of measurement as well... must be considered in the interpretations of test results  This process is facilitated by considering the concept of standard error of measurement (SEM)."

*AAMR's Mental Retardation* at 57.  The *AAMR's Mental Retardation* goes on to explain:

> Both of the primary American mental retardation diagnosis schemes make reference to significantly subaverage intellectual functioning as a defining characteristic of mental retardation.  The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (American Psychiatric Association, 1994) defined significantly subaverage as an IQ score of about 70 or below and added a statement concerning measurement error and an example of a Wechsler IQ of 70 considered to represent a range of 65 to 75.  The American Association on Mental Retardation defined it as approximately 70 to 75, taking into account measurement of error.

Id. at 58.

10

USCA5 945

living, social skills, community use, self-direction, functional academics, health and safety, leisure, and work. Undersigned counsel have interviewed multiple witnesses who report Mr. Bourgeois' serious deficiencies in all realms of functioning. They have also proffered an opinion from a mental health professional that Mr. Bourgeois evidences these adaptive deficits. See Declaration of Dr. Jethro Toomer at ¶¶ 10-12. *A fortiori* he also has established the presence of significant deficits in adaptive functioning required for a finding of mental retardation.

Finally, Mr. Bourgeois has alleged facts sufficient to prove that these intellectual and adaptive deficits had their on-set before age 18. The evidence strongly suggests that the etiology of his mental retardation is partially pre-natal, and these deficits were exacerbated by a variety of additional contributing causes in early childhood. Whatever the etiology, his adaptive impairments had clearly manifested by childhood. *A fortiori* he also has proven that his mental retardation originated during the developmental period, as required by Atkins and its progeny.

Mr. Bourgeois has mental retardation under any constitutionally acceptable definition. His death sentence must be vacated under Atkins. At a minimum he has pled a *prima facie* case that he is mentally retarded and the Court should afford him an evidentiary hearing at which he can prove these facts. See In re Mathis, 483 F.3d 395, 397 (5th Cir. 2007) (*prima facie* showing made in context of filing of a successive habeas petition when prisoner made a "sufficient showing of possible merit to warrant a fuller exploration by the district court").

## C. Trial Counsels' Failure to Investigate, Prepare, and Present this Claim to the Court Constitutes Ineffective Assistance of Counsel.

Petitioner references the above described general description of the law of ineffectiveness of counsel. At the time of Petitioner's trail (2004), the law was clear that a person with mental

11

USCA5 946

retardation was not eligible for the death penalty.  This prohibition was contained in the Federal

Death Penalty Act, and was embodied as an Eighth Amendment protection in Atkins.  Counsel

should have properly investigated and pursued this claim, particularly in view of Dr. Weiner's pre-

trial IQ testing.  No reasonable counsel would have ignored an IQ score of 75, and would have

explored it further for presentation as a complete defense to the death penalty, or at a minimum, as

mitigating evidence.[12]

Instead of investigating Mr. Bourgeois' mental retardation, trial counsel affirmatively avoided

this issue.  Nearly two months prior to trial, trial counsel inexplicably agreed to delete any reference

to mental retardation or learning disability from the jury questionnaire.  PTT 1/16/04, 7.  This was

done without having had IQ testing done on Mr. Bourgeois.  Further, despite the repeated urging of

mental health experts Dr. Cunningham and Dr. Estrada to the contrary, trial counsel failed to have

Mr. Bourgeois evaluated by a neuropsychologist, the only professional qualified to administer full

scale intelligence tests, until only one week before trial.  See Estrada Declaration at ¶¶ 16-17 (*PA*

# 7); Cunningham Declaration at ¶¶ 5-6 (*PA #6*); Weiner Declaration at ¶ 2 (*PA #16*). Even worse,

trial counsel failed to recognize the significance of Mr. Bourgeois' low score on Dr. Weiner's

administration of the WAIS-R.

Counsels' failure to utilize Dr. Weiner will be discussed more fully in the next section of this

brief addressing ineffective assistance of counsel in the penalty phase.  Safe to say, counsel

inexplicably failed to utilize the highly relevant evidence arising from Dr. Weiner's testing with

---

[12] At the time of Petitioner's trial, the Supreme Court had specifically identified borderline mental retardation (which is the range into which Petitioner falls if he is not actually mentally retarded) as a mitigating factor.  Williams v. Taylor, 529 U.S. 362, 398 (2000); see, also, Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death.")

12

regard to this claim, or Claim II, below.

In a similar vein, trial counsel failed to interview Mr. Bourgeois' family and friends regarding his possible mental retardation.  Trial counsel failed to personally interview any individuals with background information on their client at all, and they failed to instruct their investigators to seek out information about Mr. Bourgeois' intellectual disability.

Trial counsels' failure to investigate, present and prepare information about Mr. Bourgeois' mental retardation constitutes deficient performance under Strickland.  Petitioner was prejudiced as a result of this deficient performance.

Petitioner's mental retardation has been manifest since childhood.  Trial counsel were ineffective for failing to investigate, prepare, and present Petitioner's mental retardation to this Court.  If trial counsel had done so, Petitioner would have been found ineligible for the death penalty before trial even began.  See In re Johnson, 334 F.3d 403 (5th Cir. 2003) (trial judge is the appropriate fact-finder for a determination of mental retardation); United States v. Nelson, 419 F. Supp.2d 891, 892 (E.D.La. 2006) (pre-trial Atkins determination by the Court is appropriate); See also United States v. Webster, 421 F.3d 308, 312 (5th Cir. 1998) (affirming trial court's finding that Defendant was not mentally retarded).  Trial counsels' failure to protect their mentally retarded client from an illegal death sentence prejudiced Petitioner.

> **D.     This is a Non-Waivable Claim: This Court's Finding that Petitioner is a Person with Mental Retardation Would Preclude Execution Even if Counsel were not Ineffective.**

Petitioner submits that counsels' failure to develop and present the instant claim was ineffective under the Sixth Amendment.  However, even if the Court were to find that counsel were not ineffective, Petitioner submits that the Court would still have to grant sentencing relief.  This is

13

because the Supreme Court has held that it violates the Eighth Amendment to execute a person with

mental retardation.  Atkins.  Thus, mental retardation is a status precluding execution and that status

cannot be waived.

> **E.      Because of Petitioner's Chronic and Severe Mental Illness, His Execution Would Violate the Eighth Amendment.**

Mr. Bourgeois has a long and substantial history of major mental illness.  The Eighth

Amendment's prohibition on execution of the mentally retarded and underage offenders should be

expanded to preclude the execution of the severely mentally ill.  Similar to people with mental

retardation and juveniles, execution of the mentally ill serves no retributive or deterrent function and

offends "evolving standards of decency."

As discussed in Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court held that the

Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution

of individuals with mental retardation.  The Court reasoned that a person with mental retardation is

both less culpable and less able to be deterred because of his "diminished capacity to understand and

process information, to communicate, to abstract from mistakes and learn from experience, to engage

in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318.

In Roper v. Simmons, 543 U.S. 304 (2005), the Court held that the execution of juveniles

who commit crimes while under age eighteen also violates the Eight Amendment.  Analogous to

Atkins, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is

imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by

reason of youth and immaturity....[T]he likelihood that the teenage offender has made the kind of

cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be

14

**USCA5 949**

virtually nonexistent." Id. at 571-72 (internal quotations omitted).

Although neither Atkins nor Roper explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. Atkins' and Roper's bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Bourgeois, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." Atkins, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, *or* © to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major

15

mental health association in the United States has published a policy statement addressing the issue

of the execution of mentally ill offenders, and all of those organizations advocate either an outright

ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation

system can be implemented.[13]   Moreover, just as in Atkins and Roper, where international law and

opinion weighed against the execution of persons with mental retardation, international law and

opinion weigh against the execution of the mentally ill.[14]

Petitioner does not have, and never has had, an intact brain.  See Claim II, *infra.*  He is

severely brain damaged and suffers from Borderline Personality Disorder.  He cannot think the way

---

[13] *See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States*. Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States*. Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor.  The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[14] The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).  Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid.  Moreover, customary international law also prohibits the execution of Petitioner.  *Id.*

16

USCA5 951

that other people think; he cannot experience and interact with the world the way other people do; he cannot conform his behavior to the norms of society or the requirements of the law the way other people can; he cannot act in his own best interest in a rational manner; and he cannot do anything about any of this. Atkins compels that Petitioner's sentence violates the Eighth Amendment.

Because of both his mental retardation and severe mental illness, there is no meaningful way to distinguish Petitioner from the people protected by Atkins. His execution would violate the Eighth Amendment. The holdings of Atkins and Roper should be extended to protect Mr. Bourgeois from a penalty disproportionate to his culpability.

As with mental retardation, Petitioner's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**CLAIM II.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE.**

**A.    Introduction.**

Counsel failed to provide Petitioner with effective assistance at the penalty phase in violation of the Sixth and Eighth Amendments. Petitioner was raised in a highly abusive and dysfunctional setting. He was subject to brutal corporal, sexual, and emotional abuse. He is brain damaged, with significantly impaired judgment. He has an IQ in the range of mild mental retardation.[15] He suffers from a delusional paranoid disorder and post traumatic stress disorder, as well as from a combination of schizoid, paranoid, and borderline personality disorders. When subjected to stressors he has little to no control of his impulses and he is subject to dissociative and psychotic breaks.

All of this evidence mitigates. The Supreme Court has said so repeatedly in its modern

---

[15] If the Court finds that Petitioner is mentally retarded, relief would have to be granted under Claim I. If the Court does not so find, his low intelligence unquestionably places him in the borderline range of mental retardation.

17

USCA5 952

jurisprudence. Yet counsel, inexplicably, failed to present this evidence.

The performance of capital counsel must be measured against the fundamental underlying Eighth Amendment principle that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence" available to be presented in his case.  Williams v. Taylor, 529 U.S. 362, 393 (2000).

Eighth Amendment jurisprudence is replete with authority finding the very types of evidence that was not presented in Petitioner's case to be mitigating.  Eddings v. Oklahoma, 455 U.S. 104 (1982) (finding childhood abuse and family dysfunction mitigating); Williams v. Taylor, 529 U.S. 362 (2000) (same, and also finding borderline intelligence mitigating); Wiggins v. Smith, 539 U.S. 510 (2003) (same); Rompilla v. Beard, 545 U.S. 374 (2005), (trial counsel ineffective for failing to present available evidence of mental illness, childhood abuse, fetal alcohol syndrome, brain damage, and childhood poverty); Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than death."); Tennard v. Dretke, 542 U.S. 274, 288 (2004) (low IQ scores are important mitigating evidence); Brewer v. Quarterman, 127 S.Ct. 1706 (2007) (jury must be able to give mitigating effect to evidence of mental illness and childhood abuse); Nelson v. Quarterman, 472 F.3d 287, 306 (5th Cir. 2006) ("Nelson's mitigating evidence of borderline personality disorder and abandonment by his mother had relevance ... a reasonable juror could have concluded that, while the murder was deliberate, Nelson was less morally culpable as a result of his borderline personality disorder and abusive childhood than a murderer without such a mental illness and similar upbringing might have been.").

Counsel has a duty to provide the jury with more than just a rudimentary view into the

18

background of his capital client. <u>Wiggins</u>, 539 U.S. at 524 (counsel ineffective when they presented only "rudimentary" outline of capital defendant's abusive upbringing).  Here it is indisputable that counsel failed to provide the jury with even a rudimentary picture of Petitioner's life and mental health.  The jury heard nothing of the real and palpable mitigating circumstances in Petitioner's life.  It did not hear about Petitioner's low intelligence.  It heard very little about the abuse that he suffered as a child, and it heard absolutely nothing about the psychological scars that resulted from the abuse.  Shockingly, the jury heard nothing about the multiple and interacting mental illnesses that plague Mr. Bourgeois' life and functioning.  Indeed, one need look no further than Dr. Estrada's declaration to see that the jury was not provided with a complete and accurate picture of the real Alfred Bourgeois.  Dr. Estrada, the Government's expert in the field of psychiatry, observed Petitioner's entire trial, and now states:

> I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions.  Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.

Declaration of Government and Court expert witness Carlos R. Estrada, M.D., dated May 14, 2007 (copy contained in *PA*, document # 7), at ¶ 18.

### B.      The Defense Case at Penalty Phase.

As outlined more fully in the *Motion*, the defense case at penalty phase was notable for its brevity. The Defense called only three witnesses.  Michelle Armont, Petitioner's half sister, testified on direct for just 8 transcript pages (TT 3/23/04, 94-102).  She testified to a strained relationship between Petitioner and his mother but provided no information about Petitioner's childhood abuse.

USCA5 954

The defense's second witness, Carl Kevin Henry, testified for 5 pages (TT 3/23/04, 111-116).  He related, in minimal detail, some of the abuse Petitioner suffered at the hands of his mother in childhood.   Id., at 113-115.  He also told the jury that Petitioner came to live with the elderly neighbor, Miss Mary.  The third and final defense witness, the Reverend Herman Clayton, Jr., Petitioner's childhood acquaintance, provided 5 more pages of direct testimony (TT 3/23/04, 121-126).  He related that he never saw Petitioner's mother abuse him or any of her children, but he had heard that she did so from Petitioner and his siblings (id., at 125).

This, in sum, describes the entire defense case.  Despite, as shown below and in the *Motion*, having at their disposal both expert and lay witnesses whom could have put Petitioner's violent background into a mitigating context, counsel rested after putting on a mere **18 pages of direct testimony**.

### C.    The Unpresented Evidence.

As described in full in the *Motion*, there was a wealth of mitigating information available to the defense that was not presented to the jury.

Petitioner's jury was not told that he had an IQ of 68 to 75 (in the range of mild mental retardation).  See Declarations of Dr. Weiner, *PA* document # 16, and Dr. Gelbort, *PA* document #8.  They were not made aware of his childhood abuse and abandonment, (See Declarations of Lay Witnesses, discussed in Claim II of *Motion*, and Declaration of Drs. Toomer, *PA* document #14, and Sadoff, *PA* document #13), and the impact of these childhood events on his psychological development.  See Declaration of Dr. Estrada, at ¶ 10 ("[N]either I, not any other expert, testified about the significance of childhood sexual and/or physical abuse from a mental health perspective.  Yet it is not disputed in the mental health field that the significance is profound.").  See also

Declarations of Drs. Holden, *PA* document # 11; Cunningham, *PA* document #6; Toomer, supra; and Sadoff, supra. The jury was not told of his brain damage and his multiple mental and personality disorders. See id. and Declarations of Drs. Weiner, supra, and Gelbort, supra.

If the full and true information about Mr. Bourgeois' had been presented at trial, the jury would have heard, for example, that "Mr. Bourgeois suffered a history of family dysfunction and childhood abuse of both a physical and sexual nature, and that he is saddled with cognitive deficits that further affect his ability to make good judgments." Declaration of Dr. Estrada, at ¶9. "The combination of abuse and abandonment have an exponential impact on a child. Each are bad singularly – in combination they cause severe psychological impairments. The effects on Mr. Bouregois' adult behavior from this combination are evident." Declaration of Dr. Toomer, at ¶ 6.

The jury would have also heard about Petitioner's personality disorders: "Mr. Bourgeois has debilitating personality disorders, including Borderline Personality Disorder... [which indicates that he] can decompensate into psychotic states when under significant stress." Declaration of Dr. Sadoff, at ¶ 9. See Declaration of Dr. Estrada, at ¶ 10, ("Borderline Personality Disorder can be a debilitating condition that significantly impacts upon a person's ability to function in the world. In extreme cases, the patient can lapse into psychotic states.").

Expert testimony could have also educated the jury about Petitioner's significant brain damage, identified through neuropsychological testing. This testing revealed that Petitioner "showed deficits in his ability to function with new information and in unfamiliar settings," Declaration of Dr. Weiner, at ¶ 3. Further, his impairment means he "may and often act[] impulsively and without forethought." Declaration of Dr. Gelbort, at ¶ 9.

Finally, expert testimony would have provided the important mitigating evidence about Mr.

21

Bourgeois low intelligence. "This finding is mitigating as it reflects his difficulties and impairments in problem solving and making judgments." Declaration of Dr. Sadoff, at ¶ 12.

In sum, the jury was not told about Petitioner's "precarious psychological functioning... due to a constellation of events and conditions.":

> [H]e suffers from the lasting impact of savage childhood sexual and physical abuse. He has impaired intelligence (IQ scores in the mentally retarded range). He has organic brain impairments which particularly impact on his ability to control impulses, make judgments and predict the consequences of his actions. His psychological functioning deteriorates dramatically from his already deficient baseline during times of stress. Psychological testing (MCMI) suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder. On Axis II, he suffers from a combination of schizoid, paranoid and borderline personality disorders. It is my opinion that when he has acted in a rageful manner, he is likely acting out of mini-psychotic episodes secondary to his borderline personality disorder.

Declaration of Jethro Toomer, Ph.D. *PA* document # 14 at ¶3. See also, Declaration of Dr. Holden, at ¶ 23 ("[It is my opinion that] the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions.").

### D.    Deficient Performance.

It is hard to imagine that counsel had a sound tactic or strategy for not presenting the evidence that they had. With respect to Dr. Weiner, it is apparent that counsel did not arrange his evaluation until the last minute. This fact is evidenced by the date of his evaluation, and as he indicates in his Declaration, he was required to do it on a Saturday because the trial was starting the next week. Declaration of Donald Weiner, Ph.D., *PA* document #16, at ¶ 2.

Such last minute searching for mitigating evidence is anathema to the Eighth Amendment requirement that counsel conduct a timely and thorough mitigation investigation. See e.g. Williams v. Taylor, 529 U.S. at 395 (counsels' investigation "fell short of professional standards" when they

22

"did not begin to prepare for [the penalty phase] until a week before trial"). ABA Guidelines, Commentary to Guideline 10.7, Investigation ("The mitigation investigation should begin as quickly as possible"). While counsel's last minute decision to have their client receive neuropsychological testing may evidence their lack of appreciation of the importance of such testing (although they were encouraged to have it done by both Dr. Cunningham and Dr. Estrada), the last minute testing may have also prevented counsel from learning about its significance. As noted in the *Motion*, it is not clear why counsel did not call Dr. Weiner. See *Motion* at ¶ 60, n.10. However, it is hard to impossible to imagine that counsel would have had a sound or even rational reason for not using this highly mitigating evidence of low IQ, brain damage, and impaired judgment.

With respect to Dr. Cunningham, counsels' failure to call him is also extraordinary. First, Dr. Cunningham is a nationally known and well-regard forensic psychologist who has special expertise in the area of capital sentencing:

> [Counsel] located and sought to hire Dr. Mark Cunningham, a recognized propensity for violence expert with extensive experience in federal capital cases. When Stitt's family did not have sufficient funds to hire Dr. Cunningham, Malinski instead hired the concededly less expensive and less qualified Dr. Thomas Pasquale. The district court found that "[t]here is no doubt that Dr. Cunningham would have been the stronger expert."

United States v. Stitt, 441 F.3d 297, 302 (4th Cir. 2006). As set forth in the *Motion*, Dr. Cunningham was prepared to provide a comprehensive view of how Petitioner's life and background molded him into an impaired individual. See *Motion* at ¶¶ 84-90. As also noted in the *Motion*, counsel told the Court that they were considering not calling Dr. Cunningham in the hope that they would obtain what they needed from the Government's expert, Dr. Estrada (*Motion* at ¶¶ 58-60). Although this could be a sound tactic in the abstract, it was nonsensical when the reality of Dr. Estrada's testimony

USCA5 958

came crashing down around counsel.  Counsel obtained virtually nothing useful from Dr. Estrada.

They failed to obtain evidence that Petitioner was subjected to an abusive childhood.  They certainly

did not obtain any evidence of impaired intelligence or organic brain damage.  Dr. Estrada could

have testified to all of this had he been permitted to rely on the work done by Dr. Weiner and Dr.

Cunningham, but he was not allowed to do so because the defense indicated that the defense expert

witnesses would not be called.

Thus, while counsel articulated a "decision" not to call Dr. Cunningham, this decision simply

made no sense and was far from "sound" when one compares what Dr. Cunningham could have said,

with what Dr. Estrada actually said.

It is apparent from the recollections of Dr. Weiner and Dr. Cunningham, that trial counsel

had not developed a coherent strategy regarding their case at penalty phase prior to trail.  Even on

the eve of penalty phase, it seems that trial counsel had not yet determined how to proceed.

Declaration of Dr. Cunningham at ¶¶12 and 15.  It is clear, then, that trial counsel had not adequately

prepared for penalty phase.  The decisions they made during the penalty phase of trial fall far below

the "reasonable professional judgments" mandated by Harrison v. Quarterman, 496 F.3d 419, 424

(5th Cir. 2007) (quoting Strickland, at 690-1 ) ("[S]trategic choices made after less than complete

investigation are reasonable precisely to the extent that reasonable professional judgments support

the limitations on investigation.").

### E.      Prejudice.

There can be no question but that had the jury heard about Petitioner's horrific childhood,

his low IQ, and his cognitive and mental impairments, that there is a reasonable probability that at

least one juror would have voted for life – the standard governing prejudice in this context. Wiggins,

24

539 U.S. at 535 (prejudice found when "there is a reasonable probability that at least one juror would have struck a different balance.").

The testimony of Dr. Cunningham, Dr. Weiner, Dr. Holden, and Dr. Estrada could have made all the difference between life and death in this case. The jury was not provided with an accurate and complete picture of Alfred Bourgeois. Again, Dr. Estrada's current Declaration ends any debate about prejudice.

**F.** **Counsel Ineffectively Failed to Move to Strike Dr. Estrada's Opinion that Petitioner Posed a Risk of Future Dangerousness.**

In his direct examination, Dr. Estrada testified that he conducted a "risk assessment" which showed that Petitioner "has a much higher tendency toward violence than an ordinary person" TT 3/22/04, 285. He indicated that this opinion was based on Petitioner's history of sexual and physical abuse, abandonment, neglect and rejection. Id., at 281.

However, on cross examination, defense counsel tried to question Dr. Estrada about Petitioner's history of abuse and dysfunction, and the Government's objection to this line of questioning was sustained. See *Motion* at ¶ 60.

At that point, it was plain that the basis for Dr. Estrada's risk assessment was gutted. Counsel failed to move to strike the opinion, and by so-doing, allowed the Government to have it both ways – Petitioner was abused for the aggravating purpose of risk assessment, but not for the mitigating purposes. This was ineffective.

Petitioner has pled facts which if proven would entitle him to relief. Accordingly, he is entitled, at a minimum, to an evidentiary hearing to prove these facts.

25

USCA5 960

**CLAIM III.    NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A RATIONAL FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS.    FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM AND TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

The Government had the burden of proving beyond a reasonable doubt each and every element of murder including that the fatal injuries were inflicted within the special maritime and territorial jurisdiction of the United States, i.e., on the grounds of the Corpus Christi Naval Air Station.  No reasonable view of the Government's evidence exists, however, upon which a rational fact finder could conclude that the fatal injuries were inflicted on the Air Station grounds.  Accordingly, this court must vacate the judgement of conviction.   Moreover, counsel were ineffective for failing litigate this claim previously and for failing to gather and present readily available evidence that would have shown that the fatal blows were struck outside of federal jurisdiction, thus rebutting this element of the charge and to rebut the Government's theory of how the crime took place.  Petitioner was prejudiced and his judgment of conviction and sentence must be vacated.

That the Government must prove every element of an offense beyond a reasonable doubt is well-settled and long-standing.  Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Gaudin, 515 U.S. 506, 510 (1995); United States  v. Booker, 543 U.S. 220 (2005); In re Winship, 397 U. S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")

A criminal conviction violates due process of law if the evidence presented at trial was

26

USCA5 961

insufficient to convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 313-14, 324 (1979) ("This is the first of our cases to expressly

consider the question whether the due process standard recognized in Winship constitutionally

protects an accused against conviction except upon evidence that is sufficient fairly to support a

conclusion that every element of the crime has been established beyond a reasonable doubt. . . . the

applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at

the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.").

The jurisdictional requirement that the murder be committed "within the special maritime

and territorial jurisdiction of the United States" is an element of the federal crime of murder. See

18 U.S.C. §1111(b).  Additionally, 18 U.S.C. § 3236 states that murder is "committed at the place

where the injury was inflicted . . .  which caused the death, without regard to the place where the

death occurs."  To satisfy these elements of the federal murder statutes, the Government must prove

that the murder occurred on the grounds of the Naval Air Station beyond a reasonable doubt and to

do so it must prove beyond a reasonable doubt that the fatal blows were struck on the grounds of the

Air Station.[16]

In this case, the Government failed to meet its burden of proving that the fatal blows were

struck on the grounds of the Air Station and thus failed to prove the element of jurisdiction.  The

Government's actual presentation of evidence failed to prove this element by legally sufficient

---

[16]  In United States v. Bell, 993 F.2d 427, 429 (5th Cir. 1993), the Fifth Circuit Court of
Appeals held that the jurisdiction element of the federal homicide statute had to be proven only by
a preponderance of the evidence.  This holding, however, has been directly questioned, although not
overruled, by three post-Apprendi decisions.  See, United States v. Reff, 479 F.3d 396,400 (5th Cir.
2007); United States v. Bailey, 169 Fed. Appx. 815, 821 (5th Cir. 2006); United States v. Perrien, 274
F.3d 936, 939, n.1 (5th Cir. 2001).  This is largely an academic point because, as shown below, the
Government's proof in this case does not even meet the lower preponderance standard.

27

USCA5 962

evidence in violation of due process of law.  Moreover, evidence in the Government's file – which

was shared with defense counsel – showed that the fatal blow was actually struck many days <u>before</u>

Petitioner arrived at the Air Station.  However, counsel ineffectively failed to use this evidence to

challenge jurisdiction.  Under either analysis, Petitioner is entitled to vacation of his conviction.[17]

**A.      The Government Failed to Prove by Legally Sufficient Evidence That the Fatal Injury was Inflicted on the Grounds of the Corpus Christi Naval Air Station.**

The only witness presented by the Government who testified that Petitioner struck a blow

was Petitioner's then seven year old daughter, AB-1994.  She testified that she recalled the day that

her "sister went to the hospital" TT, 3/2/04,  33.  She recounted that her sister tipped over the potty

after which Petitioner became enraged and banged the decedent's head against the interior front

windshield a number of times.  <u>Id.</u>, at 36-39.[18]

There was no evidence offered through this or any other witness to demonstrate that the fatal

blows were inflicted on the grounds of the Air Station.  Nor were there any reasonable inferences

---

[17]   This precise issue (the timing of the infliction of a fatal blow relevant to federal jurisdiction) was addressed in <u>United States v. Parker</u>, 622 F.2d 298 (8th Cir. 1980).  In <u>Parker</u>, three defendants appealed their convictions arising from a murder that allegedly took place within the confines of Fort Leonard Wood in Missouri, property of the United States Army.  The Court of Appeals found that the forensic evidence (the autopsy report) as well as the statements of the defendants indicated that the fatal blow to the decedent's head did not take place on Fort Leonard but instead took place at an off base bar.  <u>Id.</u> at 302.  The court further found that the evidence tended to show that the body of the decedent was then dumped on the base.  <u>Id.</u>  The Court reversed the convictions of two of the three defendants finding that there was insufficient proof that the fatal blow was struck on the base (the third defendant gave a statement which provided some proof that it was struck on the base and did not obtain relief).

As set forth below, here, as in <u>Parker</u>, the forensic evidence clearly established that the fatal injury could not have been inflicted on the Corpus Christi Naval Air Station and Petitioner's conviction, like the convictions in <u>Parker</u>, must be vacated.

[18]  As shown below, the testimony of the expert who performed the autopsy did not shed any light on the question of when the fatal injuries were inflicted.

28

to be drawn that this is where these blows were inflicted.

This evidence was insufficient to prove the element of jurisdiction and no reasonable fact finder could have done so. Counsel ineffectively failed to move for a judgment of acquittal and ineffectively failed to raise this defect on direct appeal.

**B.      Counsel Were Ineffective for Failing to Prove that the Fatal Blows Were Inflicted Days Before the Victim's Death.**

Dr. Elizabeth Rouse, MD, performed the autopsy and testified at trial. TT 3/8/04, 2-67. She testified that she performed the autopsy two days after the alleged assault. She found that the cause of death was closed head injury, which she termed a subdural hematoma, on the right side of the head. She was never asked to testify to the estimated time that the fatal injury occurred. Id. at 22-23. Instead the only portion of her testimony related to the timing of any of the injuries related to the victim's "recent" scalp wounds, which Dr. Rouse clearly stated were **not the fatal injuries**. TT 3/8/04, 10-20.

Dr. Rouse also testified that she sent the sections of brain tissue from the area where the fatal subdural hematoma was found to a neuropathologist. Id. at 59. Yet neither the Government nor trial counsel questioned her about the results of the neuropathologist's analysis. In fact, trial counsel's cross-examination of Dr. Rouse took up less than three pages of transcript. TT 3/8/04, 176-78.

The Government failed to even ask Dr. Rouse the time of the infliction of the fatal wound despite the fact that it knew it had the burden of proving that the fatal injury was inflicted on the grounds of the Naval Air Station.[19] The Government likely did not ask this question because it had

---

[19]  In its closing argument the Government acknowledged this burden: "The last element that we have to prove is that it happened on a special territorial or maritime jurisdiction of the United States and that was because it was on the Navy base," (TT 3/16/04, 10), but otherwise failed to discuss the evidence supporting its proof of this point.

29

in its file scientific evidence showing that the fatal wound occurred **a minimum of 10 days prior to the autopsy of the decedent.** This scientific evidence, in the form of a neuropathologist's report, was dispositive: this murder *did not* take place on the Naval Air Station and it *did not* take place in the manner described by AB-1994.

The neuropathologist's report (summarized in the autopsy report, *PA* document #52) clearly and unequivocally found that the fatal injuries to the brain were at a minimum **over 10 days old at the time of the autopsy** – long before Petitioner was alleged to have fatally assaulted the decedent in the truck and long before he was on the Naval Air Station grounds and long before he was even in the state of Texas. Specifically, the neuropathologist, Kathleen Kagan-Hallet, MD, microscopically examined the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately ten days old and the injury to the rest of the brain (cerebral white matter) was over 7 days old. (Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50).

Despite having the neuropathologist's report in their possession, trial counsel never contested the timing of the fatal injury and the related jurisdictional issue. Counsel never even attempted to cross-examine Dr. Rouse on this critical element of the Government's case and failed to confront her with Dr. Kagan-Hallet's findings. Counsel also never interviewed or called Dr. Kagan-Hallet to the stand. Nor did counsel retain a forensic pathologist, which as shown below, could have also demonstrated to the jury the fatal flaw in an essential element of the murder charge and in the Government's theory of the case. Counsel's performance was deficient. See Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (In capital case counsel's performance deficient and conviction reversed - despite confession by defendant – where counsel failed to retain ballistics expert to challenge state's

30

expert.)

Had counsel interviewed Dr. Kagan-Hallet and called her to the stand, counsel could have established – through the Government's own expert – that the infliction of the fatal injury could not have occurred on the Naval Air Station property.  Dr. Kagan-Hallet would have testified that she examined microscopically the brain tissue from the area of the fatal wound (right side of head) and found that the right subdural hematoma was approximately ten days old and the injury to the rest of the brain (cerebral white matter) was over 7 days old.  (*PA*, # 50).  This scientific evidence from a Government expert, prepared at the request of the Government's expert Dr. Rouse –  had it been presented to the jury – would have devastated the Government's theory of its case against Petitioner and would have rebutted the jurisdiction element of the offense of federal murder.

Undersigned counsel retained  Dr. Werner Spitz, a forensic pathologist with over 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition.  Dr. Spitz examined the autopsy report, the autopsy photographs and Dr. Kagan-Hallet's report and concluded that the fact that the fatal injuries were a week or more old calls into question the causation of the injuries and the timing of the fatal injuries.  (Declaration of Werner Spitz, MD dated 5/10/07, *PA* #53).  Dr. Spitz further concluded that the autopsy results and the neuropathology report do not comport with the testimony of AB-1994.  Id.  The findings of Dr. Kagan-Hallet and the findings of Dr. Spitz establish that Petitioner was prejudiced and vacation of the conviction is required.  See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (conviction reversed since counsel's deficient performance in failing to interview eyewitness prejudiced defendant where state's case rested primarily on eye witness testimony.)

31

USCA5 966

**CLAIM IV.    TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, IN VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**A.    Introduction**.

The Government presented expert testimony and prosecutorial argument that Petitioner's semen was detected during the post-mortem rectal examination of JG-1999. The Government used this evidence, as well as evidence of alleged trauma to JG-1999's vagina, to argue that Petitioner sexually assaulted JG-1999. Despite the extremely inflammatory and prejudicial nature of this evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and penalty phases of trial, defense counsel failed to present readily available expert testimony that would have eviscerated the Government's evidence that semen was present and JG-1999 was sexually assaulted.

At the time of trial, counsel could have presented expert testimony indicating that there was no scientific basis for the testimony of the Government's expert witnesses (Dr. Scott Benton, Caroline Zervos and Anthony Onorato), that semen was present on the post-mortem rectal swab taken from JG-1999. Counsel could have presented expert testimony indicating that if the substance recovered from the rectal swab of JG-1999 was semen, sperm should have been observed. Despite multiple tests, no sperm were ever observed in this case. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, false positives are not uncommon in the test used by the Government to allegedly identify the substance as semen. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to identify the alleged semen, has been detected in multiple male and female bodily fluids. Counsel

32

USCA5 967

could have presented expert testimony indicating that, contrary to the testimony at trial, there was

no evidence of trauma to the vagina of JG-1999.

In short, counsel could have refuted the major portions of the Government's presentation

regarding sexual abuse and anal rape of the victim. Trial counsel, however, failed to develop and

present any of this available expert testimony. Trial counsel were ineffective and their deficient

performance prejudiced Mr. Bourgeois at trial and at sentencing, in violation of his rights under the

Sixth Amendment to the United States Constitution.

**B.      The Testimony and Arguments Presented at Trial and at the Penalty Hearing.**

The Government first set forth the evidence of the alleged semen detected in JG-1999's

rectum in its opening statement to the jury:

> Also, there will be testimony that a swab was taken from the bottom, from the rectum
> of the baby, and that swab, even though it was taken two days after this incident
> occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will
> testify that that swab showed that there was seminal fluid in the rectum of the baby.

TT 3/2/04, 42.

In keeping with its promise to the jury, the Government presented the testimony of Dr. Scott

Benton, who was qualified as an expert in child sexual assault. Dr. Benton testified that sexual

assault in children is difficult to detect because children avoid disclosure; perpetrators purposefully

try to avoid injury to the child; and the vagina, anus and mouth of a child heal rapidly. TT 3/5/04,

18. Thus, according to Dr. Benton, it is common to see a child who has been sexually abused display

no physical signs of trauma. Id. at 19.

However, Dr. Benton testified that even in the absence of trauma or a report of assault,

evidence of male sexual assault can also be proven through forensic testing and the detection of

33

semen.  Id. at 22.  He testified that semen is the "product of the prostate gland of men. . . composed

of water and various proteins and enzymes. . . meant to be a vehicle for sperm during ejaculation."

Id. at 49.  Dr. Benton also testified about the different forensic tests used for the detection of semen:

> The two main tests used for that are acid phosphatase, which is produced predominantly in the prostate of men, and with ejaculation or even pre-ejaculation, that can be deposited either on the skin or in the vagina or the anus or mouth of the victim.
>
> **And a more specific or confirmatory test is called prostatic specific antigen, also known as P30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, except in male prostate, and with one exception, human breast milk.**
>
> The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quick enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which will tell you that there was the presence of male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible.
>
> So those are the main trace evidence that we look for, the biological evidence and the physical evidence that we look for to help establish whether or not a sexual assault took place.

Id. at 22-23.  In further discussing the P30 assay, Dr. Benton noted that the test is designed to

specifically confirm the presence of the P30 protein, which, according to him, is found only in the

male prostate gland (where semen is produced) and the lactating breasts of women:

> The P30 is a protein, and we call it the prostate specific antigen.  That's what I was talking about sort of earlier.  It exists or is produced in the human prostate and in the lactating breast of women.  People who are breast-feeding, it can be found in breast milk.  So from the prostate, we know acid phosphatase and P30 can be done.  So I order the acid phosphatase, and then we refer on – because crime labs can do more expensive tests, to do the P30 test. . . . **It is the confirmatory test for the presence of the prostatic specific antigen, also known as PSA or P30**.  These are synonymous terms.  And that's what it tests for.

Id. at 53.

34

USCA5 969

On cross-examination, Dr. Benton stressed the reliability of the P30 test, over other tests, in

determining the presence of P30 and semen.

> We then move to the P30 test. This is the second group of tests. Just to reiterate, there's two types of tests. There's a screening test, and there's a confirmatory test. The acid phosphatase is in the screening group. We want to know, is there a possibility that there's semen there, even if it's erroneous. The confirmatory test is different. **The confirmatory test is we don't want to make any mistakes**. We want the most specific test possible. And frequently, it's also a more expensive test. You use the cheapest test you can for screening, because you're doing it to a lot of people. But the P30, you want to put your best stuff on it.
>
> So in confirmatory tests, the profile, the statistical profile of it is that it has the lowest false positive rate of any test. . . .**We know with the acid phosphatase that it's accuracy can sometimes be off, but it's still very good. With the P30, very low levels of false positives are ever reported.** And there's multiple different ways to test for the P30, just to confirm that it is really there. I think that answers your questions.

Id. at 54-55.

According to Dr. Benton it was not unusual to identify semen where no sperm are detected,

id. at 23, in part because of the low survivability and rapid degradation of sperm.

> Sperm's survivability usually is only in the cervix or in the womb, the uterus of the woman. In the vagina itself, it usually doesn't live more than 24-48 hours. In a little girl, prepubertal girl, it doesn't live very long, hours. So they will die. They'll lose their little tails. And once they lose their tails, they're very difficult to find, on a rape kit or trace forensic evidence. You'll find evidence of semen much easier than you'll find sperm. Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing. So the sperm can be destroyed in those environments, and you could still detect semen, but not find sperm. So those would be the conditions in which you could see semen, but not sperm.

Id. at 51-52.[20]

Dr. Benton also testified that based on his review of the autopsy photographs, and what in

---

[20] Dr. Benton also opined that it was not uncommon to encounter semen without sperm in men's pre-ejaculate fluid, in men with vasectomies or with "Azoospermia" – low sperm count. TT 3/5/04, 50-51.

35

USCA5 970

his opinion was blood outside of blood vessels, JG-1999 suffered trauma to her vagina. Id. at 44-46.

The Government also presented the testimony of FBI forensic serologist Caroline Zervos. Ms. Zervos testified that as part of the FBI's protocol, when sample sizes permit, two tests, presumptive and confirmatory, are usually performed to determine the presence of semen or other serological substances. Id. at 63-64. Ms. Zervos testified that in this case, however, only a confirmatory test for the presence of semen was conducted on the evidence labeled Q5-Q7, the post-mortem rectal swabs taken from JG-1999. Id. at 86. She testified that only the confirmatory test was used in order to avoid the false positives sometimes associated with presumptive tests. Id. at 87. Ms. Zervos also testified that in this case, a P30 test was the confirmatory test used on the rectal swabs, and that it was positive for the presence of semen. Id.[21]

On cross-examination, Ms. Zervos testified that the P30 protein could also be found in male blood and male urine, and thus tests of those substances could also result in a positive P30 test. Id. at 103-04. However, according to Ms. Zervos, no female fluids contain the P30 protein. Id. at 105

The Government also presented the testimony of FBI forensic DNA examiner Anthony Onorato. Mr. Onorato testified that the only DNA present on the rectal swabs, Q5-Q7, was female and belonged to JG-1999. Id. at 118. He also testified that it was not uncommon to have semen where male DNA is not detected. Id.; 127-28.[22] On cross-examination, Mr. Onorato testified that the only place, outside of male semen, where the P30 protein can be found, is the blood of a male

---

[21] Ms. Zervos also testified that testing for the presence of semen on four oral swabs of JG-1999 was negative. TT 3/5/04, 87.

[22] Mr. Onorato also testified that an additional test for the presence of male DNA, performed by Orchid-Cellmark Laboratories, on behalf of the FBI, in this case, was also negative. TT 3/5/04, 132-04.

36

USCA5 971

with prostate cancer. Id. at 128.

During closing arguments of the guilt/innocence phase of trial, the Government seized upon

the testimony of Dr. Benton, Ms. Zervos and Mr. Onorato. The prosecutor argued:

> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June 29th. The baby was thrown on the side of the truck on June 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know.

> The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show. You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes? I said, wt (sic) that Vaseline? No, we don't have Vaseline in the truck. What is so bad about having Vaseline? I thought that was interesting. It's a lubricant. Why would you have to deny that?

TT 3/16/04, 19-20.[23]

Counsel recognized the impact of this highly prejudicial testimony. After initially neglecting

to discuss this evidence, (TT 3/16/04, 41) ("Your Honor, this is unusual, may I – something, I forgot

to talk about. May I do that?"), and without presenting a forensic expert for the defense, counsel

attempted to counteract the evidence of sexual assault. Despite the testimony that semen was found,

he argued that no evidence of semen or sexual assault existed.

> They say sexually abused. **And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital.**

> \*                                    \*                                    \*

---

[23] The Government's argument regarding petitioner's use of Vaseline to sexually abuse JG-1999 is based on Dr. Benton's testimony that with lubrication, the rectum of a child is sufficiently flexible to withstand the trauma of an adult male penis, and quickly heal. TT 3/5/04, 36-39.

37

First you learned about DNA, some of you may already have learned a lot about DNA. I know I don't know much about DNA but that you can prove who didn't do something but it's not a sure thing who did it. We learned that.

Secondly, with regard to DNA, we learned that there was a test which was found positive for semen and that the expert who had examined that and talked freely about (inaudible) protein. **He said that there was a better test and so he sent the semen off for a better test. And that test was negative. That test was negative, the better test.** And that was the testimony from the witness.

\*                                    \*                                    \*

And I suggest to you, if that's going on, that should have no reliability as far your decision making in this case because you'd have none. And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call, was negative. **There's no evidence of semen, I suggest to you, being found on this child.**

TT 3/16/04, 24; 41-42; 43. However, because no evidence was presented to support his argument that there was no semen found, and based on the allegedly positive P30 test indicating semen was found, an objection to defense counsel's argument was sustained, and the following exchange took place:

Ms. Booth:    Your Honor, I have to object. That is a mischaracterization of the evidence.

The Court:    That is sustained.

Mr. Tinker:    The test that the witness ask for, and maybe I don't understand it, was negative and that's the testimony before you folks.

Ms. Booth:    I have to object, your Honor.

The Court:[24]    Let me see counsel at side bar.

The Court:    **The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again, there was** –

---

[24] The transcript erroneously attributes this comment to Mr. Tinker.

38

USCA5 973

Mr. Tinker:    (Inaudible)

The Court:    It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of that child.  it was –

Mr. Tinker:    (Inaudible).

The Court:    **That is what the expert testified to, there was seminal fluid found in her anus. What they couldn't identify because it was degraded, was the DNA.  There was no question of the expert testified.  They don't have to believe it but there's no question that the expert testified that there was seminal fluid** –

Mr. Tinker:    I didn't do that on purpose – we got over here and I said, I object.  And you said, why do you –

The Court:    What you objected to was the guy coming in and saying, well, they to again to get another DNA expert to try to (inaudible), not to identify the DNA.  It was too degraded.

Mr. Tinker:    You said, why do you object that it was negative and so I said, okay, it was negative.  But I didn't know (inaudible).  Well anyway, I'm just saying –

The Court:    (Inaudible) that there was DNA that came back no – they couldn't find DNA.  They could only find JG-1999's DNA.

Mr. Tinker:    But I didn't do that on purpose, Judge.

The Court:    But you've said it several times (inaudible) that there was another test they could have done to identify the seminal fluid.

Mr. Tinker:    (Inaudible).

The Court:    Don't put emphasis on it because they don't have to believe what the experts say.

TT 3/16/04, 43-45.

Subsequently, during its penalty phase closing argument, the Government used the alleged semen evidence as a basis for urging the jury to sentence Mr. Bourgeois to death.

Was he laughing when he beat JG-1999 to death?  Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body?**

39

USCA5 974

*                                    *                                    *

> Let's talk about lack of remorse.  The Defendant spoke to you.  Was there remorse in his voice?  Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't.  Not ever.  He murdered this baby.  **His signature with his teeth marks and his semen is all in that baby**.

TT 3/24/04, 70; 75-76.

### C.    Trial Counsels' Deficient Performance.

To establish deficient performance, Petitioner must demonstrate that counsels' representation "fell below an objective standard of reasonableness."  Strickland v. Washington, 466 U.S. 688, 694 (1984).  While the Supreme Court has not set forth a bright line test for reasonable attorney conduct, it has emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.  "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Id. at 690.

Courts have long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.[25] Those guidelines dictate that counsel in a capital case should "secure the assistance of experts where it is necessary or appropriate for:

---

[25]  In Wiggins v. Smith, 539 U.S. 510 (2003), the Supreme Court found that the ABA Guidelines constituted "well-defined norms" that are "'guides to determining what is reasonable.'" Id. at 524 (quoting Strickland v. Washington, 466 U.S. 668, 688-89 (1984)).  The 1989 ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." Hamblin v. Mitchell, 354 F.3d 482, 487 (6th Cir. 2003).

USCA5 975

(A)    preparation of the defense;
(B)    adequate understanding of the prosecution's case; [or]
(C)    rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial ...."

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, § 11.4.1.D.7 at 95 (1989 ed.); ABA GUIDELINES § 10.7 at 80 (2003 ed.), Commentary ("the elements of an appropriate investigation include the following: 4. Physical Evidence: Counsel should make a prompt request to the relevant government agencies for any physical evidence or expert report relevant to the offense or sentencing, as well as the underlying materials.  With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence, and conduct appropriate analysis of all other available forensic evidence").

When a case involves significant forensic evidence, reasonable counsel seek out and utilize experts who will support their defense.  See, e.g., Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (counsel's performance deficient for failing to develop and present expert ballistics testimony that would have provided the jury with conflicting evidence bearing on the defendant's role in the crime); Richey v. Mitchell, 395 F.3d 660, 685 (6th Cir. 2005) (counsel ineffective for failing to present expert testimony offering competing scientific evidence) (rev'd on other grounds Bradshaw v. Richey, 546 U.S. 74 (2005)).

In Soffar, the prosecution's theory – supported by the defendant's confession and a prosecution ballistics expert – was that Soffar and an accomplice had fired five shots at the scene of the crime:  a warning shot and one shot into each of the four victims.  Soffar, 368 F.3d at 472, 476.  Statements by the surviving eyewitness indicated that only four shots were fired, and that the witness was shot in a location different from that in which the witness was found (and where Soffar's

41

statement placed him).  Accordingly, testimony by a defense ballistics expert, subsequently presented during post-conviction proceedings, had the potential to support an alternative version of the facts and discredit the defendant's confession.  Id.  On these facts, the Fifth Circuit found counsel's performance deficient for failing to develop and present the readily available testimony of a ballistics expert which would have undermined the state's case.  Id. at 476-77 ("As was made evident during state habeas proceedings, Soffar's defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense.").

Here, as in Soffar, the Government relied on expert testimony to support its case that semen was present in JG-1999's rectum and that she was sexually abused.  Here, as in Soffar, defense counsel were or should have been aware that there were serious questions about the validity of the expert testimony.  Indeed, as set forth below, counsel in this case, like Soffar, "would not have had to look hard" to find an expert.  On the contrary, they were in possession of an expert opinion which completely undermined the Government's allegations.   Here, as in Soffar, counsel's performance was deficient for failing to develop and present expert testimony which would have undermined the Government's theory of sexual abuse.

### 1.    Counsel Ineffectively Failed to Counter the Government's Contention that Petitioner's Semen Was Found on the Victim.

On October 8, 2003, counsel filed an *ex parte* motion for the appointment of Dr. Elizabeth Johnson as a defense DNA expert.  *PA*, document # 46.  On October 20, 2003, this Court granted that motion. *PA*, document # 47.  On January 16, 2004, counsel informed the Court that contrary to the Government's assertion that all samples had been consumed during prior testing, Dr. Johnson had identified an additional biological sample which was available for serological and DNA testing.

USCA5 977

PTT 1/16/04, 32-34.  With the assistance and consent of the Government, the remaining sample was sent to Dr. Johnson.  Id. at 34-36.

On February 25, 2004, after counsel had failed to provide the Government with a report from Dr. Johnson and several other defense experts, this Court issued an Order indicating that all expert reports, including Dr. Johnson's, must be turned over by February 26, 2004.  PA, document # 48.; PTT 2/25/04, 130-48.  If not provided, counsel would be precluded from presenting the testimony of Dr. Johnson.  Id.  Counsel never proffered a report from Dr. Johnson.

On March 2, 2004, Dr. Johnson provided trial counsel with a two page summary of the testimony she could provide if called to testify.  Regarding the Government's conclusion that semen was detected on the rectal swab taken from JG-1999, Dr. Johnson concluded:

- The FBI did not test the rectal swab with AP reagent or do a sperm search.  They only did a P30 test with the ABA card and a DNA test.  The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction.

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

*PA*, document # 49.  Dr. Johnson also provided counsel with an opinion showing that the prostatic specific antigen (PSA) is found in bodily fluids, other than male semen, including: amniotic fluid, breast milk, saliva, female urine and female serum.  Id.

Dr. Johnson was not called to testify at Petitioner's trial.

43

USCA5 978

Had counsel called Dr. Johnson, the jury would have been presented with scientific evidence that completely undermined the Government's evidence and strongly supported counsel's argument that there was no semen present and JG-1999 had not been sexually abused. As Dr. Johnson explains:

> Had I been called as a witness, I would have testified consistent with my findings as outlined above and in the synopsis I faxed to Mr. Tinker on March 2, 2004. Had I been called as a witness at Mr. Bourgeois' trial I would have testified that there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen, and that four scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA testing) were negative for the presence male fluids or male cells on the rectal swabs. That only the P30 test gave a (weak) positive result and should not be considered conclusive in light of numerous contradictory tests. Accordingly, I would have testified that there was insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was present in JG-1999's rectum.
>
> [H]ad I been called as a witness at trial, I would have testified that the Government's evidence at trial regarding the alleged semen was erroneous and scientifically unsubstantiated. I would have specifically addressed the erroneous testimony of Dr. Scott Benton and testified that spermatozoa are very durable and do not easily degrade (they are so durable that an additional chemical is required to break open spermatozoa in the laboratory), that spermatozoa can be easily detected microscopically and their abundance in seminal fluid facilitates microscopic detection even after the tail is lost, and that spermatozoa can be found for up to six days in the vaginal tract of a living female. In summary, I would have provided scientific evidence and testimony which would have directly contradicted the Government's evidence and theory of prosecution.

Declaration of Elizabeth Johnson, Ph.D., *PA*, document # 49, ¶¶ 5-6.

Dr. Johnson is not alone in her view. Trial counsel could also have presented additional expert testimony which would have supported Dr. Johnson's conclusions and counsels' argument that no semen was found, and would have further undermined the testimony of Dr. Benton, Caroline Zervos and Anthony Onorato.

Undersigned counsel have consulted with Dr. Edward T. Blake and Alan Keel of Forensic

44

Science Associates who have determined that:[26]

- There is no basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999.

- Contrary to the testimony at trial, the P30 test is not a stand alone confirmatory test for the presence of semen. Because of the hyper-sensitivity of the P30 assay, false positives are not uncommon. For example, the P30 assay is so sensitive that positive results have been identified in semen free female urine. Thus, contrary to the testimony at trial, the P30 protein has been identified in body fluids other than semen, male blood, and male urine. Without the presence of acid phosphatase and/or sperm, the P30 assay is not and should not be considered a stand alone confirmatory test.

- The presence of sperm is the only confirmatory test for semen. Even then, if there is a low number of sperm, the test may not be confirmatory. There are many scenarios which might lead to the presence of sperm in a substance which is not semen. Finding a low number of sperm does not necessarily mean that there was ejaculate at that location. In this case there were no sperm identified in any of the tests which were performed. Moreover, in this case, if the substance identified by the P30 assay was semen, sperm should have been identified. Because of the high unit volume of sperm in semen the finding of sperm is more sensitive than the P30 assay.

- Dr. Benton's testimony defining semen as the water and protein containing substance which is produced in the prostate gland is incomplete if not erroneous. Semen is the combination of the secretions of the testes, seminal vesicles, prostate, bulbourethral glands and sperm. Moreover, Dr. Benton's testimony regarding the survivability of sperm is completely irrelevant. Indeed, the more important issue is the persistence of sperm. Thus, even if sperm lose their tails or die as easily as Dr. Benton describes, they do not degrade easily or rapidly and DNA from those sperm cells can be identified

---

[26] Dr. Blake and his Forensic Science Associates in Richmond, California, are nationally renowned. Dr. Blake's curricula vitae was included as an exhibit to the *Motion* (*PA*, document # 41). Mr. Keel's curricula vitae is included as part of the Report of Forensic Science Associates, *SPA*, document # 65. Dr. Blake and his firm provide criminalistic and forensic serology services to law enforcement, prosecuting agencies, attorneys, insurance companies and private individuals. As a doctoral student, Dr. Blake assisted in discovering, isolating and identifying the P30 protein. He was also the first scientist in the United States to use polymerase chain reaction (PCR) based DNA testing. Additional information on this celebrated forensic laboratory is available on its web site, www.fsalab.com.

USCA5 980

and extracted for decades.  Again, in this case, no sperm were ever identified.

• Dr. Elizabeth Johnson's pre-trial conclusions, contained in her March 1, 2004 summary to trial counsel, are accurate and there is no scientific basis for counsel's failure to present her testimony at trial.

Report of Forensic Science Associates, *SPA*, document # 65 at 3, 17, 19-27.

Counsels' performance was deficient for failing to develop and present the available expert testimony to counter the Government's assertion that semen was present in JG-1999's rectum. See Richey, 395 F.3d at 685 ("[where] there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit testimony rebutting the state's expert testimony") (quoting Knott v. Mabrey, 671 F.2d 1208, 1213 (8th Cir. 1982)); Bower v. Quarterman, 2007 WL 2326065, *8 (5th Cir. 2007) (counsel constitutionally required to seek out expert where crucial legal issue rests on reliability of scientific evidence).

### 2. Counsel Ineffectively Failed to Counter the Government's Evidence of Sexual Trauma.

Trial counsel also ineffectively failed to challenge Dr. Benton's testimony that the autopsy of JG-1999 revealed vaginal trauma. See TT 3/5/04, 44-46.  While counsel argued that the autopsy of JG-1999 revealed no vaginal trauma, they failed to present any evidence to support their argument.

Government witness Dr. Elizabeth Rouse testified that during her autopsy she performed a sexual assault examination on JG-1999.  TT 3/8/04, 59-60.  In her autopsy report, Dr. Rouse concluded that, "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**."  See Autopsy Report of Dr. Elizabeth Rouse, PA, document # 52, p. 3.  Dr. Rouse, however, did not testify about the results of that examination, id.,

46

USCA5 981

and counsel failed to elicit the results during cross-examination.  Id. at 65-67.

Counsel were ineffective for failing to make "efforts to secure information in the possession

of the prosecution" (Dr. Rouse's autopsy report) and to use that information to develop helpful

evidence for the defense.  Rompilla v. Beard, 545 U.S. 374, 387 (2005).   In addition, counsel

ineffectively failed to develop and follow up on this obvious "red flag" in Dr. Rouse's report

(indicating no evidence of trauma), which showed the need for further investigation, development

and presentation of expert testimony to dispute the Government's contention that Petitioner sexually

traumatized the victim.[27]

Had counsel pursued the lead presented by Dr. Rouse's autopsy report they could have

presented their own evidence that Petitioner did not sexually assault the victim.  Undersigned

counsel have done so and the result is exculpatory.  Dr. Werner U. Spitz has determined that:

> With regard to the testimony of Dr. Scott Benton, whereby, Jakerenn Gunter had
> what appeared to be inflammatory changes in the genital area, some six weeks before
> her death and evidence of apparent bruising at the time of the postmortem
> examination, as seen by Dr. Benton on photographs, it is my comment that Dr. Rouse
> who performed the autopsy specifically describes on page three of her report, at the

---

[27]  See e.g. Wiggins, 539 U.S. at 524 (counsel must "pursu[e] ... leads" created by known information); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (counsel must "follow[] through on" questions raised by mental health evaluation); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (counsel ineffective where he had some "information regarding possible mitigating evidence," and "failed to follow up with further interviews and investigation"); Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (counsel must "follow available leads").  See also Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed"); Driscoll v. Delo, 71 F.3d 701, 707-08 (8th Cir. 1996) (defense counsel has the duty to study and understand lab results and scientific aspects of case);  Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1256 (W.D. Wash. 1994), aff'd, 64 F.3d 1432 (9th Cir. 1995) (counsel ineffective for failing to obtain an independent evaluation of ballistic and forensic evidence that could have showed that co-defendant fired the first, fatal shot); Demarest v. Price, 905 F. Supp. 1432, 1450 (D. Col. 1995) (counsel has duty to investigate scientific aspects of state's case and consult with the appropriate experts to counter state's blood spatter experts).

47

USCA5 982

end of paragraph three, "the external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic." Further down in the same paragraph, the autopsy report continues "on the upper left buttock, there is hyperpigmented macule, 1.0 x 0.6 cm consistent with a café au lait spot." As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

Declaration of Werner U. Spitz, M.D., PA document # 53, ¶ 15.

Counsels' performance was deficient. Given the importance of Dr. Benton's and Dr. Rouse's testimony, and especially given counsels' recognition at the time that it was suspect (as evidenced by their unsupported arguments that there was no sexual trauma to JG-1999), counsel were ineffective for failing to obtain defense experts, like Dr. Johnson, Dr. Blake, Alan Keel and Dr. Spitz, who could have assisted counsel in preparing cross-examination of Dr. Benton and Dr. Rouse and affirmatively presenting the exculpatory opinions of these experts.[28]

Counsel's failure to develop and present available expert testimony to rebut the

---

[28] See Rompilla, 545 U.S. at 387 ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case"); ABA GUIDELINE 11.4.1 ("Counsel should secure the assistance of experts where it is necessary or appropriate for," inter alia, "preparation of the defense," "adequate understanding of the prosecution's case," "rebuttal of any portion of the prosecution's case"); Pavel v. Hollins, 261 F.3d 210, 223-25, 227-28 (2d Cir. 2001) (counsel ineffective for failing to seek assistance of medical expert who could have undermined testimony of state's medical expert); Gersten v. Senkowski, 299 F.Supp.2d 84, 103-04 (E.D.N.Y. 2004) (same), aff'd, 426 F.3d 588, 607-11 (2d Cir. 2005) (same); Holsomback v. White, 133 F.3d 1382, 1388 (11th Cir. 1998) (counsel ineffective for failing to investigate, develop and present medical expert testimony that could have undermined state's case); Harris v. Wood, 64 F.3d 1432, 1436 (9th Cir. 1995) (counsel ineffective for failing to obtain "independent evaluation of the ballistic evidence or the forensic evidence"); Troedel v. Wainwright, 667 F.Supp. 1456, 1461 (S.D. Fla. 1986) (counsel ineffective for failing to consult expert to refute prosecution forensic expert), aff'd, 828 F.2d 670 (11th Cir. 1987) (per curiam); Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir. 1983) (counsel ineffective for failing to develop and present expert testimony regarding fatal bullet's trajectory that would have supported self-defense).

48

Government's allegation that semen was found in JG-1999's rectum and that she was sexually abused was deficient. Counsels' performance in failing to present available expert testimony to rebut the testimony of Government witnesses Dr. Scott Benton, Caroline Zervos and Anthony Onorato was deficient. Additionally, counsels' performance in failing to elicit and present expert testimony that there was no trauma to JG-1999's vagina was deficient.

Trial counsel could have had no reasonable tactical or strategic reason for failing to challenge the above described testimony and evidence. Indeed, counsel tried to do so. On one occasion counsels' argument was prohibited (with respect to the presence of semen) and in another his argument was simply unsupported by the evidence (with respect to the presence of trauma). But, both arguments demonstrate that this evidence was of concern to counsel and that they felt compelled to address it. However, due to their ineffective performance, counsel were without the ammunition to effectively respond.

**D.     Petitioner Was Prejudiced by Counsel's Ineffectiveness.**

In order to establish prejudice Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694; Soffar, 368 F.3d at 478 (prejudice is determined by "whether there is a reasonable probability that counsel's errors affected the outcome of the trial."). "Prejudice" is not an outcome-determinative test. Strickland, 466 U.S. at 693-94. The question is not whether representation by effective counsel would have actually changed the jury's ultimate verdict, nor even whether representation by effective counsel would "more likely than not" have changed the verdict. Id. Instead, prejudice is established when confidence in the outcome is undermined because of counsel's deficiencies. Id. at 694; Williams v. Cain, 125 F.3d 269 (5th Cir. 1997) (citing Strickland).

49

Moreover, with respect to the penalty phase, prejudice is determined by the impact of counsel's deficient performance on at least one juror. See Wiggins, 539 U.S. at 535 (prejudice found when "there is a reasonable probability that at least one juror would have struck a different balance."); Williams, 529 U.S. at 393-95 (ratifying effect on a single juror standard applied by Virginia trial court); Soffar, 368 F.3d at 479 (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty."). In order to establish prejudice for counsels' failure to call witnesses, the Fifth Circuit requires a petitioner to show that the testimony would have been favorable and that the witness would have testified at trial. Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985).

In finding that the petitioner was prejudiced by trial counsels' failure to develop and present expert testimony, the Soffar Court stated:

> Because of the ineffectiveness of Soffar's defense counsel, the jury never heard the contrary opinions of an available qualified ballistics expert that only four shots were fired (not five as Soffar's statement purported to say), and that the arrangement of bullet holes in the carpet clearly showed that Garner was shot in a different place from where he was found by police (and not where Soffar said he shot him).
>
> Had the jury been confronted with this considerable evidence favorable to Soffar, there is a reasonable probability it would have reached a different result. In particular, had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty.

Soffar, 368 F.3d at 479.

Here, as in Soffar, because of counsels' ineffectiveness, the jury never heard the "contrary opinions of the available qualified expert[s]" that there was no semen present in the rectum of JG-1999 and no physical evidence of sexual assault. Here, as in Soffar, "[h]ad the jury been confronted with this considerable evidence favorable to [Mr. Bourgeois], there is a reasonable probability it

50

would have reached a different result."  Accordingly, here, as in <u>Soffar</u>, Mr. Bourgeois was prejudiced because "had the jury been so confronted, there is a reasonable probability that at least one juror would have refused to return a verdict of guilty." <u>Id.</u>

As a result of trial counsels' ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted.  This unrebutted evidence impacted the guilt/innocence and penalty phases of Mr. Bourgeois' trial.

Because Mr. Bourgeois was alleged to have been the only person who could have been the source of the alleged semen, the unrebutted evidence of semen and sexual abuse was directly relevant to the identity of the killer and undermined Mr. Bourgeois' defense that he was not JG-1999's killer.  Indeed, any argument that Mr. Bourgeois was not the person who killed JG-1999 was apt to carry significantly less weight when the jury was told, without evidence to the contrary, that his semen was present in her rectum and her vagina was traumatized.  In addition, the prejudice to Petitioner's defense was compounded by the flawed bite mark evidence counsel ineffectively failed to rebut.  <u>See</u> Claim V, below.  Had counsel performed effectively, they could have supported their argument that no semen was found and that JG-1999 was not sexually abused, and their argument that Mr. Bourgeois was not JG-1999's killer would have been profoundly more convincing.

Moreover, the unrebutted evidence of semen and sexual abuse was presumably admitted in support of the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner.  18 U.S.C. § 3592(c)(6).  As set forth above, this evidence was specifically used by the Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (<u>e.g.</u>, "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").  This flawed and prejudicial evidence skewed the jury's deliberative weighing

51

USCA5 986

process in favor of death.  As a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die.  Petitioner was prejudiced.

Mr. Bourgeois' rights under the Sixth Amendment of the United States Constitution were violated.  He is entitled to a new trial and a new sentencing hearing.  At a minimum he has pled a *prima facie* case that he was denied the effective representation of counsel and the Court should afford him an evidentiary hearing at which he can prove these facts.

CLAIM V.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND THE DIGITAL ENHANCEMENTS OF THE BITE MARK PHOTOGRAPHS AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.

The jury was presented with unreliable and false scientific evidence.  The Government's bite mark experts, Dr. Senn and Dr. Chrz, who testified that Petitioner was the "probable" source of the bite marks found on the deceased, formed their opinions based upon digital photographs that were "enhanced" by another Government expert, Dr. Oliver.  However, Dr. Oliver's methodology was deeply flawed and unreliable.  In addition to relying on the highly inaccurate digital "enhancements," Dr. Senn and Dr. Chrz also utilized untested and invalid odontological identification methods to opine that Petitioner was the likely source of the bite marks.  Based on these inaccurate conclusions, the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent. TT 4/24/04, 76.

Despite the devastating effect of this testimony and its gross lack of a scientific basis, trial counsel did absolutely nothing to preclude it – by way of a pre-trial Daubert motion – or by rebutting

USCA5 987

it once it was admitted, by way of expert testimony or an educated cross-examination of the

Government's experts.  Petitioner was prejudiced and a new trial and penalty hearing are mandated.

### A.    The Admissibility of Expert Testimony.

It is well settled that Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), and

Federal Rule of Evidence 702 require a trial judge to act as a gatekeeper, excluding scientific and

non-scientific opinions or methods that lack sufficient reliability or relevance.[29]  The court must

determine at the outset whether the reasoning and methodology underlying the expert testimony is

scientifically valid.  Simply put, evidentiary reliability and relevancy (and thus admissibility) are

based upon scientific or technical validity.  In performing this gatekeeper function, a trial court

should apply the following factors:  1) whether the theory or technique is generally accepted within

the relevant scientific or technical community, 2) whether the theory or technique has been subjected

to peer review and publication, 3) whether the theory or technique can and has been tested, 4)

whether the known or potential rate of error is acceptable, and 5) whether there are standards

controlling the technique's operation.  Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th

Cir. 2007); See also, Moore v. Ashland Tire Chemical Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en

banc).

---

[29]  Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In Kumho Tire Co. v. Carmichael, 526 U.S. 137(1999), the Supreme Court held that the gatekeeper protections of Daubert apply to scientific as well as non-scientific expert opinions. Accord  In re Silica Products Liability Litigation, 398 F. Supp. 2d 563, 621 (S.D. Tex.  2005) (Jack, J.).

USCA5 988

The expert's testimony "must be reliable at each and every step or else it is inadmissable. 'The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.'" Knight, 482 F.3d at 354-5 (5th Cir. 2007) (quoting Heller v. Shaw, 167 F.3d 146, 155 (3d Cir. 1999)).  Thus, "*any step* that renders the analysis unreliable . . . renders the expert's testimony inadmissable.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In re Silica Products Liability Litigation, 398 F. Supp. 2d 563, 625 (S.D. Tex. 2005) (Jack, J.) (quoting  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994)).

Of course counsel play a role in triggering the Court's gate keeping function.  Absent an application from counsel calling into question the admissibility of the particular evidence, the Court cannot necessarily be expected to know that the evidence is of questionable validity.

The party proffering the expert testimony must establish that "the proffered evidence is *both* 'reliable' and 'relevant.'   Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'  Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" Knight v. Kirby Inland Marine Inc., 482 F.3d at 352 (5th Cir. 2007) (quoting Daubert, 509 U.S. at 589, 593).  In making the reliability inquiry "it is the district court's responsibility to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." In re Silica Products, 398 F. Supp. at 622, quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137,152 (1999); Skidmore v. Precision Printing &Pkg.,Inc., 188 F.3d 6060, 618 (5th Cir. 1999).

In this case the Government's expert bite mark evidence and the digital enhancements of the

54

USCA5 989

bite mark photographs failed to meet *either* the reliability or relevance prongs of <u>Daubert</u>. This evidence was admitted, however, because Petitioner's counsel utterly failed in their duty to investigate and challenge this evidence by way of a pre-trial <u>Daubert</u> motion or by calling expert witnesses at trial to rebut it. Counsel's performance was deficient.

### B. Counsel's Duty to Investigate Related to Mounting a <u>Daubert</u> Challenge.

Trial counsel have a critical duty to conduct an adequate pretrial investigation of the Government's scientific evidence. This duty stems from counsels' general investigative duties in a capital case. The Supreme Court has explained the relationship between an attorney's pre-trial investigation and the choices that he makes with regard to matters of trial strategy:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

<u>Strickland v, Washington</u>, 466 U.S. 668, 690-91 (1984); <u>Wiggins</u>, 539 U.S. at 526 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.") Hence, absent such investigation counsel cannot be heard to say that they had a tactic or strategy for failing to challenge the evidence in question.

It is long-established that counsel have a duty to conduct a thorough pretrial investigation into the material aspects of the Government's case:

A substantial body of Fifth Circuit case law insists, however, 'that effective counsel

55

USCA5 990

> conduct a reasonable amount of pretrial investigation.' . . . . this circuit has recognized that, *at a minimum*, counsel had the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, is a proper guide for determining what is reasonable under the circumstances.

Nealy v. Cabana, 764 F.2d 1173, 1177-78 (5th Cir. 1985) (quoting Martin v. Maggio, 711 F.2d 1273, 1280 (5th Cir. 1980)).

In Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004), the Fifth Circuit made clear that the pretrial preparation and investigation responsibilities of counsel in a capital case, including the retention of expert witnesses, applied equally to both the guilt and penalty phases of the trial:

> We recognize that Wiggins was decided in the context of a defense counsel's decision regarding whether to offer a mitigation case during the sentencing phase of a trial. However, this is a difference without distinction. Whether the failure to conduct a reasonable investigation occurs at the sentencing phase or at the guilt phase should warrant no meaningful distinction in defining a person's right to effective assistance of counsel. Id. at 368 F.3d at 477 n. 40.

The United States Supreme Court, like the Fifth Circuit Court of Appeals, has long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.[30]

It is indisputable that at the time of Petitioner's trial, counsel had a pretrial duty to thoroughly examine all of the Government's forensic evidence, with the assistance of appropriate experts. See, e.g., ABA GUIDELINES; Soffar, id. (district court grant of habeas relief in capital case affirmed

_____

[30] See ABA PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE DEFENSE FUNCTION § 4.1 (1971); ABA STANDARDS FOR CRIMINAL JUSTICE, THE DEFENSE FUNCTION § 4-4.1 (2D ED. 1980); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN CAPITAL CASES § 10.7(2003).

56

– despite confession by defendant – where counsel failed to retain a ballistics expert to rebut state's expert and where counsel failed to interview a material witness); Driscoll v. Delo, 71 F.3d 701, 707-08 (8th Cir. 1996) (defense counsel has the duty to study and understand lab results and scientific aspects of case); Demarest v. Price, 905 F. Supp. 1432, 1449-50 (D. Col. 1995) (counsel has duty to investigate scientific aspects of state's case and consult with appropriate experts to counter state's blood spatter experts). See also Berryman v. Morton, 100 F.3d 1089, 1100-01 (3d Cir. 1996) (counsel ineffective for failing to investigate witness whose testimony would have tended to discredit the complainant's identification); United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989) (counsel must contact known witnesses and attempt to obtain available evidence which diminishes the Commonwealth's case and/or supports the defense).

The Fifth Circuit has not hesitated to overturn convictions where counsel's pretrial investigation was deficient. See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (grant of habeas corpus relief by district court affirmed and new trial granted where counsel failed to interview eyewitnesses prior to trial); Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990) (grant of habeas corpus by district court affirmed and new trial ordered where counsel failed pre-trial to investigate insanity defense since "It must be a very rare circumstance indeed where a decision not to investigate [insanity defense] would be 'reasonable after counsel had notice of the client's mental health problems.'"); Woodard v. Collins, 898 F.2d 1027 (5th Cir. 1990) (district court's finding that counsel's performance was deficient for failing to investigate all counts of the indictment affirmed.); Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) (district court's denial of habeas corpus petition reversed and new trial ordered where counsel failed to adequately investigate insanity defense prior to trial.); Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985) (district court's denial of petition for

57

habeas  corpus reversed and new trial granted where trial counsel failed to investigate and interview

material witnesses prior to trial.).

For the following reasons counsels' pretrial investigation and trial challenges concerning the

bite mark evidence were deficient.  Moreover, Petitioner was prejudiced at the trial and penalty

phases, and accordingly, he should be afforded a new trial and penalty hearing.

**C.**     **Strickland Deficient Performance: Counsel Failed to Mount a Pretrial
        Challenge to the Bite Mark and Photographic Enhancement Evidence and
        Failed at Trial to Rebut this Evidence.**

**1.      The Enhanced Images of the Bite Marks.**

Trial counsel was on notice of the Government's intention to use enhanced images of the bite

marks a full year before trial, and was provided, pretrial, with a compact disc containing all of the

enhanced images.  PTT 3/20/03, 13-14.  Despite being unfamiliar with digitally enhanced images

("I want to see how its done"; "I don't understand it"; "I've never seen it" (TT 3/8/04, 15), counsel

never even looked at the enhancements until mid-trial, just moments before Dr. Oliver was going

to testify before the jury. Id. at 15, 18.  Incredibly, counsel advised the court that he was not pursuing

a Daubert challenge – *before* he even saw the enhancements.  Id. at 14-15.

Then, when counsel was given the opportunity by the trial court to cross-examine Dr. Oliver

before trial – concerning his enhancement methodology –  counsel asked not a single serious

question.  Counsel asked if anyone else in the country "do[es] this kind of thing" and when that

question was answered in the affirmative, counsel withdrew the question.  Then counsel jokingly

asked how large a family Dr. Oliver had.  TT 3/8/04, 29-30.  Counsel did not ask a single question

relevant to the Daubert reliability factors.  Counsel then made a general objection to the prejudicial

nature of the photographs.  This objection was summarily denied by the trial court.  Id. at 30-31.

USCA5 993

In front of the jury, counsel did even less.  He did not ask a single question of Dr. Oliver concerning his enhancement techniques.  In fact, counsel did not ask a single question concerning the bite mark photographs.  Instead, counsel's entire cross-examination consisted of two and one half pages of questions concerning whether Dr. Oliver knew where the electrical cord he had examined had come from.  TT 3/8/04 at 227-230.  Finally, counsel did not present any type of rebuttal testimony – expert or lay witness – to challenge the accuracy of Dr. Oliver's digital enhancements of the bite mark photographs.

Had counsel conducted even a cursory investigation into the methods used by Dr. Oliver they could have precluded the admission of the enhanced photographs (as well as the opinions of Drs. Senn and Chrz to the extent that they relied upon these images to form the basis of their opinions and testimony.)  As discussed in Section D(1) infra, reasonable investigation would have revealed that the methods used by Dr. Oliver to enhance the original bite mark photographs were scientifically and technically flawed.  Moreover, they were not valid for use at trial since they were untested, they had not been subjected to peer review and publication, there was no known or potential rate of error, and they were not generally accepted by the forensic community.  Moreover, had counsel simply reviewed the reports provided to them by the Government, they could have called their reliability into serious question.

### 2.    The Government's Bite Mark Evidence.

Counsel acknowledged months before trial that rebutting the bite mark evidence was critical to Petitioner's defense.  Counsel acknowledged that retaining a bite mark expert was essential to rebut this highly inflammatory and probative evidence, PTT 6/26/03, 8-10, 22-23, and they assured the Court that they intended to retain such an expert.  PTT 7/16/03, 47-50; PTT 10/20/03, 13-14;

USCA5 994

PTT 10/24/03, 6-7. Counsel, however, never retained an expert and never challenged the reliability

or relevancy of this evidence by way of a pretrial Daubert motion or during trial. Instead counsel

allowed this testimony to come in, unchallenged, and relied solely on an ineffective cross-

examination to attempt to challenge this important evidence.

It is well settled in this Circuit that counsel cannot solely rely on even a sound cross-

examination to challenge the Government's case – much less a cursory cross. This point was

recently reiterated by the Fifth Circuit Court of Appeals when the court reversed a conviction due

to counsel's failure to adequately confront a lay witness:

> [I]n Bryant, we expressly rejected the notion that 'vigorous' cross-examination of
> eyewitnesses at trial can 'cure' counsel's failure to interview the witnesses before
> trial. We pointed to the obvious fact that effective cross-examination 'does not
> necessarily indicate that a reasonable lawyer, viewing the trial *ex ante*, would have
> regarded an interview of the eyewitnesses as unnecessary.' . . . even if cross-
> examination was effective, 'that is not to say it could not have been improved by
> prior investigation. . . . The fact that trial counsel was marginally successful in some
> respects does not excuse his complete failure to investigate and prepare *before* trial.

Anderson v. Johnson, 338 F.3d 382, 391-92 (5th Cir. 2003). Certainly, if Anderson's counsel was

ineffective for failing to interview a *lay* witness pretrial, Petitioner's counsel were ineffective for

failing to prepare for and challenge the Government's *expert* witnesses. Cf. Leal v. Dretke, 428 F.3d

543 (5th Cir. 2005) (counsel fulfilled his investigative duty and was not ineffective where he retained

a bite mark expert who conducted an independent review of the state's expert's findings who agreed

with the state's bite mark expert's conclusions).

> **3.    Counsels' Failure to Use the Exculpatory Opinion of a Government
> Expert Who was not Called by the Government.**

Counsels' failure to retain their own expert was a gross departure from accepted norms.

However, counsels' failure even to use a report written by another Government expert, was even

60

more troubling.  Some eight months before trial the Government provided counsel with two expert reports prepared by United States Army Colonel J. Curtis Dailey, DDS, which completely rebutted the findings of Drs. Senn and Chrz. (Copies of these reports are contained in *PA*, document # 44). Colonel Dailey examined actual excised skin of the bite mark, the original autopsy photographs, as well as Dr. Oliver's enhanced images.  Dr. Dailey then compared this evidence to the stone dental casts of Petitioner, Robin and AB-1994.  PTT 3/20/03, 14.  Colonel Dailey concluded that neither Robin, AB-1994 nor Petitioner could be **included or excluded** as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the bite marks, 3) the ruler was in a different spatial plane than the mark being photographed, and 4) the very similar metric and spatial pattern relationships between the three individuals' dentition.  *PA*, document # 44.

Thus, Dr. Dailey directly contradicted Dr. Senn and Dr. Chrz.  Had trial counsel simply called Dr. Dailey as a witness (at either a pretrial Daubert hearing or at trial) his testimony would have carried great weight.  After all, Dr. Dailey was an active-duty United States Army Colonel at the time he examined the bite marks, and he was the first such expert contacted by the Government.  Furthermore, he had the actual excised skin of the bite marks (in addition to the enhanced images) and yet he was still unable to exclude or include any of the potential biters.  His testimony also would have been extremely persuasive with the trial court and the jury since he was the first expert the Government consulted – and presumably the most qualified in the eyes of the Government.  Dr. Dailey's findings (that Robin could not be excluded) also directly support the defense theory that Robin (the step-mother) was the abuser of the child, not Petitioner (the natural father).  See also Claim IV (debunking semen and sexual abuse evidence).  At a minimum, Dr. Dailey's findings

61

would have constituted substantive evidence that Petitioner was not the source of the bite marks and were thus exculpatory at the guilt and sentencing phases of trial.  Id.

Furthermore, had counsel interviewed Dr. Dailey they would have learned from him that AUSA Patti Booth became irate when Dr. Dailey informed her that he could not identify Petitioner as the biter.  Specifically, when Dr. Dailey informed AUSA Booth of his conclusions she angrily told Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she would go out and find an expert who could.  *PA*, document # 45.  This testimony from Dr. Dailey could have refuted the Government's misleading argument that AB-1994 was excluded as the source of the bite marks and that the jury did not hear any evidence of expert "shopping."  TT 3/16/04, 19-20.  AUSA Booth knew when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had not excluded Robin or AB-1994 as a possible biter.  Nonetheless, she was able to make this – no expert-shopping argument –  because counsel failed to present the testimony of Colonel Dailey, DDS, or even consult with this witness.

Finally, counsels' failure to litigate a pretrial Daubert motion – concerning both the bite mark identification testimony and the digital enhancements of the bite mark photographs – was especially unreasonable since such motions were and are routinely successful in this Circuit.[31]  Counsel did

---

[31]  See e.g., United States v. Amador-Velasco, 2007 WL 1655266 (5th Cir. June 2007) (affirming district court's preclusion of expert testimony concerning drug smugglers because, inter alia, such testimony lacked sufficient reliability); Knight v. Kirby Inland Marine Inc., 482 F.3d 347 (5th Cir. 2007) (affirming district court's preclusion of expert testimony concerning causation since, although expert's methodology "unassailable,"gap between underlying data was simply too great and was not generally accepted, was not subjected to peer review, publication or testing); Cleveland v. United States, 457 F.3d 397 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning emergency medicine because expert in one medical specialty not qualified to testify as expert in another medical area); Shelter Insur. Co. v. Ford Motor Co., 2006 WL 3780474 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning fire cause and origin because expert, despite impressive credentials and experience, not qualified to opine about precise

USCA5 997

cause of fire); United States v. McGinnis, 2006 WL 2828661 (5th Cir. 2006) (affirming district court's preclusion of expert testimony concerning identification because, although expertise of expert was not challenged, his testimony did not assist the jury); In re Silica Products Litigation, 398 F. Supp. 2d 563 (S.D. Tex. 2005) (Jack, J.) (district court precluded expert testimony concerning diagnosis of silicosis because it failed to satisfy the minimum medically acceptable criteria and because no quality control measures were taken); Guy v. Crown Equip. Corp., 394 F.3d 320 (5th Cir. 2004) (affirming district court's preclusion of expert testimony concerning defective design because, *inter alia*, expert relied on unscientific conceptual sketches and failed to test his designs); Burleson v. Tex. Dept. of Criminal Justice, 393 F.3d 577 (5th Cir. 2004) (affirming district court's preclusion of expert testimony concerning causation of cancer because, *inter alia*, the testimony had never been tested and never been submitted for peer review); United States v. Ramos, 2003 WL 21790181 (5th Cir. 2003) (affirming district court's preclusion of expert testimony concerning voice identification – based on Fed. R. Evid. 702 and Daubert); IQ Products Co. v. Pennzoil,, 305 F.3d 368 (5th Cir. 2002) (affirming district court's preclusion of expert testimony concerning market conditions because it was based on insufficient data and unreliable methodology.); Abdeljalil v. City of Fort Worth, 2000 WL 1568142 (5th Cir. 2000) (affirming district court's preclusion of expert testimony – based on Daubert – because it was not reliable); Hammond v. Coleman, 2000WL 283165 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning condition of product because methodology and basis for opinion too speculative); Seatrax Inc. v. Sonbeck International, 200 F.3d 358 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning damages because expert did not have any formal or professional training in accounting and did not conduct independent examination of sales figures); Munoz v. Orr, 200 F.3d 291 (5th Cir. 2000) (affirming district court's preclusion of expert testimony concerning discrimination statistics because, inter alia, not in accord with experts in the field); Williams v. Valmet, 1999 WL 1328055 (5th Cir. 1999) (affirming district court's preclusion of expert testimony concerning design defect of hand rail based on Daubert); United States v. Katz, 178 F.3d 368 (5th Cir. 1999) (affirming district court's preclusion of expert testimony in child pornography case concerning age of children because of lack of reliability of images); Black v. Food Lion, Inc., 171 F.3d 308 (5th Cir. 1999) (reversing district court's denial of Daubert motion– because expert's opinion failed to gain acceptance in within medical profession and had no known potential rate of error); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (en banc) (affirming district court's preclusion of expert testimony concerning causation of reactive airways dysfunction because, although expert certified specialist, opinion had no scientific basis and analytical gap was too wide); Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir. 1997) (affirming district court's preclusion of expert testimony concerning design defect because expert qualified in mechanical engineering not civil engineering); Allen v. Pa. Engineering Corp., 102 F.3d 194 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning causation of fatal cancer because not supported by a single scientific study); Barrett v. Atlantic Richfield Co., 95 F.3d 375 (5th Cir. 1996) (affirming district court's preclusion of two expert's testimony concerning toxic chemical exposure because application of studies of cotton rats exposure to chemicals to humans consisted of speculation); Brown v. Miska, 96 F.3d 1445 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning defective car seat because it was based on specious, questionable, and unscientific methodology);

63

nothing to challenge the reliability of this evidence. For the following reasons Petitioner was prejudiced and a new trial and penalty hearing are mandated.

### D. <u>Strickland</u> Prejudice: Counsels' Deficient Performance Caused Prejudice.

Under <u>Strickland</u>, 466 U.S. at 694, in order to prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's deficient performance caused prejudice. In order to establish prejudice Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." <u>Id.</u> at 694. The test this court should apply to determine prejudice is "whether there is a reasonable probability that counsel's errors affected the outcome of the trial." <u>Soffar</u>, 368 F.3d at 478 ("A reasonable probability need not be proof by a preponderance that the result would have been different"); <u>Williams v. Cain</u>, 125 F.3d 269 (5th Cir. 1997).

The Government's bite mark experts, Dr. Senn and Dr. Chrz, formed their opinions and testified using distorted, inaccurate, confusing, misleading, exaggerated and incomplete digital enhancements of the bite mark photographs that had been created by the Government's expert, Dr.

<u>Abram v. Reichold Chemicals, Inc.</u>, 95 F.3d 48 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning cause of death because not supported by any medical or scientific literature); <u>United States v. Bratcher</u>, 95 F.3d 49 (5th Cir. 1996) (affirming district court's preclusion of expert polygraph testimony – based on Fed. R. Evid. 702 and Daubert.); <u>Brock v. Wal-Mart</u>, 1996 WL 60595 (5th Cir. 1996) (affirming district court's preclusion of expert testimony concerning foreseeablity because lacked scientific reliability); <u>Pedraza v. Jones</u>, 71 F.3d 194 (5th Cir. 1995) (affirming district court's preclusion of expert testimony concerning heroin withdrawal because none of <u>Daubert</u> requirements met); <u>Wheat v. Pfizer, Inc.</u>, 31 F.3d 340 (5th Cir. 1994) (affirming district court's preclusion of expert testimony concerning causation of death because hypothesis lacked empirical foundation and not subjected to peer review and publication); <u>Marcel v. Placid Oil Co.</u>, 11 F.3d 563 (5th Cir. 1994) (affirming district court's preclusion of economic expert testimony because based on study that was outdated and statistically suspect); <u>Rosado v. C.J. Deters</u>, 5 F.3d 119 (5th Cir. 1993) (affirming district court's preclusion of accident reconstruction expert testimony because expert did not have specialized knowledge in area.).

64

Oliver.  In addition to relying on these inaccurate digital enhancements, Dr. Senn and Dr. Chrz also utilized untested and invalid odontological identification methods to opine that Petitioner was the source of the bite marks.  Based on these inaccurate conclusions, the prosecutor argued that Petitioner had left his "signature with his teeth marks" on the decedent.  TT 4/24/04, 76.

The inflammatory and inaccurate bite mark evidence was devastating to the defense at both the guilt/innocence stage and the penalty stage of the trial. The prosecutors urged the jury to consider this evidence to convict Petitioner of first degree murder in both their opening and closing statements.  TT 3/2/04, 30-31, 34, 42,  TT 3/16/04, 19-20, 48-49 (testimony of bite mark experts used to inculpate Petitioner).   The prosecutors also utilized the bite mark evidence extensively in their closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  TT 3/24/04, 37, 41, 70, 76. ("His signature *with his teeth marks* and his semen is all in that baby.")  For the following reasons there is a reasonable probability that had counsel simply challenged this evidence pretrial or rebutted it at trial the outcome of this case would have been different.

### 1.    Dr. Oliver's Digital Image Enhancements Were Utterly Unreliable.

The original autopsy photographs were taken with a 35mm camera.  Dr. Oliver testified that there are two broad categories of image processing techniques: those that attempt to bring out features that are not visible in the original image and those that *actually change* the relative value or prominence of features in the image. TT 3/8/04, 15-18.  Dr. Oliver employed the second type of image processing that actually modified the original 35mm autopsy photographs. Id.  Specifically, he employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method. Id. at 19.  Dr. Oliver admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions

65

USCA5 1000

(orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5.

Dr. Oliver also admitted that it was very important when analyzing the newly created images to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  Dr. Oliver emphasized that valid conclusions require "going back to the original image."  TT 3/8/04, 13-14.  However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit into the PowerPoint.  Id. at 19.  In his presentation to the jury and in reaching his conclusions he never went back to the original 35 mm photograph but instead he called the digitized image the "original."  Id. at 26.  In describing his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

Undersigned counsel provided copies of the original 35mm autopsy photographs, the scanned digitized autopsy photographs, and the enhanced images created by Dr. Oliver to forensic digital imaging and digital imaging enhancement experts employed with Cherry Biometrics, Inc.  These experts found that the imaging enhancements created by Dr. Oliver were scientifically and technically unreliable and invalid.

The digitized/scanned images were found to be "distorted" "inaccurate"  "incomplete" and "over-reaching alterations." Report of Mark Cherry and Manfred Schenk, MAC (*PA*, document # 43).  Dr. Oliver's method of converting the original 35mm photographs into digital images with a 600 dpi scanner instead of a 3600 dpi scanner created digital images that had a much narrower color spectrum than the original photographs.  Additionally, the images themselves were distorted (from a 35 mm shape to a 3x2 or 4x3 image) and compressed because Dr. Oliver used  JPEG,  a lossy, *not* lossless, compression program.  The images were then further distorted and further detail was lost

66

USCA5 1001

when Dr. Oliver converted them to PowerPoint.

The enhancements Dr. Oliver created from the scanned/digitized images were also "clearly inaccurate" with "[m]isplaced color everywhere." Id.   The CLAHE enhancement method that Dr. Oliver utilized failed to account for coloration and distortion problems caused by the concept of "Bayer Pattern Nearest- Neighbor Coloration" or "interpolation."  This problem occurs when images look to the nearest neighbor to determine their color and sometimes their shape. Interpolation is far more pronounced when an enhancement technique like CLAHE is used since it breaks a large image into a number of smaller ones.  Interpolation is apparent throughout all of Dr. Oliver's enhanced images.  Id.

One could not imagine a more prejudicial and inaccurate enhancement technique when looking for "unseeable" and "unphotographable" injuries than a technique like CLAHE  that allows images to draw colors and shapes from neighboring images.

The methods and techniques utilized by Dr. Oliver failed to comport with Daubert:

- The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

- Lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead.

- The 35 mm pictures should have been presented as the original evidence. They were the "Best Evidence."  The techniques of not using the "Best Evidence" is not generally accepted in the scientific/technical community.

- The digital images presented as "original images" were compressed and therefore they lacked original detail.

- There are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

67

USCA5 1002

- One cannot substitute enhancement for details that were lost during the digital conversion. The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

- The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

*PA*, document # 43. Had trial counsel consulted with experts such as those who have been consulted by undersigned counsel, they would have seen the merit to a Daubert challenge.

Werner Spitz, MD, a forensic pathologist with 54 years of experience and the author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition, was also retained by undersigned counsel. Dr. Spitz reviewed the enhanced autopsy images including those of the bite marks. Dr. Spitz concluded that the enhanced images were "misleading, confusing, exaggerate the findings, and produce artifacts." Spitz Declaration, *PA*, document # 53. He also found that the enhanced images introduced "new dimensions, new colors, new uncertainties . . . [and were] without scientific merit." Id. Dr. Spitz also noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often mistaken for injuries*." Id.

Undersigned counsel also provided the bite mark photographs (digitized originals and enhanced images) and the three sets of stone dental models to Dr. C. Michael Bowers, DDS, JD, a board certified forensic odontologist and expert in the area of forensic dental digital imaging. *PA*, document # 42. Dr. Bowers described the enhanced images created by Dr. Oliver as "excessive manipulation" and " **the most overly 'enhanced' images I have ever seen used in actual casework**." Id. Dr. Bowers further noted that the enhancement technique utilized by Dr. Oliver introduced "uncontrolled digital noise . . . into the computer-manipulated image that does not reflect

68

USCA5 1003

the original state of the picture." Id.

Dr. Bowers found that the "ruler" and "injury pattern" in the enhanced bite mark images had "undergone considerable alteration [and] . . . change." The "contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradation of color in the bruise (indicating either less or more pressure by the biter) are lost." Id.

Dr. Bowers also concluded that no scientific or technical foundation existed for Dr. Oliver's analysis and presentation. Dr. Bowers found that the methods of enhancement utilized by Dr. Oliver would not have withstood a Daubert challenge:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . . The Government has no data as to known or potential error rate . . . of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

*PA*, document # 42.

Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were unreliable. They would have litigated a Daubert motion and Dr. Oliver's enhanced images as well as the conclusions of Dr. Senn and Dr. Chrz would have been precluded. Petitioner was prejudiced.

69

USCA5 1004

## 2.      The Opinions of Dr. Senn and Dr. Chrz Were Also Unreliable.

Both Dr. Senn and Dr. Chrz relied upon the enhanced images created by Dr. Oliver in presenting their opinions to the jury. For this reason alone, their bite mark opinions were scientifically and technically invalid and should have been precluded.  Moreover, even if the significant inaccuracies of the enhanced images are ignored, the opinions of Drs. Senn and Chrz fail to meet the Daubert standards for valid science.

The Government experts' conclusions that Petitioner was the "probable biter" and the prosecutor's argument that Petitioner was the "probable biter" (3/16/04, 49) and had left his "signature" (3/24/04, 76) in the form of his teeth marks went well beyond the boundaries of accepted and valid bite mark identification.  Dr. Bowers noted that "the validity, reliability and accuracy of bite mark identification have not improved to the point where it should be used as the sole means of identifying the biter." *PA*, document #42.  Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or 'probably the biter' via teeth marks are not rendering a reliable opinion."  Id.

Dr. Spitz agrees with Dr. Bowers that "Odontological bite mark identification has been abundantly shown to be unreliable for identification in the absence of other studies, such as DNA or at least blood type verification." *PA*, document # 53.

In this case that is exactly what occurred.  The Government specifically did not ask AB-1994 if she saw Petitioner bite the decedent on the lower back despite questioning her extensively about Petitioner's biting of the decedent.   The Government also did not ask Robin to identify Petitioner as the biter of the decedent's lower back.  When all was said and done the Government relied solely (and improperly) on expert testimony to argue that Petitioner had left his "signature" on the

70

decedent's body in the form of his "teeth marks."

Dr. Bowers, a diplomate of The American Board of Forensic Odontology ("ABFO"), notes that this scientific community "has minimal scientific research supporting reliable positive identifications from bite marks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy." He also noted that the Bite Mark Standards and Guidelines of the ABFO do not delineate a threshold for bite mark evidence below which an opinion may not be rendered. *PA*, document # 42.

An ABFO study completed in 1999 found that the examiners were wrong nearly half the time they tried to identify the source of a bite mark and 63.5% of the examiners committed false positives in some of the test cases. Id. The examiners who participated in this study were not novices but diplomates of the ABFO – the most accomplished in the field. Id. Thus viewed, bite mark evidence is not more reliable than flipping a coin.

A second study was conducted in 2001 and the results were published in the Journal of Forensic Science. This study – which again included experienced examiners – involved pattern detail that exceeded that found in actual bite mark casework, and allowed for controls of variables that are uncontrolled in actual casework. The results still showed a significant error rate of 15.9%.

These studies, the lack of scientific research supporting reliable positive identifications from bite marks in skin, and the failure of the ABFO to delineate a threshold for bite mark evidence below which an opinion may not be given, render bite mark evidence scientifically and technically invalid. Counsel were ineffective for failing to litigate a Daubert challenge to *all aspects* of the bite mark identification evidence in this case.

The importance of Petitioner being the "probable" biter of the lower back bite mark was not

71

lost on the prosecutor at the guilt phase of the trial. ("You have a bite mark identifying that he is the probable biter and Robin is not.") TT 3/16/04, 49. In her closing argument she showed the photograph of this bite mark to the jury and described it as the "only piece of physical evidence" that inculpated Petitioner. TT 3/16/04, 48-49. The prosecutor also emphasized the bite mark evidence in urging the jury to consider Petitioner's brutality: "[t]hey had never seen a bite mark like this before. They had never seen a bite mark with *such force behind it* that would leave this imprint" "the bite is so *incredibly intense*, the force behind the bite is so remarkable . . . this just doesn't happen, except, when you have someone that's so wants to cause the victim so much pain, *wants to see her suffer*." Id. See Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (conviction reversed since counsel's deficient performance in failing to interview eyewitness prejudiced defendant where state's case rested primarily on eye witness testimony.)

The Government also recognized the importance of the bite mark evidence at the penalty phase. In support of the argument that the murder was committed in a heinous, cruel or depraved manner, and that it involved torture and serious physical abuse to the decedent, the prosecutor in her closing arguments referred to the bite mark no fewer than four times, and misleadingly argued that Petitioner's "signature with his teeth marks and his semen is all in that baby." TT 3/24/04, 37, 41, 70, 76. Needless to say, the bite mark evidence affected the jury's weighing of the aggravating and mitigating evidence.

For all of the above reasons, trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinions of Dr. Oliver, Dr. Senn and Dr. Chrz on the grounds that it was not technically or scientifically reliable. Trial counsel

72

was also ineffective for failing to rebut this evidence with an expert of his own, or at a minimum,

with the un-called Government expert, Dr. Dailey.  Petitioner was prejudiced and a new trial and

sentencing are mandated.

**CLAIM VI.** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS, FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY, AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

In Claim V, above, Petitioner shows that counsel were ineffective for failing to consult

appropriate experts in order to mount a Daubert challenge to the bite mark evidence and Dr. Oliver's

"enhancement" testimony.  The same failures apply to counsels' failure to challenge Dr. Oliver's

enhancement testimony related to the scores of other photos that he used showing a variety of alleged

wounds to the victim.  The methods used by Dr. Oliver to enhance the original autopsy photographs

were scientifically and technically invalid for use in a capital trial since they were untested, they had

not been subjected to peer review and publication, there was no known or potential rate of error, and

they were not generally accepted by the forensic community.

As alleged earlier with respect to Claim V, trial counsel had a pretrial duty to investigate the

Government's scientific evidence.  Trial counsel, however, did nothing prior to trial to investigate

this evidence.[32]  Trial counsel were also ineffective for failing to object to the admissibility of the

---

[32] Trial counsel were on notice of the Government's intention to use enhanced images of the autopsy photographs a full year before trial, and were provided pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images, counsel never even looked at the enhancements until moments before Dr. Oliver testified. TT 3/8/04, 15, 18. Furthermore, counsel advised the court that he was not pursuing a Daubert challenge — *before* he even saw the enhancements. TT 3/8/04, 14-15.  The only objection eventually raised by counsel was that the prejudice of the enhanced images outweighed the probative value. This objection was denied. Id. at 30.

USCA5 1008

enhanced images on authentication grounds and for failing to rebut this evidence once it was

admitted at trial and heard by the jury.  Instead, trial counsel sat back and allowed this inaccurate and

highly inflammatory evidence to be heard by Petitioner's jury unchallenged, unrebutted and

uncontradicted.  Petitioner was prejudiced and a new trial and penalty hearing are mandated.

### A.      Counsel Were Ineffective for Failing to Mount a Pretrial Daubert Challenge to the Photographic Enhancement Evidence.

As discussed in Claim V, Dr. Oliver testified as a Government witness using digital

enhancements of the autopsy photographs. TT 3/8/04, 15-18, 183-231.  Dr. Oliver was permitted

to give highly inflammatory testimony in painstaking detail (taking up over 44 pages of transcript),

showing the jury the huge number of alleged injuries his "enhancements" had "uncovered."  TT

3/8/04, 30.  Trial counsels' cross-examination of Dr. Oliver took up just three pages of transcript.

Id. at  227-230. Utilizing these enhancements, Dr. Oliver identified the following injuries on the

decedent:  "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8

pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one

constellation suggestive of a bite mark, and three lacerations."  TT 3/8/04, 226.  The vast majority

of these injuries were not visible on the autopsy photographs and were not testified to by Dr. Rouse,

the pathologist who actually performed the autopsy without resort to such enhancement.[33]

---

[33] As described in Claim V, Dr. Oliver employed the Contrast-Limited Adaptive Histogram Equalization ("CLAHE") contrast enhancement method, which actually changed the original 35 mm photographs.  Id. at 19.  Dr. Oliver admitted that he picked the range of parameters to be used to redistribute the colors and he chose colors that in his opinion represented contusions (orange), whip marks (yellow) and scars (light blue).  Id. at 22, 24-5. Dr. Oliver also admitted that it was very important when analyzing the newly created images  to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct.  TT 3/8/04, 13-14. However, Dr. Oliver admitted that he had digitized the original 35mm photographs and then downsized them to fit onto the PowerPoint.  Id. at 19.  In his presentation to the jury and in reaching his conclusions he erroneously considered digitized images as the "original."  Id. at 26.  In describing

74

USCA5 1009

The methods and techniques utilized by Dr. Oliver failed to comport with almost every aspect of Daubert.[34]  The forensic digital imaging and digital imaging enhancement experts retained by undersigned counsel found that these enhancements were distorted, inaccurate, incomplete and over-reaching alterations.  *PA*, document # 43.

Specifically, the defense experts from Cherry Biometrics, Inc., found that:  1) the numerous layers of modification the original photographs underwent created a situation where the known or potential rate of error is impossible to determine; 2) lossless compression of forensic evidence is the scientific and technical standard.  In this instance it was not used, lossy compression was used instead; 3) the 35 mm pictures were the original or "best" evidence and the technique of not using the "best" is not generally accepted in the scientific/technical community; 4) the digital images presented as "original images" were compressed and therefore they lacked original detail; 5) there are no standards controlling the techniques, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there; 6) enhancements cannot be substituted for details that were lost during the digital conversion, and 7) the enhancement techniques used are not well-known, regulated, regarded or accepted within the United States or international forensic community and

---

his ability to identify bruises Dr. Oliver conceded "it all sort of boils down to whether you are a lumper or splitter." Id. at 28.

[34] The Dabuert evidentiary reliability and relevancy (and thus admissibility) analysis focuses upon scientific or technical validity.  In performing the gatekeeper function, a trial court applies the following factors in determining whether proffered testimony is scientifically or technically valid: 1) whether the theory or technique is generally accepted within the relevant scientific or technical community, 2) whether the theory or technique has been subjected to peer review and publication, 3) whether the theory or technique can and has been tested, 4) whether the known or potential rate of error is acceptable, and 5) whether there are standards controlling the technique's operation. Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir. 2007).

USCA5 1010

have not been tested, or subjected to peer review or publication in the forensic community.  *PA*,

document #43.

Dr. Bowers, another defense expert, also concluded that no scientific or technical foundation

existed for Dr. Oliver's analysis and presentation.  Specifically, Dr. Bowers found that the methods

of enhancement utilized by Dr. Oliver did not comport with Daubert:

> There are no established thresholds or limits to the operator's use of digital enhancement in this case.  The only control is the operator's subjectivity.  In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard. . . .  The Government has no data as to known or potential error rate . . .  of their enhancement method . . . There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied.  Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used . . . .

Bowers Declaration, *PA*, document # 42.

Finally, Dr. Werner Spitz, MD a forensic pathologist with 54 years of experience and the

author of the seminal textbook MEDICOLEGAL INVESTIGATION OF DEATH, 4th Edition, reviewed the

autopsy report, the enhanced autopsy images, the photographs taken at the time of autopsy, as well

as the testimony of Dr. Rouse and Dr. Oliver.  Dr. Spitz concluded that the enhanced images were

"misleading, confusing, exaggerate[d] the findings, and produce[d] artifacts." Spitz Declaration, *PA*,

document # 53.  He also noted that if "the documentation of bruises is at issue, the pathologist

performing the autopsy can use their scapel for such documentation and study." Id.  He also found

that the enhanced images introduced "new dimensions, new colors, new uncertainties in so far as the

findings in the enhancements were not present at the autopsy table."  Dr. Spitz found that the

enhancements . . . are none other than inflammatory, without scientific merit." Id.  Dr. Spitz also

noted that "[d]ark skinned individuals frequently have variations of skin pigment and tones *often*

76

USCA5 1011

*mistaken for injuries*." Id.

There can be no question that this inflammatory and highly inaccurate evidence was devastating to the defense at both the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the jury to convict Petitioner of first degree murder describing the vast number of injuries as evidence establishing – "a systematic execution" "a systematic dehumanization" and "a systematic degradation." TT 3/16/04, 13,16,46, 48, 54. Based directly on Dr. Oliver's testimony (and his image enhancements), the prosecutor argued that the sheer number of injuries established Petitioner's "relentless cruelty," since, she claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries. TT 3/24/04, 73.

As discussed in detail in Claim V, counsel's failure to litigate a Daubert motion is especially inexcusable since these motions are routinely and successfully litigated in this Circuit.[35] Had counsel reviewed these enhanced images in a timely manner and retained a qualified expert to assist them, they would have learned that the methods and techniques employed by Dr. Oliver were utterly unreliable. They would have litigated a Daubert motion and Dr. Oliver's testimony and his PowerPoint presentation with the enhanced images would have been precluded by this court.

---

[35] See note 32, above.

USCA5 1012

**B**. **Trial Counsel Were Ineffective for Failing to Object to the Admissibility of this Evidence under Federal Rules of Evidence 901, 1001 and 1002 and for Failing to Rebut this Evidence Once it Was Admitted at Trial.**

It is well settled that Federal Rules of Evidence 901[36], 1001[37] and 1002[38] require the authentication of evidence, and in the case of photographs the original is required to prove its contents. Dr. Oliver's scanned digital images and his enhanced images were significantly inaccurate, incomplete and overreaching alterations of the original 35mm autopsy photographs. These images were not and could not be properly authenticated and were not and could not be considered admissible copies of the original photographs. See United States v. Seifert, 351 F. Supp. 2d 926, 928 (D. Minn. 2005), aff'd. 445 F.3d 1043(8th Cir. 2006) (enhanced images admissible only if shown to be accurate, authentic and trustworthy).

Counsel, however, failed to object to the admission of these altered images pursuant to Federal Rules of Evidence 901, 1001 and 1002 and the court admitted this evidence. Counsel were ineffective.

As discussed in detail in Claim V, counsel had a duty – once the testimony of Dr. Oliver was admitted and heard by the jury – to rebut it. Had counsel adequately prepared for trial they could have easily marshaled the above described evidence (Cherry Biometrics, Inc., Dr. Bowers and Dr. Spitz) and presented a compelling rebuttal to Dr. Oliver's findings. Counsel, however, never

---

[36] Fed. Rule of Evid. 901(a) provides in pertinent part: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

[37] Fed. Rule of Evid. 1001(2) provides in pertinent part: "**Photographs**. 'Photographs' include still photographs, X-ray films, video tapes, and motion pictures."

[38] Fed. Rule of Evid.1002 provides in pertinent part: "To prove the content of a . . . photograph, the original . . . photograph is required . . . ."

78

USCA5 1013

retained an expert and this inaccurate, invalid and highly inflammatory evidence was submitted to

the jury unchallenged, unrebutted and uncontradicted.  Counsel were ineffective.

### C.        Petitioner Was Prejudiced.

There can be no question that Dr. Oliver's findings were devastating to the defense at both

the guilt/innocence stage of the trial and at the penalty stage of the trial. The prosecutors urged the

jury to consider this evidence to convict Petitioner of first degree murder.  TT  3/16/04, 13, 16, 46,

48, 54.  The prosecutors also utilized these findings in their closing arguments at the penalty stage

in urging the jury to sentence Petitioner to death.  TT 3/24/04, 73.

The Government used the sheer number of injuries found by Dr. Oliver to support its case

at the guilt phase of the trial.  "You heard Dr. Oliver testify that she had over 300 injuries on her

body.  So you know  . . .  to do that kind of damage, you've got to make at least ten injuries a day.

Ladies and gentlemen, ten injuries a day, a systematic execution of a baby.  And that's what it was.

A systematic execution.  A systematic dehumanization.  A systematic degradation of that child." TT

3/16/04, 13-14.

The importance of the sheer number of injuries found by Dr. Oliver was emphasized by the

prosecutor again at the penalty phase of the trial.  The prosecutor argued:

> [T]he injuries to the baby's body, the 360-some injuries on that baby's body, and we
> knew from the guilt/innocence phase that he was with that child for 36 days , that's
> when we think the abuse started. So in 36 days we got 360 marks.  That means that
> we have to do 10 a day.  That means that you would have to . . . 10 hours is longer
> than what we work a day.  So you're going to have to start before work starts, and
> you're going to have to work through lunch to get an abuse in every hour; and that
> doesn't count the abuses that are on top of the abuse.  And so you just count that as
> one of 360.

TT 3/24/04, 73.

79

USCA5 1014

Petitioner was clearly prejudiced by trial counsels' deficient performance, and a new trial and sentencing proceeding are mandated.  See Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) and Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003).

Trial counsel violated Petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution by failing to challenge via a Daubert motion the admissibility of the testimony and opinion of Dr. Oliver.  Dr. Oliver's testimony was not scientifically reliable.  Trial counsel were ineffective for not objecting, on authentication grounds, pursuant to Federal Rules of Evidence 901, 1001 and 1002 .  Finally, trial counsel were ineffective for failing to rebut this evidence once it was admitted at trial and heard by the jury.  Petitioner was prejudiced and a new trial and sentencing are mandated.

**CLAIM VII.    THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

## A.    Introduction

The Government failed to disclose to Petitioner powerful impeachment evidence concerning three of the four jailhouse informants who testified against Petitioner at his trial.  Specifically, the Government failed to disclose promises and understandings of favorable treatment concerning the informants' underlying cases that it had with these witnesses prior to their testimony at Petitioner's trial. Each one of these witnesses – after testifying against Petitioner – in fact received benefits both in the cases that were pending at the time of their testimony and in sentences they were serving at the time of their testimony.  Further, each one of these witnesses testified falsely – in response to questions posed by the prosecutor – concerning their understanding of future favorable treatment.

80

USCA5 1015

The Government's failure to disclose these understandings and its elicitation of, and failure to correct, false testimony violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), Napue v. Illinois, 360 U.S. 264, 269 (1959), and their progeny.

**B.    The Relevant Law.**

**1.    The Prosecutor's Due Process Duty to Disclose Favorable Evidence.**

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be "deprived of life, liberty or property, without due process of law . . ." The United States Supreme Court has long held that the right to due process requires a federal prosecutor to disclose favorable evidence that is material to either guilt or sentencing. Brady, 373 U.S. at 87; Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995); Banks v. Dretke, 540 U.S. 668 (2004). Accord, Graves v. Dretke, 442 F.3d 334, 339 (5th Cir. 2006); Dickson v. Quaterman, 453 F.3d 643, 646-67 (5th Cir. 2006); United States v. Sipe, 388 F.3d 471, 477 (5th Cir. 2004); Hudson v. Whitley, 979 F.2d 1058, 1062 n.6 (5th Cir. 1992).[39]

The prosecution's "duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently

---

[39] The Fifth Circuit has held that to state a Brady claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, and (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence. See Parr v. Quarterman, 472 F.3d 275, 254 (5th Cir. 2006); Rector v. Johnson, 120 F.3d 551, 558 (5th Cir. 1997). The Fifth Circuit's formulation of the fourth element of a Brady claim may conflict with Supreme Court precedent holding that a criminal defendant is entitled to rely on representations made by a prosecutor that all exculpatory information has been disclosed. See Banks, 540 U.S. at 695 ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed").

81

USCA5 1016

associated with the Court's decision in Brady v. Maryland." Kyles, 514 U.S. at 432.  A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  Kyles, 514 U.S. at 422 (in assessing a Brady claim the court acknowledged that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").[40]

The due process requirements of the Brady doctrine also apply to evidence that can be utilized to impeach the prosecutor's theory or witnesses.  Bagley, 473 U.S. at 676 (Brady's disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); Giglio, 405 U.S. 150, 152 (1972) ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule") (quoting Napue, 360 U.S. at 269); Graves, 442 F.3d at 339 ("Brady applies equally to evidence relevant to the credibility of a key witness"); Dickson, 453 F.3d at 647 ("[t]o prevail on a Brady claim, '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching...") (quoting Strickler, 527 U.S. at 282-82).

The Brady obligations of the prosecution do not end with the jury's verdict.  The duty to disclose is ongoing through all stages of the appellate and post-conviction process.  Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing");  Imbler v. Pachtman 424 U.S.

---

[40] See also Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Caldwell v. Mississippi, 472 U.S. 320 (1985); Ford v. Wainwright, 477 U.S. 399, 414 (1986) (each holding that a capital case requires heightened judicial review and enforcement of procedural safeguards).

USCA5 1017

409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.") (citing ABA Code of Professional Responsibility § EC 7-13 (1969); ABA Standards for Criminal Justice, Prosecution and Defense Function § 3.11 (1971).[41]

It is also clear under Brady and its progeny that the Government has a duty to provide exculpatory or favorable evidence regardless of whether the defense made a specific request for the item in question. See Banks, 540 U.S. at 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. . . . A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process. Ordinarily we presume that public officials have properly discharged their official duties.") (quoting Bracy v. Gramley, 520 U. S. 899, 909 (1997)); Dickson, 453 F.3d at 647 ("[t]he prosecution has a duty to disclose [Brady] evidence even absent a specific request by the accused") (citing Strickler, 527 U.S. at 280). Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "discharge[] their official duties," United States v. Mezzanatto, 513 U.S. 196, 210 (1995), and that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

---

[41] See also Steidle v. Fermon, 494 F.3d 623, 629 (7th Cir. 2007) (the Supreme Court has reiterated that "the duty to disclose [exculpatory material] is ongoing") (quoting Ritchie, 480 U.S. at 60); Thomas v. Goldsmith, 979 F.2d 746, 750 (9th Cir. 1992) ("We do not refer to the state's duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant [post-conviction] proceeding.").

83

USCA5 1018

Finally, the failure to disclose all material evidence favorable to an accused violates due process whether or not the prosecutor acted in good faith.  Brady, 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 110 (1976); Dickson v. Quarterman, 462 F.3d 470, 477 (5th Cir. 2006) (to prevail on a Brady claim the "evidence must have been suppressed by the State, either willfully or inadvertently"):

> The duty of a prosecutor, as the representative of the sovereign in a criminal case, is not that it shall win a case, but that justice shall be done. . . .Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when disclosure is required. Accordingly, a prosecutor faithfully discharges his duty where he fully understands his obligations under Brady, not where, as here, he fails to consciously think about it one way or the other.

Dickson, 462 F.3d at 479 (internal quotation marks and citations omitted).  Indeed, because "the preservation of our civil liberties depends upon the faithful and ethical exercise of power by [prosecutors] who bear the mantle of public trust ... [w]here the actions of [prosecutors] are contrary to these aspirational principles, whether for improper or guileless reason, courtroom victories are pyrrhic and such conduct 'should attract no courtroom approbation.'" Id. at 480 (quoting Banks, 540 U.S. at 696); Brady, 373 U.S. at 87-88 ("[a] prosecution that withholds evidence ... which, if made available, would tend to exculpate [a defendant] or reduce the penalty helps shape a trial ... that does not comport with standards of justice, even though ... his action is not 'the result of guile[]' ..."); Graves, 442 F.3d at 339 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution") (quoting Brady, 373 U.S. at 87).

USCA5 1019

## 2.     Brady Materiality.

Kyles v. Whitley, 514 U.S. 419 (1995) sets forth the long-standing and indisputable constitutional standard governing the circumstances requiring a new trial or sentencing based upon withheld exculpatory evidence – that is, when such evidence is "material." The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict – "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. Id., at 435 n.8. Instead, materiality is established when a defendant demonstrates:

> [A] 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

Kyles, id. at 434, quoting United States v. Bagley, 473 U.S. 667, 678 (1985); Dickson, 453 F.3d at 647 ("Evidence is material under Brady where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different. . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome") (quoting Bagley, 473 U.S. at 682); Graves, 442 F.3d at 339-40 (same); Hudson, 979 F.2d at 1062 n.7 (same).

Brady's materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel. Gonzales v. Quarterman, 458 F.3d 384, 390

85

USCA5 1020

(5th Cir. 2006) ("[th]e test for prejudice under <u>Brady</u> and <u>Strickland</u> is the same").[42]  Accordingly, the <u>Brady</u> materiality inquiry, like the <u>Strickland</u> prejudice inquiry, properly focuses on whether the withheld evidence would have had an effect <u>on even a single juror</u>.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); <u>Williams</u>, 529 U.S. at 393-95 (ratifying effect on a single juror standard applied by Virginia trial court); <u>Soffar v. Dretke</u>, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty").[43]  Thus, if even a single juror reasonably could have found Petitioner not guilty or found a mitigating circumstance that was not found, or might have differently balanced the aggravating and mitigating circumstances, confidence in the outcome is undermined and a new trial and/or penalty hearing is required.  Moreover, like <u>Strickland</u> prejudice, <u>Brady</u> materiality is satisfied by a showing of less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

<u>Strickland</u>, 466 U.S. at 694.

In determining the materiality of suppressed evidence, the Court should not evaluate the

---

[42]  <u>See</u> <u>also</u> <u>Marshall v. Hendricks</u>, 307 F.3d 36, 52 (3d Cir. 2002) ("[t]he standard for materiality is the same as that iterated in <u>Strickland</u>").

[43]  <u>See also</u> <u>Emerson v. Gramley</u>, 91 F.3d 898, 907 (7th Cir. 1996) (Posner, C.J.) (prejudice evaluated in light of "need to convince only one of twelve jurors to refuse to go along with a death sentence"); <u>Kubat v. Thieret</u>, 867 F.2d 351, 371 (7th Cir.) ("even if only one juror had been confused, the reliability of the verdict is undermined"), <u>cert. denied</u>, 493 U.S. 874 (1989); <u>Harris v. Blodgett</u>, 853 F. Supp. 1239, 1270 (W.D. Wash. 1994), <u>aff'd</u>, 64 F.3d 1432 (9th Cir. 1995).

86

USCA5 1021

evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial. Kyles. 514 U.S. at 436 (in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met.). Sipe, 388 F.3d at 478 ("[w]hen there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result") (citing Kyles).[44]

### C.      The Improper Suppression of Evidence.

The Government failed to disclose evidence that could have significantly impeached three of the four jailhouse informants who testified against Petitioner.

#### 1.      Adam Longoria.

Adam Longoria was a jailhouse informant who testified for the Government and against Petitioner at the penalty phase of the trial. TT 3/22/04, 144-187. Specifically, Longoria told the jury that while he was incarcerated with Petitioner in the Nueces County Jail, Petitioner asked him to kill three female witnesses that were going to testify against him in this murder trial – Robin Bourgeois (wife), Lisa Moore (cousin) and Gaynell Collins (ex-wife). Id at 155-62. Longoria also told the jury that in return for these murders Petitioner offered to give him an 18 wheeler truck worth $100,000 and drug contacts so he could make drug runs for extra money. Id. at 157. Longoria testified that Petitioner admitted to him that he had beaten the decedent with a bat and extension cord and had thrown these items out the window of the truck, before he got to the Naval Base. Id. at 163-66.

Longoria also testified on direct examination that he had not been promised anything in

---

[44] See also Schledwitz v. United States, 169 F.3d 1003, 1016-17 (6th Cir. 1999) (granting new trial based on "the total cumulative effect" of the suppressed evidence).

USCA5 1022

return for his testimony against Petitioner:

> Q.    Okay.  Now, do you and I . . . have I promised you *anything* to come in here to testify?
>
> A.    No, ma'am *not a thing*.
>
> Q.    And you understand that there's no way that I can help you in your state case.
>
> A.     I understand fully.
>
> Q.    And I've told you that.
>
> A.     Yes ma'am you have.
>
> Q.     I pass the witness, Your Honor.

3/22/04, 166-67.

On two separate occasions prior to Longoria's testimony, the Government – in response to questions from this Court with defense counsel present – assured the Court and defense counsel that Longoria was receiving no consideration in exchange for his testimony.  TT 3/9/04, 7 ("Adam Longoria is a state prisoner.  We are giving him nothing.  And he knows that we can't give him anything.");  TT 3/19/04, 23 ("There's no promises, nothing.")

On cross-examination Longoria stuck with this story and again insisted he had no understanding, expectations or agreements for favorable treatment from the Government – in his words "none whatsoever." TT 3/22/04, 186.  And on re-direct the Government again asked Longoria "And, you know you're not going to get anything for this, right?" and he responded in the affirmative.  Id. at 187.  This testimony was false.  Longoria understood that he would receive favorable treatment in his open cases in return for his testimony against Petitioner.

At the time he testified against Petitioner, Longoria was facing significant amounts of jail

88

USCA5 1023

time.  He was awaiting trial for a May 30, 2003 arrest for bank robbery (03-CR-1884-E) where he was charged as an habitual offender (a charge which carried a mandatory 25-99 year sentence.)  He was also facing the potential violation of a ten year probation sentence he had just received 3 months before the arrest on the bank robbery – for a felony charge of evading arrest as well as endangerment to a child (02-CR-3585-E).  In the evading arrest case, Longoria had avoided a possible mandatory 25 to 99 year sentence when he pled the case out for 10 years' probation on February 4, 2003.  The bank robbery charge was Longoria's second possible mandatory 25 to 99 year sentence in less than 3 months – not to mention that a conviction would also be a  violation of the 10 year probation sentence.  Longoria knew this time the 25-99 year requirement would be applied.  In effect, Longoria was looking at life imprisonment.  Yet, Longoria told Petitioner's jury he did not expect any help on these pending matters.

In fact, Longoria did expect favorable treatment and for good reason.  When he met with AUSA Booth, prior to his testimony against Petitioner, he asked for favorable treatment and was told she could not help him now, but after he testified against Petitioner she would help him.  Longoria recalls this conversation as follows: "I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole." (Declaration of Adam Longoria, *PA*, document # 31).

In a separate due process violation, Longoria also advised AUSA Booth that he was taking anti-psychotic drugs at the time he was housed with Petitioner and at the time he testified against him.  Id.  This fact should have been disclosed.  East v. Johnson, 123 F.3d 235, 238-39 (5th Cir. 1997) (Brady violation where prosecution withheld evidence of witness' mental health problems).

89

Longoria's counsel on the robbery charge and the probation violation was Bill May. At some point in the winter or spring of 2004 Longoria advised Mr. May that he was cooperating in the Bourgeois case. Longoria also told Mr. May that he had spoken to AUSA Booth and was expecting she would help him after his testimony against Petitioner. Mr. May, with this conversation in mind, then filed a continuance of Longoria's robbery trial and probation violation until after he testified against Petitioner. (See Copy of Continuance Motion in *SPA*, # 66).

Longoria testified against Petitioner on March 22, 2004. On May 5, 2004 his bank robbery case and probation violation were listed for trial/disposition in the Nueces County Court. Mr. May asked the state prosecutor Mr. James Sales if he (Sales) had spoken to AUSA Patti Booth. Mr. Sales advised him that he in fact had spoken with her and Sales then dropped the habitual offender mandatory sentence provisions and offered Longoria a plea agreement on his robbery case *and* his probation violation for 7 years' total incarceration. Mr. May knew that Longoria was facing his second mandatory 25-99 year sentence in a little over a year and he knew Longoria would never have received such a lenient disposition if it had not been for his testimony against Petitioner. The main reason Mr. Sales dropped the habitual offender mandatory aspects of the case was because of his (Sales') conversation with AUSA Booth. (Declaration of Bill May dated 5/1/07, contained in *PA*, document # 32)

The favorable treatment did not stop there. Since being sent to prison to serve his 7 year sentence, AUSA Booth has written a letter on behalf of Mr.Longoria to the Texas Parole Board, and in it she mentioned his cooperation and testimony in the Bourgeois trial. (Longoria Declaration). In a May 10, 2007 telephone conversation with undersigned counsel, AUSA Booth acknowledged

90

USCA5 1025

that she wrote such a letter on behalf of Longoria.[45]

The understanding of favorable treatment and the favorable treatment actually bestowed on Longoria should have been disclosed to Petitioner and his trial counsel. Additionally, trial counsel should have been told that Longoria was on anti-psychotic medication at the time he was housed with Petitioner and at the time he testified against him. Brady has been violated and a new sentencing proceeding is mandated.

### 2.    Orlando Campos.

Orlando Campos was a jailhouse informant who testified against Petitioner at both the guilt/innocence and penalty stages of trial. At guilt/innocence Campos told the jury that he had been incarcerated with Petitioner in the Bee County Jail and during that time Petitioner admitted to him that he had beaten the decedent, killed her and then told his wife to lie about it. He also told the jury that Petitioner spoke with "pride" about beating his wife. TT 3/9/04, 218-20. At the penalty hearing he testified that Petitioner admitted to beating his prior wives and girlfriends, admitted he was going to kill his wife when he got out and admitted to being involved in drug trafficking. TT 3/23/04, 81.

At the time he testified against Petitioner, Campos was serving a 12 year sentence from Bee County that he had received after numerous violations of probation and parole. (B-99-2055-0-CR-B)

On two occasions AUSA Booth assured the court and counsel that Orlando Campos had been promised nothing in return for his testimony against Petitioner. On March 9, 2004 AUSA Booth assured trial counsel and the court that "we are giving him nothing." TT 3/9/04, 7. Then again on March 17, 2004 AUSA Booth stated " I have promised him nothing." TT 3/17/04, 57. In front of

---

[45] Petitioner sought to obtain this letter from the parole authorities, but was advised that such a letter could only be disclosed pursuant to court order. Petitioner will shortly move for such an order.

91

USCA5 1026

the jury Campos repeatedly told the jury that no promises had been made to him.  Upon questioning by AUSA Booth, Campos stated that he understood the United States had no power in state court to reduce his sentence and that he hoped that the prosecutor would relay to the authorities that he testified but that he has not been promised anything for his cooperation against Petitioner.  TT 3/9/04,  216.

On cross-examination he stuck with this story and stated that AUSA Booth told him the Government could not reduce his time.  Id. at 224.   Finally, on redirect he reiterated that AUSA Booth told him there was nothing she could do for him except tell the authorities he testified – and was testifying against Petitioner because he should be held accountable.  Id. at 225-26.

Campos' testimony was false.  In fact, prior to testifying against Petitioner he had asked for help in reducing his 12 year sentence.  Either AUSA Booth or FBI Agent Beckett told him that they could not help him at that time but promised to help him with his sentence after the trial was over. (Declaration of Kathleen Kaib dated 5/14/07, contained in *PA*, document # 30).  Campos was paroled after serving less than 3 years of his 12 year sentence.  Id.

### 3.     Darrick Moore.

Darrick Moore, another jailhouse informant, testified on behalf of the Government and provided highly incriminating testimony against Mr. Bourgeois at both the guilt/innocence and penalty phases of trial.  See TT 3/9/04, 200-215; TT 3/23/04, 86-87.

During the guilt/innocence phase of trial, Moore testified that while they were both incarcerated at the Nueces County Jail, Mr. Bourgeois first told him that JG-1999 died after getting hit on the head during a fight between Mr. Bourgeois and his wife, Robin.  TT 3/9/04, 204. Moore testified that Mr. Bourgeois told him that JG-1999 was a bad child and would "shake her butt" like

92

an adult. Id. at 205-06. He testified that Mr. Bourgeois told him that he whipped JG-1999 with shower shoes, brushes and extension cords. Id. at 206. He also testified that before Mr. Bourgeois got comfortable in the jail dorm, he originally told Moore that his wife Robin, killed JG-1999. Id. Darrick Moore also testified that Mr. Bourgeois told him that the injuries to JG-1999's ears were caused by his finger nails while the Government thought they were teeth marks. Id. at 207. According to Darrick Moore, Mr Bourgeois told him that he caused those injuries by picking JG-1999 up by her ears. Id. He also testified that Mr. Bourgeois told him that the injuries to JG-1999's feet were caused by a cigarette lighter. Id. at 207-08.

At the penalty phase, Moore testified that Mr. Bourgeois told him he beat his wives; that Mr. Bourgeois said his wife Robin, would "get what she had coming"; and that Mr. Bourgeois said he ran drugs from New Orleans to Miami with his brother. TT 3/23/04, 87.

The Government again capitalized on this highly incriminating and prejudicial testimony to argue in favor of a conviction and a death sentence.

> In this case we have a perfect victim. We have a baby. But you heard testimony that, from Darrick Moore, the Defendant said the baby was bad, was a bad baby, acted like an adult, would wiggle its bottom. I think the evidence supports here, believe the evidence supports here that this was an unlawful, unjustified killing.

TT 3/16/04, 8-9.

> What do we know from the witnesses about Alfred Bourgeois, the real Alfred Bourgeois? We know that he beats, abuses, all of his wives and brags about it.

TT 3/24/04, 69.

At the time he testified on behalf of the Government, Moore believed he was facing a five-to twenty-year prison sentence for possessing 8.5 grams of crack cocaine with intent to sell. TT 3/9/04, 208-09. He testified that he was "hoping" to get a downward departure after cooperating

93

USCA5 1028

with the Government against Mr. Bourgeois. Id. at 203.  However, Moore was not merely "hoping"

for a reduced sentence, he knew he would be getting a reduced sentence:

> I was an inmate in Nueces County jail along with Alfred Bourgeois.
>
> I was facing 13 years for drug sales [and] delivery.
>
> I spoke with the prosecutor for Bourgeois' case Ms. Patti Booth, about statements that Bourgeois made in prison.
>
> She told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced.
>
> I met with Ms. Patti Booth a second time, before I testified against Bourgeois, and she told me that she had spoken to Lance Duke and they had agreed to reduce my sentence if I agreed to cooperate against Bourgeois.
>
> She also told me if I did good on the stand she would make sure that sentence I was going to get would be reduced even further.
>
> I was concerned and scared that I was going to get 13 years in prison so I agreed to testify against Bourgeois.

Declaration of Darrick Moore, *SPA* # 67, ¶ 1-7.

Consistent with his known agreement, although he was facing 151-188 months in prison,

Moore was sentenced to 65 months incarceration and that sentence was later further reduced to 50

months.  Id. at ¶¶ 8-9 ("I testified against Bourgeois and in fact my sentence was reduced to 65

months because of this testimony ...  A couple of months later as I recall my sentence was reduced

to 50 months because I cooperated with the DEA").  See also Darrick B. Moore, Transcript of

Sentencing, 4/22/04, contained in *PA*, document # 61; Judgment of Sentence, 4/22/04, *PA*, document

# 62; Amended Judgment of Sentence, 12/27/04, *PA*, document # 63.

Thus, contrary to his trial testimony, by testifying on behalf of the Government, Moore was

not just "hoping" for a reduced sentence, he had already entered into an agreement with the

94

Government and <u>knew</u> he was <u>guaranteed</u> a reduced sentence.  <u>See</u> TT 3/9/04, 203 (testimony of Darrick Moore: "hoping" for downward departure).  As promised, his expectations were met.  The Government violated its obligation under <u>Brady</u> and its progeny.

### D.    The Suppressed Evidence Should Have Been Disclosed and Was Material.

The evidence about the benefits to Longoria, Campos and Moore could have been used to impeach their credibility and establish a motive for their testimony on behalf of the Government.  As such, <u>Brady</u> mandated its disclosure.  <u>Giglio</u>, 405 U.S. 150, 152 (1972) ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule") (quoting <u>Napue</u>, 360 U.S. at 269); <u>Bagley</u>, 473 U.S. at 676 (<u>Brady</u>'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); <u>Sipe</u>, 388 F.3d at 488-90 (government improperly failed to disclose evidence of additional benefits to cooperating witnesses which prevented defense from effectively attacking the credibility of the witnesses); <u>Graves</u>, 442 F.3d at 339 ("<u>Brady</u> applies equally to evidence relevant to the credibility of a key witness"); <u>Dickson</u>, 453 F.3d at 647 ("[t]o prevail on a <u>Brady</u> claim, '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching...") (quoting <u>Strickler</u>, 527 U.S. at 282-82).

An understanding that a witness will receive a benefit in consideration of testimony, is especially material because it can change the way the jury looks at that witness' credibility.  Thus, the jury is entitled to know about deals, agreements, negotiations, etc. with prosecution witness.  <u>See</u> <u>Giglio</u>, 405 U.S. at 154-55; <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and

95

it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

The improper suppression of evidence about the benefits to the jailhouse informants prejudiced Mr. Bourgeois and thus, was material. At trial, Alfred Bourgeois argued that he did not cause the death of his daughter. See e.g. TT 3/16/04, 35 (defense closing argument) ("I just want to make it clear. Mr. Tinker and my position that Alfred Bourgeois did not kill his child"). Mr. Bourgeois' defense was that his wife, Robin Bourgeois, initially a suspect, committed the assault on his daughter which led to her death. See e.g. Id. at 28-30 (defense closing argument) ("All you folks need to do is look at the evidence. Look at Robin Bourgeois ... She had the motive"). Mr. Bourgeois made no admissions to law enforcement, during or after his arrest for the death of his daughter. The physical evidence admitted at trial of alleged bite marks and sexual assault, if believed, at best, establish an assault – not murder. See also Claims IV, V, and VI (debunking sexual assault and bite mark evidence). Moreover, the evidence admitted at trial regarding the presence of multiple injuries to JG-1999's body, if believed, does not establish who inflicted those injuries and is not inconsistent with Mr. Bourgeois defense that Robin, and not he, caused JG-1999's death. See also Claims V and VI (debunking photo enhancement evidence).

Accordingly, the evidence admitted at trial through the testimony of jailhouse informants was highly prejudicial to Mr. Bourgeois. Indeed, through these jailhouse informants, the Government introduced evidence that: Mr. Bourgeois admitted beating JG-1999 with a bat, extension cord, shower shoes and brushes; he attempted to hire someone to kill potential witnesses; he admitted beating his wife, ex-wives and girlfriends, and did so with "pride"; he was involved in drug and illegal alien trafficking (whom he called "wetbacks"); he picked at JG 1999's ears until they bled and

96

USCA5 1031

burned her with a cigarette lighter; he constantly changed his story about the circumstances of JG-1999's death; referred to JG-1999 as "that fucking baby" and laughed when retelling a story about JG-1999s head swelling after a beating; he asked for advice on explaining away physical and forensic evidence; and, finally, that he admitted beating JG-1999, killing her, and finally telling his wife to lie about it. See generally TT 3/9/04, 200-15, 218-20 3/22/04, 144-87; TT 3/23/04, 81, 82-87 (testimony of Adam Longoria, Orlando Campos, Wiley Taylor and Darrick Moore).

This evidence presented through the jailhouse informants went directly to the alleged intentionality and maliciousness of the offense and painted a devastatingly harmful picture of Mr. Bourgeois. This evidence completely undermined Mr. Bourgeois' defense and made it highly unlikely, if not impossible, that any juror would believe that Petitioner did not kill JG-1999. Not surprisingly, the Government took full advantage of this testimony in its guilt/innocence and penalty phase closing arguments. See e.g. TT 3/16/04, 17 ("He called it 'it'. The kid that died. The fucking kid"); TT 3/24/04, 70 ("When was the other time he laughed? He laughed when he was – and excuse my language – when he was talking, he said – Wiley Taylor, and he said, "Yeah, that baby's fucking head swelled up like a watermelon, and he laughed." Was he laughing when he beat JG-1999 to death? Was he laughing when he bit her, or he burns her, or he put his filthy semen in her little body").

As a result of the prosecutor's abrogation of duty under Brady, the jury that convicted Mr. Bourgeois and sentenced him to death never heard that three of the four jailhouse informants were testifying in exchange for considerable personal benefit. The jury was left with an inaccurate understanding about a witness' motivation for testifying or the strength of the prosecution's case because of the non-disclosure. Napue, 360 U.S. at 269-70; Giglio, 405 U.S. at 154-55; Pyle v.

97

Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 103, 112 (1935). See also TT 3/22/04, 186 (testimony of Adam Longoria) ("Q[uestion]. So you're just [testifying] so justice can be served. A[nswer]. It's the right thing to do."); TT 3/22/04, 56-58 (prosecutor arguing at penalty closing that Campos' only motivation for testifying was to hold Mr. Bourgeois "accountable").

Had the jury heard this evidence there is more than a reasonable probability that at least one juror would have found the informants' testimony incredible and found that there was insufficient evidence to convict Mr. Bourgeois of murder. In its absence, Mr. Bourgeois did not get a "fair trial" and the verdict is not "worthy of confidence." Kyles 514 U.S. at 434 ("[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004) (petitioner was prejudiced because "there is a reasonable probability that at least one juror would have refused to return a verdict of guilty").

Moreover, had the jury heard the evidence about the benefits to the witnesses, there is more than a reasonable probability that at least one juror would have found their testimony incredible and voted to sentence Mr. Bourgeois to life imprisonment. Wiggins, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance"). Indeed, there is more than a reasonable probability that at least one juror would not have believed that Mr. Bourgeois was, as described by the jailhouse informants, the cold, cruel, calculating and child molesting murderer of his own two year old daughter. Id. Moreover, even if they believed he was guilty of killing his daughter, without the testimony of the jailhouse informants, there is more than

98

a reasonable probability that at least one juror would have found that Mr. Bourgeois may have unintentionally killed his daughter and thus, voted to spare his life. Id.

United States v. Sipe, 388 F.3d 471, 477 (5th Cir. 2004) is instructive as to the materiality of the suppressed evidence in this case. In Sipe, a border patrol agent was tried and convicted for using excessive force in the arrest of a Mexican national attempting to enter the United States illegally. Id. at 472. The evidence at trial included the testimony of several other illegal aliens who agreed to cooperate on behalf of the government. Id. In response to the defendant's motion for exculpatory and impeachment evidence, the government informed Sipe that the cooperating witnesses had been allowed to remain and work in the country pending trial, but "no other promises or advantages" had been given. Id. at 475. After he was convicted, Sipe alleged multiple Brady violations including a claim that although he was aware of some of the benefits to the cooperating witnesses, the government had violated its obligations under Brady by failing to disclose additional benefits. Id. at 488. The District Court granted a new trial and the Government appealed.

On appeal, the Fifth Circuit held that government had violated its Brady obligations by failing to provide the defense with the evidence of additional benefits. Id. at 488-90. The Court held that although Sipe did have some information upon which he could impeach the witnesses, the "scope of the additional benefits," when coupled, in part, with the prosecutor's affirmative statement that "no other benefits were given," prevented Sipe from effectively attacking the credibility of the witnesses and thus, established materiality under Brady. Id. at 489.

Here, as in Sipe, "the additional benefits" to Longoria, Campos and Moore (significant reductions in charges and sentences), coupled with the prosecutor's assertions that "[w]e are giving [them] nothing," TT 3/9/04, 7 (Longoria and Campos) or that they were just "hoping" for

99

government assistance (Moore), also prevented Petitioner from effectively attacking the credibility of the jailhouse informants and fully establishing their bias on behalf of the government.  The suppressed evidence was material.

The evidence about the benefits to the jailhouse informants was material to Mr. Bourgeois defense and its improper suppression prejudiced him at trial and sentencing.  Mr Bourgeois was denied his right to due process and is entitled to a new trial and sentencing hearing.  At a minimum he has pled a *prima facie* case that he was denied due process and the Court should afford him an evidentiary hearing at which he can prove these facts.

### E.    The Government Knowingly Permitted the Use of False Testimony.

In addition to suppressing the disclosable evidence, the Government failed to correct the informants' false testimony.  It is long settled that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial, is a denial of due process.  Mooney, 294 U.S. at 112; Napue, 360 U.S. at 269 (citing Pyle, 317 U.S. at 216; United States v. Anderson, 574 F.2d 1347, 1355 (5th Cir. 1978) (citing Napue); United States v. Bermea, 30 F.3d 1539, 1565 (5th Cir. 1995).  "The same result obtains when the State, although not soliciting false testimony, allows it to go uncorrected when it appears."  Napue, 360 U.S. at 269; Anderson, 574 F.2d at 1355; Pyles v. Johnson,136 F.3d 986, 996 (5th Cir. 1998).  Due process is violated "where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew *or should have known* was perjured."  Kyles , 514 U.S. at 433; Agurs,  427 U.S. at 103-04.

Like the Brady rule, the rule from Napue applies even where, as here, the testimony that the state knows is false goes to an issue affecting a prosecution witness' credibility, rather than directly to the question of the defendant's guilt.  As the United States Supreme Court explained in Napue:

100

USCA5 1035

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend.

360 U.S. at 269; Anderson, 574 F.2d at 1355 ("[t]he same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence").

Here, the government knowingly permitted jailhouse informants to falsely testify that they had no agreed or expected benefit in exchange for their testimony on behalf of the prosecution. As set forth above, this was false and the government took no steps to correct the testimony. Moreover, as set forth above, Mr. Bourgeois was prejudiced by improper admission of the false testimony from the jailhouse informants. Mr. Bourgeois' right to due process was violated. Napue, 360 U.S. at 269.

### F.    Trial Counsel Were Ineffective.

Additionally, trial counsel were ineffective for failing to investigate and present evidence which would have further undermined the credibility of two of the jailhouse informants who testified on behalf of the Government. Petitioner's rights under the Sixth Amendment were violated.

The Supreme Court has explained the relationship between an attorney's pre-trial investigation and the choices that he makes with regard to matters of trial strategy:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

101

USCA5 1036

judgments.

Strickland, at 690-91.

The Fifth Circuit has long held that counsel have a duty to conduct a thorough pretrial

investigation into the material aspects of the Government's case:

> A substantial body of Fifth Circuit case law insists, however, 'that effective counsel
> conduct a reasonable amount of pretrial investigation.' . . . . this circuit has
> recognized that, *at a minimum*, counsel had the duty to interview potential witnesses
> and to make an independent investigation of the facts and circumstances of the case.
> This duty is reflected in the American Bar Association Standards for Criminal
> Justice, is a proper guide for determining what is reasonable under the circumstances.

Nealy v. Cabana, 764 F.2d 1173, 1177-78 (5th Cir. 1985) quoting Martin v. Maggio, 711 F.2d 1273,

1280 (5th Cir. 1980).[46]

In this case, counsel abdicated their duty by failing to investigate, develop and present

evidence which would have undermined the credibility of two of the Government's jailhouse

informants.  Timothy Allen and Phillip Jackson, along with Adam Longoria and Darrick Moore,

were all housed with Mr. Bourgeois at the Nueces County Jail.  Had trial counsel fulfilled their duty

to conduct a thorough investigation, Mr. Allen and Mr. Jackson would have provided evidence

---

[46] See also Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) (grant of habeas corpus relief by district court affirmed and new trial granted where counsel failed to interview eyewitnesses prior to trial); Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990) (grant of habeas corpus by district court affirmed and new trial ordered where counsel failed pre-trial to investigate insanity defense since "it must be a very rare circumstance indeed where a decision not to investigate [insanity defense] would be 'reasonable' after counsel had notice of the client's mental health problems."); Woodard v. Collins, 898 F.2d 1027 (5th Cir. 1990) (district court's finding that counsel's performance was deficient for failing to investigate all counts of the indictment affirmed.); Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) (district court's denial of habeas corpus petition reversed and new trial ordered where counsel failed to adequately investigate insanity defense prior to trial); Nealy v. Cabana, 764 F.2d 1173 (5th Cir. 1985) (district court's denial of petition for habeas corpus reversed and new trial granted where trial counsel failed to investigate and interview material witnesses prior to trial).

102

directly contradicting the testimony of Adam Longoria and Darrick Moore and their claims of

unbiasedness on behalf of the Government.  As Mr. Jackson has stated:

> In the summer of  2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas.  At that time, I was housed with several other inmates including Alfred Bourgeois, Darrick Moore, Adam Longoria and Timothy Allen.
>
> During the time we were incarcerated, Mr. Bourgeois would often tell me that he was being accused of a crime which his wife committed.  He said that his wife had hurt his daughter because she was jealous and angry that Mr. Bourgeois had fathered a child with another woman.   I never heard him admit to hurting his daughter and he did not say anything different to Adam Longoria or Darrick Moore because we were all housed on the same pod.
>
> I specifically heard Darrick Moore say he wanted to testify against someone to get a lesser sentence.  He said he had already given information against someone in his federal drug case but that he needed to do more to help his situation.  Darrick Moore said he needed to figure out who else he was going to tell on.  I also heard Darrick Moore say that he was worried about his girlfriend who was going out to clubs spending his money while he was in jail.  I actually saw him crying because he was so worried about the prison time he was facing on his drug charges.
>
> I remember Alfred Bourgeois and Adam Longoria, who I know as "David", getting into a fight.  Mr. Bourgeois had offered Mr. Longoria some toothpaste and Longoria got insulted by the offer.  After that, I heard Longoria say that anyone, like Mr. Bourgeois, who denies a crime so often must be guilty.  I heard him say "my girl gave me up so why can't I give up someone else."

Declaration of Phillip Jackson, *SPA* # 68, ¶ ¶ 2-5.  Similarly, Timothy Allen states:

> In the summer of  2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas.  I was housed there while awaiting trial on the firearm possession charges.  At that time, I was housed with several other inmates including Alfred Bourgeois, Darrick Moore and Adam Longoria.  For a while, Mr. Bourgeois and I were cellmates.
>
> During the time we were incarcerated, Alfred Bourgeois was very involved in Bible study.  While I frequently heard Mr. Bourgeois discussing the Bible, I never heard Mr. Bourgeois discuss his case with Adam Longoria or Darrick Moore.  The only thing he told me about his case was that his wife was wrongfully accusing him.  I never heard him admit to hurting his daughter and I know that he would not have made that admission to Moore or Longoria.

103

Darrick Moore was in jail awaiting trial on an open federal drug charge. I remember he was very concerned and worried about the prison time he was facing. He constantly worried that if he got convicted on the drug charges he was facing, he was never going to get out of jail. He was scared to death about being convicted and sentenced to life imprisonment because of his prior conviction in California. He kept saying there was no way he could handle a long prison term since he had too much going for him on the street.

Darrick Moore was also very worried about his relationship with his girlfriend, Lisa Fernandez. I knew Lisa Fernandez from my time on the street. I told him she was not a trustworthy person. He then became very worried that she would not be faithfully waiting for him if he got a long prison sentence. Several times, I heard Darrick Moore say that he could not afford to get convicted and get a long sentence.

Declaration of Timothy Allen, *SPA* # 69, ¶¶ 2-5.

Mr. Jackson and Mr. Allen were both willing and available to testify at trial. See Declaration of Phillip Jackson, *SPA* # 68, ¶ 5; Declaration of Timothy Allen, *SPA* # 69, ¶ 6 ("Had I been contacted at the time of trial, I would have testified about what I knew and the things I have stated in this affidavit"). Although trial counsel was aware that Mr. Bourgeois was housed with inmates, in addition to those who testified at trial, counsel never interviewed those inmates to determine what they knew about Mr. Bourgeois and his alleged statements to the jailhouse informants. See e.g. TT 3/22/04, 150-51 (testimony of Adam Longoria discussing inmates housed with him and Mr. Bourgeois); Declaration of Phillip Jackson, ¶ 5; Declaration of Timothy Allen, ¶ 6 ("No one has previously contacted me to discuss what I knew about Mr. Bourgeois, Adam Longoria or Darrick Moore").

As a result, counsel, already hampered by the Government's Brady violations, were unable to effectively challenge the credibility and bias of two witnesses who offered extremely damaging testimony against Mr. Bourgeois. Counsel were ineffective and Mr. Bourgeois was prejudiced.

104

USCA5 1039

Strickland, 466 U.S. at 694.   Mr Bourgeois was denied his Sixth Amendment right to the effective

assistance of counsel and is entitled to a new trial and sentencing hearing.  At a minimum he has pled

a *prima facie* case that he was denied effective assistance and the Court should afford him an

evidentiary hearing at which he can prove these facts.

### CLAIM VIII.    TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.

It is well settled that "[r]epresentation of a criminal defendant entails certain basic duties.

Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a

duty to avoid conflicts of interest."  Strickland v. Washington, 466 U.S. 668, 688 (1984) (citing

Cuyler v. Sullivan, 446 U.S. 335, 346 (1980)); Wood v. Georgia, 450 U.S. 261, 271 (1981); accord

Harms v. Quarterman, 2007 WL 1256616 (S.D. Tex. 2007) (Jack, J.).  This "duty of loyalty [is]

perhaps the most basic of counsel's duties."  Strickland, 466 U.S. at 692(1984).

 "Undivided allegiance and faithful, devoted service to a client are prized traditions of the

American lawyer.  It is this kind of service for which the Sixth Amendment makes provision. And

nowhere is this service deemed more honorable than in case of appointment to represent an accused

too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group,

or may be charged with an offense which is peculiarly abhorrent."  Von Moltke v. Gillies, 332 U.S.

708, 725-26 (1948) citing Canons 4 and 15, ABA Canons of Professional and Judicial Ethics.

The right to conflict-free counsel applies regardless of whether counsel is appointed by the

court or selected by the defendant.  Cuyler, 446 U.S. at 344; See also, United States v. Infante, 404

F.3d 376, 389 (5th Cir. 2005) ("Under the Sixth Amendment, if a defendant has a constitutional right

to counsel, he also has a corresponding right to representation that is free from any conflict of

105

USCA5 1040

interest.") quoting United States v. Vaquero, 997 F.2d 78, 89 (5th Cir. 1993).

Because this duty of loyalty is so fundamental, and because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," prejudice is presumed when counsel has a conflict of interest. Strickland, 466 U.S. at 692 (citing Cuyler, 446 U.S. at 345-50); see also Glasser v. United States, 315 U.S. 60, 73 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow the courts to engage in nice calculations as to the amount of prejudice arising from its denial").

In Strickland, the Supreme Court explained the rationale behind this presumption of prejudice:

> [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

Strickland, 466 U.S. at 692.

In a criminal case "[a] conflict exists when defense counsel places himself in a position conducive to divided loyalties." United States v. Medina, 161 F.3d 867, 870, n.1 (5th Cir. 1998); Accord Harms v. Quarterman, 2007 WL 1256616 (S.D. Tex. 2007) (Jack, J.). An "actual conflict of interest" is "precisely a conflict that affected counsel's performance. . . ." Mickens v. Taylor, 535 U.S. 162, 184 (2002).

When presented with a conflict of interest claim the Court "must ask whether [counsel] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict

106

adversely affected the representation." United States v. Infante, 404 F.3d 376, 392 (5th Cir. 2005). Furthermore, "[w]hether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." Id.

From the very beginning of this case, Petitioner was deprived of his right to counsel acting in his interest. Petitioner was represented at trial, and on direct appeal, by Mr. Tinker and Mr. Gilmore. Trial counsel had irreconcilable conflicts from the start of this capital case. These conflicts adversely affected counsels' performance, depriving Petitioner of a fair trial, a fair sentencing and violating his Sixth Amendment right to counsel. A new trial and sentencing are mandated.

### A. Government Witness, Ross Griffin, Was Represented By Petitioner's Counsel.

Prior to and during Petitioner's trial, Mr. Gilmore represented an individual by the name of Ross Griffin. Griffin was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana. Griffin was housed with Petitioner in the Nueces County Jail along with Adam Longoria and Darrick Moore. Griffin was cooperating with AUSA Patti Booth as a jailhouse informant against Petitioner (FBI 302 dated 7/1/03 contained in *PA*, document # 60). Had trial counsel not been laboring under a conflict of interest they could have interviewed/investigated Griffin and would have learned that he had been offered favorable treatment to cooperate against Petitioner and had been provided information about Petitioner's case. Griffin could have been called as a witness for Petitioner to testify to these facts and to the fact that

USCA5 1042

the other jailhouse informants that he knew (Longoria and Moore) had received similar treatment in return for cooperating against Petitioner.  Because counsel was laboring under a direct conflict of interest he could not and did not conduct such an interview/investigation and Griffin was not called as a witness on behalf of Petitioner.

For the above reasons Petitioner's counsel had an actual conflict of interest that adversely affected his representation of Petitioner and a new trial and sentencing hearing are mandated.  See United States v. Guidry, 462 F.3d 373 (5th Cir. 2006) (district court disqualified defendant's counsel because he had previously represented a Government witness despite the fact that the court did not rely on this witness' testimony.); United States v. Millsaps, 157 F.3d 989 (5th Cir. 1998) (affirming district court's disqualification of defendant's counsel because counsel represented a potential government witness); Wheat v. U.S., 486 U.S. 153 (1988) (affirming district court's disqualification of defendant's counsel because counsel represented a potential government witness).

**B.      Government Witness Adam Longoria, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client.**

Mr. Gilmore also was laboring under an actual conflict of interest with regard to jailhouse informant Adam Longoria.  Prior to Petitioner's trial  Mr. Gilmore had actually called Longoria as a witness on behalf of another one of Mr. Gilmore's clients who had been housed at the Nueces County Jail.  Longoria was called – by Mr. Gilmore in Mr. Gilmore's other trial –  to testify to matters he had heard while in the same jail (Nueces County Jail) and same cellblock as Petitioner. Furthermore, the prosecutor in this "other" case was the same prosecutor (James Sales) who offered Longoria a radically reduced sentence six weeks after he testified against Petitioner – despite Longoria's testimony to Petitioner's jury that Sales "hates me now." TT 3/22/04, 186.  Having used

108

USCA5 1043

Longoria as a witness to give sworn testimony as to matters he observed in prison on behalf of a client (not Petitioner), Mr. Gilmore was conflicted and failed to fully and effectively confront Longoria on cross-examination at the penalty phase of Petitioner's trial.   TT 3/22/04 179-80, 186.

For the above reasons Petitioner's counsel had an actual conflict of interest that adversely affected his representation of Petitioner and a new trial and sentencing hearing are mandated.  See United States v. Infante, 404 F.3d 376 (5th Cir. 2005) (conviction vacated where counsel previously represented two witnesses against his current client); Perillo v. Johnson, 205 F.3d 775 (5th Cir. 2000) (capital conviction vacated where defendant's lawyer previously represented witness against defendant); United States v. Martinez, 630 F.2d 361 (5th Cir. 1980) (a conflict existed when attorney previously represented a witness who testified against current client in a related matter).

**C.      Government Witness Orlando Campos, Had Previously Been Called as a Witness By Petitioner's Counsel on Behalf of Another Client.**

Mr. Gilmore was also laboring under a conflict of interest with regard to jailhouse informant Orlando Campos.  Campos testified as a jailhouse informant for the Government and against Petitioner at both the guilt/innocence and penalty stages of trial. Prior to Petitioner's trial, Mr. Gilmore represented Roel "Dody" Contreras, a co-defendant of Campos' in a Bee County capital murder case.  Campos originally agreed to testify against Mr. Contreras in return for a plea to reduced charges and a probation sentence.  However, after originally testifying against Mr. Contreras (while Mr. Gilmore represented Mr. Contreras) and after receiving his drastically reduced sentence, Campos changed his mind and attempted to disavow his prior testimony against Mr. Contreras. Given this change of events, Mr. Gilmore was conflicted and prevented  from fully and effectively confronting Campos on cross-examination at the guilt/innocence and penalty phases of Petitioner's

109

USCA5 1044

trial.  TT 3/9/04, 221-223,  3/23/04, 81.   Mr. Gilmore, however, never confronted Campos with this prior testimony.

For all of these reasons Petitioner's trial counsel were laboring under several actual conflicts of interest prior to and during their representation of Petitioner and Petitioner was denied his Sixth Amendment right to counsel.  As a result of these conflicts, counsels' performance was adversely affected.  Petitioner is entitled to a new trial and sentencing proceeding.

**CLAIM IX.** **PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.     Introduction.**

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935); accord United States v. Corona, 551 F.2d 1386, 1391 (5th Cir. 1978) (quoting Berger, 295 U.S. at 88); United States v. Goff, 847 F.2d 149, 164 (5th Cir. 1988) (same); Dickson v. Quarterman, 462 F.3d 470, 479 (5th Cir. 2006) (same).  Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." Berger, 295 U.S. at 88; Corona, 551 F.2d at 1391; Dickson, 462 F.3d at 479.[47]

As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the Government –  and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper

_____

[47] See also United States v. Leslie, 783 F.2d 541, 567 (5th Cir. 1986) (Williams, J. dissenting) ("The cherished title "United States Attorney" is not a hunting licence which exempts its holder from the ethical constraints of advocacy") (citing United States v. Becket, 706 F.2d 519, 521 n. 5 (5th Cir. 1983).

110

prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88; Goff, 185 F.3d 307 at 163 ("[i]n considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give what he says the ring of authenticity"); United States v. Gallardo-Trapero, 185 F.3d 307, 319-20 (5th Cir. 1999) ("[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says") (citing Goff, 185 F.3d at 163).[48]

The United States Supreme Court has subjected closing arguments in capital cases to a greater degree of scrutiny. Caldwell v. Mississippi, 472 U.S. 320 (1985). These principles are particularly important in the penalty phase of a capital case where the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," Woodson v. North Carolina, 428 U.S. 280, 305 (1976), and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury, Gregg v. Georgia, 428 U.S. 153, 189 (1976), together with the "highly subjective" nature of the sentencing decision, Caldwell, at 340-41 n.7 (1985), require that special scrutiny be given to prosecutorial argument. As the Third Circuit has explained:

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system…Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices. [Berger's requirement that the prosecutor refrain from improper argument] applies with particular force to the prosecuting attorney in the penalty phase of a capital case.

---

[48] See also Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.") (citing Berger). "For this reason, misconduct by the prosecutor ... must be scrutinized carefully." Drake, 762 F.2d at 1459 (citing Berger).

USCA5 1046

Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991); see also Olson v. Shillinger, 861 F.2d 612, 626 n. 12 (10th Cir. 1988) ("the minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase…).

This Court's review of a claim of improper prosecutorial argument involves a two step analysis.  First, this Court must decide whether or not the prosecutor made an improper remark. If the Court determines that an improper remark was made, then it must determine if the remark affected Petitioner's substantial rights.  Gallardo-Trapero, 185 F.3d 307 at 320; United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000).  In determining whether Petitioner's substantial rights have been affected the Court must consider three factors: "(1) the magnitude of the prejudice caused by the argument(s) (2) the efficacy of any cautionary instructions given, and (3) the strength of the evidence of [petitioner's] guilt." Gallardo-Trapero, 185 F.3d 307 at 320; Goff, 847 F.2d at 165; United States v. Tomblin, 46, F.3d 1369, 1389 (5th Cir. 1995).

Where individual remarks by themselves do not create a due process violation, their cumulative effect may. See United States v. Garza, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not, we think it beyond question that the prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant"); Goff, 185 F.3d at 163 ("We do not reach the question whether these other instances of misconduct, taken separately or in the aggregate, also rise to the level of error.  The cumulative effect only adds to the prosecutor's

112

misconduct").[49]

During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial and a reliable capital sentencing verdict. The prosecutor's comments, both individually and cumulatively, amounted to prosecutorial misconduct. To the extent that trial counsel failed to object to any of these comments and arguments or request a curative instruction, they were ineffective. The Court's failure to give an immediate curative instruction exacerbated the harm. Petitioner was denied his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

**B.    The Prosecutor Engaged in Misconduct by Referring to Mr. Bourgeois as "That Thing."**

The prosecutor engaged in misconduct by improperly referring to Mr. Bourgeois as "that thing." During the guilt/innocence phase closing argument, the prosecutor stated:

> The doctors told you they did a test bite mark. And they did a test bite mark that went away in 24 hours. I'm showing you now what's Government's Exhibit 97 and you're going to have all these photos back there. And they told you they analyzed this bite mark. And they did the best they could to determine – to exclude, their goal was to see who they could exclude. And they excluded Robin. But who did they not exclude? They didn't exclude this man, **that thing that's sitting right there**.

TT 3/16/04, 48-49. It is well settled that this type of characterization in highly improper. Indeed, as the Fifth Circuit held in reversing a conviction wherein the prosecutor used the term "hoodlum" to describe the defendant:

---

[49]    See Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense, violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence); Davis v. Zant, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process).

113

USCA5 1048

> This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick out in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises – succinct, pithy, colorful and expressed in a sharp break with decorum of which the citizen expects from the representative of his government.

Hall v. United States, 419 F.2d 585, 587 (5th Cir. 1969); Goff, 847 F.2d at 164 (reference to defendants as "crooks" improper) (citing Hall, 419 F.2d at 587).[50]

### C. The Prosecutor Engaged in Misconduct by Improperly Appealing to the Jury's Sense of Civic Responsibility.

During the Government's guilt/innocence phase closing argument, the prosecutor engaged in misconduct by improperly appealing to the jury's sense of civic responsibility. The prosecutor stated:

> The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen. The arrogance of his cruelty.

TT 3/16/04, 17-18. Appeals to a jury's sense of civic responsibility are improper. Viereck v. United States, 318 U.S. 236, 247 (1943) (holding that the prosecutor's statements, including telling jurors that "[t]he American people are relying upon you ladies and gentlemen for their protection against this sort of a crime" compromised the defendant's right to a fair trial); United States v. Young, 470 U.S. 1, 18 (1985) ("The prosecutor was ... in error to try to exhort the jury to 'do its job'; that kind of pressure ... has no place in the administration of criminal justice, see, e.g., ABA Standards for

---

[50] See also United States v. Cannon, 88 F.3d 1495, 1502-03 (8th Cir. 1996) (reference to defendant as "bad people" improper); United States v. Hands, 184 F.3d 1322, 1332-33 (11th Cir. 1999) (reference to defendant as "wickedly vicious, monster, drug dealer" improper).

114

USCA5 1049

Criminal Justice, 3-5.8(c) and 4-7.8(c)."); Handford v. United States, 249 F.2d 295 (5th Cir.1958) (prosecutor's improper argument constituted reversible error when he called on jury's sense of civic duty to convict defendant for unpaid taxes on liquor to remedy problem with alcohol related deaths).[51]

In this case, the prosecutor's argument improperly urged the jury to sentence Mr. Bourgeois to death, not because of the evidence, but because of their civic responsibility. This was highly improper.

### D.    The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument.

The prosecutor engaged in misconduct by making an argument she knew to be false. In her guilt/innocence phase closing argument, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks. You didn't hear that. The only child whose bite was analyzed was excluded. He told you that there was forum shopping by the United States on our experts and what did you hear? We sent our teeth to Dr. Senn. Dr. Senn made his analysis and sent it for a second opinion. In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion. Is that expert shopping or is that just making sure?

---

[51] See also United States v. Strode, 229 F.3d 1161 (9th Cir. 2000) (prosecutorial misconduct required reversal where prosecutor told jury that "justice demanded a guilty verdict"); United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999) (vacating conviction where prosecutor argued: "I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty"); United States v. Leon-Reyes, 177 F.3d 816, 822 (9th Cir. 1999) ("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence"); United States v. Manning, 23 F.3d 570, 572 (1st Cir. 1994) (vacating conviction where prosecutor vouched for government's case by telling jury government witnesses were "bound by their oath").

USCA5 1050

TT 3/16/04, 19-20.   This argument was false and highly improper. It is well established that an

argument based on knowingly false evidence violates due process.  See Mooney v. Holohan, 294

U.S. 103, 112 (1935); Napue v. Illinois, 360 U.S. 264, 269 (1959) (citing Pyle v. Kansas, 317 U.S.

213, 216 (1942)); accord United States v. Anderson, 574 F.2d 1347, 1355 (5th Cir. 1978) (citing

Napue).

In this case, the Government had engaged in "forum shopping" for favorable bite mark

evidence.  As fully set forth in Claim V, before trial the Government consulted with United States

Army Colonel J. Curtis Dailey, M.D., who was unable to provide them with favorable bite mark

evidence.  Indeed, Dr. Dailey could not single out Petitioner as the alleged biter of JG-1999.

Thereafter, when Dr. Dailey informed AUSA Booth of his conclusions, AUSA Booth angrily told

Dr. Dailey that Petitioner was a "very bad man" and if he could not help her by finding a match she

would go out and find an expert who could.  AUSA Booth then hung up the phone on Dr. Dailey.

 See *PA*, document # 45.  Thus, contrary to her argument to the jury, the Government did "forum

shop" and the prosecutor's argument was patently false.

**E.    The Prosecutor Engaged in Misconduct by Repeatedly Making Improper Biblical References.**

The prosecutor engaged in misconduct by repeatedly making improper biblical references

during the guilt/innocence closing argument.  The prosecutor stated:

> Now you've all heard of the Proverb that pride comes before the fall.  With your permission I would like to just change the Proverb just a little bit and speak to arrogance before the fall.

> *                              *                              *

> He called it 'it'.  The kid that died.  The fucking kid and those words are sacrilegious when you speak about this lamb because he didn't see it as human.

116

TT 3/16/04, 11, 17, 46.  These comments were highly improper.  Arguments urging the jury to decide a case based upon factors other than the evidence presented or instructions of the court are improper.  Accordingly, such religious arguments have been condemned by virtually every court to consider them.  Sandoval v. Calderon, 231 F.3d 1140, 115051 (9th Cir. 2000) (collecting cases).[52]

### F.    The Prosecutor Engaged in Misconduct by Improperly Injecting Personal Information about Herself as Part of the Jury's Deliberations.

The prosecutor engaged in misconduct when she improperly told the jury that she had five children, has buried family and that her youngest brother was in Iraq.  During the penalty phase closing argument, the prosecutor stated:

Ms. Booth:    Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death.  And he's very wrong.  **I've raised five children, I've buried family** –

Mr. Tinker:    She's outside the record here, your Honor, and I just –

Ms. Booth:    Judge I'm responding to – he opened the door.

Mr. Tinker:    About how many kids she's got doesn't have anything to do with the trial in this case.

The Court:    Go ahead, Ms. Booth

Ms. Booth:    **My baby brother is in Iraq serving his country**.  Things are hard, and this is the hardest thing that I have ever done in my life.

---

[52] To the extent that any of these improper arguments during the guilt/innocence phase impacted Petitioner's sentence, they also violated Petitioner's right to due process and his rights under the Eighth Amendment to the United States Constitution.  See Chambers v. Mississippi, 486 U.S. 578, 585 (1992) (verdict based on inapplicable aggravating factor violates Eighth Amendment and invalidates death sentence); Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (capital sentencing must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

117

TT 3/24/04, 66-67.  Although defense counsel previously stated that seeking death may be easy for Ms. Booth, id. at 64, the prosecutor's response was highly improper.  If defense counsel's comments were improper, the prosecutor should have objected and requested a curative instruction from the Court.  See Young, 470 U.S. at 11 (it is at least "[c]lear [that] two improper arguments-two apparent wrongs-do not make for a right result").  Instead, the prosecutor improperly diminished the jury's sense of ultimate responsibility for their life or death decision by telling them that she personally believed death was the appropriate sentence, even though seeking death was more difficult than raising five children, coping with the death of family members and living with the constant fear and insecurity of having her youngest brother in a war zone.  Caldwell, 472 U.S. at 328-29 ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

> **G.      The Prosecutor Engaged in Misconduct by Describing Mr. Bourgeois as a "Dog."**

The prosecutor engaged in misconduct when she improperly described Mr. Bourgeois and his brothers as "attacking like a bunch of dogs."

> You know he was emboldened by the legal system not working.  You know it.  He abused women, he abused – abused babies, and nothing ever happened.  Temporary restraining orders were filed, but he got his wife to pull those back.  Charges were filed on him for taking a gun and putting it in the face of his aunt, widowed aunt, with a dying son inside, pointing guns and saying, "I'm going to kill you," **and biting his cousin and attacking like a bunch of dogs, his brothers.**

Id. at 71-72.  This was extremely improper.  Comparison of the Petitioner to an animal has no place in our criminal justice system.  United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002) (argument that defendant's were "hunting each other like animals" improper); see also Section A,

118

USCA5 1053

<u>supra</u> (citing cases)  These dehumanizing comments served one purpose: to inflame the passions of the jury, which was about to embark on the most serious of duties – deciding the life or death of the Petitioner.  They were improper and they cannot be condoned.  Indeed, the prosecutor's comments were nothing but a call to the jurors to ignore the evidence and make their sentencing decision on the basis of fear and passion, rather than as a "reasoned moral response" to the "uniquely individual human being" before them.  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319 (1989).[53]

**H.      The Prosecutor Engaged in Misconduct by Improperly Disparaging Trial Counsel.**

The prosecutor engaged in misconduct by improperly disparaging opposing counsel.  During its penalty phase closing argument, the prosecutor stated:

> And do you know why I bring that up, ladies and gentlemen?  Because we brought people in here that were in prison with the defendant; we brought them in here and we didn't bring them in a suit.  We told you right off the bat, they've done bad things, they're convicted.  But that's not what the defense did.  Marched them in here in suits to testify, didn't mention he was a fired policeman, convicted at least three times for fraud.

> Mr. Tinker:      Your Honor, we have no control of what a witness shows up wearing when they're subpoenaed to be here and I object to that line of argument, that we had something to do with that.
>
> *                                *                                *

> You know, and I think that maybe even the Defendant has convinced and said it so many times to his Defense counsel, that the baby was an it, because Mr. Gilmore said, "Well, he was happy about it."

---

[53]  <u>See also</u> <u>Lesko</u>, 925 F.2d at 1545; <u>Tucker v. Zant</u>, 724 F.2d 882, 886 (11th Cir. 1984) ("A prosecutor may not attempt to inflame jurors faced with this awesome choice [between life and death] by playing on their passions, prejudices, and fears."); <u>Newlon v. Armontrout</u>, 885 F.2d 1328, 1335-38 (8th Cir. 1989) (prosecutorial arguments that appeal to jurors' fears are improper and require that death sentence be vacated); <u>Commonwealth of Northern Mariana Islands v. Mendola</u>, 976 F.2d 475, 486-87 (9th Cir. 1992) (prosecutorial comments that are "designed to appeal to the passions, fears, and vulnerabilities of the jury" are improper).

119

USCA5 1054

Id. at 72-73, 77.  These comments were highly improper.  Indeed, as the Fifth Circuit held in finding

that a prosecutor's improper comments on a defendant's right to counsel violated his right to a fair

trial: "[n]o prosecutor [ ] may impugn the integrity of a particular lawyer or that of lawyers in

general, without basis in fact, as a means of imputing guilt to a defendant."  United States v.

McDonald, 620 F.2d 559, 562 (5th Cir. 1980); United States v. Frascone, 747 F.2d 953, 957-58 (5th

Cir. 1984) (prosecutor's argument that he took an oath to seek justice while defense counsel took

an oath to his client was improper because "it seeks to draw the cloak of righteousness around the

prosecutor in his personal status as government attorney and impugns the integrity of defense

counsel"); see also Buford v. Rowan Companies, 994 F.2d 155, 158 (5th Cir. 1993) (even where no

intent to malign counsel is present, comments which impugn the integrity of defense counsel are

"difficult, if not impossible, to sanitize [ ] so as to remove the taint") (quoting McDonald, 620 F.2d

at 564).

> **I.**     **The Prosecutor Engaged in Misconduct by Making a Knowingly False Argument Regarding Government Witness Orlando Campos.**

The prosecutor engaged in misconduct by falsely arguing that Government witness Orlando

Campos testified on behalf of the prosecution solely out of a sense of justice.  During its penalty

phase closing argument, the prosecution argued:

> The Defense talked about how you shouldn't believe these guys, these prisoners, because, you know, they're all in here, to be paid.  I just want to bring one person to your memory.  Remember Orlando Campos?  He was the second prisoner we brought in.  He was the State – had been convicted on state charges and he told you that he knew that the Government couldn't really help him much. He hoped that we would tell the State prosecutor something and maybe he would get lesser but what did he really tell you.  Why did he tell you he came in here?  He told you he came in here because the Defendant confessed, said, I killed that child.  I can tell God because God will forgive me but I ain't never going to tell a jury – or a judge, he said.  One of his letters, one of the defendant's letters talks about the fact that he has given this up to

120

> God.  But what's really important is Orlando Campos told you the reason he came
> in here is not because he hoped to get lesser time but because he had a child, a six
> year old, and he believed that this man should be held accountable.

Id. at 57-58.  The prosecutor, however, knew this argument was false.  The use of false, inaccurate or misleading prosecutorial testimony deprives a defendant of a fair trial.  See Mooney, 294 U.S. at 112; Napue, 360 U.S. at 269 (citing Pyle, 317 U.S. at 216); accord United Anderson, 574 F.2d at 1355 (citing Napue).

In this case, Orlando Campos more than "hoped" he would be getting a sentence reduction for his cooperation with the Government, he knew he would be getting a deal.  See Claim VII. Accordingly, the prosecutor's argument that Mr. Campos was cooperating solely because he thought Mr. Bourgeois should be held accountable was false and improper.  There is a more than reasonable likelihood that this false and improper argument impacted the decision of the jury.

> **J.      The Prosecutor Engaged in Misconduct by Improperly Disparaging and
> Diminishing the Jury's Consideration of Petitioner's Proffered Mitigation**.

A defendant's constitutional rights are violated when the state impedes the consideration of mitigating evidence by any means.  Mills v. Maryland, 486 U.S. 367, 374-75 (1988).  Indeed, a death penalty that is imposed by a jury that has not fully considered and given effect to mitigating evidence is unconstitutional.  The Eighth Amendment requires that the sentencer must consider and give full effect to "any aspect of the defendant's character or record ... that the defendant proffers as a basis for a sentence less than death."  Lockett v. Ohio, 438 U.S. 586, 604 (1978); accord McCleskey v. Kemp,  481 U.S. 279, 304 (1987); Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Woodson v. North Carolina, 428 U.S. at 280, 304 (1976).

In this case, the prosecutor flouted this fundamental Eighth Amendment principle by

121

USCA5 1056

improperly disparaging and diminishing the mitigation proffered on behalf of Mr. Bourgeois.  The

prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers
> the aggravating factors that he's alleged to, and they are that he was under substantial
> duress, that he was – that he was driving in an 18- wheeler with three children, that
> he had family and economic pressures.  You know and I thought, "Oh, well, that's
> just life, that's not mitigation."

Id. at 74.  While the jury in this case was certainly free to decide that the mitigation proffered on

behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument

that Mr. Bourgeois' evidence "was not mitigation," improperly prevented the jury from considering

the mitigating evidence.  Thus, the jury's weighing process was improperly skewed in favor of death.

### K.    Conclusion.

The prosecutor's comments and arguments in this case were not simply isolated instances

of prosecutorial excess.  Individually and cumulatively the prosecutor's comments so infected the

trial with unfairness as to make the conviction a denial of due process.  See Garza, 608 F.2d at 665

("While any single statement among those we have isolated might not be enough to require reversal

of the conviction and, indeed, some clearly would not we think it beyond question that the

prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant");

Goff, 185 F.3d at 163 ("We do not reach the question whether these other instances of misconduct,

taken separately or in the aggregate, also rise to the level of error.  The cumulative effect only adds

to the prosecutor's misconduct"); Lesko v. Lehman, 925 F.2d at 1546 (individually and cumulatively

the prosecutor's comments "so infected the trial with unfairness as to make the conviction a denial

of due process").

Counsels' failure to object, request a limiting instruction, or raise and preserve these issues

USCA5 1057

at trial or on appeal denied Petitioner his right to effective assistance of counsel. Petitioner's right to effective representation under the Sixth Amendment to the United States Constitution was violated. Strickland v. Washington, 466 U.S. 668 (1984).

Defense counsels' deficiency in failing to object to the prosecutor's arguments was highlighted by the failure of the court to give curative instructions. Corona, 551 F.2d at 1391 n.5 ("the trial judge has an obligation in the interests of fairness and justice to stop the prosecutor from delivering a greatly prejudicial argument *sua sponte*").[54]

Accordingly, Petitioner has established that the prosecutor's remarks were improper and that his substantial rights were violated. Gallardo-Trapero, 185 F.3d 307 at 320. Indeed, these errors undermined the reliability of the verdict and sentence and deprived Petitioner of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Petitioner is entitled to a new trial and sentencing hearing.

---

[54] See Mann v. Dugger, 844 F2d 1446, 1457 (11th Cir. 1988) ("When a trial court does not correct misleading [prosecutorial] comments… the state has violated the defendant's… rights because the court has given the state imprimatur to those comments; the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law."); Lesko, 925 F2d at 1546-1547(trial court's general instruction on closing arguments did not cure due process violation as the instructions were not immediate and did not specifically address the prosecutor's errors); Mahorney v. Wallman, 917 F.2d 469, 473-74 (10th Cir. 1990) (same). While it may be argued that the court gave general instructions to the jury regarding the weight of opening and closing remarks, this does not cure the prejudicial effect of these remarks. Newlon v. Armontrout, 885 F.2d 1328, 1337 (8th Cir. 1989) ("With respect to curing the error by jury instruction, the trial judge made no comment *sua sponte* to the jury and issued no curative instruction after the closing argument was completed. The State's argument that the standard jury instruction that statements made by counsel during opening and closing argument are not evidence cures any error made by the prosecutor is without merit. Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious").

123

**Claim X.     TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO REBUT THE EVIDENCE OF PETITIONER'S INDIFFERENT DEMEANOR AT THE GUILT STAGE OF TRIAL WITH MENTAL HEALTH EVIDENCE**

### A.     The Testimony and Arguments Presented at Trial.

At trial, the Government elicited testimony from several witnesses to show Petitioner's apparent indifferent demeanor to the injuries and death of his daughter. The Government used this evidence to bolster their case against Petitioner, arguing that Petitioner's seemingly callous attitude pointed to his cruel heart, and by implication, his guilt. In her opening statement, AUSA Patti Booth described Mr. Bourgeois as "callous" (TT 3/2/04, 41), and told the jury:

> You'll hear the people testify about the demeanor of the Defendant. You'll hear how when the ambulance came, it was Robin that went with the child to the hospital at Driscoll. You're going to hear a Mr. Smith come and testify that he offered to take Mr. Bourgeois to the hospital, and he was more concerned about getting his load than he was about going to the hospital with his child, who is obviously not resuscitating.

TT 3/2/04, 40.

In fact, extensive testimony was presented regarding Mr. Bourgeois' inappropriate behavior both at the scene of his daughter's injuries and at the hospital. Several witnesses described Petitioner's lack of emotion. See TT 3/2/04, 159 (Karen Krueger) (Petitioner did not cry or seem excited); id. at 225 (Timothy Darr); id. at 275 (David Paoletti); id. at 320, 323 (William Smith).

In addition, multiple Government witnesses testified that they were surprised by Petitioner's apparent lack of emotion on the day of his daughter's injuries. See e.g. TT 3/2/04, 122, (Hal Resides) ("I ... was surprised by just the matter-of-fact tone in his voice about what had – where his child was... I wouldn't have expected to see him at all. I thought he would have been at the hospital."); id. at 207 (Joni Dee Parker) ("He was really calm. That, you know, surprised me.); id. at 318 (William Smith) ("I was very shocked [by his demeanor]. I would have left the trailer, truck,

USCA5 1059

everything, to be with my daughter.").

Witnesses also reported Petitioner's inaction at the scene. See e.g. id. at 203 (Ms. Parker) ("He was just watching. He was just standing there watching."); id. at 225-7 (Mr. Darr); id. at 158 (Ms. Krueger) ("No. He never did [go to help Robin]. He was in the warehouse on the phone."; id. at 164 (He didn't "even glance toward the child" while they were giving CPR to the child).

Some of the most prejudicial testimony against Petitioner described his inappropriate comments after his daughter was taken by emergency personnel. Joni Dee Parker testified:

Q:    And did the Defendant, the driver, ever say anything or make any comments while he's on the dock with you there?

A:    He just shook his head and said, "Kids."

TT 3/2/04, 204

Michael Brozgal testified, "[T]he guy didn't seem like he was really that concerned. He was like – the comment he made was, 'that's a shame what happened.' And when he said it, there was no concern or anything in his eyes, just like, that's a shame, like I'd say if a I dropped a glass or something, you know, just kind of heartless." Id. at 289. Mr. Darr told the jury:

Q:    So while his child was in the hospital, he was still trying to line up loads?

A:    Yes, ma'am.

Q:    Did that concern or surprise you?

A:    Yes. I mean... why would you be worrying about a load?

TT 3/2/04, 238

According to Government witness William Smith, Mr. Bourgeois apparently even took a phone call from a dispatcher while the doctors were announcing the sad news that the victim would

125

USCA5 1060

most likely die.  Id. at 324 ("[The phone call] actually interrupted what the doctors were saying.").

Unquestionably, this sort of testimony about Mr. Bourgeois' behavior in the face of his daughter's passing prejudiced the jury against him in both the guilt and sentencing phase of trial. Evidence of such a callous and indifferent reaction to the serious injuries of a two year old is shocking.  The fact that the victim's parent acted this way is even more appalling.  Absent any evidence to explain and normalize this behavior, the jury could not help but draw negative inferences toward Petitioner, and impute this behavior with both guilty and deserving of the death penalty. Trial counsel was obliged to attempt to mitigate this evidence.

## B.      Deficient Performance.

To establish deficient performance, Petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Id.  "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  Id. at 690.

The ABA Guidelines dictate that counsel in a capital case should secure the assistance of experts to assist in the preparation of the defense and to rebut any portion of the prosecution's case. ABA Guidelines § 10.11 (F).

In this case, defense counsel was obligated to secure expert assistance to rebut the damaging testimony regarding Petitioner's unusual and unexpected behavior on the day of the victim's death. See, e.g., Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (counsel's performance deficient for failing to develop and present rebuttal expert ballistics testimony); Richey v. Mitchell, 395 F.3d 660, 685

126

USCA5 1061

(6th Cir. 2005) (counsel ineffective for failing to present expert testimony offering competing scientific evidence) (reversed on other grounds Bradshaw v. Richey, 546 U.S. 74 (2005)).

The eyewitnesses' damning descriptions of Mr. Bourgeois' demeanor could easily have been mitigated by expert psychological and psychiatric testimony. Mr. Bourgeois suffers from several mental disorders that explain his demeanor on that day. First, Mr. Bourgeois is mentally retarded. See Claim I, *supra*, and, at a minimum, has borderline intelligence. This combined with his other neuropsychological deficits inhibit his ability to process new information, especially in stressful situations. See Claim II, *supra*. Mr. Bourgeois is also known to suffer from multiple overlapping personality disorders, which further damage his ability to react to attachment and loss in a normal manner. Id. For example, he suffers from Borderline Personality Disorder, which can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress. Id. This sort of "spacing out" is not volitional, but is a symptom of the disorder. A mental health expert could have explained to the jury that Mr. Bourgeois' behavior was typical of someone with his unique constellations of mental illnesses. The loss of a family member was more than Mr. Bourgeois could handle, given his impaired cognitive and emotional functioning.

As demonstrated in Claims I and II, defense counsel had this information at their fingertips and could have presented it at guilt phase to rebut evidence regarding Mr. Bourgeois' demeanor. In this way, the demeanor evidence, rather than pointing to Mr. Bourgeois' guilt and hardness of heart, could have humanized him in the eyes of the jury. This information, in the event Mr. Bourgeois was found guilty, could also have bolstered the defense's penalty phase presentation. An understanding of Mr. Bourgeois' mental health would have provided the jury with a more mitigating, coherent story of both the offense and the actor they believe committed it, allowing the jury to better evaluate Mr.

127

USCA5 1062

Bourgeois' culpability.

### C.    Prejudice.

Petitioner was prejudiced by trial counsel's deficient performance because there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694. Prejudice is established when, as here, confidence in the outcome is undermined because of counsel's deficiencies. Id. at 694. "There is a reasonable probability that at least one juror would have struck a different balance." Wiggins, 539 U.S. at 535. In order to establish prejudice for counsel's failure to call witnesses, the Fifth Circuit requires a petitioner to show that the testimony would have been favorable and that the witness would have testified at trial. Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985). This test, too, has been met. See Declarations of Drs. Cunningham, Estrada, Weiner, Gelbort, Sadoff, Toomer, and Holden, *PA* documents #1-16.

As a result of trial counsel's ineffectiveness, extremely prejudicial and highly inflammatory evidence went unrebutted. This unrebutted evidence impacted both the guilt/innocence and penalty phases of Mr. Bourgeois' trial. It is unquestionable that evidence of Mr. Bourgeois' odd and uncaring behavior helped convince the jury of Petitioner's guilt. Without any expert testimony in rebuttal, Mr. Bourgeois appeared callous enough that the jury could have believed he did the crime. The prejudicial evidence also skewed the jury's deliberative weighing process at sentencing phase in favor of death. As a result of trial counsel's ineffectiveness, the jury was left to weigh unrebutted and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die. See Chambers v. Mississippi, 486 U.S. 578, 585 (1992) (verdict based on inapplicable aggravating factor violates Eighth Amendment and invalidates death sentence); Godfrey v. Georgia, 446 U.S. 420, 428 (1980)

128

USCA5 1063

(capital sentencing must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death). Petitioner was prejudiced.

Mr. Bourgeois' rights under the Sixth Amendment of the United States Constitution were violated. He is entitled to a new trial and a new sentencing hearing. At a minimum he has pled a *prima facie* case that he was denied the effective representation of counsel at both trial and on appeal, and the Court should afford him an evidentiary hearing at which he can prove these facts.

**CLAIM XI.** **PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND TO COUNSEL WHEN THE GOVERNMENT'S MENTAL HEALTH EXPERT RELIED UPON PETITIONER'S INTERACTIONS WITH DEFENSE COUNSEL DURING THE TRIAL TO FORMULATE ADVERSE OPINIONS ABOUT HIM.**

As set forth in the *Motion* (¶ ¶ 272-273) the Government elicited testimony from its expert, Dr. Estrada that Petitioner presented a danger of future violence, had a Narcissistic Personality Disorder, and was manipulative of others. Dr. Estrada based these views in part on his observation of Petitioner during the trial proceedings, as follows:

> I would say that in my opinion, Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim. He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.

> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him. And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

TT 3/22/04, 286. Counsel failed to object to this testimony.[55]

---

[55] Just before this testimony, Dr. Estrada was discussing Petitioner's Narcissistic Personality Disorder and how it contributed to his overall assessment that Petitioner was a danger of committing future dangerous acts. See TT 3/22/04, 285 (assessing Petitioner as a future danger based on

129

USCA5 1064

Petitioner, as any criminal defendant, has a constitutionally secured right to attend his trial Illinois v. Allen, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial"). Petitioner, as any defendant, also has a right to counsel. Gideon v. Wainwright, 372 U.S. 335 (1963). This right is sacrosanct – thus, if it is determined that a defendant has been denied counsel, he is entitled to a new trial without the need to show prejudice. United States v. Cronic, 466 U.S. 648 (1984). The right to counsel and to a fair trial includes the right to "assist" counsel. Dusky v. United States, 362 U.S. 402 (1960) (defendant who is unable to consult with and assist counsel due to mental disease or defect is not competent to be tried). It also includes the right to "participate" in one's defense. Riggins v. Nevada, 504 U.S. 127, 149 (1992).

When the Government uses a criminal defendant's exercise of the right to be present, the right to counsel and the right to assist counsel and participate in his defense against him – as occurred here with respect to Dr. Estrada's testimony – such use encumbers the exercise of those rights and violates the Fifth and Sixth Amendments. Indeed, the Supreme Court has repeatedly held that constitutional rights are violated when encumbered by adverse inference relevant to their invocation. See, e.g. Doyle v. Ohio, 426 U.S. 610 (1976) (prosecutor's comment on post-arrest silence violated due process); Griffin v. California, 380 U.S. 609, 614 (1965) (defendant's Fifth Amendment right against self-incrimination was violated when the jury was permitted to draw adverse inferences from the silence noting "a penalty imposed by courts for exercising a constitutional privilege . . . cuts down on the privilege by making its assertion costly.").

Supreme Court precedent also exists condemning the use of mental health evidence secured

---

"background factors and personality factors").

130

in violation of a constitutional right.  In <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), the Court held that the use of comments made by a defendant to a mental health professional during a competency evaluation could not be used against that defendant in the penalty phase of his trial to prove that he was a future danger.  Such use constituted a violation of the defendant's Fifth Amendment right to remain silent.[56]

Dr. Estrada's testimony exacted a cost on Petitioner's exercise of his right to attend trial, to consult with and assist counsel, and to participate in his own defense.  Petitioner had a constitutionally secured right to do each of these things, yet his invocation of those rights was used against him, thus violating the specific rights in question and due process of law.

Dr. Estrada's testimony in this regard caused Petitioner demonstrable harm. The jury found the non-statutory aggravating factor that Petitioner was "likely to commit future acts of violence and pose a threat to the lives and safety of others" (<u>Bourgeois</u>, 423 F.3d at 506) and balanced this factor with the other aggravating factors against the mitigating factors found in returning the death sentence.  <u>Id.</u>

Trial counsel ineffectively failed to object to this improper testimony and appellate counsel also ineffectively failed to raise it on direct appeal.  There could have been no reasonable tactic or strategy for not having raised this claim.  <u>Strickland</u>.

---

[56]  The use also violated the defendant's Sixth Amendment right to counsel, as he was represented by counsel at the time of the interview, but counsel was neither notified of it, nor present.

131

USCA5 1066

CLAIM XII.    APPELLATE COUNSEL WERE INEFFECTIVE IN MULTIPLE RESPECTS.

Appellate counsel were ineffective for failing to raise two specific claims that were objected to at trial, but which were not addressed on direct appeal. They were also ineffective for failing to address all of the above-described record-based claims.

A.    General Principles.

The Sixth Amendment to the United States Constitution secures Petitioner the right to counsel at trial. U.S. Const. amend. VI ("In all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense ."). Strickland v. Washington, 466 U.S. 668 (1984); Gideon v. Wainwright, 372 U.S. 335 (1963); Johnson v. Zerbst, 304 U.S. 458 (1938); Powell v. Alabama, 287 U.S. 45 (1932). The Sixth Amendment right to counsel includes the concomitant right to the effective assistance of counsel, Strickland v. Washington, id., and the right to effective counsel extends to a criminal defendant's first appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985); Roe v. Flores-Ortega, 528 U.S. 470 (2000).

The standard for reviewing claims of appellate ineffectiveness is the same as for claims of trial counsel ineffectiveness. Flores-Ortega, 528 U.S. at 477-78 (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835, 840, n4 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).

B.    Failure to Raise Record-Based Claims.

Counsel ineffectively failed to identify and litigate on direct appeal each of the record-based claims described herein. Where, as here, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the

132

USCA5 1067

range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993 ) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance); Orazio v. Dugger, 876 F.2d at 1513 (appellate counsel's failure to raise claim on direct appeal found to violate defendant's right to effective assistance of counsel); Matire, 811 F.2d at 1435 (where the basis for a claim "was obvious on the record, and must have leaped out upon even a casual reading of transcript," and the law on the subject was "known at the time," appellate counsel was ineffective for failing to raise it).

Petitioner asserts that his appellate counsel had no reason to avoid raising all meritorious record-based claims described above, even if the questions were not properly raised and preserved at trial. Thus, appellate counsel in this case were ineffective for failing to raise all of the record-based claims discussed herein, which were raised at trial.

C.    **This Court Improperly Admitted Inflammatory and Prejudicial Photographs During Both the Guilt/Innocence and the Penalty Stages of Trial. Direct Appeal Counsel Ineffectively Failed to Raise this Error.**

The admission of highly inflammatory photographs at both the guilt/innocence and penalty phases of trial denied Petitioner his right to a fair trial and warrants both a new trial and a new

133

USCA5 1068

sentencing hearing. The trial court improperly allowed into evidence graphic and extensive photographs of the corpse of the decedent as well as a slide show of seventy-five enhanced autopsy photographs. Petitioner's right to a fair sentencing hearing was also violated when these autopsy photographs were admitted into evidence at the penalty phase, along with highly prejudicial and irrelevant photographs of the decedent in her coffin and the decedent's grave. This evidence was inflammatory and irrelevant. The prejudicial effect of its introduction grossly outweighed its probative value. Petitioner was denied a fair capital trial. His rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution have been violated.

The Government, over defense objection, was permitted to introduce and publish to the jury photographs depicting the decedent's autopsy. See TT 3/8/04, 94-178 (testimony of Dr. Rouse). Also over defense objection, the Government introduced a slide show of the enhanced autopsy photographs. TT 3/8/04, 183- 231 (testimony of Dr. Oliver). The Government also introduced, over objection, photographs of the decedent in her coffin and of her grave. TT 3/22/04, 223-241. All of these photographs were displayed on computer screens for the jury to view. This technology allowed even more graphic displays, including "zoom-in" technology, that was utilized by the doctors.

The Court's decision to admit these photographs constitutes reversible error. Under Rule 403 of the Federal Rules of Evidence, a balance between must be struck between probative and prejudical value of the evidence. Many of the photographs had little to no probative value (e.g. the grave site, and the victim in her coffin), while their prejudicial impact was palpable.

The admission of multiple photographs at trial violated Rule 403 because they were 1) altered/enhanced, 2) in color, 3) enlarged/close ups, and 4) served little to no purpose except to

134

inflame the jury's passions. The jury viewed multiple color pictures of the victim's autopsy. These pictures depict such gruesome images as the decedent's head with the scalp retracted (See e.g. Trial Exhibit. 55, 56, 57, 58, and 59; TT 3/8/04,125-128, 143); the decedent's brain being removed from the skull (See e.g. Exh. 61, TT 3/8/04, 134); and a photograph of the decedent's eyes in her eye sockets with the irises removed (Exh. 63, TT 3/8/04, 141-2). The jury viewed autopsy pictures for a second time when Dr. Oliver testified. Dr. Oliver presented several repetitive photographs of the injuries on the decedent's body. These pictures, in addition to being cumulative to Dr. Rouse's testimony, were **enhanced** to further accentuate any injuries on the decedent. These enhancements served to further inflame the jury's senses and prejudice them against Petitioner.

Accepting arguendo that the autopsy photographs and slide show were relevant, their admission was inflammatory, prejudicial and cumulative, in violation of Petitioner's constitutional rights. The Government used multiple means to present the same evidence repeatedly. This excessive presentation of the same images over and over prejudiced Petitioner's right to a fair trial. Because many of the photographs were cumulative, there was no need for the jury to view all of the photographs and the slide show in order to understand the nature of the decedent's injuries and the circumstances of her death, which were the Government's stated reasons for presenting the excessive evidence. Further, a less gruesome and prejudicial means was available to present the same evidence. Dr. Akhtar testified that he had ordered a CT scan of the decedent's brain, which showed "that there was blood in all areas in and around the brain, and the brain was swollen." TT 3/9/04, 96. Instead of showing the inflammatory photos, the CT scan could have been shown.

These autopsy pictures were also incorporated into the penalty phase of trial, although they were even less relevant at that stage. TT 3/22/04, 13. Additional inflammatory photographs were

135

introduced at penalty phase for the first time, including 17 pictures of the young victim from when she lived with her mother and grandmother. Two of these pictures seem especially inappropriate: Exhibit 410, a picture of the young victim's dead body in her casket and Exhibit 411, a picture of her grave. TT 3/22/04, 223-241. These pictures were clearly irrelevant and served no purpose except to prejudice the jury against Petitioner. Even if these photographs were relevant in some way to sentencing, their probative value was overcome by their prejudicial nature. Trial court was in error.

The above-described errors deprived Petitioner of his rights under the Sixth and Eighth Amendments to the United States Constitution. To the extent trial counsel failed to adequately object to the admission of these photographs, they were ineffective. Appellate counsel were clearly deficient for failing to raise these meritorious record based claims. Faith in Petitioner's guilty verdict and death sentence is undermined because it is likely the jury was overly prejudiced by these photographs. A new trial and new sentencing phase are warranted.

> **D. Petitioner's Eighth Amendment Right to Individualized Sentencing Was Violated When Testimony Was Elicited That Compared His Background to the Psycho-Social Histories of Others Who Have Been Sentenced to Death. Counsel Were Ineffective for Failing to Properly State the Objection at Trial, and for Failing to Raise this Claim on Direct Appeal.**

Appellate counsel also ineffectively failed to raise a patent Eighth Amendment claim that was objected to at trial. Error was committed when the Court permitted the prosecutor to make comparisons between Petitioner and other death-sentenced prisoners.

The Eighth and Fourteenth Amendments to the United States Constitution establish the "constitutional mandate of individualized determinations in capital sentencing proceedings" based upon the character, background, and record of the individual and the circumstances of the offense. Sumner v. Shuman, 438 U.S. 66, 75 (1987); Lockett v. Ohio, 438 U.S. 586, 605 (1978)

136

USCA5 1071

("individualized consideration [is] a constitutional requirement in imposing the death sentence");

see also Stringer v. Black, 503 U.S. 222, 231 (1992) (noting the "requirement of individualized

sentencing"); Zant v. Stephens, 462 U.S. 862, 879 (1983) (describing requirement of "*individualized*

determination on the basis of the character of the individual and the circumstances of the crimes");

Enmund v. Florida, 458 U.S. 782, 798 (1982) ("we insist on 'individualized consideration as a

constitutional requirement in imposing the death sentence'"(quoting Lockett)).  "[I]n capital cases

the fundamental respect for humanity underlying the Eighth Amendment requires consideration of

the character and record of the individual offender and the circumstances of the particular offense

as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson

v. North Carolina, 428 U.S. 289, 304 (1976).

Petitioner's right to individualized sentencing was violated when the Government elicited

testimony from their mental health expert at penalty phase, Dr. Estrada, that compared Mr.

Bourgeois' history of childhood abuse to the psycho-social histories of others on death row.  TT

3/23/04, 57.  Dr. Estrada conceded on the stand that he knew of death-sentenced inmates who, like

Mr. Bourgeois, had been abused as children.  Dr. Estrada's reference to the social backgrounds of

other inmates under sentence of death lessened the jury's consideration "of compassionate or

mitigating factors stemming from the diverse frailties of humankind." Woodson, 428 U.S. at 304

(mandating that capital defendants be treated as "unique individual human beings" as opposed to

"members of a faceless, undifferentiated mass.").

The Government's elicitation of evidence that compared Mr. Bourgeois to other individuals

who had been convicted and sentenced to death was also unconstitutional because it encouraged the

jury to sentence Mr. Bourgeois to death.  See e.g. Stringer, 503 U.S. at 232 ("[W]hen the sentencing

137

USCA5 1072

body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."). The jury was allowed to reason that other individuals who had been abused as children had been sentenced to death, so Mr. Bourgeois should be as well. Thus, the Government's use of information about the abuse histories of other capital prisoners "creates the possibility not only of randomness but also of bias in favor of the death penalty," and requires the death sentence to be invalidated. Stringer, 503 U.S. at 236.

Because it violated Mr. Bourgeois' right to an individualized sentencing proceeding, the information presented by Dr. Estrada regarding the psycho-social histories of other inmates on death row should not have been admitted at sentencing phase. The admission of such evidence "allowed the sentencer to consider evidence that would not otherwise have been before it." Brown v. Sanders, 546 U.S. 212, 221 (2006). In such a case, "due process mandates reversal." Id. The Brown case is instructive because it explores the impact different sorts of evidence can have on the jury's deliberative process at sentencing. In Brown, the sentence of death was affirmed even though one of the sentencing factors presented to the jury was later found to be invalid. The sentence was affirmed because it was found that the evidence underlying the invalid sentencing factor would still have been presented to the jury. Id. at 222-3. In Petitioner's case, however, the information presented by Dr. Estrada about the psycho-social histories of other inmates would not have been admitted under any rubric for consideration at sentencing. This information skewed the jury's decision making and invalidates the sentence. See Brown, at 221 ("[S]uch skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.")

138

At trial, defense counsel attempted to object to this testimony and asked for a mistrial. TT 3/23/04, 74-78. Mr. Tinker's confusion about the testimony to which he was objecting, and his inability to state a well-supported objection served Mr. Bourgeois an injustice. Further, and more importantly, counsels' failure to raise this meritorious claim at all on appeal denied Mr. Bourgeois his right to effective assistance of appellate counsel. Petitioner was prejudiced by counsel's deficient performance. Strickland v. Washington, 466 U.S. 668.

### CLAIM XIII. PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE ERRORS IDENTIFIED ABOVE.

Each of the claims presented herein individually entitles Petitioner to relief from his conviction and sentence. However, even if this Court finds that Petitioner is not entitled to relief based on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair trial and the heightened procedural safeguards constitutionally required in capital cases.

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief.[57] If the court finds cumulative

---

[57] See, e.g., Kyles v. Whitley, 514 U.S. 419, 437-38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); Taylor v. Kentucky, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (the cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); Harris v. Wood, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992) (granting relief for cumulative effect of errors including counsel's failure to present mitigating evidence, the court's refusal to admit exculpatory evidence, and improper sentencing-stage instructions); Kubat v. Thieret, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; Strickland "clearly allows the court to consider the cumulative effect of counsel's

139

USCA5 1074

error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each error or deficiency.[58]  Moreover, if the court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted.  Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting O'Neal v. McAninch, 513 U.S. 432 (1995)).

The circumstances of this case demonstrate that the cumulative effect of counsels' serious failures, and the constitutional errors committed by the Court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's convictions should be overturned. Alternatively, Petitioner's sentences of death should be vacated. Collectively and cumulatively, these errors denied Petitioner his rights to due process of law and his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

**CLAIM XIV.  PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING.**

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255.  The "standards for § 2255 hearings are essentially the same as for evidentiary hearings under a habeas petition."  Advisory Committee Note to Rule 8 of the Rules Governing Section 2255 Proceedings.

---

errors in determining whether a defendant was prejudiced").

[58]  E.g., Mak, 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [relief]").

140

USCA5 1075

In habeas proceedings, an evidentiary hearing is appropriate when the habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts.  See Townsend v. Sain, 372 U.S. 293, 312-19 (1963); Goodwin v. Johnson, 132 F.3d 162, 178 (5th Cir. 1998) ("When there is a factual dispute [that] if resolved in the petitioner's favor would entitle [him] to relief . . . a federal habeas petitioner is entitled to discovery and an evidentiary hearing").  "[H]earings are particularly important in capital cases ... where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" Parkus v. Delo, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting Ford v. Wainwright, 477 U.S. 399 (1986)).

Here, the petition alleges colorable Fifth, Sixth and Eighth Amendment claims, including numerous facts outside of the record which, if proved, would entitle Mr. Bourgeois to relief.  Under Townsend and Rule 8, Petitioner is entitled to an evidentiary hearing on all such claims.

### CLAIM XV.    THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.

In his *Motion*, Petitioner alleged that the manner in which the Government would carry out his execution by lethal injection would violate the Eighth Amendment.  He also pled that the litigation of this claim was not appropriate in this *Motion*, or at this time, and that he raised the claim in the *Motion* in order to avoid a later allegation that the claim was waived.

Petitioner stands by those suggestions as to why the so-called lethal injection claim ought not be litigated in this context at this time.

Since the filing of the *Motion*, another reason has arisen which counsels against litigating at this time.  On September 25, 2007 the Supreme Court granted certiorari in Baze v. Rees, 07-5439. This cert grant addresses the same legal issues that would be presented in Petitioner's challenge to

141

USCA5 1076

the lethal injection procedures used by the Bureau of Prisons. Accordingly, even if the Court were

inclined to direct litigation of this matter now, it would certainly make sense to await what will likely

be a definitive ruling by the Supreme Court on all or most of the claims that would be litigated.

All that said, if the Court believes it more appropriate to litigate these issues now and in the

context of this *Motion*, Petitioner stands ready to do so.

### CONCLUSION

For all of the above reasons, those set forth in the *Motion*, and based upon the entire record

of these proceedings, Petitioner respectfully requests that the Court grant the relief sought in the

*Motion*.

Respectfully Submitted,

/s/ Michael Wiseman

_____

MAUREEN KEARNEY ROWLEY, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Supervisory Assistant Federal Defender
Victor Abreu, Esq.*
James McHugh, Esq.
Assistant Federal Defenders
Elizabeth Larin, Esq.
Research and Writing Specialist
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated: Philadelphia, PA
        October 5, 2007

142

USCA5 1077

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 5th day of October, 2007 I served the foregoing upon the following persons by e-file and United States Mail:

Patricia Hubert Booth
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
Patti.Booth@usdoj.gov

Tony R. Roberts
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

James L. Turner
United States Attorney's Office
PO Box 61129
Houston, TX 77208-129
jim.turner@usdoj.gov

/s/ Michael Wiseman

_____

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | |
| | : | Honorable Janis Graham Jack |
| -against- | : | U.S.D.J. |
| | : | |
| ALFRED BOURGEOIS, | : | **This is a Capital Case** |
| | : | |
| Petitioner. | : | |
| | : | |

**PETITIONER'S SUPPLEMENTAL APPENDIX**
**IN SUPPORT OF**
**MOTION FOR RELIEF PURSUANT TO**
**28 U.S.C. SECTION 2255**
**OR IN THE ALTERNATIVE**
**PURSUANT TO 28 U.S.C. 2241**

> MAUREEN KEARNEY ROWLEY, ESQ.
> CHIEF FEDERAL DEFENDER
> By: Michael Wiseman, Esq.*
> Supervisory Assistant Federal Defender
> Victor Abreu, Esq.*
> James McHugh, Esq.
> Assistant Federal Defenders
> Elizabeth Larin, Esq.
> Research and Writing Specialist
> Federal Community Defender Office
> for the Eastern District of Pennsylvania
> Capital Habeas Corpus Unit
> Suite 545 West – The Curtis Center
> Philadelphia, PA 19106
> 215-928-0520
> *Co-Counsel of Record for Petitioner
> Alfred Bourgeois

Dated: Philadelphia, PA
       October 5, 2007

**USCA5 1079**

**Index to Supplemental Appendix**

Document        Description
Number

64.            Declaration of Elizabeth Johnson, Ph.D., dated 9/26/07
65.            Forensic Science Associates Report, dated 9/24/07 and Curricula Vitae of Alan
               Keel
66.            Motions for Continuance in State v. Longoria Nos. 02-CR-3585-E and 03-CR-
               1884-E
67.            Declaration of Darrick Bernard Moore
68.            Declaration of Phillip Jackson
69.            Declaration of Timothy Allen
70.            Declaration of Brenda Goodman
71.            Declaration of Claudia Mitchell

USCA5 1080

64

USCA5 1081

**DECLARATION OF ELIZABETH JOHNSON, PH.D.**
**PURSUANT TO 28 U.S.C. § 1746**

I, Elizabeth Johnson, Ph.D., hereby declare that the following is true and correct.

1.      I am a forensic scientist specializing in forensic biology and DNA issues. Between 1992 and 1996, I established and directed the DNA laboratory at the Harris County Medical Examiner's Office in Houston, Texas. Thereafter, from 1997 to 2003, I was employed at Technical Associates, a private criminalistics laboratory in Ventura, California. I currently maintain a solo forensic science practice, based in Thousand Oaks, California, providing testing, review, consultation, testimony, and education to those in need of assistance with forensic DNA. A copy of my curriculum vitae is attached.

2.      In late 2003, I was retained as a defense forensic expert in the case of the United States v. Alfred Bourgeois, No. Cr-C-02-216 (S.D. Texas). I was retained by Mr. Bourgeois' trial attorneys and specifically recall communicating with Mr. Douglas Tinker, Esq but do not recall any interaction with Mr. John Gilmore, Esq. I understand that Mr. Bourgeois was convicted of capital murder and was sentenced to death related to the killing of his daughter on the grounds of the Corpus Christi Naval Air Station. I have been asked by Mr. Bourgeois' current defense counsel to complete this declaration regarding my involvement with this case. All opinions herein are stated to a reasonable degree of scientific certainty. All factual assertions are true to the best of my knowledge.

3.      In February, 2004, in consultation with Mr. Tinker, I arranged to have three rectal swabs (labeled 020718001 NH Q5, Q6 and Q7) collected at the time of autopsy from the rectum of Mr. Bourgeois' daughter, JG-1999, sent to my former laboratory,

Technical Associates.  These items had previously been in the custody of the FBI and were alleged to contain semen according to FBI laboratory reports.  I directed that these swabs be examined for the presence of spermatozoa and semen, and if found, that DNA typing be performed in an attempt to identify its origin.  These swabs were thoroughly examined by chemical and microscopic means and included testing shavings of the stained portion of the wooden swab sticks.  Tests were performed for the presence of acid phosphatase (AP) and P30 proteins found in seminal fluid as well as for microscopic detection of spermatozoa.

4.    On March 2, 2004, I faxed Mr. Tinker a synopsis of my findings and conclusions regarding the testing of the items I was provided.  That synopsis also outlined the testimony I could present at trial and potential areas for cross examination of the Government's expert witnesses.  In that synopsis I stated, in part:

- The FBI did not test the rectal swab with AP reagent or do a sperm search. They only did a P30 test with the ABA card and a DNA test.  The ABA card was positive but there is no indication of male DNA found either in the non-sperm or the sperm fraction;

- We did do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm).

- The P30 positive (weak on our test) test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen.

- The tested sample would be expected to contain 500 sperm and 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to get a DNA result (which they did not find male DNA).

5.    I was never called to testify at Mr. Bourgeois' trial.  Had I been called as a witness, I would have testified consistent with my findings as outlined above and in the

synopsis I faxed to Mr. Tinker on March 2, 2004. Had I been called as a witness at Mr.

Bourgeois' trial I would have testified that there was insufficient scientific evidence to

conclude that the substance contained on the tested swabs was semen, and that four

scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA

testing) were negative for the presence male fluids or male cells on the rectal swabs. That

only the P30 test gave a (weak) positive result and should not be considered conclusive in

light of numerous contradictory tests. Accordingly, I would have testified that there was

insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was

present in JG-1999's rectum.

6.      Mr. Bourgeois' current counsel has provided me with additional

information including: the direct appeal opinion, trial transcripts, FBI forensic lab reports

and testing data and the conclusions of forensic scientists Dr. Edward Blake and Alan

Keel. My review of these documents strongly confirms my original findings and

conclusions. My review of these documents also confirms that had I been called as a

witness at trial, I would have testified that the Government's evidence at trial regarding

the alleged semen was erroneous and scientifically unsubstantiated. I would have

specifically addressed the erroneous testimony of Dr. Scott Benton and testified that

spermatozoa are very durable and do not easily degrade (they are so durable that an

additional chemical is required to break open spermatozoa in the laboratory), that

spermatozoa can be easily detected microscopically and their abundance in seminal fluid

facilitates microscopic detection even after the tail is lost, and that spermatozoa can be

found for up to six days in the vaginal tract of a living female. In summary, I would have

USCA5 1084

provided scientific evidence and testimony which would have directly contradicted the

Government's evidence and theory of prosecution.

I hereby certify and declare under penalty of perjury that the statements contained

herein are true and correct.

Elizabeth Johnson, Ph.D.

Dated: September 26, 2007

USCA5 1085

# Resume

**Elizabeth A. Johnson, Ph.D.**
**1534 N. Moorpark Road, No. 364**
**Thousand Oaks, CA 91360**
*telephone* **805-553-0445**
*facsimile* **805-553-0487**
*circej@earthlink.net*

## EDUCATION

College
: BS Chemistry, cum laude
Department of Chemistry
Wofford College, Spartanburg, SC
1978-1982

Graduate
: Ph.D. -- conferred July, 1987
Department of Microbiology and Immunology
Medical University of South Carolina, Charleston, SC
August 1982 - July 1987

Dissertation
: *Production and characterization of a monoclonal antibody to an antigen present on subsets of natural killer cells and human tumor cells.*

## POSITIONS HELD

Private Forensic Consultation May, 2003 - present

Senior Forensic Scientist
: Technical Associates, Inc.
4125 Market Street, Suite #3
Ventura, CA 93003
February 1997 – May, 2003

Director
: DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
September 1993 - December 1996

Supervisor
: DNA Laboratory / Serology Section
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
April 1993 - September 1993

Assistant Toxicologist
: DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
November 1991 - April 1993

Post-doctoral Fellow
: Department of Molecular Hematology
Advisor: Albert Deisseroth, M.D., Ph.D.
Chairman, Department of Hematology
M.D. Anderson Cancer Research Hospital
Houston, TX 77030
October 1988 - November 1991

USCA5 1086

Department of Microbiology and Immunology
Advisor: Alfred Tsang, Ph.D.
Medical University of South Carolina
Charleston, SC
September 1987 - September 1988

## CONTINUING EDUCATION - FORENSICS

CLASSES and WORKSHOPS

Y-STR Analysis on Forensic Casework, American Academy of Forensic Sciences, February 2004.

Expert Witness Workshop, Southwestern Working Group on DNA Analysis Methods (SWGDAM), January, 2000.

Mitochondrial DNA Workshop, International Symposium on Human Identification, September, 1999.

FBI/SWGDAM STR Workshop, Austin, TX, 1998.

Statistics Workshop, International Symposium on Human Identification, September, 1996, 2002.

STR Workshop, The Promega Corporation, May, 1995.

Roche Amplitype Workshop, Roche Molecular Systems, December, 1992.

Armed Forces Institute of Pathology DNA Identification Laboratory, visiting scientist to learn methods of mitochondrial DNA sequencing on aged remains, October, 1992.

Advanced Aspects of Forensic DNA Analysis (courtroom testimony), FBI Academy, June, 1992.

CONFERENCES

International Symposium on Human Identification 1992, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2002, 2003, 2004.

American Academy of Forensic Sciences 1992, 1993, 1994, 1995, 2001.

The Future of DNA Technology, Washington, DC, 1996.

CODIS Software Symposium, Quantico, VA, 1995.

Advances in DNA Technology, Bethesda, MD, 1992.

## OTHER INFORMATION

CERTIFICATIONS

Certification of Qualification as Laboratory Director in Forensic Identity by the State of New York Department of Heath, issued August 12, 2002.

USCA5 1087

## PROFESSIONAL SOCIETIES

Member of American Academy of Forensic Sciences

Association of Forensic DNA Analysts and Administrators (AFDAA)
(formerly Southwest Working Group on DNA Analysis Methods)

## INVITED LECTURES

California Habeas Corpus Resource Center Spring Conference, June, 2007.

Washington State Bar Association, May, 2007.

CACJ/CPDA Capital Case Defense Seminar, February, 2007.

Texas Criminal Defense Lawyers Association, September, 2006.

Rusty Duncan Law Seminar, San Antonio, Texas, June, 2006.

Osgoode Professional Development Center Symposium on Forensic DNA Evidence, Toronto, Canada, April, 2006.

Third Annual Forensic Science Conference DNA Cross-Examination College, Washington, D.C., September, 2005.

Texas Criminal Defense Lawyers Association, September, 2005.

Forensic Bioinformatics 4th Annual Conference, Dayton, OH, August 2005.

CACJ/CPDA Capital Case Defense Seminar, February, 2005.

Texas Criminal Defense Lawyers Association, August, 2004.

California Habeas Corpus Resource Center Spring Conference, May, 2004.

CACJ/CPDA Capital Case Defense Seminar, February, 2004.

Washington State Bar Association, September, 2003.

Texas Criminal Defense Lawyers Association, August, 2003.

Utah Criminal Defense Lawyers Association, April, 2003.

The Innocence Project, March, 2003.

Second Annual Texas Capital Defense Conference, October, 2002.

Guest lecturer, University of Texas Law School, Advanced Criminal Defense class, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2004, 2006.

California Public Defenders Association (CPDA), January, 2001.

Texas Criminal Defense Lawyers Association, October, 1997.

Arizona Public Defenders' Seminar, April, 1997.

The Amersham Corporation, April, 1996.

College of the Mainland, April, 1995.

USCA5 1088

Southwest Association of Toxicologists, May, 1993.

## BIBLIOGRAPHY

PUBLICATIONS

1.    Taylor, M.S., A. Challed-Spong, and E.A. Johnson. Co-amplification of the HLA DQα and amelogenin genes: optimization and validation. *J. Forensic Sciences*, 42 (1), 1997.

2.    Johnson, E., W. Henzel, and A. Deisseroth. An isoform of protein disulfide isomerase isolated from chronic myelogenous leukemia cells alters complex formation between nuclear proteins and regulatory regions of interferon-inducible genes. *J. Biol. Chem.*, 267:14412-14417, 1992.

3.    Seong, D., S. Sims, E. Johnson, J. Lyding, A. Lopez, M. Garovoy, M. Talpaz, H. Kantarjian, G. Lopez-Berestein, C. Reading, and A. Deisseroth. Activation of class I HLA expression by TNF-alpha and gamma-interferon is mediated through protein kinase C - dependent pathway in CML cell lines. *British Journal of Haematology*, 78:359-367, 1991.

4.    Deisseroth, A., O.M.Z. Howard, A. Wedrychowski, D. Seong, N. Paslidis, M. Romine, S. Sims, C.V. Herst, T. Yuan, K. Wu, T. Lopez and E. Johnson. Summary and Future Directions, in *Chronic Myelogenous Leukemia: Molecular Approaches to Research and Therapy*; A. Deisseroth and R. Arlinghaus, eds., 1991, pp.469-475.

5.    Wedrychowski, A., D. Seong, N. Paslidis, E. Johnson, O.M.Z. Howard, S. Sims, M. Talpaz, H. Kantarjian, J. Hester, J. Turpin, G. Lopez-Berestein, J. Gutterman, E.J. Freireich and A. Deisseroth. Characterization of nuclear proteins which bind to interferon-inducible transcriptional enhancers in hematopoietic cells. *J. Biol. Chem.*, 265:21433-21440, 1990.

6.    Deisseroth, A., C.V. Herst, A. Wedrychowski, S. Sims, D. Seong, E. Johnson, T. Yuan, M. Romine, N. Paslidis, P. Gao, L. Huston, D. Claxton, S. Kornblau, H, Kantarjian, M. Talpaz and C. Reading. Future directions in molecular and genetic therapy of leukemias and solid tumors. *M.D. Anderson Cancer Bulletin*, 1990.

7.    Seong, D.C., S. Sims, E. Johnson, O.M.Z. Howard, J. Hester, M. Talpaz, H. Kantarjian and A. Deisseroth. A phosphatase activity present in peripheral blood myeloid cells of CML patients but not normal individuals alters nuclear protein binding to transcriptional enhancers of interferon-inducible genes. *J. Clin. Invest.*, 86:1664-1670, 1990.

8.    Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia and K.Y. Tsang. Specificity of anti-lymphocyte antibodies in sera from patients with AIDS-related complex (ARC) and healthy homosexuals. *Clin. and Exp. Immunol.*, 73:68-73, 1988.

9.    Tsang, K.Y., E.A. Johnson and M.F. LaVia. Anti-p24 antibody reactivity in Acquired Immunodeficiency Syndrome (AIDS) related complex patients treated with Isoprinosine. *Annals of Internal Medicine*, 107:595, 1988.

10.   Johnson, E., L. Miribel, P. Arnaud and K.Y. Tsang. Purification of IgM monoclonal antibody from murine ascitic fluid by a two step column chromatography procedure. *Immunol. Lett.*, 14:159-165, 1987.

ABSTRACTS

1.    Ballard, K.D., R.S. Orkiszewski, P.R. DeForest, M.S. Taylor, E.A. Johnson, and L. Ragle: EDTA testing in forensics: direct derivatization for GC-MS/MS analysis and the quantity of dried bloodstain analyzed. *Proceedings of the 45th ASMS Conference on Mass Spectrometry and Allied Topics*, Palm Springs, California, June 1-5, 1997, p. 54.

USCA5 1089

2.    Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle.  DNA typing and the determination of EDTA in forensic samples by GC-MS/MS.  Presented at the Seventh International Symposium on Human Identification, Scotsdale, AZ, 1996.

3.    Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. Determination of EDTA in forensic samples by capillary GC-MS and GC-MS/MS.  Presented at the 44th ASMS Conference on Mass Spectrometry and Allied Topics, Portland, Oregon, 1996.

4.    Stacy, T., E.A. Johnson, J. Krebsbach, S. Bowne, and R. Cotton.  Chemiluminescence of forensic casework: a comparison of the hybridization and detection methods of three independent laboratories.  Presented at the Sixth International Symposium on Human Identification, Scotsdale, AZ, 1995.

5.    Taylor, M.S., A. Challed, and E.A. Johnson.  Co-amplification of the amelogenin gene with DQ-$\alpha$ utilizing the Amplitype reaction mix and amplification protocol. Presented at the Fifth International Symposium on Human Identification, Scotsdale, AZ, 1994.

6.    Taylor, M.S., A. Challed, and E.A. Johnson.  Co-amplification of the amelogenin gene with DQ-$\alpha$ utilizing the Amplitype reaction mix and amplification protocol. Presented at the California Association of Criminalists spring meeting, Los Angeles, CA, 1994.

7.    Johnson, E., and M. Pennington.  Use of alkaline phosphatase-labeled probes and chemiluminescence detection methods for establishing an RFLP data base and analysis of forensic cases.  Presented at the Fourth International Symposium on Human Identification, Scotsdale, AZ, 1993.

8.    Johnson, E., W. Henzel, and A. Deisseroth.  Elevated levels of phospholipase C alpha are associated with alteration of complexes formed between interferon-inducible transcriptional enhancers and nuclear proteins in cells of interferon resistant chronic myelogenous leukemia (CML) patients.  Presented at the annual meeting of the American Society for Hematology, Denver, CO, 1991.

9.    Johnson, E., D. Seong, A. Wedrychowski, S. Sims, M. Romine, L. Huston, R. Luttrell and A. Deisseroth.  A cytoplasmic phosphatase which is elevated in CML myeloid cells alters the binding of nuclear proteins to interferon-inducible transcriptional enhancers.  Presented at the annual meeting of the American Society for Hematology, Boston, MA, 1990.

10.   Tsang, K.Y., E.A. Johnson, L. Bishop, M.F. La Via H.H. Fudenberg and M.Arlen.  Monoclonal antibodies to human colon carcinoma-associated antigen(s).  FASEB, Washington, DC (abstract no.4322), 1987.

11.   Trojanowska, M., K.Y. Tsang, E.A. Johnson, L. Bishop, M. Christian and R.Q. Warren.  Expression of *c-myc*, *c-myb* oncogenes and interleukin-2 receptor in human peripheral blood mononuclear cells after treatment with an immunopotentiator (isoprinosine).  FASEB, Washington, DC (abstract no. 850), 1987.

12.   Johnson, E.A., J. Minowada, M.F. La Via, and K.Y. Tsang.  A monoclonal antibody to human NK cells is reactive with various tumor cell lines.  Federation of American Societies of Experimental Biology (FASEB), Washington, DC (abstract no. 956), 1987.

13.   Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia, M.E. Christian and K.Y. Tsang.  Analysis of anti-peripheral blood mononuclear cell (PBMC) antibodies in sera from AIDS, ARC, and healthy homosexuals.  First Annual Conference of Clinical Immunology Society, Baltimore, MD, 1986.

14.   Johnson E.A., B. Koger, M. La Via and K.Y. Tsang.  A shared antigen between human natural killer (NK) cells and various tumor cells is recognized by an anti-NK monoclonal antibody.  First Annual Meeting, Clinical Applications of Flow Cytometry, Charleston, SC, 1986.

USCA5 1090

15.    Johnson, E.A., K.Y. Tsang, B. Koger, B. Ward, R.Q. Warren, M. La Via and H.H. Fudenberg. Production of a monoclonal antibody reactive with human natural killer cells. Federation Proceedings, 44, No. 4, 1330, 1985.

USCA5 1091

65

USCA5 1092



3053 Research Drive, Richmond, CA 94806
FAX (510) 222-8887
(510) 222-8883

September 24, 2007

Victor J. Abreu, Esq.
Assistant Federal Defender
Federal Community Defender Office
Capital Habeas Unit
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19106

**US v. Alfred Bourgeois**
**No. Cr-C-02-216**
**Our File No. 07-227**

**<u>Review of the Government's Proof as to the Presence of Semen
in the Absence of Sperm
offered by the Testing and Testimony of the FBI
and the Testimony of Dr. Scott Benton</u>**

<u>Background</u>

In April of 2002, Alfred Bourgeois of LaPlace, Louisiana was determined through paternity testing to be the biological father of JaKarenn Gunter, a two year old female child of Katrina Harrison. Gunter and Harrison lived in Livingston, Texas. At this time Bourgeois was married to Robin Bourgeois and they had two children. In May, 2002 Bourgeois was ordered to support Gunter. Bourgeois was already supporting a fourth child from a previous marriage. At the same hearing, Bourgeois was awarded seven weeks visitation and he took custody of the child that same afternoon. There is no evidence that Gunter was in poor health or injured upon Bourgeois taking custody of her.

USCA5 1093

Our File No. 07-227

The final seven weeks of Gunter's life transpired in LaPlace at the Bourgeois residence or on the road with the Bourgeois family in the cab of a tractor-trailer. The last 22 days of her life were essentially spent living in the truck with the entire family of five on the road. At one point, the child was examined in LaPlace in late May, 2007 by Dr. Scott Benton of Louisiana Child Protective Services. It is alleged that Bourgeois "systematically abused and tortured" Gunter during this seven week period until she sustained head injuries on July 27, 2002 that resulted in her death the next day. At autopsy, Dr. Elizabeth Rouse described "deep tissue bruising" in every area of the child's body along with numerous whip marks, scars, and other injuries. Dr. Rouse concluded that Gunter was a chronically abused or battered child, and that the head injury was the ultimate cause of death. Bourgeois claimed the child fell from the tractor cab to the pavement; the Government claims that Bourgeois essentially beat the child to death in the cab of the truck and faked her fall.

Among numerous items, three rectal swabs, one rectal swab smear slide, three vaginal swabs, one vaginal swab smear slide, and Gunter's clothing including underpants were collected pursuant to investigation of the child's death. Because the child's death occurred on a federal military base (during a delivery by Bourgeois), these items were examined by the Federal Bureau of Investigation [FBI] laboratory at Quantico, Virginia. Some evidence specimens were also examined for the Government by Orchid Cellmark. Autopsy photographs of the child's body were examined by Dr. Benton and compared to his previous examination of the child. Caroline Zervos and Anthony Onorato of the FBI testified that semen, but no sperm, was detected on the rectal swabs from Gunter and nowhere else, and that no DNA potentially attributable to the semen source was detected. Benton testified to the changes to Gunter's body between his examinations and proffered explanations for the absence of sperm and/or sperm DNA on the rectal swabs in the presence of detectable semen.

2

USCA5 1094

Our File No. 07-227

Scope of Review

The following documents were reviewed towards the preparation of this report:  trial transcript of the testimony of Dr. Scott Benton; trial transcript, bench notes, and report of Caroline Zervos of the FBI; trial transcript, bench notes, and report of Anthony Onorato of the FBI; trial opening and closing statement transcripts of the Government and Defense in this case; the Fifth Circuit United States Court of Appeals decision in this case; an Orchid Cellmark DNA Analysis report; the autopsy examination report of Dr. Elizabeth A. Rouse; and a letter "report" by Dr. Elizabeth Johnson.

This review concerns and focuses **only** on [1] the testing by Zervos and Onorato of the FBI, and by Cellmark, of the autopsy body orifice specimens and clothing of Gunter for semen, their subsequent DNA analyses and trial testimony with regard to the claimed detection of semen in the absence of definitive proof; and [2] the elaborate but erroneous trial testimony of Benton with regard to the constituents of semen, the persistence of semen and sperm in body orifices, especially post-mortem, and the utility of p30 or prostate-specific antigen [PSA] as stand-alone confirmation of the presence of semen.  We take no position as to the alleged "systematic abuse and torture" of Gunter, including the possibility of sexual abuse – only that the Government's **proof of the presence of semen** associated with the body of the child was inadequate and flawed, and should never have been offered by the scientists as evidence in this case.

3

USCA5 1095

Our File No. 07-227

## The Forensic Investigation:  Looking for Semen

The Gunter Rectal Swabs and Smear

Jakarenn Gunter died June 28, 2002 after approximately 24 hours of hospitalized life support.  Though not specifically described in the autopsy report of Dr. Elizabeth Rouse, apparently three rectal and three vaginal swabs were collected from her body at autopsy on June 29, 2002.[1]  At least one rectal smear slide and one vaginal smear slide were prepared from the swabs.  Dr. Rouse made the following observations:  "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus.  The hymen is present and appears atraumatic.  The back is straight, and the anus is unremarkable and atraumatic."  Gunter's clothing, including underpants, collected by the hospital upon her arrival, was also taken as evidence.  The FBI received these specimens on July 18, 2002 and the examination for semen on the swabs and smears began on August 16, 2002.

The provided FBI analyst bench notes indicate the three rectal swabs Q5, Q6, and Q7 were packaged together within a single white carton, and each was similarly described as stained with reddish brown material covering the swab head and extending about 1.5 inches onto the swab stick.  One-half of each swab was removed at this stage of the examination.  Blood was detected on all three swabs via positive presumptive test with phenolphthalin and positive crystal test for hemoglobin.  No acid phosphatase testing, the routine presumptive test for semen, was conducted on any of the rectal swabs.  Apparently, the sampled portions of each swab were extracted with liquid and tested for p30, or prostate specific antigen (PSA) with Abacus Diagnostics ABAcard commercial assays with positive results for each rectal swab.  No quantitative assessment of the strength of each positive PSA test was described.  No photographic documentation of these PSA results were provided; it is unclear whether such documentation exists.  This sampling consumed a full half of the rectal swab

---

[1] FBI analyst bench notes describe the dates of collection of the body orifice swabs and smears as 6/29/02.

4

USCA5 1096

Our File No. 07-227

specimens as a whole. There are no bench notes describing any slide preparation or microscopy of the pelleted debris normally of interest and preserved upon making the liquid extract from the swabs.[2] The fate of the particulate material, including the cellular debris, from each sampled half rectal swab is also unclear. One of the remaining half rectal swabs, Q7, was forwarded for DNA analysis.

One smear slide prepared (at autopsy) from one of the anal swabs from Gunter was examined on August 28-29, 2002. A white smear was visible on the slide. Whether and/or how the slide was stained was not described. No spermatozoa were observed on this slide. In fact, there is no notation of the observation of a single sperm cell from any of the specimens examined in this case.

The FBI's DNA analysis of the Q7 half rectal swab specimen began on September 16, 2002. One half of the half swab was removed for testing; according to the bench notes "The rest remains." In light of the positive PSA assay result, this quarter rectal swab was differentially digested to isolate non-sperm cells (blood and epithelial cells from the swab source) from any sperm cells that might be present on the swab. The product of the first digestion is normally called the non-sperm or epithelial or female fraction. The product of the second digestion is called the sperm or male fraction. This process, when done with skill and attention to detail, can result in a cell pellet essentially free of non-sperm cells and a "sperm fraction" essentially free of non-sperm DNA. No notes describing this differential digestion process or the DNA isolation and purification process were provided. No notes describing the volume of the female and male DNA extracts were provided.

---

[2] The normal practice in sampling body orifice swabs is to remove a portion (half is typical) of the swab, which is then extracted with liquid to recover the soluble material from the swab and to isolate the particulate debris, including epithelial cells and sperm cells, into a pellet, so that each fraction can be tested independently. It is the cellular debris that is now of most utility for any subsequent genetic analysis, e.g., DNA testing.

USCA5 1097

Our File No. 07-227

Nevertheless, the female fraction prepared from this quarter rectal swab contained approximately 100 ng DNA/$\mu l$, a value expected from a sample expected to be rich in DNA from the rectal epithelium and apparent blood of the child. Unexpectedly, the sperm or male DNA fraction from this quarter rectal swab sample contained approximately 50 ng DNA/$\mu l$ extract. This represents either the presence of abundant sperm in the sperm or male fraction sample or it reflects a very poor removal of non-sperm cells and/or DNA through the sperm pellet isolation process. No microscopy of the post-digestion cell pellet was done. PCR-based DNA analysis utilizing the Profiler Plus and Cofiler STR reagent sets for both the female and male fractions from the Q7 rectal swab sample resulted in robust profiles compatible with only the female child Gunter. No male DNA was detected via amelogenin in either fraction and no alleles foreign to Gunter were detected at any of the thirteen autosomal genes for which robust results were obtained.

Still convinced there was semen, and hence, sperm cells, associated with the Gunter rectal swabs, the FBI sent the remaining two Q5 and Q6 half rectal swabs and the remaining Q7 quarter rectal swab to Orchid Cellmark in Germantown, Maryland for a male-specific Y-chromosome DNA analysis. No details of the Cellmark work other than their terse report were provided. In their report of November 14, 2002 to Special Agent Megan Beckett, Cellmark DNA Analyst III Jeffrey Hickey and Laboratory Director Robin Cotton, Ph.D., describe receiving three partial anal swabs from Robert Johnson, and apparently, utilizing all three swabs in a fruitless Y-chromosome PCR based DNA analysis. They wrote: "No results were obtained when a DNA extract isolated from the items listed above was tested at the Y-chromosome loci DYS390, DYS19, DYS389 I, and DYS389 II." Even when the remaining three partial swabs were combined, which represented one and one-quarter whole rectal swabs, no male DNA was detected using a male DNA-specific assay that is, without question amongst the forensic science community, capable of fishing minute quantities of male DNA from a sea of female DNA. This YSTR analysis essentially completed the consumption of the three Gunter rectal swabs.

6

USCA5 1098

Our File No. 07-227

However, some small quantity of swab material (cotton) usually persists on the swab sticks after sampling; and, some of the same material that stains the swabs heads usually exists on the swab sticks. This is indeed the case here, in that the FBI notes describe stain material extending about 1.5 inches below the swab head onto the stick of all three swabs. At least one of these rectal swab remnants was ordered on January 16, 2004 to be sent to Dr. Elizabeth Johnson of Thousand Oaks, California. None of Johnson's bench notes or report were provided to us. In a handwritten letter to Doug Tinker, Bourgeois' trial counsel, dated March 1, 2004, Johnson described the thrust of her work and her conclusions regarding the presence of semen on the Gunter rectal swab remnant that was provided to her. Johnson indicates the rectal swab remnant was sufficient for testing for acid phosphatase and PSA, and for microscopy of the cellular debris. She stated her acid phosphatase test was negative; that her PSA test was weakly positive; and, that no sperm were observed from the swab. Johnson further stated that she believed that if the weak positive PSA assay was attributable to semen on the swab that there should be "plenty" of sperm in the sample to observe them microscopically and to detect the male DNA from them in a PCR-based DNA analysis. She also stated that the weak positive PSA result could have resulted from something other than semen (a "false" positive). Apparently, Johnson made no attempt to detect male DNA from the Gunter rectal sample.

The Gunter Underpants

The underpants worn by Gunter when she presented at the hospital on July 27, 2002 were examined by the FBI beginning on August 19, 2002. This item, Q14, is size 4 Spencer's brand bear motif underpants. The garment was further described as heavily soiled with multiple reddish-brown, brownish, blackish, and yellowish stains. At least five defined stain areas and one general swabbing from the garment were tested. Blood was detected in all five areas, 1B, 2, 3B, 4, and 5 with phenolphthalin, and hemoglobin was detected in areas 1B and 3B. Acid phosphatase was detected in stains 1B, 2, 3B, and 5, but not in stain 4 or the general swabbing sample. Stain 2 was described as the crotch area and the dark

7

USCA5 1099

Our File No. 07-227

stain material was described as fecal matter. No PSA was detected from stain 1B, 2, 3B, or 5. Neither the size of the stain sample cuttings nor the extraction volume was described. Stain 4 and the general swabbing sample were not tested for PSA. No microscopy was conducted on the any samples from the underpants, even though it is readily apparent that extracts, suitable for microscopy, were prepared from the four stain areas tested for PSA. No DNA analysis was attempted on any of the samples from Gunter's underpants.

Zervos' report of her work in this case was published September 25, 2002 and is attached as Exhibit 1; Onorato's report of his work in this case was published January 17, 2003 and is attached as Exhibit 2. The Cellmark Report of November 14, 2002 is attached as Exhibit 3. The Johnson "report" of March 1, 2004 is attached as Exhibit 4.

## The Government's Opening Statement

During her opening statement to the jury, U.S. Attorney Patti Booth sets the stage for including alleged sexual abuse of Gunter in the "systematic abuse and torture" that led to the child's death.

> "Also, there will testimony that a swab was taken from the bottom, from the rectum of the baby, and that swab, even though it was taken two days after this incident occurred, that there will be experts from the FBI laboratory, Tony Onorato, who will testify that that swab showed that there was seminal fluid in the rectum of that baby." [TT42:19-24]

In his opening statement, defense counsel Douglas Tinker doesn't address this issue, leaving this allegation completely uncontested before the jury.

8

USCA5 1100

Our File No. 07-227

## Trial Testimony of Dr. Scott Benton

The Government was in the enviable position of having at its disposal a forensic pediatric physician, Dr. Scott Benton, who had examined JaKarenn Gunter because of perineal blood in her diaper on May 21, 2002, only a short period of time after Bourgeois had taken custody of the child. Benton was unable to make any finding as to the source of the blood; nor was there any evidence of abuse of this child. Benton was retained to compare autopsy photos of Gunter with those he had taken of the child on May 21, 2002 during his examination. At trial, Benton delivered a dramatic and very eloquent description of the physical transformation of this child during the few weeks she was in Bourgeois custody. Also, the prosecutor had reports from the FBI asserting that semen but no sperm was detected on rectal swabs from the female child victim, and no male DNA could be detected from the rectal swabs, even with a sophisticated Y chromosome test which could find and genetically discriminate male DNA from a minute amount of male DNA lost in an overwhelming amount of female DNA. The Government would use Dr. Benton, through false, or at best, erroneous testimony to account for the absence of sperm from the alleged semen on the rectal swabs, and to bootstrap this alleged sodomy of the child at about the time of her death in late August, 2002 to the perineal bleeding for which Benton had examined the child back in late May, 2002.

As revealed in his direct testimony, at the time of this trial Dr. Benton was employed by Children's Hospital of New Orleans where he was the Director of the Children-at-Risk Evaluation Center, and he was also a Clinical Associate Professor at both the Louisiana State and Tulane Universities. Benton testified his current work included the supervision of three clinics in Louisiana: one in New Orleans, one in Baton Rouge, and one in Covington; that he, as the Director of the Pediatric Forensic Medicine Fellowship Program for the LSU School of Medicine also directed the training of new pediatricians in evaluating children suspected of abuse; that he also provided the core lecture series for first year medical students at both LSA and Tulane; that he was in clinic four days per week and that he personally saw about 600 children per year and reviewed over

9

USCA5 1101

Our File No. 07-227

1,500 cases per year, or over 5 per clinic day.  Dr. Benton also testified that he has testified "in court proceedings or trials concerning (his) examinations" on "many occasions".

In an answer that continued for over four pages of transcript, Benton testified that "sexual assault evidence includes things that are specific to men" including semen, and that there are three main tests that are used:  the acid phosphatase test, the "more confirmatory" prostate specific antigen or p30 assay, and the "even more confirmatory" observation of sperm [TT22:6-21].  Benton testified the PSA/p30  assay "is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, including animal products, except in male prostate, and with one exception, human breast milk." [TT22:16-19]

Benton continued his description of the search for evidence of sexual assault:

> A.  The other test that we look for that is even more confirmatory is sperm.  In some cases, if you act quickly enough – the sperm degrades – you can actually find the sperm.  And then the last step of that, which provides identity also, is if you can get the Y chromosome off the sperm, you can also do DNA analysis, which can tell you that there was presence of a male product in a place where it shouldn't be, a female, and it also can help provide identification, if that's possible." [TT22:20-25; 23:1-3]
> …
>
> Q.  I want to ask you on the – is it uncommon to have semen and no sperm?
> A.  No, not in my experience.  [TT23:7-9]

In anticipation of her next two witnesses, Zervos and Onorato, towards the end of her direct examination of Benton, the prosecutor returns to the subject of semen, its composition, and how one might have semen without sperm from an otherwise normal sperm-producing male.  Again, Dr. Benton is very eloquent, continuing his answers uninterrupted for page after page of transcript.  And because his answers, especially with regard to the constituents of semen, the persistence of semen and sperm in body orifices, and the utility of p30 or

10

USCA5 1102

Our File No. 07-227

prostate-specific antigen as stand-alone confirmation of the presence of semen

are so far from reality, it is necessary to present a large portion of his voluminous

testimony here:

Q. Now, I want to ask you, Doctor, what is semen?
A. Semen, s-e-m-e-n, is a product of the prostate gland of men. And it's composed of water and various proteins and enzymes. It's meant to be a vehicle for sperm during ejaculation.
Q. Okay. And does it always have sperm in it?
A. No. The prostate doesn't make the sperm. The prostate makes semen. It is possible to have semen without sperm in it.
Q. All right. And if you found – let me just give you a hypothetical. If, on a child, semen was found that was taken from a swab from her anus, and there were no sperm in that semen, does that mean that that is not semen?
A. No.
Q. Okay. Can you give us the reasons why there may not be sperm in semen?
A. Yes. Starting at the very beginning, to sort of help understand. Sperm is produced in the testes, or colloquially known as the balls of men. And they are stored in the epididymis or this little sack, this little sack that's above the testes. And during ejaculation, or during the sex act, there is – there can be pre-ejaculation, if you will, where the prostate, which is a gland that surrounds the bladder in men, will deposit some lubricants. Not to be offensive, but in the first part of the sex act, the urethra gets cleansed with these prostatic secretions. So as there's excitement and erection, you will have deposition of this pre-ejaculate, which is all products of the prostate, and that's semen. So it's possible if you're just capturing what happened at that event, that's semen without sperm in it. Until you actually have the orgasm, the sperm is not introduced to that flow. So that's the first reason you can have semen without sperm, is that you're just looking at the pre-ejaculate, not the ejaculate with the sperm in it. [TT49:12-25; 50:1-19]

Benton goes on to describe semen without sperm as the results of vasectomy,

illness, the physical inability to produce sperm (azoospermia), and diminished

sperm numbers due to multiple ejaculation and stochastic sampling:

"And if the sperm count is so low, it's possible that you're sampling an area that has semen but doesn't have sperm in it, or it never had sperm in it." [TT51:7-10]

11

USCA5 1103

Our File No. 07-227

Finally, Benton describes the loss of sperm in body orifices without the concomitant loss of semen:

"The other obvious one is that the seminal products, semen, the products of the prostate, are very stable. If they get on clothes and they dry, they can last for years. They are a little less stable in wet environments, like the rectum or the vagina or the mouth. But they're much more stable than sperm is. Sperm's survivability usually is only in the cervix or in the womb, the uterus of women. In the vagina itself, it doesn't live more than 24 to 48 hours. In a little girl, prepubertal girl, it doesn't live very long, hours. So they will die. They'll lose their little tails. And once they lose their tails, they're very difficult to find, on rape kit or trace forensic evidence. You'll find evidence of the semen much easier than you'll find sperm. Particularly in the rectum, there's all kinds of bacteria that will attack that sort of thing. So the sperm can be destroyed in those environments, and you could still detect semen but not find sperm. So those would be the conditions in which you could see semen, but not see sperm." [TT51:14-25; 52:1-6]

On cross examination, defense counsel pursues only one line of questioning, dealing with the potential for "false positive" results when testing for the presence of semen. Dr. Benton testifies that the acid phosphatase test can have a "high percentage" of false positives but that with p30 "very low levels of false positives are ever reported". Finally, Benton admits the p30/PSA test is not foolproof:

Q. The p30 test, there is some chance of that being erroneous, too?
A. That is true. [TT55:16-18]

## Trial Testimony of FBI Analysts Zervos and Onorato

Trial Testimony of Caroline Zervos

Zervos began her direct testimony by describing a two-step presumptive/confirmatory test procedure in identifying whether or not blood or semen might be present in a specimen/stain of interest. She describes a process

12

USCA5 1104

in which an interesting stain is first tested for the "presumptive" presence of the body fluid, and if positive, it is then tested with a "confirmatory" test and if both are positive, then the presence of the tested for body fluid is confirmed [TT 63:6-25]. She then describes how the <u>confirmatory test</u> may be omitted if the sample size is limiting [TT 64:4-11]. Later in her testimony comes the following exchange in which Zervos unequivocally states that semen was identified on the Gunter rectal swabs:

> Q.  All right.  What kind of tests did you perform on Q5 through Q7, the rectal swabs?
> A.  The serological examinations that we conducted on the rectal swabs, we tested them for the presence of blood and semen.  And blood was identified on the rectal swabs, and semen was identified on the rectal swabs. [TT86:14-19]

Zervos then immediately directly contradicts her prior testimony regarding the two-step presumptive/confirmatory testing process:

> Q.  What kind of test do you use – did you use to test for the semen on those rectal swabs?
> A.  We conducted our, the presumptive and confirmatory tests for blood, and we did our confirmatory test only for the presence of semen.
> Q.  Why didn't you do a presumptive test?
> A.  On swabs that are taken, recovered from the vaginal area and other intimate orifices, we just conduct a confirmatory semen test, because there are fluids that can react as a false positive nature with our presumptive test for semen.  So we bypass the presumptive test and only do a confirmatory test.
> Q.  And what confirmatory test did you use?
> A.  Its called p30, and it tests for a protein that's a component of semen. [TT86:20-25; 87:1-8]

She then reiterates her unequivocal identification of semen on the rectal swabs:

> Q.  Human specific, okay.  So now, on Q5 and Q7, you can testify to the presence of semen.  Is that right?
> A.  That's correct.  [TT87:12-14]

USCA5 1105

Our File No. 07-227

On cross examination, defense counsel Tinker attempts to determine how specific the p30 assay is with regard to the unequivocal identification of semen on the Gunter rectal swabs, and the Court steps in to assist him:

> The Court:  He's asking actually, not this – is there anything else that could test positive for a p30 test besides this particular prostate protein?
> The Witness:  Yes. Yes, there is.
> The Court:  Is that what you're asking?
> Mr. Tinker:  Yes. [TT103:25; 104:1-5]

Zervos then goes on to describe that p30/PSA is found at low levels in male peripheral blood and male urine, but she is unaware of its existence in any female fluids:

> Q.  And is there anything in the anal passage that would have – that might have that same reaction, other than semen?
> A.  In the rectal area?  I don't think so.  I don't exactly know the answer to that.
> …
> Q.  You might – could – well , if you don't know, that's all right. But we can ask somebody --
> A.  Well, I'm a little confused on your question, but the studies have shown that this protein that we test for can be in low concentrations in other body fluids.  And those are those fluids that I mentioned, in male urine and male peripheral blood.
> The Court.  But not in a female child?
> The Witness.  Not that I'm aware of.

At this point, the Court has recognized that the Government's proof for the presence of semen associated with the Gunter rectal swabs relies solely on the presence of a positive p30/PSA test result which two government witnesses have testified is neither specific for semen or even p30.  As defense counsel concludes his cross-examination of Zervos, the Court realized that defense counsel has not come to the same conclusion, or at least has not fleshed out before the jury the potential uncertainty, if not outright confounding, of that proof by Zervos' revelation that p30/PSA is not entirely specific to semen, as well as Dr. Benton's admission that positive p30 results can be obtained from substances other than

14

USCA5 1106

Our File No. 07-227

p30. The Court again attempts to assist defense counsel in developing this impeachment:

> (Bench conference on the record.)
> The Court: Before she leaves for good, I wanted to make sure that you had every possible question you wanted to ask her. It wasn't – what she said, when you said – you were trying to ask if there could be a false positive for something else. But she told you where this same exact prostate protein could be found. Instead of saying, is there anything else that could cause a false positive for this. Do you see what I'm saying? That was what I wanted to clarify, and I thought was what you wanted to know.
> Mr. Tinker: I thought she said that maybe, maybe not. I mean, that's kind of –
> The Court: I don't think you got everything you wanted out of that, is all that I'm saying, Mr. Tinker. Have you got somebody else –
> Mr. Tinker: I got more than I wanted, Judge. My understanding of what she said was that she didn't know whether things in food might cause that or –
> The Court: That's okay. I'll let it go. I just wanted – I was trying to help you. [TT106:20-25; 107:1-14]

Defense counsel did not attempt on cross examination to further impeach Zervos' claim of identifying semen on the child's rectal swabs. He called no defense witness to reveal the slippery slope upon which the Government's proof of semen rested, even when provided with that knowledge by his own expert Dr. Elizabeth Johnson, as described below.

Trial Testimony of Anthony Onorato

On direct, with regard to the presence of semen on the Gunter rectal swabs, Mr. Onorato had little to add to the testimony of Zervos. He testified that he did recover DNA from the rectal swab; that he relied upon the representation of Zervos that the rectal swab had semen on it; and that he was unable to detect any DNA foreign to the child from the rectal swab [TT118:6-11]. When asked if it was "uncommon that when you have semen on a swab that you won't be able to get the DNA off of it?" he testified that he could get the DNA off the swab, but that there was either too little male DNA to detect or any male DNA present was

15

Our File No. 07-227

lost in a sea of female DNA from the child [TT118:12-24]. Onorato then described sending the rectal swabs out to a private laboratory for Y STR testing [TT119:1-17] . On cross examination, defense counsel demonstrates his confusion with regard to the potential commingling of semen in a body orifice with fluid and cells from the orifice source and a swabbing of that orifice in an attempt to collect whatever might be available; and Onorato re-affirms his belief that there was semen on the rectal swab:

> Q. And this was the swab that the lady, the serologist, and I would probably mispronounce her name, she -- her test showed that it was semen.
> A. Ms. Zervos had detected semen on that swab, that's correct.
> Q. And the test you did as far as DNA showed that that was consistent with her DNA.
> A. It showed that we only recovered DNA from the person from whom the swab was taken, that's correct.

Later, Onorato acknowledges that p30 is found in other body fluids, but erroneously limits its detection to male blood from those males who have prostate cancer:

> Q. Are there other substances that might (contain p30)?
> A. There are other substances, body fluids, that may possess this particular protein. It's at such low levels, however. Semen levels of this protein are astronomically high.
> Q. In the test sample?
> A. In a semen sample.
> Q. Okay.
> A. This protein is astronomically high, compared to its content in, say, something like male blood. And generally it's only found in male blood when the individual has a prostatic malignancy.
> Q. Has a what?
> A. I'm sorry, prostate cancer.
> The Court: Is that what a PSA is, you mean?
> The Witness: Your Honor, that's exactly – a PSA test tests for the same exact protein. That's correct.

So now, through the testimony of two Government scientists and that of Dr. Benton, the jury is left with the impression that p30/PSA, if not essentially specific to semen, is found only in other male body fluids or breast milk and at

16

USCA5 1108

Our File No. 07-227

very low levels, and is relied upon by the FBI as stand-alone confirmation of the presence of semen, even for specimens collected from an environment like the human rectum. This notion is left unchallenged by the defense.

The defense calls no witness nor forensic expert to challenge the Government's proof of semen in this case, even though it had retained Dr. Elizabeth Johnson, and she had informed the defense of many of the problems in the Government's semen evidence proof.

## The Government's Closing Argument

Ms. Booth reminds the jury of the evidence of sexual abuse of the child, of how the FBI detected semen on the rectal swabs and how Dr. Benton explained why that semen was void of sperm:

> "The DNA, our DNA, our expert testified that swabs that were taken from [Gunter's] little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June the 29th. The baby was thrown on the side of the truck on June the 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know." [TT20:5-15]

## Defense Closing Argument

In his closing argument defense counsel Tinker does make an attempt to address the lack of proof of the presence of semen on the child's rectal swabs by reminding the jury that the male-specific Y-chromosome test attempted by the Government was fruitless:

> "Secondly, with regard to the DNA, we learned that there was a test which was found positive for semen and that the expert who

17

USCA5 1109

Our File No. 07-227

had examined that and talked freely about (inaudible) protein. He said there was a better test and so sent the semen off for a better test. And that test was negative. That test was negative, the better test. And that was the testimony from that witness." [TT42:3-9]
…

"And there's nothing but insinuations since that test for the semen, the advanced test, I don't know what its call[ed], was negative. There's no evidence of semen, I suggest to you, being found on this child." [TT43:17-20]

This statement produced sustained objections from the Government that led to a bench conference, in which the Court appears to have lost the reservation expressed previously with regard to the Government's semen evidence proof:

The Court: The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client. Don't refer again. There was –
Mr. Tinker: (Inaudible)
The Court: It is not the same thing. There is (inaudible), no evidence of any kind that there was no seminal fluid in the anus of the child. It was –
Mr. Tinker: (Inaudible)
The Court: That is what the expert testified to, there was seminal fluid found in her anus. What they couldn't identify, because it was degraded, was the DNA. There was no question of the expert testified. They don't have to believe it but there's no question that the expert testified that there was seminal fluid – [TT44:6-19]

The United States 5th Circuit Court of Appeals accepted the Government's proof of semen on the child's rectal swab without question. They state:

*504 "There was also evidence of sexual abuse" reiterating the child's unremarkable visit to Dr. Benton in May, 2007 and "Furthermore, after [Gunter's] death, rectal swabs revealed the presence of semen." [423 F.3d 501]

18

USCA5 1110

Our File No. 07-227

## Setting the Record Straight

The Constituents of Semen

Contrary to the testimony of Dr. Benton, semen is the suspension of sperm cells in seminal fluid, not merely a product of the prostate gland without sperm. Neither is the fluid portion of semen merely a product of the prostate gland, but a complex mixture of fluids from the seminal vesicles, the prostate gland, the bulbourethral glands, and other minor glands (urethral and preputial). Neither does the prostate contribute the majority of the liquid of seminal fluid. The seminal vesicles contribute 65-70%, the prostate 25-30%, and the other contributions are 2-5%. Of the prostate gland's contribution, only about 1% is protein including acid phosphatase and p30/PSA. Semen is produced in a cascade reaction at orgasm. The vas deferens contract forcing sperm, which have been stored in the epididymis, up to the ampullae (top end) of the vas deferens. The sperm then pass through ducts into the urethra where they are mixed with the fluids from the seminal vesicles, the prostate, and bulbourethral glands forming semen which is then ejaculated. [See Boron, et al, 2005; *Medical Physiology*: Elsevier/Saunders]

Also contrary to the testimony of Dr. Benton, "pre-ejaculate" fluid is the product of the bulbourethral glands, not the prostate gland, and it typically comprises less than 1% of semen. As the product of the bulbouretheral glands and not the prostate, it is likely that this fluid does not contain any more p30/PSA than might be detected in the peripheral blood of a male. The claim by Dr. Benton that one might be detecting only "pre-ejaculate" or bulbourethreal fluid as semen, collected from an environment such as the rectum, is patently absurd to a knowledgeable scientist. But this claim went totally unchallenged, thereby misleading the jury. While there is a "cleansing" of the urethra and some potential lubrication for the foreskin/glans penis by this bulbourethral gland product, this "pre-ejaculate" fluid's primary function is to increase the mobility of sperm in the vagina and cervical mucus.

19

USCA5 1111

Our File No. 07-227

Dr. Benton described other possible ways in which semen might be void of semen: vasectomy, temporary pathology or illness, or multiple ejaculation. Clearly, vasectomy is not in play here, as Bourgeois had an infant child even younger than Gunter and there is no indication of this surgery after the conception of this child. Also, since Bourgeois had at least three known children, and was apparently healthy at the time of this incident, there is no reason to believe he might be azoospermic or even oligospermic as the result of temporary illness. How often Bourgeois might have ejaculated resulting in a reduced sperm count prior to the alleged sodomy is not known, but the entire family of five had been on the road together in the cab of the tractor-trailer for the last 22 days of Gunter's life. Given that about 2,000 sperm mature every second in normal spermiogenesis, and that the volume of semen is reduced proportionately to the number of sperm per unit volume, Benton's claim of the detection of normal semen void of sperm by chance is also patently absurd.

The Forensic Identification of Semen

The average ejaculate is about three milliliters of semen. This semen contains an average of 300 million sperm, or about 100,000 sperm per microliter of neat semen. A microliter, one-millionth of a liter, of semen, or about one-thirtieth of a drop from a typical eyedropper, a volume that can easily reside on the head of a pin, will contain about 100,000 sperm. Therefore, a miniscule amount of semen should contain an abundant number of sperm. And since sperm are only found in semen, the observation of sperm is proof of the presence of semen. In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a forensic specimen. The relevance of the semen is the only debatable issue given the observation of sperm. Because of the definitive nature of this proof of semen, the recovery and visualization of sperm cells has always been critical in the forensic investigation of alleged sexual assault.

USCA5 1112

Our File No. 07-227

The fairly recent development of the capability to uniquely identify the sperm source of as few as 100 sperm through DNA analysis has revolutionized the investigation and prosecution of sexual assault offenders. Hence, the recovery and visualization of sperm from forensic specimens has become even more important. Although this sperm recovery and visualization process is not difficult, it does require care and skill and is time consuming. At a minimum it requires: [1] the efficient collection of cellular debris from a specimen sample such as a portion of a swab or garment stain; [2] the differential staining of the various cell populations amongst the recovered debris; [3] and time spent at the microscope carefully examining the stained slides. In order to minimize the amount of time and effort spent preparing and examining specimens microscopically, various other easier and less time-consuming methods of screening potential semen-bearing specimens are generally employed before looking for sperm. Even though these other screening tests are not specific for the presence of semen, they are highly sensitive for soluble components or semen, so they can be useful in eliminating specimens or stains not likely to contain a significant amount of semen, and hence, a useful number of sperm.

In this case, and in most cases nationwide, the presumptive test for semen is an acid phosphatase[3] spot test, which requires only a minute amount of the head of a swab or a ca. 2 mm thread from a fabric stain. This "direct" (and most sensitive) testing of a sample for a quick and vivid color producing reaction provides the presumptive indication of the presence of semen on the parent swab or stain. Because of the sensitivity of the acid phosphatase test, a negative (no color production) result will usually end the search for semen in that specimen. The confirmation of the presence of semen is usually the microscopical observation of sperm cells in the cellular debris recovered from an aqueous extraction of the stain material from a larger portion of the swab/stained fabric. If no sperm are observed and the strength of the acid phosphatase reaction is

---

[3] Acid phosphatase is an enzyme that is present in extremely high amounts in semen and in very low amounts in other body fluids. As such, the test is highly sensitive and when positive is generally indicative of the presence of semen, warranting further investigation of the sample.

USCA5 1113

Our File No. 07-227

such that one still suspects that semen is present in the sample, then a p30/PSA assay may be conducted on the aqueous portion of the extract. If the PSA assay is positive in the presence of acid phosphatase but no sperm are observed, the presence of semen is highly likely. This result is somewhat rare, because the incidence of azoospermia, from vasectomy or otherwise, is only about 5% of the population. If the PSA assay is negative in the presence of acid phosphatase, then it is highly unlikely that semen is present.

Recently, PSA assays developed for use as an indicator of benign prostate hyperplasia and prostate cancer have been adopted by large forensic laboratories as a screening tool for the presence of semen. These commercially-sold PSA assays are highly, but not absolutely, specific for human p30 protein. And because they are hypersensitive, detecting human p30/PSA antigen in the one part per 1-10 million dilution range, they are capable of detecting levels of semen at which no forensic significance can be assigned, even though sperm should still be observed. For example, consider a toddler's clothes, especially underpants, machine washed with adult clothes that bear heavy semen deposits as the result of normal sexual activity. More than an adequate amount of semen will be transferred to the toddler's clothing during the wash and survive the rinse and machine drying process to be detected by these commercial PSA assays. Even if the investigation controls for the generalized distribution of semen on the undergarment, such a finding could still result in wrongful criminal charges being brought against the source of the semen. It is recognized that there is likely no innocent explanation for semen being present in a child's body orifice. However, given the explosively inflammatory nature of such a claim, the scientific support of such a claim must be unequivocal.

Given that semen contains an average of 200 million to 500 million sperm per milliliter (ml or thousandth of a liter) and about 820,000 nanograms (ng, or billionth of a gram) PSA per ml, and that these commercial PSA assays claim to detect less than 2ng/ml, then a "positive" result attributable to normal semen should contain at least 450 to 1200 sperm. This is more than an adequate number of sperm to expect to obtain a robust DNA analysis result, especially from a Y-

22

USCA5 1114

Our File No. 07-227

chromosome assay. And even if one utilized as little as 5% of the cell pellet for microscopy, that slide preparation should bear about 22 to 60 sperm. Such a sperm density on a spot slide preparation should never go unobserved, even in the presence of potentially occlusive epithelial cells and fecal material. Assuming the FBI personnel are even marginally competent at recovering, identifying, and isolating sperm from forensic specimens, if the Gunter rectal swab PSA result was due to semen, then not only should the FBI have observed sperm, their DNA test results should have detected ample male DNA to discriminate its source. A failure to recover and observe sperm in the presence of semen most likely reflects poor technique and skill, not aspermic semen.

In this case, and apparently as routine practice according to the testimony of Zervos, the FBI now uses these commercial medical PSA assays when testing female body orifice swabs for semen. The FBI also relies upon these assays, when positive, without any discrimination of the "strength" of the result, even in the absence of (or failure to recover and/or observe) sperm from the same specimen. This is scientifically irresponsible, if not negligent. PSA has been unequivocally shown to be neither semen-specific nor even male specific. PSA has been documented in the scientific literature to be at levels detectable by these hypersensitive commercial assays in breast milk, amniotic fluid, and much more disturbingly, female urine, which was not mentioned by either FBI witness nor Dr. Benton. The reliance by the FBI (and other Government laboratories) on these commercial medical PSA assays in the absence of significant acid phosphatase activity or the observation of sperm is unsound. We do not challenge the Government's right to present PSA assay results to juries as indicative of the potential presence of semen. But to not fully inform the jury as to the limitations of a stand-alone PSA assay result, and, as in this case, to use a pediatric physician to aggrandize that finding, misled the jury.

23

USCA5 1115

Our File No. 07-227

Review of the provided FBI bench notes reveals the following facts:

[1] While Zervos sampled and extracted half of all three Gunter rectal swabs, she performed no microscopy on any of her samples, relying solely on the previously-prepared rectal swab smear slide as representative of all three swabs, upon which no sperm was observed. In the absence of the predicate/requisite sperm for any probative DNA analysis, she referred the case forward for DNA analysis; a full one-half of the rectal swab evidence was consumed in this screening exercise. This material, rather than any of the remaining rectal swab evidence, could have and should have been utilized for any subsequent in-house DNA analysis. The fate of the cell debris from this half of the rectal swab evidence is unknown. This disjoined sampling of precious evidence reflects a cavalier, if not reckless systematic approach to the examination of body orifice specimens by the FBI.

[2] Onorato performed no examination whatsoever for sperm or even semen on the separate and distinct sample he took from one of the Gunter rectal swabs. Even after, in theory, digesting away the female epithelial cells and producing a cell debris pellet that should be relatively much richer per unit volume in sperm than the undigested cell debris pellet, Onorato made no attempt to demonstrate, through post-digestion microscopy, the presence of sperm in his sample.

[3] Onorato measured 50 ng DNA/$\mu$l in the "male" or sperm DNA fraction[4] he prepared from his one-quarter Gunter rectal swab sample and he measured 100 ng DNA/$\mu$l in the "female" or non-sperm DNA fraction from this same sample. We now know that only female DNA was detected in the male/sperm fraction from the rectal swab. The digestion/washing process used by Onorato should have resulted in the reduction of several orders of magnitude of non-sperm DNA from the residual cell pellet, leaving little to no detectable

---

[4] This represents the DNA equivalent to over 14,000 sperm per microliter of this preparation, or an average semen dilution of only about 1:7

24

USCA5 1116

Our File No. 07-227

female DNA. Onorato reduced the female DNA in the male fraction by only one-half. Such a finding should have compelled Onorato to question his protocol and/or his skill in isolating sperm, particularly from specimens with expected low numbers of sperm. Post-digestion microscopy would have revealed numerous surviving epithelial cells or that Onorato's washing process was severely inadequate. Post-digestion microscopy would have significantly improved the ability to discern/reveal any sperm in this sample. A failure to observe sperm in the post-digestion cell pellet would have further undermined the claimed presence of semen on the rectal swabs.

The absence of sperm from a suspected semen source, who by default had to be Alfred Bourgeois, who by all evidence was a normal semen producer, together with the absence of any male DNA from the suspected semen on the Gunter rectal swabs in separate DNA analyses by the FBI and Orchid Cellmark, should have given any scientist pause in offering this questionable semen finding to a jury. However, this finding was even further perverted before the jury by Dr. Benton's "confusion" of the concept of sperm persistence with viability, a concept in which any physician in his position should be well versed.

The Persistence of Semen: Seminal Fluid versus Sperm

Dr. Benton testified that sperm degrade much more quickly than the fluid component of semen, especially in the rectal environment. This is diametrically untrue. As testified to by Benton, it is true that sperm will lose their motility and cease to respire as living cells within hours of ejaculation. They also easily "loose their little tails". But contrary to Benton's testimony, the persistence, as opposed to viability, of sperm cells is dramatically longer than that of the soluble constituents of semen, including acid phosphatase and p30.

The soluble components of semen are subject to the same diluting forces and environmental conditions as are sperm wherever the semen is deposited. In a dry, cool environment semen (both the fluid and cellular components) will

25

Our File No. 07-227

persist for decades, if not longer. In a moist environment, however, sperm cells will persist much longer than the fluid component of semen. This is because sperm cells are equipped with a specialized cell membrane that makes them much more highly resistant to degradation and assimilation by normal metabolic mechanisms than are free dissolved proteins like acid phosphatase and p30 and even epithelial and white blood cells. As described previously, we exploit the hardiness of the sperm cell membrane and its resistance to degradation. We digest away non-sperm cells and soluble protein with an exogenous proteinase in order to then isolate the sperm from those soluble proteins and non-sperm cells. Further, because they are particulate, we can concentrate them into a small volume via centrifugation, thereby dramatically increasing the opportunity to recover and observe them. We can enhance that observational capacity by staining the cell debris with different stains that not only distinguish sperm from non-sperm cells, but also distinguish the unique morphological characteristics of the sperm cell. Because of this, Dr. Benton's claims that the detection of normal semen in the absence of sperm by mechanisms other than aspermia is most sensitive and uncommon, and that one might be able to detect seminal fluid in one area that is void of sperm because of chance, are ludicrous to any knowledgeable forensic scientist.

The ability to recover semen, and hence, sperm, from body orifices depends on several factors, but mostly on the passage of ante-mortem time and the physical activity of the "victim". Semen will be rapidly cleared from living body orifices by gravity drainage, natural dilution and metabolic mechanisms, and environmental conditions. But semen, and particularly sperm, deposited in a body orifice at about the time of death will persist even beyond initial decomposition stages. Sperm numbers sufficient for robust DNA analysis are recovered from buried bodies and bloated bodies that have washed up on shore. Semen associated with a body in a cold or winter environment will persist even longer.

Thus, completely contrary to Dr. Benton's testimony, it is unexpected to detect semen in the absence of sperm. One should be able to concentrate, isolate,

26

USCA5 1118

Our File No. 07-227

stain, and identify sperm from semen dilutions that are beyond the detectable limits of the soluble protein components; therefore, it is axiomatic that whenever the soluble components of semen are detectable, sperm should be easily detected. While it is possible to have sperm whose DNA is degraded beyond detection limits, the sperm cells themselves will maintain their integrity and be readily identifiable.[5]  Assays such as acid phosphatase and p30, which are convenient and relatively specific, are used to focus an investigation for semen.  But one should never rely upon any single result except the observation of sperm as an unequivocal identification of semen.  If semen was truly detected in this case by PSA assay, sperm should have been observed and a typable quantity of sperm DNA should have been recovered from it.

Other Considerations Not Explored at Trial

It is true that semen deposited into the rectum of any living person will be fairly rapidly cleared by drainage and natural metabolic processes, particularly defecation.  So it is likely that any semen detected on the child's rectal swabs was deposited in the child's rectum after the child's most recent defecation preceding her death.  It also appears undisputed that if there is semen on the rectal swabs, then that semen is from Alfred Bourgeois.  It is unclear from the portions of the trial transcript provided to us whether or not the opportunity existed for Bourgeois to have sodomized the child in the interval between the child's last defecation and her death, given that the family of five essentially lived in the cab of the truck for the last days, if not weeks, of the child's life.  We have no information as to whether this opportunity or its absence was developed at trial.  This information, including when the child's underpants were last changed, and whether or not the potty chair and its contents were examined for semen, should have been developed at trial.

---

[5] For example, microscope slide smears with semen that have been treated with caustic dyes during staining and/or excess heat during fixing will reveal  normal sperm cells but the sperm DNA may be degraded.

USCA5 1119

Our File No. 07-227

The FBI at least considered the potential for semen to be associated with the child's clothes, and four areas from the child's underpants Q14 were tested for semen and abandoned. The FBI's reports and notes reveal that no other items of evidence, except the body orifice swabs from the child, were tested for the presence of semen which might be commingled with epithelial cells from the child, including:

Q17 Gunter's shorts;

Q18 Gunter's shirt;

Q19 Alfred Bourgeois' shorts;

Q20 Alfred Bourgeois' shirt;

Q27/Q28 the child's potty seat top and bottom, respectively;

Q29/Q30 a seat cover from the truck;

Q34 syringe with fluid (sample of contents of the potty?);

Q35-Q38 four towels from the truck;

Q39-Q41 three sheets from the truck;

Q42/Q43 two comforters from the truck;

Q44-Q48 pillows and pillowcases from the truck;

Q49 mattress pad from the truck.

An unequivocal finding of semen commingled with biology from the child on any of the above items would have essentially cemented the Government's allegation of sodomy of the child by Bourgeois. Conversely, the absence of semen commingled with biology from the child would further undermine the alleged act of sodomy of the child by Bourgeois in the obligate time interval between the child's last defecation and her death, and the environment of opportunity during life in the truck.

28

USCA5 1120

Our File No. 07-227

It is recommended the items listed above, the body orifice swabs from the child, including the two remnant rectal swab sticks, and the child's underpants, be re-examined.  If you have any questions, please contact us.

Sincerely,

Alan Keel, Criminalist

29

USCA5 1121

Our File No. 07-227

# Exhibit 1

FBI Report of Caroline Zervos

Case ID No. 70A-HQ-60227
Lab No. 020718001 NH HZ

Dated:  September 25, 2002

USCA5 1122

7-1 (Rev. 5-13-99)

LABORATORY

# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

Date:  September 25, 2002

To:  Houston
  Corpus Christi RA

Case ID No.:  70A-HO-60227

Lab No.:  020718001 NH HZ

Reference:  Communication dated July 15, 2002

Your No.:

Title:  ALFRED BOURGEOIS;
  ROBIN BOURGEOIS;
  JA' KARENN GUNTER- VICTIM
  MURDER ON A FEDERAL RESERVATION

Date specimens received:  July 18, 2002

The specimens listed below were submitted under cover of communication dated July 15, 2002 and received in the DNA Analysis Unit I:

## ITEMS LISTED AS FROM JA' KARENN GUNTER:

Q1-Q4      Oral swabs   (1B36)

Q5-Q7      Rectal swabs   (1B36)

Q8-Q10     Vaginal swabs   (1B36)

Q11        Oral smear   (1B36)

Q12        Anal smear   (1B36)

Q13        Vaginal smear   (1B36)

Enclosure (0)

Page 1 of 4

This Report is Furnished for Official Use Only

USCA5 1123

Q14           Underpants  (1B117)

Q15-Q16       Socks  (1B117)

Q17           Shorts  (1B117)

Q18           Shirt  (1B117)


## ITEMS LISTED AS FROM ALFRED BOURGEOIS:

Q19           Shorts  (1B37)

Q20           Shirt  (1B37)

Q20.1         Document  (1B37)

Q21-Q22       Shoes  (1B37)


## ITEMS LISTED AS FROM TRACTOR TRAILER:

Q23           Seat cutting  (1B8)

Q24           Seat cutting  (1B16)

Q25           Seat cutting  (1B17)

Q26           Gauze pad  (1B23)

Q27           Toilet seat-top  (1B18)

Q28           Toilet seat-bottom  (1B18)

Q29-Q30       Seat covers  (1B28)

Q30.1         Left arm seat cover  (1B28)

Q30.2         Right arm seat cover  (1B28)

Q31           Portion of door panel  (1B31)

Q32           Swab  (1B34)

Q33           Swab  (1B41)

Q34           Syringe with fluid  (1B50)

Q35           Towel  (1B46)

Page 2 of 4
020718001 NH HZ

USCA5 1124

Q36          Towel  (1B47)

Q37          Towel  (1B48)

Q38          Towel  (1B49)

Q39-Q40      Sheets  (1B60)

Q41          Sheet  (1B62)

Q42          Comforter  (1B64)

Q43          Comforter  (1B65)

Q44          Pillow  (1B61)

Q45-Q46      Pillows  (1B63)

Q47-Q48      Pillow cases  (1B63)

Q49          Mattress padding  (1B68)


## ITEMS LISTED AS FROM RESIDENCE AT 1533 GRANT STREET, LA PLACE, LA:

Q50-Q59.1    Swabs  (1B107)

Q60          Swab  (1B107)

Q61-Q66      Swabs  (1B90)

Q67          Sock  (1B103)

Q68-Q69      Underpants  (1B103)

Q70          Belt  (1B88)

Q71          Belt  (1B100)

Q72          Belt  (1B108)

Q72.1        Belt  (1B108)

Q73          Washcloth  (1B114)

Q74          Towel  (1B115)

Q75          Pillow  (1B85)


Page 3 of 4
020718001 NH HZ

USCA5 1125

Q76-Q77     Sofa cushion covers   (1B111)

Q78         Plastic wrap   (1B113)

Q79         Plastic wrap   (1B112)

Q80         Doll   (1B101)

Q81         Belt   (1B81)

Q81.1       Belt   (1B81)


K1          Liquid blood sample listed as from ALFRED BOURGEOIS   (1B119)

K2          Dental mold listed as from ALFRED BOURGEOIS   (1B120)


NE1         Control swabs (1B34; 1B42; 1B90)


The results of the serological examinations are included in this report. The DNA analysis examinations are continuing and you will be notified of the results of these examinations in a separate report. The submitted items will be returned to you under separate cover by overnight mail service.


## RESULTS OF EXAMINATION

Semen was identified on specimens Q5 through Q7. Specimens Q1 through Q4 and Q8 through Q14 were examined for the presence of semen; however, none was found.

Blood was identified on specimens Q5 through Q7, Q14, Q29, Q30 and Q52. A chemical test for the possible presence of blood was positive on specimens Q1 through Q4, Q8 through Q10, Q50, Q51 and Q53 through Q60; however, the presence of blood was not confirmed. Specimens Q19, Q20, Q30.1, Q30.2, Q61 through Q66, Q81 and Q81.1 were examined for the presence of blood; however, none was found.

No other serological examinations were conducted.

Caroline M. Zervos
DNA Analysis Unit I
(202)324-3508


Page 4 of 4
020718001 NH HZ

USCA5 1126

Our File No. 07-227

# Exhibit 2

FBI Report of Anthony Onorato

Case ID No. 70A-HQ-60227
Lab No. 020718001 NH HZ; 020904008 HZ

Dated: January 17, 2003

USCA5 1127

7-i (Rev. 5-13-99)

# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

Date:  January 17, 2003

To:     Houston

Case ID No.:   70A-HO-60227-92

Lab No.:     020718001 NH HZ
             020904008 HZ

Reference:   Communications dated July 15, 2002 and September 3, 2002

Your No.:

Title:   ALFRED BOURGEOIS;
         ROBIN BOURGEOIS;
         JA'KARENN GUNTER - VICTIM
         MURDER ON A FEDERAL RESERVATION

Date specimens received:  July 18, 2002 and September 4, 2002

The items below were submitted under cover of the communication dated July 15, 2002, assigned Laboratory number 020718001, and subjected to DNA analysis in DNA Analysis Unit I:

Q2          Oral swab (1B36)

Q7          Rectal swab (1B36)

Q21-Q22     Shoes (1B37)

Q29         Seat cover (1B28)

Q30         Seat cover (1B28)

Q31         Portion of door panel (1B31)

Q52         Swab (1B107)

Page 1 of 5

This Report is Furnished for Official Use Only

70A-HO-60227

USCA5 1128

Q58          Swab (1B107)

K1           Liquid blood sample listed as from ALFRED BOURGEOIS (1B119)

The items below were submitted under cover of the communication dated September 3, 2002, assigned Laboratory number 020904008, and received in DNA Analysis Unit I:

Q82 - Q83     Cords  (1B75)

Q84          Cord (1B80)

Q85 - Q89     Autopsy photos

K3           Liquid blood sample listed as from ROBIN BOURGEOIS  (1B121)

K4           Buccal sample listed as from ALFREDESHA BOURGEOIS  (1B123)

K5           Buccal sample listed as from ALFREDA BOURGEOIS (1B124)

This report contains the results of the supplemental serological and DNA analysis examinations.

**Report of Examinations:**

A presumptive chemical test for the possible presence of blood was positive on specimen Q21;  however, the presence of blood could not be confirmed.  Specimens Q22 and Q31 were examined for the presence of blood;  however, none was detected.

Deoxyribonucleic acid (DNA) was isolated from specimens Q2, Q7, Q21-1, Q29-1 (a bloodstain recovered from this seat cover), Q29-2  (a stain recovered from this seat cover), Q30-1 (a bloodstain recovered from this seat cover), Q31  (a stain recovered from this portion of door panel), Q52, Q58, K1(ALFRED BOURGEOIS), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) and subjected to DNA typing by the polymerase chain reaction (PCR) at the nine (9) short tandem repeat (STR) loci and amelogenin sex typing locus of the AmpFℓSTR® Profiler Plus™ ID Amplification Kit and, sample quantity permitting, the six (6) STR loci and amelogenin sex typing locus of the AmpFℓSTR® COfiler™ PCR Amplification Kit.  The STR types detected for these specimens are given by locus in the tables that follow.

It is noted that specimen Q2 is being used as a known specimen from JA'KARENN GUNTER and will be designated Q2(JA'KARENN GUNTER) to further distinguish it from any other questioned (Q) specimen.

No STR typing results unlike Q2(JA'KARENN GUNTER) were obtained from specimen Q7.

Based on the STR typing results, Q2(JA'KARENN GUNTER) is the source of the DNA obtained from specimens Q29-1, Q30-1, Q52, and Q58 to a reasonable degree of

USCA5 1129

scientific certainty.  Insufficient DNA was isolated from specimen Q58 for PCR typing at the genetic loci of the COfiler™ Kit.

The STR typing results for specimen Q29-2 indicate the presence of DNA from three or more individuals.  Based on this mixture result, K1(ALFRED BOURGEOIS), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) cannot be excluded as potential contributors to the DNA obtained from specimen Q29-2.  The probability of selecting an unrelated individual from a general population who could be a potential contributor to the mixture of DNA obtained from specimen Q29-2 is approximately 1 in 14 from the Black population, 1 in 25 from the Caucasian population, 1 in 28 from the Southeastern Hispanic population, and 1 in 33 from the Southwestern Hispanic population.  It is noted that Q2(JA'KARENN GUNTER) can be excluded as a potential contributor to the mixture of DNA obtained from specimen Q29-2.  Insufficient DNA was isolated from specimen Q29-2 for PCR typing at the genetic loci of the COfiler™ Kit.

The STR typing results for specimen Q31 indicate the presence of DNA from two or more individuals.  Based on this mixture result, K1(ALFRED BOURGEOIS) cannot be excluded as a potential contributor to the DNA obtained from specimen Q31.  The probability of selecting an unrelated individual from a general population who could be a potential contributor to the mixture of DNA obtained from specimen Q31 is approximately 1 in 4 from the Black population, 1 in 9 from the Caucasian population, 1 in 6 from the Southeastern Hispanic population, and 1 in 6 from the Southwestern Hispanic population.  It is noted that Q2(JA'KARENN GUNTER), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) can be excluded as potential contributors to the mixture of DNA obtained from specimen Q31.  Insufficient DNA was isolated from specimen Q31 for PCR typing at the genetic loci of the COfiler™ Kit.

Based on the amelogenin typing results, the DNA detected in specimens Q7, Q29-1, Q30-1, Q52, Q58, Q2(JA'KARENN GUNTER), K3(ROBIN BOURGEOIS), K4(ALFREDESHA BOURGEOIS), and K5(ALFREDA BOURGEOIS) is of female origin.  The DNA detected in specimen K1(ALFRED BOURGEOIS) is of male origin.  A mixture of male and female DNA was detected in specimens Q29-2 and Q31.

Insufficient DNA was recovered from Q21-1 (a stain recovered from this shoe) for PCR typing.

Based on the STR typing results, the DNA obtained from K4(ALFREDESHA BOURGEOIS) and K5(ALFREDA BOURGEOIS) could have originated from a biological offspring of K1(ALFRED BOURGEOIS) and K3(ROBIN BOURGEOIS).  The DNA obtained from Q2(JA'KARENN GUNTER) could have originated from a biological offspring of K1(ALFRED BOURGEOIS); however, it is noted that K3(ROBIN BOURGEOIS) cannot not be the biological mother of Q2(JA'KARENN GUNTER).

No other serological or DNA analysis examinations were conducted.

Page 3 of 5
020904008 TFZ

USCA5 1130

AmpFlSTR® Profiler Plus™ ID

| SAMPLE | D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|
| Q2 (JA'KARENN GUNTER) | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q7 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q29-1 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q30-1 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q52 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| Q58 | 15,15 | 14,18 | 25,26 | 14,15 | 27,30 | 21,22 | 12,12 | 12,13 | 8,10 |
| K1 (ALFRED BOURGEOIS) | 15,16 | 18,18 | 21,26 | 13,14 | 27,32.2 | 18,22 | 12,12 | 12,13 | 8,10 |
| K3 (ROBIN BOURGEOIS) | 15,17 | 16,17 | 22,23 | 14,14 | 29,30 | 12,20 | 11,11 | 11,12 | 10,11 |
| K4 (ALFREDESHA BOURGEOIS) | 16,17 | 17,18 | 21,23 | 13,14 | 30.32.2 | 18,20 | 11,12 | 11,13 | 8,11 |
| K5 (ALFREDA BOURGEOIS) | 15,16 | 16,18 | 21,22 | 14,14 | 27,30 | 12,22 | 11,12 | 12,12 | 8,11 |

Page 4 of 5
020904008 HZ

USCA5 1131

AmpFℓSTR® COfiler™

| SAMPLE | D3S1358 | D16S539 | TH01 | TPOX | CSF1PO | D7S820 |
|---|---|---|---|---|---|---|
| Q2 (JA'KARENN GUNTER) | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q7 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q29-1 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q30-1 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| Q52 | 15,15 | 9,12 | 6,7 | 10,10 | 12,12 | 8,10 |
| K1 (ALFRED BOURGEOIS) | 15,16 | 10,12 | 6,7 | 8,10 | 11,12 | 8,10 |
| K3 (ROBIN BOURGEOIS) | 15,17 | 12,13 | 7,8 | 8,8 | 10,12 | 10,11 |
| K4 (ALFREDESHA BOURGEOIS) | 16,17 | 10,13 | 7,7 | 8,10 | 12,12 | 8,11 |
| K5 (ALFREDA BOURGEOIS) | 15,16 | 10,12 | 6,8 | 8,10 | 10,12 | 8,11 |

**Remarks:**

Items Q82 through Q89 were returned to you by overnight mail service on October 10, 2002. Items Q5, Q6, Q7, Q12, and K1 were returned to you by overnight mail express on October 21, 2002. The remainder of the submitted items of evidence will be returned to you under separate cover by overnight mail service. In addition to the evidence in the case, any remaining processed DNA from specimens examined by DNA analysis is also being returned to you. The processed DNA can be found in a package marked PROCESSED DNA SAMPLES: SHOULD BE REFRIGERATED/FROZEN. It is recommended that these samples be stored in a refrigerator/freezer and isolated from evidence that has not been examined.

Anthony J. Onorato
DNA Analysis Unit I
(202)324-4581

Page 5 of 5
020904008 HZ

USCA5 1132

Our File No. 07-227

# Exhibit 3

Orchid Cellmark Report of Jeffrey A. Hickey
and Robin W. Cotton, Ph.D.

Cellmark Case No. F021475

Dated: November 14, 2002

USCA5 1133



ORCHID
CELLMARK

20271 Goldenrod Lane · Germantown, MD 20876
301.428.4980  800.USA.LABS
301.428.4877 Fax
www.orchidcellmark.com

## REPORT OF LABORATORY EXAMINATION
November 14, 2002

Special Agent Megan Beckett
Federal Bureau of Investigation
800 North Shoreline Boulevard, Suite 1100, North Tower
Corpus Christi, TX  78408

Re:  Cellmark Case No. F021475
     Agency Case No. 70A-HO-60227

**EXHIBITS:**

Items of evidence were received for analysis for analysis on October 31, 2002.  Polymerase chain reaction (PCR) testing was performed on the items listed below:

Description
Three partial swabs (identified in the letter dated October 28, 2002, from Robert Johnson, as anal swabs)

**RESULTS:**

No results were obtained when a DNA extract isolated from the items listed above was tested at the Y chromosomal loci DYS390, DYS19, DYS389 I, and DYS389 II.

**CONCLUSIONS:**

Anal swabs:

No conclusion can be made regarding the anal swabs due to an insufficient amount of amplified DNA.

020718001 NH HZ

*Accredited by the American Society of Crime Laboratory Directors / Laboratory Accreditation Board*
Dallas, TX  ·  Germantown, MD  ·  Nashville, TN

USCA5 1134

Report for Case No. F021475
November 14 , 2002
Page Two


EVIDENCE DISPOSITION:

In the absence of specific instructions, evidence will be returned to the submitting agency by
Federal Express or other appropriate carrier.



Jeffrey A. Hickey                                    Robin W. Cotton, Ph.D.
DNA Analyst III                                      Laboratory Director


If expert witnesses are needed for depositions or court testimony, please notify us by telephone at
301-515-6155 at least four weeks in advance.


CC:  Mr. Tony Onorato
     Federal Bureau of Investigation
     935 Pennsylvania Avenue, NW
     Washington, DC  20535



O20718001 NH HZ

USCA5 1135

Our File No. 07-227

**Exhibit 4**

Letter Report of Elizabeth Johnson, Ph.D.
Two Handwritten Pages and One Page of Copied Text

Dated: March 1, 2004

USCA5 1136

☒003

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
Thousand Oaks, CA 91360
circej@earthlink.net

Phone 805-553-0445

Fax 805-553-0487

3/1/04

To Doug Tinker
Fax - 361-882-3635
Re Bourgeois

①

Doug -

I'm in colorado so hope you can read my writing. classues for cross exam of FBI witnesses (both Carolyn & Anthony)

1) FBI did not test the rectal swab with AP reagent or do a sperm search. They only did a P30 test with the ABA card and a DNA test. The ABA card was positive but there is <u>no</u> indication of male DNA found either in the non-sperm or the sperm fraction.

2) We <u>did</u> do an AP test (negative) and a P30 test (weak positive) and a microscopic sperm search (negative for sperm)

3) The P30 positive (weak on our test) test would be a false positive due to bacterial proteins found on the rectal swab. If there was actually sperm on the swab, they should be observed.

USCA5 1137

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
**Thousand Oaks, CA 91360**
*circek@earthlink.net*

Phone 805-553-0445

Fax 805-553-0487

*Bourgeois continued*

②

if the P30 test is positive from semen:

Calculations:

a. Sensitivity of the ABA card = 4 ng/ml PSA

b. Semen contains a mean of 800,000 ng/ml PSA

c. $\dfrac{800,000}{4}$ = 1/200,000 dilution of semen should be detectable

d. Semen contains on average 100 million sperm per ml of semen

e. A 1/200,000 dilution of semen would then be expected to contain 500 sperm
$$\left[ \frac{100 \times 10^6 \text{ sperm}}{200,000 \text{ dilution}} = 500 \text{ sperm} \right]$$

f) 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to give a DNA result (which they did not) fund. male DNA).

Hope this helps I'll be back Wednesday.

*Libby Johnson*

USCA5 1138

☑ 005

100 µL of serum was mixed with 100 µL of HEPES (0.24 %, pH 7.2) to facilitate absorption, and added to the membrane. Blood samples from four nursing mothers were collected and dried on DNA cards. The bloodstains were extracted in 1 mL HEPES for two hours. The stains were centrifuged in Spin-Ease and 200 µL of extract was added to Seratec PSA *Semiquant* Kits.

Results of the Seratec PSA *Semiquant* Kits were read after ten minutes

## Results and Discussion

It is now quite clear that the term prostatic specific antigen (PSA) is a misnomer. Although present in great amounts in seminal plasma, its presence has been detected in a variety of other body fluids (Table 1). The greatest concentrations of PSA outside of semen have been in breast milk and amniotic fluid. Generally, the forensic biologist does not encounter these fluids, however, one unusual case of the detection of PSA in a diaper originating from the colostrum in breast milk from a nursing child has been reported [20].

| Fluid | Concentration PSA (ng/mL) | Reference |
|-------|---------------------------|-----------|
| Semen | 200,000 to 5.5 million | Sensabaugh [3] |
| Semen | 820,000 (mean) | Lovgren, et.al [21] |
| Amniotic fluid | 0.60 (avg.) 8.98 in one case | Lovgren, et.al [21] |
| Breast milk | 1 (avg.) 2100 in one case | Lovgren, et.al [21] |
| Breast milk | Majority < 1.0; > 100 in one case | Filella, et.a. [22] |
| Breast milk | 0.47 (median) | Yu and Diamandis [9] |
| Saliva | None | Lovgren, et.al [21] |
| Female urine | 3.72 (mean) | Breul, et.al. [11] |
| Female urine | 1.73 (mean) | Breul, et.al. [12] |
| Female urine | 0.12 – 1.06; 0.29 mean | Schmidt, et.al. [13] |
| Female serum | 0.53 (mean) | Breul, et.al. [11] |
| Female serum | Majority < 0.01 | Yu and Diamandis [14] |
| Female serum | Majority < 0.1 | Diamandis and Yu [23] |

**Table 1. Concentration of PSA in various body fluids (liquid).**

Substantial levels of PSA have been found in amniotic fluid and breast milk. Cases involving lactating or pregnant women should be treated with due caution.

Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present or the survivor is menstruating, blood may be present on vaginal swabs or on stains in underwear. When an extract is prepared from a stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the stain is from female urine or serum?

The Abacus Diagnostics *OneStep ABAcard p30 Test* is used quite extensively throughout forensic laboratories in the United States. It has a listed sensitivity of 4 ng PSA/mL.

2

USCA5 1139

## CURRICULUM VITAE

# Charles Alan Keel

- Employment
- Education
- Professional Affiliations
- Presentations
- Personal
- Contact Information

## EMPLOYMENT

Criminalist, North Louisiana Crime Lab, Shreveport, Louisiana 1982-1984

Criminalist III, Oakland Police Department, Oakland, California 1984-1993

Consultant in Forensic Science, Shreveport, Louisiana, 1994-1996 Death Investigator, Caddo Parish Coroner's Office, Shreveport, Louisiana, 1994-1996

Criminalist, Tulsa Police Department, Tulsa, Oklahoma, 1996

Criminalist, San Francisco Police Department, San Francisco,California, 1996-1999

Criminalist/Consultant in Forensic Science, Forensic Science Associates, Richmond, California, 1999-present

## EDUCATION

Bachelor of Science (Zoology), Texas A & M University, CollegeStation, 1978

Graduate Course Work, Texas A & M University, College Station, 1978-80 in Food Science and Technology/Human Physiology

Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS

The American Academy of Forensic Sciences

The American Board of Criminalistics
- Diplomate in General Criminalistics, 1991
- Fellow in Molecular Biology, 1994
DNA Technical Leader/Manager pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred December, 1999

## PRESENTATIONS

USCA5 1140

*A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

*A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

*Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

*Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

## CONTINUING EDUCATION

Recombinant DNA Technology, University of California Extension,Berkeley, 1986

Forensic DNA Analysis, University of California Extension, Berkeley, 1989 The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

Instrumental STR Analysis, Perkin-Elmer/Applied Biosystems, Foster City, 1996 Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, 1996

## PERSONAL

Born July 5, 1956 in Lyons Georgia.

## CONTACT INFORMATION

Alan Keel
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806

USCA5 1141

1-510-222-8883 voice
1-510-222-8887 fax
Email: akeel *at* fsalab *dot* com

---

FSA Home Page              Introduction              Staff Curriculum Vitae
Interesting Cases                                     Useful Forensic Links

USCA5 1142

66

USCA5 1143

**ORIGINAL**

CAUSE NO: 02-CR-3585-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

THE STATE OF TEXAS          §          IN THE DISTIRCT COURT
                           §
VS.                        §          148TH JUDICIAL DISTRICT
                           §
ADAM LONGORIA              §          NUECES COUNTY, TEXAS

## MOTION FOR CONTINUANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ADAM LONGORIA, Defendant, by and through his attorney of record, BILL MAY, and moves the Court to continue the case for the following reasons:

I.

This case is set for Docket Call on March 25, 2004 at 1:30pm and Jury Trial on March 29th, 2004 at 9:00am.

II.

The defendant currently was a witness for the Federal Government on The United States of America Vs Alfred Bourgeois and testified for the Federal Government in which now the Federal Bureau of Investigations needs to interview him in reference to his testimony. Counsel for the defendant has requested the transcripts on his testimony on March 24th, 2004, in which he will need in order to forego on this case. Counsel respectfully requests that this case be reset until he receives the transcripts to provide adequate representation to the defendant and allow the Federal Bureau of Investigations time to interview the Defendant.



USCA5 1144

III.

WHEREFORE PREMISIS CONSIDERED, Defendant prays that the Court grant

his Unopposed Motion for Continuance and sets the case for a later date.

RESPECTFULLY SUBMITTED,

BILL MAY
ATTORNEY AT LAW
BAR NO. 13271600
800 N. SHORELINE STE 400 N.
CORPUS CHRISTI, TEXAS 78401
(361)994-0233        994-9285 FAX

CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of this foregoing Motion has been

hand delivered to the Office of the Assistant District Attorney James Sales, at the Nueces

County Courthouse on 901 Leopard St. Corpus Christi, Texas 78401 on the __23rd__, of

__March__, 2004.

Bill May

USCA5 1145

CAUSE NO: 02-CR-3585-E

| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

ORDER

On this the _____, day of March, 2004, came to be heard the Defendant's

motion for Continuance and it is the ORDER of this court that the motion be:

GRANTED                          DENIED

SIGNED AND ENTERED THIS THE _____ DAY OF _____, 2004.

<br>

_____
JUDGE PRESIDING

USCA5 1146

ORIGINAL

CAUSE NO: 03-CR-1884-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

## MOTION FOR CONTINUANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ADAM LONGORIA, Defendant, by and through his attorney of record, BILL MAY, and moves the Court to continue the case for the following reasons:

I.

This case is set for Docket Call on March 25, 2004 at 1:30pm and Jury Trial on March 29th, 2004 at 9:00am.

II.

The defendant currently was a witness for the Federal Government on The United States of America Vs Alfred Bourgeois and testified for the Federal Government in which now the Federal Bureau of Investigations needs to interview him in reference to his testimony. Counsel for the defendant has requested the transcripts on his testimony on March 24th, 2004, in which he will need in order to forego on this case. Counsel respectfully requests that this case be reset until he receives the transcripts to provide adequate representation to the defendant and allow the Federal Bureau of Investigations time to interview the Defendant.



USCA5 1147

III.

WHEREFORE PREMISIS CONSIDERED, Defendant prays that the Court grant

his Unopposed Motion for Continuance and sets the case for a later date.

RESPECTFULLY SUBMITTED,

BILL MAY
ATTORNEY AT LAW
BAR NO. 13271600
800 N. SHORELINE STE 400 N.
CORPUS CHRISTI, TEXAS 78401
(361)994-0233      994-9285 FAX

CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of this foregoing Motion has been

hand delivered to the Office of the Assistant District Attorney James Sales, at the Nueces

County Courthouse on 901 Leopard St. Corpus Christi, Texas 78401 on the _23rd_, of

_March_, 2004.

Bill May

USCA5 1148

CAUSE NO: 03-CR-1884-E

| THE STATE OF TEXAS | § | IN THE DISTIRCT COURT |
| | § | |
| VS. | § | 148TH JUDICIAL DISTRICT |
| | § | |
| ADAM LONGORIA | § | NUECES COUNTY, TEXAS |

ORDER

On this the _____, day of March, 2004, came to be heard the Defendant's

motion for Continuance and it is the ORDER of this court that the motion be:

GRANTED                    DENIED

SIGNED AND ENTERED THIS THE _____ DAY OF _____, 2004.


_____

JUDGE PRESIDING

USCA5 1149

67

USCA5 1150

## AFFIDAVIT/DECLARATION OF Darrick Moore
### PURSUANT TO 28 U.S.C. § 1746

I, Darrick Moore, hereby swear and affirm as follows: 1.) I was an inmate in Nueces County Jail along with Alfred Bourgedis.

2) I was facing 13 years for drug sales + delivery.

3) I spoke with the prosecutor for Bourgeois' case, Ms. Patti Booth, about statements that Bourgeois made in prison.

4) She told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

MD

**AFFIDAVIT/DECLARATION OF** Darrick Moore (cont.)
**PURSUANT TO 28 U.S.C. § 1746**

5) I met with Ms. Patti Booth a second time, before I testified against Bourgeois, and she told me she had spoken to Lance Dee and they had agreed to reduce my sentence if I agreed to cooperate against Bourgeois

6.) She also told me if I did good on the stand she would make sure that the sentence I was going to get would be reduced even further.

7.) I was concerned and scared that I was going to get 13 years in prison so I agreed to testify against Bourgeois.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____

USCA5 1152

**AFFIDAVIT/DECLARATION OF** Darrick Moore (cont.)
**PURSUANT TO 28 U.S.C. § 1746**

8.) I testified against Bourgeois and in fact my sentence was reduced to 65 months because of this testimony.

9.) A couple months later as I recall my sentence was reduced to 50 months because I cooperated with the DEA.

I, hereby swear and affirm that the above is true and correct under penalty of perjury.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____ 9/18/07

USCA5 1153

68

USCA5 1154

## DECLARATION OF PHILLIP JACKSON
## PURSUANT TO 28 U.S.C. § 1746

I, Phillip Jackson, pursuant to 28 U.S.C. § 1746 swear, affirm and depose that the following is true and correct:

1.      My name is Phillip Jackson. I am currently incarcerated at the Texas Department of Criminal Justice, Stevenson Unit in Cuero, Texas. I am currently serving a sentence for aggravated assault and probation violation.

2.      In the summer of 2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas. At that time, I was housed with several other inmates including Alfred Bourgeois, Darick Moore, Adam Longoria and Timothy Allen.

3.      During the time we were incarcerated, Mr. Bourgeois would often tell me that he was being accused of a crime which his wife committed. He said that his wife had hurt his daughter because she was jealous and angry that Mr. Bourgeois had fathered a child with another woman. I never heard him admit to hurting his daughter and he did not say anything different to Adam Longoria or Darick Moore because we were all housed on the same pod.

4.      I specifically heard Darick Moore say he wanted to testify against someone to get a lesser sentence. He said he had already given information against someone in his federal drug case but that he needed to do more to help his situation. Darick Moore said he needed to figure out who else he was going to tell on. I also heard Darick Moore say that he was worried about his girlfriend who was going out to clubs spending his money while he was in jail. I actually saw him crying because he was so worried about the prison time he was facing on his drug charges.

5.      I remember Alfred Bourgeois and Adam Longoria, who I know as "David", getting into a fight. Mr. Bourgeois had offered Mr. Longoria some toothpaste and Longoria got

USCA5 1155

insulted by the offer. After that, I heard Longoria say that anyone, like Mr. Bourgeois, who denies a crime so often must be guilty. I heard him say " my girl gave me up so why can't I give up someone else."

6.     No one had previously contacted me to discuss what I knew about Mr. Bourgeois, Adam Longoria or Darick Moore. Had I been contacted at the time of trial, I would have testified about what I knew and the things I have stated in this affidavit.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Phillip Jackson    9-19-2007
TDCJ # 01189921    #1189921

Dated:

USCA5 1156

69

USCA5 1157

**DECLARATION OF TIMOTHY ALLEN
PURSUANT TO 28 U.S.C. § 1746**

I, Timothy Allen, pursuant to 28 U.S.C. § 1746 swear, affirm and depose that the following is true and correct:

1. My name is Timothy Allen. I am currently incarcerated at F.C.I. Three Rivers in Three Rivers, Texas. I am serving a 90 month sentence for possession of a firearm.

2. In the summer of 2003, I was incarcerated at the Nueces County Jail in Corpus Christi, Texas. I was housed there while awaiting trial on the firearm possession charges. At that time, I was housed with several other inmates including Alfred Bourgeois, Darick Moore and Adam Longoria. I was a trustee at the jail.

3. During the time we were incarcerated, Alfred Bourgeois was very involved in Bible study. While I frequently heard Mr. Bourgeois discussing the Bible, I never heard Mr. Bourgeois discuss his case with Adam Longoria or Darick Moore. The only thing he told me about his case was that his wife was wrongfully accusing him. I never heard him admit to hurting his daughter and I know that he would not have made that admission to Moore or Longoria.

4. Darick Moore was in jail awaiting trial on an open federal drug charge. I remember he was very concerned and worried about the prison time he was facing. He constantly worried that if he got convicted on the drug charges he was facing, he was never going to get out of jail. He was scared to death about being convicted and sentenced to life imprisonment because of his prior conviction in California. He kept saying there was no way he could handle a long prison term since he had too much going for him on the street.

USCA5 1158

5.     Darick Moore was also very worried about his relationship with his girlfriend, Lisa Fernandez.  I knew Lisa Fernandez from my time on the street.  I told him she was not a trustworthy person.  He then became very worried that she would not be faithfully waiting for him if he got a long prison sentence.  Several times, I heard Darick Moore say that he could not afford to get convicted and get a long sentence.

6.     No one has previously contacted me to discuss what I knew about Mr. Bourgeois, Adam Longoria or Darick Moore.  Had I been contacted at the time of trial, I would have testified about what I knew and the things I have stated in this affidavit.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

#31108-179

_____
Timothy Allen

Dated: 9 – 6 - 07

USCA5 1159

70

USCA5 1160

## DECLARATION AND AFFIDAVIT OF BRENDA GOODMAN
## PURSUANT TO 28 U.S.C. § 1746

Brenda Goodman, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Brenda Goodman. My grandmother was Mary Clayton. Alfred Bourgeois lived with my grandmother when he was a boy. She took him in because of his mother's cruelty.

2.     Alfred was very slow as a child and had lots of trouble with his school work. My grandmother tried to help Alfred, but she could not help him was his school work because she could not read or write. She made an X for her signature all her life.

3.     The community that Alfred grew up in was very poor. Medical care was not adequate. There was one doctor for most of the community and he would often give the same medicine to lots of different people that had different complaints. My grandmother was like many others, using natural medicine. The treatments included using Clorox on bee stings. When Alfred had any problems while living with my grandmother she used those same ways with him.

4.     There was a very high incidence of alcoholism in the community. Kids would sit outside the bar while their parents were inside drinking. Alfred's mother, Eunice was a heavy drinker. She drank most every day. She drank till she became drunk. People did not think about it because it was so much a part of daily life in this poor community. Alfred had to perform many chores for his mother because she was too drunk to do for herself.

5.     Eunice had babies by several different men. She was slow. People would say that Eunice was crazy and that Eunice and all her children were slow. Eunice cussed a lot. It seemed like every other word was a cuss word. Her language to Alfred was abusive and uncaring. She

USCA5 1161

was very cruel to Alfred and her other children. She showed them little love and was quick to beat them for any small reason or for no good reason.

6. Alfred's uncle, Isaac, married a woman named Beatrice. Beatrice is stone crazy. She can hardly complete a thought. She can't explain herself. She is known for talking loud and crazy and people that know her don't pay any attention to what she says. Alfred's uncle Isaac was known as one of the worst drunks around. He could work during the day and then drink until he passed out. He would just stay and sleep it off wherever he fell out. He was just another part of the many bad influences that fell upon anybody associated with that family. I feel very sorry for them and all that they went through.

7. Nobody ever contacted me on Alfred's behalf before his trial. I would have spoken with them and been willing to testify for Alfred if I had been asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Brenda Goodman

Dated: 10/4/07

71

USCA5 1163

DECLARATION AND AFFIDAVIT OF CLAUDIA MITCHELL
PURSUANT TO 28 U.S.C. § 1746

Claudia Mitchell, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    My name is Claudia Mitchell. Alfred Bourgeois and I have the same father but different mothers.

2.    Alfred and I were not raised together and neither of us was raised by our father, Alfred Sterling. I didn't meet my brother, Alfred, until we were teenagers. His mother had basically just thrown Alfred away. Since she had rejected him he was looking for a family where he could be accepted. Our father, Alfred Sterling, was not the answer that Alfred was looking for. Alfred tried to make his way into his father's life but Alfred Sterling was a manipulative, mentally abusive man and could not be the father that Alfred wanted and needed.

3.    From the first time I met Alfred I did not think there was anything normal about him. He was being introduced to me as my brother and he walked in the house and said, "can I get the keys to the car?" That was very inappropriate when we had just met. As I got to know him better I realized he had no internal monitor. He just blurted stuff out and that made him come across as bold but it was really that anything he thought just came out of his mouth.

4.    Alfred was paranoid. He always believed people were doing him wrong. He was a very troubled person.

5.    Alfred would get mentally preoccupied. He was there but not there. He would get detached from what was going on around him. Other times he only addressed what was right in front of his face.

6.    Alfred was not very smart and did not understand a lot of things. He was limited

USCA5 1164

in reading and writing. He tried to function and tried to look good. He was able to hide a lot of his inadequacies. He had a way of connecting with people and then those people would do stuff for him that he was unable to do for himself.

7. Alfred stayed with me in Texas for a while. When he got here he was wearing clothes that were too small for him. He could not cook at all. He could not really function on his own so he started to feed off my life. He would ride on my accreditation. I helped him with paperwork. I filled out applications for him. His pattern was to just try to look good and hide his failings, then he could connect with someone who could help him function so that he could continue to try and feel less inferior to everyone else. There were other people at other times that filled this role for Alfred.

8. At times Alfred let down his guard with me. At those times I could see how really messed up and troubled he was. He told me once that when he got hurt and angry he could not help but lash out at the person. He said once he hit a person one time he would see darkness and then could not control himself. He was better off when he was off driving his truck by himself. That is why he would stay out on the road for weeks at a time. I told Alfred to get help.

9. No one working on Alfred's behalf ever asked me about the things in this affidavit prior to Alfred's trial. I would have told them and I would have been willing to testify for Alfred if I had been asked.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Claudia Mitchell

Dated: 9/16/07

USCA5 1165

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | C.R. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

UNITED STATES MOTION FOR EXTENSION OF TIME
TO FILE AN ANSWER TO PETITIONER'S SECTION 2255 MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this Motion for

Extension of Time to File an Answer to Petitioner's Section 2255 Motion in the above

referenced case. On July 19, 2007, this Court permitted Petitioner's counsel to file a

legal memorandum supporting his May 2007 Section 2255 Motion and Ordered the

document filed by September 28, 2007. In that same Order, this Court Ordered the

United States to file a response in this case by January 28, 2008, and set March 28,

2008 as the due date for Petitioner's reply to the Government's response.

As this Court is aware, this is a capital case which resulted in the jury

sentencing Petitioner to death. As one would expect, the record in this case is

voluminous, and the trial involved complex legal and factual issues. Petitioner is

USCA5 1166

presently represented in his instant motion by four attorneys from the Federal Public Defender's Capital Habeas Corpus Unit.  A cursory review of the 130 page motion and the subsequent 142 page legal memorandum reveal a detailed and comprehensive attack on almost every aspect of Petitioner's trial and sentence.  The legal pleadings are supported by 71 evidentiary documents, including statements and reports from 15 separate witnesses who are proffered as experts in medical or scientific fields of training.  The legal pleading raises approximately nine distinct substantive claims and an additional 10 issues alleging ineffective assistance of counsel.  Many of the issues revolve around the opinions of the proffered experts, and several of the very complex issues raise new claims.

Upon receiving Petitioner's pleadings and supporting documentation, undersigned counsel began the arduous task of re-assembling the record and evidence in this case and reviewing all of Petitioner's submissions.  Presently, undersigned counsel has drafted a 100-plus page response addressing approximately half of Petitioner's issues.  Due to the breadth of Petitioner's issues and the nature of some of his allegations, it has become apparent that the government will have to conduct some investigation of certain claims and seek expert advice on various aspects of Petitioner's medical and scientific assertions.  This will require additional time beyond the government's current due date.

2

In addition to working on the instant case from October 2007 to the present, undersigned counsel was responsible for filing 10 lengthy pleadings with the Fifth Circuit Court of Appeals and preparing for and presenting oral argument in direct criminal appeals. During that time period, undersigned counsel also had additional management and supervisory duties as Deputy Chief of the Criminal Appellate Division in Houston, Texas. Moreover, as of January 20, 2008, undersigned counsel will begin a temporary one-year assignment with the General Counsel's office assisting the Executive Office for United States Attorneys in Washington, D.C. Due to this temporary assignment, undersigned counsel will only be able to work on the instant case during evenings and weekends for the remainder of the year. Although the Corpus Christi Division of the United States Attorney's office is rendering assistance in this proceeding, undersigned counsel remains the primary person responsible for responding to Petitioner's pleadings.

In light of the forgoing circumstances, the government requests this Court grant a 90-day extension, to and including April 28, 2008, and assign a new due date for any reply by Petitioner. This extension is necessary to enable undersigned counsel to fully review the pleadings and record and adequately respond to this very extensive and thorough motion. If at all possible, the government will file its answer sooner.

3

USCA5 1168

Undersigned counsel conferred with Assistant Federal Public Defender James

McHugh, one of Petitioner's co-counsel, and he indicated that Petitioner's defense

team is not opposed to this 90-day extension request.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney


 /S/ Tony R. Roberts
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx. 26173
P.O. Box 61129
Houston, Texas 77208

4

USCA5 1169

## CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a

copy of the above Motion for Extension of Time was placed in the mail on January

15, 2008, via certified mail, return receipt requested to:

Maureen Kearney Rowley
Michael Wisemen
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106


　　　　　　　　　　　　　_/S/ Tony R. Roberts_
　　　　　　　　　　　　　TONY R. ROBERTS
　　　　　　　　　　　　　Assistant United States Attorney

5

USCA5 1170

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,       §
    Respondent,                 §
                                §
vs.                             §       C.R. No. C-02-216
                                §       C.A. No. C-07-223
ALFRED BOURGEOIS,               §
    Petitioner.                 §

ORDER

It is hereby ORDERED that the United States' Motion for Extension of Time

to File an Answer to Defendant's Section 2255 Motion is GRANTED.  The United

States is ordered to file an answer in the instant cause by _____, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


6

USCA5 1171

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,     §
    Respondent,               §
                              §
vs.                           §     C.R. No. C-02-216
                              §     C.A. No. C-07-223
                              §
ALFRED BOURGEOIS,             §
    Petitioner.               §

ORDER

It is hereby ORDERED that the United States' Motion for Extension of

Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.  The

United States is ordered to file an answer in the instant cause by _____,

2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


USCA5 1172

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,　　　　§
　　　Respondent,　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
vs.　　　　　　　　　　　　　　　　§　　　C.R. No. C-02-216
　　　　　　　　　　　　　　　　　　§　　　C.A. No. C-07-223
　　　　　　　　　　　　　　　　　　§
ALFRED BOURGEOIS,　　　　　　　　§
　　　Petitioner.　　　　　　　　　　§

ORDER

It is hereby ORDERED that the United States' Motion for Extension of Time

to File an Answer to Defendant's Section 2255 Motion is GRANTED.  The United

States is ordered to file an answer in the instant cause by _April 28_, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _July 30_, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _15_ day of _January_ 2008.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

6

USCA5 1173

USCA5 1174

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
1133 NORTH SHORELINE, RM. 208
CORPUS CHRISTI, TX 78401

OFFICIAL BUSINESS

CERTIFIED MAIL™

7003 3110 0002 0869 5940

**Michael Wiseman**
Office of the Federal Public Defender
601 Walnut Street  - The Curtis Center, Suite 545
Philadelphia, PA 19106

USCA5 1175

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
1133 NORTH SHORELINE, RM. 208
CORPUS CHRISTI, TX 78401

OFFICIAL BUSINESS



CERTIFIED MAIL™

7003 3110 0002 0869 5957

**Victor Julio Abreu**
Office of Federal Public Defender
1701 W Hwy 83, Ste 405
McAllen, TX 78501

USCA5 1176

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
1133 NORTH SHORELINE, RM. 208
CORPUS CHRISTI, TX 78401

OFFICIAL BUSINESS



**CERTIFIED MAIL**™

7003 3110 0002 0869 5964

**James L Turner**
US Attorneys Office
PO Box 61129
Houston, TX 77208-1129

USCA5 1177

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
1133 NORTH SHORELINE, RM. 208
CORPUS CHRISTI, TX 78401

OFFICIAL BUSINESS



7003 3110 0002 0869 5988

**Tony R Roberts**
Office of the US Attorney
PO Box 61129
Houston, TX 77208

**SENDER:** COMPLE.. THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the fr... space permits.

1. Article Addressed to:

Victor Juli Abrue
Office of the FPD
1701 W Hwy 83, Ste 405
McAlle.. Texas 78501

2:02cr216      #404

..TE THIS SECTION ON DELIVERY

A. Signature

X ☑ Agent
   ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
United States Courts
Southern District of Texas

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

JAN 2 2 2008

Michael N. Milby, Clerk of Court

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☑ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article Number
   (Transfer from service label)     7003 3110 0002 0869 5957

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

USCA5 1178

**SENDER:** *COMPLETE THIS SEC* · · · | · · · SECTION ON DELIVERY

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature
X [signature]  ☐ Agent  ☐ Addressee

B. Received by ( *Printed Name* )  C. Date of Delivery
Marcius Vinson-Parks  01/12/07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

**Tony R Roberts**
Office of the US Atty
PO Box 61129
Houston, Texas 77208

United States
Southern District

**JAN 2 2 2008**

Michael N. Milby, Clerk of Court

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

2:02cr216    #404

4. Restricted Delivery? *(Extra Fee)*  ☐ Yes

2. Article Number
*(Transfer from service label)*

7003 3110 0002 0869 5988

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

USCA5 1179

**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**1. Article Addressed to:**

James L Turner
US Attys Office
PO Box 61129
Houston, Texas 77208

2:02cr216      #404

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____     ☐ Agent
                      ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery
Marcus Venson-Nook     01/17/08

D. Is delivery address different from item 1?   ☐ Yes
United States Court
Southern District of Texas
FILED
If YES, enter delivery address below:   ☐ No

JAN 2 2 2008

Michael N. Milby, Clerk of Court

3. Service Type
☑ Certified Mail     ☐ Express Mail
☐ Registered         ☑ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

**2. Article Number**
(Transfer from service label)     7003 3110 0002 0869 5964

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

USCA5 1180

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Michael Wiseman
Office of the FPD
601 Walnut Street
The Curtis Center, Suite 545
Philadelphia, PA 19106

2:02cr216    #404

**SECTION ON DELIVERY**

A. Signature

X  K. Prescott    ☑ Agent    ☐ Addressee

B. Received by (*Printed Name*)    C. Date of Delivery
K. Prescott    1/23/08

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

United States Court
Southern District of Texas
FILED

JAN 28 2008

Michael N. Milby, Clerk of Court

Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☑ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

2. Article Number
(*Transfer from service label*)    7003 3110 0002 0869 5940

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

USCA5 1181

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : |  |
| ALFRED BOURGEOIS, | : | Electronically Filed |
|  | : |  |
| Petitioner. | : |  |
|  | : |  |

**PETITIONER'S UNOPPOSED MOTION TO AMEND COURT'S
ORDER LIMITING MR. BOURGEOIS' CORRESPONDENCE**

Petitioner, Alfred Bourgeois, through undersigned counsel, hereby moves to amend this Court's order restricting Mr. Bourgeois' correspondence, and in support of this *Motion* states the following.

1.      Pending before the Court is *Petitioner's Motion Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* challenging his convictions and sentence of death related to the 2002 beating death of his daughter, JG-1999.  On October 5, 2007 Petitioner filed a *Memorandum in Support*, and the Government's answering pleading is currently due on April 28, 2008.

2.      During pre-trial proceedings the Government raised a concern that Petitioner was having improper and allegedly threatening communications with witnesses and potential witnesses. As a result, the Court issued a series of orders placing restrictions on Petitioner's oral and written communications with prisoners and others outside of his place of confinement.  Even though

1

USCA5 1182

Petitioner was convicted in 2004, Petitioner understands that the United States Bureau of Prisons (BOP) considers these orders still in effect and does not permit Petitioner to write or place telephone calls to people outside his current place of confinement.

3.      Undersigned counsel visited Petitioner at U.S.P. Terre Haute on January 22, 2008. At the beginning of the meeting, BOP counselor Randy White advised counsel that Petitioner was on a hunger strike ostensibly related to the on-going restrictions on his communications. Counselor White's stated purpose was to see if counsel could persuade Mr. Bourgeois to abandon his strike. Counselor White presented Petitioner with copies of two orders which he indicated formed the basis for the BOP's on-going restriction on Petitioner's communication. A copy of the orders are attached to this Motion.[1] Counsel naturally advised Mr. Bourgeois to abandon his strike, and he agreed to do so. Counsel also promised Mr. Bourgeois that he would file this *Motion*.

4.      It appears from the attached orders that at some point the Court permitted Petitioner to communicate through his trial counsel. Since trial counsel (Mr. Gilmore and Mr. Tinker) no longer represent Petitioner, this arrangement has resulted in a total ban on Petitioner's communication.

5.      Undersigned counsel requests that the Court permit Mr. Bourgeois to have written communication with the outside world, so long as the communications are first sent to undersigned counsel who will review them for propriety before sending them on to the addressee. Counsel is

----

[1]Undersigned counsel has been unable to access these orders on PACER (which tells counsel that they are not authorized to view these documents) and therefore counsel believe that they will not be able to reconstruct the entire sequence of orders related to the question of Mr. Bourgeois' communication. However, counsel believe, based upon Counselor White's communication, that the attached orders reflect BOP's current understanding with respect to the limits on Mr. Bourgeois' communication.

2

USCA5 1183

willing to act in this capacity and will enclose with each such letter a cover letter explaining to the recipient that counsel will stop forwarding letters to them upon request.

6.      Counsel has communicated with AUSA Tony Roberts about this *Motion*, and Mr. Roberts has authorized counsel to advise the Court that the Government does not object to the relief requested herein.

WHEREFORE, counsel for Petitioner request that the Court modify its prior order to permit Petitioner to send written communications to those outside of BOP custody, in accordance with the terms set forth in the accompanying proposed order.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated: Philadelphia, PA
        February 5, 2008

USCA5 1184

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 5th day of February, 2008, I caused the foregoing upon the following person in the manner indicated below:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Michael Wiseman


Michael Wiseman

USCA5 1185

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,           :           No. Cr-C-02-216
                                                    :           No. Cv-07-223
                          Respondent,      :      Honorable Janis Graham Jack,
                                                    :                 U.S.D.J.
        -against-                               :
                                                    :         **This is a Capital Case**
ALFRED BOURGEOIS,                        :
                                                    :
                          Petitioner.           :
_____ :

**ORDER**

AND NOW this ___ day of _____, 2008 consideration of *PETITIONER'S UNOPPOSED MOTION TO AMEND COURT'S ORDER LIMITING MR. BOURGEOIS' CORRESPONDENCE*, it is hereby ORDERED:

Petitioner's motion is granted in accordance with the following terms:

A.      The United States Bureau of Prisons (BOP) is directed to permit Petitioner to have written communications with persons outside of BOP custody in accordance with BOP policy governing prisoner communications and with the following additional terms;

B.      All such written communications must be sent by Petitioner to his counsel of record, Michael Wiseman and/or Victor Abreu, at the following address:

Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Curtis Center – Suite 545 West
Philadelphia, PA 19106

C.      Upon receipt, counsel shall review the correspondence to insure that they are proper including that they contain no threats or intimidation;

D.      If the communication is determined to contain improper content, counsel shall retain the letter and notify Petitioner in writing that the letter has not been forwarded;

USCA5 1186

E.      If the communication is deemed proper, counsel will forward it to the addressee along with a cover letter from counsel advising the addressee that if they wish to not receive further correspondence from Petitioner, they can inform counsel of the same in writing;

F.      This order shall remain in effect until further order of the Court.

**SO ORDERED,**

_____

Hon. Janis Graham Jack
USDJ

Dated: Corpus Chrisi, Texas
       February 5, 2008

**USCA5 1187**



United States District Court
Southern District of Texas
ENTERED

NOV 24 2003

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA        §
                                §
vs.                             §        Crim. No. C-02-216(1)
                                §
ALFRED BOURGEOIS                §

ORDER OF CONFINEMENT

On this day was held a status conference in the above-styled action. It has come to the Court's attention that despite this Court's prior orders that Defendant is not to have any correspondence with anyone except for his attorneys (See Order Clarifying Prior Order attached hereto), Defendant has mailed at least two letters to individuals other than his lawyers and possibly made phone calls to persons other than his attorneys. It is believed that Defendant has been aided in making such communication through trustees among other individuals being held in the jail.

For these reasons, the Court reiterates its prior order that Defendant is not to have any correspondence or communication with anyone except for his attorneys, whether by telephone, letter, or otherwise. Defendant is ORDERED not to make any telephone calls to anyone other than his attorneys.

Furthermore, it is ORDERED that Defendant be placed in maximum security where he is to have no contact with any other inmate. It is ORDERED that Defendant have one hour of supervised recreational activity a day -- alone except for jail guards as may be required.

USCA5 1189

It is ORDERED that Defendant's food slot remain locked except as needed for supplying food.

SIGNED and ENTERED this the 24th day of October, 2003.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

2

JAN- 8-03 WED 5:31 PM                                          FAX NO. 504  2841             P. 1

01/08/2003  17:52    511  3538

PAGE 01

United States Courts
Southern District of Texas
ENTERED

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

JAN 08 2003

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA,          §
                                   §
vs.                                §    Criminal Action. No. C-02-216
                                   §
ALFRED BOURGEOIS,                  §

## ORDER CLARIFYING PRIOR ORDER

On December 20, 2002, this Court held a hearing in the above-referenced case regarding, in part, defendant's communication. The United States had concerns that defendant had been making threats to others in his written and verbal communications. This Court held that defendant could only communicate with others through his attorney, John Gilmore.

On January 8, 2003, this Court held a hearing regarding the scope and effect of this prior order. The Court now clarifies its December 20, 2002 Order in that defendant is not to have any correspondence with anyone except for his attorney, whether by telephone, letter, or otherwise. If defendant's attorney believes that this restriction creates an impact upon defendant's legal defense, an application may be made ex parte for relief.

SIGNED and ENTERED' on this the 8th day of January, 2003.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

---

' Facsimile signed order has the same full effect as an original signed order.

1

28

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, Clerk of Court
By
        Deputy Clerk

2:02cr216 #28          Page 1/1

2:02cr216 #126         Page 3/3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA         §
                                 §
VS.                              §    CRIMINAL ACTION NO. C-02-216
                                 §
ALFRED NMI BOURGEOIS             §

## Order

In 2004, petitioner Alfred Bourgeois was convicted of first degree premeditated murder under 18 U.S.C. § 1111(a) and sentenced to death.  On May 14, 2007, he filed a motion for relief under 28 U.S.C. § 2255.

Before Bourgeois's trial, the government advised this Court that Bourgeois was making verbal and written threats to other people.  Accordingly, Bourgeois was ordered not to communicate with anybody except his trial counsel.  Trial counsel no longer represents Bourgeois.

Bourgeois has now filed a motion stating that the United States Bureau of Prisons regards the earlier orders as still operative.  As a result, Bourgeois claims that he is unable to communicate with anybody outside the facility in which he is confined.  He requests an order permitting him to communicate with, and through, his postconviction counsel.  The government does not oppose this motion, but this Court is concerned that the reasons the limitations were originally placed on Bourgeois's ability to communicate with individuals other than his attorneys are still applicable.  Accordingly,

IT IS ORDERED THAT Petitioner's Unopposed Motion To Amend Court's Order Limiting Mr. Bourgeois' Correspondence (Docket Entry 413) is **Granted In Part**;

1 / 2

USCA5 1191

IT IS FURTHER ORDERED THAT Petitioner may freely communicate, in accordance with the standard procedures of the United States Bureau of Prisons, with his counsel; and

IT IS FURTHER ORDERED THAT the government's trial counsel, Assistant United States Attorney Patti Booth, shall file a response to Bourgeois's motion on or before March 6, 2008, stating the government's position on whether the restrictions placed on Bourgeois's ability to communicate with people other than his attorney should remain in place.

SIGNED and ORDERED this 6th day of February, 2008.

Janis Graham Jack
United States District Judge

2 / 2

USCA5 1192

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          §
    Respondent,                            §
                                                       §
    vs.                                             §   CR. No. C-02-216
                                                       §   C.A. No. C-07-223
ALFRED BOURGEOIS,                       §
    Petitioner.                              §

UNITED STATES' UNOPPOSED MOTION FOR SECOND EXTENSION
OF TIME TO FILE AN ANSWER TO PETITIONER'S SECTION 2255 MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this unopposed

Motion for a Second Extension of Time to File an Answer to Petitioner's Section

2255 Motion in the above referenced case.  In support thereof, the government states

the following.

On July 19, 2007, this Court permitted Petitioner's counsel to file a legal

memorandum supporting his May 2007 Section 2255 Motion and Ordered the

document filed by September 28, 2007.  In that same Order, this Court Ordered the

government to file a response in this case by January 28, 2008, and set March 28,

2008, as the due date for Petitioner's reply to the government's response.  Since that

time, this Court has granted the government an extension of time due to the reasons

USCA5 1193

contained in the government's January 15, 2008 motion for such. *See* District Court

Docket Entries # 403, 404. This Court generously granted the Government's request

establishing the government's current due date as April 28, 2008, and resetting

Petitioner's due date for a reply to July 28, 2008.

As noted in the government's January 2008 motion, undersigned counsel has

been detailed to Washington D.C. for a one-year assignment with the Executive

Office of the United States Attorneys' office. Notwithstanding that detail,

undersigned counsel remains the primary person responsible for responding to

Petitioner's claims in the instant action. The government has made some progress in

obtaining investigative assistance but is currently still searching for expert assistance

in responding to various complex scientific, medical, and other technical claims made

by Petitioner.

On February 11, 2008, the Fifth Circuit Court of Appeals granted *en banc*

rehearing in *United States v. Gomez-Gomez*, No. 05-41461, __ F.3d __, (5th Cir., Feb.

11, 2008). *Gomez-Gomez* will revisit the very complex and broad-ranging issue of

sentence enhancements for "crimes of violence" in illegal reentry cases under 8

U.S.C. § 1326. Undersigned counsel has been lead counsel on that case since March

2006: government brief filed in May 2006; oral argument presented to the Fifth

Circuit in February 2007; obtained Solicitor General approval to seek rehearing *en*

2

*banc*; and filed the government's petition for rehearing *en banc* in August 2007.

Thus, undersigned counsel is now responsible for complying with the Fifth Circuit's

scheduling Order regarding this *en banc* case.[1]

The February 11, 2008 Order directs undersigned counsel to submit the

government's *en banc* brief on April 11, 2008. Oral argument before the *en banc*

Court is set for the week of May 19, 2008. Undersigned counsel will work on the

*Gomez-Gomez* case in addition to his primary duties as a detailed attorney with the

General Counsel's Office in Washington D.C.

As this Court is obviously aware, the issues involved in the *Gomez-Gomez en*

*banc* case have caused great consternation amongst the district courts within the Fifth

Circuit as well as resulting in conflicting and confusing decisions from various

appellate courts. Undersigned counsel hopes that the results of *Gomez-Gomez* will

bring clarity and unity regarding the much-litigated question of what qualifies as a

"crime of violence" for sentence enhancement purposes under USSG § 2L1.2. To

---

[1] The Fifth Circuit Court of Appeals' letter to counsel notifying the parties of the Court's decision to hear this case *en banc* instructs the parties to address whether *United States v. Calderon-Pena*, 383 F.3d 254 (5th Cir. 2004) (en banc) "should be overruled or modified." Undersigned counsel also represented the government throughout the entirety of the *Calderon-Pena* proceedings. As such, there is no one within the Southern District of Texas who is better situated to address the broad-ranging concerns at issue in the *Gomez-Gomez en banc* proceedings than undersigned counsel.

USCA5 1195

achieve such a result will require undersigned counsel to devote most of his time over the next few months to drafting the government brief and preparing for oral argument.

At the same time, undersigned counsel will continue to draft the government's response to Petitioner's pleading.  The government is hopeful of quickly locating and interviewing witnesses and obtaining expert advice and guidance on various issues raised by Petitioner's pleadings.  Moreover, the government has no interest in unnecessarily extending the instant proceedings.  The government anticipates that an evidentiary hearing will be necessary once all the pleadings are filed and this Court has had an opportunity to review those pleadings.  It is certainly not in the government's interest to delay any such hearing.

Nevertheless, due to the recent developments identified in this motion, the government requests this Court grant an additional extension of 89-days, to and including July 25, 2008, and assign a new due date for any reply by Petitioner. Undersigned counsel will continue to draft the government's response in the instant case and will devote every extra minute to the instant case upon completing the work in the *Gomez-Gomez* case.  This extension is necessary to enable undersigned counsel to fully and adequately address Petition's complex claims.  If at all possible, the government will file its answer before the established new due date.

4

USCA5 1196

Undersigned counsel conferred with Assistant Federal Public Defender James

McHugh, one of Petitioner's co-counsel, and he indicated that Petitioner's defense

team is not opposed to this additional 89-day extension request.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney

    /S/ *Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

5

USCA5 1197

## CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a

copy of the above Motion for Extension of Time was placed in the mail on February

19, 2008, via certified mail, return receipt requested to:

Maureen Kearney Rowley
Michael Wisemen
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106


/S/ *Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney

6

USCA5 1198

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,  §
    Respondent,  §
      §
vs.  §  CR. No. C-02-216
      §  C.A. No. C-07-223
ALFRED BOURGEOIS,  §
    Petitioner.  §

ORDER

It is hereby ORDERED that the United States' Second Motion for Extension

of Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.  The

United States is ordered to file an answer in the instant cause by _____,

2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____, 2008.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1199

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

It is hereby ORDERED that the United States' Second Motion for Extension

of Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.

The United States is ordered to file an answer in the instant cause by _____

_, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the

government's response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____, 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

It is hereby ORDERED that the United States' Second Motion for Extension

of Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.

The United States is ordered to file an answer in the instant cause by July 21, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's response on

or before October 20, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

SIGNED and ORDERED this 19th day of February, 2008.

_____
Janis Graham Jack
United States District Judge

1 / 1

2:02 CR 216



USCA5 1202

2:02 CR 216

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com℠

**OFFICIAL USE**

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | D.E.416 |
| Return Reciept Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To _Tony Roberts_

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800 Rev 2002                See Reverse for Instructions

7003 0110 0002 0872 8358

USCA5 1203

2:02 CR216



USCA5 1204

2:02 CR 216



USCA5 1205

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

James L. Turner
USATHY OFF.
PO Box 61129
Houston, TX 77208

2:02CR214, DE 416

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _Cal_ ☐ Agent
☐ Addressee

B. Received by ( *Printed Name*)   C. Date of Delivery
Kenn Car-                          2/26/8

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

United States District
Southern District of Texas
FILED

**FEB 28 2008**

Michael N. Milby, Clerk of Court

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☒ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*           ☐ Yes

2. Article Number
   *(Transfer from service label)*

7003 3110 0002 0872 8341

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

**USCA5 1206**

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Michael Wiseman
FPD
601 Walnut St.
Ste 545
Philadelphia, PA
2:02cR216, DE 416

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X → Ismael Ortiz    ☐ Agent   ☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery
→ Ismael Ortiz   2-25-08

United States
Southern District of Texas

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:   ☐ No

FEB 2 8 2008

Michael N. Milby, Clerk of Court

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
*(Transfer from service label)*

7003 3110 0002 0872 8327

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

USCA5 1207

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Tony Roberts
US Atty OFF.
PO Box 61129
Houston, TX 77208

2:02CR216, DE 416

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery
Michael Sec. of Courts            2/26/08

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

FILED

FEB 28 2008

Michael N. Milby, Clerk of Court

3. Service Type
☐ Certified Mail     ☐ Express Mail
☐ Registered         ☐ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)

7003 3110 0002 0872 8358

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

USCA5 1208

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Victor
Julio Abreu
FPD
1701 W Hwy 83, Ste 405
McAllen, TX 78501

2:02CR216, DE 416

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
☐ Addressee

B. Received by (Printed Name)     Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

Southern District

FILED

MAR 04 2008

Michael N. Milby, Clerk of Court

3. Service Type
☐ Certified Mail     ☐ Express Mail
☐ Registered     ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7003 3110 0002 0872 8334

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

USCA5 1209

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | CRIMINAL NO. C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

**GOVERNMENT'S RESPONSE TO COURT ORDER OF FEBRUARY 6, 2008
REGARDING DEFENDANT'S MOTION TO AMEND
THE COURT'S ORDER LIMITING CORRESPONDENCE**

COMES NOW the United States of America, by and through the United States Attorney

for the Southern District of Texas, and Patti Hubert Booth, the undersigned Assistant United

States Attorney, and files the following **RESPONSE TO THE COURT'S ORDER OF**

**FEBRUARY 6, 2008.**

I.

The defendant, Alfred Bourgeois ("Bourgeois") through new counsel, has filed a Motion

to Amend the Court's Order Limiting Correspondence. Attachments to defendant's motion are

two previous court orders regarding the limitations of defendant's communication. The first

order was entered on January 8, 2003, following a hearing held before the Court on this issue,

and the second order was entered on October 24, 2003, which was entered following a lengthy

status conference held before the Court as to several issues, one of which was Bourgeois'

continued threats to potential witnesses.

Defendant Bourgeois was convicted on March 16, 2004, of first degree murder of his

child following an eight day jury trial. After four days of hearings as to the punishment phase of

**USCA5 1210**

Bourgeois' conviction, the jury announced its unanimous decision to sentence Bourgeois to death for this crime.

The government established numerous times through prior motions and in Court hearings that defendant Bourgeois is a violent, manipulative and dangerous individual, who repeatedly threatened others before and during his trial.

During Bourgeois' incarceration in Corpus Christi, Texas, and prior to trial, an inmate named Orlando Campos, who was housed with Bourgeois, contacted case agents and informed them that Bourgeois repeatedly told Campos that he "Bourgeois" was going to kill his wife. Bourgeois' wife at the time was Robin Bourgeois. Campos told agents that Bourgeois said he had a brother who owed him a favor and that this brother asked Bourgeois if he wanted **anything done to Robin.** Campos told agents that Bourgeois answered his brother **not now... because it would look bad.**

Campos contacted case agents a second time when Bourgeois told Campos that he was going to have his brother **kill Robin now.** Campos stated to agents that Bourgeois said he was not going to wait until his trial to have **Robin** murdered. Campos also told agents that Bourgeois told him that he, "Bourgeois" has the ability to have anyone killed through his family, and that his family had already killed one of his ex-wives for him.

Another inmate named Wiley Lee Taylor, was also housed with Bourgeois during this time period. Taylor also informed the government that Bourgeois told Taylor of his plans to kill his wife **Robin.** Taylor told agents that Bourgeois stated that the only reason he was in jail was due to Robin's cooperation with the FBI. Taylor told agents that Bourgeois said that when he got out of jail that he was going to pull Robin's tongue out with a pair of pliers, cut it off and

2

USCA5 1211

watch her bleed to death. He further told Taylor that after he cut off her tongue, he was going to slit her throat just before she died. Taylor said that Bourgeois told him he did not care if he got caught, that **it was something he had to do.** Taylor, like Campos had done, informed agents that Bourgeois bragged that he had the power to kill someone through his family. Finally, Taylor told agents that Bourgeois stated that when this was all over, they would **get that bitch**.

The government has no evidence to substantiate that Bourgeois' personality and his manipulative tendencies toward others has changed since his conviction.

Further, in reviewing the defendant's previous correspondence, in particular, correspondence to the defendant's wife's uncle, Anthony Dumas, the defendant directly threatened Robin's life, stating that, "Robin's days will be short... This niece of yours will have a short life... Robin's day is coming." See attached Exhibit "A".

In reviewing other correspondence from the defendant, Bourgeois cleverly directs the recipient of his letter to get in touch with his brother Lloyd, so that they can discuss the defendant's case with Lloyd. In another letter written by the defendant to his brother and sister-in-law, Lloyd and Anita, the defendant directs Lloyd to "do what we spoke about." Unless the attorneys currently representing the defendant are aware of the contents of these letters, a statement such as "do what we spoke about" might go unnoticed, yet cause great harm to individuals such as Robin. See attached Exhibit "B".

In addition, in much of the defendant's correspondence, Bourgeois' statements are "down and out" untruths which could potentially taint these witnesses. Furthermore, the fact of the matter is that many of these witnesses have had time on their hands to reconsider the defendant's

3

USCA5 1212

death sentence. Even though present counsel for Bourgeois have assured the government they will consciously inspect the defendant's mail for attempts to intimidate, threaten, or manipulate witnesses, the government feels that supervision of his correspondence is even more important at this time, because many of these witnesses have a familial relationship with Bourgeois, feel badly about the fact that he received the death penalty, and are subject to being easily manipulated in Bourgeois' plight.

Because this defendant currently has a pending Motion for Relief under Title 28, Section 2255 or in the alternative, relief under Title 28, Section 2241, which challenges his conviction and death sentence related to the 2002 beating death of his daughter, and, based on the examples of defendant's behavior, it is unreasonable to assume that defendant Bourgeois will cease in making threats to family members or potential witnesses, should a hearing come about as a result of the pending motion(s) before the Court.

Until these matters are resolved, government stands on its position that Bourgeois not be allowed to communicate with anyone other than his attorney.

II.

Should a hearing result from this matter, the government would produce witnesses to re-establish the level of threats Bourgeois made before and during his trial.  However, the government does not believe a hearing is necessary to resolve this matter.

USCA5 1213

III.

Accordingly, the government requests that the motion be denied.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
UNITED STATES ATTORNEY


By:    /S/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney
Federal I.D. No. 19500
State Bar I.D. No. 02650500
800 N. Shoreline Blvd., Suite 500
Corpus Christi, TX 78401
(361) 888-3111
(361) 888-3200 (fax)

5

USCA5 1214

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing response with attachments

has been served upon Mr. Michael Wiseman, Assistant Federal Public Defender, Philadelphia,

PA via facsimile and through the ecf filing system on this 6th day of March, 2008.


      /S/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney

USCA5 1215

Anthony Dumas,

Tell your niece exactly what I say, She got a $4000 dollar check, cashed it and didn't tell me nothing about this check, She drew up a Power-of-Attorney without me giving her no permission, she took item out my house and didn't but not 1 thing in my home, I put you out for a Reason I came home June 26 and my weed-eater was stolen, Alfredesha had some Pennies you had under the dresser me and Robin & Alfredesha found that's why's I put you out and Robin & I both changed the locks with your nephew Jason's right there. I've always been straight up I don't play games, I'm straight and your neice let you back in my house for 1 Reason, She wants you come too count lie for he saying you seen me beat that child, Anthony God knows you wouldn't home enough too see me beat no-one, how can you even fix your mouth too say you seen me beat some.one, not 1 time you ever seen me beat Alfredesha, nor Jakaren. You are lying and I got a Video tapes that we had in my truck when we had the party for Alfreda birthday my lawyer got FBI got out my truck. Anthony I got pictures was in my Expendition my lawyer has with all of us fishing and this child had no abuse on these pictures. I also got Jakaren mother too mail my lawyer those different picture we took the 3 weeks before we left too go on my new job, there was not no sign of abuse, Anthony I got my daughter Beth took some pictures with me, Alfredesha & Jakaren at Beth Graduation, I

Exhibit "A"

USCA5 1216

have some more pictures that my friend Alton Lane and his wife took at his daughter graduation party by her grandmother In Braytree that Alton long and his wife bringing too count for me. I got some friend Ben and Liz whom seen Afrodesha & JaKaren the day before we left too go on this trip & JaKaren had No bruises, or child abuse on her. My friend Anthony momma down the street give my Defense Investigater A report that she got A chance too see this child early that morning we left and she stated this child had no signs of child Abuse. Stacy also has been question and Stacy also said the day we left this child nor Afrodesha had no abuse. Lloyd has the reports if you want see them of all the people seen this child before we left. My daddy and his girlfriend seen JaKaren the day we left from the house and they all made a report this child had no abuse. Robin is using you, I don't know why my wife does the shit she do, I always told Robin she'll fuck me again. My Dad I called him he & his girlfriend informed me that his daughter which is my sister whom live In Belle Point In the front of my Subdivision Informed my Dad that Robin is Running & messing with a guy In my Subdivision. Also I have 4 people seen Robin took some Vacuum Cleaner & Pictures out my house. My next door neighbor In the house next too me seen Robin taking items out my house and those Antique Cars Audrell children has my Antiques. Your niece is one Cold No-Good Woman, But God has her day numbered. Robin

USCA5 1217

Page 2

is hunting too many people and getting away. How can a person get off with so much. Anthony its nothing Robin do I don't know. I'm very well known and believe me I am getting more news being locked up. I will get the news. That's your niece and I understand that. But Robin getting you too come too count too lie for her because she know you need a place too live that's using you. She ain't thought about you when she help me change those locks that Wednesday the day B-4 JR Karen died. Robin told FBI that when they flew her home she didn't want no one know she was home, Anthony my wife wrote me a letter stating Stacy Williams, Sexy Slim, Anthony, and Ali broke in my house, well I made three copies, Uoyd have one I have one, my lawyer has the original and State-Farm Mike Williams in Laplace has one so Robin done falsely forge a $4600 check on my Home Owner Policy and wouldn't even have the heart too tell me, and Ms. Donna Leonard notarized a Power-of-Attorney for Robin, Anthony Ms. Donna & Robin both one headed for trouble, I got my Attorney typed up A Power-of-Attorney with my brother Uoyd Ferinand Jr. being over all my Assets. On July 15, 2000 Robin came too count she tried too fool me in giving her too get me too give her Power of Attorney, I knew than Robin was up too no-good but the paper I gaved her was not A Power-of-Attorney, so Ms. Donna being A Notary know dam well I gotta be in Presence for her too Notarized something for me. I got my attorney Kenny Brown in Laplace too notarize

**USCA5 1218**

Page 4

. Any paper work I need. When it come down too business I wouldn't never used Ms. Donna cause Robin know MRS. Donna will beg the shit out of you for money. But what hurts Anthony my wife know I need money In here I seen Robin a list of Items I need, My house was 3 notes behind you think Robin would have the common sense too save my Expedition or the house, my credit cards I Ran up buying her clothes when she left me for Al. No dude Robin only thought about Robin, but In the name of God, Robin days will be short. This piece of yours will have a short-life. Robin is messing over too many people, then talking about Stacy Williams, Sexy Stimy Anthony, Ali broke In my house. But you see she fucking with them white folks now, she barking up the wrong thee, and Ms Donna with her so-call Religious Ass behind all this. That just why she having so much bad luck right now. Anthony all I can tell you, Robin is heading for trouble. My house did not get broken into. I got Eye witnesses Seen Robin took my stuff out the house. This so-call Police Report Robin claim she was gonna send me In her letter she wrote State-Farm got copies of this letter. I aint trying too hurt Your neice but for a Husband she love so much, She fucked n every-way she could. But God sees it all, Robin day is coming brother, I'm getting mine right now but Lord I hate too see when hers come. Then Robin goes too my cousin Lisa Daigne tell her Alfred Bourglois & her still commute.

USCA5 1219

Pages

I called my cousin Lisa after I called you Anthony Monday night and Lisa informed me that Robin told her she has been writing me and we're writing each other back and forth. Well I told Lisa that Robin wrote me 1 time Since I got locked up June 27, 2002 at 8:30pm. I told Lisa how the FBI agents tried too trick me saying I seen my wife kill my child. Anthony that's your niece, God knows I loved Robin but the last thing in the world I wanted see Is my wife In No-body Jail. Man that's something I don't care what Robin I have done me I wouldn't In for nothing in the world turn my back on my wife. Now Robin has done me some Cold Shit, but seeing my wife In Jail. I couldn't live with that. Anthony I don't care what Robin do too me I would never go too the extent of Fucking her the way she let these people bull shit her. All this shit about extention Cord beating-biting this child, brutalizing this child, your niece told those people all this. Robin let these white folks scared the fuck out of her, I know what happened. I don't beat my children. I got 6 other children I don't beat them. Robin don't know these people don't give A Fuck about her neither me and she'll see. They used the fuck out of her. They played that dam game with me telling me my wife said this & that, as I told Michael Harris the FBI agent my wife ain't told you a dam thing, come too find out, my lawyer showed me the Report Robin fucked me all up the Ass, Spit on me, then kick me too the Dump. Man how cold can your niece be. Robin got arrested for those Limos Anthony I was there for my wife. Robin fucked over me for All costing me

USCA5 1220

Page 6

money out my ass with phone bill on my cell phone, LDS # on my phone calling another nigger on my phone I still took that niece of your back. I had too do A second mortgage on my house I got in so much debt by her new clothes, Afineesha new clothes, Afineesha new clothes and the girl get $4600 dollars of my Home Owner's Insurance and wouldn't send me A quarter. Man I am taking this shit so hard. My house could have been saved with $4600 dollars. Robin only thought about Robin, then I know her she's hanging around Lisa too get that $800 that I give Lisa too get her ass out of Jail. You neice Anthony has Fuck me every-way she could. But brother believe me Robin days Are Short, she think she fooling me, and mis-using me, Anthony I may see life In Prison if Im convicted, but brother Robin got hers coming. Im locked up the girl got a man up the street from me, my sister Elizabeth aint lying, my sister up the street aint gonna play with my Dad about this, but My Dad, my brother Lloyd, my brother Keith told me when Robin done that shit with Al and I let her back so easy she'll do it again. God knows my Dad done throwed that in my face, Keith definitely throwed it back, and now Robin put A Restraining order on Lloyd after Lloyd the one give me the money too get her Ass out of Jail for another man. That $800 I got that from Lloyd. Robin I always told her she Just like her mom. She dirty and Anthony Robin aint gotta be like this. But I always told Robin need help. Something is Really wrong with my wife. All this is affecting those children and she dont Realize.

USCA5 1221

Page 1

My friend, you Asked me too write you and Im writing.
Anthony I have tried too help you entire fAmily when they
needed, Yet Im sending you another List something like
I sent Robin before I got moved I need money too buy
certain things out the commissary here, All I've done
Im allowed too get $100 a week for things I Need.
I written Jason, your Aunt, I sent letter for them too
read stating I need money and not one ever Responded
too say hello. Man I Am so hurt I need money. All
these guy IN her got people In their family sending them
money every week, yet I got all these people I've helped In my
wife family and you mean now Im locked up I ain't shit.
Anthony Dumas all this is killing me by the day. Lloyd have sent
me some money, Keith sent $60 dollars, Allen sent $50 dollars,
Bryan & Michelle sent $50 dollars, Bean & Liz sent me $75 dollars
My cousin Jersey & Pinky sent $50 dollars, My cousin Alita
Bourgeois wrote me several times on situations. But as for my
wife, you & your side all yAll after my shit In my house and not
1 of you ever sent me A quarter. What kind of heart yall
have. I ain't gottA write and Ask yAll for money yAll
should be willing too send me something. No one even sent me
A letter of Alfred Im sorry too hear your situation. Its like
I don't Exist. But God Sees All this. I wrote Robin
5 too 7 different times and I get one page letter stating
my house got broken In by Stacy, Ali, Anthony and Sexy Slim,
signed by your wife and I'll send you Alfred A copy of the

Police Report, Well Im still waiting on this Police Report. At the time Robin sent me this letter I also mailed a Copy of this letter too Kerny Brown, my attorney ons BellePointe and Lloyd and Kerny met and Kerny Brown Informed Lloyd that he got his brother-in-law who is a Police and his sister who work at the front desk and they both informed at that time Robin never placed A Police Report at that time stading the house was broken into. I had Lloyd go too State-Farm br.ing them a copy of the letter Robin sent me saying who broke In my house. Anthony at this time State-Farm Mike Williams are Investigating this situation, and I told Lloyd I did not give Robin permission too file no claim on my Home Owners Insurance neither did I give Ms. Donna leonard any permission too Notarized any paper for me. Ms. Donna being a Notary knows better, she can not notarized nothing for No-body without that person being notified. Lloyd has hired Kerny Brown as his Attorney too see Ms. Donna leonard get her license Revoked for the crime she has helped Robin committed. Ms. Donna according too another lawyer talked too Phyliss advised Lloyd Donna leonard got into some trouble awhile back with some money stealing that went down, and Anthony do too the way Ms. Donna begs she'll do anything for A dollar. Robin also have told me somethings Ms. Donna has done, but I know half or my stolen items, especially my antiques CAR is at my Donna leonard or her Daughter Audnell house. Robin will do anything too buy friendship at this time and Audnell loved my cars she once told me her children wanted some like that.

USCA5 1223

Anthony I wrote you like you asked me too but this is my last, the last time I wrote you, you said you never got the mail, that's cause your niece beat you at it. Robin told Lloyd she got things I wrote that she gonna use on me in court, well Lloyd asked me too stop writing Robin cause she don't mean me or nobody no good. Well Anthony like I told Robin in those letters and I'll say it again I did not kill this daughter of mine, she fell out the truck. Anthony I say it again I don't give a dam what FBI say these people have bullshit Robin too turn against me, this I know, they may give Alfred life on Death what-ever, but all this Robin has told these people you watch what happened, If she seen me did all this and didn't report me, they aint gonna give Robin those children back. You watch what I tell you. Robin call herself done fuck me, but Anthony I been a Detective for 1½ I know they system, those people will slap something on Robin, you just watch what I tell you, Robin In my brief case had statements that me & her got back together, I had restraining order she put on me for being abusive too her and the child and on top of that she got Judge Becnel & Judge Sterling Snowdy too Resolve this Restraining order, that's Purjery the Feds will slap something on Robin mark my word, she's being used, Anthony Im a ex Detective, I know the system. They are right now using my wife and she too Stupid & Kiniving too see this. My wife got caught with Food Stamp Card and you Anthony living with us, Robin and I together you think Robin passed a Polygraph and they kept her children, Child Protection told Robin In 45 days she'll get Alfre & Freda, too this day Robin aint got those children and she aint gonna get

**USCA5 1224**

Page 90

them, Anthony when Robin told FBI agents I was whipping Ja'Karenn with Leather belts, Extension cords, I bite this child trying too Fuck Alfred, that's where your niece fucked up. These FBI agents Robin told them she scared of me that's why she didn't say nothing but they got Restraining orders, she put on me and then got them Resolve by 2 different judges, plus later she go get Food Stamps with you there too, Anthony you watch my wife fucked her-self. Those FBI agents watching your niece like a hawk. Then Lloyd informed me that FBI contacted Al Teabolt about those limo being painted, Al called Lloyd told Lloyd, Al told FBI she stole a check and cash at First American Bank, and her husband gave the money back too keep Robin out Jail, Also Al gave FBI Cheryl Morial home # because Robin had borrowed some-money and refuse too pay this girl, then on top of that Anthony, Lloyd told me Robin mother was contacted by FBI agents and Veronica give Robin a real bad report. Now according too Lloyd, Veronica, Sheryl Morial, and Albert Teabolt, the FBI met all Al place in Laplace. Talk too Lloyd, Anthony Dumas Lloyd has all the details. From her Lloyd informed me that FBI went too First American Bank, and St. John Sheriff office and got every reports Robin Bourgeois even filed within the last 10 years on any-body. Now Anthony, Lloyd told me that Robin told FBI that I used too beat my wife Gaynell Collins, and Kerry Brown's sister Informed Kerry Brown that FBI went talk too Gaynell Collins on me beating on her and Gaynell Collins told FBI that we never had no fights and she never filed no charges when Alfred Bourgeois and her was married. Now Kerry told Lloyd FBI asked Gaynell Collins how I was with my other children

USCA5 1225

when they were around me. According too Kerry Brown, Gaynell Collins told FBI she just couldn't believe what she heard because Alfred Bourgeois went out his way for his children, and that she had a nephew name Rashad Collins was strung out ok Alfred and Alfred gave Rashad the world. So from her Gaynell Collins told FBI agents too go talk too her mom & Dad cause they were also crazy about Alfred. So Anthony if this happens like Kerry Brown told Lloyd, Robin hunted herself. Now FBI agent went into other detail that Gaynell Collins said about some situation she had with Robin Batiste at that time but I rather not go into what my ex wife confronted about your niece. It just aint good. Now Robin got FBI agent's too talk too my next door neighbor whom got rid of Alfredesha cat, he couldn't say too much but I got on his ASS about taking Alfredesha cat away and I had a real ugly attitude. Well 2 more thing, when Alfredesha was questioned along with A. Attorney has 2 be present every time Alfie is being questioned I my attorney informed me that Alfredesha did said the next door neighbor took her cat away and her Daddy told him off. The last thing Anthony Alfredesha was question why I put you out the house the day we left home. According too my attorney Alfredesha told FBI agents that her mom & Dad changed the locks because you had stolen my weed-eater, and some pennies out her bank too buy liqwe. FBI asked Alfredesha who else was at the house when your daddy and momma change the lock. Alfie Responded A cousin JASON. FBI ask Alfredesha if her uncle ever had the Police pick him up for coming In the house drunk. According too my lawyer Alfie replied I time but my Daddy always put him out for being drunk.

USCA5 1226

Page 2

Now FBI a lady asked Afhredesha how many Dogs she had. Afhredesha responded 3 dogs. FBI lady asked Afhredesha do you daddy have locks on his gates. Afhredesha told them my daddy has locks on each gate and chains so no one get In the yard too get In her Swimming Pool & Jacuzzi. One last thing my attorney Informed me Afhredesha do you think some body can break In yall house and steal all your toys out the house. My attorney say Afhredesha replied my daddy got bars and dogs all around and my dogs just let Uncle Anthony, My Daddy, my Momma & Me-Alfie In the yard. Right here Anthony told me something when my attorney told me what Afhredesha said, these people watching every move your niece is making and with my Attorney telling FBI agent Robin Bourgeois and Donna Leonard drew up A Power of Attorney and he had typed a Legal one up and Fed-Ex too Lloyd Ferinand TR, I feel these people gonna hang Robin Bourgeois for this Claim she filed with State Farm, the last time my Attorney talked too FBI agents In New Orleans, La they tracking down what signatures & what bank cash this check that Robin Bourgeois cashed. Dude talk too your niece she tryin too Fuck Alfred, but this kind of shit I can't get her out of. Im In Prison already. These people trying to hang me but Anthony they gonna get your niece of something I see it coming. I know State Farm, First American Bank are talking too Mr.Jose, my lawyer. Robin done got herself Into something not thinking the Feds already watching her. That girl got A head like A Rock, Mand. Plus she still messing around and got A Husband In Prison & 2 children In Foster-Care. Robin gotta be a fool if she think she ain't being watch at child Protection just gotta here she messing around. Man oh man. That girl ain't using her Fucking head. Im gone.

USCA5 1227

Anthony I got several people Lloyd has went too that's coming too court. I♥ Lloyd Winnabago B♥ my behalf when I left home this child was not physically beat up with a Extension cord OR all those belt Robin gave FBI. On this so call blood Robin claim was on my comforder and pillows In the living room, My attorney has advised me Tuesday 24, this week of September the tesles has come back on all these Items that Robin gave FBI out my house like the belts, the extension cords, the pillow cases, comfonters, plastic of my bed, covers off my sofa there was not 1 signed of my DNA blood on those items, also on those bite marks your niece claim when I bit my child we guess what my Forensic Dentures did not match on not one of those bites. Robin told FBI that I did. On the extension cords, and the belts not none of Jakanew DNA or flesh was on any of these belts & Extension cords like your neice claim. Robin said I beat this child with my Sandal, well I got good news, Pathology Lab found nothing. So maybe now your niece might come up with some more lies on me. My Attorney Jose' had me smiling when he told me the Results on the lab turned back over too FBI agents. See God don't like Uglyness. Your neice my friend has got some explaining too do. She made me look stupid, now I wanta see her come IN court, I Really want Robin too take the stand now so court knowing what I know now. I wanta see her Re-actions when she here what I already know. You know I got a free-ticket for my Divorce. Alfredesha nor Alfreda will save her ass this time, I don't need that Trouble. I hate too tell you, but I will Divorce this no-good

USCA5 1228

stinking dirty low down broke-ass bitch with a smile on my face. You tell her exactly what I said, buy the way show her this letter that Dirty too-good walking Demon just like her No-good mother. That niece of yours want ever got the opportunity too fuck me no more. I got Kenny Brown, my attorney and his sister Nicole coming too court, I got Albon & Gail Preston coming too court, I got my daddy and his friend coming too court, I got my next door neighbor Anthony and his momma coming too court, I got Ben & Liz coming too court, I got Brian, Albert & Catina coming too court, I got Stacy Williams coming too court, your neice will face up some people that seen this child before she died. My son Anthony & Beth and Dee Dee all my children will be there, I got JaKanon momma Katrina Harrison too be there too testify how Robin called playing like my sister Judge Stacy Williams. I got Lloyd too contact Katrina for me. I got that letter Robin hand wrote Child Protection in Livingston, Tx so Anthony do me a favor, tell that big fat stink smelling noo-good hoe bring it on. Lil Billy-BJ and my cousin Linda will also be there too testify on shit Robin has done. That gun she plant on my son saying he broke in my house and the other Anthony in my sob when she found my gun had me thinking that boy stole my gun well Lloyd got his momma involve, all Stacy Williams & Anthony, Sexy Slim, Anthony momma then need is a ride. Lloyd has promised me if he gotto too rent another Winnabago he'll see all these people are in court. Tell Robin she dig a hole for me, but watch who fall in the pit.

USCA5 1229

eating your shit. I've been suffering A long time.
8 long fucking Years. A change Is gotta come. You wantA
Play a Player. You better bring your Dum Ass back too school
cause you done fuck with the wrong one. I Always told you
Your screw was loose. So Uncle since you wantA lie for
Robin you too bring it on, when you got Arrested the night for
the Alcohol coming IN my house Your niece made a 911 call and Lloyd
got Kerry Brown too get the Records of this conversation. On A
murder case like I got your Reputation will bill up my case. My
DAD always talk about how drunt you always are, also Robin that
Video tape for Alfreda birthday with Ja'Kanen IN it, my lawyer smiled
Re say looking at that tape Lord help me, that tape 90° won my case, The
R 10° is when those bite marks didn't match me teeth and all
the blankets, sheets, belts had no DNA blood for Alfred Bourgeois nor
Ja'Kanen Gunter. Lord thank you Farther I always wanted too
get out this family. Lord again Thanks Farther you Answered
my Prayer and I Love You God and Lord I know you got something
much better for me.

Again Thanks Robin Batiste I will never
ever call you by my last name hoe. You thief.
wanta steal out my house and aint                    Alfred Bourgeois
Put A quarder IN the house
That's A Bitch for You and
Robin because You have no heart you wouldn't know what trouble
o have cost Alfred Bourgeois. You better find God IN Your life
is   you got some serious Praying too do. Another man ain't gonna
help you. Somebody will Put Your Big $350 lbs ass IN the grave you
keep fucking over people like you do.

USCA5 1230

o tell Robin she has made my dream come true. I been wanna Divorce that Big Fat Slutt, that fucking wet back. That hoe ain't worth A penny. You take A hoe out the street put them In something nice, tried too give A bitch a good life, and she fuck the man made her what she should have been. The hoe ain't worth a Fuck and from this day 9-27-02 That bitch ain't got A Fucking thing oo tell me. That bitch everything come out that hoe mouth is A lie that NO-fuck-stinking hoe. Make sure you let her see his. As long ass Robin Batiste is loving that hoe better ever oo come In my face, I always told Althedasha she had A Pitiful oo good so called mother. That bitch can't buy those children a can of talking about being A momma. Anthony you niece is A _ grace too my children. What she's done Althedsha Bourgeois i'll never-ever forget this shit. That NO good cold blooded big fat bad breath fucking slutt. Bring it on Robin, I'm ready or your NO-good Ass - Anthony be sure tell her I'm waiting for er cause I got more surprises for her, she better get her shit together cause In that court-Room the game will be over she's payed for the last 8 years of my life. Tell Big Momma bring t on, Katrina has given my lawyer a copy of her letter she hand rote, you stupid ass - handwrite something Evil. Robin bring it on your favorite words Oh Im scared of Althed, Althed made me do it hat shit ain't gonna work. I work for Althed sister as A Paralegal. _ by Im smiling In this jail-house bring it on Judge Stacy William got the telephone bills, I got Katrina Harrison friend Lisa turned on you stupid Ass. Just bring it on. FBI got with all my children on how bad you mistreated them. Bitch Bring your Big-Ass on. I had enough

USCA5 1231



# JIM WELLS COUNTY SHERIFF'S DEPT.

**OSCAR LOPEZ**
**P.O. BOX 1286**
**ALICE, TEXAS 78333**

CHIEF DEPUTY
MELVIN ARNOLD

CHIEF CLERK
GRACE ZERTUCHE

JAIL ADMINISTRATOR
MAJOR RICHARD L. MILL

MAJOR CARLOS R. GARZA

MAJOR JUAN G. BARREF

Dear James Sykes / United States Marshall

    Marshall Sykes, on January 6, 2003, I Captain Sandra L. Salas, Jail Administrator for the Jim Wells County Sherif's Department, processed a letter from Federal Inmate Alfred Bougouis, addressed to "Mr. John Gilmore." I noticed that the envelope appeared to be somewhat bulky, and practically unsealed.
I called it to another Supervosor's attention and had him witness my inspection of the letters contents. Inside the envelope, there was a letter to Mr. Gilmore, however, inside the same envelope was a well sealed envelope addressed to "Mr. and Mrs. Loyd Ferinand Jr of 3446 Wendy Drive in Paulina Louisiana.

    At this point, I contacted the U.S. Marshall's office in Corpus Christi, Texas and spoke to Marshall Eleazar Jaime. Mr. Jaime directed me to Marshall Sykes. Marshall Sykes informed me that I was to proceed to mail the letter addressed to "Mr. Gilmore,"however I was instructed to hold on to the letter addressed to Mr. and Mrs. Loyd Ferinand Jr., until further notice. I advised Marshall Sykes that the letter would be in my possession at the Office for their inspection.

    If you have any questions, please feel free to contact me at my office at 361-668-0341 Ext #24.

Thank You

Captain Sandra Salas

Witness

Exhibit "B"

FICE PH:  361-668-0341
FICE FAX: 361-668-0569

JAIL PHONE: 361-668-5733

USCA5 1232

Lloyd & Anita,

I need you get your list of witness together for count. On Jan 2,2003 my attorney informed me that FBI agents Are trying too come up with 3 more changes on me. They are trying too say that Ja'Karen Vagina had my sperm and Alfredesha has been raped In her Anal area by me, Lloyd — I ain't worried because I know better. These FBI agents are fishing for Bait and I know for a fact this is all He say - I say. Alfredesha do not drink water At all, Robin lets this girl eat nothing but Junk food and there is a Clinic In Liding, La where Alfredesha has been going get treatment for her stomach being constipated and have been having Stool problems awhile. Get with binnie Boungers Alfedesha's Nanny, She knows the Clinic, I need too get these records on some records too my Attorney. Get with binnie, she works In that area and know the Doctor In which Robin & binnie has bought Alfredesha for chick-ups on this issue. Also Lloyd FBI are also trying too tie me into some murder In Livingston, Tx. On Dec 20,2002 I went too count the Prosecutor got up lied too the Judge say I wrote some letter to have a witness Killed In Livingston, Tx that died around Dec 19,2002. Lloyd I only been too Livingston, Tx twice In my life-time. Thats April 27,2002 from 5Am too 5pm too meet Ja'Karen and May 15,2002 too pick up Ja'Karen after count. Now I only know Katrina Harrison only In Livingston, Tx. I met a girlfriend and spoke on the phone with her but I don't know this girl and nobody else. But FBI agents do not want me too write or call none of you but do what we spoke about. Don't forget all my witness, pictures and the video tapes we talk about. Also Attorney Keeny Browns has some records thats

USCA5 1233

Very helpful and let him know when I go too court. Kerry Brown says not to Trust these folks as we spoke he finds It strange that FBI agents never put in the Discovery Package that Kerry Brown spoke with Agent Michael Harris and another Agent. Also Lloyd I know Kerry Brown spoke with you on some Issues dealing with Robin mother and Albert Teabolt. FBI agent spoke too Robin mother and Attorney Kerry Brown finds it strange that none of this is In my Discovery. In Which I sent Kerry Brown a copy of. Also Kerry Brown spoke with some of my Employment Informants at R.E. Garnison and also none of this was mentioned In my Discovery. You know Why Lloyd. Because anything Good came out FBI agent Michael Harris don't want the Judge Travis Graham Jack too Know but Kerry Brown got a plan I can't write on paper but its a good plan go by and speak to Kerry Brown if you haven't already. I know you Lloyd you are on top of things for me. FBI agent Michael Harris has tried too Downgrade my character. Also have those Pastor's we spoke about send my character directly too the Judge Address I sent you Already and I Know I told you this already but I gotta tell you again. Lloyd those Are some of the most Crooked FBI agents I ever seen but you & Kerry Brown (Attorney start getting those Petitions together In my neiborhood.

Lloyd this is sad I don't want to screw a woman In her butt what the Hek I wanta screw my favorite child Alfrodesha for. Those people Are sad too even come up with a idea like this. They would Convict me so bad they Are fishing bait and Hard.

Thanks

Alfred Bourgeois

1-7-03

God with Kerry Brown he got some Plans? ? ? ?

Pages 2 of 2

Lloyd, Reverenend Albert sent me mail when I was In Bee County Jail, Paster Bernard sent me a good Recommedation from Ben & Liz of Laplace, LA. I Also seen another recommendation that Pastor Neal Bernard Sent on my behalf when I was In Bee County Jail in Beeville, Tx. One of the Jaibes showed me these 3 letters of my Character but he could give them too me because FBI agents want too scan all my mail but this been since Dec 20, 2002 and I still havent got my mail. Stacy Williams wrote me a few letters but I wrote her and told her don't write me because they're scanving my mail. I wrote Alton & Nicole a letter that FBI got too but I say a week and a half before I found out Stacy sent me mail. She is beny upset Lloyd how FBI used her name and lied In her report. I knew Lloyd when I read that report that FBI agents was lying on Stacy Williams. Stacy and I Lloyd go way back yonder before Robin even came in the picture. We are tight. Stacy Knows Robin and she said Robin Uncle she talk too personally and he also said he did not tell FBI agent Michael Harris half of that crap his saying plus Lloyd you even showed Anthony Dumas the reports you have. Stacy show Anthony the reports I sent her of Anthony, stacy and my nextdoor neighbor. Lloyd, Stacy even say she showed the neighbor a copy of his report and he also stated he did not told FBI agent this crap he wrote up. Lloyd this is sad I done lost a love one and gotta go thru all this bullshit to get a conviction. Also Michelle spoke too Katrina from Livingston and get with Michelle she has good news from Katrina on my behalf. Thanks.

USCA5 1235

All my letter I'm getting In Jail over the past 6 months has remailed too my pal AHon Long JR. I don't trust these folks so I read them quick and Remail them too AHon. That's my upkeeper on mail & other Issues I will not discuss until later. But I don't trust these folks for nothing as per conversations we've had.

See ya later

I have written Katrina though a friend and I written a few of my witnesses already and told them do not write me at All. You got with my witness on youre end do not write me at All. Stop my flow of mail Immediately. Shut it down Lloyd. Kerry Brown, Attorney says the least they know of our plans the better.

Lloyd don't forget with got a Judge in the family Judge Marilyn Jasmin Bourgeois that's Eric Bourgeois wife. Me and Marilyn are real tight. Our Cousin Linnie say she's already got some tips for Judge Marilyn about my case only thing she a State Judge In Edgard but Linda told me and sent me some info but I think these people here got too them cause I can't find the papers at all. But Linda has been getting with Judge Marilyn Jasmin Bourgeois and you know Eric Bourgeois and I are real tight. Michelle our sister spoke with Eric about some info Kerry Brown got on those false Restraining orders Robin put on me. This stuff is not even or Record In Edgard, La no more according too Judge Marilyn Jasmin Bourgeois Eric's wife.

Alfred Bourgeois
1-7-2003

Mead

USCA5 1236

# UNITED STATES OF AMERICA
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

---

**UNITED STATES OF AMERICA**
     **V.**

**NOTICE OF SETTING**

**ALFRED BOURGEOIS**

**CR.C  02-216  (1)**

---

## YOU ARE HEREBY DIRECTED TO APPEAR
## VIA TELEPHONE CONFERENCE BEFORE:

### JUDGE  JANIS GRAHAM JACK

United States Courthouse
Corpus Christi, Texas  78401

## On    Wednesday, March 19, 2008    at    1:10 pm

---

## PURPOSE OF PROCEEDING:

| | |
|---|---|
| **Final Pretrial Conference** *Note: Client(s) are required to appear* | **Motion Hearing** |
| **Jury Selection and Trial** | **Show Cause Hearing** |
| **Rearraignment** | **Sentencing** |
| **X** **Other:** **Motion to Amend Limiting Correspondence** | **Motion Hearing re SRT** |

---

MICHAEL N. MILBY, Clerk
By Deputy:  **Sondra Scotch**

**cc:**
    **Victor Abreu, Michael Wiseman,**
    **Tony Roberts, Patti Hubert Booth**

**March 17, 2008**

USCA5 1237

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA　　　§
　　　　　　　　　　　　　　　　§
　　　　v.　　　　　　　　　　　§　　　CRIMINAL NO.  C-02-216
　　　　　　　　　　　　　　　　§
ALFRED BOURGEOIS　　　　　　　§

## MOTION TO UNSEAL FORENSIC PSYCHIATRIC EVALUATION

COMES NOW the United States of America by and through Donald J. DeGabrielle, Jr.,

United States Attorney in and for the Southern District of Texas, and Elsa Salinas-Patterson,

Assistant United States Attorney and moves the Honorable Court to order the United States

Clerk's Office to unseal the above-styled Forensic Psychiatric Evaluation filed with the Court on

January 20, 2004, for the purpose of preparing a 2255 response to Petitioner's Motion for relief

pursuant to 28 U.S.C. Section 2255 or in the alternative pursuant to 28 U.S.C. 2241.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
UNITED STATES ATTORNEY

By:　　/s/ Elsa Salinas-Patterson
　　　　ELSA SALINAS-PATTERSON
　　　　Assistant United States Attorney
　　　　Texas Bar No. 00791593
　　　　Southern District No. 22489
　　　　800 N. Shoreline Blvd., Suite 500
　　　　Corpus Christi, Texas  78401
　　　　(361) 888-3111 Fax (361) 888-3200

USCA5 1238

CERTIFICATE OF SERVICE AND CONSULTATION

I, Elsa Salinas-Patterson, Assistant United States Attorney, hereby certify that I have

contacted Michael Wiseman, Attorney for the defendant, and Mr. Wiseman is NOT

OPPOSED to the government's motion to unseal the Forensic Psychiatric Evaluation.

Additionally, I hereby certify that a true and correct copy of the foregoing Unopposed Motion to

Unseal Forensic Psychiatric Evaluation and Order was faxed to Mr. Wiseman on this 25th day of

June, 2008.

 /s/ Elsa Salinas-Patterson
ELSA SALINAS-PATTERSON
Assistant United States Attorney
800 N. Shoreline Blvd., Ste. 500
Corpus Christi, Texas 78401
PH:(361) 888-3111; FX:(361)888-3200
Texas Bar No.  00791593
Southern District No.  22489

USCA5 1239

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| 5. | § | CRIMINAL NO.  C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

**ORDER**

On Motion of the United States, the Forensic Psychiatric Evaluation in the above matter

is hereby ordered unsealed.

SIGNED on  _____ day of June, 2008.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1240

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On this day came on to be considered the United States of America's Motion to Unseal Forensic Psychiatric Evaluation (D.E. 427) for the purpose of preparing a 2255 response to Petitioner's motion for relief pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. § 2241.  The United States of America's motion is granted and the Forensic Psychiatric Evaluation in the above matter is hereby ordered unsealed for the limited purpose of preparing a response to Petitioner's motion for relief  pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. § 2241.  The Forensic Psychiatric Evaluation shall then be re-sealed.

SIGNED and ORDERED this 26th day of June, 2008.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1241

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

UNITED STATES' UNOPPOSED MOTION FOR THIRD EXTENSION
OF TIME TO FILE AN ANSWER TO PETITIONER'S SECTION 2255 MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through

the United States Attorney for the Southern District of Texas, files this unopposed

Motion for a Third Extension of Time to File an Answer to Petitioner's Section 2255

Motion in the above referenced case.  In support thereof, the government states the

following.

This Court initially Ordered the government to file a response to Petitioner's

lengthy motion and legal memorandum by January 28, 2008, and set March 28, 2008,

as the due date for Petitioner's reply to the government's response.  Since that time,

this Court has granted two extensions of time to the government due to the reasons

contained in the government's prior motions. *See* District Court Docket Entries # 403,

USCA5 1242

404, 415, 416.  As such, the government's current due date is July 21, 2008, and Petitioner's due date for a reply is October 20, 2008.

As noted in the government's prior motions, undersigned counsel has been detailed to Washington D.C. until the end of January 2009 to work with the Executive Office for United States Attorneys.  Notwithstanding this assignment, undersigned counsel remains the primary responsible counsel for drafting the written response to Petitioner's claims in the instant case.  Undersigned counsel's ability to work on the instant case was severely limited during the months of March, April, and May, due to a combination of responsibilities in Washington D.C. and responsibilities in drafting the brief and presenting the oral argument at the Fifth Circuit Court of Appeals in the *en banc* rehearing in *United States v. Gomez-Gomez*, 517 F.3d 730 (5th Cir., Feb. 11, 2008).  As this Court might recall, *Gomez-Gomez* revisited the very complex and broad-ranging issue of sentence enhancements for "crimes of violence" in illegal reentry cases under 8 U.S.C. § 1326.

Notwithstanding those duties, the government has made great progress toward finalizing its lengthy response to Petitioner's claims and obtaining opinions from certain experts that are necessary to adequately respond to Petitioner's comprehensive allegations.  However, some of those experts have requested additional time to complete adequate and accurate statements in response to Petitioner's claims.  For

USCA5 1243

instance, Dr. William Oliver is preparing a response regarding the use of his photographic imaging of the bite mark evidence but has indicated that he cannot complete his response until the end of August 2008 because he is moving to a new location. Similarly, Dr. Joel Kutnick is preparing a response to the mental retardation claims but has been called out of state and is unable to complete his response until sometime in August 2008. Undersigned counsel cannot adequately respond to Petitioner's claims without the responses from these two experts. Moreover, the government is seeking a response from Petitioner's trial defense counsel regarding their trial and appellate tactical decisions. The allegations of ineffective assistance are wide ranging and necessitate extensive review to address all of the challenges to trial counsel's decisions throughout the litigation process.

As noted in our prior motions for extensions, the government has no interest in unnecessarily extending the instant proceedings. The government continues to anticipate that an evidentiary hearing will be necessary notwithstanding the lengthy pleadings, but the government remains hopeful that some of the issues can be resolved via sufficiently thorough pleadings.

Based upon the government's reliance on the aforementioned evidence and opinions, the government respectfully requests this Court grant one more extension of 60 days, to and including September 19, 2008, and assign a new due date for a

3

USCA5 1244

reply by Petitioner.  Undersigned counsel will continue to devote every extra minute to the instant case to ensure that the government's response is filed without delay. The government assures this Court that this extension is necessary to enable undersigned counsel to fully and adequately address Petitioner's complex claims.  If at all possible, the government will file its answer before the new due date.

Undersigned counsel conferred with Assistant Federal Public Defender Michael Wiseman, one of Petitioner's co-counsel, and he indicated that Petitioner's defense team is not opposed to this additional 60-day extension request.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney


*/S/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

4

USCA5 1245

<u>CERTIFICATE OF SERVICE</u>

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a

copy of the above Motion for Extension of Time was placed in the mail on July 11,

2008, via certified mail, return receipt requested to:

Maureen Kearney Rowley
Michael Wisemen
Victor Abreu
James McHugh
Elizabeth Larin
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106


           */S/ Tony R. Roberts*
           TONY R. ROBERTS
           Assistant United States Attorney

USCA5 1246

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,    §
    Respondent,    §
        §
vs.    §    CR. No. C-02-216
        §    C.A. No. C-07-223
ALFRED BOURGEOIS,    §
    Petitioner.    §

ORDER

It is hereby ORDERED that the United States' Third Motion for Extension of

Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.  The

United States is ordered to file an answer in the instant cause by _____,

2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____, 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1247

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| | § | |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

It is hereby ORDERED that the United States' Third Motion for Extension

of Time to File an Answer to Defendant's Section 2255 Motion is GRANTED.

The United States is ordered to file an answer in the instant cause by _____

, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____, 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1248

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

It is hereby ORDERED that the United States' Third Motion for Extension of Time to

File an Answer to Defendant's Section 2255 Motion is GRANTED.  The United States is

ordered to file an answer in the instant cause by September 19, 2008.

It is FURTHER ORDERED THAT Petitioner may reply to the government's

response on or before December 19, 2008.

The United States is instructed not to request further extensions to file its answer.

The clerk of this Court shall send a copy of this Order to the parties by any

receipted means.

SIGNED and ORDERED this 11th day of July, 2008.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1249

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)   C. Date of Delivery<br>7/16/08 |
| 1. Article Addressed to:<br><br>**James L Turner**<br>US Attorneys Office<br>Appellate Division<br>PO Box 61129<br>Houston, TX 77208-1129<br><br>02cr216 430 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>United States Courts<br>Southern District of Texas<br>FILED<br><br>JUL 1 8 2008<br><br>Michael N. Milby, Clerk of Court<br><br>3. Service Type<br>☐ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number<br>(Transfer   7003 3110 0002 0872 9683 | |

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540        **USCA5 1250**

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Tony R Roberts**
Office of the US Attorney
PO Box 61129
Houston, TX 77208

02CR 216 430

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____    ☐ Agent
                              ☐ Addressee

B. Received by (Printed Name)   | C. Date of Delivery
                                | 7/16/08

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

United States Court
Southern District of Texas
FILED

**JUL 1 8 2008**

Michael N. Milby, Clerk of Court

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article
   (Transfer    7003 3110 0002 0872 9676

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

USCA5 1251

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

**United States Courts**
**Southern District of Texas**
**FILED**
**JUL 21 2008**

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

1. Article Addressed to:

Michael N. Milby, Clerk of Court

**Michael Wiseman**
Office of the Federal Public Defender
601 Walnut Street
The Curtis Center, Suite 545
Philadelphia, PA 19106

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

JUL 18 2008

02CR816 #430

Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number    7003 3110 0002 0872 9669

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

USCA5 1252

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to: 02 CR 216 430

Victor Julio Abreu
Office of Federal Public Defender
1701 W Hwy 83
Ste 405
McAllen, TX 78501

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X Marie Jasso   ☐ Agent
   ☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery
Marie Jasso   21 July 08

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)   ☐ Yes

2. Article Number
(Transfer from service label)   7003 3110 0002 0872 9652

PS Form 3811, Domestic Return Receipt   102595-02-M-1540

**USCA5 1253**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|     Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
|     Petitioner. | § | |

RESPONDENT'S MOTION SEEKING ORDER FOR
AFFIDAVIT FROM DEFENSE COUNSEL TO ENABLE RESPONDENT
TO ADEQUATELY RESPOND TO PETITIONER'S SECTION 2255 MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through the United

States Attorney for the Southern District of Texas, files this Motion  seeking a Court Order for the

trial defense counsel, Mr. Douglas Tinker and Mr. John Gilmore, to file affidavits in response to the

allegations of ineffective assistance of counsel in Petitioner's pleading.  The government is unable

to fully address Petitioner's allegations without said affidavits.  In support thereof, the government

states the following:

The government's response is currently due on September 19, 2008.  The complexity of the

issues raised by the Petitioner has required the government to seeking three extensions.  The

government has primarily focused upon obtaining the opinion of expert witnesses to respond to

several of Petitioner's substantive claims.  At the same time, the government has remained hopeful

that trial defense counsel would willingly and voluntarily provide written responses to Petitioner's

claims of ineffective assistance of counsel.  However, subsequent to the government's most recent

motion for an extension, the counsel representing Petitioner in his instant pleading has taken direct

USCA5 1254

action to prevent trial defense counsel from providing information to the government that would facilitate this Court's review of the issues presented. (*See* Appendix A).

On July 17, 2008, Petitioner's current counsel sent a letter to Douglas Tinker and John Gilmore to "remind" them that Petitioner has not waived the attorney-client privilege. *Id.* The letter claims that allegations of ineffective assistance "do not constitute a waiver of the privilege." *Id.* However, the letter adds that Petitioner "may ultimately have to waive some aspects of the privilege in order to have certain of his claims heard," but his counsel avers that "he has yet to [waive the privilege]." *Id.*

In stark contrast to Petitioner's claims in the letter to his former trial defense counsel, the rule in the Fifth Circuit states: "The privilege is not an inviolable seal upon the attorney's lips. It may be waived by the client; and where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue." *Laughner v. U.S.*, 373 F.2d 326, 327 & n.1 (5th Cir. 1967); *see also*, *Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001) and *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003). Unless Petitioner is hereby withdrawing his claims of ineffective assistance of counsel, he has waived any privilege he heretofore had in regards to his specific allegations which are extremely broad and far reaching.

Mr. Gilmore has indicated a willingness to respond to Petitioner's allegations, but after Petitioner's July 17 letter, he is now hesitant to do so without a Court Order. Mr. Tinker has not yet informed the government of his full intentions regarding how, or whether, he will respond to Petitioner's allegations. In any event, to avoid further delays, the government respectfully requests that this Court Order Mr. Tinker and Mr. Gilmore to submit responsive affidavits to this Court.

USCA5 1255

Indeed, said responsive affidavits might enable this Court to resolve some of the issues raised on an expanded record without resort to an evidentiary hearing on those issues. To the extent that Petitioner desires to enforce his attorney-client privilege with regard to specific issues, the government would not oppose Petitioner's withdrawal of those issues.

As the government is unsure whether Petitioner's letter will have the same chilling effect upon Mr. Tinker as it has had upon Mr. Gilmore, and in an abundance of caution in desiring to fully reply to Petitioner's 2255 motion in an expedient manner, the government moves this Court to Order Mr. Tinker and Mr. Gilmore to submit affidavits to this Court, with a copy to undersigned counsel, responding to all of the allegations presented in Petitioner's Section 2255 Motion.

As noted in our prior motions for extensions, the government has no interest in unnecessarily extending the instant proceedings. The government continues to anticipate that an evidentiary hearing will be necessary notwithstanding the comprehensive nature of the pleadings, but the government remains hopeful that some of the issues can be resolved on the record and the pleadings.

USCA5 1256

Undersigned counsel conferred with Assistant Federal Public Defender Elizabeth Larin, one

of Petitioner's co-counsel, and she indicated that Petitioner's defense team opposes this motion.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney


   /S/ Tony R. Roberts
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

4

USCA5 1257

CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a copy of the

above Motion for Extension of Time was placed in the mail on July 31, 2008, via certified mail,

return receipt requested to:

> Maureen Kearney Rowley
> Michael Wisemen
> Victor Abreu
> James McHugh
> Elizabeth Larin
> Federal Community Defender Office
> for the Eastern District of Pennsylvania
> Capital Habeas Corpus Unit
> Suite 545 West – The Curtis Center
> Philadelphia, PA 19106

 __/S/ *Tony R. Roberts*___
 TONY R. ROBERTS
 Assistant United States Attorney

USCA5 1258

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. No. C-02-216 |
| | § | C.A. No. C-07-223 |
| ALFRED BOURGEOIS, | § | |
| Petitioner. | § | |

ORDER

It is hereby ORDERED that Mr. Douglas Tinker, and Mr. John Gilmore, 622 South Tancahua, Corpus Christi, Texas, shall submit sworn and signed affidavits addressing the issues of ineffective assistance of counsel raised in Petitioner's Section 2255 Motion. Said affidavit shall be filed in this Court and served upon the United States Attorney's office in Corpus Christi, Texas by _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties, and to Mr. Tinker and Mr. Gilmore, by any receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2008.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1259

# FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CAPITAL HABEAS UNIT

### FEDERAL COURT DIVISION DEFENDER ASSOCIATION OF PHILADELPHIA

### SUITE 545 WEST -- THE CURTIS CENTER
### 601 WALNUT STREET
### PHILADELPHIA, PA 19106

| | | |
|---|---|---|
| **ELLEN T. GREENLEE**<br>DEFENDER | **PHONE NUMBER (215) 928-0520**<br>**FAX NUMBER (215) 928-0826**<br>**FAX NUMBER (215) 861-3508** | **MAUREEN KEARNEY ROWLEY**<br>CHIEF FEDERAL DEFENDER |

July 17, 2008

Douglas Tinker, Esq.
John Gilmore, Esq.
622 South Tancahua
Corpus Christi, Texas
By Regular and E-mail (Libbyeven@hotmail.com)

Re:    Section 2255 Proceedings in <u>United States v. Alfred Bourgeois</u>, No. Cr-C-02-216 (S.D. Texas)

Gentlemen:

On July 11, 2008 the government filed a motion seeking an extension of time to file a response to our 2255 petition.  In that motion the government's counsel indicated that they "are seeking a response from Petitioner's trial defense counsel regarding their trial and appellate tactical decisions."

We are writing at this time to remind you that until such time as Mr. Bourgeois waives the attorney-client privilege, all privileges relevant to your representation remain in effect.  The allegations in the Petition do not constitute a waiver of the privilege, and although Mr. Bourgeois may ultimately have to waive some aspects of the privilege in order to have certain of his claims heard, he has yet to do so.  Moreover, the waiver – when it is made – will be claim-specific, meaning that it will not be a waiver of the privilege related to all topics, but only as to specific ineffectiveness claims raised in the petition.

We believe that any such waiver will occur when the parties are before Judge Jack at which time she can rule on the scope of the waiver.  Until such time as Judge Jack rules on any such waiver

**USCA5 1260**

(including its scope), on behalf of Mr. Bourgeois we are writing to notify you that the privilege is not waived and we request that you not speak with the Government or its agents with respect to your prior representation.  Moreover, we request that you not provide any documents to the government which are covered by the attorney-client or work-product privileges, such time as a specific waiver of these privileges is proffered by Mr. Bourgeois.

In the event that you have already spoken with the Government and/or provided documents to them, please advise us of that fact immediately.  Should you have any questions regarding this, feel free to contact us.

As you can see, we have copied Mr. Roberts and Ms. Booth, and thus notifying them as well that Mr. Bourgeois invokes his privileges.

Yours,

Michael Wiseman
Chief, Capital Habeas Unit
Victor J. Abreu
Assistant Federal Defender

cc:     Patricia Hubert Booth
        Patti.Booth@usdoj.gov
        Tony R. Roberts
        Tony.Roberts@usdoj.gov

USCA5 1261

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Respondent, | § <br>§ <br>§ | |
| vs. | § <br>§ | CR. No. C-02-216<br>C.A. No. C-07-223 |
| ALFRED BOURGEOIS,<br>Petitioner. | § <br>§ | |

ORDER

It is hereby ORDERED that Mr. Douglas Tinker, and Mr. John Gilmore, 622 South

Tancahua, Corpus Christi, Texas, shall submit sworn and signed affidavits addressing the issues

of ineffective assistance of counsel raised in Petitioner's Section 2255 Motion. Said affidavit

shall be filed in this Court and served upon the United States Attorney's office in Corpus Christi,

Texas by _____, 2008.

The clerk of this Court shall send a copy of this Order to the parties, and to Mr. Tinker

and Mr. Gilmore, by any receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2008.

_____

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1262

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____ :
: 
UNITED STATES OF AMERICA, : No. 2:07-cv-00223
:
Respondent, : Honorable Janis Graham Jack,
: U.S.D.J.
-against- :
: **This is a Capital Case**
ALFRED BOURGEOIS, :
: Electronically Filed
Petitioner. :
_____ :

**PETITIONER'S MOTION FOR ADDITIONAL TIME TO
RESPOND TO GOVERNMENT'S MOTION SEEKING
ORDER FOR AFFIDAVIT FROM DEFENSE COUNSEL**

Petitioner, Alfred Bourgeois, hereby moves for additional time to respond to the

Government's motion seeking an Order from this Court to compel trial counsel to file an

affidavit.   In support of this *Motion*, he states the following.

1.      On May 14, 2007, Petitioner, through undersigned counsel, filed his *Motion for

Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241*

(hereinafter " 2255 Motion") (document #).  On October 5, 2007, Petitioner filed his

memorandum of law in support of that motion (document #).

2.      After several extensions, the Government's answer to Petitioner's 2255 Motion is

currently due on September 19, 2008.

3.      On July 31, 2008, the Government filed a motion seeking an Order compelling

trial counsel, Douglas Tinker, Esq., and John Gilmore, Esq., to file affidavits in response to the

allegations of ineffective assistance of counsel contained in Petitioner's 2255 Motion.

USCA5 1263

4.      Petitioner opposes the Government's motion and requests sufficient time to respond to the averments contained therein.  Unfortunately, Petitioner's lead counsel, Michael Wiseman, Esq., has been on vacation since July 28, 2008 and will not return until August 11th. Additionally, undersigned counsel, Victor J. Abreu, Esq. will be on parental leave from August 11, 2008 until August 18th .

5.      Accordingly, Petitioner respectfully requests until August 15, 2008 to respond to the Government's motion.  This time will give Mr. Wiseman ample opportunity to review the Government's motion, consult with co-counsel, research and write a response.

6.      Petitioner attempted but was unable to reach Tony Roberts, Esq., or Patricia Booth, Esq., to determine the Government's position on this Motion.

WHEREFORE, Petitioner respectfully requests that the Court grant his *Motion for Additional Time to Respond to Government's Motion Seeking Order for Affidavit from Defense Counsel* and grant Petitioner until August 15, 2008 to file his response.

Respectfully Submitted,

/s/ Victor J. Abreu

_____

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated: Philadelphia, PA
        August 6, 2008

USCA5 1264

USCA5 1265

**CERTIFICATE OF SERVICE**

I, Victor J. Abreu, Esq., hereby certify that on this 6th day of August, 2008, I caused the foregoing upon the following person in the manner indicated below:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


/s/ Victor J. Abreu

Victor J. Abreu

USCA5 1266

USCA5 1267

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

                                     :

UNITED STATES OF AMERICA,        :        No. Cr-C-02-216

                                       :        No. Cv-07-223

               Respondent,      :   Honorable Janis Graham Jack,

                                       :            U.S.D.J.

        -against-            :

                                       :     **This is a Capital Case**

ALFRED BOURGEOIS,            :

                                       :

               Petitioner.        :

_____  :

**ORDER**

AND NOW this ____ day of _____, 2008, upon consideration of *Petitioner's*

*Motion for Additional Time to Respond to Government's Motion Seeking Order for Affidavit*

*from Defense Counsel*, it is hereby ORDERED that Petitioner's Motion is GRANTED.

Petitioner shall file his response to the Government's motion on or before August 15, 2008.

    **SO ORDERED,**

                                     _____

                                     Hon. Janis Graham Jack
                                     United States District Judge

USCA5 1268

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____          :

UNITED STATES OF AMERICA,                :          No. Cr-C-02-216
                                         :          No. Cv-07-223
                 Respondent,             :     Honorable Janis Graham Jack
                                         :          U.S.D.J.
            -against-                    :
                                         :       Electronically Filed
ALFRED BOURGEOIS,                        :
                                         :
                 Petitioner.             :
_____          :

**PETITIONER'S ANSWER IN OPPOSITION TO THE**
*GOVERNMENT'S MOTION SEEKING ORDER FOR AFFIDAVIT FROM DEFENSE*
*COUNSEL TO ADEQUATELY RESPOND TO PETITIONER'S SECTION 2255 MOTION*

Petitioner, ALFRED BOURGEOIS, through undersigned counsel hereby

submits his Answer in Opposition to the *Government's Motion Seeking Order For*

*Affidavit From Defense Counsel To Adequately Respond to Petitioner's Section 2255*

*Motion* (document # 435) (hereafter, *Motion*).

**INTRODUCTION**

The Government requests a broad order requiring trial defense counsel to

complete affidavits relevant to their representation of Petitioner.  Petitioner fully

acknowledges – as he did in his July 17, 2008 letter to defense counsel referenced in

the *Motion* – that he implicitly waives the attorney-client and work-product privileges

1

USCA5 1269

for any issue for which he has claimed that counsel were ineffective. Conversely, he retains these privileges in all other respects. Thus, the Government's broad request that trial counsel simply produce statements about their representation of Petitioner, if granted in its current form, has the potential to reveal communications, documents and/or work product, for which these privileges have not been waived. In short, the dispute at this juncture is not about whether Petitioner's retains his privileges. Rather, the dispute is about the mechanism that will permit the Government to get the information it needs, while insuring that Petitioner is able to protect those privileges he has not waived.

### ANALYSIS

Petitioner does not dispute that he waives the attorney-client and work-product privileges as to communications and documents relevant to the claims of ineffective assistance of counsel. The Government's citations to this effect are accurate. *Motion* at 2. See also Baker v. General Motors Corp., 209 F.3d 1051, 1055 (8th Cir. 2000). However, there is more for the Court to consider.

A waiver of these privileges occurring as a result of a claim of ineffective assistance of counsel raised in a post-conviction pleading is an "implied waiver." Bittaker v. Woodford, 331 F.3d 715, 719 (9th Cir. 2003) ("The privilege may be found to have been waived by implication when a party takes a position in litigation that

2

USCA5 1270

makes it unfair to protect the party's attorney-client communications . . . The doctrine

of waiver by implication reflects the position that the attorney-client privilege was

intended as a shield, and not a sword.") (ellipses in original).

Bittaker, relied upon by the Government (*Motion* at 2), explains the distinction

between an implied and express waiver of privileged information.  Id. at 719.  An

express waiver occurs when disclosure of the ostensibly privileged matter is made to

a third party who is not bound by the privilege.  In such an instance, the court has "no

role in encouraging or forcing the disclosure – [it] merely recognizes the waiver after

is has occurred."  Id.  Conversely, a waiver resulting from a claim of ineffectiveness

is considered under the "doctrine of implied waiver":

> The doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege. . .  The court imposing the waiver does not order disclosure of the materials **categorically**; rather the court directs the party holding the privilege to produce the privileged materials if it wishes to go forward with its claims implicating them.  The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it.

Id., at 720 (emphasis added).  Bittaker, also cautions that the:

> [C]ourt must impose a waiver **no broader than needed** to ensure the fairness of the proceedings before it.  Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose.  Courts . . . that have imposed waivers under the fairness principle have therefore **closely tailored the**

3

USCA5 1271

> **scope of the waiver** to the needs of the opposing party in litigating the claim in question.

Id., (emphasis added) citing, Kerr v. U.S. District Court, 426 U.S. 394 (1976) (court should ensure that the "balance between the petitioner's claims of . . . privilege and plaintiffs' asserted need for the documents is correctly struck.") (ellipses in original); see also, In re: Lott, 424 F.3d 446, 453 (6th Cir. 2005) ("Implied waivers [such as when a habeas petitioner raises a claim of ineffectiveness] are consistently construed narrowly");[1] Johnson v. Alabama, 256 F.3d 1156, 1179 (11th Cir. 2001) ("the precise boundaries of the privilege will vary from case to case, and in many instances will require careful evaluation by the district court") (cited by Government, *Motion* at 2); Alvarez v. Woodford, 81 Fed.Appx. 119, 2003 WL 22682463 at *1 (9th Cir. Nov. 12, 2003) (approving disclosure of otherwise privilege documents to the prosecution in response to a claim of ineffectiveness after "the Magistrate Judge gave careful consideration to each document at issue, such that only those documents or portions of documents relating to the claim asserted by the client would be disclosed")

---

[1]Lott illustrates the potential havoc that can be wreaked on a habeas petitioner's legitimately held privileges. In Lott the district court found an implicit waiver of the attorney client privilege based on the petitioner's claim of actual innocence. The Court of Appeals noted that "there is no question that the attorney-client privilege remains applicable in habeas proceedings," but is waived for claims of ineffective assistance of counsel, Lott, 424 F.3d at 452-55. It held that a claim of actual innocence does not waive the privilege in any respect. Id., at 455-56.

4

USCA5 1272

(internal quotation marks and citations omitted); <u>Mason v. Mitchell</u>, 293 F.Supp.2d 819-823-24 (N.D. Ohio 2003) ("waiver in habeas cases should be limited to the extent necessary to litigate a petitioner's ineffective assistance of counsel claims").

Rather than requesting that the Court supervise a "closely tailored" waiver of the privileges, the Government's *Motion* proposes to cut the Court entirely out of this critical process. Instead, and contrary to <u>Bittaker</u>, it seeks a "categorical" waiver of the privilege. Should the Court grant the Government's *Motion*, the scope of the privileges to be waived, including documents, strategies, communications and other work-product that ought to properly remain privileged – because they are unrelated to Petitioner's claims of ineffectiveness – would be disclosed pursuant to the unilateral reckonings of the Government and Petitioner's former counsel. Both the Court and Petitioner – who continues to validly hold at least some privileges – would be cut entirely out of the disclosure process.

### THE APPROPRIATE REMEDY

Thus, it is left to the Court to devise a mechanism by which the Government can obtain the information it believes it needs, while protecting Petitioner's validly held privileges.

Ideally, this Court would supervise the extent to which the privilege is waived

USCA5 1273

at an evidentiary hearing.[2]   However, Petitioner appreciates that this might not serve

the Government's asserted need for this information in order to respond to the 2255

Motion. *Motion* at 1. Petitioner is not sure that the Government must have counsels'

sworn statements to respond to the allegations in the 2255 Motion.[3]   However,

assuming that is so, Petitioner proposes that the Court permit the parties to depose

trial counsel.[4] Proceeding by deposition would permit Petitioner's counsel to ensure

[2]It is noteworthy that in each of the three cases cited by the Government, the question of whether a particular privilege was waived in the face of a claim of ineffectiveness, arose during or following an evidentiary hearing. Laughner v. United States, 373 F.2d 326, 327 (5th Cir. 1967) addressed the privilege issue on appeal following a hearing ("There is not [sic] contention nor any indication in the record that the testimony elicited from the attorney in this case exceeded the scope of that waiver."). Similarly, Johnson v. Alabama, 256 F.3d 1156 (11th Cir. 2001) considered the issue following an evidentiary hearing at which counsel testified. Bittaker (*Motion* at 2) addressed whether privileged information disclosed in response to an ineffective assistance of counsel claim in a habeas proceeding could be used by the prosecution at a subsequent retrial of the petitioner.

[3]In Petitioner's view, the Government does not really need this information to respond to the Petition because even if counsel completed declarations offering facially sound strategic reasons related to each claim of ineffectiveness, Petitioner would still be entitled to an evidentiary hearing to test the validity and accuracy of counsels' assertions. See e.g. Townsend v. Sain, 372 U.S. 293 (1963) ("Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing"); Schriro v. Landrigan, 127 S.Ct. 1933, 1940 (2007) (evidentiary hearing is appropriate when it "could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

[4]Depositions in post-conviction litigation are permitted by Rule 6 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, and are routine. See e.g. McCumber v. United States, 30 F.3d 78 (8th Cir. 1994) (referencing deposition of

6

that only communications, documents and work product directly related to the

ineffectiveness claims raised would be disclosed.  In the event that there is a dispute

as to any privilege, a timely ruling could be sought from the Court.  See, In re: Lott,

424 F.3d 446, 449, 450 (6th Cir. 2005) (permitting "the extraordinary remedy" of

interlocutory mandamus review of discovery order implicating attorney-client

privileged communications in habeas litigation, even though the general rule is that

such orders are only reviewable at the conclusion of the litigation, because "courts

must work to delineate the scope of the privilege in ways that are predictable and

certain.  An uncertain privilege – or one which purports to be certain, but rests in

widely varying applications by the courts – is little better than no privilege.")

(internal quotation marks and citations omitted).

Petitioner's counsel believe that depositions could be completed by the time

---

counsel); Long v. United States, 883 F.2d 966, 969 (11th Cir. 1989) (same); White v. United States, 858 F.2d 416, 419 (8th Cir. 1988) (multiple depositions).  In United States v. Alvarado, 2007 WL 922178 * 7 (S.D. Texas March 23, 2007) this Court declined to grant a petitioner's request for depositions, but only because he failed to allege what would be learned in depositions and therefore failed to show good cause for the discovery.  That is not a concern here because it is clear that the testimony (whether at a deposition or at a hearing) of trial counsel will be required to resolve many of the issues raised in the 2255 Motion.

Although Rule 6(c) contemplates that the Government may be required to pay Petitioner's expenses related to such depositions, Petitioner's counsel would waive any claim for expenses.

USCA5 1275

that the Government's responsive pleading is currently due.  However, even if depositions would engender short delay in the Government's response, that is a fair and appropriate cost to pay for the protection of Petitioner's validly held privileges.

If, after all counsel coordinate schedules, it appears that depositions could not take place before the current due date for the Government's response, two alternatives occur to Petitioner: 1) the Court could expand the Government's time to answer until shortly after the completion of the depositions or 2) the Court could require that the Government file its response, with leave to supplement it with any information learned during the depositions.

The Court or the Government may have other suggestions for how to strike the careful balance required to protect Petitioner's privileges while giving the Government the information it seeks, and Petitioner is amenable to any reasonable proposals.  Petitioner however, should not be required to sit by while his former counsel and his current party-opponent conduct a unilateral review and potential violation of his privileges.

USCA5 1276

## CONCLUSION

The Government's *Motion* should be denied.  Instead, the Court should permit the Government to notice trial counsel for depositions to be conducted as quickly as all counsels' schedules permit.  Depending on how quickly the depositions can be scheduled, the Government's response should either be delayed for a short time, or it should be permitted to supplement its response with information learned during the depositions.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Victor J. Abreu, Esq.
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:      Philadelphia, PA
            August 13, 2008

9

USCA5 1277

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 13th day of August 2008, I caused the foregoing upon the following person in the manner indicated below:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

/s/ Michael Wiseman

Michael Wiseman

USCA5 1278

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

On August 28, 2008, the Court held a telephone conference in the above-styled motion. At the conference, the Court made the following orders:

1.    The Court **GRANTS** the United States' "Motion Seeking Order for Affidavit from Defense Counsel to Enable Respondent to Adequately Respond to Petitioner's Section 2255 Motion." (Docket Entry No. 435). Courts have uniformly held that an ineffective-assistance claim waives attorney/client privilege, at least within the scope of the issues raised by the claim. *See In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005); *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001); *Bittaker v. Woodford*, 331 F.3d 715, 718-19 (9th Cir. 2003); *Crutchfield v. Wainwright*, 803 F.2d 1103, 1121 (11th Cir. 1986); *United States Ballard*, 779 F.2d 287, 292 (5th Cir. 1986); *United States v. Woodall,* 438 F.2d 1317, 1326 (5th Cir. 1971). The inquiry required by *Strickland v. Washington*, 466 U.S. 668, 69 (1984) presupposes that Mr. Douglas Tinker and Mr. John Gilmore will be able to respond to the accusations of ineffective assistance both at trial and on appeal. The Court will consider any future argument that the responses of either attorney overstep the bounds of the attorney/client privilege waived by Bourgeois.

1

USCA5 1279

2.      The Court **ORDERS** Mr. Tinker and Mr. Gilmore to respond to the allegations of

ineffective assistance to the best of their ability.  Mr. Gilmore will prepare an

affidavit on or before September 12, 2008.  It has come to the attention of the

Court that, in the event of a hearing in this case, it may be necessary to preserve

the testimony of Mr. Tinker.  The parties have agreed that the most efficient way

to do so is through written questions.  The United States will prepare the first set

of questions for Mr. Tinker by September 5, 2008.  Mr. Tinker's responses to the

questions will be filed with the Court.  Mr. Gilmore will file a written notice with

the Court if Mr. Tinker cannot complete his answers by September 22, 2008.

Bourgeois will submit any further questions for Mr. Tinker within ten days after

the initial responses are filed with the Court.

3.      The Court **ORDERS** the United States of America's to respond to Bourgeois'

motion for relief pursuant to 28 U.S.C. § 2255 or in the alternative 28 U.S.C.

§ 2241 on or before October 15, 2008.

SIGNED and ORDERED this 28th day of August, 2008.

_____
Janis Graham Jack
United States District Judge

2 / 2

USCA5 1280

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | Electronically Filed |
| Petitioner. | : | |
| _____ | : | |

### Notice of Service

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I caused to be served upon Douglas Tinker, Esq. *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.* I also served a copy on James Gilmore, Esq., so that he might assist in securing Mr. Tinker's response. The Interrogatories are 23 in number, with additional sub-parts, and are contained on nine pages.

They were served upon both attorneys by fax at their office and by overnight mail.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545- West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated: October 14, 2008
       Philadelphia, PA

USCA5 1281

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I served a copy of this Notice of Service upon the following persons in the manner indicted:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

Patricia Hubert Booth
United States Attorney's
Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
Patti.Booth@usdoj.gov

/s/      Michael Wiseman

_____

Michael Wiseman

USCA5 1282

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA

v.                                            Case No.: 2:02–cr–00216
                                              Judge Janis Graham Jack

Alfred NMI Bourgeois

                        Defendant

---

## NOTICE OF SETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 10/30/08

**TIME:** 09:00 AM

**TYPE OF PROCEEDING:** Telephone Conference

Date:   October 29, 2008

                                    Michael N. Milby, Clerk

USCA5 1283

✎AO 435
(Rev. 03/08)

**Administrative Office of the United States Courts**

**TRANSCRIPT ORDER**

| FOR COURT USE ONLY |
| --- |
| DUE DATE: |

*Please Read Instructions:*

| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 12/17/2008 | |
| --- | --- | --- | --- |
| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545 WEST | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
| 8. CASE NUMBER 2:02-CR-00216 | 9. JUDGE JANIS GRAHAM JACK | DATES OF PROCEEDINGS | |
| | | 10. FROM | 11. TO |
| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS | | |
| | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS | |

**15. ORDER FOR**

- ☐ APPEAL
- ☐ NON-APPEAL
- ☐ CRIMINAL
- ☒ CIVIL (HABEAS)
- ☐ CRIMINAL JUSTICE ACT
- ☐ IN FORMA PAUPERIS
- ☐ BANKRUPTCY
- ☐ OTHER *(Specify)*

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
| --- | --- | --- | --- |
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | PHONE CONFERENCES | 3/19/2008, 8/28/2008, |
| ☐ BAIL HEARING | | | 10/30/2008 |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
| --- | --- | --- | --- | --- | --- |
| ORDINARY | ☐ | ☒ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | |
| --- | --- | --- |
| 18. SIGNATURE *Kathrin Hennig* | ☐ EMAIL ONLY REQUIRED | |
| | ☐ EMAIL AND HARD COPY REQUIRED | |
| 19. DATE 12/17/2008 | ☐ EMAIL ADDRESS: | |

**20. TRANSCRIPT TO BE PREPARED BY**
- 3/19/2008 (Digital # 1:14-1:35) (ERO: V Jano)
- 8/28/2008 (Digital # 8:29-8:46) (ERO: I Cayce)
- 10/30/2008 (Digital # 9:00-9:14) (ERO: V Jano)

**COURT ADDRESS**

| | DATE | BY | | |
| --- | --- | --- | --- | --- |
| ORDER RECEIVED | 12-18-08 | VG | | |
| DEPOSIT PAID | — | | DEPOSIT PAID | — |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:**     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

USCA5 1284

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                            :
UNITED STATES OF AMERICA,                :        No. Cr-C-02-216
                                                            :        No. Cv-07-223
                        Respondent,               :        Honorable Janis Graham Jack,
                                                            :               U.S.D.J.
            -against-                                   :
                                                            :        **This is a Capital Case**
ALFRED BOURGEOIS,                           :
                                                            :        Electronically Filed
                        Petitioner.                   :
_____    :

**PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME
TO FILE REPLY BRIEF IN
SUPPORT OF SECTION 2255 MOTION**

Petitioner, Alfred Bourgeois, through undersigned counsel hereby moves for an

unopposed extension of ninety (90) days to submit his Reply Brief in Support of his Section 2255

Motion.  In support, he states the following.

1.        On May 14, 2007 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C.*

*Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* challenging his convictions and

sentence of death related to the 2002 beating death of his daughter, JG-1999 (document # 396).

On October 5, 2007, Petitioner filed his memorandum of law in support of that motion

(document # 402).

2.        After several unopposed extensions, the Government's answer to Petitioner's

2255 Motion was filed on October 15, 2008 (document # 442).

3.        Petitioner's reply to the Government's answer is currently due on January 15,

2009.  Unfortunately, as a result of counsel's multiple capital case commitments and the past

holiday vacation schedule, counsel will be unable to complete Petitioner's Reply Brief by its

**USCA5 1285**

current due date.  Moreover, the Government's answer raises several issues which require extensive research to properly reply.  Accordingly, Petitioner respectfully requests an extension of ninety (90) days from the current due date to file his reply.

3.      This Motion is made in good faith and is not intended to unduly delay these proceedings. The Motion is made based upon actual case needs and is required in order to effectively and professionally represent Petitioner and provide the court with a competent, well researched and well written brief which will assist the court in the resolution of this matter. Counsel are confident that they will be able to file the Reply in ninety days, and do not anticipate the need for further extension requests.

4.      Counsel has consulted with attorney for the Government, Assistant United States Attorney, Tony Roberts, Esq., who has indicated that Respondents are not opposed to Petitioner's extension request.

WHEREFORE, counsel for Petitioner respectfully request that the Court extend his time to file Petitioner's Reply Brief ninety (90) days until April 15, 2009.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated: January 6, 2009

USCA5 1286

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 6th day of January, 2009, I caused

the foregoing upon the following person in the manner indicated below:

BY EMAIL

Tony R. Roberts, Esq.
PO Box 61129
Houston, TX 77208
**Tony.Roberts@usdoj.gov**

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Patti.Booth@usdoj.gov**

/s/ Michael Wiseman

Michael Wiseman

Dated: Philadelphia, Pennsylvania
January 6, 2009

USCA5 1287

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                            :
UNITED STATES OF AMERICA,                :          No. Cr-C-02-216
                                                            :          No. Cv-07-223
                              Respondent,        :      Honorable Janis Graham Jack,
                                                            :                 U.S.D.J.
               -against-                             :
                                                            :      **This is a Capital Case**
ALFRED BOURGEOIS,                           :
                                                            :
                              Petitioner.            :
_____   :

**ORDER**

        AND NOW this _____ day of January, 2009 upon consideration of *Petitioner's*

*Unopposed Motion For Extension of Time to File Reply brief in Support of Section 2255 Motion*,

it is hereby ORDERED:


        Petitioner's motion is GRANTED.  He may file his Reply Brief in Support of his Section

2255 Motion on or before April 15, 2009.



                                                    _____
                                                    Honorable Janis Graham Jack
                                                    USDJ

USCA5 1288

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA       §
                               §
VS.                            §    CRIMINAL ACTION NO. C-02-216
                               §
ALFRED NMI BOURGEOIS           §

## **ORDER**

On this day came on to be considered *Petitioner's Unopposed Motion For Extension of Time to File Reply brief in Support of Section 2255 Motion* (D.E. 446).  Petitioner's motion is GRANTED. Petitioner shall file his Reply Brief in Support of his Section 2255 Motion on or before April 15, 2009.

SIGNED and ORDERED this 12th day of January, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

**USCA5 1289**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,          *     CRIMINAL ACTION
                                   *
          PLAINTIFF,               *     CR-C-02-216(1)
                                   *
VS.                                *
                                   *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                  *     MARCH 19, 2008
                                   *     1:14 P.M.
          DEFENDANT.               *
                                   *
* * * * * * * * * * * * * * * * * *


TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77208

                 (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                MOLLY CARTER, P. O. BOX 270203
          CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 1290

APPEARANCES:  (Continued)

FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. VICTOR JULIO ABREU
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           1701 WEST HIGHWAY 83, SUITE 405
                           McALLEN, TEXAS 78501

**USCA5 1291**

(The proceedings began at 1:14 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  This is Patti Hubert Booth for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. WISEMAN:  Good afternoon, Your Honor.  It's Michael Wiseman and Victor Abreu for Mr. Bourgeois.

THE COURT:  All right.  You filed a motion for Mr. Bourgeois, Mr. Wiseman, and I sent it, I made a notice to send it to Ms. Booth to respond, because even though apparently it was noted as unobjected to, there was some history there that I wanted to make sure we didn't miss.

MR. WISEMAN:  Yes.

THE COURT:  And so I didn't know if you still wanted to have your motion heard, and if so, that's what we're doing now.

MR. WISEMAN:  Yeah, I was actually just -- this is Michael Wiseman, for the record.  I was just explaining to Mr. Roberts and Ms. Booth that we didn't know quite as much as we probably should have when we filed the motion.  And I was hoping to lay that out.  The bottom line is I did have a couple of points I wanted to make --

USCA5 1292

THE COURT:  Sure.

MR. WISEMAN:  -- and some alternative suggestions.

As I indicated in our motion, Mr. Bourgeois, when I visited him in January, was on a hunger strike, and his counselor came in with a copy of the orders in question and asked me if I could intervene in some way to get Mr. Bourgeois to start eating again.  So I discussed it with him.  And long story short, I promised to file this motion in consideration for him eating again, and that seemed to do the trick at the time.

And we do understand now that there's a little bit more to this than we had initially appreciated, and you know, that the proposal we had set forth that we review his correspondence had actually been rejected by the Court pretrial.

My understanding is that since we filed the motion, the BOP has moved Mr. Bourgeois to a completely isolated area.  He used to be amongst other prisoners.  So at this point, he's not only not getting incoming or outgoing mail, but he's not even around other people.  And you know, that's pretty, a pretty tough way to go, even for --

THE COURT:  Well, where is he?  Is he in that -- Mr. Wiseman, is he in that new federal death row deal?

MR. WISEMAN:  Yes, he is.  He's in Terra Haute, and he's in the Special Confinement Unit.  My understanding, and

USCA5 1293

it's a rough one, is that there are certain parts of it that are more or less isolated.  He used to be amongst some other prisoners.  Now he's completely isolated.

I don't know this for sure, but I think what happened was -- and we did do some research on this, it's not an area we have to get into too often -- but we were looking what the Court's authority was as well as the BOP's authority.  And the bottom line seems to be that the BOP actually can do all the things we're complaining of, whether Your Honor ordered it or not.  So your order is more of a recommendation to them, which they take into consideration in addressing what conditions of confinement are appropriate.

I think what happened, I don't know this for a fact, but what I think happened is after we filed the motion, they went back and looked at it and decided, oh, he was in isolation pretrial, so he should be in isolation now.  So our efforts at helping him have actually put him in a, or our attempt to help him have put him in a worse position than he was in before we started poking around.

So what we would propose at this point is to file -- he was in isolation pretrial because there were prisoner witnesses against him who he apparently threatened.  Since he is no longer --

THE COURT:  No, no, no.  No, no, no.

MS. BOOTH:  That's not the only reason.

USCA5 1294

THE COURT:  There were witnesses, there were witnesses that he threatened.  And it was -- the concern was, because his brother was on the outside and he was on the inside, that there were some witnesses that were concerned.  And in fact, one of them was murdered, and one of them had her house burned down the night before she testified.

MR. WISEMAN:  Right.  I --

THE COURT:  So whether there's any connection, I don't know, and I never found there to be.  But I'm just saying --

MR. WISEMAN:  Right.

THE COURT:  -- there were legitimate concerns --

MR. WISEMAN:  Yeah.

THE COURT:  -- about keeping him in isolation.

MR. WISEMAN:  We understand that.  And it certainly is a legitimate concern.  What I was trying to articulate was that he has no prisoners around him who he has any interest or any motive at this point in threatening, because they're not related to his case.

So what I was going to suggest was if the Court would consider ordering or recommending, or however way the Court would want to do it, that there's no longer a need to keep him isolated from other death row prisoners, and at the same time address the mail as follows:  We don't see, you know, even though we don't have the history Your Honor does, we don't see

USCA5 1295

any threat with him receiving mail.  In other words, if he gets mail from --

THE COURT:  I agree with you.  I don't think I have any problem with his receiving mail.

MR. WISEMAN:  Okay.

THE COURT:  The problem came when I messed up an order early on.

MR. WISEMAN:  Uh-huh.

THE COURT:  I thought I had made it clear that he was to correspond only through his attorneys, and meaning that if they thought the correspondence was all right, they could forward it.

MR. WISEMAN:  Right.

THE COURT:  And what happened was, they misunderstood.  And so Mr. Bourgeois was sending envelopes sealed and addressed inside envelopes --

MR. WISEMAN:  I see.

THE COURT:  -- to his attorney.

MR. WISEMAN:  And they weren't reading it.

THE COURT:  And those witnesses, I think, were contacting the U.S. -- those people that -- somehow there were witnesses that contacted the AUSA that said, you know, we are receiving these communications somehow.

MR. WISEMAN:  Uh-huh.

THE COURT:  One of them, I think, Ms. Booth, was the

USCA5 1296

brother -- was it Lloyd Bourgeois?  Is that his name?

MR. WISEMAN:  From -- yeah, Lloyd.  Right.

THE COURT:  He was driving around one of the witness's houses frequently, that kind of thing.

MR. WISEMAN:  Yeah, yeah.

MS. BOOTH:  Judge, just one more thing for the record.  One of the -- I tried to have my FBI Agent here, but she's out digging for a body.  One of the witnesses, which was his cousin, called us and said, "Look, I'm afraid that he's going to kill me.  I'm frightened," who had agreed to testify.  Well, the next day they find her dead in her house.

Now, that is separate.  That is separate and apart from his, the woman that had his child who was stabbed 37 times by someone in the, a Black Knight prison gang.  And that is separate and apart from the house that burned down.  So there were several things happening on the outside.

THE COURT:  While he was on the inside.  I think that was the point.

MS. BOOTH:  Right.  Right.

THE COURT:  And there was a legitimate concern at least to restrict that correspondence.  And it was such a concern actually that he was moved into the federal courthouse, which doesn't have those kind of accommodations.

MR. WISEMAN:  Right, right.

THE COURT:  For the entire time of the trial.  And so

**USCA5 1297**

the Marshals were with him 24/7, but he got fantastic food. They had, you know --

MR. WISEMAN:  Right.

THE COURT:  And I think he was very -- he was in better circumstances than he would have been in a county jail.

MR. WISEMAN:  Yeah.  Well look, I, you know, none of us on this end are, you know, in a position to, you know --

THE COURT:  You're not in a position to guarantee. That's the problem.

MR. WISEMAN:  Yeah, dispute or guarantee, you know. So we're just trying to figure out a proposal that would, you know, give him some relief from this complete isolation.

And just as an example, his father passed away recently, and he found out from us, because a relative couldn't even send him notice of that.  So I mean, just that kind of basic communication with some people, one-way communication, that is, allowing him to receive mail.

So if he can receive mail from people who want to write to him, and he can't write back, I mean, I think that would, you know, at least in my mind, obviate any concerns about threats.

And then I would propose that as far as commercial mail, in other words, if he wants to, you know, send away to religious institutions or, you know, educational institutions to take courses or whatever, that there really, I don't see any

**USCA5 1298**

reason for there to be any limits on his incoming or outgoing commercial mail.  And that's, you know --

MS. BOOTH:  On the religious, there is a problem.

MR. WISEMAN:  Oh, okay.  What would that be?

MS. BOOTH:  Well, the problem is, and I can't put my finger right now on the name of the people, but there, he was trying to do something through a pastor type situation, trying to do -- and I don't, I can't remember right now exactly what it was, but he had figured out a way to manipulate it that way. And we have some letters somewhere --

MR. WISEMAN:  Uh-huh, uh-huh.

MS. BOOTH:  -- that deal with that --

MR. WISEMAN:  Okay.

MS. BOOTH:  -- exact issue.

MR. WISEMAN:  I was thinking of religious as like, you know, major known churches or, you know, I'm not talking about some guy who might call himself a pastor.

But you know, maybe the solution to this would be if there are some specific folks that we can mutually identify that could cause problems, we'll just, you know, tell the BOP, don't let him receive or send mail to those folks, you know, rather than just making it this global, you know, he can't communicate with anyone.  Because, you know really, I won't go on and on, but it really is just terribly isolating at this point.

**USCA5 1299**

We get, you know, we're the only one that he has contact with now.  And although we have a significant number of folks working on the case, we don't have time to do all this talking to him, you know.  He can go on and on.  So we'd like to get a little relief ourselves and get him hooked up with some other folks and distract him a little bit.

So I guess to summarize, the proposal we have is that he not be isolated from other death row prisoners and that he be allowed to receive incoming mail from all the identifiable problematic individuals, and that he be permitted to send and receive commercial mail.  And we think that's reasonable and should accommodate any security concerns for folks on the outside.

Judge, that's our position on all this.

THE COURT:  Ms. Booth?  Mr. Roberts?

MR. ROBERTS:  Judge, this is Tony Roberts.  I had originally thought that the motion was to be directed at changing the attorneys' names, and only, and that that was the only thing that was going to be, that they were going to do was change that, and I was assured that the Federal Public Defender would do everything the Court instructed them on, on keeping the correspondence, you know, as safe as it was during trial.

So that was the only thing that we really were unopposed to.  And it makes sense that obviously if he's got ineffective assistance allegations, that there would be, you

USCA5 1300

know, direct, that any mail that he sends would go through his current attorneys and not Mr. Gilmore and Mr. Tinker.  So --

THE COURT:  Well, has there been a problem with that?

MR. WISEMAN:  Well, Your Honor -- this is Michael Wiseman.  My understanding, and maybe I'm just confused about it, is that in a pretrial ruling, or pretrial hearing, Your Honor sort of backed off of that idea, because you were concerned that that placed his lawyers in an awkward position of arguably receiving evidence of a crime.  So if Mr. Bourgeois sent us a letter that said, you know, rub out, you know, Mr. X, we would know about it and be under an ethical obligation to do something about it.  And that just opens up all kinds of cans of worms.

So my understanding, and this is, I was explaining to Mr. Roberts before Your Honor got on the phone, we didn't realize that when we made this proposal.  I mean frankly, I think we would be okay with doing that, but I don't think that was something Your Honor was okay with pretrial.  We would be happy to screen his mail and actually read it, and obviously let him know that we're going to be reading it.

THE COURT:  What happened was it put Mr. Gilmore and Mr. Tinker, when we started, I thought we had started a different way, and it turned out that it was not feasible for Mr. Gilmore or Mr. Tinker to do that.

MR. WISEMAN:  Uh-huh.

USCA5 1301

THE COURT:  They thought they were just supposed to pass through the mail, which made absolutely --

MR. WISEMAN:  Right.

THE COURT:  -- no sense at all.

MR. WISEMAN:  No sense, no, no.

THE COURT:  And so, but you are able to communicate with your client all right.  Is that right?

MR. WISEMAN:  I'm sorry.  I didn't hear you.

THE COURT:  Are you able to communicate with Mr. Bourgeois?

MR. WISEMAN:  Yes, we have been able to communicate with him.

THE COURT:  Okay.

MR. WISEMAN:  That's not been an issue at all for us.  This is purely about communicating with others.

THE COURT:  So has, and I don't want to compromise your position with your client, but has he expressed any -- is there somebody in particular he wants to communicate with?

MR. WISEMAN:  The answer is yes.  I don't have names off the top of my head.  I mean, he'd like to communicate with a lot of people.  I could certainly come up with a list if that would be helpful, but you know, I --

THE COURT:  I don't think so.  I think it's just a problem.

MR. WISEMAN:  Yeah, yeah.

**USCA5 1302**

14

THE COURT:  Because of --

MR. ROBERTS:  And if I remember right, the issue that Ms. Booth raised was there was, you know, there were so many different types of communications going out, and if I remember right, there was something to the nature of him --

THE COURT:  Is this Mr. Roberts?

MR. ROBERTS:  Yes.  I'm sorry.

THE COURT:  Okay.

MR. ROBERTS:  Mr. Roberts, yes.  There was something to the nature of him writing to a pastor and saying he wanted to reconcile with his wife or something, and the pastor was very sympathetic about that and actually was trying to contact the wife before.  So it was that kind of a thing where he just --

THE COURT:  Right.  Right.  She went into the witness protection program or something with her child.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And there was -- it's a huge problem.  He was writing to me for a while.

MR. WISEMAN:  Yes.

THE COURT:  I'm sure those letters are in -- you know, trying to locate his wife, because he thought he was being ripped off in the divorce.  I don't think they had any assets.  So he clearly just wanted to find her.

MR. WISEMAN:  Yeah, this is Mr. Wiseman again.  I

USCA5 1303

mean, you know, we're happy to serve in that role.  And obviously we would read the letters, and we would let Mr. Bourgeois know that we're going to read the letters carefully, and hopefully that would dissuade him from any silliness, but --

THE COURT:  I just, like you say, that puts you in a very awkward position, because --

MR. WISEMAN:  It does potentially, yes.  It does.  And --

THE COURT:  And I just don't think -- I appreciate the offer.

MR. WISEMAN:  Yeah.

THE COURT:  And I'm sure Mr. Bourgeois does, but I think it's just an inappropriate thing for you to --

MR. WISEMAN:  Okay.  Well, I just wanted to clarify that.  So I guess we're back then to, you know, my alternative proposal of, you know, allowing certain communications to go through to him, and allowing all commercial communication.

MR. ROBERTS:  I just want to clarify our -- this is Tony Roberts again.  I just wanted to clarify that, you know, in our non-opposition to the motion, it was really just to change the attorneys' names.  And anything that, any role that Mr. Gilmore and Mr. Tinker were playing during trial would now be converted over to the Federal Public Defender's Office, because obviously they're representing him now.  So perhaps it

USCA5 1304

was my -- I should have probably written a response stating the limitations of our non-objection.

THE COURT:  Okay.  No, then I misread the motion.  I thought it was completely unopposed, and I thought it was a motion to allow him unfettered communication with the outside world.

MR. ROBERTS:  Yeah.  No, Your Honor.  I definitely did not agree to that.  The United States would not have agreed to that, based on the history.  And it just, I probably -- when I read the motion, I thought -- and I did read the motion after I got it, and I thought it was, I thought it was clear enough in the sense that we were unopposed in that he was trying to change the roles of the attorneys.  But perhaps I misread it as well.

MR. WISEMAN:  Yeah, and I think -- this is Mr. Wiseman again.  I think the fault lies with us, you know, in that we didn't have good information when we started out.  And we thought that's what we were doing was just substituting the names, but we didn't realize that it was something Your Honor had already rejected earlier.  So the whole thing got off on a bad foot, and I think the blame lies with us.  And again, I apologize to Mr. Roberts and the Court for any of that confusion.

THE COURT:  So what, from the Government, what is your recommendation?

USCA5 1305

MR. ROBERTS:  Well, Your Honor, Ms. Booth filed a response in accordance with the Court's order, and I really think at this time we're so far removed from Mr. Bourgeois and his situation that I don't see how we could give an informed, an informed position, other than what we wrote and filed in response to the Court.

MR. WISEMAN:  Your Honor, this is Michael Wiseman again.  I mean, I guess I appreciate what Mr. Roberts just said, you know, but the idea is that the initial isolation of Mr. Bourgeois within the County Jail, I thought, was to keep him both from being able to write, but also to primarily keep him away from the prisoners who were going to testify against him.

THE COURT:  No.

MR. WISEMAN:  That's simply not an issue.

THE COURT:  No, no, no.  When he got even further isolated, it was when he tried to hire somebody to allegedly kill some witnesses --

MR. WISEMAN:  Oh, okay.

THE COURT:  -- and work with his brother to do that.

MR. WISEMAN:  I see.  I see.

THE COURT:  And that was another reason.  And that was one of the jailers that was carrying messages back and forth.  So that's what got him finally transferred over to the federal courthouse, because there just seemed to be no way we

USCA5 1306

could work around this --

          MR. WISEMAN:  Yeah, yeah.

          THE COURT:  -- incident.  Now, the jury found this to be, I guess, credible, but my concern always was that I didn't find it to be true or not true.  I just found it to be a concern that was worth working with.

          MR. WISEMAN:  Yeah, yeah.

          THE COURT:  And --

          MR. ROBERTS:  Your Honor, there was even one occasion when he put a note, he wrote some information on a court order --

          THE COURT:  He did.

          MR. ROBERTS:  -- slipped it inside of a Bible -- and this is Tony Roberts again, sorry.  I keep forgetting we're not standing in front of you, Your Honor.  But that he had slipped a note inside of a Bible and asked one of the guards if he could pass the Bible over to another inmate, who had declared to be a part of the Texas Syndicate.  And that was part of the evidence that came out during the sentencing phase, where he was attempting to hire somebody.  He wanted that other prisoner to then send the mail out to his brother.

          So that became very disconcerting, because we couldn't even, you know, we couldn't just leave him in the midst of people that actually did have contacts with the outside.

USCA5 1307

MS. BOOTH:  And the other -- this is Patti Hubert Booth for the United States.  Your Honor, the other, we have letters that we intercepted that he was using another inmate for sending out letters to witnesses.  He wrote the letters, and the inmate had, you know, put his return address and his inmate number, and the letters went out.  And that was another reason we didn't want him around other prisoners, because he's able to manipulate people.  He's one of the smartest and most manipulative prisoners we've ever had in our --

MR. WISEMAN:  Well, Your Honor, I -- Michael Wiseman here. I don't want to, you know, get into a tit-for-tat about how smart he is, because that's a claim in the case.

THE COURT:  Well, I know, I've read --

MR. WISEMAN:  Obviously, we don't agree with that.

THE COURT:  Mr. Wiseman, I read your 2255.

MR. WISEMAN:  Yes, yes, yes.

THE COURT:  And --

MR. WISEMAN:  Right.

THE COURT:  And I'm sure you're aware of the ups and downs of that.

MR. WISEMAN:  Yes.  Well, in any event, you know, I can, you know, the more we go into this, the more regret I have that we brought it up, because it's bringing up all these bad things that happened.  I guess with respect to his isolation, you know, it sounds like the Government has some pretty

**USCA5 1308**

legitimate concerns that they've articulated.  I guess then, what about letting him receive mail from people who want to write to him, without allowing him to write back?

THE COURT:  I think, Mr. Wiseman, the best thing I can do --

MR. WISEMAN:  Yeah.

THE COURT:  -- you know, knowing what is going on and the concerns previously, to make sure that the people are protected that need to be protected, is not to enter any change of any kind of order at all.  I'm going to leave whatever it is there.

MR. WISEMAN:  Okay.

THE COURT:  And it's really up to the Bureau of Prisons to make their own determination as to what --

MR. WISEMAN:  Okay.

THE COURT:  -- what he can do and what he can't do.

MR. WISEMAN:  Okay.  Will Your Honor issue an order to that effect then?  Because they may still be acting on their impression of what your position is.

THE COURT:  No, that's -- that order that I entered is still there.

MR. WISEMAN:  Still there, okay.

THE COURT:  And that's what's going to stay there.

MR. WISEMAN:  Okay.  All right.  Well, I appreciate everyone's time in considering this.  Obviously, we felt like

USCA5 1309

we had to do it.

THE COURT:  You're doing a good job, Mr. Wiseman, both of you.  And you -- well anyway, I think you're doing a fine job for your client.

MR. WISEMAN:  Appreciate that, Your Honor.  Thank you.

THE COURT:  Thank you all very much.

MR. WISEMAN:  Okay.

THE COURT:  You're excused.

(Proceedings concluded at 1:35 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    January 20, 2009
Molly Carter                        Date

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,      *   CRIMINAL ACTION
                                *
        PLAINTIFF,         *   CR-C-02-216(1)
                                *
VS.                        *
                                *   CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,         *   AUGUST 28, 2008
                                *   8:29 A.M.
        DEFENDANT.         *
* * * * * * * * * * * * * * * * * *

TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:      MS. PATTI HUBERT BOOTH
                              MS. ELSA SALINAS-PATTERSON
                              OFFICE OF THE U.S. ATTORNEY
                              800 NORTH SHORELINE, SUITE 500
                              CORPUS CHRISTI, TEXAS 78401

                              MR. TONY R. ROBERTS
                              OFFICE OF THE U.S. ATTORNEY
                              P. O. BOX 61129
                              HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:         MS. LORI CAYCE

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 1311

APPEARANCES:  (Continued)


FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           MR. JAMES McHUGH
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:              MR. JOHN GILMORE

USCA5 1312

(The proceedings began at 8:29 a.m.)

(Call to Order of the Court.)

THE COURT:  Ms. Scotch, would you call the case?

THE CLERK:  Oh, yes, Your Honor.  I'm having a little trouble hearing you.  Did you say call the case?

THE COURT:  Yes.

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States.

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. WISEMAN:  Michael Wiseman and James McHugh for Mr. Bourgeois.

MR. GILMORE:  And John Gilmore.

THE COURT:  I wanted to have this hearing because of the difficulty I understood the Government was having getting responses from the trial attorneys and the appeal attorneys, Mr. Gilmore and Mr. Tinker, because Mr. Bourgeois has stated that he is not waiving his attorney-client privilege to all things, which I understand.  But we have to find a way for Mr. Tinker and Mr. Gilmore to respond to the allegations of ineffective assistance of counsel, both at trial and appeal, and still stay in the boundaries of responding directly to these allegations.

So what I'm thinking is that the case law says pretty

much that the attorney --

MR. WISEMAN:  Your Honor, I'm sorry, I'm having trouble hearing you.  It's Michael Wiseman.

THE COURT:  You know, I can't hear you all either.  Should I call back in?

THE CLERK:  Yes.

THE COURT:  Could you hear anything I said, Mr. Wiseman?

MR. WISEMAN:  I barely could hear, and I think I may have missed parts of it.

THE COURT:  Okay.  Let me call back.

MR. WISEMAN:  Okay.

MS. BOOTH:  Okay.  She's going to call back.  Do we hang up?

THE CLERK:  No, no.

MS. BOOTH:  Oh, okay.  Okay.

(PAUSE.)

THE COURT:  Ms. Scotch, would you try again?

THE CLERK:  Yes, Your Honor.  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS-PATTERSON:  Elsa Salinas-Patterson for the United States.

USCA5 1314

MR. WISEMAN:  Michael Wiseman and James McHugh for Mr. Bourgeois.

MR. GILMORE:  And John Gilmore.

THE COURT:  Okay.  Can y'all hear me better, Mr. Wiseman?

MR. WISEMAN:  I can, yes.

MS. BOOTH:  Yes, ma'am.

MS. SALINAS-PATTERSON:  Yes, ma'am.

THE COURT:  Okay.  Maybe we should all speak up, because now I'm having trouble hearing you all.  I called the hearing, as I said before, because of the 2255 that Mr. Bourgeois has filed alleging ineffective assistance of counsel in several areas, both in the trial and in the appeal. And Mr. Bourgeois has made it clear that he does not intend to waive all the attorney-client privilege, only attorney-client privileges for those matters that would be required to respond to the allegations of ineffective assistance of counsel.  Is that correct, Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.  That is exactly our position.

THE COURT:  All right.  What I'm going to do is order Mr. Gilmore and Mr. Tinker to respond, to the best of their abilities, as they deem fit, all -- and by affidavit or otherwise, and we'll get to that -- all of the allegations, to all of the allegations of ineffective assistance of counsel,

**USCA5 1315**

both in the trial and in the appeal.

If now, and I suppose those responses, however they come, I can entertain at another point objections that they've gone outside the bounds of responding to those questions. But I need to at least get the responses as Mr. Gilmore and Mr. Tinker deem it appropriate before I entertain objections as to outside the bounds of attorney-client privilege.

Mr. Wiseman, do you agree with that? Is that an okay way to proceed?

MR. WISEMAN: Yes, I think conceptually that's right. I guess my --

THE COURT: I couldn't think of any other way to do it. You know?

MR. WISEMAN: Yeah, I guess the point being, before the proverbial cat gets out of the bag, we would like to have an opportunity to assert any relevant privileges. I think that would be best accomplished --

THE COURT: I don't think that's actually going to work until the cat is out of the bag, then you can assert your privilege. I can rule on it and strike it from the record.

MR. WISEMAN: Okay. Well, that would work.

THE COURT: That's the only way I can think of doing this conceptually, Mr. Wiseman, because the case law says the attorneys that are alleged to have been incompetent, or ineffective assistance of counsel, have the right to respond as

USCA5 1316

they deem necessary.  Now, if you believe that they've done more than what's necessary, I will entertain it at that time.

MR. WISEMAN:  Okay.

THE COURT:  So, Mr. Gilmore.

MR. GILMORE:  Yes, Your Honor.

THE COURT:  This is difficult to even talk about.  Do you have any suggestions as to how best to preserve Mr. Tinker's testimony?

MR. GILMORE:  He can communicate right now, Judge. I'm not sure if -- I would have to speak with him to see if he would be more comfortable doing this as an affidavit or, or if his deposition needs to be taken.

THE COURT:  It seems to me that the options are probably not affidavit but written questions --

MR. GILMORE:  Okay.

THE COURT:  -- or oral deposition.

MR. GILMORE:  Okay.

THE COURT:  Because his testimony needs to be preserved for a future evidentiary hearing, if any, and we really can't do that by affidavit, because there has to be some type of cross-examination, either by written questions or by oral deposition.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I have a suggestion.  In my limited experience with written questions and other civil litigation, sometimes they prove to

USCA5 1317

be less than satisfactory, in terms of really getting to the heart of the matter. And it doesn't really allow for the kind of contemporaneous give and take between the examiner and the witness. I think, you know, it would be best for all parties and the Court to just have a deposition, where both sides can --

THE COURT: Mr. Wiseman, Mr. Tinker has brain cancer and has difficulty speaking.

MR. WISEMAN: Oh, I'm sorry, I didn't know that.

THE COURT: And may not be able to do that.

MR. WISEMAN: I'm sorry. I wasn't aware of that fact.

THE COURT: And we need to preserve the testimony in whatever way it is comfortable for Mr. Tinker to do.

MR. WISEMAN: Absolutely. I absolutely agree.

THE COURT: If it takes a flurry of written questions over a short period of time, then that's the way it's going to be.

MR. WISEMAN: Okay. Absolutely.

THE COURT: Then we'll leave that, Mr. Gilmore, to Mr. Tinker's option.

MR. GILMORE: I agree that written questions would probably be the way to go, Judge.

THE COURT: And I don't mean to be so presumptuous, but I understand that he has some trouble speaking. Is that

USCA5 1318

correct?

MR. GILMORE:  That's correct.

THE COURT:  Okay.  So how quickly can you propound these questions?

Can I ask, Mr. Gilmore, on the record if you can tell me that you and Mr. Tinker consulted with all of your trial and appeal strategies?

MR. GILMORE:  Did we consult with --

THE COURT:  With each other.

MR. GILMORE:  I didn't hear that, Judge.  I'm sorry.

THE COURT:  Did you and Mr. Tinker consult with each other on all your trial and appeal strategies?

MR. GILMORE:  We did, Judge.

THE COURT:  Okay.

MR. GILMORE:  But we divided up the trial, Mr. Tinker did all the expert witnesses.  Even though we talked about it, he handled all the expert witnesses, and I handled law enforcement and lay witnesses.

THE COURT:  But you made those decisions jointly on how to proceed with each witness?

MR. GILMORE:  We did.

THE COURT:  Okay.  I ask that for the record, Mr. Wiseman, because -- well, for obvious reasons.

MR. WISEMAN:  Yes.

THE COURT:  So how quickly do you want to proceed?  I

USCA5 1319

guess it would be the Government proceeding with the first set of questions?  And Mr. Gilmore, if you want to be -- if you want to take Mr. Gilmore's deposition, you may do so.

MR. GILMORE:  That's fine with me.

THE COURT:  Unless, it seems more practical -- now, I'm not interested in the time line of preserving Mr. Gilmore's deposition, I mean testimony.  You can start with Mr. Gilmore's affidavit.  Mr. Gilmore, I think, would that be better for you?  Then they'll know whether or not they want to take a deposition.

MR. GILMORE:  That will be fine, Judge.

THE COURT:  Is that all right with you, Mr. Wiseman?

MR. WISEMAN:  Yeah, I think under the circumstances, whatever way both Counsel feel is best to proceed is going to be okay with us.

THE COURT:  So I'm going to order you then to provide your affidavit, Mr. Gilmore, in response to the best of your ability to all these allegations of ineffective assistance of counsel.

MR. WISEMAN:  I'm sorry, Your Honor, this is Michael Wiseman.  I thought Your Honor was suggesting written questions for Mr. Gilmore.

THE COURT:  Not Mr. Gilmore, for Mr. Tinker.

MR. WISEMAN:  Oh, I see.  So Mr. Gilmore's going to do the affidavit?

USCA5 1320

THE COURT:  Because I don't have the same concern about preserving the testimony of Mr. Gilmore.

MR. WISEMAN:  I understand.

THE COURT:  It seems to me more efficient for you all to start with the traditional way of affidavits for Mr. Gilmore, and then you can decide whether or not you want to take his testimony or whether we should go directly into a hearing.

MR. WISEMAN:  Okay.  I understand.

THE COURT:  I have a great concern about preserving Mr. Tinker's testimony for any future hearings.

MR. WISEMAN:  Yes.

THE COURT:  And the best way to do that is by question and answer, whether it's written or by oral deposition.  And you must remember that this may be the only time you will have to submit questions to Mr. Tinker.  So do whatever you want as quickly as you need.

Mr. Gilmore, how much time do you need to file an affidavit?

MR. GILMORE:  A week, I guess, Judge.

THE COURT:  All right.  You are familiar then -- you've read the habeas corpus?

MR. GILMORE:  I have in the past, Judge.  I haven't recently.

THE COURT:  Okay.  Then let's make it ten days --

USCA5 1321

MR. GILMORE:  Okay.

THE COURT:  -- to submit your affidavit.  And how much time do you all want to begin your written questions, Mr. Wiseman and Mr. Roberts, your written questions for Mr. Tinker?

MR. WISEMAN:  I guess I would ask for two weeks, if that's not too long under the circumstances.

MR. GILMORE:  It might be.

THE COURT:  Let's make it a week.

MR. WISEMAN:  A week, okay.

THE COURT:  And then, because there will be follow-up questions, I'm sure.

MR. WISEMAN:  Yeah.

THE COURT:  Now, Mr. Gilmore, I know you can't speak for Mr. Tinker, but I know that you're familiar with his condition.

MR. GILMORE:  I am, Judge.

THE COURT:  How much time do you think would be required for Mr. Tinker to respond to these written questions?

MR. GILMORE:  It just depends on what his condition is.  He has good days and bad days.  I would say that probably, he could probably finish it within a week, depending on how long it is.

THE COURT:  All right.  Well, let's just leave that open.  And Mr. Gilmore, if it's going to take him longer than

USCA5 1322

two weeks to respond after he receives them, I'll rely on you to file some kind of written notice to the Court.

MR. GILMORE:  I will, Judge.

THE COURT:  Does anybody object to Mr. Gilmore acting on Mr. Tinker's behalf in this regard?

MR. WISEMAN:  Mr. Bourgeois does not.

MS. BOOTH:  Nor does the Government.

THE COURT:  Are there any further issues that we need to resolve at this hearing?  Mr. Wiseman?

MR. WISEMAN:  I don't have any, no.  Thank you.

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  If I understand right, that gives, that gives us till approximately September 5th.

THE COURT:  Mr. Roberts, I can't hear you.

MR. ROBERTS:  Oh, I'm sorry.  Is that any better?

THE COURT:  That's better.  Thank you.

MR. ROBERTS:  Okay.  Yes, Your Honor.  I'm just trying to clarify, if I understand right, we have until approximately the 5th of September to submit questions to Mr. Tinker?

THE COURT:  Yes.

MR. ROBERTS:  And then you said ten days for Mr. Gilmore.  Would that be approximately the 8th of September?

THE COURT:  Ten days from today for Mr. Gilmore to respond by written affidavit to the allegations.

USCA5 1323

MR. ROBERTS:  Okay.

THE COURT:  And then you all can decide whether you want to depose him or how far you want to go with that.

MR. ROBERTS:  Yes, Your Honor.  What I'm looking at is obviously our --

THE COURT:  And for Mr. Gilmore, most particularly, I'm going to overrule the attorney-client privilege assertion as to your response to any allegation that has been made against you and Mr. Tinker of ineffective assistance of counsel.

And again, Mr. Wiseman, I'm going to rely on you, on behalf of Mr. Bourgeois, if these responses are filed, by affidavit or by written question, and you think that they have gone outside the bounds of the particular waiver of attorney-client privilege, I will take that up in a subsequent hearing.

MR. WISEMAN:  Yes.  I understand.

MR. ROBERTS:  And Your Honor, Tony Roberts again for the United States.  The only other question I have is our response, of course, is due still on the 19th of September. And, I mean, I can certainly surmise and make arguments as to what I think the --

THE COURT:  No, no, I'll -- let's just leave it as it is until you get these responses.  Okay?

MR. ROBERTS:  Okay.

THE COURT:  Or let's make it mid October.  How is

**USCA5 1324**

that?

MR. ROBERTS:  Our response due in mid October?

THE COURT:  Ms. Scotch, what's a day on the calendar in mid October that isn't a weekend?

MR. WISEMAN:  Your Honor, I just have one logistical question.  This is Michael Wiseman again.  Does the Court prefer that we file our proposed questions to Mr. Tinker, or just send them directly to Mr. Gilmore to present to Mr. Tinker?

THE COURT:  You know, I've never done this before.  You know --

MR. WISEMAN:  Yeah.

THE COURT:  In civil discovery, we do not allow discovery to be filed.  It's a local rule with the Court.

MR. WISEMAN:  Right.

THE COURT:  But would you prefer to have them filed with the Court, Mr. Wiseman?

MR. WISEMAN:  I don't really have a preference.  I just didn't want to, under the circumstances, do the wrong thing.

THE COURT:  To run afoul.  I understand.

MR. WISEMAN:  I'd be happy to send them to Mr. Gilmore to present to Mr. Tinker at his discretion, if that's all right with him and the Court.

THE COURT:  I suppose that what you want to do is

USCA5 1325

when you get the responses, was go ahead and file them with the Court.

MR. ROBERTS:  When we get the responses.

THE COURT:  How about that?

MR. ROBERTS:  This is Tony Roberts.

MR. WISEMAN:  Okay.  So I will send my questions to Mr. Gilmore.  And when we get the responses, we'll make sure they get filed with the Court.  Is that what the Court's suggesting?

THE COURT:  That's what I'm thinking, yes.

MR. WISEMAN:  Yeah, okay, that's fine with us.

MR. ROBERTS:  And of course --

THE COURT:  And that will be a copy -- by that time, it will be a copy of the questions with the answers.  Correct?

MR. WISEMAN:  Right.  Right.  Right.  Okay, well that works for --

THE COURT:  Is there anything further?  Mr. Gilmore, do you have any concerns about the -- procedurally?

MR. GILMORE:  Well, Your Honor, this is John Gilmore. Are you talking to me?

THE COURT:  Yes, sir.

MR. GILMORE:  Oh, I didn't hear the question.  I'm sorry.

THE COURT:  Do you have any concerns at all about this, about my rulings today, procedurally or otherwise?

USCA5 1326

MR. GILMORE:  No, Your Honor.

THE COURT:  Anything further?

MR. ROBERTS:  Your Honor, on the --

MR. WISEMAN:  Not from Mr. Bourgeois.  Thank you.

THE COURT:  Thank you all very much --

MR. ROBERTS:  Your Honor --

THE COURT:  -- for your appearances.

MR. ROBERTS:  Your Honor --

THE COURT:  You're excused.  Yes?

MR. ROBERTS:  This is Tony Roberts for the United States.  Can you hear me?

THE COURT:  Yes, sir.

MR. ROBERTS:  I just, I didn't hear, did you give us a new date, due date in October for our --

THE COURT:  Oh, Ms. Scotch, the new date?

THE CLERK:  You said mid October, Judge?

THE COURT:  Yeah, mid October, a weekday.

THE CLERK:  Mid October is a Wednesday, October the 15th.

THE COURT:  Okay.

THE CLERK:  And that's a Wednesday.

THE COURT:  That, Mr. Roberts, will be your response date.  And if we need to redo that, we'll think about it later.  Okay?

MR. ROBERTS:  Thank you, Your Honor.

USCA5 1327

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  Thank you, you're excused.

MR. GILMORE:  Thank you, Judge.

(Proceedings concluded at 8:46 a.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    January 20, 2009
Molly Carter                        Date

USCA5 1328

```
                    IN THE UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF TEXAS
                         CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
          PLAINTIFF,             *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    OCTOBER 30, 2008
                                 *    9:00 A.M.
          DEFENDANT.            *
                                 *
* * * * * * * * * * * * * * * * * *


               TRANSCRIPT OF TELEPHONE CONFERENCE

           BEFORE THE HONORABLE JANIS GRAHAM JACK
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:           MS. PATTI HUBERT BOOTH
                              MS. ELSA SALINAS-PATTERSON
                              OFFICE OF THE U.S. ATTORNEY
                              800 NORTH SHORELINE, SUITE 500
                              CORPUS CHRISTI, TEXAS 78401

                              MR. TONY R. ROBERTS
                              OFFICE OF THE U.S. ATTORNEY
                              P. O. BOX 61129
                              HOUSTON, TEXAS 77208

                  (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:               MS. VELMA GANO



       PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
         TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
         CORPUS CHRISTI, TEXAS 78427 (361) 945-2525
```

USCA5 1329

APPEARANCES:  (Continued)


FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:              MR. JOHN GILMORE

USCA5 1330

(The proceedings began at 9:00 a.m.)

(Call to Order of the Court.)

THE COURT:  Would you call the case, Ms. Scotch?

THE CLERK:  Yes, Your Honor.  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS-PATTERSON:  Elsa Salinas-Patterson for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. GILMORE:  And John Gilmore.

THE COURT:  Mr. Wiseman, I wanted to just ask you how you anticipated we should go forward with this.  I know you have some time left to file your response to the Government's response.

MR. WISEMAN:  Yes, Your Honor.  We certainly intend to do that.  We may be asking for a little extra time to do that, given the length of the Government's response.  But we certainly intend to file a reply.

I had spoken with Mr. Gilmore, who advised me that he was not hopeful that Mr. Tinker was going to be able to respond to the interrogatories that we asked him to.  So I guess that's going to require some separate discussion, assuming that's the case.

USCA5 1331

THE COURT:  That's really why I wanted, what I wanted to talk to you about today.

MR. WISEMAN:  Yeah.

THE COURT:  Is that when we talked before you sent out the interrogatories by written questions to Mr. Tinker, I told you I thought that would be the only way to get testimony, to preserve testimony from Mr. Tinker.  And I have seen the responses of Mr. Tinker's interrogatories that you sent out, the deposition by written questions, is what I called it, and wanted to know if you needed to amplify that or what you need to do, rather quickly, and if it could be done, which is why I wanted Mr. Wiseman and Mr. Gilmore on the phone.

MR. WISEMAN:  Right.  It's Michael Wiseman.  I mean, we, just to be clear, we did propound some follow-up questions, and I guess Mr. Gilmore can let us know if he thinks those are going to be answered.

THE COURT:  How's Mr. Tinker, Mr. Gilmore?

MR. GILMORE:  John Gilmore.  Judge, his condition's rapidly deteriorating.  He's made a marked downturn --

THE COURT:  I'm sorry, I can't hear you.

MR. GILMORE:  He's made a marked downturn since last week.  I went over to try to get him to answer the interrogatories.  He was unable to.  And now he's having problems swallowing.  His nurse thinks that it's not going to be much longer.

USCA5 1332

THE COURT:  Mr. Gilmore, you're fading out.  Are you on a cell phone or land line?

MR. GILMORE:  No, Your Honor.  I'm standing at a, I'm on the land phone.  I'm in the courthouse, in a courtroom.

MR. WISEMAN:  Your Honor, I was able to make out as much as Mr. Gilmore said about Mr. Tinker not being able right now to respond to our interrogatories.  So I guess that leaves my side with the choice of either moving to strike the answers of the Government's or not.  And I'm frankly not prepared today to make that decision.  But I can certainly let the Court know that in short order.  I just have to get with my colleagues and focus on that question.

THE COURT:  Well, I can tell you I'm not going to strike them.  You can file a motion to strike, if you would like, Mr. Tinker's responses.

MR. WISEMAN:  Okay.

THE COURT:  But I told you the situation some month ago --

MR. WISEMAN:  Oh, no, I understand.

THE COURT:  -- and told you to move rapidly with all the questions you wanted answered --

MR. WISEMAN:  Yeah.

THE COURT:  -- a deposition by written questions.  I know that that was not the preferred manner to do that.

MR. WISEMAN:  Yeah, yeah.

USCA5 1333

THE COURT:  But I hadn't heard anything back, and I didn't know if you had sent follow-ups or what the situation was.

MR. WISEMAN:  Well no, Your Honor, I did file a notice with the Court that I had propounded these interrogatories, and I did so within --

THE COURT:  I guess I -- you know, I guess I thought that notice was after the fact.  I didn't realize these were follow-up --

MR. WISEMAN:  No.

THE COURT:  -- deposition by written questions.

MR. WISEMAN:  We followed the time line that the Court set out --

THE COURT:  Okay.

MR. WISEMAN:  -- in its order, and we propounded them I believe timely.  And that notice I filed was just to let everybody know that I had in fact asked Mr. Gilmore to get the interrogatories to Mr. Tinker.

THE COURT:  Okay.

MR. WISEMAN:  And so now we know that they --

THE COURT:  But it may be enough to know that Mr. Gilmore and Mr. Tinker worked in concert in their defense.

MR. WISEMAN:  Uh-huh.

THE COURT:  And Mr. Gilmore may have all the information that Mr. Tinker had, or Mr. Gilmore may be able to

get that information.

MR. WISEMAN: Yeah. I guess, Your Honor, just reflecting back on the question about what next, I think we talked, in our little argument we had about the motion, the Government's motion, to have Mr. Gilmore and Tinker complete affidavits. I think the Court was agreeable to conducting a deposition of Mr. Gilmore. So I think, given the whole --

THE COURT: I'm not that concerned about the deposition of Mr. Gilmore, because we can do that live. I anticipate an evidentiary hearing.

MR. WISEMAN: Right.

THE COURT: And I don't see any reason why that can't be done, Mr. Gilmore's testimony can't be done in court.

MR. WISEMAN: Okay.

THE COURT: My concern was the preservation of Mr. Tinker's testimony by deposition by written questions.

MR. WISEMAN: Right.

THE COURT: And frankly, the questions that you asked, sent for Mr. Tinker originally were not too detailed. And I was a little surprised about that.

MR. WISEMAN: You mean the ones the Government propounded?

THE COURT: Oh, I'm sorry. That was the Government. Well, whoever did it, I told you both to do it, but apparently you --

USCA5 1335

MR. WISEMAN:  Your Honor, just to be clear, your order envisioned the Government going first and then us going after receipt of Mr. Gilmore's, I'm sorry, Mr. Tinker's responses to the Government.

THE COURT:  Okay.  Well, I didn't remember that.  But I guess I anticipated both of you moving a little bit quicker than did you.

MR. WISEMAN:  We were following the order.

THE COURT:  Okay.

MR. WISEMAN:  I thought the order was clear in that respect, and we followed it.

Well, I guess the question then is what next.  And I think we -- let me get with my colleagues this week, and we'll alert the Court by motion as to whether we think we're going to need some extra time to file our reply.  And if we don't, then --

THE COURT:  I don't have any problem with giving you extra time.  My concern again is your access.  I pretty well -- Mr. Gilmore, do you feel like you have all the information that Mr. Tinker would have given?

MR. GILMORE:  Honestly, Your Honor, no, I don't.

THE COURT:  In what regard?

MR. GILMORE:  When Mr. Tinker came on board on the case, he had just --

THE COURT:  I really cannot hear you.  Can you speak

USCA5 1336

up?

MR. GILMORE:  I'm -- can you hear me now, Judge?

THE COURT:  Yes, thank you.

MR. GILMORE:  When Mr. Tinker came into the case, he was just coming off of his retirement, and his docket wasn't as big as mine, and he was able to devote more time to talking to the experts.  That's why we divided the case, him doing the experts, the mitigation people, and me doing the lay witnesses.

THE COURT:  Now I can't hear you.  Can you identify those experts any way?

MR. GILMORE:  I didn't have any personal contact with our experts.

THE COURT:  Okay.  Was there a way to identify those experts so they can be deposed?

MR. GILMORE:  Yes, I believe so, Judge.

MR. WISEMAN:  We've spoken with all of the experts ourselves, Your Honor, and we've got declarations from a number of them in the appendix we filed.  So we --

THE COURT:  Right.

MR. WISEMAN:  We have been working on the assumption of late that we were going to have to go from the record as to, and from what the experts say as to Mr. Tinker's interaction with them.

THE COURT:  Okay.

MR. WISEMAN:  I guess that just is what it is.

USCA5 1337

There's not anything anyone can do about it.  And we'll have to make the best of that.

THE COURT:  Yeah, I think from, I understood from whatever the record is that Mr. Tinker interacted mostly with the experts but shared that information with Mr. Gilmore, so they made a joint decision as to how to proceed with that testimony from the experts.  Is that correct, Mr. Gilmore?

MR. GILMORE:  Yes, Your Honor.

THE COURT:  Okay.  So I think we can go through the back way and get the information, at least from the experts' point of view as to what their interaction was with Mr. Tinker, then Mr. Gilmore can tell us what that discussion was about whether or not to present the experts, what portion, if any, to present in the case.

MR. WISEMAN:  Yeah, this is Michael.  I think that's a, that sounds like the best way we can do it at this point, given the circumstances.

THE COURT:  If I recall, there was something, there was an expert or so that Mr. Tinker didn't, in his response, didn't remember who he had contacted.  Was it a bite expert?

MR. ROBERTS:  Your Honor, this is Tony Roberts.  My recollection is that it was the -- he said he had talked to someone about the bite mark and did not recall who that was.

THE COURT:  Is there any way we can find that from his records, Mr. Gilmore?

USCA5 1338

MR. GILMORE:  I'll try to get access to his records.
My -- was your question he was waiting for a response from
somebody that he didn't get back timely?

THE COURT:  No.  That person was identified.  That
was --

MR. WISEMAN:  That was Dr. Johnson --

MR. GILMORE:  Dr. Johnson, yes.

MR. WISEMAN:  -- I believe.

THE COURT:  And again, that person's identified, that
Mr. Tinker was not satisfied with her testing and that she had
not returned his calls and didn't get back to him in time to
present anything at trial.  Was that the bite expert?

MR. WISEMAN:  No.  She was the DNA expert, Your
Honor.

THE COURT:  Yeah.  Well, I thought there was a bite
expert he didn't recall.  Is there any way that we could
re-create who that would be, Mr. Gilmore, from --

MR. WISEMAN:  Your Honor, I've got all that
information in our file, and I'm sure we can, you know, we
can --

THE COURT:  Oh, you've got that, Mr. Wiseman?

MR. WISEMAN:  I'm sorry?

THE COURT:  You've got that?

MR. WISEMAN:  Yeah, we know who all the experts that
were consulted with and whether or not Mr. Tinker spoke with

USCA5 1339

them, and you know, we have that information.

THE COURT:  Okay.  Who was that expert?

MR. WISEMAN:  We can reproduce that.  I'm sorry?

THE COURT:  Who was that expert that he, Mr. Tinker consulted, with whom he consulted?

MR. WISEMAN:  I think the one you're talking about is, her name is Johnson.  And she was relevant to a question of, related to DNA.

MR. ROBERTS:  Your Honor, this is Tony Roberts --

THE COURT:  Okay.  But wasn't there a bite expert that he said he couldn't remember?

MR. WISEMAN:  There were bite experts.  I don't have those names in front of me, though.  And I'm not --

MR. ROBERTS:  Your Honor, if I might --

THE COURT:  But you do know who that is, Mr. Wiseman?

MR. WISEMAN:  Yes, we do.  We do.

THE COURT:  Okay.

MR. ROBERTS:  I was just going to clarify -- this is Tony Roberts -- I was just going to clarify, in answer to Question 7, which was in reference to Dr. Senn, Dr. Hertz and Dr. Oliver, and Dr. Dailey, that Mr. Tinker did in fact respond that he believed he had, he believed that he had an expert review the evidence, but at this time does not recall who that person was.

THE COURT:  Can we find out who that person is,

USCA5 1340

Mr. Gilmore, do you think?

MR. GILMORE:  I'll attempt to find out, Judge.

THE COURT:  Okay.  Anything else, Mr. Wiseman, that you can think of that we need to be planning on at this time?

MR. WISEMAN:  No, Your Honor.  I think, you know, you'll be hearing from us, as I mentioned earlier, very soon as to whether we need time or not.

THE COURT:  Yeah, well I can see, I can see your problem with striking Mr. Tinker's testimony, since you didn't get a chance to cross-examine him.  But I'm not really sure how to go about, how to go about remedying that.

MR. WISEMAN:  Yeah, I understand the problem.  You know, let me get with my partners, and we will, you know, propose something to the Court.  We'll either file a motion in that regard, or if we don't, then that will be our position that it's okay to stand as it is.  And we'll file our reply, and I think there may be some motions we want to file with regard to, you know, identifying the issues for hearing, and I guess we could take it from there.

THE COURT:  Okay.  Mr. Gilmore, does Mr. Tinker, did he finally get hospice?

MR. GILMORE:  He has hospice.  He has 24-hour care right now.

THE COURT:  Oh, that's wonderful.  I'm so glad about that.  All right.  Anything else?

USCA5 1341

MR. WISEMAN:  Not from me, Your Honor.

MR. ROBERTS:  Your Honor, this is Tony Roberts again for the United States.  We had briefly heard from Mr. Gilmore that there were some concerns he had about the questions that were submitted by Mr. Wiseman.  And we obviously, the Government did not get copies of the questions that Mr. Wiseman submitted, and we were just wondering if the Court wanted to inquire about the concerns Mr. Gilmore had about the questions.

THE COURT:  Mr. Gilmore, could you tell -- could you speak to that?

MR. GILMORE:  I'm not -- I can't remember, Judge. It's been about a couple of weeks since I received them and tried to go over them with Mr. Tinker.  I can't remember what the problems were.

MR. WISEMAN:  You know, if there's a problem, we can certainly send you a copy of the questions.  There's no big secret there.  And I'll send them to you when I get back to my office.

THE COURT:  Would you do that, please, Mr. Wiseman and --

MR. WISEMAN:  I'm sorry?

THE COURT:  Would you do that?  Would you send that to Mr. Gilmore?

MR. WISEMAN:  Sure.  Sure.  No big secret there.

MR. ROBERTS:  Could the Government get a copy of

USCA5 1342

those?

MR. GILMORE:  I have them.  I have them, Judge.  I think Mr. Roberts wants them.

MR. WISEMAN:  Yeah, yeah, I was saying I would be happy to send them to the Government.

THE COURT:  Okay.

MR. WISEMAN:  There's no problem with that.

MR. ROBERTS:  Thank you, Your Honor.  This is Tony Roberts again.  The only thing I can add to that is that we heard they might be very, very technical questions that are just impossible to answer.  But I guess we can see that once we get them.

MR. WISEMAN:  Well, why don't I send them to you and you can see what you think of them, and we can go from there.

THE COURT:  All right.  Anything else you all need to talk about on this call?

MR. WISEMAN:  Not from the Petitioner.

MR. ROBERTS:  Not from the Government, Your Honor.

MR. GILMORE:  Not from me, Judge.

THE COURT:  All right.  Thank you all very much for your appearances.

MR. WISEMAN:  All right.  Thank you.

THE COURT:  Particularly Mr. Gilmore.  Thank you.

MR. GILMORE:  Thank you.

THE COURT:  Bye-bye.

USCA5 1343

MR. WISEMAN: Goodbye.

(Proceedings concluded at 9:14 a.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    January 20, 2009
Molly Carter                        Date

**USCA5 1344**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA

v.

Alfred NMI Bourgeois

Defendant

Case No.: 2:02–cr–00216

Judge Janis Graham Jack

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Michael N. Milby, Clerk

USCA5 1345

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,

                 Respondent,

          -against-

ALFRED BOURGEOIS,

                Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:

No. Cr-C-02-216
No. Cv-07-223
Honorable Janis Graham Jack,
U.S.D.J.

**This is a Capital Case**

Electronically Filed

**PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME
TO FILE REPLY BRIEF IN
SUPPORT OF SECTION 2255 MOTION**

Petitioner, Alfred Bourgeois, through undersigned counsel hereby moves for an

unopposed extension of sixty (60) days to submit his Reply Brief in Support of his Section 2255

Motion.  In support, he states the following.

1.      On May 14, 2007 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C.*

*Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* challenging his convictions and

sentence of death (document # 396).  On October 5, 2007, Petitioner filed his memorandum of

law in support of that motion (document # 402).

2.      After several unopposed extensions, the Government's answer to Petitioner's

2255 Motion was filed one year later on October 15, 2008 (document # 442).

3.      This Court granted Petitioner's one previous request for an extension and his reply

to the Government's answer is currently due on April 15, 2009.  Counsel have been diligently

researching and writing Petitioner's Reply Brief and fully expected completion by the current due

date.  However, as a result of counsel's multiple capital case commitments, counsel will be

USCA5 1346

unable to complete the brief by its current due date.  Accordingly, Petitioner respectfully requests an extension of sixty (60) days from the current due date to file his reply.

3.      This Motion is made in good faith and is not intended to unduly delay these proceedings. The Motion is made based upon actual case needs and is required in order to effectively and professionally represent Petitioner and provide the Court with a competent, well researched and well written brief which will assist in the resolution of this matter.  Counsel have requested a sixty (60) day extension to avoid any additional requests for time to file Petitioner's Reply Brief and no further extensions will be requested.

4.      Counsel has consulted with attorney for the Government, Assistant United States Attorney, Tony Roberts, Esq., who indicated that the government is unopposed to this request but noted its concern regarding how additional extensions might affect the availability of witnesses in the event that an evidentiary hearing is necessary.  Petitioner will, however, as he always has, continue to work with the Government, at the Court's discretion, to accommodate the schedule of opposing counsel and witnesses.

5.      Counsel genuinely appreciates the Court's continued attention to this matter and all parties consideration of this request.

USCA5 1347

WHEREFORE, counsel for Petitioner respectfully request that the Court extend his time

to file Petitioner's Reply Brief sixty (60) days until June 15, 2009.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Chief, Capital Habeas Unit
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated: April 8, 2009

USCA5 1348

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 8th day of April, 2009, I caused the

foregoing upon the following person in the manner indicated below:

BY EMAIL

Tony R. Roberts, Esq.
PO Box 61129
Houston, TX 77208
**Tony.Roberts@usdoj.gov**

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Patti.Booth@usdoj.gov**

/s/ Michael Wiseman

Michael Wiseman

Dated: April 8, 2009
        Philadelphia, Pennsylvania

USCA5 1349

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                          :
UNITED STATES OF AMERICA,                 :          No. Cr-C-02-216
                                          :          No. Cv-07-223
              Respondent,                 :     Honorable Janis Graham Jack,
                                          :              U.S.D.J.
        -against-                         :
                                          :      **This is a Capital Case**
ALFRED BOURGEOIS,                         :
                                          :
              Petitioner.                 :
_____  :

**ORDER**

AND NOW this _____ day of April, 2009 upon consideration of *Petitioner's Unopposed*

*Motion For Extension of Time to File Reply brief in Support of Section 2255 Motion*, it is hereby

ORDERED:

Petitioner's motion is GRANTED.  He may file his Reply Brief in Support of his Section

2255 Motion on or before June 15, 2009.


                                    _____
                                    Honorable Janis Graham Jack
                                    USDJ

USCA5 1350

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA            §
                                    §
VS.                                 §    CRIMINAL ACTION NO. C-02-216
                                    §
ALFRED NMI BOURGEOIS               §

## ORDER

On this day came on to be considered *Petitioner's Unopposed Motion for Extension of Time to File Reply Brief in Support of Section 2255 Motion*. (DE 454). Bourgeois' motion is GRANTED. Bourgeois shall file his reply brief on or before June 15, 2009.

SIGNED and ORDERED this 8th day of April, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1351

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **This is a Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | Electronically Filed |
| Petitioner. | : | |
| | : | |

**PETITIONER'S UNOPPOSED MOTION FOR FINAL TEN DAY EXTENSION OF TIME
TO FILE REPLY BRIEF IN SUPPORT OF SECTION 2255 MOTION**

Petitioner, Alfred Bourgeois, through undersigned counsel hereby moves for a final,

unopposed extension of ten (10) days to submit his Reply Brief in Support of his Section 2255

Motion.  In support, he states the following.

1.      Petitioner's reply brief is currently due on June 15, 2009.  Petitioner's counsel are

in the process of completing their drafting and editing of the document.  However, due to other

litigation matters, and the size and complexity of the issues addressed in this case, counsel

require one final short continuance.

2.      Petitioner's counsel appreciate the Court's and Government's past consideration

of their requests for additional time.  They are confident that with this final extension they will be

able to provide the Court with a completed brief, that will be helpful and meet the highest

standards in this important matter.

3.      Counsel (Abreu) has consulted with attorney for the Government, Assistant

1

USCA5 1352

United States Attorney, Tony Roberts, Esq., who has indicated that Respondents are not opposed

to Petitioner's extension request.

WHEREFORE, counsel for Petitioner respectfully request that the Court extend his time

to file Petitioner's Reply Brief ninety (10) days until June 26, 2009.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Victor J. Abreu, Esq.
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated: June 12, 2009

2

USCA5 1353

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 12th day of January, 2009, I caused the foregoing upon the following person in the manner indicated below:

BY EMAIL

Tony R. Roberts, Esq.
PO Box 61129
Houston, TX 77208
**Tony.Roberts@usdoj.gov**

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Patti.Booth@usdoj.gov**

/s/ Michael Wiseman

Michael Wiseman

Dated: Philadelphia, Pennsylvania
June 12, 2009

USCA5 1354

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216-1 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

On this day came on to be considered *Petitioner's Unopposed Motion for Final Ten Day*

*Extension of Time to File Reply Brief in Support of Section 2255 Motion*. (DE 457).  Bourgeois'

motion is GRANTED. Bourgeois shall file his reply brief on or before June 26, 2009.

SIGNED and ORDERED this 12th day of June, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1355

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : |  |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | **Capital Case** |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |
| _____ | : |  |

### PETITIONER'S *REPLY* TO RESPONDENT'S *ANSWER*
### TO MOTION FOR RELIEF PURSUANT TO
### 28 U.S.C. SECTION 2255
### OR IN THE ALTERNATIVE
### PURSUANT TO 28 U.S.C. SECTION 2241

LEIGH SKIPPER, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated:    Philadelphia, PA
          June 26, 2009

**USCA5 1356**

## PRELIMINARY STATEMENT

Petitioner filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. Section 2241* on May 14, 2007 (document #396). It will be referred to as *Petitioner's Motion* and will be cited as *PM* followed by a page reference.

On October 5, 2007 Petitioner filed a *Memorandum in Support* of his *Motion* (document # 402). It will be referred to as *Petitioner's Memorandum* and will be cited as *P-Mem* followed by a page reference.

The Government filed *Respondent's Sealed Answer to Section 2255 Motion, Motion for Dismissal and Brief* on October 15, 2008 (document # 442). It will be referred to as *Respondent's Answer* and will be cited as *RA*, followed by a page reference.

As in *Petitioner's Motion* and *Petitioner's Memorandum* the following citations will be utilized: references to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The opinion of the United States Courts of Appeals rendered on direct appeal United States v. Bourgeois, 423 F.3d 501 (August 25, 2005) will be cited as Bourgeois.

i

USCA5 1357

Petitioner filed an *Appendix* with *Petitioner's Motion* and a *Supplemental Appendix* with *Petitioner's Memorandum.* They will be cited as *PA* and *SPA*, respectively, followed by citation to particular documents. Along with this *Reply* he files a modest number of additional documents in his *Second Supplemental Appendix*, which will be cited as *SSA*, followed by citation to particular documents.

For ease of reference, the claims for relief discussed herein will be referred to by the same numbers as contained in *Petitioner's Memorandum.*

Alfred Bourgeois will be referred to by name, or as "Petitioner." The United States will be referred to as "the Government."

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

ii

USCA5 1358

## TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Structure of this Reply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Part One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    Counter-Statement of the Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.    The Government's General Denial . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    C.    Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        1.    Ineffective Assistance of Counsel and Prosecutorial
               Misconduct Overcome Default  . . . . . . . . . . . . . . . . . . . . . . .  5

        2.    United States Treaty Obligations are Enforceable
               by Mr. Bourgeois in this Litigation to Overcome
               Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        3.    Scope of Appellate Review Under the FDPA is
               Irrelevant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    D.    The Government's "Concerns Regarding Various
        Documents"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

USCA5 1359

E.    New Procedural Issue: The Government's Use of Mr. Tinker's

Answer to Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


Part Two, Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Claims I & II.    Petitioner is a Person with Mental Retardation.  Counsel

Ineffectively Failed to Investigate and  Present Mental

Retardation and Other Extant Mitigating Factors in

Capital Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


A.    The Correct Standard for Adjudicating Ineffective

Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


1.    Strickland Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


2.    The Government's Assertion that "Strickland does not

Impose a Constitutional Requirement that Counsel Must

Uncover Every Scrap of Evidence that Could

Conceivably Help their Client" Is Incomplete and

Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19


B.    Petitioner's Alleged "Lie" about Suffering a Brain Injury did

not Justify Counsels' Failure to Present Evidence of

Petitioner's Impaired Intellectual Functioning or Cognitive

Deficits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


C.    Contrary to the Government's Assertions, the Flynn Effect is

Valid and Widely Accepted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25


D.    Petitioner Possesses Adaptive Deficits . . . . . . . . . . . . . . . . . . . . . . 26

iv

USCA5 1360

E.    Counsels' Alleged Tactic – To Obtain Evidence of
Petitioner's Childhood Abuse Through Dr. Estrada –
Failed Miserably, and Counsel Failed to Regroup . . . . . . . . . . . . . 29

F.    Failure to Call Dr. Holden at the Penalty Hearing . . . . . . . . . . . . . 31

Claim III.    No Reasonable View of the Evidence Existed upon Which
a Rational Fact Finder Could Conclude That the Fatal
Injuries Were Inflicted Within the Special Maritime and
Territorial Jurisdiction of the United States in Violation of
Due Process.  Furthermore, Counsel Were Ineffective
for Failing to Litigate this Claim and to Present Readily
Available Evidence to Rebut this Element of the
Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.    The "Ignored" Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.    Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . 40

Claim IV.    Trial Counsel Were Ineffective for Failing to Present
Available Expert Testimony  That Would Have
Undermined the Government's Assertion That Petitioner's
Semen Was Found in JG-1999's Anus, and that
Petitioner Sexually Abused Her, in Violation of Mr.
Bourgeois' Rights under the Sixth Amendment to
the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1.    The alleged "semen" evidence . . . . . . . . . . . . . . . . . . . . . . . 42

v

USCA5 1361

a.     Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

b.     Availability of Other Expert Testimony on this
Point . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2.     The alleged evidence of vaginal and anal trauma . . . . . . . . 51

B.     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

C.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Claim V.     Trial Counsel Rendered Ineffective Assistance by Failing to
Litigate a <u>Daubert</u> Motion Challenging the Scientific and
Technical Reliability of the Opinions of Dr. Senn and
Dr. Chrz Concerning the Bite Mark Evidence and
the Digital Enhancements of the Bite Mark Photographs and
for Failing to Rebut this Evidence Once it Was Admitted
at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Claim VI.     Trial Counsel Rendered Ineffective Assistance of Counsel by
Failing to Litigate a <u>Daubert</u> Motion Challenging the
Scientific and Technical Reliability of the Opinions of
Dr. Oliver Concerning the Digitally Enhanced Autopsy
Photographs and for Failing to Object to Their Admissibility
and for Failing to Rebut this Evidence Once it Was Admitted
at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

USCA5 1362

Claim VII.   The Government Violated its Obligations under
Brady V. Maryland by Failing to Disclose to Petitioner
Information Material to His Ability to Prepare and Present a
Defense at Trial and Sentencing Denying Petitioner His Rights
under the Fifth, Sixth and Eighth Amendments to the United
States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

   A.   The Improper Suppression of Evidence . . . . . . . . . . . . . . . . . . . . . 89

   B.   Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Claim VIII.   Petitioner Is Entitled to Relief from His Conviction and
Sentence Because Trial Counsel Labored under a Conflict
of Interest That Adversely Affected Their Representation
of Petitioner at Trial and Sentencing, in Violation of
Petitioner's Sixth Amendment Right to Counsel . . . . . . . . . . . . . 101

Claim IX.   Prosecutorial Misconduct in Closing Argument at
Both the Guilt/Innocence and Penalty Phases Denied
Petitioner His Constitutional Right to Due Process and His
Rights under the Sixth and Eighth Amendments to the
United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

   1.   The Prejudicial Effect of the Prosecutor's Remarks . . . . . . . . . . . 106

   2.   Cautionary Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

   3.   The Strength of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

USCA5 1363

## STRUCTURE OF THIS REPLY

*Respondent's Answer* makes many points for which a response is not necessary.

Petitioner responds only to those points which are relevant to the resolution of the issues before the Court, and in so-doing, avoids argument for argument's sake.

Generally, the Government asserts procedural arguments and substantive points. Accordingly, this *Reply* is divided into two primary *Parts*. In *Part One*, Petitioner responds to the Government's procedural arguments and arguments unrelated to the merits of his substantive claims.

*Part Two* addresses Petitioner's *Claims for Relief.* In its discussion, the Government has chosen to rearrange Petitioner's *Claims*, separating those related to ineffectiveness from substantive issues. Petitioner herein reintegrates the discussion and uses the same claim numbers as used in *Petitioner's Memorandum.*

## ARGUMENT

## PART ONE

### A.    Counter-Statement of the Facts.

Petitioner has pled and proffered specific facts and expert opinions in support of his claims. Pretending as if those facts either do not exist or are of no consequence, the Government devotes over one-third of its *Answer* (50 pages of its 143 page document) to a detailed recitation of the trial facts. See *RA*, 7- 58. While

1

USCA5 1364

these facts are of interest, this stoic and lengthy recitation, which fails to connect the trial facts to the Petitioner's post-conviction allegations, has much the same force as one hand clapping, and adds little to the resolution of the issues before the Court. Petitioner fully expects to prove all of his allegations at a hearing. With those allegations proven, the Government's factual recitation becomes nothing more than a testament to trial counsels'[1] ineffective representation. Effective counsel would have been able to present a strong counter to the Government's facts in both the guilt and penalty phases.

As Petitioner alleges and as he will prove, Petitioner is a victim in his own right. He is a victim of horrendous childhood abuse, and its durable psychological scars. He is a victim of brain dysfunction. He is victim of unrelenting mental health impairments. He is a person with mental retardation, and at least, he is in the borderline range of intellectual functioning. He did not sexually abuse the victim in this case, as the Government's scientific presentation regarding semen and sexual trauma were illusory. The bite marks found on the victim cannot be traced to Petitioner with certainty any greater than guess work. There is a significant likelihood that he is not the killer or did not kill alone. And, there is no question but

---

[1]Petitioner throughout refers to trial counsel in the plural, recognizing, however, that many of the decisions, errors or omissions alleged may actually be attributable separately to either Mr. Tinker or Mr. Gilmore.

2

that – whoever was the killer – the fatal injury occurred outside of the jurisdiction of the federal government, and this prosecution should not have been brought in this Court, as a matter of law.

Ultimately, Petitioner was the victim of poor lawyering.  Petitioner does not make that charge lightly, but as he trusts the Court and hopefully even the Government will see, despite their sterling and well-deserved reputations as highly skilled and qualified counsel, Mr. Gilmore and Mr. Tinker dropped the ball in this case.

## B.      The Government's General Denial.

In a short paragraph the Government asserts a "denial" to "each and every allegation of fact" asserted by Petitioner, except those "supported by the record;" and "demands strict proof thereof."  The Government "objects" to the expert opinions presented by Petitioner, absent an opportunity to test them against Daubert. *RA*, 6.

Initially, the Government's general denial of all alleged facts is of little utility. See, Provident Life and Accident Insurance Company v. Goel, 274 F.3d 984, 994 (5th Cir. 2001) ("a general denial in an original pleading is insufficient to create issue of material fact"); Joe Regueira, Inc. v. American Distilling Company, Inc., 642 F.2d 826, 831 (5th Cir. 1981) ("general denial insufficient to overcome specific affidavits"); Landry v. Two R. Drilling Company, 511 F.2d 138, 141, n.2 (5th Cir.

3

1975) (general denial "insufficient to join issue").

Nonetheless, Petitioner does not and has not requested summary relief and therefore at most the Government's general denial of all facts militates in favor of the Court conducting an evidentiary hearing on a number of the issues pled by Petitioner. Petitioner will shortly file a formal motion seeking a hearing on all issues for which there is a dispute of material facts.

Petitioner's to-be-filed request for a hearing will also dispose of the Government's demand for "strict proof," as Petitioner fully intends to prove every fact he has pled. The hearing will also dispose of the Government's "objection" to the expert opinions proffered with his *Motion*. Again, Petitioner intends to present each expert who has proffered an opinion and will demonstrate at a hearing that each opinion not only is Daubert-worthy, but is incontestable.

## C.    Procedural Default.

The Government asserts that Petitioner's claims are procedurally defaulted because they could have been raised on direct appeal but were not. *RA*, 60-62. Petitioner is not entirely certain how to untangle the Government's presentation on procedural default, however he discerns the following three points that merit discussion.

4

USCA5 1367

**1.    Ineffective Assistance of Counsel and Prosecutorial Misconduct Overcome Default.**

Each claim presented in *Petitioner's Motion* sounds in either ineffective assistance of counsel or due process violations owing to prosecutorial suppression of exculpatory information.  As the Government appears to acknowledge, ineffective assistance of counsel overcomes any procedural default.  See *RA*, 61-62 (acknowledging that generally ineffective assistance of counsel can establish "cause and prejudice" sufficient to overcome a default); Murray v. Carrier, 477 U.S. 478, 488 (1986) ("if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not conduct trials at which persons who face incarceration must defend themselves without adequate legal assistance.").

Although the Government does not acknowledge it, prosecutorial suppression of exculpatory information provides "cause" that overcomes procedural default.  See Strickler v. Greene, 527 U.S. 263, 283 (1999) ("As we explained in Murray v. Carrier . . . it is just such [suppression of exculpatory evidence that] ordinarily establish[es] the existence of cause for a procedural default."); Banks v. Dretke, 540 U.S. 668 (2004).   Thus, to the extent Petitioner did not previously raise the due process/prosecutorial suppression claims at trial or on direct appeal, the

USCA5 1368

Government's suppression of the exculpatory evidence provided "cause" for the ostensible default.

As to the "prejudice" prong of the "cause and prejudice" test, it is clear that the prejudice analysis is coextensive with Brady v. Maryland, 373 U.S. 83 (1963) materiality. Banks v. Dretke, 540 U.S. at 698. Thus, if Petitioner demonstrates that the suppressed evidence was material either as to guilt or penalty, he establishes "prejudice" for overcoming the default.

**2.      United States Treaty Obligations are Enforceable by Mr. Bourgeois in this Litigation to Overcome Procedural Default.**

In response to Petitioner's assertion that United States international treaty obligations require that this Court overlook any procedural defaults and reach the merits of claims in this capital litigation, the Government contends that these treaties do not vest enforceable individual rights upon Mr. Bourgeois. *RA*, 62-65. The Government relies on two Courts of Appeal opinions. See id., citing United States v. Zabaneh, 837 F.2d 1249, 1261 (5th Cir. 1988) and United States ex rel. Saroop v. Garcia, 109 F.3d 165, 168 (3rd Cir. 1997).

In addition to the contrary authorities and arguments set forth in *Petitioner's Memorandum*, *P-Mem*, 3-5, the Government overstates its position. Although it cites

6

USCA5 1369

Sanchez-Llamas v. Oregon, 548 U.S. 331, 342 (2006),[2] it neglects to mention that while the Court declined to resolve the question whether the petitioners were granted enforceable rights under Article 36 of the Vienna Convention, four members of the Court believe that the treaty **did** provide petitioners with such enforceable rights. While the government argued in Sanchez-Llamas that there is a "long-established presumption that treaties and other international agreements do not create judicially enforceable individual rights[,]"  Id. at 377, Justice Breyer, joined by three other Justices, went further than the majority and explicitly rejected that position: "the Head Money Cases make clear that a treaty may confer certain enforceable 'rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other.'" Id. (J. Breyer, dissenting) (citing Head Money Cases, 112 U.S. 580, 598-99 (1884)).  Justice Breyer concluded that the Vienna Convention is such a treaty.  Id.

Thus, this is very much an open question, and should this Court not find ineffective assistance of counsel or governmental misconduct sufficient to establish

---

[2]The citation and discussion to Sanchez-Llamas is inapposite to the question here.  In Sanchez-Llamas the question of the treaty obligation was itself not presented to the state courts, and therefore it was found procedurally defaulted. Thus, rather than standing for the broad proposition asserted by the Government, in reality, it stands only for the routine habeas corpus proposition that claims not presented to a state in accordance with its rules are defaulted from consideration in federal habeas corpus proceedings.

7

USCA5 1370

"cause and prejudice," it should apply the cited treaty obligations to overcome any default.

The Government's "no enforceable individual rights" argument also lacks force as it is supported only by extradition cases, which are quite different from the rights at issue here. *RA*, 63. In those cases, the defendants challenged the jurisdiction of federal courts to try them because they had been abducted from foreign countries by federal officials allegedly in violation of applicable extradition treaties. See e.g. Zabaneh, 837 F.2d at 1261, Chapa-Garza, 62 F.3d 118, 120 (5th Cir. 1995). In these cases, the courts rejected the defendants' claims, relying on long-standing principles holding that the misconduct of a law enforcement official in bringing a suspect to trial is not grounds for dismissing a case. The principle, known as *male captus bene detentus* (improperly arrested, properly detained), was first adopted in the United States in Ker v. Illinois, 119 U.S. 436 (1886).[3] Thus, those cases relied upon by the Government are distinguishable as each rested on a different basis for finding no

---

[3]In that case, the U.S. Supreme Court held that a United States citizen who was abducted by a federal official from a foreign country for trial in a state court could not challenge his indictment or conviction on the ground that he was improperly brought within the jurisdiction of the court. The *male captus bene detentus* rule was affirmed, most recently, in United States v. Alvarez-Machain, 504 U.S. 655 (1992), a case involving an abduction by United States officials in violation of an international treaty provision prohibiting such conduct. The same rule was followed in Attorney-General of the Government of Israel v. Eichmann, 36 I.L.R. 5 (Jm. D.C. 1961) (Isr.).

8

cause of action for a treaty violation.[4]

### 3.     Scope of Appellate Review Under the FDPA is Irrelevant.

In a rather odd argument, the Government asserts that because of the expansive

appellate review conducted by the Court of Appeals in a capital case, it has reviewed

and rejected all substantive claims contained in *Petitioner's Motion*.     The

Government goes on to say that such review precludes section 2255 review because

the claims are previously litigated.  *RA*, 65-66.

This argument fails.  First, the bulk – if not all – of Petitioner's claims were not

apparent from the record reviewed on direct appeal.   These claims of ineffective

assistance of counsel and Government suppression of exculpatory evidence, are based

---

[4]Even within the context of extradition, international treaties have been held to be a basis for asserting individually enforceable rights.  For example, courts have held that under the doctrine of specialty, an extradited criminal defendant has standing to challenge his trial for an offense for which he was not delivered up by the asylum country.  See United States v. Thirion, 813 F.2d. 146, 151 (8th Cir. 1987) (rejecting as "without merit" the argument that an extradited individual lacks standing to challenge a violation of an extradition treaty), United States v. Diwan, 864 F.2d 715, 721 (11th Cir. 1989) (stating that "the extradited individual . . . can raise only those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty") (citations omitted), cert. denied, 492 U.S. 921, 106 L. Ed. 2d 595, 109 S. Ct. 3249 (1989), United States v. Cuevas, 847 F.2d 1417, 1426 (9th Cir. 1988) (stating that "[a] person extradited may raise whatever objections the extraditing country would have been entitled to raise") (citation omitted), cert. denied, 489 U.S. 1012, 109 S. Ct. 1122, 103 L. Ed. 2d 185 (1989). Again, the Government has overplayed its hand.

9

on **extra-record** facts and investigation that were not before the Court of Appeals. Second, even if they were part of the record or were even remotely discernable from the appellate record, the Government's assertion that all record-based claims are procedurally defaulted because they are previously litigated is not the law. Indeed, in the recent decision in <u>Cone v. Bell</u>, 129 S.Ct. 1769, 1781 (April 29, 2009) the Court held that a claim is not barred from section 2254 review based on a state court's contention that it was already presented and reviewed: "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." So, even assuming that the Government's theory of prior review by the Court of Appeals is valid – a dubious proposition at best – this would not preclude merits review of the claim(s) in section 2255 proceedings.

**D.    The Government's "Concerns Regarding Various Documents."**

The Government voices its concern that many of the declarations proffered by Petitioner are "deficient" as they do not comply with 28 U.S.C. § 1746, and therefore could not serve to support or defend a summary judgment motion under Fed.R.Civ.P. 56(e). *RA*, 67-68.

The Government's concerns are misplaced for two reasons. First, Petitioner is not moving for summary judgment, and has never asserted his entitlement to relief

10

USCA5 1373

based simply on the proffered declarations.  Rather, he has always envisioned that these declarations and expert reports would be presented at an evidentiary hearing. See *PM*, ¶ 292 (requesting an evidentiary hearing with respect to "any contested material fact"); *P-Mem*, p. 140-141 (same).  Second, even if Petitioner were moving for summary judgment, the alleged deficiencies identified by the Government are illusory.  Section 1746 does not require verbatim repetition of the language cited by the Government (*RA*, 68).  Rather, the section only requires that the concepts embodied in the statute be communicated "substantially" in the form urged by the Government.  Petitioner's documents are in substantial compliance with this statute. In any event, the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, Rule 2 ("The Motion") contains no requirement whatsoever for submission of sworn or unsworn declarations in support of a motion.  The Rule simply requires that a prisoner "state the facts supporting each ground" for relief.  Petitioner has more than satisfied this requirement.  The Government's technical objections do not provide a basis for denying relief as to any claim, and as Petitioner will show herein and in his to-be-filed motion for an evidentiary hearing, he has proffered far more than necessary to obtain a hearing on his claims.

11

USCA5 1374

**E.    New Procedural Issue: The Government's Use of Mr. Tinker's Answer to Interrogatories.**

Subsequent to the filing of *Petitioner's Motion*, but before the Government filed its *Answer*, it came to Petitioner's counsels' attention that the Government intended to attempt to speak with trial counsel about their representation of Petitioner, *ex parte*. As a result, current counsel wrote to trial counsel to remind them that Petitioner did not waive privileges or confidentiality as to any matter not directly related to claims of ineffectiveness and asking counsel not to speak with the Government until such time as ordered by this Court. See *Letter from Petitioner's Counsel to Trial Counsel*, dated July 17, 2008, attached to *Respondent's Motion Seeking Order for Affidavit from Defense Counsel* (document #435). Petitioner's letter caused the Government to file its *Motion*, which in turn led the Court to convene a telephone conference with the parties and Mr. Gilmore on August 28, 2008.

During that conference Petitioner's counsel proposed that trial counsel be deposed so that current counsel could make objections to any privileged material, thus allowing this Court to supervise proceedings related to privileges and confidences. However, during that conference Petitioner's counsel learned for the first time that Mr. Tinker was gravely ill and that a deposition of Mr. Tinker would

12

USCA5 1375

not be appropriate or possible.  See Transcript of 8/28/08, 8.  In order to do the best it could to preserve Mr. Tinker's testimony, the Court ordered that each side have an opportunity to propound interrogatories to Mr. Tinker.  Both sides agreed to that procedure as the best that could be done under the circumstances.  Id., at 8-9. The Court also required Mr. Gilmore to complete an affidavit.  Id., at 10. The timing for propounding these interrogatories and for submission by Mr. Gilmore of his affidavit were set forth in the Court's order of August 28, 2008 (document # 438).

Pursuant to the Court's order, the Government propounded the first set of interrogatories.  Mr. Tinker's responses were filed under seal with the Court on September 22, 2008 (document # 440).  The Court's clerk provided copies of this submission to Petitioner's counsel on October 2, 2008 (unnumbered docket entry of October 2, 2008).  Petitioner propounded his interrogatories in accordance with the timing set forth in the Court order and filed a notice with the Court that he did so (document # 441) (A copy of *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.* and *Notice of Service* of them, are contained in *SSA*, documents # 72 & 73).

Regrettably, Mr. Tinker's health deteriorated and he was not able to respond

13

USCA5 1376

to Petitioner's interrogatories.[5]  He since passed away on November 10, 2008.  The

Government has appended both Mr. Tinker's responses to its interrogatories and Mr.

Gilmore's affidavit to its *Answer* as Attachments A & B, respectively.

Through the fault of neither the Court nor the parties, Mr. Tinker's recollection

is only ostensibly preserved in his responses to the Government's interrogatories.

While this is not the fault of anybody, these circumstances disadvantage Petitioner

in that he has not had the same opportunity to obtain answers to his questions that the

Government had to obtain answers to theirs.  Petitioner submits that this presents two

issues for the Court's consideration.

1.      As the Court observed, the interrogatories filed by the Government were

"not too detailed" (Transcript of 10/10/08, 7).  In contrast, Petitioner propounded far

more extensive questions, albeit not as detailed as Petitioner would ordinarily have

desired in view of Mr. Tinker's medical condition.  Given that the Court has only Mr.

Tinker's cursory response to "not too detailed" questions, Petitioner submits that the

Court should not give undue weight to them.

2.      The Government had an opportunity to propound questions that it

---

[5]Mr. Tinker's inability to complete Petitioner's interrogatories was discussed
at a phone conference with the Court on October 30, 2008.

USCA5 1377

believed would lead to evidence supporting its position.  Yet, with regard to a number

of issues and questions (pointed out within the claim-by-claim discussion, below), it

failed to inquire at all, or only superficially.  In effect, the Government failed to

produce evidence when it had the opportunity to do so.  This failure should lead to

this Court's drawing of an adverse inference that if the Government had asked it

would have received answers unhelpful to its position:

> [T]his circuit has long recognized that a party's failure to call available witnesses **or produce evidence that would clarify or explain disputed material facts** can give rise to a presumption that the evidence, if produced, would be unfavorable to that party. [citing cases]

United States v. Wilson, 322 F.3d 353, 363 (5th Cir. 2003).

15

USCA5 1378

PART TWO

CLAIM FOR RELIEF

CLAIMS I
& II.          PETITIONER IS A PERSON WITH MENTAL RETARDATION. COUNSEL
               INEFFECTIVELY FAILED TO INVESTIGATE AND PRESENT MENTAL
               RETARDATION AND OTHER EXTANT MITIGATING FACTORS IN
               CAPITAL SENTENCING.[6]

Petitioner's claims that his counsel were ineffective in their failure to

thoroughly investigate and present evidence of his mental retardation (Claim I) and

his overall mental health impairments, organic brain deficits and traumatic childhood

(Claim II), have many points in common. Accordingly, Petitioner addresses these

claims together.

The Government's treatment of these claims contains multiple errors of fact,

law and reasoning. Petitioner herein addresses the most egregious of those errors.

A.      The Correct Standard for Adjudicating Ineffective Assistance of Counsel.

In its general discussion of the law governing evaluation of penalty phase

ineffectiveness (including failure to present evidence of Petitioner's mental

retardation), the Government makes two significant mistakes, which Petitioner now

---

[6]Because there is significant overlap in Petitioner's responses to the
Government's argument in regard to these two claims, Petitioner has combined them
for purposes of this Reply.

16

USCA5 1379

addresses.

### 1.    <u>Strickland</u> Prejudice.

The Governments cites  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993) as

governing prejudice under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984):

> The prejudice prong, however, is more than just an outcome determinative test; it requires the petitioner to demonstrate that the result of the proceeding was fundamentally unfair or unreliable. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."

*RA*, 107, <u>quoting</u> <u>Lockhart</u>, 506 U.S. at 372, and <u>citing</u> <u>Goodwin v. Johnson</u>, 132 F.3d

162, 174 (5th Cir. 1998).

This is in error:  <u>Lockhart</u>'s "unreliability or unfairness" requirement does not

govern <u>Strickland</u> prejudice, as the Supreme Court has stated repeatedly.  In <u>Williams</u>

<u>v. Taylor</u>, 529 U.S. 362 (2000) the Court held that the Virginia Supreme Court's

reliance on <u>Lockhart</u>'s prejudice standard (requiring a petitioner to show "unfairness

and unreliability") was erroneous:

> The Virginia Supreme Court erred in holding that our decision in <u>Lockhart</u> [], modified or in some way supplanted the rule set down in <u>Strickland</u>. . . Cases such as . . . <u>Lockhart</u>, do[es] not justify a departure from a straightforward application of <u>Strickland</u> when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him. In the instant case, it

17

USCA5 1380

is undisputed that Williams had a right--indeed, a constitutionally protected right--to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

Williams, 529 U.S. at 391, 393.  See also Glover v. United States, 531 U.S. 198, 202 (2001) ("the Seventh Circuit drew the substance of its no-prejudice rule from our opinion in Lockhart . . . our holding in Lockhart does not supplant the Strickland analysis").

Contrary to the Government's assertion, prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).   Such a probability can be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.  Lockhart has no application to prejudice review in this case.

18

USCA5 1381

**2.     The Government's Assertion that "<u>Strickland</u> does not Impose a Constitutional Requirement that Counsel Must Uncover Every Scrap of Evidence that Could Conceivably Help their Client" Is Incomplete and Inadequate.**

The Government next asserts that counsel need not conduct a scorched earth policy in search of mitigating evidence, including evidence of mental retardation. *RA*, 113-114.  Notably, the six cases cited by the Government for this proposition all **pre-date** the trilogy of Supreme Court cases which amplify the constitutional requirements for capital counsel to conduct a thorough investigation, initially envisioned in <u>Strickland</u>.  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

The Government's "uncover every scrap of evidence" refrain simply does not respond to the well-recognized imperative that capital counsel must conduct a thorough investigation that cannot be abandoned until it is reasonable to do so. Indeed, the Government's refrain was addressed and rejected in <u>Rompilla</u>.  In <u>Rompilla</u>, the Commonwealth of Pennsylvania sought to excuse counsels' failure to review a prior court file which contained important mitigating evidence, because they had done other investigation:

> At argument the most that Pennsylvania (and the United States as *amicus*) could say was that defense counsels' efforts to find mitigating evidence by other means excused them from looking at the prior

19

conviction file. . . . And that, of course, is the position taken by the state postconviction courts.  Without specifically discussing the prior case file, they too found that defense counsels' efforts were enough to free them from any obligation to enquire further.

Rompilla, 545 U.S. at 388, 389.  However, the Court explained:

[That such reasoning] is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case.

Rompilla, id.

Thus, the touchstone of reasonable capital preparation and investigation is exactly what is set forth in Strickland – counsel must do what it is reasonable to do, and counsels' so-called strategic choices made in the absence of such thorough preparation and investigation are highly challengeable:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsels' judgments.

20

USCA5 1383

Strickland, 466 U.S. at 690-91.

**B.      Petitioner's Alleged "Lie" about Suffering a Brain Injury did not Justify Counsels' Failure to Present Evidence of Petitioner's Impaired Intellectual Functioning or Cognitive Deficits.**

Petitioner has an intelligence quotient that has been measured between a high of 75 (Weiner's pre-trial testing) and a low of 70 (Gelbort's post-conviction testing), *PM*, 5. Weiner's result of 75, when adjusted for the Flynn Effect, places Petitioner at an IQ of 68, *PM*, 6 & n.8. Thus, Petitioner's intellectual functioning based on administration of two IQ tests (each of which, as Petitioner will show at a hearing, is a gold standard test) falls in the range of mild mental retardation. Based on Dr. Weiner's testing, counsel had an Eighth Amendment obligation to inquire as to whether Petitioner is a person with mental retardation, and, at a minimum, was obliged to present the IQ score as evidence of borderline intellectual functioning, which the Supreme Court has indicated is, **by itself**, highly mitigating. *P-Mem*, 12 & n.12.

In the same testing, Dr. Weiner provided Mr. Bourgeois with a small number of neuropsychological tests. The most significant finding in that testing was a "significantly impaired" score on the Categories Test. *PA*, document # 16 (Weiner declaration, 1-2). Dr. Weiner noted the significance of this finding in his report to

21

USCA5 1384

trial counsel and in his post-conviction declaration, specifically noting that this finding was mitigating (id.).

Despite these significant findings of impairment in cognitive functioning and intellectual ability, and the witness' opinion that these findings were mitigating, the Government asserts that counsel made a sound tactical decision not to present these findings because Mr. Bourgeois "lied" when he said that he had been in an accident with a resulting coma, and the Government provided documentation to counsel of this alleged falsehood. *RA*, 75, 109.

The Government's argument falls utterly flat. The Government's argument fails to take account of Dr. Weiner's opinion that, "My test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told me about the damage." *PA*, document # 16, 2, ¶ 6. See also Declaration of Michael Gelbort, Ph.D., ¶ 10 (*PA*, document # 8) (Dr. Weiner's "testing results indicating dysfunction 'stands on their own' . . . I am confident in stating that Mr. Bourgeois' impairments exist, even if the etiology is not completely clear.").

The Government's argument fails to account for the fact that despite the "lie" Dr. Weiner administered an objective test for malingering, which Mr. Bourgeois

22

USCA5 1385

passed with flying colors. Therefore, regardless of the etiology of Mr. Bourgeois'

impairments and intellectual deficits, Dr. Weiner's testing shows the existence of

these impairments, and his testing was valid, i.e. not the product of malingering. Dr.

Weiner specifically reported to trial counsel that he tested Petitioner with the

T.O.M.M. instrument, which is an objective and scientific measure designed to

determine if Mr. Bourgeois was malingering or providing good effort. Id., ¶ 6.[7]

The Government fails to take into account that, if anything, Mr. Bourgeois was

not faking bad, i.e., malingering, in his pretrial mental health evaluations, but to the

contrary, was attempting to present an untrue, mentally healthy picture of himself.

---

[7]Mr. Bourgeois' performance on the T.O.M.M. shows that Dr. Kutnick's suggestion that this rather simple – if not mentally retarded – man fooled the tests is way off the mark. *RA*, 74, 111. The T.O.M.M. alone shows that he was not malingering. Moreover, for Dr. Kutnick to be correct, Mr. Bourgeois would have had to be smart enough to know the difference between the T.O.M.M. and the IQ testing and thus know to do poorly on the IQ test, but quite well on the T.O.M.M. It would also mean that he would have to be smart enough to achieve virtually the same scores (i.e. within the margin of error) on the two IQ tests administered to him years apart (Weiner in 2004 and Gelbort in 2007), while at the same time knowing that he should not score too badly on these IQ tests, in order to allay suspicion that he was faking bad. For Dr. Kutnick to be correct, he would also have to explain how Mr. Bourgeois knew to do badly only on some of the testing, but not on other testing – such explanation being necessary to account for why he did not tank on all the testing. While Petitioner imagines it is theoretically possible that Mr. Bourgeois is a diabolical genius who has managed to fool Dr. Weiner, Dr. Estrada and Dr. Gelbort, and all of the testing given to him (some of which is designed and administered for the sole purpose of objectively measuring any efforts at malingering), Petitioner would look forward to Dr. Kutnick's explanation as to how he could achieve this.

23

USCA5 1386

See e.g. Declaration of Dr. Carlos Estrada, *PA*, document # 7, ¶¶4-5 (indicting how Mr. Bourgeois presented an "idyllic" history which Dr. Estrada did not believe to be accurate). Indeed, Dr. Weiner took account of Mr. Bourgeois' misrepresentations about his history and found them to be relevant to his opinions about Mr. Bougeois. Weiner Declaration, *PA*, document # 16, ¶7.

Finally, the Government fails to take into account that Mr. Tinker ruled out mental retardation well before Dr. Weiner even conducted his testing and before the Government informed counsel of Mr. Bourgeois' lie. *PM*, 17, n.9 (noting that Mr. Tinker ruled out mental retardation months before Weiner's testing). This is another instance of counsel making an ostensible tactical decision without having caused the requisite investigation to be conducted.

In sum, counsels' alleged tactical decision not to present this highly mitigating evidence, **evidence which could have rendered Petitioner ineligible for the death penalty**, was not an informed one. Counsel never spoke to his retained expert about his test results and more to the point about whether the "lie" in any way impacted the reliability of the results. Indeed, both Dr. Weiner and Dr. Estrada have opined that Dr. Weiner should have been called as a witness despite the "lie." Weiner Declaration ¶ 3 (noting that his findings were mitigating); Estrada Declaration, ¶ 17

24

USCA5 1387

("I was surprised that the defense decided not to call him as a witness, and I was concerned that I could not reference his important findings in my testimony").

## C.    Contrary to the Government's Assertions, the Flynn Effect is Valid and Widely Accepted.

The Government argues that counsel were not ineffective for failing to present evidence of Mr. Bourgeois' mental retardation because his score of 7**6** is above the cutoff for mild mental retardation.[8]   *RA*, 72-73.  In this argument, the Government discounts the Flynn Effect, stating that it is a "controversial theory that is not accepted by many psychologists." *RA*, 74.  This is incorrect.

The Flynn Effect is widely recognized, scientifically valid, and is accepted in forensic matters.  Butler v. Quarterman, 576 F.Supp.2d 805, 815 (S.D.Tex., 2008) (accepts validity of the Flynn Effect ); U.S. v. Davis, 611 F.Supp.2d 472, 486 (D. Md. 2009) ("support for the use of the Flynn Effect to adjust IQ scores in the forensic context . . . is widespread.")  Thomas v. Allen, –  F.Supp.2d – , 2009 WL 1353722, at* 15 (N.D.Ala. April 21, 2009) ("[W]hile some psychologists may still ponder the precise cause(s) of the Flynn effect, **no reputable member of the relevant**

---

[8]The Government continues to state that Petitioner scored a 7**6** on Dr. Weiner's IQ testing. *RA*, 72-73.  As noted, however, Petitioner actually scored a 7**5**, but Dr. Weiner erred when he transposed the number from his data to his report.  *PM*, 5, n.4.

25

USCA5 1388

**professional communities** denies that IQ scores have been increasing at the average rate of 0.30 points a year since the 1930s."); Holladay v. Allen, 555 F.3d 1346, 1358 (11th Cir. 2009) (acknowledging WAIS scores may have been elevated because of the Flynn Effect); Walker v. True, 399 F.3d 315, 322-23 (4th Cir. 2005) (criticizing district court for refusing to consider Flynn Effect and directing the district court to consider its persuasiveness on remand).  Neither the Government nor Dr. Klutnick acknowledge or account for these authorities.

**D.    Petitioner Possesses Adaptive Deficits.**

The second prong of the definition of mental retardation requires that an individual have significant limitations in adaptive behavior. The adaptive deficit requirement is designed to make sure that the individual's IQ score is a reflection of a real-world disability.  The focus of the clinical inquiry regarding this second prong is to determine whether there are significant things that the individual being evaluated cannot do, that someone without his disability can do.  Individuals who have mental retardation – like everyone else – differ substantially from one another.  For each person with mental retardation, there will be things he cannot do, but also things he can do.  Indeed, one of the fundamental precepts in the field of mental retardation is that "[w]ithin an individual, limitations often coexist with strengths."  See *Mental Retardation, Definition, Classification and Systems of Support*, 10th Edition,

26

USCA5 1389

American Association of Mental Retardation, 2002, (AAMR) at p.1.[9]

Because the mixture of skill strengths and skill deficits varies widely among persons with mental retardation, there is no clinically accepted list of common, ordinary strengths or abilities that preclude a diagnosis of retardation. Thus, the focus in assessing an individual's adaptive behavior must be on deficits in adaptive behavior, rather than strengths.[10]

Ignoring all of this, the Government provides a litany of things that Mr. Bourgeois is capable of doing and based on those strengths, concludes that he does

---

[9] The AAMR was cited with approval in <u>Atkins v. Virginia</u>, 536 U.S. 304, 309, n. 3, n. 5 (2002).

[10]<u>United States v. Davis</u>, 611 F.Supp.2d 411, 475-76 (N.D. Ala. 2009):

The AAMR manual also specified five additional assumptions that should be included as part of the application of the definition of mental retardation. One of these assumptions is particularly salient in the context of this case:

*Assumption 3: "Within an individual, limitations often coexist with strengths."* This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation. AAMR 2002 at 8.

USCA5 1390

not have deficits in adaptive functioning.  *RA*, 77-78.  The Government says that because Mr. Bourgeois operated a truck and car, completed a job application (for a job he did not get because of psychological difficulties), and was able to "callously throw" the victim into the air, he does not possess the requisite deficits.  Id.  The Government fares no better when it resorts to Dr. Kutnick's opinion that because Petitioner drove a truck, supported himself, and comprehended his legal situation,[11] he is not mentally retarded.  *RA*, 79.  Clearly, the Government's recitation is not responsive to the requirements of the AAMR.

In any event, to lay some of the Government's arguments to rest, Petitioner has engaged Dr. Victoria Swanson to perform an objective measure of adaptive deficits using a widely recognized and accepted measure, the Vineland-II Adaptive Behavior Scale.  She administered this instrument to Beverly Frank, who, after reviewing the background materials provided by counsel, appeared to Dr. Swanson to be a "prime subject to whom to administer" the test.  As Dr. Swanson's Declaration indicates, based on the reporting of Ms. Frank, Mr. Bourgeois scored well within the range of mental retardation in this test for adaptive deficits.  See Swanson Declaration, *SSA*,

---

[11]This last observation is particularly inapposite, as obviously a person can be mentally retarded and competent to proceed to trial, i.e. comprehend his legal situation.  Atkins, 536 U.S. at 317 ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.")

28

USCA5 1391

document # 74.[12]

**E.      Counsels' Alleged Tactic – To Obtain Evidence of Petitioner's Childhood Abuse Through Dr. Estrada – Failed Miserably, and Counsel Failed to Regroup.**

The Government argues that counsel had a sound tactic of trying to elicit mitigating evidence through its cross examination of Dr. Estrada.  *RA*, 112.  While this sounds fine in theory, in practice, it was a terrible failure.  And, while such failure would not by itself constitute ineffectiveness, counsel had a chance to regroup, but failed to do so.

Counsels' alleged tactic came to a screeching halt when this Court sustained the Government's objection, thus preventing Dr. Estrada from testifying that Petitioner had an abuse and dysfunctional childhood.  *PM*, ¶¶ 58-66.  The record demonstrates that faced with the abject failure to adduce the critical evidence of childhood abuse and dysfunction, counsel still had a chance to overcome this problem.  He had Dr. Cunningham and Dr. Weiner available, not to mention scores of lay witnesses (see Declarations of lay witnesses contained in *PA*, documents # 17-

---

[12]Dr. Swanson is a career-long expert in diagnosing and providing services to people with mental retardation.  Her specific qualifications regarding mental retardation are superior to Dr. Klutnick's, whose curriculum vitae appears to demonstrate no particular expertise in this highly specialized area.

29

40) all of whom would have testified to the tortuous upbringing that marked Mr. Bourgeois' life.

But, the Government says that this evidence did not exist because Petitioner denied it. *RA*, 112. Yet, any mental health professional worth his or her salt, **including Dr. Estrada, the Government and Court's own witness in this case**, would have testified that such denials from adult victims of childhood abuse are expected, and are easily explained from a clinical perspective. See Estrada Declaration, ¶ 5 (*PA*, document # 7) ("It is not uncommon for even adult victims of childhood abuse to 'deny' that they were abused. This 'denial' phenomenon is largely a psychic defense put up by the victim to normalize the horrors that they suffered. The existence of this phenomenon also makes it particularly important for the mental health practitioner to not rely only on self-reports, particularly in the forensic setting."). Thus, counsel easily could have explained Mr. Bourgeois' denials. The Government's attribution of this tactic to counsel fails.

These facts also rebut the Government's related assertion that "trial defense counsel had no factual basis to inquire or pursue a claim that Petitioner had an abusive childhood other than the speculations of Dr. Estrada." *RA*, 114. This is true except for the 23 lay witnesses and four experts (Cunningham, Weiner, Estrada and Holden) who were prepared to testify to the factual basis.

30

USCA5 1393

## F.    Failure to Call Dr. Holden at the Penalty Hearing.

The Government's response to counsels' failure to call Dr. Holden in the

penalty phase is particularly unsatisfying. *RA*, 118. Nowhere is there support for the

proposition that counsel made a tactical decision to not call Dr. Holden because his

penalty testimony would have contradicted Petitioner's denial of guilt. Again, the

Government's failure to propound this specific question in its interrogatories speaks

loudly. The Government failed to ask Mr. Tinker why he did not call this witness,

and the Government's made-up answer to a question it did not ask, is not

persuasive.[13] As noted above in *Part One*, Section E2, this Court can and should

---

[13]The Government's failure to ask is contrasted with the specific interrogatory asked of Mr. Tinker by Petitioner's counsel:

16.    The record shows that you proffered the testimony of Professor of Psychology George W. Holden (University of Texas) as a guilt phase witness to establish a defense that Mr. Bourgeois did not kill with premeditation. PTT 3/1/04, 1-72. The Court denied this application, but suggested that the defense consider calling him at a potential penalty phase. Id., at 74 (attached as Exhibit C). You had previously alerted the Court that you were considering calling him in the penalty phase. PTT 10/20/03, 11-12 (attached as Exhibit D).

In view of Dr. Holden's potential testimony that "the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions" (Holden Declaration, Exhibit 11, Petitioner's Appendix), please describe your tactical or strategic reason for not calling him as a witness in the penalty phase of trial.

*Petitioner's Interrogatories Directed to Douglas Tinker, Esq., SSA*, document # 72,

31

USCA5 1394

draw an inference against the Government for failing to pursue this inquiry.

The Government's made-up tactic – that Holden was contrary to Petitioner's denial of guilt – is true in virtually all capital penalty phases. The Eighth Amendment does not require presentation of mitigating evidence only when a capital defendant admits his guilt. Rompilla v. Beard, 545 U.S. 374 (2005) makes this point quite clearly:

> Rompilla's sentencing strategy stress[ed] residual doubt [as to his guilt] . . . five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man. Rompilla's 14-year-old son testified that he loved his father and would visit him in prison.

Rompilla, id., at 378, 386. Despite this on-going insistence that Rompilla was innocent, the Supreme Court had no difficulty in finding counsel ineffective for failing to investigate and present mitigating evidence which would "have destroyed the benign conception of Rompilla's upbringing" id., at 391.[14]

---

at 4.

[14]Rompilla also puts to rest the Government's related point that counsel had a good reason not to present Petitioner's Borderline Personality Disorder, which it contends was contradictory to his guilt phase defense. *RA*, 109.

32

**CLAIM III.**    **NO REASONABLE VIEW OF THE EVIDENCE EXISTED UPON WHICH A RATIONAL FACT FINDER COULD CONCLUDE THAT THE FATAL INJURIES WERE INFLICTED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES IN VIOLATION OF DUE PROCESS.    FURTHERMORE, COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THIS CLAIM AND TO PRESENT READILY AVAILABLE EVIDENCE TO REBUT THIS ELEMENT OF THE OFFENSE.**

The Government concedes, as it must, that under the federal murder statute (18 U.S.C. § 1111), it had the burden at trial of proving that the fatal injury was inflicted on the grounds of the Corpus Christi Naval Air Station.    See *RA*, 81.    The Government also does not dispute the report of its own trial neuropathologist, Dr. Kathleen Kagan-Hallet, which clearly and unequivocally stated that the fatal injury was ten days old, and therefore could not have been inflicted on the grounds of the Naval Air Station.    The Government also does not even attempt to identify any strategy (reasonable or unreasonable) that would justify defense counsel from not using this report at trial. This is discussed in Section "B," below.

Instead, the Government attempts to address the compelling impact of Dr. Kagan-Hallet's report by relying on other evidence which it contends Petitioner has ignored.  However, as demonstrated, Petitioner has not ignored this evidence.  To the contrary, he has discussed it, and as that discussion shows, none of this evidence even addresses, much less militates against Petitioner's salient point: Dr. Kagan-Hallet concluded that the fatal injury was struck ten days before the victim's death on the

33

USCA5 1396

day the family arrived at the Naval Air Station, and therefore there was no federal jurisdiction.

Under a sufficiency of evidence analysis, the Government's evidence and all reasonable inferences must be taken as true.  Jackson v. Virginia, 443 U.S. 307 (1979).  Without conceding the validity of the Government's evidence, application of this test shows that Petitioner engaged in a course of assaultive conduct.  However, in order to prove the jurisdictional element, the Government was obliged to prove beyond a reasonable doubt where the fatal injury was administered.  The Government's *Answer* misses this point.  It relies on evidence showing a pattern of assaults and injuries.  However, nowhere does the Government rebut Petitioner's two primary points: 1) the fatal injury did not occur on federal lands and therefore the Government did not prove federal jurisdiction; and 2) counsel were ineffective for failing to present the evidence conclusively demonstrating the lack of jurisdiction.

## A.    The "Ignored" Testimony.

The Government contends that Petitioner has ignored the trial testimony of: AB-1994, Dr. Rouse, Dr. Akhtar, Dr. Kuffel, Robin Bourgeois and Petitioner.  For the following reasons, these arguments are factually inaccurate.

**AB-1994.**  First, the Government argues that Petitioner "wholly ignores" the

34

testimony of AB-1994. *RA*, 81, 121. This is simply incorrect. Petitioner specifically addressed the testimony of AB-1994 – as it relates to this claim – in both *Petitioner's Motion* and *Petitioner's Memorandum*. In fact, as Petitioner explained, AB-1994's testimony is exactly what makes trial counsels' failure to introduce Dr. Kagan-Hallet's report so egregious and constitutionally deficient.

Specifically, Petitioner argued: the Government's theory as to when the fatal blows were inflicted rested solely on the testimony of AB-1994;[15] AB-1994 did not testify that the fatal blows were struck on the Naval Air Station base;[16] AB-1994's credibility was always in serious question since this child-witness gave several different accounts as to what happened on the Naval Air Station;[17] that for several months AB-1994 insisted that petitioner never struck the decedent but rather insisted the decedent had fallen from the truck (TT 3/5/04, 56); and, finally that there were several witnesses readily available to testify that AB-1994 had a well known reputation for fabrication.[18]

Clearly, the Government's contention that Petitioner "wholly ignores"AB-

---

[15]See *PM* at ¶¶110, 117, 118; *P-Mem* at p. 28.

[16]*PM* at ¶110, *P-Memo* at p. 28.

[17]*PM* at ¶117.

[18]*PM* at ¶116.

35

1994's testimony is simply wrong.  Instead, the testimony of AB-1994 is at the heart of this claim.  Her testimony is what makes counsels' failure to present the scientific evidence concerning the time and location of the infliction of the fatal injury constitutionally deficient.  Furthermore, there can be no doubt that defense counsel knew it was critical to discredit AB-1994 in the eyes of the jury.  It is clear from counsels' cross-examination of AB-1994 (TT 3/5/04, 53-56) and their closing arguments (TT 3/16/04, 24-45), that they were urging the jury to discredit AB-1994 and specifically her testimony concerning what took place on the Naval Air Station base.  What better way to do so than to present the **Government's own** scientific expert evidence showing that this witness was wrong?

And, quite aside from any issue related to AB-1994's credibility, even assuming that her testimony clearly showed that Petitioner assaulted the victim on the grounds of the Naval Air Station, this child-witness (nor any lay witness for that matter) was not competent to testify as to which of the blows was fatal.  In this case, with so many alleged assaults, that conclusion required scientific expertise.

There is no reason why counsel –  in possession of the Government's own expert report that unequivocally stated that the fatal injury was 10 days old  – would not use that scientific evidence to impeach the ever changing story of AB-1994 and to rebut, if not eviscerate, the element of jurisdiction.

36

**Dr. Rouse.**    The Government contends that Dr. Rouse testified that there were "recent injuries with 'fresh hemorrhage'" and that she "averred that her findings regarding when the injuries occurred were consistent with the severe injuries occurring on June 27, 2002." *RA*, 83.  This is partially correct, but misses the point.

Dr. Rouse did testify that she observed "recent" bruises and "fresh hemorrhage."  However, all of these injuries were located on the scalp and **were not** fatal. TT 3/8/04, 14-15, 19-20.  Dr. Rouse clearly and unequivocally testified that the scalp injuries **"did not result in the death."** Id. at 20.  Rather, she testified the injury "within her brain"  the "subdural hematoma" (below both the scalp and the skull) is "what actually resulted in her death."  Id. at 21.  It is this wound – the right subdural hematoma – that Dr. Kagan-Hallet determined was approximately 10 days old.  Not surprisingly, the prosecutor never asked Dr. Rouse about Dr. Kagan-Hallet's findings.

The Government also argues that Dr. Rouse "averred that her findings regarding when the injuries occurred were consistent with the severe injuries occurring on June 27, 2002." *RA*, 83.   This is simply not true.  The Government provides no page citation for this alleged "averment" by Dr. Rouse and for good reason – it does not exist.

**Dr. Akhtar and Dr. Kuffel**.  The Government argues that the testimony of

37

USCA5 1400

both Dr. Akhtar and Dr. Kuffel "was consistent with a finding that JG suffered the life-threatening injuries on June 27, 2002." See *RA*, 83. Unfortunately for the Government, the testimony of these doctors had nothing whatsoever to do with the timing or location of the infliction of the fatal injury.

Dr. Akhtar was one of the emergency room physicians who treated the decedent on June 27-28, 2002. Dr. Akhtar was never asked, nor did he opine, as to the timing of the infliction of the fatal injury. He did, however, testify that the CT scan revealed that the decedent had a severe brain injury. TT 3/9/04 at 96-97. It is this severe brain injury that Dr. Kagan-Hallet determined was 10 days old.

Dr. Kuffel, an ophthalmologist, performed a posthumous examination of the decedent's retina. Dr. Kuffel was never asked, nor did he opine, as to the timing of the infliction of the fatal injury. He did, however, testify that his examination revealed that the blood behind the decedent's eyes could have been caused by a subdural hematoma. TT 3/8/04 at 88-91. It is this very same "subdural hematoma" that Dr. Kagan-Hallet determined was 10 days old.

**Robin Bourgeois.** The Government also argues that the fatal injuries must have been inflicted on the Naval Air Station base because Robin testified that the family had stopped in Louisiana – and there was no evidence or indication that the

38

decedent "had suffered any fatal injury prior to them arriving or departing from their Louisiana residence." RA, 83-84. Initially, this argument fails because, as with AB-1994, it pits lay testimony as to cause and time of death against scientific evidence as to cause and time of death.

Additionally, this argument is contradicted by other portions of the Government's presentation. In its closing argument, the Government argued that Petitioner repeatedly and severely beat and abused the decedent every single day for **36 straight days**. The Government called it a "systematic execution" a "systematic dehumanization." TT 3/16/04, 13-14. The Government even presented testimony that the decedent – days prior to arriving at the Naval Air Station – fell 10 feet onto her head causing her head to swell up like a watermelon. TT 3/9/04, 246. It is disingenuous to now argue that the decedent could not have been fatally injured prior to the arrival at the Naval Air Station.

**Petitioner's Trial Testimony.** Finally, the Government argues that Petitioner's own testimony "firmly established that JG was still alive and had not suffered that fatal injury at the time Petitioner's truck was broken down while on Corpus Christi Naval Station." *RA*, 84. Specifically, the Government argues that Petitioner testified that the decedent was "playing and singing her ABCs with him and

39

USCA5 1402

AB-1994" and Robin was combing her hair while on the Naval Air Station base.  Id.

The Government argued at trial that Petitioner's entire testimony including what took place at the Naval Air Station, was a complete lie.  TT 3/16/04, 10, 12, 13, 15, 55.  To now argue that this fabricated testimony rebuts the scientific evidence of its own expert is beyond the pale – indeed, if Mr. Bourgeois is to be believed, the Government must concede that Petitioner also denied committing the offense.  While Petitioner does not expect such a concession, this point does show just how precarious is the Government's position.

### B.   Ineffective Assistance of Counsel.

While not disputing that it had the burden at trial of proving that the fatal injuries were *inflicted* on the grounds of the Naval Air Station base, and not disputing the report of its own neuropathologist, Dr. Kathleen Kagan-Hallet, which clearly and unequivocally stated that the fatal injuries were 10 days old, the Government's Answer is **notable for what it does not allege**.  Nowhere does it offer the slightest tactic or strategy that could even conceivably justify counsels' failure to make use of the jurisdiction-busting report of Dr. Kagan-Hallet.

Here it is also notable that the Government did not ask Mr. Tinker about this issue in its interrogatories.  As pointed out in *Part One, Section E 2*, the Court should

40

USCA5 1403

draw an adverse inference against the Government for failing to pose questions

related to this issue. In contrast, Petitioner's Interrogatories posed these questions in

a straightforward manner.[19] Regrettably, due to Mr. Tinker's condition, Petitioner did

not receive answers to these questions.

_____

[19]Petitioner asked the following questions:

**Interrogatories Related to Claim III.**

18.    Pursuant to 18 U.S.C. §§1111(b) and 3236, the Government was required to prove beyond a reasonable doubt that the fatal injuries were inflicted on the grounds of the Corpus Christi Naval Air Station. Prior to trial the Government provided defense counsel with an autopsy report prepared by Dr. Elizabeth Rouse and a report from Dr. Kathleen Kagan-Hallet, a neuropathologist. Dr. Kagan-Hallet examined the evidence in this case and determined that the fatal injuries were approximately ten days old. Dr. Kagan-Hallet's report was specifically referenced in the autopsy report prepared by Dr. Rouse.

A.    Did you have a strategic or tactical reason for failing to cross-examine the Government's pathologist Dr. Elizabeth Rouse, who performed the autopsy, as to the timing of the infliction of the fatal injuries?

B.    Did you have a strategic or tactical reason for failing to call as a witness Dr. Kathleen Kagan-Hallet, to testify that she thoroughly examined the evidence in this case and determined that the infliction of the fatal injuries was approximately ten days prior to death?

C.    Did you have a strategic or tactical reason for failing to retain and call as a witness a neuropathologist to testify that the infliction of the fatal injuries was approximately ten days prior to the date of death?

See *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.*, page 3, included in *SSA* as document # 72.

41

USCA5 1404

**CLAIM IV. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY THAT WOULD HAVE UNDERMINED THE GOVERNMENT'S ASSERTION THAT PETITIONER'S SEMEN WAS FOUND IN JG-1999'S ANUS, AND THAT PETITIONER SEXUALLY ABUSED HER, IN VIOLATION OF MR. BOURGEOIS' RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Trial counsel were ineffective for failing to present readily available expert testimony that would have completely undermined the Government's evidence that semen was present in the rectum of JG-1999 and that she was sexually assaulted. See *PM*, 62-75; *P-Mem*, 32-52. Indeed, the evidence counsel failed to present would have established that the recovered substance was not semen and there was no trauma to JG-1999's vagina or rectum. Id. However, as a result of counsels' deficient performance, extremely prejudicial evidence of an alleged sexual assault went completely unrebutted and severely harmed Petitioner's guilt-phase defense. Id. This incredibly prejudicial evidence also weighed heavily against Petitioner in the penalty phase of trial. Accordingly, counsels' deficient performance caused Petitioner severe prejudice and relief as to each phase of trial is required.

### A.    Deficient Performance.

#### 1.    The alleged "semen" evidence.

Petitioner has broadly argued that counsel were ineffective for failing to present the jury with available expert evidence showing that semen was not found on

42

USCA5 1405

the victim.  The Government recasts this claim and focuses on the much narrower question regarding Dr. Johnson's alleged tardiness.  *RA*, 123-24, citing *Respondent's Sealed Interrogatories for Douglas Tinker, RA*, Attachment A.  While counsels' interactions with Dr. Johnson are relevant to Petitioner's ineffectiveness claim, the Government's narrow focus on the timing question does not resolve the larger issue. This is so for several reasons.

The ultimate responsibility for the timely presentation of exculpatory material falls on counsel.  Moreover, in this instance, the report was a mere two days late, and despite this Court's earlier statements that it would grant some leeway in this regard, counsel should have, but did not, ask this Court for permission to present this critical expert.  Indeed, because counsels' strategy was to dispute the alleged evidence of sexual assault, even if her report was late, counsel could have had no reasonable strategic basis for failing to seek permission from the Court to present the testimony of Dr. Johnson, who would have provided unequivocal testimony that no scientific basis existed for the Government's allegation that the recovered substance was semen.  Moreover, leaving Dr. Johnson completely aside, there were other experts available who could have debunked the Government's semen theory.  Therefore the Government's narrow focus on the timing issue is not responsive to the broader claim of ineffectiveness relating to counsels' failure to debunk the Government's

43

allegations that semen was recovered from the rectum of JG-1999.

### a.    Timing.

Admittedly, Dr. Johnson's report was submitted to counsel after the Court imposed deadline for disclosing expert reports. *P-Mem*, 43. However, this fact only highlights counsels' deficient performance. Indeed, it was counsels' responsibility to ensure that all expert reports were submitted in a timely manner and Dr. Johnson was not the only expert for which counsel neglected to obtain a timely report. See TT 2/25/04, 135-48 (discussing counsels' failure to secure and disclose expert reports from Dr. Rupp, Dr. Holder and Dr. Weiner); see also *Government's **Third** Motion for Reciprocal Discovery, 2/17/04* (district court document # 187) (requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norton, and Dr. Donald Weiner). Moreover, any allegation that Dr. Johnson is at fault for the late disclosure because she was uncommunicative with counsel is belied by the record. On January 16, 2004, just a month and half before she submitted her report to counsel, Mr. Tinker expressly told the Court that Dr. Johnson has been prompt in her work and good at communicating with counsel. TT 1/16/04, 34-35 ("As soon as she gets it and has an opportunity to test it, and I think she'll be prompt. She's been good about talking to me about

44

issues").[20]

More importantly, regardless of why Dr. Johnson's report was obtained after the Court imposed deadline, counsel should have requested leave of the court to present her critical testimony.  Dr. Johnson's report was obtained just **two business days** after the Court imposed deadline, **one day before** the presentation of the Government's case in chief, and **thirteen days before** the presentation of any defense evidence.[21]  Counsel also notified the Government and the Court of the substance of Dr. Johnson's testimony as early as February 25, 2004, **four days before** the start of the Government's case and **seventeen days before** the presentation of defense evidence.  TT 2/25/04, 145 ("Well the issue, the main issue, is whether or not their

---

[20]As additional evidence of Dr. Johnson's alleged tardiness, the Government points to Dr. Johnson's declaration which was submitted in September 2007, while most other declarations and reports were submitted in May 2007. *RA* at 123-24.  This is silly.  Dr. Johnson's declaration was timely filed in conjunction with other expert reports, including a report from Forensic Science Associates, as part of the *Supplemental Appendix* (*SPA*) submitted with *Petitioner's Memorandum.*  Notably, despite having one year to complete its *Answer*, the Government references a report from Dr. Senn **that it was unable to obtain at the time of its filing and apparently, has still not obtained.**  *RA* at 129 n. 35 ("the Governments has been unable to obtain a final version of Dr. Senn's draft").  This irony appears lost on the Government.

[21]The Court imposed deadline for the production of expert reports was Thursday, February 26, 2004.  Dr. Johnson's report was prepared on Monday, March 1 and faxed to counsel on Tuesday, March 2, 2004.  The Government's presentation of evidence began on Wednesday March 3, and the defense presentation of evidence commenced on March 15, 2004.

45

findings were of seminal fluid, whether that was seminal fluid").  Moreover, as the

record reflects, the Court was prepared to grant the Government additional time to

address any of Dr. Johnson's conclusions with its own experts or, if needed, even hire

new experts:

MS. BOOTH:     Okay.  And could we do Thursday morning at 10:00 o'clock, Judge, only because whatever this woman [Dr. Johnson] comes back with, we might have to send that back to our DNA specialist.

COURT:        I'm going to give you time to do that.

MS. BOOTH:     Okay.

COURT:        I mean that's understandable to hear from, you know, from both reciprocal discovery.  You may have to re-designate and I'll let you re-designate.  If you need another expert because of the latest disclosure –

MS. BOOTH:     The other problem —

COURT:        But you must supplement it at some point before the witness takes the stand.

TT 2/25/04, 122-33.

Under these circumstances, where: the Court had voiced a willingness to

accommodate the Government in anticipation of a last-minute or late submission of

Dr. Johnson's report, the Court had authorized expenditures for this expert and

46

USCA5 1409

despite the production of her report a scant two days after the deadline, there was

simply no prejudice to the Government, there really can be no legitimate excuse for

counsels' failure to seek permission to use this important witness.

Nevertheless, the Government argues that counsel was not deficient in failing

to present the testimony of Dr. Johnson because her report was not "illuminating" and

did not "supply a reasonable basis to tactically decide to call her as a live witness."[22]

---

[22]The Government prefers to speculate as to why Mr. Tinker did not request permission to present the witness, instead of posing the question to him when it had the chance. However, Petitioner did the pose all of the relevant questions to Mr. Tinker, as follows:

21.  At trial, the Government presented expert testimony and argued to the jury that Mr. Bourgeois' semen was detected during the post-mortem rectal examination of the deceased, JG-1999. As part of your preparation for trial, you retained and consulted with a defense DNA expert, Dr. Elizabeth Johnson. On March 1, 2004, the day before the start of jury selection, Dr. Johnson provided you with a summary of the testimony she could provide if called to testify to counter the Government's assertions regarding the alleged semen. See Exhibit H, attached. In that summary, Dr. Johnson concluded that the FBI did not conduct the full panoply of tests to confirm the presence of semen; the additional AP reagent and sperm search test she conducted were both negative; if the substance recovered from JG-1999 was semen, sperm should have been detected but were not; and, false positives are possible in the only test conducted by the government – the P30 test. Id. You have previously stated that you and Mr. Gilmore considered using the testimony of Dr. Johnson at trial but that "[s]he did not do the testing you requested in a timely fashion and, therefore, we did not utilize her services." Respondents' Interrogatories for Douglas Tinker at 11-14.

A.    Would you agree that the testimony regarding the alleged semen

USCA5 1410

*RA*, 124-25. According to the Government, because she would have "acknowledged

the presence of some semen," it was a "reasonable tactical decision for trial counsel

to utilized [sic] Dr. Johnson's expertise in assisting on cross-examination without

calling her as a witness to confirm the presence of semen." Id. at 124; 127 (Dr.

Johnson "would have had to acknowledge that the swab tested positive for semen").

The Government's argument, however, is patently false and fails entirely to

---

> reportedly discovered in the rectum of JG-1999 was highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?
>
> B.   Do you acknowledge having received the faxed summary of Dr. Elizabeth Johnson's proposed testimony on March 1, 2004?
>
> C.   Would you agree that Dr. Johnson's conclusions as stated in her March 1, 2004, summary would have been beneficial to the defense in countering the Government's allegations regarding the alleged semen?
>
> **D.   If so, did you have a strategic or tactical reason for failing to request relief from the Court's deadline so that you could present the testimony of Dr. Johnson?**
>
> E.   Did you have a strategic or tactical reason for failing to request additional time from the Court to consult another expert who could have countered the government's alleged semen evidence?
>
> F.   Was Dr. Johnson the only expert you consulted regarding the alleged semen evidence?

*Petitioner's Interrogatories Directed to Douglas Tinker, Esq.*, *SSA*, document # 72, at 7-8.

48

USCA5 1411

comprehend the nature and import of the testimony Dr. Johnson could have provided.

Dr. Johnson's testing did not "confirm the presence of semen" or "acknowledge

that the swab tested positive for semen." On the contrary she would have testified

that:

> [T]hat there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen, and that four scientific tests (AP, P30, sperm search, STR DNA testing and Y chromosome DNA testing) were negative for the presence male fluids or male cells on the rectal swabs. That only the P30 test gave a (weak) positive result and should not be considered conclusive in light of numerous contradictory tests. Accordingly, I would have testified that there was insufficient scientific evidence to conclude that Mr. Bourgeois' semen, or any semen, was present in JG-1999's rectum.
>
> **[H]ad I been called as a witness at trial, I would have testified that the Government's evidence at trial regarding the alleged semen was erroneous and scientifically unsubstantiated**. I would have specifically addressed the erroneous testimony of Dr. Scott Benton and testified that spermatozoa are very durable and do not easily degrade (they are so durable that an additional chemical is required to break open spermatozoa in the laboratory), that spermatozoa can be easily detected microscopically and their abundance in seminal fluid facilitates microscopic detection even after the tail is lost, and that spermatozoa can be found for up to six days in the vaginal tract of a living female. In summary, I would have provided scientific evidence and testimony which would have directly contradicted the Government's evidence and theory of prosecution.

Declaration of Elizabeth Johnson, Ph.D., *SPA*, document # 64, ¶¶ 5-6; see also *PA*,

document # 49 (3/1/04 report of Dr. Johnson) ("[t]he P30 positive (weak on our test)

49

test could be a false positive due to bacterial proteins found in the rectal swab.  If there was actually sperm on the swab, they should be observed if the P30 test is positive from semen").

Nothing in Dr. Johnson's report or potential testimony can be construed to "confirm" or "acknowledge" the presence of semen.  Indeed, that counsel found Dr. Johnson's report and conclusions credible and important enough to attempt to use them on cross-examination, only highlights that counsel did not have a strategic reason not to use this witness – to the contrary, it shows that counsel needed.  The same is true for counsels' reliance on this witness in his closing argument.  *P-Mem*, 37-39 (Court precluded counsels' argument that "[t]here's no evidence of semen, I suggest to you, being found on this child" because counsel failed to produce any evidence to support his argument).[23]  Again, it is obvious from this attempt to argue the lack of semen present, that counsel **wanted** to use this evidence.  What is also obvious, is that without calling this witness (or taking the steps discussed below) counsel was without ammunition to do so.

---

[23]Moreover, as the Court instructed the jury, the questions, statements or arguments of counsel are not evidence. See TT 3/2/04, 18 ("The evidence which you are to consider consists of the testimony of witnesses and exhibits admitted into evidence"); TT 3/16/04, 61 ("Remember that any statements, objections, or arguments made by the lawyers are not evidence").

USCA5 1413

Had counsel called Dr. Johnson, the jury would have been presented with scientific evidence that completely undermined the Government's evidence and strongly supported counsels' argument that there was no semen present and JG-1999 had <u>not</u> been sexually abused.

### b.      Availability of Other Expert Testimony on this Point.

Even if, as the Government now claims, counsel was unhappy about the promptness of Dr. Johnson's work, other expert testimony was available at the time of trial which could have rebutted the Government's contention that the recovered substance was semen. <u>See</u> Report of Forensic Science Associates, *SPA*, document # 65 at 3, 17, 19-27 (concluding, in part, that there is no scientific basis for the testimony of Dr. Benton, Caroline Zervos or Anthony Onorato, that semen was definitively present on the post-mortem rectal swab taken from JG-1999); *P-Mem*, 44-46.  Again, given the extreme prejudice to Petitioner from the allegation that semen was present in JG–1999's rectum, counsel should have been mindful of any delay on Dr. Johnson's part (if there was actually a delay) and should have requested the assistance of a new expert.

### 2.      The alleged evidence of vaginal and anal trauma.

The Government asserts that trial counsels' performance was not deficient for

51

failing to counter Dr. Benton's testimony of alleged vaginal trauma to JG-1999. *RA*, 125. According to the Government, it was "reasonable for counsel to have relied upon the expertise of [Dr. Benton][24] and ultimately decide that there was no need to keep searching for an expert who might eventually provide an opinion that would support an argument that there was no trauma." Id.

The Government's argument runs counter to over two decades of federal jurisprudence. Counsel have a duty to conduct an independent investigation and evaluation of the Government's forensic evidence, including having their own expert evaluate the evidence, advise them and testify, if required. See *P-Mem*, 40-42.[25]

---

[24]The *Answer* mistakenly refers to Dr. Johnson instead of Dr. Benton. *RA*, 125.

[25]See also, Ake v. Oklahoma, 470 U.S. 68, 82 & n.8 (1985) (emphasizing importance of expert assistance to defense, for affirmative presentation of evidence and "to assist in preparing the cross-examination" of prosecution experts; defendant is "at an unfair disadvantage, if he is unable ... to parry **by his own witnesses** the thrusts of those against him" (citations omitted)); Siehl v. Grace, 561 F.3d 189 (3d Cir. 2009) (state court rejection of Petitioner's claim that counsel was ineffective for stipulating to fingerprint evidence without the assistance of a qualified defense expert was an unreasonable application of Strickland); Dugas v. Coplan, 428 F.3d 317, 327-34 (1st Cir. 2005) (counsel ineffective for failing to obtain defense experts to assist in cross-examining prosecution's experts and support defense); Gersten v. Senkowski, 299 F.Supp.2d 84, 103-04 (E.D.N.Y. 2004), aff'd, 426 F.3d 588, 607-11 (2d Cir. 2005) (counsel ineffective for failing to obtain expert assistance where defense expert could have presented testimony and assisted in cross-examination of prosecution expert); Pavel v. Hollins, 261 F.3d 210, 223-25 (2d Cir. 2001) (counsel ineffective for failing to "call a medical expert to testify as to the significance of the physical evidence presented by the prosecution"); Holsomback v. White, 133 F.3d

52

Moreover, in this case, even without an independent expert evaluation of the Government's evidence, counsel could have presented overpowering evidence, **from the Government's own witnesses,** negating the allegations of vaginal trauma and establishing the lack of rectal trauma. Dr. Elizabeth Rouse, who **performed the autopsy** of JG-1999, specifically found that "[t]he external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**. **The Hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic.**" See Autopsy Report of Dr.

_____

1382, 1386-89 (11th Cir. 1998) (counsel ineffective for failing to investigate and develop expert testimony); Jones v. Wood, 114 F.3d 1002, 1011-12 (9th Cir.1997) (granting evidentiary hearing on claim that counsel was ineffective for failing to obtain expert testing and evaluation of blood evidence); Driscoll v. Delo, 71 F.3d 701, 707-09 (8th Cir. 1996) (counsel ineffective where his failure to reasonably investigate and develop scientific evidence "allow[ed] the jury to retire with [a] factually inaccurate impression" about that evidence); Harris v. Wood, 64 F.3d 1432, 1436 (9th Cir. 1995) (counsel ineffective when "he did not obtain an independent evaluation of the ballistics evidence or the forensic evidence"); Sims v. Livesay, 970 F.2d 1575, 1579-81 (6th Cir. 1992) (counsel ineffective for failing to investigate and obtain scientific testing regarding gunshot residue); Troedel, 667 F.Supp. at 1461 (counsel ineffective for failing to consult expert to refute prosecution expert testimony regarding gunshot residue), aff'd, 828 F.2d 670; Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir. 1983) (counsel ineffective for failing to develop and present expert testimony regarding bullet trajectory); Williams v. Martin, 618 F.2d 1021, 1025-26 (4th Cir. 1980) (where defense claimed gunshot wounds were not cause of death, "an effective defense ... require[d] the assistance of an expert witness").

53

USCA5 1416

Elizabeth Rouse, *PA*, document # 52, p. 3.  Thus, contrary to the Government's contention, trial counsel would not have needed to do much "searching" to find an expert who would have rebutted the Government's contention of sexual assault. Rather than rely on the erroneous and highly prejudicial testimony of Dr. Benton, counsel could have simply asked Dr. Rouse, **who was present and testified at trial** on behalf of the Government, about her findings regarding JG-1999's vagina and anus.  However, neither trial counsel nor, not surprisingly, the Government, asked Dr. Rouse about her observations regarding JG-1999's vagina and anus.  See Soffar v. Dretke, 368 F.3d 441, 476-77 (5th Cir. 2004) (finding counsel ineffective for failing to hire a ballistics expert and noting that "Soffar's defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense").

Had counsel questioned Dr. Rouse about the findings contained in her autopsy report, counsel could have argued that had Petitioner, an adult male, actually raped JG-1999, a two-year-old child, evidence of trauma to her vagina or anus would certainly have been observed at autopsy.  Counsel could have argued that any rape was highly unlikely because, as Dr. Rouse observed, JG-1999's hymen was "present and [ ] atraumatic."  Counsel could have also argued that Petitioner did not sodomize the child because there was no evidence of rectal trauma at autopsy.  Moreover,

54

counsel could have argued that Dr. Rouse's conclusion of no anal trauma, proved that

no semen was recovered from JG-1995's rectum.  Thus, Dr. Rouse could have single-

handedly undermined **all** of the evidence of alleged sexual assault.

Shockingly, the *Respondent's Answer* fails to address Petitioner's claims of

ineffectiveness for failing to elicit Dr. Rouse's autopsy findings.  See *RA*,122-27 –

this silence speaks volumes.  Equally shocking, in its interrogatories to Mr. Tinker,

the Government did not ask whether counsel had any tactical or strategic basis for

failing to elicit this testimony from Dr. Rouse.  See *RA* Attachment A, *Respondent's*

*Sealed Interrogatories for Douglas Tinker*; Cf. *Petitioner's [unanswered]*

*Interrogatories Directed to Douglas Tinker, Esq.*  Again, the Government's failure

to even seek direct answers to important questions when it had the chance to do so

stands in stark contrast to the specific questions Petitioner posited to Mr. Tinker, and

requires the Court to draw an adverse inference that had they asked questions such

as the following, the Government would have received unhelpful responses.[26]

---

[26]Unlike the Government, Petitioner propounded clear and direct questions on
this critical topic:

20. **Interrogatories Related to Claim IV.**

At trial, prosecution witness, Dr. Elizabeth Rouse, who conducted the autopsy,
testified that she performed a sexual assault examination on the body of the
deceased, JG-1999.  See TT 3/8/04, 59-60, Exhibit E, attached.  However, Dr.

55

USCA5 1418

Rouse did <u>not</u> testify about whether her examination of JG-1999 revealed any evidence of vaginal trauma and no questions were asked on direct or cross-examination regarding those observations. Morever, in her autopsy report, Dr. Rouse specifically concluded that "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**. **The hymen is present and appears atraumatic**. The back is straight. The anus unremarkable and atraumatic." <u>See</u> Autopsy Report of Dr. Elizabeth Rouse at p. 3, Exhibit F, attached. Nevertheless, prosecution witness, Dr. Scott Benson, testified that the autopsy of JG-1999 revealed vaginal trauma. <u>See</u> TT 3/5/04, 44-46, Exhibit G, attached.

A.    Did you consider Dr. Benton's testimony regarding the alleged vaginal trauma to JG-1999 to be highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

B.    Did you have a strategic or tactical reason for not cross-examining Dr. Rouse regarding the conclusions in her autopsy report ("The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic**" – i.e., that there was <u>no</u> vaginal trauma to JG-1999) in an effort to challenge Dr. Benton's conclusions?

C.    Did you have a strategic or tactical reason for failing to call Dr. Rouse as a defense witness to testify about her autopsy results and her conclusion that there was <u>no</u> vaginal trauma to JG-1999?

D.    Did you have a strategic or tactical reason for failing to call your own expert to review the autopsy results and testify that the post-mortem examination of JG-1999 revealed <u>no</u> vaginal trauma, particularly in view of the disagreement between Benton and Rouse on this point?

E.    Did you have a strategic or tactical reason for failing to cross-examine Dr. Benton to challenge his testimony that the autopsy revealed vaginal trauma by using Dr. Rouse's actual autopsy report which indicates that there was <u>no</u> vaginal trauma to JG-1999.

56

USCA5 1419

Given counsels' attempt to argue that there was no evidence of sexual abuse, counsels' strategy was clearly to refute and limit the impact of this extremely gruesome and prejudicial evidence. Counsel, however, presented <u>no</u> evidence to support his argument and could have had no reasonable tactical or strategic basis for failing to elicit Dr. Rouse's findings to refute the "semen" and vaginal trauma evidence.

Nevertheless, as the Government concedes, at a minimum, an evidentiary hearing is required on this issue. *RA*, 142 ("'the lack of any response by trial defense counsel regarding their tactical decisions may well warrant an evidentiary hearing").

## B. Prejudice.

The Government asserts that Petitioner was not prejudiced by counsels' deficient performance because there is no reasonable probability of a different outcome had counsel presented the evidence that no semen was present and there was no evidence of trauma to JG-1999's vagina. *RA*, 125-27. Again, the Government is wrong.

Obviously, the evidence of sexual assault upon this child was highly inflammatory. All things being equal, this evidence would have understandably

---

See *Petitioner's Interrogatories Directed to Douglas Tinker*, Esq., pages 6-7, included in *SSA* as document # 72.

57

turned any jury against Petitioner. However, in addition to the obvious inflammatory nature of this evidence, it caused specific damage to Petitioner's trial defense. Petitioner's trial theory attempted to show that Robin was the perpetrator. See e.g. TT 3/16/04, 34 (defense closing argument) ("I think you have the right to wonder whether Robin Bourgeois committed these acts against this child"); id. at 35 ("I just want to make it clear. Mr. Tinker and my position is that Alfred Bourgeois did not kill this child"); id. at 38 ("And she – by the way, in the first – the first – the CPS interview, [AB-1994] said that her mother [Robin] came up with the idea of lets put the baby down and say she fell out of the truck"); id. at 40 ("Robin Bourgeois is the one who has, as Mr. Tinker told you, the motive. The motive for killing this baby"). This theory was obliterated by the allegations of sexual assault and presence of semen, which could only have been perpetrated by Petitioner as the only male with access to the child. Thus, the semen/sexual assault evidence all but doomed Petitioner's defense.

The unrebutted evidence of semen and sexual abuse was also highly prejudicial in the penalty hearing. Again, in addition to the generally inflammatory and highly prejudicial nature of such evidence, it also supported the statutory aggravating circumstance that the killing was committed in a heinous, atrocious or depraved manner. 18 U.S.C. § 3592(c)(6). This evidence was specifically used by the

58

Government as a basis for arguing in favor of the death penalty, TT 3/24/04, 70; 75-76, (e.g., "Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body**").

Finally, in addition to its support for a specific aggravating circumstances, any reasonable jury would have weighted this evidence in its deliberative weighing process. See 18 U.S.C. § 3593(e) (jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death"). Thus, as a result of trial counsels' ineffectiveness, the jury was left to weigh unrebutted, inaccurate, false and highly inflammatory evidence when deciding if Mr. Bourgeois should live or die. This constitutes prejudice, no ifs, ands or buts.

The Government's reliance on Burton v. United States, 237 F.3d 490 (5ᵗʰ Cir. 2000) is misplaced. *RA*, 126. In Burton, the defendant, who was convicted of drug conspiracy charges, alleged that trial counsel was ineffective for failing to present evidence that the lease to a Rolls Royce, alleged to be his, was actually in his sister's name. Burton, 237 F.3d at 494. Evidence of the defendant's guilt included undercover purchases of cocaine, camera surveillance, wiretapping, a paid confidential informant, id. at 491, and six cooperating co-conspirators with direct

59

USCA5 1422

knowledge of the defendant's responsibility for supplying crack cocaine. Id. at 494. Under these circumstances, the Court found that the evidence of guilt was so strong that "there was no reasonable probability that production of the lease would have affected the outcome of [the defendant's] trial." Id. Moreover, the Court concluded that because the evidence of guilt was so overwhelming, "trial counsel could have reasonably concluded that the lease documents would not have undermined the prosecution's case..." Id. Last, Burton found that the unpresented lease documents were partially incriminating and thus, counsel could not be ineffective for failing to present evidence that could incriminate their client, especially where that evidence was cumulative of other admitted evidence. Id.

Petitioner's case is vastly different. Whereas the unpresented evidence in Burton was only a small part of a far larger inculpatory picture, the semen/sexual assault evidence against Petitioner played a far more significant role. It all but determined the identity of the killer. And, quite apart from that point, it had to have improperly turned the jury against Petitioner in all other respects. See *P-Mem*, 49-52 (discussing prejudice); Soffar, 368 F.3d at 478 ("[a] reasonable probability need not be proof by a preponderance that the result would have been different, but it must be a showing sufficient to undermine confidence in the outcome") (quoting Williams v. Cain, 125 F.3d 269, 279 (5th Cir. 1997)). For these reasons, the Government's

60

USCA5 1423

attempt to distinguish <u>Soffar</u> (*RA*, 126) ("[a]pplying <u>Burton</u> and <u>Soffar</u> requires an analysis of how important the evidence of the semen was to Petitioner's conviction for murder and sentence") on the grounds that the unpresented expert evidence rebutting the presence of semen or vaginal trauma would not have affected the outcome of this case, is also unavailing.

The palpable prejudice arising from the evidence in this case, which distinguishes it from <u>Burton</u>, is evidenced by trial counsels' unsuccessful attempts to argue that there was no evidence of semen or sexual assault. <u>See</u> TT 3/16/04, 24, 41-43; *P-Mem* at 37-39. However, while recognizing the importance of rebutting this evidence, counsel, in this case, failed to present any evidence to support his argument of no semen or vaginal/rectal trauma.

## C.    Conclusion.

This is not even a close issue of counsels' ineffectiveness. Counsel was faced with devastatingly prejudicial evidence of sexual assault. They tried to argue against it, but their argument was not permitted (properly) because they had elicited no evidence to support it. Yet, counsel could have presented expert testimony establishing that there was no scientific evidence to support the semen/sexual assault evidence. <u>See</u> *PA*, document # 49 (3/1/04 report of Dr. Johnson); *SPA*, document #

61

64 (Declaration of Elizabeth Johnson, Ph.D); *SPA*, document # 65 (Report of Forensic Science Associates). Counsel could have presented expert testimony indicating that if the substance recovered from the rectal swab of JG-1999 was semen, sperm should have been observed. Id. Counsel could have presented evidence that despite multiple tests, no sperm were ever observed in this case. Id. Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, false positives are not uncommon in the test used by the Government to allegedly identify the substance as semen. Id.[27] Counsel could have presented expert testimony indicating that, contrary to the testimony at trial, the P30 protein used to identify the alleged semen, has been detected in multiple male and female bodily fluids. Id. Counsel could also have presented expert testimony indicating that, contrary to the testimony at trial, there was no evidence of trauma to the vagina or rectum of JG-1999. Id. None of this extremely significant, exculpatory, and readily available evidence was presented to the jury that convicted Petitioner and sentenced him to death.

---

[27]Again, as Dr. Johnson would have testified, contrary to the Government's assertion, RA at 127, the existence of a false positive does not confirm the presence of semen. See Declaration of Elizabeth Johnson, Ph.D., *SPA*, document # 64, *PA*, document # 49 (3/1/04 report of Dr. Johnson). Hence the term "false positive."

62

USCA5 1425

CLAIM V.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING
TO LITIGATE A DAUBERT MOTION CHALLENGING THE SCIENTIFIC
AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. SENN AND
DR. CHRZ CONCERNING THE BITE MARK EVIDENCE AND THE
DIGITAL ENHANCEMENTS OF THE BITE MARK PHOTOGRAPHS AND
FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT
TRIAL.

The Government's bite mark experts, Dr. Senn and Dr. Chrz, formed their

opinions and testimony based upon deeply flawed and unreliable images that were

created from the original autopsy photographs. They also utilized untested and

invalid odontological identification methods. Based on their unreliable and incorrect

testimony, the prosecutor argued that Petitioner had left his "signature with his teeth

marks" on the decedent. TT 3/24/04, 7. Trial counsel did nothing to preclude this

evidence or to rebut it once it was admitted. Counsel was ineffective, Petitioner was

prejudiced and a new trial and penalty hearing are mandated.

The Government first argues that a Daubert challenge to this testimony would

have been "misplaced" because the enhancement techniques utilized by Dr. Oliver are

sound and are not the type of "scientific" or "medical" evidence that would normally

be challenged under Daubert. *RA,*128. Specifically, the Government argues that Dr.

Oliver's use of "adaptive histogram equalization" was and is widely accepted. Id. at

129. The Government is wrong. Reliance by forensic odontologists on the enhanced

images created by Dr. Oliver falls squarely within the gate-keeping parameters of

63

USCA5 1426

Daubert and, more important, his methods fail to meet the Daubert standards.

The National Academy of Sciences ("NAS") in its recent comprehensive study

on forensic science, *Strengthening Forensic Science in the United States: A Path*

*Forward* (hereafter, *NAS Report*) (copy attached as *SSA*, document # 75) devoted an

entire section of its report to forensic odontology.[28] The NAS specifically addressed

---

[28]As stated on its website, the National Academy of Sciences is the leading governmental entity charged with responsibility for investigating and reporting on the leading scientific issues of the day:

The National Academy of Sciences (NAS) is an honorific society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare.

The NAS was signed into being by President Abraham Lincoln on March 3, 1863, at the height of the Civil War. As mandated in its Act of Incorporation, the NAS has, since 1863, served to "investigate, examine, experiment, and report upon any subject of science or art" whenever called upon to do so by any department of the government. Scientific issues would become even more contentious and complex in the years following the war. To keep pace with the growing roles that science and technology would play in public life, the institution that was founded in 1863 eventually expanded to include the National Research Council in 1916, the National Academy of Engineering in 1964, and the Institute of Medicine in 1970. Collectively, the four organizations are known as the National Academies.

Since 1863, the nation's leaders have often turned to the National Academies for advice on the scientific and technological issues that frequently pervade policy decisions. Most of the institution's science policy and technical work is conducted by its operating arm, the

64

USCA5 1427

reliance on computer enhanced photographs, digitalization and histology as aides in

analyzing bite marks – and found this practice wholly lacking in scientific reliability.

---

National Research Council, created expressly for this purpose. These non-profit organizations provide a public service by working outside the framework of government to ensure independent advice on matters of science, technology, and medicine. They enlist committees of the nation's top scientists, engineers, and other experts, all of whom volunteer their time to study specific concerns. The results of their deliberations have inspired some of America's most significant and lasting efforts to improve the health, education, and welfare of the population. The Academy's service to government has become so essential that Congress and the White House have issued legislation and executive orders over the years that reaffirm its unique role.

The Academy membership is composed of approximately 2,100 members and 380 foreign associates, of whom nearly 200 have won Nobel Prizes. Members and foreign associates of the Academy are elected in recognition of their distinguished and continuing achievements in original research; election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer. The Academy is governed by a Council consisting of twelve members (councilors) and five officers, elected from among the Academy membership. Dr. Ralph J. Cicerone is the president of the National Academy of Sciences.

See NASonline.org (last visited June 24, 2009).

In 2005 Congress, recognizing that significant improvements are needed in forensic science, directed the NAS to evaluate the state of forensic science in this country.  P.L. No. 109-108, 119 Stat. 2290 (2005). The NAS  – as a result of this congressional directive – conducted the most comprehensive study of forensic science ever attempted.  This study was completed and the report entitled "Strengthening Forensic Science In The United States: A Path Forward" was published in March 2009.

65

USCA5 1428

The "adaptive histogram equalization" techniques used by Dr. Oliver fall squarely within the practices reviewed and discredited by the NAS.

The NAS noted that the American Board of Forensic Odontology ("ABFO") lists a large number of methods for analysis of bite marks including computer enhancement and/or digitalization of bite marks and histology. *NAS Report* at 5-35. The NAS found that the ABFO guidelines "do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what degree of probability." Id. at 5-35-36. The NAS also found that "there is no science on the reproducibility of the different methods of analysis that lead to the conclusions about the probability of a match." Id. at 5-36. The NAS concluded that even when following the ABFO guidelines "different experts provide widely differing results and a high percentage of false positive matches of bite marks using controlled comparison studies."[29] Id.

The problems with the reliability of forensic odontology evidence, identified by the *NAS Report*, were exactly the problems Petitioner's experts identified in *Petitioner's Motion*. Specifically, the scientists at Cherry Biometrics found that the

---

[29]This exact problem was identified by Petitioner's forensic odontology expert, Dr. C. Michael Bowers, in his report appended to *Petitioner's Motion*. See *PA, document # 42 at pp 7-9.*

USCA5 1429

techniques utilized by Dr. Oliver were not generally accepted, they were not regulated and they had not been tested nor peer reviewed. *PA*, ¶¶ 161-165. Defense expert, Dr. C. Michael Bowers – whose publications were cited with approval in the *NAS Report* – also warned that Dr. Oliver's enhancement techniques were not supported by a scientific or a technical foundation – the only controls being the "operator's subjectivity." Id. at ¶170.

Petitioner knew this to be true when he pled his claims, and now the most respected government funded and endorsed scientific body – the NAS – has clearly and unequivocally examined and found deficiencies in numerous aspects of the current forensic odontology practice – including reliance on the very type of image enhancement techniques utilized by Dr. Oliver. Furthermore, all of these problems existed at the time of Petitioner's trial. The Government simply cannot credibly argue – as it attempts to do here – that the use of computer enhancements, digitalization and histology techniques like the ones created by Dr. Oliver and utilized here by Dr. Senn and Dr. Chrz do not fall within Daubert's coverage. Reliance by Dr. Chrz and Dr. Senn on Dr. Oliver's enhancement techniques not only fall squarely within the gate-keeping parameters of Daubert, they clearly fail to meet the Daubert requirements for reliability.

The Government also argues that Dr. Chrz "merely looked at the images of Dr.

67

USCA5 1430

Oliver but did not rely upon them for his analysis" but instead relied upon the original autopsy photographs and suggested bite mark guidelines from the ABFO in arriving at his conclusions. *RA*,129. These back tracking assertions do not save Dr. Chrz's scientifically unreliable and erroneous testimony.

There is no dispute that both Dr. Senn and Dr. Chrz utilized the enhanced images created by Dr. Oliver in their trial testimony, as acknowledged by the Government. In discussing Dr. Oliver's enhancements the Government states they were "part of what Dr. Senn and Dr. Chrz utilized in making their analysis." *RA*,128. Why does the Government say in one breath that Dr. Chrz did "utilize" the enhancements and Dr. Chrz in the next breath says he did not "utilize" them? Dr. Chrz' qualification of his testimony – now insisting that he merely looked at the images but did not use them to form his opinion – leads one to wonder: If Dr. Oliver's enhancements are so reliable and accurate, why does Dr. Chrz now attempt to distance himself from them?

With respect to Dr. Senn, the Government also avers that he did not utilize the enhancements but rather that he too looked at the images but relied only on the original photographs. *RA*, 129 n. 35. This qualification is even more curious than the qualifications with regard to Dr. Chrz, since Dr. Senn specifically testified that the enhancements helped him to view the bite marks. TT 3/8/04, 249. Dr. Senn,

68

however, has still not submitted a report confirming his non-reliance on the images.

In any event, even if one assumes that the Government's experts "looked at" but did not "rely" on Dr. Oliver's work, the *NAS Report* unequivocally states that compliance with the ABFO guidelines does not ensure an accurate and reliable analysis. The NAS specifically found that the ABFO guidelines "do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what degree of probability." *NAS Report* at 5-35-36. The NAS also found that, "If a bite mark is compared to a dental cast using the guidelines of the ABFO, and the suspect providing the dental cast cannot be eliminated as a person who could have made the bite mark, there is not established science indicating what percentage of the population or subgroup of the population could also have produced the bite." Id. at 5-36.

This is exactly what Dr. Chrz did here. He compared a dental cast of Petitioner's dentition and determined that he was the probable biter. TT 3/08/04, 311. And this is exactly what Petitioner's experts and now the NAS say is not supported by science – now, or at the time of Petitioner's trial. The NAS specifically concluded that *no scientific studies* support the conclusion that forensic odontologists can make an identification based on a bite mark – regardless of whether the ABFO guidelines were followed. *NAS Report* at 5-37.

69

Here again, the NAS is in complete accord with the opinion of Petitioner's odontological expert, Dr. Bowers. Even before the publication of the *NAS Report*, Dr. Bowers stated: "the validity, reliability and accuracy of bite mark identification have not improved to the point where it should be used as he sole means of identifying the biter." *PA*, document #42. Furthermore, Dr. Bowers noted that "odontologists identifying a specific biter or probable biter via teeth marks are not rendering a reliable opinion." Id.

Dr. Chrz also belatedly attempts to clarify his testimony by now stating he did not identify "a particular individual but rather which of the suspects most likely inflected (sic) the patterned injury." See *RA*, Attachment J. This statement is simply untrue. Dr. Chrz testified that Petitioner was the probable biter. TT 3/08/04, 311.

The Government next argues that defense counsel did effectively prepare to meet this evidence since Mr. Tinker met and interviewed Dr. Oliver, Dr. Senn and Dr. Chrz, and had an expert review the evidence. RA,130. The only expert Petitioner is certain that Mr. Tinker met with prior to trial was Dr. Senn.[30] He did not meet with Dr. Oliver prior to trial. If he retained an expert – and Mr. Tinker only said he

---

[30]Since Mr. Tinker is deceased, the only way to conclusively determine the experts seen by Mr. Tinker is to obtain this information from the Government's experts. Petitioner will make this request in his to-be-filed motion for discovery.

70

USCA5 1433

believed he did but could not remember the person's name – he certainly did not provide that expert with the materials necessary to provide a reliable opinion. The record in this case is clear; Mr. Tinker was woefully unprepared to challenge this expert evidence.

Mr. Tinker was provided, pretrial, with a compact disc containing all of the enhanced images – including the enhanced bite mark images. PTT 3/20/03, 13-14. Despite being unfamiliar with digitally enhanced images ("I want to see how its done"; "I don't understand it"; "I've never seen it") (TT 3/8/04, 15), Mr. Tinker never even looked at the enhancements until mid-trial, just moments before Dr. Oliver was going to testify before the jury. Id. at 15, 18. Incredibly, counsel advised the court that he was not pursuing a Daubert challenge – before he even saw the enhancements. Id. at 14-15.

When counsel was given the opportunity by the trial court to cross-examine Dr. Oliver – concerning his enhancement methodology – he asked if anyone else in the country "do[es] this kind of thing" and when that question was answered in the affirmative, counsel withdrew the question. Counsel did not ask a single question relevant to the Daubert reliability factors. Had counsel conducted even a cursory investigation into the methods used by Dr. Oliver, the defense could have precluded the admission of the enhanced photographs, as well as the opinions of Drs. Senn and

71

USCA5 1434

Chrz.

The Government argues that trial counsel did not take " a wholly unreasonable approach" in simply arguing that the opinions of Drs. Senn and Chrz do not identify Petitioner as the biter – since the opinions simply ruled out two of the family members. *RA,*131-32.  This argument flies in the face of the evidence introduced at trial *by the Government.*  Dr. Chrz – relying on scientifically unsound and unreliable methods – testified that Petitioner was the "probable" biter.  TT 3/08/04, 311.  This testimony could not be rebutted by simply arguing that he did not identify Petitioner – since he, in effect, did so.

In an opinion issued just yesterday, the Supreme Court highlighted why counsel were ineffective in this case for failing to subject the Government's highly subjective and unreliable science to adversarial testing. In Melendez-Diaz v. Massachusetts, — U.S. —, 2009 WL 1789468 (June 25, 2009), the Court held that a criminal defendant has a Sixth Amendment right to confront lab technicians who conduct forensic analyses.  In so holding, Justice Scalia, writing the for the Majority, noted that:

> Nor is it evident that what respondent calls "neutral scientific testing" is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation . . . Serious deficiencies have been found in the forensic evidence used in criminal

72

USCA5 1435

trials.    One commentator asserts that "the legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics.

Melendez-Diaz, 2009 WL at * 8.[31]

There is no question that this inflammatory and inaccurate bite mark evidence was devastating to the defense at both the guilt and penalty phases of trial. The prosecutors urged the jury to consider bite mark evidence to convict Petitioner in both their opening and closing statements.  TT 3/2/04, 30-31, 34, 42,  TT 3/16/04, 19-20, 48-49.    The Government also utilized the bite mark evidence extensively in its closing arguments at the penalty stage in urging the jury to sentence Petitioner to death.  See TT 3/24/04, 37, 41, 70, 76 (prosecutor arguing for death because "[h]is signature with his teeth marks and his semen is all in that baby").

If this inaccurate and unreliable bite mark testimony failed to point the finger at Petitioner – as the Government now contends – then the Government's arguments were improper: is the Government now saying that it went too far when it argued that Petitioner left his *signature with his teeth?*

Finally, the Government argues that trial counsel acted reasonably in not calling Dr. Dailey since his testimony would have "simply been" that he was "unable

---

[31]Justice Scalia also approvingly cited the *NAS Report*.  Id.

73

USCA5 1436

to exclude or include any of the potential biters" and would not have had any "ascertainable impact on the opinions of Dr. Senn and Dr. Chrz." RA,132. This argument is wanting. Dr. Dailey concluded that he could not "exclude" Petitioner, Robin or AB-1994. Dr. Senn and Dr. Chrz both concluded that they could exclude Robin and AB-1994 – leaving Petitioner as the only possible biter. TT 3/08/04, 245, 311. Dr. Dailey directly contradicts Dr. Senn's and Dr. Chrz' exclusion of Robin and AB-1994,which is why the Government did not call him and exactly why defense counsel should have called him.

Furthermore, had counsel called Dr. Dailey they would have been able to present testimony that AUSA Booth told Dr. Dailey that if he could not help her she would go out and find an expert who could. *PA*, document # 45. Dr. Dailey could have refuted Ms. Booth's misleading argument that AB-1994 was excluded as the source of the bite marks and that the jury did not hear any evidence of expert "shopping." TT 3/16/04, 19-20. AUSA Booth knew when she made that argument that she had consulted more than one expert and that the first expert she retained (Dr. Dailey) had not excluded Robin or AB-1994 as a possible biter. Nonetheless, she was able to make her "no expert-shopping" argument because counsel failed to present the testimony of Colonel Dailey, DDS.

74

**CLAIM VI.  TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO LITIGATE A <u>DAUBERT</u> MOTION CHALLENGING THE SCIENTIFIC AND TECHNICAL RELIABILITY OF THE OPINIONS OF DR. OLIVER CONCERNING THE DIGITALLY ENHANCED AUTOPSY PHOTOGRAPHS AND FOR FAILING TO OBJECT TO THEIR ADMISSIBILITY AND FOR FAILING TO REBUT THIS EVIDENCE ONCE IT WAS ADMITTED AT TRIAL.**

Dr. William Oliver testified as a Government witness using digital enhancements that he had created from the autopsy photographs.  Dr. Oliver described a multitude of injuries that were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy.  Relying on Dr. Oliver's enhanced images, the prosecutor argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries.  The methods used by Dr. Oliver were scientifically and technically invalid and trial counsel were ineffective for failing to litigate a <u>Daubert</u> motion to preclude this evidence and for failing to rebut it once it was admitted.

The Government first argues that Petitioner's objections to Dr. Oliver's testimony only go to the weight of the evidence and therefore "under Rule 104(e); it would not render the evidence inadmissible." *RA*, 132.  This is incorrect.  Dr. Oliver

75

was offered as an expert in the field of forensic pathology and forensic imaging, TT 3/8/04, 191, and accordingly, this Court had a duty to act as a gatekeeper under Daubert, to keep unreliable science from the jury. Daubert analysis, as this Court well knows, is qualitatively different from admitting evidence for whatever worth the fact finder may give it. Given the Government's insistence that Petitioner's experts be subjected to the "rigors" of Daubert *RA*, 69 (which Petitioner is happy to do), one would expect the Government to appreciate the difference.

The Government next argues that a Daubert motion would have been denied since "adaptive contrast enhancement" is the subject of many peer-reviewed articles and has been in use in the medical field for over 20 years. *RA*, 132-33. In making this argument the Government relies upon a letter from Dr. Oliver wherein he alleges that he did a "quick search" of "adaptive contrast enhancement" in the search engine SCIRUS and located 115 peer-reviewed journals and another search on MEDLINE and found 31 peer-reviewed articles. See *RA*, Attachment I. This argument is nothing more than misdirection.

Petitioner has not challenged the **general use** of adaptive contrast enhancement – the Government and Dr. Oliver are well aware of this. Petitioner has challenged the specific techniques used by Dr. Oliver in this case to create enhancements from autopsy photographs of external injuries. Specifically, Dr. Oliver employed the

76

Contrast-Limited Adaptive Histogram Equalization contrast enhancement method. TT 3/8/04 at 19. He admitted that **he** picked the range of parameters to be used to redistribute the colors and **he** chose colors that in his opinion represented contusions (orange), whip marks (yellow), and scars (light blue). Id. at 22, 24-5. He also admitted that it was very important when analyzing the newly created images to go back to the original photographs to make sure there were no artifacts and that "your" clinical judgment is correct. TT 3/8/04, 13-14. Finally, in describing his ability to identify bruises he conceded "it all sort of boils down to whether you are a lumper or a splitter." Id. at 28.

Not surprisingly, Dr. Oliver's "quick search" fails to unearth a single article – peer-reviewed or otherwise – that discusses his prohibitively subjective techniques. He cannot cite to such an article because none exist. Yet, Dr. Oliver indignantly argues that a challenge to his methods is the equivalent of a challenge to the "fundamental practice of forensic pathology." *RA*, Attachment I at 4. Dr. Oliver doth protest too much. Simply put, Dr. Oliver's methodology has never been peer reviewed and this prong of Daubert cannot be satisfied. That said, it really is extraordinary that trial counsel neglected to mount a Daubert challenge for a scientific opinion that at the time had yet to be peer-reviewed, and which remains so today.

USCA5 1440

Next the Government argues that Dr. Oliver "claims" that his "methodology has withstood a <u>Daubert</u> challenge." *RA*, 133.  In making this "claim" Dr. Oliver cites to three cases but concedes that he is "no lawyer and can't competently discuss the legal aspects of them."  *RA*, Attachment I at 2.  Dr. Oliver's "claim" is misleading.

At the time of Petitioner's trial no court had found that Dr. Oliver's methods and techniques met the <u>Daubert</u> requirements.  Only two of the three cases cited by Dr. Oliver took place prior to Petitioner's trial (<u>State v. Jones</u> (2000) and <u>State v. Bagwell</u> (1999)) and neither case involved a <u>Daubert</u> challenge.  Simply put, a <u>Daubert</u> challenge was not raised, litigated or ruled upon in these two cases.  These two cases are legally irrelevant.

In the third case relied upon Dr. Oliver, <u>North Carolina v. Delgado</u>, the trial took place in June 2008.  In <u>Delgado</u> a limited objection was raised concerning only certain aspects of the methodology utilized by Dr. Oliver.  The objection neither cited nor relied upon the <u>Daubert</u> factors and it specifically did not challenge the technical aspects of Dr. Oliver's methods.  In response to the <u>Delgado</u> court's question as to why he (Dr. Oliver) believed his methods were generally accepted in the forensic community, Dr. Oliver averred that his methods had been peer-reviewed and he had been permitted to testify in courts on prior occasions.  This answer was misleading as Dr. Oliver cannot identify a single article wherein his methods of image

78

USCA5 1441

enhancement have ever been peer reviewed.  Further, Dr. Oliver failed to inform the

Delgado court that Daubert challenges had not been raised and ruled upon in the

proceedings where he had testified previously.  Dr. Oliver was permitted to testify in

Delgado, however, the appeal in this matter is presently pending.  Dr. Oliver's

misleading statement proffered herein by the Government only casts additional doubt

as to the veracity and reliability of his opinions.

Next the Government and Dr. Oliver take issue with the credentials of

Petitioner's expert in forensic odontology, Dr. C. Michael Bowers.  Specifically, the

Government (based on Dr. Oliver's accusations) alleges that "Dr. Bowers does not

appear to have the proper training in image processing and notes that he (Dr. Oliver)

has an MS in Computer Science with a concentration on medical image processing."

*RA*, 133.  This Court will decide which expert witness is reliable.  Petitioner notes,

however, that the NAS agreed with each and every problem that Dr. Bowers raised

regarding Dr. Oliver's enhancements in this case.  Furthermore, the *NAS Report*

specifically relied upon and cited to publications by Dr. Bowers.

The Government next argues that Dr. Oliver's opinions and his testimony were

proper because he always went "back to the original image" in forming his opinions.

*RA*, 133. Unfortunately, Petitioner's jury did not have the same option as Dr. Oliver

– to go back to the original photographs.  Dr. Oliver's jury presentation did not

79

USCA5 1442

include the original photos but instead relied upon extremely distorted images that had been digitized, scanned, compressed and then converted to PowerPoint.  That inconvenient fact, however, did not stop Dr. Oliver from repeatedly representing to Petitioner's jury that they must compare his enhancements to the original photographs. TT 3/08/04, 204, 213, 215, 216, 218.

At the time of trial the Government averred that Dr. Oliver's testimony was being presented to help the jury evaluate and determine the extent and number of the external injuries on the decedent's body.  TT 3/08/04, 192.  Dr. Oliver now insists that his enhanced images were presented in court only as medical illustrations to be used by the jury to make this determination.  See RA, Attachment I at 2, 4-5. Furthermore, at trial when presenting his "illustrations" to Petitioner's jury, Dr. Oliver repeated  that they must look at the original photographs when making their evaluations of the external injuries.  TT 3/08/04, 204, 213, 215, 216, 218.  Dr. Oliver was insistent on this point because he believed an accurate comparison could not be made between enhanced images and anything other than the original photographs. Yet, Dr. Oliver did not present the original photographs to the jury  – instead he concedes, as he must, that he used the digitized images he had scanned, compressed and then converted to PowerPoint.  RA, Attachment I, at 3.

How was Petitioner's jury supposed to make an accurate evaluation and

80

USCA5 1443

determination of the extent of the external injuries on the decedent's body if they were never provided with the original photographs? The answer is simple, they could not and they did not. If reliance on the originals was critical for Dr. Oliver to reach a valid conclusion, it was also critical for the jury to reach a valid conclusion. Unfortunately, the jury was never given this opportunity because Dr. Oliver was allowed to make a presentation that did not include the original photographs and trial counsel were ineffective for failing to litigate a Daubert motion to preclude this limited and misleading presentation.

Dr. Oliver characterizes Petitioner's Daubert challenge as a "contrived attack" on his work. Id. at 2. Yet here again we see Dr. Oliver – like Dr. Chrz and presumably Dr. Senn – insisting that he did not rely on the enhanced images, in any way, in order to form his opinion. The question again must be asked: If these enhanced images were so scientifically reliable and accurate, why then does every Government expert – including the expert who created them – insist they did not rely upon them? And if the enhanced images are not reliable or necessary for the experts to form their opinions, why then were they shown to Petitioner's jury in lieu of the original images?

Petitioner was clearly prejudiced by counsels' inaction. Undersigned counsel provided copies of the original autopsy photographs and the scanned and digitized

81

version of the autopsy photographs to its forensic digital imaging enhancement experts employed with Cherry Biometrics, Inc.   These experts found that the digitized/scanned images – that Dr. Oliver represented to the jury were the original photographs – were "distorted" "inaccurate"  "incomplete" and "over-reaching alterations." *PA*, document # 43.  Furthermore, Dr. Oliver's methods and techniques in digitizing and compressing the original photographs were found to be noncompliant with almost every aspect of Daubert.

The Government next argues that counsel was not "constitutionally deficient for failing to challenge Dr. Oliver's methodology" because counsel "did not believe the Government experts were sufficiently conclusive in their opinions and even found their respective opinions to conflict in some regards."  *RA*, 134.  This argument is meritless.  Dr. Oliver was the only expert (defense or prosecution) that testified to his methodology.  His opinions were presented in completely "conclusive" testimony and his opinions did not conflict with any other expert because no other expert was called to support or rebut his methodology.

Finally, the Government speculates that defense counsel "perhaps understood better than present counsel that Dr. Oliver's conclusions were based upon the original photographs of the autopsy and that his digital images were simply demonstrative aids." *RA,* 134.  This argument ignores the clear record in this case:  trial counsel did

82

USCA5 1445

not "understand" anything about Dr. Oliver's testimony let alone the fact that Dr.

Oliver was basing his conclusions on the original photographs. Had he understood

this, he would have insisted that Dr. Oliver allow the jury to also see the original

photographs. Instead, counsel sat back and allowed Dr. Oliver to "illustrate" for the

jury the external injuries based on a comparison of unreliable and inaccurate image

enhancements and distorted images of the original autopsy photographs that had been

digitized, scanned, compressed and then converted to PowerPoint. Any objective

review of the original photos versus the distorted images the jury actually viewed,

immediately underscores what effective counsel would have done had he actually

appreciated the situation. He would have raised a <u>Daubert</u> challenge and insist that

the jury see the originals.

Furthermore, trial counsel were on notice of the Government's intention to use

enhanced images of the autopsy photographs a full year before trial, and was provided

pre-trial with a compact disc containing all of the enhanced images. PTT 3/20/03,

13-14. Despite being completely unfamiliar with digitally enhanced images, and

despite one year's lead time ("I want to see how its done"; "I don't understand it";

"I've never seen it"), counsel never even looked at the enhancements until mid-trial,

and just moments before Dr. Oliver was going to testify before the jury. TT 3/8/04,

15, 18. Then counsel advised the court that he was not pursuing a <u>Daubert</u> challenge

83

USCA5 1446

— before he even saw the enhancements.  TT 3/8/04, 14-15.

It simply is not possible for counsel to conduct adequate preparation in such a complex area mid-trial.  In a capital case, counsels' failure to prepare in advance and be ready to mount the appropriate gate-keeper challenge is even more egregious. Counsels' failure to review the enhanced images prior to trial precludes any credible argument that he somehow conducted an adequate investigation and acted pursuant to a reasonable strategy.  Indeed, Strickland shows the fallacy of this argument when it cautions that so-called strategic calls are only owed deference when they are made after full preparation and investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsels' judgments.

Strickland, 466 U.S. at 690-91.

Counsels' failure to mount the appropriate Daubert challenge caused Petitioner prejudice in the same way that the semen/sexual assault evidence did.  Based on Dr. Oliver's testimony, the jury was able to conclude that Petitioner caused the victim a

84

USCA5 1447

multitude of injuries – that in reality may not have existed.  Utilizing the enhancements he created, Dr. Oliver identified the following alleged injuries on the decedent:  "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations." TT 3/8/04, 226.  The majority of these "injuries" were not visible on the autopsy photographs and were not testified to by Dr. Rouse, the pathologist who actually performed the autopsy.  Based directly on Dr. Oliver's testimony –  and the enhancements he created –  the prosecutor argued that the sheer number of injuries established the "relentless cruelty" of Petitioner since, she claimed, he would have had to beat the decedent every hour on the hour for 36 straight days to accumulate that number of injuries.  TT 3/24/04, 73.  She also described the decedent's death as a "systematic execution" and a "systematic dehumanization."  TT 3/16/04, 13-14.

This testimony could only have prejudiced the jury against Petitioner as a general matter in both phases of trial.  It doomed his guilt phase defense and unquestionably adversely effected the jury's weighing in the sentencing phase.

85

**CLAIM VII. THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITIONER HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Government failed to disclose to Petitioner powerful impeachment evidence concerning at least three of the four jailhouse informants, Adam Longoria, Orlando Campos and Darrick Moore, who testified against Petitioner at his trial. Specifically, the Government failed to disclose promises and understandings between it and these witnesses that they would receive consideration (favorable treatment in their own criminal matters) in exchange for testimony against Petitioner. Further, each one of these witnesses testified falsely – in response to questions posed by the prosecutor and defense – concerning their understanding of future favorable treatment. The Government's failure to disclose these understandings and its elicitation of, and failure to correct, false testimony violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), Napue v. Illinois, 360 U.S. 264, 269 (1959), and their progeny. See *PM*, 98-109; *P-Mem*, 80-105.

Initially, it is important to note that Petitioner does not impugn the good faith of these prosecutors. After all, decisions about what information a prosecutor is obligated to disclose can be difficult and must be made on a case by case basis. That

86

USCA5 1449

said, regardless of whether the trial prosecutors' actions were intentional or not – and

Petitioner has no reason to believe that these prosecutors intentionally violated

Petitioner's due process rights – Petitioner is entitled to relief.  The prosecutor's

intent, or bad or good faith, is not a factor to be considered.  See *P-Mem*, 84.

Sometimes, in such situations, the potential consideration is implicit and it may

not occur to a prosecutor that she/he is obliged to turn it over to the defense.

Nonetheless, a "prosecutor anxious about tacking too close to the wind will disclose

a favorable piece of evidence" Kyles v. Whitley, 514 U.S. 419, 439 (1995).  This is

particularly so when, as in this case, a prosecutor deals with tacit, future consideration

as opposed to express, written agreements.  The Due Process Clause requires that not

only formal plea agreements with a prosecutor be disclosed, but that informal or

implicit understandings must also be disclosed:

> [E]vidence of any understanding or agreement is relevant to such
> witness' credibility and a jury is entitled to consider it . . . Because it is
> a constitution we deal with, not semantics . . . it makes no practical
> difference whether the understanding is consummated by a wink, a nod
> and a handshake, or by a signed and notarized formal document
> ceremoniously impressed with a wax seal. A deal is a deal.

Rickman v. Dutton, 864 F.Supp. 686, 705 (M.D. Tenn. 1994) (internal quotation

marks and citations omitted).  Cases are legion holding that such implicit, informal,

87

USCA5 1450

wink and nod, handshake-type deals must be disclosed.[32]

_____

[32]See e.g. Douglas v. Workman, 560 F.3d 1156, 1185 -86 (10th Cir. 2009) ("A deal is a deal-explicit or tacit. There is no logic that supports distinguishing between the two"); Bell v. Bell, 512 F.3d 223, 233 (6th Cir. 2008) ("The existence of a less formal, unwritten or tacit agreement is also subject to Brady's disclosure mandate"); Wisehart v. Davis, 408 F.3d 321, 323 (7th Cir. 2005) (if there was a "tacit understanding that if [the witness'] testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge" ... "Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed"); Gilday v. Callahan, 59 F.3d 257, 269 (1st Cir. 1995) (disclosure of "understanding" between defense counsel and prosecutor would have permitted the jury to reasonably infer that, even if the wink and nod deal had not been explicitly communicated to [the witness], he must have been given some indication that testimony helpful to the Government would be helpful to his cause."); Reutter v. Solem, 888 F.2d 578, 582 (8th Cir.1989) ("[t]he fact that there was no agreement ... is not determinative of whether the prosecution's actions constituted a Brady violation requiring reversal.... We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material ... and that petitioner therefore is entitled to relief"); United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986) ("[F]acts which imply an agreement ... bear on [the witness's] credibility and would have to be disclosed"); Brown v. Wainwright, 785 F.2d 1457, 1465 (11th Cir. 1986) ("it is a constitution we deal with, not semantics. The thrust of Giglio and its progeny has been to ensure that the jury knows all the facts that might motivate a witness in giving testimony"); Haber v. Wainwright, 756 F.2d 1520, 1524 (11th Cir. 1985) ("Giglio did not speak in terms of the state's duty to disclose only bona fide enforceable grants of immunity. Its reach extends to any understandings or agreements") (internal quotation marks and citations omitted, emphasis in original); DuBose v. LeFevre, 619 F.2d 973, 978 (2d Cir. 1980) (informal negotiations and witness' belief that prosecutor would "do the right thing" and that a favorable plea deal was "within the realm of possibility" if she testified, constituted an understanding subject to Brady disclosure rule); Bragan v. Morgan, 791 F.Supp. 704, 715 (M.D. Tenn. 1992) (noting that Giglio did not speak in terms of only *bona fide* enforceable agreements); Duggan v. Texas, 778 S.W.2d 465, 468 (Tx. Ct. of Crim. Apps. 1989) (en banc) ("judicially imprudent to attempt to distinguish express agreements between the State and a testifying accomplice from those agreements which are merely implied, suggested, insinuated or inferred").

88

USCA5 1451

## A.    The Improper Suppression of Evidence.

The Government argues that Petitioner is not entitled to relief because he has not established that either the jailhouse witnesses or the prosecutor "knew" the witnesses would be receiving any benefit "directly attribute[d]" to their testimony in this case. *RA*, 88, 89-90.

However, the Government acknowledges that Petitioner has proffered evidence establishing that each of the jailhouse witnesses, in fact, received "some reduced sentence, dropped charges or early release on parole," after their testimony against Mr. Bourgeois. *RA*, 88. The Government also acknowledges that AUSA Booth provided post-trial assistance to the witnesses. Id. ("Petitioner has not produced any reliable evidence establishing that AUSA Booth 'knew' exactly what, if any, benefit would result for her post-trial efforts to assist or help any particular witness"). AUSA Booth has also candidly acknowledged that she provided assistance. See *P-Mem*, 90-91 (discussing AUSA Booth's letter to the Texas state parole board on behalf of Adam Longoria).

Given the witnesses' and the prosecutor's strident insistence at trial that no benefit was promised or bestowed in exchange for their testimony, this evidence alone should entitle Petitioner, at minimum, to an evidentiary hearing. See TT

89

USCA5 1452

3/22/04, 166-67 (testimony of Adam Longoria stating he was promised "not a thing" in exchange for his testimony); TT 3/9/04, 7 (AUSA Booth) ("Adam Longoria is a state prisoner.  We are giving him nothing.  And he knows that we can't give him anything."); TT 3/19/04, 23 ("There's no promises, nothing"); TT 3/22/04, 186-187 (same); TT 3/9/04, 216, 224, 225-26 (testimony of Orlando Campos denying any promises in exchange for his testimony); TT 3/9/04, 7 (AUSA Booth re: Campos) ("we are giving him nothing"); 3/17/04, 57 ("I have promised him nothing"); TT 3/9/04, 203 (testimony of Darrick Moore that he was only "hoping" for a downward departure).

Moreover, the Government ignores Petitioner's proffered evidence of what the witnesses actually "knew" about why they were receiving benefits.  See Affidavit of Adam Longoria, *PA*, Document # 31 ("I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial.  She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole"); Declaration of Kathleen Kaib, *PA*, document # 30 (interview with Orlando Campos indicating that either AUSA Booth or FBI Agent Beckett promised to help him with his sentence after the trial was over);[33] Declaration of Darrick

[33]In determining if a prosecutor's actions are "knowing," actual knowledge by the trial prosecutor is *not* required.  Knowledge of law enforcement personnel

90

USCA5 1453

Moore, *SPA* # 67, ¶¶ 4-5 ("[AUSA Booth] told me if I testified against Bourgeois she

would contact my prosecutor, Lance Duke, and make sure that my sentence was

reduced. I met with Ms. Patti Booth a second time, before I testified against

Bourgeois, and she told me that she had spoken to Lance Duke and they had agreed

to reduce my sentence if I agreed to cooperate against Bourgeois. She also told me

if I did good on the stand she would make sure that sentence I was going to get would

be reduced even further").

Additionally, on May 10, 2007, Petitioner received, via fax from the

Government,[34] a letter from Mr. Longoria to AUSA Booth, stating:

> I'm letting you know that since you have never answered any of my
> letters or have done any of the things that you said you would (one being
> that you were suppose (sic) to write a letter to the Parole Board, which
> you never did) do. I'm going to help them with their case. I haven't told
> them that, but I think I will write them a letter in the next week and let
> them know. I will say that all the testimony I gave at the trial was false
> and I was told what to say by you and the F.B.I. agents that you worked
> with. I did my part and it didn't cost you next to anything and then you
> go and lie and screw me over. Is that how you treat the people that help
> you? You acted like a wole (sic) different person when I was with you.
> Once you got what you wanted, you said to hell with him. You know
> what I'm going to do, I'll wait for a reply from you and if I get none then

---

involved with the prosecution team is attributed to the trial prosecutor. Giglio, 405
U.S. at 154.

[34]Petitioner appreciates the Government's compliance with its ongoing Brady
obligations. See Imbler v. Pachtman, 424 U.S. 409 (1976).

91

USCA5 1454

I'll write them lawyers in Philadelphia and work with them. I'll give you
till the 11th to respond back.

*5/3/07 Letter from Adam Longoria to AUSA Booth*, *SSA*, document # 77. As Mr.
Longoria's letter makes clear, contrary to his trial testimony, **promises were made**
and Longoria's testimony on behalf of the Government was given with the
**expectation** that the Government would fulfill those promises.[35] Moreover,
according to his letter, it appears that Mr. Longoria provided **false** testimony on
behalf of the Government in exchange for promised benefits. Id.

Nonetheless, the Government attempts to minimize the significance of its
undisclosed promises to witnesses by asserting that even if promises were made, the
prosecutor had no control over any state court proceedings and no control over any
final sentence in federal court. *RA*, 87, 88. This misses the point.

Even if the Government's assertion were true, it is the **witness' expectation**
of some benefit in exchange for their testimony, regardless of whether it is actually
received, that creates the prosecution's Brady obligation. Indeed, this expectation
creates a bias in favor of the prosecution which can be used to impeach the witnesses

---

[35]As we now know, AUSA Booth did write a letter to the parole board on
behalf of Mr. Longoria. See *P-Mem*, 90-91 (discussing AUSA Booth's letter to the
Texas state parole board on behalf of Adam Longoria).

92

USCA5 1455

credibility and thus, the jury is entitled to know about deals, agreements, negotiations with, or expectations of, prosecution witnesses.  See Bagley, 473 U.S. at 683-84 (Brady requires the disclosure of "promises of reward" and "inducements" offered to witnesses); Giglio, 405 U.S. at 154-55 ("evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); Napue v. Illinois, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

In this case, the witnesses were not just "hoping" for a benefit or testifying in exchange for "nothing at all," per their testimony.  On the contrary, the witnesses **expected** and **knew** that efforts would be made on their behalf in exchange for their testimony.  The Government was obliged to disclose this information.

Moreover, any assertion that the recommendation of a respected federal prosecutor has no impact on a state or federal court proceeding is hard to accept and is belied by Petitioner's proffered evidence.  See *P-Mem*, 90 (discussing Adam Longoria's reduction of sentence from a possible 25-99 years to 7 years based on

93

USCA5 1456

AUSA Booth's conversation with state prosecutor James Sales);[36] id. at

---

[36]The Government asserts that Adam Longoria's March 28, 2004 letter to FBI agent Beckett wherein he states that "you all owe me nothing," "entirely undermines" Mr. Longoria's recent affidavit. See RA, 90; RA, Attachment H. However, read in conjunction with his post-conviction affidavit, PA document # 31 and the Declaration of his attorney, Bill May, PA, document # 32, Longoria's statement to FBI agent Beckett can easily be interpreted to read "you all owe me nothing," other than what was previously agreed. That Mr. Longoria was seeking **additional** help from the prosecution to see his new baby is supported by the recent declaration of Jennifer Lee Valdez, his ex-wife who states:

> On January 10, 2003 Adam Longoria and I got married while he was still in the county jail. He got out of jail a few months later and in late May I found out I was pregnant.
>
> Two days after I found out I was pregnant Adam Longoria got locked up for bank robbery.
>
> I had my baby on January 21, 2004. Adam was still in jail when the baby was born.
>
> Detectives on his bank robbery case told me he was a liar and that he had lied to me
> about many things.
>
> Adam constantly told me that he was facing twenty-five to ninety-nine years but that he had worked out a deal with the prosecutor to get no time in jail at all.
>
> I remember he told me he and his lawyer had worked with the prosecutor on a deal to get him no jail time at all instead of the twenty-five to ninety-nine years he was facing.
>
> He constantly told me on the phone and in letters how he was working on this deal so that he could get out of jail and also so that he could hold the baby.

94

USCA5 1457

92 (discussing Orlando Campos' parole from state prison after serving less that 3 years on a 12 year sentence when he was promised help from AUSA Booth or FBI agent Beckett); id. at 94 (discussing Darrick Moore's reduction of sentence from a possible 151-188 months to 50 months after AUSA Booth spoke with AUSA Lance Duke).[37]

The Government also argues that the failure to disclose Adam Longoria's use of anti-psychotic drugs did not violate Brady because prosecutors may not have known about it, and this was not a "benefit" bestowed on Longoria. *RA*, 90-91. The Government, however, ignores the affidavit of Mr. Longoria wherein he specifically states that he was on anti-psychotics and Paxil at the time of his involvement in this case and that "[**AUSA**] **Patti Booth knew about the medication I was on.**" See

---

A couple years, when I was dating another guy, this other guy made me throw out Adam's letters.

Affidavit/Declaration of Jennifer Lee Valdez, *SSA*, document # 76. At a minimum, Longoria's Letter to Agent Beckett, his recent affidavit and the declarations of Bill May and Jennifer Valdez show that material facts are in dispute and an evidentiary hearing is required.

[37]The Government does not dispute the veracity of Mr. Moore's declaration wherein he indicates that his sentence was reduced based on an agreement between AUSA's Booth and Lance Duke. See *RA*, 88 & n. 32; Declaration of Darrick Moore, *SPA* # 67, ¶ 5.

95

USCA5 1458

Affividavit of Adam Longoria, *PA*, document # 31.[38]

Evidence of Longoria's use of anti-psychotic medication was directly relevant to his memory; ability to recall information; ability to perceive information, conversations and events; ability to accurately relay information; and, overall credibility. Thus, regardless of whether it was a benefit bestowed by the Government, the prosecution was obliged to disclose its knowledge of Mr. Longoria's use of anti-psychotic medication and mental state at the time of trial. See *P-Mem* at 89-90.[39]

### B.    Materiality.

---

[38]Anti-psychotic medications such as Clozapine and Risperidone are used to treat schizophrenia, schizoaffective disorders, substance induced psychosis, personality disorders and affective disorders. *Textbook of Pharmacology* 432 (Alan M. Schatzberg, M.D. & Charles B. Nemeroff, M.D., Ph.D. eds., American Psychiatric Publishing, 3rd ed. 2004). Paroxetine (Paxil) has been approved for the treatment of depression, panic disorder, obsessive-compulsive disorder, social anxiety disorder, generalized anxiety disorder and posttraumatic stress disorder. Id. at 259.

[39]See also Wilson v. Beard, 2006 WL 2346277, *12, *17 (E.D.Pa. Aug. 9, 2006), appeal pending, Wilson v. Beard, No. 06-9004 (3d Cir.) (Brady violation where prosecution failed to disclosed evidence or witness' psychiatric history, including schizophrenia and the use of psychotropic an **anti-psychotic** medications, which counsel could have been used to question the witness credibility including: their perception of reality; ability to observe; memories; and ability to tell the truth); United States v. Perdomo, 929 F.2d 967, 971-72 (3d Cir. 1991) (Brady violation where prosecution withheld evidence of witness' prior convictions and psychiatric problems; "Such information would have been critical in presenting the witness' mental state, demeanor and behavior to the jury, and in questioning the witness' credibility"); Chavis v. North Carolina, 637 F.2d 213, 224-25 (4th Cir. 1980) (Brady violation where prosecution withheld evidence of witness' mental health problems).

USCA5 1459

The Government contends that Petitioner cannot meet the "demanding" legal standards to establish the materiality of the Brady violations. *RA*, 87.  Respondents greatly overstate this burden.  See *P-Mem*, 85-87 (discussing materiality).

Moreover, where, as here, the prosecutor knowingly permits less-than-true information to be conveyed to the jury, an even more defense-friendly materiality standard applies, *P-Mem*, 100-01.  Under these circumstances, the proper materiality standard is that of United States v. Bagley, 473 U.S. 667, 678-79 & n.9 (1985), United States v. Agurs, 427 U.S. 97, 103 (1976) and Giglio v. United States, 405 U.S. 150, 154 (1972), which requires the Government to show that the error is harmless

97

USCA5 1460

beyond a reasonable doubt.[40]  Petitioner has met his burden.[41]

The Government states that it is "somewhat difficult to ascertain whether Petitioner is raising a separate claim with regard to alleged false testimony as it is so closely tied to the Brady violations."  RA, 91-92.  But, the presentation of false testimony creates a separate ground for relief from Petitioner's Brady claim. Compare *P-Mem*, 100-01, Claim IV, Section E ("The Government Knowingly Permitted the Use of False Testimony.  In addition to suppressing the disclosable evidence, the Government failed to correct the informants' false testimony"); with *P-*

---

[40]See also Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to Brady claims and claims that the prosecution has knowingly used perjured testimony or false evidence.... If the prosecution has knowingly used perjured testimony or false evidence, the standard is considerably less onerous: the conviction 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict...'" 992 F.2d at 497 (quoting Bagley, 473 U.S. at 682 (1985); Braun v. Powell, 227 F.3d 908, 920 (7th Cir. 2000) ("when the prosecutor knowingly relies on false testimony, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury") (quoting Agurs, 427 U.S. at 103 and noting that "the Agurs standard . . . sets a lower threshold for determining materiality")); United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting Agurs) (when the prosecutor knowingly conveys false information to jury, falsehood is material "if there is any reasonable likelihood" it "could have affected the judgment of the jury," requiring the State to show "harmless[ness] beyond a reasonable doubt").

[41]Once again the Government has greatly overstated the standard of prejudice. See *RA*, 92 (citing cases from the Court of Appeals for the Fourth Circuit for the proposition that Petitioner must meet a "heavy burden" to prevail on a claim that the prosecutor knowingly presented false testimony).

98

USCA5 1461

*Mem*, 101 ("[m]oreover, as set forth above, Mr. Bourgeois was prejudiced by improper admission of the false testimony from the jailhouse informants. Mr. Bourgeois' right to due process was violated. Napue, 360 U.S. at 269").

Evidence of the benefits bestowed on the jailhouse witnesses and Mr. Longoria's mental health problems and use of anti-psychotic drugs should have been disclosed to the defense. This improperly suppressed information was material to the guilt/innocence and sentencing phases of Mr. Bourgeois trial. See *P-Mem,* 95-100 (discussing materiality and prejudice to Petitioner from the Government's non-disclosure). For this reason, the Government's contention that any failure to disclose this evidence was harmless, or immaterial, is wrong. See *RA*, 89, 91. But see *P-Mem*, 95-100 (discussing materiality and prejudice to Petitioner from the Government's non-disclosure).

Moreover, as trial counsel have stated, their strategy included ascertaining "what benefit the [jailhouse witnesses] were receiving from the Government" and attempting to "locate witnesses to impeach their credibility." See *Response Affidavit of John Gilmore, Esq.*, *RA*, Attachment B, pp. 3-4. To impeach the witnesses during cross-examination, trial counsel also "used all the information [they] could obtain." Id.; see also *Respondent's Interrogatories for Douglas Tinker*, *RA*, Attachment A, pp. 19-22. Thus, in assessing materiality, this Court must considers how counsel, who

99

USCA5 1462

sought to "use all information [they] could obtain" to "impeach [the jailhouse

witnesses'] credibility," could have used the suppressed information at trial and

through pretrial investigation and development of other evidence.  See Kyles, 514

U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to

competent counsel would have made a different result reasonably probable"); id. at

441-49 (reviewing ways in which competent counsel could have used and developed

withheld information to impeach prosecution witnesses and undercut police

investigation); Bagley, 473 U.S. at 676 (materiality analysis considers whether

suppressed information, "if disclosed and used effectively" by the defense, may have

made a difference); id. at 683 (materiality inquiry considers "any adverse effect that

the [suppression] might have had on the preparation or presentation of the

defendant's case" and "the course that the defense and the trial would have taken had

the defense not been misled").[42]

Here, trial counsel could have used the suppressed evidence to support their

argument that the jailhouse witnesses should not be believed and that their testimony

---

[42]See also Perdomo, 929 F.2d at 971 (materiality "inquiry requires
consideration of ... possible effects of non-disclosure on the defense's trial
preparation"); Banks v. Reynolds, 54 F.3d 1508, 1519 (10th Cir. 1995) (materiality
inquiry must "recognize that evidence in the hands of a competent defense attorney
may be used to uncover other leads and defense theories").

USCA5 1463

in favor of the Government was motivated by more than any alleged desire just do the right thing.  See e.g. TT 3/22/04, 186 (testimony of Adam Longoria) ("Q[uestion]. So you're just [testifying] so justice can be served.  A[nswer].  It's the right thing to do."); TT 3/22/04, 56-58 (prosecutor arguing at penalty closing that Campos' only motivation for testifying was to hold Mr. Bourgeois "accountable").

The duty to enforce Brady "with painstaking care is never more exacting than it is in a capital case."  Kyles, 514 U.S. at 422.  Viewing the Brady material collectively, in this case, as required by Kyles, 514 U.S. at 436, confidence is undermined in the first-degree murder conviction and death sentence.[43]

**Claim VIII.    PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED THEIR REPRESENTATION OF PETITIONER AT TRIAL AND SENTENCING, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

Mr. Gilmore's clear strategy during this trial was to discredit Adam Longoria and Orlando Campos who were both testifying as witnesses for the Government. However, both Mr. Longoria and Mr. Campos were also witnesses for the defense for

---

[43]The Government also argues that even if undisclosed consideration was bestowed on one of the jailhouse witnesses, this would not impact the others in this case. *RA*, 91. This is incorrect. Kyles, 514 U.S. at 445 (suppression of evidence that provides "impeachment of one []witness can call for a new trial even though the attack does not extend directly to others.")

101

USCA5 1464

two of Mr. Gilmore's other clients.  Thus, in one court proceeding Mr. Gilmore was ethically bound to do everything in his power to discredit these two witnesses (Petitioner's trial) and in the other court proceedings he was ethically bound to do everything he could to vouch for and bolster their credibility.  This conflict of interest became obvious at Petitioner's trial during his cross-examination of Mr. Longoria and Mr. Campos.  Specifically, it was revealed to Petitioner's jury that Mr. Gilmore had proffered Mr. Longoria as a defense witness in another case.  With respect to Campos, Mr. Gilmore had an interest in seeing his credibility unchallenged because he was offering favorable testimony with regard to one of Mr. Gilmore's former clients.   TT 3/9/04, 221-223, 3/22/04, 179.  The Government now argues that this conflict claim is "novel, new and unmoving." *RA*, 94.  The Government is wrong.

How persuasive and effective could Mr. Gilmore be in convincing Petitioner's jury to disbelieve Mr. Longoria and Mr. Campos when the jury knew that Mr. Gilmore in another proceeding had presented, relied upon and vouched for Mr. Longoria's credibility? If the jury was going to discredit anything it would have been Mr. Gilmore's fickle arguments concerning whether these witnesses on one day were credible and worthy of believing and on another day were lying snitches.  And how hard did Mr. Gilmore pursue the issue of Mr. Campos' lack of credibility – on behalf of Petitioner –  when he knew another client was relying on Mr. Campos being found

102

USCA5 1465

credible?   Mr. Gilmore was laboring under an obvious conflict of interest that was neither "new" nor "novel", rather it was actual and irreconcilable.

The Government also argues that Petitioner's conflict claim is "substantive . . . rather than being couched in an ineffective assistance claim" and is therefore procedurally defaulted. *RA*, 95.  This is not so.  Petitioner's claim, like all conflict of interest claims, arises under the Sixth Amendment's right to counsel.  The only difference between a conflict claim and an ordinary ineffective assistance of counsel claim is that with a conflict of interest claim prejudice may be presumed.  The caption of the claim itself clearly and specifically states it arises under the Sixth Amendment right to counsel.  Additionally, Petitioner cites the Sixth Amendment in four of the seven paragraphs that make up this claim. *PM*, ¶¶ 245, 246, 247 & 251.  Finally, the first case cited by Petitioner in the conflict of counsel section of *Petitioner's Memorandum* is Strickland – the seminal case on ineffective assistance of counsel claims, which speaks of counsel's "duty of loyalty" to his client. Strickland, 466 U.S. at 688.  Petitioner goes on to quote Strickland three more times.

The Government next argues that this claim should be denied because Ross Griffin did not testify. *RA*, 96.  Mr. Griffin's failure to testify is exactly why this claim is meritorious. Mr. Gilmore represented Mr. Griffin when he was a cooperating witness against Petitioner.  Mr. Griffin could have provided extremely valuable

103

USCA5 1466

testimony concerning any benefits he was promised or received in return for his agreeing to cooperate against Petitioner. However, because he was represented by Mr. Gilmore this avenue of investigation was never pursued and the testimony never presented.

Finally, the Government speculates that even if Mr. Gilmore was laboring under a conflict of interest, Mr. Tinker could have stepped in and handled these witnesses. *RA*, 96-97. This argument simply ignores the record in this case. Mr. Gilmore – not Mr. Tinker – handled the investigation and cross-examination of the prisoner witnesses. See *RA*, Attachment B. And it was Mr. Gilmore who had a conflict with Mr. Griffin, Mr. Longoria and Mr. Campos. The Government's speculation, in this capital case, of what could have or should have occurred here to avoid this conflict of interest does nothing to remedy the deprivation of Petitioner's Sixth Amendment right to effective assistance of counsel. A new trial and sentencing is the only thing that will remedy this denial of his right to counsel.

104

USCA5 1467

**CLAIM IX.  PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT AT BOTH THE GUILT/INNOCENCE AND PENALTY PHASES DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During Petitioner's capital trial, the United States Attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial, and a reliable capital sentencing verdict. The prosecutor's comments, both individually and cumulatively, amounted to prosecutorial misconduct. Trial counsels' failure to object to any of these comments and arguments, or request a curative instruction, was ineffective. Moreover, the Court's failure to give an immediate curative instruction exacerbated the harm. Petitioner was denied his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. See *PM*, 112-120; *P-Mem*, 110-123. For the most part, Petitioner relies on the factual and legal arguments set forth in the *Petition Motion* and *Petitioner's Memorandum*, and only addresses the Government's more erroneous arguments.

The Government's Answer correctly identifies the three-part test this Court must employ in determining if a prosecutor's improper remarks have affected Petitioner's "substantial rights," i.e., whether due process has been violated. See *RA*, 98 ("a reviewing court must focus on three factors: (1) the magnitude of the

105

USCA5 1468

prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction") (citing <u>United States v. Lowenberg</u>, 853 F.2d 295, 302 (5th Cir. 1988)); <u>see</u> <u>also</u> *P-Mem*, 112 (identifying three part test). However, the Government falters in its application of this three part test to Petitioner's case.

**1.    The Prejudicial Effect of the Prosecutor's Remarks**.

Relying on <u>Lowenberg</u>, the Government argues that the prosecutor's references to Mr. Bourgeois as "that thing" and "dog," were a "fair interpretation of the evidence." *RA*, 98 (quoting <u>Lowenberg</u>, 853 F.2d at 302); <u>see</u> <u>also</u> *P-Mem*, 113-14, 118-19 (alleging misconduct as result of the prosecutor's references to Petitioner as "that thing" and "dog"). The Government is wrong and its reliance on <u>Lowenberg</u> is greatly misplaced.

In <u>Lowenberg</u>, where the defendant was on trial for the facilitation of prostitution, the Court held that the prosecutor's references to the defendant as "pimp" and "filthy pimp," were not unfairly prejudicial. <u>Id.</u> at 302. Although the Court found these comments were "clearly inappropriate," <u>id.</u> at 301, and "certainly uncalled for," <u>id.</u> at 302, the Court held that the references were an invited response to the defendant's argument that he was a business man and not a "pimp," a term the

106

USCA5 1469

defense first used in their own argument.  Id.  In other words, the Court found that calling the defendant a "pimp," **in a prostitution case**, where the defendant **first** claimed he was not a "pimp," was an invited response.  Id.

On the other hand, in this, a murder case, the prosecutor did not refer to Petitioner as "murderer," "killer," "assassin" "child killer" or some other term reflective of the actual charges.  Instead, the prosecutor called Petitioner "that thing" and "dog" – terms which can be associated with none of the actual charges at trial. Moreover, the prosecutor did not refer to petitioner as "that thing" and "dog" in response to any argument made by the defense wherein they first alleged that he was not a "thing" or a "dog."   Thus, in this case, unlike Lowenberg, the prosecutor's improper comments were not a "fair interpretation of the evidence" and were not invited responses.

The Government also claims the prosecutor's argument to the jury that it did not engage in forum shopping regarding Dr. Dailey was "proper and correct."  *RA*, 100; *P-Mem*, 115-16 (alleging false argument by the prosecutor that no expert forum shopping had occurred on behalf of the Government).  According to the Government, because Dr. Dailey never provided a definitive opinion, their search for a "different" expert opinion did not amount to forum shopping.  *RA*, 100.

107

USCA5 1470

However, Dr. Dailey did provide a definitive opinion: he concluded that he could not "exclude" Petitioner or Robin or AB-1994 as possible contributors of the alleged bite marks to JG-1999.  See *Declaration of Army Colonel J. Curtis Dailey, M.D. PA*, document # 45; see also *PM*, *P-Mem*, *Reply*, Claim V.  Thus, the Government's search for experts, Dr. Senn and Dr. Chrz, who concluded that they could exclude Robin and AB-1994 – leaving Petitioner as the only possible biter – did amount to forum shopping.  Id.  Dr. Dailey's opinion that neither Petitioner, nor Robin, nor AB-1994 could be excluded did not support the prosecution's theory of the case, and that is why the Government continued "shopping" for another expert opinion.  See *Declaration of Army Colonel J. Curtis Dailey, M.D. PA*, document # 45 (stating that AUSA Booth told Dr. Dailey that if he could not help her she would go out and find an expert who could).  The Government's current and prior assertion that there was no expert forum shopping is false.

## 2.      Cautionary Instructions.

The Government concedes that no immediate or specific cautionary instructions were requested by counsel or given by the Court in response to the prosecutor's improper arguments. *RA*, 104-05.  The Government, however, asserts that the Court's general instructions on the evidentiary value of counsel's argument were adequate to cure the prosecutor's improper comments.  Id. ("the Court arguably

108

USCA5 1471

gave a cautionary instruction by giving the standard instructions about the appropriateness of counsel's argument, including that it is not evidence . . . the standard cautionary instruction was sufficient"). The Government is wrong and cites no authority for this proposition and ignores Petitioner's cases establishing that such general instructions are not sufficient to cure improper prosecutorial comment or argument. *P-Mem*, 123 n. 54.[44] Similarly, the Government does not address Petitioner's argument and authority establishing that the Court had an independent obligation, unfulfilled in this case, to *sua sponte*, provide cautionary instructions. Id.

### 3. The Strength of the Evidence.

The Government also asserts that the strength of the evidence and the nature and character of the charges against Mr. Bourgeois, would have entitled to the prosecution to use "even stronger language" about Petitioner or the case. *RA*, 105. Again, the Government is wrong.

As set forth throughout the *Petitioner's Motion*, *Petitioner's Memorandum* and

---

[44]See also U.S. v. Goff, 847 F.2d 149, 165 (5th Cir. 1988) ("It is doubtful that its general instructions were sufficient to counter the effect of at least some of the prejudicial statements."); U.S. v. McPhee, 731 F.2d 1150, 1153 (5th Cir. 1984) (trial court's later reference in the jury charge that the defendant was "not on trial for any act or conduct or offense not charged in the indictment" was grossly inadequate under the circumstances, where there was no cautionary instruction made after the prosecutor's improper statements).

109

this *Reply*, the strength of the evidence establishing that Petitioner was responsible, or solely responsible for JG-1999's death is seriously in doubt. See e.g. *PM*, *P-Mem*, Claims IV, V, VI, VII, X, XI. Moreover, Petitioner's right to a fair trial and due process are not diminished because of the nature of the charges or allegations. See e,g. Walbey v. Quarterman, 2009 WL 113778, *8, 309 Fed.Appx. 795 (5th Cir. Jan. 19, 2009) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter . . . To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge . . . Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act"). Similarly, the heinous nature of the charges do not excuse the Government's conduct in this instance.

USCA5 1473

## CONCLUSION

Petitioner will soon file a motion for discovery and for an evidentiary hearing. He believes that he should obtain both. This case presents meritorious and troubling issues regarding Mr. Bourgeois' right to effective counsel and a fair proceeding. Counsel look forward to moving forward with these issues via an evidentiary hearing, and ultimately to obtaining the relief to which Petitioner is entitled.

Respectfully Submitted,

/s/     Michael Wiseman

_____

Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner Alfred Bourgeois

Dated:     Philadelphia, PA
               June 26, 2009

111

USCA5 1474

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 26th day of June, 2009 I served the foregoing upon the following persons by e-file and United States Mail:

Patricia Hubert Booth

United States Attorney's Office

800 North Shoreline,

Suite 500 Corpus Christi, TX 78401

Patti.Booth@usdoj.gov


Tony R. Roberts

United States Attorney's Office

PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov


James L. Turner

United States Attorney's Office

PO Box 61129
Houston, TX 77208-129
jim.turner@usdoj.gov


/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 1475

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : |  |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | **Capital Case** |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____ :

### PETITIONER'S SECOND SUPPLEMENTAL APPENDIX
### IN SUPPORT OF
### MOTION FOR RELIEF PURSUANT TO
### 28 U.S.C. SECTION 2255
### OR IN THE ALTERNATIVE
### PURSUANT TO 28 U.S.C. SECTION 2241

LEIGH SKIPPER, ESQ.
CHIEF FEDERAL DEFENDER
By: Michael Wiseman, Esq.*
Chief, Capital Habeas Corpus Unit
Victor Abreu, Esq.*
James McHugh, Esq.
Elizabeth Larin, Esq.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
*Co-Counsel of Record for Petitioner
Alfred Bourgeois

Dated:    Philadelphia, PA
          June 26, 2009

USCA5 1476

**Index to Second Supplemental Appendix**

**Document   Description
Number**

| | |
|---|---|
| 72. | Petitioner's Interrogatories Directed to Douglas Tinker |
| 73. | Notice of Service of Petitioner's Interrogatories to Douglas Tinker |
| 74. | Declaration of Victoria Swanson, Ph.D., dated June 8, 2009 |
| 75. | Strengthening Forensic Science in the United States: A Path Forward, Report of the National Academy of Sciences |
| 76. | Declaration of Jennifer Lee Valdez |
| 77. | Letter from Adam Longoria to AUSA Booth, dated 5/3/07 |

USCA5 1477

72

USCA5 1478

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,        :              No. Cr-C-02-216
                                                    :              No. Cv-07-223
                   Respondent,              :         Honorable Janis Graham Jack,
                                                    :                   U.S.D.J.
             -against-                        :
                                                    :
ALFRED BOURGEOIS,                 :
                                                    :
                   Petitioner.               :
_____   :

**Petitioner's Interrogatories Directed to Douglas Tinker, Esq.**

Pursuant to Fed.R.Civ.P. Rules 26 and 33, and pursuant to the Court's order
of August 28, 2008, Petitioner, Alfred Bourgeois, propounds the following
interrogatories.

**Interrogatories Related to Claim I.**

1.    A.    When you reported to the Court that mental retardation is not an issue in this case (see PTT, 1/16/04, 7, attached as Exhibit A)[1] had you caused Mr. Bourgeois to be subjected to intelligence testing, or had you reviewed any reports of intelligence testing?

      B.    On what did you base this concession?

2.    A.    Following receipt of the report of Dr. Donald E. Weiner (dated March

_____

[1]Pre-trial and trial transcripts are cited as "PTT" and "TT" respectively, followed by the corresponding date and page numbers.

1

USCA5 1479

3, 2004), did you have a follow up meeting or telephone conversation with him?

B.    If so, describe the content of that meeting.

C.    If not, did Mr. Gilmore?

3.    At the time of this trial were you aware of the significance of a score on an intelligence test of 75?

4.    A.    Were you familiar with the so-called Flynn-effect at the time of this trial?

B.    If so, please describe your understanding of it.

5.    Did you have a tactical or strategic reason for not calling Dr. Donald E. Weiner, as a witness at the sentencing hearing?  If so, please state it.

6.    A.    Did you possess a tactical or strategic reason for having Dr. Weiner evaluate Mr. Bourgeois one week prior to the start of trial?[2]

B.    If so, please state the reason(s).

7.    Were you aware of the criteria for establishing mental retardation as set forth in <u>Atkins v. Virginia</u>?

8.    Describe the steps, if any, taken to determine whether Mr. Bourgeois met the criteria as a person with mental retardation.

9.    Did you ever review Dr. Weiner's raw test data, or have another expert do so? If not, did you have a tactical or strategic reason for not doing so?

---

[2]The record reflects that jury selection commenced on February 9, 2004 and testimony began on March 2, 2004.  Dr. Weiner's report indicates he tested  Mr. Bourgeois on February 28, 2004 and issued his report on March 3, 2004.

USCA5 1480

**Interrogatories Related to Claim II.**

10.   A.   Did you consider that an I.Q. in the borderline range of mental retardation is considered a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase of trial to discuss the results of his I.Q. testing?

11.   A.   Did you consider that the diagnosis reached by Dr. Weiner, that Mr. Bourgeois has a "Cognitive Disorder - Mild cerebral damage with moderate posterior cerebral damage" is considered a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase of trial to discuss the results of his neuropsychological testing and the meaning and significance of this finding?

12.   A.   Did you consider Dr. Weiner's conclusion that "Mr. Bourgeois['] . . . performance on the Category test suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions" to be a mitigating fact in a death penalty sentencing phase?

      B.   What tactic or strategy dictated your decision not to call Dr. Weiner in the penalty phase to discuss and explain this conclusion?

13.   Was it your desire to elicit, present and/or otherwise establish before the penalty phase jury that Mr. Bourgeois had a history of childhood abuse, neglect and family dysfunction?

14.   A.   Please indicate whether you agree with Mr. Gilmore's recent statement that you did not call Dr. Cunningham as a penalty phase witness because "Dr. Cunningham's explanation [for Mr. Bourgeois' actions] conflicted with Mr. Bourgeois' defense."

      B.   If you agree, please explain how this guilt-phase "conflict" prevented or

3

USCA5 1481

impaired you from calling Dr. Cunningham in the penalty phase?

15. In view of Mr. Gilmore's recent statement: "Mr. Tinker informed me that he thought it would be more effective developing mitigation evidence through Dr. Estrada, than through Dr. Cunningham, and in view of the Court's ruling during your trial cross-examination of Dr. Estrada "that no witness here has testified that Mr. Bourgeois was sexually-physically abused or neglected in any way" (TT 3/23/04, 27-29, attached as Exhibit B), please explain the basis for your decision not to call Dr. Cunningham as a mitigation witness to provide evidence about Mr. Bourgeois' history of childhood abuse, neglect and family dysfunction?

16. The record shows that you proffered the testimony of Professor of Psychology George W. Holden (University of Texas) as a guilt phase witness to establish a defense that Mr. Bourgeois did not kill with premeditation. PTT 3/1/04, 1-72. The Court denied this application, but suggested that the defense consider calling him at a potential penalty phase. Id., at 74 (attached as Exhibit C). You had previously alerted the Court that you were considering calling him in the penalty phase. PTT 10/20/03, 11-12 (attached as Exhibit D).

In view of Dr. Holden's potential testimony that "the killing was the product of numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions" (Holden Declaration, Exhibit 11, Petitioner's Appendix), please describe your tactical or strategic reason for not calling him as a witness in the penalty phase of trial.

17. A.     Do you disagree with Dr. Estrada's statement that:

"I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile. . . While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions." Declaration Carlos R. Estrada, M.D., dated May 14, 2007 (Exhibit 7, Petitioner's Appendix).

B.     If you agree with Dr. Estrada's assessment, please explain how it came

4

to be that the jury was not provided with an accurate assessment of your client's mental health profile.

C.     If you disagree, please state the basis for your disagreement.

**Interrogatories Related to Claim III.**

18.   Pursuant to 18 U.S.C. §§1111(b) and 3236, the Government was required to prove beyond a reasonable doubt that the fatal injuries were inflicted on the grounds of the Corpus Christi Naval Air Station. Prior to trial the Government provided defense counsel with an autopsy report prepared by Dr. Elizabeth Rouse and a report from Dr. Kathleen Kagan-Hallet, a neuropathologist. Dr. Kagan-Hallet examined the evidence in this case and determined that the fatal injuries were approximately ten days old. Dr. Kagan-Hallet's report was specifically referenced in the autopsy report prepared by Dr. Rouse.

A.     Did you have a strategic or tactical reason for failing to cross-examine the Government's pathologist Dr. Elizabeth Rouse, who performed the autopsy, as to the timing of the infliction of the fatal injuries?

B.     Did you have a strategic or tactical reason for failing to call as a witness Dr. Kathleen Kagan-Hallet, to testify that she thoroughly examined the evidence in this case and determined that the infliction of the fatal injuries was approximately ten days prior to death?

C.     Did you have a strategic or tactical reason for failing to retain and call as a witness a neuropathologist to testify that the infliction of the fatal injuries was approximately ten days prior to the date of death?

19.   The Government called Mr. Bourgeois' wife Robin and his daughter AB-1994 to testify as to what transpired on the day the decedent was found lying on the grounds of the Naval Air Station. Their testimony directly contributed to his conviction and sentence of death. Prior to trial, both Robin and AB-1994 had given various and conflicting accounts as to these events. You were provided with at least some of these statements prior to trial.

A.     Did you investigate Robin and AB-1994's reputation for being truthful,

USCA5 1483

honest and law-abiding?

B.     Did you have a strategic or tactical reason for failing to confront either Robin or AB-1994 with their poor reputation for being honest, truthful or law-abiding?

C.     Did you have a strategic or tactical reason for failing to call witnesses to testify to the poor reputation in the community of Robin or AB-1994 for being truthful, honest and law-abiding?

**Interrogatories Related to Claim IV.**

20.    At trial, prosecution witness, Dr. Elizabeth Rouse, who conducted the autopsy, testified that she performed a sexual assault examination on the body of the deceased, JG-1999. See TT 3/8/04, 59-60, Exhibit E, attached. However, Dr. Rouse did not testify about whether her examination of JG-1999 revealed any evidence of vaginal trauma and no questions were asked on direct or cross-examination regarding those observations. Morever, in her autopsy report, Dr. Rouse specifically concluded that "The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus**. **The hymen is present and appears atraumatic**. The back is straight. The anus unremarkable and atraumatic." See Autopsy Report of Dr. Elizabeth Rouse at p. 3, Exhibit F, attached. Nevertheless, prosecution witness, Dr. Scott Benson, testified that the autopsy of JG-1999 revealed vaginal trauma. See TT 3/5/04, 44-46, Exhibit G, attached.

A.     Did you consider Dr. Benton's testimony regarding the alleged vaginal trauma to JG-1999 to be highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

B.     Did you have a strategic or tactical reason for not cross-examining Dr. Rouse regarding the conclusions in her autopsy report ("The external genitalia are those of a normal female child, **and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic**" – i.e., that there was no vaginal trauma to JG-1999) in an effort to challenge Dr. Benton's conclusions?

6

USCA5 1484

C.  Did you have a strategic or tactical reason for failing to call Dr. Rouse as a defense witness to testify about her autopsy results and her conclusion that there was <u>no</u> vaginal trauma to JG-1999?

D.  Did you have a strategic or tactical reason for failing to call your own expert to review the autopsy results and testify that the post-mortem examination of JG-1999 revealed <u>no</u> vaginal trauma, particularly in view of the disagreement between Benton and Rouse on this point?

E.  Did you have a strategic or tactical reason for failing to cross-examine Dr. Benton to challenge his testimony that the autopsy revealed vaginal trauma by using Dr. Rouse's actual autopsy report which indicates that there was <u>no</u> vaginal trauma to JG-1999.

21.  At trial, the Government presented expert testimony and argued to the jury that Mr. Bourgeois' semen was detected during the post-mortem rectal examination of the deceased, JG-1999.  As part of your preparation for trial, you retained and consulted with a defense DNA expert, Dr. Elizabeth Johnson.  On March 1, 2004, the day before the start of jury selection, Dr. Johnson provided you with a summary of the testimony she could provide if called to testify to counter the Government's assertions regarding the alleged semen.  <u>See</u> Exhibit H, attached.  In that summary, Dr. Johnson concluded that the FBI did not conduct the full panoply of tests to confirm the presence of semen; the additional AP reagent and sperm search test she conducted were both negative; if the substance recovered from JG-1999 was semen, sperm should have been detected but were not; and, false positives are possible in the only test conducted by the government – the P30 test.  <u>Id.</u>  You have previously stated that you and Mr. Gilmore considered using the testimony of Dr. Johnson at trial but that "[s]he did not do the testing you requested in a timely fashion and, therefore, we did not utilize her services."   Respondents' Interrogatories for Douglas Tinker at 11-14.

A.  Would you agree that the testimony regarding the alleged semen reportedly discovered in the rectum of JG-1999 was highly prejudicial to Mr. Bourgeois' defense at both the guilt/innocence and penalty phases of trial?

7

USCA5 1485

B.    Do you acknowledge having received the faxed summary of Dr. Elizabeth Johnson's proposed testimony on March 1, 2004?

C.    Would you agree that Dr. Johnson's conclusions as stated in her March 1, 2004, summary would have been beneficial to the defense in countering the Government's allegations regarding the alleged semen?

D.    If so, did you have a strategic or tactical reason for failing to request relief from the Court's deadline so that you could present the testimony of Dr. Johnson?

E.    Did you have a strategic or tactical reason for failing to request additional time from the Court to consult another expert who could have countered the government's alleged semen evidence?

F.    Was Dr. Johnson the only expert you consulted regarding the alleged semen evidence?

**Interrogatories Related to Claims V & VI.**

22.    At the guilt phase of trial the Government called forensic pathologist Dr. Williams Oliver.  Dr. Oliver did not perform the autopsy in this case and was not present for the autopsy.  Dr. Oliver digitally enhanced the original autopsy photographs and testified to numerous injuries on the decedent's body that he was able to discover but that did not appear on the original autopsy photographs.  Furthermore, the Government's bite mark experts Drs. David Senn and Bryan Chrz utilized these enhanced images in their examination and testimony to the jury.  The findings of Drs. Oliver, Senn and Chrz were utilized by the Government at both the guilt and penalty stages of the trial.

A.    Did you have a strategic or tactical reason for failing to retain an expert in the area of digital enhancements of photographs to rebut the testimony of Dr. Oliver?

B.    Did you have a strategic or tactical reason for failing to litigate a *Daubert* motion prior to the testimony of Dr. Oliver in an attempt to preclude the testimony of Dr. Oliver and the testimony of any experts

USCA5 1486

that relied upon or utilized the digital enhancements created by Dr. Oliver?

C.      Did you have a strategic or tactical reason for failing to object to the admission of these digital enhancements under Federal Rules of Evidence 901, 1001 and 1002?

23.     At trial the Government called forensic odontologists Dr. David Senn and Dr. Bryan Chrz. Both testified that AB-1994 and Robin could be excluded as the biter of the back of the decedent . Dr. Senn further testified that Mr. Bourgeois could not be excluded or included as the biter and Dr. Chrz concluded that Mr. Bourgeios was the probable biter. Prior to retaining these experts, the Government retained Dr. J. Curtis Dailey, DDS, a United States Army Colonel and forensic odontologist. Dr. Dailey arguably conducted a more thorough examination than did Drs. Senn and Chrz since he was provided with the actual skin of the decedent. Dr. Dailey concluded that both AB-1994 and Robin as well as the defendant **could not be excluded** as the biter of the back of the decedent. The Government provided the defense, prior to trial, with the reports of Dr. Dailey which contained his findings.

A.      Did you have a strategic or tactical reason for failing to litigate a *Daubert* motion prior to the testimony of Drs. Senn and Chrz in an attempt to preclude their testimony?

B.      Did you have a strategic or tactical reason for failing to call Dr. Dailey as a witness to rebut the testimony of Drs. Senn and Chrz?

C.      Did you have a strategic or tactical reason for failing to cross-examine Drs. Senn and Chrz with the reports of Dr. Dailey?

D.      Did you consult with a defense expert to rebut the testimony of Drs. Senn and Chrz, and if not, did you have a strategic or tactical reason for not doing so?

9

**USCA5 1487**

Respectfully Submitted,


_____

Michael Wiseman
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545- West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated:      October 14, 2008
            Philadelphia, PA

USCA5 1488

73

USCA5 1489

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|                                        |   |                              |
|----------------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,              | : | No. Cr-C-02-216              |
|                                        | : | No. Cv-07-223                |
| Respondent,                            | : | Honorable Janis Graham Jack, |
|                                        | : | U.S.D.J.                     |
| -against-                              | : |                              |
|                                        | : | **This is a Capital Case**   |
| ALFRED BOURGEOIS,                      | : |                              |
|                                        | : | Electronically Filed         |
| Petitioner.                            | : |                              |

_____

### Notice of Service

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I caused to be served upon Douglas Tinker, Esq. *Petitioner's Interrogatories Directed to Douglas Tinker, Esq.* I also served a copy on James Gilmore, Esq., so that he might assist in securing Mr. Tinker's response. The Interrogatories are 23 in number, with additional sub-parts, and are contained on nine pages.

They were served upon both attorneys by fax at their office and by overnight mail.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Victor Abreu
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545- West, The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated: October 14, 2008
        Philadelphia, PA

**USCA5 1490**

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 14th day of October, 2008 I served a copy of this Notice of Service upon the following persons in the manner indicted:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov

Patricia Hubert Booth
United States Attorney's
Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
Patti.Booth@usdoj.gov


/s/      Michael Wiseman
_____
Michael Wiseman

USCA5 1491

74

USCA5 1492

## DECLARATION AND AFFIDAVIT OF VICTORIA SWANSON, Ph.D. PURSUANT TO 28 U.S.C. § 1746

Victoria Swanson, Ph.D., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.    I am a clinical psychologist. I obtained my doctorate in school psychology from Louisiana State University in 1999. My primary area of practice is providing psychological services and behavioral consultation to individuals with mental retardation and developmental delays, and to public and private providers of services to this population. I also provide services to children and adolescents with severe behavior disorders and significant academic challenges. I have done this work through my private practice since 2000.

2.    For my entire professional career I have been responsible for identifying and providing services to people with mental retardation. Before I entered into private practice, I served as the Director of Psychological Services at Southwest Louisiana Developmental Center in Iota, Louisiana; in that capacity, I managed the delivery of services to approximately 150 mentally retarded individuals living in publicly funded residential facilities and supportive living placements. I have worked with mentally ill and developmentally delayed individuals since 1973. I have worked as a social worker, a psychological examiner, a school psychologist, and an administrator. From 2003 to 2005, I served as the President of the National Psychology Division of the American Association on Intellectual and Developmental Disabilities (AAIDD) (formerly the American Association on Mental Retardation (AAMR)). I have been qualified as an expert in psychology and as an expert in field of Mental Retardation multiple times in several jurisdictions. Most of my forensic practice centers in Louisiana. However, I have also been qualified as an expert in Alabama, Georgia, and Mississippi. My curriculum vitae is attached.

USCA5 1493

3.      I was asked by counsel to Alfred Bourgeois to conduct testing to determine his level of adaptive functioning as a child and to discern whether he qualifies for a diagnoses of mental retardation.  To accomplish this task, I have reviewed voluminous background materials about Mr. Bourgeois provided to me by counsel, including reports by psychologists and psychiatrists, affidavits by neighbors and relatives, and intelligence testing by Dr. Weiner and Dr. Gelbort.  The most recent neuropsychological evaluation reveals a full scale IQ of 70 on the WAIS-III, and Dr. Weiner's scoring (adjusted for the Flynn effect) also places him in the range of mental retardation.

4.      After reviewing these materials, in March, 2009, I administered the Vineland-II Adaptive Behavior Scale to Mrs. Beverly Frank.  Based on my review of materials and preliminary interview of Mrs. Frank, I learned that she is the granddaughter of Mary Clayton.  Mary Clayton was not related to Alfred Bourgeois, but was a member of his community and an elder in his family's church.  Due to the mistreatment she witnessed being perpetrated against Alfred at his home, Mrs. Clayton took Alfred into her home and cared for him as if he were her own child.  Mrs. Frank was a young adult at the time and visited her grandmother and Alfred almost daily.  She observed Alfred and several of her nieces and nephews near in age to Alfred, and therefore was able to report both Mr. Bourgeois' adaptive ability and compare his functioning to his peers.  Accordingly, she was a prime subject to whom to administer the Vineland–II instrument.

5.      Mr. Bourgeois scored a 66 on the Vineland- II.  On the sub-scales he scored a 69 in Communication; a 66 in Daily Living Skills; and 66 in Socialization.  These scores place him well within the range of mental retardation in the sphere of adaptive deficits.  They also corroborate what the other psychologists had already learned through interviews and affidavits of Mr. Bourgeois' relatives and neighbors.

6.      Based on my review of the records and my own testing, it is my opinion to a

USCA5 1494

reasonable degree of psychological certainty that Mr. Bourgeois is an individual with mental retardation.

7.       I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Victoria Swanson, Ph.D.

DATE: 6/8/09

USCA5 1495

75

USCA5 1496

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD

**Committee on Identifying the Needs of the Forensic Science Community**

**Committee on Science, Technology, and Law Policy and Global Affairs**

**Committee on Applied and Theoretical Statistics Division on Engineering and Physical Sciences**

## NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

**THE NATIONAL ACADEMIES PRESS**
**Washington, D.C.**
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1497

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

**THE NATIONAL ACADEMIES PRESS**     **500 Fifth Street, N.W.**     **Washington, DC 20001**

NOTICE:   The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.   The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

**This study was supported by Contract No. 2006-DN-BX-0001 between the National Academy of Sciences and the National Institute of Justice.** Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

International Standard Book Number  xxxxxxxxxxxx
Library of Congress Catalog Card Number  xxxxxxxxxxx

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, *http://www.nap.edu.*

Copyright 2009 by the National Academy of Sciences.  All rights reserved.

Printed in the United States of America

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1498

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1499

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1500

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Committee on Identifying the Needs of the Forensic Science Community

**HARRY T. EDWARDS**, (*Co-chair*), Judge, U.S. Court of Appeals for the District of Columbia Circuit

**CONSTANTINE GATSONIS**, (*Co-chair*), Director, Center for Statistical Sciences, Brown University

**MARGARET A. BERGER**, Suzanne J. and Norman Miles Professor of Law, Brooklyn Law School

**JOE S. CECIL**, Project Director, Program on Scientific and Technical Evidence, Federal Judicial Center

**M. BONNER DENTON**, Professor of Chemistry, University of Arizona

**MARCELLA FIERRO**, Medical Examiner of Virginia (ret.)

**KAREN KAFADAR**, Rudy Professor of Statistics and Physics, Indiana University

**PETE M. MARONE**, Director, Virginia Department of Forensic Science

**GEOFFREY S. MEARNS**, Dean, Cleveland-Marshall College of Law, Cleveland State University

**RANDALL S. MURCH**, Associate Director, Research Program Development, Virginia Polytechnic Institute and State University

**CHANNING ROBERTSON**, Ruth G. and William K. Bowes Professor, Dean of Faculty and Academic Affairs, and Professor, Department of Chemical Engineering, Stanford University

**MARVIN SCHECHTER**, Attorney

**ROBERT SHALER**, Director, Forensic Science Program, Professor, Biochemistry and Molecular Biology Department, Eberly College of Science, The Pennsylvania State University

**JAY A. SIEGEL**, Professor, Forensic and Investigative Sciences Program, Indiana University-Purdue University

**SARGUR N. SRIHARI**, SUNY Distinguished Professor, Department of Computer Science and Engineering and Director, Center of Excellence for Document Analysis and Recognition (CEDAR), University at Buffalo, State University of New York

**SHELDON M. WIEDERHORN** (NAE), Senior NIST Fellow, National Institute of Standards and Technology

**ROSS ZUMWALT**, Chief Medical Examiner, Office of the Medical Examiner of the State of New Mexico

**Staff**

**ANNE-MARIE MAZZA**, Study Director

**SCOTT WEIDMAN**, Director, Board on Mathematical Sciences and Their Applications

**JOHN SISLIN**, Program Officer, Board on Higher Education and Workforce

**DAVID PADGHAM**, Program Officer, Computer Science and Telecommunications Board (until 5/08)

**STEVEN KENDALL**, Senior Program Associate

**KATIE MAGEE**, Senior Program Assistant (until 9/07)

**KATHI E. HANNA**, Consultant Writer

**SARA D. MADDOX**, Editor

**ROBIN ACKERMAN**, Christine Mirzayan Science and Technology Policy Fellow

**GEMAYEL JEAN-PAUL**, Christine Mirzayan Science and Technology Policy Fellow

**JOHNALYN D. LYLES**, Christine Mirzayan Science and Technology Policy Fellow

**SANDRA OTTENSMANN**, Christine Mirzayan Science and Technology Policy Fellow

**DEIDRE PARSONS**, Christine Mirzayan Science and Technology Policy Fellow

**SARAH RYKER**, Christine Mirzayan Science and Technology Policy Fellow

**SUNBIN SONG**, Christine Mirzayan Science and Technology Policy Fellow

v

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1501

PREPUBLICATION COPY

## Committee on Science, Technology, and Law

**DONALD KENNEDY** (NAS/IOM), *(Co-chair)*, President Emeritus and Bing Professor of Environmental Science Emeritus, Stanford University; Emeritus Editor-in-Chief, *Science*

**RICHARD A. MERRILL** (IOM), *(Co-chair)*, Daniel Caplin Professor of Law Emeritus, University of Virginia Law School

**FREDERICK R. ANDERSON, JR.**, Partner, McKenna, Long, & Aldridge LLP

**MARGARET A. BERGER**, Suzanne J. and Norman Miles Professor of Law, Brooklyn Law School

**ARTHUR I. BIENENSTOCK**, Special Assistant to the President for SLAC and Federal Research Policy, Stanford University

**BARBARA E. BIERER**, Senior Vice President for Research, Brigham and Women's Hospital

**ELIZABETH H. BLACKBURN** (NAS/IOM), Morris Herzstein Professor of Biology and Physiology, Department of Biochemistry and Biophysics, University of California, San Francisco

**JOE S. CECIL**, Project Director, Program on Scientific and Technical Evidence, Federal Judicial Center

**RICHARD F. CELESTE**, President, Colorado College

**JOEL E. COHEN** (NAS), Abby Rockefeller Mauzé Professor and Head, Laboratory of Populations, The Rockefeller University and Columbia University

**KENNETH W. DAM**, Max Pam Professor Emeritus of American and Foreign Law and Senior Lecturer, University of Chicago Law School

**ROCHELLE COOPER DREYFUSS**, Pauline Newman Professor of Law and Director, Engelberg Center on Innovation Law and Policy, New York University School of Law

**ALICE P. GAST** (NAE), President, Lehigh University

**LAWRENCE O. GOSTIN** (IOM), Associate Dean for Research and Academic Programs, Linda D. and Timothy J. O'Neill Professor of Global Health Law, Georgetown University; Professor of Public Health, The Johns Hopkins University

**GARY W. HART**, Wirth Chair Professor, School of Public Affairs, University of Colorado, Denver

**BENJAMIN W. HEINEMAN, JR.**, Senior Fellow, Harvard Law School and Harvard Kennedy School of Government

**DAVID BROCK HORNBY**, Judge, U.S. District Court, District of Maine

**DAVID KORN** (IOM), Vice Provost for Research, Harvard University

**RICHARD A. MESERVE** (NAE), President, Carnegie Institution of Washington

**DUNCAN T. MOORE** (NAE), Professor, The Institute of Optics, University of Rochester

**ALAN B. MORRISON**, Visiting Professor, Washington College of Law, American University

**HARRIET RABB**, Vice President and General Counsel, Rockefeller University

**PAUL D. RHEINGOLD**, Senior Partner, Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP

**BARBARA ROTHSTEIN**, Director, Federal Judicial Center

**JONATHAN M. SAMET** (IOM), Founding Director, Institute for Global Health and Chairman, Department of Preventive Medicine, University of Southern California

**DAVID S. TATEL**, Judge, U.S. Court of Appeals for the District of Columbia Circuit

**Staff**
**ANNE-MARIE MAZZA**, Director
**STEVEN KENDALL**, Senior Program Associate

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1502

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Committee on Applied and Theoretical Statistics

**KAREN KAFADAR**, (*Chair*), Rudy Professor of Statistics and Physics, Indiana University

**AMY BRAVERMAN**, MISR Co-Investigator, Statistics and Data Analysis, Earth and Space Sciences Division, Jet Propulsion Laboratory

**CONSTANTINE GATSONIS**, Director, Center for Statistical Sciences, Brown University

**MICHAEL GOODCHILD** (NAS), Professor, Department of Geography, University of California, Santa Barbara

**KATHRYN B. LASKEY**, Professor, Department of Systems Engineering and Operations Research, George Mason University

**MICHAEL LESK** (NAE), Professor, Library and Information Sciences, Rutgers University

**THOMAS A. LOUIS**, Professor, Department of Biostatistics, Bloomberg School of Public Health, The Johns Hopkins University

**MICHAEL A. NEWTON**, Professor, Department of Biostatistics and Medical Informatics, University of Wisconsin, Madison

**MICHAEL L. STEIN**, Professor, Department of Statistics, The University of Chicago

**Staff**
**SCOTT WEIDMAN**, Director
**NEAL GLASSMAN**, Senior Program Officer
**BARBARA WRIGHT**, Administrative Assistant

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1503

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# ACKNOWLEDGMENTS

## ACKNOWLEDGMENT OF PRESENTERS

The committee gratefully acknowledges the contributions of the following individuals who made thoughtful presentations before it:

Chris Asplen, *Gordon Thomas Honeywell Government Affairs*; Peter D. Barnett, *Forensic Science Associates*; Richard E. Bisbing, *McCrone Associates, Inc., and Scientific Working Group on Materials Analysis (SWGMAT)*; Joseph P. Bono, *U.S. Secret Service*; Michael R. Bromwich, *Fried, Frank, Harris, Shriver & Jacobson LLP*; Bruce Budowle, *Federal Bureau of Investigation*; James Burans, *U.S. Department of Homeland Security*; Thomas Cantwell, *U.S. Department of Defense*; Larry Chelko, *U.S. Army Criminal Investigation Laboratory*; John Collins, *DuPage County Sheriff's Office Crime Laboratory*; Charles Cooke, *Office of the Director of National Intelligence*; Robin Cotton, *Boston University School of Medicine*; Joseph A. DiZinno, *Federal Bureau of Investigation*; James Downs, *National Association of Medical Examiners* and *Consortium of Forensic Science Organizations* and *Georgia Bureau of Investigation*; Itiel Dror, *University of Southampton*; Arthur Eisenberg, *Forensic Quality Services*; Barry A. J. Fisher, *Los Angeles County Sheriff's Department*; Eric Friedberg, *Stroz Friedberg, LLC*; Robert E. Gaensslen, *University of Illinois at Chicago*; Brandon L. Garrett, *University of Virginia*; Michael D. Garris, *National Institute of Standards and Technology*; Ed German, *U.S. Army* (ret.); Paul C. Giannelli, *Case Western Reserve University School of Law*; Bruce A. Goldberger, *American Academy of Forensic Sciences*; Hank Greely, *Stanford University*; Barbara Guttman, *National Institute of Standards and Technology*; David W. Hagy, *U.S. Department of Justice*; Randy Hanzlick, *Fulton County Medical Examiner's Center* and *Emory University School of Medicine*; Carol Henderson, *National Clearinghouse for Science, Technology and the Law* and *Stetson University*; Matthew J. Hickman, *U.S. Department of Justice*; Peter T. Higgins, *The Higgins-Hermansen Group*; Max M. Houck, *West Virginia University*; Vici Inlow, *U.S. Secret Service*; Jan L. Johnson, *Illinois State Police*; Jay Kadane, *Carnegie Mellon University*; David Kaye, *Arizona State University*; Peter D. Komarinski, *Komarinski & Associates, LLC*; Roger G. Koppl, *Farleigh Dickinson University*; Glenn Langenburg, *Minnesota Bureau of Criminal Apprehension*; Deborah Leben, *U.S. Secret Service*; John Lentini, *Scientific Fire Analysis, LLC*; Alan I. Leshner, *American Association for the Advancement of Science*; William MacCrehan, *National Institute of Standards and Technology*; Bill Marbaker, *American Society of Crime Laboratory Directors*; Kenneth F. Martin, *Massachusetts State Police*; Carole McCartney, *University of Leeds*; Stephen B. Meagher, *Federal Bureau of Investigation* and *Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)*; Jennifer Mnooken, *University of California, Los Angeles Law School*; John E. Moalli, *Exponent*; John Morgan, *U.S. Department of Justice*; Michael Murphy, *Las Vegas Office of the Coroner*; Peter Neufeld, *The Innocence Project*; John Onstwedder III, *Illinois State Police*; Garry F. Peterson, *Hennepin County Medical Examiner's Office* and *National Association of Medical Examiners*; Joseph L. Peterson, *California State University, Los Angeles*; Peter Pizzola, *New York Police Department Crime Laboratory*; Joe Polski, *Consortium of Forensic Science*

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1504

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

*Organizations* and *International Association for Identification*; Larry Quarino, *Cedar Crest College*; Irma Rios, *City of Houston Crime Lab*; Michael Risinger, *Seton Hall Law School*; Michael J. Saks, *Sandra Day O'Connor College of Law, Arizona State University*; Nelson A. Santos, *Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG)*; David R. Senn, *The University of Texas Health Science Center at San Antonio*; Robert Stacey, *American Society of Crime Laboratory Directors, Laboratory Accreditation Board*; David Stoney, *Stoney Forensic, Inc.*; Peter Striupaitis, *International Association for Identification* and *Scientific Working Group for Firearms and Toolmarks (SWGGUN)*; Rick Tontarski, *U.S. Army Criminal Investigation Laboratory*; Richard W. Vorder Bruegge, *Federal Bureau of Investigation*; Victor W. Weedn, *New Jersey Office of the State Medical Examiner*; and Tom Witt, *West Virginia University*.

## ACKNOWLEDGMENT OF REVIEWERS

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the National Academies' Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the process.

We wish to thank the following individuals for their review of this report: R. Stephen Berry, University of Chicago; Christophe Champod, Universite de Lausanne, Switzerland; William Chisum, Retired, National Crime Investigation and Training; Joel Cohen, Rockefeller University; Peter DeForest, John Jay College of Criminal Justice; Stephen Fienberg, Carnegie Mellon University; Barry Fisher, Los Angeles County Sheriff's Department; Mark Flomenbaum, Boston University; Ross Gardner, Gardner Forensic Consulting; Paul Giannelli, Case Western Reserve University; Randy Hanzlick, Emory University; Keith Inman, Forensic Analytical Sciences, Inc.; Dan Kahan, Yale Law School; Roger Kahn, Harris County Medical Examiner's Office; Elizabeth Loftus, University of California, Irvine; C. Owen Lovejoy, Kent State University; Kenneth Melson, George Washington University; Michael Murphy, Office of the Coroner/Medical Examiner, Las Vegas, Nevada; Hyla Napadensky, Retired, Napadensky Energetics Inc.; Joseph Peterson, California State University, Los Angeles; William Press, University of Texas, Austin; Jed Rakoff, U.S. District Court Southern District of New York; Carl Selavka, U.S. Army Criminal Investigation Laboratory; David Stoney, Stoney Forensic, Inc.; and Charles Wellford, University of Maryland.

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of this report was overseen by John Bailar, University of Chicago, and Royce Murray, University of North Carolina, Chapel Hill. Appointed by the National Academies, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

ix

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1505

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1506

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# CONTENTS

**Preface**                                                                      **P-1**

**Summary**                                                                      **S-1**
    Introduction
    Findings and Recommendations

**1**   **Introduction**                                           **1-1**
    What Is Forensic Science?
    Pressures on the Forensic Science System
    Organization of this Report

**2**   **The Forensic Science Community and the Need for Integrated Governance**   **2-1**
    Crime Scene Investigation
    Forensic Science Laboratories and Service Providers
    Case Backlogs
    NIJ's Coverdell Forensic Science Improvement Grant Program
    Forensic Services Beyond the Traditional Laboratory
    Federal Forensic Science Activities
    Research Funding
    Professional Associations
    Conclusions and Recommendation

**3**   **The Admission of Forensic Science Evidence in Litigation**   **3-1**
    Law and Science
    The *Frye* Standard and Rule 702 of the Federal Rules of Evidence
    The *Daubert* Decision and the Supreme Court's Construction of Rule 702
    The 2000 Amendment of Rule 702
    An Overview of Judicial Dispositions of *Daubert*-Type Questions
    Some Examples of Judicial Dispositions of Questions Relating to
        Forensic Science Evidence
    Conclusion

**4**   **The Principles of Science and Interpreting Scientific Data**   **4-1**
    Fundamental Principles of the Scientific Method
    Conclusion

**5**   **Descriptions of Some Forensic Science Disciplines**   **5-1**
    Biological Evidence
    Analysis of Controlled Substances
    Friction Ridge Analysis
    Other Pattern/Impression Evidence:  Shoeprints and Tire Tracks
    Toolmark and Firearms Identification
    Analysis of Hair Evidence
    Analysis of Fiber Evidence

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1507

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Questioned Document Examination
Analysis of Paint and Coatings Evidence
Analysis of Explosives Evidence and Fire Debris
Forensic Odontology
Bloodstain Pattern Analysis
An Emerging Forensic Science Discipline: Digital And Multimedia Analysis
Conclusions

**6   Improving Methods, Practice, and Performance in Forensic Science**       **6-1**
Independence of Forensic Science Laboratories
Uncertainties and Bias
Reporting Results
The Need for Research
Conclusions and Recommendations

**7   Strengthening Oversight of Forensic Science Practice**       **7-1**
Accreditation
Standards and Guidelines for Quality Control
Proficiency Testing
Certification
Oversight as a Requirement of Paul Coverdell Forensic Science Improvement Grants
Codes of Ethics
Conclusions and Recommendations

**8   Education and Training in Forensic Science**       **8-1**
Status of Forensic Science Education
Challenges and Opportunities to Improve Forensic Science Education
Research as a Component of Forensic Science Education Programs
Status of Training
Education in the Legal System
Conclusions and Recommendation

**9   Medical Examiner and Coroner Systems: Current and Future Needs**       **9-1**
Medical Examiners and Coroners (ME/C)
ME/C Jurisdiction
ME/C Missions
Variations in ME/C Systems
Qualifications of Coroners and Medical Examiners
ME/C Administration and Oversight
ME/C Staffing and Funding
The Movement to Convert Coroner Systems to Medical Examiner Systems
Utilization of Best Practices
Potential Scientific Advances that May Assist ME/Cs
The Shortage of Medical Examiners and Forensic Pathologists
Standards and Accreditation for Death Investigation Systems
Quality Control and Quality Assurance
Continuing Medical Education
Homeland Security
Forensic Pathology Research
Common Methods of Sample and Data Collection
Conclusions and Recommendation

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1508

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

**10     Automated Fingerprint Identification Systems**                    **10-1**
       Interoperability Challenges
       Conclusions and Recommendation

**11     Homeland Security and the Forensic Science Disciplines**          **11-1**
       Conclusions and Recommendation

**Appendices**

**A      Biographical Information of Committee and Staff**                 **A-1**

**B      Committee Meeting Agendas**                                       **B-1**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1509

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1510

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# PREFACE

Recognizing that significant improvements are needed in forensic science, Congress directed the National Academy of Sciences to undertake the study that led to this report. There are scores of talented and dedicated people in the forensic science community, and the work that they perform is vitally important. They are often strapped in their work, however, for lack of adequate resources, sound policies, and national support. It is clear that change and advancements, both systemic and scientific, are needed in a number of forensic science disciplines—to ensure the reliability of the disciplines, establish enforceable standards, and promote best practices and their consistent application.

In adopting this report, the aim of our committee is to chart an agenda for progress in the forensic science community and its scientific disciplines. Because the work of forensic science practitioners is so obviously wide-reaching and important—affecting criminal investigation and prosecution, civil litigation, legal reform, the investigation of insurance claims, national disaster planning and preparedness, homeland security, and the advancement of technology—the committee worked with a sense of great commitment and spent countless hours deliberating over the recommendations that are included in the report. These recommendations, which are inexorably interconnected, reflect the committee's strong views on policy initiatives that must be adopted in any plan to improve the forensic science disciplines and to allow the forensic science community to serve society more effectively.

The task Congress assigned our committee was daunting and required serious thought and the consideration of an extremely complex and decentralized system, with various players, jurisdictions, demands, and limitations. Throughout our lengthy deliberations, the committee heard testimony from the stakeholder community, ensuring that the voices of forensic practitioners were heard and their concerns addressed. We also heard from professionals who manage forensic laboratories and medical examiner/coroner offices; teachers who are devoted to training the next generation of forensic scientists; scholars who have conducted important research in a number of forensic science fields; and members of the legal profession and law enforcement agencies who understand how forensic science evidence is collected, analyzed, and used in connection with criminal investigations and prosecutions. We are deeply grateful to all of the presenters who spoke to the committee and/or submitted papers for our consideration. These experts and their work served the committee well.

In considering the testimony and evidence that was presented to the committee, what surprised us the most was the consistency of the message that we heard:

> *The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country. This can only be done with effective leadership at the highest levels of both federal and state governments, pursuant to national standards, and with a significant infusion of federal funds.*

The recommendations in this report represent the committee's studied opinion on how best to achieve this critical goal.

P-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1511

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

We had the good fortune to serve as co-chairs of the committee entrusted with addressing Congress' charge. The committee, formed under the auspices of the National Academies' Committee on Science, Technology, and Law and Committee on Applied and Theoretical Statistics, was composed of many talented professionals, some expert in various areas of forensic science, others in law, and still others in different fields of science and engineering. They listened, read, questioned, vigorously discussed the findings and recommendations offered in this report, and then worked hard to complete the research and writing required to produce the report. We are indebted to our colleagues for all the time and energy they gave to this effort. We are also most grateful to the staff, Anne-Marie Mazza, Scott Weidman, Steven Kendall, and the consultant writer, Kathi Hanna, for their superb work and dedication to this project; to staff members David Padgham and John Sislin, and editor, Sara Maddox, for their assistance; and to Paige Herwig, Laurie Richardson, and Judith A. Hunt for their sterling contributions in checking source materials and assisting with the final production of the report.

Harry T. Edwards and Constantine Gatsonis
Committee Co-chairs

P-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1512

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# SUMMARY

## INTRODUCTION

On November 22, 2005, the Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006 became law.[1] Under the terms of the statute, Congress authorized "the National Academy of Sciences to conduct a study on forensic science, as described in the Senate report."[2] The Senate Report to which the Conference Report refers states:

> While a great deal of analysis exists of the requirements in the discipline of DNA, there exists little to no analysis of the remaining needs of the community outside of the area of DNA. Therefore . . . the Committee directs the Attorney General to provide [funds] to the National Academy of Sciences to create an independent Forensic Science Committee. This Committee shall include members of the forensics community representing operational crime laboratories, medical examiners, and coroners; legal experts; and other scientists as determined appropriate.[3]

The Senate Report also sets forth the charge to the Forensic Science Committee, instructing it to:

(1)　assess the present and future resource needs of the forensic science community, to include State and local crime labs, medical examiners, and coroners;

(2)　make recommendations for maximizing the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(3)　identify potential scientific advances that may assist law enforcement in using forensic technologies and techniques to protect the public;

(4)　make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners available to work in public crime laboratories;

(5)　disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(6)　examine the role of the forensic community in the homeland security mission;

(7)　[examine] interoperability of Automated Fingerprint Information Systems [AFIS]; and

(8)　examine additional issues pertaining to forensic science as determined by the Committee.[4]

In the fall of 2006, a committee was established by the National Academy of Sciences to implement this congressional charge. As recommended in the Senate Report, the persons selected to serve included members of the forensic science community, members of the legal community, and a

---

[1] P.L. No. 109-108, 119 Stat. 2290 (2005).

[2] H.R. REP. NO. 109-272, at 121 (2005) (Conf. Rep.).

[3] S. REP. NO. 109-88, at 46 (2005).

[4] Ibid.

S-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1513

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

diverse group of scientists. Operating under the project title "Identifying the Needs of the Forensic Science Community," the committee met on eight occasions: January 25-26, April 23-24, June 5-6, September 20-21, and December 6-7, 2007, and March 24-25, June 23-24, and November 14-15, 2008. During these meetings, the committee heard expert testimony and deliberated over the information it heard and received. Between meetings, committee members reviewed numerous published materials, studies, and reports related to the forensic science disciplines, engaged in independent research on the subject, and worked on drafts of the final report.

Experts who provided testimony included federal agency officials; academics and research scholars; private consultants; federal, state, and local law enforcement officials; scientists; medical examiners; a coroner; crime laboratory officials from the public and private sectors; independent investigators; defense attorneys; forensic science practitioners; and leadership of professional and standard setting organizations (see the Acknowledgments and Appendix B for a complete listing of presenters).

The issues covered during the committee's hearings and deliberations included:

(a)   the fundamentals of the scientific method as applied to forensic practice—hypothesis generation and testing, falsifiability and replication, and peer review of scientific publications;

(b)   the assessment of forensic methods and technologies—the collection and analysis of forensic data; accuracy and error rates of forensic analyses; sources of potential bias and human error in interpretation by forensic experts; and proficiency testing of forensic experts;

(c)   infrastructure and needs for basic research and technology assessment in forensic science;

(d)   current training and education in forensic science;

(e)   the structure and operation of forensic science laboratories;

(f)   the structure and operation of the coroner and medical examiner systems;

(g)   budget, future needs, and priorities of the forensic science community and the coroner and medical examiner systems;

(h)   the accreditation, certification, and licensing of forensic science operations, medical death investigation systems, and scientists;

(i)   Scientific Working Groups (SWGs) and their practices;

(j)   forensic science practices—
pattern/experience evidence
   o   fingerprints (including the interoperability of AFIS)
   o   firearms examination
   o   toolmarks
   o   bite marks
   o   impressions (tires, footwear)
   o   bloodstain pattern analysis
   o   handwriting
   o   hair
analytical evidence
   o   DNA
   o   coatings (e.g., paint)

S-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1514

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

- o chemicals (including drugs)
- o materials (including fibers)
- o fluids
- o serology
- o fire and explosive analysis

digital evidence;

(k) the effectiveness of coroner systems as compared with medical examiner systems;

(l) the use of forensic evidence in criminal and civil litigation—
- o the collection and flow of evidence from crime scenes to courtrooms
- o the manner in which forensic practitioners testify in court
- o cases involving the misinterpretation of forensic evidence
- o the adversarial system in criminal and civil litigation
- o lawyers' use and misuse of forensic evidence
- o judges' handling of forensic evidence;

(m) forensic practice and projects at various federal agencies, including NIST, the FBI, DHS, U.S. Secret Service, NIJ, DEA, and DOD;

(n) forensic practice in state and local agencies;

(o) nontraditional forensic service providers; and

(p) the forensic science community in the United Kingdom.

The testimonial and documentary evidence considered by the committee was detailed, complex, and sometimes controversial. Given this reality, the committee could not possibly answer every question that it confronted, nor could it devise specific solutions for every problem that it identified. Rather, it reached a consensus on the most important issues now facing the forensic science community and medical examiner system and agreed on 13 specific recommendations to address these issues.

## Challenges Facing the Forensic Science Community

For decades, the forensic science disciplines have produced valuable evidence that has contributed to the successful prosecution and conviction of criminals as well as to the exoneration of innocent people. Over the last two decades, advances in some forensic science disciplines, especially the use of DNA technology, have demonstrated that some areas of forensic science have great additional potential to help law enforcement identify criminals. Many crimes that may have gone unsolved are now being solved because forensic science is helping to identify the perpetrators.

Those advances, however, also have revealed that, in some cases, substantive information and testimony based on faulty forensic science analyses may have contributed to wrongful convictions of innocent people. This fact has demonstrated the potential danger of giving undue weight to evidence and testimony derived from imperfect testing and analysis. Moreover, imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence.

Further advances in the forensic science disciplines will serve three important purposes. First, further improvements will assist law enforcement officials in the course of their investigations to identify perpetrators with higher reliability. Second, further improvements in forensic science practices should reduce the occurrence of wrongful convictions, which reduces the risk that true offenders continue to commit crimes while innocent persons inappropriately serve time. Third, any improvements in the forensic science disciplines will undoubtedly enhance the Nation's ability to address the needs of homeland security.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1515

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

Numerous professionals in the forensic science community and the medical examiner system have worked for years to achieve excellence in their fields, aiming to follow high ethical norms, develop sound professional standards, ensure accurate results in their practices, and improve the processes by which accuracy is determined. Although the work of these dedicated professionals has resulted in significant progress in the forensic science disciplines in recent decades, major challenges still face the forensic science community. It is therefore unsurprising that Congress instructed this committee to, among other things, "assess the present and future resource needs of the forensic science community," "make recommendations for maximizing the use of forensic technologies and techniques," "make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners," and "disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques." These are among the pressing issues facing the forensic science community. The best professionals in the forensic science disciplines invariably are hindered in their work because these and other problems persist.

The length of the congressional charge and the complexity of the material under review made the committee's assignment challenging. In undertaking it, the committee first had to gain an understanding of the various disciplines within the forensic science community, as well as the community's history, its strengths and weaknesses, and the roles of the people and agencies that constitute the community and make use of its services. In so doing, the committee was able to better comprehend some of the major problems facing the forensic science community and the medical examiner system. A brief review of some of these problems is illuminating.[5]

### Disparities in the Forensic Science Community

There are great disparities among existing forensic science operations in federal, state, and local law enforcement jurisdictions and agencies. This is true with respect to funding, access to analytical instrumentation, the availability of skilled and well-trained personnel, certification, accreditation, and oversight. As a result, it is not easy to generalize about current practices within the forensic science community. It is clear, however, that any approach to overhauling the existing system needs to address and help minimize the community's current fragmentation and inconsistent practices.

Although the vast majority of criminal law enforcement is handled by state and local jurisdictions, these entities often are sorely lacking in the resources (money, staff, training, and equipment) necessary to promote and maintain strong forensic science laboratory systems. By comparison, federal programs are often much better funded and staffed. It is also noteworthy that the resources, the extent of services, and the amount of expertise that medical examiners and forensic pathologists can provide vary widely in different jurisdictions. As a result, the depth, reliability, and overall quality of substantive information arising from the forensic examination of evidence available to the legal system vary substantially across the country.

### Lack of Mandatory Standardization, Certification, and Accreditation

The fragmentation problem is compounded because operational principles and procedures for many forensic science disciplines are not standardized or embraced, either between or within jurisdictions. There is no uniformity in the certification of forensic practitioners, or in the

---

[5] In this report, the "forensic science community," broadly speaking, is meant to include forensic pathology and medicolegal death investigation, which is sometimes referred to as "the medical examiner system" or "the medicolegal death investigation system."

S-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1516

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

accreditation of crime laboratories. Indeed, most jurisdictions do not require forensic practitioners to be certified, and most forensic science disciplines have no mandatory certification programs. Moreover, accreditation of crime laboratories is not required in most jurisdictions. Often there are no standard protocols governing forensic practice in a given discipline. And, even when protocols are in place (e.g., SWG standards), they often are vague and not enforced in any meaningful way. In short, the quality of forensic practice in most disciplines varies greatly because of the absence of adequate training and continuing education, rigorous mandatory certification and accreditation programs, adherence to robust performance standards, and effective oversight.[6] These shortcomings obviously pose a continuing and serious threat to the quality and credibility of forensic science practice.

**The Broad Range of Forensic Science Disciplines**

The term "forensic science" encompasses a broad range of forensic disciplines, each with its own set of technologies and practices. In other words, there is wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material. Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as hair). The "forensic science community," in turn, consists of a host of practitioners, including scientists (some with advanced degrees) in the fields of chemistry, biochemistry, biology, and medicine; laboratory technicians; crime scene investigators; and law enforcement officers. There are very important differences, however, between forensic laboratory work and crime scene investigations. There are also sharp distinctions between forensic practitioners who have been trained in chemistry, biochemistry, biology, and medicine (and who bring these disciplines to bear in their work) and technicians who lend support to forensic science enterprises. Many of these differences are discussed in the body of this report.

The committee decided early in its work that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation. However, the committee solicited testimony on a broad range of forensic science disciplines and sought to identify issues relevant across definable classes of disciplines. As a result of listening to this testimony and reviewing related written materials, the committee found substantial evidence indicating that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

**Problems Relating to the Interpretation of Forensic Evidence**

Often in criminal prosecutions and civil litigation, forensic evidence is offered to support conclusions about "individualization" (sometimes referred to as "matching" a specimen to a particular individual or other source) or about classification of the source of the specimen into one of several categories. With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source. In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there are important variations among the disciplines relying on expert

---

[6] See, e.g., P.C. Giannelli. 2007. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007); B. Schmitt and J. Swickard. 2008. "Detroit Police Lab Shut Down After Probe Finds Errors." *Detroit Free Press.* September 25.

S-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1517

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

interpretation. For example, there are more established protocols and available research for fingerprint analysis than for the analysis of bite marks. There also are significant variations within each discipline. For example, not all fingerprint evidence is equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. These disparities between and within the forensic science disciplines highlight a major problem in the forensic science community: The simple reality is that the interpretation of forensic evidence is not always based on scientific studies to determine its validity. This is a serious problem. Although research has been done in some disciplines, there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods.[7]

### The Need for Research to Establish Limits and Measures of Performance

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called on to address. Thus, although some techniques may be too imprecise to permit accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on some characteristics of the individual from which the specimen was taken, but it may not be able to reliably match the specimen with a specific individual. However, the definition of the appropriate question is only a first step in the evaluation of the performance of a forensic technique. A body of research is required to establish the limits and measures of performance and to address the impact of sources of variability and potential bias. Such research is sorely needed, but it seems to be lacking in most of the forensic disciplines that rely on subjective assessments of matching characteristics. These disciplines need to develop rigorous protocols to guide these subjective interpretations and pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from other areas, notably from the large body of research on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.[8]

### The Admission of Forensic Science Evidence in Litigation

Forensic science experts and evidence are used routinely in the service of the criminal justice system. DNA testing may be used to determine whether sperm found on a rape victim came from an accused party; a latent fingerprint found on a gun may be used to determine whether a defendant handled the weapon; drug analysis may be used to determine whether pills found in a person's possession were illicit; and an autopsy may be used to determine the cause and manner of death of a murder victim. In order for qualified forensic science experts to testify competently about forensic evidence, they must first find the evidence in a usable state and properly preserve it. A latent fingerprint that is badly smudged when found cannot be usefully saved, analyzed, or explained. An

---

[7] Several articles, for example, have noted the lack of scientific validation of fingerprint identification methods. See, e.g., J. J. Koehler. Fingerprint error rates and proficiency tests: What they are and why they matter. 59 HASTINGS L.J. 1077 (2008); L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability and Risk* 7(2):87; J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7(2):127.

[8] The findings of forensic science experts are vulnerable to cognitive and contextual bias. See, e.g., I.E. Dror, D. Charlton, and A.E. Péron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156:74, 77. ("Our study shows that it is possible to alter identification decisions on the same fingerprint, solely by presenting it in a different context."); I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600; Giannelli, *supra* note 6, pp. 220-222. Unfortunately, at least to date, there is no good evidence to indicate that the forensic science community has made a sufficient effort to address the bias issue; thus, it is impossible for the committee to fully assess the magnitude of the problem.

S-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1518

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

inadequate drug sample may be insufficient to allow for proper analysis. And, DNA tests performed on a contaminated or otherwise compromised sample cannot be used reliably to identify or eliminate an individual as the perpetrator of a crime. These are important matters involving the proper processing of forensic evidence. The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is *science* in any given forensic science discipline.

Two very important questions should underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Thus, it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support. Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

In 1993, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] the Supreme Court ruled that, under Rule 702 of the Federal Rules of Evidence (which covers both civil trials and criminal prosecutions in the federal courts), a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[10] The Court indicated that the subject of an expert's testimony should be scientific knowledge, so that "evidentiary reliability will be based upon scientific validity."[11] The Court also emphasized that, in considering the admissibility of evidence, a trial judge should focus "solely" on the expert's "principles and methodology," and "not on the conclusions that they generate."[12] In sum, *Daubert*'s requirement that an expert's testimony pertain to "scientific knowledge" established a standard of "evidentiary reliability."[13]

In explaining this evidentiary standard, the *Daubert* Court pointed to several factors that might be considered by a trial judge: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) a scientific technique's degree of acceptance within a relevant scientific community.[14] In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one."[15] The Court expressed confidence in the adversarial system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction

---

[9] 509 U.S. 579 (1993).

[10] Ibid., p. 589.

[11] Ibid., pp. 590 and 591 n.9 (emphasis omitted).

[12] Ibid., p. 595. In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court added: "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

[13] *Daubert*, 509 U.S. at 589, 590 n.9, 595.

[14] Ibid., pp. 593-94.

[15] Ibid., p. 594. *In Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire* importantly held that Rule 702 applies to both scientific and nonscientific expert testimony; the Court also indicated that the *Daubert* factors might be applicable in a trial judge's assessment of the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." Ibid., at 150.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1519

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1521 of 2008    PageID #: 3411

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[16] The Supreme Court has made it clear that trial judges have great discretion in deciding on the admissibility of evidence under Rule 702, and that appeals from *Daubert* rulings are subject to a very narrow abuse-of-discretion standard of review.[17] Most importantly, in *Kumho Tire Co., Ltd. v. Carmichael*, the Court stated that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[18]

*Daubert* and its progeny have engendered confusion and controversy. In particular, judicial dispositions of *Daubert*-type questions in criminal cases have been criticized by some lawyers and scholars who thought that the Supreme Court's decision would be applied more rigorously.[19] If one focuses solely on reported federal appellate decisions, the picture is not appealing to those who have preferred a more rigorous application of *Daubert*. Federal appellate courts have not with any consistency or clarity imposed standards ensuring the application of scientifically valid reasoning and reliable methodology in criminal cases involving *Daubert* questions. This is not really surprising, however. The Supreme Court itself described the *Daubert* standard as "flexible." This means that, beyond questions of relevance, *Daubert* offers appellate courts no clear substantive standard by which to review decisions by trial courts. As a result, trial judges exercise great discretion in deciding whether to admit or exclude expert testimony, and their judgments are subject only to a highly deferential "abuse of discretion" standard of review. Although it is difficult to get a clear picture of how trial courts handle *Daubert* challenges, because many evidentiary rulings are issued without a published opinion and without an appeal, the vast majority of the *reported* opinions in criminal cases indicate that trial judges rarely exclude or restrict expert testimony offered by prosecutors; most *reported* opinions also indicate that appellate courts routinely deny appeals contesting trial court decisions admitting forensic evidence against criminal defendants.[20] But the reported opinions do not offer in any way a complete sample of federal trial court dispositions of *Daubert*-type questions in criminal cases.

The situation appears to be very different in civil cases. Plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, while prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically, the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases.[21]

Prophetically, the *Daubert* decision observed that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and

---

[16] *Daubert*, 509 U.S. at 596.

[17] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-143 (1997).

[18] *Kumho Tire*, 526 U.S. at 153.

[19] See, e.g., P.J. Neufeld. 2005. The (near) irrelevance of *Daubert* to criminal justice: And some suggestions for reform. *American Journal of Public Health* 95(Supp.1):S107.

[20] Ibid., p. S109.

[21] See, e.g., *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000); 1 D.L. Faigman, M.J. Saks, J. Sanders, and E.K. Cheng. 2007-2008. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* Eagan, MN: Thomson/West, § 1.35, p. 105 (discussing studies suggesting that courts "employ *Daubert* more lackadaisically in criminal trials—especially in regard to prosecution evidence—than in civil cases—especially in regard to plaintiff evidence").

S-8

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1520

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

quickly."[22] But because accused parties in criminal cases are convicted on the basis of testimony from forensic science experts, much depends upon whether the evidence offered is reliable. Furthermore, in addition to protecting innocent persons from being convicted of crimes that they did not commit, we are also seeking to protect society from persons who have committed criminal acts. Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified by the forensic science community. "[T]here is no evident reason why ['rigorous, systematic'] research would be infeasible."[23] However, some courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely "demand more by way of validation than the disciplines can presently offer."[24]

The adversarial process relating to the admission and exclusion of scientific evidence is not suited to the task of finding "scientific truth." The judicial system is encumbered by, among other things, judges and lawyers who generally lack the scientific expertise necessary to comprehend and evaluate forensic evidence in an informed manner, trial judges (sitting alone) who must decide evidentiary issues without the benefit of judicial colleagues and often with little time for extensive research and reflection, and the highly deferential nature of the appellate review afforded trial courts' *Daubert* rulings. Given these realities, there is a tremendous need for the forensic science community to improve. Judicial review, by itself, will not cure the infirmities of the forensic science community.[25] The development of scientific research, training, technology, and databases associated with DNA analysis have resulted from substantial and steady federal support for both academic research and programs employing techniques for DNA analysis. Similar support must be given to all credible forensic science disciplines if they are to achieve the degrees of reliability needed to serve the goals of justice. With more and better educational programs, accredited laboratories, certified forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. The current situation, however, is seriously wanting, both because of the limitations of the judicial system and because of the many problems faced by the forensic science community.

## Political Realities

Most forensic science methods, programs, and evidence are within the regulatory province of state and local law enforcement entities or are covered by statutes and rules governing state judicial proceedings. Thus, in assessing the strengths, weaknesses, and future needs of forensic disciplines,

---

[22] *Daubert*, 509 U.S. at 596-97.

[23] J. Griffin and D.J. LaMagna. 2002. *Daubert* challenges to forensic evidence: Ballistics next on the firing line. *The Champion*, September-October:20, 21 (quoting P. Giannelli and E. Imwinkelried. 2000. Scientific evidence: The fallout from Supreme Court's decision in *Kumho Tire*. *Criminal Justice Magazine* 14(4):12, 40).

[24] Ibid. See, e.g., *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir. 2003) (noting "that while further research into fingerprint analysis would be welcome, to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good." (internal quotation marks omitted)).

[25] See J.L. Mnookin. Expert evidence, partisanship, and epistemic competence. 73 BROOK. L. REV. 1009, 1033 (2008) ("[S]o long as we have our adversarial system in much its present form, we are inevitably going to be stuck with approaches to expert evidence that are imperfect, conceptually unsatisfying, and awkward. It may well be that the real lesson is this: those who believe that we might ever fully resolve—rather than imperfectly manage—the deep structural tensions surrounding both partisanship and epistemic competence that permeate the use of scientific evidence within our legal system are almost certainly destined for disappointment.").

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1521

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

and in making recommendations for improving the use of forensic technologies and techniques, the committee remained mindful of the fact that Congress cannot directly fix all of the deficiencies in the forensic science community. Under our federal system of government, Congress does not have free reign to amend state criminal codes, rules of evidence, and statutes governing civil actions; nor may it easily and directly regulate local law enforcement practices, state and local medical examiner units, or state policies covering the accreditation of crime laboratories and the certification of forensic practitioners.

Congress' authority to act is significant, however. Forensic science programs in federal government entities—whether within DOJ, DHS, DOD, or the Department of Commerce (DOC)—are funded by congressional appropriations. If these programs are required to operate pursuant to the highest standards, they will provide an example for the states. More importantly, Congress can promote "best practices" and strong educational, certification, accreditation, ethics, and oversight programs in the states by offering funds that are contingent on meeting appropriate standards of practice. There is every reason to believe that offers of federal funds with "strings attached" can effect significant change in the forensic science community, because so many state and local programs currently are suffering for want of adequate resources. In the end, however, the committee recognized that state and local authorities must be willing to enforce change if it is to happen.

In light of the foregoing issues, the committee exercised caution before drawing conclusions and avoided being too prescriptive in its recommendations. It also recognized that, given the complexity of the issues and the political realities that may pose obstacles to change, some recommendations will have to be implemented creatively and over time in order to be effective.

## FINDINGS AND RECOMMENDATIONS

### The Fragmented System: Symptoms and Cures

The forensic science disciplines currently are an assortment of methods and practices used in both the public and private arenas. Forensic science facilities exhibit wide variability in capacity, oversight, staffing, certification, and accreditation across federal and state jurisdictions. Too often they have inadequate educational programs, and they typically lack mandatory and enforceable standards, founded on rigorous research and testing, certification requirements, and accreditation programs. Additionally, forensic science and forensic pathology research, education, and training lack strong ties to our research universities and national science assets. In addition to the problems emanating from the fragmentation of the forensic science community, the most recently published *Census of Crime Laboratories* conducted by BJS describes unacceptable case backlogs in state and local crime laboratories and estimates the level of additional resources needed to handle these backlogs and prevent their recurrence. Unfortunately, the backlogs, even in DNA case processing, have grown dramatically in recent years and are now staggering in some jurisdictions. The most recently published BJS *Special Report of Medical Examiners and Coroners' Offices* also depicts a system with disparate and often inadequate educational and training requirements, resources, and capacities—in short, a system in need of significant improvement.

Existing data suggest that forensic laboratories are under resourced and understaffed, which contributes to case backlogs and likely makes it difficult for laboratories to do as much as they could to (1) inform investigations, (2) provide strong evidence for prosecutions, and (3) avoid errors that could lead to imperfect justice. Being under resourced also means that the tools of forensic science—and the knowledge base that underpins the analysis and interpretation of evidence—are not

S-10

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1522

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

as strong as they could be, thus hindering the ability of the forensic science disciplines to excel at informing investigations, providing strong evidence, and avoiding errors in important ways. NIJ is the only federal agency that provides direct support to crime laboratories to alleviate the backlog, and those funds are minimal. The forensic science system is under resourced also in the sense that it has only thin ties to an academic research base that could support the forensic science disciplines and fill knowledge gaps. There are many hard-working and conscientious people in the forensic science community, but this under resourcing inherently limits their ability to do their best work. Additional resources surely will be necessary to create high-quality, self-correcting systems.

However, increasing the staff within existing crime laboratories and medical examiners' offices is only part of the solution. What also is needed is an upgrading of systems and organizational structures, better training, the widespread adoption of uniform and enforceable best practices, and mandatory certification and accreditation programs. The forensic science community and the medical examiner/coroner system must be upgraded if forensic practitioners are to be expected to serve the goals of justice.

Of the various facets of under resourcing, the committee is most concerned about the knowledge base. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capabilities of forensic science disciplines to discern valid information from crime scene evidence. For the most part, it is impossible to discern the magnitude of those limitations, and reasonable people will differ on their significance.

Forensic science research is not well supported, and there is no unified strategy for developing a forensic science research plan across federal agencies. Relative to other areas of science, the forensic disciplines have extremely limited opportunities for research funding. Although the FBI and NIJ have supported some research in forensic science, the level of support has been well short of what is necessary for the forensic science community to establish strong links with a broad base of research universities. Moreover, funding for academic research is limited and requires law enforcement collaboration, which can inhibit the pursuit of more fundamental scientific questions essential to establishing the foundation of forensic science. The broader research community generally is not engaged in conducting research relevant to advancing the forensic science disciplines.

The forensic science enterprise also is hindered by its extreme disaggregation—marked by multiple types of practitioners with different levels of education and training and different professional cultures and standards for performance and a reliance on apprentice-type training and a guild-like structure of disciplines, which work against the goal of a single forensic science profession. Many forensic scientists are given scant opportunity for professional activities, such as attending conferences or publishing their research, which could help strengthen the professional community and offset some of the disaggregation. The fragmented nature of the enterprise raises the worrisome prospect that the quality of evidence presented in court, and its interpretation, can vary unpredictably according to jurisdiction.

Numerous professional associations are organized around the forensic science disciplines, and many of them are involved in training and education (see Chapter 8) and are developing standards and accreditation and certification programs (see Chapter 7). The efforts of these groups are laudable. However, except for the largest organizations, it is not clear how these associations interact or the extent to which they share requirements, standards, or policies. Thus, there is a need for more consistent and harmonized requirements.

In the course of its deliberations and review of the forensic science enterprise, it became obvious to the committee that, although congressional action will not remedy all of the deficiencies in forensic science methods and practices, truly meaningful advances will not come without

S-11

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1523

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

significant concomitant leadership from the federal government. The forensic science enterprise lacks the necessary governance structure to pull itself up from its current weaknesses. Of the many professional societies that serve the enterprise, none is dominant, and none has clearly articulated the need for change or presented a vision for accomplishing it. And clearly no municipal or state forensic office has the mandate to lead the entire enterprise. The major federal resources—NIJ and the FBI Laboratory—have provided modest leadership, for which they should be commended: NIJ has contributed a helpful research program and the FBI Laboratory has spearheaded the SWGs. But again, neither entity has recognized, let alone articulated, a need for change or a vision for achieving it. Neither has the full confidence of the larger forensic science community. And because both are part of a prosecutorial department of the government, they could be subject to subtle contextual biases that should not be allowed to undercut the power of forensic science.

The forensic science enterprise needs strong governance to adopt and promote an aggressive, long-term agenda to help strengthen the forensic science disciplines. Governance must be strong enough—and independent enough—to identify the limitations of forensic science methodologies, and must be well connected with the Nation's scientific research base to effect meaningful advances in forensic science practices. The governance structure must be able to create appropriate incentives for jurisdictions to adopt and adhere to best practices and promulgate the necessary sanctions to discourage bad practices. It must have influence with educators in order to effect improvements to forensic science education. It must be able to identify standards and enforce them. A governance entity must be geared toward (and be credible within) the law enforcement community, but it must have strengths that extend beyond that area. Oversight of the forensic science community and medical examiner system will sweep broadly into areas of criminal investigation and prosecution, civil litigation, legal reform, investigation of insurance claims, national disaster planning and preparedness, homeland security, certification of federal, state, and local forensic practitioners, public health, accreditation of public and private laboratories, research to improve forensic methodologies, education programs in colleges and universities, and advancing technology.

The committee considered whether such a governing entity could be established within an existing federal agency. The National Science Foundation (NSF) was considered because of its strengths in leading research and its connections to the research and education communities. NSF is surely capable of building and sustaining a research base, but it has very thin ties to the forensic science community. It would be necessary for NSF to take many untested steps if it were to assume responsibility for the governance of applied fields of science. The committee also considered NIST. In the end analysis, however, NIST did not appear to be a viable option. It has a good program of research targeted at forensic science and law enforcement, but the program is modest. NIST also has strong ties to industry and academia, and it has an eminent history in standard setting and method development. But its ties to the forensic science community are still limited, and it would not be seen as a natural leader by the scholars, scientists, and practitioners in the field. In sum, the committee concluded that neither NSF nor NIST has the breadth of experience or institutional capacity to establish an effective governance structure for the forensic science enterprise.

There was also a strong consensus in the committee that no existing or new division or unit within DOJ would be an appropriate location for a new entity governing the forensic science community. DOJ's principal mission is to enforce the law and defend the interests of the United States according to the law. Agencies within DOJ operate pursuant to this mission. The FBI, for example, is the investigative arm of DOJ and its principal missions are to produce and use intelligence to protect the Nation from threats and to bring to justice those who violate the law. The work of these law enforcement units is critically important to the Nation, but the scope of the work

S-12

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1524

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

done by DOJ units is much narrower than the promise of a strong forensic science community. Forensic science serves more than just law enforcement; and when it does serve law enforcement, it must be equally available to law enforcement officers, prosecutors, *and* defendants in the criminal justice system. The entity that is established to govern the forensic science community cannot be principally beholden to law enforcement. The potential for conflicts of interest between the needs of law enforcement and the broader needs of forensic science are too great. In addition, the committee determined that the research funding strategies of DOJ have not adequately served the broad needs of the forensic science community. This is understandable, but not acceptable when the issue is whether an agency is best suited to support and oversee the Nation's forensic science community. In sum, the committee concluded that advancing *science* in the forensic science enterprise is not likely to be achieved within the confines of DOJ.

Furthermore, there is little doubt that some existing federal entities are too wedded to the current "fragmented" forensic science community, which is deficient in too many respects. Most notably, these existing agencies have failed to pursue a rigorous research agenda to confirm the evidentiary reliability of methodologies used in a number of forensic science disciplines. These agencies are not good candidates to oversee the overhaul of the forensic science community in the United States.

Finally, some existing federal agencies with other missions occasionally have undertaken projects affecting the forensic science community. These entities are better left to continue the good work that defines their principal missions. More responsibility is not better for these existing entities, nor would it be better for the forensic science community or the Nation.

The committee thus concluded that the problems at issue are too serious and important to be subsumed by an existing federal agency. It also concluded that no existing federal agency has the capacity or appropriate mission to take on the roles and responsibilities needed to govern and improve the forensic science enterprise.

The committee believes that what is needed to support and oversee the forensic science community is a new, strong, and independent entity that could take on the tasks that would be assigned to it in a manner that is as objective and free of bias as possible—one with no ties to the past and with the authority and resources to implement a fresh agenda designed to address the problems found by the committee and discussed in this report. A new organization should not be encumbered by the assumptions, expectations, and deficiencies of the existing fragmented infrastructure, which has failed to address the needs and challenges of the forensic science disciplines.

This new entity must be an independent federal agency established to address the needs of the forensic science community, and it must meet the following minimum criteria:

- It must have a culture that is strongly rooted in science, with strong ties to the national research and teaching communities, including federal laboratories.
- It must have strong ties to state and local forensic entities as well as to the professional organizations within the forensic science community.
- It must not be in any way committed to the existing system, but should be informed by its experiences.
- It must not be part of a law enforcement agency.
- It must have the funding, independence, and sufficient prominence to raise the profile of the forensic science disciplines and push effectively for improvements.

S-13

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1525

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

- It must be led by persons who are skilled and experienced in developing and executing national strategies and plans for standard setting; managing accreditation and testing processes; and developing and implementing rulemaking, oversight, and sanctioning processes.

No federal agency currently exists that meets all of these criteria.

**Recommendation 1:**

To promote the development of forensic science into a mature field of multidisciplinary research and practice, founded on the systematic collection and analysis of relevant data, Congress should establish and appropriate funds for an independent federal entity, the National Institute of Forensic Science (NIFS). NIFS should have a full-time administrator and an advisory board with expertise in research and education, the forensic science disciplines, physical and life sciences, forensic pathology, engineering, information technology, measurements and standards, testing and evaluation, law, national security, and public policy. NIFS should focus on:

(a) establishing and enforcing best practices for forensic science professionals and laboratories;

(b) establishing standards for the mandatory accreditation of forensic science laboratories and the mandatory certification of forensic scientists and medical examiners/forensic pathologists—and identifying the entity/entities that will develop and implement accreditation and certification;

(c) promoting scholarly, competitive peer-reviewed research and technical development in the forensic science disciplines and forensic medicine;

(d) developing a strategy to improve forensic science research and educational programs, including forensic pathology;

(e) establishing a strategy, based on accurate data on the forensic science community, for the efficient allocation of available funds to give strong support to forensic methodologies and practices in addition to DNA analysis;

(f) funding state and local forensic science agencies, independent research projects, and educational programs as recommended in this report, with conditions that aim to advance the credibility and reliability of the forensic science disciplines;

(g) overseeing education standards and the accreditation of forensic science programs in colleges and universities;

(h) developing programs to improve understanding of the forensic science disciplines and their limitations within legal systems; and

(i) assessing the development and introduction of new technologies in forensic investigations, including a comparison of new technologies with former ones.

S-14

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1526

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

The benefits that will flow from a strong, independent, strategic, coherent, and well-funded federal program to support and oversee the forensic science disciplines in this country are clear: The Nation will (1) bolster its ability to more accurately identify true perpetrators and exclude those who are falsely accused; (2) improve its ability to effectively respond to, attribute, and prosecute threats to homeland security; and (3) reduce the likelihood of convictions resting on inaccurate data. Moreover, establishing the scientific foundation of the forensic science disciplines, providing better education and training, and requiring certification and accreditation will position the forensic science community to take advantage of current and future scientific advances.

The creation of a new federal entity undoubtedly will pose challenges, not the least of which will be budgetary constraints. The committee is not in a position to estimate how much it will cost to implement the recommendations in this report; this is a matter best left to the expertise of the Congressional Budget Office. What is clear, however, is that Congress must take aggressive action if the worst ills of the forensic science community are to be cured. Political and budgetary concerns should not deter bold, creative, and forward-looking action, because the country cannot afford to suffer the consequences of inaction. It will also take time and patience to implement the recommendations in this report. But this is true with any large, complex, important, and challenging enterprise.

The committee strongly believes that the greatest hope for success in this enterprise will come with the creation of the National Institute of Forensic Science (NIFS) to oversee and direct the forensic science community. The remaining recommendations in this report are crucially tied to the creation of NIFS. However, each recommendation is a separate, essential piece of the plan to improve the forensic science community in the United States. Therefore, even if the creation of NIFS is forestalled, the committee vigorously supports the adoption of the core ideas and principles embedded in each of the following recommendations.

*Standardized Terminology and Reporting*

The terminology used in reporting and testifying about the results of forensic science investigations must be standardized. Many terms are used by forensic scientists in scientific reports and in court testimony that describe findings, conclusions, and degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include, but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can and does have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence. Although some forensic science disciplines have proposed reporting vocabulary and scales, the use of the recommended language is not standard practice among forensic science practitioners.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should contain, at minimum, "methods and materials," "procedures," "results," "conclusions," and, as appropriate, sources and magnitudes of uncertainty in the procedures and conclusions (e.g., levels of confidence). Some forensic science laboratory reports meet this standard of reporting, but many do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "the greenish, brown plant material in item #1 was identified as marijuana"), and they include no mention of methods or any discussion of measurement uncertainties.

Many clinical and testing disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. A good example is the ISO/IEC 17025 standard

S-15

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1527

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

(commonly called "ISO 17025"). ISO 17025 is an international standard published by the International Organization for Standardization (ISO) that specifies the general requirements for the competence to carry out tests and/or calibrations. These requirements have been used by accrediting agencies to determine what a laboratory must do to secure accreditation. In addition, some SWGs in the forensic disciplines have scoring systems for reporting findings, but these systems are neither uniformly nor consistently used. In other words, although appropriate standards exist, they are not always followed. Forensic reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including measures of uncertainty in reported results and associated estimated probabilities where possible.

**Recommendation 2:**

> **The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.**

*More and Better Research*

As noted above, some forensic science disciplines are supported by little rigorous systematic research to validate the discipline's basic premises and techniques. There is no evident reason why such research cannot be conducted. Much more federal funding is needed to support research in the forensic science disciplines and forensic pathology in universities and private laboratories committed to such work.

The forensic science and medical examiner communities will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, there is an urgent need for collaborative efforts to (1) develop new technical methods or provide in-depth grounding for advances developed in the forensic science disciplines; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile ground for discourse among the communities. NIFS should recommend, implement, and guide strategies for supporting such initiatives.

**Recommendation 3:**

> **Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:**
>
> (a) **Studies establishing the scientific bases demonstrating the validity of forensic methods.**
> (b) **The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realistic**

S-16

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1528

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**case scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.**

(c) **The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.**

(d) **Automated techniques capable of enhancing forensic technologies.**

To answer questions regarding the reliability and accuracy of a forensic analysis, the research needs to distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry. (Some of the legal issues are addressed in Chapter 3.)

*Best Practices and Standards*

Although there have been notable efforts to achieve standardization and develop best practices in some forensic science disciplines and the medical examiner system, most disciplines still lack best practices or any coherent structure for the enforcement of operating standards, certification, and accreditation. Standards and codes of ethics exist in some fields, and there are some functioning certification and accreditation programs, but none are mandatory. In short, oversight and enforcement of operating standards, certification, accreditation, and ethics are lacking in most local and state jurisdictions.

Scientific and medical assessment conducted in forensic investigations should be independent of law enforcement efforts either to prosecute criminal suspects or even to determine whether a criminal act has indeed been committed. Administratively, this means that forensic scientists should function independently of law enforcement administrators. The best science is conducted in a scientific setting as opposed to a law enforcement setting. Because forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.

**Recommendation 4:**

> **To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1529

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

**Recommendation 5:**

> **The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.**

**Recommendation 6:**

> **To facilitate the work of the National Institute of Forensic Science (NIFS), Congress should authorize and appropriate funds to NIFS to work with the National Institute of Standards and Technology (NIST), in conjunction with government laboratories, universities, and private laboratories, and in consultation with Scientific Working Groups, to develop tools for advancing measurement, validation, reliability, information sharing, and proficiency testing in forensic science and to establish protocols for forensic examinations, methods, and practices. Standards should reflect best practices and serve as accreditation tools for laboratories and as guides for the education, training, and certification of professionals. Upon completion of its work, NIST and its partners should report findings and recommendations to NIFS for further dissemination and implementation.**

*Quality Control, Assurance, and Improvement*

In a field such as medical diagnostics, a health care provider typically can track a patient's progress to see whether the original diagnosis was accurate and helpful. For example, widely accepted programs of quality control ensure timely feedback involving the diagnoses that result from mammography. Other examples of quality assurance and improvement—including the development of standardized vocabularies, ontologies, and scales for interpreting diagnostic tests and developing standards for accreditation of services—pervade diagnostic medicine. This type of systematic and routine feedback is an essential element of any field striving for continuous improvement. The forensic science disciplines likewise must become a self-correcting enterprise, developing and implementing feedback loops that allow the profession to discover past mistakes. A particular need exists for routine, mandatory proficiency testing that emulates a realistic, representative cross-section of casework, for example, DNA proficiency testing.

S-18

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1530

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

SUMMARY—PREPUBLICATION COPY

**Recommendation 7:**

> **Laboratory accreditation and individual certification of forensic science professionals should be mandatory, and all forensic science professionals should have access to a certification process. In determining appropriate standards for accreditation and certification, the National Institute of Forensic Science (NIFS) should take into account established and recognized international standards, such as those published by the International Organization for Standardization (ISO). No person (public or private) should be allowed to practice in a forensic science discipline or testify as a forensic science professional without certification. Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories and facilities (public or private) should be accredited, and all forensic science professionals should be certified, when eligible, within a time period established by NIFS.**

**Recommendation 8:**

> **Forensic laboratories should establish routine quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners. Quality control procedures should be designed to identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement.**

*Codes of Ethics*

A number of forensic science organizations—such as AAFS, the Midwestern Association of Forensic Scientists, ASCLD, and NAME—have adopted codes of ethics. The codes that exist are sometimes comprehensive, but they vary in content. While there is no reason to doubt that many forensic scientists understand their ethical obligations and practice in an ethical way, there are no consistent mechanisms for enforcing any of the existing codes of ethics. Many jurisdictions do not require certification in the same way that, for example, states require lawyers to be licensed. Therefore, few forensic science practitioners face the threat of official sanctions or loss of certification for serious ethical violations. And it is unclear whether and to what extent forensic science practitioners are required to adhere to ethics standards as a condition of employment.

**Recommendation 9:**

> **The National Institute of Forensic Science (NIFS), in consultation with its advisory board, should establish a national code of ethics for all forensic science disciplines and encourage individual societies to incorporate this national code as part of their professional code of ethics. Additionally, NIFS should explore mechanisms of enforcement for those forensic scientists who commit serious ethical violations. Such a code could be enforced through a certification process for forensic scientists.**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1531

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

*Insufficient Education and Training*

Forensic science examiners need to understand the principles, practices, and contexts of scientific methodology, as well as the distinctive features of their specialty. Ideally, training should move beyond apprentice-like transmittal of practices to education based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and instruction on how to document and report the analysis. A trainee also should have working knowledge of basic quantitative calculations, including statistics and probability, as needed for the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. Legitimization of practices in forensic disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role, and under no circumstances can it supplant the need for the scientific basis of education in and the practice of forensic science.

In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted between experts in the forensic science disciplines and law schools, legal scholars, and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in the forensic science disciplines, by offering credit for forensic science courses taken in other colleges, and by developing joint degree programs. And judges need to be better educated in forensic science methodologies and practices.

**Recommendation 10:**

> **To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and develop graduate education programs designed to cut across organizational, programmatic, and disciplinary boundaries. To make these programs appealing to potential students, they must include attractive scholarship and fellowship offerings. Emphasis should be placed on developing and improving research methods and methodologies applicable to forensic science practice and on funding research programs to attract research universities and students in fields relevant to forensic science. NIFS should also support law school administrators and judicial education organizations in establishing continuing legal education programs for law students, practitioners, and judges.**

S-20

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1532

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*The Medicolegal Death Investigation System*

Although steps have been taken to transform the medicolegal death investigation system, the shortage of resources and lack of consistent educational and training requirements (particularly in the coroner system)[26] prevent the system from taking full advantage of tools—such as CT scans and digital X-rays—that the medical system and other scientific disciplines have to offer. In addition, more rigorous efforts are needed in the areas of accreditation and adherence to standards. Currently, requirements for practitioners vary from nothing more than age and residency requirements to certification by the American Board of Pathology in forensic pathology.

Funds are needed to assess the medicolegal death investigation system to determine its status and needs, using as a benchmark the current requirements of NAME relating to professional credentials, standards, and accreditation. And funds are needed to modernize and improve the medicolegal death investigation system. As it now stands, medical examiners and coroners (ME/Cs) are essentially ineligible for direct federal funding and grants from DOJ, DHS, or the Department of Health and Human Services (through the National Institutes of Health). The Paul Coverdell National Forensic Science Improvement Act is the only federal grant program that names medical examiners and coroners as eligible for grants. However, ME/Cs must compete with public safety agencies for Coverdell grants; as a result, the funds available to ME/Cs are inadequate. The simple reality is that the program has not been sufficiently funded to provide significant improvements in ME/C systems.

In addition to direct funding, there are other initiatives that should be pursued to improve the medicolegal death investigation system. The Association of American Medical Colleges and other appropriate professional organizations should organize collaborative activities in education, training, and research to strengthen the relationship between the medical examiner community and its counterparts in the larger academic medical community. Medical examiner offices with training programs affiliated with medical schools should be eligible to compete for funds. Funding should be available to support pathologists seeking forensic fellowships. In addition, forensic pathology fellows could be allowed to apply for medical school loan forgiveness if they stay full time at a medical examiner's office for a reasonable period of time.

Additionally, NIFS should seek funding from Congress to support the joint development of programs to include medical examiners and medical examiner offices in national disaster planning, preparedness, and consequence management, involving the Centers for Disease Control and Prevention (CDC) and DHS. Uniform statewide and interstate standards of operation would be needed to assist in the management of cross-jurisdictional and interstate events. NIFS should support a federal program underwriting the development of software for use by ME/C systems for the management of multisite, multiple fatality events.

NIFS should work with groups such as the National Conference of Commissioners on Uniform State Laws, the American Law Institute, and NAME, in collaboration with other appropriate professional groups, to update the 1954 Model Post-Mortem Examinations Act and draft legislation for a modern model death investigation code. An improved code might, for example, include the elements of a competent medical death investigation system and clarify the jurisdiction of the medical examiner with respect to organ donation.

The foregoing ideas must be developed further before any concrete plans can be pursued. There are, however, a number of specific recommendations, which, if adopted, will help to modernize and improve the medicolegal death investigation system. These recommendations deserve the immediate attention of Congress and NIFS.

[26] Institute of Medicine. 2003. *Workshop on the Medicolegal Death Investigation System.* Washington, DC: National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1533

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

**Recommendation 11:**

To improve medicolegal death investigation:

(a) Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to states and jurisdictions to establish medical examiner systems, with the goal of replacing and eventually eliminating existing coroner systems. Funds are needed to build regional medical examiner offices, secure necessary equipment, improve administration, and ensure the education, training, and staffing of medical examiner offices. Funding could also be used to help current medical examiner systems modernize their facilities to meet current Centers for Disease Control and Prevention-recommended autopsy safety requirements.

(b) Congress should appropriate resources to the National Institutes of Health (NIH) and NIFS, jointly, to support research, education, and training in forensic pathology. NIH, with NIFS participation, or NIFS in collaboration with content experts, should establish a study section to establish goals, to review and evaluate proposals in these areas, and to allocate funding for collaborative research to be conducted by medical examiner offices and medical universities. In addition, funding, in the form of medical student loan forgiveness and/or fellowship support, should be made available to pathology residents who choose forensic pathology as their specialty.

(c) NIFS, in collaboration with NIH, the National Association of Medical Examiners, the American Board of Medicolegal Death Investigators, and other appropriate professional organizations, should establish a Scientific Working Group (SWG) for forensic pathology and medicolegal death investigation. The SWG should develop and promote standards for best practices, administration, staffing, education, training, and continuing education for competent death scene investigation and postmortem examinations. Best practices should include the utilization of new technologies such as laboratory testing for the molecular basis of diseases and the implementation of specialized imaging techniques.

(d) All medical examiner offices should be accredited pursuant to NIFS-endorsed standards within a timeframe to be established by NIFS.

(e) All federal funding should be restricted to accredited offices that meet NIFS-endorsed standards or that demonstrate significant and measurable progress in achieving accreditation within prescribed deadlines.

(f) All medicolegal autopsies should be performed or supervised by a board certified forensic pathologist. This requirement should take effect within a timeframe to be established by NIFS, following consultation with governing state institutions.

*AFIS and Database Interoperability*

Great improvement is necessary in AFIS interoperability. Crimes may go unsolved today simply because it is not possible for investigating agencies to search across all the databases that might hold a suspect's fingerprints or that may contain a match for an unidentified latent print from a

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1534

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

crime scene. It is also possible that some individuals have been wrongly convicted because of the limitations of fingerprint searches.

At present, serious practical problems pose obstacles to the achievement of nationwide AFIS interoperability. These problems include convincing AFIS equipment vendors to cooperate and collaborate with the law enforcement community and researchers to create and use baseline standards for sharing fingerprint data and create a common interface. Second, law enforcement agencies lack the resources needed to transition to interoperable AFIS implementations. Third, coordinated jurisdictional agreements and public policies are needed to allow law enforcement agencies to share fingerprint data more broadly.

Given the disparity in resources and information technology expertise available to local, state, and federal law enforcement agencies, the relatively slow pace of interoperability efforts to date, and the potential gains from increased AFIS interoperability, the committee believes that a broad-based emphasis on achieving nationwide fingerprint data interoperability is needed.

**Recommendation 12:**

**Congress should authorize and appropriate funds for the National Institute of Forensic Science (NIFS) to launch a new broad-based effort to achieve nationwide fingerprint data interoperability. To that end, NIFS should convene a task force comprising relevant experts from the National Institute of Standards and Technology and the major law enforcement agencies (including representatives from the local, state, federal, and, perhaps, international levels) and industry, as appropriate, to develop:**

**(a)    standards for representing and communicating image and minutiae data among Automated Fingerprint Identification Systems. Common data standards would facilitate the sharing of fingerprint data among law enforcement agencies at the local, state, federal, and even international levels, which could result in more solved crimes, fewer wrongful identifications, and greater efficiency with respect to fingerprint searches; and**

**(b)    baseline standards—to be used with computer algorithms—to map, record, and recognize features in fingerprint images, and a research agenda for the continued improvement, refinement, and characterization of the accuracy of these algorithms (including quantification of error rates).**

These steps toward AFIS interoperability must be accompanied by federal, state, and local funds to support jurisdictions in upgrading, operating, and ensuring the integrity and security of their systems; retraining current staff; and training new fingerprint examiners to gain the desired benefits of true interoperability. Additionally, greater scientific benefits can be realized through the availability of fingerprint data or databases for research purposes (using, of course, all the modern security and privacy protections available to scientists when working with such data). Once created, NIFS might also be tasked with the maintenance and periodic review of the new standards and procedures.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1535

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

*Forensic Science Disciplines and Homeland Security*

Good forensic science and medical examiner practices are of clear value from a homeland security perspective, because of their roles in bringing criminals to justice and in dealing with the effects of natural and human-made mass disasters. Forensic science techniques (e.g., the evaluation of DNA fragments) enable more thorough investigations of crime scenes that have been damaged physically. Routine and trustworthy collection of digital evidence, and improved techniques and timeliness for its analysis, can be of great potential value in identifying terrorist activity. Therefore, the forensic science community has a role to play in homeland security. However, to capitalize on this potential, the forensic science and medical examiner communities must be well interfaced with homeland security efforts, so that they can contribute when needed. To be successful, this interface will require the establishment of good working relationships between federal, state, and local jurisdictions, the creation of strong security programs to protect data transmittals between jurisdictions, the development of additional training for forensic scientists and crime scene investigators, and the promulgation of contingency plans that will promote efficient team efforts on demand. Policy issues relating to the enforcement of homeland security are not within the scope of the committee's charge and, thus, are beyond the scope of the report. It can hardly be doubted, however, that improvements in the forensic science community and medical examiner system could greatly enhance the capabilities of homeland security.

**Recommendation 13:**

> **Congress should provide funding to the National Institute of Forensic Science (NIFS) to prepare, in conjunction with the Centers for Disease Control and Prevention and the Federal Bureau of Investigation, forensic scientists and crime scene investigators for their potential roles in managing and analyzing evidence from events that affect homeland security, so that maximum evidentiary value is preserved from these unusual circumstances and the safety of these personnel is guarded. This preparation also should include planning and preparedness (to include exercises) for the interoperability of local forensic personnel with federal counterterrorism organizations.**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1536

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 1
# INTRODUCTION

The world of crime is a complex place. Crime takes place in the workplace, schools, homes, places of business, motor vehicles, on the streets, and, increasingly, on the Internet. Crimes are committed at all hours of the day and night and in all regions of the country, in rural, suburban, and urban environments. In many cases, a weapon is used, such as a handgun, knife, or blunt object. Sometimes the perpetrator is under the influence of alcohol or illicit drugs. In other cases, no one is physically hurt, but property is damaged or stolen—for example, when burglary, theft, and motor vehicle theft occur. In recent years, information technology has provided the opportunity for identity theft and other types of cybercrime. A crime scene often is rich in information that reveals the nature of the criminal activity and the identities of those persons involved. Perpetrators and victims may leave behind blood, saliva, skin cells, hair, fingerprints, footprints, tire prints, clothing fibers, digital and photographic images, audio data, handwriting, and the residual effects and debris of arson, gunshots, and unlawful entry. Some crimes transcend borders, such as those involving homeland security, for which forensic evidence can be gathered.

Crime scene investigators, with varying levels of training and experience, search for and collect evidence at the scene, preserve and secure it in tamper-evident packaging, label it, and send it to an appropriate agency—normally a crime laboratory, where it may be analyzed by forensic examiners. If a death was sudden, unexpected, or resulted from violence, a medicolegal investigator (e.g., coroner, medical examiner, forensic pathologist, physician's assistant) will be responsible for determining whether a homicide, suicide, or accident occurred and will certify the cause and manner of death.

Crime scene evidence moves through a chain of custody in which, depending on their physical characteristics (e.g., blood, fiber, handwriting), samples are analyzed according to any of a number of analytical protocols, and results are reported to law enforcement and court officials. When evidence is analyzed, typically forensic science "attempts to uncover the actions or happenings of an event . . . by way of (1) identification (categorization), (2) individualization, (3) association, and (4) reconstruction."[1] Evidence also is analyzed for the purpose of excluding individuals or sources.

Not all forensic services are performed in traditional crime laboratories by trained forensic scientists. Some forensic tests might be conducted by a sworn law enforcement officer with no scientific training or credentials, other than experience. In smaller jurisdictions, members of the local police or sheriff's department might conduct the analyses of evidence, such as latent print examinations and footwear comparisons. In the United States, if evidence is sent to a crime laboratory, that facility might be publicly or privately operated, although private laboratories typically do not visit crime scenes to collect evidence or serve as the first recipient of physical evidence. Public crime laboratories are organized at the city, county, state, or federal level. A law enforcement agency that does not operate its own crime laboratory typically has access to a higher-level laboratory (e.g., at the state or county level) or a private laboratory for analysis of evidence.

---

[1] K. Inman and N. Rudin. 2002. The origin of evidence. *Forensic Science International* 126:11-16.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1537

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

According to a 2005 census by the Bureau of Justice Statistics (BJS),[2] 389 publicly funded forensic crime laboratories were operating in the United States in 2005: These included 210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories, and they received evidence from nearly 2.7 million criminal cases[3] in 2005. These laboratories are staffed by individuals with a wide range of training and expertise, from scientists with Ph.D.s to technicians who have been trained largely on the job. No data are available on the size and depth of the private forensic laboratories, except for private DNA laboratories.

In general, a traditional crime laboratory has been defined as constituting "a single laboratory or system comprised of scientists analyzing evidence in one or more of the following disciplines: controlled substances, trace, biology (including DNA), toxicology, latent prints, questioned documents, firearms/toolmarks, or crime scene."[4] More recently, increasing numbers of laboratories specialize in the analysis of evidence in one area, for example, DNA or digital evidence. (See Chapter 5 for a more complete description and discussion of the forensic science disciplines.)

The capacity and quality of the current forensic science system have been the focus of increasing attention by Congress, the courts, and the media. New doubts about the accuracy of some forensic science practices have intensified with the growing number of exonerations resulting from DNA analysis (and the concomitant realization that guilty parties sometimes walk free). Greater expectations for precise forensic science evidence raised by DNA testing have forced new scrutiny on other forensic techniques. Emerging scientific advances that could benefit forensic investigation elicit concerns about resources, training, and capacity for implementing new techniques. A crisis in backlogged cases, caused by crime laboratories lacking sufficient resources and qualified personnel, raises concerns about the effectiveness and efficiency of the criminal justice system. When backlogs prolong testing time, issues involving speedy trials may arise. In addition, backlogs discourage law enforcement personnel and organizations from submitting evidence. Laboratories also may restrict submissions of evidence to reduce backlogs. All of these concerns, and more, provide the background against which this report is set.

Finally, if evidence and laboratory tests are mishandled or improperly analyzed; if the scientific evidence carries a false sense of significance; or if there is bias, incompetence, or a lack of adequate internal controls for the evidence introduced by the forensic scientists and their laboratories, the jury or court can be misled, and this could lead to wrongful conviction or exoneration. If juries lose confidence in the reliability of forensic testimony, valid evidence might be discounted, and some innocent persons might be convicted or guilty individuals acquitted.

Recent years have seen a number of concerted efforts by forensic science organizations to strengthen the foundations of many areas of testimony. However, substantial improvement is necessary in the forensic science disciplines to enhance law enforcement's ability to identify those who have or have not committed a crime and to prevent the criminal justice system from erroneously convicting or exonerating the persons who come before it.

---

[2] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[3] Ibid., p. 9. "A 'case' is defined as evidence submitted from a single criminal investigation. A case may include multiple 'requests' for forensic services. For example, one case may include a request for biology screening and a request for latent prints."

[4] Ibid., p. 24.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1538

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## WHAT IS FORENSIC SCIENCE?

Although there are numerous ways by which to categorize the forensic science disciplines, the committee found the categorization used by the National Institute of Justice to be useful:

1. general toxicology;
2. firearms/toolmarks;
3. questioned documents;
4. trace evidence;
5. controlled substances;
6. biological/serology screening (including DNA analysis);
7. fire debris/arson analysis;
8. impression evidence;
9. blood pattern analysis;
10. crime scene investigation;
11. medicolegal death investigation; and
12. digital evidence.[5]

Some of these disciplines are discussed in Chapter 5. Forensic pathology is considered a subspecialty of medicine and is considered separately in Chapter 9.

The term "forensic science" encompasses a broad range of disciplines, each with its own distinct practices. The forensic science disciplines exhibit wide variability with regard to techniques, methodologies, reliability, level of error, research, general acceptability, and published material (see Chapters 4 through 6). Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology, and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks). Some activities require the skills and analytical expertise of individuals trained as scientists (e.g., chemists or biologists); other activities are conducted by scientists as well as by individuals trained in law enforcement (e.g., crime scene investigators, blood spatter analysts, crime reconstruction specialists), medicine (e.g., forensic pathologists), or laboratory methods (e.g., technologists). Many of the processes used in the forensic science disciplines are largely empirical applications of science—that is, they are not based on a body of knowledge that recognizes the underlying limitations of the scientific principles and methodologies used for problem solving and discovery. It is therefore important to focus on ways to improve, systematize, and monitor the activities and practices in the forensic science disciplines and related areas of inquiry. Thus, in this report, the term "forensic science" is used with regard to a broad array of activities, with the recognition that some of these activities might not have a well-developed research base, are not informed by scientific knowledge, or are not developed within the culture of science.

---

[5] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1539

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## PRESSURES ON THE FORENSIC SCIENCE SYSTEM

As mentioned above, a number of factors have combined in the past few decades to place increasing demands on an already overtaxed, inconsistent, and under resourced forensic science infrastructure. These factors have not only stressed the system's capacity, but also have raised serious questions and concerns about the validity and reliability of some forensic methods and techniques and how forensic evidence is reported to juries and courts.

### The Case Backlog—Insufficient Resources

According to the 2005 BJS census report, a typical publicly funded crime laboratory ended the year with a backlog of about 401 requests for services, received another 4,328 such requests, and completed 3,980 of them. Roughly half of all requests were in the area of controlled substances. The average backlog has risen since the 2002 census,[6] with nearly 20 percent of all requests backlogged by year end. The Department of Justice (DOJ) defines a case as backlogged if it remains in the laboratory 30 days or more without the development of a report or analysis. Federal, state, and local laboratories reported a combined backlog of 435,879 requests for forensic analysis.[7] According to the census, a typical laboratory performing DNA testing in 2005 started the year with a backlog of 86 requests, received 337 new requests, completed 265 requests, and finished the year with 152 backlogged requests.

The backlog is exacerbated further by increased requests for quick laboratory results by law enforcement and prosecutors. Witnesses before the committee testified that prosecutors increasingly rely on laboratories to provide results prior to approving charges and have increased requests for additional work on the back end of a case, just before trial.[8] Backlogs are compounded by rising police agency requests for testing (e.g., for DNA evidence found on guns and from nonviolent crime scenes). Laboratories are thus challenged to balance requests for analyses of "older" and "cold" cases with new cases and must make choices to allocate resources by prioritizing the evidence to be analyzed. In California, voters passed Proposition 69, requiring that a DNA sample be obtained from all convicted felons. This increased the workload and resulted in 235,000 backlogged cases by the end of 2005.[9]

These backlogs can result in prolonged incarceration for innocent persons wrongly charged and awaiting trial and delayed investigation of those who are not yet charged, and they can contribute to the release of guilty suspects who go on to commit further crimes.

### The Ascendancy of DNA Analysis and a New Standard

In the 1980s, the opportunity to use the techniques of DNA technologies to identify individuals for forensic and other purposes became apparent. Early concerns about the use of DNA for forensic casework included the following: (1) whether the detection methods were scientifically valid—that is, whether they correctly identified true matches and true nonmatches and (2) whether DNA analysis of forensic samples is reliable—that is, whether it yields reproducible results under defined conditions of use. A 1990 report by the congressional Office

---

[6] J.L. Peterson and M.J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at: www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf.

[7] Durose, op. cit.

[8] J.L. Johnson, Laboratory Director, Illinois State Police, Forensic Science Center at Chicago. Presentation to the committee. January 25, 2007.

[9] Durose, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1540

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1542 of 2008 PageID #: 3432

of Technology Assessment concluded that DNA tests were both reliable and valid in the forensic context but required a strict set of standards and quality control measures before they could be widely adopted.[10]

In 1990, the Federal Bureau of Investigation (FBI) established guidelines for DNA analysis and proficiency testing and four years later created the Combined DNA Index System (CODIS), which allows federal, state, and local crime laboratories to exchange and compare DNA profiles electronically, thereby linking crimes to each other and to convicted offenders.

In 1992, the National Research Council (NRC) issued *DNA Technology in Forensic Science*, which concluded that, "No laboratory should let its results with a new DNA typing method be used in court, unless it has undergone . . . proficiency testing via blind trials."[11] In addition, the report cautioned that numerous questions must be answered about using DNA evidence in a forensic context that rarely had to be considered by scientists engaged in DNA research—for example, questions involving contamination, degradation, and a number of statistical issues. While confirming that the science behind DNA analysis is valid, a subsequent NRC report in 1996 recommended new ways of interpreting DNA evidence to help answer a key question for jurors—the likelihood that two matching samples can come from different people.[12] This 1996 report recommended a set of statistical calculations that takes population structure into account, which enhanced the validity of the test. The report also called for independent retesting and made recommendations to improve laboratory performance and accountability through, for example, adherence to high-quality standards, accreditation, and proficiency testing.

Since then, the past two decades have seen tremendous growth in the use of DNA evidence in crime scene investigations. Currently more than 175 publicly funded forensic laboratories and approximately 30 private laboratories conduct hundreds of thousands of DNA analyses annually in the United States. In addition, most countries in Europe and Asia have forensic DNA programs. In 2003, President George W. Bush announced a 5-year, $1 billion initiative to improve the use of DNA in the criminal justice system. Called the *President's DNA Initiative*, the program pushed for increased funding, training, and assistance to ensure that DNA technology "reaches its full potential to solve crimes, protect the innocent, and identify missing persons."[13]

Thus, DNA analysis—originally developed in research laboratories in the context of life sciences research—has received heightened scrutiny and funding support. That, combined with its well-defined precision and accuracy, has set the bar higher for other forensic science methodologies, because it has provided a tool with a higher degree of reliability and relevance than any other forensic technique. However, DNA evidence comprises only about 10 percent of case work and is not always relevant to a particular case.[14] Even if DNA evidence is available, it will assist in solving a crime only if it supports an evidential hypothesis that makes guilt or innocence more likely. For example, the fact that DNA evidence of a victim's husband is found in the house in which the couple lived and where the murder took place proves nothing. The fact that the husband's DNA is found under the fingernails of the victim who put up a struggle may

---

[10] U.S. Congress, Office of Technology Assessment. 1990. *Genetic Witness: Forensic Uses of DNA Tests*. OTA-BA-438. Washington, D.C.: U.S. Government Printing Office, NTIS order #PB90-259110.

[11] National Research Council. 1992. *DNA Technology in Forensic Science*. Washington, D.C.: National Academy Press, p. 55.

[12] National Research Council. 1996. *The Evaluation of Forensic DNA Evidence: An Update*. Washington, D.C.: National Academy Press.

[13] See www.dna.gov/info/e_summary.

[14] The American Society of Crime Laboratory Directors. 2004. *180 Day Study: Status and Needs of U.S. Crime Labs*. p. 7, table 2.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1541

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

have a very different significance. Thus, it is essential to articulate the reasoning process and the context associated with the evidence that is being evaluated.

**Questionable or Questioned Science**

The increased use of DNA analysis as a more reliable approach to matching crime scene evidence with suspects and victims has resulted in the reevaluation of older cases that retained biological evidence that could be analyzed by DNA. The number of exonerations resulting from the analysis of DNA has grown across the country in recent years, uncovering a disturbing number of wrongful convictions—some for capital crimes—and exposing serious limitations in some of the forensic science approaches commonly used in the United States.

According to The Innocence Project, there have been 223 postconviction DNA exonerations in the United States since 1989 (as of November 2008).[15] Some have contested the percentage of exonerated defendants whose convictions allegedly were based on faulty science. Although the Innocence Project figures are disputed by forensic scientists who have reexamined the data, even those who are critical of the conclusions of The Innocence Project acknowledge that faulty forensic science has, on occasion, contributed to the wrongful conviction of innocent persons.[16]

The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny. Most of these techniques were developed in crime laboratories to aid in the investigation of evidence from a particular crime scene, and researching their limitations and foundations was never a top priority. There is some logic behind the application of these techniques; practitioners worked hard to improve their methods, and results from other evidence have combined with these tests to give forensic scientists a degree of confidence in their probative value. Before the first offering of the use of DNA in forensic science in 1986, no concerted effort had been made to determine the reliability of these tests, and some in the forensic science and law enforcement communities believed that scientists' ability to withstand cross-examination in court when giving testimony related to these tests was sufficient to demonstrate the tests' reliability. However, although the precise error rates of these forensic tests are still unknown, comparison of their results with DNA testing in the same cases has revealed that some of these analyses, as currently performed, produce erroneous results. The conclusions of forensic examiners may or may not be right—depending on the case—but each wrongful conviction based on improperly interpreted evidence is serious, both for the innocent person and also for society, because of the threat that may be posed by a guilty person going free. Some non-DNA forensic tests do not meet the fundamental requirements of science, in terms of reproducibility, validity, and falsifiability (see Chapters 4 through 6).

Even fingerprint analysis has been called into question. For nearly a century, fingerprint examiners have been comparing partial latent fingerprints found at crime scenes to inked fingerprints taken directly from suspects. Fingerprint identifications have been viewed as exact

---

[15] The Innocence Project. *Fact Sheet: Facts on Post-Conviction DNA Exonerations.* Available at www.innocenceproject.org/Content/351.php. See also B.L. Garrett. Judging innocence. 108 COLUM. L. REV. 55 (2008) (discussing the results of an empirical study of the types of faulty evidence that was admitted in more than 200 cases for which DNA testing subsequently enabled postconviction exonerations).

[16] See J. Collins and J. Jarvis. 2008. The wrongful conviction of forensic science. *Crime Lab Report.* July 16. Available at www.crimelabreport.com/library/pdf/wrongful_conviction.pdf. See also N. Rudin and K. Inman. 2008. Who speaks for forensic science? *News of the California Association of Criminalists.* Available at www.cacnews.org/news/4thq08.pdf, p. 10.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1542

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

means of associating a suspect with a crime scene print and rarely were questioned.[17] Recently, however, the scientific foundation of the fingerprint field has been questioned, and the suggestion has been made that latent fingerprint identifications may not be as reliable as previously assumed.[18] The question is less a matter of whether each person's fingerprints are permanent and unique—uniqueness is commonly assumed—and more a matter of whether one can determine with adequate reliability that the finger that left an imperfect impression at a crime scene is the same finger that left an impression (with different imperfections) in a file of fingerprints. In October 2007, Baltimore County Circuit Judge Susan M. Souder refused to allow a fingerprint analyst to testify that a latent print was made by the defendant in a death penalty trial. In her ruling, Judge Souder found the traditional method of fingerprint analysis to be "a subjective, untested, unverifiable identification procedure that purports to be infallible."[19]

Some forensic science methods have as their goal the "individualization" of specific types of evidence (typically shoe and tire impressions, dermal ridge prints, toolmarks and firearms, and handwriting). Analysts using such methods believe that unique markings are acquired by a source item in random fashion and that such uniqueness is faithfully transmitted from the source item to the evidence item being examined (or in the case of handwriting, that individuals acquire habits that result in unique handwriting). When the evidence and putative source items are compared, a conclusion of individualization implies that the evidence originated from that source, to the exclusion of all other possible sources.[20,21] The determination of uniqueness requires measurements of object attributes, data collected on the population frequency of variation in these attributes, testing of attribute independence, and calculations of the probability that different objects share a common set of observable attributes.[22] Importantly, the results of research must be made public so that they can be reviewed, checked by others, criticized, and then revised, and this has not been done for some of the forensic science disciplines.[23] As recently as September 2008, the Detroit Police crime laboratory was shut down following a Michigan State Police audit that found a 10 percent error rate in ballistic evidence.[24]

The forensic science community has had little opportunity to pursue or become proficient in the research that is needed to support what it does. Few sources of funding exist for independent forensic research (see Chapter 2). Most of the studies are commissioned by DOJ and conducted by crime laboratories with little or no participation by the traditional scientific community. In addition, most disciplines in the profession are hindered by a lack of enforceable standards for interpretation of data (see Chapter 7).

---

[17] R. Epstein. Fingerprints meet *Daubert:* The myth of fingerprint 'science' is revealed. 75 *Southern California Law Review* 605 (2002).

[18] S.A. Cole. 2002. *Suspect Identities: A History of Fingerprinting and Criminal Identification.* Boston: Harvard University Press; Epstein, op. cit.

[19] *State of Maryland v. Bryan Rose.* In the Circuit Court for Baltimore County. Case No. K06-545.

[20] M.J. Saks and J.J. Koehler. 2005. The coming paradigm shift in forensic identification science. *Science* 309:892-895.

[21] W.J. Bodziak. 1999. *Footwear Impression Evidence–Detection, Recovery, and Examination.* 2nd ed. Boca Raton, FL: CRC Press.

[22] Ibid. See also NRC, 1996, op. cit.

[23] P.C. Giannelli. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007).

[24] B. Schmitt and J. Swickard. 2008. Detroit Police lab shut down after probe finds errors. *Detroit Free Press* on-line. September 25.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1543

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

### Errors and Fraud

In recent years, the integrity of crime laboratories increasingly has been called into question, with some highly publicized cases highlighting the sometimes lax standards of laboratories that have generated questionable or fraudulent evidence and that have lacked quality control measures that would have detected the questionable evidence. In one notorious case, a state-mandated review of analyses conducted by West Virginia State Police laboratory employee Fred Zain revealed that the convictions of more than 100 people were in doubt because Zain had repeatedly falsified evidence in criminal prosecutions. At least 10 men had their convictions overturned as a result.[25] Subsequent reviews questioned whether Zain was ever qualified to perform scientific examinations.[26]

Other scandals, such as one involving the Houston Crime Laboratory in 2003, highlight the sometimes blatant lack of proper education and training of forensic examiners. In the Houston case, several DNA experts went public with accusations that the DNA/Serology Unit of the Houston Police Department Crime Laboratory was performing grossly incompetent work and was presenting findings in a misleading manner designed to unfairly help prosecutors obtain convictions. An audit by the Texas Department of Public Safety confirmed serious inadequacies in the laboratory's procedures, including "routine failure to run essential scientific controls, failure to take adequate measures to prevent contamination of samples, failure to adequately document work performed and results obtained, and routine failure to follow correct procedures for computing statistical frequencies."[27,28]

The Innocence Project has documented instances of both intentional and unintentional laboratory errors that have lead to wrongful convictions, including:

- In the laboratory—contamination and mislabeling of evidence.
- In information provided in forensics reports—falsified results (including "drylabbing," i.e., providing conclusions from tests that were never conducted), and misinterpretation of evidence.
- In the courtroom—suppression of exculpatory evidence; providing a statistical exaggeration of the results of a test conducted on evidence; and providing false testimony about test results.[29]

Saks and Koehler have written that the testimony of forensic scientists is one of many problems in criminal cases today.[30] They cite the norms of science, which emphasize "methodological rigor, openness, and cautious interpretation of data," as norms that often are absent from the forensic science disciplines.

Although cases of fraud appear to be rare, perhaps of more concern is the lack of good data on the accuracy of the analyses conducted in forensic science disciplines and the significant potential for bias that is present in some cases. For example, the FBI was accused of bias in the

---

[25] *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division* (WVa 1993) 438 S.E.2d 501(Zaine I); and 445 S.E.2d 165 (Zain II).

[26] Ibid.

[27] *Quality Assurance Audit for Forensic DNA and Convicted Offender DNA Databasing Laboratories. An Audit of the Houston Police Department Crime Laboratory-DNA/Serology Section, December 12-13, 2002.* Available at www.scientific.org/archive/Audit%20Document--Houston.pdf.

[28] See also M.R. Bromwich. 2007. *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room.* Available at www.hpdlabinvestigation.org.

[29] The Innocence Project. Available at www.innocenceproject.org/Content/312.php.

[30] Saks and Koehler, op. cit.

1-8

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1544

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

case of the Madrid bombing suspect Brandon Mayfield (see Box 1-1). In that case, the Inspector General of DOJ launched an investigation. The FBI conducted its own review by a panel of independent experts. The reviews concluded that the problem was not the quality of the digital images reviewed, but rather the bias and "circular reasoning" of the FBI examiners.[31]

---

**Box 1-1  FBI Statement on Brandon Mayfield Case**

"After the March terrorist attacks on commuter trains in Madrid, digital images of partial latent fingerprints obtained from plastic bags that contained detonator caps were submitted by Spanish authorities to the FBI for analysis. The submitted images were searched through the Integrated Automated Fingerprint Identification System (IAFIS). An IAFIS search compares an unknown print to a database of millions of known prints. The result of an IAFIS search produces a short list of potential matches. A trained fingerprint examiner then takes the short list of possible matches and performs an examination to determine whether the unknown print matches a known print in the database.

Using standard protocols and methodologies, FBI fingerprint examiners determined that the latent fingerprint was of value for identification purposes. This print was subsequently linked to Brandon Mayfield. That association was independently analyzed and the results were confirmed by an outside experienced fingerprint expert.

Soon after the submitted fingerprint was associated with Mr. Mayfield, Spanish authorities alerted the FBI to additional information that cast doubt on the findings. As a result, the FBI sent two fingerprint examiners to Madrid, who compared the image the FBI had been provided to the image the Spanish authorities had.

Upon review it was determined that the FBI identification was based on an image of substandard quality, which was particularly problematic because of the remarkable number of points of similarity between Mr. Mayfield's prints and the print details in the images submitted to the FBI."

The FBI's Latent Fingerprint Unit has reviewed its practices and adopted new guidelines for all examiners receiving latent print images when the original evidence is not included.

SOURCE: FBI. May 24, 2004, Press Release. Available at
www.fbi.gov/pressrel/pressrel04/mayfield052404.htm.

---

Parts of the forensic science community have resisted the implications of the mounting criticism of the reliability of forensic analyses by investigative units such as Inspector General reports, The Innocence Project, and studies in the published literature. In testimony before the committee, it was clear that some members of the forensic science community will not concede that there could be less than perfect accuracy either in given laboratories or in specific disciplines, and experts testified to the committee that disagreement remains regarding even what constitutes an error. For example, if the limitations of a given technology lead to an examiner declaring a "match" that is found by subsequent technology (e.g., DNA analysis) to be a "mismatch," there is disagreement within the forensic science community about whether the original determination constitutes an error.[32] Failure to acknowledge uncertainty in findings is common: Many examiners claim in testimony that others in their field would come to the exact same conclusions about the evidence they have analyzed. Assertions of a "100 percent match"

---

[31] U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case*. Also see R.B. Stacey. 2005. *Report on the Erroneous Fingerprint Individualization in the Madrid Train Bombing Case*. Available at www.fbi.gov/hq/lab/fsc/current/special_report/2005_special_report.htm.

[32] N. Benedict. 2004. Fingerprints and the *Daubert* standard for admission of scientific evidence: Why fingerprints fail and a proposed remedy. *Arizona Law Review* 46:519; M. Houck, Director of Forensic Science Initiative, West Virginia University. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1545

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

contradict the findings of proficiency tests that find substantial rates of erroneous results in some disciplines (i.e., voice identification, bite mark analysis).[33,34]

As an example, in a FBI publication on the correlation of microscopic and mitochondrial DNA hair comparisons, the authors found that even competent hair examiners can make significant errors.[35] In this study, the authors found that in 11 percent of the cases in which the hair examiners declared two hairs to be "similar," subsequent DNA testing revealed that the hairs did not match, which refers either to the competency or the relative ability of the two divergent techniques to identify differences in hair samples, as well as to the probative value of each test.

The insistence by some forensic practitioners that their disciplines employ methodologies that have perfect accuracy and produce no errors has hampered efforts to evaluate the usefulness of the forensic science disciplines. And, although DNA analysis is considered the most reliable forensic tool available today, laboratories nonetheless can make errors working with either nuclear DNA or mtDNA—errors such as mislabeling samples, losing samples, or misinterpreting the data.

Standard setting, accreditation of laboratories, and certification of individuals aim to address many of these problems, and although many laboratories have excellent training and quality control programs, even accredited laboratories make mistakes. Furthermore, accreditation is a voluntary program, except in a few jurisdictions in which it is required (New York, Oklahoma, and Texas)[36] (see Chapter 7).

**The "CSI Effect"**

Media attention has focused recently on what is being called the "CSI Effect," named for popular television shows (such as *Crime Scene Investigation*) that are focused on police forensic evidence investigation.[37] The fictional characters in these dramas often present an unrealistic portrayal of the daily operations of crime scene investigators and crime laboratories (including their instrumentation, analytical technologies, and capabilities). Cases are solved in an hour, highly technical analyses are accomplished in minutes, and laboratory and instrumental capabilities are often exaggerated, misrepresented, or entirely fabricated. In courtroom scenes, forensic examiners state their findings or a match (between evidence and suspect) with unfailing certainty, often demonstrating the technique used to make the determination. The dramas suggest that convictions are quick and no mistakes are made.

The CSI Effect specifically refers to the real-life consequences of exposure to Hollywood's version of law and order. Jurists and crime laboratory directors anecdotally report that jurors have come to expect the presentation of forensic evidence in every case, and they expect it to be conclusive. A recent study by Schweitzer and Saks found that compared to those who do not watch CSI, CSI viewers were "more critical of the forensic evidence presented at the trial, finding it less believable. Forensic science viewers expressed more confidence in their

---

[33] D.L. Faigman, D. Kaye, M.J. Saks, and J. Sanders. 2002. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* St. Paul, MN: Thompson/West.

[34] C.M. Bowers. 2002. The scientific status of bitemark comparisons. In: D.L. Faigman (ed.). *Science in the Law: Forensic Science Issues.* St. Paul, MN: West Publishing.

[35] M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5):964-967; see also Bromwich, op. cit.

[36] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

[37] See *U.S. News & World Report.* 2005. The CSI effect: How TV is driving jury verdicts all across America. April 25.

1-10

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1546

verdicts than did non-viewers."[38] Prosecutors and defense attorneys have reported jurors second guessing them in the courtroom, citing "reasonable doubt" and refusing to convict because they believed that other evidence was available and not adequately examined.[39]

Schweitzer and Saks found that the CSI Effect is changing the manner in which forensic evidence is presented in court, with some prosecutors believing they must make their presentation as visually interesting and appealing as such presentations appear to be on television. Some are concerned that the conclusiveness and finality of the manner in which forensic evidence is presented on television results in jurors giving more or less credence to the forensic experts and their testimony than they should, raising expectations, and possibly resulting in a miscarriage of justice.[40] The true effects of the popularization of forensic science disciplines will not be fully understood for some time, but it is apparent that it has increased pressure and attention on the forensic science community in the use and interpretation of evidence in the courtroom.

**Fragmented and Inconsistent Medicolegal Death Investigation**

The medicolegal death investigation system is a fragmented organization of state and local entities called upon to investigate deaths and to certify the cause and manner of unnatural and unexplained deaths. About 1 percent of the U.S. population (about 2.6 million people) dies each year. Medical examiner and coroner offices receive nearly 1 million reports of deaths, constituting between 30 to 40 percent of all U.S. deaths in 2004, and accept about one half of those (500,000, or 1 in 5 deaths) for further investigation and certification.[41] In carrying out this role, medical examiners and coroners are required to decide the scope and course of a death investigation, which may include assessing the scene of death, examining the body, determining whether to perform an autopsy, and ordering other medical tests, forensic analyses, and procedures as needed. Yet the training and skill of medical examiners and coroners and the systems that support them vary greatly. Medical examiners may be physicians, pathologists, or forensic pathologists with jurisdiction within a county, district, or state. A coroner is an elected or appointed official who might not be a physician or have had any medical training. Coroners typically serve a single county.

Since 1877, in the United States, there have been efforts to replace the coroner system with a medical examiner system.[42] In fact, more than 80 years ago, the National Academy of Sciences identified concerns regarding the lack of standardization in death investigations and called for the abolishment of the coroner's office, noting that the office "has conclusively demonstrated its incapacity to perform the functions customarily required of it."[43] In its place, the report called for well-staffed offices of a medical examiner, led by a pathologist. In strong

---

[38] N.J. Schweitzer and M.J. Saks. 2007. The CSI Effect: Popular fiction about forensic science affects public expectations about real forensic science. *Jurimetrics* 47:357.

[39] See *U.S. News & World Report,* op. cit.

[40] Schweitzer and Saks, op. cit.; S.A. Cole and R. Dioso-Villa. 2007. CSI and its effects: Media, juries, and the burden of proof. *New England Law Review* 41(3): 435.

[41] M.J. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2007. *Medical Examiner and Coroners' Offices, 2004.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/meco04.pdf.

[42] W.U. Spitz and R.S. Fisher. 1982. *Medicolegal Investigation of Death,* 2nd ed. Springfield, IL: Charles C. Thomas.

[43] National Research Council. 1928. *The Coroner and the Medical Examiner.* Washington, D.C.: The National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1547

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

terms, the 1928 committee called for the professionalization of death investigation, with medical science at its center.

Despite these calls, efforts to move away from a coroner system in the United States have stalled. Currently, 11 states have coroner-only systems, 22 states have medical examiner systems, and 18 states have mixed systems—in which some counties have coroners and others have medical examiners. Some of these states have a referral system, in which the coroner refers cases to medical examiners for autopsy.[44] According to a 2003 Institute of Medicine report, in addition to the variety of systems in the United States, the location and authority of the medical examiner or coroner office also varies, with 43 percent of the U.S. population served by a medical examiner or coroner housed in a separate city, county, or state government office. Other arrangements involve an office under public safety or law enforcement. The least common placement is under a forensic laboratory or health department.[45]

Variability also is evident in terms of accreditation of death investigation systems. As of August 2008, 54 of the medical examiner offices in the United States (serving 23 percent of the population) have been accredited by the National Association of Medical Examiners, the professional organization of physician medical examiners. Most of the country is served by offices lacking accreditation.[46] Similarly, requirements for training are not mandatory. About 36 percent of the population lives where minimal or no special training is required to conduct death investigations.[47] Recently, an 18-year-old high school student was elected a deputy coroner in Indiana after completing a short training course.[48]

Additionally, funding for programs supporting death investigations vary across the country, with the cost of county systems ranging from $0.62 to $5.54 per capita, and statewide systems from $0.32 to $3.20.[49] Most funding comes from tax revenues, and with such limited funds available, the salaries of medical examiners and skilled personnel are much lower than those of other physicians and medical personnel. Consequently, recruiting and retaining skilled personnel is a constant struggle.

At a time when natural disasters or man-made disasters could create great havoc in our country, the death investigation system is one that is of increasing importance. Deaths resulting from terrorism, with the exception of any suicide perpetrators, are homicides that require robust medicolegal death investigation systems to recover and identify remains, collect forensic evidence, and determine cause of death.

**Incompatible Automated Fingerprint Identification Systems**

In the late 1970s and early 1980s, law enforcement agencies across the Nation began adopting Automated Fingerprint Identification Systems (AFIS) to improve their efficiency and reduce the time needed to identify (or exclude) a given individual from a fingerprint. Before the use of AFIS, the fingerprint identification process involved numerous clerks and fingerprint examiners tediously sifting through thousands of classified and cataloged paper fingerprint cards.

---

[44] R. Hanzlick and D. Combs. 1998. Medical examiner and coroner systems: History and trends. *Journal of the American Medical Association* 279(11):870-874.

[45] Institute of Medicine (IOM). 2003. *Medicolegal Death Investigation System: Workshop Report.* Washington, D.C.: National Academy Press.

[46] Ibid.

[47] R. Hanzlick. 1996. Coroner training needs. A numeric and geographic analysis. *Journal of the American Medical Association* 276(21):1775-1778.

[48] See www.wthr.com/Global/story.asp?S=6534514&nav=menu188_2.

[49] IOM, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1548

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

AFIS was an enormous improvement in the way local, state, and federal law enforcement agencies managed fingerprints and identified people. AFIS searches are much faster than manual searches and often allow examiners to search across a larger pool of candidates and produce a shorter list of possible associations of crime scene prints and unidentified persons, living or dead.

Working with a system's software, fingerprint examiners can map the details of a given fingerprint—by features that consist of "minutiae" (e.g., friction ridge endings and ridge bifurcations)—and ask the system to search its database for other records that closely resemble this pattern. Depending on the size of the database being searched and the system's workload, an examiner often can get results back within minutes.

However, even though AFIS has been a significant improvement for the law enforcement community over the last few decades, AFIS deployments and performance (operational capacities) today are still far from optimal. Many law enforcement AFIS installations are stand-alone systems or are part of relatively limited regional networks with shared databases or information-sharing agreements. Today, systems from different vendors often are incompatible and hence cannot communicate. Indeed, different versions of similar systems from the same vendor often cannot effectively share fingerprint data with one another. In addition, many law enforcement agencies also access the FBI's Integrated Automated Fingerprint Identification System database (the "largest biometric database in the world"[50]) through an entirely separate stand-alone system—a fact that often forces fingerprint examiners to enter fingerprint data for one search multiple times in multiple states (at least once for each system being searched). Additionally, searches between latent print to AFIS 10-print[51] files suffer by not being more fully automated: Examiners must manually encode a latent print before searching the AFIS 10-print database. Furthermore, the hit rate for latent prints searched against the AFIS database is approximately 40 percent (see Chapter 10). Much good work in recent years has improved the interoperability of AFIS installations and databases, but the pace of these efforts to date has been slow, and greater progress must be made toward achieving meaningful, nationwide AFIS interoperability.

### The Growing Importance of the Forensic Science Disciplines to Homeland Security

Threats to food and transportation, concerns about nuclear and cyber security, and the need to develop rapid responses to chemical, nuclear, radiological, and biological threats underlie the need to ensure that there is a sufficient supply of adequately trained forensic specialists. At present, public crime laboratories are insufficiently prepared to handle mass disasters. In addition, demands will be increasing on the forensic science community to develop real-time plans and protocols for mass disaster responses by the network of crime laboratories and death investigation systems across the country—and internationally. The development and application of the forensic science disciplines to support intelligence, investigations, and operations aimed at the prevention, interdiction, disruption, attribution, and prosecution of terrorism has been an important component of both public health and what is now termed "homeland security" for at least two decades. With the development and deployment of enhanced capabilities came the integration of forensic science disciplines much earlier in the investigative process. As a result, the forensic science disciplines could be more fruitfully leveraged to generate investigative leads to test, direct, or redirect lines of investigation, not just

---

[50] See www.fbi.gov/hq/cjisd/iafis.htm.

[51] AFIS 10-print records the fingers, thumbs, and a palm print on a large index card. These prints are carefully taken, clear, and easy to read, and they make up the bulk of the AFIS data available today.

1-13

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1549

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES -- PREPUBLICATION COPY

in building a case for prosecution. Forensic science disciplines are essential components of the response to mass fatality events, whether natural or man made.

### The Admission of Forensic Science Evidence in Litigation

As explained in Chapter 3, most forensic science disciplines are inextricably tethered to the legal system; many forensic fields (e.g., firearms analysis, latent fingerprint identification) are but handmaidens of the legal system, and they have no significant uses beyond law enforcement. Therefore, any study of forensic science necessarily must include an assessment of the legal system that it serves. As already noted, and as further amplified in Chapters 4 and 5, the forensic science system exhibits serious shortcomings in capacity and quality; yet the courts continue to rely on forensic evidence without fully understanding and addressing the limitations of different forensic science disciplines.

The conjunction between the law and forensic science is explored in detail in Chapter 3. The bottom line is simple: In a number of forensic science disciplines, forensic science professionals have yet to establish either the validity of their approach or the accuracy of their conclusions, and the courts have been utterly ineffective in addressing this problem. For a variety of reasons—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and the common lack of scientific expertise among judges and lawyers who must try to comprehend and evaluate forensic evidence—the legal system is ill-equipped to correct the problems of the forensic science community. In short, judicial review, by itself, is not the answer. Rather, tremendous resources must be devoted to improving the forensic science community. With more and better educational programs, accredited laboratories, certification of forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. This is particularly important in criminal cases in which we seek to protect society from persons who have committed criminal acts and to protect innocent persons from being convicted of crimes that they did not commit.

## ORGANIZATION OF THIS REPORT

This report begins with a series of chapters describing the current forensic science system, the use of forensic science evidence in litigation, and science and the forensic science disciplines. It then addresses systemic areas for improvement with the goal of attaining a more rigorous and robust forensic science infrastructure, including standards and best practices, education, and training. Pursuant to its charge, in three chapters the committee addresses special issues in the areas of medicolegal death investigation (Chapter 9), AFIS (Chapter 10), and the interrelationships between homeland security and the forensic science disciplines (Chapter 11).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1550

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 2
# THE FORENSIC SCIENCE COMMUNITY AND THE NEED FOR INTEGRATED GOVERNANCE

Forensic investigations involve intelligence and information gathering, crime scene investigation, laboratory analysis, interpretation of tests and results, and reporting and communication with members of law enforcement and the judicial system. Law enforcement agencies within the United States vary in organizational structure regarding how forensic science examinations are conducted and evidence is admitted into court (see Chapter 3). Variations are attributable to the geographical size and population served by the jurisdictional authority, the types and level of crimes encountered, the funding source, and local tradition. In general, however, the forensic science community includes crime scene investigators; state and local crime laboratories; medical examiners; private forensic laboratories; law enforcement identification units; resources such as registries and databases; professional organizations; prosecutors and defense attorneys; quality system providers (i.e., accrediting and certifying organizations); and federal agencies that conduct or support research as well as provide forensic science services and training. This chapter provides an overview of the major components of the forensic science community. Data about laboratories are based largely on two surveys conducted by the Bureau of Justice Statistics (BJS) in 2002 and 2005 of publicly funded crime laboratories[1] and a more recent survey of "nontraditional forensic service providers" conducted by researchers at West Virginia University.[2]

In addition to forensic laboratories, about 3,200 medical examiner and coroner offices provided death investigation services across the United States in 2004.[3] These entities—which may comprise a coroner system, a medical examiner system, or a mixed system at the county or state level—conduct death scene investigations, perform autopsies, and determine the cause and manner of death when a person has died as a result of violence, under suspicious circumstances, without a physician in attendance, or in other circumstances. These offices are described in greater detail in Chapter 9. In addition, standard setting, accrediting, and certifying organizations are described in greater detail in Chapter 7, and education and training programs are described in Chapter 8.

The committee's first recommendation, appearing at the end of this chapter, calls for a more central, strategic, and integrated approach to forensic science at the national level.

---

[1] J.L. Peterson and M.J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at: www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf; M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[2] T.S. Witt, Director, Bureau of Business and Economic Research, West Virginia University. "Survey of Non-Traditional Forensic Service Providers." Presentation to the committee. December 6, 2007.

[3] R. Hanzlick, Fulton County Medical Examiner's Center and Emory University School of Medicine. 2007. "An Overview of Medical Examiner/Coroner Systems in the United States—Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007. The Bureau of Justice (2004) omits Louisiana and classifies Texas as a medical examiner state, and accordingly reports the total as 1,998. According to Hanzlick, many of Texas's 254 counties maintain justice of the peace/coroners offices. The total number includes Justices of the Peace in Texas.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1551

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

## CRIME SCENE INVESTIGATION

Evidence recovery and interpretation at the crime scene is the essential first step in forensic investigations. Several organizational approaches to crime scene investigation and subsequent forensic laboratory activity exist, sometimes involving a large number of personnel with varied educational backgrounds. Conversely, in some jurisdictions, a single forensic examiner might also be the same investigator who goes to the crime scene, collects evidence, processes the evidence, conducts the analyses, interprets the evidence, and testifies in court. In other jurisdictions, the investigators submit the evidence to a laboratory where scientists conduct the analyses and prepare the reports. Crime scene evidence collectors can include uniformed officers, detectives, crime scene investigators, criminalists, forensic scientists, coroners, medical examiners, hospital personnel, photographers, and arson investigators.[4] Thus, the nature and process of crime scene investigation varies dramatically across jurisdictions, with the potential for inconsistent policies and procedures and bias. Some analysts say that the lack of standards and oversight can result in deliberate deception of suspects, witnesses, and the courts; fraud; and "honest mistakes" made because of haste, inexperience, or lack of a scientific background.[5]

In 1978, the U.S. Supreme Court held for the first time in *Monell v. Department of Social Services of the City of New York*[6] that a municipality can be held directly liable for violating a person's constitutional rights under 42 U.S.C. section 1983. Partly in response to this liability, most large cities and metropolitan areas created their own professionally trained crime scene units. However, in smaller suburban and rural communities, evidence from a crime scene may be collected and preserved by a patrol officer or investigator. Even in large metropolitan areas, most crime scene investigation units are composed of sworn officers.

Recognizing that some agencies did not have the resources to adequately train all personnel in crime scene processing, in 2000 the National Institute of Justice (NIJ) and its Technical Working Group on Crime Scene Investigation (TWGCSI) developed *Crime Scene Investigation: A Guide for Law Enforcement*, which stated that "successful implementation of this guide can be realized only if staff possess basic (and in some cases advanced) training in the fundamentals of investigating a crime scene."[7] However, there remains great variability in crime scene investigation practices, along with persistent concerns that the lack of standards and proper training at the crime scene can contribute to the difficulties of drawing accurate conclusions once evidence is subjected to forensic laboratory methods. (See Chapter 5 for a discussion of methodologies and Chapter 7 for further discussion of standards and ethics.)

## FORENSIC SCIENCE LABORATORIES AND SERVICE PROVIDERS

The configuration of forensic laboratories varies by jurisdiction. Some are located within a state police department as part of a statewide system of laboratories and training programs. For example, in Illinois, state law mandates that the laboratory system provide forensic services to law enforcement agencies in all 102 counties (population 12.7 million). Although the forensic

[4] B. Fisher, Director, Scientific Services Bureau, Los Angeles County Sheriff's Department. Presentation to the committee. April 24, 2007.
[5] See J.I. Thornton. 2006. Crime reconstruction—ethos and ethics. In: W.J. Chisum and B.E. Turvey (eds.). *Crime Reconstruction*. Boston: Elsevier Science, pp. 37-50.
[6] 436 U.S. 658 (1978).
[7] Available at www.ncjrs.gov/pdffiles1/nij/178280.pdf, p. 2.

2-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1552

Case 2:19-cv-00392-JMS-DLP Document 10-1 Filed 10/18/19 Page 1554 of 2008 PageID #: 3444

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

laboratory system is part of the Illinois State Police, 98 percent of the casework completed is for the 1,200 local and county police agencies across the state.[8]

Not all forensic services are performed in traditional crime laboratories—they may be conducted by a sworn law enforcement officer with no scientific training (e.g., some latent print examiners). Thus, forensic service providers may be located in law enforcement agencies, may be crime scene investigators, or may be a for-profit entity. There are no good data on the entire universe of forensic science entities, although there have been efforts to gather data on publicly funded crime laboratories and nonlaboratory-based providers. The committee could find no data regarding for-profit forensic science service providers, except for DNA laboratories, of which there are approximately 30 in the United States.

**Publicly Funded Laboratories**

BJS has conducted two censuses of publicly funded forensic crime laboratories. The first census, administered in 2002, established baseline information on the operations and workload of the Nation's public crime laboratories.[9] The 2005 census documented changes in workload and backlog that have occurred since the 2002 census. According to the 2005 census, 389 publicly funded forensic crime laboratories were operating in the United States in 2005—210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories. The estimated budget for all 389 crime laboratories exceeded $1 billion, nearly half of which funded state laboratories. The BJS report cites a total of nearly 2.7 million new cases[10] in 2005, including a much larger number of separate requests for forensic services. Some laboratories are full-service facilities; others might conduct only the more common analyses of evidence (see Chapter 5).

*Funding Sources*

According to the 2005 BJS census, in addition to federal, state, or local support, 28 percent of publicly funded laboratories charged fees for service, and 65 percent reported receiving some funding from grants. However, funding for laboratories has not increased with increasing demands. Some laboratory directors appearing before the committee cited budget cuts as high as 22 percent over the past five years.[11]

*Personnel and Equipment*

The 2005 BJS census estimated that publicly funded crime laboratories employed more than 11,900 full-time equivalent (FTE) personnel in 2005. Most crime laboratories are relatively small: the median staff size in 2005 was 16. Distinctly different professional tracks exist within forensic laboratories, ranging from laboratory technicians and general examiners to scientists. According to the census data, analysts or examiners—persons who typically prepare evidence, conduct tests, interpret results, sign laboratory reports, and testify in court—comprised 58 percent of all crime laboratory FTEs in 2005. Technical support personnel, who typically assist analysts or examiners in preparing evidence and conducting tests, accounted for 10 percent of all FTEs. Thirteen percent of FTEs were managerial personnel, 8 percent were in clerical positions,

---

[8] J. Johnson, Illinois State Police Forensic Science Center at Chicago. Presentation to the committee. January 25, 2007.

[9] Peterson and Hickman, op. cit.

[10] Durose, op. cit. "A 'case' is defined as all physical evidence submitted from a single criminal investigation submitted for crime laboratory analysis," p. 9.

[11] Johnson, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1553

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

and 6 percent were crime scene technicians. Similar ranges in the distribution of personnel are evident among laboratories by type of jurisdiction served. (The uncertainties in these reported percentages depend on the number of laboratories that responded to the FTE survey questions.) A 2006 NIJ report cited equipment shortages (which may include insufficient equipment maintenance) as a limiting factor in processing cases.[12] It cited equipment needs at the 50 largest laboratories in the disciplines of controlled substances, trace evidence, firearms, questioned documents, latent prints, toxicology, and arson. Evidence submission may or may not be automated, depending on the laboratory. Lack of automation increases the time the laboratory spends on logging in evidence.

A 2005 survey of public crime laboratories conducted by researchers at the State University of New York at Albany found that the number of FTEs in a laboratory ranged from 2 to 280, with an average of 34, the majority of whom have bachelor's degrees.[13] Because of the distinctly different professional tracks within larger laboratories, for example, technicians perform tests with defined protocols, and credentialed scientists conduct specialized testing and interpretation. Unlike many other professions, the forensic science disciplines have no organized control over entry into the profession, such as by degree, boards or exams, or licensure (see Chapter 7). Control mechanisms traditionally have been held through employment and job function.[14]

Of the laboratories surveyed by the State University of New York at Albany, only 21 percent reported having a sufficient number of FTEs to complete their workload. The authors concluded that "as total number of cases increases, scientists do not have proper equipment, enough time, adequate resources, enough information from the DA [district attorney], enough time to prepare for courtroom testimony, and the needed resources to provide courtroom testimony."[15] In addition, "as casework capacity increases, pressure to complete cases too quickly increases significantly, and pressure to extend opinions beyond the scientific method and pressure to get a particular result also increases significantly."[16]

The National Association of Medical Examiners (NAME) also reports acute personnel shortages in the death investigation system, with a critical need for significantly more board-certified forensic pathologists than are currently available. (See Chapter 9 for a discussion of the medicolegal death investigation system.)

*Laboratory Functions*

According to the 2002 BJS data, almost all public crime laboratories examine controlled substances (90 percent). Sixty-three percent examine firearms and toolmarks, 65 percent screen biological samples (usually in preparation for DNA analysis on selected exhibits), and 61 percent examine latent prints.[17] Fifty-nine percent of laboratories examine one or more forms of trace evidence (e.g., hairs, fibers, glass, or paint). Fewer laboratories examine questioned documents (26 percent) or conduct computer crime investigations (11 percent). As would be expected, larger laboratories are able to perform a broader range of examinations.

---

[12] NIJ. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

[13] W.S. Becker, W.M. Dale, A. Lambert, and D. Magnus. 2005. Letter to the editor—Forensic lab directors' perceptions of staffing issues. *Journal of Forensic Sciences* 50(5):1255-1257.

[14] D.S. Stoney. Chief Scientist, Stoney Forensic, Inc. Presentation to the committee. January 26, 2007.

[15] Becker, et al., op. cit., p. 1255.

[16] Ibid., p. 1256.

[17] Peterson and Hickman, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1554

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

In terms of crime scene investigation, 62 percent of laboratories report having sent examiners directly to crime scenes, although most forensic examiners did not visit crime scenes. Twenty-five percent of the laboratories reported that laboratory personnel also served as crime scene investigators. However, more than half of laboratories (62 percent) reported that agencies or persons not affiliated with the laboratory handled most major investigations—usually a police unit with specialized evidence technicians or crime scene search officers who go onsite to take photographs and locate, preserve, label, and gather physical evidence.

## CASE BACKLOGS

According to the 2005 BJS data, the Nation's 389 crime laboratories received an estimated 2.7 million new cases during 2005. Almost half were submitted to state laboratories. Laboratories serving local jurisdictions received about 1.3 million cases in 2005, including 727,000 cases received by county laboratories and 566,000 by municipal laboratories.

> An estimated 359,000 cases were backlogged (not completed within 30 days) at the end of 2005, compared to 287,000 at yearend 2002. This represents a 24 percent increase in backlogged cases between 2002 and 2005. State laboratories accounted for more than half of the backlog in both years. Among the 288 laboratories that reported this information, the median number of cases received in 2005 was about 4,100. Overall, laboratories ended the year with a median backlog of about 400 cases. Six percent of laboratories that received cases in 2005 reported having no backlog at yearend.[18]

In 2005, federal laboratories received the fewest cases.

Fifty-one percent of the laboratories reported outsourcing one or more types of forensic services to private laboratories in 2005, primarily DNA casework, toxicology, Combined DNA Index System (CODIS) samples, and controlled substances.

In a communication with the committee, Los Angeles County Sheriff's Department Crime Laboratory Director Barry Fisher warned that to manage backlogs, laboratories triage cases:

> Murders, rapes, aggravated assaults and the like have priority, as do cases going to court, cases where a suspect is being held on an arrest warrant, highly publicized cases, etc. Property crimes, such as burglaries, are often far down the list. This makes the likelihood of examining evidence from property crime cases unlikely. Oddly, the police and prosecutors are rarely consulted about how priorities are determined. The use of triage is the lab's best effort to manage its own scarce resources. Another factor at play in case management is that the "squeaky wheel gets the grease." This means that a persistent investigator who calls the lab often enough will get his case done more quickly than the investigator who just sends the case down to the lab expecting that it will be done.[19]

---

[18] Ibid., pp. 3, 4. The committee notes that the 30-day turnaround metric is an arbitrary metric useful for comparative purposes only.
[19] Letter to the committee from B.A.J. Fisher. June 12, 2007.

2-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1555

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

Fisher also cautioned that backlog data are not entirely reliable, saying that one of the reasons for the lack of data is that laboratories count backlogs, case submissions, tests, output, and outcomes differently. Additionally, many laboratories lack automated information management systems to "capture the very data that might support their case for more assistance."[20] Finally, it is difficult to track cases for which forensic work has moved all the way through the criminal justice system: Police, prosecutors, and forensic laboratories use different tracking systems.

## NIJ'S COVERDELL FORENSIC SCIENCE IMPROVEMENT GRANT PROGRAM

Through the Paul Coverdell National Forensic Science Improvement Act (P.L. 106-561), the Justice Department operates the Paul Coverdell Forensic Science Improvement Grants Program (the Coverdell program), which awards grants to states and units of local government to help improve the quality and timeliness of forensic science and medical examiner services.[21] The program provides funding for expenses related to facilities, personnel, equipment, computerization, supplies, accreditation, certification, and education and training. In 2004, the Justice for All Act (P.L. 108-405) expanded the Coverdell program, with the aim of reducing the backlog.

A state or unit of local government that receives a Coverdell grant must use the grant for one or more of three purposes:

(1) To carry out all or a substantial part of a program intended to improve the quality and timeliness of forensic science or medical examiner services in the state, including those services provided by laboratories operated by the state and those operated by units of local government within the state.
(2) To eliminate a backlog in the analysis of forensic science evidence, including, among other things, a backlog with respect to firearms examination, latent prints, toxicology, controlled substances, forensic pathology, questioned documents, and trace evidence.
(3) To train, assist, and employ forensic laboratory personnel as needed to eliminate such a backlog.[22]

The expectation for those receiving grants is "demonstrated improvement over current operations in the quality and/or timeliness of forensic science or medical examiner services provided in the state, including services provided by laboratories operated by the state and services provided by laboratories operated by units of local government within the State."[23] The output measures for Coverdell awards are:

(1) Change in the number of days between submission of a sample to a forensic science laboratory and delivery of test results to a requesting office or agency.

---

[20] Ibid.

[21] P.L. 106-561 (December 21, 2000). An Act to improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes and for other purposes. Cited as the Paul Coverdell National Forensic Sciences Improvement Act.

[22] See www.ojp.usdoj.gov/nij/topics/forensics/nfsia/welcome.htm.

[23] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1556

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

(2) The number of backlogged forensic cases analyzed with Coverdell funds, if applicable to the grant.

(3) The number of forensic science or medical examiner personnel who completed appropriate training or educational opportunities with Coverdell funds, if applicable to the grant.[24]

States may be eligible for both "base" (formula) and competitive funds from NIJ for forensic science programs. Units of local government within states may be eligible for competitive funds and may apply directly to NIJ. The Coverdell law (42 U.S.C. § 3797k(4)) requires that, to request a grant, an applicant for Coverdell funds must submit:

- A certification and description regarding a plan for forensic science laboratories.
- A certification regarding use of generally accepted laboratory practices.
- A certification and description regarding costs of new facilities.
- A certification regarding external investigations into allegations of serious negligence or misconduct.

Program funding was $10 million in Fiscal Year (FY) 2004, $15 million in FY 2005, and $18.5 million in FY 2006. Funds may be used for personnel, computerization, laboratory equipment, supplies, accreditation, education, training, certification, or facilities.

## FORENSIC SERVICES BEYOND THE TRADITIONAL LABORATORY

Many forensic examiners do not work in a traditional crime laboratory. Often they work within law enforcement offices in units called "identification units" or "fingerprint units." For example, a 2004 study conducted by the American Society of Crime Laboratory Directors (ASCLD) for NIJ reported that two-thirds of fingerprint identifications take place outside of traditional crime laboratories.[25] Insufficient data are available on the size and expertise of this population of forensic examiners who are not employed in publicly funded forensic science laboratories. Therefore, in 2006, a survey instrument modeled after the BJS census was developed by researchers at West Virginia University in collaboration with the International Association for Identification (IAI).[26] Its survey was sent to 5,353 IAI U.S. members in April 2007,[27] targeting forensic scientists working outside the crime laboratories surveyed by BJS.

Of the units responding to the IAI survey, most were publicly funded (e.g., city, borough, village, town, county, state, or federal), with half working at the local level. Units at the city, borough, village, or town level had a median annual budget of $168,850, compared to $387,413 at the county level. Half are small units, with one to five full- and part-time employees. The units primarily conduct crime scene investigations, latent print and 10-print examinations, photography, and bloodstain pattern analyses. A smaller number are involved in other forensic functions, such as the analysis of digital evidence, footwear, tire track impressions, firearms, forensic art, questioned documents, polygraph tests, and dental evidence.

---

[24] Ibid.

[25] American Society Crime Laboratory Directors. 2004. *180-Day Study Report: Status and Needs United States Crime Laboratories.* Available at www.ncjrs.gov/pdffiles1/nij/grants/213422.pdf.

[26] Witt, op. cit.

[27] Ibid. Of the 815 surveys returned, 308 represented responses from active forensic service provider organizations (i.e., only 1 response per organization was included) outside of publicly funded crime laboratories.

2-7

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1557

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

For the responding units, the mean number of cases received per year was 2,780. The mean backlog was 9.4 percent of the annual caseload, with the backlog for latent prints being higher, at 12.3 percent of the caseload. More than half of the units report outsourcing work, primarily firearms, latent print, and footwear analyses. Although 69 percent of respondents replied that they had some system for verifying results, only 15 percent are accredited.

## FEDERAL FORENSIC SCIENCE ACTIVITIES

Several federal agencies either provide support for forensic infrastructure, certification, and training, or conduct or fund forensic science in support of their missions. Brief descriptions follow.

**Federal Forensic Science Laboratories**

The largest publicly funded forensic laboratory in the country is the Federal Bureau of Investigation (FBI) Laboratory in Quantico, Virginia. Other federal agencies have smaller crime laboratories, for example, the U.S. Secret Service, the U.S. Army, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (known as ATF), the U.S. Postal Service, the Internal Revenue Service, and the U.S. Fish and Wildlife Service. In addition, the Department of Commerce's National Institute of Standards and Technology (NIST) conducts research in support of standard setting for gunshot residue analysis, trace explosives detectors, DNA analysis, and more. Some of these efforts are described below.

*The FBI Laboratory*

The types of cases investigated by the FBI include terrorism, espionage, public corruption, civil rights, criminal organizations and enterprises, white collar crime, and violent crime. Investigative case work services include those involving:

- chemistry
- cryptanalysis and racketeering records
- DNA analysis
- explosives
- evidence response
- firearms-toolmarks
- hazardous materials
- investigative and prosecutive graphics
- latent prints
- photographic operations and imaging services
- questioned documents
- structural design
- trace evidence
- specialty units

According to the 2005 BJS report, the FBI Laboratory had approximately 600 employees in 2005, and it partners with state and local crime laboratories throughout the country. Its FY 2007 budget was $63 million. The FBI Laboratory provides a full range of forensic services and handles a large volume of fingerprint work, receiving approximately 50,000 fingerprint

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1558

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1560 of 2008 PageID #: 3450

**THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY**

submissions every day. In July 1999, the FBI updated its fingerprint databases with the Integrated Automated Fingerprint Identification System (IAFIS). Previously, all prints arrived on paper fingerprint cards that had to be processed by hand. With the introduction of IAFIS, prints and pictures can be submitted electronically.

According to the 2005 BJS census, the FBI laboratory began 2003 with an estimated backlog of 3,062 requests for forensic services. About two-thirds of the backlog was attributable to latent print requests. During 2003, the FBI laboratory received 6,994 new requests and completed 7,403 requests. The estimated year end backlog was 2,653 requests, a 13 percent reduction over the previous year. Latent print requests comprised half of the year end 2003 backlog. No data were provided in the 2005 census.

By the end of the first quarter of 2004, the FBI Laboratory reported a total backlog of 2,585 requests. This included 1,216 latent print requests, or 47 percent of the total. The FBI Laboratory reported a need for additional equipment and 249 additional FTEs in order to have achieved a 30-day turnaround on all 2003 requests. The cost of the additional equipment was estimated to be $40 million. Based on starting salaries for analyst/examiners, the estimated cost of the additional FTEs exceeds $17.5 million.

The FBI Laboratory also has working partnerships with the forensic science community's Scientific Working Groups (SWGs) that are tasked with generating guidelines and standards for specific forensic disciplines (see Chapter 7). The FBI also provides training for the forensic science community and conducts and funds research (see later discussion).

In addition, the FBI collects and maintains data and materials for multiple databases and registries (see Box 2-1). The largest is CODIS, which is composed of three components: the forensic database, the missing persons database, and the convicted felon database. The FBI CODIS Unit is responsible for developing, providing, and supporting the CODIS Program to federal, state, and local crime laboratories in the United States and selected international law enforcement crime laboratories to foster the exchange and comparison of forensic DNA evidence from violent crime investigations. The CODIS Unit also provides administrative management and support to the FBI for various advisory boards, Department of Justice (DOJ) grant programs, and legislation regarding DNA.

---

**Box 2-1  FBI Databases and Reference Libraries**

The CODIS Program consists of the development, enhancement, and support of software that enables forensic DNA laboratories to store, maintain, and search DNA profiles from crime scenes, offenders, and missing persons. Support of the CODIS software includes training for DNA analysts and help-desk services, as well as a yearly national meeting for all CODIS administrators. The unit also provides CODIS software to international law enforcement laboratories to assist them in establishing a DNA database program. Forty law enforcement laboratories in 25 countries now have the CODIS software. CODIS consists of a three-tiered hierarchy of databases: the NDIS [National DNA Index System], the State DNA Index System, and the Local DNA Index System. The highest level in the CODIS hierarchy is NDIS, which contains the DNA profiles contributed by participating federal, state, and local forensic DNA laboratories. There are more than 170 NDIS participating sites across the United States, including the FBI Laboratory, the U.S. Army Criminal Investigation Laboratory, and a laboratory in Puerto Rico.

The NDIS contains 6.2 million offender profiles and 233,454 forensic profiles as of August 2008. Its operation requires determining the eligibility of samples for the National Index in accordance with applicable federal law, developing procedures for laboratories participating in the Index, and monitoring the participating laboratories' compliance with federal law. The CODIS Unit also provides administrative

---

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1559

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY**

management and support for the NDIS Procedures Board and other DNA working groups. As of August 2008, CODIS has produced more than 74,500 hits, assisting in more than 74,700 investigations.[28]

The National Automotive Paint File contains entries dating as far back as the 1930s. The Paints and Polymers Subunit also serves as the U.S. repository for the Paint Data Query database, which is a Canadian database. State and local law enforcement agencies investigating hit-and-run homicides rely on both the National Automotive Paint File and the Paint Data Query database.

The FBI Explosives Reference File contains several thousand standards that help examiners identify the components and manufacturers of explosive and incendiary devices. The Explosives Reference Tools database (EXPeRT) combines the text of FBI Laboratory reports with evidentiary photographs from bombing cases and permits the rapid retrieval of information on any aspect of the forensic examination. The database also contains manufacturer data and open-source literature on the construction and use of explosives and explosive devices. An examiner can search EXPeRT, find similar devices, and identify similarities in the components used in the construction of an improvised explosive device.

The Reference Firearms Collection contains more than 5,500 handguns and shoulder firearms; and the Standard Ammunition File, a collection of more than 15,000 military and commercial ammunition specimens from both domestic and international manufacturers.

SOURCE: FBI website at www.fbi.gov/hq/lab/html/ipgu1.htm.

### U.S. Secret Service (Department of Homeland Security [DHS])

The U.S. Secret Service laboratory examines evidence, develops investigative leads, and provides expert courtroom testimony. As part of the 1994 Crime Bill (P.L. 103-322), Congress mandated that the U.S. Secret Service provide forensic/technical assistance in matters involving missing and exploited children. On April 30, 2003, President George W. Bush signed the PROTECT Act of 2003 (P.L. 108-21), known as the "Amber Alert Bill," which gave full authorization to the U.S. Secret Service in this area. The forensic services utilized by the Secret Service include identification, forensic automation, polygraph, questioned documents, and visual information.

### Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

The ATF Laboratories reside within DOJ. Currently, the ATF Laboratories have more than 100 employees working in 4 laboratories in 3 cities. In FY 2005, ATF Laboratories performed more than 2,600 forensic examinations with an authorized staff of 106 positions and a budget of approximately $16 million.

In FY 2006, the ATF Laboratories:

- analyzed 64 samples related to alcohol and tobacco diversion;
- processed 3,086 forensic cases;
- spent 171 days providing expert testimony in the courts;
- spent 242 days at crime scenes; and
- spent 371 days providing training to federal, state, and local investigators and examiners.

A new $135 million National Laboratory Center in suburban Maryland was opened in 2003. The National Laboratory Center contains a unique fire testing facility, designed to support fire investigations. Each ATF Laboratory also has a mobile laboratory designed to support the

---

[28] See www.fbi.gov/hq/lab/codis/clickmap.htm.

2-10

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1560

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

examination of evidence at the scene of a fire or explosion. In FY 2006, ATF established a DNA analysis capability at the National Laboratory Center.[29] The Laboratories are ASCLD/Laboratory Accreditation Board (LAB) accredited in the disciplines of trace evidence, biology (serology only), questioned documents, firearms/toolmarks, and latent prints.

In a 2006 semiannual report from the DOJ Office of the Inspector General (OIG), the OIG's Audit Division evaluated whether the ATF Laboratories managed workloads effectively to provide timely services to ATF field divisions. The audit report stated the following:

> Our audit found that processing times have not significantly improved in the past 4 years. Two-thirds of completed forensic examinations continued to take more than 30 days to complete and about one-third of examinations took more than 90 days.
>
> Improvements in the timeliness of laboratory examinations have been limited because ATF has not accomplished actions it committed to in 2001, such as increasing the number of examiner positions in the forensic laboratories, implementing a new priority system, implementing a new information management system, and significantly reducing the size of its backlog of examination requests. Laboratory staffing generally was adequate to manage the incoming workload, but backlogged requests continued to interfere with the timely analysis of incoming examination requests. The audit found that the backlog could increase as a result of unusually resource-intensive cases. We concluded that if these conditions are not addressed serious consequences may result, such as delays in making arrests and bringing offenders to trial.[30]

**Department of Defense (DOD)**

DOD's forensic requirements are growing beyond the traditional realm of criminal investigations, casualty investigations, and medical examiner functions toward more intelligence and counterintelligence functions. DOD's activities are primarily mission oriented, but they also serve specific functional roles in criminal investigations. A DOD Forensic Sciences Committee provides advice on forensic science activities across the department.

Like other crime laboratories, DOD has capabilities in most of the forensic science disciplines. Its major forensic entities include the Criminal Investigation Laboratory, the Armed Forces Institute of Pathology, the Cyber Crime Center ($20 million annually), and the Central Identification Laboratory ($1 million annually), all of which are ASCLD/LAB accredited. [31] The Army also maintains the Armed Forces Repository of Specimen Samples for the Identification of Remains, with more than 5 million DNA samples primarily from military service members. It also maintains a searchable database of DNA profiles from detainees and known or suspected terrorists. The Criminal Investigation Laboratory provides worldwide forensic laboratory services, training, and research and development (R&D) to all DOD investigative agencies.

---

[29] See www.atf.treas.gov/labs/index.htm.

[30] Office of the Inspector General. *Semiannual Report to Congress*, October 1, 2005-March 31, 2006. April 8, 2006. Available at www.usdoj.gov/oig/semiannual/0605/message.htm. Also see U.S. Department of Justice Office of the Inspector General Audit Division, Audit Report 06-15. March 2006. *Follow-Up Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives Forensic Science Laboratories Workload Management.*

[31] L.C. Chelko, Director, U.S. Army Criminal Investigation Laboratory. Presentation to the committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1561

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

DOD currently is developing a "Defense Forensic Enterprise System" to more centrally manage, integrate, and coordinate across the Services for both criminal investigation and warfighter operations, as well as to serve homeland security functions.[32] Part of the system is the Joint Expeditionary Forensic Facilities, which are modular by design for deployment purposes but which are also designed for expansion to full-spectrum analyses. The Defense Forensic Network connects all DOD forensic operations virtually and synchronizes worldwide DOD forensic operations. A Forensic Training and Research Academy is responsible for all DOD forensic examiner training and serves as DOD's certification authority. In addition to conducting its own research, DOD partners with academia, industry, and other federal agencies. It is collaborating with the National Forensic Science Technology Center to leverage its work in deployable forensic instrumentation and technologies and with NIJ on technology transfer strategies.

**National Bioforensic Analysis Center (NBFAC), DHS**

NBFAC is a component of the National Biodefense Analysis and Countermeasures Center (NBACC), which is operated by a contractor on behalf of DHS, with a proposed budget of $28.3 million for FY 2009. NBFAC and NBACC are not federal agencies. Their prime customer for their services is the FBI. They do not perform complete forensic analyses on evidence from biocrimes and bioterrorism; they do perform or direct the performance (by one or more of their affiliated laboratories) of analyses targeting biological materials and biotoxins. NBFAC provides the laboratories and training for FBI Laboratory examiners in several disciplines to safely and effectively conduct their standard examinations on contaminated traditional evidence. It is also charged with establishing and maintaining reference collections of biological agents.[33]

**National Counterproliferation Center**

The National Counterproliferation Center, a policy and program oversight organization within the Office of the Director of National Intelligence, is seeking to bring a unified, strategic perspective to microbial forensics (bioforensics) research and development and its application to intelligence purposes. Microbial forensics is a "developing interdisciplinary field of microbiology devoted to the development, assessment, and validation of methods to fully characterize microbial samples for the ultimate purpose of high confidence comparative analysis."[34]

---

[32] R. Tontarski, Chief, Forensic Analysis Division, CID Command, U.S. Army Criminal Investigation Laboratory. Presentation to the committee. September 21, 2007.

[33] J. Burans, Bioforensics Program Manager, National Bioforensics Analysis Center. Presentation to the committee. September 21, 2007.

[34] C.L. Cooke, Jr., Office of the Deputy Director for Strategy and Evaluation, National Counterproliferation Center. Presentation to the committee. September 21, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1562

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

## RESEARCH FUNDING

Nearly all forensic science research funds are channeled through DOJ. NIJ and the FBI are the two primary federal sources of funding for forensic science research.

**National Institute of Justice (NIJ)**

NIJ provides the bulk of funds for research. The BJS 2002 census found that of the 12 percent of laboratories that had resources dedicated to research, the primary source of funding for this research was NIJ.

NIJ has two operating offices: (1) the Office of Research and Evaluation develops, conducts, directs, and supervises research and evaluation activities across a wide variety of issues and (2) the Office of Science and Technology manages technology research and development, the development of technical standards, testing, forensic science capacity building, and technology assistance to state and local law enforcement and corrections agencies.[35] NIJ's forensic science programs relevant to research include the President's DNA Initiative; General Forensics R&D; the Forensic Resource Network; and Electronic Crime. These programs vary in their direct support of research. Research decisions are managed through a peer review process.[36] Total expenditures for forensic research were $78 million in FY 2002, but they decreased to $33 million by FY 2009. According to John Morgan, Deputy Director, NIJ, the agency is able to fund 5 to 7 percent of the applications submitted.[37] Commentators have noted that NIJ funds often are not awarded to working members of the forensic science community.[38]

In 2003, the President announced a five-year, $1 billion initiative to improve the use of DNA in the criminal justice system. The President's DNA Initiative pushed for increased funding, training, and assistance to ensure that DNA technology "reaches its full potential to solve crimes, protect the innocent, and identify missing persons."[39] Congress has appropriated more than $300 million to date for the initiative, although only a small fraction is directed toward research. Since 2003, DOJ has made grants in excess of $26 million for new research on forensic tools and techniques,[40] with grants tending to go to population geneticists, medical geneticists, molecular biologists, technology experts, and crime laboratory personnel. The bulk of the funding has gone to state and local law enforcement agencies to support the examination of nearly 104,000 DNA cases from 2004 to 2007 and 2,500,000 convicted offender and arrestee samples, which will be added to the national DNA database. More than 5,000 "hits," or matches to unknown profiles or other cases, have resulted from these efforts. In 2008, NIJ expects to fund the testing of an additional 9,000 backlogged cases and more that 834,000 backlogged convicted offender and arrestee samples.[41]

---

[35] See www.ojp.gov/nij/about_rsrchpri.htm#1.

[36] J. Morgan, Deputy Director National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Presentation to the committee. January 25, 2007.

[37] Ibid.

[38] K. Pyrek. 2007. *Forensic Science Under Siege: The Challenges of Forensic Laboratories and the Medico-Legal Investigation System*. Burlington, MA: Academic Press (Elsevier), p. 448.

[39] See www.dna.gov/info/e_summary.

[40] Morgan, op. cit.

[41] Statement of J.S. Morgan, Deputy Director National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, before the U.S. Senate Committee on the Judiciary concerning "Oversight of the Justice For All Act: Has the Justice Department Effectively Administered the Bloodsworth and Coverdell DNA Grant Programs?" January 23, 2008.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1563

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY**

Under the General Forensics R&D Program, 53 awards have been made through 2007 for the development of "tools and technologies that will allow faster, more reliable, more robust, less costly, or less labor-intensive identification, collection, preservation, and/or analysis of forensic evidence; tools that provide a quantitative measure or statistical evaluation of forensic comparisons; and identification or characterization of new analytes of forensic importance."[42] In FY 2007, solicitations were issued for proposals in Research and Development on Crime Scene Tools, Techniques, and Technologies; Research and Development on Impression Evidence; Research and Development in the Forensic Analysis of Fire and Arson Evidence; and Forensic Toxicology Research and Development.

The size of the NIJ research program warrants comparison with other research programs. In FY 2007, NIJ awarded 21 grants for forensic research and development (not including awards for DNA research) (see Box 2-2). As will be seen in Chapter 5, the number of open research questions about the more common forensic science methods greatly exceeds 21, and none of these open questions appear to be squarely addressed by the projects listed in Box 2-2. The 2007 NIJ awards totaled nearly $6.6 million, with an average award size of $314,000. As a comparison, in the same year, the National Institutes of Health awarded 37,275 research project grants, averaging $359,000, for a total of $15 billion.[43] Also in FY 2007, the National Science Foundation made over 11,500 research project awards for a total of $6.0 billion.[44]

---

**Box 2-2**
**FY 2007 NIJ Awards for Forensic Science Research and Development**

**Biometric Technologies**

Automatic Fingerprint Matching Using Extended Feature Set, Michigan State University, $260,038
Selective Feature-Based Quality Measure Plug-In for Iris Recognition System, Indiana University, $84,858
Site-Adaptive Face Recognition at a Distance, General Electric Co., $496,341

**Forensic DNA Research and Development**

A Low-Cost Microfluidic Microarray Instrument for Typing Y-Chromosome Single Nucleotide
    Polymorphisms (SNPs), Akonni Biosystems, Inc., $448,466
A Rapid, Efficient and Effective Assay to Determine Species Origin in Biological Materials, Bode
    Technology Group, Inc., $170,212
DNA Profiling of the Semen Donor in Extended Interval Post-Coital Samples, University of Central
    Florida, $271,504
Microfabricated Capillary Array Electrophoresis Genetic Analysis for Forensic Short Tandem Repeat DNA
    Profiling, Regents of the University of California, $592,183
National Institute of Justice Forensic DNA Research and Development, Network Biosystems, Inc.,
    $497,346
National Institute of Justice Forensic DNA Research and Development in Vermont for Fiscal Year
    2007,Vermont Department of Public Safety, $112,481
Population Genetics of Single Nucleotide Polymorphisms (SNPs) for Forensic Purposes, Yale University,
    $680,516

---

[42]Morgan, 2007, op. cit.
[43]See http://report.nih.gov/index.aspx?section=NIHFunding.
[44]See www.nsf.gov/news/news_summ.jsp?cntn_id=105803.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1564

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1566 of 2008
PageID #: 3456

Sperm Capture Using Aptamer-Based Technology, Denver, City and County of, $370,813

Tools for Improving the Quality of Aged, Degraded, Damaged or Otherwise Compromised DNA Evidence, Louisiana State University, $580,337

Y Chromosome Whole Genome Analysis Strategies: Improved Detection of Male DNA, University of Central Florida, $324,705

**Research and Development on Crime Scene Tools, Techniques and Technologies**

Detecting Buried Firearms Using Multiple Geophysical Technologies, University of Central Florida, $89,584

Developing Fluorogenic Reagents for Detecting and Enhancing Bloody Fingerprints, Portland State University, $168,904

Electronic Fingerprint Development Device "Fuma-Room," Mountain State University, $61,152

Investigations on the Use of Sample Matrix to Collect and Stabilize Crime Scene Biological Evidence for Optimized Analysis and Room Temperature Storage, California State University, Los Angeles, University Auxiliary Services, $353,449

Rapid Visualization of Biological Fluids at Crime Scenes Using Optical Spectroscopy, University of South Carolina Research Foundation, $382,394

**Research and Development on Impression Evidence**

Analysis of Footwear Impression Evidence, Research Foundation of the State University of New York, $350,172

The Use of Infrared Imaging, a Robust Matching Engine and Associated Algorithms to Enhance Identification of Both 2-D and 3-D Impressions: Phase 1, SED Technology, LLC, $295,247

SOURCE: www.ojp.usdoj.gov/nij/awards/2007.htm#solvingcoldcaseswithdna.

NIJ's Forensic Resource Network is a system of four forensic centers whose mission is to assist state and local forensic service providers in achieving their service delivery goals through research and development, testing and evaluation, training, technology transfer, and technology assistance.

The NIJ Electronic Crime Portfolio addresses "the practical needs of the criminal justice community in its efforts to respond to electronic crime, aiding/assisting law enforcement in the discovery, analysis, presentation and preservation of digital evidence of probative value."[45]

In September 2007, NIJ announced the addition of four Technology Centers of Excellence to serve as resources within their respective technology focus areas by providing technology assistance to law enforcement personnel as well as by working with technology developers and users to test and evaluate equipment in operational environments. In addition, NIJ set aside $5 million for grants to support the development of forensic science standards at NIST.[46]

**Federal Bureau of Investigation (FBI)**

The FBI Laboratory also receives roughly $33 million per year for its own research. To set priorities, the laboratory consults with its own staff and with working-level scientists in the SWGs they support.

---

[45] Ibid.

[46] J. Morgan, Deputy Director for Science and Technology, NIJ. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1565

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

The FBI's Counterterrorism and Forensic Science Research Unit "provides technical leadership/advancement of counterterrorism and forensic sciences for the FBI as well as for state and local law enforcement agencies through the development and validation of new technologies/techniques by both internal and outsourced research efforts and through advanced scientific training in specialized forensic procedures."[47] It fulfills its research mission through two core programs.

The Research and Development Program creates and coordinates the development of new forensic techniques, instrumentation, and protocols for FBI Laboratory units to use in terrorism and violent crime cases. The program focuses its efforts in the areas of DNA analysis, trace organic chemical analysis, toxicology, explosives, fingerprints, drug and materials analysis (e.g., paints, tapes, inks, glass, and metals), database development, anthropology, microbial forensics, and field instrumentation. The committee was told that the program publishes some of its results in scientific journals. The Research Partnership Program transfers new forensic technologies and procedures to case-working examiners at state and local crime laboratories through collaborative studies and implements SWG-defined protocols and national forensic databases. Workshops include those involving the use of an automotive carpet fiber database, messenger RNA (mRNA) profiling of human semen, the visualization and identification of pepper spray on evidentiary materials, 1-step purification of DNA from different matrices, and the permanence of friction ridge skin detail.

## PROFESSIONAL ASSOCIATIONS

Numerous professional organizations are focused on the forensic science disciplines (see Box 2-3). The Consortium of Forensic Science Organizations, founded in 2000, includes the largest of these organizations—the American Academy of Forensic Sciences (AAFS), ASCLD, ASCLD/LAB, IAI, NAME, and Forensic Quality Services (FQS).

AAFS, with 6,000 members worldwide, was founded in 1948. It created and supports the Forensic Specialties Accreditation Board, which accredits certification organizations.[48] Membership includes physicians, attorneys, dentists, toxicologists, physical anthropologists, document examiners, psychiatrists, physicists, engineers, criminalists, educators, and others. AAFS sponsors an annual scientific meeting, publishes the *Journal of Forensic Sciences*, and promotes research, education, and training. It also operates the Forensic Science Education Programs Accreditation Commission (see Chapter 8 for further discussion).[49]

IAI was founded in 1915 and has 6,700 members worldwide. Its members tend to be involved at the "front end" of the process—crime scene investigation, evidence collection, and evidence preservation.[50] It operates certification programs in seven disciplines and publishes the *Journal of Forensic Identification.* The focus of its activities is pattern evidence—for example, fingerprint, footwear, tire track, questioned documents, forensic photography, and forensic art.

ASCLD/LAB and FQS accredit crime laboratories and are discussed in greater detail in Chapter 7. Chapter 9 describes the activities of NAME.

---

[47] See www.fbi.gov/hq/lab/html/cterror1.htm.

[48] See www.thefasb.org.

[49] B.A. Goldberger, AAFS President-Elect. Presentation to the committee. January 25, 2007.

[50] J. Polski, IAI Chief Operations Officer. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1566

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

---

**Box 2-3 Forensic Associations and Societies**

American Academy of Forensic Sciences
American Board of Criminalistics
American Board of Forensic Anthropology
American Board of Forensic Odontology
American Board of Forensic Toxicology
American Society for Quality
American Society for Testing and Materials
American Society of Crime Laboratory Directors
American Society of Questioned Document Examiners
AOAC International
Association of Firearm & Tool Marks Examiners
Association of Forensic Quality Assurance Managers
California Association of Criminalistics
Canadian Society of Forensic Sciences
Council of Federal Forensic Crime Laboratory Directors
Forensic Science Society
International Association for Identification
International Association of Arson Investigators
International Association of Bloodstain Pattern Analysts
International Association of Coroners and Medical Examiners
International Association of Forensic Nurses
International Association of Forensic Toxicologists
Mid-Atlantic Association of Forensic Scientists
Midwestern Association of Forensic Scientists
National Association of Medical Examiners
National Center of Forensic Science
National Forensic Science Technology Center
New Jersey Association of Forensic Scientists
Northeastern Association of Forensic Scientists
Northwest Association of Forensic Scientists
Society of Forensic Toxicologists
Southern Association of Forensic Science
Southwestern Association of Forensic Scientists
Wisconsin Association for Identification

---

## CONCLUSIONS AND RECOMMENDATION

The fragmented nature of the forensic science community makes it difficult to gather data on the entire universe of forensic service entities and activities, although efforts have been made to collect data on publicly funded crime laboratories and nonlaboratory-based providers. For example, the committee could find no data available on for-profit forensic service providers, other than on DNA laboratories. Thus, attempts to construct effective policies are hampered by the lack of coherent and consistent information on the forensic science infrastructure in the United States. However, the large amount of information provided to the committee by people engaged in the forensic science enterprise and by experts who have studied how well that

2-17

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1567

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

enterprise functions all points to a system that lacks coordination and that is under resourced in many ways.

By using the term "under resourced," the committee means to imply all of its dimensions. Existing data suggest that forensic laboratories are under resourced and understaffed, which contributes to a backlog in cases and likely makes it difficult for laboratories to do as much as they could to inform investigations, provide strong evidence for prosecutions, and avoid errors that could lead to imperfect justice. But under resourced also means that the tools of forensic science are not as strong as they could be. The knowledge base that underpins analysis and the interpretation of evidence—which enable the forensic science disciplines to excel at informing investigations, providing strong evidence for prosecutions, and avoiding errors that could lead to imperfect judgment—is incomplete in important ways. NIJ is the only federal agency that provides direct support to crime laboratories to alleviate the backlog, and those funds are minimal. The enterprise also is under resourced in the sense that it has only thin ties to an academic research base that could undergird the forensic science disciplines and fill knowledge gaps. This under resourcing limits the ability of the many hard-working and conscientious people in the forensic science community to do their best work.

Among the various facets of under resourcing, the committee is most concerned about the knowledge base, which is further examined in Chapter 5. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capability of the forensic science disciplines to discern valid information from crime scene evidence. For the most part, it is impossible to discern the magnitude of those limitations, and reasonable people will differ on their significance.

Forensic science research is not well supported, and there is no unified strategy for developing a forensic science research plan across federal agencies. Relative to other areas of science, the forensic science disciplines have extremely limited opportunities for research funding. Although the FBI and NIJ have supported some research in the forensic science disciplines, the level of support has been well short of what is necessary for the forensic science community to establish strong links with a broad base of research universities and the national research community. Moreover, funding for academic research is limited and requires law enforcement collaboration, which can inhibit the pursuit of more fundamental scientific questions essential to establishing the foundation of forensic science. Finally, the broader research community generally is not engaged in conducting research relevant to advancing the forensic science disciplines.

The forensic science community also is hindered by its extreme disaggregation—marked by multiple types of practitioners with different levels of education and training and different professional cultures and standards for performance. Many forensic scientists are given scant opportunity for professional activities such as attending conferences or publishing their research, which could help strengthen that professional community. Furthermore, the fragmented nature of the forensic science community raises the worrisome prospect that the quality of evidence presented in court, and its interpretation, can vary unpredictably according to jurisdiction.

Numerous professional associations are organized around the forensic science disciplines, and many of them are involved in training and education (see Chapter 8) and developing standards and accreditation and certification programs (see Chapter 7). The efforts of these groups are laudable. However, except for the largest organizations, it is not clear how these associations interact or the extent to which they share requirements, standards, or policies. Thus, there is a need for more consistent and harmonized requirements.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1568

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1570 of 2008
PageID #: 3460

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

In the course of its deliberations and review of the forensic science community, it became obvious to the committee that truly meaningful advances will not come without significant leadership from the federal government. The forensic science community lacks the necessary governance structure to pull itself up from its current weaknesses. Insufficiencies in the current system cannot be addressed simply by increasing the staff within existing crime laboratories and medical examiners offices. Of the many professional societies that serve the forensic science community, none is dominant, and none has clearly articulated the need for change or presented a vision for accomplishing it. And clearly no municipal or state forensic office has the mandate to lead the entire community. The major federal resources—NIJ and the FBI Laboratory—have provided modest leadership, for which they should be commended. NIJ has contributed a helpful research program and the FBI Laboratory has spearheaded the SWGs. But again, neither entity has recognized, let alone articulated, a need for change or a vision for affecting it. Neither has the full confidence of the larger forensic science community. And because both are part of a prosecutorial department of the government, they could be subject to subtle contextual biases that should not be allowed to undercut the power of forensic science.

The forensic science community needs strong governance to adopt and promote an aggressive, long-term agenda to help strengthen forensic science. Governance must be strong enough—and independent enough—to identify the limitations of forensic science methodologies and must be well connected with the Nation's scientific research base in order to affect meaningful advances in forensic science practices. The governance structure must be able to create appropriate incentives for jurisdictions to adopt and adhere to best practices and promulgate the necessary sanctions to discourage bad practices. It must have influence with educators in order to effect improvements to forensic science education. It must be able to identify standards and enforce them. The governance entity must be geared toward (and be credible within) the law enforcement community, but it must have strengths that extend beyond that area. Oversight of the forensic science community and medical examiner system will sweep broadly into areas of criminal investigation and prosecution, civil litigation, legal reform, investigation of insurance claims, national disaster planning and preparedness, homeland security, certification of federal, state, and local forensic practitioners, public health, accreditation of public and private laboratories, research to improve forensic methodologies, education programs in colleges and universities, and advancing technology.

The committee considered whether such a governing entity could be established within an existing federal agency. The National Science Foundation (NSF) was considered because of its strengths in leading research and its connections to the research and education communities. NSF is surely capable of building and sustaining a research base, but it has very thin ties to the forensic science community. It would be necessary for NSF to take many untested steps if it were to assume responsibility for the governance of applied fields of science. The committee also considered NIST. In the end analysis, however, NIST did not appear to be a viable option. It has a good program of research targeted at forensic science and law enforcement, but the program is modest. NIST also has strong ties to industry and academia, and it has an eminent history in standard setting and method development. But its ties to the forensic science community are still limited, and it would not be seen as a natural leader by the scholars, scientists, and practitioners in the field. In sum, the committee concluded that neither NSF nor NIST has the breadth of experience or institutional capacity to establish an effective governance structure for the forensic science enterprise.

There was also a strong consensus in the committee that no existing or new division or unit within DOJ would be an appropriate location for a new entity governing the forensic science

2-19

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1569

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

community. DOJ's principal mission is to enforce the law and defend the interests of the United States according to the law. Agencies within DOJ operate pursuant to this mission. The FBI, for example, is the investigative arm of DOJ and its principal missions are to produce and use intelligence to protect the Nation from threats and to bring to justice those who violate the law. The work of these law enforcement units is critically important to the Nation, but the scope of the work done by DOJ units is much narrower than the promise of a strong forensic science community. Forensic science serves more than just law enforcement; and when it does serve law enforcement, it must be equally available to law enforcement officers, prosecutors, and defendants in the criminal justice system. The entity that is established to govern the forensic science community cannot be principally beholden to law enforcement. The potential for conflicts of interest between the needs of law enforcement and the broader needs of forensic science are too great. In addition, the committee determined that the research funding strategies of DOJ have not adequately served the broad needs of the forensic science community. This is understandable, but not acceptable when the issue is whether an agency is best suited to support and oversee the Nation's forensic science community. In sum, the committee concluded that advancing science in the forensic science enterprise is not likely to be achieved within the confines of DOJ. Moreover, DHS is too focused on national security to embed a new entity within it.

The committee thus concluded that no existing agency has the capacity or appropriate mission to take on the roles and responsibilities needed to govern and improve the forensic science community. The tasks assigned to it require that it be unfettered and objective and as free from bias as possible. What is needed is a new, strong, and independent entity with no ties to the past and with the authority and resources to implement a fresh agenda designed to address the many problems found by the committee and discussed in the remainder of this report.

The proposed entity must meet the following minimum criteria:

- It must have a culture that is strongly rooted in science, with strong ties to the national research and teaching communities, including federal laboratories.
- It must have strong ties to state and local forensic entities, as well as to the professional organizations within the forensic science community.
- It must not be in any way committed to the existing system, but should be informed by its experiences.
- It must not be part of a law enforcement agency.
- It must have the funding, independence, and sufficient prominence to raise the profile of the forensic science disciplines and push effectively for improvements.
- It must be led by persons who are skilled and experienced in developing and executing national strategies and plans for standard setting; managing accreditation and testing processes; and developing and implementing rulemaking, oversight, and sanctioning processes.

No federal agency currently exists that meets all of these criteria.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1570

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1572 of 2008 PageID #: 3462

THE NEED FOR INTEGRATED GOVERNANCE—PREPUBLICATION COPY

**Recommendation 1:**

> To promote the development of forensic science into a mature field of multidisciplinary research and practice, founded on the systematic collection and analysis of relevant data, Congress should establish and appropriate funds for an independent federal entity, the National Institute of Forensic Science (NIFS). NIFS should have a full-time administrator and an advisory board with expertise in research and education, the forensic science disciplines, physical and life sciences, forensic pathology, engineering, information technology, measurements and standards, testing and evaluation, law, national security, and public policy. NIFS should focus on:
>
> (a)  establishing and enforcing best practices for forensic science professionals and laboratories;
>
> (b)  establishing standards for the mandatory accreditation of forensic science laboratories and the mandatory certification of forensic scientists and medical examiners/forensic pathologists—and identifying the entity/entities that will develop and implement accreditation and certification;
>
> (c)  promoting scholarly, competitive peer-reviewed research and technical development in the forensic science disciplines and forensic medicine;
>
> (d)  developing a strategy to improve forensic science research and educational programs, including forensic pathology;
>
> (e)  establishing a strategy, based on accurate data on the forensic science community, for the efficient allocation of available funds to give strong support to forensic methodologies and practices in addition to DNA analysis;
>
> (f)  funding state and local forensic science agencies, independent research projects, and educational programs as recommended in this report, with conditions that aim to advance the credibility and reliability of the forensic science disciplines;
>
> (g)  overseeing education standards and the accreditation of forensic science programs in colleges and universities;
>
> (h)  developing programs to improve understanding of the forensic science disciplines and their limitations within legal systems; and
>
> (i)  assessing the development and introduction of new technologies in forensic investigations, including a comparison of new technologies with former ones.

The benefits that will flow from a strong, independent, strategic, coherent, and well-funded federal program to support and oversee the forensic science disciplines in this country are clear: The Nation will (1) bolster its ability to more accurately identify true perpetrators and exclude those who are falsely accused; (2) improve its ability to effectively respond to, attribute, and prosecute threats to homeland security; and (3) reduce the likelihood of convictions resting on inaccurate data. Moreover, establishing the scientific foundation of the forensic science disciplines, providing better education and training, and requiring certification and accreditation

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1571

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES —PREPUBLICATION COPY

will position the forensic science community to take advantage of current and future scientific advances.

The creation of a new federal entity undoubtedly will pose challenges, not the least of which will be budgetary constraints. The committee is not in a position to estimate how much it will cost to implement the recommendations in this report; this is a matter best left to the expertise of the Congressional Budget Office. What is clear, however, is that Congress must take aggressive action if the worst ills of the forensic science community are to be cured. Political and budgetary concerns should not deter bold, creative, and forward-looking action, because the country cannot afford to suffer the consequences of inaction. It will also take time and patience to implement the recommendations in this report. But this is true with any large, complex, important, and challenging enterprise.

The committee strongly believes that the greatest hope for success in this enterprise will come with the creation of NIFS to oversee and direct the forensic science community. The remaining recommendations in this report are crucially tied to the creation of NIFS. However, each recommendation is a separate, essential piece of the plan to improve the forensic science community in the United States. Therefore, even if the creation of NIFS is forestalled, the committee vigorously supports the adoption of the core ideas and principles embedded in the additional recommendations that appear in this report.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1572

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 3

# THE ADMISSION OF FORENSIC SCIENCE EVIDENCE IN LITIGATION

This chapter describes the legal system's reliance on forensic science evidence in criminal prosecutions and examines the existing adversarial process for admitting this type of evidence. The report describes and analyzes the current situation and makes recommendations for the future. No judgment is made about past convictions and no view is expressed as to whether courts should reassess cases that already have been tried. The report finds that the existing legal regime—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and judges and lawyers who often lack the scientific expertise necessary to comprehend and evaluate forensic evidence—is inadequate to the task of curing the documented ills of the forensic science disciplines. This matters a great deal, because "forensic science is but the handmaiden of the legal system."[1] As explained in Chapters 4 and 5, there are serious issues regarding the capacity and quality of the current forensic science system; yet, the courts continue to rely on forensic evidence without fully understanding and addressing the limitations of different forensic science disciplines. This profound conjunction of law and science, especially in the context of law enforcement, underscores the need for improvement in the forensic science community. The report concludes that every effort must be made to limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified.

## LAW AND SCIENCE

Science and law always have had an uneasy alliance:

> Since as far back as the fourteenth century, scientific evidence has posed profound challenges for the law. At bottom, many of these challenges arise from fundamental differences between the legal and scientific processes. . . . The legal system embraces the adversary process to achieve "truth," for the ultimate purpose of attaining an authoritative, final, just, and socially acceptable resolution of disputes. Thus law is a normative pursuit that seeks to define how public and private relations *should* function . . . . In contrast to law's vision of truth, however, science embraces empirical analysis to discover truth as found in verifiable facts. Science is thus a descriptive pursuit, which does not define how the universe should be but rather describes how it actually *is*.

---

[1] 4 D.L. Faigman, M.J. Saks, J. Sanders, and E.K. Cheng. 2007-2008. *Modern Scientific Evidence: The Law and Science of Expert Testimony*. Eagan, MN: Thomson/West, § 29.4, p.6. See also P.C. Giannelli and E.J. Imwinkelried. 2007. *Scientific Evidence,* 4th ed. Albany, NY: Lexis Publishing Co., on the latest forensic techniques and scientific concepts used in collecting and evaluating evidence.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1573

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

> These differences between law and science have engendered both systemic and pragmatic dilemmas for the law and the actors within it. . . . Moreover, in almost every instance, scientific evidence tests the abilities of judges, lawyers, and jurors, all of whom may lack the scientific expertise to comprehend the evidence and evaluate it in an informed manner.[2]

Nowhere are these dilemmas more evident than in decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

Forensic science experts and evidence are routinely used in the service of the criminal justice system. DNA testing may be used to determine whether sperm found on a rape victim came from an accused party; a latent fingerprint found on a gun may be used to determine whether a defendant handled the weapon; drug analysis may be used to determine whether pills found in a person's possession were illicit; and an autopsy may be used to determine the cause of death of a murder victim. In order for qualified forensic science experts to testify competently about forensic evidence, they must first find the evidence in a usable state and properly preserve it. A latent fingerprint that is badly smudged when found cannot be usefully saved, analyzed, or explained. An inadequate drug sample may be insufficient to allow for proper analysis. And, DNA tests performed on a contaminated or otherwise compromised sample cannot reliably identify or eliminate an individual as the perpetrator of a crime. These are important matters having to do with the proper "processing" of forensic evidence. The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is *science* in any given "forensic science" discipline.[3]

The degree of science in a forensic science method may have an important bearing on the reliability of forensic evidence in criminal cases. There are two very important questions that *should* underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant:[4] The goal of law enforcement actions is to identify those who have committed crimes and to prevent the criminal justice system from erroneously convicting the innocent. So it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support.

As discussed in Chapters 4 and 5, no forensic method other than nuclear DNA analysis has been rigorously shown to have the capacity to consistently and with a high degree of certainty support conclusions about "individualization" (more commonly known as "matching" of an unknown item of evidence to a specific known source). In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there also are important variations among the disciplines relying on expert interpretation. For example, there are more established protocols and available research for the analysis of fingerprints

---

[2] Developments in the law – confronting the new challenges of scientific evidence. 108 HARV. L. REV. 1481, 1484 (1995) (hereinafter "Developments in the law") (footnotes omitted); see also M.A. Berger and L.M. Solan. The uneasy relationship between science and law: An essay and introduction. 73 BROOK. L. REV. 847 (2008).

[3] Principles of science are discussed in Chapter 4.

[4] Descriptions and assessments of different forensic science disciplines are set forth in Chapters 5 and 6.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1574

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

than for bite marks. In addition, there also are significant variations within each discipline. Thus, not all fingerprint evidence is equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. In short, the interpretation of forensic evidence is not infallible. Quite the contrary. This reality is not always fully appreciated or accepted by many forensic science practitioners, judges, jurors, policymakers, or lawyers and their clients.[5]

## THE *FRYE* STANDARD AND RULE 702 OF THE FEDERAL RULES OF EVIDENCE

During the twentieth century, as science advanced, the legal system "attempted to develop coherent tests for the admissibility of scientific evidence."[6] The first notable development occurred in 1923 with the issuance of the landmark decision in *Frye v. United States*.[7] The *Frye* case involved a murder trial in which the defendant sought to demonstrate his innocence through the admission of a lie detector test that measured systolic blood pressure. The court rejected the evidence, stating:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.[8]

The *Frye* decision held that the lie detector test was unreliable because it had not gained "general acceptance" in the relevant scientific community. The meaning of the *Frye* test is elusive. Indeed, "[t]he merits of the *Frye* test have been much debated, and scholarship on its proper scope and application is legion."[9] For many years, the *Frye* test was cited in both civil and criminal cases, but it was applied most frequently in criminal cases.[10] "In the 70 years since its formulation in the *Frye* case, the 'general acceptance' test [was] the dominant standard for determining the admissibility of novel scientific evidence at trial."[11]

In 1975, more than a half-century after *Frye* was decided, the Federal Rules of Evidence were promulgated to guide criminal and civil litigation in federal courts. The first version of Federal Rule of Evidence 702 provided that:

---

[5] See 4 Faigman et al., op. cit., *supra* note 1, §29.3, p. 6 ("Few forensic scientists harbor serious misgivings about the expectation of good science on the part of their clients, be they the police, the prosecution, or the defense bar. . . . The clients want good science and the truth if it will help their case."); S. Scarborough. 2005. They keep putting fingerprints in print. *The CACNews*. California Association of Criminalists, 2nd Quarter. Available at www.cacnews.org/news/2ndq05.pdf, p. 19 ("As scientists we are confident that any 'critic' that tries to prove the fallibility of fingerprints will actually find the opposite. Just as we testify to everyday.").

[6] Developments in the law, *supra* note 2, p. 1486.

[7] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

[8] Ibid., p.1014.

[9] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 586 & n.4 (1993) (citing authorities).

[10] P.C. Giannelli. 1993. "Junk science": The criminal cases. *Journal of Criminal Law and Criminology* 84:105, 111, and n.35.

[11] *Daubert*, 509 U.S. at 585.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1575

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[12]

In place of *Frye*'s requirement of general scientific acceptance, mere "assistance" to the trier of fact appeared to be "the touchstone of admissibility under Rule 702."[13]

After the promulgation of Rule 702, litigants, judges, and legal scholars remained at odds over whether the rule embraced the *Frye* standard or established a new standard.[14] There was also much controversy surrounding the application of Rule 702 in civil cases. Most notably, Peter Huber popularized the now well-known phrase "junk science" to criticize the judiciary's acceptance of unreliable expert testimony in support of tort claims.[15] Huber's study was sharply criticized,[16] but it nonetheless spurred a debate over the use of expert testimony in the courts. However, "[d]espite the highly visible efforts to reform the rules governing experts in the civil arena, the 'junk science' debate . . . all but ignored criminal prosecutions."[17] The "neglect of the problems of expert testimony in criminal prosecutions" was seen by some as "deplorable."[18]

## THE *DAUBERT* DECISION AND THE SUPREME COURT'S CONSTRUCTION OF RULE 702

In 1993, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court finally clarified that Rule 702, not *Frye*, controlled the admission of expert testimony in the federal courts.[19] *Daubert* was a civil case brought by two minor children and their parents, alleging that the children's serious birth defects had been caused by their mothers' prenatal ingestion of Bendectin, a prescription drug marketed by the defendant pharmaceutical company. In support of a motion for summary judgment, the drug company submitted an affidavit from a qualified expert, who stated that he had reviewed all the literature on Bendectin and human birth defects and had found no study showing Bendectin to be a human teratogen (i.e., an agent that can cause malformations of an embryo or fetus). The plaintiffs countered with experts of their own, each of whom concluded that Bendectin could cause birth defects. Their conclusions were based on animal studies that found a link between Bendectin and malformations; pharmacological studies of the chemical structure of

---

[12] FED. R. EVID. 702, P.L. No. 93-595, § 1, 88 Stat. 1926 (effective January 2, 1975).

[13] Giannelli, op. cit., *supra* note 10, p. 107.

[14] T. Lyons. 1997. *Frye, Daubert* and where do we go from here? *Rhode Island Bar Journal* 45(5):21 (stating that "the vast majority of federal circuit and other courts adopted *Frye* as the standard of admissibility in their jurisdictions.").

[15] P.W. Huber. 1991. *Galileo's Revenge: Junk Science in the Courtroom*. New York: Basic Books.

[16] See, e.g., K.J. Chesebro. *Galileo's* retort: Peter Huber's junk scholarship. 42 AM. U. L. REV. 1637 (1993); Book Note: Rebel without a cause. 105 HARV. L. REV. 935 (1992).

[17] Giannelli, op. cit., *supra* note 10, p. 110.

[18] Ibid., pp. 110-111. Over time, a number of courts and commentators found the "general acceptance" test seriously wanting. See 1 Faigman et al., op. cit., *supra* note 1, § 1:6, pp. 13-17; P.C. Giannelli. The admissibility of novel scientific evidence: *Frye v. United States*, a half-century later. 80 COLUM. L. REV. 1197, 1207-1208 (1980) ("[T]he problems *Frye* has engendered–the difficulties in applying the test and the anomolous results it creates–so far outweigh [its] advantages that the argument for adopting a different test has become overwhelming."); M. McCormick. Scientific evidence: Defining a new approach to admissibility. 67 IOWA L. REV. 879, 915 (1982) (*Frye*'s "main drawbacks are its inflexibility, confusion of issues, and superfluity."); J.W. Strong. Questions affecting the admissibility of scientific evidence. U. ILL. L.F. 1, 14 (1970) ("The *Frye* standard, however, tends to obscure these proper considerations by asserting an undefinable general acceptance as the principal if not sole determinative factor.").

[19] 509 U.S. 579 (1993).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1576

Strengthening Forensic Science in the United States: A·Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

Bendectin that purported to show similarities between the structure of the drug and that of other substances known to cause birth defects; and the "reanalysis" of previously published epidemiological (human statistical) studies. The district court held that the expert testimony proffered by the plaintiffs was inadmissible, because their scientific evidence was not sufficiently established to have general acceptance in the field to which it belonged.[20] The court of appeals, citing *Frye*, affirmed the judgment of the district court, declaring that expert opinion based on a methodology that diverges significantly from the procedures accepted by recognized authorities in the field cannot be shown to be generally accepted as a reliable technique.[21] The Supreme Court reversed, holding that the trial court had applied the wrong standard in assessing the expert testimony proffered by the plaintiffs. The case was then remanded for further proceedings.

In construing and applying Rule 702, the *Daubert* Court ruled that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[22] The Court rejected the *Frye* test, noting that the drafting history of Rule 702 made no mention of *Frye*, "and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'"[23] The Court indicated that the subject of expert testimony should be "scientific knowledge," so "evidentiary reliability will be based upon scientific validity."[24] The Court also emphasized that, in considering the admissibility of evidence, trial judges should focus "solely" on experts' "principles and methodology," and "not on the conclusions that they generate."[25] In sum, *Daubert*'s requirement that expert testimony pertain to "scientific knowledge" established a standard of "evidentiary reliability."

In explaining this evidentiary standard, the *Daubert* Court pointed to several factors that might be considered by a trial judge: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) a scientific technique's degree of acceptance within a relevant scientific community.[26] In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one."[27] The Court also rejected the suggestion that its liberal construction of Rule 702 would "result in a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions."[28] Rather, the Court expressed confidence in the adversary system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and

---

[20] *Daubert v. Merrell Dow Pharm, Inc.*, 727 F. Supp. 570, 575 (S.D. Cal. 1989).

[21] *Daubert v. Merrell Dow Pharm., Inc.*, 951 F.2d 1128, 1129-30 (9th Cir. 1991).

[22] *Daubert*, 509 U.S. at 589.

[23] Ibid., p. 588 (internal citations omitted).

[24] Ibid, p. 590 and n.9 (emphasis omitted).

[25] Ibid., p. 595. In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court added: "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

[26] Ibid., pp. 592-94.

[27] Ibid., p. 594. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire* importantly held that Rule 702 applies to both scientific and nonscientific expert testimony; the Court also indicated that the *Daubert* factors might be applicable in a trial judge's assessment of the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." 526 U.S. at 150.

[28] *Daubert*, 509 U.S. at 595.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1577

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[29]

*Daubert*-type questions may be raised by the parties pretrial,[30] or during the course of trial,[31] or *sua sponte* by the trial judge.[32] Sometimes a trial judge will conduct a formal *"Daubert* hearing" before ruling on a party's objection to expert testimony; sometimes, however, the judge will simply entertain a party's objection, hear arguments, and then rule.[33] Judges sometimes rule on the briefs alone, without the benefit of formal arguments. There are any number of questions that might arise concerning the testimony of a forensic science expert or about the forensic evidence itself. These questions might include, *inter alia*, issues relating to one of the five *Daubert* factors or other factors appropriate to the forensic evidence, the relevance of the evidence, the qualifications of the expert, the adequacy of the evidentiary sample about which the expert will be testifying, and the procedures followed in the handling and processing of the evidence. After considering the matter at issue, a trial judge may exclude the evidence in whole or in part, prevent or limit the testimony of the expert witness, or deny the challenge. The Supreme Court has made it clear that trial judges have great discretion in deciding on the admissibility of evidence under Rule 702, and that appeals from *Daubert* rulings are subject to a very narrow abuse-of-discretion standard of review.[34] Most importantly, in *Kumho Tire Co., Ltd. v. Carmichael*, the Court made it clear that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[35]

## THE 2000 AMENDMENT OF RULE 702

In 2000, Rule 702 was amended "in response to *Daubert*."[36] The revised rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[37]

---

[29] Ibid., p. 596.

[30] See, e.g., *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001). ("[B]ecause *Daubert* generally contemplates a 'gatekeeping' function, not a 'gotcha' junction, [the case law] permits a district court to reject as untimely *Daubert* motions raised late in the trial process.")

[31] See, e.g., *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) (holding trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function under *Daubert* as to expert testimony).

[32] See, e.g., *Hoult v. Hoult*, 57 F.3d 1, 4 (1st Cir. 1995) ("We think *Daubert* does instruct district courts to conduct a preliminary assessment of the reliability of expert testimony, even in the absence of an objection.").

[33] 1 Faigman et al., op. cit., *supra* note 1, § 1.8, p. 23 (stating "[i]n general, most courts considering the matter hold that a separate hearing to determine the validity of the basis for scientific evidence is not required" and discussing cases).

[34] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

[35] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

[36] FED. R. EVID. 702 advisory committee's note (2000 Amendments).

[37] FED. R. EVID. 702.

3-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1578

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

The commentary accompanying the revised rule[38] recites the *"Daubert* factors" and then goes on to explain that:

Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include:

(1)    Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.[39]

(3)    Whether the expert has adequately accounted for obvious alternative explanations.

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[40]

All of these factors remain relevant to the determination of the reliability of expert testimony under the rule as amended.

The commentary accompanying the revised rule also notes that:

[T]he amendment [to Rule 702] does not distinguish between scientific and other forms of expert testimony. The trial court's gatekeeping function applies to testimony by any expert. While the relevant factors for determining reliability will vary from expertise to expertise, the amendment rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert

---

[38] FED. R. EVID. 702 advisory committee's note (2000 Amendments) (citations and quotation marks omitted).

[39] The commentary cites *General Electric*, 522 U.S. at 146 (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[40] The commentary cites *Kumho Tire*, 526 U.S. at 150 (*Daubert*'s general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1579

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

The amendment requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. While the terms "principles" and "methods" may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge. For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of

Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail). . . . *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct.1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").[41]

Given this view of Rule 702—which makes clear that "technical or other specialized knowledge" may be credited as expert testimony "so long as the principles and methods are reliable and applied reliably to the facts of the case"—it is not surprising that the courts might be hard pressed, under existing standards of admissibility, to hold some forensic science practitioners to the more demanding standards of the traditional sciences.[42]

## AN OVERVIEW OF JUDICIAL DISPOSITIONS OF *DAUBERT*-TYPE QUESTIONS

Assessing the admission of forensic evidence in litigation is no small undertaking, given the huge number of cases in which such evidence is proffered. Moreover, although *Daubert* remains the standard by which admissibility in federal cases is measured under Federal Rule of Evidence 702, states remain free to apply other evidentiary standards. Some states still apply some version of the

---

[41] FED. R. EVID. 702 advisory committee's note (2000 Amendments).
[42] See generally Giannelli and Imwinkelried, op. cit., for thoughtful discussions of the admissibility of some forms of forensic science testimony as technical or other specialized knowledge under Rule 702.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1580

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY

*Frye* standard, while others have adopted *Daubert* or some version of the *Daubert* test.[43] Considering the patchwork of state standards and the fact that "[s]tate courts receive 200 times more criminal prosecutions than federal courts," because "[f]orensic science is used most commonly in crimes of violence, and most crimes of violence are tried in state court,"[44] a comprehensive overview would be difficult to create.

The focus of this section and succeeding sections of this chapter will be on judicial dispositions of *Daubert*-type questions in criminal cases in the federal courts. The reason for this is that, although not every state has adopted the *Daubert* standard, there is little doubt that *Daubert* has effectively set a norm that applies in every federal court and in a great many state jurisdictions. It cannot be ignored, and the reported federal cases give the best evidence of how *Daubert* is applied by the judiciary.

Judicial dispositions of *Daubert*-type questions in criminal cases have been criticized by some lawyers and scholars who thought that the Supreme Court's decision would be applied more rigorously to protect the rights of accused parties:

> [*Daubert*] obligated trial court judges to assume the role of "gatekeepers" and to exclude proffered scientific evidence unless it rested on scientifically valid reasoning and methodology. Many thought *Daubert* would be the meaningful standard that was lacking in criminal cases and that it would serve to protect innocent defendants.
>
> . . .
>
> [However, a]n analysis of post-*Daubert* decisions demonstrates that whereas civil defendants prevail in their *Daubert* challenges, most of the time criminal defendants almost always lose their challenges to government proffers. But when the prosecutor challenges a criminal defendant's expert evidence, the evidence is almost always kept out of the trial. . . . In the first 7 years after *Daubert*, there were 67 reported federal appellate decisions reviewing defense challenges to prosecution experts. The government prevailed in all but 6, and even among the 6, only 1 resulted in the reversal of a conviction. In contrast, in the 54 cases in which the defense appealed a trial court ruling to exclude the defendant's expert, the defendant lost in 44 cases. In 7 of the remaining 10, the case was remanded for a *Daubert* hearing.[45]

This critique of reported federal appellate decisions cannot be the end of the analysis, however. First, there are two sides to any discussion concerning the admissibility and reliability of forensic evidence: (1) enhancing the ability of law enforcement to identify persons who commit crimes and (2) protecting innocent persons from being convicted of crimes that they did not commit. It is easier to assess the latter than the former, because there are no good studies indicating how many convictions are lost because of faulty forensic science evidence. Second, if one focuses solely on federal appellate decisions, the picture is not appealing to those who have preferred a more

---

[43] See generally D.E. Bernstein and J.D. Jackson. The *Daubert* trilogy in the states. 44 JURIMETRICS J. 351 (2004).

[44] P.J. Neufeld. 2005. The (near) irrelevance of *Daubert* to criminal justice: And some suggestions for reform. *American Journal of Public Health* 95(Supp. 1):S107, S110.

[45] Ibid., p. S109. See also P.C. Giannelli. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. REV. 163 (2007).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1581

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1583 of 2008
PageID #: 3473
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

rigorous application of *Daubert*. Federal appellate courts have not with any consistency or clarity imposed standards ensuring the application of scientifically valid reasoning and reliable methodology in criminal cases involving *Daubert* questions.[46] This is not really surprising. The Supreme Court itself described the *Daubert* standard as "flexible." This means that, beyond questions of relevance, *Daubert* offers appellate courts no clear substantive standard pursuant to which to review decisions by trial courts.[47] As a result, trial judges exercise great discretion in deciding whether to admit or exclude expert testimony, and their judgments are subject only to a highly deferential "abuse of discretion" standard of review.[48]

To get a clearer picture of judicial dispositions of *Daubert*-type questions, we need to know how these matters are handled by trial courts. Unfortunately, the picture is unclear. There are countless *Daubert*-type, evidentiary challenges in criminal cases, some resulting in formal *Daubert* hearings, and many others not. There is no way to know with any degree of certainty how many of these challenges are entirely or partially sustained, because many trial court judgments on evidentiary matters are issued without published opinions[49] and with no appeal. If a defendant's challenge is sustained and is followed by an acquittal, no appeal ensues and the matter is over. If a defendant's challenge is sustained and is followed by a conviction, the defendant obviously will not appeal the favorable evidentiary ruling. If a defendant's challenge is rejected and is followed by an acquittal, no appeal ensues and the matter is over. *Reported* opinions in criminal cases indicate that trial judges sometimes exclude or restrict expert testimony offered by prosecutors;[50] *reported* opinions also indicate that appellate courts routinely deny appeals contesting trial court decisions admitting forensic evidence against criminal defendants.[51] But the reported opinions do not offer in any way a complete sample of federal trial court dispositions of *Daubert*-type questions in criminal cases.[52]

---

[46] See, e.g., *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005); *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001). The *Havvard* decision has been described as "[a]n excellent, albeit deeply troubling, example of a court straining scientific credulity for the sake of a venerable forensic science." See 1 Faigman et al., op. cit., *supra* note 1, § 1:30, pp. 85-86.

[47] As noted above, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 153.

[48] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997); see also H.T. Edwards and L.A. Elliott. 2007. *Federal Standards of Review*. St. Paul, MN: Thomson/West, pp. 72-74 (explaining that when a trial judge acts pursuant to broad discretion, appellate court scrutiny is necessarily very limited).

[49] See, e.g., *Hoult*, 57 F.3d at 5 (district courts are not required "to make explicit on-the-record rulings regarding the admissibility of expert testimony"); *United States v. Locascio*, 6 F.3d 924, 938-939 (2d Cir. 1993) ("We decline . . . to shackle the district court with a mandatory and explicit trustworthiness analysis. . . . In fact, we assume that the district court consistently and continually performed a trustworthiness analysis *sub silentio* of all evidence introduced at trial. We will not, however, circumscribe this discretion by burdening the court with the necessity of making an explicit determination for all expert testimony.").

[50] See, e.g., *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) (toolmark analysis); *United States v. Mikos*, No. 02-137, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003) (expert testimony relating to comparative bullet lead analysis); *United States v. Horn*, 185 F. Supp. 2d 530 (D. Md. 2002) (evidence of defendant's performance on field sobriety tests); *United States v. Rutherford*, 104 F. Supp. 2d 1190 (D. Neb. 2000) (handwriting analysis).

[51] See, e.g., *United States v. Ford*, 481 F.3d 215 (3d Cir. 2007); *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006); *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005); *United States v. Davis*, 397 F.3d 173 (3d Cir. 2005); *United States v. Conn*, 297 F.3d 548 (7th Cir. 2002); *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001); *United States v. Malveaux*, 208 F.3d 223 (9th Cir. 2000); *United States v. Harris*, 192 F.3d 580 (6th Cir. 1999).

[52] In 2000, Michael Risinger published a study in which he found that, "as to proffers of asserted expert testimony, civil defendants win their *Daubert* reliability challenges to plaintiffs' proffers most of the time, and that criminal defendants virtually always lose their reliability challenges to government proffers. And, when civil defendants' proffers are challenged by plaintiffs, those defendants usually win, but when criminal defendants' proffers are challenged by the

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1582

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1584 of 2008 PageID #: 3474

The situation is very different in civil cases. The party who loses before the trial court in a nonfrivolous civil case always has the right and incentive to appeal to contest the admission or exclusion of expert testimony. In addition, plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, whereas prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically, the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases.[53]

## SOME EXAMPLES OF JUDICIAL DISPOSITIONS OF QUESTIONS RELATING TO FORENSIC SCIENCE EVIDENCE

### Judicial Dispositions of Questions Relating to DNA Evidence

> DNA typing has been subjected to the most rigorous scrutiny by the courts, presumably because its discriminating power is so great and so much is at stake when a suspect is associated to a crime scene only through DNA typing. Or perhaps because (at least some) modern courts or lawyers are more literate about science than they were in the past.[54]

Unlike many forensic techniques that were developed empirically within the forensic community, with little foundation in scientific theory or analysis, DNA analysis is a fortuitous byproduct of cutting-edge science. From the beginning, eminent scientists contributed their expertise

---

prosecution, the criminal defendants usually lose." D. M. Risinger Navigating expert reliability: Are criminal standards of certainty being left on the dock? 64 ALB. L. REV. 99, 99 (2000). However, the sample of federal district court decisions included "only sixty-five . . . criminal cases, and only fifty-four dealt with dependability issues in a guilt-or-innocence context . . . . These fifty-four cases represented *twelve opinions on defense challenges to prosecution proffers*, and forty-two opinions on government challenges to defense proffers. Of the twelve defense challenges, the government's challenged evidence was fully admitted eleven times, and admitted with restrictions once." Ibid., p. 109 (emphasis added) (footnotes omitted). The study did not include any sample of trial court dispositions of *Daubert*-type claims in which no opinion was issued, which might explain why the study included only 12 dispositions of defense challenges to prosecution proffers. The author speculated that "one can be relatively confident that virtually any decision totally excluding government proffered expertise on dependability grounds would have been the subject of some sort of opinion, at least the first time the decision was made in regard to a particular kind of proffer." Ibid. But there is no reason to believe that this assumption is correct. Trial judges routinely issue evidentiary rulings without reported opinions, and many such rulings might implicate *Daubert*-type questions. Merely because a defense attorney fails to state "I object on *Daubert* grounds" says very little about whether the objection raises an issue that is cognizable under *Daubert*.

[53] See, e.g., *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000); see also 1 Faigman et al., op. cit., *supra* note 1, § 1:35, p. 105 (discussing studies suggesting that courts "employ *Daubert* more lackadaisically in criminal trials—especially in regard to prosecution evidence—than in civil cases—especially in regard to plaintiff evidence"); Risinger, op. cit., *supra* note 52, p. 100 ("The system shipwreck I fear is that in ten years we will find that civil cases are subject to strict standards of expertise quality control, while criminal cases are not. The result would be that the pocketbooks of civil defendants would be protected from plaintiffs' claims by exclusion of undependable expert testimony, but that criminal defendants would not be protected from conviction based on similarly undependable expert testimony. Such a result would seem particularly unacceptable given the law's claim that inaccurate criminal convictions are substantially worse than inaccurate civil judgments, reflected in the different applicable standards of proof.").

[54] 4 Faigman et al., op. cit., *supra* note 1, § 29:35, p. 41.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1583

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

to ensuring that DNA evidence offered in a courtroom would be valid and reliable,[55] and by 1996 the National Academy of Sciences had convened two committees that issued influential recommendations on the use of DNA technology in forensic science.[56] As a result, principles of statistics and population genetics that pertain to DNA evidence were clarified, the methods for conducting DNA analyses and declaring a match became less subjective, and quality assurance and quality control protocols were designed to improve laboratory performance.

Although some courts initially refused to admit the results of DNA testing because of perceived flaws,[57] DNA evidence is now universally admitted by courts in the United States. When 2 profiles are found to "match" in a search of the Federal Bureau of Investigation's (FBI's) Combined DNA Index System (CODIS) database using 13 short tandem repeat (STR) loci, the likelihood that the profiles came from different people is extremely small. In other words, assuming the samples were properly collected and analyzed, an observer may state with a high degree of confidence that the two profiles likely came from the same person.

Among existing forensic methods, only nuclear DNA analysis has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between an evidentiary sample and a specific individual or source. Indeed, DNA testing has been used to exonerate persons who were convicted as a result of the misapplication of other forensic science evidence.[58] However, this does not mean that DNA evidence is always unassailable in the courtroom. There may be problems in a particular case with how the DNA was collected,[59] examined in the laboratory,[60] or interpreted, such as when there are mixed samples, limited amounts of DNA, or biases due to the statistical interpretation of data from partial profiles.[61]

---

[55] See, e.g., *United States v. Yee*, 134 F.R.D. 161 (N.D. Ohio 1991) (hearings held over 6 weeks featuring a total of 12 expert witnesses on the admissibility of DNA evidence); *People v. Castro*, 545 N.Y.S.2d 985 (N.Y. Sup. Ct. 1989) (hearings held over 12 weeks featuring a total of 10 expert witnesses on the admissibility of DNA evidence).

[56] National Research Council, Committee on DNA Forensic Science. 1996. *The Evaluation of Forensic DNA Evidence.* Washington, DC: National Academies Press; National Research Council, Committee on DNA Technology in Forensic Science. 1992. *DNA Technology in Forensic Science.* Washington, DC: National Academies Press.

[57] See *Castro*, 545 N.Y.S.2d at 999 (finding after a pretrial hearing that the "DNA identification evidence of inclusion" was inadmissible because "[t]he testing laboratory failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty"). Decided a few years before the *Daubert* decision was handed down, *Castro* applied a modified *Frye* standard to determine the admissibility of DNA evidence. Later federal cases, both pre- and post-*Daubert*, held that alleged errors in handling and interpreting specific DNA samples would not render the evidence inadmissible as a matter of law, but should instead be raised at trial as factors for the jury to weigh in determining the credibility of the DNA evidence. See, e.g., *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992); *United States v. Trala*, 162 F. Supp. 2d 336, 349 (D. Del. 2001), *aff'd*, 386 F.3d 536 (3rd Cir. 2004), *vacated on other grounds*, 546 U.S. 1086 (2006); *United States v. Shea*, 957 F. Supp. 331, 340-41 (D.N.H. 1997), *aff'd*, 159 F.3d 37 (1st Cir. 1998).

[58] According to The Innocence Project, there have been 220 postconviction DNA exonerations in the United States since 1989. See The Innocence Project, Fact Sheet: Facts on Post-Conviction DNA Exonerations. Available at www.innocenceproject.org/Content/351.php; see also B.L. Garrett. Judging innocence. 108 COLUM. L. REV. 55 (2008) (discussing the results of an empirical study of the types of faulty evidence that was admitted in more than 200 cases for which DNA testing subsequently enabled postconviction exonerations); but see J. Collins and J. Jarvis. 2008. *The Wrongful Conviction of Forensic Science.* CRIME LAB REPORT. Available at www.crimelabreport.com/library/pdf/ wrongful_conviction.pdf (contesting the percentage of exonerated defendants whose convictions allegedly were based on faulty forensic science).

[59] See, e.g., W.C. Thompson. DNA evidence in the O.J. Simpson trial. 67 U. COLO. L. REV. 827 (1996) (detailing the defense counsel's theory that proper procedures were not followed in the collection or handling of the DNA samples at various points in the murder investigation).

[60] See, e.g., L. Hart. 2003. "DNA Lab's Woes Cast Doubt on 68 Prison Terms." *Los Angeles Times.* March 31, at 19; A. Liptak. 2003. "Houston DNA Review Clears Convicted Rapist, and Ripples in Texas Could Be Vast." *New York Times.*

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1584

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1586 of 2008 PageID #: 3476

Courts were able to subject DNA evidence to rigorous evaluation standards from the beginning,[62] because scientific groundwork for DNA analysis had been laid outside the context of law enforcement. The National Institutes of Health (NIH) and other respected institutions funded and conducted extensive basic research, followed by applied research. Serious studies on DNA analysis preceded the establishment and implementation of "individualization" criteria and parameters for assessing the probative value of claims of individualization. This history stands in sharp contrast to the history of research involving most other forensic science disciplines, which have not benefitted from extensive basic research, clinical applications, federal oversight, vast financial support from the private sector for applied research, and national standards for quality assurance and quality control. The goal is not to hold other disciplines to DNA's high standards in all respects; after all, it is unlikely that most other current forensic methods will ever produce evidence as discriminating as DNA. However, using *Daubert* as a guide, the least that the courts should insist upon from any forensic discipline is certainty that practitioners in the field adhere to enforceable standards, ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

## Judicial Dispositions of Questions Relating to Drug Identification

Over the years, there have been countless instances in which trial judges have assessed the admissibility of expert testimony relating to drug analyses, either *sua sponte* or pursuant to objections raised by defense counsel. Because trial court decisions in these matters often are resolved without published written opinions and with no challenges on appeal, there is no sure way to know how often trial judges deny the admissibility of the evidence. Trial judges may sometimes sustain challenges to the admissibility of expert testimony, especially in instances where the defense can show defects in the foundational laboratory reports.[63] But there are very few such reported cases.

In addition to alleged defects in laboratory reports and sampling procedures, trial courts routinely consider whether experts possess the necessary qualifications to testify and, more generally, whether expert testimony is sufficiently reliable to be admitted under *Daubert* and Federal Rule of Evidence 702. However, in published opinions addressing expert testimony based on drug identification, federal appellate courts rarely reverse trial court decisions rejecting *Daubert* challenges.[64] Why? First, as noted above, in cases where the evidence is excluded at trial, no appeal will be taken. Second, the scientific methodology supporting many drug tests is sound. This means that, regardless of the standard of review, most decisions by trial courts will withstand scrutiny. Finally, courts of appeals owe great deference to trial court judgments on questions relating to the admission of evidence.[65]

---

March 11, at A14; R. Tanner. 2003. "Crime Labs Stained by a Shadow of a Doubt." *Los Angeles Times*. July 13, at 18.

[61] See, e.g., *Coy v. Renico*, 414 F. Supp. 2d 744, 761-63 (E.D. Mich. 2006) (rejecting habeas petitioner's claim that he was denied a fair trial because the statistical techniques used to evaluate mixed DNA samples were insufficiently reliable); see also B.S. Weir. 2007. The rarity of DNA profiles. *Annals of Applied Statistics* 1(2):358-370 (suggesting that wholesale searches of large DNA databases for solving cold cases might yield false positives with some regularity).

[62] See *supra* text accompanying note 54; see also *Gov't of V.I. v. Byers*, 941 F. Supp. 513 (D.V.I. 1996); *United States v. Jakobetz*, 747 F. Supp. 250 (D. Vt. 1990), *aff'd*, 955 F.2d 786 (2d Cir. 1992).

[63] See, e.g., *United States v. Diaz*, 2006 WL 3512032 (N.D. Cal. 2006).

[64] See, e.g., *United States v. Moreland*, 437 F.3d 424, 430-31 (4th Cir. 2006), *cert. denied*, 547 U.S. 1142 (2006); *United States v. Scalia*, 993 F.2d 984, 988-90 (1st Cir. 1993).

[65] See, e.g., *United States v. Gaskin*, 364 F.3d 438, 460 n.8 (2d Cir. 2004) (holding that "when a party questions whether sound scientific methodology provides a basis for an expert opinion, it may move to preclude the admission of the opinion" under *Daubert*; however, when a defendant makes no such motion and instead stipulates to the admissibility of the expert opinion, "he cannot complain on appeal that the opinion lacks foundation").

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1585

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

The importance of the limited standard of review was clearly explained in *United States v. Brown:*[66]

> Immersed in the case as it unfolds, a district court is more familiar with the procedural and factual details and is in a better position to decide *Daubert* issues. The rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization. And we don't want to denigrate the importance of the trial and encourage appeals of rulings relating to the testimony of expert witnesses. All of this explains why the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*, and why we give the district court considerable leeway in the execution of its duty. That is true whether the district court admits or excludes expert testimony. *Joiner*, 522 U.S. at 141-42 ("A court of appeals applying 'abuse-of-discretion' review to [*Daubert*] rulings may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it."). And it is true where the *Daubert* issue is outcome determinative.[67]

**Judicial Dispositions of Questions Relating to Fingerprint Analyses**

Over the years, the courts have admitted fingerprint evidence, even though this evidence has "made its way into the courtroom without empirical validation of the underlying theory and/or its particular application."[68] The courts sometimes appear to assume that fingerprint evidence is irrefutable. For example, in *United States v. Crisp*, the court noted that "[w]hile the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well."[69] The court went on to say:

> [E]ven if we had a more concrete cause for concern as to the reliability of fingerprint identification, the Supreme Court emphasized in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Ultimately, we conclude that while further research into fingerprint analysis would be welcome, "to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good."[70]

Opinions of this sort have drawn sharp criticism:

> [M]any fingerprint decisions of recent years . . . display a remarkable lack of understanding of certain basic principles of the scientific method. Court after court, for example, [has] repeated the statement that fingerprinting met the *Daubert* testing criterion by virtue of having been tested by the adversarial process over the last one-

[66] 415 F.3d 1266 (11th Cir. 2005).
[67] Ibid., pp. 1265-66 (alteration in original) (internal quotation marks, other internal citations omitted).
[68] M.A. Berger. Procedural paradigms for applying the *Daubert* test. 78 MINN. L. REV. 1345, 1354 (1994).
[69] 324 F.3d 261, 268 (4th Cir. 2003).
[70] Ibid., pp. 269-70 (second alteration in original) (other internal citation omitted).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1586

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1588 of 2008
PageID #: 3478

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

hundred years. This silly statement is a product of courts' perception of the incomprehensibility of actually limiting or excluding fingerprint evidence. Such a prospect stilled their critical faculties. It also transformed their admissibility standard into a *Daubert*-permissive one, at least for that subcategory of expertise.[71]

This is a telling critique, especially when one compares the judicial decisions that have pursued rigorous scrutiny of DNA typing with the decisions that have applied less stringent standards of review in cases involving fingerprint evidence.

In holding that fingerprint evidence satisfied *Daubert*'s reliability and relevancy standards for admissibility, the Fourth Circuit's decision in *Crisp* noted approvingly that "the Seventh Circuit [in *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001)] determined that *Daubert*'s 'known error rate' factor was satisfied because the expert in *Havvard* had testified that the error rate for fingerprint comparison was 'essentially zero.'"[72] This statement appears to overstate the expert's testimony in *Havvard*, and gives fuel to the misconception that the forensic discipline of fingerprinting is infallible. The *Havvard* opinion actually described the expert's testimony as follows:

> [The expert] testified that the error rate for fingerprint comparison is essentially zero. Though conceding that a small margin of error exists because of differences in individual examiners, he opined that this risk is minimized because print identifications are typically confirmed through peer review. [The expert] did acknowledge that fingerprint examiners have not adopted a single standard for determining when a fragmentary latent fingerprint is sufficient to permit a comparison, but he suggested that the unique nature of fingerprints is counterintuitive to the establishment of such a standard and that through experience each examiner develops a comfort level for deciding how much of a fragmentary print is necessary to permit a comparison.[73]

This description of the expert's equivocal testimony calls into question any claim that fingerprint evidence is infallible.

The decision in *Crisp* also pointed out that "[f]ingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911."[74] The court, however, pointed to no studies supporting the reliability of fingerprint evidence. When forensic DNA first appeared, it was sometimes called "DNA fingerprinting" to suggest that it was as reliable as fingerprinting, which was then viewed as the premier identification science and one that consistently produced irrefutable results. During the effort to validate DNA evidence for courtroom use, however, it became apparent that assumptions about fingerprint evidence had been reached without the scientific scrutiny being accorded DNA. When the Supreme Court decided *Daubert* in 1993, with its emphasis on validation, legal commentators turned their attention to fingerprinting and

---

[71] 1 Faigman et al., op. cit., *supra* note 1, § 1:1, p. 4; see also J.J. Koehler. Fingerprint error rates and proficiency tests: What they are and why they matter. 59 HASTINGS L.J. 1077 (2008).

[72] 324 F.3d at 269 (quoting *Havvard*, 260 F.3d at 599).

[73] *Havvard*, 260 F.3d at 599. The *Havvard* decision is sharply criticized by 1 Faigman et al., op. cit., *supra* note 1, § 1:30, pp. 86-89.

[74] *Crisp*, 324 F.3d at 266. The decision cites a number of other legal references, including, *inter alia*: *People v. Jennings*, 96 N.E. 1077 (1911); J.L. Mnookin. Fingerprint evidence in an age of DNA profiling. 67 BROOK. L. REV. 13 (2001) (discussing history of fingerprint identification evidence).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1587

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

began questioning whether experts could match and attribute fingerprints with a zero error rate as the FBI expert claimed in *Havvard*, and whether experts should be allowed to testify and make these claims in the absence of confirmatory studies. As noted above, most of these challenges have thus far failed, but the questions persist.

The 2004 Brandon Mayfield case refueled the debate over fingerprint evidence. The chronology of events in the Mayfield case is as follows:

> March 11, 2004: Terrorists detonate bombs on a number of trains in Madrid, Spain, killing approximately 191 people, and injuring thousands more, including a number of United States citizens.
>
> May 6, 2004: Brandon Bieri Mayfield, a 37-year-old civil and immigration lawyer, practicing in Portland, Oregon, is arrested as a material witness with respect to a federal grand jury's investigation into that bombing. An affidavit signed by FBI Special Agent Richard K. Werder, submitted in support of the government's application for the material witness arrest warrant, [avers] that Mayfield's fingerprint has been found on a bag in Spain containing detonation devices similar to those used in the bombings, and that he has to be detained so that he cannot flee before the grand jury has a chance to obtain his testimony.
>
> May 24, 2004: The government announces that the FBI has erred in its identification of Mayfield and moves to dismiss the material witness proceeding.[75]

In March 2006, the Office of the Inspector General of the U.S. Department of Justice issued a comprehensive analysis of how the misidentification occurred.[76] And in November 2006, the federal government agreed to pay Mayfield $2 million for his wrongful jailing in connection with the 2004 terrorist bombings in Madrid.[77] The Mayfield case and the resulting report from the Inspector General surely signal caution against simple, and unverified, assumptions about the reliability of fingerprint evidence.

In *Maryland v. Rose*, a Maryland State trial court judge found that the Analysis, Comparison, Evaluation, and Verification (ACE-V) process (see Chapter 5) of latent print identification does not rest on a reliable factual foundation.[78] The opinion went into considerable detail about the lack of error rates, lack of research, and potential for bias. The judge ruled that the State could not offer testimony that any latent fingerprint matched the prints of the defendant. The judge also noted that, because the case involved the possibility of the death penalty, the reliability of the evidence offered against the defendant was critically important.[79]

---

[75] S.T. Wax and C.J. Schatz. 2004. A multitude of errors: The Brandon Mayfield case. *The Champion*. September-October, p. 6. The facts of the case and Mayfield's legal claims against the government are fully reported in *Mayfield v. United States*, 504 F. Supp. 2d 1023 (D. Or. 2007).

[76] Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case*. Available at www.usdoj.gov/oig/special/s0601/exec.pdf.

[77] E. Lichtblau. 2006. "U.S. Will Pay $2 Million To Lawyer Wrongly Jailed." *New York Times*. November 30, at A18.

[78] *Maryland v. Rose*, Case No. K06-0545, mem. op. at 31 (Balt. County Cir. Ct. Oct. 19, 2007) (holding that the ACE-V methodology of latent fingerprint identification was "a subjective, untested, unverifiable identification procedure that purports to be infallible" and therefore ruling that fingerprint evidence was inadmissible). The ACE-V process is described in Chapter 5.

[79] Professor Jennifer Mnookin has also highlighted an important concern over "the rhetorical dimensions of the

3-16

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1588

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

---

FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY

---

The same concerns cited by the judge in *Maryland v. Rose* can be raised with respect to other forensic techniques that lack scientific validation and careful reliability testing.

**Judicial Dispositions of Questions Relating to Other Forensic Disciplines**
Review of reported judicial opinions reveals that, at least in criminal cases, forensic science evidence is not routinely scrutinized pursuant to the standard of reliability enunciated in *Daubert*. The Supreme Court in *Daubert* indicated that the subject of an expert's testimony should be "scientific knowledge"—which implies that such knowledge is based on scientific methods—to ensure that "evidentiary reliability will be based upon scientific validity." The standard is admittedly "flexible," but that does not render it meaningless. Any reasonable reading of *Daubert* strongly suggests that, when faced with forensic evidence, "trial judge[s] must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." As the reported cases suggest, however, *Daubert* has done little to improve the use of forensic science evidence in criminal cases.

> For years in the forensic science community, the dominant argument against regulating experts was that every time a forensic scientist steps into a courtroom, his work is vigorously peer reviewed and scrutinized by opposing counsel. A forensic scientist might occasionally make an error in the crime laboratory, but the crucible of courtroom cross-examination would expose it at trial. This "crucible," however, turned out to be utterly ineffective.

> . . .

> Unlike the extremely well-litigated civil challenges, the criminal defendant's challenge is usually perfunctory. Even when the most vulnerable forensic sciences— hair microscopy, bite marks, and handwriting—are attacked, the courts routinely affirm admissibility citing earlier decisions rather than facts established at a hearing. Defense lawyers generally fail to build a challenge with appropriate witnesses and

---

testimony . . . provide[d] in court" by members of the fingerprint community:

> At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term "positive" or "absolute" identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it. In fact, if a fingerprint examiner testifies on her own initiative that a match is merely "likely" or "possible" or "credible," rather than certain, she could possibly be subject to disciplinary sanction! Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validated standards for declaring a match, such claims of absolute, certain confidence in identification are unjustified, the product of hubris more than established knowledge. Therefore, in order to pass scrutiny under *Daubert*, fingerprint identification experts should exhibit a greater degree of epistemological humility. Claims of "absolute" and "positive" identification should be replaced by more modest claims about the meaning and significance of a "match."

J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7(2):127; see also Koehler, *supra* note 71.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1589

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

new data. Thus, even if inclined to mount a *Daubert* challenge, they lack the requisite knowledge and skills, as well as the funds, to succeed.[80]

The reported decisions dealing with judicial dispositions of *Daubert*-type questions appear to confirm this assessment. As noted above, the courts often "affirm admissibility citing earlier decisions rather than facts established at a hearing." Much forensic evidence—including, for example, bite marks[81] and firearm and toolmark identifications[82]—is introduced in criminal trials without any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline. One recent judicial decision highlights the problem. In *United States v. Green*, Judge Gertner acknowledged that toolmark identification testimony *ought not be considered admissible* under *Daubert*.[83] But the judge pointed out that "the problem for the defense is *that every single court* post-*Daubert* has admitted this testimony, sometimes without any searching review, much less a hearing."[84] Judge Gertner allowed the prosecution's expert to describe the similarities between the shell casings at issue, but prohibited him from testifying that there was a definitive match. Obviously feeling bound by circuit precedent, the judge stated:

---

[80] Neufeld, *supra* note 44, at S109, S110.

[81] There is nothing to indicate that courts review bite mark evidence pursuant to *Daubert*'s standard of reliability. See, e.g., *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (denying habeas petition after finding, in part, that the inclusion of bite mark testimony against the defendant had not denied him a fair trial, and stating that "while the science of forensic odontology might have been in its infancy at the time of trial . . . certainly there is some probative value to comparing an accused's dentition to bite marks found on the victim."). Two recent cases might, at first glance, seem to indicate that courts were beginning to seriously evaluate the general credibility of bite mark testimony, but this is not in fact the case. In *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005), the court denied summary judgment to police officers in a 42 U.S.C. § 1983 action where exculpatory DNA evidence that directly contradicted inculpatory bite mark evidence was "intentionally or recklessly withheld from the officer who was actually preparing the warrant application," ibid., p. 84, resulting in petitioner being wrongfully imprisoned for 41 days. However, the *Burke* court rejected the petitioner's claim that the inclusion of bite mark evidence in the arrest warrant had demonstrated "reckless disregard for the truth," because the method was generally unreliable. Ibid., pp. 82-83. In *Ege v. Yukins*, 380 F. Supp. 2d 852 (E.D. Mich. 2005), *aff'd in part and rev'd in part*, 485 F.3d 364 (6th Cir. 2007), the court granted the habeas petition of a defendant whose conviction was based in significant part on bite mark testimony from a later-discredited expert witness. But the disposition in *Ege* rested primarily on the flaws of one "particular witness and his particular testimony," not on a judicial evaluation of "*the* [bite mark] *field's* more general shortcomings." 4 Faigman et al., op. cit., *supra* note 1, § 36:6, p. 662.

[82] There is little to indicate that courts review firearms evidence pursuant to *Daubert*'s standard of reliability. See e.g., *United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) (upholding defendant's conviction after finding, in part, that it was not an abuse of discretion for the court to admit testimony on shell casing comparisons by the Government's firearms expert); *United States v. Foster*, 300 F. Supp. 2d 375 (D. Md. 2004) (denying defendant's motion to exclude expert firearms testimony). Several federal trial judges, however, have subjected expert firearm testimony to rigorous analysis under *Daubert*. In *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006), Judge Saris concluded that toolmark identification testimony was generally admissible under *Daubert*, but excluded the specific testimony at issue, because the experts failed to properly document their basis for identification, and because an independent examiner had not verified the experts' conclusions. Likewise, in *United States v. Diaz*, No. 05-CR-167, 2007 WL 485967, at *14 (N.D. Cal. Feb. 12, 2007), Judge Alsup allowed firearm identification testimony under *Daubert*, but prevented experts from testifying to their conclusions "to the exclusion of all other firearms in the world" and only allowed testimony "to a reasonable degree of certainty." *Cf. United States v. Glynn*, 578 F. Supp. 2d 569 (S.D.N.Y. 2008), where Judge Rakoff precluded testimony that a bullet and shell casings came from a firearm linked to the defendant "to a reasonable degree of ballistics certainty," because "whatever else ballistics identification analysis could be called, it could not fairly be called 'science.'" However, the judge ruled that although inadmissible under *Daubert*, testimony that the evidence was "more likely than not" from the firearm was admissible under Federal Rule of Evidence 401. See also *Green*, 405 F. Supp. 2d 104, discussed in the text.

[83] 405 F. Supp. 2d at 107-08.

[84] Ibid., p. 108.

3-18

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1590

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE EVIDENCE IN LITIGATION – PREPUBLICATION COPY**

I reluctantly [admit the evidence] because of my confidence that any other decision will be rejected by appellate courts, in light of precedents across the country, regardless of the findings I have made. While I recognize that the *Daubert-Kumho* standard does not require the illusory perfection of a television show (CSI, this wasn't), when liberty hangs in the balance—and, in the case of the defendants facing the death penalty, life itself—the standards should be higher than were met in this case, and than have been imposed across the country. The more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more.[85]

"[T]he undeniable reality is that the community of forensic science professionals has not done nearly as much as it reasonably could have done to establish either the validity of its approach or the accuracy of its practitioners' conclusions,"[86] and the courts have been "utterly ineffective" in addressing this problem.[87]

## CONCLUSION

Prophetically, the *Daubert* decision observed that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly."[88] But because accused parties in criminal cases are convicted on the basis of testimony from forensic science experts, much depends upon whether the evidence offered is reliable. Furthermore, in addition to protecting innocent persons from being convicted of crimes that they did not commit, we are also seeking to protect society from persons who have committed criminal acts. Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies condoned by the courts before the techniques have been properly studied and

---

[85] Ibid., p. 109 (footnotes omitted). "The case law on the admissibility of toolmark identification and firearms identification expert evidence is typified by decisions admitting such testimony with little, and usually no, reference to legal authority beyond broad 'discretion' and an adroit sidestepping of any judicial duty to assure that experts' claims are valid. Appellate courts defer to trial courts, and trial courts defer to juries. Later appellate courts simply defer to earlier appellate courts." 4 Faigman et al., op. cit., *supra* note 1, § 34:5, p. 589.

[86] Mnookin, op. cit., *supra* note 79.

[87] Neufeld, op. cit., *supra* note 44, p. S109. In *Green*, 405 F. Supp. 2d at 109 n.6, Judge Gertner also noted that:

> [R]ecent reexaminations of relatively established forensic testimony have produced striking results. Saks and Koehler, for example, report that forensic testing errors were responsible for wrongful convictions in 63% of the 86 DNA Exoneration cases reported by the Innocence Project at Cardozo Law School. Michael Saks and Jonathan Koehler, *The Coming Paradigm Shift in Forensic Identification Science*, 309 SCIENCE 892 (2005). This only reinforces the importance of careful analysis of expert testimony in this case.

See also S.R. Gross, *Convicting the Innocent* (U. Mich. Law Sch. Pub. Law & Legal Theory Working Paper Series, Working Paper No. 103, 2008). Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100011 (forthcoming in *Annual Review of Law & Social Science* 2008).

[88] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596-97 (1993).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1591

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

their accuracy verified. "[T]here is no evident reason why ['rigorous, systematic'] research would be infeasible."[89] However, some courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely "demand more by way of validation than the disciplines can presently offer."[90]

Some legal scholars think that, "[o]ver time, if *Daubert* does not come to be diluted or distorted, . . . courts will increasingly appreciate its power and flexibility to evaluate proffered expert testimony."[91] However, at least with respect to criminal cases, this may reflect an unrealistic assessment of the problem. "The principal difficulty, it appears, is that many [forensic science] techniques have been relied on for so long that courts might be reluctant to rethink their role in the trial process. . . . In many forensic areas, effectively no research exists to support the practice."[92]

As the discussion in this chapter indicates, the adversarial process relating to the admission and exclusion of scientific evidence is not suited to the task of finding "scientific truth." The judicial system is encumbered by, among other things, judges and lawyers who generally lack the scientific expertise necessary to comprehend and evaluate forensic evidence in an informed manner, trial judges (sitting alone) who must decide evidentiary issues without the benefit of judicial colleagues and often with little time for extensive research and reflection, and the highly deferential nature of the appellate review afforded trial courts' *Daubert* rulings. Furthermore, the judicial system embodies a case-by-case adjudicatory approach that is not well suited to address the systematic problems in many of the various forensic science disciplines. Given these realities, there is a tremendous need for the forensic science community to improve. Judicial review, by itself, will not cure the infirmities of the forensic science community.[93] The development of scientific research, training, technology, and databases associated with DNA analysis have resulted from substantial and steady federal support for both academic research and programs employing techniques for DNA analysis. Similar support must be given to all credible forensic science disciplines if they are to achieve the degrees of reliability needed to serve the goals of justice. With more and better educational programs, accredited laboratories, certified forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. The present situation, however, is seriously wanting, both because of the limitations of the judicial system and because of the many problems faced by the forensic science community.

---

[89] J. Griffin and D.J. LaMagna. 2002. *Daubert* challenges to forensic evidence: Ballistics next on the firing line. *The Champion*. September-October:21.

[90] Ibid. See, e.g., *Crisp*, 324 F.3d at 270.

[91] 1 Faigman et al., op. cit., *supra* note 1, § 1:1, p. 5 n. 9.

[92] Ibid. § 1:30, p. 85 (footnotes omitted).

[93] See J.L. Mnookin. Expert evidence, partisanship, and epistemic competence. 73 BROOK. L. REV. 1009, 1033 (2008) ("[S]o long as we have our adversarial system in much its present form, we are inevitably going to be stuck with approaches to expert evidence that are imperfect, conceptually unsatisfying, and awkward. It may well be that the real lesson is this: those who believe that we might ever fully resolve—rather than imperfectly manage—the deep structural tensions surrounding both partisanship and epistemic competence that permeate the use of scientific evidence within our legal system are almost certainly destined for disappointment.").

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1592

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 4

# THE PRINCIPLES OF SCIENCE AND INTERPRETING SCIENTIFIC DATA

> Scientific method refers to the body of techniques for investigating phenomena, acquiring new knowledge, or correcting and integrating previous knowledge. It is based on gathering observable, empirical and measurable evidence subject to specific principles of reasoning.
>
> Isaac Newton (1687, 1713, 1726) "Rules for the study of natural philosophy," *Philosophiae Naturalis Principia Mathematica*

Forensic science actually is a broad array of disciplines, as will be seen in the next chapter. Each has its own methods and practices, as well as its strengths and weaknesses. In particular, each varies in its level of scientific development and in the degree to which it follows the principles of scientific investigation. Adherence to scientific principles is important for concrete reasons: they enable the reliable inference of knowledge from uncertain information— exactly the challenge faced by forensic scientists. Thus, the reliability of forensic science methods is greatly enhanced when those principles are followed. As Chapter 3 observes, the law's admission of and reliance on forensic evidence in criminal trials depends critically on (1) the extent to which a forensic science discipline is founded on a reliable scientific methodology, leading to accurate analyses of evidence and proper reports of findings and (2) the extent to which practitioners in those forensic science disciplines that rely on human interpretation adopt procedures and performance standards that guard against bias and error. This chapter discusses the ways in which science more generally addresses those goals.

## FUNDAMENTAL PRINCIPLES OF THE SCIENTIFIC METHOD

The scientific method presumes that events occur in consistent patterns that can be understood through careful comparison and systematic study. Knowledge is produced through a series of steps during which data are accumulated methodically, strengths and weaknesses of information are assessed, and knowledge about causal relationships is inferred. In the process, scientists also develop an understanding of the limits of that knowledge (such as the precision of the observations), the inferred nature of relationships, and key assumptions behind the inferences. Hypotheses are developed, are measured against the data, and are either supported or refuted.

Scientists continually observe, test, and modify the body of knowledge. Rather than claiming absolute truth, science approaches truth either through breakthrough discoveries or incrementally, by testing theories repeatedly. Evidence is obtained through observations and measurements conducted in the natural setting or in the laboratory. In the laboratory, scientists can control and vary the conditions in order to isolate exclusive effects and thus better understand the factors that influence certain outcomes. Typically, experiments or observations must be conducted over a broad range of conditions before the roles of specific factors, patterns, or variables can be understood. Methods to reduce errors are part of the study design, so that, for example, the size of the study is chosen to provide sufficient statistical power to draw

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1593

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

conclusions with a high level of confidence or to understand factors that might confound results. Throughout scientific investigations, the investigator must be as free from bias as possible, and practices are put in place to detect biases (such as those from measurements, human interpretation) and to minimize their effects on conclusions.

Ultimately, the goal is to construct explanations ("theories") of phenomena that are consistent with broad scientific principles, such as the laws of thermodynamics or of natural selection. These theories, and investigations of them through experiments and observed data, are shared through conferences, publications, and collegial interactions, which push the scientist to explain his or her work clearly and which raise questions that might not have been considered. The process of sharing data and results requires careful recordkeeping, reviewed by others. In addition, the need for credibility among peers drives investigators to avoid conflicts of interest. Acceptance of the work comes as results and theories continue to hold, even under the scrutiny of peers, in an environment that encourages healthy skepticism. That scrutiny might extend to independent reproduction of the results or experiments designed to test the theory under different conditions. As credibility accrues to data and theories, they become accepted as established fact and become the "scaffolding" upon which other investigations are constructed.

This description of how science creates new theories illustrates key elements of good scientific practice: precision when defining terms, processes, context, results, and limitations; openness to new ideas, including criticism and refutation; and protections against bias and overstatement (going beyond the facts). Although these elements have been discussed here in the context of creating new methods and knowledge, the same principles hold when applying known processes or knowledge. In day-to-day forensic science work, the process of formulating and testing hypotheses is replaced with the careful preparation and analysis of samples and the interpretation of results. But that applied work, if done well, still exhibits the same hallmarks of basic science: the use of validated methods and care in following their protocols; the development of careful and adequate documentation; the avoidance of biases; and interpretation conducted within the constraints of what the science will allow.

**Validation of New Methods**

One particular task of science is the validation of new methods to determine their reliability under different conditions and their limitations. Such studies begin with a clear hypothesis (e.g., "new method X can reliably associate biological evidence with its source"). An unbiased experiment is designed to provide useful data about the hypothesis. Those data— measurements collected through methodical prescribed observations under well-specified and controlled conditions—are then analyzed to support or refute the hypothesis. The thresholds for supporting or refuting the hypothesis are clearly articulated before the experiment is run. The most important outcomes from such a validation study are (1) information about whether or not the method can discriminate the hypothesis from an alternative, and (2) assessments of the sources of errors and their consequences on the decisions returned by the method. These two outcomes combine to provide precision and clarity about what is meant by "reliably associate."

For a method that has not been subjected to previous extensive study, a researcher might design a broad experiment to assist in gaining knowledge about its performance under a range of conditions. Those data are then analyzed for any underlying patterns that may be useful in planning or interpreting tests that use the new method. In other situations, a process already has been formulated from existing experimental data, knowledge, and theory (e.g., "biological markers A, B, and C can be used in DNA forensic investigations to pair evidence with suspect").

4-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1594

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

To confirm the validity of a method or process for a particular purpose (e.g., for a forensic investigation), validation studies must be performed.

The International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) developed a joint document, "General requirements for the competence of testing and calibration laboratories" (commonly referred to as "ISO 17025"), which includes a well-established list of techniques that can be used, alone or in combination, to validate a method:

- calibration using reference standards or reference materials;
- comparison of results achieved with other methods;
- interlaboratory comparisons;
- systematic assessment of the factors influencing the result; and
- assessment of the uncertainty of the results based on scientific understanding of the theoretical principles of the method and practical experience.[1]

A critical step in such validation studies is their publication in peer-reviewed journals, so that experts in the field can review, question, and check the repeatability of the results. These publications must include clear statements of the hypotheses under study, as well as sufficient details about the experiments, the resulting data, and the data analysis so that the studies can be replicated. Replication will expose not only additional sources of variability but also further aspects of the process, leading to greater understanding and scientific knowledge that can be used to improve the method. Methods that are specified in more detail (such as DNA analysis, where particular genetic loci are to be compared) will have greater credibility and also are more amenable to systematic improvement than those that rely more heavily on the judgments of the investigator.

The validation of results over time increases confidence. Moreover, the scientific culture encourages continued questioning and improvement. Thus, the relevant scientific community continues to check that established results still hold under new conditions and that they continue to hold in the face of new knowledge. The involvement of graduate student researchers in scientific research contributes greatly to this diligence, because part of their education is to read carefully and to question so-called established methods. This culture leads to continued reexamination of past research and hence increased knowledge.

In the case of DNA analysis, studies have evaluated the precision, reliability, and uncertainties of the methods. This knowledge has been used to define standard procedures that, when followed, lead to reliable evidence. For example, below is a brief sample of the specifications required by the Federal Bureau of Investigation's (FBI's) Quality Assurance Standards for Forensic DNA Testing Laboratories[2] in order to ensure reliable DNA forensic analysis:

- Testing laboratories must have a standard operating protocol for each analytical technique used, specifying reagents, sample preparation, extraction, equipment, and controls that are standard for DNA analysis and data interpretation.

---

[1] Quoted from Section 5.4.5 2 (Note 2) of ISO/IEC 17025, "General requirements for the competence of testing and calibration laboratories" (2nd ed., May 15, 2005).

[2] DNA Advisory Board. 2000. *Forensic Science Communications* 2(3): available at www.bioforensics.com/conference04/TWGDAM/Quality_Assurance_Standards_2.pdf.

4-3

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1595

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

- The laboratory shall monitor the analytical procedures using appropriate controls and standards, including quantitation standards that estimate the amount of human nuclear DNA recovered by extraction, positive and negative amplification controls, and reagent blanks.
- The laboratory shall check its DNA procedures annually or whenever substantial changes are made to the protocol(s) against an appropriate and available NIST standard reference material or standard traceable to a NIST standard.
- The laboratory shall have and follow written general guidelines for the interpretation of data.
- The laboratory shall verify that all control results are within established tolerance limits.
- Where appropriate, visual matches shall be supported by a numerical match criterion.
- For a given population(s) and/or hypothesis of relatedness, the statistical interpretation shall be made following the recommendations 4.1, 4.2, or 4.3 as deemed applicable of the National Research Council report entitled *The Evaluation of Forensic DNA Evidence* (1996) and/or a court-directed method. These calculations shall be derived from a documented population database appropriate for the calculation.[3]

This level of specificity is consistent with the spirit of the guidelines presented in ISO 17025. The second edition (May 15, 2005) of those guidelines includes the following minimum set of information for properly specifying the process of any new analytical method:

(a)     appropriate identification;
(b)     scope;
(c)     description of the type of item to be tested or calibrated;
(d)     parameters or quantities and ranges to be determined;
(e)     apparatus and equipment, including technical performance requirements;
(f)     reference standards and reference materials required;
(g)     environmental conditions required and any stabilization period needed;
(h)     description of the procedure, including
  -     affixing of identification marks, handling, transporting, storing and preparation of items;
  -     checks to be made before the work is started;
  -     checks that the equipment is working properly and, where required, calibration and adjustment of the equipment before each use;
  -     the method of recording the observations and results;
  -     any safety measures to be observed;
(i)     criteria and/or requirements for approval/rejection;
(j)     data to be recorded and method of analysis and presentation;
(k)     the uncertainty or the procedure for estimating uncertainty.[4]

---

[3] Paraphrased from Section 9 of the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories.
[4] Quoted from Section 5.4.4 of ISO/IEC 17025, "General requirements for the competence of testing and calibration laboratories" (2nd ed., May 15, 2005).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1596

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

## Uncertainty and Error

Scientific data and processes are subject to a variety of sources of error. For example, laboratory results and data from questionnaires are subject to measurement error, and interpretations of evidence by human observers are subject to potential biases. A key task for the scientific investigator designing and conducting a scientific study, as well as for the analyst applying a scientific method to conduct a particular analysis, is to identify as many sources of error as possible, to control or to eliminate as many as possible, and to estimate the magnitude of remaining errors so that the conclusions drawn from the study are valid. Numerical data reported in a scientific paper include not just a single value (point estimate) but also a range of plausible values (e.g., a confidence interval, or interval of uncertainty).

### Measurement Error

As with all other scientific investigations, laboratory analyses conducted by forensic scientists are subject to measurement error. Such error reflects the intrinsic strengths and limitations of the particular scientific technique. For example, methods for measuring the level of blood alcohol in an individual or methods for measuring the heroin content of a sample can do so only within a confidence interval of possible values. In addition to the inherent limitations of the measurement technique, a range of other factors may also be present and can affect the accuracy of laboratory analyses. Such factors may include deficiencies in the reference materials used in the analysis, equipment errors, environmental conditions that lie outside the range within which the method was validated, sample mix-ups and contamination, transcriptional errors, and more.

Consider, for example, a case in which an instrument (e.g., a breathalyzer such as Intoxilyzer) is used to measure the blood-alcohol level of an individual three times, and the three measurements are 0.08 percent, 0.09 percent, and 0.10 percent. The variability in the three measurements may arise from the internal components of the instrument, the different times and ways in which the measurements were taken, or a variety of other factors. These measured results need to be reported, along with a confidence interval that has a high probability of containing the true blood-alcohol level (e.g., the mean plus or minus two standard deviations). For this illustration, the average is 0.09 percent and the standard deviation is 0.01 percent; therefore, a two-standard-deviation confidence interval (0.07 percent, 0.11 percent) has a high probability of containing the person's true blood-alcohol level. (Statistical models dictate the methods for generating such intervals in other circumstances so that they have a high probability of containing the true result.) The situation for assessing heroin content from a sample of white powder is similar, although the quantification and limits are not as broadly standardized. The combination of gas chromatography and mass spectrometry (GC/MS) is used extensively in identifying controlled substances. Those analyses tend to be more qualitative (e.g., identifying peaks on a spectrum that appear at frequencies consistent with the controlled substance and which stand out above the background "noise"), although quantification is possible.

### Error Rates

Analyses in the forensic science disciplines are conducted to provide information for a variety of purposes in the criminal justice process. However, most of these analyses aim to address two broad types of questions: (1) can a particular piece of evidence be associated with a particular class of sources? and (2) Can a particular piece of evidence be associated with one particular source? The first type of question leads to "classification" conclusions. An example of such a question would be whether a particular hair specimen shares physical characteristics common to a particular ethnic group. An affirmative answer to a classification question indicates

4-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1597

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

only that the item belongs to a particular *class* of similar items. Another example might be whether a paint mark left at a crime scene is consistent (according to some collection of relevant measurements) with a particular paint sample in a database, from which one can infer the class of vehicle (e.g., model(s) and production year(s)) that could have left the mark. The second type of question leads to "individualization" conclusions—for example, does a particular DNA sample belong to individual X?

Although the questions addressed by forensic analyses are not always binary (yes/no) or as crisply stated as in the previous paragraph, the paradigm of yes/no conclusions is useful for describing and quantifying the accuracy with which forensic science disciplines can provide answers.[5] In such situations, results from analyses for which the truth is known can be classified in a two-way table as follows:

| Truth | Analysis results | |
|---|---|---|
| | yes | no |
| yes | a (true positives) | b (false negatives) |
| no | c (false positives) | d (true negatives) |

The conceptual framework and terminology for evaluating the accuracy of forensic analyses is illustrated using a *hypothetical* example from microscopic analysis of head hair. In this situation, multiple features, both qualitative and quantitative, on each sample of hair are assessed. Qualitative features include color (e.g., blonde, brown, red), coloring (natural or treated), form (straight, wavy, curved, kinked), texture (smooth, medium, coarse). Quantitative features include length and diameter. Undoubtedly, these features will vary from hair to hair, even from the same individual, but features that vary *less* for the *same* individual (i.e., within-individual variability) and *more* for *different* individuals (i.e., between-individual variability) are needed for purposes of class identification and discrimination. These features may also be combined in some fashion to result in some overall score, or set of scores, for each sample, and these scores are then compared with those from the target sample. In the final analysis, however, a binary conclusion is often required. For example, "Did this hair come from the head of a Caucasian person?"

As in the case of all analyses leading to classification conclusions (e.g., diagnostic tests in medicine), the microscopic hair analysis process must be subjected to performance and validation studies in which appropriate error rates can be defined and estimated. Consider a hypothetical study in which 100 samples (each with multiple hairs) are taken from the heads of 100 individuals from class C, and another 100 samples are taken from the heads of individuals not in class C. The analyst is asked to determine, for each of the 200 samples, whether it does or does not come from a person in class C, and the true answer is known. The validation study returns the following results:

---

[5] More complete discussion of the questions addressed by forensic science may be found in references such as K. Inman and N. Rudin. 2002. The origin of evidence. *Forensic Science International* 126:11-16; and R. Cook, I.W. Evett, G. Jackson, P.J. Jones, and J.A. Lambert. 1998. A hierarchy of propositions: Deciding which level to address in casework. *Science and Justice* 38:231-239.

4-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1598

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

| Hypothetical Hair Analysis Validation Study | | | |
|---|---|---|---|
| | Analysis of Hair Samples Indicates: | | |
| | Class C | Not Class C | Row Total |
| Sample is from Class C Persons | 95<br>True Positive (correct determination) | 5<br>False Negative | 100 |
| Sample is not from Class C Persons | 2<br>False Positive | 98<br>True Negative (correct determination) | 100 |
| Column Total | 97 | 103 | Overall total 200 |

The accuracy of a test (here, microscopic hair analysis) can be assessed in different ways. Borrowing terminology from the evaluation of medical diagnostic tests, four characterizations and their associated measures are given below. Each one is useful in its own way: the first two emphasize the ability to *detect* an association; the last two emphasize the ability to *predict* an association:[6]

- Among samples from persons in Class C, the fraction that is correctly identified by the test is called the "sensitivity" or the "true positive rate" (TPR) of the test. In this table, the sensitivity would be estimated as [95/(95+5)] x 100=95 percent.
- Among samples from persons not in Class C, the fraction that is correctly identified by the test is called the "specificity" or the "true negative rate" (TNR) of the test. In this table, the specificity would be estimated as [98/(2+98)] x 100=98 percent.
- Among samples classified by the test as coming from persons in Class C, the fraction that actually turns out to be from Class C is called the "positive predictive value (PPV)" of the test. In this table, the PPV would be estimated as [95/(95+ 2)] x 100=98 percent.
- Among samples classified by the test as coming from persons not in Class C, the fraction that actually turns out to not be persons from Class C is called the "negative predictive value (NPV)" of the test. In this table, the NPV would be estimated as [98/(5+98)] x 100=95 percent.

The above four measures emphasize the ability of the analysis to make correct determinations.[7] "Error rates" are defined as proportions of cases in which the analysis led to a

---

[6] See, e.g., X-H. Zhou, N. Obuchowski, and D. McClish. 2002. *Statistical Methods in Diagnostic Medicine*. Wiley & Sons, for a general account of methods for diagnostic tests. A series of NAS/NRC reports have applied such methods to the examination of forensic disciplines. See, e.g., NRC. Committee to Review the Scientific Evidence on the Polygraph. 2003. *The Polygraph and Lie Detection*. Washington, DC: The National Academies Press; NRC. 2004. *Forensic Analysis: Weighing Bullet Lead Evidence*. Washington, DC: The National Academies Press; NAS. 2005. *The Sackler Colloquium on Forensic Science: The Nexus of Science and the Law*, November 16-18, 2005.

[7] Each estimate (of sensitivity, specificity, PPV, NPV) is associated with an interval that has a high probability of containing the true sensitivity, specificity, PPV, NPV. The larger the study, the more precise the estimate (i.e., the narrower the interval of uncertainty about the estimate).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1599

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

false conclusion. For example, the complement of sensitivity (100 percent minus the sensitivity) is the percent of false negative cases in which the sample was from class C but the analysis reached the opposite conclusion. In the above table, this would be estimated as 5 percent. Similarly, the complement of specificity (100 percent minus the specificity) is the percent of false positive cases in which the sample was not from class C but the analysis concluded that it was. In the above table this would be estimated as 2 percent. A global error rate could be defined as the percent of incorrectly identified cases among all those analyzed. In the above table this would be estimated as [(5+2)/200] x 100=3.5 percent.

Importantly, whether the test answer is correct or not depends on which question is being addressed by the test. In this hair comparison example, the purpose is to determine whether the hair came from the head of an individual from class C. Thus, the analysis should be evaluated on the accuracy of the classification. In this example, if the analysis indicated "Class C" but the hair actually came from a "non-Class C" individual, then the analysis returned an incorrect classification. This accuracy evaluation does not apply to other tasks that are beyond the goal of the particular analysis, such as pinpointing the individual from whom the specimen was obtained. In the paint example about paint marks left by a vehicle, if the question is whether a vehicle under investigation was a model A made by manufacturer B in 2000, then a correct answer is limited to only the model, manufacturer, and year.

Although only illustrations, these examples serve to demonstrate the importance of:

- the careful and precise characterization of the scientific procedure, so that others can replicate and validate it;
- the identification of as many sources of error as possible that can affect both the accuracy and precision of a measurement;
- the quantification of measurements (e.g., in the example of GC/MS analysis of possible heroin, reporting peak area, as well as appropriate calibration data, including the response area for a known amount of analyte standard, rather than merely "peak is present/absent");
- the reporting of a measurement with an interval that has a high probability of containing the true value;
- the precise definition of the question addressed by the method (e.g., classification versus individualization), and the recognition of its limitations; and
- the conducting of validation studies of the performance of a forensic procedure to assess the percentages of false positives and false negatives.

Clearly, better understanding of the measuring equipment and the measurement process leads to more improvements to every process and ultimately to fewer false positive and false negative results. Most importantly, as stated above, whether the test answer is correct or not depends on the question the test is being used to address. In the case of microscopic hair analysis, the validation study may confirm its value in identifying *class characteristics* of an individual, but not in identifying the specific person.

It is also important to note that errors and corresponding error rates can have more complex sources than can be accommodated within the simple framework presented above. For example, in the case of DNA analysis, a declaration that two samples match can be erroneous in at least two ways: The two samples might actually come from different individuals whose DNA appears to be the same within the discriminatory capability of the tests, or two different DNA profiles could be mistakenly determined to be matching. The probability of the former error is

4-8

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1600

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PRINCIPLES OF SCIENCE—PREPUBLICATION COPY**

typically very low, while the probability of a false positive (different profiles wrongly determined to be matching) may be considerably higher. Both sources of error need to be explored and quantified in order to arrive at reliable error rate estimates for DNA analysis.[8]

The existence of several types of potential error rates makes it absolutely critical for all involved in the analysis to be explicit and precise in the particular rate or rates referenced in a specific setting. The estimation of such error rates requires rigorously developed and conducted scientific studies. Additional factors may play a role in analyses involving human interpretation, such as the experience, training, and inherent ability of the interpreter, the protocol for conducting the interpretation, and biases from a variety of sources, as discussed in the next section. The assessment of the accuracy of the conclusions from forensic analyses and the estimation of relevant error rates are key components of the mission of forensic science.

### Sources of Bias

Human judgment is subject to many different types of bias, because we unconsciously pick up cues from our environment and factor them in an unstated way into our mental analyses. Those mental analyses might also be affected by unwarranted assumptions and a degree of overconfidence that we do not even recognize in ourselves. Such cognitive biases are not the result of character flaws; instead, they are common features of decisionmaking, and they cannot be willed away.[9] A familiar example is how the common desire to please others (or avoid conflict) can skew one's judgment if coworkers or supervisors suggest that they are hoping for, or have reached, a particular outcome. Science takes great pains to avoid biases by using strict protocols to minimize their effects. The 1996 National Academies DNA report, for example, notes, "[l]aboratory procedures should be designed with safeguards to detect bias and to identify cases of true ambiguity. Potential ambiguities should be documented."[10]

A somewhat obvious cognitive bias that may arise in forensic science is a willingness to ignore base rate information in assessing the probative value of information. For example, suppose carpet fibers from a crime scene are found to match carpet fibers found in a suspect's home. The probative value of this information depends on the rate at which such fibers are found in homes in addition to that of the suspect. If the carpet fibers are extremely common, the presence of matching fibers in the suspect's home will be of little probative value.[11]

A common cognitive bias is the tendency for conclusions to be affected by how a question is framed or how data are presented. In a police line-up, for instance, an eyewitness who is presented with a pool of faces in one batch might assume that the suspect is among them, which may not be correct. If the mug shots are presented together at one time and the witness is asked to identify the suspect, the witness may choose the photograph that is most similar to the perpetrator, even if the perpetrator's picture is not among those presented. Similarly, if the photographs are presented sequentially and the witness knows that only a limited number will be presented, the eyewitness might tend to "identify" one of the last photographs under the assumption that the suspect must be in that batch. (This is also driven by the common bias toward reaching closure.) A series of studies has shown that judges can be subject to errors in

---

[8] C. Aitken and F. Taroni. 2004. *Statistics and the Evaluation of Evidence for Forensic Scientists*. Chichester, UK: John Wiley & Sons.

[9] See, e.g., M.J. Saks, D.M. Risinger, R. Rosenthal, and W.C. Thompson. 2003. Context effects in forensic science: A review and application of the science of science to crime laboratory practice in the United States. *Science and Justice* 43(2):77-90.

[10] NRC. 1996. *The Evaluation of Forensic DNA Evidence*. Washington D.C.: National Academy Press.

[11] C. Guthrie, J.J. Rachlinski, and A.J. Wistrich. 2001. Inside the judicial mind. *Cornell Law Review* 86:777-830.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1601

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

judgment resulting from similar cognitive biases.[12] Forensic scientists also can be affected by this cognitive bias if, for example, they are asked to compare two particular hairs, shoeprints, fingerprints—one from the crime scene and one from a suspect—rather than comparing the crime scene exemplar with a pool of counterparts.

Another potential bias is illustrated by the erroneous fingerprint identification of Brandon Mayfield as someone involved with the Madrid train bombing in 2004. The FBI investigation determined that once the fingerprint examiner had declared a match, both he and other examiners who were aware of this finding were influenced by the urgency of the investigation to affirm repeatedly this erroneous decision.[13]

Recent research provided additional evidence of this sort of bias through an experiment in which experienced fingerprint examiners were asked to analyze fingerprints that, unknown to them, they had analyzed previously in their careers. For half the examinations, contextual biasing was introduced. For example, the instructions accompanying the latent prints included information such as the "suspect confessed to the crime" or the "suspect was in police custody at the time of the crime." In 6 of the 24 examinations that included contextual manipulation, the examiners reached conclusions that were consistent with the biasing information and different from the results they had reached when examining the same prints in their daily work.[14]

Other cognitive biases may be traced to common imperfections in our reasoning ability. One commonly recognized bias is the tendency to avoid cognitive dissonance, such as persuading oneself through rational argument that a purchase was a good value once the transaction is complete. A scientist encounters this unconscious bias if he/she becomes too wedded to a preliminary conclusion, so that it becomes difficult to accept new information fairly and unduly difficult to conclude that the initial hypotheses were wrong. This is often manifested by what is known as "anchoring," the well-known tendency to rely too heavily on one piece of information when making decisions. Often, the piece of information that is weighted disproportionately is one of the very first ones encountered. One tends to seek closure and to view the initial part of an investigation as a "sunk cost" that would be wasted if overturned.

Another common cognitive bias is the tendency to see patterns that do not actually exist. This bias is related to our tendency to underestimate the amount of complexity that can really exist in nature. Both tendencies can lead one to formulate overly simple models of reality and thus to read too much significance into coincidences and surprises. More generally, human intuition is not a good substitute for careful reasoning when probabilities are concerned. As an example, consider a problem commonly posed in beginning statistics classes: How many people must be in a room before there is a 50 percent probability that at least two will share a common birthday? Intuition might suggest a large number, perhaps over 100, but the actual answer is 23. This is not difficult to prove through careful logic, but intuition is likely to be misleading.

All of these sources of bias are well known in science, and a large amount of effort has been devoted to understanding and mitigating them. The goal is to make scientific investigations as objective as possible so the results do not depend on the investigator. Certain fields of science (most notably, biopharmaceutical clinical trials of treatment protocols and drugs) have developed practices such as double-blind tests and independent (blind) verification to minimize the impact of biases. Additionally, science seeks to publish its discoveries, findings, and conclusions so that they are subjected to independent peer review; this enables others to study biases that may exist

---

[12] Ibid.

[13] R.B. Stacey. 2004. A report on the erroneous fingerprint individualization in the Madrid train bombing case. *Journal of Forensic Identification* 54:707.

[14] I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600-616.

4-10

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1602

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PRINCIPLES OF SCIENCE—PREPUBLICATION COPY

in the investigative method or attempt to replicate unexpected results. Avoiding, or compensating for, a bias is an important task. Even fields with well-established protocols to minimize the effects of bias can still bear improvement. For example, a recent working paper[15] has raised questions about the way cognitive dissonance has been studied since 1956. Although these results must be considered preliminary because the paper has yet to be published, they do demonstrate that continual vigilance is needed. Research has been sparse on the important topic of cognitive bias in forensic science—both regarding their effects and methods for minimizing them.[16]

### The Self-Correcting Nature of Science

The methods and culture of scientific research enable it to be a self-correcting enterprise. Because researchers are, by definition, creating new understanding, they must be as cautious as possible before asserting a new "truth." Also, because researchers are working at a frontier, few others may have the knowledge to catch and correct any errors they make. Thus, science has had to develop means of revisiting provisional results and revealing errors before they are widely used. The processes of peer review, publication, collegial interactions (e.g., sharing at conferences), and the involvement of graduate students (who are expected to question as they learn) all support this need. Science is characterized also by a culture that encourages and rewards critical questioning of past results and of colleagues. Most technologies benefit from a solid research foundation in academia and ample opportunity for peer-to-peer stimulation and critical assessment, review and critique through conferences, seminars, publishing, and more. These elements provide a rich set of paths through which new ideas and skepticism can travel and opportunities for scientists to step away from their day-to-day work and take a longer-term view. The scientific culture encourages cautious, precise statements and discourages statements that go beyond established facts; it is acceptable for colleagues to challenge one another, even if the challenger is more junior. The forensic science disciplines will profit enormously by full adoption of this scientific culture.

### CONCLUSION

The way in which science is conducted is distinct from, and complementary to, other modes by which humans investigate and create. The methods of science have a long history of successfully building useful and trustworthy knowledge and filling gaps while also correcting past errors. The premium that science places on precision, objectivity, critical thinking, careful observation and practice, repeatability, uncertainty management, and peer review enables the reliable collection, measurement, and interpretation of clues in order to produce knowledge.

---

[15] M.K. Chen. 2008. *Rationalization and Cognitive Dissonance: Do Choices Affect or Reflect Preferences?* Available at www.som.yale.edu/Faculty/keith.chen/papers/CogDisPaper.pdf.

[16] See, e.g., I.E. Dror, D. Charlton, and A.E. Peron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156:74-78; I.E. Dror, A. Peron, S. Hind, and D. Charlton. 2005. When emotions get the better of us: The effects of contextual top-down processing on matching fingerprints. *Journal of Applied Cognitive Psychology* 19:799-809; and B. Schiffer and C. Champod. 2007. The potential (negative) influence of observational biases at the analysis stage of fingerprint individualization. *Forensic Science International* 167:116-120.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1603

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

USCA5 1604

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 5
# DESCRIPTIONS OF SOME FORENSIC SCIENCE DISCIPLINES

This chapter describes the methods of some of the major forensic science disciplines. It focuses on those that are used most commonly for investigations and trials as well as on those that have been cause for concern in court or elsewhere because their reliability has not been sufficiently established in a systematic (scientific) manner in accordance with the principles discussed in Chapter 4. The chapter focuses primarily on the forensic science disciplines' capability for providing evidence that can be presented in court. As such, there is considerable discussion about the reliability and precision of results—attributes that factor into probative value and admissibility decisions. It should be recalled, however, that forensic science also provides great value to law enforcement investigations, and even those forensic science disciplines whose scientific foundation is currently limited might have the capacity (or the potential) to provide probative information to advance a criminal investigation.[1] This chapter also provides the committee's summary assessment of each of these disciplines.[2]

Because forensic science aims to glean information from a wide variety of clues and evidence associated with a crime, it deals with a broad range of tools and with evidence of highly variable quality. In general, the forensic science disciplines are pragmatic, with practitioners adopting, adapting, or developing whatever tools and technological aids they can to distill useful information from crime scene evidence. Many forensic science methods have been developed in response to such evidence—combining experience-based knowledge with whatever relevant science base exists in order to create a procedure that returns useful information. Although some of the techniques used by the forensic science disciplines—such as DNA analysis, serology, forensic pathology, toxicology, chemical analysis, and digital and multimedia forensics—are built on solid bases of theory and research, many other techniques have been developed heuristically. That is, they are based on observation, experience, and reasoning without an underlying scientific theory, experiments designed to test the uncertainties and reliability of the method, or sufficient data that are collected and analyzed scientifically.

In the course of its deliberations, the committee received testimony from experts in many forensic science disciplines concerning current practices, validity, reliability and errors, standards, and research.[3] From this testimony and from many written submissions, as well as from the personal experiences of the committee members, the committee developed the consensus views presented in this chapter.

---

[1] For example, forensic odontology might not be sufficiently grounded in science to be admissible under *Daubert*, but this discipline might be able to reliably exclude a suspect, thereby enabling law enforcement to focus its efforts on other suspects. And forensic science methods that do not meet the standards of admissible evidence might still offer leads to advance an investigation.

[2] The chapter does not discuss eyewitness identification or line-ups, because these techniques do not normally rely on forensic scientists for analysis or implementation. They clearly are of major importance for investigations and trials, and their effective use and interpretation relies on scientific knowledge and continuing research. For similar reasons, this chapter does not delve into the polygraph. The validity of polygraph testing for security screening was addressed in National Research Council, Committee to Review the Scientific Evidence on the Polygraph. 2003. *The Polygraph and Lie Detection.* Washington, DC: The National Academies Press. It does not cover forensic pathology, because that field is addressed in Chapter 9.

[3] A complete list of those who provided testimony to the committee is included in Appendix B.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1605

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## BIOLOGICAL EVIDENCE

Biological evidence is provided by specimens of a biological origin that are available in a forensic investigation. Such specimens may be found at the scene of a crime or on a person, clothing, or weapon. Some—for example, pet hairs, insects, seeds, or other botanical remnants—come from the crime scene or from an environment through which a victim or suspect has recently traversed. Other biological evidence comes from specimens obtained directly from the victim or suspect, such as blood, semen, saliva, vaginal secretions, sweat, epithelial cells, vomitus, feces, urine, hair, tissue, bones, and microbiological and viral agents. The most common types of biological evidence collected for examination are blood, semen, and saliva. Human biological evidence that contains nuclear DNA can be particularly valuable because the possibility exists to associate that evidence with one individual with a degree of reliability that is acceptable for criminal justice.

### Sample Data and Collection

At the crime scene, biological evidence is located, documented, collected, and preserved for subsequent analysis in the crime laboratory. Locating and recognizing biological evidence can be more difficult than a layperson would presume. For example, blood is not always red, some red substances are not blood, and most biological evidence, such as saliva or semen, is not readily visible. Crime scene investigators locate biological evidence through tests that screen for the presence of a particular biological fluid (e.g., blood, semen, saliva), and investigators have a choice of techniques.[4] For blood they might use an alternate light source (ALS) at 415nm, the wavelength under which bloodstains absorb light and are thus more visible to the naked eye. Most commonly, though, the screening test for blood is a catalytic chemical test that turns color or luminesces in the presence of blood. Scene investigators may also use Luminol, fluorescein, or crystal violet to identify areas at the scene where attempts were made to clean a bloody crime scene.

These tests for blood may also locate other evidence that should be collected and taken to the laboratory for analysis. Recently, immunological tests that can identify human hemoglobin or glycophorin A have become available. These are blood-specific proteins that can be demonstrated to be of human origin. At some point in the future, these immunological tests may replace standard chemical tests, and, although more expensive, they are more specific because they identify blood conclusively instead of just presumptively. Investigators also have several techniques for locating semen at the crime scene. Commonly they rely on an ALS, under which semen, other biological fluids, and some other evidence will luminesce. More recently, immunological tests can be used to identify seminal plasma proteins, for example, prostate specific antigen (p30 or PSA) or semenogelin.[5]

Finding saliva at the scene is mostly happenstance. Although it luminesces with the ALS at specific wavelengths, the glow is not as strong, and a weaker ALS light source may not highlight it well and possibly not at all. Thus, it can be easily missed. Screening tests for saliva

---

[4] Interpreting the results of any screening test requires expertise and experience. Many crime scene investigators have the requisite experience, but they may lack a scientific background, and it is not always straightforward to correctly interpret the results of screening tests. Crime scene investigations that require science-based screening tools are most reliable if someone is involved who understands the physics and chemistry of those tools.

[5] I. Sato, M. Sagi, A. Ishiwari, H. Nishijima, E. Ito, and T. Mukai. 2002. Use of the "SMITEST" PSA card to identify the presence of prostate-specific antigen in semen and male urine. *Forensic Science International* 127(1-2):71-74.

5-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1606

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

are chemical tests that identify amylase, an enzyme occurring in high concentrations in saliva. But the screening is not definitive, because other types of tissue also contain amylase, including the particular type (AMY 1) that is associated with saliva.

### Analyses

Although the forensic use of nuclear DNA is barely 20 years old, DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged. DNA enjoys this preeminent position because of its reliability and the fact that, absent fraud or an error in labeling or handling, the probabilities of a false positive are quantifiable and often miniscule. However, even a very small (but nonzero) probability of false positive can affect the odds that a suspect is the source of a sample with a matching DNA profile.[6] The scientific bases and reliability of other types of biological analysis are also well established, but absent nuclear DNA, they can only narrow the field of suspects, not suggest any particular individual.

Testing biological evidence in the laboratory involves the use of a logical sequence of analyses designed to identify what a substance is and then from whom it came. The sequence begins with a forensic biologist locating the substance on the evidence. This is followed by a presumptive test that would give more information about the substance, typically using the same tests employed by scene investigators: the ALS, enzymatic, chemical, or immunological tests. Once the material (e.g., blood, semen, or saliva) is known, an immunological test or a human DNA test is run to determine whether the sample comes from a human or an animal.

The final step in the analytical sequence procedure is to identify the source of the biological material. If a sufficient sample is present and is probative, the forensic biologist prepares the material for DNA testing. The analyst who conducts the DNA test may or may not be the same person who examines the original physical evidence, depending on laboratory policies.

A decision might be required regarding the type of DNA testing to employ. Two primary types of DNA tests are conducted in U.S. forensic laboratories: nuclear testing and mitochondrial DNA (mtDNA) testing, with several variations of the former. For most biological evidence having evidentiary significance, forensic DNA laboratories employ nuclear testing routinely[7], and testing for the 13 core Short Tandem Repeat (STR) polymorphisms is the first line of attack.[8] The results are entered into the Federal Bureau of Investigation's (FBI's) Combined DNA Indexing System (CODIS) and are searched against DNA profiles already in one of three databases: a convicted felon database, a forensic database containing DNA profiles from crime scenes, and a database of DNA from unidentified persons.

Sometimes the evidence dictates testing just for Y STRs, which assesses only the Y (male) chromosome. In sexual assaults for which only small amounts of male nuclear DNA are available (e.g., a large excess of vaginal DNA), it is possible to obtain a Y STR profile of the male who left the semen. Unlike the 13 core loci used in CODIS searches, where a match of all 13 is a strong indicator that both samples come from the same individual, Y STR testing is not as definitive with respect to identifying a single person. A third nuclear test involves the analysis of

---

[6] W.C. Thompson, F. Taroni, and C.G.G. Aitken. 2003. How the probability of a false positive affects the value of DNA evidence. *Journal of Forensic Sciences* 48(1):47-54.

[7] T.R. Moretti, A.L. Baumstark, D.A. Defenbaugh, K.M. Keys, J.B. Smerick, and B. Budowle B. 2001. Validation of short tandem repeats (STRs) for forensic usage: Performance testing of fluorescent multiplex STR systems and analysis of authentic and simulated forensic samples. *Journal of Forensic Sciences* 46(3):647-660.

[8] Some laboratories are now using 16 loci, 13 of which are the original core loci.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1607

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

single nucleotide polymorphisms (SNPs). Although no public forensic DNA laboratory in the United States is routinely analyzing forensic evidence for SNPs, the utility of this genomic information for cases in which the DNA is too damaged to allow standard testing has garnered attention since its use in the World Trade Center identification effort.[9]

If insufficient nuclear DNA is present for STR testing, or if the existing nuclear DNA is degraded, two options potentially are available. One technique amplifies the amount of DNA available, although this technique is not widely available in U.S. forensic laboratories. A second alternative is to sequence mitochondrial DNA (mtDNA). Since 1996, it has been possible to compare single-source crime scene samples and samples from the victim or defendant on the basis of mtDNA. Four FBI-supported mtDNA laboratories and a few private mtDNA laboratories conduct DNA casework. This technique has been particularly helpful with regard to hairs—which do not contain enough nuclear DNA to enable analysis with current methods unless the root is present—and bones and teeth. Because it measures only a single locus of the genome, mtDNA analysis is much less discriminating than nuclear DNA analysis; all people with a common female ancestor (within the past few generations) share a common profile. But mtDNA testing has forensic value in its ability to include or exclude an individual as its source.

Laboratories entering the results of forensic DNA testing into CODIS must meet specific quality guidelines, which include the requirement that the laboratory be accredited and that specific procedures be in place and followed. In accredited laboratories, forensic DNA personnel must take proficiency tests and must meet specific educational and training requirements. (See Chapter 8 for further discussion.) Laboratory analyses are conducted by scientists with degrees ranging from a bachelor's degree in science to a doctoral degree. Each forensic DNA laboratory has a technical leader, who normally must meet additional experience and educational requirements.

Although DNA laboratories are expected to conduct their examinations under stringent quality controlled environments, errors do occasionally occur. They usually involve situations in which interpretational ambiguities occur or in which samples were inappropriately processed and/or contaminated in the laboratory. Errors also can occur when there are limited amounts of DNA, which limits the amount of test information and increases the chance of misinterpretation. Casework reviews of mtDNA analysis suggest a wide range in the quality of testing results that include contamination, inexperience in interpreting mixtures, and differences in how a test is conducted.[10]

---

[9] B. Leclair, R. Shaler, G.R. Carmody, K. Eliason, B.C.Hendrickson, T. Judkins, M.J. Norton, C. Sears, and T. Scholl. 2007. Bioinformatics and human identification in mass fatality incidents: The World Trade Center disaster. *Journal of Forensic Sciences* 52(4):806-819. Epub 2007 May 25.

[10] Personal communication, Terry Melton, Mitotyping Laboratory. December 2007. See also L. Prieto; A. Alonso; C. Alves; M. Crespillo; M. Montesino; A. Picornell; A. Brehm; J.L. Ramirez; M.R. Whittle; M.J. Anjos; I. Boschi; J. Buj; M. Cerezo; S. Cardoso; R. Cicarelli; D. Comas; D. Corach; C. Doutremepuich; R.M. Espinheira; I. Fernandez-Fernandez; S. Filippini; Julia Garcia-Hirschfeld; A. Gonzalez; B. Heinrichs; A. Hernandez; F.P.N. Leite; R.P. Lizarazo; A.M. Lopez-Parra; M. Lopez-Soto; J.A. Lorente; B. Mechoso; I. Navarro; S. Pagano; J.J. Pestano; J. Puente; E. Raimondi; A. Rodriguez-Quesada; M.F. Terra-Pinheiro; L. Vidal-Rioja; C. Vullo; A. Salas. 2008. GEP-ISFG collaborative exercise on mtDNA: Reflections about interpretation, artefacts and DNA mixtures. *Forensic Science International: Genetics* 2(2):126-133; and A. Salas, L. Prieto, M. Montesino, C. Albarrán, E. Arroyo, M. Paredes-Herrera, A. Di Lonardo, C. Doutremepuich, I. Fernández-Fernández, A. de la Vega. 2005. Mitochondrial DNA error prophylaxis: Assessing the causes of errors in the GEP'02-03 proficiency testing trial. *Forensic Science International* 148(2-3):191-198.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1608

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**Reporting of Results**

FBI quality guidelines require that reports from forensic DNA analysis must contain, at a minimum, a description of the evidence examined, a listing of the loci analyzed, a description of the methodology, results and/or conclusions, and an interpretative statement (either quantitative or qualitative) concerning the inference to be drawn from the analysis.[11]

**Summary Assessment**

Unlike many forensic techniques that were developed empirically within the forensic science community, with limited foundation in scientific theory or analysis, DNA analysis is a fortuitous by-product of cutting-edge science. Eminent scientists contributed their expertise to ensuring that DNA evidence offered in a courtroom would be valid and reliable (e.g., in the 1989 New York case, *People v. Castro*), and by 1996 the National Academy of Sciences had convened two committees that issued influential recommendations on handling DNA forensic science.[12] As a result, principles of statistics and population genetics that pertain to DNA evidence were clarified, the methods for conducting DNA analyses and declaring a match became less subjective, and quality assurance and quality control protocols were designed to improve laboratory performance.

DNA analysis is scientifically sound for several reasons: (1) there are biological explanations for individual-specific findings; (2) the 13 STR loci used to compare DNA samples were selected so that the chance of two different people matching on all of them would be extremely small; (3) the probabilities of false positives have been explored and quantified in some settings (even if only approximately); (4) the laboratory procedures are well specified and subject to validation and proficiency testing; and (5) there are clear and repeatable standards for analysis, interpretation, and reporting. DNA analysis also has been subjected to more scrutiny than any other forensic science discipline, with rigorous experimentation and validation performed prior to its use in forensic investigations. As a result of these characteristics, the probative power of DNA is high. Of course, DNA evidence is not available in every criminal investigation, and it is still subject to errors in handling that can invalidate the analysis. In such cases, other forensic techniques must be applied. The probative power of these other methods can be high, alone or in combination with other evidence. This power likely can be improved by strengthening the methods' scientific foundations and practice, as has occurred with forensic DNA analysis.

## ANALYSIS OF CONTROLLED SUBSTANCES

The term "illicit drugs" is widely used to describe abused substances. Other terms that are used include "abused drugs," "illegal drugs," "street drugs," and, in the United States, "controlled substances." The latter term refers specifically to drugs that are controlled by federal and state laws.[13]

---

[11] DNA Advisory Board. 2000. Quality assurance standards for forensic DNA testing laboratories. *Forensic Science Communications* 2(3). Available at www.bioforensics.com/conference04/TWGDAM/Quality_Assurance_Standards_2.pdf.

[12] National Research Council. 1992. *DNA Technology in Forensic Science*. Washington, D.C.: The National Academies Press; National Research Council. 1996. *The Evaluation of Forensic DNA Evidence: An Update*. Washington, D.C.: National Academies Press.

[13] See, e.g., 21 U.S.C.A. § 802(6).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1609

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

The analysis of controlled substances is a mature forensic science discipline and one of the areas with a strong scientific underpinning. The analytical methods used have been adopted from classical analytical chemistry, and there is broad agreement nationwide about best practices.[14] In 1997, the U.S. Drug Enforcement Administration and the Office of National Drug Control Policy cosponsored the formation of the Technical Working Group for the Analysis of Seized Drugs, now known as the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG). This organization brings together more than 20 forensic practitioners from all over the world to develop standards for the analysis and reporting of illicit drug cases. Their standards are being widely adopted by drug analysis laboratories in the United States and worldwide.

## Sample Data and Collection

Controlled substances typically are seized by police officers, narcotics agents, and detectives through undercover buys, raids on drug houses and clandestine drug laboratories, and seizures on the streets. In some cases, forensic chemists are sent to clandestine laboratory operations to help render the laboratory safe and help with evidence collection. The seized drugs may be in the form of powders or adulterated powders, chunks of smokeable or injectable material, legitimate and clandestine tablets and capsules, or plant materials or plant extracts.

## Analyses

Controlled substances are analyzed by well-accepted standard schemes or protocols. Few drug chemists have the requisite botanical background to identify any common illicit plants other than marijuana; thus, in cases that require botanical identification, the assistance of outside experts is enlisted.

Sampling can be a major issue in the analysis of controlled substances. Although sometimes only trace amounts of a drug are present (e.g., in a syringe used to inject heroin), at other times there are hundreds or thousands of packages of drugs or very large bags or bales. SWGDRUG and others have proposed statistical and nonstatistical methods for sampling,[15] and a wide variety of methods are used.

Most controlled substances are subjected first to a field test for presumptive identification. This is followed by gas chromatography-mass spectrometry (GC-MS), in which chromatography separates the drug from any diluents or excipients, and then mass spectrometry is used to identify the drug. This is the near universal test for identifying unknown substances. Marijuana is an exception, because it is identified normally through a sequence of tests—a presumptive color test, followed by low-powered microscopic identification, and finally by thin-layer chromatography.

## Reporting of Results

Most drug chemists produce terse reports for attorneys and courts. The reports contain administrative data and a short description of the evidence. The weight or number of exhibits is stated and then the results of the analysis. A typical report for a marijuana case might read as follows:

---

[14] See F. Smith and J.A. Siegel (eds.). 2004. *Handbook of Forensic Drug Analysis*. Burlington, MA: Academic Press.

[15] Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) Recommendations. Available at www.swgdrug.org/approved.htm.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1610

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

Received:    Item 1 - a sealed plastic bag containing 25.6g of green-brown plant material.

Results:    The green-brown plant material in item 1 was identified as marijuana.

Some laboratories might mention the tests that were conducted, but in most cases the spectra, chromatograms, and other evidence of the analysis and the chemist's notes are not submitted. Likewise, possible sources of error and statistical data are not commonly included. From a scientific perspective, this style of reporting is often inadequate, because it may not provide enough detail to enable a peer or other courtroom participant to understand and, if needed, question the sampling scheme, process(es) of analysis, or interpretation.

**Summary Assessment**

The chemical foundations for the analysis of controlled substances are sound, and there exists an adequate understanding of the uncertainties and potential errors. SWGDRUG has established a fairly complete set of recommended practices.[16] It also provides pointers to a number of guidelines for statistical sampling, both for illegal drugs per se (created by the European Network of Forensic Science Institutes) and for materials more generally (created by the American Society for Testing and Materials).

The SWGDRUG recommendations include a menu of analytical chemistry techniques that are considered acceptable in certain circumstances. Because this menu was constructed to be applicable worldwide, it includes options that allow laboratories to substitute a concatenation of simple methods if they do not have access to the preferred analytical equipment (e.g., GC-MS). It is questionable, however, whether all of the possible combinations recommended by SWGDRUG would be acceptable in a scientific sense, if one's goal were to identify and classify a completely unknown substance. The committee has been told that experienced forensic chemists and good forensic laboratories understand which tests (or combinations of tests) provide adequate reliability, but the SWGDRUG recommendations do not ensure that these tests will be used. This ambiguity would be a less significant issue if the reports presented in court contained sufficient detail about the methods of analysis.

## FRICTION RIDGE ANALYSIS

Fingerprints, palm prints, and sole prints have been used to identify people for more than a century in the United States. Collectively, the analysis of these prints is known as "friction ridge analysis," which consists of experienced-based comparisons of the impressions left by the ridge structures of volar (hands and feet) surfaces. Friction ridge analysis is an example of what the forensic science community uses as a method for assessing "individualization"—the conclusion that a piece of evidence (here, a pattern left by friction ridges) comes from a single unambiguous source. Friction ridge analysis shares similarities with other experience-based methods of pattern recognition, such as those for footwear and tire impressions, toolmarks, and handwriting analysis, all of which are discussed separately below.

Friction ridge analysis is performed in various settings, including accredited crime laboratories and nonaccredited facilities. Nonaccredited facilities may be crime laboratories, police "identification units," or private practice (consultants). In some instances, the latent print

---

[16] See www.swgdrug.org/approved.htm.

5-7

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1611

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

examiner is employed solely to perform latent print casework. Some examiners may also perform other types of forensic casework (e.g., footwear and tire impressions, firearms analysis). In some agencies, fingerprint examiners also are required to respond to crime scenes and can be sworn officers who also perform police officer/detective duties.

The training of personnel to perform latent print identifications varies from agency to agency. Agencies may have a formalized training program, may use an informal mentoring process, or may send new examiners to a one- to two-week course. The International Association for Identification (IAI) offers a training publication, "Friction Ridge Skin Identification Training Manual,"[17] and the Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST) offers a guideline, "Training to Competency for Latent Print Examiners."[18] Although these are excellent resources, they are not required, and there is no auditing of the content of training programs developed by nonaccredited agencies. The IAI also offers a certification test that measures both the knowledge and skill of latent print examiners; however, not all agencies require latent print examiners to achieve and maintain certification.

**Method of Data Collection and Analysis**

The technique used to examine prints made by friction ridge skin is described by the acronym ACE-V: "Analysis, Comparison, Evaluation, and Verification." [19] It has been described in forensic literature as a means of comparative analysis of evidence since 1959.[20] The process begins with the **analysis** of the unknown friction ridge print (now often a digital image of a latent print). Many factors affect the quality and quantity of detail in the latent print and also introduce variability in the resulting impression. The examiner must consider the following:

(1)    Condition of the skin—natural ridge structure (robustness of the ridge structure), consequences of aging, superficial damage to the skin, permanent scars, skin diseases, and masking attempts.

(2)    Type of residue—natural residue (sweat residue, oily residue, combinations of sweat and oil); other types of residue (blood, paint, etc.); amount of residue (heavy, medium, or light); and where the residue accumulates (top of the ridge, both edges of the ridge, one edge of the ridge, or in the furrows).

(3)    Mechanics of touch—underlying structures of the hands and feet (bone creates areas of high pressure on the surface of the skin); flexibility of the ridges, furrows, and creases; the distance adjacent ridges can be pushed together or pulled apart during lateral movement; the distance the length of a ridge might be compressed or stretched; the rotation of ridge systems during torsion; and the effect of ridge flow on these factors.

(4)    Nature of the surface touched—texture (rough or smooth), flexibility (rigid or pliable), shape (flat or curved), condition (clean or dirty), and background colors and patterns.

---

[17] International Association for Identification. *Friction Ridge Skin Identification Training Manual*. Available at www.theiai.org.

[18] SWGFAST. *Training to Competency for Latent Print Examiners*. Available at www.SWGFAST.org.

[19] Ashbaugh, op. cit.; Triplette and Cooney, op. cit.; J. Vanderkolk. 2004. ACE+V: A model. *Journal of Forensic Identification* 54(1):45-52. SWGFAST. 2002. *Friction Ridge Examination Methodology for Latent Print Examiners*. Available at www.SWGFAST.org.

[20] R.A. Huber. 1959-1960. Expert witness. *Criminal Law Quarterly* 2:276-296.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1612

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

(5)    Development technique—chemical signature of the technique and consistency of the chemical signature across the impression.

(6)    Capture technique—photograph (digital or film) or lifting material (e.g., tape or gelatin lifter).

(7)    Size of the latent print or the percentage of the surface that is available for comparison.

The examiner also must perform an analysis of the known prints (taken from a suspect or retrieved from a database of fingerprints), because many of the same factors that affect the quality of the latent print can also affect the known prints.

If the latent print does not have sufficient detail for either identification or exclusion, it does not undergo the remainder of the process (comparison and evaluation). These insufficient prints are often called "of no value" or "not suitable" for comparison. Poor-quality known prints also will end the examination. If the examiner deems that there is sufficient detail in the latent print (and the known prints), the comparison of the latent print to the known prints begins.

Visual **comparison** consists of discerning, visually "measuring," and comparing—within the comparable areas of the latent print and the known prints—the details that correspond. The amount of friction ridge detail available for this step depends on the clarity of the two impressions. The details observed might include the overall shape of the latent print, anatomical aspects, ridge flows, ridge counts, shape of the core, delta location and shape, lengths of the ridges, minutia location and type, thickness of the ridges and furrows, shapes of the ridges, pore position, crease patterns and shapes, scar shapes, and temporary feature shapes (e.g., a wart).

At the completion of the comparison, the examiner performs an **evaluation** of the agreement of the friction ridge formations in the two prints and evaluates the sufficiency of the detail present to establish an identification (source determination).[21] Source determination is made when the examiner concludes, based on his or her experience, that sufficient quantity and quality of friction ridge detail is in agreement between the latent print and the known print. Source exclusion is made when the process indicates sufficient disagreement between the latent print and known print. If neither an identification nor an exclusion can be reached, the result of the comparison is inconclusive. **Verification** occurs when another qualified examiner repeats the observations and comes to the same conclusion, although the second examiner may be aware of the conclusion of the first. A more complete description of the steps of ACE-V and an analysis of its limitations is provided in a paper by Haber and Haber.[22]

Although some Automated Fingerprint Identification Systems (AFIS) permit fully automated identification of fingerprint records related to criminal history (e.g., for screening job applicants), the assessment of latent prints from crime scenes is based largely on human interpretation. Note that the ACE-V method does not specify particular measurements or a standard test protocol, and examiners must make subjective assessments throughout. In the United States, the threshold for making a source identification is deliberately kept subjective, so that the examiner can take into account both the quantity and quality of comparable details. As a result, the outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner. In fact, recent research by Dror[23] has shown that experienced examiners do not

---

[21] Ashbaugh, op. cit.; SWGFAST. *Friction Ridge Examination Methodology for Latent Print Examiners*.

[22] L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert*. *Law, Probability, and Risk* 7(2):87-109.

[23] I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600-616.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1613

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

necessarily agree with even their own past conclusions when the examination is presented in a different context some time later.

This subjectivity is intrinsic to friction ridge analysis, as can be seen when comparing it with DNA analysis. For the latter, 13 specific segments of DNA (generally) are compared for each of two DNA samples. Each of these segments consists of ordered sequences of the base pairs, called A, G, C, and T. Studies have been conducted to determine the range of variation in the sequence of base pairs at each of the 13 loci and also to determine how much variation exists in different populations. From these data, scientists can calculate the probability that two DNA samples from different people will have the same permutations at each of the 13 loci.

By contrast, before examining two fingerprints, one cannot say a priori which features should be compared. Features are selected during the comparison phase of ACE-V, when a fingerprint examiner identifies which features are common to the two impressions and are clear enough to be evaluated. Because a feature that was helpful during a previous comparison might not exist on these prints or might not have been captured in the latent impression, the process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process. For these reasons, population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner. Little research has been directed toward developing population statistics, although more would be feasible.[24]

**Methods of Interpretation**

The determination of an exclusion can be straightforward if the examiner finds detail in the latent print that does not match the corresponding part of the known print, although distortions or poor image quality can complicate this determination. But the criteria for identification are much harder to define, because they depend on an examiner's ability to discern patterns (possibly complex) among myriad features and on the examiner's experience judging the discriminatory value in those patterns. The clarity of the prints being compared is a major underlying factor. For 10-print fingerprint cards, which tend to have good clarity, even automated pattern-recognition software (which is not as capable as human examiners) is successful enough in retrieving matching sets from databases to enjoy widespread use. When dealing with a single latent print, however, the interpretation task becomes more challenging and relies more on the judgment of the examiner. The committee heard presentations from friction ridge experts who assured it that friction ridge identification works well when a careful examiner works with good-quality latent prints. Clearly, the reliability of the ACE-V process could be improved if specific measurement criteria were defined. Those criteria become increasingly important when working with latent prints that are smudged and incomplete, or when comparing impressions from two individuals whose prints are unusually similar.

The fingerprint community continues to assert that the ability to see latent print detail is an acquired skill attained only through repeated exposure to friction ridge impressions. In their

---

[24] See, e.g., E. Gutiérrez, V. Galera, J.M. Martínez, and C. Alonso. 2007. Biological variability of the minutiae in the fingerprints of a sample of the Spanish population. *Forensic Science International* 172(2-3):98-105. For information about the basic availability of data, see C. Champod, C.J. Lennard, P.A. Margot, and M. Stoilovic. 2004. *Fingerprints and other ridge skin impressions*. Boca Raton: CRC Press; D.A. Stoney. 2001. "Measurement of Fingerprint Individuality." In: H.C. Lee and R.E. Gaensslen (eds.). *Advances in Fingerprint Technology*. 2nd ed. Boca Raton, FL: CRC Press; pp. 327-387.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1614

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

view, a lengthy apprenticeship (typically two years, at the FBI Laboratory) with an experienced latent print examiner enables a new examiner to develop a sense of the rarity of features and groups of features; the rarity of particular kinds of ridge flows; the frequency of features in different areas of the hands and feet; the degree to which differences can be accounted for by mechanical distortion of the skin; a sense of how to extract detail from background noise; and a sense of how much friction ridge detail could be common to two prints from different sources.[25] From this base of experience, the fingerprint community asserts that the latent print examiner learns to judge whether there is sufficient detail (which varies with image quality) to make a source determination during the evaluation phase of ACE-V.

The latent print community in the United States has eschewed numerical scores and corresponding thresholds, because those developed to date[26] have been based only on minutia, not on the unique features of the friction ridge skin (e.g., lengths of ridges, shapes of ridges, crease lengths and shapes, scar lengths and shapes). Additionally, thresholds based on counting the number of features that correspond, lauded by some as being more "objective," are still based on primarily subjective criteria—an examiner must have the visual expertise to discern the features (most important in low-clarity prints) and must determine that they are indeed in agreement. A simple point count is insufficient for characterizing the detail present in a latent print; more nuanced criteria are needed, and, in fact, likely can be determined.

## Reporting of Results

SWGFAST has promulgated three acceptable conclusions resulting from latent print comparison: individualization (or identification), exclusion, or inconclusive.[27] Although adherence to this standard is common, some latent print examiners report either "identification" or "negative" results. "Negative" (or sometimes "not identified") is an ambiguous conclusion, and it could mean excluded, inconclusive, or unable to locate after exhaustive search. It is problematic that the meaning of "negative" may be specific to a particular agency, examiner, or case.

Latent print examiners report an individualization when they are confident that two different sources could not have produced impressions with the same degree of agreement among details. This is a subjective assessment. There has been discussion regarding the use of statistics to assign match probabilities based on population distributions of certain friction ridge features. Current published statistical models, however, have not matured past counts of corresponding minutia and have not taken clarity into consideration. (This area is ripe for additional research.) As a result, the friction ridge community actively discourages its members from testifying in terms of the probability of a match; when a latent print examiner testifies that two impressions "match," they are communicating the notion that the prints could not possibly have come from two different individuals.

As noted in Chapter 3, Jennifer Mnookin of the University of California, Los Angeles School of Law summarized the reporting of fingerprint analyses as follows:

---

[25] T. Busey and J. Vanderkolk. 2005. Behavioral and electrophysiological evidence for configural processing in fingerprint experts. *Vision Research* 45:431-448.

[26] See, e.g., I.W. Evett and R.A. Williams. 1996. A review of the sixteen points fingerprint standard in England and Wales. *Journal of Forensic Identification* 46(1):49-73.

[27] SWGFAST. *Friction Ridge Examination Methodology for Latent Print Examiners.* Available at www.swgfast.org/Training_to_Competency_for_Latent_Print_Examiners_2.1.pdf.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1615

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term 'positive' or 'absolute' identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it . . . Given the general lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validated standards for declaring a match, such claims of absolute, certain confidence in identification are unjustified . . . Therefore, in order to pass scrutiny under Daubert, fingerprint identification experts should exhibit a greater degree of epistemological humility. Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a 'match.'[28]

**Summary Assessment**

Historically, friction ridge analysis has served as a valuable tool, both to identify the guilty and to exclude the innocent. Because of the amount of detail available in friction ridges, it seems plausible that a careful comparison of two impressions can accurately discern whether or not they had a common source. Although there is limited information about the accuracy and reliability of friction ridge analyses, claims that these analyses have zero error rates are not scientifically plausible.

ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of analysis. ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. For these reasons, merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner or producing reliable results. A recent paper by Haber and Haber[29] presents a thorough analysis of the ACE-V method and its scientific validity. Their conclusion is unambiguous: "We have reviewed available scientific evidence of the validity of the ACE-V method and found none."[30] Further, they state:

[W]e report a range of existing evidence that suggests that examiners differ at each stage of the method in the conclusions they reach. To the extent that they differ, some conclusions are invalid. We have analysed the ACE-V method itself, as it is described in the literature. We found that these descriptions differ, no single protocol has been officially accepted by the profession and the standards upon which the method's conclusions rest have not been specified quantitatively. As a consequence, at this time the validity of the ACE-V method cannot be tested.[31]

---

[28] J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7:127. See also the discussion in C. Champod. 2008. Fingerprint examination: Towards more transparency. *Law Probability and Risk* 7:111-118.

[29] Mnookin, op. cit.

[30] Ibid., p. 19.

[31] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1616

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1618 of 2008
PageID #: 3508

Recent legal challenges, *New Hampshire vs. Richard Langill*[32] and *Maryland vs. Bryan Rose*,[33] have also highlighted two important issues for the latent print community: documentation and error rate. Better documentation is needed of each step in the ACE-V process or its equivalent. At the very least, sufficient documentation is needed to reconstruct the analysis, if necessary. By documenting the relevant information gathered during the analysis, evaluation, and comparison of latent prints and the basis for the conclusion (identification, exclusion, or inconclusive), the examiner will create a transparent record of the method and thereby provide the courts with additional information on which to assess the reliability of the method for a specific case. Currently, there is no requirement for examiners to document which features within a latent print support their reasoning and conclusions.

Error rate is a much more difficult challenge. Errors can occur with any judgment-based method, especially when the factors that lead to the ultimate judgment are not documented. Some in the latent print community argue that the method itself, if followed correctly (i.e., by well-trained examiners properly using the method), has a zero error rate. Clearly, this assertion is unrealistic, and, moreover, it does not lead to a process of method improvement. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g., errors in executing the process steps, as well as errors in human judgment).

Some scientific evidence supports the presumption that friction ridge patterns are unique to each person and persist unchanged throughout a lifetime.[34] Uniqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared.[35]

To properly underpin the process of friction ridge identification, additional research is also needed into ridge flow and crease pattern distributions on the hands and feet. This information could be used to limit the possible donor population of a particular print in a statistical approach and could provide examiners with a more robust understanding of the prevalence of different ridge flows and crease patterns. Additionally, more research is needed regarding the discriminating value of the various ridge formations and clusters of ridge formations.[36] This

---

[32] 157 N.H. 77, 945 A.2d 1 (N.H., April 04, 2008).

[33] No. K06-0545 (MD Cir. Ct. Oct. 19, 2007).

[34] F. Galton. 1892. *Fingerprints.* New York: MacMillan; H. Cummins and C. Midlo. 1943. *Finger Prints, Palms and Soles: An Introduction of Dermatoglyphics.* Philadelphia: The Blakiston Company; A. Hale. 1952. Morphogenesis of volar skin in the human fetus. *The American Journal of Anatomy* 91:147-173; S. Holt and L.S. Penrose. 1968. *The Genetics of Dermal Ridges.* Springfield, IL: Charles C. Thomas Publishing; W. Montagna and P. Parakkal. 1974. *The Structure and Function of Skin.* New York: Academic Press; J. Raser and E. O'Shea. 2005. Noise in gene expression: Origins, consequences, and control. *Science* 39:2010-2013.

[35] Some in the friction ridge community point to an unpublished 1999 study by the Lockheed-Martin Corporation, the "50K vs. 50K Fingerprint Comparison Test," as evidence of the scientific validity of fingerprint "matchup." But that study has several major design and analysis flaws, as pointed out in D.H. Kaye. 2003. Questioning a courtroom proof of the uniqueness of fingerprints. *International Statistical Review* 71(3):524. Moreover, even if it were valid, the study provides only a highly optimistic estimate of the reliability of friction ridge analyses, biased toward highly favorable conditions.

[36] Haber and Haber also provide a sensible research agenda for enhancing the validity of fingerprint comparisons.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1617

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

would provide examiners with a solid basis for the intuitive knowledge they have gained through experience and provide an excellent training tool. It also would lead to a good framework for future statistical models and provide the courts with additional information to consider when evaluating the reliability of the science. Recently, research has begun to build some of this basis.[37]

There is also considerable room for research on the various factors that affect the quality of latent prints (e.g., condition of the skin, residue, mechanics of touch). Formal research could provide examiners with additional tools to support or refute distortion explanations. Currently, distortion and quality issues are typically based on "common sense" explanations or on information that is passed down through oral tradition from examiner to examiner. A criticism of the latent print community is that the examiners can too easily explain a "difference" as an "acceptable distortion" in order to make an identification.[38]

## OTHER PATTERN/IMPRESSION EVIDENCE: SHOEPRINTS AND TIRE TRACKS

Other pattern evidence, also referred to as impression evidence, occurs when an object such as a shoe or a tire leaves an impression at the crime scene or on another object or a person. Impressions can be either two dimensional, such as shoeprints in dust, or three dimensional, such as tire track impressions in mud. Shoeprints and tire tracks are common types of impression evidence examined by forensic examiners, but the list of potential types of impression evidence is long. Examples include bite marks, markings on bullets and cartridge cases, ear prints, lip prints, toolmarks, some bloodstain patterns, and glove prints.[39] Although there are general approaches concerning the analytical sequence of various types of impression evidence, each has its own set of characteristics. For example, some types of impression evidence, such as those arising from footwear and tires, require knowledge of manufacturing and wear, while other types, such as ear prints and bloodstain patterns, do not. Because footwear and tire track impressions comprise the bulk of the examinations conducted, the remarks in this section are specifically focused on these analyses. Bite marks, markings on bullets and cartridge cases, and bloodstain patterns are covered in later sections in this chapter.

### Sample Data and Collection

Impression evidence at the scene is generally of two types: latent (invisible to the naked eye) or patent (visible). The quality of impression evidence left at the scene cannot be controlled, but failures in the initial scene work used to collect, preserve, and possibly enhance the evidence will degrade the quality of the evidence eventually used for comparative analysis. After documentation at the scene, the evidence is preserved and possibly enhanced using techniques such as those based on chemistry (e.g., metal detection), physical characteristics (e.g., super glue fuming, powder dusting, casting), or transfer onto a contrasting surface (e.g., electrostatic

---

[37] E.g., C. Neumann, C. Champod, R. Puch-Solis, N. Egli, A. Anthonioz, and A. Bromage-Griffiths. 2007. Computation of likelihood ratios in fingerprint identification for configurations of any number of minutiae. *Journal of Forensic Sciences* 52(1):54-64; N.M. Egli, C. Champod, and P. Margot. 2007. Evidence evaluation in fingerprint comparison and automated fingerprint identification systems—Modelling within finger variability. *Forensic Science International* 167(2-3):189-195.

[38] U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case.* Office of the Inspector General Oversight and Review Division, January.

[39] M. Liukkonen, H. Majamaa, and J. Virtanen. 1996. The role and duties of the shoeprint/toolmark examiner in forensic laboratories. *Forensic Science International* 82:99-108.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1618

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

transfer or gel lifting). The quality of the enhanced impression that is used for comparison will depend largely on the experience, training, and scientific knowledge of the scene investigator as well as the agency's resources.

Although some analysis of impression evidence might begin at the scene, the comparison of scene evidence to known exemplars occurs in the laboratory. The educational background of forensic scientists who examine shoeprints and tire track impressions runs the gamut from a high school diploma to scientists with Ph.D.s. Identifications are largely subjective and are based on the examiner's experience and on the number of individual, identifying characteristics in common with a known standard.

**Analyses**

The goal of impression evidence analysis is to identify a specific source of the impression, and the analytical process that this follows generally is an accepted sequence: identifying the class (group) characteristics of the evidence, followed by locating and comparing individual, identifying (also termed accidental or random) characteristics.[40]

Class characteristics of footwear and tires result from repetitive, controlled processes that are typically mechanical, such as those used to manufacture items in quantity. Although defined similarly by various authors, Bodziak describes footwear class characteristics as "an intentional or unavoidable characteristic that repeats during the manufacturing process and is shared by one or more other shoes."[41] For tires, Nause defines class characteristics as, "[p]hysical characteristics acquired during the manufacturing process (made from the same mold) that tires have in common."[42] He continues, "Class characteristics can often be combined to limit a tire impression to a very select group within the overall group bearing similar class characteristics. (In the field of forensic tire evidence, class characteristics often refer to such things as design, pattern, size, shape, mold variations, etc.)."[43] Regardless of the type of impression evidence, class characteristics are not sufficient to conclude that any one particular shoe or tire made the impression. That latter step—which is not always possible—requires comparison of the individual identifying characteristics on the impression evidence with those on a shoe or tire that is suspected of leaving the impression. These individual characteristics occur during the normal use of an item, sometimes called wear and tear,[44] and are created by "random, uncontrolled processes."[45] For footwear, Bodziak writes that "individual identifying characteristics are characteristics that result when something is randomly added to or taken away from a shoe outsole that either causes or contributes to making that shoe outsole unique."[46] Such characteristics might include cuts, scratches, gouges, holes, or random inclusions that result from manufacturing, such as bubbles, and those that result from adherent substances, such as rocks, chewing gum, papers, or twigs.

Following analysis of the impression, an identification is determined or ruled out according to the number of individual characteristics the evidence has in common with the

---

[40] Ibid.

[41] W.J. Bodziak. 1999. *Footwear Impression Evidence–Detection, Recovery, and Examination.* Boca Raton, FL:CRC Press, 2nd ed., p. 329.

[42] Nause, op. cit.

[43] Ibid.

[44] M.J. Cassidy. 1980. *Footwear Identification.* Quebec, Canada: Government Printing Office Centre.

[45] K. Inman and N. Rudin. 2001. *Principles and Practice of Criminalistics.* Boca Raton, FL:CRC Press, p. 129.

[46] Ibid., p. 335.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1619

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

suspected source. But there is no defined threshold that must be surpassed, nor are there any studies that associate the number of matching characteristics with the probability that the impressions were made by a common source. It is generally accepted that the specific number of characteristics needed to assign a definite positive identification depends on the quality and quantity of these accidental characteristics and the criteria established by individual laboratories.[47] According to Cassidy, many factors and accidental characteristics are required before a positive identification can be established; however, the most important are the examiner's experience, the clarity of the impression, and the uniqueness of the characteristic.[48] Proficiency testing for examiners of impression evidence is available through Collaborative Testing Service, Inc., but the proficiency tests for footwear impressions include samples that are either a match or not a match[49]—that is, none of the samples included in the tests have the sort of ambiguities that would lead an experienced examiner to an "inconclusive" conclusion. IAI has a certification program for footwear and tire track examiners.[50] The group's recommended course of study has 13 segments, and each segment includes a suggested reading list and practical and/or written exercises. The student must pass an examination. This course of study does not require an understanding of the scientific basis of the examinations, and it does not recommend the use of a scientific method. Also, there is no provision or recommendation for proficiency testing or continuing education. SWGTREAD, a group of footwear and tire track examiners formed by the FBI, recommends that a trainee candidate have (1) a bachelor's degree (preferably in a physical or natural science) from an accredited college or university; or (2) an associate degree or 60 college semester hours, plus two years of job-related forensic experience; or (3) a high school diploma or equivalent, plus four years of job-related forensic experience.[51]

**Scientific Interpretation and Reporting of Results**

For footwear evidence, Fawcett[52] and Bodziak[53] have attempted to assign probabilistic or statistical significance to impression comparisons. Generally, shoeprint and tire track examiners prefer nonstatistical language to report or to testify to the result of their findings. Terms such as "positive identification" and "nonidentification" can be used to indicate an identification or nonidentification, respectively, and "nonconclusive" would indicate situations in which the analysis falls short of either of the other two.[54]

In a European survey, examiners were given identical mock cases. Accidental, identifying characteristics were purposely put onto the sole of new shoes, and examiners were asked to make a statement concerning the strength of matches. The results of the survey concluded that there were considerable differences in the conclusions reached by different laboratories examining identical cases."[55] SWGTREAD recommends terminology such as:

---

[47] Liukkonen, Majamaa, and Virtanen, op. cit.

[48] Cassidy, op. cit.

[49] H. Majamaa and Y. Anja. 1996. Survey of the conclusions drawn of similar footwear cases in various crime laboratories. *Forensic Science International* 82:109-120.

[50] Recommended Course of Study for Footwear & Tire Track Examiners. 1995. Mendota Heights, MN: International Association for Identification.

[51] SWGTread. *Guide for Minimum Qualifications and Training for a Forensic Footwear and/or Tire Tread Examiner.* Available at www.theiai.org/guidelines/swgtread/qualifications_final.pdf.

[52] A.S. Fawcett. 1970. The role of the footmark examiner. *Journal of the Forensic Science Society* 10:227-244.

[53] Bodziak, op. cit., pp. 342-346.

[54] Ibid.

[55] H. Majamaa and Y. Anja., op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1620

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

- "identification" (definite conclusion of identity)
- "probably made" (very high degree of association)
- "could have made" (significant association of multiple class characteristics)
- "inconclusive" (limited association of some characteristics)
- "probably did not make" (very high degree of nonassociation)
- "elimination" (definite exclusion)
- "unsuitable" (lacks sufficient detail for a meaningful comparison).

Additionally, SWGTREAD discourages the use of once common terminology, such as "consistent with" (acceptable when used to describe a similarity of characteristics), "match/no match," "responsible for/not responsible for," and "caused with/not caused with."[56] Neither the IAI nor SWGTREAD address the statistical evaluation of impression evidence.

**Summary Assessment**

The scientific basis for the evaluation of impression evidence is that mass-produced items (e.g., shoes, tires) pick up features of wear that, over time, individualize them. However, because these features continue to change as they are worn, elapsed time after a crime can undercut the forensic scientist's certainty. At the least, class characteristics can be identified, and with sufficiently distinctive patterns of wear, one might hope for specific individualization. However, there is no consensus regarding the number of individual characteristics needed to make a positive identification, and the committee is not aware of any data about the variability of class or individual characteristics or about the validity or reliability of the method. Without such population studies, it is impossible to assess the number of characteristics that must match in order to have any particular degree of confidence about the source of the impression.

Experts in impression evidence will argue that they accumulate a sense of those probabilities through experience, which may be true. However, it is difficult to avoid biases in experience-based judgments, especially in the absence of a feedback mechanism to correct an erroneous judgment. These problems are exacerbated with the less common types of impression evidence. For example, a European survey found that 42 laboratories conducted 28,093 shoeprint examinations and 41 laboratories conducted 591 tire track examinations, but only 14 laboratories conducted a total of 21 lip print examinations and 17 laboratories conducted a total of 100 ear print examinations.[57] Although one might argue that those who perform the work in laboratories that conduct hundreds or thousands of evaluations of impression evidence develop useful experience and judgment, it is difficult to assert that the field has enough collective judgment about the variabilities in lip prints and ear prints based on tens of examinations. The community simply does not have enough data about the natural variability of those less frequent impressions, absent the presence of a clear deformity or scar, to infer whether the observed degree of similarity is significant.

Most of the research in the field is conducted in forensic laboratories, with the results published in trade journals, such as the *Journal of Forensic Identification*. With regard to reporting, SWGTREAD is moving toward the use of standard language to convey the conclusions reached.[58] But neither IAI nor SWGTREAD addresses the issue of what critical

---

[56] SWGTREAD. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations*. Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

[57] Liukkonen, Majamaa, and Virtanen, op. cit.

[58] SWGTREAD. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations*. Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1621

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

research should be done or by whom, critical questions that should be addressed include the persistence of individual characteristics, the rarity of certain characteristic types, and the appropriate statistical standards to apply to the significance of individual characteristics. Also, little if any research has been done to address rare impression evidence. Much more research on these matters is needed.

## TOOLMARK AND FIREARMS IDENTIFICATION

Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used or when the internal parts of a firearm make contact with the brass and lead that comprise ammunition. The marks left by an implement such as a screwdriver or a firearm's firing pin depend largely on the manufacturing processes—and manufacturing tools—used to create or shape it, although other surface features (e.g., chips, gouges) might be introduced through post-manufacturing wear. Manufacturing tools experience wear and abrasion as they cut, scrape, and otherwise shape metal, giving rise to the theory that any two manufactured products—even those produced consecutively with the same manufacturing tools—will bear microscopically different marks. Firearms and toolmark examiners believe that toolmarks may be traced to the physical heterogeneities of an individual tool—that is, that "individual characteristics" of toolmarks may be uniquely associated with a specific tool or firearm and are reproduced by the use of that tool and only that tool.

The manufacture and use of firearms produces an extensive set of specialized toolmarks. Gun barrels typically are rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior. The process of cutting these grooves into the barrel leaves marks and scrapes on the relatively softer metal of the barrel.[59] In turn, these markings are transferred to the softer metal of a bullet as it exits the barrel. Over time, with repeated use (and metal-to-metal scraping), the marks on a barrel (and the corresponding "stria" imparted to bullets) may change as individual imperfections are formed or as cleanliness of the barrel changes. The brass exterior of cartridge cases receive analogous toolmarks during the process of gun firing: the firing pin dents the soft primer surface at the base of the cartridge to commence firing, the primer area is forced backward by the buildup of gas pressure (so that the texture of the gun's breech face is impressed on the cartridge), and extractors and ejectors leave marks as they expel used cartridges and cycle in new ammunition.

Firearms examination is one of the more common functions of crime laboratories. Even small laboratories with limited services often perform firearms analysis. In addition to the analysis of marks on bullets and cartridges, firearms examination also includes the determination of the firing distance, the operability of a weapon, and sometimes the analysis of primer residue to determine whether someone recently handled a weapon. These broader aspects are not covered here.

### Sample and Data Collection

When a tool is used in a crime, the object that contains the tool marks is recovered when possible. If a toolmark cannot be recovered, it can be photographed and cast. Test marks made by recovered tools can be made in a laboratory and compared with crime scene toolmarks.

---

[59] Although the metal and initial rifling are very similar, the cutting of the individual barrels, the finishing machining, and the cleaning and polishing begin the process of differentiation of the two sequentially manufactured barrels.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1622

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

In the early 1990s, the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed separate databases of images of bullet and cartridge case markings, which could be queried to suggest possible matches. In 1996, the National Institute of Standards and Technology (NIST) developed data exchange standards that permitted the integration of the FBI's DRUGFIRE database (cartridge case images) and the ATF's CEASEFIRE database (then limited to bullet images). The current National Integrated Ballistic Information Network (NIBIN) includes images from both cartridge cases and bullets that are associated with crime scenes and is maintained by the ATF.

Periodically—and particularly in the wake of the Washington, D.C. sniper attacks in 2002—the question has been raised of expanding the scope of databases like NIBIN to include images from test firings of newly manufactured firearms. In concept, this would permit downstream investigators who recover a cartridge case or bullet at a crime scene to identify the likely source firearm. Though two states (Maryland and New York) instituted such reference ballistic image databases for newly manufactured firearms, proposals to create such a database at the national level did not make substantial progress in Congress. A recent report of the National Academies, *Ballistic Imaging*, examined this option in great detail and concluded that "[a] national reference ballistic image database of all new and imported guns is not advisable at this time."[60]

**Analyses**

In both firearm and toolmark identification, it is useful to distinguish several types of characteristics that are considered by examiners. "Class characteristics" are distinctive features that are shared by many items of the same type. For example, the width of the head of a screwdriver or the pattern of serrations in the blade of a knife may be class characteristics that are common to all screwdrivers or knives of a particular manufacturer and/or model. Similarly, the number of grooves cut into the barrel of a firearm and the direction of "twist" in those grooves are class characteristics that can filter and restrict the range of firearms that match evidence found at a crime scene. "Individual characteristics" are the fine microscopic markings and textures that are said to be unique to an individual tool or firearm. Between these two extremes are "subclass characteristics" that may be common to a small group of firearms and that are produced by the manufacturing process, such as when a worn or dull tool is used to cut barrel rifling.

Bullets and cartridge cases are first examined to determine which class characteristics are present. If these differ from a comparison bullet or cartridge, further examination may be unnecessary. The microscopic markings on bullets and cartridge cases and on toolmarks are then examined under a comparison microscope (made from two compound microscopes joined by a comparison bridge that allows viewing of two objects at the same time). The unknown and known bullet or cartridge case or toolmark surfaces are compared visually by a firearms examiner, who can evaluate whether a match exists.

**Scientific Interpretation**

The task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm.

---

[60] National Research Council. 2008. *Ballistic Imaging.* Washington, D.C.: The National Academies Press, p. 5.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1623

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

Guidance from the Association of Firearm and Tool Mark Examiners (AFTE)[61] indicates that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a particular bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. The standards then define agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool."[62]

Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same tool, is a challenging task. AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training. In earlier years, toolmark examiners relied on their past casework to provide a foundation for distinguishing between individual, class, and subclass characteristics. More recently, extensive training programs using known samples have expanded the knowledge base of examiners.

The emergence of ballistic imaging technology and databases such as NIBIN assist examiners in finding possible candidate matches between pieces of evidence, including crime scene exhibits held in other geographic locations. However, it is important to note that the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images. The growth of these databases also permits examiners to become more familiar with similarities in striation patterns made by different firearms. Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates.[63] The National Academies report, *Ballistic Imaging*, while not claiming to be a definitive study on firearms identification, observed that, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." That study recognized the logic involved in trying to compare firearms-related toolmarks by noting that, "Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun," but it cautioned that, "A significant amount of

---

[61] Theory of identification, range of striae comparison reports and modified glossary definitions—An AFTE Criteria for Identification Committee report. 1992. *Journal of the Association of Firearm and Tool Mark Examiners.* 24:336-340.

[62] Ibid., p. 336.

[63] Recent research has attempted to develop a statistical foundation for assessing the likelihood that more than one tool could have made specific marks by assessing consecutive matching striae, but this approach is used in a minority of cases. See A.A. Biasotti. 1959. A statistical study of the individual characteristics of fired bullets. *Journal of Forensic Sciences* 4:34; A.A. Biasotti and J. Murdock. 1984. "Criteria for identification" or "state of the art" of firearms and tool marks identification. *Journal of the Association of Firearms and Tool Mark Examiners* 16(4):16; J. Miller and M.M. McLean. 1998. Criteria for identification of tool marks. *Journal of the Association of Firearms and Tool Mark Examiners* 30(1):15; J.J. Masson. 1997. Confidence level variations in firearms identification through computerized technology. *Journal of the Association of Firearms and Tool Mark Examiners* 29(1):42. For a critique of this area and a comparison of scientific issues involving toolmark evidence and DNA evidence, see A. Schwartz. 2004-2005. A systemic challenge to the reliability and admissibility of firearms and tool marks identification. *Columbia Science and Technology Law Review* 6:2. For a rebuttal to this critique, see R.G. Nichols. 2007. Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges. *Journal of Forensic Sciences* 52(3):586-594.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1624

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."[64]

**Summary Assessment**

Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited. For example, a report from Hamby, Brundage, and Thorpe[65] includes capsule summaries of 68 toolmark and firearms studies. But the capsule summaries suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability. Overall, the process for toolmark and firearms comparisons lacks the specificity of the protocols for, say, 13 STR DNA analysis. This is not to say that toolmark analysis needs to be as objective as DNA analysis in order to provide value. And, as was the case for friction ridge analysis and in contrast to the case for DNA analysis, the specific features to be examined and compared between toolmarks cannot be stipulated a priori. But the protocols for DNA analysis do represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science.

---

[64] All quotes from National Research Council. 2008. *Ballistic Imaging*. Washington, D.C.: The National Academies Press, p. 3.

[65] J.E. Hamby, D.J. Brundage, and J.W. Thorpe. The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels—A research project involving 468 participants from 19 countries. Available online at http://www.fti-ibis.com/DOWNLOADS/Publications/10%20Barrel%20Article-%20a.pdf.

5-21

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1625

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

## ANALYSIS OF HAIR EVIDENCE

The basis for hair analyses as forensic evidence stems from the fact that human and animal hairs routinely are shed and thus are capable of being transferred from an individual to the crime scene, and from the crime scene to an individual. Forensic hair examiners generally recognize that various physical characteristics of hairs can be identified and are sufficiently different among individuals that they can be useful in including, or excluding, certain persons from the pool of possible sources of the hair. The results of analyses from hair comparisons typically are accepted as class associations; that is, a conclusion of a "match" means only that the hair could have come from any person whose hair exhibited—within some levels of measurement uncertainties—the same microscopic characteristics, but it cannot uniquely identify one person. However, this information might be sufficiently useful to "narrow the pool" by excluding certain persons as sources of the hair.

Although animal hairs might provide useful evidence in certain cases (e.g., animal poaching), animal hair analysis often can lead to an identification of only the type of animal, not the specific breed[66]; consequently, most (90 to 95 percent) of hair analyses refer to analyses of human hair. Human hairs from different parts of the body have different characteristics; Houck cautions strongly against drawing conclusions about hairs from one part of the body based on analyses of hairs from a different body part.[67]

Houck and Bisbing recommend as minimal training for hair examiners a bachelor's degree in a natural or applied science (e.g., chemistry, biology, forensic science), on-the-job training programs, and an annual proficiency test.[68]

### Sample Data and Collection

Sample hairs received for analysis initially are examined macroscopically for certain broad features such as color, shaft form (e.g., straight, wavy, curved, kinked), length, and overall shaft thickness (e.g., fine, medium, coarse).

In the second stage of analysis, hairs are mounted on microscopic slides using a mounting medium that has the same refractive index (about 1.54) as the hair, to better view the microscopic features (see next section). One hair or multiple hairs from the same source may be mounted on a glass microscope slide with an appropriate cover slip, as long as each mounted hair is clearly visible. It is most important that questioned and known hairs are mounted in the same type of mounting medium.

During this examination, the hair analyst attempts to identify the part of the body from which the hair might have come, based on certain definable characteristics that distinguish hairs from various body locations. Occasionally, suspects can be eliminated on the basis of these simple microscopic characteristics.

A "control" or "comparison" group of hairs must be collected from a known hair source. A known head hair sample should consist of hairs from the five different areas of the scalp (top, front, back including nape, and both sides). Known hair samples should be obtained by a combination of pulling and combing from the sampled region. Ideally, a total of 50 hairs should be obtained from the scalp. A known pubic hair sample or a sample from any other somatic

---

[66] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.

[67] M.M. Houck and R.E. Bisbing. 2005. Forensic human hair examination and comparison in the 21st century. *Forensic Science Review* 17(1):7.

[68] Ibid., p. 12.

5-22

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1626

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

region should ideally consist of 25 hairs obtained by pulling and combing from different regions. A comparison can still be performed with less than the recommended number of hairs, but this may increase the likelihood of a false exclusion.[69]

Features from human hair analyses can be divided broadly into "major characteristics" and "secondary characteristics." The former category includes features such as color, treatment (e.g., dyed, bleached, curled, permed), pigment aggregation (e.g., streaked, clumped, patchy), and shaft form (e.g., wavy, straight, curly). Other major characteristics may include pigment distribution (e.g., uniform, peripheral, clustered), medulla appearance, if present (e.g., continuous, interrupted, or fragmented—and opaque or translucent), hair diameter, medullary index, and presence or absence of cortical fusi (e.g., root or shaft). Secondary characteristics include cuticular margin (e.g., smooth, serrated, looped, or cracked), pigment density (e.g., absent, sparse, heavy), pigment size (e.g., absent, fine, coarse), tip shape (e.g., tapered, cut, rounded, frayed, split), and shaft diameter (e.g., narrow or wide).[70]

**Studies of Accuracy in Identification**

In 1974, investigators Gaudette and Keeping described a system of hair analysis and used it in a study of pairwise comparisons among 861 hairs from 100 different persons.[71] They acknowledged that "the hair samples were not chosen from the population at random, but were selected so that the probability of two hairs being similar would be greater, if anything, than in the population at large."[72] From their assignment of probabilities, the authors estimated that the chance of asserting a difference between two hairs from the same person is small, about 1 in 4,500.[73] This assignment of probabilities has since been shown to be unreliable.[74] Moreover, the study does not confirm the chance of asserting a match between two dissimilar hairs, and the authors acknowledge that, "due to the fact that so many of the characteristics coded are subjective—for example, color, texture—it was not possible to get complete reproducibility between two or more examiners coding the same hair."[75]

Barnett and Ogle raised four concerns with the Gaudette and Keeping study: (1) it relied on idealized (not from real life) test scenarios; (2) there was no objective basis for selecting the features; (3) the statistical analysis of data from the study was questionable; and (4) there was a possible examiner bias.[76] Gaudette attempted to address these concerns through a further study. However, this additional study involved only three hair examiners, in addition to the author. The author concluded that:

> . . . whereas hair is not generally a basis for positive personal identification, the presence of abnormalities or unusual features or the presence of a large number of

---

[69] Scientific Working Group on Materials Analysis (SWGMAT). 2005. Forensic human hair examination guidelines. *Forensic Science Communications* 7(2). Available at www.fbi.gov/hq/lab/fsc/backissu/april2005/standards/2005_04_standards02.htm.

[70] Ibid.

[71] B.D. Gaudette and E.S. Keeping. 1974. An attempt at determining probabilities in human scalp hair comparison. *J. Forensic Sciences* 19(3):599-606.

[72] Ibid., p. 65.

[73] A later study on human pubic hairs (Caucasian only) estimated this probability as "about 1 in 800." B.D. Gaudette. 1976. Probabilities and human pubic hair comparisons. *Journal of Forensic Sciences* 21(3):514-517.

[74] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.

[75] Gaudette and Keeping, op. cit.

[76] Barnett and Ogle, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1627

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

different unknown hairs all similar to the standard can lead to a more positive conclusion. The problem, at present, lies in finding suitable additional characteristics [of hair, for effecting individualization]. Although there is basic agreement as to the value of the macroscopic and microscopic characteristics used, other characteristics are either unreliable or controversial. Physical characteristics such as refractive index, density, scale counts, tensile strength, and electrical properties have been proposed by some workers but have been attacked by others, and the general consensus is that they are of little use in hair comparison.[77]

In 1990, Wickenheiser and Hepworth attempted a study to address examiner bias in a small study with only two examiners. They reported that "no incorrect associations were made by either examiner."[78] But a study with only two examiners cannot offer accurate and precise estimates of bias in the population of examiners.

An attempt at an objective system for identifying "matches" among hair samples is presented in Verma et al., based on a neural network.[79] According to the authors of this article, "The system accurately judged whether two populations of hairs came from the same person or from different persons 83% of the time."[80] The article states that 83 percent was obtained by testing the neural network on all possible pairs among 9 samples of hairs from 9 people (i.e., 81 combinations, of which 9 are "true matches" and 72 are "true mis-matches"). Their *Table 3*[81] can be summarized as follows:

|  | System said "same" | System said "different" |  |
|---|---|---|---|
| Same person | 5 | 4 | Total= 9 |
| Different persons | 9 | 64 | Total=73 |

Because the total of these 4 numbers is 82, not 81, one presumes a typographical error in the table; as stated, the number of correct calls is $(5 + 64)/81=0.85$, or 85 percent. (If one of the counts, 5 or 64, is off by 1, the percentage would be 84 percent.) However, the table also shows that the neural network claimed 9 of the 73 different pairs as "same," for a false positive rate of $9/73=12$ percent, and 4 sets of hairs from the same person as "different," for a false negative rate of $4/9=44$ percent. With such high error rates, one would want to study improvements to such systems before putting them into routine practice.

Houck et al. indicate that proficiency testing is conducted regularly for hair experts in crime laboratories.[82] Collaborative Testing Services[83] offers hair and fiber proficiency tests

---

[77] B.D. Gaudette. 1978. Some further thoughts on probabilities and human hair comparisons. *Journal of Forensic Sciences* 23(4):758-763, pp. 761-762.

[78] Wickenheiser and Hepworth, op. cit., p. 1327.

[79] M.S. Verma, L. Pratt, C. Ganesh, and C. Medina. 2002. Hair-MAP: A prototype automated system for forensic hair comparison and analysis. *Forensic Science International* 129:168-186.

[80] Ibid., page

[81] Ibid., page 180.

[82] M.M. Houck, R.E. Bisbing, T.G. Watkins, and R.P. Harman. 2004. Locard exchange: The science of forensic hair comparisons and the admissibility of hair comparison evidence: *Frye* and *Daubert* considered. *Modern Microscopy Journal* Available at www.modernmicroscopy.com/main.asp?article=36&searchkeys=Houck%2BBisbing.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1628

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

annually. Unfortunately, mass production of test samples such as hair is problematic. Because known samples exhibit a range of characteristics within each of the major and secondary characteristics, it is not possible to provide comparable samples to multiple examiners.

### Scientific Interpretation and Reporting of Results

The success of hair analyses to make a positive identification is limited in important ways. Most hair examiners would opine only that hairs exhibiting the same microscopic characteristics "could" have come from a particular individual. Moreover, the "best" or most reliable characteristics will vary by case. For example, "color" may be a critical determinant in a case where it is artificial, because that introduces additional independent variables, such as the time since treatment and the actual hair color, while a natural hair might provide less information.

However, several members of the committee have experienced courtroom cases in which, despite the lack of a statistical foundation, microscopic hair examiners have made probabilistic claims based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial. Aitken and Robertson discuss some probabilistic concepts with respect to hair analysis.[84]

The availability of DNA analysis has lessened the reliance on hair examination. In a very high proportion of cases involving hair evidence, DNA can be extracted, even years after the crime has been committed. Although the DNA extraction may consist of only mitochondrial DNA (mtDNA), such analyses are likely to be much more specific than those conducted on the physical features of hair. For this reason, cases that might have relied heavily on hair examinations have been subjected more recently to additional analyses using DNA.[85] Because of the inherent limitations of hair comparisons and the availability of higher-quality and higher-accuracy analyses based on mtDNA, traditional hair examinations may be presented less often as evidence in the future, although microscopic comparison of physical features will continue to be useful for determining which hairs are sufficiently similar to merit comparisons with DNA analysis and for excluding suspects and assisting in criminal investigations.

### Summary Assessment

No scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population. There appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a "match." In one study of validity and accuracy of the technique, the authors required exact agreement on seven "major" characteristics and at least two agreements among six "secondary" characteristics.[86] The categorization of hair features depends heavily on examiner proficiency and practical experience.

An FBI study found that, of 80 hair comparisons that were "associated" through microscopic examinations, 9 of them (12.5 percent) were found in fact to come from different

---

[83] See www.collaborativetesting.com.
[84] C.G.G. Aitken and J.A. Robertson. 1986. A contribution to the discussion of probabilities and human hair comparisons. *Journal of Forensic Sciences* 32(3):684-689.
[85] M.M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5): 964-967.
[86] R.A. Wickenheiser and D.G. Hepworth. 1990. Further evaluation of probabilities in human hair comparisons. *Journal of Forensic Sciences* 35(6):1323-1329.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1629

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES -- PREPUBLICATION COPY**

sources when reexamined through mtDNA analysis.[87] This illustrates not only the imprecision of microscopic hair analyses, but also the problem with using imprecise reporting terminology such as "associated with," which is not clearly defined and which can be misunderstood to imply individualization.

In some recent cases, courts have explicitly stated that microscopic hair analysis is a technique generally accepted in the scientific community.[88] But courts also have recognized that testimony linking microscopic hair analysis with particular defendants is highly unreliable.[89] In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value. The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA. Microscopy and mtDNA analysis can be used in tandem and may add to one another's value for classifying a common source, but no studies have been performed specifically to quantify the reliability of their joint use.

## ANALYSIS OF FIBER EVIDENCE

Fibers associated with a crime—including synthetic fibers such as nylon, polyester and acrylic as well as botanical fibers such as ramie or jute, which are common in ropes or twines—can be examined microscopically in the same way as hairs, and with the same limitations. However, fibers also can be analyzed using the tools of analytical chemistry, which provide a more solid scientific footing than that underlying morphological examination. In some cases, clothing and carpets have been subjected to relatively distinctive environmental conditions (e.g., sunlight exposure or laundering agents) that impart characteristics that can distinguish particular items from others from the same manufacturing lot. Fiber examiners agree, however, that none of these characteristics is suitable for individualizing fibers (associating a fiber from a crime scene with one, and only one, source) and that fiber evidence can be used only to associate a given fiber with a class of fibers.[90]

Another type of fiber analysis consists of physically matching two remnants that appear to be torn from one another. By comparing the shapes of the mating edges, and aligning any patterns in the cloth, it can sometimes be possible to associate a fragment with the garment or other item from which it was torn. This is a form of pattern matching, analogous to the matching of shoe and tire prints, but it will not be discussed further here.

### Sample Collection and Analysis

The collection of fibers and of a comparison group follows the same procedures as those for mounting hairs. If a macroscopic analysis (e.g., or color, texture, shape) suggests that the two samples appear to be the same, additional procedures such as the following are pursued:

---

[87] Houck and Budowle, op. cit.

[88] E.g., *State v. West*, 877 A.2d 787 (Conn. 2005); *Bookins v. State*, 922 A.2d 389 (Del. Supr, 2007).

[89] See P.C. Giannelli and E. West. 2001. Hair comparison evidence. *Criminal Law Bulletin* 37:514.

[90] See, e.g., R.R. Bresee. 1987. Evaluation of textile fiber evidence: A review. *Journal of Forensic Sciences* 32(2):510-521. See also SWGMAT. 1999. Introduction to forensic fiber examination. *Forensic Science Communications* 1(1), available at www.fbi.gov/hq/lab/fsc/backissu/april1999/houcktoc.htm, which includes the following summarization in Section 5.4: "It can never be stated with certainty that a fiber originated from a particular textile because other textiles are produced using the same fiber types and color. The inability to positively associate a fiber to a particular textile to the exclusion of all others, however, does not mean that a fiber association is without value."

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1630

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

1. Microscopy (reflected light)
2. Polarized light microscopy/fluorescence microscopy
3. Infrared microscopy (to determine man-made fiber composition, such as nylon, polyester)
4. Solubility in a medium
5. Melting point
6. Cross-sectional shape
7. Pyrolysis GC
8. Microspectrophotometry (MSP)
9. Raman spectroscopy

The last of these, Raman spectroscopy, often can provide additional information on polymer chain length (short, medium, long) and branching. Its use in forensic laboratories is rare, although research is under way to develop possible applications. A good overview of fiber evidence is provided by Grieve and Robertson.[91]

**Summary Assessment**

A group of experienced paint examiners, the Paint Subgroup of the Scientific Working Group on Materials Analysis (SWGMAT), has produced guidelines,[92] but no set standards, for the number and quality of characteristics that must correspond in order to conclude that two fibers came from the same manufacturing batch. There have been no studies of fibers (e.g., the variability of their characteristics during and after manufacturing) on which to base such a threshold. Similarly, there have been no studies to inform judgments about whether environmentally related changes discerned in particular fibers are distinctive enough to reliably individualize their source, and there have been no studies that characterize either reliability or error rates in the procedures. Thus, a "match" means only that the fibers could have come from the same type of garment, carpet, or furniture; it can provide only class evidence.

Because the analysis of fibers is made largely through well-characterized methods of chemistry, it would be possible in principle to develop an understanding of the uncertainties associated with those analyses.[93] However, to date, that has not been done. Fiber analyses are reproducible across laboratories because there are standardized procedures for such analyses. Proficiency tests are routinely provided and taken annually, and the reports are available from Collaborative Testing Services.

## QUESTIONED DOCUMENT EXAMINATION[94]

Questioned document examination involves the comparison and analysis of documents and printing and writing instruments in order to identify or eliminate persons as the source of the handwriting; to reveal alterations, additions, or deletions; or to identify or eliminate the source of typewriting or other impression marks. Questions about documents arise in business, finance,

[91] M. Grieve and J. Robertson. 1999. *Forensic Examination of Fibres*. London: Taylor and Francis Ltd.
[92] SWGMAT, op. cit. Available at www.fbi.gov/hq/lab/fsc/backissu/april1999/houcktoc.htm.
[93] Some relevant questions to be addressed are identified in Bresee, op. cit.
[94] This discussion is primarily based on *Standard Descriptions of Scope of Work Relating to Forensic Document Examiners (ASTM Designation E 444-98), Standard Guide for Test Methods for Forensic Writing Ink Comparison (ASTM Designation E 1422-01), Standard Guide for Writing Ink Identification (ASTM Designation E 1789-04)*, and *Standard Guide for Examination of Handwritten Items (ASTM Designation E 2290-03)*.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1631

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

and civil and criminal trials, and in any matter affected by the integrity of written communications and records. Typical analyses include:

- determining whether the document is the output of mechanical or electronic imaging devices such as printers, copying machines, and facsimile equipment;
- identifying or eliminating particular human or machine sources of handwriting, printing, or typewriting;
- identifying or eliminating ink, paper, and writing instrument;
- establishing the source, history, sequence of preparation, alterations or additions to documents, and relationships of documents;
- deciphering and restoring obscured, deleted, or damaged parts of documents;
- recognizing and preserving other physical evidence that may be present in documents; and
- determining the age of a document.

Questioned document examiners are also referred to as forensic document examiners or handwriting experts; questioned document examination includes the field of handwriting identification, while handwriting includes cursive or script style writing, printing by hand, signatures, numerals, or other written marks or signs. Forensic document examination does not involve a study of handwriting that purports to create a personality profile or otherwise analyze or judge the writer's personality or character.

### Analyses

Equipment used in questioned document examination includes microscopes and other optical aids, photographic and other imaging devices, and a wide variety of imaging materials adaptable for use with numerous lighting methods, including those involving ultraviolet, visible, and infrared light, and other regions of the electromagnetic spectrum. Software tools recently have become available for the analysis of handwriting.[95] The analysis of papers and inks is similar to other forensic chemistry work. The principal procedures used for ink examination are nondestructive optical examinations and chemical examinations. Optical examinations include those that use visible and alternative light sources—for example, determining whether the class of ink is ballpoint pen; using ultraviolet examination to reveal indications that a document has been stained by chemicals; and employing reflected infrared to observe luminescence at different wavelengths. Chemical examination includes spot testing during which solvents are applied in small amounts to the ink line. For example, ballpoint inks, which are either oil based or glycol based, are highly soluble in pyridine. Inks formulated for fountain pens, porous point pens, and roller pens generally are water soluble in ethanol and water. Indelible markers are solvent based and generally would be soluble in pyridine.

Ink examination can have one of two objectives: class identification—for which the intention is to identify the ink formula or type based on a reference library of samples of inks—and comparison, for which the goal is to compare two ink samples to determine whether they are of common origin. Ink comparisons usually are performed to answer four basic categories of questions: (1) whether an ink is the same (in formula) as that on other parts of the same

---

[95] For an overview, see S.N. Srihari and G. Leedham. 2003. A survey of computer methods in forensic document examination. *Proceedings of the 11th International Graphonomics Society Conference*, pp. 278-281. Available at www.ntu.edu.sg/sce/labs/forse/PDF/docExam_7.pdf.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1632

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

document or on other documents; (2) whether two writings with similar ink have a common origin (e.g., the same writing instrument or ink well); (3) whether the ink of entries over a period of time is consistent with varying ages or indicates preparation at one time; and (4) whether ink is as old as it purports to be.

Most problems with ink examinations arise from confounding factors that interact with the ink. These can be part of the writing process, such as blotting wet ink; variations in the papers; various forms of contamination on the document; or a combination of these factors. Most ink examinations must be performed on paper and without defacing the handwriting, and this creates a number of sampling and analytical challenges.

The examination of handwritten items typically involves the comparison of a questioned item submitted for examination along with a known item of established origin associated with the matter under investigation. Requirements for comparison are that the writing be of the same type (handwritten/cursive versus hand printed) and that it be comparable text (similar letter/word combinations). Special situations involving unnatural writing are forgery (an attempt to imitate/duplicate the writing of another person) and disguise (an attempt to avoid identification as the writer). The basis for comparison is that handwriting/handprinting/numerals can be examined to obtain writing characteristics (also referred to as features or attributes). The characteristics are further classified into class characteristics (the style that the writer was taught), individual characteristics (the writer's personal style), and gross/subtle characteristics.

Specific attributes used for comparison of handwriting are also referred to as discriminating elements, of which Huber and Headrick have identified 21.[96] Comparisons are based on the high likelihood that no two persons write the same way, while considering the fact that every person's writing has its own variabilities. Thus, an analysis of handwriting must compare interpersonal variability—some characterization of how handwriting features vary across a population of possible writers—with intrapersonal variability—how much an individual's handwriting can vary from sample to sample. Determining that two samples were written by the same person depends on showing that their degree of variability, by some measure, is more consistent with intrapersonal variability than with interpersonal variability. Some cases of forgery are characterized by signatures with too little variability, and are thus inconsistent with the fact that we all have intrapersonal variability in our writing.

**Scientific Interpretation and Reporting of Results**

Terminology has been developed for expressing the subjective conclusions of handwriting comparison and identification, taking into account that there are an infinite number of gradations or opinions toward an identification or elimination. Several scales, such as a five-point scale and a nine-point scale, are used by questioned document examiners worldwide. The nine-point scale is as follows:

1. Identification (a definite conclusion that the questioned writing matches another sample)
2. Strong probability (evidence is persuasive, yet some critical quality is missing)
3. Probable (points strongly towards identification)
4. Indications [that the same person] did [create both samples] (there are a few significant features)

---

[96] R.A. Huber and A. M. Headrick. 1999. *Handwriting Identification: Facts and Fundamentals.* Boca Raton, FL: CRC Press.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1633

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

5. No conclusion (used when there are limiting factors such as disguise, or lack of comparable writing)
6. Indications [that the same person] did not [create both samples] (same weight as indications with a weak opinion)
7. Probably did not (evidence is quite strong)
8. Strong probably did not (virtual certainty)
9. Elimination (highest degree of confidence)[97]

**Summary Assessment**

The scientific basis for handwriting comparisons needs to be strengthened.[98] Recent studies have increased our understanding of the individuality and consistency of handwriting and computer studies[99] and suggest that there may be a scientific basis for handwriting comparison, at least in the absence of intentional obfuscation or forgery. Although there has been only limited research to quantify the reliability and replicability of the practices used by trained document examiners, the committee agrees that there may be some value in handwriting analysis.

Analysis of inks and paper, being based on well-understood chemistry, presumably rests on a firmer scientific foundation. However, the committee did not receive input on these fairly specialized methods and cannot offer a definitive view regarding the soundness of these methods or of their execution in practice.

## ANALYSIS OF PAINT AND COATINGS EVIDENCE

Paint is a suspension of solid pigments in a polymeric binder that, after application by brushing, spraying, dipping, or other means, forms a protective and/or decorative coating. When two objects come in contact with one another and at least one of these objects is painted, a transfer of paint may occur. This transferred paint can be compared to the paint located near the point of damage to determine if the two samples have a common origin. Painted surfaces tend to be repainted over time, providing a characteristic history of layer sequence. Painted surfaces are encountered frequently at crime scenes in the form of vehicles, architectural structures, tools, bicycles, boats, and many other items. The results of the examinations often are valuable both during the investigation and as evidence if a trial results. Paint examinations by their nature can be useful in suggesting possible connections of evidence from the crime scene to its source and therefore are helpful in narrowing or excluding possible witnesses and suspects as well as in providing useful information for investigative leads.

---

[97] *Standard Terminology for Expressing Conclusions of Forensic Document Examiners, ASTM Designation E 1658-04.*

[98] M. Kam, G. Fielding, and R. Conn. 1997. Writer identification by professional document examiners. *Journal of Forensic Sciences* 42(5):778-786, reports on proficiency tests given to more than 100 questioned document examiners and to a control group of individuals with similar educational backgrounds. Each subject made 144 pair-wise comparisons. Although the study showed that document examiners are much more accurate than lay people in determining whether or not two samples "match" (based on the "identification" and "strong probability" definitions of ASTM standard E1658), professionals nonetheless declared an erroneous match in 6.5 percent of the comparisons. A similar, more recent study, focusing on whether individual signatures were genuine, is reported in J. Sita, B. Found, and D. Rogers. 2002. Forensic handwriting examiners' expertise for signature comparison. *Journal of Forensic Sciences* 47:1117. That study found that professional handwriting examiners erred in 3.4 percent of their judgments.

[99] E.g., S.N. Sargur, S.-H. Cha, H. Arora, and S. Lee. 2002. Individuality of handwriting. *Journal of Forensic Sciences* 47(4):1-17.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1634

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY**

### Sample Data and Collection

There are many different types of paint and other coatings, including architectural, vehicular, and marine. Evidence collected from the crime scene may include painted surfaces such as automotive panels, tools, or victims' or suspects' clothing, or spray paint, smears, chips, or flakes. After documentation at the scene, the damaged painted surface is protected and preserved and then submitted to the laboratory. When it is not possible to bring the painted item or a portion of it to the laboratory, paint samples may be removed in such a way that the entire layer sequence is captured intact.

### Analyses

The proper recognition and collection of paint evidence at the scene precedes the comparison of evidence occurring at the laboratory. The color, texture, type, layer sequence, and chemical composition of known and questioned paints are compared, and a conclusion is rendered. Additionally, in cases for which no suspect vehicle and questioned paint are available, it may be possible to provide at least an investigative lead based on the color and metallic/nonmetallic type of paint present. If appropriate, the Royal Canadian Mounted Police's PDQ (Paint Data Query) database may be searched, and vehicular information may be provided regarding the possible makes, models, and year range of vehicles that used the questioned paint system.

The examination and comparison of paint evidence requires microscopic and instrumental techniques and methods. The examination of questioned and known samples follows an analytical process that identifies and compares the class (or group) characteristics of the evidence.[100] Occasionally, identifying characteristics exist across edges that allow edge or piece fitting. These characteristics include irregular borders, brush stroke striations, polish mark striations, or surface abrasion markings. When paint fragments physically fit back to a sample from a known source, the fragments are identified as having come from that specific source. Only when physical fitting is possible can an individualized source determination be made

Examiners involved with the analysis of paint evidence in the laboratory typically possess an extensive scientific background, because many of the methods and analyses rely heavily on chemistry.[101] The suggested minimum education requirement is a bachelor's degree in a natural[102, 103] or applied science,[104] with many candidates possessing a graduate degree. Coursework needs to include one year (or equivalent) of general chemistry with laboratory, organic chemistry with laboratory, analytical/instrumental analysis, and light microscopy to include basic polarized light microscopy—the latter obtained through structured coursework if it is not available at the graduate or undergraduate level.[105] On-the-job training continues in the laboratory, with its length depending on the examiner's experience. Before examiner trainees can work cases independently, they must observe and work under the supervision of an experienced

---

[100] SWGMAT. 1999. Forensic paint analysis and comparison guidelines. *Forensic Science Communications* 1(2): available at www.fbi.gov/hq/lab/fsc/backissu/july1999/painta.htm.

[101] SWGMAT. 2000. Trace evidence quality assurance guidelines. *Forensic Science Communications* 2(1): available at www.fbi.gov/hq/lab/fsc/backissu/jan2000/swgmat.htm.

[102] G.S. Anderson (ed.). Canadian Society of Forensic Science. 2007. *CSFS Careers in Forensic Science*, p. 15. Available at www.csfs.ca/contentadmin/UserFiles/File/Booklet2007.pdf.

[103] SWGMAT 2000, op. cit.

[104] Ibid.

[105] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1635

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

examiner. The completion of a laboratory's training program in paint analysis can range between 12 to 18 months.[106]

**Scientific Interpretation and Reporting of Results**

SWGMAT sets guidelines for this field, but it has not recommended report wording, and there are no set criteria for determining a conclusion, although a range of conclusions may be used to show the significance of the examination results. The strength of a conclusion depends on such variables as the number of layers present, the sample condition, and the type of paint (vehicular or structural). Terms such as "matched," "indistinguishable," "consistent," or "similar" are used along with the properties of the paints that were compared in stating the results of the comparison.

If there are no significant differences in the properties compared, the examiners may conclude that the paint or coating samples could have had a common origin. This does not mean they came from the same source to the exclusion of all others, but rather that they may have originated from the same source or from different sources that were painted or coated in the same manner. As the number of different layers associated increases (e.g., multiple different layers on a repainted surface), it may be concluded that it is unlikely that the questioned paint originated from any source other than that of the known paint.

SWGMAT has suggested forensic paint analysis and comparison guidelines[107,108] that discuss the examination procedure and instrumentation options, and ASTM has published the general guidelines.[109] However, neither includes report wording suggestions. Additional work should be done to provide standard language for reporting conclusions and sources of uncertainty. Such work has been completed by working groups for other forensic disciplines. Proficiency testing requirements are agreed upon by the predominant accrediting organization, the American Society of Crime Laboratory Directors-Laboratory Accreditation Board (ASCLD/LAB), which requires testing (internal or external) once per calendar year.

**Summary Assessment**

As is the case with fiber evidence, analysis of paints and coatings is based on a solid foundation of chemistry to enable class identification. Visual and microscopic examinations are typically the first step in a forensic examination of paints and coatings because of the ability to discriminate paints/coatings based on properties determined with these examinations. Several studies have been conducted that included hundreds of random automotive paint samples[110] These studies have concluded that more than 97 percent of the samples could be differentiated based on microscopic examinations coupled with solubility and microchemical testing. Another study[111] determined that more than 99 percent of 2,000 architectural paint samples could be

---

[106] Anderson, op. cit.; SWGMAT.

[107] SWGMAT. 1999. Forensic paint analysis and comparison guidelines. *Forensic Science Communications* 1(2): available at www.fbi.gov/hq/lab/fsc/backissu/july1999/painta.htm.

[108] SWGMAT. 2002. Standard guide for using scanning electron microscopy/X-ray spectrometry in forensic paint examinations. *Forensic Science Communications* 4(4): available at www.fbi.gov/hq/lab/fsc/backissu/oct2002/bottrell.htm.

[109] Ibid.

[110] S.G. Ryland and R.J. Kopec. 1979. The evidential value of automobile paint chips. *Journal of Forensic Sciences* 24(1):140-147; J.A. Gothard. 1976. Evaluation of automobile paint flakes as evidence. *Journal of Forensic Sciences* 21(3):636-641.

[111] C.F. Tippet. 1968. The evidential value of the comparison of paint flakes from sources other than vehicles. *Journal of the Forensic Sciences Society* 8(2-3):61-65.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1636

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

similarly differentiated. However, the community has not defined precise criteria for determining whether two samples come from a common source class.

## ANALYSIS OF EXPLOSIVES EVIDENCE AND FIRE DEBRIS

Explosives evidence encompasses a wide range of materials from unburned, unconsumed powders, liquids, and slurries, to fragments of an explosive device, to objects in the immediate vicinity of an explosion thought to contain residue from the explosive. A typical analytical approach would be to identify the components and construction of an explosive device and conduct an analysis of any unconsumed explosives and residues. In addition to the analysis and identification of low and high explosives, chemical reaction bottle bombs are also analyzed. The scene of an explosion can require special investigative attention. What may appear to be a small piece of scrap metal could in fact be an important piece of the device that caused the explosion. The very nature of an explosion has a direct impact on the quality of evidence recovered. Pristine devices or device fragments, or appreciable amounts of unconsumed explosive material, should not be expected.

### Analyses

Generally speaking, laboratories will not accept devices until they have been rendered safe. Examiners involved with the analysis of explosives evidence in the laboratory typically have an extensive scientific background, because the methods used entail a large amount of chemistry and instrumentation. The Technical Working Group for Fire and Explosives (TWGFEX), a group of fire debris and explosives examiners, suggests that an explosives examiner be required to possess a bachelor's degree in a natural or applied science, with recommended coursework in chemistry and instrumental analysis.[112] The group also recommends that the examiner complete a training program that includes the analysis of low and high explosives, instruction in the use of instrumentation used in routine analyses, the construction of explosive devices, and participation in a postblast investigation course. Although there is no official certification program for explosives examiners, TWGFEX has devised a suggested training guide. The guide is divided into seven modules, each with a reading list, practical exercises, and methods of evaluation.[113] To ensure that examiners maintain a level of competency, proficiency testing (internal or external) is required by ASCLD/LAB once per calendar year.[114]

The ultimate goal of an explosives examination is the identification of the explosive material used, whether it is through the analysis of an intact material or of the residue left behind when the material explodes. Intact material lends itself to being more easily identified. The individual components of postblast residue may often be identified (e.g., potassium chloride and potassium sulfate). The training and experience of examiners allows them to deduce what types of explosive material were originally present from possible combinations of explosive materials.

Whether it is a low explosive or high explosive, the analysis of an intact explosive material follows a procedure that begins with a macroscopic and microscopic examination of the

---

[112] TWGFEX Explosive Examiners Job Description. Available at http://ncfs.ucf.edu/twgfex/documents.html.

[113] TWGFEX Training Guide for Explosives Analysis Training. Available at http://ncfs.ucf.edu/twgfex/Documents.html.

[114] American Society of Crime Laboratory Directors International. 2006. *Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories*, p. 20. See www.ascld-lab.org/international/indexinternational.html

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1637

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

material, followed by a burn test, when appropriate. The results of the initial observations will dictate how the rest of the analysis will proceed. Typically it will involve the use of instrumentation that provides both elemental and structural information about the material, such as X-ray diffraction, scanning electron microscope-energy dispersive X-ray analysis, or infrared spectroscopy. TWGFEX has devised guidelines for the analysis of intact explosives that categorize the instruments that can be used based on the level of information they provide.[115] The information gathered, if sufficient, can be useful in identifying the material.

The analysis of postblast explosive residues begins much like the analysis of intact explosives, with the macroscopic and microscopic analysis of the evidence submitted (whether it is an expended device, fragments of a device, or debris from near the site of the explosion). If no intact explosive material is found, a sequence of extracts may be used to capture any organic and/or inorganic residues present. These extracts are then analyzed employing the same instrumentation used for intact explosives. However, the results produced differ in their specificity, and it is here that the training and expertise of the examiner plays a large role. To interpret the results properly, the examiner must have knowledge of the composition of explosives and the reaction products that form when they explode. Interpretation can be further complicated by the presence of contaminants from, for example, the device or soil.[116]

Examination conclusions for postblast residues range from "the residue present was consistent with an explosive material" to "the residue is only indicative of an explosive" to "no explosive residues were present." TWGFEX recently has developed a set of guidelines for the analysis of postblast explosive residues,[117] but has yet to make any recommendations for report wording.

The examination of fire debris not associated with explosions often aims to determine whether an accelerant was used. To assess the effects of an accelerant, one might design an experiment, under a range of conditions (e.g., wind speed, temperature, presence/absence of other chemicals) with two groups: one in which materials are burned in the presence of an accelerant ("treatment") and one with no accelerant ("control"). The measured outcomes on the burned materials might be measures that characterize the damage patterns (e.g., depth of char, size of bubbles on surfaces). Differences in the ranges of these measurements from the materials in the two groups (treatment versus control) suggest a hypothesis about the effects of an accelerant. Following this exploration, one should design validation studies to confirm that these measures do indeed characterize the differences in materials treated or untreated with an accelerant.

**Summary Assessment**

The scientific foundations exist to support the analysis of explosions, because such analysis is based primarily on well-established chemistry. As part of the laboratory work, an analyst often will try to reconstruct the bomb, which introduces procedural complications, but not scientific ones.

By contrast, much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite

---

[115] TWGFEX Recommended Guidelines for Forensic Identification of Intact Explosives. Available at http://ncfs.ucf.edu/twgfex/documents.html.

[116] C.R. Midkiff. 2002. Arson and explosive investigation. In: R. Saferstein (ed.). *Forensic Science Handbook.* Vol. 1, 2nd ed. Upper Saddle River, NJ: Prentice Hall.

[117] TWGFEX Recommended Guidelines for Forensic Identification of Post-Blast Explosive Residues. Available at http://ncfs.ucf.edu/twgfex/action_items.html.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1638

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set. However, according to testimony presented to the committee,[118] many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., "alligatoring" of wood, specific char patterns) have been shown not to be true.[119] Experiments should be designed to put arson investigations on a more solid scientific footing.

## FORENSIC ODONTOLOGY

Forensic odontology, the application of the science of dentistry to the field of law, includes several distinct areas of focus: the identification of unknown remains, bite mark comparison, the interpretation of oral injury, and dental malpractice. Bite mark comparison is often used in criminal prosecutions and is the most controversial of the four areas just mentioned. Although the identification of human remains by their dental characteristics is well established in the forensic science disciplines, there is continuing dispute over the value and scientific validity of comparing and identifying bite marks.[120]

Many forensic odontologists providing criminal testimony concerning bite marks belong to the American Board of Forensic Odontology (ABFO), which was organized in 1976 and is recognized by the American Academy of Forensic Sciences as a forensic specialty. The ABFO offers board certification to its members.[121]

### Sample Data and Collection

Bite marks are seen most often in cases of homicide, sexual assault, and child abuse. The ABFO has approved guidelines for the collection of evidence from bite mark victims and suspected biters.[122] The techniques for obtaining bite mark evidence from human skin—for example, various forms of photography, dental casts, clear overlays, computer enhancement, electron microscopy, and swabbing for serology or DNA—generally are well established and relatively noncontroversial. Unfortunately, bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and swelling and healing. These features may severely limit the validity of forensic odontology. Also, some practical difficulties, such as distortions in photographs and changes over time in the dentition of suspects, may limit the accuracy of the results.[123]

### Analyses

The guidelines of the ABFO for the analysis of bite marks list a large number of methods for analysis, including transillumination of tissue, computer enhancement and/or digitalization of the bite mark or teeth, stereomicroscopy, scanning electron microscopy, video superimposition, and histology.[124] The guidelines, however, do not indicate the criteria necessary for using each method to determine whether the bite mark can be related to a person's dentition and with what

---

[118] J. Lentini. Scientific Fire Analysis, LLC. Presentation to the committee. April 23, 2007. Available at www7.nationalacademies.org/stl/April%20Forensic%20Lentini.pdf.

[119] NFPA 921 Guide for Explosion and Fire Investigations, 2008 Edition. Quincy, MA: National Fire Protection Association.

[120] E.g., J.A. Kieser. 2005. Weighing bitemark evidence: A postmodern perspective. *Journal of Forensic Science, Medicine, and Pathology* 1(2):75-80.

[121] American Board of Forensic Odontology at www.abfo.org.

[122] Ibid.

[123] Rothwell, op. cit.

[124] American Board of Forensic Odontology, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1639

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

degree of probability. There is no science on the reproducibility of the different methods of analysis that lead to conclusions about the probability of a match. This includes reproducibility between experts and with the same expert over time. Even when using the guidelines, different experts provide widely differing results and a high percentage of false positive matches of bite marks using controlled comparison studies.[125]

No thorough study has been conducted of large populations to establish the uniqueness of bite marks; theoretical studies promoting the uniqueness theory include more teeth than are seen in most bite marks submitted for comparison. There is no central repository of bite marks and patterns. Most comparisons are made between the bite mark and dental casts of an individual or individuals of interest. Rarely are comparisons made between the bite mark and a number of models from other individuals in addition to those of the individual in question. If a bite mark is compared to a dental cast using the guidelines of the ABFO, and the suspect providing the dental cast cannot be eliminated as a person who could have made the bite, there is no established science indicating what percentage of the population or subgroup of the population could also have produced the bite. This follows from the basic problems inherent in bite mark analysis and interpretation.

As with other "experience-based" forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases in which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence. Bite marks often are associated with highly sensationalized and prejudicial cases, and there can be a great deal of pressure on the examining expert to match a bite mark to a suspect. Blind comparisons and the use of a second expert are not widely used.

**Scientific Interpretation and Reporting of Results**

The ABFO has issued guidelines for reporting bite mark comparisons, including the use of terminology for conclusion levels, but there is no incentive or requirement that these guidelines be used in the criminal justice system. Testimony of experts generally is based on their experience and their particular method of analysis of the bite mark. Some convictions based mainly on testimony by experts indicating the identification of an individual based on a bite mark have been overturned as a result of the provision of compelling evidence to the contrary (usually DNA evidence).[126]

More research is needed to confirm the fundamental basis for the science of bite mark comparison. Although forensic odontologists understand the anatomy of teeth and the mechanics of biting and can retrieve sufficient information from bite marks on skin to assist in criminal investigations and provide testimony at criminal trials, the scientific basis is insufficient to conclude that bite mark comparisons can result in a conclusive match. In fact, one of the standards of the ABFO for bite mark terminology is that, "Terms assuring unconditional identification of a perpetrator, or without doubt, are not sanctioned as a final conclusion."[127]

---

[125] Bowers, op. cit.

[126] Bowers, op. cit.

[127] American Board of Forensic Odontology, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1640

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

FORENSIC SCIENCE DISCIPLINES – PREPUBLICATION COPY

Some of the basic problems inherent in bite mark analysis and interpretation are as follows:

(1)    The uniqueness of the human dentition has not been scientifically established.[128]
(2)    The ability of the dentition, if unique, to transfer a unique pattern to human skin and the ability of the skin to maintain that uniqueness has not been scientifically established.[129]

     i.  The ability to analyze and interpret the scope or extent of distortion of bite mark patterns on human skin has not been demonstrated.
    ii.  The effect of distortion on different comparison techniques is not fully understood and therefore has not been quantified.

(3)    A standard for the type, quality, and number of individual characteristics required to indicate that a bite mark has reached a threshold of evidentiary value has not been established.

**Summary Assessment**

Despite the inherent weaknesses involved in bite mark comparison, it is reasonable to assume that the process can sometimes reliably exclude suspects. Although the methods of collection of bite mark evidence are relatively noncontroversial, there is considerable dispute about the value and reliability of the collected data for interpretation. Some of the key areas of dispute include the accuracy of human skin as a reliable registration material for bite marks, the uniqueness of human dentition, the techniques used for analysis, and the role of examiner bias.[130] The ABFO has developed guidelines for the analysis of bite marks in an effort to standardize analysis,[131] but there is still no general agreement among practicing forensic odontologists about national or international standards for comparison.

Although the majority of forensic odontologists are satisfied that bite marks can demonstrate sufficient detail for positive identification,[132] no scientific studies support this assessment, and no large population studies have been conducted. In numerous instances, experts diverge widely in their evaluations of the same bite mark evidence,[133] which has led to questioning of the value and scientific objectivity of such evidence.

Bite mark testimony has been criticized basically on the same grounds as testimony by questioned document examiners and microscopic hair examiners. The committee received no evidence of an existing scientific basis for identifying an individual to the exclusion of all others. That same finding was reported in a 2001 review, which "revealed a lack of valid evidence to support many of the assumptions made by forensic dentists during bite mark comparisons."[134] Some research is warranted in order to identify the circumstances within which the methods of forensic odontology can provide probative value.

---

[128] Senn, op. cit.

[129] Ibid.

[130] Ibid.

[131] American Board of Forensic Odontology, op. cit.

[132] I.A. Pretty. 2003. A web-based survey of odontologists' opinions concerning bite mark analyses. *Journal of Forensic Sciences* 48(5):1-4.

[133] C.M. Bowers. 2006. Problem-based analysis of bite mark misidentifications: The role of DNA. *Forensic Science International* 159 Supplement 1:s104-s109.

[134] I.A. Pretty and D. Sweet. 2001. The scientific basis for human bitemark analyses—A critical review. *Science and Justice* 41(2):85-92. Quotation taken from the abstract.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1641

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## BLOODSTAIN PATTERN ANALYSIS

Understanding how a particular bloodstain pattern occurred can be critical physical evidence, because it may help investigators understand the events of the crime. Bloodstain patterns occur in a multitude of crime types—homicide, sexual battery, burglary, hit-and-run accidents—and are commonly present. Bloodstain pattern analysis is employed in crime reconstruction or event reconstruction when a part of the crime scene requires interpretation of these patterns.

However, many sources of variability arise with the production of bloodstain patterns, and their interpretation is not nearly as straightforward as the process implies. Interpreting and integrating bloodstain patterns into a reconstruction requires, at a minimum:

- an appropriate scientific education;
- knowledge of the terminology employed (e.g., angle of impact, arterial spurting, back spatter, castoff pattern);
- an understanding of the limitations of the measurement tools used to make bloodstain pattern measurements (e.g., calculators, software, lasers, protractors);
- an understanding of applied mathematics and the use of significant figures;
- an understanding of the physics of fluid transfer;
- an understanding of pathology of wounds; and
- an understanding of the general patterns blood makes after leaving the human body.

### Sample Data and Collection

Dried blood may be found at crime scenes, deposited either through pooling or via airborne transfer (spatter). The patterns left by blood can suggest the kind of injury that was sustained, the final movements of a victim, the angle of a shooting, and more. Bloodstains on artifacts such as clothing and weapons may be crucial to understanding how the blood was deposited, which can indicate the source of the blood. For example, a stain on a garment, such as a shirt, might indicate contact between the person who wore the shirt and a bloody object, while tiny droplets of blood might suggest proximity to a violent event, such as a beating.

### Analyses

Bloodstain patterns found at scenes can be complex, because although overlapping patterns may appear simple, in many cases their interpretations are difficult or impossible.[135],[136] Workshops teach the fundamentals of basic pattern formation and are not a substitute for experience and experimentation when applying knowledge to crime reconstruction.[137] Such workshops are more aptly applicable for the investigator who needs to recognize the importance of these patterns so that he or she may enlist the services of a qualified expert. These courses also are helpful for attorneys who encounter these patterns in the course of preparing a case or when preparing to present testimony in court.

---

[135] H.L. MacDonell. 1997. Bloodstain Patterns. Corning, NY: Laboratory of Forensic Science; S. James. 1998. *Scientific and Legal Applications of Bloodstain Pattern Interpretation*. Boca Raton, FL: CRC Press; P. Pizzola, S. Roth, and P. DeForest. 1986. Blood drop dynamics–II. *Journal of Forensic Sciences* 31(1): 36-49.

[136] Ibid.; R.M. Gardner. 2004. *Practical Crime Scene Processing and Investigation*. Boca Raton, FL: CRC Press; H.C. Lee; T. Palmbach and M.T. Miller. 2005. *Henry Lee's Crime Scene Handbook*. Burlington, MA: Elsevier Academic Press, pp. 281-298.

[137] W.J. Chisum and B.E. Turvey. 2007. *Crime Reconstruction*. Burlington, MA: Elsevier Academic Press.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1642

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Although there is a professional society of bloodstain pattern analysts, the two organizations that have or recommend qualifications are the IAI and the Scientific Working Group on Bloodstain Pattern Analysis (SWGSTAIN). SWGSTAIN's suggested requirements for practicing bloodstain pattern analysis are outwardly impressive, as are IAI's 240 hours of course instruction. But the IAI has no educational requirements for certification in bloodstain pattern analysis.[138] This emphasis on experience over scientific foundations seems misguided, given the importance of rigorous and objective hypothesis testing and the complex nature of fluid dynamics. In general, the opinions of bloodstain pattern analysts are more subjective than scientific. In addition, many bloodstain pattern analysis cases are prosecution driven or defense driven, with targeted requests that can lead to context bias.

**Summary Assessment**

Scientific studies support some aspects of bloodstain pattern analysis. One can tell, for example, if the blood spattered quickly or slowly, but some experts extrapolate far beyond what can be supported. Although the trajectories of bullets are linear, the damage that they cause in soft tissue and the complex patterns that fluids make when exiting wounds are highly variable. For such situations, many experiments must be conducted to determine what characteristics of a bloodstain pattern are caused by particular actions during a crime and to inform the interpretation of those causal links and their variabilities. For these same reasons, extra care must be given to the way in which the analyses are presented in court. The uncertainties associated with bloodstain pattern analysis are enormous.

## AN EMERGING FORENSIC SCIENCE DISCIPLINE: DIGITAL AND MULTIMEDIA ANALYSIS

The analysis of digital evidence deals with gathering, processing, and interpreting digital evidence, such as electronic documents, lists of phone numbers and call logs, records of a device's location at a given time, e-mails, photographs, and more. In addition to traditional desktop and laptop computers, digital devices that store data of possible value in criminal investigations include cell phones, GPS devices, digital cameras, personal digital assistants (PDAs), large servers and storage devices (e .g., RAIDS and SANS), video game consoles (e.g., PlayStation and Xbox), and portable media players (e.g., iPods). The storage media associated with these devices currently fall into three broad categories. The first, magnetic memory, includes hard drives, floppy discs, and tapes. The second, optical memory, includes compact discs (CDs), and digital versatile discs (DVDs). The third, electrical storage, includes USB flash drives, some memory cards, and some microchips. These items are the most commonly encountered in criminal and counterintelligence matters, but laboratories have been asked to examine such items as scuba dive watches in death investigations and black boxes in aircraft mishaps.

The proliferation of computers and related devices over the past 30 years has led to significant changes in and the expansion of the types of criminal activities that generate digital evidence. Initially, computers were either the weapon or the object of the crime. In the early days, most computer crime involved manipulating computer programs of large businesses in order to steal money or other resources. As computers became more popular, they became

---

[138] See "Bloodstain Pattern Examiner Certification Requirements," available at: theiai.org/certifications/bloodstain/requirements.php.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1643

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

storage containers for evidence. Drug dealers, book makers, and white collar criminals began to keep computerized spreadsheets detailing their transactions. Digital cameras and the Internet have made child pornography increasingly available, and computers act as a digital file cabinet to hold this contraband material. Finally, digital media have become witnesses to daily activities. Many individuals have two cell phones with text messaging and/or e-mail capability, several computers, a home alarm system, a GPS in the car, and more; even children often possess some subset of these items. Workplaces use magnetic card readers to permit access to buildings. Most communication involves some kind of computer, and by the end of each day, hundreds of megabytes of data may have been generated about where individuals have been, how fast they got there, to whom they spoke, and even what was said. Suicide notes are written on computers. Sexual predators stalk their victims online via e-mail, chat, and instant messaging. Even get-away cars are equipped with GPS devices. Finally, computer systems have become (with ever-increasing frequency) the victims of unauthorized control or intrusions. These intrusions often result in the manipulation of files and the exfiltration of sensitive information. In addition, computers in automobiles that track speed, breaking, and turning are valuable in accident reconstruction. As a result, almost every crime could have digital evidence associated with it.

### Sample Data and Collection

The best practices for the collection of digital evidence most often call for the person at the scene to disconnect the power cord for the computer and related peripheral equipments (e.g., monitor, printer) and seize these items, as well as any loose storage media such as thumb drives and CDs. This method works well in most cases. However, some data (like recently typed passwords, malicious programs, and active communication programs) are volatile and are stored in the electronic chips of the system. In these circumstances, this information is lost when the device is turned off. In intrusion investigations or in cases in which encryption software is being used, this volatile information could be the key to a successful analysis and prosecution.[139]

Recognizing potential sources of digital evidence is also an ongoing challenge. Investigators are likely to seize a desktop computer but walk past a PlayStation. Thumb drives can be fashioned to look like a pocket knife, writing pen, or even a piece of sushi. Cell phones and wireless Internet capability present another challenge: If these devices are turned on while in law enforcement custody, they could be remotely accessed and altered by a suspect.

### Analyses

The typical approach to examining a computer involves two main phases. The first is the imaging phase. During this process, the storage device (most often a hard drive) is fitted with an appliance that prevents any new information from being written. Then, all of the data are copied to a new blank hard drive. The copy is compared with the original, most often by using a mathematical algorithm called Message Digest–5, otherwise known as MD5 Hash. The MD5 Hash value gives a unique series of numbers and letters for every file. In the examination phase, this forensically sound copy is examined for saved computer files with probative value. These so-called logical files often are pictures, documents, spreadsheets, and e-mail files that have been saved by the user in various folders or directories. Logical files are patent evidence. Next, the forensic copy is examined for files that have previously been deleted. The computer files are

---

[139] See W.G. Kruse and J.G. Heiser. 2001. *Computer Forensics: Incident Response Essentials*. Boston: Addison-Wesley.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1644

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1646 of 2008
PageID #: 3536

sometimes called physical, because the data are physically present on the hard drive but they are not logically available to the computer operating system. Such files constitute latent evidence.

Finally, system files that are created and saved by the operating system are examined. These files are analogous to a surveillance tape that shows programs that were running on the computer and files that were changed. The goal of most of these examinations is to find files with probative information and to discover information about when and how these files came to be on the computer.[140]

Digital evidence has undergone a rapid maturation process. This discipline did not start in forensic laboratories. Instead, computers taken as evidence were studied by police officers and detectives who had some interest or expertise in computers. Over the past 10 years, this process has become more routine and subject to the rigors and expectations of other fields of forensic science. Three holdover challenges remain: (1) the digital evidence community does not have an agreed certification program or list of qualifications for digital forensic examiners; (2) some agencies still treat the examination of digital evidence as an investigative rather than a forensic activity; and (3) there is wide variability in and uncertainty about the education, experience, and training of those practicing this discipline.

A publication of the Department of Justice Computer Crime and Intellectual Property Section, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*,[141] describes the challenging legal issues surrounding the examination of digital evidence. For example, sometimes the courts have viewed computers as a piece of evidence that is sent to a laboratory for forensic examination, and as having no special legal constraints, while other times, the courts have viewed computers as a virtual room or filing cabinet.[142] For the latter cases, a warrant must be obtained that specifies how the examination will be conducted and which files can be recovered before the electronic device can be examined.

Finally, the analysis of digital evidence differs from other forensic science disciplines because the examination generates not only a forensic report, but also brings to light documents, spreadsheets, and pictures that may have probative value. Different agencies have handled these generated files in different ways: Some treat them as exhibits, while others treat them as derivative evidence that requires a chain of custody and special protection.

A growing number of colleges and universities offer courses in computer security and computer forensics. Still, most law enforcement agencies are understaffed in trained computer security experts.

---

[140] See E. Casey. 2004. *Digital Evidence and Computer Crime*. Burlington: Academic Press; E. Casey. 2001. *Handbook of Computer Crime Investigation: Forensic Tools & Technology*. Burlington: Academic Press; B. Carrier. 2005. *File System Forensic Analysis*. Boston: Addison-Wesley; S. Anson and S. Bunting. 2007. *Mastering Windows Network Forensics and Investigation*. Indianapolis: Sybex; and H. Carvey and D. Kleiman. 2007. *Windows Forensic Analysis*. Burlington: Syngress.

[141] Available at www.usdoj.gov/criminal/cybercrime/s&smanual2002.htm.

[142] See, e.g., G.R. McLain, Jr., 2007. *United States v. Hill*: A new rule, but no clarity for the rules governing computer searches and seizures. *George Mason Law Review* 14(4):1071-1104; D. Regensburger, B. Bytes, and B. Bonds. 2007. An exploration of the law concerning the search and seizure of computer files and an analysis of the Ninth Circuit's decision in *United States v. Comprehensive Drug Testing, Inc. Journal of Criminal Law and Criminology* 97(4)1151-1208.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1645

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

## CONCLUSIONS

The term "forensic science" encompasses a broad range of disciplines, each with its own set of technologies and practices. Wide variability exists across forensic science disciplines with regard to techniques, methodologies, reliability, error rates, reporting, underlying research, general acceptability, and the educational background of its practitioners. Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology, and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as fibers, hair, and fire debris). Some methods result in class evidence and some in the identification of a specific individual—with the associated uncertainties. The level of scientific development and evaluation varies substantially among the forensic science disciplines.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1646

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 6
# IMPROVING METHODS, PRACTICE, AND PERFORMANCE IN FORENSIC SCIENCE

In a presentation to the committee, Jennifer Mnookin, of the University of California, Los Angeles School of Law, cautioned against yielding to two extremes in developing expectations for the forensic science disciplines. The first is the risk of letting the "perfect" be the enemy of the "good." That is, many forms of forensic investigation and analysis may work relatively well once appropriate tasks have been set for them. "The opposite danger is the risk of overconfidence about what we think we know—the risk of making unjustified inferences on the basis of limited information, or sometimes a resistance to gaining new information that would help us do it better."[1]

Nonetheless, a number of the forensic science disciplines, as they are currently practiced, do not contribute as much to criminal justice as they could. This chapter discusses the improvements that are needed and makes four major recommendations. It does not evaluate the quality of evidence collection and management—steps that provide the inputs to forensic methods—although, obviously, the quality of those steps is critical in maximizing the investigative and probative value of that evidence.

## INDEPENDENCE OF FORENSIC SCIENCE LABORATORIES

The majority of forensic science laboratories are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency. This system leads to significant concerns related to the independence of the laboratory and its budget. Ideally, public forensic science laboratories should be independent of or autonomous within law enforcement agencies. In these contexts, the director would have an equal voice with others in the justice system on matters involving the laboratory and other agencies. The laboratory also would be able to set its own priorities with respect to cases, expenditures, and other important issues. Cultural pressures caused by the different missions of scientific laboratories vis-à-vis law enforcement agencies would be largely resolved. Finally, the forensic science laboratories would be able to set their own budget priorities and not have to compete with the parent law enforcement agencies.

## UNCERTAINTIES AND BIAS

Few forensic science methods have developed adequate measures of the accuracy of inferences made by forensic scientists. All results for every forensic science method should indicate the uncertainty in the measurements that are made, and studies must be conducted that enable the estimation of those values. For the identification sciences (e.g., friction ridge analysis, toolmark analysis, handwriting analysis), such studies would accumulate data about the intraindividual variability (e.g., how much one finger's impressions vary from impression to impression, or how much one toolmark or signature varies from instance to instance) and the

---

[1] J. Mnookin, Professor of Law, University of California, Los Angeles Law School. Presentation to the committee. April 23, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1647

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

interindividual variability (e.g., how much the impressions of many fingerprints vary across a population and in what ways). With that information, one could begin to attach confidence limits to individualization determinations and also begin to develop an understanding of how much similarity is needed in order to attain a given level of confidence that a match exists. Note that this necessary step would change the way the word "individualization" is commonly used. The concept of individualization is that an object found at a crime scene can be uniquely associated with one particular source. By acknowledging that there can be uncertainties in this process, the concept of "uniquely associated with" must be replaced with a probabilistic association, and other sources of the crime scene evidence cannot be completely discounted. The courts already have proven their ability to deal with some degree of uncertainty in individualizations, as demonstrated by the successful use of DNA analysis (with its small, but nonzero, error rate).

Finally, as discussed in Chapter 4, the accuracy of forensic methods resulting in classification or individualization conclusions needs to be evaluated in well-designed and rigorously conducted studies. The level of accuracy of an analysis is likely to be a key determinant of its ultimate probative value.

Some initial and striking research has uncovered the effects of some biases in forensic science procedures,[2] but much more must be done to understand the sources of bias and to develop countermeasures.[3] Some principles employed in other fields should be useful, although some (e.g., blinding) may not be feasible for some types of forensics work. The forensic science disciplines are just beginning to become aware of contextual bias and the dangers it poses. The traps created by such biases can be very subtle, and typically one is not aware that his or her judgment is being affected. An overview of the effect of bias in the forensic science disciplines can be found in Risinger et al., 2002.[4] Decisions regarding what analyses need to be performed and in what order also can be influenced by bias and ultimately have the potential to skew results.

Forensic scientists who sit administratively in law enforcement agencies or prosecutors' offices, or who are hired by those units, are subject to a general risk of bias. Bias also is introduced through decisions made about evidence collection, which controls who is listed as a suspect. Evidence collection and crime scene investigation can require scientific knowledge and judgment, and these functions are normally outside the control of forensic scientists.

---

[2] E.g., I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56 (4):600-616; I.E. Dror, D. Charlton, and A Peron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156(1):74-78; D.E. Krane, S. Ford, J.R. Gilder, K. Inman, A. Jamieson, R. Koppl, I.L. Kornfield, D.M. Risinger, N. Rudin, M.S. Taylor, and W.C Thompson. 2008. Sequential unmasking: A means of minimizing observer effects in forensic DNA interpretation. *Journal of Forensic Sciences* 53(4):1006-1007; L.S. Miller. 1987. Procedural bias in forensic science examinations of human hairs. *Law and Human Behavior* 11(2):157-163.

[3] See the discussion of biases provided in Chapter 4.

[4] D.M. Risinger, M.J. Saks, W.C. Thompson, and R. Rosenthal. 2002. The *Daubert/Kumho* implications of observer effects in forensic science: Hidden problems of expectation and suggestion. *California Law Review* 90:1-56; Krane, et al., op. cit.

6-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1648

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY

## REPORTING RESULTS

There is a critical need in most fields of forensic science to raise the standards for reporting and testifying about the results of investigations. For example, many terms are used by forensic examiners in reports and in court testimony to describe findings, conclusions, and the degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates evidence. Yet the forensic science disciplines have not reached agreement or consensus on the precise meaning of any of these terms. Although some disciplines have developed vocabulary and scales to be used in reporting results, they have not become standard practice. This imprecision in vocabulary stems in part from the paucity of research in forensic science and the corresponding limitations in interpreting the results of forensic analyses. Publications such as Evett et al.[5], Aitken and Taroni[6], and Evett[7] provide the essential building blocks for the proper assessment and communication of forensic findings.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should describe, at a minimum, methods and materials, procedures, results, and conclusions, and they should identify, as appropriate, the sources of uncertainty in the procedures and conclusions along with estimates of their scale (to indicate the level of confidence in the results). Although it is not appropriate and practicable to provide as much detail as might be expected in a research paper, sufficient content should be provided to allow the nonscientist reader to understand what has been done and permit informed, unbiased scrutiny of the conclusion.

Some forensic laboratory reports meet this standard of reporting, but most do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "The green, brown plant material in item #1 was identified as marijuana"). The norm is to have no description of the methods or procedures used, and most reports do not discuss measurement uncertainties or confidence limits. Many disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. Although some of the Scientific Working Groups have a scoring system for reporting findings, they are not uniformly or consistently used.

Forensic science reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including associated probabilities where possible. Courtroom testimony should be given in lay terms so that all trial participants can understand how to weight and interpret the testimony. In order to enable this, research must be undertaken to evaluate the reliability of the steps of the various identification methods and the confidence intervals associated with the overall conclusions.

---

[5] I.W. Evett, G. Jackson, J.A. Lambert, and S. McCrossan. 2000. The impact of the principles of evidence interpretation on the structure and content of statements. *Science and Justice* 40(4):233-239.

[6] C.G.G. Aitken and F. Taroni. 2004. *Statistics and the Evaluation of Evidence for Forensic Scientists*. 2nd ed. V. Barnett, ed. Chichester, UK: John Wiley & Sons Ltd.

[7] I.W. Evett. 1990. The theory of interpreting scientific transfer evidence. *Forensic Science Progress* 4:141-179.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1649

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

## THE NEED FOR RESEARCH

Barry Fisher, Director of the Crime Laboratory of the Los Angeles County Sheriff's Department, has said, "We run the risk of our science being questioned in the courts because there is so little research."[8] In 2001 Giannelli wrote, "In many areas [of forensic science] little systematic research has been conducted to validate the field's basic premises and techniques, and often there is no justification why such research would not be feasible."[9] As Smith et al. note, the United States has a renowned higher education system, and many basic research discoveries relating to the forensic science disciplines have been made in academia.[10] However, the forensic science disciplines suffer from an inadequate research base: Few forensic scientists have the opportunity to conduct research, few academics are positioned to undertake such research, and, importantly, the funding for forensic research is insufficient. Others believe that the field suffers because the research initiatives being funded and pursued lack an overarching strategic plan.[11]

There are several explanations for the relative lack of funding for basic and applied research in the forensic science disciplines. First, forensic practice was started in, and has grown out of, the criminal justice and law enforcement systems. Many forensic science techniques were developed to aid in the investigatory phase of law enforcement and then were adapted to the role of aiding in prosecution by providing courtroom testimony. Thus, forensic practitioners who work in public crime laboratories often are seen as part of the prosecution team, not as part of the scientific enterprise. Second, some of the forensic science disciplines rely on an apprenticeship model for training, rather than on codifying their methods in a scientific framework. Third, federal agencies that fund scientific work, such as the National Science Foundation, the National Institutes of Health, and the Department of Defense, generally have not considered forensic science as part of the science base they need to support. It has been only in recent years that the National Institute of Justice has taken interest in funding forensic science research, but the majority of these funds have been awarded to reduce case backlogs, especially for cases that involve the analysis of DNA (see Chapter 2).

The forensic science disciplines need to develop rigorous protocols for performing subjective interpretations, and they must pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from work in other areas, notably from the large body of research that is available on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called upon to address. Thus, although some techniques may be too imprecise to permit the accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on the subpopulation of the individual from which the specimen was derived, even if it cannot associate reliably the hair with a specific individual. However, the definition of the appropriate question is only a first step in evaluating the

---

[8] K. Pyrek. 2007. *Forensic Science Under Siege: The Challenges of Forensic Laboratories and the Medico-Legal Investigation System.* Burlington, MA: Academic Press, p. 231.

[9] P.C. Giannelli. 2001. Scientific evidence in civil and criminal cases. *Arizona State Law Journal* 103:112.

[10] F.P. Smith, R.H. Liu, and C.A. Lindquist. 1988. Research experience and future criminalists. *Journal of Forensic Sciences* 33(4):1074-1080.

[11] IAI Positions and Recommendations to the NAS Committee to Review the Forensic Sciences. September 19, 2007. See presentation by K.F. Martin, IAI President, to the committee. December 6, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1650

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY**

performance of a forensic technique. The research design should address the questions that arise in the specific context of forensics.

A complete research agenda should include studies to establish the strengths and limitations of each procedure, sources of bias and variation, quantification of uncertainties created by these sources, measures of performance, procedural steps in the process of analyzing the forensic evidence, and methods for continual monitoring and improving the steps in that process.

## CONCLUSIONS AND RECOMMENDATIONS

Wide variability is found across forensic science disciplines not only with regard to techniques and methodologies (see Chapter 5), but also with regard to reliability, error rates, reporting, research foundations, general acceptability, and published material. Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis, and analyses of fibers and fire debris); others are based on expert interpretation of observed patterns (e.g., of fingerprints, writing samples, toolmarks, bite marks, and hairs). The briefings and materials that informed this report illustrate that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

In most areas of forensic science, no well-defined system exists for determining error rates, and proficiency testing shows that some examiners perform poorly. In some disciplines, such as forensic odontology, the methods of evidence collection are relatively noncontroversial, but disputes arise over the value and reliability of the resulting interpretations.

In most forensic science disciplines, no studies have been conducted of large populations to establish the uniqueness of marks or features. Yet, despite the lack of a statistical foundation, examiners make probabilistic claims based on their experience. A statistical framework that allows quantification of these claims is greatly needed. These disciplines also critically need to standardize and clarify the terminology used in reporting and testifying about the results and in providing more information.

Little rigorous systematic research has been done to validate the basic premises and techniques in a number of forensic science disciplines. The committee sees no evident reason why conducting such research is not feasible; in fact, some researchers have proposed research agendas to strengthen the foundations of specific forensic disciplines.[12] Much more federal funding is needed to support research in forensic science and forensic pathology in universities and in private laboratories committed to such work. The forensic science and medical examiner communities (see Chapter 9) will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, collaborative efforts are urgently needed to: (1) develop new technical methods or provide in-depth grounding for advances developed in forensic science; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile grounds for discourse among the communities. The proposed National Institute of Forensic Science (NIFS) should recommend, implement, and guide strategies for supporting such initiatives.

Although a long-term research agenda will require a thorough assessment of each of the assumptions that underlie forensic science techniques, many concerns regarding the forensic science disciplines can be addressed immediately through studies in which forensic science

---

[12] See, e.g., L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert*. *Law, Probability and Risk* 7(2):87-109.

6-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1651

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

practitioners are presented with a standardized set of realistic training materials that vary in complexity. Such studies will not explore the components of the decision process, but they will permit an assessment of the extent to which skilled forensic science practitioners will reach the same or similar conclusions when presented with the types of materials that lead to disagreements.

**Recommendation 2:**

> **The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.**

**Recommendation 3:**

> **Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:**
>
> **(a) Studies establishing the scientific bases demonstrating the validity of forensic methods.**
> **(b) The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realistic case scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.**
> **(c) The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.**
> **(d) Automated techniques capable of enhancing forensic technologies.**

To answer questions regarding the reliability and accuracy of a forensic analysis, the research must distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether or not a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1652

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

METHODS, PRACTICE, AND PEFORMANCE – PREPUBLICATION COPY

**Recommendation 4:**

To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.

**Recommendation 5:**

The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1653

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1654

PREPUBLICATION COPY

# 7
# STRENGTHENING OVERSIGHT OF
# FORENSIC SCIENCE PRACTICE

Several commentators appearing before the committee noted that nearly anyone with a garage and some capital theoretically could open a forensics laboratory and start offering services. Although this might be a bit hyperbolic, the fact is that there are no requirements, except in a few states (New York, Oklahoma, and Texas), for forensics laboratories to meet specific standards for quality assurance or for practitioners to be certified according to an agreed set of standards.[1] Well-publicized problems in large crime laboratories have uncovered systematic deficiencies in quality control. For example, in 2002, the Houston Police Department Crime Laboratory and Property Room came under scrutiny because of a range of quality concerns that created "profound doubts about the integrity of important aspects of the criminal justice system in Harris County."[2] Problems included poor documentation, serious analytical and interpretive errors, the absence of quality assurance programs, inadequately trained personnel, erroneous reporting, the use of inaccurate and misleading statistics, and even "drylabbing" (the falsification of scientific results).[3] In most cases, existing efforts to impose standards and best practices in forensic science practice rely on the voluntary participation of some members of the forensic science community working diligently to improve overall quality in the field.

Despite important movement in recent years toward developing and implementing quality control measures in the forensic science disciplines, a lack of uniform and mandatory quality assurance procedures, combined with some highly publicized problems involving large crime laboratories, has led to heightened attention to efforts to remedy uneven quality among laboratories through the imposition of standards and best practices. The American Bar Association has recommended that, "Crime laboratories and medical examiner officers should be accredited, examiners should be certified, and procedures should be standardized and published to ensure the validity, reliability, and timely analysis of forensic evidence."[4]

In *Daubert v. Merrell Dow Pharmaceuticals*,[5] the Supreme Court cited as a relevant factor in assessing expert testimony the "existence and maintenance of standards controlling the technique's operation." Standards and best practices create a professional environment that allows organizations and professions to create quality systems, policies, and procedures and maintain autonomy from vested interest groups. Standards ensure desirable characteristics of services and techniques such as quality, reliability, efficiency, and consistency among practitioners. Typically standards are enforced through systems of accreditation and certification,

---

[1] See N.Y. EXEC. § 995-b (McKinney 1996); (accreditation by Forensic Science Commission); OKLA. STAT. ANN. tit. 74 § 150.37 (requiring accreditation by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board or the American Board of Forensic Toxicology); TEX. CRIM. PROC. CODE art. 38.35 (accreditation by the Department of Public Safety).

[2] M.R. Bromwich. 2007. *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room.* June 13. Available at www.hpdlabinvestigation.org, p. 1.

[3] Ibid.

[4] American Bar Association. 2006. *Report of the ABA Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process. Achieving Justice: Freeing the Innocent, Convicting the Guilty.* P.C. Giannelli and M. Raeder (eds.) Chicago: American Bar Association.

[5] 509 U.S. 579 (1993).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1655

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY
_____

wherein independent examiners and auditors test and audit the performance, policies, and procedures of both laboratories and service providers. In addition, requirements for quality control can be imposed on entities receiving federal funds, and professional groups can develop codes of ethics and conduct to serve as measures against which performance can be assessed.

This chapter addresses some of the traditional approaches used by technical professions to enhance the quality of performance—accreditation, certification (including proficiency testing), and oversight—tied to federal funding. In each approach, standards are used to measure the quality of institutions or organizations, either in terms of their policies and procedures or in terms of the proficiency and skills of an individual practicing the discipline. However, as mentioned above, with the exception of three states mandating certification (New York, Oklahoma, and Texas), the accreditation of laboratories and certification of forensic examiners remains voluntary.

## ACCREDITATION

Accreditation is just one aspect of an organization's quality assurance program, which also should include proficiency testing where relevant, continuing education, and other programs to help the organization provide better overall services. In the case of laboratories, accreditation does not mean that accredited laboratories do not make mistakes, nor does it mean that a laboratory utilizes best practices in every case, but rather, it means that the laboratory adheres to an established set of standards of quality and relies on acceptable practices within these requirements. An accredited laboratory has in place a management system that defines the various processes by which it operates on a daily basis, monitors that activity, and responds to deviations from the acceptable practices using a routine and thoughtful method. This cannot be a self-assessing program. Oversight must come from outside the participating laboratory to ensure that standards are not self-serving and superficial and to remove the option of taking shortcuts when other demands compete with quality assurance. In addition, accreditation serves as a mechanism to strengthen professional community ties, transmit best practices, and expose laboratory employees directly to the perspectives and expectations of other leaders in the profession.

An example of a strong accreditation system is that required through the Clinical Laboratory Improvement Amendments of 1988 (CLIA).[6] Through this legislation, the Centers for Medicare & Medicaid Services (CMS) regulates all clinical laboratory testing (except research) performed on humans in the United States. In total, CLIA covers approximately 189,000 laboratory entities (see Box 7-1).

Some key elements of CLIA and of other accreditation programs that might be incorporated into a mandatory accreditation system for forensic science include:

- a national organization that can mediate the accreditation process;
- an application process with criteria by which organizations are eligible to apply;
- a process of self-evaluation;
- an external evaluation process, including site visits by external evaluators;

_____
[6] 42 U.S.C. § 263a.

7-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1656

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

- an appeals process;
- a repeat cycle of evaluation and external evaluation, and;
- a set of standards by which entities can be evaluated.[7]

---

**Box 7-1 Clinical Laboratory Improvement Amendments of 1988 (CLIA)**

The objective of the CLIA program is to ensure quality laboratory testing. All clinical laboratories must be properly certified to receive Medicare or Medicaid payments. CLIA requires all entities that perform even one test using "materials derived from the human body for the purpose of providing information for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of, human beings" to meet certain federal requirements. If an entity performs tests for these purposes, it is considered to be covered by CLIA and must register with the CLIA program.

CMS and CDC develop standards for laboratory certification (it is actually a certificate of accreditation). In addition, CDC conducts studies and convenes conferences to help determine when changes in regulatory requirements are needed. Oversight is conducted through onsite inspections of laboratories conducted every two years using federal surveyors or surveyors of deemed organizations or state-operated CLIA programs approved for this purpose. Oversight includes a comprehensive evaluation of the laboratory's operating environment and personnel, as well as its proficiency testing, quality control, and quality assurance procedures. The laboratory director plays a critical role in assuring the safe and appropriate use of laboratory tests—he or she must meet required qualifications and must ensure that the test methodologies selected are capable of providing the quality of results required for patient care. Laboratory directors are required to take specific actions to establish a comprehensive quality assurance program.

Six organizations are deemed to offer accreditation of laboratories for CLIA. An accreditation organization that applies or reapplies to CMS for deeming authority, or a state licensure program that applies or reapplies to CMS for exemption from CLIA program requirements of licensed or approved laboratories within the state, must provide extensive documentation of its process. This includes a detailed description of the inspection process, a description of the steps taken to monitor the correction of deficiencies, a description of the process for monitoring performance, procedures for responding to and for the investigation of complaints against its laboratories, and a list of all its current laboratories and the expiration dates of their certification.

CLIA also provides for sanctions that may be imposed on laboratories found to be out of compliance with one or more of the conditions of accreditation (e.g., unsuccessful participation in proficiency testing). These include suspension, limitation, or revocation of the certificate; civil suit to enjoin any laboratory activity that constitutes a significant hazard to the public health; and imprisonment or fine for any person convicted of the intentional violation of CLIA requirements. The regulations also require that the Department of Health and Human Services Secretary annually publish a list of all laboratories that have been sanctioned during the preceding year. Sanctions can be appealed.

SOURCE: www.cms.hhs.gov/clia/.

---

In addition, accrediting organizations typically offer education and training programs to help the participating entities comply with the standards. Accreditation cannot guarantee high quality—that is, it cannot guard against those who intentionally disobey or ignore requirements. However, over time it can reduce the likelihood that violations will occur, and reports of

---

[7] Institute of Medicine. 2001. *Preserving Public Trust: Accreditation and Human Research Participation Protection Programs.* Washington, D.C.: National Academy Press.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1657

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

infractions should trigger increased scrutiny by an accrediting body. And, by requiring that education be a standard that must be met as a condition of accreditation, incremental change and quality improvement can be achieved individual by individual.

**Development of Current Forensic Laboratory Accrediting Organizations**

In the 1970s, FBI Director Clarence Kelley and FBI Laboratory Director Briggs White organized a group of crime laboratory directors that eventually became known as the American Society of Crime Laboratory Directors, or ASCLD. ASCLD's Committee on Laboratory Evaluation and Standards was focused on developing quality assurance standards, and in 1981 the ASCLD/Laboratory Accreditation Board (ASCLD/LAB) was formed. In 1988, it was officially incorporated as a not-for-profit organization.

In 1994, the passage of the DNA Identification Act established a DNA Advisory Board (DAB) to develop and enforce quality assurance standards for crime laboratories seeking access to the FBI's national database of DNA profiles (see below). The DAB recommended that crime laboratories seek accreditation as quickly as possible. According to the *Crime Lab Report*, "Because ASCLD/LAB policies and procedures would not allow accreditation to be awarded to a single work unit, laboratories that were not prepared to undergo a full ASCLD/LAB accreditation assessment seemed to have no other alternative but to forfeit access to the DNA database until they were ready for a full accreditation audit."[8]

In 1995, the private not-for-profit corporation National Forensic Science Technology Center (NFSTC) was formed by the ASCLD executive board for training, education, and support of accreditation.[9] NFSTC could support and assist crime laboratories preparing for a full ASCLD/LAB accreditation as well as audit and temporarily certify DNA units that complied with DNA-specific quality assurance standards.[10,11] NFSTC subsequently formed a new independent accreditation corporation, Forensic Quality Services (FQS), with the idea that its program would be based on the new ISO/IEC 17025 international standard for testing and calibration laboratories.[12]

In 2003, the ASCLD/LAB Delegate Assembly approved the implementation of an ISO/IEC 17025 program, and ASCLD/LAB began offering these accreditations in April 2004. Accreditations for forensic science laboratories are now conducted using *General requirements for the competence of testing and calibration laboratories 17025 ISO/IEC* (2005),[13] the same requirements under which private and public laboratories are accredited. The international standards are developed through technical committees to deal with particular fields of technical activity. In order for sector specific requirements for forensic laboratories to be addressed, ISO allows for the amplification of requirements or supplemental requirements, such as *ASCLD/LAB-International Supplemental requirements for the accreditation of forensic science testing laboratories* (2006).

ASCLD/LAB's areas of focus are laboratory management and operations, personnel qualifications, and the physical plant. The following must be in place for accreditation:

---

[8] *Crime Lab Report*. December 20, 2007. Available at www.crimelabreport.com/monthly_report/12-2007.htm.
[9] See http://nfstc.org/aboutus/history/history.htm.
[10] Ibid.
[11] DNA procedures are regulated under the DNA Identification Act of 1994. DNA Identification Act of 1994, 42 U.S.C. § 14132 (1994).
[12] See www.forquality.org.
[13] See www.iso.org/iso/catalogue_detail?csnumber=39883.

7-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1658

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

- procedures to protect evidence from loss, cross-transfer, contamination, and/or deleterious change;
- validated and documented technical procedures;
- the use of appropriate controls and standards;
- calibration procedures;
- complete documentation of all evidence examination;
- documented training programs that include competency testing;
- technical review of a portion of each examiner's work product;
- testimony monitoring of all who testify; and
- a comprehensive proficiency testing program.[14]

The ASCLD/LAB accreditation cycle is five years, with annual reports required from each accredited laboratory that consist of any changes in management, staff, facilities, methodologies, proficiency testing, and testimony monitoring. All accredited laboratories must maintain written copies of appropriate technical procedures, including descriptions of sample preparation methods, controls, standards, and calibration procedures, as well as a discussion of precautions, sources of possible error, and literature references. In addition, ASCLD/LAB has a policy regarding the reporting of noncompliance with requirements, a portion of which is excerpted below:

> In keeping with the stated objective of 'identifying those laboratories which meet established standards,' the ASCLD/LAB Board has determined that, as an accrediting body, we must be timelier in reviewing instances of significant non-compliance. To further this objective, all accredited laboratories must disclose to ASCLD/LAB all substantive occurrences of non-compliance within 30 calendar days of determining that the non-compliance has occurred.[15]

In addition to this particular requirement, the ISO program has a requirement for an annual surveillance visit. During this site visit, any issues that may have come to the attention of ASCLD/LAB and/or requirements selected by ASCLD/LAB are reviewed. The accreditation programs are managed by a paid staff member working under the direction of a board of directors, which is elected by the Delegate Assembly. The Delegate Assembly is composed of the directors of all accredited laboratories and laboratory systems. Inspectors must complete a training program and must be employed in an accredited laboratory. At any time, if an issue is brought to the attention of ASCLD/LAB, the board of directors can, after determining that the claim is substantive, implement an interim inspection of that particular issue and the entire laboratory. The program also includes a system of sanctions and an appeal process.

**Status of Accreditation**

ASCLD/LAB's international program has accredited 60 laboratories as of April 2008, in addition to 337 laboratories accredited under the original Legacy program.[16] FQS-International (FQS-I) has accredited just over 50 laboratories in 1 or more disciplines; however, FQS-I allows

---

[14] R. Stacey, President, ASCLD/LAB. Presentation to the committee. January 25, 2007.
[15] 2008 version of the ASCLD/LAB Legacy Accreditation Manual.
[16] See www.ascld-lab.org/legacy/aslablegacylaboratories.html.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1659

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

forensic laboratories to customize their accreditation by phasing in one discipline at a time.[17] A survey of International Association for Identification (IAI) members, who tend to work in settings other than traditional crime laboratories, revealed that only 15 percent of respondents are accredited.[18]

Only a few jurisdictions require that their forensics laboratories be accredited. According to the 2005 census of 351 publicly funded crime laboratories, more than three-quarters of laboratories (78 percent) were accredited by ASCLD/ LAB.[19] Another 3 percent were accredited by some other professional organization, such as the ISO. State-operated laboratories (91 percent) were more likely to be accredited than laboratories serving county (67 percent) or municipal (62 percent) jurisdictions. Among the 230 laboratories providing accreditation information in both the 2002[20] and 2005 censuses, the accreditation rate increased during the three years from 75 to 87 percent.

However, identification units—that is, those forensic entities outside crime laboratories—do not participate in accreditation systems and are not required to do so. Given that some disciplines are practiced largely outside the laboratory environment (e.g., 66 percent of fingerprint analyses are not conducted in crime laboratories), there is a substantial gap in the number of programs participating in accreditation.[21,22]

As mentioned previously, DNA analysis is regulated under the DNA Identification Act of 1994, which created an advisory board on quality assurance, tasked with promulgating standards for proficiency testing of laboratories and analysts. The terms of the original advisory board expired, and now the FBI Quality Assurance Standards apply to DNA laboratories receiving federal funds. The standards require periodic (every other year) audits using the FBI Quality Assurance Standards to ensure compliance. The FBI guidelines require that two proficiency tests be completed annually by DNA examiners as well as by technical support personnel performing relevant analytical techniques. The tests must be administered by a source external to the laboratory. The FBI is responsible for developing and maintaining a DNA audit document for assessing compliance with DNA standards and also provides DNA auditor instruction to all ASCLD/LAB inspectors, in addition to the forensic DNA community, on how to interpret the DNA standards. The FBI also reviews audit findings and remedial action, if any. Once all standards are met, it notifies the laboratory of full compliance.

---

[17] See www.forquality.org/fqs_I_Labs.htm.

[18] T.S. Witt. Director, Bureau of Business and Economic Research, West Virginia University. Presentation to the committee. December 6, 2007.

[19] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[20] J.L. Peterson and M. J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf.

[21] Witt, op. cit.

[22] Accreditation is also available for other more specific forensic science disciplines. For example, the National Association of Medical Examiners (NAME) operates an accreditation program for coroners and medical examiners offices (see Chapter 9). The American Board of Forensic Toxicology accredits toxicology laboratories.

7-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1660

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1662 of 2008 PageID #: 3552

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## STANDARDS AND GUIDELINES FOR QUALITY CONTROL

Standards provide the foundation against which performance, reliability, and validity can be assessed. Adherence to standards reduces bias, improves consistency, and enhances the validity and reliability of results. Standards reduce variability resulting from the idiosyncratic tendencies of the individual examiner—for example, setting conditions under which one can declare a "match" in forensic identifications. They make it possible to replicate and empirically test procedures and help disentangle method errors from practitioner errors. Importantly, standards not only guide practice but also can serve as guideposts in accreditation and certification programs. Many forensic science disciplines have developed standards, but others have not, which contributes to questions about the validity of conclusions.

Several groups produce standards for use in the forensic science disciplines. For example, ASTM International (ASTM), originally known as the American Society for Testing and Materials, is an international standards organization that develops and publishes voluntary technical standards for a wide range of materials, products, systems, and services. In the area of forensic science it offers, for example:

- Standard Guide for Minimum Training Requirements for Forensic Document Examiners
- Standard Guide for Forensic Paint Analysis and Comparison
- Standard Guide for Non-destructive Examination of Paper
- Standard Guide for Forensic Analysis of Fibers by Infrared Spectroscopy
- Standard Terminology for Expressing Conclusions of Forensic Document Examiners

At the federal level, the National Institute of Standards and Technology (NIST) conducts research to establish standards in a limited number of forensic areas, for example, organic gunshot residue analysis, trace explosives detectors, and improvised explosive devices.[23] Its laboratories develop tests, test methods, produce reference data, conduct proof-of-concept implementations, and perform technical analyses. They also develop guides to help forensic organizations formulate appropriate policies and procedures, such as those concerning mobile phone forensic examinations. These guides are not all-inclusive and they do not prescribe how law enforcement and incident response communities should handle investigations. Instead, they provide principles for establishing policies and procedures.[24]

In accordance with ISO/IEC 17025, which states that all technical procedures used by a science laboratory should be fully validated before they are used in casework, the European Network of Forensic Science Institutes has developed a guidance document for its member laboratories to use in validating techniques employed in forensic casework.[25]

---

[23] B. MacCrehan. National Institute of Standards and Technology. Analytical Chemistry Division. Presentation to the committee. September 21, 2007.

[24] B. Guttman. National Institute of Standards and Technology National Software Reference Library. Presentation to the committee. September 21, 2007.

[25] European Network of Forensic Science Institutes Standing Committee for Quality And Competence (QCC). 2006. *Validation and Implementation of (New) Methods.*

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1661

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

The FBI initiated the first Scientific Working Groups (SWGs) in the early 1990s to facilitate consensus around forensic science operations among federal, state, and local agencies.[26] Each SWG has a formal structure and functions in accordance with its bylaws. Membership is at the discretion of the chair of the working group. Most SWGs include members from both public and private organizations. Meetings held at least once a year allow SWG members to discuss issues of concern and reach consensus on documents drafted throughout the year. The SWGs create, prepare, and publish standards and guidelines for their constituents in the forensic science community. These documents provide crime laboratories a basis for operational requirements, although the committee found that some standards and guidelines lack the level of specificity needed to ensure consistency. However, enforcement of the guidelines is left to the appropriate governing agency and each group's internal policies. The SWGs generate voluntary guidelines and protocols, which carry no force of law. Nonetheless, the SWGs have been a source of improved standards for the forensic science disciplines and represent the results of a profession that is working to strengthen its professional services with only limited resources.

The FBI Laboratory currently sponsors the following groups:

- Scientific Working Group for Firearms and Toolmarks (SWGGUN)
- Scientific Working Group for Forensic Document Examination (SWGDOC)
- Scientific Working Group for Materials Analysis (SWGMAT)
- Scientific Working Group on Bloodstain Pattern Analysis (SWGSTAIN)
- Scientific Working Group on DNA Analysis Methods (SWGDAM)
- Scientific Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG)
- Scientific Working Group on the Forensic Analysis of Chemical Terrorism (SWGFACT)
- Scientific Working Group on the Forensic Analysis of Radiological Materials (SWGFARM)
- Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)
- Scientific Working Group on Microbial Genetics and Forensics (SWGMGF)
- Scientific Working Group on Shoeprint and Tire Tread Evidence (SWGTREAD)

Additional SWGs may be sponsored by other FBI divisions or other agencies. For example, the U.S. Drug Enforcement Administration supports the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) (see Box 7-2).

---

**Box 7-2 A Sampling of SWGs**

*SWGDRUG*[27]

In 1997, the Drug Enforcement Agency and the Office of National Drug Control Policy created and sponsored a Technical Working Group for the Analysis of Seized Drugs (TWGDRUG), which was renamed a Scientific Working Group (SWGDRUG) in 1999. The stated objectives of SWGDRUG include the specification of requirements for forensic drug practitioners, the promotion of professional development, the exchange of information within the forensic science community, the promotion of ethical standards of practitioners, the provision of minimum standards for drug examinations and reporting, the establishment of quality assurance requirements, the consideration of relevant

---

[26] Federal Bureau of Investigation. 2000. Scientific Working Groups. Available at www.fbi.gov/hq/lab/fsc/backissu/july2000/swgroups.htm.

[27] N. Santos. 2007. "Drug Identification." Presentation to the committee. April 23, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1662

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

international standards, and the promotion of international acceptance of SWGDRUG recommendations. Individual subcommittees currently are devoted to evaluating analytical methods, setting standards for quality assurance, estimating uncertainty, formatting draft and final recommendations, and maintaining a glossary. The subcommittee develops recommendations, which the core committee votes to accept or reject. If accepted, draft documents are released for public comment for at least 60 days. Following public comment and possible revision, the core committee holds a final vote. Three-quarters of the core committee must be present, and two-thirds of those present must vote affirmatively in order to confer official status to a proposed recommendation.

SWGDRUG has produced guidelines for quality assurance protocols, methods of analysis and identification of seized drugs, and education and training materials for forensic practitioners. Quality assurance guidelines emphasize the integrity and storage of evidence, the validation and documentation of procedures, and the verification of standards. Among SWGDRUG's recommendations for education is a requirement that entry level forensic drug analysts possess at least a bachelor's degree in a natural science, with coursework in general, organic, and analytical chemistry. Guidelines on methods and analyses categorize analytical techniques into three groups, according to discriminating ability: "A" techniques are deemed the most discriminating, and "C" techniques are considered the least discriminating. For the purposes of identifying substances, SWGDRUG recommends the use of at least one "A" technique and one other additional test for validation. When an "A" technique cannot be used, at least two uncorrelated "B" tests and one additional method are suggested. SWGDRUG also has released supplementary documents to assist in implementing these guidelines.

## SWGGUN[28]

The FBI established SWGGUN in 1998 and has continued to fund the initiative in subsequent years. Subcommittees of a 20-member board draft guidelines in conjunction with external experts. Guidelines are posted on the SWGGUN website for public comment before the board finalizes the recommendations with an affirmative vote by two-thirds of the members present at a meeting.[29] Currently, SWGGUN offers guidelines on trigger pull analysis, education and experience requirements for firearm and toolmark examiners and trainees, laboratory training manuals, laboratory quality assurance programs, the range of possible conclusions when comparing toolmarks, projectile path reconstruction, and the examination of silencers. The SWGGUN website also offers an "admissibility resource kit," which offers arguments intended to satisfy the prongs of the *Daubert* standard.

## SWGMAT[30]

Since 1996, SWGMAT has been issuing voluntary guidelines addressing trace evidence, including hair comparison. Quality assurance guidelines, published in 2000, advise that two examiners separately analyze samples and suggest minimum levels for training and qualifications for examiners and laboratories. Hair comparison guidelines, published in 2005, address techniques for collecting hair samples, examining and interpreting protocols for microscopic examination, and using DNA testing in hair analysis. Notably, the use of DNA testing of hair is advised only after an initial microscopic analysis is conducted. In contrast to the larger forensic science community's recent interest in blind testing and statistical verification, SWGMAT proposes the following approach: The examiner should consider what meaning can be attached to an exclusion or association based upon the known case circumstances. Probabilities and population statistics should not be used in the interpretation of microscopic hair

---

[28] P. Striupaitis, Chair, IAI Firearm/Toolmark Committee, and member, SWGGUN. Presentation to the committee. April 23, 2007.
[29] Ibid.
[30] R.E. Bisbing, Executive Vice President, McCrone Associates, Inc., and member SWGMAT. Presentation to the committee. April 24, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1663

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

comparisons. Databases, from which population statistics can be generated (as is done in DNA analysis), are not practical or realistic for hair analysis.

### SWGFAST[31]

In 1995, the FBI created a Technical Working Group on Friction Ridge Analysis, Study, and Technology (TWGFAST). The group was renamed as a Scientific Working Group (SWGFAST) in 1998 and has continued to provide guidelines on fingerprint evidence, with funding from the FBI. Additionally, a National Institute of Justice grant has supported the development of a forthcoming SWGFAST reference manual.

The SWGFAST bylaws allow for up to 40 members and require biannual meetings. Members have included agency employees from federal, state, local, and foreign bodies and from the academic and private sectors. Proposed guidelines are released to the community for comment after receiving an affirmative vote by two-thirds of the SWGFAST members present at a meeting. A draft document is adopted following community review and feedback, if two-thirds of the members present at a meeting again vote in favor of such action. Accepted guidelines are reconsidered five years after adoption. Existing SWGFAST guidelines address automation training, digital imaging, friction ridge analysis for latent print examination, latent print proficiency testing, professional conduct, minimum qualifications and competency for latent print trainees, quality assurance, interpretation and conclusions, and validation research.[32]

Like all other SWG documents, SWGFAST's guidelines have no inherent authority or force of law. However, in collaboration with academic institutions, law enforcement agencies, and industy, SWGFAST has participated in the development of a standard data format for the Interchange of Fingerprint, Facial, & Scar Mark and Tattoo Information, through the American National Standard for Information Systems-NIST (ANSI-NIST-ITL 1-2007). Additionally, crime laboratories have purportedly relied on SWGFAST guidelines in order to meet the ASCLD/LAB accreditation Standards.[33]

Despite the proliferation of standards in many of the forensic science disciplines, their voluntary nature and inconsistent application make it difficult to assess their impact. Ideally, standards should be consistently applicable and measurable. In addition, mechanisms should be in place for their enforcement, with sanctions imposed against those who fail to comply. As such, standards should be developed with a consideration of the relevant measures that will be used to provide a meaningful evaluation of an organization's or individual's level of compliance. Appropriate standards must be coupled with effective systems of accreditation and/or certification that include strong enforcement mechanisms and sanctions.

Individual laboratories undergoing accreditation develop their own laboratory protocols. Whether these protocols adhere to the SWG standards depends on the individual examiners in the discipline in the laboratory in question. Accrediting bodies require that the methods meet a level of acceptable practice. Currently, most of these practices are slight variations of the SWG guidelines, with adjustments to accommodate differences in equipment.

---

[31] S. Meagher, Fingerprint Specialist, Federal Bureau of Investigation, and Vice-Chair SWGFAST. Presentation to the committee. April 24, 2007.

[32] See www.theiai.org/guidelines/swgfast/index.php.

[33] Meagher, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1664

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## PROFICIENCY TESTING

Although many forensic science disciplines have engaged in proficiency testing for the past several decades, several courts have noted that proficiency testing in some disciplines is not sufficiently rigorous.[34] ASCLD/LAB's website states that "Proficiency testing is an integral part of an effective quality assurance program. It is one of many measures used by laboratories to monitor performance and to identify areas where improvement may be needed. A proficiency testing program is a reliable method of verifying that the laboratory's technical procedures are valid and that the quality of work is being maintained." [35] Similarly, ISO/IEC 17025 policies state:

> Proficiency testing is one of the important tools used by laboratories and Accreditation Bodies for monitoring test and calibration results and for verifying the effectiveness of the accreditation process. As such, it is an important element in establishing confidence in the competence of Signatories and their accredited laboratories covered by this Arrangement.[36]

There are several types of proficiency tests, with the primary distinction among them being whether the examiner is aware that he or she is being tested (an open or declared test) or does not realize that the sample presented for analysis is a test sample and not a real case (a blind test). Tests can be generated externally, by another laboratory (sometimes called an interlaboratory test), or internally. Another type of testing involves random case reanalysis, in which an examiner's completed prior casework is randomly selected for reanalysis by a supervisor or another examiner.[37]

Interlaboratory testing can be conducted for a number of purposes:

(1)    to determine the performance of individual laboratories for specific tests or measurements and to monitor laboratories' continuing performance;

(2)    to identify problems in laboratories and initiate remedial actions, which may be related to, for example, individual staff performance or the calibration of instrumentation;

---

[34] See *United States v. Crisp*, 324 F.3d 261, 274 (4th Cir. 2003); *United States v. Llera Plaza*, 188 F. Supp. 2d 549, 565, 558 (E.D. Pa. 2002); *United States v. Lewis*, 220 F. Supp. 2d 548, 554 (S.D. W.Va. 2002).

[35] See www.ascld-lab.org/legacy/pdf/aslabinternproficiencyreviewprogram.pdf. It is worth noting that several studies have assessed or published crime laboratory proficiency testing results, which generally reveal the need for improvement: J.L. Peterson, E.L. Fabricant, K.S. Field, and J.I. Thornton. 1978. *Crime Laboratory Proficiency Testing Research Program.* Washington, DC: U.S. Government Printing Office; J.L. Peterson and P. Markham. 1995. Crime laboratory proficiency testing results, 1978-1991, I: Identification and classification of physical evidence. *Journal of Forensic Sciences* 40(6):994-1008; J.L. Peterson and P. Markham, 1995. Crime laboratory proficiency testing results, 1978-1991, II: Resolving questions of common origin. *Journal of Forensic Sciences* 40(6):1009-1029.

[36] See www.iso.org/iso/catalogue_detail?csnumber=39883.

[37] Refer to ISO/IEC Guide 43-1:1997(E) Section 4 for a list of proficiency testing schemes. Refer to ASTM E 1301 Section 6 for an overview of organization and design of proficiency tests. SWGs also provide guidelines for proficiency testing in the relevant discipline.

7-11

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1665

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

(3)    to determine the performance characteristics of a method and to establish the effectiveness and comparability of new tests or measurement methods; or

(4)    to assign values to reference materials and assess their suitability for use in specific tests or measurement procedures.[38]

Blind proficiency testing is recommended, but not required, by ASCLD/LAB—not as a way to determine error rates, but as a more precise test of a worker's accuracy. Initially, mandatory blind testing was proposed as part of the federal DNA Identification Act. A Department of Justice (DOJ) panel designed blind tests, evaluated them, and estimated it would cost $500,000 to $1 million annually for one test per laboratory.[39] In appropriate circumstances, proficiency testing should include blind testing.

ASCLD/LAB has a detailed proficiency testing program that requires all active examiners to take at least one proficiency test per year (two tests per year in DNA), that each discipline within the laboratory participate in an external proficiency test that is reviewed by a proficiency test review panel, and that any proficiency test that is not successfully completed be immediately reported to ASCLD/LAB along with a corrective action plan. To retain accredited status for a full five-year term, a laboratory must continue to meet the standards under which it was accredited. One of the means by which ASCLD/LAB monitors compliance is by reviewing proficiency testing reports submitted by approved test providers.

According to the 2002 BJS census,[40] 274 of the 351 publicly funded laboratories were engaged in proficiency testing. Proficiency testing was slightly less common among smaller laboratories and those serving municipal jurisdictions (8 laboratories did not engage in such testing, and 69 did not answer the survey question). Among the laboratories engaged in proficiency testing, almost all use declared tests. Slightly more than half engaged in proficiency testing use random case reanalysis. Twenty-six percent of the laboratories engaged in proficiency testing use blind tests. In addition, the BJS survey reported that almost all laboratories engaged in proficiency testing used tests that were generated externally (thus allowing comparative analysis). In addition to external tests, 74 percent of laboratories engaged in proficiency testing also used internally generated tests. Data on proficiency testing were not collected for the 2005 census.

**CERTIFICATION**

The certification of individuals complements the accreditation of laboratories for a total quality assurance program. In other realms of science and technology, professionals, including nurses, physicians, professional engineers, and some laboratorians, typically must be certified before they can practice.[41] The same should be true for forensic scientists who practice and testify. Although the accreditation process primarily addresses the management system, technical

---

[38] European Network of Forensic Science Institutes. 2005. *Guidance on the Conduct of Proficiency Tests and Collaborative Exercises Within ENFSI.* Available at www.enfsi.eu/uploads/files/QCC-PT-001-003.pdf.

[39] J.L. Peterson, G. Lin, M. Ho, Y. Chen, and R.E. Gaensslen. 2003. The feasibility of external blind DNA proficiency testing. Available at www.astm.org/JOURNALS/FORENSIC/PAGES/4241.htm.

[40] Peterson and Hickman, op. cit.

[41] T. Ortelli. 2008. Characteristics of candidates who have taken the Certified Nurse Educator: CNE examination: A two-year review. *Nursing Education Perspectives* 29(2):120; P. Nowak. 2008. Get IT-certified: Having employees with the right certifications can help dealers and integrators qualify for business and gain access to IT networks. *Network Technology* 38(3):123; S. Space. 2007. Investigator certification. *Issues in Clinical Trials Management* 8(2):73.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1666

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1668 of 2008 PageID #: 3558

methods, and quality of the work of a laboratory (which includes the education and training of staff), certification is a process specifically designed to ensure the competency of the individual examiner.

The American Bar Association has recommended that certification standards be required of examiners, including "demanding written examinations, proficiency testing, continuing education, recertification procedures, an ethical code, and effective disciplinary procedures."[42] In addition to improving quality, certification programs can enhance the credibility of certificate holders. An excellent description of the certification process is contained in the following excerpt from the National Association of Medical Examiners (NAME) website:

> In general, certification boards consist of respected professionals in a particular area of professional practice who develop standards for education, training, and experience that are required before one can become 'certified' in a particular professional discipline. Successful completion of a written and/or practical examination is also usually required. In essence, 'certification' usually means that a particular individual has completed a defined course of education, training, and experience, and has passed an examination prepared by peers which demonstrates that the individual has obtained at least the minimum level of competence required to practice the specific discipline. A number of 'Certification Boards' exist for people in various scientific disciplines....[43]

The professional forensic science community supports the concept of certification. ASCLD recommends that laboratory managers support peer certification programs that promote professionalism and provide objective standards. In 2002, the Technical Working Group on Forensic Science Education recommended certification of an individual's competency by an independent peer-based organization, if available, from a certifying body with appropriate credentials. In addition, IAI supports certification of forensic science practitioners.[44]

Some organizations, such as the American Board of Criminalists (ABC), offer examiner certification programs, but some certification organizations appear to lack stringent requirements.[45] In response, the American Academy of Forensic Sciences has formed a Forensic Specialties Accreditation Board to accredit certifying organizations. Organizations are invited to participate if they meet established requirements, such as periodic recertification, a sufficient knowledge base for certification, a process for providing credentials, and a code of ethics.[46] Currently accredited boards include:

- American Board of Criminalistics
- American Board of Forensic Document Examiners
- American Board of Forensic Toxicology

---

[42] American Bar Association, op. cit., p. 7.

[43] See http://thename.org/index.php?option=com_content&task=view&id=80&Itemid=41.

[44] K.F. Martin, President, IAI. Presentation to the committee. September 19, 2007.

[45] See M. Hansen. 2000. Expertise to go. *ABA J.* 86:44-45; E. MacDonald. 1999. "The Making of an Expert Witness: It's in the Credentials." *Wall Street Journal.* February 8, p. B1.

[46] See FABS Standards for Accrediting Forensic Specialty Certification Boards at www.thefsab.org/standards_20070218.pdf.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1667

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

- American Board of Medicolegal Death Investigators
- Board of Forensic Document Examiners
- International Institute of Forensic Engineering Sciences

IAI also has established certification programs in:

- Bloodstain Pattern Analysis
- Crime Scene Investigation
- Footwear
- Forensic Art
- Forensic Photography/Imaging
- Latent Print
- Tenprint Fingerprint[47]

Other certification programs exist for (but are not limited to) the following forensic science disciplines:

- Document Examination (The American Board of Forensic Document Examiners [ABFDE])
- Drug Analysis, Fire Debris Analysis, Molecular Biology, Trace Analysis, and General Criminalistics (ABC)
- Firearms and Tool Mark Identification (Association of Firearm and Tool Mark Examiners [AFTE])
- Forensic Odontology (The American Board of Forensic Odontology [ABFO])
- Forensic Pathology (The American Board of Pathology [ABP])
- Toxicology (American Board or Forensic Toxicology [ABFT])

Each of these entities has specific educational, training, and experience requirements, including a series of competency tests—both written and practical—and participation in proficiency testing, and provide continuing education/active participation by means of publication, presentation, and membership in professional organizations.

## OVERSIGHT AS A REQUIREMENT OF
## PAUL COVERDELL FORENSIC SCIENCE IMPROVEMENT GRANTS

One way of enforcing quality control is through the conditional funding of programs. The *Justice for All Act of 2004* (P.L. 108-405) that created the Coverdell Forensic Science Improvement Grants required that grant recipients certify that they have a process in place for independent, external investigations if allegations arise of "serious negligence or misconduct substantially affecting the integrity of the forensic results."[48]

In December 2005, the Office of the Inspector General (OIG) of DOJ issued a report of an audit that found that the Office of Justice Programs (OJP), which administers the program, "had not enforced or exercised effective oversight over the external investigation requirement for

---

[47] K.F. Martin, President, IAI. Presentation to the committee. September 19, 2007.
[48] 42 U.S.C. § 3797k(4).

7-14

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1668

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1670 of 2008
Strengthening Forensic Science in the United States: A Path Forward    PageID #: 3560
http://www.nap.edu/catalog/12589.html

the Fiscal Year (FY) 2005 Coverdell Program."[49] OJP did not require grant applicants to identify the government entities that they certified could perform independent external investigations:

> Our review found that NIJ did not enforce the Act's certification requirement. NIJ's FY 2005 Coverdell Grant Program Announcement did not give applicants necessary guidance on what constitutes an independent external investigation or how to make the required certification. In addition, the announcement did not provide examples of external investigation certifications and did not require an applicant to name the government entity responsible for conducting independent, external investigations. NIJ was aware of the shortcomings in the announcement because of questions it received from potential applicants and concerns expressed by the OIG, but failed to correct them.[50]

The OIG made three recommendations to improve the program announcement and application process (see Box 7-3).

A second audit of the program was released in January 2008.[51] Again, it reported that not all forensic laboratories that had received FY 2006 grant funds were covered by a government entity with the authority and capability to independently investigate allegations of serious negligence or misconduct. "Further, OJP's guidance does not require grantees and sub-grantees (forensic laboratories) to refer allegations of serious negligence and misconduct to entities for investigation."[52] The OIG found that 78 of the 231 entities contacted did not meet the external investigation certification requirement. It also found that "OJP did not adequately review the information it did obtain to ascertain that the certifications submitted by the grantees were properly completed."[53] The OIG made three recommendations to OJP to correct its certification process (see Box 7-3).

---

[49] U.S. Department of Justice Office of the Inspector General. 2005. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program*, Evaluation and Inspections Report I-2006-002. Available at www.usdoj.gov/oig/semiannual/0605/ojp.htm.
[50] Ibid.
[51] U.S. Department of Justice Office of the Inspector General. 2008. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program*, Evaluation and Inspections Report I-2008-001.
[52] Ibid., p, ii.
[53] Ibid., p. iii.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1669

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY

---

**Box 7-3 Recommendations from Two Reviews of the Coverdell Grant Program**

2005 - We believe that Coverdell Grant Program Announcements must provide necessary guidance to applicants and request the information required for NIJ to evaluate the external investigation certifications and conduct effective oversight of the grants. To meet the requirements of the Justice for All Act of 2004, we recommend that OJP, as part of its oversight of NIJ:

1. Require that all Coverdell Grant Program Announcements contain guidance on what constitutes an independent external investigation and examples of government entities and processes that could satisfy the certification requirement.
2. Require that each Coverdell Grant applicant, prior to receiving funds, provide the name of the government entity with a process in place to conduct independent external investigations into allegations of serious negligence or misconduct.
3. Consider requiring each Coverdell Grant applicant, prior to receiving funds, to submit a letter from the government entity that will conduct independent external investigations acknowledging that the entity has the authority and process to investigate allegations of serious negligence or misconduct.

2006 - To improve OJP's administration of the Coverdell Program and better ensure that allegations of negligence or misconduct are subject to independent external investigation, the OIG recommends that OJP take the following actions:

1. Revise the certification template to require that applicants name the government entities and confirm that the government entities have:
   a.      the authority,
   b.      the independence,
   c.      a process in place that excludes laboratory management, and
   d.      the resources to conduct independent external investigations into allegations of serious negligence or misconduct by labs that will received Coverdell funds.
2. Provide applicants with guidance that allegations of serious negligence or misconduct substantially affecting the integrity of forensic results are to be referred to the certified government entities.
3. Revise and document the Coverdell Program application review process so that only applicants that submit complete external investigation certifications are awarded grants.

SOURCE: U.S.DOJ Office of the Inspector General. 2005. *Review of the Office of Justice Programs' Forensic Science Improvement Grant Program*, Evaluation and Inspections Report I-2006-002. Available at www.usdoj.gov/oig/semiannual/0605/ojp.htm. U.S. DOJ OFFICE of Inspector General. 2008. Review of the Office of Justice Programs' Forensic Science Improvement Grant Program, Evaluation and Inspections Report I-2008-001.

---

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1670

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1672 of 2008
PageID #: 3562

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## CODES OF ETHICS

A code of ethics is another mechanism for encouraging the development and use of professional standards of conduct. However, there is disagreement about how effective such codes are in achieving that goal.[54] In 1991, Ladd argued that codes of ethics serve no good purpose and that reliance on such codes confuses ethics with law.[55] Some authors have noted that although practicing professionals rarely turn to their codes of ethics for guidance, the adoption of a code of ethics is critical to the professionalization of a group, because it indicates that the group recognizes an obligation to society that transcends its own self-interest.[56] However, codes of ethics can serve to provide rational bases for punishments, such as exiling violators from the community.

In the field of engineering, Davis asserts that codes of ethics should be understood as conventions among professionals:

> The code is to protect each professional from certain pressures (for example, the pressure to cut corners to save money) by making it reasonably likely . . . that most other members of the profession will not take advantage of her good conduct. A code protects members of a profession from certain consequences of competition. A code is a solution to a coordination problem.[57]

Also in the field of engineering, Harris et al. argue that codes can serve as a collective recognition by members of a profession of its responsibilities, creating an environment in which ethical behavior is the norm.[58] Moreover, a code of ethics can serve as an educational tool, providing a starting point for discussion in coursework and professional meetings.

Many forensic science organizations—such as the American Academy of Forensic Sciences, the California Association of Criminalists, and ASCLD—have codes of ethics or codes of professional practice imploring members to act with honesty, integrity, and objectivity; to work within the bounds of their professional competence; to present testimony and reports in a clear and objective manner; and to avoid conflicts of interest and potential bias, among other things. The codes that do exist are generally comprehensive, but they vary in content. As a consequence, there is no single code of ethics to which all members of the forensic science profession subscribe. As the committee concluded its work, it learned of an effort by ASCLD/LAB to develop a uniform code of ethics.

---

[54] A series of articles published in the *Journal of Forensic Sciences* 34(3) (May 1989) addressed a range of ethical dilemmas facing individuals practicing science in the criminal justice system.

[55] J. Ladd. 1991. The quest for a code of professional ethics: An intellectual and moral confusion. In: D.G. Johnson (ed.). *Ethical Issues in Engineering*. Englewood Cliffs, NJ: Prentice-Hall, pp. 130-136.

[56] H.C. Luegenbiehl. 1983. Codes of ethics and the moral education of engineers. *Business and Professional Ethics Journal* 2:41-61; D.G. Johnson (ed.). 1991. *Ethical Issues in Engineering*. 1991. Englewood Cliffs, NJ: Prentice-Hall, 137-154.

[57] M. Davis. 1991. Thinking like an engineer: The place of a code of ethics in the practice of a profession. *Philosophy and Public Affairs* 20(2):150-167, p. 154.

[58] C.E. Harris, M.S. Pritchard, and M.J. Rabins. 1995. *Engineering Ethics: Concepts and Cases*. Belmont, CA: Wadsworth Publishing.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1671

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1673 of 2008 PageID #: 3563

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## CONCLUSIONS AND RECOMMENDATIONS

Although some areas of the forensic science disciplines have made notable efforts to achieve standardization and best practices, most disciplines still lack any consistent structure for the enforcement of "better practices," operating standards, and certification and accreditation programs. Accreditation is required in only three states—New York, Oklahoma, and Texas. In other states, accreditation is voluntary, as is individual certification. Certification, while broadly accepted by the forensic science community, is not uniformly offered or required.

Although many forensic science organizations have codes of ethics, these codes can be enforced to regulate only the practices of persons who belong to a given organization. A uniform code of ethics should be in place across all forensic organizations to which all forensic practitioners and laboratories should adhere.

**Recommendation 6:**

> **To facilitate the work of the National Institute of Forensic Science (NIFS), Congress should authorize and appropriate funds to NIFS to work with the National Institute of Standards and Technology (NIST), in conjunction with government laboratories, universities, and private laboratories, and in consultation with Scientific Working Groups, to develop tools for advancing measurement, validation, reliability, information sharing, and proficiency testing in forensic science and to establish protocols for forensic examinations, methods, and practices. Standards should reflect best practices and serve as accreditation tools for laboratories and as guides for the education, training, and certification of professionals. Upon completion of its work, NIST and its partners should report findings and recommendations to NIFS for further dissemination and implementation.**

**Recommendation 7:**

> **Laboratory accreditation and individual certification of forensic science professionals should be mandatory, and all forensic science professionals should have access to a certification process. In determining appropriate standards for accreditation and certification, the National Institute of Forensic Science (NIFS) should take into account established and recognized international standards, such as those published by the International Organization for Standardization (ISO). No person (public or private) should be allowed to practice in a forensic science discipline or testify as a forensic science professional without certification. Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories and facilities (public or private) should be accredited, and all forensic science professionals should be certified, when eligible, within a time period established by NIFS.**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1672

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING OVERSIGHT— PREPUBLICATION COPY

**Recommendation 8:**

Forensic laboratories should establish routine quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners. Quality control procedures should be designed to identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement.

**Recommendation 9:**

The National Institute of Forensic Science (NIFS), in consultation with its advisory board, should establish a national code of ethics for all forensic science disciplines and encourage individual societies to incorporate this national code as part of their professional code of ethics. Additionally, NIFS should explore mechanisms of enforcement for those forensic scientists who commit serious ethical violations. Such a code could be enforced through a certification process for forensic scientists.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1673

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1674

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 8
# EDUCATION AND TRAINING IN FORENSIC SCIENCE

Forensic examiners must understand the principles, practices, and contexts of science, including the scientific method. Training should move away from reliance on the apprentice-like transmittal of practices to education at the college level and beyond that is based on scientifically valid principles, as discussed in Chapter 4. For example, in addition to learning a particular methodology through a lengthy apprenticeship or workshop during which a trainee discerns and learns to copy the skills of an experienced examiner, the junior person should learn what to measure, the associated population statistics (if appropriate), biases and errors to avoid, other threats to the validity of the evidence, how to calculate the probability that a conclusion is valid, and how to document and report the analysis. Among many skills, forensic science education and training must provide the tools needed to understand the probabilities and the limits of decisionmaking under conditions of uncertainty.

To correct some of the existing deficiencies, the starting place must be better undergraduate and graduate programs, as well as increased opportunities for continuing education. Legitimating practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education and training and the proper conduct of research.

Education and training in the forensic science disciplines serve at least three purposes. First, educational programs prepare the next generation of forensic practitioners. The number of secondary and postsecondary students interested in the forensic science disciplines has grown substantially in recent years. In response, colleges and universities have created new certificate and degree programs to prepare students for forensic science careers. There are several types of forensic practitioners, including criminalists (those who work in crime laboratories), who make up a large part of the forensic science workforce and who often enter the profession with a bachelor's degree, and other forensic science practitioners (e.g., pathologists, odontologists, entomologists, toxicologists, anthropologists), who typically have advanced degrees, often Ph.D.s, and who might work part time in forensic science activities. Another group of forensic examiners include crime scene investigators, who usually do not have advanced degrees; many do not have college degrees above the associate level.

Second, forensic science practitioners require continuing professional development and training. Scientific advances in forensic science techniques and research in the forensic science disciplines are of interest to practitioners who must be aware of these new developments. Forensic science practitioners also may need to complete additional training for certification purposes or may desire to learn new skills as part of their career development. Training refers to the "formal, structured process through which a forensic scientist reaches a level of scientific knowledge and expertise required to conduct specific forensic analyses."[1] Continuing professional development is the "mechanism through which a forensic scientist remains current or advances to a higher level of expertise, specialization, or responsibility."[2]

---

[1] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students*. Washington DC: National Institute of Justice, p. 25.
[2] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1675

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

Third, there is a need to educate the users of forensic science analyses, especially those in the legal community. Judges, lawyers, and law students can benefit from a greater understanding of the scientific bases underlying the forensic science disciplines and how the underlying scientific validity of techniques affects the interpretation of findings. These three objectives are explored in more detail in this chapter.

## STATUS OF FORENSIC SCIENCE EDUCATION

### Demand for Forensic Science Practitioners

Demand for more and better-skilled forensic science practitioners is rising at both the macro and micro levels. At the macro level, the appropriate question to ask is, what is the need for forensic science expertise in the United States? At the micro level, the question to ask is, what are the needs of a crime laboratory in hiring new forensic science personnel?

As the National Institute of Justice (NIJ) notes:

In recent years, the demand for forensic scientists has increased for many reasons, including population demographics, increased awareness of forensic science by law enforcement, increased numbers of law enforcement officers, database automation in several categories of physical evidence, jury expectations, legal requirements, accreditation and certification requirements of laboratories and personnel, impending retirement of a large number of currently practicing forensic scientists, and increased public awareness of forensic science through the popular media.[3]

One manifestation of the need for more examiners is the backlog of requests for forensic services at crime laboratories. As noted in previous chapters of this report (based on the 2005 Census of Publicly Funded Forensic Crime Laboratories), many forensic laboratories experience large backlogs in requests for forensic services. To achieve a 30-day turnaround on all 2005 requests, the different forensic science disciplines would have needed varying increases in the number of full-time examiners performing that work—ranging from an estimated 73 percent increase in DNA examiners to an estimated 6 percent increase in examiners conducting toxicology analysis.[4]

The most recent *Occupational Outlook Handbook*, prepared by the Bureau of Labor Statistics at the U.S. Department of Labor, found that job growth for forensic science technicians will grow much faster than average, with 13,000 jobs available in 2006 and a projected 31 percent rise, or 17,000 jobs, projected by 2016.[5] Yet one analyst argued that "existing science programs overproduce graduates relative to the actual labor market" in criminalistics.[6] Having an accurate picture of demand—as well as the capacity of employers to absorb new forensic science

---

[3] Ibid., p. 3.
[4] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.
[5] Bureau of Labor Statistics, Department of Labor. "Science Technicians." In: *Occupational Outlook Handbook, 2008-09 edition.* Available at www.bls.gov/oco/ocos115.htm#projections_data.
[6] R.E. Gaensslen. 2003. How do I become a forensic scientist? Educational pathways to forensic science careers. *Analytical and Bioanalytical Chemistry* 376:1151-1155.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1676

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1678 of 2008
PageID #: 3568
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

professionals—is important for colleges and universities that are educating and training the future workforce. Additional information on such factors as retirement and attrition rates and on trends in funding for laboratory personnel could assist educational providers in obtaining a more accurate picture of future employment prospects for their students.

The micro level focuses on the skills that individuals need to gain entry into forensic science careers (see Table 8-1). As a starting point, one needs an appropriate degree. The required minimum degree for entry-level forensic science positions ranges from a bachelor's degree to a doctoral or medical degree.[7] Almirall and Furton[8] suggest that it is possible to begin a career as a crime scene investigator or in firearms, documents, or fingerprints with an associate degree.

| Table 8-1 Educational Pathways to Some Forensic Science Careers | |
| --- | --- |
| **Forensic Discipline** | **Educational Requirements** |
| Crime scene investigation | Jobs are typically held by law enforcement personnel. Meet requirements for joining the law enforcement agency. For federal jobs, a college degree is required. |
| Computer crime investigation/ forensic computer science | B.S. in computer science or computer engineering; M.S. may be common. |
| Criminalistics | B.S. in the physical sciences, with background in chemistry |
| Forensic engineering | B.S. in engineering; practitioners may also be licensed as professional engineers (PEs). |
| Forensic pathology | Appropriate college degree; M.D.; internship and pathology residency; and specialized training in forensic pathology; additionally requires state license and board certification. |
| Forensic odontology | Appropriate college degree; D.D.S. or D.D.M.; may include additional specialty training; additionally requires state license and board certification. |
| Forensic entomology | Ph.D. in entomology. |
| Forensic anthropology | M.S. or M.A. at minimum; many have Ph.D.s. |
| Forensic psychiatry | Similar to forensic pathology, with residency in psychiatry. |
| Forensic psychology | M.S.W. or Ph.D. in psychology; often must meet state requirements for clinical practice and may be certified. |
| SOURCE: Gaensslen, 2003. | |

It should be noted that the preferred degree is often higher than an associate degree. Almirall and Furton posit that future trends favor a minimum of a graduate degree in almost all areas of forensic science.[9]

---

[7] Gaensslen, op. cit.

[8] R. Almirall and K.G. Furton. 2003. Trends in forensic science education: Expansion and increased accountability. *Analytical and Bioanalytical Chemistry* 376:1156-1159.

[9] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1677

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

An issue that has received much attention is the degree requirements for positions in crime laboratories. A requirement for an entry-level position in most crime laboratories is at least a bachelor's degree in a natural science or forensic science, and many laboratories require a year or two of experience, with a master's degree. Over the years, most crime laboratory hires have been and continue to be graduates with degrees in chemistry or biology.

Several studies have focused on the needs of crime laboratories. In 1988 Siegel conducted a survey of undergraduate students at Michigan State University, forensic science practitioners employed by the Michigan State Police, and 240 members of the American Society of Crime Laboratory Directors (ASCLD).[10] Survey respondents expressed a strong preference for a master's degree in forensic science and a lack of preference for the B.S. in criminalistics/forensic science. One explanation noted by the respondents was "that too many programs passing themselves off as forensic science programs were actually little more than criminal justice programs with a forensic science internship and a smattering of 'hard' science."[11] Another finding was the importance of chemistry in the backgrounds of prospective forensic science examiners.

Also in 1988, Higgins and Selavka surveyed laboratory managers.[12] Similar to the findings of Seigel, "chemical knowledge was the most important ability they considered when evaluating potential employees...."[13] In 1996, Furton et al. surveyed members of the ASCLD, primarily drug chemists and trace evidence analysts.[14] This survey found that "the majority of crime lab directors responding require applicants to have B.S. degrees with a preference for chemistry/biochemistry, followed by biology and forensic science with a requirement for a substantial number of chemistry and other natural science courses."[15]

## Proliferation of Forensic Science Programs

In recent years, increasing attention has been paid to the forensic science disciplines by the media in the form of many new books, movies, high-profile court cases, and, especially, television shows such as *Crime Scene Investigation* (or CSI).[16] This media attention has resulted in explosive demand by college (as well as primary and secondary school) students for academic courses and degree programs that will prepare them for careers in forensic science that are like those portrayed in the media. Evidence of this is the dramatic rise in enrollments in forensic science courses on college campuses.[17]

---

[10] J.A. Siegel. 1988. The appropriate educational background for entry level forensic scientists: A survey of practitioners. *Journal of Forensic Sciences* 33(4):1065-1068.

[11] Ibid., pp. 1067-1068.

[12] K.M. Higgins and C.M. Selavka. 1988. Do forensic science graduate programs fulfill the needs of the forensic science community? *Journal of Forensic Sciences* 33(4):1015-1021.

[13] Ibid., p. 1017.

[14] K.G. Furton, Y.L. Hsu, and M.D. Cole. 1999. What educational background is required by crime laboratory directors? *Journal of Forensic Sciences* 44:128-132.

[15] Ibid., p. 130.

[16] See, e.g., S. Smallwood. 2002. As seen on TV. *Chronicle of Higher Education* 48(45):A8-A10.

[17] There have been similar increases in demand at the K-12 level. Forensic science has become a popular component of science teaching. An informal survey conducted in 2004 by the National Science Teachers Association found that, "Of the 450 middle and high school science educators who responded to an informal survey, 77 percent indicated that their school or school district is using forensic investigations to teach science. When asked if the popularity of forensic-based TV shows had ignited students' interest in science, the response was a resounding 'yes' (78 percent)." *NSTA Survey Reveals Forensic Science Is Hottest New Trend in Science Teaching*, available at http://science.nsta.org/nstaexpress/nstaexpress_2004_10_25_forensic.htm.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1678

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

One issue facing academic forensic science programs is combating Hollywood's version of the career of a forensic practitioner. "Students who enter forensic science programs often expect to work in conditions similar to the television crime shows they watch. Many find they are unprepared for the reality of a career in the field. 'A lot of new students come to our programs looking for an exciting career. Unfortunately, they come with unrealistic expectations,' says Charles Tindall, director of forensic science at the Metropolitan State College of Denver."[18]

Until recently, there were few academic programs in the forensic science disciplines. The earliest forensic science degree programs and the oldest continually functioning educational degree programs in forensic science in the United States were established at Michigan State University in 1946 and the University of California at Berkeley in 1950.[19] A survey conducted in the mid-1970s located 22 colleges and universities in the United States offering degrees (in one case a certificate) in criminalistics/forensic science, although some of these institutions offered multiple degrees.[20]

In the 1980s, a contraction of programs occurred—particularly at the graduate level. Stoney argues that this was because of a lack of financial and administrative support.[21] Higgins and Selavka suggest that the end of funding provided by the Law Enforcement Assistance Administration in 1978 took important federal support away from many institutions.[22] Additionally, they suggest that the then-declining enrollment in graduate programs might have reflected the generally low-paying opportunities available to newly minted graduates.

In recent years, this trend has reversed itself. Many colleges and universities, seeing the potential revenue from increasing numbers of new students, have responded by creating all manner of new academic programs. The American Academy of Forensic Sciences (AAFS) now lists 138 undergraduate, 59 graduate, and 6 doctoral forensic science degree programs in the United States.[23] Not all are science based—many are criminal justice programs. The curricula of these degrees range from rigorous scientific coursework amounting to a degree in chemistry or biology with forensic science content, to little more than criminal justice degrees with an internship.

**Doctoral Programs in Forensic Science**

There is no doctoral program specifically in forensic science; the programs noted by AAFS offer Ph.D.s (mostly in chemistry) with a concentration in that area. Some scholars consider this to be a shortcoming in forensic science education. More than 20 years ago, Kobilinksy and Sheehan conducted a survey of crime laboratories throughout the United States and found that almost 73 percent of those responding believed there was a need for a Ph.D. program.[24] The advantages of a Ph.D. program lie in its positive effect on basic research in the field. Doctoral programs offer more research depth and capacity, have ties to other fields, have

---

[18] National Institute of Justice. 2007. *Addressing Shortfalls in Forensic Science Education.* InShort, NCJ 216886. Washington, DC: U.S. Department of Justice, National Institute of Justice.

[19] A. Vollmer, Chief of Police, Berkeley, California, established the School of Criminology at the University of California at Berkeley.

[20] J.L. Peterson, D. Crim, and P.R. De Forest. 1977. The status of forensic science degree programs in the United States. *Journal of Forensic Sciences* 22(1):17-33.

[21] D.A. Stoney. 1988. A medical model for criminalistics education. *Journal of Forensic Sciences* 33(4):1086-1094.

[22] Higgins and Selavka, op. cit.

[23] See www.aafs.org.

[24] L. Kobilinksy and F.X. Sheehan. 1984. The desirability of a Ph.D. program in forensic science. *Journal of Forensic Sciences* 29(3):706-710.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1679

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

high expectations for quality, supply graduate student personnel to question and check past work and challenge conventional wisdom, and inspire more mentoring, which has two-way benefits.

## CHALLENGES AND OPPORTUNITIES TO IMPROVE
## FORENSIC SCIENCE EDUCATION

The overarching challenges facing forensic science education, since its inception, have been inconsistent quality and insufficient funding. Commentators have noted repeatedly the deficiencies of forensic science education programs.[25] Because, until recently, no nationally recognized, mandated standards existed for forensic science degree programs at any level, consistent quality cannot be achieved. Peterson et al. note that while "the primary objective of all degree programs is similar, the capabilities of graduates from the respective institutions are not uniform. Laboratories are forced to evaluate each graduate student individually to determine his suitability for a given position."[26]

Unevenness in the quality of these programs has caused problems for students and future employers. The Council of Forensic Science Educators stated that, "Students completing these lesser programs expect to find employment in crime labs but are surprised to learn that lab management is not impressed by the curriculum."[27]

Additionally, the lack of applicants with a science or forensic background means that crime laboratories have to spend precious time and resources in the training of new scientists.[28] If forensic science education programs had sufficient rigor in science, law, and forensics, crime laboratories would have to spend less time and money for training,[29] thereby shortening as well the apprenticeship time needed. Forensic science methods should be taught in the framework of common scientific practice (see Chapters 4 through 6). Even if a student graduates with a science degree, he or she often lacks education in issues that are critical to the functioning of crime laboratories, including quality assurance and control, ethics, and expert testimony. Peterson et al. found that, "The faculty surveyed believes their students to be well prepared for entry into the field. This is not totally consistent with the feedback from some laboratories which have been less than satisfied with newly graduated recruits."[30] They continue to recommend that, "Measures should be taken to improve feedback from the laboratories to the schools to insure that the curriculum is not only comprehensive from an academic standpoint but also meets the practical requirements of operating laboratories."[31]

Over the past few years, major strides have been taken in bringing a measure of standardization to forensic science education programs and boosting their quality. The NIJ report, *Forensic Science: Review of Status and Needs,* called in part for an accreditation system for such programs. Following this report, in 2001, NIJ established a Technical Working Group for Education and Training in Forensic Science (TWGED)—consisting of 47 experts, including educators, judges, attorneys, crime laboratory directors, and subject matter scientists—that developed recommended curricular guidelines for undergraduate and graduate forensic science

---

[25] See, e.g., Peterson et al., op. cit; L.W. Bradford. 1980. Barriers to quality achievement in crime laboratory operations. *Journal of Forensic Sciences* 25(4):902-907; Stoney, op. cit.; NIJ, op. cit.

[26] Peterson et al., op. cit., p. 31.

[27] See www.criminology.fsu.edu/COFSE/default.htm.

[28] Stoney, op. cit.

[29] NIJ, 2007, op. cit.

[30] Peterson et al., op cit., p. 32.

[31] Programs accredited by FEPAC are required to complete periodic self-assessments, which include job placement statistics and employer satisfaction surveys.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1680

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1682 of 2008
PageID #: 3572

programs. These were provided in a 2004 report.[32] In 2002, the American Academy of Forensic Sciences created an ad hoc committee, the Forensic Education Program Accreditation Committee, to look into issues regarding an accreditation system. The committee was made a standing committee in 2004, at which time the name was changed to the Forensic Science Education Program Accreditation Commission (FEPAC). FEPAC is made up of five forensic science educators, five crime laboratory directors, and one public member. FEPAC created a process for accrediting undergraduate and graduate forensic science programs using the TWGED standards.[33]

FEPAC standards are divided into three parts (see Table 8-2). There are general standards that all programs must meet and then additional standards for undergraduate and graduate programs.

---

**Table 8-2. Major Areas of FEPAC Standards**

**General Standards for All Programs**
- Eligibility
- Planning and Evaluation
- Institutional Support
- Student Support Services
- Recruiting and Admissions Practices, Academic Calendars, Catalogs, Publications, Grading, and Advertising
- Record of Student Complaints
- Distance Learning and Other Alternative Delivery Mechanisms

**Undergraduate Program Standards**
- Mission, Goals, and Objectives
- Undergraduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

**Graduate Program Standards**
- Mission, Goals, and Objectives
- Graduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

SOURCE: www.aafs.org.

---

[32] Technical Working Group for Education and Training in Forensic Science. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions and Students,* Special Report. Washington, DC: U.S. Department of Justice, National Institute of Justice. NCJ 203099.
[33] See FEPAC Accreditation Standards, available at www.aafs.org/pdf/FEPAC%20Accreditation%20Standards%20_082307_.pdf.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1681

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

An important note regarding the accreditation process is that the program must award at least a bachelor's degree in either forensic science or a natural science with a concentration in forensic science at both the bachelor's and master's levels. Programs that award certificates or associate degrees are ineligible for accreditation in this system. Additionally, at this time only U.S. programs are eligible for accreditation.

To summarize the general standards, such programs shall:

- have an explicit process for evaluating and monitoring its overall efforts to fulfill its mission, goals, and objectives; for assessing its effectiveness in serving its various constituencies; for modifying the curriculum as necessary, based on the results of its evaluation activities; and for planning to achieve its mission in the future;
- have adequate institutional support in the form of financial resources, facilities, instructional, and support services;
- provide adequate student support services, such as mentoring, advising, and career placement;
- have policies and procedures for student recruitment and admissions, with advisers to students regarding requirements for employment;
- have procedures for handling student complaints; and
- consider the use of distance learning as an instructional technique, demonstrating that all required laboratory experiences are hands-on for all students.

Concerning the undergraduate curriculum, it should, at a minimum, ensure that each student (1) obtain a thorough grounding in the natural sciences; (2) build upon this background by taking a series of more advanced science classes; and (3) develop an appreciation of issues specific to forensic science through course work and laboratory-based instruction.

Forensic science undergraduates in the chemistry track should take, at a minimum, chemistry courses required for chemistry majors—general chemistry, organic chemistry, physical chemistry, analytical chemistry, instrumental analysis, and biochemistry. Forensic science students in the biology track should take those chemistry courses required for biology majors and biology courses for biology majors, including general biology, biochemistry, instrumental analysis, genetics, molecular biology, and population genetics. All forensic science students should, at the earliest point possible, take a hands-on crime scene investigation course that teaches the principles of evidence, including its collection, preservation, and value. Additionally, the forensic science courses in drug analysis, criminalistics, and forensic biology (including DNA analysis) should be at the highest level. All forensic science majors should take a capstone course.

For graduate programs, the curriculum should, at a minimum, ensure that each student (1) understand essential issues in the forensic science disciplines, including the reduction of error rates; (2) develop an understanding of the areas of knowledge that are essential to forensic science; (3) acquire skills and experience in the application of basic forensic science concepts and of specialty knowledge to problem solving; (4) be oriented in professional values, concepts and ethics; and (5) demonstrate integration of knowledge and skills through a capstone experience, such as a formal, objective tool (e.g., the American Board of Criminalistics Forensic Science Aptitude Test) or another comprehensive examination or a thesis and/or research project.

Depending on the specialty track of interest, graduate students should take advanced courses in specialty areas of interest—drug analysis, toxicology, criminalistics, forensic biology, and forensic DNA analysis (including mtDNA sequencing, low copy number techniques, and

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1682

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

SNPs). The criminalistics and forensic biology courses should be advanced beyond those seen at the undergraduate level. If the student has not had those lower-level courses, they should be taken first. Graduate students also should take a hands-on crime scene investigation class that covers investigation techniques and evidence association, including its examination, collection, and preservation. In addition, in-service work with a collaborating institution can provide significant practical training.

Finally, the standards lay out a suggested curriculum for forensic science education programs. At the undergraduate level, coursework includes several classes in the natural sciences (with a focus on chemistry); specialized science courses (e.g., microbiology, genetics, biochemistry); forensic science courses—which cover courtroom testimony; introduction to law; quality assurance; ethics; professional practice; evidence identification, collection and processing; a survey of the forensic science disciplines; and additional courses in the student's area of specialization. Laboratory work must be complemented with hands-on training that closely mimics the experiences of the crime laboratory. At the graduate level, students should take core forensic science topics, such as physical evidence concepts and ethics and professional responsibilities; courses in specialized areas; and a graduate seminar—all aimed at developing skills for conducting independent research.

FEPAC began a pilot accreditation program in the fall of 2003, accrediting five programs,[34] and the number of accredited programs has continued to grow (see Table 8-3). As of January 2008, 16 programs have met FEPAC's rigorous standards and accordingly have been accredited by FEPAC.

Accredited forensic science programs are listed on the AAFS website. Accreditation is seen as providing a "seal of quality to an institution;" helping faculty to improve their curricula; creating a standard for measuring the quality of forensic science programs; and benefiting laboratories by reducing the need for in-house training.[35] Accreditation should become the norm. The committee believes that, to encourage accreditation, a mechanism could be developed whereby only accredited programs would be eligible to receive certain federal grants and/or scholarships for its students. If the forensic science disciplines are to grow in stature and be recognized for their scientific rigor and high standards of quality, their research base must be broadened and strengthened. This will occur only if significant federal research funds are made available to universities by scientific granting agencies such as the National Institutes of Health and the National Science Foundation. Crime laboratories would be the beneficiaries of a wave of well-educated workers who would elevate the scientific standards of the field. The forensic science degree programs that are not sufficiently rigorous eventually would disappear, because their graduates would not be competitive in the employment arena. Consequently, employers would be more confident in the capabilities of graduates of forensic science programs and hence would be more inclined to hire them.

---

[34] Cedar Crest College (Allentown, Pennsylvania), Eastern Kentucky University (Richmond, Kentucky), Florida International University (Miami, Florida), Metropolitan State College of Denver (Denver, Colorado), and Michigan State University (East Lansing, Michigan).
[35] NIJ, 2000, op. cit.

8-9

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1683

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

| Table 8-3. FEPAC Accredited Programs, 2008 | |
| --- | --- |
| **Programs** | **Degree Program** |
| Albany State University | Bachelor of Science Degree in Forensic Science |
| Arcadia University | Master of Science Degree Program in Forensic Science |
| Cedar Crest College | Bachelor of Science Degree Program in Chemistry, Biochemistry, Biology, and Genetic Engineering, with a concentration in Forensic Science |
| Eastern Kentucky University | Bachelor of Science Degree Program in Forensic Science |
| Florida International University | Certificate Programs in Conjunction with the Bachelor of Science in a Natural Science such as Chemistry or Biology |
| Florida International University | Master of Science Degree Program in Forensic Science |
| Marshall University | Master of Science Degree Program in Forensic Science |
| Metropolitan State College of Denver | Bachelor of Science Degree Program in Chemistry with a concentration in Criminalistics |
| Michigan State University | Master of Science Degree Program (biology and chemistry tracks) |
| University of Mississippi | Bachelor of Science Degree in Forensic Chemistry |
| Ohio University | Bachelor of Science Degree in Forensic Chemistry |
| SUNY at Albany | Master of Science Degree in Forensic Molecular Biology |
| Virginia Commonwealth University | Bachelor of Science Degree in Forensic Science |
| Virginia Commonwealth University | Master of Science Degree in Forensic Science |
| West Chester University | Bachelor of Science Degree Program In Forensic and Toxicological Chemistry |
| West Virginia University | Bachelor of Science Degree - Forensic and Investigative Science Program |
| SOURCE: www.aafs.org. | |

## RESEARCH AS A COMPONENT OF FORENSIC SCIENCE EDUCATION PROGRAMS

Student research and exposure to research is a critical component of an appropriate forensic science education.[36] Research funding supports both faculty and graduate student research. Funding also supports the acquisition and maintenance of equipment and major research instrumentation and laboratory renovation.[37] As noted in Chapter 2, the level of funding for forensic science research programs is seen by many observers as inadequate. Fisher notes that "labs are looking for more forensic scientists at the master's and doctorate level. For universities to run graduate-level programs in the science, research dollars must be made available. However, the amounts of such R&D funds available to support forensic science at the National Institute of Justice are small and are all but non-existence [sic] from the National Science Foundation, and other funding sources."[38] Likewise, NIJ reported in 2004 that, "Currently, no sustainable source of State or Federal funding exists to support graduate education or research in forensic science.

---

[36] To receive accreditation by FEPAC, a graduate program must include a component in which each student completes an independent research project leading to a thesis or written report, presented orally in a public forum for evaluation.

[37] NIJ, 2004, op. cit., p. 23.

[38] B.A.J. Fisher. 2003. Field needs adequate funding, national forensic science commission. *Forensic Focus*. See http://forensicfocusmag.com/articles/3b1persp1.html.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1684

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1686 of 2008
PageID #: 3576

Nor should state and local governments fund research, as their funds have to support the service mission of the laboratories. The National Institute of Justice has traditionally provided virtually all federal research funding for forensic science, but additional funding from alternative sources is essential."[39]

Many forensic degree programs are found at small colleges or universities with few graduate programs in science and where research resources are limited. The lack of research funding has discouraged universities in the United States from developing research-based forensic degree programs, which leads to limited opportunities to attract graduate students into such programs. Only a few universities offer Ph.D.-level education and research opportunities in forensic science, and these are chemistry or biology programs with a forensic science focus. Most graduate programs in forensic science are master's programs, where financial support for graduate study is limited.

In addition, the lack of research funds means that universities are unlikely to develop research programs in forensic science. This lack of funding discourages top scientists from exploring the many scientific issues in the forensic science disciplines. This has become a vicious cycle during which the lack of funding keeps top scientists away and their unavailability discourages funding agencies from investing in forensic science research. Traditional funding agencies have never had a mission to support forensic science research.

## STATUS OF TRAINING

Continuing education and in-service training in forensic science have been significant issues for many years. Funding programs initially were offered in the early 1970s through the Law Enforcement Assistance Administration. As forensic science grew, the needs for ongoing training and continuing education also grew. Several studies funded by NIJ have been undertaken since 1999—*Forensic Sciences: Review of Status and Needs* (1999); [40] *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students* (2004),[41] developed by TWGED; and a report prepared by ASCLD for NIJ, published in May 2004, which has become known as the *180-day Study Report: Status and Needs of United States Crime Laboratories.*[42]

The issues addressed in all of these reports are the same ones confronting this committee today, namely the need for continuing education and the ongoing training of working examiners in the various disciplines:

> Prior to conducting analysis on evidence, forensic scientists require both basic scientific education and discipline-specific training. To be in compliance with widely-accepted accreditation standards, scientists in each of the disciplines must have, at a minimum, a baccalaureate degree in a natural science, forensic science, or a closely-related field. Each examiner must also have successfully completed a

---

[39] NIJ, 2004, op. cit., p. 22.
[40] National Institute of Justice. 1999. *Forensic Sciences: Review of Status and Needs*. Washington DC: National Institute of Justice.
[41] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students*. Washington DC: National Institute of Justice.
[42] American Society of Crime Laboratory Directors (ASCLD). 2004. *180-day Study Report: Status and Needs of United States Crime Laboratories*. Largo, FL: ASCLD.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1685

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

competency test (usually after a training period) prior to assuming independent casework.[43]

After the initial training period, continuing training is necessary to maintain and update knowledge and skills in new technology, equipment, and methods.

Accreditation and certification programs require some type of continuing education, and the various Scientific Working Groups (SWGs) recommend such programs (see Chapter 7). Continuing professional development also is a means of expanding one's expertise and career advancement.

**Training Needs**

As described by ASCLD:

> When a new analyst or examiner is hired, usually a recent university graduate, that individual requires initial training to build competency. The length of the initial training provided to an analyst depends upon the laboratory specialty area the trainee will enter.
>
> For example, controlled substance analysts may require only six to twelve months of training. Those training in experience-based disciplines such as latent prints examinations, firearms and toolmarks analyses, and questioned documents examinations may require up to three years of training before being permitted to perform independent casework. During their training period, individuals in experience-based disciplines serve much like an apprentice to a senior examiner.[44]

NIJ describes a variety of training needs for forensic scientists in crime laboratories by position.[45] For operational scientists, training is needed to stay up to date in theoretical and practical issues (such as applying methods and performing analyses). Everyone in a laboratory needs orientation in such topics as the criminal justice system, the legal system, ethics, professional organizations, the basic philosophy of forensic science, overview of disciplines of forensic science, quality control (e.g., good laboratory practice), effective expert testimony, and safety. First-line supervisors need training in quality assurance, case file review, and basic supervision skills; and managers need training in fiscal management, quality systems management, leadership, project management, human resource management, and customer service. Training can be done in-service or through short courses. The 1999 NIJ report identifies a number of examples of such courses.

On-the-job training involves specific challenges; it is labor intensive and can be expensive.[46] The costs of training include the salary of the trainee as well as the opportunity cost of the lost productivity of the trainer. Moreover, there are no uniform recommendations on the content of training in the forensic science disciplines. ASCLD has suggested some examples of efforts to make training more efficient, including conducting some training in conjunction with

---

[43] Ibid., p. 12.
[44] ASCLD, op. cit., p. 15.
[45] NIJ, op. cit., 1999.
[46] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1686

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**EDUCATION AND TRAINING-PREPUBLICATION COPY**

universities (essentially conducting training while forensic scientists are students and before they are full-time employees), and some laboratories have tried collaborating to train employees.

**Continuing Education**

Continuing education is critical for all personnel working in crime laboratories as well as for those in other forensic science disciplines, such as forensic pathologists or anthropologists. Some commonly used approaches to continuing education are instructor led, professional conferences/seminars, distributed learning, apprenticeship, residency, internship, teaching and presentations by trainee/employee, and independent learning.[47]

The greatest issue for continuing education is quality. TWGED has provided guidelines for training courses. First, there should be specific eligibility requirements. Specified minimum and experiential requirements should be consistent with recognized, peer-defined standards (e.g., SWGs, ASCLD/Laboratory Accreditation Board). Factors such as drug use, credit and criminal history, and personal references may affect career opportunities. Second, the structure of the training programs should include: learning objectives; instructor qualifications; student requirements; a detailed syllabus; performance goals; periodic assessments; and competency testing. Third, program content can include a mix of discipline-specific and core elements. Core elements are essential topics that lay the foundation for entry into professional practice, regardless of the specialty area. They include the following:

- Standards of conduct—includes professional ethics training.
- Safety—includes biological, chemical, and physical hazards.
- Policy—includes such administrative and laboratory policies as standard operating procedures, quality assurance, accreditation, and security.
- Legal—includes expert testimony, depositions, rules of evidence, criminal and civil law and procedures, and evidence authentication.
- Evidence handling—includes interdisciplinary issues; recognition, collection, and preservation of evidence; and chain of custody.
- Communication—includes written, verbal, and nonverbal communication skills; report writing; exhibit and pretrial preparation; and trial presentation.

Discipline-specific elements include such topics as the history of the discipline, relevant literature, methodologies and validation studies, instrumentation, statistics, knowledge of related fields, and testimony. Finally, individuals should be assessed through mechanisms such as oral examinations, written examinations, laboratory practicals and laboratory exercises, mock trials, and the assessment of technical performance by appropriate senior staff.

## EDUCATION IN THE LEGAL SYSTEM

The forensic science community needs to educate those who use their services and therefore needs to understand the services and their terminology. Users of forensic science analyses include law enforcement officers, forensic pathologists, the bar, the judiciary, the general public, and policymakers. This section focuses on education for the legal community of judges, lawyers, and juries.

---

[47] NIJ, op. cit., 2004.

8-13

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1687

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY**

In recent years, some judges have struggled to understand increasingly complex scientific evidence. Sophisticated epidemiology and toxicology studies often are introduced in mass tort litigation. Complex econometric models are common in antitrust cases. Disputes over sophisticated engineering principles often are at the core of patent litigation. Failure to consider such evidence in a thoughtful and thorough manner threatens the integrity and independence of the judiciary. Following the *Daubert* decision, the Federal Judicial Center published the *Reference Manual on Scientific Evidence*, and a second edition was issued in 2000 to "facilitate the process of identifying and narrowing issues concerning scientific evidence by outlining for judges the pivotal issues in the areas of science that are often subject to dispute."[48] In addition, the courts have responded to the growing complexity of evidence by developing science-based judicial education programs that explain scientific issues as they may arise in the context of litigation. However, these courses are not mandatory, there is no fixed routine of continuing education in legal practice with regard to science, and there are no good ways to measure the proficiency of judges who attend these programs.

Pfefferli suggests that it is important to tailor education programs to the needs of judges:

> Forensic educational programs directed towards proficiency in evidence matter must meet the needs of judicial magistrates, which goes beyond a better understanding of the scientific principles and technical methods applied to criminal investigations to demonstrate the existence of a crime. These programs have to look at a variety of different kinds of forensic evidence and their interacting processes, giving special attention to individualization/identification process; evidential value and evaluation of evidence; critical issues and quality assurance, and deterministic versus probabilistic opinions of experts."[49]

Pfefferli further notes that different members of the judicial community should benefit from customized training. For example, prosecutors and defense attorneys might benefit from a focus on the interpretation of and requirements for evidence; and judges may benefit from information on evaluating the scientific rigor of expert testimony and the reliability of forensic evidence.

At the end of the 1990s, NIJ noted that training for the judiciary was sporadic at the federal, state, and local levels and rare in general.[50] Virginia is one state that provides annual seminars for the judiciary, and ASCLD formerly provided training to judges.

Reliance on DNA technology for identification purposes in forensic science spurred the development of judicial education programs. As part of the President's DNA Initiative, the Department of Justice developed a series of publications and online training programs designed for officers of the courts, including judges. The course, "Principles of Forensic DNA for Officers of the Court," released in 2006, is designed "to educate criminal justice professionals and other

---

[48] Federal Judicial Center. 2000. *Reference Manual on Scientific Evidence.* 2nd ed., p. vi.

[49] P.W. Pfefferli. 2003. *Forensic Education & Training of Judges and Law Enforcement Magistrates.* Presentation at the International Society for the Reform of Criminal Law, 17th International Conference, The Hague. Available at www.isrcl.org/Papers/Pfefferli.pdf, p. 2.

[50] NIJ, op. cit., 1999.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1688

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

EDUCATION AND TRAINING-PREPUBLICATION COPY

practitioners about the science of DNA analysis and the legal issues regarding the use of DNA in the courtroom."[51] The 15 training modules in the course include:

- information on the biology of DNA;
- the history of forensic DNA analysis;
- how to understand a forensic DNA laboratory report;
- factors in postconviction DNA testing requests;
- information about forensic DNA databases;
- issues involved in presenting DNA evidence in the courtroom;
- information on the admissibility issues regarding the use of DNA evidence; and
- an extensive glossary with basic definitions relating to forensic DNA analysis.

But other than this initiative, judicial education programs have not focused on the forensic science disciplines.

Another avenue for education would be courses taught by forensic science education programs, but geared to continuing education participants rather than full-time students. The University of Florida, for example, offers a distance learning, continuing education course for Florida lawyers that is certified by the Florida Bar Association and that covers a variety of forensic science topics. Professional organizations also have offered courses. For example, the National District Attorneys Association founded the American Prosecutors Research Institute (APRI) as a nonprofit research, technical assistance, and program development resource for prosecutors at all levels of government. In the past, APRI has offered training opportunities in forensic science, although its programs have decreased in recent years. The National College of District Attorneys and the National Association of Criminal Defense Attorneys also periodically offer courses in forensic science. A third option is for law schools to offer more courses in the forensic disciplines, statistics, or basic science methodology, or to provide credit for students wishing to take courses in those fields.

Unfortunately, it might be too late to effectively train most lawyers and judges once they enter their professional fields. Training programs are beneficial in the short term, because they offer responsible jurists a way to learn what they need to know. For the long term, however, the best way to get lawyers and judges up to speed is for law schools to offer better courses in forensic science in their curricula.

**Juries and Scientific Evidence**

Despite common stereotypes about jury incompetence and runaway juries, research has demonstrated a consistency between jury and bench trial verdicts, regardless of the level of scientific complexity involved.[52] Even in cases in which jurors express incomplete and flawed understandings of scientific and technical evidence, researchers have described jury results as generally justified.[53] Moreover, it has been suggested that jurors' errors in interpreting

---

[51] Office of Justice Programs, U.S. Department of Justice. 2006. *Department of Justice Releases Interactive Training Tool on Principles of Forensic DNA*. Available at www.ojp.usdoj.gov/newsroom/pressreleases/2006/NIJ06036.htm.

[52] V.P. Hans, D.H. Kaye, M.B. Dann, E.J. Farley, and S. Albertson. 2007. *Science in the Jury Box: Jurors' Views and Understanding of Mitochondrial DNA Evidence*. Cornell Law School Legal Studies Research Paper No. 07-02; available at http://ssrn.com/abstract=1025582; T. Eisenberg, P.L. Hannaford-Agor, V.P. Hans, N.L. Mott, G.T. Munsterman, S.J. Schwab, and M.T. Wells. 2005. Judge-jury agreement in criminal cases: A partial replication of Kalven & Zeisel's *The American Jury. Journal of Empirical Legal Studies* 2:171-206.

[53] Hans, op. cit.

8-15

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1689

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES –PREPUBLICATION COPY

evidentiary information are often traceable in part to misleading presentations and instructions by attorneys and judges.[54]

However, juries have been described as least comfortable and competent with regard to statistical evidence.[55] Interestingly, juries are often hesitant to give as much credence as experts suggest to the statistics associated with DNA evidence.[56] Juries frequently raise concerns about laboratory error and sample contamination, even when opposing counsel does not introduce such issues.[57]

Jurors' use and comprehension of forensic evidence is not well studied. Better understanding is needed in this area, and recommendations are needed for programs or methods that will better prepare juries in appropriate, unbiased ways for trials in which scientific evidence is expected to play a large or pivotal role. However, several studies indicate that trial judges agree with jury verdicts in an overwhelming proportion of criminal cases.[58]

## CONCLUSIONS AND RECOMMENDATION

Despite major strides made in recent years in bringing a measure of standardization to forensic science education programs and boosting their quality, more information is required on the number of programs that are available and the depth and breadth of the course offerings. It appears that there are no formal and systematically applied standards or standardization requirements for forensic science education programs, making the quality and relevance of existing programs uncertain. Moreover, there are no requirements or incentives in place to ensure that forensic science education programs must be accredited in order to receive federal funds.

Current funding is insufficient for developing graduate training programs that cut across organizational, programmatic, and disciplinary boundaries and that can attract students in the life and physical sciences to pursue graduate studies in multidisciplinary fields critical to forensic science. Similarly, too few funding sources exist for research conducted in association with forensic science graduate programs.

In addition, forensic researchers, legal scholars, and forensic practitioners and members of the bench and bar do not have sufficient opportunities and venues for interaction and sharing information. This impedes the translation of advances in forensic science to legal scholars and litigators (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials. The result is needless delay in improvements in criminal and civil laws and procedures, law enforcement practices, litigation strategies, and judicial decisionmaking.

Lawyers and judges often have insufficient training and background in scientific methods, and they often fail to fully comprehend the approaches employed by different forensic

---

[54] Ibid.

[55] Ibid. See also W.C. Thompson and E.L. Schumann. 1987. Interpretation of statistical evidence in criminal trials: The prosecutor's fallacy and the defense attorney's fallacy. *Law and Human Behavior* 11:167-187; W.C. Thompson. 1989. Are juries competent to evaluate statistical evidence? *Law and Contemporary Problems* 52:9-41.

[56] J.J. Koehler. 2001. When are people persuaded by DNA match statistics? *Law and Human Behavior* 25:493-513; D.A. Nance and S.B. Morris. 2002. An empirical assessment of presentation formats for trace evidence with a relatively large and quantifiable random match probability. *Jurimetrics Journal* 42:403-448; J. Schklar and S.S. Diamond. 1999. Juror Understanding of DNA evidence: An empirical assessment of presentation formats for trace evidence with a relatively small random-match probability. *Journal of Legal Studies* 34:395-444.

[57] Schklar and Diamond, op. cit.

[58] Hannaford-Agor, Hans, and Munsterman, op. cit.

8-16

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1690

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

science disciplines and the strengths and vulnerabilities of forensic science evidence offered during trials.

Forensic science examiners need additional training in the principles, practices, and contexts of scientific methodology, as well as in the distinctive features of their specialty. Training should move well beyond intern-like transmittal of practices to teaching that is based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and should also receive instruction on how to document and report the analysis. A trainee in addition should have working knowledge of basic probability and statistics as they relate to the tasks he or she may need to address in the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. The legitimization of practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role; under no circumstances can it supplant the need for the scientific basis of education and of the practice of forensic science. In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the degree of reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony (such as the *Daubert* standards) is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted among experts in forensic science and legal scholars and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in forensic science, by offering credit for forensic science courses students take in other colleges, and by developing joint degree programs.

**Recommendation 10:**

> **To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and develop graduate education programs designed to cut across organizational, programmatic, and disciplinary boundaries. To make these programs appealing to potential students, they must include attractive scholarship and fellowship offerings. Emphasis should be placed on developing and improving research methods and methodologies applicable to forensic**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1691

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES --PREPUBLICATION COPY

science practice and on funding research programs to attract research universities and students in fields relevant to forensic science. NIFS should also support law school administrators and judicial education organizations in establishing continuing legal education programs for law students, practitioners, and judges.

8-18

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1692

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 9

# MEDICAL EXAMINER AND CORONER SYSTEMS: CURRENT AND FUTURE NEEDS

The role of coroner emerged in England in the ninth or tenth century. In the twelfth century, under King Richard I, the role of coroner was formalized in the Articles of Eyre.[1] Coroners or "crowners" were "guardians of the crown's pleas." The office originally was created to provide a local official whose primary duty was to protect the financial interest of the crown in criminal proceedings. On behalf of the crown, the crowner was responsible for inquests to confirm the identity of the deceased, determine the cause and manner of death, confiscate property, collect death duties, and investigate treasure troves. Through the implementation of British Common Law, settlers in North America brought coroner laws to the early colonies.[2] Moreover, early state constitutions explicitly mentioned the position of coroner, often without defining the role.[3] Georgia's state constitution was the first. Article XL stated that, "[i]n the absence of the chief justice, the senior justice on the bench shall act as chief justice with the clerk of the county, attorney for the State, sheriff, coroner, constable, and the jurors."[4]

The first formal acknowledgment of the need for medical training for coroners occurred in 1860, when Maryland passed legislation allowing coroners to require that a physician be present at an inquest. In 1877, Massachusetts became the first state to replace its coroners with medical examiners, who were required to be physicians. Physician medical examiners began performing autopsies for coroners in Baltimore in 1890. In 1918, New York City instituted a medical examiner system.[5]

The National Academy of Sciences first addressed the state of death investigation in 1928. The National Research Council's (NRC's) Committee on Medical Legal Problems, whose members included Roscoe Pound, Dean of Harvard Law School, and John Henry Wigmore, Dean of Northwestern Law School, released a harshly critical report entitled *The Coroner and the Medical Examiner*.[6] In its first four recommendations, the 1928 committee suggested the following: (1) That the office of coroner be abolished. It is an anachronistic institution which has conclusively demonstrated its incapacity to perform the functions customarily required of it; (2) That the medical duties of the coroner's office be vested in the office of medical examiner; (3) That the office of medical examiner be headed by a scientifically trained and competent pathologist, selected and retained under civil service, and compensated by a salary which will attract men of genuine scientific training and ability; and (4) That the office of medical examiner be provided with the services of a staff competent in toxicology, bacteriology and other sciences necessary in the scientific investigation of causes of death, and with adequate scientific equipment . . ..[7]

---

[1] Institute of Medicine (IOM). 2003. *Medicolegal Death Investigation System: Workshop Summary*. Washington, DC: The National Academies Press, p. 8.
[2] Ibid.
[3] Ibid.
[4] GA. CONST. of 1777, art. XL.
[5] IOM, 2003, op. cit.
[6] Bulletin of the National Research Council, No. 64. 1928. *The Coroner and the Medical Examiner*. Washington DC: National Research Council.
[7] Ibid., p. 89.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1693

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

Additionally, the 1928 committee recommended the development of medicolegal institutes, which would affiliate medical examiners with hospitals and universities.[8] In 1932, another NRC committee produced a review of existing medicolegal collaborations, which were mostly located in Europe.[9] This committee again advised a larger role for medical doctors within forensic science and criminal proceedings.[10]

In 1954, the National Conference of Commissioners on Uniform State Laws issued the Model Post-Mortem Examinations Act (the Model Act).[11] In its prefatory note, the Model Act stated the following:

> The purpose of the Post-Mortem Examinations Act is to provide a means whereby greater competence can be assured in determining causes of death where criminal liability may be involved. Experience has shown that many elected coroners are not well trained in the field of pathology, and the Act should set up in each state an Office headed by a trained pathologist, this Office to have jurisdiction over post-mortem examinations for criminal purposes. The Office would supersede the authority of Coroner's Offices in this field.[12]

Following the release of the Model Act, a number of states implemented the proposed guidelines. Between 1960 and 1979, 12 states converted from coroners to medical examiners.[13] However, in the subsequent decades, updates to death investigation organizations slowed considerably. Between 1980 and 1999, only three states converted from coroner to medical examiner systems.[14] Since then, 11 states with coroners have remained unchanged, and only a handful of individual counties have independently implemented recommendations from the Model Act.[15] Several of the remaining coroner states have provisions in their state constitutions requiring that coroners be elected.[16] Although these provisions may be amended or removed, to do so will require political momentum. However, these provisions do not prohibit the addition of appointed medical examiners. For example, Kentucky has maintained county coroners, as dictated by its constitution, while also implementing medical examiners to serve at the state and district levels.[17]

---

[8] Ibid., p. 90.

[9] Bulletin of the National Research Council, No. 87. 1932. *Possibilities and Need for Development of Legal Medicine in the United States*. Washington DC: National Research Council.

[10] Ibid., pp. 111-112.

[11] The model act has been posted by the National Association of Medical Examiners (NAME) at: http://thename.org/index.php?option=com_content&task=view&id=97&Itemid=41.

[12] Ibid..

[13] Hanzlick, 2003, op. cit.

[14] Ibid.

[15] Ibid.

[16] ARK. CONST. art. VII, § 46; COLO. CONST. art. XIV, § 8; IDAHO CONST. art. XVIII, § 6; IND. CONST. art. VI, § 2; MISS. CONST. ANN. art. V, § 135.

[17] KY. CONST. § 99; KY. REV. STAT. ANN § 72.210 (2007).

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1694

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY

## MEDICAL EXAMINERS AND CORONERS (ME/C)

About 2,342 medical examiner and coroner offices provided death investigation services across the United States in 2004.[18] Individual state statutes determine whether a medical examiner or coroner delivers death investigation services, which include death scene investigations, medical investigations, reviews of medical records, medicolegal autopsies, determination of the cause and manner of death, and completion of the certificate of death.

## ME/C JURISDICTION

ME/C jurisdiction is determined by each state code and generally extends to deaths that are sudden and unexpected, deaths that have no attending physician, and all suspicious and violent deaths. The actual classes of death over which the ME/C assumes jurisdiction vary from state to state. Classes may include deaths resulting from injury, such as by violence or poisoning; by circumstance, such as related to fire or under anesthesia; by decedent status, such as prisoners or mental health patients; or by timeframe, such as deaths that occur within 24 hours of admission to a hospital. About 1 percent of the U.S. population (about 2.6 million people) dies each year. In 2004, ME/C offices received nearly 1 million reports of deaths, constituting between 30 to 40 percent of all U.S. deaths, and accepted about one half of those (500,000, or 1 in 6 deaths) for further investigation and certification.[19] Depending on the jurisdiction, about 40 to 50 percent of deaths referred to the ME/C will, after investigation and examination, be attributed to natural causes, 27 to 40 percent to accident, 12 to 15 percent to suicide, 7 to 10 percent to homicide, and 1 percent as undetermined.[20]

## ME/C MISSIONS

ME/Cs serve dual purposes. First, they serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses. Second, as public health officers, they surveil for index cases of infection or toxicity that may herald biological or chemical terrorism, identify diseases with epidemic potential, and document injury trends.

Additional ME/C responsibilities include the response to and investigation of all deaths resulting from all hazards, including terrorism and mass fatality events, and the identification of the unidentified dead. In addition, some 13,000 unidentified individuals are currently entered into databases for the unidentified dead, and many thousands more are entered as missing persons, as thousands of families search for them. Accessing these databases and matching them to the many thousands of individuals entered as missing persons is a major challenge for all organizations. Eighty percent of surveyed ME/C systems "rarely or never" utilize the National Crime Information Center Unidentified and Missing Persons (NCIC UP/MP) files to match their dead bodies to those reported as missing by law enforcement agencies, even though NCIC

---

[18] Hanzlick, 2007, op. cit. The Bureau of Justice Statistics omits Louisiana and classifies Texas as a medical examiner state, and accordingly reports the total as 1,998. According to Hanzlick, many of Texas's 254 counties maintain justice of the peace/coroner's offices.

[19] J.M. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2004. *Medical Examiners and Coroners' Offices, 2004*. U.S. Dept of Justice, Bureau of Justice Statistics Special Report NCJ216756.

[20] *Office of the Chief Medical Examiner's Annual Report: 2006*. Available at www.vdh.state.va.us/medExam/Reports.htm.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1695

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

recently granted access to the files by ME/Cs. Access, however, is not uniform, and the information that may be available could be limited.[21]

The newly established National Institute of Justice (NIJ) Office of Justice Programs, National Missing and Unidentified Persons System, NamUs, remains underutilized. Identification efforts for either of the national government databases require multiple investigative as well as data entry skills, and they are labor intensive. ME/Cs need a functional death investigation system; staff to develop identification features; and the necessary education, training, and equipment to utilize the multiple databases that are necessary to identify the unidentified dead and to meet the increasing societal expectations that ME/C systems should be able to identify the unidentified.[22] Critically needed is a federal requirement that ME/C systems enter information on the unidentified into federal databases. A later section in this report discusses the medical examiner/coroner role in homeland security.

## VARIATIONS IN ME/C SYSTEMS

As of 2004, administratively, 16 states had a centralized statewide medical examiner system, 14 had a county coroner system, 7 had a county medical examiner system, and 13 had a mixed county ME/C system.[23] Eight states had hybrid arrangements, with coroners and a state medical examiner office that performed medicolegal duties. The District of Columbia relies on a medical examiner system (see Figure 9-1). In large cities and counties, forensic pathologists serve both as medical examiners and pathologists. A few large systems, such as those of Los Angeles, California, and Cuyahoga County, Ohio, bear the historical name of a coroner system, but function essentially under a medical examiner structure. Eighty percent of ME/C offices are run by county coroners.

In total, there are approximately 2,342 separate death investigation jurisdictions.[24] Of 1,590 coroner offices in the United States, 82 serve jurisdictions with more than 250,000 people; 660 medium-sized offices serve between 25,000 and 249,999 people; and 848 offices serve small jurisdictions of fewer than 25,000 people.[25] The hodgepodge and multiplicity of systems and controlling statutes makes standardization of performance difficult, if not impossible. Some observers believe that a revisiting of the model code is required, as has been proposed by numerous study groups over the years, in order to work toward the development of a modern model code for death investigation systems that utilizes new and available technologies that are responsive to the needs of the citizens.[26]

---

[21] J.C.U. Downs, Board Member and Chair, Governmental Affairs Committee, National Association of Medical Examiners; Vice Chair, Consortium of Forensic Science Organizations; Coastal Regional Medical Examiner, Georgia Bureau of Investigation. Presentation to the committee. June 5, 2007.

[22] National Missing and Unidentified Persons System, NamUS. See www.namus.gov.

[23] Downs, op. cit.

[24] R. Hanzlick. "An Overview of Medical Examiner/Coroner Systems in the United States--Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007.

[25] Ibid.

[26] Ibid.

9-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1696

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1698 of 2008
PageID #: 3588
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html



**Figure 9-1. Death investigation systems in the United States, 2004.**

SOURCE: J.M. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2004. *Medical Examiners and Coroners' Offices, 2004.* U.S. Dept of Justice, Bureau of Justice Statistics Special Report NCJ216756. (Note: In 2007, Kentucky became legally a mixed county ME/C system.[27])

## QUALIFICATIONS OF CORONERS AND MEDICAL EXAMINERS

Jurisdictions vary in terms of the required qualifications, skills, and activities for death investigators. Coroners are constitutional officers, with 82 percent being elected and 18 percent appointed.[28] Coroners as elected officials fulfill requirements for residency, minimum age, and any other qualifications required by statute. They may or may not be physicians, may or may not have medical training, and may or may not perform autopsies (see Box 9-1). Some serve as administrators of death investigation systems, while others are responsible solely for decisions regarding the cause and manner of death. Typical qualifications for election as a coroner include being a registered voter, attaining a minimum age requirement ranging from 18 to 25 years, being free of felony convictions, and completing a training program, which can be of varying length. The selection pool is local and small (because work is inconvenient and pay is relatively low), and medical training is not always a requirement. Coroners are independent of law enforcement and other agencies, but as elected officials they must be responsive to the public, and this may lead to difficulty in making unpopular determinations of the cause and manner of death.

---

[27] Constitution of the State of Kentucky, § 99.
[28] P.M. Murphy, Coroner, Clark County Coroner's Office, Las Vegas, Nevada. "The Coroner System." Presentation to the committee. June 5, 2007.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1697

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

Recently a 17-year-old high school senior successfully completed the coroner's examination and was appointed a deputy coroner in an Indiana jurisdiction.[29] In one state, justices of the peace are charged with determining cause and manner of death, but they are not medical death investigators. Whether coroners refer cases to pathologists for autopsy is largely budget driven (an autopsy costs about $2,000), although access to pathologists may be an issue if regional interjurisdictional arrangements do not exist. Even so, 84 percent of coroner offices see a need for professional standards,[30] and they identify resources for infrastructure, staff, and training as continuing needs.

---

**Box 9-1 What Is an Autopsy?**

An autopsy is the systematic external and internal examination of a body to establish the presence or absence of disease by gross and microscopic examination of body tissues. The pathologist makes a surgical incision from shoulder to shoulder and from the midpoint of the shoulder to shoulder incision to the pubic bone. The skin is reflected, and each organ in the chest, including the neck structures, abdomen, and pelvis is removed and carefully examined. An incision is also made from the mastoid bone on the right to the mastoid bone on the left, and the scalp is pulled forward and the bony cap removed to reveal the brain. The brain is removed and examined. The pathologist takes a small sample or biopsy of all tissues and archives them in formalin to maintain them for future reference. In medicolegal autopsies, all tissues other than the biopsies are replaced in the body, except for perhaps the brain or heart, which may be retained and examined by consultants for diagnoses causing or contributing to death. For hospital autopsies, depending on the list of permissions given by the person qualified to give permission, tissues and organs may be retained for study, research, or other investigations. The pathologist submits small 2 x 2 cm sections of tissue to the histology laboratory, where thin slices a few microns thick are subjected to chemical treatment to preserve them. The tissue blocks are shaved, so that a thin layer can be mounted on a glass slide and stained with dyes to differentiate cells. The pathologist can recognize diseases in the stained tissue. Medicolegal autopsies are conducted to determine the cause of death; assist with the determination of the manner of death as natural, suicide, homicide, or accident; collect medical evidence that may be useful for public health or the courts; and develop information that may be useful for reconstructing how the person received a fatal injury.

---

Options for improving death investigation by coroners include (1) replacing coroner systems with medical examiner systems; (2) increasing the statutory requirements for performance of coroners; or (3) infusing funding to improve the capabilities of coroners.[31]

Some coroners have suggested establishing a "Coroner College."[32] Coroners want grants for equipment, accreditation incentives, and access to forensic laboratories, NCIC, and automated fingerprint identification systems.[33] Lack of direct access to laboratories and insufficient funding for testing impair the expertise of coroners. Some coroners are amenable to protocols that would ensure the use of forensic pathologists for autopsy. However, even with

---

[29] "Teen Becomes Indiana's Youngest Coroner." See http://happynews.com/news/5122007/teen-becomes-indiana-youngest-coroner.htm.
[30] Murphy, op. cit.
[31] Ibid.
[32] Ibid.
[33] Murphy, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1698

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

these improvements, the assessment of the dead for disease, injury, medical history, and laboratory studies is a medical decision, as opposed to a decision that would be made by a lay person with investigative and some medical training. The disconnect between the determination a medical professional may make regarding the cause and manner of death and what the coroner may independently decide and certify as the cause and manner of death remains the weakest link in the process.

In contrast, medical examiners are almost always physicians, are appointed, and are often pathologists or forensic pathologists. They bring the body of knowledge of medicine to bear when assessing the history and physical findings and when deciding on the appropriate laboratory studies needed to determine the cause and manner of death. In statewide systems, cities and counties have local medical examiners that are physicians trained to receive the reports of death, decide jurisdiction, examine the body, and make a determination of the cause and manner of death. They certify locally many obvious natural and accidental deaths. In statewide and regionalized statewide systems, local medical examiners do not need to be forensic pathologists and do not perform autopsies, but they do refer, according to protocols, deaths from violence—particularly suicides, homicides, and deaths occurring under suspicious circumstances—to a central or regional autopsy facility for autopsy and further follow-up by a forensic pathologist. In hybrid or mixed state systems, coroners may refer cases for autopsy to forensic pathologists, but there is no supervision or quality assurance to ensure that the coroner's certification of the cause of death and manner of death is concordant with the pathologist's conclusions.

## ME/C ADMINISTRATION AND OVERSIGHT

ME/Cs have varying forms of organizational oversight. Forty-three percent of the U.S. population is served by systems that are independent, 33 percent by offices residing administratively in public safety or law enforcement organizations, 14 percent by offices in health departments, and 10 percent by offices within a forensic laboratory. Government reports over the years have recommended that a medical examiner system should be an independent agency or should report to a commission so that it avoids any conflicts of interest and so that it reports directly to the jurisdictional governing body. When this is not possible, incorporation into a health department, instead of into law enforcement agencies, seems to provide the next most compatible location.[34]

## ME/C STAFFING AND FUNDING

ME/C offices serving populations of less than 25,000 people employ 1 to 2 full-time equivalent (FTE) staff members, while offices serving populations of 1 million or more employ an average of 50 FTEs.[35] Competent death investigations require that trained medical death investigators attend scenes; medically credentialed persons perform external physical examinations; and forensic pathologists perform medicolegal autopsies, employ and interpret radiographs, prepare records, maintain databases, and provide competent and credible testimony in courts. Staff requires training and expensive equipment to utilize and integrate new technologies. Efforts are restricted by budgets, and budgets vary widely, ranging from $18,000 to

---

[34] V. Weedn. "Legal Impediment to Adequate Medicolegal Death Investigation." Presentation to the committee. June 5, 2007.
[35] Downs, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1699

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY
_____

$2.5 million annually for county systems, depending on the size of the population. A 2007 survey conducted for the National Association of Medical Examiners (NAME) by Hanzlick revealed that county systems' per capita cost ranged from $1.31 to $9.19, with a mean of $2.89. State systems benefit from economies of scale and function more economically at $.64 to $2.81, with a mean of $1.76.[36] The large variation in qualifications, staffing, budgets, and the multiple skills required for competent death investigations, especially in small jurisdictions, has resulted in marked variation in the quantity and quality of death investigations in the United States.

Physical facilities also vary in adequacy. Only one-third of offices have in-house facilities to perform the histology needed to make microscopic diagnoses on tissues sampled at autopsy. Only one-third have in-house toxicology capabilities to identify drugs present in the deceased that either contributed to or were the primary cause of death. One-third do not have radiology services in-house that would allow the identification of missiles, disease, bony injury or identification features in decedents.[37] Some coroner systems do not have any physical facility at all.

It is clear that death investigations in the United States rely on a patchwork of coroners and medical examiners and that these vary greatly in the budgets, staff, equipment, and training available to them, and in the quality of services they provide. No matter what the level of quality of other forensic science disciplines that are supported by a particular jurisdiction may be, if the death investigation does not include competent death investigation and forensic pathology services, both civil and criminal cases may be compromised.

All ME/Cs share the following deficiencies to some degree:

- imperfect legal structure/code controlling death investigations;
- inadequate expertise to investigate and medically assess decedents;
- inadequate resources to perform competent death investigations;
- inadequate facilities and equipment for carrying out body views and conducting autopsies;
- inadequate technical infrastructure (laboratory support);
- inadequate training of personnel in the forensic science disciplines;
- lack of best practices and information standards;
- lack of quality measures and controls;
- lack of information systems; and
- lack of translational research and associations with university research.[38]

## THE MOVEMENT TO CONVERT CORONER SYSTEMS TO MEDICAL EXAMINER SYSTEMS

As mentioned above, the movement to improve death investigations by bringing in medical expertise in the form of medical examiner systems is not new. Early NRC reports were followed in 2003 by an Institute of Medicine Workshop on the Medicolegal Death Investigation System, which also concluded that the medical examiner system is the best organizational structure for utilizing medical expertise to assess the presence or absence of disease and injury

_____

[36] R. Hanzlick. "An Overview of Medical Examiner/Coroner Systems in the United States–Development, Current Status, Issues, and Needs." Presentation to the committee. June 5, 2007.
[37] Murphy, op. cit.
[38] Downs, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1700

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

and for correlating the medical findings and investigative information to arrive at a determination of cause of death and manner of death. Progress has been very slow.

Additional impediments to progress include the need for some states to change state constitutions or codes, the political constituent base underpinning local coroners, insufficient population and budget to support a competent independent system in small localities, an unwillingness to develop cooperative regionalization for provision of autopsy services, the shortage of physicians—especially pathologists and forensic pathologists—and lack of interest, advocacy, or the perception of need.[39] To implement such conversions, the United States will require a national vision, a model code, increased numbers of forensic pathologists, and funding for infrastructure, staff, education, training, and equipment.

One possible model for providing incentives for these conversions could be an initiative similar to the Law Enforcement Assistance Administration (LEAA). LEAA was a federal agency operating from 1968 to 1982 with the purpose of funneling federal funding to state and local law enforcement agencies. The agency created state planning agencies and funded educational programs, research, and matching grants for physical plants and a variety of local crime control initiatives. For example, an $8 million grant to Virginia established the Virginia Department of Forensic Science, a premier state forensic laboratory that provides forensic science services to all state agencies and the Medical Examiner System in Virginia. [40] If the capitalization of a medical examiner system is the major impediment to progress, an LEAA model can remove that barrier. However, a Medical Examiner Assistance Administration, or MEAA, would need to be structured so that the medical examiner would not be considered a servant of law enforcement and thus would not be placed in a position in which there is even an appearance of conflict of interest. Sensitive cases, such as police shootings and police encounter deaths, jail and prison deaths, deaths in public institutions, and others, require an unbiased death investigation that is clearly independent of law enforcement. All previous studies have recommended that the medical examiner be independent of other agencies, or if they are to be under the umbrella of a central agency that the reporting chain should be through a health department. The medical examiner is first and foremost a physician, whose education, training, and experience is in the application of the body of medicine to situations that have a legal dimension that must be answered by a practitioner of medicine.

## UTILIZATION OF BEST PRACTICES

The tremendous variation in death investigation systems also impedes interagency and interjurisdictional communication and the development of standardized best practices both in death investigation and in the performance of medicolegal autopsies.

NIJ and NAME have attempted to provide guidance for best practices. The NIJ document *Death Investigation: A Guide for the Scene Investigator; Medicolegal Death Investigator: A Systematic Training Program for the Professional Death Investigator*; the NAME Autopsy Standards and Inspection Checklist; and NAME's Forensic Pathology Autopsy Standards are available, but there is no incentive for death investigation systems to adopt them for use.[41]

---

[39] Downs, op. cit; Weedn, op. cit., Hanzlick, op. cit.

[40] Law Enforcement Assistance Administration, at www.archives.gov/research/guide-fed-records/groups/423.html.

[41] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. *Death Investigation: A Guide for the Scene Investigator*. Available at www.ojp.usdoj.gov; S.C. Clark, M.F. Ernst, W.D. Haglund, and J.M. Jentzen. 1996. Medicolegal Death Investigator: A Systematic Training Program for the Professional Death Investigator. Occupational Research and Assessment. Grand Rapids; NAME Autopsy Standards and Inspection

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1701

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Compliance is further limited because of heavy case loads, deficiencies in trained staff, absence of equipment, nonavailability of required day-to-day and consultative services, and the presence of contradictory policies and practices.

## POTENTIAL SCIENTIFIC ADVANCES THAT MAY ASSIST ME/Cs

In addition to current technologies, which are often unavailable and underutilized, new technologies are on the horizon to assist death investigators, medical examiners, and forensic pathologists.

Computerization of case records and the development of case information databases should be standard in any death investigation office, so that death data may be tracked for trends, response to public health and public safety interventions can be streamlined and accelerated, and continuing quality assurance measures can be implemented. There is no standard method of sample and data collection for ME/C systems. Multiple systems are commercially available that can be structured to meet the particular needs of any death investigation system. The initial cost of such systems is significant, and they require continuing maintenance, which rules out their utilization by small and/or underfunded offices. Even if such computer systems were present in each office, there is no standardization that would allow them to talk to one another, a necessity in a multijurisdictional event such as the Hurricane Katrina disaster, for which databases across states were critical to the identification of the dead and the tracking of survivors.

Laboratory information systems are available for the management of medical evidence, laboratory specimens, laboratory data, forensic samples, and personal effects. Effective database management allows information to be gathered and utilized by staff and analyzed for trends and quality issues. Effective databases are essential for managing any multiple fatality event. Rapid electronic transmission of reports is feasible if encryption software is available. At this time, ME/C information systems are less interoperable than current Automated Fingerprint Identification Systems (see Chapter 10). Although the standard autopsy report generally covers the internal examination by organ systems, reporting formats are not standardized among jurisdictions. And, although the NAME Forensic Autopsy Performance Standards provide a model for reporting autopsy findings,[42] it is not widely used.

Imaging equipment is critical to documenting findings sufficient for courts, for review by outside experts, and for reevaluation as medical knowledge advances. Fluoroscopy is helpful for locating missiles. Computed tomography scanning and nuclear magnetic resonance imaging may often present a better visual picture of some injuries and would likely reduce the number of autopsies carried out to rule out occult injury and to document in greater detail the extent of injury in accidents. The "Virtual Autopsy," or "virtopsy," utilizes multislice computed tomography and magnetic resonance imaging combined with 3-D imaging technology to create vivid images of the interior of the human body.[43]

The advantages of the virtopsy are that it is not invasive or destructive of tissue and can provide dramatic pictures of skeletal and soft tissue injury. It also provides some information when there is a religious objection to autopsy. Virtopsy has the potential to detect internal bleeding, missile paths, bone and missile fragmentation, fracture patterns, brain contusion, and gas embolism, in addition to occult fractures that are technically difficult to demonstrate during

---

Checklist at www.thename.org; and G. Peterson and S. Clark. 2006. Forensic Autopsy Performance Standards at www.thename.org.

[42] G. Peterson and S. Clark. 2006. Forensic Autopsy Performance Standards. Available at www.thename.org.

[43] See www.nlm.nih.gov/visibleproofs/galleries/technologies/virtopsy.html.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1702

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

the traditional autopsy. Although a standard forensic autopsy is needed to recover evidence such as bullets or bomb fragments within the body and to collect specimens for testing, virtopsy offers a valuable tool for examination when dissection of the body is not feasible, when evidence is hard to visualize, or when a more complete assessment of injury is desired in noncriminal cases. For example, instead of a simple external examination for an obviously lethal injury in a vehicular violence death, virtopsy would permit more extensive cataloging of the injury to help automotive engineers design safer vehicles. The same technology can enhance bite mark impressions and some patterned injuries. Only a few ME/Cs have access to virtopsy at this time, and very few have the budget to purchase the expensive equipment or to build a suitable facility and staff and maintain it.

Scanning electron microscopy is not new but few ME/Cs have access to it to assist in identifying the metal conductor(s) in electrocution injuries, gunpowder residues in gunshot injuries, and other trace metals on skin or in tissues.

The anthrax bioterrorism attack that occurred in Connecticut, Maryland, New York, Virginia, and Washington, D.C., highlighted the need to have biosafety capability for autopsy facilities. Currently, most autopsy facilities are 20 years old, on average, and are outdated in physical plant, technology, and biosafety capability. One-third of them lack design/airflow control of pathogens, and most function at biosafety level 2 rather than level 3.[44] Upgrading facilities to handle the potential biohazards associated with bioterrorism will require a massive infusion of funds that localities currently are unable or unwilling to provide. Laboratory safety in an era in which bioterrorism is a real threat remains an ongoing issue.

In-house toxicology services utilizing state-of-the-art equipment are essential for identifying drugs, intoxicants, and poisons and for detecting unsuspected homicides, suicides, and child and elder abuse. Yet only 37 percent of systems have in-house toxicology capabilities.[45] The cost for complete toxicology utilizing private sector laboratories for cases is high, resulting in insufficient toxicology screening and minimal testing on cases even when they are clearly indicated.

Molecular diagnosis conducted on blood and tissue samples is routine in hospital laboratories to diagnose disease. Investigations of unexplained sudden deaths, especially in young people and infants, would benefit from greater access to molecular diagnostics. Molecular diagnostic procedures are available, but most ME/C offices cannot afford to conduct these procedures and do not have the medical expertise to request them or the skills to interpret them. For example, testing for inborn errors of metabolism should be a part of any examination of the unexpected death of an infant or toddler, and testing for long QT syndrome is important in determining the cause of cardiac death in young people or in those whose family pedigree discloses other sudden unexpected deaths. Molecular testing is available for the etiology of multiple causes of sudden cardiac death, including abnormalities in ion channels in cell membranes or channelopathies, hypertrophic cardiomyopathy, long QT syndrome, Marfan syndrome, right ventricular cardiomyopathy, dilated cardiomyopathy, and Ehlers-Danlos syndrome.[46]

---

[44] Downs, op. cit.

[45] Ibid.

[46] S.E. Lehnart, M.J. Ackerman, D.W. Benson, R. Brugada, C.E. Clancy, J.K. Donahue, A.L. George, A.O. Grant, S.C. Groft, C.T. January, D.A. Lathrop, W.J. Lederer, J.C. Makielski, P.J. Mohler, A. Moss, J.M. Nerbonne, Y.M. Olson, D.A. Przywara, J.A. Towbin, L.H. Wang, A.R. Marks. Inherited arrhythmias: a National Heart, Lung, and Blood Institute and Office of Rare Diseases workshop consensus report about the diagnosis, phenotyping, molecular

9-11

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1703

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

Some testing can be carried out on a dried blood sample long after death has occurred.[47] Some molecular diseases are heritable, and it could be argued that the ME/C has a duty to identify these diseases and alert families about their presence. Many medical examiner offices archive a card with a dried blood sample on decedents, primarily to document personal identification, should the need arise, but also for future study. In the future, kin may request the archived blood cards, as the molecular diagnosis of disease improves and families seek to identify their risk. Thus, ME/Cs need education and training in and access to the specialized laboratory testing available to establish the molecular basis of disease and of sudden unexpected natural death.

## THE SHORTAGE OF MEDICAL EXAMINERS AND FORENSIC PATHOLOGISTS

Medical examiners are physicians who are appointed and charged with determining the cause and manner of death. In some states, medical examiners are forensic pathologists, while in other statewide systems, local, city, and county medical examiners are physicians but do not need to be forensic pathologists. They receive death investigation training and are responsible for examining bodies that do not require medicolegal autopsy and, according to system guidelines, for referring cases that need autopsy to regional offices where forensic pathologists perform the examinations and initiate further investigation as needed. Well-trained local medical examiners keep costs in line by reducing transportation costs to regional or central offices and are more accessible than pathologists in distant offices. Changes in the delivery of health care, increased patient caseloads, the inconvenience of attending scenes, the need for before and after hours examination of decedents, and the level of remuneration have made it difficult for statewide systems to recruit busy physicians to serve as community or local medical examiners. If this trend continues, systems will rely more heavily on lay medical death investigators and will need to develop training programs that assure competency.

Forensic pathology is the subspecialty of medicine devoted to the investigation and physical examination of persons who die a sudden, unexpected, suspicious, or violent death. Forensic pathology derives its name from "forensis" (public), or pertaining to the forum, and "pathos" (suffering), referring to pathos or suffering. The term ultimately evolved to encompass the study of deaths due to injury and disease and of deaths that are of interest to the legal "forum." Forensic pathologists are physicians who have completed, at a minimum, four years of medical school and three to four years of medical specialty training in anatomical pathology or anatomical and clinical pathology, followed by an accredited fellowship year in forensic pathology. They are certified by examination and assessment of their credentials by the American Board of Pathology in, at a minimum, anatomical pathology, and by subspecialty examination, as having special competence in forensic pathology.

As of 2008, approximately 38 forensic pathology residency programs accredited by the Accreditation Council for Graduate Medical Education sponsored approximately 70 training fellowships. Some positions are unfunded, and others did not find suitable candidates. Forty-two candidates were certified in forensic pathology by the American Board of Pathology in January 2008. Pathologists must recertify by examination every 10 years to maintain their certifications, in addition to maintaining a professional license in the state in which they are practicing, by

---

mechanisms, and therapeutic approaches for primary cardiomyopathies of gene mutations affecting ion channel function. *Circulation* 13;116(20):2325-2345.

[47] Personal communication between M.J. Ackerman and Marcella Fierro. June 16, 2008.

9-12

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1704

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

submitting a description of practice for pathologists that do not practice as hospital staff and by earning continuing medical education credits.[48]

Forensic pathologists examine the dead to identify specific classes of injury, collect medical evidence, determine the presence or absence of natural disease, and determine the physiological cause of death. They document their findings in reports for the civil and criminal courts and provide information to family members and others who have a legitimate need to know. They may sign the death certificate describing the manner or circumstances under which death occurred (natural, accident, suicide, homicide, or undetermined). The examinations forensic pathologists carry out may be inspections or "views" of the external surfaces of a body or a medicolegal autopsy, which comprises an external and internal examination of the head, thorax, abdomen, and any other body region pertinent to the case. The nature of the death and its circumstances dictate which type of examination the forensic pathologist performs on an individual case. Pathologists who are not certified in forensic pathology perform many of the medicolegal autopsies in the United States.

Forensic pathologists practice in multiple settings. Most operate within death investigation systems and are appointed as civil servants and serve as medical examiner forensic pathologists. Some function as private practitioners, while others serve as consultants. They may operate under a fee-for-service agreement or be under contract to a city or county jurisdiction to provide medical examiner services. Others may serve as coroner's pathologists, and perform autopsies and prepare reports for coroners, who by statute assign the cause and manner of death and sign the death certificate.

An estimated 1,300 pathologists have been certified in forensic pathology since the American Board of Pathology first offered the certification in 1959 (about 5,000 medical residents enter internal medicine programs each year). Currently, approximately 400 to 500 physicians practice forensic pathology full time. Although there are only about 70 positions available each year, recent data indicate that only 70 percent of the slots are filled. NAME recommends an autopsy caseload of no more than 250 cases per year. The estimated need is for about 1,000 forensic pathologists; about 10 percent of available positions are vacant because of manpower shortages and/or insufficient funding of pathologist positions.[49] Although many forensic pathologists earn between $150,000 and $180,000 annually, this range is much lower than the average income of most hospital-based pathologists starting at the entry level.

An Association of American Medical Colleges (AAMC) survey indicates that the average medical school graduate in 2006 finished with debt in excess of $130,571 (including premedical school borrowing), with 72 percent having a debt of at least $100,000.[50] Interested pathology residents are less likely to elect to practice forensic pathology as a career if they are already burdened by debt load, and a program of loan forgiveness for years of service in a medical examiner system would be a major enticement to students who are considering a career in pathology. The shortage of qualified forensic pathologists required to staff aspiring medical examiner systems constitutes a major challenge not only for offices that are currently seeking staff, but for the future as well.

---

[48] American Board of Pathology at www.abpath.org/200801newsltr.htm; *ABP Examiner* 39. January 1, 2008 at www.abpath.org/200802newsltr.htm.

[49] Hanzlick, 2007, op. cit.

[50] Association of American Medical Colleges at www.ama-assn.org/ama/pub/category/5349.html.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1705

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

## STANDARDS AND ACCREDITATION FOR DEATH INVESTIGATION SYSTEMS

Currently, the standard for quality in death investigation for medical examiner offices is accreditation by NAME. Accreditation attests that an office has a functional governing code, adequate staff, equipment, training, and a suitable physical facility and produces a forensically documented accurate, credible death investigation product. Of all ME/C systems nationally, only 54 are accredited by NAME. The NAME accreditation checklist is available online and describes the requirements for accreditation.[51] Accreditation is for a period of five years. NAME also offers an individualized assessment program to enable jurisdictions to identify what they need to meet accreditation standards. Impediments to developing systems that meet accreditation requirements include the following:

- Most coroner systems cannot qualify for accreditation because of problems related to size, insufficient staff and equipment, and insufficiently trained personnel, which inhibit their ability to perform a competent physical examination, make and/or exclude medical diagnoses on dead bodies, and make determinations of the cause and manner of death. The historic role of the coroner is insufficient to accurately perform the medicolegal and public health functions related to sudden, unexpected, or violent death.
- Many medical examiner systems are constrained by budget, lack of staff, lack of equipment, and insufficient facilities and cannot meet NAME standards.
- The accreditation process requires considerable staff work, including written policies and procedures.
- The process requires renewal.
- There is administrative cost of the process.
- Many offices do not see any benefit to accreditation.

Federal incentives are lacking for states to perform an assessment of death investigation systems to determine status and needs, using as a benchmark and goal compliance with NAME current professional standards, guidelines, and accreditation requirements.

## QUALITY CONTROL AND QUALITY ASSURANCE

Quality control and quality assurance begin with the implementation of standardized policies and procedures by qualified staff. For lay medical investigators, registration and certification by the American Board of Medicolegal Death Investigators requires standard performance procedures as outlined in the NIJ document *Death Investigation: A Guide for the Scene Investigator* and other published education and training documents.[52] For forensic pathologists, basic competence is initially documented by examination and certification and subsequently by recertification by the American Board of Pathology. Written office and morgue policies and procedures with scheduled reviews and updates help ensure consistent performance over time. Professional performance parameters, such as the NIJ investigation guidelines for investigators and the NAME forensic autopsy standards, are offered as national documents that

---

[51] NAME Autopsy Standards and Inspection Checklist at www.thename.org.
[52] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. *Death Investigation: A Guide for the Scene Investigator*. Available at www.ojp.usdoj.gov.

9-14

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1706

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY

all systems should be able to follow. Professional continuing education must be available and supported, and it should be mandatory.

## CONTINUING MEDICAL EDUCATION

For pathologists to maintain professional standing they must earn Continuing Medical Education (CME) credits in accordance with the number required by their state medical licensing board. Attendance at forensic educational meetings, such as the annual meetings of NAME and the American Academy of Forensic Sciences (AAFS), help keep medical staff current. Other opportunities that offer valuable CME credits are meetings that focus on pediatric forensic issues and general pathology updates. AAFS meetings are multidisciplinary and afford an opportunity for updating in forensic anthropology, forensic odontology, and other forensic disciplines. The American Society of Clinical Pathologists offers CheckSample exercises and quizzes on forensic subjects prepared by experts.[53] Regular in-house training on emerging technologies in pathology and forensic science, and journal clubs covering a broad spectrum of journals, can help educate and reeducate forensic pathologists and investigators. Medical death investigators may attend the same meetings. The College of American Pathologists offers self-assessment programs in anatomical and forensic pathology, as well as a continuing education program of forensic pathology case challenges.[54]

## HOMELAND SECURITY

As part of homeland security, the National Response Plan (National Response Framework as of March 2008) identifies ME/Cs under Emergency Support Function 8 as responsible for management of the dead resulting from any hazardous event.[55] All deaths resulting from any form of terrorism are under the jurisdiction of the ME/C. MED-X, the bioterrorism surveillance program provided by the Centers for Disease Control and Prevention (CDC) for ME/Cs, utilizes syndromic surveillance of primarily out-of-hospital deaths (deaths occurring before the opportunity occurs for hospitalization and medical assessment and testing) to quickly identify deaths resulting from bioterrorism.[56]

With the exception of some large city, county, and state systems, the level of preparedness of ME/C jurisdictions is generally very low. Larger medical examiner systems may be able to manage events causing several hundred simultaneous single-site recoverable bodies with minimal outside assistance. Any event with thousands of fatalities would require federal assistance. Some statewide systems have developed consortia with neighboring states to supplement staff and equipment, but smaller cities and counties will need to rely entirely on federal assets such as Disaster Mortuary Operational Response Teams and the DOD Joint Task Force Civil Support.[57] Homeland security and disaster response would be well served by

---

[53] American Society of Clinical Pathologists CheckSample. Available at www,ascp.org/Education/selfStudyPublications/checkSample/default.aspx.

[54] See http://cap.org/apps/cap.portal?.

[55] Homeland Security National Response Plan (known as the National Response Framework after March 2008) at www.dhs.gov.

[56] Ibid; K.B. Nolte, S.L. Lathrop, M.B. Nashelsky, J.S. Nine, M.M. Gallaher, E.T. Umland, J.L. McLemore, R.R. Reichard, R.A. Irvine, P.J. McFeeley, R.E. Zumwalt. 2007. "Med-X": A medical examiner surveillance model for bioterrorism and infectious disease mortality. *Human Pathology* 38:718-725.

[57] Disaster Mortuary Operational Response Team at: www.dmort.org; Joint Task Force Civil Support at: http://jtfcs.northcom.mil.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1707

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

universal improvement in ME/C offices to manage mass fatality events such as the multistate Hurricane Katrina tragedy and the World Trade Center attacks, while also surveilling for the links between bioterrorism deaths. Multiple fatality management across jurisdictional lines, such as was needed in response to Hurricane Katrina, is nearly impossible under current conditions, given the absence of medical expertise in some systems, the absence of standards of performance, and the noninteroperability of systems and procedures. The recent infusion of funds to the states through the Department of Health and Human Services (DHHS) and the Department of Homeland Security (DHS) is of little assistance when there are no competent systems able or willing to employ those funds. Uniform statewide and interstate standards of operation, consolidation of small systems, regionalization of services, and standardization of staff training are needed to assist in the management of interstate and cross-jurisdictional events. A software program is needed that is universally usable and available, and its use should be promulgated by ME/C systems for multiple fatality management. (See also Chapter 11.)

## FORENSIC PATHOLOGY RESEARCH

Currently, little research is being conducted in the areas of death investigation and forensic pathology in the United States. Individual ME/C offices mainly utilize their databases for epidemiological retrospective reviews. Individual forensic pathologists operating in any system carry heavy caseloads and often have no dedicated time, expertise, facilities, or funding for research. Research is further limited because many offices operate training programs independent of university medical schools. Occasionally, a specific case may inspire "litigation research" directed to the elucidation of a specific problem related to a case that is being litigated actively, but this does not replace broad and systematic research of a forensic issue. Few university pathology departments promote basic pathology research in forensic problems such as time of death, injury response and timing, or tissue response to poisoning. In general, research interest often is inspired by a national goal that is funded through grants. A review of the forensic literature for basic research in forensic pathology reveals that efforts are originating largely from Europe, Scandinavia, and Japan. In other countries, universities house a department of legal medicine and/or departments of forensic medicine and pathology where forensic pathologists have the time, expertise, and funding needed to perform basic forensic research.

The Accreditation Council for Graduate Medical Education (ACGME) requires forensic pathology training programs to provide fellows an opportunity for scholarly research or other scholarly activities.[58] These research projects are usually small and limited in scope because of the constraints of a one-year fellowship, legislation that does not permit most basic research on tissues that are available upon autopsy without the permission of next of kin, lack of funding, and lack of space. Historically, the consent issue derives from the fact that forensic autopsies are carried out for medicolegal purposes and thus do not require permission from the next of kin. But without this permission, research that utilizes tissue from medical examiner offices does not take place. The time constraints for the performance of medicolegal autopsies make finding families and obtaining consent difficult. Many projects consist of epidemiological reviews that while of interest are not basic science.

Some U.S. universities may administer some forensic pathology fellowship programs, while others may include forensic pathologists within their departments of pathology. In these

---

[58] Accreditation Council for Graduate Medical Education. Available at:
www.acgme.org/acWebsite/downloads/RRC_progReq/310forensicpath07012004.pdf.

9-16

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1708

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY**

instances, the forensic pathologist usually supervises a departmental autopsy service that performs hospital and forensic autopsies. A university connection usually provides the university with the opportunity to rotate pathology residents and medical students through an ME/C office for a brief period, usually several months, and provides exposure to forensic pathology as part of an overall education program for medical students or as required by ACGME for training residents in general pathology. Even in universities that have a department of forensic science, research is limited to the forensic science disciplines, and little or no research is devoted to forensic pathology or forensic medicine. In some cases, there may be collaborative, ongoing epidemiological activities, such as when forensic pathologists work with members of departments of trauma surgery to develop statistical studies or when a forensic pathologist presents data at surgical or pediatric death review conferences. Of the many impediments to academic research in forensic pathology in the United States, the most significant are the lack of understanding of forensic research challenges, the lack of a perceived need and national goals, the lack of grant funding of any kind to support research, the lack of forensic pathology researchers, and the lack of recognition for efforts directed to forensic pathology research within the university community. Grant funding drives research, but virtually no funding is available to encourage departments of pathology to make forensic pathology research a focus, and there is little tradition of collaboration between academic and forensic pathologists.

Translational research bridges the gap between basic science discoveries and their practical applications. In the case of forensic pathology/medicine, this means taking basic science research knowledge to the autopsy table.[59] Given the large numbers of autopsies performed in the United States in medical examiner offices, there is a great need for new knowledge that will filter down to the autopsy pathologist and for opportunities for practicing forensic pathologists to identify problems that need basic research.

## COMMON METHODS OF SAMPLE AND DATA COLLECTION

State statute determines the sample or collection of cases that ME/Cs investigate and examine. The minimal data collected on each case is demographic and is entered on the certificate of death by the state division of vital records and death statistics, which also maintains the data. The data are reported nationally each year to the National Center for Health Statistics. ME/C offices with databases may keep records pertaining to their particular jurisdiction and collect additional data on specific diagnoses, or classes, of death. They collect useful death data through child fatality review teams, adult fatality review teams, surveillance programs for family and intimate partner violence, and the National Violent Death Review System.[60] None of these data collection projects is federally mandated, and for small systems there is no perceived benefit. ME/C reports are available to next of kin and others as provided by statute. ME/C investigations recognize product and equipment failures leading to death and report them to appropriate agencies. Before 2005, when funding was withdrawn, CDC maintained the Medical Examiner and Coroner Information Sharing Program (MECISP) to receive reports of product-

---

[59]NIH Roadmap for Medical Research: Re-engineering the Clinical Research Enterprise–Translational Research. Available at http://nihroadmap.nih.gov/clinicalresearch/overview-translational.asp.
[60]National Violent Death Reporting System. Available at www.cdc.gov/ncipc/profiles/nvdrs/default.htm.

9-17

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1709

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

associated deaths, which allowed early recognition of problem products.[61] Originally, MECISP was established to obtain data from all deaths investigated by ME/Cs and to share such information with relevant agencies. The major goals of MECISP were to improve medicolegal death investigation and to facilitate the sharing of death investigation information.[62] Many agencies depend on ME/C investigations and autopsies to complete their work, such as the Occupational Health and Safety Administration, social services agencies, victim witness compensation programs, and workers compensation agencies.

Systems with in-house forensic pathologists may collect autopsy data, but often the data are collected in a format that is different from the one used for the underlying (proximate) cause of death data as listed on death certificates. The reporter may use a pathology classification system such as SNOMED (Systematized Nomenclature of Medicine) or an individually devised system that tracks diseases or injuries of personal or system-specific interest.[63] There is no universally accepted or required system for collection or maintenance of autopsy data by medical examiners and coroners. Analysis of data may be local or regional, and it may be conducted by review teams or by national organizations or agencies with interests in specific classes of data.

Scientific interpretation and summaries of the results are included in the reports generated by each ME/C office. Reports by medical death investigators that describe the circumstances of death are descriptive and vary in quality depending on the standards of the office. Pathologists produce the autopsy reports and may or may not provide an interpretive summary of findings. Reports vary from the academic pathology report that lists each organ system and any deviations from normal to the problem-oriented autopsy report that prioritizes diagnoses from the most important leading to death followed by any contributory and then noncontributory pathology of interest. Not all pathologists follow the NAME autopsy standards. The general expectation, at least for the legal forum, is that each autopsy will have documented the findings in sufficient detail through narrative and photographs and that review by another pathologist will confirm the adequacy of the examination.

Requiring the adoption of standards for death investigations and autopsies as well as accreditation of all ME/C offices would benefit all parties, including the recipients of ME/C services. Because the credibility of unaccredited offices is rarely challenged, implementing and enforcing standards will require major incentives as well as negative consequences for nonadherence.

---

[61] Centers for Disease Control and Injury Prevention Medical Examiner Coroner Information Sharing Project. Available at www.cdc.gov/ncphi/disse/nndss/contact.htm#mecisp.

[62] MECISP was established in 1986 by CDC with goals that included improving the quality of death investigation in the United States mainly by achieving uniformity and improving the quality of information obtained during the investigation of deaths by ME/Cs. The program was active and productive and very well received by medical examiners. It constituted the major interface between the public health and the ME/C systems. Approximately 10 years ago, CDC went through a period of internal reorganization and administratively began decreasing the budget for MECISP. MECISP was moved from the CDC National Center for Environmental Health to the CDC Epidemiology Program Office. The budget was eliminated in 2004, despite the efforts of NAME. R. Hanzlick. 2006. Medical examiners, coroners, and public health. *Archives of Pathology and Laboratory Medicine* 130:1247-1282.

[63] SNOMED. Available at www.snomed.org.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1710

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

MEDICAL EXAMINER AND CORONER SYSTEMS— PREPUBLICATION COPY

## CONCLUSIONS AND RECOMMENDATION

ME/C systems function at varying levels of expertise, often with deficiencies in facilities, equipment, staff, education, and training. And, unfortunately, most systems are under budgeted and understaffed. As with other forensic science fields, there are no mandated national qualifications or certifications required for death investigators. Nor is medical expertise always required. In addition, there is no one recognized set of performance standards or best practices for ME/C systems nor are there incentives to implement one recognized set. Also lacking are universally accepted or promulgated methods of quality control or quality assurance. It is clear that the conversion of coroner systems to medical examiner systems as recommended by many studies has essentially halted and requires federal incentives to move forward.

The Model Post Mortem Examination Act of 1954 needs to be revisited and updated to include the elements of a progressive and responsive death investigation law. The revised code should include standards for administration, staffing, and training. Any changes to the system will require federal incentives to implement the changes in each state.

The shortage of forensic pathologists speaks to the need to provide incentives for young physicians to train in forensic pathology. Systems with authorized positions cannot fill them, because of this shortage and budget deficits. The National Forensic Sciences Improvement Act (NFSIA) must be fully funded to support the core needs of ME/C grantees for equipment and facilities, training and education, and infrastructure.

Many ME/C systems do not utilize up-do-date technologies that would help in making accurate medical diagnoses. Moreover, many are unable to make use of advances in forensic technology because of staff educational deficiencies, untrained staff, and budget stringencies. Basic and translational forensic pathology research are nearly nonexistent.

Homeland security is compromised because operating units related to forensic pathology are not standardized, and the multiplicity of systems precludes meaningful communication among units. Surveillance for bioterrorism and chemical terrorism is not universal, and database systems cannot operate across jurisdictional lines to share data or manage multiple fatality incidents.

Although steps have been taken to transform the medicolegal death investigation system, the shortage of resources and the lack of consistent educational and training requirements prevent investigators from taking full advantage of tools, such as CT scans and digital X-rays, that the health care system and other scientific disciplines offer. In addition, more rigorous efforts are needed in the areas of accreditation and adherence to standards. Currently, requirements for practitioners vary from an age and residency requirement to certification by the American Board of Pathology in forensic pathology.

Funds are needed to assess and modernize the medicolegal death investigation system, using as a benchmark the current requirements of NAME related to professional credentials, standards, and accreditation. As it now stands, ME/Cs are essentially ineligible for direct federal funding and cannot receive grants from DHHS (including the National Institutes of Health [NIH]) and the Department of Justice or DHS. The Paul Coverdell NFSIA is the only federal grant program that names ME/Cs as eligible for grants. However, ME/Cs must compete with public safety agencies for Coverdell grants; as a result, the funds available to ME/Cs have been significantly reduced. NFSIA is not funded sufficiently to provide significant improvements in ME/C systems. In addition to more direct funding, other initiatives could be pursued to improve medicolegal death investigation practices.

9-19

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1711

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

AAMC and other appropriate professional organizations might organize collaborative activities in education, training, and research to strengthen the relationship between the medical examiner community and its counterparts in the larger academic medical community. Medical examiner offices with training programs affiliated with medical schools should be encouraged to compete for funds. Funding should be available to support pathologists who are seeking forensic fellowships. In addition, forensic pathology fellows could apply for medical school loan forgiveness if they stay full time at a medical examiner's office for a reasonable period of time.

Additionally, the proposed National Institute of Forensic Science (NIFS) should seek funding from Congress to allow it, CDC, and DHS, jointly, to design programs of interest to medical examiners and medical examiner offices in national disaster planning, preparedness, and consequence management. Uniform statewide and interstate standards of operation would be needed to assist in the management of cross-jurisdictional and interstate events. NIFS also might consider whether to support a federal program underwriting the development of software for use by ME/C systems for the management of multisite, multistate, or multiple fatality events.

NIFS also could work with groups such as the National Conference of Commissioners on Uniform State Laws, the American Law Institute, and NAME, in collaboration with other appropriate professional groups, to update the 1954 Model Post Mortem Examinations Act and draft legislation for a modern model death investigation code. An improved code might, for example, include the elements of a competent medical death investigation system and clarify the jurisdiction of the medical examiner with respect to organ donation. Although these ideas must be developed in greater detail before any concrete plans can be pursued, the committee makes a number of specific recommendations, which, if adopted, will help to modernize and improve the medicolegal death investigation system. These recommendations deserve the immediate attention of NIFS and Congress.

**Recommendation 11:**

**To improve medicolegal death investigation:**

(a)  **Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to states and jurisdictions to establish medical examiner systems, with the goal of replacing and eventually eliminating existing coroner systems. Funds are needed to build regional medical examiner offices, secure necessary equipment, improve administration, and ensure the education, training, and staffing of medical examiner offices. Funding could also be used to help current medical examiner systems modernize their facilities to meet current Centers for Disease Control and Prevention-recommended autopsy safety requirements.**

(b)  **Congress should appropriate resources to the National Institutes of Health (NIH) and NIFS, jointly, to support research, education, and training in forensic pathology. NIH, with NIFS participation, or NIFS in collaboration with content experts, should establish a study section to establish goals, to review and evaluate proposals in these areas, and to allocate funding for collaborative research to be conducted by medical examiner offices and medical universities. In addition, funding, in the form of medical student loan forgiveness and/or fellowship support, should be made available to pathology residents who choose forensic pathology as their specialty.**

9-20

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1712

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1714 of 2008
PageID #: 3604
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

(c)     NIFS, in collaboration with NIH, the National Association of Medical Examiners, the American Board of Medicolegal Death Investigators, and other appropriate professional organizations, should establish a Scientific Working Group (SWG) for forensic pathology and medicolegal death investigation. The SWG should develop and promote standards for best practices, administration, staffing, education, training, and continuing education for competent death scene investigation and postmortem examinations. Best practices should include the utilization of new technologies such as laboratory testing for the molecular basis of diseases and the implementation of specialized imaging techniques.

(d)     All medical examiner offices should be accredited pursuant to NIFS-endorsed standards within a timeframe to be established by NIFS.

(e)     All federal funding should be restricted to accredited offices that meet NIFS-endorsed standards or that demonstrate significant and measurable progress in achieving accreditation within prescribed deadlines.

(f)     All medicolegal autopsies should be performed or supervised by a board certified forensic pathologist. This requirement should take effect within a timeframe to be established by NIFS, following consultation with governing state institutions.

9-21

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1713

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1714

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 10
# AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS

In the late 1970s and early 1980s law enforcement agencies across the Nation began adopting Automated Fingerprint Identification Systems (AFIS) to improve their efficiency and reduce the amount of time it took to identify (or not exclude) a given individual from a fingerprint or to conduct a background investigation. AFIS introduced an enormous improvement in the way local, state, and federal law enforcement agencies managed fingerprints and identified people. Before the use of AFIS, the fingerprint identification process involved numerous clerks and fingerprint examiners sifting through thousands of tediously classified and cataloged paper fingerprint cards, while dealing with delays and challenges caused by the realities of exchanging information with other agencies by mail, fax, or other means. With AFIS, fingerprint examiners use computer workstations to mark the features of a scanned fingerprint image (e.g., ridge endings, bifurcations), encode the resulting data in a machine-readable format, and then search for similar fingerprints in an associated database of known fingerprints and records. AFIS searches are fast, and they often allow examiners to search across a larger pool of candidates. Although challenging cases can be time consuming, depending on the size of the database being searched and the system's workload, AFIS often can return results to the examiner within minutes.

AFIS searches today fall into two distinct categories:

**10-print searches**, which typically involve comparing relatively high-quality, professionally obtained fingerprint images—for example, prints taken during an arrest or booking or as part of a background check—with fingerprint records in an agency database, such as the FBI's Integrated Automated Fingerprint Identification System (IAFIS) or a state's criminal fingerprint database; and

**Latent print searches**, which are considerably more complicated than 10-print searches. In a latent print search, a fingerprint examiner attempts to identify an individual by comparing a full or partial latent fingerprint from a crime scene with the records contained in an AFIS database. Latent prints are regularly of poor quality and may be only a partial print, and often fingerprint examiners may not even know from which finger a given latent print came.

A third category (albeit one that includes elements of both categories listed above) might also be called "unidentified burned, decomposed, or fragmented prints," which may be either a complete 10-print card to be compared with known prints on file to confirm identity or partial prints recovered from the skin or dermis of damaged fingers of an unknown decedent to determine identity. This third category can include prints from single individuals recovered from a small single event or victims of a mass casualty event resulting from naturally occurring catastrophes or terrorism. In either case, AFIS systems have reduced the time required to accomplish many identifications from weeks to hours.

Today, the process of populating AFIS systems with records is managed primarily by uploading 10-print records from police bookings and background checks. Because images from these sources are generally of good quality (indeed, poor-quality 10-print records are normally redone at the time they are taken), an automated algorithm is adequate for extracting the features

10-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1715

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

used to index an image for retrieval. Computer algorithms work well for performing comparisons of 10-print records (e.g., to see if the prints taken when one applies for a security clearance match the prints taken during a previous background check). However, submitting a latent print for comparison is a more customized process, requiring fingerprint examiners to mark or adjust the features manually to retrieve stored prints with the same features in analogous places. Because latent print images normally are not as clear or as complete as images from a 10-print card, the image processing algorithms used for 10-prints are not as good as the human eye in spotting features in poor images.

AFIS has been a significant improvement for the law enforcement community over the past decades, but AFIS deployments today are still far from optimal. Many law enforcement AFIS implementations are stand-alone systems or are part of relatively limited regional networks with shared databases or information-sharing agreements—the Western Identification Network (WIN) is one example of such a regional network (for more information on WIN, see Box 10-1).

---

**Box 10-1 The Western Identification Network**

WIN was formed in May 1988 to facilitate the creation of a multistate AFIS implementation. A year later, the state legislatures of Alaska, California, Idaho, Oregon, Nevada, Utah, Washington, and Wyoming appropriated the necessary funding to begin work on the system.

The initial WIN AFIS was installed in Sacramento, California, with remote subsystems in Cheyenne, Wyoming; Salt Lake City, Utah; Boise, Idaho; Carson City, Nevada; and Salem and Portland, Oregon. Booking terminals also were installed in numerous locations throughout these states, and existing similar stand-alone systems in Alaska, California, and Washington were connected to WIN in 1990 to complete the initial network. At first, WIN's centralized automated database included 900,000 fingerprint records, but after connecting to Alaska, California, and Washington, the number of searchable fingerprint records increased to more than 14 million. Today, WIN members have access to more than 22 million fingerprint records from the western United States.

NOTE: For information about WIN, see
www.winid.org/winid/who/documents/WINServiceStrategyJanuary2008.pdf.

---

Today, AFIS systems from different vendors most often cannot interoperate with one another. Indeed, different versions of similar systems from the same vendor sometimes cannot share fingerprint data with one another. In addition, many law enforcement agencies also access the FBI's IAFIS database[1] through an entirely separate stand-alone system—a fact that often forces fingerprint examiners into entering fingerprint data for one search multiple times (at least once for each system being searched).

There is no doubt that much good work has been done in recent years aimed at improving the interoperability of AFIS implementations and databases (see Box 10-2), but the committee believes that, given the potential benefits of more interoperable systems, the pace of these efforts to date has been too slow, and greater progress needs to be made toward achieving meaningful, nationwide AFIS interoperability.

---

[1] See www.fbi.gov/hq/cjisd/iafis.htm.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1716

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

AUTOMATED FINGERPRINT IDENTIFICATION SYSTEMS —PREPUBLICATION COPY

---

**Box 10-2  Working Toward AFIS Interoperability**

As early as 1986, the American National Standards Institute (ANSI) and the National Bureau of Standards (now known as the National Institute of Standards and Technology, or NIST) were working on ways to facilitate the exchange of fingerprint data. Their collaboration produced a standard defining minutiae data and both low- and high-resolution fingerprint images. The standard was not successful, however, because of conflicts with proprietary systems.

In 1993, ANSI and NIST teamed up again to create another fingerprint data standard, a standard later updated in 1997. It defined standards for minutiae data and low- and high-resolution fingerprint images in both binary and grayscale format, as well as methods for compressing and decompressing image data.

In the late 1990s, the International Association for Identification's AFIS Committee successfully demonstrated a method of conducting remote fingerprint searches across jurisdictions and across equipment from different vendors.[2]

In 2003, the ANSI/NIST standard was updated again. It grew to include 16 record types in total, with the addition of standards for such things as palm print data and latent print data.[3] The standard was recently updated once more and has subsequently been approved by ANSI's Board of Standards Review as an ANSI standard.[4]

The NIST-sponsored Minutiae Interoperability Exchange Test (MINEX) program is an ongoing series of coordinated development efforts aimed at improving the performance and interoperability of fingerprint minutiae standards. In 2004, the original project undertook to determine the feasibility of using minutiae data (rather than image data) as the interchange medium for fingerprint information between different fingerprint matching systems.[5]

---

## INTEROPERABILITY CHALLENGES

Despite the work done to date to achieve broader AFIS interoperability and its potential benefits (i.e., more crimes solved, quicker and more efficient searches, and better use of limited law enforcement resources), several persistent challenges to reaching this goal remain.

**Technical Challenges**

The technical challenges to AFIS interoperability involve both those that are encountered and addressed by the information technology community in other disciplines (such as data sharing and algorithmic performance) and those that are specific to AFIS and the sharing of fingerprint information (e.g., feature identification, reliability of latent print comparisons). In addition, systems will need to be designed with the flexibility to handle other kinds of biometric data in the future (e.g., iris and palm scans and possibly genomic data). As these latter challenges are addressed, retrieval algorithms within proprietary AFIS systems also may tend to converge, which could simplify the broader interoperability challenges.

Creating useful technical standards is never a simple undertaking, especially given a diverse array of stakeholders, proprietary systems, and ever-advancing technological capabilities

---

[2] The committee's final report is available at www.onin.com/iaiafis/IAI_AFIS_071998_Report.pdf.

[3] For more information on the ANSI/NIST standards, see P. Komarinski. 2005. *Automated Fingerprint Identification Systems.* Boston: Elsevier Academic Press, pp. 162-166.

[4] This approved revision of the ANSI/NIST-ITL 1-2000 standard is now available as NIST Special Publication 500-271: *Data Format for the Interchange of Fingerprint, Facial, & Other Biometric Information-Part 1* (ANSI/NIST-ITL 1-2007) at http://fingerprint.nist.gov/standard/Approved-Std-20070427.pdf.

[5] More information about the work of the MINEX series is available at http://fingerprint.nist.gov/minexII/.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1717

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY

(e.g., improved pattern recognition, better hardware, increased data compression). However, the successful interoperability of other distributed information networks—such as modern banking systems (e.g., ATM machines[6]), information sharing networks in the real estate world,[7] the Centers for Disease Control and Prevention's Public Health Information Network,[8] and even the Internet itself, each of which functions only by reliance on a number of finely crafted and agreed standards and protocols—is proof that efforts to develop and implement standards pay off in the end by allowing greater collaboration and sharing of information.

One other major area of technical challenge to achieving AFIS interoperability involves the algorithms that systems use to identify features in fingerprint images (e.g., how a system determines that a given pattern of pixels corresponds to a true ridge ending or bifurcation and how it infers what type of feature those pixels actually represent). To date, these algorithms have been largely proprietary and vendor specific (i.e., different for each type of system). In fact, experienced latent print examiners have found that different systems will retrieve different stored prints in response to a given input map of features, and they have learned system-specific ways of annotating features on a latent print in order to maximize the success of each system's (inferred) search algorithms. However, achieving broad-based AFIS interoperability will require baseline standards for these algorithms, so that fingerprint examiners can be assured of consistent feature mapping across systems. As mentioned previously, fingerprint examiners have learned by experience to provide different inputs to different vendors' systems, often purposely leaving out information—knowing that the added input will degrade the search quality:

> The examiner does not necessarily encode every point he can find in the latent print. LPU [latent print unit] examiners have learned through experience with the IAFIS program which types of points are most likely to yield a correct match. LPU Unit Chief Meagher told the OIG [Office of Inspector General] that examiners are taught to avoid encoding points in areas of high curvature ridge flow, such as the extreme core of a print. Unit Chief Wieners and Supervisor Green told the OIG that IAFIS does not do well when asked to search prints in which points have been encoded in two or more clusters separated by a gap. One reason is that IAFIS gives significant weight to the ridge count between points. If the ridge count between two clusters of points in a latent is unclear, IAFIS may fail to retrieve the true source of the print. Thus, an examiner will not necessarily encode every point that can be seen in a latent fingerprint, but rather may limit his encoding to points in a defined area in which the ridge count between points is clear.[9]

---

[6] Indeed, financial card transactions are facilitated by their own ISO standard (ISO 8583-1:2003). For more information, see www.iso.org/iso/iso_catalogue/catalogue_tc/catalogue_detail.htm?csnumber=31628.

[7] See, e.g., the Metropolitan Regional Information System (MRIS) at www.mris.com/about/WhoWeAre.cfm.

[8] CDC's Public Health Information Network is a national initiative to improve the capacity of the public health community to use and exchange information electronically by promoting the use of standards and defining functional and technical requirements. The network employs a messaging system (PHINMS) to rapidly and securely share sensitive health information among CDC and other local, state, and federal organizations over the Internet—information such as HIV records, pandemic information, and information on bioterrorism. Complete information about PHIN and PHINMS is available at www.cdc.gov/phin/.

[9] Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case*, p. 119.

10-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1718

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1720 of 2008 PageID #: 3610
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

The fact that today's systems often do not effectively utilize most of the available feature information and require substantial input from fingerprint examiners suggests that there is significant room for improvement. An ideal, comprehensive AFIS, for example, would be capable of automated:

- reading of latent prints;
- encoding of most features of usable quality, including those features identified as Level 1 (fingerprint classes such as whorl, arch), Level 2 (minutiae), Level 3 (pores, cuts), and ridge paths, together with a provision for including other features that could be defined by the vendor/user;
- recognizing absent, blurred, double/multioverlap, poor-quality sections of an observed print and encoding the system to downweight, or omit entirely, during the search process;
- recognizing any orientation information;
- conducting database searches;
- providing "best matches"; and
- collecting statistical data based on the quality of the print and numbers/types of features.

Other technical challenges might include the development and use of a secure Web interface (or an analogous system) that would permit authorized latent print examiners in any jurisdiction to submit queries to IAFIS and other federated AFIS databases, as well as the development of standard procedures for maintaining AFIS databases securely, removing redundancies, ensuring that fingerprint data are entered properly, and conducting quality control and validation of searches (i.e., ensuring that queries are actually searching an entire database). Although some of the capabilities mentioned here are present in today's commercially available systems, significant improvement still can be realized.

**Support from Policymakers**

Given the complexity of the AFIS interoperability challenge and the large number of players whose contributions and cooperation will be necessary to meet that challenge, it is clear that no effort aimed at nationwide interoperability will succeed without strong, high-level support from policymakers in federal and state government. Resources available to law enforcement agencies for the deployment, use, and maintenance of AFIS systems vary greatly from jurisdiction to jurisdiction, and the considerable expenses associated with purchasing, maintaining, training for, operating, and upgrading an AFIS implementation—which can easily cost millions of dollars[10]—must be well thought out and weighed against other competing costs and interests facing law enforcement.

The committee hopes that this report will help convince policymakers of the benefits to nationwide interoperability and move them to provide much-needed support to law enforcement agencies, vendors, and researchers to help them achieve this goal. Indeed, the committee believes that true AFIS interoperability can be achieved in a timely manner only if policymakers provide a strong, clear mandate and additional funding from federal and state governments—both to support the research and development work necessary to achieve truly interoperable systems and

---

[10] See P. Komarinski. 2005. *Automated Fingerprint Identification Systems*. Boston: Elsevier Academic Press, p. 145.

Copyright © National Academy of Sciences. All rights reserved.

**USCA5 1719**

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES— PREPUBLICATION COPY**

to assist law enforcement agencies in purchasing, implementing, and managing systems and training personnel.

## Vendors

As suggested above, AFIS equipment and service vendors must cooperate to ensure nationwide AFIS interoperability. However, to date—and as one could reasonably expect in a technology sector in which product differentiation and the maintenance of competitive advantages are prime concerns—vendors have had little incentive to design their systems to enable them to share information with competitors' systems. The committee believes that increased cooperation among AFIS vendors is a key to achieving meaningful interoperability. For example, one can imagine how it might prove useful if AFIS vendors could collaborate (perhaps through work facilitated by the proposed National Institute of Forensic Science [NIFS]) on developing standard (or baseline) retrieval algorithms. Such a step conceivably could make it less time consuming for fingerprint examiners to run searches on many different systems because they would not have to manually *tune* their searches to work on the systems of different vendors.

## Administrative, Legal, and Policy Issues

As noted earlier, most AFIS implementations are either stand-alone systems or are part of relatively limited regional databases. To achieve truly interoperable systems, jurisdictions must work more closely together to craft acceptable agreements and policies to govern the routine sharing of fingerprint information. NIFS can facilitate the development of standard agreements along these lines, which could include issues such as the extent of system access to other jurisdictions, the management of search priorities, and the recovery of costs associated with processing the requests from outside agencies. In addition, many jurisdictions also might want assurances that they will not be held responsible for any possible misuse of fingerprint information that is provided to other law enforcement agencies.

## CONCLUSIONS AND RECOMMENDATION

Great improvement is possible with respect to AFIS interoperability. Many crimes no doubt go unsolved today simply because investigating agencies cannot search across all the individual databases that might hold a suspect's fingerprints or contain a match for an unidentified latent print from a crime scene. It is possible that some perpetrators have gone free because of the limitations on fingerprint searches.

The committee believes that, in addition to the technical challenges noted above, a number of other critical obstacles to achieving nationwide AFIS interoperability exist involving issues of practical implementation. These include (1) convincing federal and state policymakers to mandate nationwide AFIS interoperability; (2) persuading AFIS equipment vendors to cooperate and collaborate with the law enforcement community and researchers to create and use baseline standards for sharing fingerprint image and minutiae data and interfaces that support all searches; (3) providing law enforcement agencies with the resources necessary to develop interoperable AFIS implementations; and (4) coordinating jurisdictional agreements and public policies that would allow law enforcement agencies to share fingerprint data more broadly.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1720

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1722 of 2008
PageID #: 3612
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Given the disparity in resources and information technology expertise available to local, state, and federal law enforcement agencies, the relatively slow pace of interoperability efforts to date, and the potential gains that would accrue from increased AFIS interoperability, the committee believes that a new emphasis on achieving nationwide fingerprint data interoperability is needed.

**Recommendation 12:**

**Congress should authorize and appropriate funds for the National Institute of Forensic Science (NIFS) to launch a new broad-based effort to achieve nationwide fingerprint data interoperability. To that end, NIFS should convene a task force comprising relevant experts from the National Institute of Standards and Technology and the major law enforcement agencies (including representatives from the local, state, federal, and, perhaps, international levels) and industry, as appropriate, to develop:**

**(a)    standards for representing and communicating image and minutiae data among Automated Fingerprint Identification Systems. Common data standards would facilitate the sharing of fingerprint data among law enforcement agencies at the local, state, federal, and even international levels, which could result in more solved crimes, fewer wrongful identifications, and greater efficiency with respect to fingerprint searches; and**

**(b)    baseline standards—to be used with computer algorithms—to map, record, and recognize features in fingerprint images, and a research agenda for the continued improvement, refinement, and characterization of the accuracy of these algorithms (including quantification of error rates).**

These steps toward AFIS interoperability must be accompanied by the provision of federal, state, and local funds to support jurisdictions in upgrading, operating, and ensuring the integrity and security of their systems; the retraining of current staff; and the training of new fingerprint examiners to gain the desired benefits of true interoperability. Additionally, greater scientific benefits can be realized through the availability of fingerprint data or databases for research purposes (using, of course, all the modern security and privacy protections available to scientists when working with such data). Once created, NIFS might also be tasked with the maintenance and periodic review of the new standards and procedures.

Copyright © National Academy of Sciences. All rights reserved. .

USCA5 1721

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**PREPUBLICATION COPY**

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1722

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# 11
# HOMELAND SECURITY AND
# THE FORENSIC SCIENCE DISCIPLINES

In its charge to the committee, Congress raised the question of the role of forensic science in homeland security. The committee recognized that, to address this issue thoroughly, it would need additional expertise and more time to fully undertake an analysis of the role that forensic science currently plays and could possibly play in the future. Such an analysis would require serious study of the current configuration of the Department of Homeland Security (DHS) and its relationships with the forensic science community, law enforcement, and national security. Indeed, as the committee began to explore this issue it became clear that the question of the role of forensic science in homeland security is a study unto itself. Not wanting to ignore this issue, the committee limited its analysis to the presentations made to the committee and the expertise of its membership. Consequently, this chapter should be viewed as a first step in addressing the role of forensic science in homeland security.

The development and application of the forensic science disciplines to support intelligence, investigations, and operations aimed at the prevention, interdiction, disruption, attribution, and prosecution of terrorism has been an important component of what is now termed "homeland security" for at least two decades. Major terrorist bombings in the United States and abroad in the 1980s and 1990s influenced the U.S. government to enhance federal investigative and forensic science entities to be able to respond more effectively. For example, forensic science played an important role in investigating the bombing of Pan Am Flight 103 (1988), the first bombing of the World Trade Center in New York City (1993), the Oklahoma City bombing (1995), the suspected attack or sabotage of Trans World Airline Flight 800 (1996), the bombing of the USS Cole (2000), and the bombings of the U.S. Embassies in Kenya and Tanzania (1998). And even though the identification of the Unabomber (1996) occurred as a result of the cooperation of his brother with the authorities, the forensic evidence against Theodore Kaczynski was substantial and crucial to the case.

The nature of homeland security requires the integration of forensic science into the investigative process much earlier than is the case for criminal justice. That is, for homeland security, forensic science plays not only its traditional role of inferring what happened at a crime scene and who was involved, but also contributes more intensively to generating investigative leads and testing, directing, or redirecting lines of investigation. In this role, forensic science contributes to the gathering of effective and timely intelligence and investigative information on terrorists and terrorist groups. This requires both traditional forensic science tools and enhanced and specialized forensic analysis and information sharing—new tools that are being developed primarily by the intelligence and defense communities in the United States, with each community tailoring the new tools to its specialized needs and missions.

The intelligence and investigative capabilities thus build on a foundation of traditional forensic science expertise that exists in the military and the FBI. The Department of Defense (DOD), for example, includes the U.S. Army Criminal Investigation Laboratory, which, with its 137-member staff, carries out criminal investigations. It also conducts research activities to develop specialized techniques needed by the military. Some of the nontraditional forensic science capabilities available within that laboratory include methods suited to intelligence

11-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1723

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

gathering and counter-intelligence and the ability to make inferences about foreign language documents. Plans for the future include developing capabilities such as increased integration of biometrics (used for security) and forensic science and improved accident investigation and reconstruction.[1]

Other DOD forensic science capabilities are found in the Armed Forces Institute of Pathology (with a staff of 25), the Cyber Crime Center (with a staff of approximately 190), the Joint POW/MIA Accounting Command Central Identification Laboratory (more than 46 staff members), and the Armed Forces DNA Identification Laboratory (with staff of approximately 138).[2] The Joint POW/MIA Accounting Command Central Identification Laboratory bills itself as the largest forensic anthropology laboratory in the world.[3] Also contributing to DOD's forensic science capabilities is its Biometrics Task Force, which leads in the development and implementation of biometric technologies for combatant commands, military services, and other DOD agencies.[4] The DOD forensic science capabilities are not centrally managed.[5]

DOD has a particular interest in DNA identification, both of its own people and of enemies. The department has a repository of five million DNA samples, primarily from military service members, intended mostly for casualty identification. DOD also pools data with intelligence and law enforcement programs to build and maintain the Joint Federal Agencies Intelligence DNA Database, a searchable database of DNA profiles from detainees and known or suspected terrorists.[6]

The DOD forensic science laboratories are relatively well resourced, according to the Director of the U.S. Army Criminal Investigation Laboratory, and DOD personnel are active in professional forensic science organizations, national certification/accreditation bodies, and national scientific working groups. Of particular note is that all of DOD's institutional laboratories are nationally accredited,[7] unlike many civilian law enforcement laboratories.

An example of federal efforts to develop forensic science methods of importance to homeland security is the relatively new National Biodefense Forensic Analysis Center, established by DHS in 2004. The center's mission is to provide a national capability to conduct and coordinate forensic analyses of evidence from biocrime and bioterror investigations. It is supported by DHS research to fill short- and long-term capabilities gaps, but the center itself is devoted to actual casework. Before its establishment, the Nation had no dedicated biocontainment laboratories, staff, or equipment to conduct bioforensic analysis. It had no methods to enable the handling of biothreat agent powders, no methods to support traditional forensic analyses of evidence contaminated with a biothreat agent, and no place in which to receive large quantities or large pieces of evidence contaminated with a biothreat agent. There were no established methods for handling evidence and conducting analysis, no quality guidelines or peer review of methodologies, and no central coordination for bioforensic analyses. These gaps became very apparent during the Nation's response to the anthrax attacks of 2001.[8]

---

[1] L.C. Chelko, Director, U.S. Army Criminal Investigation Laboratory. "Department of Defense Forensic Capabilities." Presentation to the Committee. September 21, 2007.

[2] Ibid.

[3] Ibid.

[4] T. Cantwell, Senior Forensic Analyst, Biometric Task Force and Leader, Forensic Integrated Product Team, Department of Defense, "Latent Print Analysis." Presentation to the Committee. December 6, 2007.

[5] Chelko, op. cit.

[6] Ibid.

[7] Ibid.

[8] J. Burans, Director, National Bioforensics Analysis Center. "The National Biodefense Analysis and Countermeasures Center." Presentation to the Committee. September 21, 2007.

11-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1724

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Bioforensics, which is sometimes referred to as microbial forensics, or as forensic microbiology, is a developing interdisciplinary field of microbiology devoted to the development, assessment, and validation of methods for fully characterizing microbial samples for the ultimate purpose of high-confidence comparative analyses. It supports attribution investigations involving pathogens or toxins of biological origin used in a biological attack. The bioforensics toolkit includes diagnostic assay systems that can identify infectious agents rapidly, as well as organic and inorganic analytical chemistry, electron microscopy, and genetic engineering. Much of the work must be conducted according to stringent safety and containment protocols, and dedicated laboratories are now under construction. The center's capabilities enable the identification and/or characterization of biological threats, physical and chemical analyses, and the generation of data that can help in investigations and ultimate attribution. In addition to conducting casework, the center aims to develop and evaluate assays for high-consequence biological agents that threaten humans, animals, and plants, achieve accreditation for bioforensic casework and then continue to expand the scope of accreditation for newly established capabilities, and establish and maintain reference collections of biological agents for comparative forensic identifications.[9]

Another component of forensic science for homeland security is found in the Office of the Director of National Intelligence, which coordinates the various elements of the intelligence community. Within that office is a National Counterproliferation Center that also carries out work in bioforensics.[10] The considerable threat of the acquisition, development, and use of weapons of mass destruction (WMD; chemical, biological, radiological, and nuclear weapons) has led U.S. government agencies to develop new forensic science capabilities. In 1996, this development was begun with the establishment of a specialized forensic hazardous materials unit in the FBI Laboratory, which came at a time of greater awareness of and concern over WMD in the hands of terrorists and in preparing for the 1996 Olympic Games in Atlanta. Interest and investment in this type of capability has diversified and expanded since that time in the FBI as well as in DOD, the Department of Energy, the Intelligence Community, and DHS. The programs described above are visible evidence of the government's commitment to forensic science and infrastructure as integral components of homeland security. At the time of this writing, the importance of forensic science and its potential for improving the attribution of WMD are also active topics in discussions internationally.

The traditional U.S. forensic science community generally has not been included directly in planning, preparedness, resourcing, response, training, and the exercising of large-scale or specialized forensic science capabilities for terrorism and homeland security, although the FBI Laboratory provides a link between homeland security applications of forensic science and traditional uses in criminal justice. One reason for this segmentation is that the traditional community has heavy commitments to day-to-day law enforcement requirements, timelines, and backlogs. Also, many of the homeland security applications of forensic science require specialized expertise and infrastructure that are not widespread, and they might require access to information that is protected by security classification. Although major metropolitan law enforcement agencies and forensic laboratories, such as those in New York City and Los Angeles, have developed some specialized tactical capacities of these types, most of the U.S. forensic science enterprise does not and will not legitimately invest in such capacities and will

---

[9] Ibid.
[10] C.L. Cooke Jr., Office of the Deputy Director for Strategy & Evaluation, National Counterproliferation Center. "Microbial Forensics: Gaps, Opportunities and Issues." Presentation to the Committee. September 21, 2007.

11-3

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1725

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES – PREPUBLICATION COPY**

rely instead on agencies such as the FBI and those who are part of the FBI-led Joint Terrorism Task Forces[11] in some 100 U.S. cities.

For the most part, the specialized capacities and capabilities needed for homeland security are not warranted for most civilian forensic science laboratories and medical examiner offices, although there are exceptions, and some of the skills embodied in these new forensic efforts may have direct applicability to traditional forensic science disciplines. However, the skills embodied within the traditional forensic science and medical examiners communities are potentially an important asset for assisting in homeland security. The geographic dispersion of those communities is an additional asset, because a security event or natural disaster can occur anywhere, beyond the quick reach of specialized federal capabilities. In addition, to the extent that members of the forensic science and medical examiners communities might respond to WMD attacks before specialized experts can, it is important to train those local responders sufficiently so that they can properly preserve critical evidence while protecting themselves from harmful exposure. More generally, there would be value in strengthening the links between civil forensic scientists and those affiliated with DOD and DHS, so that all sectors can pool their knowledge.

The medical examiner community, in particular, could be viewed as a geographically distributed and rapidly deployable "corps" that can augment federal experts in efforts to monitor emerging public health threats or respond to catastrophes. When a catastrophic event takes place, whether it is the result of nature or terrorism, a large contingent of medical examiners is sometimes needed on short notice. Yet medical examiners have not been appropriately funded or trained in the management of mass fatality incidents. (See Chapter 9 for a more complete discussion of the medical examiner's role in homeland security.) Plans and policies must be developed that enable this contingent use of medical examiners.

In written input to the committee, Barry A.J. Fisher, Director of the Scientific Services Bureau of the Los Angeles County Sheriff's Department, stated the needs and opportunities as follows:

> . . . [C]onsider a situation where there are multiple events in the US and aboard occurring simultaneously. Resources could be stretched to the breaking point, not to mention the concept of *surge capacity*. There is <u>not</u> an unlimited supply of forensic scientists available to the FBI. But there are probably 5,000+ public forensic scientists at State and local crime labs who could be enlisted to help. Some jurisdictions have plans in place to use local talent. Others do not. It varies from region to region.

> Forensic scientists are often called to crime scenes to assist in the collection of evidence. Yet few would recognize that they were looking at a potential improvised explosive lab. There is little training available at the national level. Much of the information is classified. State and local forensic scientists have no need for security clearances but often go through law enforcement background checks. This creates a classic 'Catch 22' situation. State and local forensic personnel can't be given classified information to recognize terrorist devices which they might be able to disable before they and others are injured.

---

[11] *Protecting America Against Terrorist Attack: A Closer Look at the FBI's Joint Terrorism Task Forces.* Federal Bureau of Investigation. December 2004. Available at www.fbi.gov/page2/dec04/jttf120114.htm.

11-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1726

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

The identification of victims in mass casualties is another area where State and local forensic labs could play a part. (They could, for example, provide fingerprint identification services.) While few labs have the capacity to mount a major DNA testing effort, personnel are knowledgeable in evidence collection and can assist in such efforts. Again there are no consistent plans for using local or regional resources.

Medical examiners and coroners use a system of volunteers called D-MORT (Disaster Mortuary Operational Response Team) to assist in mass casualty events whether natural or caused by terrorist incidents. A similar program could be considered to enlist State and local forensic scientist to assist in major incident situations.[12]

This chapter illustrates the overlap between the capabilities of forensic science and the needs of homeland security, but ideally, the forensic science community and homeland security communities should be more integrated with better communication. However, the committee limited its recommendations on this matter because it recognized two critical factors: (1) the forensic science system is in need of a major overhaul (see Chapters 2 through 8), and until these issues are addressed it makes little sense to expand the efforts of state and local forensic scientists into homeland security operations and (2) many issues that would arise from such integration (e.g., federal jurisdiction, national security issues, restrictions on sharing of information) go beyond the charge and principal focus of the committee.[13]

## CONCLUSIONS AND RECOMMENDATION

Good forensic science and medical examiner practices are of clear value from a homeland security perspective because of their roles in bringing criminals to justice and in dealing with the effects of natural and human-made mass disasters. Forensic science techniques (e.g., the evaluation of DNA fragments) enable the thorough investigations of crime scenes. Routine and trustworthy collection of digital evidence, and improved techniques and timeliness for its analysis, can be of great potential value in identifying terrorist activity. Therefore, a strong and reliable forensic science community is needed to maintain homeland security. However, to capitalize on this potential, the forensic science and medical examiner communities must be well interfaced with homeland security efforts, so that they can contribute when needed. To be successful, this interface will require: (1) the establishment of good working relationships among federal, state, and local jurisdictions; (2) the creation of strong security programs to protect data transmittals across jurisdictions; (3) the development of additional training for forensic scientists and crime scene investigators; and (4) the promulgation of contingency plans that will promote efficient team efforts on demand. Although policy issues relating to the enforcement of homeland security are beyond the scope of this report, it is clear that improvements in the forensic science community and the medical examiner system could greatly enhance the capabilities of homeland security.

---

[12] B.A.J. Fisher. June 12, 2007. "Contemporary Issues in Forensic Science," unpublished paper submitted to the committee.

[13] See Institute of Medicine, 2008, *Research Priorities in Emergency Preparedness and Response for Public Health Systems* and workshop summaries of the Disasters Roundtable, dels.nas.edu/dr/

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1727

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES -- PREPUBLICATION COPY

**Recommendation 13:**

> Congress should provide funding to the National Institute of Forensic Science (NIFS) to prepare, in conjunction with the Centers for Disease Control and Prevention and the Federal Bureau of Investigation, forensic scientists and crime scene investigators for their potential roles in managing and analyzing evidence from events that affect homeland security, so that maximum evidentiary value is preserved from these unusual circumstances and the safety of these personnel is guarded. This preparation also should include planning and preparedness (to include exercises) for the interoperability of local forensic personnel with federal counterterrorism organizations.

11-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1728

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# APPENDIX A

## BIOGRAPHICAL INFORMATION OF COMMITTEE AND STAFF

**Harry T. Edwards (Co-chair)** was appointed to the United States Court of Appeals for the District of Columbia Circuit by President Carter in 1980. He served as Chief Judge from September 15, 1994, until July 16, 2001. Judge Edwards graduated from Cornell University, B.S., 1962, and the University of Michigan Law School, J.D., 1965, with distinction and honors. He was a member of the Michigan Law Review and was elected to the Order of the Coif. Before joining the bench, Judge Edwards practiced law in Chicago from 1965 to 1970. Between 1970 and 1980, he was a tenured Professor of Law at the University of Michigan and at Harvard Law School. He also served as Visiting Professor at the University of Brussels and as a member of the faculty at the Institute for Educational Management at Harvard University. Since joining the bench, he has taught at numerous law schools, including Duke, Georgetown, Harvard, Pennsylvania, Michigan, and New York University, where he has been a member of the faculty since 1990. Judge Edwards is currently a Visiting Professor of Law at the New York University School of Law. During his years as Chief Judge of the D.C. Circuit, Judge Edwards directed numerous automation initiatives at the Court of Appeals; oversaw a complete reorganization of the Clerk's Office; implemented case management programs that helped to cut the court's case backlog and reduce case disposition times; successfully pursued congressional support for the construction of the William B. Bryant Annex to the E. Barrett Prettyman U.S. Courthouse; presided over the court's hearings in *United States v. Microsoft*; established programs to enhance communications with the lawyers who practice before the court; and received high praise from members of the bench, bar, and press for fostering collegial relations among the members of the court. Judge Edwards' many positions have included Chairman of the Board of Directors of AMTRAK; member of the Board of Directors of the National Institute for Dispute Resolution; member of the Executive Committee of the Order of the Coif; member of the Executive Committee of the Association of American Law Schools, and Chairman of the Minority Groups Section; Vice President of the National Academy of Arbitrators; and member of the President's National Commission on International Women's Year. He also has received many awards for outstanding service to the legal profession and numerous Honorary Doctor of Laws degrees. Judge Edwards is a member of the American Law Institute; the American Academy of Arts and Sciences; the American Judicature Society; the American Bar Foundation; the American Bar Association; and the Supreme Court Historical Society. He is director/mentor at the Unique Learning Center in Washington, D.C., a volunteer program to assist disadvantaged inner city youth. Judge Edwards is the coauthor of five books. His most recent book, coauthored by Linda A. Elliot, *Federal Courts—Standards of Review: Appellate Court Review of District Court Decisions and Agency Actions*, was published in 2007. He has also published scores of law review articles dealing with labor law, equal employment opportunity, labor arbitration, higher education law, alternative dispute resolution, federalism, judicial process, comparative law, legal ethics, judicial administration, legal education, and professionalism. One of his most significant publications, "The Growing Disjunction Between Legal Education and the Legal Profession," published in the *Michigan Law Review* in 1992, has been the source of extensive comment, discussion, and debate among legal scholars and practitioners in the United States and abroad.

A-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1729

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

**Constantine Gatsonis (Co-chair)** is Professor of Biostatistics at Brown University and the founding Director of the Center for Statistical Sciences. He is a leading authority on statistical methods for the evaluation of diagnostic tests and biomarkers and has extensive involvement in research in Bayesian biostatistics, meta-analysis, and statistical methods for health services and outcome research. He is Network Statistician of the American College of Radiology Imaging Network, a National Cancer Institute-funded national collaborative group conducting multicenter studies of imaging in cancer diagnosis and therapy. Dr. Gatsonis has served on numerous review and advisory panels, including the Immunization Safety Review Committee of IOM, the Committee on Applied and Theoretical Statistics of NAS, panels of the Center for Devices and Radiological Health of U.S. Food and Drug Administration, the HSDG Study Section of the Agency for Health Care Policy Research, the Commission of Technology Assessment of the American College of Radiology, the Data Safety and Monitoring Boards for the National Institute of Neurological Disorders and Stroke and the U.S. Department of Veterans Affairs, and several National Institutes of Health grant review panels. He is co-convener of the Screening and Diagnostic Tests Methods Working Group of the Cochrane Collaboration and a member of the steering group of the Cochrane Diagnostic Reviews initiative to develop systematic reviews of diagnostic accuracy for the Cochrane Library. Dr. Gatsonis is the founding editor-in-chief of *Health Services and Outcomes Research Methodology* and serves as Associate Editor of the *Annals of Applied Statistics, Clinical Trials and Bayesian Analysis*. Previous editorial positions include membership of the editorial board of *Statistics in Medicine, Medical Decision Making*, and *Academic Radiology*. Dr. Gatsonis was elected fellow of the American Statistical Association and the Association for Health Services Research.

**Margaret A. Berger** received her A.B. from Radcliffe College and her J.D. from Columbia University School of Law. She is widely recognized as one of the nation's leading authorities on scientific evidentiary issues and is a frequent lecturer across the country on these topics. Professor Berger is the recipient of the Francis Rawle Award for outstanding contribution to the field of postadmission legal education by the American Law Institute/American Bar Association for her role in developing new approaches to judicial treatment of scientific evidence and in educating legal and science communities about ways in which to implement these approaches. Professor Berger served as the Reporter for the Working Group on Post-Conviction Issues for the National Commission on the Future of DNA Evidence. She has been called on as a consultant to the Carnegie Commission on Science, Technology, and Government and has served as the Reporter to the Advisory Committee on the Federal Rules of Evidence. She is the author of numerous amicus briefs, including the brief for the Carnegie Commission on the admissibility of scientific evidence in the landmark case of *Daubert v. Merrell Pharmaceutical, Inc.* She also has contributed chapters to both editions of the Federal Judicial Center's Reference Manual on Scientific Evidence (1994, 2000). Professor Berger has been a member of the Brooklyn Law School faculty since 1973. She has served on the following National Academies committees: the Committee on Tagging Smokeless and Black Powder; the Committee on DNA Technology in Forensic Science: An Update; and the IOM Committee on Evaluation of the Presumptive Disability Decision-Making Process for Veterans. She currently serves as a member of the National Academies Committee on Science, Technology, and Law, on the Committee on Science, Engineering, and Public Policy, and on the Committee on Ensuring the Utility and the Integrity of Research Data.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1730

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

APPENDIX A—PREPUBLICATION COPY

**Joe S. Cecil** is a Senior Research Associate and Project Director in the Division of Research at the Federal Judicial Center. Currently, he is directing the center's Program on Scientific and Technical Evidence. As part of this program, he serves as principal editor of the Center's *Reference Manual on Scientific Evidence*. He has published several articles on the use of court-appointed experts and is currently examining changes in summary judgment practice in federal district courts over the past 30 years. Dr. Cecil received his J.D. and a Ph.D. in psychology from Northwestern University. He serves on the editorial boards of social science and legal journals. He has served as a member of several panels of NAS, and currently is serving as a member of the National Academies Committee on Science, Technology, and Law. Other areas of research interest include federal civil and appellate procedure, jury competence in complex civil litigation, claim construction in patent litigation, and judicial governance.

**M. Bonner Denton** is a Professor of Chemistry and a Professor of Geosciences at the University of Arizona. He received his B.S. and B.A. in 1967 from Lamar State College of Technology. In 1972, he received his Ph.D. from the University of Illinois. He is the recipient of the American Chemical Society Division of Analytical Chemistry Award in Spectrochemical Analysis, 2001; the Pittsburgh Spectroscopy Award, 1998; the University of Arizona Excellence in Teaching Award, 1993; and the SAS Lester Strock Award, 1991. Dr. Denton has served as the editor of four texts on scientific optical imaging and has authored more than 190 peer-reviewed manuscripts. He has served as President of the Society of Applied Spectroscopy; Chair of the Analytical Division of the American Chemical Society; a Galileo Fellow, College of Science, University of Arizona, 2004; Fellow, Royal Society of Chemistry, 2004; Fellow, Society for Applied Spectroscopy, 2006; and Fellow, National Association of the Advancement of Science, 2006. His research interests include analytical instrumentation and spectroscopy and mass spectrometry.

**Marcella F. Fierro** served as Chief Medical Examiner for the Commonwealth of Virginia, and Professor of Pathology and Professor and Chair of the Department of Legal Medicine at Virginia Commonwealth University from 1994 to 2008. Dr. Fierro oversaw the medical examiner investigations of all violent, suspicious, and unnatural deaths in Virginia. She teaches forensic pathology to medical schools, law students, law enforcement agencies, Commonwealth's attorneys, and other interested groups. She received a B.A. in biology cum laude from D'Youville College, Buffalo, New York, and earned her M.D. from the State University of New York at Buffalo School of Medicine. She completed residency training in pathology at the Cleveland Clinic and the Medical College of Virginia, Virginia Commonwealth University. She was a fellow in forensic pathology and legal medicine at Virginia Commonwealth University and the Office of the Chief Medical Examiner in Richmond, Virginia. Dr. Fierro is certified by the American Board of Pathology in anatomical, clinical, and forensic pathology. After serving as Deputy Chief Medical Examiner for Central Virginia for 17 years, Dr. Fierro accepted a position as Professor of Pathology at East Carolina University School of Medicine, where she served as a Professor of Pathology in the division of forensic pathology and taught general and forensic pathology until she returned to Virginia in 1994 as Chief. Dr. Fierro has been active in professional organizations as a member of the Forensic Pathology Council of the American Society of Clinical Pathologists and Chair of the Forensic Pathology Committee of the College of American Pathologists. She is Past President of the National Association of Medical Examiners and served on the board of directors and the executive committee of that organization and currently serves on several committees. Dr. Fierro is a Fellow of the American Academy of Forensic Sciences, was a member of the Forensic Science Board for the Commonwealth, and has

A-3

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1731

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

served as a consultant to the Federal Bureau of Investigation for the National Crime Information Center Unidentified and Missing Persons Files and on federal panels and committees that are developing best practices in mass fatality management. Dr. Fierro has been active in the legislative process, serving as a resource and advocate in Virginia for matters related to forensic and medical examiner issues. Recent activities include establishing child and maternal mortality review teams and the National Violent Death Reporting System and Family and Interpersonal Violence surveillance programs for Virginia. Dr. Fierro has published in professional journals, edited a textbook, contributed chapters to several books, and presented at international meetings. Dr. Fierro served as a reviewer for the American Journal of Forensic Medicine and Pathology. She received Virginia's Public Health Hero Award and the National Association of Medical Examiners Service award, and she was elected to Alpha Omega Alpha as a distinguished alumna of the School of Medicine, State University of New York at Buffalo.

**Karen Kafadar** is Rudy Professor of Statistics and Physics at Indiana University. She received her B.S. and M.S. degrees from Stanford and her Ph.D. in statistics from Princeton under John Tukey. Her research focuses on exploratory data analysis, robust methods, characterization of uncertainty in quantitative studies, and analysis of experimental data in the physical, chemical, biological, and engineering sciences. Previously, she was Professor and Chancellor's Scholar in the Departments of Mathematical Sciences and Preventive Medicine & Biometrics at the University of Colorado-Denver; Fellow at the National Cancer Institute (Cancer Screening section); and Mathematical Statistician at Hewlett Packard Company (R&D laboratory for RF/Microwave test equipment) and at the National Institute of Standards and Technology (where she continues as Guest Faculty Visitor on problems of measurement accuracy, experimental design, and data analysis). Previous engagements include consultancies in industry and government, as well as visiting appointments at the University of Bath, Virginia Tech, and Iowa State University. She has served on previous NRC committees and also on the editorial review boards for several professional journals as editor or associate editor and on the governing boards for the American Statistical Association, the Institute of Mathematical Statistics, and the International Statistical Institute. She is an Elected Fellow of the American Statistical Association and the International Statistical Institute, and she has authored more than 80 journal articles and book chapters and has advised numerous M.S. and Ph.D. students.

**Peter M. Marone** is the Executive Director of the Virginia Department of Forensic Sciences. He joined the department in 1978 and served as Central Laboratory Director from 1998 until 2005, when he was named Director of Technical Services. Mr. Marone began his forensic career at the Allegheny County Crime Laboratory in 1971 and remained in Pittsburgh until 1978. Mr. Marone is a member of the American Society of Crime Laboratory Directors (ASCLD), the American Academy of Forensic Sciences, the Mid-Atlantic Association of Forensic Scientists, and the International Association for Chemical Testing and the Forensic Science Society. He has served on the ASCLD's DNA Credential Review Committee (for DNA) and was Co-Chair of the Undergraduate Curriculum Committee of the Technical Working Group for Forensic Science Training and Education. He is a past chair of the American Society of Crime Laboratory Directors Laboratory Accreditation Board, a member of the Forensic Education Program Accreditation Commission for the American Academy of Forensic Sciences, and the chair of the Board of Directors of the Consortium of Forensic Science Organizations. Mr. Marone received his B.S. and M.S. in chemistry from the University of Pittsburgh.

A-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1732

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**Geoffrey S. Mearns** is the Dean of the Cleveland-Marshall College of Law at Cleveland State University. Before his appointment in July 2005, Dean Mearns was a practicing lawyer. His practice focused on federal criminal investigations and prosecutions and complex commercial litigation. While in private practice, he was also actively involved in pro bono work. Before commencing private practice in 1998, Dean Mearns had a distinguished nine-year career as a prosecutor with the U.S. Department of Justice. During his tenure with the Justice Department, he was an Assistant United States Attorney for the Eastern District of New York, where he was Chief of the Organized Crime and Racketeering Section. In that position, he was responsible for investigating, prosecuting, and supervising cases against members and associates of organized crime families charged with racketeering, murder, extortion, bribery, and obstruction of justice. Dean Mearns also was the First Assistant United States Attorney for the Eastern District of North Carolina. From 1997 to 1998, as Special Assistant to the United States Attorney General, Dean Mearns participated in the prosecution of Terry Nichols, one of two men convicted for bombing the Oklahoma City Federal Building. Dean Mearns received his undergraduate degree from Yale University in 1981, and he received his law degree from the University of Virginia in 1987. After graduating from law school, Dean Mearns clerked for the Honorable Boyce F. Martin, Jr., of the United States Court of Appeals for the Sixth Circuit. Dean Mearns has been active in professional and community service. Among other activities, he was twice Chair of the Merit Selection Committee on Bankruptcy Judgeships for the Northern District of Ohio; he was Chair of the Merit Selection Committee on United States Magistrate Judgeship for the Northern District of Ohio; and he was Chair of the Board of Trustees of Applewood Centers, Inc. He is a trustee of Wingspan Care Group, Inc., of the Cleveland Metropolitan Bar Association, and of the Sisters of Charity Foundation of Cleveland. Dean Mearns has been an adjunct professor at Case Western Reserve University School of Law and New York Law School. He has published articles on criminal litigation, and he is a frequent speaker and commentator on various criminal law issues, including counterterrorism.

**Randall S. Murch** is the Associate Director, Research Program Development, Research Division, National Capital Region, Virginia Tech. He holds Adjunct Professorships in the School of Public and International Affairs, College of Architecture and Urban Studies, and the Department of Plant Pathology, College of Agriculture and Life Sciences. He is also a Visiting Professor, Department of War Studies, King's College London, United Kingdom. Dr. Murch received his B.S. in biology from the University of Puget Sound, Tacoma, Washington, his M.S. in botanical sciences from the University of Hawaii in 1976, and his Ph.D. in plant pathology from the University of Illinois, Urbana-Champaign in 1979. He has extensive strategy, analysis, and leadership experience in the design, development, and implementation of advanced forensic capabilities for intelligence, counterterrorism. and other national security applications and purposes. Following brief service in the U.S. Army Reserve, Dr. Murch's first career was with the Federal Bureau of Investigation (FBI), where he was a Special Agent. He was assigned to the Indianapolis and Los Angeles Field Offices, where he performed counterterrorism, counterintelligence, and other investigations. During his career, Dr. Murch was assigned to the FBI Laboratory as a forensic biologist, research scientist, department head, and deputy director, at various times. Interdispersed with his Laboratory assignments were four assignments in the bureau's technical investigative program: as a program manager for complex operations planning, Intelligence Division; unit chief for a technology development and deployment group, Technical Services Division; squad supervisor; New York Field Office; and Deputy Director, Investigative Technology Division (formally Technical Services Division). Between his last

A-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1733

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY**

Laboratory assignment and his last technical investigative program assignment, he was detailed to the Defense Threat Reduction Agency, Department of Defense, where he was the director of the Advanced Systems and Concepts Office and led advanced studies on complex current and future challenges dealing with weapons of mass destruction. He created the FBI's WMD forensic investigative program, served as the Bureau's science advisor to the 1996 Olympic Games, led forensic investigative aspects of a number of major terrorism cases, and initiated a number of new programs for both the FBI Laboratory and technical investigative program. In 1996, Dr. Murch created the FBI's Hazardous Materials Response Unit, the Nation's focal point for the forensic investigation of WMD threats, events and hoaxes. Throughout his FBI career, he also was involved with extensive liaison at the national and international levels in furthering science and technology for law enforcement, counterterrorism, and national security purposes. Dr. Murch retired from the FBI in November 2002, after nearly 23 years of service. From December 2002 through December 2004, Dr. Murch was employed as a Research Staff Member, Institute for Defense Analyses, a leading Federally Funded Research and Development Center, where he led and participated in studies for the defense, intelligence, and homeland security communities. He is still an Adjunct Staff Member at the institute. He joined Virginia Tech in December 2004, where he now works in the areas of life science research program development, systems biology, microbial systems biology, microbial forensics, and biosecurity and university strategic planning. He has served or still serves on several advisory boards, including the Board of Life Sciences, NRC; the Defense Threat Reduction Agency's Threat Reduction Advisory Committee; the Defense Intelligence Agency's BioChem 2020; the FBI's Scientific Working Group on Microbial Genomics and Forensics, and a new standing committee of NAS for the Department of Homeland Security's National Biodefence Analysis and Countermeasures Center. He has also been a member of or advised study committees of NRC, NAS, IOM, the Defense Science Board, and the Threat Reduction Advisory Committee. Dr. Murch has been a member of the American Academy of Forensic Sciences and the American Society of Crime Laboratory Directors; has served on the Board of Directors, American Society of Crime Laboratory Directors; and has been a member of the National Institute of Justice DNA Proficiency Testing Panel. He also served as the Designated Federal Employee on the DNA Advisory Board.

**Channing Robertson** received his in B.S. in chemical engineering from the University of California, Berkeley; his M.S. in chemical engineering from Stanford University; and his Ph.D. in chemical engineering, with an emphasis on fluid mechanics and transport phenomena, from Stanford University. Professor Robertson began his career at the Denver Research Center of the Marathon Oil Company and worked in the areas of enhanced oil recovery, geophysical chemistry, and polyurethane chemistry. Since 1970, he has been on the faculty of Stanford's Department of Chemical Engineering and has educated and trained more 40 doctoral students, holds 7 patents, and has published more than 140 articles. He is Director of the Stanford-National Institutes of Health Graduate Training Program in Biotechnology. He was Co-Director of the Stanford initiative in biotechnology known as BioX, which in part includes the Clark Center for Biomedical Engineering and Sciences. He directed the summer Stanford Engineering Executive Program. Dr. Robertson received the 1991 Stanford Associates Award for service to the University, the 1991 Richard W. Lyman Award, and the Society of Women Engineers Award for Teacher of the Year 2000 at Stanford. He is a Founding Fellow of the American Institute of Medical and Biological Engineering. Dr. Robertson serves on the Scientific Advisory Committee on Tobacco Product Regulation of the World Health Organization and on the Panel on Court-Appointed Scientific Experts of the American Association for the Advancement of Science.

A-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1734

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1736 of 2008
PageID #: 3626

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Because of his interests in biotechnology, he has consulted widely in the design of biomedical diagnostic devices. Dr. Robertson has also served as an expert witness in several trials, including the Copper-7 intrauterine contraceptive cases (United States and Australia), the Stringfellow Superfund case, and, most recently, the Minnesota tobacco trial.

**Marvin E. Schechter** has been a solo practitioner, specializing in criminal defense matters before state, federal, and appeals courts, since 1994. Mr. Schechter has held several positions with the Legal Aid Society of New York, including Deputy Attorney-in-Charge, Criminal Defense Division, Kings County. He is currently a member of the Board of Directors of the National Association of Criminal Defense Attorneys, a member of the Executive Committee of the Criminal Justice Section of the New York State Bar Association, and a past president of the New York State Association of Criminal Defense Attorneys. Mr. Schechter co-founded Getting Out/Staying Out, a program that provides 18- to 22-year-old Rikers Island Correctional Facility inmates with the opportunity to earn a GED and receive job counseling, employment, and housing. He has taught at the National Institute for Trial Advocacy programs at Hofstra University and Cardoza Law School and has been an adjunct professor for trial advocacy at Fordham University Law School. He received his J.D. from Brooklyn Law School.

**Robert Shaler** received his Ph.D. from Pennsylvania State University in 1968 and has had academic appointments at the University of Pittsburgh School of Medicine, the University of Pittsburgh School of Pharmacy, the City University of New York, New York University School of Medicine, and, most recently, at Pennsylvania State University. He joined the scientific staff of the Pittsburgh and Allegheny County Crime Laboratory in 1970, where, as a criminalist, he practiced forensic science, testified in court, and investigated crime scenes. He joined the Aerospace Corporation staff in 1977 and managed four Law Enforcement Assistance Administration contracts, one of which resulted in setting the bloodstain analysis standard for the Nation's crime laboratories until the mid 1980s. In 1978, he joined the staff of the New York City Medical Examiner's Office as the head of its serology laboratory, a position he held until 1987, when he moved to the Lifecodes Corporation, the Nation's first forensic DNA typing laboratory. As the Director of Forensic Science and Business Development, he introduced "DNA Fingerprinting" to the Nation's legal and law enforcement communities, through a series of nationwide, informational lectures. Dr. Shaler returned to the Medical Examiner's Office in 1990, where he created a modern Department of Forensic Biology, designed its current 300,000 square foot modern building, and established the city's first crime reconstruction team, which still operates from within the Medical Examiner's Office. In the wake of the 9/11 attacks on the World Trade Center, he assumed responsibility for the DNA identification effort, designing the testing strategy and coordinating the work of six different laboratories. In 2005, he published a book, *Who They Were—Inside the World Trade Center DNA Story: The Unprecedented Effort to Identify the Missing*, that told the story of the people working behind the scenes of the DNA work done at the Medical Examiner's Office in New York City. In July 2005, he retired from the Medical Examiner's Office and accepted a professorship at Pennsylvania State University, where he is the director of the university's forensic science program. His crime scene investigation course has attracted national attention, and his research interests are broad, focusing on applying science and technology to crime scene investigation and quantifying the biological response to trauma and stress. He has taught several workshops to working law enforcement professionals in crime scene investigation, crime reconstruction, and bloodstain pattern analysis.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1735

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

**Jay A. Siegel** is Professor and Director of the Forensic and Investigative Sciences Program at Indiana University Purdue University, Indianapolis. Before this appointment, he was Director of the Forensic Science Program at Michigan State University, where he retired after 25 years. Previous to that, that he was Professor of Chemistry at Metropolitan State College in Denver, Colorado, and earlier he spent three years as a forensic chemist with the Virginia Bureau of Forensic Sciences, where he analyzed illicit drugs and trace evidence. Dr. Siegel has testified as an expert witness more than 200 times in 7 states, as well as in federal and military courts. Dr. Siegel is a Fellow with the American Academy of Forensic Sciences, where he was awarded the Paul Kirk Award for outstanding service to the Criminalistics section in 2005. He is also a member of the American Chemical Society, the Midwest Association of Forensic Scientists, and the Forensic Science Society (United Kingdom). He is a member of the International Association for Identification and an Academic Affiliate member of the American Society of Crime Lab Directors. Dr. Siegel is an active researcher in forensic science, with many scientific publications. He currently serves as the principal investigator on a research grant from the National Institute of Justice on ink analysis, his second grant for this work. He also is the author of two textbooks in forensic science and is the editor in chief of the Encyclopedia of Forensic Sciences.

**Sargur Srihari** received a B.Sc. in physics and mathematics from the Bangalore University in 1967, a B.E. in electrical communication engineering from the Indian Institute of Science, Bangalore, in 1970, and a Ph.D. in computer and information science from the Ohio State University, Columbus, in 1976. Dr. Srihari is a State University of New York Distinguished Professor at the University of Buffalo in the Department of Computer Science and Engineering. He is the founding director of the Center of Excellence for Document Analysis and Recognition. He has supervised 30 completed doctoral dissertations. Dr. Srihari is a member of the Board of Scientific Counselors of the National Library of Medicine. He is chairman of CedarTech, a corporation for university technology transfer. Dr. Srihari has been general chairman of several international conferences and workshops: the Third International Workshop on Handwriting Recognition held in Buffalo, New York, in 1993, the Second International Conference on Document Analysis and Recognition, in Montreal, Canada, 1995, the Fifth International Conference on Document Analysis and Recognition, 1999, held in Bangalore, India, and the Eighth International Workshop on Handwriting Recognition, 2002, held in Niagara-on-the-Lake, Ontario, Canada. Dr. Srihari has served as chairman of TC-11 (technical committee on Text Processing) of the International Association for Pattern Recognition. He is currently Chair of the International Association for Pattern Recognition's Publicity and Publications Committee. Dr. Srihari received a New York State/United University Professions Excellence Award for 1991. He became a Fellow of the Institute of Electronics and Telecommunications Engineers (India) in 1992, a Fellow of the Institute of Electrical and Electronics Engineers in 1995, and a Fellow of the International Association for Pattern Recognition in 1996. He was named a distinguished alumnus of the Ohio State University College of Engineering in 1999.

**Sheldon M. Wiederhorn (NAE)** received his B.S. in chemical engineering from Columbia University in 1956 and his M.S. and Ph.D. from the University of Illinois, also in chemical engineering, with a minor in solid state physics. His Ph.D. topic was high pressure physics, with an emphasis on phase transformations in alkali halides. After finishing graduate school, he worked at DuPont at the Research Station in Wilmington, Delaware, during which time his research and scientific interests gradually changed toward materials science with a specialization in the mechanical behavior of ceramic materials. After three years, he began work at the National

A-8

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1736

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1738 of 2008
PageID #: 3628
Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Bureau of Standards, where he carried out an independent research program on the mechanical behavior of glasses and ceramic materials. At the National Bureau of Standards, now the National Institute of Standards and Technology, Dr. Wiederhorn carried out a program on the mechanical reliability of brittle materials. He was one of the first to apply fracture mechanics techniques to study the fracture of ceramic materials. A consequence of his research was the development of techniques to assure the structural reliability of brittle ceramic materials. Techniques pioneered by Dr. Wiederhorn are now used to assure the reliability of glass windows in airplanes and in space vehicles. Dr. Wiederhorn is best known for the experiments he developed to study and to characterize subcritical crack growth in glasses. The results of these studies illustrated the complexity of subcritical crack growth, and a natural conclusion of his study was that the failure of glass was caused by the slow growth of cracks to a critical size, which determined the time-to-failure. In addition to his work on the fracture of glass, Dr. Wiederhorn directed a program to measure the deformation of structural ceramics at very high temperatures. The objective of this work was to develop ceramic materials that could be used as turbine blades in power turbines used for more efficient production of electricity. The program led by Dr. Wiederhorn has resulted in the development of new measurement techniques for characterizing creep at elevated temperatures. A new mechanism of creep has also been discovered by Dr. Wiederhorn and his group, and ways have been suggested to improve the creep behavior of nonoxide materials at high temperatures. Dr. Wiederhorn has received many awards for his research and leadership at the National Institute of Standards and Technology. These include both a Silver and Gold Medal awarded by the Department of Commerce and the Samuel Wesley Stratton Award by the National Bureau of Standards. He is also a Fellow of the American Ceramic Society and has received a number of important awards for his research from this society, including the Jeppson Award for outstanding research on ceramic materials. He is now a Distinguished Lifetime Member of the American Ceramic Society. In 1991, Dr. Wiederhorn was elected a member of the National Academy of Engineering. At the National Institute of Standards and Technology, Dr. Wiederhorn is now a Senior Fellow and continues to carry out a research program on the mechanical properties of ceramic materials. His current interests are to use the Atomic Force Microscope to investigate the atomistics of crack growth in glasses and ceramic materials, with the hope of learning more about the crack growth process and the relation between crack growth and the microstructure of glass.

**Ross E. Zumwalt** is Chief Medical Investigator of the State of New Mexico. He received his undergraduate education from Wabash College in Crawfordsville, Indiana. Dr. Zumwalt graduated from the University of Illinois College of Medicine. He completed a rotating internship and one year of pathology residency at the Mary Imogene Bassett Hospital in Cooperstown, New York. Dr. Zumwalt then completed his pathology residency at the Southwestern Medical School and Parkland Hospital in Dallas. He received his forensic fellowship training at the Dallas County Medical Examiner's Office. Dr. Zumwalt served in the United States Navy as director of laboratories at the Navy Regional Medical Center in Camp Lejeune, North Carolina. He spent two years as deputy coroner in Cleveland, Ohio, and six years as deputy coroner in Cincinnati, Ohio, before coming to the Office of the Medical Investigator in 1987. Dr. Zumwalt is certified in anatomic and forensic pathology by the American Board of Pathology. He was a trustee of the American Board of Pathology from 1993 to 2004. He is currently a member of the Residency Review Committee for Pathology. Dr. Zumwalt has served as president of the National Association of Medical Examiners and is a member of the following professional organizations: The National Association of Medical Examiners; the American Academy of Forensic Sciences; the College of American Pathologists; the American Society of

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1737

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

Clinical Pathologists; the United States and Canadian Academy of Pathology; the American Medical Association; and the American Association for the Advancement of Science.

## Staff

**Anne-Marie Mazza** is Director of the Committee on Science, Technology and Law. She joined the National Academies in 1995. She has served as Senior Program Officer with both the Committee on Science, Engineering, and Public Policy and the Government-University-Industry Research Roundtable. In 1999 she was named the first director of the Committee on Science, Technology, and Law, a newly created program designed to foster communication and analysis among scientists, engineers, and members of the legal community. In 2007, she became the director of the Christine Mirzayan Science and Technology Graduate Policy Fellowship Program. Dr. Mazza has been the study director on numerous Academy reports, including *Science and Security in a Post 9-11 World, 2007; Reaping the Benefits of Genomic and Proteomic Research, 2005; Intentional Human Dosing Studies for EPA Regulatory Purposes: Scientific and Ethical Issues, 2004; The Age of Expert Testimony: Science in the Courtroom, 2002; Issues for Science and Engineering Researchers in the Digital Age, 2001;* and *Observations on the President's Fiscal Year 2000 Federal Science and Technology Budget, 1999.* Between October 1999 and October 2000, she divided her time between the Committee on Science, Technology, and Law and the White House Office of Science and Technology Policy, where she served as a Senior Policy Analyst responsible for issues associated with the government-university research partnership. Before joining the Academy, Dr. Mazza was a Senior Consultant with Resource Planning Corporation. She received a B.A., M.A., and Ph.D. from The George Washington University.

**Scott T. Weidman** is the Director of NRC's Board on Mathematical Sciences and Their Applications. He joined NRC in 1989 with the Board on Mathematical Sciences and moved to the Board on Chemical Sciences and Technology in 1992. In 1996, he established a new board to conduct annual peer reviews of the Army Research Laboratory, which conducts a broad array of science, engineering, and human factors research and analysis, and he later directed a similar board that reviews the work of the National Institute of Standards and Technology. He has worked full time with the Board on Mathematical Sciences and Their Applications since June 2004. During his NRC career, he has staffed studies on a wide variety of topics related to mathematical, chemical, and materials sciences; laboratory assessment; and science and technology policy. His current focus is on building NRC's capabilities and portfolio related to all areas of analysis and computational science. He holds bachelor degrees in mathematics and materials science from Northwestern University and an M.S. and Ph.D. in applied mathematics at the University of Virginia. Before joining NRC, he held positions with General Electric, General Accident Insurance Company, Exxon Research and Engineering, and MRJ, Inc.

**David Padgham** is Policy Director at the High Performance Computing Initiative Council on Competitiveness. Before joining the council, he was an associate program officer at the Computer Science and Telecommunications Board of NRC. His work there comprised a robust mix of writing, research, and project management, and he was involved in the production of numerous reports, including, most recently, *Software for Dependable Systems: Sufficient Evidence?; Engaging Privacy and Information Technology in a Digital Age;* and *Renewing U.S. Telecommunications Research.* Before joining the Computer Science and Telecommunications Board in 2006, Mr. Padgham was a policy analyst for the Association for Computing Machinery,

A-10

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1738

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

where he worked closely with its public policy committee, USACM, to support the organization's policy principles and promote its policy interests. Mr. Padgham holds a master's degree in library and information science, 2001, from the Catholic University of America in Washington, D.C., and a B.A. in English, 1996, from Warren Wilson College in Asheville, North Carolina.

**John Sislin** is a Program Officer with the Board on Higher Education and Workforce. His work focuses on topics in international affairs, higher education, globalization, and the impact of science and technology on society and security. His work on international affairs includes: developing a system to monitor compliance with international labor standards for the U.S. Department of Labor and development of a biographical database on world leaders with foreign education or employment experience sponsored by the MacArthur Foundation. Dr. Sislin's work in higher education has focused on gender (three projects on recruiting, retaining, and advancing women in science and engineering in higher education and academic careers) and the role of community colleges in educating future engineers. He has worked on program evaluations for the NIST, the United States Institute of Peace, and NSF. Other projects include a survey of life scientists' attitudes toward personal responsibility regarding dual-use research and biosecurity and a study of priorities in civil aeronautics research sponsored by NASA. Before coming to the Academies, Dr. Sislin's previous research focused on international and civil conflict, human rights, international security, and U.S. foreign policy. Dr. Sislin received a B.A. from the University of Michigan in Russian and East European Studies and a Ph.D. in Political Science from Indiana University.

**Steven Kendall** is Senior Program Associate for the Committee on Science, Technology, and Law. He is a Ph.D. candidate in the Department of the History of Art and Architecture at the University of California, Santa Barbara, where he is completing a dissertation on nineteenth-century British painting. Mr. Kendall received his M.A. in Victorian art and architecture at the University of London. Before joining The National Academies in 2007, he worked at the Smithsonian American Art Museum and The Huntington in San Marino, California.

**Kathi E. Hanna** is a science and health policy consultant, writer, and editor specializing in biomedical research policy and bioethics. She served as Research Director and Senior Consultant to President Clinton's National Bioethics Advisory Commission and as Senior Advisor to President Clinton's Advisory Committee on Gulf War Veterans Illnesses. More recently, she served as the lead author and editor of President Bush's Task Force to Improve Health Care Delivery for Our Nation's Veterans. In the 1980s and 1990s, Dr. Hanna was a Senior Analyst at the congressional Office of Technology Assessment, contributing to numerous science policy studies requested by congressional committees on science education, research funding, biotechnology, women's health, human genetics, bioethics, and reproductive technologies. In the past decade, she has served as an analyst and editorial consultant to the Howard Hughes Medical Institute, the National Institutes of Health, IOM, NAS, and several charitable foundations, voluntary health organizations, and biotechnology companies. Before coming to Washington, D.C., she was the Genetics Coordinator at Children's Memorial Hospital in Chicago, where she directed clinical counseling and coordinated an international research program in prenatal diagnosis. Dr. Hanna received an A.B. in biology from Lafayette College, an M.S. in human genetics from Sarah Lawrence College, and a Ph.D. from the School of Business and Public Management, The George Washington University.

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1739

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES — PREPUBLICATION COPY

**Sara D. Maddox** is a science and health policy editor who served as senior editor for reports to the President of the National Bioethics Advisory Commission, including *Ethical Issues in Human Stem Cell Research* and *Research Involving Human Biological Materials: Ethical Issues and Policy Guidance*. Earlier in her career she was a writer and editor at the Howard Hughes Medical Institute, and she has served as a science editor and writer for reports of the Secretary's Advisory Committee on Genetics, Health, and Society. Ms. Maddox participated in editing *Firepower in the Lab: Automation in the Fight Against Infectious Diseases and Bioterrorism*, a publication based on a colloquium on bioterrorism and laboratory-based data held at NAS. She has edited reports of the National Resource Council, including *Intentional Human Dosing Studies for EPA Regulatory Purposes: Scientific and Ethical Issues* and *Participants* and *Science and Security in a Post 9/11 World*. She also was editor for IOM's *Genes, Behavior, and the Social Environment: Moving Beyond the Nature/Nurture Debate*.

A-12

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1740

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

PREPUBLICATION COPY

# Appendix B

## COMMITTEE MEETING AGENDAS

### MEETING 1
### Washington, D.C.
### JANUARY 25, 2007

8:30    Welcome and Introductions

Committee Co-Chairs
Harry T. Edwards, Judge, U.S. Court of Appeals for the District of Columbia Circuit
Constantine Gatsonis, Director, Center for Statistical Studies, Brown University

8:45    Charge to Committee

David W. Hagy, Deputy Assistant Attorney General for Policy Coordination, Office of Justice
Programs, U.S. Department of Justice and Principal Deputy Director, National Institute of Justice,
U.S. Department of Justice

9:10    Discussion

9:30    Importance of Study to the Forensics Community

Joe Polski, Chair, Consortium of Forensic Science Organizations

9:45    Discussion

10:15   Current State of Forensics:  Census of Publicly Funded Forensic Crime Labs

Joseph L. Peterson, Director and Professor, School of Criminal Justice and Criminalistics,
California State University, Los Angeles

Matthew J. Hickman, U.S. Department of Justice, Bureau of Justice Statistics

10:45   Discussion

11:15   Overview of Forensics Training and Education

Max M. Houck, Director, Forensic Science Initiative and Director, Forensic Business
Development, College of Business and Economics, West Virginia University

Larry Quarino, Assistant Professor, Cedar Crest College

12:00   Discussion

12:15   Lunch

B-1

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1741

**STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY**

1:00      Daily Operations of Forensic Labs

   Joseph A. DiZinno, Assistant Director, Laboratory Division, Federal Bureau of Investigation

   Jan L. Johnson, Laboratory Director, Forensic Science Center at Chicago, Illinois State Police

   Irma Rios, Assistant Director, City of Houston Crime Lab

2:15      Discussion

3:00      National Institute of Justice Research Program and Budget - Future Needs and Priorities

   John Morgan, Deputy Director for Science and Technology, National Institute of Justice, DOJ

3:20      Discussion

3:45      Views from the Major Forensic Science Organizations: Issues and Challenges

   Bruce A. Goldberger, President-Elect, American Academy of Forensic Sciences

   Bill Marbaker, President, American Society of Crime Laboratory Directors

   Robert Stacey, President, American Society of Crime Laboratory Directors, Laboratory Accreditation Board

   Arthur Eisenberg, Board Member, Forensic Quality Services

   Joe Polski, Chief Operations Officer, International Association for Identification

   James Downs, Board Member and Chair, Government Affairs Committee, National Association of Medical Examiners

5:00      Discussion

5:30      Adjourn

## JANUARY 26, 2007

8:30      Opportunities for Improvement: Critical Areas

   Michael Risinger, Professor of Law, Seton Hall Law School

   Peter Neufeld, Co-Founder and Co-Director, The Innocence Project

   David Stoney, Chief Scientist, Stoney Forensic, Inc.

9:30      Discussion

10:00     Adjourn

B-2

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1742

Case 2:19-cv-00392-JMS-DLP  Document 10-1  Filed 10/18/19  Page 1744 of 2008
PageID #: 3634

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## MEETING 2
## Washington, D.C.
## APRIL 23, 2007

8:00    Welcome and Introductions

        Harry T. Edwards and Constantine Gatsonis
        Committee Co-Chairs

8:10    Essential Elements of Science: Hypotheses, Falsifiability, Replication, Peer Review

        Alan I. Leshner, Chief Executive Officer, American Association for the Advancement of Science

        The Science of Statistics: Error Testing, Probabilities, Observer Bias

        Jay Kadane, Senior Statistician, Department of Statistics, Carnegie Mellon University

9:00    Discussion

9:20    Forensic DNA

        Science

        Robin Cotton, Director, Biomedical Forensic Sciences Program, Boston University School of
        Medicine

        Policy and Politics

        Chris Asplen, Vice President, Gordon Thomas Honeywell Government Affairs and former
        Executive Director, U.S. Attorney General's National Commission on the Future of DNA
        Evidence

10:10   Discussion

10:45   The Science of Forensic Disciplines

        What is the state of the art? Where is research conducted? Where is it published? What is the
        scientific basis that informs the interpretation of the evidence? Where are new developments
        coming from? What are the major problems in the scientific foundation or methods and in the
        practice? What research questions would you like to have answered?

        Moderator: Constantine Gatsonis, Committee Co-Chair

10:50   Drug Identification

        Joseph P. Bono, Laboratory Director, Forensic Services Division, U.S. Secret Service

11:15   Discussion

11:45   Lunch

12:30   Pattern Evidence with Fingerprints and Toolmarks as Illustrations
        Fingerprints

        Ed German, Latent Print Examiner, U.S. Army, Retired

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1743

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

Toolmarks

Peter Striupaitis, Chair, International Association for Identification, Firearm/Toolmark Committee and Member, Scientific Working Group for Firearms and Toolmarks (SWGGUN)

1:30    Discussion

2:00    Trace Evidence with Arson and Hair as Illustrations

Arson

John Lentini, Scientific Fire Analysis, LLC

Hair

Max M. Houck, Director, Forensic Science Initiative and Director, Forensic Business Development, College of Business and Economics, West Virginia University

3:00    Discussion

3:45    Forensic Odontology: Bite Marks

David R. Senn, Director, Center for Education and Research in Forensics and Clinical Assistant Professor, Department of Dental Diagnostic Science, The University of Texas Health Science Center at San Antonio

4:10    Discussion

4:30    Commentators

Robert E. Gaensslen, Head of Program in Forensic Science, College of Pharmacy, University of Illinois at Chicago

Jennifer Mnookin, Professor of Law, University of California, Los Angeles Law School

David Kaye, Regents' Professor of Law and Professor of Life Sciences, Arizona State University

5:15    Comments from the Floor

5:45    Adjourn

## APRIL 24, 2007

8:00    Welcome and Introductions

Harry T. Edwards and Constantine Gatsonis
Committee Co-Chairs

8:10    From Crime Scene to Courtroom:  The Collection and Flow of Evidence

Barry A. J. Fisher, Director, Scientific Services Bureau, Los Angeles County Sheriff's Department and former President, American Academy of Forensic Sciences

8:45    Discussion

B-4

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1744

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

9:15    Practice and Standards: Scientific Working Groups

What is the process for establishing the guidelines and standards? What are the guidelines/standards for each of these disciplines? How is quality control/quality assurance monitored and enforced? What recommendations have these organizations made and have they been implemented? What is needed?

Moderator: Harry T. Edwards, Committee Co-Chair

9:20    Drug Identification

Nelson A. Santos, Drug Enforcement Administration and Chair, Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG)

9:40    Discussion

10:00    Pattern Evidence: Latent Prints

Stephen B. Meagher, Fingerprint Specialist, Federal Bureau of Investigation and Vice-Chair, Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)

10:30    Discussion

11:00    Trace Evidence: Hair Analysis

Richard E. Bisbing, Executive Vice President, McCrone Associates, Inc. and member, Scientific Working Group on Materials Analysis (SWGMAT)

11:20    Discussion

11:45    Commentators

Paul C. Giannelli, Weatherhead Professor, Case Western Reserve University School of Law

Carol Henderson, Director, National Clearinghouse for Science, Technology and the Law and Professor of Law, Stetson University

Michael J. Saks, Professor of Law & Psychology and Faculty Fellow, Center for the Study of Law, Science, & Technology, Sandra Day O'Connor College of Law, Arizona State University

12:30    Comments from the Floor

1:00    Adjourn

B-5

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1745

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

## MEETING 3
## Washington, D.C.
## JUNE 5, 2007

8:15   Welcome and Introductions

Harry T. Edwards and Constantine Gatsonis
Committee Co-Chairs

8:30   Forensic Sciences: Issues and Direction

Bruce Budowle, Senior Scientist, Laboratory Division, Federal Bureau of Investigation

9:30   Challenges for Crime Laboratories:  City, County, and Private

Peter Pizzola, Director, New York Police Department Crime Laboratory

John Collins, Director, DuPage County Sheriff's Office Crime Laboratory

John E. Moalli, Group Vice President and Principal Engineer, Exponent

11:00   Emerging Issues: Cybercrime, fMRI (functional Magnetic Resonance Imaging) and Lie Detection, and Photographic Comparison Analysis

Eric Friedberg, Co-President, Stroz Friedberg, LLC

Hank Greely, Deane F. and Kate Edelman Johnson Professor of Law, Stanford University

Richard W. Vorder Bruegge, Supervisory Photographic Technologist-Examiner of Questioned Photographic Evidence, Federal Bureau of Investigation

12:30   Working Lunch: Continuation of Morning Session

1:15   Automated Fingerprint Identification Systems (AFIS) Interoperability

John Onstwedder III, Statewide AFIS Coordinator for the Forensic Sciences Command, Forensic Science Center at Chicago, Illinois State Police

Peter T. Higgins, Principal Consultant, The Higgins-Hermansen Group

Peter D. Komarinski, Komarinski & Associates, LLC

2:15   Medical Examiner System

Randy Hanzlick, Chief Medical Examiner, Fulton County Medical Examiner's Center, Fulton County, Georgia and Professor of Forensic Pathology, Emory University School of Medicine

James Downs, Board Member and Chair, Governmental Affairs Committee, National Association of Medical Examiners; Vice Chair, Consortium of Forensic Science Organizations; Coastal Regional Medical Examiner, Georgia Bureau of Investigation

Garry F. Peterson, Chief Medical Examiner Emeritus, Hennepin County Medical Examiner's Office, Minnesota; Chair, Standards, Inspection and Accreditation Committee and Standards Subcommittee and Past President, National Association of Medical Examiners

B-6

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1746

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

APPENDIX B—PREPUBLICATION COPY

Victor W. Weedn, Acting State Medical Examiner, New Jersey Office of the State Medical Examiner

4:15    Comments from the Floor

5:00    Adjourn

## MEETING 4
## Woods Hole, Massachusetts
### SEPTEMBER 20, 2007

1:30    Welcome

Harry T. Edwards and Constantine Gatsonis
Committee Co-Chairs

1:35    Lessons Learned From the Houston Police Department Investigation

Michael R. Bromwich, Independent Investigator, Fried, Frank, Harris, Shriver & Jacobson LLP

2:45    200 Exonerations:  A Look at the Cases Involving Faulty Forensic Evidence

Brandon L. Garrett, Associate Professor of Law, University of Virginia

Peter Neufeld, Co-Founder and Co-Director, The Innocence Project

4:15    Ethics in Forensic Science

Peter D. Barnett, Partner, Forensic Science Associates

5:00    Reducing Error Rates: A New Institutional Arrangement for Forensic Science

Roger G. Koppl, Director, Institute for Forensic Science Administration, Fairleigh Dickinson University

6:00    Adjourn

### SEPTEMBER 21, 2007

8:15    Welcome

Harry T. Edwards and Constantine Gatsonis
Committee Co-Chairs

8:20    The U.K. Forensics System

Carole McCartney, Centre for Criminal Justice Studies, School of Law, University of Leeds

B-7

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1747

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES—PREPUBLICATION COPY

9:20    The Role of Forensics in Homeland Security

Charles Cooke, Bio-Specialist, Office of the Deputy Director for Strategy and Evaluation, National Counterproliferation Center, Office of the Director of National Intelligence

James Burans, Bioforensics Program Manager, National Bioforensics Analysis Center, U.S. Department of Homeland Security

Larry Chelko, Director, U.S. Army Criminal Investigation Laboratory

Rick Tontarski, Chief, Forensic Analysis Division, U.S. Army Criminal Investigation Laboratory

11:00   Forensics at the National Institute of Standards and Technology

Michael D. Garris, Image Group Manager, National Institute of Standards and Technology

Barbara Guttman, Line Manager, National Software Reference Library, National Institute of Standards and Technology

William MacCrehan, Research Chemist, Analytical Chemistry Division, National Institute of Standards and Technology

12:20   Adjourn

## MEETING 5
## Washington, D.C.
## DECEMBER 6, 2007

8:15    Welcome and Introductions

Harry T. Edwards and Constantine Gatsonis
Committee Co-Chairs

8:30    Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)

Glenn Langenburg, Minnesota Bureau of Criminal Apprehension

9:15    Fingerprint Source Book

John Morgan, Deputy Director for Science and Technology, National Institute of Justice, U.S. Department of Justice

9:45    International Association of Identification: Key Issues

Kenneth F. Martin, Crime Scene Services, Massachusetts State Police

10:30   Forensic Science Issues at the U.S. Secret Service

Vici Inlow, Forensic Services Division, U.S. Secret Service

Deborah Leben, Forensic Services Division, U.S. Secret Service

B-8

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1748

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**APPENDIX B—PREPUBLICATION COPY**

11:10   Contextual Bias

       Itiel Dror, School of Psychology, University of Southampton

12:00   Lunch

1:00    The Coroner System

       Michael Murphy, Las Vegas Office of the Coroner

1:50    Survey of Non-Traditional Forensic Service Providers

       Tom Witt, Bureau of Business and Economic Research, College of Business and Economics, West
Virginia University

2:30    Department of Defense Latent Print Analysis

       Thomas Cantwell, Senior Forensic Analyst, Biometric Task Force and Leader, Forensic Integrated
Product Team, U.S. Department of Defense

3:15    Comments from the Floor

3:45    Adjourn

Copyright © National Academy of Sciences. All rights reserved.

USCA5 1749

# 76

USCA5 1750

AFFIDAVIT/DECLARATION OF JENNIFER LEE VALDEZ
PURSUANT TO 28 U.S.C Sec. 1746

1.  My name is Jennifer Lee Valdez.  I reside in Corpus Christi, Texas, where I was born and raised.

2.  ~~After I graduated from high school~~ *J.V.* In 1995, I moved to Houston.  My family and friends were still in Corpus Christi.

3.  One weekend in the late summer or fall of 2002 I came home to Corpus Christi for a visit and I met Adam Longoria in a club.

4.  We began to date.  In the fall of 2002 he got locked up for drinking and driving.  I had no idea until he got locked up that he had a criminal record.  He had lied to me about that.

5.  On January 10, 2003 Adam Longoria and I got married while he was still in the county jail.  He got out of jail a few months later and in late May I found out I was pregnant.

6.  Two days after I found out I was pregnant Adam Longoria got locked up for bank robbery.

7.  I had my baby on January 21, 2004.  Adam was still in jail when the baby was born.

8.  Detectives on his bank robbery case told me he was a liar and that he had lied to me about many things.

9.  Adam constantly told me that he was facing twenty-five to ninety-nine years but that he had worked out a deal with the prosecutor to get no time in jail at all.

10. I remember he told me he and his lawyer had worked with the prosecutor on a deal to get him no jail time at all instead of the twenty-five to ninety-nine years he was facing.

11. He constantly told me on the phone and in letters how he was working on this deal so that he could get out of jail and also so that he could hold the baby.  A couple years later, when I was dating another guy, this other guy made me throw out Adam's letters.

12. As soon as he got locked up for the bank robbery my dad and I started getting notices from the bank that Adam had stolen our checks and written bad checks that bounced.

USCA5 1751

13.    When he was sentenced to seven years on bank robbery, my whole family
       and I were shocked that he did not get more time.  I believe I filed for
       divorce in April 2004.

14.    To this day, Adam Longoria still harasses me by calling me.  I have
       changed my number numerous times but he still finds it.

15.    I have filed reports to the police and prison for harassment and for him
       using a cell phone in the prison but nothing ever happens to him.

I hereby certify that the facts set forth above are true and correct to the best of my
personal knowledge, information and belief, subject to the penalty of perjury,
pursuant to 28 U.S.C. Sec. 1746.


*Jennifer Valdez*


USCA5 1752

77

USCA5 1753

# U.S. Attorney's Office
# Southern District of Texas
800N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111
Fax: (361) 888-3200



DATE: 5-10-07

RE: Alfred Bourgeois. I received this letter and I am sending you this
notice.

---

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME: Victor Abreu

FAX NO. 215-928-0826          VOICE NO.

FROM: PATTI BOOTH

OPERATOR: Dianna Winstead

TOTAL NUMBER OF PAGES (INCLUDING THE COVER SHEET) 2

**IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED BELOW, PLEASE CALL.**

## CONFIDENTIALITY NOTICE

This facsimile transmission is intended only for the use of the indicated recipient. This transmission may contain information that is privileged, sensitive, and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, disclosure, or reproduction of this transmission is strictly prohibited. If the intended recipient is not an employee or an individual within your office, please notify the sender or the U.S. Attorney's Office immediately by telephone at the above listed number. Please return the transmission to the U.S. Attorney's Office or the above listed address by U.S. Mail. Thank you.

USCA5 1754

Asst. U.S. Attorney

Patti Booth

800 N. Shoreline Dr., Suite 500

Corpus Christi, Tx.

-78401-


RE: (United States v. Alfred Bourgeois)


Dear Ms. Booth,                                              5/3/07


    Well, the reason for this letter is in regards to the case that I helped you with. I had a visit from 2 attorney's from the Federal Community Defender Office for the Eastern District of Pennsylvania (Capital Habeas Unit) Federal Court Division- Defender Association of Philadelphia. One of the attorney's that I spoke with is Mr. Victor Abreu (Asst. Federal Defender).

    I'm letting you know that since you have never answered any of my letters or have done any of the things that you said you would (one being that you were suppose to write a letter to the Parole Board, which you never did) do. I'm going to help them with their case. I haven't told them that, but I think I will write them a letter in the next week and let them know. I will say that all the testimony I gave at the trial was false and I was told what to say by you and the F.B.I. agents that you worked with. I did my part and it didn't cost you next to anything and then you go and lie and screw me over. Is that how you treat the people that help you? You acted like a wole different person when I was with you. Once you got what you wanted, you said to hell with him. You know what I'm going to do, I'll wait for a reply from you and if I get none then I'll write them lawyers in Philadelphia and work with them. I'll give you till the 11th to respond back.

    I will close this letter for now, but hope to hear back from you. Thakn you for your time and consideration on this matter.


                                    Repectfully Submitted


                                    Adam J. Longoria #1233335
                                    Stile Unit
                                    3060 FM 3514
                                    Beaumont, Tx. 77705-7635

USCA5 1755

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,

Respondent,

-against-

ALFRED BOURGEOIS,

Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:

No. Cr-C-02-216

Honorable Janis Graham Jack,
U.S.D.J.

**Capital Case**

### PETITIONER'S MOTION FOR AN EVIDENTIARY HEARING
### AND
### DISCOVERY

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby moves for an evidentiary hearing and discovery in this capital section 2255 proceeding, and in support states the following.

1.    Pending before the Court is Petitioner's *Motion for Relief Pursuant to 28 U.S.C. § 2255*.  Petitioner has filed a supporting memorandum of law; the Government has answered the motion and memorandum, and Petitioner has replied. Because Petitioner has made allegations, which if proven, would entitle him to relief, he must be afforded an evidentiary hearing and discovery, as follows.

1

USCA5 1756

**Evidentiary Hearing**

2.      28 U.S.C. § 2255(b) sets forth the standard governing when a hearing is

appropriate and required:

> Unless the motion and the files and records of the case conclusively
> show that the prisoner is entitled to no relief, the court shall . . . grant a
> prompt hearing thereon [and] . . . make findings of fact and conclusions
> of law with respect thereto.

The Court of Appeals for the Fifth Circuit has strictly construed this language,

holding that an evidentiary hearing is required "[i]f the district court cannot resolve

the allegations without examining evidence beyond the record." United States v.

Smith, 915 F.2d 959, 964 (5th Cir. 1990); Byrne v. Butler, 845 F.2d 501, 512 (5th Cir.

1988) ("If the petitioner's allegations cannot be resolved absent an examination of

evidence beyond the record, a hearing is required"); Martinez v. Dretke, 111

Fed.Appx. 224, 229 & n.15 (5th Cir. 2004) (applying same standard in section 2254

case). The Government's *Answer* acknowledges this standard. *Respondent's Answer*

(*RA*) at 142.

3.      Petitioner herein easily meets this standard. He has alleged facts, which

if proven, would entitle him to relief, and it is unlikely that the Court can resolve any

of his claims without "examining evidence beyond the record," as the Government

partially concedes. *RA* at 142 ("While the record in the present case is arguably

2

USCA5 1757

sufficient to enable this Court to resolve Petitioner's claims without a hearing, many

of the issues rest upon expert witness testimony that this court likely cannot resolve

without an evidentiary hearing.  Moreover, the lack of any response by trial defense

counsel regarding their tactical decisions may well warrant an evidentiary hearing").

4.     When the above standard is applied to the record of this litigation and

Petitioner's allegations, Petitioner is entitled to a hearing. This is particularly so in

view of the Government's correct acknowledgment that a hearing is "likely"

appropriate.  Petitioner provides the following non-exhaustive list[1] of issues to be

resolved at a hearing with respect to each of his claims.

**Claim I:**     A hearing will determine if Petitioner is a person with mental retardation and whether counsel were deficient for failing to thoroughly investigate and present this evidence;

**Claim II:**    A hearing will determine if Petitioner has mental health deficits resulting from his childhood abuse and dysfunction (including cognitive impairments and organ brain damage); whether counsel were deficient for failing to thoroughly investigate and present this evidence;

**Claim III**:   A hearing will determine if the fatal blow was struck outside of federal lands and whether counsel ineffectively failed to investigate, develop

---

[1]Petitioner does not herein set forth every conceivable fact or issue that would be addressed at a hearing, and does not mean to waive any fact or part of a claim that is not expressly discussed.  He offers this list to demonstrate that he requires a hearing to prove at least those issues and facts set forth herein.  This list is also not meant to take the place of a pre-hearing disclosure setting forth in whatever detail the Court requires the precise witnesses who Petitioner would call at a hearing along with the contours of their testimony.

USCA5 1758

and present this evidence;

**Claim IV:** A hearing will determine if the Government's "proof" that semen was found on the victim and whether she suffered sexual assault was valid and whether counsel ineffectively failed to rebut this proof;

**Claims V & VI:** A hearing will determine whether the forensic opinions offered by and techniques offered in support of the opinions by Dr. Senn, Dr. Chrz, Dr. Oliver with regard to digital enhancements and bite marks were not <u>Daubert</u>-worthy and will show that counsel ineffectively failed to challenge these opinions;

**Claim VII:** A hearing will show that the Government provided undisclosed consideration to the jail-house witnesses and/or that these witnesses possessed a Government-induced expectation of consideration;

**Claim VIII:** A hearing will set forth the nature of trial counsel's relationship with two Government witnesses, and will establish that these relationships affected counsel's representation;

**Claim IX:** A hearing will determine whether counsel possessed a reasonable tactical or strategic reason for failing to object to the various improper prosecutorial comments, or to seek a curative instruction with regard to the same;

**Claims X - XII:** A hearing will resolve whether counsel ineffectively failed to rebut evidence of Petitioner's trial demeanor and whether counsel ineffectively failed to raise any of the record based claims contained in his Motion.

5.    It is inconceivable that the Court will be able to resolve these claims,

most of which require both trial counsel's and expert testimony to resolve, without

4

USCA5 1759

a hearing.  Accordingly, Petitioner requests that the Court permit a hearing on each of these issues and subparts.

**Discovery**

6.        Petitioner's discovery requests are governed by Rule 6 of the *Rules on Motion Attacking Sentence Under Section 2255*.  Rule 6 states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 299 (1969)); United States v. Webster, 392 F.3d 787, 801 (5th Cir. 2004) (A habeas petitioner may "invoke the process of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so . . . A federal habeas court must allow discovery and an evidentiary hearing only where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief").

7.        When a petitioner establishes good cause, discovery must be allowed. The United States Supreme Court has explained that "[t]he very nature of the writ [of

5

habeas corpus] demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." Harris, 394 U.S. at 291. Johnston v. Love, 165 F.R.D. 444, 445 (E.D. Pa. 1996) ("it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry").[2] Since the purpose of post-conviction discovery "is to ensure that the facts underlying a [habeas] claim are adequately developed," a court must allow discovery whenever "a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." Id. Accordingly, a court may not deny a petitioner's discovery motion "if there is a sound basis for concluding that the requested discovery **might** allow him to demonstrate" his entitlement to relief. Id. This is never more so than in the context of a capital case, where the unique finality and

---

[2]Accord McDaniel v. United States District Court, 127 F.3d 886, 888 (9th Cir. 1997) (where Petitioner "presented specific allegations . . . [he] is entitled to discovery"); Johnston v. Love, 165 F.R.D. at 445 (Rule 6's "history makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." Accordingly, "a court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the requested discovery might allow him to demonstrate that he has been confined illegally."); Gaitan-Campanioni v. Thornburgh, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim.").

6

USCA5 1761

irreversibility of the sentence requires heightened procedural safeguards.  See e.g.

Kyles v. Whitley, 514 U.S. 419, 422  (1995) (Court's "duty to search for

constitutional error with painstaking care is never more exacting than it is in a capital

case").

       8.     With these standards in mind, Petitioner requests the following discovery

from the United States:[3]

     A.     NCIC report and prior criminal record print out for all prisoner witnesses;

     B.     Any and all letters or other correspondence and/or notes of conversations (pre and post trial) concerning the prisoner witnesses and their criminal cases (state and/or federal) involving in any way the Government or its agents and any state and/or local courts, prosecutors, police, probation or parole officers, parole boards or other law enforcement officials, agencies or bodies;[4]

---

[3]**Discovery Instructions:**

1.    Petitioner requests production of only materials that were not  previously provided to the defense (either at trial, on direct appeal or in post-conviction). If the Government believes that any requested materials were previously provided, Petitioner would appreciate being advised of the same, including the date of production, and, if available, a copy of any letter, email or communication sent with and documenting the production.

2.    When Petitioner refers to "prisoner witnesses" he includes both those who testified against Petitioner as well as those who cooperated with the prosecution, or who were spoken with by the prosecution, but who did not testify.

[4]It is to be recalled that Ms. Booth advised counsel that she in fact wrote one letter for witness Longoria to the Texas parole authorities.  See *Petitioner's*

7

USCA5 1762

C.    Any and all correspondence to and from prisoner witnesses generated before or after trial, including any notes taken by the Government or its agents reflecting discussions with such witnesses;

D.    In <u>United States v. Darrick Moore</u>, 03- CR- 075-1, the Government's sentencing memorandum, and any sentencing motions filed by the Government, including any motion filed pursuant to Fed.R.Crim.P. 35 (both before and after the sentencing proceeding held on 4/22/04), and any correspondence from or to the Government and Mr. Moore and/or his counsel;

E.    In <u>United States v. Wiley Taylor</u>, 01-CR-360, the Government's sentencing memorandum, and any sentencing motions filed by the Government, including any motion filed pursuant to Fed.R.Crim.P. 35 (both before and after the sentencing proceeding), and any correspondence from or to the Government and Mr. Taylor and/or his counsel;

F.    The case names, docket number and agencies involved, and any documents concerning the prisoner witnesses and other criminal matters in which they have cooperated with any federal, state, or local authorities;

G.    Any transcript, tape recordings or notes taken by the Government or its agents of any preparation or proffer sessions with the prisoner witnesses;

H.    All documents relating to any promises or understandings or agreements formal or informal between the prosecution, its agents, and representatives and the prisoner witnesses including counsel for such persons;

I.    All Jencks Act (18 U.S.C. § 3500) material for the prisoner witnesses, not previously disclosed to trial counsel, including but not limited to any proffer agreements, proffer letters, grand jury testimony and plea agreements;

---

*Memorandum*, 90-91; *Petitioner's Reply* at 92.

8

USCA5 1763

J.      Mental health records for all prisoner witnesses;

K.      All documents relating to pre-trial meetings or conversations between trial counsel (Mr Tinker and Mr. Gilmore) and the Government's expert witnesses (Dr. Daily, Dr. Chrz, Dr. Senn and Dr. Oliver) with respect to this case, and the dates and locations of said meetings or conversations;

L.      The title of any articles that purport to be a peer review of any aspect of the image enhancement methodology utilized by Dr. William Oliver in this case.

M.      The name of any software programs (freeware or copyrighted) used by Dr. Oliver in this case to enhance the images of the autopsy photographs; any evidence of efforts or attempts to have this software peer reviewed; and any peer reviews of this software;

N.      Any and all notes, reports, correspondence, findings, opinions or conclusions relating to any biological material subjected to forensic testing including, but not limited to, any documents or material tested, reviewed or evaluated regarding the presence of semen by Anthony Onorato, Caroline Zervos, FBI laboratories or Orchid Cellmark laboratories;

O.      Any and all notes, reports, correspondence, finding, opinions and conclusions relating to any evidence of sexual assault to JG-1999 including, but not limited to, any notes, reports, correspondence, findings, opinions or conclusions of Dr. Elizabeth Rouse and Dr. Scott Benton.

P.      Any and all notes, reports and correspondence between Government attorneys, the FBI, or agents thereof, in connection with opinions, findings and conclusions of United States Army Colonel, Dr. J. Curtis Dailey.

Q.      Any and all documents relating to pre-trial, trial and post-trial meetings between Government attorneys, FBI, or agents thereof, and Robin Bourgeois and AB-1994, including, but not limited to notes, letters,

USCA5 1764

reports and 302's;

R.      In view of the nature of Petitioner's allegations regarding undisclosed consideration and fallacies with respect to some of the forensic opinions, Petitioner requests production of all previously undisclosed 302 reports, expert opinions or expert notes, prepared in this case, regardless of whether the subject of the 302 reports or author of the expert opinion or note testified at trial;

S.      In view of the Government's on-going due process obligations to provide exculpatory evidence to the defense (Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976)), Petitioner requests that the Government disclose any evidence that is supportive of Petitioner's claims.  In that regard, Petitioner requests that the Government review its file with an eye toward determining if any previously undisclosed evidence is material to Petitioner's guilt or penalty in view of Petitioner's post-conviction claims.

9.      Petitioner seeks the following third party discovery:

T.      Case file maintained by the District Attorney of Nueces County, Texas regarding its prosecution of Adam Longoria (docket #s 03-CR-1884-E and 02-CR-3585-E);

U.      Case file maintained by the District Attorney of Bee County, Texas, regarding its prosecution of Orlando Campos (docket # 99-2055-0-CR-B).[5]

---

[5]Petitioner is serving this Motion on the District Attorney of Nueces and Bee Counties, so that the may be heard on this request.

10

USCA5 1765

WHEREFORE, Petitioner respectfully requests that the Court grant the relief

requested herein.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois


Dated:       Philadelphia, PA
             July 1, 2009

USCA5 1766

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 1st day of July, 2009 I served the foregoing upon the following persons in the manner indicated:

By U.S. Mail and E-Mail
Tony R. Roberts, Esq.
PO Box 61129
Houston, TX 77208
**Tony.Roberts@usdoj.gov**

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Patti.Booth@usdoj.gov**

By U.S. Mail
Nueces County District Attorney
901 Leopard, Room 206
Corpus Christi, TX 78401

Bee County District Attorney
105 West Corpus Christie Street
Room 305
Beeville, TX 78102

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 1767

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,     :     No. Cr-C-02-216

                              :

           Respondent,        :     Honorable Janis Graham Jack,
                              :              U.S.D.J.

     -against-                :

                              :     **Capital Case**

ALFRED BOURGEOIS,             :

                              :

           Petitioner.        :

_____ :

## ORDER

AND NOW, this ___ day of _____, 2009 upon consideration of the motion of Petitioner for an Evidentiary Hearing and Discovery, the Government's Answer to the Motion, and the entire record of this case, it is hereby **ORDERED:**

1.     Petitioner's Motion is Granted;

2.     The Court will consult with counsel to set a schedule for an evidentiary hearing, and for pre-hearing disclosures;

3.     The Government shall provide Petitioner with the discovery requested in his Motion within ____ days of the date of this Order;

4.     The District Attorneys of Nueces and Bee County, Texas shall provide copies of the documents requested by Petitioner within ___ days of the date of this Order.

     **So ordered,**

                              _____
                              Janis Graham Jack, U.S.D.J.

USCA5 1768

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA            §
                                    §
VS.                                 §   CRIMINAL ACTION NO. C-02-216
                                    §
ALFRED NMI BOURGEOIS               §

## ORDER

On July 1, 2009, Bourgeois filed a motion for an evidentiary hearing and for discovery.

(Docket Entry No. 460).  Bourgeois' motion identifies issues that he wishes to develop in an

evidentiary hearing.  His motion also outlines discovery he wants to engage in to prepare for the

hearing.  The Government has not yet filed a reply.  The Court **ORDERS** the Government to file

a reply to the pending motion on or before September 11, 2009.

SIGNED and ORDERED this 12th day of August, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1769

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA          §      CRIMINAL NO. 2:02-CR-216
    Respondent,              §
              §
              §      Capital Case
              §
ALFRED BOURGEOIS                  §
    Petitioner,

### GOVERNMENT'S MOTION FOR DISCOVERY


The United States of America, by and through its United States Attorney for the Southern District of Texas, Tim Johnson, and the undersigned Assistant United States Attorney, Elsa Salinas-Patterson, hereby files this Motion for Discovery and Proposed Order.

The government requests this Honorable Court to order the release of the remaining documents and trial preparation memorandums and notes that have previously been disclosed to the Capital Habeas Corpus Unit (hereafter referred to as "Habeas Unit"), Federal Community Defender Office, and which are currently stored in the law office of attorney John Gilmore. The government is of the understanding that the Habeas Unit has taken possession of many of the defense trial records/documents and requests that the government be allowed to take possession of said remaining documents so that said documents can be properly documented and chronicled in preparation of future responses to the Habeas Unit's Discovery Motions.

Additionally, the government requests that all defense *ExParte* Motions and Hearings

USCA5 1770

regarding said Motions be unsealed so that the government may request transcriptions of said hearings so that the government may be able to respond to the Habias Unit's discovery motions and/or any future evidentiary hearings.

Respectfully Submitted,

TIM JOHNSON
UNITED STATES ATTORNEY

/S/ Elsa Salinas-Patterson
By:        ELSA SALINAS-PATTERSON
Assistant United States Attorney
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas
PH:(361) 888-3111; FX:(361) 888-3200
Texas Bar No.  00791593
Southern District No.  22489

CERTIFICATE OF SERVICE AND CONSULTATION

I, Elsa Salinas-Patterson, Assistant United States Attorney, hereby certify that a true and correct copy of the above and foregoing Government's Motion for Discovery and Order was served upon James McHugh this 28th day of August, 2009 by emailing to Micahel_Wiseman@fd.org and that the government consulted with James McHugh and he has "no position" to the government's motion:

/S/ Elsa Salinas-Patterson
ELSA SALINAS-PATTERSON
Assistant United States Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL NO. 2:02-CR-216 |
| Respondent, | § | |
| | § | |
| | § | Capital Case |
| ALFRED BOURGEOIS | § | |
| Petitioner, | | |

## ORDER REGARDING GOVERNMENT'S MOTION FOR DISCOVERY

Before this Court  is the Government's Motion for Discovery  in the above-captioned

criminal case.  After careful consideration, it is the opinion of this Court that:

The government's request that Mr. John Gilmore release to the United States Attorney's

Office the remaining documents and trial preparation memorandums and notes that have previously

been disclosed to the Capital Habeas Corpus Unit regarding the above-referenced case and that the

government be allowed to maintain custody of said documents is hereby

_____GRANTED; _____ Not Granted;

The government's request to unseal the defenses'  *ExParte* Motions and Hearings which

were filed during the case-in-chief and during the sentencing phase of the above-referenced case be

unsealed for the purpose of allowing the government to order transcripts of said hearings and to

obtain copies of said Motions is hereby

_____GRANTED; _____Not Granted.

SIGNED at Corpus Christi, Texas, on this _____ day of August, 2009.

_____

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1772

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

_____

|                              |   |                          |
|------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA,    | : | No. Cr-C-02-216          |
|                              | : |                          |
| Respondent,                  | : | Honorable Janis Graham Jack, |
|                              | : | U.S.D.J.                 |
| -against-                    | : |                          |
|                              | : | **Capital Case**         |
| ALFRED BOURGEOIS,            | : |                          |
|                              | : |                          |
| Petitioner.                  | : |                          |

_____ :

**PETITIONER'S *ANSWER IN PARTIAL OPPOSITION*
TO GOVERNMENT'S MOTION FOR DISCOVERY**

Petitioner, ALFRED BOURGEOIS, through counsel hereby submits this

*Answer in Partial Opposition* to the Government's *Motion for Discovery*.

1.      Pending before the Court is Petitioner's section 2255 motion for relief.

On July 1, 2009 Petitioner filed a *Motion for Evidentiary Hearing and Discovery*

(document # 460).  When the Government had not yet filed any response to

Petitioner's *Motion*, on August 12, 2009 this Court ordered that a response be filed

on or before September 11, 2009 (Document # 462).

2.      On August 28, 2009 the Government filed its *Motion for Discovery*

(document # 463).  Petitioner has no opposition in principle to providing the

Government with appropriate discovery, subject to the requested *Protective Order*

USCA5 1773

discussed below.  However, Petitioner does oppose the Government's *Motion* as currently constituted.

3.    The Government has requested that Petitioner turn over the entire trial file of Mr. Gilmore and Mr. Tinker.[1]  Petitioner believes that this request is over broad.  Petitioner has no objection to providing documents that are relevant to the issues that are before the Court.  However, the entire trial file will obviously contain materials that are irrelevant to the issues before the Court and which are protected by privilege.  Therefore, Petitioner believes that the Government should be required to make a specific request for materials related to issues that are before the Court so that Plaintiffs counsel may go through the file and provide only that information which is relevant.

4.    Pursuant to Fed.R.Civ.P., Rule 26 discovery is limited to "relevant" and non-privileged material.  Wiwa v. Royal Dutch Petroleum Company, 392 F.3d 812, 820 (5th Cir. 2004).  Even though "relevance' is defined broadly under Rule 26 to include any evidence that is "reasonably calculated to lead to the discovery of

---

[1]The Government has a minor misunderstanding.  It seems to believe that Mr. Tinker has retained portions of his file while providing other portions to current counsel for Mr. Bourgeois (see *Motion* at 1 "the government is of the understanding that the Habeas Unit has taken possession of many of the defense trial records").  In reality, Mr. Gilmore and Mr. Tinker represented to current counsel the they provided the entire file to the undersigned.  The file was copied and the original was returned to Mr. Tinker and Mr. Gilmore.

2

USCA5 1774

admissible evidence," id., when confronted with a *bona fide* claim of privilege, the relevance of the privileged materials must be established, and even then, relevant, but privileged information may not be discoverable. Baldrige v. Sharpiro, 455 U.S. 345, 360 (1982) ("If a privilege exists, information may be withheld, even if relevant to the lawsuit and essential to the establishment of plaintiff's claim"). To be clear, Petitioner recognizes that he will be waiving attorney-client and work-product privileges for those documents related to claims of ineffective assistance of counsel. However, he will not be making such a waiver for documents unrelated to such claims, for which he retains such privileges.

5.      The over breadth of the Government's request can be seen by comparing it to Petitioner's discovery requests. Petitioner did not ask for the production of the entire prosecution file and had he done so one can imagine that the Government would vehemently oppose such a broad request. Instead, he made specific requests for information that is germane to the specific issues before the Court. The Government should be held to the same standard. The Court should deny the Government's current *Motion* without prejudice and permit them to file a claim-specific request.

6.      One more point merits mention. The Government claims that it requires the requested discovery to prepare for "future responses to the Habeas Unit's

3

Discovery Motions." *Motion* at 1. However, Petitioner's discovery motion specifically requested only those documents **not** provided to trial counsel. See *Discovery Motion* at 7, n.3, Instruction 1.[2] Petitioner assumes that the Government is able to determine what it provided to the defense at trial, and therefore does not understand why the Government needs to see the defense trial file in order to provide Petitioner with the materials that were not provided to trial counsel.

7.      The Government has requested that the Court also unseal *Ex Parte Motions and Hearings*. Petitioner has no objection to this request, again so long as such unsealing is covered by a *Protective Order*.

### Protective Order

8.      Because the materials requested by the Government are privileged work-product and/or attorney client privileged information, should the Court order discovery either in response to the current motion or in the future, Petitioner requests that any such disclosures be covered by the following protective order:

---

[2]Petitioner exempted from disclosure any previously provided information:

> Petitioner requests production of only materials that were not previously provided to the defense (either at trial, on direct appeal or in post-conviction). If the Government believes that any requested materials were previously provided, Petitioner would appreciate being advised of the same, including the date of production, and, if available, a copy of any letter, email or communication sent with and documenting the production.

4

a.    Any information provided by Petitioner to the Government that is privileged should not be redisclosed by the Government to any person or entity not directly employed by the Government in the litigation of this case;

b.    Should the Government make any public filing in either this litigation or on any appeal by either party, any reference to privileged materials should either be redacted in the public document or the document should be filed under seal;

c.    At the conclusion of this litigation and any appeal by either side, the Government should be required to return any such privileged information to Petitioner's counsel and may not retain any paper, electronic or computerized copies;

d.    Should Petitioner be awarded a retrial or resentencing, the Government may not use any privileged information learned in the course of these discovery proceedings against Petitioner for any purposes, including on its direct or rebuttal case, or to impeach Petitioner or any other witnesses testimony during any such retrial or resentencing.

USCA5 1777

WHEREFORE, Petitioner respectfully requests that the Court deny the

Government's *Motion* in part, consistent with the arguments made herein, and that it

provide that any disclosures be subject to the above *Protective Order*.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:      Philadelphia, PA
            September 4, 2009

USCA5 1778

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 4th day of September, 2009 I served the foregoing upon the following persons in the manner indicated:

<u>By U.S. Mail and E-Mail</u>
Tony R. Roberts, Esq.
PO Box 61129
Houston, TX 77208
**Tony.Roberts@usdoj.gov**

Patricia Hubert Booth, Esq.
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Patti.Booth@usdoj.gov**

Elsa Salinas-Patterson
United States Attorney's Office
800 North Shoreline, Suite 500
Corpus Christi, TX 78401
**Elsa.S.Patterson@usdoj.gov**

/s/ Michael Wiseman
_____
Michael Wiseman

USCA5 1779

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS


UNITED STATES OF AMERICA

v.                                          Case No.: 2:02–cr–00216
                                            Judge Janis Graham Jack

Alfred NMI Bourgeois

                    Defendant

---

## NOTICE OF SETTING


**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR
THE PLACE, DATE AND TIME SET FORTH BELOW.**



**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 9/9/09

**TIME:** 10:15 PM

**TYPE OF PROCEEDING:** Telephone Conference



Date:    September 8, 2009

                                                    Clerk of Court


USCA5 1780

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On September 9, 2009, the Court held a telephone conference to address the Government's Motion for Discovery.  (DE 463).  The Government seeks discovery of all documents originally prepared and possessed by trial counsel that are relevant to Bourgeois' motion to vacate under 28 U.S.C. § 2255.  Bourgeois filed an answer in partial opposition, arguing that the Government's motion was overbroad because it requested information not relevant to the proceedings or that is protected by privilege.  (DE 464).  At the conference, the Court ordered that within sixty days Bourgeois will submit to the Government any documents that are relevant and which they can agree to turn over without compromising Bourgeois' attorney/client privilege.  Bourgeois will submit the remainder of the records to the Court under seal for *in camera* inspection.  For ease of reference, the  Court recommends that Bourgeois Bates stamp the sealed material.  If the Court orders Bourgeois  to provide any remaining documents to the Government, the Court will allow Bourgeois sufficient time to file an objection.

SIGNED and ORDERED this 9th day of September, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1781

%AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

**TRANSCRIPT ORDER**

*Please Read Instructions:*

**FOR COURT USE ONLY**

**DUE DATE:**

| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-925-0520 | 3. DATE 9/14/2009 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545 WEST | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:02-cr-00216 | 9. JUDGE JANIS GRAHAM JACK | DATES OF PROCEEDINGS |
|---|---|---|

10. FROM

11. TO

| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS |
|---|---|

13. CITY CORPUS CHRISTI   14. STATE TEXAS

**15. ORDER FOR**

- ☐ APPEAL
- ☐ NON-APPEAL
- ☐ CRIMINAL
- ☒ CIVIL (HABEAS)
- ☐ CRIMINAL JUSTICE ACT
- ☐ IN FORMA PAUPERIS
- ☐ BANKRUPTCY
- ☐ OTHER *(Specify)*

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

United States Courts
Southern District of Texas
DA FILED

SEP 21 2009

Clerk of Court

| PORTIONS | DATE(S) | PORTION(S) | |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | TELEPHONE CONFERENCE 9/9/2009 (FILED) | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☒ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges (deposit plus additional).

**ESTIMATE TOTAL**

| 18. SIGNATURE Kathrin Hennig | ☐ EMAIL ONLY REQUIRED ☒ EMAIL AND HARD COPY REQUIRED |
|---|---|
| 19. DATE 9/14/2009 | ☐ EMAIL ADDRESS: |

**20. TRANSCRIPT TO BE PREPARED BY**

• 9/9/2009 (DIGITAL # 10:26-10:36)
(CERO: v. gano)

**COURT ADDRESS**

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | 9-21-09 | VG | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:**   COURT COPY   TRANSCRIPTION COPY   ORDER RECEIPT   ORDER COPY

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,         *     CRIMINAL ACTION
                                  *
          PLAINTIFF,              *     CR-C-02-216(1)
                                  *
VS.                               *
                                  *     CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                 *     SEPTEMBER 9, 2009
                                  *     10:28 A.M.
          DEFENDANT.              *
                                  *
* * * * * * * * * * * * * * * * *


              TRANSCRIPT OF TELEPHONE CONFERENCE

          BEFORE THE HONORABLE JANIS GRAHAM JACK
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77002

              (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:              MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
          TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                MOLLY CARTER, P. O. BOX 270203
          CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 1783

APPEARANCES:   (CONTINUED)

FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                            OFFICE OF THE FEDERAL PUBLIC DEFENDER
                            601 WALNUT STREET
                            THE CURTIS CENTER, SUITE 545
                            PHILADELPHIA, PENNSYLVANIA 19106

ALSO PRESENT:               MR. JOHN S. GILMORE, JR.

USCA5 1784

(The proceedings began at 10:28 a.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas for the United States.

THE COURT:  That's not loud enough.

THE CLERK:  Yes, Your Honor.

MR. ROBERTS:  Tony Roberts for the United States.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MR. GILMORE:  And John Gilmore.

THE COURT:  That's not going to work.

THE CLERK:  Okay.  Hold on.

(PAUSE.)

THE CLERK:  Let's try this one more time.

THE COURT:  Okay.  Let's try it again.

THE CLERK:  Can I have appearances, please, again?

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MR. GILMORE:  And John Gilmore.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.

USCA5 1785

THE COURT:  Do you have copies of all the records of Mr. Gilmore and Mr. Tinker?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  I'm wondering, anything you cannot agree to turn over, Mr. Wiseman --

MR. WISEMAN:  Yes.

THE COURT:  -- if you could submit to the Court --

MR. WISEMAN:  Sure.

THE COURT:  -- under seal.  I'll go through it all.

MR. WISEMAN:  Okay.

THE COURT:  Because the issue is kind of competence of Mr. Bourgeois, whether or not the attorneys were ineffective for failing to put on evidence of his competence or mental state, mental condition.  So what I thought I would do, if you could -- whatever you can give them, give them.

MR. WISEMAN:  Okay.

THE COURT:  And what you can't agree, give under seal to -- file under seal.  I'll go through it.  And before I give anything to the Defendant, I mean, to the Government, I will file a notice that this is what I think is not covered, or that is relevant to this issue.

MR. WISEMAN:  Okay.

THE COURT:  And then you'll have an opportunity to file objections.

MR. WISEMAN:  About his mental state?

USCA5 1786

THE COURT:  Does that sound okay?  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.  I was asking if, just the issue related to his mental health deficits or --

THE COURT:  Well -- are you on a speaker phone?

MR. WISEMAN:  -- I can ask for a hearing on.

THE COURT:  Okay.  Mr. Wiseman?

MR. WISEMAN:  Yes.

THE COURT:  Okay.  Are you off the speaker phone?

MR. WISEMAN:  I wasn't on it.

THE COURT:  Oh, okay.  Well, I'm having trouble hearing your voice.

MR. WISEMAN:  Oh, I'm sorry.

THE COURT:  So whatever issues you've raised in your petition --

MR. WISEMAN:  Is Your Honor ordering me to --

THE COURT:  -- relating to ineffective assistance of counsel.

MR. WISEMAN:  Any ineffective assistance claim.  Okay.

THE COURT:  Any of your ineffective assistance claims.

MR. WISEMAN:  Okay.

THE COURT:  And the way I understand it is that the most important one are the bite marks, and failure to put on the issue of his mental competence or incompetence.  Is that

USCA5 1787

correct?

MR. WISEMAN:  Right.

THE COURT:  Anything else, Ms. Salinas?  Ms. Booth?  Mr. Roberts?

MR. ROBERTS:  Your Honor, well, this is Tony Roberts for the United States.  The issue of ineffective assistance is one aspect.  The other thing that we've become aware of recently is that Mr. Bourgeois was making notes, which he passed to his Defense Counsel during trial.  We believe that we are, that notes are relevant to --

THE COURT:  Well, I'm going to -- this is what I'm thinking.  Anything he wrote -- and I can't remember what I did with the letters he sent me, whether they're part of the file or whether I sent them back.  But those kind of things would be relevant as to his competence.

MR. ROBERTS:  Okay.  So --

THE COURT:  But I will make a note of those, and say --

MR. ROBERTS:  -- letters?

THE COURT:  I agree with you.  Anything that would reflect on his ability, his mental competence or mental disability would be relevant.  And so I'll make a list of those, file them, and say this is what I think is relevant, and give Mr. Wiseman and Mr. Bourgeois a chance to object.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.

USCA5 1788

As a logistical matter, we're going to need a bit of time to do this.  We're dealing with probably about a dozen banker boxes, give or take, so --

THE COURT:  With what?

MR. WISEMAN:  To read all the papers, I would say it's going to take probably 90 days to do that, and to sort out what we think is relevant and not relevant.

THE COURT:  Mr. Wiseman, you're not to sort out.  I'm going to do that.  Anything you can't agree to do --

MR. WISEMAN:  Decide what to give to you and to give to them directly.

THE COURT:  Well, I would imagine that you have reviewed this repeatedly to file your motions.

MR. WISEMAN:  Well, of course we have.  And I'm just saying I have to physically go through it now and make two piles.  And I think that's going to take some time.

THE COURT:  I don't think it should take 90 days.

MR. WISEMAN:  With the Court's order on it, it's just going to take us some time to do that.

THE COURT:  Any objection to 60 days, Mr. Roberts? Ms. Booth?  Ms. Salinas?

MR. ROBERTS:  No, Your Honor.  I just wanted to add that the --

THE COURT:  Is this Mr. Roberts?

MR. ROBERTS:  Yes.  I'm sorry, Your Honor.  Tony

Roberts for the United States.  I just wanted to add, we are filing a response, in accordance with the Court's order, in response to their request for evidentiary hearing and for discovery.  We are putting that together and will be filing that this week.  And I just wanted to alert the Court that in our response, we are going to make the argument that there is no need for an evidentiary hearing.  And a couple of the things that we've --

THE COURT:  I thought you needed this information to file your response.

MR. ROBERTS:  Well, we need this information to understand part of the response, Your Honor, but we're -- as far as an evidentiary hearing goes, we still believe that you can make a decision without needing the evidentiary hearing, but --

THE COURT:  Well, we don't need to argue that now, though.

MR. ROBERTS:  That's true, Your Honor.

THE COURT:  But it is nice to hear from you, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.  Nice to be back in Texas, in fact.

THE COURT:  Anything else?

MR. ROBERTS:  No, Your Honor.

MR. WISEMAN:  Not from Mr. Bourgeois.

USCA5 1790

MR. GILMORE:  Nothing from me, Judge.  John Gilmore.

THE COURT:  Well, it's good to hear from you, too, Mr. Gilmore.

MR. GILMORE:  Good to hear from you, too, Judge.

THE COURT:  And Mr. Wiseman, some day we'll meet.  I don't think we've met yet, have we?

MR. WISEMAN:  No, we haven't.  I'm looking forward to it.  Although I was just telling Mr. Gilmore, I've known too well the very humid weather you have down there.  So I hope the Court will keep that in mind with scheduling any appearances.

THE COURT:  Well, we'll try to make it mid winter, if that's all right.

MR. WISEMAN:  That's great.  I appreciate that.

THE COURT:  All right.  Thank you, Mr. Wiseman.

MR. WISEMAN:  Sure thing.  Take care.

THE COURT:  Goodbye.

(Proceedings concluded at 10:36 a.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter _____     October 12, 2009 _____
Molly Carter                        Date

**USCA5 1791**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA

v.                                                    Case No.: 2:02–cr–00216
                                                      Judge Janis Graham Jack

Alfred NMI Bourgeois

                        Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the
E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court.
To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must
ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing
the transcript's docket number, the item's location by page and line, and including only the following
portions of the protected information. This statement must be filed within 21 days of the transcript being
filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the
instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only
responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for
compliance.


                        Clerk of Court

USCA5 1792

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,          :              No. Cr-C-02-216
                                                    :              No. Cv-07-223
                    Respondent,             :        Honorable Janis Graham Jack
                                                    :              U.S.D.J.
            -against-                          :
                                                    :           Electronically Filed
ALFRED BOURGEOIS,                    :
                                                    :
                    Petitioner.               :
_____   :

**PETITIONER'S NOTICE OF COMPLIANCE WITH
RESPONDENT'S DISCOVERY REQUEST**

Counsel for Petitioner, ALFRED BOURGEOIS, hereby files this Notice of

Compliance with Respondent's Discovery Request.

**Background**

1.      On August 28, 2009 Respondent filed its *Motion for Discovery* seeking

trial defense counsels' file.

2.       On September 4, 2009 counsel for Petitioner filed an *Answer in Partial

Opposition*.

3.      On September 9, 2009 the Court convened a telephonic conference

resulting in an order that Petitioner's counsel provide any documents in defense

1

USCA5 1793

counsels' trial file which relate to any of the section 2255 claims alleging that trial counsel were ineffective in their representation. The Court also ordered the production of all of Mr. Bourgeois trial writings that may impact upon an assessment of his mental abilities. These productions were ordered to be made in sixty days of the Court's Order.

### Compliance

While reserving all objections and arguments as to the relevance, probative value and admissibility of the documents, Petitioner notifies the Court that he has complied with the Court's Order to produce defense counsels' trial file. Because undersigned counsel did not wish to make judgments as to which documents the Government may believe are relevant to particular claims of ineffective assistance of counsel, or which of Mr. Bourgeois' writings bear upon an assessment of his mental abilities, counsel are producing defense counsels' entire trial file (consisting of 11,611 pages of Bates-stamped documents), by placing the same in overnight mail, with the following exceptions:[1]

- Counsel have withheld twenty one (21) pages from trial counsel's file which he is submitting to the Court today, under seal, for *in camera* review;

---

[1]Counsels' staff is completing the production and the documents will be placed in overnight delivery tomorrow, November 10, 2009.

2

USCA5 1794

- Counsel have not provided transcripts of court proceedings in this case.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Victor J. Abreu, Esq.
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:       Philadelphia, PA
             November 9, 2009

### CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 9th day of November, 2009, I caused the foregoing upon the following person in the manner indicated below:

Tony R. Roberts Esq.
United States Attorney's Office
PO Box 61129
Houston, TX 77208-1129
Tony.Roberts@usdoj.gov
and by E-File

/s/ Michael Wiseman

_____

Michael Wiseman

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v | § | CRIMINAL NO. C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

**MOTION FOR IN CAMERA INSPECTION OF OUTGOING MAIL BY DEFENDANT
TO AN INDIVIDUAL OTHER THAN HIS ATTORNEY OF RECORD**

COMES now, the United States of America, by Tim Johnson, the United States Attorney

for the Southern District of Texas, and Patti Hubert Booth, Assistant United States Attorney, and

hereby moves the Court to inspect a package that inmate BOURGEOIS has addressed to be

mailed to an individual other than his attorney of record.

On December 7, 2009, the government received a telephone call from Brian English, a

case worker at the Federal Prison in Terre Haute, Indiana, where inmate BOURGEOIS currently

resides.  Mr. English informed the government that BOURGEOIS had addressed a package to be

mailed to Ms. Angela Lockett Sampson with the Mississippi Center for Legal Services, who is

not his attorney of record.  Mr. English also informed the government that he checked and

verified that Ms. Sampson does indeed work as an attorney for the Mississippi Center for Legal

Services.  Additionally, the government verified this information as well, and found Ms.

Sampson is listed as an attorney for this organization in Jackson, Mississippi.

On December 8, 2009, the government contacted Mr. English as to the contents of the

package.  Mr. English stated that he did not read the material, but did a cursory inspection, and it

appeared to him that the material contained in the package was referencing a divorce issue.  Mr.

USCA5 1796

English stated that he was unsure whether this package could be mailed, given that the restricted mail order issued by the Honorable Janis Graham Jack, specifically states that Mr. Bourgeois can correspond only with his counsel and in accordance with the standard procedures of the United States Bureau of Prisons. Mr. Bourgeois' current counsel of record, according to PACER is Mr. Michael Wiseman, and Mr. Victor Abreu.

The government is concerned that because BOURGEOIS is attempting to communicate with someone other than his counsel of record, and therefore, in order to avoid inappropriate contact with a witness or a victim, the government hereby moves the Court to order the Federal Bureau of Prisons at Terre Haute, Indiana, to deliver the package to the Court for an in camera inspection, to make a determination whether it can subsequently be mailed to Ms. Angela Lockett Sampson.

Respectfully Submitted,

TIM JOHNSON
UNITED STATES ATTORNEY


/S/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney
Federal I.D. No. 19500
Texas State Bar I.D. No. 02650200
800 North Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111

2

USCA5 1797

## CERTIFICATE OF SERVICE AND CONSULTATION

I, Patti Hubert Booth, do hereby certify, that I have contacted  Mr. Victor Abreu, an attorney for defendant Alfred Bourgeois and Mr. Abreu is opposed to this motion.  Attorney Michael Wiseman was not able to be reached.  Additionally, a true and correct copy of this Motion and the Proposed Order thereon has been served via the ecf filing system to Mr. Michael Wiseman and Mr. Victor Abreu on this 9th day of December, 2009.


/S/ Patti Hubert Booth
PATTI HUBERT BOOTH
Assistant United States Attorney

3

USCA5 1798

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v | § | CRIMINAL NO. C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

## <u>ORDER GRANTING MOTION FOR IN CAMERA INSPECTION</u>

After consideration of the Government's Motion for an In Camera Inspection of mail

which defendant Alfred Bourgeois has addressed to be mailed to Ms. Angela Lockett Sampson,

it is hereby,

ORDERED that the Government's Motion is GRANTED, and that the mail in question

shall be mailed to the Court as follows for an In Camera inspection:

The Honorable Janis Graham Jack
United States District Judge
United States Federal Courthouse
1133 N. Shoreline Boulevard
Corpus Christi, Texas 78401

RE:    Inmate Mail - Alfred Bourgeois

SIGNED on this _____ day of December, 2009.


_____
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1799

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,              :            No. Cr-C-02-216
                                                    :            No. Cv-07-223
                    Respondent,            :        Honorable Janis Graham Jack,
                                                    :                 U.S.D.J.
         -against-                         :
                                                    :
ALFRED BOURGEOIS,                          :        Electronically Filed
                                                    :
                    Petitioner.            :
_____          :

**PETITIONER'S *ANSWER* TO GOVERNMENT'S**
***MOTION FOR IN CAMERA INSPECTION OF OUTGOING MAIL***

Petitioner, ALFRED BOURGEOIS, through undersigned counsel, hereby

opposes the Government's *Motion for In Camera Inspection of Outgoing Mail to an*

*Individual Other than his Attorney of Record* (hereafter, *Motion*).

1.      According to the government's *Motion*, on December 7, 2009, it received

a telephone call from Brian English, a counselor at the United States Penitentiary at

in Terre Haute, where Mr. Bourgeois is imprisoned.  Mr. English informed the

government that Mr. Bourgeois had addressed a package to be mailed to Ms. Angela

Lockett Sampson, an attorney at the Mississippi Center for Legal Services.  Mr.

English seized the package, believing it violated this Court's order precluding Mr.

1

USCA5 1800

Bourgeois from sending mail to anybody but his counsel of record in this case.

2.      Undersigned counsel believe that the seized package was addressed to the attorney representing Robin Bourgeois in divorce proceedings initiated by Robin Bourgeois. Mr. English has informed undersigned counsel that the contents of the package appear related to the pending divorce proceedings and does not contain any apparent contraband.

3.      Mr. Bourgeois, through undersigned counsel, opposes the in camera review of his outgoing mail related to his divorce proceedings.  Mr. Bourgeois is not represented on his divorce matter, and clearly he has a right to self-representation in that matter and to access to the courts.  See generally Bounds v. Smith, 430 U.S. 817 (1977) (recognizing prisoners' constitutional right to access to courts).  This Court's order limiting Mr. Bourgeois outgoing mail should not prevent him from protecting his legal rights when he has been sued.  Clearly, precluding him from sending papers to opposing counsel in an ongoing divorce proceedings, would prevent Mr. Bourgeois from asserting his legal rights in those proceedings.

4.      The fact that these papers are directed to a member of the bar, as opposed to being sent to Robin Bourgeois, also weigh against an *in camera* inspection by this Court.  Presumably, if those papers contain offensive or threatening content, counsel for Ms. Bourgeois will act as a proper filter to protect Ms. Bourgeois.

2

USCA5 1801

WHEREFORE, Mr. Bourgeois respectfully requests that his legal mail related to his divorce be allowed to be forwarded to opposing counsel without in camera review by this Court. Further, counsel for Petitioner request that this Court modify its prior order to permit Petitioner to send written communications related to his divorce proceedings to both his wife's divorce lawyer and the court hearing that case, without prior inspection from this Court.

A proposed order summarizing these requests is attached.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman, Esq.
Chief Capital Habeas Corpus Unit
Victor J. Abreu, Esq.
Supervising Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520
Michael_Wiseman@fd.org

Dated:      December 10, 2009
               Philadelphia, PA

3

USCA5 1802

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 10th day of December, 2010, I served the foregoing upon the following persons in the manner indicated:

Tony R. Roberts, Esq.
PO Box 61129
Houston, Texas 77208
Tony.Roberts@usdoj.gov

Patricia Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
800 North Shoreline, Suite 500
Corpus Christi, Texas 78401
Patti.Booth@usdoj.gov
Elsa.S.Patterson@usdoj.gov

/s/      Michael Wiseman

Michael Wiseman

USCA5 1803

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | |
| ALFRED BOURGEOIS, | : | |
| | : | |
| Petitioner. | : | |

_____   :

**ORDER**

And Now, this ___ day of December, 2009 upon consideration of the government's *Motion for in Camera Inspection of Outgoing Mail* and Petitioner's *Answer in Opposition*, it is hereby ORDERED:

1.    The government's *Motion* is denied.

2.    The authorities at the USP Terre Haute are hereby directed to permit Mr. Bourgeois to send mail to opposing counsel or the Court with respect to his ongoing divorce proceedings, without inspection or encumbrance.

_____
Janis Graham Jack, U.S.D.J.

USCA5 1804

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA

v.                                               Case No.: 2:02–cr–00216
                                                 Judge Janis Graham Jack

Alfred NMI Bourgeois

                        Defendant

---

## NOTICE OF SETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 12/14/09

**TIME:** 01:15 PM

**TYPE OF PROCEEDING:** Telephone Conference

Date:    December 11, 2009

                                                 Clerk of Court

USCA5 1805

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA

v.                                          Case No.: 2:02–cr–00216
                                            Judge Janis Graham Jack

Alfred NMI Bourgeois

                        Defendant

---

## NOTICE OF SETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR
THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 12/14/09

**TIME:** 01:15 PM

**TYPE OF PROCEEDING:** Telephone Conference

Date:    December 14, 2009

                                            Clerk of Court

**USCA5 1806**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

## **ORDER**

On December 14, 2009, the Court held a telephone conference to address the Government's Motion for In Camera Inspection of Outgoing Mail by Defendant to an Individual Other Than His Attorney of Record.  (DE 472).  Bourgeois filed an answer in opposition.  (DE 473).  At the conference, the Court ordered that the motion would be denied without prejudice. The attorneys for Bourgeois offered to obtain the challenged mail from the Federal Bureau of Prisons and provide a copy to the Government.  The parties will inform the Court whether the challenged mail should be forwarded to the intended recipient consistent with the Court's earlier orders limiting Bourgeois' mail.

The Court also ordered the Government to file a response to the pending Motion for an Evidentiary Hearing and Discovery.  (DE 460).  The Government assured that it would file the response as soon as possible.  The Court ordered the Government to provide a status update in this case within 30 days which outlines which issues need to be set for a hearing.  Bourgeois may file a reply within 14 days thereafter.

SIGNED and ORDERED this 15th day of December, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1807

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

The Government has sought discovery of all records from Bourgeois relating to defense

counsel's preparation for trial. (DE 463). In response to the Government's motion for

discovery, Bourgeois has turned over to the Government all of his defense counsel's files, with

the exception of twenty-one pages that he has filed under seal for *in camera* review. (DE 471).

Bourgeois maintains that disclosure of those records could compromise his attorney/client

privilege. This Court has inspected the records and finds that Bourgeois' objection to the

discovery of the twenty-one pages that he filed under seal is well founded. Accordingly, the

Court denies the Government's discovery request with respect to the sealed records.

SIGNED and ORDERED this 21st day of December, 2009.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1808

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,        §
    Respondent,                §
                                 §
vs.                              §    CR. No. C-02-216
                                 §    C.A. No. C-07-223
ALFRED BOURGEOIS,                §
    Petitioner.                §

GOVERNMENT'S RESPONSE TO PETITIONER'S
MOTION FOR AN EVIDENTIARY HEARING AND DISCOVERY
AND MOTION FOR RECIPROCAL DISCOVERY

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government," by and through the United

States Attorney for the Southern District of Texas, files this Response to Petitioner's Motion for an

Evidentiary Hearing and Discovery.  Additionally, the Government herein moves for continuing

reciprocal discovery.

On July 1, 2009, Petitioner filed a motion requesting an evidentiary hearing and seeking

discovery.  On August 12, 2009, this Court Ordered the Government to file a reply to Petitioner's

motion.  The Government's response was due on September 11, 2009.  However, this Court held

a telephonic conference to discuss discovery matters regarding the files of Petitioner's former trial

defense counsel.  This Court therein extended the Government's response due date until a time after

Petitioner's current counsel could ascertain what documents could be released to the Government

from the former defense counsel's files.  Petitioner has now delivered a portion of those documents

to the Government, and this Court ordered the Government to file its response.

While the Government will make a concerted effort to comply with the discovery request,

it should be noted that most of the requested discovery should already be in Petitioner's possession

USCA5 1809

because his trial defense counsel turned over all their files to his current defense counsel team.[1] The record of trial establishes that the Government maintained an "open file policy" with trial defense counsel throughout the litigative process. Moreover, many of the specific discovery requests in Petitioner's motion are so broad that they arguably expand to attorney-work product of the Government attorneys – such as the notes of the Government attorneys who were present during various pre-trial preparation interviews – which is not discoverable and is not relevant to Petitioner's claims. Thus, in responding to Petitioner's discovery request, the Government will not include any notes that are attorney-work product.

I.     Evidentiary Hearing:

Petitioner has moved this Court for an evidentiary hearing. While the Government's October 2008 response briefly discussed the need for an evidentiary hearing (*See* Respondent's Answer, pp. 141-42, Dkt # 442, 443 - Sealed Events), the Government did not concede that a hearing was necessary. It remains true that Petitioner's claims substantially rest upon statements made by "expert" witnesses, and that his claims of ineffective assistance of counsel <u>might</u> warrant a hearing for this Court to make credibility assessments. However, upon a more recent review of the evidence, pleadings, and following a detailed interview of Mr. Gilmore about the tactical decisions made during the trial, the Government is convinced that this Court can resolve all of petitioner's allegations without the need for an evidentiary hearing.

_____

[1] As noted, the Government filed a separate discovery request focused upon the trial files that trial defense counsel, John Gilmore, retained in his office. According to Mr. Gilmore, Petitioner's present defense counsel team was given full access to those files and were permitted to copy any and all documents contained therein. Mr. Gilmore's files contained writings made by Petitioner during trial which Petitioner used to communicate his thoughts about the events occurring during the trial. Those documents are still being reviewed and could demonstrate the mental capacity of Petitioner regarding Petitioner's mental retardation claim.

2

USCA5 1810

First, while Petitioner has submitted voluminous pleadings and documents discussing the mental capacity and alleged limitations of Petitioner's ability to function, conspicuously absent from Petitioner's submissions is any actual diagnosis of mental retardation. Petitioner has merely submitted evidence that Petitioner might have a low IQ and might have adaptive functioning that could indicate mental retardation that possibly began before he was 18 years old. However, there is no evidence before this Court to support a conclusion that Petitioner does, in fact, suffer from mental retardation. As such, Petitioner has not presented a *prima facie* case to support his claim of mental retardation, and thus, has not established the need for an evidentiary hearing on this matter.

Secondly, the claims of ineffective assistance of counsel are sufficiently refuted upon a review of the sentencing phase transcripts viewed together with Mr. Gilmore's affidavit. (*See* District Court Dkt # 439 - Sealed Event). Mr. Gilmore acknowledges that mitigation evidence existed which could have been presented. However, he clearly notes a significant problem that undermines Petitioner's current claims: "The problem, in our perspective, was that Mr. Bourgeois **denied that he had committed the crime** and [sic] throughout the trial, including his allocution to the jury. Dr. Cunningham's explanation conflicted with Mr. Bourgeois' defense." *Id*. at p.3. Mr. Gilmore also noted in his affidavit that the trial defense team relied upon Dr. Estrada's evaluation of Mr. Bourgeois, and that Dr. Estrada opined that Mr. Bourgeois "appears to have an **above average intelligence**." *Id*. at p.2 (emphasis added). While it is very apparent that Petitioner's current defense team would have chosen a different approach to representing Petitioner, that is not the legal or evidentiary standard for an ineffective assistance of counsel claim. Indeed, Petitioner's claim on his instant motion rests almost entirely upon a wholly different trial tactic – to mitigate the egregious nature of Petitioner's criminal conduct. In the words of Mr. Gilmore, that quite simply

3

USCA5 1811

"conflicted with Mr. Bourgeois' defense" that he did not commit the crime. Petitioner has not established a *prima facie* case of constitutional ineffective assistance of counsel. They have merely established that there was another tactical approach that could have been taken in this case, but that approach would have required Petitioner to change his defense of innocense. Thus, there is no need for an evidentiary hearing on this claim.

Finally, the claims of prosecutorial misconduct and insufficient evidence of guilt do not merit an evidentiary hearing because they fall far short of establishing a *prima facie* case of prejudice. As fully addressed in the Government's October 2008 response, the evidence of guilt was overwhelming. Petitioner unmercifully beat the two-year old victim and ultimately murdered her while present upon the military facility in Corpus Christi. Indeed, the Fifth Circuit Court of Appeals stated that "This is not a close case." *United States v. Bourgeois*, 423 F.3d 501, 512 (5th Cir. 2005). The evidence of the extent of the injuries, together with the substantial planning and premeditation, established that Petitioner's crime was committed in a most unusually heinous, cruel, and depraved manner. In the light of such evidence, there is absolutely nothing that could have mitigated against a finding that a sentence of death was the appropriate sentence in this case, particularly where Petitioner's defense was that he did not commit the acts that caused the murder. There is no need for an evidentiary hearing in this case.

While the Government's position is that this Court can resolve all issues on the record, the Government acknowledges that holding a hearing where a defendant has been sentenced to death is not an unreasonable decision. It provides the petitioner with one last opportunity to make his record while also permitting the court to assess credibility of witnesses and experts. If this Court deems that holding a hearing is appropriate, the Government moves to limit that hearing to issues

USCA5 1812

involving ineffective assistance claims and possibly receiving expert testimony upon petitioner's

mental retardation claims.

II.    Discovery:[2]

The Government will respond to the requests for discovery by the paragraphs Petitioner

assigned to each request in Petitioner's motion without restating the requested discovery.

A.  The "prisoner witnesses" used by the Government during the trial were Adam Longoria,

Wiley Taylor, Darrick Moore, and Orlando Campos.   The Government will provide these

documents.

B.  The Government will provide these documents absent any attorney work-product.

C.  This is repetitive to request B.  The Government requests petitioner to clarify the request

identifying how it is distinctive from the request made in paragraph B.

D.  Sentencing memorandums and motions filed in US v Moore, 03-075-1: These documents

are sealed and the Government will make them available for viewing but will not provide a copy.

E.  Sentencing memorandums and motions filed in US v Taylor, 01-360:  These documents

are sealed and the Government will make them available for viewing but will not provide a copy.

F.   The Government has no knowledge of cooperation in cases other than the prisoner

witnesses' own case (identified in D and E above) and the instant case.

---

[2]  On September 4, 2009, Petitioner filed an answer to the Government's Motion for
Discovery.  (District Court Docket # 464).  In that answer, Petitioner states that he "exempted
from disclosure any previously provided information" and then restated a part of his Motion for
Discovery.  *Id*. at p.4, n.2.  Because the Government had an "open file policy," there is no "date
of production, ... copy of any letter, email or communication sent with and documenting the
production" of all the evidence made available to trial defense counsel.  Thus, the Government
will reproduce as much requested discovery as reasonably available and within its possession.

5

G.  The Government has no knowledge of transcripts or tape recordings of preparation or proffer sessions with the prisoner witnesses.  The Government will again produce 302s from such sessions.  Any attorneys' notes are work-product.

H.  The Government will produce again the plea agreements related to Moore and Taylor. The Government does not possess any such documents related to Longoria and Campos.  The Government will make the sealed 5K motions available for review but will not provide copies due to safety concerns.

I.  The Government has no material other than that previously disclosed.

J.  The Government will produce any mental health records in our files regarding Moore and Taylor.  However, the Government does not have in its possession any mental health records related to Longoria and Campos.

K.  This request is vague and over-broad.  To the extent it can be determined, the Government is not aware of any documents relating to this request .  However, the Government is aware of a meeting arranged between Doug Tinker and Patti Booth to meet Dr. Senn at Dr. Senn's office.  This meeting occurred, but the Government is not aware of any written documentation regarding this meeting.

L.  This request is vague and seeks irrelevant information at this stage in the proceedings. The habeas corpus process is not intended to provide discovery for the purpose of re-litigating issues on a substantially distinctive trial strategy.  To whatever extent that this request is relevant to issues cognizable in a habeas corpus proceeding, the Government requests more specificity.

M.  The names of software programs that Dr. Oliver used were identified during the trial.

6

USCA5 1814

N.  All biological material subjected to forensic testing have already been provided to defense counsel and were discussed during the trial.  The Government is not aware of any forensic testing beyond that already disclosed.

O.  The Government made all evidence of sexual assault available to trial defense counsel and to whatever extent they copied said documentation, it would be contained in the trial defense file.  The Government is not aware of any evidence regarding the sexual assault of the victim other than the evidence already provided to trial defense counsel and presented in court.

P.  This request is unclear, and the Government requests more specificity.  To the extent that it seeks internal deliberative process information, such is privileged and will not be provided.

Q.  This request is too broad, and the Government requests more specificity.  As required by statute, and more specifically due to security concerns involving the safety of witnesses during the trial, the Government had daily contact with Robin Bourgeois and AB-1994.  The Government has previously provided the 302s for both of these witnesses but will provide these documents again.

R.  Requests for documents related to individuals and experts that were not part of the trial are not relevant to a habeas corpus proceeding.  The Government is not aware of any requirement to provide 302 reports or opinions of consultants or experts that are ultimately not used in a case except for the duty to produce statements governed by its obligations under *Brady* and *Giglio*.  The Government is not aware of any such statements other than those already provided.

S. The Government is aware of its continuing duty to provide to Petitioner any evidence that is supportive of Petitioner's claims.  The Government is not presently aware of any such evidence.

USCA5 1815

Respectfully submitted,

TIM JOHNSON
United States Attorney


   *s/ Tony R. Roberts*
TONY R. ROBERTS
Assistant United States Attorney
TX Bar No. 17022000
S.Dist.Tx.  26173
P.O. Box 61129
Houston, Texas  77208-1129

8

USCA5 1816

CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, do hereby certify that a copy of the

above Response to Petitioner's Motion for Evidentiary Hearing and Motion for Discovery was

placed in the mail on December 24, 2009, via certified mail, return receipt requested to:

>Michael Wisemen
>Victor Abreu
>James McHugh
>Maureen Kearney Rowley
>Elizabeth Larin
>Federal Community Defender Office
>for the Eastern District of Pennsylvania
>Capital Habeas Corpus Unit
>Suite 545 West – The Curtis Center
>Philadelphia, PA 19106

>_s/ Tony R. Roberts_
>TONY R. ROBERTS
>Assistant United States Attorney

9

USCA5 1817

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          §
    Respondent,                    §
                                   §
vs.                                §   CR. No. C-02-216
                                   §   C.A. No. C-07-223
ALFRED BOURGEOIS,                  §
    Petitioner.                    §

ORDER

It is hereby ORDERED that an initial hearing will take place on _____, 2010.

This hearing will provide the parties an opportunity to present argument regarding what issues, if

any, should be addressed in a subsequent evidentiary hearing.

The clerk of this Court shall send a copy of this Order to the parties by any receipted means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2009.


_____

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,          §
    Respondent,                    §
                                   §
vs.                                §   CR. No. C-02-216
                                   §   C.A. No. C-07-223
ALFRED BOURGEOIS,                  §
    Petitioner.                    §

ORDER

It is hereby ORDERED that an initial hearing will take place on _____, 2010.

This hearing will provide the parties an opportunity to present argument regarding what issues, if

any, should be addressed in a subsequent evidentiary hearing.

The clerk of this Court shall send a copy of this Order to the parties by any receipted

means.

Signed at Corpus Christi, Texas, this _____ day of _____ 2009.

 

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 1819

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :           No. Cr-C-02-216
                                        :           No. Cv-07-223
                 Respondent,            :       Honorable Janis Graham Jack,
                                        :               U.S.D.J.
       -against-                        :
                                        :
ALFRED BOURGEOIS,                       :           Electronically Filed
                                        :
                 Petitioner.            :
_____        :

**PETITIONER'S MOTION FOR SHORT EXTENSION OF TIME
TO FILE REPLY TO GOVERNMENT'S RESPONSE TO PETITIONER'S
MOTION FOR DISCOVERY AND EVIDENTIARY HEARING**

Petitioner, Alfred Bourgeois, moves for a short extension of time in which to file a *Reply Memorandum* in support of his previously filed *Motion for an Evidentiary Hearing and Discovery*, and in support states the following.

1.      On July 1, 2009 Petitioner filed his *Motion for an Evidentiary Hearing and Discovery* (document # 460). Following Petitioner's compliance with the Government's own discovery motion (document # 463), this Court ordered the Government to answer Petitioner's *Motion* "as soon as possible" (Court's Order, December 15, 2009, document # 476). The same order provides Petitioner 14 days in which to file a *Reply*.

1

USCA5 1820

2.    The Government filed its *Response to Petitioner's Motion* on December 24, 2009 (document # 480), making Petitioner's *Reply* due yesterday, January 7, 2010. Petitioner is in the process of finalizing that *Reply* but due to competing case demands, it will not be completed before Monday January 11, 2010.

3.    Petitioner apologizes for not complying with the Court's deadline and for not timely moving for an extension of time. This was unintentional. Petitioner has important points to make in his *Reply* and requests that he be permitted to file it on January 11, 2010.

WHEREFORE, Petitioner respectfully requests that he be permitted to file his *Reply* on or January 11, 2010.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:    Philadelphia, PA
          January 8, 2010

2

USCA5 1821

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 8th day of January 2010, I served the foregoing upon the following persons in the manner indicated:

Tony R. Roberts, Esq.
PO Box 61129
Houston, Texas 77208
Tony.Roberts@usdoj.gov

Patricia Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
800 North Shoreline, Suite 500
Corpus Christi, Texas 78401
Patti.Booth@usdoj.gov
Elsa.S.Patterson@usdoj.gov

/s/    Michael Wiseman

Michael Wiseman

USCA5 1822

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,    :       No. Cr-C-02-216

             :       No. Cv-07-223

         Respondent,    :  Honorable Janis Graham Jack,

            :       U.S.D.J.

    -against-       :

            :

ALFRED BOURGEOIS,    :

            :

    Petitioner.     :

_____  :

**ORDER**

And Now, this ___ day of January, 2010 upon consideration of Petitioner's Motion for a Short Extension of Time to File His Reply Memorandum in support of his Motion for Discovery and for an Evidentiary Hearing, it is hereby ORDERED:

The Motion is Granted. Petitioner shall file his Reply on or before January 11, 2010.

_____
Janis Graham Jack, U.S.D.J.

USCA5 1823

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On this day came on to be considered Petitioner's Motion for Short Extension of Time to

File Reply to Government's Response to Petitioner's Motion for Discovery and Evidentiary

Hearing.  (D.E. 481).  The Motion is Granted. Petitioner shall file his Reply on or before January

11, 2010.

SIGNED and ORDERED this 11th day of January, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1824

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : |  |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : | **Capital Case** |
| ALFRED BOURGEOIS, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____  :

### PETITIONER'S REPLY
### IN SUPPORT OF
### MOTION FOR AN EVIDENTIARY HEARING AND DISCOVERY

On July 1, 2009 Petitioner filed his *Motion for an Evidentiary Hearing and Discovery* (hereafter, *Motion*) (document # 460). The Government filed its *Response to Petitioner's Motion* on December 24, 2009 (document # 480) (hereafter, *Response*). Petitioner files this *Reply*.

### Evidentiary Hearing

1. The Government "acknowledges that holding a hearing where a defendant has been sentenced to death is not an unreasonable decision" *Response*, 4. Moreover, the Government does not dispute any of the legal principles governing Petitioner's entitlement to a hearing. Thus, the parties are not in disagreement that

1

USCA5 1825

a hearing should be conducted, however the scope of the hearing remains somewhat

at issue.  Petitioner will address the issues which he believes merit evidentiary

resolution, and in that discussion will address the Government's contrary arguments.

2.    Before addressing individual claims, counsel wish to clear up an

apparent area of confusion.  The Government appears to believe that Petitioner's

"claims of ineffective assistance of counsel" are related only to Claim II, alleging that

counsel were ineffective for failing to present available mitigating evidence in the

penalty phase of trial.  See *Response*, 3.  In reality, in addition to Claim II, Petitioner

has pled six other claims in which he contends that counsel were ineffective.[1]  Each

require evidentiary resolution.

### Claim I:    Petitioner is Mentally Retarded and Counsel Were Ineffective for Failing to Present this Evidence.

3.    The Government opposes a hearing on Petitioner's status as a person

with mental retardation by asserting that "conspicuously absent from Petitioner's

submissions is any actual diagnosis of mental retardation"(*Response* at 3). This is

---

[1]Petitioner has also pled that counsel were ineffective for: Claim I (not investigating and presenting evidence of mental retardation); Claim III (not presenting available evidence that the fatal injuries occurred outside the territorial jurisdiction of the United States); Claim IV (failing to present evidence to undermine the Government's sex-abuse evidence); Claim V (failing to challenge the bite-mark evidence); Claim VI (failing to challenge digitally enhanced photos); Claim IX (failing to object to improper prosecutorial comments); and Claim X (failing to rebut evidence of Petitioner's "indifferent demeanor").

USCA5 1826

incorrect as Petitioner has submitted such a diagnosis.  See Declaration of Victoria

Swanson, Ph.D., dated June 8, 2009, ¶ 6 ("Based on my review of the records and my

own testing, it is my opinion to a reasonable degree of psychological certainty that

Mr. Bourgeois is an individual with mental retardation").[2]

4.      The Government also points out that Mr. Gilmore's affidavit reveals that

the defense relied upon the statement of Dr. Estrada, that Mr. Bourgeois "appears to

have an above average intelligence."  *Response*, 3 (emphasis added).  However,

counsels' ostensible reliance on "appearances" raises more questions than it answers

– questions that are appropriately resolved at an evidentiary hearing.  While Dr.

Estrada merely noted Mr. Bourgeois' "appearance" – which was obviously not based

on any psychometric testing – the defense had available Dr. Weiner's actual IQ

testing, on which Mr. Bourgeois scored a 75, placing him in range of mental

retardation.  See Declaration and attached Report of Dr. Donald E. Weiner, document

# 16 (*Petitioner's Appendix in Support of 2255 Motion*.[3]

---

[2]Dr. Swanson's declaration was included in *Petitioner's Supplemental Appendix,* submitted with *Petitioner's Reply to Respondent's Answer to 2255 Motion*, identified as document # 74.

[3]As noted in the *Petition*, Mr. Bourgeois actually scored a 75, not 76, and Dr. Weiner made a transcription error when he referenced the score in his report. Moreover, when the score is adjusted for the Flynn Effect, his actual IQ is 68. See *Petition* at pages 5-6.

USCA5 1827

5.      Effective counsel would not have relied on Dr. Estrada's statement regarding "appearances" without trying to reconcile that statement with the actual IQ testing.   Had an attempt been made to reconcile these points, counsel would have discovered that Dr. Weiner's IQ testing is far more reliable than the "appearance" noted by Dr. Estrada, and Dr. Weiner's testing places Mr. Bourgeois at anywhere from a 68 to 75, and thus in the range of mental retardation.   At a minimum this conflict requires evidentiary resolution.

### Claim II:    Counsel Were Ineffective For Failing to Investigate and Present Available Mitigating Evidence.

6.      The Government asserts that no hearing is necessary because trial counsel made a tactical decision not to present the mitigating evidence proffered by current counsel, because that mitigating evidence conflicted with Mr. Bourgeois' denial of guilt. *Response* at 3-4.  The Government is incorrect as a matter of fact and law.

7.      Factually, trial counsel did attempt to make a presentation about childhood abuse, but was prevented from doing so.  Counsel sought to elicit from Dr. Estrada on cross examination that Mr. Bourgeois was subject to savage abuse as a child, and that this abuse made him more apt to be violent as an adult.  However, that effort was terminated because Dr. Estrada was not permitted to rely on Dr. Weiner or

4

USCA5 1828

Dr. Cunningham as sources for the abuse evidence (because counsel decided not to call them as witnesses), and Dr. Estrada had no other sources upon which to rely. Counsel was then forced to argue by implication, i.e. that people who commit such horrific violence must come from abused backgrounds. See *Petition* at ¶¶ 59-62.

8.      Counsel made a further, if half-hearted, attempt to present a smidgin of abuse evidence through the very brief testimony of Carl Kevin Henry and the Reverend Herman Clayton, Jr. (*Petition*, ¶¶ 69-71).

9.      Thus, contrary to the Government's arguments, counsel did **not** make a tactical decision **not** to present childhood abuse and resulting psychological scars, because it conflicted with Mr. Bourgeois' denial of the offense.  Rather, they tried to elicit this testimony and make argument about it, but did so in an ineffective manner.

10.      The Government has also failed to address at all Petitioner's assertion that he is entitled to a hearing on his alternative claim that counsel were ineffective for failing to present evidence of Petitioner's borderline mental retardation.  Thus, even if Petitioner does not qualify as a person with mental retardation, his borderline IQ (ranging in the mid-70s), is itself mitigating, and, as the Supreme Court has held, such borderline cognitive functioning is relevant mitigation, see Smith v. Texas, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 78]. . . as a reason to impose a sentence more lenient than

USCA5 1829

death."), that should be admitted even if it bears no connection to the offense, Tennard v. Dretke, 542 U.S. 274, 287 (2007) (evidence of low IQ admissible at penalty phase despite failure to show that crime was connected to low IQ).

11. The Government is also wrong on the law. A defendant's denial of guilt does not relieve capital counsel of their duty to investigate and present extant mitigating evidence. Initially, most capital defendants reach the penalty phase of trial with at least an official denial of their guilt. Accordingly, the AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, February, 2003, Guideline 10.7, requires penalty phase preparation to proceed regardless of statements made by the defendant about his guilt or innocence. See also Rompilla v. Beard, 545 U.S. 374 (2005) (counsel ineffective for incomplete mitigation investigation and presentation even though their client insisted he was not guilty and counsel presented a "residual doubt" defense in penalty phase); Stafford v. Saffle, 34 F.3d 1557, 1563 (10th Cir. 1994) ("We conclude that [counsel] performed well below the prevailing professional norm in his handling of the penalty phase of this capital case. We do not think that an alibi defense would have been inconsistent at all with the presentation of the mitigating evidence . . . The jury obviously had already rejected the alibi defense when they convicted Stafford in the guilt phase in less than two hours, and any good attorney

USCA5 1830

should have pursued alternative mitigating arguments with vigor in the penalty phase of the trial.")

### Claim III.   Counsel's Ineffective Failure to Challenge the Jurisdictional Element of the Offense.

12.     This claim is as compelling as it is straight-forward: counsel failed to present evidence to the jury that Dr. Elizabeth Rouse, who performed the autopsy and testified as the Government's witness at trial, authored a report indicating that the fatal blow in this case was inflicted at least ten days prior to the date of the child's death on the grounds of the Naval Air Station.  Thus, this report defeats, and at a minimum significantly challenges, the essential element of federal jurisdiction.  See *Petition*, ¶¶ 111-113.  Yet, counsel inexplicably and ineffectively, failed to bring this finding to the jury's attention.

13.     The Government's *Response* fails to address the need for a hearing on this claim.  Instead of discussing whether an evidentiary hearing is required, the Government simply says that there was overwhelming evidence of Petitioner's guilt.  *Response*, 4.  While the prosecution presented significant evidence from which the jury could conclude that Petitioner beat the victim on federal lands, that does not address the question presented by this claim, i.e. where and when was the fatal blow delivered.  Petitioner maintains that he did not strike any of the blows attributed to

USCA5 1831

him by the Government. However, for sake of argument, even assuming he delivered every blow attributed to him by the prosecution while on the grounds of the Naval Air Station, the fact remains that the Government's medical examiner wrote a report saying that the fatal blow was inflicted ten days earlier, when Mr. Bourgeois was unquestionably not on the grounds of the Naval Air Station, or any other federal lands. Had that opinion been presented, there is far more than a reasonable likelihood that a properly instructed jury would have not found the jurisdictional element, and an acquittal would have been required. A hearing on this claim is not just required, it is compelled by the law and facts.

**Other Claims.**

14. The Government does not expressly address the other Claims for which Petitioner requests a hearing. Nonetheless, Petitioner briefly recounts the factual issues that require resolution with respect to the remaining claims.

15. In **Claim IV**, he alleges facts showing that counsel had in their possession forensic evidence showing that there was no sexual abuse of the victim perpetrated by Mr. Bourgeois. Counsel ineffectively failed to present these facts to the jury, and that failure impacted both the guilt and penalty phases of trial. Petitioner should be permitted to prove these facts.

16. In **Claim V and VI**, Petitioner alleges that trial counsel ineffectively

USCA5 1832

failed to challenge the admissibility and integrity of the scientific evidence of bite marks and of the digitally enhanced photos used to depict the child's injuries. Again, these deficiencies impacted both the guilt and penalty phases of trial. This evidence in question was particularly important in the prosecutor's arguments for a death sentence, as they showed the offenses to be particularly gruesome and heinous (albeit, unreliably). Thus, this unreliable evidence likely impacted the jury's weighing deliberations and particularly prejudiced Petitioner with respect to the penalty phase.

17.    In **Claims IX** and **X**, Petitioner wishes to present the brief testimony of trial counsel regarding their failures to object to the prosecutor's improper arguments before the jury and their failure to rebut the Government's argument regarding Petitioner's alleged "indifferent demeanor."

18.    **Oral Argument.** As articulated in the last phone conference in this case, Petitioner believes that there should be oral argument on the scope of the hearing. The Government appears to agree with that suggestion. See *Proposed Order* accompanying *Response* (proposing an "initial hearing" to permit parties to "present argument regarding what issues, if any, should be addressed in a subsequent evidentiary hearing"). Accordingly, Petitioner requests the opportunity to address these issues in oral argument before the Court. The Court had mentioned April, 2010 as a possible time for such argument, and counsel are free for most of that month.

9

(Counsel have a commitment during the week of April 12, 2010 and would request

that the Court not schedule argument for that time.)

## Discovery

19.    The Government makes two general objections to the requested

discovery.  Petitioner will first address those general objections and then will reply

to the Government's individual responses.

20.    **The Government's Relevance Objections**.  The Government objects

to a number of Petitioner's requests as "irrelevant."  See *Response,* 2, 6, 7.  Rule 6 of

the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255 states that

discovery may be had by leave of court, but otherwise is governed by the Federal

Rules of Civil Procedure.  With respect to "relevance," Fed.R.Civ.P., Rule 26(b)(1)

(*Scope of Discovery*) states that "Parties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim . . . Relevant information

need not be admissible at trial if the discovery appears reasonably calculated to lead

to the discovery of admissible evidence."  This Rule has been interpreted to permit

and encourage broad discovery:

> Courts have traditionally construed relevance broadly: information is
> relevant if it encompasses any matter that bears on, or that reasonably
> could lead to other matter that could bear on, any issue that is or may be
> in the case.  Thus, although the district court is customarily accorded
> wide discretion in handling discovery matters, we will not uphold a

10

USCA5 1834

ruling which has failed to adhere to the liberal spirit of the Rules.

Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991) (internal quotation marks and footnotes omitted).   Petitioner will apply the "liberal spirit" and "reasonably calculated" standards to the Government's claim-specific invocation of this objection.

21.   **The Government's Work-Product Objections.**   The Government contends that notes of witnesses taken by Government attorneys are protected from disclosure by the work-product privilege.   *Response*, 2, 5, 6.   The Government, however, ignores that this privilege is qualified, and under the circumstances presented by Petitioner's requests, it must yield to the need to discover the truth.   The work-product privilege is not absolute.   Upjohn Co. v. United States, 449 U.S. 383, 401-02 (1981).   When an attorney's mental impressions are themselves at issue in a lawsuit, the work-product privilege is overcome.   In re Cendent Corp. Sec. Litig., 343 F.3d 658, 664 (3d Cir. 2003); Helen of Troy Limited v. John Paul Mitchell Systems, Inc., 2007 WL 1858819 at * 7 (W.D. Texas, June 26, 2007).   The privilege can also be overcome when attorney notes are themselves part of a fraud or criminal conduct. In re Grand Jury Proceedings, 43 F.3d 966, 972 (5th Cir. 1994).[4]

---

[4]Petitioner certainly does not suggest that the Government lawyers were involved in criminal activity or fraud when they may have failed to turn over exculpatory information to the defense at trial.  However, a violation of due process by suppression of exculpatory information – as alleged by Petitioner in this case – overcomes the work-product privilege because the attorney's notes are themselves

USCA5 1835

22.      **Government's "Open File Policy."**  The Government maintains that it

conducted "open file" discovery with trial counsel.  *Response*, 5, n.2.  This assertion

does not advance the discovery dispute.  Unfortunately, it is a reality of the criminal

justice system that some times, some prosecutors, do not include the exculpatory

evidence in the file that they open to the defense.  See Banks v. Dretke, 540 U.S. 668,

692-93 (2004) (noting that the prosecutor who claimed an "open file policy" kept

back from the defense the exculpatory evidence) and discussing, Strickler v. Greene,

527 U.S.263, 273-75 (1999) ("The prosecution file given to the Strickler petitioner,

however, did not include several documents prepared by an important prosecution

witness, recounting the witness' initial difficulty recalling the events to which she

testified at the petitioner's trial. . . . Those absent-from-the-file documents could have

been used to impeach the witness.") (citations and internal quotation marks omitted).

Here, as pled in the *Petition*, we have some reason to believe that this may have been

the case with respect to the prisoner witnesses who testified for undisclosed

consideration, and possibly some of the forensic witnesses.

23.      If the prosecutors wish to open their full file to inspection by the current

defense team, counsel would welcome that, and it would likely resolve most, if not

---

evidence of the violation of Petitioner's rights, just as such notes can in other cases
evidence attorney fraud or criminal conduct.

12

USCA5 1836

all, of the current discovery disputes.

## Specific Issues

24.     Using the same letter designations as in the initial *Motion*, Petitioner will now address the Government's objections to specific requests.

25.     **Request A.**  The Government has indicated that it will produce the requested materials.

26.     **Request B.**  The Government indicates it will provide these materials, except for those that are "work-product."  This is an instance where the work-product privilege should yield to the need to acquire attorney notes, if those notes reveal the presence of undisclosed consideration.  At a minimum, the Government should be required to do what Petitioner has done: submit any arguably privileged information to the Court for *in camera* inspection.

27.     **Request C.**  The Government does not respond to this request because it is repetitive of Request B, and it requests an explanation for how the two are different.  They are different because Request B seeks communications between the Government and its agents and other law enforcement or court authorities, while Request C seeks such communications directly between the Government and its agents, and the prisoner witnesses.  With this clarification, Petitioner requests a more complete response.

13

USCA5 1837

28.    **Request D.**  Petitioner accepts the Government's invitation to inspect the requested reports.

29.    **Request E.**  Petitioner accepts the Government's invitation to inspect the requested reports.

30.    **Request F.**  Petitioner seeks information about other cases in which the prisoner witnesses cooperated.  The Government claims no such knowledge. Petitioner submits that the notes of the Government attorneys and/or their agents may well contain such information, and the Court should not be required to rely only of the recollection of Government counsel.  This is yet another reason for the Government to provide their notes for *in camera* inspection.

31.    **Request G.**  The Government again invokes attorney work product to exempt their notes of sessions in which the prisoner witnesses were prepared or engaged in proffers.  Petitioner requests that such notes be submitted to the Court for *in camera* inspection.  See Kyles v. Whitley, 514 U.S.  419, 430 (1995) (Brady violation found based on, *inter alia*, failure to provide defense with notes and transcripts of witness interviews).

32.    **Request H.**  Petitioner accepts the Government's representation that it will provide the plea agreements and its invitation to inspect the 5K motions.

33.    **Request I.**  The Government contends that it has provided all Jencks Act

14

USCA5 1838

materials.

34.    **Request J.**  The Government indicates it will produce mental health records for Moore and Taylor, but that it has none for Longoria or Campos.

35.    **Request K.**  The Government asserts that this request is "vague and over-broad," but then proceeds to respond to it.  Petitioner simply requests any notes created by Government attorneys or agents of any meeting that they attended in which trial defense counsel interviewed Government expert witnesses Daily, Chrz, Senn or Oliver.  In the event such notes exist and the Government contends that they are covered by the  work product privilege, Petitioner requests that they be provided to the Court for *in camera* inspection.  In this instance any such notes may be of critical importance because trial counsel Mr. Tinker, who was primarily responsible for handling the experts in this case, is now deceased.  Any notes that can shed light on his actions or thought processes are of critical importance and should be shared with defense counsel.

36.    **Request L.**  Petitioner seeks a list of any articles showing that the image enhancement methodology utilized by Dr. William Oliver has been subject to peer review.  To be clear, counsel does not expect that the Government has such a list, but requests that such a list be obtained from Dr. Oliver.  It must be recalled that this list is highly relevant to Petitioner's claim that trial counsel ineffectively failed to subject

15

USCA5 1839

this highly questionably methodology to a <u>Daubert</u> challenge.[5]  Indeed, in their

*Answer* to the 2255 Motion, the Government indicated that Dr. Oliver maintains that

there are such articles, and he mentions the same in his attached statement

(Attachment I to the *Answer*).  It should not be difficult for Dr. Oliver to identify

those peer reviewed articles upon which he relies.  Such information is highly

germane to Petitioner's contention that these methods should not have passed a

<u>Daubert</u> challenge.  Thus, contrary to the Government's assertion, this request is

neither "vague" nor "irrelevant."

37.   **Request M.**  The Government responds that all such computer programs

used by Dr. Oliver were identified at trial.

38.   **Request N.** The Government responds that the results of all testing have

been shared with trial counsel.  However, the Government failed to respond to the

request for notes or other documents generated in the testing process.  The

Government also failed to disclose whether any biologic materials remain for further

testing.  Petitioner requests a more complete response.

39.   **Request O.** The Government contends that it has provided all evidence

---

[5]As noted in Petitioner's *Reply* to Government's Response in Opposition to 2255 Motion (document # 74) at pages 63-65, the recent National Academy of Sciences Report found the methods used by the Government's expert to be lacking in scientific credibility.

16

USCA5 1840

of sexual assault to trial counsel. Again, however, the Government did not address the specific request for notes generated in the process of analyzing this evidence. Petitioner requests a more complete response.

40.     **Request P.** The Government states that this request is "unclear" and the response would be privileged as "deliberative." Petitioner would note that this request seeks exculpatory evidence in regard to the Government's interactions with Dr. Dailey. See *Petition*, ¶¶ 180-182. These paragraphs of the *Petition* are based on the declaration of Dr. Dailey (see *Petitioner's Appendix*, document # 45) indicating that the Government may have misrepresented to the jury its interactions with this uncalled witness. Thus viewed, the Government's notes about such interactions are not privileged. If they exist, they should be provided to the Court for *in camera* inspection.

41.     **Request Q.** The Government objects to this request as over-broad. To be clear, Petitioner is not interested in the Government's daily and routine contact with these witnesses. Petitioner is interested in notes generated when these witnesses were being questioned and/or prepared for testimony. Such notes should be submitted *in camera* for the Court's inspection.

42.     **Request R.** Petitioner here seeks documents of witnesses who were interviewed but were not called at trial. He seeks such documents for both experts

17

and other prisoner witnesses.  The reason for this request is clear: if expert or prisoner witnesses were interviewed but were not called, they may have provided the Government with exculpatory information.  Thus, such information could be admissible in these proceedings, or could lead to the discovery of admissible evidence, and the Government's relevance objection is not well-founded.  Petitioner would also point out that withholding such documents is contrary to the Government's stated "open file policy" – if there are such documents that were not provided to trial counsel and which the Government will not now provide, their files are not entirely open.

43.     **Request S.** The Government indicates that it has fully discharged its on-going Brady obligation.

## Resolution of the Discovery Disputes

44.     Although the Government has agreed to provide some of the requested discovery, there is much still in dispute.  Petitioner proposes the following plan to resolve these disputes.  **First**, the Government should provide all of the information and documents it has agreed to provide and permit the inspections it has agreed to, and should do so within 30 days.  **Second**, the Government should provide further responses in view of the clarifications and arguments set forth in this document, and this too should be done within 30 days.  **Third**, the Government should submit for *in*

18

USCA5 1842

*camera* inspection all notes identified above by Petitioner that the Government contends are protected by the work-product privilege.[6] **Fourth**, within 30 days of receipt of the Government's production and inspection, and the Government's further responses, Petitioner will file a statement with the Court outlining what, if any, disputes remain so that they can be addressed when the parties are before the Court for argument on the scope of the evidentiary hearing.

## Conclusion

Petitioner submits that he has identified serious issues in this case. These are issues that require both discovery and evidentiary resolution. As a prelude to such discovery and hearing, he requests the opportunity to fully address them before the Court.

---

[6]Petitioner would request that the Government identify by type and number the documents that it submits for *in camera* inspection.

19

USCA5 1843

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:        Philadelphia, PA
              January 11, 2010

20

USCA5 1844

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 11th day of January 2010, I served the foregoing upon the following persons in the manner indicated:

Tony R. Roberts, Esq.
PO Box 61129
Houston, Texas 77208
Tony.Roberts@usdoj.gov

Patricia Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
800 North Shoreline, Suite 500
Corpus Christi, Texas 78401
Patti.Booth@usdoj.gov
Elsa.S.Patterson@usdoj.gov

/s/  Michael Wiseman

Michael Wiseman

USCA5 1845

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,                          §
    Petitioner,                        §
                                       §    Civil No. C-07-223
        v.                             §    (Criminal No. C-02-216)
                                       §
UNITED STATES OF AMERICA,                   §
    Respondent.                        §

GOVERNMENT'S UNOPPOSED MOTION TO COMPEL THE
BUREAU OF PRISONS TO FORWARD BOURGEOIS'
CHALLENGED CORRESPONDENCE TO DEFENSE COUNSEL
AND FOR COUNSEL TO PROVIDE A COPY OF THE SUBJECT
CORRESPONDENCE TO THE GOVERNMENT

I.

Relevant Background

On December 20, 2002, the court conducted a hearing in the above criminal case regarding concerns that Bourgeois had sent threatening communications to prospective witnesses in his criminal trial. The court ordered that Bourgeois "could only communicate with others through his [then] attorney, John Gilmore". (DOC. 28). On January 8, 2003, the court clarified its order "that the defendant is not to have any correspondence with anyone except for his attorney, whether by telephone, letter or otherwise. If defendant's attorney believes that this restriction creates an impact upon defendant's legal defense, an application may be made *ex parte* for relief".(DOC. 28).

Thereafter, on December 7, 2009, the Bureau of Prisons retained a piece of

USCA5 1846

mail, which Bourgeois was attempting to mail in apparent violation of the court's

subject order. The mail was addressed to Ms. Angela Lockett-Sampson, with the

Mississippi Center for Legal Services, which was representing Bourgeois' wife in the

pending divorce proceedings. The government moved the court for an *in camera*

inspection of the subject mailing to determine if it should be mailed as addressed.

(DOC. 472). Bourgeois opposed the government's motion, arguing that, as a *pro se*

litigant in his divorce suit, he should be allowed to correspond with opposing counsel,

who could screen any threatening communications from the intended recipients

(DOC. 473). On December 14, 2009, the court conducted a telephone conference on

the matter. As noted in the court's written order of December 15, 2009 (DOC. 476),

the court denied without prejudice the government's motion for an *in camera*

inspection of the December 7, 2009, challenged mailing. The court noted however,

that Counsel for Bourgeois "offered to obtain the challenged mail from the Federal

Bureau of Prisons and provide a copy to the government". The court further ordered

the parties to "inform the Court whether the challenged mail should be forwarded to

the intended recipient consistent with the Court's earlier orders limiting Bourgeois'

mail". (DOC. 476). On December 17, 2009, the Bureau of Prisons mailed the

challenged mailing to Bourgeois' attorney of record in the instant cause, Victor

Abreu. On January 4, 2010, Counsel forwarded a copy of the December 7, 2009,

USCA5 1847

mailing to the government. The government has reviewed the subject correspondence and notes that it relates strictly to Bourgeois' divorce suit, and contains no threats to anyone. The government believes the subject mailing should be forwarded to the original addressee, Angela Lockett-Sampson.

On December 14, 2009, the government learned that Bourgeois had been successful in filing pleadings in his divorce suit and in corresponding with Ms. Angela Lockett-Sampson, who had received correspondence from Bourgeois relating to Bourgeois' pending divorce suit. The government alerted the court of this apparent violation of the court's restriction on Bourgeois' correspondence (DOC. 477).

Pending Issue

Thereafter, on February 8, 2010, the Bureau of Prisons retained two additional pieces of mail Bourgeois was attempting to mail from prison, in apparent violation of the court's subject order. One of the pieces is addressed to Bourgeois' wife's divorce attorney, Angela Lockett-Sampson. The second is addressed to the Clerk of the Court, Chancery Court, Warren County, MS.

The government believes this latest correspondence violates the court's restriction on Bourgeois' correspondence. Accordingly, the government moves the court to order the Bureau of Prisons to forward the subject mailings to attorney of record for Bourgeois, Michael Wiseman. Additionally, the government moves the

-3-

USCA5 1848

court to instruct Counsel Wiseman to forward a copy of the two recent mailings to the government (as was done with an earlier mailing), so that the parties may inform the court whether each believes the subject mailings should be forwarded to the original addressees.

## II.

For these reasons, the undersigned moves the court to order the Bureau of Prisons to forward to Michael Wiseman, Bourgeois' attorney of record in the instant cause, the two mailings Bourgeois attempted to send on February 8, 2010, which are still retained by the Bureau of Prisons.

The government further moves the court to order Counsel for Bourgeois to forward a copy of the two subject mailings of February 8, 2010, to the government.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

_____

MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-4-

USCA5 1849

# CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on March 5, 2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised he had no objection to the subject motion and proposed order, as long as he had an opportunity to seek relief from the court, if the correspondence contained privileged material.

_____

MARK M. DOWD
Assistant United States Attorney

USCA5 1850

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion for extension has been served by placing it in the United States mail, postage prepaid, on March 8, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

_____

MARK M. DOWD
Assistant United States Attorney

USCA5 1851

USCA5 1852

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

### ORDER (PROPOSED) GRANTING GOVERNMENT'S
### MOTION TO COMPEL

The Government's motion to compel is GRANTED. The Bureau of Prisons is

ORDERED to forward the two envelopes addressed respectively to Angela Lockett-

Sampson and to the Chancery Clerk to Counsel for Bourgeois, Michael Wiseman,

Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern

District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

Mr. Wiseman is instructed to review the correspondence to initially determine

whether he believes it contains matters privileged from government access.  If so, Mr.

Wiseman may seek *ex parte* relief from this Court. Otherwise, Mr. Wiseman is

-7-

USCA5 1853

instructed to forward a copy of the subject mailings to the government.  Both Mr.

Wiseman and the government are instructed to review the subject mailings and advise

the court whether the mailings should be forwarded to the original addressees.


_____                    _____
Date                                       HON. JANIS GRAHAM JACK
                                           UNITED STATES DISTRICT JUDGE

USCA5 1854

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,              §
    Petitioner,                §
                               §    Civil No. C-07-223
    v.                         §    (Criminal No. C-02-216)
                               §
UNITED STATES OF AMERICA,       §
    Respondent.                §

GOVERNMENT'S CORRECTED UNOPPOSED MOTION TO COMPEL THE BUREAU OF PRISONS TO FORWARD BOURGEOIS' CHALLENGED CORRESPONDENCE TO DEFENSE COUNSEL AND FOR COUNSEL TO PROVIDE A COPY OF THE SUBJECT CORRESPONDENCE TO THE GOVERNMENT

I.

Relevant Background

On December 20, 2002, the court conducted a hearing in the above criminal case regarding concerns that Bourgeois had sent threatening communications to prospective witnesses in his criminal trial. The court ordered that Bourgeois "could only communicate with others through his [then] attorney, John Gilmore". (DOC. 28). On January 8, 2003, the court clarified its order "that the defendant is not to have any correspondence with anyone except for his attorney, whether by telephone, letter or otherwise. If defendant's attorney believes that this restriction creates an impact upon defendant's legal defense, an application may be made *ex parte* for relief".(DOC. 28).

Thereafter, on December 7, 2009, the Bureau of Prisons retained a piece of

USCA5 1855

mail, which Bourgeois was attempting to mail in apparent violation of the court's

subject order. The mail was addressed to Ms. Angela Lockett-Sampson, with the

Mississippi Center for Legal Services, which was representing Bourgeois' wife in the

pending divorce proceedings. The government moved the court for an *in camera*

inspection of the subject mailing to determine if it should be mailed as addressed.

(DOC. 472). Bourgeois opposed the government's motion, arguing that, as a *pro se*

litigant in his divorce suit, he should be allowed to correspond with opposing counsel,

who could screen any threatening communications from the intended recipients

(DOC. 473). On December 14, 2009, the court conducted a telephone conference on

the matter. As noted in the court's written order of December 15, 2009 (DOC. 476),

the court denied without prejudice the government's motion for an *in camera*

inspection of the December 7, 2009, challenged mailing. The court noted however,

that Counsel for Bourgeois "offered to obtain the challenged mail from the Federal

Bureau of Prisons and provide a copy to the government". The court further ordered

the parties to "inform the Court whether the challenged mail should be forwarded to

the intended recipient consistent with the Court's earlier orders limiting Bourgeois'

mail". (DOC. 476). On December 17, 2009, the Bureau of Prisons mailed the

challenged mailing to Bourgeois' attorney of record in the instant cause, Victor

Abreu. On January 4, 2010, Counsel forwarded a copy of the December 7, 2009,

USCA5 1856

mailing to the government. The government has reviewed the subject correspondence and notes that it relates strictly to Bourgeois' divorce suit, and contains no threats to anyone. The government believes the subject mailing should be forwarded to the original addressee, Angela Lockett-Sampson.

On December 14, 2009, the government learned that Bourgeois had been successful in filing pleadings in his divorce suit and in corresponding with Ms. Angela Lockett-Sampson, who had received correspondence from Bourgeois relating to Bourgeois' pending divorce suit. The government alerted the court of this apparent violation of the court's restriction on Bourgeois' correspondence (DOC. 477).

Pending Issue

Thereafter, on February 8, 2010, the Bureau of Prisons retained two additional pieces of mail Bourgeois was attempting to mail from prison, in apparent violation of the court's subject order. One of the pieces is addressed to Bourgeois' wife's divorce attorney, Angela Lockett-Sampson. The second is addressed to the Clerk of the Court, Chancery Court, Warren County, MS.

The government believes this latest correspondence violates the court's restriction on Bourgeois' correspondence. Accordingly, the government moves the court to order the Bureau of Prisons to forward the subject mailings to attorney of record for Bourgeois, Michael Wiseman. Additionally, the government moves the

-3-

USCA5 1857

court to instruct Counsel Wiseman to forward a copy of the two recent mailings to the government (as was done with an earlier mailing), so that the parties may inform the court whether each believes the subject mailings should be forwarded to the original addressees.

II.

For these reasons, the undersigned moves the court to order the Bureau of Prisons to forward to Michael Wiseman, Bourgeois' attorney of record in the instant cause, the two mailings Bourgeois attempted to send on February 8, 2010, which are still retained by the Bureau of Prisons.

The government further moves the court to order Counsel for Bourgeois to forward a copy of the two subject mailings of February 8, 2010, to the government.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney
 /s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-4-

USCA5 1858

## CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on March 5, 2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised he had no objection to the subject motion and proposed order, as long as he had an opportunity to seek relief from the court, if the correspondence contained privileged material.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 1859

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion for extension has been served by placing it in the United States mail, postage prepaid, on March 8, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 1860

USCA5 1861

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

ORDER (PROPOSED) GRANTING GOVERNMENT'S
MOTION TO COMPEL

The Government's motion to compel is GRANTED. The Bureau of Prisons is

ORDERED to forward the two envelopes addressed respectively to Angela Lockett-

Sampson and to the Chancery Clerk to Counsel for Bourgeois, Michael Wiseman,

Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern

District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

Mr. Wiseman is instructed to review the correspondence to initially determine

whether he believes it contains matters privileged from government access. If so, Mr.

Wiseman may seek *ex parte* relief from this Court. Otherwise, Mr. Wiseman is

-7-

USCA5 1862

instructed to forward a copy of the subject mailings to the government.  Both Mr.

Wiseman and the government are instructed to review the subject mailings and advise

the court whether the mailings should be forwarded to the original addressees.


_____        _____
Date                        HON. JANIS GRAHAM JACK
                            UNITED STATES DISTRICT JUDGE

USCA5 1863

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## SCHEDULING ORDER

On March 18, 2010, the Court held a telephone conference to discuss scheduling matters. The parties will appear before the Court on **April 20, 2010** at **1:30 p.m.** for oral argument to discuss the issues that will be developed in an evidentiary hearing. The parties have agreed that Bourgeois will not need to be in attendance for the oral argument. Counsel for movant will investigate whether Bourgeois may participate telephonically.

The evidentiary hearing will begin on **September 20, 2010** at **8:30 a.m**. The Court anticipates that the hearing will not take more than four days.

SIGNED and ORDERED this 19th day of March, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1864

Case 2:19-cv-00392-JMS-DLP    Document 10-1    Filed 10/18/19    Page 1866 of 2008
PageID #: 3756
Case 2:02-cr-00216    Document 485-1    Filed in TXSD on 03/08/10    Page 1 of 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## ORDER            GRANTING GOVERNMENT'S MOTION TO COMPEL

The Government's motion to compel is GRANTED. The Bureau of Prisons is ORDERED to forward the two envelopes addressed respectively to Angela Lockett-Sampson and to the Chancery Clerk to Counsel for Bourgeois, Michael Wiseman, Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

Mr. Wiseman is instructed to review the correspondence to initially determine whether he believes it contains matters privileged from government access. If so, Mr. Wiseman may seek *ex parte* relief from this Court. Otherwise, Mr. Wiseman is

-7-

USCA5 1865

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1867 of 2008
Case 2:02-cr-00216   Document 485-1   Filed in TXSD on 03/08/10   Page 2 of 2
PageID #:3757

instructed to forward a copy of the subject mailings to the government.  Both Mr.

Wiseman and the government are instructed to review the subject mailings and advise

the court whether the mailings should be forwarded to the original addressees.

_3-18-10_
Date

HON. JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

-8-

USCA5 1866

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | **Capital Case** |
| ALFRED BOURGEOIS, | : | |
| | : | |
| Petitioner. | : | |

_____   :

#### PETITIONER'S NOTICE OF SUPPLEMENTAL AUTHORITY

Petitioner, Alfred Bourgeois, hereby submits the following supplemental authority supporting his prior motion for an evidentiary hearing.

1.     Petitioner wishes to bring to the Court's attention the following recent Courts of Appeals' decisions reversing district court denials of an evidentiary hearing in section 2255 litigation.

2.     In United States v. Johnson, 2010 WL 1521273 (5th Cir. April 16, 2010), *per curiam,* (unpublished), the Court of Appeals for the Fifth Circuit remanded for an evidentiary hearing following the petitioner's request for a certificate of appealability, without requiring merits briefing, because the "record d[id] not conclusively" demonstrate that the prisoner was not entitled to relief.   (Copy

1

USCA5 1867

attached)

3.     In <u>United States v. Sinisterra</u>, — F.3d —, 2010 WL 1236310, at *4, *6

(8th Cir. April 1, 2010), the Court of Appeals for the Eighth Circuit, in a capital case,

granted an evidentiary hearing because a "§ 2255 movant is entitled to an evidentiary

hearing unless 'the motion and the files and records of the case conclusively show

that [he] is entitled to no relief.' 28 U.S.C. § 2255. . . Without a complete record, we

cannot determine whether Sinisterra was prejudiced by counsels' alleged failure to

investigate and present mitigation evidence. Thus, we conclude that the case must be

remanded for an evidentiary hearing.") (Copy attached)

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:      Philadelphia, PA
                 April 20, 2010

2

USCA5 1868

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 20th day of April 2010, I served the foregoing upon the following persons in the manner indicated:

Tony R. Roberts, Esq.
PO Box 61129
Houston, Texas 77208
Tony.Roberts@usdoj.gov

Patricia Hubert Booth, Esq.
Elsa Salinas-Patterson, Esq.
800 North Shoreline, Suite 500
Corpus Christi, Texas 78401
Patti.Booth@usdoj.gov
Elsa.S.Patterson@usdoj.gov


/s/  Michael Wiseman

Michael Wiseman

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 487 of 2008 PageID #: 3761

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 09-60800
Summary Calendar

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 16, 2010

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee

v.

REGINALD LEVAND JOHNSON,

                    Defendant-Appellant

---

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:08-CV-112

---

Before KING, STEWART and HAYNES, Circuit Judges.

PER CURIAM:[*]

    Reginald Levand Johnson, federal prisoner # 12362-042, moves this court for a certificate of appealability (COA) to appeal the district court's denial of his 28 U.S.C. § 2255 motion, which challenged his jury trial conviction for violating the Armed Career Criminal Act. Johnson was sentenced to 235 months in prison.

---

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

USCA5 1870

In his COA motion, Johnson argues that trial counsel was ineffective for failing to (1) object to the court's jury instruction regarding a felon in possession of a firearm; (2) investigate and obtain discovery material; (3) call alibi witnesses; (4) inform him of a plea offer and inform the Government of his intention to plead guilty to a lesser included offense; (5) cross-examine government witnesses regarding exculpatory evidence; and (6) object to prior offenses used to enhance his sentence and for failing to furnish the presentence report prior to sentencing. Johnson contends further that appellate counsel was ineffective for failing to raise the above issues on direct appeal and that the district court erred by denying his § 2255 motion without first holding an evidentiary hearing. Johnson also moves this court for authorization to proceed in forma pauperis (IFP) on appeal. Johnson's motion to proceed IFP on appeal is granted.

Johnson has made a substantial showing of the denial of a constitutional right regarding his claim that counsel was ineffective for failing to communicate the plea offer. *See* 28 U.S.C. § 2253(c)(2); *Teague v. Scott*, 60 F.3d 1167, 1170-71 (5th Cir. 1995). The record does not conclusively indicate whether counsel communicated the plea offer of 15 years in prison, making an evidentiary hearing on that issue necessary. *See United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). A COA is granted solely on this claim. The district court's judgment is vacated, and the case is remanded for further proceedings in relation to that claim. We offer no opinion on the merits of this ineffective assistance of counsel claim.

Johnson has failed to make a substantial showing of the denial of a constitutional right in relation to his remaining claims. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Consequently, a COA is denied as to those claims. *See id.*

COA GRANTED IN PART; COA DENIED IN PART; IFP GRANTED; VACATED AND REMANDED.

2

USCA5 1871

Case 2:19-cv-00392-JMS-DLP   Document 10-1   Filed 10/18/19   Page 1873 of 2008 PageID #: 3763

No. 09-60800

3

USCA5 1872



Page 1

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

H  Only the Westlaw citation is currently available.

United States Court of Appeals,
Eighth Circuit.
German C. SINISTERRA, Appellant,
v.
UNITED STATES of America, Appellee.
No. 08-1925.

Submitted: Dec. 15, 2009.
Filed: April 1, 2010.

**Background:** Following affirmance, 315 F.3d 873, of his convictions for murder, drug trafficking, traveling in interstate commerce with the intent to commit a murder for hire, and criminal forfeiture, as well as of his death sentence, defendant moved to vacate, set aside, or correct sentence. The United States District Court for the Western District of Missouri, Gary A. Fenner, J., denied the motion, and defendant appealed.

**Holdings:** The Court of Appeals, Wollman, Circuit Judge, held that:

(1) remand was required, to determine whether counsel were ineffective for failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury;

(2) prosecutor's closing remarks, arguing that the mitigation evidence was a smoke screen and that it would be wrong to base defendant's sentence on how his children felt, did not have effect of diverting jury from its role in weighing that mitigation evidence;

(3) prosecutor's argument that jury could act as the conscience of the community and send a message to all other drug dealers, was improper; but

(4) counsel were not ineffective in failing to object to prosecutor's improper argument.

Affirmed in part, reversed in part, and remanded.

West Headnotes

[1] Criminal Law 110 ⚷ 1652

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)3 Hearing and Determination
                110k1651 Necessity for Hearing
                    110k1652 k. In general. Most Cited Cases

No hearing is required as to a motion to vacate, set aside, or correct sentence where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based. 28 U.S.C.A. § 2255.

[2] Criminal Law 110 ⚷ 1139

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)13 Review De Novo
                110k1139 k. In general. Most Cited Cases
Court of Appeals reviews de novo the district court's rejection of the substantive claims presented in a motion to vacate, set aside, or correct sentence. 28 U.S.C.A. § 2255.

[3] Criminal Law 110 ⚷ 1881

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1879 Standard of Effective Assistance in General
                    110k1881 k. Deficient representation and prejudice in general. Most Cited Cases
To establish a claim of ineffective assistance of counsel, a defendant must prove that his attorneys' performance was deficient and that the deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1873

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

**[4] Criminal Law 110 ☜ 1882**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
               110k1882 k. Deficient representation in general. Most Cited Cases
Deficient performance, as required to establish a claim of ineffective assistance of counsel, is that which falls below the range of competence demanded of attorneys in criminal cases. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☜ 1882**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
               110k1882 k. Deficient representation in general. Most Cited Cases
Standard for judging whether counsel's performance was deficient, as required to establish a claim of ineffective assistance of counsel, is an objective one, viewed in light of professional norms prevailing when the representation took place. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☜ 1882**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
               110k1882 k. Deficient representation in general. Most Cited Cases
In determining whether counsel's performance was deficient, as required to establish a claim of ineffective assistance of counsel, Court must consider whether counsel's assistance was reasonable under all the circumstances. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ☜ 1961**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
To establish prejudice, as required in a claim of ineffective assistance of counsel based on failure to present adequate mitigating evidence at capital sentencing proceeding, a defendant must establish a reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it at sentencing, and that had the jury been confronted with such mitigating evidence, there was a reasonable probability it would have returned with a different sentence. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ☜ 1181.5(6)**

110 Criminal Law
   110XXIV Review
      110XXIV(U) Determination and Disposition of Cause
         110k1181.5 Remand in General; Vacation
            110k1181.5(3) Remand for Determination or Reconsideration of Particular Matters
               110k1181.5(6) k. Counsel for accused. Most Cited Cases
Remand was required, on capital murder defendant's appeal from denial of postconviction relief, to determine whether counsel were ineffective for failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury; record did not conclusively show that defendant's attorneys acted within the range of competence demanded of attorneys in criminal cases in their investigation and presentation of mitigation evidence regarding the circumstances of defendant's life and his mental health, and that defendant did not suffer prejudice as a result of that alleged ineffectiveness. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

**[9] Criminal Law 110** 🔑        **1960**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1960 k. Adequacy of investigation of
mitigating circumstances. Most Cited Cases

**Criminal Law 110** 🔑        **1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in
sentencing phase. Most Cited Cases
Defense counsel has an obligation, under the Sixth
Amendment, to conduct a thorough background
investigation and to exercise reasonable, professional
judgment in determining the mitigation evidence to
present during the penalty phase of a capital trial.
U.S.C.A. Const.Amend. 6.

**[10] Sentencing and Punishment 350H** 🔑        **1653**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(C) Factors Affecting Imposition in
General
            350Hk1653 k. Mitigating circumstances in
general. Most Cited Cases
Sentencing juries must be able to give meaningful
consideration and effect to all mitigating evidence that
might provide a basis for refusing to impose the death
penalty on a particular individual, notwithstanding the
severity of his crime or his potential to commit similar
offenses in the future.

**[11] Sentencing and Punishment 350H** 🔑        **1780(2)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(2) k. Arguments and conduct
of counsel. Most Cited Cases
To ensure the reliability of the determination that death
was the appropriate punishment, a prosecutor may not
argue that such consideration is forbidden.

**[12] Sentencing and Punishment 350H** 🔑        **1780(2)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(2) k. Arguments and conduct
of counsel. Most Cited Cases
As long as the jurors are not told to ignore or disregard
mitigators, a prosecutor may argue, based on the
circumstances of the case, that they are entitled to little or
no weight.

**[13] Sentencing and Punishment 350H** 🔑        **1780(2)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(2) k. Arguments and conduct
of counsel. Most Cited Cases
Prosecutor's closing remarks in penalty phase of capital
murder prosecution, arguing that the mitigation evidence
was a smoke screen, similar to an octopus's beclouding the
surrounding water, and that it would be wrong to base
defendant's sentence on how his children felt, did not have
improperly divert jury from its role in weighing that
mitigation evidence; argument did not direct jury to
disregard the mitigating evidence. U.S.C.A. Const.Amend.
6; 28 U.S.C.A. § 2255.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

**[14] Sentencing and Punishment 350H** ⌐         **1780(2)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(2) k. Arguments and conduct
of counsel. Most Cited Cases
Prosecutor's remarks in penalty phase of capital murder
prosecution, telling jury it could act as the conscience of
the community and send a message to all other drug
dealers that the community would not tolerate crimes like
defendant's, were improper; remarks impinged on jury's
duty to make an individualized determination that death
was the appropriate punishment.

**[15] Criminal Law 110** ⌐         **2150**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
            110k2145 Appeals to Sympathy or Prejudice
                110k2150 k. Comments on frequency of
offenses, and appeals for law enforcement. Most Cited
Cases
Prosecutors may not, in their arguments, encumber an
individual defendant with the responsibility for the nation's
drug problems, in addition to the defendant's personal
crimes and misdeeds.

**[16] Criminal Law 110** ⌐         **2150**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
            110k2145 Appeals to Sympathy or Prejudice
                110k2150 k. Comments on frequency of
offenses, and appeals for law enforcement. Most Cited
Cases
The prosecution puts too significant a burden on a single
defendant when it asks jury to act as the conscience of the
community and send a message from one case to another.

**[17] Sentencing and Punishment 350H** ⌐         **1615**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1613 Requirements for Imposition
                350Hk1615 k. Individualized determination.
Most Cited Cases
Eighth Amendment requires consideration of the character
and record of the individual offender and the
circumstances of the particular offense as a
constitutionally indispensable part of the process of
inflicting the penalty of death. U.S.C.A. Const.Amend. 8.

**[18] Criminal Law 110** ⌐         **1962**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1962 k. Argument and comments.
Most Cited Cases
Counsel was ineffective, at penalty phase in prosecution
for, inter alia, murder, in failing to object to prosecutor's
argument that jury could act as the conscience of the
community and send a message to all other drug dealers
that the community would not tolerate crimes like
defendant's; case law was sufficiently developed at time of
trial to put a reasonably competent attorney on notice that
the prosecutor's arguments were improper. U.S.C.A.
Const.Amend. 6.

**[19] Criminal Law 110** ⌐         **1962**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1962 k. Argument and comments.
Most Cited Cases
Counsel were not ineffective, in prosecution for, inter alia,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1876

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

murder, in failing to object to prosecutor's improper argument, at penalty phase, that jury could act as the conscience of the community and send a message to all other drug dealers that the community would not tolerate crimes like defendant's, where defendant was not prejudiced by the improper argument; there was no reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different, since substantial evidence, including defendant's confession, supported the jury's findings. U.S.C.A. Const.Amend. 6.

[20] Criminal Law 110 ⚷ 1969

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1966 Appeal
               110k1969 k. Raising issues on appeal; briefs. Most Cited Cases
Appellate counsel were not ineffective, in prosecution for, inter alia, murder, in failing to appeal trial counsel's failure to object to prosecutor's improper argument, at penalty phase, that jury could act as the conscience of the community and send a message to all other drug dealers that the community would not tolerate crimes like defendant's, where defendant was not prejudiced by the improper argument. U.S.C.A. Const.Amend. 6.

Appeal from the United States District Court for the Western District of Missouri. Timothy M. Gabrielsen, Asst. Fed. Public Defender, Tucson, AZ, argued (Jon M. Sands, Fed. Public Defender, Leticia Marquez, Asst. Fed. Public Defender, Tucson, AZ, John Jenab, Jenab & McCauley, LLP, Olathe, KS, on the brief), for appellant.

Lajuana M. Counts, Asst. U.S. Atty., Kansas City, MO, argued (Matt J. Whitworth, U.S. Atty., Jeffrey E. Valenti, Asst. U.S. Atty., on the brief), for appellee.

Before RILEY,[FN1] Chief Judge, WOLLMAN, and MELLOY, Circuit Judges.

WOLLMAN, Circuit Judge.

*1 German Sinisterra was convicted of murder, drug trafficking, traveling in interstate commerce with the intent to commit a murder for hire, and criminal forfeiture, and was sentenced to death. After his convictions and sentence were affirmed on appeal, *United States v. Ortiz,* 315 F.3d 873 (8th Cir.2002), Sinisterra moved to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Sinisterra argued, among other things, that he had been denied his Sixth Amendment right to effective assistance of counsel during the penalty phase of his trial. The district court denied the motion without holding an evidentiary hearing, and Sinisterra appeals. We affirm in part, reverse in part, and remand for an evidentiary hearing.

I. Background

Sinisterra worked as a drug courier for Edwin Hinestroza, who ran a cocaine distribution ring in the Kansas City, Missouri, area. Cocaine shipments came from La Oficina, a drug cartel, in Colombia, South America, via Mexico. Sinisterra transported cocaine from Houston, Texas, to Kansas City.

Hinestroza lived in Kansas City with Monica Osma, the sister of the murder victim, Julian Colon. In late 1998, $240,000 of drug proceeds was stolen from the apartment that Hinestroza and Osma shared. According to Osma, the apartment was robbed and she was injured during the robbery. Shortly after the alleged robbery, Hinestroza, his associate, and two men claiming to represent La Oficina questioned Osma about the incident. They did not believe her account and issued a death threat, meaning that La Oficina would not be satisfied unless someone was killed.

Two days after the meeting with Osma, Hinestroza asked Colon and Héberth Andres Borja-Molina to meet him at a hotel, where they were confronted by Hinestroza, Sinisterra, and two other men. Colon and Borja-Molina went with the men to another house in Kansas City, where they were bound with duct tape and beaten. The men demanded to know where the missing $240,000 was. The beatings and demands continued until Borja-Molina overheard Hinestroza order the men to "shoot him [Colon]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

in the head" and then heard "shoot the other one, too." Borja-Molina heard the sound of a gunshot and ringing in his ears. Pretending to be dead, Borja-Molina was placed with Colon's body in the trunk of a vehicle. The vehicle was driven to a park, where it and the bodies were abandoned. After he was arrested, Sinisterra admitted that he had shot Colon and that Hinestroza had employed him to participate in the beatings and shootings, promising to pay him $1,000 for his participation.

Sinisterra was charged with (1) conspiracy to distribute five or more kilograms of cocaine; (2) aiding and abetting the use of a firearm in relation to a drug-trafficking crime and committing a murder in the perpetration of a drug-trafficking crime; (3) knowingly traveling in interstate commerce with the intent that a murder for hire be committed; and (4) criminal forfeiture. Attorney Fred Duchardt was appointed to represent Sinisterra. He asked Jennifer Herndon to serve as co-counsel. Both Duchardt and Herndon had previously handled capital cases. Duchardt hired Daniel Grothaus, a private investigator, to serve as both the fact investigator and the mitigation specialist. Grothaus was highly regarded as a fact investigator, and Duchardt gave him the dual role to obtain a higher pay rate. Herndon disagreed with the decision to forego hiring a mitigation specialist.

*2 According to his affidavit, Grothaus has been working as a defense investigator in capital cases since 1988. Grothaus spent the majority of his time investigating issues related to the guilt phase of Sinisterra's trial, although he interviewed some of Sinisterra's friends and family members in Houston for mitigation purposes. Those interviews provided information about Sinisterra's relationships and his role as a husband, father, and friend. Grothaus did not investigate Sinisterra's background or social history and did not gather any records of his life history. Herndon, who was in charge of the penalty phase of trial, undertook most of the mitigation investigation herself. Grothaus was not asked to develop mitigation themes, to prepare demonstrative evidence for the penalty phase, or to assist in drafting the mitigating factors to be considered by the jurors.

Defense counsel decided to present mitigation evidence through live witnesses at the penalty phase of trial. Because Sinisterra was born and raised in Buenaventura, Colombia, Herndon traveled to Colombia to meet with Sinisterra's mother, other family members, and friends. According to Herndon, the interviews she conducted were preliminary interviews to get acquainted with the family and friends and to develop rapport; she did not delve into issues of abuse or family discord. She recorded her interviews, but did not intend to introduce the recordings at trial. She made no attempt to gather records in Colombia, nor did she ask Sinisterra's family members who lived there to do so. The potential Colombian witnesses were required to secure visas or humanitarian parole to gain entry into the United States. According to Duchardt, although all appropriate steps were taken to assist potential witnesses in timely applying for the visas, the applications were denied and thus Sinisterra's relatives were unable to enter this country.

Following the guilt phase of Sinisterra's trial, the jury convicted him of the crimes described above. During the penalty phase of the trial, Sinisterra introduced ten witnesses in support of mitigation: his wife, his mother-in-law, his nine-year-old daughter, his daughter's mother, two friends, a former employer, two corrections officers, and a probation officer. The videotaped interviews, which were redacted and shown to the jury, constituted the only evidence regarding Sinisterra's childhood in Colombia. No evidence of Sinisterra's mental health or capacity was presented.

During closing arguments, the government asked the jury to send a message to Sinisterra and other drug traffickers like him and to act as the conscience of the community. The government also told the jurors that the mitigation evidence was a "smoke screen" and compared it to the dark ink an octopus ejects to evade danger. The prosecutor framed the murder as being cold and premeditated, telling the jury that defense counsel wanted its sympathy but that it would be wrong to base the sentence on how Sinisterra's children felt. Neither Duchardt nor Herndon objected to the government's closing argument.

*3 The jury returned a death-sentence verdict on the murder and murder-for-hire counts. It found three statutory aggravating factors: (1) the murder was committed with the expectation of pecuniary gain; (2) the murder included substantial planning and premeditation; and (3) Sinisterra intentionally attempted to kill more than

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1878

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

one person. The jury also determined that Sinisterra was likely to commit criminal acts of violence in the future and was a continuing threat to society. The jury found no statutory mitigating factors, but found a number of non-statutory mitigating factors, concluding that Sinisterra loved and supported his family and friends.

Following the affirmance of his conviction and sentence, Sinisterra brought the present action, alleging that his counsel were ineffective for failing to investigate and present mitigation evidence and for failing to object to the government's inappropriate remarks during its closing argument. The motion included a section describing Sinisterra's childhood. It stated that Sinisterra's parents were illiterate and that his father may have been mentally retarded. As a child, Sinisterra had witnessed his father chase his mother around the house with a machete. After his father abandoned the family, Sinisterra's mother often beat him with a horsewhip. The motion further asserted that four teenagers gang-raped Sinisterra when he was seven and that he later ran away, living homeless in the streets of Cali, Colombia. Sinisterra also spent time in juvenile correctional facilities. He returned to his family when he was twelve or thirteen, only to be sexually abused by his older brother. Sinisterra never learned to read or write, and he suffered at least two head injuries. The motion noted that two of Sinisterra's three brothers had been murdered, one in 1986 and one in 1994. Herndon and Grothaus submitted affidavits, stating that they were unaware of the information regarding Sinisterra's childhood.

Sinisterra's habeas counsel arranged for Sinisterra to be examined by a Spanish-speaking neuropsychologist, who opined that Sinisterra had a low range of intellectual abilities. The neuropsychologist determined that Sinisterra is probably not mentally retarded, but that he likely suffered brain damage and was at risk for poor judgment and impulsivity. The report included much of the same background information as the § 2255 motion, attributing the facts to interviews with Sinisterra, his mother, and his sister.

In response to the government's request, the district court directed Duchardt to submit an affidavit regarding Sinisterra's allegations of ineffective assistance of counsel. Duchardt defended his decision to hire Grothaus as the fact investigator and mitigation specialist. He further attested that he "reviewed the details in the amended petition concerning Mr. Sinisterra's background" and acknowledged that he was aware of the information before trial. Duchardt recounted the results of Sinisterra's pre-trial mental health evaluation by a Spanish-speaking psychiatrist and stated that, in light of the psychiatrist's finding that Sinisterra had "no mental problems," he decided to not pursue the matter further. Moreover, after reviewing the neuropsychologist's report appended to Sinisterra's § 2255 motion, Duchardt stated that he likely would not have used that evidence at trial.

*4 Both trial attorneys responded to Sinisterra's claim that their failure to object to the prosecutor's closing argument constituted ineffective assistance. Duchardt explained that he did not object during penalty phase closing argument because it was Herndon's responsibility to do so. Moreover, he did not find the arguments at issue in this appeal to be improper. Herndon explained that she was not aware of the case law prohibiting the prosecutor from asking the jury to "send a message" and that she had no strategic reason for failing to object.

The district court denied Sinisterra's § 2255 motion without holding an evidentiary hearing. The district court concluded that counsel adequately investigated and presented mitigation evidence, including evidence of Sinisterra's mental health and capacity. The district court similarly rejected Sinisterra's argument that defense counsel were ineffective for failing to hire a mitigation specialist who could present forensic testimony at trial. It determined that the prosecutor's closing argument did not constitute an impermissible emotional appeal but rather presented the facts to the jury so that it could weigh the aggravating and mitigating factors. The district court concluded that because the argument was not improper, counsel were not ineffective for failing to object. The district court denied Sinisterra's request for a certificate of appealability.

We subsequently certified the following issues for review: (1) whether counsel were ineffective for failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury; (2) whether counsel were ineffective for failing to investigate and present mental health evidence; (3) whether counsel were ineffective for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1879

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

failing to retain and utilize a qualified mitigation expert; and (4) whether trial and appellate counsel were ineffective for failing to object to prosecutorial misconduct during closing argument. We answer only the fourth of these issues directly at this stage of the case, concluding that it is necessary to remand the remaining issues for further development in the district court, as outlined in the following discussion.

## II. Failure To Investigate and Present Mitigation Evidence

[1][2] Sinisterra contends that the district court abused its discretion in denying an evidentiary hearing on his § 2255 claims that his trial counsel were ineffective for failing to investigate and present mitigation evidence. A § 2255 movant is entitled to an evidentiary hearing unless "the motion and the files and records of the case conclusively show that [he] is entitled to no relief." 28 U.S.C. § 2255. "No hearing is required where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Watson v. United States,* 493 F.3d 960, 963 (8th Cir.2007) (internal quotations and citation omitted). Accordingly, to determine whether the district court abused its discretion in denying an evidentiary hearing, we must consider the validity of the movant's claims for relief. *Anjulo-Lopez v. United States,* 541 F.3d 814, 817 (8th Cir.2008). We review *de novo* the district court's rejection of the substantive claims. *Id.*

**\*5** [3][4][5][6][7] To establish his claim of ineffective assistance of counsel, Sinisterra must prove that his attorneys' performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance is that which falls below the "range of competence demanded of attorneys in criminal cases." *Id.* at 687 (internal quotations and citation omitted). The standard is an objective one, viewed in light of professional norms prevailing when the representation took place. *Bobby v. Van Hook,* --- U.S. ----, ----, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (per curiam); *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. We must consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. To establish prejudice,

Sinisterra must establish a "reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong v. Belmontes,* --- U.S. ----, ----, 130 S.Ct. 383, 386, --- L.Ed.2d ----, ---- (2009) (per curiam) (quoting *Wiggins v. Smith,* 539 U.S. 510, 535, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)) (internal quotations and alterations omitted).

[8][9] We conclude that Sinisterra's claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence merits further review. Sinisterra's counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase of Sinisterra's trial. *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Simmons v. Luebbers,* 299 F.3d 929, 938-39 (8th Cir.2002). Sinisterra argues that counsel failed to meet those obligations, and the record does not affirmatively refute the factual assertions upon which Sinisterra's claim is based.

The record does not conclusively show that Sinisterra's attorneys acted within the range of competence demanded of attorneys in criminal cases. Sinisterra's § 2255 motion set forth facts pertaining to his life in Colombia, including rape, physical and sexual abuse, homelessness, privation, and head injuries. No testimony or other evidence about these factual allegations was presented at trial. Herndon and Grothaus stated that they did not know this information about Sinisterra's upbringing, but Duchardt stated that he was "aware of all of this information prior to the start of the trial." The record thus leaves unanswered a number of questions related to his attorneys' performance, including whether Duchardt exercised reasonable professional judgment in refraining from presenting information of which he had knowledge and whether Herndon's mitigation investigation was constitutionally deficient for failing to discover that information. Moreover, the district court has not determined whether Sinisterra's factual assertions are credible or whether Sinisterra can present evidence to support them.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

**\*6** The record does not affirmatively refute Sinisterra's claim that he suffered prejudice as a result of the alleged ineffective assistance of counsel. The factual allegations set forth in the § 2255 motion differ in kind and substance from the evidence contained in the recorded interviews presented at trial. The district court's order denying relief did not address the allegations, concluding instead that the recordings sufficiently conveyed the evidence of Sinisterra's childhood.[FN2] The recorded interviews expressed that Sinisterra was a good worker and a good person, who did not attend school because his family was poor. His sister explained that there were eight children in the family and that two of Sinisterra's three brothers died violent deaths. The recorded interviews did not mention the alleged rape, physical and sexual abuse, homelessness, or head injuries. If deemed credible and supported by evidence, these factual assertions might present "the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability." *Wiggins,* 539 U.S. at 535, 123 S.Ct. 2527 (recounting petitioner's troubled history, which included privation, abuse, physical torment, sexual molestation, rape, homelessness, and diminished capacity). *Compare Porter v. McCollum,* --- U.S. ----, ----, 130 S.Ct. 447, 454, --- L.Ed.2d ----, ---- (2009) (per curiam) (concluding that defendant was prejudiced by counsel's failure to present evidence that might have influenced the jury's appraisal of Porter's moral culpability, including evidence of his heroic military service, his struggles upon his return from war, his childhood history of physical abuse, and his brain abnormality, difficulty reading and writing, and limited schooling), *with Belmontes,* 130 S.Ct. at 387-88 (concluding that additional evidence of the defendant's background and humanizing features would have offered an insignificant benefit because the sentencing jury was well acquainted with those topics), *and Van Hook,* 130 S.Ct. at 19-20 (concluding that the defendant failed to show prejudice because the additional relevant evidence provided only minor details). Without a complete record, we cannot determine whether Sinisterra was prejudiced by counsels' alleged failure to investigate and present mitigation evidence. Thus, we conclude that the case must be remanded for an evidentiary hearing.

Also to be developed on remand is whether counsel were ineffective for failing to investigate and present evidence of Sinisterra's mental health and capacity. Standing alone, this claim may not have warranted remand, because Duchardt gave as a reason for his decision to forego pursuing or presenting mental health evidence his determination that no further investigation was necessary after a Spanish-speaking psychiatrist evaluated Sinisterra and reported "no mental problems." This claim of error, however, is interwoven with the overarching claim of failure to investigate and present mitigation evidence. No evidence of Sinisterra's mental health or capacity was presented during the penalty phase of his trial.[FN3] In light of the fact we are remanding for an evidentiary hearing, we conclude that Sinisterra should be permitted to inquire into his trial attorneys' investigation of and their decision to forego any penalty-phase presentation of his mental health and capacity.

**\*7** Sinisterra also claims that counsel were ineffective for failing to hire a mitigation expert. He relies on the 2003 revised version of the American Bar Association (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which prescribe the appointment of two attorneys, an investigator, and a mitigation specialist. The Supreme Court recently has reminded us that the ABA guidelines may serve as " 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook,* 130 S.Ct. at 16. The ABA standards in effect at the time of Sinisterra's trial contemplated that the attorneys would complete the mitigation investigation, hiring a mitigation specialist or other expert to assist in the investigation and presentation of mitigation evidence if necessary. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1, pp. 4-5, and 11.4.1, pp. 13-16 (1989). At oral argument, Sinisterra's appellate habeas counsel conceded that if the trial attorneys had conducted a proper mitigation investigation, the need for a mitigation specialist would have been obviated. We agree that the substance of Sinisterra's claim is whether counsel adequately investigated and presented mitigation evidence, including mental health and capacity evidence, and that an affirmative answer to that question will moot the question whether they should have retained a mitigation specialist.

III. Failure To Object to Prosecutor's Closing Argument

Sinisterra contends that his trial counsel were ineffective for failing to object to the prosecutor's improper closing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

argument and for failing to appeal his sentence based on the prosecutor's misconduct in making the closing argument set forth below. To establish this ineffective assistance claim, Sinisterra must demonstrate that counsels' performance was deficient and that there is a reasonable probability that, but for counsels' failure to object or failure to appeal, the result of the proceeding would have been different. *Middleton v. Roper,* 455 F.3d 838, 849 (8th Cir.2006) (quoting *Bucklew v. Luebbers,* 436 F.3d 1010, 1021 (8th Cir.2006)); *see also Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. In deciding whether counsels' performance fell below the minimum standards of professional competence, we must first determine whether the prosecutor's conduct warranted an objection.

### A. Prosecutor's Arguments

Sinisterra categorizes two types of improper argument. He contends that the prosecutor encouraged the jury to disregard the proffered mitigation evidence, precluding the jury from fairly considering the mitigation evidence in violation of the Eighth Amendment. He further argues that the prosecutor improperly linked Sinisterra to the broader drug problems in the United States, denying him an individualized sentencing determination, in violation of the Eighth Amendment.

### 1. Remarks Regarding Mitigation Evidence

**\*8** [10][11][12] Sinisterra contends that the prosecutor's closing argument disparaged his mitigation evidence, barring the jury from considering the impact his execution would have on his children. As recounted above, the prosecutor had argued that Sinisterra's mitigation evidence was a smoke screen, similar to an octopus's beclouding the surrounding water, and that it would be wrong to base Sinisterra's sentence on how his children felt. "[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007). To ensure the reliability of the determination that death was the appropriate punishment, a prosecutor may not

argue that such consideration is forbidden. *Id.* at 259 n. 21. "[A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." *United States v. Johnson,* 495 F.3d 951, 978 (8th Cir.2007).

[13] The prosecutor's closing argument did not direct the jury to disregard the mitigation evidence that Sinisterra's execution would have a negative effect on his children. The prosecutor's smoke screen/octopus argument was just that: the prosecutor's characterization of Sinisterra's evidence. "[I]t is unrealistic to suggest that such empty cliches seriously affected the jury's deliberations." *United States v. Procopio,* 88 F.3d 21, 32 (1st Cir.1996) (holding that the prosecutor's closing argument characterizing the defense arguments as "illusions" and "a smoke screen" were "more wind than rain" and did not affect the jury's deliberations). When the prosecutor stated that "[i]t would be wrong to base your verdict on how [Sinisterra's children] feel," he had been comparing aggravating circumstances evidence to mitigation evidence and had framed the murder as "cold, premeditated." Taken in its context, the remark went to the weight of the evidence and did not instruct the jury to ignore the evidence of the impact a death sentence would have on Sinisterra's children. Moreover, the remark was made only once, and the district court properly instructed the jury as to how to weigh the evidence. Accordingly, we conclude that the remarks did not have the effect of diverting the jury from its role in weighing Sinisterra's mitigation evidence.

### 2. Conscience of the Community and Related Remarks

Sinisterra's next claim of error relates to the prosecutor's remarks that the jury could act as the conscience of the community and "send a message to all other drug dealers that this community will not tolerate [crimes like Sinisterra's]." The prosecutor introduced these themes during closing argument and expanded on them in rebuttal, stating:

**\*9** Ladies and gentlemen, decent people, decent citizens, fear for their lives because of drug traffickers like German Sinisterra. We cannot forget that he was a member of a very efficient but unforgiving cocaine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1882

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterras of the world.

It is time to turn the tables on drug traffickers like this defendant. Finish the message that you began with your verdict of guilt in this case. Tell this defendant and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes. There is no worse crime. As you sit there you are not just twelve people. You are ... the conscience of the community and you have a unique opportunity to make a difference. You have a unique opportunity to send a message. Don't squander that opportunity. Have the courage to do the right thing.

...

German Sinisterra believes by his actions that murdering couriers over a drug debt is just part of doing business. Tell him he's wrong and tell the other drug traffickers of the world if they come to Kansas City they are going to be dealt with in the most severe way, they are going to receive a sentence of death.

[14][15][16][17] The prosecutor's arguments linking Sinisterra to the broader drug problems of the United States, telling the jury to act as the conscience of the community, and asking the jury to send a message with its verdict were improper. Such arguments impinge upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant. *Weaver v. Bowersox,* 438 F.3d 832, 841 (8th Cir.2006). Prosecutors may not encumber an individual defendant with the responsibility for the nation's drug problems, in addition to the defendant's personal crimes and misdeeds. *United States v. Johnson,* 968 F.2d 768, 771 (8th Cir.1992). Similarly, the prosecution puts too significant a burden on a single defendant when it instructs the jury to act as the conscience of the community and send a message from one case to another. *Bowersox,* 438 F.3d at 841 (citing *Sublett v. Dormire,* 217 F.3d 598, 600-01 (8th Cir.2000), and *Johnson,* 968 F.2d at 770-71)). The Eighth Amendment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable

part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). The prosecutor's arguments had the capacity to divert the jury from its essential role and thus should not have been made.

B. Deficient Performance for Failing To Object

[18] We turn then to the question whether counsels' performance was deficient for failing to object. Herndon, who was responsible for making the penalty phase objections, concedes that her failure to object was not a strategy-based decision, but was instead the result of her lack of awareness that such arguments were improper.

**\*10** We conclude that our case law was sufficiently developed at the time of Sinisterra's trial to put a reasonably competent attorney on notice that the prosecutor's arguments were improper. In *United States v. Lee,* 743 F.2d 1240, 1252-53 (8th Cir.1984), we concluded that the prosecutor's arguments that the jury would send a message to other drug smugglers and its guilty verdicts would have an impact on the drug trade amounted to an improper emotional appeal calculated to persuade the jury on facts other than those before it. We also cautioned against conscience of the community arguments, concluding that any error in the prosecutor's advancement of that argument was cured by defense counsel's contemporaneous objection and the trial court's prompt cautionary instruction. *Id.* at 1253 n. 5. Similarly, in *Johnson,* we held that the prosecutor appealed to the jury to be the conscience of the community in an improper and inflammatory manner by urging the jury to "stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting this poison on the streets." 968 F.2d at 770.

C. Lack of Prejudice

[19] Although the prosecutor's send a message/conscience of the community comments went beyond the pale and defense counsel offered no good reason for her failure to object, Sinisterra has not shown that there is a reasonable probability that, but for Herndon's failure to object, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))

result of the proceeding would have been different. On direct appeal, we concluded that the jury instructions "specifically rebut the defendants' argument that the jury did not understand its role as the decision-maker of the sentence." *Ortiz,* 315 F.3d at 903. Knowing that it was responsible for imposing punishment, the jury found that Sinisterra committed murder after substantial planning and premeditation and with the expectation of pecuniary gain. The jury also determined that Sinisterra, in concert with others, intentionally attempted to kill more than one person.

Substantial evidence supported the jury's findings, including Sinisterra's confession that he shot Colon. With the $1,000 payment for his involvement in the beatings and shootings, he planned on spending the evening drinking alcohol. On direct appeal, we concluded that "there was ample evidence that Mr. Sinisterra intentionally attempted to kill multiple persons." *Id.* at 901. We reviewed the evidence that supported a finding of future dangerousness and determined that the government had established that Sinisterra lacked remorse and acted as an enforcer for Hinestroza. The record showed that Sinisterra used physical force and threats of violence to collect drug debts and enforce discipline. One witness testified that Sinisterra offered to "pop" a guy for $2,000. In light of the evidence against him, Sinisterra has failed to show that, had counsel objected, he would not have received the death sentence.

[20] Having found no prejudice, we conclude that Sinisterra's claim that counsel were ineffective for failing to appeal the prosecutorial misconduct alleged in his § 2255 motion is without merit.

Conclusion

**\*11** We affirm the district court's judgment that counsels' failure to object to the prosecutor's closing argument did not deny Sinisterra his Sixth Amendment right to counsel. We reverse the district court's judgment that Sinisterra's remaining ineffective assistance of counsel claims could be decided without an evidentiary hearing. The case is remanded with instructions to hold an evidentiary hearing to determine whether counsel were ineffective for failing to investigate and present mitigation evidence, including

evidence of Sinisterra's mental health and capacity. We deny Sinisterra's motion to supplement the record.

> FN1. The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

> FN2. The order adopted and relied upon the government's erroneous contention that the recordings had an impact on the jury's findings as "demonstrated in the jurors finding as a non-statutory mitigating factor that Sinisterra's 'lack of guidance and support as an adolescent made him an easy target of violent drug culture.'" D. Ct. Order of Dec. 14, 2007, at 19. The jury returned that finding in Hinestroza's case, not Sinisterra's, and Hinestroza was sentenced to life imprisonment.

> FN3. With respect to Sinisterra's mental capacity, the district court's order relied upon the government's erroneous contention that evidence of Sinisterra's mental capacity had been presented to the jury. The order stated that "Dr. Wheelock testified about his finding that Sinisterra had a low IQ during the trial. The jury had an opportunity to hear this testimony and consider it during the trial and penalty phase." D. Ct. Order of Dec. 14, 2007, at 20. Dr. Wheelock, however, testified at a pretrial hearing that Sinisterra had a performance scale IQ of 75, and the jury never heard that evidence. During the guilt phase, Dr. Wheelock had testified that Sinisterra was not fluent in English and that his English-language comprehension level was less than a first-grade level. The district court sustained the government's objection to Dr. Wheelock's testimony regarding Sinisterra's intelligence, deciding that that testimony "goes to his mental capacity," and advising defense counsel that the evidence would be admitted if the trial proceeded to the penalty phase.

C.A.8 (Mo.),2010.
Sinisterra v. U.S.
--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))END OF

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA5 1884

Page 13

--- F.3d ----, 2010 WL 1236310 (C.A.8 (Mo.))
(Cite as: 2010 WL 1236310 (C.A.8 (Mo.)))


DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clerk, U.S. District Court
Southern District of Texas
FILED

APR 20 2010

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CASE NO.   CR C 02-216

| UNITED STATES OF AMERICA | § | Judge | Hon. Janis Graham Jack |
| | § | Clerk | S Scotch |
| vs. | § | ERO | V Gano |
| | § | Proceeding: | Hearing |
| ALFRED BOURGEOIS | § | Date: | April 20, 2010 |
| | § | Exhibit List of: | Govt |
| Page  1  of  1 | § | Attorney: | Tony Roberts |

| Exhibit No. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 1 | Letter dated April 20, 2010 from David R Senn DDS, DABFO | ✓ | ✓ | | April 20, 2010 | |

USCA5 1886



**The University of Texas**
**Health Science Center at San Antonio**
Mail Code 7919
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

| | | |
|---|---|---|
| David R. Senn, DDS, DABFO | Forensic Services | 567-3379 |
| Forensic Odontology | Education & Research | 567-1755 |
| Director | TeleFAX | 567-1965 |
| Center for Education and Research in Forensics (CERF) | senn@utshscsa.edu | |

April 20, 2010

RE: US District Court Case C-02-216



Patti Booth, US Attorney
One Shoreline Blvd.
Suite 500
Corpus Christi, Texas 78401

Ms. Booth:

I have reviewed the material relating to the Bourgeois case that you sent to me by FedEx on July 30, 2008. The major objections to the dental testimony in the original trial seem to revolve around the use of the images enhanced by Dr. Oliver. Although I viewed and used the enhanced images from Dr. Oliver, for my analysis of the patterned injuries I primarily used the original NCIS images and the enhancements to those images that I myself made.

I cannot critique any of Dr. Oliver's enhanced images of injuries other than those of the patterned injuries on the right forearm and the lower left back of     JG          , DOB     /99. Those injuries were labeled by me in my report as injuries A and B. Although I reviewed all of the images, the following are the images I used as a basis for my analysis.
   Injury A: Images S, U, V, X, AA, DD, KK
   Injury B: Images PP and SS

Some confusion may have been caused by the following wording in my report describing the images used:

> *Each of these images was examined in the original form and in enhanced forms. The images were enhanced by William Oliver, MD at Armed Forces Institute of Pathology. The enhancement protocols are explained in a cover letter received with the images from Dr. Oliver.*

The "*in enhanced forms*" meant that in addition to the images enhanced by Dr. Oliver, I also adjusted and enhanced the images for analysis using Adobe Photoshop tools including but not limited to the "Levels" and "Brightness and Contrast" tools. I analyzed each image in original form and in both my own enhanced form and in the form enhanced by Dr. Oliver. I should have

Page 1 of 6

USCA5 1887

made this clearer in the original report. I utilized the Oliver enhanced images in the written report and the courtroom presentation because I believed those enhanced images would be more readily visible to attorneys, jurors and others.

I cannot discuss or critique the enhancements of other injuries but I disagree with the critics of Dr. Oliver's enhanced images of the two patterned injuries that I analyzed. Every feature that is visible in Dr. Oliver's enhancements of these two injuries is also visible in the original images and in the images that I personally enhanced. As I understand the concept, there is no basis here for a "fruit of the poisonous tree" argument when considering the two bite mark injuries.

Before the original trial I requested and received a copy of Dr. Oliver's enhancement protocol. This protocol was also included as part of Dr. Oliver's PowerPoint presentation. The text of that protocol is copied below in italics:

*Image Enhancement Protocol*
*William R. Oliver, MD*
*Armed Forces Institute of Pathology*

1.  *Basic image adjustment*
    1.  *Color balancing*
    2.  *Cropping*
    3.  *Standard digitization parameterization*
2.  *Contrast Enhancement*
    1.  *Histogram stretch*
    2.  *Histogram equalization*
    3.  *Contrast Limited Adaptive Histogram Equalization (CLAHE)*
    4.  *Wavelet packet-embedded contrast enhancement, consisting of*
        1.  *CLAHE of first level blur component, with arithmetic (x4) increase in detail component*
        2.  *CLAHE of second level blur component with unsharp mask of second-level detail (of first-level blur component) and arithmetic (x4) increase of first-level detail component.*
        3.  *All wavelet decompositions were performed using a Daubechies 6 wavelet in a modified version of the UB wvlt library, modified for use in the AVS/Express and/or AVS 5 development environment.*
5. *Glare estimation and flattening.*
6. *Unsharp masking*
7. *Blind deconvolution*

*Note that the image processing is performed for image exploration, and all details discussed in the conclusions are present in the original digitized image. Because they are used for image exploration and not the fundamental basis of conclusion, because the parameterization for many of these methods is interactive, and because of file space requirements, intermediate images and images not used in illustration are not necessarily retained. The processed images in this report are all contrast-enhanced.*

USCA5 1888

Regarding the opinions of Dr. Dailey copied below in italics as stated in his report of 14 July 2003:

> *Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:*
> *1. The diffuse presentation of the bite marks in all of the photographs,*
> *2. The distorted position of the marks, in some of the photographs, at the time of photography.*
> *3. The ruler/scale being in a different spatial plane than the mark being photographed. [however it must be noted that the photographic evidence provide (sic) was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the past seventeen years.]*
> *4. The very similar metric and spatial (pattern) relationships between the three individual's dentition.*

I agree with Dr. Dailey that the marks were difficult to analyze and that there were challenges. For those reasons it was not possible to associate the bitemark on the arm with any of the suspects. I also agree with Dr. Dailey that the photography was quite good. The quality of the photography allowed the exclusion of two suspects and the inability to exclude the third for the bitemark on the lower back. While I agree with Dr. Dailey about the similar metric relationships, the three mouths were similar in overall size, I disagree with him about the spatial relationships…specifically the variations in the positions of specific anterior teeth. This is based on the ability to discern within the overall mark the marks made by at least six upper and six lower teeth, to distinguish the class characteristics of upper and lower teeth, and to visualize their relative positions in the arches. The comparison of these features seen in the bitemark to the exemplars of the teeth of the three subjects emphasized the differences between them. These differences were the bases for my opinions.

Regarding the opinions of Dr. Bowers as stated in his May 11, 2007 letter: Dr. Bowers is an attorney and part of his letter seems to address legal issues that are beyond my area of expertise. I am not an attorney and will not comment on those legal issues. His description of the issues of distortion and perspective in the photography are well founded. Some of those issues are well within the parameters for image adjustments that forensic odontologists often use including, but not limited to, those that are included in the published work, Digital Analysis of Bite Mark Evidence, authored by Raymond J. Johansen, D.M.D. and C. Michael Bowers, D.D.S., J.D.

Dr. Bowers further stated the following concerning Dr. Oliver's enhancements: "*I have not even seen any record of what methods he used. Whatever means he used, his results produced the most overly "enhanced" images I have ever seen used in actual casework.*" As stated previously, the enhancement protocols were available for any and all to see. To criticize work by a board certified forensic pathologist with special skills and knowledge without even knowing much less understanding the nature of that work or the methods used seems ill-advised and bordering on negative expectation bias.

Dr. Bowers' misrepresentation of the 1999 ABFO Bitemark Workshop # 4 as evidence of the statistical validity and error rate inherent in bitemark analysis is well known. He continues to publish articles misrepresenting the issue and continues to quote numerous articles published by others that are based upon his questionable characterization of Bitemark Workshop #4. He almost invariably fails to report the conclusions published following Bitemark Workshop #4. The paper was rejected by the Journal of

Page 3 of 6

USCA5 1889

Forensic Sciences but was later published in another journal. In their paper Results of the 4th ABFO
Bitemark Workshop-1999 published in Forensic Science International, Volume 124, 27 December 2001,
pp 104-111, Kristopher L. Arheart and Iain A. Pretty stated the following conclusions copied below in
italics: (first sentence bolded by me)

> **The results of the present survey indicate that bitemark examination is an
> accurate forensic technique, at least with cases such as used in this study.**
> However, some might question whether it is accurate enough. According to Swets,
> a ROC value above 0.9 indicates "high accuracy", 0.7–0.9 means "useful for some
> purposes", and 0.5–0.7 represents "poor accuracy" [11]. Thus, the overall value
> in this study (0.86) indicates less than optimal accuracy. Examination of the
> responses to individual cases ( Table 2) reveals that only the value for Case 2 falls
> into the "high accuracy" category. The Youden's index scores, when weighted,
> show that the cutoff points can be altered for each individual examiner to minimize
> either false positives or false negatives. The authors believe that, in the spirit of
> "innocent until proven guilty", forensic dentists must minimize false positives at all
> costs. The repercussions of forensic determinations are serious and often
> intractable, affecting the suspect's life forever.

Dr. Bowers virtually ignores the position stated by the American Board of Forensic Odontology (ABFO)
regarding this exercise. Part of the ABFO position statement is copied below in italics and the full text is
attached as an addendum:

> In conclusion, the ABFO states that due to the limitations imposed by the case
> material used in Bitemark Workshop #4, one cannot draw accurate statistical
> conclusions applicable to actual casework. Bitemark Workshop #4 was neither
> designed as, nor can it be used as, a proficiency test for forensic odontology.
> Tests of consistency and validity (necessary in a proficiency examination) were
> neither accomplished nor attempted; and, as subsequent reviewers of the data
> correctly pointed out, the construction of the examination and the workshop was
> not designed to produce an examination that had statistical validity and
> statistical consistency. The ABFO reiterates that it remains the responsibility of
> each individual examiner to determine if sufficient evidence exists to go forward
> with a meaningful bitemark analysis.

Regarding Dr. Bowers' opinions about the quality of the evidence, especially in bitemark B, the bitemark
on the back, in his May 11, 2007 report he cites photographic issues in this case as follows in italics:

> **Photographic Issues**
> The physical details of bitemarks A and B are only reflected by bruising and are
> not clearly present. The bruising is generalized in nature and possesses poor
> edge detail. The original image of bitemark B is poorly illuminated. The low light
> conditions when the picture was taken significantly impeded analysis by the
> Government's dental experts, since both dentists resorted to using various"
> enhancement" methods on the original image. The anatomical location of B is a
> curved surface. A large portion of the bruise is not in the same "plane" nor
> "parallel" to the camera. This creates "off angle" distortion of the pattern seen
> on the skin. The Government's experts used this area of distortion in their direct
> comparison. The only remedy was to have the original evidence photographed in

Page 4 of 6

USCA5 1890

*sections with a ruler in place. This opportunity was obviously lost after the child
left the autopsy suite.*

These opinions seem to be in direct conflict with his statements in the work that he co-authored
Digital Analysis of Bite Mark Evidence, Chapter 4: Detecting and Correcting Angular
Distortion, Page 62, Discussion of Analytical Limitations in Bite Mark Analysis, paragraph 3.
That paragraph is copied below in italics:

> *In most cases, the evidence to be reviewed falls somewhere between the ideal and
> the useless in terms of camera angle, scale placement, and exposure. Photoshop
> can help in a large number of these cases but, again, it is up to the investigator to
> understand how much distortion is significant, how it affects the analysis and its
> impact on the strength of the ultimate opinion.*

Regarding both Dr. Dailey's and Dr. Bowers' opinions that none of the injuries to the hands and
feet have characteristics of human bite marks: The photographs below show images of both sides
of the right hand of      JG        at autopsy. Without scaled photographs of these injuries
no comparison analysis is possible. However, it is still my opinion that the injuries shown are
probable human bite injuries. The mechanism would have involved placing the entire hand into a
mouth and biting initially at the position of the yellow and black arrows in the lower images. The
bitten hand would then have been pulled out of the mouth either by the victim as a reflex to the
pain of the bite or by the biter, thereby creating the linear marks and other injuries.



USCA5 1891



In conclusion, I feel that the petitioners' issues regarding the enhancement of images can be justified and explained to the satisfaction of reasonable persons. I am confident that I followed the protocols and guidelines for bitemark analysis that were in place at the time of my original analysis. I have reviewed the material again and my conclusions regarding this case are unchanged..., AB 1994       and Robin Bourgeois can be excluded as biters for Bitemark B on the back of .    J G       .. Alfred Bourgeois is a possible biter for that same mark and cannot be excluded.

I declare under penalty of perjury that the foregoing statement is true and correct.

David R. Senn, DDS, D-ABFO
April 20, 2010

Page 6 of 6

USCA5 1892

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On April 20, 2010, the Court held a hearing in the above-styled case. At the conference,

the Court ordered as follows:

1. The Government will submit for in camera review by April 27, 2010,

   contemporaneous notes taken by Ms. Elsa Salinas Patterson and Ms. Patricia

   Hubert Booth from their interviews with lay and expert witnesses during trial

   preparation. Bourgeois may file an *in camera* suggestion of what information he

   wishes to have divulged from the attorneys' notes.

2. The Government will submit by April 27, 2010, a draft protective order regarding

   access by the attorneys for Bourgeois to the investigating FBI agents' FD-302

   forms, which under no condition will be disclosed to any others or to Bourgeois

   himself.

3. The attorneys for Bourgeois will turn over to the Government the psychological

   data underlying the mental retardation testing by April 27, 2010.

USCA5 1893

4.      In preparation for the evidentiary hearing, the parties will disclose expert reports

consistent with Rule 26 of the Federal Rules of Civil Procedure.

5.      The evidentiary hearing will begin on September 20, 2010, and will last no more

than 4 days.  Bourgeois will have 2.5 days to put on witnesses and evidence; the

Government will have 1.5 days.  As discussed in the hearing, the parties will

present testimony and evidence relating to claims 1, 2, 4, 5, 6, 7, and 8 as

enumerated in Bourgeois' Motion to Vacate.  Bourgeois will call no more than

two expert witnesses with regard to each claims 4, 5, and 6 and will limit their

direct testimony to 30 minutes.  Bourgeois may call 4 lay witnesses briefly to

support claim 7.  He will also limit the number of lay witnesses to support claims

1 and 2.  Bourgeois may submit an affidavit, deposition by written questions, or

other form of testimony by Dr. Elizabeth Rouse to support claim 3.

SIGNED and ORDERED this 21st day of April, 2010.

_____
Janis Graham Jack
United States District Judge

2 / 2

USCA5 1894

AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

FOR COURT USE ONLY

DUE DATE: 5-27-10

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 4/21/2010 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545 WEST | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:02-CR-00216 | 9. JUDGE JANIS GRAHAM JACK | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 4/20/2010 | 11. TO 4/20/2010 |

| 12. CASE NAME | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

☐ APPEAL  ☐ CRIMINAL  ☐ CRIMINAL JUSTICE ACT  ☐ BANKRUPTCY
☐ NON-APPEAL  ☒ CIVIL  HABEAS  ☐ IN FORMA PAUPERIS  ☐ OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

United States Courts
Southern District of Texas
FILED

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | APR 26 2010 |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | David J. Bradley, Clerk of Court |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | 4/20/2010 |
| ☐ SENTENCING | | ORAL ARGUMENT | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☒ | ☒ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges (deposit plus additional).

ESTIMATE TOTAL

| 18. SIGNATURE V. Hennig | ☐ EMAIL ONLY REQUIRED |
|---|---|
| | ☐ EMAIL AND HARD COPY REQUIRED |
| 19. DATE 4/21/2010 | ☐ EMAIL ADDRESS: |

| 20. TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|
| Garcia Services | |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | 4-26-10 | VG | | |
| DEPOSIT PAID | — | | DEPOSIT PAID | — |
| TRANSCRIPT ORDERED | 4-27-10 | VG | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:**  COURT COPY  TRANSCRIPTION COPY  ORDER RECEIPT  ORDER COPY

USCA5 1895

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,              §
     Petitioner,               §
                               §     Civil No. C-07-223
          v.                   §     (Criminal No. C-02-216)
                               §
UNITED STATES OF AMERICA,      §
     Respondent.               §

GOVERNMENT'S AGREED MOTION FOR A PROTECTIVE ORDER
AS TO FBI NOTES PROVIDED BY THE GOVERNMENT TO
COUNSEL WISEMAN AND ABREU

I.

Relevant Background

Michael Wiseman and Victor Abreu (hereinafter "Counsel"), of the Capital

Habeas Corpus Unit, Federal Community Defender for the Eastern District of

Pennsylvania, represent Bourgeois in the instant action filed pursuant to 28 U.S.C. §

2255. Counsel have requested discovery from the government of all notes made in

connection with the FBI reports filed in connection with the case, which the Court has

Ordered the government to provide.

Security issues, discussed at the hearing of April 20, 2010, provide good cause

for the issuance of a protective order to limit access to and restrict copying of the

subject notes made in connection with the subject FBI reports, pursuant to Fed. R.

Civ. P. 26(c) and Fed. R. Crim. P. 16(d).

USCA5 1896

II.

For these reasons, the undersigned moves the court to enter the attached

protective order.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-2-

USCA5 1897

## CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on April 27,

2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised

he agreed to the subject motion and proposed protective order.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 1898

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion for the issuance of a protective order has been served by placing it in the United States mail, postage prepaid, on April 27, 2010, addressed to:  Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

-4-

USCA5 1899

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,                    §
    Petitioner,                      §
                                     §    Civil No. C-07-223
        v.                           §    (Criminal No. C-02-216)
                                     §
UNITED STATES OF AMERICA,            §
    Respondent.                      §

(PROPOSED) PROTECTIVE ORDER

The government having demonstrated good cause, the Court Orders that the

following Protective Order be entered:

All agent notes made in the preparation of the FBI reports filed in the above

case received by Counsel pursuant to their requests for discovery from the government

shall be deemed to be confidential. These documents may be used only by Counsel

Wiseman and Abreu and only for purposes of any proceedings incident to litigating

the claims presented in the petition for writ of habeas corpus pending before this

Court. Disclosure of the contents of the documents and the documents themselves may

not be made to any other persons, including the Petitioner and Counsels' staff, without

an order from this Court.

At the conclusion of the said Capital Habeas Corpus Unit's representation of

Bourgeois, Counsel shall return the hard copies and paper copies of all subject notes

-5-

USCA5 1900

in their possession to the government and file an affidavit with this Court that Counsel

has fully complied with this Order.  This order shall continue in effect after the

conclusion of the habeas corpus proceedings, and until the Capital Habeas Corpus

Unit's representation of Bourgeois terminates and Counsel fully complies.


_____               _____
Date                            HON. JANIS GRAHAM JACK
                                UNITED STATES DISTRICT JUDGE

USCA5 1901

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,                     §
    Petitioner,                  §
                                 §
VS.                                   §    Civil No. C-07-223
                                 §    (Criminal No. C-02-216)
                                 §
UNITED STATES OF AMERICA,             §
    Respondent.                  §

## PROTECTIVE ORDER

The government having demonstrated good cause, the Court Orders that the following

Protective Order be entered:

All agent notes made in the preparation of the FBI reports filed in the above case received

by Counsel pursuant to their requests for discovery from the government shall be deemed to be

confidential. These documents may be used only by Counsel Wiseman and Abreu and only for

purposes of any proceedings incident to litigating the claims presented in the petition for writ of

habeas corpus pending before this Court. Disclosure of the contents of the documents and the

documents themselves may not be made to any other persons, including the Petitioner and

Counsels' staff, without an order from this Court.

At the conclusion of the said Capital Habeas Corpus Unit's representation of Bourgeois,

Counsel shall return the hard copies and paper copies of all subject notes in their possession to

the government and file an affidavit with this Court that Counsel has fully complied with this

Order. This order shall continue in effect after the conclusion of the habeas corpus proceedings,

1 / 2

USCA5 1902

and until the Capital Habeas Corpus Unit's representation of Bourgeois terminates and Counsel

fully complies.

      SIGNED and ORDERED this 27th day of April, 2010.

                      Janis Graham Jack
                United States District Judge

2 / 2

USCA5 1903

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,      )    CRIMINAL ACTION
                               )
          PLAINTIFF,           )    CR-C-02-216(1)
                               )
VS.                            )    CORPUS CHRISTI, TEXAS
                               )    APRIL 20, 2010
ALFRED BOURGEOIS,              )    1:26 P.M.
                               )
          DEFENDANT.           )
.............................)

<u>TRANSCRIPT OF HEARING</u>
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:                MS. PATTI HUBERT BOOTH
                               MR. TONY ROBERTS
                               MR. MARK DOWD
                               MS. ELSA SALINAS
                               ASSISTANT U.S. ATTORNEYS
                               800 N. SHORELINE, STE 500
                               CORPUS CHRISTI, TEXAS 78401


THE DEFENDANT:                 MR. MICHAEL WISEMAN
                               MR. VICTOR J. ABREU
                               ASSISTANT FEDERAL DEFENDERS
                               SUITE 545 WEST, CURTIS BUILDING
                               601 WALNUT STREET
                               PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:                  MR. CHRIS CUTLER
                               PRO SE LAW CLERK


(DEFENDANT APPEARING BY TELEPHONE)


THE COURT RECORDER:            MS. VELMA GANO




PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

**USCA5 1904**

(The proceedings began at 1:26 p.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.  Elsa Salinas will be here in just one moment, Your Honor.  She also will be sitting at our table.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

THE COURT:  How are you, Mr. Roberts?

MR. ROBERTS:  Very well, Your Honor.

THE COURT:  How are you, Mr. Dowd?

MR. DOWD:  Very good, Your Honor.  Mark Dowd for the Government.

MR. WISEMAN:  Good afternoon, Your Honor.  It's Michael Wiseman, W-I-S-E-M-A-N, for Mr. Bourgeois.

THE COURT:  Well, nice to meet you.

MR. WISEMAN:  Yes, likewise, Your Honor.

MR. ABREU:  Good afternoon, Your Honor.  Victor Abreu, A, B as in boy, R-E-U, on behalf of Mr. Bourgeois.  Good to see you, Your Honor.

THE COURT:  Thank you.  So, Mr. Wiseman or Mr. Abreu, do you want to begin and talk about what you want to see?

MR. WISEMAN:  Sure.  We have been speaking with Mr. Roberts and I believe by mutual agreement we are going to

want to just bring up some discovery issue regarding some notes, and I think it's Mr. Roberts who wanted to address the Court on that.

THE COURT:  Oh, okay.  Are these notes from the, from Mr. Bourgeois?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  What?

MR. ROBERTS:  The defense has asked for attorney's notes that were taken while we were preparing for the case, and Elsa Patterson took a lot of notes while she was preparing and there are two boxes of these notes that they have asked for in discovery, and our position is that it's work product and that we shouldn't have to give them the notes of one of the attorneys participating in the trial team, and so that's just a matter that we haven't been able to agree upon with what we should do with these notes.  There is nothing, if there was anything in them that was Brady or Giglio, we would certainly turn that over, but there is nothing that I --

THE COURT:  So what's the issue on that?  What are you looking for specifically?

MR. WISEMAN:  Yes, Your Honor.  The reply memorandum that we filed on January 11th, that was a reply with regard to discovery.  We addressed the Government's work product contentions, and we understand that generally speaking notes

of lawyers are protected work product, but the work product privilege is not an absolute privilege, it's qualified.  Our view is that if there are notes in there, for instance, regarding opinions of experts that might be helpful to us or with regard to prisoner witnesses that might be helpful to us or other issues that might be helpful, we would be entitled to that.  Our suggestion to Mr. Roberts was that he provide them in camera to the Court, much as we did with our material that we thought was privileged.

THE COURT:  Well, that can't be much, would it, could it be?

MR. ROBERTS:  Well, Your Honor, what I have seen is two full-size boxes, and what we would have to do is have Ms. Salinas-Patterson, who is here now, we would have to have her go through all of these to make, to divide them out between what she was taking when she had a witness present and what she was actually taking in preparation when no witness was around.

THE COURT:  Okay.  Well, I don't see any reason why you can't do that and let me look at them.

MR. ROBERTS:  Okay.

THE COURT:  I mean, you know, as you can see, I am giving them every possible benefit.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Ms. Salinas, what you missed by being on

time actually, I'm sorry we started early, is that they had made, the movant had made a request to the Government to see their notes.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  In particular your notes.  And I think the notes that you took while you were interviewing an expert, notes you took while you interviewed the prisoner witnesses, could there be much of that?  Can you go through that and just file it under camera?  Is there much of that?

MS. SALINAS:  No, there's not much of that at all, Your Honor.

THE COURT:  Have you got it already divided out, just in case?

MS. SALINAS:  Well, we haven't --

THE COURT:  Not about how you interpreted things but, you know, what you took down when you interviewed the witnesses and that would, that's it.  Not how you spun it when you prepared for trial.  I don't mean that you spin things, but.

MS. SALINAS:  I do.  But we have narrowed it --

THE COURT:  I didn't know lawyers ever did that.

MS. SALINAS:  Well, I, anyway, Your Honor, I -- there are two boxes, Your Honor.  I have gone through one box already.  Most of that is just my getting a summary under each -- that was just my stuff, and so I think it won't take

me very long to go through the second box.

THE COURT:  I think what they are looking for are notes that you took contemporaneous with interviewing the witnesses, both expert and prisoner witnesses.  Is this right, Mr. Wiseman?

MR. WISEMAN:  Your Honor, in addition, lay --

THE COURT:  Oh, don't do that.

MR. WISEMAN:  I'm sorry.  Getting used to the acoustics.  Lay witnesses --

THE COURT:  I know.  Everything, every strange noise goes right into our ear, and sometimes people knock on those microphones, so.

MR. WISEMAN:  Oh, yes, okay.

THE COURT:  And all you have to do is speak normally and she will pick it up.

MR. WISEMAN:  Okay.

MS. SALINAS:  And in his terms, when you stated that those when we interviewed the witnesses --

THE COURT:  Wait a minute.  Is that right, Mr. Wiseman?

MR. WISEMAN:  Yeah, I was going to add lay witnesses as well, Your Honor.

THE COURT:  Interview of witnesses, that's fine.

MR. WISEMAN:  Exactly.

THE COURT:  Contemporaneous notes you made

interviewing witnesses, or something you made immediately thereafter as if you were reciting what they had said to you, not your interpretation.  Do you see what I mean?

MS. SALINAS:  Yes, Your Honor.  And in most of those, the notes, when we interviewed some of the witnesses Megan was there, so Ms. Beckett was the one who took the notes, so there's not hardly anything that I wrote, I was just there listening to it, and Ms. Beckett --

THE COURT:  Well, just whatever you have got, give it to me in camera.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  And if I see anything, and maybe he can do, Mr. Wiseman, if you would like to do an in camera brief, if you expect some amazing thing that you don't want to disclose to them really what you are looking for, do an in camera brief to me --

MR. WISEMAN:  Okay.

THE COURT:  -- about what you are interested in, okay?

MR. WISEMAN:  Very well.

MR. ROBERTS:  And, Your Honor, there was one other thing that -- we did, it's kind of late but I did provide Mr. Wiseman a copy of this today.  I finally got a signed statement from Dr. Senn.  There was some confusion between him and I two years ago, what he had submitted, and I just

**USCA5 1910**

wanted to submit that as an additional piece of evidence in support of the response that we had.

THE COURT:  Any objection, Mr. Wiseman?

MR. WISEMAN:  No, Your Honor.

THE COURT:  All right, then that's fine.

MR. ROBERTS:  May I approach the bench, Your Honor?

THE COURT:  Yes.  Well, just mark it as an exhibit for today.  If you can mark it as Government Exhibit 1, how's that?  Unless you have got a string of exhibits.

MR. ROBERTS:  Your Honor, attached to our pleading was A through I, so we can mark it as --

THE COURT:  That would be J.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Or we can do evidentiary hearings for today.  How about we do it for today, Defendant's Exhibit 1 for today?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  What's wrong?

MR. ROBERTS:  She handed me a Government.  Is that fine, Your Honor, Government Exhibit?

THE COURT:  That would be fine.

MR. ROBERTS:  Okay

(Government's Exhibit 1 admitted into evidence)

THE COURT:  I think Mr. Wiseman is part of the Government, too, but that's okay.

MR. WISEMAN:  Oh, absolutely.  Your Honor, how would you like us to address the Court?  Do you want us at the podium or seated or --

THE COURT:  Standing and the podium.

MR. WISEMAN:  Okay, very well.  Shall I proceed?

THE COURT:  I can see you better.  Yes, please.

MR. WISEMAN:  Thank you.  Nice to meet you finally, Your Honor.

THE COURT:  Nice to meet you.

MR. WISEMAN:  And may it please the Court, Mr. Abreu and I are here today for Mr. Bourgeois, who I understand is listening in --

THE COURT:  Do you want to ask him to make sure that he is connected?

MR. WISEMAN:  Yes.  Mr. Bourgeois, are you hearing us?

THE DEFENDANT:  Yes, sir.  Yes, sir.

MR. WISEMAN:  Thank you.  I submitted last evening supplemental authority.

THE COURT:  I saw that.

MR. WISEMAN:  Okay.

THE COURT:  I am going to give you an evidentiary hearing, so you don't need any more authority on it.

MR. WISEMAN:  Okay.  Well I couldn't resist.

THE COURT:  I know.  It was very exciting.  I did

**USCA5 1912**

appreciate it.

MR. WISEMAN:  But, you know, that authority I think speaks to the basic rule which is that we are entitled to a hearing on any of the claims that --

THE COURT:  It doesn't say you are entitled to a hearing on any of the claims, but you are entitled to anything that might increase your record and be of benefit to an appellate court or to me.

MR. WISEMAN:  Well, certainly that.  The point I wanted to make, however, was that any claim that is not conclusively decided by the record against us with the --

THE COURT:  And there are some of those in here.

MR. WISEMAN:  Okay.  Well, our view obviously is --

THE COURT:  Different.

MR. WISEMAN:  Is a little different, and that's why we are here.  I was going to suggest to the Court that we proceed in the order of the claims, and I spoke with Mr. Roberts and I think we are in agreement that if the Court wants to, we would be willing to alternate, so I would address Claim 1, he would address Claim 1 and then move to Claim 2, and that way --

THE COURT:  Let me see if I can help you at all.

MR. WISEMAN:  Sure.

THE COURT:  Claim 4.

MR. WISEMAN:  Yes.

THE COURT:  I will give you 30 minutes to present that testimony at the evidentiary hearing.  It looks to me from your briefs that that ought to be concise enough to do that.  And I don't mean cross-examination, just whatever you would like to put on with that.  5, 30 minutes to put on a challenge to the bite mark.  6, 30 minutes to put on a challenge to Dr. Oliver regarding the digitally enhanced autopsy photos.

MR. ROBERTS:  Your Honor --

THE COURT:  Is that okay?

MR. WISEMAN:  In principle it's wonderful.  I think the time frame is a little tight.

THE COURT:  But, you know, just reading through the affidavits it seems pretty clear.  I mean, it's not like we are going before a jury.  You can put on an expert about semen, for instance, and say this test in our opinion is not any good because A, B, C and D.

MR. WISEMAN:  Sure.  I mean we can certainly make it quick.  We have, regarding the sexual trauma we have two experts of our own.  I don't know if the Government is going to want to put on any of its experts.  But I should think putting on two experts is going to take, even moving quickly, more than 30 minutes.  And those experts would be Dr. Johnson and Dr. Blake.

THE COURT:  I'm sorry.  Did I say 30 minutes for

that particular one?

MR. WISEMAN:  Yes, you did.

THE COURT:  Oh, yes, Number 4.

MR. WISEMAN:  Right.

THE COURT:  Okay.  Well, why don't we make that one an hour?

MR. WISEMAN:  Okay.

MR. ROBERTS:  Your Honor, if I might, we are having, we are not real sure because we renumbered the issues, and if we could just --

THE COURT:  Okay.  I have Number 4 issue as the trial counsel provided ineffective assistance of counsel by failing to present evidence available, available expert testimony that would have shown Bourgeois did not sexually abuse, assault the victim.  So I am going to give them 30 minutes per expert, they say they have got two experts, and put them on for a total of an hour.  And then Number 5, I have that trial counsel provided ineffective assistance by not litigating a Daubert challenge to testimony from Dr. Senn and Dr. Kerrs -- I can't remember how to pronounce the name -- concerning the bite mark evidence.

MR. WISEMAN:  That's --

THE COURT:  And I thought you had one affidavit on that.

MR. WISEMAN:  Actually we have several.  We have got

**USCA5 1915**

Dr. Cherry, we have got Dr. Dailey.

THE COURT:  Well, if they are all going to say the same thing, pick a couple and tell me what they can, you know, and have them testify.

MR. WISEMAN:  Okay.

THE COURT:  Would that be fair?

MR. WISEMAN:  Yeah, I think that would be fair.  I guess I am, you know, we will do the best we can with what the Court gives us but, you know, again --

THE COURT:  Well, this is my thought.

MR. WISEMAN:  Yeah.

THE COURT:  I don't want to retry it.

MR. WISEMAN:  I understand.

THE COURT:  I am giving you an evidentiary hearing.

MR. WISEMAN:  Yes.

THE COURT:  And you asked for two weeks and, of course, in my opinion that's ridiculous.

MR. WISEMAN:  Right.

THE COURT:  Because that's about the time it took to do the trial.

MR. WISEMAN:  I understand that, and if I can just say, Your Honor, that's a reaction that we frequently see in --

THE COURT:  And I can understand that, too.

MR. WISEMAN:  Yeah.

THE COURT:  But I do think that if we go through this item by item and I tell you -- and this is not including cross-examination or redirect.

MR. WISEMAN:  Uh-huh.

THE COURT:  But if you put on two witnesses that you pick that you think would be most representative, and you can, and I will accept as a proffer that you have four witnesses that will say the same thing.

MR. WISEMAN:  Okay.

THE COURT:  I mean it seems fair to me, instead of hearing the same thing over and over again.

MR. WISEMAN:  Sure, if we can proffer that would be, that would be --

THE COURT:  Well, pick two, then, that you think are most representative and give them, we will give them 30 minutes each for direct for Item Number 5.

MR. WISEMAN:  Okay.

THE COURT:  And I guess I thought I am not reading all your affidavits properly or it has been awhile since I have read them, I now have in front of me a summary, which is what I was using.

MR. WISEMAN:  Right.

THE COURT:  For Number 6, for not having a Daubert challenge for Dr. Oliver concerning the digitally enhanced autopsy, in my, I don't remember those being used anything

USCA5 1917

but to show the jury.  Right?

MR. WISEMAN:  Correct.

THE COURT:  I mean they weren't used to say we are measuring this on this.

MR. WISEMAN:  They were displayed for the jury, they were part of Dr. Oliver's --

THE COURT:  They were displayed for the jury.

MR. WISEMAN:  -- PowerPoint presentation.

THE COURT:  Right, as representative of her injuries.  So that's the attack that you would want to say, is that it's not representative, it overstated her injuries?

MR. WISEMAN:  Correct.

THE COURT:  Okay.  How many witnesses do you have for that?

MR. WISEMAN:  I just want to be accurate in the -- I know we have Mr. Cherry and his --

THE COURT:  I think I told you two days for a hearing, didn't I?  I am going to give you more than that.

MR. WISEMAN:  Yeah, you told us two-and-a-half.

THE COURT:  Well, then.

MR. WISEMAN:  It's not like one now, but --

THE COURT:  I may give you another day.

MR. WISEMAN:  Okay.  So that's three-and-a-half?

THE COURT:  Because you are so, you are pitiful.  Okay, one --

**USCA5 1918**

MR. WISEMAN:  We have Dr. Bowers and Mr. Cherry.

THE COURT:  Okay.

MR. WISEMAN:  On the enhancement.  So that's two witnesses.

THE COURT:  How about two, 30 minutes for each of those on direct?

MR. WISEMAN:  I feel like I am bargaining here.  I have 45.

THE COURT:  Look, why don't you try to be as efficient as you can --

MR. WISEMAN:  Yes.

THE COURT:  -- in putting this evidence on, because you are making a record of this.

MR. WISEMAN:  Yes.

THE COURT:  And I don't see that you would have to go on and on about saying these are the problems with Dr. Oliver's testimony.

MR. WISEMAN:  Yes.  Your Honor, I just wanted the Court to know, and I hope it's been evident so far, that we are serious folks and we are not here to waste anyone's time.

THE COURT:  I have never seen anybody more serious.

MR. WISEMAN:  Is that right?  Oh, well.

THE COURT:  I am very impressed --

MR. WISEMAN:  Oh.

THE COURT:  -- with the beauty of your briefs, not

just in the legal argument but the efficiency of words, and I just expect you to be able to put that on in the same way.

MR. WISEMAN:  Yeah, and we intend to.  I just, you know, I don't want to see this, you know, overly cramped and not consult those --

THE COURT:  I think you will find if you prepare as you have been, in the same standard you have been doing, that you will be able to present this to me each witness 30 minutes, and that's not including, like I said, direct, I mean redirect or cross-examination.

MR. WISEMAN:  Okay.  Well, we will endeavor to do that then.

THE COURT:  And Number 7 may not require, I don't think, evidentiary.  I think you have got the affidavits?

MR. WISEMAN:  Well, if the Government will accept the truth of them we certainly don't feel the need to call the witnesses.

THE COURT:  Well, the way I remember --

MR. WISEMAN:  Yeah.

THE COURT:  Let me just make sure I have got it right, three -- we are talking about four witnesses?

MR. WISEMAN:  Correct.

THE COURT:  Three of whom were state prisoners.

MR. WISEMAN:  Correct.

MS. BOOTH:  No, two.

THE COURT:  And Ms. Booth had no authority -- did you say two?

MS. BOOTH:  There were two state and two federal.

THE COURT:  Okay, two state witnesses.  They had no authority to make any representations of any kind.

MR. WISEMAN:  Yeah.  I think the issue here is not, if I could say, not express representations, I think it's more tacit agreements, tacit understandings, which Brady and its progeny recognize as being equally problematic, so I think what the witness was actually expecting, based on discussions and conversations --

THE COURT:  I thought they testified about that.

MS. BOOTH:  They testified about that, Your Honor, and I believe that we have submitted the letter by, written by Mr. Longoria after the trial, even writing a letter to the Government saying I know you didn't promise me anything and, but I'd like for you to do this.

MR. WISEMAN:  Your Honor, I mean he has given us statements that contradict that letter, I mean it requires evidentiary resolution.  These would be quick witnesses, I mean ten minutes apiece I would imagine.

THE COURT:  Okay.

MR. WISEMAN:  No more than that.

THE COURT:  I don't mind.

MR. WISEMAN:  Okay.

THE COURT:  It's just, it's easier, Ms. Booth, just to put them on and move on.

MS. BOOTH:  Right.

THE COURT:  Than to try to restrict somebody.  I mean, you know, I have the greatest respect for what they are trying to do.

MS. BOOTH:  Yes, I do, too, Your Honor.

THE COURT:  I have a feeling it may not always be successful when they do their work and it has got to be very frustrating, so, you know, 40 minutes out of our life is not going to be a big sacrifice.

MR. ROBERTS:  Your Honor, if I might just --

THE COURT:  Four ten-minute witnesses.  I know I am cutting you out of the whole deal, Mr. Roberts.

MR. ROBERTS:  No, I am not worried about that, Your Honor, I trust your judgment in this, but what I am concerned about with that regard is that Ms. Booth may well be excluded from the case if we handle the Brady issues.

THE COURT:  That's not going to work.  You know, if she needs to testify as the attorney she can do that.  Do you have any problem with that, Mr. Abreu and Mr. Wiseman?

MR. WISEMAN:  Oh, no, not at all.

THE COURT:  Yeah.  I just don't think she not -- we can't exclude her at this point because it's not appropriate for representation of the Government which has been fine for,

USCA5 1922

you know, she has been outstanding.

MR. WISEMAN:  Yeah, we have no problem with that.

THE COURT:  And if she needs to testify she needs to testify.  There are four of you sitting there, one of them can cross-examine her.

MR. ROBERTS:  Thank you, Your Honor.  That's fine.

THE COURT:  Or put her on as your own witness.  8?  Oh, how long -- let me just get this before I forget it -- how many days do you think it's going to take you to do that in camera filing with those documents, Ms. Salinas?  And I will accept your representation when you file that that's all there is, there isn't any more.

MS. SALINAS:  And I believe there might be some from Ms. Booth, Your Honor, so if we could have maybe a week to go through it together?

THE COURT:  Do you think that would work?

MS. BOOTH:  Yes, Your Honor, we could do that.

THE COURT:  Okay.  Is that fine with you?

MR. WISEMAN:  Oh, sure.  I just want to add the Government has been very forthcoming in showing us stuff and we appreciate that, so, yeah, that's fine.  There is one thing they haven't shown us which I will bring to the Court's attention but I --

THE COURT:  What is that?

MR. WISEMAN:  Yesterday the, actually they did show

us about 200 pages of agent notes that were used to compile the 302s, and we started to look at them and asked if we could have copies of them.

THE COURT:  Oh, they don't give out copies.

MR. WISEMAN:  I gathered that.

THE COURT:  But you know what you can do, I don't know if you know how to, if you know about this, you can actually go in with your Dictaphone or your recorder and dictate it word-for-word.

MR. WISEMAN:  Uh-huh.  Yeah, I guess I just wasn't sure why that wasn't discoverable.

THE COURT:  I will tell you why.

MR. WISEMAN:  Yeah.

THE COURT:  We started having people, it was very compromising to everybody involved, those, like DEA forms --

MR. WISEMAN:  Uh-huh.

THE COURT:  -- they would be glued around bathrooms around town with names circled, and in the jail, so they didn't want to be responsible for physically handing out documents that might compromise other people.

MR. WISEMAN:  Yeah --

THE COURT:  So that's why I am saying you can go over there, you can send somebody over, somebody locally, and dictate them for you.

MR. WISEMAN:  Yeah, I guess the thing I was

wondering then is if we agreed to a protective order not to disclose them beyond Mr. Abreu and myself if that wouldn't satisfy that concern.  It's just, it's very difficult to make any sense of them without the 302s and it would take hours to compare and they are statements of witnesses so I would think we would be permitted to see them.

THE COURT:  What do you-all think about a protective order that nobody sees them but these two attorneys?

MS. BOOTH:  Judge, I think that sets a precedent because then every other, all of our other honorable attorneys from down here can come in and make the same argument.

THE COURT:  How about I make -- do you have any, other than the precedent do you have any deep philosophical problem with this, if I say that this is the death penalty exception?

MS. BOOTH:  I don't --

MR. ROBERTS:  Your Honor, I can't think of, I cannot articulate a reason why not.  I guess the other part that may be able to be added to the exception aspect is they are taking these back away from the local area.

THE COURT:  Well, they have to be returned, every single one, and they have to say at the end of the litigation, if it ever comes, that they have returned every single document and give an affidavit to that effect.

MS. BOOTH:  And that they did not copy the documents.

THE COURT:  And that they didn't, that there are no other copies.

MR. WISEMAN:  We will be happy to do that.

MR. DOWD:  Your Honor, if I could make a suggestion?

THE COURT:  Yes, sir, tell me.

MR. DOWD:  The purpose that, as I understand, Mr. Wiseman wants to look, wants to have the 302s, now that he has the agent notes underlying the 302s, is to determine whether or not the 302s are accurately reflected by the notes.

THE COURT:  Right, if there is something left out.

MR. DOWD:  We could have the 302s in the discovery room with the notes, someone could go over them -- because that's the only purpose that the 302s are needed by Mr. Bourgeois.

THE COURT:  I guess it's a matter of expense and time.

MR. DOWD:  Okay.

THE COURT:  You know, these lawyers were found, thank goodness, by the Federal Public Defenders, this is what they do, and they are out of Pennsylvania.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And a person's life is at stake.

USCA5 1926

MR. DOWD:  I understand, Your Honor.

THE COURT:  In contrast to other cases where we don't really have people coming from that far away, you know. Louisiana, maybe California I guess, but it's unusual.

MR. DOWD:  I was just thinking about Longoria who was stabbed 32 times when they discovered he was cooperating.

THE COURT:  Right.

MR. WISEMAN:  Well, Your Honor, we certainly will not disclose these documents to our client, Mr. Bourgeois.

THE COURT:  Why don't you draft, in the next week, any protective order that you think would satisfy the concerns of the Government.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And submit it to Mr. Wiseman and Mr. Abreu and see if they are satisfied, and if they are I will enter it.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  And then after that you can take two weeks to give them all the copies.  How is that?

MR. DOWD:  That's fine, Your Honor.  Thank you.

MR. WISEMAN:  And that certainly works for us.

THE COURT:  And not your, Mr. Bourgeois is not going to see them.

MR. WISEMAN:  No, not at all.

THE COURT:  Only you-all.

MR. WISEMAN:  Absolutely.

THE COURT:  Okay.  And you don't have any agents or investigators or anybody that's going to look at it?

MR. WISEMAN:  Well, we, we have people working on the case but we will not disclose them to those people.

THE COURT:  Okay, thank you.

MR. WISEMAN:  So, I guess --

THE COURT:  All right, so we are finished with all the discovery issues --

MR. WISEMAN:  Yes.

THE COURT:  -- Mr. Wiseman, Mr. Abreu?

MR. ABREU:  Yes Your Honor.  Thank you.

THE COURT:  Any discovery issues from your point of view, Mr. Roberts?

MR. ROBERTS:  We, Your Honor, you haven't gotten to the mental retardation issue yet but I assume we are heading there and that we are probably having a hearing.

THE COURT:  We are getting there.  That's going to be the big issue.

MR. ROBERTS:  Yes, Your Honor, and we actually --

THE COURT:  That's not going to have a 10-minute or a 30-minute limit.

MR. ROBERTS:  Okay, Your Honor.

THE COURT:  I am going to give that a 45-minute limit.

USCA5 1928

MR. ROBERTS:  Thank you, Your Honor.  We, I discussed with Mr. Wiseman and Mr. Abreu just before we came in here that, anticipating that we would have that, we have a, two experts, a Dr. Moore, Dr. Roger Moore, and a Dr. Price, Randall Price, who we would like to have interview Mr. Bourgeois and go through the most recent ways for tests for an IQ, and I have got a letter here from them, from Dr. Moore, and I have got their CDs that I would want to submit.

THE COURT:  Well, am I correct in assuming that there are like three criteria that, I think, to make, to determine whether someone has mental retardation for the purposes of invoking constitutional claims and no execution?

MR. ROBERTS:  That's my understanding.

THE COURT:  One of them is a documented history under the age of 18 of mental retardation.  Now, we have no testing results here for Mr. Bourgeois under 18.

MR. WISEMAN:  That's correct as to the fact that we do not have any documented tests from pre 18.  However, I would differ slightly in the Court's formulation.  I believe that we have to prove onset, we don't have to prove documented onset before age 18.

THE COURT:  All right, thank you.  I think you are right about that.  Then it may not be that those post 18 examinations are going to be that persuasive, but I am going to certainly let you present them.  And if the movant gets to

USCA5 1929

present them, certainly the Government should have the same opportunity to interview, to send their experts to interview Mr. Bourgeois.  Now, what is the time limit, would you say the next 45 days?  We have got this set in September, time certain.  Forty-five days?  Do you object to it?

MR. WISEMAN:  Your Honor, I don't object.  I would like to discuss, and we could do this --

THE COURT:  Some parameters?

MR. WISEMAN:  Well, just, yes, if we could --

THE COURT:  Why don't you see if you can agree to some parameters on this, and if you cannot, we will do a telephone conference on it.

MR. WISEMAN:  Okay, that's fine, but we don't object in principle to those examinations.

MR. ROBERTS:  And, Your Honor, the reason I brought it up now, you were asking about discovery.  Dr. Moore and Dr. Price have communicated to me that they need the actual test material that the experts utilized in giving the --

THE COURT:  One week.

MR. ROBERTS:  -- particularly Mr., Dr. Gilmore.

THE COURT:  Have you got that?

MR. WISEMAN:  We don't have it but --

THE COURT:  Have you got that stuff?

MR. WISEMAN:  Our experts will certainly be happy to send it to their experts.  I believe psychologists will only

USCA5 1930

release it to other psychologists, but we certainly don't object to the release of it.

THE COURT:  Okay.  Well, if it doesn't happen in seven days from today, you-all let me know.

MR. ROBERTS:  Well, I will echo Mr. Wiseman's sentiments earlier, we have really been able to work well with the discovery issues and trying our best we can not to bring those to --

THE COURT:  Isn't that what happens with very good lawyers, though?

MR. ROBERTS:  Well, we hope so.

THE COURT:  It's a testament to your, both, of your intelligence and perseverance, both sides.  So we have got that.  I think then we have addressed all the discovery issues?

MR. WISEMAN:  Yes, as far as we know.

THE COURT:  Okay, let's move on then to 8.  What kind of evidence do you anticipate with that or just the fact that it was?

MR. WISEMAN:  That would be a number of questions to Mr. Gilmore, I understand.

THE COURT:  Okay.  So he will be here anyway testifying.

MR. WISEMAN:  In fact, just so the Court knows, as soon as Your Honor set the date I emailed him and asked him

**USCA5 1931**

if that was --

THE COURT:  Thank you.  Is that good for him?  I
didn't even --

MR. WISEMAN:  He said he would keep it open.

THE COURT:  Okay.  So we don't need anything
further, and that will be probably on cross-examination by
you of Mr. Gilmore.

MR. WISEMAN:  Correct.

THE COURT:  So 9.

MR. WISEMAN:  Yes, that was really --

THE COURT:  Did you claim, I can't remember now, did
you claim that the defense counsel were deficient because
they failed to object to these remarks?

MR. WISEMAN:  No, I think it was more along the
lines of they failed to present any mental health rebuttal of
that line of questioning, but I --

THE COURT:  Okay.  Well, if there is, 9 is by
itself, the prosecution engaged in misconduct by making
improper argumentative statements in the guilt, innocence and
penalty phases, I am going to rule that that's procedurally
barred.  You may, however, put on evidence of ineffective
assistance of counsel for failure to rebut that.  Is that,
that's your argument, is it not?

MR. WISEMAN:  I'm sorry, Your Honor, you are talking
now about the prosecutorial statements in closing argument?

THE COURT:  Yes, sir.

MR. WISEMAN:  Yeah, that is a, in our view, an ineffectiveness claim.  That would be --

THE COURT:  I didn't see it stated.  I just may have misread it, but if that's an ineffective for failure to object --

MR. WISEMAN:  Yes, and for failure to raise it on direct --

THE COURT:  And failure to put witnesses.

MR. WISEMAN:  No, I don't think that there are any witnesses that we would need to call on that, other than questioning --

THE COURT:  Mr. Gilmore?

MR. WISEMAN:  -- Mr. Gilmore on it.

THE COURT:  Okay.  So we are okay with that.  10?

MR. WISEMAN:  That, I would submit to the Court, would really be part of the Claim 2, the mitigation claim.  It's a separate claim but it's going to involve the same witnesses.

THE COURT:  I, you know, you are at such a disadvantage, and I know that my observations, which will either go on the record now or at the evidentiary hearing or in a written order or maybe all three, are taking in consideration any further appeal, if at all, and I can tell you that it's, you have a severe disadvantage by not have

USCA5 1933

seen Mr. Bourgeois' demeanor during this trial.  I can tell you on the record that it was unbelievable.  He displayed, what the witnesses said at the scene of the event, if at all, where he was only on the phone while his daughter lay dying on the ground, he was on the phone making plans for a future transportation, and I can tell you that that was the type of demeanor that was shown here.  Have you looked at the movie that the U.S. Attorney showed about the swimming?

MR. WISEMAN:  About the what?

THE COURT:  The movie that was introduced showing him swimming with JaKaren?

MR. WISEMAN:  Yes, yes.

THE COURT:  And while the jurors were weeping during that, he would glance up and look away and smile and he didn't care.  The appearance was that he did not have a care in the world about this.

MR. WISEMAN:  Yeah, and --

THE COURT:  I want to mention this clearly for the record.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  And that was his demeanor during the excruciatingly heartbreaking pictures of his child up there with whip marks and everything else that was testified to. And I know that your psychologist will testify, but they were not here and we all were, and I have never seen that kind of

USCA5 1934

demeanor on a defendant that was watching pictures of the death of his child --

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  -- and the very graphic pathology pictures of his dead child.

MR. WISEMAN:  I understand exactly what the Court's talking about.

THE COURT:  So I want to make that clear for the record.

MR. WISEMAN:  Yeah.  I --

THE COURT:  And I realize that you can after the fact come in with psychologists and say, well, that is part of his psychological makeup, which cuts both ways, so I just want to mention that to you for the record, but I do have observations of this as well.

MR. WISEMAN:  No, I am sure you do and I think the Court's heartfelt observations are exactly the reason why counsel was duty bound to offer the available mental health explanation.  You know, Mr. --

THE COURT:  What was it?  What was the mental health explanation?

MR. WISEMAN:  Oh, he's --

THE COURT:  His appearance of --

MR. WISEMAN:  Mr. Bourgeois is a victim in his own right of severe, horrific childhood abuse, sexual abuse,

USCA5 1935

trauma, dysfunction.  We have three to five experts, depending on how many we get to put on, who will put that in context and explain his borderline personality, and so the Court knows I don't want to --

THE COURT:  So that doesn't make him incompetent.

MR. WISEMAN:  No, we are not suggesting he is incompetent to proceed.

THE COURT:  But if they had put on that evidence, just by way of curiosity, if they, if the defendant had put on that way, that type of evidence, would that not have been an even stronger reason to be a predictor of future criminal and violent conduct?

MR. WISEMAN:  Well, the defense had the worst of both worlds, they didn't put that evidence on and they still had their client portrayed as a future danger.  And certainly the jury seeing him in what appeared an indifferent if not cavalier demeanor could have been explained to the jury as the product of a mental illness and, you know, I think counsel's --

THE COURT:  Okay.

MR. WISEMAN:  -- failure to do that is not excusable.

THE COURT:  I wanted to, in case something happened to me in the future, I took senior status before my time or what have you, that those, my observations were clear and on

**USCA5 1936**

the record.

MR. WISEMAN:  And I would just suggest to the Court that, you know, your observations are obviously, are valid and legitimate and accurate, but they are made without the contextual mental health explanation.

THE COURT:  Absolutely.

MR. WISEMAN:  Okay.  So, in any event, getting to that claim, we would intend to incorporate that in the presentation of our mental health experts.

THE COURT:  I would appreciate that.

MR. WISEMAN:  Okay.

THE COURT:  And you certainly are allowed to do that.  I understood that -- that was why I was trying to limit some of these things that I thought could be directed very quickly and --

MR. WISEMAN:  Yes.

THE COURT:  And the points could be made quickly.

MR. WISEMAN:  Yeah.

THE COURT:  Now, I do not think that it's going to be that quick with the mental health experts, because both sides I'm sure will have multiple experts.  I would like to get some idea of how many you expect to have.  And what I expected you to do was to put on mental health experts to address -- oh, and have you seen the -- the letters are part of the record that he wrote me, are they not, post-

conviction?

MR. WISEMAN:  Mr. Bourgeois?

THE COURT:  Yes.

MR. WISEMAN:  We have seen the ones that he has provided to us or that the Court has forwarded.  I don't know if he has sent something that I haven't seen.

THE COURT:  Would you make sure that, Ms. Scotch, would you mind going, getting those from Ms. Hardin?  I just want to make sure that you got them.  So I expect your mental health experts to address the area of mental retardation, and the evidence that you thought should have been presented by way of mitigation as to what his childhood was like, and do you have other -- how many people do you anticipate, by way of mental health care providers, will provide that information?

MR. WISEMAN:  I'm trying to do the tally in my head. I think it's about a half dozen.

THE COURT:  Okay.

MR. WISEMAN:  It might be four, it might be seven but it's somewhere in that area.  I think I just said four to seven.

THE COURT:  Okay.  And how many do you have?  Some will be same, I guess.  Dr. Estrada testified and apparently has given affidavits for both, for, now for the movant.

MR. ROBERTS:  Yes, Your Honor.  We don't intend to,

I mean obviously Dr. --

THE COURT:  Or petitioners, sorry.

MR. ROBERTS:  Yes, Your Honor.  Your Honor, we intend to definitely have Dr. Moore as a witness.  We may only use Dr. Price as a consultant, but if he ends up participating in the examination then he would become a witness.

THE COURT:  Okay.

MR. ROBERTS:  There's at least those two.  We have Dr. Kutnick that provided statements, we have, I believe there's one or two others, so approximately four or five.

THE COURT:  Now, I expect again, like I mentioned with the teeth people and the other people, that you don't have them say the same thing.  They can all sit in here as your experts and they can say, "I adopt the testimony for the same reasons as so-and-so but I have this to add."  Do you see what I mean?

MR. WISEMAN:  Yes, of course.

THE COURT:  I don't want to cut off your record but I don't see why we should hear --

MR. WISEMAN:  You don't want people --

THE COURT:  -- everybody say the same thing over and over again.

MR. WISEMAN:  I certainly understand.  Regarding the Government's experts, could we establish some sort of

USCA5 1939

schedule for provision of reports, hopefully at least 30 days before a hearing, if not sooner?

MR. ROBERTS:  That's no problem with us, Your Honor.

THE COURT:  And what about your experts' reports?

MR. WISEMAN:  We have turned over declarations and/or reports of all of our experts.

THE COURT:  Well, do you have where, have you given them the information of their prior, the prior testimony and --

MR. WISEMAN:  They haven't asked for that.  If they want that we certainly can endeavor to --

THE COURT:  Well, this is kind of a civil trial.

MR. WISEMAN:  No, it certainly is, isn't it?

THE COURT:  So that, Rule 26 requires that you look at Rule 26 and determine --

MR. WISEMAN:  Yeah.

THE COURT:  -- give those reports in conformance with Rule 26.

MR. WISEMAN:  Okay.  We will certainly do that.

THE COURT:  And so when would you be able to give yours?

MR. WISEMAN:  I would say probably in 30 days to get that information together.  I am just wondering if, would the Court require that if both parties agree amongst themselves not to require the Rule 26 disclosures?  I mean these are all

USCA5 1940

forensic experts.

THE COURT:  At this point they are required.

MR. WISEMAN:  Okay.

THE COURT:  Now, if you-all want to make some accommodation with each other and change that rule, that's fine.

MR. WISEMAN:  I am just saying that they are all forensic experts who make a living testifying and so, you know, it's not --

THE COURT:  I think usually, you know, when I was doing this, I wanted to see where they had testified before.

MR. WISEMAN:  Sure, sure.

THE COURT:  And look at those transcripts if available.

MR. WISEMAN:  Yeah.  All right.  Well, we will talk about it and we will certainly comply with the --

THE COURT:  Because I always found it interesting, just for instance, for whatever witness, that they always said the same thing every time and never varied.  So that's of interest.  Okay.  So, do you think now that covers what is going to happen at the evidentiary hearing?

MR. WISEMAN:  I think the one big part that has been, well, two parts have been left out so far are the lay witnesses with regard to adaptive deficits as well as the mitigation case.

**USCA5 1941**

THE COURT: Sorry. I was talking about that all in one group but I started with the expert witnesses and forgot about the lay witnesses.

MR. WISEMAN: Right.

THE COURT: How many lay witnesses, those must be identified as well.

MR. WISEMAN: Yes, they have been, and in fact we have given the Government at their request the last known addresses of the lay witnesses.

THE COURT: How many are you going to have?

MR. WISEMAN: We have proffered 23 declarations. I don't think we have to call 23. Perhaps we can pick our best ten and proffer the remaining 13. And we will try to cover different areas so the Court's not seeing the same thing. And let me actually get with my colleagues and the witnesses, it may be that fewer will do. I just need to, you know, I don't want to commit to a firm number here. But I appreciate we don't need 23 witnesses all saying the same thing and we won't do that. We will --

THE COURT: How many witnesses are you going to have?

MR. ROBERTS: Your Honor --

THE COURT: Are you just going to rely on the record on this part?

MR. ROBERTS: To a certain extent, but Dr. Moore and

Dr. Price has, again, has communicated to me that there is a need to go beyond what the Federal Public Defender has done and beyond even what the mitigation experts have done at trial, if we are going to actually have some type of adaptive functioning analysis that is relevant to the Court.

THE COURT:  Okay.

MR. ROBERTS:  And the aspect that they are looking at are people that are disinterested giving their understanding at the time Alfred Bourgeois was in front of them, such as teachers or people that existed that are not, that are disinterested.  And so to some extent we are going to ask the psychologists to communicate to the FBI agents what it is they need in trying to locate people, and if we --

THE COURT:  Okay.

MR. ROBERTS:  -- can locate people that have that relevant information then we would like to bring those forward.

THE COURT:  Well then, again, because this is a combined civil/criminal kind of thing, if you find evidence that would benefit Mr. Bourgeois in that search, you need to provide that as well.

MR. ROBERTS:  Certainly, Your Honor.

MR. WISEMAN:  Your Honor, I can -- I appreciate that.  I can tell the Government and the Court that we really beat the bushes to try to find folks who remember Mr.

Bourgeois from when he was a child.  This is a very small rural community.

THE COURT:  A small place, wasn't it?

MR. WISEMAN:  It was, and, you know, there's not a lot of records left.  We have given the Court all that we have.

THE COURT:  You didn't find any school records for him?

MR. WISEMAN:  Not from elementary school.  The earliest we found was high school where he was, you know, Cs, Ds and Fs, basically.

(Off the record discussion at counsel table)

(Court conferring off the record with clerk)

THE COURT:  I am trying to remember why I wrote this letter.  I think, I will tell you what, I think -- this, I am going to show you this letter where I wrote to Mr. Warner.  I think that that is a lawyer out of the Valley who wanted to be on the team.

MS. BOOTH:  Larry Warner.

THE COURT:  Yes.  Isn't that what happened?

MS. BOOTH:  It was in the courtroom when he asked to be placed on the team.

THE COURT:  And that's why that letter is in the record.  You can give it back.  I just couldn't remember what --

USCA5 1944

MR. WISEMAN:  I thought we had competition.

THE COURT:  Would you hand those -- Mr. Wiseman, I just want to make sure that you have got those documents. Mr. Bourgeois wrote me, as you can see, numerous correspondence, and I think I docketed everything, but just to be on the safe side, that's what I have in my records.

MR. WISEMAN:  Are these for us to keep?

THE COURT:  Are those copies?

(Court conferring off the record with clerk)

THE COURT:  Does that look familiar?

MR. WISEMAN:  Not the most recent one, and I really couldn't say about the older ones.  I mean if Your Honor docketed them, we --

THE COURT:  I am going to have them printed out from the docket for you.  I keep a record of letters that come in to me and I docket them.

MR. WISEMAN:  We have told Mr. Bourgeois not to write to the Court.  I hope he is listening to that.

THE COURT:  Well, I thought it was very illustrative, actually.

MR. WISEMAN:  Your Honor, the last issue I think that needs to be covered is the jurisdiction issue, which we, I can tell the Court, think is a very serious issue.

THE COURT:  I agree with you on that.

MR. WISEMAN:  Yeah, okay.

USCA5 1945

43

THE COURT:  And, you know, you may be right about where the child died, but all I have to go with is the evidence that was heard at the trial.

MR. WISEMAN:  Well, right.  It's a claim of ineffectiveness.

THE COURT:  Mr., I know, but Mr. Bourgeois testified, and he wanted to testify, that it happened on the Navy base, that the child fell out of the truck.

MR. WISEMAN:  Right.

THE COURT:  His daughter also testified that he bashed her head against the wall while in the Navy base, and then decided she was dead and he had to put her out on the sidewalk and call, somebody called 9-1-1.

MR. WISEMAN:  Right.  Well, it's apparent from the reports that the science says differently and I think --

THE COURT:  No, it doesn't, actually, because that child had been traumatized by somebody for six weeks and she had old subdural hematomas, she had old all kinds of things. She had leather skin.  The interesting thing about this case is that, you know, when Mr. Bourgeois came for his paternity thing and was given parental rights and support obligations, there were a series of pictures taken of that child right before she headed on the road trip, into the Louisiana trip with Mr. Bourgeois, so it was clear what she looked like at the time and then it was clear what she looked like at death,

and as I think her, there was testimony that her mother came in and said, "No, that's not my baby."

MR. WISEMAN:  Yes.

THE COURT:  And so I just want to mention that because the testimony was very compelling that the child, at the time that she, of course, died in the hospital, and there was compelling testimony at the time of the, at the trial that he had beat her head against the truck wall to finish her off.  I knew she was, we all knew that she had severe damages, probably enough, possibly enough to have killed her in another few days, but the final coup was to smash her head against the wall according to the testimony of the, or the window of the truck, and there was blood on the window, I believe.  Wasn't that the testimony?  No?

MR. ROBERTS:  No, we didn't have any testimony of blood on the window.

THE COURT:  But there was, but then she was found on the ground and 9-1-1 took her to the hospital where she died. And, so whatever you want to make of those records are, you can't change the fact that she died in the hospital after being picked up on the Navy base.

MR. WISEMAN:  No, that's all true.

THE COURT:  And that she had all severe old injuries, including subdural hematomas.

MR. WISEMAN:  That's all true, Your Honor.  I think

the legal claim is that the place where the fatal blow was struck is the proper --

THE COURT:  Ten days earlier?

MR. WISEMAN:  Yes.

THE COURT:  Before she died?  Fatal means dying.

MR. WISEMAN:  Well, the pathologist's report indicates that the subdural hematoma was --

THE COURT:  Was ten days old.

MR. WISEMAN:  Ten days old.

THE COURT:  But that does not mean that she died --

MR. WISEMAN:  That's the cause of death, according to the, to Dr. Rouse.  Dr. Rouse said the subdural hematoma to the right side of the brain is the cause of death.  I can say that, you know, I was curious that the Government has not got a declaration from Dr. Rouse rebutting our claim.  One would have thought, you know, with all the declarations they have proffered, that that would have been one that they would have sought.

THE COURT:  You know, I thought there was testimony of a fresh --

MR. WISEMAN:  All the fresh wounds --

THE COURT:  -- subdural hematoma.

MR. WISEMAN:  There are lots of testimony about fresh wounds and none of them were the fatal wounds.  The fatal wound is the right-sided cerebral hematoma.

USCA5 1948

THE COURT:  Well, all I know is that she wasn't dead then from it.  She died on the Navy base.

MR. WISEMAN:  Well, correct, but the --

THE COURT:  She died in the Driscoll Children's Hospital.

MR. WISEMAN:  If I shoot somebody off the Navy base and they wander onto the Navy base and collapse and die, there's no jurisdiction there.  If the fatal blow was struck ten days earlier and it takes that long for the person to succumb, the fact that they succumbed on the Navy base does not give the Court jurisdiction, and that's the claim, and we think it's pretty clear.  We are going to present expert testimony, we expect Dr. Rouse will be here.  Dr. Kagen-Hallett, unfortunately, has passed away.

THE COURT:  Who has?

MR. WISEMAN:  Dr. Kagen-Hallett.  That's the neural pathologist who authored the report about the injury being ten days old.

THE COURT:  The woman?

MR. WISEMAN:  Yes.

MR. ROBERTS:  Your Honor --

THE COURT:  The woman who was in the, who was the military, was -- she's alive.

MR. WISEMAN:  That's Dr. Rouse.

THE COURT:  Who?

USCA5 1949

MR. WISEMAN:  Dr. Rouse testified.  She is still alive.

THE COURT:  Okay.

MR. WISEMAN:  It's the report --

THE COURT:  Well, you, I guess you are more familiar with this than I am but I don't remember the testimony being that way.  Mr. Roberts?

MR. ROBERTS:  Your Honor, I'm holding Dr. Rouse's, the relevant portion of Dr. Rouse's testimony, and it's pages, it's in the transcript, it's March 8th was when she testified, day five of the case, docket entry 354, and pages 19 through 59 pretty much set out her understanding of the recency of the injuries.  She, and I don't want to belabor the point because there's, the real point here is there's no additional evidence that they can bring in that would be useful for this Court in an evidentiary hearing, because the question is whether the medical examiner, Dr. Rouse, was able to identify exactly which blow killed the child and whether that occurred on the base.  That's what they are arguing. The fact of the matter is Dr. Rouse testified that she was able to determine that the injuries were recent.  She was able to, upon further questioning she was able to say that they had, that the injuries that the child had would be consistent with injuries in the past few days prior, and she didn't get to the autopsy until two days after the death,

USCA5 1950

that the, what really killed the child was forces that were transmitted to the brain.  And when I then continued to ask her about the methodology of the death, she acknowledged that she had no way of knowing how the child was killed, she just knew the mechanism of the death.  And then she said, when I explained to her how it was described to us by the child witness that the child was slammed against the inside of the cab four times and I asked her, "Would those head injuries that you observed in this autopsy be consistent with such an incident," and she said yes.  So between that and the evidence from Mr. Bourgeois himself about the child being alive and the other circumstances --

THE COURT:  She said, he said at trial that she was bright and vibrant --

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  -- up until she fell out of the truck.

MR. ROBERTS:  And was doing her ABCs in his lap --

THE COURT:  Right.

MR. ROBERTS:  -- while the truck was broken down at the --

THE COURT:  So that's a little hard to controvert.

MR. ROBERTS:  Yes, Your Honor.  So we believe that there's no reason to send that issue to an evidentiary hearing.  We don't, we can't fathom what evidence they could bring in.  And Dr. Rouse, if put on the stand she would not,

her testimony would be the same.  She has, because the child had so many injuries she has no way of identifying which injury occurred in which time frame.  The neurologist said ten-day duration.  The neurologist did not say subdural hematoma occurred ten days prior.  It was a --

THE COURT:  A building thing.  I remember it as being a building thing over a ten-day period.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And that the final blow was the day that she died.

MR. ROBERTS:  And there were at least four head contusions, if I remember correctly --

THE COURT:  That were fresh.

MR. ROBERTS:  That were fresh.

MR. WISEMAN:  Your Honor, Dr. Kagen-Hallett, who was the neural pathologist to whom the sample was sent for her opinion, said, quote, "Right-sided subdural hematoma" -- I'm sorry.

MR. ROBERTS:  Your Honor, I have the neurology report.  I'll hand it to Mr. Wiseman if he would like to read it.

THE COURT:  Would you hand it, let me see it?

MR. WISEMAN:  Yes.  Yes.

MR. ROBERTS:  Yes, Your Honor, if the Court would like --

**USCA5 1952**

THE COURT:  Oh, you can give it to him, give it to Mr. Wiseman.

MR. WISEMAN:  Yeah, I was just looking at my notes but, Your Honor, I was going to read it --

THE COURT:  Didn't the retina doctor also testify that she had had acute and sudden detachment of her retina?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And was bleeding behind the retina?

MR. ROBERTS:  Yes, Your Honor, had blood in the eyes.

THE COURT:  To where she couldn't possibly have seen after that?

MR. ROBERTS:  I don't recall the --

THE COURT:  I mean, I am assuming if she had bloody retinas that she can't see.

MR. WISEMAN:  What Dr. Kagen-Hallett says --

THE COURT:  Didn't we have, didn't somebody say that?

MR. ROBERTS:  Yes, Your Honor, we had a doctor that came in and talked about how he looked into her eyes and saw the blood behind her eyes.

THE COURT:  He saw her eyes in Driscoll Children's Hospital.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And he said that was from an acute

USCA5 1953

trauma.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, for purposes of this claim we are not contesting that this child was obviously severely abused over a course of time.

THE COURT:  No, I know that.

MR. WISEMAN:  That's not the issue.  The issue is --

THE COURT:  But we are talking about where she was killed.

MR. WISEMAN:  Right.  The issue is where was the cause of death inflicted.  What Dr. Kagen-Hallett says is, "Right subdural hematoma, mostly recent, minimal organization (approximately ten days duration}."

THE COURT:  Duration.

MR. WISEMAN:  Right.

THE COURT:  That's how --

MR. WISEMAN:  Right.

THE COURT:  -- long it took to build it up.

MR. WISEMAN:  Right.  Dr. --

THE COURT:  And mostly recent.

MR. WISEMAN:  Dr. Rouse said that the cause of death was a right-sided subdural hematoma.  So, you know, it seems pretty plain to us that at a minimum Dr. Rouse needs to explain why that right-sided subdural hematoma, which she said was the cause of death, didn't, happened on the Naval

**USCA5 1954**

base.

THE COURT:  Had what?

MR. WISEMAN:  Happened on the Naval base.  It's contradicting the neural pathologist's report that says it's ten days earlier.  And we --

THE COURT:  No, it doesn't.

MR. WISEMAN:  Let me make one other point.

THE COURT:  That isn't what it says, sir.  Mr. Wiseman, it doesn't say that.

MR. WISEMAN:  That's not what it says.

THE COURT:  It doesn't say that it's ten days old.

MR. WISEMAN:  Approximately ten days duration.  That means it started --

THE COURT:  It started, but --

MR. WISEMAN:  Right, the subdural hematoma started.

THE COURT:  But with each blow to the head, and that was what was discussed at the trial -- I'm not going to give you, let you have evidentiary on that.  I'm sorry, that is way too far-fetched.

MR. WISEMAN:  If I could just make two more quick points about that, I think the relevant --

THE COURT:  No, thank you.

MR. WISEMAN:  I'm sorry.

THE COURT:  Thank you.  That is way too far-fetched.  Okay, so moving right along, that takes care of everything

USCA5 1955

then?

MR. WISEMAN:  That's everything that we have, I think.

(Court conferring off the record with clerk)

THE COURT:  Do you have the letters that I showed Mr. Wiseman from Mr. Bourgeois?  Did you get them out of the -- they are docketed, they are docketed.

MR. ROBERTS:  I don't know if we have them or not, Your Honor.

MS. BOOTH:  We didn't bring them.

THE COURT:  They are all sealed.  Okay, just give those to Mr. Wiseman and get, and I'll take mine back.

MR. ABREU:  May I, Your Honor?

THE COURT:  Yes, sir.

MS. BOOTH:  Judge, we don't know if we have all of them either.

THE COURT:  Make them, just go Xerox a copy, would you?  Mr. Feldman, would you do that?  I just thought that maybe if your psychologist and mental health care evaluators had not seen those letters that might be of some benefit. Okay, what else?

MR. WISEMAN:  I think the Court has covered all of the claims.  So we were talking about giving us an extra day, which would make it three-and-a-half days?

THE COURT:  Yes.

MR. WISEMAN:  You look like you maybe have four in your eyes.

THE COURT:  No.  I am going to give you out of three-and-a-half-days, I am going to give you two-and-a-half of those days to put on your documents, to put on your evidence and to cross-examination, to cross-examine.

MR. WISEMAN:  And what's the other day?

THE COURT:  Sorry?

MR. WISEMAN:  I'm not following.  I thought it was three-and-a-half days --

THE COURT:  Three-and-a-half days total for everybody together.

MR. WISEMAN:  Oh.  When we started it was four for everybody.  It was going to be two-and-a-half for us and a day-and-a-half for them.

THE COURT:  Well, then we just cut it back.  Okay.

MR. WISEMAN:  Are you saying we are going to get --

THE COURT:  No.  Four days.  Four days, we have four days.  Sorry.  I thought we were at four days and you said two-and-a-half, so that's why I said I will give you an extra day.

MR. WISEMAN:  The last time we spoke, Your Honor --

THE COURT:  Four days altogether.

MR. WISEMAN:  Yeah.  The last time we spoke Your Honor said two-and-a-half for us, one-and-a-half for them.

USCA5 1957

THE COURT:  That's exactly what you get.

MR. WISEMAN:  Okay.  When you said an extra day --

THE COURT:  Now, what I'm going to let you do --

MR. WISEMAN:  Yes.

THE COURT:  -- is use that affidavit for whatever doctor you want to say whatever happened to the child.  Okay?

MR. WISEMAN:  We are getting back to the cause of death?

THE COURT:  Yes.

MR. WISEMAN:  Yeah.  Your Honor, I have a lot more to say about that claim.  I can see Your Honor didn't really want to hear it.

THE COURT:  I think it's absurd.

MR. WISEMAN:  I, I --

THE COURT:  But I understand you have a job to do and I will let you proffer two affidavits from two doctors.  How is that?

MR. WISEMAN:  That sounds acceptable under the circumstances.

THE COURT:  Well, are they going to say anything more in person than they are going to say?

MR. WISEMAN:  I want Dr. Rouse here.  I want to talk to Dr. Rouse.  I want to cross-examine her, as trial counsel should have cross-examined her, about what the cause of death was and when it happened, and I don't see why that should

be --

THE COURT:  Well, the death happened in the hospital.  All we have are witnesses as to what happened when the final blow occurred.  And I, you know, why don't you do this, why don't you send interrogatories -- there's no wrong, there's no reason that you can't do that -- to her and ask.

MR. WISEMAN:  How about a deposition?  Let us take a deposition of her, a two-hour deposition.  We will go to where she is and we won't, we won't burden her with -- I think we can certainly get everything asked in two hours and --

THE COURT:  Do interrogatory, do deposition by written questions.  And if that's not satisfactory I will rethink it, but I still think it's, I still think it's not your best cause of action.

MR. WISEMAN:  Okay.  We will work with that then.

THE COURT:  Because there was just too much, it was too much evidence even from your client saying when the cause of death was and where.  Something else I was going to tell you to do.  Oh.  I don't remember the testimony of the retina doctor.  In fact, if I hadn't talked to him recently I wouldn't have remembered that he had been here on another occasion.  And so I figured if he testified he must have testified about fresh bleeding in the retina.  I didn't ask him, but do you-all remember that?  Somebody that examined

USCA5 1959

the child, he must have examined her in the hospital?

MR. ROBERTS:  Yes, Your Honor.  And I was looking for his information, but the child was brought to the hospital, the child was still alive, the child was taken by helicopter away and then, but during the time that the child was at the hospital the doctor came in, there were multiple doctors came in.

THE COURT:  Well, she wasn't taken by helicopter.

MR. ROBERTS:  Well --

THE COURT:  She was ambulanced to Driscoll Children's.

MR. ROBERTS:  Well, she was ambulanced to the hospital but there was a -- let me see if I can find in my notes real quick, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  And then she was ambulanced again to another hospital.

(Off the record discussion at counsel table)

THE COURT:  Have we got the transcripts?  Have you-all got the transcripts?

MR. WISEMAN:  Beg pardon?

THE COURT:  Have you got the transcripts ready, got them on --

MR. DOWD:  We have them here, Your Honor.

THE COURT:  I just wanted to, I wanted to see what

the retina doctor said.

(Off the record discussion at counsel table)

THE COURT:  What's his name, Ms. Booth?

MS. BOOTH:  It's Dr. Octar.

THE COURT:  Well, there was another one, though, that said his name was something different that told me he testified in Bourgeois and I didn't remember it at all.  It's not -- it's Kerfole or something like that?  Or maybe that's his first name, Octar.

(Off the record discussion at counsel table)

MS. BOOTH:  It's Noruna.

THE COURT:  Was there a Kerfole or Kerful --

MS. BOOTH:  Yes, there was.

THE COURT:  He's the one who said to me on the phone, "Oh, I remember you from the Bourgeois trial," and I didn't remember him at all.

(Off the record discussion at counsel table)

MR. ROBERTS:  Do you want the testimony, Your Honor, or --

THE COURT:  Can I look at it?

MR. ROBERTS:  Yes, Your Honor.

(Off the record discussion at counsel table)

THE COURT:  And the other ophthalmologist was named what?

MR. ROBERTS:  It was not another ophthalmologist,

**USCA5 1961**

Your Honor.  My recollection is it was an emergency room doctor, and I think that was the one that --

THE COURT:  What was his name?

MS. BOOTH:  Dr. Octar.  He was a pediatric intensive care physician.

THE COURT:  Do I have that in this volume?

MR. ROBERTS:  It's in a different binder, Your Honor.

MS. BOOTH:  No, it's right here.

THE COURT:  Did your experts, Mr. Wiseman, look at Dr. Coufal's testimony?

MR. WISEMAN:  I believe they looked at all of the testimony.

THE COURT:  Now, he found retinal hemorrhaging more significant than he had ever seen in a child and the result of a shaken baby syndrome and consistent with blunt recent trauma to the head.  Did you get that?

MR. WISEMAN:  I believe our expert --

THE COURT:  It wasn't --

MR. WISEMAN:  -- Dr. Spitz, reviewed --

THE COURT:  You don't see blood in the back unless it's recent.

MR. WISEMAN:  Yeah.  I am not disputing that, I just believe that Dr. Spitz was aware of that.

(Mr. Wiseman and Ms. Booth conferring off the record)

MR. WISEMAN:  Your Honor, I am just looking at Dr. Spitz's declaration right now.  In paragraph 6 he indicates he reviewed the jury trial transcript, including testimony of, among other people, Dr. Octar, so he apparently was aware of that testimony and he nonetheless opined that there were significant questions with regard to the timing of the death, the fatal blow I should say, or the fatal injuries, based on the subdural hematoma, the issue we have been discussing.

MS. BOOTH:  And so that means that he did not review Dr. Coufal's.

THE COURT:  Well, not necessarily.

MR. WISEMAN:  No, he reviewed the trial transcript including, so he named some specific folks but he reviewed the entire trial transcript.

(Off the record discussion at counsel table)

MR. ROBERTS:  Your Honor, if I might, I just found something on Dr. Spitz's, paragraph 16, I mean his, the basis of his opinion is on reviewing all the information and in paragraph 16, I mean one of his disagreements is with the eyewitness testimony of the child's head being struck multiple times on the interior of the vehicle.  I just, that kind of, I mean that just is kind of indicative of maybe what his opinions are based upon.  He is disregarding eyewitness testimony in order to reach the conclusion.  And I just noted that as I was reading Dr. Spitz's statement.

USCA5 1963

MR. WISEMAN:  Your Honor, I feel a need to respond ever so slightly.

THE COURT:  Do you want to stand up while you are doing that?

MR. WISEMAN:  Sure, sure.  Dr. Spitz literally wrote the book on forensic pathology, he is an expert of the highest national esteem, and I don't know that we can resolve --

THE COURT:  Well, did he look at -- what did he look at?

MR. WISEMAN:  He, he --

THE COURT:  Did he look at her autopsy, did he look at slides or --

MR. WISEMAN:  He looked at the autopsy reports, he looked at the trial transcript --

THE COURT:  But he never examined any physical evidence from the child?

MR. WISEMAN:  Let me, let me be clear and tell you exactly what he says he looked at.  Paragraph 3 of his report says that he reviewed the following information:  The autopsy report including the transcript of neural pathology consultation, the forensic odontology reports of Dr. Senn, Dr. Chrz, a transcript of the jury trial and then he names a number of specific witnesses, several CDs with body photographs and their enhancements of two years and eight

**USCA5 1964**

month old African-American deceased minor.  The actual color and black and white photos which are reviewed are of acceptable and satisfactory quality to render an opinion.  He criticizes the enhancements.  And that's what he reviewed.

THE COURT:  So he didn't see any autopsy slides or anything like that?

MR. WISEMAN:  Well, he saw CDs with slides.  I can't say for sure.  Several CDs with body photographs.

THE COURT:  Okay, but that's not slides like autopsy slides.

MR. WISEMAN:  I can't be sure if it is or it isn't.  I don't know from that one --

THE COURT:  Well, I mean he didn't weigh the brain or anything like that?

MR. WISEMAN:  Well, no, I mean he wasn't at the autopsy, obviously.

THE COURT:  Okay.

MR. WISEMAN:  I think what Mr. Roberts was referring to is his view that the lay witness testimony is contradicted by the scientific evidence as to when and where --

THE COURT:  It's not, though.  You are not, we are not reading those documents in the same way.  I will let you proffer his testimony however you want to do it, but I can tell you how far that's going to go.

MR. WISEMAN:  Okay.

THE COURT:  And it will give you a record of it, though, and he can, you can proffer it any way you want to.

MR. WISEMAN:  Okay, and we will certainly submit some interrogatories to the, to Dr. Rouse.

THE COURT:  You may.

MR. WISEMAN:  Thank you.

THE COURT:  Okay.  Anything else?

MR. WISEMAN:  Not from the petitioner.

MR. ROBERTS:  Your Honor, we have, we are sending a number of peer review articles from Dr. Oliver that are, they are very, very large documents, so we will be getting those and those may end up becoming an issue with regard to Dr. Oliver and if necessary we will submit those to the Court.

THE COURT:  What was that?

MR. ROBERTS:  Dr. Oliver was the expert who came in and testified about taking the color out of the photos and made them into black and white, and it's about the imaging and they are challenging the Daubert issue with regard to his methodology.

THE COURT:  Okay.

MR. ROBERTS:  And we are trying to provide those and they have turned out to be quite lengthy.  The last thing I would like to do, Your Honor, if I could, is go ahead and make a, enter into the record Dr. Moore's letter from April the 12th, 2010, Dr. Moore's CV and Dr. Price's CV, if I could.

USCA5 1966

Those were the experts that we are going to rely upon that we are asking to be able to conduct the evaluation of Mr. Bourgeois.

THE COURT:  Okay.  Well, I don't, they said they didn't have any objections, so.

MR. ROBERTS:  I don't, we don't have anything else, Your Honor.

THE COURT:  Ms. Booth, anything you can think of? Ms. Salinas?

MS. SALINAS:  No, Your Honor.

MS. BOOTH:  No, Your Honor.

MR. DOWD:  Nothing further, Your Honor.

THE COURT:  Okay.  That's it?

MR. WISEMAN:  That's it.  Unless you want more.

THE COURT:  Well, I think you gave me your best stuff, don't you think?  Okay, so four days, two-and-a-half days for Mr. Bourgeois, a day-and-a-half for the Government, and that includes your cross-examination of Government witnesses and vice-versa for the Government.  Your day-and-a-half includes your cross-examination of Bourgeois witnesses.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  For purposes of our planning, what's the Court's day usually look like in term of the length?

THE COURT:  8:30 to 5:30.

MR. WISEMAN:  Okay.

USCA5 1967

THE COURT:  An hour for lunch.  We have a mid-morning break, mid-afternoon break.  If you need more, that's fine.

MR. WISEMAN:  Okay.

THE COURT:  But it's straight through.

MR. WISEMAN:  Yeah, I know.  I get it.

THE COURT:  I mean that's why, I mean it's not like if you are, you know, when you are in state court that there's a lot of TROs or something coming up.  It's just this.

MR. WISEMAN:  Okay.

THE COURT:  And I have got the days blocked off just for you-all, nothing else.

MR. WISEMAN:  Excellent.

MR. ROBERTS:  And, Your Honor, you would just like us to work amongst ourselves to arrange when Mr. Bourgeois can be evaluated by Dr. Moore?

THE COURT:  Yes, please.  Now, another thing I forgot to bring up, I know what I wanted to bring up, is it is not required that Mr. Bourgeois be here for an evidentiary hearing according to the statute.

MR. WISEMAN:  Your Honor, I know what part of the statute you are referring to.  I am not sure I read it that way.  I think if there is going to be a summary disposition of the case, I would think Mr. Bourgeois has a right to be

USCA5 1968

here and we would very much like him to be here.

THE COURT:  I was just throwing that out to see if you agreed with it.

MR. WISEMAN:  Yeah, well, no, we require him.

THE COURT:  Because it's a huge expense to have him here.

MR. WISEMAN:  I understand that and, you know --

THE COURT:  We could, I guess, figure it out, Ms. Scotch keeps urging video, with a direct telephone line to just his counsel.

MR. WISEMAN:  Yeah, I mean that's, that would require us to have somebody up there with him and it breaks up our defense team.

THE COURT:  Well, not really.  I mean, if I had a direct telephone line right in here that you could talk to him.  Do you see what I mean?

MR. WISEMAN:  Yeah, I guess I do.  Look, our preference would strongly be to have our client here.  Even though he is, in our view, not fully able to assist and participate because of his mental health deficits, we do think he has a right to be here.

THE COURT:  Well, if he, you know, can't help you, why would he need to be here?

MR. WISEMAN:  Well, I think due process applies even to, you know, people with deficits.  I mean, I am not saying

he is incompetent.  He is competent but he is impaired, and nonetheless he has articulated to us he would like to be here, we would like to have him here.

THE COURT:  May I, I am going to make one requirement about the proffer from your expert that wants to talk about the cause of death and the time of death.

MR. WISEMAN:  Yes.

THE COURT:  That he must review both Coufal's testimony as well as the emergency room doctor.

MR. WISEMAN:  Certainly.

THE COURT:  And I want it to say in whatever proffer that he has done that.

MR. WISEMAN:  Yes.

THE COURT:  And why he thinks that he didn't see new blood in the retina from recent smashing of the head.

MR. WISEMAN:  Okay.

THE COURT:  Thank you very much.

MR. WISEMAN:  Thank you, Your Honor.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Thank you.  You-all, once again, are surprising, you are so good.  Thank you.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Not that I'm surprised that you are good, but it's always a treat to have good lawyers here.

(The proceedings ended at 2:49 p.m.)

**USCA5 1970**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


___/s/  Judith M. Garcia_____        _May 4, 2010_____

**USCA5 1971**

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**


UNITED STATES OF AMERICA

v.                                                      Case No.: 2:02–cr–00216
                                                        Judge Janis Graham Jack

Alfred NMI Bourgeois

                           Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.


- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).


Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:


- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.


Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.


David Bradley, Clerk

USCA5 1972

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On May 6, 2010, the Court held a telephone conference in the above styled-case. At the

conference, the Court made the following orders:

1. The Government will disclose to Bourgeois' attorneys a list of tests that Dr. Price will select from when performing his examination of Bourgeois for mental retardation. The Government has represented that Dr. Moore will only perform a mental-status examination. If Dr. Moore should anticipate performing any other testing, the Government will disclose that information to Bourgeois' attorneys. The Government will turn over the lists of potential testing instruments a week before the examination.

2. The Government will submit a draft protective order regarding the copyright of the testing instruments, as necessary.

3. The mental health examinations by the Government's experts will be videotaped. The Court orders that access be allowed for videotaping the mental examinations.

4. The parties will modify the standard pretrial order form for the purposes of this case. The parties will label the resulting document a "Final Hearing Order." The parties will adapt the standard pleading as necessary, but will include paragraphs 1, 4, 10, 11(a).

5. The parties will exchange Rule 26 disclosures by August 6, 2010.

SIGNED and ORDERED this 6th day of May, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 1973

✎AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

**TRANSCRIPT ORDER**

FOR COURT USE ONLY
**DUE DATE:**

Please Read Instructions:

| 1. NAME: KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 5/6/2010 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545 W. | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:02-CR-00216 | 9. JUDGE JANIS G. JACK | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 5/6/2010 | 11. TO 5/6/2010 |

| 12. CASE NAME | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

☐ APPEAL          ☐ CRIMINAL          ☐ CRIMINAL JUSTICE ACT          ☐ BANKRUPTCY

☐ NON-APPEAL     ☒ CIVIL  HABEAS     ☐ IN FORMA PAUPERIS            ☐ OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | PHONE CONFERENCE | 5/6/2010 |
| ☐ BAIL HEARING | | | |

Clerk, U.S. District Court
Southern District of Texas
FILED
MAY 10 2010
David J. Bradley, Clerk of Court

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIM | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL |
|---|---|

| 18. SIGNATURE V. Hennig | ☒ EMAIL ONLY REQUIRED (14-DAY CATEGORY) |
|---|---|
| | ☐ EMAIL AND HARD COPY REQUIRED |
| 19. DATE 5/6/2010 | ☐ EMAIL ADDRESS: KATHRIN_HENNIG@FD.ORG |

| 20. TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|
| | |

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | 5-10-10 | ✓G | |
| DEPOSIT PAID | | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE |

**DISTRIBUTION:**     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

USCA5 1974

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| UNITED STATES OF AMERICA, | * | CRIMINAL ACTION |
|---|---|---|
| | * | |
| PLAINTIFF, | * | CR-C-02-216(1) |
| | * | |
| VS. | * | |
| | * | CORPUS CHRISTI, TEXAS |
| ALFRED BOURGEOIS, | * | MAY 6, 2010 |
| | * | 1:09 P.M. |
| DEFENDANT. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *


TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:          MS. PATTI HUBERT BOOTH
                             MS. ELSA SALINAS
                             OFFICE OF THE U.S. ATTORNEY
                             800 NORTH SHORELINE, SUITE 500
                             CORPUS CHRISTI, TEXAS 78401

                             MR. TONY R. ROBERTS
                             OFFICE OF THE U.S. ATTORNEY
                             P. O. BOX 61129
                             HOUSTON, TEXAS 77002

                    (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:          MS. VELMA GANO


        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
            TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                 MOLLY CARTER, P. O. BOX 270203
              CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 1975

APPEARANCES:   (CONTINUED)


FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                            OFFICE OF THE FEDERAL PUBLIC DEFENDER
                            601 WALNUT STREET
                            THE CURTIS CENTER, SUITE 545
                            PHILADELPHIA, PENNSYLVANIA 19106

USCA5 1976

(The proceedings began at 1:09 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts for the United States.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

THE COURT:  All right.  Y'all had some questions. Let's start with the testers, the mental health testers.

MR. WISEMAN:  I'm having trouble hearing you, Your Honor.

THE COURT:  Is this better?  Hold up.

MR. WISEMAN:  A little bit.

MR. ROBERTS:  I'm having trouble as well, Your Honor, from Tony Roberts.

THE COURT:  Okay.  Okay.  I got it.  I got it.  Okay. Is this better?

MR. WISEMAN:  Yes, that's better.

MR. ROBERTS:  Yes.

THE COURT:  Okay.  I had it turned down too far.

Let's start with the mental health provider testing, the evaluators.

USCA5 1977

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  I've spoken with Dr. Moore.  Mr. Wiseman and myself have been corresponding with regards to how to set this up.  And the two main issues, I think, is one where Mr. Wiseman has asked for the tests, the list of test questions and the list of types of tests that they're going to give before they go in.  And Dr. Moore has informed me that, first of all, he doesn't intend to administer any tests other than the mental status exam, because he's focusing on the adaptive functioning.

So that's the only test that Dr. Moore will be giving.  But he will evaluate Alfred Bourgeois based on the tests.  And as far as I understand, he'll ask him about his past.

On the other side, Dr. Price is going to address the cognitive functioning.  And he said that he would, he will do the evaluation consisting entirely of standardized testings and will not be actually interviewing Alfred Bourgeois about the facts of the case or his life prior to the instant offense.

So the initial question, I think, is whether or not they should be required to give all the list of tests and all the list of questions that might be asked to Mr. Bourgeois before they go into the interview.  They've both told me that they've never had to do that, that that was something that was a new request to them.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.

USCA5 1978

I'm not interested in the questions they're going to ask.  I'm interested in the tests.  And I've personally been involved in another case where --

THE COURT:  I really just want to hear about this one.  Tell me what you want.

MR. WISEMAN:  Dr. Price has done this before, is my point.  He's provided tests.  Obviously, the provision of tests for Dr. Moore is academic.  If he's only going to do interviewing and the mental status exam, that's fine.  With regard to Dr. Price, I would submit that knowing the tests he's going to administer is appropriate.  It's appropriate use of Your Honor's discretion.

THE COURT:  Why?

MR. WISEMAN:  I would also --

THE COURT:  Why is it -- why do you need to know that in advance?

MR. WISEMAN:  I'm sorry?

THE COURT:  Why do you need to know what tests he's going to be giving in advance?

MR. WISEMAN:  Well, Mr. Bourgeois has a right to counsel at this point in the proceedings.  And as part of that right to counsel, I have a right to know the scope of the examination.  I would cite to Your Honor the case of Buchanan versus Kentucky, 483 U.S. 202 (sic) at 424, where it discusses the case of Estelle v. Smith, a prior Supreme Court case.  And

USCA5 1979

the quote there is discussing the right to counsel, the Sixth Amendment right to counsel in a mental health evaluation.

It says, quote, "Thus, in our view, Smith had not received the opportunity to discuss with his Counsel the examination or its scope." We have a right to know what kinds of tests they're going to administer, that in the words of Buchanan, we can discuss that with our client, both the examination and the scope. You know, that just springs from his right to have an attorney.

THE COURT: Well, what tests did your -- what tests did your examiners give him?

MR. WISEMAN: I'm sorry?

THE COURT: What tests did your examiners give him?

MR. WISEMAN: My examiners?

THE COURT: Yes.

MR. WISEMAN: Well, the neuropsychologist gave him the Halstead-Reitan battery, an intelligence test. There was some personality testing administered as well. I don't have the list in front of me, but I think those were the general categories of tests that were administered.

I'm not even thinking of objecting necessarily to any of the tests. I just want the know what they are. In case there's something there that I think is completely irrelevant, I think I should have a right ahead of time to bring that to the Court's attention.

USCA5 1980

THE COURT:  Well, I agree with you.  So I don't see anything wrong with disclosing the tests that Dr. Price is going to administer.  You don't need anything further from Dr. Moore.  Is that right, Mr. Wiseman?

MR. WISEMAN:  That's correct.

THE COURT:  What test is Dr. Price going to administer?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.

THE COURT:  I mean, if they're standardized tests, I guess it's no big deal.  You know, if he just lists everything he might do or he's thinking about doing and just say, "He's going to pick from the following exams," I think that's satisfactory.  It gives notice to the Movant.

MR. WISEMAN:  Yeah.  Your Honor, I am relying on the expertise of both Dr. Price and Dr. Moore.  And we've essentially -- we're not going to be present.  We haven't asked them to give us a list --

THE COURT:  Okay.  All I'm saying is that give them the list of tests that they are considering about -- they're considering using, everything they may use, and then they don't have to use them all.

MR. WISEMAN:  Your Honor, with respect to Defense Counsel's presence at the evaluations --

THE COURT:  Wait a minute.

USCA5 1981

MR. WISEMAN:  -- I understand --

THE COURT:  Are you talking about the Respondent?

MR. WISEMAN:  I'm sorry?

THE COURT:  Are you talking about the Respondent, Mr. Roberts, or --

MR. WISEMAN:  I requested of Mr. Roberts that he agree that a member of my staff can be present --

THE COURT:  I assume he's not agreeing to that.

MR. WISEMAN:  He is not agreeing to that.  In the alternative, I've asked for videotaping, which I understand there may not be agreement on as well.  Again, this is a right to counsel issue.

THE COURT:  Well, hold up.  Hold up.  Can you videotape it, Mr. Roberts -- obviously the Government is going to pay for it, whether I say the Movants pay for it or not.  So can you videotape it where he doesn't know it's being videotaped?

MR. ROBERTS:  I'm sorry.  Can we videotape it where he's what, Your Honor?

THE COURT:  Where he's not aware that it's being videotaped.

MR. ROBERTS:  We could -- we could ask the -- he's going to be at the Terra Haute, at the facility.  It's my understanding he's going to be in a room that -- I don't know how he would be videotaped.  It would have to -- without him

**USCA5 1982**

knowing that it was being videotaped.  I can ask --

THE COURT:  Well, I don't think it makes any difference.  I don't see any possible harm to the Government in videotaping the testing, unless there's some problem with Doctors Moore and Price.

MR. ROBERTS:  Well, Your Honor, I didn't have a problem.  I actually -- I mean, from a prosecutorial position --

THE COURT:  I think the more information I have, the better.

MR. ROBERTS:  -- asked the doctors if it would affect the, if it had a potential to affect the outcome.  And I told them that I was going to rely completely on their position.  Because the goal here is to get as accurate an assessment as possible.  Dr. Moore and Dr. Price have both come back with objections to the process.  And both of them, in their history, have gone in and found people mentally retarded and gone in and found others not.  And so they --

THE COURT:  Well, I'm not understanding.  What is their specific objection?

MR. ROBERTS:  Your Honor, their specific objection is -- and I'm going to read what Dr. Moore wrote to me.

THE COURT:  Okay.

MR. ROBERTS:  He said -- he first starts off that "There are numerous articles indicating that a person's

USCA5 1983

behavior changes during evaluation when observed by a third party.  In this evaluation situation, part of the standardization of our own clinical skills and observations has been honed in a one-on-one, non-observed situation. Introducing the presence of observers or recording equipment introduces unnecessary distractions and potentially affects the examinee's performance and also shifts our attention as evaluators, based on the realization that we are being observed or recorded and evaluated, as opposed to focusing our full attention on the task at hand, which is evaluating the Defendant."

THE COURT:  That's it?  Are you there?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Well, you know, I know as a matter of fact when psychologists are being trained to do testing, they look in a two-way mirror, or they're sitting in a room watching the examinations being given.  There are third parties there not unusually in those circumstances, especially in training institutions.  I don't see why it would be unusual to have in a prison someone else observing it, and therefore videoing it.  I mean, the whole thing is to present to me and to make a record. Why not have a video record of the interviews?

MR. WISEMAN:  And that's our interest as well, Your Honor.  This is Michael Wiseman.

THE COURT:  I mean, I think that I could learn from

USCA5 1984

seeing a video of the way he responds.

MR. WISEMAN:  Yeah, I also want to have a record of what was said by him, as well as the doctor.

THE COURT:  Because you know how those things get open to interpretation, even after the tests are made.  So why not record them?

MR. ROBERTS:  Well, I mean, Your Honor, again, I'm deferring to the expertise of my, of the two psychologists. They're telling me that recording it brings distractions in and it could affect their ability to make a pure and accurate assessment.

So I really don't have a -- I don't have a legal response.  I'm not responding from a legal perspective.  In fact, I said -- I told Mr. Wiseman that he could e-mail the doctors directly and ask if they would be willing to accept his, the conditions he wanted to put on the interview, and they contacted me back directly and said they would object because, and gave me these reasons.

So my goal, as always, has been to have him, have Mr. Bourgeois evaluated objectively so that we can assess his mental status.  And if our experts come back and say he's mentally retarded, then we're going to turn around and react as we're supposed to, go up and state that at that point in time we would not be able to go forward with the sentence.

MR. WISEMAN:  And you know, Your Honor, this is

Michael Wiseman.  I don't doubt Mr. Roberts for a moment in that regard, and you know, he's speaking on behalf of these doctors, who I don't know.  And frankly, you know, as former President Reagan once said, you know, "Better to verify --" "Trust, but verify," I believe was the expression.

So I, you know, I can't fathom how having a video camera in the room would in any way significantly impact this, if impact it at all.  And my only thought is that, Your Honor, we would probably need an order for the prison to go forward with the videotaping.

MR. ROBERTS:  That's probably correct, Your Honor. If I could ask -- and Your Honor, you may deem it not even relevant to the analysis, but I'm kind of curious if there were any recordings made of Mr. Bourgeois when he was interviewed and evaluated by the, Mr. Wiseman's experts and whether or not they were actually present when he was evaluated for those tests.

MR. WISEMAN:  We were not present, and there were no recordings.  Of course, there's a very different interest involved here, as --

THE COURT:  I understand that.  We don't need to go down that road.  But of course, I think if there were recordings, that might be another matter.  But I can't imagine that you would have recorded them actually.

MR. WISEMAN:  No.

USCA5 1986

THE COURT:  Because you can test all you want and not have to disclose.

MR. ROBERTS:  And I don't -- again, Your Honor, Tony Roberts for the United States.  I don't have a legal argument or basis for this.  I'm relying totally on the doctors, and essentially they're telling me that this, these things interject distractions into the process.  So that's all I can tell you is that I'm relying on my expert.  That's what they tell me.  Obviously if you order us to do differently, we'll do as you order.  But I don't have a legal argument for why we need to do it a different way.

THE COURT:  All right.  I'm going to go ahead and order that they be videotaped.  Then who's going to videotape them?  That's another thing.  Mr. Roberts, you want to have the Government do that?

MR. ROBERTS:  We can, Your Honor.  We -- I don't know if the present facility has someone that they worked with before.  Mr. Wiseman said that he knows of this being done before.

MR. WISEMAN:  Yeah.  In that instance, the doctor himself brought in the video camera and set it up and ran it. You know, we'd be happy to assist in whatever way we can, either by obtaining equipment, you know, hiring a videographer. I mean we'll accommodate the Government in any way that's needed.  I mean, I'm certain it can be done, with a small video

**USCA5 1987**

camera on a tripod.

MR. ROBERTS:  Your Honor, in addition to that, at the point in time when I guess it's recorded, we would -- I guess we would make copies of that and provide it to the parties. But I understand that there's some copyright concerns?

MR. WISEMAN:  Yes, Your Honor.  And I addressed that --

THE COURT:  Oh, yeah, about he said they would do a protective order.

MR. ROBERTS:  I can't hear you, Your Honor.

THE COURT:  I think that Mr. Wiseman, in the memo I have in front of me, a copy of whatever he's sent to Doctors Price and Moore, that he offered to enter into any protective order --

MR. ROBERTS:  Okay.

THE COURT:  -- to cover the copyright problems with the standardized testing.

MR. ROBERTS:  All right.  Well, I will certainly get with Dr. Moore and Dr. Price and ask them their -- ask for their input on how we proceed with videotaping.  And then I do believe that the prison will need that order before they'll allow that in.  I understand that we actually have to give a whole list of -- the expert has to give a whole list of things that he intends to bring in.  And if anything is not on that list, he won't be able to bring it in, or something of that

USCA5 1988

nature.

MR. WISEMAN:  Your Honor, I also wanted to bring up a question about the pretrial order, if that would be appropriate now.

THE COURT:  Okay.  Have we taken care of the other issue satisfactorily to everybody?

MR. WISEMAN:  I'm satisfied.  This is Michael Wiseman.

MR. ROBERTS:  Your Honor, I understand the, you would like -- you would like Dr. Price to give a list of --

THE COURT:  Of any tests he may contemplate doing.

MR. ROBERTS:  -- to bring with him into the facility.

THE COURT:  Well, I don't know if he brings them in. I don't know if he's committed them to memory or -- no, it's not the list that he's going to use.  It's the list he's going to choose from.

MR. ROBERTS:  Okay.

THE COURT:  I don't think he has to commit till he sees him as to what kind of tests he's going to give.  I think the whole point is Mr. Wiseman wants a list of whatever he may be contemplating giving.  Is that right, Mr. Wiseman?

MR. WISEMAN:  That's correct.

MR. ROBERTS:  Okay.  I'll have Dr. Price provide that.

THE COURT:  And do we need some time lines on this?

**USCA5 1989**

MR. ROBERTS:  Well, Your Honor --

THE COURT:  Like a week before the testing?

MR. ROBERTS:  -- all that can be set up.  Dr. Price is available and ready to conduct his evaluation on June the 21st.

THE COURT:  Mr. Wiseman, is a week in advance enough?

MR. WISEMAN:  For the list of tests?

THE COURT:  Yes.

MR. WISEMAN:  Yeah, that's fine.  That's fine.  We had already talked about some dates, and I think there was no problem with the dates.  The only question was the ones we presented to Your Honor.  So I think we could work it out from here, in terms of the logistics.

THE COURT:  Okay.  And I'll just put in the order that it's been represented that Dr. Moore is not going to be administering any tests, just doing an interview.  Is that right?

MR. ROBERTS:  He does not intend to administer any tests to Mr. Bourgeois, other than a mental status exam.

MR. WISEMAN:  And that's understood, Your Honor, by Petitioner, and that's totally fine.

THE COURT:  I guess I'm just going to add in there that if he changes his mind and wants to do some tests, he has to disclose them to you a week in advance.

MR. WISEMAN:  Okay.

**USCA5 1990**

THE COURT:  So at least we're covered on that.

MR. WISEMAN:  That's fine, Your Honor.  Thank you.

THE COURT:  Okay.  And then before -- before the videotaping of either one of these examinations, Mr. Wiseman is going to enter into a protective order?

MR. WISEMAN:  Yes, Your Honor.  Should I draft that, or does Mr. Roberts want to do that?

THE COURT:  Mr. Roberts, why don't you do that when you consult with your experts and see what they're concerned about.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Now, let's go to the Joint Pretrial Order.

MR. WISEMAN:  Yes, Your Honor.  The question was, I read your preferences, which refers to the form of order that is contained in the local rules.  And you know, at first glance, I just wasn't sure if Your Honor wanted us to actually use this form or not.  I mean, we've -- Mr. Roberts and I have talked about exchanging and pre-marking exhibits and expert reports by, you know, a particular date and all that.  I guess given all the writing we've already done in this case, if Your Honor was interested in us doing more writing.  And so that was the basic question.

(PAUSE.)

MR. WISEMAN:  I'm sorry.  Is everyone there?

USCA5 1991

THE COURT:  I'm sorry.  I'm thinking.

MR. WISEMAN:  Oh, okay.

THE COURT:  I'm reading through the order that I use, the Joint Pretrial Order.

MR. WISEMAN:  I thought maybe I got cut off.  I didn't hear anything.

THE COURT:  Stay with me, Mr. Wiseman.

(PAUSE.)

THE COURT:  I think we'll call it a Joint Hearing Order.  Okay?  And feel free to amend this any way you want when you do it together.  But I want in there just appearance of Counsel -- I've got -- have you got the usual Joint Pretrial Order in front of you?

MR. WISEMAN:  I have it in front of myself, Your Honor.

THE COURT:  Okay.  Paragraph 1, no 2, no 3.  I don't think there will be any motions.  So no 4, unless there are motions.  If there are motions, you can throw that in.  No 5, no 6, no 7, no 8, no 9, but all of 10.

MR. WISEMAN:  Okay.

THE COURT:  And 11.

MR. WISEMAN:  And 11.

THE COURT:  And at the end of Paragraph A, put in Rule 26 disclosures 60 days prehearing.  And we're going to call this a final hearing order.

USCA5 1992

MR. WISEMAN:  Your Honor, I think Mr. Roberts was going to bring up next the issue of expert reports.  I think the timing may be that he's -- we, between ourselves, talked about August 6th as a date for the exchange of expert --

THE COURT:  You know what, then we'll have all Rule 26 disclosures for experts by what, August what?

MR. WISEMAN:  August 6th was the date we had talked about.

THE COURT:  6th will be fine.

MR. ROBERTS:  Yes, Your Honor.  And with one caveat that Dr. Moore is doing his evaluation after Dr. Price, and he is obviously working on other, another case as well -- maybe not obviously, but, and he has one trip that has already been planned that he can't change, at the end of July.  So he has told me that he's going to work as diligently as possible.  I have an e-mail from him, and it -- that August 6th is very tight for him, but he's going to do his best to work within those deadlines.

THE COURT:  Well, why don't you just do an amendment, do a motion for an amendment if that becomes a problem.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  And Your Honor, just so the Court knows, I told Mr. Roberts we would be fine with reasonable continuances of that date, if his expert makes his best efforts.

USCA5 1993

THE COURT:  Okay.  So I don't think we need -- I think we're just talking about Paragraphs 10 and 11.  Certainly not 12 and certainly not 13.

MR. WISEMAN:  Okay.

THE COURT:  I don't think we need any of 14 either.

MR. WISEMAN:  Okay.

THE COURT:  And as I say, just cursorily looking through it, I don't think I've ever had but one of these before, and it wasn't my trial.  It was a State habeas.  So you all are probably more familiar with this than I am.  If you can think of other items that should appear in a joint hearing order, please feel free to add them in.

MR. WISEMAN:  Okay.  We'll do that.

THE COURT:  Anything else?

MR. WISEMAN:  Not from Mr. Bourgeois.

MR. ROBERTS:  Not from the United States, Your Honor, unless Ms. Booth or Ms. Salinas has anything.

MS. SALINAS:  No, Your Honor.

MS. BOOTH:  I don't have anything.

THE COURT:  And Mr. Roberts, I'm going to go ahead and issue the order about the videotaping.  But if you take that order to your experts, and there's something really that I haven't thought of or Mr. Wiseman hasn't thought of or you haven't thought of about that particular order that would be of concern to your experts that we might be able to address, you

USCA5 1994

can put it more specifically in a motion for rehearing.
Because they weren't here today, and you just read the
paragraph, and there may be something, instead of the general
statements, more specific.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  See what I mean?  I don't know what, but
I'm not the expert.  So anything else you all can think of?

MR. WISEMAN:  Not from Mr. Bourgeois.

MR. ROBERTS:  No, Your Honor.

MS. SALINAS:  No, Your Honor.

MR. ROBERTS:  Thank you for holding this conference
so quickly.

THE COURT:  Oh, no.  That's what I do.  Y'all pay me
for that.  All right.  Thank you all -- or the public pays us
all for this.  Right?

MR. WISEMAN:  That's true.

THE COURT:  Thank you all very much.  You're excused.

(Proceedings concluded at 1:36 p.m.)

**USCA5 1995**

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    May 25, 2010
Molly Carter                        Date

USCA5 1996

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

UNITED STATES' OPPOSED MOTION FOR RECONSIDERATION OF
COURT'S ORDER TO VIDEOTAPE PETITIONER'S MENTAL HEALTH
EXAMINATION.

I.

## A.    Relevant Background

On April 20, 2010, this Court held a status hearing to determine what issues from Petitioner's

2255 motion would warrant an evidentiary hearing in September 2010.  This Court determined that

Petitioner's mental retardation claim warranted such a hearing in addition to other issues.  The

United States noted that Petitioner had proffered statements from expert witnesses indicating that

those experts had conducted mental retardation testing and intended to testify about Petitioner's

mental status during the evidentiary hearing.  The United States requested permission to have

Psychologists Roger Moore and Randall Price conduct mental retardation testing.  Counsel for

petitioner, Michael Wiseman and Victor Abreu, of the Capital Habeas Corpus Unit, Federal

Community Defender for the Eastern District of Pennsylvania, stated that Petitioner would agree to

permit the testing.  The parties informed the Court that they would attempt to work out the logistics

of the testing. Unfortunately, the parties were unable to agree and requested a telephone conference

with the Court.

On May 6, 2010, this Court held a telephone conference.  The United States informed this

Court that Petitioner's counsel had requested to either be present for the testing or to have the testing videotaped. The United States also informed this Court that both Dr. Moore and Dr. Price objected to having counsel present and to videotaping stating that either would interfere with the accuracy of the testing results. Petitioner's counsel stated that its request was based upon Petitioner's Constitutional right to remain silent and his right to counsel. This Court then Ordered that the testing by Dr. Moore and Dr. Price would be videotaped.[1]

The United States communicated this Court's Order to Dr. Moore and Dr. Price. Dr. Moore and Dr. Price voiced additional concerns about having the examination videotaped and provided additional reasons that militate against videotaping the examination. Additionally, the United States informed the Bureau of Prisons (BOP) officials about the requirement to videotape the examination. The BOP officials voiced security concerns. The additional objections by the psychologists and those raised by the BOP officials were not communicated to the Court during the May 6, 2010, telephone conference. The United States has also researched the Constitutional concerns raised by Petitioner's counsel at the May 6, 2010, hearing and now believe that those concerns are unfounded. For these reasons, as further discussed below, the United States herein requests this Court to reconsider the Order that the mental retardation tests and evaluations by Dr. Moore and Dr. Price be videotaped.

**B.    Alternative Motion for Hearing**

If this Court is not persuaded to reconsider the Order to videotape the testing and evaluation by Dr. Moore and Dr. Price based upon this pleading, then the United States requests the opportunity

---

[1] The Court also Ordered that Dr. Price must submit a list of all tests from which he will choose to give to Petitioner. That part of this Court's ruling is not at issue in this reconsideration motion.

USCA5 1998

to present testimony to support the objections to videotaping the testing and evaluation. Dr. Moore, Dr. Price, and the BOP officials are available to present testimony supporting their objections during the week of June 7, 2010.

It is important to note that the United States is merely seeking to determine the truth of Petitioner's mental retardation claims. If Dr. Moore or Dr. Price were to determine that Petitioner is mentally retarded, the United States would move to set aside the jury's sentence of death. Currently, the United States believes that Petitioner's evidence falls well short of establishing mental retardation. The United States could forgo additional testing and simply respond to and rebut Petitioner's evidence at the evidentiary hearing. The burden clearly rests upon Petitioner to demonstrate that he is mentally retarded. Notwithstanding that burden, the United States believed that the best way to ascertain the truth was to have Dr. Moore and Dr. Price conduct their own testing and inform the parties of their conclusions.

The primary basis for objecting to the videotaping of the mental retardation testing and evaluation originates from the psychologists and the BOP officials themselves. In fact, Dr. Price has now suggested that he would be professionally required to withdraw from further participation in this case if he was required to be videotaped during his evaluation of the Petitioner. The BOP security concerns have been explained to the United States by Chief Correctional Supervisor Hector Joyner. He is charged with the overall security of the Federal Correctional Complex in Terre Haute, Indiana, which includes the Special Confinement Unit where Petitioner is confined.

The United States desires to know the truth and believes the best method for discerning the truth is to have Dr. Moore and Dr. Price test and evaluate Petitioner. However, the requirement to videotape the testing might prevent the psychologists from being able to conduct the testing. To

-3-

USCA5 1999

better inform this Court of the details of the objections, the United States is prepared to present testimony from Dr. Moore and Dr. Price, as well as BOP officials. If this is deemed necessary, the United States requests that this Court hold a hearing during the week of June 7, 2010, and permit Dr. Moore, Dr. Price, and the BOP officials to testify about their concerns regarding the videotaping of the proposed testing.

II.

**A.        <u>Basis for Reconsideration</u>**

After the May 6, 2010, telephone conference, the United States contacted BOP officials and informed them of this Court's Order regarding videotaping the examination. The BOP officials voiced grave concerns about security and the impact of this decision on future cases in which defense counsel make similar requests. The BOP officials stated that they currently house more than 50 federal inmates with a sentence of death pending. They state that many of those inmates have psychological testing and requests for videotaping of this testing is common. The housing location of these inmates presents a security problem for BOP, and it could open the floodgates to videotaping testing done within BOP. As such, the BOP officials are concerned about the long-term implications of this Court's Order. The BOP officials also asked that I alert the Court to the fact that inmates maintain their own web sites and are very proactive in regards to what the inmates include on those web sites. As such, the fact that one inmate is permitted to videotape an examination within the maximum security area would quickly be disseminated to the public.

The United States also informed Dr. Moore and Dr. Price of this Court's Order regarding videotaping of the testing and evaluation. Dr. Price is licensed in Texas and Oklahoma and stated that he is ethically bound to oppose the videotaping based on the Rules and Regulations of the Texas

-4-

USCA5 2000

State Board of Examiners of Psychologists, the American Psychological Association Ethical Code

of Conduct, and the National Academy of Neuropsychology.  Prior to the May 6, 2010 conference,

Dr. Price had not provided any specifics regarding these ethical concerns.  However, if asked to

testify about this matter, Dr. Price would essentially testify as follows:

> The Rules and Regulations of the Texas State Board of Examiners of Psychologists Section 465.16 (d) require licensed psychologists to "conduct testing and maintain and release test protocols and data in a secure manner that does not compromise the validity of the test".

> The American Psychological Association Ethical Code of Conduct, Standard 9.11 (2002) requires psychologists to maintain the integrity and security of tests so as not to decrease the test's validity.  The development and refinement of intelligence tests requires many years of research, effort, and expense; improper disclosure of test materials may result in breach of contract claims against psychologists who violate the terms of their test purchase or lease agreements.

The Official Position Statement of the National Academy of Neuropsychology on Test Security (Approved 10/5/99) recognizes the need to maintain test security to protect the uniqueness of test instruments.  Psychological test procedures are to be used only by psychologists trained in the use and interpretation of test instruments.  Maintaining test security is critical as public dissemination of novel test procedures can enable individuals to alter their responses in advance of actual examination.  The paper compares the videotaping and release of secure test instruments to the situation in which a student gains access to test items and the answer key for a final examination before taking the test.  The restandardization of a replacement test is a costly and time-consuming project.  For example, the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) cost several million dollars, required testing of over 5000 cases, and took more than five years to complete.

> Additionally, the Official Position Statement of the National Academy of Neuropsychology on the Presence of Third Party Observers During Neuropsychological Testing (Approved 5/15/99) recognizes the distracting effect of the presence of people other than the examiner and the examinee in the testing room.  The presence of a third party in the testing room is also inconsistent with the standardized test administration requirements.  Performance on complex tasks may decline and performance on overlearned tasks may be enhanced, "leading to a spuriously magnified picture of neuropsychological deficit".[2]

---

[2]  Affidavit of Dr. Price which was submitted in the case of *Hearn v. Quarterman*, Civil No. 3:04-CV-0450-D in the United States District Court for the Northern District of Texas.

-5-

USCA5 2001

Dr. Price also provided a link to a "You-Tube" video clip where Psychologist George Denkowski was videotaped while conducting an IQ test. The videotaped interview was apparently not supposed to be released to the public, yet the video clip was subsequently posted on the Internet. The captions added to the video clip challenge the method in which the psychologist asked one specific question during the IQ test. For the reasons set out above, Dr. Price believes it would be unethical for him to permit his testing to be videotaped. Dr. Moore has similar objections and would testify about specific concerns he has regarding the negative impact on the validity, reliability, and objectivity of the test results if the evaluation is videotaped or a third person is present.

Notably, several circuits have recognized that counsel's presence during a mental examination may interfere with the reliability of the test results. *United States v. Bohle*, 445 F.2d 54, 67 (7th Cir. 1971); *United States v. Baird*, 414 F.2d 700, 711 (2d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 559 (1970); and *United States v. Albright*, 388 F.2d 719, 726-27 (4th Cir. 1968). *But see Thornton v. Corcoran*, 132 U.S.App.D.C. 232, 407 F.2d 695, 698-702 (1969).

Dr. Moore and Dr. Price added that they do not intend to question Petitioner about the underlying offense or about any other criminal conduct. Indeed, both of them suggested that any concerns by Petitioner's counsel about their questions violating Petitioner's right to remain silent could be assuaged by a Court Order not to ask Petitioner any questions about any criminal conduct. As discussed more fully below, the United States does not believe that Petitioner actually retains his right to remain silent in this context. However, if that right applies, a Court Order that no questions be asked about criminal conduct would be a reasonable protection.

**B.    No right to counsel or self-incrimination concerns:**

After the May 6, 2010, hearing, the United States researched the claims asserted by

-6-

USCA5 2002

Petitioner's counsel during the hearing. Contrary to opposing Counsel's assertions, Petitioner's Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel are not at issue under the current circumstances. Petitioner raised the defense of mental retardation himself and does not have an absolute right to have his attorney present during a psychiatric examination where the testing is being administered in response to the alleged defense. *See generally Riles v. McCotter*, 799 F.2d 947, 954 (5th Cir. 1986), *quoting Vardas v. Estelle*, 715 F.2d 206, 209 (5th Cir. 1983) (citing *United States v. Cohen*, 530 F.2d 43, 48 (5th Cir.1976). Importantly, Petitioner is voluntarily submitting to this examination with the knowledge and consent of his attorneys after presenting psychiatric evidence for his own benefit. Under such circumstances, the Fifth Circuit has concluded that a Petitioner's Fifth and Sixth Amendment rights are not implicated. *See Coble v. Cockrell*, 80 Fed.Appx. 301, 312 (5th Cir. 2003) (unpublished).

In *Smith v. Estelle*, 602 F.2d 694 (5th Cir.1979), the Fifth Circuit Court of Appeals, relying on *Cohen*, 530 F.2d at 48, specifically concluded that the defendant did not have a right to have his attorney present during a psychiatric evaluation when the examination was to decide if the defendant was sane. 602 F.2d at 708 (reasoning that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination."). The Supreme Court noted this ruling and did not question or indicate any disapproval of the ruling in its review of the holding. *Estelle v. Smith*, 451 U.S. 454, 470 n. 14, 101 S.Ct. 1866 (1981). Subsequent to the holding in *Estelle v. Smith*, the Supreme Court concluded that there is no Sixth Amendment violation where a defense counsel is aware of the scope and nature of a psychological examination and consulted with the defendant prior to the examination. *Buchanan v. Kentucky,* 483 U.S. 402, 424-25, 107 S.Ct. 2906, 2918-19 (1987).

USCA5 2003

Additionally, Petitioner's assertion of mental retardation removes his subsequent claim of a Fifth Amendment privilege against self incrimination in regards to the United States' request to have a government-sponsored mental examination conducted upon Petitioner.  In *Estelle v. Smith*, the Supreme Court recognized that "When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."  451 U.S. at 465, 101 S.Ct. At 1874.   The Supreme Court added that several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. *Id*. (Citing *Cohen*, 530 F.2d at 47-48; *Karstetter v. Cardwell*, 526 F.2d 1144, 1145 (9th Cir. 1975); *United States v. Bohle*, 445 F.2d 54, 66-67 (7th Cir. 1971); *United States v. Weiser*, 428 F.2d 932, 936 (2nd Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S.Ct. 1606 (1971); *United States v. Albright*, 388 F.2d 719, 724-725 (4th Cir. 1968); *Pope v. United States*, 372 F.2d 710, 720-721 (8th Cir. 1967) (*en banc*), vacated and remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145 (1968)).  The sanity defense and a mental retardation defense to a sentence of death are essentially similar concepts.

In the instant case, Petitioner submitted mental examinations sponsored by his own counsel under conditions of their own design.  Those examinations were not subjected to videotaping.  The government has a right to fully confront Petitioner's sponsored mental examinations.  Petitioner's counsel seeks to impose conditions on the United States' sponsored responsive mental examination (Counsel's presence or videotaping), which potentially reduces the reliability of Dr. Moore's and Dr. Price's mental examination, and thus diminishes the United States' ability to fully confront Petitioner's claim of mental retardation.

USCA5 2004

Additionally, videotaping Dr. Moore's and Dr. Price's examination is unnecessary.  The format and procedures used will serve as the foundation for the psychologists' conclusions and testimony.  The procedures used will be shared with Petitioner in advance of the evidentiary hearing for their own evaluation.  Further, any incriminating admissions by Petitioner occasioned by the government-sponsored examination would be subject to a suppression motion.

For these reasons, the undersigned moves this Court to reconsider its May 6, 2010 Order and permit Dr. Moore and Dr. Price to evaluate Petitioner without the requirement of videotaping the evaluation and without permitting Petitioner's counsel to be present during the evaluation.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

TONY R. ROBERTS
Assistant United States Attorney

MARK M. DOWD
Assistant United States Attorney

 /s/ PATTI HUBERT BOOTH
 PATTI HUBERT BOOTH
Assistant United States Attorney
State Bar No. 02650500
Federal Bar No. 19500
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
Office: (361) 888-3111
Fax: (361)888-3200

-9-

USCA5 2005

## CERTIFICATE OF CONSULTATION

On May, 25, 2010, Tony R. Roberts, Assistant United States Attorney, conferred with Mr.

Michael Wiseman, Counsel for Bourgeois, who advised he opposes the subject motion for

reconsideration.

/s/ PATTI HUBERT BOOTH
PATTI HUBERT BOOTH
Assistant United States Attorney

-10-

USCA5 2006

**CERTIFICATE OF SERVICE**

I, Patti Hubert Booth, Assistant United States Attorney, certify that a true and correct copy of this motion for reconsideration has been provided by Notice of Electronic Filing or fax to Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Counsel for Alfred Bourgeois, on this 25th day of May 2010.


/s/ PATTI HUBERT BOOTH
PATTI HUBERT BOOTH
Assistant United States Attorney

USCA5 2007