# Attachment B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## (PROPOSED) ORDER

After consideration of the United States' motion to reconsider this Court's Order of May 6, 2010, it is hereby ORDERED that Dr. Moore and Dr. Price may proceed with their mental evaluation of Alfred Bourgeois without videotaping the evaluation and without the presence of Petitioner's counsel.


_____                    _____
Date                                               HON. JANIS GRAHAM JACK
                                                   UNITED STATES DISTRICT JUDGE

USCA5 2008

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                          Case No.: 2:02–cr–00216
                                                            Judge Janis Graham Jack

Alfred NMI Bourgeois

                              Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.


David Bradley, Clerk

USCA5 2009

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

_____

|                                      |   |                              |
|--------------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,            | : | No. Cr-C-02-216              |
|                                      | : |                              |
| Respondent,                          | : | Honorable Janis Graham Jack, |
|                                      | : | U.S.D.J.                     |
| -against-                            | : |                              |
|                                      | : | **Capital Case**             |
| ALFRED BOURGEOIS,                    | : |                              |
|                                      | : |                              |
| Petitioner.                          | : |                              |

_____

### PETITIONER'S *RESPONSE IN OPPOSITION* TO GOVERNMENT'S *MOTION FOR RECONSIDERATION OF COURT'S ORDER TO VIDEOTAPE PETITIONER'S MENTAL HEALTH EXAMINATION*[1]

On May 6, 2010 the Court ordered that the Government videotape the mental health examinations of Petitioner to be performed by its experts (document # 498). The Government has now filed a *Motion for Reconsideration* (*Motion*) of this order (document # 501). Petitioner submits this *Response in Opposition*. Petitioner submits that the Government has not offered persuasive reasons for this Court to reconsider its prior ruling, or to conduct a hearing on the Government's *Motion*.

The Governments seek reconsideration for two reasons. The "primary basis" for reconsideration relates to concerns raised by the Government's experts that

_____

[1]All emphasis in this *Answer* is supplied unless otherwise noted.

1

USCA5 2010

videotaping the evaluations will compromise "test security" – which the Government has chosen to couch as an "ethical" concern (*Motion*, 3-6).  The Government also offers unspecified "security" concerns voiced by a Bureau of Prison (BOP) official (*Motion*, 3-4).

Because of these twin concerns, the Government takes the position that videotaping of a mental health evaluation should never be done, and videotaping can never be done at the USP – Terre Haute.  However, the Government's position is not sacrosanct.  Indeed, the Government's own experts have agreed to and insisted on recording past evaluations, and the BOP has allowed such recording to occur in the past at Terre Haute when requested by the Government.  Regrettably, it would appear that both the Government's experts and the BOP may not have been entirely forthcoming in the instant *Motion*, as will be demonstrated.

A.      **The Government's Experts' "Ethical Concerns."**

The Government argues that the examinations should not be videotaped because doing so will compromise test security and therefore the "ethics" of at least one of their experts.  These concerns are illusory at best, and are likely patently false.

Dr. Price, who has voiced the ethical concerns regarding test security, has voluntarily **audiotaped** neuropsychological and psychological testing and interviewing in at least one other federal capital case of which counsel are aware. In

2

USCA5 2011

<u>United States v. Edward Leon Fields</u>, Cr. 03-73–RW (E.D. Ok.), Dr. Price was retained by the Government to conduct a pre-trial psychological and neuropsychological evaluation of a capital defendant. As the excerpted page from his *Report* of his evaluation shows, both of his sessions with the defendant were audio-taped. The audiotapes of the sessions were shared with the defense. See page 16 of Dr. Price's report, attached as an Exhibit.[2]

The Government has represented that Dr. Price will administer, among other tests, the WAIS IV, which is an instrument designed to measure intelligence. Parts of the test requires the subject to respond to oral questions posed by the evaluator. Thus, although audiotaping may not **show** the tests, it certainly would reveal the questions asked, which one would believe would also compromise test security. Thus, if Dr. Price is truly concerned about test security, the Government needs to explain why audiotaping does not constitute a security breach.

The Government has more explaining to do. It retained Dr. Daniel Martell as its neuropsychological expert in this case. See *Respondents' Sealed Answer to*

---

[2] This report has been filed as a public document in Mr. Fields' section 2255 case and therefore counsel have no concern about filing this excerpt publically in this case.

3

USCA5 2012

*Section 2255 Motion* (document # 443) at page 73-74.[3]  Dr. Martell testified for the

Government in another capital section 2255 case about why he routinely attempts to

videotape all of his evaluations and why doing so constitutes sound forensic practice.

Q:      Was your evaluation of Mr. Hammer – yours and Dr. Matthews [the Government psychiatrist], was it videotaped?

A:      Yes, it was.

Q:      Why did you allow for videotaping?

A:      I try and do this in every case unless I'm precluded by the parties.  I feel that it protects everyone involved.  It provides the defense with an absolute record of everything that I said, everything that I did, so their experts can look for mistakes, can question my methods if they choose to do so.  It protects me because I don't have to spend time writing notes which can be quite cumbersome, and so it makes it a more efficient test process, and it gives me an absolute record of the answers that were given so I'm not trying to paraphrase a defendant.

So I think overall **it's good forensic practice to videotape the exams and preserve the record.**

United States v. David Paul Hammer, 96-CR-239 (M.D. Pa.), Transcript, August 29,

2005, pages 51-52 (attached as Exhibit).

Thus, contrary to the Government's current expert's (Dr. Price) view – that

videotaping is always prohibited by ethical concerns over test security – the

---

[3]Dr. Martell's name has not appeared since the Government filed its *Answer* which included comments about Dr. Martell's views and included his *curriculum vitae* as a exhibit.  It is not clear to Petitioner, nor has the Government articulated any reason, as to why it appears to have dropped him from this case.

USCA5 2013

Government's apparently former expert (Dr. Martell) believes it to be good forensic practice. This discrepancy is not explained by the Government.

The Government complains that Petitioner's mental health experts were permitted to conduct examinations "under conditions of their own design" which did not include videotaping (*Motion*, 8). Therefore, the Government reasons, it should be permitted to do the same. This is an extraordinary argument. One-half of the neuropsychological and intelligence testing that comprise Petitioner's current mental retardation claim, was done by Dr. Weiner years before current counsels' entry into this case. Current counsel took those results as they found them. It is worth noting that Dr. Weiner's result on IQ testing was a 75, which, when adjusted for the Flynn Effect, is actually a 68. This result is remarkably similar (i.e. statistically identical) to the score of 70 obtained by Dr. Gelbort in post-conviction testing. Petitioner has thus scored in the mentally retarded range already on two tests. Dr. Price's passing concern that videotaping will lower the score (*Motion* at 5 "Performance on complex tasks may decline"), would seem irrelevant since Petitioner has already scored in the range of mental retardation.[4]

---

[4]It is also noteworthy that Dr. Price's concerns regarding test accuracy seem to arise only in the case of a third party observer. There is nothing in his quoted material regarding adverse impacts on accuracy based solely on videotaping.

5

USCA5 2014

The Government's current position that videotaping is never appropriate is also undercut by the Government's position in another capital section 2255 case, United States v. Keith D. Nelson, No. 04-8005-CV-W-FJG, No. 99-00303-01-CR-W-JFG (W.D. Missouri), where the United States has moved to **require** videotaping of a forensic mental health evaluation.  In Nelson, the Government retained Dr. Martell and Park Dietz, by whom he is employed, to conduct three days of mental health evaluations of Mr. Nelson (including neuropsychological evaluation).  The Government moved to have these sessions audio and videotaped, with the tapes being provided to the court and defense counsel.  See *Government's Motion to Establish Procedures by Which a Mental Health Examination of Movant Will Be Conducted*, at page 5 (attached as an Exhibit).[5]

Ironically, the defense in Nelson opposed the audio and videotaping of the

---

[5]In stark contrast to the Government's position in this case, the Government in Nelson agreed to permit counsel to be present, albeit outside the examination room, in "recognit[ion of] the movant's Sixth Amendment right to counsel" Id., at 5.  That is no longer an issue in this case because Petitioner's counsel are satisfied not to be present, so long as the sessions are taped.  Accordingly, Petitioner will not respond further to the Government's discourse on the Fifth and Sixth Amendment.

It should be noted that the Government incorrectly asserts that Petitioner's counsel **still wish to be present** for the evaluations. *Motion*, 8 ("Petitioner's counsel seeks to impose conditions on the United States sponsored responsive mental examination (Counsel's presence or videotaping) . . .")).  This is not so.  As articulated during the May 6, teleconference, counsel are happy to rely on the videotaping as a substitute for their presence.

USCA5 2015

evaluations.   In response, the Government in <u>Nelson</u> cited the American Bar Association Guidelines on Criminal Justice Mental Health Standards, 7-3.6, as requiring preservation of an evaluation and argued that audio and videotaping was far superior to "get to the truth" than the simple provision of an experts notes (an alternative proposed by the defense):

> In a case as important as this, the ultimate goal is reaching a correct, just result.   One way to accomplish that goal is to conduct these examinations transparently. . . a audio- or video-recording would be the best record of what will occur.  Additionally, notes are inadequate for capturing relevant behavioral data that an expert may witness, but be unable to adequately describe in written notes.  **If the real goal in this post-conviction setting is to get to the truth, there is a much better way of recording the movant's examination.**

<u>Id.</u>, 5, 7.

The Government in <u>Bourgeois</u> claims that the only way to "get to the truth" is by not videotaping (*Motion*, 3) ("the United States is merely seeking to determine the truth . . .the best way to ascertain the truth . . .The United States desires to know the truth . . . "). Yet, in <u>Nelson</u> the United States took the polar opposite position that the truth is best determined by a contemporaneous videotaping of the record. Petitioner believes that videotaping is the best way. In any event, given the discrepant positions assumed by the United States in <u>Nelson</u> and in <u>Bourgeois</u>, the Government here cannot credibly maintain that not videotaping is the only way to obtain a credible

USCA5 2016

result.

The Government complains that a video of a Dr. Denkowski from Texas was put on "You-Tube," and that this unexplained and unfortunate incident should cause this Court to reconsider what the Government's own expert (Martell) considers "good forensic practice." *Motion*, 6. Counsel obviously cannot be held accountable for the unknown actions of unknown people in some other case. Counsel have already offered to enter into a protective order (as recognized in this Court's May 6 Order) and they can assure the Court that they will abide by any protective order precluding redisclosure of such tapes to anybody outside the defense team.

There is further irony in the Government's citation to the Denkowski incident. Undersigned counsels' office has encountered Dr. Denkowski in a Pennsylvania case where mental retardation was at issue. The state court judge who presided over the hearing found that Dr. Denkowski inappropriately administered and scored tests. This finding was made based upon the review of a videotape of Denkowski's evaluation, thus showing the value of videotaping to ensure a truthful result:

USCA5 2017

[Defense expert] Dr. Cooke **reviewed the video tape** of the examination and found tremendous deviation from a standard assessment. N.T. 10/25/06: 65. Dr. Cooke added that Dr. Denkowski rephrased the questions multiple times, which violated the standardized procedure. N.T. 10/25/06:132. Furthermore, Dr. Cooke testified that the ABAS manual does not discuss altering scores based on the administrator's subjective view. N.T.I0/25/06:133. During the examination, Dr. Denkowski asked 215 questions, 45 of which were adjusted. N.T. 11/29/06.

<u>Commonwealth of Pennsylvania v. Jose DeJesus</u>, November Term, 1997, No. 350 1/1 (CCP, Phila. Co., August 10, 2007) <u>slip opinion</u> at 12 (excerpt attached as Exhibit).[6]

The findings against Dr. Denkowski endorse the efficacy of Dr. Martell's view that videotaping is "good forensic practice" because it provides an "absolute record" of the testing. Dr. Martell's position is really what is at the core of the current dispute. It is imperative that counsel have a record of what happens in the evaluation so that they can, quite literally, keep the Government's experts honest. The Government's experts' concerns about test security are easily met, and do not come close to outweighing this Court's need to have as much information as possible to resolve these important issues.

---

[6]It is also noteworthy that Dr. Denkowski is the subject of pending disciplinary action initiated by the Texas State Board of Examiners by Psychologists. A copy of the Complaint is attached as an Exhibit. The basis for the discipline was the maladministration of tests related to mental retardation.

9

USCA5 2018

**B.    Security Concerns.**

The Government fails to offer any specific basis for the security concerns voiced by a single BOP official, so it is difficult if not impossible to respond to them. However, as counsel have noted above, the Government has moved to videotape in the <u>Nelson</u> case and that motion appears to not have caused any such concerns to be raised by the BOP.  Undersigned counsel were involved in the <u>Hammer</u> case, also discussed above, and can represent to the Court that Dr. Martell's evaluation of Mr. Hammer was done and videotaped at the USP – Terre Haute.  Thus, in at least two instances where the **Government** has wanted to videotape, the BOP has not raised their alleged security concerns.

Because defense counsel in <u>Nelson</u> were opposed to the videotaping (<u>see</u> Government's *Motion to Establish Procedures* at 6 (noting that the defense was opposed to audio or videotaping)), they wrote to the Warden of the USP – Terre Haute to inquire as to the policies governing videotaping.  Although it appears in context that the Warden did not necessarily understand that the defense was opposed to videotaping, her recent response to that inquiry states that "every request for videotaping and audio recording is carefully reviewed and considered **on a case by case basis**.  The decision is based upon the individual facts and circumstances of each particular request."   <u>See</u> Letter from H.J. Marberry, Complex Warden to Gary

10

USCA5 2019

Brotheron, Esq., dated may 7, 2010, attached as an Exhibit.

The Government has not indicated what "individual facts" about the Bourgeois request "poses a security risk" of a "potential disruption" to the facility. To the contrary, the Government's pleading relies upon the **generalized concerns** voiced by a single BOP representative (Mr. Joyner) that videotaping in this case will have an impact on "future cases" and will "open floodgates" to videotaping requests in other cases *Motion*, 4. Thus, Mr. Joyner's generalized concerns are contrary to the policy articulated by the Warden, that the BOP will conduct a "careful . . . case-by-case" review with a decision "based upon the individual facts and circumstances of each particular request."

Even more troubling, based upon counsels' current information, the BOP appears to permit videotaping when the Government asks for it, but denies it when it is requested by the defense. If this is the case, the Government has more explaining to do.

In the Hammer case, Dr. Martell brought with him a tripod and handheld video camera. He set it up, turned it on, and let it run. It is difficult to imagine how such an arrangement can pose a danger to the orderly and safe running of the facility. If the Government or its expert do not have this equipment at their disposal, Petitioner's counsel will gladly loan it to them.

11

USCA5 2020

In another matter, District Judge Dale A. Kimball (D. Utah), overruled the Government's generalized security concerns about videotaping at the USP Terre Haute's death row, by placing common sense restrictions on the taping.  In Trentadue v. Federal Bureau of Investigation, 2:04-CV-772 (D. Utah), a litigant initiated a suit against the FBI, seeking production of documents under the Freedom on Information Act.  In connection with that suit, he sought to take the videotaped depositions of two federal prisoners, including one housed at the USP – Terre Haute.[7]  The BOP raised generalized security concerns just as they have in the Government's *Motion*, which the court easily resolved:

> As to the BOP's concern that a video recording poses a threat to the security of the institutions, the court will limit the usage of the video recording equipment to only the room in which the deposition is taken. The two affidavits submitted by the Federal Defendants express concerns that various aspects of the prison grounds, security systems, equipment storage, offices, staff, other inmates and various other items might be filmed.
>
> While it is doubtful that Plaintiff intended to video anything other than Nichols and Hammer during their actual depositions, the court hereby orders that no video equipment may be used other than in the specific room where each deposition is taking place, and the video equipment may not record the images of any person other than Nichols and Hammer.  In addition, if it would allay the security concerns of the

---

[7]The facts underlying the suit related to the Oklahoma City bombing case for which Timothy McVeigh and Terry Nichols were convicted.  Mr. Trentadue wished to take the videotape depositions of a Mr. Hammer – coincidently the same Mr. Hammer discussed above in regard to Dr. Martell's videotaping – and Mr. Nichols.

12

USCA5 2021

respective prison officials, Plaintiff is directed to make arrangements to meet a designated prison official at a predetermined location outside of the correctional facility and so that the prison official make take possession of the recording equipment and transport it to the proper location where the deposition will take place.

Trentadue, order dated Sept. 25, 2008 (attached as an Exhibit), reversed on other grounds, Trentadue v. F.B.I., 572 F.3d 794 (10th Cir. 2009).

The Government says that some prisoners at Terre Haute maintain websites and that fact adds to the security concerns. *Motion*, 4. Again, this is a generalized concern that has nothing to do with this case. If the Government is concerned that Mr. Bourgeois would post the tape to a website, that concern is easily covered by a protective order prohibiting counsel from sharing the tape with their client. If it is the concern that Mr. Bourgeois would post the fact that his evaluation was videotaped, counsel is not sure why disseminating the **fact** that a video – and not the video itself – would implicate prison security. Counsel would also remind the Court that Mr. Bourgeois is under severe restrictions imposed by this Court about having any communications with the outside world. As this Court knows from the BOP interception of his mail to counsel for his wife, Robin Bourgeois, these restrictions are being closely imposed.

13

USCA5 2022

**C.   Conclusion.**

There is much wrong with the positions of the Government's experts and the BOP. There is nothing sacrosanct about not permitting videotaping. It has been done before on Terre Haute's death row. There is no insurmountable ethical or security concerns, which can be readily addressed with an appropriate protective order. On balance, the need to provide the Court with the most reliable and truthful information in this case tips heavily in favor of requiring videotaping.

There is no need to take evidence on the Government's *Motion*. The Government has not proffered a sufficient basis for requiring a hearing, i.e. even taking their facts as true, there is no reason to reconsider.

14

USCA5 2023

For all of these reasons, the Court should deny the *Motion* without a hearing and with prejudice.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Victor Abreu
James McHugh
Elizabeth Larin
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:      Philadelphia, PA
            May 29, 2010

USCA5 2024

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 29th day of May 2010, I served the foregoing upon the following persons in the manner indicated:

Tony Roberts
Patti Hubert Booth
Mark Dowd
Elsa Patterson
at
Tony.Roberts@usdoj.gov
Mark.Dowd@usdoj.gov
Patti.Booth@usdoj.gov
Elsa.S.Patterson@usdoj.gov
By Email and ECF Filing


/s/  Michael Wiseman

Michael Wiseman

192

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **SEALED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.    CR-03-73-WH |
| | ) | |
| EDWARD L. FIELDS, | ) | FILED UNDER SEAL PURSUANT |
| | ) | TO COURT ORDER DATED 12/20/04 |
| Defendant. | ) | |

## REPORT OF NEUROPSYCHOLOGICAL EVALUATION
## OF J. RANDALL PRICE, Ph.D, DATED JULY 1, 2005

**FILED**

JUL 0 1 2005

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By: _____
Deputy Clerk

DAVID E. O'MEILIA
United States Attorney

_____
DOUGLAS A. HORN, OBA No.  13508
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
(918) 382-2700

USCA5 2026

Neuropsychological Report: Edward L. Fields, Jr.

|  | Effexor XR 37.5 mg daily for one week and then 75 mg daily for two weeks (samples provided). Return in three weeks or if he feels suicidal. |
|---|---|
| 07/07/03 | Follow-up. Mr. Fields reported: doing a little better; catching snakes at night and selling them for 40 cents per running foot; broke-up with old girl friend but spent weekend with new girlfriend; continues to think about suicide, but not seriously; appetite increased. Dr. noted that Mr. Fields seemed happier and less negative. Assessment was that clinical depression and compulsive disorder had improved. Effexor was increased to 150 mg (prescription given). Return in one month. |

## Time Tables

Time Table 1 is an addendum to this report and attempts to provide a time line of specific events, descriptions, and comments from a variety of individuals who knew Mr. Fields and were questioned about his behavior. The purpose of the Table is to provide examples of behaviors that help understand Mr. Fields over the course of his life as recorded in the records provided this examiner.

Table 2 includes comments and events taken from the records provided this examiner that are difficult to place in a time line but that shed light on the perceptions of others about Mr. Fields.

## INFORMED CONSENT:

Before the first session began, Ms. O'Connell, counsel for the defense, met with her client and me to insure a smooth beginning With his counsel present, I informed Mr. Fields about the nature of the evaluation, who had retained my services, the limits on confidential, his right to refuse to cooperate, his right to contact his attorney, and that the entire evaluation would be audio-taped. He gave consent both orally and in writing. Ms. O'Connell also met with her client and me at the beginning of the second session. The second session was also audio-taped.

## BEHAVIOR OBSERVATIONS AND MENTAL STATUS:

Ed Fields is a 38 year-old, Caucasian male in no apparent physical or emotional stress. He was attired in typical jail clothes. Personal hygiene was good with the exception of needing a shave. He wore correctional lenses. Hearing was within normal limits. His motor behavior was remarkable for a bilateral tremor secondary to medication. Gross attention and concentration was adequate for formal testing to proceed. Mr. Fields was alert, oriented, and cooperative throughout the evaluation session. Affect and mood were euthymic. Thought processes were goal-directed and logical. Thought content revealed no present or past delusions. He denied suicidal or homicidal thoughts. Sensorium was clear. Memory functions were grossly intact. Intelligence was judged to be average to above average. The results of this evaluation are judged to be a reliable and valid representation of his neuropsychological status.

## RESULTS OF CLINICAL INTERVIEW:

Mr. Fields has been incarcerated since 7/18/03 when he was charged with capital murder. He is now in a single cell designed for a disabled person so he has his own shower. Before coming to jail, he was staying with different girlfriends and in his truck in a campsite at Lake Wister. His main girlfriend continued to talk to him on the phone for approximately seven months after he was arrested but has since reconciled with her husband. Mr. Fields was working at a plastics

USCA5 2027

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COPY

United States of America      :
                              :
                              :
    vs                        :    96-CR-239
                              :
                              :
David Paul Hammer             :


        BEFORE:        Honorable Malcolm Muir

        PLACE:         Williamsport, Pennsylvania

        PROCEEDINGS:   Rule 2255 Hearing

        DATE:          Monday, August 29, 2005

        VOLUME:        Sixteen


APPEARANCES:

For the United States:    Frederick E. Martin, Esquire
                          United States Attorney's Office
                          240 West Third St., Suite 316
                          Williamsport, PA    17701


For the Defendant:        Anne L. Saunders, Esquire
                          Federal Public Defender's Office
                          Suite 306, 100 Chestnut Street
                          Harrisburg, PA    17101


OFFICIAL COURT REPORTER

USCA5 2028

2

APPEARANCES, (Cont'd.)

FOR THE DEFENDANT:        Michael Wiseman, Esquire
                         James J. McHugh, Esquire
                         James Moreno, Esquire
                         Federal Court Division
                         Defender Assoc. of Philadelphia
                         Capital Habeas Corpus Center
                         Suite 545 West
                         Independence Square West
                         Philadelphia, PA    19106

OFFICIAL COURT REPORTER

USCA5 2029

to do that, and he knows cognitively what happens in court, he would be fit to proceed.

Q    Now, in addition to referring to Dr. Gelbort's examinations in October or the fall of 1997, did you also examine Dr. Wolfson's testing such as it was done and reported in defendant's exhibit 139.1?

A    I reviewed what he wrote about his testing. I didn't have the advantage of the actual test data.

Q    And with respect to the testing and his results, how if at all do you compare yourself with your testing results with Dr. Wolfson?

A    Well, actually I think Dr. Wolfson's testing was done by Richard Frederick, who is a Ph.D. psychologist in the Bureau of Prisons that works with Dr. Wolfson. And I found his finding to be quite consistent with my own. They did not do as much neuropsych testing, but overall found strong memory and average IQ and a lack of malingering on psychopathology of faking mental disorder, that he was not doing that.

Q    With respect to, again, Mr. Hammer's evaluation, you said that Dr. Matthews was there for day one, but not for day two, is that correct?

A    That's correct.

Q    And first of all, was your evaluation of Mr. Hammer -- yours and Dr. Matthews, was it videotaped?

USCA5 2030

MARTELL - DIRECT

A    Yes, it was.

Q    Why did you allow for videotaping?

A    I try and do this in every case unless I'm precluded by the parties.  I feel that it protects everyone involved.  It provides the defense with an absolute record of everything that I said, everything that I did, so their experts can look for mistakes, can question my methods if they choose to do so.  It protects me because I don't have to spend as much time writing notes which can be quite cumbersome, and so it makes it a more efficient test process, and it gives me an absolute record of the answers that were given so I'm not trying to paraphrase a defendant.

So I think overall it's good forensic practice to videotape the exams and preserve the record.

Q    Now, on the second day of testing you were by yourself, is that correct?

A    Yes.

Q    And with respect to when you were alone with Mr. Hammer, did he indicate that he had any knowledge of your -- your background or experience?

A    Yes, he did.

Q    And how did that come about?

A    He was actually quite cordial.  He waited until the second day to tell me that he had heard some things about my background, that he heard that maybe I was a prosecution

OFFICIAL COURT REPORTER

USCA5 2031

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Case No. 04-8005-CV-W-FJG |
| v. | ) | Crim. No. 99-00303-01-CR-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**GOVERNMENT'S MOTION TO ESTABLISH PROCEDURES
BY WHICH A MENTAL HEALTH EXAMINATION OF
MOVANT WILL BE CONDUCTED**

Comes now the United States of America, by Beth Phillips, United States

Attorney, and Jeffrey Valenti and David Ketchmark, Assistant United States Attorneys,

all for the Western District of Missouri, and moves this court for an Order establishing

the procedures by which a mental health examination of movant will be conducted.

## I. Background

On November 6, 2005, Movant Keith D. Nelson, by and through counsel, filed

a Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States

Code, Section 2255.

On February 24, 2006, counsel for the United States filed its response to

Nelson's Motion to Vacate, Set Aside, or Correct Sentence.

On November 21, 2006, this Court issued an opinion denying the movant's

claims in their entirety.  Additionally, a certificate of appealability was denied.

After taking an appeal of that decision, on October 27, 2008, a panel of the

USCA5 2032

Eighth Circuit Court of Appeals, issued an opinion granting a certificate of appealability on six of the allegations of error raised by movant. A hearing is currently scheduled for Monday, June 14, 2010 before this honorable court on the following six allegations of ineffective assistance of counsel:

a.   Failure of trial counsel to conduct adequate mitigation investigation including failure to move for a continuance to complete the mitigation investigation;

b.   Failure of trial counsel to conduct adequate investigation of defendant's mental health;

c.   Trial counsel's advice or instruction to the defendant to decline to submit to a mental health examination by a government examiner;

d.   Failure of trial counsel to make objections to the allegedly inflammatory and improper comments in the Government's closing argument and rebuttal argument;

e.   Failure of appellate counsel to conduct adequate review of the trial record and the law; and

f.   Failure of appellate counsel to raise on appeal the Government's allegedly improper comments in closing arguments.

On March 31, 2010, counsel for movant provided government counsel with the preliminary report of Xavier Amador, Ph.D.

On April 7, 2010, counsel for movant, in support of movant's motion for post-conviction relief, filed a Notice of Intent to Offer Evidence of Mental Disease or Defect Bearing on the Issue of Punishment.

-2-

USCA5 2033

On April 9, 2010, counsel for movant, filed a Motion Opposing, and/or to Establish Conditions of, Government Mental-Health Evaluation. Having some disagreement with movant's proposed procedures, this response follows.

## II. Summary of Government Position

Under Rule 12.2(c)(1)(B) of the Federal Rules of Criminal Procedure, the Court is vested with wide latitude in establishing the procedures by which a mental health examination of a movant is to be conducted. In this instance, the government believes that the American Bar Associations (ABA) Guidelines on Criminal Justice Mental Health Standards, 7-3.6, is both reasonable and fair. Throughout movant's post-conviction relief petition, he charges former counsel with being objectively unreasonable when assessed under prevailing professional norms. Furthermore, he repeatedly cites to Supreme Court precedent where the ABA Guidelines are frequently referred to as the benchmark for determining what actions taken by counsel are reasonable. Consequently, it is completely inconsistent and unreasonable to object, as movant now does, to using those same standards when judging his mental condition.

## III. Argument

A district court is vested with wide latitude when establishing procedures or protocols to follow in conducting a mental health examination of a movant when it has decided to order one upon a motion by the government. Federal Rules of Criminal Procedure, 12.2(c)(1)(B). The movant has given notice that he intends to utilize mental health evidence as it bears on the issue of punishment. Likewise, current counsel

-3-

USCA5 2034

provided the government with the preliminary mental health report of Dr. Xavier

Amador, among others.  As a result, the government has, by separate motion, asked this

court for an order authorizing it to conduct a mental health examination of the movant,

conducted by its own expert witnesses.  Should such an examination be ordered by the

court, it is necessary to determine the manner by which this examination will take

place.

The Supreme Court has said, "[p]revailing norms of practice as reflected in the

American Bar Associations standards and the like. . . ." are examples of objectively

reasonable attorney practices.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

More recently, the Court reiterated its view that the ABA standards are "'guides to

determining what is reasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) quoting

*Strickland*, 466 U.S. at 688.  Apparently agreeing with these statements when preparing

the Memorandum of Law supporting his 2255 petition, movant repeatedly cited to

various ABA Standards when charging his former counsel with constitutionally

deficient representation.  Now, however, he argues that his mental health evaluation

should be conducted in a manner that is in conflict with those same ABA Standards.

This position is inconsistent, inherently unreasonable and arguably a stratagem

designed to frustrate the government and this Court from fairly coming to a conclusion

on his mental state.

-4-

USCA5 2035

**A.**  *Government's Proposed Procedures for Conducting Mental Health Examination*

Consistent with the ABA Guidelines on Criminal Justice Mental Health Standards, 7-3.6[1], the government proposes the following protocols for its examination:

1) Government experts, Dr. Park Dietz (psychiatrist) and Dr. Dan Martell (psychologist), would conduct a joint, two or three day examination of the movant at the facility of his incarceration, F.C.C. Terre Haute[2];

2) The examinations would be both audio- and video-taped[3];

3) A copy of the recorded tapes would be provided to both government and post-conviction counsel promptly;

4) The doctor's notes will be preserved for later production to counsel;

5) Recognizing the movant's Sixth Amendment right to counsel, the government experts would allow the movant to have representation present, but not in the room while the examination is occurring. Instead, at appropriate points, the movant will be allowed to consult with counsel, who will be allowed to make any necessary clarifications, or offer documents before the examinations are complete. To the extent possible (based on facility capability), some type of audio or video feed will be provided so counsel can monitor the examination;

6) Mental health testing and instruments selected would be chosen by the individual expert witness. Consideration to the tests and instruments selected

---

[1]Attached to this motion as Exhibit "A."

[2]ABA Standard 7-3.6(e) states, ". . . [j]oint evaluations should be encouraged . . . They should be permitted when agreed upon by the prosecutor and defense attorney. A joint evaluation involves either a simultaneous evaluations by two or more mental health . . . professionals or a single evaluation by a mental health . . . professional agreed on by both parties." Since defense counsel has already conducted its own mental health evaluation of movant, this proposal applies to a mental health evaluation conducted by two government-hired professionals.

[3]ABA Standard 7-3.6(d) states, ". . . [a]ll court-ordered evaluations of movant initiated by the prosecution should be recorded on audiotape or, if possible, videotape, and a copy of the recording should be provided promptly to the defense attorney. . . ."

Case 4:04-cv-08005-FJG   Document 138   Filed 04/20/10   Page 5 of 10

USCA5 2036

by defense experts will be given, but cannot be controlling. Repetitive use of the same instrument can cause issues due to the "practice effect" and the government witnesses need the flexibility to exercise the professional judgment for which they have been hired. It is not practical, nor would a reliable result obtain from either government counsel, post-conviction counsel, or this court to try and micro-manage the testing and evaluation of a subject in the area of mental health, where testing decisions do not follow a script, but instead are the product of professional judgment and clinical presentation of the tested subject. Moreover, the government experts need to be able to administer tests that assess the reliability and validity of other test data collected and be able to make independent determinations of whether either malingering or coaching has taken place.

**B.**     *Response to Movant's Evaluation Procedures*

Assuming that the government would file a request to conduct a mental examination of him, the movant has submitted six procedures for this court's consideration. Those conditions are summarized as: (1) opposition to audio- or videotaping of the examination; (2) retention, followed by later production of the government examiner's notes; (3) a limitation on the use of any admissions made by movant in the course of examination; (4) a request pursuant to *Estelle v. Smith*, 451 U.S. 454 (1981) to monitor, but not record, the examination; (5) a limitation to be imposed on the government examiner to only conduct testing previously performed by defense experts; and (6) an agreement that defense counsel can approve, or be given notice at least 10 days in advance of testing, of any testing to be conducted by the government experts, such that litigation can ensue if no agreement is met. In response to each condition, the government argues the following:

(1) As stated above, the government objects to the defense proposal that no audio- or video-taping of the examination will take place. Given the ABA

-6-

USCA5 2037

Standards repeated reference by the Supreme Court as being the guide that helps to determine reasonableness, it seems objectionably reasonable to follow those Standards here. In a case as important as this, the ultimate goal is reaching a correct, just result. One way to accomplish that goal is to conduct these examinations transparently. Accordingly, the movant wants the government expert's notes to be retained and ultimately produced, but those notes are not the best record of what will transpire in the examinations. Instead, a audio- or video-recording would be the best record of what will occur. Additionally, notes are inadequate for capturing relevant behavioral data that an expert may witness, but be unable to adequately describe in written notes. If the real goal in this post-conviction setting is to get to the truth, there is a much better way of recording the movant's examination. Indeed, audio- or video-taping the examination is the better practice and should be the more objectively reasonable course.

(2) The government agrees that its expert's notes will be retained for production at a later date to counsel. Additionally, the government would promptly produce either an audio- or video-tape of the movant, should one be ordered by the Court.

(3) The government partially objects to the proposed limitation on the information that the movant may disclose upon examination. The government agrees that if the movant elects to proceed with mental health evidence at the upcoming post-conviction hearing (as he has provided notice to do), the government may rebut or utilize statements made by the movant. To the extent that the government is barred from using this information for any other purpose, the government objects. Should the movant prevail at anytime on his motion for post-conviction relief and consequently be granted a new guilt phase trial or penalty phase hearing, the government would not and should not be barred from using any admissions made by the movant during the anticipated mental health evaluation in the event the movant would attempt to use mental health diseases or defects as either an affirmative defense or as mitigating evidence. This reservation is forward-looking and may never come to pass, but a limitation as broadly worded as espoused by the movant could potentially bar a future prosecution unnecessarily. To the extent that the movant would place his mental health in issue, the government should not be barred from using his statements, but would agree that otherwise, such a limitation is appropriate.

(4) The government agrees that defense counsel should be allowed to monitor the examination, but should not be allowed into the room while the examination is taking place. Being present in the room while the examination is occurring

-7-

USCA5 2038

creates a well recognized threat to the reliability and validity of test data, primarily due to the contamination of the testing process by deviating from standardized test administration practices. Instead, some ability to monitor the examination will need to be worked out with F.C.C. Terre Haute, but the government would suggest a live audio- or video-feed which would allow counsel to monitor, and, at appropriate times, counsel their client. Should such an audio- or video-feed not be feasible, perhaps a second recording device of counsel's choosing could be implemented.

(5) The government objects to limiting its experts to testing performed by the defense experts. Repetition of the same tests can affect the reliability and validity of test data because of the "practice effect," a phenomenon whereby subjects test artificially high because of increased skills as a result of practice on a particular type of test. Additionally, if a subject has advance notice of the testing to be employed, they can either be coached, or have thought of their answers in advance. Neither scenario gets the type of accurate information that is at the heart of why an examination is necessary in this case. Finally, without making comment on the tests performed by the defense experts, they may not have chosen the best tests available, or may not have chosen to administer tests that would be necessary to critically assess the reliability and validity of collected test data, such as test effort and/or psychopathology. To draw these conclusions, the government experts need to be free to exercise their professional judgment, tempered by their knowledge of the prevailing professional norms in their respective fields.

(6) The government objects to essentially giving defense counsel line-item veto power of how they conduct a mental health evaluation. Lawyers need not micro-manage exert witnesses, but instead should look to see if professional norms are followed. In this case, experts in the field of psychiatry and psychology are in a far better position than government counsel, post-conviction counsel, or even this Court to determine which tests should be administered in a mental health examination. Oftentimes, which test to administer is the product of the clinical presentation of the person being examined and is influenced by the strengths and weaknesses that become apparent during evaluation. Also, choosing a battery of tests that compliment, rather than mimic the tests performed by defense experts, will provide a more complete picture of the overall mental health of the movant, while still avoiding the "practice effect" issue.

-8-

USCA5 2039

USCA5 2040

## IV. Conclusion

The United States respectfully requests that the Court order the movant be examined by its mental health experts under the procedures outlined above.

<div style="text-align: right">

Respectfully submitted,

BETH PHILLIPS
United States Attorney

By    */s/Jeffrey Valenti*

JEFFREY VALENTI
Assistant United States Attorney

DAVID KETCHMARK
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

</div>

-9-

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served this 19th day of April 2010 by electronic notice or by U.S. Mail, postage prepaid, to:

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

Gary E. Brotherton
Legal Writes, LLC
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381


*Jeffrey Valenti*
Jeffrey Valenti
Assistant United States Attorney

JV/blw                                                -10-

USCA5 2041

IN THE
COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF                          :        NOVEMBER TERM, 1997
PENNSYLVANIA    **RECEIVED**              :        **FILED**

    v.          **AUG 1 0 2007**         :

JOSE DEJESUS    **PCRA UNIT**            :        No. 350 1/1       **AUG 1 0 2007**

                                                  **Criminal Appeals Unit**
                 **OPINION & ORDER**              **First Judicial District of PA**

GREENSPAN, J.                                     DATED: August 10, 2007

PROCEDURAL HISTORY

Defendant, Jose DeJesus, was tried and convicted before this court and a jury on August 5, 1999, of two counts of first degree murder, two counts of aggravated assault, possession of an instrument of crime (PIC), criminal conspiracy, and recklessly endangering another person (REAP). At trial defendant was represented by Joseph Canuso, Esquire. Following a penalty hearing, the jury found four aggravating circumstances and no mitigating circumstances and therefore returned a sentence of death for each murder conviction.[1] On August 17, 1999, this court formally imposed the death sentence and sentenced the defendant to additional consecutive sentences of 20 to 40 years for the two aggravated assault charges, two-and-a-half to five years for the PIC charge and 10 to 20 years for the conspiracy charge. Defendant appealed and on March 8, 2000, this Court filed an extensive opinion. On December 31, 2001, the Supreme Court of Pennsylvania affirmed defendant's judgments of sentence. Commonwealth v.

---

[1] The aggravating circumstances found by the jury were that the defendant was paid by another person for killing the victim, 42 Pa.C.S. § 9711(d)(2); that, during the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense, § 9711(d)(7); that the defendant had a significant history of felony convictions involving the use of threat or violence, § 9711(d)(9); and that the defendant was convicted of another murder committed at the time of the offense at issue, § 9711(d)(11).

·1

USCA5 2042

retardation range. N.T. 11/29/06: 112. The unadjusted adaptive domain scores were 84 in social skills, 77 in practical skills, and 69 for conceptual skills. N.T. 11/29/06:114-15.

Dr. Puente questioned Dr. Denkowski's administration of the ABAS because he conducted the exam in a self-reporting format, asked leading questions, and readjusted defendant's initial results. N.T. 10/23/06: 79-80. Dr. Cooke reviewed the video tape of the examination and found tremendous deviation from a standard assessment. N.T. 10/25/06: 65. Dr. Cooke added that Dr. Denkowski rephrased the questions multiple times, which violated the standardized procedure. N.T. 10/25/06:132. Furthermore, Dr. Cooke testified that the ABAS manual does not discuss altering scores based on the administrator's subjective view. N.T. 10/25/06:133. During the examination, Dr. Denkowski asked 215 questions, 45 of which were adjusted. N.T. 11/29/06:110-11.

Dr. Denkowski adjusted defendant's composite score on the ABAS from 71 to 86. N.T. 10/25/06: 135. Dr. Martell believes that Dr. Denkowski inflated the ABAS scores because he asked leading questions. N.T. 1/4/07: 295-96. Dr. Denkowski explained that he adjusted defendant's scores for lifestyle because the instrument is based on functioning in mainstream society and not for criminal defendants. N.T. 11/29/06: 105-06. According to Dr. Olley, the ABAS allows for self-reporting, but such administration should only be employed where the subject is a high-functioning individual. N.T. 10/26/06: 60-61. However, Dr. Denkowski believes that a mildly mentally retarded person can self-report. N.T. 11/29/06: 95.

Dr. Olley explained that the AAMR recommends using the SIB-R to assess adaptive behavior by interviewing people other than the subject. N.T. 10/26/06: 56. Dr. Olley used information given by Minerva Rivera, defendant's cousin who has known

12

USCA5 2043

SOAH Docket No. 520 09- 2882

License No. 21909 (Licensed Psychologist)

TSBEP Complaint No. 07-213-3967 and No. 08-029-3967

| | | |
|---|---|---|
| TEXAS STATE BOARD OF | § | BEFORE THE STATE |
| EXAMINERS OF PSYCHOLOGISTS | § | |
| v. | § | OFFICE OF |
| GEORGE C. DENKOWSKI, Ph.D. | § | |
| RESPONDENT | § | ADMINISTRATIVE HEARINGS |

## COMPLAINT

COMES NOW, the Texas State Board of Examiners of Psychologists (Board),

and makes this Complaint against George C. Denkowski, Ph.D. (Respondent), based on

the alleged violations of the TEXAS OCCUPATIONS CODE CHAPTER 53, § 53.02; CHAPTER

469, RULE 469.7 AND CHAPTER 470, RULE 470.21 OF THE TEXAS ADMINISTRATIVE CODE,

(the Rules).  In support of this Complaint and based on information and belief, the Board

charges and alleges the following:

## I.

## JURISDICTION

Respondent currently holds, and has held at all times relevant to this matter,

Board License Number 21909 (licensed psychologist) and is subject to the jurisdiction of

the Board under the Psychologists' Licensing Act.

TSBEP Complaint No. 07-213-3967 and No. 08-029-3967          1

USCA5 2044

## II.

## STATEMENT OF FACTS

1. TSBEP No. 07-213-3967:  Respondent provided psychological services to a defendant, Daniel Plata, in a capital murder appeal in 2005.

2. Respondent made administration, scoring and mathematical errors in conjunction with psychological tests given to defendant Daniel Plata.

3. The Respondent deviated from testing protocols in the administration and scoring of psychological tests given to defendant Daniel Plata.

4. The Respondent failed to properly address language and cultural issues with defendant Daniel Plata, a native of Mexico.

5. TSBEP No. 08-029-3967:  Respondent intentionally misused or abused psychological testing, in particular, the Adaptive Behavior Assessment System (ABAS) or Adaptive Behavior Assessment System-II (ABAS-II) in connection with forensic assessments of death row inmates including but not limited to Daniel Plata, Alfred Dewayne Brown, and Michael Richards, with regard to assessment of mental retardation.

6. Respondent intentionally deviated from the norms of scoring methodology presented in the test manual for the ABAS-II, creating his own scoring criteria and substituting his clinical judgment for the scoring criteria.

7. The administration manual provided with the ABAS-II and research literature in this field do not support the Respondent's idiosyncratic approaches to testing and scoring the ABAS-II.

USCA5 2045

8.  Respondent described his proprietary and idiosyncratic method for improperly altering psychological test scores to determine the presence or absence of mental retardation in the subject of a forensic psychological examination, in an article published in the American Journal of Forensic Psychology, Volume 26, Issue 3, 2008.

## III.

## ALLEGED VIOLATIONS

1.  Respondent violated Board rule 465.9 pertaining to competency by making administration, scoring and mathematical errors in conjunction with psychological testing; by failing to properly address language and cultural issues in the subjects of psychological testing; and by deviating from testing protocols in the administration and scoring of psychological tests to determine mental retardation in the subjects of psychological testing. This conduct is described above in paragraphs 1, 2, 3, 4, 5, and 6.

2.  Respondent violated Board rule 465.10 pertaining to basis for scientific and professional judgments by intentionally deviating from testing protocols in the administration and scoring of psychological tests to determine mental retardation in the subjects of psychological testing and by developing his own idiosyncratic approach to psychological testing. This conduct is described above in paragraphs 1, 2, 3, 5, 6, 7, and 8.

3.  Respondent violated Board rule 465.16 pertaining to evaluation, assessment, testing and reports by intentionally deviating from testing protocols in the administration and scoring of psychological tests to determine mental retardation

USCA5 2046

in the subjects of psychological testing. This conduct is described above in paragraphs 1, 2, 3, 4, 5, 6, 7 and 8.

4.    Respondent violated Board rule 465.18(a)(4) pertaining to forensic services by conduct which violated other Board rules, described above, in the provision of forensic psychological services. This conduct is described above in paragraphs 1, 2, 3, 4, 5, 6, 7 and 8.

5.    The above-referenced Statement of Facts and Rules are subject to amendment.

## IV.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Board prays that a hearing on this complaint will be heard and that the administrative law judge shall make findings of fact and conclusions of law that Respondent violated Board Rules and the Psychologists' Licensing Act, and to grant the Board all other relief to which it may be entitled under the Administrative Procedure Act, Rules of SOAH, and the Act and Rules of the Board.

Respectfully submitted,

Dianne L. Izzo
State Bar Number 24049733
General Counsel
Texas State Board of Examiners of
Psychologists
333 Guadalupe, Suite 2-450
Austin, Texas 78701

(512) 305-7705
(512) 305-7701 fax
Dianne.Izzo@tsbep.state.tx.us

TSBEP Complaint No. 07-213-3967 and No. 08-029-3967        4

USCA5 2047

## CERTIFICATE

I hereby certify that a true and correct copy of the foregoing was sent by first class mail and by FAX to (817) 338-1787to Jennifer M. Andrews, J.D., attorney for Respondent, at Wallach & Andrews, PC, 550 Bailey Avenue, Suite 500, Fort Worth, TX 76107, on this 27th day of February, 2009.

_____
Dianne L. Izzo

USCA5 2048



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

Office of the Warden

May 7, 2010

Gary Brotherton
Attorney & Counselor at Law
Stonebridge Office Park
601 W. Nifong Blvd., Building 1, Suite C
Columbia, MO   65203

Dear Mr. Brotherton:

This is in response to your correspondence received in my office on April 30, 2010, regarding your client, Keith Nelson, Register Number 07440-031, an inmate currently confined at the Federal Correctional Complex, Terre Haute, Indiana. You request information concerning the policies for videotaping and audio recording a psychology evaluation of inmate Nelson, and further request the policy in regard to photographing inmate Nelson, his cell and other areas of the facility.

The Federal Bureau of Prisons is committed to providing secure institutions to house offenders and protect the public, as well as provide a safe environment for both staff and inmates. Visiting requests for inmates in the Special Confinement Unit are initiated and coordinated by unit staff. Unit staff need to be notified in advance of any special equipment a psychologist needs to bring into the institution to conduct a psychological evaluation. The use of video and audio devices within a secure institution poses a security risk and may cause potential disruption to the orderly running of the institution. Therefore, every request for videotaping and audio recording is carefully reviewed, and considered on a case by case basis. The decision is based upon the individual facts and circumstances of each particular request.

In the event you desire consideration for a similar request for your client, it is suggested you submit a written request outlining what you would like to accomplish, when you would like the evaluation conducted, equipment requests, and who would be conducting the evaluation.

I trust this response addresses your concerns pertaining to these matters. If you have further questions or concerns, feel free to call a member of the unit staff at 812-244-4400.

Sincerely

H. J. Marberry
Complex Warden

USCA5 2049

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

JESSE C. TRENTADUE,

Plaintiff,

vs.

FEDERAL BUREAU OF
INVESTIGATION and FEDERAL
BUREAU OF INVESTIGATION,
OKLAHOMA CITY FIELD OFFICE,

Defendants.

ORDER

Case No. 2:04CV772 DAK

This matter is before the court on the Federal Defendants' Motion to Reconsider

Discovery Order and Request for Oral Argument.  The court has carefully reviewed the written

memoranda submitted by the parties.  Pursuant to local rule 7-1(f), the court has concluded that

oral argument would not be helpful or necessary, and thus the court will determine the motion on

the basis of the written memoranda.  *See* DUCivR 7-1(f).   Now, being fully advised, the court

renders the following Order.

On September 20, 2007, the court issued granted Plaintiff's Motion to Conduct

Discovery.  Specifically, the court stated that it would permit Plaintiff to take–and videotape–the

depositions of Nichols and Hammer, so long as these individuals are willing to cooperate.

The Federal Defendants argue (1) that this court's Discovery Order exceeds the

permissible scope of discovery under FOIA, (2) that the court lacks jurisdiction because the court

USCA5 2050

there is no longer an Article III case and controversy, (3) there is no question as to the FBI's good faith sufficient to justify the Discovery Order, and (4) the BOP has determined that a video recording poses a threat to the security of the institutions where these individuals are confined.

Defendants, however, asserted the first three arguments in their Memorandum in Opposition. The court rejected those arguments previously and will not reconsider them at this point. As to the BOP's concern that a video recording poses a threat to the security of the institutions, the court will limit the usage of the video recording equipment to only the room in which the deposition is taken. The two affidavits submitted by the Federal Defendants express concerns that various aspects of the prison grounds, security systems, equipment storage, offices, staff, other inmates and various other items might be filmed.

While it is doubtful that Plaintiff intended to video anything other than Nichols and Hammer during their actual depositions, the court hereby orders that no video equipment may be used other than in the specific room where each deposition is taking place, and the video equipment may not record the images of any person other than Nichols and Hammer. In addition, if it would allay the security concerns of the respective prison officials, Plaintiff is directed to make arrangements to meet an designated prison official at a predetermined location outside of the correctional facility and so that the prison official may take possession of the recording equipment and transport it to the proper location where the deposition will take place.

Now that the court has declined to reconsider its Discovery Order and made clear that Plaintiff is entitled to conduct this discovery, the court will now close this case. Plaintiff has stated, however, that he "believes that if he is allowed to depose Nichols and Hammer, these men

2

USCA5 2051

will be able to provide evidence that will link the informants thus far revealed to the SPLC and, thereby, identify and/or document the existence of records responsive to Plaintiff's FOIA requests that have not been produced." If Plaintiff is correct and through these depositions he discovers the existence of records responsive to Plaintiff's FOIA request, he may file a motion to reopen the case. At that point, the court will determine whether it is appropriate to reopen the case or to direct Plaintiff to file another FOIA request.

Finally, the Federal Defendants have filed an "Objection" to Plaintiff's filing of a "Notice of Release of Documents," along with attached documents. While the court agrees that they are not relevant to the issue of whether Plaintiff is entitled to depose Nichols and Hammer--and the court has not relied on these documents in making its decision--the court declines to strike them from the record, as requested by the Federal Defendants.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Federal Defendants' Motion to Reconsider [docket # 114] is DENIED and their Objection [docket # 130] is OVERRULED. The Clerk of the Court is directed to close this case.

DATED this 25th day of September, 2008.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

3

USCA5 2052

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## **ORDER**

On May 6, 2010, this Court entered an order addressing the Government's upcoming testing of the movant Alfred Bourgeois for mental retardation. (DE 498). The Order allowed for videotaping of the testing and required the Bureau of Prisons to provide access for the videotaping. In that Order, the Court invited the Government to submit a proposed protective order that would protect the integrity of the testing.

The Government filed a motion to reconsider the Order allowing for videotaping. (DE 503). The Government's motion stated that their expert witnesses had voiced concerns about having the examination videotaped. Also, the motion stated that Bureau of Prisons officials were concerned that the examination would pose a security concern. In a June 7, 2010, telephonic hearing, the Government expressed a desire to call witnesses to support its motion for reconsideration. On this date, the Court held a telephonic conference and heard testimony from Dr. Jack Randal Price and Dr. Roger Moore, expert witnesses for the Government, and from Captain Hector Joyner, a chief correctional supervisor with the Bureau of Prisons in Terra Haute, Indiana.

USCA5 2053

Testimony from the witnesses clarified their concerns, but proved them to be baseless. Captain Joyner's testimony reduced the Bureau of Prisons' position to a concern that a videotape of the examination would eventually be available in a publicly assessable forum. This Court's Order, however, allows the Government to propose a protective order that will prevent dissemination of the resultant videotape. Questioning of the expert witness discussed ethical concerns about recording the examination. The questioning, however, showed no direct prohibition on videotaping by the governing professional organizations and only identified concerns that would be ameliorated by any protective order. The experts' greatest concern seemed to be the possibility that the presence of an observer, either physical or represented by electronic recording, would affect Bourgeois' performance in testing. Captain Joyner, however, explained that in this, as in all other examinations, a guard would observe the examination through a window. A guard has observed the earlier examinations in this case. The experts' concerns about the presence of third parties, therefore, cannot prevent videotaping of their examination. No basis exists for this Court to reconsider its earlier Order.

The Government's motion for reconsideration is **DENIED**.

SIGNED and ORDERED this 9th day of June, 2010.

_____
Janis Graham Jack
United States District Judge

2 / 2

USCA5 2054

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA

v.                                                  Case No.: 2:02–cr–00216
                                                    Judge Janis Graham Jack

Alfred NMI Bourgeois

                            Defendant

---

## NOTICE OF SETTING

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 9/10/10

**TIME:** 09:00 AM

**TYPE OF PROCEEDING:** Evidentiary Hearing

Date:   June 13, 2010

                                                    David Bradley, Clerk

USCA5 2055

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

GOVERNMENT'S NOTICE OF POTENTIAL
TESTING INSTRUMENTS

I.

On May 6, 2010, the Court ordered the government to provide "a list of tests that Dr. Price will select from when performing his examination of Bourgeois for mental retardation". The Court ordered these disclosures be made in writing one week before the scheduled testing.

II.

Dr. Price is scheduled to examine Mr. Bourgeois on June 21st and 22nd, 2010. Dr. Price will not be administering the WAIS IV, but will be employing the following possible assessment techniques:

Clinical Interview and History;
Mental Status Examination;
Behavior Observations;
Minnesota Multiphasic Personality Inventory-2;
Personality Assessment Inventory;
Psychopathy Checklist Revised;

USCA5 2056

Structured Interview for DSM-IV for Personality;
Wide Range Achievement Test-4.

III.

For these reasons, the undersigned files this notice with the court.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

-2-

USCA5 2057

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this notice of potential testing instruments has been served by placing it in the United States mail, postage prepaid, on June 14, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

-3-

USCA5 2058

AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

**TRANSCRIPT ORDER**

*Please Read Instructions:*

**FOR COURT USE ONLY**

**DUE DATE:**

| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 6/11/2010 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST., SUITE 545 W. | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:2002 cr C0216 | 9. JUDGE JANIS G. JACK | DATES OF PROCEEDINGS |  |
|---|---|---|---|
|  |  | 10. FROM 6/7/2010 | 11. TO 6/7/2010 |

| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS |  |
|---|---|---|
|  | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☑ CIVIL (HABEAS) | ☐ IN FORMA PAUPERIS | ☐ OTHER (Specify) |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE |  | ☐ TESTIMONY (Specify Witness) |  |
| ☐ OPENING STATEMENT (Plaintiff) |  |  |  |
| ☐ OPENING STATEMENT (Defendant) |  |  |  |
| ☐ CLOSING ARGUMENT (Plaintiff) |  | ☐ PRE-TRIAL PROCEEDING (Spcy) |  |
| ☐ CLOSING ARGUMENT (Defendant) |  |  |  |
| ☐ OPINION OF COURT |  |  |  |
| ☐ JURY INSTRUCTIONS |  | ☑ OTHER (Specify) |  |
| ☐ SENTENCING |  | PHONE CONFERENCE | 6/7/2010 |
| ☐ BAIL HEARING |  |  |  |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☑ | ☐ | NO. OF COPIES |  | United States Court Southern District of Texas FILED |
| 14-Day | ☐ | ☐ | NO. OF COPIES |  | JUN 17 2010 |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES |  |  |
| DAILY | ☐ | ☐ | NO. OF COPIES |  | David J. Bradley, Clerk of Court |
| HOURLY | ☐ | ☐ | NO. OF COPIES |  |  |
| REALTIME | ☐ | ☐ |  |  |  |

*per premium M. Vielman*

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL |  |
|---|---|---|

| 18. SIGNATURE  K. Hennig | ☑ EMAIL ONLY REQUIRED ☐ EMAIL AND HARD COPY REQUIRED |
|---|---|

| 19. DATE 6/11/2010 | ☐ EMAIL ADDRESS: KATHRIN_HENNIG@FD.ORG |
|---|---|

| 20. TRANSCRIPT TO BE PREPARED BY (DIGITAL # 2:57 - 3:25) VELMA GANO | COURT ADDRESS |
|---|---|

| ORDER RECEIVED | DATE 6-17-10 | BY VG |  |
|---|---|---|---|
| DEPOSIT PAID |  |  | DEPOSIT PAID |  |
| TRANSCRIPT ORDERED |  |  | TOTAL CHARGES |  |
| TRANSCRIPT RECEIVED |  |  | LESS DEPOSIT |  |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT |  |  | TOTAL REFUNDED |  |
| PARTY RECEIVED TRANSCRIPT |  |  | TOTAL DUE |  |

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

USCA5 2059

| ✏AO 435<br>(Rev. 03/08) | Administrative Office of the United States Courts<br>**TRANSCRIPT ORDER** | **FOR COURT USE ONLY**<br>**DUE DATE:** |
|---|---|---|

*Please Read Instructions:*

| 1. NAME: KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 6/11/2010 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545W. | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2-2002CV 00216 | 9. JUDGE JANIS G. JACK | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 6/9/2010 | 11. TO 6/9/2010 |

| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☒ CIVIL (HABEAS) | ☐ IN FORMA PAUPERIS | ☐ OTHER *(Specify)* |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | PHONE CONFERENCE | 6/9/2010 |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to<br>Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☑ M. Wiseman | ☐ | NO. OF COPIES | | United States Courts<br>Southern District of Texas<br>FILED |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | JUN 17 2010 |
| DAILY | ☐ | ☐ | NO. OF COPIES | | David J. Bradley, Clerk of Court |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | |
|---|---|---|

| 18. SIGNATURE *K. Hennig* | ☒ EMAIL ONLY REQUIRED<br>☐ EMAIL AND HARD COPY REQUIRED |
|---|---|
| 19. DATE 6/11/2010 | ☐ EMAIL ADDRESS: KATHRIN_HENNIG@FD.ORG |

| 20. TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | 6-17-10 | VE |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:**   COURT COPY   TRANSCRIPTION COPY   ORDER RECEIPT   ORDER COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,      )    CRIMINAL ACTION
                               )
            PLAINTIFF,         )    CR-C-02-216(1)
                               )
VS.                            )    CORPUS CHRISTI, TEXAS
                               )    JUNE 7, 2010
ALFRED BOURGEOIS,              )    2:57 P.M.
                               )
            DEFENDANT.         )
.............................)

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES BY TELEPHONE FOR:

THE GOVERNMENT:            MS. ELSA SALINAS
                          MR. TONY ROBERTS
                          ASSISTANT U.S. ATTORNEYS
                          800 N. SHORELINE, STE 500
                          CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:            MR. MICHAEL WISEMAN
                          ASSISTANT FEDERAL DEFENDERS
                          SUITE 545 WEST, CURTIS BUILDING
                          601 WALNUT STREET
                          PHILADELPHIA, PENNSYLVANIA 19106

THE COURT RECORDER:       MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

USCA5 2061

(The proceedings began at 2:57 p.m.)

(The case was called)

THE CLERK:  May I have appearances please?

MR. WISEMAN:  Michael Wiseman, W-I-S-E-M-A-N, for Mr. Bourgeois.

MS. SALINAS:  Elsa Salinas --

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MS. SALINAS:  And Elsa Salinas on behalf of the United States.

MR. ROBERTS:  Your Honor, Tony Roberts again for the United States.  Mark Dowd for the United States is unavailable, as is Patti Booth.  She is in another courtroom at this time.

THE COURT:  Okay.  I was looking at the motion to reconsider by the Government and looking at the petitioner's response.  Is it a fact that this Dr. Price has actually audiotaped testing before?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  Dr. Price has informed the United States that he was ordered to audiotape before and that he agreed to do it at that time and since that time, the other things that he has pointed out to us, he said that he believes that, in his opinion, it's professional misconduct for him to actually agree to have that --

USCA5 2062

THE COURT:  Why is that?

MR. ROBERTS:  -- evaluation audiotaped or --

THE COURT:  Why is that?

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  Why would it be professional misconduct?

MR. ROBERTS:  He cited to me a provision in the Texas code --

THE COURT:  Does he know he's in Federal Court?

MR. ROBERTS:  -- the release of information.

THE COURT:  Sorry, did you, does he understand he is in Federal Court?

MR. ROBERTS:  I, yes, Your Honor, he did.

THE COURT:  Well, then I don't really want, need any citings from the Texas codes.

MR. ROBERTS:  Yes, Your Honor.  He was, his concern is that his license could be subject to be evaluated under the Texas code, not necessarily --

THE COURT:  Oh, okay.  Why would that be?  What does the Texas code say?

MR. ROBERTS:  It tells, it says that they have to safeguard all information and it says --

THE COURT:  But this is not a confidential, this is not a confidential communication.

MR. ROBERTS:  Yes.

THE COURT:  Of any kind.

USCA5 2063

MR. ROBERTS:  Well, that's exactly the reason I thought it would be best to have him testify and give his --

THE COURT:  I think you had better find somebody else to do this.

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  I think you had best find somebody else for you to do this.

MR. ROBERTS:  Well, I know that in the defense's response they noted Dr. Martell, and we have not been able to get Mr. Martell's ear as much as we had hoped, and we actually turned our attention towards Dr. Price and Dr. Moore when we started investigating and reviewing the Flynn Effect aspect and noted that both Dr. Price and Dr. Moore had extensive experience in dealing with the Flynn Effect argument.  I, quite honestly, I even tried to reach Dr. Martell again today.  He is extremely difficult to reach.  I will try and I will continue to try to reach him and if he is willing and able to do the testing under videotaping, I wouldn't have a problem with that, Your Honor.  I just, we have not been in contact with him for some time.

THE COURT:  You know, I never, I never anticipated having a videographer there.  You know, I don't know why you can't just set something up on a stand and face it toward the defendant.  I don't think that the doctor needs to be videotaped.  I think that the point for the movant is to see

USCA5 2064

the client's reaction.  Is that right?

MR. WISEMAN:  Yes, Your Honor, that's right.
Michael Wiseman.

THE COURT:  So, I mean, he can have it over his shoulder, the doctor can, and put it in the field of vision. I think anybody, all of us can run a video camera, so he ought to be able to seat Mr. Bourgeois in the field of vision of the video camera and proceed.  There would be nobody else there, it will just be videoed for posterity.  And if Mr. Price thinks his license is at risk, which seems kind of ridiculous because there's absolutely no confidentiality in a court-ordered examination, which is what this is, then obviously you need to find somebody else to do it.

MR. ROBERTS:  Yes, Your Honor.  It wasn't so much the confidentiality aspect, Your Honor, as it was his concern about the requirement on the psychologist to safeguard the testing material and to insure that it does not, it is not released, and one of the things that he --

THE COURT:  I thought we were going to talk about a protective order.  I'm sorry, Mr. Roberts, I keep interrupting you.  Go ahead.

MR. ROBERTS:  That's all right, Your Honor, it's your courtroom.

THE COURT:  No, it's yours.

MR. ROBERTS:  Well, there was, he is not -- I

USCA5 2065

understand, and I agreed that and I informed him that there would a protective order, and then he referred me over to this YouTube clip that ended up on YouTube, obviously, where another psychologist was interviewing an individual and that somehow got out into -- and it was Dr. Price's belief and Dr. Moore's belief that that interview that was conducted by that individual was also under a protective order, and so there was a concern that --

THE COURT:  Well do you know, have you gotten a copy of that information?

MR. ROBERTS:  I have not, yet, Your Honor, no.

MR. WISEMAN:  Your Honor, Michael Wiseman. Obviously we are going to abide by the Court's orders and, you know, I mean if this thing winds up on YouTube there would be a very short list of possible suspects and we wouldn't --

THE COURT:  I would think so, and, as we all know, there would be tremendous consequences.

MR. WISEMAN:  Oh absolutely, absolutely, as there should be.

MR. ROBERTS:  And I just --

THE COURT:  But, you know --

MR. ROBERTS:  Dr. Price --

THE COURT:  Let me tell you this.  You know, I have been hearing discovery matters for over 16 years, in every

USCA5 2066

kind of a case, and I litigated, when I practiced for 13 years, discovery matters, and we never decided discovery that was under protective order based on YouTube or internet disclosure or somebody standing out in front of the courthouse with it on billboards and I don't think that's an appropriate consideration, especially in this type of a case. This is a capital murder case, the jury may have convicted Mr. Bourgeois of this offense but his life is at stake, and I don't see any reason why he shouldn't have video for his attorney to look at this examination.  And I think these are inappropriate objections, Mr. Roberts, and I don't think they are coming from you-all but I think from your examiners.  And I would be glad if you want to have Dr. Price or Dr. Moore come in here over the next week to discuss this.

MR. ROBERTS:  I, Your Honor, I have already asked them to be present in Corpus this week and, I mean, I am really having a hard time articulating their professional guideline objections as well as the Bureau of Prisons.  And Ms. Salinas is also on the line here and she can weigh in on this as well, because she was in with our, some of our conversations.  But the Bureau of Prisons is claiming that in the interim, from when there was a videotape recording in the past, they had a, the confinement facility at Terre Haute was different and that now they have a different location where they keep inmates like Mr. Bourgeois and they have, they are

articulating some security concerns, and they state that in every case they get requests for videotaping these kind of things and they are concerned about how this is going to impact future requests.

THE COURT:  Well, I am not understanding that exactly.

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  What is this security claim in particular?  When examinations like this are given, are, will Mr. Bourgeois be in the same room as the examiner?

MR. WISEMAN:  Yes, he would be, Your Honor.

THE COURT:  Is this, I'm sorry, who said that?

MR. WISEMAN:  That's Michael Wiseman.

THE COURT:  And I assume that he would be shackled for the protection of the examiner?

MR. WISEMAN:  I'm sorry, Michael Wiseman again.  At some points during the neuropsychological examination he would probably have to have his hands free to be able to manipulate the materials, and that's pretty routine in these.

THE COURT:  For written materials?

MR. WISEMAN:  I'm sorry?

THE COURT:  He would have written materials?

MR. WISEMAN:  Well, he might have to fill in, you know, answers.

THE COURT:  Okay.  Okay.

MR. WISEMAN:  And solve, or else he might have to assemble blocks.

THE COURT:  So I am not, I guess I am not understating the articulable security -- security concern, if we are talking about two people in an open room, what is the security concern about having a video, the video set up behind the doctor's shoulder?

MR. ROBERTS:  Well, Your Honor, that is exactly why I --

THE COURT:  Who is speaking?

MR. ROBERTS:  -- have instructed the Bureau of Prisons to be --

THE COURT:  Who is speaking?

MR. ROBERTS:  -- available also.

THE COURT:  Who is speaking?

MR. ROBERTS:  Because, again, these are not my objections, Your Honor, they are --

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Yes, ma'am?

THE COURT:  Is that you speaking?

MR. ROBERTS:  Oh, yes.  It's Tony Roberts for the United States.  Sorry, Your Honor.

THE COURT:  Thank you.  Go ahead.

MR. ROBERTS:  The Bureau, what the Bureau of Prisons said to us was that they would have to shut down the entire

USCA5 2069

facility to take the security, the camera equipment and all, and whatever the equipment is, through the facility to the back part of the facility, that once that camera is in there, all the inmates have access to their own website and to email, that they would then start advocating or informing the world, so to speak, that people were allowed to be, bring videotapes in and videotape things, and then I don't really understand the remaining security issues and I think --

THE COURT:  There must be more to it than that, Mr. Roberts.

MR. ROBERTS:  There has got to be more, Your Honor, and I am trying to understand.

THE COURT:  I feel bad for you even having to say that.

MR. ROBERTS:  Thank you, Your Honor.  I just, I, we have been coordinating with the, you know, I took your order immediately and went back to my two experts and to the Bureau of Prisons and said, "This is what the Court has ordered, this is how we are going to do this," and they started raising new objections to how this was going to be done, and so --

THE COURT:  Okay.  I --

MR. ROBERTS:  -- I told them that I would go back and ask the Court to reconsider based on their objections and then I would request an opportunity for them to come in and

USCA5 2070

articulate what it is --

THE COURT:  Mr. Wisefeld, how do you want to do this?  I don't want to not get -- I'm sorry, I didn't mean Wisefeld.  I just had somebody in here named Wisefeld.  Mr. Wiseman, how do you, how do you anticipate --

MR. WISEMAN:  Your Honor --

THE COURT:  -- letting the Government make a record of the objections for Dr. Price and Dr. Moore as well as the Terre Haute facility?

MR. WISEMAN:  Yeah, I have no problem in principle, I'm just dealing with some logistical issues about getting our team down there next week for this type of a hearing. Frankly, I think the Government has not proffered sufficient basis for the Court to even have an evidentiary hearing.

THE COURT:  Well, it sounds like it to me.

MR. WISEMAN:  Yeah.

THE COURT:  But this is the problem.

MR. WISEMAN:  If the Court wanted to --

THE COURT:  If they can't --

MR. WISEMAN:  -- perhaps we could do it by telephone?

THE COURT:  I don't mind doing it by telephone.

MR. WISEMAN:  I'm sorry?

THE COURT:  I don't mind doing all of it by telephone.

USCA5 2071

MR. WISEMAN:  Yeah, I mean, and then we could certainly stand by and ask pertinent questions.  I mean, I don't imagine it will be all that involved.  So I guess that would be my suggestion.

THE COURT:  Okay.  When are you-all free this week to do this?

MR. ROBERTS:  Your Honor, Dr. Price and Dr. Moore will both be in Corpus Christi on Wednesday all day.

MR. WISEMAN:  This Wednesday?

MR. ROBERTS:  This Wednesday.

THE COURT:  Why are they coming into Corpus?

MR. ROBERTS:  I couldn't, I had to figure out something, Your Honor, and I just decided to bring them to Corpus so that we could have them present in case you allowed for them to be present and get their own rationale to why they object to this process.

THE COURT:  Mr. Wiseman, are you free on Wednesday?  Again, everyone would have to appear by telephone, whether they are in Corpus or elsewhere.

MR. ROBERTS:  Sure, Your Honor.

MR. WISEMAN:  Yes, I'm free on Wednesday.

THE COURT:  10:00 O'clock?

MR. WISEMAN:  10:00 O'clock sounds fine.

THE COURT:  Wait a minute.  We are starting a jury trial.  Jury selection day is Wednesday.  Okay.

USCA5 2072

(Court conferring off the record with clerk)

MS. SALINAS:  This is Ms. Salinas, this --

THE COURT:  I wonder if we could do jury selection, if we could do this first thing in the morning and then jury selection after that.

MR. WISEMAN:  Your Honor, I'm a little tight early in the morning.  This is Michael Wiseman.  I have a medical appointment first thing.

MS. SALINAS I was just about to say the same thing.  This is Elsa Salinas.  I have got a medical appointment at 10:00 but I can, I can talk to Mr. Roberts about that later.

(Court conferring off the record with clerk)

THE COURT:  How long do you think this will take?  Could I do it during the noon hour?

MR. ROBERTS:  I would -- this is Tony Roberts for the United States, Your Honor.  I would hope so.  I, my intention is to simply put Dr. Price, then Dr. Moore, and then the BOP official on the stand and say, "Please inform the Court of why you believe it's inappropriate to do the, to have the videotape," and let them articulate their objections, because, as I have said before --

THE COURT:  I hope they do a better job than you-all.

MR. ROBERTS:  I understand, Your Honor.  I mean, from --

USCA5 2073

THE COURT:  I got it, Mr. Roberts.  You know I'm teasing you.  I understand your situation.  Let me ask you this, is it not usual, let's say Dr. Price goes in with no video and no audio and does task A, B and C; does he not have to disclose the task A, B and C, the questions, to the movant?

MR. WISEMAN:  Your Honor, this --

THE COURT:  I mean if Mr. Bourgeois sees them, why can't his attorney see them?

MR. WISEMAN:  In my experience, Your Honor, typically --

THE COURT:  Who is speaking?

MR. WISEMAN:  -- is that the --

THE COURT:  Who is speaking?

MR. WISEMAN:  -- the psychologist -- I'm sorry, Michael Wiseman.  The psychologist would disclose the raw data to our psychologist and that protects the test protocols.  I should think that if our psychologist then informs us that there is some error in the scoring, we would then be able to take that material and enter it as an exhibit, notwithstanding the secrecy of the test.  There has to be a way for us to confront the witness.

THE COURT:  Okay.  Well, let me ask you this: Doesn't Mr. Bourgeois know what the tests are, because he is being given the test?

**USCA5 2074**

MR. WISEMAN:  Of course.

THE COURT:  Then why can't his attorney know what it is?

MR. WISEMAN:  Well, I agree.  I am just anticipating that that's the answer that you would get from the --

THE COURT:  I am talking to Mr. Wiseman?

MR. WISEMAN:  Yes, I'm sorry, Michael Wiseman.

THE COURT:  Okay.  This is my concern, Mr. Roberts, about Dr. Moore and Dr. Price's objections, because whatever Mr. Bourgeois knows his attorney is supposed to know, and if Mr. Bourgeois is given the test then why can't his attorney -- I don't get it.

MR. ROBERTS:  Well, Your Honor -- Tony Roberts for the United States.  The one thing I can articulate is that there is a distinct difference between an individual taking a test and going and reporting how the test was given and that and actually videotaping and memorializing every single question on a test that is copyrighted, a test that is protected.  We have got this whole issue of the Flynn Effect and these arguments that people slowly over time learn how to change their mental abilities and then therefore their testing scores are different, and the societies that are putting these out protect their test material so that they don't have to do a new, update the testing every year or every so often, they can do it over several years at a time.

USCA5 2075

Because it takes extensive research and extensive study and quite expensive for, my understanding is, that for them to put out a new test. So now we have the phase, the number IV that is available, but it has only been on the market for, I understand, a year or two.

MR. WISEMAN: Your Honor, it's Michael Wiseman. We have no problem, of course, with maintaining test security. That's not the issue. We are not asking for copies of the test, we simply want the exam to be videotaped.

THE COURT: Well, then you get the copy of the test that way.

MR. WISEMAN: Well, except we won't -- we will only have questions and answers and not necessarily the written materials. But, more importantly, we would be bound by a protective order to not disclose that, and so I don't see where it compromises test security.

THE COURT: Well, I don't get it either but I sure want to give them an opportunity to articulate whatever it is their concerns are. What I don't get is that, I don't see any problem, just theoretically, if Mr. Bourgeois instead of what you are claiming he is, Mr. Wiseman, were an absolute genius with total recall, I don't know why he couldn't write down every question and answer that he gave. Is there any prohibition to that?

MR. WISEMAN: Not that I am aware of. Michael

USCA5 2076

Wiseman.  No.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  I don't know how the psychologists administer the test so I don't know that if he was writing down every question and then writing down every answer, I don't know how that would, how they would claim or articulate how that would impact the accuracy of the results.

THE COURT:  Okay.

MR. ROBERTS:  That would be a great question to ask them.  They are the experts, they are the ones that I am relying --

THE COURT:  I mean, I don't know if there are certain nuances like you ask question A, if you should stretch it out over a minute because of certain reasons, and that that is the secret in how the questions are, the tone of the nuances of the questions, or if the secrets are just in the questions.  So we'll have to get that --

MR. ROBERTS:  And --

THE COURT:  What do you think Mr. Wiseman, we will have to get that from the experts on Wednesday?

MR. WISEMAN:  Yeah, I guess.  I don't know the answer to that.  I expect that, you know, the test is the test and then, you know, they are concerned with the questions being put out before the public.  But again,

USCA5 2077

that's, you know, that's not something that can't be covered by a protective order.

THE COURT:  Well, in the meantime, Mr. Roberts, I think you ought to start looking for different examiners.

MR. ROBERTS:  Yes, Your Honor.  I have, I mean, I am going to contact Dr. Martell again and find out if he is in fact available.  We have, obviously we are on a short time span here.

THE COURT:  Yes, sir, and I appreciate that, too.  But, on the other hand, if Dr. Price did these audio and he didn't lose his license, then that argument is going to look a little funny.

MR. ROBERTS:  I understand, Your Honor.  And I have confronted him with what has happened in the past and the attachments that Mr. Wiseman submitted and asked him to comment on those and he told me that he does have some reasons for why he would not do it himself again, if a court ordered it he would, in fact in this case he said he would actually withdraw before he --

THE COURT:  Well, that's why I am saying you had better find another examiner.

MR. ROBERTS:  Well, I have Dr. Moore in addition, Your Honor, and we, as Mr. Wiseman commented, we have Dr. Martell and I will follow up with him, and Dr. Price is, actually, his name has been mentioned in several Fifth

USCA5 2078

Circuit cases and that's how I ended up finding him.  He has been acknowledged as somebody that has a lot of experience and knowledge in this area and so I reached out to find out if he was available to assist us when the Fifth Circuit published his name in one of their published cases, so I will certainly look for other possibilities but I am hopeful that we can go forward, and whether it's Dr. Price or just Dr. Moore or even Dr. Martell back again, I will pursue all the options, Your Honor.  And as I stated in our motion for reconsideration, quite frankly, I mean we are, if my doctors are telling me that they are not going to do this because of a videotaping, and I, then we obviously could just pull back and just say oh, fine, we will just respond to the defense's evidence.  It's their burden and we could do that.  That's not what I want to do, but.

THE COURT:  Well, I understand that.  I'm sorry, I would be sorry to be the cause of depriving you of that, but I think it would be more likely that the doctors have done themselves out of a fee, actually.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  But, we will see.

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Your Honor, did you set a time, this is Michael Wiseman, for --

THE COURT:  I think I'm, 12:00 noon.

USCA5 2079

MR. WISEMAN:  12:00 noon, your time, okay.  Your Honor, could I bring up one other matter?

THE COURT:  Yes, sir.  Is this Mr. Wiseman?

MR. WISEMAN:  Yes, it is, I'm sorry.

THE COURT:  Yes, sir.

MR. WISEMAN:  I had communicated with Ms. Scotch and Mr. Roberts about this previously and I was going to do a motion but then Mr. Roberts and I talked about it, we thought we, maybe it would be just easier to bring it up with you.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Gilbert, our neuropsychologist, is unavailable for the week of the hearing, he is going to be out of the country on a prepaid trip.  It seems to me, and I don't have a preference necessarily, that the alternatives would be either to pick a different day when he is available and the Court is available or else to have his testimony done by deposition, a trial deposition.  I have got a number of alternative dates and I am personally fine with either plan depending on what the Court wants to do.

THE COURT:  Mr. Roberts, what is your preference?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  My preference would be to actually have live testimony if we could get him in before, and to --

THE COURT:  Just preserve it?  Because if it's a deposition I want to participate, because I usually do.  I

USCA5 2080

mean if I am the decision maker and the fact finder, I like to see the person and ask him some questions myself.

MR. WISEMAN:  Sure.  Live testimony would be fine. This is Michael Wiseman.

THE COURT:  So we can do that by video-conferencing with all of us there, or we can have him come to Corpus and preserve his testimony that way, in court.

MR. WISEMAN:  Okay.  This is Michael Wiseman.  The, should I get with Ms. Scotch on the proposed dates?

THE COURT:  Yeah, you-all, Mr. Roberts, you and Mr. Wiseman pick a preference.  We can do it in the courtroom or we can do it in the courtroom with video-conferencing.

MR. WISEMAN:  Well, Your Honor -- this is Michael Wiseman.  I guess if we are going to, you know, do it by video we might as well be in Corpus and just make it another part of the hearing.

THE COURT:  And that's fine, as long as you don't need him to sit through the whole hearing to look at the other experts.

MR. WISEMAN:  No, I don't think that --

THE COURT:  Okay.

MR. WISEMAN:  -- would be required from petitioner's perspective.

MR. ROBERTS:  And that would be my -- Tony Roberts for the United States, Your Honor.  That would be my

USCA5 2081

preference as well, to have him present, because I would want one of my expert psychologist's --

THE COURT:  If you can find one.

MR. ROBERTS:  --  his testimony, perhaps guiding us and giving us counsel.

THE COURT:  Okay.  Anything else?

MR. WISEMAN:  Not from petitioner.

THE COURT:  Well, you-all go ahead and get with Ms. Scotch.  You want to do it right now?

MR. WISEMAN:  Sure.

THE COURT:  Do you know the dates that your expert is free?

MR. WISEMAN:  I do.

THE COURT:  What are they, start throwing them out.

MR. WISEMAN:  September 8th through the 10th, or October 6th through the 8th.

THE COURT:  It will be September.

MR. WISEMAN:  Okay.

(Court conferring off the record with clerk)

THE COURT:  The 10th?  The 10th is a Friday, how is that?

MR. WISEMAN:  That's fine with petitioner.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor -- yeah, Tony Roberts for the United States, Your Honor.  The only thing I would want

to do is check with Dr. Moore and Dr. Price to see if one of those two could be available during that time, and I will do that immediately.

THE COURT:  Well, I mean, if they are not going to take the case then, if Dr. Price is not going to take the case, I hate to spend too much time working around his schedule.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  On the other hand --

MR. ROBERTS:  -- come to a resolution, I --

THE COURT:  If he may rethink his position, then maybe we have something else to work with.

MR. ROBERTS:  Yes, Your Honor.  I know that Dr. Price has worked with both the, both sides of a case.  He has worked with a lot of courts and I'm sure we will be able to come to some resolution.

THE COURT:  Okay, I appreciate that.  And, you know, I would be glad to draw the protective order as tightly as you-all want it with built-in consequences that poor Mr. Wiseman has to pay for a reissuing of the new test if he lets it out.

MR. WISEMAN:  That's good.  I thought, Your Honor, you were going to suggest some imprisonment, but.

THE COURT:  No sir, because then you wouldn't be able to take your video camera in.

USCA5 2083

MR. WISEMAN:  That's right.

THE COURT:  Anything else?

MR. WISEMAN:  So, will the test --

THE COURT:  Okay, so we are going to go with that date, the 10th, unless I hear back from Mr. Roberts and Mr. Wiseman calling Ms. Scotch for an alternative date.

MR. WISEMAN:  Okay, and --

THE COURT:  Do you have an extra date to give them right now?  Okay.  8:00, 9:00, 10:00 O'clock in the morning, which do you want?

MR. WISEMAN:  Earlier the better for petitioner.  I guess 9:00 O'clock.

THE COURT:  9:00 O'clock is perfect.  She says that we are free September 8th, 9th and 10th.  So those are the three dates available now if you can talk to Drs. Price and Moore.

MR. ROBERTS:  Your Honor, in that case, could we do it, I would prefer -- this it Tony Roberts for the United States, Your Honor.  I would prefer Thursday the 9th.

THE COURT:  Would you, why don't we just do it this way:  The reason I put it on the 10th, on Friday, because I will be picking juries that week also and it's easier to break on a Thursday at 5:00 than break midweek.  So, let's keep it on Friday unless you have a huge conflict.

MR. ROBERTS:  That's fine, Your Honor.  Tony

USCA5 2084

Roberts.  Thank you, Your Honor.

THE COURT:  Besides, we try to get people to Corpus to spend money for the weekend.  Right, Ms. Salinas?

MS. SALINAS:  That's right, Your Honor.

THE COURT:  All right.  Thank you-all very much. You are excused.

MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  Thank you, Your Honor.

MS. SALINAS:  Thank you, Your Honor.

(The proceedings ended at 3:25 p.m.)

USCA5 2085

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


    /s/  Judith M. Garcia                    June 29, 2010

USCA5 2086

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,   )   CRIMINAL ACTION
   )
         PLAINTIFF,   )   CR-C-02-216(1)
   )
VS.   )   CORPUS CHRISTI, TEXAS
   )   JUNE 9, 2010
ALFRED BOURGEOIS,   )   12:05 P.M.
   )
        DEFENDANT.   )
..............................)

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES BY TELEPHONE FOR:

THE GOVERNMENT:           MS. PATTI HUBERT BOOTH
           MR. TONY ROBERTS
           MR. MARK DOWD
           MS. ELSA SALINAS
           ASSISTANT U.S. ATTORNEYS
           800 N. SHORELINE, STE 500
           CORPUS CHRISTI, TEXAS 78401

THE DEFENDANT:           MR. MICHAEL WISEMAN
           ASSISTANT FEDERAL DEFENDERS
           SUITE 545 WEST, CURTIS BUILDING
           601 WALNUT STREET
           PHILADELPHIA, PENNSYLVANIA 19106

FC TERRE-HAUTE           MS. MARY ELLEN DOUCETTE-LUNSTRUM
BUREAU OF PRISONS:

THE COURT RECORDER:           MS. VELMA GANO

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

USCA5 2087

(The proceedings began at 12:05 p.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. ROBERTS:  Tony Roberts for the United States.

MR. DOWD:  Mark Dowd for the United States.

MR. WISEMAN:  Michael Wiseman for --

DR. PRICE:  Dr. Randall Price --

MR. WISEMAN:  -- Mr. Bourgeois.

DR. PRICE:  Sorry.

MR. WISEMAN:  Michael Wiseman for Mr. Bourgeois.

MS. BOOTH:  Your Honor?

THE COURT:  Yes?  Yes?

MS. BOOTH:  This is Patti Hubert Book for the United States, and we have our two psychologists, I mean our two experts here, Dr. Price and Dr. Moore, and we would like to put on some evidence from both of these gentlemen as well as our chief of the correctional part of the BOP, but first Mr. Roberts has a couple of remarks he would like to make.

THE COURT:  Okay.  Remark away, Mr. Roberts.

MR. ROBERTS:  Yes, Your Honor.  I, there is also an attorney from BOP with --

THE COURT:  You need to speak up, please.

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette-

**USCA5 2088**

Lunstrum, Bureau of Prisons attorney at FC Terre Haute is also present.

THE COURT: Okay.

MR. ROBERTS: Thank you, Your Honor. Tony Roberts for the United States, Your Honor. This -- first of all, we thank you for giving us an opportunity to have this telephone conference. This whole, the entire premise of the United States trying, attempting to get an evaluation conducted on Alfred Bourgeois is really premised upon Mr. Bourgeois not having taken the WAIS IV and --

THE COURT: Not taking what?

MR. ROBERTS: Not taking the WAIS IV, which is the new version of the IQ testing. And it has come to our attention that, through a document we received from the Bureau of Prisons, that there was something conducted by the defense, some type of neuropsychological evaluation done in August of 2009, and if in fact Mr. Bourgeois has already been tested it may be a moot point. And so I am sorry to bring this up at this point in time but I just received the document about within the last hour where a Dr. Victoria Swanson, with a member of the Federal Public Defenders trial team, Elizabeth Boren, had gone to the facility in August 19, 2009 to conduct a neuropsychological evaluation. And so, I had spoken to Mr. Wiseman at our last hearing when he was here in Corpus and my recollection was that he assured me

USCA5 2089

that no one had, they had not done additional testing.  We do not have any evidence nor have been given any documentation regarding an August 2009 testing.  Our two experts who are on the phone have assured me that any kind of IQ testing at that time would have been the WAIS IV.  So we are a little bit concerned that maybe there is something we don't know.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor, Michael Wiseman.  Dr. Swanson in August of 2009 administered one instrument, the ADDAS.  I --

THE COURT:  I'm sorry, can you speak up?

MR. WISEMAN:  -- asked her to provide that to --

THE COURT:  Can you speak up, please?

MR. WISEMAN:  I'm sorry?

THE COURT:  Can you speak up?  I can't hear you.

MR. WISEMAN:  Sure.  Dr. Swanson, at our request, administered one instrument in August of 2009, it would be ADDAS, A-D-D-A-S, and that is a test for adaptive deficits, it's not an IQ test.  She did not administer a WAIS IV.  No doctor has administered a WAIS IV on our behalf.

THE COURT:  So what does that mean to you, Mr. Roberts?

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  My, Dr. Moore has indicated to me that that's not a problem, that's an adaptive behavior test, and so we

**USCA5 2090**

are fine.  I just wanted to make sure, I had just gotten that information, I just wanted to make sure where we stood on the need to even press forward.  So, Your Honor, at this time, what I would like to do is have Mark Dowd introduce Dr. Price to you and have him, have Dr. Price give you his position on the and his objections to having the testing videotaped, and then we will proceed with Dr. Moore and then the Bureau of Prisons objection.

MR. WISEMAN:  Michael Wiseman here, Your Honor.  Is this going to be in the form of question and answer?

THE COURT:  I assume.  Do you want to do it in the narrative, Mr. Dowd?

MR. DOWD:  Your Honor, to save time and because of the electronic difficulties here, I would --

THE COURT:  I'm sorry, are you on a speaker phone, Mr. Dowd?

MR. DOWD:  I am not, Your Honor.

THE COURT:  Okay.  How do you want to do this?

MR. DOWD:  I was going to ask Dr. Price some rather leading questions just to permit him to get his views heard.

THE COURT:  Okay.

MR. DOWD:  I could do it --

THE COURT:  Let's just start it.

MR. DOWD:  -- is what I'm saying.

THE COURT:  Put him under oath, Ms. Scotch.

USCA5 2091

THE CLERK:  Yes, Your Honor.

RANDALL PRICE, GOVERNMENT'S WITNESS #1, SWORN

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Please.

DIRECT EXAMINATION

BY MR. DOWD:

Q   Dr. Price, would you state your full name for the record and spell your last name, please?

A   Yes.  My full name is Jack Randall Price and my last name is spelled P-R-I-C-E.

Q   Would you briefly advise the Court of your credentials?

THE COURT:  I can't hear you, Mr. Dowd.

THE WITNESS:  I am a psychologist, a forensic psychologist and neuropsychologist.  I have been practicing psychology in the state of Texas for 26 years and I have been a professor of psychology for 38 years.  I am licensed to practice psychology in the states of Texas and Oklahoma.  I am board certified in forensic psychology by the American Board of Professional Psychology and I am board certified in neuropsychology by the American Board of Professional Neuropsychology.

BY MR. DOWD:

Q   Dr. Price, have you had occasion to be contracted by both the defense as well as the state or the government in offering opinions about psychological testing?

USCA5 2092

A    I have.

Q    And what would you tell the Court as far as the approximate breakdown between those two parties?

A    Since -- oh, and this is -- I think I am supposed to identify myself each time, is that correct?

Q    That's correct.

A    Okay.  I'm sorry, this is Dr. Price.  Since 1984, which was the first time I testified, I have testified at the request of the defense approximately 60 percent of the time and at the request of the state or the prosecution approximately 40 percent.  In Atkins cases such as this, I have testified five times at the request of the prosecution and three times at the request of the defense.

Q    All right.  Mark Dowd.  Dr. Price, I think you wanted to make three --

THE COURT:  Mr. Dowd, could you speak up, please?

BY MR. DOWD:

Q    -- points.  The impact of third-party observers, whether they are present or whether it's in the form of a video or audiotaping, could you address your concern on that issue?

THE COURT:  I, Mr. Dowd, I cannot hear you.

MR. DOWD:  Oh, you cannot hear me, Judge?

THE COURT:  No.  Please speak up.

MR. DOWD:  All right.

USCA5 2093

BY MR. DOWD:

Q    Dr. Price, I would first like you to address any distinction between third-party observers, whether they are actually present or by virtue of a video or audiotaping.

A    It's -- this is Dr. Price.  The official statement of the National Academy of Neuropsychology holds that observer effects also extend to situations where the person, the observer is not actually present but is present through some sort of electronic apparatus.  At least two empirical studies published in the Clinical Neuropsychologist and in the Journal of Forensic Neuropsychology show that audio and videotaping of psychological testing has the same effect as an, as the actual presence of an observer.

THE COURT:  And what is that?

THE WITNESS:  It is that it -- and this is Dr. Price, I'm sorry -- that the presence of an observer has an effect on the test results in such a way that it prevents us from comparing the examinee's performance to the established norm because the standardization of the test did not include third-party observers.  And any factor that compromises the standard administration of the psychological test jeopardizes the validity and the reliability of the test results due to those.  The presence of an observer is a distraction both external and internal, it interferes with the rapport of the examiner and the examinee and it alters

USCA5 2094

the behavior of the examinee through what has been studied empirically as the social facilitation effect where observers lower the performance of the examinee on complex test questions and items and may increase the performance on easier, overlearned items.

THE COURT:  Have you ever tested anybody on death row without a guard around?

THE WITNESS:  I have.  Not in the -- on every occasion there has never been a guard in the room when I have tested a --

THE COURT:  Where are the guards?

THE WITNESS:  Excuse me?

THE COURT:  Where are the guards?

THE WITNESS:  They are outside, outside the room.

THE COURT:  Are they looking in?

THE WITNESS:  This is Dr. Price.  Yes, sometimes they will but typically they -- it depends on the prison.  In Texas there is a window and periodically they will look in to see if everything is okay.

BY MR. DOWD:

Q   Mark Dowd, Your Honor.  Dr. Price, did you have occasion to audiotape a psychological test on an Edward Fields?  And if you did, explain to the Court the circumstances of that.

A   Yes.  This is Dr. Price.  In 2005 I conducted a psychological evaluation of Edward Fields in Oklahoma.  It

USCA5 2095

was pre-trial.  There was, as I recall, a court order for a third-party observer, the defense attorney, and I voiced my concerns about having her in the room while I conducted the evaluation and we compromised and I did make an audio tape of that evaluation and provide it to the defense attorney.  And at that time I agreed to do that, and I wouldn't again but I did it then.

Q    And how far --

THE COURT:  Well, did that compromise your test?

BY MR. DOWD:

Q    -- into the case -- I'm sorry.

THE COURT:  Did that compromise your test?

THE WITNESS:  It -- this is Dr. Price.  In that particular case I didn't think that it did.  The individual was quite intelligent and very assertive and outgoing and I did not think that, in that case, that it did compromise the test results, Your Honor.

THE COURT:  Well, if it does compromise, can you adjust for that?

THE WITNESS:  You -- this is Dr. Price, I'm sorry. There is no quantitative way to adjust for that.  I would have to simply say that there was an observer either electronically or in person and that may have had an effect on the results.  We don't know how much and on what subtest to make any kind of an adjustment.  There is no, no

USCA5 2096

scientific procedure for that.

BY MR. DOWD:

Q    Dr. Price -- Mark Dowd here -- do your professional rules or ethical standards dictate whether or not third-party observers may be present?

A    This is Dr. Price.  The various professional organizations of which I am a member have official policy statements some of which explicitly say third-party observers should not be present.  Some have some exceptions for that, that, all say, though, that the psychologist should follow carefully the standardization, the standardized procedures for administering and scoring the test, and that any deviation from that may have an effect on the test results and invalidate them.  These groups that have such statements are the National Academy of Neuropsychology, the American Academy of Clinical Neuropsychology and the Texas Board of Examiners of Psychologists have an admonishment to follow exactly what the procedures are, and the Standards for Educational and Psychological Testing also indicate that it is the ethical and professional obligation of the psychologist to follow those procedures exactly.  In the case of the WAIS III, in the manual it stated that no other person other than you should be in the room during the testing.

Q    Finally, Dr. -- Mark Dowd, Your Honor.  Finally, Dr. Price, do you have a concern about the security of the

USCA5 2097

future reliability of the psychological testing?

A    This is Dr. Price.  I do.  The, for any test the valid use of that test depends on the examinee's unfamiliarity with the test items, and any procedure that places the test protocols and items in the hands of anyone other than another qualified mental health provider is problematic.  And again, those same professional organizations that I cited earlier all say that it is our ethical obligation to protect the security of the test materials.  And included in that, again, in Texas is the Board of Examiners rules and regulations for psychologists that state that test protocols and data should be kept in a secure manner that does not compromise the validity of that test.

THE COURT:  Well, are you going to give him the same test that he already had with his own psychologist?

THE WITNESS:  This is Dr. Price.  No, those tests are old and at this time considered to be outdated.  At least the IQ test, Your Honor.

THE COURT:  Okay.

THE WITNESS:  There are also -- this is Dr. Price. There are also other tests that we give in a forensic evaluation that are very important to assess the individual's effort to see that they are not intentionally trying to do poorly, and those tests, the procedure in them needs to be kept secure so that those tests continue to give us a way to

USCA5 2098

empirically assess the person's, how hard they are trying and if it's a valid evaluation.  These tests take years to develop.  They have to be standardized.  They take, the IQ tests, the WAIS III took over five years and the WAIS IV closer to seven, in which they have to test, to standardize these tests they have to test over 5,000 individuals across the United States to develop the norms, and if we didn't, if we don't have those tests kept in a secure fashion, that it would lead us to have to assess such things as intelligence in a subjective fashion as opposed to a more --

THE COURT:  Well, there is no reason to think, Doctor, if I enter a protective order that it will be violated.  I have no reason to assume that.  I have entered literally thousands of protective orders without any problem.

THE WITNESS:  This is Dr. Price.  Yes, ma'am.

MR. WISEMAN:  Your Honor, it's Michael Wiseman.  May I ask a few questions?

THE COURT:  Sure.

MR. DOWD:  Your Honor, I just had one final question, if I might.  Mark Dowd.

THE COURT:  Okay, Mr. Dowd, finish up.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q  Dr. Price, would your, any part of your evaluation, would it implicate any comments by Mr. Bourgeois relating to the

USCA5 2099

facts of the case or how would you react to, how do we keep the facts of the case out of your results?

THE COURT:  Why would you have to?  It's not a confidential examination.

THE WITNESS:  This is Dr. Price.  Your Honor, if I may, I would be assessing his intelligence and would not need to ask and would not ask any questions about the offense, and if he did begin to talk about that for some reason, I would stop him.

THE COURT:  Why?

THE WITNESS:  It is not necessary or relevant to my assessment of his intellectual functioning.

THE COURT:  Okay.

MR. DOWD:  I would pass the witness, Your Honor.

THE COURT:  All right.  Mr. Wiseman, you may proceed.

MR. WISEMAN:  Thank you, Your Honor.  This is Michael Wiseman.

                    CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Doctor.

A   This is Dr. Price.  Good afternoon, Mr. Wiseman.

Q   Dr. Price, the guideline that you refer to is the American Psychological Association ethical guidelines of conduct --

USCA5 2100

A    Yes?

Q    -- regarding test security?

A    This is Dr. Price.  If I understand the question, does the APA Ethical Code speak to test security?

Q    Yes.  You, Doctor, I'm sorry, Mr. Robertson and Ms. Booth in their pleading indicated that you would testify with respect to the APA Ethical Code of Conduct Standard 9.11, and they paraphrased it as saying it requires psychologists to maintain the integrity and security of tests, and my question is did you in fact rely on the APA Ethical Code in your conversation with the Government?

A    This is Dr. Price.  I did.  I told them or I sent them information indicating the various professional organizations and ethical codes, official statements that influence my opinions.

Q    And I just want to read to you a sentence or two from that code of ethics.  This is an accurate reading of Standard 9.1, Maintaining Test Security.  "The term test materials refers to manuals, instruments, protocols and test questions with stimuli, and that includes test data as defined in 9.04. Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations and in a manner that permits adherence to this ethics code."

Is that an accurate statement of what's contained in that

USCA5 2101

portion of the code?

A    In 9.04?

Q    No, 9.1.

A    9.1.  This is Dr. Price.  I have the code in front of me and there is a Section 9 on assessment and there is a Section 9.01 and then the 9.04.  I don't see a Section 9.1.

Q    All right.  Doctor, is there a section that's captioned Maintaining Test Security?

A    Yes, sir, that's 9.11.

Q    9.11.  My mistake.  In that section does it say, "Psychologists shall make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations"?

A    This is Dr. Price.  It does, yes, sir.

Q    Okay.  And so there is no prohibition on audio or videotaping in the section on maintaining test security?

A    There -- this is Dr. Price.  There is no prohibition on the audio or videotaping of psychological testing in the APA Code of Ethics, that's correct.

Q    Okay.  And is it your view that if Judge Jack orders the examination to be videotaped that, with a protective order, that you would not be engaged in reasonable efforts to maintain test security?

A    This is Dr. Price.  I think, while I think that would be a reasonable effort to maintain test security, my concern is

**USCA5 2102**

more about the test results, reliability and validity.

Q   Okay.  So the ethical issues that the Government maintains that were put in their motion -- did you review that, by the way?

A   I have.

Q   Okay.  The ethical issues in that motion are really not the problem at this point, is that right?

A   This is Dr. Price.  I wouldn't say they are not a problem.  I would still have concerns.  If anybody has the, who is not a qualified mental health professional has the opportunity to review the audio or videotape of the testing, that is still a concern, and if no one was going to view it other than perhaps the Judge, I don't, I wouldn't have a problem with it.  I am still concerned about it, but your question about is that a reasonable effort to protect the security of the test, I do think it's a reasonable effort.  I am --

Q   Okay.  And, Doctor, if you took that reasonable effort, in other words, submitted to the Judge's order that the examination be videotaped, you don't really fear losing your license, do you?

A   This is Dr. Price.  No, I don't fear losing my license under those conditions, no.

Q   Or being otherwise sanctioned?

A   Excuse me?

USCA5 2103

Q    Or being otherwise sanctioned by the Texas authorities?

A    This is Dr. Price.  It's my -- I don't think so.  I mean, I would hope not.

Q    Nor would we.  Now, with respect to the potential effects of third-party or -- and to be clear, we are not talking about third parties, per se, we are talking about the presence of a videotape which you would operate.  Your view is that there are two empirical studies that show that audio and videotaping has the same effect on testing as the presence of a third-party observer?

A    This is Dr. Price.  I cited my knowledge of two studies that show that audio and videotaping of psychological testing has the effect of altering the performance and, of an examinee, and it's an unnecessary distracter.

Q    And did I understand you to say, Dr. Price, that the, these alleged variances in performance have not been quantified by these studies?

A    This is Dr. Price.  No.  If that -- that's not what I testified to.  That they do have, there is empirical evidence that third-party observers and electronic substitutes for that are deviations from the standardization of the test and have an empirical effect on the test results.

Q    Okay.  My question was do they quantify, these studies, the degree of effect?

A    This is Dr. Price.  I'm sorry that I didn't understand

USCA5 2104

that question.  There is no study that I know of that can reliably quantify how much of an effect that would have in that particular evaluation, no, sir.

Q    What's changed between your evaluation -- oh, before we get to that question, in Mr. Field's evaluation that you spoke about earlier you indicated that you engaged in a compromise and agreed to audiotape rather than have the lawyer present, is that right?

A    That's my -- this is Dr. Price.  Yes, that's my recollection of that case, yes, sir.

Q    Okay.  And what's changed since that evaluation in late 2004 and now that leads you to say you wouldn't agree to such a compromise again?

A    This is Dr. Price.  My further study of the matter, conversations with colleagues, the review and the expansion of this, it's become a more frequent request, and I, my opinion about it has evolved over the last five years.

Q    And would you agree that none of the various associations or societies or academies that you spoke of earlier have an absolute bar on videotaping?

A    This is Dr. Price.  There are no official statements that I know of that say an absolute bar.  They make recommendations for those of us practicing in the field to avoid third-party observers, either actual observers or electronic substitutes.

USCA5 2105

THE COURT:  Well, you really can't do that in a federal death row, avoid observers at all.

MR. WISEMAN:  I'm sorry?

THE COURT:  I can't imagine you can avoid observers on death row.

MR. WISEMAN:  Well, that's true enough, Your Honor. That was Michael Wiseman, for the record.

BY MR. WISEMAN:

Q    Dr. Price, so absent an across-the-board prohibition in any of the relevant academies or associations governing these issues, you would agree that it's a case-by-case determination to be made by the Court and the forensic evaluator and, of course, the lawyers?

A    This is Dr. Price.  Yes, I would agree that there are exceptions to this and in certain situations a third party is allowed, an interpreter, in other situations like with a child who is afraid and the calming presence of the parent allows for a more valid evaluation, and it's because of those exceptions, that's the reason that these organizations do not have an absolute prohibition on this.

Q    Okay.  Those are not the only exceptions to having an audio or videotape done of an evaluation, would you agree?

A    This is Dr. Price.  I am sure there are other exceptions, yes, sir.

Q    All right.

USCA5 2106

MR. WISEMAN:  I have no further questions of the witness, Your Honor.

THE COURT:  Thank you.  Do you have another witness?

MR. DOWD:  Nothing further from this witness, Your Honor.

(Sound of voices in background)

THE COURT:  I'm sorry, is somebody speaking?  Hello?  I'm sorry, I cannot hear anybody right now.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  Can you hear me now?

THE COURT:  Yes.

MR. WISEMAN:  I can as well.

MR. ROBERTS:  I'm sorry, I had my phone on mute.  That makes it difficult to communicate with the Court, so.

THE COURT:  It does.

MR. ROBERTS:  But this is Tony Roberts for the United States, Your Honor.  We would like to proceed with Dr. Moore at this time.  And just before I do that, Your Honor, I wanted to clarify something that was insinuated in Mr. Wiseman's questioning of Dr. Price, and that is that the main concern is on the ethical aspect of maintaining the security of the testing.  If I, if my comments on our previous telephone conferences have indicated that, that was just one of the concerns that our experts have voiced, and if I was inarticulate in presenting this, the real concerns, the

USCA5 2107

biggest concerns that they have voiced --

THE COURT:  Well, you told me he said he was worried he was going to lose his license.  That's about as clear as you can get.  And in fact, if ordered to do, if I ordered a video-conference, videotaping, he wouldn't do it.

MR. ROBERTS:  Yes, Your Honor.  And I believe his position is still that.  He is still on the phone, we can, I mean, certainly ask him if he would do it at this point in time if you ordered it.  I don't think that question, that question was not asked of him.  But the point was that he informed us, Dr. Price did inform us that he had ethical concerns that could affect his license and his practice.

THE COURT:  Right.

MR. ROBERTS:  And I don't think I ever went as far as to say he would lose his license but perhaps I did, and if I did, I misspoke.

THE COURT:  Okay.

MR. ROBERTS:  So --

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  I, you know, and I don't think there was any intentionality here but I am feeling a little bit sandbagged when the Government's motion focuses almost entirely with respect to the doctors on the ethical issues.  There is a passing mention, which I actually pointed out in my response, to impact on tests.  I was prepared today to deal primarily with

USCA5 2108

the ethical issues; now I am told those are small potatoes and it's really the effect.  So I am feeling a little bit sandbagged.  I'm not sure I have any specific application to make but I just thought I would make the Court aware of that view.

MR. ROBERTS:  Your Honor, Tony Roberts for the United States.  I don't know if that necessitates a response from the United States or not but I, I simply, my intention in our motion was to request reconsideration so that the experts could better articulate the basis for their positions and that it was clear on, especially on the, on Monday, that I was inarticulate in being able to voice --

THE COURT:  Well, show me in your motion where you talk about a third-party problem.

MR. ROBERTS:  Your Honor, the, any time I mention that the --

THE COURT:  Just show it to me in your motion, just quote it.

MR. ROBERTS:  Your Honor, if you will give me a moment, I have got the motion in front of me.  Yes, Your Honor.  At the bottom of page 5 in our motion, in quoting some of the concerns of the National Academy of Neuropsychology, "The presence of a third-party observer during the testing recognizes the distracting effect of the presence of people other than the examiner and the examinee

in the testing room," and it mentions, "The presence of a third party in the testing room is also inconsistent with the standardization test administration requirements and performance on complex tasks, leading to a seriously flawed picture of neuropsychological defect." So, there is also, on page 6, a mention of --

THE COURT: But that has to do with a counsel's presence and that's not going to happen.

MR. ROBERTS: I'm sorry, Your Honor?

THE COURT: Well, page 6 has to do with counsel's presence and we are not talking about counsel's presence.

MR. ROBERTS: Yes, Your Honor. The entire motion was about reconsidering the videotaping, though.

THE COURT: Right.

MR. THORPE: When I mention on page 6 at the very, at the top paragraph with Dr. Moore having similar objections, I mentioned he would testify about the specific concerns he has regarding the negative impact on the validity, liability and objectivity of the test results if the evaluation is videotaped or a third person is present.

THE COURT: But you talk about counsel's presence during a mental examination.

MR. WISEMAN: Your Honor, this is Michael Wiseman. I think that's part of the problem here. I mean, you know, when I do motions to reconsider I usually attach declarations

USCA5 2110

from witnesses with specific averments and references.  I mean, I don't know what these studies that the Doctor referenced say.  I don't know if there are counterstudies. And as the Court, I think, points out, the one little paragraph at the bottom of page 5 talks about third-party observers and does not specifically discuss the effect, if any, of videotaping --

THE COURT:  Okay, move on.  Anything, any other examination of Dr. Price?

MR. WISEMAN:  Not from the petitioner, Your Honor.

THE COURT:  Okay.  Do you have anything further from Dr. Price, Mr. Dowd?  Okay, then you want me to hear from -- can I hear from the Federal Bureau of Prisons, the Terre Haute deal?

MR. ROBERTS:  Yes, Your Honor.  Tony Roberts for the United States.  They are on the line as well.  I think their input is going to be short.  But there was one more question that Mr. Dowd would like to ask Dr. Price.

THE COURT:  I would like to hear from the Bureau of Prisons right now, please.

MR. ROBERTS:  Okay.  Your Honor, we have, we have Captain Hector Joyner on the line, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  And --

THE COURT:  Is she an attorney or --

USCA5 2111

MR. ROBERTS:  Captain Joyner, he is not an attorney, Your Honor, he is the -- in fact, Captain Joyner, are you there?

MR. JOYNER:  Yes, I am.

THE COURT:  Okay.

MR. ROBERTS:  Would you state your name and your position on the record, please?

MR. JOYNER:  My name is Hector Joyner.  I am currently the chief correctional supervisor of the Federal Correctional Complex in Terre Haute, Indiana.

MR. ROBERTS:  It's my understanding we also have an attorney on the line that is the counsel of -- she will not be testifying, though, is that correct?

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette-Lunstrum.  That's correct, I will not be testifying.

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Mary Ellen Doucette --

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Bureau of Prisons attorney, and --

THE COURT:  I can't hear you.

MS. DOUCETTE-LUNSTRUM:  Okay.  Can you hear me now?

THE COURT:  Okay.  I can't hear the counsel, so does somebody else want to speak for the, does Mr. Joyner want to speak?

USCA5 2112

MR. ROBERTS:  Yes, Your Honor, I will -- Tony Roberts for the United States.  I will, Ms. Mary Ellen Doucette-Lunstrum simply said that she is the counsel, she is counsel participating but will not be testifying, she is just listening.

THE COURT:  Oh, okay.  Then go ahead with Mr. Joyner.

MR. ROBERTS:  Yes, Your Honor.  Mr. Joyner --

THE COURT:  Let me administer the oath to him, please.

MR. ROBERTS:  Yes, Your Honor.

HECTOR JOYNER, DEFENDANT'S WITNESS #2, SWORN

THE COURT:  Okay, go ahead, Mr. Joyner.

THE WITNESS:  Sorry, Your Honor?

THE COURT:  Go ahead, tell me what you want to tell me.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q   Yes, Mr. Joyner, would you please inform the Court of the security concerns that you have with regard to a particular inmate, being allowed to videotape his --

THE COURT:  This is not for the benefit of the inmate.

THE WITNESS:  Okay.  Hector Joyner.  As the complex captain, I am the custodial security expert in relation to --

USCA5 2113

THE COURT:  For death row there?

THE WITNESS:  -- institutional security, and I am concerned about the delicate balance and the stability within the unit which would create tension within the special confinement unit.

THE COURT:  Well, why would anybody know about it?

THE WITNESS:  Well, there's a couple of reasons, Your Honor.  First of all, the inmates that are pulled, that are removed from the cells within the unit itself, it's a pretty visible unit, Your Honor, and the officers would in fact have to remove him from the rest of the housing units within the cells, and because of some of the other inmates that are in there that are working on their cases, they actually have access to the law libraries and other accesses to their recreational period, so they would in fact see Inmate Bourgeois being removed and extracted from that particular section of the unit and put in a separate section.

THE COURT:  Yeah, well, doesn't that happen any time he has an attorney visit or any time he has his own psychologist come and examine him?

THE WITNESS:  Yes, he does.

THE COURT:  So I am not getting the problem.

THE WITNESS:  Well, it would, I feel that it would elevate him to a certain level of notoriety, thereby giving the appearance of a preferential treatment of one inmate over

USCA5 2114

Toynan - Direct

the other in relation to a videotape.

THE COURT:  I don't, I don't understand that.  Is there any other concern you have?

THE WITNESS:  Well, we have, in the, that's been requested in the past and due to the security concerns, especially with videotaping with inside a secure facility, we have not allowed that to happen.  There's structures, there's keys, there's  designs, the towers --

MR. ROBERTS:  Your Honor, this is Tony Roberts for the United States.

BY MR. ROBERTS:

Q   Could you inform the Court as to how the inmates interact with each other?  You mentioned, I don't think you explained well enough to --

THE COURT:  Oh, I think I know that, Mr. Roberts.  I believe this is the same security that allowed Mr. Bourgeois to interact with a guard and get messages out to the outside, which is extremely dangerous, so I don't, I am not really impressed with the security there.

MR. ROBERTS:  Yes, Your Honor.  And I think one of the things I would like to --

THE COURT:  So I know how they interact with each other and with the guards, apparently.

MR. ROBERTS:  Yes, Your Honor, and there, and we do have those --

USCA5 2115

THE COURT:  And if it hadn't been an inmate bringing that to the institution's attention, that guard would still be there passing messages.

MR. ROBERTS:  Yes, Your Honor, and --

THE COURT:  Anything else about the inmates contacting each other?

MR. ROBERTS:  Yes, Your Honor.  There was, I believe Captain Joyner can speak to the fact of an inmate being able to communicate with others that he had received special treatment.

THE COURT:  What is special treatment about having a government-appointed, a government-hired psychologist go in and examine him?  I am not understanding the special treatment there.

MR. ROBERTS:  Well, obviously, Your Honor -- Tony Roberts --

THE COURT:  You are the one who wanted the examination and now I hear from the guard that's special treatment.

MR. ROBERTS:  Not --

THE COURT:  I find this entire conversation absolutely ridiculous.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  It's not --

THE COURT:  So, apparently Terre Haute doesn't allow

USCA5 2116

videoing so it's just not going to happen?

MR. ROBERTS:  Yes, Your Honor.  The special treatment is --

THE COURT:  I thought I understood from your motion that they had allowed it in the past.

MR. ROBERTS:  Well, here is the problem, this is one of the things I wanted Captain Joyner to address, and that is that in 2005 a videotaping was allowed under different circumstances because they were in an old, older facility, and in fact Michael Wiseman, it is my understanding, was involved in the case, and so they were allowed to do it at a different time in the facility.  The facility is changed now and it's, and I would like for Captain Joyner to talk a little bit about the difference from 2005 to the present because there is a vast difference in the circumstances surrounding what would happen if we went ahead with the videotaping of Alfred Bourgeois at this time.

MR. WISEMAN:  Your Honor, this is Michael Wiseman.  Just perhaps for purposes of expediency, if we could talk about the Government's application made in the Nelson case a couple of months ago to have videotaping done, we can compare apples to apples.

THE COURT:  Yeah, could you tell us about that?  What happened with that, was it videotaped at Terre Haute or not?

USCA5 2117

MR. WISEMAN:  Well, Your Honor, the -- this is Michael Wiseman.  I pulled up the order that the Court entered subsequent to that application and what the Court did was it said because the defense did not want it done -- I will read the order, paragraph 7 of the order dated May the 19th of this year, quote, "In lieu of defense representation during government testing and evaluation," -- I'm sorry, I'm reading the wrong paragraph.  Here it is.  "The Government proposes that the examination be both audio and video recorded.  In support of this the Government cites the ADA mental health standards.  Nelson's counsel opposes this condition and states that this standard was enacted to protect the rights of the defendant and is not" --

THE COURT:  Who was opposed to it?

MR. WISEMAN:  The prosecution.  "The Court, the Court agrees that since the purposes of the recording is to protect the defendant, since Nelson's counsel does not wish the examination to be recorded the Government has no right to insist on this condition.  The Court does also allow counsel to be present via a video feed."  So my point in all this, Your Honor, is that when the Government in April of this year made the application to have videotaping done at Terre Haute, was Captain Joyner involved in that discussion and why was the Government permitted to --

THE COURT:  Was Captain Joyner involved in that

USCA5 2118

discussion, Mr. Roberts?

MR. ROBERTS:  I am not sure, Your Honor.  I just found out that there was this other scenario yesterday where another Assistant U.S. Attorney's Office had made a request to videotape it, and I have put a request in just this morning to our Capital Crimes Unit in Washington, D.C. asking if we, if there is any type of guidance that they are giving to the Department of Justice employees with regard to videotaping, because it's quite troubling to me that, that there is, you know, that there are different approaches that are being taken here, and I'm just curious whether or not Mr. Wiseman knows whether it's Dr. Martell that is advising that U.S. Attorney or not.

MR. WISEMAN:  Yeah, as I indicated in my response, Dr. Martell is in fact involved in that Nelson case, and that was all in my response.

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.  What my perception is, is as an Assistant U.S. Attorney I don't have expertise in mental retardation, I rely on my experts.  Mr. Wiseman is exactly correct that we had contacted Dr. Martell in 2008.  I made a proffer to the Court on Monday that the reason that we started using Dr. Price and Dr. Moore is because I got focused on the Flynn Effect issue and, relying upon both Dr. Price and Dr. Moore, I have been told that this adversely affects the validity of the testing.

USCA5 2119

I inadvertently --

THE COURT:  But, see, if there are guards watching, Mr. Roberts, I don't understand about the third-party effect.

MR. ROBERTS:  Well, Your Honor, Dr. Moore could, if he could just --

THE COURT:  Mr. Joyner, when you have inmates visited on, by their attorneys, is there, are they observed through a window?

THE WITNESS:  Yes, they are, Your Honor.

THE COURT:  Continuously, I would assume?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  And so if they are given testing by, apparently Mr. Bourgeois has had testing by his own psychologist, so they were observed also continuously?

THE WITNESS:  Yes, they were.

THE COURT:  All right.  So, I think we move on from the third-party problem and tell me something else.

MR. ROBERTS:  Your Honor, I guess the problem is that, I mean, the continuous observation is not that they are standing there looking inside and the guards are certainly not listening to what's going on inside, and it's not even apparent that, I mean the guards are around all the time so the, I mean I think in that particular scenario --

THE COURT:  Mr. Roberts, move on to something else.

MR. ROBERTS:  Okay.  Well, Your Honor, I mean I have

Dr. Moore here that can testify about what the national

standards and the standardization are and how these

psychological industries have determined.

THE COURT:  Well, make it quick.  I have got ten

minutes left before my jury comes back.

MR. WISEMAN:  Your Honor, I had a question of

Captain Joyner, if I could?

THE COURT:  Yes, sir.

MR. WISEMAN:  I assume that's what the Court is

still interested in hearing about?

THE COURT:  Yes, sir.

MR. WISEMAN:  Okay.

CROSS-EXAMINATION

BY MR. WISEMAN:

Q    Captain Joyner, were you shown the letter of May 7, 2010

from Warden Marberry to counsel Gary Rotherington?

A    Hector Joyner.  Yes, I was.

Q    All right.  And in that letter it indicates that, "Every

request for video and audio recording was carefully reviewed

and considered on a case-by-case basis.  The decision is

based on the individual facts and circumstances of each

particular request," close quote.  Have you done a

particularized individual determination as to whether video,

I'm sorry, videotaping is, raises special security concerns

in Mr. Bourgeois' case?

USCA5 2121

A    Yes, I have, and what I would say is, and I believe Mr. Roberts was wanting, before you-all got back and forth, there was a previous videotaped examination in the special confinement unit but that was back in early 2005 at the old United States penitentiary.  During that transition period, the new United States penitentiary opened in March of 2005. The primary penitentiary inmates at the old facility had been moved to the new facility.  In 2005 when that videotaping was conducted, the special confinement unit inmates, they had not moved over until July of 2005.  Since then, again going back to the structural design, it is completely different design in relation to the pathways and the entries into the particular facilities, and the way design is now it could potentially disrupt institutional operations based on it is, when you talked about apples and apples, Mr. Wiseman, it is truly now structurally apples and oranges in relation to where the special confinement unit is now.

Q    All right.  Let me --

THE COURT:  I don't understand why it would interrupt institutional activities any more than an attorney visit or a visit from somebody else, from his own psychologist.  What's the difference?

THE WITNESS:  The difference is before the attorneys --

THE COURT:  I'm talking about right now.

USCA5 2122

THE WITNESS:  Oh, well, because right now we shut, we basically shut the institution down to allow attorneys or visitors or things of that nature to enter into the new special confinement unit.

THE COURT:  I am not, I am still not understanding why you wouldn't shut it down to bring, to have this psychologist, a government-requested psychologist come visit Mr. Bourgeois.  Why would you mind shutting it down for that?

THE WITNESS:  Well, in order to do it, I mean we would --

MR. WISEMAN:  Your Honor, this is Michael Wiseman --

THE COURT:  Let me hear from Mr. Joyner, please.

THE WITNESS:  Yes, ma'am.  If you, if your, if your order, if the Court orders us to shut down institutional operations --

THE COURT:  I am not ordering you to shut down institutional operations.  I am just amazed that you would let the defendant's psychologist come in and test him and have some objection to the U.S. Attorney's request for coming in and being tested.

THE WITNESS:  Well, Your Honor, we have not --

MR. ROBERTS:  Your Honor, Tony Roberts --

THE WITNESS:  We have not allowed videotaping in the special confinement unit at this new location.

THE COURT:  Pardon?  I can't understand you, what

are you saying?

THE WITNESS:  I said, Your Honor, we have not allowed videotaping in the new special confinement unit since it opened.

THE COURT:  Why is that?

THE WITNESS:  Well, because some of the reasons that I have stated.

THE COURT:  No, I didn't get any of those reasons. What were the reasons?

THE WITNESS:  The reasons were about the structural designs and concerns, the difference between the entry and the pathways, the location of the special confinement unit.

THE COURT:  We are talking a handheld video.  What is the problem?

THE WITNESS:  Well, again, Your Honor, the handheld video, filming inside of the secure special confinement unit would --

THE COURT:  We are talking about the, whatever room you put the attorneys in.

THE WITNESS:  Right, Your Honor, but, again, I know what you --

THE COURT:  Do they see something that threatens your security when an attorney comes in?

THE WITNESS:  Videotaped, yes, Your Honor.

THE COURT:  I'm sorry, when the attorney comes in,

USCA5 2124

do they scrutinize the area and create some risk to your security?

THE WITNESS:  No, they don't, they don't create any risk, but it's not secure --

THE COURT:  Why?  What's the difference between the defendant's attorney coming in looking and a video?

THE WITNESS:  Well, again, the video potentially could not only give Mr. Bourgeois a little bit of notoriety --

THE COURT:  How?

THE WITNESS:  I understand what you said, Your Honor, about the protective order, but if this video could potentially wind up on a YouTube or some sort of public website --

THE COURT:  Okay, that's your concern.  I just was trying to isolate the concern.

THE WITNESS:  That's main, my main concern, I mean as far as whether or not, again, in respect to your protective orders, I just would, really would not want that video to wind up on a public website and eventually violate, or, you know, decrease the security, potential security within the special confinement unit.

THE COURT:  Well, what would a video see, by the way, inside the attorney visiting room or the psychological examination room?  What would they see that would endanger

USCA5 2125

Taylor - Cross

your security?

THE WITNESS:  Well, initially they are going to see the actual, the layout of the room itself, whether --

THE COURT:  Well, doesn't everybody that goes into it see the layout?  I mean somebody that goes in and looks at it could draw it out very clearly, couldn't they?

THE WITNESS:  Yes, they can, Your Honor.

THE COURT:  Okay, so what else?

THE WITNESS:  As far as the actual physical design and whether or not, whether you see bars, walls, concrete, steel, mesh --

THE COURT:  Well, isn't that what everybody sees in the room?

THE WITNESS:  Yes, Your Honor.

THE COURT:  What else would be compromised?

THE WITNESS:  Everybody that has access, they can create or draw anything they want as they see it --

THE COURT:  And put it on YouTube.

THE WITNESS:  It could not potentially wind up on some sort of public website.

THE COURT:  Sure.  Okay.  Anything else?  Did you want to put on --

MR. ROBERTS:  -- for the United States.

THE COURT:  Pardon?

MR. ROBERTS:  Tony Roberts for the United States.

THE COURT:  Mr. Roberts, either you want to do this examination or you don't.  I am not understanding where you are coming from.

MR. ROBERTS:  Well, Your Honor, I just want --

THE COURT:  Why you want to actually sink your own examination is beyond me.

MR. ROBERTS:  Well, Your Honor --

THE COURT:  It's clear there are no legitimate concerns by the institution, so either you put them up to this, which is really distressing --

MR. ROBERTS:  Well, Your Honor, I --

THE COURT:  I am just not understanding your interest in this.

MR. ROBERTS:  My interest is obtaining a valid, usable --

THE COURT:  Didn't you hear Dr. Price say that he did one by audio and he didn't think it at all compromised the results of the test?

MR. ROBERTS:  In that case.  In that case, Your Honor, is what he said, and --

THE COURT:  Yeah.  Well, why would you think it would in this?  I mean why not give it a try and he will know if it's compromised and we will talk about it then?

MR. ROBERTS:  First of all, Your Honor, we know, we know some of how Alfred Bourgeois is and what we have seen at

**USCA5 2127**

trial.  I think Dr. Moore had some really valid comments to make with regard to the validity of the test both to the defendant and to the United States and to the Court.  I think the Court --

MR. WISEMAN:  Your Honor, Dr. Moore -- this is Michael Wiseman.  My understanding of Dr. Moore's --

MR. ROBERTS:  Your Honor, I think the Court was interested in the truth of whether Mr. Bourgeois is mentally retarded or not and I think maybe we have gotten --

THE COURT:  Don't you know that I have spent days with Mr. Bourgeois and listened to him and read his letters? I mean this may not even be something for expert testimony, but you are welcome to bring in anybody you want.

MR. ROBERTS:  Yes, Your Honor.  I just, if I could back up for just a minute, I mean this test was, we just, we simply requested that he be tested, we didn't ask the Court to order it.  And Michael Wiseman, the defense counsel, told us that he had volunteered, that Mr. Bourgeois would volunteer to this, so, and then he put the condition of videotaping on it or being present, and all I did is I --

THE COURT:  Actually, I have already got an order to that effect.

MR. ROBERTS:  I'm sorry, Your Honor?

THE COURT:  I have already got an order to that effect, so please continue on with your presentation, not the

USCA5 2128

argument.

MR. ROBERTS:  Yes, Your Honor.  Well, will you take testimony from Dr. Moore?

THE COURT:  If you do it very quickly.  I now have three minutes left.

MR. ROBERTS:  I will, Your Honor, very quickly. Dr. Moore, would you please introduce yourself to the Court.

DR. MOORE:  Yes, I'm Dr. Roger Moore.  I am a clinical and forensic psychologist.

THE COURT:  I need you to speak up, please, sir.

DR. MOORE:  I beg your pardon, ma'am.  My name is Roger Moore.  I am a doctoral level psychologist in clinical and forensic.

MR. ROBERTS:  And, Dr. Moore, Tony Roberts --

THE COURT:  Yes, would you give him the oath, Ms. Scotch?

MR. ROBERTS:  You have testified many times --

THE COURT:  Please, just a moment, please.

MR. ROBERTS:  -- in court, is that correct?

THE COURT:  Just a moment, please.

MR. ROBERTS:  Oh, yes, Your Honor.

ROGER MOORE, GOVERNMENT'S WITNESS #3, SWORN

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    Dr. Moore, you have testified many times as an expert in both Federal and State Courts, is that correct?

A    That is correct.

Q    And you have conducted many tests for intellectual functioning assessments, have you not?

A    Yes, that's correct.

Q    Okay.  And you have testified both for the defense and the Government in cases, I believe you said about 60 percent for the Government and about 40 percent for the defense, or am I wrong?

          MR. WISEMAN:  That was Dr. Price.

          THE WITNESS:  That's right, that -- this is Dr. Moore.  That was Dr. Price who had the 60/40.  Mine is about 25 percent for the defense and about 75 percent for the Government in terms of cases where I have worked or consulted with them.

BY MR. ROBERTS:

Q    And can you tell the Court what your biggest concern is with regard to videotaping the assessment in this case?

A    My biggest concern is that having the assessment videotaped or audiotaped or observed violates the testing norms and the manual recommendation and introduces error into the examination.  It tends to decrease the performance of the

USCA5 2130

Case 2:19-cv-00392-JMS-DLP    Document 10-2    Filed 10/18/19    Page 125 of 2164
PageID #: 4023

examinee on a wide range of tasks -- memory, attention, learning, concentration -- and so it undermines the validity and the reliability of the scores.  And my job in this case, I don't have a dog in the fight, I understand I have been hired by the Government but my job as a psychologist, as a forensic psychologist, is to make the best call that I can, and I want to be able to have data that is as reliable and valid as possible to help me to come up with the most accurate assessment that I can.

Q   And -- Tony Roberts for the United States.  How would the presence of videotaping impact your ability to do your job in evaluating Alfred Bourgeois in this case?

A   This is Roger Moore.  It does a number of things.  It introduces distracters for both.  It interrupts test rapport. It has been shown that examinees tend to perform more poorly when they are under observation in any of these different modes, those being audiotaped, videotaped and observation.

MR. ROBERTS:  Your Honor, I think that's all I -- Tony Roberts for the United States.  I know the time is short.  Your Honor, I simply am trying to get to the truth here and the, I think Dr. Moore has stated the concerns that he has given to us but --

THE COURT:  Well, how do you address this, that the guards, that Terre Haute has said that every examination is witnessed from beginning to end through a window?

USCA5 2131

MR. ROBERTS:  Are you asking me, Your Honor?

THE COURT:  Yes, can you address that?  Do you have an expert that can address that?

THE WITNESS:  This is Roger Moore.  I have done evaluations at many different institutional facilities, super max facilities --

THE COURT:  Have you recorded any of them?

THE WITNESS:  I beg your pardon, ma'am?

THE COURT:  Have you recorded any of them?

THE WITNESS:  No, ma'am.  None, not only have none been audio or video-recorded, none have been observed either. There are not guards in the room.  In fact, in many of these cases there aren't even guards outside the room, when the evaluation is done I have to go about trying to make efforts to get --

THE COURT:  Okay.  Listen, Dr. Moore, what I have heard today is at Terre Haute, if you have not been there, apparently they are outside a window from start to finish.

THE WITNESS:  My request of them would be to not be observing through that window --

THE COURT:  Well, I don't think that's going to happen.  Is that going to happen, Mr. Joyner?

MR. JOYNER:  No, ma'am, they will be outside the room.

THE COURT:  Okay.  So what else do you have to say

USCA5 2132

about this issue, Dr. Moore?

THE WITNESS:  Then that raises my concerns.  I would want, again, to speak with Terre Haute of whether it will be possible to have someone outside, a guard outside the door but not observing in any sort of a manner.

THE COURT:  That's not going to happen.

THE WITNESS:  -- the door so if I needed them on the --

THE COURT:  It's not going to happen.

THE WITNESS:  I'm sorry, ma'am?

THE COURT:  It's not going to happen.  And, in fact, apparently he has already been examined by his own psychologist with someone watching.

THE WITNESS:  Yes, ma'am, but that would call into question the validity and the reliability of that test.

THE COURT:  Well, that's what you can do.  Is there anything else that you-all want to put on, Mr. Roberts?  This has been very disappointing.

MR. ROBERTS:  Well, Your Honor, I would only, I think it's just a matter of characterizing Captain Joyner's testimony, I mean I don't know --

THE COURT:  He's worried it's going to be on the internet.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Anything else?

USCA5 2133

MR. ROBERTS:  I don't, I just, I am not sure that he said that someone watches from beginning to end on the --

THE COURT:  Yes, he did.  I asked him with specificity.  Anything else?  Anything else, Mr. Wiseman?

MR. ROBERTS:  The United States would have some briefing --

MR. WISEMAN:  I actually --

THE COURT:  Okay.  The motion to reconsider is denied.  Thank you very much.  You are excused.

MR. ROBERTS:  Thank you, Your Honor.

MR. WISEMAN:  Thank you, Your Honor.

(The proceedings ended at 1:15 p.m.)

USCA5 2134

INDEX

WITNESSES
FOR GOVERNMENT:

|  | Direct | Cross |
|---|---|---|
| Randall Price | 6 | 14 |
| Hector Joyner | 27 | 35 |
| Roger Moore | 44 | |

USCA5 2135

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


__/s/  Judith M. Garcia_____        _June 29, 2010__

USCA5 2136

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No.: 2:02–cr–00216
                                                      Judge Janis Graham Jack

Alfred NMI Bourgeois

                          Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the
E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court.
To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must
ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing
the transcript's docket number, the item's location by page and line, and including only the following
portions of the protected information. This statement must be filed within 21 days of the transcript being
filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the
instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only
responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for
compliance.


                          David Bradley, Clerk

USCA5 2137

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

GOVERNMENT'S AGREED MOTION FOR A PROTECTIVE ORDER AS TO PSYCHIATRIC EXAMINATION AND EVALUATION

I.

Relevant Background

Michael Wiseman and Victor Abreu (hereinafter "Counsel"), of the Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, represent Bourgeois in the instant action filed pursuant to 28 U.S.C. § 2255. Counsel has requested, and the court has ordered the government to provide a copy of the video tape of the psychiatric examination of Bourgeois by Dr.s Moore and Price, psychologists retained by the government.

Confidentiality concerns relating to the dissemination of the Psychologists' testing procedures and techniques, discussed at the telephonic hearing of June 9, 2010, provide good cause for the issuance of a protective order to limit access to and restrict copying of the audio/video recording of the Psychologists psychiatric

USCA5 2138

examination of Bourgeois, pursuant to Fed. R. Civ. P. 26(c) and Fed. R. Crim. P. 16(d).

<div align="center">II.</div>

For these reasons, the undersigned moves the court to enter the attached protective order.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

USCA5 2139

## CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on August 5, 2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised he agreed to the subject motion and proposed protective order.

<div style="text-align: right;">

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

</div>

USCA5 2140

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion for the issuance of a protective order has been served by placing it in the United States mail, postage prepaid, on August 5, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 2141

examination of Bourgeois, pursuant to the Court Order, and Fed. R. Crim. P.
16(d). I, **Mark M. Dowd, Assistant United States Attorney,** certify that a copy of this

ALFRED BOURGEOIS,
    Petitioner,

    v.                                         (Criminal No. C-02-216)

UNITED STATES OF AMERICA,         MARK M. DOWD
    Respondent.                   Assistant United States Attorney

GOVERNMENT'S AGREED (PROPOSED) PROTECTIVE ORDER AS TO PSYCHIATRIC EXAMINATION AND EVALUATION

The government having demonstrated good cause, the Court Orders that the following Protective Order be entered:

Relevant Background

All audio/video recordings of psychiatric examination of Bourgeois received by Counsel, pursuant to the Court's order, from the government shall be deemed to be confidential.  These recordings may be used only by Counsel Wiseman and Abreu, their staff, and expert witnesses retained by Wiseman and Abreu to participate in this litigation, and only for purposes of any proceedings incident to litigating the claims presented in the petition for writ of habeas corpus pending before this Court. Disclosure of the recordings and the contents thereof may not be made to any other persons, including the Petitioner, without an order from this Court. Except for copies made for necessary staff and subject experts, no further copies or transcriptions of the

restrict copying of the audio/video recording of the Psychologists psychiatric

USCA5 2142

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

### (PROPOSED) PROTECTIVE ORDER

The government having demonstrated good cause, the Court Orders that the following Protective Order be entered:

All audio/video recordings of psychiatric examination of Bourgeois received by Counsel, pursuant to the Court's order, from the government shall be deemed to be confidential. These recordings may be used only by Counsel Wiseman and Abreu, their staff, and expert witnesses retained by Wiseman and Abreu to participate in this litigation, and only for purposes of any proceedings incident to litigating the claims presented in the petition for writ of habeas corpus pending before this Court. Disclosure of the recordings and the contents thereof may not be made to any other persons, including the Petitioner, without an order from this Court. Except for copies made for necessary staff and subject experts, no further copies or transcriptions of the

-5-

USCA5 2143

recordings are to be made by Counsel, staff or experts.

At the conclusion of the said Capital Habeas Corpus Unit's representation of Bourgeois, Counsel shall collect all copies disseminated to staff and experts, and return the recordings to the government, cause to be permanently erased any copy of the recordings stored on Counsel's, staff or experts' computers used to view the recordings, and file an affidavit with this Court that Counsel has fully complied with this Order. This order shall continue in effect after the conclusion of the habeas corpus proceedings, and prohibits Counsel, staff and experts from disclosing the contents of the subject recordings.

_____        _____
Date                           HON. JANIS GRAHAM JACK
                               UNITED STATES DISTRICT JUDGE

USCA5 2144

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

GOVERNMENT'S CORRECTED AGREED MOTION FOR A PROTECTIVE ORDER AS TO PSYCHIATRIC EXAMINATION AND EVALUATION

I.

Relevant Background

Michael Wiseman and Victor Abreu (hereinafter "Counsel"), of the Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, represent Bourgeois in the instant action filed pursuant to 28 U.S.C. § 2255. Counsel has requested, and the court has ordered the government to provide a copy of the video tape of the psychiatric examination of Bourgeois by Dr.s Moore and Price, psychologists retained by the government.

Confidentiality concerns relating to the dissemination of the Psychologists' testing procedures and techniques, discussed at the telephonic hearing of June 9, 2010, provide good cause for the issuance of a protective order to limit access to and restrict copying of the audio/video recording of the Psychologists psychiatric

USCA5 2145

examination of Bourgeois, pursuant to Fed. R. Civ. P. 26(c) and Fed. R. Crim. P. 16(d).

<div align="center">II.</div>

For these reasons, the undersigned moves the court to enter the attached protective order.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

USCA5 2146

## CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on August 5, 2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised he agreed to the subject motion and proposed protective order.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 2147

**CERTIFICATE OF SERVICE**

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion for the issuance of a protective order has been served by placing it in the United States mail, postage prepaid, on August 5, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 2148

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## (PROPOSED) PROTECTIVE ORDER

The government having demonstrated good cause, the Court Orders that the following Protective Order be entered:

All audio/video recordings of psychiatric examination of Bourgeois received by Counsel, pursuant to the Court's order, from the government shall be deemed to be confidential.  These recordings may be used only by Counsel Wiseman and Abreu, their staff, and expert witnesses retained by Wiseman and Abreu to participate in this litigation, and only for purposes of any proceedings incident to litigating the claims presented in the petition for writ of habeas corpus pending before this Court. Disclosure of the recordings and the contents thereof may not be made to any other persons, including the Petitioner, without an order from this Court. Except for copies made for necessary staff and subject experts, no further copies or transcriptions of the recordings are to be made by Counsel, staff or experts.

USCA5 2149

At the conclusion of the said Capital Habeas Corpus Unit's representation of Bourgeois, Counsel shall collect all copies disseminated to staff and experts, and return the recordings to the government, cause to be permanently erased any copy of the recordings stored on Counsel's, staff or experts' computers used to view the recordings,  and file an affidavit with this Court that Counsel has fully complied with this Order.  This order shall continue in effect after the conclusion of the habeas corpus proceedings, and prohibits Counsel, staff and experts from disclosing the contents of the subject recordings.

_____          _____
Date                                              HON. JANIS GRAHAM JACK
                                                     UNITED STATES DISTRICT JUDGE

USCA5 2150

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## PROTECTIVE ORDER

The government having demonstrated good cause, the Court Orders that the following Protective Order be entered:

All audio/video recordings of psychiatric examination of Bourgeois received by Counsel, pursuant to the Court's order, from the government shall be deemed to be confidential. These recordings may be used only by Counsel Wiseman and Abreu, their staff, and expert witnesses retained by Wiseman and Abreu to participate in this litigation, and only for purposes of any proceedings incident to litigating the claims presented in the petition for writ of habeas corpus pending before this Court. Disclosure of the recordings and the contents thereof may not be made to any other persons, including the Petitioner, without an order from this Court. Except for copies made for necessary staff and subject experts, no further copies or transcriptions of the recordings are to be made by Counsel, staff or experts.

At the conclusion of the said Capital Habeas Corpus Unit's representation of Bourgeois, Counsel shall collect all copies disseminated to staff and experts, and return the recordings to the government, cause to be permanently erased any copy of the recordings stored on Counsel's, staff or experts' computers used to view the recordings, and file an affidavit with this Court that Counsel has fully complied with this Order. This order shall continue in effect after the

1 / 2

USCA5 2151

conclusion of the habeas corpus proceedings, and prohibits Counsel, staff and experts from

disclosing the contents of the subject recordings.

      SIGNED and ORDERED this 6th day of August, 2010.

                      Janis Graham Jack
                  United States District Judge

2 / 2

USCA5 2152

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                        :
UNITED STATES OF AMERICA,               :          No. Cr-C-02-216
                                        :          No. Cv-07-223
                    Respondent,         :     Honorable Janis Graham Jack,
                                        :              U.S.D.J.
       -against-                        :
                                        :
ALFRED BOURGEOIS,                       :        Electronically Filed
                                        :
                    Petitioner.         :
_____          :

**PETITIONER'S MOTION FOR ADDITIONAL COURT DATES
TO PRESENT HIS EVIDENCE**

Petitioner, Alfred Bourgeois, through undersigned counsel moves for

additional court dates to present his evidence in support of this section 2255 motion.

The Government takes no position on this Motion.

1.      The Court initially set an evidentiary hearing on Petitioner's section

2255 Motion to commence on September 20, 2010.  Petitioner was to have two and

one half days to present his evidence and the Government was allotted one and half

have days to present its case.  The Court ruled that it would hear evidence on all of

Petitioner's claim, except for his jurisdiction claim.

2.      Because one of Petitioner's expert witnesses, Michael Gelbort, Ph.D.,

1

USCA5 2153

was unable to appear during the week of September 20, the Court permitted him to testify on September 10, 2010.

3.      On August 13, 2010 Petitioner provided the Government with its Witness List (attached as Exhibit A) and its list of pre-marked hearing exhibits (attached as Exhibit B).

4.      As evidenced by the Witness List and pre-marked exhibits, the hearing will present a series of factually complex issues. Petitioner understands that the Court is primarily interested in evidence related to Petitioner's claim of mental retardation and the related claim that trial counsel were ineffective for failing to present available mental-health related mitigating evidence.  Petitioner will call eight expert witnesses in support of these two claims.  Additionally, he will call Mr. Gilmore (trial counsel), Gerald Bierbaum, Esq. (mitigation specialist) and Kerry Brown, Esq. (a lawyer who assisted the family during the trial).  In order to save time, Petitioner agreed to call a representative sampling of the dozens of lay witnesses that could be called. Accordingly, Petitioner has listed nine potential lay witnesses, of which he will call between four and six.

5.      Undersigned counsel are experienced in the requirements and logistics of putting on a hearing of this nature.  It is counsel's considered view that it will be near impossible to put on eight experts, three lawyers and four to six mitigation

2

witnesses in the time allotted.  Of course, Petitioner would also like to present evidence on his other claims, thus making the schedule even more difficult for Petitioner.

6.      The Court may believe that it would be appropriate to allow the hearnig to proceed and delay a ruling on whether Petitioner should get additional time, based on the progress of the hearing.  However, because the bulk of Petitioner's witnesses are either experts, or other professionals, scheduling takes on increased significance. Petitioner does not wish to be in a position of having forensic witnesses on location waiting to testify, only to have to reschedule them because the hearing has not gone as quickly as the Court imagined it might.  Petitioner would prefer to have a reasonable schedule, so as to not incur additional expense in having multiple experts waiting to testify.

<div align="center"><strong>Petitioner's Request</strong></div>

7.      Petitioner proposes the following changes to the schedule:

A.      Since Petitioner will present Michael Gelbort, Ph.D. on Friday September 10, Petitioner requests that he be allowed to call additional witnesses to fill out that day.

B.      Petitioner requests that he be provided the second half of Wednesday September 22 – currently scheduled for the beginning of the

<div align="center">3</div>

USCA5 2155

Government's presentation – and all day Thursday to complete his case. Thus, under the proposed changes, Petitioner will have five full days to present his case: September 10 and 20 through 24.

C.  If the Court is agreeable to these changes, the Government's presentation will have to be rescheduled. If the Court's and Government counsel's schedule permits, it would make sense to have the Government begin its case on Friday September 25. Counsel will then make themselves available at the Court and Government's request for the second day of the Government's presentation.

### Conclusion

8.  Petitioner's counsel appreciate the multiple accommodations provided to them by the Court and its staff. They make this request because of their sincere belief that additional time is needed. Counsel's only interest is in making a complete and persuasive presentation. Counsel has not requested more days than they believe they need in the hope that the Court will split the difference. Counsel believe that they will need five days to present their case. This request is not meant to vex or to delay the resolution of this important case.

9.  Petitioner's counsel have communicated with Government counsel, who indicated that they take no position on this Motion.

10.  Finally, because scheduling of witnesses is being held up pending

4

resolution of this Motion, Petitioner requests that the Court address it at its earliest

convenience.  Counsel will be available for a telephone conference to discuss this,

should the Court desire.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman

Michael Wiseman
Victor Abreu
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520

Dated:        Philadelphia, PA
              August 16, 2010

### Certificate of Service

I, Michael Wiseman, hereby certify that on August 16, 2010 he served the foregoing on Government's counsel by email and electronic case filing:

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas

/s/ Michael Wiseman

Michael Wiseman

5

USCA5 2157

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :
                                         :
UNITED STATES OF AMERICA,                :        No. Cr-C-02-216
                                         :
             Respondent,                 :     Honorable Janis Graham Jack,
                                         :              U.S.D.J.
         -against-                       :
                                         :        **Capital Case**
ALFRED BOURGEOIS,                        :
                                         :
             Petitioner.                 :
_____     :

### PETITIONER'S WITNESS LIST

## Expert Witnesses Related to Mental Retardation and Unpresented Mitigation Evidence

Mark D. Cunningham, Ph.D
Carlos Estrada, M.D.
Michael M. Gelbort, Ph.D.
George W. Holden, Ph.D.
Kathleen Kaib, M.S.S., M.L.S.P., L.S.W
Victoria Swanson, Ph.D.
Jethro Toomer, Ph.D.
Donald E. Weiner, Ph.D.

## Expert Witnesses Related to Other Forensic Issues

Edward T. Blake
Michael Bowers
John Dailey
Elizabeth Johnson
Alan Keel

1

USCA5 2158

Manfred Shenk

**Professional Witnesses Related to All
Claims of Ineffective Assistance of Counsel**

Gerald Bierbaum, Esq.
Kerry Brown, Esq.
John Gilmore, Esq.

**Lay Witnesses Related to Mental
Retardation and Unpresented Mitigation Evidence**[1]

Claudia Williams
Beverly Frank
Michelle Armont
Murray Bourgeois
Brenda Goodman
Claudia Mitchell
Donald Reese
Carl Henry
Louis Russell, Jr.

**Lay and Prisoner Witnesses Related to Undisclosed
Consideration and Unpresented Mitigation Evidence**

Adam Lonoria
Orlando Campos
Darrick Moore
Phil Jackson
Tim Allen
Bill May
Jennifer Valdez

---

[1]Counsel will call between four and six of these nine witnesses.

USCA5 2159

Submitted

/s/ Michael Wiseman

Michael Wiseman
Philadelphia, Pennsylvania

August 13, 2010

USCA5 2160

## Index to Petitioner's Hearing Exhibits
## Page 1

**Exhibit #    Description**

1.    Letter from Mark D. Cunningham, Ph.D., ABPP to John Gilmore, Esq., Regarding Neurological Evidence,  2/10/2004

2.    Letter from Mark D. Cunningham, Ph.D., ABPP, to John Gilmore, Esq. Regarding Presence of Mitigating Factors, 2/25/2004

3.    Letter from Mark D. Cunningham, Ph.D., ABPP Letter to John Gilmore, Esq., Regarding Risk Assessment Factors, 2/25/2004

4.    Mark D. Cunningham, Ph.D., ABPP, Power Point Regarding Mitigating Factors, March 2004

5.    Mark D. Cunningham, Ph.D., ABPP, Power Point Regarding Risk Assessment, March 2004

6.    Declaration of Mark D. Cunningham, Ph.D., ABPP, 5/11/2007

7.    Curriculum Vitae, Mark D. Cunningham, Ph.D., ABPP

8.    E-Mail from Mark D. Cunningham, Ph.D., ABPP

9.    Proposed Direct Examination of Mark D. Cunningham, Ph.D., ABPP

10.    Memorandum to File, Mark D. Cunningham, Ph.D., ABPP, 3/24/2004

11.    Declaration of Carlos R. Estrada, M.D., 5/14/2007

12.    Curriculum Vitae, Carlos R. Estrada, M.D.

13.    Trial Report of Carlos R. Estrada, M.D., 1/20/04

14.    Letter from Carlos R. Estrada, 2/25/2004

15.    Declaration of Michael M. Gelbort, Ph.D., 5/11/2007

16.    Raw Data from Evaluation of Michael M. Gelbort, 4/27/2007

17.    Curriculum Vitae, Michael M. Gelbort

18.    Letter from George W. Holden, Ph.D. to Douglas Tinker, 12/19/2003

19.    Letter from George W. Holden, Ph.D. to Douglas Tinker, 2/24/2003

20.    Declaration of George W. Holden, Ph.D., 5/13/2007

21.    Curriculum Vitae, George W. Holden, Ph.D

22.    Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W, 5/4/2007

23.    Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W, 5/14/2007

24.    Curriculum Vitae, Kathleen Kaib, M.S.S., M.L.S.P., L.S.W

25.    Declaration of Robert L. Sadoff, M.D., 5/12/2007

26.    Declaration of Jethro Toomer, Ph.D., 5/9/2007

27.    Supplemental Report of Jethro Toomer, Ph.D., 8/12/2010

28.    Curriculum Vitae, Jethro Toomer, Ph.D.

**Index to Petitioner's Hearing Exhibits**
**Page 2**

**Exhibit #    Description**

29.        Report of Neuropsychological Evaluation Conducted by Donald
           E. Weiner, Ph.D., 3/3/2004
30.        Declaration of Donald E. Weiner, Ph.D., 5/10/2007
31.        Raw Data from Evaluation of Donald E. Weiner, Ph.D., 2/28/2004
32.        Declaration of Victoria Swanson, Ph.D., 6/8/2009
33.        Supplemental Report of Victoria Swanson, Ph.D., 8/12/2010
34.        Raw Data from Evaluation Performed by Victoria Swanson, Ph.D.
           3/25/2009
35.        Additional Raw Data Generated by Victoria Swanson, Ph.D.
36.        Curriculum Vitae, Victoria Swanson, Ph.D.
37.        Declaration of Michelle Armont, 4/26/2007
38.        Declaration of Nathaniel Banks, 5/10/2007
39.        Declaration of Issac Bourgeois III, 5/10/2007
40.        Declaration of Murray Bourgeois, 5/10/2007
41.        Declaration of Wilmer Bougeois, Sr., 5/9/2007
42.        Declaration of Lawanda Cook, 5/1/2007
43.        Declaration of Anthony Dumas, 5/9/2007
44.        Declaration of Anita Ferdinand, 5/8/2007
45.        Declaration of Beverly Frank, 5/9/2007
46.        Declaration of Allen Henry, 5/10/2007
47.        Declaration of Jersey Henry, 5/10/2007
48.        Declaration of Yvonne R. Joseph, 5/9/2007
49.        Declaration of Eleanor Bourgeois McGuffey, 5/9/2007
50.        Declaration of Alton Preston, 5/1/2007
51.        Declaration of Jevona Jeanette Rixner, 5/10/2007
52.        Declaration of Keith Rixner, 5/9/2007
53.        Declaration of Louis Russell, Jr., 5/9/2007
54.        Declaration of Ivy Thomas, 5/1/2007
55.        Declaration of Michelle Warren, 4/25/2007
56.        Declaration of Claudia Williams, 5/10/2007
57.        Bierbaum Interviews of Claudia Williams, 2/25/04, 3/7/2004
58.        Psychological Evaluation of Alfred Bourgeois, 5/22/1985
59.        Packet of Bourgeois Financial Data
60.        E-Mails from Gerald Bierbaum

## Index to Petitioner's Hearing Exhibits
## Page 3

**Exhibit #**    **Description**

61.    Memoranda Generated by Gerald Bierbaum
62.    Letter from Jose Gonzalez-Falla to Gerald Bierbaum, 1/9/2004
63.    Trial Notebook
64.    Proposed Direct Examinations
65.    Hotel Arrangements for Defense Witnesses
66.    List of Trial Witnesses
67.    List of Defense Mitigation Witnesses
68.    Government Request for Redaction of Mitigation Slides
69.    List of Government Expert Witnesses
70.    Sentencing Phase Verdict Form (Blank)
71.    List of Proposed Mitigating Factors
72.    Defense Motion to Withdraw Motion For Continuance, 12/16/2003
73.    Defense Ex Parte Motion for Mental Health Evaluation, 12/5/2003
74.    Defense Ex Parte Motion for Mitigation Specialist, 8/12/2003
75.    Defense Motion for Discovery, 5/5/2003
76.    Defense "Brady Motion for Discovery of All Favorable Evidence," 5/5/2003
77.    Defense Motion For Expert Witness, 10/8/2003
78.    Selected Case Law in Defense File
79.    Juror Questionnaire (Blank)
80.    Transcripts of Calls Made by Alfred Bourgeois
81.    Hospital Records, River Parishes Hospital
82.    Responses by Douglas Tinker, Esq. To Government Interrogatories, 9/22/2008
83.    Response Affidavit, John Gilmore, Esq., 9/19/2008
84.    Petitioner's Interrogatories Direct to Douglas Tinker, Esq., 10/14/2008
85.    Memoranda Generated by Lisa Milstein
86.    School Record, Alfred Bourgeois
87.    Results of Alfred Bourgeois Firearms Testing, 5/6/1985
88.    Report of Forensic Science Associates, 9/24/2007
89.    Resume, Edward T. Blake
90.    Curriculum Vitae, Charles Allen Keel
91.    Declaration of Elizabeth Johnson, Ph.D., 9/26/2007
92.    Report of Elizabeth A. Johnson, Ph.D., 3/1/2004

**Index to Petitioner's Hearing Exhibits**
**Page 4**

**Exhibit #     Description**

93.     Curriculum Vitae, Elizabeth A. Johnson, Ph.D.
94.     Defense Ex Parte Motion for Appointment of Expert Witness, 10/8/2003
95.     Government's Third Motion For Reciprocal Discovery, 2/17/2004
96.     Curriculum Vitae, Charles Michael Bowers
97.     Curriculum Vitae, Manfred Schenk
98.     Curriculum Vitae, Jon Curtis Dailey, D.D.S.
99.     Declaration of Adam Longoria, 4/24/2007
100.    Declaration of Bill May, 5/1/2007
101.    Sentencing Transcript, U.S. v. Darrick B. Moore, 4/22/2004
102.    Judgment in U.S. v. Darrick B. Moore, 4/22/2004
103.    Amended Judgment U.S. v. Darrick B. Moore, 12/27/2004
104.    Motions for Continuance in State v. Longoria
105.    Declaration of Darrick B. Moore, 9/18/2007
106.    Declaration of Phillip Jackson, 9/19/2007
107.    Declaration of Timothy Allen, 9/6/2007
108.    Declaration of Jennifer Lee Valdez
109.    Letter from Adam Longoria to AUSA Patti Booth, 5/3/2007`
110.    Declaration of Brenda Goodman, 10/4/2007
111.    Declaration of Claudia Mitchell, 9/16/2007
112.    Hospital Records on Alfred Bourgeois, Charity Hospital
113.    Neurology Report, Frank P. Bonikowski, M.D., 2/17/2004
114.    Physical Examination for Truck Drivers, 4/27/1988
115.    Hospital Records, Spohn Hospital, 2/2004

USCA5 2164

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## ORDER

On this day came on to be considered *Petitioner's Motion for Additional Court Dates to Present His Evidence*.  (DE 515).  Bourgeois' motion is **DENIED.**

SIGNED and ORDERED this 18th day of August, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2165

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS,              §
   Petitioner,                 §
                            §     Civil No. C-07-223
      v.                       §     (Criminal No. C-02-216)
                            §
UNITED STATES OF AMERICA,      §
   Respondent.                 §

GOVERNMENT'S UNOPPOSED MOTION TO WITHDRAW TRIAL EXHIBITS TO COPY FOR USE IN EVIDENTIARY HEARING PURSUANT TO 28 U.S.C. SECTION 2255

I.

The court has scheduled an evidentiary hearing on Bourgeois' Section 2255 Motion.  At this hearing the government intends to reference and to offer into evidence numerous exhibits, noted in the attached order, admitted during the trial of Bourgeois. The government also seeks to provide copies of these trial exhibits to present Counsel for Bourgeois.   The government intends to copy the subject trial exhibits and to return the original exhibits to the court.

USCA5 2166

II.

Accordingly, the undersigned moves the court to enter the attached proposed

order.

Respectfully submitted,

JOSE ANGEL MORENO.
United States Attorney

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney
P.O. Box 61129
Houston, Texas  77208
(713) 567-9102

USCA5 2167

# CERTIFICATE OF CONSULTATION

I, Mark M. Dowd, Assistant United States Attorney, certify that on August 23,

2010, I conferred with Mr. Michael Wiseman, Counsel for Bourgeois, who advised

he was unopposed to the subject motion.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 2168

# CERTIFICATE OF SERVICE

I, Mark M. Dowd, Assistant United States Attorney, certify that a copy of this motion to Withdraw the Trial Exhibits has been served by placing it in the United States mail, postage prepaid, on August 23, 2010, addressed to: Mr. Michael Wiseman, Esq., Chief Capital Habeas Corpus Unit, Federal Community Defender for the Eastern District of Pennsylvania, Suite 545 West-The Curtis Center, Philadelphia, PA 19016.

/s/ Mark M. Dowd
MARK M. DOWD
Assistant United States Attorney

USCA5 2169

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS, | § | |
| Petitioner, | § | |
| | § | Civil No. C-07-223 |
| v. | § | (Criminal No. C-02-216) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## (PROPOSED) ORDER

Pursuant to the government's instant motion, the Court ORDERS that the

District Clerk release to the government the following Government Trial Exhibits:

Exhibits 33, 37, 38, 40-44, 51, 52, 55-59, 61-63, 150-224, 329-334, 342-344, 360,

373, 384, 392, 415b, 416b.

The government is ORDERED to return the original trial exhibits to the

Court after they are copied.

_____
Date

_____
HON. JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 2170

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## <u>ORDER</u>

Pursuant to the Government's unopposed motion (Docket Entry No. 517), the Court

**ORDERS** the Clerk to release the following original trial exhibits to the Government for

copying: Exhibits 33, 37, 38, 40-44, 51, 52, 55-59, 61-63, 150-224, 329-334, 342-344, 360, 373,

384, 392, 415b, and 416b.   The Government will provide copies of the exhibits to counsel for

Bourgeois.   The Court **ORDERS** the Government to return the original trial exhibits to the Court

after they are copied.

SIGNED and ORDERED this 25th day of August, 2010.

_____

Janis Graham Jack
United States District Judge

1 / 1

USCA5 2171

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

United States Courts
Southern District of Texas
FILED

AUG 2 5 2010

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | }{ |
| VS. | }{    C    CR-C-02-216 |
| ALFRED BOURGEOIS | }{ |

## RECEIPT FOR WITHDRAWAL OF EXHIBITS

THIS WILL ACKNOWLEDGE RECEIPT OF THE FOLLOWING GOVERNMENT

EXHIBITS:  SEE ATTACHED ORDER

| Exhibit No. | | INITIALS |
|---|---|---|
| 33 | | |
| 37 | not an admitted exhibit | ✓ |
| 38 | | |
| 40-43 | | |
| 44 | not an admitted exhibit | ✓ |
| 51 | | |
| 52 | | |
| 55-59 | | |

| Exhibit No. | INITIALS |
|---|---|
| 61-63 | |
| 150-224 | |
| 329-334 | |
| 342-344 | |
| 360 | |
| 373 | |
| 384 | |
| 392 | |
| 415b | |
| 416b | |

DATE: 8/25/10

RECEIVED BY: _____

ACKNOWLEDGED BY: _____

USCA5 2172

Case 2:19-cv-00392-JMS-DLP   Document 10-2   Filed 10/18/19   Page 167 of 2164
PageID #: 4065
Case 2:02-cr-00216   Document 518   Filed in TXSD on 08/25/10   Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA        §
                                §
VS.                             §   CRIMINAL ACTION NO. C-02-216
                                §
ALFRED NMI BOURGEOIS            §

## ORDER

Pursuant to the Government's unopposed motion (Docket Entry No. 517), the Court **ORDERS** the Clerk to release the following original trial exhibits to the Government for copying: Exhibits 33, 37, 38, 40-44, 51, 52, 55-59, 61-63, 150-224, 329-334, 342-344, 360, 373, 384, 392, 415b, and 416b.   The Government will provide copies of the exhibits to counsel for Bourgeois.  The Court **ORDERS** the Government to return the original trial exhibits to the Court after they are copied.

SIGNED and ORDERED this 25th day of August, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2173

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :

UNITED STATES OF AMERICA,              :          No. Cr-C-02-216
                                       :          No. Cv-07-223
                   Respondent,         :     Honorable Janis Graham Jack,
                                       :             U.S.D.J.
        -against-                      :
                                       :
ALFRED BOURGEOIS,                      :         Electronically Filed
                                       :
                   Petitioner.         :
_____      :

### PETITIONER'S MOTION FOR BRIEF CONFERENCE TO ADDRESS WITNESS UNAVAILABILITY

Petitioner, Alfred Bourgeois, through undersigned counsel, moves for the Court to conduct a brief telephonic conference to address the unexpected unavailability of a critical defense witness. In support of this request, Petitioner states as follows.

1.    Carlos Estrada, M.D., was a witness for the Court and the Government at trial. In 2007 he provided a declaration to Petitioner's counsel seriously calling into question whether the jury heard all of the relevant mitigating evidence in Petitioner's background. Accordingly Dr. Estrada is a critical witness at the upcoming hearing.

USCA5 2174

2.      As the attached declaration from Dr. Estrada demonstrates, through a failure of his office staff, his commitment to appear at the hearing was not calendared. He made subsequent plans to be out of the country from September 17 to September 26, 2010.  He requested that we communicate this to Court and ask for consideration of his dilemma and permit him to testify at a different time.  Counsel discovered this problem yesterday and brings it to the Court's attention immediately.

3.      Counsel appreciates that they can subpoena this witness but is reluctant to do so without first seeking the Court's guidance.  Also, given that the Court has denied Petitioner's request to provide additional hearing dates, counsel is obviously concerned that the Court not perceive this as end-run around the Court's order. Accordingly, counsel request that the Court conduct a brief telephone conference to provide counsel with such guidance.

4.      Counsel communicated with the Government, which does not yet have a position with respect to this situation.

USCA5 2175

WHEREFORE, Petitioner respectfully requests that the Court convene a conference to discuss the unavailability of this witness.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:      Philadelphia, PA
            August 26, 2010

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 26th day of August, 2010, I served the foregoing upon the following persons by E-Mail and ECF filing:

Tony Roberts, Esq.
Patti Booth, Esq.
Mark Down, Esq.

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2176

# ATTACHMENT  1

USCA5 2177

## DECLARATION OF CARLOS R. ESTRADA, M.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Carlos R. Estrada, M.D., hereby declare that the following is true and correct.

1. I am a medical doctor with a specialty in psychiatry. I was a Court and Government witness at the trial of U.S. v. Alfred Bourgeois, 02-cr-216. I provided a declaration previously to current counsel for Mr. Bourgeois, who filed it with the Court. I was subsequently advised that I would be called as a witness when and if this case went to a hearing.

2. On or about April 22, 2010 I was advised by defense counsel that the Court had set a hearing date for the week of September 20, 2010. I was asked if I was available at that time. I advised counsel that I was and I promised counsel that I would keep those dates open. I reiterated to counsel my availability on those dates when I met with them again in June, 2010.

3. Regrettably, my office staff made an error and neglected to calendar this commitment. I subsequently made plans to be outside of the United States from September 17 through September 26, 2010. My travel arrangements have been made, and are not-refundable. The cost of the airline tickets alone is $1,271 for my wife and I. In addition to the cost, cancellation of the trip will be a particular hardship, as the family is preparing a celebration of my 73rd birthday in Guatemala.

4. This error was discovered by my office manager yesterday, August 25, 2010, when she was contacted by counsel to schedule my appearance for September 20. I was asked by counsel to complete this declaration explaining these circumstances.

5. I apologize for this oversight and request the Court's indulgence. Should the Court excuse my appearance during the week of the 20th, I can make myself available at the Court's direction either before September 17 or after September 26, 2010.

USCA5 2178

08/26/2010  14:55    3619938874    COASTALBENDPSYCHASSO    PAGE  03

I hereby certify and declare under penalty of perjury that the statements contained herein are

true.

_____
Carlos R. Estrada, M.D.

Dated: Corpus Christi, Texas
        August 26, 2010

USCA5 2179

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### CORPUS CHRISTI DIVISION

United States Courts
Southern District of Texas
FILED

AUG 27 2010

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | }{ |
| VS. | }{  C   CR-C-02-216 |
| ALFRED BOURGEOIS | }{ |

## RECEIPT FOR EXHIBITS

THIS WILL ACKNOWLEDGE THAT THE FOLLOWING GOVERNMENT EXHIBITS

HAVE BEEN RETURNED TO THE CLERK:  SEE ATTACHED ORDER

| Exhibit No. | | INITIALS |
|---|---|---|
| 33 | | BC |
| 37 | not an admitted exhibit | ✓ BC |
| 38 | | BC |
| 40-43 | | BC AU |
| 44 | not an admitted exhibit | ✓ BC |
| 51 | | BC |
| 52 | | BC |
| 55-59 | | BC AU |

| Exhibit No. | INITIALS |
|---|---|
| 61-63 | BC AU |
| 150-224 | BC AU |
| 329-334 | BC KU |
| 342-344 | BC AU |
| 360 | BC |
| 373 | BC |
| 384 | BC |
| 392 | BC |
| 415b | BC |
| 416b | BC |

DATE: **August 27, 2010**     RECEIVED BY: _Brandy Los_, Dep. Clerk

ACKNOWLEDGED BY: _____

USCA5 2180

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA §
§
VS. § CRIMINAL ACTION NO. C-02-216
§
ALFRED NMI BOURGEOIS §

## ORDER

Pursuant to the Government's unopposed motion (Docket Entry No. 517), the Court

**ORDERS** the Clerk to release the following original trial exhibits to the Government for

copying: Exhibits 33, 37, 38, 40-44, 51, 52, 55-59, 61-63, 150-224, 329-334, 342-344, 360, 373,

384, 392, 415b, and 416b. The Government will provide copies of the exhibits to counsel for

Bourgeois. The Court **ORDERS** the Government to return the original trial exhibits to the Court

after they are copied.

SIGNED and ORDERED this 25th day of August, 2010.

Janis Graham Jack
United States District Judge

1 / 1

USCA5 2181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA    §
                            §
VS.                         §    CRIMINAL ACTION NO. C-02-216
                            §
ALFRED NMI BOURGEOIS        §

**ORDER**

Pursuant to the telephone conference held on August 30, 2010, the Court **GRANTS**

Bourgeois' motion to address the unavailability of his witness, Dr. Carlos R. Estrada.  (DE 519).

The parties agreed to present Dr. Estrada's testimony through video deposition.

SIGNED and ORDERED this 31st day of August, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2182

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____        :

UNITED STATES OF AMERICA,        :        No. Cr-C-02-216
                                 :        No. Cv-07-223
        Respondent,              :        Honorable Janis Graham Jack
                                 :        U.S.D.J.
        -against-                :
                                 :        Electronically Filed
ALFRED BOURGEOIS,                :
                                 :
        Petitioner.              :
_____        :

**NOTICE OF DEPOSITION**

PLEASE TAKE NOTICE that on the 10th day of September, 2010 Petitioner will take the Deposition by Oral Testimony of Carlos R. Estrada, M.D., in the above captioned matter, starting at 10:00 a.m. until 2:00 p.m. at the following location:

Esquire Deposition Services
500 North Shoreline Blvd.
Suite 712
Corpus Christi, Texas 87471

Said deposition will be video recorded and transcribed.

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 2183

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 3rd day of September, 2010, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2184

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____        :

UNITED STATES OF AMERICA,              :        No. Cr-C-02-216
                                       :        No. Cv-07-223
               Respondent,             :     Honorable Janis Graham Jack
                                       :            U.S.D.J.
        -against-                      :
                                       :       Electronically Filed
                                       :
ALFRED BOURGEOIS,                      :
                                       :
               Petitioner.             :
_____        :

## CORRECTED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that on the 10th day of September, 2010 Petitioner will take the Deposition by Oral Testimony of Carlos R. Estrada, M.D., in the above captioned matter, starting at 10:00 a.m. until 2:00 p.m. at the following location:

Esquire Deposition Services
Premier Business Suites
5262 South Staples, Suite 300
Corpus Christi, Texas   78411
Telephone: 361-991-0773

Said deposition will be video recorded and transcribed.

PLEASE TAKE FURTHER NOTICE that this Notice replaces the prior Notice of Deposition, filed on September 3, 2010 and corrects the address contained in the prior notice.

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 2185

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 7th day of September, 2010, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2186

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No.: 2:02–cr–00216
                                                      Judge Janis Graham Jack

Alfred NMI Bourgeois

                              Defendant

---

**NOTICE OF RESETTING**

**TAKE NOTICE THAT A PROCEEDING IN THIS CASE HAS BEEN SET FOR
THE PLACE, DATE AND TIME SET FORTH BELOW.**

**Before the Honorable**

Janis Graham Jack

**PLACE:**

United States District Court
1133 N. Shoreline Blvd.
Corpus Christi, TX

**DATE:** 9/10/10

**TIME:** 03:30 PM

**TYPE OF PROCEEDING:** Evidentiary Hearing

Date:    September 9, 2010

                                                      David Bradley, Clerk

USCA5 2187

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,

      Respondent,

-against-

ALFRED BOURGEOIS,

      Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:

No. Cr-C-02-216
No. Cv-07-223
Honorable Janis Graham Jack,
U.S.D.J.


Electronically Filed

**PETITIONER'S UNOPPOSED MOTION FOR ISSUANCE OF SUBPOENA
DUCES TECUM IN ADVANCE OF HEARING**

COMES NOW, Petitioner, ALFRED BOURGEOIS, by and through undersigned counsel, and in accordance with Federal Rule of Criminal Procedure 17(b), and Section 1825 of Title 28, United States Code, respectfully moves this Court to order the unopposed issuance of subpoena duces tecum requiring the Custodian of Records, Wilford Hall Medical Center, Medical Law office, 2000 Berdquist Drive, Suite 1, Lackland Air Force Base, San Antonio, TX 78236, (210) 292-7808, to appear and produce the documents requested herein in advance of hearing. In support of this motion, Petitioner states as follows:

1.     Petitioner was charged with the 2002 beating death of his daughter, JG-1999. On March 16, 2004 he was convicted by a jury of one count of first-degree

USCA5 2188

premeditated murder (18 U.S.C.A. § 1111(a)). Following a sentencing hearing, the jury returned a verdict of death.  Petitioner was formally sentenced to death by this Court on March 24, 2004.

2.       In Claim III of his Petition for a Writ of Habeas Corpus, Petitioner alleged that the Government lacked jurisdiction as no reasonable view of the Government's evidence existed upon which a reasonable fact finder could conclude that the fatal injuries to JG-1999 were inflicted on the Corpus Christi Naval Air Station. See Petitioner's Motion for Relief Pursuant to 28 U.S.C. Section 2255 at 58-62. Specifically, Petitioner alleged that the subdural hematoma identified as the cause of death by the medical examiner, Dr. Elizabeth Rouse, resulted from an injury that occurred days before Petitioner arrived at the naval base.  Id.; see also Neuropathology Report of Dr. Kathleen Kagan-Hallet, MD, contained in *PA*, document # 50.  Thus, despite the fact that JG-1999 died on the base, the Government lacked jurisdiction to try and convict Mr. Bourgeois. Id.; 18 U.S.C. § 3236 (murder is "committed at the place where the injury was inflicted . . . which caused the death, without regard to the place where the death occurs")

3.       During argument on the scope of the evidentiary hearing, the Court denied a hearing on Claim III but stated that Petitioner could proffer, via affidavit, any expert evidence in support of his claim. See NT 4/20/10, 55.  The Court also requested that any additional expert opinion and affidavit specifically include and

USCA5 2189

reference a review of the testimony of Dr. Coufal, the Opthamologist, and the emergency room physician.  Id. at 67.  Additionally, the Court noted that Petitioner's experts had not previously had an opportunity to review the actual autopsy slides prepared by Dr. Rouse during the autopsy of JG-1999.  Id. at 61-62.

4.    Immediately thereafter, Petitioner consulted forensic neuropathologist, Jan E. Leestma, M.D., M.M.,[1] to review the evidence regarding JG-1999's cause of death and the age and timing of the previously identified fatal subdural hematoma. However, after conducting his initial review (including the testimony of Dr. Coufal and the ER physician as the Court requested), Dr. Leestma also requested review of the autopsy slides.  On June 11, 2010, petitioner requested those slides from the Government.

5.    On August 9, 2010, AUSA Tony Roberts notified Petitioner that Dr. Rouse had finally responded to his previous inquiries and informed him that the

---

[1]Dr Leestma is a 1964 graduate of the University of Michigan School of Medicine.  He completed his training in Neuropathology at Albert Einstein College of Medicine, NY in 1968. Dr. Leestma served in the United States Air force Medical Corps at the Armed Forces Institute of Pathology from 1968-71 and was honorably discharged with the rank of Major USAF, MC.  From 1971-85, Dr. Leestma was Associate Professor of Pathology and Neurology at Northwestern Medical School and Chief, Neuropathology at Northwestern Memorial Hospital and the Children's Memorial Hospital in Chicago, IL.  He has also served as Assistant Medical Examiner with the Cook County Medical Examiner's Office.  Dr. Leestma is the author of more than 100 professional publications including his text, Forensic Neuropathology, 2d. Ed. (2009).

USCA5 2190

autopsy slides were currently located at the Wilford Hall Medical Center at Lackland Air Force Base in San Antonio, TX.

6.    After several attempts to reach their legal department, Petitioner has recently confirmed the presence of the autopsy slides at the Wilford Hall Medical Center and that a subpoena duces tecum would be required to release the autopsy slides to Petitioner's expert, Dr. Leestma.

7.    Accordingly, Petitioner respectfully requests that this Court issue a subpoena requiring the Custodian of Records, Wilford Hall Medical Center, Medical Law office, 2000 Berdquist Drive, Suite 1, Lackland Air Force Base, San Antonio, TX 78236, (210) 292-7808, to produce the following documents in advance of the hearing:

> Any and all slides, photographs and impressions prepared during the course of the autopsy by Dr. Elizabeth A. Rouse , Maj., USAF, MC, FS, Assistant Medical Examiner, Office of the Armed Forces Medical Examiner, of Jakerren Gunter; SSAN: 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; Date of Birth: 10/05/99; Date/Time of Death: 6/28/02, 1105; Autopsy No. A02-42; AFIP No. 2846051; Rank: Civilian; Place of Death: Driscoll Children's Hospital, Corpus Christi, TX; Place of Autopsy: Driscoll Children's Hospital, Corpus Christi, TX; Date/time of autopsy: 6/02/29, 1330.

8.    Additionally, Petitioner respectfully requests that in lieu of  personal appearance the slides, photographs and impressions be delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

USCA5 2191

9.    Petitioner is unable to pay the costs of the subpoena.  He has previously been found eligible for appointed counsel.

10.    Petitioner has consulted attorney for the Government, AUSA Tony Roberts, Esq., who indicated that the Government is NOT opposed to this request.

WHEREFORE, Petitioner respectfully requests that this Court grant this unopposed motion for the issuance of a subpoena duces tecum and payment of expenses.

Respectfully submitted,

/s/Michael Wiseman

MICHAEL WISEMAN
VICTOR J. ABREU
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West - The Curtis Center
Philadelphia, PA 19106
215-928-0520

Date: September 7, 2010

USCA5 2192

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____        :

UNITED STATES OF AMERICA,        :        No. Cr-C-02-216
        :        No. Cv-07-223
        Respondent,        :        Honorable Janis Graham Jack,
        :        U.S.D.J.
        -against-        :
        :
ALFRED BOURGEOIS,        :        Electronically Filed
        :
        Petitioner.        :
_____        :

## ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM IN ADVANCE OF HEARING

NOW on this _____ day of _____, 2010, upon consideration of

Petitioner's unopposed motion for issuance of a subpoena duces tecum requiring the

production of documents in advance of hearing, it is hereby ORDERED that

Petitioner's motion is GRANTED.

It is hereby ORDERED that a subpoena shall be issued to the Custodian of

Records, Wilford Hall Medical Center, Medical Law office, 2000 Berdquist Drive,

Suite 1, Lackland Air Force Base, San Antonio, TX 78236, (210) 292-7808; and shall

produce the following documents requested by the defendant in advance of hearing:

> Any and all slides, photographs and impressions prepared during the course of
> the autopsy by Dr. Elizabeth A. Rouse , Maj., USAF, MC, FS, Assistant

USCA5 2193

Medical Examiner, Office of the Armed Forces Medical Examiner, of Jakerren Gunter; SSAN: 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; Date of Birth: 10/05/99; Date/Time of Death: 6/28/02, 1105; Autopsy No. A02-42; AFIP No. 2846051; Rank: Civilian; Place of Death: Driscoll Children's Hospital, Corpus Christi, TX; Place of Autopsy: Driscoll Children's Hospital, Corpus Christi, TX; Date/time of autopsy: 6/02/29, 1330.

It is further ORDERED that in lieu of personal appearance, the slides, photographs and impressions may be delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210,
Chicago IL 60642.

It is further ORDERED that a subpoena shall be served by the United States Marshals and that the costs incurred by the process and the fees of the subpoena shall be paid in the same manner in which similar costs and fees are paid in the case of a subpoenaed issued on behalf of the government.

_____
Janis Graham Jack
United States District Judge

USCA5 2194

✎AO89 (Rev. 7/95) Subpoena in a Criminal Case

UNITED STATES DISTRICT COURT

<table>
<tr><td>SOUTHERN</td><td>DISTRICT OF</td><td>TEXAS</td></tr>
</table>

| | |
|---|---|
| UNITED STATES<br><br>V.<br><br>ALFRED NMI BOURGEOIS | **SUBPOENA IN A CRIMINAL CASE**<br><br>Case Number:   C-02-216 |

TO:   Custodian of Records,
Wilford Hall Medical Center, Medical Law office,
2000 Berdquist Drive, Suite 1
Lackland Air Force Base
San Antonio, TX 78236
(210) 292-7808

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified or any subsequent place, date and time set by the court, to testify in the above referenced case.  This subpoena remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| PLACE<br><br>UNITED STATES COURTHOUSE<br>1133 NORTH SHORELINE BLVD.<br>CORPUS CHRISTI, TEXAS 78401 | COURTROOM<br>District Judge<br>Janis Graham Jack |
|---|---|
| | DATE AND TIME<br>Monday 9/20/10 at 8:00 a.m. |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

Any and all slides, photographs and impressions prepared during the course of the autopsy by Dr. Elizabeth A. Rouse , Maj., USAF, MC, FS, Assistant Medical Examiner, Office of the Armed Forces Medical Examiner, of Jakerren Gunter; SSAN: 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; Date of Birth: 10/05/99; Date/Time of Death: 6/28/02, 1105; Autopsy No. A02-42; AFIP No. 2846051; Rank: Civilian; Place of Death: Driscoll Children's Hospital, Corpus Christi, TX; Place of Autopsy: Driscoll Children's Hospital, Corpus Christi, TX; Date/time of autopsy: 6/02/29, 1330.

In lieu of personal appearance, the slides, photographs and impressions may be delivered to:

Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT<br><br>DAVID J. BRADLEY, CLERK | DATE |
|---|---|
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:
Victor J. Abreu , Esq. ,  Assistant Federal Public Defender

Curtis Center, Suite 545 West, Independence Square West, Philadelphia, PA 19106; (215) 928-0520          **USCA5 2195**

AO89  (Rev. 7/95)  Subpoena in a Criminal Case (Reverse)

| PROOF OF SERVICE | | |
|---|---|---|
| RECEIVED | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | FEES AND MILEAGE TENDERED TO WITNESS<br><br>☐  YES     ☐  NO     AMOUNT _____ |
| SERVED BY (PRINT NAME) | | TITLE |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information

Executed on _____              _____
                          DATE                                         SIGNATURE OF SERVER


                                                         _____
                                                         ADDRESS OF SERVER

                                                         _____

ADDITIONAL INFORMATION

USCA5 2196

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER FOR ISSUANCE OF SUBPOENA DUCES TECUM
IN ADVANCE OF HEARING**

NOW on this 10th day of September, 2010, upon consideration of

Petitioner's unopposed motion for issuance of a subpoena duces tecum requiring

the production of documents in advance of hearing, it is hereby ORDERED that

Petitioner's motion is GRANTED.

It is hereby ORDERED that a subpoena shall be issued to the Custodian of

Records, Wilford Hall Medical Center, Medical Law office, 2000 Berdquist Drive,

Suite 1, Lackland Air Force Base, San Antonio, TX 78236, (210) 292-7808; and

shall produce the following documents requested by the defendant in advance of

hearing:

> Any and all slides, photographs and impressions prepared during the course
> of the autopsy by Dr. Elizabeth A. Rouse , Maj., USAF, MC, FS, Assistant
> Medical Examiner, Office of the Armed Forces Medical Examiner, of
> Jakerren Gunter; SSAN: 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; Date of Birth: 10/05/99; Date/Time
> of Death: 6/28/02, 1105; Autopsy No. A02-42; AFIP No. 2846051; Rank:
> Civilian; Place of Death: Driscoll Children's Hospital, Corpus Christi, TX;
> Place of Autopsy: Driscoll Children's Hospital, Corpus Christi, TX;
> Date/time of autopsy: 6/02/29, 1330.

1 / 2

USCA5 2197

It is further ORDERED that in lieu of personal appearance, the slides,

photographs and impressions may be delivered to:

> Dr. Jan E. Leestma, 1440 North Kingsbury Street. Suite 210, Chicago IL 60642.

It is further ORDERED that a subpoena shall be served by the United States

Marshals and that the costs incurred by the process and the fees of the subpoena

shall be paid in the same manner in which similar costs and fees are paid in the

case of a subpoenaed issued on behalf of the government.

SIGNED and ORDERED this 10th day of September, 2010.

_____
Janis Graham Jack
United States District Judge

2 / 2

USCA5 2198

| ✎AO 435 (Rev. 03/08) | Administrative Office of the United States Courts | FOR COURT USE ONLY |
|---|---|---|
| | **TRANSCRIPT ORDER** | **DUE DATE:** |
| *Please Read Instructions:* | | |

| 1. NAME ELSA SALINAS, AUSA | 2. PHONE NUMBER (361) 888-3111 | 3. DATE 9/14/2010 | |
|---|---|---|---|
| 4. MAILING ADDRESS 800 N. SHORELINE BLVD, SUITE 500 | 5. CITY CORPUS CHRISTI | 6. STATE TX | 7. ZIP CODE 78401 |

| 8. CASE NUMBER C-02-216 | 9. JUDGE ~~HAYDEN HEAD~~ *JACK* | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 9/10/2010 | 11. TO 9/10/2010 |
| 12. CASE NAME U.S. VS. ALFRED BOURGEOIS | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| [X] APPEAL | [X] CRIMINAL | [ ] CRIMINAL JUSTICE ACT | [ ] BANKRUPTCY |
| [ ] NON-APPEAL | [ ] CIVIL | [ ] IN FORMA PAUPERIS | [ ] OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

United States Courts
Southern District of Texas
FILED

SEP 14 2010

David J. Bradley, Clerk of Court

| PORTIONS | DATE(S) | PORTION(S) | |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [X] OTHER (Specify) | |
| [ ] SENTENCING | | EVIDENTIARY HEARING | 09/10/2010 |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| 14-Day | [ ] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [X] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |
| REALTIME | [ ] | [ ] | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|
| 18. SIGNATURE *Elsa Salinas* | PROCESSED BY | |
| 19. DATE 9/14/2010 | PHONE NUMBER | |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS | |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | 9-14-10 | UG | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

DISTRIBUTION:    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

USCA5 2199

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

## WRIT OF HABEAS CORPUS AD TESTIFICANDUM

To:    Warden, FCI Three Rivers, U.S. Highway 72 West, Three Rivers, Texas  78071

To:    United States Marshal, Southern District of Texas, or any other authorized United States Marshal

GREETINGS:

You are hereby commanded to deliver **TIMOTHY LYNN ALLEN (#31108-179)** into the custody of the United States Marshal for the Southern District of Texas, at Corpus Christi, Texas on September 20, 2010, for the purpose of having said witness available for a hearing in the above-numbered and styled cause to be held before Janis Graham Jack, United States District Judge for the Southern District of Texas, on September 20, 2010, at 8:30 a.m.  Said witness will remain in the custody of said United States Marshal until the consummation of said hearing at which time the witness shall be returned to your custody.

WITNESS the Honorable Janis Graham Jack, United States District Judge, United States District Court for the Southern District of Texas, and the seal of said Court at the city of Corpus Christi, Texas, on this the 15th day of September, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2200

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
          PLAINTIFF,             *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 10, 2010
                                 *    2:49 P.M.
          DEFENDANT.             *
                                 *
* * * * * * * * * * * * * * * * *


               TRANSCRIPT OF EVIDENTIARY HEARING

          BEFORE THE HONORABLE JANIS GRAHAM JACK
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77002

               (APPEARANCES CONTINUED ON PAGE 2)

COURT RECORDER:            MS. VELMA GANO


     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
        CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 2201

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106


ALSO PRESENT:              MS. KATHERIN HENNIG, PARALEGAL

USCA5 2202

(The proceedings began at 2:49 p.m.)

(Call to Order of the Court.)

THE CLERK:  Court calls Criminal Action C-02-216, United States of America versus Alfred Bourgeois.  May I have appearances, please?

MR. ROBERTS:  Tony Roberts for the United States, Your Honor.

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. DOWD:  Mark Dowd for the United States.

MS. SALINAS:  Elsa Salinas for the United States.

MR. WISEMAN:  Michael Wiseman, good afternoon, Your Honor, for Mr. Bourgeois.

THE COURT:  Good afternoon.

MR. WISEMAN:  Along with Elizabeth Larin --

THE COURT:  Hi.

MR. WISEMAN:  -- L-A-R-I-N, my co-counsel.  If it's all right with the Court, our paralegal, Katherin Hennig, would like to sit at counsel table.

THE COURT:  Absolutely.

MR. WISEMAN:  Thank you, Your Honor.

MR. ROBERTS:  Your Honor, we also have Dr. Roger Moore.  He's a psychologist, and he's been working with us in this case.  And if it's all right, we'd like to have him sit at the table as well.

THE COURT:  Any objections?

4

MR. WISEMAN:  No, not at all.

THE COURT:  Okay.

MR. ROBERTS:  One statement, Your Honor, that Dr. Moore --

THE COURT:  I'm waiting actually for Ms. Scotch to come back in.  She was going to hook in Mr. Bourgeois by telephone.  Does she know where he is?  He's in Houston, I think.

(Court and Clerk conferring off the record.)

THE COURT:  Okay.  Let's see how we're doing on that.

(PAUSE.)

THE CLERK:  It's going to be another three or four minutes.

THE COURT:  Okay.  Ms. Scotch says it will be another three or four minutes, we've been told, to hook up Mr. Bourgeois.

MR. WISEMAN:  Okay.  Your Honor, I thought Mr. Bourgeois was going to be produced in the courtroom.

THE COURT:  Not for this hearing, no.

MR. WISEMAN:  Not for this hearing, but the next time.

THE COURT:  Absolutely.

MR. WISEMAN:  Okay.  I understand.

THE COURT:  He's already as far as Houston, I've been told.

USCA5 2204

MR. WISEMAN:  Okay.

THE COURT:  And he's supposed to be here -- I don't know if I'm supposed to say.  Marshals?  When are you going to be in town?

MR. WISEMAN:  We'll be here next Friday afternoon.

THE COURT:  Okay.  Then he'll be here apparently Saturday.

MR. WISEMAN:  Oh, excellent.

THE COURT:  I think that's what I've been told.

MR. WISEMAN:  Excellent.

THE COURT:  Mr. Padilla, could you check with the Marshals and ask -- tell them I've already told them that he'll be here Saturday and make sure that he'll, they'll have access to him?  See if there's any problems.  Thanks.

(PAUSE.)

THE COURT:  Anything you all feel comfortable taking up before Mr. Bourgeois is in attendance?

MR. WISEMAN:  If there's something the Court wants to, I have nothing in particular, other than my witness.  If the Government has anything, I'm happy to discuss it.

MR. ROBERTS:  We don't have anything, Your Honor, not that I can think of at this time.  We're not going to deal with evidence, I don't think, until the 20th.

THE COURT:  Well, today, of course.

MR. ROBERTS:  Yes, Your Honor, from the witness.  But

USCA5 2205

one thing I did want to note is that Dr. Moore will have to leave at 4:00.  So if he gets up and leaves, you want me to put that on the record?

THE COURT:  He's not leaving till I'm going.  So if he gets to go at 4:00, I do too.

MR. ROBERTS:  That would be fine with us, Your Honor.

THE COURT:  That's fine, Dr. Moore.

MR. ROBERTS:  Thank you, Your Honor.

(PAUSE.)

THE COURT:  Do you know where the plugs are?

MR. WISEMAN:  I'm sorry?  Oh, the plugs, yes.

THE COURT:  You can lift up those things and just pull out, if you want.

MR. WISEMAN:  Ms. Scotch was giving us a tour yesterday.  It was very --

THE COURT:  And you know, we made a video, too, on the Southern District website --

MR. WISEMAN:  Oh.

THE COURT:  -- that shows all the Court, all of the electronic equipment and how we use it.

(PAUSE.)

THE COURT:  Any exhibits?

MR. WISEMAN:  Yes.  I have them marked and ready to go.

THE COURT:  Do you want to offer them now?  Or do you

know if there's a problem?

MR. WISEMAN:  That's fine with me.  I was going to introduce them through Dr. Gelbort.

THE COURT:  Do you want to show them to the Respondent and --

(Counsel conferring off the record.)

(Discussion off the record regarding other matters.)

MR. WISEMAN:  Well, I'm all ready to go.  I guess when the witness takes the stand, I'll just have him identify what it is I'm going to offer.

THE COURT:  That's fine.

MR. WISEMAN:  The Government has seen all these things before.

(PAUSE.)

(Attempting to connect conference call.)

THE COURT:  Is this Lieutenant Hinkel?

THE CLERK:  Not yet.

THE COURT:  Oh.  Sorry.  Just tell me when I'm supposed to say something.

MR. VILLARREAL:  Lieutenant Villarreal.  Hello?

THE CLERK:  Lieutenant Villarreal?

MR. VILLARREAL:  Yes.

THE CLERK:  Okay.  Is Mr. Bourgeois with you yet?

MR. VILLARREAL:  Not yet.  We're getting him out of the cell right now.

USCA5 2207

THE CLERK:  Please let us know when he's in the room.

MR. VILLARREAL:  Okay.  Stand by.

THE COURT:  Marshal Alvarado, this is Mr. Wiseman.  I don't know if you've met him before.  This is our deputy, head of Marshal Service here.  I went ahead and told him when Mr. Bourgeois would be here because Mr. Wiseman and his group are coming Friday afternoon, and I wanted to make sure -- he will be housed here in the federal courthouse.

MR. ALVARADO:  Oh, he will?  Okay.

THE COURT:  Yes.  So there will be someone here 24/7.  How you contact him, that's -- you'll have to contact Marshal Alvarado and see how to do that.

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.  We can do that.

Because I'm sure they'll want to see him on Saturday and Sunday.

MR. WISEMAN:  Yeah, we'll want to stop in, yeah.  Thank you so much.

THE COURT:  While they're seeing the sights of Corpus.

MR. WISEMAN:  Seen them.

THE COURT:  Five minutes?

MR. WISEMAN:  I've been here a number of times.

THE COURT:  Is that okay?  Did I do anything security

wrong or -- okay.

MR. ALVARADO:  He'll be here some time -- well, if you guys are coming in Friday, by Saturday he'll be here.

MR. WISEMAN:  That's fine.

THE COURT:  Thanks.  Thanks, Mr. Padilla.

(PAUSE.)

(Court and Clerk conferring off the record.)

(Connecting conference call.)

MR. VILLARREAL:  Lieutenant Villarreal.

THE CLERK:  Lieutenant Villarreal, is Mr. Bourgeois there?

MR. VILLARREAL:  Ma'am?

THE CLERK:  Is Mr. Bourgeois there?

MR. VILLARREAL:  He's walking right in.  Stand by. I've got you on speaker phone.  Stand by.

(PAUSE.)

MR. VILLARREAL:  Ma'am, Mr. Bourgeois is here now.

THE COURT:  Okay.  Mr. Bourgeois, can you hear us?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  Go ahead, Mr. Wiseman.

MR. WISEMAN:  Thank you, Your Honor.

Mr. Bourgeois, this is Michael Wiseman, and we're going to be examining Dr. Gelbort.

THE DEFENDANT:  Uh-huh.

MR. WISEMAN:  Okay.  Your Honor, we'll call

USCA5 2209

Dr. Gelbort to the stand.

THE COURT:  Could you come forward, please, sir.

MICHAEL M. GELBORT, DEFENSE WITNESS NO. 1, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Good afternoon, Dr. Gelbort.

A.   Good afternoon.

Q.   What is your profession?

A.   I'm a clinical neuropsychologist in private practice.

THE COURT:  Could you please state your full name and spell it for the record?

THE WITNESS:  Sure.  Michael M. Gelbort.  The last name is G-E-L-B-O-R-T.

BY MR. WISEMAN:

Q.   And you say you're a clinical neuropsychologist --

THE COURT:  Wait, don't touch the microphone.  Sorry. It hooks right into her ears.  So what you need to do, if you could lean your right arm onto that shelf there, then you're in good shape.  Okay.  Go ahead.

BY MR. WISEMAN:

Q.   Can you tell the Court what your qualifications are?

A.   I went to college at Grinnell College in Grinnell, Iowa.

THE COURT:  Has that been introduced?

MR. WISEMAN:  Not yet, Your Honor.  I'll have him identify it and proceed that way.

USCA5 2210

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort, if you look on the screen in front of you, do you recognize that document?

THE WITNESS:  Can I move this a little bit, Your Honor?

THE COURT:  Pardon?

THE WITNESS:  Can I just tilt this so I can see it better?

THE COURT:  No.  You have to do it blindfolded and backwards.  No, just tilt it anyway you want to.  It's perfectly all right.

THE WITNESS:  Thank you.

THE COURT:  Is that okay?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   That's P-17.  Do you recognize that document?

A.   I do.

Q.   And what is it?

A.   It appears to be a copy of my vitae.

Q.   And is it an up-to-date copy?

A.   Reasonably so.  There's more things that could be added to it, but it's got the gist of my training and experience.

Q.   And can you give the Court a sense of what that training

USCA5 2211

and experience is?

A.    I went to college in Grinnell, Iowa.  I finished college in three-and-a-half years with a double major, psychology and general sciences, and I graduated with high honors.  I went to a doctoral program, a Ph.D. program in clinical psychology at Texas Tech University.  Went through that program in a fairly standard fashion.  I had a minor in applied human neuropsychology.

I worked on the side.  I was a counselor at a halfway house for criminals transferring back into the community.  I also spent a couple of years working at the medical school performing neuropsychological evaluations for two neurologists and two neurosurgeons.  And I was responsible for running a developmental disability clinic, where we evaluated children pretty much from under one year up to 15 years of age.

I did a predoctoral internship at Milwaukee County Mental Health Complex.  I was working with inpatients and outpatients with severe psychological issues.  I was also administering neuropsychological testing there and actually teaching some of the staff neuropsychology.  And then --

THE COURT:  You know, I read your vitae, and it's great.  Just introduce it.

MR. WISEMAN:  Okay.  Very well.

THE COURT:  But I have a question about this.  I always get confused about neuro, about neuropsychologists.  I

USCA5 2212

disqualified somebody -- not him -- one time that was a
neuropsychologist that wanted to talk about physiology of the
brain, and he had never even had high school biology.

Okay, you obviously are not in that category, but
when you diagnosed Mr. Bourgeois with organic brain disorder, I
thought that physicians do that and not psychologists.  So
explain to me how that works.  I just want to be clear on it.

THE WITNESS:  First off, I didn't necessarily make
that particular diagnosis.  But it could be made --

THE COURT:  I thought it was -- I thought there was
something in there in his report.

MR. WISEMAN:  Oh, I believe he's going to testify
that Mr. Bourgeois has organic impairments.

THE COURT:  Okay.  Good.

THE WITNESS:  And to answer your question, though,
physicians can make that diagnosis.  Neuropsychologists can as
well --

THE COURT:  Okay.

THE WITNESS:  -- based on our training and hopefully
experience.

THE COURT:  Okay.  Are there actual -- I'm going to
let him testify.  Never mind.  I just wanted to be clear.

MR. WISEMAN:  I was going to get into all those
areas, Your Honor --

THE COURT:  Go right ahead.

USCA5 2213

MR. WISEMAN:  -- right away.

THE COURT:  I just kind of jump into the --

MR. WISEMAN:  You sure do.

THE COURT:  -- the bottom line.

THE WITNESS:  It's a good question, though, and we'll get there, I hope.

THE COURT:  But you know, this other guy had not ever, you know, and he had not -- and he finally admitted that he made up the diagnosis himself because he thought it was good.

THE WITNESS:  That's an interesting --

THE COURT:  It's one of the few, one of the few experts I ever not allowed to testify.  So --

MR. WISEMAN:  All right.  Well, I'm going to offer Dr. Gelbort as an expert in forensic neuropsychology and --

THE COURT:  Any objection?

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Sure.  Have you looked at his CV?

MR. ROBERTS:  Yes, we have, Your Honor.

THE COURT:  Okay.

(PAUSE.)

MR. ROBERTS:  No objection, Your Honor.

MR. WISEMAN:  Thank you.  Dr. Gelbort, in follow-up to the Judge's questions, could you give the Court a working understanding of what a neuropsychologist is and what the

USCA5 2214

science of neuropsychology is?

THE WITNESS: Sure. You know, I think the definition that is most commonly put out there is that neuropsychology is the study of the relationship between the brain and behavior. And neuropsychologists typically look at both emotional functioning as well as cognitive functioning, cognitive being thinking skills.

Sometimes I liken it to the front and back of a mountain, where when we approach people, we see their personality more often than not. But behind that, and working in consonance with it, would be their cognitive abilities, how intelligent they are, how well they learn, remember, process information, even basic functions, such as do they perceive accurately.

THE COURT: Do you also evaluate people like with cognizance disorders, for instance, Alzheimer's or frontal lobe problems?

THE WITNESS: Absolutely.

THE COURT: And you work with neurologists on that, too, to come up with a plan and that sort of thing?

THE WITNESS: Neurologists are probably, if not my first -- they're one of my top three referral sources. I have --

THE COURT: Sure.

THE WITNESS: -- eight different neurologists who

USCA5 2215

send me patients regularly.  And the diagnoses they're concerned about are anything from someone who's suspected of having a dementing illness, Alzheimer's or vascular dementia or the like; people after closed head injuries, car accidents, bicycle accidents, muggings, that sort of thing; people who have seizure disorders.

I'm getting referrals regularly from neurosurgeons who are seeing brain tumors and are concerned about the effects on cognitive abilities as well as the effects of their intervention.  They're asking me, where's language, where is memory?  Because when they go to do surgery, they don't want to disrupt any more language or memory than they need to.

So if you think about a wagon wheel, the neurologist and psychiatrist are probably on one shoulder, and the other shoulder is the neuropsychologist, at least in a hospital, in an office-based practice.  Physiatrists, people who do physical medicine rehabilitation who help people after strokes, after brain injuries are another major source of referrals.

THE COURT:  I'm familiar with your specialty, because I know that a lot of the big teaching hospitals, when you go to be evaluated for cognitive disorders, there's neuropsychological testing, and there's neurologists and there's CAT scans and MRIs and all these things.

THE WITNESS:  In the more sophisticated centers, the neurologists will employ or bring in a neuropsychologist.  The

USCA5 2216

psychiatrists will oftentimes do their best job of assessing, and when things don't go the way they expect them to, based on their assessment, they'll say, "I may not be seeing everything, and someone else may be able to see something to help, a neuropsychologist."  That's another major source of my referrals.

THE COURT:  And did Mr. Bourgeois -- speaking of just organic things, because you're going to say this part and this part, you know, I assume, via your psychological testing, that you can pinpoint areas of the brain.  But did he ever have MRIs or CT scans or anything like that?

THE WITNESS:  Not that I'm aware of.

THE COURT:  Okay.  Go ahead.

BY MR. WISEMAN:

Q.   Doctor, I was actually going to ask you:  Could you discuss briefly what the nature of neuropsychological testing is and contrast it to the type of neuroimaging that the Court just referred to?

A.   Let me take the second part of the question first, if I can, because I think it helps for an understanding.  The brain, at least to me and people like me, is a very fascinating organism -- organ, and it works in a variety of ways.  You can talk about it in terms of the structure.  And if there's a problem with the structure, such as a lesion, a tumor growing that's putting pressure on it or eating in the tissue, that

USCA5 2217

will cause changes in the way the brain functions.  And if it's near the respiratory centers or the centers that control the heart, you could have a problem that way.  But if it's in the cortex area that controls thinking, you may have changes in thinking abilities.  And depending on where it is and what functions are living in those areas, or if it's affecting the whole brain, you'll see changes in the way a person thinks and acts.

THE COURT:  I always think of your specialty and Dr. Moore's as being a more nuanced way of finding, finding things that other people may not, other specialties that are physical specialties may not be able to find.

THE WITNESS:  We may get to a point, and if you look at the literature and read about things like functional MRI, we're moving more in that direction, where, you know, the neuroradiologist looks at the picture, sees the tumor and knows exactly and can measure how many sonometers by how many sonometers.

THE COURT:  Right.  But you can see what it's impacting.

THE WITNESS:  Correct.  And that's really the point, is that the brain is a structural organ.  It also works electrically.  So if you're concerned about electrical dysfunction, you don't do an MRI.  I've been asked that, "Well, why didn't you have an MRI done," for someone who has a seizure

USCA5 2218

disorder.  They have a problem that's affecting the electrical impulses in the brain.  And the way to look at that is with an electrical study.

THE COURT:  Like an EEG?

THE WITNESS:  Exactly right.  That's exactly right. And when you're concerned about behavioral changes, you certainly can look at the structure and say, "Well, there's a little tumor over there."  But as far as I know in this setting, in a forensics setting, there's no statute that says if you have a tumor, then we do this with you, and if you don't have a tumor, we do that.  But rather, in this setting, we're concerned about, I believe the Court's concerned about behavior and can he control his behavior in a normal fashion, or not well as a normal person, but still reasonably well.

THE COURT:  I saw that the bottom line in your -- that one of -- not the bottom line.  I hate that expression. But one of your conclusions, that he had such a, he had a behavioral disorder where he could not put the brakes on his behavior, that he could not control his behavior.

THE WITNESS:  The frontal lobes are sometimes, in a very crass way, talked about as the gas pedal and the brake pedal of behavior.  And the frontal lobes, another way to think about them, if you've ever seen the little picture of the homunculus, the little man inside the brain who's controlling the rest of the brain, the frontal lobes are really where the

USCA5 2219

homunculus lives.

So it's kind of the control center and the central processing center. And when people have trouble initiating, the couch potato -- first off, they don't, I don't think, end up in court because they sit on the couch and they don't do much and they don't get in much trouble. That's a problem typically with frontal lobe.

Same token, the ones who have trouble putting on the brakes or put on the brakes too late, quite often that's a frontal lobe problem.

THE COURT: And that's what you think is part of Mr. Bourgeois' presentation?

THE WITNESS: There's a very subtle distinction there. Most neuropsychologists are sensitive to not say there is brain damage. That's something that should be looked at, should be done --

THE COURT: Organ -- I got it.

THE WITNESS: You can talk about organicity, but --

THE COURT: You don't look at the physical structure. You look at the behavior to try to pinpoint where there may be problem areas.

THE WITNESS: Back to what you said, the nuance. We're looking at a reflection of the integrity of the nervous tissue. When the nervous tissue has problems, it gives rise to aberrant or abnormal behaviors. We can measure that and confer

USCA5 2220

backwards.  When someone consistently has problems with abilities that arise from frontal lobe, from what research has shown to be frontal lobe functions, then we say this person can't do normal frontal lobe behavior, and hence, more likely than not, there's a frontal lobe abnormality.  But we can't see it, per se.

THE COURT:  Okay.  So you think --

THE WITNESS:  That's where FMRI and PET scan may come in and start saying, there it is.

THE COURT:  The PET scan is pretty good now for doing some Alzheimer's diagnoses, but you can have -- I know this, I should say this, because my brother has Alzheimer's at a very young age.  And he has frontal lobe involvement, frontal lobe dementia, as well as Alzheimer's.  And they've done every possible test that you can, other than biopsy.  That's why I'm familiar, by the way, with your specialty --

THE WITNESS:  Uh-huh.

THE COURT:  -- and your area of expertise, because --

THE WITNESS:  That's too bad.

THE COURT:  That's horrible actually.  It's the worst illness on earth.  But in any event --

THE WITNESS:  I would vote ALS is worse, but that's my personal --

THE COURT:  My aunt had that, so -- and you may be right.

USCA5 2221

BY MR. WISEMAN:

Q.   Dr. Gelbort, so just to make sure I'm clear now, if a person shows up clean on neural imaging, is it your view that neuropsychology can still identify brain dysfunction?

A.   In the worst case scenario is neuropsychology wouldn't. And I'm harkening back to a study I saw when I was in Medical Center in Houston, an individual who died of traumatic brain injuries in a car accident.  And we couldn't test him because he was dead, but his image, just before he died, the neural imaging was normal.  And you can understand why, if I explain a little bit, you know, why that can happen.

          THE COURT:  Well, you know, one of the things -- here I am building your case for you, but, you know, soldiers that are coming back, and I look at this because soldiers that are coming back from war, even though they didn't have a direct hit on their head, have very discrete brain damage that's not, that's behaviorally diagnosed only because of the shaking.  And they may have been half a mile from a rocket.  But just the vibrations alone can cause them discrete brain problems.

          THE WITNESS:  And in fact, neuropsychology took off after World War II, when vets were coming back with shell shock, which is what you're talking about.  They were put on the psych units --

          THE COURT:  No, this was actually, these people are having dementia.

USCA5 2222

THE WITNESS: No, no, that's exactly right.

THE COURT: Yeah.

THE WITNESS: But they called it shell shock back then, because they weren't --

THE COURT: Oh really? Oh, I see.

THE WITNESS: They weren't hit by the shells, but they were getting hit by the blast waves of the shell.

THE COURT: Right.

THE WITNESS: And they were acting strangely, so they got put on the psychiatric units. The psychiatrists said there's nothing psychiatrically wrong with them, and they turned it over to the neuropsychologists who these battery of tests said here's the cognitive difficulties that's arising from the impact, the waves, the shock waves that have gone through the air. Just like the Murrah Federal Building wasn't knocked down by anything that hit it directly, but rather the shock waves of the explosion. Same concept.

THE COURT: I'm sorry --

MR. WISEMAN: Quite all right.

THE COURT: -- Mr. Wiseman. You do your case.

MR. WISEMAN: Okay.

THE COURT: I shouldn't just be visiting.

BY MR. WISEMAN:

Q.   Doctor, I put up what is marked as Petitioner's 16 and ask if you recognize that document.

USCA5 2223

A.    It would be helpful to see the top of it.  It looks like it's either the Wechsler Memory Scale or the WAIS-III.  I can't tell from --

Q.    Okay.  I'll move it over a little.

A.    Pull it down, please.

Q.    Oh.

A.    There you go, Wechsler Memory Scale, Third Edition.

Q.    Okay.  And is that the first page of a larger set of documents?

A.    It's part of the test battery that I administered to Mr. Bourgeois.

Q.    Okay.  And so I take it from that answer that you in fact conducted a neuropsychological evaluation of Mr. Bourgeois?

A.    I did.

Q.    All right.  And your notes and data from that are contained in what's been marked as Petitioner's 16?

A.    I believe that's true.  I presented them or gave them to the professionals that you asked me to, and I think they've been collated.  I think you have the packet there.

          MR. WISEMAN:  Your Honor, I'm a little unfamiliar with ELMO technology.  Can I show the witness the document so he can just thumb through it to make sure it's the right --

          THE COURT:  You just did.

          MR. WISEMAN:  Well, I showed him the top page.  This is a 40-page exhibit, and I just want to have the record be

USCA5 2224

clear that this is --

THE COURT:  Okay.  Didn't he give it to you?  You can go up there.

MR. WISEMAN:  Well, he did.  I just want to --

THE COURT:  Okay.

MR. WISEMAN:  -- cover my bases.

THE COURT:  The only thing you do, you've got to keep the cap on there because of all my electronic equipment here.  Actually, it's your electronic equipment, but in between swigs, put a cap on it.  I guess I should say that's Coke, for the record, Coca-Cola.

MR. WISEMAN:  I believe it's Dr. Pepper.

THE COURT:  Okay, Dr. Pepper.

MR. WISEMAN:  Diet Dr. Pepper.

THE WITNESS:  This does appear to be the data for my neuropsychological evaluation.

BY MR. WISEMAN:

Q.    And so the record is clear, when did you conduct your neuropsychological evaluation of Mr. Bourgeois?

A.    It was April 27, 2007.

Q.    And where did that happen?

A.    It was at, I think it's called USP at Terra Haute.

Q.    And what are the components of the neuropsychological evaluation you conducted with Mr. Bourgeois?

A.    The way I've been taught and instructed and choose to

USCA5 2225

proceed with the neuropsychological evaluation, there's three major components. One is the testing, per se, formal testing and hopefully a useful battery is employed, one that's valid and reliable and is designed to answer the question that's being presented.

The second part would be the interview, where you actually talk to the patient and see how they look or present, see what they, again, look like, how they sound, how they respond, how quick, how slow. You check their mood, different things that can contribute to the overall diagnosis and understanding of the patient.

And then finally, I believe you should be looking at historical information, something that is more objective and has a greater time span, something that predates the question that you're being asked to entertain.

And the reason being is that each type of data has merit on its own face, and when you put the three together and you find that they agree, then you have a good firm basis of support for any conclusions you can draw.

THE COURT: Did you do those tests where you can determine if somebody is making up the answers?

THE WITNESS: Malingering?

THE COURT: Yes.

THE WITNESS: I didn't use any of the tests that are considered to be contrived --

USCA5 2226

Gelbort - Direct                                27

THE COURT:  Okay.

THE WITNESS:  -- where you're oftentimes not telling the patient something that's true.  You're setting them up to do something other than what they might normally do.  And there's a couple of reasons.  Probably the first one is that people in his intelligence range who have subnormal intelligence, the research shows that they're not, those tests are not real valid with them.

THE COURT:  But see, one of the things, you're assuming then that his intelligence is low, when in fact he could be malingering on the intelligence test.  And so then you don't give him the malingering test -- sorry.

MR. WISEMAN:  I was just going to say, Your Honor, I've got a whole section devoted to malingering.

THE COURT:  You got that?  Okay.  Go right ahead.

MR. WISEMAN:  Believe me, I've got it covered.

THE COURT:  I knew you would.

THE WITNESS:  But I want to answer that question.

MR. WISEMAN:  And you'll have your chance, I promise.

THE COURT:  Did you look at his letters and things that he sent me?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Dr. Gelbort --

USCA5 2227

MR. WISEMAN:  Is there a way I can move this so I can get more of the document on there?

THE CLERK:  Can I show him?

THE COURT:  You can -- please.

(PAUSE.)

THE COURT:  See?  It's magic.

MR. WISEMAN:  Oh, wow.  That's amazing.  I still use a feather pen, so --

BY MR. WISEMAN:

Q.   So, Dr. Gelbort, I've put up what's been marked as Petitioner's 132 --

THE COURT:  Are you going to offer any of these for admission?

MR. WISEMAN:  I'm going to offer them all, yes.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's a list of the materials that were provided to me. And it says up at the top, "Background Information."

Q.   Okay.  And did you review some of these materials before your actual meeting with Mr. Bourgeois?

A.   Yes.

Q.   And some of them after?

USCA5 2228

A.    Correct.

Q.    Okay.  In addition to the materials on that list, did you recently have an opportunity to view videotapes of the Government's expert witnesses evaluating Mr. Bourgeois?

A.    Two different psychologists working with him, yes, I did.

Q.    Okay.  As the Court's already anticipated, you've reached some conclusions to a reasonable degree of neuropsychological certainty.  Why don't you tell us generally what those conclusions are, and then we'll get to the basis for those opinions.

A.    Sure.  You know, the big opinions, or the ones that are further reaching, were that Mr. Bourgeois is of limited intellectual ability.  He comes out -- he tests out pretty much in the borderline to mildly defective range.

He shows indication of difficulties, as we were talking about before, of having frontal lobe impairments, that he did take the tests as requested and put forth good effort.

His learning is problematic, especially when he has to understand conceptually the information being presented to him. So he can memorize adequately, but he has trouble taking in or encoding and forming new memories and making lasting memories for information that's more conceptual or complex.

He has some relative strengths.  He certainly has adequate or normal spelling abilities, when compared with others in his age bracket.  His basic reading abilities, in other words, his

USCA5 2229

capacity to look at words and understand what the words are, are fine.

Q.    Okay.  And why don't we jump to the concept of malingering before we discuss your specific test findings.  In a forensic setting, especially a death penalty case, are you particularly on guard with regard to malingering?

A.    I think you have to be.  In fact, I think the concern about the adequacy of the test administration and the adequacy -- let me say it differently.  The way I was taught is there are certain assumptions that need to be met in order to interpret test data.  And one of the assumptions that is very central is that the person put forth reasonable effort.

You don't have to have super human effort.  You don't have to have abnormal effort, but you have to have the person engaged.  So things like, you know, if someone comes in drunk or stoned, you're not going to test them.  They're not going to be able to put forth reasonable effort.

By the same token, if they're not trying, if they're not answering in a way reflective of what they're capable of doing, you're not going to be able to interpret the data properly.  So that's something you have to look at from the get-go.

Q.    And assuming that the person appears to be putting forth reasonable effort, how do you -- with regard to Mr. Bourgeois in particular, how did you know that he wasn't purposely throwing a test?

USCA5 2230

A.   Well, I'm going to pick on two words.  First off, how did I know?  It's how did I decide.  It wasn't that I knew.

Q.   Okay.

A.   But, you know, looking at the data, I made that decision.  And the other word --

THE COURT:  So what you're saying, this is an educated guess.

THE WITNESS:  Boy, I don't know if I would phrase it quite like that.  There's something --

THE COURT:  Well, it's your opinion.

THE WITNESS:  There's something of a decision tree.

THE COURT:  Okay.

THE WITNESS:  Is there a big book and I can look in the back and find the absolute right answer?  No.  But on the other hand, as I will, I'll try to justify --

THE COURT:  Okay.

THE WITNESS:  -- why I came to the decision I did.

The other thing that, the other word I'll pick on is you said something to the effect of how he looked.  And I'm going to say that how he looks is certainly data.  That's part of the presentation that you look at in the interview.  But it's not just how a person looks or how they strike you, rather how the data lines up.

And some of the malingering tests are designed to collect data specific to malingering.  Before there were the

USCA5 2231

malingering tests, and there's an industry around the malingering tests, the way the authors of this battery and the way it's been done for a long time is to look within the data for internal idiosyncrasies or the way the data agrees with itself.

And in this case, we have the added luxury of having had two test administrations.  He's taken another battery of tests before, so we can compare test/retest patterns of behavior.

BY MR. WISEMAN:

Q.    And that would be Dr. Weiner's testing?

A.    Correct.

Q.    And did you see consistency in the test/retest analysis?

A.    Yes, very much so.

Q.    All right.  And in particular, why don't we talk specifically about the IQ testing.  What did he score on your IQ testing?

A.    His full scale IQ on my administration of the WAIS-III was a 70.

Q.    And what did he score on Dr. Weiner's administration?

A.    He gave the precursor to the WAIS-III.  He gave the WAIS-R, and Mr. Bourgeois had a 75 Full Scale IQ.

Q.    And at the time that Dr. Weiner administered the WAIS-R, was it the standard test to administer?

A.    It was an outdated test at that point in time.

USCA5 2232

Q.    All right.  And what do neuropsychologists do when they encounter an IQ that's obtained as a result of the administration of an outdated test?

A.    Well, I think it's more general issue is any time you look at data, you have to understand the adequacies and inadequacies of it.  Using an outdated IQ test has some inherent issues or problems.  Research has shown that the scores will tend to become inflated as time goes on when you're using an old test.  So there's -- formulas have been developed to kind of give you an idea of how much the test score will be inflated or over represent, if you will, the person's ability.

Q.    And does that over-inflation have a name?

A.    It's called the Flynn Effect --

Q.    Okay.

A.    -- when it refers to IQ testing.

Q.    Did you do a calculation applying the Flynn Effect to Dr. Weiner's outdated administration of the WAIS-R?

A.    I did.

Q.    And what does that come to?

A.    If you apply the correction factor, if you will, trying to figure out what the number is more likely to be, it comes out as about an IQ of 68.

Q.    And for purposes of assessing malingering, what does it say to you that someone would have scored a 70 on an IQ test in 2007, and three years earlier score a 68, or even a 75, for

USCA5 2233

that matter?

A.    Just, you can just say a 75 on the outdated test.  It says that there's good consistency across time.  The importance of that is that if someone is faking or feigning bad in this case -- I guess the best way I can say it is a personal example.  If I was trying to deflate my ability or feign bad on an IQ test and I give them regularly, like every week, I can certainly pull my punch and give you poor answers, and I can probably even get my answers to have the right sort of pattern.

So the tests generally start off easy and get more difficult.  There are certain questions that seem to anecdotally be out of order, so people may miss the earlier ones, even though they're deemed to be or generally construed to be the easier ones.  I could probably get the pattern to pass if someone was reading it blind.  But it would be real tough, two or three years later, to take the test or similar test again and get the same type of pattern and the same type of score.  And that's knowing the test and having hopefully reasonably intellect -- reasonable intellect.

Q.    And the WAIS-III that you administered, does it have a number of subtests to it?

A.    Yes.

Q.    And what's the number?

A.    It's got 14 total, but typically only 11 are used to compute the IQ.

USCA5 2234

Q.    And did you compare the subscale tests on your WAIS-III to the subscale tests on Dr. Weiner's WAIS-R?

A.    Sure.

Q.    And did you see consistency or inconsistency on that?

A.    The internal pattern, again, the overall flavor and shape of the data was pretty consistent.

Q.    Now, let's look at another test you gave called the Category Test.  And before I ask you questions about it, why don't you give us a working understanding of what the Categories Test asks you to do and what information it provides to the person administering it.

A.    Sure.  The Category Test, based on factoring analytical research has been shown to reflect whole brain functioning.  It focuses more on frontal lobe abilities.  It looks at synthetic reasoning, the ability to generalize from one stimulus situation or configuration to another.  It's typically seen as more of a visual, spatial than a verbal test, but people do it in different fashions, so it really gets at both sides of the equation.

I liken it to Jeopardy, where you're not necessarily saying, "This is what I want you to do," and then have the person answer the questions based on the question asked, but rather they need to find a pattern within the data.  They need to find a way of thinking about the data where they can reason through, based on hypothesis testing, and come up with the

USCA5 2235

right approach that gives them the right answer.

So the format of the test is forced choice.  There's four answers.  You've got a 25 percent chance of being right just by simply guessing, even if you didn't know what the question was.  Again, there's seven subparts to it.  The first six have one specific concept.  The last one is a summary, so you go back through and you have to remember what you did on prior tests.

The first two subtests are considered gimmes, in that it's hard to get them wrong if you had some sort of working cognitive ability and you don't over think it.  So we look at those, and when people have problems with those or make mistakes, we always wonder why that is.

The third subtest seems to be the most difficult for most people.  The fourth is unique.  Fifth and sixth have the same concept.  And like I said, the seventh is like a review.

It's, to a neuropsychologist, at least to me, it's, I think, a wonderful test in that there's a lot of information when people make mistakes.  When they're on a roll and doing well and then the configuration of the data changes somewhat and they make a mistake, you can kind of see which way they went off the road, either left or right.  So it's a very nice test, in that it gets the higher cognitive abilities, whole brain abilities.  It's interesting to look at.  It's actually fun to give.

Q.   Okay.  I'm going to put up Page 20 from Exhibit P-16 and

USCA5 2236

ask you if you can describe --

A.    You've got it upside down.

Q.    I've got it upside down.  There you go.  Is that the score sheet for the Halstead?

A.    That's the data sheet for the Halstead Category Test.

Q.    All right.  And you say that it has seven subtests.  And the first two are gimmes.

A.    I call them gimmes.

Q.    Right.  And by that, you mean they're real easy.

A.    So again, there's cards that are being shown one at a time.  The patient is told, "You get one guess or one chance to answer, and I'll tell you right or wrong, and then we'll go on to the next one, and you can't go back."  The concept for the first subtest is Roman numerals.  We don't say the concept is Roman numerals.  Rather, the first one is the Roman Numeral I.  It's a black number on a white sheet.  And if the person says, "One," you say, "Correct."  You don't tell them why.  You don't say, "That's right, you guessed it, it's a Roman numeral."  They can guess "one" for any reason.  You don't ask them the reason.  The next one is a Roman Numeral III, then you're back to a I, a IV, et cetera.

So sometimes you'll get someone who I said over thinks, and they look at the Roman Numeral I, and they count the corners, and they may say, "Four," or they count the sides and they may say, "Two."  Quickly, people tend to get that one

USCA5 2237

correct.

The second subtest is a simple counting task, where there's first one circle, second there's three circles, back to one circle, four, and then it will change.  It will go from circles to squares, for example, or bars or letters or words.  But again, it's a counting test.  Most people get them all correct.  And the check mark on the right means he got the right answer.

Subtest three is where things get very challenging.  On each card in subtest three, there's four items.  And three are the same in some fashion, and the fourth one is different.  So it could be three blue and one white.  It could be three triangles and one square.

What gets challenging is now it's a second order solution, in that it's not just counting, but rather you have to figure out which one is different.  So in the second position, or if it's a white circle, a blue circle, a white circle, a white circle, you have to notice which one is different and then try the hypothesis of naming the second, number two, it's in the second position.

People have trouble with it.  And you can see at the bottom, Mr. Bourgeois made 30 errors out of 40.  So he was performing exactly at chance.

When people are malingering and figure it out and say, "Well, I should be getting a bunch of these wrong," that's when

USCA5 2238

you start getting things like 38 errors out of 40, which by chance would be very difficult to do.  So he's right in the ball park for someone who just didn't get it and kept guessing, kept working at it, but didn't have an idea.

THE COURT:  But if you're a smart malingerer, it seems like you could do -- you could know, "I'm not going to do 38 out of 40 wrong," because everybody's seen my letters and this kind of thing, so you can say, "I'll do about, you know this percentage."

THE WITNESS:  So --

THE COURT:  I'm just saying.

THE WITNESS:  That's exactly right.  I'm thinking of my brother who, you know, took the SAT and got a 1600, and did it again to see if he could, and did it again.  He could figure that out.  But chances are I'm not looking at him and seeing an academic history with D's and C's and someone who was getting into all sorts of trouble.  I see a very different history.

So when I reconcile the history and the way they present and how they sound and all sorts of other things that predate any concern or reason to come under scrutiny, that's when that three-legged stool, the fact that all three prongs need to kind of line up.

It doesn't make sense to say that this gentleman was so clever as to say, "Ah, you know, it's forced choice.  I need to get 30 errors, so I'll keep count as I go through and make

USCA5 2239

30 mistakes."  That would be impressive.

THE COURT:  He might be.

MR. WISEMAN:  All right.  Well, let's keep going then.

THE COURT:  Right?

THE WITNESS:  Is it absolutely possible?  Sure.  Just like a meteor may hit us in the next ten seconds.  But I'm not going to worry about that.  And, you know, is it possible?  I would have to say it's possible.  Is it at all likely?  No.

BY MR. WISEMAN:

Q.   And putting it in the province of our profession, do you have a reasonable certainty that, as to whether Mr. Bourgeois was malingering?

A.   I have a reasonable guess and -- or a reasonable opinion. And based on all the data, looking at test/retest over the course of years, looking at the pattern of errors that he's made on various tests, I would say the chance is so slim that it's not really a significant concern at all.  It's not even a concern.

Q.   And what do you take from the fact on the fourth subtest he then only got four errors out of the total?

A.   He got that one.  That one he figured out.

Q.   And if he were malingering, would you expect to see a good score like that?

A.   Well, unless in the course of malingering, he said, "Gee,

USCA5 2240

I better do well on one of these subtests, otherwise, people will think I'm malingering." At some point, you know, you can come up with -- I can come up with all sorts of hypotheses, and I can over think this, or I can just look at the data and say this comports with someone who -- again, he, I think when he took it for Dr. Weiner, he had like 94 errors, which statistically is in the same ball park as this. He did kind of the same, except for this time he did get number four, whereas on the prior testing, he didn't, as far as I know.

Q. Okay. And you mentioned the number of errors that he attained on that test. What's the cutoff on the Halstead Category Test for a determination of impairment?

A. The general score, if you have to pick one cutoff, is about 51 errors.

Q. And what can you conclude from his score of 80 errors on yours and 94 errors on Dr. Weiner's, as to his brain function?

A. Well, he's clearly into the impaired range. And impaired doesn't mean he's just not very good. Impaired means he's, in this case, probably in the bottom one to two percent of the population. And it may be bottom one percent is more accurate than bottom two percent.

Q. You gave him something called the Wide Range Achievement Test?

A. Yes.

Q. And how did he score on that?

USCA5 2241

A.    He scored --

Q.    Well, first of all, why don't you tell the Court what that measures?

A.    It's a measure of academic achievement functioning.  It looks at sight reading, not comprehension, but simply can you read words and pronounce them correctly; spelling abilities; and math calculations, using paper and pencil.

Q.    And what were his scores in those three areas on the Wide Range Achievement Test that you administered?

A.    He had a standard score of 85 on the sight reading, a standard score of 100 on the spelling, and a standard score of 74 on the math.  That places him for his age at the 16th percentile, the 50th percentile and the 4th percentile.  The reading and spelling are considered high school level, even though he's at the 16th percentile in the reading, and the math was at a fifth grade level.

Q.    And two sets of questions about that score.  First, what does the disparity between being in the 4th percentile and the 50th percentile tell you about malingering?

A.    In and of itself, I don't know if it says anything about malingering, other than maybe he's a tremendous speller and pulled his punch and went from the 90th percentile down to the 50th, thinking that would make people think that there was something wrong with him.  I don't know.  I don't know how to approach a question like that, other than to say he put forth

USCA5 2242

adequate effort on spelling, such that he's testing out in the middle of the average range.

Q.    And what does it tell you substantively about his abilities?

A.    His spelling abilities are average.  His ability to sound out or pronounce words are right in the middle of the low average range.  Low average is generally 80 to 89.  His math abilities with a standard score of 74 are in the borderline defective range.  70 to 79 is that level.  It's also consistent, he had said when I took history, that he had always had trouble with math.

Q.    And how do you reconcile a person scoring a 70 on an IQ test and -- well, withdrawn.

      What percentile would a 70 put Mr. Bourgeois in on the IQ testing?

A.    70 is exactly the 2.2 percentile.

Q.    All right.

A.    It's two standard deviations below the mean.

Q.    And how do you reconcile that score with the fact that he was in the 50th percentile in spelling on the WRAT, the Wide Range Achievement Test?

A.    I don't know that there's any reconciliation necessary, other than he's a much better speller than he is intelligent. We all have our strengths and weaknesses.  And, for example, within the subtests, the 70 is computed based on six verbal and

USCA5 2243

five performance or visual spatial subtests.  Within those subtests from the IQ, he had strengths and weaknesses.  He was weakest on verbal comprehension and abstract reasoning.  And on that score, that was his lowest score across the battery.

Contrary, on a visual spatial motor speed test, how quickly can he assemble electronic radios, he's one notch above the center of the average range.  So he's good with dexterity tasks, even though he's very poor with comprehension.  That's just the way his brain works.

Q.   And going back to the subtests on the WAIS that you administered, did you see a similar difference between his verbal and performance?  And I'm thinking in particular the digit symbol subtest.

A.   Digit symbol, that's the one I just mentioned that he had good dexterity.  Verbally, he was -- his highest score was an 8 on digit span, which is average to low average.  That's verbal attention and concentration.  I mentioned before the dementias. Quite often people with dementias have good attention and concentration, but they don't form meaningful or lasting memories.

So if you simply hold a brief conversation with them that's based on working memory, can they focus on what you're saying and respond in kind, they look just, you know, they present, they seem okay.  But if you ask them an hour later what the conversation was about or what the conversation meant,

USCA5 2244

they have grave difficulties.

So we can have, we all do have strengths and weaknesses. His are in terms of attention and concentration and fine motor speed.  His weaknesses are in terms of comprehension, understanding, appreciating social norms and morays, this sort of thing.  That part of his brain doesn't keep up at all.

THE COURT:  So appreciating social morays, it sounds like, with unable to put the brakes on and control his behavior, it sounds kind of sociopathic.

THE WITNESS:  People who are sociopaths are oftentimes described in the same terms.

THE COURT:  Okay.

THE WITNESS:  The difference would be, you know, when I debrief families, I hold up two index fingers, put them together and say, these look the same, but they're coming from very different sides.  So you can have people who look similar to one another, but they may have that sort of behavior for very different reasons.

People who have dementias may have frontal lobe problems and have trouble putting on their brakes and accuse people of stealing from them.  But in this case, it's because they forgot where they put something.  When they don't have something, they don't say, "Well, maybe I forgot."  They say, "Someone must have taken it."  They're making accusations, not that they're mean-hearted people, necessarily -- some of them

USCA5 2245

may be -- but because they have memory disturbance.  So you could have someone else who's making accusations because they are a mean-hearted person.  Two people making accusations, but for very different reasons.

THE COURT:  So you could be a mean-hearted sociopath and have this same dynamic?

THE WITNESS:  Have the same presentation.

THE COURT:  Same presentation.

THE WITNESS:  I would actually say the dynamic is different, but the presentation -- the behavior may be similar, but the underlying reason, the etiology could be very different.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Before we leave the Wide Range Achievement Test, were you aware of any testing administered by Dr. Victoria Swanson in 2009?

A.   My understanding is that Dr. Swanson did a Woodcock Johnson, a psycho-educational battery.

Q.   And how does that compare, just test-wise, with the Wide Range Achievement Test?  Is one more comprehensive than the other or gives you different information?

A.   The Woodcock Johnson is quite a bit more comprehensive.  I would suggest that the analogy would be that the Woodcock-Johnson to the WRAT, the Wide Range Achievement Test,

USCA5 2246

is much like the neuropsychological battery taking many hours, is to a neurologist's mental status or a neurologist's five-minute screening exam.  One is much more in depth and gets at the same stuff, but with a lot more accuracy and validity, because it's looking at a deeper level.

Q.    Okay.  Did you administer a test called Trails?

A.    Yes.

Q.    And describe what that is and how Mr. Bourgeois scored on those.

A.    Trail Making Test is probably one of the most sensitive tests for cognitive dysfunction for the amount of time it takes to administer.  It resembles what we have all done with our children, I suspect, where you connect the dots.  In this case, it's a standard form, circles, 1 through 25.  It's a timed test.  You give a sample first to make sure the person has the concept.  There are very few individuals of age who can't do the test.  And it's also nice in that it works cross culturally, in that it's the numeric system, at least for -- there are certain cultures that use a different numbering system -- but it works pretty well for all sorts of people.

It's, as opposed to a power test, seeing how much the person knows.  It's a speed test; how quickly can they do it and do it accurately.  Mr. Bourgeois took 30 seconds to complete it.  He made one error in so doing.  Any error is considered problematic, because it's such an easy test.  It

USCA5 2247

normally means that the person, for lack of a better word, got ahead of themselves.  They raced faster than they could actually do the test accurately.

Q.    And I've put up Page 17 from Exhibit P-16.  Does that depict Mr. Bourgeois' administration of the Trails A Test?

A.    Yes.

Q.    And can you point out where the error is that he made?

A.    You can just follow along, 1, 2, 3, 4, 5, 6, 7, 8, 9.  He missed 10.  That didn't get counted.  11, 12, 13, 14 -- you've got to pull it down, please.  15, 16, 17, 18, 19, 20, 21, and then from, he went from 22 right to 25 and then had to go back.  He was corrected.  He missed a number, go back to 22.

Q.    And let me put up, if I --

THE COURT:  So how many did he miss?

THE WITNESS:  Just one.  There was one error counted against him.

THE COURT:  Okay.  So what does that mean?

THE WITNESS:  It means he was going faster than he could accurately process the information.  That's probably -- in fact, I would say at least --

THE COURT:  Just missing one?

THE WITNESS:  You're not supposed to miss any in that.  You're coached to do it accurately, not to make any mistakes.

BY MR. WISEMAN:

USCA5 2248

Q.   And let me put up the score sheet from Trails B, which is Page 19 of that exhibit.  Did he make any errors in his administration of Trails B?

A.   No, there were no errors counted against him.

Q.   Okay.  And in both Trails A and B, do you derive any information from the amount of time it takes to complete each task?

A.   Sure.  Like I said, it's a timed test, so you're looking, you're comparing the individual versus the normative sample. The cutting scores, again, if you have to pick one cutting score, Trails A, it's 40 seconds.  He took 30.  And when you say 40 seconds, the statistic for the most part is 95 out of 100 people, normal adults, should be able to do the task in under 40 seconds.  Now, if you're at 38 seconds, you know, maybe you're at the 10th percentile, but you're not down at the 5th or below.

Q.   Okay.  And on Trails B, what's the time cut-off?

A.   The cutting score there is 90 seconds.

Q.   And what did he score?

A.   He had 78 seconds, no errors.

Q.   Okay.  And so you were talking about on Trails A that he was sort of getting ahead of himself when he made the error. Is there any information you can take from that and apply it to the other data you have, for instance, the Categories Test?

A.   As the Judge pointed out, "Just one error?"  Well, one

USCA5 2249

error is considered in the studies and the research to be significant. And the interpretation is that there's some impulsivity or disinhibition. You, I would say never, although there are, I see neuropsychologists doing this, but I would say you don't make a conclusion from one piece of data. Generally, I like to see at least three different bits or types of information to corroborate before I'm willing to draw a conclusion. But this is one of those things that causes you to raise an eyebrow and say impulsivity, disinhibition, trouble keeping his actions in line with reasonable thoughts, someone who benefits from slowing down. Oftentimes you find nervous system dysfunction in people who have this pattern.

Q.    Is there any test/retest consistency or inconsistency in Trails A and B, between your administration and Dr. Weiner's administration?

A.    I don't recall his data on that offhand. I'd have to look back.

Q.    Well, why don't I mark, or not mark, but show you this document. Does that appear to be Dr. Weiner's raw data, the front page of it?

A.    That's a page from the WAIS-R from Dr. Weiner.

Q.    Okay. And if I could just approach the witness, so he can go through the document.

A.    Thank you. Dr. Weiner's Trails A was a score of 32 seconds, zero errors. And B was 93 seconds, zero errors. So

USCA5 2250

the time was pretty similar on Trails A.  On my administration, Mr. Bourgeois made an error.  Trails B, from Dr. Weiner's administration, he was over the cutoff in terms of time, but again, no errors.

Q.   Did you administer a series of memory tests?

A.   Yes.

Q.   And was it part of a battery?

A.   Yes.

Q.   And what's the name of that battery?

A.   Well, the whole battery is the Halstead-Reitan.  Many of these, or most of these tests come from the Halstead-Reitan.  The memory test, the major one that was given in this case were portions of the Wechsler Memory Scale-3.

Q.   And did you notice any impairments in any of the subtests of the Wechsler Memory Scale?

A.   Yes.

Q.   And what does that tell you about Mr. Bourgeois' brain and his functioning?

A.   His scores on tests of conceptual learning and memory for both verbal and visual information were very low.  He had a score of 4 on the Logical Memory One and a score of 2 on the Family Pictures.  So verbal and visual memory for more meaningful or conceptual information were significantly suppressed compared with normals or average people.

     On the rote memorization portions, both verbal and

USCA5 2251

visually, he had scores of 7.  So he's low average on those tasks or those abilities.

Q.    And what does it add to the overall picture of Mr. Bourgeois' ability to function?

A.    That's a useful question from a neuropsychological perspective.  The overall picture, what neuropsychologists do is try to look at the whole pattern.  And what diagnosis neuropsychologically, as well as in other fields of medicine, is we're looking for patterns of data.

What you're seeing or what I'm describing here bit by bit is that things that are more conceptual that require higher level processing, that require him to think about more things at once and then work with them in a goal-directed fashion, as opposed to more concrete tasks or more mechanical tasks, just how quickly he can manipulate objects.  He has trouble on the former.  And those are things that tend to be more frontal lobe related.

So going back to neuropsychology 101, where you take each of these tasks and you look at the research and you say this one largely arises from left frontal abilities, this one is largely occipital right hemisphere, and you put little stars on a picture of a brain, based on -- or you know, pluses or minuses, based on good or bad behavior, we're seeing a series of minuses in the front portion of this man's brain.

Q.    And did you -- you mentioned you had an opportunity to

USCA5 2252

watch the video of Mr. Bourgeois being evaluated by the Government doctors.  I want to particularly draw your attention to the administration of what's called proverbs by Dr. Price. I believe that was the last disk.  What did you observe with -- first of all, what are proverbs, in this setting, not the biblical setting, and what information did you derive from his performance?

A.   I suspect they're somewhat related, biblical to this setting, but --

Q.   Okay.  I'll stand corrected.

A.   Essentially, the administration of proverbs in psychiatric or psychological or neuropsychological assessment is to see if people can abstract and understand things that are similar or analogous or representational.  It looks for cognitive complexity.  It kind of delineates or will show when people are being very concrete or simply can't think beyond the concrete meaning of the words.

Q.   Now, let me just ask:  Is the distinction between concrete and abstract a sign or symptom of frontal lobe impairment?

A.   Abstracting ability is generally attributed to frontal lobe functions.  So if you're having a tendency to be very concrete, we would say that your frontal lobes are not doing what they're supposed to do.  They're not helping you. Concrete thinking is very useful thinking.  Abstract thinking is also very useful.  You need both in order to get along in

USCA5 2253

the world.

People who think out of the box all the time and can't see where the box is have trouble.  By the same token, people who are stuck in the box and can't think beyond it have difficulty, too.  They have different sorts of problems typically.  And we're more likely to see the people with abstracting problems, at least in a clinical practice, than those who are having trouble being concrete.  I think there's also more of them.

Proverbs by themselves are kind of a difficult test because there's a confound -- if you've heard a proverb before and had it explained to you, and then someone asked you to explain that one and you're simply doing it based on rote memory, we're not testing your abstracting ability.  We're testing your memory ability.

By the same token, if you present proverbs that are so esoteric or idiosyncratic that most people haven't heard them, then you can see if the person can wrap themselves around it and figure it out.

Frankly, I prefer to use things like analogies.  I think the Miller Analogy Test is a great way to look at abstract reasoning, rather than explaining proverbs, but --

Q.   Did you make observations as to whether Mr. Bourgeois, number one, was familiar with the proverbs Dr. Price was asking him about, and two, did he -- was he able to interpret them?

A.   He said to most of them that he had not heard them before.

USCA5 2254

So for the purposes of seeing if he can abstract, that's useful in that he's not just parroting back or repeating something he had remembered from the past, assuming again that he's being straightforward.  And he could have been lying and had heard it and just didn't want to acknowledge that.  I suspect that's not the case.

Based on the ones he said he hadn't heard, he really, he was -- I'm interpreting this, but I would say he was, if not overwhelmed, he wasn't, you know, tearful or anything, but he was like "I have no idea."  He was quite forthcoming, saying, "I really don't know what to do with that.  I don't have any idea what that means."

Q.   And what were just one or two of the proverbs that were administered, just to give the Court a sense of what we're talking about?

A.   Strike while the iron is hot, something like that.  Ones that are somewhat common.  They're not in everyday parlance, but many people certainly of adult age have heard them.

Q.   And the first disk of Dr. Price's evaluation, did you see any type of mental status exam being administered to Mr. Bourgeois?  And if so, what information did you derive from that?

A.   Mr. Bourgeois was asked orientation questions:  "Do you know where you are?"  "Do you know what the date is?"  Various things like that.  He did fine on all those.

USCA5 2255

Q.   Okay.  And what about the questions in which he was asked, you know, why -- for example, why does the moon appear larger than the stars?  What time of day is your shadow the shortest?  First of all, what are those questions aimed at, and how did he respond?

A.   Most of those are less common, or maybe they're equally common with some of the proverb questions, but they're designed for critical reasoning, critical thinking.  You should be able to figure those out if you have reasonable intellect, if you stop and think about what the question means.  You know, when the flag is blowing to the south, which direction is the wind coming from?  Most people can figure something like that out without too much difficulty.

Q.   And did Mr. Bourgeois perform on those adequately?

A.   No, he didn't.

Q.   And again, does that add information, for your purposes, to how his frontal lobes are functioning?

A.   I would say that that loads largely on intellect.  That that's the first order interpretation, is that those are the responses of someone who's not very bright, assuming they're putting forth reasonable effort.  And the frontal lobes are certainly involved in that sort of problem solving activity.

Q.   All right.  We're getting down towards the end here.  I just wanted to ask you a little bit about the clinical interview you conducted.  Typically, when you interview a

USCA5 2256

forensic subject, patient, however you want to call it, how much credence or how much do you believe of what that person tells you?

A.   Well, I listen to everything, hopefully, and I also -- and frankly, this applies in my office or in the hospital or a forensic case -- I understand that people are, to the best of their ability, or to less than the best of their ability, trying to give me information relevant to the question I'm asking, as they perceive the question.  Some people are very good -- and this is where concreteness helps the psychologist, because when I'm asking specific questions, I'm looking for specific bits of information.

Personality and cognitive difficulties enter into answering the question, and sometimes the answers are vague, off the point.  Sometimes they're very specific, concrete and accurate.

I appreciate that nobody is giving me an actual accurate history.  Just like a history book doesn't give you an actual accurate history of what had happened, and how it has been shaded or shaped or changed sometimes has information about the person and their cognitive or emotional condition.

Q.   And what did you learn from what Mr. Bourgeois told you about his background and his histories, as he related it?

A.   I asked him certain particular areas.  I'm always interested in medical history, academic history, family

USCA5 2257

history.  It's evident, from what he's told me, that he had had some injuries that could have had effect on his cognitive abilities.

THE COURT:  Have you seen any of his school records?

THE WITNESS:  I have subsequently, yes.

THE COURT:  Okay.  Where --

THE WITNESS:  Actually, some -- from what I saw, there's not much.  I think I saw a couple of pages.

THE COURT:  What did you see exactly?

THE WITNESS:  I saw a transcript from high school, which was --

THE COURT:  Do you have that with you?

THE WITNESS:  I think I do.

MR. WISEMAN:  If you want to pull it out, that would be great.

THE COURT:  Can I see it?

THE WITNESS:  Yes.

MR. WISEMAN:  Give the Court some background.  We're going to be introducing --

THE COURT:  Do you have any of the elementary school records?

MR. WISEMAN:  That's just what I was about to say. We have a single page.  That's all we were able to find.

THE COURT:  That's all what?

MR. WISEMAN:  That's all that remain --

USCA5 2258

THE COURT:  Okay.

MR. WISEMAN:  -- from his history.

THE WITNESS:  May I, Your Honor?

THE COURT:  Sure.

MR. WISEMAN:  Should I mark that, Your Honor, or --

THE COURT:  Sure.  Why don't you do that.  Have you seen them?

No, give them to Mr. Wiseman to mark, please.  Thank you, Ms. Gano.

Is this your only copy or --

MR. WISEMAN:  No.  I just want to --

THE COURT:  Okay.

MR. WISEMAN:  -- make sure I don't mess up our numbering.

MR. ROBERTS:  Can I go over there and look at his table, Your Honor?  It would be easier for us to just look --

THE COURT:  Have you not seen them?

MR. WISEMAN:  I'll put them up in a moment.

MR. ROBERTS:  Yeah, I've seen them, but I want to make sure it's the exact same things we've --

THE COURT:  That's fine.

(Counsel conferring off the record.)

MR. WISEMAN:  Your Honor, this is in our premarked exhibits.  It's 86.

BY MR. WISEMAN:

USCA5 2259

Q.   Why don't you tell us what information you think is important on that sheet of paper, Doctor.

A.   I, you know, my first reaction is just looking at the grades -- let me back up.  It says in the upper left-hand corner, I think, "Lutcher High."  And it's my understanding that this is his high school, if not transcript, it's a record of how he did.  Along the left, you can see English, Math, I believe that's Social Studies, Science, Health, et cetera.

THE COURT:  Any indication of a prior IQ test of any kind?

MR. WISEMAN:  No, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   And what grades -- I mean, we can read it, but you see basically C's and D's?

A.   By and large.  There's a few B's up there as well.  Down at the bottom, Beginning Band, I think, is a B.  I can't tell in the Health and Phys. Ed. if the first grade is a B or --

Q.   This is a little like an eye test for you, huh?

A.   I'm sorry.  I think Afro-American History looks like a B as well for half a unit credit.  I don't know if that was a smaller course.

Q.   And do you have any familiarity with the school system in Louisiana at about that time?

A.   I have anecdotal familiarity.

USCA5 2260

THE COURT:  What time is it?

MR. WISEMAN:  I'm sorry, Your Honor.  This would have been in --

THE COURT:  I can't see the top.

MR. WISEMAN:  Yes.  It says 1983 at the top there.

THE WITNESS:  Yeah, I mean, his date of birth is '64.

MR. WISEMAN:  If you look in the upper right, it says, "5/24/83, Date of --" it says, "Date of Graduation."  I'm not offering it for the truth that he graduated.

BY MR. WISEMAN:

Q.   You were about to say, do you have any sense of what the school district was like then?

A.   You know, I used to -- I worked for four years in Houston, and I had some familiarity, but it was case by case.  I can't tell you what the statistics were, so I don't know that I could do anything other than take a guess or speculate.  That's about as --

THE COURT:  So it appears that he graduated from high school.

THE WITNESS:  Yes.

THE COURT:  And he didn't fail anything.

THE WITNESS:  At least not that's on the transcript. You know, I don't know their system.  There are some places where if you fail or withdraw, it doesn't show up on your transcript.  So I don't know that we can --

USCA5 2261

THE COURT:  Well, we have no indication that that's the case.

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, just so the Court knows, we'll be offering a witness when we reconvene who's going to be able to offer the Court some insight into the school district at that point in time.

THE COURT:  Was it a teacher of Mr. Bourgeois?

MR. WISEMAN:  No, it's not.  It's Dr. Swanson who worked for the State of Louisiana as a school psychologist. And she's familiar with this particular school district and what their standards were and what their practices were.  So you'll have more information on that.

BY MR. WISEMAN:

Q.   So you were starting to say that you want to hear about medical, academic and family history.  What else did you --

THE COURT:  What are his -- do you have elementary school?

MR. WISEMAN:  No.  That's the only page we have.  We have found no other record.  We can -- I don't want to testify here.  We were told by the authorities that everything else was simply lost, you know, flooding, Katrina, a bunch of reasons why they don't have material.  This was the only page we were able to find.

USCA5 2262

THE COURT:  And where did you get that?

MR. WISEMAN:  Lutcher High School, I believe?  Yes, Lutcher High School had that.

THE COURT:  Okay.

MR. WISEMAN:  Yeah.  After repeated visits, stern visits, I would add.

BY MR. WISEMAN:

Q.   What did you learn about his family history from him?

A.   He had, other than a typical or average family history, he described physical abuse from his mother.  There was description of some sexual abuse he suffered at the hands of one or two men, I believe.  He was reared in part by I think it was a neighbor woman, a nice neighbor lady down the street.  It sounded like a very difficult upbringing.  He didn't highlight it, but it sounded like it was rather challenging.

Q.   Was there any consistency between what he told you about his upbringing and other materials that you reviewed?

A.   Yes.

Q.   Background materials?

A.   Well, in fact, I think the other materials, I would say, would amplify that he under-represented the difficult circumstances in which he was reared.

Q.   And describe for the Court how he presented himself.  How did he speak?  How did he appear to the naked eye?

A.   If you were a fly on the wall, you would have seen a

USCA5 2263

fairly talkative gentleman who certainly wasn't shy. He was verbose, forthcoming. I think I was the fortunate one of the psychologists, at least after watching the interview from the other two doctors, that I had much more of a structured interview. Testing is considered a structured interview. And it was easier for me to keep Mr. Bourgeois on track and to get my data. I had more control, because I had questions I had to ask.

He is gregarious. He is somewhat tangential. Some of his spontaneous speech kind of lacks focus, goes off in different directions.

Q. Did you see any information in the materials you reviewed about his narcissistic tendencies or narcissistic personality disorder?

A. There was description in various materials of him being rather narcissistic.

Q. And did you see evidence of that in your interview with him?

A. I would concur.

Q. Okay. And so what does that mean in terms of your evaluation of his actual functioning versus the way he presented in that narcissistic sort of way?

A. Well, concretely, it meant you have to take control of the interview process to keep him focused and to get particular questions answered. More abstractly, I think I had mentioned

USCA5 2264

before that personality and cognitive abilities interact.

The narcissism oftentimes coupled with what I'm calling low intellect, because that's what I believe is here, you get individuals who are trying to cover or mask or hide their deficiencies. And one of the ways they do that, especially when you have a gregarious narcissistic person who talks a lot, is that they try to steer conversations or they tell you what they want to know, or more often than not, they tell you what they know about or what they think they know about, rather than just simply answering questions.

Q. Did you see Dr. Estrada's report from the time of trial, and in particular, with reference to his assessment of Mr. Bourgeois' intelligence?

A. Yes.

Q. And what did Dr. Estrada say? And why don't you tell us if you agree or not?

A. There was a line in his I believe written report saying that this gentleman was of average or slightly above average intellect, something to that effect.

Q. Now, let me just stop you before you go on. Was there any indication in that report that Dr. Estrada did any type of psychometric testing?

A. No, there wasn't. And he being a psychiatrist, I can't speak directly to it, but typically or rarely would a psychiatrist ever do formal psychometric. I've never seen a

USCA5 2265

psychiatrist do an IQ test to actually measure it.  Oftentimes they will do --

THE COURT:  I think, I think he has somebody in his office that does testing.

MR. WISEMAN:  Well, he -- Dr. Weiner got involved.  That's when Dr. Weiner got involved.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Estrada recommended him, and we'll tie that all together for the Court.

THE COURT:  Okay.

THE WITNESS:  Well, eventually, not in his report, but eventually Dr. Estrada made comment in some subsequent writing saying that he had not been afforded Dr. Weiner's information, so he didn't have the psychometric data at the time that he put together that opinion.

BY MR. WISEMAN:

Q.   Okay.  Needless to say -- I guess it's not needless, but I take it you don't agree with his assessment of a above average intelligence?

A.   Well, I wouldn't argue him out of his opinion.  On the other hand, formal psychometric data, which is the way you assess intellect, says that this man is not of average to above average intellectual abilities.  I'd rather base my opinion on formal testing than interview and -- especially with someone who --

THE COURT:  Mr. Wiseman, can I see you over here just a second?

MR. WISEMAN:  Yes.

(Discussion off the record.)

THE COURT:  In my multitasking, I was looking at -- I pull up my motions as they're being filed, and Mr. Bourgeois filed one for a subpoena for the slides and report for the autopsy.  And -- but he filed it under seal, so I thought it was secret, and I didn't know why it was secret.  And he said no, it wasn't secret.  So is there any opposition to me granting the subpoena?  Have you seen it?

MR. ROBERTS:  Your Honor, we have not seen it.  We were -- the United States was actually contacted and helped him locate where these slides were.

THE COURT:  Okay.

MR. ROBERTS:  So we don't have any opposition to the motion.  And we're trying to help them get the slides ourselves.

MR. WISEMAN:  And I apologize to the Government and the Court.  That was inadvertently filed under seal.  It was our understanding you had no opposition, and we'll certainly get you a copy of that, especially since you don't oppose it.

BY MR. WISEMAN:

Q.   Yes, I was going to ask you, Doctor --

THE COURT:  Sorry, I did -- sorry.

USCA5 2267

BY MR. WISEMAN:

Q.   Before we wrap up, ask you if you recognize what's been marked as P-15.

A.   That's the first page of my, the declaration I wrote a couple of years ago.

Q.   And let me switch to Page 5.  Is that your signature?

A.   It is.

Q.   Okay.  And it's dated May 11, 2007?

A.   Correct.

Q.   And I just wanted to ask you about one aspect of the declaration.  In Paragraph 10, which is on Page 5, you said, "I understand there is some disagreement over the etiology of Mr. Bourgeois' impairments.  Dr. Wiener believed they were due to a motor vehicle accident.  There's some question as to whether Mr. Bourgeois actually suffered a head injury in the accident."

From a neuropsychological perspective, of what significance is it to your conclusion that Mr. Bourgeois has brain impairments as to what the etiology of those impairments is?

A.   The presence of impairments is objectively found in the data.  There are times when it's important, in legal settings when it's important to understand what caused the impairments and, or the time frame.  So, for example, in a civil case where someone has had, demonstrated cognitive impairments and they've

USCA5 2268

been involved in a motor vehicle accident, it's pretty important to figure out were the impairments there prior to the motor vehicle accident, or were they caused by the car accident, if they're bringing suit and looking for damages.

In this type of a forensic setting, it seems to be less important to understand what caused them, but rather to understand when they were caused. If they occurred after someone is charged with a crime, then they weren't present and wouldn't have been affecting the person at the time of the commission, if that's what happened. Whereas if they were there lifelong or congenital from before birth or at birth, then they would have been on board or having an effect on the person's behavior.

So for my purposes, the first part of the decision tree is: Is it a normal functioning brain, or are there impairments? And if you said it's a normal functioning brain, then it doesn't much matter what happened to the person. They're functioning okay, even if they've had bad accidents or injuries or medical problems.

Once you establish that there's a problem there, then it probably is useful to say how long standing have these problems been? When did they occur?

Q.   And is the fact, or I shouldn't say the fact, would the assumption that Mr. Bourgeois may not have suffered a loss of consciousness in this three-wheeler accident that Dr. Weiner

USCA5 2269

spoke about, does that in any way affect the validity or the significance of his testing?

A.    The testing doesn't change.  And just to kind of lend some perspective to that, you don't have to have a loss of consciousness to have suffered a traumatic brain injury.  And that's well documented.  There are many people who have mild traumatic brain injuries, and there was no loss of consciousness.

You know, it's easier to talk about it if there, if someone's in a coma.  You know, it's obvious that something has happened.  There's a lot of people who suffer brain injuries in car accidents and they never had a loss of consciousness.  But oftentimes they're described by EMTs as they were walking around dazed and confused.  Well, that's no loss of consciousness, but there's been something that's happened to affect their cognitive functioning.

Q.    And in terms of etiology, in your experience in forensic neuropsychology, is childhood abuse of the type suffered by Mr. Bourgeois the cause at times of the brain impairments that you've seen here?

A.    It's a twofold answer.  You can have people who are struck in the head in the course of child abuse who suffer brain injuries.  And a shaken baby is the more extreme case where people, children die from it.

THE COURT:  Well, how do you know that happened to

USCA5 2270

him?

THE WITNESS:  I didn't say that it did.

THE COURT:  Oh, okay.

THE WITNESS:  He's just asking -- my understanding of the question was he was just asking is that the sort of thing that can cause.

THE COURT:  Okay.

THE WITNESS:  And yes, it can.

THE COURT:  Is somebody going to testify that happened to him?

MR. WISEMAN:  Well, certainly abuse.  Not specifically shaken baby, I don't think, but abuse, striking about the head, certainly --

THE COURT:  Who's going to testify about that?

MR. WISEMAN:  We're going to have lay folks testify, relatives.

THE WITNESS:  And I'm sorry if I confused it.

THE COURT:  Who?

MR. WISEMAN:  Family and relatives.

THE COURT:  Oh, family and relatives that saw it?

MR. WISEMAN:  Yeah, absolutely.

THE COURT:  Okay.

THE WITNESS:  Yeah.  I'm sorry if I confused it.  I said shaken baby as the extreme example.

MR. WISEMAN:  As an example, right.

USCA5 2271

THE WITNESS:  I didn't, you know, I'm not aware --

THE COURT:  I got it.  I'm just -- sorry.  I wanted to make sure.

BY MR. WISEMAN:

Q.   Okay.

A.   The second aspect of that, though, is that there's research that's been coming out for several years now showing that the brain development actually changes as a result of abuse or neglect.  I don't think it's conclusive, and I think some of the newer types of testing of how the brain functions may well -- we couldn't have done it before these sorts of tests.  But they're saying that the brain doesn't develop quite the same way if you're abused at a young age.

Q.   Okay.  And just two more areas I want to touch upon. Looking at Dr. Weiner's data and adding it to your data, looking at it as one big evaluation, what does his data add to yours, in terms of the opinions you've offered?

A.   The data is -- this sounds funny to say it adds something, because it's largely redundant.

Q.   Okay.

A.   So does it change anything?  Does it add any additional or other insights?  No.  But what it does do is say that at one point in time, with one examination, the patient performed with a certain pattern to his data, a certain footprint.  And then a couple of years later, under different circumstances, the same

USCA5 2272

footprint, by and large, was obtained.  That's probably the strongest indication that the patient was putting forth reasonable effort on both occasions, and that it's actually --

THE COURT:  But these are both post, around, after he's been indicted for capital murder.

THE WITNESS:  Absolutely.

THE COURT:  So it looks like what you're saying is that he presents, not that he is, but he presents with the symptoms of a narcissistic sociopath.

THE WITNESS:  You said narcissistic sociopath.  I --

THE COURT:  You said narcissistic.

THE WITNESS:  I agree with narcissistic.

THE COURT:  And you said a sociopath --

THE WITNESS:  I said --

THE COURT:  He has the same presentation as a sociopath, but a different -- but different origin.

THE WITNESS:  I haven't decided yes or no.  I haven't rendered any opinion about whether or not he's sociopathic or not.  I would absolutely agree that many of the behaviors I've seen described can be caused by sociopathic etiology.  But they can also --

THE COURT:  But he's not -- but your opinion, he's not smart enough to be a sociopath.

THE WITNESS:  Is he smart enough to be?  I would say he's smart -- you know, sociopathic behaviors don't have a

USCA5 2273

threshold.

THE COURT:  An IQ?  I didn't know.

THE WITNESS:  I mean generally you have people who are of average intellect, but it probably helps if you're being sociopathic to have adequate intellect, because you have to remember things and you have to appreciate, if I do this to this one, you know, I don't want to get caught.  So you have to be able to plan to some degree a little bit more than just the very rudimentary.

THE COURT:  But you did say he did test out as a narcissist, or he presented as a narcissist.

THE WITNESS:  He presents.  I didn't say test.

THE COURT:  And he has the same behavior, many of the same behavioral patterns as a sociopath, but you're not calling him a sociopath.

THE WITNESS:  I would say --

THE COURT:  No brakes on the right and wrong kind of thing and --

THE WITNESS:  He says things to kind of cover for himself at times, from reading the history.  I think more central, I mean, that's a characteristic of people who have sociopathy.  It's also a characteristic, which is I think in this case much more central, to someone who has a borderline personality disorder.

THE COURT:  Okay, neither of which is good.

USCA5 2274

THE WITNESS:  I don't want them for my neighbor.

THE COURT:  Right.

MR. WISEMAN:  What does it mean "good," Your Honor?

THE COURT:  Pardon?

MR. WISEMAN:  I'm just concerned --

THE COURT:  I guess the point --

MR. WISEMAN:  Good for who and what?

THE COURT:  This is the point.

MR. WISEMAN:  Okay.

THE COURT:  The whole point of this is ineffective assistance of counsel.

MR. WISEMAN:  Sure.

THE COURT:  This is not the kind of testimony one would want to put on as a defense attorney, that he tests as a narcissist.  You don't want him to be living next door, that he's got a borderline personality, he's got tendencies of sociopath, sociopathic behavior.  This presents a future danger to the community.  That's all I'm saying.

MR. WISEMAN:  Okay.

THE COURT:  And this is not, you know, this is not something that I would have expected his attorneys to put on at trial.

MR. WISEMAN:  I'm glad Your Honor has clarified that, because I think that's --

THE COURT:  So now, that's where you need to be

USCA5 2275

headed.

MR. WISEMAN:  Yeah.  And we're going to get there, I promise you.

THE COURT:  Okay.  But not today.

MR. WISEMAN:  Well, certainly not today, no.

THE COURT:  Okay.

MR. WISEMAN:  We need about two weeks for that, but I'll settle for two-and-a-half more days.  That was said with a smile, for the record.

THE COURT:  Thank you.  I can't have a 2255 longer than the trial, I don't think.

MR. WISEMAN:  I'm just --

THE COURT:  Okay.  Thank you.  You're not being mad at me.

MR. WISEMAN:  No, no, of course not.  Goodness gracious.

THE COURT:  Okay.  I feel better.  I can sleep easier tonight.

MR. WISEMAN:  Just on this sociopathic organic impairment question --

THE COURT:  In just a moment, he's going to say we're all narcissistic sociopaths --

THE WITNESS:  Not unless I'm asked.

THE COURT:  Oh.

THE WITNESS:  No, I wouldn't.

USCA5 2276

BY MR. WISEMAN:

Q.   Dr. Gelbort, are all sociopaths suffering from organic brain dysfunction?

A.   No.

Q.   And some of them are just plain mean and they do wrong things because they choose to?

A.   Some sociopaths?  Yeah, sure.

Q.   Okay.  And does Mr. Bourgeois, in your view, fit into that category?  Or are there organic explanations for some of his bad conduct?

A.   Well, there certainly are organic issues present, based on the testing and his history.  They are the types of problems and issues that contribute to people having trouble acting in an adaptive, effective, goal-directed and proper fashion.  They make it more difficult for someone who has any sort of emotional disturbance.  It's kind of like the gyroscope that's starting to wobble and now you start shaking the table that it's on.  You've got both things working against him.  These are people that we like to see in our clinic or in the hospital as inpatients when they're in their teens and start them on medications to stabilize the behavior and keep them from wobbling so far out of whack.  It keeps them from having trouble going forward and keeps society from having trouble.

Q.   Okay.  Last thing I wanted to ask you about:  Were you asked by my office to assess Mr. Bourgeois for a formal

USCA5 2277

diagnosis of mental retardation?

A.   No.

Q.   And nonetheless, in your declaration, Paragraph 6, you say that your review of the history shows many of the telltale signs of adaptive skills deficits.  What did you mean by that?

A.   He's had trouble in areas that overlap or are adaptive skills issues throughout his life, based on the history I've seen and what I've come to understand about him.

Q.   And I take it then that the IQ he scored on your administration of the WAIS was within the range of mental retardation?

A.   There's two prongs to a diagnosis of mental retardation. The IQ is probably -- I'm going to, because I like to be involved in that part, I think it's the easier one.  And my test administration, as well as the prior test administration, even without any manipulation of the numbers trying to account for Flynn Effect, would qualify him.  You know, the current thinking is that you need 70 or less IQ points to be diagnosed. But because of measurement error, we can go up to a score of 75 and you can still be included in the definition, in the diagnosis.

          MR. WISEMAN:  Okay.  If I could just consult with my --

          THE COURT:  Don't you look at his adaptive behavior, too, outside?  I mean, having a commercial truck driving

USCA5 2278

license and, you know, owning a home and balancing a checkbook and all those kind of things is certainly not indicia of retardation, at least in my limited opinion.

THE WITNESS:  That's a great discussion.  And the diagnosis of mental retardation is not based on things that you have accomplished, but rather that you have to have -- the score alone, that's the separate issue, that's the first prong. The second prong is that you have to have, generally the diagnosis is two areas that are suppressed or low or impaired. So you can have lots of things that you can do, but if you have at least two areas that you can't do things, then you're eligible and properly diagnosed with retardation.

THE COURT:  Okay.

THE WITNESS:  Most people who are certainly mildly mentally retarded live in the community, have a job, handle money in some rudimentary fashion, ride a bus.  So if you're looking -- best way I can explain it is if you have a chain with 100 links and you've got 97 good links and three bad ones, what's going to limit your behavior is not the 97 good ones. We can talk about those --

THE COURT:  But the way I understand the case law is he has to have been discovered to have had this mental retardation early in life.

THE WITNESS:  Ah.  There's big discussion now, ever since Atkins --

USCA5 2279

THE COURT: Right.

THE WITNESS: -- when all of a sudden it became important to look back and say was the person -- we didn't used to retrospectively try to diagnose mental retardation. Retardation was diagnosed because people needed adaptations and help to get through, the people who didn't have family to help them. So if you had a functional family, you know, you were sheltered, your family took care of these things --

THE COURT: Well, I understand. But I've got to go by the -- I mean I've got to have --

MR. WISEMAN: Your Honor.

THE COURT: -- some indication --

MR. WISEMAN: Yes.

THE COURT: -- of earlier established mental retardation.

MR. WISEMAN: Our view on, we think this is borne out by both the case law as well as the sciences, is that there has to be onset before 18, but not diagnosis.

THE COURT: So you have to look at that anecdotally and not pure test scores --

MR. WISEMAN: Exactly.

THE COURT: -- is what you're saying.

MR. WISEMAN: I mean, obviously if we had a diagnosis pre-18, then we would present that and be very pleased with that. But absent a diagnosis, we have to show onset.

USCA5 2280

THE COURT: But I want to tell you that when I look at it, it's difficult. It's difficult to say, okay, suddenly he's tested as mentally retarded after he's convicted or shortly before he's convicted of capital murder. And so you look at that a little bit more carefully, is all I'm saying --

MR. WISEMAN: I understand.

THE COURT: -- than if you have absolute proof of early on before any of these bad things started to happen.

MR. WISEMAN: Sure. And we will be presenting evidence on that, but as Dr. Gelbort testified --

THE COURT: But it will be anecdotal, more than --

MR. WISEMAN: Well, anecdotal, and it will be professional opinions, based on the anecdotal information.

THE WITNESS: There's a whole new issue -- we didn't used to do retrospective diagnosis, because no one cared.

THE COURT: It wasn't necessary, yeah.

THE WITNESS: The question was never asked, so the answer was never attempted. Now it is, because of criminal legal cases. It wasn't an issue 20 years ago. No one ever tried to say, "Now, was that person retarded back then, and are they retarded now?" It wasn't an issue.

THE COURT: The only one I had actually before, before the Supreme Court case, that I granted the habeas corpus, was a capital case, and all they had to do was go a block over here next to the County Courthouse actually, is in

USCA5 2281

the same block as the Corpus Christi Independent School District.  His lawyers only had to walk over there and get the records, and he had --

MR. WISEMAN:  Yeah.  That was a 2254, if I --

THE COURT:  Yes.  54.

MR. WISEMAN:  Yeah, yeah, I read it.

THE COURT:  But then I got reversed because --

MR. WISEMAN:  Procedurally.

THE COURT:  Yes, but --

MR. WISEMAN:  There was a default issue, if I recall.

THE COURT:  So then the Supreme Court, in the interim, came out with this -- and they sent it back to me.  I sent it to the State to determine State values of mental retardation.  And apparently all, even the State's experts came in and testified that he was mentally retarded.

MR. WISEMAN:  Right.

THE WITNESS:  There are some slam dunks, and then there are some that are in the gray zone and --

THE COURT:  Well, this was very difficult, because this man had killed a police officer, and --

THE WITNESS:  It's a terrible thing to try to figure out.  And you folks have --

THE COURT:  But that was easy, because the records were there.

THE WITNESS:  You folks have done it to us.  We

USCA5 2282

didn't used to have to do this.

THE COURT:  This was an ineffective assistance of counsel claim, just like this one here.  And should it have been presented and -- and I thought it should have been.

THE WITNESS:  And for what it's worth, I stayed out of -- well, that question wasn't asked of me, so I didn't have to address it.

MR. WISEMAN:  I have no other questions on direct examination.  Thank you, Doctor.

THE COURT:  Thank you.

MR. WISEMAN:  Should I leave my exhibits at the Bar of the Court?

THE COURT:  Well, you need to offer them, don't you?

MR. WISEMAN:  Oh, yes, absolutely.

THE COURT:  That would be -- I hate to tell you how to do this, but --

MR. WISEMAN:  No, no, I appreciate those kinds of reminders.  Should I name them, or will the record reflect what's been marked already?

THE COURT:  I think you have called the numbers out --

MR. WISEMAN:  I have.

THE COURT:  -- for each one that you've reviewed.

MR. WISEMAN:  Okay.  So --

THE COURT:  So just give me the numbers.

USCA5 2283

MR. WISEMAN:  Okay.  That will be P-16, 15, 86, 31, 132, and 17.

THE COURT:  And I think there was a -- was his vitae 16?

MR. WISEMAN:  The vitae was 17, is what I have.

THE COURT:  17, okay.  Any objections to the admission of Movant's 15, 16, 17, 31, 86, and 132?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Those are admitted.  Have you given them to Ms. Scotch?

MR. WISEMAN:  I've just handed them.

THE COURT:  Six exhibits.

(Court and Clerk conferring off the record.)

THE COURT:  Oh, yeah.  Okay.  The most recent one that was filed at 3:00 something this afternoon.  Hand that to Mr. Roberts' table.

Would you read that subpoena and make sure that's okay?

MR. ROBERTS:  I'm sorry, Your Honor, read the subpoena and --

THE COURT:  Yeah, just make sure before you do that.  I just want to get that subpoena out.

MR. ROBERTS:  Can we take a brief --

MR. WISEMAN:  Oh, that's our subpoena?

THE COURT:  Pardon?

USCA5 2284

MR. WISEMAN:  Is that the one that we filed?

THE COURT:  Yes.

MR. WISEMAN:  Oh.

THE COURT:  At 3:00 something or other this afternoon.

MR. WISEMAN:  Oh.

THE COURT:  How did you do that?  Do you have somebody else here?

MR. WISEMAN:  Yeah, we have folks in Philadelphia.

THE COURT:  You know, you must have filed it earlier and it just got docketed at 3:50 --

MR. WISEMAN:  People are back at the office.  We have thousands of folks behind us.

THE COURT:  Massive computer networking.

MR. ROBERTS:  Your Honor, could we take a quick recess?

THE COURT:  Sure.  Do you have a flight out?

THE WITNESS:  It just left.

THE COURT:  Well --

THE WITNESS:  But I'd like to use the bathroom, please.

THE COURT:  Yes, after you fasten your seat belt.

(Recess from 4:44 p.m. to 4:52 p.m.)

THE COURT:  The subpoena?

MR. ROBERTS:  Yes, Your Honor.  I have no problem

USCA5 2285

with the subpoena.

THE COURT:  Okay.  Can I have it back, and let me sign it.  Thanks.

Are you ready?

MR. ROBERTS:  Waiting for Ms. Booth, Your Honor.

THE COURT:  Okay.  Where did she go?

MR. ROBERTS:  We can address, we can address this real quickly.  We're going to offer the two videotapes that was of the interviews from Dr. Price and Dr. Moore as evidence.  And we're going to get those -- we'd like to offer them today so the Court can have an opportunity to view them if the Court desires to do so, since obviously witnesses are talking about what they've observed and their impressions.  So we've spoken to Mr. Wiseman about that.

THE COURT:  Now, these are your witnesses?

MR. ROBERTS:  These are Dr. Moore and Dr. Price --

THE COURT:  Okay.

MR. ROBERTS:  -- that interviewed Alfred Bourgeois at the prison.  I'm going to offer the entire disk.

THE COURT:  After all that dust up, they did it, with the --

MS. BOOTH:  Yes, they did, Your Honor.

THE COURT:  -- video?

MR. ROBERTS:  Yes, Your Honor, and --

THE COURT:  And it turned out to be helpful to you,

USCA5 2286

you're assuming.

MR. ROBERTS:  Well, we did note that it made a measurable impression on Dr. Price, who was before quite opposed, and perhaps has changed his opinion of this.  So at any rate, we would like to offer --

THE COURT:  Dr. Price has changed his opinion from what to what?

MR. ROBERTS:  If you recall, Dr. Price was the one that was opposed to having the videotaped interview.

THE COURT:  Yes.  I don't know why, though.  I never understood that.

MR. WISEMAN:  Yeah.

MR. ROBERTS:  They still did not do the WAIS-IV, so they did not, they didn't actually present the WAIS-IV because of copyright concerns.

THE COURT:  Okay.

MR. ROBERTS:  But since that's gone, then there's really nothing in there to be concerned about with the copyright side.  And so we were going to offer those today, and then additionally, we did have Dr. Estrada's deposition this morning.  It's been asked for expedited, so that's going to be presented to you, I believe, next week.

THE COURT:  What did he have to say?

MR. WISEMAN:  Oh, very helpful to the Defense.

THE COURT:  To you?

USCA5 2287

MR. WISEMAN:  Absolutely, yeah.  That's not just my opinion.  That's a fact.

THE COURT:  Ms. Booth is not in agreement.

MS. BOOTH:  I am shocked.  He said the man was of above average intelligence, was not retarded, and was a violent man.

THE COURT:  Well --

MS. BOOTH:  There we go.  I thought it went well for the United States.

THE COURT:  Okay.  There you have it.

MR. WISEMAN:  Well, I guess that's why Your Honor is in the big chair there, because you get to decide what's helpful and to whom.

Regarding the Government's videos, I have no objection to them being offered out of turn.  I would just -- and I know the Court will do this --

THE COURT:  Oh, Mr. Bourgeois, are you still on the phone?

THE DEFENDANT:  Yes, ma'am.

MR. WISEMAN:  I would ask the Court, if you're going to watch them before --

THE COURT:  Tell me.

MR. WISEMAN:  -- our case is complete, that you obviously keep an open mind.

THE COURT:  Would you rather just, that I just saw

USCA5 2288

them in the case?

MR. WISEMAN:  Well, I would prefer that you hold off watching them until our witnesses have testified about our view of them.

THE COURT:  Okay.

MR. WISEMAN:  Otherwise you're seeing sort of raw data without explanation.  And we have some things we want to point out about them.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  You think you just want to show them as you're going along?

MR. WISEMAN:  Well, we're going to have our own clips that we're going to want to show.  I have no problem at all, obviously if the Court wants to watch all 16 hours of them. I've watched them myself.

THE COURT:  I need to watch 16 hours of them?

MR. ROBERTS:  It's --

THE COURT:  Well, I'll tell you what, probably the only time I have to do that -- because I've got to --

TELEPHONE RECORDING:  If you'd like to make a call, please hang up and try again.

THE COURT:  Okay.

TELEPHONE RECORDING:  If you need help, hang up and then dial your operator.  If you'd like to make a call, please

USCA5 2289

hang up and try again.  If you need help, hang up and then dial your --

THE COURT:  Could you -- thank you.

THE CLERK:  You want me to try again?

THE COURT:  Yeah, keep trying.

MR. ROBERTS:  We must have lost him.

THE COURT:  We lost him.  Sorry.  But probably the only time I'm going to have to do that is on the weekends, because I've got a jury trial starting Monday.  And then I've got naturalization ceremonies all day Friday, and then we start Bourgeois the next Monday.

MR. WISEMAN:  Yeah, yeah.

THE COURT:  So if I promise not to be prejudiced or preconceived -- you know, the funny thing about being a fact finder is that I watched him, you know, for all these weeks that I had him in trial.

MR. WISEMAN:  Sure.

THE COURT:  I had colloquies with him, so I, you know, I have some basis, too --

MR. WISEMAN:  Yeah.

THE COURT:  -- of coming up with an opinion.  I don't know if it's that good.  But I have to make the fact finding at some point.

MR. WISEMAN:  Yes.

THE COURT:  But I do want the benefit of all this

USCA5 2290

other information.

MR. WISEMAN:  Right.  And again, we have no opposition to the Court watching them.  We think you should watch them.  You know, there's certain aspects of them that we want to, you know --

THE COURT:  Spin your way, like they want to spin their way.

MR. WISEMAN:  I wasn't going to say spin.

THE COURT:  Sorry.

MR. WISEMAN:  I was going to say elucidate.

THE COURT:  Thank you.

MR. WISEMAN:  And you know, that we think we have some important points about.

THE COURT:  I don't think you all are like Richard Gere in, you know, Chicago, so --

MR. WISEMAN:  My point is made.  Thank you, Your Honor.

MS. BOOTH:  Your Honor, we're going to be asking to admit into evidence the different, the many disks, which we have them marked in our exhibit list as Government's Number 4, 5, 6, 7, 8 --

THE COURT:  Wait a minute.  4, 5, 6, 7, 8 --

MS. BOOTH:  -- 6, 7, 8, 9, 10, 11, 12 and 13 are the videos for the interview conducted by Dr. Price.  And then --

THE COURT:  Any objection?

USCA5 2291

MR. WISEMAN:  No objection.

THE COURT:  Okay.  4 through 13, Government's Exhibit, are admitted.  We're still trying to get Mr. Bourgeois back.  Is this okay to do this preliminarily?

MR. WISEMAN:  Sure, sure, sure.

THE COURT:  Okay.

MS. BOOTH:  And then Government's 19, 20, 21 and 22, which are the video disks for Dr. Moore's interview.

THE COURT:  Any objection?

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Okay.  19, 20, 21 and 22 are admitted. Would you give them to Ms. Scotch at some point?

MS. BOOTH:  They're being brought over right now.

THE COURT:  Okay.  Now, do you want to examine --

MR. ROBERTS:  Yes, Your Honor, we do have some questions.

THE COURT:  Okay.  Go ahead.

MR. ROBERTS:  Would you like us to wait for Mr. Bourgeois?

THE COURT:  Oh, good point.  We'll wait for Mr. Bourgeois.  Sorry.

(PAUSE.)

THE COURT:  You know, Bureau of Prisons has Mr. Bourgeois on the line in our main line.  Would you go out and -- Mr. Cutler, would you mind telling Ms. Scotch that he's

USCA5 2292

on one of these lines?

(PAUSE.)

(Court and Clerk conferring off the record.)

THE COURT:  Are you there?

THE DEFENDANT:  (Inaudible.)

THE COURT:  Can you speak up, Mr. Bourgeois?  Are you there?

MR. VILLARREAL:  He's here.

THE DEFENDANT:  Yeah.

THE COURT:  Okay.

THE DEFENDANT:  That's kind of where we got cut off. Right after you asked me if I was on the telephone, it got cut off.

THE CLERK:  We got cut off.

THE COURT:  Okay.  Now we're back.

THE DEFENDANT:  Sorry.  I'm sorry about that.

THE COURT:  That's quite all right.  Now you're back. Are you ready?

THE DEFENDANT:  Yes, ma'am.

MR. ROBERTS:  Yes, Your Honor.  I was going to ask for the exhibits, Your Honor, to be able to reference a couple of them.

THE COURT:  We don't have the CDs?

MR. ROBERTS:  No, we don't, Your Honor.

THE COURT:  Oh, we have these other six right here.

USCA5 2293

MR. ROBERTS:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Gelbort, as I said before, we're not really, we're not challenging your expertise in this area, but in reviewing through your --

THE COURT:  He's going to say they're challenging your conclusions.  That would be my guess.

THE WITNESS:  I'm on board.

BY MR. ROBERTS:

Q.   What I do have some questions about is through your CV, it appears that maybe it's not completely up to date.  And so I was kind of curious about such things as:  Are you still the Vice Chair of the Brain Injury Association of Illinois?  You've been Vice Chair since 1994?

A.   After, I think it was nine, ten or eleven years, I stepped down as Vice Chair, and now I'm Emeritus or on the Honorary Board.  So I'm still on the board of --

THE COURT:  Where do you live?

THE WITNESS:  In Evanston, outside of Chicago.

THE COURT:  I know where that is.  I was there a couple of months ago.

BY MR. ROBERTS:

Q.   And so there's some other things that are in here that maybe are kind of dated in the same way through your CV?

USCA5 2294

A.   I don't think there's too much there that -- that, I would agree, is dated, and it doesn't have an end point on that. That's an error.  I haven't been adding presentations and the like that I've done, for several, several years.

Q.   Okay.  Are you still a consultant at Cornerstone Services?

A.   Yes, I am.

Q.   And you still have a private practice?

A.   Yes, I do.

Q.   And then if I understood right, from 2006, you've actually testified in 11 cases and done approximately 24 depositions?

A.   I would be guessing, but I think my office did put together some statistics and forwarded them to someone.  So I don't know the numbers, but --

THE COURT:  Are you going to ask him if the majority of his income comes from testifying?

MR. ROBERTS:  Not necessarily, Your Honor, but we can ask that question.

BY MR. ROBERTS:

Q.   Does the majority of your income come from testifying?

A.   Four to six percent of my time and income seems to come from legal cases, criminal and civil.  If you followed me around all week, you'd see me in my office or at the hospital pretty much every day, five or six days a week.  The bulk of the work I do is clinical work.  I'm a clinician.  I'm not an academician.  I'm not a researcher.  I see patients on referral

USCA5 2295

from neurosurgeons, neurologists, physiatrists, psychiatrists, pediatricians, internists, gerontologists.  I do evaluations and then get them reports as to what's right or wrong with their patients and what they should do about it.  That's how I make my living.

Q.    How did you get into the forensics business?

A.    In Houston, when I was Director, I got kind of popular among some of the personal injury attorneys, I think because of my status.  The job title I had was Director of Psychology and Neuropsychology at TIRR.  And in Chicago, my ex-partner had a friend who would do some criminal work and had the probably bad judgment to get into a staring contest with the Judge and wasn't welcomed back in court.  My ex-partner didn't want to do any criminal work, and I was new into the practice, so I got kind of pushed up there.  And a couple --

Q.    So you started doing criminal work on the forensics side in what year?

A.    1990.

Q.    1990.  And during the time that you have been hired in a criminal context, all that work has been on the defense side?

A.    I think it's fair to characterize that 98 percent has been for the defense.  There have been times when State's attorneys or Government attorneys have asked me to look at a case, and I've given them my opinions or I've told them what I see that's right or wrong.  I've been asked by Judges to do some

USCA5 2296

evaluations as well.  But by and large, most of the work has been done for defense attorneys.

Q.   So this list of cases that you provided to us, you said that was put together by someone in your office?  It wasn't put together by you?

A.   I believe that my assistant went back through my day planner and pulled out cases.  I think the request was for cases I've either testified in in court or by deposition, and I think she just went back through for the past couple of years and pulled out dates where I had been providing testimony.  Some of those I'm pretty sure are going to be civil cases as well.  In fact, probably it's the majority, but I couldn't tell you.

Q.   Okay.  And earlier in your testimony, you were talking a little bit about your background.  You mentioned about running a development disabilities clinic.  Were you the actual one running the clinic?

A.   I didn't do the administrative work.  But in terms of doing the evaluations, I was the one, you know, I was doing all the clinical work from the psychological perspective.  I was supervised by my dissertation adviser, Roger Green, at the time.  So I was charged with doing it, and he would oversee what I was doing.

Q.   Wasn't there a professor who was a psychologist that was actually running the clinic, and you were working for him?

USCA5 2297

A.   I think it's best characterized that I was doing it.  He would -- I would bring back cases to him in his office and discuss them as we were going on.  When we first started, he was there with me.  And after a couple, three months, he said, "You do it.  You're able to do this."  It was a team.  We had, I think, an occupational therapist and speech pathologist.  We would do an evaluation of children, some under a year of age. We would put together the evaluation, talk about it.  I'd take my part back and discuss it with him.  He'd say, "Yep," or "Add this to it," or --

Q.   And for the period of time, you were actually having someone else do the evaluations, and you were then reviewing the information?

A.   Not in the developmental disability clinic.  I was doing the neuropsychs.

Q.   When you testified in 1995 in a case out in Pennsylvania, you actually had testified that someone else was doing the evaluations, and then you were reviewing them.  Did you change that process at some time?

A.   You'd have to show me that testimony, make sure we're talking about the same thing.  I certainly don't recall testimony from 1995.

Q.   Do you recall a case of Harrod versus Ruoff?

A.   No.

Q.   Dr. Paul Ruoff?

USCA5 2298

THE COURT: Why don't you just show him.

MR. ROBERTS: Yes, Your Honor.

MR. WISEMAN: Your Honor, I'm not sure what document he's showing him. Could I see a copy?

THE COURT: Yes, show it -- look at it, Mr. Wiseman.

MR. WISEMAN: Thank you.

THE COURT: And then let him show it to him.

(PAUSE.)

MR. ROBERTS: It's just a minor point, Your Honor. I'm just going to move on.

BY MR. ROBERTS:

Q. I was just trying to determine really when he -- when you started, Doctor. If you could just tell us when you started doing the actual evaluations of individuals you were seeing in a criminal context.

A. As I said, 1990, I think, was the first case. It was a 29-year-old young man who got into trouble for sexually accosting his six, seven or eight-year-old stepsister.

THE COURT: His what?

THE WITNESS: Six, seven or eight. I can't remember how young she was, but she was under ten, stepsister.

THE COURT: Okay. How old was he?

THE WITNESS: He was 29, I believe.

THE COURT: Okay.

BY MR. ROBERTS:

USCA5 2299

Q.   And in the cases that you've been a part of in a criminal context, have you ever found anyone that you've evaluated to have actually been malingering?

A.   Yes.

Q.   And what case was that?

A.   I don't recall the names.  It's been more than one.  It's been several.  I don't recall the names.

THE COURT:  Well, would it be safe to assume that if you do most of your work for criminal Defendants, that they wouldn't be calling you to testify in those?

THE WITNESS:  Oh, they absolutely didn't call me to testify.

THE COURT:  In the malingering ones.

THE WITNESS:  Absolutely not.

THE COURT:  Okay.  So I think that's what you're -- that's what you need to know.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  That he never came and testified on behalf of a Defendant that this person was malingering.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  So now the next question would be the percentages, malingerers versus nonmalingerers.

THE WITNESS:  The number of malingerers, or the number of people I find that are malingering --

THE COURT:  In the criminal context.

USCA5 2300

THE WITNESS:  Right.  I would say the percentage is actually fairly small.  There are many people who don't put forth good effort.  And there are those that are overtly malingering, where the data, you look at it and the pattern is all screwed up, it doesn't make sense compared with what we know about how the brain functions --

THE COURT:  Okay.

THE WITNESS:  -- when you're working or not working.  There are more people who don't seem to have put forth as good an effort as they can.  You know, they kind of lighten up.  And in fact, I typically explain to patients in this setting that if you don't put forth good effort, you may have a problem and we'll never know --

THE COURT:  Okay.

THE WITNESS:  -- or we won't be able to talk about it.

THE COURT:  Well, we're talking about criminal Defendants that are going to trial --

THE WITNESS:  Correct.

THE COURT:  -- or after post-conviction problems.  So would it be safe to say then -- I assume this is what you're trying to get at, that the majority of people you examine you do not believe are malingering.

THE WITNESS:  The majority of people, when I examine them, based on my administration of the tests --

USCA5 2301

THE COURT:  Sure.

THE WITNESS:  -- as well as encouraging them to do what they can, as best as they can, if they want to try to, in effect, help themselves, that not putting forth good effort will ruin the data, and I will have nothing to say.

THE COURT:  Okay.

THE WITNESS:  So based on that set of assumptions and the way I administer the tests, I would say, in my experience, I've had 5 percent, perhaps 4 percent, who were overtly malingering --

THE COURT:  Okay.

THE WITNESS:  -- where just like this person didn't listen at all.

THE COURT:  Okay.

THE WITNESS:  And then there's probably another 10, 15 percent who don't put forth as good an effort as they need to, and the data becomes kind of confused and you can't do anything with it.

THE COURT:  Got it.  That's what you wanted to know?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   Have you ever heard of an article that's entitled Identification of Feigned Mental Retardation Using the New

USCA5 2302

Generation of Malingering Detection Instruments, Preliminary

Findings?  Have you heard of that?

A.    It's not ringing any bells.

Q.    Do you know of the, a person named Lilly, G-R-A-U-E?  Have

you heard of that name?

A.    G-R-A-U-E?

        THE COURT:  Wouldn't it just be better to show it to

him?

        MR. ROBERTS:  Yes, Your Honor.

        THE COURT:  And let him look at it and see if he's

familiar with it.

        MR. ROBERTS:  May I approach the witness?

        THE COURT:  What's the date of the article?

        MR. ROBERTS:  The date of the article is 2007.

        THE COURT:  Okay.  Do you want to look at it first,

Mr. Wiseman?

        MR. WISEMAN:  Yeah, I'd like to see a copy.  I'd

actually like to have a copy, if it's going to be used.

        THE COURT:  Do you have a copy?

        MR. ROBERTS:  We'll get a copy for him, Your Honor.

        THE COURT:  Don't mark on it.

    (Counsel conferring off the record.)

        MR. ROBERTS:  Your Honor, this one is marked on.

        THE COURT:  Who marked on it?

        MR. ROBERTS:  Dr. Moore.

USCA5 2303

THE COURT:  Dr. Moore?

MR. ROBERTS:  Highlighted, Your Honor.  He has a highlight on page, Page 932.

THE COURT:  It's going to make it difficult to copy.

MR. WISEMAN:  I don't have a problem with the -- it's just the highlight.

THE COURT:  If you get the citations, you ought to be able to find it.

MR. WISEMAN:  Yeah, we'll be fine.

THE COURT:  Where was it published?

MR. ROBERTS:  It was published in 2007.

THE COURT:  Where?

MR. ROBERTS:  It was in --

THE COURT:  Readers Digest?

MR. ROBERTS:  Psychology Press, Your Honor.

THE COURT:  Okay.  Have you heard of Psychology Press?

THE WITNESS:  I've heard of it.

THE COURT:  And?

THE WITNESS:  It's not --

THE COURT:  It's not top drawer or anything?

THE WITNESS:  I would tend to agree with that.  It's not citeful or --

THE COURT:  Okay.  I'm just guessing, by your expression.  Okay.

USCA5 2304

MR. ROBERTS:  I'll show him the article, Your Honor.

(PAUSE.)

BY MR. ROBERTS:

Q.   Doctor, I'm going to refer you to one particular paragraph and ask you if you would agree with this statement.

A.   Forgive me, but procedurally, unless I at least look at the abstract, to take it completely out of context, I mean, you can ask me and I'll say, "I don't know," because that's --

THE COURT:  Is there an abstract printed at the top?

THE WITNESS:  I'm reading the abstract.

THE COURT:  Okay.

THE WITNESS:  I'm halfway through it.

THE COURT:  Okay.  Take all the time you want.

THE WITNESS:  Thanks.

THE COURT:  You're going to be here for the night anyway.

(PAUSE.)

THE COURT:  Is there any way he can get out tonight? Do you have somebody trying to rebook him?

MR. WISEMAN:  Yeah, we tried.  And unfortunately, the last flight out is not that late.  We're here for the night as well.

THE COURT:  Okay.

MR. WISEMAN:  Although we had planned to leave tonight initially.  And I am missing a baseball game tomorrow.

USCA5 2305

I was going to go watch my New York Mets in New York City.

THE COURT:  That's no big loss.

MR. WISEMAN:  Oh, my.

MR. ROBERTS:  If we're airing out our differences, I had to call in to my colonel and ask permission to show up late for military duty tomorrow morning.

THE COURT:  Oh, my.

MS. BOOTH:  Okay.  It's my husband's birthday, and --

THE COURT:  Is he home?

MS. BOOTH:  -- he's home from Afghanistan.  He's only been here 39 days in two years.

THE COURT:  How long is he here this time?

MS. BOOTH:  He's going to be home for 27 days.

THE COURT:  Congratulations.

MS. BOOTH:  Thank you.

THE COURT:  Anybody else want to chime in?

THE WITNESS:  I'm missing High Holidays with my family in Toronto.  We went up to be with them.

THE COURT:  Oh, this is --

THE WITNESS:  Rosh Hashanah.

THE COURT:  -- Rosh Hashanah.

THE WITNESS:  Yeah.

THE COURT:  Sorry.

THE WITNESS:  It's okay.  They're annoyed, but I said this comes first.

USCA5 2306

(PAUSE.)

THE WITNESS:  Forgive me, but just procedurally, this is -- Psychology Press is the publisher.  This is actually from the Clinical Neuropsychologist, which is a decent referee journal.

THE COURT:  Oh, that is a good --

THE WITNESS:  Yeah.

MR. ROBERTS:  I'm certainly not an expert in this area.

THE COURT:  There you go, Mr. Roberts.

MR. ROBERTS:  And unfortunately, Dr. Moore did have to leave, so I don't have his expertise to rely upon.  I apologize.

THE WITNESS:  I'll do my best to help you.  I'm trying to be impartial.

So you wanted me to look at one particular --

BY MR. ROBERTS:

Q.   Actually, yes, I think it was Page 932, or 937.  And it's actually highlighted in yellow, and it is with regard to the Malingered Neurocognitive Deficit Percentage or Base Rate.

A.   Did you -- I'm sorry?  Which page did you say?

MR. ROBERTS:  Your Honor, may I approach one more time?

THE COURT:  Sure.

THE WITNESS:  Okay.  Thank you.

USCA5 2307

BY MR. ROBERTS:

Q.   You see where they said their Base Rate Malingered Neurocognitive Deficit area is 41 percent?

A.   Forgive me, but I'm going to read the whole paragraph, rather than just the one line.

Q.   Very well.

A.   And I'd prefer to read the whole article.

THE COURT:  Do you want to read the whole article?

THE WITNESS:  That's the proper way to do it.

THE COURT:  Why don't you do that.

(PAUSE.)

THE COURT:  Ms. Booth, you had a sealed motion for continuance?

MS. BOOTH:  Yes, ma'am.

THE COURT:  I just granted it.

MS. BOOTH:  Great, great.  And my FBI Agent has been sent to Washington on that.

THE COURT:  Okay.

(PAUSE.)

THE WITNESS:  Are you planning to ask questions just pertaining to that one spot?  I can -- there's a study here which, if you're not going to ask about the results, I won't waste anyone's time and read.

THE COURT:  Well, you can -- what happens is this, he asks the questions, you answer them.  You can confer with

USCA5 2308

Mr. Wiseman, and he can clear everything up that you really want to say.

THE WITNESS:  I'm just, if he's asking about what's on this page, I don't need to spend our time and read the study and the results of the study.  If he's asking about -- what he pointed to thus far is just some background --

THE COURT:  You can read the whole page.  You can read the whole article.  You decide how you want to do it.  And if --

MR. WISEMAN:  Why don't we see what the questions are, Dr. Gelbort, and if you can answer them, fine; if not, you can keep reading.

THE WITNESS:  Well, I won't be shy, and if you ask a question that's beyond what I've read, I'll say I need to go on reading then, if that's okay.

THE COURT:  Perfect.

BY MR. ROBERTS:

Q.   My question is not going to involve that chart, and so if you could just tell us, that article that you just read indicates that there's a 41 percent base rate in malingering; is that correct, at least with regard to the part that I referred to?

A.   Well, it says 41 percent, but it's talking about cases -- if you go up above, the 41 percent is referring to cases that have to do with "Undergoing neuropsychological testing," I'm

USCA5 2309

quoting, "in compensation-seeking circumstances."  So it's referring to, I believe, civil cases here.  It's not necessarily applicable, it doesn't necessarily generalize to criminal cases.

Q.   The --

A.   And for what it's worth, the methodology has not been elucidated.  Several other things that they talked about there, they're generalizing from -- they're not generalizing.  They're presenting bits and pieces of data, and one has to be careful not to generalize beyond what they're talking about, which is I think what -- I'm not going to suggest that you're doing that, but you're taking information pertinent to a civil case, a car accident, for example, or someone saying, "I can't think as well, I can't work as well, so you owe me for my lost wages," versus someone who is in a legal proceeding, but different circumstances.

Q.   All right.  Well, I'm not going to get into an argument with you about the --

A.   I won't get into an argument with you at all.

Q.   -- 41 percent, about the -- I'm not going to get into an argument with you about the 41 percent, how it applies.  But the point that they were making is that there is a higher percentage of malingering in general on these kind of tests.  And so I would ask you --

A.   Excuse me.  I don't understand.  There's a higher

USCA5 2310

percentage in general on these tests, compared with what?

Q.   The 4 to 6 percent that you just stated from the witness

stand.

          THE COURT:  Actually, he -- well --

          THE WITNESS:  You're comparing apples and oranges,

and I can explain why, if you want to know.

BY MR. ROBERTS:

Q.   Okay.  Well, let me just ask you this.  You've mentioned

several times that effort is an important part of evaluating

how someone's taking a test.  Is that accurate?

A.   Absolutely.  And it says that in this article as well.

Sure.

Q.   Is malingering, to you, is it an all or nothing, where

someone is -- is it, in your concept, is it that someone is

malingering all the time on, all the way through the test, or

is it possible that they're just malingering at certain points?

A.   It's not even that it's all or nothing at certain times or

not at other times, but it's the level of investment a person

puts in.  I've already explained that.  I've had people, I said

3, 4, 5 percent, I believe, or 4 or 5 percent that I've tested

where they were just out and out malingering the whole time.

Then there's others, I said 10 to 15 percent, I believe, if you

were listening, who are not putting forth maximal effort.  And

hence, there are data -- there may be something wrong with

them, but the data is not interpretable.

USCA5 2311

Q.   Okay.  You said that you did not use contrived tests and that --

THE COURT:  Does somebody have on a phone that's on, not off?

MS. BOOTH:  Judge, I tried to turn it off, because I went to call Debbie, and I couldn't get it to go off, so I made the noise putting it off again.

THE COURT:  It's off?

MS. BOOTH:  I think it's off.  I've been pressing --

THE COURT:  Ms. Hohle, would you help her?  She's challenged.

MS. BOOTH:  I've been pressing it and pressing it, and it won't go off.

THE COURT:  I would fine you, but I'm too tired.

BY MR. ROBERTS:

Q.   You said you don't use contrived tests?

A.   I prefer not to.

Q.   And these are -- so what tests did you actually use to evaluate whether Alfred Bourgeois was malingering or not?

A.   You want to define tests?

Q.   I'm asking you what did you use at all, whether tests or not.

A.   Okay, what mechanisms.  Tests, I didn't use any formal tests.  Those are the contrived tests.  I did use the tried and true, as I explained before, way that this has been done since

USCA5 2312

pretty much 1950, when neuropsychologists were working with war vets, where you look at the internal pattern, as well as whether or not the data makes sense based on the person's presentation and their history.  So, and I've already given examples of that.

When you look at the category tests, where on the easy tests, where people generally get nothing wrong, only patients don't know that, he got nothing wrong.  On the test which is most difficult, he was absolutely at chance level.  He didn't get it.  And rather than doing better or worse than chance, he performed at chance.

When you look at the test data across time, from Dr. Weiner's evaluation to mine, if you laid it out and graphed it and laid one graph over the other, the similarities are striking.  You could almost call it textbook evidence of someone who's putting forth reasonable effort, because over a two to three-year period, the strengths are still the strengths, the weaknesses are still the weaknesses.

For example, on Dr. Weiner's WRAT-3, he found high school level reading, high school level spelling, sixth grade level arithmetic.  Several years later, I find high school level reading, high school level spelling, fifth grade level arithmetic.  The difference is insignificant.  It's shocking how consistent --

Q.    Let me stop you there for just a minute, because you bring

USCA5 2313

up a good point.

A.    Sure.

Q.    And that is --

       MR. WISEMAN:  Well, Your Honor, I'm going to object if the witness was in the middle of his answer or finishing his answer.  I thought he was in the middle of, or completing his answer.

       MR. ROBERTS:  I just -- Your Honor, it was fairly narrative, and I just, I asked him a pretty simple question, so I --

       THE COURT:  Well, do you want to object to the non --

       MR. ROBERTS:  I will object that it was nonresponsive, Your Honor.

       THE COURT:  Okay.  That's sustained.  Now you can cut it off, and you can have him testify any way you want to.  Okay?  Because only the questioner can object to nonresponsiveness.  It's true.

       MR. WISEMAN:  Okay.

       THE COURT:  The nonquestioner objects to narrative, which you're not objecting to.

       MR. WISEMAN:  Right.

       THE COURT:  He can object to nonresponsiveness.

       MR. WISEMAN:  Okay.

BY MR. ROBERTS:

Q.    Dr. Gelbort, there is a -- I'll show you the first page

USCA5 2314

from Exhibit P-16, so that you know, that's the test that you gave to Alfred Bourgeois. And then I'm going to put back up here the Trail Test that you indicated where he missed one. You gave him this test in 2007. Is that correct?

A.   Yes.

Q.   That's a fairly simple test, is it not?

A.   I describe it as a simple test, yes.

Q.   Okay. Now, for the record, that's Page 17 of this exhibit. And you're aware that Dr. Weiner gave him the WAIS-R in 2004, and it contained this same test. Correct?

A.   I don't know what you mean by the same test.

Q.   Okay. Sorry. The Trail Making Test. And I'm showing you what -- let me show you the front, first page, Exhibit P-31, the test that Dr. Weiner gave to Alfred Bourgeois in 2004, and Page 14 of that test is the exact same Trail Test. Is that correct?

A.   That, for what it's worth, that's not part of the WAIS, either the WAIS-R or the WAIS-III. But it's the same Trail Making Test. I trust that there's been a problem with the copying and that 14 has been, and as well as 12, has been cut off. But yes, it should be the same test.

Q.   Okay. And at the top, it indicates he had zero that he missed. Is that correct?

A.   That's right.

Q.   That's a simple test that he took in 2004. And whether

it's part of the WAIS-IV or WAIS-III, it's part of the exhibit. And this was a test that he was given in 2004 and again when you gave it to him in 2007. And this is an example of a test that he had already taken once?

A.   Yes.

Q.   And then he missed a simple one line, and a few minutes ago in your direct testimony, you mentioned how the one mistake was rather important to you in analyzing his testing ability.

A.   I think if you go back and review what I said, that one instance, I made a point of it, I said I normally like to see three instances of something before I draw a conclusion, but the single instance is something that causes me to raise an eye brow and to look for that type of behavior or be concerned about that type of behavior.

Q.   But something that simple, where someone misses, that's possibly, that could possibly be someone malingering, could it not?

        MR. WISEMAN:  Objection to possible, Your Honor. We're not dealing in possibilities here.  Anything's possible, of course.

        THE COURT:  Overruled.

        THE WITNESS:  Any possibility does exist.  Someone who's malingering can miss one or not miss one.  That in and of itself doesn't indicate malingering or not malingering.

BY MR. ROBERTS:

USCA5 2316

Q.    Thank you.  Would someone's truthfulness have any impact on your ability to ascertain whether they were malingering?

A.    Whether or not they're being truthful?

Q.    Yes, being truthful --

A.    I mean, malingering -- malingering, by definition, is someone who's not, in a sense, being truthful.

Q.    So when you're evaluating answers to questions, whether it's on the test or whether it's, whether you're asking them direct questions to assess them, make an assessment of them, wouldn't truthfulness be important?

A.    Truthfulness is always important, of course.

Q.    You, in your declaration, you state that you reviewed background material, and you mentioned Dr. Weiner's report. How much of an emphasis did you place on Dr. Weiner's report?

A.    It was a source of data that I reviewed and looked at and thought about in the course of making my own opinions.

Q.    Would you have given a WAIS-R in 2004?

A.    Would I have given a WAIS-R in 2004?

Q.    Yes.

A.    Possibly.

Q.    Even though it was outdated?

A.    I said possibly.

Q.    It's not considered malpractice to give an outdated test?

A.    It's not considered malpractice, no.

Q.    So you would have possibly given a WAIS-R in 2004?

USCA5 2317

A.   For the third time, possibly I might have.  I probably would have chosen not to, but I possibly could have.  It just depends on the circumstances.

Q.   Were you aware that in Dr. Weiner's report that there, that there was an inaccurate fact from Alfred Bourgeois that Dr. Weiner relied upon when he started talking about the head injury?

A.   I believe that there were some things described or reported that were inaccurate, yes.

Q.   Okay.  Earlier in your direct examination, you mention the fact that there's a difference between someone that might be in a concussion, have a concussion from an injury, you were trying to, it sounded like you were trying to distinguish or say that sometimes people can make a mistake as to whether or not they have a concussion.  It sounds like -- were you aware that Alfred Bourgeois had reported to Dr. Weiner that in 1984 he had a coma lasting one to two months?

A.   I think I read that somewhere.

        THE COURT:  Who?

        MR. ROBERTS:  That Alfred Bourgeois reported to Dr. Weiner before he took -- while Dr. Weiner was doing his report --

        THE COURT:  Okay.

        MR. ROBERTS:  -- that he had had a coma as a result of an accident in 1984.

USCA5 2318

BY MR. ROBERTS:

Q.   And that played a significant -- that appears to, at least in Dr. Weiner's report, that appears to play a role in his determination that there was a brain injury, does it not?

A.   You'd have to ask Dr. Weiner.

Q.   Okay.  Well, do you recall where Dr. Weiner thought that there was a head injury?  Do you recall if he thought it was frontal or if it was in some other area of the brain?

A.   I don't know that he -- I didn't read it trying to figure -- I can tell you that he was of the opinion that there was more posterior impairment than anterior.  I don't know if he made a correlation between those.  I think he did suggest that one of the proximate causes of his cognitive dysfunction was from the injury he suffered in 1984.

Q.   And were you aware that when confronted with the medical records of that accident, that there was no coma within the medical records?

A.   Who was confronted with them?

Q.   I was asking you if you were aware that when Dr. --

          THE COURT:  Actually, apparently the medical records did not reflect he had a coma.

          THE WITNESS:  Correct.

          THE COURT:  Okay.

          THE WITNESS:  Or well, what the medical records reflect is that when he was admitted to the hospital, that he

USCA5 2319

was alert.  That's what they described in -- it wasn't the EMT.
I think it was the admission note.  For all we know, I suspect
not, but for all we know, he certainly could have had a loss of
consciousness at the scene and recovered.  That happens quite
often.  But in any event, unless it took a long time to
transport, which I doubt, he didn't have a loss of
consciousness lasting more than, I guess an hour.  And probably
didn't have that.

THE COURT:  Well, he didn't have a two-month coma?

THE WITNESS:  No, he did not.

THE COURT:  Okay.

THE WITNESS:  Absolutely not.  In fact, he probably
didn't have a coma at all.  That normally would be reported.

BY MR. ROBERTS:

Q.   Doctor, now, I want to go back for a minute to your
discussion about the conclusions about Alfred Bourgeois'
possible brain -- would you call it damage, brain damage, or
just impairment?

A.   I talked about dysfunction or impairment.

Q.   And you say that it was in the frontal lobe?

A.   The tests that show the most consistent pattern of
suppression or poor performance are things that are typically
attributed to frontal lobe, or largely to frontal lobe
functioning.

Q.   So you use the word "attributed."  So is it correct in

USCA5 2320

layman's terms to say you observe somebody performing a certain way, whether it's in daily activities or taking these tests that you generate, and if they perform a certain way or act a certain way, you then attribute that to some form of brain injury or brain impairment?

A.   Well, you've mixed the metaphors.  When, for example, if you see someone who is having word salad, who is expressing themselves and the words are coming out in a strange way, there's paraphasic errors, paraphasic distortions, you can't understand what they're saying and they're mixing up their words, and you come up with a hypothesis.

It could be a form of schizophrenia.  That would explain that.  That's what you see in some people with schizophrenia. It could be a Wernicke-Korsakoff psychosis, which is an alcohol related problem.  It could be a Wernicke's aphasia, which is a post-central result typically of a stroke.

And then you go ahead and say there is a pattern of dysfunction or deficits, the behavioral presentation, and you try to figure out why that is occurring.  And that's what I do for a living.  I get asked by doctors, you know, what are the problems and what are those correlated with and what do we do about them.

If you have someone who's having trouble getting their words out, now it's again possibly an aphasic disorder, it could be a major depression.  You go through the differential,

USCA5 2321

and you do testing.  This is how diagnosis works.

So that's all we actually did with Mr. Bourgeois is, you know, they ask a question, "Is there something wrong?"  We go about testing to see, front to back, side to side, top to bottom, basic abilities --

THE COURT:  So you assume something's wrong before you --

THE WITNESS:  No.  Oh, no.

THE COURT:  Okay.

THE WITNESS:  The question is, is there something wrong?

THE COURT:  Oh, okay.  Thank you.

THE WITNESS:  And the first part of the decision tree is, did the --

BY MR. ROBERTS:

Q.   But you do reach a conclusion?

A.   Pardon me?

Q.   You do reach a conclusion, based on what you believe is happening inside the brain?

A.   No, based on the data, not based on what you assume is happening inside the brain.  You keep turning it around.

Q.   Well, you know that --

THE COURT:  Yeah, but I got it, and I'm the fact finder.

THE WITNESS:  But he keeps asking the questions.

USCA5 2322

THE COURT:  It doesn't matter.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q.   You are aware that Dr. Estrada has written a report where he has found that Alfred Bourgeois suffers from borderline personality disorder.  Correct?

A.   I think I saw that, yes.

THE COURT:  I think he said the same thing actually. Didn't you say that?

THE WITNESS:  That -- I brought up that borderline -- you were talking about antisocial --

THE COURT:  Right.

THE WITNESS:  -- or sociopathy, and I said borderline is probably more central and first to consider before --

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. ROBERTS:

Q.   And you described this frontal lobe impairment as causing someone to not be able to stop their behavior or hard to put the brakes on, to use your words.

A.   I said frontal lobe impairment can give rise to problems, and I said, you know, using the kind of crass terms, the gas pedal or the brake pedal of behavior, that initiation as well as inhibition is largely rooted in frontal lobe functioning. And when people have impairments in frontal lobe function,

USCA5 2323

oftentimes it shows up as difficulty initiating or inhibiting behaviors.

I also said that the people who have trouble initiating, the couch potatoes, tend not to come into court, because they're sitting at home on the couch.  The people who have trouble inhibiting or who are slow to inhibit, who have disinhibition syndromes or frontal lobe syndromes, seem to be over-represented in court.  And that's what the research shows, too.

Q.   And, but that same, the same conduct, where they're, maybe they're in a frustrated situation and they can't stop themselves and they move into a violent conduct, that can also be explained by a borderline personality disorder, could it not?

A.   I think I gave that example, too.  I put up two fingers saying you can have similar behaviors coming from very different quadrants, and that the personality of the person, as well as the cognition interact, and that in fact one can exacerbate the other.

It's like the gyroscope winding out of control.  When you have cognitive difficulties, it's harder to deal with personality issues.  If you have personality issues, it's harder to deal with cognitive dysfunction.

I brought in there, too, I think it's important the support of family can keep these people out of harm's way.  In

USCA5 2324

fact, when we see people in court, more often than not, it's the confluence of not having enough help from the family, having a cognitive problem, having some personality issues, and then possibly drugs and alcohol.  And that's the common person who ends up in the courtroom.

Q.   Are you -- have you often been hired by defense to come in and evaluate a Defendant before they go into trial?

A.   Often?  Not in my --

Q.   I'm sorry, maybe that's a bad word.  Have you been hired by a defense team to come in and evaluate a particular person accused of a crime before a trial occurs?

A.   I've been asked at the time of original trial to come in and evaluate someone and say, you know, essentially, are there cognitive deficits, and if there are, what are they, and how do they impact the person's behavior?  That's happened, yes.

Q.   And when you give an opinion to the defense attorney, do you expect the defense attorney to rely upon your opinion?

A.   I don't know that I would expect them to rely on it.  I do hope that they listen to it and allow me to educate them and ask enough questions so that they know what they have, from a psychological or neuropsychological perspective, and I expect that they make decisions.  I mean frankly, a third to half the cases I do evaluations, the attorneys say that's not going to help us, and we're not interested, or we're not going to use that information.  That's not uncommon at all.

USCA5 2325

Q.   If it doesn't help them, they're not going to use it?

A.   If it doesn't contribute the way they say it, to their legal defense, then they say, "Thank you," and that's the end of our association.

Q.   And you are -- did you get a chance, you said that you reviewed a lot of the evidence and information in this case. Is that right?  You reviewed a lot of documents and a lot of transcripts from this case?

A.   I certainly didn't say the evidence, or I forget the other word you just used.  I'm sorry.  I did read -- well, you've got the list.  It was presented first off.

Q.   Well, the list that you, that's been provided to us of what you actually reviewed includes day one through four of the trial testimony.  Did you read all that?

A.   I skimmed through that.

Q.   And it's the penalty phase, and it includes March 24th --

        THE COURT:  I'm sorry.  Did you read all that or skimmed?

        THE WITNESS:  Skimmed it.  I skimmed it.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q.   Did you read -- how many of Alfred Bourgeois' letters that he wrote that were very lengthy, how many of those did you read?

A.   More than I want to think about.  I probably read five or

USCA5 2326

six of them, and I skimmed most of the other ones.

Q.    Can you give us the context of one of those letters?

A.    There was one where he was telling his wife all the things he had done for her and all the things he had paid for and that things were going to change when he was back on the scene. That would be an example.

Q.    Well, that sounds kind of like a nice letter.  Did it end that way?

A.    I wouldn't characterize it like that.

Q.    Did the letter end that way, where it was going to be all nice and everything's fine when he gets back?

A.    I don't recall it ending with everything's going to be all nice when he gets back.  It was more --

Q.    Do you remember about how many pages that letter might have been?

A.    I don't recall offhand.

Q.    Do you remember how it was written?  Was it written, you know, very clearly and within the lines?  Or was it written all over the place or, can you give us some idea?

A.    I don't know what "all over the place" means.

Q.    Well, I'm just trying -- you tell me.  What did the letter look like?

A.    It looked like a letter, I would say, if I had to characterize the style, it was more of a bullet point or a listing of different --

USCA5 2327

THE COURT:  That was before she testified?

THE WITNESS:  I'm sorry, I don't recall the time frame on it.

THE COURT:  Well, it makes a difference, huge difference actually.

THE WITNESS:  I just remember it being --

THE COURT:  Okay.

THE WITNESS:  -- an upset letter.  He wanted things different.  He was unhappy -- the summary statement I made is that he was unhappy with the way the relationship had gone and he wanted to straighten things out and do things differently.

BY MR. ROBERTS:

Q.  There's a report that, it says in here that you reviewed, mental health report.  It says you reviewed, from a, it says Neurological Evaluation by Frank Bonikowski.  Who is that, and what was that document?

THE COURT:  Do you have all of these documents?

MR. ROBERTS:  We don't have this one, Your Honor. We're kind of interested in what this might be.

THE COURT:  Okay.

MR. WISEMAN:  It's Petitioner's 113 that was premarked.  You should have it, Mr. Roberts.

THE COURT:  Can you show it to him?  Have you got it?

THE WITNESS:  I think you still have my book that has that.

USCA5 2328

MR. WISEMAN: Oh, we took your book from you?

THE WITNESS: Well, you pulled out the page that had the school record. I don't think you brought --

THE COURT: Right, the school record, and didn't give it back.

THE WITNESS: It's Tab 56, I believe.

(PAUSE.)

THE COURT: Can I see it, too? Is that it?

MR. WISEMAN: Sure.

(PAUSE.)

MS. BOOTH: Your Honor, while we're waiting, is it all right if I tender to the Court the exhibits that we offered?

THE COURT: Right. If you would give them to, just lay them in front of Ms. Scotch.

MR. ROBERTS: Your Honor, would you like me to wait till you finish?

(PAUSE.)

THE COURT: Thank you. Did he ever have the MRI? Do you know?

MS. LARIN: Not that we are aware of. We don't know the answer to that.

THE COURT: When was the trial?

MR. ROBERTS: 2004, Your Honor.

THE COURT: So this was after -- this was before the

USCA5 2329

trial that Bonikowski saw him?

MR. ROBERTS:  Apparently, Your Honor.

MR. WISEMAN:  Your Honor, the history which will hopefully come out through a variety of witnesses is that Dr. Cunningham recommended neurological testing, including neuropsych testing.  Subsequent to that, Dr. Weiner was retained to do the testing, and Dr. Bonikowski also did his neurological evaluation.

THE COURT:  Okay.

MR. WISEMAN:  That's the history.

MR. ROBERTS:  And that was --

THE COURT:  I think I must have signed authorizations for all these things.

MR. WISEMAN:  Oh, I'm sure you did.

THE COURT:  They were probably under seal or something.

MR. WISEMAN:  Yeah, yeah.  And that was done in mid to late February just before trial.

THE COURT:  Right.  Okay.

MR. ROBERTS:  Ready, Your Honor?

THE COURT:  Go ahead.  Thank you.

BY MR. ROBERTS:

Q.    So I was just curious, does that report add or take away anything from your opinion, the report you just read?

A.    It has import in that he underwent what appears to be a

fairly standard neurological examination with EEG. The EEG normal awake and asleep was the interpretation, which is a fairly common or typical suggestion for an MRI and neuropsychological testing.

So I would suggest or I would say that in a typical clinical setting, this is a reasonable thing to do. I think in a forensic setting or where there's this much on the table, it's a start. It's consistent with what I see frequently in patients who have cognitive dysfunction, but no gross physical problems or severe impairments. This is common in what you see with people who have mild or even mild/moderate impairments.

Q. So all of this analysis, all of these testings, these neurological evaluations and everything, it all goes to try to explain someone's behavior. Is that right? I know it goes to understand how the brain's functioning, but in the context of the criminal aspect, if someone is coming, approaching you and saying, "I want you to evaluate this Defendant," they're trying to understand how someone might have, why they might have done something. Is that right?

A. You keep vacillating between two words, and there's -- they sound like a subtle difference, but to me it's important. Understand versus explain. I don't know that you can explain the behavior, but you can certainly understand that a brain such as Mr. Bourgeois' that has certain limitations and impairments is imminently more likely to do things that are

USCA5 2331

strange, bizarre or out of the norm.

A normal functioning brain, understandably, gives rise to normal behavior.  People who have impairments, and especially if there's other collateral problems or things that exacerbate their cognitive limitations, or their cognitive limitations are exacerbating other emotional or personality disorder issues, they are much more likely to demonstrate odd behaviors.

Some of it never comes to the light of the Court because it's just strange eccentricities and they live their little lives and they may be withdrawn.  They're out there.  There's other people who, because of frontal lobe disinhibition syndromes or rages or whatever, end up in the court system.

What I'm saying is that testing shows abnormalities, that the abnormalities appear to be valid.  But this is not because he's trying to do this.  There's just too much that argues that this is a valid and accurate assessment.  And that people who have this pattern of abnormalities are more likely to be found to behave in ways that are not adaptive, not helpful, not appropriate.

Q.   Are you aware of what he was accused of actually doing?

A.   Yes.  Convicted of it in fact, right?

Q.   Well, yeah.  But at the time before, as we were going towards the trial, I'm just curious if you were aware of the severity of the injuries to the baby.

A.   I, you know, forgive me, but I'd say it's pretty horrible.

USCA5 2332

Q.    Okay.  Are you also aware that throughout the trial, and even at the end, to the jury, that he continued to profess his innocence, that he said he never committed any of those injuries to the child?

A.    I don't know that that's been consistent, but I've seen that in different places, and I think even subsequent to conviction, he's contended that he wouldn't do such a thing.

Q.    I mentioned a moment ago the transcripts, and you said you skimmed them.  There's one in particular I'd like to know if you had a chance to read, and that's from March 24, where the Defendant, Alfred Bourgeois, actually asked to approach the bench and spoke to the Judge about how he believed his case should have been presented and how he wanted to make a statement to the jury.  And then he ultimately did make a statement to the jury.  Did you get a chance to review how he related to the Court and how he related to the jury?

A.    I skimmed it, and I don't have great recollection.  I'm sorry.

Q.    Do you think that -- I mean, that's a pretty stressful environment, is it not?  You're about to go before a jury and know that someone's going to ask to take your life?

A.    I think it would be for most people.  It probably was for him.

Q.    How he reacted in that situation and his cognitive process through that, don't you think that would have been important to

USCA5 2333

look at in analyzing whether he's functioning properly?

A.   With all due respect, I missed that class in school.  I never had the class where, when someone's approaching the Judge, how they should or shouldn't, how to assess that.  I just took the ones that had to do with the tests that we use in everyday practice.

     I can have my own opinion as to how that affects a person, but when I'm basing an assessment of their intellect, I'm going to use my intellectual tests.

Q.   So you would prefer to use an IQ test over how somebody is --

          THE COURT:  How they actually function --

          MR. ROBERTS:  Function.

          THE COURT:  -- is what he's saying.  Because the Fifth Circuit says you have to look at both.

          THE WITNESS:  Well, if I'm asked to assess their IQ level, I'm going to use the IQ test.  And I will take into account collateral behavior, their presentation, which I think the courtroom behavior would be part of that, as well as history.

BY MR. ROBERTS:

Q.   When you gave these tests -- I have Petitioner Exhibit 16 here.  Again, this is your test.  Was there some reason you didn't give him the full test, some reason you didn't require him to answer all of the portions of this test?

USCA5 2334

A.    Sure.

Q.    There was?

A.    Sure.

Q.    So there was some stuff you just didn't, you didn't think was necessary for him to respond to on this test?

A.    The nature of testing, at least again, the way I was taught, is that every test is designed to answer a question. So --

Q.    I thought it was a standardized test.

A.    It is a standardized test.

Q.    And you've got like, on Page 10, you've got a logical memory test, recognition, that there was no answer at all.  So you didn't think that was pertinent to his, to the evaluation of his IQ?

A.    You're looking at the Wechsler Memory Scale, which doesn't measure IQ.

Q.    Good point.  Not the IQ --

A.    The 11 subtests that are utilized to assess the IQ were all administered.

Q.    And there are some pages that are left blank.  So did you --

A.    Again, are you looking at the Wechsler Memory Scale or the Wechsler Adult Intelligence Scale, Third Edition?

Q.    Well, I'm showing you what's marked as Petitioner Exhibit 16.

USCA5 2335

A.   And if you look at the top, it says, "Wechsler Memory Scale."

Q.   Wechsler Memory Scale.  And within this document, is Page 10.

A.   That's recognition, logical memory.  I chose not to give that.  That's correct.  That's not part of the IQ test.  It's part of the memory scale.

Q.   Okay.

A.   And --

Q.   You chose not to give that?

A.   That's right.  There's several more parts --

Q.   You also chose not to give this test?

A.   The second part of faces, the long-term recall, that's correct.

Q.   Okay.  No answers on this page either.

A.   That's right.  The second administration of family pictures.  Number one was given.  Number two was not.

Q.   Okay.  So just so I understand correctly, when there are portions of tests that you, as you're testing an individual, you decide that you're just not going to give to that individual?

A.   And there are at least 100 more neuropsychological tests I didn't give either.  Of course.

Q.   Okay.  You mentioned the Flynn Effect briefly.  You didn't really go into it that much, and I'm not going to go into it

USCA5 2336

much either.  But the Flynn Effect has been used to adjust an IQ score.  Is that an accurate statement?

A.    I wouldn't use the word "adjust."  You might, but I would choose not to.

Q.    Okay.  The -- is it accurate to say the Flynn Effect is generally applied to lower a score?

A.    The Flynn Effect doesn't lower a score, no.  That's not an accurate statement either.

Q.    That's not accurate either.  Okay.  Have you ever used the Flynn Effect on a patient that was not in the courtroom?

A.    I don't think you use the Flynn Effect.  The Flynn Effect is something that has been shown through research to occur and exist.  And it's something that when you understand conceptually as well as practically that it exists and that it occurs, it's something to take into consideration as you interpret data.

Q.    What is the word you would use in applying the Flynn Effect?  Do you have a word?  How can I get -- what word can I use to discuss the Flynn Effect's application with you?

A.    I think you have to pick your own words.  If you want to ask me a question I can, you know, answer, I would be happy to do that.

Q.    Well --

A.    But you might have to not be fishing for an answer.  You might just have to ask me why does it matter or what is the

USCA5 2337

matter.  Maybe that's the way to do it.

Q.   My question is, is the Flynn Effect applied, used, in any form or fashion, with a patient in a clinical setting, as opposed to in a courtroom?

A.   Well, I don't think it's applied in a courtroom.  The Flynn Effect exists.  It's like gravity.  I'm not applying gravity, but it exists.

Q.   The Flynn Effect exists for the courtroom.  Is that correct?

A.   I don't understand what you're asking.

Q.   Do you use the Flynn Effect in assessing an IQ for any patient that is not involved in a criminal case?

A.   Let me see if I can help you.  The Flynn Effect exists.  And if I have a patient in my office that I have to assess, and all I have is, for example, the WAIS-R, and I need to assess intellect, and I get one chance to do it, I may choose to use the WAIS-R, with the understanding that it's an outdated test.  And it's not malpractice, but it is using a test that doesn't apply specifically.

So it has to be recognized that it's an outdated test, and that the Flynn Effect exists.  So when I get an IQ of 110, I can say, if I had the proper test, an up-to-date test, this patient would probably test out with an IQ of about 100.  So that can happen.

In my office, frankly I don't think we have a WAIS-R on

USCA5 2338

the shelf any more.  I've got the manual, so I can go back and look at old stuff, but we don't have the test equipment.

Q.    So have you ever applied the Flynn Effect to reduce an IQ for a patient?

A.    I haven't applied it, and I don't reduce IQs.

Q.    Is it true that -- and I think you mentioned this on your direct examination, it was a while ago, but that there are people that present well?  The way that they act and they're adapting to the environment, if someone were to look at them, they would never think that that person was mentally retarded, because of the way they present themselves?

A.    I don't think it applies just to mental retardation.  I see it commonly --

Q.    But that's my question.  My question is with regard to mental retardation, and the question is whether or not it's, the way people present themselves, often in the adaptive nature of how they are dealing with their circumstances.

A.    The adaptive nature?  I think what you can say is that -- first off, you have to recognize that ten people with mental retardation with similar IQ scores are not all going to look exactly the same.

Q.    But some people present so well that there's no -- that someone even of your background, education, experience would look at them and say they're not mentally retarded.  But I know you wouldn't, because you're going to go through all the

USCA5 2339

testing, but I'm talking about someone of average walk of life.

A.   I think the lay population -- and again, it's my belief, and from I see out around me and what I see in court for that matter, is that people tend to look at folks and make judgments or make decisions.  I've been heard to say that for the most part only dermatologists should be diagnosing based on how a person looks.

That's not entirely true.  For example, Down Syndrome is something that you can have a pretty good accuracy.  You can be pretty accurate in appreciating someone with Down Syndrome, based on their faces, the way they do look.

But mental retardation, if you listen to people who lecture on it, the classic example is they'll show a picture of ten people and say, "Which ones of them are mentally retarded?" and people will say, "Well, that one looks mentally retarded, and that one does.  These people look normal."  Well, in fact, the picture can be all people with mental retardation or all people who are normal.  You can't tell mental retardation based on an appearance or presentation.

Behavior gives you some insight, but typically, it's only if the behavior is really suppressed.  You know, the article you gave me, it talks about just that, that the mildly retarded individuals are most often out in the community working and participating.  But that's -- most people don't understand what mental retardation is.

USCA5 2340

Q.    The other side of that's true, too, is it not, that there are people that just test poorly, that just, even in taking tests, they get under stress and they just don't test well.

A.    If you test poorly, like you have an IQ of 50, we call that mental retardation.

Q.    So you're just, again, you're just going on the IQ test.

A.    Well, if you have adaptive living skills and there are two or more areas in the impaired range, too, I mean, that's the classification.  The diagnosis is pretty cut and dried.  You read it, you apply it.

Q.    In fact, the DSM-IV speaks to this and says that the measurement of adaptive skills is seen as a check against the over-reliance of IQ scores in a diagnostic -- in the diagnosis of mental retardation.  Does that sound right?

A.    That's right.  I mean, there's been an evolution.  What was it, 35, 40 years ago, you could have an IQ of 85 and be diagnosed with mental retardation.  Conceptually, mental retardation now is seen as something that occurs in the bottom one or two percent of the population, and mild retardation is much more prevalent than moderate, which is more prevalent than severe or profound.  It has to do with people who don't fit into normal society.

They can go out and be in normal society if they have supports.  And that's kind of the focus of the mental retardation community is to help people adapt.  We talk about

USCA5 2341

adaptation and providing support so that these people can fit in as best as possible into a normal community.

Q.   Let me ask one more question.  On your report you mentioned that you did not formally assess Alfred Bourgeois' adaptive functioning.  And earlier you said that you weren't even asked to make an assessment of mental retardation.  Those are both accurate statements?

A.   Yes.

Q.   Okay.  So you're not here today to tell us that he's mentally retarded.  You're here today to address his IQ.

A.   I did not perform sufficient evaluation.  I looked at his IQ and measured that, so I can say that based on his IQ score, he qualifies for diagnosis of mental retardation, if he has limitations in the adaptive living skills, and if the onset was before the age of 18.

Q.   Do you think it would be worthwhile to give him a WAIS-IV at this point in time?

A.   As I said before, testing is to answer questions.  If there's a question that can be raised that's relevant that a WAIS-IV would be the answer, then sure.  But if there's not a question that would be addressed by the WAIS-IV, then it's just an academic exercise.

          MR. ROBERTS:  May I have just a moment, Your Honor?

          THE COURT:  Yes, sir.

     (Counsel conferring off the record.)

USCA5 2342

MR. ROBERTS:  Your Honor, we have no further questions at this time.

THE COURT:  Let me see you up here again.  I forgot to ask a question of you about another deal.

(Discussion off the record.)

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Just a few questions on redirect, Dr. Gelbort.  The Bonikowski report, which is Petitioner's 113, remarked, says at the end that, quote, Further, the patient's neuropsychological study should tell whether there are underlying or predisposing factors that would also explain some of his behavior, especially with regards to prior history of abuse by a parent, closed quote.

From your review of Dr. Weiner's report, do you think Dr. Weiner's testing answered those questions or attempted to answer them?

A.   Answered?  No.  Attempted to, probably in some fashion, but I don't think it was -- it was lacking.

Q.   The report itself was lacking?

A.   The report and the interpretation.  There was more that could have been done with that data, if proper questions had been presented and follow-up had occurred.

Q.   Okay.  If instead of calling Dr. Weiner they had called you, and you did the testing in 2004 that you did in 2007, did

USCA5 2343

Gelbort - Redirect

your testing answer the question posed by Dr. Bonikowski?

A.   Oh, I think my testing did, but I don't think it's just a question of me versus Dr. Weiner.  I think other neuropsychologists could have done a better job of interpreting what was there.

Q.   Okay.  Just to be clear, you gave the entire WAIS-III.

A.   No, I didn't give the entire WAIS-III.  There are --

Q.   Oh, that's --

A.   There are extra subtests which do not contribute and are not counted and are not used to calculate the IQ.  There are intended to be six specific subtests from the verbal side and five from the performance side that are used to calculate an IQ.  If you spoil a subtest or don't have equipment, you can use one of the other three, in place of.  And then you still have enough subtests to compute a full IQ.  You can, with less accuracy, extrapolate it.  If you want to give five and four, rather than six and five.  But what was given to Mr. Bourgeois are the six verbal subtests and the five performance that are meant to be used to calculate a full scale and performance and verbal IQ.

Q.   And the test that Mr. Roberts was showing you up on the screen relating to the Wechsler Memory Scale, why is it that you didn't give those particular subtests?

A.   There subtests that provide data that's not very useful or informative.  I mean, as I think I've alluded to,

USCA5 2344

there are -- when you go to look in the big book of the listing of all the even commonly given psychological or the neuropsychological tests, you know, there are well over a hundred.  Part of the testing process is to construct a battery to answer the question that you're asked.  And just because there may be 15 subtests in the Wechsler Memory Scale doesn't mean all 15 are useful in answering the question.

If you're going to answer the question, "What's his IQ," you need to give those 11 subtests, or you need to try.  The memory scale, I know very few neuropsychologists who ever give the whole thing, in its entirety.  It just provides information that is either irrelevant or not useful.

Q.   Regarding this article about 40 percent of people malingering on neuropsychological testing of some sort, would it be accurate that in your experience and your knowledge of the field that there's not a rate of 40 percent malingering on neuropsychological testing?

A.   I would say that that -- it says 41 percent.  I would say that that's absolutely the truth.

Q.   That what is the truth?

A.   That there's not 41 percent malingering on neuropsychological examinations.

Q.   And would you have a livelihood to go to if almost half the people you tested were malingering?

A.   I might have a different livelihood, but neuropsychology

USCA5 2345

would be very different than it is today if this was accurate in the clinical population, and even I think in the forensic population.  I mean, you have to read the whole article to understand it in context.  So, I mean, you can grab that sentence, but I think there's a whole lot more going on than just that one sentence.

Q.   And finally, Mr. Roberts was asking you to, whether the impairments explain the offense, that Mr. Bourgeois' impairments explain the offense, and you felt that wasn't quite accurate.  In your experience as a forensic neuropsychologist in capital cases, pretrial, who typically makes that ultimate decision about whether the impairments explain the offense in a penalty phase?

A.   I don't know -- I'm not sure how to answer that.  I think it's the jury and the Judge who get to decide those issues. The neuropsychologist is simply, I believe, helping people understand who they're looking at in terms of their neurocognitive functioning.  Rather than relying on, he looks this way, it's like we can do better than that.  We can say this is how he tests out on standardized tests that have been shown to indicate in this case intellectual level or frontal lobe functioning or whatever other abilities we're actually able to measure.

Q.   And I guess it's obvious, but if that information isn't presented to the jury, they can't make that decision, can they?

USCA5 2346

Gelbort - Redirect                      147

A.   Well, I think they're stuck making the decision based on how the patient looks to them, in their eyes, and what they know.

You know, when I lecture, I oftentimes talk about the guy looking for something underneath the street lamp on a dark night, and the second guy comes up and helps and they don't find it.  And the second guy says, "What did you lose?"  And he says, "I lost my glasses."  And, "Are you sure you lost them here?"  He says, "No, I lost them over there.  But it's dark over there.  I can't see.  I'm looking here."

People tend to make decisions based on what they know.  I don't know too many folks who see like my patient who's talking gibberish and say, "Well, I think they're crazy," but of course there's probably ten other diagnoses that I'm not aware of that can cause you to talk gibberish.  Most people don't go outside of the box there.

So most people look at someone, and we're all -- everybody starts as an amateur psychologist and says I think he's this or I think he's that, and very few people say, "And I bet there's a whole bunch of other things he could be that I just don't know about."  So that's why you bring in -- you know, when you go to your doctor, that's what you're doing.  "I think it's this, but I should probably go see my doctor, because they're the ones with tests."

MR. WISEMAN:  Okay.  Thank you.

USCA5 2347

148

MR. ROBERTS:  We don't have anything further either, Your Honor.

THE COURT:  All right.  Anything else?

MR. WISEMAN:  Not from Mr. Bourgeois.

THE COURT:  Thank you, sir.  You may stand down.  So this hearing is concluded.  We'll go off the record, and would you hang up the phone.

(Proceedings concluded at 6:28 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    September 16, 2010
Molly Carter                        Date

INDEX

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL M. GELBORT | 10 | 94 | 143 | |

| EXHIBITS: | | ADMITTED |
|---|---|---|
| P-15: 5/11/07 DECLARATION OF DR. GELBORT . . . . . . . | | 84 |
| P-16: WECHSLER MEMORY SCALE, THIRD EDITION . . . . . . | | 84 |
| P-17: CURRICULUM VITAE OF DR. MICHAEL M. GELBORT . . . | | 84 |
| P-31: DR. WEINER'S 2004 TESTING OF DEFENDANT . . . . . | | 84 |
| P-86: RECORD FROM LUTCHER HIGH SCHOOL  . . . . . . . . | | 84 |
| P-132:  LIST OF MATERIALS PROVIDED TO DR. GELBORT . . . | | 84 |

USCA5 2349

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                                          Case No.: 2:02–cr–00216
                                                            Judge Janis Graham Jack

Alfred NMI Bourgeois

                            Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.


David Bradley, Clerk

USCA5 2350

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | |
| ALFRED BOURGEOIS, | : | Electronically Filed |
| | : | |
| Petitioner. | : | |
| _____ | : | |

**PETITIONER'S RENEWED MOTION FOR ADDITIONAL COURT
TIME IN WHICH TO
PRESENT HIS EVIDENCE**

Petitioner, Alfred Bourgeois, through undersigned counsel renews his motion

for additional court time.  In support of this Motion, Petitioner states as follows:

1.     On August 16, 2010 Petitioner filed a motion requesting additional court

time to present his case.  The Court denied the motion the next day.

2.     Petitioner has completed two full court days (September 20 and 21,

2010) in this post-conviction case.  In addition, the Court heard from a single witness

on September 10, 2010 and has accepted as evidence the video deposition of Carlos

Estrada, which the Court has graciously agreed to review during non-Court time.  The

Court's initial scheduling order allotted Petitioner two and one half days.  Petitioner

1

USCA5 2351

acknowledges that because of the September 10 court session and the Court's willingness to review the Estrada deposition outside of normal court hours, that Petitioner has already been provided more than the original two and one half days allotted. Petitioner is highly appreciative of this consideration.

3. However, as Petitioner has maintained since the April 20, 2010 argument addressing the scope of the hearing, and in his August 16, 2010 original motion for additional court days, due to the number of issues, their complexity and the weightiness of this matter, additional time would be needed.

4. At the end of this second court date, Petitioner still has the following witnesses who are ready and available to provide relevant testimony on issues that the Court has already ruled are worthy of evidentiary development:

- John Gilmore (trial counsel)
- Dr. Elizabeth Johnson (trial counsel's DNA expert)
- Kerry Brown, Esq. (Mr. Bourgeois private counsel prior to the offense)
- Dr. George Holden (trial expert on family violence)
- Dr. Michael Bowers (bite mark and photo imaging expert)
- Gerald Bierbaum, Esq. (trial mitigation specialist)
- Alan Keel (post-conviction DNA expert)
- Various witnesses relevant to undisclosed consideration provided to government witnesses including: Jennifer Valdez, Orlando Campos, Darrick Moore, Adam Longoria and Tim Allen.

5. Counsel respectfully submit that they have proceeded expeditiously and with dispatch. While they do not claim to have proceeded with perfection, they do

2

believe that they have presented relevant, non-cumulative evidence that is worthy of consideration.

6.      Without question the Court is vested with wide discretion to rule on this request, as it did in setting the original schedule and in denying Petitioner's initial motion for additional court time.  Petitioner further appreciates that the Court has started early and gone late on each date.  However, the fact remains that Petitioner has at least another day's worth of witnesses.  Because these witnesses have relevant testimony to provide on issues that this Court has deemed hearing-worthy, Petitioner respectfully submits that it would be an abuse of this Court's discretion to not permit Petitioner to complete his case.  Petitioner would further submit that the provision of a hearing on issues before the Court is not full and fair if the Court does not permit counsel to present relevant, non-cumulative evidence on issues that the Court should already ruled would be the subject of the hearing.  Moreover, denial to Petitioner of the ability to complete the hearing will result in a denial of his Fifth Amendment right to due process as well as a denial of those rights that are asserted in his Grounds for Relief.

7.      In consideration of the Court's schedule, past accommodations and to ease any extra burden on the Court, Petitioner makes the following concessions:

●      They will proffer the witnesses related to undisclosed consideration;

3

USCA5 2353

- Counsel and the Government have agreed that they will proffer Alan's Keel's declaration and will offer him for cross examination, thus saving additional time;

- Petitioner's counsel will gladly return at a later date, if the Court wishes to proceed further, but the Court's schedule cannot accommodate extra time this week;

- If it would ease any burdens on the Court and its personnel, counsel will waive Mr. Bourgeois' presence at any future hearing date.

8.    Petitioner will report to this Court at 9:15 a.m. tomorrow, as directed at the close of today's session.  They are prepared to proceed with their witnesses.

It is Petitioner's earnest hope that the Court will permit him to complete his presentation.

Respectfully Submitted

/s/    Michael Wiseman

Michael Wiseman
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520

Dated:    Philadelphia, PA
          September 21, 2010

4

USCA5 2354

## Certificate of Service

I, Michael Wiseman, hereby certify that on September 21, 2010 he served the foregoing on Government's counsel by e-mail and electronic case filing:

<div align="center">

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas

</div>

/s/ Michael Wiseman

Michael Wiseman

USCA5 2355

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| _____ | : |  |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
|  | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
|  | : | U.S.D.J. |
| -against- | : |  |
|  | : |  |
| ALFRED BOURGEOIS, | : | Electronically Filed |
|  | : |  |
| Petitioner. | : |  |
| _____ | : |  |

**PETITIONER'S OBJECTION TO COURT'S
COMMENT REGARDING THE DEMEANOR OF
DR. MARK CUNNINGHAM**

1.      Mark Cunningham, Ph.D. testified in these post-conviction proceedings on September 21, 2010.  Toward the end of the Government's cross-examination of Dr. Cunningham, the Court stated on the record that the witness appeared "angry." Petitioner's counsel attempted to place his legal position on the record with respect to this comment by the Court.  The Court precluded counsel from placing his position on the record and threatened to prohibit his re-direct examination of this witness if he persisted in addressing this issue.

2.      Since counsel was not permitted to speak on the record, counsel hereby files this objection to the Court's comment, and the Court's refusal to permit him to

1

USCA5 2356

state his position on the record.

3.     Had the Court permitted counsel to address the Court, he would have told the Court the following:

In counsel's estimation the witness never raised his voice.  He made no hand gestures or facial expressions that even remotely seemed inappropriate or angry.  His tone of voice, rate of speech and overall demeanor was consistent throughout his testimony.

Counsel would further observe that shortly before the Court's observation, the Court ridiculed part of the witness' testimony; asked prosecutor Booth if she agreed with this ridicule and laughed at the witness.

In counsel's view the witness had every reason to become angry, but, as noted above, he remained calm and consistent in his presentation.

4.     Had the Court not threatened to preclude counsel's re-direct examination of this witness, counsel could have asked the witness questions that would have established that he was not in fact "angry."

5.     Obviously the Court is the finder of fact in this matter.  In that role the Court has every right to discount any or all of the testimony of any witness.  However, when the Court makes an observation as it did in this instance, counsel have the right and indeed the obligation, to place their views respecting the observation on the record.

6.     Subsequent to counsel's attempt to speak, the Court commented that

2

USCA5 2357

counsel needed to be respectful to the Court.  Counsel believes that they have been

respectful and they indeed possess an abiding respect for the Court.  Nonetheless, if

the Court believes that counsel acted inappropriately in any way, the Court has

counsel's apology for their conduct.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner,
Alfred Bourgeois

Dated:      Philadelphia, PA
            September 22, 2010

### Certificate of Service

I, Michael Wiseman, hereby certify that on this 22th day of September, 2010, I served the foregoing upon the following persons by E-Mail and ECF filing:

Tony Roberts, Esq.
Patti Booth, Esq.
Mark Down, Esq.

/s/ Michael Wiseman

_____
Michael Wiseman

3

USCA5 2358

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA, | : | No. Cr-C-02-216 |
| | : | No. Cv-07-223 |
| Respondent, | : | Honorable Janis Graham Jack, |
| | : | U.S.D.J. |
| -against- | : | |
| | : | |
| ALFRED BOURGEOIS, | : | Electronically Filed |
| | : | |
| Petitioner. | : | |
| _____ | : | |

**PETITIONER'S MOTION TO STRIKE FOR VIOLATION
OF FED.R.CIV.P. 26**

Petitioner, Alfred Bourgeois, through undersigned counsel moves to strike a portion of the testimony of Dr. Price taken at the proceedings of September 23, 2010. In support of this Motion, he states as follows.

1.     The Court ordered the parties to conduct expert witness discovery for the current hearing pursuant to Fed.R.Civ.P. 26(a)(2). Pursuant to the Court's order, the exchange of expert reports were required by August 13. The parties ostensibly met that deadline when they exchanged expert reports and related materials by that date.

2.     As the Court is well aware, Rule 26(a)(2) states that an expert report "must contain a complete statement of **all** opinions the witness will express and the

1

USCA5 2359

basis and reasons for them."  A portion of today's testimony of Dr. Randall Price violated the requirements of the Rule.  His report addresses the IQ testing that has been administered to Petitioner, the question of adaptive deficits relevant to the mental retardation issue before the Court, and the question of personality disorders.

3.      Dr. Price's report quite literally does not contain a single word, much less an opinion and the basis for it, regarding the presence or absence of organic brain damage.  Nonetheless, in his testimony today, Dr. Price critiqued Dr. Weiner's and Dr. Gelbort's reliance on Petitioner's deficient scores on the Categories Test and Trails B test in reaching their conclusion that Petitioner's suffers from brain damage.[1] Moreover, his critique relied on his application of unidentified norms to evaluate Petitioner's performance.  Dr. Price neither named the norms he purportedly applied, nor did he offer any specific explanation as to how they apply in this case.

4.      What is particularly troubling about this violation of the disclosure rule is that these particular questions are highly complex and would require counsel to conduct research into the literature or consult with his experts to rebut this testimony.

---

[1]To be clear, organic brain damage can occur even in the absence of a traumatic brain injury.  As Drs. Gelbort and Weiner testified, such damage can have a variety of other causes.  As explained to the Court today, counsel are relying on the 1993 truck accident in which Mr. Bourgeois struck his head on the steering wheel, not as proof that he sustained a traumatic brain injury on that occasion, but to support their position that counsel ineffectively failed to pursue neuropsychological testing before trial despite the presence of this red flag for organic damage.

2

Counsel has endeavored to acquire expert information on these questions tonight, but has been unsuccessful.

5.    Obviously, the purpose of the disclosure rule is to enable counsel to conduct proper preparation of their cross examination. Petitioner has been able to do so with all other aspects of Dr. Price's testimony, which was properly disclosed in his report. However, an area as complex as this cannot be prepared "on the fly." Petitioner's ability to cross examine has been significantly prejudiced by this violation. Accordingly, he requests that the testimony regarding Trails B and Categories be stricken from the record.

6.    Due to the lateness of the hour, counsel has not endeavored to ascertain the Government's position regarding this Motion.

USCA5 2361

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520

Dated:      Philadelphia, PA
            September 23, 2010

## Certificate of Service

I, Michael Wiseman, hereby certify that on September 23, 2010 he served the foregoing on Government's counsel by electronic case filing:

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas

/s/ Michael Wiseman

Michael Wiseman

4

USCA5 2362

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CASE N0O. <u>C-02-216-S</u>

| | | |
|---|---|---|
| <u>United States of America</u> | )( | Judge <u>Janis Graham Jack</u> |
| | )( | Courtroom <u>Deputy Sondra Scotch</u> |
| vs. | )( | Court Reporter/Recorder <u>Velma Gano</u> |
| <u>Alfred Bourgeois</u> | )( | Proceeding: <u>Evidentiary Hearing</u> <u>under 28 U.S.C. § 2255</u> |
| | )( | Date: <u>September 20, 2010</u> |
| | )( | Exhibit List of: <u>Defense</u> |
| Page 1 of 20 | )( | Attorney: <u>Michael Wiseman</u> |

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 1. | Letter from Mark D. Cunningham, Ph.D., ABPP to John Gilmore, Esq., Regarding Neurological Evidence, 2/10/2004 | ✓ | ✓ | | 9/21/10 | |
| 2. | Letter from Mark D. Cunningham, Ph.D., ABPP, to John Gilmore, Esq. Regarding Presence of Mitigating Factors, 2/25/2004 | ✓ | ✓ | | 9/21/10 | |
| 3. | Letter from Mark D. Cunningham, Ph.D., ABPP Letter to John Gilmore, Esq., Regarding Risk Assessment Factors, 2/25/2004 | ✓ | ✓ | | 9/22/10 | |
| 4. | Mark D. Cunningham, Ph.D., ABPP, Power Point Regarding Mitigating Factors, March 2004 | ✓ | ✓ | | 9/21/10 | |
| 5. | Mark D. Cunningham, Ph.D., ABPP, Power Point Regarding Risk Assessment, March 2004 | ✓ | ✓ | | 9/21/10 | |

USCA5 2363

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 6. | Declaration of Mark D. Cunningham, Ph.D., ABPP, 5/11/2007 | | | | | |
| 7. | Curriculum Vitae, Mark D. Cunningham, Ph.D., ABPP | ✓ | ✓ | | 9/21/10 | |
| 8. | E-Mail from Mark D. Cunningham, Ph.D., ABPP | ✓ | ✓ | | 9/21/10 | |
| 9. | Proposed Direct Examination of Mark D. Cunningham, Ph.D., ABPP | ✓ | ✓ | | 9/21/10 | |
| 10. | Memorandum to File, Mark D. Cunningham, Ph.D., ABPP, 3/24/2004 | ✓ | ✓ | | 9/21/10 | |
| 11. | Declaration of Carlos R. Estrada, M.D., 5/14/2007 | | | | | |
| 12. | Curriculum Vitae, Carlos R. Estrada, M.D. | | | | | |
| 13. | Trial Report of Carlos R. Estrada, M.D., 1/20/04 | | | | | |
| 14. | Letter from Carlos R. Estrada, 2/25/2004 | | | | | |
| 15. | Declaration of Michael M. Gelbort, Ph.D., 5/11/2007 | ✓ | ✓ | | 9/10/10 | |
| 16. | Raw Data from Evaluation of Michael M. Gelbort, 4/27/2007 | ✓ | ✓ | | 9/10/10 | |
| 17. | Curriculum Vitae, Michael M. Gelbort | ✓ | ✓ | | 9/10/10 | |
| 18. | Letter from George W. Holden, Ph.D. to Douglas Tinker, 12/19/2003 | ✓ | ✓ | | 9/22/10 | |
| 18a | Letter to Holden from Tinker dated November 21, 2003 | ✓ | ✓ | | 9/22/10 | |
| 19. | Letter from George W. Holden, Ph.D. to Douglas Tinker, 2/24/2003 | ✓ | ✓ | | 9/22/10 | |

Page 2 of  13

USCA5 2364

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 20. | Declaration of George W. Holden, Ph.D., 5/13/2007 | ✓ | ✓ | | 9/22/10 | |
| 21 | Curriculum Vitae, George W. Holden, Ph.D. | ✓ | ✓ | | 9/22/10 | |
| 22 | Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W, 5/4/2007 | | | | | |
| 23 | Declaration of Kathleen Kaib, M.S.S., M.L.S.P., L.S.W, 5/14/2007 | | | | | |
| 24 | Curriculum Vitae, Kathleen Kaib, M.S.S., M.L.S.P., L.S.W | ✓ | ✓ | | 9/20/10 | |
| 25 | Declaration of Robert L. Sadoff, M.D., 5/12/2007 | | | | | |
| 26 | Declaration of Jethro Toomer, Ph.D., 5/9/2007 | | | | | |
| 27 | Supplemental Report of Jethro Toomer, Ph.D., 8/12/2010 | | | | | |
| 28 | Curriculum Vitae, Jethro Toomer, Ph.D. | ✓ | ✓ | | 9/20/10 | |
| 29 | Report of Neuropsychological Evaluation Conducted by Donald E. Weiner, Ph.D., 3/3/2004 | ✓ | ✓ | | 9/20/10 | |
| 29a | Curriculum Vitae, Donald E. Weiner, Ph.D., FICPP, FPPR, P.C. | ✓ | ✓ | | 9/20/10 | |
| 30 | Declaration of Donald E. Weiner, Ph.D., 5/10/2007 | | | | | |
| 31 | Raw Data from Evaluation of Donald E. Weiner, Ph.D., 2/28/2004 | ✓ | ✓ | | 9/10/10 | |
| 32 | Declaration of Victoria Swanson, Ph.D., 6/8/2009 | | | | | |

Page 3 of  13

USCA5 2365

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 33 | Supplemental Report of Victoria Swanson, Ph.D., 8/12/2010 | ✓ | ✓ | | 9/20/10 | |
| 34 | Raw Data from Evaluation Performed by Victoria Swanson, Ph.D. 3/25/2009 | ✓ | ✓ | | 9/20/10 | |
| 35 | Additional Raw Data Generated by Victoria Swanson, Ph.D. | ✓ | ✓ | | 9/20/10 | |
| 36 | Curriculum Vitae, Victoria Swanson, Ph.D. | ✓ | ✓ | | 9/20/10 | |
| 37 | Declaration of Michelle Armont, 4/26/2007 | | | | | |
| 38 | Declaration of Nathaniel Banks, 5/10/2007 | | | | | |
| 39 | Declaration of Issac Bourgeois III, 5/10/2007 | | | | | |
| 40 | Declaration of Murray Bourgeois, 5/10/2007 | | | | | |
| 41 | Declaration of Wilmer Bougeois, Sr., 5/9/2007 | | | | | |
| 42 | Declaration of Lawanda Cook, 5/1/2007 | | | | | |
| 43 | Declaration of Anthony Dumas, 5/9/2007 | | | | | |
| 44 | Declaration of Anita Ferdinand, 5/8/2007 | | | | | |
| 45 | Declaration of Beverly Frank, 5/9/2007 | | | | | |
| 46 | Declaration of Allen Henry, 5/10/2007 | | | | | |
| 47 | Declaration of Jersey Henry, 5/10/2007 | | | | | |
| 48 | Declaration of Yvonne R. Joseph, 5/9/2007 | | | | | |

USCA5 2366

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 49 | Declaration of Eleanor Bourgeois McGuffey, 5/9/2007 | | | | | |
| 50 | Declaration of Alton Preston, 5/1/2007 | | | | | |
| 51 | Declaration of Jevona Jeanette Rixner, 5/10/2007 | | | | | |
| 52 | Declaration of Keith Rixner, 5/9/2007 | | | | | |
| 53 | Declaration of Louis Russell, Jr., 5/9/2007 | | | | | |
| 54 | Declaration of Ivy Thomas, 5/1/2007 | | | | | |
| 55 | Declaration of Michelle Warren, 4/25/2007 | | | | | |
| 56 | Declaration of Claudia Williams, 5/10/2007 | ✓ | ✓ | | 9/21/10 | |
| 57 | Bierbaum Interviews of Claudia Williams, 2/25/04, 3/7/2004 | | | | | |
| 58 | Psychological Evaluation of Alfred Bourgeois, 5/22/1985 | ✓ | ✓ | | 9/24/10 | |
| 59 | Packet of Bourgeois Financial Data | | | | | |
| 60 | E-Mails from Gerald Bierbaum | ✓ | ✓ | | 9/21/10 | |
| 61 | Memoranda Generated by Gerald Bierbaum | | | | | |
| 61a | Bourgeois statements | ✓ | ✓ | | 9/24/10 | |
| 62 | Letter from Jose Gonzalez-Falla to Gerald Bierbaum, 1/9/2004 | | | | | |
| 63 | Trial Notebook | | | | | |

USCA5 2367

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 64 | Proposed Direct Examinations | | | | | |
| 65 | Hotel Arrangements for Defense Witnesses | | | | | |
| 66 | List of Trial Witnesses | | | | | |
| 67 | List of Defense Mitigation Witnesses | | | | | |
| 68 | Government Request for Redaction of Mitigation Slides | | | | | |
| 69 | List of Government Expert Witnesses | | | | | |
| 70 | Sentencing Phase Verdict Form (Blank) | | | | | |
| 71 | List of Proposed Mitigating Factors | | | | | |
| 72 | Defense Motion to Withdraw Motion For Continuance, 12/16/2003 | ✔ | ✔ | | 9/21/10 | |
| 73 | Defense Ex Parte Motion for Mental Health Evaluation, 12/5/2003 | | | | | |
| 74 | Defense Ex Parte Motion for Mitigation Specialist, 8/12/2003 | | | | | |
| 75 | Defense Motion for Discovery, 5/5/2003 | | | | | |
| 76 | Defense "Brady Motion for Discovery of All Favorable Evidence," 5/5/2003 | | | | | |
| 77 | Defense Motion For Expert Witness, 10/8/2003 | | | | | |
| 78 | Selected Case Law in Defense File | | | | | |
| 79 | Juror Questionnaire (Blank) | | | | | |

Page 6 of 13

USCA5 2368

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 80 | Transcripts of Calls Made by Alfred Bourgeois | | | | | |
| 81 | Hospital Records, River Parishes Hospital | ✓ | ✓ | | 9/22/10 | |
| 82 | Responses by Douglas Tinker, Esq. To Government Interrogatories, 9/22/2008 | ✓ | ✓ | | 9/22/10 | |
| 83 | Response Affidavit, John Gilmore, Esq., 9/19/2008 | ✓ | ✓ | | 9/22/10 | |
| 84 | Petitioner's Interrogatories Direct to Douglas Tinker, Esq., 10/14/2008 | | | | | |
| 85 | Memoranda Generated by Lisa Milstein | | | | | |
| 86 | School Record, Alfred Bourgeois | ✓ | ✓ | | 9/10/10 | |
| 87 | Results of Alfred Bourgeois Firearms Testing, 5/6/1985 | | | | | |
| 88 | Report of Forensic Science Associates, 9/24/2007 | ✓ | ✓ | | 9/22/10 | |
| 89 | Resume, Edward T. Blake | | | | | |
| 90 | Curriculum Vitae, Charles Allen Keel | ✓ | ✓ | | 9/22/10 | |
| 91 | Declaration of Elizabeth Johnson, Ph.D., 9/26/2007 | ✓ | ✓ | | 9/22/10 | |
| 92 | Report of Elizabeth A. Johnson, Ph.D., 3/1/2004 | ✓ | ✓ | | 9/22/10 | |
| 93 | Curriculum Vitae, Elizabeth A. Johnson, Ph.D. | ✓ | ✓ | | 9/22/10 | |
| 94 | Defense Ex Parte Motion for Appointment of Expert Witness, 10/8/2003 | | | | | |
| 95 | Government's Third Motion For Reciprocal Discovery, 2/17/2004 | | | | | |

Page 7 of  13

USCA5 2369

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 96 | Curriculum Vitae, Charles Michael Bowers | ✓ | ✓ | | 9/22/10 | |
| 97 | Curriculum Vitae, Manfred Schenk | | | | | |
| 98 | Curriculum Vitae, Jon Curtis Dailey, D.D.S. | ✓ | ✓ | | 9/21/10 | |
| 99 | Declaration of Adam Longoria, 4/24/2007 | | | | | |
| 100 | Declaration of Bill May, 5/1/2007 | | | | | |
| 101 | Sentencing Transcript, U.S. v. Darrick B. Moore, 4/22/2004 | | | | | |
| 102 | Judgment in U.S. v. Darrick B. Moore, 4/22/2004 | | | | | |
| 103 | Amended Judgment U.S. v. Darrick B. Moore, 12/27/2004 | | | | | |
| 104 | Motions for Continuance in State v. Longoria | | | | | |
| 105 | Declaration of Darrick B. Moore, 9/18/2007 | | | | | |
| 106 | Declaration of Phillip Jackson, 9/19/2007 | | | | | |
| 107 | Declaration of Timothy Allen, 9/6/2007 | | | | | |
| 108 | Declaration of Jennifer Lee Valdez | | | | | |
| 109 | Letter from Adam Longoria to AUSA Patti Booth, 5/3/2007 | | | | | |
| 110 | Declaration of Brenda Goodman, 10/4/2007 | | | | | |
| 111 | Declaration of Claudia Mitchell, 9/16/2007 | | | | | |

USCA5 2370

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 112 | Hospital Records on Alfred Bourgeois, Charity Hospital | | | | | |
| 113 | Neurology Report, Frank P. Bonikowski, M.D., 2/17/2004 | | | | | |
| 114 | Physical Examination for Truck Drivers, 4/27/1988 | | | | | |
| 115 | Hospital Records, Spohn Hospital, 2/2004 | | | | | |
| 116 | Overlays of bitemarks of Alfred, Alfredesha and Robin | ✓ | ✓ | | 9/22/10 | |
| 117 | "Inquiry into the Scientific Basis for Bitemark Profiling and Arbitrary Distortion Compensation" | | | | | |
| 118 | "Uniqueness of the Dentition as Impressed in Human Skin: A Cadaver Model" | | | | | |
| 119 | "Biomechanical Factors in Human Dermal Bitemarks in a Cadaver Model" | | | | | |
| 120 | "Suspect Lineup and Bitemark Comparisons" | | | | | |
| 121 | "Expert Disagreement in Bitemark Casework" | | | | | |
| 122 | "Identification from Bitemarks" | | | | | |
| 123 | "Forensic Odontology Bite Marks" | | | | | |
| 124 | "Lack of Dental Uniqueness Between Two Bite Mark Suspects" | | | | | |
| 125 | "Problem-based analysis of bitemark misidentifications: The role of DNA" | | | | | |

Page 9 of 13

USCA5 2371

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 126 | "The Response of Skin to Applied Stress: Investigation of Bitemark Distortion in a Cadaver Model" | | | | | |
| 127 | "Recommendations and Guidelines for the Use of Digital Image Processing in the Criminal Justice System" | | | | | |
| 128 | "Statistical Evidence for the Similarity of the Human Dentition" | | | | | |
| 129 | Materials Relied Upon, C. Michael Bowers | | | | | |
| 130 | Materials Relied Upon, Mark Cunningham, Ph.D. | ✓ | ✓ | | 9/21/10 | |
| 131 | Materials Relied Upon, Carlos Estrada, M.D. | | | | | |
| 132 | Materials Relied Upon, Michael Gelbort, Ph.D. | ✓ | ✓ | | 9/10/10 | |
| 133 | Materials Relied Upon, George W. Holden, Ph.D. | | | | | |
| 134 | Materials Relied Upon, Elizabeth Johnson | | | | | |
| 135 | Materials Relied Upon, Manfred Schenck | | | | | |
| 136 | Materials Relied Upon, Victoria Swanson, Ph.D. | ✓ | ✓ | | 9/20/10 | |
| 137 | Materials Relied Upon, Jethro Toomer, Ph.D. | | | | | |
| 138 | Materials Relied Upon, Donald Weiner, Ph.D. | | | | | |
| 139 | Report of Dr. J. Curtis Dailey, DDS 9/29/2002 | ✓ | ✓ | | 9/21/10 | |

Page 10 of  13

USCA5 2372

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 140 | Report of Dr. J. Curtis Dailey, DDS 7/14/2003 | ✓ | ✓ | | 9/21/10 | |
| 141 | NAS Report "Strengthening Forensic Science in the United States - A Path Forward" | ✓ | ✓ | | 9/23/10 | |
| 142 | Report of Michael Cherry and Manfred Schenk, MAC 5/11/2007 | | | | | |
| 143 | Report of Michael Bowers, DDS, JD 5/11/2007 | | | | | |
| 144 | Motion for Continuance 12/09/2003 | ✓ | ✓ | | 9/21/10 | |
| 145 | Defendant's Motion for Mental Health Evaluation, 12/05/2003 | | | | | |
| 146 | Government's Response to Defendant's Motion for Mental Health Evaluation, 12/10/2003 | | | | | |
| 147 | Agreed Order Committing Defendant for Examination to Determine Competency, 12/19/2003 | | | | | |
| 148 | Order, 12/15/2003 | | | | | |
| 149 | Motion for Travel Authorization, 02/05/2004 | | | | | |
| 150 | Motion for Funding for Mitigation Specialist, 08/12/2003 | | | | | |
| 151 | Invoice from Mark D. Cunningham, Ph.D., ABPP to John Gilmore, Esq, 4/30/2007 | ✓ | ✓ | | 9/21/10 | |
| 152 | Excerpts of Medical Records re. JG | ✓ | ✓ | | 9/23/10 | |

USCA5 2373

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 153 | Autopsy Report by Elizabeth Rouse, M.D. 1/10/2003 | | | | | |
| 154 | Chart of Ranges of Expected WAIS-IV Composite Scores for Selected WAIS-III Scores | ✓ | ✓ | | 9/20/10 | |
| 155 | Comparative Chart of IQ Testing Administered by Dr. Weiner and Dr. Gelbort to Alfred Bourgeois | ✓ | ✓ | | 9/20/10 | |
| 156 | Dr. Weiner's File | ✓ | ✓ | | 9/20/10 | |
| 157 | Ex Parte Order Approving Dr. Weiner to make Neuropsychological Assessment 2/13/2004 | ✓ | ✓ | | 9/22/10 | |
| 158 | Chart of Expected WAIS-III Scores for Selected WAIS-R IQ Scores | ✓ | ✓ | | 9/22/10 | |
| 159 | Phrase written by Alfred Bourgeois dictated and timed by Dr. Swanson | ✓ | ✓ | | 9/20/10 | |
| 160 | "Intellectual Disability - Definition, Classification, and Systems of Support", p.43 | ✓ | ✓ | | 9/20/10 | |
| 161 | Phrase written by Alfred Bourgeois when prompted by Dr. Swanson (timed) | ✓ | ✓ | | 9/20/10 | |
| 162 | Report of J. Randall Price, Ph.D. | | | | | |
| 163 | Oral and Videotaped Deposition of Dr. Estrada | ✓ | ✓ | | 9/20/10 | |
| 164 | Transcript - Deposition of Dr. Estrada | ✓ | ✓ | | 9/20/10 | |

Page 12 of 13

USCA5 2374

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 165 | Timeline Investigation of the Case | ✓ | ✓ | | 9/21/10 | |
| 166 | Bourgeois Family | ✓ | ✓ | | 9/21/10 | |
| 167 | Bourgeois Notes From ACTI | ✓ | ✓ | | 9/21/10 | |
| 168 | Facsimilie Transmission to Doug Tinker from E Johnson | ✓ | ✓ | | 9/22/10 | |
| 169 | | | | | | |
| 170 | | | | | | |
| 171 | Coastal Bend Psychiatric Assoc.  Forensic Referral Form | ✓ | ✓ | | 9/23/10 | |
| 172 | | | | | | |
| 173 | | | | | | |
| 174 | | | | | | |
| 175 | | | | | | |
| 176 | | | | | | |
| 177 | Comparison | ✓ | ✓ | | 9/24/10 | |
| 178 | SEALED EXHIBIT- ABAS II | ✓ | ✓ | | 9/23/10 | |
| 179 | P30 Test Results | ✓ | ✓ | | 9/24/10 | |
| | | | | | | |

Page 13 of  13

USCA5 2375

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CASE NO. <u>C-02-216-SS</u>

| | | |
|---|---|---|
| <u>United States of America</u> | )( | Judge ___<u>Janis Graham Jack</u>___ |
| | )( | Courtroom ___<u>Deputy Sondra Scotch</u>___ |
| vs. | )( | Court Reporter/Recorder <u>Velma Gano</u> |
| <u>Alfred Bourgeois</u> | )( | Proceeding: <u>Evidentiary Hearing</u> <u>under 28 U.S.C. § 2255</u> |
| | )( | Date: ___<u>September 20, 2010</u>___ |
| | )( | Exhibit List of: ___<u>Government</u>___ |
| | )( | Attorney: <u>AUSA Tony Roberts</u> <u>AUSA Patti Hubert Booth</u> <u>AUSA Elsa Salinas</u> <u>AUSA Mark Dowd</u> |

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 1. | Report of Dr. Price | ✓ | ✓ | | 9/23/10 | |
| 2. | Dr. Price CV | ✓ | ✓ | | 9/23/10 | |
| 3. | Dr. Price List of Prior Testimony | ✓ | ✓ | | 9/23/10 | |
| 4. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disk]. | ✓ | ✓ | | 9/10/10 | |
| 5. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disk]. | ✓ | ✓ | | 9/10/10 | |
| 6. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1disks]. | ✓ | ✓ | | 9/10/10 | |
| 7. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 8. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 9. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |

USCA5 2376

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 10. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 11. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 12. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 13. | Videos of Dr. Price's psychological examination of Mr. Bourgeois [1 disks]. | ✓ | ✓ | | 9/10/10 | |
| 14. | Voluntary Statement of Mr. Bourgeois to Dr. Price | ✓ | ✓ | | 9/23/10 | |
| 15. | Report of Dr. Moore | ✓ | ✓ | | 9/24/10 | |
| 16. | Addendum Report Dr. Moore | ✓ | ✓ | | 9/24/10 | |
| 17. | Dr. Moore CV | ✓ | ✓ | | 9/24/10 | |
| 18. | Dr. Moore List of Prior Testimony | ✓ | ✓ | | 9/24/10 | |
| 19. | Videos of Dr. Moore's psychological examination of Mr. Bourgeois [1 discs] | ✓ | ✓ | | 9/10/10 | |
| 20. | Videos of Dr. Moore's psychological examination of Mr. Bourgeois [1 discs] | ✓ | ✓ | | 9/10/10 | |
| 21. | Videos of Dr. Moore's psychological examination of Mr. Bourgeois [1discs] | ✓ | ✓ | | 9/10/10 | |
| 22. | Videos of Dr. Moore's psychological examination of Mr. Bourgeois [1 discs] | ✓ | ✓ | | 9/10/10 | |
| 23. | Legal Correspondence by Mr. Bourgeois from prison (47 pages) | ✓ | ✓ | | 9/23/10 | |
| 24. | Legal Correspondence by Mr. Bourgeois from prison (29 pages) | ✓ | ✓ | | 9/23/10 | |
| 25. | Legal Correspondence by Mr. Bourgeois from prison (43 pages) | ✓ | ✓ | | 9/23/10 | |
| 26. | Legal Correspondence by Mr. Bourgeois from prison (2 pages) | ✓ | ✓ | | 9/23/10 | |
| 27. | Letter by Mr. Bourgeois to Robin Bourgeois in 1998 (5 pages) | ✓ | ✓ | | 9/24/10 | |

USCA5 2377

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 28. | American Checking Acct Statements from 12/27/00 to 1/24/02 seized from Mr. Bourgeois' briefcase (177 pages) | ✓ | ✓ | | 9/24/10 | |
| 29. | Benefits Election Package seized from Mr. Bourgeois' briefcase (3 pages) | ✓ | ✓ | | 9/24/10 | |
| 30. | CDL Citation Record seized from Mr. Bourgeois' briefcase (1 page) | ✓ | ✓ | | 9/24/10 | |
| 31. | US Express Expense Report seized from Mr. Bourgeois' briefcase (1 page) | ✓ | ✓ | | 9/24/10 | |
| 32. | Correspondence to Kerry Brown seized from Mr. Bourgeois' briefcase (1 page) | ✓ | ✓ | | 9/24/10 | |
| 33. | Correspondence to Ministries seized from Mr. Bourgeois' briefcase (9 pages) | ✓ | ✓ | | 9/24/10 | |
| 34. | Hibernia Mortgage Payment coupon and check seized from Mr. Bourgeois' briefcase (1 page) | ✓ | ✓ | | 9/24/10 | |
| 35. | DOT Medical Examination Certificate seized from Mr. Bourgeois' briefcase (1 page) | ✓ | ✓ | | 9/24/10 | |
| 36. | Medical Examination for Driver from briefcase (4 pages) | ✓ | ✓ | | 9/24/10 | |
| 37. | Letter to the Court from Ms. BOURGEOIS (7 pages) | ✓ | ✓ | | 9/24/10 | |
| 38. | Skipper Transportation Application for Driver Qualification (6 pages) | ✓ | ✓ | | 9/24/10 | |
| 39. | Ford Motor Credit Application (7 pages) | ✓ | ✓ | | 9/24/10 | |
| 40. | Letter Requesting Reduction in child Support payments (1 page) | ✓ | ✓ | | 9/24/10 | |
| 41. | Birthday Party Video | ✓ | ✓ | | 9/24/10 | |
| 42. | [342] Swimming Video | | | | | |
| 43. | Dog Video | ✓ | ✓ | | 9/24/10 | |
| 44. | [329] Letter to Robin Bourgeois and Anthony of 8/8/02 | | | | | |
| 45. | [330] Letter to Robin Bourgeois # 2 | | | | | |

Page 3 of  15

USCA5 2378

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 46. | [331] Letter to Robin Bourgeois # 3 | | | | | |
| 47. | [332] Letter to Robin Bourgeois # 4 | | | | | |
| 48. | [333] Letter to Robin Bourgeois or Anthony Dumas | | | | | |
| 49. | [334] Letter to Stacy Williams | | | | | |
| 50. | Letter to Katrina | | | | | |
| 51. | Letter to Cherry Smith | | | | | |
| 52. | Letter to Lloyd and Anita | | | | | |
| 53. | Letter to Anthony Dumas | | | | | |
| 54. | Letter to Lisa | | | | | |
| 55. | Letter to Alton Preston | | | | | |
| 56. | Letter to Sheryl Morrial | | | | | |
| 57. | [360] Letter from Mr. Bourgeois in 1998 | | | | | |
| 58. | [392] Letter from Mr. Bourgeois (16 pages) | | | | | |
| 59. | [343] Telephone Conversation with Anthony Dumas | | | | | |
| 60. | [373] Transcript of Telephone Conversation with Anthony Dumas | | | | | |
| 61. | [344] Telephone Conversation with Nathaniel and Dana Banks | | | | | |
| 62. | [384] Transcript of Telephone Conversation with Nathaniel Banks | | | | | |
| 63. | Report of Jerrilyn Conway Forensic Examiner F.B.I. Lab | ✓ | ✓ | | 9/24/10 | |
| 64. | CV of Ms. Conway | ✓ | ✓ | | 9/24/10 | |
| 65. | Ms. Conway Court History | ✓ | ✓ | | 9/24/10 | |
| 66. | Dr. Oliver Report | | | | | |
| 67. | Dr. Oliver CV | | | | | |
| 68. | Dr. Oliver Appendix A | | | | | |
| 69. | Dr. Oliver Appendix B | | | | | |

USCA5 2379

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 70. | Dr. Oliver case history | | | | | |
| 71. | [415b] Report of Dr. Senn | ✓ | ✓ | | 9/21/10 | |
| 72. | [416b] Report of Dr. Chrz | ✓ | ✓ | | 9/21/10 | |
| 73. | Interrogatories for Douglas Tinker | ✓ | ✓ | | 9/22/10 | |
| 74. | Response Affidavit of John Gilmore | | | | | |
| 75. | [33]AUTOPSY PHOTOGRAPH (L)UPPER LIP RIGHT SIDE | | | | | |
| 76. | [37] AUTOPSY PHOTOGRAPH (OOOO)OUTSIDE LEFT LEG | | | | | |
| 77. | [38] AUTOPSY PHOTOGRAPH (QQQQ)INSIDE LEFT LEG | | | | | |
| 78. | [40] AUTOPSY PHOTOGRAPH (UUUU) PALM RIGHT HAND | | | | | |
| 79. | [41] AUTOPSY PHOTOGRAPH (TTTT)FINGERS LEFT HAND | | | | | |
| 80. | [42] AUTOPSY PHOTOGRAPH (SSSS)TOP LEFT HAND | | | | | |
| 81. | [43] AUTOPSY PHOTOGRAPH (YYYY) PALM RIGHT HAND | | | | | |
| 82. | [44] AUTOPSY PHOTOGRAPH (ZZZZ)FINGERS RIGHT HAND | | | | | |
| 83. | [51] AUTOPSY PHOTOGRAPH (PPPP)TOP OF LEFT FOOT | | | | | |
| 84. | [52] AUTOPSY PHOTOGRAPH (DDDD)RIGHT HEEL | | | | | |
| 85. | [55] AUTOPSY PHOTOGRAPH (RRRR) SCALP SHOWING MULTIPLE HEMORRHAGES | | | | | |
| 86. | [56] AUTOPSY PHOTOGRAPH (MMM) SCALP SHOWING SINGLE HEMORRHAGES | | | | | |

Page 5 of  15

USCA5 2380

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 87. | [57] AUTOPSY PHOTOGRAPH (XXXX) SCALP SHOWING SINGLE HEMORRHAGES (CLOSE UP) | | | | | |
| 88. | [58] AUTOPSY PHOTOGRAPH (WWWW) SCALP SHOWING HEMORRHAGE | | | | | |
| 89. | [59] AUTOPSY PHOTOGRAPH (LLLL) SCALP SINGLE HEMORRHAGE | | | | | |
| 90. | [61] AUTOPSY PHOTOGRAPH (ZZZZ) BRAIN INSIDE SKULL | | | | | |
| 91. | [62] AUTOPSY PHOTOGRAPH (AAAAA) SKULL WITHOUT BRAIN | | | | | |
| 92. | [63] AUTOPSY PHOTOGRAPH (FFFFF) BLOWN RETINAS | | | | | |
| 93. | [150] DR. OLIVER: (SLIDE 10)  LATERAL ASPECT OF RIGHT LEG - WHIP MARKS | | | | | |
| 94. | [151] DR. OLIVER:  (SLIDE 11) CONTRAST ENHANCED PHOTO OF SLIDE 10 | | | | | |
| 95. | [152] DR. OLIVER:  (SLIDE 12) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 10 | | | | | |
| 96. | [153] DR. OLIVER: (SLIDE 14)  LATERAL ASPECT OF THE RIGHT LEG, SLIGHTLY MORE SUPERIOR AREA, INCLUDES THE LATERAL ASPECT OF THE LOWER ABDOMEN ON THE RIGHT - SCAR AND NONSPECIFIC CONTUSIONS | | | | | |
| 97. | [154] DR. OLIVER:  (SLIDE 15) CONTRAST ENHANCED PHOTO OF SLIDE 14 | | | | | |
| 98. | [155] DR. OLIVER:  (SLIDE 16) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 14 | | | | | |

USCA5 2381

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 99. | [156] DR. OLIVER: (SLIDE 18) ANTEROLATERAL ASPECT OF THE LOWER LEG ON THE RIGHT AND PORTIONS OF THE MEDIAL ASPECT OF THE LEFT LOWER LEG - CONTUSIONS, SCARS, AND WHIP MARK. | | | | | |
| 100. | [157] DR. OLIVER: (SLIDE 19) CONTRAST ENHANCED PHOTO OF SLIDE 18 | | | | | |
| 101. | [158] DR. OLIVER: (SLIDE 20) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 18 | | | | | |
| 102. | [159] DR. OLIVER: (SLIDE 21) DORSAL SURFACE OF THE RIGHT FOOT - HEALED SCARS, HEALING ULCERATIONS, CONTUSION AND ABRASION/EXCORIATION OF THE MEDIAL ASPECT OF THE HEEL. | | | | | |
| 103. | [160] DR. OLIVER: (SLIDE 22) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 21 | | | | | |
| 104. | [161] DR. OLIVER: (SLIDE 24) LEFT LEG - CLOSE-UP OF THE WHIP MARK AND AN ADDITIONAL SCAR | | | | | |
| 105. | [162] DR. OLIVER: (SLIDE 26) THREE-TRACK PATTERN OF AN ELECTRICAL CORD | | | | | |
| 106. | [163] DR. OLIVER: (SLIDE 27) ELECTRICAL CORD | | | | | |
| 107. | [164] DR. OLIVER: (SLIDE 28) ELECTRICAL CORD | | | | | |
| 108. | [165] DR. OLIVER: (SLIDE 31) LATERAL ASPECT OF THE LEFT LOWER LEG, MEDIAL ASPECT OF THE RIGHT LOWER LEG, AND SOLE OF THE RIGHT FOOT. WHIP MARKS, CONTUSION, SCAR, ULCERATIONS, AND PUNCTATE SCAR. | | | | | |

USCA5 2382

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 109. | [166] DR. OLIVER:  (SLIDE 32) CONTRAST ENHANCED PHOTO OF SLIDE 31 | | | | | |
| 110. | [167] DR. OLIVER:  (SLIDE 33) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 31 | | | | | |
| 111. | [168] DR. OLIVER:  (SLIDE 35) SOLE OF THE RIGHT FOOT - CONTUSIONS AND ULCERATIONS | | | | | |
| 112. | [169] DR. OLIVER:  (SLIDE 37) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 35 | | | | | |
| 113. | [170] DR. OLIVER:  (SLIDE 36) CONTRAST ENHANCED PHOTO OF SLIDE 35 | | | | | |
| 114. | [171] DR. OLIVER:  (SLIDE 39) DORSAL ASPECT OF THE FEET - CLOSE-UP OF THE SCARS  AND ULCERATION | | | | | |
| 115. | [172] DR. OLIVER:  (SLIDE 40) CONTRAST ENHANCED PHOTO OF SLIDE 39 | | | | | |
| 116. | [173] DR. OLIVER:  (SLIDE 41) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 39 | | | | | |
| 117. | [174] DR. OLIVER:  (SLIDE 43) MEDIAL ASPECT OF THE UPPER PORTION OF THE RIGHT LEG - WHIP MARKS, CONTUSIONS, AND PUNCTATE AND LINEAR SCARS. | | | | | |
| 118. | [175] DR. OLIVER:  (SLIDE 44) CONTRAST ENHANCED PHOTO OF SLIDE 43 | | | | | |
| 119. | [176] DR. OLIVER:  (SLIDE 45) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 43 | | | | | |

USCA5 2383

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 120. | [177] DR. OLIVER:  (SLIDE 47) MEDIAL ASPECT OF THE RIGHT LEG, AND PORTIONS OF THE POSTERIOR ASPECT OF THE LEFT THIGH - CONTUSIONS | | | | | |
| 121. | [178] DR. OLIVER:  (SLIDE 48) CONTRAST ENHANCED PHOTO OF SLIDE 47 | | | | | |
| 122. | [179] DR. OLIVER:  (SLIDE 49) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 47 | | | | | |
| 123. | [180] DR. OLIVER:  (SLIDE 51) POSTERIOR ASPECT OF THE LEFT THIGH - FOUR CURVILINEAR MARKS CONSISTENT WITH WHIPPING MARKS AND CONTUSIONS. | | | | | |
| 124. | [181] DR. OLIVER:  (SLIDE 52) CONTRAST ENHANCED PHOTO OF SLIDE 51 | | | | | |
| 125. | [182] DR. OLIVER:  (SLIDE 53) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 51 | | | | | |
| 126. | [183] DR. OLIVER:  (SLIDE 55) BUTTOCKS -   CONTUSIONS AND APPROXIMATELY 17 HEALED AND HEALING SCARS. | | | | | |
| 127. | [184] DR. OLIVER:  (SLIDE 56) CONTRAST ENHANCED PHOTO OF SLIDE 55 | | | | | |
| 128. | [185] DR. OLIVER:  (SLIDE 57) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 55 | | | | | |
| 129. | [186] DR. OLIVER: (SLIDE 59) POSTERIOR ASPECT OF THE LEFT FLANK - CONTUSIONS AND SCARS | | | | | |
| 130. | [187] DR. OLIVER:  (SLIDE 60) CONTRAST ENHANCED PHOTO OF SLIDE 59 | | | | | |

USCA5 2384

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 131. | [188] DR. OLIVER: (SLIDE 61) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 59 | | | | | |
| 132. | [189] DR. OLIVER: (slide 63) RIGHT FLANK - WHIP MARK AND CONTUSIONS | | | | | |
| 133. | [190] DR. OLIVER: (SLIDE 64) CONTRAST ENHANCED PHOTO OF SLIDE 63 | | | | | |
| 134. | [191] DR. OLIVER: (SLIDE 65) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 63 | | | | | |
| 135. | [192] DR. OLIVER: (SLIDE 67) UPPER RIGHT FLANK AND BACK - WHIP MARK AND CONTUSIONS. | | | | | |
| 136. | [193] DR. OLIVER: (SLIDE 68) CONTRAST ENHANCED PHOTO OF SLIDE 67 | | | | | |
| 137. | [194] DR. OLIVER: (SLIDE 69) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 67 | | | | | |
| 138. | [195] DR. OLIVER: (SLIDE 71) ABDOMEN - CONTUSIONS, WHIP MARK, AND NON-LOOPED PATTERNED CONTUSION | | | | | |
| 139. | [196] DR. OLIVER: (SLIDE 72 ) CONTRAST ENHANCED PHOTO OF SLIDE 71 | | | | | |
| 140. | [197] DR. OLIVER: (SLIDE 73) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 71 | | | | | |
| 141. | [198] DR. OLIVER: (SLIDE 76) RIGHT ARM - CONTUSIONS, A RECTANGULAR PATTERNED CONTUSION, A CURVILINEAR PATTERNED INJURY NOT CONSISTENT WITH A WHIPPING MARK IS PRESENT OVER THE FOREARM, HEALED SCARS. | | | | | |

USCA5 2385

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 142. | [199] DR. OLIVER: (SLIDE 77) CONTRAST ENHANCED PHOTO OF SLIDE 76 | | | | | |
| 143. | [200] DR. OLIVER: (SLIDE 78) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 76 | | | | | |
| 144. | [201] DR. OLIVER: (SLIDE 79) RIGHT ARM | | | | | |
| 145. | [202] DR. OLIVER: (SLIDE 80) CONTRAST ENHANCED PHOTO OF SLIDE 79 | | | | | |
| 146. | [203] DR. OLIVER: (SLIDE 81) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 79 | | | | | |
| 147. | [204] DR. OLIVER: (SLIDE 84) DORSAL SURFACE OF THE RIGHT HAND - CONTUSION, MULTIPLE HEALING ABRASIONS AND SCARS, CONFLUENT CONTUSION CONFLUENCY | | | | | |
| 148. | [205] DR. OLIVER: (SLIDE 85) CONTRAST ENHANCED PHOTO OF SLIDE 84 | | | | | |
| 149. | [206] DR. OLIVER: (SLIDE 86) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 84 | | | | | |
| 150. | [207] DR. OLIVER: (SLIDE 88) LATERAL ASPECT OF THE LEFT ARM - CONTUSIONS AND HEALED SCARS | | | | | |
| 151. | [208] DR. OLIVER: (SLIDE 89) CONTRAST ENHANCED PHOTO OF SLIDE 88 | | | | | |
| 152. | [209] DR. OLIVER: (SLIDE 90) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 88 | | | | | |
| 153. | [210] DR. OLIVER: (SLIDE 92) DORSAL SURFACE OF THE LEFT HAND - CONFLUENT CONTUSION, HEALED SCARS, AND HEALING ABRASIONS | | | | | |

USCA5 2386

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 154. | [211] DR. OLIVER: (SLIDE 93) CONTRAST ENHANCED PHOTO OF SLIDE 92 | | | | | |
| 155. | [212] DR. OLIVER: (SLIDE 94) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 92 | | | | | |
| 156. | [213] DR. OLIVER: (SLIDE 96) PALMAR SURFACES OF THE HANDS - CONTUSIONS, AND HEALING ABRASIONS | | | | | |
| 157. | [214] DR. OLIVER: (SLIDE 97) CONTRAST ENHANCED PHOTO OF SLIDE 96 | | | | | |
| 158. | [215] DR. OLIVER: (SLIDE 98) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 96 | | | | | |
| 159. | [216] DR. OLIVER: (SLIDE 100) ANTERIOR FACE AND UPPER CHEST - CONTUSIONS AND HEALING ABRASION | | | | | |
| 160. | [217] DR. OLIVER: (SLIDE 101) CONTRAST ENHANCED PHOTO OF SLIDE 100 | | | | | |
| 161. | [218] DR. OLIVER: (SLIDE 102) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 100 | | | | | |
| 162. | [219] DR. OLIVER: (SLIDE 104) RIGHT SIDE OF THE FACE - NONSPECIFIC CONTUSIONS AND PATTERNED CONTUSION | | | | | |
| 163. | [220] DR. OLIVER: (SLIDE 105) CONTRAST ENHANCED PHOTO OF SLIDE 104 | | | | | |
| 164. | [221] DR. OLIVER: (SLIDE 106) ANNOTATED CONTRAST ENHANCED PHOTO OF SLIDE 104 | | | | | |

USCA5 2387

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 165. | [222] DR. OLIVER: (SLIDE 108) MOUTH - LACERATION OF THE LIP AS WELL AS LACERATION OF THE UPPER AND LOWER FRENULA. | | | | | |
| 166. | [223] DR. OLIVER: (SLIDE 109) MOUTH | | | | | |
| 167. | [224] DR. OLIVER: (SLIDE 110) MOUTH | | | | | |
| 168. | LTR FROM ADAM  LONGORIA DATED 03/28/04 | | | | | |
| 169. | LTR TO TEXAS BOARD OF PARDONS DATED 02/09/06 | | | | | |
| 170. | LTR FROM ADAM LONGORIA DATED 05/03/07 | | | | | |
| 171. | Background Information Considered Dr. Senn | | | | | |
| 172. | Dr. David Senn Report | ✓ | ✓ | | 9/21/10 | |
| 172a | ABFO Position Paper on Bitemark Workshop #4 | ✓ | ✓ | | 9/22/10 | |
| 173. | Dr. David Senn CV | ✓ | ✓ | | 9/21/10 | |
| 174. | Dr. David Senn Biographical Information | ✓ | ✓ | | 9/21/10 | |
| 175. | Swanson Report | ✓ | ✓ | | 9/20/10 | |
| 176. | Letter from Alfred Bourgeois to Gerald Birebaum (8 pages) | ✓ | ✓ | | 9/22/10 | |
| 177. | Letter from Alfred Bourgeois to Gerald Birebaum (4 pages) | ✓ | ✓ | | 9/22/10 | |
| 178. | Letter from Alfred Bourgeois to John Gilmore (10 pages) | ✓ | ✓ | | 9/22/10 | |
| 179. | Letter from Alfred Bourgeois to John Gilmore (1 pages) | ✓ | ✓ | | 9/22/10 | |
| 180. | Letter from Alfred Bourgeois to John Gilmore (3 pages) | ✓ | ✓ | | 9/22/10 | |
| 181 | Letter with FBI 302 from Alfred Bourgeois to John Gilmore (6 pages) | ✓ | ✓ | | 9/22/10 | |

USCA5 2388

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|---|---|---|---|---|
| 182 | Letter from Alfred Bourgeois to John Gilmore (9 pages) | ✓ | ✓ | | 9/22/10 | |
| 183 | Letter from Alfred Bourgeois to John Gilmore (6 pages) | ✓ | ✓ | | 9/22/10 | |
| 184 | Letter from Alfred Bourgeois to John Gilmore (5 pages) | ✓ | ✓ | | 9/22/10 | |
| 185 | Letter with FBI 302 from Alfred Bourgeois to John Gilmore (9 pages) | ✓ | ✓ | | 9/22/10 | |
| 186 | Letter from Alfred Bourgeois to John Gilmore (1 pages) | ✓ | ✓ | | 9/22/10 | |
| 187 | Letter from Alfred Bourgeois to John Gilmore (2 pages) | ✓ | ✓ | | 9/22/10 | |
| 188 | Letter from Alfred Bourgeois to John Gilmore (2 pages) | ✓ | ✓ | | 9/22/10 | |
| 189 | Letter from Alfred Bourgeois to John Gilmore (5 pages) | ✓ | ✓ | | 9/22/10 | |
| 190 | Letter from Alfred Bourgeois to John Gilmore (3 pages) | ✓ | ✓ | | 9/22/10 | |
| 191 | Letter from Alfred Bourgeois to John Gilmore (6 pages) | ✓ | ✓ | | 9/22/10 | |
| 192 | Letter from Alfred Bourgeois to John Gilmore (2 pages) | ✓ | ✓ | | 9/22/10 | |
| 193 | Letter with FBI 302 from Alfred Bourgeois to John Gilmore (8 pages) | ✓ | ✓ | | 9/22/10 | |
| 194 | Letter from Alfred Bourgeois to John Gilmore (4 pages) | ✓ | ✓ | | 9/22/10 | |
| 195 | Letter from Alfred Bourgeois to John Gilmore (1 pages) | ✓ | ✓ | | 9/22/10 | |
| 196 | Letter from Alfred Bourgeois to John Gilmore (7 pages) | ✓ | ✓ | | 9/22/10 | |
| 197 | Letter from Alfred Bourgeois to John Gilmore (3 pages) | ✓ | ✓ | | 9/22/10 | |
| 198 | Letter from Alfred Bourgeois to John Gilmore (6 pages) | ✓ | ✓ | | 9/22/10 | |

USCA5 2389

| Exhibit no. | Description | Marked | Offered | Object | Admitted | Not Admitted |
|---|---|:---:|:---:|:---:|:---:|:---:|
| 199 | Letter from Alfred Bourgeois to John Gilmore (9 pages) | ✓ | ✓ | | 9/22/10 | |
| 200 | Letter from Alfred Bourgeois to John Gilmore (7 pages) | ✓ | ✓ | | 9/22/10 | |
| 201 | Diagnostic Criteria for 301.20 Schizoid Personality Disorder (1 Page) | ✓ | ✓ | | 9/20/10 | |
| 202 | Declaration and affidavit of Brenda Goodman | ✓ | ✓ | | 9/21/10 | |
| 203 | | | | | | |
| 204 | The National Academies - power point | ✓ | ✓ | | 9/22/10 | |
| 205 | Forensic Detection of Semen III | ✓ | ✓ | | 9/24/10 | |
| 206 | FBI Facsimile dated 02/26/2004 | ✓ | ✓ | | 9/24/10 | |
| 207 | | | | | | |
| 208 | Number of Guesses by David Clark | ✓ | ✓ | | 9/24/10 | |

USCA5 2390

**AO 435**
(Rev. 03/08)

*Please Read Instructions:*

**Administrative Office of the United States Courts**

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**
**DUE DATE:**

| 1. NAME  KATHRIN HENNIG | 2. PHONE NUMBER  215-928-0520 | 3. DATE  10/1/2010 |
|---|---|---|

| 4. MAILING ADDRESS  601 WALNUT ST, SUITE 545 W. | 5. CITY  PHILADELPHIA | 6. STATE  PA | 7. ZIP CODE  19106 |
|---|---|---|---|

| 8. CASE NUMBER  2:02-cv-00216 | 9. JUDGE  JANIS G. JACK | DATES OF PROCEEDINGS |
|---|---|---|

| 12. CASE NAME  USA v. BOURGEOIS | 10. FROM 9/20/2010 | 11. TO 9/24/2010 |
|---|---|---|

LOCATION OF PROCEEDINGS

13. CITY CORPUS CHRISTI    14. STATE TX

**15. ORDER FOR**

- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [x] CIVIL (HABEAS)
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [ ] BANKRUPTCY
- [ ] OTHER *(Specify)*

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [x] OTHER (Specify) | 9/20/2010 - 9/24/2010 |
| [ ] SENTENCING | | EVID. HEARING | |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| 14-Day | [ ] | [x] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |
| REALTIME | [ ] | [ ] | | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

**ESTIMATE TOTAL**

| 18. SIGNATURE | [x] EMAIL ONLY REQUIRED |
|---|---|
| | [ ] EMAIL AND HARD COPY REQUIRED |
| 19. DATE  10/1/2010 | [x] EMAIL ADDRESS: MICHAEL_WISEMAN@FD.ORG  KATHRIN_HENNIG@FD.ORG |

20. TRANSCRIPT TO BE PREPARED BY

YELLA GANO

COURT ADDRESS

United States Courts
Southern District of Texas
**FILED**

**OCT 04 2010**

David J. Bradley, Clerk of Court

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

Due
10-13-10

AO 435
(Rev. 03/08)

Administrative Office of the United States Courts

**PARTIAL TRANSCRIPT ORDER**

*Please Read Instructions:*

| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 10/4/2010 |
|---|---|---|

| 4. MAILING ADDRESS 601 WALNUT ST. SUITE 545 W. | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
|---|---|---|---|

| 8. CASE NUMBER 2:02-cr-00216 | 9. JUDGE JANIS G. JACK | DATES OF PROCEEDINGS |
|---|---|---|

10. FROM 9/20/2010    11. TO 9/24/2010

| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS |
|---|---|

13. CITY CORPUS CHRISTI    14. STATE TX

**15. ORDER FOR**

- ☐ APPEAL
- ☐ NON-APPEAL
- ☐ CRIMINAL
- ☒ CIVIL (HABEAS)
- ☐ CRIMINAL JUSTICE ACT
- ☐ IN FORMA PAUPERIS
- ☐ BANKRUPTCY
- ☐ OTHER (Specify)

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☒ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | KEEL, JOHNSON | 9/28/2010 |
| ☐ OPENING STATEMENT (Defendant) | | CONWAY | 9/24/2010 |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spey) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | | |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☒ | NO. OF COPIES | | United States Court Southern District of Texas FILED |
| EXPEDITED | ☐ | ☒ | NO. OF COPIES | | OCT 05 2010 |
| DAILY | ☐ | ☐ | NO. OF COPIES | | David J. Bradley, Clerk of Court |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | 2:15 pm fax |
| REALTIME | ☐ | ☐ | | | |

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges
(deposit plus additional).

| 18. SIGNATURE *U. Hennig* | ☒ EMAIL ONLY REQUIRED |
|---|---|
| | ☐ EMAIL AND HARD COPY REQUIRED |
| 19. DATE 10/4/2010 | ☒ EMAIL ADDRESS: MICHAEL_WISEMAN@FD.ORG |
| | KATHRIN_HENNIG@FD.ORG |

| 20. TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|
| YELENA GRANO Molly Carter | |

| ORDER RECEIVED | 10-5-10 VG | |
|---|---|---|
| DEPOSIT PAID | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | 10-6-10 VG | TOTAL CHARGES |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE |

DISTRIBUTION:    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

USCA5 2392

CJA 20  APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL

| 1. CIR./DIST./DIV. CODE TXS | 2. PERSON REPRESENTED ALLEN, TIM | | VOUCHER NUMBER 1010060000065 | |
|---|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 2:02-000216-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER | |
| 7. IN CASE/MATTER OF (Case Name) US v. BOURGEOIS | 8. PAYMENT CATEGORY Other | 9. TYPE PERSON REPRESENTED Other:_____ | 10. REPRESENTATION TYPE (See Instructions) Witness (O... | |

**11. OFFENSE(S) CHARGED** (Cite U.S. Code, Title & Section)  If more than one offense, list (up to five) major offenses charged, according to severity of offense.

United States District Court
Southern District of Texas
FILED

OCT 05 2010

David J. Bradley, Clerk of Court

**12. ATTORNEY'S NAME** (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS

JIMENEZ, FRED
509 Lawrence #301
Corpus Chirsti  TX  78401

Telephone Number: (361) 888-7744

**14. NAME AND MAILING ADDRESS OF LAW FIRM** (only provide per instructions)

**13. COURT ORDER**

- [X] O  Appointing Counsel
- [ ] F  Subs For Federal Defender
- [ ] P  Subs For Panel Attorney
- [ ] C  Co-Counsel
- [ ] R  Subs For Retained Attorney
- [ ] Y  Standby Counsel

Prior Attorney's Name: _____
Appointment Date: _____

- [ ] Because the above-named person represented has testified under oath or has otherwise satisfied this court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 12 is appointed to represent this person in this case, or
- [ ] Other (See Instructions)

Signature of Presiding Judicial Officer or By Order of the Court

10/05/2010
Date of Order          Nunc Pro Tunc Date

Repayment or partial repayment ordered from the person represented for this service at time of appointment.  [ ] YES  [ ] NO

**CLAIM FOR SERVICES AND EXPENSES**                    **FOR COURT USE ONLY**

| | CATEGORIES (Attach itemization of services with dates) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH ADJUSTED HOURS | MATH/TECH ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|---|
| 15. | a. Arraignment and/or Plea | | | | | |
| In Court | b. Bail and Detention Hearings | | | | | |
| | c. Motion Hearings | | | | | |
| | d. Trial | | | | | |
| | e. Sentencing Hearings | | | | | |
| | f. Revocation Hearings | | | | | |
| | g. Appeals Court | | | | | |
| | h. Other (Specify on additional sheets) | | | | | |
| | (Rate per hour = $        )      TOTALS: | | | | | |
| 16. | a. Interviews and Conferences | | | | | |
| Out of Court | b. Obtaining and reviewing records | | | | | |
| | c. Legal research and brief writing | | | | | |
| | d. Travel time | | | | | |
| | e. Investigative and Other work  (Specify on additional sheets) | | | | | |
| | (Rate per hour = $        )      TOTALS: | | | | | |
| 17. | Travel Expenses  (lodging, parking, meals, mileage, etc.) | | | | | |
| 18. | Other Expenses  (other than expert, transcripts, etc.) | | | | | |
| | **GRAND TOTALS (CLAIMED AND ADJUSTED):** | | | | | |

| 19. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE FROM _____ TO _____ | 20. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION | 21. CASE DISPOSITION |
|---|---|---|

**22. CLAIM STATUS**  [ ] Final Payment  [ ] Interim Payment Number _____  [ ] Supplemental Payment
Have you previously applied to the court for compensation and/or remimbursement for this case?  [ ] YES  [ ] NO  If yes, were you paid?  [ ] YES  [ ] NO
Other than from the court, have you, or to your knowledge has anyone else, received payment (compensation or anything or value) from any other source in connection with this representation?  [ ] YES  [ ] NO  If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.

Signature of Attorney: _____                          Date: _____

**APPROVED FOR PAYMENT — COURT USE ONLY**

| 23. IN COURT COMP. | 24. OUT OF COURT COMP. | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMT. APPR / CERT |
|---|---|---|---|---|
| 28. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER | | | DATE | 28a. JUDGE / MAG. JUDGE CODE |
| 29. IN COURT COMP. | 30. OUT OF COURT COMP. | 31. TRAVEL EXPENSES | 32. OTHER EXPENSES | 33. TOTAL AMT. APPROVED |
| 34. SIGNATURE OF CHIEF JUDGE, COURT OF APPEALS (OR DELEGATE) Payment approved in excess of the statutory threshold amount. | | | DATE | 34a. JUDGE CODE |

USCA5 2393

## Notice to CJA Panel Attorneys

Please submit vouchers for payment no later than 45 days after the final disposition of the case, unless good cause is shown. *Guide to Judiciary Policies and Procedures*, Vol. VII, Chap. II, Pt. C, Sec. 2.21. Vouchers submitted after the expiration of the 45-day period must include a statement explaining the reason(s) for the delay.

Delayed vouchers adversely affect the CJA budgeting process. Failure to timely submit vouchers for payment may result in delay or denial of payment.

You MUST submit vouchers with expense worksheets. You can download the worksheets from www.txs.uscourts.gov - go to District Court, then under the Miscellaneous Links/Documents section, click on CJA Appointment Information. The Expense Worksheet is located in the Forms section.

Effective 7/24/06, the **original** CJA voucher will NOT be mailed to the appointed attorney. The copy of the voucher, which you received by either email or fax, is sufficient for processing.

*All attorneys appointed to represent  material witnesses must submit a separate voucher for each material witness.

USCA5 2394

                 IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
         PLAINTIFF,              *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 22, 2010
                                 *    9:25 A.M.
         DEFENDANT.              *
* * * * * * * * * * * * * * * * * *

      PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 3
   (TESTIMONY OF ELIZABETH ANN JOHNSON AND CHARLES ALAN KEEL)

         BEFORE THE HONORABLE JANIS GRAHAM JACK
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

              (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:            MS. VELMA GANO


      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
            MOLLY CARTER, P. O. BOX 270203
         CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 2395

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:        MR. VICTOR JULIO ABREU
                          MR. MICHAEL WISEMAN
                          MS. ELIZABETH A. LARIN
                          OFFICE OF THE FEDERAL PUBLIC DEFENDER
                          601 WALNUT STREET
                          THE CURTIS CENTER, SUITE 545
                          PHILADELPHIA, PENNSYLVANIA 19106

                          MR. JAMES McHUGH
                          FEDERAL COMMUNITY DEFENDER OFFICE
                          FOR THE EASTERN DISTRICT OF
                          PENNSYLVANIA
                          601 WALNUT STREET
                          THE CURTIS CENTER, SUITE 540
                          PHILADELPHIA, PENNSYLVANIA 19106

USCA5 2396

(The proceedings began at 9:25 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 9:28:10 a.m.)

ELIZABETH ANN JOHNSON, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ABREU:

Q.    Ms. Johnson, can you please state your name for the record?

A.    Yes.  It's Elizabeth Ann Johnson.

Q.    Thank you.  Ms. Johnson, how are you employed?

A.    I'm a self-employed forensics scientist.

Q.    And where do you practice?

A.    Southern California, Thousand Oaks.

Q.    I'm going to show you what's been previously marked as Petitioner's 93 and ask you if you recognize that particular document.

A.    Yes.

Q.    What is that?

A.    It's a copy of my CV.

MR. ABREU:  Your Honor, at this time we would offer a copy of Petitioner's 93.

MR. DOWD:  No objection, Your Honor.

THE COURT:  Petitioner's 93 is admitted.

BY MR. ABREU:

Q.   And, Ms. Johnson, how long have you been in private consultation with regard to forensics?

A.   Self-employed for, since 2003.

Q.   And prior to that, what were you doing?

A.   Before that, I worked at a private laboratory in Ventura, California, for six years.  And prior to that, I was with the Medical Examiner's Office in Harris County, Texas.

Q.   And how long were you there, in Harris County, Texas?

A.   Five years.

Q.   Okay.  Have you been qualified as an expert in DNA in the past?

A.   Yes.

Q.   Have you been qualified as an expert in forensic biology?

A.   Yes.

Q.   Have you testified in state court as an expert in those fields?

A.   Yes.

Q.   Approximately how many times?

A.   About a hundred.

Q.   Have you testified in federal court?

A.   Yes.

Q.   Approximately how many times?

A.   It's just an estimate, probably a dozen times.

Q.   Have you ever been denied expert status in a case?

A.   No.

USCA5 2398

MR. ABREU:  Your Honor, at this time --

THE COURT:  Any objection to her being received as an expert in DNA, Mr. Dowd?

MR. DOWD:  No, Your Honor.

THE COURT:  Then it's accepted.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.   Ms. Johnson, in 2003 were you retained in the case of United States versus Alfred Bourgeois?

A.   Yes, I was.

Q.   And who were you retained by?

A.   Douglas Tinker.

Q.   Do you recall any interactions with Mr. John Gilmore?

A.   I don't.

Q.   So every interaction you had in the case was only with Mr. Tinker?

A.   As I recall, yes.

Q.   And what were you retained to do back in 2003?

A.   To review some documents regarding some testing in the case and to consult with Mr. Tinker.

Q.   Testing by whom?

A.   The FBI.

Q.   Were you directed to conduct any testing of your own?

A.   Eventually, yes.

Q.   Okay.  And in relation to that, to what you were requested

to do, did you receive any evidence?

A.    Yes.

Q.    What did you receive?

A.    I contracted the work to the laboratory Technical Associates that I had just left, and that laboratory received some rectal swabs taken from the victim in the case.

Q.    Did you direct any testing of those rectal swabs?

A.    Yes, I did.

Q.    What tests did you request?

A.    I asked that they be examined for the presence of seminal fluid and spermatozoa, and that would include several, involve doing several tests.  And depending on what was found, we would do a DNA test or not.

Q.    Okay.  Did you actually perform the tests yourself?

A.    I did not.

Q.    Was that unusual for someone else to perform the tests?

A.    It's not unusual, no.

Q.    At the time that you conducted that testing, did Mr. Tinker express any concern about the fact that you were not actually performing the test yourself?

A.    No.  It's pretty typical.

Q.    What two tests again did you perform?

A.    Well, the swabs were examined and tested with acid phosphatase.

Q.    Okay.  Let me stop you right there.  What is acid

USCA5 2400

phosphatase?

A.    Acid phosphatase is an enzyme that is present in several bodily fluids, but it's present in much higher concentrations in seminal fluid.

Q.    Is acid phosphatase unique to men?

A.    No.

Q.    And is it unique to semen?

A.    No.

Q.    Okay.  And how exactly is that test performed?

A.    That's a very quick color change test.  What's done is typically some portion of the swab is removed and put into a test plate, and the test reagents are dropped onto it.  And if there's a color change within a certain amount of time, it's considered positive.

      In this particular case, there was very little cotton left on the swab, so the sticks were shaved and soaked in a very low volume of water, and that low volume wash was then subsequently used for the other test.

Q.    Was the material you received from the FBI sufficient enough to conduct an acid phosphatase test as you conducted?

A.    Well, there was staining on the sticks.

Q.    Right.

A.    And had there been seminal fluid on the sticks, that would have been sufficient to get a test result.  You can always conduct a test.  You just don't know what the result's going to

USCA5 2401

be.

Q.    What was the result of that particular test?

A.    Negative.

Q.    It was negative for the presence of acid phosphatase?

A.    Correct.

Q.    Okay.  What other testing did you conduct?

A.    The same low volume water wash was used to do a p30 test, using a test card.  And then the --

Q.    Before we get to p30, let me ask you about if you performed a microscopic sperm search.

A.    That's done on the cellular pellet.

Q.    Okay.  Explain to us how that's done.

A.    Okay.  Well, I described the low volume water wash, and then that material is taken out and retained for the test on the soluble proteins.  And then for the microscopic sperm search, what you do is you put the material, the fabric and the stick material into a larger volume of water, and you agitate it thoroughly, and then you spin it down in a way that only the cellular material pellets in the bottom of the tube and in your cotton and your sticks are in a little basket in the top of the tube.  You remove the liquid, and then you re-spin the cellular material in a very small volume of liquid.  You remove about 10 percent of it.  You put it on a microscope slide.  You fix it. You stain it.  You look for the presence of sperm.

And then in this particular case, the first steps of the

USCA5 2402

DNA digestion were done, so that any epithelial cells would have been broken up and gone, taken away.  And a second slide is made from the sperm pellet or what would be a sperm pellet.

Q.   Okay.  And those epithelial cells are the cells that would be present at the, on the same slide, and so the reason to remove them is so that they wouldn't interfere with your observation of potential sperm?

A.   Yes.

Q.   And the material you received and the evidence you received from the FBI, was that sufficient to do all those steps that you just described to us?

A.   Given the staining on the sticks, again, you can always do the tests.  And given the staining on the sticks, we did this.

Q.   Okay.  What was the result of that microscopic sperm search?

A.   Negative for spermatozoa on both the slides.

Q.   Okay.  Were you aware at the time that the FBI had also conducted certain testing in this case?

A.   Yes.

Q.   What testing had the FBI done, as far as you knew?

A.   They had done a p30 test.

Q.   Okay.  What else?

A.   And they had examined the smears made from the rectal swab.

Q.   Okay.  And when you say they examined the smears, what

USCA5 2403

were they examining?  A microscopic examination?

A.    It -- yes, that is.

Q.    Is that different than the microscopic examination that you did?

A.    They're both microscopic examinations.  In our test, we broke open the epithelial cells in case any were interfering with the observation of sperm.

      What they did was they just looked at the slide where the swab was just run across the slide.

Q.    Okay.  Were you aware of what result they obtained using their procedure?

A.    Yes.

Q.    What was that?

A.    They saw no sperm.

Q.    Okay.  And the procedure you used was actually a more specific method of locating sperm?

A.    More efficient.

Q.    And again, what was the result of that?

A.    Negative.

Q.    Okay.

      THE COURT:  Okay.  Nobody found any sperm.  So get to the point of her testimony.

      MR. ABREU:  Yes, Your Honor.

BY MR. ABREU:

Q.    Did the FBI conduct any DNA tests?

USCA5 2404

A.   Yes, they did.

Q.   Okay.  What two different tests did they conduct?

A.   Well, they conducted themselves one test which was using autosomal STRs.  And then they sent out to a laboratory in Dallas the material for Y chromosome testing.

Q.   Okay.  What were the results of either one of those tests?

A.   Negative --

Q.   Okay.

A.   -- for male DNA.

Q.   Let me ask you specifically about the test conducted by Orchid Cellmark.

A.   Yes.

Q.   What was that test?  What kind of test was that?

A.   It's Y chromosome testing.

Q.   And is there any more significance to a negative Y chromosome testing than the other DNA tests performed by the FBI?

A.   Yes, there is.

Q.   What is that and why is that?

A.   The test performed by the FBI will detect total human DNA, female and male DNA.

          MR. DOWD:  Your Honor, could the doctor repeat that? I couldn't quite make that out.

          THE COURT:  Would you mind, without touching the microphone, please, putting your right arm on the shelf in

USCA5 2405

front of you?  It kind of leans you into the microphone a little bit easier.

THE WITNESS:  Okay.  The test that the FBI did was autosomal STR testing.  It detects total human DNA, male and female.  They detected only the DNA of the female victim.  It could be that if there's a male contributor at a very low level, that that male might not be seen in the vast excess of the female DNA.

The test that Cellmark did, the Y chromosome DNA testing targets specifically the Y chromosome only present in males.  You can have a ton of female DNA present in the sample, and it will totally ignore that.  There will be no interference from the female DNA in the Y chromosome testing.  It targets only the male DNA.

It's extremely sensitive testing.  It can detect -- you would see some peaks at 50 to 100 picograms of DNA.  That corresponds to between 15 and 30 sperm cells.

BY MR. ABREU:

Q.   And how many were located in this case?

A.   There was no male DNA detected.

Q.   Okay.  Now, you were aware that the FBI conducted a p30 test.

A.   Correct.

Q.   And you also conducted a p30 test.

A.   Yes.

USCA5 2406

Q.   What is p30?

A.   P30 is a protein that is found in abundance in human seminal fluid, and it is found in lesser concentrations in some other fluids.

Q.   What other fluids?

A.   Amniotic fluid has been reported, breast milk, urine from men, some serum from men, and some female serum, and some female urine.

Q.   Okay.  And just so --

THE COURT:  What type of female serum?

THE WITNESS:  Well, serum is from the blood.

THE COURT:  Okay.  I know, but is it, could it be from a two-and-a-half year old child?

THE WITNESS:  The literature is not specific on the age range or the details.

THE COURT:  Okay.  Can you tell me, is a Y chromosome subject to denigration over time?

THE WITNESS:  Um --

THE COURT:  Or is it something that should stay around?

THE WITNESS:  Well, all DNA is subject to some degradation, but the advantage of doing the Y chromosome testing is it's only going to target the male DNA, and the female DNA won't be --

THE COURT:  I understand, but how long a time would

USCA5 2407

it degrade, would it take to degrade the chromosomes?

THE WITNESS:  Any degradative forces is totally dependent on storage and conditions, and it could be anywhere from a few hours in some --

THE COURT:  Okay.

THE WITNESS:  -- circumstances to decades in other circumstances.

THE COURT:  Okay.

BY MR. ABREU:

Q.   And the sample you received, that was received -- the sample that was preserved and sent to you by the FBI.  Correct?

A.   Yes.

Q.   Okay.  And are there -- let me just follow up on the Judge's question.  Are there circumstances where in fact sperm and/or male DNA are located years after an offense -- or years after it's been discovered, let me ask that.

A.   Yes, decades.  Sperm are incredibly tough and durable.

Q.   What do you mean by that?

A.   They are so durable they have an extra reinforcing protein that is so hard to break open that we have to add an extra chemical to the test reaction in the laboratory to break them open.

Q.   Okay.  So --

THE COURT:  But when it's gathered -- I guess, you know, I heard evidence at the trial that they didn't think to

USCA5 2408

do -- why, I don't know -- but the pediatric hospital where she came for her last hours didn't think to do a rape exam or anything like that.  So it was after she was dead that they took these swabs.

THE WITNESS:  Uh-huh.

THE COURT:  And so someone testified at trial that the sperm would have suffered degradation over that time period.

THE WITNESS:  Okay.  I --

THE COURT:  Is that true or --

THE WITNESS:  I think that was Dr. Benton's testimony.

THE COURT:  Yes.

THE WITNESS:  That was totally erroneous.

THE COURT:  Okay.

THE WITNESS:  Sperm are very durable.  They can be found in decomposing bodies 30 days after, you know --

THE COURT:  Well, I read about how they, you know, the Innocence Project and what have you, and they come up with the old DNA from -- but I guess I assume that that was stored like in a rape kit that was done pretty quickly or --

THE WITNESS:  No.  I mean --

THE COURT:  That's not necessary?

THE WITNESS:  -- there is evidence being analyzed in cold cases that are decades old.  And again, decomposing bodies

USCA5 2409

that have been burned, sperm have been detected in the vaginal

canals of these bodies.

            THE COURT:  Okay.  So days isn't old?

            THE WITNESS:  Weeks, months --

            THE COURT:  Okay.

            THE WITNESS:  -- years.

BY MR. ABREU:

Q.    And I was going to ask you about Dr. Benton's testimony

specifically.  Was his testimony regarding the persistence of

sperm accurate, in your estimation?

A.    No, it was not.

Q.    The survivability of sperm?

A.    No, it was not.

Q.    We were talking a minute ago about the Y chromosome test.

Does the Y chromosome, the component, does that degrade any

differently than any other part of the sperm or any other part

of DNA?

A.    No.  All the chromosomes, including the Y, they're subject

to the same degradative forces at the same time.

Q.    Getting back to p30 quickly here, you've identified male

urine, some female urine, breast milk, amniotic fluid, male

serum and female serum as other fluids where p30 has been

detected.

A.    Yes.  And did you say female urine as well?

Q.    Oh, female urine.  I don't know if I said it, but thank

USCA5 2410

you. So despite -- is p30 also known as Prostate Specific Antigen?
A. Yes.
Q. And despite that name, is it specific to the prostate?
A. No, because it's found in these other fluids at lower levels.
Q. And like acid phosphatase, which you testified to earlier, is it specific to semen?
A. No, it is not.
Q. And like acid phosphatase, as you testified earlier, is it specific to men?
A. No.
Q. Okay.
THE COURT: Could two-and-a-half year old children have it, little girls?
THE WITNESS: I'm not aware that any children have been included in the studies.
THE COURT: Okay.
THE WITNESS: So I can't comment one way or the other.
MR. ABREU: Okay.
THE COURT: Thank you, ma'am.
BY MR. ABREU:
Q. Which, by the way, which -- how is a p30 test performed, the one that you did, or directed, I should say?

A.   The one that was done at Technical Associates was also done with a test card.  It was done with a different test card called a Seratec card, which is more sensitive than the one, than the ABA card, the ABA card that the FBI used.

Q.   And why is that significant?

A.   Well, Technical Associates obtained a result which they recorded as a weak positive.  It, that test card, that Seratec card has an internal control line, which has a quantitative value to it.  They have an internal control line, which is at the equivalent of a 4 nanogram per milliliter concentration of p30.  And this test result was weaker than that control line.  And unfortunately, the ABA cards do not have that similar --

Q.   And what significance can you draw from the quantitative difference in a test like p30?

A.   Well, any time you have any quantitative data, you can get some idea of how much material you're dealing with, you know, how much -- if it were semen that was causing the reaction, how much semen that you might be dealing with.

Q.   And knowing that information, would that lead you to have some idea about how much sperm you, for instance, might be able to detect?

A.   Yes.

Q.   Okay.  Now, despite the positive p30 by the FBI and the weak positive p30 test that you reported, you did not opine that there was sufficient evidence -- or what was your opinion,

USCA5 2412

let me ask that, whether there was sufficient evidence to conclude that in fact semen was detected?

A.   Well, I took all of the test results together to make an opinion and not just the p30.

Q.   Okay.

A.   Or I'm sorry, was the question whether there was --

Q.   Right.  What was your opinion regarding whether there was sufficient evidence to conclude that there was semen present?

A.   Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs.

Q.   And when was your testing and review of the FBI testing complete?  Do you recall?

A.   The end of December of 2003.

Q.   Let me show you what I am marking as Petitioner's Exhibit 168.

        MR. ABREU:  Your Honor, this has previously been provided to the Government.

BY MR. ABREU:

Q.   And ask you if you recognize that document.

A.   Yes.

Q.   What is that?

A.   It's a fax that I sent to Douglas Tinker on December 31st,

USCA5 2413

2003.

Q.   Okay.  And what were you informing him of on December 31st of '03?

A.   That I tried to call him and I couldn't get an answer or a message machine, that I had completed my review on the Bourgeois case and wanted to discuss it with him.

MR. DOWD:  Your Honor, we received that yesterday, and we have no objection to its admission.

THE COURT:  The number is?

MR. ABREU:  Petitioner's 168.

THE COURT:  Petitioner 168 is admitted.

MR. ABREU:  Thank you, Your Honor.

BY MR. ABREU:

Q.   Did you eventually have a conversation with Mr. Tinker about your review of the FBI results and your own testing?

A.   Yes.

Q.   Was that a written conversation -- I mean, I'm sorry -- did you write him, was that a verbal conversation, my question?

A.   We had several conversations.  At that time, at the end of December, the testing had not been done by Technical Associates.  I was advising him that it should be done.  And that was, I believe, completed at the end of January of '04.

Q.   The testing by Technical Associates was completed in January of '04?

A.   Correct.

USCA5 2414

Q.   Did you subsequently provide Mr. Tinker with a written synopsis of your conclusions?

A.   What I provided him was a handwritten document, because I was in Colorado on another case and didn't have my file, and he kind of caught me off guard needing something.  So I put together a handwritten document for him, to assist him in cross-examination.

Q.   Let me show you what's been previously marked as Exhibit, as Petitioner's Exhibit 92 and ask you if you recognize that particular document.

A.   Yes.

Q.   And what is that document?

A.   It's the document I prepared and faxed to him from Colorado.

Q.   Okay.  That's your handwriting?

A.   Yes.

Q.   And what date is that document dated?

A.   March 1st, '04.

Q.   And does that document, as far as you know, accurately reflect what in fact you had found after your examination, in your review?

A.   Yes, it does.

Q.   Let me ask you what you reported to Mr. Tinker in what appears to be Paragraph 1.  Do you see that?

A.   Yes.

USCA5 2415

Q.    What did you report to Mr. Tinker in that report?

A.    That the FBI did not test the rectal swab with acid phosphatase reagent or do a sperm search.  And I need to clarify, not a sperm search as part of their DNA digestion. They just looked at the slide, the smear that was made.

They only did a p30 test with an ABA card and a DNA test. The ABA card was positive, but there's no indication of male DNA found in the non-sperm or sperm fraction.

Q.    Okay.  Could you just tell us what the difference is between a sperm and non-sperm fraction, when you use that term?

A.    When you test these samples that possibly contain sperm, it's done by what's known as a differential digestion process. In the first step, all the cells that aren't sperm, whether that's epithelial cells or blood cells, anything that's not a sperm is going to break open and extract into the liquid phase. That phase is removed.  And then the sperm are -- well, it's removed after the sperm are centrifuged and pelleted to the bottom of the tube.  Because the sperm are so tough and durable, they're washed, and then in a second step they are broken open to provide what should be, if all is done efficiently, a clean sperm DNA fraction.

Q.    Okay.  Let me direct you to Paragraph Number 2.  What did you report to Mr. Tinker on March 1st of '04?

A.    We did do an AP test, and it was negative, a p30 test that was weak positive, and a microscopic sperm search negative for

USCA5 2416

sperm.

Q.   And what did you report in Paragraph 3?  Let me move that up.

A.   Had a P30 positive weak on our test which could be a false positive due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed.  And it goes on to the next page.

Q.   I'm sorry?

A.   And then it continues on the next page, that paragraph.

Q.   Oh, my apologies.  Let me just ask you one question.  Is there -- did you mention that you reported regarding the possibility that bacteria might have led to the positive p30?

A.   Yes.

Q.   And when you say that bacteria might have led to that positive p30 test, what do you mean by that?

A.   It's suspicious because this is a result on a rectal swab. It's extremely weak.  And in light of all the negative tests, that that is something that would have to be considered.

Q.   So you're not saying -- you're not saying the bacteria actually caused the positive p30.  You're saying that that's something that needs to be considered.

A.   That's right.

Q.   Okay.  Had you been called as a witness at trial in 2004, would you have testified consistent with the information that's contained on this Page 1 of the document that you sent to

USCA5 2417

Mr. Tinker?

A.   Yes.

Q.   Okay.  Let me now refer you to Page 2.  Can you tell us what that information is on Page 2?

A.   Yes.  I take some calculations through that I was -- in an effort to try to educate Mr. Tinker to cross-examine the witness, that also if the p30 -- the p30 test is positive, if it were from semen, then I use the calculation based on the sensitivity of the ABA card and how much sperm is in semen, and I come up with a figure of how many sperm would be expected to have been on that swab or the swabs that they tested.

Q.   Okay.  And how many did you determine should have been detected?

A.   Five hundred.

Q.   Okay.  And obviously that assumes that we're not talking about somebody with a vasectomy or something like that.

A.   Correct.

Q.   Okay.

A.   And let me clarify.  Five hundred would have been on the swab.  And even -- when you make the slide, you take 5 or 10 percent.  So even if you took 10 percent, that's 50 that would go on the slide, and that is more than sufficient to detect.

Q.   Had you been called as a witness at trial in 2004, would you have testified consistent with the information that you reported to Mr. Tinker on Page 2 of this document?

USCA5 2418

A.    Yes.

Q.    Let me refer you now to Page 3.  Can you tell us what that is?

A.    Yes.  This is a page from a publication, and it lists a table with various substances, including semen, but other substances in which PSA has been found, and their concentrations.

Q.    Okay.  And those are some of the same fluids that we've discussed already.  Correct?

A.    Yes, it is.

Q.    And I'm looking at some of those concentrations, and I'm curious about whether the concentrations listed there are sufficient to react and cause a positive p30 test on a card, on a test card.

A.    Well, the limited detection of the ABA card --

Q.    Yes.

A.    -- is 4 nanograms per mil --

Q.    Okay.

A.    -- and 2 nanograms per mil for the Seratec card.  So some of them are.  I mean, some of them are greatly -- breast milk, greater than 101 case.  Some of them are not meeting that limited detection, but some are.

Q.    Okay.  And let me ask you -- well, let me read you something from the results and discussions and ask you if you agree or disagree with that particular statement.  It says, "It

USCA5 2419

is now quite clear that the term Prostate Specific Antigen is a misnomer.  Although present in great amounts in seminal deposits, its presence has been detected in a variety of other body fluids."  Do you agree with that?

A.    Yes.

Q.    Okay.  You've told us that already.  Down, down to the bottom.  "Of particular concern to this analyst is the detection of PSA in female urine and female serum.  The finding of urine on a pair of underwear from a rape survivor would not be uncommon.  In addition, if trauma is present, or the survivor is menstruating, blood may be present on the vaginal swabs or on the stains in the underwear.  When an extract is prepared from the stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen?  In other words, what is the likelihood that the stain is from female urine or serum?"

     Do you agree or disagree with that statement?

A.    I agree that there is cause for concern and to consider these factors.

Q.    Okay.  And had you been called at trial in 2004, would you have testified consistent with the information that's contained on Page 3 of this document that you sent to Mr. Tinker?

A.    Yes.

Q.    Now, we've already said that this original report was dated March 1st of '04.  Correct?

USCA5 2420

A.   Yes.

Q.   Were you aware at the time that you sent this report that the Court had issued an order indicating that all expert reports had to be submitted by February 26th of '04?

A.   I was not.

Q.   Did Mr. Tinker ever make you aware of that particular deadline?

A.   I don't believe he did.  This is -- if he had, I would have sent a report.  This was something that I had to prepare in a bit of a rush from a different state and send off at his request, because I think the witnesses were going on the next day, or shortly thereafter.

Q.   And you say this is not an actual report?

A.   It's not what I would consider to be a report, no.

Q.   And would you have even sent these conclusions sooner than March 1st had Mr. Tinker made you aware of that particular deadline?

A.   Yes.

Q.   If you had been asked?

A.   Yes.

Q.   Okay.  In 2007, did you, were you contacted by my office in regards to this case?

A.   Yes.

Q.   And what were you asked to do at that time?

A.   I was asked to review some documents and prepare a

USCA5 2421

declaration.

Q.   Okay.  Do you recall what documents you were asked to review?

A.   The direct appeal opinion and some testimony, trial testimony from Ms. Zervos and Anthony Onorato and Dr. Benton, as well as the FBI notes, re-review the notes and data.

Q.   Okay.  And did you review an autopsy report by Dr. Elizabeth Rouse?

A.   Yes.

Q.   Okay.  Did you also review the conclusions of Forensic Science Associates?

A.   The conclusions at that time, yes.

Q.   Did you prepare an affidavit in connection with what you were requested to do?

A.   Yes, I did.

Q.   Let me show you what's been marked, previously marked as Petitioner's Exhibit 91 and ask you if you recognize that particular document.

A.   Yes.

Q.   What is that document?

A.   That is the declaration I prepared in 2007.

Q.   Okay.  And is that your signature on the last page of that document?

A.   Yes, it is.

Q.   And is the information contained in that particular

USCA5 2422

document true and correct to the best of your knowledge?

A.    Yes.

        MR. ABREU:  Your Honor, at this time we would offer Petitioner's 91.

        MR. DOWD:  No objection, Your Honor.

        THE COURT:  I'm sorry?

        MR. DOWD:  No objection, Your Honor.

        THE COURT:  Petitioner's 91 is admitted.

BY MR. ABREU:

Q.    Now, we've already discussed Mr. Benton's -- Dr. Benton's testimony.  Excuse me.  Let me ask you whether you -- and you've already stated that you reviewed Ms. Zervos' testimony. Is that correct?

A.    Correct.

Q.    And who was Ms. Zervos?

A.    She was the supervisor of the Serology Unit at the time at the FBI that did the work regarding the p30 testing.

        MR. ABREU:  May I have a second, Your Honor?

        THE COURT:  Yes, sir.

        MR. ABREU:  Thank you.

    (PAUSE.)

BY MR. ABREU:

Q.    Let me refer you to a specific portion of the transcript, if I may, regarding Ms. Zervos' testimony.  Ask you if you recall reading this, in response to a question from Mr. Tinker.

USCA5 2423

Question:  "And what kinds of things could you find might -- could you find that might have the same reaction?"

Answer:  "Uh-huh, the protein has been found in male peripheral blood, as well as male urine, at very low concentrations.  Concentrations much lower than we would ever expect from semen."

Question:  "Is there any --"

The Court:  "Can I follow up on that one?  Much lower than --"

Mr. Tinker:  "I'd be afraid to tell you no, Judge."

The Court:  "All right.  No, go ahead."

Mr. Tinker:  "I wasn't sure if that was clear what you were asking for."

Question, a little further down:  "So you're saying that there was, there may be similar proteins in male urine and what else?"

Answer:  "In male peripheral blood."

Did you review that portion of Ms. Zervos' testimony?

A.   Yes, I did.

Q.   Is her testimony regarding where p30 may be located accurate?  Or complete?  Let me ask you that.

A.   It's not complete.

Q.   Okay.  Because you've already testified that it could be found in these other substances.

A.   Yes.

USCA5 2424

Q.   Had you been called as a witness at the time of trial, would you have been able to address Ms. Zervos' testimony that p30 is only found in male peripheral blood and semen?

A.   Yes, I would have.

Q.   Did you also review the testimony of Mr. Onorato?

A.   I did.

Q.   And who is Mr. Onorato?

A.   He was the FBI examiner in the DNA Unit that performed the DNA tests.

Q.   Let me refer you to a specific portion of that testimony, if I may.

     Question, from Mr. Tinker:  "Are there any other things that have similar or the same protein, like in food or anything else?"

     Answer:  "There are no foods that contain this protein."

     You would agree with that?

A.   Yes.

Q.   Okay.  Question:  "Are there other substances that might --"

     Answer:  "There are other substances, body fluids, that may possess this particular protein.  It's at such low levels, however.  Semen levels of this protein are astronomically high."

     Question, down a little further:  "Okay."

     Answer:  "This protein is astronomically high, compared to

USCA5 2425

its content in, say, something like blood, male blood.  And generally it's only found in male blood when the individual has prostate malignancy."

At the top.  Do you see that?

A.   I do.

Q.   Was Mr. Onorato's testimony about where p30 might be located complete?

A.   It was not.

Q.   Had you been called as a witness in 2004, would you have been able to address Mr. Onorato's testimony regarding where p30 could be located?

A.   Yes, I would.

Q.   Do you recall Dr. Benton's testimony about where p30 can be located?

A.   Specifically, I recall a discussion about where it's produced.

Q.   I'm sorry?

A.   Where it was produced.  I don't recall the specifics about where he said it was located.

Q.   Let me read you this portion of Mr., of Dr. Benton's testimony.

"And more specific, a confirmatory test is called Prostate Specific Antigen, also known as a p30 assay.  And this is confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily fluids, including animal bodily

USCA5 2426

products, except in male prostate, and with one exception,

human breast milk."

     Do you recall that testimony?

A.    Yes, I do now.

Q.    Okay.  Was Mr. Benton's testimony complete regarding where

p30 has been located?

A.    It was not.

Q.    And had you been called as a witness in 2004, would you

have been able to testify regarding the accuracy of that

testimony?

A.    Yes, I would have.

Q.    Okay.  Did you also have an opportunity to look at the

autopsy report of Dr. Elizabeth Rouse?

A.    I did.

Q.    Okay.  I just have a few more minutes.  Let me show you

what's been previously marked as Petitioner's Exhibit 153 and

ask you if you recognize that particular document.

A.    Yes, I do.

Q.    Let me refer you to page, the third page of that document.

          MR. ABREU:  And I apologize for the markings on this,

Your Honor.  I didn't have a clean copy of it.  I'm not sure if

this was the original trial document that was marked this way

or not.

BY MR. ABREU:

Q.    Refer you to the sentence that says, that begins the

USCA5 2427

Johnson - Direct                                    34

bottom of -- let me just point to it, right here.  "The external."

"The external genitalia are those of a normal female child, and there is no evidence of any trauma or labia or introitus.  The hymen is present, and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic."

Did you read that in Dr. Rouse's report?

A.    Yes, I did.

Q.    Is that the type of evidence that you consider when you make your determinations as a forensic biologist?

THE COURT:  Make a determination in what?  I don't understand.

MR. ABREU:  Of whether in fact this might be semen. My apologies, Your Honor.

MR. DOWD:  Judge, I would -- I don't think she's been qualified as a -- to that extent.

THE COURT:  Sustained.

MR. ABREU:  I'll rephrase the question.

BY MR. ABREU:

Q.    What significance does that particular document have regarding the testing and -- or your conclusions?  Let me ask that.

MR. DOWD:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. ABREU:

USCA5 2428

Q.   You did review that particular document?

A.   I did.

Q.   Let me ask you about a separate document that's been previously marked as Petitioner's Exhibit 152, and ask you if you recognize those particular documents.

A.   Yes.

Q.   What are those documents?

A.   It's the documentation of the sexual assault exam.

Q.   On what date was that examination?

A.   Looks like it was 6/28/02.

Q.   Okay.  June 28th of '02, and that would have been while JG1999 was still alive?

A.   Yes.

Q.   JG1999?  Okay.  Let me refer you to the four pages in on that particular document and ask you regarding Number 2, the pelvic examination.  Let me see if I can zoom that in a little bit.  Do you see that?

A.   Yes.

Q.   And where it noted that, "The vulva labia major, no trauma.  Vulva labia minor, no trauma.  The hymen, no trauma noted.  Vagina, not visualized.  Cervix, not visualized.  Perineum, no trauma noted.  Anus, no sphincter tone, no trauma noted."  Did you review those?

A.   Yes.

Q.   Let me refer you to, looks like Page 9 of those documents.

USCA5 2429

Johnson - Direct

And the very top paragraph, which starts, "The hospital SANE department was consulted as well.  The patient had a sexual abuse examination that was normal and showed no evidence of any sexual abuse.  The patient also had a thorough physical examination documenting ecchymosis and injuries to the child's body.  The diagram of this examination is in the patient's chart."

Did you review that document as well?

A.    Yes.

Q.    Do you know what the SANE unit is?  If you do --

A.    Uh-huh, yes.

Q.    What is that unit?

A.    It's a sexual assault -- it stands for Sexual Assault Nurse Examiner.

Q.    Okay.  Is that, from your understanding, someone who's trained to detect evidence of sexual assault?

A.    To collect evidence of sexual --

Q.    Okay.

A.    -- that might be associated with sexual assault, and make examinations and opinions, yes.

Q.    After reviewing the additional testimony, evidence that was, and documents that were sent to you by my office, what is your opinion regarding whether there was sufficient evidence to scientifically conclude that there in fact was semen present in this particular case?

USCA5 2430

A.   My opinion --

MR. DOWD:  Your Honor, I would object to the relevance.  I think the focus is what Doug Tinker and Mr. Gilmore knew from Dr. Johnson at the time of trial.

MR. ABREU:  If I may, Your Honor?

THE COURT:  Go ahead.

MR. ABREU:  There was also testimony that was presented at trial that this particular witness could have rebutted, and she has testified to date.  So I want to ask her if, in fact, her opinion has changed after reading those documents or after looking at that particular evidence and testimony.

THE COURT:  I think you've already done that.

MR. DOWD:  No objection, Your Honor.

MR. ABREU:  Okay.  I --

THE COURT:  I think --

MR. ABREU:  If we've done it, I don't --

THE COURT:  I think she said, "This is what I would testify to, and these are my differences from what happened at trial."

MR. ABREU:  Okay.  Are the opinions you've given --

THE COURT:  Is that right?

MR. ABREU:  The Judge asked you a question.

THE WITNESS:  I'm sorry.  What was the question?

THE COURT:  No, I was asking you.

USCA5 2431

MR. ABREU:  Oh, I'm sorry, Your Honor.  Okay.  I think it's covered and we're okay.

BY MR. ABREU:

Q.   Are the opinions you've given here today given to a reasonable degree of scientific certainty?

A.   Yes.

Q.   And were the opinions you could have provided at the time of trial, would those have been given to a reasonable degree of scientific certainty?

A.   Yes.

MR. ABREU:  Your Honor, I have no further questions.

THE COURT:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. DOWD:

Q.   Dr. Johnson, my name is Mark Dowd.  I'm going to ask you a few questions.

A.   Good morning.

Q.   When were you originally hired by Douglas Tinker on this case?

A.   In late 2003.

Q.   What do you mean by late 2003?

A.   Like in the fall of 2003.

Q.   September?

USCA5 2432

A.    I don't have the appointment order in front of me, but it was in the fall.

Q.    You remember it being in the fall of 2003?

A.    It was in the fall of 2003, yes.

Q.    And what were you asked to do by Mr. Tinker?

A.    I was asked initially to review the work done by the FBI and consult with him, and then based on that I recommended that testing be done, and he agreed.  And then during the course of the case, he did --

Q.    Well, let me stop you there.  What did Mr. Tinker advise you, or what did he send you initially to look at?

A.    Initially, the material from the FBI, and I believe that was the testing material from the FBI is what I recall.

Q.    Did you receive the swab, the swab and the FBI lab reports initially in the fall of 2003?

A.    No, not the swabs initially.  Initially, it was the FBI lab notes and reports, and then I had some discussions with Ms. Booth to get the procedures and operating, standard operating procedures for the lab.

Q.    To obtain a testing swab?

A.    No, no, not that.  Those are the protocols of the lab.

Q.    Oh, okay.

A.    I needed to know some information from the FBI lab protocols.

Q.    How they did the tests?

USCA5 2433

A.    Correct.  So I needed those.  Those were provided to me later.  And then --

Q.    Do you remember how much later that was?

A.    It was also -- I think it was also in the fall of 2003.

Q.    Okay.

A.    And then based on my conversation with Mr. Tinker after December 31st, I recommended that testing be done.

Q.    And when did that communication occur?

A.    Sometime in early January.

Q.    Okay.  And what was the reason for the delay between the fall of 2003 and January 2004 in your recommendation that testing take place?

A.    Well, it takes a while for any expert to work a case into their case load and complete the, complete the review.  It was quite a lot of material to review.

Q.    So you were busy.

A.    I was, yes.

Q.    Okay.  And when you were initially hired by Mr. Tinker, did you ask Mr. Tinker what the time frame was for the trial and what the time line was going to be for your work?

A.    I may have.  I typically quote everybody six to eight weeks to work the case in and do a review, and longer if it's a large amount of material to review.

Q.    Okay.  But the -- but going from the fall of 2003 to January of 2004, that was beyond your normal six to eight-week

USCA5 2434

response time?

A.    No, I don't think so.

Q.    No?

A.    I can't recall exactly when the appointment order was signed.  It might not have even been till November.  But -- and then the discovery material, it's from the time I receive the discovery material.

Q.    Okay.  So that would be a typical response time?

A.    Yes.

Q.    Okay.  But you weren't aware of when the trial was scheduled?

A.    It was -- he told me it was scheduled for the spring of 2004.

Q.    He said the spring of 2004?

A.    I don't --

Q.    He didn't give you a date?

A.    I don't recall whether it was an exact date.

Q.    Okay.  Is that important to know when the trial is going to start?

A.    Yes.

Q.    Because you need to get your examination done, your report written.

A.    That's right, yes.

Q.    Right?  And testing may, you may decide that testing requires even further testing.

USCA5 2435

A.   Yes.  I don't always write a written report.  It's only upon request.

Q.   Oh.  You just show up at court and testify?

A.   I don't show up very often in court and testify.  He did ask that I testify, and there were some circumstances that I asked Mr. Tinker to obtain a court order that specified my rate and amount authorized, because the original order did not specify any details.  I asked him multiple times to provide that, and he never did.

Q.   And, but you say that you sometimes, even though you're hired on a case, you don't always prepare a written report?

A.   That's not only my practice, but for most --

Q.   I'm just asking you.

A.   Yeah.  For the majority of times, I am not asked to prepare a written report.  Sometimes I'm asked not to prepare a written report.

Q.   All right.  But if you're going to testify, you know you have to prepare a written report.

A.   Usually.  Not in every circumstance that I've testified in.

Q.   Hmm.  In federal court, did you have to -- you testified in federal court twelve times?

A.   About twelve times.

Q.   You prepared reports in those cases?

A.   I think I prepared declarations in most.

USCA5 2436

Q.   Okay.  Declarations, which has all the information.
Because this is not simple stuff, is it?  I mean, it's fairly
complicated, and you would otherwise relay this information to
somebody over the telephone?  Or how would you relay your
information if you don't provide a written report?

A.   Usually over the telephone.

Q.   Really?

A.   Yes.

Q.   Okay.

A.   To the attorney who hires me, yes.

Q.   Okay.  And you're not concerned that something could be
misunderstood or --

A.   It's a decision between the attorney and myself, what
their needs are and what I can provide them.

Q.   All right.  Well, did Mr. Tinker ask you to prepare a
report?

A.   I don't recall that he specifically did.  If he had, I
would have.

Q.   Okay.  And you knew this was a death penalty case --

A.   Yes.

Q.   -- in federal court?  Okay.  Now, where were you between
January of '04 and March of '04?  Were you pretty much at your
office in California?  Or were you working on other cases
around the country?

A.   Oh, I have other cases all the time.  I can't be specific.

USCA5 2437

I know I was working --

Q.   Okay.

A.   -- some in Colorado.

Q.   All right.  And at that time that you sent the note --

well, first of all, let's -- there was a fax --

A.   Uh-huh.

Q.   -- to Mr. Tinker?

A.   Yes.

Q.   And that was on New Year's Eve?

A.   Yes.

Q.   On 2003?  Is that right?

A.   Right.

Q.   Now Year's Eve, 2003.  Because you couldn't get ahold of

him by phone that day?

A.   Yes.

Q.   You were working that day, New Year's Eve?

A.   Yes, I often work New Year's Eve.

Q.   You expected Mr. Tinker to be there?

A.   Well, I had -- I believe I had tried previously to get

him.

Q.   Okay.

A.   And with no success, so I finally just faxed him a note.

Q.   So you faxed him.  So you -- at that point, you were

reaching out to Mr. Tinker --

A.   Yes.

USCA5 2438

Q.    -- to make sure everything was being handled correctly and properly?

A.    Trying to contact him --

Q.    Okay.

A.    -- to let him know I had finished my review.

Q.    All right.  Now, what were you doing on March 1st of 2004?

A.    I was -- apparently, from this fax transmission, I was in Colorado.

Q.    Okay.  And you're referring to the Petitioner Exhibit 92, your written note?

A.    Yes.

Q.    Dated March 1st, 2004.  And you indicate that you're in Colorado, and "so I hope you can read my writing."

A.    Uh-huh.

Q.    And it's, you know, it speaks for itself.  It's not bad handwriting, but it's, there's a couple of words I had trouble with.  Were you concerned that Mr. Tinker would be able to read this?

A.    Well, I typically don't prepare handwritten reports or transmissions, and I was obviously in somebody else's office or some other location, which I didn't have a printer available to me, so I had to handwrite it.

Q.    All right.  But you, I think you'll agree that this is not very professional to send your findings in the form of a handwritten note?

USCA5 2439

Johnson – Cross                                46

A.    I have already agreed to that.

Q.    All right.

A.    I was caught off guard.

Q.    Okay.  And how is it that you were caught off guard?  You were, had no idea when the trial was going to start in this case?

A.    I think he told me that, but I did not know -- I believe -- my recollection is that he called or left a message and said the witnesses were going, from the FBI, were going on the next day or shortly thereafter, and he needed some assistance with those witnesses.

Q.    So you sent this -- you didn't, it didn't occur to you that, you know, this trial, he told me it's in -- you don't remember when he told you it was going to be, but you thought sometime in the spring of 2004?

A.    Uh-huh.

Q.    So it wasn't that you decided that, you know, "I better make contact with him, because it's getting to be the spring of 2004, and I better, you know, send my findings to him"?

A.    Well, I had had several phone conversations with him prior to that.

Q.    Okay.  So, but you never discussed when the trial was starting?

A.    I'm sure we did.  I don't have an independent recollection of what date he said.

USCA5 2440

Q.    All right.  And is there a reason that you waited until March 1st, 2004, to send your report to him, to send this note?

A.    Because he didn't ask for it prior to that.

Q.    Okay.  And it was just, you were -- you only sent it because he prompted -- was it like an urgent phone call you got?

A.    Yes.

Q.    He said --

A.    Urgent call or urgent message.

Q.    -- "We're in the middle of trial, and I need your report"?

A.    "I need --" he said something to the effect, the witnesses were going on, because it specifically refers to these witnesses and the cross-examination.

Q.    Okay.  How long did it take you to jot this note?

A.    I don't recall.  Probably less than an hour to do the research and jot the note.

Q.    To do the research?

A.    Well --

Q.    What was involved?

A.    I attached a page from a publication.

Q.    Oh, you -- on that page that's attached?

A.    Yes.

Q.    Okay.  To find that for him?

A.    Yes.

Q.    And, but otherwise, this was just about five minutes to

USCA5 2441

write this note?

A.   I don't know, ten or fifteen, something like that.

Q.   Okay.  And what did you have with you?  You were in Colorado --

A.   Yes.

Q.   -- on a different case?

A.   Yes.

Q.   Okay.  So what, did you have your case file on this --

A.   I don't believe I did.

Q.   So you did this note by memory?

A.   I remembered what the FBI had done, and I may have been in touch with Technical Associates by telephone.

Q.   But you don't remember?

A.   I don't recall, but I probably had been.

Q.   Okay.  But you don't really remember what you relied upon in writing this note?

A.   I am pretty certain I didn't have the file, but a lot of the cases that I've recently reviewed are fresh in my memory, and then again whatever testing that might have been done by Technical Associates, I was, it was clearly easy to make contact with them to verify.

Q.   And how many cases do you normally have that you're working on at one time?

A.   You know, that's a tough question to answer, because some cases will stay open for two or three years, where I don't

USCA5 2442

really do much work on them, but they are open cases.

Q.   They're dormant until something happens?

A.   They're dormant.  They're in formaldehyde until something happens to them.

Q.   Uh-huh.  But you had indicated you're very busy, and you were traveling around the country, so you wrote this from memory?

A.   It's not that complicated, in my opinion.

Q.   All right.  And when did you get the lab results from -- I didn't quite follow that.  At first I thought you said that the testing was concluded from Technical Associates in March, or excuse me, in December of 2003.  Then a little while later, I thought you said the testing was completed in January '04. What was the December '03 and the January '04 figures, dates?

A.   Okay.  The December '03 was when I tried to make contact with Mr. Tinker about doing independent testing, that fax that says, "Please call me.  I can't reach you."  And so any discussion we had about doing testing would have been done, you know, at that subsequent time.  The lab did the testing, I believe, at the end of January of '04.

Q.   Okay.  So did you get -- so that was to set up the Technical Associates testing?

A.   Yes, for them --

Q.   Okay.

A.   -- to get the evidence and do the testing.

USCA5 2443

Q.   All right.  And that was December '03, so you had, you had contacted Tinker, and you got authorization to go forward with that?

A.   I don't think I talked to him on that day.  It was sometime after that.

Q.   That's when you were trying to make contact.  And then subsequent to that, you talked to him, and by January of '04 --

A.   Uh-huh.

Q.   -- the Technical Associates had quickly done the testing.

A.   By the end of January, yes.

Q.   Okay.  Oh, the end of January?

A.   I think it was the end of January.

Q.   Do you have a date on that?  They sent you a report or something?

A.   No.  It's based on the notes I reviewed of theirs.  I think it was January 31st or something like that.

Q.   All right.  And is there any reason you didn't generate a report once you received the results from the Technical Associates lab?

A.   Well, they did the testing, so it's their responsibility to generate that.  And again, they don't, they don't always, when I've hired them or anyone else to do some lab work for me, they don't always generate a written report.  It's only upon request.

Q.   So this is all just by phone, the Technical Associates

USCA5 2444

does their, does their lab work, and then they would call your office, and then you would call Mr. Tinker, and that's it? There's never reports generated?

A.    Unless somebody requests one.  There's a charge for a report, both by myself and the lab, so a lot of times the attorneys don't want one.

Q.    So the reason you didn't do a report after you got the lab results in January of '04, before Tinker called you during trial in March of '04, is that he never asked for one.

A.    From me?

Q.    Yes.

A.    I don't recall that he did.  I would have written one for him.

Q.    Right.  That was the question.  He never -- that's the reason you didn't do it, because he never asked for a report.

A.    That's my recollection, yes.

Q.    Were you going to call him before the trial started to give him the results of this lab results?

A.    I did.  I did.

Q.    Oh, you called him after January '04 --

A.    Yes.

Q.    -- and gave him the results?

A.    I talked to him on several occasions, yes.

Q.    Do you remember the dates of those?

A.    I'm not sure if I have the -- there was one on January

USCA5 2445

7th, January 15th, January 16th --

Q.    Who instigated the --

A.    Pardon me?

Q.    -- the call on January 7th?

A.    I don't know who instigated.  I just have recorded a phone call.

Q.    Do you remember if you called him or he called you?

A.    I don't.

Q.    Okay.

A.    I have it recorded in my billing --

Q.    All right.

A.    -- as a telephone call.

Q.    That there was a phone call.  And then the 13th?

A.    January 7th, January 15th.

Q.    Oh, 15th?

A.    January 16th, January 20th, January 26th.

Q.    Oh.

A.    February 3rd.

Q.    Okay.

A.    February 4th, February 10th, February 18th.

Q.    Oh.

A.    February 25th.

Q.    Goodness.  Is that it?

A.    Pardon?

Q.    Is that it?

USCA5 2446

A.   That's all I have.

Q.   February 25th?  And in none of those calls did Mr. Tinker advise you that the trial was starting in February?

A.   I'm sure he did.  As I told you, he asked me to testify.

Q.   Okay.  And he never asked for any, for you to write any of this down until you got the call when he was in trial on March 1st?

A.   That's correct.

Q.   Okay.  Now, during all these calls, ten calls, what was the focus of the calls?

A.   I don't have that information here.  I'm sure we discussed the lab results and what issues he might have at cross-examination.

Q.   Hmm, I thought you could remember --

A.   I'm sorry?

Q.   I thought you could remember your cases.

A.   I remember my cases, but not every single detail.

Q.   Okay.

A.   And as I did testify, I do recall he -- many conversations about testifying, and I asked many times that he provide me with a court order that specified my rate and an amount that would be approved by the Court.

Q.   And that was never done?

A.   It was never done.

Q.   Okay.  Now, in these calls, I mean, you don't remember the

USCA5 2447

focus of them, but do you recall if Mr. Tinker appeared well-schooled in this science, semen detection, DNA detection?

A.    He --

Q.    Or did you have to lead him, you know, by the hand from, you know, primary school to preparation for the trial?

A.    He was not well-versed in --

Q.    He was not well-versed in --

A.    Correct.

Q.    -- in semen detection or DNA detection?

A.    Correct.

Q.    Okay.  And that was because of his questions to you?

A.    Yes.

Q.    Okay.  But did you bring him up to speed?

A.    I tried.

Q.    Okay.  But you explained all these, the different testing, the significance of the sensitivity and the different testing to him?

A.    I don't recall exactly what I explained to him.  I did try to do that in certainly this written fax from Colorado that I sent.

Q.    Okay.  But this is not an unusual interchange between you and a trial lawyer.  This would be something that you do for a living.  Right?

A.    It's pretty typical.

Q.    So what would you, what would be your intent in bringing

USCA5 2448

the attorney up to speed --

A.    Well --

Q.    -- on the science?

A.    So that they can adequately present the issues or cross-examine the witnesses at trial.

Q.    All right.  And understand the underlying science --

A.    Correct.

Q.    -- of this testing?

A.    Yes.

Q.    So they can cross-examine the FBI lab specialists?

A.    Well, understand what they're being told and cross-examine them, yes.

Q.    All right.  And you're convinced you did your job and you brought Mr. Tinker up to speed?

A.    I tried.  I'm not convinced he was up to speed.

Q.    Okay.  Why is that?

A.    I got the impression he still did not grasp the concepts that well.

Q.    From his conversation with you?

A.    Yes.

Q.    All right.  You didn't know Mr. Tinker?

A.    I did not.

Q.    Okay.  That was your first and only interaction with him?

A.    The only case I've ever had with him, yes.

Q.    Okay.  And if I told you he was kind of a Columbo type,

USCA5 2449

that he would stumble around the courtroom and inadvertently --

MR. ABREU:  Your Honor, objection.

THE COURT:  The nature of the objection?

MR. ABREU:  I'm not sure this is relevant to what this witness performed, the task she performed and what she was asked to do.

MR. DOWD:  Well, I'm just trying to develop, Your Honor, that the witness is perceiving Mr. Tinker's, you know, ignorance from the way she interacted with him.  But I'm trying to develop that Mr. Tinker -- I'm just trying to lay out that Mr. Tinker was fairly coy in his dealings with witnesses, you know, before the Court.

MR. ABREU:  She's already said she didn't know him, Your Honor.

MR. DOWD:  But she made a conclusion that the way he interacted with her, she concluded that Mr. Tinker was not comprehending, not comprehending the science that she was explaining.

THE COURT:  Sustained -- overruled.  Thank you.  Yes, go ahead.

MR. DOWD:  Thank you, Your Honor.

THE WITNESS:  Could you repeat the question?

BY MR. DOWD:

Q.   If I told you that Mr. Tinker was kind of a Columbo type, and he would appear to be stumbling in the courtroom, yet

USCA5 2450

uncover, you know, valuable evidence and win most of his cases, I mean, would that change your opinion about whether he was comprehending you?

A.    No.  I mean, I could only judge based on my interactions with him.

Q.    Did you read the part of the transcript in which Mr. Tinker got the FBI specialist, Carolyn Zervos, to admit that she didn't know if PSA was contained in digested food protein that would be contained in the rectum?

A.    I did read that, yes.

Q.    Okay.  And that was a fairly dramatic point in the trial, don't you think?

A.    I wasn't present in the courtroom.  I can't assess the drama.

Q.    Well, I don't mean dramatic in a theatrical sense, but isn't that a critical point that Mr. Tinker was able to elicit from Carolyn Zervos?

A.    He did elicit something that, you know, happens to be, you know, she didn't know.  That's actually a bonus.  But there were other parts of the testimony that --

Q.    Well, no, I'm just asking about that part.

A.    Okay.

Q.    Was that -- you say it was a bonus.  Was that very good evidence that he elicited on behalf of his client from Carolyn Zervos?

USCA5 2451

A.   Well, I'm not an attorney, but any time you get a witness to admit they don't know something, I would say that that's probably a good thing for the attorney.

Q.   And that the, that a swab taken from the rectum could contain, you know, a sample that could have been, you know, the PSA result could have been the result of digested food protein? Wouldn't that be a dramatic piece of evidence for the Defense?

A.   Well, I think her answer was she didn't know.

Q.   Right.

A.   Uh-huh.

Q.   She didn't know --

A.   Right.

Q.   -- if the PSA could be explained as the result of food protein contained on the rectal swab, digested food protein.

A.   That was her testimony.

Q.   Right, right.  All right.  Would you be surprised if the Defense reported that they had difficulty reaching you during this period?

A.   Given the number of conversations I had with him, I would be surprised.

Q.   Okay.  You said you travel a lot around the country working on cases?

A.   It depends.

Q.   Okay.

A.   Sometimes I don't travel for months at a time.

USCA5 2452

Q.   All right.  Is your office number, is that cued into your cell phone?  Or how does that work?

A.   My cell phone is, number is listed on my office message machine.

Q.   Oh, okay.  If you call that number, you get your -- you say, "If you need to reach me, call my cell number"?

A.   Sure, yes.

Q.   Okay.  Because it's not on your letterhead.  Right?

A.   Right.

Q.   You just have your office phone?

A.   Correct.

Q.   Now, in your note, you indicate that the FBI did not test the rectal swab with AP reagent, or do a sperm search.

A.   Right.

Q.   But you're aware that there was actually three rectal swabs, not one.  Right?

A.   Correct.

Q.   Okay.  But you have just "rectal swab" in your note.

A.   That's what I say in the note, yes.  I know there was five, six and seven --

Q.   You know that now.  But at the time you wrote this note, were you thinking that there was just one rectal swab?

A.   I don't think so, because I knew that the lab had received three, the Technical Associates lab had received three.

Q.   Why did you write "swab" instead of "swabs"?  And you do

USCA5 2453

that repeatedly.

A.    Typically, it's treated as one sample, and that's probably why I write that.  Even though there are three, it was collected from one site.  And it was batched and treated as one sample by Technical Associates.

Q.    Now, you indicated in your note that they only did a p30 test with the ABA card and a DNA test.

A.    Right.

Q.    Okay.  But there's more than one type of DNA test.  Right?

A.    There's -- yes.

Q.    There's at least three that I'm aware of.  Right?

A.    I don't know what you're aware of.

Q.    Well, I'm not going to ask you what I'm aware of, but there's at least three.  Right?

A.    There's autosomal testing, there's Y testing, there's mitochondrial testing.  Those are the three typically used in forensics.

Q.    And there was two different types of DNA testing used in this case.

A.    Autosomal and Y chromosome.

Q.    What?

A.    Autosomal DNA testing and Y chromosome DNA testing.

Q.    And the Orchid -- what's the name of that lab, Orchid --

A.    Cellmark.

Q.    -- Cellmark --

USCA5 2454

A.    Right.

Q.    -- did the Y chromosome?

A.    Yes.

Q.    And did the FBI do the other one?

A.    Yes.

Q.    Okay.  Did you think you needed to explain the difference between those two DNA testing procedures to Mr. Tinker in your note?  Or you were just rushed or --

A.    Well, I probably just discussed it with him over the phone.  These witnesses were the FBI witnesses, and this is -- I was referring to what they had done.

Q.    Did you say "disgusted"?

A.    No, "discussed with."

Q.    Oh, "discussed with."

A.    Sorry.

Q.    I'm sorry.  Okay.  So you think that the reason you left it out of your note is because you must have talked to him on the phone about these matters?

A.    I probably did, and I could only speculate why it's not in the note.

Q.    Okay.  Because you don't know.

A.    I don't know.  We're talking about two specific witnesses going on --

Q.    Right.

A.    -- at that time.

USCA5 2455

Q.   Could it be that you were just rushed and needed to get this note to him and --

A.   It might have been.

Q.   -- didn't have time to include all your thoughts and comments?

A.   It's possible.

Q.   Okay.  And you indicate that the ABA card was positive, but there was no indication of male DNA in either the sperm or the non-sperm fractions.

A.   Yes.

Q.   Well, did you find that significant, that you know, when Mr. Onorato found a large amount of female DNA sperm in the male DNA sperm fraction?

A.   Yes.

Q.   Why didn't you share that with Mr. Tinker?

A.   Well, I probably did over the phone.

Q.   Okay.

A.   What you're looking for here is indication of male DNA, in these circumstances.

Q.   All right.  And the reason you wrote this note was to prepare Mr. Tinker to cross-examine Mr. Onorato and Ms. Zervos?

A.   Yes.

Q.   Well, if that was the purpose of the note, why wouldn't you include this -- that would be a good cross-examination question, wouldn't it --

USCA5 2456

A.    I wasn't --

Q.    -- of Onorato?

A.    I'm not sure that it's clear to me whether the Cellmark
person was coming.

Q.    But this was the FBI result.

A.    Right.

Q.    And that was the witnesses you were preparing Mr. Tinker
for.

A.    Yes.

Q.    So why wouldn't you include that anomaly or explain to
Mr. Tinker that that's significant that Mr. Onorato found a lot
of male DNA in the -- or excuse me -- female DNA in the male
sperm fraction?

A.    Why wouldn't I have said that to him?

Q.    Yes, in the note.

A.    It's, it's not that significant.

Q.    Oh, it's not?

A.    I mean, the reason the female DNA is there --

Q.    Uh-huh.

A.    -- is they didn't do the procedure very well.  But --

Q.    And you don't think that's significant?

A.    You're still not picking up male DNA.  That's what's
really significant.

Q.    Is it significant -- well, you've indicated that that's
evidence that they were not doing the procedure very well?

USCA5 2457

A.   They're not washing that, what we call the sperm pellet. If there is sperm there, they're not washing the pellet very well.

Q.   So that would impugn the FBI's protocol, or at least the lab procedure on this test.  Essentially, they botched this test?

A.   They, in my opinion, didn't do it as well as they could because they clearly got a lot of female DNA carryover into the male fraction.

Q.   All right.  And if you did the test properly, you wouldn't have the female DNA still found with the male DNA fractions?

A.   In a perfect test, in a perfect execution of the test, correct.

Q.   Well, not just perfect, you say that they -- and I don't want to put words in your mouth -- but I think you indicated that this was evidence they didn't do the test properly.

A.   They didn't do it as well as they could have.

Q.   Now you're softening your position.

A.   No, they -- well, let me just put it this way.  I see this sort of thing happen more often than it should happen.  They're not the only people doing it this inefficiently.

Q.   But it's still an indication of inefficiency?

A.   Yes.

Q.   Perhaps improper lab procedures?

A.   In my opinion, yes.

USCA5 2458

Q.    But you didn't think to alert Mr. Tinker to this
significant --

A.    Well --

Q.    -- cross-examination point?

A.    As I've pointed out to you before, I had numerous
conversations with him by telephone.

Q.    Uh-huh.

A.    And it wasn't my intent to recapture every point that we
made by telephone in this short note.  This was specifically --

Q.    Do you remember for certain that you discussed this with
Mr. Tinker on one of these phone calls?

A.    I probably did, in that there was -- that's the kind of
thing I would discuss with him.  There was mostly female DNA,
with no male DNA detected in that fraction.

Q.    But it wasn't something that you thought to include on the
note.

A.    That's correct, it's not on the note.

Q.    And explain to the Court that -- now there's a -- and I
don't know all the science, but at some point there's a
centrifuge --

A.    Uh-huh.

Q.    -- which is designed to eliminate or to separate the
female DNA from the male DNA?

A.    When the differential digestion is done --

Q.    That's what you called it, right.

USCA5 2459

Johnson - Cross                                                          66

A.    Uh-huh, and the non-sperm cells, everything that's not sperm --

Q.    Uh-huh.

A.    -- whether it's blood or epithelial cells, those get broken open and taken into the liquid phase.

Q.    Uh-huh.

A.    So the sperm still stay intact as cells.

Q.    Uh-huh.

A.    Those would get centrifuged down to the bottom of the test tube as a pellet.  You draw off the liquid.

Q.    Pellet?

A.    Pellet.

Q.    Uh-huh.

A.    The cell pellet.

Q.    Uh-huh.

A.    You draw off the liquid, and then you're supposed to wash that pellet, which in theory would be sperm, if there were sperm there.

Q.    And you're saying that often female DNA remains with what should be only the sperm?

A.    It's coating the sides of the tube.  And if the analyst doesn't wash that tube and wash that pellet well, they'll have, you'll have, or they will have female carryover or DNA carryover.  If it was a situation where it was only DNA from a male, it would be male carryover.  But it's from the non-sperm

USCA5 2460

fraction.

Q.   All right.  And then what is this?  Number two, what is that first word?

A.   "We" --

Q.   "You'll"?

A.   "We did."

Q.   Oh, that's a "We."  Okay.  "We did an AP test."

A.   Uh-huh.

Q.   "Negative."

A.   "And a p30 test."

Q.   "And a p30 test."  Now, you say you didn't actually do the p30 test; it was done by Technical Associates?

A.   Yes.

Q.   And that's the lab you used to work at?

A.   Yes.

Q.   I think I read that some place.  And were you in between labs during this period?  Or why did -- you weren't associated with another lab?  Or how does that work?

A.   No.  I had left the lab to do private work and private consultation.

Q.   Okay.

A.   Any lab work that I needed to have done usually was referred back to them, or sometimes I would do the evidence examination myself there.

Q.   All right.  Now, you don't indicate to Mr. Tinker the

USCA5 2461

sensitivity of the p30 test you used?

A.   On the second page, I --

Q.   Oh, you do?

A.   I indicated to what the FBI's was, not ours.

Q.   Right.  That's my --

A.   Right.

Q.   That's my question.  You didn't indicate to Mr. Tinker the sensitivity of the p30 test that you had Technical Associates do?

A.   Not in this -- not at this time, no.

Q.   Okay.  And do they only do one type of p30 test over there?

A.   At any particular time?

Q.   Well, did you tell them which p30 test to do?  Or did they decide what to do?

A.   No, they, at any given time, and it's changed over the years, but at any given time they'll have a particular procedure validated.  We used to use crossover electrophoresis, then we replaced it with ABA cards, and then it was replaced with Seratec cards.

Q.   And repeat again, which p30 test did they do?

A.   The test cards using Seratec cards.

Q.   Seratec.  Okay.  And the FBI used a different one.  They used the ABA card?

A.   Yes.

USCA5 2462

Q.   Test, okay.  And these tests are all calibrated to react at a certain level of sensitivity?

A.   They have a reported minimum sensitivity by the manufacturer.

Q.   Okay.  And what was the minimum sensitivity of the Seratec?

A.   The minimum sensitivity of the Seratec, as they, as the manufacturer reported it, was I think 2 nanograms per microliter -- per milliliter.  I'm sorry.  Per milliliter.

Q.   2 nanograms per milliliter.

A.   Correct.

Q.   Okay.  And what was the sensitivity of the FBI test?

A.   Well, they used the ABA card.

Q.   Right.

A.   And the manufacturer's reported sensitivity was 4 nanograms per milliliter.

Q.   Okay.  So that the -- but isn't that the -- isn't the actual functional sensitivity of the ABA card test, you're calling it the ABA card?

A.   Uh-huh.

Q.   That's how you say that -- isn't it a half a nanogram?  Won't it pick up semen down to a half a nanogram per milliliter?

A.   That is not what the manufacturer states.

Q.   Uh-huh.

USCA5 2463

A.   The FBI had procedures to determine what the lot sensitivity for each different lot of cards, but I don't know what they had determined the sensitivity of that lot of cards to be.

Q.   Isn't the 4 nanogram per milliliter sensitivity, isn't that the guaranteed level that the manufacturer guarantees that it will result positive at that level, but it's actually more sensitive than 4 nanograms per milliliter?

A.   Well, they state in their insert that the sensitivity of the ABA card p30 test is 4 nanograms per milliliter.  That's what they state.

Q.   Because that's what the manufacturer guarantees?

A.   It's what they state --

Q.   Okay.  All right.

A.   -- in their insert, yes.

Q.   Are you aware of the guarantee of the manufacturer in these different tests?

A.   I think I've already stated --

Q.   I missed that?

A.   -- what their stated sensitivity is.  4 nanograms per mil for ABA and 2 for Seratec.

Q.   Okay.  But you're not aware that the ABA card test will actually trigger a positive result down to a half a nanogram per milliliter?

A.   It's up to -- if it does, it's up to the laboratory to

USCA5 2464

establish whether it does or not --

Q.    Okay.  But you're --

A.    -- with each lot of cards.

Q.    You're not aware that it does?

A.    I'm not.

Q.    Okay.  And I mean, is it important to know, you know, if the FBI specialist is testifying and he's saying that it has a 4 nanogram per milliliter and your results come to Mr. Tinker and he doesn't know what your, the sensitivity of the test that you provided?  Did you tell him what the sensitivity of the test you had done at Technical Labs -- Technical Associates?

A.    I don't know if I did or not.  This was -- this communication was all about the FBI's work and cross-examining them on their work --

Q.    Uh-huh.

A.    -- with their cards.

Q.    Okay.  But you sent him the, your test results as well?  And I'm talking about the Technical Associates results.

A.    I did inform him of that, yes.

Q.    Okay.  You didn't want him to do any kind of analysis or comparison between the two tests?

A.    I didn't see the need to.  And he, as I said, had difficulty grasping the details sometimes.

Q.    Okay.  And you indicated --

            THE COURT:  Are you talking about Mr. Tinker?

USCA5 2465

THE WITNESS:  Yes.

THE COURT:  You knew what he was thinking?

THE WITNESS:  I could tell from his responses, he did not appear to be grasping the finer points of the technical issues.

BY MR. DOWD:

Q.   He was sucking you in.

A.   I won't speculate.

Q.   All right.  Does a --

THE COURT:  But you did.

THE WITNESS:  Pardon?

THE COURT:  I said, "but you did speculate."

THE WITNESS:  About whether he was sucking me in or not.  I was working for him.  I don't see the reason why he would.

BY MR. DOWD:

Q.   And how do you distinguish between a, or do you distinguish between a strong positive, positive, weak positive?  You indicated in your note that it was a weak positive from the associate, Technical Associates lab.

A.   Yes.

Q.   And why do you say "weak positive"?

A.   Because the test line was barely visible, and the analyst called it a weak positive.  It's actually very difficult to see on a photograph even.

USCA5 2466

Q.    So that was the analyst's term?

A.    Yes, that was --

Q.    You just passed that term on to Mr. Tinker?

A.    Yes.  That's her, what she wrote down, "weak positive."

Q.    Okay.  And so as the line -- you do the test, and it's designed so that a line goes up the page, higher and higher as the result gets more positive?

A.    No.

Q.    You said it was just a little line -- see, I don't follow --

A.    No.

Q.    -- how that works.

A.    It's a color intensity is what I'm talking about.

Q.    Oh, it's a color intensity.

A.    Yes.

Q.    Okay.  So a particular color shows up, and that tells you that it's a positive?

A.    No.  The test card is designed like a little pregnancy test card.

Q.    Oh, okay.

A.    And lines will develop.  There's a test line.  If that results in a color change, the test is positive.  And then there's a control line, which always should show up.

Q.    If the test was done properly.

A.    If the card is working right.

USCA5 2467

Q.   If the card's working.

A.   Yeah, the control line should always show up.

Q.   Okay.  If a control line doesn't show up, you just throw it away and start over, right?

A.   Right.

Q.   Okay.

A.   Now, if the control line is there as it should be, and the test line is not there, then the test is negative.  If the control line is there and then the test line is very, very strong --

Q.   Meaning a deep, rich color?

A.   A deep, rich color, right.

Q.   Uh-huh.

A.   Versus a very faint color, then you would determine that to be a weak --

Q.   What color is it?

A.   It's pink.

Q.   It's pink?  And it could go to like a deep red?

A.   Pretty much, yeah.

Q.   Or pink.  And -- but you still use the word positive.  You still say positive.

A.   Referring to the Technical Associates test?  Is that what you're referring to?

Q.   Yes, yes.  I'm sorry, your test results.

A.   Yes, the analyst recorded it as a weak positive.

USCA5 2468

Q.   Okay.  Doesn't the weakness or the strength of the coloring of the test, doesn't that indicate the amount of semen that's detected, not either the presence or absence of semen?

A.   It's -- the color reaction is, it's not going to be there.  The line's not going to be there if there's no semen.

Q.   Right.

A.   Okay.

Q.   And if there's a little semen, it will be a weak color?  If there's a lot of semen detected, it will be a strong, deep, rich color?

A.   Yes.

Q.   Okay.

A.   This --

Q.   So it's not telling you that there's no semen.  It's telling you that there's a small amount of detectable semen.

A.   Yes.  And I do have to put in, for the record, the caveat of if you have too much, you can get a false negative.  But that didn't appear to be the case here.

Q.   And if it's too red, then it's --

A.   No.  If the semen in the sample is too concentrated, the test card will appear negative.

Q.   Oh, it won't even detect any semen?

A.   It's overloading the card and blocking the site --

Q.   Oh.

A.   -- for the binding to occur.  It doesn't apply to this.  I

USCA5 2469

just have to point that out for the record, though.

Q.    And -- but you really didn't share with Mr. Tinker the Technical Associates lab results to compare them with the FBI lab results because that's really like comparing apples and oranges?

A.    No, I did tell him.

Q.    Different sensitivities?

A.    No, I did tell him what the --

Q.    No, but you didn't give him those results for him to compare them with the FBI results.  I think you testified to that earlier, that that wasn't the point of you giving him those results, so he could compare them.  Did I misunderstand that?

A.    I'm not sure I'm understanding your question.  I did tell him what their results were, and I told him what our results were.

Q.    Right.

A.    And --

Q.    And I asked you why you didn't, you know, fill him in on the significance of the sensitivity of the two different tests which are different, and you said that wasn't the purpose that I was giving it to him, to compare --

A.    Right.

Q.    -- to the FBI results.

A.    But his task was to cross-examine their witnesses on their

USCA5 2470

tests.

Q.   Right, right.  Okay.  Now, you advised Mr. Tinker that the results of the APA test was negative.

A.   AP test, correct.

Q.   What did I say?  AP test was negative.  And which AP test did you administer?

A.   It's an acid phosphatase spot test.

Q.   Is that the same one the FBI administered?

A.   They use a different test chemical and different, slightly different procedure.  It's still a color change catalytic reaction.  It's not exactly the same test.

Q.   Is that significant to let Mr. Tinker know that you gave him a different type of AP test?

MR. ABREU:  Your Honor, I just want to object.  I believe the testimony on direct was that the FBI did not give an acid phosphatase test.  And I believe that's what that --

THE WITNESS:  Yeah, they don't -- they didn't do one.  Excuse me.

MR. DOWD:  Oh, I'm sorry.  I'm sorry.

THE COURT:  Thank you.  That's sustained.

MR. DOWD:  I'm sorry.  I stand corrected.

BY MR. DOWD:

Q.   And is it important to know which type of AP test was given?

A.   Not really.

USCA5 2471

Q.    It's not significant?

A.    No.

Q.    And what was Mr. Tinker supposed to draw from the fact that your, the FBI had a weak positive on the p30 test?  You look --

A.    Okay.

Q.    You look surprised.

A.    The FBI did not report a strength of their test.  They just reported it positive.

Q.    Oh.  Did you look at the -- you didn't look at the FBI raw data?

A.    There is no raw data on an ABA test card.  They should have made photographs --

Q.    On a p30?

A.    Right.

Q.    Oh, ABA card.  I'm sorry.  Go ahead.

A.    They -- any decent laboratory would photograph the results, and they did not.  And there was no way for me to review the actual test itself.  It's just a notation, a note in a worksheet.

Q.    So you weren't provided any information regarding the FBI test which resulted in a weak positive?

A.    They recorded it as positive.  They didn't note that it was weak.

Q.    Okay.

USCA5 2472

A.    So I have no way of determining whether it was very positive or weak positive.

MR. ABREU:  Your Honor, may I object at this moment?

THE COURT:  Pardon me?

MR. ABREU:  May I object --

THE COURT:  Sure.

MR. ABREU:  -- and make a request here?  I personally, Your Honor, have not seen the FBI's raw data.  The witness has indicated that she's never seen the raw data.  I want to know if there in fact is raw data that we should be looking at and whether in fact the FBI did have a weak positive.  I know I've made a request for that information, but I have not seen that.

THE COURT:  Is there -- do you have the raw data?

MR. DOWD:  I don't have it in front of me, Your Honor.  I --

THE COURT:  Is it available?

MR. DOWD:  Well, I'll have to look.  My witness --

THE COURT:  Ask the FBI if --

MS. BECKETT:  It's my -- it's my memory that they don't give that out.  They keep it with them and they explain it, but they don't just hand out the raw data.  We had that problem at the time of the trial.

MS. BOOTH:  No, not -- excuse me.  It's Patti Booth for the United States.  And we got every bit -- you ordered us,

USCA5 2473

Judge.  Mr. Tinker came in here, pitched a fit about the raw data for Dr. Johnson.

THE COURT:  Right.

MS. BOOTH:  And we were able to get, and it was a program that we had to get, which had never been given out before, and we got it and sent it to Ms. Johnson.  Ms. Johnson and I spoke on the phone about that.  We got all the raw data that we, that they had.

THE WITNESS:  That -- Your Honor --

MR. ABREU:  Your Honor, I don't disagree with any of that.  My question is Mr. Dowd is asking questions whether he, whether the witness has seen indications about a, whether it was weak positive or not.  The only thing --

THE COURT:  Did you get the raw data to Ms. Johnson, Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

THE WITNESS:  Excuse me, Your Honor.  They're talking about the wrong thing.

MR. ABREU:  Yeah.

THE WITNESS:  Excuse me.

MR. ABREU:  Let me address the Judge.

THE COURT:  Okay.  Well, you know, talk to Ms. Booth and see what you got.

MR. ABREU:  I know we don't have anything that says

USCA5 2474

weak positive.  All we have is a check mark on a test that says it was positive.  That's the only thing we've ever seen, the only thing we've ever provided to Ms. Johnson.  And if that does exist, I would actually like to see that information, Your Honor.  That's my request.

THE COURT:  Okay.  Where is the raw data?  And why is it not given out?

MS. BOOTH:  Oh, and I remember now, the FBI Agent just -- it was the protocol that Ms. Johnson, that Dr. Johnson had asked for --

THE COURT:  Okay.

MS. BOOTH:  -- which we got, and it was on a special program that we had to get, and it was very difficult to get, but we got it and got it to her.  Now, the raw data --

THE COURT:  Nobody ever asked for it?

MS. BOOTH:  Judge, I, you know, I thought that protocol and raw data were the same thing, so I can't tell you that now, unless we go back and just try to --

THE WITNESS:  Excuse me, Your Honor --

THE COURT:  Yes, ma'am.

THE WITNESS:  None of that is correct, pertaining to this.  The raw data refers to the DNA.

THE COURT:  Okay.

THE WITNESS:  What we would need to see here is an actual photograph of the ABA test card.  So the raw data has

USCA5 2475

nothing to do with the ABA test card.

THE COURT:  Oh, so the raw data wouldn't help you at all?

THE WITNESS:  It has nothing to do with it.

THE COURT:  Okay.  So what did you need?

THE WITNESS:  A photograph of the ABA test card.

MR. ABREU:  She's referring to the specific testing information from the person who conducted the ABA test card, which I do recall I specifically requested.  And as a matter of fact, Mr. Dowd was actually kind enough to let me speak to Ms. Conway, Jerrilyn Conway, who is the FBI person who's going to come and testify at some point during these proceedings, Your Honor.  And she told me that everything was sent to Dr. Johnson so that we should have everything.

If they're discussing information that's specific to this p30 test that the FBI conducted, I know for a fact I have never seen it.  I know for a fact I have never provided that to Dr. Johnson because she's never seen it.  We don't have it.  And if that exists, Your Honor, I would like to see that information.  I want to know if they had a weak positive, as opposed to a positive, because they testified it was positive, not weak positive.  I want to know that.

MR. DOWD:  Judge, my understanding is -- I was told that by our FBI lab expert that's coming in this afternoon, and I understood that she sent all that material to -- wasn't there

USCA5 2476

some stuff that she sent directly to your office?

MR. ABREU:  What she sent directly to me, Your Honor, were the protocols for the FBI testing, which apparently were already previously provided.  I have those, and I appreciated that.  This is a very different request.  So when the tester is actually testing, she's making notes, "I see this."  "I see this as a weak positive."  "I see this as a strong positive." Photographs are often taken of the actual tests, so that when people come to court, you can see what the actual test says.  I have not seen that information.  Our experts have not seen that information.  That's what I'm requesting, Your Honor.

MR. DOWD:  Judge, I can confirm that with Ms. Conway, and we'll try to call her and get that information.

THE COURT:  Okay.  Would it make a difference if you saw that?

THE WITNESS:  Yes, a photograph would be very helpful, of that ABA test card.

THE COURT:  Tell me why.

THE WITNESS:  Because then I could see the intensity of the test line that developed, so that I would know whether or not the note that she made on the worksheet, where she puts, just checks "positive" or writes "positive," or makes the symbol "positive," is, you know, very strong or very weak or moderate.

BY MR. DOWD:

USCA5 2477

Q.   But again, that was --

THE COURT:  Did you ever ask for Mr. Tinker to get you a photograph of the --

THE WITNESS:  In my discovery request, I always include photographs.  Some laboratories do not photograph those cards, and my --

THE COURT:  Well, do you have a copy of your discovery request?

THE WITNESS:  It's on my laptop in my hotel room, but it's --

THE COURT:  You want to pull it up and see if you did that?  Would that be helpful?

MR. DOWD:  I'm sorry, Your Honor?

THE COURT:  Would that be helpful?

MR. DOWD:  On her program?  I didn't follow that.

MR. ABREU:  She has it on her laptop, Your Honor.

THE COURT:  Yes.

MR. ABREU:  It's in her hotel room.

THE WITNESS:  I don't --

THE COURT:  Oh.  Well, that wouldn't be helpful.

MR. ABREU:  That would not be that helpful at the moment.

THE WITNESS:  It's my understanding that the FBI laboratory probably does not photograph these cards.

MR. DOWD:  Okay.  And the Judge --

USCA5 2478

THE COURT:  Where did you get that understanding?

THE WITNESS:  Well, if they're provided discovery for photographs and then they don't provide the photographs --

THE COURT:  Okay.  Do you know if you got, if you asked for that?

THE WITNESS:  I would have given Mr. Tinker my discovery request, which has, from day one, always referred to all photographs pertaining to the testing.  That would have been in the discovery request, had --

THE COURT:  Well, did you talk to him about photographs?  Do you know if you talked to him specifically --

THE WITNESS:  I don't specifically recall.

THE COURT:  I wouldn't -- if I had gotten that as an attorney, I wouldn't have known what that meant.

THE WITNESS:  Well, typically when any laboratory provides you with their case --

THE COURT:  I know.  But did you put "laboratory photographs"?

THE WITNESS:  It is in my test, in my discovery request.

THE COURT:  Okay.

THE WITNESS:  It specifically --

THE COURT:  Over the lunch hour, do you think you can go get that and bring it back?

THE WITNESS:  Yes.  May I add that when a laboratory

USCA5 2479

makes these photographs, it's part of their case file.  And if it's not in the case notes, it's a pretty good indication they don't take the photographs in the first place.

MR. DOWD:  All right.

MR. ABREU:  May I just add one more thing, Your Honor?

THE COURT:  Sure.

MR. ABREU:  Even if, in fact, the FBI did not photograph these test cards, I don't know if Mr. Dowd is asking questions regarding documents that I still haven't seen, which are whether the FBI recorded a weak positive or a regular positive.  Again, we've presented evidence that a weak positive versus a positive is relevant.  If, in fact, it was a weak positive, I suspect Mr. Tinker would have wanted to use that at trial to say, "This is not necessarily semen because of the weak positive."  I suspect that's what he would have tried to use it for.  If that's information, I would like to see it.  It might implicate Brady.  I think I'd like to see that information, Your Honor, from the FBI, if they have bench notes and specific documents related to the testing and the card.

THE COURT:  Where did you see it, Mr. Dowd?

MR. DOWD:  I was told by Ms. Jerrilyn Conway, Your Honor, our expert witness --

THE COURT:  And she's going to be here?

MR. DOWD:  She's flying in this afternoon.

USCA5 2480

THE COURT:  Okay.

MR. DOWD:  Will be here at 3:45.  And I understood it was material that had been shared.  But that will, I'll be able to put testimony on on that.

BY MR. DOWD:

Q.   Now, whether it's a weak positive or a strong positive, the test is designed to disclose the presence of semen --

A.   No.

Q.   -- whether it's weak or positive.  Are you --

A.   P30.

Q.   Go ahead.

A.   P30.  Not --

Q.   What did I say?  Semen?

A.   Yes.

Q.   Okay, p30.  I'm sorry.  But a weak positive is still a positive.  That still discloses the presence of p30 in the test result.  Is that right?

A.   The test, the test is designed to detect p30.  But whether or not -- you can make some double-checks and checks and balances based on the intensity of the color reaction, which gives you an idea of concentration or the amount of material you're dealing with.

Q.   So the color, stronger color indicates a larger quantity of p30 than a weaker color?

A.   Correct.

USCA5 2481

Q.   But it's, a weaker color still discloses the presence of p30?

A.   It is -- yes.  The test is supposed to be specific for p30.

Q.   And have you ever testified that a weak positive result demonstrates the presence of p30?

A.   I can't recall.  May or may not have.  I don't recall specifically.

Q.   Well, would you have?

A.   Whether a weak result would have demonstrated the positive -- the presence of p30?

Q.   Yes.

A.   That would be the kind of thing that I would note, if that was what the test result was, but I would also include the results of other tests that were --

Q.   Sure.

A.   -- designed to be double-checks.

Q.   Sure.  And what was the significance of the negative AP test result that you were sharing with Mr. Tinker?  What was the significance of that, in relation to the positive or weak positive testing that was done on the p30 test?

A.   Well, the AP test is a presumptive test for seminal fluid.  Acid phosphatase is contained in high amounts in seminal fluid.

Q.   And how does the AP test work?  What reaction must occur for a positive result to result, positive result to occur?

USCA5 2482

A.   It's a catalytic change.  There's -- there are different test reagents that can be used.  The test reagent that Technical Associates uses is provided by SERI.  That's a lab, or a vendor.  And you make the test reagent, and it's a liquid. And in the, when you make it up, it's almost colorless, almost. But in the presence of a sample that contains high levels of acid, or acid phosphatase, you take a little bit of that sample and you put it in a test plate, and then you drop the AP reagent on.  That acid phosphatase, if it's present, is going to cause a catalytic change to the components of the reagent and convert that material from a colorless liquid to a very bright pink liquid, if there's a lot of acid phosphatase there. If there's not much acid phosphatase there, it will be slightly pink.  And if there's no acid phosphatase there, it won't change from its original color.

Q.   Is there an enzyme involved in this reaction?

A.   Well, acid phosphatase is the enzyme.

Q.   Oh, it's an enzyme?

A.   Yeah.

Q.   Okay.  And in order for a positive result to occur, that enzyme, acid, AP, acid phosphatase, has to be functional, has to be reactive.  Correct?

A.   Yes.

Q.   If it's dead, if it's no longer sensitive to the test agent, then even, you know, if there was seminal fluid there,

USCA5 2483

you're not going to get an AP test positive result?

A.    Well, what I can tell you is that semen stains that are decades old will test positive with this test reagent.

Q.    Okay.  What would you expect the impact of the environment within a rectum to have on the viability -- and I don't mean just being alive, but I mean being preserved, the AP being preserved and not to trigger a positive test result?  What would the impact of the environment of the rectum -- I'm talking about a live rectum, not a, you know, a dead person. What impact would that have on the ability of the AP to still be viable and test positive?

A.    Well, there are semen -- I'm sorry -- swabs taken from rectal swabs, vaginal swabs, again, that are decades old that if semen is present, it will be detected.

Q.    But in a live rectum, you know --

A.    Yes.

Q.    -- on a person who's alive, how long would you expect acid phosphatase to survive in a live rectum?

A.    In a living person, all of the forces that influence whether you're going to detect semen, for example, in the vaginal tract or rectal tract, more so have to do with activity and drainage --

Q.    Uh-huh.

A.    -- than decomposition, if that's your point.

Q.    Let's stick to the rectum.

USCA5 2484

A.    Okay.

Q.    And so that the drainage, gravity, normal evacuation, that would impact the presence or survivability of the AP within the rectum?

A.    Yes.  If there's -- if that is there from seminal fluid.

Q.    Uh-huh.

A.    And then that seminal fluid is draining or removed by defecation, those all -- all those factors influence how much material is left to detect.

Q.    All right.  And what about the bacteria in the rectum?  I mean, would that have any impact on the survivability?  I say survivability, but I mean the viability of the AP contained there to still result in a positive test result?

A.    Not -- not really.  Again, there's bacteria in the vaginal tracts, bacteria in most forensic evidence, and AP tests are routinely positive on samples that are decades old.

Q.    Okay.  And you would equate bacteria in the vaginal tract with the bacteria that may be contained in a rectum?

A.    Different strains, could be some of the same strains of bacteria.

Q.    Okay.

A.    I'm not aware that there's any preferential forces working on acid phosphatase to destroy its enzymatic activity in the rectum versus any place else.

Q.    Okay.  And you indicate that the bacteria on the swab

USCA5 2485

was -- I want to read this exactly -- "The p30," let's see, this here, "The p30 positive weak on our test could be a false positive, due to bacterial proteins found on the rectal swab."

So the bacteria within the rectum that was transferred onto the swab, in your opinion here, was sufficient to cause a false positive on the p30, but you don't think it would have any impact on the AP test?

A.    No.  Let me explain my, if I may, rationale here.  This test is the only test, amongst many, that was remotely positive.  And I cannot independently evaluate the strength of the FBI's test on the p30.  Only --

Q.    You're talking about your p30 test was remotely positive, you said?

A.    Weak, weakly.  Very weakly positive.

Q.    Oh, weakly?  Okay.

A.    So in, my intent is, with only that result being positive and only weakly positive and everything else being negative, and it is from a rectal swab, it is a possibility that has to be considered.  I'm not saying that it is from a bacterial cross-reaction.  I'm saying -- it's my intent to convey that it's just something that has to be considered in light of all the other negative tests.

Q.    No, that's not what you said.  You said, "The p30 positive weak on our test could be a false positive due to bacterial proteins found on the rectal swab."  You didn't say that that's

USCA5 2486

something that he might consider.

A.    Well, I do point out above and below that these other tests are negative.

Q.    Right.

A.    As I've told you before, this wasn't meant to be a full-blown comprehensive report.

Q.    Okay.  Now, you know, I noticed on here, you see where it says, "The p30 positive weak on our test," did you write "would" and then you changed it to "could"?  Or did somebody else change that to --

A.    No.

Q.    -- "would" or "could"?  Or how did that happen?

A.    That's my writing.  It's just --

Q.    So even the C and the W, that's you?

A.    I don't know whether it was a slip of the pen or what, but "could" is my intent, and that's what it's written as.

Q.    You meant to say "could," but you first wrote "would"?

A.    I don't know if I first wrote "would" or if that's just a slip of the pen.

Q.    You think, you got your Cs and Ws mixed up?

A.    I can't say at this moment what happened at that moment.

Q.    Doesn't it look like you wrote "would"?  I mean, if you changed it to "C," it looks like you clearly wrote "would," and then you came back.  You didn't stop at the W.  You finished the whole word, and then you came back and changed the "would"

USCA5 2487

to "could."

A.    I don't know at this moment --

Q.    You don't know?

A.    -- whether that was what happened.  My -- it clearly, in the finished product, says "could," and that is what is consistent with what I would say, what I would testify to.

Q.    All right.  Now, normally you would formulate what you're going to write, you're going to formulate what you're going to write before you actually start writing.  Correct?

A.    I would make some notes, and if I were in my office with my computer, I'd make some notes and do extensive editing.  Again, this was not the circumstance under which I was working.

Q.    And I mean, it's a fairly dramatic change, is it not?  Because if you wrote "would" first, and then came back and changed it to "could," and you say you don't remember when you made that change, you're going from positively to possibly.  Because if you said that this test would be a false positive due to bacterial protein, that's a positive statement.  If you go back and change it to "could," you're just making it a possibility, it could be.  So that's a rather dramatic change in position, isn't it?

A.    I don't know if it's dramatic.  What would be consistent with my thought process and my testimony then and today would be could, a possibility.

Q.    Okay.  But I'm asking you about the "would."

USCA5 2488

A.    I've already --

Q.    You don't remember even writing it.

MR. ABREU:  Your Honor, I'm going to object at this time.  I think the witness has answered the question multiple times.

THE COURT:  Move on to something else, please.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.    Now, you only mentioned the potential for the bacterial protein to trigger a false positive.  Is that the only -- is that the only thing that you could consider or that you understood that would produce a false positive under these circumstances?

A.    Well, no, because I put on this third page a list -- a chart from a publication with other materials that would give a false positive -- I mean, would give a positive reaction --

Q.    Okay.

A.    -- not necessarily a false positive.

Q.    And so you assume, just from normal course, that bacterial proteins would be on the swabs?

A.    It's pretty much a given you're going to have bacteria on a rectal swab.

Q.    Is there a test to determine if there's bacterial proteins on the swab?

A.    Well, you could culture the swab to see if there are

USCA5 2489

bacteria present, but that's not typically done in the forensics setting.

Q.    But if this is, if this is something that would have produced a false positive, did you think to tell your lab to have that done, to determine if the swabs contained these viable bacterial proteins that could interfere with the test?

A.    They -- I said it was a possibility, not a conclusive situation.

Q.    Yeah, it was the possibility you included in your note.

A.    And the laboratory does not do bacterial cultures.

Q.    Oh, they don't anyway.  Okay.

A.    They don't.

Q.    Okay.

A.    No forensic laboratory does.

Q.    Well, you just described that you could do a culture to determine that, but who would do that?

A.    That would be a microbiology lab.

Q.    Okay.  But you didn't think to have that done?

A.    It's not a typical process, no.

Q.    And what do you think the source of the bacterial proteins that you assumed were on the rectal swabs?  Would this be from digested food protein or protein that lives in the rectum all the time, or what?

A.    Well, bacteria live in the digestive system all the time.

Q.    Okay.

USCA5 2490

A.    Bacteria produce proteins.

Q.    Okay.  And are these the same as the bacteria found on digesting and digested foods?

A.    Everybody's -- if you took a culture of different people's intestinal bacteria, you'd find a lot in common and probably some in different.  So I really can't be any more specific than that.

Q.    All right.  Now, what is the scientific process in which bacterial protein would interfere with the p30 test, the normal functioning of the p30 test, or cause a false positive?

A.    Well, if any protein caused a false positive, it would be because there is some similarity in its antigenic activity or shape, so that -- see, this test works by an antibody binding to its target.

Q.    Uh-huh.

A.    And its target is supposed to be p30.  But if there were some protein that had a similar --

Q.    Signature?

A.    -- binding, similar signature, so that that antibody bound to it, it could cause a test reaction to behave the same way.

Q.    All right.  And there's evidence and studies that show that certain bacteria have the same signature as p30 and can interfere with the test result?

A.    There are none that specifically say that.  Again, I explained to you my rationale for that is in light of all of

USCA5 2491

the negative tests, that would be something to consider.

Q.   But there's no scientific basis that, to say that bacterial protein could have the same signature as p30 and fool the p30 test?

THE COURT:  Would you wrap this up --

MR. DOWD:  Oh, yes, Your Honor.

THE COURT:  -- sometime this year?

MR. DOWD:  Yes, Judge, I'll speed it up.

BY MR. DOWD:

Q.   There's no scientific basis for your conclusion that bacterial protein could have been the cause of the false positive?

A.   There's not a specific report in the literature of certain strains causing it, but there have been very limited, very, very limited studies involving bacterial cultures or even rectal swabs.

Q.   Now, your sensitivity, the numbers you used was based on the 4 nanograms per milliliter, the amount of sperm that would be found in a semen sample?

A.   No, that's not the right -- the 4 nanograms per milliliter is the stated limit of detection for the ABA p30 card.

Q.   Right.  And that's the figure you used in your computations?

A.   Yes, because it was that card that the FBI used, and --

Q.   Okay.

USCA5 2492

A.    -- that's their stated limit.

Q.    And if that card was actually sensitive down to a half a nanogram, then that would throw your numbers off, and your 500 figure would be reduced to, I think, 62.  But don't ask me to do the math.  It would have a dramatic effect on your computations, wouldn't it?

A.    It would cut it eight-fold.  So you would have to divide --

Q.    Okay.

A.    -- 50 by 8.  I'm sorry, 500.  500 by 8.

Q.    And would you suspect that a weak positive, which would suggest a low amount of semen, would also suggest a low amount of sperm in that sample?

A.    Generally a low amount of semen will have a lower amount of sperm.  But sperm are very, very abundant per microliter even.

Q.    All right.

A.    And to answer your question, if that --

Q.    That was the question.

A.    Excuse me.

Q.    That the low amount of semen would suggest a low amount of sperm in that sample.  I think you've indicated that's right.

A.    The lower the amount of seminal fluid, generally the lower, lower amount of sperm than if you had more seminal fluid.  But again, the sperm is very, very abundant.

USCA5 2493

Q.   Okay.  But that would further reduce your computations?

A.   I was answering your previous question.

Q.   Uh-huh.

A.   If you divided 500 by 8, that would still be -- that should come out to about 60 something sperm on the swab.  And even if you took a few -- even if you took 10 percent of that, put it on a slide, you would still -- you should still be able to detect a few sperm.

Q.   And your testimony is that the, that the PSA found in female urine and female serum are at levels high enough to trigger a positive result on the ABA card test?

THE COURT:  I thought you didn't know whether a two-year-old would trigger anything on that level.

THE WITNESS:  I don't know what's present in the serum and urine of a two-year-old because none of these studies involve children.

BY MR. DOWD:

Q.   Okay.  So this article that you sent to Mr. Tinker wouldn't be -- may not have been applicable in this case, because it's more general than the general population, and not including children it's found?

A.   I don't think that any of these studies include children.  This is demonstrative that this p30 is found in other bodily fluids, not just in the bodily fluids of men.

Q.   And what about the -- I'm going to rush through this.

USCA5 2494

What about the degradation of sperm cells within a live rectum?

A.    Okay.

Q.    You talked about how indestructible they are.

A.    Yes.

Q.    Would that be true even in a live rectum?

A.    Yes.

Q.    How long would you expect a sperm cell to remain, you know, viable within a rectum, a live rectum, not a decomposing body?

A.    Well, the term "viable" is not appropriate here in the first place.

Q.    I know.  You're right.

A.    And --

Q.    What would be a good word to say that it's still intact, that you could get a DNA sample or identify it?

A.    "Detectable" is a better term.  "Intact" isn't a good term either.

Q.    Okay.

A.    Because that implies the tail is present.  And the answer to the question is, it is a function more of drainage and physical removal rather than any destructive forces of any bacteria or enzyme present in the body cavity.

Q.    So the bacteria wouldn't have any effect on the sperm in the rectum?

A.    Sperm are very tough, and it takes extra steps to crack

USCA5 2495

them open in the lab.  It's -- it does not have -- the bacteria in the rectal canal does not have an influence over whether they're breaking those sperm open.  Again, it's the physical removal of the material.

Q.   Okay.  And once a sperm breaks down, it breaks apart, the tail falls off, the midsection falls off, and you're kind of left with the head?

A.   Yes.

Q.   Okay.  And does the head of the sperm cell look like a yeast cell?

A.   It can sometimes -- sometimes a yeast can be mistaken if the analyst doesn't really know how to distinguish the two.

Q.   All right.  And you talked earlier about separating sperm from a cotton swab.  Do you know the extraction sufficiency of sperm, separating sperm cells from a cotton swab?

A.   It depends on who's doing it.

Q.   But it can be as low as 1 percent, 1 to 10 percent?

A.   It depends on who's doing it.  Technical Associates is very efficient at extracting sperm.

Q.   And what would you say that their extraction sufficiency level is?

A.   I'd say it's close to 100 percent.

Q.   100 percent, they can get every sperm out of a cotton swab?

A.   They've done studies, using their techniques -- yes.

USCA5 2496

Q.    100 percent?

A.    It's very close to that.

Q.    Very close to 100 percent.  Okay.  And how would they know that?

A.    By putting, using known amounts of semen on swabs, and then using different techniques.  Again, they do a technique using an extra agitation procedure that some labs don't.

Q.    Uh-huh.

A.    And they're very, very efficient at extracting sperm from any kind of sample.

Q.    Do you know what the FBI protocol is, as far as identifying a sperm?

A.    Yes.

Q.    A sperm cell?  What is that?

A.    They require that the sperm be intact, with a tail attached, to call it a sperm.

Q.    All right.  So earlier when you testified that the FBI did a microscopic examination of the rectal smear and it was negative --

A.    Right.

Q.    -- that just means that there was no intact sperm.  In other words, with a tail.

A.    They won't report a sperm unless it's intact.  They -- I think their protocol says to make notes of components.

Q.    Uh-huh.

USCA5 2497

A.   Which I saw no indication --

Q.   So that's all that result meant is that they didn't find any complete, intact sperm cells.

A.   No, it doesn't mean that that's all that meant.  It could mean that they saw no components either.  They made no notation in the laboratory notes of seeing any components.

Q.   Well, we don't know that.  In other words, all they're saying is that we didn't find any intact --

THE COURT:  Okay.  Move on.

MR. DOWD:  Okay, Judge.

BY MR. DOWD:

Q.   You indicated that everything is subject to the degradation process at the same time.  Did you mean at the same rate?  Everything degrades -- I think you were talking about semen, sperm, DNA.

A.   Oh, I think I was talking -- I believe that was when the Judge asked me if the Y chromosome would degrade faster --

THE COURT:  I think she just said that everything was subject to degradation, but not at the same rate.

THE WITNESS:  No, I -- sorry if I misunderstood.  I think I interpreted your question to mean, would the Y chromosome degrade faster than the other chromosomes?

THE COURT:  Oh, yes, I did ask that.

THE WITNESS:  And the answer to that is no, the Y chromosome would not degrade faster than the others.

USCA5 2498

BY MR. DOWD:

Q.   What about p30 and AP?  Will they degrade at the same rate within a live rectum?

A.   I don't know if one protein is more subject to degradation than the other.

Q.   And you indicated you don't know if p30 is present in little girls?  You don't know if there's any presence of p30 in little girls, their fluid, urine, blood?

A.   I'm not aware of any studies involving children.

        MR. DOWD:  One second, Your Honor.  Just going over my notes.

BY MR. DOWD:

Q.   Let me ask you this.  They did a p30 test on a swab that they took from dark brown stains in the victim's underwear that they believed was blood.

A.   Okay.

Q.   Do you remember looking at that?

A.   I don't recall the specific result on that, though.

Q.   And that result was negative, FBI result was negative for p30 on the, what appeared to be a blood stain in the child's underwear.  You didn't --

A.   Okay.  I probably -- I reviewed all of the lab notes.  I just don't recall --

Q.   Okay.

A.   -- the result.

USCA5 2499

Q.    All right.  And I don't have the Q number for you, but if that's true, wouldn't that suggest that the positive p30 test result from the rectal swab was not the result of this little girl's blood, since the blood in the underwear was not, did not trigger a positive p30 test result?

A.    If the blood came back to be hers, I mean -- sorry -- yes, if it came back to be hers from DNA testing, which I think it did, it's an indication that her, again, blood, would not have p30.

Q.    And could we understand from that that if it was -- if the rectal swab -- then therefore, the rectal swab would not have been positive because of contamination by her blood.

A.    Well, there's more going on on a rectal swab than just blood.  There's fecal material and --

Q.    Right.  But we know that it wouldn't have been her blood that triggered the positive result, since her blood didn't trigger a positive result in the swab from the underwear.

A.    It's a good indication.  It wouldn't be from blood, but you're speaking specifically about blood and not the other things that would be --

Q.    Right.  I'm asking you if you can eliminate her blood as triggering the positive PSA result on the rectal swab, since it didn't trigger a positive result in the swab from her underwear, from the blood in her underwear.

A.    Given that all of that is correct, which I don't have the

USCA5 2500

ability to verify here --

Q.    Assume that's true.

A.    -- I would assume -- yes.

Q.    Then you could eliminate, if that was true, you could eliminate her blood as causing that positive PSA --

A.    Only the blood.

Q.    -- in the rectal, in the rectal swab?  Only the blood --

A.    The blood.

Q.    -- which would leave urine, female urine.  Right?  And amniotic fluid.  Now, we know there's no amniotic fluid in her rectum, and there's no breast milk in her rectum.  Right?  So that leaves urine as the only potential source of that PSA positive result from the rectal swab?

A.    I don't know what this child ingested or didn't ingest, so I don't know what else might have been in her intestinal tract. We were specifically speaking only about the blood.

Q.    Right.  But in the chart that you sent, it had breast milk --

A.    Right.

Q.    -- amniotic fluid, female serum and female blood, right, as other sources of PSA?

A.    Right.

Q.    Right.  And so we know it's not female blood, because her blood didn't trigger a positive PSA in the underwear result. Female serum is still open, female --

USCA5 2501

THE COURT:  Except for nobody knows whether that female serum of a two-year-old has that in it.

BY MR. DOWD:

Q.   With that proviso, you don't even know if a little girl's urine or blood could trigger a PSA.  Now serum, is that the same as blood?

A.   It's the noncellular component of blood.

Q.   All right.

A.   So it's part of it.  It's not the whole thing.

Q.   Okay.  But if you got a negative result from testing her blood, would that suggest that you'd get a negative result from testing her serum, her blood serum?

A.   The serum would be more concentrated than just testing a blood stain.

Q.   Uh-huh.

A.   So there, you know, you have that condition to consider. But you know, it's likely that you probably wouldn't find it in her serum if it wasn't in her blood.

Q.   You could likely eliminate serum.

A.   Probably.

Q.   You're left with urine, but again we don't know if a little girl's urine has PSA in it.  But you can eliminate breast milk because -- are you saying that breast milk could be digested and still trigger a PSA?

A.   Sure.  Yes, there -- it's actually even --

USCA5 2502

THE COURT:  Okay.  There's no indication she had breast milk, so --

MR. DOWD:  Okay, Judge.

THE COURT:  -- please move on.

MR. DOWD:  Okay, Judge.

THE COURT:  This is really getting to be absurd.

MR. DOWD:  I'm sorry, Your Honor.  I'm sorry.

BY MR. DOWD:

Q.   So that would just leave female urine.  Right?

A.   Um --

Q.   If she wasn't breast feeding.

THE COURT:  Oh, for goodness sake.

MR. DOWD:  We're done, Judge.

THE COURT:  Are you done?

MR. DOWD:  I'm done.  I pass the witness.

MR. ABREU:  May I, Your Honor?

THE COURT:  Yes, quickly.

MR. ABREU:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ABREU:

Q.   Ms. Johnson, Mr. Dowd --

THE COURT:  To me, the importance of this is even if she had testified, would it have made any difference?

MR. ABREU:  And I want to get to that point.

THE COURT:  So -- that would be good.  Thank you.

USCA5 2503

MR. ABREU:  I want to get to that point second.  One quick thing I do want to ask Ms. Johnson about.

BY MR. ABREU:

Q.  Mr. Dowd asked you about the female urine, as he was attempting to do at the end, and whether that could have been in the breast milk.  Are you aware, or were you aware that there was testimony in this particular case that the child had ingested male urine prior to her death?

A.  I wasn't aware of it at the time of trial.  You discussed that with me recently.

Q.  Okay.  Could that have impacted the test in this particular case?

A.  It might have, yes.

Q.  Okay.

THE COURT:  I don't remember if we knew how recently that had happened.

MR. ABREU:  Maybe we can find that testimony.  That will be part of the record, and we can -- I don't have to necessarily address that with this particular witness.

THE COURT:  That would be good.

MR. ABREU:  Okay.

THE COURT:  I mean, I was thinking about that as well.

MR. ABREU:  Okay.  Thank you.

THE COURT:  But I didn't remember if we knew when

that was.

MR. ABREU:  Okay.

THE COURT:  Just from time to time it happened.

MR. ABREU:  Part of my recollection, Your Honor, is that as a matter of fact in the cab of the truck there was a bottle that she had picked up that was like a road bottle that they used for quick stops and that she had picked that up at some point and consumed some of that.  I have to check the date and the timing of that, but I'm not sure of that, but --

THE COURT:  Well, there's something in the trial that he made her drink his urine out of his urine bottle, and that the final event occurred, according -- I think I'm remembering this right -- when she tipped over her potty seat.

MR. ABREU:  Correct, Your Honor.  And I think there was also some indication, and Your Honor's recollection is likely as accurate as mine, if not more so --

THE COURT:  Probably not.

MR. ABREU:  -- that she also accidentally ingested some also.  But I will check that.

THE COURT:  No, I know she was -- somewhere along the road somebody testified that he made her drink his urine.

MR. ABREU:  And the only reason I --

THE COURT:  I don't know when.

MR. ABREU:  The only reason I bring that up is

USCA5 2505

because Mr. Dowd brought that up, Your Honor.

BY MR. ABREU:

Q.    So let me ask you about the Court's question specifically. Even if there are not studies regarding p30 specifically detected in two-year-olds, does that change your opinion about whether there was sufficient evidence presented at trial for the Government to testify that this substance was definitively semen because of a positive p30?  That's a long question.  I apologize.

A.    It is my opinion then and now that there is not sufficient evidence that there was semen present in the rectum of this child.

Q.    Thank you.  The Government asked you what the FBI policy was on intact sperm versus sperm --

THE COURT:  What is -- tell me again what p30 is.

MR. ABREU:  Are you asking me or her, Your Honor?

THE WITNESS:  P30 is a protein.

THE COURT:  Is it a hormonal protein?

THE WITNESS:  It is a protein that is found in very high concentrations in semen, and in other concentrations, lower concentrations in other fluids.

THE COURT:  I ask that because if it's hormonal, you can pretty much assure that it's probably not going to be in a two-and-a-half-year-old naturally.  But I didn't know if you knew what it was.

USCA5 2506

THE WITNESS:  It -- I can't tell you whether it's naturally occurring in two-and-a-half year olds, because nobody studies these kind of things in children typically.

THE COURT:  Well, there may be a reason for that, because it could be hormonal.

THE WITNESS:  I'm not aware --

THE COURT:  You're describing breast milk, you're describing semen, you're describing all those things that might think it comes in after, as some kind of a hormonal carry.

THE WITNESS:  I don't know the answer to that.  I think it's more because typically clinical studies of this nature don't involve children.

THE COURT:  Well, I mean, there might be a reason for that.

THE WITNESS:  I'm not aware that there -- that the reason that there are no studies is because it's hormonally, or an adult hormonal occurrence --

THE COURT:  Okay.

THE WITNESS:  -- exclusively.

MR. ABREU:  May I, Your Honor?

THE COURT:  Please.

BY MR. ABREU:

Q.   The Government asked you about the intact tails versus -- intact sperm versus sperm with no tails.

A.   Right.

USCA5 2507

Q.   And the Government asked you whether you were familiar with the FBI policy on that.

A.   Right.

Q.   And if I understand your testimony, you testified that the FBI does not consider a sperm a sperm unless it's completely intact?

A.   Yes.

Q.   Is that the policy at your lab?

A.   No, it's not.

Q.   Is that your policy?

A.   No.

Q.   So in this particular case, if the FBI had seen sperm or what appeared to be sperm, based on the policy at your lab, would you have called it sperm?

A.   Yes.

Q.   Did you see anything, intact or not intact, that appeared sperm in the microscopic search conducted by Technical Associates?

A.   No.  It was reported as negative, and specifically no sperm.

Q.   And that would have been, also included sperm that was not intact at all?

A.   Even if it was just a sperm head, correct.

Q.   Okay.  The Government asked you about whether the drainage, or perhaps you just testified about drainage being a

USCA5 2508

factor in this particular case, and whether sperm could be

detected.  Do you recall that?

A.    Right.

Q.    Are you aware that the child was in a comatose state or a

comatose-like state for the period preceding her death?

A.    Yes.

Q.    And that she was laying on her back during that period?

A.    Yes.

Q.    The Government asked you whether this, in fact document P,

I believe it's P-92.  Is that still up here in this book,

Mr. Dowd?

        MR. DOWD:  Oh, did I walk off --

        MR. ABREU:  And Your Honor, if I neglected to offer

P-92 specifically, which I believe is her written report to

Mr. Tinker, I would offer that --

        THE COURT:  Any objection to P-92?

        MR. DOWD:  No, Your Honor.

        THE COURT:  P-92 is admitted.

BY MR. ABREU:

Q.    Okay.  The Government asked you whether P-92 was created

from memory.  Do you recall that?

A.    Yes.

Q.    Is there anything in P-92 that's inaccurate, to the best

of your knowledge?

A.    The only thing that is inaccurate was a misprint.  I put

USCA5 2509

"4 nanograms per microliter" at one place, instead of "milliliter," but all of the calculations are based on 4 nanograms per milliliter.

Q.    And otherwise, the information you were prepared to testify, that you presented to Mr. Tinker, is accurate in that document as well.

A.    Yes.

Q.    Okay.  The Government asked you about the difference between swab versus swabs.

A.    Yes.

Q.    Do you recall how many swabs the FBI did testing on, further testing, including DNA testing?

A.    They did DNA testing only on one.

Q.    That would be Q7.  Is that correct?

A.    Yes.

Q.    Might that also account for the difference between swab versus swabs?

A.    Yes.  It's just a matter of semantics.

Q.    The Government asked you whether you prepared a report in every single case.  Do you recall that?

A.    Yes.

Q.    Are there occasions when the Defense, if you're working for the Defense, asks you not to prepare a report because the information might not be helpful?

A.    Many times.

USCA5 2510

Q.   And is that, does that account for the reason you sometimes do not prepare a report?

A.   Many times, yes.

Q.   In this particular case, had Mr. Tinker asked you to prepare a formal report, would you have done so?

A.   Absolutely.

Q.   And in fact, your findings are again contained in P-92. Correct?

A.   Yes.

Q.   Okay.  Let me --

MR. ABREU:  I'm going to be very brief again, Your Honor, and I'll be almost done.

BY MR. ABREU:

Q.   Let me ask you, let me put on, ask you to take a look at this portion of testimony here, this exchange between Mr. Tinker, Ms. Booth and the Court on -- let me just get a date -- January 16th of 2004, in a pretrial conference regarding you and your work.

And if you look at the bottom here, where Mr. Tinker starts, "That's my response, though.  As soon as she gets it and she has the opportunity to test it, and I think she'll be pretty prompt, she has been good about talking to me about issues."

Does that conform with your recollection of your responsiveness to Mr. Tinker's requests?

USCA5 2511

A.    Yes.  I had numerous conversations with him.

Q.    That's on Page 35 and 34 -- 34 and 35 of the January 16th transcript.

The Government asked you about the cards that you use, the Seratec card.

A.    Right.

Q.    Do you know which card the FBI uses today?

A.    I believe they use Seratec today.

Q.    So they now use the same card that you were using back then.

A.    Yes.

Q.    Okay.  The Government asked you about the sensitivity of the ABA card.

A.    Yes.

Q.    Let me show you what I am now going to quickly mark as Petitioner's -- can I have the number, please -- 169, and ask you if you know what this is.

A.    Yes, I do.

Q.    This is going to be difficult to read.  Can you tell us what that is?

A.    This is the product insert from the ABA test card.

Q.    So this comes along with the test and gives guidance on usage for that particular test?

A.    Yes.

Q.    Okay.  And the Government had asked you about what a

USCA5 2512

positive looks like.

A.    Uh-huh.

Q.    And let me just show you this first one here on the left that says "positive," and it has one line that's dark under the test, and one line under the C.  T for test, C for control, I suspect.

A.    Yes.

Q.    And when you have positive for both, that gives you a positive indication for p30?

A.    Correct.

Q.    A negative would give you a control line that's positive, but nothing under the test line.

A.    Yes.

Q.    And an invalid test would give you no line on either.

A.    No line on either, or another situation would be a test line there, but no control line.

Q.    Okay.  Let me refer you to the second page of that product insert, where it talks about the sensitivity of the test.  And let me read something to you, because it might be easier.  "The minimum detection limit of the Abacus ABA card One Step PSA test has been shown to be 4 nanograms per milliliter in 10 minutes."

      Is that the sensitivity at which the manufacturer guarantees the card?

A.    Yes, and the 10 minutes is important, too.

USCA5 2513

Q.   Okay.   Why is that?

A.   Because these cards have a tendency to develop a positive test line, even if they're negative, and you wait longer than 10 minutes.   They can do that.

Q.   And in this particular case, we have not seen any information regarding how long that particular test that the FBI did, how long it took for them to do it.   Correct?

A.   Well, their protocol says to read it in 10 minutes, but we have not seen any independent verification or a photograph of the card to verify any of that.

Q.   And the Government asked you whether the cards are not in fact sensitive down to .5 nanograms per milliliter.   Do you recall that?

A.   Yes.

Q.   If you were using a card at that rate, would you be using it at a sensitivity that the manufacturer was telling you we cannot guarantee the accuracy of?

A.   They would be exceeding what the manufacturer's sensitivity level is.   And it's not to say that they can't do their own studies and come up with something different.   If it's vastly different, you would have to wonder why it's vastly different.

Q.   And lastly, let me just show you the section where it talks about the limitations of the ABA card and refer you to number 3 in particular, where it says, "Even if the test result

USCA5 2514

Johnson - Redirect                                         121

is positive, careful forensic judgment should be made in
conjunction with other information available from other testing
and diagnostic procedures."  Do you see that?

A.    Yes.

Q.    Do you agree with that?

A.    Yes, I do.

Q.    And in this particular case, some of the other information
available from other testing and diagnostic procedures would
include the negative AP test?

A.    Yes.

Q.    Would include the negative DNA test?

A.    Yes.

Q.    Would include the negative Y STR chromosomal testing?

A.    Yes.

Q.    Would include the negative smear slide by the FBI?

A.    Yes.

Q.    Would include the negative microscopic search by Technical
Associates?

A.    Yes.

Q.    And that's all the information that you considered in
making your careful forensic judgment?

A.    Correct.

        MR. ABREU:  I have no further questions, Your Honor.

        THE COURT:  Thank you.

        MR. DOWD:  Nothing further, Your Honor.

USCA5 2515

122

THE COURT:  Thank you very much.  You may stand down.

(Excerpt stopping at 11:52:40 a.m.)

* * * * *

(Excerpt beginning at 7:18:35 p.m.)

(Witness sworn.)

MR. ABREU:  And just so the Court is aware, I have already, prior to his entering the room, informed him about the microphone rules, Your Honor.

THE COURT:  In continuing your reasonable behavior, I knew that -- I would expect you to do that.

CHARLES ALAN KEEL, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ABREU:

Q.   Mr. Keel, can you please state your name for the record?

A.   Charles Alan Keel.

Q.   That's K-E-E-L.  Correct?

A.   Correct.

Q.   And how are you employed, sir?

A.   I'm a forensic scientist with Forensic Science Associates in Richmond, California.

Q.   Let me show you what's previously been marked as Petitioner's Exhibit 90 and ask you if you recognize that document.

A.   Yes, I do.  It's my CV.

MR. ABREU:  Your Honor, I offer Mr. Keel's CV,

USCA5 2516

Petitioner's 90.

MR. DOWD:  No objection, Your Honor.

THE COURT:  Petitioner's what?

MR. ABREU:  90.

THE COURT:  Did you say "No objection"?

MR. DOWD:  I did, Your Honor.

THE COURT:  Petitioner 90 is admitted.  Thank you.

BY MR. ABREU:

Q.  And where are you currently employed?

A.  At Forensic Science Associates in Richmond, California.

Q.  I'm sorry.  You mentioned that already.  And what is your position there?

A.  I'm a criminalist, a forensic scientist.  I specialize in the identification and genetic characterization of human body fluid evidence.

Q.  And did you tell us how long you had been working as a forensic scientist?

A.  Since 1982.

Q.  Okay.  Not the entire time with Forensic Science Associates?

A.  No.

Q.  Okay.  I won't go into --

THE COURT:  Did you have a graduate degree?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.

USCA5 2517

THE WITNESS:  I didn't finish my master's.

BY MR. ABREU:

Q.   Just let me ask you about a couple of things on your CV. One of them mentions that you have a DNA technical leader. What does that mean?

A.   That's --

Q.   Or that you are.

A.   -- a credential given by the American Society of Crime Laboratory Directors to individuals who are qualified to basically supervise a forensic DNA laboratory according to the FBI Quality Assurance Guidelines.

Q.   And who do you work with?

A.   I work with Dr. Edward Blake and Peter Barnett.

Q.   And did Dr. Blake consult with you on this particular case?

A.   Yes, he did.

Q.   And does Dr. Blake have any special knowledge regarding p30, or interest regarding p30?

A.   Yes.  He was, I think, the first or one of the first discoverers of p30 when he was at the University of California at Berkeley.

Q.   Have you been qualified as an expert in the past in forensic biology and DNA?

A.   Yes, many times.

Q.   In both state and federal court?

USCA5 2518

A.   I believe so in federal court.  I'm not really sure.  But I think so.

MR. ABREU:  Your Honor, at this time I would offer Mr. Keel as an expert in forensic biology and DNA.

MR. DOWD:  No objection, Your Honor.

THE COURT:  Then he is accepted.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.   In 2007, were you contacted by my office --

A.   Yes, I was.

Q.   -- in regard to the case of United States versus Alfred Bourgeois?

A.   Yes.

Q.   And did you review documents at that time that were provided by my office?

A.   I did.

Q.   Do you recall what documents you reviewed?

A.   Pretty much, yes.  You want me to list them?

Q.   Let me ask you this, are those documents that you reviewed listed in your report?

A.   They are.

Q.   Then no need to list them at this time.  And after your review of those particular documents, did you prepare a report?

A.   I did.

Q.   Let me show you now what has been marked as Petitioner's

USCA5 2519

Exhibit 88, Your Honor.  And ask you if you recognize that document.

A.    Yes.  That's the front page of my, first page of my report.

Q.    Okay.  I'm going to take you back to Page 29 of that report.  Do you see that?

A.    Yes.  That's my signature.

Q.    Okay.  And did you read this report before you signed it?

A.    I did.

Q.    Is the information in that report true and correct, to the best of your knowledge?

A.    Yes.

          MR. ABREU:  Your Honor, there's been an agreement by and between Counsel that if I were to question Mr. Keel for the next three-and-a-half hours, he would testify consistently with the information contained in his report, and that his report may be admitted for that --

          THE COURT:  P-80?

          MR. ABREU:  P-88, Your Honor.

          THE COURT:  Any objection to the admission of P-88?

          MR. ABREU:  No, Your Honor.

          THE COURT:  P-88 is admitted.

          MR. ABREU:  And that he would testify consistent with the information contained in P-88, Your Honor.

          THE COURT:  Okay.  Thank you.

USCA5 2520

BY MR. ABREU:

Q.   I have three quick questions.  Did you, as part of your review, look at the 2004 report of Elizabeth Johnson?

A.   I did.

Q.   Did you agree with the conclusions contained in that particular report?

A.   Yes.

Q.   What conclusion did you reach in your report regarding whether there was sufficient evidence for the Government to have proceeded based on a positive p30 with evidence that semen was detected in this particular case?  What conclusion did you reach?

A.   My conclusion is that there's no proof of semen being detected on the, in the evidence that was presented at trial.

Q.   And are all the opinions in your report and that you would have testified to and would testify to here today made to a reasonable degree of scientific certainty?

A.   Yes.

          MR. ABREU:  With that, Your Honor, I would pass the witness.

          THE COURT:  Can I ask about the -- can I ask him some questions?

          MR. ABREU:  Yes, absolutely, Your Honor.

          THE COURT:  Did it test positive for p30?

          THE WITNESS:  I'm sorry?

USCA5 2521

THE COURT:  Did you do any of your own testing?

THE WITNESS:  No, ma'am.

THE COURT:  Well, where did you get your information?

THE WITNESS:  My information came from the FBI and from Orchid Cellmark and from Elizabeth Johnson.

THE COURT:  Okay.  She didn't do her own testing either apparently.  Is that right?  Ms. Johnson?

MR. ABREU:  That's correct, Your Honor.  If I could just --

THE COURT:  Okay.  So the test -- go ahead.

MR. ABREU:  No, I was just going to say, the way it works, actually the FBI testified this way as well at the time of trial, other people, the biologists do the tests, and then the forensic examiners come in and testify about those tests.  That's what Ms. Zervos did at the time of trial, Ms. Onorato did -- Mr. Onorato did.

THE COURT:  Okay.  But it tested positive for p30.

THE WITNESS:  There was certainly a visible line produced on the assay card, yeah.

THE COURT:  Okay.  So, I mean, you don't disagree with that.

THE WITNESS:  I do not disagree with that.

THE COURT:  But can p30 be in a toddler?

THE WITNESS:  In a toddler?

THE COURT:  Yes.

USCA5 2522

THE WITNESS:  You mean as a function of their own normal biology?

THE COURT:  Right.

THE WITNESS:  We don't really know the answer to that question.  Every cell in every person's body possesses two copies of the gene that produces p30.  So at least theoretically --

THE COURT:  Okay.  I guess the reason I ask that, I just -- when I was talking to one of the other experts, it seemed to me they said it could be in breast milk, it can be, of course, in semen, and it can be in -- I can't remember what else.  But all of those seem to be a function of maturity.

THE WITNESS:  Well, that's just it.  We don't know when this particular gene may express this particular protein.

THE COURT:  Okay.  But I guess I --

THE WITNESS:  But then again, we don't know that the assay itself is not entirely specific.  It may be an artifactual or an adventitious result, because we don't know everything that might react with the antibodies that are in the assay.

THE COURT:  Okay.

BY MR. ABREU:

Q.   And when you say an artifact, you mean that the positive p30 that was obtained as a result of this test may be a reaction to maybe not even p30?

USCA5 2523

A.   Oh, absolutely.

THE COURT:  He's saying a false positive.  Is that what you're saying?

THE WITNESS:  Well, it's positive.  It's either positive or negative.  So there's really no such thing --

THE COURT:  So it's positive.

THE WITNESS:  -- as a false positive.

THE COURT:  Okay.

THE WITNESS:  It's whether or not the result is coming from p30 or not.

BY MR. ABREU:

Q.   And for you, the ultimate question was then whether that p30 is definitive of the presence of semen.  And in your opinion, was it or was it not?

A.   Well, it's whether or not the result on the assay card could be attributed to semen.  And it might be --

THE COURT:  Well, you can't rule that out, can you?

THE WITNESS:  No, I can't rule it out.  But it's -- if I had done the testing, I would have ruled it out because I would have expected to find sperm.

THE COURT:  Okay.

THE WITNESS:  And I would have also gone back and probably done some acid phosphatase testing.

THE COURT:  I think it was taken -- I think it was taken like three days after --

USCA5 2524

THE WITNESS:  Absolutely.  That's another issue is how could it persist for so long in the rectum of this child.

THE COURT:  Was it in or next to?  I couldn't remember.

MR. ABREU:  It's a rectal swab, Your Honor.  So it's not a smear of the rectal area.  That's a separate thing that's done.  And that was done also.  This is a rectal swab.

THE COURT:  Okay.

MR. ABREU:  So what happens is it's inserted, Your Honor, into the rectum of the child.  That's correct.

THE COURT:  Okay.  So you wouldn't expect sperm to last that long?

THE WITNESS:  Oh, no, absolutely you would expect sperm to last.  You wouldn't expect --

THE COURT:  For how long?

THE WITNESS:  -- the soluble --

THE COURT:  Oh, I'm sorry.  I forgot the other testimony.

THE WITNESS:  You wouldn't expect the soluble components of semen to last that long.  But sperm are very tough little cells.  I mean, they have to be, because they endure --

THE COURT:  I know their job.  I remember this.

MR. ABREU:  Would you have expected --

THE WITNESS:  And in fact we --

USCA5 2525

THE COURT:  So they can live externally for --

THE WITNESS:  No, no.

THE COURT:  -- for several days?

THE WITNESS:  No, they don't live, Your Honor.  They simply persist.

THE COURT:  Okay.  So they're dead and lying there.

THE WITNESS:  They're dead.  They die rather quickly, yes.

THE COURT:  Okay.  Well, say somebody had had a vasectomy.

THE WITNESS:  Well, then there wouldn't be any sperm there.

THE COURT:  That's true.  Okay.

BY MR. ABREU:

Q.   And just because they're dead, would you still find their remnants in a microscopic sperm search, or actually find dead sperm?  Let me ask that.

A.   You just find the sperm.

Q.   Gotcha.

A.   I mean, they'd be dead, but you could find them very --

THE COURT:  Unless the person had had a vasectomy.

MR. ABREU:  That's right.

BY MR. ABREU:

Q.   And in this particular case, given --

THE COURT:  And I'm not saying -- I don't know

USCA5 2526

anything about that.  I'm just curious.  I'm not throwing that in.  It's not going to be in the order.  It's not going to be anywhere.

BY MR. ABREU:

Q.    Given the smear search by the -- the smear slide search by the FBI and the microscopic sperm search by Technical Associates, would you have expected sperm to have been detected in this particular case?

A.    If the results on the assay card was due to semen, absolutely.

MR. ABREU:  That's all I have, Your Honor.

THE COURT:  Thank you.

MR. ABREU:  Thank you.

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Please.

MR. ABREU:  I would just interrupt.  The CV, do you need it, P-88?

MR. DOWD:  Yeah, just in case.

THE COURT:  Yeah, but don't take it back with you.  Because when everybody's done, it stays up here.

CROSS-EXAMINATION

BY MR. DOWD:

Q.    Okay.  Doctor, my name is Mark Dowd.  I'm going to ask you a few questions.

A.    It's not "Dr."  It's just "Mr."

USCA5 2527

Q.    Oh, "Mr." I'm sorry. I'm so used to talking to doctors that --

A.    I'm just an Aggie.

            THE COURT: Okay. I got your point there, Mr. Dowd.

BY MR. DOWD:

Q.    Alan Keel. Mr. Keel, you started out by saying that there's no evidence of semen, and then you indicated to the Court that you could not rule it out. Is that fair to say? That was your testimony?

A.    Well, my testimony was that if the --

Q.    Did I not quote you accurately?

A.    I don't recall.

Q.    Okay.

A.    But my --

Q.    Let me ask you a question.

A.    Okay.

Q.    You've indicated that we don't know what will react with the assay. And you're talking about the p30 test?

A.    Yes.

Q.    We don't know what -- and the way the p30 test is, and help me with the science, something has to hook onto the protein on two sides of it in order to trigger a positive result?

A.    There are two what are called epitopes --

Q.    Uh-huh.

USCA5 2528

A.   -- on the protein, the p30 protein.  And each of those has to be recognized in order for this assay to give a positive test.  However, we don't know -- I don't even know if that epitope has been characterized in terms of its amino acid sequence and its confirmation, to be recognized as an epitope.  And we don't know whether or not that particular protein amino acid structure and confirmation could be mimicked in any other protein.  I mean, there are thousands and thousands of other proteins out there.  So --

Q.   So that the p30 test is completely unreliable because we don't know what other things could hook onto the protein and trigger a positive result?

A.   Well, it's certainly reliable in that we can use it as a screening tool, in the same way that we use acid phosphatase.

Q.   Okay.

A.   But because, just like acid phosphatase is found in other body fluids, just like p30, it's only a presumptive test.

Q.   So the best we could do with a p30 test, if you have a positive AP test, acid phosphatase test, is the high likelihood of -- did I read your report to say the high likelihood of semen?

A.   Certainly if you have elevated acid phosphatase levels and elevated p30 levels, then that would be highly likely that that's coming from semen.

Q.   All right.

USCA5 2529

A.    But then again, I would certainly expect to find sperm in such a situation.

Q.    Right.  Let me clear something up.  You had indicated that you thought that Dr. Benton had provided false testimony in the trial?  Is that your position?

A.    Either false or just completely ignorant.

Q.    Either false or completely ignorant?

A.    That's correct.

Q.    False meaning he knowingly provided false testimony to the Court or to the jury, and ignorant is just that he was just mistaken?

A.    I -- if that's what ignorant means.

Q.    Well, that's your term.  That's the distinction you're making?

A.    Well, ignorant means you just don't know any better.  You just don't know.

Q.    All right.

A.    And you offer an opinion about something you don't know anything about.

Q.    Do you have any evidence that he knowingly provided false testimony to the Court?

A.    Well, I don't know whether or not he knew what he was saying wasn't true or not.  How would I know that?

Q.    Okay.

A.    But certainly a person in his position should have known

USCA5 2530

that.

Q.   All right.  Well, you used the word false, and I thought you used it rather loosely.

     Now, the -- I'm just referring back to your report.  You indicate that blood was detected on all three of the rectal swabs in this case?

A.   That's my understanding.

Q.   And under the phenol --

A.   -- thalein.

Q.   Say that.

A.   Phenolphthalein.

Q.   The phenolphthalein and positive crystal test for hemoglobin?

A.   That's my understanding, yes.

Q.   But doesn't the crystal test test for hemochromogen?

A.   Well, that's the product of the crystal.

Q.   Uh-huh.

A.   Yeah.

Q.   Okay.  Would you expect to get -- let me -- you indicated you agreed with Dr. Johnson's analysis?

A.   Yes.

Q.   All right.  And let me ask you about the, the AP test results, the acid phosphatase test results.  I think it's just late in the day.  I'm having trouble verbalizing.  Would you expect to get a positive test result on the AP test result of a

USCA5 2531

sample that had been in a rectum for three, four, five days?

A.   I wouldn't really have an expectation.  I would simply do the test.  And myself personally, I probably wouldn't do that test at first.  I would simply do the sperm search.  And not finding sperm, I would probably abandon the specimen.  But that's not the sequence that we have here.

Q.   You would have skipped the AP test?

A.   I don't do AP testing on swabs, no.

Q.   Oh, okay.  You go right to the --

A.   Not as a matter of course.

Q.   -- PSA?

A.   I don't use the PSA test either.

Q.   Oh, you don't?

A.   Unless I have some other issue that I need to explore.  No, I -- with swabs, I go straight to the sperm search.

Q.   Okay.  And if you don't find sperm, case closed?

A.   Pretty much, unless there's information that there might be semen from a vasectomized individual.  I've had two such cases in my entire career.

Q.   All right.  And is there any difficulty -- well, what is your process for removing sperm cells from a cotton swab?

A.   Simply taking a portion of the swab, typically half, and solubilizing anything that will dissolve into an amount of buffer, or even water.  Typically that depends upon how much of the swab you take.  I would probably use about a half to a

USCA5 2532

milliliter of the buffer.  And then I would pellet the particulate debris and remove the supernatant, remove the liquid fraction, so that I had a concentrated pellet.  And then I would resuspend that in about an equal volume of fluid, typically 20 to 40 microliters, about a drop from a typical eye dropper.  I would take about two microliters, or about 5 percent of the total suspension, put that onto a microscope slide, and dry it, fix it, stain it and search it.

Q.   All right.  And what's the sufficiency of removing sperm from cotton swabs?

A.   You mean the extraction efficiency?

Q.   The rate of sufficiency -- there it is, extraction sufficiency.

A.   It would vary from person to person.  For me, it's pretty high.  I can typically predict how much sperm DNA I'm going to get from a specimen, based upon how many sperm I visualize on the microscope slide.  I mean, I can extrapolate back fairly well.  So for me, it's very high.

Q.   And -- 90 percent?

A.   I would say even higher.

Q.   And how do you know if it's 90 percent?  How do you determine that there's --

A.   I just described that to you.

Q.   -- you got 90 and there's only 10 percent left?

A.   Oh, you mean 10 percent left on the swab?

USCA5 2533

Q.   On the swab.

A.   Because I just explained to you, sir, I can count just a few microscope fields -- you have to understand, I make a spot on a slide that's maybe 5, 6 millimeters in diameter.  It's very small.  And I might only have to look at five or six fields to get a sense of how many sperm there are per microscope field.  Then I know there are about 100 to 120 fields in that spot, and I know I've used about 5 percent of my total sample.  So it's simply a mathematical determination of how many sperm I should have in my parent sample.  You do the math, how much DNA is in a sperm, you can predict how much DNA you've got in your sample.  It's a very accurate way to quantify how much DNA you have associated with sperm.

Q.   Well, I'm interested in the sperm within the fluid, the seminal fluid.  Did you say there's like 100 fields within your microscopic view?

A.   No, no, there's one field.  But within the spot, I'm --

Q.   What spots?

A.   I'm magnifying this 400 times.

Q.   Uh-huh.

A.   Okay.  Sperm are extremely small.  So --

Q.   How small is a sperm?

A.   I don't really know, just maybe 5 microns.

Q.   100,000 on the head of a pin or --

A.   Oh, absolutely, yeah.

USCA5 2534

Q.    Okay.  So --

A.    Yeah.

Q.    -- it could be 100,000 on the head of a pin?

A.    Sure.

Q.    Okay.  All right.

A.    Do you understand, sir, how I can arrive at --

        THE COURT:  Okay.  This is what happens.  He asks the questions --

        THE WITNESS:  I'm sorry, Your Honor.

        THE COURT:  -- and you answer them.  But thank you.

BY MR. DOWD:

Q.    I'll be honest with you, I didn't understand that last part.  So I don't know that you answered my question.  Would acid phosphatase degrade rapidly within a live rectum to the extent it would not be detectable in the AP test?

A.    That would certainly be my expectation, that proteins that have a function that we depend upon, they do something.  And in this case, we make them produce a color change.  It would be my expectation that not only would the protein itself be diluted, but it would be so insulted by the environment, it would either be chewed up by bacteria or it would be denatured to the point where it couldn't do its job, that it would be difficult to detect it after a couple of days, just -- and the same would go for any protein that's subjected to that kind of insult.

Q.    And you indicated that the seminal fluid as well would not

USCA5 2535

last long within the environment of a rectum?  I'm talking about a live rectum.

A.    Correct.

Q.    Okay.  But that the -- you would expect to find the sperm remaining in the rectum?

A.    Certainly the sperm would persist much longer than the soluble components of the semen, yes.

Q.    Is there something about the sperm that allows it to stay in the rectum, or would it also be pushed out by gravity and dilution and things like that?

A.    Well, I mean, the sperm are going to be affected by everything, anything else that affects the soluble components as well.  I mean, they're microscopic.  If stuff is going to drain out of the rectum, the sperm are going to drain out with it.  So the conditions are the same, regardless of whether we're talking about the sperm or we're talking about the soluble components.

Q.    All right.

A.    The sperm are simply a much tougher cell, so they're going to persist in an environment where the proteins won't.

Q.    You understood the FBI protocol for identifying sperm only allows them to make a positive identity of a sperm if the entire sperm is there, tail, midsection and head is intact.  Did you understand that?

A.    I certainly understand that that's their arbitrary policy.

USCA5 2536

There's certainly nothing that prevents them from identifying a sperm head as a sperm head.

Q.    So that when the FBI found, or reported no sperm on the rectal smear slide taken at autopsy, they're just saying that they didn't find any complete sperm, intact sperm?

A.    Well, that's an inference you can draw.

Q.    Okay.

A.    But it flies in the face of the rest of their work.  So my inference taken from the fact that they're unable to detect any male DNA associated with the specimen and that Orchid Cellmark was even unable to detect Y chromosome DNA in a much more sensitive assay, that there are no sperm there.

Q.    Uh-huh.  But just to interpret that test result, that's all they're saying when they give a negative result on the, on their sperm search.  They're only looking for intact sperm.

A.    Well, if that's what it means, that's highly misleading.

Q.    Okay.  That's highly misleading?

A.    Absolutely.

Q.    Now, you were critical of the FBI because they didn't include the bench notes when they did the differential digestion to separate the male and the non-male fractions, but isn't that in the FBI protocols, which is public record?

A.    I didn't have them.

Q.    Okay.  Are you aware that the FBI protocols are public record, they're available online?

USCA5 2537

A.   No, but they weren't even provided when we asked for them, so no, I didn't --

Q.   Oh, you didn't, you never got the FBI protocols?

A.   I never got their DNA protocols, no.

Q.   Oh, okay.  I didn't know that was missing.  Okay.  Now, you were becoming critical of the FBI, their process there.  You indicate that the male fraction contained 50 nanograms DNA for each, is that microliter --

A.   Yes, sir.

Q.   -- extract?

A.   Yes, sir.

Q.   This was, you concluded from this that there was either abundant sperm in the male fraction, which you dispute, or a poor removal of non-sperm cells and/or DNA cells through the sperm isolation process.  Is that your conclusion from --

A.   Well --

Q.   -- from that?

A.   -- you've misquoted it slightly, but --

Q.   I kind of summarized it just to fit it into a couple of pages.  But is that a fair --

A.   Well --

Q.   -- representation of your point?

A.   I don't know what you mean by DNA cells.  DNA cells.

Q.   I guess the point is that the, when they did their differential -- what do you call that, differential --

USCA5 2538

A.    Digestion.

Q.    -- digestion, that they want to remove the, any female cells from what is left with the male fraction?

A.    Well, you want to remove all cells that aren't sperm.

Q.    Okay.

A.    Okay.

Q.    And what happened in this case is after they had done the process, they still had a large amount of female DNA within the male fraction?

A.    Correct.

Q.    Is that right?

A.    Correct.

Q.    And that's the point, that's the criticism you were making, that they must have not have done that process properly, or they would not have been left with so much female sperm?  Or did I misunderstand that in the report?

A.    Well, I'm not sure I understand what you're saying, they must not have done it properly.  The goal of that is to remove virtually all of the female DNA.

Q.    Right.

A.    If you've still got half as much female DNA in there as you started out with, you haven't been very efficient at removing the female DNA.  You want to end up with basically none.  And you only -- excuse me -- you only need about a half a nanogram of DNA to get a robust result.  And if you've got 50

USCA5 2539

nanograms per microliter, that's 500 times the amount you need. You've got to get rid of that stuff.

Q.   But if a large amount of DNA, female DNA is left in the male fraction, would that suggest that the FBI didn't do the extraction properly, didn't separate out the female cells from the male cells?

A.   It's one of two things.  They either left a lot of female cells behind, in the post-digest pellet, or they simply didn't wash the particulate debris that was left after the digestion enough times to dilute away the female DNA.

Q.   Would -- if you were called to testify at the trial in this case in responding to that, would you -- you think that's a critical point to bring up?  Critical of the FBI process, of the FBI lab's process in this extraction?

A.   Absolutely.  I mean, that's -- that is an extremely poor result.

Q.   Okay.  Done by the FBI lab?

A.   Yes.

Q.   Okay.  And that would be something that you would want to bring up and point out to the jury?

A.   Yes, because if that were a result that I had, it would immediately trigger, hey, you know, I've got too much female DNA here.  I haven't done this right, because I should be finding male DNA from the semen that's on this rectal swab.

Q.   All right.

USCA5 2540

A.    So I need to go back and either repeat the process, or I need to go back and look to see if, you know, maybe look at some of the cell debris from the three swabs that I've sampled and look to see, do these guys have any sperm in them?  You know, what's going wrong here?  How come I'm not getting any results that's attributable to the sperm?

Q.    Right.  And that would be something that you'd at least want to cross-examine the FBI experts on --

A.    Well, sure.

Q.    -- how they messed this up?

A.    But if I were the FBI expert, I would have already done that.  I mean --

Q.    Done what?

A.    -- that's my duty.

Q.    No, no, no.  I mean, this is a point that the defense attorneys would want to cross-examine the FBI experts on as well.

A.    Well, certainly.

        MR. ABREU:  Your Honor, I want to object at this time.  I don't think he's qualified to testify to what Defense Counsel might be doing or not be doing.

        MR. DOWD:  Your Honor --

        THE COURT:  Sustained.  Just move on, please.

        MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

USCA5 2541

Q.   On January 16th of '04, the stained swab remnants were sent to Dr. Johnson for testing.  Do you remember that?

A.   That's my understanding, yes.  Uh-huh.

Q.   All right.  And the AP, her AP test was negative, but her PSA test was weakly positive, and that no sperm were observed from the swab?

A.   You're asking me --

Q.   Yeah, I'm asking.

A.   That's my understanding.

Q.   That's your understanding?

A.   That's my understanding, yes.

Q.   All right.  What was your -- you made a point, you were discussing Dr. Scott Benton's testimony, and you suggested that the Government bootstrapped the alleged, I think that was your word, bootstrapped the alleged sodomy of 2002 to the perineal bleeding of May 12th post-sodomy of, I guess that would be 2004, to the perineal bleeding of May 12th, 2002.  Did I understand that?

A.   Yes.

Q.   That the child had some bleeding some time before, and Scott Benton examined her?

A.   That's my understanding, yes.

Q.   All right.  Did you understand that the Government was trying to tie in the alleged sodomy of, surrounding the case, here in 2004 -- or I guess 2003, right -- with this previous

USCA5 2542

bleeding?

A.    Well, certainly if I had been on a jury, that would be the impression or the inference that I could have drawn from Dr. Benton's testimony, yes.

Q.    That's how you read that testimony?

A.    Yes.

Q.    Okay.  I want to make sure I have this right.  Dr. Benton described, perhaps over-simply, that semen is a product of the prostate gland in men, meant to be a vehicle for sperm during ejaculation.  But you're saying that that's not right, that sperm is, or that semen is always, always has sperm?

A.    The definition of semen is the suspension of sperm in seminal fluid.

Q.    That's what it is.  All right.  And -- but you can have semen without sperm, as the Judge pointed out, if you have a vasectomy?

A.    No.  Then you have seminal fluid.

Q.    Okay.  So semen and seminal fluid are not synonymous.

A.    No.

Q.    Okay.

        THE COURT:  Semen is the total of the seminal fluid and the sperm.

        THE WITNESS:  Correct.

        MR. DOWD:  Semen is the total, and seminal fluid is what mixes with the sperm.

USCA5 2543

THE COURT:  But you can also -- there are people that say that semen is also the seminal fluid without the sperm.

MR. DOWD:  Okay.

THE COURT:  So it may be interchangeable.

MR. DOWD:  Okay.

BY MR. DOWD:

Q.   Now, the -- and you've corrected Dr. Benton as well about the source of seminal fluid, or is it semen, seminal fluid, is not the prostate gland?  Or at least not solely the prostate gland, but the seminal vesicles?

A.   Well -- I'm sorry.

Q.   And the bulbourethral glands and other minor glands, that all those glands produce -- is it semen or seminal fluid?

A.   Semen is produced in a cascading reaction at ejaculation.

Q.   Okay.

A.   Okay.  The sperm are forced out of the vas deferens, and they are, then they're commingled with all of these fluids from all these glands.  Dr. Benton simply said that semen is the product of the prostate gland.  And that's nowhere near the truth.  The prostate gland comprise -- the prostate gland secretions comprise only about 25 to 30 percent of the seminal, even the seminal fluid.

THE COURT:  Maybe he meant the p30 comes from the prostate gland.

THE WITNESS:  Well, that's not what he said, Your

Honor.

BY MR. DOWD:

Q.    Talking about Dr. Benton?

A.    Yes.

Q.    Yeah.  You know, I've always heard that if you, if a man has his prostate removed, that he will not be able to produce semen.  And, you know, if he ejaculates, there's not going to be any sperm coming out, there's not going to be anything coming out.  Is that -- did I understand that correctly?

A.    I don't know.  I don't know.

THE COURT:  He's not a doctor.  Don't ask him these things.

MR. DOWD:  Oh, okay.  Okay.

BY MR. DOWD:

Q.    Now, you were critical of the defense attorneys in the case in your report.

MR. ABREU:  Your Honor, I would just object to the characterization until I hear what was actually said.

MR. DOWD:  Well, okay.

MR. ABREU:  Or if he can point us to what he's --

MR. DOWD:  All right.

BY MR. DOWD:

Q.    Defense closing argument on Page 17.  "In his closing argument, Defense Counsel Tinker did not make an attempt to address the lack of proof of the presence of semen on the

USCA5 2545

child's rectal swabs, reminding the jury that the male specific Y chromosome test attempted by the Government was fruitless," on and on.  On Page 18, there's several other criticisms.

You were critical of the defense team in this case, Mr. Keel?

A.   On Page 17, I actually present the attempt that he did make --

Q.   Uh-huh.

A.   -- to address the lack of proof of the presence of semen.

Q.   Oh.

A.   Not a criticism.

Q.   Uh-huh.  What was the fruitless?

A.   The Y chromosome test.

THE COURT:  I'll just say, Wikipedia says here that semen is an organic fluid, also known as seminal fluid.

MR. DOWD:  That's what I thought, Judge.  I thought it was the same thing.

THE COURT:  I'll just say Wikipedia says that.  Who knows.

MR. DOWD:  Okay.  Okay.  I agree with Wikipedia.

BY MR. DOWD:

Q.   Are you saying that --

MR. ROBERTS:  Could we have just a moment, Your Honor?

THE COURT:  Yes, please.

USCA5 2546

THE WITNESS:  Could I get some water?

THE COURT:  Yes, sir.

THE WITNESS:  Thank you.

THE COURT:  Could somebody give him some water?  Do y'all have water?  Petitioner's team?

MR. ABREU:  I'm -- we're fine.  I'm fine at the moment.

THE COURT:  No, your --

UNIDENTIFIED SPEAKER:  Thank you for asking.

(Laughter.)

THE COURT:  The most reasonable man in the room doesn't need water.

COURT SECURITY OFFICER:  You want me to get some water out of the --

THE COURT:  Would you, please?  We'll get it.  Thank you very much, Mr. Castillo.

How much more, do you think?

MR. DOWD:  Not much, Your Honor.

THE COURT:  Really?

MR. DOWD:  I just have a few more questions.

BY MR. DOWD:

Q.   The pre-ejaculate, Dr. Benton testified that the positive p30 result from the rectal swabs could possibly have resulted from the presence of pre-ejaculate in the rectum transferred to the swabs.  And you responded, I'll quote from your report --

USCA5 2547

A.    Could you tell me what page we're on?

Q.    Oh, see, I took notes from it.  Let me see if I can help you.  This would be under the "Setting the record straight." Do you remember that, that the --

A.    Oh, yeah, I certainly remember it.

Q.    Okay.

A.    I just wanted to be able to follow along with you.

Q.    Okay.  I'm losing my voice here.  Let's see.  That's --

A.    Page 19?

Q.    Page 19, okay.  There it is.  Okay.  So I guess on that bottom paragraph, the pre-ejaculate typically comprises less than 1 percent of the total semen produced.  And you suggest that the, it's likely that the pre-ejaculate does not contain any more PSA than might be detected in the peripheral blood of a male.  You used the word -- your use of the word "likely" struck me.  Is this based on scientific experiments or testing or --

A.    No, no, it's --

Q.    -- is that your opinion?  What --

A.    It's simply based on logic.  The bulbourethral gland, this pre-ejaculate fluid is a product of the bulbourethral glands and not the prostate.  So, I mean, it's the prostate gland that produces the overwhelming majority of p30.

Q.    Uh-huh.

A.    So if the bulbourethral glands are going to be producing

USCA5 2548

any p30, it's probably going to be about the same amount of p30 as you would normally expect to find circulating in their bloodstream.  I mean, because they don't make p30 as an active function, so --

Q.    But the bulbourethral glands --

A.    I mean, that's just the logical conclusion.

Q.    I'm sorry, but the bulbourethral gland can produce p30?

A.    It, as a tissue, possesses the gene, the p30 gene in every cell.  So theoretically, it could produce it, but --

Q.    At a level that would be picked up on a p30 test?

A.    That's what Dr. Benton's claiming.  I don't know.  I don't think so.  I don't even think it makes p30.

Q.    Well, I'm asking you.  I'm asking you, would -- could PSA be produced in the bulbourethral gland at a level that would be picked up and test positive in a p30 test?

A.    Certainly the levels that are in the normal serum, blood serum of males is detectable by these assays.

Q.    Is that a "yes"?

A.    It's an "I don't know."

Q.    Oh, you don't know?

A.    But it's certainly plausible, yes.  But the fact, the suggestion that you might be detecting only pre-ejaculate fluid in this environment from the rectum is just patently absurd.  That would be like --

Q.    That's not my question.  My question is, could the

USCA5 2549

bulbourethral gland have produced the PSA that was detected in the p30 test?

MR. ABREU:  Your Honor, I'm going to object because I think it's been asked and answered.  And additionally, I think the original question related to Dr. Benton's testimony, which I think the witness was about to answer, how it related to Dr. Benton's actual testimony.

MR. DOWD:  Well, he was going beyond my question, Your Honor.  Nonresponsive.

THE COURT:  Sustained.

BY MR. DOWD:

Q.   So your conclusion that it could not be pre-ejaculate is that most of the pre-ejaculate fluid is generated by the bulbourethral gland, but you're saying you don't know if the bulbourethral gland can produce PSA.  Did I understand that correctly?

A.   I don't understand your question.  You're suggesting that, or Dr. Benton is suggesting that something that comprises less than 1 percent of the total volume of semen is what was actually -- might have been picked up on the rectal swab, and that that's what the p30 result came from.  And that's ridiculous.  That's like taking a drink of coffee and not getting any caffeine.

Q.   Well, I don't think that was the testimony.  But your response is that it couldn't be that the pre-ejaculate could

USCA5 2550

not have triggered a positive PSA result because the pre-ejaculate comes from the bulbourethral gland.  That's what -- isn't that in your report?  And it doesn't come from the prostate.  Isn't that the point in your report?

A.    But you're taking it out of context.

Q.    Please, please answer my question.

A.    The context is that --

Q.    Sir --

        MR. DOWD:  Your Honor, I would object to the nonresponsive --

        THE WITNESS:  I'm trying to answer his question, Your Honor.

        THE COURT:  Sustained.

BY MR. DOWD:

Q.    Would it surprise you to know that pre-ejaculate contains high levels of PSA and AP?

A.    Yes.

Q.    That would surprise you to know that?

A.    Yes.  It wouldn't -- I don't know if it would surprise me as much with the acid phosphatase, but it would surprise me with regard to AP, I mean, with regard to p30.

Q.    And you don't have any scientific basis to suggest that pre-ejaculate does not contain PSA at levels that will trigger a positive p30 test?  Are you relying on any studies?

A.    No.  I'm simply drawing an inference that since the

USCA5 2551

pre-ejaculate is not the product of the prostate gland, which is the primary producer of p30 in males, that it would not contain, necessarily contain any more p30 than the normal circulating blood serum of a male, and that it is absurd to think that they would be detecting something, only something that comprises less than 1 percent of the total volume of semen on this rectal swab that was -- this swab that was inserted into this child's rectum.

I mean, there's not going to be just this little pool of pre-ejaculate fluid sitting there.  I mean, that's just ludicrous.

Q.    You indicated that the record was clear that Mr. Bourgeois did not have a vasectomy.

A.    Well, I think it's pretty clear that he had a one-year-old child, so he's certainly capable of producing sperm a year ago at this time.

THE COURT:  Not a year ago.  You don't know that.

BY MR. DOWD:

Q.    Not a year ago at this time.

A.    At that time.

Q.    At that time.

A.    Right.

Q.    Well, there's a fellow in my office that has several kids, and he has a vasectomy.

A.    I don't understand your point.

USCA5 2552

THE COURT:  Well, you don't --

MR. DOWD:  He had the vasectomy after he had the kids.

THE COURT:  The point is you don't know if Mr. Bourgeois had a vasectomy.

THE WITNESS:  No.  No, of course not.  The inference there is that he had just had a child.  And unless he had a vasectomy in the interim, then he's produce -- a normal sperm producer.

BY MR. DOWD:

Q.   You indicate that he was apparently healthy at the time of the crime.  He couldn't be azoospermic or oligospermic as a result of temporary illness.  That was your, another conclusion you drew from the record?

A.   Right.  That's an inference that I'm drawing because he's a working truck driver.

Q.   All right.  And so someone could be without sperm, due to illness?

A.   No.  That's Dr. Benton's testimony.  This is all derived from Dr. Benton's testimony.

Q.   Well --

A.   Dr. Benton is the person who's making these claims.  I don't know.

Q.   Yeah, but you're saying he is, to rebut that, you're saying he was apparently healthy at the time of the crime, so

USCA5 2553

he couldn't be azoospermic or oligospermic as a result of temporary illness.

A. Well, if he's not sick, and if -- as Dr. Benton claimed, those conditions might make you produce lower amounts of sperm, then that's not applicable to Mr. Bourgeois, because he wasn't sick, as far as I could tell.

Q. So you don't know if illness can render you without sperm.

A. I'm sure there probably are illnesses that can do that.

Q. All right. And can you point to any evidence in the record that Mr. Bourgeois didn't have any such illness?

A. No. As I explained, that's an inference that's being drawn. That's not that hard to draw.

Q. And you also indicate that the presumptive test for semen is the AP test, the acid phosphatase test.

A. That is a presumptive test for semen, yes.

Q. It's extremely sensitive, and you go on to say that if the AP test is negative, that usually ends testing. The observance of sperm is the only confirmatory test.

A. That's correct.

Q. All right. Why wouldn't the negative result on the AP test always end further testing?

A. Well, it depends upon the context of the sample and the case. You can't just operate like you're working from a cookbook.

Q. Uh-huh.

USCA5 2554

A.    It depends on the individual specimen that you're testing. For the most part, if I'm testing a huge blanket and I'm looking for semen on this blanket and it's got a number of interesting deposits --

Q.    Uh-huh.

A.    -- that might fluoresce or simply look like they might be a body fluid stain, then I'm going to test them for AP.  If they're negative, I'm going to abandon that stain and go to the next one, because it probably doesn't have a significant level of semen in it that would be useful for any investigative purposes.  So that's how you use AP as a screening tool.

Q.    All right.  And if you had some reason to believe that the AP test wouldn't be reliable, then you might skip it completely or ignore its result, right, and go to the PSA test?

A.    No.

Q.    You wouldn't?

A.    Can you be a little more specific?

Q.    Well, if you had some reason --

A.    What are we talking about?  Are we talking about the blanket?

Q.    If you had some reason not to have confidence in the AP test --

A.    I don't -- I have extreme confidence in the AP test.

Q.    Let's say --

A.    It's the best test I've got.

USCA5 2555

Q.    Let's say a sample taken from a rectum.

A.    I wouldn't bother.

Q.    Because there's no confidence in the AP results.  Right?

A.    No, because I've got a finite specimen, a little swab. I'm going to cut a portion of that off and look for sperm from it.  I'm going to go right to the heart of the matter.

Q.    Okay.

A.    I'm not going to have to screen 20 stains --

Q.    You're not going to mess around with the AP --

A.    -- on a blanket.

Q.    -- or the PSA, you're going to go right to the sperm search?

A.    Absolutely.

Q.    Okay.  Now, in a sperm search, you actually have to find the sperm.  It's -- you have to visually find, separate it out, that whole differentiation process and actually locate a sperm. Correct?

A.    Correct.  But as I described the process to you, it's very easy.

Q.    Okay.  And the AP test is a simple chemical test.  The PSA test is a simple chemical test.

A.    The PSA test requires the most work of all when you're talking about a garment.

Q.    Uh-huh.

A.    If you're talking about a swab, then it's on par with, in

USCA5 2556

Keel - Cross                                         163

terms of sample preparation, with the microscopic search for sperm.  The search for sperm would take longer, because you have to prepare the slide and stain it and examine it, spend some time at the microscope.  But both those tests involve removing a portion of the stain material that looks interesting to you off of that and into a liquid environment --

Q.   All right.

A.   -- so that you can then work with it.

Q.   And finding a sperm cell would be much easier?

A.   Is that a question?

Q.   Yes.  Would finding a sperm cell be much easier?

A.   Much easier than what?

Q.   Than going through the PSA testing that you described.

A.   No.  Doing the PSA test would probably be easier.

Q.   Okay.

A.   But it would be much less definitive.

Q.   Okay.

A.   That's why I would simply look for sperm.

Q.   All right.

A.   And not finding any sperm, I would probably abandon that specimen.

Q.   If you don't find sperm, that's it.  It's a negative finding.

A.   It means I didn't find any sperm, yes.

Q.   And you would conclude that any positive semen result

USCA5 2557

would not be reliable.

A.    I wouldn't have any positive semen result.

Q.    No, but if you were -- let's say another lab did the semen result, they got a positive, you're asked to find sperm like in this case, you find no sperm, then you don't trust the semen result.

A.    Where did the semen result come from?  From what kind of --

Q.    Well, in this case, it was done by the FBI, and again by Ms. Johnson?

A.    No, no, what's the nature of the test you're asking me to accept from some other laboratory?

Q.    Well, the ABA card for the FBI, and I believe Dr. Johnson did the Seratec.  Is that right?

A.    But your hypothetical is some other laboratory has done some work and indicated they believe there's semen on this specimen.

Q.    Uh-huh.

A.    They send the specimen to me.  I examine a portion of it for sperm, and I can't find any sperm.  I'm going to tell them there's no semen here.  If that's your question, then that's correct.

Q.    Okay.  Now, you indicate that the commercial PSA tests are so sensitive that you can actually get a positive result on a toddler's clothes if it is washed with a man's underwear

USCA5 2558

containing semen?  Did I understand that correctly?

A.   Yes.  I have been involved in such a case from Montana, yes.

Q.   Oh, that was in -- that happened in a particular case?  That's where you got that?

A.   Absolutely.

Q.   Okay.  So it's not -- they didn't do a study on that?

A.   No.  No.  This was a specific case that was done by the state of Montana, and then I reworked the case.

Q.   All right.  And how did they decide that that was the source of the sperm?

A.   Because we proved it empirically.  The specimen was a toddler's pair of underpants that they had taken out of the chest of drawers or whatever.  It had been neatly folded after doing laundry and put away.  Because of other allegations that were made against the father of this toddler, they went to other clothing, freshly washed clothing, and examined it for semen.

Q.   Okay.

A.   And got a result.

Q.   So that was a conclusion that was drawn in this particular case, but no studies have been done, no experiments have been done to prove that your theory is correct?

A.   How is that not proof?

        THE COURT:  Okay.

USCA5 2559

BY MR. DOWD:

Q.   Well, has it been repeated?

THE COURT:  Is this going to end up -- excuse me.

MR. ABREU:  Your Honor, I am going to object.

THE COURT:  Oh, well, I'm going to object.  What's going on?

MR. DOWD:  I'll move on.

THE COURT:  Are we almost done?

MR. DOWD:  We're almost done.  I've got like two questions, Judge.

THE COURT:  This is just very argumentative and --

MR. DOWD:  Yes, Your Honor.

THE COURT:  There's nothing --

MR. DOWD:  It just struck me as strange.

THE COURT:  I'm not getting anything out of this, if you want me to get something out of it.

MR. DOWD:  Okay.  Okay.

BY MR. DOWD:

Q.   But even if that was the case, you're not suggesting that if this child's underwear had picked up semen from the wash, that that semen would enter her rectum?  You're not suggesting that that as an explanation here, are you?

A.   By no means.

Q.   All right.

A.   And I state that in my report, sir.

USCA5 2560

Q.   Oh, it's in there?  Okay.

A.   But I think you're mischaracterizing the, my analogy with regard to the sensitivity of the test to the examination of the child's underpants.  Certainly if there were semen in her rectum, I would expect to find some semen in her underpants as a result of the act of sodomy.  I mean, that goes without saying.

Q.   Okay.

A.   And just like the FBI did, that's why they examined the underpants.  And not finding any semen in the underpants is another red flag that should have gone up.  You know, maybe we need to take another look at these rectal swabs.

Q.   And AP and semen, you would expect that to degrade more rapidly while the child is alive than postmortem?

A.   You mean, you're talking about the soluble components of semen?  Um --

Q.   Well, I really meant the soluble and nonsoluble.  But semen or seminal fluid?

          THE COURT:  Okay.  Where -- are you almost done with this?

          MR. DOWD:  Yes.  That's my last question, Judge, yeah.

          THE COURT:  That's it?  Thank you.

          MR. DOWD:  Well, if I can get an answer.

          THE COURT:  He's not going to.

USCA5 2561

MR. DOWD:  He's not going to answer?  Okay.

THE WITNESS:  Oh, yes, I am.

THE COURT:  What's your next --

MR. ABREU:  Very briefly, and this is the last --

THE COURT:  Oh, okay.  Go ahead.  Excuse me.

MR. ABREU:  This is our last witness.

THE WITNESS:  No --

MR. ABREU:  Oh, you are going to answer.  Sorry.

THE WITNESS:  The answer to his question is a person who is dead and not active, not moving around, isn't standing up, they aren't walking, they aren't doing their normal course of life, things aren't flowing out of these body orifices and they're not being diminished and diluted in that fashion, whereas if someone is dead and there's a pool of semen in their vagina on their rectum, it's just going to sit there until the normal decay processes get rid of it.  But you can recover it, you know, a long time after they're dead.

MR. DOWD:  All right.  Thank you, Mr. Keel.

THE COURT:  Okay.  Thank you all very much.  Now you're -- you've got one more?

MR. ABREU:  Thank you.  Just a very -- couple of questions.

REDIRECT EXAMINATION

BY MR. ABREU:

Q.  I just wanted to clarify.  I think there was some

USCA5 2562

confusion when there was discussion about the swabs having semen in this particular case, as Mr. Dowd asked some other questions. Just so we can clarify your opinion, in this particular case, what is your opinion whether semen was detected, based on the evidence that you've reviewed?

A.   In my -- there's no semen on these swabs. You have two independent laboratories that can't find sperm on the swabs. You have two independent laboratories who can find no male --

THE COURT:   You know what, I think we've got his opinion very clearly.

MR. ABREU:   That I wanted to make sure, Your Honor.

BY MR. ABREU:

Q.   And just one last question, or two questions related to the same area. Mr. Dowd asked you, the Government asked you whether you were aware of the FBI manual stating that only a sperm head and tail constitutes finding sperm. Do you recall that?

A.   Yes.

Q.   Okay. And they asked you whether you were aware of any bench notes or any notes, notations about whether the smear they observed had just sperm heads, for instance, that they couldn't qualify as full sperm. Did you hear that?

A.   No.

Q.   Okay. Have you reviewed anything at any point, any notes indicating that the smear that the FBI observed had any sperm

USCA5 2563

particles or fragmented sperm?

MR. DOWD:  Your Honor, I would object.  What's his basis for knowing that?

MR. ABREU:  That's what I -- you asked the question. That's what I want to know, what's his basis, what's your basis for the question.

THE COURT:  Wait, wait, wait.

MR. DOWD:  How does he know what else is on the --

THE COURT:  Just ask the question.

MR. DOWD:  -- the smear?

BY MR. ABREU:

Q.   Well, I'm going to ask, have you read any notes related, that have been provided by me to you from the FBI regarding sperm fragments on the smear?

A.   The only note that has been provided to me is a form that has the word "sperm" in a column, and then either a dash meaning negative or the word "NEG" under the word "sperm."

Q.   Let me just show you this one document.

A.   That's all I have.

Q.   I'm sorry.  This will be my last question.  The Government asked you about whether you had seen the FBI protocol manual. I actually happen to have a copy of that right here.  And I'm relating to a chapter, Series 111, 16 pages, and this is Page 12, and 10.3.  And I'll just read it.  "The presence of cellular elements consistent with being either dissociated

USCA5 2564

human spermatozoa heads and/or tails is not sufficient basis for the conclusive determination that human semen is present on an item of evidence.  The presence of such dissociated cellular components should be recorded in the case notes."  Do you see that?

A.   I do see that.

Q.   Did you read any case notes saying there was dissociated semen in this particular case?

A.   No.

MR. ABREU:  Your Honor, I'm going to again renew my request.  If the FBI has notes that we have not seen regarding what was observed, I would like to see them.

MR. DOWD:  Judge, to that point --

THE COURT:  Please.

MR. DOWD:  -- our FBI expert has now arrived, and if I could have a minute to confer with her.

THE COURT:  Please.  Thank you.

(PAUSE.)

MR. DOWD:  Your Honor, she's going to retrieve the case file.  It's just down the hall.  And --

MR. ABREU:  And I'll just ask, while she's getting them, ask a follow-up question, Your Honor, of the witness.

MR. DOWD:  She's up to testify tomorrow, but we'll straighten this out.

MR. ABREU:  If there were --

USCA5 2565

THE COURT:  Is there anything not disclosed in the FBI file?

MR. DOWD:  Our expert indicates to me that she has correspondence that shows that it was shared with the Defense at the trial stage.

THE COURT:  Okay.

MR. DOWD:  So I haven't seen it, but that's what she's --

THE COURT:  Photographs?

MR. DOWD:  No, correspondence.

THE COURT:  Correspondence.

MR. DOWD:  That this went to the Defense at the trial stage.

THE COURT:  All right.  I don't know what that means, but --

MR. ABREU:  Mr. Dowd and I will talk, Your Honor.

THE COURT:  You will?

MR. ABREU:  He and I get along just fine.

THE COURT:  You just need to leave by midnight.  Oh, that's right, the two reasonable people in the whole courtroom.

MR. ABREU:  You remembered.

BY MR. ABREU:

Q.   If there were dissociated sperm, would the Y chromosome test conducted by the FBI have picked up male, picked up those particular chromosomes in the dissociated sperm?

USCA5 2566

A.    Well, the test was done by Orchid Cellmark.

Q.    I'm sorry, Orchid Cellmark.

A.    But if there was a sufficient amount of semen to produce the result on the p30 assay card, then there should have been more than enough sperm present to produce a result that would be detected by that DNA assay, yes.

Q.    And would those dissociated sperm have been visible on the microscopic search conducted by Technical Associates?

A.    Certainly.

          MR. ABREU:  I have no further questions, Your Honor.

          MR. DOWD:  Nothing further, Your Honor.

          THE COURT:  Thank you, sir.  You may stand down.

     (Excerpt concluded at 8:23:25 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Molly Carter                    October 12, 2010
Molly Carter                        Date

USCA5 2567

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ELIZABETH ANN JOHNSON | 3 | 38 | 109 | |
| CHARLES ALAN KEEL | 122 | 133 | 168 | |

| EXHIBITS: | RECEIVED |
|---|---|
| PX-88:  REPORT OF CHARLES ALAN KEEL . . . . . . . . . . . | 126 |
| PX-90:  CV OF WITNESS CHARLES ALAN KEEL . . . . . . . . | 123 |
| PX-91:  2007 DECLARATION OF ELIZABETH ANN JOHNSON . . . | 29 |
| PX-92:  3/1/94 HANDWRITTEN REPORT OF ELIZABETH JOHNSON | 115 |
| PX-93:  CV OF WITNESS ELIZABETH ANN JOHNSON . . . . . . | 3 |
| PX-168:  FAX FROM ELIZABETH JOHNSON TO MR. TINKER . . . | 20 |

USCA5 2568

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
          PLAINTIFF,             *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 24, 2010
                                 *    8:26 A.M.
          DEFENDANT.             *
                                 *
* * * * * * * * * * * * * * * * *


      PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 5
              (TESTIMONY OF JERRILYN CONWAY)

          BEFORE THE HONORABLE JANIS GRAHAM JACK
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

              (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:            MS. VELMA GANO


      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
        TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
              MOLLY CARTER, P. O. BOX 270203
         CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 2569

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 2570

(The proceedings began at 8:26 a.m.)

(Call to Order of the Court.)

* * * * *

(Excerpt beginning at 9:38:05 a.m.)

JERRILYN CONWAY, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. DOWD:

Q.    Ms. Conway, would you state your full name for the record and spell your last name, please?

A.    My name is Jerrilyn Conway.  My last name is spelled C-O-N-W-A-Y.

Q.    All right.  And how are you employed?

A.    I'm a forensic examiner in the Nuclear DNA Unit at the FBI Laboratory.

Q.    All right.  And what do your duties include there?

A.    As a forensic examiner, I determine what examinations need to be done initially by our unit.  Those examinations are carried out by a biologist.  The biologist then returns their analysis and examination paperwork to me.  I'll review those documents, make conclusions, determine if any additional examinations need to be conducted, and then write a report.

Q.    All right.  And if you would give the Court a highlight of your education, any formal training in this area, any certificates that you hold, any qualifications or certifications that you hold to qualify you in this area.

USCA5 2571

MR. ABREU:  Excuse me, Your Honor.  If it will help speed things along, I have no objection to her qualifications as an expert in this area.  If he wants to ask specific questions --

THE COURT:  What's the area again?

MR. DOWD:  Evaluation of the semen, Your Honor.

THE COURT:  Okay.

MR. ABREU:  I have no objection to her qualification as an expert.

THE COURT:  Thank you.  She'll be accepted.

MR. ABREU:  Thank you.

MR. DOWD:  In general, it's the blood, DNA semen testing.

BY MR. DOWD:

Q.   Let me just quickly ask if you can recognize Government's Exhibit Number 64.  Do you recognize that?

A.   I do.

Q.   Okay.  And what is this?

A.   This is a copy of my CV.

Q.   All right.  You provided this to the Government?

A.   I did.

MR. DOWD:  We'd offer Number 64 into evidence, Your Honor?

MR. ABREU:  Without objection, Your Honor.

THE COURT:  Government's 64 is admitted.

USCA5 2572

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.   And then Government's Exhibit Number 65, do you recognize this?

A.   I do.

Q.   And what is this?

A.   This is a list of my court qualifications.

Q.   Okay.  These are cases you testified in and was qualified as an expert in?

A.   That's right.

MR. DOWD:  All right.  We'd offer Number 65 into evidence, Your Honor.

MR. ABREU:  No objection, Your Honor.

BY MR. DOWD:

Q.   All right.  And then finally, Exhibit Number 63, do you recognize this document?

A.   I do.

Q.   And what is this?

A.   This is a statement I prepared for this matter.

Q.   All right.

MR. DOWD:  We'd offer Number 63 into evidence as well, Your Honor.

MR. ABREU:  Again, no objection, Your Honor.

THE COURT:  Thank you.

MR. DOWD:  Now, Ms. Conway --

USCA5 2573

THE COURT:  That's admitted.

MR. DOWD:  Oh, thank you, Judge.

THE COURT:  Sorry.

MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q.   Ms. Conway, we're going to speed right along here.  What is the acid phosphatase test, and what does it test for?

A.   The test that we use to detect acid phosphatase is called a BCIP, which stands for Bromo Chloro Indolyl Phosphate.  It's a test that will detect the high levels of acid phosphatase that are present in semen.

Q.   All right.  And how does that test physically work?  What process is involved?

A.   Generally we use this test for items of evidence such as clothing or bedding, and we'll take a swab, we'll have a moistened swab and we'll rub that swab on the stain to take a little bit of that stain onto the swab.  The swab we'll then put into a test tube, and then our test reagent.  That solution will be put into a water bath for 15 minutes, and we look for a color change.  So the solution is colorless, and when it's acted upon by acid phosphatase, it will turn blue.

Q.   Okay.  And what is the actual mechanics of the underlying reaction, chemical reaction or biological reaction that produces the color change?

A.   Acid phosphatase acts as an enzyme and acts on the

USCA5 2574

substrate that's in the solution that we add to our test tube. It actually cleaves the phosphate off of that molecule and changes it from a colorless solution to a blue color that's then on the swab.

Q.    All right.  And what --

A.    So it's an enzymatic reaction.

Q.    In what state does the acid phosphatase, the actual substance, have to be in in order to trigger a positive result, test result?

A.    The acid phosphatase has to be active and functioning.  So it has to actually be able to do its cleaving of the substrate. It has to be functioning.

Q.    So the enzyme has to be functioning.

A.    That's right.

Q.    Okay.  And how long will acid phosphatase function under normal laboratory conditions?  If it's preserved in a lab, would you expect the acid phosphatase to continue functioning to the degree it will result in a positive test result?

A.    I would.  If a stain is deposited and then dried, and then that evidence is stored in a dry environment and hopefully refrigerated as well, it could last for many years.

Q.    Okay.  What would -- what about in a live rectum?

A.    Well, the studies that have been done have been on typically vaginal, post-intercourse vaginal swabs.  We found that when -- well, we didn't find, but the studies show that

USCA5 2575

the acid phosphatase will last for an average of 14 hours when a swab is taken after, after the intercourse.

Q.   And after 14 hours?

A.   It tends not to be able to be detected.

Q.   All right.  And what about in a rectum?

A.   Well, a rectum --

Q.   Would you have an opinion about how long acid phosphatase would remain active, detectable under this test, in a live rectum?

A.   It may be similar.  It depends on whether the individual has actually defecated.  That, of course, would lead to drainage, and as opposed to just being diluted and degraded, it would actually be sort of washed away.

Q.   All right.  And you say it would be similar, meaning that it would no longer be detectable, after, under this test, after 14 hours?

A.   Approximately.  That would be my expectation.

Q.   All right.  Why doesn't the FBI lab conduct AP or acid phosphatase testing in suspected semen samples, especially obtained from intimate body orifices, like a vagina or a rectum?

A.   Well, there's two reasons.  One is that the vaginal secretions also contain acid phosphatase, so it's possible that a positive result on our AP test would be a result of those vaginal secretions.  Rectal swabs, from drainage, could also be

USCA5 2576

contaminated with vaginal secretions.

And then the other reason is that because of the known degradation rate of acid phosphatase, we know that the AP will actually lose its ability to be detected sooner than our p30 test, which is our PSA test.  So we go straight to the p30 test to determine whether semen's present on those swabs.

Q.   All right.  Other than degradation of the acid phosphatase, you know, in 14 hours, after 14 hours, are there any other -- do we know if there's anything else that can cause a false negative in an acid phosphatase test?

A.   Well, again, the false negative, I would say that we're just unable to detect semen.  It would have been diluted enough.  There is, of course, a detection limit.  Eventually the concentration of that is so limited that we would not be able to detect a positive result.

Q.   All right.  Now, what about the p30 test, or the PSA test? What does that test for?

A.   The PSA test is, we use the, in this case, we used the ABA card to detect PSA, which is a protein that's elaborated by the prostate during ejaculation.

Q.   Okay.  And how settled is the science regarding what substances can trigger a positive ABA card test result, positive test result?

A.   There's numerous validation studies that show that this test is very specific, which means that other substances have

USCA5 2577

not been shown to react positively with this test.  And it's also very sensitive, which means that it will detect PSA at a reasonably low level.

I should say it does have a limit to that sensitivity, which is important, because we don't want for other substances that contain PSA at very low levels to react with this card.

Q.   All right.  And if Mr. Keel said that we just don't know what will trigger a PSA positive test result, would that be accurate?

A.   I don't think that that's accurate.  The literature is filled with validation studies, I think I cited at least five in my statement, that show that the PSA test is both specific and sensitive.

Q.   All right.  And how long has the PSA test been used, have been used to detect semen in, you know, laboratory environments?

A.   In our lab, we started using -- the first PSA test that we started using was an ELISA test, which was brought on line in the early 1990s.  We started using then the ABA card in 1998.

Q.   All right.  What is the, as far as the different types of PSA tests, what is the ABA card PSA test?

A.   It basically looks like a pregnancy, a pregnancy stick.  It's actually in a card format, so the solution is added to a well at one end of the card.  There's a membrane that the solution then, by capillary action, is drawn through the card.

USCA5 2578

It reaches the test region first.  There --

Q.   Well, before you get to that, explain the extraction and dilution process before the actual final substance is tested on the card.

A.   So when we test our -- when we test our swabs, we take a quarter of the swab, we cut that length-wise -- we cut the swab length-wise so that we take a quarter of the swab.  A swab can hold between .1 and .15 milliliters of fluid.  That would be the maximum volume that you would expect to have on that swab.

Q.   Uh-huh.

A.   So we take a quarter of that, and we put it then in a buffer, which is a solution of about a mil.  That effectively --

Q.   A mil?

A.   A milliliter, excuse me, a milliliter.  And that effectively dilutes the original concentration of the substance that was on the swab.  There's also what we call an extraction efficiency dilution --

Q.   Well, before we get to that, in that initial dilution, that is the standard, and that's how the test was designed to be, to test that particular standard at that point?

A.   That is our protocol for detect -- for cutting swabs from sexual assault kits.  That's our protocol.  That's part of our protocol.

Q.   Okay.  And is that how that ABA card test was designed to

USCA5 2579

test the PSA at that standard level of dilution?

A.    To take a portion.  The manufacturer, depending on how sensitive -- depending on -- the manufacturer designed it so that you could extract the PSA from a stain, either from a swab or from a cutting of fabric, clothing item or bedding, and then extract that into a buffer solution and run it on the card, yes.

Q.    All right.  And you were discussing the next step of dilution.

A.    Right.  So the next dilution that is important is we have, there's an extraction efficiency that is associated with extracting the soluble protein out of the swab, and that's been determined, and the literature supports that that extraction efficiency is only between 1 and 10 percent.

Q.    Okay.

A.    So that effectively dilutes the sample even further, so that then the buffer that is run on the card has a significantly lower level of PSA than the original substance that might have been deposited on that swab.

Q.    Than the actual pure substance --

A.    Exactly.

Q.    -- that was deposited?  All right.

A.    That's right.

Q.    And is that -- and then what happens?

A.    And then a portion of that buffer, that solution, is added

USCA5 2580

to the card.  The solution is bound by an antibody.  The protein is bound by an antibody, and it goes, it travels up the card and it reaches the test region, where it's bound, if PSA is present, it's bound by an additional antibody that's attached to the membrane.  It continues, the solution continues up to the control region, which gives us a color change to ensure that the test is working properly.

Q.   All right.

A.   And then its read after 10 minutes.

Q.   Okay.  And what's the significance of a finding of a weak positive in a PSA test?

A.   The weak positive result means that there is a limited amount of PSA present, which means there's a limited amount of semen present.  However, this is a qualitative test.  If it's positive, then there is -- then PSA is present, and it's present at a level that semen can be concluded to be on the swab.

Q.   Okay.  So it doesn't question the results, only the amount of semen that is detected?

A.   That's right.

Q.   All right.

A.   And it helps the forensic examiner then determine what stains might be appropriate for further testing.

Q.   And are PSA test results normally quantified?

A.   In the sense that we, we do -- the biologists, when they

USCA5 2581

run the card, will make a note as to whether they're weak or very weak, or if it's just a positive line, then they won't make a note.

Q.    What is the environment within a live rectum on the ability of the PSA test to detect PSA deposits there in the rectum?

A.    Well, once the sample is collected on the swab and then is preserved, that swab can be taken on for testing.  So the environment in the rectum is important because of the amount of time that may have passed between when the semen was deposited there and when the sample was collected.

Q.    All right.  And are there any studies that you're aware of supporting the proposition that bacterial proteins could contaminate a swab and produce a false positive result in a PSA test?

A.    No.  And in fact, there's a validation paper that I presented in my statement that is, that specifically tested six microorganism species to make sure that those didn't react with the PSA test.

Q.    All right.  Can you direct the Court's attention to that particular study?

A.    I can.  The author is Hawkmeister (phonetic), and it was published in 1999 in the Journal of Forensic Science.

Q.    Okay.  What conclusions can you draw from a negative AP test result 18 months after a positive PSA test result on the

USCA5 2582

same sample?

A.   Well, the negative AP test, as I discussed earlier, the AP is somewhat more fragile than PSA in that it's been shown to degrade faster, at least in the vagina, and therefore likely in the rectum as well.  So my expectation is that this is a very limited sample that has potentially been degraded, that the AP test is unable to detect, but the PSA test is.

Q.   And explain the SRT process that the FBI uses to conduct DNA tests of biological samples.

A.   The extraction process?  Is that what you're asking about?

Q.   Uh-huh.

A.   The differential extraction process is one in which a swab is cut and added to a solution.  Chemicals are added to break apart the non-sperm cells, and then the sample is centrifuged. The centrifugation allows that pellet, a pellet to be formed which would be the sperm fraction or would contain the sperm cells.  That non-sperm fraction is then removed from the pellet, and that's the non-sperm DNA fraction.

Q.   All right.  And does -- so it's designed to separate the female DNA from the male DNA?

A.   Yes.  Yes.

Q.   Okay.

A.   Really more the non-sperm DNA --

Q.   All right.

A.   -- from the sperm DNA.

USCA5 2583

Q.   And if female DNA is detected within the male fraction, does that always suggest that the test was not done properly or the procedure was not done properly?

A.   No.  The procedure is a delicate procedure.  It does need to be done carefully.  But there are samples that are challenging, and so sometimes after the number of washes –– our typical wash of the pellet is twice.  Sometimes after those two washes, there's still a significant amount of female DNA in that pellet.

Q.   And what are some of the reasons for that?

A.   Well, the sample, as I said, the sample could be just a challenging sample.  It may not have completely broken apart during the, during the initial, the initial step where the non-sperm cells should have been broken apart.  Maybe they weren't completely broken apart.  So it is certainly something that's not ideal, but it's not something that doesn't happen.

Q.   All right.  And did you review Dr. Johnson's statistical sperm calculations ––

A.   I did.

Q.   –– in her report?  And do you think those are –– she suggests that there should be 500 sperm on the sample.  Do you think her calculations are correct?

A.   Well, I wouldn't say that her calculations are wrong, but they certainly don't take into account the natural variability of both PSA and sperm within a semen sample.

USCA5 2584

Q.   All right.  So you have that variability.  She used the mean --

A.   She did, yes.

Q.   -- of sperm --

A.   Well, she used -- exactly.  She used the mean of the PSA amount, which she used one figure, which was 800,000 nanograms per mil.  That number has been shown to be variable between .2 and 3.5 million.

Q.   Uh-huh.

A.   .2 and 3.5 -- oh, now I'm getting my numbers -- so 200,000 nanograms per mil to 350 million nanograms per -- three-and-a-half nanograms per --

Q.   So there's a gross variability in that figure, in that number of sperm?

A.   There is a variability in the amount of PSA that's present in a normal sperm sample.  There's also variability in the number of sperm that can be present in a sperm sample, even in a person that's considered a normal producing sperm donor.

Q.   So the sperm is not equally distributed within the semen?

A.   It's not equally distributed, but it's also not -- it's also not consistently the same amount.  100 million sperm per mil is an average, but it can go to as low as 50 million, up to 150 million, and that can affect the calculation as well.

Q.   All right.  Did she also use the, rely on the PSA test sample or statistics that it has a sensitivity of 4 nanograms

USCA5 2585

per mil?

A.    Yes, she did.

Q.    And is the PSA test, do you know if this ABA card PSA test is more sensitive than the -- explain to the Court the sensitivity of that test and the meaning of the 4 nanograms per mil as the manufacturer's sensitivity.

A.    The manufacturer guarantees that the card is at least, at least sensitive to 4 nanograms per mil.  In our hands and during our validation, we found that these cards were sensitive down to about .5 nanograms per mil.

Q.    So half a nanogram per mil?

A.    Half a nanogram per mil.

Q.    Okay.  And would that throw off her calculation as well?

A.    Well, it's another factor.  It's another factor of 8.

Q.    In other words, so the sperm would -- her calculation would be reduced by another factor of 8?

A.    That's right.

Q.    All right.  And did you, applying your, these factors you've just discussed, did you come up with a different figure as far as how many sperm could be expected on that sample?

A.    Well, I would expect there would be a range.  So, you know, 1 to 2 to 5 would be the low end of that range.  A higher range, you would even potentially go up to, say, 1,000 or more.  So it just, we really don't know what sort of sample this was.  And again, since we know that there was time that has elapsed,

USCA5 2586

we know that the sample has been degraded somewhat.

Q.   All right.  Now, in Dr. Johnson's note of March 1st, 2004, she also included a single page from an article --

A.   Yes.

Q.   -- which set out other substances that would trigger a positive PSA result.  I think it said mother's milk, amniotic fluid, female urine, female blood --

A.   That's right.

Q.   -- female serum.  Were you able to obtain that complete article?

A.   I was, yes.

Q.   Okay.  And let me show you what's been marked as Government's Exhibit Number 205, Your Honor.  Do you recognize this?

A.   I do.

Q.   What is this article?

A.   This is the full article of what she had taken the second page from.

Q.   Okay.  And on the second page of this article, it has a page that Dr. Johnson included in her March 1st report?

A.   That's right.

Q.   All right.

     MR. DOWD:  Judge, we'd offer this into evidence, 205.

     MR. ABREU:  Without objection, Your Honor.

     THE COURT:  Government's 205 is admitted.

USCA5 2587

BY MR. DOWD:

Q.    All right.  And did you -- you have had a chance to review this article?

A.    I have.

Q.    Okay.  And I think Counsel pointed out in Dr. Johnson's testimony, asked her to look at this paragraph here that I'm pointing to on Page 2, under that Table 1, Concentration of PSA in Bodily Fluids, Liquid?

A.    Yes.

Q.    Is this, I mean, does this paragraph discuss the results of the study, or is this more of an anecdotal finding by the authors?

A.    Well, this paragraph seems to be laying out the reasoning behind the study that is then contained in the next several pages.  So this paragraph says that, you know, the analyst is concerned that female urine or female serum, which is blood, might give a positive PSA result.

Q.    All right.  But what was the ultimate conclusion of the authors in this article, as far as the reliability of PSA tests, especially in testing these items listed on Page 2?

A.    They did some experiments to determine that both female urine and female blood would not give a positive result on the PSA test.  And in fact, they can be assured that if the PSA test was positive, that they can be assured that that came from semen.

USCA5 2588

Q.   All right.  So they were complementary, or they verified the reliability of the PSA test to determine semen and eliminate these substances as potential positive triggers?

A.   They did.  They did not test breast milk or amniotic fluid, but they did test both female urine and female serum.

Q.   Do we know if breast milk ingested and then excreted, or at least received in the rectum, if that would result in a positive PSA finding?  What is the science surrounding that?

A.   Well, there was a study -- or it wasn't a study.  There was a case that, where they postulated that that might be the reason for the positive results on an infant's -- I'm not sure if it was a rectal swab or in a diaper.  But they didn't necessarily -- they just postulated that that might be the reason for it.  And I don't know that they necessarily concluded that that must have been where it came from.

Q.   All right.  Now, in the, on Page 2 here, it gives these particular substances that could, that actually contain PSA at different levels.  And are these concentration levels described in the center section, is this, does this refer to undiluted substances of PSA?

A.   Exactly.  This is the amount of PSA that's in the substance itself.

Q.   Okay.  And is that the dilution level that would be tested in the PSA test?

A.   No, because as I described before, we use -- the maximum

USCA5 2589

amount that would be on a swab, we take a quarter of that swab. There's an extraction efficiency. So all of those dilution factors add a factor of about 1 to 250 to potentially 1 to 2,500 to these levels.

Q. Okay. So if you took the purities of the undiluted, undiluted concentrations here on Page 2 and you applied the dilution levels that the test requires and that the FBI did in this case, would any of these substances listed produce a positive PSA result?

A. No. The only one that would be close would potentially be the first listing of breast milk, where they say one case it was found at 2100. But even that would be very close to our detection limit.

Q. All right.

A. And I wouldn't expect that to give us a positive result.

Q. And that's what the authors of the article go on to say?

A. Yes.

Q. All right. And in connection with Dr. Johnson, you listened to her testimony?

A. I did.

Q. Okay. And she described the testing done by the Technical Associates, her old lab?

A. Yes.

Q. Okay. In your file, did you find the actual test result or the communication between them and Dr. Johnson?

USCA5 2590

A.    I did.

Q.    All right.  Let me show you what's been marked as Government's Exhibit Number 206.  And this is a two-page document, and I should show you the second page.  Do you recognize this document?

A.    I do.

Q.    What is this?

A.    Well, this is a page from my file.  This is a summary of the results from Technical Associates that was submitted, I think, to Dr. Johnson.

        MR. DOWD:  Your Honor, we'd offer this into evidence, Exhibit 206.

        MR. ABREU:  No objection, Your Honor.

        THE COURT:  Government's 206 is admitted.

        MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q.    And in this exhibit, what does the Technical Associates have to say about the p30 protein test?

A.    Well, in the third paragraph, they describe it as a confirmatory test for semen.

Q.    Okay.  Now, there's an issue regarding the fragility of sperm cells, and that once they lose their tail, they're difficulty to -- they're difficult to identify under a microscope.  Could you speak to that?  Tell the Court your opinion as far as the viability of sperm cells in different

USCA5 2591

environments --

MR. ABREU:  Your Honor, I would object to the characterization of they're difficult to observe under a microscope once they lose their tails.  I believe the experts who have already testified testified that they can still be identified under a microscope, even if they don't have tails.

MR. DOWD:  I'll ask the witness, Judge.

THE COURT:  Overruled.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Go ahead.

BY MR. DOWD:

Q.   Ms. Conway, can you address the viability of sperm cells in a rectum, a live rectum, as well as the difficulty, if it is difficult, to identify sperm cells once they've lost their tail and/or midsection?

A.   So the FBI protocol is to only identify a sperm cell if it's intact, with the head, the midpiece and the tail all intact.

Q.   So on the smear test, if the FBI looked at the smear slide, the autopsy smear slide from the rectum and found no sperm, what's the significance of that finding?

A.   Well, that's a negative result.  We didn't -- we didn't observe any sperm cells on that slide.

Q.   All right.  And you were going on to say what the FBI protocol was as far as identifying sperm cells.

USCA5 2592

A. So the biologist would note if they saw what looked like heads or what looked like tails, though generally the tails don't remain after they've been degraded. Or if they fall off of the sperm head, then they usually get degraded as well. So they would note if they had seen any. They did not.

Q. All right. And what about the survivability of a sperm cell within a live rectum?

A. Well, it's limited. The studies, as I -- most of the studies have been done on post-intercourse samples that were taken vaginally. So most of the studies show that those can only be detected, that sperm cells can only be identified after maybe 24 hours. Cervical samples, sometimes you can observe a sperm that will last longer. In the rectum, there's no, there's no cervix where the sperm can hide, so they're subjected to the degradative forces that are in there.

Q. All right. Oh, before I forget, this is out of order, but I wanted to broach this. Dr. Johnson testified that there's no literature, there's no studies which suggest that, as regards to the presence of PSA in female serum, female blood, female urine, she's unaware of any studies that involve children. Are you familiar with any studies involving whether or not PSA exists in female children, little girls?

A. I am. There is a study that was published, I believe his last name is pronounced Antonoir (phonetic), in the British Journal of Urology in 2004, that describes serum levels of PSA

USCA5 2593

in both boys and girls.  And they determined that the level in girls is --

Q.    PSA in serum?

A.    In serum, that's right.

Q.    Uh-huh.

A.    That the level in girls is .004 nanograms per mil of PSA. In boys, it's also at that level until they hit puberty-ish, and then it starts to rise.

Q.    All right.  And, but the PSA in little girls, in the serum in little girls at .004, would that trigger, or could that trigger a positive PSA result in the one the FBI did?

A.    No.  No.

Q.    Or the one that Dr. Johnson did?

A.    No.

Q.    Because it's too low of a level?

A.    That's right.

Q.    All right.

A.    Even if that were put undiluted on the card, which we know that there's dilution steps that are --

Q.    So even undiluted, it still wouldn't trigger a positive result?

A.    No.

Q.    And is there any significance to the fact that the swab taken from the blood stain from the child's underwear at the same time as the autopsy, as the rectal swabs were done,

USCA5 2594

that that produced a negative PSA result?

A.   Well, it would have been a cutting that was taken from the underwear.  And that stain was also, had blood identified in that particular area.  So that cutting gave a negative PSA result, which indicates that the blood wouldn't have been the cause of a positive PSA result.

Q.   In other words, we can eliminate the victim's blood as triggering the positive PSA result from the swab from the rectum?

A.   Yes.

Q.   The swabs?  Now, what about pre-ejaculate fluid, are there any studies that you're aware of in which pre-ejaculate fluid has been found to contain PSA and AP?

A.   It has been, yes.  There was a study in 2004.  The author was Dennison.  It's also listed in my statement, that he looked at, among many other things during his specificity studies, pre-ejaculate emission fluid does contain high levels of both PSA and acid phosphatase.

Q.   And what conclusions can you draw from that?

A.   That pre-ejaculate emission fluid -- they also looked for sperm cells in those samples and found that, I think it was only one of the eight samples that they tested contained any sperm cells at all.

Q.   All right.  So pre-ejaculate fluid can also trigger a positive PSA result.

USCA5 2595

A.   Yes, it can.

Q.   All right.  What about drinking male urine?  Could that trigger a positive PSA result from a rectal swab?

A.   I would not expect that, no.

Q.   Why would that be?

A.   There's too many forces at work.  There's obviously a dilution.  She -- there's other things that she's eating and drinking.  Those are going to dilute the sample.  The sample, I mean, your digestive system is very efficient at breaking down protein and absorbing protein to use as energy, so the protein should be broken down to a point that it would not be detected.  There's no reason to think that that would give a positive result from a rectal swab, no.

Q.   All right.  In this case, assuming that sperm was deposited in this particular rectum, how can you explain two positive test results for semen, the PSA, two positive PSA results, a negative AP result 18 months later, and apparently the inability to identify any sperm cells on the sample that was sent to Dr. Johnson?

A.   My explanation is that this is at the lower level of detection.  We're at the threshold of being able to even detect the PSA.  We know that it's a limited sample.  It's potentially been degraded.  The AP test could have degraded as well to a point that it's not detectable.  The sperm cells either were not deposited in abundance, so depending on the natural

USCA5 2596

variation in the semen, there could have been a limited number to begin with. And then they would have also been degraded. So I think we're just at the lower limit of detection, and that the PSA test, as a confirmatory test, shows that semen was present on those swabs.

Q. All right. Now, the FBI did a differential extraction. They pelleted the sperm sample. What was the purpose of the FBI doing that?

A. In an attempt to identify the DNA that may have been present in the sperm cells.

Q. Okay. So they didn't do it to identify sperm cells. They did it to identify any DNA present?

A. That's right, yes.

Q. Okay.

MR. DOWD: Your Honor, I'll pass the witness.

THE COURT: Thank you.

MR. ABREU: May I, Your Honor?

THE COURT: Please.

CROSS-EXAMINATION

BY MR. ABREU:

Q. Good morning, Ms. Conway.

A. Good morning.

Q. I'm going to start by showing you what the Government has previously marked and discussed with you, which is Government's Exhibit 206. That would be the report from Technical

USCA5 2597

Associates.  See that there?

A.    Yes.

Q.    Okay.  You said you found this in your file?

A.    I did.

Q.    You found this yesterday when you were reviewing your file?  And when did you find it?

A.    Well, it was in the file when I reviewed it back in June.

Q.    Okay.  Did you provide it to the Government yesterday?

A.    I did.

Q.    Okay.  And it was then -- do you know if it was provided to me yesterday?

A.    I didn't know.  I assumed that it was.

Q.    Okay.  Is your file with you here today?  Did you bring it with you?

A.    Yes, I did.

Q.    Okay.  Now, for purposes of this, for your testimony today, let's say I agree or we all agree that P, that a positive PSA assay can be confirmatory for the presence of semen.  Let's start with that premise.  Okay?

A.    Okay.

Q.    Do you understand that the question before the Court today is whether p30 tests alone, in the face of a negative AP, a negative DNA test, a negative Y STR test, Y chromosomal testing, two negative sperm searches, and no physical evidence of sexual abuse could be confirmatory for the presence of

USCA5 2598

semen?  Can we agree that that's -- you understand that that's the question that's before the Court today?

A.   Yes.

Q.   Okay.  And just so I understand the FBI position, the FBI position is that despite all those other negatives which I just listed, the p30 test alone confirms the presence of semen.

A.   Yes.

Q.   Okay.  When did you first -- well, let me, before I move on, let me show you in this same document from Technical Associates -- what day is that document dated, by the way?

A.   The 19th of February 2004.

        MR. ABREU:  And for the record, Your Honor, may that reflect that that's approximately seven days before the Court's February 26th, 2004, order for the production of all expert reports.

BY MR. ABREU:

Q.   And just for completeness of the record, I notice that there's a fax number at the top.  What day is that fax date?  Can you tell us what date that is?  Can you see that?

A.   February 25th --

Q.   2004?

A.   -- 2004.

Q.   Thank you.  And for the record, I'll note that that's the day before the Court's compliance order, the Court's order for compliance.

USCA5 2599

In the middle of that particular document, it indicates the three rectal swabs were examined visually. The major portion of the cotton on all three swabs had been previously removed. Substantial staining was seen on the wood swab sticks. The remaining swab material and stain surfaces on the wooden sticks of all three swabs were shaved and collected in a tube to be processed for the presumptive test and spermatozoa search.

How many swabs did the FBI test for sperm?

A.   We didn't test any of the swabs for sperm.

Q.   How many did they do a microscopic sperm search on, or microscopic sperm search on?

A.   We didn't test any of the swabs.

Q.   How many of the swabs were tested for AP?

A.   We didn't test the swabs for AP.

Q.   How many of those swabs were subjected to use for a smear, smear microscopic search?

A.   I don't know. The smear that was provided to us was provided with the swabs. So that would have been collected by the nurse examiner.

Q.   How many of those swabs were used for the DNA testing that was used -- that was done afterwards?

A.   One.

Q.   One. That would be Q7?

A.   That's right.

USCA5 2600

Q.   So you would agree with me that the microscopic sperm search that Technical Associates undertook was regarding what was the remaining of all three swabs that were collected.  You would agree with me there?

A.   Yes.

Q.   And you would agree with me that the AP test they ran was for all three swabs?

A.   Yes.

Q.   Okay.  When were you first contacted to be involved in this case?

A.   In May of this year.

Q.   You were not the person who testified at trial?

A.   No, I was not.

Q.   Okay.  Carolyn Zervos testified at trial?

A.   That's right.

Q.   Anthony Onorato testified at trial?

A.   Yes.

Q.   Are they still employed by the FBI?

A.   Yes, they are.

Q.   Both of them?

A.   Yes.

Q.   Is there a reason that you know of that they are not here to testify today?

A.   This case was assigned to me when the, when the request was made for our laboratory to provide an expert.  My --

USCA5 2601

Anthony Onorato is now our unit chief, and so he generally would -- this is something that has taken a lot of time and is not something that he -- that he felt would be more thoroughly handled by another examiner that is normally testifying.

Q.   Did he not think it was important to be here?

A.   Absolutely not.

Q.   He had more important things to do?

A.   He -- he elected to delegate this responsibility.

MR. DOWD:  Judge, I'm going to object.  I think we've gone through this.  I think this is becoming argumentative.

MR. ABREU:  I'll move on, Your Honor.

BY MR. ABREU:

Q.   Did you discuss their reports with them before -- their prior reports with them before your testimony today?

A.    I didn't discuss them, no.  I reviewed their files and looked and read through their reports.

Q.   Okay.  Did you discuss any portion of this case with them before your testimony today?

A.   Yes, probably.

Q.   You did?  When did you have discussions with them?

A.   I would have to check my files.  I'm not sure.

Q.   Are you located in the same office as them?

A.   I'm not, no.

Q.   So these conversations would have happened by phone?

A.   Yes.

USCA5 2602

Q.   And your files that you have reflects when those conversations took place?

A.   My -- I keep that in a log.  It's not part of the -- it's not part of this file.  I just keep a phone log with all my conversations.

Q.   Would you have made any notes regarding your conversations with Mr. Onorato and Ms. Zervos?

A.   No.

Q.   I'll show you --

MR. ABREU:  May I have a second, Your Honor?

THE COURT:  Yes.

MR. ABREU:  Thank you.  I have a bunch of documents here.

(PAUSE.)

MR. ABREU:  I'll come back to that in a second.  I can't find the document.  I'm sorry.

BY MR. ABREU:

Q.   I'll show you your, what's been previously marked as Government's Exhibit 63.  That is your report -- no -- that is your report in this case?

A.   Yes.  It's my statement.

Q.   Okay.  Is this, is the information contained in this report your personal opinion as an expert or the position of the FBI?

A.   I would say that it's my personal opinion, though I would

USCA5 2603

expect that the examiners at the laboratory would also agree with these statements.

Q.    Is there some reason that your report and opinions are not contained on FBI letterhead?

A.    Well, this is not in the sense of -- it's not a report in the sense that this is a summary of my conclusions that was prepared specifically for this case.  So as it's not a report, I didn't put it on letterhead.

Q.    Okay.  But you work for the FBI?

A.    I do.

Q.    And you were asked to consult on this case as an employee of the FBI?

A.    Yes.

Q.    And your opinions here are regarding information on a case that the FBI has been working on?

A.    Yes.

Q.    But it's not on FBI letterhead?

A.    No.

Q.    Okay.  When was this report provided to the Government for the first time?

A.    August probably the 3rd or the 4th, since I dated this the 2nd.

Q.    Of 2010?  But you all --

A.    Of 2010.

Q.    I'm sorry.  But you all have been in discussions since

USCA5 2604

May?

A.    That's right.

MR. DOWD:  Your Honor, discussions with whom?

BY MR. ABREU:

Q.    Well, I'd like to know myself.  Discussions with whom?
You mentioned in your testimony that you had first been
involved in this case since May.

A.    That's right.

Q.    Who were you having suggestions with in May?

A.    Generally with AUSA Mark Dowd.

Q.    Okay.

MR. DOWD:  Is that satisfactory, Mr. Abreu?

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.    Have you, or did you review any photographs with the
reportedly positive PSA cards that the FBI reported in this
case?

A.    No.

Q.    Why is that?

A.    We don't obtain -- we don't take photographs of our ABA
cards.

Q.    Is there some reason that the Federal Bureau of
Investigation does not take photographs of ABA cards?

A.    The biologist records their results.  A second biologist
then reads those results and agrees with them.  We don't take

USCA5 2605

photographs of our ABA cards.

Q.   You would agree with me, however, that the reason you do these tests are generally as part of criminal matters?

A.   That's right.

Q.   And that these matters are going to be relied on by the prosecution?

A.   Yes.

Q.   Relied on by the defense?

A.   Yes.

Q.   Relied on by courts?

A.   Yes.

Q.   But the FBI doesn't think it's important to photograph these cards?

A.   The results are recorded by the biologist and then reviewed by a second biologist, so no.  That information is captured in the notes.

Q.   Is there a specific policy at the FBI regarding photographing of, or nonphotographing of evidence?

A.   Of evidence?  No.

Q.   Is there a written protocol that says you cannot photograph PSA cards?

A.   No.  But the protocol does not contain instructions for the biologist to photograph ABA cards.

Q.   Let me show you, in Paragraph 2 of your report, it indicates the items that you reviewed in this particular

USCA5 2606

case --

A.    Yes.

Q.    -- in preparation for your testimony and for your report, correct?

A.    Yes.

Q.    And it indicates that you reviewed the DNA files from the FBI Laboratory, and it gives their numbers and the reports of Anthony Onorato and Carolyn Zervos.  Correct?

A.    That's right.

Q.    Did you review that testimony from the trial in 2004?

A.    I did.

Q.    That's not on your report.

A.    It's not, you're right.

Q.    Okay.  But you did review that testimony?

A.    I did.

Q.    Okay.  You mention in -- is there a second page to this report -- I believe it's Paragraph 4 of your report, you list some of the other substances and fluids where PSA has been detected.  Correct?

A.    Yes.

Q.    And those fluids include male urine?

A.    That's right.

Q.    Female urine?

A.    Yes.

Q.    Female serum?

USCA5 2607

A.    Yes.

Q.    Amniotic fluid?

A.    Yes.

Q.    Breast milk?

A.    Yes.

Q.    The serum of boys?

A.    Yes.

Q.    The serum of girls?

A.    Yes.

Q.    Okay.  Let's go back to Mr. Onorato's testimony which you reviewed.  Let's start with Zervos' testimony.  I apologize. Did you read in Ms. Zervos' testimony where she testified that "PSA or p30 has not been detected in any female fluids that I'm aware of"?  Did you read that?

        MR. DOWD:  Your Honor, could we get a page number?

        MR. ABREU:  Absolutely.  My apologies.  I'm talking about the transcript of March 5th, 2004, at Page 105.

BY MR. ABREU:

Q.    "Not present in any female fluids that I'm aware of."  Did you read that?

A.    Yes.

Q.    That would be incorrect?

A.    It is, yes.

Q.    And in 2004 at the time she testified that "there were no female fluids that I'm aware of," that was also incorrect and

USCA5 2608

known in 2004?

A.   Well, she wasn't aware of them.  I mean, I don't know if that was correct.  But certainly in 2004, there were studies that show that at very low levels, there is PSA.

Q.   I understand.

A.   But not detectable by our card.

Q.   I understand.  And we'll talk about that.  But the fact that it's been detected in other fluids, including female fluids, was known to the FBI in 2004?

A.   It doesn't seem to have been known to her.

Q.   Okay.  It was known in the scientific community?

A.   There were studies that had already been published, yes.

Q.   Okay.  When you were having conversations with Ms. Zervos about this case, as you told us that you had, did you tell her that her testimony in 2004 was not accurate?

A.   No.

Q.   Did you tell her that her testimony was incomplete?

A.   No.

Q.   Did you urge her to call the Government and tell them that her testimony was incorrect?

A.   No.

Q.   Let me show you, from that same transcript, the testimony of Anthony Onorato at Page 128 and 129.  Question from Mr. Tinker, on cross-examination:  "Are there other things that have similar or the same protein, like food or anything?"

USCA5 2609

Referring to p30.

Answer, from Mr. Onorato:  "There are no foods that contain this protein, no."

We all agree with that.  You agree that's correct, no foods that are known to contain p30?

A.    No.  Right.

Q.    "Okay.  Are there other substances that might?"

Answer:  "There are other substances, body fluids, that might possess this particular protein.  It's at such low levels, however.  Semen levels of this protein are astronomically high."

You would agree with that as well.  Correct?

A.    Yes.

Q.    Okay.  Following page -- or same page, sorry, further down.  Okay.  Answer, at the bottom:  "This protein is astronomically high, compared to its content in, say, something like male blood.  And generally it's only found in male blood when the individual has prostatic malignancy."

"Has what?"

"Prostate cancer."

Did you see that?

A.    Yes.

Q.    That's not a complete listing of all the fluids where p30 has been found either.  Is that correct?

A.    It's not, no.

USCA5 2610

Q.    Okay.

A.    And I would say that I don't know that I've necessarily listed everything that p30 is necessarily found in.

Q.    Are there other substances as well?

A.    I tried to be complete --

Q.    Okay.

A.    -- but I don't necessarily know.  But if they are at levels, it would be at very low levels.

Q.    I understand that.  We will talk about that, I promise. When you read Mr. Onorato's testimony, who is now the chief of your unit -- I'm assuming you spoke to him as well.  Correct?

A.    I'm not sure that I did.

Q.    Did you call him and say, "Mr. Onorato, your testimony at this trial in 2004 was not accurate"?

A.    No.

Q.    Did you tell the Government his testimony was not accurate?

A.    I don't find that his testimony isn't accurate.

Q.    Is it incomplete?

A.    I don't know that he was --

        MR. DOWD:  Judge, I would object.  I mean, the witness answers the questions that are posed during the trial. So if he can direct her attention to which question was, in which the answer was incomplete.

BY MR. ABREU:

**USCA5 2611**

Q.    Did Mr. Zervos -- did Mr. Onorato, from what you read, ever indicate that p30 had been detected in any female fluids?

A.    I don't know if he was asked that.

Q.    Did he ever say -- did you ever read that he said it?

A.    I don't -- I don't think that he did.  But I don't have that transcript memorized.

Q.    So when Mr. Tinker asked him, as I just displayed on the screen, whether there were foods that contained this protein, or are there other substances that might, and he answers, "The protein is astronomically high compared to its content in, say, something like male blood, and generally only found, it's only found in male blood when an individual has prostatic malignancy," is that a complete answer or a complete description of all the substances where fluids were found?

A.    Well, above that.

Q.    Yes.

A.    Do you mind putting it back up?

Q.    Oh, I'm sorry.

        MR. DOWD:  Your Honor, I would object.  The transcript speaks for itself.

        MR. ABREU:  I would agree with that.

        MR. DOWD:  That's before the Court.

        MR. ABREU:  I would agree with that.

        THE WITNESS:  Above that he -- oh, sorry.

        MR. ABREU:  I would agree with that.

USCA5 2612

BY MR. ABREU:

Q.    Did you review the testimony of Dr. Scott Benton in this case?

A.    I did.

Q.    I refer Counsel to the transcript from the same day, March 5th of '04, at Page 22, regarding this paragraph noting right here in the middle that starts, "And a more specific."

    "And a more specific or confirmatory test is called prostatic specific antigen, also known as a p30 assay.  And this is a confirmatory test for the presence of semen, because it doesn't exist anywhere else in bodily products, including animal bodily products, except in the male prostate, and with one exception, human breast milk."

    Did you read that testimony?

A.    I did.

Q.    You would agree that that is also incorrect?

A.    It is.

Q.    Did you inform the Government that this testimony was incorrect?

A.    No.

Q.    Is there anything else that you recall about Dr. Benton's testimony that was incorrect?

A.    I read it and I reviewed it, but I couldn't --

Q.    Okay.

A.    -- point out anything specific.

USCA5 2613

Q.   Maybe we can talk about one or two of those things then. Let me refer you here to Page 51 and 52 of that same transcript, same date, Counsel, regarding sperm.

"In a little girl, prepubertal girl" --

THE COURT:  What?

MR. ABREU:  Prepubertal, I guess, is the term.

THE COURT:  Prepubescent.

MR. ABREU:  Well, I'm just reading what's on the transcript, Your Honor.

THE COURT:  No, that's got to be a mistake in the transcript.

MR. ABREU:  I understand.  I was just reading what's there.

THE COURT:  Okay.  That's got to be a mistake in the transcript --

MR. ABREU:  Okay.

THE COURT:  -- which happens.

BY MR. ABREU:

Q.   "It doesn't live very long, hours.  So they'll die.  They lose their little tails.  And once they lose their little tails, they're very difficult to find on a rape kit and trace forensic evidence."  Next page, "You'll find evidence of the semen much easier than you'll find sperm."

Did you read that?

A.   I did.

USCA5 2614

Q.   That's not correct either, is it?

A.   Well, I wouldn't -- I don't know that sperm would necessarily last any less time than the PSA.  It just depends on the -- it depends on the sample and the situation.

Q.   But even after they're dead and they lose their little tails, you can find sperm.

A.   In our laboratory, we require for them to be intact, but --

Q.   So at that -- I'm sorry.

A.   To identify a sperm.

Q.   Okay.  But you can find evidence of sperm.  Correct?

A.   Potentially.

Q.   Find heads?

A.   It depends on how many there are and whether or not the biologist can recognize those.

Q.   And what about his comment that sperm would be much harder to find than evidence of semen?

A.   As far as a difficulty, I'm not sure that that is something I could answer.

Q.   Okay.  Let's talk about the AP test which Counsel asked you about.  We agree that acid phosphatase is an enzyme?

A.   Yes.

Q.   And that it's found in high levels in semen?

A.   Yes.

Q.   And in significantly lower levels in other substances as

USCA5 2615

well?

A.   Yes.

Q.   Okay.  Including female substances.

A.   Yes.

Q.   Okay.  Do you know if the FBI manual, the protocol manuals are available online?

A.   They're not, no.

Q.   They're not.  So if yesterday Counsel for the Government asked one of -- or I should say day before yesterday -- asked Mr. Keel why he didn't get the manual online, it's because it's not available online.

A.   It's not online, no.

Q.   Okay.  Thank you.  Let me show you what is, this document is, and see if you can identify that for me, please.

A.   That is the serology procedure manual that was -- I see the 2001, 2002, but --

Q.   Let me slide it up so you can see that --

A.   Okay.

Q.   -- that date as well.

A.   Okay, right.  So this was in effect until between October 31st, 2001, to December 23rd, 2002.

Q.   Okay.  And this is the manual that was in effect at the time that this particular evidence in this case was collected?

A.   When it was collected?  Yes.

Q.   And when the examination in this case took place by the

USCA5 2616

FBI?

A.   Yes, the serology exams, yes.

Q.   Okay.  Let me show you here, according to the table of contents, Chapter 4 covers the procedure for the presumptive identification of semen?

A.   Yes.

Q.   Okay.  Let me turn to Chapter 4.  And regarding -- let me zoom that in.  Is that too -- is that one out of focus? "Regarding the Procedure for the Presumptive Identification of Semen."  Because -- or let me read the whole section there. "Human semen possesses acid phosphatase activity that can be exploited for the presumptive identification of this body fluid.  Because APase activity is not exclusive to human semen, a positive test is only presumptive identification and warrants that the stain should be tested further to conclusively identify semen.  A stain that fails to exhibit APase activity is almost certainly not semen."

     You would agree with that particular statement there. Correct?

A.   A stain, yes.

Q.   Okay.  But you would agree that a stain that does not exhibit APase activity is almost certainly not semen.

A.   Right.  But this is actually, this is referring to stains that are deposited and then dried.

Q.   And I understand that.  We're going to be talking about

USCA5 2617

swabs.  But you would agree with this particular statement?

A.   I would.

Q.   Okay.  And part of the reason that acid phosphatase is just a presumptive test is that the substance exists in so many other -- in fluids other than semen.  Correct?

A.   Yes.

Q.   And so a positive doesn't necessarily reflect that it's semen.

A.   That's right.

Q.   It could be reflecting one of these other substances.

A.   That's right.

Q.   And the FBI's policy on not using acid phosphatase tests on, for instance, swabs is they're afraid, or they're worried about potential false positives from other substances.

A.   Well, I wouldn't say that we're worried.  I would say that the positive result isn't necessarily useful.

Q.   Uh-huh.

A.   So it's much more efficient to go straight to our confirmatory test.

Q.   So, for instance, if you had a swab of a vaginal area or an anal or a rectum, you would be concerned, or you would be, I'll say concerned, that any positive acid phosphatase activity might be reflecting some of the other substances in that particular swab, from the vaginal cavity or from the rectal cavity?

USCA5 2618

A.    I wouldn't say concerned.  I would say that it's not a useful, it's not a useful test.

Q.    Because you might get a false positive?

A.    Or a false negative.

Q.    Okay.  And in this case, you understand in our case here that the acid phosphatase test was actually negative.

A.    I do.

Q.    Okay.  Number 3 of your report, you indicate that with regards to the AP test, the BCIP procedure -- and that's the procedure that you identified as the chemical that you use to react with acid phosphatase --

A.    That's right.

Q.    -- BCIP.  Of course, I can't pronounce the first B, but I'll say BCIP -- "procedure is not routinely conducted on items of evidence likely to have such fluids."

      I'm curious about your use of the word "routinely" in that particular matter.  Does that mean that sometimes it is done?

A.    No, it means that it's routinely not done.

Q.    Is it ever done?

A.    I can't think of a time that it's been done, no.

Q.    And this is --

            THE COURT:  Could we take a morning break?

            MR. ABREU:  That would be fine, Your Honor.

            THE COURT:  Fifteen minutes.  Thanks.

         (Recess from 10:48 a.m. to 11:18 a.m.)

USCA5 2619

THE COURT:  You may proceed.

MS. BOOTH:  Your Honor, I think there are some issues we need to take up, if that's all right with you.

THE COURT:  Okay.  Sure.

MS. BOOTH:  Promptly, Mr. Wiseman has given me a list of witnesses that he would like to have deposed.  And Your Honor, there are one, two, three, four, five, six, seven, eight names on this list.

My second complaint is that three of these witnesses were not even subpoenaed to be here, were not on the witness list.  The other complaint that I have is one of the people they want to call, Michelle Armont, sat out there for three days and they didn't call her.

THE COURT:  She's not going to be deposed.

MS. BOOTH:  The other comment that I have, Your Honor, they are the Petitioners.  They should have put on evidence as to their case when they were putting on their case. Now they want to depose Bill May, Orlando Campos, Derrick Moore, and Adam Longoria.  That was a major part of their Brady case, and they brought no one.

THE COURT:  Okay.  That's not going to happen.  I thought they were talking about the declarations that they had from the people in Louisiana.

MS. BOOTH:  And Your Honor, I really, I really feel like I have to say this.  They have had three, at least three

years to get ready for this case.

THE COURT:  Ms. Booth --

MS. BOOTH:  Mr. Gilmore --

THE COURT:  I actually told them where they could find Bill May, and they didn't make any effort.  They used the old address.  He is not going to be deposed.  Derrick Moore is not going to be deposed.  Mr. Longoria is not going to be deposed.  The lady who sat out there for three days is not going to be deposed.  So who else is on there?

MS. BOOTH:  Wilmer Bourgeois, who was not on their witness list; Yvonne Joseph, who was not on their witness list; and Jersey Henry, who's not on their witness list.  They want to try another case because they didn't get everything they wanted.  They've had three years to get ready, and they're criticizing -- this case is here because they are saying that Douglas Tinker and John Gilmore did not do a good job.  And they had a quarter of the time that they have had to get ready for trial.

MR. WISEMAN:  I'm not sure why Ms. Booth is screaming.  But in any event, Your Honor, I think it's been very clear that we have been trying to abide by the Court's direction to keep this hearing streamlined.  I believe --

THE COURT:  Look, I'm not going to listen to any more about your streamline nonsense.  You all had all the time in the world to do this.

USCA5 2621

MR. WISEMAN:  Oh, we did.

THE COURT:  I let you -- let me read, or watched 16 hours of video interviews.  I watched a two-hour video deposition of Dr. Estrada.  You could have deposed any of these people before the hearing, any of them.

MR. WISEMAN:  Your Honor --

THE COURT:  There's no streamline.  I'm not going to hear any more arguments about how I said streamline the case. What you put on already was not streamlined.

MR. WISEMAN:  Well, that's the point.

THE COURT:  So, so what I'm telling you is that you will not be deposing people that you could have brought before. It's not going to happen.  You're not going to depose Bill May, when I gave you every opportunity and even told you where you could find him, or Mr. Longoria, or Mr. Moore, just because you didn't ask the Marshal Service for a decent address --

MS. BOOTH:  Or Mr. Campos.

THE COURT:  -- or put your investigator on it.  And certainly not the lady who sat out there for three days.  His sister, Michelle?

MR. WISEMAN:  Yes.

THE COURT:  She's not going to be deposed either.

MR. WISEMAN:  Okay.  So I guess then that leaves the Wanda Cook, Jersey --

THE COURT:  Were they on your witness list?

USCA5 2622

MR. WISEMAN:  Well, Your Honor, we were told --

THE COURT:  Were they on your witness list?

MR. WISEMAN:  No.  We were told to present four to six lay witnesses.  We brought nine.  We presented seven.  I mean, we could have presented all these folks, but you told us, present four to six.  We presented seven.  We went beyond that.  So, I mean, we are a little bit in a precarious position because you're telling us, you know, to only present a certain number of people.  Michelle Armont was here, and that would have been number eight, and Ms. Booth would have been standing up saying, you know, "What's number eight doing up there when they said they were only going to do four?"

THE COURT:  Okay.

MS. BOOTH:  And Your Honor, I object to that.  I would not.  I would not have objected to him calling as many -- in fact, I didn't even know that you had limited it to four to six.  I thought that when they gave us the thing, there was a notation on there that they were going to call four to six of them, because they gave us a proposed list.  They were going to call four to six.

MR. WISEMAN:  When we were here in April, Your Honor, and I remember standing here, and we were discussing the length of time we'd have to present the case, and you had given me certain directions as to how long you wanted to hear from certain witnesses, and you know, we took it to heart.  I mean,

USCA5 2623

we did the best we could to work within those constraints.
It's not a matter of streamlining.  You were telling us how to
do it, and we abided by it.

So, I mean, we're talking now about four lay
witnesses.  I mean, I was happy to offer their declarations.
The Government, you know, raised their objection.  Your Honor
said, "Well, depose them if you want to offer their
declarations."  That's all this is about.

I mean, you know, Bill May, we talked to Mr. Roberts
the other day, and he agreed informally to a deposition of Bill
May, if Bill May was physically --

MS. BOOTH:  Oh, wait a minute.

THE COURT:  Mr. Roberts?

MR. WISEMAN:  -- was physically able.

MR. ROBERTS:  I have to respond to that, Your Honor.
I did not informally agree.  I said, "Tell us how you would get
him, where you would contact him.  I'll talk to my team, and
then we'll tell you what our response is," Your Honor.

THE COURT:  So that was a misrepresentation,
Mr. Wiseman?

MR. WISEMAN:  I apparently was.  I misunderstood.
That came from another member of my team, so it may have gotten
lost in the translation.  The point being that, you know, we've
been trying to, you know, to work this out and, you know --

THE COURT:  You can depose, not Michelle, the lady

USCA5 2624

who was here for three days.  You should have called her.
And --

MS. BOOTH:  Judge, there are three people here that he didn't even put on his witness list that now he wants to bring in.  This is trying the case after you've tried the case.  All of us, when we -- after, you know, because I'm usually in that position --

MR. WISEMAN:  Your Honor, my ears hurt.  I can't believe how she's standing by my side screaming.

THE COURT:  Mr. Wiseman, she's not standing by your side.  She's about five feet away.  And she's not screaming.

MR. WISEMAN:  All right.  I have sensitive hearing.

THE COURT:  You must.  If you couldn't tell that Dr. Cunningham was angry, then you have real perception problems.

MR. WISEMAN:  Well, that may be.

THE COURT:  Why didn't you -- okay.  Now he's going to blame me for not putting them on the --

MR. WISEMAN:  I'm not blaming you, Your Honor.  You told us how to proceed, and we proceeded that way.  It's not a blaming thing.  I'm not, you know, the Court didn't do anything wrong.  You're trying to run a courtroom, and I understand that.  You know, you told us how you wanted it done, and we tried to comply.  I mean, I don't know what else I can say.

MS. BOOTH:  And, Judge, there was no objection

USCA5 2625

whatsoever to the seventh witness that was put on. So there's no indication at all there would have been a complaint from the Government about the eighth witness they put on.

MR. WISEMAN: All right. We're done with Michelle. We're not talking about Michelle.

THE COURT: Okay. Now, I just asked my law clerk for confirmation on this, that he said he had 23 declarations, 23 declarations. And I said to him, "Call your best ten witnesses." Not four to six, ten. Now, we can play it again if you'd like to hear it.

MR. WISEMAN: If that's her recollection --

THE COURT: And you didn't do that.

MR. WISEMAN: That was on the April 20th -- Your Honor, my colleague is whispering in my ear that that may have been a reference to all of the issues. I don't have the transcript in front of me, so I'm not --

THE COURT: I said best ten lay witnesses.

MR. WISEMAN: Okay. I didn't recall it that way.

THE COURT: How many -- you put on, how many witnesses did you put on?

MR. WISEMAN: Seven lay witnesses.

THE COURT: How many witnesses altogether?

MR. WISEMAN: Oh, a lot.

THE COURT: Well, there was no way you could have thought I said only ten witnesses, period. You could not have

USCA5 2626

interpreted that.

MR. WISEMAN:  That's true.

THE COURT:  And now you're trying to go back and redo -- I told you to put on your best ten lay witnesses, because you said you had 23 declarations from all these people in his background.  And I think that that may have been a little too much.  And you only put on six.

MR. WISEMAN:  Seven.

MS. BOOTH:  Seven.

THE COURT:  Seven.  I thought there were six lay witnesses.

MR. WISEMAN:  We count seven, Your Honor.

THE COURT:  Okay.

MS. BOOTH:  It was seven.

MR. WISEMAN:  We may be counting Kerry Brown in that group.

THE COURT:  Okay.  And you had room for three more. And you could have asked for more if you had, if somebody had something extra special to say.  But I certainly never intimated that I would accept declarations --

MR. WISEMAN:  No, you didn't.  Of course not.

THE COURT:  -- instead of live witnesses.

MR. WISEMAN:  You didn't.

THE COURT:  Ms. Gano, you want to go back to that hearing and make sure that my law clerk's not misremembering?

USCA5 2627

April --

MR. WISEMAN:  May I check my transcript as well?

THE COURT:  Yes.  Oh, have you got a transcript?
Well, if we've got a transcript, we don't have to go back
anywhere.

MR. WISEMAN:  Well, it's on my computer.

THE COURT:  Okay.  Go look.

(PAUSE.)

MR. WISEMAN:  Your Honor, at Page 35 of the April 20
proceedings, you and I were discussing the lay witnesses, and
it says -- I'm talking to you and I say, "I'm trying to do a
tally in my head.  I think it's about a half dozen."  I say,
"It might be four, it might be seven."  Obviously, I wasn't
fully prepared, so we're talking four to seven.  And I think at
Page 39, Your Honor said that you didn't want to hear
repetitive lay witnesses.  In other words, you didn't want to
hear lay witnesses coming up --

THE COURT:  Say the same thing.

MR. WISEMAN:  Saying the same thing.  And obviously
if we're putting them up there to talk about abuse, they're
going to be talking about abuse.  So it's -- I think that
informed our decision making in terms of how many to bring.

Now, when we got to the point of -- I mean, we have
to remember how this all got started.  We got to the point of
offering the lay declarations.  It was Your Honor's suggestion

USCA5 2628

that we depose them if we want to proceed them.

THE COURT:  Well, that's because I thought you had said I had limited your lay witnesses.

MR. WISEMAN:  No, no, I don't feel that we've been limited.

THE COURT:  And apparently I did not.

MR. WISEMAN:  No, I have never thought Your Honor was limited in terms of the number of witnesses.  I think it was, you know, I've had some complaints about the time, which Your Honor has certainly rectified.  You know, but I've never felt that Your Honor has told us we can't call witnesses.

So I think that's how it all got started.  And I really do think that, you know, if we --

THE COURT:  Okay.  At Page 39, let's go right there.

MR. WISEMAN:  Okay.

THE COURT:  Line 12 -- okay.  I'm missing Page 39.

MR. WISEMAN:  Oh, look at that.  I said ten.

THE COURT:  "How many are you going to have?"  We were talking, at their request, the last known address of the lay witnesses.

MR. WISEMAN:  Uh-huh.

THE COURT:  "How many are you going to have?"

"We have proffered 23 declarations.  I think -- I don't think we have to call 23.  Perhaps we can pick our best 10 and offer the remaining 13.  And we'll try to cover

USCA5 2629

different areas so the Court's not seeing the same thing."

"How many witnesses are you going to have?"

Okay.  You said you were going to offer your best ten witnesses.

MR. WISEMAN:  Yeah, that's true.

THE COURT:  Lay witnesses.

MR. WISEMAN:  That's certainly true.

THE COURT:  So you didn't bring ten.  And I didn't limit you to ten.

MR. WISEMAN:  No, you didn't.

THE COURT:  And you brought seven, and you had another lady sitting out there that you could have called, and now you want to depose her, so that's not going to happen.

MR. WISEMAN:  Right.  We're past that.  We understand the Court's ruling.

THE COURT:  So we're moving on.  So what we're down to is deposing the expert you were concerned about.

MR. WISEMAN:  The two experts.

THE COURT:  Two experts, one about -- something in response to Dr. Price's testimony.

MR. WISEMAN:  Correct.

THE COURT:  And then the other one about digital enhancements.

MR. WISEMAN:  Correct.

THE COURT:  And that's what you can depose.

USCA5 2630

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  And then if they have responsive experts, they can do that.  Next?

MR. WISEMAN:  Your Honor --

THE COURT:  We're back to you.

MR. DOWD:  Judge, could I address the Court?

THE COURT:  Yes.

MR. DOWD:  And the focus of the expert on Dr. Price's testimony are those singular issues, the --

THE COURT:  It was about the organic --

MR. DOWD:  The norms --

THE COURT:  The brain organic thing, and the norms of the --

MR. DOWD:  For the Trail Making Test and the conflict test.

THE COURT:  For those two things.

MR. DOWD:  Okay, the norms that he used, which was elicited.

THE COURT:  Is that right, Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor, it's correct.  It's the two tests.  I may use the word brain, even if it doesn't relate to those two tests, but I assure Mr. Dowd and the Court --

THE COURT:  Okay.

MR. WISEMAN:  -- it's going to be limited to those

USCA5 2631

issues.

THE COURT:  Those two things.

MR. DOWD:  Yes, Your Honor.

MR. WISEMAN:  Thank you.

THE COURT:  And then the digital enhancement.  Now we're back to you.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  Continue on.

MR. ABREU:  Thank you.

THE COURT:  Is that a flash drive?  What is that?

MR. WISEMAN:  Oh, yeah, I didn't even realize I -- it is actually.

THE COURT:  Okay.

MR. WISEMAN:  I didn't realize I was wearing it.

MR. ABREU:  That's how we get him to go where we want him.

THE COURT:  I see.

MR. WISEMAN:  She's noticed that, by the way.

THE COURT:  I did.  You told me in the elevator yesterday his mother did not send him to law school -- well, you said your mother sent you to law school to carry all these bags.

MR. WISEMAN:  I said parking the car, Your Honor, not carrying bags.

CROSS-EXAMINATION (Continued)

USCA5 2632

BY MR. ABREU:

Q.   Hi, Ms. Conway.

A.   Hi.

Q.   Sorry.  When we took a break, we were talking about whether the AP test is routinely conducted on items of evidence, and you corrected me that your proposition is that it's not routinely done.

A.   That's right.

Q.   And my question to you then was whether that meant that it sometimes is done, and in certain situations may be done.

A.   And I can't think of a situation where it's been done.

Q.   Okay.  And you cite as support for that the DNA Unit Serology Manual, Procedure Manual Number 102.  Is that correct?

A.   Yes.

Q.   And Number 102 refers to the 2009 version of the manual?

A.   The current version that's in use, yes.

Q.   Do you know if that proposition that they're not routinely done on those pieces of evidence existed in the manual that was in effect at the time that this case was investigated?

A.   I don't know that it was laid out in the manual.  I'm not sure.

Q.   So back in 2002, at the time this case was investigated, it's possible that the manual didn't say it, and that therefore it could have been done?

A.   Our practice was still not to do it at that time.

USCA5 2633

Q.    Even if the manual doesn't say that?

A.    The manual may not have specified.

Q.    All right.  Oh, by the way, that 2002 manual at the time of the investigation, let me refer you to the signature page of that manual.  Who is cited as the preparer of that particular manual?

A.    Carolyn Zervos.

Q.    Uh-huh.  And who is the technical reviewer?

A.    Anthony Onorato.

Q.    And those would be the same Carolyn Zervos and Anthony Onorato who testified in this case?

A.    They are, yes.

Q.    And issuance is signed by whom?

A.    The Unit Chief at the time, Jennifer Smith.

Q.    I'm sorry, the issuance.

A.    Oh, I'm sorry.  That's the approval.  The issuance is also Anthony Onorato.

Q.    And again the same Anthony Onorato.

A.    Yes.

Q.    Okay.  We'll come back to that.  Let me show you what has now been marked as Petitioner's Exhibit 179.  Let me zoom that in and ask you if you recognize that document.

A.    I do.

Q.    And what is that?

A.    This is the p30 test result page that was recorded at the

USCA5 2634

time that these swabs were tested.

Q.    And has this document been in your file the entire time, as far as you know?

A.    Yes.

Q.    And when was it provided to the Government this week?

A.    Was it provided this week?

Q.    Yeah.  There was an issue a couple of days ago where it was rediscovered and --

A.    I provided it again, though my understanding is that they were able to find it in their file as well.

Q.    In the Government's file?

A.    Yes.

Q.    Do you know if it was located in the file that was made for trial counsel at the time of trial?

A.    I have no knowledge of that.

Q.    Who would?

A.    I don't know.

Q.    Okay.  Regarding the positives that are listed for Q5, Q6 and Q7, which are the swabs in question here, what's listed as the result for Q5?

A.    Positive, and the remark says "very weak."

Q.    Okay.  For Q6?

A.    Also positive.  The result -- the remark says "very weak."

Q.    And Q7?

A.    Positive, and the remark says "weak."

USCA5 2635

Q.   Do you recall in your review of the trial transcript whether Carolyn Zervos or Anthony Onorato ever mentioned that the results were very weak, very weak, and weak?

A.   I don't think that they did, though I don't know that they were asked.

Q.   Okay.  But you know that it was not said at the time of trial?

A.   I don't think so.

Q.   Okay.  Let me show you what I am marking as Petitioner's Exhibit 180, ask you if you recognize that document.

A.   I do.

Q.   I'm sorry, my Brooklyn accent comes out occasionally when I say "recognizing."  Recognize is what I mean.

A.   I do.

Q.   Okay.  And what is that document?

A.   That is the first page of the Serology Procedures Manual that's in use currently at the FBI Laboratory.

Q.   Okay.  And let me turn to Page 2 -- and when you say "currently in use," it's in use since 2009?

A.   Yes.  I'm not sure if there has been an update in the meantime, but I don't think there has.

Q.   Okay.  And again, let me ask you, whose approval is signed there?

A.   Anthony Onorato.

Q.   Same Anthony Onorato?

USCA5 2636

A.   Yes, it is.

Q.   Okay.  Let's see if we can zoom this in a little bit.  Are you familiar with this, with this document?

A.   I am.

Q.   And this document is a flow chart of the way evidence is tested in the FBI depending on what kind of evidence it is?

A.   Yes, it is.

Q.   Or particularly serological evidence?

A.   That's right.

Q.   And if we start on the right-hand side, we see what we're talking about in this case, alleged semen.  We're starting right at the top here.  Correct?

A.   Yes.

Q.   And as you've already testified, if we have swabs, as we have in this case, they proceed to the left, which is this way --

A.   Yes.

Q.   -- on the chart.  And as you also testified, the FBI's policy is to move directly to a p30 test.

A.   That's right.

Q.   Okay.  And not conduct an AP test, which is done on the other side.

A.   That's right.

Q.   Okay.  By the way, I do have to ask you a question about the acid phosphatase, one question.  Mr. -- the Government

USCA5 2637

asked you about an 18-month analysis acid phosphatase test, an 18-month-old acid phosphatase test and what you might expect to find at that point.

A.   Yes.

Q.   Do you recall that?

A.   Yes.

Q.   Are you aware that in this case the evidence was collected immediately upon the child's death?

A.   My understanding is the autopsy was a day or two later.

Q.   It was a day later.

A.   A day later.

Q.   And the evidence was collected slightly before the time of the autopsy, or at the time of autopsy?

A.   That was my understanding, yes.

Q.   So we're not talking about an 18-month period of time here.  Correct?

A.   That's right.

Q.   And I'm also assuming that you're not telling us that the FBI did not properly preserve this particular evidence.

A.   No.

Q.   Okay.  And acid phosphatase, in an area when it's properly preserved, can be detected many years later.

A.   Yes.

Q.   And even sometimes not properly preserved.

A.   That's true.

USCA5 2638

Q.    That's true.  Okay, thank you.  Now, under the "Conduct p30 Test," if it's positive, you finish, you have consult, and you note your results.  Correct?

A.    Yes.

Q.    And that's because the FBI has a policy of positive p30 being definitive for the presence of semen.

A.    That's right.

Q.    If it's negative, it recommends that smear slides be observed.  Correct?

A.    That's right.

Q.    I'm curious, in this particular case, if the result was positive, why Ms. Zervos undertook a smear slide review.

A.    I don't know.

Q.    And she's not here to tell us why that is.

A.    She's not.

Q.    And we can't look at those allegedly positive PSA cards because they were not photographed.

A.    The results from those cards were recorded and put in the notes.

Q.    I understand your point.  But we, myself, Mr. Dowd, the Judge cannot look at those results because they were not photographed.

         MR. DOWD:  Judge, that's been asked and answered about 15 minutes ago, I think.

         THE COURT:  Can you move on a bit?

USCA5 2639

MR. ABREU:  Absolutely, Your Honor.

THE COURT:  Thank you.

BY MR. ABREU:

Q.   And just to -- so you're not sure why she took that particular approach?

A.   I don't know.  It may be that that was done --

Q.   I don't want you to speculate.  But if you don't know, that's fine.

A.   I don't know.

Q.   Okay.  Thank you.  And it's interesting, or let me just ask this.  It looks like a sperm search is kind of a test of last result -- last resort, I should say?

A.   It is in our lab, yes.

Q.   Is it considered a more sensitive test than a p30 test?

A.   Not more sensitive, but sometimes we would detect sperm when we don't detect p30.

Q.   So sometimes sperm is present when p30 is not?

A.   Sometimes.

Q.   Okay.  And just to clarify, nobody in this case, Ms. Zervos, for instance, did not see any sperm in this particular case when she undertook that smear slide review?

A.   That's right.

Q.   And she did not see any dissociated sperm?

A.   No.

Q.   No sperm heads, nothing of that nature?

USCA5 2640

A.   No.

Q.   That would have been noted --

          MR. DOWD:  Your Honor, I would object.  The testimony is they didn't do a sperm search on the dissociated fragments or --

          MR. ABREU:  I'm going to -- I can clarify that.

          THE COURT:  Good.

          MR. ABREU:  Thank you, Your Honor.

BY MR. ABREU:

Q.   Ms. Zervos observed the slides?

A.   The -- no.  The biologist would have observed the slides.

Q.   And reported that to Ms. Zervos?

A.   That's right.

Q.   And had the biologist observed sperm heads, would that have been noted somewhere?

A.   It would have, yes.

Q.   Where would it have been noted?

A.   On the serology exam sheet.

Q.   Did you see anything on the serology exam sheet indicating that sperm heads were located?

A.   No, I did not.

Q.   Did you see anything on the serology sheet that indicated that sperm tails were located?

A.   No.

Q.   Did you see anything on that sheet that indicated that any

USCA5 2641

kind of fragmented sperm part was located on that smear slide?

A.   I did not.

Q.   Okay.  In Paragraph 5 of your report, you also indicated that because p30 is confirmatory for the presence of semen, smear slides are generally not prepared.  Is that true?

A.   That's true.

Q.   Okay.  Here we have smear slides.  Correct?

A.   The smear slides that were prepared by the nurse examiner, yes.

Q.   Okay.  Let me just ask you briefly about the two DNA tests that were undertaken in this particular case.  There was first a, an STR?

A.   Autosomal STRs, yes.

Q.   Autosomal STR taken, and then there was a Y chromosome STR taken as well.

A.   That's right, by a different laboratory.

Q.   That would be Cellmark Laboratories?

A.   It was.

Q.   And Mr. Dowd asked you about what might be expected to be found when you compare the two fractions on, say, the autosomal DNA.

A.   That's right.

Q.   It would be a sperm fraction and a non-sperm fraction.

A.   That's right.

Q.   Was any male DNA detected in either one of those two

USCA5 2642

fractions?

A.    It was not.

Q.    And then you would agree with me that the Y chromosomal test is specifically -- a significantly more sensitive test for the detection of male chromosomes.

A.    Yes, it can be.

Q.    It can be significantly more sensitive or is significantly more sensitive?

A.    It can be.

Q.    You would agree with me that the FBI was not even doing that test at the time?

A.    We were not.

Q.    Didn't have the capability?

A.    No.

Q.    That's why it went to Orchid Cellmark.

A.    That's right.

Q.    And you would also agree with me that that test that can be more sensitive was also negative.

A.    It was, yes.

Q.    For any male DNA.

A.    Yes.

Q.    Now, if you had semen, without sperm, as you've told us we can have in this particular case, it's possible, though, that one of those two DNA tests might have picked up male DNA in that semen, even if there were no sperm.

USCA5 2643

A.    It is possible, yes.

Q.    But again, we don't have that in this particular case.

A.    That's right.

Q.    No male DNA in this alleged semen.

A.    That's right.

Q.    Okay.  Does the FBI still use the ABA card, the ABA card?

A.    We do not.

Q.    What card do you use now?

A.    We use a Seratec card.  It's very similar.

Q.    A Seratec, S-E-R-T-A-C?

A.    T --

Q.    S-E-R-A-T-E-C?

A.    Yes.

Q.    Okay.  Thank you.  Just for the record.

     Why did the FBI switch from the ABA card, the ABA card, to
the Seratec card?

A.    We were having issues with some of the lots that we
received from ABA.

Q.    What kind of issues?

A.    The membrane would be misaligned within the cartridge.
Sometimes the cards were not performing according the our QC
requirements.

Q.    Sometimes you were getting ghost lines?

A.    No, we weren't getting ghost lines.  We were getting
incomplete lines, which would be an inconclusive result.  We

USCA5 2644

were getting inconclusive results with some of our positive known samples.

Q.  What's the difference between an incomplete line and a ghost line?

A.  Well, I wouldn't use the term "ghost line."  I'm not sure what you mean by that.  I guess my understanding of that would just be a very weak line.

Q.  A ghost band -- a ghost band?  Maybe I wasn't using the right term.

A.  Band.  I'm not sure what you mean.

Q.  Okay.  Does the FBI conduct validation studies?

A.  We do.

Q.  And they do them every so often to validate the cards they're using and the procedures that they're using?

A.  Well, no.  We generally do a validation study before we bring a new technology on line.  And then any time we get a new lot of cards or reagent from the manufacturer, we'll test it with QC checks to make sure that it's performing properly.

Q.  Okay.  And let me show you what I am marking as Petitioner's Exhibit 181, and ask you what that top page of that document is.

A.  This is a summary of the validation study that was conducted for the p30 cards in our unit.

Q.  Okay.  Let me move ahead to this particular document and ask you if you've seen that particular document before.

USCA5 2645

THE COURT:  Could you zoom it in just a bit, please, sir?

MR. ABREU:  Absolutely, Your Honor.

THE COURT:  Thank you.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q.   Have you seen that before, ma'am?

A.   I have seen it.  It looks familiar, but it's been -- but I didn't remember it saying "ghost bands."

Q.   Okay.  Well, let me just read it for the record.  It says, "Usage of the ABA cards demonstrated lot specific quality control issues, such as incomplete test line," which you've told us about, "misalignment of card components and ghost bands.  Certain lots demonstrated inadequate sensitivity, failed to detect.  Due to these quality control issues with the ABA card, it was deemed necessary to evaluate alternate -- alternative cards."  Do you see that?

A.   I do.

Q.   Now, again, I know it's been asked and answered before, but we ourselves cannot determine what the results of these cards were because we have not seen them.  Is that true?

MR. DOWD:  Judge, I would object to the relevance.  The issue that this relates to is why the defense attorneys didn't use Ms. Johnson as a witness to contest the FBI testimony and Dr. Benton's testimony.  And it seems like we're

USCA5 2646

retrying the case as far as the viability of the FBI results, which is really not the direct issue here.

MR. ABREU: Your Honor, if I may respond to the Court?

THE COURT: Please.

MR. ABREU: The issue also is whether there was sufficient evidence for the FBI to have testified that in this particular case that positive p30 indicated the definitive presence of semen. And this goes to that, Your Honor.

MR. DOWD: Judge, this is an ineffective assistance issue.

MR. ABREU: We have to prove prejudice, Your Honor.

MR. DOWD: But the allegation is that they should have called Dr. Johnson.

MR. ABREU: Not just Dr. Johnson.

MR. DOWD: And we know what Dr. Johnson would have testified to.

MR. ABREU: It's not just Dr. Johnson. The allegation is that the Defense could have presented evidence which would have contradicted the evidence that this was in fact p30 -- semen from this positive p30. That's the allegation. It could have been Dr. Johnson. It could have been -- the reason we presented Mr. Keel was to show that Dr. Johnson was not the only one who had this information, and it could have been presented from other sources as well.

**USCA5 2647**

MR. DOWD:  But this is outside the allegation, Your Honor.  They're going to the underlying -- attacking the underlying ABA card test.

MR. ABREU:  If the Government is conceding that we don't have to substantiate this issue, I'll move on to something else.

MR. DOWD:  I'm just saying it wasn't part of the allegation, Your Honor.

THE COURT:  Why don't you move on to something else.

MR. ABREU:  Okay.

BY MR. ABREU:

Q.   Let's talk about Paragraph 4 of your report, where you indicate in the last sentence that "The FBI Laboratory's PSA test includes dilution steps to ensure that only semen can produce a positive result, making the test confirmatory for the presence of semen."  Do you see that?

A.   I do.

Q.   And that's consistent with what you testified here today?

A.   It is.

Q.   And the position of the FBI is that their and your dilution process eliminates a possibility of anything else reacting with the card?

A.   That's right.

Q.   Okay.  How do you know the quantity of p30 you're starting with in an unknown sample?

USCA5 2648

A.    You don't.

Q.    How do you know how far you're diluting an unknown sample?

A.    You know how far you're diluting a sample because you've set up your procedure to include, to basically effectively dilute the sample.

Q.    If you don't know how much you started with, how do you know how far you're diluting it when you add your buffer?

A.    You know how far you're diluting it because you're diluting it by a factor, and that factor is determined by your procedure.

Q.    So your factor of dilution, and your unknown is still an X quantity, unknown quantity.  And you add how much buffer to this unknown quantity?

          MR. DOWD:  Your Honor --

          THE COURT:  I'm sorry?

          MR. ABREU:  How much buffer do you add to this unknown quantity?

          MR. DOWD:  Judge, that's two questions.

          MR. ABREU:  It's two questions, Your Honor?  I'll try to rephrase it.

          MR. DOWD:  He's asking about the factors, and now he's asking a different question.

          THE COURT:  Are you almost done?

          MR. ABREU:  Not that much more, Your Honor, yes.

          THE COURT:  Okay.  Well, move it along, would you

USCA5 2649

please?

MR. ABREU:  I will.

BY MR. ABREU:

Q.   My question is how much -- how can you tell how far you're diluting an unknown sample?

A.   Well, the dilution factor is consistent, no matter how much -- no matter what the original concentration is.

Q.   The steps you take, how much you add to that unknown is constant.  Correct?

A.   How much you add to it, and the dilution factor is known.

Q.   Okay.  Now, you indicated that, for instance, in Paragraph 4, there are, at an average, 260 nanograms per mil of p30 in, let's say, for instance, male urine.  Correct?

A.   That's right.

Q.   The sensitivity of the cards used by the FBI are sensitive to what level right now?

A.   Approximately half a nanogram per mil.

Q.   Half a nanogram.  How would you make that into a ratio?

A.   A ratio --

Q.   Or display that as a ratio?

A.   A ratio of what?

Q.   Let me locate it quickly.  No, I'll come back to that as soon as I find it.  Let me move on to something, so I don't hold everybody up.

You mentioned that there was a study which showed that

USCA5 2650

bacteria was unlikely to react to the PSA card.

A.    That's right.

Q.    You would agree with me that that particular study only studied six microorganisms?

A.    It did.

Q.    And you would also agree with me that the rectal cavity contains significantly more than six microorganisms?

A.    It could.  Those are very common microorganisms that can be found, both in the rectum and in other places.

Q.    There could be hundreds of bacteria?

A.    Hundreds -- not hundreds of bacteria types, no.

Q.    How many types of bacteria?

A.    In the rectum?

Q.    Yes.

A.    There would be a limited number.  I don't know exactly.

Q.    Okay.  And that study that you cited was also a study of four people -- of ten people.  I'm sorry, or of ten samples.

A.    I don't think that study was specific as to how many of the bacteria, how many bacteria were tested.  That's a different part of the study.

Q.    Okay.  Let me get back to this particular document, which states the very weak, very weak and weak results.  Would you consider that to indicate a borderline level of p30?

A.    Near our threshold, yes.

Q.    Okay.  Let me show you the 2002 manual, and show you

USCA5 2651

Conway - Cross

Chapter 11, the procedure for the microscopic identification of spermatozoa, and read to you -- and Your Honor, if I may -- and again, this is the manual that was in effect at the time of this particular case.  Correct?

A.    It is, yes.

Q.    And it indicates that "Attempts to identify human semen in some categories of evidence must be approached through an identification of spermatozoa rather than detection of human semen specific proteins such as p30.  These categories would include smear slide material submitted by contributors, unusual stain materials that defy attempts towards solubilization, and protein components and stain extracts that possess borderline levels of p30."  Do you see that?

A.    I do.

Q.    And you would agree that here we have borderline levels of p30?

A.    Which might be why she did the sperm search.

Q.    That may be why, which was actually negative.  Correct?

A.    It was.

Q.    So what it's telling us is that when you have borderline levels of p30, additional testing might be necessary to confirm the presence of semen.

A.    Not to confirm the presence of semen, no, but to identify sperm.

Q.    And that was not the case here.

USCA5 2652

MR. DOWD:  What was not the case here?

BY MR. ABREU:

Q.   Did they do a microscopic sperm search?

A.   Of the slides, yes.

Q.   They did -- they did a smear slide or a microscopic, actual microscopic pellet production sperm search?

A.   They -- so they did a sperm search of the microscopic slide that came with the evidence.

Q.   Okay.

MR. ABREU:  I'm almost done, Your Honor.

(PAUSE.)

MR. ABREU:  I have nothing further at the time, Your Honor.

THE COURT:  Thank you.  Mr. Dowd?

MR. DOWD:  Just a few questions, Your Honor.

REDIRECT EXAMINATION

BY MR. DOWD:

Q.   Ms. Conway, just a few questions.  Now, on Ms. Zervos' testimony --

A.   Yes.

Q.   -- that you looked at a minute ago, I want to provide a little more context, if I can.  I believe this is the same page that was, that you were prompted to look at earlier.  Page 105, I think that's the same page.  And down here -- but not in a female child, this is where you looked earlier on this page,

USCA5 2653

where you were asked to --

A.   I believe --

Q.   You were prompted to look at this earlier about Ms. Zervos saying that the p30 is not in female fluids.

A.   I believe so.

Q.   All right.  And toward the top of this page, the question is -- well, just immediately above that, the question was, "And is there anything in the anal passage that would have, that might have that same reaction other than semen?"  And is the reaction they're discussing the test reaction, the reaction of the substance to, in the p30 test?

A.   I'm not --

        MR. ABREU:  Your Honor, yes, I would object to leading, Your Honor.

        MR. DOWD:  Well, I'm trying to be quick.  Let me --

BY MR. DOWD:

Q.   What were you going to say?

A.   I was going to say I'm not sure.

Q.   Okay.  Let me go to a previous page, Page 104, and at the top of Page 104, they're discussing that there wouldn't be anything else that could test positive for a p30 test besides this particular prostate protein.  Is that right?

A.   It is.

Q.   Okay.  And so that's -- is that -- well, the record speaks for itself, so I won't ask you that question.  But that's

USCA5 2654

offered for the context of Ms. Zervos' testimony.

And in Mr. Onorato, on Page 128, you were asked if Mr. Onorato listed the -- Page 128, you were asked if Mr. Onorato had listed all the things that contained PSA. And can you tell if he's asked that question, to list all the substances which contained PSA?

A.    It looks like, on Line 16, he says, "Are there other substances that might," and Mr. Onorato's answer is "There are other substances, body fluids, that may possess this particular protein, at such low levels, however."

Q.    All right.  So Mr. Onorato has conceded that other bodily fluids and other materials can contain PSA?

A.    He has.

Q.    All right.  And he was never asked to list them or to identify them?

A.    I didn't see that, no.

Q.    All right.  At least in the context of that earlier testimony.

A.    That's right.

Q.    Now, Dr. Benton, you were alerted to part of the testimony which Dr. Benton testified that sperm are difficult to find and that evidence of semen was easier to find.

A.    He did say that, yes.

Q.    Is that true?  Was Dr. Benton correct about that?

A.    I don't -- I don't know that he was -- I'm not sure what

USCA5 2655

he meant by "easier."

Q.    All right.  Well, let me ask you, how is sperm found or identified?

A.    In our laboratory, we look at the slides that are collected at the time of the, by the nurse examiner, and those slides are looked at microscopically.  Generally, it takes between two and four hours to search a sperm slide thoroughly to determine whether semen's present, to determine whether --

Q.    Two to four hours.

A.    That's right.

Q.    Okay, because of the size of the cell?

A.    It's very small.  That's right.  So we have to magnify it significantly, and we have to go through the slide frame by frame.

Q.    And you have to identify it visually.

A.    That's right.

Q.    All right.  And how is semen identified or detected?

A.    Well, the swabs are cut --

Q.    Well, not the whole process.  But is it a visual?

A.    It's not a -- it's not --

Q.    Under a microscope?

A.    It's not under a microscope.  The cards are read.  They take about 10 minutes to read.  And then they're just looked at and determined whether or not the test line is present or not.

Q.    All right.  And as far as AP, testing for AP?

USCA5 2656

A.    The AP test is fairly quick as well.

Q.    All right.

A.    It's a chemical test.  We look for a color change.

Q.    So in that context, what is easier to find or detect, sperm cells, semen, or AP?

A.    I would say the easier test is the AP test, and then the p30 test, for us, and then the sperm search.

Q.    All right.  So in that, to that extent, Dr. Benton was correct that semen is easier to find than sperm?

A.    P30 is easier to find, yes.

Q.    All right.  P30, I'm sorry.  Now, you talked about the FBI protocol on, for the use of the AP test, and you indicated that an AP test is not useful when you're testing a swab.

A.    That's right.

Q.    And why is that?

A.    For two reasons.  One is that the AP test may be positive simply because the vaginal acid phosphatase has reacted with the test.  So a positive result isn't necessarily indicative of semen.  The other reason is that because we know that if time has passed since the semen was deposited, the AP can degrade or be undetectable at a faster rate than p30.  So a negative test result can also not necessarily indicate the lack of semen.

Q.    All right.  Now, in the -- there was a question about the 18-month delay, and that I asked you, and you were cross-examined on the 18-month delay.  Did you understand that,

USCA5 2657

my question to be if there was an 18-month delay in the collection of the swab or an 18-month delay in Dr. Johnson's performance of the AP test?

A.   Well, the 18-month delay would have been in the performance of the test, not the collection of the swab.

Q.   Is that how you understood my question?  Or did you think I was -- because I may have been inartful in my questioning.  Did you understand that I was asking about the 18-month delay in Dr. Johnson's test, from the collection of the swab?

A.   I'm not sure.

Q.   Okay.  Well, let me ask it then.  Does the 18-month delay from the collection of the swab to Dr. Johnson's AP test, would that have any impact on the results of -- the reliability of Dr. Johnson's negative AP result?

A.   Probably not, if the -- assuming the swabs were collected, were preserved appropriately, which I'm, I would assume that they were.

Q.   Okay.  And you understand that the swab was collected at autopsy or immediately after death?

A.   That's right.

Q.   Okay.  Explain the, what search the FBI did for sperm in this case.

A.   The sperm search that was done was done on the microscope slide that was provided and prepared at the time of the autopsy.

USCA5 2658

Q.   Okay.  And that's sometimes referred to as the smear slide?

A.    The smear slide, yes.

Q.    And how is that slide prepared?

A.    My understanding is that it's prepared from the swabs that were collected.  So the swabs are collected, and then one of them is used to create the smear slide.  Both the swabs and the smear would be dried and then preserved and sent to the laboratory for analysis.

Q.    Is it called a "smear slide" simply because they take the swab and they just smear it across a microscope slide?

A.    They do.

Q.    Okay.  And what is the potential for depositing sperm on a slide when it's done with that method?

A.    Well, if there's a significant amount of sperm present on the swab, it will likely be transferred to the slide.  If it's limited, there may not be effective transfer of it.

Q.    Okay.  Is that the most efficient way to extract sperm on to -- for detection?

A.    Well, it's a useful way to be able to preserve the evidence at the time of collection.  Yes.  But on the other hand, it's not necessarily, if you were trying to identify sperm cells in a limited sample, then it would be more efficient to potentially look at a sperm pellet that was prepared from the swab.

USCA5 2659

Q.   All right.  And did the FBI do any other search for sperm?

A.   No, we did not.

Q.   Okay.  So there was no search for sperm done on the pelleted material that went off to the Orchid Cellmark lab?  I mean done by the FBI.

A.   Done -- there was no other material looked at for a sperm slide.

Q.   Okay.  I just wanted to clear that up.

MR. DOWD:  Thank you, Your Honor.  That's all I had.

MR. ABREU:  Just very briefly, Your Honor?

THE COURT:  Yes, sir.

MR. ABREU:  Thank you.

RECROSS-EXAMINATION

BY MR. ABREU:

Q.   Were you aware that the child's underpants were also collected?

A.   Yes.

Q.   And they were tested?

A.   They were.

Q.   They were tested for AP activity?

THE COURT:  For what?

MR. ABREU:  AP.  I'm sorry.

THE COURT:  Okay.

BY MR. ABREU:

Q.   Acid phosphatase.  I'm sorry.

USCA5 2660

A.    There were, portions of the underwear were tested, yes, for AP activity.

Q.    And p30 activity?

A.    Yes.

Q.    And they were all negative?

A.    That's right.

Q.    Those are the -- as far as you know, those are the underpants she was wearing at the time of the incident?

A.    They were the underpants that were collected at the autopsy.

Q.    Okay.  The dilution process which you explained and described to us, the FBI uses that, I assume, because they think it's the most effective process, dilution process?

A.    Yes.

Q.    And that being an effective dilution process for the FBI, I'm assuming you share that with other law enforcement agencies around the country?

A.    We share it with them?  I'm not sure what you mean by that.

Q.    You told other labs around the country that we, the FBI, have this process which prevents p30 cards from reacting with anything but semen.

       MR. DOWD:  Judge, I would object.  This is way beyond any redirect.  I limited myself to just a few questions.

       THE COURT:  Sustained.

USCA5 2661

BY MR. ABREU:

Q.    Would you agree with me that other crime labs around the country do not agree with the FBI regarding whether p30 can be a confirmatory test alone?

THE COURT:    Just a moment.

MR. DOWD:    Same objection, Your Honor.    Same objection, Your Honor.

THE COURT:    Sustained.

MR. ABREU:    May I just have a second to review my notes, Your Honor?    And I will be done.

THE COURT:    Thank you.

MR. ABREU:    Thank you.

(PAUSE.)

MR. ABREU:    That's all I have, Your Honor.

MR. DOWD:    Nothing further, Your Honor.

THE COURT:    Thank you, ma'am.    Is she excused?

MR. DOWD:    May she be excused?

THE COURT:    You're excused.    Thank you.

(Excerpt concluded at 12:13:00 p.m.)

USCA5 2662

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    October 12, 2010
Molly Carter                        Date

USCA5 2663

INDEX

| RESPONDENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JERRILYN CONWAY | 3 | 29 | | |
| | | 64 | 85 | 92 |

EXHIBITS:                                                                    RECEIVED

GX-63:  STATEMENT OF JERRILYN CONWAY . . . . . . . . . .     6

GX-64:  CV OF JERRILYN CONWAY . . . . . . . . . . . . .     4

GX-65:  LIST OF CASES CONWAY HAS QUALIFIED IN . . . . .     5

GX-205:  FULL ARTICLE RE: JOHNSON'S REPORT  . . . . . .    19

GX-206:  REPORT FROM TECHNICAL ASSOCIATES . . . . . . .    23

USCA5 2664

AO 435
(Rev. 03/08)

**Administrative Office of the United States Courts**

**TRANSCRIPT ORDER**

*Please Read Instructions:*

FOR COURT USE ONLY

| | |
|---|---|
| 1. NAME KATHRIN HENNIG | 2. PHONE NUMBER 215-928-0520 | 3. DATE 10/8/2010 |
| 4. MAILING ADDRESS 601 WALNUT ST, SUITE 545 W. | 5. CITY PHILADELPHIA | 6. STATE PA | 7. ZIP CODE 19106 |
| 8. CASE NUMBER 2-02-CV-00216 | 9. JUDGE JANIS G. JACK | DATES OF PROCEEDINGS |
| | 10. FROM 9/20/2010 | 11. TO 9/24/2010 |
| 12. CASE NAME USA v. BOURGEOIS | LOCATION OF PROCEEDINGS |
| | 13. CITY CORPUS CHRISTI | 14. STATE TEXAS |

**15. ORDER FOR**

- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [X] CIVIL (HABEAS)
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [ ] BANKRUPTCY
- [ ] OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [X] OTHER (Specify) EVID. HEARING | 9/20 - 9/24/2010 |
| [ ] SENTENCING | | (except for Keel, Johnson + Conway Testimonies) | |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES |
|---|---|---|---|
| ORDINARY | [ ] | [X] | NO. OF COPIES |
| 14-Day | [ ] | [ ] | NO. OF COPIES |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES |
| DAILY | [ ] | [ ] | NO. OF COPIES |
| HOURLY | [ ] | [ ] | NO. OF COPIES |
| REALTIME | [ ] | [ ] | |

United District of Texas
Southern FILED
OCT 12 2010
David J. Bradley, Clerk of Court

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges (deposit plus additional).

18. SIGNATURE

19. DATE 10/8/2010

20. TRANSCRIPT TO BE PREPARED BY VELMA GANO

- [X] EMAIL ONLY REQUIRED
- [ ] EMAIL AND HARD COPY REQUIRED
- [X] EMAIL ADDRESS: MICHAEL_WISEMAN@FD.ORG, KATHRIN_HENNIG@FD.ORG

| | | | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**DISTRIBUTION:** COURT COPY TRANSCRIPTION COPY ORDER RECEIPT ORDER COPY

USCA5 2665

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

UNITED STATES OF AMERICA

v.                                             Case No.: 2:02–cr–00216
                                               Judge Janis Graham Jack

Alfred NMI Bourgeois

                        Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

David Bradley, Clerk

USCA5 2666

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____         :

UNITED STATES OF AMERICA,          :          No. Cr-C-02-216
                                   :          No. Cv-07-223
          Respondent,              :          Honorable Janis Graham Jack,
                                   :                 U.S.D.J.
     -against-                     :
                                   :
ALFRED BOURGEOIS,                  :          Electronically Filed
                                   :
          Petitioner.              :
_____         :

**PETITIONER'S OPPOSED MOTION TO TAKE
BRIEF DEPOSITION OF DR. MICHAEL GELBORT**

1.      As the Court will recall, Petitioner moved to strike a portion of the

testimony of Dr. Randall Price that was related to the question of whether Petitioner

suffers from organic brain damage.   In his *Motion to Strike for Violation of*

*Fed.R.Civ.P. 26* (document # 568, filed on September 23, 2010), Petitioner pointed

out that Dr. Price's report did not include any discussion whatsoever of the issue of

Petitioner's organic brain damage. Because the report did not mention brain damage,

Petitioner's counsel was not prepared to cross-examine Dr. Price on this highly

technical subject.

2.      To make Petitioner whole for this violation of Fed.R.Civ.P. 26, the Court

1

USCA5 2667

permitted Petitioner to take the deposition of Dr. Price on this topic.  That deposition is scheduled to occur on November 10, 2010 in Houston, Texas (the location having been agreed to by the parties).  In preparing for this deposition counsel have learned that Dr. Gelbort would have had significant points to make regarding Dr. Price's view of the neuropsychological testing, but of course those points were not made because Dr. Price's views of the testing were not contained in his report.

3.      Thus, to make Petitioner further whole for the Government's violation of Rule 26, Petitioner moves to depose Dr. Gelbort on this limited issue.  Counsel believe that this deposition would last for less than one hour.  Dr. Gelbort already plans to sit with counsel during their deposition of Dr. Price and counsel would be prepared to conduct the Gelbort deposition immediately upon completion of Dr. Price's deposition.

4.      Counsel communicated this request to the Government, which opposes it.  The Government proposed as an alternative, that Dr. Gelbort submit a declaration regarding his view on this topic.  This counter-proposal is not acceptable to Petitioner because, as with all of the other witnesses in this case, the Court should be able to make credibility determinations based on actual testimony.  In this regard it should be noted that the Government successfully opposed the admission of other declarations for this precise reason.

USCA5 2668

5.      What is clear is that these issues have arisen because the Government

violated the Rule.  Petitioner should not suffer any disadvantage as a result of this

violation.  In short, he should be made whole, which in this instance means being

afforded the opportunity of having the Court view the testimony of Petitioner's

witness on video tape.

WHEREFORE, Petitioner respectfully moves for an order permitting the video-

taped deposition of their expert, Dr. Michael Gelbort, in which he will respond to Dr.

Price's testimony on organic brain damage.

Respectfully Submitted

/s/      Michael Wiseman

Michael Wiseman
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520

Dated:      Philadelphia, PA
            October 21, 2010

3

USCA5 2669

**Certificate of Service**

I, Michael Wiseman, hereby certify that on October 21, 2010 he served the foregoing on Government's counsel by e-mail and electronic case filing:

Tony Roberts, Esq.
Patti H. Booth, Esq.
Mark Dowd, Esq.
Elsa Patterson-Salinas, Esq.


/s/ Michael Wiseman

Michael Wiseman

USCA5 2670

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

UNITED STATES OF AMERICA,          :

                                   :          No. Cr-C-02-216

Respondent,      :          No. Cv-07-223

                                   :      Honorable Janis Graham Jack

-against-              :          U.S.D.J.

                                   :      Electronically Filed

ALFRED BOURGEOIS,                  :

                                   :

Petitioner.         :

_____    :

**NOTICE OF DEPOSITION**

PLEASE TAKE NOTICE that on the 28th day of October, 2010 Petitioner will take the Deposition by Oral Testimony of Manfred Schenk, in the above captioned matter, starting at 10:00 a.m. until concluded at the following location:

Esquire Deposition Solutions
Suite 1305, Four Houston Center
1221 Lamar Street
Houston, TX 77010

Said deposition will be video recorded and transcribed.

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2671

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 25th day of October, 2010, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2672

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                    :
UNITED STATES OF AMERICA,          :          No. Cr-C-02-216
                                                    :          No. Cv-07-223
              Respondent,                   :     Honorable Janis Graham Jack
                                                    :              U.S.D.J.
      -against-                                 :
                                                    :       Electronically Filed
ALFRED BOURGEOIS,                      :
                                                    :
              Petitioner.                       :
_____  :

**NOTICE OF DEPOSITION**

      PLEASE TAKE NOTICE that on the 28th day of October, 2010 Petitioner will take the Deposition by Oral Testimony of William R. Oliver, M.D. in the above captioned matter, starting at 12:00 p.m. until concluded at the following location:

Esquire Deposition Solutions
Suite 1305, Four Houston Center
1221 Lamar Street
Houston, TX 77010

Said deposition will be video recorded and transcribed.

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2673

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 25th day of October, 2010, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2674

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA    §
                            §
VS.                         §    CRIMINAL ACTION NO. C-02-216
                            §
ALFRED NMI BOURGEOIS        §

**ORDER**

On this day came on to be considered *Petitioner's Opposed Motion to Take Brief*

*Deposition of Dr. Michael Gelbort*.  (DE 579).  Bourgeois' motion is **DENIED**.

SIGNED and ORDERED this 26th day of October, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2675

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION


ALFRED BOURGEOIS                          §
    Petitioner,                           §
                                          §    CIVIL NO. C-07-223
        v.                                §    CRIMINAL NO. C-02-216
                                          §
UNITED STATES OF AMERICA,                 §
    Respondent.                           §


GOVERNMENT'S UNOPPOSED MOTION TO WITHDRAW TRIAL EXHIBITS TO COPY
FOR USE IN DEPOSITIONS

COMES NOW, the United States of America, through José Angel Moreno, United States

Attorney and Patti Hubert Booth, Assistant United States Attorney for the Southern District of

Texas, and moves this Honorable Court to allow the government to obtain copies of certain trial

exhibits.

The Court has held an evidentiary hearing on Bourgeois' Section 2255 Motion. At this

hearing the Court allowed additional depositions to be held. In order to prepare for these

depositions, the government moves the Court to release certain trial exhibits for the limited

purpose of copying them in order to prepare for and hold these depositions. The government

agrees to return the original exhibits to the Court, as soon as the copies have been made.

USCA5 2676

Accordingly, the undersigned moves the Court to enter the proposed order granting this

request.

Respectfully submitted,

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By:   s/ Patti Hubert Booth_____
PATTI HUBERT BOOTH
Assistant United States Attorney
Federal I.D. No. 19500
Texas Bar I.D. No. 02650500
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111

USCA5 2677

## CERTIFICATE OF SERVICE AND CONSULTATION

I hereby certify that I have contacted Mr. Michael Wiseman, Counsel for Bourgeois, and Mr. Wiseman is not opposed to this Motion and the order thereon.  I also certify that I have served a true and correct copy of the foregoing motion and order upon Mr. Wiseman via the ecf filing system on this 26th day of October, 2010.

  s/ Patti Hubert Booth
 PATTI HUBERT BOOTH
 Assistant United States Attorney

USCA5 2678

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS                        §
    Petitioner,                         §
                              §    CIVIL NO. C-07-223
          v.                        §    CRIMINAL NO. C-02-216
                              §
UNITED STATES OF AMERICA,                §
    Respondent.                         §

## ORDER

Pursuant to the government's motion to obtain copies of certain trial exhibits for the limited purpose of holding depositions in the above referenced case, the Court ORDERS that the District Clerk release to the government the following Government Trial Exhibits:

Exhibit 46, 49, 53, 67, and 68 through 106.

Further, the government is hereby ORDERED to return the original trial exhibits to the Court after they are copied.

SIGNED on this _____ day of October, 2010.

_____

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 2679

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA §
§
VS. § CRIMINAL ACTION NO. C-02-216
§
ALFRED NMI BOURGEOIS §

**ORDER**

Pursuant to the government's motion to obtain copies of certain trial exhibits for the limited purpose of holding depositions in the above referenced case, (D.E. 583), the Court ORDERS that the District Clerk release to the government the following Government Trial Exhibits:  Exhibit 46, 49, 53, 67, and 68 through 106.

Further, the government is hereby ORDERED to return the original trial exhibits to the Court after they are copied.

SIGNED and ORDERED this 26th day of October, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2680

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA                    }{

VS.                                         }{        CASE    CR-C- 02-216  (1)

ALFRED BOURGEOIS                            }{

## RECEIPT FOR WITHDRAWAL OF EXHIBITS

**THIS WILL ACKNOWLEDGE RECEIPT OF THE FOLLOWING ORIGINAL EXHIBITS:**

### GOVERNMENT

| Exhibit No. | Description |
|---|---|
| 46 | photos admitted 3/8/04 |
| 49 | photos admitted 3/8/04 |
| 53 | photos admitted 3/8/04 |
| 67-106 | photos admitted 3/1/04 |

United States Courts
Southern District of Texas
FILED

OCT 2 7 2010

David J. Bradley, Clerk of Court

DATE:___October 27, 2010___          RECEIVED BY:_____

                                        Patti Hubert Booth, AUSA


                              ACKNOWLEDGED BY: _____
                                        Sondra Scotch, Deputy Clerk

USCA5 2681

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS | § | |
|     Petitioner, | § | |
| | § | CIVIL NO. C-07-223 |
|     v. | § | CRIMINAL NO. C-02-216 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|     Respondent. | § | |

## GOVERNMENT'S SECOND MOTION TO WITHDRAW TRIAL EXHIBITS TO COPY FOR USE IN DEPOSITIONS

COMES NOW, the United States of America, through José Angel Moreno, United States Attorney and Elsa Salinas, Assistant United States Attorney for the Southern District of Texas, and moves this Honorable Court to allow the government to obtain copies of certain trial exhibits.

The Court has held an evidentiary hearing on Bourgeois' Section 2255 Motion. At this hearing the Court allowed additional depositions to be held. In order to prepare for these depositions, the government moves the Court to release certain trial exhibits for the limited purpose of copying them in order to prepare for and hold these depositions. The government agrees to return the original exhibits to the Court, as soon as the copies have been made.

USCA5 2682

Accordingly, the undersigned moves the Court to enter the proposed order granting this

request.

Respectfully submitted,

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By:    s/ Elsa Salinas
       ELSA SALINAS
       Assistant United States Attorney
       Federal I.D. No. 22489
       Texas Bar I.D. No. 00791593
       800 N. Shoreline Blvd., Suite 500
       Corpus Christi, Texas 78401
       (361) 888-3111

USCA5 2683

## CERTIFICATE OF SERVICE AND CONSULTATION

I hereby certify that I have attempted to contact Mr. Michael Wiseman and Mr. Jim

McHugh, Counsel for Bourgeois, but have been unable to reach them for a consultation.

I hereby certify that I have served a true and correct copy of the foregoing motion and

order upon Mr. Wiseman via the ecf filing system on this 27th day of October, 2010.


 s/ Elsa Salinas
ELSA SALINAS
Assistant United States Attorney

USCA5 2684

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS                        §
    Petitioner,                         §
                                        §   CIVIL NO. C-07-223
    v.                                  §   CRIMINAL NO. C-02-216
                                        §
UNITED STATES OF AMERICA,                §
    Respondent.                         §

## ORDER

Pursuant to the government's second motion to obtain copies of certain trial exhibits for

the limited purpose of holding depositions in the above referenced case, the Court ORDERS that

the District Clerk release to the government the following Government Trial Exhibits:

Exhibits: 35, 125-149, 375, 376, 388 and 391.

Further, the government is hereby ORDERED to return the original trial exhibits to the

Court after they are copied.

SIGNED on this _____ day of October, 2010.

_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 2685

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALFRED BOURGEOIS | § | |
| Petitioner, | § | |
| | § | CIVIL NO. C-07-223 |
| v. | § | CRIMINAL NO. C-02-216 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

GOVERNMENT'S AMENDED CERTIFICATE OF CONSULTATION

COMES NOW, the United States of America, through José Angel Moreno, United States

Attorney and Elsa Salinas, Assistant United States Attorney for the Southern District of Texas,

and notifies the Court that a consultation has taken place between the government and defense

counsel Mr. Michael Wiseman as to Government's Second Motion to Withdraw Trial Exhibits.

Mr. Wiseman has no objection to this motion.

Respectfully submitted,

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By:    s/ Elsa Salinas
ELSA SALINAS
Assistant United States Attorney
Federal I.D. No. 22489
Texas Bar I.D. No. 00791593
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111

USCA5 2686

CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of this notice on Mr. Wiseman on

this 27th day of October, 2010, via the ecf filing system on this 27th day of October, 2010.


 s/ Elsa Salinas
ELSA SALINAS
Assistant United States Attorney

USCA5 2687

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION


ALFRED BOURGEOIS                          §
    Petitioner,                           §
                                          §    CIVIL NO. C-07-223
        v.                                §    CRIMINAL NO. C-02-216
                                          §
UNITED STATES OF AMERICA,                 §
    Respondent.                           §


## GOVERNMENT'S AMENDED SECOND MOTION TO WITHDRAW TRIAL EXHIBITS TO COPY FOR USE IN DEPOSITIONS

COMES NOW, the United States of America, through José Angel Moreno, United States Attorney and Elsa Salinas, Assistant United States Attorney for the Southern District of Texas, and moves this Honorable Court to allow the government to obtain copies of certain trial exhibits.

The Court has held an evidentiary hearing on Bourgeois' Section 2255 Motion.  At this hearing the Court allowed additional depositions to be held.  In order to prepare for these depositions, the government moves the Court to release certain trial exhibits for the limited purpose of copying them in order to prepare for and hold these depositions.  The government agrees to return the original exhibits to the Court, as soon as the copies have been made.

USCA5 2688

Accordingly, the undersigned moves the Court to enter the proposed order granting this

request.

Respectfully submitted,

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By:    s/ Elsa Salinas
ELSA SALINAS
Assistant United States Attorney
Federal I.D. No. 22489
Texas Bar I.D. No. 00791593
800 N. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401
(361) 888-3111

USCA5 2689

## CERTIFICATE OF SERVICE AND CONSULTATION

I hereby certify that the government has consulted with Mr. Michael Wiseman, Attorney for Alfred Bourgeois, regarding this amended second motion to withdraw trial exhibits and Mr. Wiseman has no objection to this motion.

Additionally, I hereby certify that I have served a true and correct copy of the foregoing motion and order upon Mr. Wiseman via the ecf filing system on this 27th day of October, 2010.

 s/ Elsa Salinas
ELSA SALINAS
Assistant United States Attorney

USCA5 2690

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

ALFRED BOURGEOIS             §
      Petitioner,            §
                          §    CIVIL NO. C-07-223
      v.                    §    CRIMINAL NO. C-02-216
                          §
UNITED STATES OF AMERICA,   §
      Respondent.       §


**ORDER**

Pursuant to the government's amended second motion to obtain copies of certain trial

exhibits for the limited purpose of holding depositions in the above referenced case, the Court

ORDERS that the District Clerk release to the government the following Government Trial

Exhibits:

Exhibits: 35, 125-149, 375, 376, 388 and 391.

Further, the government is hereby ORDERED to return the original trial exhibits to the

Court after they are copied.

SIGNED on this _____ day of October, 2010.


_____
JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

USCA5 2691

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-216-1 |
| | § | |
| ALFRED NMI BOURGEOIS | § | |

**ORDER**

Pursuant to the government's amended second motion to obtain copies of certain trial exhibits for the limited purpose of holding depositions in the above referenced case, the Court ORDERS that the District Clerk release to the government the following Government Trial Exhibits:

Exhibits: 35, 125-149, 375, 376, 388 and 391.

Further, the government is hereby ORDERED to return the original trial exhibits to the Court after they are copied.

SIGNED and ORDERED this 27th day of October, 2010.

_____
Janis Graham Jack
United States District Judge

1 / 1

USCA5 2692

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | }{ | | |
| VS. | }{ | CASE | CR-C- 02-216 (1) |
| ALFRED BOURGEOIS | }{ | | |

## RECEIPT FOR ~~WITHDRAWAL~~ Return OF EXHIBITS

**THIS WILL ACKNOWLEDGE RECEIPT OF THE FOLLOWING ORIGINAL EXHIBITS:**

## GOVERNMENT

| Exhibit No. | Description |
|---|---|
| 46 | photos admitted 3/8/04 |
| 49 | photos admitted 3/8/04 |
| 53 | photos admitted 3/8/04 |
| 67-106 | photos admitted 3/1/04 |

Clerk, U.S. District Court
Southern District of Texas
FILED

OCT 2 7 2010

David J. Bradley, Clerk of Court

DATE:   October 27, 2010        RECEIVED BY:_____
                                 Sondra Scotch, Deputy Clerk

ACKNOWLEDGED BY:_____
                Patti Hubert Booth, AUSA

USCA5 2693

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA                }{

VS.                                     }{        CASE    CR-C- 02-216  (1)

ALFRED BOURGEOIS                        }{

## RECEIPT FOR WITHDRAWAL OF EXHIBITS

THIS WILL ACKNOWLEDGE RECEIPT OF THE FOLLOWING ORIGINAL EXHIBITS:

GOVERNMENT

| Exhibit No. | Description |
|---|---|
| 35 | photo admitted 3/8/04 |
| 125-145 | photos admitted 3/1/04 |
| 146 | not admitted |
| 147-148 | photos admitted 3/8/10 |
| 149 | not admitted |
| 375-376 | photos admitted 3/5/04 |
| 388 | photo admitted 3/22/04 |
| 391 | photo admitted 3/22/04 |

United States Courts
Southern District of Texas
FILED

OCT 2 8 2010

David J. Bradley, Clerk of Court

DATE:   October 28, 2010        RECEIVED BY:   _____
                                               Debbie Hohle

                                ACKNOWLEDGED BY:  _____
                                                  Sondra Scotch, Deputy Clerk

USCA5 2694

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA }{

VS. }{ CASE  CR-C- 02-216  (1)

ALFRED BOURGEOIS }{

## RECEIPT FOR RETURN OF EXHIBITS

**THIS WILL ACKNOWLEDGE RECEIPT OF THE FOLLOWING ORIGINAL EXHIBITS:**

GOVERNMENT

| Exhibit No. | Description |
|---|---|
| 35 | photo admitted 3/8/04 |
| 125-145 | photos admitted 3/1/04 |
| 146 | not admitted |
| 147-148 | photos admitted 3/8/10 |
| 149 | not admitted |
| 375-376 | photos admitted 3/5/04 |
| 388 | photo admitted 3/22/04 |
| 391 | photo admitted 3/22/04 |

United States Courts
Southern District of Texas
FILED

OCT 2 8 2010

David J. Bradley, Clerk of Court

DATE:   October 28, 2010    RECEIVED BY:_____

Sondra Scotch, Deputy Clerk

ACKNOWLEDGED BY:_____

Debbie Hohle

USCA5 2695

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____     :

UNITED STATES OF AMERICA,           :        No. Cr-C-02-216
                                       :        No. Cv-07-223
                Respondent,        :    Honorable Janis Graham Jack
                                       :           U.S.D.J.
       -against-               :
                                       :      Electronically Filed
ALFRED BOURGEOIS,           :
                                       :
             Petitioner.          :
_____    :

**NOTICE OF DEPOSITION**

PLEASE TAKE NOTICE that on the 10th day of November, 2010 Petitioner will take the Deposition by Oral Testimony of Dr. J. Randall Price in the above captioned matter, starting at 10:00 a.m. until concluded at the following location:

Esquire Deposition Solutions
Suite 1305, Four Houston Center
1221 Lamar Street
Houston, TX 77010
Phone No. (713) 524-4600

Said deposition will be video recorded and transcribed.

/s/ Michael Wiseman

_____

Michael Wiseman

USCA5 2696

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 2nd day of November, 2010, I served the foregoing on the following persons by ECF Filing and email:

Tony Roberts, Esq.
Mark Dowd, Esq.
Patti Booth, Esq.
Office of the United States Attorney

/s/ Michael Wiseman

_____
Michael Wiseman

USCA5 2697

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA,     )    CRIMINAL ACTION
                              )
              PLAINTIFF,      )    CR-C-02-216(1)
                              )
VS.                           )    CORPUS CHRISTI, TEXAS
                              )    SEPTEMBER 20, 2010
ALFRED BOURGEOIS,             )    8:23 A.M.
                              )
              DEFENDANT.      )
..............................)

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 1
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:              MR. TONY ROBERTS
                            MS. ELSA SALINAS
                            MS. PATTI HUBERT BOOTH
                            MR. MARK DOWD
                            ASSISTANT U.S. ATTORNEYS
                            800 N. SHORELINE, STE 500
                            CORPUS CHRISTI, TEXAS 78401


THE DEFENDANT:              MR. MICHAEL WISEMAN
                            MR. VICTOR J. ABREU
                            MS. ELIZABETH LARIN
                            MR. JAMES McHUGH
                            ASSISTANT FEDERAL DEFENDERS
                            SUITE 545 WEST, CURTIS BUILDING
                            601 WALNUT STREET
                            PHILADELPHIA, PENNSYLVANIA 19106


THE COURT RECORDER:         MS. VELMA GANO




PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

USCA5 2698

(The proceedings began at 8:23 a.m.)

(The case was called)

THE CLERK:  May I have appearances, please?

MR. ABREU:  Good morning, Your Honor.  Victor Abreu on behalf of Mr. Bourgeois.

Mr. McHugh:  Good morning, Your Honor.  Jim McHugh on behalf of Mr. Bourgeois.

MR. ROBERTS:  Tony Roberts on behalf of the United States, Your Honor.

MS. BOOTH:  Patti Hubert Booth for the United States.

MS. SALINAS:  Elsa Salinas on behalf of the United States.

MR. DOWD:  Mark Dowd, Your Honor, on behalf of the United States.

THE COURT:  Your expert is back?

MR. ROBERTS:  Yes, Your Honor, we have Dr. Moore at the table.  And I do have one request.  He has a, some information on his laptop and he's got it all silenced and everything but it would be all right for him to keep his laptop on the table?

THE COURT:  Absolutely.

MR. DOWD:  Thank you.

THE COURT:  Everybody can use their laptops here.

MR. ROBERTS:  Thank you.

USCA5 2699

THE COURT:  As long as they don't make noise.  And the late Mr. Wiseman.

MR. WISEMAN:  Morning, Your Honor, I apologize.

THE COURT:  I started early.  No, I started early. Now, I watched 14 hours of the video over the weekend.  Let me tell you what the, a technical problem is that you labeled Dr. Price 1 and 2 and it turned out to be Moore 1 and 2, so I had two sets of Moore's Exhibits 1 and 2, which cut my viewing time down to 14 hours, so what I need is Dr. Price's 1 and 2.  And then I want to know if I can also watch Dr. Estrada's video on my own, like a night this week.

MR. WISEMAN:  I was going to ask Your Honor --

THE COURT:  And that gives you more courtroom time.

MR. WISEMAN:  Absolutely.

THE COURT:  Because I, that will be 16 hours of courtroom time that we have saved by me watching these videos, another probably two, two-and-a-half, for Dr. Estrada's testimony, and another three-and-a-half from having the expert on that Friday.

MR. WISEMAN:  Yes.

THE COURT:  So we are moving right along.

MR. WISEMAN:  Yes, absolutely, and I appreciate that, thank you.  Perfect, Your Honor.

THE COURT:  Are these exhibits that you offered or were they just for me?

MR. ROBERTS:  We offered them, Your Honor.

THE COURT:  Okay.  Well, they were admitted but just bear in mind that Price 1 and 2 is Moore 1 and 2.

MR. ROBERTS:  We will submit a corrected copy of that exhibit, Your Honor.  Apparently we have it right here, Your Honor.

MS. BOOTH:  We have the -- I would like to substitute --

THE COURT:  Are you sure?  Do you want me, do you want to -- never mind.  I will look at it over lunchtime and make sure, okay?

MR. WISEMAN:  Your Honor, I'm sorry, I was late and I didn't get a chance to introduce you to Mr. McHugh, who is our co-counsel.

THE COURT:  He introduced himself, thank you.

MR. WISEMAN:  He did?  Well, he's an aggressive sort, so I'm not surprised.

THE COURT:  Thank goodness.

MR. WISEMAN:  Okay.

THE COURT:  Ms. Scotch, would you hand this back to Ms. Booth?  That's labeled Price 1 and 2.  That turns out to be Moore 1 and 2, so I got two Moore 1 and 2s.  Good morning, Mr. Bourgeois.

THE DEFENDANT:  Good morning.

THE COURT:  That should say, it should say Price

USCA5 2701

Exhibits 1, disc 1 and 2, and instead it was Moore 1 and 2, so I had two sets of Moore 1 and 2.  Oh, the exhibits.  Thank you.  All right.  Would you-all like to begin?

MR. WISEMAN:  Yes, Your Honor.  We call Dr. Victoria Swanson.

DR. VICTORIA SWANSON, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE COURT:  Could you tell me how long your experts -- not -- I'm talking about the sentencing experts.

MR. WISEMAN:  Yes.

THE COURT:  The psychologists.  How much time they spent with Mr. Bourgeois?

MR. WISEMAN:  Oh, we will certainly find that out, yes.

THE COURT:  What about the gentleman from the other Friday?

MR. WISEMAN:  Dr. Gelbort?  I believe he testified that he spent between three and four hours.

THE COURT:  Thank you.

MR. ROBERTS:  Your Honor, if I may, before we start, I understand there is another defense witness in the courtroom at the moment and I don't --

THE COURT:  Who do you have?

MR. WISEMAN:  Yes, Dr. Toomer is sitting in the courtroom.  I believe, Your Honor, when we had our April

meeting here you indicated that it would move things along to have experts listening to experts, as they often do.

MR. ROBERTS:  Your Honor, I don't have a problem with their experts listening to our experts testify so that they can respond to them, but I do have a problem with theirs --

THE COURT:  They don't need to be listening to their own experts.

MR. ROBERTS:  To their own experts, yes, Your Honor.

MR. WISEMAN:  Oh, I --

MR. ROBERTS:  I'd move to invoke the rule.

MR. WISEMAN:  I had thought what the Court intended at that time was, for example, Dr. Swanson is going to be talking about mental retardation and Dr. Toomer could also be talking about it at length.  If he listens --

THE COURT:  Talking about what?

MR. WISEMAN:  Mental retardation.  If he listens to Dr. Swanson then we can avoid going through a lot of the same material and move things along.  That's all it's about.

THE COURT:  No.  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  I mean I want to hear their independent --

MR. WISEMAN:  Sure.

THE COURT:  -- testimony.

MR. WISEMAN:  May I proceed?

THE COURT:  Oh, please don't -- be careful of the microphones, please.  Yes, sir, proceed.

MR. WISEMAN:  Thank you.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good morning, Dr. Swanson.  What's your occupation?

A   I'm a licensed psychologist in the state of Louisiana.

Q   And I'm going to put up what has been marked as Petitioner's 36 and ask if you recognize that?

A   Yes.  This is my, this is my curriculum vitae.

Q   Okay.  And it's accurate and up-to-date?

A   Yes.  Yes, that's accurate as of about the end of July.

Q   Okay.  And could you briefly let the Court know what your educational background is and your occupational background?

THE COURT:  Oh, if, you know, why don't you just offer that for admission and then I can read it and you can move on.

MR. WISEMAN:  Oh, okay, very well.  I will offer the CV, Petitioner's 36.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor, and we will --

THE COURT:  Petitioner's 36 is admitted.

(Defendant's Exhibit P36 admitted into evidence)

USCA5 2704

MR. ROBERTS:  No objection, and we will stipulate to her expertise and --

THE COURT:  Well, but if he wants it to be --

MR. ROBERTS:  Sure.

THE COURT:  Let me look at it, okay?

MR. ROBERTS:  Okay.

THE COURT:  And if you want to point out particular things like treatises that she has written, that sort of thing, that's fine.

MR. WISEMAN:  That's what I was hoping to do.

THE COURT:  Please.  And I don't want to shorten your testimony.

MR. WISEMAN:  No, I --

THE COURT:  It's just that if I read it, then I will know where she went to school.

MR. WISEMAN:  I appreciate it.

BY MR. WISEMAN:

Q   Dr. Swanson, just tell us briefly where you went to school and what you did immediately after undergraduate school.

THE COURT:  Okay, I don't need to know about the school, I'm reading it.

MR. WISEMAN:  Okay.

THE COURT:  The point is, if you want to tell me about her area of expertise and --

BY MR. WISEMAN:

Q   What is your area of expertise, Dr. Swanson?

        THE COURT:   Thank you.

        THE WITNESS:   My area of expertise is in the field of mental retardation, working with people with developmental disabilities such as autism, mental retardation and learning disorders.

BY MR. WISEMAN:

Q   And for how long have you done that?

A   I've done that for approximately 35 years at a bachelor's, master's and then a doctoral level.

Q   Okay.  And where did you receive your doctorate?

A   I received my doctorate in 1999 from LSU in Baton Rouge, Louisiana.

Q   And prior to receipt of your doctorate, in what capacity were you working with people with developmental disabilities?

A   Prior to receiving my doctorate, for about 10, 14 years I was the senior master's level associate at a large developmental center for people with master's, with mental retardation, and I worked under a licensed psychologist in that capacity.

Q   And in that capacity did you have occasion to administer standardized testing for measurement of adaptive deficits?

A   Yes, I did.  I did it not only in that capacity but prior to that in Louisiana you could do it at a bachelor's level,

USCA5 2706

so I did it at a bachelor's level as well.

Q    And approximately how many such tests for adaptive
deficits have you administered in your career?

A    I would say in my career it's in the area of 10,000.

Q    And similarly with respect to testing, standardized
testing of intelligence, did you have occasion to administer
IQ tests?

A    Yes, I have.

Q    And approximately how many have you administered in your
career?

A    I would say in the thousands.

Q    And what's your current -- well, withdraw it.  Did there
come a time when you left your employment with the state?

A    Yes, there was.

Q    And when was that?

A    In 2003.

Q    And what did you do after that?

A    After that I worked solely as a private practitioner.  I
also did that part-time while I was working for the state,
but I moved into full practice in 2003 when I retired from
the state.

Q    Okay.  And what, for what types of organizations or
entities do you currently do consulting work?

A    I work for several agencies.  I work for the Office of
Citizens with Developmental Disabilities, which is the

USCA5 2707

Louisiana Office of Mental Retardation.  I am on two regional offices and I do the testing and sit on their eligibility committees to determine, to review records and determine if people are eligible for services.  I work for a mental health center in, a regional mental health center, and do testing there as well.  I work for a charter school and I am in charge of pupil appraisal there and I provide the psychological services there, and then I do all the testing as needs to be done for the special education that's provided there.  I am the director of psychological services at three residential, private residential facilities.  They are on my vitae.  And I also provide the psychological services for several community home chains in Louisiana, and there is approximately 30, about 33 community homes that I go to monthly and provide the annual assessments and then the entry assessments for those homes.  And I also provide consultation for people with developmental disabilities living in apartments, supportive placements.

Q    Okay, thank you.  What age groups do you currently work with or have worked with in your past career?

A    I think right now the oldest person I work with is around 89, late 80s, and I usually start working with people, I usually see them, probably about a year would be the youngest.

Q    Okay.  And have you held any offices that the Court would

USCA5 2708

be interested in hearing about?

A    Primarily with the American Association of Mental Retardation that is now known as the American Association for Individuals with Developmental Disabilities.  I have been on the state board for a number of years.  I'm currently off the board, but I also held a national position as the president of the psychology division with the national board, and I went off the board I think around 2003, 2004.

Q    And most of what you have described is a clinical practice.  Do you also maintain a forensic practice?

A    I don't consider myself a forensic psychologist other than I sometimes come into court.  I have been doing work forensically only since Atkins, and that would be since 2003, and I only do it in relation to cases such as this, pre-Atkins hearings or post-Atkins hearings.  The only other time I ever go to court is if I have done a test for an agency and I've court-ordered, been, that agency has been court-ordered to do it.  I may have to go to court to explain the test to the judge.

Q    And approximately how many Atkins or how many Atkins hearings or cases have you testified in?

A    Off the top of my head, I would say about 15.

Q    And has that been for the defense or the prosecution?

A    All of those have been for the defense.

Q    Is there a particular reason why you have not worked for

USCA5 2709

the prosecution?

A    Nobody from the prosecution has ever asked me.

Q    If you were asked, would you do so?

A    Yes.

Q    In your capacity in working with the, for the State of Louisiana, did you have occasion to become familiar with the school districts around the state?

A    Yes.

Q    Do you have any expertise and experience in the area of applied behavioral analysis for people with developmental disabilities, mental retardation and autism?

A    Yes.  That's a specialty that I got at my doctoral level. I also belong to a nationally recognized association for that, and my dissertation was in the area of severe behavior disorders, and applied behavior analysis is the primary treatment that is used with people with developmental disabilities autism.

Q    Okay.  And have you ever been denied qualifications by any court?

A    No.

Q    And have you ever been retained by a defense lawyer and, for an Atkins setting and not found their client to be mentally retarded?

A    Yes.

          MR. WISEMAN:  All right.  Your Honor, at this time I

USCA5 2710

would offer Dr. Swanson as an expert in clinical and forensic diagnosis and treatment of people with mental retardation and in the area of --

THE COURT: They have already stipulated to that, so move on.

MR. WISEMAN: Oh, he stipulated?

THE COURT: Yes.

MR. ROBERTS: Your Honor, I stipulated --

THE COURT: Before you started the whole thing.

MR. ROBERTS: I didn't know he was going to go into forensics and I believe she just said she doesn't consider herself an expert in forensics.

THE COURT: Okay.

MR. ROBERTS: So I would object to that.

MR. WISEMAN: All right, that's a fair point.

THE COURT: Sustained.

MR. WISEMAN: I will withdraw that.

BY MR. WISEMAN:

Q   All right.  Well, then we will move on with you as an expert, Doctor.  I would like to get some definitions established, if we could.  You mentioned the AAIDD.  Could you tell the Court what that is?

A   The AAID is, and most people are more familiar with it as the American Association for Mental Retardation, it is a collection of disciplines of people that work in the field of

USCA5 2711

mental retardation, psychiatrists, psychologists, doctors, nurses, social workers, occupational therapists, physical therapists, and the charge of this group is to be the cutting edge for the diagnosis and treatment with people with developmental disabilities, and it has been, it has been an organization for over a hundred years.  It has also been the chief organization chose, charged with defining mental retardation, and as such it puts forth a volume approximately every ten years, and it's now in its eleventh edition, where it defines the current research and criteria for the definition of mental retardation.

Q   Okay.  Is it the authoritative organization for the diagnosis and treatment of people with mental retardation?

A   Yes.

Q   And is its manual that you just described the authoritative source for the diagnosis of people with mental retardation?

A   In my opinion, yes, but I would like to, there is another one, which is the Diagnostic Statistics Manual, Fourth Edition, text revised in 2000, and that manual for the last two editions has based its definition on the AAMR definition, so they kind of go side-by-side, so there's two manuals with the DSM citing the AAMR definition.

Q   Okay.  And is there, just to be clear, the AAIDD is the same organization as the AAMR?

USCA5 2712

A    That's correct.

Q    And the name just changed recently?

A    That's correct.

Q    Okay.  Are you familiar with the Atkins case?  You have mentioned it?

A    Yes.

Q    Does Atkins refer to the AAMR as an authoritative source on these topics?

A    Yes.

Q    All right.  Where do we find the definitions for mental retardation that have guided your work?

A    The two definitions that I went by were the AAIDD Eleventh Edition.  It's often called the Green Book because they change the color by editions.  It just came out this year, in 2010.  The other one that I went by would have been the DS, that I just mentioned, was the DSM-IV TR that came out in 2000.

Q    Okay.  And how does the AAIDD define mental retardation?

A    The AAIDD latest edition, which is the Eleventh, is the, defines it as having concurrent deficits and intellectual and adaptive abilities, with adaptive ability deficits defined either as global adaptive deficits, usually associated with a global score, that's approximately two standard deviations below the mean, or significant deficits in one of three areas, conceptual, practical and social, and the third

USCA5 2713

criteria is the deficits or the onset should have been evident prior to the age of 18.

Q    And regarding that last criteria, is there any requirement that the onset be diagnosed before 18?

A    No.

Q    And compare that definition to the DSM-IV TR definition.

A    The DSM-IV TR definition is based on the Ninth Edition of the AMR Diagnostic Manual and at that time they -- it also requires concurrent deficits approximately two standard deviations below in intellectual, and then in adaptive it specifies ten areas and there should be deficits noted in at least two of those areas, and I will try to name as many of the ten off as I can --

Q    That's okay.

A    -- but it is communication, self-direction, social or interpersonal relationships, self-direction, health, home living, work, leisure, and I think maybe play and leisure, would be the ten areas.

Q    Okay.  And, under either of the definitions, does the field recognize that a person with mental retardation can have strengths in particular areas?

A    Yes.  Both of them would recognize strengths, specifically in order to diagnose mental retardation you are looking for a collection of deficits in these areas, intellectual or adaptive, but it doesn't mean that someone

USCA5 2714

couldn't have a strength as well.

Q    And when you evaluate and when you evaluated Mr. Bourgeois in this case, did you encounter any strengths?

A    Yes, I did.

Q    And when one encounters strengths in a person that they are evaluating for mental retardation, is there a protocol for probing the particular strengths that you are seeing?

A    That's right.  Well, if you see a strength in a person that has an accumulation of deficits and you want to know why is the strength there, is the strength there for a specific reason or is it there because people have put supports in place throughout this person's life to make it look like a strength, or is it an area that that person had a unique opportunity as a child.  For example, if I was working with someone who did really good landscaping work, it might have been he worked with an uncle from a very early age and learned how to do yard work, how to do all these different things, learn things about fertilizer, et cetera, so that by the time he was in his 30s he could own his own landscaping business and do fairly well.  But there would be an explanation of what within the context of his own environment provided the supports for him to learn this despite the cognitive deficits that he had.

Q    And let's begin to apply these definitions and concepts to the work you did in this case.  Have you done a

USCA5 2715

comprehensive assessment of Mr. Bourgeois to determine the presence or absence of mental retardation?

A    Yes, I have.

Q    And what did that evaluation consist of?

A    Well, there's two areas, like I said, intellectual and adaptive.  I didn't, intellectual assessments had already been done so I reviewed the intellectual assessments, and then I also considered the different strengths or deficits that I saw there when I was doing my assessment with him and talking to people who knew him growing up.  I looked at school records.  I looked at work records.

Q    Okay.  With regards to records, that's what I was hoping to discuss first.  Let me put up Petitioner's 136 and ask you if you recognize that document?

A    Yes.  I think this document includes the various reports, records that I looked at, medical records, school records, previous reports that had been done with him, testimony that I looked at.

Q    Okay.  And in addition to the materials contained on that exhibit, did you have occasion to watch the 14 hours of Government expert evaluation of Mr. Bourgeois?

A    Yes, I did.

Q    And did you review the Government's exhibits that have been, at least so far been --

        THE COURT:  I'm sorry, which?

MR. WISEMAN:  The evaluations of Dr. Moore and Dr. Price.

THE COURT:  Oh, okay.  Did she watch the video, the 16 hours?

MR. WISEMAN:  I --

THE COURT:  It's 16 hours.  I only got 14.

MR. WISEMAN:  Okay.

THE COURT:  But I'm going to have to get the other two.

MR. WISEMAN:  I won't quibble with that.  Sixteen. It felt like more.

THE WITNESS:  Well, I had two, I had, I saw two discs of Dr. Price and several discs of Dr. Moore, so I think I saw them all, yes.

MR. WISEMAN:  Okay.

THE WITNESS:  And if it's 16, 14 hours, 16 hours, I didn't time them, and I didn't watch them in all one setting.

THE COURT:  No, there are more than, there's more than that.

MR. WISEMAN:  We sent it to her in a different format so.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And did you review the Government's exhibits that have been provided to you?

A    Yes, I did.

Q    And did you review Dr. Moore and Dr. Price's reports?

A    Yes, I did.

Q    And did you review any records with respect to Mr. Bourgeois' brother Anthony?

A    Yes, I did.

Q    And, just briefly, what did those records show you?

A    Well, when I visited his sister Claudia, Anthony lives with Claudia, and there is a personal care attendant who comes in the home and mandated that, to receive that service there has to be a book of records kept in the house, and so I reviewed that record that's kept there for the personal care attendant and it has information regarding his IQ, his adaptive skills, and the specific objectives that the personal care attendant works with him in the home as well as the objectives at the date --

THE COURT:  So that's the one that Mr. Bourgeois says is retarded?

THE WITNESS:  That's correct.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    And what is his IQ, according to those records?

A    Well, his IQ was estimated to be 50, and the reason I say estimated is he has cerebral palsy and many of the tests that you give requires the use of hands, so they are estimating

USCA5 2718

that because they have had to make adaptations in the test. His adaptive skills are in the profound deficit range.

Q    All right.  So he's pretty severely impaired?

A    Pretty much all of his daily needs are met for him by others.

Q    Okay.  And in addition to the materials that you reviewed did --

THE COURT:  I'm sorry, how is he related exactly to Mr. Bourgeois?  What parent do they share?

THE WITNESS:  They share the mother.

THE COURT:  Okay.

THE WITNESS:  He is actually the fourth child of the four oldest children by the first father.

MR. WISEMAN:  And --

THE COURT:  I'm sorry, say that again?

THE WITNESS:  The first four children shared a common father, I think, and he is one of those first four Ferdinands.

THE COURT:  No, that's not right.

THE WITNESS:  There's a Claudia --

THE COURT:  I don't think that's correct.

THE WITNESS:  -- a Lloyd, a Clyde and Anthony, I think.

THE COURT:  No.  That's, I know that can't be right, because Mr. Ferdinand has a different last name.

USCA5 2719

(Ms. Larin and Mr. Wiseman conferring off the record)

MR. WISEMAN:  Your Honor, my colleague advises me that Mr. Ferdinand's name is, was not actually Ferdinand, and that may be source of the, of our confusion.  His name was changed at some point to Ferdinand.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    In addition to the materials you have reviewed, did you conduct an interview, a structured interview with Mr. Bourgeois?

A    Yes, I did.

Q    And when did that happen and where?

A    That happened in August of 2009 at Terre Haute at the federal penitentiary.

Q    And approximately how long did you spend with Mr. Bourgeois at that time?

A    I would say approximately four hours.

Q    And as part of that encounter did you administer any tests?

A    Yes, I did.

Q    What did you administer?

A    I administered a standardized test, the Woodcock-Johnson, which is a battery of academic tests, as well as tests for listening comprehension, oral expression, and then I also did informal functional assessments with him regarding various

USCA5 2720

skills, life skills.

Q   We will discuss those more in detail later, but just give the Court a sense now of what you mean by informal assessments, functional assessments.

A   Okay.  In the best possible scenario when you are assessing a person with mental retardation you actually want to assess those skills in the real environment, so you would like to watch them, possibly, while they cook or doing domestic activities, and this gives you a better measure if there's deficits there of where you would want to start treatment or providing supports.  When a person lives in a restricted setting such as an institution, a lot of times you have to simulate these tasks using different things like pictorial cards or an application, to see if they can fill out an application, for example, things like that.

Q   Okay.  And --

A   And it gives you a judge of, well, do they have the basic skills, so if they were living in the community, to apply those.

Q   These informal probes, are they ones that you got out of a book or are they ones that you have derived over your years of experience?

A   They are just ones that I have derived over my years of experience.

Q   In addition to -- well, withdraw it.  Did you also

USCA5 2721

administer a mental status exam?

A    Yes, I did.

Q    And in addition to the testing that you did and the interviewing, did you have occasion to interview other individuals who knew Mr. Bourgeois throughout his life?

A    Yes, I did.

Q    And were they people who knew him through a range of adaptive domains?

A    Yes.

Q    Did you have occasion to administer any formal standardized testing to any of the people you interviewed?

A    Yes.

Q    And we will talk more about them later in specifics.  Why didn't you, generally though, why didn't you test everyone that you interviewed?

A    Well, there are certain standards in the manuals of these standardized assessments as to who makes a good informant or doesn't make a good informant, so when you start about doing one of these you talk to the person to see how well they know them, and they need to meet certain requirements and if they don't meet those then the standardized assessment is not appropriate to be administered to that person.

Q    As a result of all the work you have done in this case, did you reach a conclusion to a reasonable degree of psychological certainty about Mr. Bourgeois?

USCA5 2722

A    Yes, I did.

Q    And what is that conclusion?

A    It was my conclusion that he met all three criteria for a diagnosis of mental retardation.

Q    For purposes of your testimony let's, it's complicated enough, let's use the AAIDD definition as we go forward.

A    Okay.

Q    To explore the basis for your conclusions.  Let's discuss intellectual functioning first.  Did you see -- well, before I ask you about the test, tell us what one needs to qualify as, to have a significant intellectual deficit for purposes of this diagnosis?

A    When you are saying significant you are looking at two standard deviations below the mean for that test, and that generally now is a mean of 100, a standard deviation of 15, so for a score of approximately 70.  You need to take into account the standard error of measurement of that test and for that score there is a confidence interval and we can be reasonably sure within that confidence that that score falls, his true score, true ability falls within that confidence interval, and for Atkins hearings that's generally plus or minus five, so you are looking at approximately a score of 70 plus or minus five points, so a 65 to a 75.

Q    And did the Atkins decision endorse that standard error of measurement?

USCA5 2723

A    Yes, it did.

Q    And does the DSM also endorse the standard error of measurement?

A    Yes, it does.

Q    And how about the AAIDD?

A    Yes.

Q    And what are the criteria, when you are looking at records, in determining whether a particular IQ test is an acceptable one for making this diagnosis?

A    Well, within the field there is an accepted gold standard for intellectual tests and that gold standard would be any of the Wechsler tests and any of the Stanford-Binet tests. Other tests have inherent weaknesses that you, that wouldn't meet quite that standard. You are also looking for a full-scale administration of the test. Abbreviated administrations, prorated administrations, would not be meeting the standard. There are also tests that can be group administered, paper-and-pencil tests that might give you very broad estimate, and it might be helpful to look at it but it would not meet the standard that's required in an Atkins hearing.

Q    Does, do achievement tests meet that standard?

A    Achievement tests aren't used for diagnosing mental retardation. They could possibly be used for determining adaptive deficits. They are really looking more at that

criteria we mentioned earlier of conceptual.  So they are not actually used to diagnose the test, they are just corroborating evidence of adaptive deficits.

Q   Were any such tests that qualify contained in the records you reviewed?

A   Yes.

Q   And could you tell the Court which ones you saw and their significance?

A   The ones that I saw was a Wechsler Adult Intelligence Scale, Revised, that was administered about the time of his trial, and the other one was a Wechsler Adult Intelligence Scale, Third Edition, which I think was administered in 2007.

Q   And just for identification purposes, the earlier one was administered by Dr. Weiner?

A   That's correct.

Q   And the more recent one by Dr. Gelbort?

A   Yes.

Q   And what were the IQ scores recorded in each test?

A   I'm flipping to make sure I don't enter any wrong scores into, and I'm looking -- the first one, the WAIS-R, got a full-scale IQ of 75, and the second one got, the WAIS-III in 2007, got a full-scale IQ of 70.

Q   Did my office provide you the data underlying those two IQ tests?

A   Yes.

Q    And did you have an opportunity to review it?

A    Yes.

Q    Did you reach any conclusion as to the accuracy of the administration and scoring of those two tests?

A    That's, I saw no scoring area -- errors.  If I remember correctly, nothing on their actual protocol where you scored the items.  There might have been a place on, where you take the cumulative scores and add them, they had left a blank, but they got the total correct.  That particular test seemed to have been computer scored and they might have been transcribing scores over.  But as far as the actual administration of the test, there were no errors that I could see.

Q    Did you have occasion to review Dr. Weiner's report?

A    Yes.

Q    And did you notice any error with regard to the report?

A    It seems in the report there might have been a transcription error there from one of the scores being transcribed to the report.

Q    Did you review the -- you have already indicated you reviewed the reports of Dr. Moore and Dr. Price.  Did they, in your view, identify any errors with respect to the scoring or the administration of those IQ tests?

A    I don't remember any errors that they identified.

Q    Did Dr. Gelbort or Dr. Weiner comment in their reports

about the issue of malingering?

A    They noticed no signs of malingering and they felt he had put forth good effort.

Q    And did Dr. Weiner in particular administer any testing for malingering?

A    Yes.  As I remember, I know, I'm fairly certain he administered a TOMMs, which is one of the instruments that has some reliability with people with mental retardation. It's a test for malingering and he passed that test.

Q    And again, referring to Dr. Moore and Dr. Price, did you see any reference in their reports with respect to malingering?

A    No.

Q    I am going to put up for you now what's been marked as Petitioner's 155 and ask you if you can, do you recognize that document and what is it?

A    This document is all the scores of the subtests -- I'm going to get to the microphone -- all the scores of the subtests that were administered in 2004 as well as 2007, and then it also shows you the performance IQ and the full-scale IQ for, and the verbal IQ for both sets of tests.  So what you are looking at here, for example, the vocabulary subtest was administered in 2004 and he made a six, and in 2007 the WAIS-III version of the vocabulary test was administered and he made a four on that same subtest.

USCA5 2727

Q    Okay.  And what data or what conclusions can you draw from what's on this chart?

A    Well, in the field of mental retardation, I think if you look at the AAIDD guidelines, one of the things that's pointed out is numerous administrations, when you compare them, is often a better measure of malingering or reliability than some of the malingering tests that are not normed for people with low cognitive functioning.  In this particular case what you are looking at are the scores hanging together and where we see strengths in one subtest do we see strengths on the second administration, where we see a weakness do we see it on the second administration.  These two tests were administered four years apart and it would be very hard to malinger, to deliberately give the wrong answer on one version of the test and then to know, well, I really need to score about the same way four years later on a newer version of the test.  So I think if you look there, and specifically what I noted is if you look at the digit symbol, that was a strength for him.  On the subtest the mean is 10, the standard deviation is three, so 10 is considered in the average range.  He scored a 10 the first time, he scored an 11 the second time.  When you look in another area, let's look at, say, similarities, he scored a five the first time and a four the second time, so those scores are fairly consistent across administrations.  Some of the subscales,

USCA5 2728

subtests on the WAIS-R were not carried over to the WAIS-III and the WAIS-III introduced some new subtests, so sometimes you can't get that comparison.

Q    And that would be the matrix reasoning, object assembly?

A    That's correct.

Q    Now, the, I take it from your testimony that one doesn't expect identical scores in various administrations?

A    No.

Q    And is that related to the whole concept of a standard error of measurement?

A    Not only that, but in this particular case there could be more than one thing.  The first time he was given the test, and we believe that was the first time it was given, every subtest was novel.  The second time he was given the test he might have had some memory.  In my own experience, after giving lots of these, whenever I pull out the red and white blocks, if they have ever had the test before that's a reminder to them, oh, yeah, I've had this test before.  The coding is another one that a lot of times they remember.  A lot of times when you give an intelligence test, what you are doing is you are giving a test that you hope is truly novel and you are explaining something they have never done before, and part of the test is how quickly can they assimilate the instructions and perform the task, and that kind of drives how well they do.  When they have had a little familiarity

USCA5 2729

Swanson - Direct                                    33

with it, they might do a little better the next time.

Q   The --

A   But I think overall these scores show consistency across administrations.

Q   And the overall IQ of 70 and 75 fall within each other's standard error of measurement?

A   That's correct.

Q   Did you recall anything in Dr. Price's report with regard to an observation of unusual scatter in these subtests?

A   What I recall is that the scatter of the subtest he thought was not typical for a person with mental retardation. I think that's what was, the gist of what was said in the report.

Q   And do you see any scatter?  Well, first of all, what is scatter and did you see any?

A   What you are looking at as scatter is how far the scores deviate, and the way I would do that is you get an average, you add up all the subtests so you kind of know what the average subtest is, and if there is a deviation, for example, in digit symbol, there is a 10 and 11 and that's significantly different than the average for all the others, and I gather that's what he was saying is you don't particularly see that large of a scatter in a mental, person with mental retardation.

Q   And what's your explanation, if you have an explanation,

USCA5 2730

for the sort of different performance on that particular test from the other tests?

A    Well, I have seen scatter like that before in people with mild mental retardation, so I did not make that observation that he did.  Digit symbol is a copying test and he copies very well.  It's trying to write spontaneously that you watch him markedly slow down.  So that's actually one of his strengths and I saw him do that informally when I assessed him as well, and it's not atypical for a person with mental retardation to have a strength, and I have tested other mentally retarded people that do well in one area, so the fact that he had a strength doesn't rule that out.  In my opinion, when you make that statement you are looking more at a discrepancy between verbal and performance being statistically significant and I didn't see that in this test.

Q    We have already heard a bit about the Flynn Effect n this case.  Could you tell the Court where you stand on that topic?

A    Okay.  The Flynn Effect is an accepted statistical phenomenon in the literature, and what we find is that over time norms get soft.  We give a test and over time, when we give the test at the end of that test life the scores tend to go up.  There have been group studies that have been done across tests to show this and these group studies make an estimate of overall what's the average that a score goes up

over a period of ten years.  Some of the earlier tests when they came out stayed out as long as 30 years between administrations, so when you go back and look at these, that's where they started basing this estimate.  But it's done on group studies, it's not done on individual studies.  But we do know that if a test is normed, you do it on the year the test was normed, not the year the test was published.  So the WAIS-R was published in '81 but they started collecting normative data in '78, so when this test was given in 2004 you are looking at a normative table that was 26 years old, so his scores are being compared to norms that are 26 years old.  The norms were soft and therefore you could expect the score to be a little bit higher.  But the way you explain this in the literature is that you have a confidence interval, so it's most likely that his score is at the lower end of that confidence interval because it's been inflated by the age of the norms of the test.  On the second test, which was the WAIS-III, that test was also old, the WAIS-IV came out in August of 2008, so the norms for the WAIS-III, they started collecting those in '95, so you are also getting a little bit of a Flynn Effect.  I don't think it's an issue in this case because the scores are there.  I mean, they are the scores we are looking for in an Atkins case.  So we can discuss Flynn if we want to, but in this particular case I don't know if we need a big debate on it

USCA5 2732

because it's not relevant.

Q    Okay.  Just bear with me one more moment then before we move on from it.  Part of the dispute or the debate in the literature in the community seems to be whether you adjust the score or explain the Flynn Effect.  How would you express the effect of the Flynn Effect in this case, the impact?

A    There's two large schools of thought on that.  The American Association of Individuals with Developmental Disabilities, most of the folks in the American Psychological Association Division 33, which is the specific division for individuals with developmental disabilities, say you should adjust the individual score.  The other camp is you can't take a group statistic study and adjust a single score on that, there's no science for doing this yet.  I think what both sides are saying is when you come into court, the court needs to clearly understand what the Flynn Effect is and what age of the norms when those scores were adjusted and the concept of a standard error of measure and a confidence interval and where you would look at that score in relation to its confidence interval.

Q    So applying all that you just said and looking at the two IQ scores we have, the 70 and the 75, and the age of the norms at the time they were administered, how would you express the IQ that you think most accurately reflects Mr. Bourgeois' intellectual ability?

USCA5 2733

A    In my opinion, his scores at the time they were obtained on those normative tables, I would, and considering the confidence interval, I would say his true score probably falls somewhere between 68 and 70.

Q    The WAIS-R that was given when it was no longer the test that was -- well, let me start over.  When the WAIS-R was given it was an older test.  Would you discount it or would you still consider it despite the fact that its norms were that old?

A    I think what we are specifically saying is at the time the WAIS-R was given the WAIS-III was already available to be used and the examiner didn't use it.  I see that quite frequently in all the records I have reviewed through the years when a neuropsychologist is doing a battery of tests. They tend to want to use the Wechsler instrument that has the greatest amount of research associated with it at that time. When you come between tests, the new test doesn't have that accumulation.  A lot of times what a neuropsychologist is looking for is brain dysfunction, and so they are looking at correlating different subtests of this with other tests that they administer, so I believe that's the reason the neuropsychologists, or in the past that has been my experience of why they would have chosen the older test.  I wouldn't discount the data.  I would put more, actually I would weigh more heavily towards the WAIS-III, which is what

USCA5 2734

should have been administered the first time, but I think that test should be looked at because the subtests do vary consistently with the WAIS-III.

Q    And let's go back to this comparative chart between the two administrations.  To my lay eye it looks like his scores went down a bit from the WAIS-R to the WAIS-III with regard to verbal but they went up a bit with regard to performance.  Do you have an explanation for that?

A    Not really, other than, as I said, the performance items are the items you see the most practice effect with because people tend to remember the blocks, they tend to remember the coding test, they don't have to listen as closely for the instructions, their mindset is ready for the response.  But generally there is not a real big statistical, the difference between these are not statistically significant, so I wouldn't put a lot of bearing on that at all.

Q    Let me ask you a hypothetical.  You have done a number of these cases.  If you were hired by a lawyer at the time of a capital trial and you were given an IQ test with a 75, or even a 76 taking into account Dr. Weiner's error in transcription, on a WAIS-R, would you have any recommendations for that lawyer?

A    Yes.  I would recommend that you pursue a full evaluation for mental retardation.

Q    And what is your view of Mr. Bourgeois' intellectual

USCA5 2735

functioning even aside from the question of whether he has adaptive deficits or not?

A    I think these tests clearly show that Mr. Bourgeois is, functions with very low cognition, and his cognitive ability is in the mild deficit range for these tests, and so no matter what, no matter if we don't go any further, we are looking at a person who has extremely low cognitive ability. That criteria I think is clearly met.

Q    And what would his percentile ranking be in terms of IQ among the general population with a 68 to a 70?

A    Oh, with a 68 to a 70 you are looking at approximately a two percentile, so 98 percent of the people in the United States perform better than he does on this test.

Q    All right.  Let's now focus on the question of adaptive deficits, and let me put up for you a slide which is marked as Petitioner's 160.  First of all, what's that first page?

A    That's the first page of the AAIDD Eleventh Edition and it's also known as the Green Book.

Q    Okay.  And it is in fact green.

A    It is in fact green, that's right.

Q    And I am going to turn to page 43 of that volume, and do you see a definition there?  It's a little hard to read on the big screen.

A    Yes.  This is the AAIDD definition of adaptive behavior and I think I mentioned it earlier as a collection of

USCA5 2736

conceptual, social and practical skills that have been learned and performed by people in their everyday lives.

Q    And this was the definition that guided your assessment?

A    Yes.

Q    How do you assess whether a person in a typical case has adaptive deficits, significant adaptive deficits?

A    Okay.  In a typical case you are trying to make a diagnosis based on their current functioning that day, that time, in their own environment.  You have their care providers that are there, their mother, their father, their brother, their sister.  If I'm doing it in a community home, I have the people that are actually providing care there.  I also have the settings where they typically perform these skills, so if I have any questions I could go and observe those as well.  And then one of the things that you want to look at when you are doing these is the context or the environment in which they are performing these skills on a typical day.  There are cultural expectations of maybe their neighborhood but there are also sometimes hidden supports that guarantee that they do well, and one of the questions you are going to be asking is if those supports weren't there would you still see that same level of performance.

Q    And how does the, what you have described as a typical adaptive deficit assessment differ in the Atkins setting?

A    Well, in the Atkins setting you are always looking back

USCA5 2737

Swanson - Direct                                    41

retrospectively because you are trying to determine if there was evidence of mental retardation prior to the age of 18. Even at the time of the offense we are looking back probably 20, 25 years in time to see what was the functioning at that time and would it meet these criteria adaptively.

Q    All right.  Now, in this case we are not going back to the time of the offense quite that far, but the point is the same, you are looking at his pre-18 functioning?

A    His pre-18 functioning, that's correct.

Q    And are there special guidelines applicable to a retrospective evaluation that you have just described?

A    Yes.  I mean retrospective evaluations were being done prior to Atkins because we frequently have people who come to agencies as adults and we have to determine are they eligible for services.  For example, Mr. Bourgeois' brother didn't access services in the state of Louisiana until 2001 and he was middle-aged at least by then, and so then the agency is charged to go back and see is there evidence that these deficits were there prior to the age of 18.  And you often have to look for records, you have to look for people who knew him at that time, you would need to be able to look at the environment, like I said, as much as possible that he lived in and start trying to tease out, well, what were the supports that he had in place, when he did well, to do well.

Q    Did you administer standardized tests in order to

USCA5 2738

determine adaptive deficits in this case?

A    Yes, I did.

Q    And let me put up for you two different exhibits.
Petitioner's 34 is a two-page exhibit.  Do you recognize it?

A    Yes.  This is a Vineland-II that I did, it's a Vineland
Adaptive Behavior Scale, Second Edition.  And we mentioned
gold standards earlier.  The two gold standards for adaptive
assessments are the Vineland Adaptive Behavior Scale, Second
Edition, I call it the VABS-II, and the Adaptive Behavior
Assessment System, Second Edition, we call that the ABAS-II,
and this is one of your gold standard standardized
assessments of the test, it's the VABS-II.  I administered
this with Ms. Franks and I administered it retrospectively
and we looked at him as he was at about the age of seven when
we did this.

Q    We are going to get to the specifics of the test.

A    Yeah.

Q    I just want to identify your data for now.  Next, I'm
going to put up --

        THE COURT:  I'm sorry, how did, how did they, I'm
sorry, I'm not understanding this.  She administered
something that had to do with Mr. Bourgeois when he was
seven?

        MR. WISEMAN:  Yes, Your Honor.  We are going to
explore that and explain the reasoning.

USCA5 2739

THE COURT:  That would be good.

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q   Next I am going to put up a Petitioner's 35, which is a 94-page exhibit, and just the top sheet, do you recognize what that is?

A   Okay, that is the ABAS-II.  I administered this same form with Ms. Franks.  It should say five to 21 there.

Q   It's got off track.

A   It's the parent form that I administered with the same informant.  It's just the other gold standard test that I mentioned earlier.

Q   Okay.  And, more broadly, does this exhibit contain all of your data --

A   Yes.

Q   -- for Mr. Bourgeois' evaluation?

A   Yes.  Right there, that's the mental status exam directly behind it I guess.

Q   All right.  So you, this packet contains the rest of your data in the case?

A   It should.  It should contain the Woodcock-Johnson, it should contain the two standardized assessments and then the mental status exam that I give.

Q   Okay.  And we are going to go through that in some detail.  Let's talk first about the Woodcock-Johnson, and

USCA5 2740

44

tell the Court initially what is the Woodcock-Johnson, what does it seek to determine and how did Mr. Bourgeois do on it?

A    Okay.  The Woodcock-Johnson is, when we talked, we have talked about gold standards in different types of tests, the Woodcock-Johnson would meet the gold standard of an academic achievement test.  It's actually a battery of many tests assessing many types of adaptive skills and then collapsing them into broad areas.  The, it is better than say a screening test such as the WRAT which is only assessing one area of reading.

Q    Right, and for the record, the WRAT is the W-R-A-T?

A    Yeah, the WRAT.  The WRAT is a Wide Range Achievement Test, it's now in its fourth edition, I think in this case there were third editions administered, and it's a brief screening instrument.  By brief, you can give it in about 20 minutes, and it gives you a broad indication.

Q    And I am putting up on the screen right now page 13 from Exhibit 35, which is the bigger packet of data, and ask you if you can explain and interpret that particular sheet?

A    Okay.  If I could, I'll just kind of go through the sheet for the Court.

Q    Sure.  And if you want to touch the screen, you can even highlight things.

A    Oh, I can, okay.  If you look right there where it says "Cluster," these are the different tests I give.  At the very

USCA5 2741

bottom down here are the specific tests that I give and then those are broken down or added together and become the cluster scores that are mentioned in this top section right here. For example, if you look down here you have letter word identification, reading fluency, story recall, and then down here there is a passage comprehension right about there. Those collapse into your broad reading score, which is here. Now, when you look at something like reading, there's actually many skills that are involved in reading. The WRAT primarily looks at word recognition, which is this one here, and if you look at his word recognition it's actually pretty good. The scores that are most relevant to the Court, in my opinion, are these scores right there which are the age equivalent scores, so he is performing in these areas similar to a person who is this age. This score right here that says "SS," that's the standard score he actually obtained on these. And over here is the grade equivalent score for each one of those tests. I think the grade equivalent score is particularly relevant to this because if you look at the DSM-IV, what experts in the field have said is most people with mild mental retardation, we expect them to function overall at about as high as a sixth grade level, which is consistent with where he is functioning here, and he does have some significant strengths and some significant weaknesses. But as I was saying earlier, going back to the first column,

USCA5 2742

those specific tests are the tests that I looked at for reading, and if we can we will talk about it, and I think when you look at the videos you will see problems that he has with reading and things that he does actually quite well with reading.  The next broad area would be broad math.

Q    Could we talk about it now?

A    Uh-huh.  Sure.

Q    I mean it seems like a good time.  What, you mentioned that he has a relative strength in terms of his word recognition, and what test is that that shows that?

A    That's the letter/word identification on which he made a 90 and he's functioning at about the eighth grade level there.  And I think on the WRAT he scored much higher than that even.  I mean they score him much, a higher grade level than that.

Q    That would have been the reading score of a high school level?

A    I think so.

Q    Okay.

A    And letter/word recognition is not phonetic decoding, it's recognizing words, it's having the ability to look at words over drill over a long period of time and possibly in more complicated words identifying the root words and then guessing from that or the context of the sentence what the word is, and this is a particular strength for him.

USCA5 2743

Q    And compare that to his ability to understand what he is reading, to comprehend what he is reading.

A    Well, his passage comprehension, which is that last little orange dot I have down there, he's more at the third grade level there, so he can read something.  And if you look at the next one, reading fluency, he's also fairly good at that.  He reads fluently at about the fifth grade level.  But when he has to break down what he reads and remembers it, then you start having problems.  The more particular problem for him is the third one there which is story recall, and in story recall you are reading him stories and then you are immediately asking him to tell you back what he just heard and that's where he really breaks down, so he, it's the more immediate reading that he has problems with in remembering.

Q    And what does the "K" there, is the "K" kindergarten?

A    Kindergarten.

Q    Okay.

A    That's right.  So if he reads something repetitively over time he's going to remember it, but it's going to take him longer to do this.  And I think specifically in the video, and I don't think the Judge saw Dr. Price's video, but if you look at Dr. Price's video there's a place where he is getting him to read the consent form and --

Q    At the beginning of the evaluation?

A    At the beginning of the evaluation.  I even timed, and

since the Judge hasn't watched it she can do the same thing when she watches it, how long it takes him to read it, if you watch his finger, because he is asked to comprehend it and understand it, so --

Q   Okay, let me just stop you.  He's reading this to himself?

A   Well, he reads it out loud, so you can kind of see him, and he moves his finger along and then he stops and he asks a question, and I timed it and it was, it took him an excessive amount of time to read that for comprehension.

Q   Do you have the amount of time it took to read?

A   Huh?

Q   Do you have that handy?

A   I wrote it down.  Let me see, I think I have it somewhere handy.  Let me see.  Without flipping, oh, no.  No, I don't, I don't have that handy.

Q   You don't have any -- okay, well.  Let me just, let's see if I can clarify one point.  Dr. Price, did Dr. Price ask him to read it aloud or did he just give it to him and say, "Read this"?

A   He said to, "Read it and make sure you understand it," and then he had to read it and understand it to sign it, and that was the instruction and that's the approach or the response style that Mr. Bourgeois used.  I thought it was very interesting when Dr. Moore gave it to him, Dr. Moore

USCA5 2745

asked him to read to him and he fluently read it.

Q    Okay.

A    But then at the end when he started asking questions Mr. Bourgeois got flustered because he couldn't remember what he read.  He's a fluent reader is what, the point I am trying to make, but he doesn't read with good comprehension.  And it was just interesting in watching the two videos, I remember immediately thinking, well, that's exactly what I saw in my Woodcock.  And so, anyway, those four tests are what makes up his overall broad reading which is about the fifth grade level, an 83 percentile, and an 83 percent -- I mean a standard score of 83, and that percentile score would probably be somewhere around 9 or 11 percentile, which would mean about 90 percent of the people his age in the United States read better than he does.

Q    And --

A    Which to me that would show functional academic deficits consistent with a person with mild mental retardation in reading.

Q    And how does that 9th or 10th percentile compare with the 2nd percentile that we typically see with MR, mentally retarded scoring?

A    Well, and I would refer the Court directly to the DSM. It breaks down the different categories and what the academic expectations would be for mild as opposed to moderate, severe

USCA5 2746

or profound.  But what we usually find with people with mild mental retardation is early on they have significant academic deficits compared to the same age peers but over time they can make up for these and we generally see a raw functioning somewhere around the sixth grade level by the time they reach adulthood, which this is consistent with what we see here.

Q    Okay.

A    But, anyway, if you go through this, for example, with going back to this section, in here you have a broad math and a broad written language and those are broken down in different categories.  The thing that I found most interesting next to the reading with him was his broad written language ability.  His overall ability is at the seventh grade level but this is primarily helped by his very high spelling score, which if you look down here is at the 13th grade equivalency, and this is his most unique strength. For some reason he can spell and he can spell extremely well. Where he breaks down is if you look down here under writing samples and writing fluency, he's much slower there on those tests.  So when he has to write quickly or he has to write spontaneously, it's much harder for him.  And you also get a chance to see that in the videos with Dr. Price for sure, and I do have one of those that I had saved.  There is a paragraph I think that he gets him to write and it's a very brief paragraph and I timed it at six minutes and 11 seconds,

USCA5 2747

and, about 14 words per minute to write that.

MR. ROBERTS:  Your Honor, the witness is holding up a document.  I'm not sure what she's referring to.

MR. WISEMAN:  Yeah, why don't we put it up on the screen.

THE WITNESS:  Okay.

MR. ROBERTS:  She has also done a number of documents --

THE WITNESS:  I'm sorry, I'm sorry.  There you go.

MR. ROBERTS:  She also has a number of documents in front of her, Your Honor, and I just don't know what she's referring to.

THE COURT:  Have you seen them?

MR. ROBERTS:  I haven't seen, I don't know what she's looking through.

THE COURT:  Okay.  Well, why don't we take a minute and let him look through the documents that you are using?

THE WITNESS:  Okay, sure.  Most of these, actually I'm looking at Dr. Price's document.  I think Dr. Price did a beautiful job of breaking down the adaptive skills and --

MR. ROBERTS:  Your Honor, may I approach?

THE WITNESS:  You can approach and look.

MR. ROBERTS:  May I approach the witness, Your Honor?

THE WITNESS:  Sure.  That's Dr. Price's raw data.  I

USCA5 2748

really had this open to Dr. Price's report because he did a really good job with that I thought. And these are some of my report and you can just thumb through. I will get this out for you.

MR. ROBERTS: I don't want to ask questions here, Your Honor, but there's a lot of information here, I don't know --

MR. WISEMAN: Well, Your Honor, I can tell the Court that the materials the Doctor has is her raw data which was turned over to the Government pursuant to the Court's direction, so I mean there's nothing new in there. If Mr. Roberts wants to look through it he's welcome to.

THE WITNESS: You're welcome -- it's Doctor, I can go by tabs and just identify it for you very quickly. This is a copy of my declaration, the first two pages. This is a sentence from the raw data of Dr. Price. This is that score sheet we are looking at on the board right now, the Woodcock-Johnson. This is my Woodcock-Johnson data that you-all have a copy of. This is the response sheet. You-all have a copy of that as well. It's a response booklet and the scoring sheet for that. This the score sheet for the ABAS-II that I administered. This is a letter to the editor from Dr. Moore to the APA, Division 33, on the Flynn Effect which I thought was very interesting. This is a report from Dr. Price. There's more, this is like a, there's two reports

USCA5 2749

for Dr. Moore, there's a supplemental report and an initial report. Let's see. This I think is Dr. Moore's ABAS data, it's all kind of clipped together. That's his data. And these are just different affidavits or declarations that I was given by the defense. That's a declaration, that's probably family members. (noise) When I'm talking, I have a hard time, I'm just trying to understand which one is Henry --

THE COURT: Please be careful of the microphone.

THE WITNESS: Okay, I'm sorry. So these are different family members right here, as best as I could understand it when I'm reading through when someone identifies themself as Isaac Henry, III, this one was Isaac, II, and so these are scribbles trying to figure out is it his mother's first cousin or his first cousin. If you have read through the declarations you might understand. That was my best guess when I was reading these declarations. This I think we have already looked at, that's my Vineland-II. And this is some kind of something that came out of this previous report or hearing. There you go. And that's it.

BY MR. WISEMAN:

Q    Okay.

A    Excuse me, I have to get this down.

Q    I --

A    Wait, just give me just a minute so I can slide this in

USCA5 2750

here without hitting that microphone.

Q   I have put up and marked the page that you were discussing just a moment ago and called it Petitioner's 159. Why don't you describe what this is and what significance it has for you.

A   Well, I just really, when I was watching the video, I had also worked with Mr. Alfred Bourgeois in the same setting and done similar things with him.  I had given him a sentence that I dictated to him, it was a nine-word sentence.  I also had him writing things for me on these different tests, and you have copies of my raw data.  And Dr. Price got him to write this and so I just timed it as we went because that was my same impressions when I worked with him.  He copies very quickly but when he has to write spontaneously it takes him much longer to write that.  Also, when I was there with him, there's multitudes of examples of his own written work in various documents that were given with him and I wanted to know how long does it take him to write something like that, and he told me sometimes when he produces a one-page document he may write it and copy it over and over again and it takes him a very long time.  And I just found this very unique because I didn't administer this but when I watched it that is about the same kind of performance that I showed with him.

Q   Okay.  Let me just ask you, the scribbles or the calculations, excuse me --

A    Okay.

Q    -- that are contained down there, are those yours?

A    Those are definitely scribbles, and I was just counting real quickly how many words did we have.  It took approximately six minutes and 11 seconds is what I timed it at, at six words a minute, if I did my math correct.  I figured about 14 words a minute, which is extremely slow.  And when you watch him, he's just extremely slow to write spontaneously and very quick to copy, so copying is a strength for him, writing spontaneously is not.  So that's why when we were talking earlier, and I think we got off on this or I got off on this, talking about his written expression, and I thought that was very interesting.  There actually is one more example that the prosecution just looked at and he asked him to write a sentence and it was, "I'm going to the gym and work out in about an hour," and that took him one minute.

Q    Could I see what you have?  Okay.

A    And I will show you that one, too, and this is in the rough data, the raw data provided by the prosecution's experts.  And I just thought that was interesting because it validated what I had seen as well as the problems that he shows in written expression.

Q    Let me, let me put that up so the Court can see what you were looking at.  I'm calling this Petitioner's 161.  160 had

already been taken.  So how long did it take Mr. Bourgeois to write that sentence?

A    One minute and 16 seconds is what I timed it at when I was watching it.

Q    And what was --

A    And he just --

Q    What was the task asked of him at that point?

A    I think he was just asked to write a sentence.

Q    About anything?

A    Or anything that he wanted to, any thought that he had, and it took him that long to come up with the sentence and that was how long it took him to write it, and I felt that was consistent with a person that would have the academic deficits that I noted on the Woodcock.

Q    Now, looking at the various strengths and weaknesses reflected on the Woodcock, do you see consistencies with the WAIS administrations that you have reviewed?

A    Yes.

Q    And what are those consistencies?

A    Between my Woodcock and the WAIS?

Q    And the WAIS.

A    Well, as I mentioned, the thing that I saw that was the most significant on the WAIS as far as his strength was his ability to copy those symbols.  And I find that as long as it's right there in front of him he does extremely well and

USCA5 2753

his copying skills are very good.  The problem for Mr. Bourgeois was when he has to spontaneously think things through.  Also, when you give him a word, vocabulary he does a little bit better, but when you start having him analyze something, for example, in similarities, you generally watch him slow down.  There are examples of that on the video and I think it's Dr. Price gives him proverbs, very simple proverbs, and I also gave him proverbs on my mental status exam, but I think the only one he got, he had a lot of trouble trying to analyze these, I think he only got one of them right and they were just basic simple proverbs that we all see.  One of the ones I used is what does it mean you can't see the forest for the trees.  He can't break that down in the abstract, the underlying meaning of that.  And I thought the video displayed that extremely well because he is talking very fluently, he's expressing himself, and then they switch to that and he doesn't have a clue of how to answer.

Q   And to the consistencies you have observed between the WAIS-R, the WAIS-III, the Woodcock-Johnson, the proverbs on the videotape, the writing and reading skills and deficits, those consistencies, do they also give you information with respect to malingering?

A   Well, yes, because when you are looking at all of this, if he had done extremely well in something I need to know, well, why does he do well and what is there about that.  For

example, he is an extremely good speller and I thought that was very interesting because he doesn't phonetically decode so where is he at that, but he has some ability to do that and that's a unique strength for him.

Q    And finally, before we leave the Woodcock, you mentioned earlier that people with mental retardation can have strengths.  Does the fact that he spells at a 13th grade level preclude a diagnosis of mental retardation?

A    No.

Q    And did you use your Woodcock administration to determine whether or not Mr. Bourgeois meets any of the adaptive deficit domains under the AAIDD?

A    Yes.  I used them in two areas.  One of them was for -- and both of them under conceptual.  In conceptual, one of the areas you are looking for is functional academics, and I think I've given a pretty broad explanation or specific explanation of how I probe for that, and overall he's functioning somewhere 5-8, 4-1 and 7-2 as far as his broad areas in broad reading, broad math and broad written language.  His academic fluency is at the fifth grade level and his actual ability to apply academics actually is at the third grade level, so this is consistent with what you would see with a person who has mild mental retardation.  I also, in that test you give them oral comprehension and other tests that probe for oral language and listening comprehension.  On

USCA5 2755

the sheets you had up earlier that was the first two broad cluster scores.  And his scores in those were at the third grade level and the fourth grade level.  Overall that was like at a 9th to 16th percentile, which is consistent, in my opinion, with people having communication deficits which is also under conceptual.  So I felt, when you are doing this it is kind of nice to have some standardized scores to back up your own clinical judgment that you make in looking through records and talking to people, and I felt we had two standard scores there for conceptual.

Q   Okay.  Let's talk briefly about the informal functional assessments that you had mentioned earlier.  Tell the Court what precisely you administered and what conclusions you reached.

A   Okay.  Well, it's very interesting to do standardized assessments, but what we really need to know is how this person can take his academic skills and function in the real community.  I bring maybe a copy of a newspaper article, which most newspapers are written about the sixth grade level, if this person is going to function in the community, and I get them to read that.  I want to know how many words per minute it takes for him to read it, and when he gets through can he answer some basic questions about that.  I found my reading probes with him were about consistent with the standardized assessments, but I think these video

USCA5 2756

examples that the Judge can actually look at are even better than the ones I can provide narratively. I got him to write some things for me as well on these different tests. I asked him about the things he can do well. Mr. Bourgeois is, quite frankly, very difficult to interview. He overestimates everything he can do and you have to talk to him an extremely long time before you start finding inconsistencies, and you need to have done a lot of homework before you go in there because he likes to present himself in the best possible manner. So a lot of times what I would say, well, I understand that, now here's some things, can you show me how you would have done that with this. One of the things I really probed was, for example, he said he did a lot of housekeeping and that he knew how to wash his own clothes, but when you really pressed him, these are things that he got girlfriends to do, his wife to do or he left with other people, but then he immediately tells, assures you he knows how to do them. So I have different cards that I use over time in trying to start where I am going to train somebody and so I would get him, okay, well, you explain to me on that shirt, which of these labels would explain, would it be a perma-press shirt, would it be this, so it's the ability to read his label, his ability to determine which wash cycle or which dry cycle to use that, which kind of detergents he would use with different things. When you start pressing him

USCA5 2757

with those things he cannot give you the answers.

Q    Did you show him any maps?

A    Yes, I did.

Q    And what did you show him a map of?

A    Well, the maps to bring into Terre Haute for me, it might have been different for other folks but I had to bring maps that had no relation to Indiana or pretty much the state of the United States or they wouldn't let me bring them in, so I brought a map of Oslo, where I had been recently, and I brought a map of Hawaii, and specifically also the island of Maui, and so we just worked with those maps because the guard let me get those maps in.  And so we, I tried to get with concepts of east and west and if you were here, you're going there, and what direction would you tell someone to go on different places, and I didn't find he was able to do that on those maps.  If you have good map skills you ought to be able to get a map if you travel to Oslo and figure out where to go and be able to get directions from that map.

Q    And you weren't asking him to interpret -- what language do they speak in Oslo?

A    Norwegian.

Q    Norwegian, okay, you weren't --

A    No, I wasn't asking him to do that.  I was really asking him more things like there's a compass on the map and how would you use that and how does that identify north, south

USCA5 2758

and east and west, and when you press Mr. Bourgeois he always tells you that what, you just get on the interstate and you follow the signs, and he can identify the colors of the signs, the type of the signs, he can identify which was a U.S. sign as versus an interstate sign, and he relies a lot on that.  He quickly tells you he didn't have to use maps anymore after that because he had a GPS system and the GPS system would tell him, and if he got lost he could always call back to the dispatcher at the trucking station that he worked for and she would give him more specific directions. And he also admitted that he frequently had somebody with him that would help guide his way.

Q    Now, did you see Dr. Price also show some maps to Mr. Bourgeois?

A    Yes.

Q    And those were maps of the United States, weren't they?

A    Yes.

Q    And what did you observe with respect to Mr. Bourgeois' ability to get from, I think it was Louisiana to Chicago?  Do you recall that?

A    It seemed to me he just immediately identified the interstates and just kind of went from there on up.

Q    Okay.

A    I know when I verbally tried to get him to describe how he would get to Kansas or how he would get somewhere, he

USCA5 2759

always told me he would go up to an interstate and then come over and then come back down.  That wouldn't necessarily be the fastest way there but it would be the way that he would go.

Q   And this sort of inability, as you have described, for him to use the directions on the maps you showed him, was that consistent with anything you saw in the video when Dr. Price was asking him about orientation?

A   Yes.

Q   And describe that for the Court.  The Court will watch it if she hasn't, but just give us your interpretation of what you saw.

A   Well, what I think Dr. Price was trying to get Mr. Bourgeois to do, and Mr. Bourgeois is extremely hard to interview, is he was trying to get him to explain some kind of directionality or orientation, because if you are a truck driver we are going to assume that you know something about directions and how to get from point A to B, north, south, east, west, some direction where the moon would be.  He was asking him a lot of different probes and I thought that was what he was trying to get, get some sense of with Mr. Bourgeois.  Mr. Bourgeois gives some fairly long-winded answers and I don't know if he got that, what he was looking for.

Q   All right.  And particularly, were there questions about

USCA5 2760

where a shadow would be cast based on where the sun is and if a flag were blowing one way which way is the wind coming?

A    That's correct.

Q    All right.

A    Because, you know, if you don't really know east or, you know, some people have practical knowledge that they have learned in life so if you don't know it as far as east, north, if you haven't learned it in school, possibly you have learned that from a practical experience.  There's people who have never gone to school and who can go out in the woods and hunt and come home very quickly, so maybe there were some other skills that he had learned that give him his sense of direction that were not academic, and I thought that's where Dr. Moore was going with that.

Q    Dr. Price?

A    But I don't know that Mr. Bourgeois --

Q    You said Dr. Moore, I think that was Dr. Price.

A    Dr. Price.

Q    Okay.  And was Mr. Bourgeois able to answer any of those orientation questions?

A    I think he got confused, as I remember the video.

Q    All right.  Is there anything else about your informal assessment, functional assessment, that you want to bring up, or should we move on to standardized testing?

A    No, not really.  I brought a dictionary, some practical

USCA5 2761

things that I wanted him to see, and he does have dictionary skills and he has learned these skills, so just functional everyday things that you would use, so I don't really think there was anything else that really I recall to mind.

Q    All right.  And overall did you draw any conclusion about his functional skills on those informal assessments and how they relate to your other adaptive testing?

A    Well, what the literature tells us I think is pretty consistent with Mr. Bourgeois.  All the family members report deficits in his early years.  I think over time there may be some deficits still in the area of conceptual and social, but in practical skills he has made the most mastery, and he demonstrated fairly good knowledge of practical skill areas.

Q    Okay.  Let's now talk about the standardized testing that you administered to the third-party informant, Beverly Frank.  First off, why did you select her as opposed to any of the other people you interviewed?

A    Well, the manual gives specific guidelines on who is a good informant.

Q    And which manual are we talking about?

A    We are talking about both manuals.

Q    Okay

A    The VABS-II and the ABAS-II, and it specifies who would be a good informant and who to look for, and you are looking for someone that knew him well over an extended period of

time and you are looking for someone that can, when you are doing something retrospectively can identify a specific point in time when they knew him well.  Because there are some skills you would not expect, say, a seven-year-old to know that you would expect a 16-year-old to know, and even someone with mild mental retardation may not be able to do something at seven and have mastered it at 16.  So you can't float along the continuum, you need to get that person, when you are doing it retrospectively, to be able, I clearly remember that point in time when I knew him well and this is where he was.  Some of the people that I interviewed, for example, siblings, had also left the home at an early age and really couldn't pinpoint a time for me.  They could give me general recollections across the spectrum of time but not anything specific.  And Ms. Franks could specifically remember the time when he came to live with his grandmother.  We had almost an hour --

Q   I'm sorry, what --

A   With her grandmother, I'm sorry.

Q   All right.

A   And we had an almost hour-long conversation where we talked about his skills in different times and then we finally finished down to that was the time she clearly knew him well, so when I administered it we only talked about what he could do at that point in time and in answer to any other

USCA5 2763

Swanson - Direct                    67

question it was always, are you sure he could do that at seven or was that something that you saw later, and if it was we didn't score it that way.

Q    And what do these manuals tell you about the need for an interview before the administration of the test?  I mean do you just walk up to people and say "Take this test" or do you --

A    Well, you have to establish really good rapport first, so, you know, it involves a point of getting a conversation. I feel that's more important in retrospective because you have to really feel comfortable and confident that you are getting good and unbiased answers of the person that you are interviewing.  It also requires that they really do know across the whole spectrum of the test because you are looking, as we talked about, across maybe ten areas, so they need to know about each of the ten areas.  And if there is a frequent, if they don't -- well, they know, for example, I interviewed people that knew about work but that's all they knew about, so they wouldn't have been a good respondent for the whole scale because they really didn't know about these other areas, they only knew about his work skills.

            THE COURT:  Okay.  Well, how did Ms. Frank know about him?

            THE WITNESS:  Ms. Frank was the granddaughter of Mrs. Taylor, Mary Taylor, we talk about a Miss Mary.

USCA5 2764

THE COURT:  Right.  Did she live with her grandmother?

THE WITNESS:  No, one of her jobs, there were family members, Ms. Taylor had family members that came by daily to check on her and that was one of her things.  She was older than Mr. Bourgeois and she came in daily to check with her grandmother.  She sometimes stayed at night with her grandmother.  And Anthony stayed there with her grandmother from the time he was seven until the time of her death.

BY MR. WISEMAN:

Q   I'm sorry, you said Anthony?

A   Not Anthony, excuse me.  Mr. Bourgeois stayed there with them from the time he was seven until the time of Miss Mary's death.

Q   And let me just ask you, you mentioned a Ms. Taylor --

THE COURT:  So Ms. Frank didn't live with her grandmother?

THE WITNESS:  No.  Well, she stayed there with her sometimes, she stayed with her in the summer, but she did not live with her.

THE COURT:  But she didn't live with the grandmother?

THE WITNESS:  No.

BY MR. WISEMAN:

Q   Did she live in proximity to the grandmother?

USCA5 2765

A    Yes.

Q    And about, you know, was she in the same community?

A    Yes, that's what I understood.

Q    And what's the name of this community that these folks lived in?

A    Okay.  This particular community that Mr. Bourgeois and Miss Mary lived in is called The Bend.

Q    Okay.

A    And it was a lot of land that an ancestor had bought and different family members had come to live on and then I think Miss Mary's family had bought some land there.  She wasn't directly related to Mr. Bourgeois.  And it is in the general area of a very small community in that parish known as Paulina, and the next real city that is of any mention is probably Lutcher.  So it's a very small rural community in Louisiana that immediately borders the Mississippi River north of Louisiana, I mean New Orleans, maybe 30 miles north of New Orleans.

Q    All right.  And I have put up the first page of Exhibit 35 which is, says "parent form," it's a little cut off there, and I think you mentioned this earlier, it says his age is five to -- what's the actual age?  I'm not --

A    Twenty-one.

Q    Twenty-one.  That's cut off, so it's not ages five to two.  And why did you use the parent form in administering

USCA5 2766

this test to Ms. Frank?

A    Well, the ABAS-II is different from the Vineland in that it has multiple forms, and when they are under the age of 16 -- the adult form starts at 16 -- so when they are under the age of 16, there's forms for under the age of five, I think three to five, there's another form for teachers, but for the child himself at the age of seven and someone that's giving knowledge on the home, this is the only form you can use.

Q    And after you interviewed -- well, why don't you describe how the ABAS is administered and its strengths and weaknesses.

A    Okay.  The ABAS and Vineland are administered in two separately different ways.  The ABAS-II you give to the person, the person reads the instructions and scores them. You ask them to score every single item from the very first item to the end of, to the last item on every subtest.  If there are items to deal with work, we scratch those out if work doesn't apply.  You read them the instructions and there is also a little template at the very front that specifies the different scores, and the person may get a zero, a one, a two, a three or a four I think it goes up to.

Q    Let me just --

A    Yeah.

Q    Let me just put up a representative page.  This is page 4

USCA5 2767

of Exhibit 35 and --

A    Can you show me the top of that page?

Q    Sure.

A    And that's exactly what I'm looking for, I think, that specifies the different levels.  So you can't read it quite as well but there is a zero, a one, a two, a three and a four, and it specifies with each little bullet, you know, more examples of which each one of those are.  And then if you look at the lower right-hand bottom where the zero, one, two and three is, then that's where you would give those scores there, so those are smaller captions of the top ones.  So there is four possible scores you can give, zero, one, two or three, and if you don't know then you can either mark you don't know or you can leave it blank or you can check that you guessed, which is what the box is for the side.  So when the person gives this test they are asked to give, to answer every single item starting from the first item to the last item of that subtest and they read it to themselves.

THE COURT:  All right.  So you, this is the test that Ms. Frank took about Mr. Bourgeois?

THE WITNESS:  That's correct, that's one of them.

THE COURT:  Even though she never lived with him and wasn't related to him and didn't go to school with him?

THE WITNESS:  That's correct.

THE COURT:  Okay.

USCA5 2768

BY MR. WISEMAN:

Q    Did you in your interview determine whether Ms. Frank had ample knowledge to complete the form?

A    Yes.  That was one of the things I did, as I said, when we started the first hour of the interview in determining that.  Her grandmother, Miss Mary, Mary Clayton (sic), was elderly and I think used a walker to get about and she came over every day to help her grandmother, and frequently Miss Mary asked her to help with Mr. Bourgeois because there were things that he needed to be done with him, or she got to observe her grandmother as she was working with him, so she had direct knowledge on a daily basis of how he met these different skills.

THE COURT:  Now, how old is she in relationship to Mr. Bourgeois?

THE WITNESS:  Judge, I am going to make a guess at this point but I would say six, seven, like when he was six she was a teenager, I think, you know, as I recall.

BY MR. WISEMAN:

Q    And what domains does the ABAS cover?

A    Okay.  The ABAS collapses into conceptual, practical and social, and it gives you a global general adaptive composite, so it gives you a general score and then the three scores that we were speaking of earlier, and you get these three scores based on ten subtests that collapse into this.

USCA5 2769

Q    Okay.   And how did the administration of the ABAS come out with Ms. Frank?

A    Okay.   And I want to clarify this at the point as the reason I give the ABAS.

Q    Okay.

A    I had a lot of concerns on whether Ms. Franks was a good informant or not and how much she would remember, so when I gave her the ABAS we had a long conversation, we probed all the different areas and then I gave her the ABAS, and my major purpose in giving her the ABAS, after I explained it to her, was I was interested in learning how much she didn't know about him, how many blanks did she leave, how many guesses did she give, because then that generally showed me there was no point in proceeding with the standardized assessment because she didn't have the knowledge skills that I needed.   And when I finished administering the ABAS and I looked at it, she had marked everything, she didn't leave any blanks, and so then I turned around and I administered the Vineland in a semi-structured interview.   And that's my preference of the test to administer because you get to probe each item more and you get to ask them are you sure he couldn't do that at that age, are there things that you could put in place that he would accomplish it, and so actually I gave him the, her the Vineland in a semi-structured interview and scored that.   I feel the Vineland is a more accurate

USCA5 2770

estimate of where he really is in compared to the ABAS.  The other thing about the ABAS is it has what we call a higher floor.  The Vineland goes all the way down to the profound deficit range and the ABAS stops at a moderate range, so you don't have as many items on the lower end of that, and I just feel the Vineland gives a better estimate of a person who is functioning in the mild deficit range.  There's more items at the lower end of the test to help judge where he is.

Q   The structured interview that was part of the Vineland, is that something that the Vineland manual tells you to do?

A   Yeah, and it's called a semi-structured interview.

Q   Semi-structured.

A   And the reason it's semi-structured is you try to keep it as conversational as possible but you move along topics with the person, and you are asking the specific questions that are on the protocol but at any time you can stop and give more information.  So if they say the person couldn't make a bed, for example, you might say, well, tell me what they did, did they pull the sheets up, and so you can ask a lot more questions about that and in asking the questions you may see that the person really does deserve a one rather than a zero because he can do some of the skills with supports.

Q   How, excuse me, how did Ms. Frank score on the Vineland compared to the score on the ABAS?

A   Okay.  As I remember, on the Vineland we got scores in

the mild deficit range, if I remember correctly.

Q   Would you like me to put it up for you?

A   Yes, would you please?  We're having to hunt it up.  Yes. So if you look at this, pretty much in communication he got a 69, a 66, a 68, and these skills are in the mild deficit range.  And we are looking at a child who is seven years old. This is the age he was when he came to live with his grandmother and where his skills were at that time.

THE COURT:  It's not his grandmother.

THE WITNESS:  I mean with her grandmother, I'm sorry.  With Miss Mary.

THE COURT:  I'm concerned about your information.

THE WITNESS:  Okay.  It's with Miss Mary Taylor, the grandmother of Ms. Franks and the lady that Mr. Bourgeois came to live with when he was about seven years of age.

BY MR. WISEMAN:

Q   And how did that scoring compare to the scoring on the ABAS?

A   It was higher than the ABAS.

Q   All right.  So he scored in a less impaired way on the Vineland?

A   That's correct.

Q   Than on the ABAS?

A   That's correct.

Q   What --

USCA5 2772

THE COURT:  I'm sorry, which one did you give to the to Ms. Frank?

THE WITNESS:  I gave both of these to Ms. Franks.

THE COURT:  Okay.  So he didn't score anything, Ms. Frank scored.

THE WITNESS:  That's correct

THE COURT:  I mean let's really keep that straight when you are talking about it, Mr. Wiseman.

MR. WISEMAN:  Sure, that's my --

THE COURT:  Because this is getting to be a little strange.  Keep going.

BY MR. WISEMAN:

Q   The scores that were recorded on each of the instruments you administered to Ms. Frank, were they both in the impaired range, significantly impaired range?

A   Yes.

THE COURT:  Did you give her any test to see how impaired she was?

THE WITNESS:  No, but I --

THE COURT:  Okay.

THE WITNESS:  -- I talked to her.

BY MR. WISEMAN:

Q   Is it typically required or even called for to do such a thing?

A   No.

USCA5 2773

Q   All right.  And the, both manuals require an interview to see if the person is a reliable informant?

A   Yes.

Q   And a person who has a basis for knowledge for the information they are providing to you?

A   Yes.

THE COURT:  How much time did you spend with Mr. Bourgeois?

THE WITNESS:  About four hours.

THE COURT:  Did you ever ask him if he remembered that lady, Ms. Frank?

THE WITNESS:  Yes.

THE COURT:  And?

THE WITNESS:  Well, he remembered her and we, actually I think the reason I keep her calling her grandmother, he calls Ms. Taylor grandmother, so that's why I keep slipping up.

THE COURT:  Well, in the interviews I saw he called her the old lady.

THE WITNESS:  Well, that's what he called her to me. But he does remember her and he remembers all the people in that community, that community of The Bend.

BY MR. WISEMAN:

Q   And you have talked about how the structured, semi-structured interview of the Vineland is preferable in your

USCA5 2774

view.  Does it have particular strengths in a retrospective evaluation?

A   I would think it does because it allows you to keep calling the person's attention back to the age at which you are interested in determining how that person was functioning.  When you are dealing with it retrospectively, they tend to bounce across the time they have known the person and if you would allow them they would give you answers of how they were when they were in high school or whatever, so in a semi-structured interview you always get that point to clarify, okay, this is what I think I've heard you say, and remember we are talking at seven, are you certain this is what he could do at the age of seven.

Q   Did you observe in Dr. Moore's report any critique of the scores that were recorded with respect to the administration to Ms. Frank?

A   Yes.

Q   And what was that, generally what was that criticism?

A   As I remember his criticism, I think the major criticism was the difference in the scores, that one was low and the other one was higher and it showed a specific bias.

Q   And did he make any observation with respect to what state or what condition Mr. Bourgeois would have been in if those were his true scores and whether he would have accessed services?

USCA5 2775

A    Oh, I remember that part.  It was more along the lines of the way a person functions with scores in the 40 is that person would more likely be institutionalized and need, wouldn't be able to function out in the community even with supports.

Q    And did you, are you familiar with the state of services for people with developmental disabilities in that part of Louisiana during the early 1970s?

A    Yes.

Q    And describe it for the Court, as well as your basis for knowing it.

A    Okay.  Well, I have always worked for the division of state government that provides services to people with developmental disabilities, not only in developmental centers, which are the institutions, as well as other types of facilities.  In that particular area, in South Louisiana, people tend to keep their children at home.  There were no services available in the community prior to about 1980 and so they lived at home if they were allowed to go to school. If they were toilet-trained they would go to school.  If not, up until the time of special education, services were provided in the home.  And there really weren't any personal care attendants or things like that that you get services for to come help you in your home.

Q    And the fact that his brother Anthony, Mr. Bourgeois'

USCA5 2776

brother Anthony didn't receive services until 2001 as an adult, did that factor into your assessment of the services available at that time?

A    Well, that's consistent with that, because I think that's about the time his mother passed and his sister Claudia assumed some responsibility for his services, and she worked or the family members worked and they were looking for someone that could help provide him services during the day. Even Claudia mentioned the family didn't want to institutionalize him because they had managed to keep him in the community all of this time.  And the services he gets now is the opportunity to go to a day program during the day and then have some people come in and help him, help her with the bathing and the physical lifting, et cetera.

Q    And did you have an opportunity to speak with a woman named Gwendolyn Thomas Smith about services in that part of Louisiana at that time?

A    Yes.

Q    And who is she and what did she describe?

A    Gwendolyn Thomas Smith was an educator in St. James Parish, which is the parish he went to school in.  She always worked in the field of special education, but prior to special education, formal federally funding, funded special education coming to Louisiana, she worked under the Title I program, the ESEA program.  It was a federally funded program

USCA5 2777

to provide assistance to low-income students and they had reading labs.  It was the early, early stages of special education in rural areas in Louisiana.  So she gave me some history of where the school system was in regard to special education and special education services at the time Mr. Bourgeois was in school.

Q   And did the information she provide you add anything to your evaluation in particular with respect to the fact that Mr. Bourgeois apparently didn't receive any services?

A   Well --

Q   Let me ask it a different way.  Was there a reason for his not receiving services other than the fact that he may not have been mentally retarded?

        MR. ROBERTS:  Your Honor, I would object, that calls for speculation.

        THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Using Anthony's brother, Mr. Bourgeois' brother Anthony as a comparison, did the fact that there was a profoundly impaired person in the home, in your view, impact the information you were getting from the family?

A   In my opinion it does, and I have seen this with another, in other families.  When you have someone with Anthony's impairment, for that family that becomes the definition of mental retardation, and so even though they may have other

USCA5 2778

children that are struggling academically or also have deficits, that person is far superior to the benchmark person or family member they are looking at and so they wouldn't put him in the same category.  In their opinion Mr. Bourgeois might have been slow in certain areas but he wasn't mentally retarded, Anthony was mentally retarded and there was no way they were the same.

Q    Let's talk now about your other interviews and review of collateral data and let's talk about the data first.  Did you have a lot of collateral data as far as Mr. Bourgeois' background to review in this case?

A    Not very much school information at all.  There were people still living in the community that I could talk to. There were some efforts he had made to make employment with sheriff's departments that I could look at.  And his first long-term employment was with a place named Schwegmann's and there were people there that I could talk to, and I was kind of familiar with that organization.

Q    All right.  So, in addition to talking to Ms. Frank and administering these two tests to her, how many other folks did you talk to?

A    Okay.  Amongst family members I spoke with Claudia, which is an older sister, Claudia Ferdinand.

MR. ROBERTS:  Your Honor, could, I just want to get a time frame for when she was actually speaking with these

individuals because I think it matters with regard to her report and when she did her report.

THE COURT:  When did you talk to them?

THE WITNESS:  Okay.  Ms. Franks was in the spring of 2009, I want to say April, about, maybe March.

BY MR. WISEMAN:

Q   Before your report?

A   Before my report, yes.  Let's see, did I talk to any -- I know I talked to Claudia Ferdinand in the last three months, is off the top of my head.  I talked to -- and that was in person.  I talked to Michelle Armont, who is a half-sister on the father's side of the family.  I talked to her in the last three months.

THE COURT:  After your report was written?

THE WITNESS:  Yes.  Let's see, who else did I talk to?  I talked, I'm trying to think of family members.  I talked to Murray Bourgeois, and he is a, I think, if I've got it correct, he is a cousin of the mother, although I think he refers to Mr. Bourgeois as his cousin.  I talked to him in the last three months.  I, by, I had a phone conversation with Carl Henry, who is a cousin and also was a work supervisor at Schwegmann's.  I talked, I talked to a brother, his brother Lloyd Ferdinand, and that's been fairly, I had a very hard time tracking down Mr. Ferdinand and that's been probably in the last 30 days that I spoke with him.

USCA5 2780

THE COURT:  Where did you find Mr. Ferdinand?

THE WITNESS:  I had phone numbers that I kept leaving messages at.  And I talked to him once at a place he said was his, a workplace of his, and then he terminated the conversation and then he called me back later that night, and then I had to return him back on his cell phone, so it was always on different, different phone lines that I was talking to him, and I gathered from the phone calls he was traveling about.  I talked to, I'm trying to remember everybody here, I talked to people that worked with him at Schwegmann's.  I talked to a Donald Reese who was a truck driver that worked with him at Schwegmann's and later was a tandem truck driver with him, they went on the same truck route together in the same truck.  I talked --

MR. ROBERTS:  Your Honor, if I may interject again, she's starting to list the people without giving us when.  I think --

THE WITNESS:  Okay, and I would say that's in the last three months.  I'm sorry.

MR. ROBERTS:  -- most have been within the last three months, right?

THE WITNESS:  The last three months.

BY MR. WISEMAN:

Q   With respect to when you spoke to these folks, I want to put up what's been marked as Petitioner's 33, and do you

recognize that?

A    Yes.

Q    And is that your report or your supplemental report in this case?

A    It think that's my supplemental report right there, yes.

Q    Okay.  So you issued a report in 2009?

A    That's correct.

Q    And you did additional interviewing?

A    Yes.

Q    And you issued a supplemental report?

A    That's correct.

Q    And the supplemental report contains the result of your, the interviews you have just described?

A    That's correct.  Now, when I did my initial report and my initial interview, I asked to talk to a lot of different folks, and the legal team was cooperative in trying to find these people for me and to give me phone numbers, et cetera. There was, the last name I was going to mention, and it has been in the last three months, is Fred Tompkins who was a senior truck driver at Schwegmann's that knew Mr. Bourgeois. I also spoke with him.

Q    What, we will get to specific things that were told to you but what generally did you learn about Mr. Bourgeois' background from the various folks that you talked to?

A    Okay.  And starting with family members that I --

**USCA5 2782**

Q    Sure.

A    -- spoke to that knew him during the developmental period, there was a history of physical abuse and emotional abuse that he sustained throughout his years.  I think that's well documented in the records.

THE COURT:  Well, it's all by Mr. Bourgeois.

THE WITNESS:  By his mother towards Mr. Bourgeois?

THE COURT:  No, I meant the documentation is all by Mr. Bourgeois after his trial.

THE WITNESS:  Oh, that's right, I guess so.

THE COURT:  Okay.

THE WITNESS:  But, and the people I talked to, they all agreed that that occurred.  Anyway --

THE COURT:  Who agreed that that occurred?

THE WITNESS:  First of all his sister Claudia.

THE COURT:  Okay.

THE WITNESS:  Who is about six years older than he is.  And she'd give instances of when he was beaten by the mother.  Not only was his nose disfigured, and this was a constant thing, he was beaten by the mother with extension cords, belts, things were thrown at him.  She told the story of a meat cleaver that the mother brought down one time and removed the tip of a finger.  She told the story of him being beaten in a bathtub so profusely that blood was running in the bathtub.  And she confirmed that he had, he was treated

USCA5 2783

differently than all the other siblings in the family.

BY MR. WISEMAN:

Q   In addition to Ms. Williams, did you hear any abuse stories from Mr. Henry?

        THE COURT:  Mr. who?

BY MR. WISEMAN:

Q   Henry, Carl Henry?

A   Carl Henry, yes.  Carl Henry was a cousin and later was his, a supervisor of his at Schwegmann's, and he frequently came back to The Bend, which was where his family was, and he played, you know, with all the children in The Bend, and he remembered that Mr. Bourgeois was emotionally and physically abused by his mother.

Q   In addition to the, to the abuse you heard from those folks, did you hear anything relevant to the mother's household while Mr. Bourgeois was a child?

A   Well, I heard more than one thing, but one thing about the mother was she was a fastidious cleaner, she was an obsessive compulsive person.

        MR. ROBERTS:  Your Honor, I'm going to object unless they can lay a foundation of who she is hearing this from.

        MR. WISEMAN:  Oh, sure.

        MR. ROBERTS:  Because it's just so generic, we don't have any idea where this information is, the source of the information.

BY MR. WISEMAN:

Q    Yeah, Why don't, why don't we -- that's a fair point.
Why don't we go through some specific folks.  Let's talk
about Claudia first.

A    Okay.

Q    Claudia Williams.

THE COURT:  Are these people going to be here?

MR. WISEMAN:  Yes.

THE COURT:  Can't we just hear from them?

MR. WISEMAN:  Sure, but then I'm afraid that I will
be confronted with not having had the expert talk about it.
I am happy to not talk about it with the expert --

THE COURT:  Well, what can she say other than that
she talked to these people and he was abused?

MR. WISEMAN:  All right.  Well, I mean, I just had
an objection from Mr. Roberts it's not specific.  If Your
Honor wants to overrule that, I will move on.

THE COURT:  No, I want --

MR. WISEMAN:  I'm happy to have her talk
generically.

THE COURT:  I was kind of hoping that we could just
move on from the hearsay stuff to something that she knows.
You know, test results and that sort of thing.

MR. WISEMAN:  Oh, sure, sure.

USCA5 2785

BY MR. WISEMAN:

Q    Well, Doctor, do people in your line of work rely on third-party reports in assessing whether there is an abuse history?

A    Yes, you have to rely on third-party reports in gathering the evidence in a retrospective diagnosis to see if you have met the criteria prior to the age of 18.

Q    And what relationship is there and why is an abuse history relevant to whether or not Mr. Bourgeois is mentally retarded?

A    Well, it could have been the abuse might be the underlying etiology of the mental retardation.  It could have been because of the abuse he developed certain patterns of emotional behavior that kept him from learning.  And then in this particular case there is a secondary issue of another diagnosis that he most likely has of a personality disorder, and a history of abuse is primary, in my opinion, of giving a personality, the type of personality disorder diagnosis that has been given to him.

Q    And what relevance does an impoverished upbringing have to whether or not Mr., and by impoverished I mean materially impoverished, have with respect to whether he's mentally retarded?

A    Well, some people that come from impoverished environments such as that have the lack of opportunity to

USCA5 2786

learn, so what you are trying to tease out is was it the lack of opportunity that caused him to be the way he was or was it low cognitive ability and not having any opportunity, he didn't get the supports he needed to achieve at the highest level.

Q   And what relevance, if any, is there to whether Mr. Bourgeois was teased as a child have to your determination of whether he is mentally retarded?

A   Well, it was what he was being teased about, I think was the most important, and he was being --

THE COURT:  Where did you get that information?

THE WITNESS:  I got that from Murray Bourgeois, the cousin.  I got that from my conversation with Lloyd, with Carl, with Claudia and, primarily those.  The other sister that knew him that I talked to that I don't think we have discussed yet knew him more as a teenager.

BY MR. WISEMAN:

Q   And same question for whether or not there was the presence of motor deficits as a child.

A   That's right.

Q   And who did you hear it from and what did you hear?

A   I heard it primarily from Carl, Lloyd and Murray, along the lines of he was much, it took him much longer to learn how to ride a bike, he was not as good as the other children, he was made fun of because he was clumsy and couldn't keep up

USCA5 2787

in the games, and then even later when he was able to do some of these things he had a harder time remembering the rules for the games.

Q   And same set of questions for the presence or absence of poor social relationships as a child.

A   Well, that's correct.  It was just harder for him to -- he was, when he was much younger he was pretty much silent and non-communicative, and then later on when he grew older he really didn't know how to socially interact with the kids and he was frequently teased or made fun of.

        THE COURT:  Did you know he had a stutter?

        THE WITNESS:  Yes, he had speech therapy when he was young, as I understand it, for stuttering, and -- yes.

BY MR. WISEMAN:

Q   Were you, did you learn from these various interviews whether he ever lived alone for any significant periods of time as a young man?

A   No, I didn't discern where he had ever lived alone. There was one time, according to his sister Claudia, that he lived in a trailer right behind her house, but even then he could rely on her for cooking and washing his clothes and things such as that.

Q   And is that relevant to the assessment of whether his home living, ability to adapt to home living is present in this case?

USCA5 2788

A    That's right, and it gives you the fact that this person had some knowledge of his home living skills at that age in his life.

Q    Did you notice in Dr. Moore's report his reliance on a fellow named Ralph, Claudia Williams' husband?

A    Yes.

Q    And did you meet Ralph?

A    Yes, I met Ralph.

Q    Describe for the Court what you, how Ralph behaved.

A    Well, when I met Ralph he was pretty disoriented, he appeared to be --

        MR. ROBERTS:  Judge, could we find out when she met Ralph and again the context?

        MR. WISEMAN:  You know, Your Honor, I'm not sure why this isn't proper cross.  If he keeps interrupting the witness, I'm not sure what the --

        THE COURT:  Well, if you want me to get a picture, I'd really like to know when she met him.

        MR. WISEMAN:  Oh, well, that's a different matter then.

        THE WITNESS:  It's been in the last three months.

        THE COURT:  So it's after you wrote your report?

        THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q    Before your supplemental report?

USCA5 2789

A    Yes.

Q    Okay.

A    And it was when I specifically had gone to the Williams home to interview Claudia Williams, he was there.  He appeared intoxicated and he was very disoriented and he kept interrupting the conversation.

Q    What time of day was it that you were there, roughly?

A    Roughly, I'd say around 3:00 o'clock in the afternoon. So if Claudia and I were talking about Mr. Bourgeois, he would become confused and thinking I was talking about something else and then sidetracked me, and so finally, I was there with a member of the legal team and she steered him to another room and kind of kept him busy so I could conclude my conversation with Ms. Williams.

Q    Did you learn from any of these particular folks about whether Mr. Bourgeois got jobs on his own or whether he got jobs with assistance?

A    Early on he got jobs with assistance.  One of the first jobs that he was able to obtain was at a Market Basket which was a, is a grocery store in Louisiana, a chain, and, as I was told, Miss Mary was able to get him that job because she knew the manager, and he worked there and I think at another grocery store.  He later had relatives that worked with the sheriff's department and he tried to get a job there.  And he went to work at Schwegmann's and he had a relative that

USCA5 2790

worked there.  Once he established skills at Schwegmann's, he met truck drivers, and when they would move on to another company he would move with them.

Q   And let's talk about Schwegmann's.  You indicated that you had some independent knowledge of what type of company Schwegmann's is.  Could you tell the Court what you know about it --

A   Well, my --

Q   -- and how you know?

A   Okay.  Well, my independent knowledge about Schwegmann's is because Mr. Schwegmann, who is now dead, founded this large supermarket chain in New Orleans and he had a handicapped child, a child that was mentally retarded, and so therefore he was pretty influential in the community in trying to get supports for folks, and he had a policy at his chain that he would hire any handicapped person that would want to work and he would work with the, he would have supports there to work with the person, so I knew a lot of people who had worked with Schwegmann's that I later worked with.  And at one time I worked in New Orleans at Magnolia School, which is a private school, and a lot of the folks that resided at that facility worked at Schwegmann as bag boys or stockers or whatever.  His in-service training actually had a way of working with disabled people that couldn't read or write very well and teaching them how to do

USCA5 2791

these basic manual tasks.

Q    And when you talked to the gentleman, Fred Tompkins, did you learn facts about Schwegmann's from him that were consistent with what you just described?

A    Yes.  Mr. Tompkins, at the time he worked there, he worked up to the point of being the senior driver, and Mr. Tompkins stated that Mr. Schwegmann was one of the first employers in New Orleans that would hire black men who couldn't read and write.

MR. ROBERTS:  Your Honor, I'm going to object to the relevance of this going down --

THE COURT:  What's the relevance?

MR. WISEMAN:  Well, the relevance is that the very first trucking job Mr. Bourgeois had was in a place that specifically recruited and supported people with disabilities.

THE COURT:  Okay.  Do you have any reason to think, to know, any personal knowledge of the fact that Mr. Bourgeois was recruited because he was mentally handicapped?

THE WITNESS:  No, Mr. Bourgeois --

THE COURT:  Just, this is a yes or no.

THE WITNESS:  No.

THE COURT:  Okay.  Then let's move from something else.

USCA5 2792

BY MR. WISEMAN:

Q   Okay.  How about whether Schwegmann's supported Mr. Bourgeois while he was working?

THE COURT:  Okay, that, the issue is move on from this.  If she has no personal knowledge that Schwegmann's hired him because --

MR. WISEMAN:  But she does.

THE COURT:  She just told me she didn't.

MR. WISEMAN:  No, but she has knowledge of the supports that were in place.  The Government is arguing he was an accomplished truck driver.  Our view is that he was given supports in the very first place he worked so that he could drive a truck, so he could learn the various skills that were needed.  If he were not given those supports, our position is he would not have achieved those things.  It's highly relevant to whether he was mentally retarded.

THE COURT:  Do you have personal knowledge that he received special supports to become a truck driver?  Personal knowledge?

THE WITNESS:  I only have the knowledge that I obtained in interviewing his supervisor and two of his co-workers.

THE COURT:  That's okay.  Are they going to come testify?

MR. WISEMAN:  Mr. Henry will be here, yes.

USCA5 2793

THE COURT:  Okay.  Then let him talk about that, okay?

MR. WISEMAN:  Okay.  Can I just ask the question?

BY MR. WISEMAN:

Q    Did he receive supports, to your knowledge?

A    Yes.

Q    Okay.

A    And I think Mr. Reese will be here.

Q    Yes.

A    Okay.  And so I interviewed three and two of them will be here and the Court could hear from them.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q    Very good.  What did you learn from Michelle Armont relative to your assessment?

A    Michelle Armont, he, Mr. Bourgeois --

THE COURT:  Now, is that his, that's his sister Michelle?

MR. WISEMAN:  Yes, half-sister.

THE COURT:  All right, thank you.

THE WITNESS:  His half-sister.  His half-sister by the father.  He came to live with Ms. Armont in his teenage years after Miss Mary died and he lived with her while he attended high school.

USCA5 2794

BY MR. WISEMAN:

Q   And what did she tell you about his ability to function?

A   When he came to live with her, at the time he was living with her, she was the one who was responsible for taking care of his clothes.  He didn't have any cooking skills.  He continued to have problems with interpersonal social relationships.  He would have girlfriends and they would frequently have spats.  And he had trouble in school.  She tried to help him in school, she tried to get some other folks to work with him, and he frequently had girlfriends that came over and helped him work on academic subjects.

Q   And let's talk about the one page of school records that we were able to provide you.  Did you see anything in there that supported your conclusion about his deficits in academic areas?

A   Well, other than I think he was approximately 20 when he graduated from high school.  We only have verbal reports of Mr. Bourgeois and family members that we believe he was retained.

Q   What do you mean by retained?

A   Well, he failed certain grades.

Q   Okay.  He was left back?

A   Left back, yes.  And then there was, there is a report, and possibly I think Mr. Henry also has knowledge of this, of him failing a grade and then making the grade up by going to

USCA5 2795

summer school.  Let's see.  The curious thing for me is nobody remembers him graduating, and when you talk to family members they are certain he didn't graduate, but the document says that he does.  I don't know if he accrued them after the time and then it was awarded.  At that time in Louisiana you graduated from high school strictly on the determination of the principal and you could leave school and come back and get the principal to look at your record and determine that you had met the requirements that were needed at that time, and that might have been what he did.

Q   Okay, so --

A   We just don't know.

Q   So that we are clear, there was no standardized method by which one graduated at that time?

A   At that time, no.

Q   Did you learn anything about -- you may have noticed on the tapes of the Government's evaluation of Mr. Bourgeois his claim to being able to fix lawnmowers and cars and things of that nature.  Did you receive contrary information from others that went into your, the formulation of your opinion?

A   Yes, I did, and particularly in talking to Murray Bourgeois.  Is he coming?

Q   Yes.

A   Before I take up too much time.

Q   Yes, he's coming.

USCA5 2796

A    I think he could address this specifically.  He is a mechanic and that's where his brother learned to do mechanics and that's where Mr. Bourgeois claims he learned, and Mr. Bourgeois can address that in his testimony.

Q    Okay.  And with respect to Carl Henry with the same proviso, that he's coming and he can talk in greater length, did you learn anything from him with respect to how long it took Mr. Bourgeois to learn to drive different types of trucks?

A    Yes.  He, the procedure there is you had to learn to drive five types of trucks before you could make truck driver, and you did this on-the-job training and it took a regular driver two weeks per truck and it would take Mr. Bourgeois maybe six months per truck, and sometimes they had to back him up to other tasks because he couldn't master the second type of truck.  So it took him much, much longer than it did the typical person.

Q    Okay.  And that was at Schwegmann's?

A    And that was at Schwegmann's.

Q    Now, we talked quite a bit about the tapes and we have talked about your interactions with Mr. Bourgeois.  How would you describe the way that he presents himself in the tapes and in your, from a clinical perspective how he presents, presented to you?

A    Well, I think I mentioned that earlier.  He tends to

USCA5 2797

overestimate his abilities.  He speaks untruths, quite frankly, about things that he can do, and sometimes when you are talking to them you know they are untruths because they don't match other things that you have seen.  But he wants to present well, he presents very well.  I think a recurrent theme in all of this is he tends to want to do as well as his brother did and he tends to try to steer you in the direction of Lloyd did this and I can do it, too.

Q   And is there a concept in the field of developmental disabilities called masking?

A   Yes.

Q   And just describe that for the Court, what that is, and --

A   Well, masking is something that people, particularly people with mild mental deficits do so that you don't recognize, to mask the fact that they are mentally retarded. They may parrot something that they have heard before or they may maintain they can do a skill that they can't do.  And they also just may redirect you so that when you answer (sic) a question, if they don't know it they very quickly start talking about something else in trying to get you distracted to another topic.  And the Judge has looked at a lot of videos and I think she can see that in the videos.

Q   And what's the explanation in your field for why people mask who have mild mental retardation?

USCA5 2798

A    Well, quite frankly, most people would prefer not to be mildly mentally retarded.  When you are functioning at a lower level it probably doesn't bother you, but when you are mild you have enough cognitive ability to recognize the difference, and it's a self-esteem issue.  You would like to present better and you would like to be like the other people that you know.

Q    And combining that -- well, did you think Mr. Bourgeois was engaged in masking during the videos and your interactions?

A    Yes.

Q    And combining that masking with what you know about his personality disorders, particularly the narcissistic personality disorder and the grandiosity that accompanies it, do you, what's your opinion as to how difficult it is to assess a person with that constellation of problems?

A    Okay, so we are moving into the area of personality disorders?

Q    Yeah, yeah.

A    And more away from the areas in mental retardation. Personality disorders are a pervasive pattern of behavior that you learn through childhood up into early adulthood and so it becomes the way that you behave, the way you act.  It's a maladaptive pattern, but it's also personality traits that you have developed over time because of the way you were

USCA5 2799

raised and the things you were exposed to.  And I think, for sure there has been some discussion, I think some people put him personality disorder NOS, some put him narcissistic and some people put him borderline.  I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they have and there is definitely mood problems there, there's self-esteem problems there, and this is some of the same problems you have with a person who is mildly mentally retarded as well.

Q   And so I guess my question was does that make it difficult to assess somebody like Mr. Bourgeois who is psychologically invested in looking good?

A   That's correct, but I think what you have to center on on a case like this is was there evidence of that at a younger age, at seven, at eight or at ten, because personality disorders aren't in place there.  They are being exposed to the things that perform that pattern.  So, yes, there is evidence as an adult he has a disorder, but there is also evidence that as a child and going up to the developmental period that he had cognitive and adaptive deficits as well that he was masking even then.

Q   We are almost to the end here.  You reached a conclusion with respect to Mr. Bourgeois' adaptive deficits?

A   Yes.

Q   And what conclusion did you reach?

A    I thought there was clear evidence that there was adaptive deficits prior to the age of 18, which would confirm a diagnosis of mental retardation.

Q    And --

A    The --

Q    Go ahead, I'm sorry.

A    Okay.  The issue with the Court, I think, today is do those adaptive deficits persist into adulthood.

Q    All right.  Before we get to that question, which we are going to get to, could you tell us in what areas you found these deficits?

A    Oh, under the age of 18 I definitely feel he has deficits in the area of conceptual and social.  And there are some practical limitations as well, but I felt the deficits were there in the area of practical and social.

Q    Okay.  And now taking the next question about post 18-and up to the time of the offense, do you have any opinion as to whether any of those deficits continued?

A    I think in early adulthood they continued and he got a lot of supports and he gradually learned to master.  It would be my opinion, I think, and it's only just an opinion, that by the age, the time of the offense, I don't think there were as, there were problems in his practical skill but I don't think there were significant deficits that would qualify in the area of practical.  There are still social limitations,

USCA5 2801

particularly in the area of interpersonal relationships, that show a lot of deficits in the area of social.  I think it could be argued, well, these are elements of his personality disorder as well.  I think it could reflect both.  I think he has both a personality disorder and he has social deficits.  And I definitely think conceptual still persists.  So to my, in my opinion we can be fairly, there's firm evidence of conceptual deficits persisting into adulthood, and this would be deficits in communication that he has.  He may have good expressive language when he is on a familiar topic but he doesn't have a good underlying understanding.  There's problems with self-direction and there's problems in interpersonal relationships.

Q    Now, you --

A    And functional academic skills.

Q    Both you and I have used the term supports.  By supports do you necessarily refer to formal state-implemented supports, a home health aide, someone to help him with his functioning, or are you talking about something else?

A    Well, you can have all kinds of supports.  You know, in the ideal world you have supports that are being given by an agency to make sure this person reaches their maximum potential.  Those weren't there for Mr. Bourgeois at all.  Sometimes there are supports within the environment.  I think Miss Mary gave him some supports that helped him do better.

USCA5 2802

I think if he had stayed in his home with his mother he wouldn't have done as well. But Mr. Bourgeois has the ability to solicit supports, and that's not uncommon with people with mild mental retardation, they find people that will help them. And I think when you talk tomorrow to Mr. Henry he can give you examples of things that Mr. Bourgeois did when he worked at Schwegmann's to guarantee success as he became a delivery man and started working at the different stores.

Q   Did you read in Dr. Moore and Dr. Price's reports, I will paraphrase here, sort of chalking up Mr. Bourgeois adaptive deficits to the presence of these various personality disorders?

A   Yes.

Q   And what's your view of that?

A   Well, as I remember them they are saying it could be one or the other, and I am just saying it could be both, I mean he could have both of these. There is nothing to say that a person with mental retardation cannot also have a personality disorder. A person with mental retardation can also have an Axis 1 diagnosis, a bipolar, schizophrenia or whatever, and I just think what you are looking at is a characteristic that is related to both.

Q   And is another way of expressing that that mental retardation is not a diagnosis of exclusion?

USCA5 2803

A   Well, that's right.  If you look at the DSM, it specifically states that there is no exclusionary diagnosis for a, for mental retardation.  A lot of them will say when you cannot diagnose this, if there is also a co-existing disorder of such-and-such, and the specific section of the DSM I'm speaking about, it even mentions in there you could have mental retardation and also have a diagnosis of a learning disorder.  Just having one does not preclude the fact with mental retardation, and what you are looking for is do these significant deficits exist and were they there prior to the age of 18.

Q   And there's something in the latest manual of the AAIDD that addresses the concept of problem behaviors and how they relate to a diagnosis.  Could you explain what a problem behavior is and whether or not that impacts your opinion that Mr. Bourgeois has mental retardation?

A   Okay.  I think that's most specifically addressed in the ninth and the tenth version, I think Dr. Moore mentions it in his report, and in that particular section what they are talking about, there are certain problem behaviors, disorders, behavior disorders that are common to people with mental retardation, self injurious behaviors, for example, or repetitive rocking or hand mouthing or things such as this, and that particular section cites various people who are well known in the field, applied behavior analysis, and when one

USCA5 2804

of these problem behaviors occur then eliminating that problem behavior might improve their adaptive skills.  For example, if someone is always mouthing their hands to the point that they are calloused and they are hard to move, they may not have good fine motor skills.  If you can eliminate the fine motor, get mobility back in the hands, the fine motor skills are going to go up.  And so that's the particular area of the AAIDD manual that I am familiar with, what you are talking about.  Another way of looking at that that I think they went into more detail in the Eleventh is problem behavior or maladaptive behavior and adaptive behavior are really two different continuums.  Adaptive behavior are the skills that we have been talking about all day.  Maladaptive behaviors may be problem behaviors that you see but it's a separate continuum.  People have a tendency, who don't know a lot about mental retardation, to think, well, this is adaptive behavior and maladaptive behavior is at the low end of the adaptive behavior, and they caution you need to look at them at two different continuums.  For example, you could have a conduct disorder and also have mental retardation, but they are two separate disorders and you need to diagnose and assess them at separate continuums.

Q   Okay, I think I'm fresh out of questions.  Thanks very much.

A   Could I have --

USCA5 2805

THE COURT:  Then we will take a 15-minute break and then continue on cross-examination.  Thank you.

(Recess at 10:40 a.m. until 10:58 a.m.)

THE COURT:  Begin the cross-examination.

MR. WISEMAN:  Your Honor, before that, if I might, could I move in the exhibits that I have marked or used during the examination?

THE COURT:  Exhibits number?

MR. WISEMAN:  That would be 33, 136, 155, 159, 160, 161, and I believe 34 and 35, and Your Honor --

THE COURT:  I think I admitted 36.

MR. WISEMAN:  That was the CV, that's right.

THE COURT:  Right.

MR. WISEMAN:  Okay.

THE COURT:  Any objections?

MR. ROBERTS:  No objections, Your Honor.

THE COURT:  Those exhibits are admitted.

(Defendant's Exhibits P33, P34, P35, P136, P155, P159, P160 and P161 admitted into evidence)

THE COURT:  Would you give those to Ms. Scotch, please?

MR. ROBERTS:  And, Your Honor, may I, I would like to utilize them.

THE COURT:  Yes, fine.

MR. ROBERTS:  Thank you.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q   Good morning, Dr. Swanson.  I'm Tony Roberts.  I represent the United States.  And I wanted to start with the last series of questions that Mr. Wiseman was asking you because he asked you a question very specifically, if it's difficult to assess a person who has things such as narcissism and borderline personality disorders, and you kind of bounced around the question, you didn't actually answer it.

            MR. WISEMAN:  Objection, Your Honor.

BY MR. ROBERTS:

Q   And so --

            THE COURT:  What's the legal objection?

            MR. WISEMAN:  It's a conclusion and I think it's --

            THE COURT:  Overruled.

BY MR. ROBERTS:

Q   I just wanted, I mean it seemed like to me when you got to the end, when you said he still had deficits, was your answer that even though he still has deficits it is difficult to assess someone as complicated or maybe, or somebody that has the personality-type disorders that Alfred Bourgeois has?

A   I think I understood his question different than the way you are asking.  I thought we were --

Q   Okay.  Well, I wrote, I wrote down --

USCA5 2807

A    I thought the question --

THE COURT:  Wait a minute.

THE WITNESS:  This is what I thought, was, is it difficult to assess an adult who might be mentally retarded and have a personality disorder.  I thought that was the question.

BY MR. ROBERTS:

Q    Okay.  Well, let me ask you straight.

A    Okay, ask me your way, please.

THE COURT:  I'm sorry?

THE WITNESS:  I asked, if he will ask me the question the way he wants it answered.

THE COURT:  Okay, this is the way this goes.

THE WITNESS:  Okay.

THE COURT:  He asks the questions, you answer.

THE WITNESS:  Okay.

THE COURT:  Okay.  There's nothing in between.

THE WITNESS:  Okay.

THE COURT:  Okay?  Go ahead.

BY MR. ROBERTS:

Q    It is correct, is it not, to say that in this particular individual and the personality disorders that he has and the deficits that you claim to have observed that it is difficult even for an expert of your caliber to make this assessment?

A    I think it would be a difficult assessment, yes.

USCA5 2808

Q    Okay.  And so in a trial setting, before we go to a trial, if a trial team goes out and finds a psychologist and obtains a psychiatrist to conduct tests and those psychiatrists or psychologists give advice to the defense counsel on a very difficult assessment, wouldn't it be logical for the defense counsel to rely upon the advice of those experts?

A    Yes.

Q    Particularly when you are dealing with a very difficult assessment?

A    Yes.

Q    Okay.  I want to briefly touch on your report in June. On June 8th of 2009 is when your report is signed.  It's a three-page report, it has seven paragraphs, and I believe -- actually I'm not sure that it was offered.  I'm not sure it was offered into evidence yet but the, you did complete a report in June of 2009?

A    Yes.  Could I have a copy of that report to look at, please?  I didn't bring any of my report.  I don't think I brought that one with me, or not to the stand.

    (Off the record discussion at counsel table)

        MR. ROBERTS:  May I approach the bench, Judge?

        THE COURT:  Yes, sir.

        MR. ROBERTS:  Sorry, Your Honor, if I might have just a moment.  The defense has decided not to offer this so

USCA5 2809

the United States is going to offer this.

THE COURT:  All right.

(Off the record discussion at counsel table)

MR. ROBERTS:  May I approach the witness, Your Honor?

THE COURT:  Yes.  Well, just, look, this is the way this works, put it on the overhead document camera and move on, please.

BY MR. ROBERTS:

Q   Dr. Swanson, I have what I've marked as Government Exhibit 175.

A   And could I see the second page?

Q   Yes.

A   I had that in front of me but I lost the second page when we were shuffling them, because that goes 1 through 6 and the third page starts maybe with number 7?  Yes, and that's --

Q   The second page that I have starts with 3 --

A   Okay.  I don't have -- okay.

Q   Paragraphs 3, 4, 5 and 6.

A   And the last one goes on to 7 --

Q   And the last paragraph --

A   -- and signed 6-8-09, yes.

Q   Okay.

A   I may have to ask to see page 2 from time to time.  I have page 1 and 2 in front of me.

USCA5 2810

Q    I understand.  But you do recognize this document?

A    Yes.

Q    What is this document?

A    Okay.  This was an initial declaration that I wrote after I had done my initial assessment which was in the spring of 2009.  I had looked at some records, I had talked to Ms. Franks at that time, and --

Q    Okay.  I have one question with regard to this document.  Did you make an assessment under adaptive functioning --

A    Could you --

Q    -- in regard to Mr. Bourgeois?

A    Would you, would you put 2 up there?  I hadn't made an adaptive assessment with Ms. Frank.

Q    Well, let me, let me draw your attention to page 3.

A    Okay, I've got that one.

Q    Which is the end of paragraph 6.  Did you make, my question is not what you -- my question is did you make a mental retardation assessment based on --

A    I made a mental retardation assessment on what I had available at that time, yes.

          MR. ROBERTS:  Your Honor, we would move this exhibit into evidence, offer it.

          MR. WISEMAN:  No objection, Your Honor.

          THE COURT:  And it is number what?

          MR. ROBERTS:  175, Your Honor.

USCA5 2811

THE COURT:  175.  And that is labeled Defendant's 175?

MR. ROBERTS:  It's --

MR. ROBERTS:  Or respondent's, I'm sorry, or movant's 175, petitioner?

MR. WISEMAN:  No, it's the Government's exhibit.

THE COURT:  Government's Exhibit 175 is admitted.

(Government's Exhibit 175 admitted into evidence)

MR. ROBERTS:  Yes, Your Honor, thank you.

BY MR. ROBERTS:

Q   Now, Dr. Swanson, as I said, as we noted, this is an assessment that you made in June of 2009 and you have already, at that point in time you have found that Mr. Bourgeois is an individual with mental retardation?

A   At that point in time, based on the information I had there, I had found that, yes.  I subsequently did other evaluations as well.

Q   We will come back to that in a few minutes, but the -- now, were you aware, and I know that you testified in Louisiana in June of 2010, this year, in a case of Joseph Smith?

A   Yes.

Q   And you went through a lot of, in that case, your adaptive functioning assessment was challenged pretty hard by the United States in that case, wasn't it?

A    Yes, it was.

Q    In fact, you had spoken to three family members of the defendant Joseph Smith and they challenged your methodology, really, and how you did your adaptive functioning in that, didn't they?

A    Yes.  They challenged how I had marked the protocols, yes.

Q    Okay.  And that was in June of 2010.  Were, you are aware, are you not, that Dr. Moore had gone out to New Orleans to try to locate family members and conduct an adaptive functioning of certain individuals in July of this year?

A    I knew he was there during the summer.

Q    Okay.  In fact, the, you are aware that the defense showed up when he went to interview Michelle Armont, are you not?

A    I was told that.

Q    Okay.  And there was a list of people that the United States were, that Dr. Moore was going to contact.  Do you know who those individuals were?

A    That Dr. Moore was going to contact?

Q    Yes.

A    No, I --

Q    That Dr. Moore was going to interview.

A    No.

USCA5 2813

Q    So you weren't aware that Dr. Moore was, had planned on interviewing the exact same people that are listed on page 3 of your, of Plaintiff Exhibit 136, the interviews that you completed within the last three months?

A    No, but I'm not surprised because those are the people that live in that community.  He interviewed other folks as well that I didn't interview.

Q    And then in August, and I will show you again Petitioner's Exhibit 33, that is a supplemental report, your supplemental report dated August 12th, 2010.

A    Yes.

Q    This year.

A    Yes.

Q    In which you, on page 2, claim, in the paragraph, let's see, it's under paragraph, section 2 under adaptive deficits, it's the one, fourth paragraph down where you list a bunch of individuals that you spoke to as informants.

A    Yes.

Q    And again, prior to that you had already made an assessment of mental retardation on behalf of Alfred Bourgeois?

A    Well, I had made an assessment based on what I had, but I had asked to see more people.  That was all that was --

Q    But you didn't see more people at that time, did you?

A    There wasn't anybody else for me to see at that

USCA5 2814

particular point in time.

Q   You spoke with Ms. Frank.

A   Uh-huh.

Q   You did an adaptive functioning assessment by giving her the ABAS and the Vineland?

A   And I interviewed her as well.

Q   And you interviewed her, and you made your assessment that Alfred Bourgeois was mentally retarded in 2009 based on Beverly Frank's information, and other information you saw but based on Beverly Frank's information, that's where you got your adaptive functioning assessment?

A   Well, that and the adaptive functioning information that I got from records that I looked through.

Q   As I have mentioned, I have, I know that you were, you testified in June 2010 in Louisiana.  I know also that you have testified several times in various courts and you were involved in a case in Mississippi involving William Lee Wiley?

A   Yes.

Q   And so we know you are an expert in this area.  What I am curious about is, is there a national organization for psychologists?

A   Yes, American Psychological Association, and then every state has its local chapter as well.

Q   But you are not a member of the American Psychological

USCA5 2815

Association?

A   I'm not a member of the national one.  I am a member of my own state one.

Q   Okay.  And then you were, the organization of AAMR, that's what you have referenced a couple times, American Association on Mental Retardation, that was, you said that's the name of the organization that -- what was its role, why did it come into being?

A   It's a collection of professionals that work with people with mental retardation, and it came into being to advocate for better diagnosis, better treatment, and to do research in the field to improve the treatment for folks with --

Q   So you would agree it is a kind of an advocacy, it fulfills an advocacy role?

A   It fulfills an advocacy role, yes.

Q   And in that role it filed an amicus brief.  I guess actually before it filed the amicus brief it changed its name, the name was changed, is that correct?

A   It --

Q   They changed it to an AAIDD?

A   I think it's had three or four names through its hundred plus years of existence and the most recent one is AAIDD.

Q   So they moved away from the mental retardation label?  Is that fine, can we use the word label?

A   That's correct.

USCA5 2816

Q   Okay.  Moved away from the concept of mental retardation as a label and they are adopting a new or advocating for a new label or terminology, and what is that new terminology that they are trying to apply?

A   It's the American Association for Individuals with Developmental Disabilities.

Q   Okay.

A   And most professional organizations --

Q   Let me just stop you there for a minute because you said individual.  Is it actually, is that the name?

A   Intellectual development.

Q   Intellectual.

A   Yeah.

Q   I think several times in your testimony you said individual and development.  Did you mean every time you mentioned that that it was actually intellectual and developmental?  You were talking about the same AAIDD --

A   Yes, intellectual.

Q   -- throughout your testimony, right?

A   Yes, yes.

Q   Okay.  There's not some other organization called the American Association for Individual and Developmental Disabilities, is there?

A   No, and, but I think I frequently referenced individuals with developmental disabilities as well.

USCA5 2817

Q    Okay.  So the goal or the advocacy is moving towards renaming this to Intellectual and Developmental Disabilities?

A    Well, in an international code it has already been renamed and that is the term that's used in Europe and other countries, and the American Psychological Association has also renamed its division that a way, and I've recently seen a proposal that's being put forth to the Federal Register that Social Security and the Government is also looking at changing the name to be in accordance with all the different codes.

Q    Okay.  And in this advocacy role for the AAIDD, are you aware that they've filed an amicus brief in the Atkins case?

A    Yes.

Q    Okay.  Do you know what the position of the association was?

A    The association was against the death penalty for individuals with mental retardation.

Q    Okay.  How much of your time do you think in the last -- well, how much of your professional time do you deal with being, testifying in criminal cases now?

A    I would estimate ten percent, just off the top of my head.

Q    Okay.  I think earlier you had testified that you thought maybe you had been involved in about 15 cases where you had been asked to come in and do an Atkins type assessment for a

USCA5 2818

defendant, but --

A   Yeah, I think I've gone to court approximately 15 times.

Q   Okay.  In June 2010, the Joseph Smith case, if you said that you had been, I mean if you said you had been in about 18 or 19 hearings, do you think that would be more accurate?

A   It might be.

Q   Okay.  And you also said earlier that every time you have been called in to make an assessment on a defendant you have found that the defendant is mentally retarded except for one case.

A   Every time I've gone to court.  In those cases that I mentioned, yes.

Q   Okay.  So if it was 19 times then you have got, 18 out of those 19 you have made a finding that the defendant is mentally retarded?

A   That's correct.

Q   And you are doing so in all of those cases in the same way that you approached your assessment in this case?

A   I would say so.  You know, since Atkins came out it's been an evolving science and there has been a lot of research and a lot of guidelines written, and I tried to follow the guidelines that were in existence at that time.  In that June case you mentioned I think I did the interviews in early 2006, which was prior to some of the latest manuals coming out in the ABAS and Vineland, and so therefore when I

USCA5 2819

administered that I didn't have those manuals, you know, those guidelines available, and that was some of the discussion we were having in that hearing.  They have come out, they came out in 2008.

Q   Okay.  Let's talk just for a minute about this standard, the mental retardation standard.  I think you addressed this on direct but I just want to cover it real quickly.  Mental, the diagnosis, or the assessment of someone who is mentally retarded is not just based on IQ scores, is that correct?

A   That's correct.

Q   Would you also agree, though, that some people just don't do well on tests?

A   Yes.

Q   Okay.  Adaptive functioning is an important part of this analysis, is it not?

A   Of a diagnosis of mental retardation, yes.

Q   Yes, okay.  If someone scored, just hypothetically, if somebody scored a 50 on an IQ test, that would, that would still not qualify them as mentally retarded unless they are also significantly impaired in the adaptive functioning, is that correct?

A   That's correct.

Q   Okay.  And, again, it has to be onset by the age of 18, so that's also an important part of the analysis, right?

A   That's correct.

**USCA5 2820**

Q    So even if someone scored 50 and they, there was evidence that they were significantly impaired in the adaptive functioning as an adult, unless there is some evidence that this onset before the age of 18, they would not be diagnosed as mentally retarded?

A    There would have to be evidence of onset prior to the age of 18.

Q    Okay.

THE COURT:  Prior to the age of what?

THE WITNESS:  Prior to the age of 18.

THE COURT:  Eighteen, thank you.

BY MR. ROBERTS:

Q    In this case obviously there was a WAIS-IV done, a WAIS-R done by Dr. Weiner, and do you remember what year he did the, that evaluation?

A    I'm fairly certain it's 2004.

Q    You are correct, 2004.  What year was the WAIS-III brought in, what year was it?

A    I'm desperately turning, but I think it was 2007.

Q    You think that the WAIS-III --

A    Oh --

Q    -- became the valid test in 2007?

A    I think 2007 was --

Q    You are guessing what question I am going to ask because you are thinking I am asking about Dr. Gelbort's test.

USCA5 2821

A    Oh, okay, I'm sorry.

THE COURT:  Okay, wait a minute.  Let her finish answering the question.  So go ahead, thank you.

THE WITNESS:  I'm going to let you restate the question --

MR. ROBERTS:  Okay, because I wasn't --

THE WITNESS:  -- because I got confused there.

BY MR. ROBERTS:

Q    Yes.  My question didn't deal with Dr. Gelbort's testing yet.

A    Okay.

Q    I said Dr. Weiner gave a test in 2004 and it was the WAIS-R.

A    Okay.

Q    What year did the WAIS-III become the normative test, when should he?  When did the WAIS-III come in and the WAIS-R was no longer supposed to be given?

A    As I remember, the WAIS-III was published and available for use in 1997.

Q    '97.

A    Yes.

Q    And Dr. Weiner gave the WAIS-R in 2004.

A    That's correct.

Q    Is that something you would have done?

A    No, I wouldn't have done that.  But I don't do neuropsych

USCA5 2822

testing either, I primarily do mental retardation testing, and I want the most current test available.

Q    You said in your direct examination that if you had had the information that Dr. Weiner had with regard to the score on the WAIS-R that you would have suggested to the defense counsel that it should pursue mental retardation and do more testing.  Is that an accurate summary of what you said?

A    I thought what I had said was that I felt there was justification to pursue an Atkins claim, to continue an evaluation to see if this individual did qualify for a diagnosis of mental retardation.  Low IQ scores are good indications.

Q    Have you ever advised a defense counsel that -- you said there was one case that you decided that wasn't mentally retarded.  Can you, do you recall the name of that case?

A    Willie Tart.

Q    And did you advise the defense counsel that there wasn't a mental retardation issue there?

A    It's a very complicated case, and once again I was only there for the adaptive component of that, but there's other, there's other problems with brain injury and epileptic seizures, et cetera.  I don't want to go into it but --

Q    Now, Dr. Gelbort has already told us a lot about that, so.

A    Yeah.

USCA5 2823

Q   But one question I have is that if you give that advice to defense counsel, wouldn't you as the expert expect them to rely upon your expertise?

A   Yeah.  In this particular case there is clear evidence he scored in the mental retardation range prior to the age of 18 due to testing that was done.

Q   Which case are you talking about?

A   Excuse me?  The Willie Tart --

Q   You said this particular?

A   The Willie Tart case.

Q   Oh, thank you, okay.

A   And so really I'm just trying to explain, I'm only in one phase of that, and so that's the only case that's listed that I actually went to court on.

Q   Okay.  Do you know what the American Psychological Association says in their ethical guidance with regard to giving or to using the most current test?

A   Yes, you --

Q   What do they say?

A   You should always use the most current test.

THE COURT:  Should always use the what?

THE WITNESS:  The, you should try to use the most current test that --

THE COURT:  Okay, thank you.

THE WITNESS:  -- you need for that particular

USCA5 2824

assessment, what's recommended in the field.

BY MR. ROBERTS:

Q   And in 2004 that would have been the WAIS-III?

A   That's correct.

Q   You have done a lot of evaluations, that's clear from your CV, and I think you told us earlier most of what you do is clinical, you are really not in the forensic area that often?

A   That's correct.

Q   Okay.  And in doing evaluations on people, like maybe when we were talking gaining information from raters, what kind of things do you do to seek, to assure that you are getting objective and neutral information from the people that you have decided are raters on the adaptive functioning?

A   On a standardized assessment is what we are talking about here?

Q   I am just curious about your approach.

A   Okay.

Q   What do you do?

A   If I'm doing a standardized assessment, like I say, for adaptive behavior where what you are really doing is an interview, with the Vineland, as I mentioned, you are doing a semi-structured interview, and you are trained to give this in such a way that you can revisit items going forward and backward, and so if a person says someone can't do something

USCA5 2825

and then later on when you're in a conversation it appears they can, you get to go back and challenge that, give additional probes, et cetera, so in that particular case you have that option.  The way the ABAS-II is set up, it's set up for the person to indicate by checking off things that they are unsure about, and when you finish administrating it you can sit down and say, well, I notice you didn't know a lot about this area or that area and can you explain to me why you were uncertain on this item or another item.

Q   Okay.  You would agree, though, that people closest to a defendant or somebody that's either about to be sentenced or is already sentenced to death, you would agree that they have a vested interest in the diagnosis of mental retardation?

A   Whenever I am doing an adaptive assessment for an eligibility determination or an Atkins, whoever I am interviewing usually has a vested interest, be it a parent who is interested in their child getting Social Security or someone who is interested in getting services, an apartment, entering a community home, there is a vested interest to show that that person does well, so that's why you need to be very careful when you give them.  I give a lot of Vinelands really, though, for treatment as well.  I have to give them every year on the people that I provide treatment for.

Q   I guess I was kind of asking more generally, and that is that people that are close to a defendant have vested

USCA5 2826

interests in the outcome of the diagnosis?

A    Yes.

Q    Okay.  You mentioned that you viewed the videotapings of, by Dr. Moore and Dr. Price, and looking at your information here it looks like you say that you have viewed a lot of the evidence in this case.  Did you review the extensive handwritings that Alfred Bourgeois wrote and that were offered in his trial?

A    Yes.  As I remember, the Government provided some that I reviewed and there were other ones that I reviewed as well. I don't know that, it seems like there were other ones at other places as well.

Q    Did --

A    There was numerous documentations of things he's written and then there were things that he had written on that were in his briefcase I think.

Q    And you were aware that he wrote a number of things while he was in, while he was being confined before trial and during trial?

A    Yes.

Q    And you read those?

A    Yes.  I think I read those, yes.

Q    To your knowledge, was anybody around to help him write those or help him figure out the thought process?

A    Not that I'm aware of, no.

USCA5 2827

Q   Did you read all the transcripts in the case?

A   I read, I don't know that I read every transcript in this case but I read a lot of transcripts.  I read a lot of testimony by different witnesses and there was like four or five days of testimony of different witnesses in the penalty phase that I read.

Q   There's one I'm particularly interested in knowing whether you read and that is on March the 24th when Alfred Bourgeois approached the Judge at the bench and discussed his concerns and wanted to speak to the jury.  Do you remember reading that one?

A   If that's in that same stage there is a long statement in there where he makes a statement, yes, I remember.

Q   Well --

          THE COURT:  Well, not the one to the jury but the one to me.

          THE WITNESS:  I don't recall.  Can I see it to see if it's something I read or not?

BY MR. ROBERTS:

Q   Sure, I can give you a copy of it so --

A   I remember some testimony between where the Judge talks to him and then there is a discussion and he also speaks to the jury, and I don't know if that's the same one or not.

Q   Okay.  Well, generally I was just trying to see if you had read that and --

USCA5 2828

A    Does that sound like the same one?

Q    It's close.  But what my question really goes toward is that you said that he has a hard time engaging in conversations in your supplemental report, that he has a hard time being a part of a conversation, and so I am just curious whether you observed him in a conversation with the Judge during that particular part of the trial?

A    I did read, I think, I'm pretty certain that I read that testimony.

Q    And he was very capable of discussing with the Judge what he wanted to do and listening to Judge Jack and what she said that, you know, and her questions back to him, wasn't he?

A    Yes, and that's kind of like expressive language and that's more of his strength in communication, yes.

Q    Okay.  Did you also listen to telephone calls that were recorded from jail that went to certain members of his family?

A    I didn't listen to the phone calls but I read numerous phone calls to a Mr. Banks, there were some to his brother Lloyd, there were some to some cousins, there were some to --

Q    Do you remember the one to Uncle --

A    -- Robin Bourgeois' uncle.

Q    Uncle Dumas?

A    Yes, yes.

Q    You only read the transcript, you didn't actually listen

USCA5 2829

to the conversation?

A    I don't think I had that conversation, no.

Q    Would it be help-, I mean wouldn't it be helpful when you are making an assessment of someone to listen to their voice inflection and how they are interacting with the individual?

A    I guess so.  I didn't get that.  I didn't -- did you provide it, did I overlook it?

Q    I am just asking if it would help, if it would be more helpful to hear the conversation rather than just reading it off a transcript.  I mean you are making a mental retardation assessment and you are helping, you are trying to help the Court understand whether Alfred Bourgeois is mentally retarded, and I'm asking you if you, this was a piece of evidence, did you get a chance to listen to it?

A    I did not listen to it.

Q    Okay.  And so you didn't listen to the one with Nate Banks either?

A    No, I read that one.

Q    Did you look over all the testimony about how he ran his business, his trucking business?

A    Yes.

Q    Did you --

A    I think I did.

Q    Do you remember when he was talking to Dr. Moore on the tape about how he would perceive of a good opportunity to

USCA5 2830

maybe open a loading opportunity or maybe start another business in different areas and how he thought that would be a good financial opportunity and a good business?  Did you hear him discussing that with Dr. Moore?

A    I heard him discussing that.

Q    Doesn't that show a deliberative process, an understanding of business acumen?  I mean doesn't that tell us that he has some ability to comprehend his surroundings in a working environment?

A    I, you know, I listened to that and he could describe it. He talked about things he was, he could, he wanted to do or he could do.  I don't know if he could do those things.  But I think what you are talking about is his ability to communicate the thought?

Q    Part of that, yes.

A    Yes, I think he demonstrated the ability to communicate the thought.

Q    I think also his ability to understand the basic concepts of business and how a business opportunity can present itself and how someone could go and grab hold of that.

A    Yes.

Q    The, how, just offhand, how quickly do you think he would be able to do a simple two-digit math problem?

A    Well, he did simple two-digit math problems for me.  When he's doing them on paper he does a little better because they

USCA5 2831

are there.  They are much harder for him to do in his brain.
So if you asked to subtract 20, 17 from 25, it takes him much
longer if you give him the same problem to work on.  And if
you look at my Woodcock-Johnson he actually did some for me.

Q   Let me ask you about this.  This is Petitioner's Exhibit
159, the statement that he asked to write.  Does that look
like a statement that somebody that only has a third grade
ability could write?

A   (Noise)  I'm so sorry, excuse me.

THE COURT:  Please.  Okay, the reason that we are so
careful is that goes directly into her ears.

THE WITNESS:  I am so sorry.

THE COURT:  And it's very painful on her hearing.

THE WITNESS:  Okay.  I'm just going to put my
glasses over here.

THE COURT:  So be especially careful, please.

THE WITNESS:  And so they're just out of the way.  I
think that's consistent with his abilities, and I think I
tried to point out that overall he has some strengths.  His
spelling ability is much higher than that.  So, you know,
you're judging this.  Overall he functions at about the third
or fourth grade level, but he has some other unique strengths
in his ability.  His spelling is much better.

BY MR. ROBERTS:

Q   So in answer to my question, this would be above and

USCA5 2832

beyond a third grade ability to write, correct?

A    There are words in here that would be difficult for a third grader to know, but I think that the overall grammar and syntax of it would be similar to someone who is third grade.

Q    Okay.  Again, kind of going to the aspect of that this assessment is difficult in this scenario, right?  You also mentioned this one sentence.  Did the -- I was just curious, is that one minute and 16 seconds?

A    Yeah, one --

Q    That's --

A    One --

Q    That's listed.  I'm sorry, this is Petitioner's Exhibit 161 that was presented to you and he has got one sentence here, "I am going to the gym and work out in about an hour," and you said it took him one minute and 16 seconds.

A    Yeah, I had started timing it when he started and, writing it, and when he finished.

        THE COURT:  Now, those are the things that can be faked.

        THE WITNESS:  I guess they could be faked, that's right.  But it was consistent with what I saw on the Woodcock as well.

BY MR. ROBERTS:

Q    Did the timing --

USCA5 2833

THE COURT:  Well, the reason I, the reason I mention that is that there was a really interesting thing when Dr. Price was giving him some tests and it was very, you know, he was to circle, read through and circle, and then Dr. Price had to go to the bathroom, so he went outside and Mr. Bourgeois is taking the test and he is flying through it. Dr. Price comes back in and it's like in fourth-time slow motion that he begins, he continues to take the test.  I don't know if you-all noticed that on the test or not, but those are things that leapt out to me when I was looking through the tapes.

BY MR. ROBERTS:

Q   Dr. Swanson, did you see that?

A   I remember him going to the bathroom.  I don't know that I recall that or not, no.

THE COURT:  I was so surprised how quickly he was circling those answers and then when Dr. Price came back in, I mean he slowed down like at least four times --

THE WITNESS:  Uh-huh.

THE COURT:  -- the speed.  It was very, very striking.

BY MR. ROBERTS:

Q   You didn't make that observation, Dr. Swanson?

A   I didn't make that observation, no.

Q   You did watch the video?

USCA5 2834

A    Yeah, I watched the video.

Q    How about while he was talking with Dr. Moore, there were several times that he talked about how he had learned things from other people, do you remember that?

A    I think so, yes.

Q    And I think you have said that he has a hard time learning in a social setting, is that right?

A    I think he does best -- there's ways that you can kind of guarantee more success with him and I think, and I didn't get a chance to address this and possibly you could address this with Mr. Henry, he learns best when he can work with somebody and watch what they do.  He learns best from a visual model.

Q    Okay.  Such as when he was learning how to cook these wild animals that he was talking about?

A    Yes.

Q    Okay.  But he also said that he had to mow the yard and keep up with the yard at the house, didn't he?

A    Yes, I heard him say that.

Q    And remember when Dr. Moore mentioned that he lived in North Carolina and you remember Alfred Bourgeois being able to quickly recall that North Carolina had hills and he remembered Raleigh and do you remember that as well?

A    Yes, I do remember that.

Q    Does that kind of go along with his ability to recall things?

USCA5 2835

A    Yes.

Q    You said you spoke to Lloyd on the telephone?

A    Yes.

Q    And do you remember what Lloyd's relationship is to Alfred Bourgeois?

A    He's his older brother.

Q    Okay.

A    And it would be his half-brother.  They have different fathers, same mother.

Q    And --

        THE COURT:  And that's Lloyd Ferdinand?

        MR. ROBERTS:  Lloyd Ferdinand.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q    Do you know what Lloyd Ferdinand says about whether Alfred Bourgeois was slow or not slow as a child?

A    I know what's, there are some declarations where he addressed that with me in the declarations, and the way he explained it to me he moved from the home, he also moved from the home, he, Claudia and Mr. Bourgeois all left at an early age, a child age, and lived with other relatives, so he didn't have any personal knowledge in the home of Mr. Bourgeois other than what he saw in The Bend, because they all lived in different houses from the mom.

Q    So you are saying that Lloyd had no personal knowledge

USCA5 2836

Swanson - Cross                                                    140

and had no ability to say whether or not Alfred Bourgeois was slow or not slow but Beverly Franks did?

A   Well, Beverly Franks was frequently in the home where he lived and Mr. Ferdinand moved in with an uncle and an aunt.

THE COURT:  Well, the reason he's asking you that is that it's so ridiculous that you rely, frankly, maybe, seems to be ridiculous to rely on Ms. Frank when Lloyd Ferdinand and Claudia and Ms. Frank all lived in different houses than Mr. Bourgeois and Mr. Bourgeois said frequently he looked up to Mr. Ferdinand and saw him frequently as well as Claudia as well as these other people, and so you picked one to rely on and not the others, so that's the point he's making.

THE WITNESS:  Okay.  I --

THE COURT:  Is that right, Mr. Roberts?

MR. ROBERTS:  I was going to make that later, Your Honor, but, in my closing argument.

THE COURT:  Move on.

THE WITNESS:  To clarify, I never could get a face-to-face interview with Mr. Ferdinand, even though I asked frequently and we tried to arrange it, and I got brief phone calls because he kept hanging up and then I had to --

THE COURT:  It's a simple question, did you talk to him about it?

THE WITNESS:  I don't think so.

THE COURT:  Thank you.

USCA5 2837

Swanson - Cross                                    141

THE WITNESS:  I don't we ever had a conversation long enough, no.

THE COURT:  Move on, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q   We'll move to the, to some of these scoring.  You mentioned in the digit symbol, you said it was like a copying.  Isn't the digit symbol more of a learning and kind of how quickly somebody can do the task more than just copying?

A   Yes, but by copying I meant the symbols are at the top of the column and so they are still there, and the idea is you learn the task and you can look at the top and put it to the bottom, so the immediate memory, it's always there, you don't have to put it in your head and remember it in your head without having knowledge of the code.  The code is always present in front of you.

Q   This is Petitioner's Exhibit 155.  The WAIS-R that Dr. Weiner gave, he scored a 76 on the verbal and on the WAIS-III a 67.  That's an astounding drop in the verbal IQ, isn't it?

A   It's ten points, approximately, nine points.  It's statistically significant at 15, I would think.

Q   So you don't think it's significant, a significant drop unless it's 15 points?

USCA5 2838

A    Well, within the test one standard deviation is 15, but you are looking at two different tests which aren't necessarily the same items and tests, two different tests normed at different times.  So if I was looking at a WAIS-III and a WAIS-III, I would probably give it a little more significance than looking at a WAIS-R and a WAIS-III, is all I was saying.

Q    Isn't it more significant since he also went up two points on the performance IQ?

A    I think I got asked that before.  I didn't see the, I didn't find it statistically significant, no.

Q    If I understand right and this term significant deficit with regard to these two standard deviations below the mean, does that basically mean that like a score of 70 on a standardized test, a 70 would fall at two standard deviations?

A    If the standard deviation is 15 and the mean is 100, exactly two standard deviations would be a 70.

Q    Okay.  And is that, is that the case with regard to the, in the Woodcock where you scored the, you referenced one and I'm looking for their, the -- this is my copy of it.  I'm not finding their exhibit exactly.  Let me just show you my copy of this, the score report.  Does that look, does that look like the test we were talking about earlier?

A    Yes.

USCA5 2839

Q    Okay.  I've got a couple of areas highlighted there because of, he did poorly on broad math but he did well on calculation, 82.  He did poor on story recall and poor on story recall delay, and I'm looking at these numbers over here.  What's the significance of the SS again?

A    That's the standard score.

Q    Okay.

A    That he obtained on that test, compared to other individuals that were in his age range of 45.

Q    And on a standard score, again, we are looking at two deviations.  Wouldn't we expect, if one were analyzing this, that the score would be around 70 if it was a standard deviation and he was scoring in the, in a deficient way on these?

A    Not necessarily, no.  There are people with mild retardation that would score in that range.

Q    Okay.  But in here, the oral language he gets 80, the listening comp he's got an 85, and he's got a number of 80s, and he's got a 68 there but then he gets 92 on the broad written language, 85, 70 on the brief math but 82 and 85 on the math calc skills and written expression.  He's got a lot of 80s on there, doesn't he?

A    That's correct.

Q    And then even down here he's got several that are 89, 99 on the spelling.  You said he was really good in spelling?

USCA5 2840

A    That was his significant strength I thought on that test.

Q    And then even on the letter/word identification he's got a 90.

A    Yes.  That's his significant strength in reading, yes.

Q    So he actually scored really well in a lot of areas, didn't he?

A    Yes.

Q    I want to go back for a minute to what makes a good informant.  You talked about this retrospective assessment of adaptive functioning, and in June of 2010 you testified about that a lot, didn't you?

A    Yes.

Q    There were some statements that you were asked about with regard to a, I believe it was a, the publication was Applied Neuropsychology.  Do you recall a, well, it was a Dr. Tassy that they had --

A    Okay.

Q    -- that was being referenced and they, you were asked to agree with or disagree with several quotes.  Do you remember that?

A    Dr. Tassy published an article in a neuropsych journal in January of 2009, I think.

Q    Okay.

A    And it specifically addresses adaptive behavior in Atkins cases.

USCA5 2841

Q    Okay.  And during that trial you were specifically asked to either agree with or disagree with several statements that were put up on the, I guess an overhead where, or maybe you were shown statements.  What I want to do is read the statement and ask you if you agree with it or not.

A    Okay.

Q    "The adaptive functioning tests were not normed using retrospective memories of adaptive behavior."

A    That's true, I agree with that.

Q    "The reliability and validity of the adaptive functioning measures is unknown."

A    The reliability.  In retrospective, yes.

Q    In retrospective?

A    In retrospective, yes.

Q    Sorry.  In context --

A    I agree with that.

Q    In context, everything that I am going to read is with regard to retrospective.

A    I agree with that statement.

Q    "Results from a retrospective evaluation should be interpreted with caution."

A    Yes.

Q    "In the context of a retrospective assessment of adaptive behavior, the rater must answer questions about how the defendant functioned at some time in the past, usually around

USCA5 2842

the time of the crime."

A    Not, I -- that might have been taken out of context.

Q    Okay.

A    I mean, to me it should be about prior to the age of 18 but you might ask, you might want to do an assessment at about the time of the crime because that's the only person, the time that person knew them.  I don't think the article was quite written that way, I think it's, they've taken something out of context there.

Q    In fairness, they did, the next dialog between you and the prosecutor at the time was a discussion that it's only important at the time of the crime if the age is under, 18 or under, and so there was a focus back on this occurring when it would be under the age of 18 or lower.  So let me ask you, let me go on to the next quote, and that is, "The validity of these ratings depends upon the accuracy of the respondent's memory.  This retrospective use of adaptive behavior scales is not the way that the tests were standardized."

A    That's correct.

Q    And so, again, those that are using retrospective assessments have to be very, very cautious about relying too heavily upon them?

A    Not only that, they need to do them exactly the way the authors of the test told them to do them, yes.

Q    In your report in the William Wiley case, you wrote a

USCA5 2843

detailed report, you discussed this retrospective assessment. If I correctly read that, there were two things that stood out to me.  One was you agree that multiple sources are very important, is that correct?

A    Yes.

Q    And then you also agree that you should assess the individual as near the age of 18 as possible.

A    Yes.

Q    But in this case you went to Beverly Frank and you asked her to look back 38 years and assess Alfred Bourgeois at the age of seven.

A    I picked the time she could best answer my questions and remember him clearly.

        THE COURT:  What time was that, what are you talking about?

        THE WITNESS:  Seven.  Seven.

        THE COURT:  She was 13, he was seven?

        THE WITNESS:  Yes.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q    And you asked her to give an assessment of how he functioned by reflecting back 38 years?

A    Yes.

Q    And you expected her to be able to identify exactly what he was doing when he was seven in order to answer these

USCA5 2844

questions?

A   Yes.

Q   You said on your direct testimony that you had concerns about the reliability of her.

A   Of --

Q   Of Beverly Frank.

A   -- Ms. Franks?   In testimony I said that today?

Q   You did.

A   Yes, and that was when I was talking about, that's why I give the ABAS-II first to see how clearly, if there were areas she didn't know, because she was in and out of the house and I wanted to be sure she was aware of all the areas. And that's an easy one to give her where she checks off what she doesn't know or she's unsure about, so that's why I administered it.

Q   You said in the William Wiley case that you should use multiple sources.   The AAIDD suggests using more than one rater.

A   Yes.

Q   But you used only one rater in this case.

A   I could only identify one person that could give me a clear time when they knew something well.   The only other one that would have been good was his sister Michelle, his half-sister, and Dr. Moore did her so there was no use doing her over.

USCA5 2845

Q    And Dr. Moore, so you are aware that Dr. Moore attempted to interview Michelle Armont?

A    Yes.

Q    And that's the one where the defense counsel showed up before, actually was present before the interview even took place?

A    I don't know the con- -- I was aware that the defense counsel was there.

Q    Let me ask you a question.  If you had gone to interview Beverly Frank and an attorney from the other side showed up and wanted to sit in on the interview, would that affect your, would that raise any concerns for you with being able to get a reliable information from the individual?  Is it possible?

A    I wouldn't want the person sitting by me or whatever, I would want her positioned somewhere else, but if she was in the area, could hear what was going on and wasn't interfering, wasn't sitting between us or interfering with the interview, I wouldn't have any concerns with someone listening or being at the other, in another room.

Q    Well, the goal of, the goal of these assessments is to get an objective input from the individual, right?

A    That's correct.

Q    You are not there, hopefully the person is not giving you one side or trying to support one side or the other, correct?

USCA5 2846

A    That's correct.

Q    I mean if they are there to give you, to support one side of a case, you are not going to get very reliable information, are you?

A    That's correct.  If I had concerns, I just either wouldn't do it or I would ask the person to leave.  I mean, I didn't have those concerns with my person, so I guess --

Q    Because we didn't, the Government didn't show up when you got ready to interview Beverly Franks, right?

A    No.

Q    Okay.

A    But if you had, I would have asked you to sit in the other room, and if you didn't interfere I wouldn't have had any problem with you listening in.

Q    Okay.  Let me ask you a few things.  And I was looking at the defense exhibit, I'm sorry, the Petitioner's Exhibit 35, which is the ABAS, and what I really wanted to do is compare some of Ms. Frank's answers on the Vineland and on the ABAS but what I found out a little bit, a little while ago was that apparently there's some, this is a very thick exhibit and the Vineland, Petitioner's 34, only has two pages, so I believe what I have been told, the Vineland was much thicker than that, is that correct?

A    I thought I furnished the Vineland protocol.

Q    I think you did and so --

USCA5 2847

MR. WISEMAN:  Your Honor, just for clarity, the Vineland --

MR. ROBERTS:  -- what I was going to clarify --

THE COURT:  I'm sorry, just a moment.

MR. WISEMAN:  The Vineland protocol was provided for the Government in the fatter packet of exhibits, the, I believe it's 35.  Petitioner's 35 has what Mr. Roberts is referring to.

MR. ROBERTS:  That's correct, Your Honor.  I was about to clarify --

MR. WISEMAN:  Dr. Swanson didn't compile the exhibits.

THE COURT:  So what are you interrupting for?

MR. WISEMAN:  To make a point of clarification.

THE COURT:  Okay, thank you.

BY MR. ROBERTS:

Q    And, Dr. Swanson, what I was about to clarify is that I wanted to compare questions from the Vineland and the ABAS but because of the way the exhibit is set up, I was going to hand it to you and ask you to look at the questions, but let me try to do it this way and see if you -- if you can follow me in this, that's fine.  If you need to look at the document I will give it to you, but it's going to be a little more difficult to go back and forth.  You might be able to figure it out better than I can because you deal with these all the

USCA5 2848

time.

THE COURT:  Well, how about we do this question and answer.

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q   Do you recall, do you -- there are parts in both the ABAS and the Vineland in which Ms. Franks responded inconsistently, is that correct?

A   That's correct.

Q   Okay.  In the ABAS, on page 7, item number 2, she was asked, she responded that Alfred Bourgeois was not able to use a fork to eat solid foods.  So if she answered on the Vineland on page 10, number 23, that he is able to correctly hold a fork, a spoon, fork or knife, that would be inconsistent, wouldn't it?

A   Did she, did I give him a two, a one or a zero on that?

Q   You'll have to --

A   I'm sorry.  Because there's different levels, and so she might have scored he couldn't and when I probed her she might have said he did it sometimes, you know, that's the only reason I ask, so where it may appear a difference, there's two scoring systems between the two that may lead you to think they scored differently.

Q   This is a, I'm going to, I'm going to go -- this is page 3 of the ABAS?

USCA5 2849

A    Uh-huh.

Q    Question number 6, "Uses sentences with a noun and a verb."  What did Ms. Franks say with regard to Alfred Bourgeois' ability to use sentences with a noun and a verb?

A    On that one there was no conversation, she just circled it herself as she read them, so she didn't say anything at that point.  If I probed that, I probed that on the Vineland, so I would see the Vineland protocol, that's where we had the discussion.  This is the ABAS where she marked it herself.

Q    Well, is it accurate that she said --

A    Oh --

Q    -- she marked it as a zero and said he's not able --

A    That's correct.

Q    -- use sentences with a noun and a verb?

A    That's correct, and if you look at the top it gives you a better explanation of what a zero is.

Q    Okay.  Well, I'm going to show you the Vineland.  This is the page from the Vineland?

A    Uh-huh.

Q    It's page 6, question number 18, "Uses phrases with a noun and a verb, for example, Katy stay, go home, et cetera," she gave him a two.

A    Uh-huh.

Q    What does that mean?

A    That means that in my interview with her she said he

USCA5 2850

could do that, and when I ask the question I generally give examples like that and we talk about the kind of conversation he has and different kinds of sentences that he could say and she indicated that he could do it.

Q   Well, when you get inaccurate or inconsistent answers on these tests like that, I mean doesn't that start to make you wonder about the reliability of the person taking the test?

A    I think I testified earlier with the ABAS-II is I don't find that it's a good instrument to give retrospectively because you are trying, I always try to center, look, remember we are talking about the time when he first moved to your grandmother's house, blah, blah, blah, blah, blah, and then we center in on that.  On the ABAS-II they seem to lose track of that to me because they are independently going through, you know, a couple of hundred items.  That's why I said I did the Vineland after I ascertained with the ABAS that she was maintaining that there was no area she didn't have any knowledge of.

Q   Okay.  I guess we can agree that it would have been more reliable to use more than just one rater?

A    I would have preferred to have more than one rater, yes.

Q    Okay.  And we can also, do you also agree that it would be more reliable to use people that knew him across a variety of settings and yet had no vested interest in the outcome, you could use those kind of people?

USCA5 2851

A    That would have been nice if I could have had a teacher or someone that would have known him prior to the age of 18, yes, that would have been great.

Q    Well, not just nice but more reliable, wouldn't it?

A    It would have been more reliable.

Q    And it would have been helpful to have ratings based on more recent contact with Alfred Bourgeois, too, wouldn't it?

A    Well, yeah.  More recent contact prior to the offense, yes.

Q    And it would have been useful to discuss the, or take these tests or at least utilize someone that might have focused or known him closer to the age of 18, wouldn't it?

A    Yes, but we have Dr. Moore's report because he did Michelle Armont and -

Q    We'll get to --

A    -- he lived with her around the age of 18.

Q    Yeah.  But you didn't do Michelle Armont?

A    I didn't do Michelle Armont.

Q    And you made a mental retardation assessment based on Beverly Frank's information, that's the only rater you used when you made your assessment?

A    Based on a rating and then when I do interviews with people I do follow the protocol and ask similar questions through there, so I also interviewed Ms. Williams but I asked her questions about the time he lived with her, which was

USCA5 2852

from 16 to about the age of 18.

Q   Okay.

A   Or 20.

Q   I want to address some issues in your supplemental report from August 12.  First, I just want to, I just want to touch on the Flynn Effect for a minute because you put a footnote in your report, note 2, addressing the widely accepted and scientifically valid Flynn Effect.  Do you apply the Flynn Effect in your clinic to patients?

A   I think the way I explained that is I implied within the confidence interval and in the narrative to make certain that whoever I am writing the report for understands the age of the norms on which I am basing this score.

Q   And, but is it accurate to say that most of the associations that touch on the Flynn Effect and, that it's primarily used in a courtroom setting?

A   The term Flynn Effect is primarily used in a courtroom setting I would say.

Q   Okay.  In your report, can you just real quickly for me cover the ten, tell me the ten areas where you say that someone in order to be adaptively deficient, what are the ten areas?

A   The ten areas that you are speaking of are those that were listed in the DSM-IV TR, and that was based on the 1992 definition of AAIDD and that would be communication,

USCA5 2853

functional academic, self-direction, social skills, leisure, self-care, home living, community use, health and safety and work.

Q   Okay.  And in your report you've got the, under the adaptive deficits you mention the Vineland and the, that you used on Beverly Frank, and then you have this paragraph that I referenced earlier where you say you have spoken with several informants and the people were Claudia Williams, Michelle Armont, Murray Bourgeois, Carl Henry, Lloyd Ferdinand, Donald Reese, Gwendolyn Thomas Smith and Fred Tompkins.  Was your first report insufficient?

A   I think the first report didn't include the information I had gathered from that second group of people, and I don't think I had all the records in 2009 that I had available by August.

Q   Okay.

A   I asked for more records.

Q   And, again, you did this after testifying in June 2010 and after learning that Dr. Moore had gone out and interviewed people, that's when you went and contacted these individuals, correct?

A   I did contact them after the June testimony and after Mr., Dr. Moore was there, yes.

Q   Okay.  At the bottom of the page 2, Petitioner's Exhibit 33, bottom of page 2, there's a statement in here where you

USCA5 2854

say that, "It is apparent from my interviews of Mr. Bourgeois' family, friends and co-workers that Mr. Bourgeois relied on support of others in order to perform routine daily life activities." You, do you remember in the video where he talked about how he had to help Miss Mary getting in and out of the bathtub?

A    Yes, I do remember that.

Q    Do you remember how he talked about being able to cook all this wildlife stuff and how he learned how to cook from her?

A    Yes.

Q    And then he would prepare stuff, and he talked repeatedly about how he had to help Miss Mary, didn't he?

A    I remember that.

Q    Let's look at the third page of your report, under the deficits in conceptual domain. First paragraph, you say, "Mr. Bourgeois is deficient in his ability to absorb and understand information." Do you think, do you think that someone that can understand the criminal process and advance their own belief in what kind of defense they should present has the ability to absorb and understand information?

        MR. WISEMAN:  I'm going to object, Your Honor, on a legal point. He is essentially asking the witness if a person with mental retardation is in and of himself, or in and of itself not competent to proceed. I think the law is

USCA5 2855

clear that a person with mental retardation can be competent to proceed, so therefore the question is legally irrelevant.

MR. ROBERTS:  Your Honor, all I am asking her is whether or not someone that has demonstrated on a record, transcript, his ability to understand the charges he has been presented with and able to articulate how he thinks his counsel should be fighting his case better would fit within the deficiency of the ability to absorb and understand information.

THE COURT:  Go ahead.

THE WITNESS:  Okay.  I think that is one, one example that would fall under there, yes.

BY MR. ROBERTS:

Q   So if he is able to understand that and, understand the criminal process and understand how he wants to proceed in the case, that that would still be deficient, his ability to absorb and understand information?

A   I think we spoke earlier that you may have some strengths and you may have weaknesses.  That doesn't offset the other deficits that he has in that area.

Q   How about the ability to write 16-page letters that contain thoughts about how an individual is upset, about what he believes or perceives his wife and family to be doing to him?  I mean you read the letters that Alfred Bourgeois wrote?

USCA5 2856

A    Yes.

Q    Are you telling us that in those letters that he demonstrates an inability to absorb and understand information?

A    I think that when he writes those letters it takes him much longer than it does someone else of normal intelligence.

Q    Well, you don't know how long it took him to write those letters.

A    I know how long it takes him to write things for me.

THE COURT:  When you were looking at him.

THE WITNESS:  Yeah, when I'm looking at it I have no idea how long it took him.  I think that's an example, if you want -- would you repeat the question so I can say yes or no, please?

BY MR. ROBERTS:

Q    Well, the question is if you look at the letters that he wrote and the train of thought in the letters and the way he applied the grammar and the concepts that existed in those letters, that doesn't support your conclusion that he's, that he has a, that he is deficient in his ability to absorb and understand information.

A    I think that's an example that does not support my conclusion, yes.

Q    I am on this paragraph where it starts, we are still on page 3, "As is typical of individuals with mild mental

USCA5 2857

retardation," you mention down at the bottom that you have learned that he was provided answers to some written tests required to obtain a driver's license.  Who did you learn that from?

A    Donald Reese, and he'll be testifying tomorrow.

Q    And what answers was he provided?

A    This is a specific kind of test, it's the truck driver's license test that you have to pass to get an endorsement on your regular driver's license in the state of Louisiana, it's a written test, and there's, if you fail it the first time you get to take the alternate form, and over a period of time these truck drivers had figured out the answers, and so you go in and you flunk it, then you go back the next day and you literally know to mark an A, a B, a C or a D.

THE COURT:  What are you talking about?

THE WITNESS:  It's a written test that was given at that time to get a truck driver's endorsement on your driver's license.

THE COURT:  For the hazardous materials?

THE WITNESS:  Huh?

THE COURT:  For the hazardous materials?

THE WITNESS:  No, it's not the -- there's a different one for the hazardous materials.

THE COURT:  Oh, okay.

THE WITNESS:  But just to drive a large truck at

USCA5 2858

that time, in the 1980s, you had to take a written test. It's different now, there's different federal regulations that have gone in place.  And that's how he got his truck driver endorsement and some of the other people in Schwegmann's.  Earlier we, I wasn't supposed to testify to this so that's why that didn't come out earlier.  And you could get the information from Mr. Reese.

Q    So Mr. Reese has told you that Alfred Bourgeois was given answers and then was able to pass the driver's license test?

A    That's right.

Q    And Mr. Reese had knowledge of that, according to what he told you?

A    Yes.

Q    Okay.  You said that --

THE COURT:  You mean to get a commercial driver's license?  I don't know what you are talking about.

THE WITNESS:  You can get a driver's license in Louisiana and at that time to be, to drive certain types of trucks you had to have an A, B, C or D, you know, endorsement, so you had to go back and take an additional written test on how to drive vehicles that had more than one axle.  For example, you take a test to be a school bus driver but then to drive an 18-wheeler it's a different test, and that's how they did it in the 1980s at that time.  And then later on you were grandfathered in if you had already passed

it at the earlier time when new regulations changed.

THE COURT:  I remember he said he was grandfathered for something.

THE WITNESS:  That's right.

THE COURT:  I thought it was a commercial driver's license.

THE WITNESS:  Now, Mr. Reese also was at the same, they were tandem drivers at the hazardous truck driving place, which is the test you are talking about, and he also had to pass that test that Mr. Bourgeois passed, and he can give you some direct information about that since I think it was decided I wasn't supposed to.

BY MR. ROBERTS:

Q   Well, let me ask you about this, your statement that he has difficulty in understanding and managing money.  You saw his -- have you seen his bank account?

A   Yes.

Q   You saw how he managed his bank account?

A   Yes.

Q   You saw the documents from his briefcase?

A   Yes.

Q   And you listened to him talk to Dr. Moore about the, how he would go about being able to run a business, charge a certain amount and only charge the people that were unloading trucks less so he would make money?

USCA5 2860

A    Yes.

Q    And so your conclusion that he had difficulty understanding and managing money you say is borne out by your interviews with informants and a review of documents regarding his finances.  Which informants?

A    When I, particularly his brother Lloyd provided him a lot of assistance in financial matters.  He had signed a lease that had put him in considerable debt on this truck that he had.  He had fallen behind on paying on his house.  He owed money on credit cards --

Q    Who is telling you all this information?

A    This was in talking to Lloyd.  And it was also, I thought, apparent in the different testimony that, I mean the different records that I reviewed about how far behind he was.  I also --

Q    So when you say informants here, you are just referring to Lloyd?

A    Not only Lloyd but then I also, and Mr. Henry will be here tomorrow and that's what he does is supervise truck drivers, so I asked him to explain this lease to me and the way as I understand it he signed it, it's, you have to, they take out of your earnings money so he's always running behind.  If he's running late, his gasoline comes out it, the maintenance on the truck, et cetera, so you have to --

Q    I'm not actually asking --

A    -- if you sign one of these you need to be a really good business manager or by the time the time is up you still owe almost the total price of the truck.

MR. ROBERTS:  Your Honor, I'm going to object to non-response, I'm just trying to get the names of --

THE COURT:  Sustained.

MR. ROBERTS:  -- people.

THE WITNESS:  Okay, I'm sorry.

MR. ROBERTS:  So the informants --

THE WITNESS:  So Corey --

THE COURT:  So listen, wait a minute, listen to the question, he's going to ask you a question, pay attention to the question and just answer the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q    When you said the informants, this is borne out by my interview with the informants, you said Lloyd and who else did you talk to?

A    Corey Henry and Donald Reese because of knowledge they had about truck driving and these truck driving leases.

Q    And you say, "A review of documents regarding his finances."  Which documents?

A    Primarily the one about the lease that --

Q    So one document?

A    -- that they showed.  That's the primary one that comes

USCA5 2862

to mind at this time, yes.  Yes.

Q   On the deficits in practicum domain, you say, "Mr. Bourgeois' history is significant for profound delays in learning new practical skills, for example, co-workers revealed," who are the co-workers?

A   That was Donald Reese and Mr. Tompkins and Mr. Henry.

Q   Then you say he was sheltered at one trucking job by a relative who held a supervisory position.  Who was that relative?

A   That was Mr. Henry.

Q   Next paragraph, you say, "However, friends and family report that even after Alfred started driving a truck he continued," and you talk about him having misjudgments and accidents and tickets.  What friends and family told you that?

A   The mailbox one I think is particularly from Mr. Murray Bourgeois who reported that.  The speeding tickets and those incidents, I think Michelle Armont discussed those with me, Murray Bourgeois discussed those with me, Claudia had knowledge of some of those, and so did Lloyd Ferdinand.

Q   Turn to page 4.  You talk about deficits in the social domain.  You indicate that one of the reasons that you found this was, "He is absolutely unable, absolutely unable to participate in two-way conversations."

            THE COURT:  What do you mean by that?  I talked to

him several times back and forth.

THE WITNESS:  And what I was talking about was --

THE COURT:  And we understood each other I thought extremely well, I have to say.

THE WITNESS:  And if you, you will have family members here and you will have Mr. Reese here and he was an incessant talker who pretty much wouldn't let you interrupt is the way that they described him, and Mr. Reese can tell you information as regard to when they drove a truck together and not only did he talk the whole time he drove, when Mr. Reese would try to lay down he talked again and it was, he didn't really want a two-way conversation, he was mainly imparting his own, his own conversation.  Mr. Bourgeois, Murray Bourgeois pointed out that the family had pretty much learned the best thing to do was just let Alfred talk and not interrupt him and not upset him, so that was kind of like the way they, in a way I think they enabled him within his own family by allowing, by never challenging some of the things that he said.

BY MR. ROBERTS:

Q   So this is the basis for your decision or your conclusion that he has deficits in the social domain?

A   That was one of the things, yes.

Q   Now, Dr. Swanson, you have testified in somewhere between 15 and 19, you have been involved in somewhere between 15 and

USCA5 2864

19 cases, I don't know, have you testified in every single one of those cases where you have given an opinion, an Atkins hearing type opinion?

A    Yeah, I've only listed the ones that I actually went to court for.  I may have done other assessments but people didn't use my work.

Q    You are an extremely experienced psychologist, you know the process for adaptive functioning, and yet you used one individual under the adaptive functioning and asking her to reflect back on 38 years.  Do you --

MR. WISEMAN:  Objection, asked and answered and argumentative.

THE COURT:  Move on.

BY MR. ROBERTS:

Q    Who asked you to go back and do the, your August 12th, 2010 report?

A    I asked to interview more people when I went in the spring of 2009 because there was only one available.  There were actually three or four scheduled but when I went those people were not able to see me due to various things that were happening in their lives, so I asked at that time that more people be found.  And at that time I knew he worked at Schwegmann's and, as I mentioned earlier, I was familiar with Schwegmann's, and I specifically --

MR. ROBERTS:  Objection, Your Honor, nonresponsive.

USCA5 2865

THE COURT:  Please listen carefully to what he's asking.

THE WITNESS:  Okay.

THE COURT:  Just repeat the question again and listen to the question.

THE WITNESS:  Okay.

BY MR. ROBERTS:

Q    Who asked you to go back and contact these individuals after July 2010?

A    I asked to interview more people and I was notified that there would be people available but I couldn't see them until after Dr. Moore saw them, we couldn't be there at the same time.

Q    When did you ask that question?

A    When did I ask to see more people?

Q    Yes.

A    I asked to see more people in the spring of 2009.

Q    And you weren't given any more information until sometime after July 2010?

A    As I remember what happened, I asked to see more people, by the time they had gathered people for me to interview Dr. Moore was already scheduled to go and they asked me to wait until after he had had a chance to interview everybody he wanted to see.  I had a hearing, as we are talking about, in June and I was out of the state in January, I mean in July

USCA5 2866

on vacation, so I wasn't available again until August to go and do these.

Q   So is it your professional opinion that your report from 2009 in this case, your declaration, is sufficient to be an assessment of mental retardation?

A   I didn't intend it to be that way, no.

Q   Okay.

MR. ROBERTS:  May I have just a moment, Your Honor?

THE COURT:  Yes, sir.

MR. ROBERTS:  We have nothing else at this time, Your Honor.

THE COURT:  Thank you.  We will break for lunch then for, come back at 1:15.

MR. WISEMAN:  Thank you, Your Honor.

(Lunch recess at 12:21 p.m. until 1:06 p.m.)

(Off the record discussion at counsel table)

THE COURT:  Is Mr. Roberts with us today?

MS. BOOTH:  Yes, Your Honor, they are.

THE COURT:  He threw you under the bus, huh?

MS. BOOTH:  Ms. Salinas went out to call to get everybody here.

THE COURT:  Any luck, Ms. Salinas?

MS. SALINAS:  Mr. Roberts is on his way, Your Honor, I am not sure where the other two are.

THE COURT:  Mr. Wiseman, I think you were

USCA5 2867

redirecting, is that right?

MR. WISEMAN:  Yes.

THE COURT:  Thank you, you may proceed.

MR. WISEMAN:  Okay, thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   Dr. Swanson, I want to show you the one page of school records we previously marked as, moved in as Exhibit 86, and direct your attention to the part where my finger is.  Do you see independent living there?

A   Yes, I do.

Q   And what grade did he achieve in that?

A   A D.

Q   Okay.  And did you --

THE COURT:  And I have already seen all these.

MR. WISEMAN:  You have.  I just wanted to --

THE COURT:  Right, okay.

MR. WISEMAN:  -- the witness to comment on it.

THE COURT:  Those are the only school records she had to look at.

MR. WISEMAN:  Correct, that's right.

BY MR. WISEMAN:

Q   And did the fact that he scored a D in home living influence your opinion as to his adaptive deficits?

A   I thought it was indicative of adaptive deficits, yes.

USCA5 2868

Q    Mr. Roberts was asking you about the line in your report about his ability, Mr. Bourgeois' ability to handle money.  I wanted to show you -- he asked you if you saw bank accounts, do you recall that?

A    Yes.

Q    I'd like to display for you, if I could, what has been previously marked as Defendant's 59 which is a set of financial records, and it's a large document, it's got 71 pages.  Does this look like the materials that you reviewed?

A    Yes, it does.

Q    Okay.  I am going to ask you some questions about these particular items.  On the first page, when you wrote in your report that he had difficult, a difficult time handling money, were you considering this unpaid, or I should say this lien placed on him by the State of Louisiana for $500 and change?

A    Yes.

Q    Okay.  And did you --

        THE COURT:  Was that Ms., was that Robin Bourgeois' --

        MR. WISEMAN:  The name on it is Alfred Bourgeois, Your Honor.

        THE COURT:  And what was that for?

        MR. WISEMAN:  It says "Motor vehicle sale tax period ended 6/00," and it's got, the amount of the lien is $503.69.

USCA5 2869

Swanson - Redirect

BY MR. WISEMAN:

Q   Did you similarly consider, in regard to his ability to handle money, his wife's income tax or a statement sent to his wife showing an overpayment of $4500 and change in the year 2001 with an income of $39,374?

A   Yes.

Q   And does that seem to you, in your experience, the kind of mismanagement of resources that --

        MR. ROBERTS:  Your Honor, I will object to her, unless she has got some --

        THE COURT:  Do you have some financial expertise?

        THE WITNESS:  No.

        THE COURT:  Okay, then she's not going to be testifying about that.

BY MR. WISEMAN:

Q   If a person making $39,000 overpays their taxes by --

        THE COURT:  Mr. --

        MR. WISEMAN:  -- 4,000 --

        THE COURT:  You are not going to be talking about that.  Go to another subject.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Did you consider this March 2nd, I am sorry, March 27th, 2002 notice from the Monogram Credit Card Bank of Georgia indicating that they were closing his account on account of

past due amounts?

A    Yes, I did.

Q    And did you consider the May 17th, 2002 letter from Hibernia Bank indicating that they were calling in the promissory note on his home?

MR. ROBERTS:  Object, Your Honor, that --

THE COURT:  That was from Ms. Bourgeois.

MR. ROBERTS:  Yes.

MR. WISEMAN:  Well -- well, fine.  I think it's relevant, Your Honor, it's a husband and wife.

THE COURT:  Well, he's, he, the videos I looked at he got, he said he got in financial trouble because Robin Bourgeois overspent without his authority and without his direction, and he started getting collection notices, never had those problems.

MR. WISEMAN:  That's fine.

THE COURT:  And so I don't know what that would have to do with him exactly.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q    Well, how about this credit card statement from Citgo dated August of '02 -- actually that's not a good example.  I will withdraw that one.  And did you see material relevant to a -- well, could I have the computer put on -- relevant to a lease on a 2001 Ford Expedition vehicle?

USCA5 2871

A    I think I did.  Yes, I looked at this.

Q    Okay.  This is incredibly tiny print so I am going to put it up on the other -- but just for purposes of the record this is page 59 of Exhibit 59.  It's obviously too small to read, so --

            THE COURT:  Actually, there is a zoom on there that makes it very easy.

            MR. WISEMAN:  I tried that.  I have a, I have it on the computer.

            THE COURT:  Okay.

BY MR. WISEMAN:

Q    Let me show it to you on the computer.  That's the same page.  Does it appear that this was a, the lease we were talking about, $476 monthly payment, 35 months, for a total of $17,157.96 with $9,000 down.  Did you consider that Mr. Bourgeois put down or committed to paying on a 36-month lease $26,000 of a $40,000 vehicle?

A    Yes, I looked at this document and I considered this.

Q    Okay.  And did you also consider --

            THE COURT:  Have you looked at -- I am sorry.  You don't know anything about, you are not an expert on finances?

            THE WITNESS:  I think I am just being asked if I looked at it and if I considered it and this was what I did.

            THE COURT:  Okay.  Well, how did you, how would you have considered if you don't, if you are not an expert on

USCA5 2872

finances?

MR. WISEMAN:  Your Honor, may I respond to --

THE COURT:  No, I am asking her.

THE WITNESS:  I guess, I think, I thought what he was addressing was someone said what financial records did you look at and I knew we did, and he said which ones were they and I think we were going through the ones that I looked at, and that's all I think I am doing.

THE COURT:  Okay.  So you didn't use that in coming up with any of your opinions?

THE WITNESS:  I wrote a statement in my report that I looked at these.

THE COURT:  Because you would have had to look at all of his records, all of his tax returns and all these other things.  You didn't do that.

THE WITNESS:  The statement in the report that said I looked at records, these are the records, financial records I looked at, and I, that's --

THE COURT:  Did you use his financial records in any opinion that you came up with?

THE WITNESS:  I, I felt they give evidence of poor management.  He has --

THE COURT:  Did you look at -- okay.

THE WITNESS:  -- basic money skills but the ones I looked at I thought showed that --

USCA5 2873

THE COURT:  But you didn't look at the overall picture, his trucking records, you know, he had a trucking company?

MR. WISEMAN:  Your Honor, he did not have a trucking company.

THE COURT:  Okay.  He said he did even in the examination about a --

MR. WISEMAN:  Well, he says a lot of things.  He did not have a trucking company.

THE COURT:  Okay.

MR. WISEMAN:  And I think the point from our perspective is that --

THE COURT:  Did you look at his tax returns, has anybody looked at his tax returns?

MR. WISEMAN:  We don't have his tax returns.

THE COURT:  Okay.  Well, I mean, that would give us a better picture, wouldn't it?

MR. WISEMAN:  Well, it would give you a better picture, Your Honor, but I think this is still relevant information.

BY MR. WISEMAN:

Q   And my question, Doctor --

THE COURT:  Well, if I am the fact finder --

MR. WISEMAN:  You are.

THE COURT:  -- then I get to determine that, so

USCA5 2874

let's move on to something else.

MR. WISEMAN:  Well, but relevance is a legal issue.

THE COURT:  Let's move on, please.

MR. WISEMAN:  I have a question for the witness regarding expert reliance on such information, if I could ask the question to complete the record.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   Dr. Swanson, do people assessing MR typically look at financial records as part of the determination of a person's ability to handle money?

THE COURT:  Mr. Wiseman, I will stipulate that that is correct.

MR. WISEMAN:  Okay.  Well then --

THE COURT:  But the point is she didn't look at all of his financial records.

MR. WISEMAN:  Well, that's true, that's true.

THE COURT:  And you take a little bit out of context and it makes no sense, is all I am saying.  So if I am the fact finder, we need to move on to a different subject, one more time.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Just one quick point.  Your CV, which has been received as --

THE COURT:  Exhibit 36.

BY MR. WISEMAN:

Q   36, yes.  I count 15 cases on there, is that accurate?

A   That's accurate, and there would actually be a 16th that I did in August.

Q   Okay.  The Judge has asked questions of you with respect to Mr. Bourgeois' communication with the Court during the trial proceedings, and I wanted to show you a page from the Green Book, this would be page 102, and what would your opinion be as to the statement in there that says, "Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having ID."  There's a citation.  "Discuss two reasons for this guideline, there was not enough available information and there is a lack of normative information."  First of all, do you agree with that statement?

A   Yes, I do.

Q   And how does it relate to Judge Jack's communication with Mr. Bourgeois and whether that speaks to the question of adaptive deficits?

A   I think what that citation is stating, that you can't use an instance of criminal behavior or one comment or one conversation to infer and make a total global assessment of somebody's adaptive abilities.

THE COURT:  But do you understand that he had, we

USCA5 2876

had several conversations with Mr. Bourgeois and it wasn't a single comment?

THE WITNESS:  And I really, I am just addressing that citation in my testimony.

THE COURT:  Okay, but you just, you actually, you, in contrast to that sentence you used other people's opinions of whether or not he could communicate because he displayed the behavior he wouldn't ever be quiet, he just kept talking and talking, which is also synonymous with a narcissistic person, is it not?

THE WITNESS:  That would be a feature of a narcissistic person.

THE COURT:  And I guess, I don't know if you heard what the last psychologist that Mr. Bourgeois had hired said, that his behavior, his presentation was also symptomatic of a narcissistic, sociopathic person, different etiology but that's what he said, and he also said he wouldn't want him living next door to him.

THE WITNESS:  I understand.  I wasn't aware of all that, no.

THE COURT:  Would you disagree with that?

THE WITNESS:  I think I testified earlier that --

THE COURT:  Just that, what I said --

THE WITNESS:  Borderline is what I would say he was more.

USCA5 2877

THE COURT:  Would you disagree with what he said?

MR. WISEMAN:  I'm sorry, Your Honor, which part?

THE WITNESS:  I do disagree because I think he's more of a borderline personality disorder than narcissistic.

THE COURT:  Okay.

THE WITNESS:  Borderline have narcissistic features but they are another similar classification under Cluster B.

THE COURT:  And he testified, because he's a forensic psychologist or a neuropsychologist, that he had, he couldn't put the brakes on his behavior, which is also symptomatic of a sociopath.  Did you know that?

THE WITNESS:  Uh --

THE COURT:  Did you know he testified like that?

THE WITNESS:  I haven't, that was in his testimony?

THE COURT:  Yes.

THE WITNESS:  Recently or --

THE COURT:  A week ago.

THE WITNESS:  Oh, well, nobody gave me any testimony from a week ago.

THE COURT:  Okay, thank you.

BY MR. WISEMAN:

Q    And one could be a sociopath that you wouldn't want living next door to you and be mentally retarded?

A    Yes.

THE COURT:  So he could be a narcissistic sociopath

and borderline retarded?

THE WITNESS:  And mildly retarded.

THE COURT:  Mildly.  Mildly retarded, sorry.

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q   When I asked you earlier about MR not being a diagnosis of exclusion, could you explain how that relates --

THE COURT:  Would you say that again?

BY MR. WISEMAN:

Q   Mental retardation --

THE COURT:  Okay.

BY MR. WISEMAN:

Q   -- is not a diagnosis of exclusion.  Can you explain again to the Court how that relates to the questions the Court just asked you about the co-morbidity --

THE COURT:  Well, what the point was, you wanted to say you can have all that and still be --

MR. WISEMAN:  Of course, of course.

THE COURT:  Well, we already did that.

MR. WISEMAN:  What's that?

THE COURT:  Don't assume that I also am -- that I cannot, that I don't have basic cognitive understanding of what you are talking about.

MR. WISEMAN:  Oh, Your Honor, your cognitive --

THE COURT:  So please move on.

USCA5 2879

MR. WISEMAN:  Your cognitive understanding is abundantly apparent.

THE COURT:  So please move on.

MR. WISEMAN:  Okay, I will move on.  I thought the Court needed further clarification.

THE COURT:  I don't think so.

MR. WISEMAN:  Okay, I am happy to move on.

BY MR. WISEMAN:

Q   Mr. Roberts questioned you about page 13, your Woodcock scores?

A   Yes.

Q   And you see where I am putting my finger on the scale scores and he pointed out a bunch of 80s.  My question is, is that 80 out of 100 or is that 80 on a bell curve?

A   That's 80 on a bell curve.  And the SS stands for standard scores.

Q   Standard scores.

A   Eighty on a bell curve and that would be approximately 1.5 standard deviations below the mean.

Q   Okay.  So that doesn't mean he's scoring --

A   Or one and a third.

Q   -- like a B student would score on these tests because he got the 80?

A   No, no, no.  You are looking at the bell curve and you are looking at below the mean, somewhere between one and two

USCA5 2880

standard deviations below the mean.

Q   Judge Jack observed that on the video Mr. Bourgeois appeared to speed up his responses to one of the psychological tests, and I haven't watched that myself yet, I haven't seen that part, or I haven't noticed that, I should say, but assuming that Judge Jack has told us what she saw, I wanted to ask you about a portion of Dr. Moore's report, I'm sorry, of Dr. Price's report, and I will mark this as Petitioner's 162.  Is this --

THE COURT:  Do you want to offer that?

MR. WISEMAN:  Eventually, yes.  Yeah, I will offer it now, sure.

THE COURT:  Well, I mean I am looking at it, so you want to --

MR. WISEMAN:  Yeah, yeah.  Yeah, I am offering it all.

THE COURT:  Okay.  Petitioner's 162 is admitted.

   (Defendant's Exhibit P162 admitted into evidence)

MR. WISEMAN:  We have nothing to hide, Your Honor.

THE COURT:  Well, I realize that.

BY MR. WISEMAN:

Q   Is this Dr. Price's report that you reviewed?

A   Yes, it is.

Q   Okay.  Now, I just want to read you a sentence out of it on page 6, under the Personality Assessment Inventory, PAI.

Are you familiar with that test?

A    I am familiar with it, yes.

Q    Okay.  It says, "This administration of the PAI resulted in an invalid profile with no clinical interpretation possible.  The potential reasons for this pattern include reading difficulties, careless or random responding, marked confusion or failure to follow the test instructions," close quote.

            THE COURT:  Is that what I was just talking about?

            MR. WISEMAN:  Yeah, yeah.

            THE COURT:  I wondered why he was zipping through it so quickly, so that would give me an indication, too, that he was doing it on purpose.

            MR. WISEMAN:  Well, that may be --

            THE COURT:  Because he was very careful when he, when Dr. Price came back into the room to be very slow and deliberate.

            MR. WISEMAN:  Right.

BY MR. WISEMAN:

Q    And my, the point of my question is, did the testing catch, assuming he purposely sped up, that he gave an invalid profile?  I mean the test caught that?

A    The test, the test was deemed invalid by the examiner so it must have caught that he sped up.  I am inferring from that that he could have been doing careless or random

USCA5 2882

responding.

Q   Okay.  And let's assume that he purposely sped up.  Would that also be consistent with a mentally retarded person's masking?

A   It would if he felt he was going too slow on the test, yes.

THE COURT:  You really ought to look at that video.

MR. WISEMAN:  Oh, I'm --

THE COURT:  I mean he was zipping through it.  I didn't think I could have read it that quickly.

MR. WISEMAN:  Okay.

THE COURT:  So that explains it better to me.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q   Now, just a few more questions.  We had this little examination, cross-examination about whether it's difficult for an expert to make a determination in this case because of Mr. Bourgeois' overall sort of grandiose presentation and all that.  Actually, the question I was interested and which I thought I was asking was does it make it difficult for lay people to judge mental retardation in a person like Mr. Bourgeois?

A   Yes, it does.

Q   And, obvious, his presentation is better than the substance, to put it in layman's terms, he presents better

USCA5 2883

than he is?

A    He presents better than he is.

THE COURT:  Isn't that one of the tests, though, of retardation is not just how he tests but how he presents?

THE WITNESS:  Well, I am not clear on that question.

THE COURT:  Okay.

MR. WISEMAN:  Well, if I can take a stab at it, is it that as an examiner --

THE COURT:  Are you going to testify?  Why don't you just tell me.

MR. WISEMAN:  I'd love to.  But I think I have to have the witness tell it.

THE WITNESS:  He's trying to get -- I think I don't understand the question.

MR. WISEMAN:  Yeah, let me try to ask the question another way.

THE WITNESS:  To reword it for me?

THE COURT:  And I thought the Fifth Circuit law is that you look not just at their test scores but their adaptive behavior, and when you are saying he looks better than he is, to me that's adaptive behavior and how he does things like running a trucking, you know, driving around, running a business, keeping his bank records.  He said in the video he had a tax consultant.  And he's bought a house, he has these cars, he makes these financial arrangements, and --

USCA5 2884

THE WITNESS: Uh-huh. And I think when you said presentation, and what I was kind of thinking was, he tries to overrepresent his abilities and hide from you what supports he got to make those decisions. And, as I understood, and I don't know a lot of legal issues, but the issue that the courts have to address is when you don't have standardized assessments, is make a real close look at adaptive behavior and see does it meet a deficit, and if it's there, if it appears to be a strength, is there anything that's supporting him that makes it look like a strength when it's not.

THE COURT: Thank you.

THE WITNESS: Okay.

BY MR. WISEMAN:

Q   Let me put up Petitioner's 155 again for you. Mr. Roberts was asking you if you thought it was an extraordinary jump from a 76 verbal to a 67 verbal, and that's a nine point difference in the two tests?

A   Yes.

Q   Okay. And I don't know if you actually did the Flynn calculation or if you have seen one, but can you explain to the Court what the Flynn calculation would be in this instance --

A   Okay.

Q   -- on an IQ score?

USCA5 2885

A    The Flynn calculation, based on group statistics, is that you would anticipate that the score goes up .3 points per year --

THE COURT:  Up?

THE WITNESS:  -- over the age of the normative test.

THE COURT:  Okay.

THE WITNESS:  So like if we're looking at, this is 26 years or 24 years, multiply that times .3, and what that's telling you is most people who took the test in 2004, a test that's based on norms from '78, in group statistics that's how much it went up.  That's an average.  So we really don't know how much his score went up, we just know it went up.  It could have gone up .3 --

MR. WISEMAN:  I think we're --

THE WITNESS:  -- a year or it could have gone more.

MR. WISEMAN:  Let me ask a clarifying question.

THE COURT:  But his didn't go up at all.

BY MR. WISEMAN:

Q    Now when you say go up --

THE COURT:  It went down.

BY MR. WISEMAN:

Q    -- you mean the norms go up?

A    Elevated the score, so you really Flynn adjust it down, yes.

Q    Exactly.  So if you did the Flynn adjustment down of 26

USCA5 2886

years times .3, my arithmetic says 7.8.

A    That's correct.

Q    Okay.  So --

A    A Flynn, you can anticipate a Flynn as much as eight points, or on the average of eight points, that's right.

Q    Okay.  So if you were to apply, if you were to apply, and I will put apply in quotes, Flynn to the verbal score in this test, he is pretty spot on, isn't he?

A    Pretty much.

Q    From a 76 to a 67 verbal.

A    That's correct, if there is -- there could be an increase because of aging norms and it might be that much, yes.

Q    Is the ability to mask an adaptive deficit or an adaptive strength?

A    It's just a characteristic, I think, that's common of people with mental retardation to try to hide what they don't know and to present it in a better light, and there are several different ways that it's commonly done.

Q    There has been a lot of questions put to you about who you chose to give a standardized test to and who you chose not to.  Did you, were you aware at the time you were deciding this question that Mr. Ferdinand, Mr. Bourgeois' brother, had been accused of making threats during the time of the trial proceeding or being involved in threats against witnesses?

USCA5 2887

A    I read phone calls, transcripts and testimony and a lot of things that indicated that, yes.

Q    All right.  And did that knowledge influence your willingness to rely on him as an informant?

A    I certainly brought that into account, but one of my biggest problems with Mr. Ferdinand is just trying to get him to talk to me.  I couldn't arrange it in 2009 and I had to really work hard to get some conversations with him 2010.

Q    Mr. Roberts used the term inconsistent responses with regard to Beverly Frank's reporting on the ABAS that Mr. Bourgeois couldn't use a fork and on the Vineland that he sometimes could use a fork.  Did you see that as inconsistent?

A    No, it's just the way that, the different ways that they are scored, and that's one of the problems I think with the ABAS is you don't get every time to ask that, where when someone is doing an interview with you I can ask, well, you are saying he never did it or did he sometimes do it, or had he started to learn or did it take a prompt to get him to do it, so you get, to me you get a better answer, particularly on a retrospective diagnosis, on the Vineland than you would on an ABAS.

Q    Now, Dr. Moore -- Dr. Price didn't do any standardized testing of adaptive deficits to your knowledge?

A    No.

USCA5 2888

Q   Okay.  Dr. Moore did some, do you recall that?

A   Yes.

Q   Okay.  Do you recall if he did any, used any informant who knew Mr. Bourgeois in multiple domains?

A   He did.  The sister.

Q   Michelle Armont?

A   Michelle Armont, and --

Q   Okay, stop.  Stop right there.

A   Okay.

Q   How did Michelle Armont's testing come out in Dr. Moore's testing?

A   In Dr. Moore's testing it came out showing he was deficient.

Q   Okay.  The other people Dr. Moore gave the ABAS-II to were people who knew Mr. Bourgeois from work?

A   Yes.

Q   And a person who knew him during childhood?

A   Yes.

        THE COURT:  Aren't all these tests designed, the tests that you are talking about that you gave to Ms. Frank, these are designed to get community help for someone who is mentally retarded, they are not determined, they are not designed to go back in time to determine if somebody was mentally retarded to get the death penalty?

        THE WITNESS:  I think what you are asking is they

USCA5 2889

Swanson Redirect                                          193

are designed to determine eligibility right now.

THE COURT:  Right now, for --

THE WITNESS:  And they are also designed to do treatment, and the authors of both tests have published how to use them retrospectively.  The Vineland did that in 2008 --

THE COURT:  But none of them were designed to do --

THE WITNESS:  They weren't designed to do that.

THE COURT:  -- do what you are doing now?

THE WITNESS:  That's right.

THE COURT:  Okay.  I just want to make sure.

THE WITNESS:  But they are recommended by experts in the field.

BY MR. WISEMAN:

Q   Although they weren't initially designed, is --

THE COURT:  They are not now designed for it, is what she just said.

MR. WISEMAN:  Well, I think that's, if I can clear that up.

BY MR. WISEMAN:

Q   When you say the authors have published, does the Vineland now have an addendum to the manual regarding retrospective administration of it?

A   Yes, when they published the expanded manual in 2008 they devoted a whole section on how to use it retrospectively.

USCA5 2890

Now, I want to be clear.  The normative data is not that based on retrospective but they do, they tell you how to do it and to interpret with caution and to make sure people know that that's the way you did it, which I think is what Dr. Moore and I did.

THE COURT:  But it's not be used in this context.  The whole thing was developed for community services in another context.  Is that not right?

THE WITNESS:  That's correct.

THE COURT:  Okay.  Move on.

MR. WISEMAN:  Yes, ma'am.  Yes, Your Honor.

BY MR. WISEMAN:

Q   When did the Flynn Effect first become published or present in the literature, was it before or after Atkins?

A   Oh, it was before Atkins.

Q   By a good ten years?

A   Yeah, I would say in the 1980s is when you first started seeing the term and the, associated with Dr. Flynn.

Q   Okay.  You watched the tape where Mr. Bourgeois talked about how he was an amazing cook and did all this cooking for Miss Mary when he lived with her and other times.  Did you actually hear him --

THE COURT:  I think he said he learned from her.

MR. WISEMAN:  Right, okay.

USCA5 2891

BY MR. WISEMAN:

Q   With that correction, did you actually hear him describe how to cook anything?

A   He talked about things he could cook.  I think someone specifically asked him how to treat the game meat and he gave a method that he said she used and that's what he used.  I didn't hear any steps or any recipes.  He certainly couldn't demonstrate that skill to me when I worked with him, and then when I quizzed him --

THE COURT:  Well, did you give him a raccoon to cook?

THE WITNESS:  No.  No, Your Honor, I didn't.

THE COURT:  Okay.  I'm just curious.

THE WITNESS:  Okay.  But we did go over some recipes and we did talk about different things you do and how you brown and how you fricassee and what you do to dice and different things like that.

THE COURT:  I don't think he did that.  What I saw in the video is he was just talking about boiling up a raccoon or a deer --

THE WITNESS:  Yeah.

THE COURT:  -- or squirrel meat, and what you put in it to make it tender and you boil it until you can stick a fork in it and it's tender.

THE WITNESS:  That's right.

Swanson Redirect                                                    196

THE COURT:  It sounded all pretty forthright to me.

THE WITNESS:  That's right.  That's what I remember him saying, yes.

THE COURT:  So I didn't ask if you, I don't, I'm not going to ask if you duplicated this recipe, I just want to know if there is any exception you take from this recipe.

THE WITNESS:  Oh, from him saying how --

THE COURT:  Yes.

THE WITNESS:  And I don't have any --

THE COURT:  Okay.

THE WITNESS:  I don't, quite frankly, Your Honor, I don't know how to soften up a raccoon at all.

THE COURT:  I would prefer not to learn, actually, but.

THE WITNESS:  It may be the way you do it and it may not be the way you do it, I don't know.

THE COURT:  But we don't, you and I don't have anything to say that that's not correct, we don't have any information.

THE WITNESS:  Yeah, we have no expertise in raccoon cooking, that's true.

THE COURT:  Thank you.  Anything in psychology or law that would tell us?

THE WITNESS:  No, I hope not.

THE COURT:  Okay.

USCA5 2893

MR. WISEMAN:  Can I be heard about this?

THE COURT:  Go right ahead.

MR. WISEMAN:  I'm just --

THE COURT:  Have you done it, Mr. Wiseman?

MR. WISEMAN:  Okay.  I think that's all.  Thank you again, Doctor.

THE COURT:  I think they get one more, I'm sorry.

THE WITNESS:  You see I'm trying to run.

THE COURT:  Have you got your water?

THE WITNESS:  I just knew I wouldn't need it this time.  I have got it over there.  I'm fine, though.

THE COURT:  Mr. Roberts, anything?

MR. ROBERTS:  I don't think so, Your Honor.

THE COURT:  Now you can go.  Is she excused or do you want her to stay?

MR. WISEMAN:  Yes, she's excused, Your Honor.

THE COURT:  Any, Mr. Roberts?

MR. ROBERTS:  She can be excused as far as we are concerned, Your Honor.

THE COURT:  You might just want to leave them some contact information.

THE WITNESS:  Okay.  And thank you so much.  And I apologize profusely about, I must be losing my peripheral vision in my old age because I just don't see that microphone that I keep bumping into.

USCA5 2894

THE COURT:  It's very difficult but we have a different kind of court reporting than probably what you are used to.

THE WITNESS:  Uh-huh.

THE COURT:  It's a digital recording.

THE WITNESS:  Uh-huh.

THE COURT:  So the sound goes into Ms. Gano's ears.

THE WITNESS:  And I apologize.  Every time I did it I just cringed.

THE COURT:  And every time I do it, she jumps out of the chair, and I am, unfortunately --

THE WITNESS:  And I want to apologize for that again.

THE COURT:  That's quite all right.  Would you call your next witness, please, sir?

MR. WISEMAN:  Yes, Your Honor.  Dr. Weiner.

THE COURT:  Could you come forward, please, sir?  Would you administer the oath?

THE CLERK:  Yes, Your Honor.

DR. DONALD WEINER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Weiner.  What do you do for a living?

A   I am a licensed psychologist in private practice.

USCA5 2895

Q    And --

THE COURT:  Would you ask him for his full name, please, sir?

MR. WISEMAN:  Oh, I'm sorry.

BY MR. WISEMAN:

Q    Full name, please?

A    Donald Edward Weiner.

Q    Okay.  And why don't you spell your last name so it's clear for the record?

A    W-E-I-N-E-R.

Q    And do you have any particular specialty?

A    One specialty area I have is the area of neuropsychology.

Q    And I want to put up on the overhead for you what I have marked as Petitioner's 29A and ask you if that's your vitae?

A    Yes, it is.

Q    Okay.

MR. WISEMAN:  Can I hand this up to the Court?

THE COURT:  Wait, wait, wait.  You can offer it and let me just look at it, okay?

MR. WISEMAN:  Okay.  Can I offer this in evidence then, Your Honor?

THE COURT:  Sure.  The number is?

MR. WISEMAN:  29A.

THE COURT:  29A is admitted.

(Defendant's Exhibit P29A admitted into evidence)

BY MR. WISEMAN:

Q   Could you briefly, the Court can see where you went to school and all that, but why don't we focus in particular on how you developed an expertise in neuropsychology.

A   I began getting -- excuse me -- interested in neuropsychology during a pre-doctoral clinical psychology internship and more interested during a post-doctoral fellowship I did at the University of Texas Medical Branch at Galveston.  And following that I have been to a number of trainings over the years with Dr. Ralph Raytan, who is one of the world authorities in neuropsychology.

THE COURT:  Okay.  Do you have any training in neurology?

THE WITNESS:  I am not a medical doctor but I have had training in neurophysiology through -- I am board certified by the professional, what's it called, licensed prescribing psychologist register, and I have taken about 350 hours of training and some of that was specific to brain and brain function and brain physiology.

THE COURT:  Well, how much of that specific for --

THE WITNESS:  Oh, I'd probably say maybe 40 hours of that.

BY MR. WISEMAN:

Q   In your --

THE COURT:  Okay, wait a minute.  You are not board

USCA5 2897

certified by any neuropsychology organization?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.  Didn't we have somebody in here that was a neuro, the other guy that was --

MR. WISEMAN:  Dr. Gelbort was also not board certified.

THE COURT:  But he had extensive training in -- actually, never mind.

MR. WISEMAN:  Well, if I could ask some more questions about that?

THE COURT:  Never mind, that's okay.

MR. WISEMAN:  Okay.

BY MR. WISEMAN

Q   In your current practice, approximately how many times a month do you administer neuropsychological tests?

A   Oh, it's probably, averages three times a month or so.

Q   And has that been pretty consistent over the course of your career?

A   Yes.

Q   So you have administered hundred of batteries?

A   Yes, I have.

Q   And --

THE COURT:  Say that again.

MR. WISEMAN:  Hundreds of batteries of tests.

THE COURT:  For neuropsychology?

USCA5 2898

MR. WISEMAN:  Neuropsychology, yes.

BY MR. WISEMAN:

Q    And your answer for that is?

A    Yes.

Q    And have you testified in courts in Texas as an expert in neuropsychology?

A    Yes, I have.

Q    Approximately how many times?

A    Oh, I'd say probably 40 to 50 times.

Q    And has that been in the State Courts as well as the Federal Courts?

A    Yes.

Q    And have you ever been denied qualifications by any judge?

A    No.

Q    What is the percent of your practice that's devoted to clinical treatment and diagnosing of patients?

A    Well, actually, about 100 percent is clinical direct services, treatment, diagnosis, evaluation, diagnosis and treatment.

Q    Okay.  And, well, I guess then the question is how much of your time do you spend doing forensic work?

A    At any given time I may have about 10 to 15 percent of my caseload involved in forensics cases, but generally with those it's someone that I either do a one-time evaluation of

USCA5 2899

or it's someone I am doing ongoing treatment that they need and then I am asked to provide expert testimony.

Q    And amongst the forensic cases that you do, how much of it is criminal law cases?

A    A very small percentage.  I'd say less than five percent.

MR. WISEMAN:  Your Honor, at this time I would offer the witness as an expert in neuropsychology.

MS. SALINAS:  I'm not in opposition, Your Honor.

THE COURT:  Sorry?

MS. SALINAS:  I am not opposed to that, Your Honor.

THE COURT:  Thank you.  Then he will be recognized as.

BY MR. WISEMAN:

Q    I want to direct your attention to 2004.  Did you do any work in the case of the United States versus Alfred Bourgeois?

A    Yes, I did.

Q    And how did that come about?  What were you asked to do and who asked you?

A    I was contacted, I believe it was by Mr. Tinker, in February of 2004 and asked to do a neuropsychological evaluation of Mr. Bourgeois.

Q    And I want to put up for you an order signed by Judge Jack, it's Exhibit P157, and it appears that on February 13th, 2004, Judge Jack signed an order appointing you to do

work on this case?

A    That's correct.

Q    And do you recall how much before that day that Mr. Tinker would have contacted you?

A    It was probably at most a couple of weeks before I actually did the evaluation.

        THE COURT:  What was the date on it again?

        MR. WISEMAN:  February the 13th, 2004.

        THE COURT:  Thank you.  And he started, when did we start trial?

        MR. WISEMAN:  The jury was sworn on February 25th.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q    So you said that Mr. Tinker asked you to do, what, a --

A    A neuropsychological evaluation.

Q    And do you recall the circumstances that you were asked to perform this evaluation under?

A    Well, there was a very tight time line and my schedule was already pretty booked, and so normally I don't do work on the weekends but I did agree to do this evaluation on a Saturday.

Q    And where did the evaluation take place?

        (Banging noise)

        THE COURT:  Oh.

        THE WITNESS:  I'm sorry.

USCA5 2901

THE COURT:  Okay.

THE WITNESS:  I apologize.

THE COURT:  Okay, nobody gets on the stand anymore from either side that is not instructed to be very careful of the microphone.

MR. WISEMAN:  I'm so sorry.

THE COURT:  Don't touch it.

THE WITNESS: I apologize.  I apologize, Your Honor.

THE COURT:  Don't touch it, don't move it, don't touch it.  Thank you.

THE WITNESS:  The evaluation was done February 28th of 2004.

BY MR. WISEMAN:

Q   And you recall that was a Saturday?

A   Yes.

Q   And where did the evaluation take place?

A   Oh, where did you say?

Q   Where?

A   At the federal courthouse.  He was being held here.

Q   Okay.  This building?

A   Yes.

Q   Okay.  I want to put up for you what's been marked as Petitioner's 29 and ask you if you recognize that?

A   Yes, that's my report based on my neuropsychological evaluation.

USCA5 2902

Q    And what do you make of the date of the report being 3-3 with the evaluation having been that Saturday?

A    Well, normally, like I said, I don't do work on a weekend and so the earliest date I was able to actually complete the report was on March the 3rd.  It was definitely a rush job.

Q    Okay.  And did you, were you provided by Mr. Tinker or anyone working with him any records with regard to Mr. Bourgeois?

A    No, I was not.

Q    Not a single piece of paper?

A    No.

Q    Is that unusual in a neuropsychological evaluation?

A    Well, particularly in forensic cases it's extremely desirable to have whatever medical records, school records that may be available in aid, and the conclusions based on the testing.

Q    I'd like to put up for you Petitioner's 81, which is a thick packet of records.  Do you recognize those?

A    Well, I'm not sure what is inside the packet.

Q    Right.  Does it look like a packet you have reviewed?

A    Hunter Medical Records.  I don't believe I have received any package --

Q    Well, would it be helpful for me to hand it you to --

A    Yes.

Q    -- look through it?

USCA5 2903

A    I did receive -- I did not receive any medical records on Mr. Bourgeois until the ones you provided me in 2007 and then the additional ones that I was recently provided, but this --

THE COURT:  Sorry, what, medical records you are talking about?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    And I guess my question is, is the packet you are currently holding are Mr. Bourgeois' medical records?

A    Yes.

Q    And they were provided to you by my office?

A    Yes.

Q    Not by Mr. Tinker's office?

A    That's correct.

THE COURT:  Now, you are not a medical doctor?

THE WITNESS:  No, I am not.

THE COURT:  Okay.  And you haven't had pre-medical courses, chemistry, biology?

THE WITNESS:  I have had -- no, I have not had --

THE COURT:  Okay.

THE WITNESS:  Did not take pre-medical courses.

BY MR. WISEMAN:

Q    I want to turn to a particular page in these records and ask you what relevance, if any, they would have for a person

USCA5 2904

doing a medical, a neuropsychological study, and this is page 12 of the exhibit and it's a little hard to read. I know you have read it.

A    Yes, I can see it there.

Q    Okay. Can you tell the Court what that line that I pointed to says?

A    It looks like the admission notes and it said, "Restrained driver of 18-wheeler survived and hit another, swerved," I'm sorry, "and hit another 18-wheeler. Hit head on steering wheel. Complained of left shoulder, left neck, left," I believe, "upper neck. No loss of consciousness. Complained of dizziness." And I'm not sure what the abbreviations are after the --

THE COURT: It's "Complained of left and right" -- let me see it. If you zoom it up I will read it for you.

THE WITNESS: Okay.

THE COURT: This is why I don't want a psychologist reading or interpreting medical records. He is not qualified to do that, Mr. Wiseman. It's not going to happen.

MR. WISEMAN: Okay.

BY MR. WISEMAN:

Q    Is a report of a head injury something that a neuropsychologist would typically want before doing a battery?

A    Yes.

THE COURT: Now, a bump on the head is not a head injury, is it?

THE WITNESS: Well --

THE COURT: You cannot tell from that that there was any head injury.

THE WITNESS: Well, all I could tell from that is that his head apparently struck --

THE COURT: Right, but you can't read any of those medical records to determine there was a head injury?

THE WITNESS: Not the severity.

THE COURT: Okay.

THE WITNESS: Just the blow to the head.

THE COURT: Is this the one that, are you the one that Mr. Bourgeois said he had been in a coma for three months?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. WISEMAN:

Q    Were you --

THE COURT: And if you had been called to testify, you would have had to tell the jury that, wouldn't you?

THE WITNESS: Yes.

BY MR. WISEMAN:

Q    Would you, if you had been provided with these records -- well, let me withdraw that. What relevance to your

USCA5 2906

evaluation was Mr. Bourgeois' report that he had been in a coma?

A    Well, at the time it appeared to be the likely cause of the impairment that was evident in the testing.

Q    Okay.  And if you had been provided with these records, would you have seen anything about the coma?

A    If I had been provided with records which I received several years later, I would have been aware that there was no head injury in the 1984 accident that he was referring to.

Q    The coma accident?

A    Correct.

Q    Okay.  But you would have seen that there was another entry regarding striking his head in an 18-wheeler accident?

A    Yes.

Q    And would that also have had relevance to your report if you had been provided the records?

A    It would have been something that definitely would have been noted in the report.

Q    All right.  And if you had had the records in your possession at the time of your evaluation of Mr. Bourgeois, would you have asked him about his claim of a coma?

A    I absolutely would have.

Q    And you would have --

          THE COURT:  Well, you asked him anyway, didn't you?

          THE WITNESS:  Yes, I asked him if he had a history,

USCA5 2907

as is a routine part of the evaluation, have you ever had any serious illnesses or injuries.

THE COURT:  And he claimed as a part of this whatever it was that he was in a coma for three months.

THE WITNESS:  Yes, he did.

THE COURT:  That turned out to be not correct.

THE WITNESS:  That's correct.

BY MR. WISEMAN:

Q   All right.  And if you had these records with you, would you have showed him the record relevant to the alleged coma and said, "Well, hold it a second, that doesn't show up here"?

A   Yes, I would have.

Q   Okay.

THE COURT:  And what would that, what would that tell us?

BY MR. WISEMAN:

Q   Well, would you have put in your report that he had suffered a coma if you had the medical records that said he didn't suffer a coma?

A   No, I would have put that he initially reported but the medical records showed that that was not the case, and then I would have put whatever he said in response to me asking about it.

Q   But you would have put also that there was a subsequent

USCA5 2908

potential head injury from striking his head in another automobile or truck accident?

THE COURT:  Well, not a subsequent, that's what he's talking about.

MR. WISEMAN:  I'm sorry?

THE COURT:  What do you mean a subsequent report?

MR. WISEMAN:  Another car accident, another truck accident.

THE COURT:  When was there another truck accident?

MR. WISEMAN:  That's my point, Your Honor, that's what I was trying to show the witness.

THE COURT:  When did he claim he was in a coma?

THE WITNESS:  From the 1984 accident.

THE COURT:  The one you are talking about right here?

THE WITNESS:  I believe that I am being asked about a separate accident which took place in 1993.

MR. WISEMAN:  There's one accident without a coma and there's a second accident with the head striking.

THE COURT:  Okay, but we don't know what kind of head injury that was?

MR. WISEMAN:  No, we don't know that.

THE COURT:  And no way of knowing and he's not qualified to do it.

MR. WISEMAN:  No, I just want to establish the date

USCA5 2909

of that other accident.

BY MR. WISEMAN:

Q    And the date would be July 7th of '93?

A    Yes.

Q    Okay.  So if counsel had provided you these records, you would have been armed with more information relevant to a potential etiology of the head injury?  Of any organic brain damage, excuse me.

A    Yes.

Q    Okay.  Now, to be clear, the information about the 1993 truck accident wouldn't necessarily account for Mr. Bourgeois' deficits which we'll talk about in a little while?

A    That's correct.

Q    Okay.  There could have been other reasons for his deficits?

A    That's correct.

Q    Okay.  One more thing I want to ask you about, and I know that this isn't something you have seen before but these records appear to have gotten to John Gilmore, who was co-counsel.  Do you remember his name?

A    Yes.

Q    Okay.  They got to him on 2-20-04 invoice date?

A    Yes.

Q    Or thereabouts.  Okay.  And your --

**USCA5 2910**

THE COURT:  Can I see, let me see that.  What was the date?

MR. WISEMAN:  2-20-04.

THE COURT:  Okay, I know, but keep going at the bottom.  I'm sorry.

MR. WISEMAN:  Where would you like --

THE COURT:  What, where, what records are we talking about?

MR. WISEMAN:  These are the medical records.  These are --

THE COURT:  From what -- from what, the '94 incident?

MR. WISEMAN:  This is all of Mr. Bourgeois' medical records that Mr. Gilmore obtained.

THE COURT:  Okay, can I look?  Keep going to the middle.  Okay.  See, it says 7-9-64?

MR. WISEMAN:  That's his date of birth.

THE COURT:  That's his birth date?  Okay.

MR. WISEMAN:  I am going to offer these if Your Honor wants to look at them more closely.

THE COURT:  Okay.  And the other medical record that you showed me is the one from the same place?

MR. WISEMAN:  Yes.

THE COURT:  Okay.

MR. WISEMAN:  These all came in the same packet.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

THE COURT:  And Mr. Gilmore had them?

MR. WISEMAN:  Mr. Gilmore had them.

THE COURT:  Okay.

MR. WISEMAN:  Dr. Weiner did not.

BY MR. WISEMAN:

Q    Do you recall, did you read any of the transcripts of the trial proceedings in this case?

A    I did review all the records you provided for me, which included the trial transcripts.

Q    And do you recall a portion on the March 24th, 2004 proceedings where Judge Jack was talking to Mr. Bourgeois?

A    Yes, I do recall reading that section.

Q    Okay.  And do you recall Judge Jack saying in effect that Dr. Weiner did an evaluation and he had all this collateral information about you?

A    Yes.

Q    All right.  And with all respect, of course, to the Court, that wasn't in fact the case?

A    That is correct.

Q    You had no information?

A    Yes, I just had --

THE COURT:  What was I talking about, do you know? What was the context of that?

USCA5 2912

MR. WISEMAN:  I think the context of it was you were trying to express to Mr. Bourgeois that you had given his lawyers much, many resources to pursue his defense.

THE COURT:  I had, and I saw that Mr. Bourgeois had said that at one point Mr. Gilmore told him that the Court was out of money.  I don't recall ever having represented that to anybody.  I gave him every possible expert known to man.

MR. WISEMAN:  And our complaint, Your Honor, is --

THE COURT:  Everything that was requested.

MR. WISEMAN:  Yeah, our complaint is certainly not with the Court funding the defense.

THE COURT:  Okay.

MR. WISEMAN:  We agree that it was well funded.  Unfortunately, from our perspective --

THE COURT:  It's what they did with it that you are complaining about?

MR. WISEMAN:  Precisely, precisely.

THE COURT:  Okay, I got it.

BY MR. WISEMAN:

Q   Let's talk about your actual evaluation, Dr. Weiner.

A   Okay.

Q   What did it consist of, given that you didn't have any records to look at?

A   I did a clinical interview with Mr. Bourgeois and then I

USCA5 2913

administered several tests, the Wechsler Adult Intelligence Scale Revised, the Wide-Range Achievement Test, Third Edition, the Halstead-Raytan neuropsychological test battery for adults, and the Test of Memory Malingering.

Q   Okay.  And this has already been received in evidence as Petitioner's 30.  Why don't we zoom that out a little bit.  Oops.  Is this the packet that contains your raw data?

A   Yes.

Q   Okay.  There has been a lot of discussion outside your presence in the court about why you chose to administer the WAIS-R at a time when it was outdated, and I'd like you to tell the Court why you did that.

A   Yes.  The WAIS-R is the test that was used and a lot of the normative data from Dr. Raytan and a scale that he developed called the neuropsychological deficit scale specifically was done with the WAIS-R, and in training workshops that I went to with Dr. Raytan he was still using this test even after the WAIS-III came out because he didn't feel there had been enough research on the WAIS-III at that time to warrant using it.

Q   Okay.

THE COURT:  It had been out for like seven years when you were using the, an older test?

THE WITNESS:  Yes.

BY MR. WISEMAN:

Q    Now that the WAIS-IV is out, do you currently use the WAIS-IV?

A    Now I have been using the WAIS-III because there has been enough research on that one, and I am going to wait on using, I do have the WAIS-IV but I am going to wait on using that until there has been enough documented research that it is useful in conjunction with the Raytan battery.

Q    Now, you have mentioned the neuropsychological deficit scale as a measure used in the Halstead-Raytan battery.  I'd like you to explain to the Court what the Halstead-Raytan battery is and what the neuropsychological deficit scale is.

A    Yes.  The Halstead-Raytan battery is a collection of several tests, and I don't know if you want me to go through them and describe them or --

Q    I don't think that's necessary --

A    Okay.

Q    -- just yet, but --

A    But it's used to answer questions of if an individual has brain damage, if so, is it mild, moderate, severe, is one side of the brain more affected than the other, and are there specific parts of the brain that are more affected.

Q    And how did Mr. Bourgeois score on that administration of the WAIS-R?

A    On the WAIS-R?

USCA5 2915

Q    Yes.

A    He had a verbal IQ of 76, a performance IQ of 76, and my report has a typo, it should have said a full-scale IQ of 75, all of which are in the borderline range.

Q    All right.  And your report, I think you just said, incorrectly listed a 76 full-scale IQ?

A    That's correct.

Q    And how do you account for that error?

A    Well, the, this report had to be gotten out very quickly in the context of other things that were scheduled and I don't remember, I might have typed this one myself to get it back in time and if so I just made a typographical error, looking at the results from the test and then transcribing it; and if it was my typist, who is usually very accurate, she then would have gotten this report back to me much more quickly than usual and could have made an error that I just didn't catch.

Q    Okay.  Did you administer, I think you mentioned the TOMM test.  What is the TOMM test, how does it work and what information does it give you?

A    It is, it stands for the Test of Memory Malingering. It's a test in which the individual is shown a series of simple pictures for three seconds each, 50 pictures, and then they are shown pages that have two pictures on each page and on each page one of the pictures is one they saw before and

USCA5 2916

the other they haven't seen, and they are asked to point to the one they saw before and then give immediate feedback if they are correct or incorrect.  There is an initial trial administered, the 50 pictures are shown once again and then a second trial is given, and normally on the second trial, unless someone is malingering, they make very few errors.

Q   And I take it, to be effective, the person is not alerted that this a test to detect malingering?

A   That's correct.

Q   All right.  So for all they know it's just another test in the battery?

A   Yes.

Q   Okay.  And how did Mr. Bourgeois score on the TOMM test?

A   He had, his score was, it showed no indications of malingering.  I believe he had only three errors on the initial trial, which is a very good score, and on the second trial he didn't make any errors, he made a perfect score.

Q   And the page I have up on the screen, page 28 of the exhibit, is the first trial you just spoke of?

A   That's correct.

Q   And so he got 47 out of 50?

A   Correct.

Q   And the second trial he got 50 out of 50?

A   That's correct.

Q   So this score of 97 out of 100 you say doesn't show

USCA5 2917

malingering.  Is that instrument normed to determine when, what number of errors is malingering or potential malingering?

A   It's, yes, and I don't have the manual with me but if you, particularly on the second trial, make more than a certain number of errors, then the odds are very high that the person is malingering.  And the research on the test was done with different populations, including brain damage populations, and people asked to simulate malingering, so.

Q   I notice you didn't administer the third trial.  Was there a reason for that?

A   The third trial was optional and I would only give that if there was just, if it was questionable from the second trial you couldn't quite be sure it was in the -- because you can get results that are in the range of questionable validity but you wouldn't conclude malingering from it.

Q   I want to show you another exhibit, this would be 154. What is this document?

A   This is a document that shows how scores on the WAIS-III would compare with, for the same person, if they were given the WAIS-IV.

Q   All right.  Now, Mr. Bourgeois scored a 75 on your WAIS-III so there's no --

A   Well, actually mine was a WAIS-R.

Q   I'm sorry, I'm sorry, WAIS-R, my mistake.  He scored a

USCA5 2918

75, so there's no precise number there for 75.

A    Well, in the --

Q    Oh, I'm, sorry, I have the wrong one up.

A    Yeah.

Q    Okay.  I'm going to withdraw that for now.

A    I think I have the page that --

Q    Yeah, I've got -- okay, here's the correct exhibit.  I'm going to show you 158.  And this is from, where is this document from?

A    This is from the manual for the WAIS-III.

Q    Okay.  So the WAIS-III manual tells you that if a person scores a 70 on the WAIS-R, right, and we recognize he scored a 75 --

A    Yeah.

Q    -- on your WAIS-R, that that would translate to a full-scale IQ of somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And what does that chart tell you in terms of interpreting your administration of the WAIS-R when the norms were no longer the norms, when the WAIS-IV was available, I'm sorry, the WAIS-III was available?

A    Well, it says that the, that his actual level of intellectual functioning is lower than that score would indicate since that WAIS-R has older normative data.

Q    Okay.

USCA5 2919

A    That his true IQ is probably four or five points lower than that.

Q    Let me go back to the other exhibit that I mistakenly put up.  This is 154.  Where is this chart from?

A    This is from the WAIS-IV manual and it shows how the IQ scores would differ if someone were administered the WAIS-III as compared to the WAIS-IV.

Q    Okay.  And again, Dr. Gelbort's administration of the WAIS-III was a 70?

A    Yes.

Q    Okay.  And that would translate on the WAIS-IV to somewhere between 65 and 69?

A    That's correct.

Q    Okay.  And again, what does that tell you about Mr. Bourgeois' actual intellectual functioning?

A    That it's in the mentally deficit range.

Q    And that would be below 70?

A    Yes.

Q    You have done a comparison between your subscales and Dr. Gelbort's subscales?

A    Yes.

Q    Do you see a consistency or inconsistency between them?

A    There's a great deal of consistency between scores.

Q    Okay.  And does that add to your view as to malingering?

A    It adds to the view that it does not appear that there

USCA5 2920

was malingering.

Q    A hard question --

THE COURT:  When was that?  When did you think there wasn't malingering?

THE WITNESS:  Oh, I didn't think there was malingering when I gave it.

THE COURT:  Right.

THE WITNESS:  But if --

THE COURT:  But you don't know about the second time?

THE WITNESS:  Well, maybe I will let you, maybe you need to rephrase your question.

MR. WISEMAN:  Sure.

THE COURT:  No, I am just asking you, can you tell, though, if there was malingering the second time when you didn't administer it?

THE WITNESS:  Oh.  Well, I couldn't just based on looking at the sheet.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    Can you look at Dr. Gelbort's data and its consistency with what you scored or what you administered and detected no malingering and derive some view as to whether there was malingering on the WAIS administration given by Dr. Gelbort?

A    Yes.  I would say, and I don't know about the other tests

but for this particular test it would be very unlikely that there was malingering and for the results to be so close to the ones that were found when I administered the test.

THE COURT:  Well, I thought they weren't close, I thought they were --

THE WITNESS:  Oh.

THE COURT:  -- far apart.

THE WITNESS:  I'm sorry, Your Honor, they are very similar.  Do you have the --

MR. WISEMAN:  May I approach the witness, if I can put this chart up?

THE WITNESS:  (Noise)  I'm sorry, Your Honor.  I will scoot back here.

BY MR. WISEMAN:

Q    This has been previously marked as --

THE COURT:  Right.

MR. WISEMAN:  -- 154 --

THE COURT:  How is that similar with the verbal IQs?

THE WITNESS:  The, there is a margin of error for each of these and --

THE COURT:  What is it?

THE WITNESS:  Well, I have to pull out the comparison here.  One moment, Your Honor.  The, there's a difference of approximately four points or so from the verbal IQ on the WAIS-R to the WAIS-III, and that 76 actually should

**USCA5 2922**

have been a 75, which would bring it down --

THE COURT:  Okay.  So what you are saying, it could be actually the difference between 79 and 63, which would be a big difference, if you do, if you do the four points on the top and four points on the bottom.

THE WITNESS:  Oh, no.  Well --

BY MR. WISEMAN:

Q    Well, is that how you do it?

A    Well, let me explain.  No, the, and I realize this can be pretty confusing, what this table that you had up a minute ago that compares the WAIS-R scores to the WAIS-III scores -- and maybe it would be helpful if you could put that back up.

Q    Sure.

THE COURT:  I'm just --

THE WITNESS:  The scores --

THE COURT:  I'm just trying to compare the two tests that were actually done, not a hypothetical one that was not done.

THE WITNESS:  Right.  So we are, that's what I am trying to explain.

THE COURT:  So that you did the WAIS-R and there was a WAIS-III?

THE WITNESS:  Correct.

THE COURT:  So I am just, I am just asking to compare those two.

USCA5 2923

THE WITNESS:  Yes, Your Honor.  The scores for the verbal IQ --

BY MR. WISEMAN:

Q   I am going to put this chart back up so you can --

A   Okay.  The scores for the verbal IQ on the WAIS-III are expected to be approximately four points lower than the same person taking the WAIS-R, so --

Q   And that would put it at as high as a 71?

A   Correct, because that 76, that's my typo in there, it should have been --

Q   Well, that's your verbal IQ.

A   Oh, I'm, I apologize, so take it, that would put it to about 72.

Q   Okay.

A   And there is also a margin of error --

THE COURT:  No, I am talking about -- oh, never mind.  I just wanted you to compare the two tests that were given.

MR. WISEMAN:  Well, that's what we are trying to do here.

THE COURT:  Okay.

MR. WISEMAN:  We have the WAIS-R on the left, the WAIS-III on the right.  Let's focus first --

THE COURT:  Well, there's a nine-point difference in the verbal IQ, or an eight-point difference.

USCA5 2924

MR. WISEMAN:  Right, and I am going to address that right now.  The verbal IQ --

THE COURT:  An eight-point difference in the verbal IQ.

THE WITNESS:  Yes, the raw, the actual, and what I am trying to explain, perhaps not very clearly, is that 76, if you use the tables in the WAIS-III manual, a 76 verbal IQ in the WAIS-R is the same as a 72 verbal IQ on the WAIS-III, so if you were going to do that you would have a 72 versus a 67, and then --

THE COURT:  No, you'd have a 72 versus a 72.

THE WITNESS:  No, you only take the points off the older one to see what it would have been on the newer one.

BY MR. WISEMAN:

Q   All right, so the 76 on the WAIS-R would be a 72, and that's within the margin of error of five points which gets exactly 67?

A   That's correct.  But there's, for any score on this --

THE COURT:  Or 77.

MR. WISEMAN:  Well, sure, we're dealing with statistics.

THE WITNESS:  Right.

THE COURT:  Well, I mean that's the unfortunate thing about statistics is that they are maneuverable for anybody to say anything they want them to say, almost.

USCA5 2925

MR. WISEMAN:  Well, you know, I don't want to argue with that old adage but I think there is a lot of science here.

BY MR. WISEMAN:

Q   I guess the question I am asking you is the fact that this all falls within the statistical range that's spot-on, what does that tell you about malingering?  How hard would it be for a person to take these tests three years apart and score within a statistical range on purpose?

A   I think it would be virtually impossible, particularly if you look at the subtest scores which are very close to each other.  I don't know, I couldn't possibly pull that off and I have been giving these IQ tests for a very long time.

Q   Did you make any observations with respect to whether Mr. Bourgeois appeared to be invested in looking good in his interview with you?

A   It appeared, especially after I was able to get data that I had not available at the time, input from other people, input from school records, that Mr. Bourgeois was attempting to present himself in a much more favorable light in terms of grades, functioning, than actually was the case.

Q   And with regard to school grades, what did he tell you and what did you put in your report about how he did in school?

A   He told me that he made Bs and Cs in school and that he

USCA5 2926

had gone to college for two months.

Q    And when you reviewed the school records, school record, I should say, the one page we provided to you, did you see Bs and Cs or did you see something else?

A    A preponderance of Cs and Ds.

Q    And did he appear invested in looking good in any other ways?

A    He didn't tell me anything about -- let me look at my report here.  He didn't recount any of the abuse that was documented by several sources in the records that I was recently given.

Q    Anything else that comes to mind?

A    Well, he didn't tell me about his problems that I had learned about in the records.  When he was a truck driver he apparently had a lot of difficulty learning how to do that and had a lot of accidents and --

Q    Dr. Price's report, did you review that?

A    Let's see.  I reviewed so many.  Which one was that?

Q    Would be 162, Petitioner's 162.

A    Can you show me the next page or the report itself?  Yes, I did review that.

Q    And do you recall seeing in there Dr. Price making reference to --

THE COURT:  I'm sorry, I didn't see that.

MR. WISEMAN:  Oh, I'm sorry.

USCA5 2927

THE COURT:  Would you show that again, please?

BY MR. WISEMAN:

Q    Not necessarily on this page but did you see in the report reference to unusual scatter on the WAIS testing?

A    Yes.

Q    And do you agree that there was scatter on this testing?

A    Well, the --

Q    Either yours or Dr. Gelbort's?

A    The only significant scatter was I believe he did within normal limits on digit symbol and all the other scores were very consistent, so I would in no way call his subtest scores a significant amount of scatter.

Q    Let's talk about the Halstead-Raytan battery.  You indicated that it is comprised of a number of different tests?

A    Yes.

Q    All right.  Rather than go through them and then list how he performed, why don't we talk about how he performed as we list them.  On the aphasia screening test, tell the Court briefly what that is and how did he score?

A    Okay, let's find it here.  That is a set of very simple tasks.  The person is shown simple pictures, asked to copy them, identify what they are, spell them, read very simple single words and sentences, repeat words spoken, do simple arithmetic problems, and normal individuals tend not to make

USCA5 2928

errors or very few errors on that, so if someone does make an error we have our jargon, it's called pathignomonic.  In other words, it's a finding that's not typically found in a normal individual that is generally associated with brain damage, and on --

Q    And how did Mr. Bourgeois score on that?

A    On the aphasia screening test he exhibited something called constructional dyspraxia, he had difficulty copying a geometrical figure, and this points to problems on the right side of the brain.

Q    All right.  And with regard to the category test, what is it and how did he score?

A    This is a, basically a concept formation test where an individual is shown a series of pictures and they are told that each picture will remind them of a number, one, two, three or four, and they have immediate feedback if they are correct or incorrect based on their response.  And there are seven subtests, I believe there's about 208 items, and making 50 errors or more than 50 errors is considered to be in the brain damage range, and Mr. --

Q    And how did Mr. Bourgeois perform on that test?

A    He made 94 errors, which is an extremely poor score.

Q    All right.  And did you administer something called finger tapping?

A    Yes.

USCA5 2929

Q    And what is it and how did he do?

A    He did adequately on that one.  Finger tapping is there is a little device with a little lever and the person is tapping with the index finger on their dominant hand in ten-second trials and then the same with their non-dominant hand, the index finger for ten-second trials, and his performance was adequate on the finger tapping.

Q    All right.  And you administered something called grip strength?

A    Yes.

Q    And how did he do on that?

A    His grip strength was adequate with his dominant hand.  It was, he was weaker than expected with his non-dominant right hand, because normally the non-dominant hand should be about ten percent weaker than the non-dominant hand and there was a bigger discrepancy than that.

Q    Okay.  And did you see any explanation for that deficiency in that performance?

A    Yes, Mr. Bourgeois reported arthritis in both hands with more in his right, so I noted in my report that discrepancy was likely due to arthritis rather than reflecting impairment in that area of brain function.

Q    And on the seashore rhythm test, what is it and how did he do?

A    This is a test where the person listens to a series of

USCA5 2930

sounds, and there's two groups of sounds, and they are asked to write down whether the two sounds sound the same or different and there's 30 pairs, and Mr. Bourgeois made nine errors, which is in the impaired range.

Q   Okay.  And there's a series of tests called the sensory perceptual examination test?

A   Yes.

Q   And is that comprised of additional subtests?

A   Yes.

Q   What are they, how did he do and what did you make of it?

A   Well, the first section is, the person is presented with bilateral sensory stimulation, so he has his eyes closed, his hands are in front of him, I tell him I am going to touch your right hand or your left hand, tell me which one, without ever telling them in advance sometimes I touch both, and if you don't perceive both and make an error that's called a suppression.  He didn't make any suppressions.  I touched one hand, the opposite side of the face, a series of trials, didn't make any errors.  I do it with auditory function, make sounds behind each ear, no errors.  The visual part, no errors.  But when it came to -- oh, in tactile finger recognition he has his eyes closed and I tell him I am going to touch one of your fingers, one, two, three, four and five, tell me which one, he made no errors.  But when we got to fingertip number writing in which he has his eyes closed and

USCA5 2931

I tell him I am going to write a number on his fingertip, it will be upside down to him, tell me which one, he had very poor performance on both sides, making a significant number of errors.

Q    Speech sounds perception, how did he do on that?

A    He made nine errors, which with Raytan's newer normative data is actually within normal limits with the -- so he did okay on that.

Q    Okay.  And tactile performance?

A    Tactual performance?

Q    I'm sorry, tactual performance.

A    That is -- do you want me to describe what it is?

Q    Yeah, please.

A    This is a test where he's blindfolded and he's told I am going to, in front of you there's board and there's a series of blocks that go on the board.  He's allowed to feel the board with one hand and then he's asked to place the blocks into the board, it's like a puzzle with ten pieces, first with his dominant hand which for him is his left hand, then with his non-dominant hand and then with both hands.  And then without any advance warning the board is taken away, the blindfold is removed, he's asked to draw the board from memory and put the blocks where they go and he's scored on how many shapes he can remember and how many he gets in the correct location.

USCA5 2932

Q   Are the initial portions of that subtest timed?

A   Yes.

Q   And how did he do on that?

A   He had a very poor score of almost 27 minutes total time and making, having a score of more than 15 point something minutes is considered to be in the brain damage range, so that was very, very poor.

Q   Okay.  And we have heard about the Trail-making test from Dr. Gelbort.  You administered trails A and B?

A   Yes.

Q   And was he impaired on either of those?

A   He was impaired on the Trail-making test Part B.  His score was in the brain damage range.

Q   Okay.  Now, I want to ask you, you know, about your conclusions regarding that test, but before I do, is the Halstead-Raytan regarded as the gold standard test for neuropsychologists?

A   Yes, at least by many neuropsychologists.  It's had more research by a huge amount than any other neuropsychological test or battery.

Q   And you had mentioned earlier the neuropsychological deficit scale.  Explain how that scale translates all this test information and how Mr. Bourgeois did.

A   Yes.  The neuropsychological deficit scale was developed by Dr. Raytan and it takes the scores on pretty much all of

USCA5 2933

the parts of the neuropsychological battery and each section is given a score anywhere from zero to three, zero, one if its normal, two or three if its in the brain damage range, and then you get a total score, and if you have more than 26 points on there it's considered to be in the brain damage range and Mr. Bourgeois' total score was 33.

Q   All right.  And just to go back to the reason you gave the WAIS-R, it's, was it because it was normed to this neuropsychological deficit scale?

A   Yes, the neuropsychological scale specifically was researched with the WAIS-R and so a portion that contributes to the total score is based on WAIS-R scores and not from the different IQ tests, even a newer one.

Q   Is there an alternative way of scoring how one would turn out on or how one performed, I should say, on the Halstead-Raytan battery?

A   Well, there's another index called the impairment index which was an older index developed by both Doctors Raytan, Halstead and Raytan, and this takes seven portions of the battery and there is a cutoff score and if a person scores beyond that cutoff score, each test that does that, that would be like one point towards that, so of the seven, let's say someone has five of the seven parts impaired, then their impairment index would be five-sevenths converted to a decimal.

USCA5 2934

Q    Okay.  And how did Mr. Bourgeois score on the impairment index?

A    His impairment index was .86.

Q    And that's basically seven divided into six impaired tests?

A    Six, right six-sevenths.  Right, seven into six, correct.

Q    Right, okay.  Confusing me.  And is that considered in the impaired range?

A    Yes.

Q    Now, you mentioned he scored particularly poorly on the category test.  Did you make a special note in your report of the implications of that for his legal situation?

A    Well, I made the same observation in my report I would have made with anyone who had an impaired score in the category test and that is to say that someone that has a score similar to Mr. Bourgeois' is likely to have difficulty adjusting to new and unfamiliar situations and may exhibit inappropriate behavior under stressful circumstances without necessarily being aware of the inappropriateness of their actions.

Q    And just to put the final point on that, this is the last page of your report where you actually make that statement?

A    Yes.

Q    Okay.  Well, my colleague points out that you said it in two places, so I guess it was important.  Is it --

USCA5 2935

THE COURT:  He really, really meant it.

MR. WISEMAN:  What's that, he really meant it?

THE COURT:  He really, really meant it.

MR. WISEMAN:  That's right.

THE WITNESS:  That's in case somebody doesn't want to read my report and they just want to get to the --

BY MR. WISEMAN:

Q    Okay.  So what were your overall conclusions about your testing Mr. Bourgeois?

A    That the test results were valid, that they revealed overall mild cerebral impairment with moderate cerebral damage in the back portion of the brain, the posterior portion of the cerebral cortex.  That there was no evidence of malingering.  That he showed some signs of depression. And, again, what I said about the category test, about the likelihood of exhibiting inappropriate behavior.

Q    And just to give us a proper perspective, when you use the term mild it doesn't sound so bad, what does mild brain dysfunction mean?

A    Well, there's a range of problems and, again, it's based on the overall results on the neuropsychological deficit scale, and mild impairment is going to cause someone problems.  His impairment on the category test in particular is not mild, it's very significant, but the overall, to kind of put everything together, overall his brain is functioning

USCA5 2936

in the mild range with some areas that have more impairment than that.

Q   Now, if you were testifying about this at the time of trial, would you have been able to offer any opinions with regard to the impact of the type of brain dysfunction you found in Mr. Bourgeois on issues of cognition?

A   Can you be more specific what you mean by cognition?

Q   His intellectual ability.  His ability to perceive and process information.

A   Yes, that he may at times perceive things in a distorted way and act in an inappropriate manner.

Q   And how would his brain damage affect his ability to control his emotions?

A   Well, brain damage at times can impair a person's ability to deal with emotions and it just depends on what part of the brain has been injured.

Q   And how about impulse control?

A   Same with that.

Q   Okay.  And ability to make judgments?

A   Yes.

Q   And how about judging future consequences of one's actions?

A   Yes, there could also be impairment in that.

Q   Now, I take it at the time of your evaluation you were not able to make any judgment as to whether Mr. Bourgeois

USCA5 2937

displayed these particular deficits because you didn't have data given to you?

A    I'm sorry, didn't have?

Q    You weren't given any collateral information?

A    Yes, that's correct.  I only knew what he told me.

Q    All right.  Now that you have received a lot of data, I assume --

A    Yes.

Q    -- from my office --

A    Yes.

Q    -- are you able to see a larger picture of how Mr. Bourgeois' brain dysfunction impacts on his actual day-to-day living in the world?

A    Yes.

Q    And tell the Court something about that.

A    Well, there appears to be a long history, from viewing the extensive records, of difficulties with impulse control, poor judgment, not thinking about consequences of actions --

THE COURT:  Such as?

THE WITNESS:  Well, such as not -- throughout his file there were several people that evaluated him and he consistently told them he was in a coma for three months, so that suggested either he believes this or, its poor judgment to, someone that had better judgment would realize that experts hopefully are going to have access to medical records

USCA5 2938

and would see that that was not the case, and that would not be something that would serve Mr. Bourgeois' situation to make up something like that.

BY MR. WISEMAN:

Q    You were not asked at the time of trial to do any sort of mental retardation evaluation?

A    No, I was not.

Q    And you were not asked by my office to do that?

A    I was not.

Q    When you saw the IQ score of 75, or with the transcription error of 76, why didn't you tell the lawyers, hey, this guy is in the borderline range of mental functioning on an outdated test, I think you should think about whether he is mentally retarded?

A    Well, I really had very little opportunity to talk to the lawyers and the communication I had, which was after they received my report, was that because Mr. Bourgeois had given me incorrect, inaccurate and not factual information about the coma, they felt that my report would not be useful and weren't going to use it in any way.

Q    All right.  Now, let's talk about that conversation.  Was it a face-to-face or a phone call?

A    A phone call.

Q    And do you recall if it was, what the duration of the phone call was?

USCA5 2939

A    It was very brief.

Q    Okay.  Five minutes, less, more?

A    It may have been less than five minutes.

Q    Okay.  I'm going to mark, I should say display for you Exhibit 156, ask you if you recognize what it is?

A    Yes.

Q    Okay.  And that's initially an invoice you submitted?

A    That's correct.

Q    And is this overall, if I flip through it, your file that you provided to my office?

A    Yes, that's from my file, that's correct.

Q    Okay.

        MR. WISEMAN:  If I could approach the witness and ask the witness to look through this short packet?

BY MR. WISEMAN:

Q    Do you see anything in that file documenting any contact with counsel subsequent to your report?

A    No, and I clearly recall the phone call but because it was so brief, it's nothing that I would have sent a bill for, and, as far as I knew, I was not going to have any further involvement, so I just sent my bill off and filed the chart away.

Q    And did that, did the -- do you remember which lawyer called you?

A    I am not positive.  I think it was probably Mr. Tinker,

USCA5 2940

but I couldn't say for sure.

Q   All right.  Let's assume for argument's sake it was Mr. Tinker.  Did he, did you perceive it as a discussion as to the meaning of your report, the significance of your report, or was it a statement from Mr. Tinker?

A   It was more of a statement.

Q   That you are not going to be used?

A   Yes.

Q   Okay.  Did he ask you what impact the alleged lie about the three-wheeler coma had on your results?

A   No.

Q   And what would you have told him if he asked you that?

A   I would have said that the actual test results appear to be valid and that there was no evidence of malingering and that the results showed that there was brain damage which was not caused, at the time I didn't know because I thought he had been in a coma, that regardless of what the cause was he has some brain damage.

Q   In your work do you ever see patients who have had -- well, let me withdraw that.  What's a traumatic brain injury?

A   A brain injury that's caused by a blow to the head or --

Q   And --

A   -- the head striking something.

Q   And can a, have you seen in your experience people with traumatic brain injuries who do not suffer losses of

USCA5 2941

consciousness?

A    Yes, many times.

Q    All right.  If Mr. Tinker had asked you about the --
first of all, if he had provided you with the medical records
about the 1993 instance when Mr. Bourgeois apparently hit
the --

        MS. SALINAS:  Objection, leads to speculation, Your
Honor.

        THE COURT:  Sustained.

        MR. WISEMAN:  Your Honor, I have an obligation to
prove counsel's deficiencies and I have to ask hypothetical
questions to do that.  It wasn't provided to him.  I have to
ask the witness what would you have done if it were provided.
So that's speculation, it's my burden.

        THE COURT:  Well, the reason that it's speculation
is, I have already gone over, he can't interpret those
medical records, and that didn't mean there was any kind of a
head injury but a grazing even, you know, that's the point.

        MR. WISEMAN:  Well, okay --

        THE COURT:  So I don't know how he could have
changed, if he couldn't interpret the records how he could
have changed his opinion, but you can ask him.

        MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q    Would you have told Mr. Tinker, if you had the medical

records, that the --

THE COURT:  He couldn't even read them.

MR. WISEMAN:  I'm sorry?

THE COURT:  He couldn't even read them, but that's okay.

BY MR. WISEMAN:

Q    Well, did you read the part about striking his head against the steering wheel?

A    Yes.  The part I, I didn't know those one initial abbreviations were in there.  I was able to read the rest of it.

Q    Okay.  And from your perspective, if you had known about a striking of a head in a truck accident on the steering wheel, would you have told -- what would you have told Mr. Tinker about that?

A    I would have said that it's possible that that could cause brain damage consistent with what my testing showed.

Q    Okay.  And if you had been given more time than you had and if you had been given any records about Mr. Bourgeois and about his deficits and impairments, could you have offered to Mr. Tinker a psychological explanation for this "lie," quote/unquote, about the coma?

A    If I had had an opportunity, yes.  If I had more information available to me and had the opportunity to do more testing, I could have.

USCA5 2943

Q    After that phone call with, presuming it was Mr. Tinker, when was the next time you discussed this case?

A    I believe it was with you or Ms. Larin in 2007.

Q    And since that time have you met with us on a number of occasions?

A    I believe a total of three times.

Q    All right.  And I take it you didn't come to Philadelphia?

A    No.

Q    Okay.  At least for that purpose.

A    Beautiful city, but no.

Q    Okay.  All right.  I have nothing else.  Thank you, Dr. Weiner.

          THE COURT:  Thank you.  Ms. Salinas?

          MS. SALINAS:  Yes, Your Honor.

          THE COURT:  You may proceed.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q    Good afternoon, Dr. Weiner.

A    Good afternoon.

Q    Back in 2002 when you were contacted to, I mean 2004 when you were contacted to perform a neuropsychological examination on Mr. Bourgeois, did you know Mr. John Gilmore?

A    I don't believe so.

Q    Did you know Mr. Douglas Tinker?

A    Just of him.

Q    Of him, okay.  Had you ever done any work before for Mr. John Gilmore?

A    Not that I can recall.

Q    Had you done any psychological evaluations for Mr. Douglas Tinker?

A    I can't recall if I did.  If I did it would have been some, probably quite a number of years prior to this one, but I don't recall.

Q    Okay.  And you were referred, Mr. Gilmore and Mr. Tinker were referred to you by Dr. Estrada?

A    That's my understanding, yes.

Q    Did you and Dr. Estrada discuss the case before you contacted Mr., or Mr. John Gilmore or Mr. Douglas Tinker contacted you?

A    No.

Q    Who contacted you?

A    I believe it was Mr. Tinker.

Q    Okay.  Now, you stated that you have conducted several, or hundreds of psychological evaluations, is that correct?

A    Yes.

Q    And do you, have you performed some of these evaluations for court settings in State Court?

A    You mean court-ordered or have they been used in cases that end up in State Court?

USCA5 2945

Q    Both.

A    I don't think I have done any neuropsychological evaluations at the request of the court for a State Court.  I have done many of them for personal injury cases, either being hired by the plaintiff or the defense attorneys, that were State Court cases.  I don't think I've ever --

Q    Okay.  Have you ever stated, testified in State Court for criminal cases?

A    I believe I have, but it has just been a very small number.

Q    Okay.  Now, and, Dr. Weiner, isn't it fair to state that attorneys, whether they are plaintiff attorneys or in civil cases, when they come to you they are employing you because of your expertise in the field of neuropsychology?

A    If, I mean I've been engaged by attorneys for other kinds of cases but more often it's for cases involving neuropsychology.

Q    Okay.  And when you were contacted back in 2004, what were you told by whom you believe was Mr. Tinker about this case?

A    Just that it was a capital murder case that was coming up for trial and that they needed a neuropsychological evaluation and that it was needed very quickly.

Q    Okay.  So you knew what your report was going to be used for?

USCA5 2946

A    Yes.

Q    Okay.  And we have been shown your psychological evaluation -- well, let me go back.  You were -- you stated that, and I am not quite sure whether I understood your explanation, you stated that when you gave the defendant the neuropsych evaluation back in 2004 you used the WAIS-R?

A    Yes.

Q    And your explanation, again, Dr. Weiner, was, why did you perform a WAIS-R when the WAIS-III had been out for approximately seven years?

A    Because Raytan's research with the neuropsychological deficit scale specifically called for the WAIS-R and the research had been done with that, and in the trainings that I went to, in fact in the initial trainings that I went to starting in the, this was back in the late '70s, he was, for neuropsychs he was saying that people should use the WAIS, even though the WAIS-R had been out for a while, just for that same reason.

Q    And, Dr. Weiner, would you not agree, though, that the protocol is to use the most current examination?

A    Well, I would not agree if specific research in a case like this specifies using that test.  If -- and at the time I did this report I believed that I was going to be called to testify and I would have explained this is the reason I used this one.  And I have the WAIS-III and I was giving the WAIS-

USCA5 2947

III to non-neuropsych kinds of situations at the time, but that's why I specifically chose the older WAIS-R.

Q    Though the protocol out there really does say that you should use, one should use the most current?

A    Well, again, Dr. Raytan, who is the inventor of this battery, was calling for the WAIS-R to be used.

Q    Okay.  When did you quit using the WAIS-R?

A    It was probably, maybe three years ago.

Q    And did you report anywhere in your report that you were using the -- well, let me retract that.  And in your report that you prepared back in March of 2004, the reason for the referral, you write in your report, was to determine whether or not the defendant had brain damage?

A    Correct.

Q    And when you spoke to Mr. Tinker, was there any indication to you from Mr. Tinker that there might be some suspect that he had some brain damage?

A    I just recall being asked to do an evaluation to determine whether or not he might have brain damage.  I don't remember him telling me whether he suspected it or not.

Q    And you don't recall that Dr. Estrada might have told you that he suspected that there might be or might not be any brain damage?

A    I have not had any communication with Dr. Estrada about this case.

USCA5 2948

Q    Prior to you conducting the examination?

A    Well, prior or after, other than what I have read from the reports that I was provided.

Q    Okay.  Now, you stated that you conducted a series of examinations on Mr. Bourgeois back in March, I'm sorry, February of 2008, 2004?

A    Yes.

Q    And you were asked about, in particular about the category test, do you recall that?

A    You mean just a little while ago?

Q    Right.

A    Yes.

Q    About his performance on the category test?

A    Yes.

Q    And I believe in your report you state that, "His performance on the category test suggests that he may exhibit inappropriate behavior under stressful circumstances."  Do you recall that?

A    Yes.

Q    And isn't it true, though, the Halstead-Raytan, the category test is a test that is considered the battery's most effective test for detecting brain damage but does not help to determine where the problem is occurring, and --

A    The category test in some specific cases can specifically point to the presence of frontal lobe damage, but barring

USCA5 2949

that, what it tells you is that there is damage present somewhere and then you have to look at the results to see where it appears that that might be.

Q   And the test also evaluates abstract ability or the ability to draw specific conclusions from general information?

A   Not the category test.  It does involve abstract reasoning but you may be thinking of, I saw in someone's report them saying that about the comprehension subtest of the WAIS.

Q   So you don't agree with that as far as the category test, that it, that the test evaluates abstract ability or the ability to draw specific conclusions from general information?

A   Well, I would say that that second part is a very vague description.  I mean it is a concept formation test and the information is just the feedback on the pictures that they are getting.

Q   Okay.  And that generalization or that description of the Halstead-Raytan battery exams doesn't say anything, does it, about inappropriate behavior under stressful circumstances?

A   That comes directly from Dr. Raytan.  In several of the workshops that I went to that's what he said about the category test.

Q   Okay.  Now, when you are asked to prepare to evaluate an

USCA5 2950

individual, you give your battery of examinations to the individual and I assume you take some time to read the results and then you prepare your final product, is that correct, which is a report?

A    That's correct.

Q    And when you give this report to the individuals who have requested this from you, they are relying on your expertise?

A    Yes.

Q    And you gave your report after you evaluated Mr. Bourgeois and had gone through the series of examinations?

A    Yes.

Q    And would it be fair to say then that both Mr. Tinker and Mr. Gilmore relied on your report?

A    Well, I can't say that they relied on it because they didn't use it.

Q    Would have relied on it?

A    I don't understand.

Q    Well, you gave them a report.

A    You mean if they had used it would, do I believe they would have relied on it?

Q    Yes.

        THE COURT:  What you can't assume is that they didn't use it for their own strategic reasons.

        THE WITNESS:  Oh, okay.

        THE COURT:  So be careful how you answer.

**USCA5 2951**

THE WITNESS:  Okay.  I'm sorry, can you please rephrase your question?

BY MS. SALINAS:

Q   Well, let me ask you this way:  In your -- you had a later conversation, once you gave the report to Mr. Tinker or Mr. Gilmore you had a conversation with them, correct?

A   They, one of them called me after they had received the report.

Q   Okay.  And they informed you why they weren't going to be using your report?

A   Yes.

Q   So you could assume, could you not, that they in fact read your report and knew what your report stated about a coma?

MR. WISEMAN:  Objection to an assumption, Your Honor.

THE WITNESS:  I would hope that they read my report.

MR. WISEMAN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Again, I believe that they surely must have read my report.

BY MS. SALINAS:

Q   And that's what your report is for, for them to read and to rely on it?

A   Yes.

Q   Okay.  And you wouldn't expect anything else other than that for them to rely on it?

A   Yes, I would not expect them to do anything else but to take into consideration that information.

Q   Right, okay.  Now, when you were evaluating the defendant, you, there was nothing told to you about an incident that occurred back in 1994 as far as an accident was concerned?

A   Are you talking about that accident that was in 1993 or --

Q   1993, excuse me.

A   Yes, I was not -- no, I was not told about that.

Q   Okay.  And so there was nothing to relate back to saying, hey, get me some records for a 1993 accident?

A   That's correct.  I didn't know of the existence of that accident.

Q   Okay.  And going back to the defense exhibit, Plaintiff's Exhibit 154, that was the chart regarding -- oh, I'm sorry, Plaintiff's Exhibit 158.  Do you recall this chart?

A   Yes.

Q   And you were asked some specific questions about the difference and the comparisons between the test that you gave in 2004 and the WAIS-III that was given in 2007.  Do you recall those questions?

A   Yes.

USCA5 2953

Q    And isn't it true that on the verbal skills or verbal performance or verbal test you would normally see in the WAIS-III, you would expect to see no more than a one-level drop?

A    I don't know what you mean by one level.

Q    Well, you would expect the verbal to be lower by about one point?

A    That's not correct.

Q    Okay.

A    There's a range here, for instance, for a WAIS-R score of 70 on the verbal you would expect the score on the WAIS-III to be as low as 66.

Q    But I'm talking about the level, the drop, the not lower than one point.

A    I don't know where you are seeing that.

Q    Well, you know the difference or what kind of variance you should see between a WAIS-R exam and a WAIS-III exam and what the charts would show?

A    Yes.

Q    And isn't it true that on a WAIS-III you would expect to see in verbal only a decrease of one level, whereas the, Mr. Bourgeois had a drop of nine levels?

A    Are you talking about level points?  You are saying one level, I don't, there's no psychological term for --

Q    Level points.

USCA5 2954

A    This chart, what this chart shows is that on, let's take a WAIS-R verbal IQ of 70, that on the WAIS-III the score could be as low as 66 or it could be as high as 70, so there could be a four-point discrepancy.

Q    Okay.  And it is still your testimony that on performance, when you are comparing a WAIS-III to a WAIS-R that WAIS-III you would expect to see a lowering of no more than four levels?

A    For that score that would be, that would be the expected range, yes.

Q    But, and you are aware that in the performance from Mr. Bourgeois when comparisoned from the 2004 to the 2007 performance actually increased by two levels?

A    Yes, he did do better on, I believe better on -- let me see, do you have the scores there on the --

Q    I need Defense 155.  I've put on the screen Plaintiff's Exhibit 155, and on his performance he had a 76 on the WAIS-R and it increased by, actually by two points in the 2007 exam.

A    Yes.

Q    And that's not what you would normally, the charts that you were shown would normally show?

A    Well, there is a margin of error for test scores so if you, even on the same test, you could give the same test to a person, let's say six months to a year apart, their score could be three points higher, it could be three points lower,

USCA5 2955

so there could be a range of six points even on the same test, so those two scores are not statistically significantly different from each other.  You really can't draw any meaningful conclusion, particularly since the table that shows the difference for performance IQ shows it could be as few as two points lower, which would make that a 74, but that 74 could correspond to a, what we call the true score, in other words if you test them on different dates, anywhere from a 71 to a 77.  The same with that 78, could be anywhere from a 75 to an 81.  So because there's an overlap there, you really can't conclude anything other than they are in the same ballpark as each other.

Q   So to you they are in the same ballpark.  This falls within the charts that we had seen earlier?

A   Yes.

Q   Okay.  And you stated earlier that, when you were testifying you mentioned some, the defendant had been in several wrecks and that he had, you had seen his driving records.  What are you, what did you see, what did you view?

A   These were I guess collateral statements from people that knew Mr. Bourgeois and one of them I remember was describing that where most people took four to six weeks to learn how to be a --

            THE COURT:  Did you talk with these people?

            THE WITNESS:  No, Your Honor.

USCA5 2956

THE COURT:  Okay.

THE WITNESS:  Where --

THE COURT:  So where did you get the information?

THE WITNESS:  These were from extensive files that Mr. Wiseman provided to me that I reviewed that I guess they are a collection of all the different people that were interviewed about Mr. Bourgeois.

BY MS. SALINAS:

Q   Do you know if they were family members that were saying that?

A   I probably could find it if you'd give me a few minutes but they -- I am not sure who said that but what I do recall from that is that that person reported that Mr. Bourgeois took, I think, about six months to learn --

Q   Well, I'm, let me just stop you.

A   Okay.

Q   But you were talking about his driving record, that he had lots of accidents and he had gotten several tickets?

A   Yes.  I was basing that on the statement that I reviewed.

Q   A statement you reviewed?

A   Yes.

Q   Whose statement was that?

A   Well, you'll have to give me a few minutes to look through and tell you that.

Q   Go ahead.

USCA5 2957

THE COURT:  Go ahead.

THE WITNESS:  Okay.  Okay, this was in a letter to Ms. Larin dated August 12th, 2010 by Victoria Swanson, it's a report, and --

BY MS. SALINAS:

Q    By Dr. Swanson?

A    Yes.

Q    So you are relying on Dr. Swanson's report?

MR. WISEMAN:  Your Honor, I am going to object. Dr. Weiner did not rely on it.  He didn't comment on it in his direct exam, direct examination.

THE COURT:  I'm sorry, but this is getting a little far afield.  He didn't hear the people say it, he didn't interview them.

MR. WISEMAN:  I agree.  I didn't ask him about it.

THE COURT:  So I don't know why she's doing it either.

MR. WISEMAN:  Okay.

THE COURT:  But there you have it.

MS. SALINAS:  We'll move on, Your Honor.

THE WITNESS:  Okay.

THE COURT:  Oh, he relied on, I thought he said he relied on this for his answer, but nonetheless.

MS. SALINAS:  Okay.

USCA5 2958

BY MS. SALINAS:

Q   And, Dr. Weiner, in your report you state that the defendant had cerebral damage?

A   Yes.

Q   He had brain damage?

A   Yes.

Q   And in your report you actually state that the brain damage was likely due to the injuries sustained in the three-wheel accident that took place in 1984?

A   Yes.

Q   Okay.  Which resulted in a coma lasting one to two months?

A   Yes.

Q   And you further state that you believe that the damage he had was to the posterior portion of the cerebral cortex?

A   That it was more significant there, yes.

Q   Okay.  And the 1993 accident that you talked about or testified earlier, that would have put the defendant at what age?

A   Let's see.  '93.  Approximately 29.

Q   And the 1984 accident would put the defendant at what age?

A   Twenty.  Approximately 20.

Q   And, Dr. Weiner, after you interviewed the defendant and you wrote your report, your report that you sent to both

USCA5 2959

Mr. Gilmore and Mr. Tinker, you did not tell those attorneys that the defendant was mentally retarded?

A    No, I did not.

MS. SALINAS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. SALINAS:  I pass the witness, Your Honor.  I have no further questions.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   A little bit of follow-up, Dr. Weiner.  You didn't tell the lawyers Mr. Bourgeois was mentally retarded why?

A    I wasn't asked to do an assessment for mental retardation.

Q    And did you --

THE COURT:  What were you asked to do?

THE WITNESS:  To see if he had brain damage or not.

BY MR. WISEMAN:

Q    And what's the difference between those two tasks?

A    Well, just to establish the presence of brain damage.  To do a neuropsychological evaluation to determine whether or not someone is mentally retarded, you would also have to do a measure of adaptive functioning.

Q    The brain damage you identified in Mr. Bourgeois, leaving aside the motor vehicle accidents or accident in his

background, could there have been other causes for his brain damage, based on material that you have now reviewed?

A    Yes.

Q    Such as?

A    Apparently a long history of physical abuse.

Q    The childhood abuse?

A    Yes.

Q    Okay.  What is the --

        THE COURT:  Did you ask him if he had any abuse?

        THE WITNESS:  No, Your Honor, I did not.

        THE COURT:  Okay.

        MR. WISEMAN:  I'm sorry, the question was did you ask him?

        THE COURT:  I did.

        MR. WISEMAN:  Okay.

        THE COURT:  That's what I asked him.

BY MR. WISEMAN:

Q    What's the phrase convergence of data mean to a psychologist?

A    I'm sorry, what is --

Q    Convergence of data.

A    Different sources of input are all helping to arrive at the same conclusion.

Q    Okay.  And so, when we look at Mr. Bourgeois' performance on these two tests we see a low and we see a high, we can put

USCA5 2961

in a margin of error into those scores, so how does a neuropsychologist or any psychologist figure out where the truth is in that range?

A    Well, first of all, we want to see does it look like the results are reliable, and reliable means you are going to get similar performance across test administration, and in this case there were different versions of the same test but when you take that into consideration the scores are within, pretty much in the range of the margin of error, which shows that the results were consistent, which would make them appear to be reliable and valid.

Q    All right.  And just to put a finer point on it, the --

THE COURT:  I'm sorry, wait.  What were you comparing just then?

THE WITNESS:  The scores on the WAIS-R and the WAIS-III --

THE COURT:  Okay.

THE WITNESS:  -- were pretty similar to each other.

THE COURT:  But when you took the scores yourself you did not say anything about mental retardation or --

THE WITNESS:  No.

THE COURT:  Okay.  Why is that?

THE WITNESS:  Why when I administered it did I not say anything about mental retardation?

THE COURT:  Yes.

THE WITNESS:  Well, first of all, I was not asked to do an evaluation for mental retardation so it would not have been possible.  Even if I had found that he had had an IQ of 60 on the IQ test, I could not have concluded that he was mentally retarded without also administering adaptive behavior instruments, which I was not asked to do.

BY MR. WISEMAN:

Q   And would you have had time to do it at that point?

A   I would not have had time to do it.  And I would have needed input from other sources, especially now that I know that I was not given actual, factual information from Mr. Bourgeois about his past.

Q   If counsel had sat down with you and discussed, or even stood up and discussed with you the implications of these scores, would you have explained to them the meaning of a 75 IQ in relation to mental retardation?

A   Yes, and I would have explained, as it states in the diagnostic DSM manual, that you can have a diagnosis of mental retardation with an IQ score as high as 75, because of the margin of error on tests, as long as there is significant deficits in adaptive functioning.

Q   Now, getting back to --

THE COURT:  Such as?

THE WITNESS:  Such as what kind of deficits, is that what you are asking?

USCA5 2963

THE COURT:  Right.

THE WITNESS:  Impairment in communications skills, impairment in social skills, impairment in --

THE COURT:  Well, you talked to him, didn't you?

THE WITNESS:  I did talk to him, yes.

THE COURT:  Did you see that he had any of those?

THE WITNESS:  Well, I really didn't have any way to reliably determine what his actual level of functioning was because he presented himself as someone who had better grades in school than he actually made, who went to college, which to my knowledge he didn't, who didn't tell me about multiple stressful circumstances in his life, the abuse and so on, so it would, in all likelihood, even if I could have administered an adaptive behavior instrument to Mr. Bourgeois, it would have been invalid because he would have probably exaggerated, made himself look like he was more capable of performing out in the world than he actually is.

BY MR. WISEMAN:

Q   Getting back to the concept of convergence of data, if we put the margin of error on the 70 and it goes down to 65 and if we go on the other end, put the margin of error of five points on the 75, we have a range of 65 to 80, and so I guess my question is, looking at a 65 to 80 with a margin of error, how do you as a psychologist know where the truth lies?

A   Well, if I were doing a mental retardation evaluation, I

USCA5 2964

would recognize that the 75 on my test would actually correspond more likely to a score of around 70 on the WAIS-III and now you tack on the margin of error and you have got 65 to 75. And, as I stated, this comes straight from the DSM manual that the diagnosis of mild mental retardation can be made specifically for that reason, that there is a margin of error, as long as there's documentation of adaptive deficits.

MR. WISEMAN: Your Honor, I am through with my questioning. I would like to move my exhibits, which I have as, these are the ones that have not been previously moved, 154, 156, 29A the Court's already admitted, and 29.

THE COURT: Any objection?

MS. SALINAS: No, Your Honor.

THE COURT: Those are admitted. Thank you.

(Defendant's Exhibits P29, P154 and P156 admitted into evidence)

MR. WISEMAN: Thank you as well, Dr. Weiner.

THE WITNESS: Do you need this that you handed me?

MR. WISEMAN: Yes, don't leave with any exhibits.

THE COURT: Ms. Salinas, anything further?

MS. SALINAS: Judge, can I have just a quick moment?

THE COURT: Yes, ma'am.

MS. SALINAS: No more questions, Your Honor.

THE COURT: Thank you, sir. You may stand down.

THE WITNESS: Thank you, Your Honor.

USCA5 2965

MR. WISEMAN:  Could we have a few minutes before our next witness, Your Honor?

THE COURT:  Oh, do you want to take a break?

MR. WISEMAN:  Yes, if that's all right.

THE COURT:  Two or three minutes?

MR. WISEMAN:  Thirty seconds.

MS. BOOTH:  How about five minutes?

THE COURT:  How about 15?

MS. BOOTH:  Okay.  Sold.

(Recess at 3:11 p.m. until 3:24 p.m.)

THE COURT:  Would you administer the oath, Ms. Casey, please?

THE CLERK:  Yes, Your Honor.

DR. JETHRO TOOMER, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  Please be seated, sir.  Thank you.

THE WITNESS:  Good afternoon, Judge.

THE COURT:  Good afternoon, sir.

MR. WISEMAN:  Dr. Toomer, I asked you before you took the stand and I will remind you, do not touch the microphone.

THE COURT:  Thank you very much for that.

MR. WISEMAN:  That's all right.  I feel like I'm personally responsible now.  Could you --

THE COURT:  Well, we all are.  I mean, I think they are losing hearing from this kind of stuff.

MR. WISEMAN:  No, I fully understand, believe me.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q   Could you state your full name for the record, please?

A   Jethro W. Toomer.  J-E-T-H-R-O,  W. Toomer, T-O-O-M-E-R.

Q   And what is your occupation, Dr. Toomer?

A   Presently I am engaged in the private practice of clinical and forensic psychology.

Q   And I am putting up on the overhead your, a document, Petitioner's 28.

A   Yes.

Q   Could you identify it?

A   Yes, that's a copy of my resume.  There has been a slight change since this.

Q   Okay.  Would you tell us what that change is?

A   Since this was done I have retired from the teaching faculty at Florida International University and I am now a consultant with the Florida International University Law School in forensic mental health.

Q   All right.

MR. WISEMAN:  I would offer Dr. Toomer's CV, Your Honor, for the Court.

THE COURT:  Number?

MR. WISEMAN:  28.

MR. DOWD:  No objection, Your Honor.

USCA5 2967

THE COURT:  28 is admitted.

(Defendant's Exhibit P28 admitted into evidence)

BY MR. WISEMAN:

Q   Dr. Toomer, the Judge can read about your education and such but could you --

THE COURT:  Where is Florida International University?

THE WITNESS:  In Miami.

THE COURT:  Thank you, sir.

BY MR. WISEMAN:

Q   Could you --

THE COURT:  Where is it located in Miami, where?

THE WITNESS:  I beg your pardon?

THE COURT:  Where in Miami?

THE WITNESS:  It's located southwest of Miami en route to the Florida Keys.

THE COURT:  Thank you.

THE WITNESS:  We are due east -- University of Miami is east, we are west.

THE COURT:  Okay, thanks.

BY MR. WISEMAN:

Q   Why don't you tell us a little bit about your background and credentials as it relates to forensic mental health evaluations?

A   I have a bachelor's, master's and PhD degree in

**USCA5 2968**

psychology.  I am a, my bachelor's degree is from Morehouse College in Atlanta, Georgia and my master's and PhD degrees are from Temple University in Philadelphia.  I completed a year's post-doc residency at Albert Einstein Hospital in Philadelphia.  I am a diplomate of the American Board of Professional Psychology, a diplomate of the American Board of Forensic Examiners, and I have been engaged in the private practice of clinical and forensic psychology for approximately 30 years.  And, as I have indicated, I recently retired from the teaching faculty in mental health counseling at Florida International University and I now consult in forensic mental health at the Law School at Florida International University.

Q   And what's the breakdown in your practice between clinical and forensic work?

A   Clinical and forensic work, it really depends on the time of the year.  Approximately 50, perhaps 50 percent to 60 percent of my practice is forensic.  The other part of my practice is involved in my private practice.  I am regional treatment consultant for the National Football League and I am regional treatment consultant for the National Basketball Association, so my work --

THE COURT:  Well, you are what for the National --

THE WITNESS:  I beg your pardon?

THE COURT:  What did you say you were?

USCA5 2969

THE WITNESS:  I am the regional treatment consultant for the National Basketball Association.

THE COURT:  What does that mean, what do you do?

THE WITNESS:  That means I deal with --

THE COURT:  If they've got sports block or something?

THE WITNESS:  Well, yeah, that and when they get in trouble, substance abuse --

THE COURT:  Oh.

THE WITNESS:  -- domestic violence, all those kinds of issues, they have to see me.

THE COURT:  Okay.

THE WITNESS:  And --

THE COURT:  And then you clear them to whatever?

THE WITNESS:  Right, according to the, there's a collective bargaining agreement that sets the criteria in terms of treatment and how long they have to receive treatment before they have a clean slate, so to speak.

THE COURT:  Is it graded for what kind of problems they have, I mean a year for this, two years for that, six weeks for this?

THE WITNESS:  What, no, what, generally what happens is that two years is the period, but it can be adjusted depending upon whether the person does exceptionally well, whether there are periods of relapse or what have you, so

USCA5 2970

there are adjustments made depending upon the nature of the offense.

THE COURT:  Did you play basketball, too?

THE WITNESS:  Beg your pardon?

THE COURT:  Did you play basketball?

THE WITNESS:  No, I did not.

THE COURT:  Okay.

THE WITNESS:  Not in college or anything like that, no.

BY MR. WISEMAN:

Q   Oh, come on now, Jethro.

A   Huh?  No.

Q   Is the work with the NBA and the NFL the reason for the seasonal adjustment and how much of your practice is clinical?

A   That is correct.

Q   Tend to have a busy time?

A   Yeah, when the season is over things get kind of busy.

Q   Okay.

MR. WISEMAN:  Your Honor, at this time I would offer Dr. Toomer as an expert in clinical and forensic psychology.

MR. DOWD:  No objection, Your Honor.

THE COURT:  He's accept- --

MR. WISEMAN:  Uh --

THE COURT:  I'm sorry?  I didn't hear you.

USCA5 2971

MR. DOWD:  Oh, I'm sorry, Judge.  I said no objection, Your Honor.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q   Dr. Toomer, you do a lot of work for defense counsel in criminal cases?

A   Yes, I do.

Q   And capital cases in particular?

A   Yes, I do.

Q   And you have done quite a bit of work with my office?

A   That's correct, yes.

Q   And do you have any particular philosophical reason why you work for the defense or is it just who calls you on the phone?

A   I, it's who calls me.  I don't solicit business or anything like that and my philosophy in terms of what I do is guided by the principals of the profession, so it doesn't really matter who calls me, I perform my activities in the same way.

Q   Okay.

THE COURT:  Well, have you testified as the, in similar circumstances has the Attorney General's Office called you?

THE WITNESS:  No, I haven't been called by the Attorney General's Office.  I do, in the Eleventh Judicial

USCA5 2972

Circuit in Florida I testify for the state in cases of competency, sanity and the like.

THE COURT:  Okay, but not for the federal government ever?

THE WITNESS:  Yes, but not for the federal government, no.

BY MR. WISEMAN:

Q    Did you conduct a forensic evaluation of Mr. Bourgeois at my request?

A    Yes, I did.

Q    And what exactly did that evaluation consist of?

A    That consisted of the administration of several protocols as well as an extensive what we call clinical assessment or psycho-educational assessment.

Q    And did you review any records either before or after you met Mr. Bourgeois?

A    Yes, I did.  There were numerous documents that were reviewed, roughly about 58 separate documents, and they included prior evaluations that had been conducted, trial transcripts and records, examinations that had been conducted by other experts and a variety of --

Q    Okay.  And let me draw your attention --

A    Yes.

Q    -- to the document that's on the screen.  Is that, it's Petitioner's 137, is that a list of the materials you

reviewed?

A    That is correct, yes.

Q    And it's two pages?

A    That's correct.

Q    Actually it's three pages, excuse me.

A    Three pages, yes.

Q    And you relied, reviewed and relied on a number of declarations from lay witnesses?

A    That is correct, yes.

Q    And did you in addition have an opportunity to speak to a number of lay witnesses?

A    I did, yes.

Q    All right.  And would that have been face-to-face or over the telephone?

A    All by telephone.

Q    And, of course, you reviewed all the expert reports on the third page of this document?

A    Yes, I did.

Q    And when and where did you meet with Mr. Bourgeois?

A    At the detention center in Terre Haute.

Q    Okay.  Terre Haute, Indiana?

A    That's correct.

Q    Do you recall approximately when that was?

A    That was on May 2nd of 2007.

Q    And how much time did you spend with him at that point?

USCA5 2974

A    I believe about four-and-a-half to five hours.

Q    And is that typical for that type of an evaluation?

A    That's about standard.

Q    Okay.

A    Standard time, yes.

Q    And what did you do in that evaluation, did you talk to him?

A    Yes.  The process involves, we mentioned earlier what we call a clinical assessment, clinical evaluation, which is, which involves taking of a developmental history, trying to determine and get some idea as to how the person has evolved from, really from birth up to the particular point in time, and then there is the administration of certain protocols that are designed to assess things such as personality functioning, whether or not, personality functioning, screening for the likelihood of some underlying neurological impairment, academic assessment, substance abuse history and those kinds of things.

Q    And the, you keep referring to protocol --

A    Tests.

Q    Tests, okay.

A    Tests, yes.

Q    And what tests did you administer, what psychological tests did you administer?

A    I administered the Bender-Gestalt designs, which is a

USCA5 2975

test that's utilized as a screening instrument to point out and to suggest whether or not there might be some problem or some difficulties in terms of, in terms of underlying neurological, neurological, they might have that as their basis, some underlying neurological involvement. Brain damage, if you will.

Q   Right.

A   It also is a screening instrument as to whether or not there might be some underlying thought process deficiencies and the like.

Q   And in particular did you administer a test called the MCMI?

A   Yes, that's the Milan Clinical Multiaxial Inventory, Third Edition.

Q   And describe for the Court briefly what that test requires of the subject.

A   The Milan Clinical Multiaxial Inventory is an instrument that's designed to assess areas of personality functioning, areas of personality deficits, and the individual is instructed to respond to a series of items that assess various dimensions of functioning. It assesses, for example, as an example of certain areas of functioning, interpersonal relationships, current and historical mental status functioning, family relationships, substance abuse history, all of those areas and others are covered, in addition to

USCA5 2976

assessing the person's beliefs regarding religion, regarding, regarding interpersonal interaction with others and the like.

Q    And how does the test get administered?  What does the person do and what do you do?

A    The person, it is a true/false design in terms of how the person responds, and the person is given a booklet and the booklet has a number of items that are listed and the person is to respond according to whether or how the item relates to them as to whether it's true or whether it's false.

Q    Okay.  And then when you get -- how many questions, roughly, are there?

A    There are about, there are approximately, I believe 300 and some items I believe on the --

Q    And --

A    I'm sorry, there are approximately, I believe 170 some items on the instrument, yes.

Q    Okay.  And how does it get scored?

A    It's scored by computer.

Q    Okay.

A    It's a computer-scored protocol that is scored and the results are returned to us.

Q    All right.  And what form do the results take, is it a report?

A    It gives a report and it indicates whether or not and to what degree -- first of all, it describes whether or not the

USCA5 2977

protocol was valid, in other words, whether the person was responding in a truthful and consistent manner.  And then given that, the next part of the report stipulates whether or not and to what degree there might be some deficiencies in terms of personality functioning or overall functioning.

Q    And if a person malingers on that test, is that reported by the computer?

A    It would be reported and would be reported in that section that I alluded to earlier in terms of whether or not the person responded in a truthful manner.

Q    And --

A    Truthful and consistent manner.

Q    -- in conducting your evaluation would you ever rely just on the results of the Milan?

A    No.

Q    One piece of data in a larger --

A    No.  The overall process in terms of conducting an evaluation requires that you consider all possible, all possible sources of data that are available, so in addition to the evaluation that is conducted face-to-face, you have the protocols, the tests that are administered.  And you also rely upon accounts of individuals who have knowledge of the person for as long as possible, you rely on those reports. And then you also rely on collateral, rely upon collateral data, school records.  If the person has been involved in any

USCA5 2978

other system, school system, criminal justice system, hospitals or whatever, you rely on that particular source of documentation also.  So all of that goes into the rendering of whatever the opinion happens to be.

Q    And in this instance what did the Milan report back about Mr. Bourgeois' personality?

A    Well, it, the Milan reported and indicated that there, that Mr. Bourgeois suffered the effects of a major personality disorder.

Q    And any in particular that are notable?

A    Well, the test itself reported the existence of deficits which were consistent with the diagnosis of a personality disorder.  There was indicated in the report results a schizoid-type personality disorder and also there were, there was evidence of a narcissistic disorder, there were elements or traits of those particular disorders, so all of those were indicated as part of the test results.

Q    And let me just ask, the --

A    Yes.

Q    Were the test results valid, did it detect any malingering?

A    No.  The test results, the results were considered to be valid and it was based, and based upon the results Mr. Bourgeois responded in an organized fashion and also responded in a truthful and consistent fashion.

USCA5 2979

Q    Now --

THE COURT:  You didn't test for mental retardation, you just tested for personality problems?

THE WITNESS  I just tested for the personality, yes.

BY MR. WISEMAN:

Q    The, does the Milan give you any information regarding Axis I major mental disorders?

A    Yes, it provides the, it provides a breakdown in terms of disorders that the individual manifests with respect to Axis I and Axis II.

Q    And with regard to Axis I, what information did the report provide you about anything on Axis I?

A    The report reflected that the major issue with regard to functioning had to do with the Axis II diagnosis.

Q    Right.  I am looking at -- well, perhaps I should put it up for you.

A    Yes, uh-huh.

MR. WISEMAN:  And I apologize, Your Honor, I accidentally marked the copy.  I will offer the Court a clean copy.

BY MR. WISEMAN:

Q    But let me show you first the top page.  Does that appear to be your declaration in this case?

A    That is correct.

Q    And that's Petitioner's 26.

USCA5 2980

A    That's correct.

Q    I want to direct your attention to page 2, and those lines up there are my markings.

A    Correct.

Q    It says here that, "Psychological testing suggests Axis I conditions of a delusional paranoid disorder and post-traumatic stress disorder."

A    That's correct, yes.

Q    Okay.  So what does that mean?  Is it diagnosing that or is it giving you information relevant to those conditions?

A    It's saying that with regard to the test results that his, his results are consistent with an individual who is diagnosed as suffering from those particular, those particular disorders, that is, a delusional paranoid disorder and post-traumatic stress disorder.  When we talk about Axis I, what we are talking about and what is reflected on Axis I are disturbances in functioning that differ from action, from Axis II diagnosis in terms of manifestation and in terms of time.  Axis I diagnoses tend to be those diagnoses where, for example, there is a time frame.  In other words, there is, when you talk to individuals, when you look at the individual's functioning, you can say at this particular point in time seems to be when the symptom etiology began to manifest itself in some prominent fashion.

          THE COURT:  When was that?

USCA5 2981

THE WITNESS:  Beg your pardon?

THE COURT:  When did it begin?

THE WITNESS:  The disorders?

THE COURT:  Right.

THE WITNESS:  The post-traumatic stress disorder and the paranoia, and the delusional paranoia disorder?

THE COURT:  Yes, sir.

THE WITNESS:  Early on individuals began to describe what they considered to be --

THE COURT:  Did you talk to the individuals?

THE WITNESS:  I talked to two of them and I had knowledge through their affidavits and statements from others, yes.

BY MR. WISEMAN:

Q   Dr. Toomer, let me just ask you, in addition to the materials that we put up earlier that you reviewed --

A   Yes.

Q   -- did you watch videos of the Government's experts' evaluation of Mr. Bourgeois?

A   Yes, I observed Mr., Dr. Moore, I believe it is.

Q   Okay.

A   Dr. Moore's interview.

Q   And did you review their reports?

A   Yes, I did.

Q   Dr. Moore and Dr. Price?

USCA5 2982

A    Yes, I did.

Q    All right.  And did you have an opportunity to speak with Kerry Brown?

A    Yes, I did.

Q    I should say Kerry Brown, Esquire?

A    Esquire, yes.

Q    Okay.  And that was a phone call you had with him?

A    Yes.  By telephone, yes.

Q    And that was recently?

A    That was recently, yes.

Q    Okay.

        THE COURT:  Before or after your report?

        THE WITNESS:  After my report.

BY MR. WISEMAN:

Q    Now, we are going to get more into the, you know, the, what the Milan is showing, but I just want to ask you initially, as a result of all these materials you reviewed and your evaluation and testing, did you reach conclusions about Mr. Bourgeois to a reasonable degree of psychological certainty?

A    Yes, I did.

Q    All right.  I am going to break this down into several categories and I'd like to first talk about the history you reviewed that's relevant to the formation of those opinions. What did you see in Mr. Bourgeois' history that you thought

was noteworthy?

A    I think the one thing that stands out in terms of history is the fact that there was consistency among the informants with respect to their observations.  Those informants described the individual's, the turbulence that characterized his developmental history, and they --

THE COURT:  Who did you talk to about that?

THE WITNESS:  I talked to, well, I saw all of the affidavits that I mentioned before --

THE COURT:  Besides the affidavits, who did you actually talk to about this?

THE WITNESS:  I spoke with, I spoke with Ms. Claudia Williams and I spoke with Mr. Wilmer Bourgeois.

BY MR. WISEMAN:

Q    And Mr. Kerry Brown?

A    And Mr. Kerry Brown, right, the attorney.

Q    All right.  And what were the informants and the declarations consistent with respect to?

A    They all described a turbulent developmental history characterized by fragmentation, if you will, and problems in the familial unit overall, and in addition to that described a pattern of instability, a pattern of abuse and a pattern of neglect that was consistent, that was persistent, and that was reflected upon by individuals who had contact with the family unit and particularly with the mother of

USCA5 2984

Mr. Bourgeois.

Q   And what did you learn about the mother's ability to sort of cope and the stressors that may have been on her while Mr. Bourgeois was a child?

A   The, Mrs. Bourgeois' ability to nurture as a parent was called into question by the informants that, whose accounts I considered.  There apparently was a great deal of stress that she experienced that was manifested in terms of how she interacted or did not interact with her children.  She was, she had given birth to five children, I'm sorry, to seven children who had four different fathers from the period of roughly '59 through '67 in terms of years.  Mr. Bourgeois' father, a Mr. Sterling, whom she had hoped to marry, was already married at the time that they were, that they were seeing each other, and then at some point he simply left and abandoned that particular unit.

Q   Did you learn anything about how many children Mr. Sterling had fathered?

A   Yes.  I believe he had like around 20 children or something like that.

Q   From different women?

A   Else-, from different women elsewhere.

Q   And did his abandonment of Mr. Bourgeois' mother have an impact on Mr. Bourgeois?

A   Yes, I think his abandonment and the abandonment that he

USCA5 2985

experienced in the family unit by the mother had significant effect and impact on his overall functioning.  He described to me and also to others the fact that the mother basically indicated to him that he would be no good, that he was no good because he was like his father, and in doing so, and given the dynamic that I mentioned earlier in terms of what was going on in the family unit, you had that compounded with other dimensions of abuse, emotional abuse as well as physical abuse, and the abuse that Mr. Bourgeois suffered, especially with regard to abandonment, was probably of the most severe kind.

Q   All right.  And let's talk about the abandonment for a moment.  I think I know what you are referring to but what do you mean when you say he was abandoned?

A   Abandonment has to do with a withdrawal or an absence of nurturing and support over time and the abandon- -- it's difficult in a way to describe because I don't want to say that one type of abandonment is better than another, but if abandonment occurs, the idea is that the abandonment should be quick, clean and it should be conclusive.  In other words, the person who is the nurturer, the giver of aid, should just leave and no longer be in the picture.  The devastation is compounded if you have abandonment and the individual who is the source of the abandonment is still seen, is still observed, there may even be some limited contact.  That is

USCA5 2986

even a more devastating form of abandonment than the previous one that I described.

Q    And we are talking about the latter abandonment in this case?

A    That's correct, yes.

Q    All right.  And factually what was, what leads you to conclude that the abandonment was not clean?

A    Because Mr. Bourgeois has a knowledge that, he believed that his mother did not care for him, wanted to get rid of him, sent him to live with a person by the name of Miss Mary in the neighborhood, and even though that had occurred he still had contact with his mother, visually and otherwise, so she was still around except that he was not part of that, part of that unit.

Q    And when you talk about the devastating impact of that type of abandonment or any abandonment, for that matter, what's going on there, why does, I mean it may seem obvious but why, why is that so devastating to a child?

A    In order for, in order for an individual, any individual, to develop the skills that are necessary in order to function in a structured, organized and productive fashion, in order for an individual to do that, that individual must have, early on, structure, security, saneness, predictability and nurturing.  Without those factors we can almost guarantee that you are going to have an individual who will be impaired

USCA5 2987

Domengo - Direct                                                           291

in terms of later functioning.

Q   Now, let me just ask you about that.  You can guarantee almost impairment in function?

A   Yes.

Q   Are you saying that everybody whose mother abandons them turns out to commit murders or leads a criminal life or --

A   No.

Q   You are shaking your head and I think --

A   No, I am not.  No, I am not.

Q   Okay.  Explain, you know, what goes on that causes some people to have more extreme impairment than other people.

A   What goes on is, one, the nature of the dysfunction that we described that we just talked about.  Another factor has to do with the onset.  Another factor has to do with the consistency and the persistence of those particular deficits that we have alluded to in terms of how it occurs, whether it is consistent over time, whether there is any intervention, whether there are any other individuals who are there to counter those particular developmental deficits.  Those are the kinds of factors that go into play that impact on what happens subsequently.  Then you can also have other factors that come into play which may be reflected in issues such as mental illness, other kinds of trauma that the individual may experience, and as a result the, what occurs or what results is going to be impacted upon by those.

USCA5 2988

Q    Did you see in the materials any reference to any sexual abuse?

A    There was one instance where Mr. Bourgeois indicated that he had been sexually abused by a neighbor.

Q    And was this in your interview with him?

A    Yes, uh-huh.

Q    Okay.

A    And also I believe in the interview with Dr. Moore.

Q    Okay.

A    Where he indicated --

        THE COURT:  Who, did he say specifically who it was?

        THE WITNESS:  No, he did not.  He did say that he went to his mother to report what had transpired and instead of being supportive he was beaten by his mother and accused of not telling the truth.

BY MR. WISEMAN:

Q    And, again, it may be obvious, what's the impact of something like that happening?

A    What --

Q    First the abuse itself --

A    Yes.

Q    -- and then the reaction to the report of the abuse?

A    What you have here is an exacerbation of the impact of the abuse because what you have now is another example of the abandonment, another example of the isolation, another

USCA5 2989

example of the nurturer's deprivation and another example of the, another example of the absence of any kind of support mechanisms within that particular, within that particular environment.

Q    And you have talked about the impact of abuse, is there a distinction to be made when the abuser is a caregiver or a parent as opposed to a stranger?

A    The impact in terms of abuse by a caregiver or by a parent is, warrants consideration, because with respect to the parent the impact is devastating because the parent is supposed to be the source of nurturing, is supposed to be the source of stability and predictability and saneness, and when that is absent it simply makes that particular process even that much more difficult to navigate for a youngster, given all of the factors that come with it.

Q    All right.  And abuse such as the type, the severity, the frequency, persistence that you saw in Mr. Bourgeois' history, does that have an impact on, or did it have an impact on his ability to form relationships?

A    Oh, by all means.  The things that we often take for granted that we are able to do in terms of forming positive relationships, in terms of being able to weigh alternatives and project consequences as part of our decision making, in terms of our being able to navigate our environment, in terms of our being able to cope with stressors and to deal with

USCA5 2990

setbacks, those kinds of skills don't just come by magic, they don't just appear as an individual ages.  They come about as a result of, one, an individual being exposed to a nurturing, caring and supportive environment; they come, two, by individuals having examples that they can follow in this particular regard; and three, by that environment helping to forge a sense of self-worth and self-esteem in the individual.  So when those things are missing, the individual is incapable of and does not have the wherewithal to be able to develop appropriately in terms of the skills that are needed to function later in life, and that's why they have problems in terms of interpersonal relationships and in terms of other aspects of functioning.  There is another factor that comes into play and that is that when an individual experiences the trauma from those deficiencies that we have outlined, what happens is that the individual, as I have indicated, is ill-equipped in terms of navigating life and the events that come, and so what happens is when the individual encounters situations that remind him or her or that serve at catalysts or cues for unresolved emotional issues linked to the aforementioned deficits, it creates a process whereby the individual begins to act impulsively and all of those deficits that we talked about earlier in terms of weighing alternatives, projecting consequences and what have you, all of those particular deficits come to the fore.

USCA5 2991

Q   Your administration of the Milan identified some paranoia.

A   Yes.

Q   And I wonder if the abuse you have talked about has an impact on a person's ability to trust?

A   Oh, by all means.  If you look at the trauma, if you look at the dynamic that we have described, what you see is a basic scenario where trust is never, trust is never reflected in terms of interaction, very likely trust is never modeled, and as a result the individual, especially growing up in an environment where there is very little in terms of reward, where there is nurturance deprivation, there will be no, the individual has never learned to trust, and the individual, in addition to not learning to trust at a very basic level, remains very suspicious about situations and about people with whom he comes in contact.

Q   You used the term modeled.

A   Yes.

Q   What does that mean in this context?

A   Modeled is, the term modeled in this context goes back to a basic principle.  Most people believe that with children, that children develop and are nurtured by our teaching them directly, you know, you do this, you do that, you do that, you do that and you don't do that.  That's not true.  Children learn mainly vicariously.  They learn by what they

USCA5 2992

observe, they learn by what they see modeled.  They learn to deal with stress by how they see their parents deal and cope with stress.  Men learn how to treat women based upon how their father treats their mother.  So it's a process of modeling and that is how individuals learn, not so much by direct teaching but by what they see modeled.

Q   And are you aware of any correlation between the kind of abuse you have identified in this case with development or brain impairments?

A   Yes.

Q   Explain that.

A   The research shows that individuals do not have to necessarily be traumatized, and when I say, physically traumatized by a blow to the head or what have you. Individuals who are exposed, and when I say exposed I mean they live in an environment that is characterized by unpredictability, instability and the like, where things are precarious, where things are capricious, where you never quite know what's going to happen from one day to the next, where you are never quite sure whether the caregiver today is going to be there tomorrow, individuals who grow up in that type of environment and where they, for example, observe violence, where there is violence going on around them, whether they are the victims or not, what tends to happen is that living in that particular environment over a period of

**USCA5 2993**

time causes actual physiological changes in the brain which show up on scans and other types of, other types of assessment tools designed to measure brain functioning.

Q   Okay.  Now, all these things you just told us about the impact of the kind of abuse Mr. Bourgeois suffered, is this some newfangled theory or is this well established in the field, is it controversial?

A   No, it's well established in the field, has been for quite some time.

Q   Now, I want to move from the history to the presence of some of these Axis II disorders that you have already discussed a bit.  First of all, define for the Court what a personality disorder is generally.

A   When we talk about a personality disorder we are talking about an enduring pattern of thinking, feeling, perceiving and behaving with respect to our environment and with respect to the things around us.  With the borderline disorder that we have alluded to here, this is reflected further in an instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image.  So we have this particular phenomenon manifesting itself and it affects all aspects of an individual's functioning.

Q   And what is the notable pattern in a borderline personality disordered person with regard to relationships?

USCA5 2994

A    Instability, inconsistency are the most prominent factors, and that inconsistency is further exacerbated by the fact that the individual tends to operate along a continuum and that continuum in terms of interpersonal relationships, that continuum begins on the one hand with what we call valuation, on the other hand we call devaluation, where the individual is idealized and then subsequent to that the individual is devalued, and so you kind of, you get that kind of vacillation, that instability along that particular continuum which reflects and which characterizes the interpersonal relationships or the quality of the interpersonal relationships of the individual.

Q    There is a phrase in your declaration at paragraph 6 that I wanted you to discuss.  You indicate, where my finger is, these relationships, meaning those of a borderline --

A    Yes.

Q    -- have a saw-tooth quality.

A    Yes.

Q    Explain what you meant by that?

A    It means that it goes back and forth, where initially it's smooth but then it's raw.  So as you go back and forth like the teeth on a saw, if you go in one direction it's smooth, when you come back in the opposite direction it's rough, and that's the nature of the interpersonal relationships, they vacillate, and they reflect the

USCA5 2995

instability, the overall instability of the personality functioning.

Q    Now, what's the origins of the name borderline?  What is the reference there to, of the actual word borderline?

A    The borderline personality disorder that we are talking about used to be described as mini-schizophrenia.

Q    Now, just stop right there.  Schizophrenia is a major mental illness?

A    Schizophrenia is a major mental illness.

Q    Axis I?

A    Axis I, characterized by significant deficits in terms of cognitive behavior and psychological functioning that's manifested in a variety of contexts.

Q    All right.  And is it an illness that involves psychosis?

A    Yes.

Q    Breaks with reality?

A    Breaks with reality, psychosis, dissociative behavior and the like, yes.

Q    And so what's the difference then between a borderline personality disorder and the major mental illness of schizophrenia or psychosis?

A    The major difference has to do with what we would call, for want of a better term, consistency.  With a schizophrenic what you have is you have this behavior over time, you have the deficits in terms of functioning, cognitive deficits,

USCA5 2996

behavioral deficits, emotional deficits that are over time.

Q    And how about the psychosis, does that last --

A    The psychosis, that's over time also.  With the borderline what you basically have is what we indicated in the description, it's instability, which is the characteristic which is the cornerstone of the borderline personality disorder where you have the individual in essence vacillates along a continuum which goes from the one end of the continuum which you call the borderline personality disorder all the way to the other end of the continuum which is the full-blown psychosis.  The borderline vacillates up and down the particular continuum, at times even manifesting what is referred to as and what is described as what are called mini-psychotic episodes, M-I-N-I.  And what we are talking about here is that there are oftentimes brief and reversible periods where the individual loses contact with reality much as a psychotic might do, but the difference is that in the borderline you have, you have the reintegration, which is what you don't have when you are dealing with schizophrenia.

Q    Okay.  And what does the field recognize as one of the -- well, withdrawn.  I take it not all borderlines have these mini-psychotic states?

A    No, because, remember, we have the continuum.

Q    Okay.

USCA5 2997

A    And the individual vacillates along the continuum.

Q    Okay.

A    From the personality disorder all the way over to psychosis or to the major mental disorder at that end of the continuum.

Q    And for those borderlines that do have these mini-psychotic episodes, what is recognized as a major cause of them?

A    The major cause tends to be, one, stress or stressors. A second major cause is the existence of cues in the environment that serve as catalysts for unresolved emotional or dormant emotional issues that have not been addressed that are the result of the deficient social environment that we have described.

Q    Did you see evidence in the materials you reviewed and the people with whom you spoke, the lay witnesses, that is consistent with Mr. Bourgeois having undergone such mini-psychotic states throughout his life?

A    Yes.  There were individuals, for example Michelle was one, who described, for example, the mood lability reflected in Mr. Bourgeois' behavior --

        THE COURT:  You talked to her personally?

        THE WITNESS:  Beg your pardon?

        THE COURT:  I want to make sure, you talked to her personally?

USCA5 2998

THE WITNESS:  No, I saw her statement.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    That would be Michelle Armont?

A    That's correct, yes.

THE COURT:  Could we stick to ones that he actually talked to?

MR. WISEMAN:  Oh, sure.

THE COURT:  Thank you.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q    Did you see any evidence from the people you spoke with, Claudia Williams, Mr. Murray Bourgeois, Kerry Brown, that would support your conclusion that you saw evidence of mini-psychotic states?

A    The individuals that I spoke with, such as Ms. Claudia Williams, describes the abuse, the physical, emotional and verbal abuse that was inflicted on her son --

Q    I'm sorry, you said her son?

A    I'm sorry.  I'm sorry, that was inflicted upon Mrs. Bourgeois' son, Alfred.

THE COURT:  Who told you that?

THE WITNESS:  This is Ms. Claudia Williams.

THE COURT:  And you talked to her?

THE WITNESS:  Yes, I did.

USCA5 2999

THE COURT:  Okay, thank you.

THE WITNESS:  And she talked about the fact that, she talked about and described the abuse that the individual suffered at the hands of his mother.  Mr. Wilmer Bourgeois talked about the fact that he believed that the behavior of Mr. Bourgeois' mother, the neglect specifically, had a profound effect on Alfred's overall behavior throughout most of his life.

MR. DOWD:  Judge, I would object to that judgment coming from a non-professional.

THE COURT:  Sustained.

MR. DOWD:  Thank you, Your Honor.

BY MR. WISEMAN:

Q   Did Ms. Williams tell you anything relevant to rages that Mr. Bourgeois may have manifested as a young man?

A   Yes, the fact that, the notion of, without necessarily provocation, adequate provocation, there would be mood swings where the individual would become angry or hostile without provocation or without any identifiable event taking place that would be proportionate to the kind of behavior that was manifested.

Q   All right.  And did she relate to any physical changes she observed during these periods of rage?

A   What she described as blanking out or not appearing to be aware of what is going on and not remembering afterwards what

USCA5 3000

had transpired.

Q   All right.  And are those consistent, those observations

consistent with what you have called a mini-psychotic state?

A   Yes.

Q   Okay.  Would a person like Mr. Bourgeois who has this

personality disorder and his history of trauma as you have

described, would you consider that person to be significantly

impaired?

A   Oh, most definitely, yes.

Q   Okay.  And was that the only set of mental health issues

that confront Mr. Bourgeois that you have reviewed?

A   No.

Q   Okay.  So when you say he would be significantly

impaired, I know you have kind of touched upon it but just

give us a sense in what, we're talking only now about the

trauma history and the development of the borderline

personality, how would he, or how was he or is he impaired as

a result of those two factors?

A   Well, he would be impaired in terms of one that we

mentioned in terms of his inability to form significant

lasting interpersonal relationships.  He would also be

impaired in terms of his own, the management and navigation

of his own environment as reflected in, you know, his mood

instability, the adverse impact in terms of that particular

phenomenon, in terms of his own self-image and self-worth, in

USCA5 3001

terms of how he functioned, in terms of how he was able or unable to manage some of the regular or normal activities of daily living.  All of those dimensions would be adversely impacted by his, the history that we described.  And as we, you know, as we mentioned earlier, what happens is that when an individual is exposed to that particular climate, environment and set of factors, what occurs is that the, is that the stability and predictability necessary for acquiring a consistent pattern of behaving and thinking is nonexistent. As a result, you have an individual who has significant deficiencies in terms of mastering their environment, reflected in deficits with respect to long-term planning, deficits in terms of consequential thinking, deficits in terms of managing conflictive data, weighing alternatives, all of those particular factors that are so necessary in order to manage effectively and to navigate our environment, all of those are missing, all of those factors are missing.

Q    Did you have occasion to speak with a mitigation specialist named Kathleen Kaib?

A    Yes, I did.

Q    And what if anything did she add to your understanding of Mr. Bourgeois and the personality disorder that you have identified?

A    She described her interactions with individuals, females, who were previously married to Mr. Bourgeois.

USCA5 3002

THE COURT:  Does she work for you or where did she come into this?

MR. WISEMAN:  She works for my office, she's a mitigation specialist.

THE COURT:  Are we going to hear from her?  Why are we hearing from her from --

MR. WISEMAN:  Well, Dr. Toomer relied on her, and so I --

THE COURT:  He didn't say that.

BY MR. WISEMAN:

Q   Well, did you rely on her?

A   Yes, she provided information that was useful.

THE COURT:  Okay.

THE WITNESS:  In this regard.

BY MR. WISEMAN:

Q   And without going into exquisite detail because it is not firsthand, what did she in sum tell you about her interaction with these women that Mr. Bourgeois was married to?

A   The, what stood out was the fact that at least on two occasions to his wives he had acknowledged that, he had acknowledged a history of abuse at the hands of his mother, and this --

Q   And this would have been pre-offense?

A   Yes, uh-huh.

Q   Okay.  Go ahead.

USCA5 3003

A    And --

THE COURT:  I'm sorry, who did he, who, I'm sorry, what do you mean, what's pre-offense?

MR. WISEMAN:  The acknowledgement of his abuse history.

THE COURT:  From whom?

MR. WISEMAN:  Well, why don't you answer the Judge's question instead of me.

THE WITNESS:  He acknowledged or he indicated or reported to his wives that he had a history of abuse at the hands of his mother.

THE COURT:  Well, did you talk to any of these wives?

THE WITNESS:  No, I did not.  This was --

THE COURT:  Okay, this is really getting far afield, so we are not going to go there.

MR. WISEMAN:  Okay.

THE COURT:  Okay.

BY MR. WISEMAN:

Q    Dr. Toomer --

A    Yes?

Q    -- do people, professionals like yourself, rely on reports from mitigation specialists?

A    Yes, we do all the time.

Q    And do those reports at times contain descriptions of

USCA5 3004

308

their interactions with other people?

A    Yes.

Q    And was Ms. Kaib's report at all out of the ordinary in that regard?

A    No.

THE COURT:  Well, does she work with you?  I mean can you vouch for her work?

MR. WISEMAN:  She works for my office, Your Honor.

THE COURT:  I understand that but I'm, I am not understanding this.  I can see relying on mitigation experts if they are somebody you have worked with and you know them.

THE WITNESS:  Yes, I have worked with her in the past, yes.

THE COURT:  Okay, then go ahead.

MR. WISEMAN:  All right.  I was done with Ms. Kaib for now.

BY MR. WISEMAN:

Q    I wanted to go to the next area of impairment.  Did you review the reports of Dr. Gelbort and Dr. Weiner?

A    Yes.

Q    All right.  And what did you learn from those reports?

A    They reported intellectual, on intellectual deficits reflected in their assessment of the defendant.

Q    And when you say intellectual deficits, give us a little more flavor.

USCA5 3005

A    They assessed his IQ, intellectual functioning.  I believe in 2004 he was administered the WAIS-R, the Wechsler Adult Intelligence Scale, Revised, and he earned an IQ of 76.

MR. DOWD:  Judge, I would object to the cumulative.

MR. WISEMAN:  All right.  You know what, I think --

MR. DOWD:  We stipulate to the test results.

MR. WISEMAN:  That's fine, that's fine.  We can move on.  He --

THE COURT:  Okay.  I would rather that you didn't bring in eight million experts to testify about what all the others have said, and you are getting way into that.

MR. WISEMAN:  Yeah, I totally, totally agree.

BY MR. WISEMAN:

Q    He had a low intelligence?

A    Yes.

Q    Okay.  And did you learn anything about brain dysfunction?

A    Yes, I did.

Q    All right.  They identified organic brain dysfunction?

A    That is correct, yes.

Q    Okay.  So what I want you to do is I want you to now add on to the deficits you have already described which you already said were, would cause significant disturbance in his functioning, add on to that organic brain dysfunction, low intelligence.  How does that add to the mix?

USCA5 3006

A    You, when you have those particular elements in addition to what we've indicated earlier, what you have is really a compounding of deficiencies that render the individual even more deficient in terms of trying to cope, in terms of trying to navigate his world, his environment, and to engage in the normal activities of daily living that are required in order to function effectively.

Q    And we have heard the term used prior to your testimony about these dysfunctions somehow inhibiting the brakes that Mr. Bourgeois can put on his behavior.

A    Uh-huh, yes.

Q    How does that add to a person who already has those impairments, the impulsivity, the lack of judgment?

A    Well, it makes that, the situation, the situation is even, is worse as a result of that, because one of the things that you learn, as I mentioned before, in terms of learning how to manage your environment, in terms of learning how to deal with things in your, you know, in your world, weighing alternatives, projecting consequences, all those kinds of behaviors, one of the other things that you learn is you learn emotional modulation, what we call the modulation of emotional expression, which means that we are able to respond affectively, affectively, i.e., emotionally, in appropriate manners, appropriate to the particular situation or appropriate to the precipitating event.  When you have these

**USCA5 3007**

deficits that we have described, that particular, that particular process, that particular ability is basically nonexistent, and so what you have is an unpredictability in terms of functioning that is manifest.

Q   Now, when a person with this, you know, the personality disorders, the trauma history, the brain damage, the low IQ, would they be impaired in their functioning in a calm environment?

A   Would they be impaired in a calm environment?

Q   Yes.

A   What would happen is that the individual in that particular environment would function only to the point that stressors, real or imagined, or catalysts were encountered that, as we indicated before, serve as a reminder of the repressed, unresolved emotional issues that are left over from a traumatic past.

Q   Okay.  And that's the last area I want to go into with you.  Let's add stress to Mr. Bourgeois' many deficits.

A   Yes.

Q   Did you learn about various stressors in his life?

A   Yes, I did.

Q   And why don't you describe the most prominent ones, and focus particularly at the time leading up to the offense, what did you know and how do you know it?

A   I spoke with Attorney Brown, who was Mr. Bourgeois'

USCA5 3008

attorney and had known Mr. Bourgeois for approximately a year-and-a-half prior to the incident and had worked with him on a number of issues.  Prior to this, Mr. Bourgeois was experiencing numerous stressors.  There were financial stressors related to the ownership of his house, there were issues in regard to child custody --

THE COURT:  Sorry, who told you about the ownership of the house?

THE WITNESS:  Attorney Brown.  He was Mr. Bourgeois' attorney.

THE COURT:  For during the divorce?

MR. WISEMAN:  He will be testifying.

THE COURT:  I mean, are we talking about during the divorce, what are you talking about?

MR. WISEMAN:  Well, I think --

THE WITNESS:  These were all stressors --

MR. WISEMAN:  Why don't you --

THE WITNESS:   These were all stressors that Mr. Bourgeois was experiencing prior to the particular incident at hand.

MR. WISEMAN:  I think the Judge is --

THE COURT:  What incident at hand are you talking about, the murder of the child?

THE WITNESS:  The crime, yes.  The murder of the child, yes.

USCA5 3009

Doe - Direct                                  313

THE COURT:  Okay.

BY MR. WISEMAN:

Q    I think, what I understood the Judge's question to be was at what point and in what different matters was Mr. Brown representing Mr. Bourgeois?

THE COURT:  Yes.  Thank you.

THE WITNESS:  He was representing him in terms of custody, he was representing him in terms of financial issues related to his home --

THE COURT:  Well, what financial issues are you talking about?

THE WITNESS:  In terms of the possible foreclosure or relating to payment of mortgage on his home.

BY MR. WISEMAN:

Q    All right.  And was --

THE COURT:  And custody issues, are we talking about Ja'Karenn, the baby that was killed?

THE WITNESS:  Yes, yes.

THE COURT:  So we are going to hear from him and so there will be no attorney/client privilege on that?

MR. WISEMAN:  Oh, no, there won't be any.

THE COURT:  Okay.

MR. WISEMAN:  We will be hearing from him and there's no privilege issues.

USCA5 3010

BY MR. WISEMAN:

Q   Did Mr. Brown tell you, Attorney Brown tell you that he was offering Mr. Bourgeois advice with regard to financial matters and --

A   Yes.

Q   Did you learn anything from Mr. Brown or from others relevant to the difficulties Mr. Bourgeois reported having with his wife at the time, Robin Bourgeois?

A   Yes, one of the major stressors, the major stressor that Mr. Bourgeois was experiencing at the time was the disruption of the marital relationship and the infidelity of his wife at the time.

Q   Now, you used the term at the beginning of this section real or perceived stressors.

A   Yes.

Q   And I'm wondering how the perceived part relates to the infidelity?

A   Well, the, Mr. Brown indicated that Mr. Bourgeois was obsessed with the infidelity, that it permeated every aspect of his functioning, that he was unable to focus, his work suffered, in other words, the work that he was trying to do at the time suffered, and that he was in essence preoccupied with this particular phenomena and betrayal, if you will, that had occurred at this time.

Q   And what does the fact that Mr. Bourgeois himself was

USCA5 3011

having infidelity, does that add at all to the, to his perception of the stress?

A   I'm sorry, repeat that again for me, please?

Q   Yeah, I, you know, as a layman I think, you know, he's, you know, what's he so upset about, he's doing the same thing.  From a psychological perspective, though, why is that either valid or not valid?

A   Well, if you look at the total picture, the totality of the picture, and focus on the individual, the fact that he may have been doing it himself is not the issue.  The issue is that it serves as a catalyst for dormant, unresolved emotional issues left over from a traumatic past.

Q   Okay.  And would --

A   Once again betrayal, abandonment, all of these are issues, clinical issues and real issues that influence behavior.

Q   Regarding the financial issues, was Mr. Bourgeois, according to Mr. Brown, having to pay legal fees that he couldn't particularly afford?

A   Correct, yeah.  There were legal fees involved, yes.

Q   And did that --

        THE COURT:  Because of what?

        MR. WISEMAN:  Legal fees that he could not afford.

        THE COURT:  Because of?

        MR. WISEMAN:  Because of --

USCA5 3012

THE WITNESS:  Because of the divorce.

THE COURT:  What divorce?

THE WITNESS:  His divorce.  Reconciliation.

THE COURT:  Did they file for divorce?

MR. WISEMAN:  There was a divorce proceeding that had been started and ended.

THE WITNESS:  There was also, there was also an issue with regard to legal charges involving the third party, Mr. Thibeau, and damage that was done to a, to his property, I believe a limo.

BY MR. WISEMAN:

Q   Was there any stress related to the possibility Mr. Bourgeois was going to lose his house at about that time?

A   Yes, all of that, the foreclosure, possibility of foreclosure, all of those were stressors that impacted him at that particular time.

Q   Now, you read portions of the trial record?

A   Yes, I did.

Q   Okay.  And you are aware that the injuries to the deceased were inflicted over many weeks?

A   Yes.

Q   Okay.  How do you reconcile that with the overall explanation you are offering for Mr. Bourgeois' behavior?  I mean when you talk about mini-psychotic episodes, one thinks of a quick incident, yet this is happening over a period of

**USCA5 3013**

time.

A    Because what transpires is that, as we indicated earlier
when we talked about the vacillation, what transpires is
stressors that occur impact on individual, the individual's
functioning, and as a result you have the maladaptive acting-
out behavior, you have the mood swings, go from one extreme
to the other, and so this particular process in terms of the
individual's maladaptive functioning is a continuing process.
It occurs, it takes place over time.  Anybody clinically who
would have been involved would have said that this is a time
bomb waiting to happen.

THE COURT:  Do you do a lot of testing on people on
death row?

THE WITNESS:  Yes, I do.

THE COURT:  Have you ever seen one that wasn't in
this kind of situation with, that was maladaptive and
dangerous and --

THE WITNESS:  That wasn't like this?

THE COURT:  Yes.

THE WITNESS:  Yes, I have.

THE COURT:  Is this --

THE WITNESS:  I have seen those who are not like
that.

THE COURT:  Okay.  Is this not unusual for somebody
on death row to be in this kind of situation mentally, a time

USCA5 3014

bomb waiting to happen?

THE WITNESS:  Is it unusual for them not to be?

THE COURT:  No.  You said he was a time bomb waiting to happen.  Is that --

THE WITNESS:  No, what I was saying was if at some point that was, that we are talking about in terms of abuse occurring over time, if someone had gotten involved earlier or at that particular point in time clinically, what have you, they would have been able to predict that this was a time bomb waiting to happen if they had taken into account history and what have you.

THE COURT:  Well, so you are testifying that he was at the time of the murder a time bomb waiting to happen?

THE WITNESS:  And what I mean by that is that you had all of these factors impacting on his functioning.

BY MR. WISEMAN:

Q    Now, Dr. Toomer --

A    Yes?

Q    -- you do a lot of work with capital cases and you are familiar with theories of mitigation?

A    Yes, I am.

Q    And what's typically offered in cases such as this?

A    Yes.

Q    Okay.  Do you have a mental health explanation for why Mr. Bourgeois was this time bomb waiting to happen?

USCA5 3015

A    Yes.

Q    Okay.  And you have described it for the last hour or so.

A    I described it, yes.  That's what I have been describing, yes.

Q    Okay.  And is it a controversial mental health position you are taking?

A    No, it's very --

Q    Did you read Dr. Moore's report and Dr. Price's report?

A    Yes.

Q    And did they dispute your conclusions in that regard?

A    No.

Q    You take 99 out of 100 psychologists, they are all going to agree time bomb waiting to happen?

A    Yes.

Q    Okay.  And because of that, is this the type of information that in your experience is offered to capital jurors?

A    Oh, by all means, definitely, to help them understand the dynamics that are influencing behavior.

THE COURT:  Well, how else does somebody, I'm sorry, but how else does someone commit murder as he was convicted of, six weeks of torture, a two-year-old child, and then killing her, how else could you be described but other than a time bomb waiting to happen?

THE WITNESS:  Well, I'm, that's what I'm saying, I'm

USCA5 3016

saying if you --

THE COURT:  How is that mitigating?

THE WITNESS:  It's mitigating because the behavior is not necessarily premeditated but is a function of the deficiencies --

THE COURT:  He --

THE WITNESS:  -- that we have described.

THE COURT:  Okay, but how do you put that on when there is evidence of six weeks of torture leading to death? Six weeks of torture leading to death.  I am not understanding how you put that on, what --

MR. WISEMAN:  Okay.  Let me see if I can ask --

THE COURT:  -- how that mitigates.

BY MR. WISEMAN:

Q    If I could ask the question, Dr. Toomer.  You reviewed the penalty phase transcripts?

A    Yes, I did.

Q    All right. Was the Government's position with regard to this offense is that Mr. Bourgeois is an evil man who did dastardly things?

A    Yes.

Q    Okay.  Does a psychological explanation for why those things happen mitigate in your experience?

A    Yes.

MR. WISEMAN:  Your Honor, I would just point out

USCA5 3017

that a number of Your Honor's questions, I mean I think Dr. Toomer can answer the psychological ones but a number of your questions, while I think are --

THE COURT:  Good.

MR. WISEMAN:  -- highly relevant, they are really legal issues.

THE COURT:  Okay.  I just --

MR. WISEMAN:  And we're certainly going to present that authority.

THE COURT:  But that's what you are using him to do is say that they should have put this information on.  I --

MR. WISEMAN:  Well, from a psychological perspective it's mitigating.

THE COURT:  I just can't see how that would be beneficial.

MR. WISEMAN:  Yeah, well, you know, the Supreme Court has said it's beneficial in five cases over the last nine years.

THE COURT:  Not in this circumstance.

MR. WISEMAN:  Oh, yes, absolutely.  In circumstances worse than this.  I have done some of them --

THE COURT:  Where there was torture for six weeks?

MR. WISEMAN:  Oh, yes.

THE COURT:  And then --

MR. WISEMAN:  In fact, when it's more horrible the

USCA5 3018

need to explain it is greater, because if you don't explain it the person looks like they are an animal, and there is an explanation for why he is not an animal. And that's my job, to convince you, and it was Mr. Tinker and Mr. Gilmore's job to convince this jury, and they failed miserably, and that's our case, and we'll prove it to you.

BY MR. WISEMAN:

Q    Dr. Toomer, I just wanted to, for the record, get some of the larger conclusions out. Did you draw a conclusion as to whether Mr. Bourgeois, as a result of all you have testified about, has an impaired capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law?

A    Yes.

Q    And what is that opinion?

A    He does.

Q    Okay. And --

THE COURT: Sorry, he has an impaired?

MR. WISEMAN: Impaired.

THE COURT: Which is the same as a sociopath, isn't it?

THE WITNESS: No.

THE COURT: Doesn't a sociopath also have a problem conforming their behavior to the normal?

THE WITNESS: Right, but it doesn't, we aren't

USCA5 3019

talking about sociopathy here.

THE COURT:  Why?

THE WITNESS:  Because we are talking about the borderline personality disorder as it reflects, as it has been manifested in Mr. Bourgeois' history.  His, what has happened to him and his history and the totality of the data is consistent with a diagnosis of a borderline personality disorder, it is not consistent with a diagnosis of sociopathy.

BY MR. WISEMAN:

Q   And, Dr. Toomer, in your review of the records have you seen any diagnosis of Mr. Bourgeois as a sociopath?

A   No, I have not.

Q   Sociopaths are often described as people without conscience?

A   Yes.

Q   Do you see that as the root of Mr. Bourgeois' behavior?

A   No, I do not.

Q   The last thing I want to talk to you about is this question of mental retardation.  You opine in your declaration that Mr. Bourgeois meets the criteria as you saw it when you conducted your evaluation?

A   Yes.

Q   Okay.  Was that a provisional observation in any respect?

A   That was a provisional observation based upon what I did

USCA5 3020

as part of my evaluation.  I did not evaluate him specifically with regard to mental retardation, but as part of the evaluative process information presents itself that serves as a basis for the provisional opinion, and then we subsequently discussed an expert being retained for that purpose.

Q   Okay.  So let's just break it down now.  You saw the IQ scores.  They qualified, in your view?

A   Yes.

Q   Okay.  And you reviewed the background material and you thought he manifested adaptive deficits in the relevant domains?

A   I did, yes.

Q   Okay.  And you saw onset before 18?

A   I did, yes.

Q   Okay.  And in your subsequent discussions with my office about your further role with regard to mental retardation, what was your understanding?

A   Well, that that was going to be done by someone else who was specializing in that particular area.

Q   Okay.  And geographically?

A   And geographically, yes, who was closer to be able to do that.

Q   Okay, I think I am done.  Thank you very much, Doctor.

        THE COURT:  Thank you.

USCA5 3021

MR. DOWD:  May I proceed, Your Honor?

THE COURT:  Yes, thank you.

CROSS-EXAMINATION

BY MR. DOWD:

Q   Dr. Toomer, my name is Mark Dowd.  I am going to ask you a few questions --

A   I'm sorry, your last name?

Q   Dowd, D-O-W-D.

A   D-O-W-D, yes.

Q   Now, let me nail down the chronology of your interviews. You -- because you indicated that there was two different time frames.  I understood from your report that you relied in your background evaluation by speaking with Claudia Williams, Mr. Bourgeois' older sister, and is it Wilmer Bourgeois?

A   Wilmer Bourgeois, yes.

Q   Wilmer?

A   My understanding it's Wilmer.

Q   Wilmer, okay.

A   W-I-L-M-E-R, yes.

Q   Okay.  And then I heard discussion about a Carrie Wilson and then a Murray Bourgeois.  What was the chronology of your background investigation?

A   I'm sorry, would you give me those, the names again?

Q   Well, I understood from your report that you gathered

USCA5 3022

your background information from Claudia Williams, Mr. Bourgeois' older sister.

A    That's correct, yes.

Q    And Wilmer Bourgeois.

A    Correct, uh-huh.

Q    Okay.  So that was -- then I heard you discussing a Carrie Wilson and Murray Bourgeois.  That wasn't part of your background investigation?

A    That wasn't me, no, no.

Q    Okay.  All right.  So you relied strictly on Claudia Williams and Wilmer, is that right?

A    Yes.

Q    Okay.  Is there any reason that you limited your background -- oh, and that was by telephone?

A    I spoke with them both, I spoke with them by phone, yes.

Q    You called them on the phone?

A    Yes.

Q    Is there any reason you limited your background investigation to just those two sources?

A    I had access to statements that were provided by informants that I utilized as part of my evaluation.

Q    And those informants were gathered by Mr. Bourgeois' team, defense team?

A    That is correct, yes.

Q    Okay.  And they simply sent those to you?

USCA5 3023

A    They provided those to me, yes, as part of my evaluation.

Q    Okay.  Did you ask for those particular individuals or did they decide which statements and individuals to send to you?

A    I asked for all information with respect to informants, all information with regard to the particular defendant's background and history.  I did not request specific persons.

Q    Okay.  You asked for all information, the good, the bad and the ugly, whatever?

A    As is the case.

Q    Whatever they had gathered on Mr. Bourgeois?

A    Yes.

Q    And the background?

A    Background information, yes.

Q    And those are the ones they sent you?

A    Yes.

Q    Okay.  But you will agree that the wider range of your sources gives you a wider range of information and probably more accurate information as well, more reliable information?

A    You try to access as much information as possible, yes.

Q    All right.  And is there any standard in which you are warned to be careful about relying solely on partial informants, people that are partial to the subject?

A    Oh, I mean we always are aware of that, but from the, in terms of what we do, in addition to trying to utilize as much

USCA5 3024

information as possible we also look for corroboration among all sources of the data, that is, the informant's background data, affiliation with other agencies or institutions, be they criminal, be they correctional, be they mental health, hospital, whatever, so we look for corroboration among all sources of the data, which is a psychological standard in terms of, you know, in terms of rendering an opinion.

Q   All right.  And you had indicated that based on your discussion with Claudia Williams and -- do you remember how long those telephone calls were?

A   I would say roughly 35 minutes, 35 to 45 minutes, something like that.

Q   All right.  And is there a format to this conversation or is it just an informal discussion with them?

A   No, it's not -- if by format you mean like a written format or anything like that?

Q   Uh-huh.

A   No, there's not a written format, but it's not also, but it also is not an unstructured process.  What we are looking for is, one, obviously we have this information, we have the relationship, we are looking at the term of the relationship, we are looking for specific information regarding what the individual was able to observe regarding the defendant in terms of the defendant functioning in that environment and with other individuals in that environment in this case, his

USCA5 3025

mother and others.  So it's not like there is a structured test or anything but it is not unstructured either.

Q   All right.  And as a result of that you decided, you indicated in your report and you said baseline.  Is that like the bottom line, baseline childhood sexual and physical abuse, even said savage, right, savage?

A   I'm sorry, where are you reading now?

Q   Oh --

MR. WISEMAN:  Here's the exhibit.

BY MR. DOWD:

Q   Well, anyway, you found, you found -- I want to make sure that's not my word -- you found, you determined that he had suffered childhood sexual and physical abuse on the basis of your reports from Williams?

A   Right, the data that was collected.  Yes.

Q   And that this produced organic brain damage?

A   Well, it didn't necessarily produce organic brain damage, it contributed to that particular, to that particular phenomena, yes.

Q   All right, so explain that.  You had indicated that, I thought I understood your testimony to be that the childhood abuse in itself can actually cause defects in the brain?

A   Changes in the structure of the brain.

Q   Okay.

A   Yeah, that is, that's what happens, yes.

USCA5 3026

Tezeno - Cross                    330

Q    And is that the --

A    So that --

Q    Go ahead.

A    So the, what the person experiences in terms of what we
have described, the lack of structure, the lack of
nurturants, the turmoil, the capriciousness, all the
instability, the characteristic instability --

Q    All those --

A    -- is what produces the changes in the brain, yes.

Q    All of those factors you described?

A    All of those factors, yes.

Q    And did I understand you to say that these, that these
defects in the brain on the basis of this child abuse will
actually show up --

A    Yes.

Q    -- in brain scans?

A    Yes, yes.

Q    They will actually, they are manifested?

A    Yes.

Q    Identifiable?  Do you know why no brain scan -- do you
know if a brain scan was attempted on Mr. Bourgeois?

A    I don't know.

Q    Would that be something that you would have done?

A    That I would have done?

Q    Or recommended?

USCA5 3027

A    That a brain scan be done?

Q    Yes.

A    I believe that there was, I don't know of any brain scan being done except that I believe that there was one done in, as part of his incarceration, but I don't, I don't know of any other having been done.

Q    Okay.  But that will actually show up on a brain scan?

A    Yes.

Q    You can demonstrate brain damage --

A    Yes.  The research --

Q    -- from childhood abuse on a brain scan?

A    Yes.  The research that has been done shows that if you take an individual who has been exposed to an environment characterized by the instability and the factors that we have described --

Q    And is the --

A    -- over time, and you take that person's brain and you do a scan and you compare it to a child who has not been in that environment, there are significant differences in the brain.

Q    And this signature on this brain scan will be different than if the --

A    The shape.

Q    -- injury was caused by trauma or impact or something like that?

A    Or direct, a direct blow?

USCA5 3028

Q    Yes.

A    Well, no, there may be some similarity, but the point is that there is a difference in the --

Q    Okay.  And it's identifiable?

A    -- in the brain that can be identified.

Q    All right.  And you -- now, as far as all this abuse, are you aware of any official corroboration of anything, that, you know, he was found with bruising at school or that he reported the sexual assault to the authorities?  I mean is there anything that comes other than from the background informants?

A    I don't recall, if you are speaking specific, of whether there was something reported at school or something of that nature, I don't have any record of that, of anything like that, you know, something being reported at school or an injury being reported at school or anything like that.

Q    All right.  Now, the, you indicated that he was, on the Axis II that he was a combination of schizoid, paranoid and personality, borderline personality disorders?

A    Correct, yes.

Q    Okay.  Now, does the schizoid finding, does that conflict with the borderline personality disorder finding?

A    No, the schizoid finding, the schizoid, once again, as we mentioned before, when you talk about schizoid what you are really talking about is a splitting, in other words, where

USCA5 3029

there is a process whereby the individual is detached or separated from reality, he is not able to process, to process reality.  The schizoid phenomena tends to be a long-term process.  It tends to be something that lasts when you have that kind of process.

Q    And what are --

A    With the borderline you get the vacillation, and that's a major difference.

Q    Let me stop you there and I'll let you get back to borderline.  What are some of the symptoms or dynamics of a schizoid personality?  How do they display them?  How is that displayed in a personality, in a person's behavior?

A    Well, when a person is schizoid, one of the first things that you observe is that there is a certain detachment, if you will, or lack of congruence between what we call ideation and affect, and what happens is a person who is schizoid can do things like the following:  They can talk about things that are highly emotional, that are emotionally charged, that would be considered emotionally devastating to a particular individual, to a particular individual, and they can talk about it without appropriate affect.

Q    All right.

A    One of the criteria for normalcy is that there is some congruence between our cognition, how we think, our behavior and our affect or our emotions, so if I am talking about

USCA5 3030

something sad that has occurred, the loss of a loved one, that would be reflected in my behavior, it would be reflected in how I talk, it would be reflected in my observable emotional behavior. When someone is schizoid, all of that is disrupted.

Q   Let me ask you a couple of symptomatic questions. Is it true that people with schizoid personality disorder, that they shun close relationships, even family relationships?

A   They can, yes.

Q   They would normally like to live alone?

A   They would, right, yes.

Q   And they wouldn't be interested in any close relationship with say a woman or a family?

A   That's not necessarily a pattern, a pattern of theirs, no.

Q   Okay. Are they normally not interested in sexual relationships?

A   That can vary. In my clinical experience that can vary.

Q   And they would normally shun like amusement parks and theme parks and things like that, is that fair to say?

A   Perhaps. The way I have heard it described, or the way I have seen it described by theorists and others is that individuals who are schizoid tend not to derive satisfaction from the kinds of things that would ordinarily give the bulk of the population satisfaction. Like you were talking about

USCA5 3031

going to a park, I think you would probably get agreement from a lot of people that yes, that's an enjoyable kind of thing.  Well, someone who is schizoid might not find that enjoyable.

Q   Going to the beach or pool parties, things like that, that would not be consistent with a schizoid?

A   Perhaps, yeah.  It would really depend, but generally it would not.

Q   Do they, are they also indifferent to praise and criticism?

A   No, not always.  Not always, no.

Q   All right.  And I didn't want to cut you off.  If you wanted to finish your statement about --

A   Yes.

Q   -- how that relates to his borderline personality, go ahead.

A   Yes.  No, the way it relates is that you have this schism, if you will, and you have the same kind of schism or a type of schism with the borderline.  The borderline on one day is composed, calm, if you will, for want of a better term, and at the drop of a hat can become angry, aggressive.  That's a split because there's not, you don't have that congruence that comes with normalcy.  Well, the schizoid is also a split.  It's a different qualitative split but it's a split nevertheless between what should be two congruent

USCA5 3032

aspects of personality functioning.

Q   All right.  Now, let me explore this rage reaction that you found.  You have indicated that this rage reaction would be consistent with his personality disorders.  Is that fair to say?

A   Well, it's consistent with the personality disorder and it comes about as a result of, as we mentioned before, one, stressors, real or imagined, real or perceived, and also by incidents or issues or situations that serve as a catalyst for unresolved emotional issues that have not been addressed.

Q   But the rage reaction would serve to provide an explanation for Mr. Bourgeois' murder of his daughter, is -- I mean that's, that would be, that's the point of your testimony, that this rage reaction is the explanation for the murder of his daughter, is that right?

A   Well, I am saying he's capable of that.

Q   Okay.

A   And I'm saying that he's capable of that particular phenomena and that that is one way to account for his behavior in terms of how he has functioned over time.

Q   And that's the point of your testimony, that this explanation just provides one explanation for his, for, if Mr. Bourgeois, if that's what you are trying not to say, if Mr. Bourgeois engaged in a rage reaction and killed his daughter?

USCA5 3033

A    Right, I'm saying that his, the combination of the factors that we have described, the mental health issues related to his overall functioning are consistent with that type of behavior, yes.

Q    All right.  Now, set aside Mr. Bourgeois' IQ --

A    Uh-huh.

Q    -- for a minute.  All this information you gathered, the abusive childhood, the sexual assault, the abandonment, all those factors that you listed, if that's all you knew, would you draw the same conclusions, that these, that this background has produced in Mr. Bourgeois this personality disorder and, with the potential for these rage reactions?

A    And what are leaving out, what did you say?

Q    We are leaving out the IQ.

A    Yes.

Q    So independent of the IQ information you would make the same finding?

A    Yes.

Q    Okay.  And those, that background information and his developed personality disputes would explain those rage reactions?

A    Yes, yes.

Q    Okay.  Whether he was a genius or whether he is mentally retarded?

A    Yes.

USCA5 3034

Q    Okay.  I want to ask you about this rage reaction or these mini-psychotic episodes.

A    Yes.

Q    They are described in similar terms by different experts in the same case but it's basically the same thing, right?

A    Yes.

Q    Okay.  Now, you are suggesting that he actually, during this mini-psychotic episode he actually doesn't know what he's doing, is that fair to say?

A    No, in, no, in -- with mini-psychotic episodes it is, it's a psychotic, it is a psychotic break.

Q    Okay.

A    The difference is, as I have indicated, the difference is that in a full-blown psychosis it remains.  In other words, the break persists, the break continues.

Q    Uh-huh.

A    The only difference here is that the individual reintegrates.  It's reversible --

Q    And --

A    -- in this particular instance.

Q    And are these more or less spontaneous events?

A    What do you --

Q    In other words, something, you talked about the stressors --

A    Uh-huh.

USCA5 3035

Q    -- something happens to trigger Mr. Bourgeois and he goes off like that?

A    Oh, yes, yes.

Q    And I'm, you know, imagining, you know, the type of thing like, you know, the shaken baby syndrome where, you know, for a few seconds he shakes the baby and then he realizes what he's doing and he, you know, sets the baby down but it's too late.  Is --

A    Well, I don't know about the example that you are using but I'm --

Q    It's just an example, it has nothing to do with this case.

A    Right, but I'm just saying that what you have is what you have described, that it can be a stressor, it can be a comment, it can be something that is seen and perceived in a particular way that may be different from how everybody else sees and perceives.  It could be a comment that everybody considers to be innocuous, the person may see it in a different way.  That's all it takes.

Q    Right, and he goes --

A    And that's what you --

Q    And normally how, I don't mean to cut you off but normally how long would you extend this episode, would you expect this episode to last?

A    Which episode now?  You mean --

USCA5 3036

Q    This psychotic rage reaction, psychotic episode.

A    It varies, it varies in terms of the individual, in terms -- there's no particular time limit but it's not prolonged, you are not talking about hours or days --

Q    All right, but --

A    -- in terms of, because when you get over into that arena then you are talking about a full-blown psychosis.

Q    Okay.  And you don't find him in that category?

A    No, I do not.

Q    Okay.  So you would expect the period to be within a few seconds or --

A    I --

Q    -- less than a minute?

A    I, well, I can't say a few seconds or less than a minute, but I am saying that what happens is that it is, the literature uses the term consistently, brief and reversible periods.

Q    All right.

A    That's how the literature describes it.  Now, that can, you know, that can cover a period -- like I said earlier, I would not, I would not consider an hour to be part of that. If you are psychotic for an hour or more you are, that's full-blown psychosis that we are dealing with, yeah.

Q    All right.  Okay.  So, and Mr. Bourgeois, he is capable of doing bad things without having, in other words, when he's

USCA5 3037

rational, is he not?

A    Oh, sure.

Q    Like any --

A    I'm sure he is.

Q    Like any --

A    I'm sure we all are.

Q    Like any of us.

A    Yeah.

Q    Right.

A    Yes.

Q    And so just because he does something violent or, you know, something bad doesn't necessarily mean that it was the result of his personality disorders?

A    I can't say that, no.

Q    You can't say that?

        THE COURT:  You mean every time he gets mad or angry it's the result of a psychosis?

        THE WITNESS:  No, he -- would you repeat the question again?

BY MR. DOWD:

Q    Well, I will just defer to the Judge.  Every time he gets mad, is it the result of a psychosis?

A    No, I can't, that's why I answered, I said I can't say that, no.

Q    Oh, okay.

USCA5 3038

THE COURT: I thought you said no.

BY MR. DOWD:

Q   You agree with that?

A   No, I said I, right, I said, no, I was saying I --

Q   You agree with that? Okay.

A   Yes.

Q   And --

THE COURT: Okay, do you agree with that statement?

THE WITNESS: Yes, I said I can't say that, yes. I am agreeing with that statement, yes.

THE COURT: Okay.

BY MR. DOWD:

Q   Just to make it clear, Mr. Bourgeois is capable of --

THE COURT: You have been up there a long time.

BY MR. DOWD:

Q   Mr. Bourgeois is capable of, you know, violence which is not the result of his personality disorders?

A   Yes, I am sure that he is.

Q   Okay. All right.

A   And we all are.

Q   Okay. So the mini-psychotic episodes could explain an instantaneous action, perhaps a short beating, but it wouldn't explain, let's say, a plan to kill witnesses or the prosecutor, you know, a long, you know, planning that went for weeks and involving other people, that wouldn't be the

USCA5 3039

result of any psychotic episode?

A   No, I don't see his behavior as being premeditated, you know, I am saying generally.  Most of his behavior, at least according to the records that I have reviewed, most of his behavior appears to be motivated by his own deficiencies.

Q   In other -- most of what behavior?

THE COURT:  I am not understanding that.  What do you mean by that?

BY MR. DOWD:

Q   Yeah, I missed that.

A   It means that when you do something it's not, you aren't -- under ordinary circumstances we say if somebody is going to make, is at a decision point, we say that the person is going to weigh all the alternatives, going to look at possible options --

THE COURT:  Did you read the trial transcript?

THE WITNESS:  Yes, uh-huh.

THE COURT:  Did you read where people testified, I think it was his wife, that he didn't want to pay child support for Ja'Karenn and he wasn't going to bring her back alive and that he was actually going to leave her, if he didn't do what he did he was going to just leave her in a bayou in Louisiana for the alligators?

THE WITNESS:  Yeah, I remember all of that there.

THE COURT:  Isn't that premeditated?

USCA5 3040

THE WITNESS:  I think --

THE COURT:  You wouldn't call that premeditated?

THE WITNESS:  No, I'd call that someone acting out of --

THE COURT:  Well, he did act out and she died.

THE WITNESS:  Well, I am saying -- no.

THE COURT:  She did.

THE WITNESS:  With regard to the statement.

THE COURT:  Okay.

THE WITNESS:  I'm talking about the statement.  With regard to the statement, his behavior is a reflection of his deficiencies in terms of --

THE COURT:  Isn't that the way we all are, though, our behavior is a reflection of our deficiencies or our assets?

THE WITNESS:  Not always.  Only in some cases.

THE COURT:  Well, how do you, how do we get our behavior if it's not motivated by some lack that we have or some positive, some negative or positive?

THE WITNESS:  Well, I think the point with Mr. Bourgeois is that that is characteristic of his overall behavior over time, not just in one instance as it is with some of us, you know, where we do --

THE COURT:  Did you know how, do you know how long this child was tortured?

USCA5 3041

THE WITNESS:  Yes.

THE COURT:  That her skin turned to leather over six weeks?

THE WITNESS:  Yeah, that was an extended period, yes.  I am aware of that, yes.

THE COURT:  None of that was premeditated?

THE WITNESS:  No, what, I think the point I am making here with this particular disorder is that, you know, when you have the mini-psychotic episodes that we have talked about, we have one, in one instance we have a situation where the individual is motivated by his deficiencies, impairment in thought, other kinds of things, but let me --

THE COURT:  Well, which of those things were motivated by his deficiency?

THE WITNESS:  Well, first of all --

THE COURT:  Which of the six weeks events were motivated by deficiencies?

THE WITNESS:  I think his overall behavior is motivated by his deficiencies.  I think the things that happened during the six-week period, during that six-week period, may have been the result of the mini-psychotic episodes that we have talked about.

THE COURT:  While he was driving the truck the whole time?

THE WITNESS:  I'm sorry, I don't, I don't follow

USCA5 3042

you.

THE COURT:  He was truck-, he was on the road.

THE WITNESS:  No, what I'm saying --

THE COURT:  So he was psychotically operating the vehicle?

THE WITNESS:  No, no, I am, I am not following you in terms of --

THE COURT:  Well, we are not communicating so I am going to let Mr. Dowd do it.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  He will figure it out.

MR. DOWD:  Thank you, Your Honor.

BY MR. DOWD:

Q   Doctor, the record demonstrates that the child had a number of injuries, I don't know if it's over 100 but probably well over 100 during the six-week period, and would the psychotic episodes explain each of those -- oh, 300 and, I am told it's 360 injuries.

A   Okay

Q   Maybe multiple injuries in each episode, but would, could mini-psychotic episodes explain all of those injuries over a six-week period?

A   I can't say that mini-psychotic episodes can explain all of those.  What I can say is that he is subject to, has been subject to mini-psychotic episodes that have characterized

USCA5 3043

his behavior over time.

Q   All right.  And the benefit or the point of this mitigation evidence that you are describing would be to show the jury that the murder was the result of one of these rage events?

A   I believe that there is, yes, that there is a mental health basis for Mr. Bourgeois' behavior.

Q   All right.  And, as the Court indicated, there was testimony that Mr. Bourgeois had actually planned the murder and I think he, there was testimony, if I am not mistaken, that he told his sister to get her black dress ready and he was going to get rid of the child and what not.  I mean doesn't that, I mean doesn't that demonstrate that this was a planned event and not the result of some psychotic episode?

A   I think that, you know, that one could make the statement or make the case that this was a planned event.  When I look at the totality of the data, not just one particular incident or one particular statement, when I look at the totality of the data, this is an individual who is impaired, who is significantly impaired psychologically, and this impairment has influenced his behavior for most of his life and continues to do so.

Q   Well, but --

THE COURT:  I guess my question is, is there anybody that you have examined on Terre, on death row --

THE WITNESS:  Yes.

THE COURT:  -- in the federal system that is not significantly impaired psychologically?

THE WITNESS:  Yes, I think there are variations because that's a continuum, and there are some who are less so, yes.

THE COURT:  But they all have some psychological impairment?

THE WITNESS:  Yeah, some impairment, yes.

THE COURT:  Okay.

THE WITNESS:  Yes.

BY MR. DOWD:

Q    And what about the fact that there was no evidence of any abuse or any rage event against his seven-year-old daughter, is that Alfredsha, did I --

A    Alfredesha.

THE COURT:  Alfredesha.

BY MR. DOWD:

Q    Alfredesha?

A    Yes.

Q    I mean, what about that factor?  Doesn't that also suggest that the rage event is not an explanation for the murder since he never abused his other daughter?

A    No, I think what it suggests --

THE COURT:  Actually, that's not what the trial

USCA5 3045

testimony showed.

MR. DOWD:  Oh, well, I stand corrected, Your Honor. I was --

THE COURT:  So, I mean, I can't forget the times that the mother of Alfredesha testified that though she was not sleeping with her husband that he consistently took Alfredesha to bed at night and locked the bedroom door.

MR. DOWD:  Oh, okay.  I got this secondhand, Your Honor, I apologize.

THE COURT:  Is that not what the testimony showed?

MR. ROBERTS:  There was testimony to that extent, Your Honor, but obviously we had no evidence about what happened behind the door, nor do we offer any.

THE COURT:  I understand that.

BY MR. DOWD:

Q   And --

THE COURT:  But, in any event, that's not a usual kind of thing, is it?

THE WITNESS:  No.

THE COURT:  Okay.  It would cause you concern, would it not?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. DOWD:

Q   And the Judge made the point about the fact that

USCA5 3046

Thomas - Cross                                                    350

Mr. Bourgeois was on the road driving, you know, a cross-country 18-wheeler driver, and there is no evidence that he ever had a rage event relating to that activity, which, you know, I just drove down here from Houston and I was ready to run somebody off the road.  I mean, if he's going cross-country over a six-week period --

THE COURT:  Will you help him, please?

MR. DOWD:  Light counseling is all I need.

BY MR. DOWD:

Q   Wouldn't you think that if Mr. Bourgeois was subject to these rage events that they would manifest themselves in his cross-country driving or in other life stress, stresses, but did you find any evidence in the record that he had these rage events in other, you know, in other areas of his life?

A   I recall an incident where he was driving his truck and he attempted to, he left the truck, I mean the truck was driving itself.

Q   Oh, he stepped away from the wheel?

A   While he was, while he was involved with someone else in the front seat of the truck.

THE COURT:  Where did you find out about this?

THE WITNESS:  If you'll give me just a moment.  That was from Lawanda Cook, and she said she never got in the truck again after that.

THE COURT:  Did you talk to her?

USCA5 3047

Toomey - Cross                351

THE WITNESS:  No, I didn't talk with her, just from her statement.

THE COURT:  Okay.  Be real careful about that.

THE WITNESS:  Okay, I'm just, he asked --

THE COURT:  Also, Mr. Wiseman, I want to make sure, since I misunderstood about your mitigation person, that he should be able to testify if he used that information.

MR. WISEMAN:  Yes, she's the next witness.

THE COURT:  Okay.  But I mean if you want anything from him that's fine, also.

MR. WISEMAN:  Okay.

THE COURT:  Okay.  I was mistaken.

MR. DOWD:  Yes, Your Honor.

BY MR. DOWD:

Q    The, well, that wasn't a rage event, he just stepped away from the wheel to talk to her and he maybe was showing off, showboating in his truck.  That was a safety event, wasn't it?

A    Well, I'm just trying to, I'm responding to the issue of his lack of judgment, lack of premeditation, if you will.

THE COURT:  He was talking about rage.  He said very specifically do you have any other instances besides this Ja'Karenn of rage.

BY MR. DOWD:

Q    Where he would go off on somebody.

USCA5 3048

A    No.   Only in terms of the emotional anger that individual has indicated but not in terms of actual violence.

Q    All right.

THE COURT:  But, now, in the trial there was the incident where his son, was it his son or a nephew that testified that he hung him upside down by the ankles from a bridge over a river?  Son, nephew?  Nephew.  Did you read about that one?

THE WITNESS:  I don't recall that, no, I don't.

BY MR. DOWD:

Q    In these, in talking to the background -- and I'm going to skip around a little bit, I'm sorry, I took some notes here.  In talking about the background information you had, people had indicated that he had mood swings, angry, hostile?

A    Yes.

Q    And was this, would this have been prior to his abandonment?

A    When you say prior to his abandonment in terms of?

Q    In other words, he was sent to live with Miss Mary?

A    Miss Mary, yes.

Q    And was this mood swings, angry, anger and hostility that Bourgeois exhibited, was that prior to his being sent off to live with Miss Mary?

A    That was across his whole, his whole life in terms of how he has functioned.

USCA5 3049

Q   Oh.  Even before the abandonment?

THE COURT:  Well, I don't think that anybody has testified that the abandonment occurred at seven years old.

MR. DOWD:  Okay.

THE COURT:  He is talking about, I think you talked about how it's cleaner to have abandonment real quickly?

THE WITNESS:  Yes, uh-huh.

THE COURT:  And his, what the others have testified, that it was over a long period of time, it wasn't just at seven, it was before then.

MR. DOWD:  Yes, Your Honor.

THE COURT:  That he says he was abused from the time he could remember.

MR. DOWD:  Okay.

THE COURT:  And that's certainly a form of abandonment, isn't it?

THE WITNESS:  Yes.

BY MR. DOWD:

Q   All right.  And weren't other siblings also sent away to live with relatives?

A   Yes, I believe that other siblings went to different places to live, reflecting the instability that was characteristic of that environment at the time.

Q   All right.  And you would expect the same type of abandonment reaction by them?

**USCA5 3050**

A    Not necessarily, because you would have to have the similar types of dynamics, and from all I can gather from the documents and what have you, Mr. Bourgeois was the subject of more abuse than anyone else in the family, as reflected by his sisters or his siblings.

Q    So it aggravated the abuse?

A    I'm sorry?

Q    It aggravated the abuse, the abandonment?

A    No, no.  He was, that he was the subject of more abuse --

Q    Right.

A    -- than anyone else.

Q    Right.  You said that when you gave him a test he understood 170 questions and responded consistently?

A    No, I was saying that his responses --

Q    Oh.

A    -- on the instruments reflected that he understood and that he responded in a consistent fashion.

Q    And he understood the instructions on the test?

A    Well, I gave it to him.  I was there, yes.

Q    All right, but he followed your instructions and he appeared to understand what you were directing him to do --

A    Yes.

Q    -- in taking the test?

A    Yes.  And I answered any questions that he had, yes.

Q    And how many pages was that test?

USCA5 3051

Toombs - Cross                          355

A    It's on front and back so it's about, it's three pages.

Q    Okay.  All right.  Now, the, I guess, you know, we are evaluating the performance of the trial lawyers here and why they didn't use mitigation testimony as you have offered here to assist him, but did you understand that Mr. Bourgeois told the psychological expert, Dr. Estrada --

THE COURT:  The psychiatrist.

BY MR. DOWD:

Q    The psychiatrist, Dr. Estrada, that he had an idyllic childhood, that there was no abuse, everything was wonderful? Were you aware of that?

A    No, I wasn't aware of that but I am not surprised by it.

Q    Okay.  So at that point --

THE COURT:  But at this point, after he gets capital punishment, then he comes forward and tells everybody about the abuse.  I'm just saying that it makes, you know, it's a hard, it's hard, you know?  So it's hard to say the lawyers were incompetent because they went with what they had, you know, they had a psychologist and they had a psychiatrist.

THE WITNESS:  But also I noticed, Your Honor, that, for example, in reviewing some of the, also the later tapes, he was --

THE COURT:  After the conviction?

THE WITNESS:  After, yes, after.

THE COURT:  Right.

USCA5 3052

THE WITNESS: That he has done the same thing. He has, for example, in the tape with Dr. Moore he is very grandiose, he is very expansive, he --

THE COURT: I agree with you a hundred percent.

THE WITNESS: Uh-huh.

THE COURT: But I am just saying if you are the lawyer and you are making a tactical decision, how many different experts do you get for him to say the same thing to before you just have to go with that? You see what I mean?

THE WITNESS: Yeah, I understand what you're saying. I am not --

THE COURT: And that's the difficult. I don't think, for, it doesn't mean it didn't happen, that the abuse didn't happen or that the other things didn't happen, but the question here for us today really is ineffective assistance of counsel, and post-conviction things that are discovered are a little bit, a little bit different. And that's not questioning any of the things you have to say. You understand?

THE WITNESS: I understand what you're saying, yes.

BY MR. DOWD:

Q   If --

MR. WISEMAN: Your Honor, I would just point out as a point of clarification that the Government argued that Mr. Bourgeois was abused for their risk assessment, counsel

USCA5 3053

argued Mr. Bourgeois was abused, so it wasn't that counsel didn't want to offer it, they just didn't support it with evidence.

THE COURT:  Well, that's the problem, because they didn't have evidence.

MR. WISEMAN:  Oh, they did.

THE COURT:  Actually -- well, oh, then they have, and I will hear that coming up.

MR. WISEMAN:  Yes, you will.

THE COURT:  But I am just saying if you have the psychiatrist and the psychologist and nobody brings it to the attorney's attention, it's difficult.

BY MR. DOWD:

Q   Doctor, in addition to this risk assessment --

THE COURT:  And I don't think Mr. Fernand was available to testify.

MR. WISEMAN:  Mr. Ferdinand.

MR. DOWD:  Ferdinand?

THE COURT:  Ferdinand.

BY MR. DOWD:

Q   You also did an adaptive functioning evaluation of Mr. Bourgeois in 2007?

A   No.  I rendered an opinion, I didn't do --

Q   Oh.

A   I didn't, no, I did not.

USCA5 3054

Q   Okay.  But you gave an opinion about his adaptive functioning?

A   Yes, uh-huh.

Q   Okay.  And again you relied on the affidavits or the declarations provided to you by Mr. Bourgeois' attorneys and you also went back and relied upon the background information you gathered from, what's her name, Claudia Williams and --

A   Yes.

Q   -- Wilmer Bourgeois?

A   Wilmer Bourgeois, yes.

Q   Okay.  And you concluded from that information that he couldn't follow simple rules from childhood through adulthood?

A   I, I, in terms of the opinion that I rendered --

Q   Uh-huh.

A   -- I based that on the documentation that I had that suggested that he had impairment in those areas, as reflected in such things as poor financial management and an inability to manage some of the normal expectations of daily life.

Q   Well --

A   As I indicated, I did not do an adaptive functioning evaluation.

Q   Not a complete evaluation.

A   Yes.

Q   But you gave your opinion on his adaptive functioning.

USCA5 3055

A    Opinion, right, yes.

Q    And you indicated that he couldn't follow simple rules from childhood through adulthood, and I guess I'm asking was this your conclusion or was this a conclusion that was provided to you?  Did you take that conclusion from the psychologists' reports that were provided to you and --

A    You mean his inability in terms of managing his functioning?

Q    That he couldn't follow simple rules from childhood through adulthood.

A    Where are you, which --

Q    I thought I got that from your conclusions here, and if I paraphrased that I apologize.  Let's see.  Is that in your report of May 9th --

A    Of May --

Q    -- 2007, the adaptive functioning opinion, was that in your original report?

A    With regard to what, his following the rules?

Q    Your, yeah, yes.

A    I don't recall.  That's why I wanted to --

Q    But your adaptive functioning opinion is contained in your original report?

A    Oh, yes, yes.

Q    Okay.

A    Yes, that's contained in the original report, yes.

USCA5 3056

Q    Well, maybe I can find it real quick.

A    Yes.

Q    Well, I'm not going to waste the Court's time.  Let me go on.  Do you believe that that is the case, from your background evaluation and from reading the statements that were provided and the psychologists', the other psychologists' reports you read?

A    Do I believe that what is the case?

Q    That he couldn't follow simple rules?

A    I'm not, I'm not sure.

Q    Okay.

A    I need to take a look at that because, that he couldn't follow simple rules?

Q    Uh-huh.

A    I was, I think, my opinion as I have expressed it was that he had difficulty managing various aspects of his life.

Q    Okay.

A    And that's reflected in those particular adaptive functioning deficits, yes.

Q    Okay.  And you knew that Mr. Bourgeois was an over-the-road truck driver?

A    That's correct, yes.

Q    Would often be on the road for weeks at a time?

A    Yes.

Q    And often by himself?

USCA5 3057

A    Yes.

Q    And he would have to negotiate his way from Florida to California and back to North Carolina or wherever his routes took him?

A    Yes.

Q    All right.

A    If he was --

Q    And he'd have to make deliveries?

A    If he was an over-the-road driver he would have to do that, yes.

Q    And arrange pickups, comply with all the Department of Transportation requirements, all the safety rules, all the driving rules?

A    I don't know all of those but I will accept those if that's what you say.  I don't know that.

Q    It's not just a cross-country jaunt, it's a fairly complicated occupation.

A    I assume that there was, there were things that were involved in terms of doing that, that it's not a simple task, yes.

Q    Well, with all his deficits, how was he able to do those things by himself?

A    I don't know that he did them by himself.

        THE COURT:  Do you know that he did not?

        THE WITNESS:  I don't know that he, I --

USCA5 3058

THE COURT:  Okay.

THE WITNESS:  I am aware of the fact that he had indicated that oftentimes he had people with him because he did not like to be by himself, but I don't know that he was always alone when he navigated those particular, those particular trips that he did.

THE COURT:  Well, being alone and getting help are two different things.  Do you have any, any indication that he had help from other people when he was on the road?

THE WITNESS:  I don't have indication that he had help --

THE COURT:  All right.

THE WITNESS:  -- from people while he was on the road but --

THE COURT:  Thank you.

THE WITNESS:  -- with Dr. Moore he indicated that he had people --

THE COURT:  He did.

THE WITNESS:  -- who taught him how to --

THE COURT:  Because he said he didn't have any support early so he went to people for advice about how to keep records and how to --

THE WITNESS:  Right.

THE COURT:  -- do his tax, he had a tax consultant --

USCA5 3059

THE WITNESS:  That's what he said.

THE COURT:  -- and he had, you know, these various and other, sundry other people that helped him learn life skills.

THE WITNESS:  That's what he reported, yes.

BY MR. DOWD:

Q    Let me just conclude.  Dr. Toomer, even if there is evidence that the defense attorneys had some indication of childhood abuse or whatever it might be, if they also had the information from Dr. Estrada that Mr. Bourgeois claimed to have an idyllic childhood and also that the one head injury that they had information about, the 1984 accident --

A    Uh-huh.

Q    -- you know, which Dr. Weiner was advised by Mr. Bourgeois about and that turned out to be false, certainly the defense attorneys would have a mixed picture about the viability of putting on some type of mitigation testimony?

MR. WISEMAN:  I am going to object to Dr. Toomer's ability to speak for why the lawyers did or did not do something.

MR. DOWD:  Well, I'm, from a psychological standpoint, Your Honor, I'm just asking if it was a mixed picture.

THE COURT:  If you can answer, that's fine.

USCA5 3060

THE WITNESS:  Okay.

BY MR. DOWD:

Q   Would you consider that to be a mixed picture?  On the one hand they have their experts providing information that Mr. Bourgeois had an idyllic childhood and the one head injury that they had they learned was false, that it was a made-up story by Mr. Bourgeois, if that was presented, don't you think that's a mixed psychological picture that they would have, psychological evidence to present?

A   Well, if we're talking about suppositions I would say yes, but that's not what I see as being an accurate account of what has existed.

Q   Okay.

MR. DOWD:  Judge, I will pass the witness with that last tortured question.

THE COURT:  Thank you.  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q   Dr. Toomer, why aren't you surprised that Mr. Bourgeois reported an idyllic childhood to at least Dr. Estrada?

A   Because oftentimes what you have with this particular disorder is what we call grandiosity where individuals exaggerate certain circumstances, situations and what have

USCA5 3061

you for a number, a number of reasons.

Q    All right.  And is one of the reasons the concept of denial?

A    Yes.

Q    And just explain briefly what that is and how it applies?

A    Well, the notion is that the individual does not want to acknowledge the reality of what has transpired and in terms of carrying that forth, in carrying that out, what you tend to get is a rejection of the reality in terms of what has taken place and what has occurred, and so you oftentimes get this kind of phenomena occurring and it continues in terms of how the individual presents, how he is capable of managing situations and what situations happen to be.

Q    And an adult survivor of childhood abuse who engages in denial, is an aspect of that related to their management of the psychological pain that the abuse causes them?

A    Sure.  Denial is a useful phenomena.  It has been found to be very useful in terms of individuals protecting themselves from the effects of trauma that they have been exposed to, and it has been found to be a ready, it has been found to be a device that is readily available to the individual in terms of trying to cope with the variety of stressors that he may have encountered or might be encountering at the time.

Q    And finally with regard to denial, from the perspective

USCA5 3062

of a forensic expert hired by the defense, when you encounter denial and you suspect that there's abuse, how do you break through that?

A    Well, one of the ways that you try to break through that is by getting corroboration of versions of events from a variety of sources and we rely on corroboration as part of the clinical assessment.

Q    Mr. Dowd asked you questions about Mr. Bourgeois' facility with taking the MCMI instrument?

A    Yes, yes.

Q    Is the MCMI a test for mental retardation?

A    No.

Q    And would you ever use it to diagnose the presence or absence?

A    No, you wouldn't.

Q    Do you derive any useful information from the fact that he took the test and it was a valid administration?

A    No.

Q    Mr. Dowd asked about other siblings who also had abandonment issues in their lives.  Are you aware of any of the other siblings, whether they suffered organic brain dysfunction or a low IQ?

A    No, I am not.

Q    And could those additional factors in Mr. Bourgeois explain why his life might have taken a different course?

USCA5 3063

A    Yes, you would have to consider the totality of the data with regard to each one.

Q    Mr. Dowd, who I am certainly not going to get next to on the road any time soon --

THE COURT:  Are you driving back to Houston?

MR. WISEMAN:  My son just moved there so I might be someday.

BY MR. WISEMAN:

Q    But the, I think the point of Mr. Dowd's questions was, well, why wasn't he stressed out by someone, you know, cutting him off on the highway or, you know, why didn't he act out then, and I want to read you a couple of sentences from the DSM-IV TR, page 707, which is the section on borderline, and ask you to agree or disagree.  Quote, "The anger of the borderline is often elicited when a caregiver or a lover is seen as neglectful, withholding on caring or abandoning.  Such expressions of anger are often followed by shame and guilt and contribute to the feeling that they have of being evil.  During periods of extreme stress, transient paranoid ideation or dissociative symptoms may occur."  So why doesn't Mr. Bourgeois go into a rage when he gets cut off but he goes into a rage when he thinks his wife is being, is cheating on him?

A    Because, as we indicated before, the event that creates the disruptive behavior is the event that serves as a

USCA5 3064

catalyst to remind the individual of the unresolved emotional issues that come from his having been brought up in a dysfunctional and traumatic environment.

Q   You were asked whether you saw other instances of violence in his background.  I would ask you about the, and Ms. Kaib is going to be testifying as soon as you are done, did you see violence reported from the women that he was married to?

A   Yes, I did.

Q   Violent rages?

A   Yes.

Q   Followed by periods of tenderness?

A   Yes.

Q   And a cycle that repeated?

A   The cycle was repeated, yes.

Q   You mentioned that brain scans can show the damage that can be caused by the type of abuse Mr. Bourgeois suffered. My question is would it necessarily show up on a brain scan?

A   It doesn't always have to, but it does.

Q   And what types of scans are we talking about here, x-rays, PET scans, functional MRIs, what are we --

A   We're talking about MRIs.

Q   Okay.

A   Yes.

Q   Last, when you talked to Claudia -- withdrawing.

USCA5 3065

Mr. Dowd asked you about this incident with Claudia Williams getting a phone call about put your black dress on, you know, suggesting that that was evidence of premeditation.  Did you learn anything else about that phone call?

A    I don't recall offhand.

Q    Okay.  You have recalled quite a bit, so I will give you a --

A    Yes.

Q    I'll give you a pass on that one.

A    I don't recall offhand, no, not regarding that.

Q    That's all I have.  Thanks very much.

        THE COURT:  Thank you, sir.

        THE WITNESS:  Thank you.

        THE COURT:  I think you have got round three coming up here.

        MR. DOWD:  Your Honor, I just have a few follow-up questions.

        THE COURT:  Okay.

                    RECROSS-EXAMINATION

BY MR. DOWD:

Q    Doctor, I may not have been fair earlier, I asked you about some factors of schizoid personality disorder.

A    Yes, uh-huh.

Q    And I want to show you something here.  Are you aware, are you familiar with Mental Retardation Definition,

USCA5 3066

Classification and Systems of Support, Ninth Edition,

American Association of Mental Retardation?

A    Yes, that's the --

Q    Okay.

A    That's not the latest edition, is it, because the name,

the nomenclature has been changed.

MR. DOWD:  Your Honor, may I have just one second?

THE COURT:  Yes.

(Mr. Dowd and Mr. Roberts conferring off the record)

BY MR. DOWD:

Q    All right, let me correct myself.  I am going to show you

what has been marked as part of the DSM-IV, and that

describes -- I hope, this is not a real good copy -- and it's

marked as Government Exhibit Number 201.  I think this is

going to be a court demonstration exhibit, but it shows --

let me see if I can bring this up.  It shows some of the

factors that the DSM-IV describes as typical of the schizoid

personality disorder.

A    Yes.

Q    Do you agree with those?  Do you recognize those as --

A    I recognize these, yes.

Q    -- the accepted --

A    Yes.

Q    -- tendencies of that disorder?

A    These are some of them, yes.

USCA5 3067

Q    All right.  And you had indicated earlier that, I think on several of those, at least you said not necessarily or --

A    Correct, yes.

Q    But these are actually the accepted tendencies of this disorder, correct, in your field?

A    Well, here's the situation:  Yes, the DSM-IV TR is designed to provide a basis for individuals across mental health professions to communicate with one another.

Q    Uh-huh.

A    But you have to also keep in mind that the DSM-IV TR does not deal with the etiology of the mental illness, it does not deal with the theory of the mental illness --

THE COURT:  Well, doesn't it have to do with the symptoms?  That's the presentation, I think that's what he's talking about.

MR. DOWD:  Yes, Your Honor.

THE WITNESS:  Well, he asked me did I agree with all of them.

THE COURT:  Well, any of them?

THE WITNESS:  Because I said, because I said yes and maybe to some of them.

THE COURT:  Got it.

THE WITNESS:  And so I am explaining why I said yes and maybe to some of his answers, some of his questions.

USCA5 3068

BY MR. DOWD:

Q   All right, but those, that presentation that's described there, that's actually the accepted presentation of that disorder?

A   Those are some of the accepted issues --

Q   Okay.

A   -- with respect to that particular disorder.

THE COURT:  Is that going to be admitted?

MR. DOWD:  Your Honor, I'm just going to use it as a trial exhibit, it's Exhibit Number 201.

THE COURT:  Well, are you going to read them off?

MR. DOWD:  Okay.

THE COURT:  I mean shouldn't it be admitted?

MR. DOWD:  I will offer it, Your Honor.  Just --

THE COURT:  Never mind.

MR. DOWD:  It's a sectional thing, I can just offer this one page.  We would offer Government's Exhibit Number 201 so I don't have to read it.

MR. WISEMAN:  No objection.

THE COURT:  Government Exhibit 201 is admitted.

(Government's Exhibit 201 admitted into evidence)

THE COURT:  And, Mr. Wiseman, I don't think you admitted the one you read off also about -- well, yes, you did because you read it, you read it in.

MR. WISEMAN:  We will get you a copy of it as well.

USCA5 3069

THE COURT:  That's okay, you read it in.

MR. WISEMAN:  Okay.

THE COURT:  It was one of those do you admit or not, do you agree or not agree.

MR. WISEMAN:  Okay.

BY MR. DOWD:

Q   And then, Doctor, you indicated that the MRI was the test that could --

A   It's one, yes.

Q   Oh.  What other tests can they use to demonstrate brain damage on the basis --

A   They could do a --

Q   -- of child abuse?

A   They could do a scan or whatever but the MRI, apparently, that's not a specialty of mine but my understanding from experts that I have spoken with, that the MRI tends to provide the greatest clarity in terms of, in terms of designating areas of change.

Q   All right.  And what is the actual brain structure that is changed or is different in someone with brain damage from child abuse?

A   Oh, it depends on the particular, on the particular individual, but the, my understanding is, from the research that I have read, that the portion of the brain is the, is the portion of the brain that is involved with areas such as

USCA5 3070

impulse control, frontal, you know, frontal lobe kinds of issues and what have you.

Q   Well, I am really asking more structurally how it appears, what parts of the brain appear to be changed.  I am not talking about how it's developed in, or how it results in behavior change, I am talking about the actual structure of the brain.

MR. WISEMAN:  Your Honor, I am going to object.  I think Dr. Toomer has said he may be at the limit of his expertise, he's read some literature on it.  I don't know that he can really answer those questions.

THE COURT:  Well, let's see if he can.

MR. WISEMAN:  Okay.

THE COURT:  If he can't, if you don't, if you can't answer these, don't answer.

THE WITNESS:  Yeah, I can't answer the question.

THE COURT:  Okay.

BY MR. DOWD:

Q   And so you don't know if there's tests or scans that can be done to determine whether or not there's brain damage on the basis of child abuse?

THE COURT:  I thought you said earlier, I thought he said something earlier it would show up on an MRI or a PET scan or a CAT scan or something.

THE WITNESS:  Yes, yes.

USCA5 3071

THE COURT:  Okay.  Is that what you asked before?

MR. DOWD:  But, Your Honor, I am trying to figure out the level, his, the level of his limitation.

BY MR. DOWD:

Q   You are convinced that there are tests that do that but you just don't know all the --

A   Oh, no, this is, I think I was misunderstood.  What I am saying is that if you expose an individual, an individual who was exposed to that particular kind of traumatic, erratic, unpredictable environment, that individual lives in a state of hyper-vigilance constantly.  As a result of that, being exposed constantly on an ongoing basis, that results in certain physical changes to the brain --

THE COURT:  That's what I understood you to say.

THE WITNESS:  -- that show up on an MRI.

THE COURT:  Yeah, that's what he said.

BY MR. DOWD:

Q   Right.  That show up on a -- right.

A   But it's, but I don't know of individuals who would use that just to see if someone had been abused as a child.

THE COURT:  The doctor that testified, I don't know about the abuse but the doctor that testified the Friday before said that he worked with neurologists and the like because they would find the lesion and he would say or he would help them determine where the lesion was --

USCA5 3072

THE WITNESS:  Where the lesion was, yes.

THE COURT:  -- based on various testing.

THE WITNESS:  Exactly, yes.

THE COURT:  So I assume that you would work together with someone like that?

THE WITNESS:  Yes.

MR. DOWD:  That's all I have, Your Honor.  We'll pass the witness.

MR. WISEMAN:  Nothing further.

THE COURT:  Thank you, sir.  Now you can go.

THE WITNESS:  Thank you, Judge.

THE COURT:  How late do you-all want to go?  You want to call your next witness?

MS. LARIN:  We have one more witness.

MR. WISEMAN:  Yeah, that would be helpful.

THE COURT:  Good.  Go right ahead.

MR. WISEMAN:  Tomorrow is a busy day.

THE COURT:  Pardon?  Is it?

MR. WISEMAN:  Oh, yes.

THE COURT:  Okay.  Who is the next witness?

MS. LARIN:  She's coming, Your Honor.  Her name is Kathy Kaib.  She's the mitigation expert.

THE COURT:  Oh, okay.  That works in your office?

MS. LARIN:  Yes.

THE COURT:  Okay, thanks.

**USCA5 3073**

MS. LARIN:  And if you don't mind, I am going to use my computer.

THE COURT:  That's why the podium is there.

MS. LARIN:  Okay, great.

THE COURT:  And there's an electrical outlet there also and a modem.

MS. LARIN:  I won't be here that long.  Hopefully we can just rely on the battery and I will be done.

THE COURT:  Okay.  How many more experts did you want to testify today, do you know?

MS. LARIN:  This is it.

THE COURT:  This is it?  Okay, good, so we're on schedule.

MS. LARIN:  Yes.

THE COURT:  Okay.

MS. LARIN:  We're on schedule for a long day.

THE COURT:  Pardon?

MS. LARIN:  For a long day.

THE COURT:  No, no, I want to make sure that we've got the time that we've given you, all the time you need.

MS. LARIN:  We're working on it.

THE COURT:  How many tomorrow witnesses do you have?

MS. LARIN:  Wait a minute, we've got it.  We have Dr. Cunningham.  We have Dr. Cunningham.  We have many family members.

USCA5 3074

THE COURT:  Okay.

MS. LARIN:  Probably about eight family members.
Dr. Cunningham.

MR. ABREU:  Elizabeth Johnson is scheduled to
testify tomorrow.  Dr. Dailey.

THE COURT:  Could you come forward, please, ma'am.

THE CLERK:  Please raise you right hand.

THE COURT:  How late do you-all want to go tonight?
You want to finish this witness?

MR. WISEMAN:  I think we can finish her.

THE COURT:  Anybody else?

MS. LARIN:  No one else.

MR. WISEMAN:  No, no.

THE COURT:  Okay.

KATHLEEN KAIB, PETITIONER/DEFENDANT'S WITNESS, SWORN

THE COURT:  And I gave the Government a day and a
half?

MR. ROBERTS:  Yes, Your Honor.

MR. WISEMAN:  Yes.

THE COURT:  But I read, you know, tonight I will do
the other two hours of Price 1 and 2.  And would you-all,
somebody offer me the Estrada deposition so I can --

MR. WISEMAN:  Yes, we'll do that as soon as Ms. Kaib
is done with it, we'll admit that.

THE COURT:  Okay, thanks.

USCA5 3075

                         DIRECT EXAMINATION

BY MS. LARIN:

Q    Good evening, Ms. Kaib.  Can you please state your name

for the record?

         THE COURT:  Finally.

         MS. LARIN:  I am a beginner so I do these things.

         THE WITNESS:  Kathleen Kaib, K-A-I-B.

BY MS. LARIN:

Q    And, Ms. Kaib, what is your occupation?

A    I am an investigator and a mitigation specialist with the

Federal Defender, Capital Habeas Unit in Philadelphia.

Q    And that means you work in my office?

A    Correct.

Q    And how long have you been working there?

A    For seven years, since 2003.

Q    And prior to that where did you work?

A    I worked at the Women's Law Project, which, as a social

worker, which is an agency that deals mostly with domestic

relations issues such as helping women with domestic

violence, child support, divorce issues.

Q    Okay.  And can you just tell us briefly your education

history?

A    I have a master's in social work from Bryn Mawr and I

also have a master's in law and social policy from the same

institution.

USCA5 3076

THE COURT: From where?

THE WITNESS: Bryn Mawr.

THE COURT: Okay, thank you.

BY MS. LARIN:

Q   And are you a licensed social worker?

THE COURT: Oh, you know, after all the problems with the microphones, could you actually use a, move a little closer? Sometimes I find that if you put your right arm on the shelf there it leans you into the microphone.

THE WITNESS: Thank you.

THE COURT: Thank you.

BY MS. LARIN:

Q   I am doing the same thing with it. Would you like me to repeat anything?

A   No.

Q   Okay.

A   I am licensed in the state of Pennsylvania.

Q   As a social worker?

A   Yes.

Q   Okay. And can you please identify this document? It's marked as, it will be marked as P24.

MS. LARIN: I think I do need a marker.

MR. WISEMAN: I know.

THE COURT: Do you have a marker for her, Ms. Scotch?

BY MS. LARIN:

Q    This is marked as P24.  Can you identify this?

A    That's my CV.

        THE COURT:  Do you want to offer it?

        MS. LARIN:  I would like to offer her CV and I would --

        THE COURT:  Any objections?  Sorry.

        MR. ROBERTS:  No objections, Your Honor.

        THE COURT:  P24 is admitted.

    (Defendant's Exhibit P24 admitted into evidence)

        THE COURT:  I'm sorry I interrupted you.

        MS. LARIN:  No, thank you.

BY MS. LARIN:

Q    And in addition to your years of experience do you regularly attend trainings in the field of social work?

A    Yes, as well as mitigation training.

Q    Okay.  And have you presented at any conferences about mitigation?

A    I have.

Q    And have you testified in court before?

A    Yes, both in State and Federal Court.

Q    And have you been qualified as a mitigation specialist and as a social worker?

A    Yes.

Q    Or in the field of social work I guess.

USCA5 3078

MS. LARIN:  Your Honor, I would like to offer Ms. Kaib as an expert in forensic social work and as a mitigation specialist.

THE COURT:  What is -- I don't know what that means, but is there any objection?

MR. ROBERTS:  Yes, Your Honor.  I'm not sure she is qualified to be a forensic anything at this point.

MS. LARIN:  You know, this came up before.  How about just in the field of social work?

THE COURT:  Could you, as a social, as a field of social work --

MS. LARIN:  And as a mitigation specialist.

THE COURT:  Any objection?

MR. ROBERTS:  To social worker, no, Your Honor.

THE COURT:  Okay.  I don't know about mitigation because I don't know what that means.  I mean I know what it means but I don't know if she's -- visit with Mr. Wiseman just for a second.

MS. LARIN:  Okay, thank you.

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  How about we --

THE COURT:  Why don't I accept her as a social worker and then you can talk to her about mitigation and see what --

MS. LARIN:  Okay.

USCA5 3079

THE COURT:  So then you can help me.

MS. LARIN:  Okay.

BY MS. LARIN:

Q   Maybe we can start there.  Can you please tell us, Ms. Kaib, briefly what is, what does a mitigation specialist do?

A   A mitigation specialist is usually part of the defense team and their job is to, different things but to collect records and things of that nature on the client's life, spend time with the client so they can tell you about their life history, and then go talk to the family members, teachers, and other important people in their life to begin to gather a social history that can be presented to the defense team that can then be given to other experts such as psychologists, psychiatrists and neuropsychologists.

Q   And on that note, are you familiar with Dr. Toomer?

A   Yes, I have worked with him several times.

Q   And has he relied on your work before?

A   Yes.

Q   And you have collaborated together in developing a social history?

A   Yes, several times.

Q   And at our request did you conduct an interview of Mr. Bourgeois' ex-wives and ex-girlfriends?

A   I did.

USCA5 3080

Q    And what was the purpose of those interviews?

A    Basically to gather, to do a mitigation interview, and what that entails is to ask questions about family violence, childhood functioning, adult functioning, mental health issues, any issues of childhood abuse or childhood neglect, and just daily functioning and also just a general social history.

Q    Okay.  And what in general did you learn from these women?

A    I learned that he had, he had volatile relationships with these women, they --

MR. ROBERTS:  Your Honor, I am going to object. It's hearsay and she's an investigator, she's a member of the trial team.

THE COURT:  Sustained.

MS. LARIN:  Your Honor, if I could just respond. One of the issues of this case is about ineffective assistance of counsel and whether they used their mitigation experts, so in part I would like to present Ms. Kaib to present what she could have provided trial counsel if they had utilized their mitigation experts.  And then the point is you take that information and you follow up and you provide it to a mental health expert.  So it's kind of hard to get that information and if we can't, so maybe it's something like, you know, not offering it necessarily for the substance

USCA5 3081

but for the process that she went through.

MR. ROBERTS:  Your Honor, she basically went around and interviewed a bunch of witnesses and now she wants to come here and tell the Court what she found out in her investigation and it's all hearsay and it's unreliable and we've got, or at least one of the affidavits that they submitted we found out is not reliable and we are going to be presenting evidence with regard to that, so I would object to her entire testimony.

MS. LARIN:  Can I respond just one more time?

THE COURT:  Okay, let me think, let me think --

MS. LARIN:  Okay.

THE COURT:  -- how to do this.  It's late, I'm tired.

MS. LARIN:  Yeah, I know.

THE COURT:  Okay, so let me think.

MS. LARIN:  I do have one more thing to add, if you --

THE COURT:  Okay, let me think about this, because I understand that -- I wonder if she could just say, if she can form an opinion.

MS. LARIN:  Well, she is a social worker and she did do interviews.  We could go two ways.  She's a social worker, she did interviews, she has been accepted as a social worker and that's what they do, or we could say it's not being

USCA5 3082

offered for the truth. therefore it's not really hearsay.

THE COURT:  The -- whatever I --

MS. LARIN:  So it's, both accomplish something in this case.

THE COURT:  Whatever I allow in from her I am going to balance it with this:  There was quite a bit of information that several of these witnesses were frightened to come forward at the time of trial that I think was very reliable.

MS. LARIN:  Yes.

THE COURT:  And so if they have something positive to say about Mr. Bourgeois, I am going to view it in that light.  Do you understand?

MS. LARIN:  Yes.  And on the same note, it's another reason why we would rely on Ms. Kaib to present whatever information for whatever value it is rather than asking them to come in today to testify.

THE COURT:  I don't understand why you wouldn't ask them to come in and testify.

MS. LARIN:  Why I would?

THE COURT:  Why you would not.

MS. LARIN:  Well, I thought you just said that they were, might be fearful and --

THE COURT:  Well, are they still fearful?

MS. LARIN:  I don't know.  I was just following up

USCA5 3083

with you.

THE COURT:  But I mean is this something new that I didn't know at time of trial?  Or that the lawyers would not have known at time of trial, because I knew --

MS. LARIN:  No, the lawyers could have known this.  And I think when you hear --

THE COURT:  I mean if I knew it --

MS. LARIN:  -- when you hear --

THE COURT:  -- they had to have known it, right?  Because that's where I would have gotten it.

MS. LARIN:  Really, what this, there's many reasons that we wanted Ms. Kaib to testify but part --

THE COURT:  What would they, tell me what the value of it would have been?

MS. LARIN:  Well, one is as an example of what, how a lawyer could have used a mitigation expert, and in this case --

THE COURT:  Tell me how.  Just, why don't you make an argument about it.

MS. LARIN:  Okay.  So Dr. Toomer --

THE COURT:  If she testifies hypothetically the following --

MS. LARIN:  Yes.

THE COURT:  -- that there was a lot of abuse with the girlfriends --

USCA5 3084

MS. LARIN:  Right.

THE COURT:  -- and the ex-wives --

MS. LARIN:  And it supports a finding of borderline.

THE COURT:  -- what would that mean?  It would what?

MS. LARIN:  It supports Dr. Toomer and Dr. Estrada's testimony about borderline personality disorder.

MR. ROBERTS:  Your Honor, we don't have any problem with borderline personality disorder.

MS. LARIN:  It's not the only evidence, but --

MR. ROBERTS:  In fact, we have acknowledged that that exists, so this is cumulative if that's the purpose of it.

THE COURT:  Then I will accept that proffer.  Is that all right?

MS. LARIN:  Can I just consult with counsel?

THE COURT:  Would you talk with Mr. Wiseman?

(Ms. Larin and Mr. Wiseman conferring off the record)

MS. LARIN:  Thank you.  He missed the whole thing.

MR. WISEMAN:  I'm sorry, Your Honor.

MS. LARIN:  He was so busy thinking, he missed what you said.

THE COURT:  What I, she has been objected to because of hearsay.  I don't have experience with mitigation experts.

MR. WISEMAN:  Right.

THE COURT:  So I don't know if there's a science

USCA5 3085

that qualifies them to do that.  I don't know if that's a recognized science or if it's a recognized area of expertise.  It seems like a recognized area of kind of hearsay.  So my suggestion to your, for your client was that I would hear a proffer from Mr. Bourgeois that corresponds to what I understood at the trial time that these, that she would testify, if allowed to testify, that these girlfriends and ex-wives would testify about domestic abuse from Mr. Bourgeois.

MS. LARIN:  And volatile relationships.

THE COURT:  And volatile relationships, which I think I know from him and I think I know from the trial.

MR. WISEMAN:  Yes.

THE COURT:  So I will accept that proffer.

MR. WISEMAN:  Okay.  And that's fine.  I would just point out that --

THE COURT:  And that, and the whole reason, then you can argue in your closing arguments what that would have done to benefit Mr. Bourgeois at time of trial.  Isn't that the point of this?

MS. LARIN:  Yes.  I mean there's a little bit more information that she --

THE COURT:  Tell me what it is.

MS. LARIN:   She also --

THE COURT:  What do you want her to say?

USCA5 3086

MS. LARIN:  -- as a proffer, she was also going to testify that some of these women told her that Mr. Bourgeois told them, pre-trial and pre-offense, that he was abused as a child.  And also, in her interviewing she noted some evidence of some adaptive deficits that she then brought back to us and encouraged us to retain a mental, an expert in mental retardation.  So there were two other areas.

THE COURT:  Any objection to this proffer?

MR. ROBERTS:  The first part I don't have a problem with, Your Honor.  The second part with regard to her having, coming back and giving them information for adaptive functioning, I have a, I do have an objection to, Your Honor.

MR. WISEMAN:  And, again, Your Honor, it's not being offered for the truth, this is how mitigation specialists work.  They come back -- you look at the ABA guidelines, they say you have a mitigation specialist --

THE COURT:  Okay, okay, look, I am just going to accept this proffer as some information that she received, truth or not truth --

MS. LARIN:  Right.

THE COURT:  -- of the information.

MS. LARIN:  Exactly.

THE COURT:  That you think that her trial attorney should have found out with proper investigation.

MS. LARIN:  Exactly.

USCA5 3087

THE COURT:  That that's what this is for.

MS. LARIN:  That's exactly what it's for.

THE COURT:  Not for the truth of the matter asserted or that she's an expert in mental health or advising you on whether to get mental health evaluations.

MR. WISEMAN:  Well, I, not to put too fine a point on it but I would quibble a little bit with the last part because in Wiggins v Smith, a 2003 Supreme Court case, they, the Supreme Court relied on and acknowledged the testimony of a mitigation specialist and that was being offered for the truth.  There is an emerging, I should say it's emerged, doctrine that allows such folks to testify.

THE COURT:  Well, okay, let's say, let's say this, that she may be qualified to say to you, "This looks, I have a pretty good suspicion that this may involve some mental retardation."

MR. WISEMAN:  Absolutely.

THE COURT:  And that's what tipped you off.

MR. WISEMAN:  There you go.

THE COURT:  I am just going to accept that.

MS. LARIN:  One of the many things.

MR. WISEMAN:  Okay.

MS. LARIN:  Okay.

MR. WISEMAN:  That's great.

THE COURT:  And then if they want to quibble at a

later date that she's not qualified to do that.  But I really think that each one of us would be qualified to do that.  I am not sure that that's an area of expertise.  I mean having represented almost 150 criminal defendants myself, I was pretty --

MS. LARIN:  And she just gets paid for it.

THE COURT:  I figure I was pretty clever about finding out who I thought was mentally retarded and who ought to be examined.

MS. LARIN:  Uh-huh.

THE COURT:  Or certainly who had a mental health issue as well, so I don't think that that's an unusual thing.

MS. LARIN:  I guess the point is, you know, they had a mitigation expert that they could have relied on if they were helping, if they were working together, and --

THE COURT:  But did they have a mental -- I don't remember saying, authorizing a mitigation expert.

MR. ROBERTS:  Yes, you did, Your Honor.

THE COURT:  I did?

MR. ROBERTS:  You did, Your Honor.

THE COURT:  Well, thank goodness.

MR. ROBERTS:  It's on the record.

MS. BOOTH:  Mr. Bierbaum.

THE COURT:  There you have it.  So I gave them everything they asked for, whatever it was.

USCA5 3089

MR. ROBERTS:  In fact, Your Honor --

THE COURT:  Even a jury consultant.

MS. BOOTH:  Yes.

THE COURT:  But I kept thinking, gosh, she looks so mature, so she comes up at the end of her thing and said she wanted to talk to me, that she, that her mother went to high school with me and I thought, oh, great.  That was a kick.  Anyway.

MS. LARIN:  So, I am not quite sure how to proceed.

THE COURT:  I think you may be done.

MS. LARIN:  I'm done, okay.

THE COURT:  That would be my guess.  What do you think?

MS. LARIN:  So my proffer was sufficient, is that -- okay.  Thank you very much, Your Honor.

THE COURT:  That was excellent.

MS. LARIN:  Good job, Ms. Kaib.  Glad we flew you down here.  And I think we are done for the day.

THE COURT:  Because I --

MR. WISEMAN:  Your Honor, we're done for the day.  We would offer up the tape of the Dr. Estrada deposition.  Do you want a transcript as well -- we have that -- or just the tape?

THE COURT:  Could I have the transcript?

MR. WISEMAN:  Oh, absolutely.

USCA5 3090

THE COURT:  I think I am so tired of the videos.  I spent the whole weekend with the videos and I was so glad that there was a mistake with two of the hours.

MR. WISEMAN:  For the record, though, perhaps we should offer the videotape and Your Honor --

THE COURT:  Absolutely.  I think that I would rather -- is it on a CD?

MS. LARIN:  Yes.

THE COURT:  Let me tell you the problem with the CDs.

MS. LARIN:  I think it's on a CD.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  What I had with the CDs for the Government, I had to get our systems people to come over to my house Saturday.

MS. LARIN:  We had similar problems.

THE COURT:  Yeah, and she, you know, downloaded an application so I could watch it.  I don't want that problem again, I'd rather just read it.

MS. LARIN:  Yeah.  So, I think he's looking for the transcript right now, but we have the, we have it all.

THE COURT:  And we can, I certainly will admit the video.

MS. LARIN:  Okay.

USCA5 3091

THE COURT:  Is there any objection?

MR. ROBERTS:  None whatsoever, Your Honor.

MR. WISEMAN:  Your Honor, I am going to mark then as --

MS. LARIN:  I have no idea.

THE COURT:  Do you know what number we might be up to?

MS. LARIN:  163?  163.

MR. WISEMAN:  Okay.  I'm going to mark as 163 two DVD discs which comprise the deposition of Dr. Estrada, and I want to extend my thanks to the Government for accommodating that, 160 --

MS. LARIN:  Three.

MR. WISEMAN:  163.  And 164 I will mark as the transcript of his deposition.

THE COURT:  Do you-all ever take cases from your office of the actual trials or do you always do the 2255s?

MR. WISEMAN:  We do post-conviction with a limited exception.

THE COURT:  Okay.

MR. WISEMAN:  We can occasionally.

MS. LARIN:  Very limited.

MR. WISEMAN:  Although I am rather busy at the moment.

THE COURT:  You did the video also?

USCA5 3092

MR. WISEMAN:  Yes, the video and the deposition. And the transcript.

THE COURT:  163?

MS. LARIN:  163 and 4.

THE COURT:  Petitioner's 163 and 164 are admitted.

(Defendant's Exhibits P163 and P164 admitted into evidence)

MR. WISEMAN:  Thank you, Your Honor.

(Off the record discussion at counsel table)

THE COURT:  And I will read Dr. Estrada's deposition tonight, but I would rather not be expected to do the other two hours of Price tonight.

MS. LARIN:  That is at your leisure, Your Honor.

THE COURT:  Well, I want to do it before he testifies.  If you can give me sort of a heads up when you expect.

MR. ROBERTS:  Your Honor, I think Dr. Price is not going to be on until Wednesday, so, I mean, depending on what their, the way their case goes, obviously it's not going to be, we won't be putting our case on --

THE COURT:  What, when do you think you will be finished?

MR. WISEMAN:  Well, we will probably be finished at noon on Wednesday and that's what we're shooting for, so tomorrow's a busy day --

USCA5 3093

THE COURT:  Do I tell them now?

MR. WISEMAN:  I'm sorry?  Uh-oh.  Tell them about what?  There's something.

THE COURT:  She won't let me tell you, so.  We may have found an extra day.

MR. WISEMAN:  Oh, all right.

THE COURT:  But that doesn't mean you can slow up.

MS. LARIN:  Don't worry.

MR. ROBERTS:  Your Honor, there's also the issue of --

THE COURT:  Or an extra half a day anyway.

MR. ROBERTS:  We might ask to have Dr. Senn taken out of order and --

THE COURT:  Doctor who?

MR. ROBERTS:  Dr. Senn.  He testified at trial.  He was the forensic odentologist.

THE COURT:  Oh, right.

MR. ROBERTS:  And the defense this last couple of weeks had sent us a number of odentology documents.  I had exported those in and all of a sudden Dr. Senn is available, so he is actually going to be present when Dr. Bowers and Dr. Dailey testify.

THE COURT:  When are they going to be testifying?

MR. ROBERTS:  Our understanding was that it would be --

MR. WISEMAN:  Tomorrow.

MR. ABREU:  Tomorrow, Your Honor.

MR. ROBERTS:  And so we would like, if possible and Dr. Senn makes it through this storm, we would ask that he be --

THE COURT:  It's nowhere but right here.

MR. ROBERTS:  We would just ask if there would be an opportunity to take him out of order so he can respond.

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes, Your Honor?

THE COURT:  And we will take, I will take that out of their day-and-a-half at the end.

MR. WISEMAN:  Oh, okay.

THE COURT:  If you let your odentologist testify tomorrow --

MR. WISEMAN:  Your Honor, I --

THE COURT:  Then Dr. Senn.  That's what you want to do?

MR. WISEMAN:  I think we have some separate objections to Dr. Senn relating to a rather late disclosure.

THE COURT:  Tell me.

MR. WISEMAN:  Well, we --

THE COURT:  Do you not want to talk about it now?

MR. WISEMAN:  Well, we certainly can.  I mean I thought we agreed that we were going to give 30 days notice

of experts and exchange Rule 26 disclosures and we found out about, Dr. Senn is not the Government's witness list, we've gotten no disclosure, we obviously know who he is but we weren't prepared for him, and then I think on Friday we got an email, an updated witness list, and Dr. Senn was on it.

THE COURT:  Okay, well, give me, if you got more tomorrow, because my initial thinking is it seems a matter of fundamental fairness to let the Government expert respond.  I don't know if that's true or not, I have to think about it.

MR. WISEMAN:  Okay.

THE COURT:  Because what your experts are attacking is his testimony at trial by saying, defense counsel, you should have known what they are going to testify to already.

MR. WISEMAN:  And we wouldn't have had a problem with him testifying, it's just that we, you know, we prepared and didn't know he was going to testify.  Mr. McHugh, who is as diligent as the day is long, is staying up nights preparing for him and I just don't know that he's going to be ready to the level that he is used to, so.

MR. McHUGH:  And, Your Honor, they have known about Dr. Bowers and Dr. Dailey for years and they never noticed Dr. Senn as testifying in this hearing until Thursday at the end of the day, and that's when they sent us an updated witness list, at the very end of it was Dr. Senn.  Over the weekend is when we got, Mr. Wiseman got the Rule 26

USCA5 3096

compliance, which I don't know is even compliant.

THE COURT:  Well, you know what, I can think of a punishment to do then.  You put on one odentologist, Dr. Senn goes next and you save your best shot to attack whatever he says newly.

MR. McHUGH:   Well, we only have one odentologist.

THE COURT:  Oh, okay.

MR. McHUGH:  That's Dr. Bowers.  Dr. Dailey is an odentologist but he was a fact witness at the time of trial that was contacted by the Government and gave an opinion that they could not exclude or include either of the, any of the three.  Our odentologist is Dr. Bowers that was retained by the defense for the purposes of this hearing.  Dr. Dailey will be brief.  The Government is aware of his affidavit, they have had that for years, and he will testify to his opinion, but the Government got that opinion from him.  He wasn't retained by us, he was retained by the Government.  Dr. Bowers is our one odentologist.

THE COURT:  Well, then it might be appropriate to put Dr. Senn before your odentologist.

MR. WISEMAN:  Well, Your Honor, that raises some logistical issues.  We've got an, tomorrow is the longest day for us, we've got oral all-day witnesses, we have Dr. Cunningham, Dr. Johnson, Kerry Brown, Professor Holden, Bowers and Dailey, so I mean we've got, I don't know how

we're going to get them all in to begin with and --

MR. ROBERTS:  Your Honor, this has kind of gotten out of proportion here.  Dr. Senn's only purpose in being here is to respond or rebut anything Dr. Bowers says about him.  He has been --

THE COURT:  Well, that's fair.

MR. ROBERTS:  He submitted --

THE COURT:  I am just giving you an option of when to, you know, if they don't want to take him out of order, if they're not going to let you take him out of order, I can tell you that you can take him out of order.

MR. ROBERTS:  And there's nothing --

MR. McHUGH:  And, Your Honor, if I may --

MR. ROBERTS:  If I can finish, just briefly.

MR. McHUGH:  Sorry.

MR. ROBERTS:  There's nothing substantive new that Dr. Senn is going to bring in.  We have --

THE COURT:  Well, that's good.

MR. ROBERTS:  We brought, we gave his report, we submitted the report, the April 20th statement, and that's his report.

THE COURT:  Okay.

MR. ROBERTS:  And so he's just here in case Dr. Bowers says something that he needs to rebut, particularly from a professional standpoint.

USCA5 3098

MR. McHUGH:  But, Your Honor, Dr. Senn and the Government has had Dr. Bowers' report talking about Dr. Senn for a couple of years and on Thursday night they tell us they are calling Dr. Senn.  And over the weekend they provided us with what they purport to be Rule 26.  It has no listing of any of his testimony in the last four years, which I understood was the Court's order.

THE COURT:  It is.

MR. McHUGH:  And I have not got that, and I am supposed to cross-examine Dr. Senn, even though they have had Dr. Bowers' compliance with Rule 26.

THE COURT:  And looked up all the depositions and all the other things.

MR. McHUGH:  Exactly.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, that's not exactly correct.  Dr. Senn's CV, his biography that lists all the cases he's testified on, all that was given to them.  They are in exhibits that we have given to the other side, we sent them those, and the only reason --

THE COURT:  When did you send them those?

MR. ROBERTS:  It would have been, it was last week. But the only reason this all came up was because we were given about ten exhibits within the last two weeks that dealt with odentology and when we started looking through them, I

USCA5 3099

sent them to Dr. Senn and said, "What are these?"

THE COURT:  Is this right?

MR. McHUGH:  Your Honor, what those exhibits are, are articles that Dr. Bowers will be testifying to that were cited in his report.  These are, some of the articles are new that were provided to the Government.

THE COURT:  Okay, everybody's doing new stuff, Dr. Senn is going to testify, get ready.

MR. McHUGH:  I understand that but, Your Honor, his CV, I don't have it.  It's not marked as an exhibit for this hearing, as far as I can see, from the Government.  I have not had any opportunity to review any of his transcripts.  They have had years to prepare for Dr. Bowers.  So I bring that to the Court's attention on Thursday night and now they are asking to take him out of order.

THE COURT:  We are not going to take him out of order.  He will go with the Government's time, so you have time to prepare.

MR. McHUGH:  Thank you, Your Honor.

THE COURT:  Are there new updates to his CV?

MR. McHUGH:  I don't know what CV they are talking about because it's not listed as an exhibit of the, that the Government has provided us, as far as I know.

THE COURT:  Okay, hold on.

MR. ROBERTS:  Dr. Senn's CV is at Government Exhibit

173.  Dr. Senn's biography is at 174.  We did provide an additional Rule 26 just to show what information he reviewed in order to get ready for his report but, again, he wasn't being offered as a new witness, and that was in Government Exhibit 171.  So 171, 172 was his report that we offered in April, and then 173 is his CV and 174 is his biography that -- and within that information is listed the cases that he has testified.  And I can go back and pull the emails if the Court's really concerned about when all this information came out, but there's nothing the Government did --

MR. McHUGH:  I have not received them.  I have no, if the emails were sent but I personally did not receive these emails, I don't know when they were sent.  I mean they noticed him Thursday night, so it wasn't sent subsequent to Thursday night?

MR. ROBERTS:  Yes, it was.

MR. McHUGH:  And we traveled on Sunday.

THE COURT:  Don't you travel with your email?  I never go anywhere, I never go anywhere without it.

MR. McHUGH:  It's, the email has been a little spotty because of the storms, I believe, but --

THE COURT:  No.

MR. McHUGH:  If we got it --

THE COURT:  No.

MR. McHUGH:  Well, what I am saying, Your Honor, is

USCA5 3101

to give me their, his prior testimony, I am preparing for my witnesses and to give me his prior testimony and give me Friday, well, we didn't get it until the weekend.

THE COURT:  When did you send it to them?

MR. ROBERTS:  Your Honor, I am going to have to pull the email up but it was, we sent it to Michael Wiseman and --

MR. McHUGH:  On Saturday.

MR. ROBERTS:  And it was not on Saturday.  It was, the documents were sent --

MR. WISEMAN:  My head's spinning.  I think it was Friday or Saturday, I don't remember exactly.

THE COURT:  Okay.

MR. WISEMAN:  I mean the point is, is that it's been within the last couple of days.  And, you know, I forwarded it to Mr. McHugh and I don't know if he --

MR. McHUGH:  And to be able to pull testimony in that short a time is just not possible.  I respect the Court's ruling that he will not be taken out of order and I will do the best job I can if he's called within the Government's case.

THE COURT:  What is his recent testimony?  What's he done?

MR. ROBERTS:  In fact, Your Honor, most of it's, he travels around teaching and he's not really in court that often.

THE COURT:  Well, what cases has he done since he testified in here?

MR. ROBERTS:  I'm going to have to look it up, Your Honor, I don't have it with me.  At page 19 on his CV, which again is Exhibit 173, he lists Texas versus Comorna in April of '08.  He's got a case in October of '07, Texas versus, that's a lot of names.  And then Texas versus Villa in January of '06.

THE COURT:  Okay, Mr. Roberts, let's see, this is Monday night, you put somebody on that all day tomorrow to get that testimony.  It's easier for you to get it, I think, than the petitioner.  It should be all transcribed somewhere with some district attorney, don't you think?

MR. ROBERTS:  I would think, Your Honor.  Again, he's not coming in to give substantive testimony.

MR. McHUGH:  Your Honor, he's testifying --

THE COURT:  Please, don't argue.  We are all on the same page.  Take a deep breath, and he's going to get the testimony.  Maybe.  What else?

MR. WISEMAN:  That's all, I think.

THE COURT:  Thank you all very much, you are excused.

   (The proceedings adjourned at 6:11 p.m., continued
    to 9-21-10)

USCA5 3103

INDEX

WITNESSES
FOR PETITIONER/DEFENDANT:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Dr. Victoria Swanson | 7 | 110 | 171 | |
| Dr. Donald Weiner | 198 | 247 | 263 | |
| Dr. Jethro Toomer | 270 | 325 | 364 | 369 |
| Kathleen Kaib | 379 | | | |

EXHIBITS

|  |  | Admitted |
|---|---|---|
| Petitioner/Defendant's: | | |
| P24 | CV of Kathleen Kaib | 381 |
| P28 | CV of Dr. Toomer | 271 |
| P29 | Report of Dr. Weiner, 3/3/04 | 268 |
| P29A | CV of Dr. Weiner | 199 |
| P33 | Supplemental Report, Dr. Swanson, 8/12/10 | 109 |
| P34 | Raw Data, Dr. Swanson, 3/25/09 | 109 |
| P35 | Additional Raw Data, Dr. Swanson | 109 |
| P36 | CV of Dr. Swanson | 7 |
| P136 | Materials Relied Upon, Dr. Swanson | 109 |
| P154 | Chart of Ranges for WAIS-IV/WAIS-III | 268 |
| P155 | Comparative Chart IQ Testing, Dr. Weiner/ Dr. Gelbort | 109 |
| P156 | Dr. Weiner's File | 268 |
| P159 | Phrase written by Mr. Bourgeois dictated timed by Dr. Swanson | 109 |
| P160 | Intellectual Disability, Definition, Classification and Systems of Support, p43 | 109 |
| P161 | Phrase written by Mr. Bourgeois prompted by Dr. Swanson | 109 |
| P162 | Report of Dr. Price | 184 |
| P163 | Oral and Videotaped Deposition of Dr. Estrada | 396 |
| P164 | Transcript - Deposition of Dr. Estrada | 396 |
| Respondent/Government's: | | |
| 175 | Swanson Report | 115 |
| 201 | Diagnostic Criteria for 301.20 Schizoid Personality Disorder | 372 |

USCA5 3104

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


  /s/ Judith M. Garcia                    November 5, 2010

USCA5 3105

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL ACTION |
| | ) | |
| PLAINTIFF, | ) | CR-C-02-216(1) |
| | ) | |
| VS. | ) | CORPUS CHRISTI, TEXAS |
| | ) | SEPTEMBER 23, 2010 |
| ALFRED BOURGEOIS, | ) | 8:53 A.M. |
| | ) | |
| DEFENDANT. | ) | |
| ..............................) | | |

TRANSCRIPT OF EVIDENTIARY HEARING – DAY 4
BEFORE THE HONORABLE JANIS GRAHAM JACK, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

APPEARANCES FOR:

THE GOVERNMENT:                 MR. TONY ROBERTS
                                MS. ELSA SALINAS
                                MS. PATTI HUBERT BOOTH
                                MR. MARK DOWD
                                ASSISTANT U.S. ATTORNEYS
                                800 N. SHORELINE, STE 500
                                CORPUS CHRISTI, TEXAS 78401


THE DEFENDANT:                  MR. MICHAEL WISEMAN
                                MR. VICTOR J. ABREU
                                MS. ELIZABETH LARIN
                                MR. JAMES McHUGH
                                ASSISTANT FEDERAL DEFENDERS
                                SUITE 545 WEST, CURTIS BUILDING
                                601 WALNUT STREET
                                PHILADELPHIA, PENNSYLVANIA 19106


THE COURT RECORDER:             MS. VELMA GANO




PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:  GARCIA
SERVICES, P.O. BOX 351, ROCKPORT, TEXAS 78381, 361-463-9790

USCA5 3106

(The proceedings began at 8:53 a.m., continued from 9-22-10)

MR. ABREU:  Some preliminary motions we'd like to request, but I don't see Mr. Dowd, who I think --

THE COURT:  The other reasonable person?

MR. ABREU:  Who I think will probably be responding.

MR. WISEMAN:  I can, I have something to do.

THE COURT:  Good.

MR. WISEMAN:  We put up on the screen at the end --

THE COURT:  Oh, Mr., here's Mr. Bourgeois.  Okay.

MR. WISEMAN:  At the end of yesterday we put up on the screen an intake sheet from Dr. Estrada showing when the Government retained him and I would like to offer it as Petitioner's 171, a one-page exhibit.

THE COURT:  Ms. Booth?

MS. BOOTH:  Oh, no objection, Your Honor.

THE COURT:  P171 is admitted.

(Defendant's Exhibit P171 admitted into evidence)

(The case was called)

THE CLERK:  May I have appearances, please?

MS. BOOTH:  Patti Hubert Booth for the United States.

MR. ABREU:  Good morning.  Victor Abreu on behalf of Mr. Bourgeois.

MR. WISEMAN:  Michael Wiseman and Elizabeth Larin

USCA5 3107

and James McHugh as well.

THE COURT:  Thank you.  We are awaiting the arrival of Mr. Dowd.

MR. ABREU:  Yes, Your Honor.

THE COURT:  Who is being reasonably late.

(Off the record discussion at counsel table)

MS. BOOTH:  If you want to, Judge, I have a witness here and I can do it by myself without help.

THE COURT:  Sure.  Go ahead.

MS. BOOTH:  The United States would call Mr. Clark to the stand.

THE COURT:  Would you administer the oath, Ms. Scotch.

THE CLERK:  Yes, Your Honor.

DANNY CLARK, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE COURT:  Could you speak up, please, sir?

THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.  Please be seated.

MS. BOOTH:  And, Mr. Clark, when you get around, do not touch the microphone.

THE WITNESS:  Yes, ma'am.

MS. BOOTH:  It comes right into the ears of the recorder and a bang is an explosion in her head.

THE WITNESS:  Yes, ma'am.

THE COURT:  And if you could just lean forward and

put your right arm on that shelf there, then you are right in the microphone.  Thank you, sir.

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION

BY MS. BOOTH:

Q   Good morning, Mr. Clark.  Could you please state your full name for the record?

A   Danny Lee Clark.

Q   And what do you do for a living, Mr. Clark?

A   Truck driver.

Q   How long have you been a truck driver?

A   Twenty-seven years.

Q   And during this 27 years, could you tell me the name of the companies that you have worked for?

A   Hall Systems, U.S. Express, R.E. Garrison.

Q   And when you worked -- do you know a person by the name of Alfred Bourgeois?

A   Yes, ma'am.

Q   And when you worked for Hall Systems, did you work with Alfred Bourgeois?

A   Yes, ma'am.

Q   When you worked for U.S. Express, did you work with Mr. Bourgeois?

A   Yes, ma'am.

Q   When you worked at R.E. Garrison, did you work with

USCA5 3109

Mr. Bourgeois?

A    Yes, ma'am.

Q    All right.  And what was Mr. Bourgeois' job?

A    A truck driver.

Q    All right.  Did you have an opportunity to observe him during this -- and this period from Hall Systems to R.E. Garrison, was that a period, how many years approximately would that be?

A    Oh, 15, 16 years, I guess.

Q    Okay.  And during that period of time you knew Mr. Bourgeois?

A    Yes, ma'am.

Q    Would you consider Mr. Bourgeois a friend of yours?

A    Yes, ma'am.

Q    And a co-worker?

A    Yes, ma'am.

Q    Did --

        MR. WISEMAN:  Objection to leading, Your Honor.

        THE COURT:  Sustained.  Well, these are kind of preliminary matters but let's stop that, please.

        MS. BOOTH:  Yes, Your Honor.

BY MS. BOOTH:

Q    Did you have an opportunity to observe him driving an 18-wheeler?

A    Different places that we would go.

USCA5 3110

Q    And did you ever ride with him in an 18-wheeler?

A    Once or twice, down to the store or something like that.

Q    All right.  And let me ask you, you drove an 18-wheeler, would you, did you go the same routes that Mr. Bourgeois or different routes?

A    We went different routes.

Q    And would you at certain times, did you ever meet at different terminals?

A    Yes, ma'am.

Q    And when you would meet at those terminals, did you ever have an opportunity to go eat with Mr. Bourgeois or do something that was kind of like --

        MR. WISEMAN:  Objection to leading, Your Honor.

BY MS. BOOTH:

Q    Did you ever have an opportunity to eat with Mr. Bourgeois?

        THE COURT:  Overruled.

BY MS. BOOTH:

Q    Did you ever have an opportunity to eat --

A    Yes, ma'am.

Q    On one or many or several occasions?

A    Oh, several occasions.

Q    All right.  And how would this happen?  Did you-all go out to eat, did you go buy something to fix, how would that happen?

**USCA5 3111**

A    Sometimes we went out, you know, got something, you know, like normal truck drivers will do.

Q    Okay.  Did you ever -- I think I asked you that question -- did you ever have an opportunity to ride with him in an 18-wheeler?

A    Once or twice, down to the store or something.

Q    All right.  Did you fear for your life when he was driving?

A    No, ma'am.

Q    Would you consider him a competent truck driver?

A    Yes, ma'am.

Q    Is this -- and let me ask you, in the world of truck driving do, do truck drivers gossip about each other's abilities?

A    Oh, yes.

Q    And if you were a dud, a loser, always screwing up, would that have gotten around in the truck driving circles?

MR. WISEMAN:  Objection, Your Honor, that calls for a hearsay response.  She's offering it for the truth.

THE COURT:  Wait a minute, I'm trying to figure out if that is hearsay.

MS. BOOTH:  I guess I'm asking --

THE COURT:  She's not asking for the words, she's asking --

MS. BOOTH:  Actually, I'm asking a reputation

USCA5 3112

question, Your Honor.

THE COURT:  A kind of a reputation question.

MR. WISEMAN:  I think it's a reputation built on what was said and she's offering it for the truth, so I think it's hearsay.  I mean she can certainly question this witness about his impressions of Mr. Bourgeois' ability.

THE COURT:  Okay, sustained.

BY MS. BOOTH:

Q   And what was your impression --

THE COURT:  Sorry, I'm slower this morning than I thought.

BY MS. BOOTH:

Q   What was your impression of Mr. Bourgeois as far as a truck driver and his ability?

A   Everything's fine, good person.

Q   And did you ever have an opportunity to be around when he turned in paperwork?

A   No.

Q   Did he ever come to you and say, "I don't understand my paperwork, could you help me do it?"

A   No, ma'am.

Q   If you would have had a question on some of the paperwork that you would have been doing, would Mr. Bourgeois have been a person that you could have gone to to ask?

A   Yes.

Q    All right.  Did you ever have an opportunity to see how Mr. Bourgeois dressed?

A    Yes.

Q    And how did he look?

A    Presentable.

Q    How about his truck?  How did he keep the inside of his truck?  Did you have an opportunity to observe that?

A    Oh, maybe once or twice.  He kept things in good shape.

Q    Okay.  Did Mr. Bourgeois have a sense of humor?

A    Yeah.

Q    Did you enjoy his company?

A    Yes.

Q    Did you ever have a cookout?

A    Sometimes at some of the terminals we would.

Q    Okay.  And did Mr. Bourgeois do some of the cooking?

A    Maybe once or twice.

Q    All right.  Did you --

A    Help out.

Q    Did you have any problem with his cooking?

A    No, ma'am.

         MS. BOOTH:  I pass the witness, Your Honor.

         THE COURT:  Mr. Wiseman?

                 CROSS-EXAMINATION

BY MR. WISEMAN:

Q    Good morning, Mr. Clark.

USCA5 3114

A    Morning.  How you doing?

Q    Good.  You recall we met a couple of weeks back, three weeks or so?

A    Yes, sir.

Q    In Birmingham, Alabama?

A    Yes, sir.

Q    Or actually it may have been the outskirts.  You indicated that you -- well, first of all, when did you first know Mr. Bourgeois?  How old was he, do you think, when you first met him?

A    I don't know how old he was.

Q    He was a grownup?

A    Yes.

Q    All right.  You met him on the job?

A    Yes, sir.

Q    You didn't know him as a child?

A    Sir?

Q    You didn't know him as a child?

A    Oh, no, sir.

Q    And you never socialized with him outside of work, never went to his house?

A    Not at his house, no, sir.

Q    When you had occasion to interact with Mr. Bourgeois, that would have been once every week or two?

A    Yes, sir.

USCA5 3115

Q   And on those occasions you would maybe at most spend 20 to 30 minutes with him?

A   Give or take.  Sometimes a little bit longer.

THE COURT:  Sometimes what?

THE WITNESS:  A little bit longer, like if we could --

THE COURT:  Thank you.

MR. WISEMAN:  Your Honor, I'm going to mark as an exhibit Petitioner's 172.  I'll offer a copy to Ms. Booth.

BY MR. WISEMAN:

Q   Sir, if you look up on either the screen in front of you or the screen up on the wall, you will see the document that I have put up there.  I'm just going to zoom out so we can see a bunch of it.  That's says "Declaration of Danny Clark." It's two pages.  That's your signature on the back page?

A   Yes, sir.

Q   And it's dated Birmingham, Alabama, September 1st, 2010?

A   Yes, sir.

Q   And it's witnessed by Pamela Tucker, investigator, it says?

A   Yes, sir.

Q   Okay.  You recall when you and I sat down and you gave me this statement?

A   Yes, sir.

Q   Okay.  And just so the Court understands how this came

USCA5 3116

about, we met, I think it was at the Denny's, at the truck stop?

A    Yes, sir.

Q    And we talked for a while?  You have to answer.

A    Yes, sir.

Q    Okay.  And after we talked for a while you graciously agreed to meet with us again?

A    Yes, sir.

Q    And at that point I presented you with this document?

A    Yes, sir.

Q    And you read the document?

A    Yes, sir.

Q    And in fact on that first page you made a change from what I thought you had said, Alfred had been working at Garrison Trucking for about a year, you changed that to several months and you initialed it?

A    Yes, sir.

Q    Okay.  So you knew this was an important document, you read it carefully and, you know, it's what you told me?

A    Yes, sir.

Q    Okay.  I just want to draw your attention to the last line there, and I'll zoom in a little bit.  The last sentence at the bottom of my finger, it said, "I would say during those times that we would spend between 20 to 30 minutes."

A    Yes, sir.

USCA5 3117

Clark - Cross                                    13

Q    So your encounters with Mr. Bourgeois while you knew him at that time were once, or once or, every week or two for a maximum of 30 minutes?

A    Yeah.

Q    Okay.

A    Yes, sir.

Q    And during those times when you saw him, you saw him to go out and get a bite to eat?  You would eat with him?

A    Yes, on and off, yes.

Q    So, just so we understand, you would run into him at various terminals?

A    Yes, sir.

Q    And you would have some down time?

A    Yes, sir.

Q    Okay.  And the two of you, and I imagine others, would get together and go out and grab a bite?

A    Yes, sir.

Q    Okay.  And that's really the extent of your interactions with Mr. Bourgeois in that setting?

A    Yeah, at different terminals.

Q    Okay.  You said you were inside his truck once or twice?

A    Yeah.  Yes, sir.

Q    Did you ever go to him to ask about paperwork?

A    No, sir.

Q    How do you know that you would have gone to him?  What

USCA5 3118

makes you say you would have gone to him?

A   Well, I could have.  I thought he, he's a good person, you know.  I wouldn't have had any problem going to him.

Q   Okay.  But you didn't really know his ability to complete paperwork?  Did you ever see him do paperwork?

A   No, sir.

Q   All right.  So you really don't know if he could do paperwork?

A   No.

Q   Okay.  You drove with him once or twice?

A   Yes, sir.

Q   And there were no incidents in that, in those occasions?

A   No, sir, there wasn't.

Q   And you have no knowledge as to whether he may have had multiple accidents on other occasions?

A   No, sir.

Q   And you don't know if his truck was hanging off a cliff in, or in a ditch in the mountains of Tennessee?

A   No, sir.

Q   Never heard about that?

A   Excuse me?

Q   You never heard about that story?

A   No, sir.

Q   Do you know a Donald Reese?

A   Donald Reese?

USCA5 3119

Q    Yeah.   I'm just wondering how big the community is of truckers.

A    No, sir.

Q    Okay.

        THE COURT:   Is he a friend of yours?

        MR. WISEMAN:   Of mine?

        THE COURT:   Yes.

        MR. WISEMAN:   Oh, no, he was the witness who testified.

        THE COURT:   Oh, sorry.

        MR. WISEMAN:   Well, he was a very nice fellow and I'm sure we could have been friends, but.

        THE COURT:   Sorry.

        MR. WISEMAN:   That's all right.

BY MR. WISEMAN:

Q    Do you remember receiving some phone calls from a Dr. Moore working for the Government?

A    Yes, sir.

Q    And he asked you some questions about Mr. Bourgeois?

A    Yes, sir.

Q    Okay.   And that was on the telephone?

A    Yes, sir.

Q    You never met personally, face-to-face, with Dr. Moore, did you?

A    Yes, sir.

USCA5 3120

Q    You did meet personally?

A    Yes, sir, I met with him.

Q    Okay.  So, would it be fair to say that you had two telephone calls and one face-to-face meeting?

A    Yes, sir.

Q    And would that have been in the beginning to mid July of this year?

A    Yes, I guess it was.

Q    Okay.  And after the first time you spoke with him -- if I told you it was July 7th, would you have any reason to dispute that?

A    No, I wouldn't dispute it.

Q    Where did you meet with him that first time?

A    I met with him at Wood Frutticher Produce Warehouse.

Q    Okay.  And he asked you questions about Mr. Bourgeois?

A    Yes.

Q    All right.  Now, I want to direct your attention to the very first time you had contact with him.  That was on the telephone, right?

A    Yes, sir.

Q    And that was a relatively short call?

A    Yes, sir.

Q    And subsequent, after that you had the meeting with him in person?

A    Yes, sir.

USCA5 3121

Q    And that was a longer meeting?

A    Yes, sir.

Q    And do you remember he asked you to complete a form or a test relevant to your knowledge of Mr. Bourgeois?

A    Yes, sir.

Q    And did he give you the test and sit down with you while you completed it or did he give it to you and say, "Do it at your leisure and send it back to me"?

A    He gave it to me and he sit over from me while I did it.

Q    All right.  And then you gave it back to him?

A    Yes, sir.

Q    Okay.  And after that, did you get another phone call from him?

A    Yes, sir.

Q    And tell us what happened in that last -- well, that was the last time you had contact with him prior to coming to Corpus Christi?

A    Yes, sir.

Q    Okay.  Tell us what happened in that last telephone contact.

A    Well, the questionnaire that I filled out, I guess I didn't complete it, and he called me and told me that he was going to send it back to me to finish completing.

Q    Okay.  So he explained to you that it was incomplete?

A    Yeah, some parts of it.

USCA5 3122

MS. BOOTH:  Your Honor, I'm going to object if he tries to offer this declaration.  I was never presented with this declaration until this moment.

MR. WISEMAN:  I'm not offering it, Your Honor.  I'm not offering it.  It's used for impeachment purposes.

BY MR. WISEMAN:

Q   Now, the first time you completed a test with regard to Mr. Bourgeois -- I'm going to put up for you a document.  I guess I'm going to mark it, we'll call it P173.  Does this look like one of the forms that you filled out for Dr. Moore?

A   Yes, sir.

Q   And it's got your name on it?

A   Yes, sir.

Q   And you're the rater, it says "Rater's name."  I'm going to turn --

MR. WISEMAN:  Actually, I'm sorry, Your Honor, that's the wrong document.  I want to mark 174.

BY MR. WISEMAN:

Q   And this looks like the same document, it's got your name on it, Danny Clark?

A   Yes, sir.

Q   I want to turn to the part of the document that says, it's a little hard to see so I'll rip it.  It says "Work."  So --

MR. WISEMAN:  Your Honor, I seem to have misplaced

USCA5 3123

an exhibit.  I'm going to need a minute.

THE COURT:  Take your time.

MR. WISEMAN:  Thank you, Your Honor.  Your Honor, I've got the document I want on my computer so I'm going to plug it in, if that's all right.  Ms. Scotch, how could I get this to project?

THE COURT:  Have you got the -- okay.

MR. WISEMAN:  I apologize for this, Your Honor.  I thought I had this all lined up.

THE COURT:  I knew you could make a mistake from time to time.

MR. WISEMAN:  Okay, now I've got what I want.  I'm going to ask the Court to deem this to be 175 and I will produce a hard copy.  This is, for counsel --

THE COURT:  If it's hooked up, can he run it through our printer or not?

MR. WISEMAN:  Oh, that would be great.

THE COURT:  Ms. Scotch?

(Court conferring off the record with clerk)

THE COURT:  Just fixing up the toner.

MR. WISEMAN:  Should I proceed or wait?

THE COURT:  Yes, please, go ahead.

BY MR. WISEMAN:

Q    Mr. Clark, this is the document on my computer that I was trying to show you.  This is the section where it asks you to

rate Mr. Bourgeois on his activities at work.

A    Okay, yes, sir.

Q    Okay.  And do you remember the rating scale that Dr. Moore explained to you?  The numbers there, 0, 1, 2, 3 or guess?

A    Yes, sir.

Q    Okay.  What was your understanding of, at that time, what those rating scales meant?  In other words, when you said he never did something, is not able or sometimes or always, what did you understand that to mean?

A    Just I guess from me knowing him and being around him, you know.

MS. BOOTH:  I guess, Your Honor, I'm going to be objecting to the use of the raw data in the courtroom.  This was between a psychologist and an interviewee and this is not information that should be -- he's not an expert, and I just never had this come up, Your Honor.  I'm understanding from our psychologist that this is, it should have been information that he will testify to and not a civilian witness.  It's like he's readministering the test here.

MR. WISEMAN:  Well, Your Honor --

THE COURT:  Sustained.

BY MR. WISEMAN:

Q    On this particular page, sir, do you see that you, you rated Mr. Bourgeois with a number of 2s?  One, two, three,

four, five, six, seven, eight.  You rated him with eight number 2s, do you see that?

A    Yes, sir.

Q    Okay.  And the rest you rated as number 3?

A    Yes, sir.

Q    Okay.  And you guessed on a couple of the items?

A    Yes, sir.

Q    After you completed this particular form, Dr. Moore called you again, right, spoke to you on the phone?

A    Yes, sir.

Q    And he told you that you had not completed the form?

A    Yes, sir.

Q    And he asked you if you would do it again and complete it?

A    Yes, sir.

Q    Did he tell you anything in particular with regard to -- and you agreed to do it a second time?

A    Yes, sir.

Q    And you in fact did it a second time?

A    Yes, sir.

Q    And prior to doing it -- he mailed it to you that time?

A    Yeah, he mailed it to me.

Q    Okay.  And prior to completing it he explained --

        THE COURT:  Would you take down the exhibit please.

        MR. WISEMAN:  Oh.

USCA5 3126

THE COURT:  Thank you.

MS. BOOTH:  Your Honor, could we have just a moment to formulate a -- would it be okay if I have Mr. -- could I just speak to Mr. Roberts just for a moment?

THE COURT:  Yes.

MS. BOOTH:  This raw data that was produced by the psychologist was then sent to the psychologist, Dr. Swanson, for Mr. Wiseman.  The way I'm going to, what I want to object to, and if I misspeak I hope I get a note from my co-counsel, is that this infor-, these, this raw data is sealed and goes from psychologist to psychologist, he has actually said, and should not have been -- but I don't believe that Dr. Swanson should have delivered the raw data to Mr. Wiseman.  That's the way I'm understanding my objection.

THE COURT:  Well, I guess he paid for it, so.

MR. WISEMAN:  Well, Your Honor, it's not sealed in the sense the Court didn't seal it.  It's typically not distributed to the community but certainly as counsel for Mr. Bourgeois I should have an opportunity to question the person who administered the, took the test, to see what he answered.

THE COURT:  That's not, that's not his test.

MR. WISEMAN:  Oh, well, it's his test about Mr. Bourgeois.  He was the responder.

THE COURT:  Oh.

USCA5 3127

MS. BOOTH:  It's a test that he took with the --

MR. WISEMAN:  Oh, no, it's not about him, it's about his understanding of Mr. Bourgeois.

MS. BOOTH:  Understanding of Mr. Bourgeois.  So --

MR. WISEMAN:  This is the ABAS test, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Can I just say one thing, Your Honor?

MR. WISEMAN:  Your Honor --

THE COURT:  Only one person.

MR. ROBERTS:  I understand.

THE COURT:  I did this with Mr. Wiseman the other day.

MR. ROBERTS:  Yes, Your Honor.

(Off the record discussion at counsel table)

BY MR. WISEMAN:

Q   Mr. Clark, I want to put up before you again the page from the second test.

MR. WISEMAN:  Could we get that up?  How do I get that to display?  Oh, I have to disconnect this or --

MS. BOOTH:  Your Honor, we are asking that this information, this test that was, this psychological examination that was given to Mr. Clark be sealed.  This is something that should be sealed and not part of open records.

MR. WISEMAN:  Your Honor, I have no problem if the Court wants to seal it after I'm done with it.  I don't want

USCA5 3128

to give out copies on the street.  I mean I just want to use it to examine the witness to see if he answered consistently, to see if Dr. Moore interpreted his scores correctly, to see if Dr. Moore reported his scores correctly.  I need to be able to confront the witness and this could in effect be an inconsistent statement.  We are about to show, in fact, it is an inconsistent response.

THE COURT:  Go ahead.

MR. WISEMAN:  Thank you.

BY MR. WISEMAN:

Q   This is the same section of the test for the second time you completed it and you can see there, Mr. Clark, that you responded to 3 in every single category, is that right?

A   Yes, sir.

Q   And on the first one you indicated you guessed twice and on this one you guessed once.  Do you have any -- let me do a quick comparison here.  You guessed for number 16 on both of them but on the second one you didn't guess for the question, "Starts back to work willingly after taking a break for lunch," but on the first one you guessed.  What information did you come across that caused you to change your response from a guess to a non-guess?  Did you learn something new?

A   No.  I actually read more into the question and that's how I came, I determined my answer.

Q   Now, this test asks you about several areas of

USCA5 3129

Mr. Bourgeois' abilities.  Do you remember that?

A    Yes, sir.

Q    Okay.  And one of them was community use.  Do you recall that?

A    I think so.

Q    Okay.  Let me put it up and I want to ask that.

A    Okay.

Q    How you guessed.  And there's community use, right?

A    Yes, sir.

Q    Okay.  And you see that you guessed six times with regard to community use?

A    Yes, sir.

Q    All right.  So you really weren't that familiar with how Mr. Bourgeois used the community, were you?

A    Not, not how he used community at home, no.

Q    And in this section, functional academics, which asked 27 questions, you guessed six times?

A    Yes, sir.

Q    And that's out of 27, and I assume where you guessed there you again really didn't know how Mr. Bourgeois functioned academically?

A    No, sir.

Q    The next section is home living, which has nine responses on the first page and then it continues on, you guessed 14 times out of 23, so I take it from that you really didn't

USCA5 3130

know much about how he functioned at home?

A    No, sir, I didn't.

Q    And that's why you guessed.  Health and safety you guessed four times, is that right?

A    Yes, sir.

Q    And did you ever see Mr. Bourgeois carry scissors?

A    No, sir.

Q    So you were guessing when you checked that he always carries scissors safely?

A    Yes, sir.

Q    Did you ever, do you recall ever seeing him test hot food before he ate?

A    Test hot food?

Q    Yeah.  Do you have a recollection of that?  I'm sorry?

A    No, sir, I didn't.

Q    All right, but you didn't guess on that one, you put that he always tests hot food before eating.

A    Yes.

Q    So why did you, why did you say he always does something that you never saw him do?

A    Well, me knowing him, the kind of person that he were, that's why that I, that's why I put that answer there.

Q    All right.  And in the next section, leisure, you guessed nine times out of 23?

A    Yes, sir.

Q    And then the next section, self-care, you guessed five times out of 25 times.  Is that right?

A    Yes, sir.

Q    Did you ever see Mr. Bourgeois wash his hair?

A    Wash his hair?

Q    Yeah.

A    No.

Q    Under self-direction, looks to me like you guessed 11 times out of 25 times.  Is that right?

A    Yes, sir.

Q    On question number 9, which you did not indicate a guess, you said that he always controls his anger when another person breaks the rules in games and other fun activities. Did you ever --

THE COURT:  Do you have that same test for the other witness that testified?

MR. WISEMAN:  For which witness?

MS. SALINAS:  Beverly Frank.  I'm sorry.

THE COURT:  Ms. Frank?

MR. WISEMAN:  Yes, we do.

THE COURT:  Would you give that to the U.S. Attorney, please?

MR. WISEMAN:  Okay.

MS. BOOTH:  No, the problem that we have, Your Honor, is that our, our expert has released these tests and

USCA5 3132

these evaluations to Dr. Swanson. Dr. Swanson sent her tests and her raw data to our expert. But it is unethical for the psychologist to release the raw data like that and so our expert didn't, did not release Dr. Swanson's to us.

MR. WISEMAN: Your Honor, that's an incorrect statement.

MS. BOOTH: And that is the concern that's at the Government's table.

THE COURT: Okay, well, then what you need to do is make sure you have the raw data.

MR. WISEMAN: And we provided it, I mean they have to get it from their doctor.

MS. BOOTH: Obviously the ethics of the psychologists --

THE COURT: Are different.

MS. BOOTH: Are different, yes, Your Honor.

THE COURT: So then you need to get them from Mr. Wiseman, the raw data. Do you have that with you today?

MR. WISEMAN: Sure. I mean I don't know if we --

THE COURT: Would you provide it?

MR. WISEMAN: If we have the ample copies. I don't want to give them my own copy but we can certainly get copies.

MS. BOOTH: Well, if they give us their copies, Your Honor, I swear that we will copy them and then return them --

USCA5 3133

Clark - Cross                                    29

MR. WISEMAN:  Okay, that's fine, we can do that.

MS. BOOTH:  -- in the condition in which we got them.

BY MR. WISEMAN:

Q   So my question was, did you ever play any games or other fun activities with Mr. Bourgeois that had rules?

A   That had rules?  No.

Q   All right.  So you really don't know whether he controls his anger when another person breaks the rules, do you?

A   No, I never seen him angry.

Q   Okay.  Now, you did socialize a little bit with Mr. Bourgeois, I imagine, in those instances in which you had meals with him and such?

A   Yes, sir.

Q   Call that socializing.  You guessed in that category seven out of 23 times?

A   Yes, sir.

Q   Do you recall an instance where he stated to you that others seemed happy, sad, scared or angry?  Do you have a recollection of that?

A   Not really.

Q   And by the way, when Dr. Moore gave you this test he asked you to rate Mr. Bourgeois' conduct as you recollected it on March the 1st, 2002?  Do you remember that?

A   Yes, sir.

USCA5 3134

Q    All right.  And that's where it says "Today's date"?

A    Yes, sir.

Q    So he was asking you to think back eight years and recall how Mr. Bourgeois was on those occasions, right?  Is that right?

A    Yes, sir.

        THE COURT:  How long ago did he take this test?

        MR. WISEMAN:  This would have been taken in July, I believe.

        THE COURT:  Okay.

        MR. WISEMAN:  I think that's all I have, Your Honor. Thank you, Mr. Clark, I appreciate it.

        THE WITNESS:  Yes, sir.

        THE COURT:  Thank you.

        MR. WISEMAN:  Let me just unplug here.

                    REDIRECT EXAMINATION

BY MS. BOOTH:

Q    Mr. Clark, your exposure to Mr. Bourgeois was over, the last time you had contact with him would have been in 2002?

A    Yes, ma'am.

        MR. WISEMAN:  Objection to leading, Your Honor.

BY MS. BOOTH:

Q    When was the last time you had contact with him?

        MR. WISEMAN:  Objection to -- oh.

USCA5 3135

BY MS. BOOTH:

Q   What year?

A   2002.

Q   And, so 2002 was the last time, and you worked with him at how many different organizations?

A   Three.

Q   And that was over a period of how many years?

A   Altogether, about 15 years.

Q   And so, did you follow him to another job or did he follow you to another job?

MR. WISEMAN:  Objection to the characterization --

MS. BOOTH:  Or to a --

MR. WISEMAN:  -- follow, Your Honor.

THE WITNESS:  No.

MR. WISEMAN:  Objection --

BY MS. BOOTH:

Q   How did that work that you --

MR. WISEMAN:  Objection to the question, Your Honor.

THE COURT:  She just changed the question.

MR. WISEMAN:  Oh, I'm sorry, I didn't hear that.

THE COURT:  Keep up.

BY MS. BOOTH:

Q   How did it work that you two individuals ended up working at three of the same trucking companies?

A   Well, at Hall Systems, sold out part of their business to

USCA5 3136

U.S. Express, so we all were still there and it was like Hall Systems/U.S. Express.  After that I left and went to R.E. Garrison.  Later, Mr. Bourgeois came to R.E. Garrison.

Q    And were you glad to see him when he showed up at R.E. Garrison?

A    Oh, yes, ma'am.

Q    All right.  And so your contact with him was over, I think you -- what did you testify to, how many years did you get to work with Mr. Bourgeois?

A    On and off, about 15.

Q    All right.  And during that period of time did you ever run, did you ever drive the same routes that Mr. Bourgeois drove?

        MR. WISEMAN:  Asked and answered on direct, Your Honor.  He already testified that he --

        THE COURT:  Yes, sustained.

BY MS. BOOTH:

Q    How many times do you think in those eight years that you saw Mr. Bourgeois?  Did you see him every week?  Once a week?

A    Maybe once, maybe twice every two weeks, maybe.

Q    Twice every two weeks, so that would be once a week?

A    About once a week, yeah.

Q    So there's 52 weeks in a year?

A    Yes, ma'am.

Q    And 52 times 15 is about how many times you had an

USCA5 3137

Clark - Redirect                                                 33

opportunity to observe Mr. Bourgeois?

A    Yes, ma'am.

Q    All right.  And he asked you if you ever got to see him wash his hair and you said no, but did you have an opportunity during these 52 times 15 times to see if Mr. Bourgeois presented himself clean, neat, smelling good?

A    He always was clean and neat.

Q    All right.  Did you have an opportunity to watch his interchange with people that worked at the terminal, with the -- were there any ladies that worked at your terminal?

A    Yes, ma'am.

Q    And did you have an opportunity to see how Mr. Bourgeois would act with the ladies?

A    Maybe once.

Q    Did you ever see him being humorous or entertaining or polite, engaging, with the women that worked at the terminal?

A    Yeah, he's polite.

Q    And was he that way with everybody?

A    Yes.

Q    All right.  Did he ever like offer to buy people a drink or dinner or cupcakes or any attention to birthdays or anything like that that you noticed?

A    I didn't notice.

Q    Okay.  Now, was there ever a time when you-all ended up at the same terminal where you would go with him to purchase

supplies for the trip?

A    Sometimes we would end up at the same terminal but we would go and grab a bite to eat or something like that.

Q    All right.  And did he have any trouble putting food in his mouth?

A    No, ma'am.

Q    All right.  Did you have to hand him his utensils or open his carton of milk or anything so that he could feed himself?

A    No, ma'am.

Q    Did you ever observe him eat anything hot?

A    No, ma'am.

        THE COURT:  When you cooked out did you have hot food?

        THE WITNESS:  Well, when we cooked out we like put stuff in like a container or something like that and then each one of us would go around and get stuff out of the container.

        THE COURT:  Well, it was hot food?

        THE WITNESS:  Well, warm, I guess it had got warm then, Your Honor.

        THE COURT:  Okay.

BY MS. BOOTH:

Q    I guess my question is, if you were barbecuing out did you ever see him run over and take a bite out of the meat there on the fire?

USCA5 3139

A    Oh, no, ma'am.

Q    All right.  So he knew not to, so you never observed him do anything that stupid, right?

A    No, ma'am.

Q    And when you did this, when you answered this test and did this test, were you trying to, what were you trying to do, were you trying to tell the observer that this is how you remember him from all of your years of exposure to him?

        MR. WISEMAN:  Objection to leading, Your Honor.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Sustained.

BY MS. BOOTH:

Q    Did you ever go with him to, I mean go with him to, go with him to Florida or end up in Florida at the same time with Mr. Bourgeois?

A    Sometimes, yes, ma'am.

Q    All right.  And what would you-all do in Florida?

A    If we had a layover we would go out and grab a bite to eat or something or sit around like guys and laugh and talk.

Q    And did you ever see him pay for his meal?

A    No, ma'am.

Q    I mean were you ever there when he, when he gave the waitress money or paid at the counter?  Do you ever remember that?

A    No, ma'am.

USCA5 3140

Q    All right.

MS. BOOTH:  I don't have anything further, Your

Honor.

THE COURT:  Thank you, ma'am.  Mr. Wiseman?

RECROSS-EXAMINATION

BY MR. WISEMAN:

Q    Mr. Clark, when you said you were glad to see

Mr. Bourgeois when he showed up at one of your jobs, I take

it from that you weren't aware that he had a violent

background?

A    No, sir.

Q    All right.  Did you know that he engaged in rageful

conduct towards people?

A    No, sir.

Q    He was always very pleasant to you?

A    Yes, sir.

Q    Pleasant to those he worked with?

A    Yes, sir.

Q    Did you ever see him fly off the handle at anybody?

A    No, sir.

Q    I just want to clarify this one point.  I thought your

declaration said that, "At that time I would see Alfred once

every week or two."  That's what you wrote when we spoke,

right?

A    Yes, sir.

Q   Okay.   Not what Ms. Booth just asked you about once or twice a week, correct?

A   Yes, sir.

Q   So this is accurate?

        MS. BOOTH:   Your Honor, I will agree that maybe it wasn't 780 times, it was only 400 times he had seen Mr. Bourgeois or had an opportunity to observe him.

        MR. WISEMAN:   Well, I will take, I will take that concession, Your Honor.

BY MR. WISEMAN:

Q   You saw Mr. Bourgeois looking clean and presentable?

A   Yes, sir.

Q   Do you know who got him that way?   Do you know if he did it himself or someone else assisted him?

A   I'm sure he did it himself.

Q   Why are you sure of that?

A   I mean every time that I talked or met with Mr. Bourgeois his appearance was always good.

Q   I understand that, but my question is how did he get that way?   Did you -- how do you know if someone didn't --

A   I don't know how he got that way.

        MS. BOOTH:   He has already testified.

        MR. WISEMAN:   No, he hasn't.   Your Honor --

        THE COURT:   He --

        MR. WISEMAN:   I'm sorry.

USCA5 3142

THE COURT:  Go ahead.

BY MR. WISEMAN:

Q   Did you ever see Mr. Bourgeois actually groom himself?
Did you ever see him take a shower?  Did you ever see him
wash his hair?  Did you ever see him cleaning under his
fingernails?

A   No, sir.

Q   All right.  So you were assuming that because he looked
presentable that he was the one who got himself in that
condition, correct?

A   Yes, sir.

Q   Now, Ms. Booth asked you if you ever saw him go and grab
a hot dog off the grill and bite into it and you said no.
Did you ever see him take a hot dog off the grill and test it
to see if it was hot?

A   No, sir.

Q   And getting back to the question of his grooming, I take
it you don't know how long it took him to get himself ready
in the morning?

A   No, sir, I don't know how long it took him.

Q   You don't know if it took 15 minutes or two hours for him
to get presentable, right?

A   No, sir.

MR. WISEMAN:  That's all.  Thank you, sir.

USCA5 3143

FURTHER REDIRECT EXAMINATION

BY MS. BOOTH:

Q   But you saw him drive an 18-wheeler?

MR. WISEMAN:  Asked and answered, Your Honor.

THE WITNESS:  Yes, ma'am.

BY MS. BOOTH:

Q   And how expensive are 18-wheelers?

A   A tractor and trailer is almost $100,000.

Q   $150,000?

A   About 100,000.

Q   $100,000.

MS. BOOTH:  That's all I have, Your Honor.

MR. WISEMAN:  Nothing further.

THE COURT:  Thank you, sir.  You may stand down.
Call your next witness.

MR. WISEMAN:  Your Honor, before the next witness
may I address the matter I --

THE COURT:  Oh, yes.

MR. WISEMAN:  Is that okay?

THE COURT:  Yes.

MR. WISEMAN:  Or he will.

MR. ABREU:  Your Honor, as you may recall, yesterday
in relation to the testimony regarding whether there was
semen or not there were some questions that came up --

THE COURT:  There was what?

USCA5 3144

MR. ABREU:  Regarding whether there was semen detected or not.  There were some questions that came up in regards to what information was provided by the FBI about their tests, whether there were photographs or any notes regarding if they were positive, weak positive.

THE COURT:  Right.

MR. ABREU:  Last night Mr. Dowd did provide me with this particular document which I will now show the Court.  It relates to Q5, in particular of note, Q5, Q6 and Q7, which are the three swabs which the FBI alleged had tested positive for semen.  As the Court can note, in their notes and remarks it indicates regarding Q5 that it was very weak, Q6 very weak, Q7 weak.  There certainly was no testimony at trial regarding the strength of those tests.  I can assure Your Honor that I have never seen this particular document and that if I had seen it, I most certainly would have used it and I most certainly would have had our experts address the significance of this particular document.  My request at this time, Your Honor, is, again, I would like -- oh, one other thing, I searched our entire file which was gathered from trial counsel which consists of 12,000 pages, I searched, did an electronic search with the term P30 and I, and this document was not part of those records.  Mr. Dowd also did a search of the files that were disclosed to us in April of this year and that document was not part of those.  They

USCA5 3145

are --

MR. DOWD:  Well, we are not sure about that.  We are still doing a search on that, Your Honor.

MR. WISEMAN:  One second, Your Honor.

(Mr. Wiseman and Mr. Abreu conferring off the record)

MR. ABREU:  Right, Your Honor, so it's a document, the documents that we searched are the 12,000 pages that we provided to the Government as part of discovery, so if they want to search that they certainly can search it as well for that document.  And Mr. Dowd is actually correct, they are in the process of checking additionally.  However, when that's complete, Your Honor, I suspect that I will have a motion to amend our claim to include a Brady violation.  And let me just make this clear, I am not saying that Ms. Booth or any member of the U.S. Attorney's Office failed to disclose it to trial counsel, because the information that I have here indicates that Ms. Booth turned over everything that she got from the FBI and I will concede that at this point.  My question is whether the FBI actually provided the U.S. Attorney's Office with this particular document which I am saying is particularly relevant.  And I also can't imagine Mr. Tinker, or perhaps I can but Mr. Tinker was certainly trying to dispute the evidence of the semen and here he has, here is a document that indicates very weak, very weak and weak, and I know that that was never used at the time of the

trial.  So, what I am requesting again, Your Honor, is for the FBI to provide me with a copy of every single document in their file related to the testing of these materials.  I would then like to review those documents before Ms. Conway testifies, or any witness for the Government testifies in this particular matter.  I should also note that Ms. Conway is not the person who testified at trial, she has never been a part of this case, so I am not sure that she would even know what was turned over at any point, but I would -- so for that reason I would really like to see that entire file and I think I am entitled to that file, Your Honor.

THE COURT:  Where is the file?

MR. DOWD:  Your Honor, we are making a copy of it right now.

THE COURT:  Okay.

MR. DOWD:  Just to fill the Court in on what I know, the original FBI file was given to us back at the time of the trial.  We made several copies of it.  One of the copies we delivered to Mr. Tinker and we still have, we still believe we have a couple of those copies, and we are going through the copy to see if this particular document is within that, which would indicate that that was part of the documents we sent to Mr. Tinker.  And I will know, I should know more about that shortly.  Then, at the time of the 2255, we digitized one of those copies of the FBI file and that's what

USCA5 3147

we sent to Mr. Wiseman back in April of 2010.  So I will know more once we look at the copy of the FBI file that we have as to whether or not that would suggest it went to Mr. Tinker or not.

(Ms. Booth and Mr. Dowd conferring off the record)

MR. ABREU:  Your Honor, actually, my request would be to inspect the original file itself, not just a copy of it.

MR. DOWD:  No, no, we are doing that.  No, we are making --

THE COURT:  That's what they are making a copy of.

MR. DOWD:  We are making a copy of the original that came with Ms. Conway, that just got here.

MR. ABREU:  I understand that.  And I think that there might be perhaps a contention by the Government at some point that it went directly also from the FBI to Ms. Johnson back at the time of trial; however, Ms. Johnson testified yesterday that she had never seen any notes regarding the strength of the FBI testing, that that information was not something she had ever seen.  And if you look at her report produced in 2004, she indicates a weak positive on our tests but she never makes any indication at that point about whether their test was weak positive or strong positive because she didn't have that information.

THE COURT:  Okay, so --

USCA5 3148

MR. ABREU:  I guess the answer to what we are saying is they are checking.  I just wanted to bring it to the Court's attention --

THE COURT:  Okay.

MR. ABREU:  -- that there may be an issue we need to further discuss.

THE COURT:  So we have, it remains to be seen.

MR. ABREU:  Thank you, Your Honor.

MR. McHUGH:  Your Honor, I have one other housekeeping matter.  Yesterday during the testimony of Dr. Bowers I was referencing the National Academy of Science's report, Strengthening Forensic Science in the United States: A Path Forward.  I talked to Mr. Roberts, I have marked as Defendant's Exhibit P141 the cover page of that report and the relevant section -- the report's a couple of hundred pages long -- the relevant section dealing with forensic odentology, and I would ask that that be admitted at this time or move for its admission at this time, and I believe Mr. Roberts has no objection to that.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  Then that's admitted.

(Defendant's Exhibit P141 admitted into evidence)

MR. ROBERTS:  Your Honor, we have several other witnesses that are going to come in here and take the stand and that Dr. Moore had questioned and so we anticipate the

USCA5 3149

same thing that just happened, we anticipate that the, that Mr. Wiseman or somebody from his team are going to come up and question the witnesses about their raw data. We, Dr. Moore has not released his testing to us. Apparently Dr. Swanson has released all of the testing to Mr. Wiseman. We would ask for them to turn over Dr. Moore's testing to us in addition to Dr. Swanson's testing because Dr. Moore will not violate his ethical guideline and give us the documents. And so I'm asking, since they have --

THE COURT: Okay. Do you have them right now?

MR. WISEMAN: I already agreed to do that, we just have --

THE COURT: Well, they need them right now.

MS. BOOTH: We need time to look at them.

THE COURT: Yes.

MS. BOOTH: We need a break.

THE COURT: Okay.

MR. WISEMAN: Okay.

(Mr. Wiseman and Mr. Roberts conferring off the record)

MR. ABREU: And one last housekeeping matter, Your Honor, if I may.

THE COURT: Yes. I don't do windows, but.

MR. ABREU: Yesterday I neglected to move into, to offer into evidence, I should say, Petitioner's 152, and my understanding, that the Government does not have an objection

46

to that.  It relates to medical records.

THE COURT:  152?

MR. ABREU:  Yes, Your Honor.

THE COURT:  Is that right?  P152?

MR. ABREU:  Mr. Dowd was just here.  Oh, right.

MR. DOWD:  That's fine, Your Honor, we have no objection.

THE COURT:  P152 is admitted.

(Defendant's Exhibit P152 admitted into evidence)

MR. ABREU:  Thank you, Your Honor.

THE COURT:  Yes, sir?

MR. ROBERTS:  Your Honor, just with regard to the raw data, I have been informed that there is still a need to maintain these copies and make sure that any copies are shredded at the end so that none of this information or data gets outside the courtroom, so I would ask that Mr. Wiseman gather his copies at the end and make sure none of this information goes to anyone else.

THE COURT:  Okay.

MR. ROBERTS:  Thank you.

MS. BOOTH:  One thing more, Your Honor, I would ask that Mr. Clark, he's here, is it, he's -- could he please be excused?  He has already testified.

THE COURT:  Is there any problem with that?

MS. LARIN:  Mr. Wiseman is not here but I don't --

USCA5 3151

THE COURT:  He just stepped out.  Wait until Mr. Wiseman comes back in.

MR. ABREU:  I don't anticipate a problem with that, Your Honor, but he's not my witness.  If I may go get him?

THE COURT:  Yes.

MS. BOOTH:  So, Your Honor, how long of a break can we have to go through this?  We really need some time.  This is going to be, this --

THE COURT:  Okay.

MS. BOOTH:  We need an hour, Your Honor.

THE COURT:  Okay.

MR. ABREU:  We have no objection to the releasing of Mr. Clark, Your Honor.

THE COURT:  Okay, Mr. Clark is released and we will take -- have you got the documents, somebody is getting the documents?

MS. LARIN:  Your Honor, I'm working on it right now.  It's on my computer and I'm putting it on a flash drive.

THE COURT:  Okay.

(Off the record at 9:48 a.m. until 9:49 p.m.)

MS. BOOTH:  Your Honor, we have sort of a reciprocal discovery policy going on here and I would ask the defense if they have prepared any other statements on any witnesses that we plan to call, I would like to have them now so I can look at them before they take the stand.  We have disclosed

everything we have.

MR. WISEMAN:  Your Honor, I'm just --

THE COURT:  That's granted.

MR. WISEMAN:  Does that apply to rebuttal exhibits?

THE COURT:  Absolutely.

MR. WISEMAN:  Things I'm going to use to impeach their witnesses?

THE COURT:  Absolutely.

MR. WISEMAN:  I don't believe they disclosed things to us ahead of time that they used to impeach.  We didn't get articles, we didn't get a variety of material, is my understanding.  In fact, the Court's standing order talks about disclosing exhibits that you are going to use on your direct case, not on your rebuttal or cross-examination case. I looked at that very carefully because I was concerned.

THE COURT:  If you have the documents you need to disclose them.

MR. WISEMAN:  Yes.

THE COURT:  Both sides.

(Off the record at 9:50 a.m. until 9:51 a.m.)

MR. WISEMAN:  Is the Court's direction that we disclose documents of statements or articles?  Because we have got a number of articles.

THE COURT:  Every document you are going to use.

MR. WISEMAN:  Okay.

THE COURT:  Give them to the Government, and the same with the Government to the defendant.  Or, actually --

MR. WISEMAN:  I mean the problem is that --

THE COURT:  -- petitioner/respondent.

MR. WISEMAN:  Yeah, the problem is we are off their case, we are off our case, and they didn't disclose any of this stuff to us until they were using it, in terms of scholarly articles and such, and it seems a little unfair that we are now being required to disclose that to them.  I, you know --

THE COURT:  I'm just, you know what, every time I make an order you want to argue.  You are going to have to stop that.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  That is one of the reasons that you, I find you so abrasive, okay?

(Recess at 9:52 a.m. until 11:23 a.m.)

THE COURT:  Now, where were we?  Are we about to call another witness, was that it?  Were you finished?  We finished that other gentleman, right?

MR. WISEMAN:  Yes, he was completed.

THE COURT:  You were about to call another witness?

MS. BOOTH:  Yes, Your Honor.  Mr. Patterson.

MR. WISEMAN:  Your Honor, can I make some disclosures to the Government?

USCA5 3154

THE COURT:  Sure.

MR. WISEMAN:  If I can find my file.  I just had my office send me, because my computer file was corrupted, a copy of Dr. Price's data, and I'm giving the Government a copy of that.

THE COURT:  Okay.

MR. WISEMAN:  In addition, in a moment I will turn over to them what I have marked as 176 and 177 which I will respectively --

THE COURT:  I thought I admitted those.

MR. WISEMAN:  Maybe my number is wrong.

THE COURT:  No?

MR. WISEMAN:  I don't think so.

MS. BOOTH:  No, you admitted 176 of the Government's.

THE COURT:  Okay, that's 176 and 177.

MR. WISEMAN:  Right.  And those are, respectively, a declaration from Dr. Oakland and a chart regarding the ABAS test.  I'll give that to the Government in a moment.

THE COURT:  Okay.  Well, you are not offering those for admission, you are just disclosing them?

MR. WISEMAN:  Not at this time.  At some point.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, in an effort to speed things along and get, make sure that our evidence is all

USCA5 3155

in --

THE COURT:  Sure.

MR. ROBERTS:  We would like to go ahead and offer all the Government's evidence right now and go through the numbers, and if there's --

THE COURT:  Okay.  Who is going to be on the, Mr. Wiseman, are you going to be the point man on this?

MR. WISEMAN:  Sure.  I don't know that we have objections to anything but I will scan it over.

THE COURT:  Well, just look, why don't you look through his numbers, then, before he starts shouting them out.

(Off the record discussion at counsel table)

MR. ROBERTS:  Your Honor, let me give them a chance to look through our exhibit list and then, and so we will do this then after the next witness or two.

THE COURT:  Okay.

MR. WISEMAN:  Your Honor, I have some authority I wanted to share with the Court, if that would be appropriate now.

THE COURT:  Sure.

MR. WISEMAN:  On the question of this raw data, and obviously this is just some preliminary research we were able to do.

THE COURT:  Okay.

USCA5 3156

MR. WISEMAN:  In the case of Rivera versus Cordeman, 06-70022, October 18, 2007, Fifth Circuit decision, at page 20, the Court of Appeals refers favorably to the District Court's review of available test data in a mental retardation case.  There's a slip opinion at 2009 West Law 1117401, and the name is?

MS. LARIN:  U.S. v Davis.

MR. WISEMAN:  U.S. v. Davis, District of Maryland, at page 19 --

THE COURT:  Okay, look, the way you do this is just to file a brief to give it to me, okay?

MR. WISEMAN:  Oh, okay.  I thought the Court might want to see that now, but.

THE COURT:  No, thank you.

MR. WISEMAN:  Okay.

THE COURT:  It's already done, so I don't need any more authority, right?

MR. WISEMAN:  Okay.  I just wanted to, you know, offer it.

THE COURT:  Thank you.  Apparently I was right on line with the Fifth Circuit.

MR. WISEMAN:  You certainly were.

THE COURT:  So there you have it.  Who is calling another witness?

MS. BOOTH:  I am.  Your Honor, would you like me to

USCA5 3157

start?

THE COURT:  Yes, please.

MS. BOOTH:  Oh, yes.  I would call Robert Patterson.

THE CLERK:  Please come forward.

ROBERT PATTERSON, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MS. BOOTH:

Q   Mr. Patterson, there is a microphone there.  Please do not touch it.

A   Okay.

Q   If you hit it, it goes right into the court reporter's ears.

A   Uh-huh.

Q   Would you please tell us your full name for the record?

A   My name is Robert M. Patterson, known as Pat Patterson.

Q   And how are you employed, Mr. Patterson?

A   I'm retired and at the present time doing some consulting work on DOT compliance.

Q   All right.  And back in 2002 where did you work?

A   I worked at R.E. Garrison Trucking.

Q   And what were you, what was your job at R.E. Garrison?

A   I was director of safety.

Q   Okay.  And what were some of your responsibilities there?

A   Some of the responsibilities was hiring and firing

drivers, different drivers, attended to all the accidents, claims, and administering workman's compensation insurance, and --

Q   Did you do driving tests with the people that came to work there?

A   I did, yes, ma'am.

Q   Did you teach a safety course to the people that were there?

A   I did.

Q   All right.  Now, I want to ask you if back in 2002 you knew an individual or you met an individual by the name of Alfred Bourgeois?

A   I did.

Q   And how was it that you met him?

A   He apparently was called into our office to be hired, for the orientation, to go through the orientation to see, to start in.

Q   All right.  And was this in May of 2002?

A   Yes, ma'am.

Q   And when -- did he send an application first?  Did you ever see an application before he actually showed up?

A   The application first goes to our recruiting office and after they do certain things to them like check their background out and their driving history and such, they come down to my office for approval or disapproval.

USCA5 3159

Q    All right.

A    To be called in for an orientation.

Q    So an evaluation had already been done, before you got the application, on his driving history and what else?

A    His records of, and his previous employers, what they said, the previous employers' check and a driving record, mainly.

Q    Okay.  And so when it came to you, did you actually meet with Mr. Alfred Bourgeois?

A    I did.

Q    And when is the first time that you met with him?

A    That's pretty difficult.  They first come in our office, and the recruiting office and the safety office is right across the hall from each other, so generally all the new recruits come in, they either come into the safety office or recruiting, and that's the first time they have ever been in R.E. Garrison, so generally I go out there, if it's not me, some other people, to try to tell them and direct them what we need to do, when it's all going to start and what the day will consist of.

Q    All right.  And the first day that you saw Mr. Alfred Bourgeois, was that, what date was that, was that a training day, was that, what was that?

A    That was the first day they come in when we do the paperwork and do the road test and --

Q    Okay.  Now, you said they come in and they do paperwork.  What type of paperwork do they do?

A    Well, administrative paperwork that goes into the qualification files, such as a 9I form, immigration form, filling out income tax forms.

Q    Do they have to sign up for insurance there at the company?

A    Yeah, uh-huh.

Q    Do they have to, do they, do you have anything where they have to designate a, designate somebody in case they are hurt in an accident or anything like that?

A    Say that again, please?

Q    Would they have to designate, I'm just asking, give the family and who to call and all those numbers?

A    Right, yes, ma'am.

Q    Okay.  And on that day is there anybody out there that goes from driver to -- and when they show up, when he showed up, was he the only person that showed up on that day?

A    No.

Q    Or was this some kind of scheduled training?

A    Yes, ma'am.

Q    All right.  And so about how many drivers do you know or do you remember showed up, show up for an average training?

A    Average training would be roughly 16, maybe, 17.

Q    Okay.  And is there anybody that's placed out there that

USCA5 3161

if somebody is having a hard time doing their paperwork will actually take the pencil and help them fill in the form?

A   No.

Q   Now, let me ask you if when a person showed up, if he was handed a stack of paperwork to fill out, if he couldn't fill out the paperwork, would that come to your attention?

A   Yes, ma'am.

Q   So after the paperwork is filled out, what else happened that day?

A   Well, we divide them up, half of them will start, go down to the doctor's office to give a specimen for a drug test.

Q   Uh-huh.

A   And the other half begins a road test, a skills test, in one of our trucks.

Q   Okay.  Now, I want to ask you, did you give Mr. Bourgeois his roads test, his field test?

A   I did.

Q   So you actually -- what truck did he drive?

A   One of our company trucks.

Q   All right.  And these company trucks, what are they, are they 18-wheelers?

A   Yes, ma'am.

Q   They are 18-wheelers?  And do you know approximately the value of the truck?

A   The truck and trailer together would be $100,000 or

USCA5 3162

upwards.

Q    Okay.  And so did you actually get in an 18-wheeler with him and have him do this?

A    I did, yes, ma'am.

Q    And then were you called upon to evaluate his driving?

A    I fill my form out when I get, when we get back.

Q    Uh-huh.

A    I fill out his, what I observed of his skills.

Q    And, and --

A    That goes in his qualification file if he completes the orientation.

Q    Okay.  Did you make a decision or an evaluation of his driving skills?

A    I did.

Q    And what was that?

A    He passed everything satisfactorily and I made a note on the bottom of the form I fill out on his test, "Good driver."

Q    And is that something you generally put when you are evaluating drivers?

A    Very, very seldom I do that.

Q    Did you make a comment to him orally about his ability?

A    I did, I told him he was a very good, professional driver.

Q    All right.  Now, after that test is done -- first they fill out the paperwork, then they have to do a driver test --

USCA5 3163

did you send him in for a drug test?

A    Yes, ma'am.

Q    All right.  What do they have to do in this training session after the drug test?

A    Well, we begin the sit-down classroom instruction.

Q    All right.  And did you conduct the sit-down classroom instruction?

A    Yes, ma'am.  We have two days of that and I done about the first three to four hours of it.

Q    All right.  Was Mr. Bourgeois in your class?

A    Yes, ma'am.

Q    Do you remember if he, how he acted when he was in your class?

A    Very cordial, very, very cordial person, easy to approach, easy to engage in conversation, easy --

Q    Did he ask you pertinent questions during the training?

A    Yes, ma'am.

Q    All right.  And did you have an opportunity to observe the way he was dressed and his hygiene?

A    Yes, ma'am.

Q    And how did he appear to you?

A    He was very professionally dressed.  He was an above average driver, in my opinion.

Q    And so after that did you recommend that he be hired?

A    On, upon completion of the orientation, that would be the

drug test being negative and satisfactorily sitting through the orientation.

Q   All right.  Now, tell me, in your job are you in charge of maintaining some kind of vigilance over the daily logs or the logbooks that the drivers must complete?

A   All the record of duty status, of course, known as the driver daily log, comes to the safety department.

Q   And were you, during the time that you were there and Mr. Bourgeois was working for R.E. Garrison, were you the person that supervised his and checked on his daily logs?

A   I did, I supervised.  We had a log clerk that works on the, actually auditing the logs, and she worked directly under me.

Q   All right.  Did you ever have any occasion where you thought his logbook entries were deficient?

A   No.

Q   Did you have any problem with him complying with the requirement of maintaining his logbooks?

A   No, ma'am.

Q   Did you ever have an opportunity to be around him when he was around other drivers?

A   I did.

Q   And when was that?

A   He would come in from a load or something, stop by the dispatch office, and a lot of, he and other drivers would

USCA5 3165

come by the recruiting office or safety office and talk with us, because we are the first people they get to know when they come in the company.

Q    Uh-huh.

A    And, yeah, I talked with him on several occasions like that.

Q    And what was your opinion of, was he a friendly person, was he a person easy to talk to?

        MS. LARIN:  Objection, Your Honor.

        THE WITNESS:  He was.  My opinion was very highly of him.

        MS. LARIN:  Objection, Your Honor.

        THE COURT:  Yes, ma'am?

        MS. LARIN:  This is an opinion.

        MS. BOOTH:  Right.  I'm asking for his opinion.

        THE COURT:  Overruled, if there's -- I didn't hear a legal objection, so go ahead.

BY MS. BOOTH:

Q    What was your opinion of the way he interacted with the rest of the people in the office and you?

A    He was a very personable guy.  He was the type person you would want to talk with, you know, and engage in conversation.

Q    And did you enjoy his company there?

A    Yeah, I did, uh-huh.

USCA5 3166

Q    Did you ever see him go into a rage?

A    No.

Q    Did you ever see him scream and holler and have a short temper or anything like that at your place of business?

A    No, ma'am.

Q    If you had to rate him during that period of time of the drivers that came through your class, that first class, what did you say, 16 people, 18, about, with what you knew about how he related to you, how he presented himself and how he drove, what would you, how would you have rated him in that group of people?

A    Above average.  He'd be in the top two or three.  Maybe in the top one, but I'd say he'd have been in the top two or three.

Q    Was there anything that ever came to your attention while he worked there that was negative about Mr. Bourgeois?

A    Nothing come to my attention in a negative manner about Mr. Bourgeois.

Q    Did anybody ever come to you and say that he was difficult to work with or uncooperative, were there any complaints like that?

A    No.

Q    Were there any complaints that he was dangerous?

A    No, ma'am.

Q    Now, is one of the things about keeping your logbooks

USCA5 3167

keeping them on time?

A   Yes, ma'am.

Q   Do you know the other documents that had to be provided in a timely manner besides the logbooks that drivers had to do?

A   He had to do his trip sheets, daily trip sheets.

Q   Daily trip sheets?

A   Showing his mileage and such, and do his bills to get paid on, and normal truck driver bills.

Q   And let me ask you about the truck that he was actually driving.  Is there a, in this 18-wheeler that he was driving, was there a laptop?

A   It had a computer in it, yes, ma'am.

Q   And did the drivers have to use a laptop to communicate with the dispatcher and with the company?

A   I don't know if you'd call it a laptop or not.  It's a computer there laying on your seat and you put stuff in, in it.  Yeah, he, it could be considered a laptop, yes, ma'am.

Q   All right.  And is that how they communicated with the dispatch?

A   That's one of the ways.

Q   Okay.  And were there other ways to communicate with dispatch?

A   Yes, ma'am.  Calling, calling on the phone.

Q   All right.  Now, when you worked -- after you said that

you approved him as a driver, did you call him in and give him an interview?

A    Yeah, that's the last step in the orientation process, to come through my office where we fill out the identification cards and make, check over their paperwork, make sure everything has been signed that requires a signature.

Q    And was everything signed and in good order?

A    Everything was in good order, yes, ma'am.

Q    All right.  And so what did you issue him on that day?

A    I issued him an identification card certifying he was, he had what we call a certification process certifying he's a legitimate DOT qualified driver for R.E. Garrison Trucking. Then we took him up to get a fuel card from the dispatch office.

Q    So you actually give him a credit card?

A    Uh-huh.

Q    From your company?

A    A fuel card, yes, ma'am.

Q    Okay.  And then did you give him, what else did you give him?

A    His identification card certifying he's a driver.  And, of course, got the keys to the truck, got issued a truck.

Q    He got the keys to a truck that was worth over $100,000?

A    Uh-huh.  And he got --

THE COURT:  I'm sorry, you have to answer in words,

Laufer - Direct                                65

not uh-huh.

THE WITNESS:  Okay.

THE COURT:  It's not usual speech.

THE WITNESS:  Your Honor, I'm struggling.  I'm --

THE COURT:  It's not the --

THE WITNESS:  -- hearing impaired.

THE COURT:  Pardon?

THE WITNESS:  I'm hearing impaired.

THE COURT:  I've got something for you then.  Hold on.  Would you get him a headphones, please, Ms. Scotch.

THE CLERK:  Yes.

MS. BOOTH:  He had told me that, and I told him that there would be this opportunity to use those and he said that he would rather not, he would just rather I speak loudly.

THE COURT:  Well, all the rest of us may not be that good, so.

THE WITNESS:  Okay.

THE COURT:  She speaks loudly ordinarily.  See if that's at all helpful to you.  How is that?

THE WITNESS:  Much better.

THE COURT:  Okay, let's do that.  So I was going to say, you have to speak in words, which is, you know, we all say uh-huh and huh-uh.

THE WITNESS:  Yes, ma'am.

THE COURT:  But in a, because when we take it down

USCA5 3170

it's got to be words.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you, sir.

BY MS. BOOTH:

Q   Now, does your company cover insurance on these drivers?

A   Yes, ma'am.

Q   All right.  And are you the person that says, "Yes, he's a qualified driver and we want to hire him"?

A   Right.

Q   Now, if he would have looked like he was in any way mentally impaired or couldn't handle a truck, couldn't dress himself, couldn't eat by himself, would you have issued him the keys to a vehicle that was over $100,000?

A   No.  No, ma'am.

Q   Had anybody that worked in your company ever come to you as a security person and say, "I'm worried about Alfred Bourgeois"?

MS. LARIN:  Objection, Your Honor, hearsay.

THE COURT:  Sustained.

MS. BOOTH:  Well, no, I'm not offering this for the truth of the matter asserted that he was impaired because I contend that he's not, but that if anybody observed that he was impaired.

THE COURT:  No, that's hearsay.

MS. BOOTH:  Yes, Your Honor.

USCA5 3171

THE COURT:  Did you have any reason to think he was mentally impaired?

THE WITNESS:  No, huh-uh.

THE COURT:  Okay.  That ought to about do it.

MS. BOOTH:  That's all I have, Your Honor.

BY MS. BOOTH:

Q   Oh, let me just ask you, did Mr. Wiseman show up at your house unannounced?

A   Yes, ma'am.

Q   And did you, did he tell you that there had been some tests given to Mr. Bourgeois?

A   No, ma'am.

Q   Okay.  Did he ask, did you ask him to come on into your house?

A   After I got identification from him, I did.

Q   Okay.  Did he call and make an appointment?

A   No.

Q   All right.

MS. BOOTH:  That's all I have, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. LARIN:

Q   Good morning, Mr. Patterson.

A   Good morning.

Q   My name is Elizabeth Larin.  I represent Mr. Bourgeois.

USCA5 3172

A    Okay.

Q    So in your testimony you said that you met Mr. Bourgeois in May of 2002?

A    Best of my recollection.

Q    And it was for a training program?

A    Pardon me?

Q    For a, he attended an orientation program with you?

A    Yes, ma'am.

Q    So he was just starting at your company?

A    Yes, ma'am.

Q    And then did you later, about six to eight weeks later, would it surprise you to find out that he actually brutally murdered a little girl?

A    It would have been very, very surprising to hear that.

Q    And when did you hear about that?

A    Heard about it the day it happened.

Q    Because it was for your company --

A    Our truck --

Q    He was working for your company?

A    Our truck was confiscated at that time.

        THE COURT:  Well, he was, he was working for, he was working for this gentleman when it happened?

        MS. LARIN:  Yes.

        THE COURT:  Is that right?

        THE WITNESS:  Uh-huh, yes, ma'am.

USCA5 3173

THE COURT:  Okay, thank you.

BY MS. LARIN:

Q   Your company doesn't do psychological testing --

A   No, ma'am.

Q   -- does it?

A   No.

Q   Does your company allow truck drivers to bring their family members on the road with them in the truck?

A   With a written permit from me, yes, ma'am.

Q   And do you recall if Mr. Bourgeois had a written permit?

A   He did.

Q   And are you aware that his family was with him on the trip --

A   Yes.

Q   -- for several weeks?

A   Yes, ma'am.

Q   Is that kind of unusual to bring a family with children for several weeks on the road?

A   Would you say that again, please?

Q   Was that unusual for someone to bring their family with small children on the road for several weeks?

A   No, it's not unusual.  It's mostly done when school is out in the summer.

Q   So the family is vacationing or --

A   Uh-huh, right.

USCA5 3174

Q   Okay.  And did you say that he kept a logbook that someone directly under you supervised?

A   He kept a logbook as part of his duties and turned it in to the safety department and we audit the logbooks once they are turned in.

Q   But did you say something about someone below you, someone you supervised audited it?

A   They do the actual audit.  The computer does the actual audit and they're going to key it in.

Q   Oh.

A   If they don't get a violation form that comes out.

Q   Did that audit involve occasional spot-checking of his log?

A   One spot-checking his log and then checking every one of them.

Q   And did you do that on a daily basis or?

A   Weekly to ten days.  They've got 13 days to get their logs in, so it would have been within a 13-day frame, time frame.

Q   So probably you had looked at his logs like once or twice by the time this incident had happened?

A   Probably.

Q   Did you ever see him use the computer on the truck?

A   No.

Q   Do you recall meeting Mr. Bourgeois' cousin, Carl Henry?

USCA5 3175

A    No, ma'am.

Q    So if he was at that orientation, you are not sure?

A    No, ma'am.

Q    Okay.  And at some point did you have the opportunity to meet with Dr. Moore?

A    No.

Q    Or talk with a Dr. Moore over the phone?

A    I talked with him over the phone, yes, ma'am.

Q    Okay.  Do you know about how long that conversation was?

A    Very short, three minutes or less.

Q    And did Dr. Moore ask you to fill out any tests or paperwork regarding Mr. Bourgeois?

A    No, ma'am.

         MS. LARIN:  One second, Your Honor.

      (Ms. Larin and Mr. Wiseman conferring off the record)

         MS. LARIN:  No more questions, Your Honor.

         THE COURT:  Thank you.

         MS. BOOTH:  I call Bill Shotts to the stand.

         THE COURT:  Thank you, sir.  You can stand down, thank you.  You can just put them on the counter there, Ms. Scotch will get them.  Thank you, sir.

         THE CLERK:  Would you come forward, please?

      WILLIAM SHOTTS, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

         THE CLERK:  Would you have a seat, please, and watch your step.

Shotts - Direct                                                   72

DIRECT EXAMINATION

BY MS. BOOTH:

Q    Hello, Mr. Shotts.

A    Good morning.

Q    Could you please state your full name for the record?

A    William D. Shotts, S-H-O-T-T-S.

Q    And how are you employed now, Mr. Shotts?

A    I am a private consultant in the transportation industry.

Q    All right.  And I want to ask you, in that capacity what do you do?

A    Basically transportation analysis for numerous companies. I have a contract with a firm in Nebraska, one in California, one in Utah and one in Alabama and one in Wisconsin, basically to do an ongoing analysis of their operations.

Q    And have you been in trucking for many years?

A    Since 1971.

Q    And I want to ask you if you know a person by the name of Alfred Bourgeois?

A    Yes, ma'am.

Q    And when did you meet him?

A    Probably been about September or October, 1996.

Q    And how was it that you met him in 1996?

A    I was employed by U.S. Express of Chattanooga, Tennessee, and they had purchased a trucking company in Birmingham, Alabama called Hall Systems and it was going to become the

USCA5 3177

regional operation for U.S. Express, and since I had regional operational experience in the past they asked me if I would go down and head that operation up for them.

Q   So, when you went down there, did you become the boss of Mr. Alfred Bourgeois?

A   Yes, as well as about 200 other drivers.

Q   Now, did -- how long did you work there at Hall?

A   Until 1999.

Q   All right.  And so during that period of time in 1996 to 1999, did you have an opportunity to observe Mr. Bourgeois --

A   When he --

Q   -- there at the terminal?

A   When he would be at the terminal, yes.

Q   Okay.  Do you -- how often do you think that you saw him?

A   It might be once a week, it might be once a month, just depending on how the runs were and when he would have the opportunity to come by the terminal there in Birmingham.

Q   All right.  And did you enjoy seeing Mr. Bourgeois when he would come in?  Was he an employee that you liked to talk to?

A   Oh, yes, very sociable.

Q   All right.  While he was working there at Hall, did you ever notice him going into any rages or losing his temper or becoming abusive to any of the people that worked there?

A   Never, ma'am.

Q   All right.  Can you describe for the record his demeanor when he was working there at Hall?

A   Well, of course, basically all I would see him would be in an environment, you know, there at the terminal where, you know, I was basically the boss and we had dispatch, customer service, things of that nature, but it was always a very amicable atmosphere, you know.

Q   During that '96 to '99 period of time, did you ever hear any complaints about Mr. Alfred Bourgeois?

A   No, ma'am, not to my knowledge.

Q   Now, after 1999 did you change where you were working?

A   Yes.  They chose to move the regional operation into a corporate environment with U.S. Express in Chattanooga and roll it into that operation, so I at that time left and went with Eagle Motor Lines which was, a gentleman owned by the name of Ken Adams who had owned Hall Systems prior to the U.S. Express acquisition, and he was wanting to start up a regional operation again so he asked me to come over and help him start it up.

Q   And when you went over there, did Mr. Bourgeois ever come over to Eagle Transport?

A   Probably two to three months afterwards when we got some of the trucks in place and things of that nature.

Q   Now, when he came over to Eagle, were you glad to see him?

USCA5 3179

A    Very much so.

Q    All right.  Did you consider him a valuable employee?

A    Yes, ma'am.

Q    And when he was working for Eagle, do you remember the types of routes that he would take?

A    We were pretty much at that time at the Eagle side southeast regional, which would run from probably Florida to Virginia, maybe Pennsylvania, over through Texas area. Didn't do any what I would consider long-haul or west coast or anything of that nature, it was pretty much of a regional operation.

Q    So it was probably around through four or five states?

A    I'd say closer to 13 or 14.

Q    Oh, 13 or 14 states, I'm sorry.

A    Take into consideration from the, you know, Virginia south to Florida and then come west through the Texas markets, so I mean you've got, you know, pretty much of the southeastern area.

Q    Okay.  And during this period of time, was there ever a time when there were customers that were specifically asking for who they called Bourgeois?

A    That happened on one occasion, as I remember --

        MS. LARIN:  Objection, Your Honor, hearsay.

        MS. BOOTH:  I'm not asking what they said, I'm just asking did they, were there people that wanted to have him

USCA5 3180

specifically work for them.

BY MS. BOOTH:

Q   Did he --

THE COURT:   Sustained.

BY MS. BOOTH:

Q   Did you ever have any requests from customers for certain drivers?

MS. LARIN:   Objection, Your Honor, hearsay.

MS. BOOTH:   I'm not asking what he said, Your Honor. Well, let me pull this back.

BY MS. BOOTH:

Q   Were there certain drivers that were more popular than other drivers, with different customers that you had?

MS. LARIN:   Objection, Your Honor, that would be based on hearsay.

THE COURT:   Overruled.

THE WITNESS:   Could you repeat the question again, Counselor?

BY MS. BOOTH:

Q   Yes, I will.  Were there drivers that were more popular with your customers than others?

A   To that I would say yes.

Q   All right.  And was Mr. Bourgeois one of those that was more popular?

A   Yes.

USCA5 3181

Q   All right.  And did you receive compliments, without saying what they were, from --

MS. LARIN:  Objection, Your Honor.

MS. BOOTH:  -- a customer that you might have?

MS. LARIN:  That is also hearsay, I believe.

THE COURT:  Well, let her finish the sentence.

MS. LARIN:  Okay, sorry.

THE COURT:  Overruled.

BY MS. BOOTH:

Q   Did you ever receive compliments on Mr. Bourgeois and his driving from any of your customers?

A   Yes.

Q   All right.  How did that make you feel --

A   Very --

Q   -- about having an employee like that?

A   Very good, because having been in the trucking industry for a number of years and classifying the stereotype truck driver, to hear some, to hear a, have a customer call and appreciate what a driver does in their behalf and your behalf makes you feel pretty good.

Q   Now, did there come a time where you didn't work for Eagle anymore and you changed companies?

A   Yes, I went to work for R.E. Garrison in Cullman, Alabama.

Q   And when was that?

USCA5 3182

A    2001.

Q    All right, in 2001.  And did there come a time where Mr. Bourgeois applied to that company?

A    It would have probably been early 2002.

Q    All right.  Now, did Mr. Bourgeois call you and tell you that he was going to apply?

A    I believe he called and asked if we were looking for any drivers and I told him he would have to check with the safety and recruiting department.

Q    All right.  And were you pleased at the call?

A    Glad to have him come aboard.  I had no, had no, had encountered no problems with him whatsoever in the past.

Q    All right.  And did he actually get hired by R.E. Garrison?

A    Yes, I believe that would have been in April or May of 2002.

Q    Now, let me ask you about these trucks at that time for R.E. Garrison.  What type of truck did Mr. Bourgeois drive? Was it an 18-wheeler?

A    Yes.

Q    Was it a vehicle that, I mean a, I guess it's a vehicle, equipped with some kind of keypad to communicate with?

A    You mean a satellite or mobile communications unit from the tractor?

Q    Yes, sir.  I'm just not using the right --

USCA5 3183

A    The answer to that is yes.

Q    All right.  And how was it that the drivers had to communicate with this equipment on the car?  Did they type in things?  How did that work?

A    You mean from --

Q    Am I being too simple with this?

A    No, no.

Q    Explain, explain what was in the cab of the --

A    Do you want me to physically describe it?

Q    Yeah, physically describe it.  Was it a complicated, sophisticated mechanism?

A    Basically what it is, on the type of unit that he would have in the truck would be a, similar to a laptop keyboard, but it doesn't have a fold-out screen like your, the, you have on your desk there.  It has a small digital readout of about probably three, maybe four lines that data will come in on that then can be scrolled through that will be the information transmitted from the dispatcher or the customer service person that would be sending the driver the load information on where he picks up and where he's delivering to.  And then for communication back to his home terminal or his dispatcher, he can send messages via this keyboard that will be directed to the respective person that happens to be responsible for that driver.  There are also shortcuts, or a couple of different terms are macro or formed messages, which

USCA5 3184

when a driver arrives at a location where he's going to pick up his load, he would send in a particular macro saying basically, "I have arrived at this particular shipping point."  And they are sequenced where you would have to know the sequence of, you know, for instance, if memory serves me correctly, I think 03, if you would press 03 on the keyboard, it would bring up a preform message that says "Arrived at shipper."  You would merely hit enter or transmit and that data would go back.  Then when you would complete your loading at a shipper, you would probably use, I believe, macro number 4, which you hit 04 on your keyboard and it would bring up information that you would have to fill in pertaining to your load, bill of lading number, perhaps, weight, pieces.  And, again, I'm doing this from memory, I apologize for that but.  And then you would hit the transmit key again and it would go back to the trucking company.  Now, the, this occurs both at point of origin or the shipping point of the load as well as the consignee and, of course, these are different numbered macros.  It might be 7 and 8 for your arrival at your consignee and 8 for you're empty at a consignee.  And, in addition, if you have any additional pick-ups or stop-offs between your point of origin and your point of destination, they have unique macros also, so you can do an arrival and a departure by the stop number of your dispatch record.  Now, this sounds very lengthy and

USCA5 3185

complicated but I can shortcut it saying that if a driver does these correctly then it saves a phone call to the dispatcher and also eliminates the dispatcher from having to do keystrokes to enter the time of arrival and departure from each one of these particular points, because it will actually, if sent correctly and in the correct sequence, it will actually integrate the trucking company's software system.  And this is something that's pretty much the standard and the norm of the industry today and has been probably back to the late '90s.

Q   Okay.  And do you know what the percentage is of truck drivers that do this correctly?  In your company?

          MS. LARIN:  Objection, Your Honor, foundation.

          MS. BOOTH:  I'll withdraw the question but --

BY MS. BOOTH:

Q   Now, tell me about these trucks.  How much does the, and I say truck, how much does the tractor cost that you gave to Mr. Bourgeois?

A   If memory serves me right, that was a Kenworth T600, so it was probably, initial purchase price, somewhere between 90 and $125,000.

Q   Okay.  And how about the trailer?

A   A dry van would be in the 12 to $15,000 category.  If it was a reefer it would be in the 40 to $50,000 category.

Q   And how, can you give me a range of what the cost of a

USCA5 3186

load might be that you would ask one of your drivers -- I know they are not all the same, but don't you have a range of how much cargo is, how much it costs, to make it cost-efficient to use a great big truck to take it?

A    Well, I mean, you know, depending on the type of commodity, you know, it might be worth $10,000 if it was a load of, you know, scrap metal, or it might be worth $300,000 or even more if it was a load of Sony TVs or laptops, you know.  I mean it varies from one truckload to another.  It can be, again, very minimal or very expensive.

Q    Now, do you put insurance on your drivers?

A    Yes.

Q    And if you had a driver -- well, that's all I want to ask about that.  Do you know how many loads that Mr. Bourgeois took during the time that he was working at R.E. Garrison, just from May of 2002 until the time the baby was murdered?

A    Based on probably six to eight, I would say.

Q    And do you have, do you know during that period of time what states or what area R.E. Garrison was working in?

A    Basically, Garrison was a southeast to west coast operation, very heavy with dry freight to the west coast and bringing refrigerated freight back.  One of the major hauls at that time was for HON Industries in Alabama and Georgia taking office furniture, file cabinets, desks, things of that nature, to their distribution centers in California.

USCA5 3187

Shelton - Direct                    83

Q   All right.  And paperwork, were drivers required to do paperwork when they went out or when they were working?

A    You mean as far as --

Q    Did they have to do a truck sheet?

A    -- company paperwork?

Q    Yes, company paperwork.

A    Could I clarify that just a little bit?

Q    Yes, sir.

A    Do you mean company paperwork in addition to what the DOT would require as far as logs or anything?

Q    Yes.

A    Yes, they had to do a trip sheet, things of that nature, showing what states they went through, what the mileage were in the states, things of that nature, have to turn in their fuel receipts, and their logs, of course, as required by the DOT, and their properly signed bills of lading for their loads that they would be delivering for the company.

Q    All right.

A    And these had to be turned in on a regular basis.

Q    And how was it, if they are out on the road, how would they get their stuff turned in?

A    Most of them used what they call TripPak, which is an overnight service available at truck stops, or they could be dropped off at any terminal, something like that.  They also had prepaid envelopes if, you know, they just wanted to drop

USCA5 3188

them in a mailbox and have them come in that way.

Q   All right.  Now, what happens if you don't turn your paperwork in and you don't turn it in properly?

A   Well, it's probably not going to be noticed real quickly because logs, you're allowed seven to 14 days to get them submitted, and, of course, if you didn't turn your fuel receipts in, you know, it's probably going to be 14 days before that gets caught.  Of course, they only do the fuel taxes monthly where they would be looking for the actual receipts.  The bills of lading would probably be seven to 14 days before it would be noticed that they weren't in for billing the customers when the accounting people would be running their unbilled load report.  At that point in time, when you would see that you had a particular driver that had missing paperwork or, you know, you usually say, you know, get a hold of the driver manager, get a hold of the driver, find out where the paperwork is, then take it to safety and see if the logs are in, and the next step would be, you know, take a week probably to go through these various aspects of the chain of command there.  But there have been drivers whose pay has been held up until they turn in their paperwork.  Because most drivers, most company drivers, I'll qualify that, are on a mileage scale where they are paid for the amount of miles that they actually drive the vehicle from point A to point B as opposed to -- so they will, they can be

USCA5 3189

paid based on the mileage they have generated, not necessarily the paperwork coming in to bill the customer for the freight.

Q   Okay.  And did you -- and you supervised Mr. Bourgeois at several different locations, is that correct?

A   About 14 years, I guess.

Q   Did you ever have any problem with him not getting his paperwork in or not getting his logbook in?

A   Not to my knowledge.  I was never made aware if there was any problems, and I know the type of operation we were running and how we had them structured, if there had been a problem I'm sure I would have become aware of it.

Q   And do you have drivers that you have to speak to about their personal hygiene?

A   Oh, yes.

Q   Now, Mr. --

A   That is --

Q   Go ahead, explain that, yeah.

A   Can I, can I expand on that just moment?

Q   Go ahead, go ahead, go ahead.

A   Having been in the industry for a number of years, there are, there are times where, you know, it's notorious, the drivers are over-the-road, you know, they're going to be away from home for a week, two weeks, a month at times, but, you know, now in today's environment and even the last 20 years,

**USCA5 3190**

you know, they've got the sleeper berth trucks and things of that nature, but still, you know, there comes a time where when you're fueling the truck you take an extra 15 minutes and grab a shave, get out of the truck and go in and take a shower.  I have had in the past drivers that walk into the terminal in Birmingham or in Cullman or even when I was working with U.S. Express in California, that you would swear up and down that, you know, they had been out plowing a field somewhere and, you know, covered with dirt, hair never combed, not shaven, things of that nature, and we have had over the past customers would call and say, "Don't send this person back in," and so, you know, we had, we, you know, I have counseled several people over, you know, you've got to, you know, step back there and take a shower now and then, you know.

Q    Was that ever a problem with Mr. Bourgeois?

A    Never.

Q    Although you never saw him take a shower, did you?

A    No, I never saw him take a shower, never saw him shave or brush his teeth or anything, but, I mean, when, the environment --

Q    But did he present --

A    The environment which I was in, being in, you know, the terminal, and my office was at the very, U.S. Express was at the very back of dispatch, my office was much similar to what

USCA5 3191

this is, if this would be dispatch out here, and I had a kind of a corner office here that I could see all of my people out there, where I could see everybody that came in or went out. You know, he was always very neat in appearance, very clean-cut.

Q   Would you have, do you consider him a friend?

A   Yes, I do.

Q   And when you heard about what had happened, were you, how did you feel about that?  Were you surprised?

A   Shock is not a strong enough statement.

Q   Would you, besides this capital murder case, would you have hired him back if he would have come back in 2002?

A   In a minute.

Q   Did Mr. Wiseman come to your house?

A   Mr. Wiseman?

Q   The attorney over here.

A   Oh.

Q   Yes.

A   I didn't recognize his name, I'm sorry.  Yes, he did.

Q   And did he make an appointment and come or did he come unannounced?

A   No, he just stopped in one morning.

Q   All right.  And did he tell you that Mr. Bourgeois had been given tests and they were low scores indicating that he might be mentally retarded?

USCA5 3192

A    Something to that effect, yes.  He said that he had been given, he had, he was basically the defense counsel for Mr. Bourgeois on this pending evidentiary hearing and wanted to know if I had worked with him in the past and I said, "Yes, but I have been under subpoena by the prosecution." And he said, "Can we talk to you for a minute?"  I said, "Yes."  And he said, "Well," he said, "what do you think," it was not the actual comment of mental retardation but the way I interpreted it was there might be a little below average mental ability.  And I said, "I never noticed anything of that nature."  And he said something in the nature of, "Well, we have interviewed and given him a series of tests and find out that there may be some things that may be below average," is the way I interpreted it, but I do not remember the actual terminology being mental retardation.

Q    Were you shocked by that assessment?

A    Yes, I was.

Q    And why is that?

A    Well, again, I was basing my, my opinion on knowledge of Mr. Bourgeois from, you know, 10 years ago, you know.  I mean, all things change and I mean, you know, apparently something has here, but I found it very hard to believe that this could have been something that was developed or could have been an issue that I would have noticed back in the environment in which I was working with him at.

USCA5 3193

Q    Okay.  Thank you.

A    But again, I did not have daily contact with him, so.

Q    Okay.  Thank you, Mr. Shotts.

        THE COURT:  Yes, ma'am.

        MS. LARIN:  Your Honor, I had to switch to my non-clicking pen.

                    CROSS-EXAMINATION

BY MS. LARIN:

Q    Good morning, Mr. Shotts.

A    Good morning, ma'am.

Q    My name is Elizabeth Larin.  I represent Mr. Bourgeois.

A    Okay.

Q    We have not met, though.

A    No, we haven't.

Q    So, I believe your testimony is that you met Mr. Bourgeois in 1996?

A    Yes, ma'am.

Q    Okay.  And you have worked with him on and off since then, or consistently?

A    Yes.  Yes, ma'am.

Q    Which one, I'm sorry?

A    I didn't hear what you said.

Q    Have you worked with him consistently through the years or --

A    Consistently?  Not day-by-day, but at three different

USCA5 3194

Shotts - Cross                                          90

employers the answer is yes.

Q    Okay.  So, about how often would you see Mr. Bourgeois?

A    Well, again, depending on whether we are talking the U.S. Express days at Birmingham or we're talking the Eagle Motor Line days which was also in Birmingham or the short period he was at R.E. Garrison in Cullman, depending on what his runs were.  I'm sure both the U.S. Express and Eagle Motor Line days in Birmingham, based on the type of operation we were running, there might be times you would see a couple of times a week if he, you know, come in and ran a load to North Carolina and back to Alabama, and there might be times, other times, where you might not see someone for two or three weeks.

Q    Okay.

A    So there was no real consistent pattern in I would see him Monday, Wednesday and Friday or Tuesday and Thursday or anything of that nature.

Q    And what was your position in these companies?

A    I was vice-president of operations at U.S. Express, I was general manager at Eagle Motor Lines, and I was director of operations at R.E. Garrison.

Q    And so what kind of interaction would you have with Mr. Bourgeois, was it a social interaction or a work related interaction?

A    More of a social interaction than anything because of the

USCA5 3195

fact, you know, I mean usually when I was dealing with people at any of those companies it was that there was a, there was some type of a problem either with a customer or with their equipment or there had been a complaint or they weren't running enough miles or they were running too many miles, and I was kind of, you know, to look after something of that nature.

Q    And you never had to have those conversations with Mr. Bourgeois?

A    No.

Q    So your, so your conversations with him were more, "Hi, how are you doing?"

A    Yeah, you know, "How are things going on the road, anything we can do for you," that kind of thing, "How's your truck doing," and that kind of thing, right.

Q    So in these conversations, were they scheduled, like would he come into your office for a regular meeting?

A    No, no.

Q    What were, where would you talk to him?

A    I would see him out talking to someone in dispatch or something like this, walk out there and say, "Hi," you know, "Al, how are you doing," and this kind of thing, and, "Where you been," and, "Have you been to Texas recently, you been," you know, "where have you been, to Florida," or whatever, you know, and just talk about things in general.  It was not

USCA5 3196

anything that, you know, I called him into my office or he came into my office or anything of that nature, it was more of a social environment, you know, but, I mean, he never had any problems in either talking to me or talking to other people in the office there.

Q   And when you say -- did you ever actually socialize with Mr. Bourgeois outside of work?

A   No.

Q   You never went to dinner with him, for example --

A   No.

Q   -- or were you ever in his --

A   Well, I'll qualify that.  I think he would probably attend some of the safety breakfasts we might have had or something like that, but as far as socializing as a one-on-one or management with driver or drivers, the answer is no.

Q   And were you -- I take it you were never at his home?

A   No.

Q   Okay.  Were you aware that his wife traveled with him when he worked at R.E. Garrison?

A   I believe that they have to receive a passenger authorization form and it's so noted in the computer.  Yes, I knew his wife was with him.

Q   Now, do you know -- you have heard the term dedicated route?

A   Yes, ma'am.

USCA5 3197

Shotton - Cross

Q    Do you know if Mr. Bourgeois drove dedicated routes more than other routes or --

A    Do I know or did he?

Q    Did he?  Did Mr. Bourgeois --

A    No.

Q    -- drive dedicated routes?

A    No.

Q    Not in your experience?  Well, maybe you should define a dedicated route.

A    Dedicated route would be where you would run from one point of origin to one destination for a customer and turn around and do the same thing back, usually what they call dedicated service.  There were some consistent runs at Garrison which would have the same origin and the same destination, and I go back to speaking of HON Furniture being a major customer of theirs and there was probably --

Q    Excuse me.

A    -- six loads a week that all went to South Gate, California, but it just happened to be whoever was there to take them.

Q    And that was at Garrison?

A    Yes.

Q    How about in the prior companies, U.S. Express and Eagle?

A    U.S. Express had some dedicated runs but they were not really fitting into the southeastern operation, and we had

USCA5 3198

some at Eagle with Parisian that were store deliveries that ran the same days every week, and we had a few with Clipper Express.

Q    And how about the concept of consistent runs as well as the dedicated routes?  Do you recall?

A    No, I don't.

Q    Okay.  You discussed the computer system that was on the Garrison truck?

A    Yes, ma'am.

Q    Did you personally train him on that computer system?

A    Did I?

Q    Uh-huh.

A    No, it was part of probably the orientation program.

Q    Did you ever actually see him use that computer, the -- on his end?

A    On his end, no.  On the receiving end as far as the company, the answer is yes.

Q    Yes.  At any of your companies did you provide psychological testing for when you hired new employees?

A    No.

Q    And I imagine you were surprised when you heard about this crime?

A    Again, your question of that earlier, Counselor, the word shocked is not a strong enough statement.  I am still, I still think about this a lot and I'm, I just can't comprehend

USCA5 3199

it, I still can't comprehend it.

Q   Because you knew Mr. Bourgeois?

A   I agree, you know, and I just, I, you know -- some of these things I think perhaps you can see coming.  I saw, I never saw any hint of this.  I was devastated.

Q   Did you ever see Mr. Bourgeois do paperwork?

A   You mean as far as filling out his logbook or something of that nature?  Yeah.

Q   You saw him do that?

A   Oh, yeah.

        THE COURT:  Was he slow or quick at it?

        THE WITNESS:  He didn't have any problem, didn't appear to have any problem at all, ma'am.

        THE COURT:  Okay.

BY MS. LARIN:

Q   And was that paperwork, the logbook is sort of a template that they fill in?

A   The logbook is kind of a graph, I like to use the term, where, you know, you're off duty here and you go down here and you drive and you're back up here kind of thing where you keep track of your --

Q   Right.

A   -- keep track of your hours.

Q   I believe this is in the trial record but you draw a line --

USCA5 3200

A    Yes.

Q    -- for when you're driving --

A    Yes.

Q    -- and when you're not driving?

A    Then you put a line down here when you have what they call a change of duty to show where the change of duty took place at.  I'm sure it's all a matter of record.

Q    It's in the record.

A    I'm sure, yeah.

Q    And did you know -- you did not know Mr. Bourgeois prior to his employment?

A    No.

Q    You never knew him as a child or --

A    No.

Q    Are you aware that Mr. Bourgeois had his license suspended in 1995?

A    In 1995?  No.

Q    So it would seem that he, his driving improved by the time you had met him?

A    Apparently so, because I didn't even meet him until 1996.

Q    And then at some point did you have the occasion to speak with Dr. Moore regarding Mr. Bourgeois?

A    We spoke briefly on the phone, yes.

Q    Do you know about how long that conversation, how long --

A    How long ago or how long the conver- --

USCA5 3201

Q   How long was that conversation?  How long did you speak to him?

A   How long the conversation was?

Q   Yes.

A   Probably 15, maybe 30 minutes at the most.

Q   Did you ever meet with him in person?

A   No.

        MS. LARIN:  Thank you, Your Honor.  I have no further questions.

        THE COURT:  Thank you.

                    REDIRECT EXAMINATION

BY MS. BOOTH:

Q   You said you never saw him on the computer but from your side you saw the answers or the replies that he put in there?

A   No, I never saw him sit there at a keyboard in his truck, but what I could observe was the information he had done correctly from the truck that would integrate the loads for the customer service and dispatchers.

Q   And compared to the other drivers in your, on your team, was his entry that came from his truck as accurate or more accurate than the group that you were, the team that you were working with?

A   Probably I would say above average.

Q   Okay.

        THE COURT:  In a logbook, don't you write things in

USCA5 3202

besides draw lines?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

THE WITNESS:  Your --

THE COURT:  So, and you observed him writing sentences and things?

THE WITNESS:  It's not necessarily sentences, ma'am, on the logbook, it's --

THE COURT:  It's Ft. Worth at 10:00 o'clock, something like that?

THE WITNESS:  Something like that.  Signature.  And it's more, again, cities and states.

THE COURT:  Uh-huh.

THE WITNESS:  And more, you know, your bill of lading number, your tracking number, you turn in a number of things, but it would be --

THE COURT:  Not a travelogue?

THE WITNESS:  No, you are exactly right, yes, thank you.

THE COURT:  Okay.  Thank you.

MS. BOOTH:  That's all I have, Your Honor.

MS. LARIN:  Just one brief question?

THE COURT:  Sure.

USCA5 3203

RECROSS-EXAMINATION

BY MS. LARIN:

Q    Regarding the computer on the truck at the Garrison Company?

A    Uh-huh.

Q    You don't know if anyone else might have inputted the information on Mr. Bourgeois' truck that you read the printouts of?

A    I, do I have knowledge if they did?

Q    Right, do you know if someone else put that information in?

A    I have no way of knowing that.

Q    But you are aware that he had family members with him on the truck?

A    According to the information I was provided, he only had families with, family members with him the last week of his, of his employment, and I believe some of the information I believe that was provided, and again I'm speculating here, on the original --

        MS. BOOTH:  Well, Your Honor, I'm going to object if he's speculating to something.

        MS. LARIN:  Right.

        THE WITNESS:  Well -- go ahead.

        THE COURT:  Overruled.  Go ahead.

        THE WITNESS:  What I was saying, what I was saying

USCA5 3204

was I don't know what information was provided at the original trial but there was, there was, from his very first day of work, when I look back at this years ago, he would, he knew how to use a computer on his very first trip, and I at that time am comfortable that he did not have anyone else there with him.

Q   Why are you comfortable with that?

THE COURT:  He said from the first day of work he could use a computer.

MS. LARIN:  Right.

BY MS. LARIN:

Q   I'm just wondering how he knows there wasn't anyone with him on that first day.

A   Well, when he left, when he left the Garrison yard on his first trip, there was no one in the truck with him.  Now, I'm going way out on a limb saying that he did not pick up someone that knew how to operate that satellite communication before he got to California.  That is the assumption I am making, Counselor.

Q   Okay.  But you were there when he left the first time?

A   Yes, ma'am.

Q   Okay.  And --

THE COURT:  I guess the point is that he knew how to work it so there was no reason for anybody to use it for him.

THE WITNESS:  Thank you very much.

USCA5 3205

THE COURT:  Is that correct?

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

THE WITNESS:  Yes, ma'am.

MS. LARIN:  Thank you, Your Honor.  No further questions.

THE COURT:  Thank you, ma'am.  What do you-all think for breaking for lunch?

MS. BOOTH:  Yes, that would be nice.

MS. LARIN:  Whatever would --

THE COURT:  You are excused.  Thank you, sir.  How much time, 45 minutes?

MS. BOOTH:  Forty-five minutes.

THE COURT:  Okay, 45 minutes it is.  Thanks.

(Lunch recess at 12:30 p.m. until 1:14 p.m.)

THE COURT:  Thank you, you may be seated.  Did anybody tell Mr. Wiseman -- did you know where the attorney lounge is?

MR. WISEMAN:  Yes, ma'am.

THE COURT:  Okay.

MR. WISEMAN:  We were down there.

THE COURT:  Okay.

MR. WISEMAN:  Thank you.

MS. BOOTH:  I went down there the other day to visit with them and they told me, accused me of being sent down

there to distract them.  I know.

THE COURT:  There's nothing for it, Ms. Booth.

MS. BOOTH:  I know.  I just like to go look at the rug in there, you know?

THE COURT:  Considering I ordered all that stuff myself.

MR. WISEMAN:  I thought the rug was quite lovely, Your Honor.

THE COURT:  Thank you.

MS. SALINAS:  It's a lovely rug, yes.

THE COURT:  It was actually the bankruptcy judge's rug from before we moved in here.  Are you all ready?

MS. SALINAS:  Yes, Your Honor.

THE COURT:  Call your next witness.

MS. SALINAS:  Call to the stand Mr. Key.

THE COURT:  Who?

MS. SALINAS:  Christopher Key.

THE COURT:  Okay.

THE CLERK:  Please come forward.

CHRISTOPHER KEY, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MS. SALINAS:

Q   Good afternoon.  Could you please state your full name for the record?

USCA5 3207

A    Carlin Christopher Key.

Q    And Mr. Key, how are you employed?

A    Southern Cal Transport.

Q    And what is Southern Cal Transport?

A    It's a trucking company.

Q    And where is it located?

A    Birmingham, Alabama.

Q    And how long have you been in the trucking business?

A    Since '94.

Q    Okay.  And when was the first -- do you know an individual, first of all, by the name of Mr. Alfred Bourgeois?

A    Yes.

Q    And when did you first meet Mr. Bourgeois?

A    I believe the first time that I actually met him was at Eagle Motor Lines, but I knew of him at U.S. Express.

MR. WISEMAN:  Objection, nonresponsive, Your Honor.

THE COURT:  Overruled.

BY MS. SALINAS:

Q    Okay.  And when you knew of him in U.S. Express, what year was that?

A    '98.

Q    '98.  And then you said you knew him when you were at Eagle Express, Eagle Motor Lines?

A    Yes.

Q    And what year was that?

A    '99.

Q    Okay.

A    Through 2001.

Q    2001, okay.  And when you were at Eagle Line, Eagle Motor Line, what were you doing for Motor Eagle Line?

A    I was a fleet manager.

Q    And at that time was Mr. Bourgeois a driver for Eagle Motor Line?

A    Yes.

Q    And as a fleet manager, what were some of the responsibilities or the duties that you had?

A    I was responsible for speaking with drivers, letting them know of their load assignments, the details of that; monitoring their progress to make sure that they were delivering on time; also monitoring their productivity to make sure that they were being productive for themselves and for us.

Q    And Eagle Motor Line back in 1999 to the period of 2001, was that a, would you classify that as a large company, a mid-size company?

A    It was relatively small when we started, around 36 trucks when I started there.  Then --

Q    And --

A    -- sometime around the end of '99, beginning of 2000, we

USCA5 3209

purchased another trucking company.  We were at 92 trucks when we purchased the other trucking company and the two companies merged together I believe was somewhere around 300 trucks.

Q    And the type of trucks that were used at Eagle Motor Line were what kind of vehicles?

A    DOT classified Class A vehicles.

Q    Are those known as 18-wheelers?

A    Yes.

Q    Okay.  And are those expensive pieces of equipment --

A    Yes.

Q    -- tractors and trailers?

A    Yes.

Q    In the range of what amount?

A    A hundred thousand for the truck, roughly 40,000 for a trailer.

Q    Okay.  And when you started at Eagle Motor Line back in, in the period of 1999, were there the same type of communications systems for the drivers that are now in place?

A    No.

Q    And how was it that you were, you had to communicate the information about the loads with the drivers?

A    It was all over the phone.  The only other communication we had was they had pagers, so they were instructed to make a check call first thing in the morning and then again in the

USCA5 3210

afternoon, and that's in addition to any time they needed information or needed to give information.

Q    Okay.

A    And then the pager was just in case we needed to get in touch with them.

Q    And Eagle Motor Line was located, back in 1999 to 2001 when you were the fleet manager, it was located where now?

A    It was Birmingham, and then after the purchase of Howard Hall Transport it was moved to Trussville.

Q    Trustville?

A    Truss, T-R-S, T-R-U-S-S-V-I-L-L-E.

Q    There in Alabama?

A    Yes.

Q    Okay.

A    A suburb of Birmingham.

Q    And as fleet manager did you have on occasion face-to-face communications with the drivers?

A    Yes.

Q    And you would have face-to-face communications with the drivers on an average how many times per week?

A    On a given -- to a given driver or just the drivers as a group?

Q    Drivers as a group.

A    I would say every day I would see at least three to ten.

Q    Okay.  And the office that you were in, is it, do we call

USCA5 3211

it a terminal?

A    Yes.

Q    And so when the drivers are through with their loads, do they automatically come into the terminal?

A    No.

Q    Okay.  The kind of loading or the loads that Eagle Motor Lines had, was running at that time, where did Eagle Motor Line drivers travel to in the United States?

A    It was expanded southeast, basically everything east of Dallas.

Q    Dallas, Texas?

A    Yes, that's correct.  And everything east of Chicago for the Midwest.  And that's, that's a vague description.  I'm not going to say that there weren't exceptions but that was primarily what we did.

Q    Okay.  And is that all year round?

A    Yes.

Q    And back, you said, in '90-, back at, when you-all purchased another company, you-all were running about approximately 92 trucks, is that correct?

A    Yes.

Q    So that, does that mean there was 92 drivers or were there more or less?

A    For us, we were a solo operation, so it would have been 92 drivers, yes.

USCA5 3212

Q   Okay.  And the information you said when you had the interaction with the drivers, what kind of information was being relayed to the drivers?

A   It would have been requirements for pick-up, on-time pick-up, on-time delivery.  If there --

Q   And let me just break that down.  When you say on-time delivery, so is the information like you have to pick up at a particular date?

A   Yes.  There were, there were some loads that would have a specific time appointment that we had to pick up.  There were others that had a window, meaning from maybe 8:00 a.m. to 2:00 p.m. or et cetera.

Q   And let me ask you this:  As a fleet manager, you mentioned just now that sometimes they had specific appointment times that they had to either pick up or deliver, is that correct?

A   Yes.

Q   And what if the drivers were, weren't there at the appointed time, what, if anything, would that do or concerns would that cause?

A   Well, obviously it would be a service failure to the customer, but what it meant to us internally was we tried to alert the customer ahead of time that we would not pick up on time, and we would gain that knowledge through either knowing that we planned it that way, meaning we didn't have a truck

USCA5 3213

available to pick up on time, or that for some reason or another a driver could not make that commitment, and it was up to them to relay that information to us.

Q   Okay.  And back in 1999 were you delivering or giving that type of information to Mr. Bourgeois yourself?

A   Yes.

Q   And during that time from 1999 to 2000 -- well, let me ask you this:  You mentioned that you were there at Eagle Line in 1999, that's when you first met Mr. Bourgeois?

A   No.  Well, yes, face-to-face, I believe that's correct, yes.

Q   You said earlier that you knew of him --

A   Yes.

Q   -- when he was at Hall Systems?

A   Yes, that's correct.

Q   And how was it that you knew of him?

A   Just word of mouth, you know, other people speaking of him in the office.

Q   Okay.  And during that time when you were working as fleet manager for Eagle Motor Lines, did it ever appear to you that Mr. Bourgeois did not understand the information you were imparting to him regarding the load pick-up dates and delivery dates?

A   No.

Q   Did you ever have to repeat to Mr. Bourgeois the

USCA5 3214

information that you were giving to him?

A    Not that I can remember, no.

Q    And did you ever have to explain instructions to him about the locations, where these places were, as far as having to give him, take out a map and show him specifically where to go?

A    Nothing outside the ordinary.  I mean, no one actually already knows where customers are.

Q    Okay.

A    So everyone has to be given some information on how to, how to get to where they're picking up.

Q    Okay.

A    But nothing abnormal.

Q    And, well, let me, now that you say that, that's right, they don't know where they're going until you tell them the specifics.

A    That's correct.

Q    Or you give them the bill of lading or, I forget what it's called, a --

A    Pick-up number?

Q    Pick-up number.  And did you have to give him, relay that information to him repetitively on the same load?

A    No, no.

Q    Now, in the trucking business, Mr. Key, there are certain regulations that one has to keep up with as far as the truck

USCA5 3215

is concerned?

A    That's correct.

Q    And we have heard a lot about the daily driver's logs.

A    Yes.

Q    Are you familiar with those?

A    Yes.

Q    And as a fleet manager did you see those logs on occasion?

A    I did not see them unless there was a problem.

Q    Okay.

A    It was our responsibility, once the safety department approached us, to counsel the drivers when they were having issues.

Q    Okay.  And you are familiar with the regulations regarding how many hours a truck driver can be on the road on a certain period of time, I don't know if it's within a 40- week, a 40-hour week or what not?

A    Yes, yes.

Q    Are, does Eagle Motor Lines impart any sort of instruction or training to the drivers about those requirements?

A    Yes, during orientation there's a, basically it's a short training class, and it's mainly a refresher because everybody that is a CDL holder is tested on logbook laws and regulations, so when they come to us with a CDL already in

hand, we have to expect that they already know something, but just as a safety precaution we do go over it in orientation.

Q    And when Mr. Bourgeois came to Eagle Motor Lines, did he come to you, to Eagle Motor Lines with some prior driving experience?

A    Yes.

Q    And that would have been as a CDL driver?

A    Yes.

Q    Now, in order to keep up or not -- let me ask you this: The safety, the inspect-, there are some inspection stations throughout the interstate, are there not?

A    Yes.

Q    And what, and those inspections or those weight stations, I believe they are called?

A    Yes, that's correct.

Q    Is that sometimes where the daily driver's logs are inspected by the inspectors?

A    Yes.  They randomly will spot-check trucks, walk out, ask for logbooks and permits, all that kind of stuff.  Also, if a driver gets pulled over for speeding they will ask for it sometimes.  And sometimes they just will randomly pull trucks over and just check them to see how they are.

Q    And if a driver indicates in his logbook that he has exceeded the hours of driving time that he's supposed to, that he is mandated not, to drive or not to drive, can they,

USCA5 3217

can that result in fines to the individual and/or to the company?

A    Yes.

Q    And so there are some, you have, is it fair to say that one has to be able to comprehend and understand the number of hours that one can drive on a given week?

A    Yes, that's true.

Q    Now, the logbooks, how important are those to your company?

A    It's extremely important.  It's kind of difficult to log everything and be productive at the same time, so someone who is excessively productive, an overachiever say, you know, per se, would have to be, they would have to be extremely knowledgeable of logbooks, the logbook hours.  They would also have to be pretty, pretty good at math, because it's, it's difficult to be, to be legal and still get a lot of miles per week.

Q    And you mentioned the word for someone who is an overachiever, and during the time from 1999 to 2001 when you were working with Mr. Bourgeois, would you classify Mr. Bourgeois as an overachiever?

A    Yes.

Q    And can you give us some examples of why you say that?

A    Well, for one thing we had a customer, I believe the customer was Clipper Transport, he ran --

USCA5 3218

Q    And you say he, who are you referring to?

A    I'm sorry, Mr. Bourgeois ran two or three loads for them and then they requested him.

MR. WISEMAN:  Objection, Your Honor, it's hearsay.

BY MS. SALINAS:

Q    Okay.  Let me ask you this:  Were there favorite drivers that some of the companies had?

A    I'm sorry?

Q    Were there some favorite drivers that some of your companies had?

A    Favorite drivers in our minds?

Q    Well, that, the different companies that you would transport for?

A    Yes.

Q    Did they --

A    Yes.

Q    Did they ever have their own special drivers that they would request?

A    Yes.

Q    And was Mr. Bourgeois one of those individuals?

A    Yes.

MR. WISEMAN:  Objection, hearsay, Your Honor.

MS. SALINAS:  I'll move on, Your Honor.

BY MS. SALINAS:

Q    Did Mr. Bourgeois do a drive or a, a particular drive for

USCA5 3219

a company known as Clipper Transport?

A    Yes.

Q    And did you give Mr. Bourgeois the Clipper Transport route?

A    Yes.

Q    I didn't hear you.

A    Yes.

Q    Okay.  And why was -- and you gave it to Mr. Bourgeois for what reason?

A    Well, let me explain a little bit.  The way it works in the office, in the office with trucking, is you have a CSR, customer service rep, that deals directly with the customer and they relay information to us, us being fleet managers, job manager, dispatcher, and then we relay that to the driver.  So the instructions that we get from the CSR we pretty much take to be the gospel because it's in everyone's best interest that every, all the information be true.  And so when it was relayed to me that he was requested by the customer --

        MR. WISEMAN:  Objection, Your Honor, it's hearsay.

BY MS. SALINAS:

Q    Let me just ask you this:  Did you get information about Mr. Bourgeois and Clipper Transport?

A    I'm sorry?

Q    Did you get, receive information?

USCA5 3220

A    Yes.

Q    And as a result of that information did Mr. Bourgeois then start running specifically for, well, not specifically, not only, but on occasion for Clipper Transport?

A    Yes.

        MR. WISEMAN:  Objection, Your Honor, that also calls for hearsay.  She's not saying what the information is but she is conveying that information was provided upon which a decision was made.

        THE COURT:  Sustained.

BY MS. SALINAS:

Q    Let me ask you this:  The Clipper Transport route, was that a designated route or was that a multistage route?  Or run, I'm sorry.

A    It was, it was designated but it, sometimes it did have multi stops.

Q    Okay.

A    But the stops were always the same stops, we never had just random stops.

Q    Okay.  And Clipper Transport was located where?

A    Atlanta and Chicago, I believe.  I believe there was also another Illinois location but I don't remember where it was.

Q    Okay.  Now, the, we were going, we were talking about the logbooks.  What is requested, what kind of information is requested for the drivers to put in their logbooks?

USCA5 3221

A    What status they are as far as on duty not driving, on duty driving, sleeper berth and off duty, as well as pretrips, which is an inspection that has to be done on the truck before their start of day, and then where they stop to fuel, that sort of thing.

Q    Okay.  And does it require them to sign it?

A    Yes.

Q    Are they required to relay the, or coordinate their stops with the bill of ladings whenever they do a pick-up or a delivery?

A    Yes.

Q    Does it include all kinds of stops, whether it's for fuel or for rest?

A    Any, anything that has to do with what they do, any change of duty status, any, anything is supposed to, everything that has anything to do with what they are doing is supposed to be on that logbook.

Q    Okay.  Now, the, Mr. Bourgeois, did he -- let me ask you this:  In your line of business do all the drivers have the same level of motivation as far as driving the most they can?

A    No.

Q    And Mr. Bourgeois, you mentioned that he was an overachiever, did he ever request more hours to drive?

A    More miles?  Yes, he did.

Q    And did he engage in that conversation with you?

**USCA5 3222**

Kern-Direct                    118

A    Yes.

Q    Can you tell us a little bit about that conversation, or those conversations?  Was it on one occasion or more occasions?

        MR. WISEMAN:  Could we place this with a time reference, Your Honor?

BY MS. SALINAS:

Q    Can you tell us when this, when you first started noticing that he was requesting more hours?

A    Immediately.

Q    Immediately.

A    And it's miles, not hours.

Q    Miles, I'm sorry.  So, is it fair to say throughout the employment of through 1999 to 2001?

A    Yes.

Q    Okay.  And can you tell us a little bit about these conversations that you would have with Mr. Bourgeois?

A    Yes.  If you consider that a paycheck being from a, on a seven-day period, if it got to the fourth or fifth day of the pay period and he didn't have the amount of miles that he wanted or thought he should have had by that time, he would, he and I would be having a conversation about why was his miles not up, what could we do to get him more miles, et cetera.

Q    And in reviewing his logbooks or the number of hours, was

USCA5 3223

he running to the top of, or for lack of a better word, to the max of the hours that he could?

A    Yes.  I would say he was maximizing his production, you know, capabilities.

Q    Now, is that a difficult thing to do in order to make sure that you are working the maximum number of hours legally required, is that some --

A    Yes.

Q    A skill that is, that is difficult to do?

A    Yes, it's difficult.  It's difficult to overachieve and maintain legality.

Q    Okay.  And when you gave Mr. Bourgeois a load assignment, did you ever have to worry about whether or not it would be done correctly?

A    No.

Q    And whenever you saw on the computer that you had a difficult customer, it was, did you ever consider putting Mr. Bourgeois on that particular trip?

A    Yes.

Q    And why was that?

A    Because of his track record with being on time, being early in most cases.  And that was driven from his need to get more miles and be more productive.  Because you have a certain amount of people that you have to monitor constantly and worry about and they take up most of your time, and then

USCA5 3224

Kesh Direct                                                                120

when you have a customer whose requirements are heavy, so to speak, meaning that they want more than most customers do, then you typically will find your over performers and put those guys on those loads because you know that you don't so much have to worry about failing service for the customer.

Q   Okay.  And the service on the trucks that the drivers were assigned to, was that responsibility left up to the drivers?

A   Yes, they were responsible for knowing their mileage intervals for when they were due an oil change or a rotation, tire rotation, or something, anything of that nature.  They were responsible for knowing those intervals.

Q   And if they exceeded those intervals or were not meeting the, like the date where the service was up, did those drivers get notified that they had not yet maintained their trucks?

A   No, we did, through the shop.  The maintenance department would let us know that we had a list of drivers or a list of trucks that, you know, were exceeding their mileage intervals or exceeding their time intervals.

Q   And you would get that information?

A   Yes.

Q   Did you ever have to have a conversation with Mr. Bourgeois that he was not keeping and maintaining his truck as required?

USCA5 3225

A    No.

Q    And you stated that you talked to Mr. Bourgeois, and especially when you were talking about his request for making sure that he got the maximum number of hours that he could. How would you describe his personal hygiene?

A    He was well kept.

Q    Okay.  Did he, did you ever have to counsel him about not maintaining his hygiene?

A    No.

Q    Okay.  The type of trips that these drivers made, and in particular I'm speaking about the type of trips that Mr. Bourgeois would have made, would they require them to be overnight for a day or two or maybe even more to, before they arrived at their point of destination?

A    Yes.  Typically our drivers were, they were home every weekend or every other weekend, and that changed over time. When I started in '99, most everybody was home about every weekend, and as that, as time moved forward, as, just through, for reasons of cost and productivity, we changed our requirements for driver home time, and I believe that when I left in 2001 it was every 10 days.

Q    So they would be on the road for 10 days?

A    Uh-huh.  I'm sorry, yes.

Q    Okay.  So they were responsible for taking enough clothing and taking care of their hygiene and what not?

USCA5 3226

Keys - Direct                                                            122

A    Yes, yes.

Q    Did the terminals, do a lot of these terminals -- well, let me ask you this:  Truck stops, are they equipped with shower services for the drivers and what not?

A    Yes.

Q    And the truck drivers, the 18-wheelers, the trucks that Mr., the truck that Mr. Bourgeois was driving, were they equipped or was it equipped with what's known as a sleeper berth?

A    Yes.

Q    And were they allowed to sleep in the sleeper berth?

A    Yes.

Q    Those sleeper berths are not, do not have shower facilities in there, do they?

A    No, they do not.

Q    Or water to wash your face or anything like that?

A    No.

Q    Okay.  On the times that you communicated with Mr. Bourgeois in the particular, whenever you saw him or talked to him about loads or what not, how would you classify his level of communication?

A    He communicated well.

Q    Okay.  Do you recall during his employment that he was ever late with a load?

A    Not that I recall, no.

USCA5 3227

Q    And as far as you are concerned did he, did Mr. Bourgeois, was he able to follow through on the instructions given to him about his particular loads and deliveries?

A    Yes.

Q    Now, so you worked with him from '99 to 2001, correct?

A    Yes.

Q    For about two-and-a-half years, is that correct?

A    Yes.

Q    And in that time was there anything about the defendant's, Mr. Bourgeois' interaction -- well, no, I'm going to retract that statement, and that brings me to a different point.  Mr. Key, during those years that you saw Mr. Bourgeois, did you ever see him having a rage attack at the terminal?

A    No.

Q    Did you ever hear him yelling and hollering in an angry manner?

A    No.

Q    And then there's, from 1999 to 2001, did you ever believe or, that Mr. Bourgeois had any mental deficiencies?

A    No.

Q    Did you believe he was mentally retarded?

A    No.

Q    Now, Mr. Key, in the trucking business, when one moves

USCA5 3228

from one trucking company to another, especially in a

management position, do -- well, you moved, did you not?

A    Yes.

Q    Did you ever talk to drivers about moving along with you?

A    Yes, I did.

Q    And usually you would, who did you want to take with

yourself, what type of driver?

A    The best drivers, the best performers.

Q    And was Mr. Bourgeois one of those drivers, or would have

been one of those drivers?

A    Would have been, yes.

        MS. SALINAS:  May I have just a moment, Your Honor?

        THE COURT:  Yes, ma'am.

        MS. SALINAS:  I have no further questions, Your

Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MR. WISEMAN:

Q    Good afternoon, Mr. Key.

A    Good afternoon.

Q    You started in the trucking business in 1994?

A    That's correct.

Q    And would that have been, not to press your memory too

much, about when in '94?

A    I would say August, September.

USCA5 3229

Q   All right.  So approximately 16 years ago?

A   Yes.

Q   Okay.  And did you start as a manager or did you start in some other capacity?

A   I started as a driver.

Q   And how long were you a driver?

A   Off and on, until '98.

Q   And in 1998 you became a manager?

A   Yes.

Q   And what time of year in 1998?

A   I think it was July.

Q   So roughly 12 years ago?

A   Yes.

Q   And you testified that when you first started at Eagle they had, well, I'm sorry, at U.S. Express, is it, that there were 36 trucks?

A   No, that was Eagle.

Q   Oh, I'm sorry, it was Eagle, okay.  And that went up to 92 trucks?

A   That's correct.

Q   And about when did it go up to 92 trucks?

A   It was gradual from, from August of '99 till the end of the year.

Q   And when you were at Express, how many trucks were you responsible for?

USCA5 3230

A    U.S. Express?

Q    Yes.

A    Seventy-five.

Q    All right.  So it was 75 trucks until you went to Eagle in what year?

A    '99.

Q    And what's the turnover like among drivers in your business?

A    Turnover?

Q    Yeah.

A    Industry standard is probably somewhere around 110, 115 percent.

Q    What does that mean?  I'm not sure I understand the answer.

A    If you have 100 drivers, in a year's time you will turn over, you will lose 114.

Q    Oh, okay.  So, from 1998 when you first met Mr. Bourgeois, I'm not good in arithmetic, sounds like we're talking about over 1,000 drivers?

A    Depends on how many drivers your trucking company had.

Q    Right.  I'm talking about your experience with the 75 trucks and then it went up to 92 trucks at the other company, we're talking --

A    That's the industry standard, that's not what I experienced.

USCA5 3231

Q    All right.  Well, I had asked you what the turnover was like, was the turnover like for you, in your experience?

A    I would say mine at U.S. Express was probably somewhere in the 20 percent, 30 percent range, and at Eagle was probably close to zero.  At least until the time, at what time we purchased Howard Hall Transport.

Q    All right.  Well, would you agree, then, that taking a range of 20 to 30 percent at U.S. Express, 100 drivers times the number of years you were there, we're talking about maybe 150, 200 drivers you were responsible for?

A    No.

Q    How many?

A    I would say there was probably no more than 100 from the time that I was at U.S. Express, and at the time I was at Eagle probably no more than 115.

Q    Okay.  So that's 215 drivers.  Now, how about when you left U.S. Express, where did you go?

A    U.S. Express?  I went to Bishop Brothers Hauling.

Q    And how many trucks were you -- well, did you have the same job?

A    It was a trucking company but it was different, it was a heavy haul outfit.

Q    Were you in a managerial/supervisory position?

A    No.

Q    What did you do?

USCA5 3232

A    I was in the permits department.

Q    What does that mean?

A    You have to have overweight/oversize permits for heavy haul, anything.

Q    Okay.  Were --

A    So that's, I ordered those permits from state offices.

Q    Were you responsible for interacting with drivers in any capacity?

A    Somewhat.

Q    Okay.  How many drivers were you responsible for in that job?

A    Well, I wasn't responsible for any of them, but I did communicate with them, so --

Q    How many did you supervise?

A    I would say probably 20.

Q    All right.  And how many years were you there?

A    Six months.

Q    Okay.  Where did you go after that?

A    Eagle Motor Lines.

Q    Okay.  And where did you go after Eagle?

A    I started my own business.

Q    And what was that business?

A    It was a detail, auto detail business.

Q    Okay.  When did you get back into trucking?

A    2000-, 2001.  No, I'm sorry, that's wrong.  2002.

USCA5 3233

Q    And where did you work?

A    Land Star.

Q    And what was your position?

A    Driver.

Q    When were you next in a supervisory position?

A    2006.

Q    Where was that?

A    Southern Cal Transport.

Q    And how many drivers are you responsible for in your managerial position at Southern Cal?

A    At that time?

Q    Yeah, at the beginning.

A    Well, when I came back to Southern Cal it was a night dispatch job and you weren't responsible for a fleet of drivers, you were one of two to four people on duty that would just take random calls from whoever called in and handle whatever issue they had.

Q    All right.  Did you --

A    Now, we had around --

Q    Go ahead.

A    I'm sorry.

Q    Go ahead, I'm sorry.

A    We had around 400 trucks at the time and it was a mostly team operation, so I would say there was probably somewhere around 600 drivers.

**USCA5 3234**

Q    And I take it you had interaction with dozens and dozens and dozens of drivers?

A    Yes.

Q    Hundreds of drivers?

A    Yes.

Q    Hundreds of interactions?

A    Yes.

Q    How long were you in that position?

A    About four months, three months.

Q    And when you were a driver during the preceding years, did you have interaction with lots of other truck drivers?

A    Some.

Q    When did you start doing -- I'm sorry, what's your current position now at Southern Cal?

A    Director of customer service.

Q    And I take it you were alluding to, on the direct examination, that means you are responsible for communicating with customers about drivers, good and bad?

A    Yes.

Q    And that would involve, I take it, the evaluation of lots of drivers?

A    The job that I was, the role I was in just before this as director of operations was more so that.

Q    Okay. Tell us --

A    The role I am in now is more directly with the customer.

USCA5 3235

Q    Okay.  Tell us about director of operations.  How big is Southern Cal now?

A    A thousand employees.

Q    And how many drivers?

A    Probably somewhere around 800, 850.

Q    And how long were you director of operations?

A    Four months.

Q    I mean, it looks like we are not going to get to a precise mathematical calculation, but you would agree from 1998 to date you have dealt with hundreds and hundreds of drivers?

A    Yes.

Q    And you have either known them, worked with them, evaluated them, supervised them?

A    Yes.

Q    Prior to coming here today, did you review the personnel file or any other file on Mr. Bourgeois maintained by any company that he has worked for?

A    No.  We have a new operating system and our old files are archived and without extensive trouble I wouldn't be able to access that.

Q    All right.  So you are testifying today purely out of your memory?

A    Yes.

Q    All right.  Who is the best driver you ever had?

USCA5 3236

A    Mark and Christine Dennis.

Q    Who is the second best?

A    Jim and Sarah Roaten.

Q    Why are you naming two names?

A    They were teams.

Q    Oh, I see, I see.  Where does Mr. Bourgeois go in that ranking, of all the hundreds of drivers you have been involved in?

A    He was, he would have been in the top 10.

Q    Top 10, as in one, two, three?

A    Top 10, yes.

Q    You testified in response to a question that he was never late.  I wrote down, "Not that I recall."  Is it that he was never late or you don't recall that he was ever late?

A    I don't recall him ever being late.

Q    All right.  Well, that's a hard answer for the record to figure out.  Are you saying he was never late or you just don't, he may have been late but you don't remember?

A    I don't believe he was.  If there was an occasion where he was ever late that was his fault, I absolutely do not remember that being the case.  The way I remember it is he never was late unless it was something that we caused, meaning we put him on a load that he absolutely could not deliver on time.

Q    You said that you never had to repeat any information to

USCA5 3237

him.  Are we to take that literally, like he never said, "What did you say," or, "I didn't hear that," or, "Could you repeat that?"

A   I would say it's possible that there may have been a time where he didn't hear me and asked me to repeat him, repeat myself.  There was never a time that he just could not understand what I was saying to him.

Q   Well, let's break that down now.  Are you saying then that you would pull out all these instructions, "Mr. Bourgeois, you have to drive from here to there and you have to get there in 12 hours and here is the address," and you pulled out a map?  Did you ever pull out a map and go over it with him?

A   I've pulled out a map with several drivers.

Q   Okay.  Including Mr. Bourgeois?

A   I don't know that to be true.

Q   You don't remember that?

A   No.

Q   Why don't you remember that?

THE COURT:  That's not -- Mr. Wiseman, move on.

BY MR. WISEMAN:

Q   During those encounters, is it your testimony that he never said, "Wait a minute, I don't understand these directions," he got the directions perfect every time and you recall that?

USCA5 3238

A    That's the way I remember it.

Q    Were you responsible for hiring Mr. Bourgeois?

A    No.

Q    In the companies that you were working when he was hired, was there any psychological testing administered?

A    Not that I know of.

Q    You said that he didn't appear to you to be mentally retarded.  Do you know anybody who is mentally retarded?

A    Yes.

Q    Okay.  What does a person who's mentally retarded seem like to you?

A    Are you asking me to explain what I think mental retardation is?

Q    Well, not quite that.  I'm asking, you said he didn't appear to be, I want to know what your understanding is of what a person who is mentally retarded appears like.

A    Someone who had more difficulty understanding reasonable issues, reasonable information, than everyone else.

Q    You said he had no mental deficiencies, or words to that effect.  What kind of mental deficiencies are you including in that statement?  What do you think he didn't have?  He was perfectly fine, perfectly normal?

A    As far as I know, yes.

Q    As far as you could tell?

A    Yes.

USCA5 3239

Q   You will have to excuse me because I am not real familiar with some of these trucking issues.  I am not understanding about the whole logging system and the hours and the miles. Are the regulations such that a driver's work in a given period of time is limited by miles?

A   No, it's limited by hours.

Q   Okay.  And I guess the assumption is made that people are going to go no more than the speed limit?

A   You cannot legally log more than the speed limit.

Q   Okay.  And so how is it that a driver, any particular driver, would not log hours, or not work a certain number of hours, how would that come about?

A   Well, if you had a delivery window that was 8:00 a.m. to 8:00 p.m. and because you just didn't feel like working very hard you chose to deliver at 8:00 p.m., then that would be less productive than 8:00 a.m.

Q   Okay.

A   And, understandably, if you delivered at 8:00 a.m. and then got another load, then you would be racking up more miles, more hours, excuse me, than the person that just delivered at 8:00 p.m.

Q   And what are the limits at the time that Mr. Bourgeois worked in your fleet, what were the limits on the amount of hours he was permitted to work?

A   No more than 10 hours without an eight-hour break, no

more than 70 hours in eight days or 60 hours in seven days.

Q   Seventy hours in what?

A   Seventy hours in eight days, 60 hours in seven days.

Q   So, in order to comply with these requirements one has to do arithmetic?

A   That's correct.

Q   Is it more complicated than arithmetic?

A   It's not more complicated than arithmetic but it is, it's almost like trying to be able to dissect a problem, like, like the problem, the math problems you got in school, if Johnny had eight apples and traveled 10 miles, that sort of thing.  It's --

Q   That sounds -- I'm sorry, go ahead.

A   It's kind of like working out a real life math problem.

Q   Okay.

A   It's not just, you know, numbers on paper.

Q   All right.  So, I just want to be clear here, the example you just gave started to sound to me at least like an algebra problem.  Is that what you're talking about?

A   No, not algebra.

Q   Not algebra.  Okay, but you agree it's arithmetic?

A   Yes.

Q   Okay.  And the number of possible entries in the log were on duty, off duty?

A   It's on duty driving, on duty not driving.

USCA5 3241

Q    How could you be on duty not driving?  What would you be doing?

A    Pretrip inspection, fueling.

Q    Okay.

A    Loading, unloading, standing on the dock having to count product.

Q    So, for example, on duty not driving inspecting, if one did that from 12:00 o'clock to 1:00 o'clock they would write down in their log 12:00 to 1:00 and count that against the hours that you are permitted to work?

A    That's correct.  Not, not against your driving hours, your driving hours were separate at 10 hours, but you couldn't have more than 15 hours on duty, period, accumulative over a 24-hour period.

Q    Okay.  So the on duty hours are more than driving hours?

A    Yes.

Q    And so that had to be kept separate?

A    Yes.

Q    So if Mr. Bourgeois stopped for lunch and spent an hour, his log would have to reflect --

A    Off duty.

Q    -- off duty lunch, one hour?

A    That's correct, and where he was.

Q    The location?

A    Yes.

USCA5 3242

Q    You mentioned about an orientation program.  Did you conduct that orientation program?

A    No.

Q    Did you attend it?

A    I have attended an orientation program.

Q    I'm talking about the one with Mr. Bourgeois.

A    No.

Q    Did I show up at your place of employment and ask to speak with you?

A    Yes.

Q    And was I accompanied by anyone?

A    Yes.

Q    What was her name?

A    I don't recall.

Q    So, your testimony is that Mr. Bourgeois was ambitious, he wanted to make money?

A    Yes.

Q    Did he ever seem like he needed the money because of pressing financial needs or that he wanted to get rich?

A    I don't believe he ever discussed his reasons for, for that.  I believe it was always just a more miles/more money type of issue.

Q    When he was hired on at the places you worked at and supervised him, were you aware of any prior trucking accidents or suspensions?

USCA5 3243

A    No.

Q    And, as I understand it from some other witnesses' testimony, there is a, typically a driver record inspection done of some sort?  You guys just don't hire somebody, you check out their record?

A    Yes, yes, MVR.

Q    Do you have any, assuming what I'm telling you is the case, do you have any explanation for why you wouldn't have known about that?

A    That was not, that was not information that I would have needed.

Q    You never visited Mr. Bourgeois' home, did you?

A    No.

Q    Never saw his family, or did you?

A    No.

Q    Ever socialize with him?

A    Outside the office you mean?

Q    Yeah.  Did you ever go the movies with him, a ball game?

A    No, I don't believe so.

Q    So your interactions with him were limited solely to the workplace?

A    Yes.

Q    Okay, I think that's all I have.  Thank you very much, sir.

        THE COURT:  Thank you.  Anything further?

USCA5 3244

MS. SALINAS:  No, nothing further from this witness, Your Honor.  May this witness be excused?

MR. WISEMAN:  Certainly.

THE COURT:  You are excused, sir.  Thank you.

THE WITNESS:  Thank you.

MS. SALINAS:  Call to the stand -- oh, sorry. Rhonda Davis.

MR. WISEMAN:  Your Honor, while we are waiting for the next witness, could I ask if the Government has obtained any criminal information about any of their civilian witnesses that they could share with us?

MS. SALINAS:  We ran them through on histories, there's nothing but, yeah, we can get that for you.

THE COURT:  Pardon?  Any convictions?

MS. SALINAS:  No, Your Honor.

THE COURT:  Okay.

THE CLERK:  Please come forward.

RHONDA DAVIS, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

MS. SALINAS:  I instructed you about the mike, is that correct?

THE WITNESS:  No, but they told me not to touch it.

                    DIRECT EXAMINATION

BY MS. SALINAS:

Q   Can you please state your full name for the record?

USCA5 3245

A    Rhonda Michelle Davis.

Q    And, Ms. Davis, how are you currently employed?

A    I am employed with Buddy Moore Trucking.

Q    And Buddy Moore Trucking is located where?

A    Birmingham.

Q    Alabama?

A    Yes, ma'am.

Q    Growing up, you grew up where, what city, what state?

A    Alabama.

Q    And when you grew up, was your family involved in the trucking business?

A    Yes, ma'am.

Q    Can you tell us a little bit about that?

A    My father was the operations manager for a company called Hall Systems.

Q    And Hall Systems was what kind of business?

A    It was a van trucking business in Birmingham.

Q    Okay.  And when you met Mr. Bourgeois -- did you, do you know somebody by the name of Mr. Alfred Bourgeois?

A    Yes, ma'am.

Q    And when you first met Mr. Bourgeois, where did you meet him?

A    I met him at my father's work.

Q    There at Hall Systems?

A    Yes, ma'am.

USCA5 3246

Q    And how old were you when you met him?

A    I would say about 12 or so.

Q    And that would have been in, if you can tell us what year?

A    It would be about '88.

Q    Okay.

A    '89, somewhere in there.

Q    And when your dad had Hall Systems, did you ever go to Hall Systems?

A    Yes, ma'am.

Q    Were you there a lot of the time, hardly any of the time?

A    All the time.

Q    And how big was Hall Systems when you were say 10 or 11 years old?

A    It was pretty good size.  It was southeast regional so they had a pretty good, you know, not too many owner/ operators but a good bit of company drivers.

Q    And back in those days did your dad, did Hall Systems have computers to keep track with the drivers?

A    Very, very few computer thing, so my dad had to go usually on a nightly kind of basis.  After we would get through eating and bathing and getting ready for homework, we would go back to work with him.

Q    And when you say we would go back, who would go back with your dad to the terminal?

USCA5 3247

A    My mother and my sister.

Q    And why would your dad take you-all back there?

A    You know, my mom would cook and so like she would just take food to feed the guard or if somebody was there sitting, you know, a driver or so, and if she had food left over, "Hey, are you hungry?"  "Sure."  "Here's you something to eat."

Q    Is that how you met Mr. Bourgeois?

A    I met him before then but I do recall that he had ate some of my mom's cooking before and --

Q    And did he like your mom's cooking?

A    Yes, yes, ma'am.

Q    And when you saw him eating, did you ever see any problems with him being able to feed himself?

A    Oh, no, ma'am.

Q    And how do you remember Mr. Bourgeois?

A    He was a great guy.  He would --

Q    And --

A    He would always come up to me, he'd call me Boo, and --

Q    He called you Boo?

A    Boo, just commenting, just, "Hey, how you doing?"  He's the type person he would walk in a room and the whole room would just light up, you know.  He just had this charisma about him, just always smiling and those pretty eyes beaming, you know, and.

USCA5 3248

Q    He's got pretty eyes, didn't he?

A    Yeah, yeah.

Q    Or doesn't he?

A    Yeah.  He would come by my desk, he would give me a hug. He would always, if I wasn't working with my father, you know, because the company split, he would come by and give me kind of a hug and ask me, "How's your pop, how's your dad?"

Q    So you said that you met him when you were as young as, I don't know, 12 years old?

A    That's when I recollect my memory.  I just remember playing games and doing homework and stuff.

Q    Okay.  And you, did you start working for Hall Systems at some point in time?

A    Yes, yes, ma'am.  When I graduated in '95 --

Q    Okay.

A    -- I started working for Hall Systems.  I worked before my senior year during the summer and then I started working full-time after I graduated.

Q    And that would have been in 1995?

A    Yes, ma'am.

Q    Was Mr. Bourgeois still with Hall Systems at 1995?

A    I believe so, yes, ma'am.

Q    And how often would you see him?

A    Pretty frequent, pretty frequent.  We had an office in New Orleans, we had a terminal there, so pretty much every,

USCA5 3249

everybody kind of said hey, you know.  He was one that you kind over fought over, you know, because he was --

Q    Kind of just like a big family?

A    Yeah, a big family, really, really tight-knit.

Q    Did you-all ever have any cookouts at the, for the company or anything like that?

A    Oh, yeah.

Q    And --

A    We always had like driver appreciation or things like that, you know.

Q    Okay.  When did, when did Mr. Bourgeois leave Hall Systems?

A    I, I cannot recall because when U.S. Express took over he was still working for U.S. Express.

Q    Okay, so that, so Hall Systems got bought out by U.S. Express?

A    Yes, the remaining stocks was bought out by U.S. Express, and then when U.S. Express split I went to another company.

Q    And what company was that?

A    I went to Deaton for the same owner as Hall Systems to take over the van division.

Q    And what was the other split, Deaton's and what?  Oh, it was Deaton and U.S. Express?

A    Hall Systems turned into U.S. Express.  I left U.S. and started at Deaton to start Eagle Motor Lines.

USCA5 3250

Q    Okay.  And did Mr. Bourgeois follow from Hall's to U.S. Express to Eagle?

A    Not, not all at once.  We were building up, you know, clientele and everything.  When I left U.S. Express and then we started Eagle, later on he came back and worked with, Eagle was the original owner of Hall Systems so it was back to the same family and he came back then.

Q    Okay.  So you started Eagle Express in what year?

A    Eagle Motor Lines, let's see here --

Q    Motor Lines, I'm sorry.

A    That's okay.  I think it was like right before 2000.

Q    Right before 2000?

A    Uh-huh.

Q    And do you recall when Mr. Bourgeois went to work for Eagle Motor Lines?

A    I believe that was going to be about, oh, I guess, about 2001 or say or something like that.

Q    Okay.  And you think he was at Hall's for approximately how long?

A    Oh, goodness.  Let's see.  From what I recall, I think he was there probably about, I don't know, I'm just guessing, about 10 years, I guess.

Q    Okay.

A    I'm not for sure on that.

Q    Okay.  And --

USCA5 3251

A    You have to understand, is that when you leave a trucking company you still contact somehow through those people, you know, like, "How is so-and-so?"  "Oh, have you heard from Bourgeois, how's he doing," you know, that kind of thing, so it's hard to keep a time line because you still talk about the same people.

Q    Okay.  And Eagle Motor Lines is located where, was located where?

A    It was located in Birmingham.

Q    Okay.

A    And we took over another company in Trussville and moved our offices to Trussville.

Q    Okay.

A    And then moved back to Birmingham.

Q    Now, during the time that you knew Mr. Bourgeois when he was in Hall's, those 10 years in Hall's and then in Eagle Line, did you ever know Mr. Bourgeois to be angry?

A    No, ma'am.

Q    Did you ever notice him to have any outrages?

A    No, ma'am.

Q    Any screaming or yelling fits of anger?

A    No, ma'am.

Q    How would you describe his personality?

A    He's the guy that you would sit down and have lunch with.

Q    Okay.

USCA5 3252

A    I mean he's just a --

Q    Did you --

A    -- good guy.

Q    Were you able to observe him interacting with other truck drivers?

A    Oh, yes, ma'am.

Q    And how did he get along with the other individuals?

A    I mean he had a laugh that could fill this room.  You knew when he was in the office before he would get to the dispatch room because he would be laughing, cutting up with the other drivers that were around.

THE COURT:  Did he understand jokes?

THE WITNESS:  Oh, yes, ma'am.

BY MS. SALINAS:

Q    Did he joke with you?

A    Oh, yes, ma'am.

Q    And how was his appearance?

A    Immaculate.  Let me tell you, there was a girl that I worked with and we always razzed him about how good he smelled, because we always said, "Man, you smell like a million dollars."  I mean everything, the shirt matched the shorts that matched the shoes, you know, it was just perfect.

Q    And what happened if he got dirty?  Do you know what would happen?

A    Oh, it wasn't long and he was finding a shower.  I mean

USCA5 3253

he just, he was very, he kept a very professional appearance and --

Q   Let me ask you this:  The place, the terminal there where Eagle Motors, Eagle Motor Lines, does it have a washer and dryer?

A   Yes.  Yes, it did.  U.S. Express also had a washer and dryer, yes.

Q   Did you ever see Mr. Bourgeois using a washer and a dryer?

A   Yes, ma'am.

Q   Did you do the laundry for him?

A   No, ma'am.

Q   Okay.  Now, the Eagle Motor Lines, what kind of work were you doing for Eagle Motor Lines?

A   Customer service.

Q   Were you familiar either in Hall's or Eagle Line, Motor Lines, with the paperwork that Mr. Bourgeois would turn in that are related to the trucking business?

A   Yes.

Q   And what would those pieces of papers encompass?

A   When I started out in trucking, they call it gofer work.

Q   They called it what kind of work?

A   Gofer.

Q   Gofer.

A   You know, you just go, you're learning, you're, you go

USCA5 3254

Davis - Direct                    150

from one part to another, and so I would go into the billing

department and I would strip bills, and so what you do, you

open their envelopes that would hold their receipts, truck

washes, logs, bill of ladings that were signed, and

everything.  Some drivers just kind of --

Q   And you're getting it --

A   -- wadded it up and threw it in there.  Nah, he stapled,

everything was with everything, very, there was little

staples.  I remember just pulling them out and I'd just fuss

at him for just popping so many staples in there, you know.

Q   Okay.  And did you ever have any complaints about his

paperwork or him not filling in, you know, the blanks or his

signature, the dates or times?

A   No, ma'am.

Q   Now, did he ever speak about his wife or his children?

A   I do recall he used to show pictures, you know, of his

children.

Q   Okay.

A   Ever so often, you know, Miss Robin would call in and

leave a message for him to call and I would satellite him or

something.

Q   Okay.  And Danny Clark, did he know, did you know Danny

Clark?

A   Yes, ma'am.

Q   Did you ever engage in conversation with the defendant

USCA5 3255

about Danny Clark?  Did they get along, do you know?

A    Yeah, I don't, I don't know of anyone that didn't get along with Mr. Bourgeois.

Q    Now, Ms. Davis, does the company or the companies you have worked with, do they ever hire people that have mental handicaps or deficiencies?

A    The company I work with now, they have got a gentleman that just sits in the guard shack and writes down the trailer numbers that come in, but none of the other companies that I worked with, never had anybody with a handicap.

Q    Now, in the years that you have known Mr. Bourgeois, was there anything about his demeanor, the way he appeared, the way he handled the paperwork or the delivery and the pick-ups that, or his interactions with people that caused you to believe that he was mentally retarded?

A    No, ma'am.

Q    Now, did someone from the defense, Mr., go and visit you and interview you back sometime this year?

A    Yes, ma'am.

Q    And who was that?

A    His attorney.

Q    Okay.  You pointed to Mr. Wiseman here?  I don't know if you know his name.

A    Yes, ma'am.

Q    And did he make an appointment to go visit you?

USCA5 3256

A    No, ma'am.

Q    Can you tell us a little bit about how that encounter occurred?

A    I got a call from Mr. Pena about that I would be receiving some paperwork across the fax to be subpoenaed, and I was like, okay, was talking to him for a little bit, and I hung up the phone and it's just like instantly my phone rang. I mean, bam. And it come from the lobby. And I picked up and he says, you know, he, Mr. Wiseman said, "I'm Mr. Bourgeois' attorney and I'd like to speak with you, I'm in the lobby."

Q    At your business?

A    Yes.

Q    In Alabama?

A    Yes.

Q    Okay. And had he called you prior to that?

A    No.

Q    Okay. And what happened?

A    Well, I went straight to my boss and I said, "Hey, guys," you know, they were in a meeting, I said, "Hey, I'm sorry to interrupt but I have just been subpoenaed and I hadn't even hung up the phone good and there's someone in the lobby here to speak with me, I don't know what to do, I've never been in this kind of position." And my boss said, "Rhonda, I wouldn't talk, you know. If you have been subpoenaed to

USCA5 3257

court, court is where you handle it, this is a place of business."

Q   Okay.

A   I said, "Okay."

Q   So did you talk to, did you talk to Mr. Wiseman?

A   I did.

Q   Did he come up to talk to you or did you go downstairs or to the lobby?

A   No, I went out to the front lobby and I talked to him and, I don't know the lady's name but she was a mitigation specialist.

Q   Okay.

A   She's, yeah, she's --

Q   Okay.  Then what happened?

A   Before I went in, I'm kind of picky, I put my iPhone on record and I slid it in my pocket and I walked out there and they talked to me, and they wanted to speak with me and I told them that, "Not at this time, I have been advised, you know, it wouldn't be a good idea."  And basically said, you know, "Did you take a test?"  And I said, "Yes."  And he opened it and said, "Is that it, that's your handwriting?"  And I said, "Yes."  And he said, "I can talk to you at lunch, I can talk to you on a coffee break," you know.  And I said, "Well," I thought man, I, how do I get off of this, I mean because he was real, kind of -- and I said, "Well," and I was

USCA5 3258

about to say something and then he said, "You know, it's not going to look good on your part if you don't speak with us." I thought what?

THE COURT:  Look good to whom?

THE WITNESS:  Yeah.  I was like what?  I just got, stood back, I said, "Look, I'll tell you what, you call me at 5:00," which I was sick and I had to go like to doc-in-the-box, and they returned my call and I just said, you know, I had spoke with the lady here and I said, you know, basically, "If you would like to speak with me, speak with me there, I've been subpoenaed to court, you know what it says, have a safe trip home and goodbye."

BY MS. SALINAS:

Q    Okay.  And do you know someone by the name of Dr. Moore?

A    Yes, ma'am.

Q    Did you meet Dr. Moore?

A    Yes, ma'am.

Q    Did he go meet with you in person?

A    Yes, ma'am.

Q    And he --

MS. SALINAS:  Your Honor, may I have just a moment?

THE COURT:  Yes.

MS. SALINAS:  I pass the witness, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. LARIN:

Q    Good afternoon, Ms. Davis.

A    Good afternoon.

Q    My name is Elizabeth Larin, I'm one of Mr. Bourgeois'
lawyers.

A    Yes.

Q    In the last part you were just talking about the day you
got subpoenaed?

A    Yes.

Q    And did you mention that you made a phone call?  You said
you spoke to some lady or something?

A    No, after he arrived -- I felt like I was going to be
ambushed, you know?

Q    Right, you got the subpoena and you have this visit the
same day?

A    No, no.  I felt like I was being ambushed, not by the
subpoena and everything in one day.  You know, when the FBI
called me they said, "We are going to be in your area at this
date, at this time."  They even called and said, "When is a
good time for you?  Let me," whatever.  I never got a phone
call.  Boom, you're at my lobby, you know.

Q    So when did the FBI call you?

A    A week or so before they had come for the speaking with
Dr. Moore.

USCA5 3260

Q    And then after all that, then you got the subpoena?

A    Yes.

Q    And then you and Mr. Wiseman had that interaction?

A    Uh-huh.  Uh-huh.

Q    Okay.

A    Same day.

Q    So, back to my original question, then you said something about you had a phone call?

A    No.  After he had came, I told him to call back at 5:00 because I was at work, there was no one to cover my desk.

Q    Right, yes.

A    And so I called Officer Pena, I believe it was.

Q    Who's Officer Pena?

A    The gentleman that called me and told me I was being subpoenaed.

Q    Oh, okay.

A    And he told me that I needed to speak with Miss Debbie at the U.S. Attorney's Office, that she would talk to me.

Q    What were you calling about?

A    I have never been subpoenaed, ma'am.

Q    Oh, okay.

A    I didn't know --

Q    I was just trying to clarify.

A    I didn't know what to say, who to say or what to do, you know.

**USCA5 3261**

Q   Uh-huh.

A   So I said, "Now, I've been subpoenaed," you know, and she said, "Well, you can, you can speak with them, you don't have to, you can, it's totally up to your decision, or you can wait till court or speak with someone, you know, involved." And I thought, well, if I keep talking about this, I mean it's just, it's draining me.  I mean, I think that test should have said enough if he had a copy of it.  That's my opinions, you know?

Q   Uh-huh.

A   So I just left it like that.

Q   Okay.  And then at any other point, did you talk to anyone after you received the subpoena?  Between you getting on the stand and getting the subpoena?

A   Talking like?

Q   I mean about the Bourgeois case.  I mean not socially to your family or anything like that.

A   Not like talking about Bourgeois' case.  A gentleman that was my boss at the time, Mr. Bill Shaw, you know, I knew that at the time when Mr. Moore and them were here they were talking to the same individuals and --

Q   Uh-huh.

A   I just said, "Hey, have you been subpoenaed?"  "Well, yes, I have."  "Well, me, too."

Q   How about, I meant with the Government, did you have any

other conversations before?

A    Just about flight and when to be ready, how long this will take, you know, take away from my family and my job.

Q    And since you have been at the hotel have you talked to anyone?

A    No.  The only time I talked, excuse me, the only time I talked was late Tuesday, Tuesday night, Wednesday night. Let's see, today's -- I'm sorry, I've been here for so long.

Q    I know the feeling.

A    Yeah.  I think it was Tuesday night that we had talked and, you know, basically said, "Hey, you know, you'll be going," you know, what the whole proceedings is.  Nothing about, like questions about the case or anything.  Just went over what, the notes that Mr. Moore had wrote.  Excuse me, Doctor.

Q    And so you spoke with Dr. Moore sometime this summer then?

A    I believe so.  I particularly don't know the date.

Q    Okay.  And did you meet with him in person?

A    I did.

Q    And that's what you were saying they arranged ahead of time?

A    Yes, ma'am.

Q    Did you ever have a phone call with him or no?

A    He called before and said, you know, "We're going to be,

USCA5 3263

would you be willing to speak with me?"  I said, "Sure."

Q   And then at some later point you sat down with him somewhere?

A   Some later time they came, they called and said when they was going to be in the area and the date of, "We're going to be here on this day, this day, what day is good for you, what time is good for you," and we set it up.

Q   Okay.  And then in that conversation with Dr. Moore, you talked to him and then you also had a test, did some sort of paper-and-pencil test?

A   Yes, yes, ma'am.

Q   Or evaluation or --

A   Yes, ma'am.

Q   I don't know what to call it.  And did, were you alone when you took, when you filled out that evaluation, or was Dr. Moore with you?

A   Dr. Moore was in the office, it was the same office.  Our office is, it's so full.

Q   It was at your workplace?

A   It was at work.

Q   Okay.

A   And we was in a office and I was on one side of the room on the desk and he was sitting in one chair, like in a chair, like fiddling with his phone or doing stuff.

Q   Okay.  And about how long was your conversation with

USCA5 3264

Dr. Moore, outside of the evaluation, outside of the paper-and-pencil evaluation?

A    I'd say it was a good about 20 or 30 minutes, something like that.

Q    And do you remember when you heard about Mr. Bourgeois' conviction?

A    Yes, ma'am.

Q    Or even before that, did you hear about the offense before?

A    Yes, ma'am.

Q    Yes.  And were you surprised by that?

A    Yes, ma'am.

Q    Shocked?

A    Yes, ma'am.  I think, I think my dad, my dad was real shocked.

Q    Your dad had known him a long time as well.  And just to clarify, you said you have known him since you were young, Mr. Bourgeois?

A    Yeah.

Q    But you said 1988.  Would it sound correct if I said more like 1991 or '92 or '93?

A    I just remember being really young.

        THE COURT:  You look young now.

        MS. LARIN:  I know.

        THE WITNESS:  I'm 33.

USCA5 3265

THE COURT:  I don't believe that.

THE WITNESS:  Yeah, 33.  I was real young.  You have to understand, my dad was a diehard.  He, it was our life.  Excuse me.  My dad has had some health problems and --

THE COURT:  I'm sorry.

THE WITNESS:  That's okay.  When you're in trucking it's like a life, it's a family.  You don't have a choice.  It's bred into you.  Either you got it or you don't.  And I took on the family tradition, third-generation being in trucking, you know, so.

THE COURT:  Do you drive?

THE WITNESS:  No, ma'am.  I wouldn't even know how to begin.  But, you know, when you work with someone so long, it's a family.  And my dad, he was just, he was really upset about it.  I got a phone call, and I cannot remember the gentleman's name, he worked for me, and he made the comment that he offered to sell the baby to the gentleman, Bourgeois, and someone else where they were loading, and he said, "Rhonda, I had, I had," he said, "well, I" --

MS. LARIN:  Your Honor, this is very nonresponsive to my question.

THE COURT:  Sustained.  I'm sorry, they made an objection so we will have to move to another question.

THE WITNESS:  Okay.

USCA5 3266

BY MS. LARIN:

Q   I was actually trying to clarify around what time you might have met Mr. Bourgeois.

A   I just remember that I was very young, you know.  When my dad would come home we would have homework ready, and I just remember --

Q   You were still in school then?

A   Yeah, I was in junior high.

Q   So --

A   Or -- go ahead.

Q   It could be possible that it was more like 1991 or 1992?

A   No.  It was before that because it was at the old Hall Systems building.

Q   So it was definitely at Hall Systems?

A   Oh, yes, ma'am.

Q   So we could look at the Hall Systems records or --

A   Sure.

Q   -- employment he had before to prove --

A   Sure.

Q   Right.

A   I mean you're taking memory of, like, I'm just saying, I just recall being very young.  See, the -- see, what it is, trucking companies move.  As they get bigger they have to have bigger property, bigger buildings, and I just recall it being at this particular building and I recall being that age

USCA5 3267

and being with my family all together.

Q   Were you familiar with a company called Matlack Trucking or Matlock Trucking?

A   Huh-uh.

Q   Okay.  So if I told you that he was actually working at Matlock Trucking in 1991?

A   Unless he left and came back.  I didn't work there, I was so young.

Q   Right.  Is that --

THE COURT:  Is it possible, counsel, he worked at both places?

MS. LARIN:  Would --

THE WITNESS:  Drivers move.

BY MS. LARIN:

Q   Not at, at the same time could they work at both places, or --

A   I've known drivers to quit and come back in two months. I'm, but I'm not for sure on the time line because I wasn't working there.

Q   I'll look into my records and see if we can clear it up. So you have known him a long time.  Were you ever afraid of Mr. Bourgeois?

A   No.

Q   Did you ever find him to be inappropriate in any way with you?

USCA5 3268

Davis - Cross                                                                    164

A    No.

Q    It seems like you considered him almost a part of your family.

A    He was hilarious.  I mean when he would walk in the room, I have, there was a girl, I have told you, that worked with me, he would come over there and just mess with us, give us a hug, "What you-all got coming out of your area, give me a good load, make sure you get me, get me something good, girl," you know, "Need to get right back, I got to turn it," you know.

Q    And would you try to get him the best loads you could?

A    Yeah.

Q    Were you, was that part of your responsibilities or did you have any control over what kind of loads he had?

A    He's, if you knew, he, the thing about him, he was so good at what he did, period, point blank.  He knew he was good at what he did.  If you had a particular customer or particular thing that most of the time that you would send them through a satellite, you know, information, he would be like, "Nah, girl, just send it to me, you don't have to send me all that stuff, I know exactly what I got to do."  He would be gone.

Q    So you would talk to him more verbally than --

A    Yeah.

Q    And you would just say, "Do this run again," and he would

USCA5 3269

do it?

A    Oh, yeah.

Q    Would you employ the satellite system to communicate with him on a regular basis?

A    Uh-huh.

        THE COURT:  You have to answer with words, I'm sorry.

        THE WITNESS:  Oh, excuse me.  Yes, ma'am.

BY MS. LARIN:

Q    Would he ever, would you be the person that if he was having trouble he would call, would you be the person on the phone?

A    It's according if it -- at a certain time line in the company, as it grew it became like driver manager, customer service.  If it had to do with customer service involvement, like a pick-up number or pay or something like that, he would talk to us, or if it had to do with his pay he would talk to the driver manager and such.

Q    And so this is, it's like a whole other world, right? So, when he would get someone --

        THE COURT:  We get, in this court we hear about trucking every day.

        MS. LARIN:  A lot.  Okay, sorry.

        THE COURT:  I appreciate you not understanding it because --

USCA5 3270

MS. LARIN:  I'm like --

BY MS. LARIN:

Q    When you --

A    It definitely has its own language.

Q    It seems like it does.  When he would arrive someplace would he call you?

A    He, if there was an issue, may it be an odd count, may it be a lump charge, may it be an extra charge for cut-and-shrink, it would be different things, "Hey, Rhonda, get with the customer, they want to charge me 75 but I'll do it for 50," you know?

Q    Uh-huh.  And he would --

A    I can --

Q    He would call you, you would be the person?

A    Yeah, he would call me.

Q    Or would you be one of the people he would call?

A    Anything, I would be one of the people called, but most of the time when it had to do with the customer he would be calling.

Q    Okay.

A    Speaking with me.

Q    So, you say that you worked with him professionally from around, I think you said 1995?

A    Yes, ma'am.

Q    To about 2000?

USCA5 3271

A   A little bit before 2000 because I, you have to understand that company got completely bought out.

Q   Okay.

A   And they closed that Birmingham office.

Q   And so then you moved on separately?

A   So the gentleman that originally owned Hall, he was going to buy out a company and he placed me there for a buyout.

Q   Okay.  So after 1999, basically --

A   Yes, ma'am.

Q   -- for all purposes, you moved on separate ways?

A   Right.

Q   Okay.  So for about four years you worked with him professionally, no longer, I mean you knew him before then but --

A   Yes.

Q   Okay.  And we are just going to approximate, it sounds like you knew him about 10 years total.

A   Uh-huh.

Q   So could you tell me about how often you would actually see Mr. Bourgeois?  Let's break it up into the two time frames.  From 1995 to 1999 you worked with him.  How often would you see him in that time frame?

A   Let's see, you said in --

Q   In 19-, after you were actually working.

A   Oh, I've worked with him?  Oh --

THE COURT: I think she's talking about like an average, like once a month, once every six months.

THE WITNESS: No, no, no.

MS. LARIN: Exactly.

THE WITNESS: No, we would see him two, three times a week.

THE COURT: Okay.

THE WITNESS: Because we were mostly southeast driven, southeast division, and either he was coming to or going through Birmingham.

THE COURT: Okay.

BY MS. LARIN:

Q    And whenever he was near Birmingham he would obviously, he --

A    Yeah, check out your, well, while he was there and his truck being maintenanced or something, come in.

Q    Okay. And prior to that, when he was working for your father's company but you weren't working there yet, how often did you see him?

A    Every, some, couple of times in like two or three months.

Q    Okay.

A    You would see him. Because he was coming out of the New Orleans office and come through the yard or something and be parked there and come in the office and see our, see our cars and stuff, and he would come in and speak with my family.

USCA5 3273

Q   Okay.  But on an occasional basis, not a regular basis?

A   No, not a regular basis.

Q   Okay.  And those contacts when you were working with him, the two to three times a week contacts you had, I'm assuming some weeks it's more, some weeks it's less of the --

A   Either it's -- are you talking about visual?

Q   Visual contact.

A   Yes, yes, you would see him like at the window or he would come in and talk.

Q   Okay.  So about how, you know, how long would those interactions be?  Were they at your place of work?

A   Yeah, most of the times he'd stick around for a little bit.  You know, a lot of drivers kind of tend to overstay their welcome in an office and you just, you're overwhelmed, but he never really overstayed his welcome.  He'd come in, "How's your dad?"  "Doing fine."  "Hey, get me a good load." You know, laugh, cut up a little bit, go sit on the couch, wait on his load, because most of the times either they were waiting for their loads to come into Birmingham, like it was preloaded and picked up, or they had to actually go load it in Birmingham.

Q   Okay.  And did you ever have any, I mean it sounds like, you said he would stop by your family's house sometimes, is that right, or your family's work?

A   No.

USCA5 3274

Q    Prior to when you worked with him?

A    Yeah.  See, what is was, my dad was the operations manager and at the end of the day he would go back after we would eat and shower and get our school stuff --

Q    Homework, yeah.

A    -- and he would go back and go over all his dispatcher stuff, because there was no real computer system.

Q    Right.

A    So he would go over stuff, do OS&D, you know, try to minimize the cost, you know, of hiring other people, so he would just kind of do more stuff there.  And so we would be there with him so the family could be together.

Q    And then you would see Mr. Bourgeois?

A    Yes, ma'am.

Q    And those occasions also were kind of work related?  He was there for work or were you having a --

A    Yeah, he was there, like his truck would be on the yard.

Q    Okay.

A    And he would just come in and say hi, you know, he would see our car and mother would have food, or just, just say hi.

Q    Okay.  It wasn't gumbo, was it?

A    I think at one time it was like red beans or something. I don't --

Q    Okay.  Did you ever, for example, go out to dinner with him?

USCA5 3275

A    No.

Q    Did you ever --

A    Just if it was, if it was like driver appreciation week they would set out tables and stuff and we would get to sit down and eat with the drivers --

Q    Okay.

A    -- and eat with the personnel and stuff.

Q    Okay.  So you were friendly but you weren't hanging out with him at night or anything on those times?  I mean, he's a little bit older than you.

A    Uh-huh.

Q    Yes.  About 10, 15 years older than you?

        THE COURT:  Thirteen years I'm counting.

        MS. LARIN:  Thirteen years, thank you.

        THE COURT:  He is, Mr. Bourgeois is 46, she's 33.

        MS. LARIN:  There you go.  Thank you, Your Honor.

        THE COURT:  It was my strong suit, subtraction.

        THE WITNESS:  But, you know, you just, I have to say this, some drivers you don't feel very, how can I say it, comfortable in like giving a hug to, because some people see that as vulnerability and they see that they've got you, you're going to do them a favor.  You didn't feel that way with him.  "Girl, come here, um, give me some," I mean he'd get you right in there and give you a big hug, "How's your pop, how's everything going?"  You know, most of the times

you have this barrier, you know, don't let, you know.  He was a really friendly kind of fellow.

BY MS. LARIN:

Q   A friendly person, yes.  Again, you were very surprised that all this happened?

A   Yes, ma'am.

Q   So I'll just briefly move on.  So I would like to mark Petitioner's Exhibit 178, if I can show this to you with this fancy system.  Do you recognize this document?

A   Yes, ma'am.

Q   And can you tell us what this is?

A   It was a test to my ability, to the knowledge that I know of what Mr. Bourgeois, if I ever saw him do the things that I, in this test, or my opinion on what he could possibly do.

MS. SALINAS:  Your Honor, I'm going to lodge the same objection Ms. Patti Booth had to this document, that it not be made public to, made a part of the public record.  That it not be made part of the public record.

MS. LARIN:  Your Honor, we have no objection to sealing the transcript or any of the evidence, if you prefer.

THE COURT:  What is that for?  I mean psychologists may have ethics about it but that doesn't necessarily apply to this proceeding, so I am not understanding, I mean we, it's already out.

MS. SALINAS:  Could I just confer for a little bit,

Your Honor?

THE COURT:  Sure.

MS. SALINAS:  Yes, Your Honor, and what I guess we are getting at is that Mr., Dr. Moore's ethics require that he makes an effort to maintain and protect the --

THE COURT:  Okay, I appreciate that.  That is overruled.  There is no trade secret in that or anything, is there?

DR. MOORE:  I'm sorry, ma'am, were you speaking to me?

THE COURT:  No, I was asking Ms. Salinas if there was, and you can confer with Dr. Moore, is there some trade secret in this?  I know we had those WAS or WAIS or something tests that nobody wanted to video because there were trade secrets.  Is this one of those things?  You do better on your own.

MS. LARIN:  I'm learning a lot.

MS. SALINAS:  What I understand, Your Honor, is just that these tests are, they have to be purchased, so they are not available by the doctors and they are not available to the general public and so --

THE COURT:  So you are afraid they, so that's the deal, you are afraid they would be copied and used to the general public to find out how smart the rest of us are?

MR. WISEMAN:  I've got a satchel full of them I'm

USCA5 3278

ready to --

THE COURT:  You got?  Are you going to sell them on the corner?

MS. SALINAS:  Oh, and I guess it also goes to the fact that you have to have certain qualifications to be able to administer and use those type of, let me think, use them, I guess, and explain them.

THE COURT:  Okay, I'm not -- I don't have any problem sealing it, I'm just not sure why, but I'll do it. Is that all right?

MS. LARIN:  No objection, Your Honor.

THE COURT:  Okay.

MS. LARIN:  So --

THE COURT:  Do you want to offer it?

MS. LARIN:  Oh, yes.  Could I offer this, please?

THE COURT:  Any objection if it's offered and then sealed?

MS. SALINAS:  No, Your Honor.

THE COURT:  Okay, that's P178 is admitted and ordered sealed, after you're finished with it.

(Defendant's Exhibit P178 admitted into evidence)

BY MS. LARIN:

Q   And this is the test that Mr., I mean Dr. Moore gave you sometime this summer?

A   Yes.

Q   And it says here today's date is February 1st, 2002.  Is that the age that he asked you to recollect Mr. Bourgeois' functioning?

A   Yes.

Q   And were you working with Mr. Bourgeois in 2002?

A   I don't -- yes.

Q   You were?  Where were you working?

A   Eagle Motor Lines.

Q   Eagle Motor Lines.  So when, I thought you said that you and he stopped working together in 1999.

A   I stopped working at Hall Systems/U.S. Express.

Q   Okay.  I'm not trying to trick you.

A   Okay.

Q   I'm just trying to --

A   Okay.

Q   In fact, I didn't even notice that till now.

A   Yes.  Just moved on to, you know, another company for the same owner.

Q   Okay.  So in 1999 you moved on and then at some other point Mr. Bourgeois joined you?

A   Correct.

Q   And it was at Eagle Motor Lines?

A   Correct.

Q   Okay.  And so that is, is this kind of the latest date you remember knowing him?

USCA5 3280

A    Yeah, uh-huh.

Q    Okay.  So at Eagle Motor Lines then, how often did you see him?

A    Weekly.

Q    And what was your position at Eagle Motor Lines?

A    Customer service.

Q    Similar to the prior employment?

A    Yeah.  When we took over that company it was a quick buy-out and it was more like a little bit of manager, customer service kind of slash manager.

Q    And who would you manage?

A    Customer service representatives.

Q    Oh, okay.  So, did you have the same sort of contact with Mr. Bourgeois in your new position?

A    Yes, ma'am.

Q    Would he call from the road and you would talk to him?

A    Uh-huh.

Q    About how often?

A    It's according if he was needing like an advance or if he needed information on a, on an actual customer or something like that.  Most of the times they would talk through their driver manager.

Q    Uh-huh.

A    Which would be like their dispatcher.

Q    Right.

USCA5 3281

A    Unless he'd come into the office and then he would speak with us.

Q    And he would always, he would make a point probably to say hi or something because --

A    Yeah.  Like I said, there was a young lady that her and I worked and he would always come over there and mess with us.

Q    So was that young lady at Hall or at Eagle Motor Lines?

A    She, I believe she is unemployed and she lives in Tennessee.

Q    No, I mean in 2002.  The young lady that --

A    The lady that was, that worked with me, she worked for Eagle Motor Lines.  We had bought out Howard Hall.

Q    Okay.  And so you said sometimes he would call saying he needed an advance?

A    Yeah, like if he needed an advance on money or something like that.

Q    Do you know about how often that would happen?

A    Not very.

Q    Not very often, okay.

        THE COURT:  Is that, that's not unusual, is it?

        THE WITNESS:  No.

        THE COURT:  For any trucker?

        THE WITNESS:  No.

        THE COURT:  Okay.

        THE WITNESS:  Because they don't want to dip into

USCA5 3282

their pocket for tolls or --

BY MS. LARIN:

Q    Right.

A    For a lumper.  You know, a lumper is who unloads your truck, so they want you to pay for it so it won't come out of their pocket.

Q    Okay.  So February 1st, 2002, you are still working with Mr. Bourgeois, you see him at least once a week you're saying?

A    Frequently, uh-huh, yeah.

Q    And Dr. Moore advised you to think carefully about your answers and take your time?

A    Uh-huh.

Q    Okay.  So I'm just going to --

        THE COURT:  I'm sorry, you have to answer with words.

        THE WITNESS:  Oh, excuse me.  Yes, ma'am.

        THE COURT:  Thank you.

        THE WITNESS:  Sorry about that.

BY MS. LARIN:

Q    I'm just going to briefly go through this.  So in the area of communication, an area of communication, this first section.

A    Uh-huh.

Q    And it says that you guessed two times, made two guesses.

USCA5 3283

A    Uh-huh.

Q    Okay.  And the second area, community use -- let me know if you are having trouble seeing this -- said you guessed 13 times.

A    Uh-huh.

Q    So that's 13 out of the 24 questions you made an estimate of what you thought Mr. Bourgeois could do?

A    Uh-huh.

Q    And those are activities that you never actually saw him do?

A    Uh-huh.

Q    And that's why you made a guess?

        THE COURT:  I'm sorry, you have to say --

        THE WITNESS:  I am so sorry.

        THE COURT:  It's not a usual kind of language thing.  I'm sorry, but I have to keep reminding you.

        THE WITNESS:  I am so sorry, I'm so southern.  Yes, ma'am.

BY MS. LARIN:

Q    It's not easy being northern either.

A    Yes, ma'am.

Q    Okay.  So --

        THE COURT:  I feel your pain.  Go ahead.

BY MS. LARIN:

Q    So 13 of use questions you felt the need to make a guess?

**USCA5 3284**

A    Yes, ma'am.

Q    Okay.  And then, and then functional academics is the next section and here you, 14 of the 27 questions you had to make a guess?

A    Yes, ma'am.

Q    One of these I was curious about, weighs himself, number 13?  I guess --

A    Yes, ma'am, he has to weigh his truck and sometimes --

Q    Oh, so it's not just your body?

A    -- people want to know a heavy or light weight.

Q    Yes.

A    -- or the weight of the product, and he has to know the weight going down the road or he will get an overweight ticket.

Q    I got it.

A    And then I will be charged, our company would be charged for that.

Q    I guess I read too fast, I was just wondering how you could have seen him weigh his own self --

A    Objects, it said other objects.

Q    Yes.  You read more carefully than I did.

A    Yes, ma'am.

Q    Okay.  So then the next section is home living?

A    Yes, ma'am.

Q    And you had to guess on 16 of the 23 areas and that's

**USCA5 3285**

because you had never lived with Mr. Bourgeois, isn't it?

A   No, ma'am, just like it, you know where it says, "Clears the table completely after a meal"?

Q   Right.

A   He's not a messy guy.  I, that's why I said, you know, hey, I would assume he's not a messy person.

Q   Right.

A   Because he was clean with himself.

Q   Right, yeah, I understand those answers.

A   Okay.

Q   I'm just clarifying that you were very careful and you guessed on the things that you didn't know.

A   Yes, ma'am.

Q   Then we move on to health and safety.

A   Okay.

Q   And you guessed 14 of the 20 times.

A   Yes, ma'am.

Q   And then we move on to leisure and you guessed 23 of 23 times, because you knew him in the work environment.

A   Yes, ma'am.

Q   And then we move to self-care and you guessed 17 of 25 times.

A   Yes, ma'am.

Q   And then we move to self-direction, and you guessed 10 times.  And then we move to social and you guessed 11 of the

USCA5 3286

23 times.  And then in the work, you did not feel a need to guess on the work questions.

A    No, ma'am.

Q    Just a second and I'll check my notes.  Have you ever gone shopping with Mr. Bourgeois?

A    No, ma'am.

Q    Okay.  Have you ever had a conversation about politics with him?

A    No, not that I know of.

Q    Or, or current events?

A    Yeah.

Q    I mean world events?

A    Not, well, we always knew when it was Mardi Gras time.

Q    Okay.

A    Yeah.  He'd make sure.

Q    That's a good point.

A    Like every now and then he'd bring us a king cake or bring us beads or things like that.  You knew when those kind of events were coming around because he would always share it with the office.

Q    So, and I don't know if I can find it right at this moment but if there's a question in here that says that he discussed, he was able to discuss political or current events, is that what you were thinking of?

A    Yeah, current events, yeah, he would most definitely tell

USCA5 3287

you, "Hey, there's been an accident," or, "I heard that there's something going on, there's going to be something going on in the city, I might have to divert," or something like that.

Q    Mardi Gras.

A    Mardi Gras.

Q    Okay.  But I think there also is a question in here, and I'm going to try to find it, that says something about shopping.  I just want to make sure.

A    I made a comment about how he put his wardrobe together and everything was current.

Q    Right.  No, I'm looking at, in this raw data.

A    Oh.

Q    I mean there's a lot of questions in here, so.

A    That's okay.

Q    I think it's, one of the questions you answered says, "Asks store clerk for help if an item cannot be found."  Did you ever see him interact with a store clerk?

A    No, but I know he had to interact with a store clerk to cash an advance or to pay for his fuel.  If he didn't, we would be charged for the fuel that would be left.

Q    So, but if an item cannot be found.  I know it's kind of a weird question.

A    Yeah, I'm pretty sure he would.

Q    Okay.  You're pretty --

USCA5 3288

A    I mean if an item couldn't be found, if an item couldn't be found on the actual load slip he would question it.

THE COURT:  Do you have more of these?

MS. LARIN:  That was my last, very last question, Your Honor.

THE COURT:  Okay.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Thank you, ma'am.

MS. LARIN:  Thank you Ms. Davis.

THE WITNESS:  Uh-huh.

MS. SALINAS:  A couple of questions, Your Honor.

REDIRECT EXAMINATION

BY MS. SALINAS:

Q    You were asked, I asked you earlier whether or not, and you testified that in your opinion the defendant, it didn't appear to you the defendant was mentally retarded.  Do you recall that?

A    Uh-huh.  Yeah, I mean, excuse me, yes, ma'am.

Q    And how about slow?  Did you, in your opinion did the defendant ever appear to you to be slow in understanding or in --

A    No, ma'am.

Q    -- in responding to anything?

A    No, ma'am.

THE COURT:  I think I've got some of these clear.

USCA5 3289

Anything else?

MS. SALINAS:  Okay.  Yes, Your Honor.  I just want to clarify something.

BY MS. SALINAS:

Q   You, a while ago when you were being questioned about why you made your guesses or whether or not you had actually seen the defendant, you actually observed what the question was asking and you said, "Yeah, but I know he had to."  So were you basing, you answered always or sometimes and then you checked guess if you had to, is that based on your observations of him in different settings?

A   Yes, ma'am.

Q   Okay.

MS. SALINAS:  Okay.  I pass the witness, Your Honor.  Nothing further.

THE COURT:  Anything else?

MS. LARIN:  One follow-up on that, I'm sorry, to the other.

RECROSS-EXAMINATION

BY MS. LARIN:

Q   So, in different settings, what different settings did you see Mr. Bourgeois in?

A   I saw him when he was through with work or when he was, you know, catching up on his hours and just being relaxed.

Q   Uh-huh.  But in your, in your place of work, right?

A    Yes, yes.

Q    I think we talked about you didn't go outside of work with him.

A    Correct.

Q    Okay.  Thank you.

THE COURT:  Thank you.  Can this witness be released?

MS. LARIN:  Yes, Your Honor.

MS. SALINAS:  Yes, Your Honor.

THE COURT:  You are released.  Thank you, ma'am.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. DOWD:  Your Honor, they're telling me they need a break.

MR. ROBERTS:  Well, Your Honor, the next witness is Dr. Price and it's going to be a long time I think, so.

THE COURT:  God, you-all are such wusses.  Okay, we'll take a 15-minute break.

(Recess at 2:59 p.m. until 3:27 p.m.)

THE COURT:  Would you call your next witness?

MR. DOWD:  We'd call Dr. Moore.  Excuse me, Dr. Randall Price, Your Honor.

MR. ROBERTS:  Your Honor, before he --

THE COURT:  Would you administer the oath.  What?

MR. ROBERTS:  Before he takes the stand, I just

USCA5 3291

wanted to ask if it was okay with defense if Dr. Moore stays in.  If not, we'll just have him leave.

MR. WISEMAN:  Oh, yeah, that's totally fine.

THE COURT:  Okay.  Would you administer the oath. Thank you.

THE CLERK:  Yes, Your Honor.

J. RANDALL PRICE, RESPONDENT/GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.  Please be seated.

THE COURT:  You may proceed.

MR. DOWD:  Thank you, Your Honor.  Dr. Price, be very, very careful with the microphone, please, especially with the --

THE COURT:  I think he has been in here listening to that.

MR. DOWD:  Okay.  I just want to be off the hook.

DIRECT EXAMINATION

BY MR. DOWD:

Q   All right.  Now, would you state your full name for the record and spell your last name, please?

A   Yes.  My full and legal name is Jack Randall Price, P-R-I-C-E.

Q   All right.  And how are you employed, Dr. Price?

A   I am a clinical and forensic psychologist and neuropsychologist.

Q   All right.  And how long have you done that work?

USCA5 3292

A    I have been teaching psychology since 1972 and I have been in the independent practice of psychology and neuropsychology since 1983.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 2 and ask if you can recognize -- did you have a chance to look through this multipage document prior to your testimony today?

A    I did.

Q    All right.  And what is this?

A    It's the most recent copy of my curriculum vitae.

Q    Okay.  Does this accurately reflect your history and your achievements?

A    Yes.

Q    All right.

        MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 2 into evidence.

        MR. WISEMAN:  No objection.

        THE COURT:  Government's Exhibit 2 is admitted.

    (Government's Exhibit 2 admitted into evidence)

BY MR. DOWD:

Q    All right.  And if you could give us the highlights of your, just brief highlights of your education, any professional organizations you belong in, any board certifications you enjoy, how long you have been practicing.  I'll just let you fill that in.

A    Okay.  I have a bachelor's, a master's and a PhD in psychology from the University of North Texas in Denton, Texas, a post-doctoral internship at the Baylor Institute for Rehabilitation, a post-doctoral fellowship from the University of Kentucky.  I am board certified in forensic psychology.  I am board certified in the field of neuropsychology.  I have been in practice since 1983.  I am licensed to practice psychology in the state of Texas and the state of Oklahoma.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 3.

THE COURT:  Where are you teaching?

THE WITNESS:  I am on the faculty at the University of Texas Southwestern School of Medicine as a clinical professor of psychiatry.  I am also a, I have a position on the faculty of the School of Law at Southern Methodist University as a lecturer in law where I team-teach a class in psychiatric and psychological evidence.

BY MR. DOWD:

Q    All right.  And, sir, would you look at the overhead and I'll ask you if you can identify it as Government Exhibit Number 3?

A    I can.  It is a list of all testimony that I have given since 1997 when I began to keep such a file.

Q    All right.  And you reviewed this multipage document

**USCA5 3294**

prior to your testimony?

A    I did, yes.

MR. DOWD:  Your Honor, we would offer Government Exhibit Number 3 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  I'm sorry?

MR. WISEMAN:  No objection.

THE COURT:  Government's 3 admitted.

(Government's Exhibit 3 admitted into evidence)

BY MR. DOWD:

Q    And in connection with your past testimony, did you, were you the expert, were you qualified as an expert witness in the Valdez case here in Corpus Christi, the state case that the Court referred to earlier?

A    I was.

Q    And what role did you play in that case?

A    I conducted an evaluation of the defendant at the request of his attorneys and testified in the state case and also in the, in the habeas proceeding after that.

Q    In this court?

A    It was not in this court, as I recall.  But it was, it was on appeal and I testified, but --

Q    Was Judge Jack the judge, presiding judge?

A    I, no, it was a male judge, I know that, and --

Q    Okay.

USCA5 3295

A    But I don't recall his name.

Q    All right.

THE COURT:  In this case?

MR. DOWD:  In the Valdez case, the state case.

THE COURT:  Oh, sorry.

MR. DOWD:  The state case that the Court had referenced earlier.

THE COURT:  Oh, I had that.  What happened with that case, as you know, it went up, I said it was ineffective assistance of counsel because he was mentally retarded.

MR. DOWD:  Yes, Your Honor.

THE COURT:  And there was no research, no mitigation, no nothing.  So Fifth Circuit reversed me but in the interim the Supreme Court came out with the Atkins case, so, and that case said it should be decided state-by-state, so it went, I think it either went back to me or I sent it over to the State Court to determine the state requirements for mental retardation.  And in fact, everybody's expert apparently testified in that case that he was mentally retarded.

THE WITNESS:  That's correct.

THE COURT:  Including the Government's witnesses.

MR. DOWD:  Yes, Your Honor.  And was --

THE COURT:  So there you have it.

USCA5 3296

BY MR. DOWD:

Q    Was that the proceeding that you were referring to when you said you testified?

A    It was, yes.

Q    All right.

THE COURT:    But it wasn't a male judge, it was actually Judge Sandra Watts.

MR. DOWD:    Oh, Judge Watts, okay.

BY MR. DOWD:

Q    And, in addition, did you also testify in the Penry case, a significant case in Texas?

A    I did.

Q    All right.    And in what role did you testify in the Valdez and the Penry cases?

A    As an expert in psychology and the evaluation of mental retardation at the request of the defense.

Q    And what would you estimate your practice is, give me a ratio between your work for the prosecution and your work for the defense.

A    Since 1997 it's approximately 55 percent at the request of the defense and 45 percent at the request of the state.

Q    All right.    And how many times have you testified as an expert in neuro and forensic psychology?

A    A total, in the last 13 years since I have kept a file on this, 237 times.

USCA5 3297

Q    All right.

        MR. DOWD:  Your Honor, we would proffer Dr. Price as an expert in neuro and forensic psychology.

        THE COURT:  Any objection?

        MR. WISEMAN:  Just one question on voir dire, if I may?

        THE COURT:  Sure.

                    VOIR DIRE EXAMINATION

BY MR. WISEMAN:

Q    Dr. Price, did I hear you say you are a professor of psychiatry or did I mishear that?

A    No, you didn't mishear that.

Q    Okay, you are a professor of psychiatry?

A    Yes, it's, because that's the department at medical school.

Q    I see, okay.

A    And then there is a division of psychology that's under the psychiatry department there.

Q    Okay.  Do you actually teach psychiatry?

A    Well, I don't, no, I teach the field of psychology and forensic psychology, and in the fellowship program for forensic psychiatrists, I've taught classes in that to psychiatrists.

Q    I see.

        MR. WISEMAN:  No objection, Your Honor.

USCA5 3298

THE COURT:  All right, then he will be admitted.

MR. DOWD:  Thank you, Your Honor.

THE COURT:  Accepted for that.

MR. DOWD:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUES

BY MR. DOWD:

Q    In connection with your duties, Dr. Price, did you have occasion to do a psychological evaluation of Mr. Alfred Bourgeois in this case?

A    I did.

Q    All right.  And in connection with that did you prepare a report?

A    I did.

Q    All right.  And let me show you what's been marked as Government's Exhibit Number 1 and ask if you can identify this?

A    Yes.  That is a copy of my report of psychological evaluation in this matter.

Q    All right.  Your Honor, we would -- and is this report accurate, accurately reflect your conclusions and findings?

A    It does.

MR. DOWD:  Your Honor, we would offer Government's Exhibit Number 1 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 1 is admitted.

USCA5 3299

(Government's Exhibit 1 admitted into evidence)

MR. DOWD:  Thank you, Your Honor.

THE COURT:  You-all have got to stop that.

MR. DOWD:  Don't say thank you?

THE COURT:  Yes.

MR. DOWD:  Yes, Your Honor.

THE COURT:  You're welcome.

BY MR. DOWD:

Q    Dr. Price, let me start with the concept of malingering. Explain what is meant by the psychological term malingering as relates to testing and evaluations.

A    It's defined as intentionally feigning or grossly exaggerating an illness for an external incentive such as compensation, to, possibly to avoid punishment or to lessen punishment in a criminal case, so it's the intentional feigning or gross exaggeration of the disorder.

Q    All right.  And can there be degrees of malingering or feigning?

A    Sure.

Q    All right.  And what is the TOMM test or the Test of Memory Malingering?

A    It is a test that is designed and has been studied to detect or to check to see if someone is feigning amnesia of a type or feigning the poor ability to recall certain kinds of data or information that pertained to them or some event.

USCA5 3300

Q    So it's designed to see if someone is faking amnesia?

A    Right.

Q    Okay.  And is it a fail-safe method to expose a malingerer in other psychological tests or evaluations?

A    No.  It is a test of effort and it's a very, if a person is faking on that test, it's a pretty good sign that they may be faking in areas other than the memory process, but it's designed to see if they are faking as it relates to their ability to recall information.

Q    All right.  And if someone was found not to be malingering as a result of the TOMM test, would that be proof certain that there is no malingering going on?

A    No.

Q    Why is that?

A    Well, it's one test and to, it's ideal to have several tests that would look at different areas of faking.  It's, it's a pretty transparent test, some people can see through it.  It's very, very easy, and if a person scores much less than chance, they are trying to get the incorrect answer.  So, it's a, it has a, it has a kind of a floor effect that it's for gross exaggeration.

Q    All right.  And as far as obtaining aberrant information or untrue information, is the choice of sources who are providing background history, can that be a further reason for giving an aberrant history of someone?

USCA5 3301

A   Well, it's a good idea in any forensic evaluation to have collateral information either from the records, if they are, if it's possible to have those, or from talking to other people who are acquainted with the person that you are evaluating to corroborate and to get real world information about how they behave such as, in a case like this, with adaptive behavior.

Q   All right.  And is there a danger or a risk if you limit your background informants to friends and family members?

A   Sure.

Q   And what is that risk?

A   Well, it's common that friends and family have a bias and want to try to help the person, and it can be intentional or it can be just a mindset or response style that they have. Ideally, the people that you talk to as informants are collateral sources, ought to be as objective of individuals as you can find that don't have a reason or don't have the mindset or the response style that can flavor their answers to your questions.

Q   All right.  And if you were told that in Mr. Bourgeois' interview with Dr. Weiner that he had concocted a story about having a head injury from a three-wheeler accident in 1984 which resulted in a coma for one to two months and that his sister, Claudia Williams, corroborated the story and reported to Dr. Weiner that, or, you know, indirectly to Dr. Weiner

USCA5 3302

Weiner - Direct                                198

that he had been knocked unconscious in that accident and remained in a coma for one to two weeks and only came out of the coma after doctors operated on him, would that suggest an attempt to malinger on the part of Mr. Bourgeois?

MR. WISEMAN:  Your Honor, I'm going to object to the hypothetical as the facts show that Dr. Weiner did not speak with any collateral sources, so it's a hypothetical based on an improper fact or an inaccurate fact.

MR. DOWD:  Your Honor, I said indirectly and it showed up in Dr. Weiner's report.

THE COURT:  Overruled.

THE WITNESS:  Yes, that would be of concern.  In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information.  And it could be a sign that they are trying to present in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

BY MR. DOWD:

Q    All right.  And would that be consistent, would the

USCA5 3303

ability to make up a story like that and coordinate its telling with another party like his sister, would that be consistent with a diagnosis of mental retardation?

MR. WISEMAN:  Objection to leading, Your Honor.

THE COURT:  Overruled.

MR. DOWD:  Thank you, Your Honor.  Yes, Your Honor.

THE WITNESS:  It would be inconsistent with mental retardation but consistent with a personality disorder or with someone who is attempting to manipulate the results of the evaluation.

BY MR. DOWD:

Q   And what significance would that be as relates to that individual's level of intellectual functioning or adaptive functioning?

A   Well, if it's an informed story or concoction including an accident that resulted in a coma which could be a, certainly a coma for that time period would be a very significant event in a neuropsychological evaluation, because a coma for that long would have a very high probability of ending up in the person having damage to the brain.

Q   All right.  But that, you are assuming that the coma was a reality, that it actually occurred?

A   Right.  And having some knowledge base that that would be interpreted like that would be atypical for someone with low intelligence.

USCA5 3304

Q    In other words, to understand the effect of the story on the professionals that would hear it?

A    Yes.

Q    Okay.  Now, you also gave Mr. Bourgeois the Mini-Mental Status Examination, the MMSE-II, is that correct?

A    Yes.

Q    And what was his, what was the results of that test?

A    It was a 28 out of a total possible of 30.

Q    And how would you gauge that score as far as his level of intellectual functioning?

A    Well, it's not a test of intellectual functioning.  It's a test of their ability to respond appropriately to questions, they're, if they are in touch with what's going on, if they are alert, if they are oriented, so it doesn't correlate too well with overall intelligence.  The reason for having such a test at the start of an evaluation is to see if they can respond to other things that you're going to do and questions that you're going to ask them.  It's a starting point.

Q    All right.  And what conclusions, if any, did you draw from that test result?

A    Well, that I could proceed with the interview and that he was, he was alert, he was oriented, he could follow directions, instructions, he could respond to questions, he could concentrate, he could pay attention.

USCA5 3305

Q    All right.  And what was his level of attention and concentration?

A    It was good.  He was certainly -- that he could think about his answers.  He had what I would refer to as a sustained attention and concentration.  The first day was over five hours, the second day close to three hours, and he was there with me mentally the whole time.

Q    All right.  And what conclusions, if any, would you be able to draw from this duration of attention and focus that Mr. Bourgeois demonstrated?

A    Well, he was able to do it.  He was intellectually cognitively able to do that.  He had a lot of energy.  He could persist in being responsive to questions.  And that length of time, to be able to concentrate would be inconsistent with mental retardation.

Q    Okay.  And did you also draw some conclusions regarding his abstract thinking and conceptualization during the interview?

A    During the interview?  Yes.  He was able to conceptualize and to think abstractly about himself, about his legal situation, about his past, present and future, and that was obvious from the interview.

Q    And then, can you compare that to his testing regarding abstraction and problem solving?

A    I can.  In any kind of formal testing, when it was about

USCA5 3306

something that wasn't personal to him, he was much more concrete in his thinking.  On, proverbs is a part of a mental status exam that we typically give, he was not, he did not give very abstract responses to those, they were concrete. He tended, on questions that were obviously cognitive questions he responded slower, he was more concrete.  He was fairly quick to say that he didn't know, that he had never heard of that.  So novel tasks to him, he was a lot more concrete than as it applied to his own life and his own past, present and future, he was more abstract

Q   And what, if anything, is significant about this inconsistency?

A   Well, it's just good to note that he, like a number of different kinds of people, doesn't test well.  I mean he doesn't, it's harder to get him involved in objective testing.  It's very easy to get him involved in talking about himself, his life, his situation.  It's easy to engage him there.  It's even difficult to, to at times to disengage him from doing that.  But objective testing, he kind of shuts down a little bit.

Q   All right.  Did he discuss the loss of his daughter, the victim in this case?

A   He did.

Q   And what, if anything, did he say about that?

A   Well, he said that it was, it was very sad to him, that,

USCA5 3307

he told me that he loved her with all of his heart and that he was very upset that she died on his watch.  And he commented that, you know, throughout the interview that, you know, he certainly proclaimed that he was not responsible for it and said that if he did something he did it and that he wasn't going to run away from his responsibility but he didn't in this case.  And that was kind of the flavor of a lot of the interview, to continue to return to the reasons that he was innocent and who was responsible for this, et cetera.

Q   Did he talk about his behavior as a parent?

A   He did.

Q   And what was his reaction with that?

A   Well, he, he said he was a good parent, that he never would abuse any child and he had never abused any child and that he, that his, all of his children, he was close to them and it was very important to him.

Q   And what, if any, significance did you attach to Mr. Bourgeois' discussion of his family and his deceased daughter?

A   Well, and, you know, I can understand his position in this at this time, that he was really, spent a lot of time attempting to portray himself as a good person, and he -- as it related to parenting, as it related to his job, as it related to his spirituality, I mean there was a lot of what I

USCA5 3308

would refer to and what we call an adult impression management.

Q    Explain to the Judge what you mean by that?

A    Well, he wanted to make a good impression on me.

Q    Okay.

A    And he's, you know, he's very talkative and verbal, as other people have testified to, and he has a certain amount of charm, and he was very cooperative and very pleasant with me the whole, the whole time.

Q    All right.  And is there any, I mean is that consistent with any personality disorders or other psychoses or other --

A    Well, it could be consistent with a lot of things.

Q    Okay.

A    I think that in his case it's, you know, it's kind of a notch above that in that he really portrays himself as a victim and portrays himself as being kind of a special person with a sense of entitlement and with probably, he portrays himself with abilities and accomplishments that are exaggerations.

Q    Okay.  And any conclusions you can draw from that?

A    Well, it, I mean to, you know, to get ahead of your questioning here somewhat I think, but I mean he certainly impresses as having a personality disorder that's longstanding and pervasive.  It has several different features, borderline, antisocial, narcissistic, a certain

USCA5 3309

amount of paranoia about the legal system, et cetera, that isn't as predominant and is, in my experience, pretty common with a lot of people who are incarcerated. So, his style in the interview was consistent with that of a personality disorder that's longstanding and pervasive.

Q   All right.  And is this, can you say whether or not this, that presentation is consistent with mental retardation?

A   Well, it is -- his presentation was not consistent with mental retardation.  The most similar thing to that that is talked about in the literature often is this idea of the cloaking of competence or masking where a person with limited intellectual abilities will say they can do things that they can't.  His, in my opinion, really exceeded that and had a different flavor to it in that it was, I mean he would admit when he couldn't do something but he certainly wanted to impress.  And his history and the records, I see that that's been a style of his, to impress others that he's very successful and has been -- even though he has been occupationally.  It was, it went beyond the cloaking of competence.

Q   All right.  Did he admit to you that he was an impulsive person with a bad temper?

A   Yes, he did.

Q   And what's the significance of that?

A   Well, you know, even though he wanted to make a good

impression and he was, you know, had that sort of self-entitlement and grandiosity at times, he also in this interview had times when I thought he was, had some insight into himself and he was being honest.  And he would say things that certainly wouldn't help him in this situation that he's in but he'd say, "Yeah, I am, I am impulsive." He'd say, "You know, I want what I want when I want it." That is how he phrased it.  And he said, "You know, there's a lot of things that make me really angry.  When somebody calls me stupid, when I hear anything about child sexual abuse, I just go off, and I do have that problem."  So, he was variable in that.

THE COURT:  Okay.  I listened to every bit of his interview.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Right?

MR. DOWD:  Yes, Your Honor.

THE COURT:  So why don't we just get to what the problem is.

MR. DOWD:  Get down to the main point?  Okay, Judge.

BY MR. DOWD:

Q   Is that consistent with, that level of introspection consistent with mental retardation?

A   No, it's not.

Q   His relationship with women, sex, what did you draw from,

what conclusion did you draw from that?

A    Well, I think it's part of his personality disorder, that it was narcissistic, it's manipulative and antisocial to a certain extent.

Q    All right.  And as relates to his educational background, did Mr. Bourgeois indicate that he was kind of a self-made man as far as doing schoolwork, things like that?

A    Yes, he, he commented on that he didn't have any help when he was a kid, he had to get it on his own, and, you know, he was proud of that.

Q    Now, he was, he was, do you know if he was ever identified in, as mentally retarded in Louisiana?

A    I found no indication that he was identified as a pupil with mental retardation.  He did receive services that would fall under special education, at least it was in the records from others and he said that he received some speech therapy, so he was identified as needing services but I saw no indication that he was identified as having mental retardation.

Q    All right.  And what about his ability to maintain his finances?  Did he indicate to you he had a secret savings account in Memphis?

A    He did.

Q    And what conclusions, if any, do you draw from that?

A    Well, I mean he was trying to hide some of his funds from

USCA5 3312

his wife and, who he claimed was the over spender in the family that had caused their financial problems, and so it's, I mean, you know, it was deceitful to her to hide those funds.

Q   Is that consistent with mental retardation?

A   I wouldn't think so, no.

Q   Now, you have touched a little bit about his driving, his work record, and have you thought about that, is his work record consistent with someone with mental retardation?

A   No, it's highly inconsistent for him to have had a job as a cross-country truck driver and performed as he did, just totally inconsistent with mental retardation.

Q   All right.  Now, you gave him also the Personality Assessment Inventory, the PAI?

A   Yes.

Q   Okay.  But you indicate that this was an invalid profile?

A   Yes.

Q   And why is that?

A   Well, it came out that it was invalid in the scoring due to something, that he didn't pay attention to the items closely, and that gave on the computer interpretation several possibilities, that he didn't understand, that he was confused or disoriented, that he couldn't read the level that's required for the test or that he was careless, and my opinion is that it was carelessness and not paying enough

USCA5 3313

attention.  He had produced valid personality inventories in the past.  I saw those in the record.  His reading ability is certainly high enough that he could read it.  I timed the test or I went back and analyzed that and he had times that he would speed up and times that he would slow down.  At the first, at the very start of the test, usually people go slower at the very start because they are figuring out kind of how this works with the false, somewhat true, mainly true, true, and they usually go slower as they're figuring that out and getting accustomed to it.  I gave it to him and had to go to the restroom and when I watched the tape he was going very fast at the start.

Q   While you were absent from the room?

A   Right.  He slowed down some but then he sped up at other times, and overall he --

Q   While you were in the room?

A   Yes, yes.

Q   So he was going slow and fast?

A   Yes.  Yeah, he --

Q   Throughout the testing?

A   It was variable but --

Q   Okay.

A   Overall, he only spent an average of seven seconds per item, which just is not paying careful attention to the item and what it's asking you.

USCA5 3314

Q    All right.  If Dr. Swanson testified that his speeding up on the PAI when you left the room to use the bathroom was evidence of masking, do you concur with that evaluation?

A    No.  I mean he sped up when I was in there, too.  I mean it's -- and he had the ability to read and to respond to those, but for some reason he didn't when I administered this.

Q    Do you attribute that to malingering on his part?

A    The test did indicate that, you know, there were a lot of his answers were on negative impression management, but I don't, I would not say that it's malingering.  I would say that it's not putting forth full effort and carelessness. You know, if he had tried to malinger a mental disorder on the test, it wouldn't look like his did.

Q    Okay.  So you think it's more carelessness and lack of effort?

A    Yes, sir.

Q    All right.  If the test had been performed successfully, what would it have been able to tell you?

A    Well, it would have pointed to if there was a mental disorder such as anxiety, depression, phobias, schizophrenia, and there's personality disorder scales on the PAI --

Q    Okay.

A    -- that could have been, it could have shown or added or taken away evidence from that.

USCA5 3315

Q   Okay.  Now, you watched all of the, I know you were present when you evaluated and interviewed Mr. Bourgeois, but you went back and watched the video of it?

A   I did, yes.

Q   All right.  Are there any, any segments of the video that you think are significant as far as assisting you in evaluating Mr. Bourgeois?

A   No, I wouldn't point to any particular parts.  I know the, one thing, just his style of interacting at the beginning and then at the end, and I know that when I came back the second day that he had thought about something that I had said and he commented on that and --

Q   Explain that to the Judge.

A   -- I thought it was significant.

Q   Explain that incident to the Judge.

A   Well, the first day I had said something in the interview, that I had seen some testing in the file and that he was a pretty good reader, and he and I discussed, and this was interesting, too, the Bible.  I've had a lot of inmates tell me that they spend a lot of time reading the Bible and I usually ask them questions about that, which I did with Mr. Bourgeois, and he answered them.  He and I talked about how the Bible is organized and the Old Testament and the New Testament and his plan for and how much time he spent on it.  Some of the books of the Bible he quoted some scripture, gave

USCA5 3316

me the reference.  I checked them that night and he was correct.  He and I talked about the difficulties that both he and I have had with the King James version and how there's versions that are much easier to understand.  So, you know, he had been reading the Bible.  So I --

Q    And comprehending it and remembering it?

A    Yes.

Q    All right.

A    So I commented on that I had seen the test scores, that he was a pretty good reader, and so the next day he commented on that and he had thought about that, that he wasn't really that good of a reader, that it was difficult and that he also wanted me to understand that he had to have help on things at times, had to have help from his brother on projects.  He, when he was going to buy a house or a car he would take somebody or ask somebody to explain things about the financing, or he would take them to help him to understand the contract that he was going to sign.  So he wanted to make sure that I understood that and I wrote that down and --

Q    Did you find that significant, that he would come back the next day and correct any compliments that you gave him?

A    Yes, I did.  It was a, it was a very positive -- I thought, and I believe he did, too, that the first five hours that I spent with him, it went really well except for him being careless on the PAI.  I mean he responded to my

USCA5 3317

questions.  We, I thought it was a good interview.

Q    Uh-huh.

A    And I did throw in a couple of things like that about the reading, and I think he started thinking about it and when I came back the second day he seemed a little down at first and I asked him, "What's the matter," and, you know, he said he hadn't slept and he had, you know, he didn't like, you know, he didn't like doing this, and that, you know, he, I think he had thought about it and what the purpose of it was and I think it flavored his view of it for a while.  But then, you know, he became engaged again on the second day and we finished up and he was very cooperative and pleasant and got very talkative again.

Q    What, if anything, did you think he was trying to accomplish when he corrected you about his good reading the next day?

A    Well, I think he understands what this is about and was, you know, that he would slip and talk about things that he had done and what he understood and he wanted me to make, I think that he wanted to make sure that I understood that he had to have help on things and he wasn't, you know, as intelligent or accomplished as maybe I thought that he was.

Q    All right.  Now, you also reviewed the WAIS-R that was administered by Dr. Weiner on February 28th of '04, is that right?

USCA5 3318

A    I did, yes.

Q    All right.  And you, in your report you comment that there was some scatter.  First of all, what is scatter -- among the subtests.  First of all, what is scatter and how is that significant?

A    Well, I did comment in the report there was scatter on the subtests of the WAIS-R.  There is also scatter in the other neuropsychological tests that were administered in 2004.  There are some very low scores, and if we kind of keep this to, either to percentiles or what we refer to as standard scores and you can see, but if you look at the subtests on page 6 of the report, he had some subtests where he scored at the first percentile.  That would mean that 99 percent of the people in the normative samples scored higher than he did.

Q    Uh-huh.

A    And on other subtests he's at the 16th percentile and even the 63rd.  With mental retardation there tends to be more of a flat profile.  While, of course, people with mental retardation can have strengths and weaknesses, on cognitive testing there tends to be a flatter profile.  Comparing, again with the scatter idea, in comparing his performance on the IQ test of 2004 with the other tests that he took, especially those of abstract thinking, his abstract thinking, his ability to plan and think ahead was higher, according to

USCA5 3319

my analysis of the data.  I used more current norms than were used in 2004 by Dr. Weiner, who used some very outdated norms on interpreting that.  I used the norms that had been more recently published that break it down to age and education.  So if you compare him to people of his age and education, his performance on those tests, the category test, the trails test, it's not, not deficient, in fact it's average to low average on those, which is higher than his IQ.  He has the ability to think and cognitive abilities that exceed his intelligence as it's measured here.

Q    Okay.  And did you make the same observation in analyzing the WAIS-III that was administered by Dr. Gelbort in 2007?

A    Yes, and you see the same thing, that there are, tend to be lower scores.  It's a newer test.  He scores lower on verbal tests or subtests than on those that weren't so verbal.  His deficient performance was on the verbal subtests and, but you see the scatter from the 1st percentile to the 63rd and the 25th and 16th, and, again, in comparing his performance on the IQ test with the neuropsychological tests that were scores of 85 and 101.  So, when you are comparing apples and apples here, his cognitive abilities exceed his measured cognitive intelligence.

Q    All right.  And again, is that consistent with mental retardation?

A    It's inconsistent with mental retardation where you would

USCA5 3320

see more even cognitive abilities across the board.  What it's consistent with is someone who has been somewhat culturally deprived, didn't profit from education as much as someone else, not experience things that were intellectually academically enriching or didn't profit from those, but the abilities are there and that's inconsistent with mental retardation.

Q   All right.  Did you compare Dr. Weiner's trailmaking test in 2004 with that given by Dr. Gelbort in 2007?

A   I did.

Q   And do you have any, did you find anything significant about those, the different score he received?

A   No.  They're at the same level.  Again, transferring those to standard scores where the average is 100, so that we can keep this straight, and of course abilities, et cetera, at the mentally retarded level or the impaired level are below 70.  The trails test that he took in '04, the standard scores were in the 90s and in '07 it was at 101.  Those are equivalent, at the same level, at the average level.

Q   All right.  And what about whether or not that suggests, his score suggests organic brain dysfunction?

A   Well, those kind of scores do not suggest organic brain dysfunction.

Q   Or any frontal lobe deficit?

A   No.  Even though there's not really a true

USCA5 3321

neuropsychological test that isolates the frontal lobe of the brain, some people say that the category test does but it's, it involves all areas, the overall integrity of the brain, as does the trails, but they have been talked about as being mainly frontal lobe controlled.  But his performance, compared to people of his age and education, is low average.

Q   So if we heard testimony that a test can actually suggest to the doctor what part of the brain is suffering the deficit, you are saying that that's not settled science?

A   Well, I was taught that in the '80s and there was a lot of effort put on what we refer to as localization, to take different scores and be able to correlate those to different areas of the brain, but since then we have kind of given up that task in neuropsychology.  Part of the reason is it just didn't hold up scientifically, and there's better ways to localize things in the brain with new medical techniques that can image the brain and that's what they're working on at this time, and people in my field don't turn to the neuropsychological tests except for gross things like language, non-verbal abilities and the two hemispheres of the brain.

Q   But not behavioral?

A   Not the anterior part of the parietal area.  It just hasn't held up.  And for most of the tests we have it requires the whole brain or many parts of the brain.  They

USCA5 3322

don't isolate.  Our tests require complex abilities that is mediated by the overall integrity of the brain.

Q    All right.  So whether Dr. Gelbort localized the deficit in the frontal lobe and Dr. Weiner localized the deficit in the posterior lobe, your testimony is that you can't localize it anywhere?

A    That's correct.

Q    All right.  Now, you also, you didn't do a complete adaptive functioning evaluation, did you, Doctor?

A    No.

Q    But you did make some observations on adaptive functioning from -- how many hours have you spent with Mr. Bourgeois?

A    Well, approximately eight to nine, although a lot of my observations about adaptive functioning came from the records.  We split up the duties in this case and mine was mainly to look at the cognitive and the neuropsychological aspects.  The adaptive behavior evaluation was to be done by Dr. Roger Moore.  So mine come from the observations in the interview that I conducted and the records as well.

Q    All right.  I'm just going to ask you just a couple of points.  You indicated that, "The mental retardation is not necessarily a life-long disorder.  His adaptive skills may develop to where the subject may no longer have the level of impairment required for a diagnosis of mental retardation,

USCA5 3323

especially in cases of mild mental retardation."  Explain to the Court what you meant by that.

A    Well, it's really important to look at adaptive behavior, everyday tasks, completion of things to adapt to the environment, to live independently at different ages.  The reason this is so important is that it used to be not such a part of the definition of mental retardation and so children were identified as mentally retarded on the basis of an IQ score alone.  When -- that related so much to their academic abilities and their cultural deprivation, but you put them in their environment that they were used to, that they had to live in, and they didn't have the problems there, they only had the problems in school.  And so that really became a social issue to not over identify culturally deprived children as mentally retarded, instead to look at their day-to-day functioning as well, and it continues to be a huge part of the diagnosis of mental retardation to look at adaptive behavior.

Q    All right.  And what observations can you make in this case regarding any, in the duration of any adaptive functioning deficits on the part of Mr. Bourgeois?

A    Well, my evaluation of him, I didn't find any significant deficits or impairments in any adaptive behaviors at this time or the time just before he was incarcerated.  I mean he certainly, I didn't see any problems with communication,

USCA5 3324

either verbal or written, with care of himself, personal hygiene, clothing, et cetera, taking care of house and home. With his social skills he's, he has really well developed social skills.  We have heard from people that have interacted with him outside of an evaluation, too.

Q    Did you read any of his writings?

A    I did.

Q    What type of writings did you read?

A    I had a lot of letters, some legal documents that he prepared.

Q    Did you look at those today?

A    I did.

Q    I mean you've seen them before but did you look at them again today?

A    I did, yes.

Q    Is that Government's 23 through 26?

A    Yes.  And they are very detailed, very, very detailed. Now, his sentence structure, his syntax is not that of an attorney or a person that's been to college, perhaps, but it's certainly, he can communicate when he writes.  He can express himself in complete thoughts, and very detailed complete thoughts.

Q    Did you, did you -- I didn't mean to cut you off but did you also ask him to write a statement on, during the interview?

USCA5 3325

A    I did, yes.

Q    All right.  Let me show you what's been marked as Government's Exhibit Number 14 and ask if you can identify that?

A    Yes.  That's the paragraph that he wrote when I evaluated him.

Q    All right.  And did you draw any conclusions from watching him write this?

MR. DOWD:  Judge, we would offer 14 into evidence.

MR. WISEMAN:  No objection, Your Honor.

THE COURT:  Government's 14 admitted.

(Government's Exhibit 14 admitted into evidence)

THE WITNESS:  Yes.  That, part of the reason for me to do that is that in doing evaluations with individuals who are incarcerated and there's writings in those case files a lot of the time, and the complicating factor that you have to look at is did they have help and how long did it take them.  Yes, it may look good but did they, they have plenty of time, obviously, and did they just spend so much time on this that it looks as good as it is.  So, I mean, I thought that he wrote that in a normal amount of time.  His handwriting is good.  It looks, I'm not a handwriting expert but it appears to me to be similar style to the other writings and letters that I examined.  And it's inconsistent with mental retardation to me.

USCA5 3326

Q    All right.  And how many letters did you read authored by Mr. Bourgeois?

A    I didn't count them.  A lot, though.

Q    A lot?

MR. DOWD:  Judge, we would offer Exhibits 23 through 26, which were the, referenced by the Doctor, the legal writings he reviewed to make his decision.

MR. WISEMAN:  No objection.

THE COURT:  Government's 22 through 26 are admitted.

MR. DOWD:  23, Your Honor.

THE COURT:  I'm sorry, through 23.

MR. DOWD:  23 through 26.  23, 24, 25, 26.

THE COURT:  23 through 26.

MR. DOWD:  Yes, Your Honor.

THE COURT:  Admitted.

   (Government's Exhibits 23 through 26 admitted into
    evidence)

MR. DOWD:  Thank you.  Yes, Your Honor.

BY MR. DOWD:

Q    And can a low score or a low performance in one of these adaptive skill sets be the result of a character trait not related to his level of intellect?

A    Sure.  There's many things that can cause a person, that can lead or be associated with an adaptive deficit. Certainly individuals with a mental illness have problems

USCA5 3327

with living independently at times.  Certain, as you said, character traits or personality traits by their very nature in a personality disorder are maladaptive.  It's not in the best interest of the person to run up credit cards and to impulsively buy things but that doesn't, that's not, that's a personality disorder trait or it's a maladaptive personality trait in this case and others, in my opinion.

Q    What about impulsivity in general, is that consistent with mental retardation?

A    It can be.  Yes, it can.

Q    Can it be, is that consistent with a number of issues, personality disorders?

A    It sure is.  It's one of those traits or findings that, it can be associated with many things, with mental illness, with personality disorders.  Some individuals with mental retardation are impulsive and aggressive, but that doesn't, it's not exclusive to them by any means.

Q    All right.  Now, Dr. Gelbort has attributed his impulsivity to an organic deficit within Mr. Bourgeois' frontal lobe, Dr. Weiner attributes it to organic brain damage in his posterior lobe, and you are suggesting that it's the result of a, his personality disorder?

MR. WISEMAN:  Objection to leading, Your Honor.

MR. DOWD:  This is all in the record, Judge.

MR. WISEMAN:  Still leading.

USCA5 3328

THE COURT:  Overruled.

BY MR. DOWD:

Q   That's the million dollar question, Doctor, how can we determine what the source, whether this impulsivity is a symptom of mental retardation or it's the result of a personality disorder?

A   Well, you take all the information into consideration, of course, and you look at, if it's an organic problem, if it's brain dysfunction, at least impulsivity, the impulsivity shows up in many areas of their life.  They walk off of jobs, they spend too much money, they get in fights with people, they get mad at people on the highway, they steal things that they want, and it's not, it's discretionary or discriminated in certain areas of their life.  The same with mental retardation, it's going to go to a lot of impulse control problems, not controlling themselves in a wide variety of areas.  You know, his impulsivity relates to certain issues in his life, to the sexual abuse that he experienced, to his problems with women, and so it's, it relates to personality issues.  He has problems, to be sure, and it's related to those but they are personality trait issues, not organic brain dysfunction or retardation.

Q   Okay.  Now, Dr. Gelbort indicated he gave the Halstead category test where Mr. Bourgeois got 30 of 40 wrong which is, he scored at chance, because it's a four-choice multiple

USCA5 3329

choice test, and he suggested that that was demonstrating that Mr. Bourgeois was not malingering because he scored exactly at chance.  Is that, do you agree with that assessment?

A    Well, it's an unusual way to put that.  If someone, if the mistakes they make on a test exceed chance, in other words, that's really evidence that they are intentionally trying to get things wrong, that's malingering, so I would agree with him on that, but scoring at chance is associated with careless, sub optimal effort, not putting forth good effort, with not trying hard.

THE COURT:  Malingering.  Malingering.

THE WITNESS:  Well, except it's not intentionally trying to get the wrong answer on easy things, it's just not trying, and so it's a form of malingering.

THE COURT:  Okay.

BY MR. DOWD:

Q    Now, the WAIS-R was developed in the 1980s, is that right?

A    The WAIS-R was normed in 1978, '79, published in 1981.

Q    Okay.  When did it become outdated?

A    In 1997 the WAIS-III was published and so certainly by that time.

Q    And why are new tests or newer editions of the test created?

USCA5 3330

A    Well, things change in our society and updated tests not only are more appealing to people, it gets their interest, but we have discovered that the norms on tests become outdated.  It's happened on the SAT, on the GRE, where they have to come in every so often and re-center it or update it. And it's the same thing here, that older tests, the norms tend to become outdated and inflate the score that the person, or that it might -- it inflates the scores of the group.

Q    All right.

A    That's pretty well established.  Which, as to whether or not it inflates that individual's score or not, there's a lot of people in the group and you don't know that.  But the norms, the way to make them accurate is to --

Q    Revise the test periodically?

A    -- is to revise the test and to re-norm the test.

Q    And would you ever give an outdated WAIS test, the WAIS-R or WAIS-III?

A    I can't think of a reason to do that.

Q    And why is that?  What would be the impact of giving an outdated test?

A    Well, it might affect the results.  It might inflate the results.

Q    All right.  Explain, short version, the Flynn Effect to the Court.

USCA5 3331

A    That's, actually it's part of what I'm talking about here.  The Flynn Effect is named for actually a political science professor in New Zealand who has studied this inflation of IQ scores over time and has found that in large groups of people on various IQ tests that there has been a relatively consistent trend for the inflation of the IQ in the group to be about three points for ten years after the norming.  So we need, even though it hasn't been consistent on all IQ tests, like the WAIS-III it wasn't consistent, and it's, some have written that it may not continue to do this, they don't know the reasons for it.  I mean, I don't think it's very evident.  In society, I'm not sure that I've noticed that people are smarter than they used to be but IQs, the measurement of intelligence as it's measured on IQ tests, have this trend with outdated --

Q    Are going up?

A    -- norms, yes.

Q    All right.  And do you believe that it should ever be applied in evaluating someone's IQ?

A    Well, I think it should be considered and noted when you are using a test that's older.

Q    Uh-huh.

A    To recognize that that score might be inflated.

Q    May not be reliable.  All right.

A    There is a controversial application that where, that

USCA5 3332

some people are advocating, especially in high-stakes decisions like this, to actually recalculate that individual's IQ score using the Flynn Effect and how long ago the test was norm.  That's controversial, it's not used other places, others say it's not the standard of practice to change somebody's IQ score, but I think we should consider that and note it in the interpretation of an old IQ score.

Q   All right.  But as far as the actual mathematical formula in which you reduce it according to the number of years the test has been, become outdated, you're saying that's a controversial theory to apply that formula?

A   That's correct, and at this time is not the standard of practice, but it's controversial and some think that it should be, especially in cases like this.

Q   How much credence would you -- you are familiar with Dr. Estrada?

A   Yes.

Q   The psychiatrist, a local psychiatrist here that evaluated Mr. Bourgeois for competence and insanity prior to the trial?

A   Yes.

Q   And you have read his material?

A   Yes.

Q   All right.  And you, he had indicated that he thought Mr. Bourgeois was above average intelligence.  Would you --

USCA5 3333

but he didn't give any IQ test.  Would you discount Dr. Estrada's opinion or how much credence would you give to Dr. Estrada's opinion?

A    Well, I don't think that he's of above average intelligence, but his clinical presentation, you talk to him and he can come across that way.  His expressive vocabulary, his verbal abilities, his ability, his social skills, et cetera, he certainly comes across as being more intelligent than his cognitive IQ scores show him to be.

Q    All right.  Dr. Weiner concluded from his, from the category test that, a test for new and unfamiliar learning situation, that Mr. Bourgeois' 94 errors, which he characterized as a very low score, indicates a tendency to exhibit inappropriate behavior under stress.  Did you review that finding?

A    I did.

Q    Okay.  And are you, do you concur with that?

A    No, I don't.  His category score, when compared to people similar to him, is equivalent to a score of 78.  Not a good score but not impaired in the borderline range.  But I don't know, I have never seen that interpretation of the category test, that under stress that it can affect a person's behavior like that.  It's a test that can be stressful.  It's something a person has likely never seen before.  It requires abstract thinking.  It requires the ability to problem solve.

USCA5 3334

It is not an easy test by any means, one of the harder tests that we give in neuropsychology.  But as far as its extrapolation to everyday life, I think it relates more to cognitive intellectual abstract thinking as opposed to the person's day-to-day function.

Q    And do you agree with Dr. Toomer's evaluation that Mr. Bourgeois suffers from a schizoid personality disorder?

A    No, I don't agree with that.

Q    Why is that?

A    I, the only place I saw any indication of that was that he was given an MCMI, which is another personality test, and it suggested that.  Where that came from, I don't know.  Any mental health professional that talks to him, he seems to me to be the opposite of a schizoid.  A schizoid is kind of a loner, quiet, doesn't like social interaction, uncomfortable with other people, far from the way Mr. Bourgeois is.

Q    And Dr. Toomer's evaluation that Mr. Bourgeois suffers rage reactions, acting out mini-psychotic episodes, secondary to his borderline personality disorder, and Dr. Cunningham referring it to his impulsive attacks of rage, do you agree with those assessments?

A    I agree that he has features of a borderline personality disorder, which is an unstable personality.

Q    Uh-huh.

A    I agree that some people with unstable personalities act

USCA5 3335

out in angry and aggressive ways that are not normal, and I believe Mr. Bourgeois has done that.  I don't, it isn't, though it's directed at certain things it doesn't appear to be, to come out like on the highways, et cetera, just in -- so, you know, I don't think it's organic but I do think it is associated with his unstable personality.

Q   All right.  And finally, would the, Mr. Bourgeois' plan, long-term plan to have witnesses or agents involved in the case killed over a period of time and take steps to attempt to carry that out, would that be consistent with suffering from a rage disorder or a mini-psychotic episode?

A   No, I think that would be consistent with antisocial psychopathic traits and features.

Q   All right.

        MR. DOWD:  Judge, I -- oh, one moment, Your Honor. Pass the witness, Your Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MR. WISEMAN:

Q   Good afternoon, Dr. Price.

A   Good afternoon.

Q   Where did Mr. Bourgeois get his unstable personality?

A   I think it came from his early childhood experiences.

Q   His abuse?

A   That's usually -- personality disorders start early in

life.  Borderline personality disorder traits are oftentimes associated to childhood abuse.

Q    Neglect?

A    Yes.

Q    His deprivations?

A    Yes.

Q    His abandonment?

A    Yes.

Q    His poverty?

A    Could be.

Q    His impoverishment, cultural, spiritual, economic?

A    That more to his cognitive intelligence, but in general childhood abuse and neglect and abandonment are typically associated with a borderline personality disorder.

Q    So you agree then with Dr. Toomer, Dr. Cunningham, Doctor, I can't remember all the doctors, about those features, about that fact, that his borderline personality derives from his abusive childhood?

A    I do.

Q    I want to actually start at the beginning.  You have given us a lot of information here and I'm trying to organize it in my own mind.

        THE COURT:  I'm sorry, are you eating something?

        THE WITNESS:  It's a throat lozenge.

        THE COURT:  Okay.  Well, why don't we just wait

USCA5 3337

until he finishes chewing and we will continue.

THE WITNESS:  I'm sorry.  Okay.

BY MR. WISEMAN:

Q    Sir, as part of your Mini-Mental Status Exam you asked Mr. Bourgeois to draw a geometric figure?

A    Yes, that's correct.

Q    All right.  And the instructions from the data say, "Display intersecting pentagons," and those are the two printed pentagons?

A    Yes.

Q    And it says, "Tell the subject to please draw this design, please copy this design," and it says, "Score one point if the drawing consists of two five-sided figures that intersect to form a four-sided figure."  And I just want to, I sort of highlighted all of that.  I myself got outside the lines.  But you will agree that what Mr. Bourgeois drew was a five-sided figure?

A    Yes, it looks like it is a five-sided figure, yes.

Q    So you should have scored him at a zero for that?

A    Probably so.  It did intersect but it does look to be a five-sided figure.

Q    Okay.  And on the score sheet here we can see that you have in fact scored him one.  It should have been a zero?

A    I'll agree with that.

Q    Okay.  Do you have an explanation for that error?

USCA5 3338

A    No.

Q    You explained to Mr. Bourgeois at the beginning of your evaluation that you were here on behalf of the Government and you basically Mirandized him, as psychologists do in these settings, is that right?

A    Informed consent, yes, sir.

Q    Okay.  And as part of that you started to tell him that if he were to reveal to you any abuse that he committed against others that you would have to be, you were obligated under the ethics of your profession to report that to law enforcement?

A    Yes.

Q    Did he --

A    If it hadn't been previously investigated.

Q    Right.  And he didn't understand that, did he?

A    He had questions about that part, yes, sir.

Q    Okay.  He didn't understand it?

A    Well, I think he came to understand it but he didn't, he had questions about it.

Q    Did he come to understand it because you took some time explaining it to him?

A    I think so, yes.

Q    All right.  But basically when you told him that you would have to report his abusive conduct that was previously undisclosed, he thought you were talking about his abuse, him

USCA5 3339

being abused as a child?

A    Yes, as I recall, he did, and we discussed that.  And it would have been that, too, I mean, but he did think it was about his abuse as a child and he was explaining that he had told people about it.

Q    Why isn't that in your report?

A    I, after explaining it to him I thought that he understood it.

Q    I want to play an excerpt from your evaluation.  Easier said than done for me.

            THE COURT:  What are you -- are you trying to play a part of the video?

            MR. WISEMAN:  Yes, Your Honor.  I am not sure how to get this thing started up.  I'm sorry, I just put a DVD in.

      (Off the record discussion at counsel table)

            THE COURT:  I still haven't watched Price 1 and 2.

            MR. WISEMAN:  Well, this is from Price 1 and 2 so you might find it --

            THE COURT:  I didn't have time to do it last night.

            MR. WISEMAN:  Well, you might find this interesting.

            THE COURT:  But I will do it.

            MR. WISEMAN:  No doubt.

      (Mr. Wiseman conferring off the record with clerk)

            MR. WISEMAN:  Now, watch this closely.

      (Video playing)

USCA5 3340

DR. PRICE:  "If there's any discussion or if you were to provide any information about any elder or child abuse that hasn't been previously talked about that was new information, then I would have to report that if it hadn't been investigated already.

MR. BOURGEOIS:  "When you say investigated, you mean prior to trial or after trial?

DR. PRICE:  "Either one.

MR. BOURGEOIS:  "Okay.

THE COURT:  "Either one.  If it was something that there wasn't anybody ever heard of it, you know, and it was new, then I'd have to report it.  Of course, it's going to be on tape anyway, if that were to come up.

MR. BOURGEOIS:  "Okay.  Well, so far as the child abuse, it wasn't reported because the trial counsel that I had, they never talked to me about any of this, you know.  All of this is new.  Now, the counsel that I have now of record, when they came down it was a whole different ball" --

(Video stopped)

MR. WISEMAN:  All right.  I --

THE COURT:  I have to tell you, I didn't understand it that way.  I understood that he might be talking about any child abuse, from Mr. Bourgeois or perpetrated by Mr. Bourgeois.

MR. WISEMAN:  And you are the fact finder.

USCA5 3341

Prisock - Cross                    237

THE COURT:  I didn't understand it.  I may have missed the beginning but I just, I under- --

MR. WISEMAN:  Well, Your Honor can watch.

THE COURT:  Okay.

MR. WISEMAN:  And I think that the Doctor has already agreed that he misunderstood the question initially, or the advisement.

BY MR. WISEMAN:

Q    Regrettably, I didn't include your next comments but Her Honor can watch it.  If I told you that you gave him no further explanation but simply moved on, would you agree that as it stood there he didn't know what you were talking about?

A    No, I wouldn't agree with that.

Q    All right.  What part did he understand?

A    Well, I think he was applying it to his trial and that, to his attorney's not investigating his child abuse and presenting that at his trial.

Q    Right, that's clear, but what you were talking about was if he had committed any unprosecuted or uninvestigated abuse, you would be required to report it to the authorities, if he discussed it with you, as a part of your ethical obligation, isn't that right?

A    Yes.

Q    Okay.  So he didn't, he didn't get that?

A    Well, he applied it to himself and --

USCA5 3342

Q   Right.

A   -- I thought he understood the idea that --

Q   Really?

A   Yeah, I did.

Q   Okay.

A   I did.

Q   All right.  Fair enough.

        MR. DOWD:  Your Honor, may we ask that the witness be permitted to finish his answer?

        THE COURT:  Yes.

        MR. WISEMAN:  I apologize.

BY MR. WISEMAN:

Q   Were you completed?

A   I thought he understood the idea.

Q   I think in your report you indicate that Mr. Bourgeois' IQ testing is in the borderline to mild mentally retarded range of intellectual functioning?

A   Yes.

Q   And his scores of 70 and 75 put him in that range?

A   Yes.

Q   So, leaving aside the controversy between the parties here as to whether Mr. Bourgeois is entitled to a formal diagnosis of mild mental retardation, you would agree that at best he is borderline deficient in his intellectual functioning?

USCA5 3343

A    That's the best measurement of his cognitive IQ that we have.  I agree with that, yes.

Q    Okay.  And I don't see in your report any criticism of the adminis- -- you read the data from both doctors?

A    Yes.

Q    Gelbort and Weiner?

A    Yes.

Q    And I don't see any report or critique in your report that they administered the test incorrectly or that they scored it incorrectly?

A    That's correct.

Q    All right.  Aside from the one point of contention about whether Dr. Weiner should have administered the WAIS-R when it was outdated, you would agree that that result still has value in this, in resolving these questions?

A    I do.

Q    So, we have got a person who you would agree suffered from, could we call it a horrific childhood?  Abandonment, abuse, impoverishment, deprivation?

A    Well, I'd rather use those words to describe it, the abandonment, the abuse of several kinds.

Q    All right.

A    Yeah, it was, that's the way it's been presented to me, that's the kind of childhood he had.

Q    And that person also is functioning in the borderline, at

USCA5 3344

best, the borderline range of intellectual functioning?

A   That's correct.

Q   And that's important in terms of Mr. Bourgeois' ability to manage his personality disorders, right?  I mean being a little smarter can help you maybe navigate some of the aspects, the negative aspects of the personality disorder?

A   It could, yes.

Q   So he really has two strikes against him in his life coming up, he's got the abuse, he's got the low intelligence?

A   I would agree with that.  He had a lot to overcome there.

Q   Okay.  Now, I was impressed with your credentials, your experience, forensic psychologist.  In fact, you co-authored an article in 2003 called Applications of Neuropsychology in Capital Felony Death Penalty Defense in the Journal of Forensic Neuropsychology.  Do you recall that article?

A   Yes.

Q   And who did you write it with?

A   I know Cecil Reynolds, who was at A&M at the time.  John Niland was another of the co-authors.

Q   I want to cover a couple of aspects of that article as they relate to this case.  You say in that article that there is a high incidence of central nervous system dysfunction present in this population, and I think in context you are referring to capital defendants.

A   That's correct.

USCA5 3345

Q    And why is there such a high incidence of -- what do you mean by central nervous system, for layman's terms, brain damage, organic dysfunction?

A    Yes, that's right.

Q    Okay.  And why, in your view, is there such a high incidence of brain damage, if you will, in this population?

A    That I think that having lower cognitive abilities that are associated with brain dysfunction, having lower intelligence in general is associated with more aggressive criminal actions.

Q    And that is due, possibly, there are a lot of factors but you would agree that one of the associated factors is brain damaged people have a hard time making proper judgments, right?

A    Judgment.  Impulse control can be a factor.

Q    Or impulsivity as we have been discussing it here?

A    Right.  Sure, I agree with that.

Q    And you also said in this article that -- well, withdraw it.  I think the point of the article, and you correct me if I'm getting this wrong, is that in capital litigation, whatever stage it's at, presentation of these types of, of this type of information is critically important, would you agree?

A    I think anything about the person's mental, personality, mental illness present, could be very important, yes.

USCA5 3346

Q    And in fact you say, quote, "The defense team must present the jurors with an explanation for the client's actions."  You go on to say that the neuropsychologist can, quote, "help the trial team and the jury understand the issue of moral culpability," close quote.  What do you mean there?

A    Well, I didn't write that part.

Q    Well, your name is on the article, right?

A    Well, that's true, but I didn't write every sentence in the article.  That's why there are so many --

Q    Okay.  So, is there anything in this article you disagree with?

A    Well, I didn't like the use of trial team and defense team.  I have always maintained that as an expert you answer questions but you are not part of the team, you are not part of the defense team, you are not part of the prosecution team, you don't, that the most important thing is objectivity and not being part of the adversarial team, and I didn't like the use of that term, but.

Q    You didn't file a dissent to the article, did you?

A    Oh, I wrote a part of that article about the use of neuropsychology.

Q    Okay.  But leaving that use of the word team, let's take the word team out and say the trial lawyer, the defense should present this type of evidence to help the jury understand the issue of moral culpability, that's really the

USCA5 3347

part I'm interested in, what did you mean by that? How does presentation of these kinds of issues, Mr. Bourgeois' abusive childhood, his low intelligence, how does that help the jury understand his moral culpability?

A    Well, an expert in psychology or in neuropsychology, if they possess valid data and information about that person's mental abilities and personality traits and disorders, that the jury might find that to be something that would lessen their view of the blameworthiness of the person.

Q    Okay. Well, I guess the reason that I am asking these questions is Her Honor has asked a number of questions of various witnesses that preceded you, I won't be as eloquent but in effect that, you know, why would you want to tell the jury that this guy can't control his impulses, why would you want to tell the jury that he can't control his relationships because, you know, even if it's due to all this stuff, and that was far less eloquent than the Judge put it, but you understand the point? I mean why do you, why do you in this article and why do your colleagues around the country do this work and present this evidence to juries in capital cases?

A    Well, because we are asked to do an evaluation and present our findings and the attorney decides if the mitigating aspects of it outweigh the aggravating aspects, and with certain things such as brain dysfunction it can be a double-edged sword, and that's the attorney's decision at

USCA5 3348

that point, not mine.

Q    All right.  At page 92 of the article, and I guess I don't know which of the three of you wrote this part but we will assume you had some say in it, "The Federal Courts have ruled repeatedly that since the invocation of the death penalty is qualitatively different from any other potential sentence, potentially mitigating factors must be admitted into evidence and considered by the judge or jury.  All of the authors of this article have worked on death penalty appeals that were successful because the evidence of the defendant's brain injury or other central nervous system compromise was not presented to the jury during punishment hearing."  And in the next paragraph you say, "Various court rulings would seem to argue the defense is compelled to identify and put forward such evidence."  I take it since you, we have all three of you, you agree with that, that statement?

A    Oh, that's my understanding of the law, yes.

        THE COURT:  Is there, do you have any evidence that he had a brain injury?

        THE WITNESS:  No.

        THE COURT:  Do you have any evidence that he is mentally retarded?

        THE WITNESS:  No.

        THE COURT:  Okay.

USCA5 3349

BY MR. WISEMAN:

Q   Well, let's define some terms here.  When we say brain injury, I'm, that would be a traumatic blow to the head, a hard injury?

A   It could be an illness that still would be a --

Q   A disease process?

A   Right.

Q   Okay.  But you would agree that he could have organic brain dysfunction and not fall into those categories?

A   Well, there has to be a reason for it and --

Q   Oh, undoubtedly.

A   And sometimes that's not easy to find, and sometimes just looking at the neuropsychological scores is not enough reason to say, because there can be low scores for a lot of reasons that have to be ruled out, especially in the absence of a defining event, a traumatic blow to the head.

            THE COURT:  Can I ask you --

            MR. WISEMAN:  Yes, Your Honor.

            THE COURT:  Mr. Wiseman, you, there may or may not have been blows to the head.  Your experts relied on blows to the head but it appears to be not any real evidence that there was unconscious things, except his sister testified after the three-wheeler, but let me ask you this:  Your, I understand your evidence to be that he has had this whatever it is since he was little, so that a blow to the head or lack

of a blow to the head hasn't changed him at all.

MR. WISEMAN:  Oh, I agree.

THE COURT:  Okay, so --

MR. WISEMAN:  I think it's Your Honor who asked about a --

THE COURT:  Okay, so we don't need to mess with the blows to the head.

MR. WISEMAN:  If Your Honor wants to forget about it, I'm happy to forget about it.

THE COURT:  Okay, we will move on from there and just talk about, because your effort has been to show that whatever has happened, he has been like this since he was --

MR. WISEMAN:  Yeah, I think --

THE COURT:  Early on.

MR. WISEMAN:  Yeah.  Let me just explain briefly why this, the blow-to-the-head part is significant.  When counsel failed to get the hospital records, in our view, in a timely way, they also failed to see that in 1993 he struck his head on a steering wheel.  Forget the coma from the three-wheeler.  In our view, that is a red flag that requires counsel to then have this person seen by a neuropsychologist.

THE COURT:  Well, he was seen by a neurologist.

MR. WISEMAN:  Well, right, but that was a week before trial started.

THE COURT:  Okay, but, I understand that but --

USCA5 3351

MR. WISEMAN:  Okay?  And that's another one of our points.

THE COURT:  But apparently, whatever your red flag is, it wouldn't have made any difference about the blow to the head because your case is that he, that something was wrong with him from the time he was little all the way up.

MR. WISEMAN:  I understand.  It's part of the counsel's deficient performance that they failed to get the record timely, they failed to look at it.  Had they looked at it --

THE COURT:  But it wouldn't have made any difference.

MR. WISEMAN:  It would have made a difference because had they looked at it and gotten Dr. Weiner's evaluation done in a timely way, they would have seen that he had a 75 IQ on an outdated test and, as has been testified to by experts, they would have submitted him to a, would have started an MR investigation, and they would have presented to the jury evidence that he had borderline intellectual functioning at a minimum, but counsel didn't have that information until trial had started, and I could rattle off a half dozen Supreme Court cases that say that's deficient performance.  Don't ask me to do it because I'm a little punchy, but I could if you dare me to.

THE COURT:  Why are you punchy?  I mean you-all are

USCA5 3352

taking turns, I'm up here the whole time.

MR. WISEMAN:  You are superhuman is all I can say.

THE COURT:  You have just made up for all your deficient --

MR. WISEMAN:  All my abrasiveness?

THE COURT:  All your abrasive comments.

MR. WISEMAN:  I'm sweet as pie, Your Honor.

THE COURT:  We are just starting over.

MR. ROBERTS:  May we respond, Your Honor?

BY MR. WISEMAN:

Q  Dr. Price, you heard what I just said to the Judge.

THE COURT:  You want to outdo Mr. Wiseman?

MR. ROBERTS:  I don't know, let me think about that.

THE COURT:  I guess I'm not getting the point about the head thing.

MR. WISEMAN:  The head thing is a red flag.  It doesn't matter whether he had a coma, it was a reason to get --

THE COURT:  Okay, it doesn't mean he had anything wrong, that he had an injury to his brain.  You're --

MR. WISEMAN:  Oh, he may have or he may not have, not have.

THE COURT:  Okay.  But it doesn't matter if he did or he didn't, what you are saying is that just the fact that he hit his head should have started some other investigation?

USCA5 3353

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  That's the point.

THE COURT:  Even if it didn't come up with anything --

MR. WISEMAN:  Right.

THE COURT:  -- it should have started an investigation.

MR. WISEMAN:  Now, to be clear, I'm not suggesting, necessarily, that he didn't have a traumatic brain injury.

THE COURT:  I understand, but just for argument's sake let's assume he never had a traumatic brain injury; nonetheless, when they saw, your point is when they saw that he struck his head on the steering wheel, even if it was just like this, and I'm hitting my head, that should have been a red flag for them to look further?

MR. WISEMAN:  Precisely.

THE COURT:  Okay.

MR. WISEMAN:  All right.

THE COURT:  So you are not saying, you are not necessarily saying he had to have had a brain injury at that time for anything to have changed?

MR. WISEMAN:  Correct.

THE COURT:  I finally got it.  Okay.

MR. WISEMAN:  Okay, good.  Well, I'm glad we had

this talk.

THE COURT:  I am so glad we did, too.  Go right ahead.

BY MR. WISEMAN:

Q    Dr. Price, do you agree with the proposition that if you as a consulting neuropsychologist saw a hospital record of a motor vehicle accident of an 18-wheeler where the admission note said, "Struck head on steering wheel in an accident," that that would be a red flag worthy of investigation, knowing nothing else about the case?

A    Well, I'm not an attorney but from a neuropsychological standpoint I think it would be significant.

Q    Okay. And --

THE COURT:  Well, if you just asked your client if anything happened and he said no, then what?

THE WITNESS:  If the client said that he didn't hit his head?

THE COURT:  Well, no, if he said it was just a nothing event.

THE WITNESS:  Then, if there wasn't at least an alteration in consciousness --

THE COURT:  Okay.

THE WITNESS:  -- it would be probably an insignificant --

THE COURT:  A non-event?

USCA5 3355

THE WITNESS:  Yes.

THE COURT:  Okay.  So we don't know if they asked him, right?

MR. WISEMAN:  Well, they didn't have --

THE COURT:  I don't think anybody asked Mr. Gilmore.

MR. WISEMAN:  They didn't have the records until trial had started.

THE COURT:  Nonetheless, they could have still said, We are going to, we ask you, Mr. Bourgeois, and if so we'll go in and ask for a continuance if there is this issue.

MR. WISEMAN:  Well, the truth of the matter is, is that counsel had him evaluated by a neuropsychologist.  Our point is, it was --

THE COURT:  Well, they went to a, took him to a neurologist.

MR. WISEMAN:  Well, to my mind that's almost irrelevant.  The --

THE COURT:  See, I don't think so.

MR. WISEMAN:  Okay.  But neurologists squeeze heads, neuropsychologist gives tests, all right, and that's the difference.

THE COURT:  Yeah, but I heard from your excellent witness that Friday --

MR. WISEMAN:  Dr. Gelbort, right.

THE COURT:  -- about how neurologists work with

USCA5 3356

neuropsychologists.

MR. WISEMAN:  Uh-huh.

THE COURT:  That they can find, that the neurologist can find if there is anything wrong with the brain but that the neuropsychologist can further hone it down to exactly where the injury is.

MR. WISEMAN:  Precisely.

THE COURT:  But they have to start with an injury.

MR. WISEMAN:  Or a reason to be inquiring.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And my next question, Dr. Price, is in the absence of a formal report of a head injury, is being subjected to a pervasive pattern of childhood abuse reason enough to inquire about cerebral dysfunction, if you're getting beat in the head as a child?

A   If there was trauma to the head as part of the child abuse --

Q   Right.

A   -- and not just trauma in general?

Q   Right.  Okay.

A   Well, if there was evidence of trauma to the head that resulted in at least an alteration of consciousness, then I would say as a neuropsychologist it would be a red flag to investigate.

USCA5 3357

Q   Okay.  And you would agree that in cases of pervasive childhood abuse such as the one we have here that it's not at all uncommon for the child to receive blows to the head?  I mean people who beat their children don't discriminate necessarily as to where they're beating them?

THE COURT:  Well.

MR. WISEMAN:  In your experience?

THE COURT:  My father did, so.  Not that it was beating but there are some parents from another generation --

MR. WISEMAN:  Yeah.

THE COURT:  -- that whipped just on the rear end and that was it.

MR. WISEMAN:  Okay.  Well, we're not talking about that.

THE COURT:  All right, but let me ask you this: What I need to hear from you, in cross-examination or direct, is to -- what I heard from your witnesses is that they were unwilling to talk about it at the time, what the mother did to Mr. Bourgeois.

MR. WISEMAN:  Well, some of them, and some of them talked about it anyway.

THE COURT:  Some of them -- they didn't really. Like the one gentleman that testified at trial and testified again here, what he said, "I knew it was happening because I saw the bruises on him," but he never saw, he never said that

he saw the mother beating him.  But the ones that have come forward now, the family members that say, "This is what happened to him," they were not going to talk about it before the trial while the mother was still alive.  So I don't really hear that all the mitigation in the world would have found this out until at this point.

MR. WISEMAN:  Well, we are turning --

THE COURT:  I'm concerned about that.

MR. WISEMAN:  We're turning this into an argument rather than an examination, but let me respond and tell you our view on that.

THE COURT:  That's what I'm asking you.

MR. WISEMAN:  Yeah, yeah.  Mr. Bourgeois himself told Mr. Bierbaum in an earlier interview that he had been abused as a child, and --

THE COURT:  Yes, but what they told, what they, what the witnesses told Mr. Bierbaum, besides what Mr. Bourgeois said -- and he didn't say about his mother either, he didn't say the whole deal that we know now, or at least that he is saying happened now -- what we know is that he was the one who was picked on more than the other children.  That was the story that was given of the abuse from the witnesses before trial.  Now that he has gotten the death sentence, they have come back with an entirely different story.

MR. WISEMAN:  You know --

USCA5 3359

THE COURT:  And the mother is dead and they are willing to talk about it.

MR. WISEMAN:  I think, Your Honor, that we would not agree with that.  You know, obviously you will make your findings but our --

THE COURT:  No, I want you to point that out whenever.

MR. WISEMAN:  Yeah, and I think we can --

THE COURT:  I want you to go through the record and point out --

MR. WISEMAN:  We can do that, we can do that.  I mean I can't do it this moment but we have --

THE COURT:  No, I know that, but I'm telling you as we are going along.

MR. WISEMAN:  That's what you want to know, I understand.

THE COURT:  Not arguing with you, in spite of what you think.

MR. WISEMAN:  All right.

THE COURT:  I want to tell you what my thoughts are so you can address them cogently --

MR. WISEMAN:  No, I --

THE COURT:  -- in final arguments or --

MR. WISEMAN:  I appreciate that.

THE COURT:  A post submission, post-hearing

USCA5 3360

submission, something along those lines.

MR. WISEMAN:  No, I appreciate that and we will certainly endeavor to do that.

THE COURT:  See, you are starting over again.  After you had a clean slate not ten minutes ago.

MR. WISEMAN:  What did I do?  I said we'll do it. I'm saying we'll listen to you.

THE COURT:  Go right ahead.

MR. WISEMAN:  You know, Your Honor, I have to say sometimes I feel like I can't win for losing here, you know?

THE COURT:  I know, I know.  It's sad.

BY MR. WISEMAN:

Q   All right.  So, I'll move on then from this article which, you know, is chock full of stuff about how you are supposed to present the stuff.  Let me ask you one more question before I do that.  You have a line in here that says the neuropsychologist can educate the trial lawyers about what they are discovering and how it fits into the picture. Would you agree, and maybe it's an obvious proposition, that you can't educate a lawyer about this stuff who won't sit down with you and discuss it?  You guys don't do telepathy or anything like that, right?  You've got to have a discussion.

A   Or a report or something.  I mean there's no secrets in the way we can do that, it has to be communicated and --

Q   Right, okay.  And --

A    They have to read it or hear it or something.

Q    I mean a report was written in this case.  I guess my question about that is, you know, the communication, I mean you didn't just give your report to these folks at the table and not talk to them about it, did you?  You had a discussion, you prepped with them, you met with them, isn't that right?

A    Right, I explained my findings and what I thought, yes.

Q    Yes.  All right.  So that's what I mean, you can't educate the lawyers, us dummies, about this important complicated stuff without sitting down and having a discussion about it?

A    That's typically the case, yes.

Q    I want to address this question of malingering that keeps popping up.  I mean you wrote a report in this case.  It's not the longest report I've ever seen, it's not the shortest.  It's shorter than Dr. Moore's, if you guys are in any kind of competition.  But you wanted to include the salient highlights of your findings, is that right?  I mean you are not holding back stuff?

A    I don't think so, no.

Q    Okay.  You have expressed a couple of times here some thoughts about, you know, the possibility that Mr. Bourgeois was malingering.  I actually didn't see the word malinger or malingering in your report.

USCA5 3362

A    Yeah, I don't think he is malingering.  I think there are some issues about effort, full effort.

Q    Effort.

A    But I didn't put that word in there because I don't have evidence that he's malingering.

Q    Okay.  And I guess the reason I'm asking that is the Court, when you were --

THE COURT:  I used the word.

MR. WISEMAN:  I'm sorry?

THE COURT:  I used the word to ask him.

MR. WISEMAN:  You used the word, right.

BY MR. WISEMAN:

Q    And it was in regard to a lack of effort.

A    Yes.

Q    And I just want to be clear, lack of effort is different than intentional malingering.

A    It's a response style that can invalidate the results.  It's more difficult to assess.  It's less severe.  It's present in a lot of cases for a lot of reasons other than the intentional --

Q    Right.

A    -- feigning or gross exaggeration of a condition for an external incentive.

Q    Right, so we are not dealing --

THE COURT:  You know, I guess, I guess when I asked

USCA5 3363

him that I thought he said it was, it could be a type of malingering.

MR. WISEMAN:  Well, that --

THE COURT:  So I don't know if you're clarifying that part or not.

MR. WISEMAN:  Well, that's what I'm trying to clarify.  I was happy with his answer until you jumped in.

THE COURT:  Sorry.  That's what stuck in my mind.

MR. WISEMAN:  Yeah.

THE COURT:  So you may want to make him take that back or whatever.

MR. WISEMAN:  Yeah.  Well, that's what I'm trying to do.

BY MR. WISEMAN:

Q   Do you know the exchange we're talking about?

THE COURT:  Are you taking that back?

BY MR. WISEMAN:

Q   Take it back, make it easy, it's getting late.

A   Effort and response style are on a continuum.  At one end is full-blown malingering where the person is feigning, completely making something up for an external incentive.  At the other end of the continuum is someone that is doing their very best on the test and being as honest as they possibly can be.

Q   Okay.

USCA5 3364

A    So everybody falls someplace on that continuum that's being evaluated, the closer you get to the end, whether malingering comes closer to that.  Poor effort is someplace in the middle, and so it needs to be considered about the validity of the findings.

Q    Right, okay.  And just to be clear, there's not a degree of intentionality in poor effort that there is in malingering, so it's a lower intent, if you will?

A    That's, I would agree with that.

Q    The Personality Assessment Inventory that you gave that was invalid because of the poor response style, that test permits a finding of malingering.  I mean, in other words, I'm looking at this -- let's just put this up, it will be easier than me characterizing it.  Let me get this guy off.  I am not -- let me just -- I got it, I got it.  All right.  So this is the report, the computer-generated validity report, and you would agree that it says at the top that such factors for the invalid, invalidity of the test, could include a failure to complete items, carelessness, reading difficulties, confusion, exaggeration, malingering, all right?  And then it goes to say what happened in this case and it doesn't identify malingering.  It identifies confusion, possible reading difficulties.  And in that regard, what grade level is this test geared to?

A    The fifth or sixth grade level.

USCA5 3365

THE COURT:  I am having problems with this, the concept of the test versus his functioning, the detailed letters and the spelling, and maybe some syntax problems but they're, they were, you know, he uses, and he used, when he talked to you or either Dr. Moore the word hypothetical and, you know, it seemed very sophisticated and very specific in his writing.  So when you talk about reading at a fifth grade level you've got to realize that he's writing normally.

THE WITNESS:  Yes.

THE COURT:  On what someone else called a twelfth grade level.

THE WITNESS:  I don't think it was his lack of reading ability that invalidated that test, I think it was carelessness.  He spent on average seven seconds per item.

THE COURT:  Okay.

THE WITNESS:  I couldn't complete it in that kind of time period in a careful fashion.

BY MR. WISEMAN:

Q   And, sir, I'm putting up --

THE COURT:  But if he can read well then what does that tell you?

THE WITNESS:  That he didn't pay attention, he didn't try hard on that test, he just --

THE COURT:  So what would you call that?  I mean I wouldn't call that, I mean that seems kind of intentional to

USCA5 3366

me.  If he can do it and didn't.

MR. WISEMAN:  Your Honor, could I ask a follow-up on that?

THE COURT:  No, wait a minute, I'm asking him this.

THE WITNESS:  Well, not trying hard has intention involved.  If he were malingering he could have tried to, tried --

THE COURT:  To give a wrong answer?

THE WITNESS:  Yes, or answers that would make him appear more disturbed than he is or something.

THE COURT:  Okay.  But he just --

THE WITNESS:  He just didn't try.

THE COURT:  So he intentionally didn't try?

THE WITNESS:  Right.

THE COURT:  Okay.

BY MR. WISEMAN:

Q   And my follow-up to that is, a child who has ADHD who can't tend to a task, would you say that they intentionally aren't tending to the task or do you say they have a psychological impairment that's impacting their ability to attend to the task?

A   Well, of course it would be that, if they have ADHD and can't pay attention, then you wouldn't say they were trying to feign that test.  If a person is able to pay attention, they can sustain attention for five or six hours to other

USCA5 3367

things, they can read, but they just didn't try on that test, then it invalidates that test. And tests are not as good as day-to-day real life observations of the person and other forms of data. That's why we look at everything.

Q Right. And you'd certainly agree that Mr. Bourgeois can talk very expressively, very extensively, and he doesn't seem to have trouble saying things?

A I think that's a very true statement.

Q Okay. And --

THE COURT: Okay. Is there any, do you have indication that he's got ADD or ADHD?

THE WITNESS: No.

THE COURT: Okay.

MR. WISEMAN: I was using that as an example, Your Honor.

THE COURT: Okay. Well, then -- okay.

BY MR. WISEMAN:

Q All right. So, if as a result of his personality disorders and his impulsivity he has a hard time tending to written tasks in this setting, that would not, that's analogous, sort of, to the ADHD example I gave, right? There's a psychological explanation for why he is not necessarily tending to the written task in the way that he's able to stay with you verbally? Would you agree?

A If I understand the question, you are saying his

USCA5 3368

Priest - Cross                                      264

impulsivity invalidated the test, that's your hypothesis that you're asking me?

Q   Well, I, yeah, I guess that's a more refined way of putting it.  I'm just wondering, is there a potential psychological reason that you are aware of in this case that could explain his lack of, or his impairment in sitting through the task short of intentionally not wanting to tend to it?

A   You know, his impulsivity is selective.  It doesn't pervade all areas of his life.  He can discuss things with, and stay on task.  For the most part he can write and stay on task.  If it's about him and things he knows about, that's not going to be that.  But, you know, he, my analysis of how long it took him to do this, in observing him, is that he sped through it, and that's as psychological as I can get about it.

Q   All right.

A   He didn't get involved in taking the test.  He didn't want -- he intentionally didn't get involved in taking the test.

Q   All right.  We will leave that area.  The Court seems to have directed a number of questions to a variety of our expert witnesses, and I'm again going to just paraphrase, you know, how come he can do some stuff and can't do other stuff, you know, he's so verbal, he can write these long letters

USCA5 3369

which while not perfect in syntax communicate ideas, and yet we are claiming he can't do other things.  And to try to answer that I have put up the score sheet from Dr. Swanson's Woodcock-Johnson.  And before I ask you about the specific findings, you would agree that the Woodcock-Johnson is the, is one of the best, most reliable tests of functional achievement, I mean it's sort of the gold standard test?

A    It is one of the better tests of academic functioning, yes.

Q    Okay.  And it far surpasses the Wide-range Achievement Test in terms of its sophistication and the richness of the data you get from it?

A    Yes.

Q    All right.  Now, let's assume for purposes of going through this that these are valid results.  We have no reason to think they aren't.  I mean look at his grade equivalencies in spelling, he's at a 13th grade level, he's a college level speller.  And he's in kindergarten on story recall.  He's in third grade, he's in third grade in other things.  I mean this is a man who clearly has strengths and clearly has weaknesses, isn't that right?

        MR. DOWD:  Your Honor, could I just ask that the exhibit be identified?

BY MR. WISEMAN:

Q    Oh, I'm sorry.  This is Exhibit 35, page 13.  I believe

USCA5 3370

it's in evidence.

A    Well, there were several things in your question.

Q    All right.  There usually are.

A    Sorry.  I would agree that he is a person with strengths and weaknesses.  I don't know about the level of effort that was involved in this administration of the Woodcock.

Q    Okay.  Well, let's compare spelling on the Woodcock to, you are familiar on the WRATs, with the Wide-range Achievement Test he took with Weiner and with Gelbort, in both of those he scored also high, in the high school range, on spelling and reading?

A    Yes. that's correct.

Q    Okay, so that's consistent, and I think your article says consistency in psychometric testing indicates validity, isn't that right?

A    Well, it's one factor in looking at validity.

Q    And -- I'm sorry, go ahead.

A    It's one factor, yeah.

Q    Okay.

A    If you find convergence of test data, that increases your confidence in it.

Q    Right.  So if he's taking an IQ test in 2004 and has a statistically identical margin of error three years later on a different test, that tells you that that's likely where his IQ falls, and that's why you said he's at best in the

USCA5 3371

borderline range of intelligence?

A    Yes, that's, that is correct.  There are other factors but I think as far as the measured cognitive IQ, having two tests three years apart increases your confidence in it.

Q    All right.  So, getting back to this thing, then, the fact that we see patterns in this testing that are quite similar to the WRAT testing given again in 2004, 2007, his same, his same strengths and weaknesses seem to keep coming up whenever he's tested, right?

A    Well, I'm looking at this.

Q    Okay.

A    And if you can make that a little larger for me for just a second.

Q    Sure.  You know, it's on the screen in front of you.

A    Oh, I'm sorry.

Q    Which, you know, I can make a larger image.

        THE COURT:  Could you zoom it up just a little bit, though?

        MR. WISEMAN:  Center it?

        THE COURT:  Zoom it just a little bit.

        THE WITNESS:  Yeah, I'm, I can see it here fine.

BY MR. WISEMAN:

Q    I don't want to lose the information, I don't want to lose the data.

A    His, I'd say this pattern is similar, yes, that the

USCA5 3372

letter word identification has a standard score of 90 and on the two administrations of the WRAT, the same kind of test was a 96 and an 85. That's, that seems to be consistent. His math is the lowest, it looks like. I don't know about the story recall delayed as being as low as it is. And understanding directions has an 89. You know, I don't have anything to compare that to except that he seemed to be able to follow --

Q   Right. You know, and I guess the reason I think, well, I think it's important, let's see if you do, is that we have had a number of lay witnesses come into court today, people who have known Mr. Bourgeois, and they are all sitting up there saying, "This guy is fine, he can talk a blue streak, he's charming, he's gregarious."

THE COURT:  And use the computer.

BY MR. WISEMAN:

Q   He can use the computer. He can do all these things. You would agree that lay people can't just look at somebody who presents well and make a determination that he's not mentally retarded? That's why we have tests, right?

A   Well, I think a lay person can tell you information about their adaptive functioning, and my observation of him as well, and looking at everything, is that if it's day-to-day practical stuff that he's familiar with and interested in, he has learned how to do it and can do it. School related

USCA5 3373

academic formal testing he doesn't do as well on.  He has strengths and weaknesses there, but his adaptive behavior is the key here.

Q   Right, the key to the adaptive behavior pronged with mental retardation?

A    That's correct.

Q   But let's expand the universe a little bit because I, my concern is, as counsel, is that these folks have come in and not only say he has adapted well but they are basically saying he's just like you and me.  "He's the best driver I ever had, he's a genius."  He's got a 70 IQ, right?

A    Well, I --

Q   They are not seeing the full picture, wouldn't you agree?

THE COURT:  Well, may I, you are talking about a 70 IQ and if you talk about the range of error from one to another, that may not be exactly correct.  And also, I guess I am concerned about these IQ tests that say he understands instructions very well, he has a high reading level and a spelling level, so on the other parts how could he be doing poorly?  Does that not tell us something?

THE WITNESS:  It does.

THE COURT:  What does it tell us?

THE WITNESS:  Well, it's very unusual to have --

THE COURT:  Isn't it?

THE WITNESS:  Yes, it's very unusual to have --

USCA5 3374

THE COURT:  So what could that mean?

THE WITNESS:  It could mean effort.  I could mean general cultural deprivation about --

THE COURT:  It could be a low effort on that scale?

THE WITNESS:  It could be, yes.

BY MR. WISEMAN:

Q   Sir, if he were giving low effort, would you expect to see a consistency and a pattern like you see in this case?  I mean if he just wasn't taking these tests with any kind of effort, I mean they'd be all over the place.  We wouldn't see the same WRAT scores.  We wouldn't see the statistically identical WAIS scores.  We wouldn't see the Woodcock-Johnson looking just like the WRATs.  We'd see a mess.  It would be all over the place.  Don't you agree with that?

A   Well, I do see a mess.

Q   You do see a mess?

A   I do see a mess.

Q   In what way?

A   The neuropsychological test scores compared to the IQ score and academic, having academic achievement scores higher than the IQ scores is very unusual.

Q   Not out of the question, though?

A   No, obviously -- (noise).  Oh, I'm so sorry.  I'm so sorry.

THE COURT:  Apologize to Ms. Gano.

USCA5 3375

THE WITNESS:  I am so sorry.

THE COURT:  Thank you, sir.  That's my concern. When I looked at those things, I didn't understand how that -- you can do a lack of, an intentional lack of effort on the areas you know that you can get away with, just hypothetically, and not on these other ones where you know you can read the instructions, you've got a good reading skill.  It just looked like a red flag to me more than --

THE WITNESS:  You know, I see a mess that it's variable effort and it's variable cognitive ability.  How can he score as high as he does on the academic test and the neuropsychological test and not on the IQ.

BY MR. WISEMAN:

Q   All right.

A   It's difficult to explain.

Q   Yeah, it's, I think you said it was unusual but I guess, you know, we're in a capital proceeding where, you know, every witness who testified today said, "We couldn't believe what happened here, this man was a totally different person." We are dealing with an unusual circumstance so I guess, given that premise -- you're shaking your head yes.

A   Yes.  It is unusual.

Q   Yes.  So given that premise, I think we have to think, you know, think about that a little.  No report you have read -- I mean Mr. Bourgeois has so far, to my knowledge,

USCA5 3376

been evaluated in 1985 for the sheriff's department, by Dr. Estrada, Dr. Weiner, Dr. Gelbort, Dr. Cunningham, Toomer, Sadoff, Swanson, Moore. Sounds like a law firm. Has any of them ever said he's a malingerer? No. Have you seen the word malingering in any of those things?

A    I don't recall seeing the word.

Q    It's not there, trust me. I wouldn't ask the question if it was there.

THE COURT: If you didn't know the answer.

MR. DOWD: Your Honor, I would ask that the witness be permitted to finish his answer.

THE COURT: Did you have something more to say?

THE WITNESS: Well, there is some consistency to what all the mental health experts have to say in this case, though.

BY MR. WISEMAN:

Q    Yeah, and that consistency is that he suffers from debilitating personality disorders, a history of child abuse and low IQ.

A    But not mental retardation.

Q    Well, you know, we're talking about a lot of issues here today, all right, and I'm focusing right now on --

THE COURT: Do you have much more to do?

MR. WISEMAN: Oh, I do. You know, I was concerned about the start time, you know, and that wasn't my doing,

USCA5 3377

that was the Government's, but I think I'm asking reasonable questions here.

THE COURT:  Twenty-five more minutes and then we will take it up in the morning?

MR. WISEMAN:  That's fine with me.  I mean, I --

THE COURT:  How much time do you think you will need in the morning?  Because I imagine it will be the same with Dr. Moore.

MR. WISEMAN:  Yeah.

THE COURT:  I want to make sure they get their witnesses on.

MR. WISEMAN:  All right.

THE COURT:  And you still have rebuttal from 4:00 to 6:00.

MR. WISEMAN:  Yeah.  I mean, I can tell the Court I don't think we are going to have rebuttal.  If we do it will be five minutes, so, yeah.

THE COURT:  Okay.  So then we ought to be okay? Continue on and I will not interrupt you one more time.

MR. WISEMAN:  I appreciate -- well, you can interrupt me any time you want.

THE COURT:  No, no.  You are very kind.

BY MR. WISEMAN:

Q   Your report does not diagnose Mr. Bourgeois as being, having an antisocial personality disorder, isn't that right?

USCA5 3378

A    That's correct.

Q    All right.  The only mention of sociopathy or psychopathology is you had one mention in your report and I think one mention in your testimony that he has some sociopathic features?

A    That's correct.

Q    All right.  Now, you administered the Structured Interview for DSM-IV Personality?

A    Yes, that's correct.

Q    All right.  And that test has a section that addresses the question of whether a person has sociopathic tendencies?

A    Or antisocial personality disorder, right.

Q    Right.  And Mr. Bourgeois did not come out on that test as presenting sociopathic or antisocial tendencies?

A    He did not, based on his self-report.

Q    Well, you --

A    Which is what this is based on.

Q    All right.

A    He did not.

Q    It's your test, right, you administered it and, I assume, think it has some value, that's why you give it?

A    Sure.

Q    Okay.  He came up clean on sociopathy?

A    On the antisocial personality disorder.

Q    I'm sorry I keep using that word.  I've read Hare and

**USCA5 3379**

Psychopaths Among Us. And again, all those doctors who have ever evaluated him, no one has ever even used the word antisocial. You are the only one. This is the first time I have seen that word applied to Mr. Bourgeois as a diagnostic term. Do you agree? I mean did you see that in any of the other reports?

MR. DOWD: Your Honor, I believe, wasn't there some testimony by Dr. Gelbort that he has antisocial --

MR. WISEMAN: He's not getting paid so why should --

THE COURT: Yeah, he said that he presented, now, he did his fingers like this, but he, together, and for the record the two index fingers together, that he presented, it's true that he had the symptoms of a sociopath or a psychopath, a narcissistic sociopath or psychopath, but that, he opined that they may have different etiologies than other types of psychopaths.

MR. WISEMAN: Right. I mean I took his testimony to mean that he wasn't saying that he was psychopathic or antisocial but that --

THE COURT: Well, he, I took it --

MR. WISEMAN: -- there's some overlap in the symptoms.

THE COURT: I took it that he, that's the way he presented but that he opined that it was a different, that it was a different etiology.

USCA5 3380

MR. WISEMAN:  Well, I --

THE COURT:  That it was an organic brain etiology or some other etiology.

MR. WISEMAN:  Right.  It's a different diagnosis, I think is the salient point.

BY MR. WISEMAN:

Q   So you gave him, you know, this test, he comes up clean on it -- well, I guess I don't have any other questions about that.  But you agree, you didn't see any other mention in any of the other reports?

A   I don't recall any in the reports.  And, as I said, I think it's part of a disordered, personality disorder, antisocial traits and features, but I did not diagnose him with antisocial personality disorder.

Q   And in fact the Structured Interview for DSM-IV Personality came up with borderline, with I think paranoid ideation.  Or maybe I should be more precise.

A   And some narcissistic.

Q   Ah, narcissistic.  Thank you.  You know, in getting back to the response style, let's talk about the verbal response style.  I mean you would agree that there were times during your interview with him where he was really trying to answer your questions, right, the verbal part?

A   Yes.

Q   Okay.  So, for example, when you asked him how many

USCA5 3381

stripes there were on the flag -- I didn't know the answer to this myself, actually, I actually had to ask my colleague -- and he said, "I don't know," but he then offered you how many stars there were, right, I mean that's an example of him trying to put forward good effort in his encounter with you?

A    I would agree with that.

Q    Okay.  And that's, at least verbally he was trying to present well and do his best?

A    Well, on that item, and that's, that is an example of something that's really an educational cultural exposure, to know the number of stripes in the flag.

Q    Right, and I'm not asking you about whether he was right or wrong or what that means, I'm just looking at the effort question.  I mean he offered you an alternative, he said, "Look, I don't know that but I know this."

A    Yeah, on that item I agree with that, yes.

Q    Okay.  And that's part of his overall attempt to, what did you call it, manage his image, right, or manage his -- go ahead.

A    It's impression management.

Q    Impression management, thank you.  He wants to look good, right?

A    Yes.

Q    And that's probably what was going on, in your view, when he told Dr. Estrada, at the time of his trial evaluation,

USCA5 3382

that he had an idyllic childhood, right, he's trying to look good?

A    I think you could fit that in there.  He was trying to put best foot forward at that time.

Q    And that's part of his response style, he wants to look good?

A    I would agree with that.

Q    All right.  Now, you said on your direct examination that you didn't think this was masking, you didn't think that this effort to look good was part of the cloak of competence that people with mental retardation sometimes put out there?

        MR. DOWD:  Judge, I don't think that's a correct rendition of the testimony.  The masking I think related to Dr. Swanson's opinion about him speeding up when Dr. Price went to the bathroom during the PAI test, unless I --

        MR. WISEMAN:  I think the witness was about to answer yes.

        THE COURT:  Well, he's going to remember what it was, I assume, so go ahead.

        THE WITNESS:  As I recall, it was when I was discussing the PAI that, but I brought up the impression management as his response style in the interview and his attempts to look good and I said it exceeded that that they discuss the concept of the cloak of competence when somebody tells you they can do something that they can't.  His is

USCA5 3383

telling you, you know, it's just trying to look good in general about everything.

BY MR. WISEMAN:

Q   Right.  Right, and that was my question, his positive attempt to manage his presentation.

A   It's positive and negative.  I mean it's, for a lot of the time it's so positive that it's narcissistic.

Q   Right.

A   And then at times he certainly wants you to know that he's a victim and that he has been --

Q   Well, hasn't he been a victim?

MR. DOWD:  Judge, I would ask that the witness be allowed to finish his answer.

MR. WISEMAN:  I apologize.

THE COURT:  Please, sir, go ahead and finish.

THE WITNESS:  Yes, but a victim of the legal system? I don't know.

BY MR. WISEMAN:

Q   Right.

A   I wouldn't think, and that's a --

Q   When we talk about victimization, I mean you would agree that given his childhood that he was a victim in his own right?

A   That's what he appears to be, based on what he's saying, yes.

USCA5 3384

Q    And what others are saying?

A    Yes.

Q    And so I guess what I'm wondering is, why couldn't it be that we are dealing here with both a need to positively manage his presentation as well as a cloak of competence? Why couldn't it be one exacerbating the other? Why is it one or the other?

A    There's no reason that it couldn't be both. It seemed in excess of what I would see with a person that's mentally retarded hiding a weakness. He's going far beyond that.

Q    Right. I mean it's, you would expect to see it above and beyond because if it's exacerbating, if you have someone who has got a cloak of competence and a narcissistic need to present well, it's doubled.

A    I have just never seen that.

Q    Well, again, we are dealing with an unusual set of circumstances here.

A    And the term cloak of competence and masking is associated with retardation.

Q    Right. And I know you don't think he's mentally retarded but, you know, that's what in controversy here. So, you know, we are really dealing with a person who has got both features going on.

THE COURT:  Just stick to questions and answers, please, Mr. Wiseman.

USCA5 3385

MR. WISEMAN:  Yes, Your Honor.

BY MR. WISEMAN:

Q   This whole idea that he is one thing or the other, you would agree that the DSM says that mental retardation is not a diagnosis of exclusion?

A   I would agree.

Q   Okay.  And so that means that you don't say, well, we have to first determine whether he's a borderline personality disordered individual before we can -- you don't have to rule anything out before we say he's mentally retarded?  If he meets the diagnostic criteria for mental retardation.

A   You'll have to repeat that question, I'm sorry.

Q   Sure.  The DSM, when it lists its diagnostic criteria for, you know, all of its illnesses, sometimes it says don't call it this if it could be that, right?  That's a diagnosis of exclusion.  Okay?  When you look at the diagnostic criteria for mental retardation, you don't see that.  Correct?

A   That's correct.

Q   Okay  So if he's got significantly sub-average intelligence and significant adaptive deficits, onset before 18, you stop, correct?

A   Yes, that's --

Q   So --

A   That's correct for this diagnosis, yes, that's correct.

USCA5 3386

Q    Okay.  So he could be borderline personality disorder, narcissistic personality disorder, brain damage, childhood abuse, all of those things, and he could be mentally retarded?

A    He could.

Q    And the DSM says that, right?  I mean there's a whole section on associated conditions and syndromes and illnesses and he could be a lot of those things and mentally retarded?

A    Certainly mental retardation is not a preventative situation for other things.  They can get sick, they can be depressed, they can be mentally ill, they can have a personality disorder.

Q    Let me ask you just about your report.  I notice that in discussing the definition you cite to the DSM and you cite to the AAMR Tenth Edition.  Is there a reason you didn't use the or cite to the Eleventh Edition of the AAMR which is now the American Association of Intellectual Developmental Disabilities?

A    No, and it's, it's a restatement of the same thing with the collapse of the categories of adaptive behaviors and, but there's, you know, I don't see significant differences.

Q    Right, and -- right.  And so, when we talk about the Green Book, the Eleventh Edition, it's the same as the Red Book in the material aspects of these issues?

A    Could you repeat that?  I'm sorry.

USCA5 3387

Q   Yeah, you know what, I'll withdraw that.  It's a silly question.  The Red Book, the Eleventh Edition, is the authoritative manual now for dealing with MR issues?

A   It is an authoritative book about MR from the AAMR, but so is the DSM about the diagnostic criteria.

Q   And, you know, I think it was Mr. Dowd who was questioning one of my witnesses about, you know, the AAMR being an advocacy group and there was sort of a hint of like, you know, they are these bomb throwers or something.  I mean, they are a reputable organization?

A   Yeah, it's a reputable organization.  It is an advocacy group but that's not --

Q   Right.

A   It's not a bad thing.

Q   Right, nothing wrong with that, right?

A   Well, no, I mean it's -- no, I don't think there's anything wrong with that at all.

Q   Now, you would agree, I think it's pretty plain, that the diagnostic criteria in the DSM called for two of ten domains of adaptive deficits to qualify for the diagnosis?

A   Yes.

Q   So let's look at those now.  I mean -- the ten of them are listed on page 49.  Let me put it up.  And I know you don't think he has any of these, all right, but let's just go through them.  He could be a good communicator, he could be

USCA5 3388

good in self-care, home living, social, interpersonal, use of community resources, self-direction, functional academic skills, but he could be deficient in, and I'm just saying hypothetically, work and leisure, and he could be fine in everything else and he would meet the diagnostic criteria under the DSM?

A    Yes, that's correct.

Q    And it doesn't matter, he could be wonderful in everything else, he could be the best truck driver that has ever lived, but if he can't take care of himself at work -- at leisure, or if his self-direction or his use of community resources, if two of those other categories are significantly impaired, he meets the qualifications?

A    Yes, that's correct.

Q    Or I should say the criteria.  You know, we have had some evidence and we may have more about how he learned to drive a truck, started out slow, improved over time, and my question is, isn't the treatment modalities for a person with mental retardation is that nowadays you offer them supports to try to eliminate the adaptive deficits?

A    That's correct.

Q    That's the whole goal of the AAMR, right?

A    Yes.

Q    And so Mr. Bourgeois never had any formal supports that we know of but he, our view, our evidence is that he relied

USCA5 3389

on folks, so if he relied on people to teach him things and was able eventually to learn to drive a truck and to, you know, handle some financial matters and as an adult to dress himself, that doesn't mean he's not having adaptive deficits as a child, does it, pre-18?  I mean that's the whole point, that we want people to improve, right?

A   That's correct, if they improve, if a person, hypothetically, is mentally retarded, adaptive behavior deficits, with the appropriate supports improves and no longer has the adaptive behavior deficits, they would not be mentally retarded any longer.

Q   Any longer?

A   That's correct.

Q   Okay.  But, that doesn't mean that he wasn't or this hypothetical person wasn't mentally retarded earlier in life?

A   That could be, yes.

Q   Now, you worked on Penry.  I didn't know that.

A   Yes.

Q   Let's assume for our discussion that for Judge Jack to award relief on this claim that he's got to be mentally retarded today.

        MR. WISEMAN:  That's not our view, Your Honor, just to be clear, but let's assume it hypothetically.

        THE COURT:  That he has to be what?

        MR. WISEMAN:  Mentally retarded today, or at the

USCA5 3390

time of the offense.  Our view is any diagnosis of mental retardation is sufficient to preclude the imposition of the death penalty, but that's a legal argument we can have.  I just want to ask a hypothetical.

THE COURT:  You -- okay.

BY MR. WISEMAN:

Q   And so my hypothetical is, if we had proof at the time of trial that Mr. Bourgeois was mentally retarded as a child but has developed out of it through supports, through prolonged learning processes, would you still consider that to be mitigating evidence to present to a jury in a capital case, that he grew up as a mentally retarded child?

MR. DOWD:  Judge, I would object.  I don't think the Doctor has been qualified as an expert in presentation of mitigating evidence in a trial.

THE COURT:  Sustained.

BY MR. WISEMAN:

Q   Would you in such a circumstance write in your report --

THE COURT:  In what circumstance?

MR. WISEMAN:  The one I just went through.

THE COURT:  The one I just sustained the objection to?

MR. WISEMAN:  Well, I'm asking a different question about that circumstance.  I'm not asking him to talk about trial strategy.

USCA5 3391

BY MR. WISEMAN:

Q    Would you tell the lawyer that you were working for that, "In my view," I mean you wrote an article on it, "this is mitigating evidence"?

A    No, I would just tell him what my opinion was about the psychological issues and it would be up to the attorney to decide if he thought that the mitigating aspect of my opinion would help his client.

Q    All right.  I want to shift gears a little bit.  You worked on a case called Eddie Fields, United States versus Eddie Fields?

A    Yes.

Q    And that's out of the Eastern District, I think, of Oklahoma?

A    Yes.

Q    And by coincidence I am involved in that matter as well so we have some common ground here.  Do you recall when you did your evaluation for the Government in that case that -- well, let me withdraw that.  When you did your evaluation for the Government, did you engage in discussions with the trial team of United States Attorneys or did you deal with a segregated team of United States Attorneys?

A    It was, I think they called it a firewall attorney or something like that, that after I finished the evaluation I didn't have any other contact with the attorney for the

USCA5 3392

United States that had retained me until I showed up to testify. As I remember it, I think that's what happened.

Q    Yeah. No, I think that comports with my recollection. And in your article, at page 118, you have got a series of recommendations and you talk about the report that's done in a capital case and it says, "The report is sealed until the defense calls its examining witnesses and it is then given to the state and to the defense." Next bullet point, "There is no communication between the state and its expert about the exam or any conclusions that were drawn from the exam until the defense witness testifies. And that's an analogous firewall type situation as you just described in the Fields case?

A    That's the way it was in the Fields case. I don't recall that part of that article --

Q    Okay.

A    -- but I trust that you're reading that accurately and completely.

        MR. DOWD:  Your Honor, may I inquire into the relevance of those questions?

        MR. WISEMAN:  Sure. It's relevant because I take it the Government is going to argue that counsel made a strategic decision not to present some of this mitigating evidence because of the invocation of the name of Park Deets, and my position is that that's, that was improper, and this

USCA5 3393

is an expert witness who can tell you from a psychological or an expert witness perspective that's not the way it's done in those cases, and that's the relevancy.

MR. DOWD:  I didn't understand the firewall with the prosecution.  I didn't follow that.  Maybe it's just me.

MR. WISEMAN:  No, I mean, you know, we could go back and forth.  It's in the law, it's in the rule.

THE COURT:  You know what, just ask him questions.

MR. WISEMAN:  Okay.

THE COURT:  Because you've got three minutes left tonight.

MR. WISEMAN:  Oh.

BY MR. WISEMAN:

Q   You testified that there was no evidence that he was a student -- that as a student he received any, he wasn't identified as being mentally retarded?

A   I didn't see any evidence of that.

Q   Okay.  I mean, you saw the one page of school records, right?

A   Yes, that's correct.

Q   I mean that's, it's not like there's a big stack of records that you looked through on that?

A    I saw that and I asked him what kind of services he received and that's --

Q   Right, right.

USCA5 3394

A    That's the extent of my information.

Q    All right.  Are you familiar with the level of services that were available in the 1960s and '70s in that part of Louisiana that he's from?

A    No.

Q    I mean he grew up in a poor area?

A    That's my understanding.

Q    Are you aware that his brother Anthony is profoundly mentally retarded and has cerebral palsy?

A    No.

Q    If I told you that his brother Anthony who has those two diagnoses didn't receive services until he was an adult living in that same area, would that change your reliance on the lack of evidence that Mr. Bourgeois didn't receive services to support your opinion he's not mentally retarded?

        MR. DOWD:  Judge, I --

        THE COURT:  Just a moment.

        MR. DOWD:  I would object.  I think that's a stretch because Anthony --

        THE COURT:  Sustained.  If you want to qualify that. See, there's no indication that anybody requested services. I think that's the problem.

        MR. WISEMAN:  Okay.  All right, fair enough.

        THE COURT:  Because I think what Ms. Booth or someone was pointing out at the time, that if you are cared

USCA5 3395

for at home and you don't think you need services and you can do, you know, whatever you think is necessary. But he started receiving services in 2001, I think.

MR. WISEMAN: Right.

THE COURT: But I think that was, his mother got ill or something?

MR. WISEMAN: Yes, yes.

THE COURT: So.

MR. WISEMAN: Well.

THE COURT: If you want to change it around and qualify it, it will be okay.

MR. WISEMAN: All right.

BY MR. WISEMAN:

Q   If a child is -- well, children are required to go to school in all the states of the Union, is that right?

A   That's my understanding.

THE COURT: You know, I don't know anymore. What is this about home schooling, and I don't even know what all this means.

MR. WISEMAN: That's fair enough. They are required to get an education.

THE COURT: I guess.

MR. WISEMAN: I don't think Eunice was home-schooling Anthony.

THE COURT: Pardon?

USCA5 3396

MR. WISEMAN:  I don't think Eunice was home-schooling Anthony.

THE COURT:  No, no, but I'm asking, it's just such a strange thing.  I don't understand who checks on that kind of thing anymore.

MR. WISEMAN:  Yeah.  That may be a whole other discussion but --

THE COURT:  When I was a kid we had truancy officers that were running around, literally.

MR. WISEMAN:  Yeah.

THE COURT:  I don't know where they are now.

MR. WISEMAN:  In Philadelphia they fine the parents if you --

THE COURT:  And that's fair.  We always get blamed for the kids anyway, right?

MR. WISEMAN:  So -- you're just trying to distract me.

THE COURT:  I am not.  I'm going to give you another three minutes tonight, I'm sorry.

MR. WISEMAN:  Okay.  So --

THE COURT:  Kids are required to go to school.

BY MR. WISEMAN:

Q   Kids are required to go to school.  So, you know, if Anthony was going to school with these conditions and there were any services available, he would have been, he would

**USCA5 3397**

have been identified as a profoundly mentally retarded person

and given services, right?  I mean.

A   You know, I don't know any of this.  I don't have any

other information.  If that's a hypothetical --

Q   Yeah.

A   -- then I would say if a child that was profoundly

retarded was going to school, I mean, I would think that they

would give him services.

Q   All right.

A   I don't know about that area, that time, or anything

about Anthony.

Q   Okay, so that's fair enough.  And I guess the point then

is that you can't put a whole lot of stock in the fact that

you didn't see evidence that Mr. Bourgeois didn't get

services in rendering your conclusion that he's not mentally

retarded.  That's the whole point here.  Do you agree with

that?

A   Well, I think it's a factor.

Q   Right.  That, I --

A   That he was identified for speech services but he says

that's what it was and I don't have any indication.

Q   Well, I mean, we don't have to have a big fight about

this.  You would agree that it's not a big factor, it's a

small factor.  It's a small, tiny, infinitesimal,

insignificant, irrelevant, silly factor.  You can pick any

USCA5 3398

one of those.

THE COURT:  Or none at all, none of the above.

MR. WISEMAN:  Your Honor, I think maybe this would be a good time to break.

THE COURT:  Might be a good time, I agree with you. We will get our thoughts together tomorrow.  What time?

MR. WISEMAN:  I think early may be better than late, just because we want to get this all done.

THE COURT:  8:00 or 8:30?

MR. ROBERTS:  8:30 should be fine, Your Honor.

THE COURT:  Okay.  All right, then I will see you then tomorrow.  Thank you, sir.

MR. ROBERTS:  I was just going to say, for the Court, we're looking at our witness list and we may have some cuts on it.

THE COURT:  Okay.

(The proceedings adjourned at 6:04 p.m. until 9-24-10)

USCA5 3399

INDEX

WITNESSES
FOR RESPONDENT/GOVERNMENT:

| | Direct | Cross | Redirect | Recross | Further Redirect | Voir Dire |
|---|---|---|---|---|---|---|
| Danny Clark | 4 | 9 | 30 | 36 | 39 | |
| Robert Patterson | 53 | 67 | | | | |
| William Shotts | 72 | 89 | 97 | 99 | | |
| Christopher Key | 102 | 124 | | | | |
| Rhonda Davis | 140 | 155 | 184 | 185 | | |
| J. Randall Price | 187 | | | | | 193 |
| | 194 | 231 | | | | |

EXHIBITS

Admitted

Petitioner/Defendant's:
141  NAS Report Strengthening Forensic Science in the
        United States – A Path Forward                        44
152  Excerpts of Medical Records re JG                        46
171  Coastal Bend Psychiatric Assoc. Forensic
        Referral Form                                          2
178  Sealed Exhibit – ABAS-II                                174

Respondent/Government's:
1    Report of Dr. Price                                     195
2    Dr. Price CV                                            188
3    Dr. Price List of Prior Testimony                       190
14   Voluntary Statement of Mr. Bourgeois to Dr. Price       221
23   Legal Correspondence by Mr. Bourgeois from prison
        (47 pages)                                           222
24   Legal Correspondence by Mr. Bourgeois from prison
        (29 pages)                                           222
25   Legal Correspondence by Mr. Bourgeois from prison
        (43 Pages)                                           222
26   Legal Correspondence by Mr. Bourgeois from prison
        (2 Pages)                                            222

USCA5 3400

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above entitled matter.


 /s/ Judith M. Garcia                        November 5,2010

USCA5 3401

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**


UNITED STATES OF AMERICA

v.                                                    Case No.: 2:02–cr–00216
                                                     Judge Janis Graham Jack

Alfred NMI Bourgeois

                              Defendant


NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the
E–Government Act of 2002, and Fed. R. Civ. P. 5.2(a) or Fed. R. Crim. P. 49.1(a).

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court.
To comply with privacy requirements of Fed. R.Civ.P.5.2 and Fed. R. Crim. P. 49.1(a), the parties must
ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing
the transcript's docket number, the item's location by page and line, and including only the following
portions of the protected information. This statement must be filed within 21 days of the transcript being
filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address (criminal cases only).

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the
instruction on our website at http://www.txs.uscourts.gov or by calling (361)888–3142 . A party is only
responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for
compliance.


                              David Bradley, Clerk

USCA5 3402

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
           PLAINTIFF,            *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 21, 2010
                                 *    8:00 A.M.
           DEFENDANT.            *
                                 *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF EVIDENTIARY HEARING – DAY 2

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

           (APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:            MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 3403

APPEARANCES:  (CONTINUED)


FOR THE DEFENDANT:          MR. VICTOR JULIO ABREU
                           MR. MICHAEL WISEMAN
                           MS. ELIZABETH A. LARIN
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 545
                           PHILADELPHIA, PENNSYLVANIA 19106

                           MR. JAMES McHUGH
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           FOR THE EASTERN DISTRICT OF
                           PENNSYLVANIA
                           601 WALNUT STREET
                           THE CURTIS CENTER, SUITE 540
                           PHILADELPHIA, PENNSYLVANIA 19106

USCA5 3404

(The proceedings began at 8:00 a.m.)

(Call to Order of the Court.)

THE COURT:  Thank you.  You may be seated.  Are you all ready?

MR. WISEMAN:  Yes, Your Honor.

MS. LARIN:  Good morning, Your Honor.

MS. BOOTH:  I'm having trouble with him, Your Honor.

THE COURT:  I knew you were going to have trouble with him.

MS. BOOTH:  Yeah.

THE COURT:  Ready?

MS. LARIN:  Good morning, Your Honor.  I'd like to call Claudia Williams, please.

THE COURT:  Okay.  Could you come forward, please, ma'am.

CLAUDIA WILLIAMS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Ms. Williams, can you please state your name for the record?

A.   Claudia Williams.

MS. LARIN:  Should she lean forward?

BY MS. LARIN:

Q.   Can you just lean a little forward?  But be careful not to touch the microphone.

USCA5 3405

A.   Yes.

Q.   And if, maybe if you put your right arm and just lean a little bit.  Okay.

THE COURT:  Thank you, ma'am.

THE WITNESS:  Thank you.

MS. LARIN:  I stole your line.  Sorry.

THE COURT:  Perfect.

BY MS. LARIN:

Q.   And how are you related to Mr. Bourgeois?

A.   That's my brother.

Q.   Are you older or younger than him?

A.   I'm older.

Q.   And how many siblings do you have?

A.   Seven.

Q.   There's seven children?  There's seven of you?

THE COURT:  Are there eight of you altogether is what you're saying?

THE WITNESS:  Seven.  My mom had seven children.

THE COURT:  Okay.  You said, "How many siblings?"

MS. LARIN:  Yeah.

THE COURT:  Never mind.

MS. LARIN:  So to clear that up, I have put together this little demonstrative aid.  It's parked P-166.  And I don't think the Government has an objection.

MS. BOOTH:  No, we don't, Your Honor.

USCA5 3406

MS. LARIN:  And it might just help things move along.

BY MS. LARIN:

Q.   So Claudia, I understand you're the oldest sibling?

A.   Yes.

Q.   Your mother's first child?

A.   Yes.

THE COURT:  Please refer to people by their last names.

MS. LARIN:  Oh, I'm sorry.

BY MS. LARIN:

Q.   Okay.  Let's just go through this quickly.  Ms. Williams, you were born in 1959?

A.   Yes.

Q.   And you have two other brothers by the same father?

A.   Yes.

Q.   Clyde and Lloyd?

A.   Yes.

Q.   Clyde, you're not sure of his date of birth, and we couldn't find any records of his date of birth, but Lloyd is 12/14/1960?

A.   Yes.

Q.   Anthony is also your brother, who has taken your last name, but his father is actually someone named Mr. Baker?

A.   Yes.

Q.   And he was born in 1962?

USCA5 3407

THE COURT:  We're having trouble hearing you.

THE WITNESS:  Oh, okay.

THE COURT:  Could you speak up or lean into the microphone more.

THE WITNESS:  Okay.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   Then there's Alfred, the Defendant, the Petitioner.  And then Michelle Rixner-Warren and Keith Rixner.  And Michelle -- they both have the same father, correct, Godfrey Rixner?

A.   Correct.

Q.   Michelle was born in 1966, and she's recently passed away?

A.   Correct.

Q.   And Keith Rixner was born in 1967?

A.   Correct.

Q.   So as I understand this birth order, Alfred was the fifth child, and he's born, your mother had five children in five years, or maybe close to six years.

A.   Correct.

Q.   Is that correct?

A.   Correct.

Q.   Thank you.  I'm going to put this away, unless -- or one other thing.  In around, you think, 1972, July 4th, 1972, your brother Clyde was drowned.  Is that correct?

A.   Correct.

USCA5 3408

Q.   He died by drowning?

A.   Correct.

          MS. LARIN:  I'm going to move on from this.

          THE COURT:  Now, did you have the same mother and father as Mr. Bourgeois?

          THE WITNESS:  No, no, ma'am.

          THE COURT:  Different father?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  And your whole, the siblings that you have that are the same father and mother are the first three, you and Mr. -- and the Clyde Ferdinand and Lloyd Ferdinand?

          THE WITNESS:  Correct.

          THE COURT:  Okay.  And did Anthony Ferdinand have the same father as you?

          THE WITNESS:  No, ma'am.

          THE COURT:  Okay.

BY MS. LARIN:

Q.   And Alfred's father was someone named Alfred Sterling?

A.   Correct.

Q.   Okay.  So there's seven children, but by four different fathers?

A.   Correct.

Q.   Okay.  I'm going to move on.  When did your mother pass --

          THE COURT:  Would you offer that so I can have it?

          MS. LARIN:  Oh, yes.  I'm sorry.  The Petitioner -- I

USCA5 3409

mean the Government has no objection, I think, so I'd like to offer that.

THE COURT:  What is the number?

MS. LARIN:  It's Petitioner's Exhibit 166.

THE COURT:  That's admitted.  Thank you very much.

MS. LARIN:  Thank you very much.

BY MS. LARIN:

Q.   And when did your mother pass away?

A.   It's been about five years now.

Q.   Okay.  And can you tell me where you all grew up?

A.   In Paulina, Louisiana.

Q.   And was there a more specific name or neighborhood of where you lived?

A.   It was down Bend Lane.

Q.   Bend Lane.  Is that B-E-N-D?

A.   B, as in boy.

Q.   B as in boy, E-N-D, as in --

THE COURT:  Around the bend.

BY MS. LARIN:

Q.   -- dog.  Around the bend?

A.   Right.  Bend Lane.

Q.   A bend in the river?

A.   Right.  Right.

Q.   Okay.  And can you describe that briefly, that neighborhood?

USCA5 3410

Williams - Direct                          9

A.   A very good neighborhood, quiet, people get along, you know, everybody communicate with one another.  Very good neighborhood.

Q.   Are you all related in some way, the families that live there?  How many families live there?

A.   About two sets of families.

Q.   Two --

THE COURT:  About what?

THE WITNESS:  About two.

THE COURT:  Two families?

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

BY MS. LARIN:

Q.   Two sets of families?

A.   Uh-huh.

Q.   And Bend Lane is actually a lane, like one street.

A.   Right.

Q.   Correct?

A.   Right.  Correct.

Q.   And what surrounds Bend Lane?

A.   You have fields, cane fields on one side.

Q.   Okay.

A.   Mostly cane fields.

Q.   And then the river on the other?

A.   Right, uh-huh.

USCA5 3411

Q.   And can you tell me about your brother, Anthony Ferdinand, Anthony Baker Ferdinand?

A.   Okay.  He born -- he has cerebral palsy.  He born like that.

Q.   Okay.  And he's had this problem his entire life.  And can you tell me some of how that affects him, what is he able to do or not do because of his cerebral palsy?

A.   The only thing he can do is feed his self, but he can't bathe his self, he can't put his clothes on --

Q.   Okay.

A.   -- stuff like that.

Q.   Can he walk?

A.   He can walk.

Q.   How old was he when he learned how to walk?

A.   Well, when he was small, he couldn't walk.  My mother used to, like drag him, because he was, he --

        MS. BOOTH:  I hate to interrupt, Your Honor.  I'm just wondering about the relevance of this line of questioning.

        THE COURT:  Could you move along, please?

        MS. LARIN:  Okay.  It is very relevant, though, Your Honor.  I'll get to that.

BY MS. LARIN:

Q.   And who supported Anthony through his childhood?  Did he receive any assistance?

        MS. BOOTH:  And again, my objection, Your Honor, is

USCA5 3412

to the relevance of this line of questioning.

THE COURT:  Could you respond to that?

MS. LARIN:  Could I respond?  The relevance is two things, the overwhelmed nature of the situation when his mother was also trying to take care of Alfred, and also the comparative disabilities.  And third, the fact, as you will find out, even Anthony wasn't receiving services through his childhood.

THE COURT:  But we know that.  He didn't start receiving services till 2001.

MS. LARIN:  Right.  Okay.  I felt like we had to, you know, support the things the doctor relied on.  But if we can move on from those things, that's fine.

MS. BOOTH:  Well, Your Honor, I think there's an assumption here that just because you don't go to the state or the government to pay for something for you, that needs are not being addressed.  That seems to be the assumption, that just because Anthony wasn't getting state supported help, that he wasn't being taken care of, which --

MS. LARIN:  That's not my assumption.

THE COURT:  Was he being taken care of?

MS. LARIN:  Of course he was being taken care of.

THE WITNESS:  My mother was taking care of him.

MS. LARIN:  Yes.

THE WITNESS:  She's the one who took care of him.

USCA5 3413

MS. LARIN:  But the point is to help me explain why Alfred was not identified as someone with special needs, as far as we can tell, by the government.

THE COURT:  By the government?

MS. LARIN:  Or by the school.  I mean, even Anthony wasn't identified, so --

THE COURT:  Was there any question in your mind that there was something wrong with Anthony?

THE WITNESS:  He was born (inaudible), he was retarded.

THE COURT:  I mean, I'm not understanding -- she said he was born with cerebral palsy, he was retarded.

MS. BOOTH:  So he was identified by the family.

THE COURT:  So the point is?

MS. LARIN:  I thought the Government was making allegations that Alfred didn't have delays, and part of their proof was that he wasn't identified by the government or the school system.  And I feel like this is evidence --

THE COURT:  They're not proving anything.

MS. LARIN:  Okay.

THE COURT:  You're supposed to be proving that he's mentally retarded.

MS. LARIN:  Okay.  We will move on.

THE COURT:  They've already been through the trial.

MS. LARIN:  Okay.  We will move on.

USCA5 3414

THE COURT:  Thank you.

MS. LARIN:  Although, I would like to go more into depth about the overwhelmed nature of the early childhood.  Is that okay?

THE COURT:  Why don't you just ask questions --

MS. LARIN:  Okay.

THE COURT:  -- about Mr. Bourgeois.

BY MS. LARIN:

Q.   So was it hard to care for Anthony as a child?

A.   Yes, ma'am.

THE COURT:  Could you please just go into Mr. Bourgeois?

MS. LARIN:  Okay.

BY MS. LARIN:

Q.   What was it like in your mother's home as a child?

A.   It was not good.

Q.   Can you describe that a little bit?

A.   My mother was a person, my mama was a person, she used to treat Alfred real bad.  She abused him real bad.  She used to, she used to -- excuse me -- Alfred was a child, he didn't listen or nothing like that.  I noticed Alfred had problems. He was very slow.  And my mother used to whip him so bad.

     I remember when I was small, she took him in the bathroom and took all his clothes off, and she whipped him so bad.  She whipped him with an extension cord.  And she whipped him so

USCA5 3415

Williams — Direct                                              14

bad, and I walked in the bathroom, I asked my mama what she was doing.  She said, "I'm whipping him."  I said, "Well, why are you whipping him?"  She said, "Because he don't listen."  I said, "Well, he didn't do anything."

     And she whipped him so bad, I have never seen that before.  She whipped him, he was blue black.  And I remember the blood was coming from the side of his legs and his back and stuff like that.  And I was fussing with her, and I said, "Mama, don't do that."  And of course, she knocked me out of the bathroom, told me to get out of the bathroom.  My mother was, she was a disturbed person, to me.

Q.   And did this sort of thing only happen one time, or did it happen more often?

A.   Constantly, when I was small, I remember that.  Constantly.  She used to whip him --

Q.   Can you describe some other things that your mother would do to Alfred?

A.   I remember one night, we was eating supper, and Alfred didn't want to eat the food.  And she said, "Why you not eating?"  And Alfred say, "I don't like that.  I don't like what you cook."  And she say, "Yeah, you're going to eat it."  And I remember, he ate a little bit and he spit it out.  And he had his hand on the table, and she took a meat cleaver and went down on his hand.  And she cut the tip of it.  My mother did Alfred some wrong things, bad things.

USCA5 3416

Q.   Can you describe any more things that she did to Alfred?

A.   I remember one time she locked him in the closet.  And he had no lights in there, and it was in a closet, and she left him in there a while.  I remember those three things.

Q.   Did that happen just three times?  Or for example, was he locked in a closet one time or more than one time?

A.   She used to do it most of the time.  She would always abuse him, the time that I could remember.

Q.   So at some point, you moved out of your mother's home.  Correct?

A.   Yeah.  Correct.

Q.   Do you know around what age you were when you moved out?

A.   About nine, about nine.

Q.   And you moved to two places.  Right?

A.   Correct.

Q.   When you were nine, you started staying where?

A.   First, I started living with Ms. Mary.  That was the lady down the street.

Q.   And so during that time, you were still spending some time at your mother's --

A.   Right.

Q.   -- and seeing Alfred?

A.   Right.  Correct.

Q.   And then around -- where did you move next?

A.   Then after that, I moved with my grandmother in Lutcher.

USCA5 3417

Q.   And where does your grandmother live?

A.   She used to stay in Lutcher.

Q.   Which is the next town?

A.   Correct.

Q.   And how old were you when you moved there?

A.   About 12.  About 12 years old.

Q.   Okay.  And you are, let me look at my chart, you are about, almost eight years -- oh, no, I'm sorry -- almost six years older than Alfred.  Correct?

A.   Correct.

Q.   So when you moved away to Paulina, Alfred was about six.

A.   Correct.

Q.   So are you saying that most --

         THE COURT:  Was that your maternal grandmother or your paternal grandmother?

         THE WITNESS:  That was my maternal grandmother.

BY MS. LARIN:

Q.   That was your father's mother or your mother's mother?

         THE COURT:  Mother's.

         THE WITNESS:  My father.

         THE COURT:  Oh, I thought you said "maternal."

         THE WITNESS:  I'm sorry, father.  My father's mother.

         THE COURT:  Your paternal.  Okay.

BY MS. LARIN:

Q.   And so around -- when you saw these beatings and the abuse

USCA5 3418

by your mother, how old was Alfred?  Was it when you were living at home or in, on the Bend?  Is that when you saw it?

A.    Yeah, I was living at home.

Q.    So Alfred was under the age of six?

A.    Correct.

Q.    You mentioned that Alfred was slow.  Can you describe what you mean by that?

A.    Like learning ability.  You used to show him things, like he couldn't catch on.  He was slow.  You had to constantly show him, you know, over and over what to do.

THE COURT:  Like what?

THE WITNESS:  Like doing his homework, he had problem with his homework.

THE COURT:  Well, you moved out before he started school.

BY MS. LARIN:

Q.    Well, you moved to Ms. Mary's.

A.    I was by Ms. Mary, living with Ms. Mary, but I was back and forth.  But Ms. Mary living, going back to my mother house.

Q.    Where was, just so --

THE COURT:  So you didn't move out completely?

THE WITNESS:  Well --

MS. LARIN:  Can I clarify, Your Honor?

THE COURT:  No, I'd like her to clarify it.

MS. LARIN:  Oh, you'd like to do it.  Okay.

USCA5 3419

THE COURT:  I think that would be best.  So you didn't move out completely?

THE WITNESS:  Well, what I used to do, we used to stay by Ms. Mary.  Like on the week, during the weekends, we would go back to my mother house, because I was like going to school, living with Ms. Mary.  But I was, like I said, I was back and forth.

THE COURT:  You lived with Ms. Mary?

THE WITNESS:  Uh-huh, I did too, uh-huh.

THE COURT:  Okay.  You didn't live with your grandmother?

THE WITNESS:  After I got 12 years old, then I moved to Lutcher with my grandmother.  I started going to school in Lutcher, uh-huh.

THE COURT:  And where was that in relationship to Ms. Mary?

THE WITNESS:  Well, the grandmother wasn't relation, but my grandmother, that was my daddy grandmother.  Ms. Mary just was a cousin to us, and we went and lived with her.  She was an old lady, and we went and lived with her for a while.

THE COURT:  When did you live with her?

THE WITNESS:  I was around about, about -- I guess it be about ten, ten, eleven years old, we started living with her.

THE COURT:  Who's "we"?

USCA5 3420

THE WITNESS:  Well, there was another girl, we used to go live with her.  The girl that I went with, that was her grandmother we went and stayed with.

THE COURT:  Who is that?

THE WITNESS:  Her name is Veranice (phonetic) Batiste.  That was her grandmother.

THE COURT:  Okay.

THE WITNESS:  And we lived there.

THE COURT:  And that's -- who all was living in the house while you were there.

THE WITNESS:  It was me, Veranice and -- it just was me and her.  But Alfred was there first before us.  Alfred had been living with her first.

THE COURT:  But if you were ten or eleven --

THE WITNESS:  Uh-huh.

THE COURT:  -- and he was six years younger, so he went, started living there at three or four?

THE WITNESS:  Your Honor, I'm not good with dates and numbers.

THE COURT:  Well, this is kind of important.

MS. LARIN:  Can I --

THE WITNESS:  Right.

THE COURT:  That's what you're here to tell us.

THE WITNESS:  I understand.

THE COURT:  I want to know how it is you observed

USCA5 3421

Mr. Bourgeois in school if you weren't living with them, all those kind of things. And this is not making a whole lot of sense.

THE WITNESS: Well, I mean, I lived --

THE COURT: You don't appear to be a great historian.

THE WITNESS: I understand. When I lived with my mother, you know, when I was younger, as a child, you know, and I --

THE COURT: Well, how old were you when you moved out from your mother's? And you moved out for school purposes?

THE WITNESS: Yes, uh-huh.

THE COURT: So --

MS. LARIN: That's actually a question.

THE COURT: Pardon?

MS. LARIN: That's actually, I would like to hear why she --

THE COURT: You want to --

MS. LARIN: Sorry.

THE COURT: I'm just -- I'm sorry. It's never a good idea --

MS. LARIN: To interrupt. I'm sorry.

THE COURT: -- to interrupt the Judge. Never good.

So you moved out to start school someplace else?

THE WITNESS: Well, Your Honor, the reason why I moved out with my mother, because I wasn't comfortable living

USCA5 3422

with my mother.

THE COURT:  Okay.

THE WITNESS:  And I wanted to go stay with Ms. Mary, when I was smaller.  And then that --

THE COURT:  How old were you when you moved to Ms. Mary's?

THE WITNESS:  I was, I had to be around about, about ten, I think.

THE COURT:  About ten?

THE WITNESS:  About ten.

THE COURT:  So Mr. Bourgeois was four?

THE WITNESS:  Uh-huh, I guess.

THE COURT:  Okay.  So you moved in with Ms. Mary when you were ten.

THE WITNESS:  Uh-huh.

THE COURT:  And then when did you move in with your grandmother?

THE WITNESS:  I had to be around about 12.

THE COURT:  Okay.

THE WITNESS:  I started to going to school in Lutcher, in Lutcher, uh-huh.

THE COURT:  Okay.  Did you go to school when you lived with Ms. Mary?

THE WITNESS:  I did, elementary, yes, uh-huh.

THE COURT:  Okay.

USCA5 3423

THE WITNESS:  Yes, ma'am.

THE COURT:  And then so you really just lived with Mr. Bourgeois for four years or so at the beginning of his life?

THE WITNESS:  Yeah, you could say that.

THE COURT:  No, you say that.  You tell me.

THE WITNESS:  Yeah.  When I was, like I said, when I was coming up small, you know, I remember the things that used to go on in the house and stuff like that, because I was the oldest, you know.

THE COURT:  So he was about birth to four when this stuff was going on.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  So he was not in school.

THE WITNESS:  Not at four, no.

THE COURT:  Okay.

THE WITNESS:  Not at four years old.

THE COURT:  So you say you came back from time to time on the weekends to your mother's house?

THE WITNESS:  Yes, ma'am, I came back on the weekends, uh-huh, with my mom.  I came back on weekends to come home.  Because like I was the oldest.

THE COURT:  What does that mean?

THE WITNESS:  I mean, me being the oldest, you know, like I had things I had to do, chores my mother say I had to

USCA5 3424

do, stuff like that.

THE COURT:  What did you do?

THE WITNESS:  Like clean up the house, cook sometime, fix up beds, stuff like that.

THE COURT:  Okay.  Go ahead.

MS. LARIN:  Thank you.

THE COURT:  Your turn.

MS. LARIN:  Thank you.  I'm sorry for interrupting you, Your Honor.

THE COURT:  That's all right.  It's a good lesson.

BY MS. LARIN:

Q.   Can you tell us how far away Ms. Mary's house was from your mother's house?

A.   From here to, just say like from where the water is out there, right there, walking distance.  It wasn't that far.

Q.   And it was on the same street?

A.   Yes, on the same street, uh-huh.

Q.   Okay.  And so would you see Alfred while you were staying at Ms. Mary's house?

A.   Correct, yes, ma'am.

Q.   About how often would you see him?

A.   When I used to go to Ms. Mary, he used to be back there, I used to go see him.  And like I said, we was back and forth. He used to come home to my mother --

Q.   I meant when you were living at Ms. Mary's house.

USCA5 3425

A.    Uh-huh.

Q.    Did you go back to your mother's house, or did he come see you at Ms. Mary's house?

A.    I used to go --

Q.    When you were about nine, ten, eleven.

A.    I used to go --

Q.    I mean ten, eleven, twelve.  I'm sorry.

A.    Okay.  Yeah, I used to go back there to, where I was living at with Ms. Mary --

Q.    Uh-huh.

A.    -- and he used to come see us.  We was like back and forth.

Q.    Okay.

A.    Uh-huh.

Q.    And then you moved to your grandmother's house.

A.    Yes.

Q.    And you would still come home to your mother's house?

A.    Right, on weekends.

Q.    And you would see Alfred.

A.    Right.  Correct.

Q.    And at some point Alfred moved into Ms. Mary's house.  Is that correct?

A.    Correct.

Q.    And do you know about how old he was?  If you don't know, that's fine.

USCA5 3426

A.    I'd say he had to be about seven, about seven years old.

Q.    Okay.

THE COURT:  And who was living at Ms. Mary's house then when Mr. Bourgeois moved in?

THE WITNESS:  Yes, ma'am.

THE COURT:  Who was living there when he moved in?

THE WITNESS:  It was Vera, she was living there, and like I said, I was there, too.  And then Alfred, you know, he came.  Ms. Mary, like, was taking care of us.

THE COURT:  Okay.  But you moved out of Ms. Mary's when you were 12.

THE WITNESS:  Right.

THE COURT:  To your paternal grandmother.

THE WITNESS:  Uh-huh.

THE COURT:  And that's when Mr. Bourgeois moved in apparently.

THE WITNESS:  Okay.

THE COURT:  No, I'm not saying -- I'm asking you.

THE WITNESS:  It's just dates, Your Honor, I'm not good with dates and time too good, you know.

THE COURT:  Well, you said and he said --

THE WITNESS:  Right.

THE COURT:  -- apparently, at least I've heard him say that he moved in with Ms. Mary when he was about seven.

THE WITNESS:  Okay.

USCA5 3427

THE COURT:  So you were at your maternal grand, paternal grandmother's by then.  Is that right?

THE WITNESS:  Uh-huh.

THE COURT:  So do you know who was living in Ms. Mary's house when Mr. Bourgeois was living there?

THE WITNESS:  Like I said, Vera.  Vera was there. She was living there with us, Vera.  Her name was Vera.

THE COURT:  Well, you weren't living there when Mr. Bourgeois was there.

THE WITNESS:  No, not at the time, because like I said I had to be about 12 --

THE COURT:  Okay.

THE WITNESS:  -- when I went back over there.  But Vera was there, because that was her grandmother.

THE COURT:  Okay.

THE WITNESS:  She was there first.  And then Alfred.

THE COURT:  And her name is?

THE WITNESS:  Vera.

THE COURT:  Last name?

THE WITNESS:  Batiste.

THE COURT:  Batiste?

THE WITNESS:  Uh-huh.

THE COURT:  And that's who was, when Mr. Bourgeois was living at Ms. Mary's, Ms. Batiste was living there, and Ms. Mary was living there, and Mr. Bourgeois?

USCA5 3428

THE WITNESS:  Yes, ma'am.

THE COURT:  Anybody else?

THE WITNESS:  That's all.  That's all I remember.

THE COURT:  Thank you.  Go ahead.

BY MS. LARIN:

Q.   Okay.  You described Alfred, you were describing Alfred as slow, and I was wondering if you could give some examples about that.

A.   All I know is when I tried to help him with his homework --

Q.   And so, just to pause, this is where we got sidetracked before.  When would you help him with his homework?  Were you living -- where were you living and where was he living that you would have, you would have helped him with his homework?

A.   At the time he was by Ms. Mary.  I used to go back there and help him with his homework.

Q.   Okay.

A.   And I used to try to help him do his homework, but I seen, what I seen about Alfred, he was very slow.  You had to constantly show him what to do and how to do it.

THE COURT:  What school did you go to?

THE WITNESS:  I went to Lutcher High School.

THE COURT:  Well, what about elementary school did you go to?

THE WITNESS:  I went to, it was Lutcher Elementary.

USCA5 3429

THE COURT:  Is that where Mr. Bourgeois went?

THE WITNESS:  I'm trying to remember the school.  I think Alfred went to Paulina's school.  I think, I'm not sure, but I think it was Paulina's school, because they had different schools.  But by me moving to Lutcher, I had to go to Lutcher Elementary.

THE COURT:  Right.

THE WITNESS:  It was Paulina.

THE COURT:  So who was living in Lutcher when you started first grade?  Where were you living when you started first grade in Lutcher?

THE WITNESS:  Where was I living?

THE COURT:  Uh-huh, yes, ma'am.

THE WITNESS:  First grade, I'm trying to remember, Your Honor.  First grade, okay, when I was in first grade, I was living with my mama.  It was at Paulina School that first year.

THE COURT:  Okay.

THE WITNESS:  Okay.  It was St. Martin, used to call it St. Martin School, right, because that was first grade.  Right.  Okay.  I was living at my mother at the time when I was going to first grade, because it was called St. Martin Paulina School.  That's where I used to go.

THE COURT:  Okay.  So what grades did you make in elementary school?

USCA5 3430

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  What grades did you make in elementary school?

THE WITNESS:  B's, B's and C's.

THE COURT:  And in high school?

THE WITNESS:  B's and C's.

THE COURT:  Go ahead.

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Is there any other examples that you could tell the Judge about things that Alfred was slow at as a child?

A.   I remember I used to tell him to do things, like one time I told him to go clean up in the bathroom, clean the tubs, the toilets and stuff, and he would go in there.  And I'd say, "Alfred, did you clean up?"  He'd say, "Yes."  I'd say, "Well, it don't look like it, because the bathtub's still dirty."  And he said, "Well, I did it."

THE COURT:  See, my husband does that.

THE WITNESS:  And he say he did it.

THE COURT:  I don't know if that's qualified as slow.

THE WITNESS:  Comprehension, it's just repeating it.

THE COURT:  I see what you mean.

THE WITNESS:  You understand?

BY MS. LARIN:

Q.   Any other examples --

USCA5 3431

MS. BOOTH:  Excuse me, Your Honor, I'm going to object for the record.  In any way implying that a 7-year-old boy that doesn't clean up the bathroom after he's been asked to do it by his sister is any indication of any kind of mental disability.

THE COURT:  Well, I think --

MS. LARIN:  What age -- I don't know that she's necessarily talking about age.

MS. BOOTH:  I'm taking the youngest possible age it can be, you know, or even younger than that.  But that's no indication of any kind of mental disability.

MS. LARIN:  Why does that --

BY MS. LARIN:

Q.   Okay.  So what age do you think you were trying to ask him to wash the bathroom?

A.   Well, I know he was young.  I can't remember the age.  I'm not good with age.

Q.   Did he seem too young that he shouldn't --

THE COURT:  Were you still living at the house when you did that?

THE WITNESS:  Yeah, because -- yes, at the time.

THE COURT:  So he would have been four or three?

THE WITNESS:  About four or five, I guess.

THE COURT:  About four.

THE WITNESS:  Uh-huh.

USCA5 3432

THE COURT: Okay. Moving on.

BY MS. LARIN:

Q.   Okay. When you asked -- did you ever -- there were other children in your home. Correct? There was Michelle, for example.

A.   Correct.

Q.   Were you around when Michelle was young?

A.   Correct. Yes, I was.

Q.   So how -- you weren't living there, but you saw Michelle often?

A.   Correct.

Q.   And if you asked Michelle to do -- was there -- could you compare what Michelle could do to what Alfred could do?

MS. BOOTH: Your Honor, I'm going to object. She's asking for some kind of retroactive interpretation of a 12-year-old, that's how old she would have been, comparing the difference between two children that were four and six. I mean, how can that be -- first of all, how can that be relevant to what we're talking about here? How can she make, how can she make that opinion? I mean, it's ludicrous, a 12-year-old, from the eyes of a 12-year-old, and what is she now? At least 39.

THE COURT: Well, where were you when we were talking about the 13-year-old taking an IQ test for Mr. Bourgeois?

MS. BOOTH: Exactly, Your Honor.

USCA5 3433

THE COURT:  Okay.

MS. LARIN:  Can I clarify?

THE COURT:  If you can answer that, fine.  If you don't remember, move on.

BY MS. LARIN:

Q.   Were you 12 years old, when we're talking about -- did you at any point ever stop having a relationship with your younger siblings?  Did you ever stop seeing them altogether?

A.   No.

Q.   How often would you see them?

A.   On a regular basis, you know.

Q.   When you were at your grandmother's, living in Lutcher, how often would you spend time at your mother's house?

A.   We would come home for the weekends and like --

Q.   Every weekend?

A.   Every weekend.

Q.   And you would live at your mother's house, and you said you had chores at your mother's house on the weekends.

A.   Correct, uh-huh.

Q.   And so you saw Alfred, Michelle, Keith and Anthony and Lloyd throughout their childhood?

A.   Correct.

Q.   Into adulthood?

A.   Correct.

Q.   Okay.  Let's pick a time.  Let's say you are 16 years old.

USCA5 3434

A.    Uh-huh.

Q.    You're living at your grandmother's house.

A.    Okay.

Q.    Alfred is 10.

A.    Okay.

Q.    Michelle is 8.  Can you give us a comparison?  Alfred is 10 years old.  Can you have that picture in your head?

A.    Okay.

Q.    Alfred was living at Ms. Mary's house.

A.    Correct.

Q.    He would also be home with the mother on weekends often?

A.    Some --

Q.    Or you would -- would you see him at Ms. Mary's house?

         THE COURT:  Sometimes?

         THE WITNESS:  Sometime.  Not often.  Because like he was living with Ms. Mary.

BY MS. LARIN:

Q.    By that time?

A.    Right.

Q.    By age ten?

A.    Right.

Q.    Okay.  Would you see him at Ms. Mary's house?

A.    Correct, yes.

Q.    Okay.  Can you offer us any examples from that age when he was living at Ms. Mary's that he seemed slow to you compared to

USCA5 3435

other children around his age?

A.   Yes.

Q.   Can you please tell the Judge?

THE COURT:  Do you have specific memories of the dates and the ages?

THE WITNESS:  I'm not good with dates.

MS. LARIN:  We're on age ten here.

THE COURT:  Just please --

MS. LARIN:  Okay.  I did it again.

THE COURT:  Don't interrupt me, please.  You said you had trouble with ages, and she's telling you what happened when he was ten.

THE WITNESS:  Right.

THE COURT:  Do you even, are you able to set that in your mind?

THE WITNESS:  Your Honor, I can remember when Alfred was that age, my mother abused him so much.

THE COURT:  Well, he was ten, so he was living with Ms. Mary.

THE WITNESS:  Yeah, but I'm just saying, you know, when he, he still used to go back and forth.  And you know, when we was there sometime, we used to see him still.  She used to abuse him and whip him a lot, and we used to see that.  And I used to ask her why she whipping him, and it's for nothing, for no reason.  I used to ask her that.  And of course, she'll

USCA5 3436

go off on me.  And that's why he didn't want to live with her, because she used to abuse him so bad.

THE COURT:  Well, I understand that.

THE WITNESS:  Uh-huh, and that's why he didn't feel comfortable --

THE COURT:  Did your mother work outside the home?

THE WITNESS:  No, ma'am.

THE COURT:  How did she live?

THE WITNESS:  Well, she was married.  She was married to my dad, but they divorced.  And then after, she remarried Michelle and Keith daddy.

THE COURT:  She what?

THE WITNESS:  She remarried.

THE COURT:  Okay.

THE WITNESS:  And then after that, well, he left, so she was on her own.

THE COURT:  How old were you when your stepfather left?

THE WITNESS:  I was a little older then.  I had to be -- trying to think.  I had to be around about -- I was like in, had to be around about 20 or something.

THE COURT:  Okay.

THE WITNESS:  Because I was a little older.  Yeah, I was older.

THE COURT:  Okay.

USCA5 3437

THE WITNESS:  But I remember that.

THE COURT:  So Counsel was asking you to compare the abilities of Mr. Bourgeois with your sister, Michelle.

THE WITNESS:  Uh-huh.

THE COURT:  Can you do that?  And can you remember a specific age for each of them when you're doing that?

THE WITNESS:  All I remember, like I say, to me, Alfred was a person you could try to explain things to him, you know, and show him things, but like to me, he had a comprehension -- he couldn't pick up right away, to me, from what I see.  You had to, you know, constantly show him and explain to him just how this go, and you do it this way, you know.

THE COURT:  Like cleaning the bathroom?

THE WITNESS:  No, not just cleaning the bathroom. I mean like his homework and -- mostly like his homework.  I noticed he had problem in his homework.  He couldn't understand certain things.  You know, you had to constantly show him, you know, what to do and how to do it.  And then --

THE COURT:  So when he started school at six, you were twelve and in, living in another community?

THE WITNESS:  Yeah.  But like I said, when I come home, when I used to come home --

THE COURT:  On the weekends.

THE WITNESS:  -- sometime on the weekends, uh-huh,

USCA5 3438

and --

THE COURT:  He did homework on the weekends in first grade?  When did you first, in that elementary school, when did you first start doing homework?  I know I was, didn't do much homework at all in elementary school, but --

THE WITNESS:  It was mostly like writing, you know, like you write -- they had them writing, writing their ABC's, stuff like, tracing stuff like that.

THE COURT:  When did you start doing homework?  Can you remember?

THE WITNESS:  When I start doing homework?  Like for myself, you mean?  Well, I mean, when you're in kindergarten, they teach that, you know, you have to do -- not homework, but you have to do like try to learn how to write your name, stuff like that.  Stuff like that, you know.

THE COURT:  Well, he writes very well, Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  I've seen his writing.

THE WITNESS:  Uh-huh.

THE COURT:  He spells well and writes well.

THE WITNESS:  Okay.

THE COURT:  So when did you -- so when you were there on the weekends, what homework was he trying to do and what age are we talking about?

THE WITNESS:  Mostly letters, like that I could

USCA5 3439

remember, letters, like --

THE COURT:  Writing his letters?

THE WITNESS:  Yeah, like the teacher have like the letter's already there, and you just have to trace it, something like that.

THE COURT:  You're supposed to, okay, or copy it?

THE WITNESS:  Yes, ma'am.  Yes, ma'am.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

BY MS. LARIN:

Q.   Okay.  We're going to fast-forward a few years.  Do you know, how long -- when did Alfred stop living with Ms. Mary?  What happened?  Did he ever stop living with Ms. Mary?

A.   As he got older.

Q.   At some point, Ms. Mary passed?

A.   Yes, ma'am.

Q.   And do you know where he moved after Ms. Mary passed?

A.   I think he went and stayed with his sister, Michelle.  Michelle Omar.

Q.   His sister, not by your mother.

A.   No, not by my mother.

Q.   Okay.

THE COURT:  Who, Michelle was --

THE WITNESS:  Michelle Omar.  That was his stepsister.  That was Alfred daddy child.

USCA5 3440

THE COURT:  Okay.  Did you know her?

THE WITNESS:  Yes, ma'am.

BY MS. LARIN:

Q.   And then at some point did Alfred stay with you?

A.   Yes, ma'am.

Q.   Can you remember about what age he was when he lived with you?

A.   He had to be a little older.  Alfred had to be a little older.  I'm trying to think of the age.  He had to be probably about 18 or 19, something like that.

Q.   Okay.  When Alfred lived with you, was he able to take care of himself?

A.   No.

Q.   Meaning, you know, did he cook his own food?

A.   No.

Q.   Who cooked for him?

A.   I did.

Q.   And how do you know he couldn't cook for himself?

A.   He thought he could cook.

THE COURT:  What does that mean?

THE WITNESS:  He tried to cook, but it wasn't eatable.  You couldn't eat it.

THE COURT:  Did he eat it?

THE WITNESS:  No.  No.  He tried, but he --

THE COURT:  Well, I hate to say this, but you know,

USCA5 3441

bad cooking is not a sign of retardation.

THE WITNESS:  Uh-huh.

MS. LARIN:  Well, according to the green book, it actually -- self-care and home living.

THE COURT:  Self-care is something different.  He bathed himself and dressed himself, all those things?

THE WITNESS:  Yeah, he bathed his self and dressed his self.

THE COURT:  Dressed himself?

THE WITNESS:  Uh-huh.

THE COURT:  No trouble with brushing his teeth?

MS. LARIN:  Your Honor --

THE WITNESS:  I'm sorry?

THE COURT:  No trouble with brushing his teeth?

THE WITNESS:  No, not when he was older.

THE COURT:  Now, how many of us here are great cooks?

MS. LARIN:  Could I just --

THE COURT:  There.  Mr. Wiseman.

MS. LARIN:  He is a great cook.  I hear from him all the time that he's a great cook.

MR. WISEMAN:  And a little narcissistic.

MS. LARIN:  Your Honor --

THE COURT:  Mr. Roberts --

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  -- are you a good cook?

USCA5 3442

MR. ROBERTS:  I am not a good cook, but I have a great wife who's a good cook, Your Honor.

THE COURT:  Is it edible, your food?

MR. ROBERTS:  The food that I cook?  I wouldn't eat it, Your Honor.

THE COURT:  Okay.

(Counsel conferring off the record.)

THE COURT:  I heard him talk about on the video that I saw, Mr. Bourgeois, talk about how he cooked deer meat and raccoons and squirrel.

THE WITNESS:  Uh-huh.

THE COURT:  He learned that from Ms. Mary?

THE WITNESS:  I don't know.  Wildlife?  I don't know.

THE COURT:  Sounded kind of bad to me.

THE WITNESS:  Wildlife, I don't know where that one came --

BY MS. LARIN:

Q.   Okay.  Can you tell us who did Alfred's laundry?

A.   I did.

Q.   And after Alfred moved -- did Alfred leave your house at some point?

A.   Yes, he did.

Q.   And where did he move?

A.   Like I said, he had moved in with Michelle, his other sister.

USCA5 3443

Q.   Right.  Then he moved with you?

A.   Right.

Q.   And what happened next after --

A.   And then after he got older, I think he moved away to LaPlace.

Q.   Did he ever live in a mobile home?

A.   Oh, yes, he did, yeah.

Q.   And where was that mobile home?

A.   It was in the same yard that my trailer was.

Q.   So about how many feet away?

A.   Like just in the backyard.

Q.   Like from me to you, or a little further?

A.   From here to the hallway out there, you could say. Because it was in the same yard.

Q.   Okay.  And at that time did Alfred cook for himself, as far as you know?

A.   No, not that I know of.

Q.   Who would feed him?

A.   Well, I would cook.

Q.   Okay.

A.   And bring him the food.

Q.   And the same for his laundry?

A.   Yes, ma'am.

Q.   Do you remember at all any of the jobs Alfred had at that time?

USCA5 3444

A.    I remember --

Q.    Around, you know, the time he was living with you and in the mobile home in your yard.

A.    Winn-Dixie, he used to work at Winn-Dixie.  I remember that.

Q.    Okay.  And what else?  Anything else?

A.    And Schwegmann he used to work, and then Imperial Sugar.

Q.    Imperial Sugar?

A.    Yes, ma'am.

Q.    What did he do there?  Do you know?

A.    Little packing little sugar.

Q.    Do you know how he got that job?

A.    My husband help him got that job.

Q.    Okay.  Do you know any other jobs he had, like who helped him get other jobs?

A.    No, I don't know who help him.  I can't remember that.

Q.    Okay.  Fast-forward again.

A.    Okay.

Q.    Now you testified at this trial, at your brother's trial.  Correct?

A.    Correct.

Q.    And in that testimony, you talked about a conversation you had with Alfred about a phone call you had with him when he was on the truck.

A.    Uh-huh.  Correct.

USCA5 3445

Q.    Can you describe that conversation, please?

A.    When we was talking, I noticed Alfred, like he was disturbed.  He was nervous.  And I talked to him and I asked him how he was doing, and he say he was tired.  It was stressful.

      And he said, "I don't know what I'm going to do."

      I said, "What you mean?"

      He said, "I don't know what I'm going to do, Sis."

      I said, "Alfred," I said, "I don't know what you're going to do," I say, "but don't do nothing to hurt yourself or hurt your family."  I say, "Don't kill yourself."  I told him that.

      And I said, "Give Robin the phone," and I talked to Robin.  And I asked her what was going on, and she just say, you know, "Everything is all right."  But I could tell in her voice there was something wrong.

Q.    And what did you think he meant?

A.    Well, when he told me that, I said, "Lord," the first thing, I said, "Lord, my brother going to kill his self."  That's what I felt.

Q.    And you also -- I'm going to mark something.  Oh, I'm going to mark Petitioner's Exhibit 56.  This has been previously provided.  Provide it again.  And, Ms. Williams, do you recognize this?

A.    Yes, ma'am.

Q.    And I'm going to turn the page to -- is that your

USCA5 3446

signature?

A.    Yes, ma'am.

Q.    Okay.  In this -- what is this?

A.    I'm sorry?

Q.    In your own words, what is this piece of paper we're looking at?

A.    That's the family, our family.

Q.    Do you see that -- do you know, do you remember how this document came about?  Did someone from my office come talk to you?

A.    Yes, ma'am, Miss Pam.

Q.    Miss Pam.  Okay.  And did you talk to her about Alfred and Alfred's background?

A.    Yes, ma'am.

Q.    And did she write this up and bring it back to you for you to read over?

A.    Correct.

Q.    And is everything in this document true and correct, to the best of your knowledge?

A.    Yes, ma'am.

Q.    Okay.  And in this document, you talk about how sometimes Alfred would go into a rage.

A.    Correct.

Q.    Can you describe that a little bit?

A.    Alfred used to get temper fits.  He used to get angry.

USCA5 3447

Like he'd turn red.  His features would change.  And he was, like to me, he would, like he just would go in a bad, bad rage. And I think Alfred was like that because how my mother used to treat him, the abuse that, how she used to whip him and stuff like that.  And I think that affect him a lot.

Q.   And was this, would this happen when he was an adult?

THE COURT:  The whippings or the rages?

MS. LARIN:  The rages.  I mean -- sorry.  Thank you.

BY MS. LARIN:

Q.   Would he have these rage episodes -- how old was he when these things would happen?

A.   Well, when he was young, when my mother was abusing him, I remember --

Q.   He would --

A.   -- he had -- yes.

Q.   And then how about when he was older, did it ever happen when he was older?

A.   Yeah, when he was older, yeah.

Q.   Okay.  Now --

MS. LARIN:  Could I have one minute, Your Honor?

THE COURT:  Pardon?

MS. LARIN:  Could I have a minute?

THE COURT:  Yes, ma'am.

MS. LARIN:  Thank you.

(PAUSE.)

USCA5 3448

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Ms. Williams.

A.   Yes, ma'am.

Q.   Do you remember before your brother's trial talking to an investigator for, who worked for Mr. Bourgeois's lawyers?

A.   Correct.

Q.   Can you tell me, can you describe him to -- where did you talk to him?  On the phone?  In person?  Do you remember?

A.   Who?

Q.   The investigator for Mr. Bourgeois.  His name was Mr. Bierbaum.  Do you remember speaking to a Gerald Bierbaum?

A.   Okay, yeah.

Q.   You do remember that?

A.   Uh-huh.

Q.   And do you remember if you told him that your brother was abused by his mother?

A.   Yes, I did.

Q.   You did tell him?

A.   Yes, ma'am.

Q.   And if the lawyers had asked you to testify about your child, your brother Alfred's childhood, would you have done so?

A.   Yes, ma'am.

Q.   And you would have answered as you did today about the abuse that you witnessed?

USCA5 3449

A.    Yes, ma'am.

Q.    And his slowness?

A.    Yes, ma'am.

MS. LARIN:  Thank you, Your Honor.  I have no further questions.

THE COURT:  Thank you, ma'am.  Ms. Booth?

MS. BOOTH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good morning, Ms. Williams.

A.    How you doing?

THE COURT:  Just a second.  What do you need?

MS. LARIN:  I'm sorry.  I didn't offer the affidavit.

THE COURT:  Number what?

MS. LARIN:  It's number, Petitioner's Number 56, Your Honor.

THE COURT:  Any objection?

MS. BOOTH:  No, Your Honor.

THE COURT:  Petitioner's 56 is admitted.

BY MS. BOOTH:

Q.    Ms. Williams, this is not the first time that you've testified in the case involving your brother, is it?

A.    Yes, ma'am.

THE COURT:  I'm sorry?

THE WITNESS:  Yes, ma'am.

USCA5 3450

THE COURT:  Is it -- no, you testified at trial, didn't you?

THE WITNESS:  At the trial, I did.

THE COURT:  Right.

MS. BOOTH:  Uh-huh.

THE COURT:  So you've testified twice in this courtroom.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you, ma'am.

BY MS. BOOTH:

Q.    And you were interviewed by Mr. Bierbaum, you testified a minute ago, and you were talked to by the FBI.  Do you remember talking to the FBI?

A.    Yes, ma'am.

Q.    In fact, then you talked to Dr. Moore.  Isn't that right?

A.    The guy right there?

Q.    Yes.

A.    Okay, yes, ma'am.

Q.    And in fact, when you talked to Mr. Bierbaum, you talked to him more than one time, didn't you?  Didn't you talk to the Defendant's investigator more than one time, maybe two or three times?  Do you remember?

A.    Two or three times?  I'm trying to --

Q.    Yeah.  Well, do you remember if you were interviewed on November the 25th of 2003?  And then again on February the 25th

USCA5 3451

of 2004?

A.    Okay.

Q.    And again on March the 2nd of 2004?

A.    Okay.

Q.    And that was by the Defense.  Is that correct?

A.    Uh-huh, correct.

Q.    Okay.

            THE COURT:  Can you hear her, Ms. Gano?  She said,
"Correct."  You need to speak up, please, ma'am.

            THE WITNESS:  Oh, okay.

            THE COURT:  Thank you.

            THE WITNESS:  Okay.

            MS. BOOTH:  Judge, do you think it would help if I
moved the microphone up just a little bit?

            THE COURT:  Let Ms. Gano do it.

            MS. BOOTH:  Okay, because it's kind of slumped down,
so she has to bend.

            THE WITNESS:  Thank you.

            THE COURT:  People before you were fiddling with it
and moving it around, so --

            THE WITNESS:  Oh, okay.

            THE COURT:  Okay.  That should be better.

BY MS. BOOTH:

Q.    So we have those three dates before and during the trial
that you spoke to the investigators of the Defense.  Now, I

USCA5 3452

want to ask you if you ever told them that Mr. Bourgeois was hit with a meat cleaver on his hand by his mother.  Did you ever tell that story to them?

A.   Not at the time, I didn't.

Q.   All right.  Did you tell them -- and I know these are horrible memories, Ms. Williams.

A.   Oh, yes, ma'am.

Q.   Did you tell them that he was whipped in the tub and that there was blood in the water?

A.   No, not at the time I didn't.

Q.   Okay.  And basically what you told them is that your, like you did in, when you were interviewed by the investigator that came for this case, the Government -- I mean Defendant's Exhibit that was just admitted that you were speaking about, when you talked to them, you told them that Alfred got whippings, more whippings than the rest of the kids in the family.  Is that right?

A.   Correct.

Q.   And, but you didn't go into, even in this affidavit that you gave on May the 10th of '07, you didn't say anything about the meat cleaver on the hand, did you?

A.   Well, Ms. Patti, the reason why I didn't say, because it was sad.  I was ashamed of my mother.

Q.   Right.

A.   I was --

USCA5 3453

Q.   And during the time of the trial, your mother was alive, wasn't she?

A.   Yes, ma'am.

Q.   And during the time of the trial, your mother, didn't you tell me your mother said that he was no good, and she knew this was what was going to happen with him?

A.   Well, I don't remember saying that he, that that was going to happen to him.  I don't remember my mother --

Q.   What did you tell me that your mom said?

THE COURT:  Was this in the trial?

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Okay.

THE WITNESS:  I'm sorry.  Repeat yourself, Ms. Patti.

BY MS. BOOTH:

Q.   During the period of the trial, your mother was still alive, wasn't she?

A.   Yes, ma'am.

Q.   And so you didn't tell these three stories that you've now disclosed at that time.  Right?

A.   Yes, uh-huh.

Q.   And in fact, most of the family were very closed about the abuse of your mother, of your mother to Alfred during that time.  Isn't that right?

A.   Correct.  Correct.

Q.   So if this horror information was not given to the

USCA5 3454

investigator, then it couldn't have gotten to the attorneys.

Correct?

A.    Correct.

THE COURT:  Speak up, please.

THE WITNESS:  Correct.

MS. LARIN:  Objection, Your Honor.  She can't know

what the lawyers knew or didn't know.

THE COURT:  Well, she's just finding out.  That's the

point, isn't it?  Overruled.

BY MS. BOOTH:

Q.    And Ms. Williams, coming into this case and testifying

against your brother was a very difficult thing, wasn't it?

A.    Yes, ma'am.

Q.    Because you were the last person from the family that

spoke to Mr. Bourgeois and to Robin before JG1999 was murdered,

weren't you?

A.    Yes, ma'am.  Yes, ma'am.

Q.    All right.  Now, in the statement that you gave to the FBI

on September the 4th of 2002, I believe you were talking -- do

you remember Ms. Beckett, the FBI Agent, Ms. Beckett, Megan?

A.    Yeah, correct.  I remember.

Q.    All right.  And do you remember talking to her?

A.    Yes, ma'am.

Q.    And do you remember telling her that you had seen bruises

on Robin, and that you knew that Robin was very afraid --

USCA5 3455

A.   Yes.

Q.   -- of Alfred?

THE COURT:  You need to speak up.

THE WITNESS:  Yes.  Yes, ma'am.

BY MS. BOOTH:

Q.   And that you knew that he had abused children that belonged to other wives that he had had.

A.   Yes, ma'am.

Q.   And that you knew that he was capable of this kind of violence.

A.   I wouldn't say capable.

Q.   Did you tell him that -- did you tell the FBI Agent that you often thought that Robin's life was in danger when Robin was with Alfred?

A.   Yes.

Q.   All right.  And that Williams also stated, and that's you, that you were pretty sure that your brother was capable of killing Robin.  Do you remember making that statement?  I have your 302, if you'd like to --

A.   Okay.

THE COURT:  Would you like to look at it?

THE WITNESS:  No, I don't have to look at it, Your Honor.

THE COURT:  Okay.

BY MS. BOOTH:

USCA5 3456

Q.    And you told Megan Beckett at that time that Alfred knew the difference between right and wrong, and he made the choice to kill JG1999.  Do you remember making that statement?

A.    I don't remember saying he made a choice.  I don't remember that.

Q.    Would you like to see your --

A.    No, ma'am.  I don't have to -- I don't have to see it.

Q.    Do you just not remember making the statement?  Or are you saying --

A.    Some things I --

Q.    -- that you didn't make the statement?

A.    Some things I don't remember, but I don't have to see it.

Q.    All right.  Now, when you -- and I want to draw you back in time now when you were a child with your brother.  And from zero to four, y'all lived together in your house with your mother and the rest of your siblings that were born at that time.  Right?

A.    Yes, ma'am.

Q.    And when he was four, that's when you moved to Ms. Mary's, which was right down the street.  Correct?

A.    Correct.

Q.    So you were, if you were six years older, you were ten when you were at Ms. Mary's.  Right?

A.    Correct.

Q.    Now, how long did you stay at Ms. Mary's?

USCA5 3457

A.    Till I got older, till, like I say, I got 12, and then I moved into Lutcher with my grandmother.

Q.    Now, let's talk about Ms. Mary.  Was Ms. Mary a person that had some type of disability with one of her legs?

A.    Yes, ma'am.

Q.    And when you moved in with Ms. Mary, wasn't it part of your living there that you were going to help her with a few things?  Did you help her there at the house?

A.    With a few things.

Q.    Yeah.  Did she need help, a little bit of help getting around?

A.    Yes, ma'am.

Q.    And did she bake and make cookies and things that she would sell in the community?

A.    Yes, ma'am.

Q.    And did you help with that?

A.    No, not help -- no.  She used to do that herself.

Q.    Okay.  And were there great big pans that were used to make these cookies and these different things that she would sell?  Do you remember that?

A.    Yes, ma'am.

Q.    All right.  And so did Ms. Mary have any boys?  Did she have male children?

A.    Oh, yeah, she did have a lot of children, a lot of older, yeah, she did.

USCA5 3458

Q.   Okay.  And was there any particular male child that would come and stay at Ms. Mary's house?

A.   Not to stay.  I don't remember that.

Q.   Like would come and spend the night or anything like that?  You don't remember that happening?  I mean, I'm just asking you.

A.   Yeah, I know --

Q.   I don't know the answer to the question.

A.   I understand.  I'm trying to remember.

Q.   Yes, ma'am.

A.   One time Ms. Mary had her son came, Leroy.  He came, stayed one time I think.

Q.   When you were there?

A.   I think so, uh-huh.

Q.   Was Leroy ever inappropriate with you, sexually?  And I realize that's a really blunt question, but --

A.   Not to me.

Q.   Okay.  Now, when you were there with Ms. Mary, you were going to Paulina School.  Is that correct?

A.   Yes, ma'am.

Q.   And what grade did -- do you remember what grade Alfred went to school?  Was he four or was he five when he went to school?  Or six or seven?  Did they have kindergarten in Paulina?

A.   Yeah, at the time they did.

USCA5 3459

Q.    Okay.  And what grade was it?  Do you remember what grade kindergarten was?

        THE COURT:  What what?

BY MS. BOOTH:

Q.    I mean, do you remember --

        MS. BOOTH:  Gah, I'm sorry, Judge, I've kind of lost my mind.

BY MS. BOOTH:

Q.    Do you remember how old the -- because some kindergartens start at four, some kindergartens start at five.

A.    Right, correct.  Probably five, because like I -- I think five.  I'm not sure.

Q.    Okay.  So at five, you would have been -- if he would have been five and going to kindergarten, you would have been eleven.

A.    Uh-huh.

Q.    Is this the period of time when you were 11 that you were tutoring Mr. Bourgeois?

A.    Yeah, trying -- yes, ma'am.

Q.    All right.  Now, tell me what subjects you were tutoring him in.

A.    Mostly like reading, reading.

Q.    With a five-year-old program, you were tutoring in reading?

A.    Mostly like, like I say, it was mostly like letters and

USCA5 3460

stuff I used to help him with, trace his name and stuff like that.

Q.   Okay.

A.   I remember.

Q.   And he was five years old, and he was having a little difficulty with that?  Is that what you --

A.   For what I see, yeah.

Q.   Okay.  What other subject did you tutor him in?

A.   Like numbers, like counting.

Q.   Okay.

A.   Okay.

Q.   And this was in the five-year-old program?

A.   Yes, ma'am.

Q.   Okay.  Now, when was the next time, if there was a next time that you tutored him, and in what subject?

A.   As go on, it was like math, and then I remember like tests, he try -- I tried to, like for the tests he had to study for, I tried to help him.

Q.   Uh-huh.

A.   Like I would, I would like --

Q.   What test?  What subject?

A.   Okay, like math.

Q.   Okay.  And what -- where were you living when you tutored him?

A.   Okay, I was at -- I was at my mother at the time.  Okay.

USCA5 3461

Q.   Okay.  So you were living with your mother when you were tutoring him.

A.   Well, like I said, we was back and forth with my mother, then after that, you know, I was living with Ms. Mary.

Q.   Right.

A.   Uh-huh.

Q.   But you went to Ms. Mary when you were ten years old.

A.   Okay.

Q.   So at nine years old, you were tutoring your brother?

A.   Yeah, trying to help him with his homework.

Q.   Okay.  So he would have been three at that time.  So you were tutoring your brother when he was three?

A.   No, not three.

Q.   Okay.

A.   He had to be, like I said, like five or something.

Q.   Right.  So that would have put you at 11, and you would have been at Ms. Mary's.

A.   Right.  Right.

Q.   Okay.  So when you left to go live in Lutcher?

A.   Yes, ma'am.

Q.   How far is Lutcher from Paulina?

A.   About a 15-minute drive.

Q.   15-minute drive.  And when you moved, you moved and you went to school in Lutcher.  Did you, when you were 12, have a driver's license or --

USCA5 3462

A.    No, ma'am.

Q.    Or a car or anything?

A.    No, ma'am.

Q.    So you didn't -- to get back to Paulina, you would have had to have been driven.  Is that correct?

A.    Correct.

Q.    Okay.  So did you -- you're saying that you came home every weekend?

A.    Yeah, every weekend just about.

Q.    Okay.  And who brought you home?

A.    My daddy was living at the time.  My daddy used to take me some time, come get me.

Q.    Okay.  And he would take you where?

A.    To my mother.

Q.    To your mother.  And that was during the period of high school.  Is that correct?  Middle school through high school?

A.    Yeah, middle -- yeah, middle school.

Q.    Middle school through high school.  And when you were living in Lutcher, were you tutoring your brother?

A.    When I used to come home?

Q.    Uh-huh.

A.    Yeah.  Like I say, for the weekend, I used to help him with his homework and stuff like that.

Q.    Okay.  So, but you said that was letters and some math.  So as you got older, what were you working with him in?

USCA5 3463

A.   What you mean?  Oh, what you mean at the time?

Q.   Well, when you were living in Lutcher.

A.   Well, like I said, when I used to come home, I used to help him with his homework, you know --

Q.   In what?

A.   Reading, math, stuff like that.

Q.   Okay.  Now, you said your grades were B's and C's.  Were they B's and C's and D's?

A.   I had a few D's.  A few F's, too.

Q.   And a few F's.

A.   I'm not ashamed to say it.

Q.   And did you know that your brother didn't have any F's --

A.   No.

Q.   -- in high school?  Did you know that Mr. Bourgeois had no F's in high school?

A.   I didn't know that, Your Honor.

Q.   Okay.  So you had B's and C's and D's and F's in high school.

A.   Uh-huh.

Q.   Okay.  All right.  Now, on from that, you said that he had difficulty, you would explain things.  Besides cleaning the bathroom, what is it that he had difficulty understanding?

A.   Comprehension.  Like you try to explain to him something, directions like on a paper, to me he was, he couldn't catch it fast, to me.

USCA5 3464

Q.    And in what time period was this that you're talking about?

A.    Constantly, from what I see.  You know, from what I could see, I was trying to help him to do.

Q.    Okay.

A.    To me, he just was slow in some things.

Q.    And did you ever mention that when you were interviewed on the 25th of 2003, on the 25th of 2004, on March the 2nd of 2004, in September of 2003?  Did you ever mention any of that to anybody that spoke to you?

A.    What you mean?  What do you mean, "anybody"?

Q.    Did you mention that to anybody that spoke to you?

A.    I let them know that, you know, my brother was slow and he had problems in learning, you know.

Q.    And when was it that you mentioned that?  Wasn't that when you spoke to the investigator from the Public Defender's Office that's here now in May of 2007?

A.    I did what?  I'm sorry.

Q.    In May of 2007, didn't you tell them then, did you tell them then?

A.    Tell them what, Ms. Patti?

Q.    That he was having trouble in school.

A.    I think I did.

Q.    Or maybe you didn't.

A.    I don't remember them asking me about that.

USCA5 3465

Q.   Okay.  Now, when he lived in the trailer behind you, do you remember how old he was?

A.   He was a little older.  I'm not --

Q.   Was he still in school?

A.   No, he wasn't in school, not at the time.

Q.   He was out of school.  Okay.  And let me ask you this, do you have -- do you do the laundry for your husband?

A.   Do I do laundry for my husband?

Q.   Uh-huh.

A.   Yeah, uh-huh.

Q.   All right.  And do you cook for your husband?

A.   Yes, ma'am.

Q.   Okay.  And when there are family gatherings, do the women cook pretty much and control how things are going to happen --

A.   No, we all --

Q.   -- in your family?

A.   We all do.

Q.   Now, did you ever -- I want to jump ahead now.

A.   Uh-huh.

Q.   After you talked about the job that your brother, I mean your husband secured for Alfred, did he have other jobs after that that you didn't have anything to do with him getting?

A.   Yeah.

Q.   Do you know if he worked for R. E. Garrison?

A.   No.  I don't know.  I don't know all the jobs he had.  I

USCA5 3466

don't know that.

Q.   Okay.  So after that initial job that your husband got for him, or helped him get --

A.   Yes, ma'am.

Q.   The jobs after that, did anybody from your family get those jobs for him?  Or did he get them for himself?

A.   No, people helped him get jobs, that I know.  I know my husband helped him get the job at Imperial Sugar.

Q.   Okay.  Did you help him get the job at R. E. Garrison?

A.   No.

Q.   All right.  And was there a time that he moved away from the trailer that was there and he actually purchased a house?

A.   Yeah.

Q.   And did you ever visit his house?

A.   Yes, I did.

Q.   And where was his house?

A.   It was in Reserve.

Q.   Okay.  And was it a nice house?

A.   It was nice.

Q.   How many bedrooms did it have?

A.   Three.

Q.   How many bathrooms did it have?

A.   Two.

Q.   And did he have a pool?

A.   Yeah, a round pool, uh-huh.

USCA5 3467

Q.    And did you go to parties at his house?  Barbecues?

A.    Yeah, sometime.

Q.    And did Mr. Bourgeois enjoy having these parties and inviting his family?

A.    Yes.

Q.    And at these parties, would he barbecue?

A.    He try.

Q.    Okay.  So he's not a very good cook?

A.    Not to me.

Q.    Okay.  But he did barbecue for you.  Right?

A.    He try.

Q.    And would he have drinks there, and would he have -- and not necessarily alcoholic, but there was alcohol there, wasn't there?

A.    Yes, ma'am.

Q.    And would people bring different dishes?  Or did he provide all the food when you would go over to his house?

A.    No, he didn't provide that, no.  We used to bring some things down.

Q.    Okay.  And did he have a video camera?

A.    I'm not sure now.  I don't remember a video camera.

Q.    Do you ever remember being at a party and him going around and videoing everybody?

A.    Okay, I remember -- yes, ma'am.

Q.    And he was running the video camera, walking around,

USCA5 3468

talking to everybody?

A.    I remember having a video camera, but you know, I can't remember, you know, what all he did with it.

Q.    And when you would go there, did y'all enjoy going and being with the family and letting the kids swim and eating barbecue?

A.    Did we enjoyed it?

Q.    Uh-huh.

A.    Yes, ma'am.

Q.    All right.  And did Mr. Bourgeois seem to enjoy being the host?

A.    Not really a host, you could say.  You know --

Q.    What do you mean?

A.    I mean, you know, to me, you know, when we would be with Alfred, he -- I don't know, he was just -- it was like a, I don't know, a distance between him.  You know, he was, I don't know, it's kind of hard to explain.  But you know, he treat us well.  You know, but you could see like his mind was, you know.

Q.    Okay.  Now, so he would invite you over for barbecues, and everybody's kids would swim.

A.    Uh-huh.

Q.    And did he have a motorcycle?  Did he have a three-wheeler?  Did he have things that the kids, he would take them rides on?

A.    He had a motorcycle, uh-huh.

USCA5 3469

Q.   Uh-huh.  And would he take the kids out and ride them around for fun?

A.   Where?  At the house?

Q.   Just around the neighborhood.  Just around the neighborhood.  Do you remember that?

A.   Well, I never seen him took the children when we were there, you know, to ride on the thing, you know.

Q.   Uh-huh.  Have you ever seen him ride his motorcycle?

A.   Yeah, one time.

Q.   Okay.

A.   When he had that accident, yeah.  He was on that four-wheeler.

Q.   On a four-wheeler.  But I'm talking about his motorcycle that he had there at the house.

A.   Okay.

Q.   Did you ever see him ride his motorcycle?

A.   Yeah, I seen him a couple of times.

Q.   And sometimes when he'd ride his motorcycle, he'd even have his dog on his lap, or carrying his dog.  Right?

A.   I didn't seen all that.  I don't know all that.

Q.   Okay.  Now, the three-wheeler accident, let's talk about that.  That wasn't when he had his house, was it?  When did the three-wheeler accident happen?

A.   I don't remember if he had the house.  I can't remember that.

USCA5 3470

Q.   Okay.  So, but he was older when he had the three-wheeler accident?

A.   Yeah, he was older.

Q.   All right.  And -- okay.  Now, did you ever see him drive a great big truck?

A.   Yeah.

Q.   A great big 18-wheeler.  Did you ever see him, did he ever drive up to your house or drive up to anything that y'all were having where you would see him actually driving this great big truck?

A.   Yes, ma'am.

Q.   And did you know that he was a cross-road, cross-country driver for probably 15, 17 years?

A.   Yes, uh-huh.

Q.   And did you ever go with him on any of these cross-country trips?

A.   No, ma'am.

Q.   All right.  Do you know, did you ever speak to any of his employers and hear what they had to say about his ability or about his job performance or anything?

         MS. LARIN:  Your Honor, we're going really far afield of time frame we were talking about on direct, and I don't know that she has any basis --

         THE COURT:  Overruled.

BY MS. BOOTH:

USCA5 3471

Q.    Did you ever talk to any of his employers?

A.    What, drives -- huh-uh, no.

Q.    After all, even through all of this, is it -- it's fair to say, Ms. Williams, isn't it, that you love your brother, you love your sister-in-law, Robin, that you don't have any -- that you love AB1994 and his other daughter AB2001?

A.    Correct.

Q.    Have you had any contact with them since this has been over?

A.    No.  No.

Q.    All right.  Now, I want to go back to, skip back again in time when you were young.  I believe that you made the statement in a couple of your statements that Mr. Bourgeois would not mind your mother.

A.    I'm sorry?

Q.    Mr. Bourgeois would not, your brother, Alfred, would not mind, and so he would get himself in trouble.  And it didn't take much to set your mother off with him.  Is that correct?

A.    What you mean "in trouble"?  I mean, explain yourself.

Q.    Well, that he would get whippings because he wouldn't mind.  Like he refused to eat, so he got in trouble.  The punishment as you say, it was way out of line, but that he was an average child that just would refuse or be insolent and --

A.    No.

MS. LARIN:  Objection, Your Honor, to the word

USCA5 3472

"average."

THE WITNESS:  He's not -- to me, what I see, he was not an average child.  The way my mother used to abuse him, how she used to whip him, that would cause any child to be insane, to me.

BY MS. BOOTH:

Q.   All right.

A.   And that's how I feel.  I mean, I seen my mom, how she used to treat him.

Q.   Uh-huh.

A.   And that, to me, being a child seeing this young, if you had a mother who would whip you and abuse you like my mother did, that's enough to make anybody insane.

Q.   Right.  But you never --

A.   That's how I feel.

Q.   -- told that to anybody.

A.   Well, no, I know I never told that --

Q.   Yes.

A.   -- because I was --

MS. LARIN:  Objection, Your Honor.  We already went through that she did in fact --

THE COURT:  Overruled.

MS. LARIN:  -- tell people.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  That's all right.

USCA5 3473

BY MS. BOOTH:

Q.    Now, you were -- I believe we've had conversations about this many years ago.  You were very proud of what your brother, Lloyd and your brother Alfred were able to accomplish when they started these, either a trucking company or staying employed. Lloyd seemed to do a little better financially, but Alfred was able to buy a house and a car and a motorcycle.  And at one point, did you know whether or not he purchased his own truck and was trying to start his company that way?

A.    I don't know that.  I don't know that.

Q.    All right.  But you assumed that he was doing well because of the house that he purchased --

        MS. LARIN:  Objection, Your Honor, to "assume."

        THE WITNESS:  I'm not going to assume that, because I don't know that.

        THE COURT:  Sorry?

        MS. LARIN:  Objection to, she's asking her to find out what she assumed.

        MS. BOOTH:  Several years ago --

        THE COURT:  Overruled.

BY MS. BOOTH:

Q.    -- weren't you, didn't you tell me that you had been proud of the fact that he had been able to do so well, coming from the background that he had come from, that he had been able to buy a house, and those things you were proud of for him?

USCA5 3474

MR. WISEMAN:  Your Honor, I'm going to object to this.

THE COURT:  Excuse me.  This is not your witness. Sit down.

MR. WISEMAN:  Oh, I'm sorry, Your Honor.

THE COURT:  Yes, sir.

BY MS. BOOTH:

Q.   Were you proud of your brother when he was able to maintain a job and have a home?

A.   I was glad for him.

Q.   Okay.  And you had told that to the prosecution team years ago, hadn't you?

MS. LARIN:  Your Honor, could I object?  She's really testifying about the things that she heard.

MS. BOOTH:  This is cross-ex.

THE COURT:  This is cross-examination.

MS. LARIN:  You can testify about what you heard as a witness?

THE COURT:  Overruled.

BY MS. BOOTH:

Q.   Now, I need just a second.

A.   Okay.

Q.   Now, let's talk about the fact that at Ms. Mary's house again that the person that would come and stay was Leroy.  Is that right?  Leroy.  And what was his last name?  Was it

USCA5 3475

Taylor, like Ms. Mary's name?

A.   Clayton.  Clayton.

Q.   Clayton.  Oh, I'm sorry, Clayton.  That's right, Ms. Mary Clayton.

A.   Yes, ma'am.

Q.   And do you know whether or not Leroy was a pedophile?

A.   A what?

Q.   A pedophile.  Abused children.

A.   I don't know that part.  I don't know that.

Q.   Okay.  Do you know whether or not he would go there and rape your brother when your brother was staying there?

A.   I don't know that.

Q.   Okay.  You've never heard that?

A.   No, not that -- no, I never heard that of him.

Q.   All right.  During this period of time when Mr. Alfred Bourgeois lived with Ms. Mary, and you say the reason that he left Ms. Mary was because he got older?  Is that what you testified to?

A.   As far as I know, that's what I think, but I don't know.

Q.   Okay.  You think it was because he got older.  And the older -- okay.  I forgot where I was going.  That happens sometimes.  And so the -- during this period of time when Mr. Bourgeois lived with Ms. Mary, were y'all attending a certain church?

A.   Yes, ma'am.

USCA5 3476

Q.   Okay.  And what church was that?

A.   Evergreen Baptist Church.

Q.   Evergreen Baptist Church.  Who was the choir teacher or the choir master for that church?

A.   At the time?

Q.   Uh-huh.  Do you remember?

A.   I think it was a lady named Brenda, and Ms. Liddy, I think.

Q.   Oh, okay.  So it wasn't a male that was the leader.

A.   We had male Sunday school teachers.

Q.   Male Sunday school teachers.

A.   Yeah.

Q.   And who taught Sunday school?

A.   They had this guy, Raymond Adam.  I remember him.

Q.   Raymond Adam.

A.   Uh-huh.

Q.   And did he teach Mr. Bourgeois?

A.   Yeah.

Q.   Okay.  And was he raping Mr. Bourgeois?

A.   I know he was a faggot.

Q.   Okay.  But did you ever hear that he raped Mr. Bourgeois?

A.   Yes, I did.

Q.   Where did you hear that?

A.   After, I heard.

Q.   Okay.  After -- I'm sorry.  You're going to have to give

USCA5 3477

me better than "after."

    THE COURT:  After the trial?

    THE WITNESS:  It was before then I had heard.

    THE COURT:  From whom?

    THE WITNESS:  It was from a family member.

BY MS. BOOTH:

Q.   Which family member?  Who told you that Mr. Raymond was -- was it that you found out that he was a faggot -- I'm using your words, not mine --

A.   I understand.

Q.   -- okay, or that you found out that he was raping Mr. Bourgeois?

A.   I didn't know if he was raping him, but I know, like I say, he was a Sunday school teacher, and he used to teach those little boys.  I remember that in Sunday school.

Q.   Okay.  He taught the little boys, but do you have any other knowledge about this?

A.   About him raping Alfred?

Q.   Uh-huh.

A.   No, not, you know, not that he raped him, no.  I'm not sure.

Q.   Was this guy a violent man?  Do you know if he had a gun?

A.   No, he wasn't violent.

Q.   Okay.

A.   But he was disturbed, for what I see.

USCA5 3478

Q.    Okay.

A.    He had problems.  He had issues, for what I see, going to Sunday school.

Q.    Okay.  And how old were you when you saw these issues?

A.    Oh, going to Sunday school?  We was young.  Like nine, ten years old we used to go to Sunday school.

Q.    Okay.  So you were nine or ten.  You were nine or ten, so that made Mr. Bourgeois four, or even less.  Three.  So was he going to Sunday school at three?

A.    No, not at three.

Q.    Okay.

A.    It was, like I say, he would have to be a little older.

Q.    Okay.

A.    But we all used to go to Sunday school together.

Q.    Okay.  So when you lived in Lutcher, did you go to Sunday school with Mr. Bourgeois?

A.    Yeah, I used to come up here and go to our church, yeah.

Q.    Oh, okay.  So it was Mr. Raymond that we're talking about.  Raymond -- and what was his name?  I'm sorry.  I didn't write it down right.

A.    His name Raymond Adam.

Q.    Adam?

A.    Yes, ma'am.

Q.    Okay.  So Raymond Adam and Leroy Clayton.  Okay.  Now, let's talk about, you were talking about some, where he would

USCA5 3479

get really mad and his face would get really red.  Okay.  Do you remember the first time you saw him get a really red face and get really mad?

A.   When my mother abused him.

Q.   Okay.  Now, your other brothers and sisters, isn't it true that she also beat all of y'all?

A.   She beat all of us, but she didn't beat us like she beat him.

Q.   Okay.  But she was physically abusive with everybody --

A.   Not with everybody.

Q.   -- and he was the worst.

A.   No, ma'am, I have to correct, not with everybody.

Q.   Okay.  So who did she leave out?

A.   With the whippings?

Q.   Uh-huh.

A.   Well, she --

Q.   Who did she not whip?

A.   Well, my little brother Anthony, because he was retarded. She didn't whip him.

Q.   Okay.  So if you're retarded, you don't get whipped. Okay.  What else?

A.   Well, all us got whipped.

Q.   Okay.

A.   But Alfred got the most of it.

Q.   He got the most?

USCA5 3480

A.    The most abused, yeah.

Q.    Right.  Okay.  And when the others would get whipped, did people's faces get red and they get all upset about it?

A.    If you had a mother like I did whip you, you would make faces too.

Q.    And please don't think I'm being disrespectful about your abuse.

A.    Oh, I'm just telling you how I feel, though.

Q.    I know.  I know.

A.    I'm just telling you how I feel.

Q.    I know, and please do.

A.    And how it is.  Oh, I don't have a problem with it.

Q.    I'm sorry.  I know this is painful.

A.    I'm just telling you the truth.

Q.    I know.

A.    Okay.  Very painful.  I don't even like to think about it.

Q.    So, but did everybody that got whipped like that get red in the face?  Did everybody that got whipped -- I mean, I realize, we'll pull aside the fact that his was much more stringent discipline, but didn't everybody get red in the face and upset when they would get whipped?

A.    Yeah, because of how my mama used to whip us.

Q.    Right.

A.    Anything, broom, her hand, anything she put her hand on.  Extension cord, yeah.  Belts, buckles.

USCA5 3481

Q.   Did she ever burn y'all with anything?  Would she burn you?

A.   I don't know about burning us, no.

Q.   Okay.  Now, these rages, were they the same all the way through, the way that he would react to anger?  Now, knowing that you only got to see him on the weekends, okay, but did you notice any change, or did he always react the same to anger or to situations like abuse?

A.   What I noticed -- like I say I'm the oldest.  We was coming up, my brother, to me, for what I see how my mother used to treat him, to me he got that way, how she used to do him --

Q.   Okay.

A.   -- for what I see.

Q.   Ms. Claudia, how -- I mean, Ms. Williams.

A.   Uh-huh.

Q.   I'm sorry, Mrs. Williams, how many of Alfred's wives were also friends with you?

A.   Friends?

Q.   That would come and talk to you.

A.   We used to talk, uh-huh.

Q.   Yeah.  And so the first wife was whom?

A.   Sheila was the first one.

Q.   All right.  And would Sheila complain to you that he was mean to her?

A.   Not all the time.  Not all the time.

USCA5 3482

Q.   But sometimes she would tell you that he was mean to her?

A.   Sometime.

Q.   Okay.

A.   Not all the time.

Q.   And did he ever hit Sheila, do you know?  Did Sheila ever tell you that?

A.   Yeah.

Q.   Was she afraid of him?

A.   No, she wasn't afraid of him.  I don't think she was afraid of him, no.

Q.   But he hit her?

A.   Every now and then.  My husband hit me.  The honest truth. I mean, you know, not hard, but --

Q.   Yeah, and you don't have to take that either.

A.   No, it's not to kill me.  You know, sometime we get in it, you know, and --

Q.   Yeah, but you don't have to take that.

A.   Well, I know that.

Q.   You realize that.

A.   I know that.  But it happens.  I think every marriage you might have a little issues going on, but it happens.

Q.   All right.  Now, his second wife, did she come and talk to you?  Who was his second wife?  Was that Gaynell?

A.   I think so, yeah.

Q.   And did Gaynell tell you that he hit her?

USCA5 3483

A.   No.  She never told me that.

Q.   Okay.  Was Gaynell afraid of him?

A.   No.

Q.   Did Gaynell leave him constantly?

A.   I don't know if she constantly leave.  I don't know that.

Q.   Okay.

A.   I don't know that.

Q.   And what was the third wife?  Do you know who the third wife was?

A.   Robin, I think.

Q.   All right.  And Robin confided in you.  Is that correct?

A.   Yeah, uh-huh.

        MS. LARIN:  Objection, Your Honor.  This is getting really beyond the scope, and none of this is in dispute.

        MS. BOOTH:  Your Honor, my contention is that he is a sociopath.  And in that way, I'm trying to give a different take on why he acted the way he did.  They're trying to prove that there's some, he's not responsible for any of his actions because he was hurt as a child.  And although I agree he was hurt as a child, I have a different take and a different theory that I'd like to put before the Court, number one, and that's our response.

        MS. LARIN:  I think, Your Honor, that should really come through an expert witness.  The fact that these women had, that there was a volatile relationship and violent relationship

USCA5 3484

with the wives and girlfriends is already --

THE COURT:  Overruled.

MS. LARIN:  -- in the record.

THE COURT:  Overruled.

BY MS. BOOTH:

Q.  The three-wheeler accident, did his rages get any worse after the three-wheeler accident?  Did they get any less?  Or was there no change at all?  Or it just wasn't any milestone at all?

A.  To me, after the accident, look like he got worser to me, for what I see, you know, after he -- after he had injured his self real bad.

Q.  Uh-huh.

A.  Yeah.

MS. BOOTH:  Could I have just a second, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

BY MS. BOOTH:

Q.  When Mr. Bourgeois was in the hospital with the three-wheeler accident, did you go and visit him?

A.  A couple times.

Q.  Okay.  And when you went to visit him, if I remember correctly, the injuries were a broken leg, I think, and a ripped scrotum.  Is that right?

A.  I don't remember all, you know, all was wrong with him,

USCA5 3485

but I know that --

THE COURT:  For who?  I'm sorry.

MS. BOOTH:  Mr. Bourgeois.

THE COURT:  Okay.

MS. BOOTH:  On the three-wheeler.

BY MS. BOOTH:

Q.    And when you went to -- did you go right after it happened?

A.    When he got in the accident?

Q.    Yes, sir -- yes, ma'am.

A.    Well, when he got hurt, when he first did it, I was there on the scene.

Q.    Oh, okay.

A.    Before the paramedics get there.

Q.    Okay.

A.    I had seen it.

Q.    Okay.

A.    I was there first.  Because I thought he was dead.

Q.    And did he appear to be in a lot of pain?

A.    Oh, he was uncon -- I thought he was dead.

Q.    Okay.

A.    Because I tried to, you know, I was trying to wake him up, but he was unconscious.

Q.    Okay.

A.    And I said, I just thought --

USCA5 3486

Q.   Now, let me ask you that.

A.   Yes, ma'am.

Q.   He was unconscious.  Did you ever tell anybody that?

A.   Yeah, I did.

Q.   Who did you tell?  Did you tell some of the investigators over here?

A.   What, on this side?

Q.   Yes, ma'am.

A.   Uh-huh.  And your side, too, I had told them that.

Q.   Who did you tell?

A.   One of the ladies.  They came and asked me about the accident.  I think it was --

Q.   When was this?  This was after the trial.  Correct?

A.   Yeah, I think so.

Q.   Okay.  So after the trial is when you first told that you were on the scene and that you had to shake him.  Is that right?

A.   Yeah, to try to wake him up.

Q.   Now, did he wake up when the ambulance drivers got there?

A.   Not for what I see, because he was unconscious.

Q.   Okay.  And so when you got to the hospital, was he in a coma for one or two weeks, or three weeks?

A.   I didn't go to the hospital right away.

Q.   Okay.

A.   You know.  I don't know that part.

USCA5 3487

Q.   Okay.  So when did you go to the hospital?

A.   It had to be probably three or four days after I went and seen him in the hospital.

Q.   Okay.  And how was he doing?

A.   Not good to me, from what I seen.

Q.   Okay.  So what do you mean?  What do you mean he wasn't doing good?

A.   He was in a lot of pain.  Like he was in and out of it, you know, he --

Q.   And so you were talking to him?

A.   No, there wasn't no talking, because he was in a lot, you know, he was in a lot of pain.

Q.   Okay.  So they were giving him pain medication?

A.   Yeah, and he was hook up to a lot of tubes and stuff.

Q.   Uh-huh.  And they had to operate on his leg?

A.   I think so, ma'am.

Q.   Okay.  But he was not in a coma?

A.   Well, when I talked in there, like I say, he was unconscious.  He's, you know, he wasn't talking or nothing when I seen him, when I went and looked at him.

          THE COURT:  Well, was he asleep or in a coma?

          MS. LARIN:  Objection, Your Honor.

          THE COURT:  To my question?

          MS. LARIN:  Oh, I -- I think that it's pretty clear that she said she (sic) was unconscious, so whether it's asleep

USCA5 3488

or in a coma, all she saw was that he was not responsive.

THE COURT:  Do you know whether he was asleep or in a coma?

MS. LARIN:  She's not a doctor.

THE WITNESS:  From what I see, he was out.

THE COURT:  Okay.

THE WITNESS:  What I see.

BY MS. BOOTH:

Q.  When, were you ever -- you spoke to Mr. Bourgeois about the fact that he was beating Robin, didn't you?

A.  I did.

Q.  You talked to him and tried to smooth things over with him, didn't you?

A.  What you mean, Ms. Patti?

Q.  I mean, you had conversations with, after Robin told you that and showed you bruises on different occasions, that he had made on her body, you knew that he was beating her.  Right?

A.  Sometime.

Q.  And you had conversations with him about that, didn't you?

A.  No, not -- to him?  To Alfred?

Q.  Uh-huh.

A.  No.

Q.  Didn't you ever try to calm him down when he was upset?  Didn't you have conversations with him?

A.  Yeah, talking to him, you know.

USCA5 3489

Q.   Okay.

A.   Like try to talk.

Q.   And was he ever sorry?  Did he ever show any lack of, I mean, did he ever show any remorse about hitting Robin?

A.   Yeah, he showed it, yeah.

Q.   What would he say?

A.   He didn't say.  He just was, like I say, he had a rage about his self.  You know, he didn't say too much.

Q.   Okay.

A.   And I say, "Alfred," you know, I know you got problems with Robin.  Y'all need to communicate and try to talk," you know, like that.

Q.   Uh-huh.

A.   Try to talk to him.

Q.   Right.  Okay.  And his relationship with AB1994, did you ever see him go into a rage about AB1994?  Or how did he treat AB1994?

A.   I never seen him whip AB1994.  He used to fuss at her when she was real bad.

Q.   Now --

     MS. BOOTH:  I guess that's all I have, Your Honor. Thank you.

     THE COURT:  Thank you.  Anything further?

     MS. LARIN:  Just one question, Your Honor.

     THE COURT:  Go right ahead.

USCA5 3490

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One question, Mrs. Williams.

A.   Okay.

Q.   On February 25th, you were interviewed by, over the phone, by Mr. Bierbaum.

A.   Uh-huh.

Q.   And I'd like to just show this.  This is Petitioner's 57, and this is, Mr. Bierbaum wrote notes about his conversation with you.  In that conversation, he asked you whether Alfred was abused.

A.   Yes, he did.

Q.   Do you recall having a conversation that he asked you whether Alfred was abused?

A.   Yes, I remember.

Q.   And you told him, as is shown in these notes, that Alfred got the most beatings.

A.   Yes, ma'am.

Q.   Do you remember that conversation?

A.   Yes, ma'am.

        MS. LARIN:  Okay.  Thank you, Your Honor.  I have no further questions.

        THE COURT:  Thank you.

        MS. BOOTH:  Well, Your Honor --

                RECROSS-EXAMINATION

USCA5 3491

BY MS. BOOTH:

Q.   I think this is a wonderful exhibit, because you also say

there that he was hard-headed, that he didn't listen.  Isn't

that correct?

A.   Ma'am, that --

Q.   I know, but didn't you say that?

A.   I'm going to answer your question.

        THE COURT:  No, no.

        THE WITNESS:  Oh, I'm sorry.

BY MS. BOOTH:

Q.   Did you, didn't you say that?

        THE COURT:  This is the way it goes.  He asked --

just a moment.

        THE WITNESS:  Okay.

        THE COURT:  She asks questions, and you answer.

        THE WITNESS:  Okay.  Yes, ma'am.  I'm sorry.

BY MS. BOOTH:

Q.   And in that, when you said he got the most whippings, then

you said, "And he was hard-headed and he didn't listen."  Isn't

that also what you said?

A.   But ma'am, that's not a cause for your mama to whip you

like my mother did.  There's no reason for any mother -- I have

kids, and I don't whip my children like that.  And that's how I

feel about it.  There's a way to whip a child.  My mother

didn't have no compassion against my brother.  And that's the

USCA5 3492

honest truth.

Q.   Or any compassion against the rest of you, except for the one that was mentally retarded.

A.   That's not true.

Q.   Correct?

A.   That's not true.  That's not true.

Q.   Well, the only one that didn't get whippings was the one that was mentally retarded.  Correct?

A.   Yeah, all us got whipping, but we didn't get whipped --

Q.   You all got whippings, except for Anthony.  Right?

A.   Right, because he was retarded.

Q.   That's right.

MS. BOOTH:  That's all I have, Your Honor.

THE COURT:  Anything further?

MS. LARIN:  No.  No, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Call your next witness.

MS. LARIN:  The next witness would be Ms. Beverly Frank.

BEVERLY FRANK, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Just be careful about the microphone.  Okay.  Good morning, Mrs. Frank.

USCA5 3493

A.    Good morning.

Q.    Can you please state your name for the record?

A.    Beverly Clayton Frank.

Q.    And are you related to Mr. Bourgeois?

A.    No, I'm not.

Q.    How do you know him?

A.    My grandmother raised, helped raise Alfred.

Q.    Can you please move forward a little into the microphone?

A.    Sure.

Q.    Okay.  How do you know Mr. Bourgeois?

A.    My grandmother helped raise Alfred.

Q.    Okay.  And where was this?

A.    This was in Paulina, Louisiana.

Q.    And where exactly in Paulina?

A.    The Bend Lane, they call it.  It's a small community.

Q.    Okay.  Where did your mother live in comparison to Alfred's mother?

A.    My grandmother?

Q.    Your grandmother.  I'm sorry.

A.    My grandmother lived about maybe four houses from Alfred mom.

Q.    And did you live on Bend Lane?

A.    Yes.

Q.    When did you live there?

A.    As a child I lived there, until I was a teenager.

USCA5 3494

Q.   Okay.  Let's backtrack.  Can you tell us what year you were born?

A.   I was born in 1948.

Q.   1948.  And so you moved off of Bend Lane probably around, when do you think, '63?  '64?

A.   Yes.  I was in high school.

Q.   Okay.  And where did you move?

A.   To Lutcher, Louisiana.

Q.   Okay.  And this was all basically before Alfred was born?

A.   Correct.

Q.   Okay.  How often did you visit your grandmother?

A.   At least about two or three times a week, and sometimes on weekends.

Q.   And was there a time that Mr. Bourgeois moved in with your grandmother?

A.   He was about seven years old when he moved in with my grandmother.

Q.   Okay.  And how often would you see him there?

A.   Basically two or three times a week, because that's when I would go to my grandmother and run errands for her, go and see her, check on her.

Q.   Okay.  And about how much time did you spend with Alfred there?

A.   I would be at my grandmother all day, because she was the type of person if you go and visit her, she didn't like an hour

USCA5 3495

visit, she would make you stay, tell you, "Well, you don't need to go right now." You know, "You stay here. Keep me company," or whatever. So I was practically there all day when I would go.

Q. And about how old were you at this time?

A. I was, I would say, just before maybe my teenage years. I had started seeing, well, seeing Alfred around that time.

Q. Okay, wait. Backtrack. You -- Alfred was seven years old when he moved in with Ms. Mary. Correct?

A. Yes.

Q. So he, that would have been about 1971, '72.

A. Correct.

Q. '71. So how old were you then?

A. I was --

Q. Sorry to make you do math. It seems like you would have been about 23 or 24 years old.

A. I was 23. I'm about to say that. I was 23. I had just gotten married, and I was between jobs, so I used to go to my grandmother a lot during that time, because I was job hunting.

THE COURT: What time period? What time period was that?

THE WITNESS: I'm trying to think. I was 23 years old --

BY MS. LARIN:

Q. When did you get married? When did you get married?

USCA5 3496

A.    Twenty-three.

Q.    What year was that?

A.    1971.

Q.    Okay.

A.    Uh-huh.

Q.    And --

           THE COURT:  So how long were you out of a job?

           THE WITNESS:  For several months.

           THE COURT:  Okay.  So during that period, you were there more?

           THE WITNESS:  Yes, because I ran --

           THE COURT:  Was it over the winter or the summer or --

           THE WITNESS:  I'm trying to think.  It was more the summer, because I got married in August of '71, and going into the fall, in other words.

           THE COURT:  So he was at school during the days?

           THE WITNESS:  Yes.

           THE COURT:  Okay.

BY MS. LARIN:

Q.    Okay.  So I'm going to try to focus you on that time.

A.    Uh-huh.

Q.    There's a lot of markers for that time.  You got married, Alfred moved into your grandmother's house.

A.    Right.

USCA5 3497

Frank - Direct                                    96

Q.   And you were spending more time than usual at your grandmother's house around that time.

A.   Yes, because I wasn't working.  I was out of work.

Q.   But even throughout your life, it sounded like you spent, you were at your grandma's house on a very regular basis.

A.   We were very close, my grandmother and I.

Q.   Okay.

A.   Very, very close.

Q.   Okay.

THE COURT:  Was there another granddaughter living with her?

THE WITNESS:  Brundrick (phonetic), yes, she was there for a while.

THE COURT:  Okay.  And how old was she when Mr. Bourgeois was there.

THE WITNESS:  I don't remember at the time exactly the age she was, but she was there.

THE COURT:  Okay.

BY MS. LARIN:

Q.   Was she actually living there, or was she around a lot, or you don't --

A.   She was actually, my grandmother help raised her, because my aunt work in New Orleans, and my grandmother helped raise her also.

Q.   Okay.

USCA5 3498

THE COURT:  Was she older than Mr. Bourgeois?

THE WITNESS:  Yes, she was a little older.

THE COURT:  How much older?  Do you know?

THE WITNESS:  No, I don't.

THE COURT:  Okay.

BY MS. LARIN:

Q.    Is she younger or older than you?

A.    She's younger than me.

Q.    Okay.  And can you describe some of the impressions you had of Alfred when he was around age seven spending time at your grandmother's house?

A.    Alfred -- my grandmother took Alfred under her wing, and she treated Alfred like she treated us, her grandkids, and she doted over her grandkids, all of her grandkids.  She loved all of us.  And she treated him no differently.  But she brought Alfred in more or less because Alfred was really mistreated by his mom.  We saw a lot of abuse.  And my grandmother just took him under her wing to stay with her.

Alfred played with my little cousins, and he was slow.  He couldn't grasp the things, like talking about, like games they played, but they took a lot of time with him.  She made sure of that.  And we just took time with him, as an individual, you know, and she treated him like he was one of us.

Q.    Okay.  Can you tell us about, other than games, is there anything else that you noticed that he was slow at for his age?

USCA5 3499

A.   He, at the age of about nine, he couldn't count money. And I realized that.  My grandmother sold candy for a little vendor, and she made freeze cups, what we call, like little frozen cups.  She would sell them.  And when she would ask Alfred to go and get a freeze cup for one of the kids in the neighborhood or some of the kids that would come there to spend their little change, he would -- he couldn't count the money back.  So it was always --

MS. BOOTH:  Your Honor, I'm sorry, I'm just going to interrupt just for a second, because I need to know a time frame on this.

THE COURT:  What time are we talking about?

MS. BOOTH:  What are we talking about, as far as age and counting money?

MS. LARIN:  She said age nine.

THE WITNESS:  I said age nine.  Age nine.  He couldn't count -- that's when I realized he couldn't count money, because he would go and get the candy, and my grandmother would either, she would tell me, "Watch the change, you know, count the change for him.  He can't count."  And she would ask us to try and help him to understand how to count the money back to the individual if they were giving change.  He couldn't count.  And you know, he just couldn't.  And we would try very hard to help him in every way that we could, you know, to understand.

USCA5 3500

BY MS. LARIN:

Q.   Is there any other examples you can think of of areas of his life that he had difficulty or seemed slow?

A.   Dressing himself, it was always an issue of dressing himself when I was there.  He was putting on the wrong color socks, I mean, you know, mismatched socks, or he couldn't tie his shoes at all, you know.  It was -- I don't know if he -- he must have been up in, really up in age when he learned to tie his shoes, because I can remember he never learned how to tie his shoes.  And buttoning his shirt, it always would be like one, one would be the opposite and wouldn't be, like, you know, the top button wouldn't be matching with the other one.

Q.   Uh-huh.

A.   And she'd make him take it a-loose.  You know, she would have that patience.  She would make him take it a-loose, or she would ask us to take it a-loose, let him start again.  Let him learn how to button his shirt.

Q.   Uh-huh.

A.   Put his belt on right, and missing the holes in the belt, you know, putting the belt on.

Q.   So let's break this down.  With the difficulties with dressing, the buttons and the belt, do you know around what age he was when he had this trouble?

A.   He was young.  He was, starting at about seven, he really couldn't dress himself.  I was mean, I was there.  I noticed

USCA5 3501

it, he couldn't dress himself --

Q.   Do you know if he --

A.   -- properly.

Q.   -- ever did learn?  Do you know when he learned how to --

A.   I saw it at the age of nine and ten, and he still was having difficulties dressing himself.

Q.   Okay.  And you said that your grandmother would make him, you said, take it a-loose.  You mean do it again?

A.   Undo it and, or either she would make us undo his shirt and tell him, "Now, do it again."

Q.   Uh-huh.

A.   "And start again, buttoning your shirt," you know.  My grandmother went to church a lot, so you know, it was a thing of him getting dressed, you know, and on his own.  And she tried to make him, teach him how to do it on his own.

Q.   Okay.  And did she have to do that with other areas of his life, really kind of have him repeat things?

A.   Yes.

Q.   Can you think of some of those things?

A.   Well, it was, like explaining himself, he couldn't really explain himself real well.  And she would tell him, you know, "Take your time."  You know, but it was a thing of not being able -- he stuttered a lot, and it was a thing of not being, just to explain his self, you know, if he wanted to do something.

USCA5 3502

Q.    Uh-huh.

A.    But she had that patience.  She sat and she actually would tell him, "Take your time.  You know, go slow.  You can do it."  And he still would have difficulties.  But she never held that against him.

Q.    And did Alfred help your grandmother around the house?

A.    Yes, she did.  My grandmother was crippled in one leg, and she had to walk with a cane.  And there was no, per se, running water to a tub.  It was a galvanized tub, and she would heat the water like on a stove or whatever.  And she would have him to put -- she would put the cold -- hot water in.  She would have him help maybe put the cold water in.  Poor thing, he would waste it all over the floor, so it was a thing of mopping it up after, you know.

      But she would, he would -- and even if she sent him to the kitchen to get something, she had to explain to him, "Alfred, go to the kitchen, go to the cabinet, go to the right-hand side of the cabinet.  You're going to see a box of crackers.  Please get it for me."  He didn't know his right from his left.  So it was like, "Go to this side and get the box of crackers."  And sometimes he would come back with the wrong thing, and she would say, "That's not right.  Go back.  And the box is yellow," or whatever.  Or explain to him what he had to look for.  But sometime he had difficulty, so we just would get up and go get it.

USCA5 3503

Q.    Uh-huh.  And your grandmother had some sort of disability?

A.    Yes, she did.

Q.    So was he there to help her in any way with the disability or --

A.    Oh, yes.  Yes.  I mean, some days my grandmother, it would be hard for her to get up and walk because of the arthritis in her legs.

Q.    Uh-huh.

A.    So he would, you know, she would ask him to get a glass of water for her.

Q.    Uh-huh.

A.    Get her medicine off the kitchen table, things of that nature.

Q.    Okay.

A.    Things like that.  He helped her a lot.

Q.    Do you remember if Alfred was teased as a child by the other children?

A.    Alfred was teased a lot.  He used to come home crying from school, being teased by the kids at school a lot, because he couldn't grasp the, like the games or other things that was going on around him, you know, with his classmates.  And he used to cry a lot.  Some of the kids in the neighborhood, one or two of them would tease him, but not -- but because of a close-knit neighborhood, they knew that he was pretty slow and that they would take, some of them, most of them would take

USCA5 3504

time with him.

Q.   Okay.  And did anyone from the Defense team, from Mr. Bourgeois's Defense team, an investigator or a lawyer, talk to you before his trial?

A.   Before today?

Q.   Yeah, before his actual trial, which was in 2004.

A.   No.

Q.   Did anyone come and --

A.   No.

Q.   -- talk to you?  You're aware your brother was a witness at trial?

A.   Yes, Herman Clayton.

Q.   But they never came and talked to you?

A.   No.

Q.   If they had come and talked to you, would you have given them this information, and would you have been willing to testify at his trial?

A.   Oh, yes, I would.

Q.   Okay.  And I'm going to mark this document as Petitioner's 45.  Can you see this?

A.   I need my glasses.

Q.   I can hand you a copy.  I'm sorry, I don't have another copy right now.  Can you -- do you recognize this document?

A.   Yes.

Q.   I'll show you, it's three pages.  And at the bottom is --

USCA5 3505

oops, sorry.  Is that your signature?

A.    Yes, it is.

Q.    Okay.  And can you tell us what this is?

A.    Declaration/Affidavit of Beverly Frank.  It's exactly the statement that I made.

Q.    And you were interviewed by someone from my office?

A.    Yes.

Q.    Do you know who that was?

A.    I can't recall the name right now.

Q.    A woman or a man?

A.    It was a lady.

Q.    A lady.  Okay.  And you told her about this information?

A.    Yes.

Q.    Then she came back and showed you this document, and you read it over?

A.    Correct.

Q.    And is everything in this document true and correct, to the best of your knowledge?

A.    Yes, it is.

          MS. LARIN:  I'd like to offer this declaration, Petitioner's 45, Your Honor.

          THE COURT:  Ms. Booth.

          MS. BOOTH:  It's cumulative, Your Honor, but --

          MS. LARIN:  The doctors relied on it, so that's why I'd like to offer it.

USCA5 3506

MS. BOOTH:  I don't know that that makes it admissible, Your Honor, but -- just the fact that somebody else relied on it.  She's testified to the things that are in there.  It seems like to me that it's just redundant.

THE COURT:  So your objection is?

MS. BOOTH:  Why would you -- I really don't have one.  You know what I mean?

THE COURT:  There you go.

MS. BOOTH:  There we go.

MS. LARIN:  Thank you.

THE COURT:  Petitioner's 45 is admitted.

MS. BOOTH:  I can be led, Your Honor.  I can be led.

MR. WISEMAN:  I like that objection.

THE COURT:  If you would have said hearsay, I might have thought about it.

MS. BOOTH:  Yeah, well, she's already testified to the hearsay anyway.

MS. LARIN:  That's not quite -- I'm sorry.  Almost.

THE COURT:  I know that.  It's quite all right.

MS. LARIN:  Thank you, Your Honor.

THE COURT:  You all tell me when you're ready for a break also.

MS. LARIN:  I'm skipping a lot of things.  I think we've covered a lot of things already.  So I'm going to --

BY MS. LARIN:

USCA5 3507

Q.   Can you just tell us briefly, what do you do for a living?

A.   Can I tell you what?

Q.   What you do for a living.  What is your occupation?

A.   I've just recently retired in March.

Q.   And what were you -- what was your --

A.   I was an administrative assistant for St. John Parish President's Office.

Q.   Okay.

          MS. LARIN:  One second, Your Honor.

          THE COURT:  Yes.

     (PAUSE.)

BY MS. LARIN:

Q.   How long were you working in the county government?

A.   Twenty-two years.

Q.   Okay.

          MS. LARIN:  Thank you, Your Honor.  I have no more questions.

          THE COURT:  Thank you, ma'am.  Do we want to take a break now before the cross?

          MR. WISEMAN:  Oh, that's fine with us.

          THE COURT:  Ms. Booth?

          MS. BOOTH:  No.

          THE COURT:  You want to go ahead?

          MS. BOOTH:  Yeah.  But I'll stop --

          THE COURT:  Okay.

USCA5 3508

MS. BOOTH:  You know --

THE COURT:  No, you tell me.

MS. BOOTH:  No, I'm ready to go, Judge.

THE COURT:  Well, go then.

MS. BOOTH:  Yes, ma'am.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good morning, Ms. Frank.

A.    Good morning.

Q.    I wanted to ask you about some time frames here and some about your family relationships.  Do you know a person by the name -- well, let me ask you, your father was Herman Clayton. Is that correct?

A.    That's correct.

Q.    And did he have any brothers?

A.    Yes, he did.

Q.    And what were their names?

A.    We had Esau, Jacob, John, Harry, James, and their sister Frances.

Q.    Now, during the time period that Mr. Bourgeois was living at your house, at your grandmother's house, did any of those men come regularly to the house?

A.    Her sons visited her often, yes.

Q.    All right.  And were any of them raping Mr. Bourgeois?

A.    I don't have knowledge of that.  I don't know.  I wouldn't

USCA5 3509

know.

Q.   Okay.  So you've never heard that one of your uncles was coming every day and sexually assaulting Mr. Bourgeois at your grandmother's house.

A.   I have no knowledge of that, no.

Q.   Okay.

THE COURT:  Well, have you ever heard that one of them was a pedophile?

THE WITNESS:  I knew that one of them was living a gay life.

THE COURT:  Was gay?

THE WITNESS:  Yes.

THE COURT:  Well, but does that make him a pedophile?

THE WITNESS:  I -- I don't know.

BY MS. BOOTH:

Q.   Does that make him a child molester?

A.   Not really.  Not to me.

Q.   Okay.

THE COURT:  Which one was that?

THE WITNESS:  Jacob Clayton.

THE COURT:  Okay.  But not -- never mind.  Go ahead.

BY MS. BOOTH:

Q.   Okay.  And so you never heard that.  All right.

A.   No.

Q.   Now, let's go on.  Now, when he came to live with your

USCA5 3510

grandmother, he was seven.

A.    Uh-huh.

Q.    And you've testified earlier that at seven, he had a difficult time getting himself dressed neatly.

A.    Yes.

Q.    But he put on his own underwear.  Right?

A.    Yes.

Q.    And he put on his own blue jeans.

A.    Yes.

Q.    And he put his socks and shoes, although the socks didn't match, he put on his socks and shoes, and he put on a shirt, although he didn't button it correctly.  Right?

A.    Uh-huh.

Q.    And so basically your complaint is to the neatness of the dressing, not the fact that he could dress himself.

        MS. LARIN:  Objection, Your Honor --

BY MS. BOOTH:

Q.   Is that right?

A.   No.

        MS. LARIN:  -- she's not complaining about anything.

        THE WITNESS:  There, at times --

BY MS. BOOTH:

Q.   Your observation, I'm sorry, not complaint.  Excuse me.

A.   Okay.  No --

        THE COURT:  Is that better?

USCA5 3511

MS. LARIN:  Thank you, Your Honor.

THE COURT:  Okay.

THE WITNESS:  It wasn't a neatness thing, it was a thing of him doing it right, not be able to understand how it's properly done.  He might have had a jacket --

BY MS. BOOTH:

Q.  Well, that's your interpretation --

A.  Yes.

Q.  -- of a little --

THE COURT:  Don't interrupt her, please.

MS. BOOTH:  I'm sorry.

BY MS. BOOTH:

Q.  But that's your interpretation of a seven-year-old boy buttoning his shirt.  Right?

A.  Buttoning his shirt, putting on his clothes.

Q.  Now, you said that during a period of time you didn't have a job.  How long a period of time was it that you were spending a lot of time at your grandmother's house?

A.  Well, it was -- I was out of a job for several months.

Q.  Okay.

A.  So I went up there at least three, three times a week, sometime on weekends, because I would run errands for her.

Q.  Okay.

A.  I had free time.  I would run errands and go to the store.

Q.  So we would say that five times -- let's just give it a

USCA5 3512

big number.  So maybe five times a week, for how many months?
Several months?  Three?

A.    Yes.

Q.    So that's three times -- five times four would be twenty,
and three times twenty would be sixty.  So during a three-month
period, you may have been at your mother's house -- your
grandmother's house sixty times.  Right?

A.    That's about right.

Q.    And then after that, you were employed.  And obviously you
had a very important job, and you were employed full-time.  Is
that right?

A.    Well, at that, when I -- I was working that job, it wasn't
with the Parish.  It was with Shell Oil Company.

Q.    Oh, okay.  And so that was a full-time job.  Correct?

A.    That's correct.

Q.    And you worked all day long.

A.    Yes.

Q.    And you were married then.  That was --

A.    Correct.

Q.    You had just gotten married.  And where did you live?  How
far did you live from your grandmother?

A.    Hmm, I would say about several miles from my grandmother.
Maybe about ten miles.

Q.    Okay.

A.    At the most.

USCA5 3513

Q.   So then after those, that three-month period, then how often do you think that you may have visited your grandmother?

A.   About three times a week.

Q.   Okay.  And what --

A.   In the afternoons.

Q.   In the afternoons.

A.   Uh-huh.

Q.   And so that would be at periods of time, like when you're talking -- what do you mean in the afternoons?

A.   I would get off at 4:30 in the afternoon.

Q.   Okay.

A.   And about 6:00 o'clock, I would go and visit my grandmother.

Q.   Okay.

A.   And I did that because I was at home by myself.  My husband was working night shifts, strictly night shifts.

Q.   Okay.  And that went on for about how long?

A.   Hmm, that went on for quite a while.  I would say maybe a couple of years I used to do that.

Q.   Okay.  So then we get up to two years.  And then after two years, did you have -- I mean, this may sound presumptuous, but were there any children involved with your life then?

A.   No.  I adopted my son, it might have been three or four years after I was married.

Q.   Okay.

USCA5 3514

A.    Uh-huh.

Q.    So for two years, you were going pretty often to --

A.    Yes.

Q.    -- your -- and then what happened after that?  Did you change jobs or your --

A.    I worked with Shell for about 13 years.

Q.    Uh-huh.

A.    And then I was out of work for a little while, for a couple of months, and then I went to work for the Parish.

Q.    Okay.

A.    And I worked for them 22 years.

Q.    And so is it -- it's fair to say, isn't it, that after the first three months, and then maybe a couple of years, so that would have been about two-and-a-half years, then your contact over at your grandmother's house got a little less than what it had been.  Isn't that --

A.    Yes.

Q.    That's -- okay.  So basically, from about seven to about nine-and-a-half, you would have had contact, more contact with Mr. Bourgeois?

A.    I did.

Q.    Okay.  And then after nine-and-a-half, it kind of changed.

A.    I saw him very little after that.

Q.    Okay.  Very little after that.

A.    Uh-huh.

USCA5 3515

Q.    So basically your exposure to him was from seven to nine-and-a-half.

A.    Yes.

Q.    And during that period of time, there was time for your grandmother to work her magic from seven to nine-and-a-half. Right?

A.    Well, she took time with him.

Q.    And in your observation, did Mr. Bourgeois return the affection that he had for your mother?

A.    Yes, he did.  It was like a safe haven for him at my grandmother's house, because he was mistreated at his mom's house.  So that was a safe haven.  She was the one that, that did the hugging and the, you know what I'm saying, and the loving.  And she treated him just like she treated us.  He was no different.  It was like he was her grandchild.

Q.    So if he were to have said, if there's a recording of him talking about Ms. Mary and saying that while he lived for (sic) her, that she was disabled, and that he would help her take a bath, and that he would help her get around --

A.    He didn't help her take a bath.  He only helped her put the water in the tub.

Q.    Okay.  Well, but I'm telling you, if he said that he helped her take a bath, helped her get around.  He didn't wipe her butt -- and I'm using his words, okay -- but that he did pretty much everything else for her, that she cooked and that

USCA5 3516

he learned to cook from her, and that she used great big pans --

A.    Uh-huh.

Q.    -- that he would have to carry around or help her with, that he went outside and would take the stuff that had to be sold, he would take that.  That's fair, right?

A.    Yes.

Q.    That he would do the yard work at her house, that he mowed her lawn, that he kept the area outside of the house.  Okay. And do you know that he continued through high school while he lived with your grandmother?

A.    The times that I went, he was there, and off and on that I would see him.  And he would still do a lot of things around the house to help her.

Q.    Right.  And do you know why he left Ms. Mary's house and why he didn't live there any more?

A.    I don't really know why he left.  I never questioned it, why he left.  All I know, you know, he had gotten older, and he was spending time at his mom's house more, started spending time there, and I really don't know.

Q.    All right.  So the arrangement that they had, Ms. Mary loving him, and he being helpful to Ms. Mary, was a very good arrangement.  Is that correct?

A.    Yes.  Yes.

Q.    Okay.  Now, after that time, have you had any contact with

USCA5 3517

him?

A.    After that time, when he got older, we had family functions and he was at all of our family functions, whether it was a birthday party or picnic or death in the family, he was there.

Q.    All right.  And did you know by then that he had become an over-land, cross-country truck driver?

A.    I knew he was a truck driver, yes.

Q.    And did you know that he bought a home and that he had married several times?

A.    I knew he had bought a house, but you know, it was later on when I found that out, that he had bought a house.

Q.    Okay.  And so when did you find that out?  Was that before or after the trial?

A.    No, that was before the trial.

Q.    Oh, okay.

A.    Yeah.

Q.    Okay.  And did you know that he had purchased a vehicle, that he had purchased cars?

A.    No.

Q.    That he owned a motorcycle?

A.    No.

Q.    Did you know his children's names?

A.    No.  I knew of them, but I didn't know his kids' names.

Q.    All right.  Did you know what his job, what his employers

USCA5 3518

or the companies that he worked for, what they thought of him?

A.   No.

Q.   All right.  So basically, your contact that you could testify to just goes straight to seven to nine-and-a-half?

A.   Uh-huh, yes.

Q.   And then as, when he got older, coming to some of the family, or coming to the family gatherings.

A.   Yes.

Q.   All right.  And I guess it would be fair to say that you were very proud of what your grandmother had accomplished, in that he was a truck driver now, he had a way to support himself.  Were these things that you were proud of?

A.   I was proud that he had made a life for himself, yes.

Q.   All right.  And was he the only child from that family to come and live with your grandmother?

A.   He was the only one out of that household, yes.  I don't remember any other that came there, only him.

Q.   You didn't know that Claudia Williams lived with your grandmother?

A.   Well, Claudia I knew was there off and on.  And I didn't have much contact with Claudia --

Q.   Okay.

A.   -- as I did with Alfred.

Q.   So you weren't visiting your grandmother during the period of time that Claudia was living there?

USCA5 3519

A.    Claudia was there, but it wasn't -- in other words, I didn't come in contact with Claudia a whole lot.

Q.    Okay.

A.    I know she used to sleep there sometimes, but I didn't come in contact with her as much.

Q.    Now, would you say that his relationship with your grandmother was good?

A.    Very good.

Q.    Would you say that his relationship with you is good?

A.    Yes, it was, pretty much.

Q.    And did you ever bring over your new husband to your grandmother's house?  I was just wondering.

A.    My husband worked at night, and he didn't visit that much during that time.

Q.    Did your mama ever come over to the house?

A.    Yes.

Q.    And how was your mama with him?

A.    Very fine.  Very good.

Q.    Okay.  And so you think your relationship with his, with your mama was good?

A.    Yes.

Q.    Okay.  And did, when you would do things, when your mother -- when your grandmother, I'm sorry, would do things for him, did he seem appreciative?

A.    Very.

USCA5 3520

Q.   And so would he hug her and say, "Thank you," or in his way -- is that what would happen?

A.   He would hug her, just like we would, all of us would.

Q.   Okay.  And did he say -- did he actually say the words, "Thank you"?

A.   He would tell her "Thank you."  And sometime he would forget and she would remind him what you're supposed to say.  That's my grandmother.

Q.   Did he ever, did he ever tell your grandmother or did your grandmother ever tell you, did he ever say, "I'm lonely.  I'm sad.  I'm happy"?

A.   No.

Q.   "I'm --"

A.   Sometime he would hug her, he would hug her, go up to her and hug her, and she would hug him back.  And she would just tell him, "You're going to be all right.  It's going to be okay."  Especially if he had visited his mom, and quite -- sometime he would go and visit his mom, and when he would come back, he would be sort of in a depressed mood.

Q.   Uh-huh.

A.   And he would hug my grandmother.  And she'd hug him back and kiss him back.

Q.   Do you know whether or not he considered like Michelle and Lloyd and Claudia, his siblings, his friends?

A.   I would think he would.

USCA5 3521

Q.    And did you find that during the period of time that you had to observe him, that seven through nine-and-a-half, that he was consistent with the friendship or the feeling that he had with that group of his friends?

A.    Just as I said, Alfred was pretty slow in grasping things, as far as games, and he was kind of shy in making friends.  But with my siblings, in other words, my cousins, they took time with him to share things with him, to teach him how to do things.

Q.    Uh-huh.

A.    And it was just a close-knit, you know, of being there and holding him out a hand to try and show him, you know, "This is how it goes.  This is what to do."  But that's the way we were raised --

Q.    Right.

A.    -- as kids.  My grandmother and my parents, that's the way they raised us, not to look down on a person, but to help him.  And that's what we did.

Q.    Did you, would he -- did he enjoy when y'all would be together?  Did y'all ever tease him lightly or make jokes and --

A.    That was a no-no.

Q.    I mean, not teasing, no.  Say things that were funny, watch cartoons, or do anything that --

A.    We would watch, yeah, they would watch television.  Yes,

USCA5 3522

he would watch, my little cousin and them, with all of us, he would watch.

Q.   And what was good during that time?  Mighty Mouse?  Or am I too old?  I mean, you know, whatever.

A.   I don't remember --

Q.   Yeah.

A.   -- during that time.

Q.   Yeah, but did he enjoy --

A.   Watching cartoons.

Q.   Could he laugh at the cartoons and, you know --

A.   Yes.

Q.   -- enjoy things like that?

A.   Yes.

Q.   Now, did you ever see him, during that period of nine, seven to nine-and-a-half, if Ms. Mary got up and she maybe needed a little assistance, or she wobbled or anything like that, was he ever attentive to her, like if she needed assistance or something?

A.   Well, if she would get up and she would, just as I said, she walked with a cane, and sometimes she would tell him, "I need help."

Q.   Okay.

A.   Especially if she sit too long and arthritis would set in --

Q.   Uh-huh.

USCA5 3523

A.    -- she would tell him, "Alfred, I need help."  And he would get up to help her.

Q.    Uh-huh.  Did he, did he ever get to the point during that period of time where you would come to the house and he would say, "Hey, you want some water," or "We have cookies"?  Did he ever get to that point?

A.    No.  No.

Q.    Okay.  I guess he didn't -- he didn't ever have any money or anything.

A.    No more than change that my grandmother would give him.  Because just as I said, she sold candy, and she sold like freeze cups, and she would put money in his pocket, especially on Sundays to go to church.

Q.    Uh-huh.

A.    Because she believed in putting money in church.  And if you were with her, you put money in church.  So she would make sure before she would leave home, she would put change into his pocket and tell him, "Alfred, don't forget, you have to put --" sometimes she would have to remind him, take the money out of his pocket, put it in church in the basket.

Q.    Now, let's talk about church.  Did you go to the same church they went to?

A.    I was Catholic, but my dad was Baptist, and I went to the same church.  I would go to church quite often with my grandmother.  I was the one that followed her to church a lot.

USCA5 3524

Q.    Okay.  So you went to Evergreen?  Is that it?

A.    Ever -- my family belonged to Evergreen Baptist Church. But just as I said, my mother's kids were Catholics.  My daddy was a Baptist.  And he belonged to Evergreen Baptist Church. He was the director of the youth choir, my dad.

Q.    Oh.

A.    And my grandmother was the mother of the church.  And by that I mean she was the oldest member of the church.

THE COURT:  Is that where Mr. Bourgeois went?

MS. BOOTH:  Your Honor, I'm going to need a break.

THE COURT:  All right.

MS. BOOTH:  I need to take a break.

THE COURT:  Well, then, I guess we'll just take a break.  We'll take a 15-minute break.  Thank you.  You can stand down.

THE WITNESS:  Okay.

(Recess from 10:08 a.m. to 10:09 a.m.)

MS. BOOTH:   -- that Mr. Bourgeois is saying is her father that sexually assaulted him (inaudible.)

MS. LARIN:  Not saying that.  Her father is not Raymond Adam.

MS. BOOTH:  I know her father is not Raymond Adam, but I know that her father is the youth, is the choir director. And I think that I remember him saying that the choir director --

USCA5 3525

MS. LARIN:  No, it was the Sunday school teacher.

MS. BOOTH:  Well --

THE COURT:  I thought he said Sunday school teacher.  But ask her.

MS. BOOTH:  But it was at different places, Your Honor.  And that's the problem, that he's made different statements about who abused him.  Sometimes he said the choir director.

THE COURT:  I understand.  I don't --

MS. BOOTH:  Sometimes he said that --

THE COURT:  I don't know.  All I saw in the videos, and I haven't seen Price 1 and 2 --

MS. BOOTH:  Right.

THE COURT:  -- he said Sunday school teacher.  I don't know about choir directors.

MS. LARIN:  And the last witness said Sunday school teacher too.

MS. BOOTH:  Well, I know, but she didn't say that was the one that -- I mean, I have heard him say that it was his choir director also, in another statement.  And I just have to figure out which statement that is.  And I don't want to hurt this -- to ask that question of this woman, Your Honor, unless I --

THE COURT:  Well, I figured that's why you wanted a break, but I can't help you there.

USCA5 3526

MS. BOOTH:  I know you can't.  I'm just telling you why I wanted a break.

MS. LARIN:  So I -- are you trying to prove that he was sexually abused?

MS. BOOTH:  No.  I'm trying to prove that he's said it now after he's been convicted.

MS. LARIN:  Right, but --

MS. BOOTH:  That's what I'm -- that's where I'm going with this, is not that it's true, but that he said it after he got convicted.

MS. LARIN:  Okay.  So he said it was Raymond Adam.

MS. BOOTH:  No, he says that there were two people. One of them was Ms. Clayton's son.

MS. LARIN:  Right.

MS. BOOTH:  And one of them was, at one point, one statement he said that it was the choir director.  In another statement he said that it was the Sunday school teacher.  And my question is --

MS. LARIN:  Okay.  Well, I never heard the choir director.

MS. BOOTH:  Okay.  Well, I have.  And that's why I just, because I --

THE COURT:  Well, you just need to ask her.

MS. BOOTH:  Okay.  I figured there's been so much ugly, I didn't want to spread any more around, Judge.

USCA5 3527

THE COURT:  Well --

MS. BOOTH:  Yeah.

THE COURT:  Now we're off the record.  Wait -- yes, sir?

MR. ABREU:  I was just trying to figure out how long our break was, Your Honor.

THE COURT:  You're down to about two minutes now, I know.

MR. ABREU:  There you go.  All right.

(Recess from 10:11 a.m. to 10:25 a.m.)

THE COURT:  Y'all can be seated.  Could the witness -- could you come back to the stand, please, ma'am?  Y'all can be seated.

MS. BOOTH:  (Clearing throat.)  That didn't sound good.

THE COURT:  No.

BY MS. BOOTH:

Q.   We were talking about the Evergreen Baptist Church, and you were telling me that your father was the choir director.

A.   He was over the youth choir for a while.

Q.   Youth choir.  And did the youth choir practice?

A.   Yes.

Q.   And were you part of the youth choir?

A.   No.

Q.   Okay.  Did you ever go to any of the practices?

USCA5 3528

A.   Maybe one or two.

Q.   Do you know whether or not Alfred Bourgeois was in the youth choir?

A.   I don't remember.

Q.   Now, your father didn't also teach Sunday school, did he?

A.   No, huh-uh.

Q.   Okay.  And do you know who taught Sunday school?

A.   No, I don't recall at the time.

Q.   Have you ever heard that Alfred claims that he was being sexually assaulted during choir practice by the -- by his Sunday school teacher?  That this was actually going on during choir practice?

A.   I have no knowledge of that, no.  I don't know anything about it.

Q.   During that period of time, from seven to nine-and-a-half with your grandmother, did you see any changes in Mr. Bourgeois as far as his, you know -- and I know you're not a doctor, but I'm just, as a mother, could you look at him and say, maybe his happiness level went up a little when he was with your grandmother?

A.   My grandmother house was a safe haven for him, because he was abused by his mother.  I mean, I actually saw him getting spankings, whippings with a belt.  I saw where she had actually sit and just picked at his nose until it bleed.  I mean, these were things that I witnessed myself.

USCA5 3529

Q.   And so your grandmother's house was a safe haven.

A.   Yes.

Q.   If you heard that Mr. Bourgeois said that he was being raped nightly in your grandmother's house, what do you have to say about that?  Have you ever heard that?

A.   I never heard it.

Q.   All right.

THE COURT:  Who was it that was, he says was doing that?

MS. BOOTH:  Mrs. -- he didn't say the first name, but it was Ms. Mary Clayton's son.  And as she testified, there were many different sons.

BY MS. BOOTH:

Q.   So you never heard that?

A.   No.

Q.   Do you know who lived across the street from your grandmother's house?

A.   I can't recall at the time and remember.  I remember Miss, a lady they called Miss Mud (phonetic) that lived right in front of her.  And across the street, I can't remember who was the family that was across the street.

Q.   Do you think if your grandmother would have thought that Alfred was being raped in her very house, that she would object to that?

A.   Oh, yes, she would.  Oh, yes.

USCA5 3530

MS. BOOTH:  I pass the witness, Your Honor.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   One more question.

A.   Okay.

Q.   Or one more group of questions.  You were asked on cross about what age Alfred had trouble putting his clothes on and doing it right.  And when you observed Alfred, were you also observing other children around the same, that were around the same age as Alfred?

A.   My little cousins and them were there all the time.  My grandmother had a house full all the time, you know, cousins coming in and out.  And they can do things on their own, dress themselves, comb their hair, put their shoes on, tie their tennis shoes, but he couldn't do it.

Q.   And you had noticed that Alfred couldn't?

A.   He struggled.

Q.   Even compared to his peer group.

A.   He struggled.

MS. LARIN:  Okay.  That is my last question, Your Honor.

THE COURT:  Thank you, ma'am.

MS. LARIN:  Thank you.

THE COURT:  Anything further, Ms. Booth?

USCA5 3531

MS. BOOTH:  No.  No, ma'am.

THE COURT:  Thank you, ma'am.  You may stand down.

THE WITNESS:  All right.

MS. LARIN:  We'll call Brenda Goodman, Your Honor.

BRENDA GOODMAN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good morning, Ms. Goodman.

A.   Good morning.

Q.   Can you please state your name for the record?

A.   Brenda Clayton Goodman.

Q.   Can you spell your last name, please?

A.   G-O-O-D-M-A-N.

Q.   Okay.  And it sounds like your voice is being picked up by the mike, which is good.  Just be careful not to lean, touch the microphone.  Okay?

And are you related to Alfred Bourgeois?

A.   I'm not.

Q.   How do you know him?

A.   My grandmother.

Q.   Who is that?

A.   Mary Clayton.

Q.   What about your grandmother?

A.   My grandmother raised Alfred.

Q.   Okay.  And can you just tell us what year you were born?

USCA5 3532

THE COURT:  Her full name again?

MS. LARIN:  Oh, the grandmother's full name?  What was your --

THE COURT:  This lady.

THE WITNESS:  Brenda Clayton Goodman.

THE COURT:  Thank you, ma'am.

BY MS. LARIN:

Q.   And can you please tell us what year you were born?

A.   1952.

Q.   Which would make you about 12 years older than Mr. Bourgeois, Alfred Bourgeois.  And did you live on the Bend?

A.   Yes, I did.

Q.   Can you just briefly describe the Bend for us?

A.   The Bend is basically a one-way street.  Everyone that lives there is basically related or some sort of way intertwined.  We all kind of grew up together.  It was very poor.  Farming.  As a girl, you attended school, and in the evening, your chores was either to clean what they call shallots, it's green onions, or strip tobacco, go in the fields, then you go into school, come back and basically everybody kind of played together.

Q.   Okay.  And when you say "one-way street," do you mean a one-lane street?

A.   One-lane.

Q.   Because the cars actually went two different ways, but --

USCA5 3533

A.    Two different ways, yes.

Q.    But it's a small street?

A.    It was a very small street, uh-huh.

Q.    Did you know what house Alfred Bourgeois's mother lived in?

A.    Yes.

Q.    And can you kind of describe it for us?

A.    A very small three bedroom home, living room, one bath, a little small concrete front porch, but it was a screened-in back porch.

Q.    Okay.  And when you say "small," is there any way you could -- I mean, you realize there were seven children living in that home.

A.    Right.

Q.    Did that size house seem like it would be crowded?

A.    It was crowded.  The whole house wasn't big as this courtroom.

Q.    Okay.  And can you tell us a little bit about Alfred's mother, please?

A.    Eunice, she had, I know, five kids maybe back to back. She had a lot of children.  Growing up, every time I saw her, she was pregnant.  She dranked.  She drank excessively.  She dranked a lot.

Q.    Okay.

A.    Dranked excessively.  She would curse the kids all the

USCA5 3534

time.  She was overwhelmed, frustrated all the time.  She couldn't remember things.

Q.   What do you mean by that?

A.   Like if you would say, you know, Eunice, such-and-such about the kids or whatever, she couldn't remember.  And I don't know, I guess it was contributed to her drinking, because she just really was forgetful.  And I could remember my mom and my grandmother having to remind her of stuff all the time.

Q.   Like what kind of things?  Do you know?

A.   "Make sure you send the kids to school.  Make sure," you know, just things that was important in life regarding raising her children.  They would have to remind her.

Q.   So in your small community, did she kind of stand out in these ways?

A.   I think, when you say "stand out," I think everybody kind of supported the fact that she had all these babies and they had to help her with these babies.

Q.   Okay.

A.   And the drinking.

Q.   Do you know what she drank?

A.   Beer.

Q.   Mostly beer?

A.   Uh-huh.

Q.   Would you see, did it seem like she would get intoxicated?

A.   Yes.

USCA5 3535

Q.    Do you know how often she would drink?

A.    Every day.

Q.    Did you know Anthony Ferdinand, the fourth child, Eunice's fourth child?

A.    NeNe?  Yes.

Q.    Is that what you called him, NeNe?

A.    Uh-huh.

Q.    And can you describe how Eunice took care of him?

A.    Well, taking care of NeNe for Eunice was very overwhelming.  The kids would -- basically Alfred would have to like pitch in.  She would make him sit there and watch him.  He couldn't walk, and it was a child that just sat in the middle of the floor.  He could not talk, couldn't do anything for himself.  And so basically everybody had to watch him, change his diapers.  If you went over to visit, that was part of your job as well, to help groom, take care, do whatever you could do while you was there, pick up clothes, do whatever.  Because it was overwhelming.  She had all these children.

Q.    Uh-huh.

A.    And NeNe, of course, was an exceptional child, retarded, couldn't walk or talk.

Q.    Right.  He had -- it's already on the record that he had cerebral palsy.

A.    Well, yeah.  We didn't know.  That's what we called it.

Q.    Okay.  What did you call it?

USCA5 3536

A.   Retarded.

Q.   Retarded.  Okay.  So did you notice anything special about Alfred and his functioning?

A.   Alfred was slow and --

        MS. SALINAS:  Your Honor, I'm going to object.  She's asking, she's not putting a time frame as to when this would have occurred.  If she could set the timing.

        MS. LARIN:  Okay.

        THE COURT:  What are you -- yes, just do the timing.

        MS. LARIN:  Let's step back.  Okay.

        THE COURT:  Thanks.

BY MS. LARIN:

Q.   So you were born in 1952.  Alfred was born in 1964.  So you guys are 12 years apart.

A.   Uh-huh.

Q.   Did you always live on the Bend?

A.   Yes.

Q.   Was there --

A.   My grandmother raised -- yes.

Q.   Was -- so explain that.  You lived on the Bend.  Did you ever move out of the Bend?

A.   Yes, I did.

Q.   When did you --

A.   When my mom -- at 13.

Q.   Okay.

USCA5 3537

A.    Thirteen, between thirteen and fifteen, but it was -- I moved when my mom got married, but it was back and forth.  And our family is very close, so it was an everyday thing.  We'd come to see our grandma every day.  We all went to the same church.  On weekends, it was at my grandma's house.  On Fridays, at grandma's house.  So it was, you moved, but it was never a leaving.

Q.    Right.

A.    And then grandma and Alfred would come and spend time at my mom's house.

Q.    Okay.  When he was older.  I mean --

A.    Right.  Well, growing up, yeah.

Q.    Okay.  So let's get a time frame then.  You lived in the community until you were about 13, when about Alfred was born, and as a baby.  And then you moved to Lutcher, but you were still in the community every weekend at least, and most days.

A.    Right.

Q.    Is that what you're saying?

A.    Right.

Q.    Okay.  Just establishing when you had the chance to observe Alfred.

A.    Right.

Q.    So let's talk about, you said that you thought Alfred was slow.  Can you pick a time, an instance that you could say, you know, an example, and we'll try to see about how, what age he

USCA5 3538

was for that example.

A.    Between six, seven years old.

Q.    So pick something that you thought he was slow at.

A.    Putting his shoes on the right feet.

Q.    Okay.

A.    He would always have his shoes on the wrong foot.  Not tying his shoes.  She had to say, "Alfred, where is your --" you know, you had to remind him to put his socks on with his shoes, if, you know --

Q.    And this was when he was living with your grandmother?

A.    Right.  And growing up, we didn't have very much, and so you had dress socks and you had school socks.

Q.    Uh-huh.

A.    And so you would tell Alfred to go put on his socks, and so he couldn't distinguish the dress socks from the school socks.  He would just go put on a pair of socks.  And, you know, "No, that's your dress socks."  He'd put the dress socks on with tennis shoes.

Q.    Right.

A.    Right, so --

Q.    Do you know about what age that was happening?

A.    It had to be around eight-ish, nine-ish.

Q.    Okay.  So you see the problem -- what you did is exactly right.  We need to keep going back to what age things happened at.

USCA5 3539

A.    Right.

Q.    Were there any other examples of things that he had difficulty with?

A.    If my grandma would say, "Alfred, go in the room and get such-and-such.  Go in the room and get such-and-such."  And he would repeat, "Go in the room and get such-and-such."  "Yeah, Alfred."  And he just standing there.  "Alfred, get such-and-such."  "Where is it?"  You couldn't say, "Turn to your right."  You had to say, "Go on the side where the bed is.  Look to this and get this."

Q.    Uh-huh.

A.    You had to just really spell it all the way out, until he had his hands on it.  "Okay.  Bring me that."

Q.    Uh-huh.

A.    And that's how --

Q.    And would he be able to do that, follow those directions?

A.    Right.  He was just -- he was always preoccupied, just could not follow instructions.

Q.    Okay.  And what, around what age was that?

A.    Eight-ish, nine-ish, ten-ish.

Q.    So let's just narrow it down.  It seems like around eight to ten, when Alfred was around eight to ten, that's when you have the clearest memory of this time.  Right?

A.    Of -- yeah.

Q.    So let's just keep talking about age eight to ten for now.

USCA5 3540

A.   Okay.  Well -- okay.

Q.   No, we can broaden it out.  Let's keep talking.  What else did he have some difficulties with?

A.   I could remember him being smaller, and we would go to grandma's.  Everybody would eat out of a plate, but he had a tin plate, and it was because like just taking his plate from wherever to the table, sometimes he would let the plate fall, and it would break.  So she had him conditioned to eat out of a tin plate --

Q.   Okay.

A.   -- where it wouldn't break.

Q.   And did she have to do that with the other children?

A.   No.

Q.   Did you ever see if he had any problems expressing himself or communicating?

A.   Yes.  He stuttered.  Is that a term?

Q.   Yes.

A.   Yeah, he stuttered.  Okay.

Q.   Did he have any problems grooming himself?

A.   Yes.  He did have problems grooming his self.  You would say, "Alfred, put your shirt on."  Alfred may button his shirt, but the first button was the third hole.  He would put the third hole on the first button, something of that nature.  And you know, the shirt just wasn't even or level.

Q.   Right.

USCA5 3541

A.    Or whatever.  He don't put all the belt in all the loops --

Q.    Uh-huh.

A.    -- you know, of his pants.  Never, you know, you'd tell him, "Alfred, put your shirt in your pants," or whatever. "Alfred, you forgot to put your T-shirt on.  Put your T-shirt on before you put your --"

Q.    Right.  And what would your grandmother do when she saw --

A.    Just show, try to help him do it, show him how to do it.

Q.    And did Alfred have chores at your grandmother's house?

A.    Yes.

Q.    Can you tell me what type of things she would have Alfred do?

A.    Well, back in the late '60s, the early '70s, after --

Q.    Okay.  Let's see.  Okay.  He moved into Ms. Mary's house around '71, we think.

A.    It was after a hurricane.  I know it was after one of the hurricanes.

Q.    Okay.  Okay.

A.    Because we lost our house on two hurricanes.  My grandma lost her house on two hurricanes.

Q.    Uh-huh.

A.    And this last hurricane, and that's why I say it was around the '70s somewhere.

Q.    Yeah.

USCA5 3542

A.    And they rebuilt their house because they couldn't -- it didn't have a sewer.  So he was responsible for taking the pot that you do your waste or whatever in, to the outhouse.

Q.    Okay.

A.    He was responsible for -- she -- well, she was crippled. She really couldn't get, you know, in a tub, per se.  But the tub we had was like a foot, it was a long, oblong tub.  He was responsible for filling that up with water, helping her take her bath.  And then when she finished taking her bath, he had to take bath in the same water, then throw the water out, because there was no sewer.

Q.    Right.  Okay.  And so he would fill the tub with water?

A.    Right.

Q.    Did he ever have any difficulties with any of his chores?

A.    Yes.  He would spill water on the floor, and you know, that was a problem, because she had to, they had to mop it up and what have you.  Every night it was, you know, the same thing, until they got money enough and my uncles had money enough to hook the sewer.  Because we were poor.  We didn't have no sewer.

Q.    Uh-huh.

A.    And this was like in the '70s.

Q.    Okay.  Were you aware of the abuse that Alfred suffered as a child?

A.    Yes.

USCA5 3543

Q.    And you touched on this briefly, but can you talk a little bit more about how Eunice treated Alfred?

A.    Eunice would curse Alfred.

Q.    Uh-huh.

A.    She would beat him.  She picked in his nose.  His nose would stay bloody all the time.  Now, I don't understand why, you know, but she would just pick in his nose till it would just bleed all the time.

Q.    And did he --

A.    And she was more harder on him than the other kids.  I don't know why, but she would just excessively curse him out all the time.  And that was, I think, why my grandmother felt the need to have to do something to help.

Q.    And did Alfred ever tell you about any other abuse that he suffered?

A.    Yes.

Q.    Can you tell us about that?

A.    My grandmother youngest son was a twin, and Alfred told me that my uncle, who loved, you know, we loved him, but my family never accepted the fact that my uncle was homosexual.

Q.    Uh-huh.

A.    And my uncle raped Alfred.  Now, I don't know at what age that happened, but when we discovered my uncle had AIDS, and Alfred told me this when he was older, that Uncle Jake had raped him.

USCA5 3544

Q.   Okay.

A.   And I had to take care of him.  I was the one that was taking care of the uncle with the AIDS.

THE COURT:  When in time did he tell you this?

THE WITNESS:  Ma'am?

THE COURT:  When did Mr. Bourgeois tell you this?

THE WITNESS:  I can't remember age, but I do remember when I discovered my uncle had AIDS was in the late '80s.  And when I had to take him home to take care of him was in '92.  He contracted pneumonia, and he had -- they was letting him out of Charity Hospital, and they sent him home with an open tube.  And so I had to be educated on how to take care of him, because my daughter, she was born in '92, and she wasn't a year old yet when I had to bring her home to my two-bedroom apartment.  And so I had to give him, me and my children had to sleep in one room.  I have another son, had to sleep in one room, and the uncle, I had to put him in the room.  Well, Alfred would come to see about him, because Alfred, they all raised him.

MS. LARIN:  Uh-huh.

THE WITNESS:  And so then there was this dark thing, and I couldn't tell my family, because I was already dealing with how to educate these older people on the uncle had AIDS, and his partner had died of AIDS a couple of months before they discovered he had the AIDS.  And so that's what I was dealing with.  So I just said, "Okay, Alfred."  You know, it was too

USCA5 3545

much for me.  But he did --

BY MS. LARIN:

Q.   It was around that time that he told you?

A.   Right.  Right.

          MS. LARIN:  One moment, Your Honor.  I have no

further questions, Your Honor.

          THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MS. SALINAS:

Q.   Good morning, Ms. Goodman.

A.   Good morning.

Q    Beverly Franks, what is her relationship to you,

Ms. Goodman?

A.   Cousin.

Q.   Cousin?

A.   Cousin.

Q.   Cousin.  And you stated, I believe you testified that you

grew up in the Bend.

A.   Uh-huh.  Yes, ma'am.

Q.   And when did you leave -- you moved when you were 13 years

old.

A.   See, you all calling it "move."  My mom got married when I

was 13 years old.  And she moved to Lutcher, Louisiana.

Q.   Okay.

A.   And that's about maybe ten or eleven, twelve at the most

USCA5 3546

miles.  And so I stayed with my grandmother a while, and when I wanted to have my way, to get things done, I moved with my mother.

Q.    Okay.

A.    But it wasn't a move like -- I'm in both places.

Q.    Well, where did you go to school when you were 13 years old?

A.    Had to be right, what ninth grade?  Cypress Grove.

Q.    In Lutcher?

A.    That's in Lutcher.  But it wasn't no restrictions.  You can catch the bus.

Q.    Okay.  But you went to school at Lutcher when you were 13.

A.    Yes, ma'am.

Q.    You weren't there at the Bend going to school in that area, where the school is there.

A.    There was no school in the Bend.  There was never a school.

Q.    In Paulina?

A.    I didn't go to Paulina Elementary.  During the time I went to school, there was St. Martin.  There was no -- it was a little room that we went to school in St. Martin as for elementary school.

Q.    Okay.  So before the age of 13, where did you attend school?

A.    A little while at St. Martin and a little while at Cypress

USCA5 3547

Grove Elementary.

Q.   And you were living with whom when you, up until the age of 13?

A.   My grandmother.

Q.   You lived in Ms. Mary's house, Mary Clayton's house?

A.   That's where I was raised.

Q.   You lived there.  Do you know Beverly Franks?  You said you know Beverly Franks.

A.   Yeah, Beverly is my cousin.  That's my grandmother's son's daughter.

Q.   And did she live with Ms. Mary?

A.   She lived with her parents, who live at the head of the street, at the head of the Bend Lane.

Q.   Okay.

A.   But living was like, if dark caught you -- I mean, if it was dark and it was -- she slept there.  I mean, we all lived together.  You have to understand --

Q.   Okay.  Let me --

A.   -- the family tradition.

Q.   And, Ms. Goodman, you're telling me that Ms. Franks is, she is -- Ms. Clayton is her grandmother as well.

A.   Yes, she is.

Q.   And in Ms. Clayton's house, up until the age of 13, who besides yourself was living in Ms. Mary's house?

A.   My mother.

USCA5 3548

Q.   And who is that?

A.   Frances Clayton Sanders.

Q.   Okay.  And who else?

A.   My Uncle Jake when he came.

Q.   I'm sorry, who?

A.   Jake Clayton.

Q.   Jay (sic)?

A.   That's -- yeah.  Esau, when he came, everybody.

Q.   And Jay (sic) Clayton is your grandmother's --

A.   My brother, Leroy Shiloh.

Q.   Leroy?

A.   Uh-huh.

Q.   That's your what, your brother?

A.   My brother.  Yeah, he went off to -- my brother is about eight or -- between -- he may be ten years older than me.  So like when he finished school, he went off to Arizona State.  So I don't remember after that.

Q.   Now, Leroy is older than you or younger than you?

A.   Older.

Q.   Older.  So Jay (sic) Clayton is your brother as well?

A.   No.

Q.   Jay (sic) Clayton is Ms. Mary's son.

A.   A twin, yeah.  That's the baby boy.

Q.   He's a twin to whom?

A.   Esau.

USCA5 3549

Q.    He's Ms. Mary's twin?

A.    No.

Q.    Okay.  Who is Ms. -- who is Jay (sic) Clayton?

A.    Mary's son, baby son.

Q.    Okay.  I thought you said a twin.

A.    He is a twin.

Q.    And who's the twin?

A.    Esau.

Q.    Esau.  Okay.  And Leroy -- and Jay (sic) and Esau, are they older than you?

A.    Uh-huh, yes, ma'am.

Q.    Go in the family order of your siblings for me, would you, please?

A.    I don't have but one brother.  That's Leroy.

          THE COURT:  She said --

          MS. SALINAS:  Okay.

          THE COURT:  Just start at the oldest child, I think.

          THE WITNESS:  For Ms. Mary?

          THE COURT:  Please.

          THE WITNESS:  Okay.  Charles Clayton; Harry Clayton, deceased; Frances Clayton Sanders, that's my mother; then Herman Clayton is Beverly's father; Ernest Clayton, deceased; I don't know who is the oldest between James and John, but there is a John Clayton and James Clayton.

BY MS. SALINAS:

USCA5 3550

Q.   Okay.  Now, up until the time --

A.   Have you got nine names?

Q.   Oh, I'm sorry.

A.   How many names have you got?

Q.   Three, four, five, six, seven.

A.   Seven, okay.  You got James, John, Herman, Harry, Ernest -- have you got Ernest?

Q.   Yes.

A.   There's nine of them, eight boys and one girl.

Q.   Okay.  And these are Ms. Clayton's sons -- I mean family members.

A.   Yes, ma'am.

Q.   Her children.

A.   Yes, ma'am.

Q.   And up until the age of 13, you said that you, along with your mother, Frances, and whom else were living with Ms. Mary?

A.   Leroy was raised in the house, and then he went off to school.

Q.   Okay.  Is that it?

A.   In between times, if my Uncle Jake didn't have a place, he was there.  But he lived in New Orleans.

Q.   Okay.

A.   But if he was -- didn't have a place to live.

Q.   Okay.  And that was it?

A.   Yeah.  My grandma house was, it wasn't a big house, but it

USCA5 3551

was the big house.  Everybody lived there.

Q.   How many bedrooms did it have?

A.   There was a living room, two bedrooms, a bath in between, a kitchen.

Q.   Okay.  Now --

A.   Front porch.

Q.   Okay.

A.   We slept on the front porch, too.  It was a closed-in front porch, so you could sleep on the front porch.

Q.   Okay.  And you stated that Mr. Bourgeois came to live at your grandma's house when he was how old?

A.   Had to be between -- he had been coming around since he was about -- she took up with him, he had to be about five or six.

Q.   You think he was five or six?

A.   Yeah.  I mean --

Q.   Okay.  And Beverly Franks, did she spend time with -- did she live in the house, Ms. Mary's house?

A.   Okay, ma'am, she lived with her parents.

Q.   Uh-huh.

A.   Which was at the head of the street.

Q.   Right.

A.   And then other uncles lived behind, and we all lived on the same street.

Q.   Okay.

USCA5 3552

A.    And so if dark caught you there, you slept there.  If it was raining -- but she didn't, she had to go and see about every day if she had to take her to the store or whatever, because she was driving.  She would drive, so she helped take her to the store, help her get groceries.  Everybody had their own little chores to do for grandma.  Somebody had to iron.  Somebody had to do, you had your chores.  You grew up -- we grew up being responsible.  And that's how she taught us to be responsible, because we had to do things for her.  She was the chief.

Q.    Okay.  But let me go back.  But what I wanted to make clear with you is that Ms. Franks didn't live in the house for any period of time for more than if she got caught in the middle of the night.

A.    Right.

Q.    Is that correct?  Is that your answer?

A.    Right.  Right.  Or you know, if you wanted to stay at grandma two, three, four days, that was fine.  Not just her.  There were other cousins.  There was 80 or something of us.

Q.    Okay.

A.    You know, and if 20 felt like staying there overnight, that's what happened.

Q.    Okay.  But I'm trying to get you -- I'm asking you if you knew at any point in time when she lived for an extended period of time other than for an overnight stay or two or three days,

did she ever stay for an extended period of time, for months at a time, at your grandma's house that you're aware of?

A.   Not that I'm aware of.

Q.   Okay.

A.   But I still don't think you understand what "staying" is.

Q.   Okay.  And you testified earlier that you could see -- let me ask you this before I ask you anything else.  You said you all actually left your grandma's house when you were about 13 years old.

A.   My mom got married.

Q.   Right.  And you and your mom --

A.   And I was both places, my mom, my grandma, my uncle.  We was just one big family.  But then eventually --

Q.   But you had a place where you had a bed, where you had your clothes, where you would stay.  Where was that, when you were 13?

A.   Both places.  Both places.

Q.   Well, you went to school in Lutcher, though.

A.   That was okay.

Q.   Okay.  Did you stay there at Lutcher for five days, and then you came home on the weekends to your grandma's house?  Are you saying, are you testifying that you did that every day?

A.   Right.  It just depends on where I wanted to stay at the time.  I catched the bus and go to Paulina and the Bend Lane, or I stayed at my mom and walked down the street to school.  It

USCA5 3554

just depends.

Q.   Okay.

A.   If you tell me what you're trying to get to, I can try to help you a little bit better.

THE COURT:  Okay, listen.  The way this works -- if you don't understand the question, that's okay.  But if you can't answer the question, that's okay.  But she asks the questions, and you answer them.  It's not that she's trying to get at anything.  Okay?

THE WITNESS:  Okay.

BY MS. SALINAS:

Q.   Okay.  And when your mother married and you left the house for a while from Ms. Mary's, did Leroy go with you?

A.   No, ma'am.  He was already gone.

Q.   Leroy was gone, okay.

(Counsel conferring off the record.)

BY MS. SALINAS:

Q.   Now, you mentioned that -- you were asked about, to describe instances when the Defendant, Mr. Bourgeois, was slow. Do you recall that question?

A.   Yes, ma'am.

Q.   And you said that, well, he couldn't -- he had trouble putting on his shoes when he was six years old.

A.   Yes, ma'am.

Q.   So where were you when you were 18 years old?

USCA5 3555

A.    Eighteen years old, back and -- Southern University at one time, at one point.  Community Action --

Q.    And Southern University is where?

A.    Baton Rouge.  But I was home every day, and then I worked for St. James Parish Community Action.

Q.    Okay.  So you're saying that when you were in college you would come back to Ms. Mary's house?

A.    Or my mom.  I didn't stay on campus.

Q.    Okay.

        THE COURT:  How far was it from your school to your home?

        THE WITNESS:  From Paulina to Baton Rouge, maybe 30, 35 miles.

        THE COURT:  Thank you.

        THE WITNESS:  It was a bus that would take us.

        THE COURT:  Well, that was convenient.

        THE WITNESS:  Yes, ma'am.

        THE COURT:  You could study both ways.

        THE WITNESS:  Yes, ma'am.  We leave home like 5:00 o'clock in the morning and come back in the evening to school -- from school.

BY MS. SALINAS:

Q.    So you went 5:00 in the morning to 8:00?

A.    No, not 8:00.  Huh-uh.  The bus would get back to Lutcher around -- it was still daytime.  In the fall, it may be getting

dark.  But it was still like 6:00, 5:30, 6:00 o'clock.

Q.   Okay.  So you were gone from the house from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.   Right.

Q.   And -- okay.  So during that time frame, you obviously didn't get to see the Defendant.

A.   Not while I was in school, no.

Q.   Okay.

A.   But when I worked for Community Action, I would check in on my grandmother.  I did like outreach social work for Community Action.

Q.   And what year was that?

A.   That was in '70, '71, '72.

Q.   '72?

A.   '71 through '72.  From '70, because I, at one point I stopped going to school all day, and then I would take some evening classes, where I would catch a ride to school.

Q.   Okay.

A.   And I was working during the day.

Q.   Now, you mentioned that the Defendant had some problems with grooming himself.  Was he able to put on his under clothing by himself?  He was able to put on his underwear by himself?

A.   I assume so, yes.

Q.   Well, you lived in the house.  I'm asking you.

USCA5 3557

A.   My grandmother -- my grandmother would supervise, making sure he had on everything that he was supposed to have on. I --

Q.   But as far as you know, he could put on his under clothing, he could put on his socks.  Correct?

A.   You had to tell him to put his socks on.  The shoes wouldn't be on the right foot.

Q.   Okay.

A.   Wouldn't be tied.  We help him -- now, I can remember helping him, everybody pitched in helping him try to tie his shoes, teaching him how to tie his shoes.

Q.   Let me ask you something.  Going back to you when you first testified, you stated -- you were talking about the Defendant's mother.  You mentioned that she drank, and that she drank a lot, and that she was intoxicated every day.  Do you recall that?

A.   Yes, ma'am.

Q.   And you said that as far as Anthony was concerned, everybody that went over there had to do something, had to help out.

A.   Yes, ma'am.

Q.   And at that time, the Defendant, Mr. Bourgeois, was living with his mother, was he not?

A.   Yes, ma'am.

Q.   And he would help out, too, wouldn't he?

USCA5 3558

A.    As far as making sure he -- because --

Q.    Like picking up trash or helping get the diapers for the baby.  He would do stuff like that.

A.    Yes.

Q.    Okay.  And --

A.    Whatever you tell him to do.  He -- Alfred was a person you had to tell him what to do.  It just wasn't -- he wouldn't just like pick up on his own and --

Q.    And that's when he was six years old.

A.    Right.

Q.    You would have to direct him to pick this up or put the sock on this other foot.  Correct?

A.    Yes, ma'am.

Q.    Okay.  But Alfred did that.

A.    Yes, ma'am.

Q.    He could get it accomplished.

A.    Yes, ma'am.

Q.    Okay.  And you gave -- you were interviewed by individuals from Mr. Bourgeois's legal team.  Correct?

A.    Yes, ma'am.

Q.    And you were interviewed, and you gave them a statement?  You talked to them?

A.    Yes, ma'am.

Q.    And in your statement, you told them that in your opinion that all of Eunice's children were slow.

USCA5 3559

A.    Yes, ma'am.

Q.    Including Claudia Williams?

A.    Yes, ma'am.

Q.    Lloyd Ferdinand?

A.    Yes, ma'am.

Q.    And who are his siblings?  Can you rattle off who the Defendant's siblings are?

A.    I had more contact with Claudia, Lloyd, Alfred.  I kind of vaguely remember Claude.  Claude was drowned.  I don't remember a whole lot.  But I remember Claudia.  I remember NeNe.

Q.    Okay.

A.    And I remember, of course, Alfred.

Q.    Did Claudia ever live with Ms. Mary?

A.    No, ma'am.

Q.    Never?

A.    Not that I recall.  But every --

Q.    Okay.  I'm just asking you if you recall.

A.    No, ma'am.

Q.    And now when the Defendant lived with your, Mr. Bourgeois lived with your grandmother, grandmother, he -- you testified earlier that he would do things like help her with her bath.  Right?

A.    Yes, ma'am.

Q.    He would get the bath water and take it to the tub and pour it into the tub?

USCA5 3560

A.    Yes, ma'am.

Q.    And he would help her get out of the tub?

A.    Yes, ma'am.

Q.    And your grandma helped him to learn how to cook?

A.    I don't know about that cooking stuff.  No.

Q.    You don't know whether or not she taught him to cook?

A.    Huh-uh.

Q.    You never saw him cook at your grandma's house?

A.    I never saw him cook, no.

Q.    But you're 12 years older than Mr. Bourgeois.  Correct?

A.    Yes.  That's the age.

Q.    And you basically left when you were 13, so he was still a baby.  So, and then you went off to college.

A.    I didn't go off to college.

Q.    Well, you went to college.  You were in school from 5:00 o'clock in the morning to 6:00 o'clock in the afternoon?

A.    For about a semester, yeah.

Q.    Okay.  Your grandma used to make candy and stuff --

A.    Yes, ma'am.

Q.    -- for the neighborhood and she would sell that?

A.    Pies, uh-huh.

Q.    And the Defendant, Mr. Bourgeois would help her with preparing those candies and fixing the pans and --

A.    Right.  Yeah, that was something all of us liked to do.  So all of us kind of grew up putting the flour in the pan.

USCA5 3561

Q.   Okay.

A.   She may have let us roll the dough out, because you have to roll the dough to put the --

Q.   Right, and do that.  And Mr. Bourgeois would help do that, too, wouldn't he?

A.   I never saw it.

Q.   Okay.

A.   You know, like she would give you the pan to eat the cake mix.  That was a big deal.  Whoever got there first --

Q.   Got to lick the spoon?

A.   To eat the -- yeah, to lick the spoon and get the cake mix.  That part.  I think the older ones, we did more of the rolling the dough and the flour or whatever.  He might have just stood by playing.

Q.   And you saw the Defendant, he would help your grandma, and he would keep the grass, yard clean for Ms. Mary?

A.   I don't know.  The grass was more raking the yard.  There was more dirt than grass.

Q.   Okay.  But keeping up the outside?

A.   You had to keep the trash --

Q.   Keeping track of the yard, Mr. Bourgeois would do that for Ms. Mary?

A.   I don't recall.

Q.   You don't recall if he would do that?

A.   Huh-uh.

USCA5 3562

Q.   Okay.  Now, did you ever attend church when you were living at Ms. Mary's house?

A.   Yes, ma'am.  There was just one --

Q.   What church did you attend?

A.   Evergreen Missionary Baptist Church.

Q.   Did Mr. Bourgeois go with you to that church, attend church with you?

A.   He didn't go with me, but he attended church.

Q.   Okay.  Do you know whether or not he went to Sunday school?

A.   That was a must.  We all went all day.

Q.   When did you quit having contact with your grandma?

A.   I never quit having contact with my grandmother.  I moved to Florida in about '72, because they was asking for students to go to University of Florida, black students, so I moved there to try to get into the University of Florida.

Q.   Okay.

A.   But I would come home holidays, during the summer, and Alfred was there.

Q.   Okay.  He would be there at your grandmother's house?

A.   Yes, ma'am.

Q.   Did you -- you said it was, the community was a big community there, big -- and everybody would play together out in the street?

A.   It's not a big community.

USCA5 3563

Q.    Well, it's a small community --

A.    But -- yeah.

Q.    -- few houses there in this acre of land or two acres of land.  Everybody would play out in the streets?

A.    Yes, ma'am.

Q.    And Mr. Bourgeois would play out in the streets with his siblings?

A.    Yes, ma'am.

Q.    Did Mr. Bourgeois go back and forth between his mom's house and your grandma's house?

A.    Yes, ma'am.

Q.    Okay.  And was that on a daily basis?

A.    I would assume.  I mean, I couldn't say every day --

Q.    Well, you lived in the house until you were 13.?

A.    Yeah.

Q.    And then you said you moved out, and coming back and forth until the time you went to college.

            THE COURT:  How much older are you than Mr. Bourgeois?  Do you know?  How old are you?

            THE WITNESS:  I'm 57.  And he is --

            MS. SALINAS:  I believe she's 12 years older.

            THE COURT:  Okay.

BY MS. SALINAS:

Q.    And did you ever see Mr. Bourgeois playing in the playground or out in the street with his siblings?

USCA5 3564

A.    Yeah, I've observed him playing.

Q.    Okay.  Let me get this straight.  When you were 13 and you and your mom, your mom got married, you moved a little bit -- you were still back and forth between your grandma's, but you weren't actually in the house every single day.  Is that correct?

A.    Just about every day, because we would make sure we saw her every day.

Q.    Okay.

A.    But whether I slept there every day or slept at my mom's every day, that's what -- I can't tell you.  I can't remember.  I can't tell you how many days at my mom and how many days.  But you know, there was both houses.

Q.    When you left to go to college, how old was Mr. Bourgeois?  Do you recall?

A.    Huh-uh.

Q.    Okay.

A.    He was young.

Q.    How young?  You said you left to Florida back in 1972?

A.    However old that would make him be.

Q.    Okay.  So he was about eight years old, is the last time that you actually had day-to-day contact with him?

A.    No.

Q.    Between the hours of 5:00 in the morning to 6:00 in the afternoon?

USCA5 3565

A.    Maybe.  But I would still come back home back and forth.
Somebody die, you come home.

Q.    Right.  But it wasn't on a --

A.    Come holidays --

Q.    Okay.  But Ms. Goodman, what I'm giving you is that when
he was eight years old, you were in Florida, University of
Florida.  Correct?

A.    Yeah.

Q.    And you were in school between the hours of 5:00 and 6:00
p.m., 5:00 a.m. in the morning to 6:00 p.m.

A.    In Florida?  Or in Baton -- in Louisiana?

Q.    Well -- okay.  When you were in Florida, what were your
school hours?

A.    Well, in Florida, I didn't get into the University of
Florida until I started working for Legal Services.  And that's
how I got in there doing some training through Legal Services
in the paralegal studies.

Q.    Okay.  Before you went to Florida, you said you were in
Baton Rouge?

A.    Right.

Q.    University of Baton Rouge?

A.    Right.

Q.    And that was in what year?

A.    In '70.

Q.    In 1970.

USCA5 3566

A.    Right.  And I went there a semester on the bus every day,
then I started working in 1970 as well for St. James Parish
Community Action.

Q.    Okay.  And then you left in '72 to Florida?

A.    Yes, ma'am.

Q.    Okay.  So when you were at Baton Rouge, the Defendant was
six.  And when you left to University of Florida, the Defendant
was eight.

A.    Yes.

Q.    So you had that contact.  You kind of had some loss of
contact between six and eight.  And then thereafter, after
eight.

A.    There was never a loss of contact.

Q.    Okay.  Daily contact, you know, 24 hours.  Not like the
way it was when you were living there, from the time you were
born till the age of 13.

A.    Yes, ma'am.

Q.    That's what I'm trying to get at.

A.    Yes, ma'am.

Q.    Okay.  And in your statement that you gave, you were
visited by the legal defense team back in 2007.  Do you recall
that?

A.    Yes, ma'am.

Q.    And you signed a declaration.

A.    Yes, ma'am.

USCA5 3567

Q.    And you were asked to describe the Defendant's behavior and everything you observed about the Defendant.  Correct?

A.    Yes, ma'am.

Q.    And in your statement, did you ever tell anybody about the sexual abuse of Alfred Bourgeois?

A.    Not until recently.

Q.    But you didn't -- when the legal team went and they had you fill out and sign declaration, you didn't tell them about the sexual abuse?

A.    I don't recall.  Is it on the statement?

Q.    It's on the statement.

A.    Okay.

Q.    Would you like to see the statement?

A.    No, ma'am.

        THE COURT:  Would it help you to refresh your memory if you saw it?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Would you hand it to her, please?

        MS. SALINAS:  Yes, Your Honor.

        THE WITNESS:  Thank you.

    (PAUSE.)

        THE WITNESS:  You said it was on the statement?

        MS. SALINAS:  I'm sorry?

        THE WITNESS:  It's on here?

BY MS. SALINAS:

USCA5 3568

Q.   It's not on there?

A.   No.

Q.   No, you didn't tell them about it.

A.   No.

Q.   And you knew at that time when they visited you that they wanted you to tell them everything about the Defendant, they were investigating, trying to get some mitigation evidence for Mr. Bourgeois?

A.   Repeat that.  I'm sorry.

Q.   That they were trying to find out if anything had been going on in his background, if he was suffering an abuse.  They asked you about those questions, did they not?

A.   Yes.  Yes.

Q.   And you didn't tell them about sexual abuse.

A.   No.

Q.   This is the first time you've told them about the sexual abuse?

A.   You mean today or --

Q.   Yes.

A.   No.  I -- we discussed it.

Q.   When the legal team, the defense legal team went to go talk to you back in 2007, you told them --

A.   I don't recall if I did in 2007.  I don't recall.

Q.   When you --

          MS. SALINAS:  We offer into evidence Government's

USCA5 3569

Exhibit Number 202, Your Honor.

THE COURT:  Any objections?

MS. LARIN:  Well, what's the basis, Your Honor?

THE COURT:  I'm sorry, I can't hear you.

MS. LARIN:  What is the basis of --

THE COURT:  I can't hear you.

MS. LARIN:  Oh, I'm sorry, Your Honor.  What is the basis of offering it into evidence?

THE COURT:  What is your objection?

MS. LARIN:  I think that her testimony is --

THE COURT:  What is your legal objection?

MS. LARIN:  Our legal objection is it would be hearsay, and she testified.

THE COURT:  Sustained.

BY MS. SALINAS:

Q.   Ms. Goodman, when exactly did you tell the legal defense team that Mr. Bourgeois had been sexually abused by one of your relatives?

A.   I don't recall the date and time.

Q.   Well, was it a month ago?  Was it two months ago?  Was it a year ago?

A.   It wasn't a year ago.

MS. LARIN:  Objection, Your Honor.  This has been asked and answered.  She says she doesn't recall if she told --

MS. SALINAS:  Your Honor, I'm trying to get --

USCA5 3570

THE COURT:  Overruled.

MS. SALINAS:  A time frame.

THE WITNESS:  I don't recall.

THE COURT:  Was it before or after his, Mr. Bourgeois's conviction?

THE WITNESS:  Before or after -- I don't recall.

THE COURT:  Okay.

THE WITNESS:  It wasn't before the conviction, because I wasn't even involved before the conviction.

BY MS. SALINAS:

Q.   So do you think it would have been more than a year ago that you told them that?

A.   Ma'am, no disrespect, I just do not recall.

Q.   Okay.  So --

A.   I mean --

Q.   All right.  Now, you talked about the chores that the Defendant would do.  One of them was filling the tub, when you were living there, and you said something about you all had a second house that didn't have any plumbing, and that occurred in the early '70s.  Do you recall that?

A.   Uh-huh.

Q.   And so that would make Mr. Bourgeois about six years old.

A.   Uh-huh.

Q.   So you're complaining that he was spilling water --

THE COURT:  I'm sorry.  You have to answer with

USCA5 3571

words.

THE WITNESS:  Yes, ma'am.

BY MS. SALINAS:

Q.    So your main complaint about that he wasn't doing chores completely or doing them right was that he was spilling water on the floors.

A.    Yes, ma'am.

Q.    Okay.  And did that upset you?

A.    No.

Q.    Would you expect that a six-year-old would not be able to be very careful when they're pouring water into a tub?

A.    Yes, no, yes.

Q.    Okay.  Do you know about Mr., where Mr. Bourgeois went after he left your grandma's house?

A.    When she died?  Or --

Q.    How old was he when she died?

A.    I don't know how old he was when she died.

Q.    What year was that?

A.    She died in '82 or '83, because my son was like around six-ish.  Six-ish.  Around six.

Q.    So he was about 18 years old?

A.    Yes.

Q.    And where did he go after that?  Do you know?

A.    I don't know where he went as a permanent address.  I know he would be to my Uncle Jake's sometimes.  He would be to my

USCA5 3572

Uncle Esau in New Orleans sometimes.  But what was his permanent address, I don't know.  But he would stay with different relatives.

MS. SALINAS:  Your Honor, I again would like to reoffer Ms. Goodman's statement.  The purpose of us offering this is not the truth of the matter, but in fact to show instead that she did not mention the sexual abuse in the statement.  It's to impeach her testimony, Your Honor.  It's offered to show conflict.

MS. LARIN:  Object.  Can I respond, Your Honor?

THE COURT:  Yes.

MS. LARIN:  What might be in the statement, she says she doesn't recall what she told the investigator, if she told or not.  So just because whether it's in the statement or not doesn't mean that's the, it represents everything --

THE COURT:  I'm sorry.  Which investigator is this?  Yours?

MS. LARIN:  My investigator.

THE COURT:  Okay.  Well, surely your investigator would have written it down if she had said it.

MS. LARIN:  Well, apparently it was missed, if it was said at all, so --

MS. SALINAS:  Your Honor, their whole premises of this case or this trial is to show that the Defendant was sexually abused by not only one, but two individuals.  That's a

USCA5 3573

very important piece of information.  And also it asked her to certify that the facts are true and correct.  And it's not in here.  And it's not hearsay, Your Honor.

MS. LARIN:  So you're using -- can I respond?

THE COURT:  Yes.

MS. LARIN:  Using the statement to prove something that wasn't said is a little --

THE COURT:  Tell me what your objection is.

MS. LARIN:  It's hearsay.  It's a negative hearsay, what she didn't say hearsay.

MS. SALINAS:  Well --

THE COURT:  Overruled.  Thank you.  It's admitted. Number what?

MS. SALINAS:  202, Your Honor.

THE COURT:  202's admitted.

MS. SALINAS:  May I have just a moment, Your Honor?

THE COURT:  Yes, ma'am.

(Counsel conferring off the record.)

MS. SALINAS:  No further questions, Your Honor.

THE COURT:  Anything further?

MS. LARIN:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   There were some conversations about conversations you had with Alfred's lawyers or defense teams.  Do you recall if you

USCA5 3574

had any contact or conversation with anyone that was working to represent Alfred Bourgeois prior to his trial in 2004?

A.    No, ma'am.

Q.    No one contacted you?

A.    No, ma'am.

COURT RECORDER:  I can't hear her.

THE WITNESS:  No, ma'am.

THE COURT:  She said "no."

THE WITNESS:  No, ma'am.

BY MS. LARIN:

Q.    And if someone had contacted you and interviewed you, would you have testified consistent to what you are testifying to today?

A.    Yes, ma'am.

Q.    One other question, Your Honor -- I mean, Mrs. Goodman.

THE COURT:  You can question me if you want.

BY MS. LARIN:

Q.    There were some questions about what chores he had, Mr. Bourgeois had, and what he was able to do.  Did you ever have the opportunity to observe Mr. Bourgeois in comparison to other children his age?

A.    Yes, ma'am.

Q.    Who were those -- I mean, you don't need to name them all, but what children would you compare him with?

A.    Cousins, people in the neighborhood, because my

USCA5 3575

grandmother was like a neighborhood big mama.

Q.   Uh-huh.

A.   So everybody played in the yard.  Everybody played in the house.  And so -- and Alfred went through a period of even just being in the house, you know, he just sometimes couldn't interact.

Q.   With the other children?

A.   Yes, ma'am.

Q.   And why wouldn't he be able to interact?  What do you mean by that?

        MS. SALINAS:  Calls for speculation, Your Honor.  Objection.

BY MS. LARIN:

Q.   What did you observe?  What do you mean when you say he wasn't able to interact?

A.   Like to play, you know, like kids was playing certain games that might have required an intelligence of instructions or doing things.  He just couldn't get it, something like that.

Q.   So in comparison to other children his age, what would you say his functioning was?

A.   Question again?

        MS. SALINAS:  Objection, Your Honor.  She's not an expert in this field.

        MS. LARIN:  When you -- I can withdraw that question and restate it.

USCA5 3576

THE COURT:  Go ahead.

BY MS. LARIN:

Q.  When you observed him and you could see what he could do and what other children could do, did you notice a difference?

A.  Yeah.  Yes, ma'am.

Q.  And what was that difference?

A.  Just take a simple thing as riding a bike.  I don't even know if he ever learned how to ride a bike, from when I was around.

THE COURT:  Well, he drove a truck later on, so --

THE WITNESS:  Right.  But a bike, you know, certain things --

BY MS. LARIN:

Q.  As a child, he couldn't do --

A.  Right.

MS. LARIN:  Okay.  I have no more questions, Your Honor.

MS. SALINAS:  I have a few.

REDIRECT EXAMINATION

BY MS. SALINAS:

Q.  Mrs. Goodman, are you telling me that if you would have testified in court back in 2004, you would have told them about the sexual abuse of Mr. Bourgeois?

A.  I would have.

Q.  But you didn't mention it in your 2007 statement.  You

USCA5 3577

didn't tell anybody about, when they interviewed you in 2007?

MS. LARIN:  Objection.

THE WITNESS:  Maybe in our culture, that was a dark thing.

BY MS. SALINAS:

Q.   So the answer is you wouldn't have testified to it then.

A.   I would have testified, yes, ma'am.

Q.   You would have testified at Court, but you wouldn't put it in your statement.

MS. LARIN:  Objection.

THE COURT:  I guess the point is, you had to tell somebody first before you would be called to testify.  And it's something you didn't want to talk about.  Is that right?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MS. SALINAS:

Q.   And you just mentioned that the Defendant couldn't ride a bike.  Do you know if anybody spent any time trying to teach Mr. Bourgeois to ride a bike?

A.   Well, it definitely wasn't my grandmother, because she was crippled.  She couldn't even teach me how to ride one.

Q.   Right.  And if his family members weren't helping him, it takes a while before a child learns how to ride a bike.  Wouldn't you agree with that?  You've got to spend time.  Someone's got to be behind you.  Someone's got to be walking

USCA5 3578

behind you.  Mr. Bourgeois did not have that, did he?

A.   No.

Q.   So it's not really surprising that he didn't know how to ride a bike, is it?

A.   Is that a --

Q.   Is it?

A.   Would that be a surprise?

Q.   Yes, if no one is teaching you how to do that at the age of five?

A.   I guess I don't know how to answer your question.

Q.   Okay.  Well, then I'll move on if you don't know how to answer that question.  Do you realize that Mr. Bourgeois, when he was -- later on in life was able to buy his own house?  Were you aware of that?

A.   No, ma'am.

Q.   Do you know he was able to purchase vehicles on his own?

A.   No, ma'am.

Q.   You didn't know that?  Did you know his house had a swimming pool?

A.   No, ma'am.

        MS. LARIN:  Objection, Your Honor.

BY MS. SALINAS:

Q.   Okay.  Do you know that he was able to --

        THE COURT:  Just a moment.

        MS. SALINAS:  I'm sorry, Your Honor.

USCA5 3579

MS. LARIN:  This is all very far beyond the scope of the examination.

MS. SALINAS:  Well, Your Honor, it goes to the things that he can do.  She's implying that he couldn't do anything as a child.  I'm just asking her what she knows about him as an adult.

MS. LARIN:  This is as an adult, and --

THE COURT:  Overruled.

MS. LARIN:  -- nothing was discussed --

THE COURT:  Thank you.

BY MS. SALINAS:

Q.   Do you know that he was able to get jobs when he left Ms. Mary's house?

A.   I know he drove truck.

Q.   You knew he drove an 18-wheeler.  Do you know that that in itself is a difficult thing to do?  Would you agree that driving an 18-wheeler and being able to maneuver an 18-wheeler is a difficult job?

MS. LARIN:  Objection, this calls for speculation.

BY MS. SALINAS:

Q.   Okay.  You don't know?

A.   No, I don't know.

Q.   Do you know he had a motorcycle and could drive a motorcycle?

A.   No, ma'am.

USCA5 3580

Q.   Okay.

MS. SALINAS:  I have no further questions, Your Honor.

MS. LARIN:  No further questions, Your Honor.

THE COURT:  Thank you, ma'am.  You may stand down.

MR. WISEMAN:  Your Honor, we're going to call Dr. Mark Cunningham.

THE COURT:  Thank you.  What do you want?

MR. WISEMAN:  I'm just saying that Dr. Cunningham at some point later in his testimony is going to want to show something from his computer, so I'm just wondering if we should plug it in now or wait for the lunch break.  I doubt we'll get to it before lunch.

THE COURT:  What do you think?  Let's wait.  We can set it up now.  Okay.

(Witness sworn.)

MR. ROBERTS:  Your Honor, I just want to note that Dr. Cunningham has apparently taken a whole stack of stuff with him to the stand.  I kind of just --

THE COURT:  Have you seen everything he's using there?

MR. WISEMAN:  I don't know if Mr. Roberts can answer that, but I can tell the Court that everything Dr. Cunningham has has been provided to the Government.

THE COURT:  Okay.  Thank you very much.

USCA5 3581

MR. WISEMAN:  Dr. Cunningham, just one -- oh, don't touch the microphone.  That's what I was about to tell you.

THE COURT:  Please don't --

MR. WISEMAN:  I was about to tell him.

THE COURT:  Ms. Gano, why don't you fix it.  I can see he's going to have to -- he's going to fiddle with it.

MR. WISEMAN:  He's a fiddler.

THE WITNESS:  Thank you.

MR. WISEMAN:  I was about to tell you, Dr. Cunningham, please be mindful of the microphone.

THE WITNESS:  Yes, sir.

MR. WISEMAN:  Because it goes into Ms. Gano's ears and causes her quite a bit of discomfort.

THE WITNESS:  Yes.

MARK CUNNINGHAM, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Can you state your name for the record, please?

A.   Mark Douglas Cunningham.

Q.   All right.  And I'm putting up on the overhead projector a document marked P-7.  And do you recognize that?

A.   Yes, sir.  That was my curriculum vitae as of July 19th, 2010.

MR. WISEMAN:  Your Honor, I would offer the curriculum vitae into evidence.

USCA5 3582

THE COURT:  Number?

MR. WISEMAN:  P-7.

THE COURT:  Any objection?

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-7 is admitted.

BY MR. WISEMAN:

Q.   Dr. Cunningham, what we've been doing, as the Judge is obviously now going to look at your CV, so rather than go through the more obvious stuff, I'm going to ask you some particular things about your background.  You're a psychologist?

A.   That's correct.

Q.   And do you have a specialty in psychology?

A.   Yes, sir, clinical and forensic psychology.

Q.   And in that field of forensic psychiatry, do you have a further specialty?

A.   Within the field of forensic psychology, I have a specialization in capital sentencing determinations, including mitigation and violence risk assessment for prison.

Q.   Okay.  And with respect to each of those two subspecialties --

THE COURT:  I'm sorry.  That was P-7 or P-12?

MR. WISEMAN:  P-7.

THE COURT:  P-7 is admitted.  Thank you.

BY MR. WISEMAN:

USCA5 3583

Q.   Within the two subspecialties you just mentioned, do you, have you lectured widely on both those topics?

A.   Yes, sir.

Q.   And would that be to professional organizations?

A.   Yes, sir.

Q.   Universities?

A.   Yes, sir.

Q.   Have you published articles in peer-reviewed journals on those two topics?

A.   Extensively.

Q.   And have you published chapters in books --

A.   Yes, sir.

Q.   -- on those subjects?

A.   Yes, sir.

Q.   Have you testified as an expert in capital sentencing in state courts?

A.   Yes, sir.

Q.   Approximately how many times?

A.   Approximately 100 times.

Q.   And would that be trial level courts?

A.   Yes, sir, in sentencing phase.  I've also testified in post-conviction and federal habeas in addition to that.

Q.   Okay.  And approximately how many times have you testified about these matters in federal court?

A.   Approximately 60 federal capital sentencing proceedings.

USCA5 3584

Q.   And between trial and post-conviction, what would the breakdown be?  What's the percentage of your court work is trial and what percentage is post-conviction?

A.   All of the cases that I described were at trial.  Perhaps 10 percent, 15 percent of my work is in post-conviction or federal habeas.

Q.   As a forensic specialist in capital sentencing, do you make it your business to read and keep up with the United States Supreme Court and Circuit Court decisions with respect to the psychological aspects of mitigation evidence?

A.   Yes, sir.

MR. WISEMAN:  Your Honor, I would offer Dr. Cunningham as an expert in forensic psychology and in the psychological aspects of capital case mitigation, including the standard of care, from a psychological perspective, not a legal perspective.

THE COURT:  Any objection?

MR. ROBERTS:  That's a long statement, Your Honor. I'm trying to process it.  I know he's an expert in --

THE COURT:  What do you mean standard of care?

MR. ROBERTS:  Yes.

MR. WISEMAN:  Perhaps if I ask the witness, he can describe that.

THE COURT:  Okay.

BY MR. WISEMAN:

USCA5 3585

Q.    Doctor, when I just used the phrase "standard of care," what does that mean to you in your specialty?

A.    Well, it has two relevant meanings.  One of those is a best practices standard.  Another is what is considered to be customary and adequate at a capital sentencing.

Q.    And when you say "adequate," again, you mean from a psycho-legal, as opposed to a legal perspective.  You're not here as an expert in the law.

A.    That's correct.

        MR. WISEMAN:  With that qualification, I'll renew my offer.

        MR. ROBERTS:  I object to that, him being qualified as a standard of care, Your Honor.  Every case is different.  There's no way you can have a standard of care in a case process.

        MR. WISEMAN:  Your Honor, the ABA guidelines as the Supreme Court has endorsed would differ with Mr. Roberts.  There's very much a standard of care.  It's published by the ABA.  The Supreme Court has endorsed it numerous times in Wiggins, Rampilla (phonetic), more recently in Van Hook.

        THE COURT:  Tell me again what standard of care is, Dr. Cunningham.

        THE WITNESS:  Yes, ma'am.  The standard of care has two definitions, as I would understand it.

        THE COURT:  Okay.

USCA5 3586

THE WITNESS:  One of them is a best practices recommendations.  In other words, there's not a --

THE COURT:  Meaning in what?  Best practices in psychology or --

THE WITNESS:  Yes, ma'am, best practices for mental health evaluations.

THE COURT:  Okay.

THE WITNESS:  That phase.  There's not a published standard of care by the American Psychological Association.  There are best practices that have been articulated in the scholarly literature.  There is also what is regarded as customary, necessary, as reflected in trainings for psychologists and for attorneys.

THE COURT:  I don't -- this is the deal.  I don't think it matters whether I qualify him, accept him as a best practices.  He can testify about it.

MR. ROBERTS:  Okay.

MR. WISEMAN:  Well, I --

THE COURT:  Is that all right?

MR. WISEMAN:  As long as we can have opinions on --

THE COURT:  So he can be an expert forensic psychologist.

MR. WISEMAN:  That works for me.

THE COURT:  Okay.

MR. WISEMAN:  With that --

USCA5 3587

THE COURT:  Since I'm not familiar with it, I'm sorry.

MR. WISEMAN:  Oh, no.  That's quite all right.

THE COURT:  Okay.

MR. WISEMAN:  I hope by the end of his testimony you will be.

THE COURT:  I will be.  Thank you.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Dr. Cunningham, I want to direct your attention to June 30th, 2003, and ask you if you were contacted with respect to the United States of America versus Alfred Bourgeois.

A.   Yes, sir, I was.

Q.   And by whom were you contacted?

A.   I received an e-mail from John Gilmore on that date.

THE COURT:  What date?

THE WITNESS:  June the 30th, 2003.  8:20 p.m.

BY MR. WISEMAN:

Q.   I'm putting up on the overhead a packet of 38 pages in length.  It's Exhibit P-8, and ask you if you, at least for the moment, recognize that top page.

A.   Yes, sir, I do.

Q.   Okay.  And what do you recognize it as?

A.   This is the e-mail that I received from John Gilmore in the evening of June 30th, 2003.

USCA5 3588

Q.   And just to be clear, because we're going to be referring to a number of e-mails in your testimony, this e-mail did not come from you to me.  I mean, I didn't get these e-mails from you, is your understanding?

A.   That's correct.

Q.   All right.  Where do you understand I got them from?

A.   It's my understanding that you got those from Mr. Gilmore.

Q.   Okay.  And why is it that, or do you have your own access to e-mails relevant to this case?

A.   No, sir.

Q.   Okay.  Now, what, in essence, is Mr. Gilmore asking you in this e-mail?  What was your understanding of the request?

A.   He is inquiring about whether I could be retained to assist the Defense in providing capital sentencing evaluation of Alfred Bourgeois.

Q.   And --

        THE COURT:  Are you going to offer this so it can be part of the record?

        MR. WISEMAN:  Oh, absolutely.  Yes.

        THE COURT:  What's the number?

        MR. WISEMAN:  It is P-8.

        THE COURT:  P-8.  Any objection?

        MR. ROBERTS:  No, Your Honor.

        THE COURT:  P-8 is admitted.

        MR. ROBERTS:  Thank you, Your Honor.

USCA5 3589

MR. WISEMAN:  I want to direct your attention to the --

THE COURT:  I'm just worried when I'm looking at them that somebody's going to forget to offer it.

MR. WISEMAN:  Oh, no.

THE COURT:  Okay.

MR. WISEMAN:  I hope I don't.

BY MR. WISEMAN:

Q.   Where I put my finger, it says, "I have requested" --

THE COURT:  Can you zoom, can you zoom into that a bit, please, sir?

MR. WISEMAN:  Sure.  Is that better?

THE COURT:  Thank you very much.

BY MR. WISEMAN:

Q.   Okay.  Where it says, "I have requested" --

A.   Yes, sir.

Q.   What is he asking you if you're able to do?

A.   He is inquiring whether I could accept an appointment as a mitigation expert, with a fee that would potentially be in the $25,000 range.

Q.   Okay.  And does he offer you any information about the current, the then current state of the mitigation case?

A.   Yes, sir, he does.

Q.   And what is he telling you?

A.   He describes, four lines from the bottom of that

USCA5 3590

paragraph, "We do not expect to be successful, mainly because we have developed very little mitigating evidence."

Q.   Okay.

A.   "It's a catch-22 situation.  We don't get a mitigation expert unless they seek the death penalty.  We don't have much mitigation evidence to dissuade the council because we don't have anyone trained to do it."

Q.   Okay.  And when he used --

THE COURT:  I'm sorry, but I think he was talking about then, persuade the Attorney General's council.

MR. WISEMAN:  That was my next question.

THE COURT:  Not to -- that was my understanding of where they were at the time.

MR. WISEMAN:  That was my very next question.

THE COURT:  They wanted information to send -- everybody has to file all these briefs, as you know.

MR. WISEMAN:  To the committee in Washington.

THE COURT:  With the Attorney General in Washington.

MR. WISEMAN:  Right.

THE COURT:  Whatever their council is.  And he wanted to head off the death penalty --

MR. WISEMAN:  Exactly.

THE COURT:  -- before it got to the death penalty.

MR. WISEMAN:  Precisely.

BY MR. WISEMAN:

USCA5 3591

Q.    And is that your understanding of what he meant by council, Dr. Cunningham?

A.    Yes, sir.

Q.    Okay.

        THE COURT:  Okay.  So we're all on the same page.

        MR. WISEMAN:  Absolutely.  Not only on the same page, the same sentence.

        THE COURT:  Thank goodness.

        MR. WISEMAN:  Okay.

        THE COURT:  Paragraph, page.

BY MR. WISEMAN:

Q.    Now, does he also tell you that he, "As it stands now, my client will receive the death penalty if convicted"?

A.    That's what he says.

Q.    Okay.  Did you respond to that e-mail?

A.    Yes, sir, I did.

Q.    All right.  And I'm going to turn the page to the -- turn the exhibit to the next page.

        THE COURT:  And that is Exhibit Number.

        MR. WISEMAN:  P-8.

        THE COURT:  Any objection to the admission of P-8?

        MR. WISEMAN:  I think we already did that.

        THE COURT:  We did that?

        MR. WISEMAN:  Yeah.

        THE COURT:  P-8 is admitted.  Thank you.

**USCA5 3592**

MR. ROBERTS:  Your Honor, apparently, I mean it's an exhibit that's got multiple documents within it.  It's one --

THE COURT:  Oh, okay.

MR. WISEMAN:  Yes.

THE COURT:  That, okay, the e-mail and the response are one, P-8.

MR. WISEMAN:  Right.  There's 30 --

THE COURT:  Sorry.

MR. WISEMAN:  Just to be clear for the record, there are --

THE COURT:  Thirty pages?

MR. WISEMAN:  -- 38 pages to this exhibit.

THE COURT:  Thank you.  Go ahead.  I'm slow myself sometimes, so --

MR. WISEMAN:  That's -- I'll leave that alone.

THE COURT:  You're a smart man.

MR. WISEMAN:  Sometimes.

BY MR. WISEMAN:

Q.   Did you respond to him on July the 1st?

A.   Yes, I did.

Q.   Okay.  And that would be the e-mail from Mark Cunningham, time 8:57 a.m.?

A.   That's correct.

Q.   Okay.  Why don't you tell us -- actually, because of its significance, why don't you read to us what your response was,

USCA5 3593

starting at the beginning.

A.   Yes, sir.  7/1/03.  "Mr. Gilmore, Thank you for your interest in retaining me in U.S. v. Alfred Bourgeois.  While I would be quite willing to consult with you regarding mitigation, my schedule would not allow me to adequately perform this evaluation and prepare my testimony by mid September, given the status of the mitigation case, as it appears from your description.  I do not know how far along you are in investigating and developing a comprehensive psychosocial history."

Q.   Why don't you stop there.  I want to ask you a question about what you mean there.  What is, in our, in your field, I should say, what is the -- is a comprehensive psychosocial history a term of art?

A.   Yes, sir.

Q.   And what does it mean in your field?

A.   That means that historical information is gathered that would allow the identification of a broad spectrum of potential adverse developmental factors.  That investigation would take a history back to the grandparents on either side of the family and include all the aunts and uncles and all the first cousins. It would include -- and with the history taken on those individuals, it would include exploration of relationship stability, psychological disorders, substance abuse histories, domestic violence, family dysfunction, child neglect, children

**USCA5 3594**

out-of-wedlock, any processes that would identify generational family dysfunction, pathological scripts or life patterns within the family system, genetic predispositions for personality disorder or psychological disorder, genetic predispositions for substance abuse issues.

Q.   So I guess the word "comprehensive" then has a significant meaning in this context.

A.   Yes, sir, it does, as well as a very extensive developmental history, and history of relationships and interactions and influences that were on the Defendant's life in terms of his immediate family and his personal experience, as well as this family constellation.

Q.   Okay.  And included in the development of that comprehensive psychosocial history, does that require the gathering of pertinent records?

A.   Yes, sir, it does.  An attempt is made to gather virtually every piece of paper that was created in the Defendant's life.

Q.   Okay.  Why don't you then continue reading.  You stopped at "comprehensive psychosocial history."

A.   "Typically, a specialized mitigation investigator/social worker is appointed to collect medical, school, social service, mental health, juvenile, military and other records.  This investigator also intensively interviews immediate and extended family, as well as friends, teachers, co-workers and other third parties.  The investigator provides summaries of the

USCA5 3595

third party interviews and develops" -- it says "of," it should be "a" -- "time line of events regarding the Defendant. As a psychologist, I would then analyze these records and conduct more strategic interviews in person or by telephone with the parties, the mitigation investigator has interviewed. If this comprehensive mitigation investigation has been completed, please advise me, as this will impact on my availability."

Q.   All right. Why don't you stop there and let me ask you a couple of questions. Are you drawing a distinction in that part you just read between the role of the mitigation specialist and the consulting psychologist?

A.   Yes, sir, I am.

Q.   Okay. And correct me if I'm wrong, just to move this along, the mitigation specialist does the initial interviews, gathers the pertinent records, gives them to you as the psychologist. You evaluate them and decide on what further steps should be taken?

A.   That's correct. Then there is a continuing interaction. As I review those and begin my own interviews, I will have suggestions about additional persons that need to be interviewed or additional investigations that need to be undertaken. The investigator finds those people, seeks those records, comes back to me. So there is a reciprocal -- there is a feedback loop that's going on as this mitigation psychosocial history is being developed.

USCA5 3596

Q.   Okay.  And is the paradigm you've just laid out here with regard to the role of the mitigation specialist and the psychologist and the feedback and the sort of relationship, is that endorsed in the literature, as well as in the ABA standards?

A.   Yes, sir.

Q.   I should say the ABA guidelines, to be more precise.

A.   Yes, sir.

Q.   Why don't you read that last paragraph, and then we'll move on.

A.   "If such a comprehensive mitigation investigation has not been completed, then I would suggest that you seek a continuance, particularly in light of the recent Wiggins decision.  Because the relevant records are often time consuming to identify and retrieve.  And because conducting the third party interviews are similarly time consuming, the investigation alone cannot typically be performed in the time between now and trial.  This investigation needs to be completed before the psychologist begins the large part of his/her evaluation."

Q.   All right.  I think we can stop there.  The remainder you're offering to suggest mitigation specialists to Mr. Gilmore?

A.   That's correct.

Q.   Okay.  Now, just so we're clear here, you're saying that

USCA5 3597

the time between July 1st and what was then the mid September trial date, two-and-a-half months, was inadequate, in your view, to start and complete both the mitigation investigation as well as for you to perform your role.

A.    That's correct.

Q.    And was there any way, in your view, that that, those functions could be performed in anywhere near two-and-a-half months?

A.    No, sir.

Q.    And in fact, how much time would you ordinarily -- and I realize things can be fluid -- but in the ordinary course, how much time would you like to have in order to see this process play out?

A.    I think I requested at least six months and said that if the mitigation investigation was undertaken aggressively, that I could be ready with my part by January.  It is often impossible to do an adequate mitigation investigation in six months because of difficulties with retrieving records and that sort of thing.  So it's not uncommon for there to be at least a year between the beginning of the mitigation investigation and the trial.

Q.    Okay.  And if you look at what I've put up now rather crooked, this is Page 4 of Exhibit 8, and actually it starts on Page 3 -- no, I'm sorry.  Where does it start?  There's no date to this e-mail, it seems, is the problem.  But you're

USCA5 3598

responding at the top there, says, "I could be ready for trial beginning in mid January, assuming an investigator began aggressively working on the social history."

A.    Yes, sir, that's in response to his e-mail below, who's asking me when I might be available.

Q.    That's quite right.  Okay.  So again, so the record's clear, what you're telling Mr. Gilmore here is that you'd be happy to do the job.  You would require till mid January, but only if a mitigation specialist was aggressively investigating Mr. Bourgeois's background.

A.    That's correct.

Q.    All right.  I want to bring to your attention Page 11 of this exhibit.  And could you just summarize what you're telling Mr. Gilmore in this July 9th, 2003, e-mail?

A.    Yes, sir.  This is in response to his July 9th inquiry that is just below my own.  It's shown at the very bottom of the screen, original message, John Gilmore.  He's asking for suggestions for an investigator.  He says, "We have an investigator working on guilt/innocence, and I would prefer someone specialized in developing mitigation evidence."

I then provided him with six individuals that I knew of with federal capital case experience and five individuals with state capital case experience.

Q.    Okay.  And one of them is Lisa Milstein?

A.    That's correct.

USCA5 3599

Q.   Okay.  And she ultimately, to your knowledge, was retained through the Court's appointment process by Mr. Gilmore and Mr. Tinker?

A.   That's my understanding, yes.

Q.   Okay.  I don't see Gerald Bierbaum on this list.  Do you know how he ultimately came to be involved in the case?

A.   It's my understanding he had some professional affiliation with Lisa Milstein, but I don't know apart from that.

Q.   Okay.  I want to show you -- take this exhibit off for a moment, and put up what's been marked as Petitioner's 151, that's 1-5-1, and ask you if you recognize this document.

A.   Yes, sir.  That is the billing statement of my work in this case.

Q.   All right.  And for the record, it's five pages in length.  Does that billing statement represent -- I'm going to use the word "significant" -- activities you performed in this case?

A.   Yes, sir.

Q.   Is it a contemporaneous record that you maintained in the course of your work in this case?

A.   Yes, sir.  I maintain production sheets each day that I am completing as the day proceeds, or if I'm in the midst of travel, at least that evening.

        MR. WISEMAN:  Excuse me for a moment, Your Honor.

        THE COURT:  Certainly.

    (PAUSE.)

USCA5 3600

BY MR. WISEMAN:

Q.   I want to show you another exhibit that's been marked as P-167.

          MR. WISEMAN:  By the way, Mr. Roberts, I incorrectly told you that was 166.  It's 167.

BY MR. WISEMAN:

Q.   Do you recognize this document?

A.   Yes, sir, I do.

Q.   And I'm just going to turn the page, and it's got a second sheet that says, "Bourgeois relevant Daily Messages"?

A.   Yes, sir.  Those are two different documents.

Q.   Okay.  And why don't you explain what each of them are.

A.   My office began using in 2004 a contact management software called ACT!, A-C-T-exclamation point.  My administrative assistant staff would make entries into ACT! under the case, the relevant case.  Actually, I think it's keyed to the primary attorney in the case.  And these reflect a printout of those ACT!-related entries that were made in this case.

Q.   Okay.  And Your Honor, I would offer at this time --

          THE COURT:  Any objection?

          MR. ROBERTS:  Your Honor, I'd like to know a little bit more, because it looks like a computer-generated document. I have no idea of the reliability --

          THE COURT:  Would you like to take him on voir dire

**USCA5 3601**

for a moment?

MR. ROBERTS:  Yes, Your Honor.

VOIR DIRE EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document --

THE COURT:  Would you stand by the microphone,
please.

MR. ROBERTS:  Sorry, Your Honor.

BY MR. ROBERTS:

Q.   Dr. Cunningham, tell me how this document is -- actually
came into your presence.

A.   Yes, sir.  My office uses a computer software program
called ACT! to manage contacts and our interactions with those
contacts.

Q.   Who produced this document?

A.   This is produced by my administrative staff at that time.
The very first entry that has the initials MBC would have been
completed by my wife, Melinda Britain Cunningham.  The second
entry that's initialed TL, that stands for Tammy Lam.

Q.   That's one problem I have with the document.  There's
nothing on there that would differentiate this from any
document that someone sat down and typed out.  So how am I
supposed to be able to determine that this is accurate and this
is all of the notes that came out of your computer?

A.   I requested that my staff -- I didn't think about ACT!

USCA5 3602

until yesterday.  I requested of them, "Retrieve any entries out of ACT! that we may have regarding the Bourgeois case."  This was e-mailed to me.

Q.   So you didn't even produce this yourself.

A.   No, sir, I don't interact with the ACT! software.  That's done by my administrative staff.

Q.   And the document on the second page that has a list of messages and references, do you know how that was produced?

A.   Yes, sir.  Each day my office provides me with summary information of the day's activities.  We call that Daily Messages.  I'm often out of town, and that's a way of me keeping up with what's happening in the office.

     Also yesterday I requested of my staff to go back through Daily Messages that we may still have in our Outlook files from that period of time.

Q.   So they could have actually missed some of the messages?  They just sent you the messages they could find?

A.   They retrieved the messages that they could find.

         MR. ROBERTS:  Your Honor, I don't know that it's accurate.  I mean, I'm not going to -- I don't have any problem with him testifying to it, but I'm a little concerned of the authenticity of the information on it, so, and as far as it being complete information.

         MR. WISEMAN:  Let me ask a couple of follow-up questions, if I might.

USCA5 3603

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Dr. Cunningham, when you received this document, did you sort through it and remove any information from it?

A.   No, sir, I did not.

Q.   Does your staff routinely and in the regular course of your business maintain these types of documents?

A.   Yes, sir, they did, and they advise me --

        THE COURT:  Well, Page 1 they just created.

        MR. WISEMAN:  Well, they maintained it in the computer, I think, is what he said.

        THE WITNESS:  Page 1 is a printout.  It's a document that exists in the computer.  This is just a printout of all the notes under ACT! for this case.

BY MR. WISEMAN:

Q.   Are they altered in any way from the way they appear on the computer?

A.   No, sir.

Q.   Other than the way they're laid out on the page?

A.   No, sir.

        MR. WISEMAN:  Your Honor, I think this is, it's a business record.  It's a contemporaneous record.

        THE COURT:  It's not really contemporaneous.  I'm not understanding.

        MR. WISEMAN:  Well, it's contemporaneous at the time

USCA5 3604

it was made.  I mean, obviously the printout happened yesterday.

THE COURT:  Well, the search was made.

MR. WISEMAN:  Correct, and was printed out yesterday.  But when it's put into the computer, it's put in as a contemporaneous record.  I think Mr. Roberts --

THE COURT:  How do you know that?

MR. WISEMAN:  He just told us.

THE COURT:  Okay.

MR. WISEMAN:  And I think Mr. Roberts' position really goes to a question of weight, not admissibility.

THE COURT:  I think you're right.  P-167 is admitted.

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  Don't say that.

MR. WISEMAN:  Oh, okay.

THE COURT:  That's all right.

MR. WISEMAN:  It's a bad habit.

THE COURT:  Well, I know.  I wish you lawyers would never say that.

MR. WISEMAN:  Your Honor, I understand the point.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   Dr. Cunningham, between P-151 and P-167, and I'm going to ask you this with a qualification, I mean, I expect you've thought thoughts about this case, you may have, you know,

USCA5 3605

written a note some place or another, but do these two documents reflect the significant, substantial tasks and actions you took in regard to your involvement in this case? Long question.

A.    The billing statement, the notations in ACT!, the notations in Daily Messages were contemporaneously prepared at that time, indicating significant contacts.  There are other contacts, in terms of brief phone calls, that sort of thing that occurred, that did not make it onto the billing statements, for example, that are alluded to in the Daily Messages or in ACT!, for example.

Q.    And so let me just ask, a quick phone call about what time should I be there, that's not going to make it on the billing statement?

A.    Yes, sir, that's correct.  It could be longer than that. It could be three or four minutes, and I simply didn't bill for that time.

Q.    Okay.  So then your answer, with that qualification, is "yes" or "no" to my question?

A.    Yes, sir, that's correct.  That is my best recollection of the substantial activities that occurred.

Q.    Okay.  I want to now show you an entry from the Court's docket --

          MR. WISEMAN:  Your Honor, I --

          THE COURT:  You know, we're at 12:00 o'clock.

USCA5 3606

MR. WISEMAN:  Oh.

THE COURT:  Is this a good time to break?

MR. WISEMAN:  Oh, sure, if the Court likes, we can do that.

THE COURT:  We'll do that.  Would you call the next case, please?

THE CLERK:  Yes, Your Honor.

THE COURT:  1:00 o'clock.

MR. WISEMAN:  1:00 o'clock.

THE COURT:  Is that all right?

THE CLERK:  Yes.

THE COURT:  1:00 o'clock.

(Recess from 12:02 p.m. to 1:02 p.m.)

THE COURT:  Okay.  Good to go.

MR. WISEMAN:  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. WISEMAN:

Q.   Dr. Cunningham, when we broke, I was about to ask you about an entry on the Court's docket.

MR. WISEMAN:  And Your Honor, for purposes of this examination, I'm going to be referring to certain entries in the Court's docket that we printed out on September 15th of this year, just for some historical perspective.  The docket --

THE COURT:  You want documents to be printed out?  Or what are you --

USCA5 3607

MR. WISEMAN:  I just printed it out for my purposes.

THE COURT:  Okay.

MR. WISEMAN:  I can mark it.  I assume there's no need to do that, since -- unless you want it.

THE COURT:  No.

MR. WISEMAN:  No?  Okay.

THE COURT:  Thank you.

BY MR. WISEMAN:

Q.   Dr. Cunningham, the document reflects that on --

THE COURT:  I was just going to show you how to do it.

MR. WISEMAN:  Oh, no, no.  We're very good with PACER.

BY MR. WISEMAN:

Q.   September -- I'm sorry -- July 16, 2003, Docket Entry 74 reflects that Ms. Booth for the Government announced that the Government will seek the death penalty.  And then two days later, September (sic) 18th, there's a scheduling order, and it's Docket Entry 76, setting trial for February 16th, 2004.  I just want you to keep those dates in mind.

A.   I'm sorry, can you tell me again when the case was set for trial in February?

Q.   Sure.  February 14th it was set for trial.  And that happened on July the 18th --

A.   Yes, sir.

USCA5 3608

Q.   -- 2003.

A.   Yes, sir.

Q.   I seem to have misplaced the marked exhibit.

MR. WISEMAN:  Your Honor, I seem to have misplaced the marked exhibit of P-8, which is the e-mails.  With the Court's permission, I'm going to use my copy, which unfortunately is marked up, but I'll --

THE COURT:  P-8?

MR. WISEMAN:  P-8.

THE COURT:  It was admitted.  Do you have it, Ms. Scotch?

MR. WISEMAN:  Oh.  Oh, we found it.  Thank you.

BY MR. WISEMAN:

Q.   Page 4 of P-8 -- I'm sorry -- all right, Page 15 of P-8, I'm going to put that up on the screen.  And I want to direct your attention to the e-mail dated 7/25/2003.  And is Mr. Gilmore giving you some advice with respect to this, your involvement in this case?

A.   Yes, sir.

Q.   And what is he telling you?

A.   He's advising me that there is a reciprocal discovery that has had a deadline identified for mid December --

Q.   Okay.

A.   -- to disclose my information.

Q.   And before that, he's telling you that the Judge has

USCA5 3609

agreed, Judge Jack agreed to appoint you to the case, trial was reset for February 2004. And of course, we just went through the docket which indicated that it's February 14th. And he advises you the reciprocal discovery date in December?

A.   Yes, sir. He has a -- also identifies he has a call in to Charlotte Holdman, who is a mitigation investigator. We're now 25 days into the correspondence that I had with him on July the 1st, indicating that if the mitigation investigation proceeded aggressively and immediately, I could be ready in January. So we've already lost 25 days, and there's not yet apparently an, a mitigation investigator on board.

Q.   Okay. I want to take you back then to your invoice. By the way, your invoice is dated April 30th, 2007. Can you explain that date?

A.   Yes, sir. That's the date that this copy was printed. The nature of the software is that when you go in and print a bill, it prints it with that date, not the date of the original billing.

Q.   Okay. And I want to direct your attention to between July the 9th, 2003, and January 22nd, 2004. The invoice reflects what activity during that period of time?

A.   There's no activity that I billed for. There were some brief telephone conferences that occurred, but there was no billable activity.

Q.   And I want to take that exhibit off and put back up 167,

USCA5 3610

and I want you to focus on the entry --

THE COURT:  Could you zoom that so we can all read it?

MR. WISEMAN:  Yes, absolutely.

BY MR. WISEMAN:

Q.    -- the entry that's dated 11/17/03.  Can you read that to the Court?

A.    Yes, sir.  "Called Douglas Tinker.  He said they have a few investigators working on getting information.  Will send records to us sometime in December, hopefully no later than mid December.  Attorneys are aware of the previous time line and are working with Judge to get a continuance/extension."

Q.    Okay.  Now, there's a few things in that I want to cover.  The previous e-mail advised you there would be a reciprocal discovery deadline of mid December, and this document is telling you that Mr. Tinker said he's hoping to get you records in December.  Would that have been, in your view, a sufficient amount of time to process the records, do what you need to do, and produce a report for discovery?

A.    No, sir.

Q.    Were you under the impression, in reading this, that a continuance at that point from what is now the February 2004 trial date was likely?

A.    Yes, sir.

Q.    And why in that e-mail did you make note that the

USCA5 3611

attorneys are aware of the previous time line you had provided to them that you required for your work?

A.    I don't understand the question.

Q.    Sure.  In this note, you say that attorneys are aware of the previous time line.

A.    This is a note that was created by Tammy Lam, my administrative assistant.

Q.    Okay.

A.    This is a call she initiated, and she is simply reporting the contents of that.  And as we have a case file, we identify deadlines that may be present so that we're keeping up with those.  So that's part of why she's initiating this call, is that deadline is rapidly approaching, and we have received nothing at all at that point.

Q.    Now, up to that point, and by "that point" I mean the last date we were talking about, which was 11/17/03, had you yet met Mr. Bourgeois?

A.    No, sir.

Q.    And had you, as yet, engaged in any interviewing the potential witnesses?

A.    No, sir.

Q.    Processing any information relevant to the case?

A.    No, sir.

Q.    And why, for all three of those things, why weren't you doing anything?

USCA5 3612

A.    I had received no records from Defense Counsel or from the mitigation investigators.  I had received no summaries of mitigation investigation interviews.  I had no psychosocial history that would provide a narrative summary of the mitigation themes that had been developed of Mr. Bourgeois's background.  I had no detailed and annotated time line to orient me to the case.  I was delaying my own interviews of Mr. Bourgeois and third parties until I had receipt of those materials, so that those interviews could progress in the most efficient and effective fashion.

Q.    So basically, you had nothing to do at that point.

A.    I suppose I could have initiated an interview of Mr. Bourgeois in the absence of having any background information whatsoever.

Q.    And would that be your standard practice?

A.    No, sir.

Q.    And is that an advisable practice?

A.    It's not the best practice.

Q.    And why not?

A.    The more information that the psychologist has in advance, the better able the psychologist is to detect if the report that the Defendant is giving is discrepant with other records or with other reports, either that the Defendant is exaggerating background factors, which happens less often, or is providing a, an overly sanitized and positive report of his

USCA5 3613

family experiences and background, which occurs more often.

If I already know the history that's been provided by records and by other interviews, then as I ask the questions, I know what to zero in on, what to obtain more information about. I'm better able to challenge discrepancies as they occur.

Q.   Let's now look at Page 20 of the e-mail packet, P-8.  And I want you to read for the Court that e-mail dated December 1st, 2003, 12:36 p.m.

A.   "Dear Mr. Gilmore:  Could you please kindly provide update to the above case, as I am in the process of reviewing and scheduling Dr. Cunningham's trial reports, time line and travels.  Thank you, and kind regards, Tammy."  That's Tammy Lam, who is my administrative assistant.

Q.   Okay.  And I'm going to turn to the previous page, which is 19, and ask you to read Mr. Gilmore's response, which came about 14 minutes after the first e-mail.  That will be right there.

A.   "Dear Mr. Gilmore:  Thanks for the update.  We will pencil into our calendar --"

Q.   You know what, let me stop you, because I've been reading this out of order, and that's my fault.  Oh, I see what it is. Okay.  I want you to read the e-mail that starts December 1st, 2003, 12:43 p.m., which actually is contained on the next page right there, "I am trying."

A.   Yes, sir.  "I am trying to get a continuance.  The case is

USCA5 3614

currently set for trial on February 16th.  However, the mitigation investigators say that they will not be finished by then."

Q.   Okay.  And finally with this section, if you could tell us what Ms. Lam then replies to Mr. Gilmore, and that would be the 12:50 response.

A.   "Dear Mr. Gilmore:  Thanks for the update.  We'll pencil into our calendar and would appreciate further update to this case.  FYI, we have yet to receive any records/information/ materials for Dr. C to begin working on the report.  Thank you and regards, Tammy."

Q.   Okay.  So we are now at December 1st of 2003, and I take it from that exchange that you still have nothing.

A.   That's correct.

Q.   I'm going to put up for you a document which is marked Defendant's P-140 -- I'm sorry -- Petitioner's 144, which is a motion that was docketed in this court on December 9th, 2003. It's captioned "Motion for Continuance."  I want to read the operative portion of the two sentences and ask you a question.

On the first page, it says, "Defendant's Attorney, John Gilmore, has been informed by the mitigation investigators, Lisa Milstein and Gerald Bierbaum, that they cannot properly complete their investigation of this case until August 2004."

And my question to you, sir, is were you consulted by Mr. Gilmore as to the actual filing of this motion?  I know he

USCA5 3615

told you he was thinking about asking for a continuance.  Did he call you up and say, "I'm filing this motion, and we're asking for August"?

A.    Not that I recall.

Q.    Now, I want to show you another motion that was docketed or filed in this court -- it doesn't have a docket stamp on it, but it's dated December 16th, 2003.  It's Petitioner's 72, and it says, "Motion to Withdraw, Motion for Continuance."

And what it says in the operative portion on Page 1 is that the Defendant filed a motion for continuance alleging that the mitigation investigators could not complete their investigation till August of '04.  Defendant -- Attorney Gilmore contacted the investigators Bierbaum and Milstein -- I'm paraphrasing -- informed them the Court would not extend the deadline.

"The investigators informed Gilmore that they would suspend work on their other investigations and concentrate on completing their investigation on this case.  The investigators have assured Counsel that their work will be completed in time for the February trial setting," closed quote.

And my question to you is were you consulted on whether at that point you could be ready for trial in February and the December discovery deadline, given the then current state of the mitigation investigation?

A.    No, sir.

USCA5 3616

Q.   And did Mr. Gilmore call you up and say, "I'm filing this motion to withdraw the motion for continuance, and can you be ready?"

A.   Not that I recall.  I don't have a recollection of being informed that there was a motion to withdraw the request for continuance.

THE COURT:  Could you have been?

THE WITNESS:  It's conceivable.  I remember becoming increasingly concerned and panicked in December and January about the absence of any materials in my possession.  So I can't imagine that I would assure them, yes, I can be ready, when I had nothing in my possession as of the 1st of December.

BY MR. WISEMAN:

Q.   I want to put up for you again, and hopefully that will assist with your response to the Court's last question.  This is 167.  It's your, the first page of your ACT! sheet, A-C-T. Is there any indication that you received such a call from Mr. Gilmore or Mr. Tinker in December of '03, other than the one of 12/1 indicating the trial set for 2/16?

A.   No, sir.  I might also -- I don't have a copy of this in front of me.  I might also look at the daily messages calendar.

Q.   I'm going to give you that next.

A.   Yes, sir.

Q.   And in fact, on 12/1/03, Mr. Gilmore's e-mail indicated to you, the trial was still proceeding in February, according to

USCA5 3617

the sheet.

A.    Yes, sir, but they're working on getting a continuance.

Q.    Working with the Judge, I think, was the --

A.    Yes, sir.

Q.    And do you see anything in the relevant daily messages -- there's nothing from December of '03.  Is that right?

A.    That's correct.  I think that's a function, though, that as far as we could go back in our system was January.

Q.    Oh, is that right?

A.    Yes, sir, in terms of retrieving Outlook messages.

Q.    I'm glad you clarified that.  Thank you.

      All right.  I want to bring you back to your invoice and ask you if you can tell the Court the date on which you, if you can tell the Court, and if so, what date that you first received any mitigation information in this case.

A.    January 31st, 2004.

Q.    And how do you know that?

A.    I billed for 80 minutes for review of mitigation interview summaries.  At that time I was, as I have said, extremely concerned about the receipt of those.  And my recollection is I reviewed them immediately upon receipt.

Q.    Okay.  And can you make any determination -- that doesn't say what you received or, you know, what type of information, but can you make any judgment from the fact that you billed for 80 minutes as to the number of interview summaries that were

USCA5 3618

sent to you?

A.   It certainly would have been more than three or four.  I'm not only reviewing these, but I am trying to analyze and understand their significance as well.  You know, in 80 minutes, given the very brief nature of many of these summaries, I anticipate that I could have gotten through ten or twelve of them.

Q.   Okay.  So anywhere from three to a dozen, depending on which ones they were and the information in them?

A.   Yes, sir, that's correct.

Q.   Okay.  Now, this is at this point about two weeks before the initial start of trial, 2/14.

A.   Yes, sir.

Q.   Of course, trial started a little later than that, but at that point, it was still set for 2/14.  I take it from your prior testimony that two weeks is not an adequate amount of time for you to begin to do what you needed to do?

A.   That's correct.

Q.   And was it even a close call?

A.   No, sir.

Q.   I'm going to show you a new document.

        MR. WISEMAN:  Your Honor, I'm going to offer these, subject to -- well, initially I'm just going to ask for him to look at it, but I'm telling the Court that I'll offer these eventually through Mr. Bierbaum or Mr. Gilmore.

USCA5 3619

BY MR. WISEMAN:

Q.   These are e-mails that came from Mr. Bierbaum's file, and they are to you and other people involved in the case.  It's marked at Petitioner's 60.  And for the record, it is 16 pages in length.

I want to direct your attention to this first one, which is dated January 30th, 2004.  And if you'll just read us where it says, "Dear Dr. Cunningham."

A.   Yes, sir.  "Here's a bunch of material from Bourgeois's case.  Please call me when you get a minute so we can set up a meeting between you, Dr. Holden, Mr. Tinker and Mr. Gilmore.  I'll send this in sections so it won't clog up your e-mail server.  Some of these are in WP, Word Perfect.  Let me know if you can't convert them, and I'll do it here."

So I stand corrected.  I received those on January the 30th.  I reviewed them on January 31st.

Q.   Okay.  Do you have any independent recollection of why you didn't review them the minute you got them?

A.   No, sir.  I would have to go back and look at the day sheet from that day to see what other tasks I was involved in or if I was even in town.

Q.   I'm going to put up another document now which is marked as Petitioner's 165.  Have you seen this document before?

A.   Yes, sir, I have.

Q.   And can you describe what it is?

USCA5 3620

A.   Yes, sir.  This is a chronological listing of the mitigation investigation interviews that were conducted by Lisa Milstein and Gerald Bierbaum.  The date in the left-hand margin reflects either the date that the interview content specifies the interview was done, or it specifies the date that the interview summary was typed up, because a number of those interview summaries only have the date that the summary is prepared, do not have the date of the actual interview.

Q.   Are you confident that the date column does not reflect the date you received these things?

A.   Yes, sir.

Q.   Is there any error?  And in particular I want to refer to the very first entry, 10/23/2002.

A.   Yes, sir.  That wasn't in 2002.  That was in 2003, as I understand it.

Q.   All right.  So the summary itself was incorrectly dated?

A.   That's correct.

Q.   Okay.  Now, did you compile this document?

A.   No, I did not.

Q.   All right.  Did I provide it to you -- it's three pages in length -- and ask you to compare it with the interview summaries that you may have had in your possession?

A.   Yes, sir, you did.

Q.   Okay.  And when I say "in your possession," I mean ones that were sent to you.

USCA5 3621

A.    That's correct.

Q.    Are there any on this list that you determined from a review of your file that you have not, that you never received from trial counsel or his mitigation specialists?

A.    Yes, there are.

Q.    And which three are those?

A.    Well, there are two of those.

Q.    I'm sorry, two.

A.    There is the Gaynell Collins, dated 1/15/04.  I don't find that in my files.  And there is Gaynell James and Anthony Belvin, dated 1/16/04.  I don't find that one in my files.

Q.    So that's two people on one summary?

A.    Yes, sir.

Q.    Okay.  Other than that, though, does this document, is it an accurate summary of what you received, from who you received it -- I should -- withdraw that.  What you received, who conducted the interview, and either the date of the interview or the transcription of the interview?

A.    Yes, sir.  This is consistent with what's on those documents that I was provided.

Q.    Okay.  Thank you.  Now, let me put this back up.  I took it away a little too soon.  I want to draw your attention to Page 2, and in particular, ask you to look above the date of 2/3/04.  So that would be starting at 1/29/04.  And tell the Court if this is the totality of what you had received by, at

USCA5 3622

most that you received by January 31st of 2004.

A.   Yes, sir.  That reflects the most that I could have received if every interview that had been done prior to that time I was provided by Gerald Bierbaum.

Q.   And you have no way of determining if you actually received all of these things before 2004?

A.   That's correct.

Q.   I'm sorry, before January 30th of 2004.

A.   I don't know that I received all of these documents in that first shipment on January the 30th, 2004.

Q.   Okay.  And again, your invoice reflecting 80 minutes makes you think you received somewhere between three and a dozen of them?

A.   Well, there were certainly more than three.  I would anticipate in the neighborhood of eight to fourteen --

Q.   Okay.

A.   -- for that amount of time.

Q.   All right.  So --

A.   I don't think I could have gotten through all of these in 80 minutes.

Q.   Okay.  "All of these" meaning all of the ones from before?

A.   The ones that had been done up to January the 30th.

Q.   All right.  Now, I want you to put on your standard of care hat and ask you, with trial two weeks away, can you describe the state of the mitigation investigation and your

USCA5 3623

ability to perform your role, given the most you could have had as of January 31st, 2004?

A.    The state of the investigation was abysmal.  The summaries that I was provided were in most instances superficial and incomplete, reflecting little generational family history and little in the way of development of information.

For example, the summary that I was provided, based on the interview of his mother, was about two-thirds of a page, and that's not single-spaced.  That's almost as if every sentence is a separate paragraph.

Q.    And who --

A.    And so it's the most fragmented of information.

Q.    Who conducted that interview, according to the summary that was provided to you?

A.    That was conducted by Lisa Milstein.

Q.    Okay.  As you began to review these and start to compare them to each other and begin to make some inquiries of your own, did you notice errors within the summaries that were provided to you?

A.    Yes, sir, I did.

Q.    And give the Court an example or two of what you were finding that caused you to conclude that there were some errors.

A.    The interview that Ms. Milstein did of Lloyd Ferdinand, Jr., who's a maternal half-brother, the interview summary is

USCA5 3624

dated November 25th, 2003, reported that their stepfather, Godfrey -- this says "Godfer Rickson," which is also incorrect -- was killed in a motor vehicle accident while intoxicated.

That simply is not part of the history of this case. There are subsequently other individuals who refer to him still being alive, that he separated from Eunice but is still living.

THE COURT:  This is the person you recommended?

THE WITNESS:  It was one of the names that I provided, yes, ma'am.

BY MR. WISEMAN:

Q.   That's a pertinent question, Dr. Cunningham.  Did you subsequently come to learn of certain difficulties Ms. Milstein was having in her personal life at this time?

A.   I was advised of that by Gerald Bierbaum.

Q.   And we're going to have Mr. Bierbaum here, and he can certainly be cross-examined, and we won't offer this for the truth, but just to give the Court a sense of where we're going. What did you learn?

A.   My recollection was he described that she was having difficulties with cocaine abuse.

Q.   And you didn't know that at the time, I take it?

A.   No, sir.

Q.   Can you think of any other errors that you began to see in that material?

USCA5 3625

A.   Yes, sir.  There was an interview that was done of Michelle Warren, who is a maternal half-sister, on February the 3rd, 2004, reporting an incident when Michelle was age 16 that Alfred lost it and was hitting her over and over.  I interviewed Michelle Warren, and she advised me that he only hit her a single time.

There was a interview summary that was done by Gerald Bierbaum of Alfred Sterling, who's the biological father.  This is a March the 2nd, 2004 interview that reported that Alfred Sterling, Sr. had 25 years of service in the U.S. Army.  Actually, it's his son, Alfred Sterling, Jr. who has 25 years of service in the military.  Again, a pretty significant error as we're talking about a critical individual in Alfred Bourgeois's life, his biological father.

Q.   All right.  Now, let me ask you, as you began to use these materials and discovered certain errors in them, what did that do to your ability to rely on them and how did it affect your schedule?

A.   Well, I was already concerned about the inadequacy of detail and development of history in these interviews.  Now there are also fundamental errors of fact, so that I have -- my confidence that I could independently rely on these was significantly reduced.  Both because of that inadequacy of depth, as well as fundamental errors, I realized that I was going to have to interview individuals and primarily rely on my

USCA5 3626

own findings, that I couldn't rely on the history that they provided.

Even things like, there was another one, an interview of Keith Rixner, who is a maternal half-brother, they describe Keith as listing his siblings in order.  The order is wrong that the siblings are in.  And so I --

THE COURT:  Did you point that out to the attorneys?

THE WITNESS:  Did I not have contact with the attorneys.  I told Gerald Bierbaum early on --

THE COURT:  Okay, well, this is --

THE WITNESS:  -- that I was greatly alarmed.  And when I came out from my interviews --

THE COURT:  Well, this seems to be a failure of the mitigating investigators, not the attorneys.

MR. WISEMAN:  Well, Your Honor, I think we're going to tie that together, and I think you'll --

THE COURT:  Rather quickly.

MR. WISEMAN:  Well, absolutely.

THE WITNESS:  All right.  Let me clarify.  My recollection is that I advised the attorneys of this when I came out to meet with them --

BY MR. WISEMAN:

Q.   That was my next topic.

A.   -- in early February, when I came out to interview Alfred Bourgeois, that I was concerned about the reliability of the

USCA5 3627

interviews that Lisa had done.

THE COURT:  Did you say exactly why?

THE WITNESS:  My recollection is that I gave details about that.  I know that I told Gerald Bierbaum that.

THE COURT:  Is there some indication on your ACT! that you did that?

THE WITNESS:  No, ma'am.  The ACT! are not entries that I make.  Those are entries that my assistants make.

THE COURT:  Okay.  So you could receive phone calls without having it entered.  Is that right?

THE WITNESS:  That's correct.

THE COURT:  Okay.  I just want to make sure. Everything is not recorded there, which is why Mr. Roberts was objecting to it.

MR. WISEMAN:  Yeah, and we, I think, qualified initially that it doesn't have every single phone call.

BY MR. WISEMAN:

Q.   Let me ask you this, Dr. Cunningham.  If an entry involved a phone call of some substance, 20 minutes, 30 minutes, would you have indicated that on your invoice?

A.   Typically.

Q.   Okay.  I mean, you don't work for free, but it's a matter of some degree of time.

A.   That is correct.

Q.   On the contrary, a quick phone call is not going to get

USCA5 3628

reflected.

A.   It may.  A phone call of greater length is almost certain to be reflected.  But briefer phone calls, even ten minutes, I might not make note of.

Q.   Okay.  I want to, in response to the Judge's question about advising the attorneys and your response that you didn't have much contact with them, I want you to look back at 167, and it's the entry dated 2/3/04.  And I'll zoom it so we can see it better.  All right.  And it's the 2/3/04 entry.  And what does that say?

A.   2/3/04.  "Bourgeois:  Bierbaum wants MDC to come for team meeting.  Looking at 2/12 or 2/13."  That's a follow-up from an earlier attempt to schedule a team meeting about 12 days earlier.

Q.   Okay.  And that would be the --

A.   Ten days earlier.

Q.   -- 1/21 entry?

A.   Yes, sir.

Q.   Why don't you read that for the Court?

A.   "Bourgeois:  Provided Bierbaum 1/26 as the date for MDC to be in Corpus Christi for a one-day team meeting.  However, he came and indicated that date is not good for the attorneys; therefore, he would have to come back to us an alternate date."

Q.   Okay.  I'm going backwards here.  Why don't you read the one above that, which is the initial e-mail about a team

USCA5 3629

meeting.

A.   "Bourgeois:  Gerald Bierbaum called.  He's trying to schedule a team meeting for next week.  He wants MDC to be in Corpus Christi sometime next week for a one-day team meeting. Voir dire begins February 8th, evidence on March 8th or 10th, MDC to testify about March 15 for one day."

Q.   Now, if -- well, let me ask you this.  Prior to this, these three entries you just read, is there anything in your, either of these exhibits that reflects an attempt on the part of the lawyers to conduct a team meeting?

A.   No, sir.

Q.   All right.  And did you in fact have any type of a team meeting with any of the lawyers up until the date of these entries?

A.   No, sir.

Q.   Given the state of the investigation, did you go through any type of decision-making process as to what your alternatives were, given the situation you were in?

A.   Yes, sir.

Q.   And tell the Court what that process was.

A.   My thought process was that there were no, there were no good alternatives, that if I withdrew because we're now on the eve of trial, that I would be abandoning this case.  On the other hand, if I proceeded, this was exactly what I was trying to avoid in the beginning when I declined a retention, unless

USCA5 3630

there was a period of time that would allow it to be done correctly. And so my perception was that there was no good alternative and that I did not, I didn't feel like it was appropriate to abandon Mr. Bourgeois. The last communication that I had had was that this trial date could not be moved.

Q. Did you, after making a decision to stick with the case, despite your concerns, what was the next thing that you did of any consequence in the case?

A. Schedule an interview trip --

Q. All right.

A. -- to come into Corpus to interview Mr. Bourgeois and meet with the attorneys.

Q. Do you recall when that interview happened?

A. Yes, sir. That interview occurred on February the 7th, 2004.

Q. I want to show you Page 2 of Petitioner's 151, which is your invoice. And is that activity reflected on your invoice?

A. Yes, sir, it is.

Q. All right. And so it appears that you traveled on 2/6, and on 2/7 you got to Corpus Christi. Describe the events of that day, as you recall them.

A. I'd been advised that Mr. Bourgeois would be available for me to begin my interview process early that morning of February the 7th, and so came to the courthouse for that purpose. I was advised that he was not here but was en route. I then went

USCA5 3631

back to the hotel and began to do telephone interviews of third

parties, so as to make use of that block of time.

I did that up until the conclusion of my interview of

Lloyd Ferdinand, Jr., the half-brother. I finished with him at

about 11:15 in the morning, as I recall. The next -- I started

my interview of Mr. Bourgeois at 2:10. And so between the

hours of 11:15 and 2:10, I went to the attorney's office, met

with them. I think that we went to lunch. Then I went back to

the --

Q. Let's stop at that meeting --

A. Yes, sir.

Q. -- for a moment, just so I can ask you about the meeting.

That was the first time you met either of the lawyers face to

face?

A. That's correct.

Q. Were you able to have a substantive conversation about the

case at that point in time with them?

A. I wouldn't describe it as substantive, in that I did not

yet have a lot of information. I had not yet met

Mr. Bourgeois. I had very little in the way of records and had

only fragmented and inadequate mitigation interview summaries

that had been provided to me. So I had an emerging hypothesis.

I was in a position to describe the nature of the things that I

usually will look at and how that will be presented, either in

mitigation or in terms of violence risk assessment. But case

specific information was limited.

Q.    Okay.  And let me just ask you, if you had gotten these, what you've described as inadequate interview summaries 90 days earlier, so let's say instead of January 30th, you would have gotten them November 30th -- is that 90 days?  Let's say November 30th.  Would you have been able at that point to make known to the mitigation specialist, this is not adequate, I need this, I need that, I need more, I need more depth?  Could you have corrected the problem?

A.    Yes, sir.  You're describing a 60-day period of time.

Q.    Sixty-day, right.

A.    If I had gotten it 60 days, then yes, sir.  As I looked at that, I would have described the inadequacy that it represented.  Again, when the summary of the interview with mother is like half a page, that is on its face inadequate.  But I did communicate to Gerald Bierbaum my concern with the depth of the interviews, as well as how few there were.

Q.    All right.  And that would have been at that point into early February?

A.    Yes, sir.

Q.    Okay.  So you met Mr. Bourgeois then for the very first and only time, I take it, on February 7th, 2004?

A.    That's correct.

Q.    And we're now a week before the then set date for trial?

A.    That's correct.  I interviewed him for five-and-a-half

USCA5 3633

hours.

Q.    And subsequent to your interview, did you send a communication to Mr. Gilmore or Tinker with regard to aspects of that interview?

A.    Yes, sir, I did.

Q.    Let me put up for you what's been marked as Petitioner's Exhibit 1, ask you if you recognize that.

A.    Yes, sir, I do.

Q.    And what is that?

A.    This is a letter dated February the 10th, 2004, which is three days following my interview of him.  This describes my recommendations for a neurological evaluation, as well as a neuropsychological evaluation of him.

Q.    Okay.  Let me just ask you, while we've got you here, what's the distinction, in your mind, between a neurological evaluation and a neuropsychological evaluation?

A.    Yes, sir.  A neurological evaluation is one that's performed by a neurologist, by a physician who specializes in neurology.  And it would be focused on looking at the physical integrity and status of the patient's nervous system, reflexes and that sort of thing.

The neuropsychological evaluation is done by a neuropsychologist.  That's a psychologist with specialized training in neuropsychology or brain behavior relationships. And the neuropsychologist uses standardized assessment

USCA5 3634

techniques that measure this person's functioning, their brain expression in visual spatial memory concentration, executive functioning and judgment, compares it against a normative sample, so that you're able to identify what practical deficits are present in this person's brain functioning as it's expressed in capabilities that are determined or mediated by the brain.

Q.   And one more question on that.  Is it, in your experience and knowledge, possible to see dysfunction in neuropsychological testing that would not appear in a neurological evaluation?

A.   Yes, sir, that's correct.  You can have deficits that appear in the neuropsychological assessment that are not apparent in that gross physical examination that's done by a neurologist.

In other words, as you think about a neurological evaluation, that has several components to it.  One is the physical examination and history taking that's done by the neurologist.  Another component is for there to be imaging studies that are done of the brain, either CT scans or MRIs that look at the anatomical structure of the brain, or EEGs that look at the electrical output of the brain, or PET scans that look at the metabolism of the brain as it's engaged in various tasks.

Those are all different components of a neurological

USCA5 3635

evaluation, distinct from a neuropsychological assessment.  And each of those may show deficits that are not apparent in one of the other assessments.

Q.    Okay.  That's satisfactory.  Thank you.  Now, in this letter that you sent on February 10th, 2004, what are the reasons that you cite for the need, in your view, to have a neurological and neuropsychological evaluation done of Mr. Bourgeois?

A.    There were several rationales.  Those that are specific to him include what was described to me as a significant head injury that occurred in approximately 1984, when a 3- or 4-wheeler that he was driving collided with a telephone pole.

The second aspect was a history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage.

Then there's also significant literature that identifies that there is a disproportionate incidence of neurological insults, neurological examination findings and neuropsychological deficits among violent offenders.  And so as a broad principle, these sorts of assessments are recommended in capital cases.

In his case, there were particular factors present from the interview that I did and from the third-party interviews

USCA5 3636

that I thought made that particularly indicated in his case.

Q.   Did you warn Counsel in regard to this evaluation that Mr. Bourgeois is not or was not, in your view, a reliable historian?

(PAUSE.)

Q.   Let me, while you're looking at that, let me show you an e-mail.  Let me show you an e-mail.  I think I may have been confused as to where that warning would have been.  I'm going to show you -- I'm going to show you Page 21 of Exhibit P-8.  Was this the e-mail that covered the letter that you just identified as P-1?

A.   Yes, sir, that's correct.

Q.   Okay.  And why don't you read that to the Court.

A.   "John," referring to John Gilmore, "please find attached in Word my rationale, recommendations for a neurological workup on Alfred Bourgeois.  Please emphasize to the neurologist and neuropsychologist who may be retained to perform these evaluations that Alfred is not a reliable historian regarding his medical or psychological, parenthesis, rage, parenthesis, history.  Accordingly, they may wish to contact his older sister Claudia for this information.  Please advise me if you require additional input or assistance on this issue."

Q.   Okay.  And my question then is what did you base your -- I'm calling it a warning -- but your suggestion that Mr. Bourgeois is not, in your view, at the time a reliable

USCA5 3637

historian?

A.    There were several features of the interview with him that caused me to think he was not a reliable historian.  He described to me regarding the 3-wheeler accident that he had an initial loss of consciousness for a couple of hours, and then was in a coma in the hospital for several months.  Then he revised that to being in a coma for one month.

When I interviewed family members about this, Claudia specifically, she recalled that he had a loss of consciousness but was not in a coma in the hospital.  In a --

Q.    Let me just ask you, when you conducted your interview of Mr. Bourgeois on February 7th of 2004, had you been provided with any hospital records with regard to any aspect of Mr. Bourgeois's life?

A.    Not that I recall.

Q.    Keep going.

A.    Regarding an injury to his nose, in his February 4th interview with Gerald Bierbaum and Mr. Tinker, he said his nose had been injured when his mother slapped him off the swing.  And then the mother told the doctor that he had hurt himself playing.

When I interviewed him three days later, he told me that his nose was broken when his mother hit him with a mop handle for lying in telling her of the sexual abuse that he said was perpetrated by Jacob Clayton, who he identified --

USCA5 3638

MR. ROBERTS:  Your Honor, may I just inquire what the witness is reading from?  I can't --

THE COURT:  What are you reading from?

THE WITNESS:  This is a summary of those discrepancies that I prepared.

THE COURT:  Since when?

THE WITNESS:  About four days ago.

MR. WISEMAN:  Why don't you show it to Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE COURT:  Please be careful of the microphone.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  Second page?

THE WITNESS:  Yes, sir.

MR. ROBERTS:  Can we get a copy of this?

MR. WISEMAN:  Absolutely.

BY MR. WISEMAN:

Q.   Did you prepare those documents for purposes of your testimony today?

A.   Yes, sir, I did.

Q.   Have you provided me with a copy of them?

A.   Yes, I have.

Q.   You have?

A.   Well, we discussed them.  I don't recall if I gave you a copy of them or not.

Q.   I'd love to have a copy.

USCA5 3639

MR. WISEMAN:  Does the Court want us to get a copy now, or can we keep going and get it for cross?

THE COURT:  Do whatever you want to do.

MR. WISEMAN:  Okay.  Why don't we keep going and we'll make a copy for Mr. Roberts for his cross-examination, if that's all right.

BY MR. WISEMAN:

Q.  Why don't you give us another example of why you believed he was not an accurate historian.

A.  I was describing the February 7th --

Q.  Yes, that's right.

A.  As I interviewed him about how his nose came to be injured, he said that his mother hit him with a mop handle for lying in telling her about the sexual abuse he said was perpetrated by Jacob Clayton, who he identified as a gay son of Mary Clayton, the woman, elderly woman that he had gone to live with.

He described that his mother told the doctor that he had fallen off a swing, when he said they didn't even have a swing. About three days before, he said that his mother had slapped him off the swing.  And then that he had injured himself playing is what she had said.

In that same interview on February the 7th, he described that he played high school football in ninth and tenth grades. When I asked him if he lettered, he did not understand that

USCA5 3640

concept of what that meant to letter, which suggested to me someone who in fact had not been involved in high school athletics. Michelle, his maternal half-sister, did not recall him playing sports in school or football in high school.

My interview, he told me that he had never touched a drop of alcohol. He had never tasted alcohol. When I responded a little incredulous at that, that he had never even tasted it, he then modified it that in 1994 he drank a daiquiri a month, but then modified that to say, so that was like two or three times in his life, and then that he drank amaretto and pineapple twice in 2000.

Q. So let me ask you, as a general matter, when you see these type of discrepancies -- and let's take the biggest one, the alleged coma that I think we all agree didn't occur, do you chalk that up to the subject being a liar, a malingerer, or something else?

A. There can be a lot of reasons why the person doesn't give you a correct report. The bottom line is I can now not rely on the things that he tells me, without corroboration, because now I don't know which part of that is an accurate report and which part may not be correct.

Q. Let me ask you a more precise question then. There's been some suggestion in these proceedings that Mr. Bourgeois's report of his coma was a malingering attempt to exaggerate his, you know, potential deficits or reasons why he'd have deficits.

USCA5 3641

Did you necessarily conclude, when you learned that there was no coma --

MR. ROBERTS: Your Honor, I'm going to object. I don't remember any testimony that has gone that direction.

MR. WISEMAN: Well, that's not the Government's position? Your Honor, I think the Government's position is that he lied about the coma to make up about a brain injury he didn't have. If that's not their position, I would be happy to move on. I'm assuming that combined with the Court's concerns about malingering that we need to address that issue. And I think this expert can shed some light on whether it's necessarily a sign of malingering.

MR. ROBERTS: I certainly don't have any problem with him testifying about whether he believes that would be a sign of malingering or not, but the qualifying question or the way that he phrased the question I object to again.

MR. WISEMAN: Well, I'll ask it more simply.

BY MR. WISEMAN:

Q. Do you think that that necessarily is a sign of malingering?

A. No, sir, not -- not in the broader context. He was describing a history of himself as being unimpaired. He's describing things like playing football in high school, being highly coordinated. His presentation generally was representing that he was highly competent and capable and

USCA5 3642

socially adept.  He didn't report that he was having rage attacks.  He was denying that he had temper-related problems.

And so his, his reports are fanciful in some respects.  They generate additional attention for him.  They may have some additional drama associated with them, but they, they do not appear to be connected to any representation of himself as being impaired.

Q.   And how does one in your position then try to get to the bottom of what is the truth about a person who tells you something like that, that isn't necessarily corroborated?  What do you do with that information?  How do you proceed?

A.   I may describe that history in my testimony, with the caution that this is solely relying on his self-report.  And he has told me other things that are not true, when I try to compare them.  I wasn't there.  I don't know what happened.  But this incident is, in this case, it's clearly inconsistent with the medical records that I eventually reviewed that talk about him being awake and alert in the hospital, following his surgery for this accident.

So I may say I can't corroborate it.  I may limit my testimony to what I can obtain from third parties or only the part that third parties could also corroborate.

Q.   Okay.  Before I ask the next question, I just want to note that Docket Entry Number 196 of 2/25/2004 indicates that jury selection is completed and the jury is sworn.  It says, "Jurors

USCA5 3643

sworn," to be more precise.

So on that date, 2/25/04, what was the state of the mitigation investigation? Had it progressed? And if so, to what degree and -- well, why don't you see if you can answer that much.

A.    Well, it was still in a very rudimentary position. At this point, I had at least interviewed him. I had recommended neurological and neuropsychological assessment, although the findings of those were not yet available to me. I had performed some interviews myself of third parties and more interviews were being provided to me by the mitigation investigator. So it was progressing, but it was still painfully inadequate.

Q.    Had you at that time, as of 2/25/04 received a comprehensive social history, as you had indicated initially would be required?

A.    I received it at about -- well, I received a chronology and social history at about that time, because I have a note on my bill that I reviewed mitigation interview summaries and chronology on February 27th, 2004.

Now, the narrative summary that I was provided was just over half a page in length. And the chronology that I was given only had one, two, three, four, five entries up to his graduation from high school.

Q.    And --

USCA5 3644

A.   So it starts at his birth, and there are five entries from birth to graduation from high school.  It contains no generational history whatsoever, and only the most fragmented chronology in terms of the critically important first 18 years of his life.

Q.   And did you -- how much time did you spend reviewing those materials on February 27th, 2004?

A.   I spent 18 minutes.  That likely included interview summaries in addition to the chronology and narrative summary.

Q.   So my initial question was had you received a comprehensive social history, and what would your answer to that be?

A.   I had not yet reviewed it.  It would have been received close to that --

Q.   Well, did you consider the materials you received on February 27th to be a comprehensive social history?

A.   No, sir.  It was a chronology entitled "Narrative Summary."  It was not a comprehensive summary.

Q.   Okay.  From the time of your first contact with Mr. Gilmore on June 30th of '03, until the time the jury was sworn on February 25th, '04, had you had any discussions with Counsel about the direction that the mitigation investigation was taking or your ideas about what direction it should take?

A.   I don't recall that I had up to that time.

Q.   Okay.  And so the February 7th meeting in their office

USCA5 3645

does not meet that description?

A.   No, sir.  That would have involved the most rudimentary of discussions, in that I had relatively little information at that time and had not yet seen him myself.  I would have discussed violence risk assessment perspectives with them at that time, because that information is primarily demographic in nature, in terms of the factors that are associated with violence in prison.

I would have described to them emerging themes from the limited mitigation investigation interviews that I had, but would not have been in a position at that point to have described in a definitive way the direction that I would identify mitigations proceeding.

Q.   And same question with regard to the mitigation specialists.  From the time that they first became involved in the will time the jury was sworn, had you had any face-to-face meetings with them?  I know there was discussion about a team meeting.  Did you ever sit down with them and say, "What have we got?  Where are we going?  What do we need to do?"

A.   No, sir.

Q.   Did you do that on the phone?

A.   There were telephone conferences.  They were of limited duration.

Q.   Is this lack of contact and -- well, withdraw that.  Would you agree that this was a lack of coordination between the

USCA5 3646

members of the defense team?

A.    Yes, sir.

Q.    And is that lack of contact and coordination a departure, in your experience, from the standard of care in capital mitigation?

          MR. ROBERTS:  Objection, Your Honor.

          MR. WISEMAN:  I'll withdraw the standard of care.

BY MR. WISEMAN:

Q.    Is it at variance with your experience in regards to the proper preparation of a capital mitigation investigation?

          MR. ROBERTS:  Objection, Your Honor.  I'm not sure there's a -- I mean, in his opinion -- again, it goes back to the fact that every case is different in how a case is proceeded.  So I don't have a problem with his expertise in mitigation, but I do have a problem with this question.

          MR. WISEMAN:  Your Honor, I thought we had agreed, or you had ruled, I should say --

          THE COURT:  Overruled.

          MR. WISEMAN:  Thank you, Your Honor.  Oh, I'm sorry. I said it again.  I'm learning.  It's hard to teach an old dog new tricks.

          THE COURT:  Tell me about it.

          THE WITNESS:  This did not reflect good practice, in my view.

BY MR. WISEMAN:

USCA5 3647

Q.   And when you train people and lecture on these topics, do you lecture them about the need for coordination?

A.   Yes, sir.

Q.   And is that consistent with the ABA guidelines?

A.   Yes, sir.

Q.   And with Supreme Court precedent?

A.   Yes, sir.

Q.   I want to show you the two reports which you provided to Counsel in this case.  First one is P-2.  It's dated February 25th, '04.  Do you recognize that as the first report you provided?

A.   Yes, sir, I do.

Q.   Okay.  And I'm going to turn the page, and I'm going to -- it's a two-page report?

A.   Yes, sir.

Q.   Okay.  And is a sparse -- oh, that's my characterization. Is a report of that size typical for your practice?

A.   This is shorter than the typical report would be.

Q.   And what was the reason that it was short?

A.   My own investigation was still at a rudimentary stage.

Q.   And you provided a second report also dated February 25th, and is P-3 that report?

A.   Yes, sir.

Q.   And what does that address?

A.   This addresses the violence risk assessment for prison.

USCA5 3648

Q.    And I want to turn your attention now to the neurological,
or I should say the neuropsychological evaluation you had
requested.  Did you eventually receive a report by a
Dr. Weiner?

A.    Yes, sir, I did.

Q.    Doctor, I'm showing you what's been already admitted
before the Court as Exhibit P-29.  Is that the cover page of
the neuropsychological evaluation done by Dr. Weiner of
Mr. Bourgeois?

A.    Yes, sir, it is.

Q.    And the date of the report is March the 3rd?

A.    Yes, sir.

Q.    And showing you again your invoice, you reviewed that
report on March the 4th, 2004?

A.    That's correct.

Q.    Now, the docket reflects that March the 4th, 2004, was the
third day of trial.  And that's Docket Entry 213.  Did you
consider the information contained in Dr. Weiner's report to be
of value for mitigation case?

A.    Yes, sir.

Q.    And just, we've heard a lot about neuropsychological
reports and evaluations.  Why don't you just give us a real
brief reason for why you thought it had value as mitigating
evidence?

A.    Yes, sir.  It describes his general intelligence as being

USCA5 3649

deficient.  It also describes cerebral dysfunction.  It describes that cerebral dysfunction would result in his handling stress more poorly.  From a -- in terms of its evidentiary value that Alfred Bourgeois has something wrong with his brain that would result in his having poor judgment and poor response to stress or could contribute to rage attacks, is a very important alternative explanation for his conduct, as opposed to his having a malignantly evil heart.

Q.   And in your experience in capital mitigation preparation and presentation, is evidence of that type offered in capital cases?

A.   Yes, sir.

Q.   Has the Supreme Court endorsed that concept?

A.   Yes, I understand.

Q.   And do you teach that concept?

MR. ROBERTS:  Your Honor, I'm just -- just one question.  I mean, he's not a legal expert.  He said in his statements, he's not an attorney.

THE COURT:  Sustained.  Keep away from those statements, Counsel.

MR. WISEMAN:  Sure, Your Honor.

BY MR. WISEMAN:

Q.   Did you subsequently -- well, withdraw that.  Did you prepare a PowerPoint presentation that you had hoped to show to the jury in this case?

USCA5 3650

A.    Yes, sir, that would accompany my testimony in this case.

THE COURT:  When did you prepare that?

THE WITNESS:  That preparation began on about March the 15th.  It was --

THE COURT:  Of what year?

THE WITNESS:  2004.  And was revised up to --

THE COURT:  After the trial?

THE WITNESS:  Well, yes, ma'am.

MR. WISEMAN:  Your Honor --

THE WITNESS:  March the -- I prepared my report on February the 25th.  I was noticed that I was being called to testify imminently, and so I then prepared demonstrative exhibits to accompany my anticipated testimony.  As I recall, the first presentation, and I may have --

BY MR. WISEMAN:

Q.    Well, let me put it up for you.

A.    Let me refer to my bill, and it will likely reflect when I began to do that.

Q.    Why don't you do that.

THE COURT:  Okay.  When were you told you were not going to be called?

THE WITNESS:  I was told on the day of trial.  I was here in court, and the second day, I observed the testimony all day Monday.  Tuesday, about midday, after the Government rested, I was advised that I would not be called.

USCA5 3651

THE COURT:  And who told you that?

THE WITNESS:  Both Defense Counsel were present, along with Gerald Bierbaum.

THE COURT:  And why did they tell you you weren't going to be called?

THE WITNESS:  The -- they said that they thought the information had been provided by Dr. Estrada, and they were concerned with what might be put on in rebuttal.

MR. WISEMAN:  In regards to rebuttal --

THE COURT:  So what day were you told that?

THE WITNESS:  I was told that on March the 23rd, 2004.

THE COURT:  All right.  Thank you.

BY MR. WISEMAN:

Q.   With regard to being told about rebuttal, were you advised that the Government had had Mr. Bourgeois evaluated by a neuropsychologist?

A.   I was not.

Q.   And were you advised by Counsel that the Government had had him evaluated by any other mental health professional other than Dr. Estrada?

A.   I was not.

Q.   Did you -- were you provided any detail about this purported rebuttal evidence?

A.   No, sir.

USCA5 3652

Q.    I wanted to --

A.    It was not a discussion.  They simply advised me, "We've decided we're not going to call you."

Q.    Okay.  What I put up now is marked as P-4.  Do you recognize the cover sheet of that?

A.    Yes, sir, I do.

Q.    And what is it?

A.    This is the printed paper copy of the slides that I prepared to accompany my testimony, as well as draft questions that the attorneys could utilize to elicit the information on those slides.

Q.    Okay.  For the record, this is a 26-page exhibit.

A.    Yes, sir.  This one refers to the adverse developmental factors or mitigating factors.

Q.    I want to put up another larger PowerPoint, which is marked as Petitioner's 5.  Do you recognize that document?

A.    Yes, sir.  This is another PowerPoint file that I created to accompany my testimony regarding violence risk assessment for prison, and it also is accompanied by draft questions that I could be asked.

Q.    And for the record, this is a 65-page PowerPoint presentation.  So you provided to Counsel two PowerPoints, along with suggested questions for your examination.

A.    That's correct.

Q.    Did you annotate additionally those slides --

USCA5 3653

THE COURT:  Are you going to offer those?

MR. WISEMAN:  Oh, yes.  Yes.  We're going to go through them in a moment.  I'll offer them right now --

THE COURT:  Why don't you offer them now as we go along.

MR. WISEMAN:  Sure.  I'd offer 4 and 5.

THE COURT:  P-4 and 5?

MR. ROBERTS:  Your Honor, I know that Dr. Cunningham -- we're not going to object to them, but I wanted to clarify.  I know that Dr. Cunningham had two different presentations.  One was a very long one.  I think it was about eight hours.  And another one was a shorter one, about four hours.  And I didn't know if these were the two of those or if they were two separate ones.  I don't remember.

BY MR. WISEMAN:

Q.   Are these the two PowerPoints you prepared for Counsel in this case?

A.   Yes, sir, they were.

Q.   Did you prepare other ones other than these two?

A.   No, sir.  I updated the mitigation slides, even after I got here to Corpus Christi, as I continued to work on them.  But that is what was provided to Counsel.

Q.   Okay.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  Sorry.  P-4 and 5 --

USCA5 3654

MR. WISEMAN:  P-4 and 5.  P-4 is --

THE COURT:  -- are admitted.

MR. WISEMAN:  -- is the mitigation one, and P-5 is the risk assessment one.

BY MR. WISEMAN:

Q.   By the way, did you anticipate that they were going to take 12 hours to go through the two of them?

A.   No, sir.

Q.   I want to show you another document.  This is P-9.  Do you recognize that?

A.   Yes, sir, I do.

Q.   And what is that document?

A.   That's a qualifying examination that -- a draft qualifying examination that I prepared for Counsel should they decide to use it to orient them to my qualifications.

Q.   Okay.  And for the record, this is 16 pages in length.

MR. WISEMAN:  I would offer that as well, Your Honor.

THE COURT:  P?

MR. WISEMAN:  P-9.

MR. ROBERTS:  No objection, Your Honor.

THE COURT:  P-9 is admitted.

BY MR. WISEMAN:

Q.   All right.  I want to talk now about what the Judge started to question you about, and that is your actual arrival in this courthouse, or in this city back in March of '04.  What

USCA5 3655

day did you arrive in Corpus Christi?

A.    I actually arrived on March the 21st, 2004.

Q.    And what day of the week was that?

A.    Sunday.

Q.    I'm sorry?

A.    Sunday.

Q.    And what did you do when you got here?  You checked into the Omni?

A.    Yes, sir.

Q.    And Bayfront or Marina?

A.    I don't recall.

Q.    Okay.

A.    But the receipts --

Q.    There are differences.

A.    The receipts are on the bill.

Q.    And --

        THE COURT:  You couldn't get in there?

        MR. WISEMAN:  Oh, no, we did.  It's actually a lovely, lovely place.  I'm enjoying a good night's sleep the four hours I'm there.

BY MR. WISEMAN:

Q.    What did you do when you finished checking in?

A.    I called Mr. Tinker on his cell phone to leave a message that I was in town and was available to meet with him.  I then left my hotel room and took my cell phone with me.

USCA5 3656

Q.   And where did you go?

A.   I went to a fitness center in the hotel to work out.

Q.   And --

A.   I assumed he was interviewing other witnesses, since a voice mail picked up my message.

Q.   Okay.  And did you hear back from him subsequent to leaving that message?

A.   Yes, sir, I did.

Q.   And when did you hear from him?

A.   When I came back to my hotel room, the message light was blinking on the hotel phone.  It was a message from him indicating that since I had not been in my room when he called, that he was going to his residence outside, some distance from Corpus Christi, and would not be meeting with me that day.

Q.   Had you anticipated a meeting that day to begin to prepare?

A.   Yes, sir.

Q.   When is the next time you saw or spoke to either lawyer?

A.   I next came to court on Monday morning.

Q.   And what did you do in court?

A.   I observed the Government's case and indicated my availability for conference.

Q.   And in particular, did you observe Dr. Estrada's direct examination?

A.   Yes, I did.

USCA5 3657

Q.   And after court that day, what did you do?

A.   I met with Mr. Tinker.

Q.   And what was the purpose of that meeting?

A.   To prepare my testimony.

Q.   And where did the meeting take place?

A.   The meeting took place in the hotel bar.

Q.   At the Omni?

A.   Yes, sir.

Q.   And approximately how long did the meeting last?

A.   About 45 minutes.

Q.   And --

          THE COURT:  Or how many drinks?

          THE WITNESS:  I had no --

          THE COURT:  I'm just kidding.  Just kidding.

BY MR. WISEMAN:

Q.   And what did you discuss with Mr. Tinker?  Or what
observations did you make as well?

A.   Mr. Tinker seemed completely unfamiliar with the
PowerPoint files that had been provided to him.  For example,
as I was going over the mitigation adverse development related
materials, he said, "Well, what about the violence risk
assessment?  Are you not going to testify about that?"  And I
said, "Yes, sir, there is a whole section of the binder that
you've been provided that reflects slides addressing that and
the direct exam -- suggested questions for direct exam that

USCA5 3658

would elicit that testimony."  That was an indication to me that he had not gotten that far in the materials I provided to even know what I was prepared to address.

Q.    And were you present in court on the 23rd at about 8:19 a.m. when Mr. Tinker addressed the Court with respect to your testimony?

A.    I don't recall.

Q.    Well, let me read you what he said and ask you if it refreshes your memory.  This is at Page 4, starting at Line 20.

      Mr. Tinker:  "Your Honor, it's my attitude, not necessarily the rest of our group, that we're going to rest, depending on how Dr. Estrada goes when we question him.  I started to say I'm going to pass him" --

      Your Honor says, "You're on the record.  You want to go off the record?"

      Mr. Tinker says, "That's all right.  No, that's all right."

      And he continues to say, "And so I'm going to -- and that's not the consensus particularly of Dr. Cunningham, and I don't think that's maybe of John" -- I presume meaning Gilmore -- "or Mr. Bourgeois.  What I'd like to have to do is to take after, after they rest -- they say they're going to rest after Estrada -- I think it would just save a whole lot of time if we could convince them what to do, and because I don't think we ought to go forward just because stuff is lying

USCA5 3659

around."

And just skipping down a few lines, the Court says, "Mr. Tinker, you have to evaluate the pros and cons of what goes into that."

And he responds, "That's right.  For instance" -- and he says, "Let me talk," which I mean someone must have been interrupting him.  He said --

THE COURT:  That would have been Ms. Booth.

BY MR. WISEMAN:

Q.   He said, "He would say things," referring to you, Dr. Cunningham, "he would talk about how many people in the penitentiary, are in the penitentiary, and that there are only 10 percent commit murders."  And that's the end of the -- oh, and then he says, "Well, I think, why the hell would I want the jury to know that?"

So does it appear to you from that passage I read that Mr. Tinker was particularly familiar with your mitigation presentation?

A.   No, sir.  That doesn't reflect that he was familiar with the mitigation presentation or the actual content of the risk assessment information that I was prepared to provide.  I don't recall hearing that discussion in the courtroom.

Q.   Okay.  And I take it from your answer that you had -- that he somewhat mischaracterized your risk assessment presentation?

A.   Yes, sir, he did.

USCA5 3660

Q.   I'd like to now, if we could, go through not both presentations, but I'd like to quickly go through the mitigation presentation, which is the 26 slide one, and just -- the Court's heard a lot about concepts that are in there from other witnesses.  So I just want you to highlight for the Court what you would have said had you been called.

A.   Yes, sir.  If we proceed through it briefly, then that will be an abbreviation of what I would have said.

Q.   I fully appreciate -- believe me, I'd love to hear it all, and I'd like to hear it twice.  But we, you know, we have other witnesses we have to get to.

A.   Yes, sir.  Could I have the screen, please?

            THE COURT:  It's that right there.

            THE WITNESS:  Yes, ma'am, I was waiting for the exhibit to come up.

            MR. WISEMAN:  I think you have to --

            THE COURT:  You're supposed to do that yourself.

            THE WITNESS:  I did that earlier.  I can certainly do it again.

        (PAUSE.)

            THE WITNESS:  Can you send it again?

            THE COURT:  Try F3.

            THE CLERK:  Yes.

            THE COURT:  Okay.

            THE WITNESS:  Should I proceed?

USCA5 3661

BY MR. WISEMAN:

Q.   Yes.  Why don't you proceed at your pace, and if I have any questions, I'll jump in.

A.   Yes, sir.  In this case, I identified several of what I would characterize as adverse developmental factors or damaging factors, in other words, factors that injured him psychologically or in terms of his brain functioning.

     The first was an overwhelmed family system that he was a part of.  And in looking at that system, Eunice, his mother, and Lloyd Ferdinand, who is the biological father of his oldest three siblings, had three children then divorced.  Soon after, Eunice had Anthony by another man.

          THE COURT:  You don't need to read it to us.

          THE WITNESS:  Yes, ma'am.

          MR. WISEMAN:  Yeah, you know.

          THE COURT:  I mean, I can read this myself.

BY MR. WISEMAN:

Q.   We've heard this history.  Why don't we -- why don't you just give us a quick summary of what's on each slide.  For example, here you could say, "An overwhelmed family system."

A.   Yes, sir, Eunice was --

          THE COURT:  Why don't you move on to the next one.  I just read it.

BY MR. WISEMAN:

Q.   Okay.  The Court's read it.

USCA5 3662

A.   He was abandoned by his father.

THE COURT:  I read that one.

THE WITNESS:  He had no significant --

THE COURT:  Okay.  Next.  Okay.

BY MR. WISEMAN:

Q.   And let me stop you at this point.  What would you have been saying about these features that you identify as an overwhelmed family system and --

A.   I would have described these things in anecdotal detail to educate the jury about the family system and the nature of the stresses that were impinging on it and how that impacted on the quality of nurturing and care that he received.  He's a product of this family system and the quality of childhood nurturance that he receives depends on who these people are who are his parents.  That has genetic implications, modeling implications and psychological experience implications.

Q.   All right.  Why don't you go to the next slide?

THE COURT:  So what does that mean?  It doesn't sound good to me.  Mischievous and sneaky, didn't listen --

THE WITNESS:  No, ma'am.

THE COURT:  -- couldn't focus, always got into things, impulsive, took things from store, got in trouble at school, frequent fights, tantrums when whipped, fabricated stories, rage attacks.  So next, next, you're going to explain all this.  Right?

USCA5 3663

BY MR. WISEMAN:

Q.   Yeah, could you tell the Court why that's mitigating?

A.   Yes, sir.  These are indications that he was psychologically damaged from an early age.

THE COURT:  Well, is there any way you're going to fix that?  Is there any way to treat that or fix it?

THE WITNESS:  Yes, ma'am.  You can treat that by providing a highly structured environment.

THE COURT:  Like prison.

THE WITNESS:  Like prison.  You can also treat that, depending on the nature of the disorder that's identified, by anticonvulsant medications that may have an anti-rage effect, by --

THE COURT:  Well, you're not a physician or a neuropsychologist, are you?

THE WITNESS:  No, ma'am, I'm a clinical and forensic psychologist.

THE COURT:  Okay.

THE WITNESS:  I'm familiar with ADHD.  That's a part of clinical psychology, as are the treatment modalities.  In this case, this isn't just ADHD, but instead is a broader inhibition difficulty that he has.

BY MR. WISEMAN:

Q.   And let me ask you, as opposed to offering a treatment for these problems, does it offer the jury a psychological

USCA5 3664

explanation to the offense?

A.   Yes, sir, it does.  And it identifies that these are characteristics that are even part of his nervous system and neuro development from an early age, that this isn't just a function of somebody with intact capabilities who makes an evil choice to sadistically abuse a child, that this is somebody who's had historical psychological and developmental problems that are even reflected in behaviors that connect to brain functioning.

Q.   And is this the type of material that you train people to consider presenting in capital mitigation?

A.   Yes, sir.

Q.   All right.  Why don't you go to the next slide.

A.   This is part of the implication of these things.  Whether you're talking about neurobehavioral disinhibition or attention deficit hyperactivity disorder.  These, the symptoms that are being described by the family have implications for both of those.

Q.   Okay.  Go on.

A.   He was also subjected to emotional rejection and abuse.

Q.   And by that you mean the abuse history that you discovered?

A.   That's correct.

Q.   And we've heard a lot about this, so --

A.   And this being the emotional aspect of that, not physical

USCA5 3665

abuse at this point, but emotional abuse, which is as injurious or does greater psychological damage to the child than the whelps or bruises on their skin.

Q.   Okay.  Go on.

A.   He was in fact subjected to physical abuse as well.  And these are a few of the anecdotal expressions of that.  There is a literature that describes a significantly increased likelihood of criminal violence from individuals that are maltreated as children.  It's a longitudinal study published by Witham and colleagues, that identifies that children with histories of maltreatment are three times as likely to be arrested for violence as adults.

There's also a longitudinal study published by Thorndike under sponsorship of the U.S. Department of Justice that identifies a markedly increased violent outcome as the types of violence within a family increase.

Of those types, there's spouse abuse, child abuse, and a climate of violence and hostility.  As each type is added on, the percentage of kids who end up being violent themselves steadily increases.

Q.   And --

A.   So this helps make the nexus of that "so what" question.  So he was mistreated as a child, so what does that have to do with his being violent as an adult?  And that research establishes that nexus.

USCA5 3666

Q.   And in offering this type of evidence, in your experience, is there a connection between this and an attempt to reduce the Defendant's moral culpability for his crime?

A.   Yes, sir.  Moral culpability from a psychological standpoint being based on the idea of what raw materials did you bring to your choices.  The greater the psychological or neurological damage or deficient intelligence, then the materials that this person brought to his or her choices are reduced, and their moral culpability is correspondingly lessened, for the same action.

Q.   Okay.  Why don't you go on.

A.   There is also historical susceptibility to rage attacks, and these are some of the descriptions that were provided by the family members.  In other words, the abuse of this child and the rage that those injuries reflect wasn't restricted just to this relationship but in fact has a long-standing history to it and also has implications that suggest some neurological substrate to it.

Q.   Okay.  Why don't you go on.

A.   This is a metaphor or a model that I developed to try to explain the interaction of these factors.  As I viewed Alfred Bourgeois, he was like a pressure cooker.  And within that pressure cooker, there is this history of an overwhelmed family system, observed domestic conflict, physical abuse, father abandonment and emotional rejection.  Those are all the legacy

USCA5 3667

of this childhood that he's carrying with him.

Now, he keeps a lid on this most of the time, and that lid is comprised of some pro-social related things of being a hard worker and maintaining steady employment, being involved with his children, being a caring uncle.

Now, even in the presence of those things, when under stress, when you heat this up a little bit, particularly the --

THE COURT:  Did you know about -- were you told about the nephew he dangled over the, by his feet over the bridge?

THE WITNESS:  I saw that in the transcript, Your Honor.  I did not have knowledge of that otherwise.

THE COURT:  Okay.

THE WITNESS:  In the heat of a relation --

THE COURT:  Do you think it might have looked bad with your "caring uncle" comment?

THE WITNESS:  Well, it isn't that he is either a caring uncle or he's not.  There's both things.  There are many witnesses that described him exhibiting caring behaviors toward them.  There are also reports of his terrifying these children and doing things that put them at risk, or even other reports of prior abuse.

Both of those things are Alfred Bourgeois.  It isn't that one is true and one is false.  They both reflect ways of his dealing with his nieces and nephews.

THE COURT:  Does this look like the same symptoms as

USCA5 3668

a sociopath?

THE WITNESS:  No, ma'am.  Someone who's a sociopath tends not to maintain long -- well, "sociopath" is an antiquated term.  We now use the term "psychopath."

THE COURT:  Psychopath, fine.  Same thing, right?

THE WITNESS:  Well, it is somewhat different in its development, but they reflect somewhat the same concept.  Somebody who's psychopathic tends to maintain a parasitic lifestyle.  In other words, they are living off of and exploiting others.  Alfred Bourgeois has maintained employment.

They tend to drift from place to place, without roots and relationships, almost like a carny.  Now, Alfred Bourgeois has short-term relationships.  He has trouble sustaining them, but he does sustain relationships.  He has maintained some degree of involvement with children, as opposed to just fathering them, moving across the country and going on.

Now, there are --

THE COURT:  Which children did you think he maintained a relationship, besides the one he murdered?

THE WITNESS:  Well, his daughter Bethany described feelings of attachment to him and recalled positive experiences with him.  As I recall, his son AW1988 described that.

THE COURT:  And you talked to them or --

THE WITNESS:  Yes, ma'am.  I talked to Bethany --

THE COURT:  Okay.

USCA5 3669

THE WITNESS:  -- about her experiences with him, as well as nieces and nephews of his.  And the aunts and uncles that also describe, or his siblings that also described him having good relationships with many of the children in the family.

BY MR. WISEMAN:

Q.   Dr. Cunningham, let me ask you --

THE COURT:  Did you know about the trial testimony of AB1994 and her mother, about how Robin Bourgeois and Mr. Bourgeois did not share a bed together, but he shared a bed with AB1994 and would lock the door every night to go in and sleep with her?

THE WITNESS:  I have read that.  I was not aware of that at the time of my testimony.  I've read that since.

BY MR. WISEMAN:

Q.   Well, at the time of your nontestimony?

A.   My nontestimony.  At the time of my --

THE COURT:  Well, I know, but these are, these are -- anyway, these are things that might be used to call into question his --

MR. WISEMAN:  Oh, sure.

THE COURT:  - his --

MR. WISEMAN:  And if he had --

THE COURT:  You know, when lawyers make a tactical decision sometimes, it doesn't mean that -- you had to know

USCA5 3670

Mr. Tinker.  When he said they were going to testify that 10 percent of people in there being murderers, he was, he was probably -- Ms. Booth, you know this -- making an excuse to me about why he wasn't going to call somebody that we had spent a lot of money on.

MR. WISEMAN:  Your Honor, I did not --

THE COURT:  That does not mean he hadn't read the report.  It did not mean that he had disregarded what Mr. Cunningham said.  He probably saw the substantial pitfalls in putting on this type of testimony.

MR. WISEMAN:  Well, Your Honor, we're going to certainly cover that in Mr. Gilmore's testimony.

THE COURT:  I expect that quickly.

MR. WISEMAN:  In Mr. Gilmore's testimony.

THE COURT:  I expect you to move right along here.

MR. WISEMAN:  Oh, absolutely.

THE COURT:  Move beyond the pressure cooker.

MR. WISEMAN:  You don't want the pressure cooker?

THE COURT:  I'm a little tired of the pressure cooker.

MR. WISEMAN:  I thought it was a square head with small ears.

THE COURT:  I really appreciate that.  I thought it was a king.

MR. WISEMAN:  Okay.

USCA5 3671

BY MR. WISEMAN:

Q.  Dr. Cunningham, we're going to have to move beyond the pressure cooker.  Do you have other slides relevant to --

THE COURT:  Apparently he's got 12 hours' worth.

MR. WISEMAN:  No, he doesn't.

THE COURT:  Oh, okay.

MR. WISEMAN:  He said it was considerably less.  And I think --

THE COURT:  How many hours does he have?  How many slides do you have?

BY MR. WISEMAN:

Q.  How many more?

A.  There are about three or four more regarding mitigation, and then there is a separate file regarding violence risk assessment.  Violence risk assessment file is about 50 or so slides.  This --

Q.  Why don't we move on with the -- and finish up the mitigation PowerPoint and then move to risk assessment briefly.

A.  Yes, sir.

Q.  Do you have any more mitigation slides that are not using the pressure cooker metaphor?

A.  Yes, sir.  There is also some research that I retrieved regarding the extent of domestic and child abuse, including fatal child abuse in our society and also risk factors for that and how those match up against Alfred Bourgeois.

USCA5 3672

Q.   Okay.

A.   This describing the very large number of women who seek assistance --

THE COURT:  What does that have to do with this case?

THE WITNESS:  To the extent that Mr. Bourgeois is someone who batters and that he is among millions of men in the United States who engage in that conduct, then his singular malevolence in terms of making him a candidate for the death penalty is somewhat reduced by a recognition, at least in terms of domestic violence, that this is a widespread, tragic but widespread dysfunction in our society.

BY MR. WISEMAN:

Q.   Dr. Cunningham, I want to ask you a question about this --

THE COURT:  I can see -- I'm sorry, Mr. Wiseman -- why that slide would not have wanted to, Mr. Tinker would not have wanted that particular slide to reach the jury.

MR. WISEMAN:  Your Honor, I don't have the benefit of knowing Mr. Tinker.

THE COURT:  No, I'm talking about that.  That would have probably offended most people on the jury, I have to tell you.  Ms. Booth, what do you think?

MS. BOOTH:  I think it's horrible.  I can't believe -- I can't believe an expert would even speak like that.

THE COURT:  I can't either.  So move on to this next

USCA5 3673

category.

MR. WISEMAN:  All right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, the information that you were seeking to offer about Mr. Bourgeois's positive relationships, were you seeking to offer that as evidence of the positive relationships per se or as a way to explain how he kept himself --

THE COURT:  Could you let him testify, Mr. Wiseman?

BY MR. WISEMAN:

Q.    -- intact?

THE COURT:  Just ask him why he was going to do that.

BY MR. WISEMAN:

Q.   Okay.  Why were you going to do that, Dr. Cunningham?

A.   The graphic was identifying how he kept a lid on --

Q.   Okay.

A.   -- in his attempts to proceed with his life in ways that did not -- to try to keep a lid on the issues that he's carrying.

Q.   Okay.  I have another question now.  Your testimony is somewhat divergent.  On the one hand, you're telling us that this mitigation case was a disaster.  You didn't have the time to work it up in the way that you thought it needed to be, you didn't have the materials.  And yet you were coming to court prepared to offer what you could.  How do you reconcile what appear to me at least to be somewhat divergent views of this

USCA5 3674

case?

A.   I don't understand the question.

Q.   You didn't have enough time to do the case.

A.   That's correct.

Q.   Yet you were purporting to have valuable --

          THE COURT:  To be fully prepared.

BY MR. WISEMAN:

Q.    -- valuable information to provide.

A.   Yes, sir.  It wasn't -- it's not a function of either having nothing, no observations, or being fully prepared.  I was partially prepared, and gathered information to describe this.

          THE COURT:  Twelve hours of prepared.

          THE WITNESS:  No, ma'am.

          THE COURT:  That's pretty prepared.

          THE WITNESS:  No, ma'am.  I never represented that my testimony would take 12 hours.

          MR. WISEMAN:  Mr. Roberts said that, Your Honor. Dr. Cunningham never said that.

          THE COURT:  Oh, okay.  I thought he said there was six hours of one and four of another.

          MR. WISEMAN:  No, no.  How many hours --

          THE COURT:  And I thought actually you said the same thing.

          MR. WISEMAN:  Oh, no.

USCA5 3675

THE COURT:  That you weren't actually going to put on -- or eight hours in one and four of another.

MR. WISEMAN:  No, what I was saying was that Mr. Roberts' suggestion that it was that long is ridiculous, and I would never think that I was going to get 12 hours from Your Honor to put on a PowerPoint, nor do I think Dr. Cunningham thought that.

THE COURT:  Well, how much time would it have taken to put all of your evidence on that you had?

THE WITNESS:  Two to three hours.

THE COURT:  Okay.

THE WITNESS:  As I was -- as I was --

THE COURT:  With 50 slides, you could put 50 slides on in --

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  Many of them are graphic models that are --

THE COURT:  Okay.

THE WITNESS:   -- slides that proceed pretty rapidly. As I would be meeting with -- my hope was to meet with Mr. Tinker.  These are proposed exhibits.  This is proposed information.

THE COURT:  Thank you.

THE WITNESS:  If there's a slide that doesn't, that he thinks is not going to be information he wants to present to the jury, if he doesn't want them to have information about the

USCA5 3676

extent of domestic violence or child abuse, then that slide would not be included in the testimony. That's a function of what we would be meeting about. Let's talk about -- these are the things that I could potentially speak to. Is that testimony that you desire to elicit?

BY MR. WISEMAN:

Q. And in your experience in presenting these types of presentations to Counsel, do you typically sit down with them and have a discussion about it? Do they ask you questions about it? Do they, you know, engage in a deliberative process with you about what to present and what not to present?

A. Yes, sir. It begins before I ever arrive. These materials were provided to him in advance, so that there could be consideration and discussion about them before I ever came. Certainly, there was lots of time on Sunday to talk about those, or early Monday morning, or Monday evening to go over these slides and discuss them and identify what were concepts that were consistent with the mitigation themes that he was emphasizing and which were not.

Q. Okay. And I take it that discussion never happened.

A. That's correct.

Q. Now, the PowerPoint with regard to risk assessment's now in evidence. Could you just summarize for us -- and I know that's hard on such a complex topic -- but do the best you can to, you know, what would you have told the jury about risk

USCA5 3677

assessment?

A.   I would have told them that risk assessments for prison are best based on this person's personal track record in confinement and on group statistical data on how capital offenders and murderers and inmates behave in prison.

In terms of that latter approach, that group statistical data, the research demonstrates that the seriousness of the offense that sends someone to prison is not a good predictor of who is seriously violent in prison and that the overwhelming majority of capital murderers, if sentenced to life in prison, never engage in serious violence.

And so that typical assumption that a murderer must be worse in prison is not supported by the data.

THE COURT:  Well, if we have data about how he behaved in the local jail, would that give us some indication?

THE WITNESS:  Yes, ma'am, if we look at his personal track record, either in terms of personally perpetrated misconduct in jail -- I was provided with no disciplinary write-ups that were made against him.

THE COURT:  Were you provided with the information that he allegedly tried to hire a hit man to kill several of the witnesses?

THE WITNESS:  Yes, ma'am.  That's another part of the risk assessment that I was prepared to address.  There's one part that addresses the likelihood that he will personally be

USCA5 3678

violent against inmates or staff in prison.  That's one assessment.  A second assessment involves his risk of ordering violence in the community from prison.  And then there's a third component which are what interventions are available within the Bureau of Prisons, either to limit his ability to personally perpetrate violence against inmates and staff or to order violence in the community.  And those are all areas that I was prepared to address.

BY MR. WISEMAN:

Q.    And were you going to address the differences between the Nueces -- I'm not sure I'm pronouncing that correctly.

THE COURT:  You did.

MR. WISEMAN:  Okay.

THE COURT:  It's Spanish.

BY MR. WISEMAN:

Q.    Okay -- County Jail and the Federal Bureau of Prisons?

A.    Yes, sir.

Q.    And their ability to maintain a safe environment?

A.    Yes, sir.

THE COURT:  Well, he got a guard to carry messages, allegedly, back and forth between himself and an alleged hit man.  Are you aware of that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Are you aware that on, actually on death row in Terra Haute that he did the same thing?

USCA5 3679

THE WITNESS:  I've read a report describing not that he was hiring a hit man --

THE COURT:  No, no, no.

THE WITNESS:  -- from Terra Haute, but that he had --

THE COURT:  He had schmoozed a guard and --

THE WITNESS:  Yes, ma'am.  As I understand it, the guard was approaching inmates.  But there was a relationship that developed where she was carrying messages --

THE COURT:  For him.

THE WITNESS:  -- to family members away from the prison.

THE COURT:  Right.

BY MR. WISEMAN:

Q.   Dr. Cunningham, we're almost to the end here.  I wanted to ask you if my office provided you from 2007 onward with additional materials about the case.

A.   Yes, sir.

Q.   And did those additional materials add to your, what would now be your presentation of the case?  Or let me ask it differently.  If you had these materials back in 2004, could you have incorporated them and added to your conclusions and your mitigating opinions?

A.   Yes, sir.  They would have supported additional adverse developmental factors in his background.

Q.   All right.  Can we just tick them off rather quickly --

USCA5 3680

THE COURT:  You may.

BY MR. WISEMAN:

Q.   -- and if I have any questions about them, I'll jump in?

A.   Yes, sir.  A genetic predisposition to personality disorder; corruptive paternal modeling of promiscuity and reproductive irresponsibility; corruptive maternal modeling of neglect, abuse and scapegoating; borderline personality features; deficient intelligence and potential mental retardation; mother's inadequacy and potentially deficient intellect; inadequate primary attachment; rejection by the legitimate paternal siblings; peer rejection and isolation; additional information regarding maternal rejection and expulsion, expulsion; additional information regarding emotional neglect and particularly supervisory neglect.

Q.   Okay.  And I take it from your response that those are all additional mitigating features that help to reduce, in your view, moral culpability?

A.   That's correct.

Q.   I wanted to ask you two more things, and I think I'll be done.  We had a witness this morning, Claudia Williams, testify that she had related some stories of abuse to the trial investigators, Mr. Bierbaum, I believe, but that she held back on relating other ones, because it was a difficult topic for her to discuss.

THE COURT:  And I think she said because her mother

USCA5 3681

was still alive, which was a big thing.

MR. WISEMAN:  Yeah, yeah.

BY MR. WISEMAN:

Q.   And when a mitigation investigation is done properly and extensively and thoroughly, how does it try to overcome that type of a problem?

A.   The mitigation investigator spends a good deal of time in person with the family, which works to develop trust and rapport with them, and increases their ability to disclose sensitive information.  That's a time-intensive process of developing that relationship.  It's not one that can typically be achieved over the phone or on brief interview.

Q.   Okay.  And we also had another witness this morning, Brenda Goodman, who testified to an admission -- I don't know if that's the right word -- but a statement Mr. Bourgeois made to her before the offense that he had been raped by a man.  And she didn't reveal -- she wasn't spoken to at the time of trial. She revealed it to our investigator -- I'm sorry, I'll take that back -- she didn't apparently reveal it to our investigator in 2007, but she talked about it on the witness stand.

How do you get through to people and get them to open up about that type of information?

MR. ROBERTS:  Your Honor, I think I -- I'm going to object in a general nature.  I mean, I think he, as a

USCA5 3682

psychologist, he's going to have to say he has to talk to an individual and figure out what that individual does. So I would object to him being able to describe how to get through people in general.

THE COURT: Go ahead.

THE WITNESS: The capabilities and experience of the examiner have something to do with it, the interviewer, in terms of instilling trust in the people that you're talking to. Part of it is in that time to build rapport. Some of it comes from interviewing other individuals and learning about it from them, so that when you then make inquiry of this person, you already know something about it.

THE COURT: Do you, would you consider that Mr. Wiseman's office has a very good mitigation investigator?

THE WITNESS: I would assume so. I don't know her personally, or him personally.

MR. WISEMAN: You know, Your Honor, I --

THE COURT: I mention that, because even yours didn't get that information.

MR. WISEMAN: Yeah, and you know what I was going to say in response?

THE COURT: Tell me something.

MR. WISEMAN: Not that I'm a witness, but we had this case with four months left to go on the statute of limitations. And I felt at the time that our investigation wasn't as strong

USCA5 3683

as it ought to have been.

THE COURT:  Could have been.

MR. WISEMAN:  And we've since tried to beef it up, but I think it's regrettable that the amount of time he had to spend with Ms. Goodman in 2007 didn't elicit that important information.  And as the chief --

THE COURT:  Well, I mean, here we are in 2010, and this is the first time she's ever mentioned it.

MR. WISEMAN:  No, it wasn't the first time.  She's told us about it since.  It's not in her declaration.  But as the chief of the unit, I take some personal responsibility that when I signed on to this case and agreed like Dr. Cunningham did to do it on the quick, that we miss some stuff.  And I regret that.

THE COURT:  Well, you've been on it for three years, so I don't think you've been forced to do it quickly.

MR. WISEMAN:  No, but the filing of the petition --

THE COURT:  Okay.

MR. WISEMAN:  -- and getting the affidavits was done, and that's our trial date.  The limitations date is our trial date.  Have to have everything done by then.

Dr. Cunningham, I think I --

THE COURT:  Well, you've done a wonderful job.

MR. WISEMAN:  Well, I appreciate that, Your Honor, but --

USCA5 3684

THE COURT:  It's the truth.

MR. WISEMAN:  -- but you know, we're human beings, and we make mistakes, you know.

Dr. Cunningham --

THE COURT:  Well, I think that's what this is all about.

MR. WISEMAN:  What's that?

THE COURT:  I think that's what this issue is, is what I was saying.

MR. WISEMAN:  Well, that's true.

Dr. Cunningham, I'm done.  Thank you very much.

THE WITNESS:  Thank you.

MR. ROBERTS:  May we have a brief break, Your Honor?

THE COURT:  Yes.

MR. WISEMAN:  And I'm going to want to offer my exhibits, the ones that weren't.  Let me pull that together.

THE COURT:  We'll do that right now.  Or you want to do it when we come back?

MR. WISEMAN:  Let me do it after the break.

THE COURT:  Okay.

MR. WISEMAN:  So we can pull it together.

THE COURT:  Fifteen?

MR. ROBERTS:  Great, Your Honor.

(Recess from 2:54 p.m. to 3:11 p.m.)

MR. WISEMAN:  Your Honor, if I could -- my intention

USCA5 3685

was to offer everything that I used.  So let me just list the numbers, and if anything hasn't been formally offered, I'll offer it now.

THE COURT:  Okay.

MR. WISEMAN:  P-1, 2, 4 and 5, 7, 8, 9, 10, 60 --

THE COURT:  16?

MR. WISEMAN:  60, 6-0.  That's the Bierbaum e-mails. 72, 144, 167.

THE COURT:  167's in.  So is 8.

MR. WISEMAN:  Okay.

THE COURT:  And so is 7.

MR. WISEMAN:  151.

THE COURT:  So is 9.

MR. WISEMAN:  165, and 130.

THE COURT:  Any objections, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  P-1, 2, 4, 5, 7, 8, 9, 10, 60, 72, 144, 151, 165 and 130 are admitted.  Go ahead, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

THE CLERK:  What about 167?

THE COURT:  I didn't -- yeah, 167.

THE CLERK:  Okay.

                    CROSS-EXAMINATION

BY MR. ROBERTS:

Q.   Good afternoon, Dr. Cunningham.

USCA5 3686

A.    Good afternoon.

Q.    It's been six years, and you're finally getting to testify in this case.

A.    I will come to the stand and testify when I'm called, sir. It's not that I have an agenda, but I'm available if I'm called.

THE COURT:  I think he was making a little joke.

THE WITNESS:  Yes, ma'am.

THE COURT:  Lighten up.

BY MR. ROBERTS:

Q.    We know it's a serious situation, but there are, I just want to say that as I've listened to your testimony, it strikes me as you're very, very focused when you get called to a case. Would that be correct?

A.    Yes, sir, I think that it is.  I'm concerned with doing a good job.

Q.    You've been an expert in this field, you've been testifying in federal courts for a long time.  Is that right?

A.    Yes, sir, 15 years.

Q.    What drew you in to becoming an expert in this field that you're in now?

A.    I was called about providing testimony in a case in Texas. It was a case having to do with violence risk assessment, which is a special issue here in Texas.  I did a literature search on the methodology of how you go about a scientifically grounded

USCA5 3687

risk assessment and began to retrieve base rate data, which is the group data that identifies rates and correlates of violence in prison, and applied that methodology in a capital case.

I then began to get called by other cases to make similar application of that science. I then began to do research in that area. And so essentially, it grew as I did research and published and as I was called upon to do work in other cases. It was not by design. It simply occurred as a growth from that area of practice.

Q. And the growth has occurred really on the defense side. You've testified almost exclusively for the defense. Is that correct?

A. I've never been called by the prosecution in a capital case.

Q. That's kind of a roundabout way of answering my question. But I mean, the fact is that you spend -- about 75 percent of your income is derived from doing these kind of cases. Is that right?

A. In any given year, someplace between 60 and 75 percent of my income is derived from capital cases at one stage or another.

Q. Okay. And you're quite experienced in how -- you're quite experienced in watching cases go forward. And I think you, I believe you've done well over 450 forensic evaluations for cases. Is that what your resumé says?

USCA5 3688

A.    The resumé doesn't describe that, I don't think.  My total forensic experience in terms of number of cases is probably in excess of 500.  I've testified in about 160 trial level capital cases.  I may have been involved in as many as 100 more, where I was not called to testify, either it pled out along the way, or for whatever reason I was not called.

Q.    But you're not a legal scholar.  Correct?  You didn't go to law school?

A.    I did not go to law school.  I am a forensic psychologist, and I'm a student of case law and psycho-legal conceptualizations.  So I know a lot more about it than a layman, and even than a general psychologist.  But I did not go to law school.

Q.    And do you spend time reading the ABA Journals and the things that are produced by the American Bar Association?

A.    As they relate to capital cases, I do.  And as landmark case law or important case law regarding capital litigation is published, I try to keep up with that.

Q.    Now --

A.    Again, likely not as thoroughly as an attorney, but I try to attend to that.

Q.    You said you've been doing this for about 15 years, you've been a forensic evaluator in courts, mostly, I mean, all for the defense, as far as your record goes.  But --

A.    No, sir.  That mischaracterized my experience.  I've been

USCA5 3689

involved in capital cases for 15 years. I've been doing

forensic-related cases for about 30 years. Didn't do a capital

case until 15 years ago. I've been called by the defense and

the state in other cases. I've only been called by the defense

in capital cases.

Q.   Thanks for clarifying that. I guess my question was

really getting to, it's my understanding that for years you

were called because of a head injury being involved in the

case. Is that -- it is my understanding that if there was a

head injury and there was some possibility that the head injury

contributed somehow to the behavior of an individual, that

Dr. Cunningham was the person to call. Is that inaccurate?

You're shaking your head no.

A.   No, sir, that's inaccurate. I don't know that I have ever

been called in a case, in a civil case, for example, that

involved a head injury and the implications that that had.

Q.   And let me reclarify. I didn't say civil. I just said --

and in fact, I was specifically referencing criminal defense

cases, where you were called because someone had a head injury

and you were going to tie that into some type of imperfect

brain or some kind of brain defect. Is that not accurate?

A.   No, sir, that's not accurate. I don't know that I have

addressed head injuries apart from a mitigating factor in

capital cases, and that typically accompanied by a

neuropsychological evaluation.

USCA5 3690

Q.    Okay.  In this case, there was, at least at first, there was a Dr. Weiner who thought there was a head injury, and you discussed that at length with Mr. Wiseman earlier.  You were present when Dr. Estrada testified.  Correct?

A.    Yes, I was.

Q.    And you were aware that the United States was prepared to cross you when you took the stand for the defense if they in fact called you, were you not?

A.    The Government always cross-examines.  Well, there was one case where they said, "Pass the witness" this last year.  But otherwise, the Government -- I'm always cross-examined.  That's not a new thing.

Q.    I guess my question is, were you aware that we had a psychiatrist and a psychologist standing by to address issues of mitigation when you -- in rebuttal?  Were you aware of that?

A.    No, sir.

Q.    Were you aware -- do you remember the name John Shaw?

A.    I do know the name of John Shaw.  He's an administrator with the Bureau of Prisons and on occasion is called --

Q.    Were you aware that in 2000 --

A.    -- as a rebuttal witness.

Q.    I'm sorry.  Were you aware that in 2004 that he had created a PowerPoint slide and that we were going to address many of the issues you discussed about the murders in prisons after you testified?  Were you aware of that?

USCA5 3691

A.    I had not seen his 2004 slide presentation.

Q.    Well, my question is whether you were aware that we were going to use John Shaw and his presentation in response to your testimony.

A.    I don't recall seeing John Shaw here or knowing who the Government had retained.

Q.    Okay.  Fair enough.  You were on the witness stand actually in this case in this courtroom on March 22nd, 2004, where there was a discussion between you and the Judge, Defense Counsel and myself with regard to what portion of the PowerPoint you were actually going to present.  Do you recall that discussion?

A.    No, sir.

Q.    You don't?  I only have a portion of the transcript.  The proceedings began that day at 8:30 in the morning.  But when you were on the witness stand --

        MR. WISEMAN:  What page are you on, Mr. Roberts?

        MR. ROBERTS:  It's on page, it's the first page -- it's actually Page 2, because the first page is the caption of the case.  But it's the Transcript of Sentencing Hearing, Day 1, March 22nd, 2004.

BY MR. ROBERTS:

Q.    And Mr. Tinker was telling the Court that when he had talked with you outside, that you said that the direct would only be a couple of hours, maybe a little longer.

USCA5 3692

And then the Court says, "Okay.  So it's not a point -- or are you doing a PowerPoint?"  And she asked you the question directly.

And you said, "Yes, ma'am, I would intend to."

So you don't have a recollection of that discussion or being on the witness stand?

A.   No, sir.  I may have been in the gallery when the Court inquired, but I don't recall taking the stand.

Q.   Actually, this Court usually doesn't question people from the gallery, but --

A.   It's conceivable that I was called to the stand.  I don't recall being sworn or being on the stand in that case.

Q.   Okay.

MR. WISEMAN:  Your Honor, the record should reflect that he was not sworn.

MR. ROBERTS:  And I don't have a problem with that, Your Honor.  There was just a --

BY MR. ROBERTS:

Q.   Let me just ask you that if you were on the witness stand and if the record, the transcript reflected that in the discussion with me that Judge Jack indicated that we would be able to impeach you by bringing in our expert about Bureau of Prisons, rather than excluding your testimony about the Bureau of Prisons, would you have recalled that discussion?

A.   I might or might not.  I wouldn't have regarded that as

USCA5 3693

unusual for the Government to call Mr. Shaw or someone else from the Bureau of Prisons about their experience of violence in prison or other issues.

Q.    And in fact, Mr. Shaw often -- or Mr. Shaw is known to testify about the number of murders that take place in prison; is he not?

A.    He has provided that testimony.

Q.    Okay.  So if you took the stand, regardless of what percent, whether it was 2 percent or 10 percent or Mr. Tinker was incorrect, you're aware that if we had brought John Shaw in, more than likely we would have been addressing how many murders take place in the prison facility.

A.    Yes, sir.  We both would have addressed that and would have been using the same statistics.  That rate is about five per hundred thousand inmates annually in the Bureau of Prisons. If you go to the U.S. Penitentiaries and you do a three or four-year average, which he might be speaking to, then your rate's going to be about twenty to twenty-five per hundred thousand inmates per year.

Q.    And that's your opinion.  You don't know whether or not that coincides with what Mr. Shaw would say, do you?

A.    Well, actually I have some familiarity with that.

        THE COURT:  Well, he just said he looked it up.  I mean, surely you look it up at the same place, wouldn't you think?

USCA5 3694

THE WITNESS:  Yes, ma'am.  And I've read transcripts of his testimony.

BY MR. ROBERTS:

Q.  Okay.  So earlier, you heard the state -- Mr. Wiseman read from a transcript that Mr. Tinker was concerned that the jury would hear that 10 percent or some number like that, that the jury would hear that 10 percent or less people in jail actually still commit murders.  And he was concerned about the jury hearing that.

THE COURT:  I thought he was talking about 10 percent of people in prison are murderers.

MR. ROBERTS:  Well --

THE COURT:  I probably misunderstood that.

BY MR. ROBERTS:

Q.  Either way, you heard that Mr. Tinker was concerned about the jury hearing about murders in relation to confined facilities, did you not?

A.  I heard that he was talking about a 10 percent number, which is at least ten-fold higher than the actual incidence on a lifetime basis.

THE COURT:  He's not talking about -- I thought he was talking about the number of murderers in prison.

THE WITNESS:  Yes, ma'am.  But state prison, it's going to be about 12 percent.  And then federal prison has a lower percentage, because of the different mix of offenses.

USCA5 3695

But there are people convicted of murder in prison.

BY MR. ROBERTS:

Q.   And there are also people in prison that commit murders while they're in prison, are there not?

A.   Yes, sir.  That's that rate that's about five per hundred thousand inmates annually for the Bureau of Prisons as a whole. It occurs, but it's extraordinarily infrequent.

Q.   And it happens in high security and medium security, low security and minimum security; does it not?

A.   I don't know that there are reports in minimum security. It may be on occasion that's occurred.  Most of the murders occur in medium or high security.

Q.   So if Mr. Tinker was concerned that they would hear that a certain percentage of inmates continue to commit murder, would that be something that you expect Mr. Shaw might have testified about?

A.   Well, it would have been a very important issue to clarify for the jury.  Research shows that jurors think there's about a 50 percent likelihood that their capital offender will kill again in prison.  The follow-up data says that's an overestimate by 50 to 250-fold.  So it's critically important that the jury hear the actual number, so as to dispel the very gross exaggeration that they have in their mind upon being confronted with this particular offender.  That's some of the information I would have liked to have clarified and explained

USCA5 3696

to Mr. Tinker had we had more than 40 minutes and he have some familiarity with the information that I had.

THE COURT:  Well, you don't know that he didn't have familiarity with your information.  You had sent it to him in advance.

THE WITNESS:  Well, yes, ma'am.  He asked me, "Are you going to testify anything about violence risk assessment?"  He had in his possession in that notebook 60 slides with direct.  When I turned to it in his notebook, he looked surprised, as if this is the first he had seen of it.  So in fact, it was very clear that he was unfamiliar with it.

BY MR. ROBERTS:

Q.   How many times have you testified in federal capital cases now?

A.   About 60.

Q.   How many current cases are you handling?

A.   I don't know the answer to that.

Q.   You don't know the number of cases you currently have?

A.   No, sir.  Sometimes I'll be contacted when a case could be two years ago, and they say, "We'd like for you to work on this," and then I never hear anything again, and we telephone them, and they say, "Oh, we settled that a year ago.  Sorry we didn't call you."

And so I may have a case that we've started a case sheet on that I get no, there's no subsequent follow-up on.  They're

USCA5 3697

just trying to save a place in line.

Q.   So if they don't follow up with you, then you turn around and follow up with them?

A.   After a while, yes, sir.

Q.   After a while.

A.   If there's a trial date that we have, then we're going to follow up with them as we see that, you know, coming within being months and months away.  They may not have a trial date. And so then we may only contact them, you know, six months might go by between contacts, because there wasn't a trial date that was set.

Q.   We saw the e-mails earlier on your direct examination with regard to your being contacted initially, and then you turn around and telling them, telling the defense team that they hadn't submitted stuff to you yet.  When you get involved in a capital case, you take on a very important role.  Is that correct?

A.   Potentially, yes, sir, depending on the role that I'm assigned within that case.  But any consultation in a capital case is important.

Q.   Well, in your statement, you talk about how important it was for Mr. Tinker and Mr. Gilmore to pretty much follow your advice.  I mean, you say in Paragraph 4 that you were retained by Mr. Gilmore and Tinker, that you were first contacted on June 30th, 2003.  You testified to that already.  Correct?

USCA5 3698

A.    Yes, sir.

Q.    That you responded on July 1st, 2003, and that's when you suggested that the defense hire a mitigation specialist.  Is that correct?

A.    Yes, sir.  That's correct.  I have no expertise in gathering records.  And it's much too expensive to have me out in the field trying to chase people down.

Q.    Are you aware of exactly when Mr. John Gilmore was actually appointed to start handling Alfred Bourgeois's case?

A.    No, sir.

Q.    If the record of the trial reflected December 20th, 2002, would you have any issue with that date?

A.    I have no knowledge one way or the other.  I don't know whether to have issue or not.  I simply don't know when he was appointed.

Q.    But you do know that he contacted you on June the 30th, 2003.

A.    That's correct.

Q.    Do you know when the United States issued a notice that it would be proceeding with the death -- with making this a capital case and pursuing the death sentence?

A.    Only from what Mr. Wiseman described sometime in mid June that a notice was provided.

Q.    I think it would --

A.    I mean, mid July, rather.

USCA5 3699

Q.   July 25th, 2003.  Does that ring a bell?

A.   I don't have documentation of that.  That would simply be from his reference.

Q.   Okay.  So let's assume for the sake of this discussion that you were contacted June 30th of the sentence of, or that the United States notice occurred on July 25th, less than a month later.  And do you know when Doug Tinker was actually appointed to begin assisting in this case?

A.   No, sir.

Q.   Let's assume for the sake of the record, and I think the record will reflect this, that it was July 25th, 2003, the same day the notice for the pursuit of the sentence of death was issued.

     MR. WISEMAN:  Your Honor, I'm sorry to interrupt Mr. Roberts, but I think it's important to be accurate with the dates here.  The docket of the Court says the notice of intent to seek the death penalty was formally filed July 23rd.  However, the Government announced before Your Honor in open court on July the 16th, Docket Entry 74, that they would be seeking the death penalty.  They had been authorized to seek it.  Your Honor told them to file a formal notice.  And that marks the date when the Court indicated you would start to gear up the case as a capital one.

     MR. ROBERTS:  That's fine, Your Honor.

BY MR. ROBERTS:

USCA5 3700

Q.   The point is that all this occurred right around the time that you were actually contacted on June the 30th, 2003.  So you're telling us you were not aware that your contact was almost simultaneous with the case, the United States beginning to seek the sentence of death?  You were not aware of that?

A.   Well, yes and no.  The initial correspondence with Mr. Gilmore indicated his expectation that this was a capital case, that discussions had been occurring with your office or with Justice about whether it would go capital.  He anticipated that under the current status of the case that Mr. Bourgeois would receive the death penalty.

The timing of the formal notice that was announced in court or that your office provided, I don't have knowledge of when that occurred, except by what you've just described.

Q.   Okay.  Well, you do have knowledge of when you suggested that Ms. Milstein be contacted.  And when did you suggest that again?

A.   I provided a list of about 11 individuals on July the 9th, 2003, at Mr. Gilmore's request.  She was among the 11 individuals, in the second tier, next to the last.

Q.   I'm showing you what's been marked as Petitioner's Exhibit 165.

A.   Yes, sir.

Q.   Can you read for us what happened on October 23rd, 2002?

A.   That indicates first interview in person Alfred Bourgeois

USCA5 3701

conducted by Milstein and Bierbaum.

Q.    So it appears that someone by the name of Milstein and Bierbaum interviewed Alfred Bourgeois as early as October 23rd, 2002.

A.    No, sir.

Q.    Do you know whether that's the same Milstein?

A.    I believe that that date is in error.  I think that date should actually reflect 2003, not 2002.  And that was clarified by Mr. Wiseman in my direct exam.

Q.    Okay.

A.    Since she was not involved in the case in 2002, and I'm -- she's one of the names that I provide, I don't know how she could get there with Bierbaum to be doing an interview in October of 2002.

Q.    I was kind of curious about that myself.  And I didn't hear the clarification, so I stand corrected.

Let me refer you to another exhibit.  Actually it is your exhibit.  This is Petitioner's Exhibit 8.  And this is the list of e-mails that you had discussed earlier.  Correct?

A.    That's correct.

Q.    I'm turning to what appears to be Page 15 at the bottom on this exhibit.

A.    Yes, sir.  Let me turn to that.  I have that.

Q.    Okay.  I believe you've already read this, but I just want to, I want to ask you about another response here, and that is

USCA5 3702

July 25th, 2003, it says -- this is John Gilmore responding to you and saying, "The Judge has agreed to appoint you in our case."

So when you talked about the dates a while ago about the dates of when the notice to proceed with the seeking the death sentence was issued, and it was in, towards the end of July 25th. So John Gilmore actually has informed you on July 25th, 2003, that the Judge has finally appointed you to the case.

So that's the first time that you were officially, at least with regard to the Court having appointed you, that's the first time that you were officially working on the case. Is that correct?

A.    That's correct.

Q.    You made several statements -- I want to get back to another statement here, but I want to just -- on your declaration to this Court in 2007, you made a statement about your concerns about John Gilmore not really knowing how to proceed with the mitigation expert. Do you remember making comments to that extent?

A.    You may need to direct me to a paragraph.

Q.    I will.

A.    Yes, sir. That's in Paragraph 8, based on a December 1st, 2003, communication. It's an e-mail that he had with our office.

Q.    Looking at your statement, your --

USCA5 3703

THE COURT:  Can you zoom that up?  I can't see it.

MR. ROBERTS:  Oh, Your Honor, this is not, we're not -- I'm going to refer to another page here, but I'm actually looking at his declaration which has not been offered yet.

BY MR. ROBERTS:

Q.   And it's an 18-page -- you gave a declaration on May -- you signed it on May the 11th, 2007.  It's an 18-page document.

A.   That's correct.

Q.   Okay.  And in that statement, you're referring to Paragraph 8, where you talked about Mr. Gilmore responding about how he was not really sure how this thing works and did not know if he should be providing me with information or if the mitigating investigators should be providing this information to me directly.

And you said, "This again reflected a lack of familiarity with the functions of Defense Counsel in preparing for a capital case."

Is that your opinion?

A.   For capital sentencing.  Yes, sir, that did point to a lack of familiarity.

Q.   Let me --

A.   And I'd be glad to explain --

Q.   Well, let me invite you to --

A.   -- why I made that assumption.

USCA5 3704

Q.   Let me have you look at an e-mail, another e-mail correspondence between you, Mr. Gilmore and your office actually.  Referencing again the Petitioner's Exhibit 8.  And I'm referring to the middle.  This is Page 19 of this exhibit --

A.   Yes, sir.

Q.   -- where on December the 1st, 2003, John Gilmore e-mailed to Tammy Lam -- and you said Tammy Lam is a member of your office?

A.   She's an administrative assistant in my office.  That's correct.

Q.   And she is the person that you trust to e-mail and correspond with attorneys on cases you're assigned to?

A.   To do status checks in terms of where we are with deadlines and update them with materials and that kind of thing.  Not to handle matters of substance.

Q.   Okay.  But here is an e-mail that John Gilmore had sent to Tammy.  And read what that is.  What is John Gilmore asking her?

A.   He said -- this was in response to her e-mail saying, "We have yet to receive any records, information, materials for Dr. C to begin working on this report."

        MR. ROBERTS:  Objection, nonresponsive, Your Honor.

        THE COURT:  Sustained.

BY MR. ROBERTS:

USCA5 3705

Q.   I ask you to read the portion of what John Gilmore is asking.

A.   Yes, sir.  It says, "Tammy, I'm not -- I'm really not sure how this works.  I've worked with mitigation experts before, but never with dedicated mitigation investigators.  Do they provide information to Dr. Cunningham, or do I?  My understanding was that Lisa Milstein and Gerald Bierbaum were to generate the basis for the doctor's report.  Let me know if you need something from me."

Q.   Did Tammy respond to him?

A.   She did.

Q.   She responded to Mr. Gilmore?

A.   No, she responded to me.

Q.   She forwarded it to you.

A.   There's an e-mail to me.

Q.   She forwarded the e-mail to you.

A.   That's correct.

Q.   And asked you to -- and asked whether you would like to respond to this or whether she should follow up with Gilmore and asked you to advise.

A.   That's correct.

Q.   These are your documents and your e-mails.  Where's the e-mail that responds to John Gilmore with regard to his question about who should provide the investigators with information?  Where is that e-mail?

USCA5 3706

A.   I don't have any of the e-mails from that era in my files. There's apparently not an e-mail of response in John Gilmore's file.

Q.   So in December the 1st at least, John Gilmore asked your office who's supposed to be coordinating with the two investigators, and who's supposed to -- at least it appears that he thought the investigators were supposed to be coordinating directly with you, doesn't it?

A.   Yes, sir.  That's part of his lack of familiarity with capital case preparation.

THE COURT:  Well, did you write to him back and tell him who was going to be doing it?  That's the question.

THE WITNESS:  I don't recall, ma'am.

THE COURT:  Well, that's kind of a biggy, isn't it?

THE WITNESS:  Not necessarily, ma'am.  It's not my job to determine whether the attorney knows about how a capital case works or not.  I'm retained by him to provide a function, not to direct the case or to ensure its quality control.

BY MR. ROBERTS:

Q.   That's interesting.  You're not to direct the case.  Well, why in your declaration do you state, in Paragraph 5, "I explained that the performance of an adequate forensic psychology evaluation required a comprehensive" -- and you go on and you basically tell them that you're outlining how they're supposed to take care of the case, in your statement

USCA5 3707

and here in this court.  And now you're telling us that that's not your role?

THE COURT:  And he prepared all the questions to be asked by the attorneys.

MR. ROBERTS:  Thanks, Your Honor.  I was getting there.  I was getting there, Your Honor.

THE COURT:  Sorry.

BY MR. ROBERTS:

Q.  I mean, Dr. Cunningham, you're the expert.  You're the person that they went to --

THE COURT:  I think I got it, unless you need something more on the record.

MR. ROBERTS:  No, Your Honor, I'll move to something else.

THE WITNESS:  I'll be glad to respond, if that's a question.

BY MR. ROBERTS:

Q.  Do you know how many capital trials that Mr. Gilmore had been involved in?

A.  I do not know.

Q.  Do you know how many capital trials Doug Tinker had been involved in?

A.  No, sir.

Q.  Did you ask?

A.  No, sir.

USCA5 3708

Q.   Did you know Mr. Bierbaum?

A.   I did.

Q.   You did.  You knew of him?

A.   Yes, sir.

Q.   Does he do an adequate job on investigating cases?

A.   I only have limited familiarity.  This was one of the last cases that I worked on him with.  I did not think this job was adequate.

Q.   You didn't think he did an adequate job on this case.

A.   That's correct.

Q.   So he failed the Defense Counsel in this case, did he not?

        MR. WISEMAN:  He wasn't Defense Counsel, Your Honor.

        THE COURT:  That isn't what he said.  Do not comment unless it's by way of an objection, please.

        MR. WISEMAN:  That was an objection.  I thought he said --

        THE COURT:  That is not what he said.

        MR. WISEMAN:  Then I stand corrected.

        THE COURT:  Yes, you do.  And you should sit that way as well.  Thank you.

        THE WITNESS:  I would ask, I guess answer that question yes and no.  The responsibility for the mitigation case does not reside with the mitigation investigator.  It resides with Defense Counsel, who's responsible for all areas of the case strategy and preparation.

USCA5 3709

BY MR. ROBERTS:

Q.    In your opinion.  Correct?

A.    Yes, sir.  That's my understanding and my opinion.  And if --

Q.    They -- did the --

A.    That's a function that is continuously monitored by Defense Counsel.

Q.    In your opinion.

A.    Yes, sir.  So that when you get to that --

Q.    But didn't the Defense Counsel hire you to assist them --

          THE COURT:  I got that.  I got that.  This is --

          MR. ROBERTS:  Yes, Your Honor.

          THE COURT:  I got this figured out, I think.

          MR. ROBERTS:  All right, Your Honor.

BY MR. ROBERTS:

Q.    I just want to comment, in your statement you also say -- you also comment on the fact that the defense were having a problem arranging the evaluation with Dr. Weiner.  You comment that they were having a problem with Dr. Weiner.  And I can refer you to that paragraph, too, if you'd like.

A.    In Paragraph 10, Mr. Tinker had, or Mr. Gilmore had described that they were having difficulty scheduling that.

Q.    With Dr. Weiner?

A.    That's correct.

Q.    And that was one of the experts they were relying on also.

USCA5 3710

Correct?

A.    That's correct.

          MR. ROBERTS:  Your Honor, I just need to take a moment.  I'm going past some of the questions because I understand you already understand some of the issues I was going to cover.

BY MR. ROBERTS:

Q.    Let me move to your Paragraph 14 in your statement, where you liken Alfred Bourgeois's psychological makeup to a pressure cooker, kind of the same thing that you put on your screen -- on your PowerPoint.  Do you see that?

A.    Please direct me to a paragraph.

Q.    It's Paragraph 14.

A.    You'll have to direct me to pressure cooker.  I don't see that in the paragraph.

          (PAUSE.)

Q.    I'm sorry, it's Paragraph 33.  You were prepared to analogize Mr. Bourgeois's functioning for the jury in order to help them understand, appreciate what made him behave violently and believe Mr. Bourgeois's psychological makeup can be likened to a pressure cooker.  That's your opinion.  Correct?

A.    Yes, sir.  I believe that's an analogy that is descriptive.

Q.    Okay.  Lower down, you said that his -- just a few sentences down from that, you say, "However, his background and

USCA5 3711

psychological makeup always made him predisposed toward

impulsivity and violence."  That's your opinion?

A.    Yes, sir, if at large in the community.

Q.    That's what you were going to tell the jury?

A.    Yes, sir.  And that's reflected in his history, that there

were recurrent instances of impulsive violence in the community

and other impulsive decisions as well.

Q.    You were actually, to use your word on Page 9 of your

statement, you were actually flabbergasted when they told you

they were not going to use you as an expert.  Is that correct?

A.    I was very surprised.  You'll have to point out

"flabbergasted" to me.

Q.    Page 9, Paragraph 17.

A.    Oh, page -- Paragraph 17.  I'm sorry.  I was looking at

Paragraph Number --

Q.    I said -- no, I said Page 9.  Sorry.

A.    Yes, I was flabbergasted that they would not be calling me

as a witness.

Q.    And it never occurred to you that Mr. Tinker might not

want the jury to know this pressure cooker information or that

people might be actually still committing murders while they're

in jail?

A.    No, sir.  That's -- I think that's not a correct

characterization.  I have prepared many perspectives --

Q.    I just asked you a question about whether you, that ever

USCA5 3712

occurred to you.

A.   It never occurred --

MR. WISEMAN:  Who cares if it occurred to him?
Objection, Your Honor.  It doesn't -- it's irrelevant.

THE COURT:  What's the legal objection?

MR. WISEMAN:  It's irrelevant whether it occurred to
him.

THE COURT:  Overruled.

BY MR. ROBERTS:

Q.   You were --

A.   Yes, sir, I was flabbergasted that he would not be calling
a mental health expert to describe the developmental history
and the relationship that developmental history had to violent
behavior, including the nature of the behavior involved in this
offense.  I was flabbergasted that the jury was not going to
hear that capital offenders are not more violent in prison than
other offenders, and that the Bureau of Prisons has significant
capability to restrain those individuals.

MR. ROBERTS:  Object to that --

THE WITNESS:  I was very surprised that --

MR. ROBERTS:  -- as nonresponsive, Your Honor.

THE COURT:  Sustained.  I think we should make note
that this witness seems to be very angry.

MR. ROBERTS:  Yes, Your Honor.  May I have just a
moment --

USCA5 3713

MR. WISEMAN:  Your Honor, I take issue with that characterization.

THE COURT:  I do not.  I'm the fact finder, and I'm going to make a record of it.

MR. WISEMAN:  Right, and I think --

THE COURT:  So you can sit down, and you can continue.

MR. WISEMAN:  I thought he said he was finished.

MR. ROBERTS:  Your Honor, can I just have a moment with Counsel?

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

(Counsel conferring off the record.)

MR. ROBERTS:  Your Honor, I have one more question, maybe two.

BY MR. ROBERTS:

Q.   Dr. Cunningham --

A    Yes, sir.

Q    -- do you know what the defense was at trial?  What was their theory?

A.   My understanding is he was asserting his innocence at trial.

Q.   And do you think that all of the information that you were providing with regard to him, why he committed such a heinous act, would be inconsistent with a defense of innocence?

USCA5 3714

A.   Yes, sir, it's inconsistent with his -- well, it's -- it explains his other conduct prior to this.

Q.   But you would agree it's inconsistent with a defense of innocence.

A.   Yes, sir.  If the defense is attempting to hold to an assertion that he is innocent of this offense, then they would not want to put on any information at all from any source, including Dr. Estrada or anybody else that he had anything damaging in his background at all.  Now, that's a high, extremely high risk decision to make, in light of the jury's verdict and in light of the evidence in this case.

Q.   You have some familiarity with the legal process.  Do you -- are you aware that it's the Defendant's right to decide whether he wants to plead guilty or innocent?  Were you aware of that?

A.   Yes, sir.  I understand that a Defendant has a right to plead.

        MR. ROBERTS:  Thank you, Your Honor.  We have nothing else.

        MR. WISEMAN:  Your Honor --

        THE COURT:  You may proceed.

        MR. WISEMAN:  Yes, Your Honor.  I have an application before I proceed.  Your Honor's obviously the fact finder --

        THE COURT:  Mr. Wiseman, ask questions, or this will be concluded.

USCA5 3715

MR. WISEMAN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Dr. Cunningham, have you testified before in capital cases in mitigation where the Defendant has maintained his innocence?

A.   Yes, sir.

Q.   How many times?

A.   I can't give you a number.  Many cases had a sentencing phase, I mean a guilt phase characterized by the defense asserting innocence at the guilt phase, followed by a sentencing phase that accepted the jury's verdict and provided mitigation and violence risk assessment perspectives.

Q.   So testifying in a case where the Defendant maintains his innocence is not unusual in your field?

A.   That's correct.

Q.   It's common?

A.   Yes, sir.

Q.   I want to refer you back to P-8 that Mr. Roberts may have inadvertently misrepresented what was going on there.  This is an e-mail of February 18th.  This is Page 28 of the exhibit. It says, "Dear Dr. Cunningham:  The Judge has ordered disclosure in the form of a written report of every matter we intend to have you testify to."

It goes on to talk about the report.  It says, "We're having problems scheduling the neuropsychologist.  We had it

USCA5 3716

set up, but the Marshals didn't follow through.  Now it looks

as if it may not get done.  We are making a record and

objecting."

A.    Yes, sir.

Q.    Does that comport with your recollection of what happened?

A.    Yes, sir.

Q.    It wasn't Dr. Weiner's fault, as far as you know?

A.    No, sir.

Q.    Mr. Roberts asked you -- Mr. Roberts asked you about your

declaration and your, in particular, Paragraph 5, that you

believed that Mr. Gilmore was inexperienced with regard to

working in this setting with mitigation specialists.  And you

gave an opinion in response to that, that I think Mr. Roberts

said, "That's your opinion, that Counsel is responsible."

      My question is, what's the basis for your opinion?

A.    My understanding of the ABA standards and guidelines, that

Defense Counsel is responsible for the orchestration and

presentation at all stages of trial.

Q.    When we first talked about this e-mail packet, I thought

it was your testimony that you don't have access to any of the

e-mails from this period of time.

A.    That's correct.

Q.    Explain to the Court why that is.

A.    In the last six years, there have been a number of

instances where there was a change in computers, that the

USCA5 3717

Outlook files were not transferred, as well as a theft of a

computer, that deprived me of access to historical Outlook

files.

Q.    So is, in your view, the absence of an e-mail responding

to Mr. Gilmore in regard to his December 1st, 2003, "How does

this work?" e-mail, does that mean that you didn't respond, or

you don't see a response in this packet?

A.    I don't see a response in that packet.  If Mr. Gilmore's

files are intact, then -- his Outlook files, then I would

expect that the response would be there.  I don't have any way

of knowing the completeness of his files.

Q.    Mr. Roberts asked you about being impeached by Mr. Shaw.

Did Mr. Tinker ever, or Mr. Gilmore ever say to you, "They're

going to bring in this Shaw guy.  What would you say in

response to his impeachment?"

A.    No, sir.

Q.    The Government has talked about some phantom psychologist

and psychiatrist they had at the ready to rebut whatever it is

you were going to say.  Did Mr. Gilmore or Mr. Tinker ever

discuss that with you and say, "What could they possibly say,

and what would you respond?"

A.    No, sir.

        MR. WISEMAN:  Your Honor, at this time I would ask

for disclosure, which has yet to occur, of the names of the two

mental health people the Government says they had, what they

USCA5 3718

knew, what they were going to say, so I can have a proper opportunity to examine this witness as to what his response would be.  I'm actually somewhat surprised that I'm hearing about this for the first time at this late date.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Yes, Your Honor.  We had given Doug Tinker and John Gilmore a lengthy resumé from Park Dietz, about 65 pages, that we were going to bring Park Dietz in.  And there was another member of his -- there was a female, I can't remember her name actually, but we had contacted her and she was prepared to come in, depending on where the evidence went with regard to a brain defect.  So we had given that information to Doug Tinker and John Gilmore.  It was -- it should have been contained within the information, particularly the lengthy CV, within this information they got.  Obviously, we weren't planning on bringing that in here, so it had no basis for this --

MR. WISEMAN:  Your Honor, I would ask for further disclosure as to what information the Government provided to Park Dietz and this other person as to, you know, whether they did any evaluations, whether they reviewed materials.  I mean, just invoking the name Park Dietz is not a strategic reason for not calling an expert in the case.  I need to know what he knew, what was told to Counsel, and if Counsel acted on it.

THE COURT:  Well, you -- I thought you had all of

Tinker and Gilmore's files.

MR. WISEMAN:  I have not seen anything relevant to Park Dietz or --

THE COURT:  You didn't see the 65-page --

MR. WISEMAN:  I do not recall seeing it.  There's no material --

THE COURT:  Are you saying you don't have it or you don't recall it?

MR. WISEMAN:  I don't recall it.  There's 12,000 pages, so I guess it's possible it's in there.

THE COURT:  Well, I mean, that's --

MR. WISEMAN:  But even if the resumé is in there, my point is still that just invoking the name is not, would not provide Counsel with a strategic reason for not calling an expert.  We need to know if this expert Park Dietz reviewed anything, if he had any opinions.  Because then Counsel should have said to Mr., Dr. Cunningham, "Look, they're going to bring in Park Dietz, and he's going to say X, Y and Z.  What are you going to say about that?"  And without that information, I think it's a red herring.  And it's extra red, and it's a rather large herring.

MR. ROBERTS:  Your Honor, all I -- I mean, we spent some time on the phone.  We e-mailed them the information that we had with regard to the case.  We sent that to Park Dietz.  And all I can tell you is that we informed that it was

USCA5 3720

rebuttal, so there was no report.  There was nothing that was -- we just told them that if they got into the area of trying to limit his violent nature, that we would be, you know, we would be prepared to rebut if they got into that area.

MR. WISEMAN:  Your Honor, Federal Rule 12.2, Federal Rule of Criminal Procedure requires in a capital case that if the Government is engaging in any type of mental health evaluations or analysis that they not only disclose it to the defense, but they have to segregate the prosecution team from that information, because the case might not ever get to a penalty phase.

So what we have here is a situation where the Government is violating that rule.  We have a very serious matter.  I think I have to get Mr. Dietz, Dr. Dietz in here, and whoever else he was working with, find out what they were told, what they told the Government.  For all we know, they gave the Government opinions that were improperly provided.  And this opens up a rather large can of worms.

Now, of course, if the Court wants to find that Counsel did not rely on this abstract invocation of Park Dietz's name --

THE COURT:  Well, I thought you were going to have Mr. Gilmore in here.  You can find that out yourself.

MR. WISEMAN:  Well, I'll find out what Mr. Gilmore knows about it, but that doesn't mean that the Government told

USCA5 3721

Mr. Gilmore everything they knew.  And it doesn't mean the Government didn't violate 12.2.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, there was no, there was no -- there was simply a communication made on the United States' part, with Park Dietz asking what, if anything, that they would comment on if Dr. Cunningham presented the evidence that we thought they were --

THE COURT:  Well, apparently Mr. Tinker and Mr. Gilmore were satisfied --

MR. ROBERTS:  We told, we gave them --

THE COURT:  -- with that representation.

MR. ROBERTS:  Yes, Your Honor.  We gave them the CV and said, "Look, depending on what he says, we're going to bring this person in to rebut."

THE COURT:  "And this is what he's going to say."

MR. ROBERTS:  And we thought that there was going to be some argument about the brain injury, was one of the -- was the primary area we were going to get into, was the fact that he had lied already and that we didn't have a brain injury.  But it was my understanding that some of the brain injury defect issue was going to go towards the future dangerousness issue.  We brought Dr. Estrada in.  There was no witness.  There was no due process violation.  It was simply a decision that Doug Tinker and John Gilmore made with regard to what's

the best way to proceed in the case.

THE COURT:  Okay.

MR. WISEMAN:  It's actually an Eighth Amendment violation and rule of criminal procedure violation.

THE COURT:  Okay.

MR. WISEMAN:  But that's beside the point.

THE COURT:  You're overruled.  Continue on with your questioning, please.

MR. WISEMAN:  Actually, I'm done with my questioning.  Thank you, Your Honor.

THE COURT:  Thank you, sir.  Anything further, Mr. Roberts?

MR. ROBERTS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may stand down.  Call your next witness.

MS. LARIN:  Your Honor, I call Carl Henry, please.

CARL HENRY, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good afternoon, Mr. Henry.

A.   Good afternoon.

Q.   Would you please state your name for the record?

A.   Carl Kevin Henry.

Q.   And I know you have a plane to catch, so I'm going to try my best to talk fast.  Okay?

USCA5 3723

A.    Okay.

Q.    How do you know Mr. Bourgeois?

A.    He's a relative, first cousin of mine.

Q.    And did you grow up with him on Bend Lane?

A.    Yes, I did.

Q.    And what is your date of birth?

A.    August the 8th, 1963.

Q.    So you are a little less than a year older than him.

A.    Yes.

Q.    About the same age.  Can you briefly just describe what you observed about Mr. Bourgeois's family life as a child?

A.    Well, he wasn't had, afforded a -- I can't find the word for it -- but as most kids, as I had growing up, you know, trips and things like that, that I had the pleasure of doing with my parents.  His family did, but he didn't have the luxury of taking part in some of the family outings that was, that his family took part in.  And in some ways, he was, you know, left behind on a lot of things.

Q.    And why, why do you think that is?

A.    Well, his mother had a resentment from him, due to his father and her and a relationship that was a one-night relationship, and it didn't work out.  And you know, she kind of held him, you know, took the misery of her, that relationship out on him.

Q.    Did you see any evidence of abuse by her, by his mother to

USCA5 3724

Alfred?

A.   Yes, I did.

Q.   What did you observe about Mr. Bourgeois's school achievement as a child?  How did he do in school?

A.   Well, he didn't -- he wasn't on the average, like the other kids.  He had -- the other kids had several classes that they would go to, you know, as part of their schooling.  But you know, and a lot of kids would tease him because he had, he stayed in this one class all day.  You know, it was considered -- it's called Title I now, but it's just another, sort of say upgrade name for special education.

Q.   Okay.  And do you have any knowledge whether he ever failed any grades?

A.   Yes.

Q.   And what --

A.   I think it was the third grade he failed.  He went to summer school that year.  He advanced -- through summer school, he advanced to fourth grade.  And he failed again in the fourth grade.  And his mother didn't let him go to summer school this time.  He stayed back.

Q.   So he had to repeat the fourth grade?

A.   The fourth grade, yeah.

Q.   And you went to the same school as he did?

A.   No.

Q.   You did not go to the same school?

USCA5 3725

A.    No, I didn't go to the same school.

Q.    So how do you know this information?

A.    Well just, I spent most of my weekends, and he and I, we talked.  You know, we're relatives, but we were like brothers, we were like two brothers, because we shared a lot of time together during the summers.  And on summers, when I would go out there, the first time he was in summer school, and I asked him, I said, "Are you going to go to" he said, "No, my mom told me I can't go."  She said, "I failed.  I'm going to have to take my punishment.  That's being kept back.  I'm not going to go forward."

Q.    Okay.  Did you notice any other problems, any other areas where Mr. Bourgeois was not able to achieve, as a child?

A.    Well, he was slow when -- bicycle riding, board games that we would play.  A lot of activities that we played, you know, he was a little slow, you know, as far as like when new games would come out and we'd play them, you know, he would have a little trouble catching on to it.  You know, and bicycle riding, you know.

Q.    Uh-huh.  Okay.  Quickly moving forward, moving on, did you have any part to play in Mr. Bourgeois later becoming a truck driver?

A.    Yes, I did.

Q.    And can you please describe that for us?

A.    Okay.  At the time when Alfred was hired at Schwegmann

USCA5 3726

Supermarket, I was the dispatcher, dispatcher in charge.  And he, once he got hired, he came over and he informed me, he said he had just got a job on, and he liked the big trucks, and he wanted to drive it.  At that time he was hired as a porter in the warehouse department, and I instructed him, I said, "Well, you need a little time on the job, and you know, I'll put your name on the list, and just do what you got to do, stay out of trouble, work hard, come to work every day, and you know, when something comes available, you'll get that shot."

Q.   Okay.  And so then he moved over to the trucking end?

A.   Yeah, we had an opening came about, and at that time I became assistant manager over transportation.  We had, an opening came for the buggy, what we call our buggy truck.  And that position was given to him to be a buggy, buggy retriever.

Q.   Can you tell me -- do you know another word for "buggy"?

A.   Basket, shopping cart.

Q.   Okay.

A.   Okay.

Q.   So what was the buggy truck?

A.   Okay.  The buggy truck, that person, their job was every morning, they would go out, they would be assigned a store, one of the stores.  They would check in with that store manager.  That store manager would then take one of his employees from within the store to accompany Mr. Bourgeois.  They would canvas the neighborhood with a trailer on the back of the truck,

USCA5 3727

picking up baskets.  That's all they would do, just canvas the neighborhood.

Some residents would call in and say, "I got one of your shopping carts on my street.  I need you to come and get it."  That's what they would do.  And he would -- him and the person from the store would ride around, and when they get a load, they'll go bring it back to the store and go out again.  That was his job throughout the day.  And at the end of the day, he would come back in.

Q.   Okay.  And can you tell a little, tell us a little bit about the process of training Alfred to promote through the trucks and learn how to drive the trucks?

A.    Okay.  The first position, the entry position was, like I said, the buggy truck.  That was basically a Ford, Chevy, just a standard pickup truck, long bed pickup truck, automatic transmission.  You would just drive around canvassing the neighborhoods.  And then from that we put you onto what's called a bobtail truck, which is a van, a van truck, some of them refrigerated, where you would go from the warehouse to a store delivering goods.

We started him on that position, and he had a few problems, so we brought him back to the buggy position.  And the person that was on the buggy truck, we moved him forward, and I gave him some personal insight as to what he needed to do in order to excel at that position.

USCA5 3728

When the position became available again, we put him on it again, and we let him rode with somebody so he can get the full understanding as to how that position operates, where you go from the warehouse to the store, get the merchandise, bringing it back and forth.

So he rode with somebody for -- I'm trying to -- he rode with somebody for a while, a Mr. Andrew Jefferson for a while, till he was the senior buggy -- senior stake driver.  He rode with him a while till Mr. Jefferson felt he was comfortable with him doing it.  So that's when we released him.  But he mainly drove from the warehouse to the store, back to the warehouse, from the warehouse to a store, back to the warehouse.

Q.   Now, this method of letting him move onto the next truck and then having to bring him back, was that, was that a sign to you that he was having some difficulties learning?

A.   Yeah.  Whenever, when we put somebody on a particular truck, if the instructor said, that's training them, said, "Okay, they're able to go," we'll put them on a trial period. And you know, being in the grocery business, we have a time frame, and we need to get goods from Point A to Point B in a timely manner.  And if it's a problem where you're having a little trouble, you know, understanding and getting the freight moved, the goods moved, then we, you know, my manager said, "Hey, we're having problems.  You know, it's taking too long to

USCA5 3729

get this there," or "Where is he at?"  You know, so we brought him back, put him on the buggy truck, let him did that.  Because after he got that down, he was good at it.  And he had somebody there with him constantly to help him, you know, with the neighborhood and everything like that.

So we brought him back.  And when the position came open again, we put him back on the truck again, and we trained him with somebody, and we said, we want him to specifically learn to go from Point A to Point B, Point A to Point B, and just show him.  And that's what we did.

Q.   Okay.  And did it take Alfred longer to learn how to drive?  Is what you're telling us, is that a longer process --

A.   Yes.

Q.   -- than what other people took --

A.   Yeah.

Q.   -- to learn how to drive?

A.   On average, once you move from the buggy truck to the van truck, you know, it usually takes a week to two weeks to grasp the concept.  It took him, you know, it took him longer than that.  Matter of fact, like I said, we brought him back to the buggy truck, and then we reintroduced it to him later.  At a later time --

Q.   Okay.

A.   -- we introduced it to him again.

Q.   And were there any other limitations to what, in Alfred's

USCA5 3730

job performance?  Did he have some other problems on the job that you recall?

A.    Well, we had forms that had to be filled out, where you, when you go to the store, you know, the managers and everybody, the clerks would have to sign off on what you're bringing them. And from time to time, we would have signatures that, you know, was left out.  Mileages on the fuel report at the end of the day, maintenance sheets, you know, he required extra help with that.

You know, when he fuel up his truck in the evening, you know, he would sometimes forget to put the mileage, how much fuel he put in there, you know.

Q.    And who would give him that extra help?

A.    I would help him.

Q.    And what exactly did you do to help him with those forms?

A.    What I did, I made him a master sheet.  I said, "Okay, this is your master sheet.  Before you bring the paperwork to me, I want you to make sure your sheet has something on every line that I gave you."

Q.    Okay.  And you had mentioned that you had had him go from Point A to Point B --

A.    Yeah.

Q.    -- point A to Point B.  Why did you have to do that?  What do you mean by that?

A.    Well, we had -- we had three trucks, and we had three of

USCA5 3731

those type trucks.  And some of the trucks may leave in the morning, and we wouldn't see them till the end of the shift.  Those were the more seasoned drivers that we felt comfortable with.  We just let them run from store to store.

We also had one truck, the truck that Mr. Bourgeois drove.  We had that one scheduled to come back so that we can give specific instructions as to what we want him to do, so we can, you know, being that we had problems with him grasping the system, we wanted to closely monitor and observe what he's doing to make sure that we get what we wanted done, properly and in a timely manner.

So we would basically send him to the store, have him come back.  You know, when he get to the store, he would call us, "I'm here.  This is what I -- I'm finished this.  What y'all want me to do?"

"Come on back to the warehouse."

Q.    Okay.

A.    "Call me when you get to the warehouse."

Q.    Did you ever try to give him a task that was more than Point A to Point B and have him, you know, do three or four things in sequence?  Was he able to do that?

A.    It was tried a couple of times.  But we had, you know, problems with the wrong merchandise being delivered to the wrong store, you know, so we went to the one -- we put him back on the, just straight A, Point A to Point B.

USCA5 3732

Q.   So if he's making these sorts of mistakes, why didn't Mr. Schwegmann just say, "Let him go"?

A.   That's not the way Mr. Schwegmann operates.

Q.   Can you tell us a little bit about how Mr. Schwegmann operated?

A.   Mr. Schwegmann was one, he had himself a brother that was mentally handicapped, and he had -- he felt he had an obligation to help someone that needed help that was willing to work and willing to learn and just at least show the initiative that they wanted to do good.  And he was willing, you know, he was willing to give that extra training.  He didn't want us to fire somebody.  He wanted us to spend that extra time to try and help them, so that they can, you know, succeed in that job.

You know, when he hired truck drivers, he didn't want the truck drivers that had been out there driving 10, 15 years.  He wanted somebody that never drove.  Everybody he hired, from the manager, meat cutter, anybody, he trained them how to do that position.  He didn't hire anybody -- none of his managers were hired off the street.  They all went through the ranks.  I started out at Schwegmann in high school working part-time and just moved up the ranks.  That was his philosophy.

Q.   And were there other drivers there that had limitations in some way?

A.   We had some older drivers that had, you know, limitations, and we did pretty much the same thing with them, because they

USCA5 3733

had -- some of them had been there since the company started. They couldn't read well. They couldn't write well. So you know, we reached out and we tried to help everybody. That's just the way he wanted us to do it.

Q.   Okay. So when Alfred moved on to the bigger trucks, he had to do more paperwork, I would imagine.

A.   That's correct.

Q.   Did he receive help from anyone else in those areas?

A.   When Alfred, when he got ready to train on the big trucks, we assigned him to the senior driver, Mr. Calvin Cryer. He's deceased now. But Calvin Cryer was one of the drivers that started out with Schwegmann. Didn't have much education, couldn't read well, and he took Alfred in and he trained him how to do things the way he did it. And one of the reasons why we assigned him to Mr. Cryer, because we know Mr. Cryer, they could work together because they was pretty much on the same, same level as far as communicating. They communicated well. When Alfred was on the flat, the van truck, he and Calvin would talk, and Calvin would take up a little time with him, and he would kind of -- Calvin understood what he was going through, because Calvin was pretty much limited himself. So he took Alfred in and he trained him on the trucks. And it took him a little longer to get the training, and Calvin didn't turn him loose till he felt he was confident enough to handle the truck safely.

USCA5 3734

Q.    And how about when he got to the stores, did he need help on the other end?

A.    When he got to the stores, being that he worked with Mr. Calvin, Mr. Calvin had a philosophy, the way he did business --

MS. BOOTH:  Your Honor, I'm going to object, because I don't think he could testify to what happened at the other stores unless he was there.  That, I mean, we're getting really far away, and we're talking about, in response to the question, Mr. Calvin's philosophy.  And the question was asked what happened at the other stores.  So there's my objection.  It's too far, Your Honor.

THE COURT:  Would there be a legal objection in there?

MS. BOOTH:  It would be a legal objection as to him speculating as to what would have happened at the other places when they got there, and he wasn't there.

MS. LARIN:  Could I lay a foundation, Your Honor?

THE COURT:  Yes.

BY MS. LARIN:

Q.    Did you ever see Alfred at the other end at the stores?

A.    I've had opportunities to go to some of the other stores and observe him at the store.  I've talked with some of the shipping clerks at the store that informed me of, you know, because we as managers, we have to go out and do random

USCA5 3735

observations of the employees as to what they're doing and ask questions. And I've had the opportunity to go to some of the other stores. That's where I learned the concept that he was doing was the concept --

Q. That you would like to talk about.

A. -- that Mr. Calvin was doing.

Q. Okay.

A. It was the same -- it was identical.

Q. And what was that? What would they do at the stores?

A. Mr. Calvin, what he did, because he was limited, he made everybody like him. He made everybody love him. And by that, whenever he would go to a store, if it was the shipping clerk's, if it was her birthday, he would bring her a cupcake, he would bring her breakfast, or he would bring her lunch. And when he came, he got royal treatment, because he would bring them a gift, or if it was their birthday, he would bring them a card, you know.

Q. And when you say "royal treatment," what do you mean? What would they do?

A. When he pulled up, he didn't have to do anything. They made sure his paperwork was correct. They made sure his loads, everything was taken off properly. He didn't even have to unload his truck. They got one of the dock hands to unload his truck for him. And they would make sure if he had something to pick up, it was on the truck, the truck was properly loaded, it

USCA5 3736

was sealed, decaled and everything.

Q.   And was this the same for Alfred, Alfred did this?

A.   Yeah.

Q.   Was Alfred ever a dispatcher at Schwegmann's?

A    No.

THE COURT:  Could you call people by their last names, please?

MS. LARIN:  I'm sorry.  I'm so used to -- I'm sorry.

BY MS. LARIN:

Q.   Was Mr. Bourgeois ever a dispatcher as Schwegmann's?

A.   No.

Q.   And why not?

A.   That wasn't his job function.  The way dispatchers were chosen, they chose them by their leadership quality, their motivation and they're able to interact with the employees, to lead them.

Q.   And would Alfred have qualified for that job at that time?

A.   No.

Q.   Do you know where Alfred went in his career after he left Schwegmann's?

A.   After he left Schwegmann, he went to work for Matlack.

Q.   And after that, did you keep track of Alfred's career in any way?

A.   Not during the time, during his tenure at Matlack, I didn't keep track of his career.  The last company he worked

USCA5 3737

for, U.S. Express, you know, I had the chance to spend some time with him, and you know, take a trip with him to the company headquarters one time.

Q.   And when was that, approximately?

A.   I want to say 2002.  I'm not sure.  I don't want to --

Q.   Okay, but --

A.   I don't want to say, give a date and it's not the correct date, but --

Q.   Okay.

A.   -- we had, I had the opportunity -- he was with U.S. Express, and he wanted me to join their team, and he asked me to take a ride with him to Birmingham to company headquarters. I said, "Well, I just can't up and go like that."  He called the people and they said, "Yeah, bring him."

Q.   Okay.

A.   So I traveled with him to Birmingham, to their regional -- I think that was their regional headquarters.

Q.   And you think this was some time around 2002?

A.   Yes.

Q.   And you drove with him in the truck?

A.   He drove to Hattiesburg, and at that point, from Hattiesburg, I drove into Birmingham for him.

Q.   Okay.  And did that truck have any special technology?

A.   The truck had one of the newly installed, it's a QUALCOMM satellite system that's used to track trucks and to keep in

USCA5 3738

contact with them.  He had one of those systems in his truck.

Q.    And were you able to watch Alfred use that system?

A.    Yeah, if you call it --

Q.    Can you describe that, please?

A.    We were driving, right before I took over driving for him, we were driving into, I think that was Hattiesburg where I took over.  And the red light came on, and I said, "The red light came on."  He said, "Oh, they trying to reach me."  I said, "Well, are you going to" -- he said, "No, it don't come on while you're driving.  You have to pull over."  I said, "Are you going to pull over?"  He said, "No, I'm not going to pull over.  When I let you drive, I'll pull over and see what they want."

So when we pulled over at the truck stop, I said, "I want to see how this thing works.  This is something new.  It's nice, computer in the truck."  He said, "I'm not going to use that.  I'm going to go call them."  And that's what he did.  He went and called the dispatcher.

Q.    Okay.

A.    And they wanted to find out if he wanted to take another run, but he told them that, "No, I'm coming in with my cousin."  He told them, "Y'all are supposed to talk with him, and then I'm supposed to have another load going back to Louisiana."  And that was that, you know.

Q.    Uh-huh.  When you -- did you have any interaction with any

USCA5 3739

other people that worked at that company when you got to Alabama?

A.    Yeah.  We got to Alabama, we got there early that morning, so they hadn't got there yet, and around 8:00 o'clock, we went there, and I met with the officials there.  There was an orientation class.  I took the orientation class.  And right after the orientation, when they broke for lunch, Alfred asked me to come with him to join him for lunch.  He was taking a couple of the dispatchers out to lunch, you know, for being nice to him and, you know, that was his -- he was treating them to lunch.  So we took them out to lunch.

Q.    And when you say, "for being nice to him," what do you mean by that?

A.    Helping him -- he said they help him out with his paperwork, you know, keep him on, you know, making sure that, you know, he had the loads that he wanted and that, you know, they made sure his paperwork, if there was a problem or anything, they interceded for him.

Q.    So Alfred is what they call an over-the-road trucker?

A.    Yes.

Q.    And do you know what kind of routes -- I always say the word wrong.

A.    Routes.

Q.    -- routes he drove?

A.    He ran a dedicated route.

USCA5 3740

Q.    What is a dedicated route?

A.    A dedicated route is, for instance, you would go -- his route that he had, he would go to Chalmette, Louisiana, to Domino Amstar Sugar Refinery, pick up liquid material to make Coke, Coca-Cola beverages, and go to Atlanta, to their -- to their manufacturing warehouse, just drop that off.  And then just back and forth.

Q.    So that's an example of a dedicated route?

A.    That's a dedicated route.  You run that route.  That's the only thing he does.

Q.    Okay.  And so your, that's your understanding of most of his career, he was driving dedicated routes.

A.    Yes.

Q.    Would Alfred ever admit he was having any difficulties to you?

            THE COURT:  Please call him by his name.

            MS. LARIN:  I'm so sorry.  Would Mr. Bourgeois -- it's been a long day, Your Honor.

BY MS. LARIN:

Q.    Would Mr. Bourgeois ever admit to having any difficulties or weaknesses to you?

A.    No, not really.  He was pretty much a proud guy.  And he wanted everybody to feel he was on the same playing field that he was on.  Now, you know, when I would get the paperwork, and if something wasn't right, I would call it to his attention.

USCA5 3741

He said, "Oh, man, I forgot.  I was thinking about this.  I was, you know, you know, trying to get off, you know, and tie," you know, but he wouldn't just come out to me and say, "Hey man, I have a problem.  Can" -- you know.  He wanted to be independent, you know, be on the same level as the other drivers.

Q.    Okay.  And what is your profession right now, your occupation right now?

A.    Okay.  I'm employed with RSC Equipment Rental.  I'm the inside sales manager.  My job title is inside sales.  I also do all the training for the employees.  I'm the defensive driving training.  I also train all employees and potential and current customers how to drive scissorlift, forklifts, manlift.  Anything that we have, I have to train new employees how to operate it and certify them that they can operate it before we allow them to operate them on their own.

Q.    And you testified at the penalty phase of Mr. Bourgeois's trial?

A.    Yes, I did.

Q.    And it came out at trial that you had a prior conviction, or some prior convictions?

A.    That's correct.

Q.    And had you told trial counsel or anyone from the defense team about those prior convictions before you testified?

A.    On initial visit when they came to visit me on my job, I

USCA5 3742

asked them would that be a problem with me going, because of that. And they told me, "Hey, it's been a while. You've fulfilled all your obligations. You haven't had any problems with the law. You know, you've been an upstanding citizen. You know, everybody's entitled to one mistake, you know, and it's evident that you, you know, you've made your corrections and you're doing what you have to do." It wouldn't be a problem.

Q. Okay. Who was it that you talked to about this?

A. Mr. Bierbaum.

Q. And when you said he came out to your job, this was in Louisiana?

A. He actually came and visited me --

Q. Okay.

A. -- on my place of employment --

Q. Okay.

A. -- when he came to talk to me about the trial.

MS. LARIN: No more questions, Your Honor.

THE COURT: Thank you, ma'am.

CROSS-EXAMINATION

BY MS. BOOTH:

Q. Hello, Mr. Henry.

A. Hi.

Q. You have been consistently here for Alfred, haven't you?

A. Yes.

USCA5 3743

Q.   You came and you got beat up the last time because of your convictions.  Right?

A.   That's correct.

Q.   And, but didn't you testify that your convictions were expunged?  Isn't that what you told the Court?

A.   I was misinformed when I told them that.  That was in error.

Q.   Okay.  But hadn't you told the Defense Counsel that your criminal history had been expunged?

A.   No.  When Mr. Bierbaum came, I told -- when he came to my job, I informed him that I had the convictions --

Q.   Uh-huh.

A.   -- and that I fulfilled all my obligations to the Court.

          THE COURT:  Well, why did you say you were misinformed about them being expunged?

          THE WITNESS:  Well, I was in the process, and they told -- what the Court had told me, that once I complete my probation and everything, that it would -- the interpretation they gave me, that it would automatically be expunged, under -- I can't think of the plea agreement that they did.

          THE COURT:  Okay.  So you thought they were expunged?

          THE WITNESS:  Yes.  Yes, ma'am.  I thought they were expunged.

BY MS. BOOTH:

Q.   All right.  And you had told that to Mr. Tinker, hadn't

USCA5 3744

you?

A.    I can't remember Mr. Tinker.

Q.    Do you remember --

THE COURT:  Well, one of the lawyers for Mr. Bourgeois.

THE WITNESS:  Okay.

THE COURT:  Do you remember telling him that?

THE WITNESS:  No.  The only person I talked to, I told Mr. Bierbaum --

THE COURT:  Okay.

THE WITNESS:  -- that -- he and I had talked in detail about that when he came to my job.

THE COURT:  And you told him they had been expunged.

THE WITNESS:  And I told -- yeah.  I said, "I fulfilled my obligations, and that upon completion of my probation and everything, my court obligation, that it would be expunged."

THE COURT:  Thank you, sir.

BY MS. BOOTH:

Q.    And that's exactly what you testified to in the courtroom the last time.  And you were the police officer that had the three convictions for fraud.  Right?

A.    Insurance fraud, that's correct.

Q.    Insurance fraud.  Okay.  Now, but back to what I was talking about, you have been consistently there for your

USCA5 3745

cousin, haven't you?

A.   Him and all my employees.

Q.   All right.  But I mean you are -- so you were born in 1965?

A.   1963.

Q.   '63.  And he was born in 1964.  So y'all are about a year apart.  Right?

A.   Okay.

Q.   Okay.  And when you were growing up, did you live in The Bend?

A.   On the weekends and during the summer.

Q.   Okay.  And when is it that you first met Alfred?  How old was he?  Was he living at his mom's house, or was he living somewhere else?

A.   Well, I'm not going to say when I first met him, because I've known him all my life.

Q.   Okay.

A.   So I can't say when I first met him.

Q.   So you knew him, and y'all were, I guess you were friends --

A.   Peas in a pod.

Q.   Peas in a pod, that's good, when he was living with his mother.

A.   That's correct.

Q.   And do you remember if he moved somewhere else?

USCA5 3746

A.    Yes.

Q.    And where did he move to?

A.    He moved with Ms. Mary Clayton.

Q.    All right.  Now, I believe you testified before that, I mean about that before, and why was it that Alfred ended up over at Ms. Mary's?

A.    Alfred ended up with Ms. Mary because as a child in the community she observed, seen and was privy to the abuse that he was subjected to with his parents.

Q.    Uh-huh.

A.    So she took him in.

Q.    Now, do you remember testifying about this before?

A.    Yeah.

Q.    All right.  And do you remember saying that, yes, when someone, when Mr., I believe it was Mr. Gilmore asked you, "Do you recall a time when he went to live with someone else?" That was the question.

      Do you remember saying, "Yes, as there was an elderly lady in the community.  She goes by the name of Ms. Mary Clayton. When she got up in age, she couldn't care for herself.  So at that point in time, she asked Eunice, could one of her daughters come and live with her to help her, help assist her, and you know, bathing and making sure that she took her medicine and eating and stuff like that.  And none of the daughters wanted to go.  So Alfred's mother, Eunice, insisted

USCA5 3747

that he go.  So you know" -- and then you went on to tell how,

at 5:00 in the evening, when the other kids were out playing or

doing stuff, Alfred was stuck over at Ms. Mary's helping her.

A.    Yeah.

Q.    Now, is that true?

A.    That's correct.

Q.    Okay.  And when he was -- did you ever visit him at

Ms. Mary's?

A.    Uh-huh.

Q.    Okay.  Do you know how old he was when he went to

Ms. Mary's?

A.    I think seven.

Q.    Okay.  So he was seven, and he was put over at Ms. Mary's

house to take care of an elderly lady.

A.    To assist her.

Q.    To assist her, right.

A.    Yeah.

Q.    Did she have any problems with any of her legs?

A.    Yeah, one of -- she damaged -- one of her legs was injured

in a car accident.  On her way to church, she was sitting on

the tailgate of the truck.  A guy made a sudden stop, and she

damaged her leg.  And she didn't want to go to the doctor.  And

as a result, she had trouble with one of her legs.

Q.    All right.  And so in this house where he lived starting

at seven, did they have running water?  Or did they have to

USCA5 3748

bring water in to take a bath?

A.   I can't -- I can't answer that, because I can't be for sure.  I mean, that was a while back.

Q.   Right.  Right.  You were, like what, eight years old --

A.   Eight years old.

Q.   -- when he moved there?

A.   Yeah.

Q.   So you two guys are first graders.

A.   Yeah.

Q.   And you're visiting on the weekends and in the summers.  Right?

A.   Yes.

Q.   And so what are the things that he would do?  You said that he would make sure that she got her medicine?

A.   Yeah.

Q.   And make sure that she ate?

A.   She had her food there, and he would make sure that she had her food.  He didn't cook.

Q.   Uh-huh.

A.   He didn't say, "Okay, you need to take two prescriptions of this."

Q.   Uh-huh.

A.   He would make sure -- she would say, "Get that pill bottle there for me," and he would do it in that sense.

Q.   Okay.

USCA5 3749

A.    He didn't -- when I said "care" --

Q.    Uh-huh.

A.    -- he was there, more or less there.  If she fall, she had somebody there to get help.

Q.    Okay.  And did he help her to take her to the bathroom so she could bathe?

A.    No.  To my knowledge, no.

Q.    Okay.  All right.  So bathing and making sure she took her medicine.  So you didn't -- okay.  But you did testify to that earlier.

A.    When I said "bathing," he may have ran her water.

Q.    Okay.

A.    You know, that's -- typically, that can be described as assisting her taking a bath.

Q.    Right.  Right.  Now, did Ms. Mary cook?

A.    To my knowledge, yeah.  She baked pies, she baked cakes. I mean, she was the baker lady.

Q.    All right.  Did she sell things out in the community?

A.    Yeah.

Q.    And did Alfred help her take those things out there and sell them?

A.    He would carry the bags that she had the pies in, and when she get to the church, some of the church sisters would help her with the pies and everything.

Q.    Okay.  And how about her house, who kept her yard?  Isn't

USCA5 3750

that something that Alfred did?

THE COURT:  Please call him by his last name.

MS. BOOTH:  I'm just as bad --

THE WITNESS:  Ms. Clayton.

BY MS. BOOTH:

Q.    Isn't that something that Mr. Bourgeois did?

A.    As he got older.

Q.    Uh-huh.

A.    As he got older, we all did.  We cut grass, you know, and stuff like that.

Q.    Right.  Normal stuff that boys do?

A.    Yes.

Q.    Cut the grass, take out the trash.  Right?

A.    Yeah.

Q.    Now, Alfred has beautiful green eyes, doesn't he?

A.    Well, I'm a man --

Q.    Oh, okay.

A.    -- I'm not going to say he got beautiful green eyes.

Q.    As Alfred got older, he was an attractive male to the girls, wasn't he?

A.    Well, I'm going to let you say that.

Q.    So as -- sorry.  You got me there.  I have to back up a little.

A.    Take your time.

THE COURT:  You got her all flustered there.

USCA5 3751

MS. BOOTH:  I'm all flustered.

BY MS. BOOTH:

Q.   Okay.  Now, when he was young, seven and eight, and you were his buddy, and you were talking about the school situation, you didn't go to the school he went to, did you?

A.   No.

Q.   All right.  And you never helped him with his homework or anything like that.  Seven- and eight-year-old boys don't get together to tutor, do they?

A.   No.

Q.   No, didn't think so.  Now, as he got older and you were working for Schwegmann's, and you actually got him the job.  Right?

A.   No, he got the job himself.  I --

Q.   He got the job by himself?  Okay.

A.   He was hired -- he went, put the application in, to my knowledge.  Got hired as a porter.

Q.   Okay.

A.   And he wanted to get on the trucks.  He was fascinated by it.

Q.   Okay.  Now, do you know how old he was when he did this?  Was he still in high school when he did this?

A.   No, because you had to be at least 18 -- I think it's 21 now -- but back then, before they grandfathered everybody in, you had to be at least 18 to hold a chauffeur's license.

USCA5 3752

Q.   Okay.

A.   To my knowledge.

Q.   And so if I had an application that he filled out and it said that he started there in '85, in, you know, June of '85, that would have made him probably about 19.  Was that about the time you remember him working there?

A.   Could be.

Q.   Okay.  And how long did you -- did you work there the whole time that he worked there?  Or did you move on to another job?

A.   I think he left before I did.

Q.   Okay.  And when you were -- and if I have a thing that says here that he worked there for about five years, that would have been to about 24, would you have any problem with that estimation?  So from 19 to 24, he worked at Schwegmann's?

A.   Okay.

Q.   Okay.  And during that period of time, 19 years old, you start him driving the -- what was it called, the buggy car?

A.   Well, he didn't start --

Q.   No, he started as a porter, right?

A.   As a porter, yeah.

Q.   But when you got him to the buggy, to the buggy, that was just a pickup with a trailer on it?

A.   With a trailer on the back, yeah.

Q.   Okay.  So he was driving a pickup truck that had a

USCA5 3753

trailer.

A.    Yeah.

Q.    And he had a driver's license to do that?

A.    Driver's license, yeah.

Q.    Wow.  And driving a trailer is not as easy as it sounds, is it?  Because you have to maneuver one vehicle while you're anticipating the moves of another part of that vehicle.  Isn't that correct?

A.    Yeah.

Q.    Okay.  Now, so then he moved up to a van.  Is that what you called it?

A.    Yes.

Q.    And is that -- when you say a van, is that like a minivan, a van like that?  Or are we talking about like an 18-wheeler?

A.    It's not an 18-wheeler.

Q.    It's a little bit --

A.    It's pretty much like a stake body truck --

Q.    Okay.

A.    -- with a closed body on it.

Q.    All right.  And then you put everything in the back.

A.    Put everything in the back.

Q.    Okay.  And that was -- how old would he have been when he started doing that?  Twenty?  Twenty-one?

A.    Twenty, twenty-one maybe.

Q.    Okay, 21.  And then he -- and you said that he did that

USCA5 3754

for about five years, and working with Mr. Calvin, and he

learned how to schmooze the girls, right, with the cupcakes and

the birthday remembrances.  Right?  So we have Alfred pulling

into these --

THE COURT:  He's shaking his head yes.  He's not

responding, but --

BY MS. BOOTH:

Q.   Right.  So we have Alfred with these pretty green eyes

going into these, going into the different --

THE COURT:  Mr. Bourgeois.

MS. BOOTH:  Mr. Bourgeois.  I'm sorry.

BY MS. BOOTH:

Q.   -- with these pretty green eyes, driving into the stores

to make deliveries, with cupcakes, remembering birthdays, and

so he's having an easier time with his loading and unloading.

Right?

A.   That's right.

THE COURT:  Sorry?

THE WITNESS:  That's correct.

THE COURT:  Okay.  Can you hear him, Ms. Gano?

COURT RECORDER:  Just barely, Your Honor.

THE COURT:  Okay.  Can you move up, please?

THE WITNESS:  Sure.

THE COURT:  Put your right arm on the shelf in front

of you.

USCA5 3755

THE WITNESS:  Okay.

THE COURT:  And it makes you go right into the microphone.

THE WITNESS:  Oh, okay.

THE COURT:  Thank you, sir.

THE WITNESS:  How's that?

THE COURT:  Perfect.

BY MS. BOOTH:

Q.    That's good.

A.    Okay.

Q.    Now, did you help him get a job with Poole Trucking Lines?

A.    No.

Q.    All right.  Now, Poole Trucking Lines, that's the big 18-wheelers.  Right?

A.    Yeah.

Q.    All right.  And you didn't help him.  He got that all by himself.

A.    To my knowledge.  I didn't -- the last company, like I said earlier, that I know he worked with was Matlack, and after that was U.S. Express.

Q.    Right.  Did you know that he also got a job at Eagle Motor Lines?

A.    No.

Q.    All right.  Did you know that he had -- you said that he had a designated route there to Birmingham.  Right?

USCA5 3756

A.   That's with U.S. Express.

Q.   With U.S. Express.  Do you know that he traveled all over the United States?  In fact, he fathered the child that was murdered down in Livingston, Texas.  Did you know that?

A.   I didn't know where that -- you know, at that point I kind of lost contact with him, because I had moved on and he had moved on.  I was spending less time in the country because I was doing things in New Orleans, so I kind of lost track with him for a while.

Q.   Yeah.  Well, he seemed to be doing pretty well, didn't he?

A.   Well, I can't answer that because, like I said, I had lost contact with him, you know.

Q.   Did you ever visit the home that he bought?

A.   I visited the home -- I think that was the home, for a bachelor party for one of his brothers.  I think that was the home.  It was a home in LaPlace.  I know that.

Q.   A home in LaPlace.  Did he have a swimming pool when you were there?

A.   I don't know.  I didn't go in the backyard.

Q.   So you didn't know he had a swimming pool?

A.   No.

Q.   All right.  Did you know that he owned a motor bike?

A.   I heard.

Q.   Okay.  Did you know -- and he rode that thing around.  Did you hear about that?

USCA5 3757

A.    I heard.

Q.    Okay.  And he had a sports car at one point, didn't he?

A.    I don't know about that.

Q.    Did you hear about that?  Okay.  So when is the last time really, Mr. Henry, that you really had any good contact with him?  Was it like up to Schwegmann, and then y'all kind of lost contact?

A.    When he left Schwegmann, you know, he pretty much went on his own and was doing his thing, and I was pretty much doing my thing.  And we kind of connected back.  I mean, we would see each other occasionally at church, because you know, if he was home, he was at church on Sundays.  So we got the chance to talk, you know, on Sundays at church, you know briefly, you know, but it was never nothing about business or anything or what you're doing.  It was just casual conversation.  You know, we'd talk, we'd be talking about, and we kind of connected back when he was with U.S. Express.

Q.    Okay.  And let me -- and so at that point, he was trying to get you a job.  Right?

A.    Yeah.

Q.    Okay.  Now, Jacob Clayton, do you know who that is?

A.    A lot of the Claytons -- like you called him Jacob Clayton.  I may not know him by Jacob Clayton.  You got -- he has a nickname.  All of them have nicknames, so you've got to give me the nicknames, because I was real small when they were

USCA5 3758

pretty much around.

Q.   Okay.  And how were Ms. Clayton's family?  Were they nice to you?  Were they a nice group of people?

A.   The daughters.  I didn't meet many of her sons.

Q.   Okay.  Now, did you -- you said you were at church.  Did you go to Evergreen Baptist Church?

A.   That's correct.

Q.   Okay.  And did you go to Sunday school?  Because y'all are about the same age.

A.   That's correct.

Q.   Did you sing in the choir?

A.   Sang in the choir.  Still do.

Q.   Okay.  And did Mr. Bourgeois sing in the choir?

A.   For a time, yeah.

Q.   All right.  Now, do you have good memories of the time that you spent at Evergreen Baptist Church?

A.   Fond memories.

Q.   Fond memories.  Would you consider that place a safe place to go to?

A.   I consider every church a safe place to go to.

Q.   Okay.  So if I told you that your Sunday school teacher was raping Alfred, what would you say about that?

A.   Well, it didn't happen at church.

Q.   Okay.  What if I told you he said it happened during choir practice?

USCA5 3759

A.   Well, I would have to -- I don't know.  But I'm saying it didn't happen, you know, during Sunday school.  Choir rehearsal, that's something else.  But it didn't happen during Sunday school.

Q.   Okay.

MS. BOOTH:  You know, Judge, could I just have a minute?  I don't think I have much more.

THE COURT:  Yes, ma'am.

(PAUSE.)

MS. BOOTH:  I have nothing further, Your Honor.

THE COURT:  Thank you.  Anything further?

MS. LARIN:  Very briefly.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   In part, just to clarify the record, you trained Mr. Bourgeois, or you saw Mr. Bourgeois being trained at Schwegmann's, and what -- can you just tell us, he started on the buggy truck, and then did he learn all the trucks?

A.   He went on the buggy truck.  Like I said, he, we moved him up to the bobtail truck, we called it, the bobtail truck.  He didn't do well on that.  We put him back on the buggy truck.  Then we moved him to the -- when another position came available, we tried him again on the bobtail truck, and we kept him on Point A to Point B, Point A to Point B.

Q.   And then did he eventually learn how to drive an

USCA5 3760

18-wheeler while he was at Schwegmann's?

A.    Yeah, Mr. Calvin, we put him under the tutelage of Mr. Calvin, and he trained him how to drive the tractor-trailers.

Q.    Okay.  And there was a brief mention about a license.  And at the time that Mr. Bourgeois was learning how to drive trucks, what type of license was required?

A.    It was a chauffeur's driver's license.

Q.    And that's not the same thing as a CDL today.  Correct?

A.    No.  It was before the CDL license was introduced.  A chauffeur's license was something that was done on a statewide level.  And after so many accidents and everything, the federal government learned that drivers were going, if they get a DWI in Louisiana, they would drive 40 miles into Mississippi and get another driver's license.  And they would continue their career.  So that's brought on the concept we're going to make it so we can track all these drivers, make sure that they all was on the same playing field.  So they made -- that's how the CDL came about.

Q.    Okay, great.  And there was one other mention that, talking about yard work and stuff, and talking about what all the normal kids did in the neighborhood.  Would you have characterized Mr. Bourgeois as normal as far as his abilities when he was a child?

A.    No.

USCA5 3761

Q.    And what would you say?

A.    Well, he, you know, he didn't learn how to, when most kids were learning to ride a bike, he still hadn't grasped the concept.  My parents bought us a bike.  It was a bike with two seats, so on weekends, me and Alfred, we would ride that bike, you know, because he would always ride on the back with me.  And we would, it made him seem normal, he was all with the other kids riding.  But because he didn't, he was still yet hadn't learned how to fully ride the bike by himself.

            MS. LARIN:  Okay.  Thank you.  No further questions.

            THE COURT:  Thank you.

            MS. BOOTH:  I don't have anything further, Your Honor.

            THE WITNESS:  Thank you all.

            MS. LARIN:  Thank you.

            THE COURT:  Thank you, sir.  Call your next witness.

            MR. McHUGH:  Donald Reese.

            MR. WISEMAN:  Your Honor, while we're waiting for the witness, could I advise the Court that during this last witness's testimony, I conducted a computer search of the file that was provided to us by Mr. Gilmore, and there is no resumé or CV from Park Dietz in it.  Moreover, there's no communication in it that I could find from the Government with regard to --

            THE COURT:  So you're complaining that the Government

USCA5 3762

failed an obligation during the trial?

MR. WISEMAN: Well, I have two complaints, or two issues. One is I don't know what the Government told Mr. Gilmore or Mr. Tinker with regard to Park Dietz. If there was a written communication of some sort, I would like to receive it.

My second complaint, which may or may not be one --

THE COURT: Well, if there's a written communication, you got it in Tinker and Gilmore's file.

MR. WISEMAN: Well, that's what I'm saying --

THE COURT: If it's not there, then it wasn't a written communication.

MR. WISEMAN: Well, that's my request, is there a communication that the Government might have that -- you know, I don't know that Mr. Gilmore's file is in perfect shape. I mean, it was given to us. We scanned it, and I don't know that it has everything. So if they have a communication, I would ask that it be produced so I can see what they told him.

My other complaint, which is a possible one, it's not an actual one yet, is this question about Rule 12.2, but that depends on what they had Park Dietz do. And I don't know that either at this point. So I don't actually have a complaint. But I'd like to see what they told Mr. Gilmore at this point.

THE COURT: Okay. Now, I'm just going to suggest for everybody here, I think we're all aware that Mr. Bourgeois is

USCA5 3763

fighting for his life, and we all recognize the solemnity of these matters and the advocacy of both sides.  I suggest, however, that you make a conscious effort to do this as smoothly as possible.  To be disrespectful to the Court never advances the cause of your client.  So be very careful with that.

So call your next witness.

MR. McHUGH:  Donald Reese, Your Honor.

(Witness sworn.)

MR. McHUGH:  Good afternoon, Mr. Reese.  I just want to caution you at the outset, please do not touch the microphone.

THE WITNESS:  Okay.

MR. McHUGH:  You can lean into it with your right hand --

THE COURT:  But you probably should lean up just a little bit more, so we can hear you better.  Actually, I haven't heard you at all, but --

THE WITNESS:  How is that?

THE COURT:  You might want to lean your right arm on the shelf, and then you're right there in the microphone.  Is that going to be uncomfortable for you?

THE WITNESS:  I can deal with it, I think.

THE COURT:  All right.  Thank you, sir.  Go ahead.

DONALD REESE, PETITIONER'S WITNESS, SWORN

USCA5 3764

DIRECT EXAMINATION

BY MR. McHUGH:

Q.    Can you state your name for the record?

A.    Donald Howard Reese.

Q.    Mr. Reese, how old are you?

A.    Forty-nine.  I just made a birthday.  I'm sorry.

Q.    Okay.  And where do you reside?

A.    In New Orleans.

Q.    Okay.  And how are you presently employed?

A.    As a driver, truck driver.

Q.    Okay.  And for what company?

A.    A company called Neff Rentals.

Q.    Okay.  And --

        MS. SALINAS:  I'm sorry.  I couldn't hear him, Your Honor.

        MR. McHUGH:  I'm sorry.

        THE WITNESS:  A company called Neff Rentals.

BY MR. McHUGH:

Q.    Okay.  So you drive a truck for Neff Rentals.  Is that right?

A.    Yes.

        THE COURT:  N-E-F-F?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Thank you, sir.

BY MR. McHUGH:

USCA5 3765

Q.    Okay.  Do you know the Defendant, Mr. Alfred Bourgeois?

A.    Yes.

Q.    Okay.  And how did it happen that you came to first meet him?

A.    Employed at Schwegmann's.  That's where I came to know Mr. Bourgeois.

Q.    Okay.  And where is Schwegmann's located?

A.    St. Rose, Louisiana.

Q.    Okay.  And what type of company is that?

A.    It's a -- well, now it's -- it was a chain grocery store that's no longer in existence.  It went under.

Q.    What type of position did you have with Schwegmann's?

A.    I drove trucks there.

Q.    Okay.  And how about Mr. Bourgeois?

A.    He was also employed as a driver.

Q.    Okay.

A.    When I knew him.

Q.    So would it be fair to say you guys were co-workers?

A.    Yes.

Q.    Okay.  Now, did there come a time when you were working at Schwegmann's and Mr. Bourgeois was working at Schwegmann's where there was a change in the rules concerning taking a test for a commercial driver's license?

A.    Yes.  While I was employed there, the federal government employed CDL, commercial driver's license.  Anyone driving had

to have a CDL.  Prior to it, basically anyone who wanted to drive a truck just had to apply for a chauffeur's license.

Q.   Okay.  And so to get the CDL, what did you have to do?

A.   Take the test that they came out with.

Q.   And did that apply to all of the drivers at Schwegmann's?

A.   Yes.  Yes, it did.

Q.   Okay.  And do you recall, can you recall an incident or a time where prior to the taking of the test that yourself, other employees, including Mr. Bourgeois, received copies -- received a copy of the test prior to the test being taken?

A.   Yes.  Yes, they --

Q.   Can you describe that for Her Honor?

A.   Well, basically when the system was employed, they wanted everyone to make sure that they complied with the changes.  And in order to do so, we had some people that, you know, management felt kind of iffy if they would be able to adhere to the new regulations by passing, you know, the new test.  So it was a test that was floating around that everybody just knew that this was copies of the original test --

Q.   Okay.

A.   -- that you had to take.

Q.   When you say "they were concerned," who is "they"?  The company?

A.   The supervisor.  I can't say the company as a whole, but you know, the management who was over us, you know, was

USCA5 3767

concerned about he had to fill voids if all these drivers didn't pass this test.

Q.   Okay.  And did the drivers talk among themselves --

A.   Yes.

Q.   -- about how to get a copy of this test?

A.   Yes.  Yes, sir.

Q.   And do you recall that Mr. Bourgeois was part of those conversations?

A.   Well, he was part of the employment there with us, and everybody was there, you know, including myself, so --

Q.   Okay.  Now, moving on from that incident, did you eventually leave Schwegmann's?

A.   Yes, I did.

Q.   Okay.  And where did you go?

A.   I went to a company called Matlack.

Q.   Okay.  And what did you do for Matlack?

A.   Drove trucks.

Q.   Okay.  And while employed at Matlack, did Mr., did you again run into Mr. Bourgeois?

A.   Yes, I did.

Q.   Okay.

A.   Yes.

Q.   And by the way, are you friends with Mr. Bourgeois, or were you co-workers?

A.   Just co-workers.

USCA5 3768

Q.   Okay.  And so how did you run into him at Matlack?

A.   Unbeknowing to me, I'm thinking Alfred had to leave before I did and went over there.  I didn't know he had left.  But in the system, I found out that the guys at Matlack told me, "Okay, well, I see you have one of your co-workers over here." I'm like, "Well, who is that?"  And they say, "Alfred Bourgeois" I say, "Oh, okay, Bourgeois."  I said, "Okay."  And so I found out, that's how I found out.  He didn't tell me that he was going over there.

Q.   So it was a coincidence --

A.   Exactly.

Q.   -- that you both ended up at the second company, Matlack.

A.   Right.

Q.   Is that right?

A.   Right.

Q.   Okay.  And did there come a point when you were employed at Matlack where you actually worked closely with Mr. Bourgeois?

A.   Yes.  They actually put us together as a team, and I guess that the reason why, because he and I both came from the same place, and we ended up at the same place.  But you know, it was just a coincidence.

Q.   Now, when you say "a team," did they have a term for that, as far as what you --

A.   "Team drivers," that's it.

USCA5 3769

Q.   So it was called "team drivers"?

A.   Yes.

Q.   So were you both driving the same truck?

A.   Yes.  We were both assigned to the same truck.

Q.   Okay.  And I want to focus you in on that part of your employment with Matlack when you were working with Mr. Bourgeois.  Do you recall an incident where Mr. Bourgeois had trouble with the console of the truck, as far as the buttons?

A.   Yes.  The very first day he and I were assigned to the truck, I thought it odd, for me, you know -- this is the first time that I really came that close with him as a working, you know, partner, companion, well, whatever you call it.  And he was just in the truck just clicking buttons, you know, like click, click, wonder what happens if I do this, do this, do this.  And I just thought it was odd.  And he hit a switch for something that's called a brake retarder.  I found out after he hit the switch what it was.  I didn't know prior to.  And he couldn't, you know, explain or tell me exactly what it was he had done.  And I wasn't watching him, so I didn't know what it was that he did.  And so I'm figuring, okay, something's wrong with the truck, we done did something, and I thought we got it out of whack or tored up or something.  So I said, "Well, let's -- since it is driveable, let's drive it to the mechanic shop and ask them to take a look at it."  And on our way over

USCA5 3770

there, he kept, you know, he finally told me, "Well, I kept messing with the buttons over there, so I'm going to just start doing this, doing this, doing this."  And so eventually, he hit the right button, and the truck, you know, began to drive properly again.

Q.    Was the truck able to drive properly after he had hit the button the first time?

A.    Well, if you knew what it was that he had done, once you engaged this button, well, then you have to change your procedure of the way you drive the truck, okay.  And I didn't know that the truck was, you know, equipped with this button. He didn't know it.  So I guess we both trying to figure out what's going on.  But at this particular time, he was in the driver's seat, and I was like in the back.  So I didn't know what was going on.  So I said, "Okay, well, you get out of the seat.  I'll take over, and I'll drive it to the maintenance shop," which is right there in the yard, you know, so -- but in the process of doing that, he was like, "Well, I know I kept doing some of these buttons here, you see," and so that's what he just, I guess just kept messing with it.

I kept saying, "Well, leave them alone.  Let's get to the shop."  But he apparently hit the right button and the truck started driving like it was supposed to.  I went to the maintenance shop anyway and asked the mechanics, you know, there what took place, what happened when he was hitting these

series of buttons.  And that's when the mechanic explained to me about the engine retarder button that he had hit.

Q.   Okay.  And after you finally get out of the, you get on the road, you're driving with him now as a team driver, did you consider Mr. Bourgeois someone who talked a lot?

A.   Yes, extremely.

Q.   Can you describe that for Her Honor?

A.   Well, for me, it's like this is my first experience as a team driver.  And the way it was explained to me in the process of the short training period, that while I'm behind the wheel, well, the guy that's working with you should be in the bunk resting, so that when you get tired, he should be fresh to go behind the wheel.  Bourgeois just kept talking, you know.  I'm like, "Well, man, I need you to, you know, go to sleep, you know, do something.  You know, take a nap."  But he just constantly kept talking.  I said, "Well, if you're not ready to rest, I'll let you drive, okay, and I'll go to sleep."  Okay?  And so we did that.  So I let him drive.  But when I get behind the wheel, he still wants to talk.  So you know, it's like -- eventually he would nap in the passenger's seat.  But as far as to stretch out and actually rest like he should, you know, to be fresh as a fresh driver, he didn't really do that, per se.

Q.   And where would you normally stretch out?  Would it be in the passenger's seat or somewhere else?

A.   No, in the -- I'm sorry -- in the back.  There was like a

sleeping, little couch I guess you could say, bed, bunk, in the, behind the seat where you could stretch out the length of the truck. As far as length-wise, it would be from the driver's seat all the way over to the door of the passenger's seat. But it would be behind the little wall that would give you some kind of semi-privacy.

Q. And so are you saying that he would not go back there, he would just sit in the passenger's seat?

A. For most of the time, yes, he would be in the passenger's seat.

Q. And he would keep talking until he fell asleep?

A. He would keep talking. And when he realized he was not talking, he would wake up and talk some more.

Q. Okay. So I guess you would characterize this as he was talking a lot more than normal?

A. Yeah.

Q. Constantly talking?

A. Yeah, yeah, yeah.

Q. Okay. Now, did there come a time that you got lost when Mr. Bourgeois was driving on a trip to Canada?

A. Well, yes. This happened so long ago. Basically, we were supposed to be going to Canada, okay. And the last I can remember is telling him, "Okay, Bourgeois, when we get here, we go north on 75." Okay. And so I took it that he understood what was going on. I mean, you know, I just figured, hey, this

USCA5 3773

is Bourgeois.  You know, he's a full grown man, and I just told him, "Okay, we're going north."  So I go to sleep --

Q.   And where would 75 have taken you if you had --

A.   Oh, I'm sorry, it would have taken us up through Michigan all the way up to Canada.

Q.   Okay.

A.   Okay, where we would finish our, you know, that particular leg of that run.

Q.   Okay.

A.   But for whatever reason, I woke up and I'm like, I'm getting up out of a daze, and I didn't really, you know, let him know that I was really awake at that time, and I looked and I'm saying, wait a minute.  It's 56 miles from New York.  I said something's wrong with this.  So I asked him, "Where are we at, Bourgeois?"  And he kind of like grumbled, "I don't know.  I don't know."

I'm like, "What you mean you don't know, man?  You're driving.  You've got to know where we're at."

And so at this time I fully awoke and found out that we had passed up I-75.  So I said, "Now we got to turn around, okay, and make up ground."  We went, I mean, just using for instance, if I went 200 miles out of the way, now I got to go back another 200.  So that's 400 miles.  We should have been at our destination by then.  You know?  And that was like one of the first incidents that I had that kind of -- well, actually

USCA5 3774

the second one.  The one in the yard I really didn't, you know, count that one, but --

Q.   Okay.  And then did there come another time, another incident with, where he was driving where you were asleep and you woke up and found yourself in a situation?

A.   Yes.  That's -- I guess that was the straw that broke the camel's back for me.  I mean, it's like -- I was in the sleeper again, letting Bourgeois drive, you know, by himself while I'm supposed to be asleep.  And I woke up to -- I don't know if everyone in here is familiar with bulk trailers at that time.  It was like a big old bore, or imagine like a two liter Coca-Cola bottle, okay, that half full, okay.  And if you shake it, it creates a slosh.

Q.   You're talking about the load in the back?

A.   The load in the back of the trailer that we were carrying.

Q.   Okay.

A.   And I say that so that, to let you know that if you come to a red light and if you stop, okay, all of a sudden, well, the slosh of that liquid product is going to rush up against the front part of the trailer, okay, the container, and it's going to make you have a hard bump, boom, like somebody run into the back of you if you're sitting at a red light.

So, well, I'm in the sleeper asleep, and all of a sudden it's like I get this big old hard ba-bump, and it like throws me forward.  So I'm asleep, and I think, okay, well, we're at a

USCA5 3775

red light.  So all of a sudden, we get another one.  And it's like boom, and now it's knocking me back the other way.  I'm saying, wait a minute, what's going on.  So I asked Alfred, "What's going on, man?"  And again, I get this grumbling noise, okay.

So another ba-bump comes, so now I'm saying this is not fair to me.  So I say, "Okay, hold up."  I stick my head out the little curtain so I could see where we're at --

Q.    Now, when you say "the little curtain," are you in that sleeping compartment?

A.    I'm in the sleeping compartment, yes, that separates us, you know, the little resting area.

Q.    So you're looking into the cab of the truck now?

A.    Yeah, yeah.  I'm in the little resting area.  So I'm like I'm peeping through the curtain.  And if you look a certain height, you can peep out, and I can look in both mirrors to see exactly what he's looking at from the driver's seat in both mirrors.  So I look to the right, and I'm like, that's not good.  It's odd.  You know, I'm like, why are we so close to the grassy area here?

So I said, "What's going on, Bourgeois?"

Then he finally say, "Okay, I'm stuck."

So I said, "Well, put the truck in park.  Let me see what's going on."

So I get out, look and I shake my head, and I say, "Oh

USCA5 3776

Lord," to myself. And I look in the back, I get out, and I walk around the truck. Okay. I looked in the inside of the, well, Tennessee, it was in Tennessee -- and I know a lot of people say the hills of Tennessee, but it looked like a mountain to me. It was a mountain. This is how scared I was. And the rear part of the trailer, okay, was in the ditch, okay, along the wall of the mountain. I walk across the street, and I look across the top of the street, and I see nothing but pine trees, the top of pine trees, and I said to myself, I can't -- I can't do this no longer, you know. This is the last -- and from that point, every time I got the telephone, I started whining to the dispatcher or crying, and you know, telling him "Hey, you know, I need to go home, I need to do this, I need to get out." I just, you know, I didn't want to put the bad mouth on Alfred. I didn't want to tell them why I wanted to get out of this truck. I didn't want this man to lose his job, you know, because of, you know, the incident that took place while I was with him.

Q.  So in other words, you get out of that situation where the truck is hanging on the cliff of a --

A.  Yes, yes.

Q.  -- of a hill, the hill --

A.  I got out and I took over, and I maneuvered the truck to get it out of the situation and --

Q.  And then did you drive the truck all the way home?

USCA5 3777

A.    No.  We drove, drove to the plant and made the delivery, where the dispatcher had told me to get out of the truck.

Q.    And then how did you get home?

A.    Well, what happened, I asked Bourgeois, I said, "Bourgeois, the dispatcher's going to call," I said, "but you tell them I left the plant walking."

    Okay.  And what happened was I got out of the plant, and from that point, Bourgeois took the truck.  And I went to a little corner grocery store, called my wife and told her I needed to get me a Western Union to the nearest bus station, Greyhound bus station.  And I called the bus station, and that was the last I saw of Alfred.  I hadn't seen him since.

Q.    And that was decades ago?

A.    Oh, yes.  That was a long time ago.

Q.    And that's the last time you've ever seen him?

A.    Right.

Q.    And so you took a bus home, rather than ride in the truck with him?

A.    Yes.  I took a Greyhound bus home.

Q.    Okay.  And this particular time frame that we're talking about, the incident in the lot of the company, the incident driving to Canada by way of New York, and the incident where you're hanging over the edge of the hills in Tennessee, how long a time frame are we talking that you --

A.    Approximately about three weeks, a three-week time frame,

USCA5 3778

yes.

Q.   So this all occurred within three weeks?

A.   Oh, yes.

Q.   And then by that point, you'd had enough.

A.   That was it.

Q.   And one final question, or one final area, I should say. Did you ever notice during this three-week time frame when you would go out on the road whether Mr. Bourgeois prepared properly or was able -- prepared properly for more than one day out on the road, if you guys were going for a couple-day trip?

A.   Well, to me, it was like no, he didn't, because the stuff he carried was in like a little bitty small, I guess at this time it would be the equivalent of like a little bitty Wal-Mart bag.  And to me, that wasn't --

Q.   And when you say "the stuff he carried," what do you mean?

A.   Just whatever his items were, his toiletries, whatever he had in his bag, I mean, you know --

Q.   Did he bring enough clothes?

A.   Not to me, no.  To me, he didn't.  Compared to me, I came -- I would come on with a carry-on suitcase and my little overnight bag for my toiletries and all that stuff.

Q.   And would you prepare the amount of clothes you'd bring --

A.   Yes, I would.

Q.   -- in conjunction with --

A.   I mean, I would take at least a week's supply of clothes,

USCA5 3779

I mean, because that's -- they told us, you know, in training, you know, you always -- you never know how long you're going to be out there, so you always be prepared to be gone for a while.

Q.   And did you believe that Mr. Bourgeois was also doing that, or was he doing something different?

A.   I believe he was doing something different, because I never saw a suitcase.  I mean, you know, I figure, hey, we're in the truck together, so I bring my suitcase in, where's yours, you know?  And all he had was a --

THE COURT:  Well, what was he doing?

THE WITNESS:  He had a little -- I'm sorry?

THE COURT:  What was he doing?

THE WITNESS:  He just had a little bag, as far as --

BY MR. McHUGH:

Q.   When you say "a little bag," do you mean like a little plastic shopping bag, something like that?

A.   Basically that's all I can remember, yeah.  That's all I can remember, just a little bitty plastic like Wal-Mart bag or something like that.

MR. McHUGH:  If I could just have a moment, Your Honor.

(PAUSE.)

MR. McHUGH:  That's all I have, Your Honor.

THE COURT:  Thank you.  Ms. Salinas.

MS. SALINAS:  Yes, Your Honor.

USCA5 3780

CROSS-EXAMINATION

BY MS. SALINAS:

Q.   Good afternoon, Mr. Reese.

A.   How you doing?

Q.   You stated that you worked with the Defendant over at Schwegmann's.  Is that correct?

A.   Yes, ma'am.

Q.   How long did you stay at Schwegmann's?

A.   How long did I stay there?

Q.   Uh-huh.

A.   Approximately five to seven years I did.

Q.   Do you know how long Mr. Bourgeois stayed at Schwegmann's?

A.   No, I do not.

Q.   Okay.  So how long of a time were you with Mr. Bourgeois at Schwegmann's?

A.   I could say maybe in the neighborhood of two to three years.

Q.   Two to three years?  Okay.  And Mag Light (sic), you said you went from Schwegmann's, you then moved on to Mag Light -- or I don't know if I'm pronouncing it correctly.

A.   Yes.  Matlack, yes.

Q.   And for you, would you say that was kind of a step up in your career, moving on to Mag Light?

A.   Well, it was an attempt for me to step up, yes, it was.

Q.   Okay.  Because they paid better, they had better benefits

USCA5 3781

and stuff like that?

A.   They had the benefits, but the pay wasn't as great.  The pay was about equal.

Q.   The pay was equal.  So then why would you say this was a move up for you or a step up for you?

A.   Because at that time I was having additions to my family. I knew at Schwegmann's that they had already told me what the pay scale was, so I was looking for other opportunities to increase my pay scale.  By going to Matlack, I was supposed to obtain better pay, but which, you know, it really didn't.

Q.   Okay.  And as a matter of fact, I think you testified that Mr. Bourgeois actually beat you along the career move.  He was at Mag Light before you were.

A.   Well, according to what I remember about the so-called union thing, okay, they told me that Bourgeois had one day seniority over me.  And in order to get one day seniority over me, that mean he had to start before I did, you know.  So --

Q.   Well, Schwegmann's is not -- is it connected to Mag Light?

A.   No, it's not.

Q.   So you could go to any other company you wanted to go to. You could apply for any other company as a truck driver.

A.   Yes, I could, yeah.

Q.   Okay.  And so Mr. Bourgeois moved on before you did.

A.   I would say.  I'm guessing.  You know.

Q.   Well, when you got to Mag Light, didn't you testify that

USCA5 3782

Mr. Bourgeois was already there?

A.   I testified that Mr. Bourgeois had one day seniority over me, yes.

Q.   At Mag Light?

A.   Yes.

Q.   Okay.  So he was there.  And you said that they put you all to drive together.  So when you're describing this incident about you all being in the truck and he's pushing the buttons, you didn't know the buttons, and Mr. Bourgeois had only one day prior to you of knowing what the buttons were.  Correct?

A.   Yes.  But what it was is -- I can't testify to him being in this particular truck before me, but it was my first time in the truck, and --

Q.   Okay.  So both of you had had approximately one day in the truck.  He may have had two days in the truck.

A.   No.  The truck was just, say okay, all right, this was a Freightliner truck.

Q.   Uh-huh.

A.   The truck that I was trained in was a Mack truck.

Q.   The truck that you were trained in when you were at Mag Light, or are you talking about --

A.   At Matlack.

Q.   Okay.

A.   At Matlack.  We're talking about Matlack now.

Q.   Right.

USCA5 3783

A.    It was a Mack truck.

Q.    Okay.

A.    Okay.  So they put us in the truck together.

Q.    Right.

A.    Okay, at the same time.

Q.    Right.

A.    So they trained us on a Mack truck, but they put us in a Freightliner truck.

Q.    Okay.

A.    Okay.  Basically it's like, okay, this is the truck you all are going to be driving.

Q.    Okay.  So you were both unfamiliar with the buttons that were in the Freight (sic) truck.

A.    I can't say we were both.  I can say I was unfamiliar.

Q.    Okay.  But I just want to make clear what you said that Mr. Bourgeois had only been there a day more than you had been.

A.    According to the --

Q.    Okay.

A.    -- guy that they told me about the seniority, yeah.

Q.    Okay.  So that's all I was saying is that you would agree that the buttons were pretty familiar -- were pretty unfamiliar to both of you.

A.    Well, I can say they weren't familiar to me.

Q.    Okay.  That's all right.  And matter of fact, he got that problem fixed out in a few minutes.  Right?  You said he hit

USCA5 3784

the right button and it got straightened out?

A.   I guess after I chastised him, well, yes, if you want to say something like that.

Q.   Okay.  And kind of like when you get a new car and you're pushing all the buttons to figure out how things work?

A.   No, I don't do that for a new car.

Q.   Oh, not for you.  I was just saying --

A.   Okay, yeah.

Q.   -- Mr. Bourgeois's behavior was like people when they get a new car --

A.   Well, people I don't know --

Q.   -- trying out the buttons?

A.   I don't know that.  I mean --

Q.   That's not unheard of.  Right?  You've heard of people doing that, playing with the buttons, saying, "Hey, let me see what this one does, and let me see what that one does."

A.   Not with that expensive vehicle, no.

Q.   No?

A.   No.  I mean, you don't just go around pressing buttons on $100,000 vehicle without knowing what they're for.

Q.   Okay.  Okay.  But that's one way to find out how they do.  Right?

A.   Like I said --

Q.   Well, you said that after --

A.   I wouldn't do it.  I wouldn't do it.

USCA5 3785

Q.   Okay.

A.   In other words, before I knew or tampered with something, I would like to know what it is I'm tampering with.

Q.   Okay.  But you would agree that everybody has their own way of learning how to handle things or how to learn things.  Correct?

A.   Sure, people do things different from what you do, yes.

Q.   Right.  Not everyone does things the way you do.

A.   Right.

Q.   Doesn't mean that they're doing it wrong or incorrectly?

A.   It doesn't mean that they're doing it right either.

Q.   Right.  Now, you stated that he talked a lot, he liked to talk a lot.  Is that correct?

A.   Yes.

Q.   But when he was behind the wheel, you never said anything, or according to your testimony that I heard when you were asked about his behavior when he was driving, you never, you didn't describe any instance when he fell asleep when he was driving.  Correct?

A.   I was asleep myself, so I never knew what was going on.  That's why I was scared.

Q.   Okay.  But certainly if he had fallen asleep, you would have felt the jerking movement --

A.   I can't say that, ma'am.  I mean, you know --

Q.   Okay.

USCA5 3786

A.    -- people nod off, you correct yourself, you wake, I don't know.

Q.    And, but you're driving an 18-wheeler.  Correct?

A.    I'm not -- at that time I wasn't driving.  I was asleep.

Q.    The vehicle you were in, Mr. Reese, with Mr. Bourgeois was an 18-wheeler.

A.    Yes.

Q.    And you can feel the maneuvers in an 18-wheeler.

A.    Not necessarily.  You can go off the line and not know it.

Q.    Okay.

A.    You can get behind the wheel and go off the line and not know it, and you're driving.

Q.    Okay.

A.    It depends on the road.

Q.    Where were you all going when you were driving for Matlack?

A.    Jesus, that was over 20 years ago.  I really couldn't tell you.

Q.    So it wasn't --

A.    All I can tell you the specific incident, because it was like, hey, a slap in the face.

Q.    Well, let me ask you this, were you traveling all over the United States?

A.    We didn't have enough time.  Only had three weeks.  I mean, we were obligated with the company because they told us,

USCA5 3787

yes, you will be going all over the United States.  And in that three-week period of time frame, I said I could not go do that.

Q.    Okay.  And you've already said that, so just listen to my question.

A.    Okay.

Q.    In the three weeks that you were driving with Mr. Bourgeois, where did you all go?

A.    That was over 20 years ago, I really couldn't tell you.  I really couldn't.

Q.    Did you go out of state?

A.    We went to Canada once that I can remember, because we finally did get to Canada.  I think we may have went into -- I really can't tell you.  Chicago maybe.  I don't know.  At this point I would be guessing.

Q.    So it wasn't, they weren't the same, you weren't making the same trip back and forth.

A.    No.  Oh, no, no, no, no, no, no.

Q.    Okay.

A.    It wasn't dedicated, no.

Q.    Okay.  And you were describing something about when you're in Tennessee, and I don't know if I can draw on this board, but you mentioned you were talking about how the tractor was on the -- the trailer was on the side of the road, the cliff?

A.    Yes.  It was somewhere in Tennessee, yes, it was.

Q.    Okay.  And I don't know -- so there's a road -- let me

USCA5 3788

see.  There's a mountain.  Right?

A.    Okay.

Q.    And then there's a road where you drive.  Right?

A.    I'm listening, yes.

Q.    And then there's more mountains as you go in Tennessee.

A.    Okay.

Q.    And you said that the trailer was on the side of the mountain.  And then you walked over and you could see the trees.

A.    Yes, the top of the trees, yes.

Q.    So it wasn't really hanging off the cliff.  You were over here in the ditch, you said.

A.    Exactly.  In the ditch, and the tractor was headed toward the cliff, yes.

Q.    Okay.  So now when you all are truck drivers, there are numerous truck stops throughout the United States, right, where truck drivers stop, they get refreshment, they can take a shower?

A.    Yes.

Q.    That kind of stuff?

A.    Yes.

Q.    And you can actually even wash your clothes at some of these truck stops?

A.    Yes, you can.  Yes.

Q.    And did y'all do that?

USCA5 3789

A.   I didn't, no.  I didn't.  I mean, because what I would do, I would take ample enough clothes that I would hope that I wouldn't run out, okay.

Q.   Okay.

A.   But in the event that I did, now, I guess you can say eventually I would.  But I think that I can remember.  I can't say I did, no.

Q.   Okay.

A.   I can't say I did.

Q.   And that's because that's how you prepare.  You like to take a lot of clothes just in case.

A.   Yes.

Q.   Like I pack.  Just in case.

A.   I don't know how you pack, but that's how I do.

Q.   Okay.  And there are some people, who Mr. Bourgeois may not have wanted to be a big packer like you, and a washateria at a truck stop would take care of his problem, wouldn't it?

A.   I guess.  I don't know.

        MS. SALINAS:  Okay.  I have no further questions for this witness, Your Honor.

        THE COURT:  Thank you.  Anything further, sir?

        MR. McHUGH:  Just briefly.  But the training that had --

        THE COURT:  Could you come to the microphone --

        MR. McHUGH:  Oh, I'm sorry.

USCA5 3790

THE COURT:  -- please, sir?

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   But the training that you had with this company was to bring more than one night's worth of clothing.  Is that fair to say?

A.   Yes.  In other words, the guy that trained me told me, "Hey, when you guys hit the road, you never know how long you're going to be gone, so you need to bring ample enough stuff with you."

Q.   Okay.  So by Mr. Bourgeois bringing a plastic bag with a small amount, one set of clothes, is that --

MS. SALINAS:  I'm going to object to that.  He never said he had one set of clothing, Your Honor.  He just said he had a small bag and never testified to how much was in that bag.

THE COURT:  Sustained.

BY MR. McHUGH:

Q.   Could you tell how much clothes he had?  Did he have four nights' clothing like you?

A.   He -- no.  Basically if I had -- well, I know for a fact that we had to stay in the hotel one time, and he kind of like, to me, I thought it was gross, but he washed his underwear, you know, with just regular hand soap and just like hung them out over the room.  So I just took for granted that the only thing

USCA5 3791

he had in the bag was underwear.

MR. McHUGH:  Thank you.  I have nothing further.

MS. SALINAS:  I have a few more questions.

RECROSS-EXAMINATION

BY MS. SALINAS:

Q.   Mr. Reese, do you know whether or not Mr. Bourgeois had the kind of money you did or whether or not he didn't have enough money to --

MR. McHUGH:  Objection, beyond the scope.

THE COURT:  Overruled.

BY MS. SALINAS:

Q.   -- to be carrying all that clothes?

A.   No, I do not know.

Q.   Okay.  And I want to go back to something I had forgotten about.  You were talking about the fact that the drivers at Schwegmann somehow got the answers to the driving test.

MR. McHUGH:  Objection, Your Honor, beyond the scope.

MS. SALINAS:  Your Honor --

THE COURT:  Overruled.

BY MS. SALINAS:

Q.   Do you remember that?

A.   Would you ask the question again?

Q.   You talked about that the drivers somehow got information, the answers to the test so they could pass and get their CDL's.

A.   Yes.

USCA5 3792

Q.    And --

A.    Okay.  It was -- in other words, when I got the information, it was supposedly an alleged test that if you take this piece of paper here and just remember these questions, this will be the test, so you don't have to worry about what the test is, just remember the answers.

Q.    Did you do that?  Did somebody give you the answers?

A.    I seen the paper, yes, I did.

Q.    Did you do that?

A.    No, I didn't --

Q.    Did you memorize the answers?

A.    -- because that had no significance to me because of the fact that at that point what I was doing with my chauffeur's license, the test wouldn't help me at all.

Q.    Okay.  So do you know whether or not Mr. Bourgeois at that time had the chauffeur's license?

A.    Strongly I would say yes.

Q.    He had his license --

A.    I would say yes.  In order for you to drive a truck at Schwegmann, you had to have a chauffeur's license, yes.

Q.    So he already had that test.

A.    I'm sorry?  I thought you said chauffeur's license.

Q.    He had already taken -- so then he had to take the test to get the CDL.  Is that what you're saying?

A.    In order for him to move on, yes.

USCA5 3793

Q.   Okay.  And you're saying it was the answers to that test that everybody had.

A.   I -- all right.  I'm not exactly sure.  All I know is that the test that was presented to me was floated around the shop.  Everybody had it, you know, everybody had to get it, this, that and the other.

Q.   Oh, okay.  So let me get this straight.  So you can't tell the Court that Mr. Bourgeois did what you described.

A.   I can't tell that he didn't.  Are you saying --

Q.   You can't tell this Court --

THE COURT:  Did he -- what she's asking you is do you have any information that Mr. Bourgeois got the answers in advance to any test he took?

THE WITNESS:  Yes.  I would say he did.

THE COURT:  How do you know that?

THE WITNESS:  Well, because everybody did.

THE COURT:  Well, do you have personal knowledge that Mr. Bourgeois did that?  Did you see him with them?

THE WITNESS:  Personal knowledge?

THE COURT:  Yes.  That's what -- that's the only thing you can testify to.

THE WITNESS:  No, no.  I can't really personally say that yes --

THE COURT:  Thank you.

MS. SALINAS:  I have no further questions, Your

USCA5 3794

Honor.

THE COURT:  Anything further?

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You may -- I'm sorry.  I can't hear you.

MR. McHUGH:  Nothing further, Your Honor.

THE COURT:  You stand up -- you all have a little problem on this side.  Stand up when you address the Court, please.

MR. McHUGH:  I apologize, Your Honor.  Nothing further.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MS. LARIN:  Your Honor, we would call Mr. Murray Bourgeois.

MR. ROBERTS:  Your Honor, just for the record, I'm going to hand Mr. Wiseman Park Dietz's CV, John Shaw's CV, and a presentation that John Shaw had prepared for us at trial that we never used.

THE COURT:  Do you have a copy?

MR. ROBERTS:  I'm giving him a copy -- I'm giving them the -- oh, a copy for the Court?

THE COURT:  No, I meant for you.

MR. ROBERTS:  We've got copies electronically, Your

USCA5 3795

Honor.

THE COURT:  Okay.

MURRAY BOURGEOIS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good afternoon, Mr. Bourgeois.

A.   Good afternoon.

Q.   Can you please state your name for the record?

A.   Murray Bourgeois.

Q.   And can you tell us what year you were born?

A.   1952, September 7th.

Q.   And are you related to Mr. Bourgeois?

A.   Yes, I am, second cousin.

Q.   To Mr. Alfred Bourgeois?

A.   Second cousin.

Q.   Second cousin.  What does that mean?  Who's related to who?

A.   That means that his mother and my daddy was first cousins. His mother daddy and my daddy's daddy were brothers.

Q.   Okay.  And did you grow up on The Bend?

A.   All my life.

Q.   And can you describe The Bend to us?

A.   I guess you could say one of these places that --

THE COURT:  Is he going to have a different description than everybody else?

USCA5 3796

MS. LARIN:  Well, I'm trying to get -- I'll try to move on.

THE COURT:  Okay.

MS. LARIN:  Thank you, Your Honor.

BY MS. LARIN:

Q.   Can you tell us the families, how the families were related on The Bend?

A.   Well, I guess you could say there was kind of like maybe two or three families that was kind of like closely related.

Q.   Okay, and --

A.   But they was more or less, they controlled the whole Bend Lane.

Q.   Okay.  And are the houses on The Bend, are they old?

A.   Oh, yeah.

Q.   How old?

A.   All of them.  For example, the house I was born and raised in, I'm 58, so that house got to be 120 years old at least.

Q.   When you say "born," you mean born in --

A.   I was born in the house.

Q.   Okay.  And would it be safe to say that some of these, that these families have been living together on The Bend all the way back to slave time?

A.   Right, all their lives.

Q.   All, I mean, all the generations have been living back --

A.   Right, uh-huh.

USCA5 3797

Q.   Okay.  And you lived on The Bend, and at some point, were you a part of the Armed Services?

A.   Yeah, United States Marine Corps.

Q.   And when was that?

A.   From December 29th, 1971, to January 21st, 1974.

Q.   And did you serve overseas?

A.   Yeah.  The last of the Vietnam Conflict.

Q.   So in '71 when you left, Mr. Alfred Bourgeois would have been about seven, turning seven, or six -- six to seven?

A.   Somewhere around in there.

Q.   And when you came back, he was about ten.

A.   Uh-huh.

Q.   All right.

         THE COURT:  You have to answer with words, sir.

         THE WITNESS:  Yes, ma'am.

         THE COURT:  Thank you.

BY MS. LARIN:

Q.   And do you have any recollection of Mr. Bourgeois when he was age six and under, before you left to go in the Marines?

A.   Yeah.  Well, he was a kid that was a lot younger than me. But from time to time we would go by their house, playing ball in the yard, and you know, I would see him.

Q.   And was there anything that stood out to you about him?

A.   Yeah, he got mistreated, treated different more than the rest of his sisters and brothers.

USCA5 3798

Q.   And how did you --

            THE COURT:  Did you see that?

BY MS. LARIN:

Q.   Did you see that?

            MS. LARIN:  Thank you.

            THE COURT:  I'm sorry.

            THE WITNESS:  Yes, ma'am.

            MS. LARIN:  I'm slowing down.  Sorry.

            THE COURT:  I'm sure that was going to be next.

            THE WITNESS:  Yes, ma'am, I did.  Well, from time to time, you would see, you know, after he would have gotten a beaten or whatever, he would have red -- he light complected already, he would have red whelps on him.

BY MS. LARIN:

Q.   This is what you saw on Alfred?

A.   Oh, yeah, yes, ma'am.

Q.   And why do you think it was more significant abuse than what might have been happening to his brothers and sisters?

A.   I don't know really all the details, but I know for sure he was always treated different.  He was always treated different.  And he was abused more than the rest.

Q.   Okay.  And do you recall his mother, Ms. Eunice Bourgeois?

A.   Yeah.

Q.   And are you aware if she tended to drink alcohol?

A.   Yes, ma'am.  She drank every day.

USCA5 3799

Murray Bourgeois - Direct

Q.   Okay.  So let's fast-forward to when you returned from your time in the service.

A.   Uh-huh.

Q.   This time Alfred is about ten years old.  Did you move back to The Bend?

A.   Yeah, I moved back home.  I was back home.

Q.   Okay.  And did you have that opportunity to observe Alfred in those years after your return?

A.   Yes, ma'am.  He was kind of hanging around the shop doing, helping, you know, with mechanic work, trying to do mechanic work like Lloyd and myself and my dad.

Q.   Okay.  So "the shop," you mean a mechanic shop?

A.   Yeah, mechanic shop.

Q.   Okay.  And you worked, you spent time at least and worked on cars in this mechanic shop?

A.   Right.

Q.   And who else spent time there?

A.   Lloyd.

Q.   Lloyd is --

A.   And -- Lloyd is Alfred's brother.

Q.   Okay.

A.   And Alfred, you know.  He was there sometimes.

Q.   Okay.  So why was Lloyd -- what relationship did you have with Lloyd that's different than everybody else?

A.   Well, Lloyd looked up on me almost like a big brother

USCA5 3800

image.

Q.   And did Lloyd move into your family's house at some point?

A.   Yeah.  When I had to go to the service, Lloyd moved in with my grandparents and my mother and dad.

Q.   Okay.  And so your father was in the mechanic shop?

A.   Right.

Q.   And Lloyd, and you would spend some time there, and you would see Alfred there.

A.   Right.

Q.   Okay.  And were you trying to teach Alfred how to work on cars?

A.   Yeah.  Every time we'd get some project going on, we would try to, you know, fill him in on it to try to teach him a few things.  But he couldn't grasp none of that.

Q.   Okay.  What do you mean -- well, give us some examples of, you know, what would he not be able to do to help.

A.   Well, if we was working on taking a starter off a car, and I told him, say, "Go catch me that 9/16 wrench" or "that half-inch socket," he didn't know what I was talking about.

Q    And then if you showed him, the next day would he know?

A.   Hmm, not really.  He'd forget.

Q.   Okay.  So do you know, was this for any lack of interest on Alfred's, Mr. Bourgeois's part?

A.   Well, he was trying to, you know, he would try, but he was slow to catch on.  This mechanic thing was like too fast of a

USCA5 3801

pace for him.

Q.   Okay.  Even -- when you say "this mechanic thing," even the identification of different tools.

A.   Right.  Right.

Q.   So you were not talking about, you know, taking apart an engine and putting it back together again.

A.   Oh, that would never happen.

Q.   Okay.  That would never happen?

A.   No.

Q.   Okay.  Were you aware when Mr. Bourgeois started driving an 18-wheeler?

A.   Well, I wasn't around when he first started.  Later on when he started coming around.  But when he first started, he was having a lot of trouble.

Q.   And --

A.   Because one of his good friends, Wardell, used to ride with him.  He used to come back and tell us stories, how "Man, you don't want to ride with Alfred.  When Alfred make a right-hand turn, everything on the corner come with him, garbage can, trees, stop sign, the front of somebody car, he going to hit it."

Q.   But it's your understanding as he grew older and had more experience, he improved as a driver?

A.   Somewhat, you would say.

Q.   Okay.  Was there anything -- and you did have some contact

USCA5 3802

with Alfred in his adult years?

A.    Yeah.

Q.    About how often would you see him, do you think?  This is, you know, twenties, thirties.

A.    Oh, not too often, because he worked a lot.  I worked a lot.  Because he used to like to wrestle.

Q.    Oh, really?

A.    Yeah.

Q.    Okay.  Was there anything unusual you noticed about Alfred in those years?

A.    Well, that he -- well, he was slower than most of the guys, you know, catching on to a lot of things.  So you know, well, and like I mentioned to him all the time how some people --

        MS. BOOTH:  Your Honor, I've got to object.  I'm sorry.  Yes, sir, I'm sorry, I didn't mean to be disrespectful to a Marine, but there's been a lot of testimony here, and there's no time period.  I need a time period what we're talking about.

        THE COURT:  Can you do that, please?

        MS. LARIN:  Yes.  All I did narrow it down to was like when he was in his twenties and thirties, but --

        THE COURT:  When who was --

        MS. LARIN:  If you could narrow it down more than that, that would be helpful.

USCA5 3803

THE COURT:  When who -- "he," who's the "he"?

MS. LARIN:  Mr. Bourgeois.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  Twenties and thirties?

MS. LARIN:  When he was an adult, is what I meant.

THE COURT:  Okay.

BY MS. LARIN:

Q.   But if you could narrow it down to a time that you're speaking about, that would be very helpful.

A.   The time that --

Q.   You said it struck you that he seemed slow, even as an adult.

A.   Right.  But well, I would consider him a young man at the time.  I wouldn't know no specific age.  Maybe early twenties, something like that, that you know, he was slower than most people.  You know, he couldn't grasp things like other people did.  You know, kind of uncoordinated.  He used to try to do things like we'd do, like ride motorcycles and stuff like that, but he couldn't catch on to that.

Q.   Do you remember a time, any trouble specifically that he had in riding his motorcycle?

A.   Well, he had one particular incident that he borrowed this guy 3-wheeler, and he told the guy he could ride it.  Well, the guy that -- told him, said, "Look, man, I don't think so."

USCA5 3804

"Oh, man, I can ride it.  I can ride it.  I can ride it."

He took off going down the street.

Q.   This is Bend Lane?

A.   Down Bend Lane.

Q.   Uh-huh.

A.   And ran smack into a telephone pole.  They had to take him to the hospital.

Q.   Is there --

A.   Yeah, he got seriously hurt.

Q.   And would you have -- is it pretty hard to run into a telephone pole?

A.   Well, the part of the 3-wheeler he didn't know is like the steering is not really so much in the steering.  It's kind of like -- excuse my French -- the cheek of your butt, that's part of your steering.  And he didn't know that.  Something that slow.  I mean, he wasn't used to riding it.  He wasn't familiar with it.  And if you'll just turn your, you know, shift your weight, that would steer the bike.

Q.   And he just --

A.   But he didn't know that.

Q.   Okay.

A.   He just took for granted, he saw other people doing it, I'd do it, Lloyd do it, and the other guys do it, and it looked simple.  It looks simple if somebody else is doing it.  But if you try it, it ain't that simple.

USCA5 3805

Q.    Okay.  And --

MS. LARIN:  One second, Your Honor?

THE COURT:  Yes, ma'am.

(PAUSE.)

BY MS. LARIN:

Q.    So do you have any information, do you think Mr. Bourgeois could fix a lawn mower?  Was he able to do that when you were working with him in the mechanic shop?

A.    Absolutely not.  No, ma'am.

Q.    Why are you so sure?

A.    I think he would try and try to make an attempt, but he just didn't have the mechanical skills to do that.

MS. LARIN:  Okay.  Okay, thank you, Your Honor.  I have no more, no further questions.

THE COURT:  Thank you, ma'am.

CROSS-EXAMINATION

BY MS. BOOTH:

Q.    Good afternoon.  My name is Patti Booth, and I just want to get the time line kind of --

A.    Okay.

Q.    -- a little clearer for me.  First of all, Mr. Murray, you were born in '52.  Is that correct?

A.    Yes, ma'am.

Q.    So you are 12 years older than Mr. Bourgeois, Mr. Alfred Bourgeois.

USCA5 3806

A.    Uh-huh.

Q.    All right.  And do you know if he always lived with his mother or if he lived with someone else when he was growing up?

A.    No, as a kid growing up, he used to live with Ms. Mary Clayton, that used to live in the back of the land, an elderly lady.

Q.    Okay.  And Ms. Clayton, I think you gave a statement on it.  Why is it that Mr. Alfred Bourgeois went to live with Ms. Mary?

A.    I'm not really sure.  I believe because of the environment that he was in, and they was really trying to get him -- Ms. Mary really felt sorry for him, and she was trying to get him out of that environment.  He was, you know, by being abused and I guess she feel, felt like she could give him a better home.

Q.    And was Ms. Mary frail?

A.    Ma'am?

Q.    Was Ms. Mary frail?

A.    Frail?

Q.    Frail.  That's what's in your statement, "frail," that Ms. Mary was frail.  Do you remember giving this statement?

A.    Ms. Mary was kind of handicapped because she had --

Q.    Okay.  So frail isn't your word --

A.    Yeah.

Q.    -- right?

USCA5 3807

A.    No, she was --

Q.    Okay.

A.    -- I guess you would say handicapped, because she walked with a stick.

Q.    Right.

A.    Kind of limped.

Q.    But I have a declaration in front of me that you signed. I think --

         MS. BOOTH:  Could I approach the witness, Your Honor, and just show it to him?

         THE COURT:  You want to show him --

         MS. BOOTH:  Oh, this is going to be hard.  You know I'm challenged here.  Is it okay if I just show him his --

         THE COURT:  Yes.  It may be quicker.

         MS. BOOTH:  Thank you, Judge.  Yes, it will be.

BY MS. BOOTH:

Q.    Is this your pretty handwriting right there?

A.    That's it.

Q.    All right.  And do you recognize this document?

         THE COURT:  But you have to question from the podium.

         MS. BOOTH:  Yes.  Yes, sir -- yes, ma'am.

         THE COURT:  Please.

BY MS. BOOTH:

Q.    And do you recognize that you signed an affidavit, a declaration for the Public Defenders?

USCA5 3808

A.   Yes, I did.

Q.   Okay.  But the word "frail" was not your word?

A.   My -- maybe they might have misunderstood me.  "Frail," what would I be -- because it actually, what type of person is Ms. Mary?

Q.   Uh-huh.

A.   Ms. Mary was an elderly lady.  She was, I would say handicapped maybe you would say.

Q.   Did she have any problem with her legs?

A.   She was crippled.

Q.   Okay.

A.   Well, I don't know what happened to her leg, but she used to walk with a stick, with a limp.

Q.   All right.

A.   So that was her condition.  But I mean, she got around everywhere she wanted to go.

Q.   And do you remember telling the Public Defenders that Ms. Mary was the mother of the church?

A.   Right.

Q.   And that she didn't have a husband?

A.   Right.

Q.   And that Alfred's mom said that he had to stay with her because Ms. Mary was frail -- or your word is "handicapped" now.  Right?

A.   That's right.

USCA5 3809

Q.   Okay.  So did you ever visit with Alfred when he was at the home of Ms. Mary?

A.   No, I didn't.

Q.   Okay.  Now, if you said that you went to serve in Vietnam in 1971 and you didn't come back till 1974, about 1971 is when Alfred would have been about six.  Do you know when Alfred went to live with Ms. Mary?

A.   I couldn't say specifically.  All I knew, it was when he was a young kid.  I couldn't give you no age time frame.  I couldn't really say for sure.

Q.   Okay.  But you were living in LaPlace, or I mean -- excuse me -- you were living on The Bend when he was living with Ms. Mary?

A.   Yes, ma'am.

Q.   All right.  And now you talked about the fact that he would come to the shop and y'all would try to include him --

A.   Uh-huh.

Q.   -- in repairing cars.  Was this before or after you went to Vietnam?

A.   Before and after.

Q.   Before and after.  So when he was coming in the shop, he was about five years old?

A.   Yeah.

Q.   And you were trying to teach him tools and things?

A.   Uh-huh.

USCA5 3810

Q.   Okay.  And he was having a difficult time with it?

A.   Well, you're not really expecting him to fix something.

Q.   Right, oh, no.

A.   No.

Q.   Just go get that.  Right?

A.   Yeah, "I need you to go get this," "Go get that."  You know, like the first stage of learning.

Q.   Right.  And so at five years old, he was having a difficult time remembering tools.  And those are -- would you agree with me that being -- that it is a gift to be able to work in mechanics, that not everybody has it?

A.   Yeah.

Q.   And are you, is your testimony that Mr. Bourgeois did not have that particular gift?

A.   Right, because he was kind of slow of learning.  Well, you wouldn't judge that when he was five years old.

Q.   Uh-huh.

A.   You would kind of give him that judgment on that later on in life --

Q.   Okay.

A.   -- when he's still trying to do the same thing, you know, and he really can't achieve it.

Q.   Okay.  So when you came back from Vietnam, he was around ten.

A.   Uh-huh.

USCA5 3811

Q.   And --

THE COURT:   You have to answer with words.   I'm sorry, sir.

THE WITNESS:   I'm sorry, ma'am.   Yes, ma'am.

BY MS. BOOTH:

Q.   Okay.   And so did you, did he come to the shop then when he was ten?

A.   Yes, ma'am.

Q.   All right.   And you said that Lloyd was better at it, but do you know how much older Lloyd is than Mr. Alfred Bourgeois?

A.   I'm not really sure, but he's older.

Q.   Yes, sir.   If I told you it was about four or five years --

A.   Yeah, that sound about right.

Q.   And so it might make a difference that Mr. Bourgeois having a little more trouble, and if he didn't have the gift, and you compare that to somebody that's five years older and somebody -- did Lloyd have the gift?

A.   Lloyd, he learned along the way.

Q.   Uh-huh.

A.   I mean, he didn't know mechanic work.   He was like, you know, he came up working with my dad, working with myself.

Q.   Uh-huh.

A.   And he learned along the way.   But he learned at a young age, you know, as he came along.

USCA5 3812

Q.   And it seems like you're very proud of Lloyd and all that he's accomplished.

A.   Yes, ma'am.

Q.   All right.  And now with Alfred, do you know what age he was when he moved away from Ms. Mary?

A.   I'm not specifically sure.

Q.   Did you know that he had to live here and live there and really didn't have any support system, any clear support system when he was still in high school?

A.   No, I'm not aware of that.

Q.   Okay.  Did you know that he got his first job over at -- and I'm going to mispronounce it -- Swaggart's, Swiggerd's?

A.   Schwegmann's.

Q.   Schwegmann's, Schwegmann's -- by going in and applying and getting the job himself?  Did you know that?

A.   I knew he worked at Schwegmann's.  I didn't know all the details.  I knew he worked there, though.

Q.   All right.  And did you know that he worked his way up from a buggy driver -- and I said it wrong.  It's a buggy -- buggy, buggy truck, buggy something, to driving the big truck?  Did you know that he worked his way up when he worked at that store, or worked for that company?

A.   I'm not really sure.

Q.   Okay.  Did you know that he got his CDL and he began to be an over-the-road trucker and that he would drive as far up as

USCA5 3813

Canada and down through Texas and Birmingham, and he's been all over the United States driving a great big truck?

A.   Well, I knew he, that's what he did for a living, more or less.  But I couldn't say, you know, how far he went --

Q.   Okay.

A.   -- how far he drove.

Q.   But you knew that he did that for a living.

A.   Right.

Q.   Now, you testified earlier, which -- about his wreck on a 3-wheeler.  He was 19 when that happened.  Right?

A.   I'm not really sure what his age was.  I wouldn't be so sure.

Q.   Okay.

A.   But he was a teenager, early twenties for sure.

Q.   Okay.  And he had never been on a 3-wheeler, had he, when he took this little drive?

A.   I don't know the whole story.  I know he -- well, he asked the guy to take a ride.  He told the guy that he could ride it.

Q.   Uh-huh.

A.   But that was the detail that came back to me.  So I said, "Well, he told you he could ride it?"  I say, "I never saw him ride a 3-wheeler before."

Q.   Okay.  So he just was pretty adventurous and took a ride on this 3-wheeler and didn't know to move his --

A.   Yeah.

USCA5 3814

Q.    -- back side.  Right?

A.    Right.

Q.    Okay.  So, and you testified that it's harder than it looks to do that.  Right?

A.    No, it's not that simple.

Q.    Okay.

A.    But if you did it once, you could do it a thousand times.

Q.    Okay.  But if you hadn't done it before, you could end up on a telephone pole.  Right?

A.    You're in a world of trouble.

Q.    All right.  So when he was with Ms. Mary, was that a good time for him?  Do you think that she treated him properly?  Or you don't know?

A.    I couldn't say for sure, but I mean, just looking at the situation, I would say it was a good time for him.

Q.    Okay.

A.    It seemed to be.

Q.    Did you go to the Evergreen Baptist Church?

A.    Do I ever go?

Q.    Did you go during that period of time when he was younger, when you were back from Vietnam?

A.    No, very seldom.

Q.    Okay.  So you didn't know the Sunday school teacher there or anything, did you?

A.    Most of the Sunday school teacher was -- well, some of the

USCA5 3815

people that was living the land, like this girl, Vanessa Scott,

and people like that, and I knew that from hearing them talk

about it.  Going out there often, I wasn't one of the members.

Q.   Okay.  Did you know Ms. Mary's sons, Jacob --

A.   Yeah.

Q.   -- different --

A.   Yes, ma'am.

Q.   Okay.  And did Alfred tell you that Ms. Mary's sons were

raping him every day?

A.   I never heard that one.

Q.   Okay.  Did he ever tell you that the Sunday school teacher

raped him at church during the choir meetings?

A.   I didn't know that either.

          MS. BOOTH:  Okay.  That's all I have, Your Honor.

          THE COURT:  Anything further?

          MS. LARIN:  Yes.  Your Honor, I would like to mark

Petitioner's statement marked P-40 and admit it into evidence,

if there's no objection.

          THE COURT:  It's already marked, isn't it?

          MS. LARIN:  It is marked.  I'd like to offer it.

          THE COURT:  Okay.  Then you want to offer it?

          MS. LARIN:  Yes.

          MS. BOOTH:  I have no --

          THE COURT:  P-40?

          MS. BOOTH:  Is that the --

USCA5 3816

MS. LARIN:  P-40, Petitioner's 40 is the --

MS. BOOTH:  It has two pages.

MS. LARIN:  It is.  I lost --

MS. BOOTH:  That's fine.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, I hate to be fussy, but --

THE COURT:  Since when?

MS. BOOTH:  Yeah.  It's, he's -- it's just cram-packed with hearsay, even hearsay from the legal team.  I mean, you know, it's --

THE COURT:  So that's your objection?

MS. BOOTH:  That's my objection.

THE COURT:  Sustained.

MS. LARIN:  Could I respond?

THE COURT:  Sure.

MS. LARIN:  We would like to offer it because the doctors did rely on it when they were making their opinion, so --

THE COURT:  Sustained.

MS. LARIN:  Okay.

REDIRECT EXAMINATION

BY MS. LARIN:

Q.   And one other question, following up on the legal team, did anyone from Mr. Bourgeois's legal team, defense team, prior to the trial in 2004 approach you and talk to you about

USCA5 3817

Mr. Bourgeois's background?

A.   No, ma'am.

Q.   That's a very long question.  Did you speak to anyone from Mr. Bourgeois's legal team in 2004?

A.   No, ma'am.

Q.   Or 2003?

A.   No, ma'am.

Q.   All right.  Is the first time you talked about Mr. Bourgeois's background in relation to his case when people from my office approached you?

A.   Yes, ma'am.

Q.   Okay.  If trial counsel, as we call it, if the legal team at trial had spoken to you in 2004, would you have testified at his trial if they had asked?

A.   Restate that for me.

Q.   Sorry.  I'm so not speaking well right now.  If they had asked you to testify at his trial, consistent to what you did today, would you have testified at Mr. Bourgeois's trial?

A.   Yes, I would have.

          MS. LARIN:  Okay.  Thank you.  I have no further questions.

          THE COURT:  Thank you.  Anything further?

          MS. BOOTH:  No, Your Honor.

          MR. McHUGH:  Dr. Dailey.

          MR. ROBERTS:  Your Honor, can we take a brief recess?

USCA5 3818

I need to, I want to find out -- Dr. Senn is here, and we need to maybe talk about some logistics, and I'd like to have Dr. Senn at the table.

THE WITNESS:  Excuse me, ma'am?

MR. ROBERTS:  Oh.

THE COURT:  Can we finish this witness?

MR. ROBERTS:  I thought it was finished.

THE COURT:  Is he finished?  Okay.

MS. LARIN:  Yes.

MR. ROBERTS:  Sorry, Your Honor.

THE COURT:  How late do y'all want to go tonight?

MR. WISEMAN:  Your Honor, we certainly appreciate the Court's accommodation, and we're willing and ready to go as long as the Court's able.  I understand there are personnel considerations, so you tell us.  But we do have witnesses and they're ready to go.

(Court and Clerk conferring off the record.)

MR. ROBERTS:  Could we take a brief recess to run out and --

THE COURT:  Yes.

MR. ROBERTS:  Thank you.

(Recess from 5:54 p.m. to 6:01 p.m.)

MR. ROBERTS:  Your Honor, for the record, Dr. Senn is now sitting at the table --

THE COURT:  All right, thank you.

USCA5 3819

MR. ROBERTS:  -- with the United States, and Dr. Moore has taken a back seat to the galley.

THE COURT:  Call your next witness.

MR. McHUGH:  Dr. Dailey.

(Witness sworn.)

THE COURT:  How many witnesses do you all have, Mr. Roberts?

MR. ROBERTS:  Your Honor, we have 16 on our list.

THE COURT:  Okay.  How many are you going to call?

MR. ROBERTS:  At least 15.

THE COURT:  Okay.  Go ahead.

JON CURTIS DAILEY, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Dr. Dailey, how are you presently employed?

THE COURT:  Could you ask him his full name, please?

MR. McHUGH:  I'm sorry.

BY MR. McHUGH:

Q.   May you state your full name for the record?

A.   Yes.  It's Jon, no H, J-O-N, Curtis Dailey.

Q.   And Dr. Dailey, I just wanted to caution you, try and avoid touching the microphone in any way, even with your hand --

A.   Okay.

Q.   -- because it creates a loud noise.

USCA5 3820

How are you presently employed?

A.   I currently am employed by Aspen Dental in Bangor, Maine.

Q.   And what do you do at Aspen Dental?

A.   I function as a general dentist there.

Q.   Okay.  And are you board certified in any dental specialties?

A.   Yes, in prosthodontics and also in forensic dentistry.

Q.   Okay.  And are you a member of any professional societies?

A.   Yes.  I'm sorry, yes.  American Academy of Forensic Sciences, American Society of Forensic Odontology, the American Board of Forensic Odontology, the American Board of Prosthodontics.

        MR. ROBERTS:  Your Honor, we'll stipulate to his expertise.

        MR. McHUGH:  Okay.  And just one or two more questions, Your Honor.

BY MR. McHUGH:

Q.   Have you previously testified as an expert in the area of forensic odontology and bite mark analysis?

A.   Yes, I have.

Q.   Okay.  And I'm going to show what has been marked as P-98.

        THE COURT:  Is this his CV?

        MR. McHUGH:  Yes.

        THE COURT:  Do you want to offer it?

        MR. McHUGH:  Yeah, I was going to offer it, yes, Your

USCA5 3821

Honor.

THE COURT:  P what?

MR. McHUGH:  P-98.

THE COURT:  That's admitted.

MR. ROBERTS:  No objection.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.   And just for the record, it lists --

THE COURT:  Well, could you just show it to me?

MR. McHUGH:  Is it not -- there we go.  Oh, the actual hard copy?

THE COURT:  Do you need to ask him questions off of it?

MR. McHUGH:  No.

THE COURT:  Okay.  I'll just read it then.

BY MR. McHUGH:

Q.   And Dr. Dailey, have you ever been a member of the Armed Forces?

A.   Yes, I have.

Q.   Okay.  Could you describe for us your Armed Forces background?

A.   I was a dentist in the United States Army Dental Corps for almost 26 years, retired as a full colonel.

Q.   Okay.  And from when to when?

A.   Essentially 1980 to 2004, 2005.

USCA5 3822

Q.   Okay.  So in 2005, you retired from the military as a colonel.  Is that right?

A.   That's correct.

Q.   Okay.  And were you also a consultant in October, back in 2002, 2003, were you also a consultant to the Armed Forces Institute of Pathology?

A.   Yes, I was.

Q.   Okay.  In the summer of 2002, were you contacted concerning the matter of United States versus Alfred Bourgeois?

A.   Yes, I was.

Q.   Okay.  And by whom were you contacted?

A.   Special Agent Brady.

Q.   Okay.

THE COURT:  Special Agent who?

THE WITNESS:  Brady.

BY MR. McHUGH:

Q.   Okay.  And do you recall what you were asked to do in this matter?

A.   They asked me to look at some pattern injuries in photographs and compare them to stone dental models of the possible biters.

Q.   Okay.  And I am going to put on the ELMO a document that is marked P-39 (sic).  And do you recognize this document?

A.   Yes, I do.

Q.   And is this a report that you prepared outlining what you

USCA5 3823

received and what you did in this matter initially?

A.    Yes, it is.

Q.    What's the date of that?

A.    29 September 2002.

Q.    Okay.  And I am going to turn -- can you say who the names of the -- you mention that you had gotten stone dental casts. What were the names of the individuals that you got?

A.    You can see them enumerated there in 2B, Alfred Bourgeois, Robin Bourgeois, and AB1994.  And I apologize if I mispronounced those.

Q.    Okay.  And did you conduct a comparison of the stone casts versus the photographs that you had received?

A.    I did.

Q.    Okay.  And I'm going to turn to the second page of that P-139, and I'm going to ask you, could you state for the Court what you concluded as a result of your analysis?

A.    Well, I could not rule in or rule out any of the three people whose dental models I looked at as possible biters.  And the reasons were that the pattern injury in the photographs was rather diffuse, meaning it wasn't a good representation of the teeth that had created the pattern injury.  And --

Q.    Is that in Point Number 1 of your report?

A.    Yes.

Q.    Okay, on Page 2.  Go ahead.

A.    And some of the photographs, the way the pattern injury

USCA5 3824

was positioned in the photographs, didn't allow it to be -- I didn't consider it to be good quality evidence.

Q.   Okay.

A.   And then the, in some of the photos, the ruler or the scientific scale that is used in the photograph that allows an examiner later on to size those photos as life-size wasn't close to the pattern injury, or it was in a different plane. In other words, geometrically, it was above or below where the pattern was made on the tissue when the photo was made.

And also the size and the sort of the, if you think about the arrangement of the teeth, in the three sets of stone dental models, the arch size of the two dental arches, the upper arch and the lower arch, when you look at stone dental models and you put them next to each other, it creates sort of an elliptical shape.  And the size of those three shapes, between the three different people, was not dramatically different. And the arrangement of their teeth was not dramatically different to allow me to make determinations of any one of them with the pattern in the photograph.

Q.   So would another way of saying, on Point 4, is that the three stone casts that you received were very similar, as far --

A.   Yes.

Q.   Okay.  And did you ever become aware that these three individuals were related?

USCA5 3825

A.    Only by looking at their names.

Q.    Okay.  And so did you, as a result of your conclusions, did you prepare this report and provide it to the Government?

A.    I did.

Q.    Okay.  And do you remember, did you provide it to the individual who you named that had provided you the photographs?  Or did you provide it to the lawyers for the Government?

A.    Well, since -- I'm trying to remember back to 2002.  But since it's addressed to Special Agent Brady, I think I sent it to him directly.

Q.    Okay.  Now, did there come a point -- and that's, I'm done with P-139 at this time.  Did there come a time when you received additional information concerning this case?

A.    Yes, several months later.

Q.    Okay.  And in fact, I'm going to show you what has been marked as P-140.  And do you recognize that?

A.    Yes.  That's a --

Q.    Okay.  What is that?

A.    That's a report I wrote in July of '03.

Q.    I'm sorry?

A.    That's a report that I wrote back to Special Agent Brady back in July of 2003.

Q.    And why did you generate this report?

A.    As it says, I received additional photographs to evaluate to see if there was additional evidence contained in those

USCA5 3826

photographs that might help me have a different opinion.

Q.   And did those photographs involve some enhancements?

A.   Yes.  Dr. Oliver, whose name is mentioned there, had provided a CD with some images that he had attempted to enhance digitally.

Q.   And these enhancements in these photographs we're talking about were all photographs of what were purported to be bite marks on the decedent's body.  Is that right?

A.   Correct.

Q.   Okay.  And so had you ever seen these type of enhancements that you received from Dr. Oliver before?

A.   Not this particular type.

Q.   And what was different about them?

A.   Well, I had never seen this, he called it, I believe, a lofting procedure, where digitally they enhanced the images to give them, with the hope that it would bring out more detail.

Q.   Okay.

A.   But I had never seen that particular technique and the way he described it to me.

Q.   Okay.  And at that time, this is July of 2003, approximately how many forensic bite mark comparison cases had you been involved in?

A.   I think I have it mentioned in here.  I don't remember off the top of my head.  150, something like that.

Q.   Okay.  And after you viewed these enhanced images, did you

USCA5 3827

come to a conclusion as a result of reviewing those images?

A.   My original conclusions did not change.

Q.   Okay.  And is that in fact listed in P-140?

A.   Correct.

Q.   Okay.  And so the same four points that you described back in September of, your September of 2002 report were the same four points that you described in the July of 2003 report.  Is that right?

A.   Yes.

Q.   Okay.  Now, did you ever speak -- did you then speak with the prosecutor in the case, recall speaking to the prosecutor in the case after that second report was prepared?

A.   Yes.

Q.   Okay.  Can you tell us who you spoke with?

A.   Attorney Patti Booth.

Q.   Okay.  What do you recall about that phone conversation?

A.   Well, she had gotten my report from Special Agent Brady, and she was upset because I, my conclusions were still the same after I had additional evidence to look at.

Q.   Okay.  And what do you -- do you recall anything particular about that phone call?

A.   I recall a lot about that particular phone call.

Q.   And can you tell us what you recall?

A.   Well, primarily I recall that she was quite upset, and she told me that Mr. Bourgeois was a very bad man, and that I

USCA5 3828

should be able to help with this case, and that if I couldn't, she would find someone who would.  And then she hung up on me.

Q.   Okay.  Did she actually say "goodbye" and hung up, or --

A.   No.  She just hung up the phone.

Q.   Okay.  And did that stand out in your forensic practice, a conversation of that nature?

A.   Yes.  I had never been treated like that in my entire professional life.

Q.   And in this particular case, you actually were retained by the Government because of the fact that you were a consultant, you were a retained consultant to the Armed Forces Institute of Pathology.  Is that right?

A.   That's my understanding of why they called me to begin with, yes.

Q.   Okay.  Dr. Dailey, were you ever contacted by anybody from Mr. Bourgeois's defense team at the time of his trial, 2002, 2003, 2004?

A.   No, I was not.

Q.   Okay.  Had you been contacted by somebody from his trial, such as an investigator or a trial attorney, would you have testified -- would you have testified in his trial if you had been called to do so?

A.   Yes, I would have.

Q.   And would you have testified consistently with your testimony that you have here today, that you've given here

USCA5 3829

today?

A.   Yes, I would have.

MR. McHUGH:  Your Honor, may I just have a moment to review my notes?

THE COURT:  Yes, sir.

(PAUSE.)

MR. McHUGH:  Your Honor, I would move in or ask to be moved in the exhibits which are P- -- I'm sorry.  Your Honor has my marked copy of the CV.  I think it's 96.

THE COURT:  98.  I've already admitted it.

MR. McHUGH:  Yes, P-98 and P-139 and P-140.  And I have no further questions.

THE COURT:  Any objections?

MR. ROBERTS:  No, Your Honor.

THE COURT:  P-139 and 140 are admitted.  Cross-examination?

MR. ROBERTS:  Your Honor, could I have just a moment?  I'm looking for a document.

(PAUSE.)

MR. ROBERTS:  Your Honor, I would like to offer some of Government's exhibits at this point in time, so that I could use them as I --

THE COURT:  And what are they?

MR. ROBERTS:  They are Government Exhibit 172, 173, 174, and 71 and 72.  Sorry to take them out of order.

USCA5 3830

THE COURT:  Any objection?

MR. McHUGH:  I understand they're just being offered at this time, but I don't --

THE COURT:  Yes.

MR. McHUGH:  I don't anticipate an objection to offering them.

THE COURT:  Okay.  Government's 172, 173, 174, 71 and 72 are admitted.

MR. ROBERTS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.  Dr. Dailey, I just want to understand.  I am interested in this.  You got involved in this case because you were in the military, did you not?

A.  Well, I was in the military at the time that it occurred, but I was involved because I was a consultant for bite marks for the Armed Forces Institute of Pathology.

Q.  Right.  And are you aware that the medical examiner in this case was a military member?  Did you know that?

A.  Not that I'm aware of, no.

Q.  Okay.  Do you recall that this case was referred to you by the Naval Criminal Investigation Service, NCIS?

A.  I think that's how Special Agent Brady got in touch with me.

Q.  In fact, Special Agent Brady worked for the NCIS, does he

USCA5 3831

not?

A.    I don't recall off the top of my head, but I had his address on there, if that's what it says and that's who he worked for.

Q.    Okay.  Your first letter that was referenced earlier, Petitioner's 139, that was in 29 September 2002, and your conclusion in that was that you could not rule in or out any of the three individuals.  Is that correct?

A.    Yes.  That was my conclusion.

Q.    So if you were called in to testify to a jury, you would basically say, "I can't exclude anybody, but I also can't say that it's one of the three people."  That's all you would be able to say.  Correct?

A.    Yes.

Q.    Okay.  Same thing when -- do you remember how you were contacted when you -- how you were contacted with regard to when you were going to be mailed Dr. Oliver's photographs?

A.    I don't remember the time line on that, no.

Q.    Do you remember how you were contacted?

A.    No, not at this time.

Q.    Did you know that they were coming from a Dr. Oliver?

A.    Yes, I did know that.

Q.    Okay.  Did you know what Dr. Oliver's role was?

A.    He was enhancing some images, or he had a technique for enhancing images.

USCA5 3832

Q.   Did you have any questions with the way, I mean, his enhancement of those images when you received them?

A.   I did, and I talked to him on the phone.

Q.   You did talk to him?  You chose only four photographs out of the enhancement.  Was there any particular reason you just decided to use -- how many did he send you?

A.   I don't recall, off the top of my head.

Q.   It was like over 30 or something like that?

A.   I don't recall.

Q.   You don't recall?  Let's see.  I think you put it in your report.  If I could have Exhibit P-140.

     (PAUSE.)

Q.   Dr. Dailey, I'm showing you what is marked as Petitioner's Exhibit P-140.

A.   Okay.

Q.   Let's zoom in instead of out.  Do you see where the sentence begins, "I had selected four photographs"?

A.   Yes.

Q.   "From the 30 photographs originally sent to me last year for evaluation for Dr. Oliver to enhance."

     So you selected four out of approximately 30 photographs?

A.   I did.

Q.   Okay.  Any reason you chose not to look at the other photographs?

A.   Well, I looked at all of them.  What it says in that

USCA5 3833

statement was I chose the four that I felt if image enhancement would be of any value, it would be those four.

Q.   Do you recall -- you do recall the call from Patti Booth. You told us that a few minutes ago.

A.   Yes.

Q.   Do you recall her asking you to also consider the other 26 photographs in that phone conversation?

A.   I don't remember that conversation, no.

Q.   You don't remember that?  And do you remember telling her, no, you've done enough on the case?

A.   No, I don't remember that either.

Q.   All right.  If you called somebody and asked them to do a little bit more investigation on something that you were looking into and they refused to do any more, you know, is it possible that you might get a little upset?

A.   I don't recall ever refusing to do anything in this case.

Q.   You don't recall it.

A.   No.

Q.   Okay.  Do you recall -- do you recall when you got the phone call from Patti Booth?

A.   I don't remember the exact day.  I was teaching a class for general dentistry residents at Fort Carson, Colorado, at the time.

Q.   I think you said in your declaration that the phone call came in on a lunch break.

USCA5 3834

A.    Yes.

Q.    Were you rushed?  Did you have to get back to teaching your course when you received the phone call?

A.    No.  We were on lunch.

Q.    You were on lunch?  Did it take away from your lunch when she called you?

A.    No.  I don't usually eat lunch when I'm teaching a course.

Q.    You don't each lunch at all when you're teaching a course?

A.    I don't usually.  I prepare the afternoon session when I'm -- students are out of the room.

Q.    Okay.  So if Ms. Booth had called you and asked you to consider the other photographs before making a final decision, you would have done that?

A.    If they had sent me more photos, I would have looked at more photos.

Q.    You received 30 photographs, and you only chose four.

A.    I chose the four that I thought would be able to be enhanced and paragraphs reveal some additional evidentiary detail.

Q.    Okay.  Do you know who Dr. David Senn is?

A.    Yes, he's sitting right there.

Q.    Sitting right where?

A.    Right there at that table.

Q.    Sitting at the prosecution table?

        MR. ROBERTS:  Let the record reflect he's correctly

USCA5 3835

identified Dr. Senn, Your Honor.

MR. WISEMAN:  Is that an in-court ID?

BY MR. ROBERTS:

Q.    What I want to know is, have you ever had -- have you had a chance to review Dr. Senn's report of April 20th, 2010?

A.    I have never seen any product of Dr. Senn's work.

Q.    Okay.  Have you ever seen Dr. Senn's CV?

A.    Have I seen his CV?  No, I've never seen his CV either.

Q.    Do you have any question, any reason to question his expertise in the area of forensic odontology?

A.    No.  He's another forensic dentistry expert, yes.

Q.    He's well recognized nationally, isn't he?

A.    I think so.

Q.    He actually teaches people to be forensic odontologists, right?

MR. McHUGH:  Your Honor, I'm going to object to the relevance.

THE COURT:  Overruled.

BY MR. ROBERTS:

Q.    He even teaches forensic odontology to others who want to become part of forensic odontology.  Correct?

A.    Yes.  He's one of many people who teach in forensic dentistry.

Q.    Did you ever get a chance to look at the forensic odontology report that Dr. Senn prepared for trial?

USCA5 3836

A.    No, I did not.

Q.    Okay.

          MR. ROBERTS:  Your Honor, may I have just a moment?

          THE COURT:  Yes, sir.

      (PAUSE.)

BY MR. ROBERTS:

Q.    You stated in your direct testimony that when you looked at the teeth, the bite marks, you didn't see any difference between the three individual biters, did you, in their -- maybe I'm stating it wrong, but the, I guess in the alignment of their anterior view?  Did you see any difference in the set?

A.    You're misinterpreting what I said.

Q.    Okay.

A.    What I said --

          THE COURT:  Okay.  All you do is just answer the question.

          THE WITNESS:  I'm sorry, Your Honor.

          THE COURT:  "Yes" or "no."

          THE WITNESS:  Please restate the question.

BY MR. ROBERTS:

Q.    In your direct testimony, you said that the three molds appeared to be similar.  Am I -- is that correct?

A.    They were all different.  I'm sorry, Your Honor.  No, that's not the way I said it.

Q.    Okay.  Well, tell me what you, what your -- when you

USCA5 3837

looked at these, you were not able to include or exclude any. But then you also, I thought you also testified that they all appeared to be, the alignment appeared to be similar.

A.   It wasn't dissimilar enough that you would be able to, in a pattern injury, make an interpretation of one versus the other.

Q.   Not even on the anterior view of the three sets of the teeth?

A.   On the --

Q.   Let me show you --

THE COURT:  How many views did you look at when you came to your conclusion?

THE WITNESS:  I looked at everything I listed in my report, Your Honor.

BY MR. ROBERTS:

Q.   Let me show you what's been marked as Government Exhibit 71, and I'll show you the front page of Dr. Senn's forensic odontology report.  And I'm showing you what is the mold for Alfred Bourgeois, and I'll ask you just to look -- would that be the anterior view?

A.   Yes.

Q.   Okay.  I ask you to look at that and tell me if that looks similar to the mold for AB1994.  Is that the anterior mold?

A.   Yes.

Q.   Does that look similar to the first mold we looked at?

USCA5 3838

A.    Not in that perspective that you're looking at straight, looking at the person straight on like that.

Q.    Okay.  What about the one below, that is labeled Robin Bourgeois"?  Is that the anterior view?

A.    Yes.

Q.    Does that look similar to the other two teeth?

A.    Not from that perspective.

Q.    Okay.  So you looked at it from some other perspectives in reaching your conclusion?

A.    The statement that I made related to the spatial arrangement of the teeth, as that when you look down on the biting surfaces of the teeth, the arch form, the arch width are similar enough between the three arch, the three individuals, their arch size, if you will, and the teeth that are present are similar enough that they don't allow any discernment between the pattern that's represented in the photographs because the pattern is not a good representation of any of those sets of teeth.

Q.    Okay.

      MR. ROBERTS:  Your Honor, I'd like to approach the witness and hand him Government Exhibit 172.

      THE COURT:  I recall that you all, Ms. Booth did disclose to the defense that, what this witness, his opinion.

      MR. ROBERTS:  Yes, Your Honor.

      THE COURT:  Is that -- that's right, Ms. Booth?

USCA5 3839

MS. BOOTH:  Yes, Your Honor, it is.

THE COURT:  Okay.  Along with your opinion of his opinion.

MS. BOOTH:  Yes, Your Honor.

THE COURT:  Uh-huh.

MR. ROBERTS:  Your Honor, I'd like to show the witness Dr. Senn's report, and the report is six pages, and I'd like the witness to be able to --

THE COURT:  Sure.

MR. ROBERTS:  -- to read through that real quick.

THE COURT:  Sure.

MR. ROBERTS:  May I approach the witness?

BY MR. ROBERTS:

Q.   I hand you what's marked as Government Exhibit 172.  And you've never seen this exhibit before, but I'd like you to look through and tell me if you can identify whether or not that is from someone you recognize.

A.   Do you want me to sit here and --

Q.   I would.

A.   -- read the whole thing?

THE COURT:  Yes.

THE WITNESS:  And review it and --

BY MR. ROBERTS:

Q.   Yes, I would.  And I'd like you to read it, and I'd like you to tell me if there's anything in his report that you

USCA5 3840

disagree with.

(PAUSE.)

A.    So what was your question to me then?

Q.    My question was simply, is there anything in that report that you would professionally disagree with?

A.    Well, since I am not at the luxury of having all these different images that Dr. --

THE COURT:  Okay.  Just listen to the question and answer, please, sir, "yes" or "no" or you can't answer.

THE WITNESS:  I can't answer your question.

BY MR. ROBERTS:

Q.    Okay.  I'll retrieve that document.  What is it that you would need in order to make a conclusion?

A.    Well, I would need the actual hard copies of everything that Dr. Senn looked at and probably a similar amount of time that he needed for his analysis to look at the evidence that he had that I didn't have.

Q.    Did you look -- in looking at that report, did it seem to be that there was something in there that you didn't have?

A.    Well, maybe I misspoke there.  I guess he -- I don't know which images he's relating to when he's saying Image AA, BB, DD, whatever at this particular point in time.

Q.    I understand.  Let me ask you one more area real quick. You retired from the military, did you not?

A.    I'm sorry?

USCA5 3841

Q.   You retired from the military?

A.   Yes, I did.

Q.   That's a pretty important date, isn't it?

A.   Yes.

Q.   It was important in your life?  Did you have any kind of a reception or anything?

A.   Not that particular day.  Earlier in the month of December I did.

Q.   I just noticed earlier you had a problem remembering whether it was 2004 or 2005.  I wondered if you remember now when you actually retired from the military.

A.   Well, the problem with that is that the Army wants you to retire at the end of the fiscal, or the calendar year.  Your effective retirement date is 31 December, but you actually go on the retirement rolls on 1 January.  So that's why it was '04 or '05.

Q.   Oh, I understand.  And in your report, you say that you retired December 31, 2004.  But you might have still be on the rolls until 2005?

A.   It's on the next day of the next year, it kicks in that way.

Q.   Okay.  The only reason I bring that up is because you actually were in a military -- were you active duty, full time active duty?

A.   Yes.

USCA5 3842

Q.   So you were in a military status the entire time you were doing the work on this case?

A.   Yes.

Q.   And it's my understanding that you actually submitted a bill to the U.S. Attorney's Office for some portion of -- to be reimbursed for some portion of the work you did in this case.

A.   Not for any of my time, which was on the Government's dime.  I submitted a bill for the hard copy materials I had to buy in order to analyze this, because the Government would not buy them for me --

Q.   And did you --

A.   -- at my place, you know, at my duty station.

Q.   And do you recall any discussions with anyone in the U.S. Attorney's Office asking if there was some way for them to allow you to be hired on after your military ended so that you could be paid for this role as an expert witness?

A.   No, I've never --

Q.   Do you remember any conversation like that?

A.   -- had that conversation, that I recall.

        MR. ROBERTS:  Your Honor, may I have just a moment?

        THE COURT:  Yes, sir.

    (PAUSE.)

        MR. ROBERTS:  I don't have anything else at this time, Your Honor.

        THE COURT:  Thank you.  Anything else?

USCA5 3843

MR. McHUGH:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.   Dr. Dailey, just a couple of questions.  Counsel asked you that if you were called to testify at Mr. Bourgeois's trial by his trial counsel, you would have given the conclusions that you could not exclude or include any of the three stone casts that you received.  Is that right?

A.   Yes.

Q.   You would also have been able to testify to the four reasons why you were not able to make that determination.  Is that right?

A.   Correct.

Q.   And those four reasons have to do with the quality of the evidence that you received in the photographs.  Is that correct?

A.   Yes.

Q.   Okay.  And the conclusions that you were able or not able to draw from them.  Is that right?

A.   Yes.

Q.   Okay.  And Counsel talked to you about that you only reviewed four photographs in your second report with Dr., that you received from Dr. Oliver.  But if your first report indicates that in the summer of 2002 you had reviewed 30 photographs, would that be accurate?

USCA5 3844

A.    Yes.

Q.    Okay.  So in fact, you reviewed what appears to be at least 30 photographs, plus four additional enhanced images, so some 34 photographs, or enhanced images and copies of photographs.  Is that right?

A.    Yes.

Q.    Okay.  And lastly, that report that was handed to you, Government's Exhibit 172, that's dated April 20th, 2010.  And did you read that report that was just handed to you?

A.    I've never seen that before.

Q.    Okay.  Well, it also included -- it was essentially Dr. Senn's rebuttal to Dr. Bowers' report.  Is that correct?

A.    It looked that way, from what I read.

Q.    Okay.  So in addition -- so if Counsel was asking you whether you can agree to anything in there, in addition to seeing the materials that Dr. Senn had, you would also want to see the report of Dr. Bowers.  Is that correct?

A.    The one he referenced, yes.  I haven't seen it either.

        MR. McHUGH:  Okay.  Thank you.  I have no further questions, Your Honor.

        THE COURT:  Thank you.  Anything further?

        MR. ROBERTS:  Nothing further, Your Honor.

        THE COURT:  All right.  You may stand down and we'll --

        THE WITNESS:  Thank you, Your Honor.

USCA5 3845

THE COURT:  -- come back at 9:15 in the morning.

MR. ABREU:  Your Honor, may I approach?  Or may I be heard?

THE COURT:  Yes, sir.

MR. ABREU:  And I stepped out, and I apologize, I stepped out of the room before right at the end of the planning session, but is 9:15 the earliest we can start?  And the only reason I ask is because a witness, one of my expert witnesses has a flight at 10:45.

THE COURT:  Yes.  9:15 is the earliest we can start. Thank you.

MR. ABREU:  Thank you, Your Honor.

(Proceedings concluded at 6:38 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    November 5, 2010
Molly Carter                        Date

USCA5 3846

INDEX

| PETITIONER'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CLAUDIA WILLIAMS | 3 | 48 | 89 | 89 |
| BEVERLY FRANK | 91 | 107 | 129 | |
| BRENDA GOODMAN | 130 | 144 | 172 | 175 |
| MARK CUNNINGHAM | 180 | 200 (Voir Dire) | | |
| | 202 | 284 | 314 | |
| CARL HENRY | 321 | 341 | 358 | |
| DONALD REESE | 362 | 379 | 389 | 390 |
| MURRAY BOURGEOIS | 394 | 404 | 415 | |
| JON DAILEY | 418 | 429 | 442 | |

EXHIBITS:                                                      RECEIVED

PX-1:  CUNNINGHAM LETTER TO GILMORE 2/10/04 . . . . . .   284

PX-2:  CUNNINGHAM LETTER TO GILMORE 2/25/04 . . . . . .   284

PX-4:  CUNNINGHAM MITIGATING FACTORS POWERPOINT . . . .   253

PX-5:  CUNNINGHAM RISK ASSESSMENT POWERPOINT . . . . .   253

PX-7:  CUNNINGHAM CURRICULUM VITAE . . . . . . . . . .   181

PX-8:  E-MAIL FROM CUNNINGHAM . . . . . . . . . . . . .   187

PX-9:  PROPOSED DIRECT EXAMINATION OF CUNNINGHAM . . .   253

PX-10:  CUNNINGHAM MEMORANDUM TO FILE 3/24/04 . . . . .   284

PX-45:  BEVERLY FRANK DECLARATION . . . . . . . . . . .   105

USCA5 3847

446

EXHIBITS: (CONTINUED)                                              RECEIVED

PX-56:   CLAUDIA WILLIAMS DECLARATION . . . . . . . . .    48

PX-60:   E-MAILS FROM BIERBAUM . . . . . . . . . . . .   284

PX-72:   WITHDRAWAL OF MOTION FOR CONTINUANCE 12/16/03 .   284

PX-98:   DAILEY CURRICULUM VITAE . . . . . . . . . . .   420

PX-130:  CUNNINGHAM MATERIALS RELIED UPON . . . . . . .   284

PX-139:  9/29/02 REPORT OF DR. DAILEY . . . . . . . . .   428

PX-140:  7/14/03 REPORT OF DR. DAILEY . . . . . . . . .   428

PX-144:  MOTION FOR CONTINUANCE 12/9/03 . . . . . . . .   284

PX-151:  CUNNINGHAM INVOICE TO GILMORE 4/30/07 . . . .   284

PX-165:  INVESTIGATION TIME LINE . . . . . . . . . . .   284

PX-166:  BOURGEOIS FAMILY . . . . . . . . . . . . . .     8

PX-167:  BOURGEOIS NOTES FROM ACT! . . . . . . . . . .   203

                    ----------------

GX-71:   DR. SENN'S REPORT . . . . . . . . . . . . . .   429

GX-72:   DR. CHRZ'S REPORT . . . . . . . . . . . . . .   429

GX-172:  DR. SENN'S REPORT  . . . . . . . . . . . . .   429

GX-173:  DR. SENN CURRICULUM VITAE . . . . . . . . . .   429

GX-174:  DR. SENN BIOGRAPHICAL INFORMATION . . . . . .   429

GX-202:  BRENDA GOODMAN DECLARATION . . . . . . . . . .   172

USCA5 3848

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


UNITED STATES OF AMERICA,        *    CRIMINAL ACTION
                                 *
        PLAINTIFF,               *    CR-C-02-216(1)
                                 *
VS.                              *
                                 *
                                 *    CORPUS CHRISTI, TEXAS
ALFRED BOURGEOIS,                *    SEPTEMBER 22, 2010
                                 *    9:25 A.M.
        DEFENDANT.               *
                                 *
* * * * * * * * * * * * * * * * *


PARTIAL TRANSCRIPT OF EVIDENTIARY HEARING – DAY 3
(TESTIMONY OF JOHNSON AND KEEL PREVIOUSLY TRANSCRIBED)

BEFORE THE HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:        MS. PATTI HUBERT BOOTH
                           MS. ELSA SALINAS
                           OFFICE OF THE U.S. ATTORNEY
                           800 NORTH SHORELINE, SUITE 500
                           CORPUS CHRISTI, TEXAS 78401

                           MR. TONY R. ROBERTS
                           MR. MARK MICHAEL DOWD
                           OFFICE OF THE U.S. ATTORNEY
                           P. O. BOX 61129
                           HOUSTON, TEXAS 77208

(APPEARANCES CONTINUED ON PAGE 2)


COURT RECORDER:        MS. VELMA GANO


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
MOLLY CARTER, P. O. BOX 270203
CORPUS CHRISTI, TEXAS 78427 (361) 945-2525

USCA5 3849

APPEARANCES: (CONTINUED)

FOR THE DEFENDANT:     MR. VICTOR JULIO ABREU
    MR. MICHAEL WISEMAN
    MS. ELIZABETH A. LARIN
    OFFICE OF THE FEDERAL PUBLIC DEFENDER
    601 WALNUT STREET
    THE CURTIS CENTER, SUITE 545
    PHILADELPHIA, PENNSYLVANIA 19106

    MR. JAMES McHUGH
    FEDERAL COMMUNITY DEFENDER OFFICE
    FOR THE EASTERN DISTRICT OF
    PENNSYLVANIA
    601 WALNUT STREET
    THE CURTIS CENTER, SUITE 540
    PHILADELPHIA, PENNSYLVANIA 19106

USCA5 3850

(The proceedings began at 9:25 a.m.)

(Call to Order of the Court.)

THE COURT:  All right.  Mr. Wiseman, I received both your filings.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  And first, I want to make it clear about Dr. Cunningham.  He was not being ridiculed.  I was stunned actually that he would put on as some evidence, some mitigating evidence that domestic violence is widespread, as if that was some mitigating evidence for this type of crime, which I do not find it to be.

And second, you have been rude and abrasive, and there's no need for it.  It does not serve your client well.  And maybe this is the way you practice, but I'm going to ask you to tone it down.

MR. WISEMAN:  I appreciate that.

THE COURT:  I'm going to give you all the rest of the day.  We will go until we're finished with your case.

MR. WISEMAN:  Thank you, Your Honor.

THE COURT:  All night if we have to.  I just -- I've got substitutes coming in for these two people.

MR. WISEMAN:  We appreciate that.  Thank you.

MS. BOOTH:  Your Honor --

THE COURT:  And I might mention, Mr. Wiseman, if you'd be a little more efficient in the presentation of your

USCA5 3851

evidence and pick your witnesses a little more carefully, you could have been done by now. So go ahead, Ms. Booth.

MS. BOOTH: Your Honor, I became aware -- I just wanted to alert the Court to the fact and I wanted to tell the Marshals that we have subpoenaed Lloyd Ferdinand, and he is --

THE COURT: Thanks for telling us in advance.

MS. BOOTH: He is -- it was a, a decision that we made last week to try to get him. In fact, he was served, I believe, yesterday, to get him here, because we found in looking through his statement, he denied making the statement that has been -- that was in the Petitioner's brief, complaint. And so because of that, we felt like we had to bring him out here.

So he's here. He is at the hotel. We've alerted the Marshals to where he's staying and given his cell phone number.

THE COURT: Thank you.

MS. BOOTH: Yes, Your Honor.

THE COURT: Is he going to be in and out rather quickly?

MS. BOOTH: Yes, Your Honor.

THE COURT: All right. Call your next witness.

MR. ABREU: Good morning, Your Honor. We would call Dr. Elizabeth Johnson.

(Stopping at 9:28:10 a.m.)

(TESTIMONY OF ELIZABETH ANN JOHNSON PREVIOUSLY

USCA5 3852

TRANSCRIBED.)

(Beginning at 11:52:40 a.m.)

THE COURT:  Do you all want to break for lunch and come back in an hour?  Or do you want to go forward with more witnesses?

MR. WISEMAN:  Your Honor, I have what I believe will be a relatively quick witness.

THE COURT:  Then call them.

MR. WISEMAN:  Okay.  George Holden, please.

MR. ROBERTS:  Your Honor, we might be able to make this even shorter.  We're going to object to the necessity of his testimony because essentially there was an entire Daubert hearing in which Dr. Holden gave the Court what he was going to testify about, and there was a lot of discussion there, and I've read his statement, and there's really nothing new that he's going to talk about that I can tell, unless there's some proffer that -- I don't see the need for Dr. Holden to even come in.

THE COURT:  Did I exclude him as a witness?

MR. ROBERTS:  You did, Your Honor.

MR. WISEMAN:  You excluded him, Your Honor, at the guilt phase on the issue of premeditation under Rule 704.

THE COURT:  Right.

MR. WISEMAN:  I'm going to be offering him or am offering him as a penalty phase witness on the question of the

USCA5 3853

psychological explanations for what Mr. Bourgeois did.

Now, I appreciate we have offered quite a bit of evidence on that.  I also want to --

THE COURT:  How long is this -- are you sure this is going to be quick?

MR. WISEMAN:  Well, I'm going to make it quick.  I can't account for the Government, but I'll be --

THE COURT:  Okay.  He wasn't offered in the sentencing phase.

MR. ROBERTS:  He was not, Your Honor.  But on the transcript of the Daubert hearing, there was an explanation of what he would testify about, and you even commented to Mr. Tinker that if he wanted to bring him back in, he could for sentencing for that very purpose.  So you have all the information before you, but I would just -- I don't think it's necessary, but I just --

THE COURT:  Let's do it, but do it quickly.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  Remember, today you've got to finish your case.

MR. WISEMAN:  I appreciate that, and I --

THE COURT:  Can you do that?

MR. WISEMAN:  I'm sorry?

THE COURT:  Can you finish your case today?

MR. WISEMAN:  We are going to do our level best, and

USCA5 3854

I appreciate the Court's accommodation.

(Witness sworn.)

THE COURT:  I mean, sometime you need to get on to Gilmore rather quickly.  Is that right?

MR. WISEMAN:  I'm sorry?

THE COURT:  I said sometime you need to call Mr. Gilmore rather quickly.

MR. WISEMAN:  Yes, Your Honor.  My colleague just made the suggestion, we'd be happy to proffer his affidavit. If the Government wants to cross-examine him, that's fine with us.

THE COURT:  What do you think?

MR. ROBERTS:  I was just --

MR. WISEMAN:  Let me just make one qualification to that, Your Honor.  I have about three minutes of questioning about his interaction with Mr. Tinker.

MR. ROBERTS:  Let's just go forward.  I'd rather just do that.

THE COURT:  Okay.  Why don't you read the affidavit, somebody read it while you're doing this.  Give him the oath again, Ms. Gano.  I'm sorry I interrupted you.

GEORGE WALKER HOLDEN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.  Please watch the microphone.

USCA5 3855

A.    Okay.

Q.    We're going to try to move very quickly through this.  Is this your CV, Petitioner's 21?

A.    Yes.

COURT RECORDER:  Could I have his name?

THE COURT:  Your name, sir?

BY MR. WISEMAN:

Q.    I'm sorry.  What's your full name?

A.    George Walker Holden.

Q.    And was the exhibit I just showed you your CV?

A.    Looked like one of my more recent ones.

THE COURT:  What's the number?

MR. WISEMAN:  P-21.  I would offer it into evidence.

THE COURT:  P-21.  Any objection?

MR. ROBERTS:  Not to the CV, Your Honor.

THE COURT:  P-21 is admitted.

BY MR. WISEMAN:

Q.    Professor Holden, tell the Court what you do for a living, and we know you're a psychologist, so just tell us briefly your specialty.

A.    I'm trained as a developmental psychologist, and my areas of expertise are parenting and family violence and the intersection of those two.

Q.    And in that regard, you research, do literature research and publications in that area?

USCA5 3856

A.    Yes.

Q.    I want to show you what's been marked as Petitioner's 18A. Do you recognize that document?

A.    Yes, I do.

Q.    Okay.  It says, "Enclosed --" this is from Mr. Tinker to you on November 21st, '03.  It says, "Enclosed please find an order of the Court appointing you, a summary of the incident, the autopsy report, DNA evidence and a neuropathology report and a disk of autopsy photos."

      The second page is the Court's order indicating you were appointed by Judge Jack on the 10th of October 2003.  Does that comport with your recollection?

A.    Yes, sir.

      MR. WISEMAN:  Your Honor, I would offer this document into evidence.

      MR. ROBERTS:  No objection, Your Honor.

      THE COURT:  What is it?

      MR. WISEMAN:  18A.

      THE COURT:  P-18A is admitted.

BY MR. WISEMAN:

Q.    I'm putting up what is 19.  Did you receive those materials from Mr. Tinker that I just described?

A.    Yes, I did.

Q.    Okay.  And you wrote a report, or by way of letter to him -- actually that's the wrong one.  Excuse me.  You wrote a

USCA5 3857

report to Mr. Tinker, which is marked as P-18?

A.    Yes.

Q.    And it's dated December 19th, 2003?

A.    Correct.

Q.    And in that report, you say at the beginning that, "I've now had a chance to go through the box of material regarding the Alfred Bourgeois case, and what was sent was only a limited amount of useful information for me to form an impression of the case."  Do you recall saying that?

A.    Yes, I do.

Q.    And at the end of the report, on Page 3, you say, "I have a number of questions that might be helpful to have answered." You go on to explain those questions as being relevant to Mr. Bourgeois's upbringing and childhood.

A.    Yes.

Q.    Did you ever get answers to the questions that you posed in Exhibit 18?

A.    No, I did not.

Q.    From Mr. Tinker?

A.    No.

Q.    Or from anyone related to the trial defense?

A.    Not at that time.

        MR. WISEMAN:  Your Honor, I would offer P-18 into evidence.

        THE COURT:  Any objection?

USCA5 3858

MR. ROBERTS:  No, Your Honor.

THE COURT:  P-18 is admitted.

BY MR. WISEMAN:

Q.   You subsequently wrote a second report, which is P-19. And that's dated February 25th, 2004.  Do you see that?

A.   Yes.

Q.   And what's your opinion in that report?

A.   Well, my opinion that was concerning the issue of premeditation.

Q.   And in a nutshell, you indicated, based on the materials you reviewed, that you at the time did not think Mr. Bourgeois premeditated this killing.

A.   Correct.

MR. WISEMAN:  Your Honor, I'd offer P-19.

THE COURT:  Any objection?

MR. ROBERTS:  No, Your Honor, I'm not going to object to the document.

THE COURT:  P-19 is admitted.

BY MR. WISEMAN:

Q.   You subsequently appeared before Judge Jack on March the 1st, 2004.  Do you roughly recall that?

A.   Yes.

Q.   And prior to your appearance, did you have any meeting with Mr. Tinker or any other member of the defense team to discuss the opinions regarding premeditation?

USCA5 3859

A.    No, I did not.

Q.    And I take it you had no additional information provided to you between the date of the report and the time of your March 1st testimony.

A.    No.

Q.    What do you recall the purpose of that hearing to be?

A.    Well, as I recall, it was to see whether my testimony would be admissible to the Court.

Q.    And was that in the penalty phase or the guilt phase?

A.    That was in the --

Q.    Guilt?

A.    Well, it was before, so it was the guilt phase, yeah.

Q.    And do you recall being asked many questions by Judge Jack, as well as the prosecution, with respect to an assumption that you were making that Mr. Bourgeois committed the offense?

A.    It's sort of vague, my recollection of it, but yes, uh-huh.

Q.    And do you recall Judge Jack making comments, or actually rulings that the question of premeditation in the guilt phase was an issue for the jury?

A.    Yes, I do.

Q.    And you in fact were not permitted to testify in the guilt phase for those reasons.

A.    Yes, I do.

Q.    Or for that reason.  All right.  I want to just read to

USCA5 3860

you -- well, actually, let me ask you this.  Did you ultimately in that hearing acknowledge, during the questioning from Judge Jack, that you did not have all the facts necessary to render an opinion on premeditation?

A.   Yes.

        MR. WISEMAN:  All right.  And for the record, Your Honor, that's Page 49 of the proceedings.

BY MR. WISEMAN:

Q.   And at the end of the hearing, did you actually admit to Judge Jack that at that time you could not provide an opinion at all with respect to premeditation?

A.   Yes, I think I did.

Q.   And that was because you, it had been pointed out to you through the various questioning that you didn't have adequate information.

A.   Right.  Correct.

Q.   And do you recall Judge Jack at one point in the proceedings telling Mr. Tinker that while you could not testify in the guilt phase, you might be a suitable penalty phase witness, and everyone should think about that?

A.   Yes.

Q.   Subsequent to your appearance before Judge Jack on March 1st, 2004, did you ever hear again from Mr. Tinker?

A.   No, I did not.

Q.   Did you hear from anybody else relevant to the defense

USCA5 3861

team?

A.    No.

Q.    And I want to shift ahead to 2007.  Did you get contacted by myself and Ms. Larin from my office?

A.    Yes.

Q.    And did we meet with you?

A.    Yes.

Q.    And you -- subsequent to that meeting, we provided you with a wealth of material about Mr. Bourgeois's background and upbringing?

A.    Yes.

Q.    And that included psychological reports?

A.    Yes.

Q.    Two neuropsych reports?

A.    Yep.

Q.    Many lay declarations?

A.    Yes.

Q.    And was that the kind of information you were looking from when you asked Mr. Tinker back in 2003 for additional information?

A.    Yes.  That was much more helpful in understanding --

Q.    Did we answer your questions?

A.    Yes.

Q.    Okay.  And as a result of that, did you complete a declaration for us, which is Petitioner's 20?

USCA5 3862

A.    Yes, I did.

Q.    All right.  And just for the record, is that the document?

A.    Yes.

MR. WISEMAN:  Okay.  Your Honor, at this time I would offer the declaration in evidence as comprising the remainder of my direct examination and pass the witness for cross.

THE COURT:  Did I admit that?

MR. WISEMAN:  20?  I don't think you admitted 20.

THE COURT:  Are you offering 20?

MR. WISEMAN:  I'm offering 20.

THE COURT:  Any objection?

MR. ROBERTS:  Your Honor, could I just make sure that the witness has actually reviewed it and that all the --

THE COURT:  Yes.

MR. ROBERTS:  -- information is actually his information --

THE COURT:  Yes.

MR. ROBERTS:  -- and that nothing else was typed?

THE COURT:  Yes.

MR. ROBERTS:  Did you read the document?  I'm sorry.

THE WITNESS:  Yes.  My declaration?

MR. ROBERTS:  Yes.

THE WITNESS:  Yes.

MR. ROBERTS:  Did you type the document yourself?

THE WITNESS:  No, I did not type it.

USCA5 3863

MR. ROBERTS:  Who typed it for you?

THE WITNESS:  I presume, well, from the defense office.

MR. ROBERTS:  You presume from the defense office?  Do you know who typed the document?

THE WITNESS:  I do not.

MR. ROBERTS:  But you did read every paragraph?

THE WITNESS:  Several times.

MR. ROBERTS:  And every statement in there is your own conclusions, your own opinions?

THE WITNESS:  Yes.  I'm very comfortable with everything that I've declared there.

MR. ROBERTS:  Okay.  We have no objection to the document, Your Honor.

MR. WISEMAN:  And just for clarification, we didn't type this --

THE COURT:  P-20?

MR. WISEMAN:  P-20.

THE COURT:  P-20 is admitted.

MR. WISEMAN:  We didn't type this in front of you, did we?

THE WITNESS:  No.

MR. WISEMAN:  We sent it to you in the mail?

THE WITNESS:  Yes.

MR. WISEMAN:  Nothing further.

USCA5 3864

THE COURT:  All right.  Go ahead.

MR. ROBERTS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.  Dr. Holden, when did you come into contact with Mr. Tinker?  Was it on the days that you sent these letters, or was it prior to that?

A.  What do you mean in contact with?

Q.  Sorry, just did Mr. Tinker -- just tell us how you first were contacted --

A.  Okay.

Q.  -- with regards to this case.

A.  As I recall, he telephoned me at my office sometime during that fall before I wrote the initial December letter.

Q.  And when he contacted you, do you recall whether he told you someone referred you to him, or how did he get your name?

A.  I believe so, yes.

Q.  Do you know how he got your name?

A.  I think it was through the Texas Defenders Association, whatever that is.  John Nyland --

Q.  Okay.

A.  -- if that name rings a bell to you.

Q.  No, that name doesn't ring a bell to me, but I do remember when you testified, and from your information you've provided, you said that you didn't, you actually had not been in court

USCA5 3865

very often.

A.   Correct, yes.

Q.   So this was something that was relatively new for you?

A.   Yes.

Q.   Did you tell that to Doug Tinker when he contacted you?

A.   I believe I did.

Q.   You think you told him that you're not very familiar with going to court and testifying?

A.   I believe so, yes.  Any time a attorney has contacted me about testifying in court, I am very quick to say, "This is not something I enjoy doing, and I haven't done it very much."

Q.   You don't like being around us?

A.   Nothing personal, but --

        MR. WISEMAN:  Speak for yourself, sir.

        THE WITNESS:  I prefer to be in the classroom.

        MR. ROBERTS:  Well, let me ask you --

        THE COURT:  Would you rather have a root canal?

BY MR. ROBERTS:

Q.   What I recall and what is reflected in your statement was that you intended on coming in and talking about this concept of filicide and the fact that a parent will often kill their child in one of these rage kind of scenarios.  Is that right?

A.   Yes, I was going to talk about filicide, yes.  I don't know how much extra detail I provided, but yes.

Q.   We covered a lot of the portion of what you're going to

USCA5 3866

testify back on March the 1st, 2004, didn't we?

A.    Yes.

Q.    And in the end, essentially you were going to turn to the jury, it was going to be your opinion, you were going to turn to the jury and say, "Alfred Bourgeois killed his daughter because he was exercising under one of the concepts of this filicide theory," and then you were going to explain how that family situation caused him to react that way.  Is that how you were going to approach the case?

A.    I was going to talk about -- well, it's hard for me to recollect my mindset back then, because we know that memory is reconstructive, rather than reticle (phonetic).  There's a lot of good psychological research on that.  So would you like me to say now how I would present it to the jury?

Q.    No, I'm not interested in how you would present it now. What I'm interested in is what you intended to do and what you were informing this Court at that time.

A.    Well, I just said, it's hard to remember exactly how I was going to present it, but --

THE COURT:  Well, then if you can't, you can't.

THE WITNESS:  I mean, I could make a stab at it, if you --

THE COURT:  No, I don't think that's really what we have in mind here.

THE WITNESS:  Okay.

USCA5 3867

THE COURT:  If you can't remember and you don't know what you were going to say, we'd just better move on.  And is your affidavit, your declaration based on what you'd say now and not what you knew back then?

THE WITNESS:  The 2007 affidavit?

THE COURT:  Yes, the declaration.

THE WITNESS:  Declaration is --

THE COURT:  What you knew in 2007?

THE WITNESS:  Has -- that was based on additional information that I received, yes.

THE COURT:  Okay.  But it wasn't based on what you knew at the time --

THE WITNESS:  No.

THE COURT:  -- of the trial.

THE WITNESS:  Correct.

THE COURT:  Okay.  Anything else?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Why?

MR. ROBERTS:  Sorry?

THE COURT:  Why would there be more?

MR. ROBERTS:  I wanted to ask one more question, Your Honor.  Your Honor, I have no more questions.

THE COURT:  That's a good thing.

MR. WISEMAN:  I certainly do not.

THE COURT:  I think that's wise.  Would you stand

USCA5 3868

down, please, sir.

Now -- what?

MR. ABREU: Just standing, Your Honor.

THE COURT: Just standing. I think it's time, we'll break for lunch, and we'll come back at 10 after 1:00.

(Recess from 12:09 p.m. to 1:13 p.m.)

THE COURT: Would you call your next witness?

MR. McHUGH: Your Honor, I just had one thing I wanted to bring to the Court's attention.

THE COURT: Okay.

MR. McHUGH: We had issued orders or motions to Your Honor for issuance of subpoenas for a couple of witnesses for today, and they had not appeared. We wanted to -- and it's a bit of a problem for us that we do need these witnesses here. Their names are Darrick Moore, William May, I'm sure Your Honor's familiar with, Orlando Campos --

THE COURT: Well, did you ever serve William May?

MR. McHUGH: I believe that the Marshals did. The point was that we had issued, asked Your Honor's --

THE COURT: Has Bill May been served?

MR. SNIDER: Your Honor, I personally worked that one, and it was unable to serve.

THE COURT: Okay.

MR. SNIDER: We were unable to serve that one.

THE COURT: So who else? Darrick Moore?

MR. McHUGH:  Darrick Moore, Bill May, Orlando Campos and Timothy Allen.  Those four are the four that we're going to need service on through the Marshals, a compulsory process of some type at some time.

THE COURT:  Well, if you can't give them an address for Bill May, I can't help you there.

MR. McHUGH:  I thought we had an address, but I'll check on that.  I thought there was an address.

THE COURT:  No, you had an old address, and I told Mr. Wiseman that you could reach him, if he was still alive -- the last I heard he was in --

MR. McHUGH:  Right.

THE COURT:  -- an intensive care unit in Dallas.  His wife was named Nina May, and she lives on Topeka.

MR. McHUGH:  Right.

THE COURT:  Now, you all have to find an address.  We can't --

MR. McHUGH:  Okay.

THE COURT:  -- compulsory do anything.  I mean, you've obviously not checked that out.

MR. McHUGH:  I think we've done some legwork on that. I can advise the Court of that at an appropriate time.  I just wanted --

THE COURT:  This is the time.

MR. McHUGH:  Okay.  Then may I confer?

USCA5 3870

THE COURT:  Yes.

(Counsel conferring off the record.)

THE COURT:  When did you find out these people weren't here?  I mean, this is -- your time deadline was over at noon today.

MR. McHUGH:  Well, we've been waiting --

THE COURT:  You've been waiting for them?

MR. McHUGH:  I mean, I've talked to our investigator, Ms. Tucker, and I said, you know, "Roam the hallways, check at the front."  She's been doing that throughout --

THE COURT:  It's a little late to demand attendance from people that you were -- it's 1:15 on Wednesday.  The time that I gave you was till noon today to present your case.  It's a little late to talk about compulsory process.

MR. McHUGH:  Well, I wanted to bring it to the Court's attention, you know --

THE COURT:  Well, you should have brought it in a timely fashion.

MR. McHUGH:  May I advise, or consult --

THE COURT:  Surely you subpoenaed these people for Monday.

MR. McHUGH:  I believe that the notice of subpoena was for today, because we knew this was the day that we would be presenting them.  I can check with the Marshals.

THE COURT:  That's a little irresponsible.

USCA5 3871

(PAUSE.)

THE COURT:  Call your next witness.

MR. McHUGH:  Jennifer Valdez, who was served by the Marshals and was transported here by the Marshals.

On one other matter, Your Honor --

THE COURT:  Would you administer the oath?

THE CLERK:  Yes, Your Honor.

(Witness sworn.)

MR. McHUGH:  Just for the Court's information, Your Honor, we have noticed Mr. Gilmore to be here at 2:30.

JENNIFER VALDEZ, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Could you state your name for the record?

A.   Jennifer Valdez.

Q.   Ms. Valdez, I'm going to ask you, first of all, please try not to touch the microphone, or don't touch the microphone, I guess I should say.

A.   Okay.

Q.   Because any touching of the microphone makes a loud noise.

Can you tell us where you were living back in 1995?

A.   I lived in Corpus Christi, and then I moved to Houston, Texas.

Q.   Okay.  And back in 1995 on one of your visits back to Corpus Christi, did you meet a gentleman by the name of Adam

USCA5 3872

Longoria?

A.   I did.

Q.   Okay.  And did you begin a relationship with him?

A.   We were talking, yes.

Q.   If you could --

A.   Yes, we were talking.

Q.   Okay.  And did there come -- when you say you were talking, it was, you were --

A.   Well, I lived in Houston, so we were just like over the phone type thing until I moved here.

Q.   Okay.  And after you moved here, did there come a time that he got arrested and locked up for a DUI, driving under the influence charge?

A.   Yes.

Q.   Okay.  And did there come a time after he got locked up for the driving under the influence charge that the relationship developed further and you eventually married Mr. Longoria?

A.   Yes.

Q.   Okay.  What day do you recall that was?

A.   I married him on January 10th of 2003.

Q.   Okay.  And after you got married to him, did there come a time that you found out that you were in fact pregnant?

A.   Yes.

Q.   Okay.  And after you found out that you were pregnant, did

USCA5 3873

something happen to Mr. Longoria?

A.    Two days after I found out I was pregnant --

THE COURT:  Mr. Who?

MR. McHUGH:  Longoria.

THE COURT:  Okay.

THE WITNESS:  Two days after I found out I was pregnant, he was arrested for a bank robbery.

MR. McHUGH:  Okay, and --

THE COURT:  For what?

THE WITNESS:  Bank robbery.

THE COURT:  Okay.

BY MR. McHUGH:

Q.    And was he the father of the child?

A.    Yes.

Q.    Okay.  And so was -- he was arrested for bank robbery. Was he incarcerated pending trial?

A.    Yes.

Q.    Okay.  And did you have communications with him during his incarceration pending trial?

A.    Yes.

Q.    Okay.  And did he tell you about what he was doing with his case, this bank robbery case?

A.    Yes, he did.

Q.    And what did he tell you?

A.    He told me that he was planning on trying to make a deal

USCA5 3874

so he can get out early to be with me and the baby.

Q.    And did he say who he was making the deal with?

A.    The prosecutors that he was talking to.

Q.    Okay.  And did he tell you this on one occasion or more than one occasion?

A.    He told me several times on the phone and through letters.

Q.    Okay.  And did you save these letters?

A.    I did for a while, and then later, when I got a new boyfriend, he made me throw out all my stuff that I had from him, letters and everything.

Q.    Okay.  And now did you eventually have this baby?

A.    Yes.

Q.    Okay.  And what date was that?

A.    January 21st of 2004.

Q.    Okay.  And that was a girl or a boy?

A.    A girl.

Q.    Okay.  That was Mr. Longoria's daughter?

A.    Yes.

Q.    Okay.

THE COURT:  It's Mr. Longoria, not Langoria.

MR. McHUGH:  I'm sorry, Longoria.

BY MR. McHUGH:

Q.    Now, after he got locked up for the bank robbery, did you speak with the detectives that were handling the matter?

A.    Yes, I did.

USCA5 3875

Q.   And what did they tell you about the arrest and about Mr. Longoria?

THE COURT:  Why are we hearing all this?

MR. McHUGH:  Your Honor, this goes to our Brady claim.

THE COURT:  Well, why don't you ask Mr. Longoria about it?

MR. McHUGH:  Well, he -- I should mention, Your Honor, he's in -- we'll get to that in about three minutes, but he's another person that we have subpoenaed also.

BY MR. McHUGH:

Q.   So did you speak with the detectives about Mr. Longoria?

A.   Yes, I did.

Q.   What did they tell you?

A.   They had told me that he had lied to me about a lot of stuff, including his criminal records and being involved in a prison gang.

Q.   Okay.  And that was while he was awaiting trial on his bank robbery?

A.   Yes.

Q.   Okay.  Did Mr. Longoria tell you what he thought he was facing as far as a possible prison sentence?

A.   He had told me he was looking at 25 to life.

Q.   Okay.  Now, after a certain time, while he's awaiting trial, did you and your father find something out about

USCA5 3876

personal checks that you had?

A.    Yes.  Soon after he got arrested, I noticed we were getting notices from the place that he had written hot checks under my name and my dad's name.

Q.    Okay.  And by "he," who do you mean?

A.    Adam.

Q.    Okay.  And now, since that time, back in 2004, has Mr. Longoria been incarcerated?

A.    He just recently got incarcerated again.

Q.    Okay.  Well, did you get notice that he had been released?

A.    Yes.  I'm on the victim services list, and they notified me about two months ahead of time that he was being released, and then again right after he was released, and then I got notified again that he was incarcerated again.

Q.    Okay.  Well, when did you get notice that he was -- did you get -- why are you a victim, if you were his wife?  Why would you be on the victims' list?

A.    While he was locked up during the bank robbery sentence, he was calling and making threats to me and my family.

Q.    Okay.  And so the victims' coordinating services here in Texas notified you that he was being released.  And when was he released?

A.    May 29th of this year.

Q.    Okay.  And as a result of him being released, did you take any action?

USCA5 3877

A.    I moved me and my daughters out of Corpus.

Q.    And why did you do that?

A.    Because I didn't want him to find us.

Q.    Okay.  And now you say that he, you heard that he had been locked up again.  What were you informed?

A.    I was informed that he was being charged with murder of a 14-year-old in Kansas.

Q.    Okay.  And when did you get -- you were informed of that just recently?

A.    Just a couple of weeks ago.

        MR. McHUGH:  If I may just check, Your Honor.

     (PAUSE.)

        MR. McHUGH:  That's all I have, Your Honor.

                        CROSS-EXAMINATION

BY MS. SALINAS:

Q.    Good afternoon, Ms. Valdez.  You testified I guess basically that you think that Mr. Longoria is a liar.  Is that correct?

A.    I know he is.

Q.    Okay.  And so you think the things he told you about he's working with his lawyer and that he's trying to work out a deal, those could be things that are also considered lies?

A.    They could be.

Q.    Okay.  So you don't know what the truth is of what Mr. Longoria has told you.

USCA5 3878

A.    I just know what he's told me.

Q.    Okay.

          THE COURT:  But you don't know if -- the point is, you don't know if any of that's true or not.

          THE WITNESS:  No, ma'am.

          THE COURT:  Okay.

          MS. SALINAS:  Okay.  Could I have just a moment, Your Honor?

          THE COURT:  Yes, ma'am.

          MS. SALINAS:  I have no further questions of this witness, Your Honor.

          THE COURT:  Thank you.

          MR. McHUGH:  Nothing further, Your Honor.

          THE COURT:  Thank you, ma'am.  You may stand down.

          MR. McHUGH:  At this time, Your Honor, the Defense would call Dr. Michael Bowers.

          Your Honor, as to your question about Mr. Longoria, I think the Marshals might be better able to speak to that, but we did also issue a motion for Your Honor to issue a subpoena. Due to his incarceration in the State of Kansas for --

          THE COURT:  Is he here?

          MR. SNIDER:  Your Honor, I'd have to find out.  I don't think so.  We did get a subpoena.  The gentleman's in custody, so it usually requires a writ for those, and we --

          THE COURT:  Did you ask for a writ to be issued for

USCA5 3879

somebody in custody?

MR. McHUGH:  Well, Your Honor, he had just recently been reincarcerated, so I know that we filed the motion for the subpoena.  I don't know if we followed up with a writ.

THE COURT:  Well, a subpoena doesn't work if somebody's in custody.  If you knew he was in custody, you have to issue, ask for a writ.  And you did not do that?  Is that correct?

MR. McHUGH:  I can't speak to that.  I'm not sure.

THE COURT:  Well, find out.

MR. McHUGH:  I will.

THE COURT:  Right now.

MR. McHUGH:  Right now?

THE COURT:  Yes.

MR. McHUGH:  And what is the question, Your Honor, did we request a writ?

THE COURT:  Did you request a writ when you found out he was in jail, or in prison?  Apparently you knew that, because this lady testified to it.

(Counsel conferring off the record.)

MR. McHUGH:  We did not, Your Honor.

THE COURT:  Okay.  I also heard from the Marshals that even though, if you recall, Mr. Wiseman, I told you that Mr. May was living in Dallas last I heard -- correct?

MR. WISEMAN:  Yes, Your Honor.

USCA5 3880

THE COURT:  -- that you still had the Marshals serve the local address where he was not.  Did you know that?  According to the Marshals.

MR. WISEMAN:  I did not know that.

THE COURT:  Okay.  In fact, did I not do everything I could to help you find Mr. May?

MR. WISEMAN:  You were extraordinarily helpful.

CHARLES MICHAEL BOWERS, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Good afternoon, Dr. Bowers.

A.   Good afternoon.

Q.   Can you state your name for the record?

THE COURT:  Please do not touch the microphone.

MR. McHUGH:  I was getting to that.

THE COURT:  I told you all, before any of your witnesses got up here, to inform them all, do not touch the microphone.  It goes directly into this lady's ears and gives her deafness.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Go ahead.

THE WITNESS:  Charles Michael Bowers.

BY MR. McHUGH:

Q.   And what is your present occupation, Dr. Bowers?

A.   I'm a dentist.

USCA5 3881

Q.    And do you also work as a medical examiner?

A.    I have a contract, contractual arrangement as a Deputy Medical Examiner with the Ventura County Medical Examiner's Office.

Q.    Okay.

A.    I'm responsible for dental evidence that's brought into the coroner's office in that county in California.

Q.    Okay.  And Dr. Bowers, are you a member of any professional societies?

A.    Yes, I am.  I'm a member of the American Academy of Forensic Sciences, a diplomate of the American Board of Forensic Odontology, member of International Association of Identification as a certified crime scene analyst.

Q.    Okay.  And have you published textbooks, journals, scholarly articles in the field of forensic odontology and photo imaging and enhancement?

A.    Yes, I have.

Q.    And have you provided expert testimony in the area of forensic odontology, bite mark analysis and photo imaging and enhancements in state or federal courts?

A.    Yes, in state courts.

Q.    Okay.

        MR. McHUGH:  And Your Honor, at this time I'm going to --

BY MR. McHUGH:

USCA5 3882

Q.    Dr. Bowers, can you identify what's been marked as P-96?

A.    That's my curriculum vitae.

        MR. McHUGH:  I'm going to offer that at this time, Your Honor.

        THE COURT:  What number is it?

        MR. McHUGH:  P-96.

        THE COURT:  Any objection?

        MR. ROBERTS:  No, Your Honor.

        THE COURT:  P-96 is admitted.

        MR. McHUGH:  At this time, Your Honor, I would offer Dr. Bowers as an expert in the area of forensic odontology, bite mark analysis and forensic photo imaging and enhancement.

        MR. ROBERTS:  Your Honor, the United States has no objection to him as an expert in forensic odontology.  We are not convinced that he is an expert in the other field.

        THE COURT:  May I see his CV, Ms. Cayce?  P-96.

        MR. ROBERTS:  To expedite it a little bit, Your Honor, we're aware he published a book on the use of photography, but it was self-published, and it's our understanding that there's no peer review of it.

        THE COURT:  There was no what?

        MR. ROBERTS:  No peer review of his --

        THE COURT:  Okay.

        MR. ROBERTS:  -- his book.

        MR. McHUGH:  And I can go into a little bit more voir

USCA5 3883

dire in that area.

THE COURT:  Go ahead.

BY MR. McHUGH:

Q.   Dr. Bowers, Counsel has mentioned that you've published a book in the area of photo enhancements and imaging.  Have you also taught training courses in photo imaging and enhancement?

A.   Yes, I have.

Q.   Okay.  And have you presented workshops in the area of photo imaging and enhancements?

A.   Yes.

Q.   And are you a certified crime scene analyst, which includes analyzing autopsy photos?

A.   Yes.

Q.   And you've also, as I had previously questioned you, presented expert testimony in this area, this specific area that Counsel's objecting to?

A.   Yes.

MR. McHUGH:  With that, Your Honor, I would ask that he be qualified.

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Just because he's presented expert testimony doesn't make him an expert, Your Honor.  I still have a concern that what he is relying upon is self --

THE COURT:  Do you want to take him on voir dire?

MR. ROBERTS:  Sure, Your Honor, I'll ask him a few

**USCA5 3884**

questions on that.

THE COURT:  Would you be seated, please, sir.

MR. McHUGH:  Oh.

VOIR DIRE EXAMINATION

BY MR. ROBERTS:

Q.   Dr. Bowers, do you have a copy of your CV in front of you?

A.   No, I do not.

MR. ROBERTS:  May I have the exhibit, please?  Or the Judge is still using it?  May I approach the witness, Your Honor?  I'm going to ask him to show us on here what of his information would, is he referring to.

THE COURT:  Fine.

BY MR. ROBERTS:

Q.   I'm handing you what's marked as P-96.  Dr. Bowers, I'd ask you to identify what in your CV actually makes you an expert in the photo imaging area.

A.   Certainly.  To start out with --

Q.   If you'll refer to the page, I'll put it on the overhead.

A.   Very good.  Let's go Page 4.  Specifically, these are peer-reviewed articles that I have published or co-authored.  Item 3, myself and another individual, Journal of Forensics Science Review, 2002, Photographic Evidence Protocol Using Digital Imaging Methods, and you can read the --

Q.   Did that article deal with enhancements?

A.   No, it did not.

USCA5 3885

Q.    Okay.

A.    It had to do with photographic issues regarding --

Q.    Can we move to something that deals with enhancements, please?

A.    Okay.  Actually in the review articles, none.

Q.    None?

A.    In the chapters in books or periodicals --

Q.    What page is that?

A.    I'm sorry, Page 3.

Q.    Oh, we're going backwards.  Okay.

A.    Go back one.  Under books, as you described as self-published, there's a small entry about enhancements.

Q.    Which book is that?

A.    That would be -- I'm sorry.  That's Number 2.

Q.    Number 2?

A.    Digital Analysis of Bite Mark Evidence.

Q.    This is the book that you self-published?

A.    Yes.

Q.    Who were the peer reviews of that?

A.    No peer review.

Q.    No peer reviews, okay.  Something else?

A.    In the realm of teaching and training, I'm not even sure if that's on this CV.  Let's see.  On Page 7, 2001-2002, that second from the top.

Q.    This one right here --

USCA5 3886

A.    Yes.

Q.    -- I'm pointing out on the overhead?

A.    Yes.   That Outline of Forensic Dentistry, that was done and enhancement was discussed.

Q.    How much of the enhancement was discussed at that?

A.    Oh, I have no compilation of percentages.

Q.    Just a small portion of the presentation?

A.    Well, it was small in regards that there were a lot of other issues involved and presented by me.  It would be considered a section of it.

Q.    And it was presented by you?

A.    Yes.

Q.    Okay.  And was it based on your book that you self-published?

A.    And my experience involving use of Photoshop and --

Q.    It's primarily Photoshop?

A.    As a user of Photoshop, yes.

Q.    As a user of Photoshop?

A.    Yes.

Q.    So is most of your experience related to the use of Photoshop and how that, Photoshop can be used to enhance?

A.    That's a substantial part of it.  And regarding training and knowledge, I've written --

Q.    Is it self-taught information where you're using Photoshop yourself and you're teaching yourself?

USCA5 3887

A.   Well, I'm not talking about teaching myself.  I'm talking about what I --

Q.   Well, I'm talking about teaching yourself, because I'm trying to find out --

A.   Okay.

Q.   -- if you actually are an expert in enhancements, or if you're just somebody that's used enhancements.  And I don't have a problem with you testifying about how you've used it.

A.   I understand.

Q.   But I do have, you know, you're here as an expert, and I haven't seen anything in your CV nor have I heard anything yet that convinces me that you have expertise in enhancements.

A.   The initial exposure I had with the use of digital methods was by a number of weekend courses in my town in Ventura, put on by I think the junior college.

Q.   And what were those courses?

          THE COURT:  On Photoshopping?

          THE WITNESS:  On Photoshop, like Photoshop for Dummies type of program, where they start you off using Photoshop --

          MR. ROBERTS:  Your Honor, I don't --

          THE WITNESS:  And from that point --

          MR. ROBERTS:  I would object to him being an expert in this area, Your Honor, but I don't have a problem with him testifying about his own use as a lay witness in that area.

USCA5 3888

THE COURT:  I'll sustain that.

MR. ROBERTS:  Thank you.

MR. McHUGH:  Your Honor, I guess I would also just ask if the Court would consider that he is an expert in digital imaging.  There was a number of articles that he pointed to that are peer-reviewed --

THE COURT:  Mr. Roberts?

MR. ROBERTS:  Your Honor, I'm not sure to what extent digital imaging is going to be impacted in the testimony.  I've looked at his, the statement that he's provided to the Court.  The declaration he provided goes into a lot of, it focuses on enhancement in Dr. Bowers' -- Dr., not Bowers, Dr. Oliver's information, and that's what I would object to him being able to testify as an expert on.

THE COURT:  Sustained.

MR. McHUGH:  Well, if I may respond, Your Honor, Dr. Bowers, I'm sorry, Dr. Oliver --

THE COURT:  Could you move on, please?

DIRECT EXAMINATION (Continued)

BY MR. McHUGH:

Q.   Are all the opinions you will give here today stated to a reasonable degree of scientific certainty?

A.   Yes.

Q.   Okay.  Dr. Bowers, can you tell us what is forensic odontology?

USCA5 3889

A.    It's the application of dental science and dental therapeutics to the law.

Q.    And in forensic odontology, are there specific subspecialties?

A.    Yes.  Besides forensics, there's -- I'm sorry.  Ask the question one more time.

Q.    Within the forensic odontology, are there specific subspecialties?

A.    Yes.  Human identification of generally deceased remains is one section.  That's -- and the second section is bite mark analysis.  Third would be personal injury, assessment of injuries in civil cases.  And the fourth is malpractice --

Q.    Okay.

A.    -- investigations as an expert witness.

Q.    And in your practice, have you had experience with all four of these areas?

A.    Yes.

Q.    Okay.  And bite -- I want to focus here today on bite mark comparison.  Is it different from the other subspecialties that you just mentioned?

A.    Yes, it is.  The difference is the others have a considerable amount of, they're all involving quality of care, treatment, therapeutics.  They have a considerable amount of scientific research and dental acceptance.  Bite marks is considerably different.  Bite marks have to do with taking

USCA5 3890

images of teeth, placing them over two dimensional photographs of skin injuries.

Q.    Okay.  And does bite mark comparison rely on some assumptions?

A.    Yes, it does.

Q.    Okay.  And can you just at this time in your examination just list a couple of those assumptions that it relies upon?

A.    Assumption one is that the dental profile of each individual is different from everyone else's.  That's defined in, by dentists as being unique.  And the second is that uniqueness is expressible in terms of its, the impression on skin.  So skin is determined to be, the assumption is reliable substrate or a reliable surface that will reflect the uniqueness of the biter.

Q.    Okay.  And in your opinion, have any of these assumptions been supported by, empirically, by reliable scientific inquiry?

A.    Supported, no.

Q.    Okay.  If it's not based on reliable scientific inquiry, then what is it based on?

A.    It's a practitioner-determined basis, meaning that it's been in use for many years and there's decades of judicial acceptance of those practitioners.

Q.    Okay.  Now, I'd like to turn your attention to the National Academy of Science.  Can you just tell us what that is, the National Academy of Science?

USCA5 3891

A. It's a scientific group. The academies encompass medicine, science, and other disciplines. Their existence is via a mandate with the United States Congress.

Q. Okay. And is it, would you say, the Congress' arm as to, or Congress' ability to investigate sciences, when they have questions concerning science?

A. That's their historically, role.

Q. Okay. And it's been around since the time of Abraham Lincoln. Is that right?

A. Quite a history, yes.

Q. Okay. And would you agree with this description of the National Academy of Science, that it's the most prominent objective and impartial scientific organization in the United States, if not the world?

A. That's been in place and the opinion for decades.

Q. Okay. And I think you mentioned it's -- now, the reason I'm asking you about the National Academy of Science is because, did they prepare a report concerning forensic evidence in 2009?

A. Yes.

Q. Okay. And was this report ordered as a mandate of Congress?

A. Yes, it was. A judicial subcommittee requested --

Q. Okay.

A. -- the report.

USCA5 3892

Q.   And in fact, are opinions from the National Academy of Science considered authoritative by courts throughout this country, including the United States Supreme Court?

A.   Their expertise is unrivaled, and they're accepted.  Their opinions are accepted.

Q.   Okay.  Now, before I get into the report, I wanted to go over a exhibit that was presented to me in completion this morning, prepared by Dr. Senn, who is the Government's expert in this matter.

MR. McHUGH:  And Your Honor, that was previously marked as P-123.  I received a complete copy of it from Mr., from the Government.  I forget exactly who provided it to me, but this morning.  So I'm going to go over that with Dr. Bowers right now.

MR. ROBERTS:  Your Honor, if I might interject.  We would ask that both the document that they submitted first and this complete document that we have provided be also received into the record.

MR. McHUGH:  I have no objection to that, Your Honor.

MR. ROBERTS:  We had marked a copy as Government Exhibit 204, if I might move that into the -- offer that, Your Honor.

THE COURT:  Government's Exhibit 204 admitted.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. McHUGH:

USCA5 3893

Q.   Now, I'm showing you what has been marked as Government Exhibit 204.  Do you recognize this, sir?

A.   Yes.

Q.   Okay.  And did I show you this today?

A.   Yes.

Q.   Okay.  And does this appear to be a presentation by Dr. David Senn to the National Academies?  And I'm going to show you Page Number 2 and the date of that.

A.   I'm familiar with this.

Q.   Okay.  And it's dated April 23rd, 2007.  Is that correct?

A.   Correct.

Q.   Okay.  Now, I'm going to go through a number of pages with you concerning this exhibit.  Was this a presentation that was made to the National Academies prior to the issuance of their 2009 report?

A.   To my knowledge, yes.

Q.   Okay.  Now, do you see that, sir, where it says, "State of the art"?

A.   Yes.

Q.   Okay.  And at the bullet point, the second bullet point, it says, "Seek second opinions from the independent blinded competent forensic odontologist."  Do you see that?

A.   Yes.

Q.   Okay.  Now, I just wanted to discuss with you for a minute what that means, a blinded analysis.  In the world of forensic

USCA5 3894

Bowers - Direct

odontology, what does that mean to you?

A.    Blinded means that the examiner, the dental examiner that's evaluating the relevant evidence doesn't know any of the circumstances regarding either the case itself, circumstantial evidence, about suspects, any determination of names on the evidence that he receives.

Q.    Okay.

A.    Things like that.

Q.    So in other words, when the examiner gets the material to examine, they're not to know who's the suspect, who's not the suspect, things of that nature.

A.    Yes.

Q.    Okay.  In this particular case, if Dr. Senn testified to Mr. Bourgeois's jury that the molds he received, the tooth molds actually had the names of each of the individuals, Alfred Bourgeois, AB1994, and Robin Bourgeois, would that be considered a blind study or analysis?

A.    No.

Q.    Now, I'd like to show you what is a page from the PowerPoint presentation, and you could just read that for the record, please.

A.    "What are the major problems in the scientific foundation, methods and practice?"

Q.    Okay.  And the very next page of this PowerPoint presentation by Dr. Senn, and what does he identify as a major

USCA5 3895

problem?

A.    "The uniqueness of the human dentition has not been scientifically established."

Q.    Okay.  So my first question to you is, do you agree with that?

A.    Yes.

Q.    Okay.  And in fact, that's what you were talking about is one of the assumptions, that bite mark comparison is reliable.

A.    Exactly.

Q.    Okay.  And in 2009, you've reviewed the NAS report concerning forensic odontology.  Is that right?

A.    Yes.

Q.    Okay.  Does the NAS report agree with this?

A.    Exactly agree.

Q.    Okay.  So if Dr. Senn testified -- I'm going to read to you from Mr. Bourgeois's transcript.  And you've reviewed Dr. Senn's testimony at Mr. Bourgeois's trial.  Is that right?

A.    Yes.

Q.    Okay.  So in 2007, the PowerPoint presentation says, "The uniqueness of human dentition has not been scientifically established."  If Dr. Senn testified, "Every person's teeth are unique.  The arrangement, the number, the situation that may have happened to your teeth from the day you were born is different for every person.  Even identical twins' teeth are different one from another.  And it's those differences that

USCA5 3896

allow us to analyze the patterns that those teeth can create to try to determine which person may or may not have made a specific bite -- made a specific mark."  Would you agree with that testimony, first of all?

A.   No.

Q.   Okay.  And in fact, would you agree that that testimony at Mr. Bourgeois's trial in 2004 is specifically in contradiction with this slide of Dr. Senn's?

A.   It's an inconsistent statement, yes.

Q.   Okay.  I'm going to show you, I believe it's the next page of the PowerPoint presentation.  And can you read that?

A.   "The ability of the dentition, if unique, to transfer a unique pattern to human skin and maintain that uniqueness has not been scientifically established."

Q.   Okay.  Now, what does that mean?  Have you seen that issue -- have you seen that forensic odontology issue before?

A.   That's -- this issue has been around for decades.

Q.   Okay.  And do you agree with that?

A.   I definitely agree with it.  It is -- the skin qualities to transfer patterns, to reflect patterns has not been established.

Q.   Okay.  And did the NAS report in 2009 specifically agree with that?

A.   Yes.

Q.   I'm going to show you the next page in Dr. Senn's

USCA5 3897

PowerPoint presentation.  And if you could read that for the record, please.

A.    "A clear statement of the type, quality and number of class and individual characteristics or other features required to indicate that a bite mark has reached a threshold of evidentiary value has not been established."

Q.    Okay.  And my question to you is, do you agree with that?

A.    Yes.

Q.    Okay.  And by the way, these are being labeled by Dr. Senn as called -- what's the very top of that slide?

A.    "Major Problems."

Q.    Okay.  And in fact, in two -- this is a 2007 presentation to the NAS.  Did the NAS agree with this in their 2009 report?

A.    Yes.  Dr. Senn was the major contributor to the committee's findings.

Q.    Okay.

A.    He spoke in front of the committee.

Q.    Okay.  I'm going to show you the next slide.  Can you read that?

A.    "Major Problems.  Forensic odontology certifying organizations have not created or administered bite mark analysis proficiency tests for their board certified members."

Q.    Okay.  And my question to you is, do you agree with that?

A.    Yes.

Q.    Okay.  And again, was that something that was taken into

USCA5 3898

consideration by the NAS and agreed with in their 2009 report?

A.    Yes.

Q.    Show you the next slide.  If you could read that for the record, please.

A.    "Major Problems.  The ability to analyze and interpret the scope or extent of distortion of bite mark patterns on skin has not been demonstrated."

Q.    First of all, do you agree with that?

A.    That's the subject of recent research, and the research findings indicate that the extent of distortion of bite mark patterns on human skin is extensive.

Q.    Okay.  And in fact, in this particular case, that's what the analysis by Dr. Senn and Dr. Chrz was done, was bite marks on human skin.  Is that right?

A.    Yes.

Q.    Okay.  And did the NAS agree with this?

A.    Yes.  Distortion was a major category of their concerns of bite mark analysis flaws.

Q.    Okay.  Another page from the PowerPoint presentation of Government witness, Dr. Senn, if you could read that.

A.    "Major Problems.  The effect of that distortion on comparison modalities is not fully understood and has not been quantified."

Q.    Now, that's referring to the slide that you just looked at.  Is that right?  The one concerning distortion on human

USCA5 3899

skin?

A.    Yes.  This is a second issue regarding distortion, has to do with comparison methods and distortion's effect on bite mark opinions basically and the methods used to determine them.

Q.    Okay.

A.    And it's not been quantified.

Q.    Okay.  And now, when you say, "It's not been quantified," obviously if it hasn't been quantified in 2007 when Dr. Senn presents it, and if the -- well, did the NAS agree with that?

A.    Yes.

Q.    Okay.  Then obviously it was not quantified in 2004 at the time of Mr. Bourgeois's trial.  Is that fair to say?

A.    Correct.

Q.    Then there's the next slide.  It's kind of a break in the slide presentation, and it's discussing about research questions.  Is that right?

A.    Yes.

Q.    Okay.  Would you read that?

A.    "What research questions do you think need to be answered?"

Q.    Okay.  Next page, what does that say?

A.    "Research Questions.  Is the dentition of each human unique?"  Second bullet point, "Do teeth transfer their distinctive characteristics to human skin and maintain and express the uniqueness?"

USCA5 3900

Bowers - Direct                    53

Q.   Okay.  So essentially Dr. Senn is advising the National Academy of Science that more research needs to be done in these areas.  Is that a fair characterization of that slide?

A.   Definitely.

Q.   And did the NAS agree with that?

A.   Yes, they did.

Q.   Okay.  And if you could look at this research question.

A.   "Research Question.  Are the currently recommended analysis and comparison methods sufficient?"

Q.   Okay.  And so is that a statement or a representation by Dr. Senn with his PowerPoint that there needs to be more research into the area of comparison methods as to whether they're sufficient?  Is that right?

A.   Yes.  It falls in that category.

Q.   And you would agree with me that that's what was done in this case, a comparison of bite marks from skin to molds.  Is that right?  And when I say "this case," Mr. Bourgeois's case.

A.   Yes.  That's exactly what occurred in Bourgeois.

Q.   Okay.  Now we're going to look at some conclusions that Dr. Senn presented to the NAS, and if you could just read that.

A.   "Conclusions.  The scientific basis for associating unknown biters to tooth marks or bite marks must be established."

Second.  "Currently, the association of one individual in an open population to a bite pattern on human skin to a

USCA5 3901

reasonable dental, medical, or scientific certainty based on pattern analysis alone cannot be scientifically supported."

Q.   Okay.  And did the NAS agree with that?

A.   They did.

Q.   Okay.  Now, I have one final conclusion that was presented by Dr. Senn to the NAS, and I'd ask you to read that.

A.   "Conclusions.  In a closed or limited population cases, it may be possible to associate a biter and the bite marks with reasonable dental, medical or scientific certainty for that limited population."

Q.   Okay.  Now, that conclusion, what I wanted to ask you about that is, did the NAS agree with Dr. Senn on that conclusion concerning the value of bite mark analysis with a closed or a limited population?

A.   No, they did not.

Q.   Okay.  And I guess at this time I'm going to show you what we had previously marked as P-141.

        MR. McHUGH:  And Your Honor, this is a very lengthy document, so I just pulled out the part that deals with forensic odontology.

BY MR. McHUGH:

Q.   But if you could identify the cover page of this.

A.   Strengthening Forensic Science in the United States, a Path Forward.

Q.   And what is this?

USCA5 3902

A.    This is the NAS report --

Q.    Okay.  So this is the --

A.    -- on certain aspects of forensic science.

Q.    So now when we talk about that last conclusion that Dr. Senn presented to the NAS concerning limited populations, what is -- tell us what that is, the limited populations versus the open population of the prior slide that the NAS did agree with.

A.    Closed population is where the odontologist is told that there is a finite number of suspects, and the comparison is based on that outside determination or outside circumstance, and the comparison is done with that number established by an outside authority.

Q.    Okay.  And is that in fact exactly what happened here, where there were three models, bite marks -- what would you call -- what were those things called?  Those bite, casts or --

A.    Dental casts.

Q.    Okay.  And where there were three dental casts provided to Dr. Senn and Dr. Chrz, is that the type of closed or limited population analysis that you're talking about?

A.    Exactly, yes.

Q.    Okay.  And in fact, I'm going to -- I'm not going to obviously ask you to cite chapter and verse from the NAS report, but I'm going to read to you a portion of it and ask you if you agree with it concerning closed population.  So if

USCA5 3903

you could listen, sir.

MR. McHUGH:  And Counsel, that's on Page 174.

BY MR. McHUGH:

Q.  "As with other experience based forensic methods, forensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases in which police agencies provide the suspects for comparison and a limited number of models from which to choose from in comparing the evidence."  Do you agree with that statement in the NAS report?

A.  Yes.

Q.  And is that what happened in this case as far as the closed or limited number of models?

A.  Yes.

Q.  And the NAS says that it has the potential for a large bias.  Is that right?

A.  Correct.

Q.  Dr. Bowers, would that bias be increased if the person who did the evaluation --

MR. ROBERTS:  Objection, Your Honor, leading.

THE COURT:  Sustained.

BY MR. McHUGH:

Q.  What would the effect be on the person, on that finding by the NAS if the person who did the evaluation actually had the names of the individuals on the back of the casts?

USCA5 3904

A.    Well, it makes it difficult to develop equal examination of the evidence, names and associated information regarding the case.  And this is an example of that.

Q.    Would the ability to be unbiased be lessened or would it increase the fact -- the potential for bias, I guess is a better way to put it?

A.    It's clear -- yes.  It's clear in the literature that bite mark analysis is a subjective application of opinion.

Q.    And not just in the literature, but the NAS took that into account.  Is that right?

A.    They certainly did, yes.

Q.    Okay.  In fact, do you agree with this from the NAS report concerning controlled or limited analysis of bite marks?  And I'm reading from the NAS at Page 174.

      "Even when using the guidelines, different experts provide widely different results and a high percentage of false positive matches of bite marks using controlled comparison studies."  Do you agree with that, sir?

A.    Yes.

Q.    Okay.  And is that again talking about the type of comparison that was done in this case?

A.    Exactly.

Q.    Now, do you agree with this statement from the NAS report?  "Bite mark comparison" --

      MR. McHUGH:  I'm sorry, Counsel, Page 173.

USCA5 3905

BY MR. McHUGH:

Q.    "Bite mark comparison is often used in criminal prosecutions and is the most controversial of the four areas of forensic odontology.  There is continuing dispute over the value and scientific validity of comparing and identifying bite marks."  Do you agree with that, sir?

A.    That's definitely a fact.

Q.    And from the NAS report, I'll ask you if you agree with this, the findings in the report.  "More research is needed to confirm the fundamental basis for the science of bite mark comparison."

A.    It's been that way for many, many years.  Yes.

Q.    Okay.  So you do agree with that?

A.    Yes.

Q.    And then do you agree with this?  "The committee," meaning obviously the NAS committee, and I'm reading from the report, "received no evidence of an existing scientific basis for identifying an individual to the exclusion of all others.  That same finding was reported in a 2001 review which revealed a lack of valid evidence to support many of the assumptions made by forensic dentists during bite mark comparisons."  Do you agree with that, sir?

A.    Yes.

Q.    And is that the -- is that touching on the assumptions that we talked about at the beginning of your presentation

USCA5 3906

about bite mark comparison?

A.    It's more than touching.  It's directly responding to those assumptions.

Q.    Okay.  If I just may have a minute.  And do you agree with this finding by the NAS or this statement in their report?  "Bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and the swelling and healing.  These features may severely limit the validity of forensic odontology."

A.    That's exactly -- that's a very accurate statement of that problem.

Q.    Okay.  And so do you agree with that?

A.    Yes, I do.

Q.    And then, now the NAS actually took into consideration -- by the way, you said you were a member of the American Board of Forensic Odontologists.  Is that right?

A.    Yes.

Q.    And did the NAS take into consideration guidelines that had been promulgated by the American Board of Forensic Odontologists?

A.    They reviewed them.

Q.    Okay.  And do you agree with this statement?  "The American Board of Forensic Odontology guidelines do not indicate the criteria necessary for using each method, including computer enhancement and/or digitalization of the

USCA5 3907

bite marks to determine whether the bite mark can be related to a person's dentition and with what degree of probability."

A.   There's no support for bite mark opinions based on probability.  There's no instructions in the guidelines regarding how you reach your conclusions.

Q.   Okay.

A.   It's generally a list of terms.

Q.   So if I'm reading this correctly, and obviously you're the expert, the NAS took into consideration the guidelines that have been in effect with the ABFO --

MR. ROBERTS:  Objection, Your Honor.  He's testifying.  He's just trying to restate what the witness has already said.

THE COURT:  Sustained.  Can you get on to some questions and answers, please, besides you testifying?

BY MR. McHUGH:

Q.   How has the --

MR. McHUGH:  Can I use ABFO as the American Board of Forensic Science?  It might move a little faster.

THE COURT:  Anything that would move this faster.

MR. McHUGH:  I'll try.

THE COURT:  You don't think you've made your point already?  What more did you want him to say?

MR. McHUGH:  I have a few more, I have some more stuff here, Your Honor, but I have an outline and I'm following

USCA5 3908

along.

BY MR. McHUGH:

Q.   How has the ABFO responded to the NAS report?

A.   They haven't responded to the NAS report's detailed review of bite mark analysis.

Q.   Okay.  Dr. Bowers, have you been involved in a number of exoneration cases?

A.   Yes.

Q.   Okay.  And approximately how many?

A.   Six.

Q.   And what do all of these cases have in common?  I'm sure there's a couple of things, but what do you find relevant that they all have in common?

A.   Bite mark analysis was a feature of the trial.

Q.   And who had the bite mark analysis been done by in each and every case?

A.   Each of the cases I was involved in, they were members of the --

          THE COURT:  Did you -- are you going to compare this to some kind of exoneration?

          MR. McHUGH:  No, Your Honor.  It goes to support, you know, as to our challenge as to Daubert whether or not this is supported within the scientific community, generally accepted, things of that nature.

          THE COURT:  Was there a Daubert challenge?

USCA5 3909

MR. McHUGH:  That's our claim, that there was not.

THE COURT:  Was there a Daubert challenge at trial?

MR. McHUGH:  That's our claim, there was not.

UNIDENTIFIED SPEAKER:  No, Your Honor.

MR. McHUGH:  Our claim is that Counsel was ineffective for not bringing a Daubert challenge, Your Honor.

THE COURT:  With him?

MR. McHUGH:  With Dr. -- with any expert, Your Honor.

THE COURT:  Okay.  Go ahead.

BY MR. McHUGH:

Q.   Were the six exoneration cases you worked on, some of these preceded Mr. Bourgeois's trial.  Is that correct?

A.   Yes.

Q.   Okay.  And they all had in common, I believe you testified to, that they all had bite mark analysis.  Who -- were the members, were the individuals who identified the bite marks members of the American Board of Forensic Odontology?

A.   Yes.

Q.   Moving along.  Dr. Bowers, are you aware of any empirical or scientific studies which support the basic premises which underline bite mark comparison?

A.   No.

Q.   Okay.  Have the methods used to utilize bite mark comparisons been tested --

A.   Um --

USCA5 3910

Q.    -- sufficiently for scientific reliability?

A.    Not for scientific reliability.

Q.    Okay.  Have the methods used to individualize bite mark evidence been tested sufficiently to be reliable scientifically?

A.    No support for that either.

THE COURT:  Okay.  Did you know that nobody testified that these bite marks belong to anybody?  Don't look to him.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  Nobody identified these bite marks as coming from a person, from a particular person.

THE WITNESS:  In the exoneration case?

THE COURT:  No, I'm talking about in this, in the trial that I had.  Did you know that?

THE WITNESS:  No.

THE COURT:  Okay.  Would that make a big difference to you?  All this was was a rule out case, could you rule out this person or that person.

THE WITNESS:  Oh, I -- I understand.

THE COURT:  A child versus an adult kind of thing.

THE WITNESS:  I'm aware of the fact that there was not a positive identification --

THE COURT:  Right.

THE WITNESS:  -- from bite marks, yes, ma'am.

THE COURT:  And that's what you're talking about.

USCA5 3911

Your exoneration cases had positive identifications, I assume?

THE WITNESS:  Not necessarily, Your Honor.

THE COURT:  What did they have?

THE WITNESS:  I know of one specifically that was a positive identification.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, just reflecting back, just to make sure the Court is aware, Dr. Chrz testified that there was a probable, that there was --

THE COURT:  Sorry.  I thought somebody testified that they couldn't rule out Mr. Bourgeois, but he --

MR. ROBERTS:  Dr. Senn did testify that way, Your Honor.  But then there was Dr. Chrz that said, came in and --

THE COURT:  Okay.  Somebody, this one, this gentleman testified that he couldn't rule out Mr. Bourgeois, but because of the teeth, wherever they were placed, he could rule out the child, AB1994.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  AB1994, and could rule out Mrs. Bourgeois.

MR. ROBERTS:  Yes, Your Honor.  That's what Dr. Senn testified to.  Just for clarity, Dr. Chrz came in after Dr. Senn testified and --

THE COURT:  But there were only three possibilities of people in the truck that it could have been.

USCA5 3912

MR. ROBERTS:  That's exactly correct.

THE COURT:  Right?

MR. McHUGH:  Yes, exactly.

THE COURT:  Okay.

MR. McHUGH:  And --

THE COURT:  So, I think that was the point is that you could rule out the child with the size of the bite mark.

MR. McHUGH:  Right, but --

THE COURT:  And Ms. Bourgeois had a particular -- didn't she have something weird with her teeth?

UNIDENTIFIED SPEAKER:  I could answer, but that's not my --

MR. ROBERTS:  Your Honor, can I have just a moment?

THE COURT:  Yes.

MR. McHUGH:  What I was going to ask Dr. Bowers is Dr. Senn testified -- there was, as I went through in the closed surveys where you only provide a limited number and you exclude two and you don't exclude one, is in effect an identification of the --

THE COURT:  Well, you just said there were only three possible people that could have done it in the truck.

MR. McHUGH:  I -- I didn't say that.

THE COURT:  Yes, you did.  You --

MR. McHUGH:  That was what was presented to the experts.

USCA5 3913

THE COURT:  You agreed -- all right.  Never mind.  Go ahead.

MR. McHUGH:  If that's -- what I meant was that was what was presented to these experts, three specific casts, dental casts.

THE COURT:  And of course, there was the testimony of the child that he was biting her all the time, which was significant, whether or not you had an expert to talk about bite marks.

MR. McHUGH:  Well, Your Honor --

THE COURT:  Did you know that?

THE WITNESS:  I don't know the testimony, Your Honor.

THE COURT:  Okay.

THE WITNESS:  I did not --

THE COURT:  Nobody told you that?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.  Does that make a difference?

THE WITNESS:  I mean -- no, ma'am, to my opinion, no.

THE COURT:  Okay.  I mean, it was apparently an eyewitness to the biting.

THE WITNESS:  Thank you.

BY MR. McHUGH:

Q.   And you're aware of, in your exoneration cases, where there's been confessions and things of that nature, and it turned out that the person --

USCA5 3914

MR. ROBERTS:  Objection, Your Honor, leading.

THE COURT:  Sustained.

MR. McHUGH:  May I move on, Your Honor?

THE COURT:  I wish you would.

MR. McHUGH:  Okay.  Well --

BY MR. McHUGH:

Q.   Have the methods used in bite mark analysis, in your opinion, Dr. Bowers, been generally accepted as reliable in the relevant scientific community?

A.   I'm sorry, could you say that one more time?

Q.   Sure.

THE COURT:  Are they any good?  Giving bite mark testimony, is it worth anything in the scientific community?  That's what you asked.  Right?

THE WITNESS:  The scientific community -- and I'm including the NAS committee and the established -- their published opinion stated that it's not scientific and wouldn't pass a Daubert challenge.

THE COURT:  Thank you.

BY MR. McHUGH:

Q.   Okay.  Now --

THE COURT:  But that's a legal conclusion of the dentist.

THE WITNESS:  And the NAS report, yes, Your Honor.

THE COURT:  Okay.  Well, that has nothing to do with

USCA5 3915

Bowers - Direct                                        68

the law, though.

THE WITNESS:  Yes, ma'am.

THE COURT:  I mean, that's their opinion.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  Thank you.

MR. McHUGH:  Right.  But what I was going through, Your Honor, without asking him the ultimate conclusion concerning Daubert, was obviously following along the Daubert factors.  And obviously that is based in science.

THE COURT:  You've done this brilliantly, but I think you should move on.

MR. McHUGH:  I'm moving on to my next area, which is the bite marks in this case.  So getting away from the Daubert issues, moving on --

THE COURT:  Why talk to him about the bite marks if he's saying it's not a scientifically approved thing?

MR. McHUGH:  Well, Your Honor, because the issue is not just should Counsel have brought a Daubert challenge --

THE COURT:  Okay, but if he --

MR. McHUGH:  -- but also had they --

THE COURT:  Had he and failed --

MR. McHUGH:  Well, no, had he, would he have been successful, what's the prejudice factor?  So I wanted to go into the issues into this case as to --

THE COURT:  How could he possibly know what the

USCA5 3916

prejudice is if he doesn't know the evidence?

MR. McHUGH:  Well, he's reviewed the evidence, the same as --

THE COURT:  He just said he didn't know that there was an eyewitness on the bite.

MR. McHUGH:  Well, Your Honor, as to science, and I think Dr. Senn would agree with this, eyewitnesses and extra testimony concerning confessions or eyewitnesses, a scientist looks --

THE COURT:  Do you know what the evidence was in this case, all of it?

THE WITNESS:  I've read the autopsy report, ma'am.

THE COURT:  No, do you know what the evidence is, all the witnesses that testified about --

THE WITNESS:  Oh, not at all.

THE COURT:  -- what he did to this child?

THE WITNESS:  No.

BY MR. McHUGH:

Q.   And is that something, as a scientist presenting an objective opinion, that you would want to know?

A.   I would not want to know.  My opinion is based just on the dental aspect.

Q.   Okay.  So in this particular case, did I provide you with a copy of the autopsy photos -- I'm just going to list this, and if I didn't, I'll ask you at the end to tell me what I

USCA5 3917

didn't provide you -- the autopsy photos, the enhanced images of the autopsy photos, as well as the bite marks by Dr. Oliver, the 35 millimeter prints of the autopsy photos and bite marks, Dr. Oliver's report, scans of the teeth, Dr. Chrz and Dr. Senn's report, Dr. Dailey's report, and the NCIS report. Did I provide you with all those materials?

A.   Yes.

Q.   Okay.  And do you have an opinion, based on what you've reviewed, whether this was a case that was particularly appropriate or inappropriate for a bite mark comparison?

A.   My opinion is that I actually agree with Dr. Dailey that the evidence available was incapable of rendering an opinion.

Q.   Okay.  And as a result of the evidence or the materials that I sent you, did you prepare some overlays?

A.   Yes, I did.

Q.   Okay.  If I may just put these on the screen, I'll start with the -- is that an overlay you prepared?

        MR. McHUGH:  And Your Honor, for the record, this is marked P-16 -- P-116.

        THE COURT:  Do you want to offer it?  Or is it part of a group?

        MR. McHUGH:  Well, there's a couple of pages to it. I'll go through the couple of pages --

        THE COURT:  Okay.

        MR. McHUGH:  -- and then I'll offer it.

USCA5 3918

BY MR. McHUGH:

Q.   Is that the first --

A.   Yes.

THE COURT:  I'm sorry, I just think it's a peculiar thing to do.  If you're already showing them to me, you ought to offer them.

MR. McHUGH:  I'm offering them --

THE COURT:  And which I keep saying that.

MR. McHUGH:  -- but I thought when I offer them, I have to give them to you.  And I only have -- these are clear plastic, so I wanted to keep them here.  But I will offer them. I will be offering them.

MR. ROBERTS:  Your Honor --

MR. McHUGH:  I offer them.

THE COURT:  Okay, you don't have to give them to me. P what?  P what?

MR. McHUGH:  This is P-116.

THE COURT:  P-116.

MR. McHUGH:  Yes.

THE COURT:  Any objection?

MR. ROBERTS:  Well, Your Honor, I don't know yet, because we're not sure what these relate to.  We just know we were given a bunch of overlays, and we don't know if they relate to this case or if they're something else.

THE COURT:  Okay.

USCA5 3919

MR. McHUGH:  Oh, no, if I have a moment to --

THE COURT:  Never mind.

MR. McHUGH:  -- lay a foundation.

THE COURT:  Go ahead.

BY MR. McHUGH:

Q.   Do these relate to this case?

A.   Yes.

Q.   Okay.  The first --

THE COURT:  How?

MR. McHUGH:  They're overlays he created from the photo images he received and things of that nature that I just went off, list that I provided to him.  So --

MR. ROBERTS:  I have no objection, Your Honor.

THE COURT:  Wait a minute.  P --

MR. McHUGH:  P-116.

THE COURT:  116 is admitted.

BY MR. McHUGH:

Q.   This first overlay, did you prepare this?

A.   Yes, I did.

Q.   Okay.  And what is that an overlay of?

A.    It's an overlay taken from the models of Robin.

Q.   Okay.  Then I'm going to show you the green over -- I'm taking that off -- the second page of P-116.  Is that an overlay that you prepared?

A.    Yes.  That's taken from the dental models of AB1994.

USCA5 3920

Q.    Okay.  And then the third page --

A.    I'm sorry.  No, I'm sorry.  That's Alfred.

Q.    Okay.  And then the third overlay that I'm providing to you, or that is part of P-116, did you prepare that?

A.    Yes.

Q.    Okay.

A.    And that is AB1994.

Q.    Okay.  Now, after you prepared those overlays, did you then prepare another document that put all the overlays together?

A.    Yes.

Q.    Okay.  And that's the fourth page of 116.  Now, Doctor, can you tell us, were you able to draw any conclusions as a result of this analysis that you performed concerning the ability to exclude or include or identify any of the potential bite marks?

A.    Yes.  This goes to the issue of how different the three individuals' incisal edges of their teeth and their arch shapes are.

Q.    Yes.

A.    And doing an overlay comparison like this for visual purposes indicates that the similarities are significant. Visually, looking at the models, the dental models of the teeth even say that they're all different in terms of the arrangement.  There is considerable overlap between all three

USCA5 3921

individuals, since both the upper arch, which is towards the top of the -- and then along the lower. In coupling that similarity with the lack of detail and nondistinct aspect of the bite mark renders, shows that there's a significant difference in my opinion versus Dr. Senn's because of the strong similarities between all three individuals.

Q. And would those similarities prevent you from drawing a conclusion as far as excluding or including or identifying?

A. That's half of it. And the other one is the aspect of the skin injury itself.

Q. And what can you further tell us about that?

A. And the skin injury didn't show any dental detail to the resolution necessary to individuate, include or exclude any of these three people.

Q. And isn't that, those two points exactly what Dr. Dailey had mentioned in his report, the similarities?

A. Yes.

Q. And also the quality of the marks on the skin?

A. Yes. Just an aside, one of these persons, one of these three is genetically related to the other two. The representation of these three statistically, or in a shape analysis, would indicate that they're very close together.

Q. Okay. Now, what are the differences between your overlays and the overlays that Dr. Senn had prepared?

A. My overlays were established looking at the models and

USCA5 3922

recording the full mesial distal width of the teeth.  That's the side-to-side width, also the full representation of the biting edges of the teeth.  Dr. Senn's overlays seemed to be a partial selection of certain aspects of various teeth of all individuals.  And that is, actually goes to what the NAS said regarding multiple methods available to the dentist in these, in this type of case, is that there's multiple methods used.  I used one method that included all the dental, all the tooth outlines, and Dr. Senn used a different method.

Q.   So when you say you used all --

A.   Or reached a different opinion and operated the, created a different example of the outlines of the teeth.

Q.   Okay.  And the, when you say you used all of the tooth versus not using all the tooth, is that what you're saying Dr. Senn did?

A.   Yes.  This is an example.  My representation is the full perimeter outline of, say, a cuspid.

Q.   Okay.

A.   And Dr. Senn's representation of the cuspid, one of the cuspids, upper cuspids, I believe, on Mr. Bourgeois was it was a little halo just around the tip of the tooth.  It wasn't the full, full width of the tooth.  And that's a considerable difference.

Q.   Okay.  So based on your review of the materials that I provided you, based on your review of the overlays that you

USCA5 3923

prepared, were you able to draw a conclusion as to the ability to include, exclude or identify?

A.    I had no opinion on -- I had no ability to include or exclude any of them.

Q.    And that would be exactly what Dr. Dailey found.  Is that right?

A.    Yes.

MR. McHUGH:  Your Honor, at this time I do have some questions concerning the photo images that Dr. Bowers reviewed. I would ask that I be allowed to ask these questions, and the Court give it the weight that it considers, given that he's here today to testify, and I would ask that the Court permit me to ask these questions concerning the digital analysis and enhancements of the photos.

MR. ROBERTS:  Your Honor, again, I would only -- I would object to any expert aspect of it.

THE COURT:  I'm not necessarily accepting it as expert.

MR. ROBERTS:  I understand, Your Honor.

THE COURT:  It can go to the weight of the evidence.

MR. McHUGH:  Thank you.

THE COURT:  But he can talk about it.

MR. McHUGH:  Oh, I'm sorry.  Thank you, Your Honor. I'm going to --

THE COURT:  You need to move this along.

USCA5 3924

MR. McHUGH:  I only have a few more minutes, Your Honor.

THE COURT:  You said that half an hour ago.

MR. McHUGH:  I mean it this time.  And I'm handing up for the Court P-116.

THE COURT:  Oh, by the way, Darrick Moore was a bad address.  The U.S. Marshals made four attempts, talked to the manager -- I assume that's the manager of some complex.  The manager says he doesn't live there.  William May, as we know, is a bad address.  Orlando Campos, bad address.  Folks that live there have lived there since June.  They don't know who he is.  Tim Allen is in custody, and they're going to bring him over when you're ready to talk to him.

MR. McHUGH:  Thank you.

THE COURT:  And probably give him a standby attorney.

MR. WISEMAN:  Thank you, Your Honor.

MR. McHUGH:  Doctor --

THE COURT:  Because I don't know what you're asking him.

MR. McHUGH:  Okay.

BY MR. McHUGH:

Q.   Dr. Bowers, did you review the images that were digitally compressed or digitized by Dr. Oliver and then enhanced by Dr. Oliver?

A.   Yes.

USCA5 3925

Q. Okay. And did you also review the original copies of the 35 millimeter prints?

A. Yes.

Q. Okay. And when I'm talking about these photographs, I'm talking about the autopsy photographs, as well as the bite mark portions of the autopsy photographs. Is that -- do you understand my question?

A. Yes, I understand that.

Q. Okay. Did you review the protocols that Dr. Oliver used to enhance the images?

A. Yes, I did.

Q. And did you review the protocols that Dr. Oliver used to digitize these photographs?

A. I was, I read a report that stated how he scanned, the fact that he scanned the original photographs.

Q. Okay. And Dr. Oliver testified that he used a JPEG form of compression. Are you familiar with JPEG?

A. Yes.

Q. And is that a lossy form of compression?

A. Yes. Lossy means that as the image is opened and closed, the compression program actually loses detail of the image. Concerns about lossy compression has been around for about, as long as I've been involved in digital, using digital methods for about 10 years.

Q. Okay. And maybe I misspoke when I said Dr. Oliver used.

USCA5 3926

I don't know from his testimony whether he used it or he was provided it in that form.  But in any event --

A.    Oh, I see.

Q.    But in any event, the form that he used for his analysis was a lossy compression.

A.    Right.  The protocol is to use them in TIFF, called lossless.

Q.    Lossless?

A.    Yes.

Q.    And are you also aware that there's FBI guidelines of working groups that indicate that if you are using the images, the digital images for purposes of analysis of impressions, that lossless (sic) compression, such as JPEG, should not be used.  Are you aware of that, sir?

A.    I have for many years.

Q.    Okay.  And, sir, what can you say about the digitized and enhanced images that you viewed that had been prepared by Dr. Oliver?

A.    His methods are unvalidated for forensic comparison purposes.

        MR. ROBERTS:  Objection, Your Honor.  I don't think -- he's not an expert, and I would object --

        MR. McHUGH:  I'd ask the Court --

        MR. ROBERTS:  -- to his ability to comment on an opinion on someone that was qualified as an expert.

USCA5 3927

THE COURT: Sustained.

MR. McHUGH: I'd ask the Court to take the evidence -- I know I'll have an opportunity to cross-examine Dr. Oliver concerning --

THE COURT: Okay. Go ahead. Go ahead.

BY MR. McHUGH:

Q.   You may answer now.

A.   Although Dr. Oliver provided an extensive literature list concerning the program he used, there's no forensic validation that studied or tested his methods relating to comparisons.

Q.   Okay. And the protocol that he provided that was listed in Dr. Senn's April 2010 report, was there any of the articles that Dr. Oliver listed specifically dealing with that protocol, From Digitization to The Claw Enhancements? Any of the articles specifically deal with that?

A.   I couldn't find any articles in the forensic disciplines that related to his program.

Q.   Okay. And the effects that these enhancements had on the photographs, can you give your opinion as to that, sir?

A.   His use of this program was uncontrolled, meaning that there's no, no limit to what he used in terms of enhancement.

Q.   Parameters?

A.   The parameters or the distortion, or the additional, addition of pixel values to the entire photograph resulted in known objects, such as hands, gloved hands, and non-injury

USCA5 3928

areas to all look the same.  So by control, it seemed to have no, no limits.  It was, in terms of his establishing locations of wounds, it seemed to be arbitrary.  The images themselves, in general, seemed to be arbitrary alteration.

Q.   And you've used, and I -- you've used Photoshop, I believe you testified on direct.  Is that correct?

A.   Yes.

Q.   Was this anything close to a use of Photoshop, as far as its effect on the images?

A.   There's strong parallels between the two.

Q.   But was it limited to what Photoshop can do, or did it go to a different level as far as --

A.   In my opinion, there is no level to it.  It's simply a simple series of changes to the image that went beyond acceptable levels.

Q.   Okay.  And are you aware of any known potential rates of error or standards that control Dr. Oliver's protocols that he utilized in this case?

A.   Well, that's just the point, there aren't any.  Digital enhancement standards at this point are actually quite lax, even with the study working groups that they've established.

MR. McHUGH:  Okay.  And I'll -- and with that, Your Honor, I have nothing further to ask of Dr. Bowers.

THE COURT:  Thank you.  Mr. Roberts?

MR. ROBERTS:  Your Honor, first I would like to offer

USCA5 3929

Government Exhibit 172A.  It is a -- it is actually an appendix or an addendum that was noted in Dr. Senn's April 2010 report, but it wasn't actually attached, and so now I've offered it, and I've provided a copy to the Defense.

MR. McHUGH:  Thank you.

(PAUSE.)

CROSS-EXAMINATION

BY MR. ROBERTS:

Q.  Good afternoon, Dr. Bowers.

A.  Good afternoon.

Q.  Are you all right there?  You were bending over to the other side.

A.  Oh, I'm just relaxing.  I'm fine.

Q.  Okay.  Now, I know that you studied psychology, dental surgery, medicine, and you actually have a law degree also. And you told us earlier that what you do now is your occupation now is a dentist, and you said contractual, contractual person as a Deputy Medical Examiner?

A.  Yes.  Would you like -- do you have a question?  I can -- should I explain it better?

Q.  I'm just asking you, I listed all these things you've studied --

A.  Yeah.

Q.  -- what you told us.  Is it correct that you only, your source of income right now is as a dentist and as a contractual

USCA5 3930

Deputy Medical Examiner?

A.   In regarding my source of income --

Q.   Yes.

A.   -- I practice four days a week in my 30-year-old dental practice.  I receive a small case-by-case stipend or payment from the Medical Examiner's Office whenever I do a case.  And then, of course, I have income from my forensic casework.

Q.   Okay.  Let's -- that's what I want to talk about really --

A.   Sure.

Q.   -- is your forensic casework.  When did you -- what was the first time you ever testified in a case?

A.   I'd have to guess.  Sometime in the '80s.

Q.   How many cases have you testified in?

A.   I don't have a -- I don't have a complete list of all of them.

Q.   Well, let me focus you, as a forensic odontologist --

A.   Uh-huh.

Q.   -- how many cases have you testified in?

A.   I have no idea.  Probably 30.

Q.   So earlier when you said, you said six, you --

A.   That was in --

Q.   -- was that a mistake on your part?

A.   That was not -- I didn't test -- the six I listed were not cases I testified in.  I was involved in the, generally the post-conviction appellate process.

USCA5 3931

Q.    Okay.

A.    Those aren't cases that I testified in.

Q.    All right.

        THE COURT:  So you've never testified in an exoneration case?

        THE WITNESS:  I was at a -- I've been at one -- I'm --

        THE COURT:  Did you ever testify?

        THE WITNESS:  Actually, I have, yes.

        THE COURT:  Okay.

BY MR. ROBERTS:

Q.    Would that be the Frimpong case?

A.    No.

Q.    No?  It's a different case?

A.    Yeah.

Q.    What case was that?

A.    It's the State of California versus Richards.

Q.    Okay.  Now, you said you're a diplomate in the American Board of Forensic Odontology.  You also know that Dr. Senn is a diplomate, a member of that as well.  Right?

A.    I know that very well.

Q.    Do you know any -- is there anyone else in the courtroom that's a member of that organization?

        MR. McHUGH:  Objection, relevance, Your Honor.

        THE COURT:  I'm sorry, I can't hear you.

USCA5 3932

MR. McHUGH:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  The gentleman in the well-fitting suit in the back is Franklin Wright.

BY MR. ROBERTS:

Q.   And what is his role?

A.   He's a forensic dentist.

Q.   Is he the president of that organization?

A.   As you say, he certainly is.

Q.   Okay.  And it's my understanding within the last couple of years, you have actually started testifying in cases on forensic odontology, and two of those includes the California versus Frimpong case, and one is Alabama versus Ramirez-Vite, or Vite?

A.   Vite.

Q.   Vite.

A.   Yes, I've testified in both.

Q.   Okay.

A.   One pretrial, one post-trial.

Q.   All right.  To your knowledge, do you know any other forensic odontologist who is testifying anywhere in the United States and saying that bite mark evidence is not reliable in the courtroom?

A.   I haven't had any conversations with anyone that has said that within the organization.

USCA5 3933

Q.   Okay.  Listen to my question closely, because I'm asking you, do you know of anybody else, as a forensic odontologist, who's testifying that bite mark evidence is not reliable?

A.   Not to my knowledge.

Q.   And to your knowledge, has bite mark evidence ever been excluded in any case?

A.   Excluded, no.

Q.   Okay.  Now, you've written several books and articles, many of those with -- I'm going to name three people that I recognize, is Peter Bush, Dr. Mary Bush and a Dr. David Sheets.  Do you recognize those names?

A.   I recognize those names.  What are you saying my role is with them?

Q.   I thought you had written books and articles with them and you were familiar with their familiarity with the area of forensic odontology.

A.   Some of that aspect is true.  I'm familiar with them.  I haven't written -- they've written a chapter for me in a currently published book.

        THE COURT:  Have you ever used bite marks in an exoneration case or testified in one?

        THE WITNESS:  Yes, ma'am, that one exoneration case of State v. Richards.

        THE COURT:  Well, what did you testify, that they didn't match?

USCA5 3934

THE WITNESS:  I testified that the injury that was, that was determined at the original trial to be a bite mark was not a bite mark.  That was my opinion.

THE COURT:  So you used it as an area of expertise to identify or not identify bite marks?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  I thought you said it wasn't scientifically reliable.

THE WITNESS:  The NAS report says, and I agree, that it's reliable for exclusion purposes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   Let's talk about the NAS report for a minute.  You actually wrote -- you wrote an article that relied upon Workshop 4 as a basis for what you determined was an error rate.  Is that right?

A.   I wrote an article that reviewed Workshop 4 and presented two statements of, or two separate analyses of that workshop.

Q.   And your article related to Workshop 4 was relied upon significantly by the NAS opinion you've been talking about, wasn't it?

A.   Well, that -- yes, it -- I don't know how important it was to them.  That particular article was --

Q.   You don't know how important it was?

A.   I don't know how -- it was referenced.  The article

USCA5 3935

actually is a treatise of 100 pages.  I'm not aware of what portion they used or what portion they didn't.

Q.   Okay.  I'm going to go back, because I want to get simply, are you -- is it your opinion that bite mark evidence, in general, can be used to identify someone that bites, if it's in a controlled population?

A.   No.

Q.   Can you identify somebody?

A.   No.

Q.   No.

A.   I do not.

Q.   Is it your opinion that bite mark evidence can be used in a controlled population to exclude people from being a biter?

A.   What do you mean by controlled?

Q.   You told us what controlled --

THE COURT:  Well, he's saying if there are three, if there are only three possible people that have done it or only four possible, and three of them are infants, and one of them's an adult, could you figure that one out?

THE WITNESS:  No, ma'am.

BY MR. ROBERTS:

Q.   You wouldn't be able to do that?  Let me give you a hypothetical.  You're an expert in this area.  Let's say we have a female that's in a confined area.  Let's just say she's in jail.  And you have two males in the cell, and one male,

USCA5 3936

Male A has really bad crooked teeth, large wide bite.  Male B has perfect, straight teeth, with a narrow arch.  Later the lady is discovered dead, with a bite mark on the flat part of her shoulder.  Would you, as a forensic odontologist, be able to identify the biter in that circumstance?

A.    That's insufficient evidence.

Q.    I asked you --

A.    I'm sorry, the details you're giving me isn't sufficient to really render an opinion at this time.  I tell you my opinion, what my statement to the investigators would be --

Q.    No, my question is real --

A.    Okay.

Q.    -- real simple --

A.    Well, I wouldn't be able to --

Q.    -- Dr. Bowers.

A.    -- render an opinion on that, sir.

Q.    If this lady had a bite mark in her, and there was only these two people in a controlled environment, you're telling us these two people, one with really bad crooked teeth, and one with straight, perfect, narrow teeth, if those were the only two people in your controlled environment, you would not be able to render an opinion?

A.    No, based on the variability of the skin, I would not be able to.

Q.    Okay.  That would be an example of a closed population,

USCA5 3937

though, wouldn't it?

A.   Closed, open, it would be the same opinion.

Q.   Okay.  You talked a lot about the information in the NAS report, and you talked about blinded, and you explained to us what that meant, and you had some concerns with Dr. Senn's knowledge of the three molds in this case.  Is that what I -- did I remember that correctly?

A.   Yes, sir.

Q.   Okay.  And you were discussing this idea of being blinded and going into this blinded, not knowing who the person is that they're trying to identify.  Were you aware that Dr. Chrz, when he did his subsequent review, had no knowledge of which of the three individuals was accused?  Were you aware of that?

A.   No, I did not.  One point regarding blinding, generally it --

Q.   Well --

A.   -- there's multiple -- to be blunt, if I could make a statement about blinding.

        MR. ROBERTS:  Well, Your Honor, my question was pretty straightforward.

        THE WITNESS:  Okay.

        THE COURT:  Could you please answer the question, sir, if you can.

        THE WITNESS:  Yes, ma'am, of course.  Yes, ma'am.  Thank you.

USCA5 3938

THE COURT:  Go ahead.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.   You provided a number of documents to the Defense Counsel --

A.   Yes.

Q.   -- in preparation for your testimony, didn't you?

A.   Yes, sir.

Q.   And you provided one document that was similar to Government's 204.

A.   Looks the same to me.

Q.   How many pages --

A.   At least that page does.

Q.   How many pages did you provide to the Defense?

A.   I don't know the number actually.  Could you tell -- could you refresh my memory?

Q.   Does 15 sound familiar?

A.   Well, I'll take your word for it.

Q.   And --

MR. McHUGH:  Your Honor, if I just may, for clarification purposes, these were provided as exhibits that we were going to use during our presentation.  Certainly I didn't present the Government with the entire, or I tried to limit what we were going to --

THE COURT:  What is your legal objection, please?

USCA5 3939

MR. McHUGH:  Just for clarification, I was providing that to the Government, not Dr. Bowers, as to what I would be using in my examination of Dr. Bowers.  So I just wanted to make that clear for the Court and Counsel.

THE COURT:  Thank you so much.  Go ahead.

BY MR. ROBERTS:

Q.   Dr. Bowers, did you provide the entire PowerPoint slide to the Defense team?

A.   Yes.

Q.   You did.  You provided them all 48 slides?

A.   Yes.

Q.   So you would be --

A.   No, I'm sorry.  I misspoke.  I gave them just the 15.

Q.   The 15 that you wanted them to see.  Correct?  Let me -- I'm going to go through some of these slides that --

MR. McHUGH:  And I'd also object, Your Honor, because this is the witness, Dr. Senn, who we did not have notice of for this hearing.  And we were provided with the full set of slides this morning.  And as the Court is aware, I objected to that at the beginning of this hearing that we weren't able to investigate Dr. Senn --

THE COURT:  What is your objection, please?

MR. McHUGH:  Well, he's impeaching, attempting to impeach Dr. Bowers with the fact that we weren't able to get all the materials concerning Dr. Senn, and we didn't have

USCA5 3940

notice of Dr. Senn until Thursday before the hearing started. We --

THE COURT:  I didn't understand that.  What are you doing?

MR. McHUGH:  We provided those exhibits weeks before that.

THE COURT:  I'm sorry.  Mr. Roberts?

MR. ROBERTS:  Your Honor, are you asking for a response or --

THE COURT:  Yes.

MR. ROBERTS:  Okay.  The document that the Defense provided us was 15 pages.  We contacted Dr. Senn and asked him to look at this and tell us whether that was the complete information, and Dr. Senn sent us the 48-page presentation, which I then went to Defense Counsel and said, and asked, "How did you get this document?"  And he told me that it was sent to him by Dr. Bowers.  And I asked if he knew that there was a longer presentation and did he have the full presentation.  So my question to Dr. Bowers is why he only gave him 15.  Why didn't he give him the whole presentation?

THE COURT:  Overruled.  Go ahead.

BY MR. ROBERTS:

Q.   Why did you not give him the entire presentation?

A.   Because I had a specific use for those 15 pages.

Q.   And your 15 pages did not include any of the conclusions

USCA5 3941

that Dr. Senn made, did it?

A.   It included -- I really can't recall.  I know I sent the pages that regarded, regarding his Major Problems section, and I was going to use it to parallel what the NAS adopted saying that Dr. --

Q.   Let me point out one page --

A.   Let me finish, please.

THE COURT:  Excuse me.

MR. ROBERTS:  It's actually non --

THE COURT:  Go ahead, Mr. Roberts.

MR. ROBERTS:  It's actually nonresponsive, Your Honor.

THE COURT:  Sustained.

MR. ROBERTS:  Thank you.

BY MR. ROBERTS:

Q.   I'm showing you Government's Exhibit 204.  You might recall that Defense Counsel showed you a couple of the conclusion pages.  And I'll just show you those.  He showed you this page that talked about the scientific basis for associating unknown biters.  But he didn't happen to show you this page, so I'd like you to look at that page.

"Bite mark analysis is too important and valuable to the investigation and adjudication of certain crimes to be discounted or overlooked."

And then the second bullet says, "The use of bite mark

USCA5 3942

analysis to exclude suspects is powerful and important."

You didn't provide that to the Defense, did you?

A.   No, I did not.

Q.   And that's one of the conclusions that Dr. Senn made in his presentation, in addition to the other conclusions, isn't it?

A.   Yes, it is.

Q.   If I remember right, you provided maybe about another 10 or so documents to the Defense so that they would understand odontology better?

A.   Approximately, yes.

Q.   Do you know if any of those were incomplete?

A.   Incomplete in whose opinion?

Q.   Well --

A.   Yours or mine?

Q.   To the same extent that you only provided 15 pages of a 48-page document, were any of the other documents that you provided to the Defense incomplete?

A.   I haven't studied them for what would, I would consider to be incompleteness.

Q.   So the answer is you don't know?

A.   I know what -- I don't know actually, yes.  The -- I could give a review of what I sent, and it was complete scientific articles.  Would you like me to make a best of my memory statement to you regarding that?

USCA5 3943

Q.    No, actually I'm going to move on to another question.

A.    Okay.

Q.    The overlays that you used, that you referred to and that have been offered, those would be considered two-dimensional reviews.

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    What is your opinion on three-dimensional features and using three-dimensional features on a bite mark to analyze it?

A.    Three-dimensional overlays in three dimension versus two dimension relating to dental individuality, meaning match rates, there's more information in three-dimensional scanning --

Q.    Okay.  So the -- in this particular case, with these particular molds, would it have been helpful to apply a three-dimensional view of these to determine whether or not they are actually distinct bite marks?

A.    I'm sorry.  You're talking about the molds and the bite marks together?

Q.    Yes.  I'm talking about use of three-dimensional --

A.    Dimensional --

Q.    -- features in evaluating bite mark evidence.  You only testified earlier to a two-dimensional aspect.

A.    Yes.

USCA5 3944

Q.   I'm asking you about your opinion on three-dimensional use.

A.   Actually, I've never -- I've never done a three-dimensional comparison.  In my opinion --

Q.   Well, what would a three-dimensional --

A.   -- you'll get more dental information off of casts most likely, in terms of two-dimensional.  Regarding the bite mark, three-dimensional won't help.

Q.   I want to understand this.  You said you've never done a three-dimensional?

A.   Three-dimensional analysis, in my, to my knowledge, is a digital analysis using 3D scanning.  Is that what you're talking about?

Q.   I don't know.  You're the expert.  You tell me --

A.   Well, I'm telling you I've never used --

Q.   -- what is three-dimensional analysis?

A.   What I'm asking, what I'm answering to you is that I've never done a 3D digital analysis of, using dental models.

Q.   Have you ever seen a bite mark case that's had a three-dimensional aspect to it?

A.   Have I ever seen -- you know, actually I have never seen a case that had three-dimensional characteristics.

Q.   Okay.  And that's actually what you testified to in the State of Alabama versus Ramirez-Vite.  Correct?

A.   Thank you.

USCA5 3945

Q.   Is that what you --

A.   Yes.

Q.   That's correct?  Okay.

A.   I mean --

Q.   Do you recognize this book, Forensic Dental Evidence --

A.   Yes.

Q.   -- An Investigator's Handbook?

A.   Yes.

Q.   How do you know this book?

A.   My name's on the front cover, which --

Q.   It sure is.  What did you do with this book?

A.   Is that the first or second edition?

Q.   It's the second edition.  What did you do with regard to this book?

A.   I was an editor and coauthor.

Q.   Do you remember a Chapter 5 that dealt with forensic dental evidence?

A.   Yes, I do.

Q.   Okay.  I'm going to show you what is Page 20 -- sorry -- Page 120 in Chapter 5.

A.   Okay.

Q.   And this, let me refer back actually to the first of the chapter.  Sorry about these pictures.  They're not really pretty.  But this is the beginning of Chapter 5, Page 93.

A.   Uh-huh.

USCA5 3946

Q.   And that's your name right there?

A.   Yes.

Q.   Did you write this chapter?

A.   Yes.

Q.   And --

          THE COURT:  What's that called?

          MR. ROBERTS:  It is the Forensic Dental Evidence,
Second Edition.

          THE COURT:  What's the chapter called?

          MR. ROBERTS:  The chapter is called Forensic Dental
Evidence, Your Honor.  Let me make sure that that's not the
chapter name maybe.  It is called Recognizing, Documenting
Evidence, Collection and Interpretation of Bite Mark Evidence.

          THE COURT:  Okay.

BY MR. ROBERTS:

Q.   And Page 120, can you read Figure 29?

A.   Yeah, I can.

Q.   What does that say?

A.   It says, "This bite mark contains three-dimensional
features that could be preserved with impressions taken with
proper dental materials."

Q.   Hmm.  I guess that's different than what you just
testified to.  Correct?

A.   Yeah.  I never did a dental comparison with that case.
But I have -- that's the one three-dimensional case that I've

USCA5 3947

seen.  Sorry.

Q.    Okay.  Now, in Dr. Senn's report -- which you've read, correct?

A.    Yes.

Q.    And it's Government Exhibit 71.  He said -- and not the report from April of 2010, but the one he did for trial --

A.    Yes.

Q.    -- when he found that he could not exclude Alfred Bourgeois.  Do you remember his opinion about that?

A.    Yes, he could not exclude.

Q.    And he referred to spatial relationships and variations in the positions of specific anterior teeth.  Do you remember him referring to that?

A.    Relationships in the bite mark?

Q.    Yes.

A.    Is that the context of --

Q.    Yes.

A.    Yes, I do recall that.

Q.    Okay.  And we showed pictures to Dr. Dailey, and I can pull them out again and show you, but do you recall looking at the anterior teeth of these three individuals and determining from a three-dimensional aspect whether or not there's a distinctive difference in those?

A.    You see, pictures aren't three-dimensional.  It's a two-dimensional representation of the front of the teeth.

USCA5 3948

Q.   I'm asking you to apply a three-dimensional analysis instead of your two-dimensional analysis you used a little bit earlier.

A.   A three-dimensional analysis, using the outside of the teeth or the cheek side of the teeth with the bite mark?  I can't --

Q.   I'm simply asking you, if you apply a three-dimensional analysis and you look at those photographs and you look at photographs of the moldings, can't you distinctively see differences in the three, those three bite marks?

A.   On the outer surfaces of the teeth, they all appear different.

Q.   Okay.  Let me ask you about, although you're not an expert in the area of enhancement, did you coauthor a, an article called Digital Analysis of Bite Mark Evidence?

A.   Yes.  It's a handbook.

Q.   It's a handbook?

A.   Yeah.

Q.   Do you recall in that, in a chapter on detecting and correcting angular distortion --

A.   Yes.

Q.   -- stating that Photoshop can help for evidence, but the evidence you reviewed is not ideal in terms of camera angles and scale placements and exposures?

A.   I generally recall that, yes, having written that, yes.

USCA5 3949

Q.   So in Dr. Senn's response, or Dr. Senn's report --

A.   Right, the second one.

Q.   -- in April of 2010 this year, when he commented on that, that was an accurate statement, that you --

A.   He copied it quite well.

Q.   Okay.  I want to talk for a minute, because it's very important, I think, in this area of the ABFO and the Bite Mark Workshop 4, because you rely on that in your opinion in this case, and you relied heavily on it throughout your testimony, don't you?

A.   Throughout what testimony?

Q.   Well, the testimony that you've had in other cases.  I mean, you're talking about proficiency testing, are we not?

A.   Validity testing and proficiency testing, there's two layers of concern I have, and proficiency testing is one of them.

Q.   Okay.  Tell --

        THE COURT:  I guess what he's trying to say is if -- your whole field of expertise is forensic odontology.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  And you say it's completely worthless in testifying.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Okay.

BY MR. ROBERTS:

USCA5 3950

Q.   And if I might, you -- what is proficiency testing?

THE COURT:  I think you can probably move on, don't you think?

MR. ROBERTS:  Okay, Your Honor, but can I show him this one statement, because this is --

THE COURT:  Yes.

MR. ROBERTS:  -- quite interesting.

BY MR. ROBERTS:

Q.   This is the one you agreed to just a little while ago. "Forensic odontology certifying organizations have not created or administered bite mark analysis proficiency tests for their board certified members."  And you agreed with that statement just a few minutes ago, didn't you?

A.   Yeah, I did.

Q.   And in fact, the whole premise of Workshop No. 4 and your concern with them is that they didn't have a proficiency -- there was a concern about proficiency testing.  But that Workshop 4 really was not a proficiency testing, was it?

A.   Oh, this argument's been going on for eleven years.  The proficiency testing -- it was certainly an attempt at a proficiency test originally.

Q.   The Forensic Odontology Certifying Organization, that includes ABFO, does it not?

A.   Yes.

Q.   And have they -- what has ABFO said about --

USCA5 3951

A.    That workshop?

Q.    -- the workshop, and whether --

A.    Quite a bit, quite a bit.

Q.    Whether it's a proficiency test or not --

A.    Quite a bit.

Q.    -- what have they said?

A.    They published an article doing a statistical review of the data from that workshop, and their outcomes were published. Later --

Q.    Okay.  Let me show you what was marked as --

A.    -- they published a retraction of that article, which is now their position.

Q.    Okay.  Have you seen what -- this is Government Exhibit 172.  It's the ABFO position paper on bite mark evidence --

A.    Uh-huh.

Q.    -- and their, on Workshop 4.  And they state, quite simply, "This workshop was not designated to be a proficiency examination."  Have you seen this paper?

A.    Most of it, yes.

Q.    That's kind of different than what you agreed to earlier about that, the slide in this, isn't it?

A.    The slide?

Q.    The slide that you agreed to that you said that they had not --

A.    Right.

USCA5 3952

Q.    -- that forensic odontology has not created or administered bite mark --

A.    At the time, in 1999, it was I think a very good effort. It certainly had the intention of being a proficiency test. There was --

Q.    Let me ask you --

A.    The arguments back and forth have a lot to do with the design.  I think the organization needs to establish a new version of proficiency testing.

Q.    I think everybody in the AF -- would you agree that everybody in the AFBO (sic) and all the forensic odontologists agree that this field of bite mark evidence and its use in courtroom or use for identification still needs to be reviewed and continued to be considered with regard to how well it's performed?

A.    The organization certainly feels that way, and there's improvement that needs to be made.

Q.    Okay.

A.    That's what we all agree on, about the only thing.

Q.    But you still believe that Workshop No. 4 was a proficiency testing?

A.    From the documents at the time, yes.

Q.    And that's different than what the AFBO (sic) believes?

A.    Yes, sir.

Q.    Okay.  Let me ask you about the Frimpong case and then ask

USCA5 3953

you about the Alabama v. Ramirez-Vite, and then I'll be done.
Has receiving income from your testimony, or receiving income
from your role as a forensic odontologist ever affected your
opinion in any case?

A.    No.

Q.    Okay.  In the Frimpong case, you recall that that was a
rape of a woman?

A.    Yes.

Q.    And there were bite marks on this woman, were there not?

A.    Yes.

Q.    And who was -- was it Frimpong that was accused?
Obviously his name's in the case number.  Was it Frimpong that
was originally accused of raping the woman?

A.    Yes.

Q.    And when you were approached, when you first were
approached in this case, they didn't have money, no one had
money to pay you, but they asked you to do an analysis of the
bite marks.  Is that right?

A.    That's incorrect.

Q.    That is incorrect?  Did they pay you -- did they offer to
pay you right up front?

A.    I was contacted by an attorney --

        THE COURT:  Okay, listen to the question.

        THE WITNESS:  Yes.

        THE COURT:  Did anybody offer to pay you up front?

USCA5 3954

THE WITNESS:  Up, in advance?

THE COURT:  Yes.

THE WITNESS:  Oh, no.

THE COURT:  Okay.  Move on then, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.   But you agreed to analyze the information, and you concluded that you -- you concluded that it was a bite mark, but you could not exclude Frimpong.

A.   No.

Q.   You didn't?  Oh.  Do you remember your testimony?

A.   Yes, I do.

Q.   Are you telling us that first of all, when you first testified in the case, are you telling us that you were able to exclude someone?  When you first testified?

A.   Yes.

Q.   You were?

A.   First -- I've only testified once at a post-conviction hearing.

Q.   This case, I'm going to show you the caption, People versus Frimpong, California.  And you were being questioned by a Mrs. Baron in that case?

A.   Yes, uh-huh.

Q.   And in that case, you were asked a question about whether --

USCA5 3955

THE COURT:  We can't see that.

MR. ROBERTS:  I'm sorry, Your Honor.  I'm trying to get, let me, I'm going to --

THE COURT:  Center it.

MR. ROBERTS:  I'm going to pull this thing off here, so it will be easier.  Sorry.  It's awful thick, Your Honor.

BY MR. ROBERTS:

Q.   Okay.  I've highlighted a few places here in yellow.  But you were asked about, you were hired, you first registered an opinion that it was just a bite mark.  You remember her asking you that question?

A.   I sure do not.

Q.   You don't?

A.   No.

Q.   But you did testify that you agreed with that, that you had --

A.   Well, we need to slow down here a little bit.  Let me finish reading this.  The question was, "Well, you were hired because you, you first registered an opinion that" --

Q.   Do you need to see the entire transcript so you can verify that this is your testimony?

A.   Sure.

Q.   All right.

A.   I'm not quite -- I would like to read that, yes.  Thank you.

USCA5 3956

Bowers - Cross                    109

THE COURT:  So your whole specialty is never any good in criminal law of any kind?

THE WITNESS:  The forensic specialty?

THE COURT:  Yeah, forensic odontologist.

THE WITNESS:  Ma'am, the book -- thank you for the question.  The book that he held up, my position in that book is bite marks are excellent to recognize, to document and for investigators to sample DNA from the area.

THE COURT:  Okay.  So you can recognize -- so they're good to say, "This is a bite mark," and to get DNA from the tooth, or from the saliva if it's fresh.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  And Your Honor, what I'm about to show is from his testimony in Frimpong, he actually testified, under oath, that he could exclude the Defendant Frimpong, after he sat here and told us he can't do that.

THE COURT:  I know.  I saw that.  So show it to him and see what that means.

MR. ROBERTS:  Yes, Your Honor.

THE WITNESS:  Oh, I don't -- fine.  You clarified it for me.  Yes, I did -- I don't need to see it.

BY MR. ROBERTS:

Q.   Now you remember?

A.   Yes.

Q.   Okay.

USCA5 3957

A.   Yes, I did exclude Frimpong.

          THE COURT:  Because he had no teeth.  No?

          MR. ROBERTS:  And no bite mark.

          THE WITNESS:  Thank you, Your Honor.

BY MR. ROBERTS:

Q.   But you didn't exclude him first.  At the first time you evaluated it, you couldn't exclude him.

A.   That was -- that was Ray Johanson's opinion.

Q.   I'm sorry, the testimony says it's yours.  Do I need to show you that?

A.   That says something different.  No, I saw it on the screen.  That's fine.

Q.   You first testified that you could not exclude Frimpong. And then later, when the Defense was able to come up with money, you came back in and you testified that you could exclude Frimpong.

A.   I never first testified.  I only -- I never testified --

Q.   Okay.  Well, first, let's clarify this.  Did you --

A.   I never testified at the trial.

Q.   Did you give --

          THE COURT:  Okay, wait, wait, wait.  What he's saying is when you were first approached, did you say that you --

          MR. ROBERTS:  Could not exclude anyone.

          THE COURT:  -- could not exclude anybody?

          THE WITNESS:  No.

USCA5 3958

MR. ROBERTS:  You didn't say that?

THE COURT:  Okay.  Well, that's what it says in the testimony.

THE WITNESS:  Yes, it certainly does.  I'm sorry.

THE COURT:  It does say that.

THE WITNESS:  Yes, it does, ma'am.  Yes.

THE COURT:  Speak up.

THE WITNESS:  Yes, Your Honor, it does say that.

THE COURT:  And then later, the intimation was, later when the Defendant's paid you money, you were able to say, "I can positively exclude Frimpong as the biter."

THE WITNESS:  I've --

THE COURT:  Do you remember that?  Because that's what the transcript says.

THE WITNESS:  Right.  The connection of those two didn't occur.

MR. ROBERTS:  Okay.

THE COURT:  Okay.  So there's no connection between the money and the testifying.

THE WITNESS:  Yes, ma'am.

BY MR. ROBERTS:

Q.   But you did at first testify you could not exclude Frimpong, and you later testified that you could exclude him.

A.   I never testified --

Q.   I'm sorry.  You know what, you're right.

USCA5 3959

THE COURT:  It's not testifying.

MR. ROBERTS:  It's not testifying.  It's my fault for saying the wrong word.

THE COURT:  So be very specific here.

MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.   You gave an opinion initially --

A.   Out of court.

Q.   -- after reviewing --

A.   Out of court?

Q.   Out of court.

A.   Okay.

Q.   Reviewing the evidence, you gave an opinion, and you were not being paid at the time, that you could not exclude Frimpong.

A.   I did not.

Q.   You did not do --

A.   I did not originally render an opinion saying I could not exclude Frimpong.

Q.   Okay.

THE COURT:  Okay.  Well, that's not what that transcript shows.  Is that right?

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  So your testimony --

THE COURT:  So you're saying your testimony, your

USCA5 3960

actual testimony was incorrect?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. ROBERTS:

Q.   So you testified incorrectly in California under oath?

A.   Taking the face value of that transcript, that was not a correct statement.

Q.   Okay.  And you were under oath, were you not, when you were testifying in that case?

A.   I certainly was.

Q.   Okay.  Do you know whether or not the Judge ultimately found you to be a credible witness in that case?

A.   The Judge didn't pick my opinion as being credible, didn't.

Q.   Did not?

A.   Did not.

Q.   In fact, let's -- I'd like to show you what's Page 411, and just so you know, I highlighted the case against Frimpong. And this is the Judge's opinion, where the Judge said, "The question becomes, what about Dr. Bowers' testimony that Mr. Randall," who's the one you ultimately identified as a possible source of the bite mark.  And the Court said, "I did not find Dr. Bowers' testimony on that issue to be credible." So you agree that the Judge found you not to be credible?

A.   That was in the appellate statement.  The Judge agreed

USCA5 3961

with the prosecution.  The Frimpong --

Q.   Okay.  My sole question is --

A.   Okay, fine.

Q.   -- did the Judge find you to be not credible?

A.   He did not agree with -- he did not agree with my opinion.
That's quite obvious.  That's all I know about the Judge.

        MR. ROBERTS:  I'm sorry, Your Honor, I was going to
move on, but there is one more, I just, I can't --

        THE COURT:  You've got something else?

        MR. ROBERTS:  I do, Your Honor.  I asked him about
the financial situation.

        THE COURT:  I got that.

        MR. ROBERTS:  And there's a part here in the case,
and I was just curious -- it's so thick.

        THE COURT:  You keep clipping and unclipping there.

        MR. ROBERTS:  Yes, Your Honor.

BY MR. ROBERTS:

Q.   On Page 119 --

A.   I'm sorry.  What case is this?

Q.   This is the Frimpong still.

A.   Frimpong, yes, sir.

Q.   I'm just going to show you, the question, from Ms. Baron
was, "Was it more to your benefit financially after you had
registered the opinion on December the 21st that was favorable
to Mr. Frimpong?"

USCA5 3962

And you said, "I provided a service that was asked of me, and I am getting paid for it, just like you are rendering a service and getting paid, Counselor."

And it's, "Dr. Bowers," the Court said, "just answer the question."  So --

THE COURT:  I sympathize.

BY MR. ROBERTS:

Q.   You do remember that testimony?

A.   Vividly.

Q.   In the Alabama case, you were asked about this same testimony, and that just happened in June of this -- July of this year.  Correct?

A.   Yes, sir.

Q.   You actually explained or tried to explain why you changed your opinion.  Do you remember giving an explanation in the Alabama case as to why you changed your opinion?

MR. McHUGH:  Your Honor, that's a mischaracterization of the Alabama testimony, and I object.

THE WITNESS:  I have --

THE COURT:  I don't know what it is.  We'll have to find out.  So I'm going to overrule your objection, subject to reconsideration as things progress.

THE WITNESS:  I'm sorry.  You asked me if I remembered my testimony?

BY MR. ROBERTS:

USCA5 3963

Q.   What I'm asking you is do you remember, when you were testifying in the Alabama case, do you remember being asked about the Frimpong case?

A.   In general, yes, I remember that.

Q.   And do you remember a question posed to you -- let me find it here.  This is just so you can see it up at the front page, State of Alabama versus Ramirez-Vite.  On Page 108, you were asked some questions about the role of bite mark analysis.  And then they mentioned the case that you had testified a few years ago in California.  And they asked you if anything about your opinion in that case or the science of a bite mark analysis had changed, and that's your answer.  Could you read that out to us?  Can you see it well enough?

A.   Um --

Q.   Starting with the "A."

A.   Below, on Line 3?  On Line 3?

Q.   Line 3, correct.

A.   Okay.  Okay.  The question is has anything regarding my opinion on bite mark analysis changed.

     "Well, the inclusion/exclusion I did was done as an example -- well, the evidence, the way I analyzed it was attempted to show the jury -- the jury -- that the bite mark evidence was ambiguous.  The orientation where you placed the teeth were compelling to more than just one orientation, meaning if you determine upper teeth in one area, the lower

USCA5 3964

teeth in the other, you could reverse it, and at the same time get a better match with it than an individual that was not on trial.  That was the reason I did that."

Q.   And when you said, "I did that," what were you referring to?

A.   That I had formed an opinion of the orientation of the teeth to the bite mark that was different than the dentist --

Q.   Than your first opinion?

A.   -- at the trial.

Q.   Okay.  And you actually -- did you actually invert the bite mark so that you could then reach a conclusion?

A.   No.  Inversion is not the proper term.

Q.   You didn't do that in that case?

A.   No.

Q.   Well, what is the proper term?

A.   It's called move it, the teeth 180 degrees counter clockwise, reversing the upper -- reversing the upper teeth/lower tooth orientation that the State odont had used at trial.  So that's what I did.

Q.   Dr. Bowers, if I understand your testimony correctly, bite mark evidence is still an area in forensics that is going through review, and it still may not be completely up to the same level of scientific --

THE COURT:  He said it's just plain old not reliable.

MR. ROBERTS:  That's what he says, Your Honor.

USCA5 3965

THE COURT:  So let's move on.

MR. ROBERTS:  Okay.  What I wanted to ask him is --

THE COURT:  There's no misunderstanding that one.

MR. ROBERTS:  Yes, Your Honor.  Just my final question.

BY MR. ROBERTS:

Q.   While you believe that it's unreliable, a lot of that is based on the fact that it depends on the person doing the test as to what the outcome is and how their level of integrity is in order to make sure it's a reliable outcome in the bite mark evidence analysis.

A.   That's one of the variations is inter-examiner differences.

Q.   Okay.

A.   Different results from different people.

Q.   Do you have any reason to question the integrity of Dr. Senn and his reason for finding conclusions in this case?

A.   Absolutely not.

Q.   Okay.

MR. ROBERTS:  That's all I have, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  You worried?

THE COURT:  Do you have more?

MR. McHUGH:  Yeah, not too much.

THE COURT:  Okay.

USCA5 3966

MR. McHUGH:  A couple of areas.

REDIRECT EXAMINATION

BY MR. McHUGH:

Q.    Dr. Bowers, you were questioned about your testimony under oath in the Frimpong case, where there was a mistake that you recognized here today that you testified --

A.    Yes.

Q.    -- concerning whether you had rendered an opinion at one point and then changed the opinion.  When you reviewed the opinion of Dr. Senn in this case, Bourgeois, where he was under oath and he said, "All bite marks are unique, including identical twins," he was under oath at that time.  Isn't that right?

A.    Yes, sir.

Q.    And in front of the NAS, the National Association of Sciences, he took a different opinion, is that right, where he says, "Uniqueness has not been scientifically validated"?

A.    Yes.

Q.    Okay.  Counsel talked to you about the possibility that money may somehow affect your opinion.  Well, wouldn't it be fair to say that if bite mark testimony, you as a forensic odontologist, is not accepted in court, that that would be, have a negative impact on you and other forensic odontologists who get paid to come into court and testify?

A.    We wouldn't have jobs.

USCA5 3967

Q.    Okay.

        THE COURT:  But you can keep coming in and testifying that your services are not any good.

BY MR. McHUGH:

Q.    Well, my -- if it's determined by courts that bite mark is not admissible, then it wouldn't be in court, and you wouldn't need to come in and rebut it, would you?

        MR. ROBERTS:  Objection, leading.

        THE COURT:  Don't bother.  Go on.

BY MR. McHUGH:

Q.    The Counsel questioned you about this debate, eleven-year debate about whether 1999 was a proficiency test and whether it wasn't.

A.    Uh-huh.

Q.    You identified it in 1999 as a proficiency test, but in fact you identified it as a proficiency test that was showing that there was not a good rate of success for forensic odontologists.  Is that right?

A.    Accuracy was average, and error rates were too high.

Q.    So whether you call it proficiency or you call it what the ABFO called it, at that time you were both saying that, whether it was proficiency or accuracy, it was inadequate to substantiate and rely upon in 1999.  Is that right?

A.    At one point, we both agreed on that.

Q.    And now Dr. Senn and the NAS also has agreed that there's

USCA5 3968

not enough proficiency testing for reliability of forensic

odontologists' bite mark comparison identification.  Is that

right?

A.    That's correct, meaning that the testing would support

reliability of our opinions.

Q.    Okay.  And Counsel showed you a book that was written that

he quoted from it, and what was the title of that book?  Do you

recall?

A.    Forensic Dental Evidence, An Investigators' Handbook.

Q.    And that's a big difference, isn't it?  That book was

written as a guide for investigators.  Is that right?

A.    The whole intention of that book was to inform evidence

technicians and BI people to what the physical characteristics

were of bite marks and all the various types of bite marks they

needed to, they needed to -- that might be good if they knew

what it looked like in inanimate objects, where they could

possibly collect saliva.  And so it was definitely a CSI

technician point of view.  I didn't get into legalities --

Q.    Right, and --

A.    -- for obvious reasons.

Q.    And you would agree with me, as Her Honor questioned you,

there's a big difference between use of bite mark forensic

odontologists to investigate such, but as opposed to admission

into a trial.  Is that right?

A.    The tooth --

USCA5 3969

THE COURT:  I don't understand what you're saying.

BY MR. McHUGH:

Q.    Well, the NAS says that it can be used for purposes of excluding.  And that would be something that you could rely on for purposes of investigation.  Is that fair to say, in looking for DNA?

A.    Yeah, investigatory --

THE COURT:  Well, why couldn't you testify to that? You just said it wouldn't be admissible at trial.

MR. McHUGH:  All other aspects, identification, inclusion, things of that nature, the NAS -- what I'm saying is there's a difference between relying on something for purposes of investigation, as opposed to admissibility in court.

THE COURT:  Could you let him testify?

BY MR. McHUGH:

Q.    That's my question, is there a difference?

A.    Yes, sir.  The difference is just like polygraph tests being used during investigations prior to trial.  The physical aspects of bite mark analysis would aid the police.

Q.    And that's what that book that you're writing about, where you're talking about how this can be a valuable tool is a book written for investigators.  Is that right?

A.    Yes, it is.

Q.    Okay.

THE COURT:  Well, investigators that can't testify.

USCA5 3970

MR. McHUGH:  It happens all the --

THE WITNESS:  No.

THE COURT:  Okay.  Let's -- are you done?

MR. McHUGH:  Just let me review, Your Honor.  I think I might be.

BY MR. McHUGH:

Q.   Oh, Counsel talked to you about the fact that you didn't provide me with the entire PowerPoint presentation of Dr. Senn. Well, when I provided you with the materials that the Government provided to me, for purposes of this hearing, did I provide you with the NAS report?

A.   Yes.

Q.   Well, as coming from the Government?

A.   Yes.

Q.   You got a copy of the --

THE COURT:  Okay, don't ask him 15 times.  Could we go with the first answer, even if you don't like it.

MR. McHUGH:  I'm not -- well, I'm just saying --

THE COURT:  Move on, please.

BY MR. McHUGH:

Q.   You got a copy of the --

THE COURT:  Please, sir, move on.

BY MR. McHUGH:

Q.   Counsel gave you an example of somebody in a closed cell, with a highly unique set of teeth.

USCA5 3971

A.    Uh-huh.

Q.    Counsel did not talk to you about the issue of whether uniqueness in teeth can be analyzed from skin.  Is that right?

A.    That's right, he did not.

Q.    And the reason that you would have problems making that identification is because of what we've testified, or what you've testified here today about the variability in skin and the lack of reliability.  Is that right?

A.    Skin is unpredictable.

Q.    And then the slide that Counsel questioned you about, about "Bite mark analysis is too important and valuable to investigation and adjudication of certain crimes to be discounted or overlooked," the NAS did not include that in their report, that part of Dr. Senn's presentation, did they?

A.    No.

          MR. McHUGH:  I have nothing further, Your Honor.

          THE COURT:  Thank you, sir.  Mr. Roberts?

          MR. ROBERTS:  No questions, Your Honor.

          THE COURT:  Thank you, sir.  You may stand down. Call your next witness.

          MR. WISEMAN:  Mr. Gilmore.

          THE COURT:  Okay.  Thank you.

          MR. McHUGH:  Oh, Your Honor, I would just ask to move my exhibits.  I have to get that PowerPoint together because it was slipping around.

USCA5 3972

THE COURT:  That would be good.  Is that an exhibit?

MR. McHUGH:  Yes.

THE COURT:  Would you give it to Ms. Scotch?

MR. McHUGH:  Yes, Your Honor.

MR. ROBERTS:  Your Honor, also just to -- I don't recall if you -- I know you accepted 204, but I don't know about 172A.

THE COURT:  Government's 172 is admitted, if there are no objections.  What else?  172A.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  And the deposition?  Did you offer Frimpong?

MR. ROBERTS:  I did not, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Gilmore, could you come forward, please, sir?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Would you administer the oath.

(Witness sworn.)

THE WITNESS:  Your Honor, may I take my briefcase with me?

THE COURT:  Absolutely.  Everybody else has taken at least three.

THE WITNESS:  Okay.

JOHN GILMORE, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

USCA5 3973

BY MR. WISEMAN:

Q. Mr. Gilmore, good afternoon. I appreciate your showing up, and I'm sure you know you're not supposed to touch the microphone?

A. I'm not going to touch the microphone. I've never testified in federal court before, so --

Q. Well, okay. But you've been in this courtroom.

A. Yes.

Q. Could you state your name for the record, please?

A. John Gilmore.

Q. And what's your relationship to the case of United States versus Alfred Bourgeois?

A. I was appointed to represent Mr. Bourgeois in I think July of 2002.

Q. I want to put up for you on the overhead what's been marked as Petitioner's 83, ask you if you recognize that document.

THE COURT: Could you zoom that in so we can see what it is?

MR. WISEMAN: Sure. Is that good, Your Honor?

THE COURT: Thank you.

BY MR. WISEMAN:

Q. Do you recognize that, sir?

A. Yes.

Q. And what do you recognize it to be?

USCA5 3974

A.    It looks like a response affidavit saying that I've never been found to be ineffective.

Q.    Okay.  And that's in this case it was filed?

A.    I can only see part of it.

Q.    Okay.  I'll move it down a bit.

A.    Yes.

Q.    Okay.  So that's the affidavit you filed in this case?

A.    Yes.

Q.    And that was at the direction of Judge Jack?

A.    To tell you the truth, I can't remember, but --

        THE COURT:  I can't either.

        MR. WISEMAN:  I think the record will show that it was at the Court's direction.

        THE COURT:  Okay.

BY MR. WISEMAN:

Q.    Is that your signature on the last page?

A.    Yeah, that's it.

Q.    And it's four pages, attached are the summaries, and the PACER printout says Page 4 of 5.  I can't locate a fifth page.

A.    Okay.

Q.    Now, when you completed this declaration, it was a declaration in response to the allegations in the petition that my office filed on behalf of Mr. Bourgeois?

A.    I believe so.  I don't have any independent recollection of preparing that affidavit or signing the affidavit.

USCA5 3975

Q.   Well, let me ask you to read it to yourself, if I can.

MR. WISEMAN:  May I approach the witness, just so he can see it?

THE COURT:  Can't you put it on the overhead document camera?

MR. WISEMAN:  Well, each page?

THE COURT:  Oh, that's okay.  Give it to him.

MR. WISEMAN:  Okay.

(PAUSE.)

THE WITNESS:  Okay.  I recall it.

BY MR. WISEMAN:

Q.   Okay.  And that's a sworn declaration?

A.   Yes.

Q.   And you -- it's notarized on the last page?

A.   Yes.

Q.   And given the seriousness of the issues before the Court, I would imagine you took some time in giving some thought to the responses that you gave?

A.   Yes.

Q.   You reviewed the petition and then responded to the allegations in it?

A.   Yes.

THE COURT:  Have we finished with the experts, by the way?

MR. WISEMAN:  Uh --

USCA5 3976

(Counsel conferring off the record.)

MR. WISEMAN:  There's one more I'm calling.

THE COURT:  Okay.  Who is that?

MS. LARIN:  Mr. Keel.

MR. WISEMAN:  Oh, that's right, Mr. Keel.

MS. LARIN:  Alan Keel.

MR. WISEMAN:  Regarding DNA.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   Do you recall, Mr. Gilmore, that the Government filed a motion to compel you to complete this declaration?  I mean, I don't want to test your memory, but the record reflects --

A.   You're talking about two years ago.

Q.   I appreciate that.  Docket Entry 435 is an unopposed motion to compel trial Defense Counsel to file responsive affidavits by the USA.  That was filed on 7/31.  And subsequently, you completed this declaration.

A.   Somebody asked me to do it or told me to do it, and I did.

Q.   All right.  Yeah, I think the Judge told you --

A.   Okay.

Q.   -- and the Government asked you.

A.   Okay.

Q.   Do you recall at that time Mr. Douglas Tinker was your co-counsel in this case?

A.   That's correct.

USCA5 3977

Q.   And he was affiliated with your law office in some way?

A.   We officed together.

Q.   And at about the same time that you completed this declaration, do you recall Mr. Tinker having completed certain interrogatories that were provided to him by the Government?

A.   I think he had, I think he had answered some questions prior to him being diagnosed with the, with cancer.  And then I think we attempted to answer some interrogatories after his surgery.

Q.   Okay.  And just so we move along in an orderly way here, this is P-82.  Does this appear to you to be the interrogatories responded to by Mr. Tinker?  Would you recognize his signature?

A.   I'd recognize Doug's signature, yes.

Q.   Let me turn to the last page.  That's Page 13.  Does that appear to be Mr. Tinker's signature?

A.   That's his signature after he had surgery, yeah.

Q.   If I told you that the record shows that these were the Government's interrogatories and that regrettably he became too ill to respond to the ones propounded by my office, does that refresh your memory?

A.   I remember going over to his house and speaking with him, and I think it was your interrogatories, and going through them with him, and I was going to write down his responses, but he was unable to remember.  I don't think he could remember any of

USCA5 3978

the answers.

Q.    And I know we all know it, but just for the purposes of the record, he passed away a couple of years ago?

A.    That's correct.

Q.    You described attempting to assist him to complete the interrogatories my office propounded.  Did you similarly assist him in responding to the Government's?

A.    I remember doing it one time.  I remember asking, doing it one time.  And that was sitting at his kitchen table.

Q.    Did you discuss with him his views of the issues that were presented in our petition?

A.    I believe we spoke about them when you filed the petition.

       MR. WISEMAN:  Your Honor, at this time I would offer in evidence P-82, which is Mr. Tinker's response to the Government's interrogatories, as well as --

       THE COURT:  Any objection to P-82?

       MS. BOOTH:  None at all.

       MR. WISEMAN:  And we would --

       THE COURT:  P-82 is admitted.

       MR. WISEMAN:  All right.  We would offer P-83, being Mr. Tinker's sworn declaration.

       THE COURT:  P-83?

       MR. WISEMAN:  I'm sorry, Mr. Gilmore's.

       MS. BOOTH:  No objection.

       THE COURT:  Mr. Gilmore.  P-83 is admitted.

USCA5 3979

MR. WISEMAN:  Thank you, Your Honor.

BY MR. WISEMAN:

Q.  I just want to put up for you for a moment what's been marked as P-81.  And I have to acknowledge that I am unclear if that's been admitted.

THE COURT:  Pardon?

MR. WISEMAN:  The sheet that I received from Ms. Scotch does not show this has been admitted, although I thought I had admitted it.

THE COURT:  P-81?

MR. WISEMAN:  Yes.

THE COURT:  P-81's admitted.  How's that?

MR. WISEMAN:  Okay, great.

BY MR. WISEMAN:

Q.  Do you recognize this document, sir?

A.  Um --

Q.  From the 12,000 pages that were in your file?

A.  I really don't, to tell you the truth.

Q.  Okay.  Well, you see it's --

A.  I see my name on there.  It's Hunter --

Q.  Okay.  It's Hunter Medical Services.

A.  Okay.

Q.  Billed to John Gilmore.

A.  Okay.

Q.  And it's regarding Mr. Bourgeois.  You see that?

USCA5 3980

A.   Yes.

Q.   Okay.  And are these records that were obtained in the course of your representation?

A.   I assume that they were.

Q.   Okay.  And you see the date of invoice, 2/20/04?

A.   Okay.  Yes, I do.  I see that.

          MR. WISEMAN:  Thank you, sir.  I have no other questions.

          THE COURT:  Ms. Booth?

          MS. BOOTH:  I have a few.

          THE COURT:  Somehow I knew you would.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good afternoon, Mr. Gilmore.

A.   Hello, Ms. Booth.

Q.   I'd like to ask you where you graduated from law school.

A.   St. Mary's University in San Antonio.

Q.   And how long have you been practicing law?

A.   Since November of 1979.

Q.   And in November of 1979, what was your first job?  What did you do first?

A.   I was kind of an independent, like hung out my shingle and started practicing law.

Q.   And did you, were you a prosecutor?

A.   I was a prosecutor.  I was hired as a prosecutor for San

USCA5 3981

Patricio, Aransas, Bee, Live Oak and McMullen County in I think June of 1982.

Q.   And how long were you a prosecutor?

A.   Twelve years.

Q.   And during that period of time, how many Defendants do you think that you came in contact with as a prosecutor?

A.   Oh, thousands.  Twelve years?  Thousands.

Q.   And did you ever come in contact with people or Defendants that you believed that might be in some way mentally retarded?

A.   Yes.

Q.   On one or many occasions?

A.   Several occasions.

Q.   All right.  And when you would identify them as mentally retarded, were there actions that you would take as a prosecutor?

A.   Well, you know, if there's a psychiatrist whose opinion I respected or a mental health expert whose opinion I respected, I would take the appropriate action, whatever that might be. If you're asking me specifically about any case, I don't recall, but --

Q.   Okay.  Now, after you were a prosecutor, what did you do?

A.   I went to work as a criminal defense lawyer.

Q.   All right.  And when you were a prosecutor, did you ever handle death penalty cases?

A.   I prosecuted two death penalty cases.

USCA5 3982

Q.   Okay.  And now as a defense attorney, how long have you been a defense attorney?

A.   Since 1994.

Q.   Have you ever handled death penalty cases?

A.   I've handled several death penalty cases.

Q.   And when you say several, is that three or is that eight or is that ten?

A.   I'm trying to think back, Ms. Booth.  I think it's been over ten, probably eleven death penalty cases.

Q.   All right.

A.   That started out as death penalty cases.  Three tried to conclusion as death penalty cases.  Others were resolved without --

Q.   You were able to get pleas for your people?

A.   Get pleas, or in the middle of the trial have the prosecutor realize that they couldn't prove their case, things like that.

Q.   All right.

A.   And I've tried probably about ten non-death capital cases.

Q.   And how many cases do you think that you've tried just in all types of felony or misdemeanor cases since you've been just a defense attorney?  Do you have a number?

A.   I probably average, I was trying to think the other day, I probably average about 20 trials a year, so --

Q.   All right.  And in fact, let me ask you, like in 2000,

USCA5 3983

weren't you named the Criminal Defense Lawyers' Attorney of the Year?

A.   Yeah, for Nueces County, yes.

Q.   Okay.  And then in 2008, weren't you named the Criminal Defense Lawyers' Lawyer of the Year?

A.   Yes.

THE COURT:  Doesn't Ms. Booth call you Atticus Finch?

THE WITNESS:  Yes, Judge.  I'm sorry.

THE COURT:  Wasn't there -- seems like there was a time, Mr. Gilmore, somewhere during the trial that I put on the record how many death penalty cases you have tried and how many Mr. Tinker had tried, because the two of you have tried more than anybody in the surrounding area.

THE WITNESS:  That's correct, Judge.

THE COURT:  And I can't remember how many Mr. Tinker had.  Significantly more than you.

THE WITNESS:  He had probably twice as many, maybe more than that.

THE COURT:  Do you know if Mr. Tinker knew anything about DNA?

THE WITNESS:  Mr. Tinker was probably the leading expert in at least this part of the country on DNA.

THE COURT:  The reason I mention that is that there was a DNA expert that testified that he didn't seem to know anything about DNA.

THE WITNESS:  Well, that would be incorrect.  He tried numerous cases involving DNA evidence.

BY MS. BOOTH:

Q.   Now, how did Mr. Tinker get appointed to this case?

A.   Mr. Tinker volunteered to help me try the case because it was apparent from the beginning that this was going to be a difficult case.  He volunteered to help and came in, and Judge Jack appointed him.

Q.   Now, if you would -- if Judge Jack would have said, "Mr. Gilmore, you get to pick whoever you want from any area that I have authority to appoint," who would you have picked?

A.   Well, Douglas Tinker.

THE COURT:  I think that's kind of what happened, wasn't it?

THE WITNESS:  Yes.

THE COURT:  You kind of roped him into it, and I appointed him.

THE WITNESS:  I got him roped into it.  Now I'd pick Jimmy Granberry, but --

BY MS. BOOTH:

Q.   And so I believe, do you remember being in the courtroom when the Judge, she talked about that question about how many cases, death penalty cases you two may have tried between each other?  And do you remember the number of 25 being thrown around?

USCA5 3985

A.    That could possibly be, yes.

Q.    Okay.  And Mr. Tinker, do you remember him being named by the State Bar as the Criminal Defense Attorney of the Year for the State of Texas?

A.    I think it was in 1995.

Q.    All right.  Do you remember him receiving an award -- and let me ask you, did Mr. Tinker keep a vitae?

A.    No.

Q.    And --

THE COURT:  I couldn't even get him to do a bill. Remember that, Mr. Gilmore?

THE WITNESS:  Yes, I do, Judge.

BY MS. BOOTH:

Q.    How many times do you think that he spoke, just in the State of Texas for the State Bar in different continuing legal education programs?

A.    Hundreds.

Q.    Hundreds?

A.    Hundreds.

Q.    All right.  And was he asked to speak out of the state, where the state would have conventions in other locations?

A.    For the National Criminal Defense Lawyers' Association, yes, he would.

Q.    All right.  And do you remember a few years ago when he was named by some criminal defense lawyers' association to be

USCA5 3986

one of the top ten criminal defense lawyers in the nation?

A.   Yes.

Q.   All right.  Now, since you've been a defense attorney, how many -- could you give me a number of how many Defendants that you've actually defended?

A.   It's got to be in the thousands.  I can't tell you exactly.  I don't keep statistics or anything like that.

Q.   Okay.  And have you, in that thousand of people that you've dealt with, have you ever come in contact with Defendants that were mentally retarded?

A.   I have.

Q.   And what do you do when you come in --

THE COURT:  Could you speak up just a little bit, Mr. Gilmore?

THE WITNESS:  I'm sorry, Judge.

THE COURT:  Ms. Cayce, can you hear Mr. Gilmore all right?

THE WITNESS:  Should I pull the --

MS. BOOTH:  But you cannot touch --

THE WITNESS:  I can't touch it?

MS. BOOTH:  No.

THE WITNESS:  I've been trying to scoot up so I can --

THE COURT:  You know, I've been telling people if they'll just put their right arm on the shelf there, it leans

USCA5 3987

you right into the microphone.

THE WITNESS:  Okay.  How's that?

THE COURT:  Thank you, sir.

THE WITNESS:  There.

BY MS. BOOTH:

Q.   Now, when you would come in contact with the Defendants that were mentally retarded, what would be your practice?  What do you do when a person that's been accused of a crime comes to you and they present to you as mentally retarded?

A.   Get a mental health expert to do an evaluation.

Q.   All right.  Has this happened on one or more than that occasions?

A.   You know, there's issues involving competency, there's issues involving insanity and mental retardation.  If you're just keeping it to the mental retardation, you know, it's probably around ten maybe.

Q.   Okay.  If we're making it broader than that, for people that have insanity issues or competency issues, how many Defendants do you think you've come in contact with that kind of --

A.   I'd say it's around 50 maybe.

Q.   And do you know a person by the name of Alfred Bourgeois?

A.   I know Mr. Bourgeois.

Q.   And were you appointed by this Court to represent Mr. Bourgeois?

USCA5 3988

A.    I was.

Q.    Do you remember when you were appointed by this Court?

A.    I remember where I was when I got the phone call from Judge Jack, yeah.

Q.    Okay.  And do you remember it being in the end of 2002?

A.    I thought I was appointed in July of 2002.

Q.    Okay.

A.    That's -- I found my time records, or at least a partial of my time records, and it looked like my first entry was July of 2002.

Q.    Well, let me ask -- in 2002?  Well, when you got appointed to represent Mr. Bourgeois, did you go and see him?

A.    You know, the 2002 may be inaccurate, because I think Judge Jack made us submit interim billing, and so I --

        THE COURT:  I did, because I was having a hard time getting bills from Mr. Tinker.

        THE WITNESS:  Yeah.  So the 2002 may not be accurate.

        MS. BOOTH:  Your Honor, I would ask the Court to take judicial notice of its docket and of all the records that pertain to the appointment of Mr. Tinker and Mr. Gilmore.

BY MS. BOOTH:

Q.    And in that, well, let me just ask you, after you got appointed to Mr. Bourgeois, did you go and see him?

A.    Yes.

Q.    And when you went to see him and you spoke to him, how did

USCA5 3989

he present himself?

A.    I didn't detect any -- if you're talking about mental health-wise --

Q.    Uh-huh.

A.    -- I didn't notice any problems.

Q.    And when you were first appointed to Mr. Bourgeois, were the charges at that time on Mr. Bourgeois, or do you remember, were they a capital murder case?

A.    No.

Q.    Do you remember what he was first charged with?

A.    I believe it was second degree murder.

Q.    And when you went to speak to Mr. Bourgeois, had you -- the first time you spoke to him, had you looked at the evidence before that?  Or did you look at it after you spoke to Mr. Bourgeois?

A.    That's six years ago.

Q.    Right.

A.    I can't remember.

Q.    Right.

A.    I'm sure that I knew something about the case before I went to talk to him.

Q.    All right.  Did you ever -- during that period of time, did you ever recommend to Mr. Bourgeois that he try to involve himself in a plea of guilty?

A.    I did.  And you know, I think the first time I met

USCA5 3990

Mr. Bourgeois was in the courtroom.  I think the Judge substituted me in on the case.

THE COURT:  For the Public Defender, I did.

THE WITNESS:  For Mr. Gonzalez.

THE COURT:  Because they couldn't do capital -- it looked like it was going to be a capital case, and I think our Public Defenders do not do capital cases.

THE WITNESS:  Right.  And I think Mr. Gonzalez-Falla had a conflict.  He had represented one of the inmates who was going to testify against Mr. Bourgeois.

MS. BOOTH:  There was a conflict, Your Honor.

THE WITNESS:  It was a conflict.

THE COURT:  You know, I don't know, because the local Federal Public Defender's office played a role in finding habeas counsel.

MS. BOOTH:  Uh-huh.

THE COURT:  So I didn't think there was a conflict, but I guess there must have been.

MR. WISEMAN:  Your Honor, I can clarify it if you want me to.

THE COURT:  Tell me that.

MR. WISEMAN:  My understanding is that there was a conflict.  That's why they got off of this case.  I do believe the Court is correct that they do not do capital habeas cases, I believe.

USCA5 3991

THE COURT:  They don't do capital habeas, but I didn't think they did capital murder cases either.  Maybe -- maybe they do.  But I've never --

MS. BOOTH:  Your Honor, we developed a witness that had been represented --

THE COURT:  And this was only the second one in the Southern District of Texas, if I recall.  So there wasn't a wealth of --

THE WITNESS:  But in answer to your question, yes --

THE COURT:  -- federal people to do those.

THE WITNESS:  Oh, sorry, Judge.

THE COURT:  Sorry.  You started out by saying --

THE WITNESS:  To answer your question, yes, I did discuss a plea with Mr. Bourgeois before the case was sent up to decide whether or not it was going to be a capital case.

BY MS. BOOTH:

Q.   All right.  And I guess I just better go ahead and ask you this now.  What was the theory of Mr. Bourgeois's defense in this case?

A.   That his wife committed the crime.

Q.   And did he maintain that from the time you met him until you finished representing him?

A.   Yes.

Q.   Was there ever any waver in that particular defense?

A.   No.

USCA5 3992

Q.   Now, with that in mind, did you develop your strategy on this case, based on that?

A.   That's what we built our case around.

Q.   Now, if the docket showed that you filed over 46 different types of documents in this case, would you have any problem with that?

A.   No.

Q.   All right.

          THE COURT:  Does that include the applications for all these different experts that I granted?  Because those were ex parte, and I don't know, I'm sure they were entered --

          MS. BOOTH:  I don't know if all of them are included, Your Honor.  I do not know that.

          THE COURT:  Okay.

          MS. BOOTH:  But at least that many.

BY MS. BOOTH:

Q.   And let me ask you, did you ever, in your dealings with Mr. Bourgeois, ever have any indication, ever even have a, any kind of thought that he might be mentally retarded?

A.   No.

Q.   All right.  Did he, when you represented him, did he assist you in your representation?  Did he give you suggestions on witnesses to call or addresses or where to find people?

A.   He was very active in the defense team.  Very active.

Q.   All right.  And in fact, is that what you called him, part

USCA5 3993

of the defense team?

A.   Yes.

Q.   Is that how y'all worked together?

A.   Yes.  He knew all the people that were involved.  He gave us names and telephone numbers of everybody that we should contact.

THE COURT:  For mitigation people?

THE WITNESS:  For mitigation and for guilt/innocence.

THE COURT:  Okay.

BY MS. BOOTH:

Q.   And let me ask you, did he ever write you any letters or send you any instructions on what you were supposed to do?

A.   A few, yes.

Q.   And did you turn all of that information over to the Public Defender?

A.   I kept every letter that Mr. Bourgeois sent me, and I think the Public Defender's Office came in and either took them or copied everything.

Q.   All right.  I want to start with Government's, what I've marked as Government's Exhibit Number 179.  I'd like to preview it to the witness to see if he --

THE COURT:  We're not previewing anything.

MS. BOOTH:  Okay.

THE COURT:  We haven't been doing that.  Do you mind?

MR. WISEMAN:  Oh, go right ahead.

USCA5 3994

MS. BOOTH:  And you --

THE COURT:  I mean, I won't look at it till it's admitted.

MR. WISEMAN:  Oh, you can look at it.

THE COURT:  Okay.

MS. BOOTH:  Well, in the interest of time, I have Government's Exhibit Number 178 all the way to Government's Exhibit Number 200, which are letters that were written by Mr. Bourgeois to Mr. Gilmore, giving him instructions.  Do you have any objection to those?

MR. WISEMAN:  No objection at all, Your Honor.

THE COURT:  Government's Exhibits 178 to 200 are admitted.

BY MS. BOOTH:

Q.  All right.  So let's look at Government's Exhibit Number 79 (sic) and just read for the Court that first line.

THE COURT:  Well, wait a minute.  I did 178 through 200.

MS. BOOTH:  Right.  But I'm starting with 179, a little bit out of order.

THE COURT:  I thought you said 79.  I beg your pardon.

MS. BOOTH:  Sorry.

THE WITNESS:  She did, Judge.

BY MS. BOOTH:

USCA5 3995

Q.    What does it say there?

A.    It says, "I, Alfred Bourgeois, have every intention of winning my case.  I have been falsely arrested, and please take your time and read this letter real well.  This will explain how we can win this case in the death of my child, JG1999."

Q.    And then it goes on --

A.    Yes.

Q.    -- to give you more instructions.

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    Okay.  I want to draw your attention to Government's Exhibit Number 178, Mr. Gilmore.  Is this another letter that you received?

A.    Yes.

Q.    And for the record, this letter is one, two, three, four, five, six, seven, eight, nine, ten, eleven pages long.  And would you read the first line of this letter?

A.    "Mr. John Gilmore, I, Alfred Bourgeois, have gone through this entire discovery package, and I've been mailing you back in part one by one.  I've reached the very last, and Mr. Gilmore, go through" something.

THE COURT:  Can you zoom that in a bit, Ms. Booth?

THE WITNESS:  It's hard to read that.  "Go through what all I have understood in the reports, everything I

USCA5 3996

underlined. I, Alfred Bourgeois, never told super liar" -- no, super --

THE COURT: Zoom in a bit more, please.

THE WITNESS: -- "super liar agent Michael Harris," Harness? I don't know.

BY MS. BOOTH:

Q. Okay. So he gave you, he told you right there and he goes on for eleven pages explaining that he's gone through the discovery package.

A. Yes.

Q. And with that letter, did you receive a DEA-6, where he withdrew and -- I mean, not a DEA-6, a 302 from the FBI where he went through and explained to you everything that he did not say and instructions on what, with underlining, instructions on what he wanted you to do?

A. Yes.

Q. Okay. I want to draw your attention to this document, which is a 302 from the FBI, where it speaks about a, the search warrant that was done, and then goes through. It is one, where he underlines what he didn't say, and he comments on the 302s, two, three, four, five, six, seven, eight, nine pages. And on the last page, if you would just read that first line, where he starts to write.

A. "Everything I have underlined I never told the FBI. On June 27th, 2002, at about 8:30 p.m., FBI Agent Michael" -- and

I can't read that name.

THE COURT: Harris?

THE WITNESS: Harris.

BY MS. BOOTH:

Q. That's it.

A. -- "got a phone call from another agent from the hospital where my wife and the rest of the family was. After the phone conversation, Michael Harris told me to -- told me turn around, put the handcuffs on me, and another agent brought me to Nueces County Jail. I, Alfred Bourgeois, never read my rights or told why I was being handcuffed."

Q. Okay. Stop right there. In this, he's giving you ammunition for a motion to suppress. Is that correct?

A. That's correct.

Q. All right.

THE COURT: Did you ever see Mr. Bourgeois write?

THE WITNESS: Did I ever witness him --

THE COURT: Right. Did he write you messages in court and --

THE WITNESS: While we were in trial, he frequently passed notes to me.

THE COURT: Was he quick in writing, or was he just laborious, slowly, one word after another? Or just regular?

THE WITNESS: I don't have a recollection, Judge. I know that he passed numerous notes to me, Judge. That's --

THE COURT:  Well, actually, I saw him writing notes. I didn't see anything unusual about it.

THE WITNESS:  I didn't notice anything unusual.

THE COURT:  Okay.

THE WITNESS:  Nothing stands out.

BY MS. BOOTH:

Q.   All right.  And let's go to Government's Exhibit Number 180, and Mr. Gilmore, if you could read that first part of that letter, if you can see -- I'm sorry.  There we go.  Can you see that?

A.   "Dear Mr. Gilmore, I want a copy of your strategy on my case.  I would like to know how you plan to attack my case and what you think the outcome will be.  I would appreciate if you could put together a brief memorandum in support of me, Alfred Bourgeois, your Defendant, and position," I guess, "regarding to my trial."

Q.   Okay.  Now, and then it goes on to give you a few more instructions.

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And then there is -- this particular dialogue and letter goes, we have three pages.  It appears to have more, not to have been finished on that third page, but --

A.   Yeah.

USCA5 3999

Q.   -- this is all we have.  Let's see.  And that was Government's Exhibit Number 180.  If we look at Government's Exhibit Number 181, again he's going through the reports that were written by the FBI underlining different things and highlighting different things.  And then at the back, which is the fourth page, what does he tell you?

A.   "I signed two labels for two vials of blood on July 17th, two thousand and" -- looks like one.  "There is a vial of blood missing.  I, Alfred Bourgeois, know what I" -- I don't know what that word is.

Q.   Well, so he's commenting on the collection of blood evidence that was taken from him.  Is that correct?

A.   That's correct.

Q.   All right.

         MR. WISEMAN:  What exhibit was that, ma'am?

         MS. BOOTH:  This was 181.

         MR. WISEMAN:  Thank you.

BY MS. BOOTH:

Q.   Now, let's look at 182.  I know this is tedious.  I'm not going to ask you to read the whole letter.  But it's another letter that was written by -- two, three, four, five, six, seven, eight -- eight pages, with a copy of the envelope, where he sent it to you at your office, Government's Exhibit Number 82 (sic) -- let me pull this down -- and can you read me that first line?

USCA5 4000

A.    "Attention, Mr. John Gilmore.  In my discovery package, I was reading Anthony Dumas," I guess, who --

Q.    Oh, no, you skipped a line.  Sorry.

A.    Oh, yeah.  "I was reading through the report that my wife, Robin Bourgeois, gave a statement, Anthony Dumas" -- I think that's his name -- "who moved in with me in the middle of March 2002.  I noticed through reading the statement he gave FBI Agent that he said he saw me beat my daughter, JG1999."

Q.    Okay, now, stop right there.  In this, he's telling you that he's gone through the discovery package, and now he's commenting on more of the statements.  Did you give the witness statements to the Defendant?  Did you let him read what all the witnesses were saying about him?

A.    I believe he had a lot of the material before I came in on the case.  But yeah, if -- I gave them to him.  I gave him everything that I had.

Q.    And did he comment on most every single witness?

A.    Yes.

Q.    And let me ask you about witnesses.  In this, when you tried the case in chief, did Mr. Bourgeois help you decide, you and Mr. Tinker, what witnesses were going to be called?

A.    Well, he's the one that proposed the witnesses to begin with.  If you're talking about the lay witnesses or --

Q.    I'm talking about lay witnesses, I'm talking about expert witnesses, and we're going to talk about that in just a minute.

USCA5 4001

A.    Okay.

Q.    But I'm talking about the people that you called or didn't call.  Did he have a say or give you direction on who he wanted in the trial?

A.    We always discussed the witnesses with Mr. Bourgeois.

Q.    Okay.  And I want to ask you now about, in the middle of these letters, so we'll just kind of break this up, about Dr. Estrada.  Who's Dr. Estrada?

A.    Dr. Carlos Estrada is a psychiatrist here in Corpus Christi.

Q.    And have you -- has he been involved in cases where you have actually involved him, hired him on one or many occasions?

A.    First of all, he's the only psychiatrist that I deal with in my practice.

Q.    And why is that?

A.    Because I trust him.  I trust him.  He is -- you want me to tell you what I told you last night?

Q.    Yes.  Tell me what you said.

A.    He is not a prostitute.  He is not a prostitute.  He will tell you the truth.  If he -- I do a lot of sexual assault cases, and he will call a --

Q.    In fact, isn't that your specialty right now?

A.    Well, I don't want to say that.

Q.    I mean, isn't that where you've been -- you've done a lot of cases lately in that area?

USCA5 4002

A.    I do a lot of sexual assault cases, yes.

Q.    Okay.

A.    And Dr. Estrada is the only person I deal with in those cases.

Q.    And why do you hire him on those kind of cases?

A.    You know, when I -- he'll call a pedophile a pedophile.  I mean he will.  And he's trained in that area.  That's -- I think he was either an instructor or something at the Menninger Clinic, which has to do with sexual behavior.

        THE COURT:  Mr. Roberts, would you put that paper down, please?

        MR. ROBERTS:  Okay, yes.

BY MS. BOOTH:

Q.    So he is a person that you trust.  Now, he wasn't hired by you for this case, was he?

A.    Well, he was the -- I had a psychiatric evaluation, I asked for a psychiatric evaluation at first, and he was the doctor that I suggested do it, and he did an evaluation of Mr. Bourgeois.

Q.    And after he did that evaluation of Mr. Bourgeois, did he give you a report?

A.    Yes.

Q.    And did you rely on that report?

A.    Yes.

Q.    Now, how many reports -- how many times have you -- do you

USCA5 4003

even have a number on how many times you've relied on expert

opinion of Dr. Estrada?

A.    Um --

Q.    Do you know?

A.    I don't know.  It's a lot.  I mean he's the only

psychiatrist that I employ.

Q.    And has that been just in 2002, or how far back does this

go that you employ Dr. Estrada?

A.    Since 1994, since I started in criminal defense.

Q.    Okay.  I'm sorry, I didn't hear you.  How long have you

been using Dr. Estrada or employing him for his services?

A.    Since 1994, 1995.

Q.    Oh, okay.  I'm sorry, I didn't hear that.  And in this

case, he gave you a report.  And in that report, didn't it say

that Mr. Alfred Bourgeois was above average intelligence?

A.    I recall that.

Q.    And did you have any reason to doubt that assessment?

A.    No.

Q.    All right.  And during the trial, did Dr. Estrada, was he

then hired by the United States to sit in the courtroom?

A.    To my dismay, yes, he was.

Q.    To your dismay.  And --

         THE COURT:  Do you want to say why that was?

BY MS. BOOTH:

Q.    And why was that?

**USCA5 4004**

THE COURT:  I was asking you, Ms. Booth.

MS. BOOTH:  Oh, why was it -- why was he hired?

THE COURT:  By the Government.

MS. BOOTH:  I can't remember the strategy we had at the time, Your Honor.

THE COURT:  I assumed it was the same reason Mr. Gilmore hired him.

MR. WISEMAN:  Your Honor, I --

MS. BOOTH:  We -- I want to be able to say this right.

THE COURT:  I thought you all agreed early on that he was both, the best for both of you.

THE WITNESS:  Well, we had no problem with him for us.

THE COURT:  Do you remember that?

MS. BOOTH:  Oh, yeah.

THE COURT:  Or am I making that up?

MS. BOOTH:  No, they came on the record, and we -- when we said that we were going to have him here, they didn't oppose him sitting in the courtroom the entire time.  The --

MR. WISEMAN:  Your Honor, if I could jump in for a moment.  My understanding from reading the record is that --

THE COURT:  What did it say?

MR. WISEMAN:  Yeah, it -- and I don't know it all, but this part says that Ms. Booth first, or the Government

USCA5 4005

first retained him with the idea that he would sit through the trial and be available to them.  Subsequently, when Mr. Gilmore asked for a competency evaluation, the Defense and the Prosecution agreed --

THE COURT:  Agreed, okay.

MR. WISEMAN:  -- to use him, even though he had already been the Government's expert.  I think that's what the record shows.

THE COURT:  Yeah.  But I mean, I don't --

MS. BOOTH:  I don't remember that.  I thought that they hired him first, and then we agreed to have him.

THE COURT:  I thought there was an agreement on the competency for Dr. Estrada between both sides.

MS. BOOTH:  Uh-huh.  Well, yeah, we agreed that he was --

THE COURT:  He, just also for the record, when we have competency hearings, he is the most, of all the psychiatrists in town, he's the one that the Government and the Defense agree on almost uniformly, for the same reason, I think, that Mr. Gilmore has expressed.

BY MS. BOOTH:

Q.   Now, did you have any reason to doubt his opinion?

A.   No.

Q.   And did you rely on that in your, when you dealt with Mr. Bourgeois?

USCA5 4006

A.    Yes.

Q.    Okay.  Now, let's go to the next one, Government's Exhibit Number 183.  And you want to read into the record the first, the first line?

A.    "Mr. Gilmore, FBI has in my property two telephone books, a burgundy 5K7" --

Q.    Could that be 5 by 7?

A.    5 something -- "and an orange 5 by 7 telephone book" -- oh, telephone book, okay -- "with some contacts and phone numbers.  Some of my witnesses can help me in this case."

Q.    Okay.  So does it appear that he's having any problem remembering the things that he was carrying with him at the time, the size of them, the color of them?

A.    No.

Q.    What they contained?

A.    No.

Q.    Okay.  Government's Exhibit Number 84 (sic).  And for the record, Government's Exhibit Number 83 (sic) is one, two, three, four, five, six pages of a letter to Mr. Gilmore and instructions on what to do with this case.

        MR. WISEMAN:  Excuse me, Ms. Booth.  Your Honor, I have the information the Court was just asking about.  The transcript of December the 10th, 2003, at Page 11, Ms. Booth is mentioning that they have listed Dr. Estrada as an expert for the Government.  That was the proceeding in which the Court was

USCA5 4007

addressing whether to provide a competency evaluation and who would do it.

THE COURT:  Okay.  Thank you.

MR. WISEMAN:  Sorry for the interruption.

THE COURT:  Go ahead, Ms. Booth.

MS. BOOTH:  And Your Honor, at this time I would urge that the Court accept the, and take as evidence in this case all of the evidence and all of the testimony in the prior case.

THE COURT:  Well, that's what I do.

MS. BOOTH:  Yes, Your Honor.  I wanted to -- and if I have been saying Government's Exhibit Number 84 or 81, I've meant 181 and 184.

BY MS. BOOTH:

Q.   So, and then we go to, let's see, Government's Exhibit Number 185, and would you read the first little sentence on that?

THE COURT:  Well, you want to zoom it a little bit more?  You just push -- show her, Mr. Roberts.

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  There you go, Ms. Booth.  You've got it.

MS. BOOTH:  I got instructions earlier today on how to do it.

THE WITNESS:  You need to push it over just a little bit more.

"Mr. Gilmore, all this underlined, I, Alfred

USCA5 4008

Bourgeois, I" -- something -- "not once opened my mouth during this transport."

BY MS. BOOTH:

Q.    And then this is a 302 that he has made annotations on, a 302 that was written by the FBI.  Is that correct?

A.    I don't know what a 302 is, but it's --

Q.    Oh, it's a report by the Federal Bureau of Investigation.

A.    Okay.

Q.    Authored by Matthew Desmond and Robert Andrews.  So he seems to have the ability to read, comprehend, and then annotate on different things that he reads, doesn't he?

A.    Yes.

Q.    All right.  Government's Exhibit Number 86 (sic), which would be quite a feat for a mentally retarded person, wouldn't it?  Government's Exhibit Number 186, could you read the first line on that?  No, probably not.

A.    "Hello, Mr. John Gilmore.  I have been trying to get" --

Q.    Hold on.  I'm trying to -- okay.

A.     -- "through to warden.  Counselor said he's calling" --

BY THE COURT:

Q.    You skipped a line, Mr. --

              THE COURT:  Unzoom it just a --

              THE WITNESS:  It's kind of hard to --

              THE COURT:  -- just a touch.

              THE WITNESS:  -- to read a moving document,

USCA5 4009

Ms. Booth.

THE COURT:  It's a good thing you don't have migraines.

BY MS. BOOTH:

Q.   Okay.

A.   "I have been trying to get through this prison system to get a phone call to you, and for some reason" -- I guess that's reason -- "the call, last I heard is your office would not get back with them.  This is what I need.  You filed motions for me a while back during my trial to get some evidence the U.S. Government was holding for me.  I have my Sprint cell phone, about $2,000 worth of clothes" -- something, looks like white -- "refrigerators" --

Q.   Okay.  You can stop right there.  What he's doing is he's asking you to --

MR. WISEMAN:  Your Honor, I'm going to object to Ms. Booth characterizing what he's doing.  The document speaks for itself.

MS. BOOTH:  This is cross-ex, Your Honor.

THE COURT:  Overruled.

BY MS. BOOTH:

Q.   And here it appears he's telling you he wants a motion filed so that he can get his property back.  Isn't that right?

A.   That's correct.

Q.   That's what he's telling you.

USCA5 4010

A.   Yes.

Q.   Okay.  Government's Exhibit Number 187, is this another letter written to you, a one-page letter written to you giving you some instructions?

A.   It appears to be, yes.

Q.   All right.

A.   I don't know how many pages it is, but I see the first page.

Q.   It is -- it's one page that we have, and then the receipt of the mail.  On Government's Exhibit Number 188, can you read that?

A.   "Mr. John Gilmore, you know who would be a big help to this case?  Stacy Williams, who you have address on the reports that FBI took.  Stacy Williams was from my house May 15th, 2002, all the way to May 27th, 2002."  I guess that's a two.

Q.   All right.  So we'll stop right there.  Again, this is a one, two-page letter.  And even in the first, the very first line, he is giving you directions and giving you suggestions on how to conduct his case.  Is that correct?

A.   Yes.

Q.   Okay.  Government's Exhibit Number 189, can you read that?  Just the first line.

A.   "Attention, Mr. Gilmore.  On this report that FBI took from this forklift driver, Adolfo Yzaguirre" -- I think I pronounced that right -- "at the Navy Base, there is a lot of,

USCA5 4011

a lot that I noticed the FBI Agent who wrote this report has left out, to their advantage."

Q.    All right.  Again, he's giving you his opinion on the report.  He's obviously read the report and the statement of Mr. Yzaguirre, and he is commenting on it and giving you suggestions.  Correct?

A.    Appears to be, yes.

Q.    Mr. Gilmore, I want to show you Government's Exhibit Number -- and Government's Exhibit 89 (sic) is one, two, three, four, five pages long, isn't it?

A.    It is.

Q.    Government's Exhibit Number 190 is one, two, three pages long.  Would you read the first?

A.    "Mr. John Gilmore, as you and I spoke on January the 2nd, 2003, in Corpus Christi, Texas, we spoke on the issues of my daughter, AB1994, in foster care, about the stool issue FBI are coming up with I molested my child in the anal area.  My daughter, AB1994, JG1999" -- is that --

Q.    Uh-huh.

A.    -- "nor any of my kids have ever been molested by me or no one."

Q.    All right.  And now he is remembering that he spoke to you on a certain date, and he's talking to you about issues?

A.    Yes.

Q.    Okay.  Government's Exhibit Number 191, which is a one,

USCA5 4012

two, three, four, five, six-page letter.  And could you read this?

A.    From Alfred Bourgeois, and he's got his CID number, or whatever number that is.  "Mr. Gilmore, I need copies of suppress evidence in my case.  I need copies of my log book of different places I went from May 31st, '02, to June 27th, '02. I need copies of the 12-pack of the different places I took my family, like camping sites, water parks, several museums, state parks, dinosaur deserts, beaches, et cetera, throughout parts of the United States."

Q.    All right.  Certainly doesn't have a problem with recall there, does he?

A.    No, if --

Q.    Sorry?

A.    If that's accurate, then he doesn't have a problem with recall.

Q.    And Government's Exhibit Number --

          THE COURT:  Did you find him to be a good historian when you visited with him?

          THE WITNESS:  Very, very good, Judge.

          THE COURT:  Okay.

BY MS. BOOTH:

Q.    Government's Exhibit Number 192, which is a two-page letter written by Mr. Bourgeois, I'd ask you to read the first line of this one.

USCA5 4013

A.    "Mr. Gilmore, I remember in court on February the 12th, 2003, you said you had my briefcase.  I'm curious about if the FBI went in and tampered with some personal records I had that's important to me.  The listed items I'm concerned about, a personal file in a tan manila folder with" something "belonging to Robin Bourgeois, says 505 St. Andrews, LaPlace, 70069, with three Polaroid pictures of Robin coming out, a black limo, a letter written by Robin to another man saying she was pregnant for another man inside this diary with the three pictures."

Q.    All right.  So he is giving you, asking you for something and implying that the FBI has tampered with evidence.  Is that correct?

A.    That's what it appears.

Q.    All right.  Government's Exhibit Number 194, which is a one, two-page letter, there are four pages attached, because it includes the envelope, and could you read the first line of this letter, Mr. Gilmore?

A.    "Mr. Gilmore, upon these paper is where Mr. Jose Gonzalez-Falla filed papers to get the results from Children's Hospital of New Orleans, Louisiana, when Robin Bourgeois, my wife, I, Alfred Bourgeois, and Stacy Williams took my daughter, JG1999, to the hospital to be checked out for the blood of my wife -- or for the blood my wife Robin Bourgeois found coming out of my daughter vaginal."

USCA5 4014

Q.   All right.  And in this, does it seem that he remembers things that have happened in the past, both in Louisiana, with his attorney?

A.   Yes.

Q.   All right.  No problem with recall there?

A.   It doesn't appear, if that's accurate, yes.

Q.   Government's Exhibit Number 195, is this a letter written to you back in 2002?

A.   Yes.

Q.   And would you read the first line, please?

A.   "Mr. John Gilmore, can you please see that my children get the enclosed envelope by Christmas time for me, please.  Inside the enclosed envelope is a handkerchief I drew for AB1994 and AB2001 when I know they are in the care of Child Protection of Corpus Christi, Texas, upon my" -- I don't know.  That's messed up.  It may be arrival, I don't know, on something 27, 2002. "May God bless you, and thank you very much.  Merry Christmas to you and your staff."

Q.   All right.  Government's Exhibit Number 196, which is a one, two, three, four, five, six-page letter, with instructions at the very top on how you're to proceed with this document. Can you read that?

A.   "Please read carefully.  Very, very important."  And he's got an asterisk.  "Mr. Gilmore or Mr. Tinker, as we were in court on January the 16th, '04, heard Mr. Tinker speak about my

USCA5 4015

deceased daughter, JG1999's head trauma," I guess "and I have some information that FBI Agent Michael Harris or whoever has my records, that this is, that was in my briefcase," something, "my arrest."

Q.   Okay.  So here we have him instructing you on what to do. He's got information that the FBI Agents took.  I mean, you know, any problem with understanding the direction he's giving you?

A.   No.

Q.   Okay.  Now, let's see, Government's Exhibit Number 197, can you read the first line of this one?

A.   Yes.  Do you want me to read it?

Q.   Yes, sir.

A.   Okay.

Q.   Please read it.

A.   "Mr. Gilmore, I, Alfred Bourgeois, need two favors of you. I need you to call my employment at R. E. Garrison in" -- something -- "Alabama, ask for a guy by the name of Billy Erskine.  I, Billy are really close to" -- I don't know what that word is -- "really close to each other."

THE COURT:  Can you zoom that in just a little bit, Ms. Booth?

THE WITNESS:  "Are really, really close to each other."  Maybe that's what it says.  "Really, really close with each other.  Have Billy Erskine in the recruiting department go

USCA5 4016

to R. E. Garrison lot and take some pictures of the inside of the sleeper of an empty Peterbilt truck.  I need the sleeper area.  If you want, you can get pictures of the whole inside, but the sleeper area is important.  Billy Erskine in recruiting keeps throw-away cameras he supplies all drivers with, and Billy Erskine would do anything for me."

BY MS. BOOTH:

Q.   Okay, now stop.

A.   Okay.

Q.   Do you remember during the trial that it was in, I mean during the preparation for this that we were trying to get pictures, or we got pictures of the inside of the cab of the 18-wheeler to use as evidence?

A.   I remember seeing pictures of them, yes, of it.  I remember going out to the Naval Air Station and viewing it myself and taking pictures myself.

Q.   All right.  And he's asking here for you to go to another 18-wheeler and get pictures of the inside cab.

A.   Yes.

Q.   And that is a three-page letter written to you with instructions on what to do in his case.  Right?

A.   Yes.

Q.   All right.  I want to show you Government's Exhibit Number 198 and ask you if you could read the first line of that one.

A.   Do you want me to read the top part or just the body of

USCA5 4017

the letter?

Q.   Well --

A.   "Certified copy" --

Q.   Start at the top, where he wrote "certified copy."

A.   "Certified copy," something file, "Page 1 for my appeals." And I really can't read that.  This something -- "Notarized this 7th day of June 2005," something notary, "Victoria" -- well, I can't read.  Something "County."  Something --

            THE COURT:  Move it over a little bit, Ms. Booth.

BY MS. BOOTH:

Q.   Okay.  Is that better?

A.   It's not better.  Well, I mean, it's better position-wise, but I can't read --

Q.   Well, if you can't read that part, don't worry.

A.   I can't read what that says.

Q.   Could you just read the first line of the letter that he wrote to you?

A.   "Mr. John Gilmore, I, Alfred Bourgeois" -- and he has his, it's either a CID number or his FBI number or whatever -- "need a favor and asking you for two things that's bothering me that I personally need you to look into.  On the record on June 27th, '02, the very day my baby JG1999 was unconscious -- look, I remember this like yesterday -- I was interviewed approximately 3:30 p.m. by Corpus Christi, Texas, by child services agents, which was two female ladies.  Now, these two

USCA5 4018

ladies were first on the crime scene that actually went inside my 18-wheeler from the front to the back of inside my cab. I mean, they went through my big rig to make (sic). Only one thing -- to make. Only one thing was found" --

Q. Could it be "to the max"?

A. "To the max," okay. It could be, yes. "Only thing was found that I got questioned about was an empty urine bottle at this time was by my driver's seat."

Q. All right. So he's remembering two things that he wants you to check into.

A. Yes.

Q. Okay. Now Government's Exhibit Number 199 --

THE COURT: What does it say, if one of the kids -- right next after that. What's the next sentence?

BY MS. BOOTH:

Q. What's the next sentence?

A. "Empty" -- I ended off --

THE COURT: If one of the --

THE WITNESS: "Well, I explained how we drive sometimes in" --

THE COURT: Rural areas.

THE WITNESS: -- "rural areas. If one of the kids gots to use the restroom" -- something about "JG1999 potty and pour it into an empty jug and later thrown out at the first truck stop or rest area I get to." That's -- is that it? Or

you want me to read more?

THE COURT: That's it. Sorry.

THE WITNESS: Okay.

THE COURT: I just wondered what that meant.

BY MS. BOOTH:

Q. How about Government's Exhibit Number 199, which is a one, two, three, four, five, six, seven-page, seven, eight, nine-page letter that's written to you? Now, about this I want to ask you a question. During the period of this time, you said that the theory of the case was that Robin did it.

A. Yes.

Q. And during this case, was Mr. Bourgeois, on many occasions, was giving you, trying to give you evidence that would smear Robin Bourgeois, wasn't he?

A. That was -- yes.

Q. And did he attempt to smear her by some kind of insurance fraud when their house was broken into? Do you remember that?

A. I seem to recall that, yes.

Q. All right. I want to call --

THE COURT: Wasn't that something about $5,000?

BY MS. BOOTH:

Q. I want to call your attention to this --

THE COURT: She took a check, was it 5,000? No, 10,000. Okay.

MS. BOOTH: 4600.

BY MS. BOOTH:

Q.    Would you look at Government's Exhibit Number 199, and could you read at the top of this page, start with "Only one page this time."

A.    "Only one page this time.  The rest is items Robin claimed got stolen when she filed that false insurance claim.  Mr. John Gilmore, I put a list together of all the things my wife was selling and claim stolen out of my house upon my arrest on June 27th, 2002.  I have records of everything I had before married to Robin Bourgeois.  As I talked to my brother Lloyd back around November, he says State Farm said Robin got a girlfriend, which is named in her statement, Donna Leonard, to make up a power of attorney saying I gave her permission.  Lloyd Ferdinand, my brother, informed me that Robin Bourgeois, my wife, filed a $10,000 claim, which she received $4600 already.  Mr. Jose Gonzalez called State Farm in LaPlace where I lived and stopped the remaining check by Lloyd calling my" -- K attorney?  X attorney -- "X attorney, Mr. Jose Gonzalez.  Mr. Gilmore, this is why I took this letter to Robin.  She, my wife didn't put a damn thing in my house, forged my name while I was in jail, didn't give or send me a dollar.  Now you see why I'm so mad.  I collect old antique cars, too, big 18-wheelers.  My wife give my favorite all to Ms. Donna Leonard grandson.  That grandson then claimed to State Farm."

Q.    All right.  Does he have any problem with sequencing and

USCA5 4021

telling the story of what's happened?

A.    No.

Q.    All right.  For the record, this is a one, two, three, four, five, six, seven-page document.  Government's Exhibit --

MR. WISEMAN:  What's the exhibit up there now, ma'am?

MS. BOOTH:  This is 199.

THE COURT:  Any objection to -- oh, I've got that admitted.  Never mind.

MS. BOOTH:  They're already -- they're already in, Your Honor.

THE COURT:  Through 200.

BY MS. BOOTH:

Q.    All right.  And I think the Judge asked you if, during the trial, and I asked you that question before, during the trial if he was sending you instructions on what to do, on questions to ask.

A.    Yes.

Q.    Okay.  Now, in this case, the Judge allowed you to hire a investigator.  Is that correct?

A.    Yes.

Q.    And did y'all, did you and Mr. Tinker hire a man by the name of Mr. Doug Tenore?

A.    Yes.

Q.    All right.  And the Judge allowed you to hire a mitigation specialist.  Isn't that correct?

USCA5 4022

A.    That's correct.

Q.    And his name was Dr. Cunningham?

A.    Mark Cunningham, yes.

Q.    Mark Cunningham.  And the Judge also allowed you to hire mitigation investigators.  Is that correct?

A.    That's correct.

Q.    And they -- was that, that was a Mr. Bierbaum and a Ms. Milstein.  Is that correct?

A.    That's correct.

Q.    Now, had you ever -- and the death penalty cases that you had been in and that Mr. Tinker had been in were all state death penalty cases, weren't they?

A.    That's correct.

Q.    Now, in the state court, are you allowed such expenses, this many expenses?

A.    No.

Q.    All right.  And even in this case, besides your own investigator and your mitigation specialist and your two mitigation investigators, she still allowed you to have a jury selection expert.  Is that correct?

A.    That's correct.

Q.    That sat with y'all during jury selection?

A.    She did, yes.

Q.    All right.  Did she even pay for new clothes for the Defendant?  Did you buy new clothes and submit a bill?

USCA5 4023

A.    Yes.

Q.    And in fact, that was addressed here in the courtroom, where Mr. Bourgeois said his clothes didn't fit any more. Isn't that right?

A.    I remember him being happy about the clothes.  He wanted to wear them after he got out.

Q.    All right.  Do you remember him asking the Marshal, could he keep the clothes if he won the case?

A.    Yes, I remember that.

Q.    All right.  And you actually went out and purchased him some shirts, and didn't the Marshals show up with jackets and --

A.    After I purchased the initial jacket and slacks, I think the Marshals came up with different clothes for him to wear every day of the trial.

Q.    So the Judge also provided that he could look like a person that was presenting himself for trial in a very dignified manner?

A.    I dressed him like a Marshal.

Q.    Okay.  Did you --

        THE COURT:  What does that mean?

     (Laughter.)

BY MS. BOOTH:

Q.    How did you -- did you do that on purpose?  Did you want to make him look a certain way?  Did you want to give him an

USCA5 4024

opportunity to --

A.    I just, that's what I bought him.  That's --

Q.    Okay.  So you're not qualified as an expert on clothing.
Right?  No?  Okay.

THE COURT:  He looks all right to me.

MS. BOOTH:  He looks fine, yes.

THE WITNESS:  My wife dressed me.

BY MS. BOOTH:

Q.    Now, let me ask you, so all of those things were allowed, and that was -- that's much more than you've ever been allowed in state court, isn't it?

A.    You know, yeah, that is more than we've ever been allotted in state court, yes.

Q.    And I believe there was some evidence that was testified to yesterday about Mr. Cunningham, and I think that that evidence showed -- do you have any problem with the fact that you may have contacted Mr., Dr. Cunningham June the 30th of 2003?

A.    I've read the e-mails that I had printed out, and I did make the initial contact with Dr. Cunningham.

Q.    Now, on Dr. Cunningham, that was June the 30th of 2002.  Had the case even been certified yet?

A.    I don't remember.  I don't remember.  I knew that it was heading that way, and I knew it was going to be a trial.

Q.    All right.  And why did you know it was going to be a

trial?

A.   Because Mr. Bourgeois refused to talk about pleading.  He maintained his innocence all through the trial, all through the case.

Q.   Let me ask you, in the plea bargaining procedure, did you try on one or numerous occasions to offer him, to talk him into trying to plead guilty in this case?

A.   Well, I recall doing it one time and receiving pretty much the final answer, you know, that it was not going to be a plea. And I think Mr. Tinker tried to talk to him also.

Q.   All right.  Let me ask, let's go back and talk about Dr. Cunningham.  Dr. Cunningham was the mitigation specialist, and did you deal mostly with him or did Mr. Tinker deal with him?

A.   Initially, I dealt with him via e-mail and maybe phone conversations.  I think I dealt with him regarding mitigation investigators, but --

Q.   And mitigation, where did you get Milstein and Bierbaum?

A.   From Dr. Cunningham.  He provided a list of possibles. And I tried, he suggested one in particular.  I tried to get her.  She wasn't available.  And somehow ended up with -- Lisa Milstein was on the list, and I don't know where Mr. Bierbaum came from.

Q.   All right.

A.   He may have come with her.  I mean, he may have just come

USCA5 4026

with her.  But he's an attorney, I believe.

Q.    He was an attorney.  So you had an attorney investigator?

A.    Yes.

Q.    As your investigator.

A.    Right.

Q.    Okay.  And did you depend on them to get that work done?

A.    Yes.

Q.    All right.  And Dr. Cunningham, do you remember Mr. Tinker, do you remember anything else about dealing with him during the fall of 2003?

A.    The only thing I remember is he wasn't going to be available the first trial setting.  I think we had a trial setting in September, and he wasn't going to be available, and he suggested other people that might be able to help us.  Then we were able to get the case continued, and he agreed to be the mitigation expert.

Q.    And the mitigation investigator, which he had suggested, that's the person y'all asked for the Court to hire.  Is that correct?

A.    That's correct.

Q.    Now, I'm going to go right through Mr. Cunningham, Dr. Cunningham, which is going to take us through the end, then I'm going to have to go back to pretrial stuff.  But Dr. Cunningham, did he, toward the end of the trial, was Mr. Tinker dealing with him?  Do you remember having -- first

USCA5 4027

of all, do you remember having a meeting with Mr.,

Dr. Cunningham to plan your strategy?

A.    Yes.

Q.    Okay.  And do you remember having a meeting with

Dr. Cunningham that was during or shortly before your

presentation of evidence on the penalty phase?

A.    I remember having a meeting with Dr. Cunningham in my

office.  He had a notebook that contained images from a

PowerPoint presentation.

Q.    Who was there?  Who was there at the meeting?

A.    Mr. Tinker and I were there.

Q.    And how long was this meeting?  Do you remember?

A.    It was, I want to say it was over an hour, couple of hours

maybe.

Q.    Okay.  And so did he take you through, did he show you a

PowerPoint presentation, or did he take you through this

presentation?

A.    He took -- he had a loose leaf notebook, and he had the

images in it, and he showed us.  And I remember seeing like a

pressure cooker and arrows pointing to the pressure cooker

showing it.

        THE COURT:  We've all seen that now.

        THE WITNESS:  Okay, Judge.

BY MS. BOOTH:

Q.    And after you had this meeting, did Dr. Cunningham tell

USCA5 4028

you what he would testify to?  Did he present you with any

questions that you could ask him about this presentation?

A.   I believe so, but that -- we split responsibilities on

this case, and Mr. Tinker dealt with the experts.  And so I

remember there being a list of questions, but I don't recall

what it was.

Q.   All right.

A.   Exactly what it was.

Q.   Oh, and let's talk about Mr. Tinker.  I want to go back

and, was Mr. Tinker a defense attorney's defense attorney?  If

you got in trouble, would you go to Mr. Tinker?

A.   I'd hire Mr. Tinker, yes.

Q.   All right.  And was he a -- was he prissy?

          THE COURT:  Or Mr. Granberry.

          THE WITNESS:  Or Mr. Granberry, yes.

BY MS. BOOTH:

Q.   Was he a person that would act like, shucks, I'm a --

          THE COURT:  I'm sorry, I forgot Mr. Jimenez in the

back there.

BY MS. BOOTH:

Q.   -- I am -- underestimate me, underestimate me, and then

I'm going to get ya?  I mean, was --

A.   No, he was very aggressive.

Q.   Okay.  And was he a kind of a free soul and kind of

avant-garde?  Maybe that's not a good word.  You describe

USCA5 4029

Mr. Tinker to me.

A.   He's the best lawyer I've ever met.  I mean, that's all I can tell you.  He's an outgoing, very personable person.

Q.   Successful lawyer?  Successful criminal defense attorney?

A.   Very successful.

Q.   Did he take cases here that nobody wanted and were afraid to touch?

A.   Yeah, and in particular the Yolanda Saldivar case.

Q.   And did he get death threats for --

A.   Yeah.  Unfortunately, I was in the office with him at that time.  Yes.

Q.   All right.  Now, after you sat and you had this presentation presented to you and Mr. Tinker, did you and Mr. Tinker talk about the presentation?

A.   Yes, we did.

Q.   And what did you think about what Mr., what Dr. Cunningham was going to put on?

A.   Didn't fit with our defense.

Q.   It didn't fit with your defense?

A.   Right.

Q.   And did you go and take this book and take it and talk to Mr. Bourgeois about it?

A.   I recall having the notebook and talking to Mr. Bourgeois, and I think that we did it at counsel table.  I don't think it was taken to downstairs when he was downstairs.  It seems like

USCA5 4030

it was in court.

Q.   Okay.  And when you showed it to Mr. Bourgeois, did he have any reflection on it?  Did he make a statement as to this presentation?

A.   Well, his position all along was that he did not commit the crime.  And so specifically what did he say?  I just remember we told him that we didn't think we were going to call Dr. Cunningham, and he did not oppose that.  And we told him why, because his theory of the mitigation part of the case didn't jive with our theory of defense.

Q.   Did he make some kind of statement to the effect that, "This means that Dr. Cunningham's saying I'm guilty"?

A.   It's something to that effect.  I can't remember exactly what was said.  But I, you know, explained to him that that's what those arrows meant that he had all the pressure on him, and that's why he exploded and did this.

Q.   And after you explained that to him, did he want to present Dr. Cunningham?

A.   He agreed with our assessment.

Q.   All right.  Now, there's an allegation that a witness was called, Carl Henry.  And Carl Henry had, when he testified, it came out in cross-examination that he had several convictions for fraud, and it didn't go well.  Carl Henry, why did y'all call Carl Henry?  Did Mr. Bourgeois ask to have him called?

A.   We didn't, we didn't contact any witness from LaPlace or

USCA5 4031

any witness that he was familiar with, without his direction. He gave us direction to talk to these people.

Q.   All right.

THE COURT:  Did he tell you who he wanted contacted?

THE WITNESS:  Yes.  He told me, he communicated mostly on the witnesses, Judge, with Doug Tenore.  I can recall, you know, I don't know if we get into hearsay or not, but Mr. Tenore said that Mr. Bourgeois had names and phone numbers memorized.

BY MS. BOOTH:

Q.   And let me ask you, on some of the people that Mr. Bourgeois told you to go to and speak to, did you -- was what they were saying not good for your defense?

A.   We brought down -- I think we spoke with over 50, at least through the investigators, spoke with over 50 people.

Q.   And let me ask you, during the trial, did you rent a room, a little conference room over in the hotel that's next to here?

A.   We got a small conference room and then a bigger room.  We had all the witnesses in the big room, and then we'd take them individually into the conference room and talk to them individually.

Q.   And how many witnesses do you think were there when you did that?

A.   I don't remember.  It was a lot.  It took most of the day talking to them.

USCA5 4032

Q.    Okay.  And after you went through this group of witnesses, is that when you decided, after talking, decide which ones to call?

A.    We make a decision, you know, how they're going to present in court and whether or not they have relevant evidence, whether or not they've got too much baggage in terms of prior convictions, things like that.

Q.    All right.  Did you know that Carl Henry had three convictions for --

A.    Specifically --

Q.    Did you know that he testified that his cases were expunged?

A.    I don't even remember the nature or the content of his testimony, Ms. Booth.  I do remember being surprised at one witness who had convictions that we weren't aware of, so --

Q.    But was that the witness that Mr. Bourgeois wanted you to call?

A.    Yes.

Q.    And Mr. Tenore would be able to tell the story of how many exactly witnesses were brought in for you to talk to?

A.    I believe he -- he arranged for most of the witnesses to be here.

Q.    Okay.  And let me ask you about that PowerPoint presentation.

            THE COURT:  From Dr. Cunningham?

USCA5 4033

MS. BOOTH:  From Dr. Cunningham.

BY MS. BOOTH:

Q.   What did Mr. Tinker think of that PowerPoint presentation?

A.   He didn't like it.

Q.   All right.  Now, how did Dr. Cunningham take the fact that he was not going to be asked to come in and testify?

A.   He was very angry.

Q.   And then a couple of years later, did he send you a letter asking you to write him a recommendation because he was up for an award?

A.   He asked me to write a recommendation for him for something.  I can't remember.  And I can't remember whether it was a letter or an e-mail.  He has my e-mail address.  He asked me to write a letter for him, and I didn't do it.

Q.   Okay.

          THE COURT:  You did not?

          THE WITNESS:  I did not.

BY MS. BOOTH:

Q.   And why didn't you do it?  Did he act professional when you told him that you were not going to allow him to testify?

A.   If you tell a professional witness that you're not going to use them, you know, he should be professional about it, and he wasn't.

          THE COURT:  What about the -- did Mr. Gilmore know about the problems you had with the one who wanted to get a job

USCA5 4034

with the Government, the bite guy?

MS. BOOTH:  Oh, Mr. Dailey.

BY MS. BOOTH:

Q.   You knew that Dr. Dailey, in fact, you had a copy of the report that Dr. Dailey had done on the four, on the bite marks. Do you remember that?

A.   I remember a report, but that was Mr. Tinker's part of the case, so --

Q.   Okay.  Do you remember why, or do you have any recollection of why Mr. Dailey, Dr. Dailey wasn't called?

A.   I have no recollection.

Q.   All right.  And we've talked about Mr. Tinker, but Mr. Tinker, do you remember the day he died?

A.   Of course.

Q.   And what date was that?

A.   Do I remember the date, or the day?  I remember spending all day Sunday with him, and through the night, and he died Monday morning.  I don't remember the exact date, but --

Q.   Okay.  And he died of cancer.  Isn't that right?

A.   That's correct.

Q.   And Mr. -- and I know that Mr. Wiseman didn't mean to imply that it was because it was defense interrogatories that he didn't answer, but I just wanted you to answer that.  If Mr. Tinker would have had a choice whether to answer the ones for the Government or the ones for the defense, do you have an

USCA5 4035

opinion which ones he would have answered?

A.    He would have answered the ones for the defense.

Q.    And --

THE COURT:  He didn't, if I recall, he didn't want to answer anything from you.

MS. BOOTH:  And did -- well, I'm not going to ask that question.

THE COURT:  Better not, whatever it is.

MS. BOOTH:  Yeah, or I'll get in trouble.

THE COURT:  Wasn't Mr. Tinker's theory that he wasn't going to help anybody prove that he was not ineffective?

THE WITNESS:  That's correct.  That's his position that he's taken that --

THE COURT:  It was steadfast through his career.

THE WITNESS:  It was.

BY MS. BOOTH:

Q.    And if he would have had an opportunity to come in here today, he would have testified that he was incompetent and --

THE COURT:  He wouldn't have done that, I don't think, would he, Mr. Gilmore?

THE WITNESS:  I don't think he would say he was incompetent, but he would have been --

THE COURT:  He wasn't going to help you prove that he was not incompetent.

THE WITNESS:  Yeah.

USCA5 4036

THE COURT:  That was sort of his M.O. throughout his legal career.

THE WITNESS:  That's right.  And he would do anything he could to save Mr. Bourgeois's life.

THE COURT:  Yes.

BY MS. BOOTH:

Q.  Oh, videotape.  Do you know about a videotape that was prepared by the mitigation specialist, Mr. Bierbaum?

A.  I remember the videotape.  I remember the conversations about the videotape.  I may have seen a little bit of it, but I believe that Mr. Tinker is the one that had it.  And I remember y'all -- I remember talking about it.

Q.  Do you remember me being with Mr. Tinker and begging him to play that videotape for the jury?

A.  I remember the conversations about the videotape, yes.  I do remember that.

Q.  That had been prepared by the mitigation specialist?

A.  Right.

THE COURT:  I'm sorry.  Who wanted that played?

MS. BOOTH:  The Government did, Your Honor.

THE COURT:  Oh, okay.

BY MS. BOOTH:

Q.  And Mr. Tinker refused to play it?

A.  He told me he wasn't going to play it, so --

Q.  Do you know the content of that video?

USCA5 4037

A.    It had something to do with a graveyard of abused children, or something to that effect, or unwanted children. Something to that effect.

Q.    Okay.  Did Mr. Bourgeois ever tell you that he was mentally retarded?

A.    No.

Q.    Did Mr. Bourgeois ever tell you that he wanted you to claim that he was a sexually abused child?

A.    I know that there were some allegations concerning that and the way he was treated as a child.

Q.    Uh-huh, but did he ask you --

A.    I don't remember.

Q.    -- or tell you anything like that?

A.    I don't remember.  I knew that that was a part of the investigator's work product.

Q.    But it hadn't come from Mr. Bourgeois, had it?

A.    I don't think it came from Mr. Bourgeois.

        THE COURT:  Would you have asked him about those kind of things in interviewing him?

        THE WITNESS:  I might have, Judge.  I probably would have.  I just, it's six years ago.  It's hard for me to remember.

BY MS. BOOTH:

Q.    Okay, Dr. Johnson.  You remember Dr. Johnson?

A.    I never had any direct contact with Dr. Johnson, but I did

USCA5 4038

talk to Mr. Tinker several times about Dr. Johnson.  He was very upset with Dr. Johnson.

Q.   Why is it that he hired Dr. Johnson or wanted Dr. Johnson?

A.   I think he went to a seminar and she spoke, and he was impressed with her and went up and contacted her after the seminar and told her about this case, and then arranged to have her hired.

Q.   And it wouldn't surprise you that there was --

A.   He may have paid for her out of his own pocket.  I'm not sure.  But -- and then sought reimbursement.  I don't know.  I don't remember if she was appointed by the Court or not.

Q.   Okay.  And did you, do you remember -- I mean, would it surprise you if there had been evidence that during the month of July that there had been many phone call -- I mean, during the month of January of 2004, that Mr. Tinker had had numerous contacts with her, and then there was no more contact after the end of January?

A.   I remember -- I don't know about the contacts he had with her before, but I remember towards trial date, he was very upset with her, because she would not talk to him.  She would not communicate with him.

Q.   And at what point did he find out that she wasn't doing her own testing?

A.   I don't remember.  I just --

Q.   Okay.

USCA5 4039

A.    I just remember him being angry.

Q.    Did he find out that she wasn't doing her own testing, that she was outsourcing it to another lab?

A.    I don't know.

Q.    Okay.  Did he express -- oh, and let me ask you this.  Did Mr. Tinker ask her for a written report?

A.    I believe he did.

Q.    And was he upset that all he got was a handwritten fax note?

A.    That's what I remember, Ms. Booth.  He was upset that he didn't get a formal report.

Q.    A formal report.

A.    Yes.

Q.    Okay.  Your mitigation investigators, how would you rate them in performance?  Did you have difficulty getting in contact with them?  Did they do what they were supposed to?

A.    I really didn't have a whole lot of contact with them, other than -- I know Mr. Tenore spent a lot of time with them.

Q.    Uh-huh.  So --

A.    I initiated the contact with them.  They came down and talked to me.  We discussed the case.  They sent me reports telling me what they wanted to do, about how much time it was going to take to do it, about how much the expense was going to be.  I remember that.  I remember dealing mostly with Ms. Milstein, but it seemed like I dealt with her more than I

USCA5 4040

did Mr. Bierbaum.

Q.   All right.  And do you know when they finally delivered their report?

A.   No.

Q.   And were you hoping they would -- they were channeled to Dr. Cunningham?  Is that correct?

A.   I thought I made inquiries of Dr. Cunningham as to how this was supposed to work, whether they were supposed to report this to him, since he was going to testify, or to both of us. I think I made inquiries about that.

Q.   Do you remember getting a satisfied response, a satisfying response from --

A.   At this point I don't recall getting a response from Dr. Cunningham.

Q.   Okay.  And you'd never had that luxury in state court. Right?

A.   I've had mitigation experts --

        MR. WISEMAN:  Your Honor, objection.  It's not a luxury, it's a constitutional right.

        MS. BOOTH:  And that being said, yes.

BY MS. BOOTH:

Q.   Did you have the opportunity to have a mitigation specialist along with mitigation investigators?

A.   Not in state court, no.

Q.   Okay.

USCA5 4041

A.   I've had mitigation experts, but not a dedicated mitigation expert.

Q.   Okay.  Now, before this case became certified as a death penalty case, did you go to Michael Shelby in Houston and ask that it not proceed as a death penalty case?

A.   Yes.

Q.   Did you have a teleconference with the Capital Crimes Counsel to ask them not to certify this as a death penalty case?

A.   Yes.

     MS. BOOTH:  If I might have just a moment, Your Honor.

     THE COURT:  Yes, ma'am.

   (Counsel conferring off the record.)

     MS. BOOTH:  Your Honor, is there any way we could have a short break?

     THE COURT:  Yes.  But can I ask you something before we take a short break?  Was there any, any indication that this event did not occur on the Navy Base?  Didn't Mr. Bourgeois testify that it occurred on the Navy Base?  She fell out of the truck on the Navy Base?

     THE WITNESS:  Yes, I believe that's correct, Judge.

     THE COURT:  Was there any controversy about that anywhere?

     THE WITNESS:  You know, getting probably confused by

USCA5 4042

the writ and the, what I knew before and during the trial, but I don't recall there being any, any discussion about that.

THE COURT:  Any controversy of any kind?

THE WITNESS:  No.  I don't recall.  I just --

THE COURT:  Okay.

BY MS. BOOTH:

Q.   In a statement that your Defendant gave one of the law enforcement, didn't he say that she was sitting on his lap singing the ABCs when they drove into the --

THE COURT:  Navy Base.

MS. BOOTH:  -- Navy Base?

MR. WISEMAN:  Your Honor, I'm going to object to the question.  My understanding that the Court's ruling in April was that that claim was not going to be the subject of an evidentiary hearing.

THE COURT:  Oh, I thought it was.

MR. WISEMAN:  Oh, no.  Oh, no.

THE COURT:  Okay.  Never mind.

MR. WISEMAN:  Yeah.  I mean, we've got lots to put on, if you want to make it an issue.

THE COURT:  No, that's fine.

MR. WISEMAN:  Take us another two weeks to do it.

THE COURT:  No, no.  No, we don't need that, thank you very much.

MR. WISEMAN:  Teasing.  Teasing.

USCA5 4043

MS. BOOTH:  So we have a break?

THE COURT:  We've got a break.

MS. BOOTH:  Fifteen minutes?

THE COURT:  Fifteen.

MS. BOOTH:  Yes, ma'am.

THE COURT:  Then how many more witnesses do you have?

MR. WISEMAN:  We have Mr. Bierbaum, we have Alan Keel, and we have Kerry Brown.

THE COURT:  Three?

MR. WISEMAN:  Three.

THE COURT:  And then you're done?

MR. WISEMAN:  Yes.

THE COURT:  Okay, thank you.

MR. WISEMAN:  On our direct case.

THE COURT:  Pardon?

MR. WISEMAN:  On our direct case.

THE COURT:  Okay.

MR. ROBERTS:  Your Honor, we'd like to release Dr. Senn --

MR. WISEMAN:  Oh, right.  I'm sorry, Your Honor. There's a prisoner we'll call, this Allen fellow who was writted in.

THE COURT:  Right.

MR. ROBERTS:  We'd like to release Dr. Senn from our witness list.  He's on our witness list.  I don't want to tell

USCA5 4044

him to go unless the Defense is aware that we're going to release him and we're not going to call him any more.

THE COURT:  Any objection?

MR. McHUGH:  The only objection -- not an objection, but I was provided with the Government's copy of his PowerPoint, and I just want to make sure that that will be moved into evidence.  That's the one that I relied upon.

MR. ROBERTS:  It's already in evidence, I believe, Your Honor.

MR. McHUGH:  Okay.

THE COURT:  Okay.  Then he is released, if there are no objections.

MR. ROBERTS:  Thank you, Your Honor.

(Recess from 4:48 p.m. to 5:05 p.m.)

THE COURT:  Are you all ready?

MS. BOOTH:  Yes, Your Honor.

CROSS-EXAMINATION (Continued)

BY MS. BOOTH:

Q.   Okay, Mr. Gilmore, I just have a few more questions to ask you about.  I want to talk to you about the -- you said that the split of the work was done where Mr. Tinker dealt with the experts.  That's right.  Right?

A.   That's right.

Q.   Okay.  And do you remember having any discussions with Mr. Tinker regarding filing Daubert motions or anything about

USCA5 4045

the digitally enhanced photos or the bite marks?

A.    I thought we had a few Daubert hearings, or Daubert, however it's pronounced, but we had a -- I seem to remember having more than one.  But I don't recall specifically what the subject matter was.

Q.    Okay.  Now, there has been -- do you know a person by the name of Ross Griffin?

A.    I represented him in a conspiracy case, marijuana conspiracy case.

Q.    Okay.  And he wasn't called in this case, was he?

A.    Not that I recall.

Q.    Okay.  Why didn't you, or do you remember, did you or Mr. Tinker not object when Mr., Dr. Estrada commented on how the Defendant seemed like he was part of the defense team, like one of the lawyers over at the table, or he seemed indifferent, and like one of the lawyers?  Except I don't believe the lawyers were indifferent.  Do you remember Dr. Estrada making that comment?

A.    Oh, I remember the comment.  I can't remember why I didn't object.  I don't think he was my witness.  I think he was Doug's witness, but --

Q.    Okay.

        THE COURT:  I think he was a Government witness, wasn't he?

        THE WITNESS:  No, but Doug was going to cross him, so

USCA5 4046

he would have objected.

BY MS. BOOTH:

Q.   Okay.  Well, could it have been considered a compliment that he was, that he looked like one of the lawyers, or not?

A.   The indifferent part wasn't a compliment.  That wasn't a compliment at all.

Q.   Okay.  Now, Orlando Campos, do you remember who Orlando Campos was?

A.   I think I had two, three trials, including this one, three trials involving Orlando Campos.

Q.   Okay.  Can you explain for the record what, about those three trials involving --

A.   Two of them, one of them was a mistrial, and the other one was a trial to the conclusion.  It was a murder case out of Bee County that was change of venue to Aransas County and then eventually tried in Victoria County.

Q.   Okay.

A.   He was testifying against my client.

Q.   He was testifying against your client?

A.   Yes.

Q.   And in fact, you cross-examined him extensively as to that when you got him in here.  Right?

A.   I seem to recall that, yes.

Q.   And what did you -- after he testified against your client, did he then recant what he had testified to?

USCA5 4047

A.    Um --

Q.    Or do you remember?

A.    I remember there was a recantation by a lot of -- there were three guys, or three or four guys that testified against my client in that case, and they were waffling back and forth. I think in the end, he did testify against my client, but I think in the mistrial, he recanted.

Q.    Okay.  And how about Adan, Adam Longoria?  Adam Longoria, do you know who he was?

A.    Adam Longoria was involved in another capital case that I had.  And I may be wrong about this, but I believe he testified against my client.  I believe he was a jailhouse snitch, what I consider --

THE COURT:  Did you ever represent him?

THE WITNESS:  No, ma'am.

THE COURT:  Did you ever represent the other guy that you talked about?  Who was the other one?

MS. BOOTH:  Orlando Campos.

THE COURT:  Did you ever represent him?

THE WITNESS:  No, Judge.

BY MS. BOOTH:

Q.    And as far as Darrick Moore is concerned, do you know who Darrick Moore was?

A.    I don't remember.

Q.    Do you remember there being an African American gentleman

USCA5 4048

that came in here and testified about what he had heard

Mr. Bourgeois say while Mr. Bourgeois was in the cell with him?

A.   I remember quite a few people coming in and testifying to

that, things like that.  But I, in particular, not Mr. Moore.

Q.   All right.  Mr. Moore, I will tell you this, Mr. Moore was

a witness that the United States had offered a 5K departure to.

Does that refresh your memory?

A.   I think I cross-examined every witness about their

motivation for testifying and what type of, either a sentence

reduction or a recommendation they were going to get from the

Government.  So if he testified, I asked him about it.

Q.   And it wasn't a surprise to you that federal defendants

would come in and testify for 5K departures, would it?

A.   I've had a couple do that myself, so --

Q.   All right.  I wanted to ask you just one last question, if

the reason that Dr. Cunningham was not allowed to testify in

the sentencing phase had anything to do with Mr. Tinker fearing

that we -- fearing the Government, or fearing anything that we

might do to him if he put somebody on.

A.   Mr. Tinker wasn't afraid of you.

Q.   And the decision not to put on Dr. Cunningham rested in a

group decision?  That's correct?

A.   It was a group decision.  Doug and I had pretty much

decided after we saw the PowerPoint presentation, the notebook,

that he wasn't going to work with our case.

USCA5 4049

Q.   And you had been, we had been in trial since what date?
Do you remember?

A.   It was a long time.  It seems like we started in February
maybe --

Q.   Uh-huh.

A.   -- and ended in March.

Q.   And you were sitting at the, over here at a table for the
defense facing the jury.  Isn't that correct?

A.   Actually, I think I spent most of my time sitting on the
other side of counsel table.  I believe that I would, or was
permitted to go talk to Mr. Bourgeois on occasion, but for
security reasons, I sat on the other side of the table.

Q.   All right.

A.   But I generally face straight ahead or towards the jury.

Q.   Okay.  And so, but you had an opportunity to watch the
jury while different pieces of evidence were being put on.
Right?

A.   I always watch the jury, yes.

Q.   All right.

          MS. BOOTH:  I pass the witness, Your Honor.

          THE COURT:  Thank you.

     (Counsel conferring off the record.)

                    REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.   Mr. Cunningham --

A.    Gilmore.

Q.    Mr. Gilmore.  I'm sorry.

A.    Yes.

Q.    I've been hearing Cunningham.  This is -- you're a unique witness so far in this case.  The Government has asked you many more questions than the Defense so far, so I'm going to have to try --

A.    I have a feeling that that's going to change.

THE COURT:  That's about to change.

BY MR. WISEMAN:

Q.    Yeah, I've got to try to even it up a little bit.  I'm at a little bit of a disadvantage.  Who's Mr. Granberry?

A.    He's my friend.  He's a lawyer.

THE COURT:  He was sitting back there.

MR. WISEMAN:  Oh.

THE WITNESS:  There he is, right there.

THE COURT:  In fact, he's right there.

MR. WISEMAN:  Oh.

THE COURT:  In the blue tie.

MR. WISEMAN:  What's his connection to this?

THE WITNESS:  We're friends.

THE COURT:  He's an observer.

THE WITNESS:  He's a friend.

MR. WISEMAN:  Oh, okay.

THE WITNESS:  He's a lawyer.  He's a friend.

USCA5 4051

BY MR. WISEMAN:

Q.    Is he your lawyer?

A.    Is he my lawyer?

Q.    Yeah.

A.    He's not my lawyer.

Q.    Okay.

A.    I mean, if I needed a lawyer, I'd hire him, but he's not my lawyer.  I don't need, think I need a lawyer in this case.

Q.    I was just curious.

A.    Yeah.

Q.    Did I hear you --

        THE COURT:  Have you got yours here?

        MR. WISEMAN:  What's that?

        THE COURT:  Have you got one here, Mr. Wiseman?

        MR. WISEMAN:  Oh, I've got a whole bunch of them, each one more fierce than the one before.

BY MR. WISEMAN:

Q.    Mr. Gilmore, did I hear you say that you spoke with Ms. Booth last night?

A.    Yes.

Q.    Okay.  And when you spoke with her, about how long did that conversation go on for?

A.    Through dinner time.  I was hungry.  It was probably, from the time that you guys got out of court, I had to drive from Portland over here, so I probably made it over here about 7:30,

USCA5 4052

and spoke with her till about 9:00 o'clock.

Q.    And during that conversation, did she ever use the word "angry"?

A.    She might have.

Q.    And did she use it in relationship to Dr. Cunningham?

A.    She might have.

Q.    And did she tell you that the Judge had mentioned that during the proceedings?

A.    She might have, yes.

Q.    Might have?  Or it sounds like she did?

A.    She did.

Q.    She did.

A.    She did.

Q.    Okay.  Did she tell you anything else about what transpired in these proceedings?

A.    No.

Q.    That's the only thing?

A.    No --

        THE COURT:  Well, independently, did you think Dr. Cunningham was angry with you?

        THE WITNESS:  Dr. Cunningham was very angry at us, Judge.

BY MR. WISEMAN:

Q.    So she didn't relate any other facts as to what was going on in this entire hearing?

USCA5 4053

A.    No.  I think that came up when I was talking about how angry he got when we told him that he wasn't going to testify. And I think she just related that to me.

Q.    In your declaration, you start out by saying that you have never been found or adjudicated ineffective in any case.

A.    Not that I can remember.

Q.    Okay.  I'm just curious, why did you put that in there? What relevance does that have to the issues in the petition?

THE COURT:  Well, you're just -- you're accusing him of being ineffective in this case.

MR. WISEMAN:  Certainly.

THE COURT:  So wouldn't that be relevant?

MR. WISEMAN:  Habit?  Practice?  I don't see the relevance.  I was just wondering what the witness', the witness was thinking at the time.

THE COURT:  Sure.

THE WITNESS:  I don't know.  Maybe I got a sample from somebody.  I don't know.

BY MR. WISEMAN:

Q.    Okay.  Do you feel you're here to defend yourself?

A.    No.  I'm here to tell the truth.

Q.    Have you ever made a mistake in your practice?

A.    Oh, I've made mistakes in my practice.

Q.    Can you sit here and comprehensively tell the Court that you performed flawlessly in this case?

USCA5 4054

A.    No.

Q.    You made mistakes.

A.    I made mistakes in this case probably.

Q.    I understood you to say that you did not use Dr. Cunningham in this case because you felt that his PowerPoint and his overall presentation was inconsistent with your defense that Mr. Bourgeois didn't commit the offense?

A.    That was the main reason.  And we weren't impressed with him, to tell you the truth.  We had dealt -- I think Mr. Tinker had met with him on one occasion before, but when it came time to make the decision what to do in the case, we decided that we weren't impressed with him.  And -- okay.

Q.    And in your declaration, at Page 3, referring to Dr. Cunningham, you say, "The problem, in our perspective, was that Mr. Bourgeois denied he committed the crime and throughout the trial, including his allocution to the jury" --

          THE COURT:  Could you zoom that in just a tad?

          MR. WISEMAN:  Oh, absolutely.

          THE WITNESS:  Yeah, I --

BY MR. WISEMAN:

Q.    "And Dr. Cunningham's explanation," meaning his presentation, "conflicted with Mr. Bourgeois's defense."

A.    That's right.

Q.    And that's what's in your declaration --

A.    Yes.

USCA5 4055

Q.    -- as to your reason.

A.    Yes.

Q.    Could you explain to me, sir, why, if -- well, withdrawn. I don't expect you to go through it in any detail, but let me see if we can, you know, just do it right quick. Dr. Cunningham was going to talk about the effects of an abusive childhood?

A.    I believe he was, yes.

Q.    Among other things.

A.    Yes.

Q.    Okay.  And that was, that presentation was somehow inconsistent with the defense that you had put forward, "I didn't do it, I'm not guilty."

A.    What relevance did that have to if he didn't do it.

Q.    I'm wondering if you can explain the reason then that in your closing argument at penalty phase -- this is at the proceedings of March 24th, 2004, at Page 47 -- and you say, "And his mother singled him out for abuse."  And before you answer that, let me give you another sampling.

      This is Mr. Tinker's closing argument, at Page 59.  Let me put this up.  It might be a little easier for the Court.  "He wouldn't even admit to Dr. Estrada, and Dr. Estrada told you this, that he had been abused as a child.  He told Dr. Estrada that he had a great home life.  And if you recall, that's the kind of psychological problem Mr. Bourgeois had.  You have the

right to conclude that he lied to you.  You have a right to conclude that."

And then in the next paragraph, "Dr. Estrada tells you that he grew up in a society where it was accepted conduct to hit children with items, sticks, switches, electrical cords. He grew up in an environment in which whipping apparently is accepted for the men."

And finally, on the next page, "I'm telling you that," meaning this evidence about abuse, "that's the kind of rearing Alfred Bourgeois had, and that's why he's here today."

Can you explain why Mr. Tinker and yourself argued abuse as an explanation if it was inconsistent with the defense?

A.    Was that me or Mr. Tinker?

Q.    That's Mr. Tinker.

A.    That's Mr. Tinker?  Because he elicited that testimony from Dr. Estrada, I believe, and then we elicited it from maybe some of the witnesses.  I mean, that's --

Q.    Right.  So it was --

A.    Dr. Cunningham -- the main part of Dr. Cunningham's testimony was going to be that Alfred did it, but he did it because of all these pressures that were on him.  I don't think we were going to be able to keep him from saying that part.  I guess we could have, but we elicited that testimony from Dr. Estrada, and I thought Dr. Estrada was effective for us. And we made a decision --

USCA5 4057

Q.    I appreciate that point.

A.    Yeah.

Q.    But my question is, in what way did Dr. Estrada's testimony about abuse as a reason for Alfred Bourgeois having committed the offense differ from Dr. Cunningham's testimony, purported testimony, that Mr. Bourgeois did it because of his history of abuse?

A.    I don't know.

Q.    You don't know?

A.    I don't know.

Q.    You would agree, it's somewhat inconsistent with what's in your declaration?

A.    It's -- yeah.  I mean, my declaration deals mostly with the stress that was put on Mr. Bourgeois that caused him to commit this offense.  That's the main reason we didn't call Dr. Cunningham, because Mr. Bourgeois denied committing the offense.

Q.    But you argued it to the jury, nonetheless.

A.    We didn't argue that.  We argued about his abusive history, past history.

Q.    Oh, I see.

A.    Yeah.

Q.    So you, you --

        THE COURT:  Were you finished answering, Mr. Gilmore?

        THE WITNESS:  I'm finished, Judge.

USCA5 4058

MR. WISEMAN:  I'm sorry if I cut him off, Your Honor.

BY MR. WISEMAN:

Q.   So you're drawing a distinction then between abuse as a mitigating factor and abuse which leads to stress and rage and the commission of the offense?  Is that a distinction you're drawing?

A.   I guess.

Q.   Okay.  Where did you derive that distinction from?

A.   I don't recall.

Q.   Did you -- I'm sorry?

A.   I don't recall.  I'm telling you that we made a decision not to call Dr. Cunningham.  We weren't impressed with Dr. Cunningham.  We didn't particularly think he was going to impress the jury, and we did not like his presentation.  That's a decision that, you know, that trial lawyers make all the time.

Q.   Did you speak with Dr. Estrada at any point -- he was available for you to talk to during the proceedings, I believe.

A.   Yeah, Dr. Estrada and Mr. Tinker spoke several times.

Q.   Did you or Mr. Tinker or both of you together ever have a discussion with Dr. Estrada where he drew the distinction between abuse as a mitigating factor and abuse which leads to rage and other mental health problems as an explanation for the offense?

A.   I don't recall.

USCA5 4059

Q.   You've testified that -- well, you read a lot of letters to the Court.  Is it your view from those letters that they appear to be, for lack of a better word, normal sounding?

A.   I wouldn't say so much normal sounding.  He's -- he was very obsessed with the case, as he should have been, and he was very persistent in making his point of view known.  And he wrote lengthy letters.  And I mean, that's all I can say.  I have clients who don't bother me at all, let me run the case myself, and then I have clients who direct me in the --

Q.   We've received a few of those lengthy letters ourselves.

A.   Yes.

Q.   Ms. Booth was asking you about whether they showed good sequencing, ability to relate a story.  Do you recall those questions?

A.   Yes.  He -- well, the parts that she had me read were sequenced, but he rambled a lot in his letters.

Q.   Did you generally find your communication with him to be not particular extraordinary in any way?  And by that, I mean, he didn't seem unusual?  He didn't seem mentally ill?

A.   I never detected that.

Q.   I'm wondering if you -- I'm going to put this up on the overhead.  It's marked as Petitioner's 145.  It's a motion that was filed in court, Defendant's motion for mental health evaluation, was filed on December 5th, 2003.  I believe it's got your signature on the second page.

USCA5 4060

Paragraph 4 says, "Defense Counsel have each visited with the accused on many occasions, have communicated with him by phone and have corresponded with him in writing."

A.    Yes.

Q.    "Counsel have observed highly unusual, often bizarre behavior, have listened to abnormal conversations and have noticed an unusual writing style."  And you've already talked about the writing style being a little rambling.  What kind of unusual, bizarre, abnormal conversations did you have with Mr. Bourgeois?

A.    I don't recall.  I really do not recall.

Q.    All right.  I can take it from the fact that your signature is on the pleading filed in this Court --

A.    If I filed it, I meant it.

Q.    Okay.  Whose job is it, in your view, or at the time of these proceedings, I guess, is the more accurate question.  Whose job was it, in your view, to ensure that the mitigation specialists were properly performing their function?

A.    Well, in the division of duties, Mr. Tinker was responsible for that part of the case.  If we're talking about the mitigation experts and the mitigation investigators, Mr. Tinker.  The lay witnesses were mine.

Q.    Okay.  And I actually meant more generally.  It's the lawyers' job, in your view?

A.    Oh, the lawyers, yes.

USCA5 4061

Q.    So you hire these folks.  They work for you.  Your job is to --

A.    Right.

Q.    -- ensure that they're doing their job.

A.    Yes.

Q.    You've testified that you didn't see any evidence of mental retardation in your encounters with Mr. Bourgeois.  And I know you've relied in part on Dr. Estrada's view that he had an above average intelligence.  I'm wondering, in your interactions before the encounter with Dr. Estrada, Mr. Bourgeois's encounter, what were you basing your view on that he did not appear to have mental retardation or low intelligence?

A.    What did I base it on?  My conversations with him.

Q.    Okay.  What kind of conversations does a person have if they're mentally retarded?  How do they present?

A.    I don't know.

Q.    So it was just sort of a gut feeling you had?

A.    Just a gut feeling.

Q.    And do you recall that a neuropsychologist named Dr. Weiner was retained by the Defense, and he evaluated Mr. Bourgeois?

A.    Yes.  I remember that he was one of our potential witnesses.

Q.    Right.  And he diagnosed Mr. Bourgeois with a number of

USCA5 4062

Gilmore - Redirect                        215

things, but the one I wanted to ask you about was he diagnosed him with a mild cerebral dysfunction. Do you know how a person presents with that condition?

A.    No.

Q.    Did you ever ask, or did Mr. Tinker ever ask, to your knowledge, Dr. Weiner what that is?

A.    No. I don't know. Doug -- Mr. Tinker dealt exclusively with Dr. Weiner. I never met Dr. Weiner.

Q.    Well, Dr. Weiner's testified that neither did Mr. Tinker. Did you ever have a phone call with him?

A.    Not that I recall.

Q.    Do you recall if Dr., if Mr. Tinker had a phone call with him about the results of his evaluation?

A.    I don't know.

Q.    There's been evidence in these proceedings that Mr. Bourgeois suffers from a borderline personality disorder. Do you know what that is?

A.    A borderline personality disorder?

Q.    Yes.

A.    Well, I have a general idea what it is.

Q.    Okay. Do you know how a person who suffers from it would present?

A.    No.

Q.    Did you ever discuss that potential with any of the mental health folks that you engaged in this case?

USCA5 4063

A.    I didn't.

Q.    Do you know if Mr. Tinker did?

A.    I don't know.

Q.    When Mr. Bourgeois wrote the letter to you about the missing blood vial, did you launch an investigation into that?

A.    It's been six years.  I don't know --

Q.    You didn't, did you?

A.    -- I can't remember.  Hmm?

Q.    You'd remember if you investigated whether the --

A.    I can't remember everything that I did back then.

Q.    Okay.

A.    I can't --

Q.    I'm trying to refresh your memory, if I can.  If you had thought that the FBI had tampered with evidence and had somehow taken a blood vial in this case, where DNA was an issue, you don't think you'd remember that?

A.    I don't recall.

Q.    Okay.

A.    I mean, I don't recall making an issue out of it.  I don't recall it.

Q.    Did you take that complaint from Mr. Bourgeois, that allegation, I should say, seriously?

A.    I don't remember reading that letter.  You know, I read the letter here today, but I don't recall that letter.

Q.    Were allegations like that of evidence tampering and a

USCA5 4064

frame, were they sort of a consistent part of Mr. Bourgeois's presentation?

A.   It was a consistent theme in his letters and his conversations.

Q.   Okay.  And did you accept that?  Did you believe it?

A.   That's what I presented to the jury.  I mean, that's -- did I believe it?  Are you asking me if I believed --

Q.   Yeah.

A.   -- if he was telling the truth?

Q.   Yeah.

A.   No.

Q.   Were those types of letters and conversations among the ones that you described to the Court in the motion for an exam that he was bizarre in his presentation?

A.   Would you rephrase the question?  I didn't --

Q.   Sure.  I'm wondering if these allegations he was making about a frame-up and tampering of evidence, does that fit into the category of his communications that you characterized to the Court in the motion as bizarre.

A.   Yeah, probably.  He was obsessed with Robin and the bad things she was doing to him, and it was hard to keep him on track sometimes.

Q.   That exhibit that the Government put up, 198, was the letter that said, "Certified copy, notarized."

A.   Yeah.

USCA5 4065

Q.   And in fact, it appears that it was notarized.  Just for the record, what's the purpose of notarization of a document?

A.   Swearing to telling the truth.

Q.   And to identify you as the person who signs the document?

A.   Yes.

Q.   Okay.  Did you have any doubt that Mr. Bourgeois had signed that letter?

A.   I'd recognize his handwriting.

Q.   And the tone?

A.   Yes.

Q.   Okay.

A.   Well, that was his handwriting.  I mean --

Q.   Do you know what masking is, in the context of mental retardation?

A.   I have no idea.

Q.   I've met Dr. Estrada on a number of occasions now, and he's truly a wonderful fellow and a skilled practitioner --

          THE COURT:  Do you want to just -- do you want to just ask the question --

          MR. WISEMAN:  Sure, sure.

          THE COURT:  -- instead of testifying, please.

          MR. WISEMAN:  Absolutely, Your Honor.

BY MR. WISEMAN:

Q.   And I think you said that he's highly credentialed and you rely on him?

USCA5 4066

A.    Yes.

Q.    What -- if I told you that he opined in this case that he did not believe that the jury was provided with an accurate and complete picture of Mr. Bourgeois's mental health profile, would you disagree with that?

A.    No.  I mean, if that's what he said --

Q.    Well --

A.    -- I trust him.

Q.    So you don't disagree with his opinion?

A.    I don't disagree with him.

Q.    You saw the e-mails between yourself and Dr. Cunningham?

A.    I read them, yes.

Q.    And was that last evening?

A.    Yes.

Q.    Ms. Booth showed them to you?

A.    Yes.

Q.    Did she describe at all Mr., Dr. Cunningham's testimony about them?

A.    No.

Q.    She just gave them to you to read?

A.    She gave me a bunch of stuff.  I had a stack that thick of stuff to read last night.

Q.    Okay.  Are you aware, from reading that, that Dr. Cunningham's office wrote to you in December of '03 and reminded you -- you, not Mr. Tinker -- that they still had

USCA5 4067

received no materials?

A.   I -- but if you show it to me, I'll -- I mean, I didn't memorize them.  I read them.

Q.   This is Exhibit P-8, Page 19.  "FYI" -- this is from Ms. Lam, who is identified as Dr. Cunningham's assistant.  John Gilmore, December 1st, 2003.  "FYI, we have yet to receive any records, information, materials for Dr. Cunningham to begin working on the report."

A.   I see that, and I see that I responded to her, asking how it works and whether they were supposed to report to him or to me.

Q.   Okay.  So he was appointed to this case sometime in the summer, telling you he needed some time to get ready?

A.   Correct.

Q.   Okay.  And I think on your cross-examination, you said that he told you he couldn't be available for trial in September.  Would it be more accurate that he told you that the investigation would take longer than that amount of time, from --

A.   My recollection --

Q.   Yes.

A.   -- is that he told me that he had a conflict.  And it may not have been the September date.  We had several -- this case lasted quite a while.  We had several dates set, and the case was reset.  But the first time I contacted him, I believe that

USCA5 4068

he said that he had a conflict for the September date.  That's my --

Q.   Well, let's clarify that then.

A.   Okay.

Q.   This is Page 2 of P-8.  "Because the relevant records are often time consuming to identify and retrieve, and because conducting the third-party interviews are similarly time consuming, the investigation alone cannot typically be performed in the time between now, July 1st, and trial," which at that discussion here is mid September.

So essentially, he's telling you, you know, it's not that I'm unavailable, but I can't, you can't pull it together in two-and-a-half months.

A.   I can only tell you, yeah, that's what he's saying here. I just recall at first he was suggesting that we hire another mitigation expert because he had a conflict.  Whether it was for the September setting or a prior setting, I can't recall.

Q.   Okay.  Were you --

A.   So, but it sounds like he's saying here that we can't get the investigation done soon enough for the September setting, and so we asked for a continuance.

Q.   Okay.  And you got that continuance until February.

A.   Yes.

Q.   Okay.  And do you recall having filed a motion before Judge Jack on December 9th, 2003, in which you said, "The

USCA5 4069

mitigation specialists can't get their work done," and you referred specifically to Bierbaum and Milstein, and that they wouldn't be ready until August of 2004.

A.   I may have.  If it's, if I filed it, then that's what I was -- yeah.

Q.   This is P-72.  Sorry for the writing on that.  Oh, I'm sorry.  That's the wrong document.  All right.  You don't dispute that it was filed.

Dr. Cunningham presented his invoice, explained it to the Court yesterday, and indicated that he didn't receive his first bit of mitigation information until January the 30th of 2004, which at that point was two weeks before trial.

A.   If that's what he testified to, then that's --

Q.   Okay.  Assuming that that's the truth and that the Court finds that to be the truth, do you have any explanation as to why six months passed without him receiving any information at all relevant to the mitigation investigation?

A.   The only thing I can tell you is that Dr. Cunningham recommended the mitigation investigators to us, and I was making inquiries as to who do they report to?  Do they report to you?  Do they report to us?  Or do they report to both of you -- both of us?  I don't -- I don't know.

Q.   You don't have an explanation?

A.   I don't recall.

Q.   Oh, okay.  Now, your answer seems to suggest that you

USCA5 4070

didn't get an answer to your questions to whom they report to?

A.    I don't recall getting an answer.

Q.    Okay.  When you didn't get an answer, assuming you didn't, did you say, "Well, hold it a minute.  I'm the lawyer here. It's our job to make sure this gets done.  What's going on? Who's reporting to whom?  When is this work going to get done?" Do you recall having a discussion like that?

A.    I don't recall.

Q.    Okay.  You would agree, though, that ultimately it was the responsibility of you and Mr. Tinker to ensure that this work got done in an appropriate, timely and accurate manner?

A.    We were responsible, yes.

Q.    Dr. Weiner testified this week that when he went in to see Mr. Bourgeois on February 28th, that's already into trial, jury selection had already been completed, that you gave him or Mr. Tinker gave him no records.

A.    I didn't contact Dr. -- is it Weimer or Weiner?

Q.    Weiner.

A.    Weiner.  I didn't contact Dr. Weiner.  I didn't have any discussions with him at all.

Q.    Well, given Mr. Tinker's representation, as I gather -- I unfortunately didn't know the man very well.  I met him a couple of times.  But do you have any explanation for the Court at all as to why he would not, assuming Dr. Weiner accurately recounted, why Mr. Tinker wouldn't have provided him with

USCA5 4071

hospital records, for example?

A.   I don't have any explanation.  I don't -- I don't know.

Q.   You would agree, though, that Counsel in a capital case should give their expert relevant records?

A.   Yes.

Q.   Dr. Cunningham told you that?

A.   Yes.

Q.   You didn't need Dr. Cunningham to tell you that.  You knew that.  Right?

A.   I know.  Yes.

Q.   So that seems to be one of the, maybe one of the mistakes you made in this case?  "You" being you and Mr. Tinker together.

A.   The Defense team?

Q.   Yeah.

A.   If the medical records weren't provided and they were requested, then we made a mistake.

        THE COURT:  With Dr. Cunningham?

        MR. WISEMAN:  I'm sorry?

        THE COURT:  Dr. Cunningham?

        THE WITNESS:  Dr. Weiner.

        MR. WISEMAN:  Dr. Weiner.

        THE COURT:  Dr. Weiner?

        MR. WISEMAN:  Yes.

        THE COURT:  Oh, okay.

USCA5 4072

BY MR. WISEMAN:

Q.   This is Exhibit 61, Petitioner's 61, and it's a packet of memoranda from Mr. Bierbaum to, in this case, it says to John Gilmore.  Okay.  And I want to turn to a particular page.  All right.  You see here on Page 18, it says, "Records"?

A.   Yes.

Q.   I just want to find a page where the, this particular memorandum starts.  Just give me a moment.

MR. WISEMAN:  I'll admit the exhibit, Your Honor, so you'll be able to review it in full.

BY MR. WISEMAN:

Q.   But this is Page 4.  It's a memorandum from Gerald Bierbaum, John Gilmore, November 11th, 2003.  And this is a plan, investigative plan for the Bourgeois case.

A.   Yes.

Q.   And on Page 18, he says, "A thorough mitigation investigation consists of reviewing all papers."  He goes on to say, talk about different kinds of records that should be reviewed.  And Alfred's medical records on Page 19, it says, "Alfred claims he was in a coma for a motorcycle accident.  We need to request the River Parish Hospital records, as well as records of Alfred's birth.  Now, that's in November, the packet of records I showed you at the beginning of my examination indicate he received those on February 20th.  Do you have any explanation to offer as to why you, the collective "you,"

USCA5 4073

didn't get those records from November until almost -- well, till the time the trial had started?

A.    I don't have any recollection.

Q.    Does that mean you have no explanation?

A.    If I don't recall, then I can't explain it.

Q.    Okay.  You would agree that that doesn't seem, that doesn't seem like good practice, does it, to wait that long with trial impending and your mitigation specialist saying, "Look, I need this stuff"?  Waiting -- I mean, that's not right, is it?

A.    It's not right.

MS. BOOTH:  The only thing I'm going to object to is a false characterization of the evidence as far as the records.  There was an invoice issued in February, on February the 20th, I believe.  That's the invoice date.  I don't believe that that's the date, there's any proof on what date those records came into the attorney's office, Your Honor.

MR. WISEMAN:  I think it goes to the weight of it, Your Honor.  I mean, you can make an inference that he received them on the date that the invoice says here are the records.  In fact --

MS. BOOTH:  Unless there is a page that shows the envelope, where it was actually received into the office.

MR. WISEMAN:  It's the exhibit at the bottom.  The invoice says that there are 101 pages.  It doesn't admittedly

USCA5 4074

say that they're attached, but I think Your Honor can draw the inference that the invoice came with 101 pages.  And I therefore don't think it's an admissibility issue but one of weight.

THE COURT:  Go ahead.

MR. WISEMAN:  Thank you, Your Honor.

BY MR. WISEMAN:

Q.   My question was, that doesn't seem right to you, does it?  It seems like bad practice.

A.   If they requested the records and we didn't get them to them on time, then it seems like bad practice.  I mean, I can't recall why the records weren't obtained.  I don't remember.

Q.   I understand.  I have a few questions about Mr. Longoria.  If you were aware that Mr. Longoria was offered a consideration in state court in return for his testimony against Mr. Bourgeois, is that something you would have used to cross-examine him?

A.   Of course.

Q.   Were you ever made aware, in regard to Mr. Longoria, that Ms. Booth wrote a letter on his behalf to the Texas Board of Pardons and Paroles after trial?

A.   I don't recall.  I don't think I knew that.

MR. WISEMAN:  If I could just have a moment, Your Honor.  I think I might be done.

(PAUSE.)

USCA5 4075

228

MR. WISEMAN:  That's all I have.  Thank you, sir.  Oh, Your Honor -- I'll offer them through Mr. Bierbaum.  Never mind.

(Counsel conferring off the record.)

MS. BOOTH:  Your Honor, I'd just like to point out for the record, so it's clear, the date that the Hunter Medical Systems issued their invoice was February the 20th.  There's no indication here that this got to the lawyers -- there's no indication what time it got -- it's 101 pages that was sent, and there's no, there's no indication when it actually got to the attorneys.

THE COURT:  I agree with you.

MR. WISEMAN:  Can I ask a follow-up in regard to that, Your Honor?

THE COURT:  Yes.

MR. WISEMAN:  Do you have any recollection of receiving these records?

THE WITNESS:  None at all.

MR. WISEMAN:  And if, in fact, the invoice came at about the time of the records --

THE COURT:  Mr. Wiseman?

MR. WISEMAN:  Yes.

THE COURT:  You don't know that, so move on from something else.

MR. WISEMAN:  Okay.  That sounds fine.

USCA5 4076

MS. BOOTH:  He can be dismissed, Your Honor.

THE COURT:  Are you finished?

MS. BOOTH:  I don't have any other questions.

THE COURT:  Thank you, Mr. Gilmore.  You're excused.  Call your next witness.

MS. LARIN:  Your Honor, I'd call Mr. Kerry Brown.

(PAUSE.)

THE COURT:  Would you -- I've got Mr. Jimenez here standing by.  Would you mind calling the inmate?

MR. WISEMAN:  Oh.

MS. LARIN:  Mr. Brown has trial tomorrow and is trying to get back tonight, so I was hoping to get him on his plane.  I mean, it's -- you get to choose.

THE COURT:  Well, I'm worried about Mr. Jimenez, too, so we're going to do Mr. Jimenez's client next.

MS. LARIN:  That's fine.

MR. McHUGH:  Your Honor, I spoke with Mr. Jimenez during the break, and he was going to go down and talk to his client, and then he was going to -- and talk to us about whether we could go speak to him.  So I told him that, you know, as soon as the witness was done, I would talk to him.  So I'll do that now.  But we do need an opportunity --

THE COURT:  Have you talked to him, Mr. Jimenez?

MR. JIMENEZ:  I have talked to him, Your Honor.

THE COURT:  And?

USCA5 4077

MR. JIMENEZ:  He wants to testify.

THE COURT:  Okay.

MR. McHUGH:  So if we may just have an opportunity to go down and talk to him briefly, and then we'll be ready to go. And Mr. Jimenez --

THE COURT:  Okay.  Make it quick.

MR. McHUGH:  Thank you.

THE COURT:  I'll give you ten minutes, fifteen, then come back up and we'll put that on.

MR. McHUGH:  We will do so.

THE COURT:  Go ahead.

MS. LARIN:  Would you like me to start this next --

THE COURT:  Yes.  Go ahead.

MS. LARIN:  Okay.

THE COURT:  Come forward, please, sir.

KERRY BROWN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LARIN:

Q.   Good evening, Mr. Brown.  Can you please state your name for the record?

A.   Kerry Dion Brown.

Q.   And just so you know, please do not touch the microphone in any way.

A.   Okay.

MS. LARIN:  Your Honor, just to state on the record,

USCA5 4078

Mr. Brown is Mr. Bourgeois's former lawyer, and Mr. Bourgeois

has waived any attorney-client privilege.

BY MS. LARIN:

Q.    Mr. Brown, where do you practice?

A.    I practice in St. John the Baptist Parish out of LaPlace,

Louisiana.

Q.    And what do you do?

A.    I have a private practice under my name, Kerry D. Brown,

L.L.C., where I do personal injury, family and business law.

And I'm also a prosecutor for the City of St. John the Baptist.

And I'm a Felony Division B prosecutor.  I am the drug court DA

for the parish, and also I'm the parish attorney tied to the

council, the parish council.

Q.    You're a busy guy, very busy man.

A.    I try, try to stay busy.

Q.    Okay.  And in your county, just to clarify, the District

Attorney's work, you can have a part-time office as a District

Attorney?

A.    Yeah.

Q.    Okay.

A.    I mean most, honestly, we have several -- we only have two

full-time assistants in the D.A.'s office in St. John the

Baptist Parish.  That is the elected official, and also he has

one attorney that has been appointed full-time attorney.  I

know he -- but our warrants are part-time warrants, though.

USCA5 4079

They're not for full time.

Q.   And you actually ran for District Attorney a few years ago.  Correct?

A.   I did, in October of 2008.

Q.   How much of the vote did you get?

A.   I think it was a 44-50 -- I don't remember the total number, but it was --

        MS. BOOTH:  Your Honor, I'm going to object to the relevance of this line of questioning.

        THE COURT:  Sustained.  Would you please get to the point of him testifying?

BY MS. LARIN:

Q.   And in 2001, what were you doing?

A.   I was a criminal defense attorney at that time, as well as had my private practice.  But I was on the opposite side of the criminal field.

Q.   And did you have the opportunity to represent Mr. Bourgeois?

A.   I did.  I did.  I represented him in several matters.  He came to me more so -- I knew him through his wife.  Robin and I, we'd known each other since middle school, through junior high, through high school.  And so I met him through Robin.

Q.   Okay.  And just briefly, can you list the legal matters that Mr. Bourgeois was facing at the time?

A.   He, well, he had -- he had a couple of issues.  He had

USCA5 4080

family matters tied to -- you know, he came to me pretty much, I had a criminal hearing over in Edgard, and I was handling a case out there.  Once I walked out into the foyer, he and Robin were there, and they told me he had an issue tied to Robin's mother, and there was another issue tied to the limousines, with Al's limos, that Robin, I think, was dealing with, but he may have been brought into it.  And when he came to my office, he was dealing with, you know, he had his business or his trucking business and other issues that he was dealing with that.  You know, he just pretty much put everything out there.

So the very first day I met him, it was more of a shotgun type, it was everything that he was dealing with.  And subsequent, following our first meeting, he and I met.  I advised him to come back once he made a couple of hauls, or whatever he did, come back, and then we spoke specifically on issues tied to his family, tied to a child support issue that he was dealing with.  But he had several child support issues that he was dealing with.  The most recent one had come up out of the case with a young lady out of Texas.

Q.   Okay.  And at that first meeting, how did he present himself?

A.   Mr. Bourgeois was always someone who, I mean, he was very well dressed, very well groomed.  However, he was always someone who I believed, he sort of like wanted to maybe let you know everything he had.  I mean, he did share with me, you

USCA5 4081

know, he had his home, he had vehicles, motorcycle, he had all these things he shared with me.  And unfortunately for me, of course, in private practice, you know, I do that.  I usually require information on who they are more so to find out whether or not they can afford the services that they are about to retain me for.

But Mr. Bourgeois pretty much shared with me all of his issues.  And I noticed, in my office, where we were at that time, he didn't, he didn't stay seated.  Mr. Bourgeois actually stood most of the time, and he walked from one end of the room to the other end of the room to my office area.  And it gave me the impression that he obviously was trying to make certain that I knew that he was in control of our situation.

And I say, well, but it wasn't an issue much at that time. Subsequently, it became to be more of an issue as to the more appointments we had, it spilled over into all of my other appointments.  And so it really created some issues over time.

Q.    Meaning he would take up too much time?  Is that what you meant?  He would take up more time than you had allotted for his meeting?

A.    Absolutely, yes.  Yes.

Q.    And did his behavior seem unusual to you?  Is that what you're trying to say, partly?

A.    To me it was.  I mean, in my office, I control and I dictate what happens in my office.  I mean, I tell them all the

USCA5 4082

Brown - Direct

time, "You come to me, you get my time.  I'll give it to you.

But this is what I'm giving to you."  I control what happens

with my time in my office.  And I noticed that with

Mr. Bourgeois, it was a little more complicated for me to

manage and control my time.

Q.   And did you subsequent -- you kind of hinted at this, but

you subsequently learned that all the money he said he had, he

actually did not have?

A.   I learned it very quickly, when my first retainer payment

didn't come in when it was supposed to come in.  And I knew

that he was on the road at the time, and -- but I knew that,

yeah, he didn't necessarily have -- if he did have it, he

wasn't coming in my office towards the services that were

needed immediately.  It did come subsequently, but I believe he

had to go maybe and -- I don't know if he spoke with a brother

or spoke with a family member or somebody who did help him to

pay the initial retainer, but he did not have -- if he had the

house, car and all the things he had and all the things that he

had acquired, maybe that's where his money was, but it

definitely wasn't in his bank account with his ability to

retain me for the services that he needed at that time.

Q.   And did you later learn that he actually was having some

problems with debt?

A.   Yes, I did, because again, as he began coming to me, the

more I began to get to know him, the more I realized he had

USCA5 4083

other obligations in the form of child support that he was paying.  I knew that he was obviously -- I think he had a new truck at that time, and it was a very nice truck.  However, when -- you know, I was no expert tied to how people manage their business, but I knew that with my smaller business owners, usually when they come to me, I create their -- I help them to create their L.L.C.s, I get their EIN numbers for them, and usually with those guys, I'm usually trying to do things to help them to manage their finances, more so, so that in the event they need their attorney, they will be able to pay their attorney.

But I saw with Mr. Bourgeois that he did not have a very good control over what was going out and what was coming in. And only because he, again, when he was on a haul, he came back, he was paid, but he was completely broke when he was paid on whatever.  Now, I didn't know what other issues he had in his life, but I knew that he wasn't managing that side well enough.

Q.   And did you try to discuss this kind of thing with him about making a plan for his business?

A.    I did.  But again, again in private practice, the purpose of that plan was to make certain that if you're going to retain your attorney, to be able to afford him.

Q.    Uh-huh.

A.    I mean, so I did sit down with him and go over what he was

USCA5 4084

dealing with. And when I asked him concerning his, you know, where he was going, when he was coming back, at one time I know he was leaving and going out west, and you know, he left the office. I want to say a few days later, we ended up getting a, well, maybe about a week-and-a-half later, we got a postcard. He knew that I graduated from the University of Utah, so he had traveled through Salt Lake and had sent me a postcard from Salt Lake, letting me know, okay, this is where I am. Which I must be honest with you, I've never had my clients send me postcard, I mean, to say this is where I am. But he did it, came back and he told me where he was, what he did.

And then again when we looked at, okay, I know you want to talk, however, there is a retainer that was required at that time. I think it was maybe $1500 or so at that time, and he couldn't afford it. And so that's when I tried to say, okay, let's try to maybe back it up a little smaller steps for you, maybe to help you realize what costs you have that you could probably eliminate. And you know, once I got into that, that's when I realized he probably was in over his head.

Q. And did you, when you say in over his head, were you able to convey to him, could he understand taking these smaller steps that you're trying to tell him about --

A. I think he, I mean, if he could understand what I was saying, yes, he understood what I was saying. But to be honest with you, he was dealing with a lot of issues. And he

USCA5 4085

understood when I was talking to him about his business.  But what I got from his mouth was everything tied to his family and his problems.  And that's where -- that's why most of our time was lost in our initial meetings, because he was so preoccupied with other issues that he couldn't focus on -- I mean, I was trying to make sure that he would at least, if I'm dedicating this time, you've got to be able to pay for it, okay, and --

Q.   So you're saying one thing to him, and what is he saying back to -- you're saying, "Hey, don't forget, you need to make some money and pay me," and what is he saying back to you?

A.   I wasn't so superficial.  I mean, but --

Q.   Right.  Of course.

A.   But I was definitely --

Q.   And in summary.

A.   Yeah, I was pretty much letting him know that, hey, look, this is your obligations.  This is where you are and where you're going.  How much -- you know, count the miles, look at the distance, gas is whatever, you know, your lodging.  Consider whatever.  While I'm doing that, he's dealing with issues tied to his family, his wife and her issues that she had with the gentleman that I know that he had come in contact with Mr. Al Teabolt.

Q.   You mean, when you say "he's dealing with," you mean he's speaking with you?  He's talking about his wife?

A.   He is.

USCA5 4086

Brown - Direct

Q.   And what --

A.   I'm saying --

Q.   Can you just briefly tell us what exactly he was so upset about, about his wife?

A.   I mean, he had learned, or he -- I don't know how soon it was from my timing meeting with him, but I know that he knew that Robin a relationship with another man, who was from St. John the Baptist Parish who had a limousine company.  His name was Al Teabolt.  And this gentleman strongly resembled, strongly resembled Alfred.  And I know Robin, he had learned of it, and this guy had the exact opposite relationship with Robin's family than Mr. Bourgeois had, because Robin's mother and the family took Al in, where they didn't take Mr. Bourgeois in.

Q.   And Mr. Bourgeois was upset about this?

A.   He was pissed off.  Yeah, he was.

Q.   How could you tell that he was upset?

A.   Sorry, Judge, but he -- because he told me.  I mean --

Q.   He would talk about it?

A.   Yeah.  He pretty much expressed his frustrations.

Q.   And did he tell you details about what had gone on between Mr. Teabolt and Mrs. Bourgeois?

A.   He shared with me what his wife had shared with him.

Q.   And what, I mean, you don't need to get into details but --

USCA5 4087

Brown - Direct

MS. BOOTH:  Your Honor, I just want to know the relevance of mental illness or mental retardation, where does this fit in?  The conversations he had with his attorney about his wife cheating on him?

THE COURT:  Please, could you move on to something relevant, please?

MS. LARIN:  But I would like to respond, because if it's not relevant, I will stop.  The reason we are having Mr. Brown testify is because we were under the impression that Your Honor would like to hear from people that the doctor spoke to and relied upon.  And we were trying to provide a broad view of what the doctors heard.  I know that it -- I mean, I understand that some of this stuff you have heard before, so -- this, for example, Mr. Brown was a source of the stressors --

THE COURT:  Could you just make it quickly, whatever it is, make it very quickly?

BY MS. LARIN:

Q.   Okay.  We will try to make it quick, Mr. Brown, to talk about the stressors that Mr. Bourgeois was undergoing when you knew him in 2001, 2002.

A.   Okay.

Q.   Okay.

A.   He was dealing with the fact that he knew that his wife had gone through every potential sexual experience that she could have experienced with him with this man also.  He was

USCA5 4088

also trying to balance the child support issues that he was dealing with and also the fact that he had a new home, or excuse me, a new truck that obviously he was kind of heavy on the regular note, whatever the payment was. He had a company he was working for, but because of the issues tied to his wife and his family, he wasn't focusing on his hauls that would get him to and from different points. And whenever he would go wherever he was going, I'm not sure how he navigated whatever he did, but I knew that it was, when he came back, he was, it appeared to be more in debt than he was when he left.

Q. Okay.

A. And I believe that he was trying to balance the issues with the home and keeping that close to him while on the road.

Q. And just one more thing. Did you also notice evidence of, besides the stressors that you noticed he was going through and the obsession over Robin's infidelities, did you notice that, any times that Alfred had trouble understanding or making poor decisions?

A. I mean, what I would call, I mean, I was --

Q. You're not an expert. This is just --

A. Keep in mind -- yeah. Keep in mind, when I met him, I mean, I had two offices, okay, and I was balancing staff in two offices, and I was taking whatever limited time I had right there to make sure I could put it towards productive cases. What I began recognizing is that Alfred honestly is a very nice

USCA5 4089

Brown - Direct

person.  He was somebody who I believed wanted to have complete control over everything.  And because that he wanted -- because of the fact that he, I don't know if it was because he grew up that way or because of how he wanted to run his life, but he told me about money that he spent on his home, for example, in the location where his home was.

It's a nice, it's a nice -- upgrades, he put marble, he put a pool, put all this stuff in this home, but the reality was that the home was maybe worth maybe $90,000 at that time.  And he spent probably two-thirds of the value of the home in improvements that didn't add square footage to the home and didn't do anything with the property.  The property may have been worth maybe 15 to $20,000 at that particular time.  He was sharing with me all the things that he was doing.  And to me, I realize, I mean, it could have been simply being misguided.  It could have been trying to keep up with whatever.  But the bottom line is that he made poor decisions, to me, that I said it doesn't make any sense to do that.  If you have that money, put it towards -- you can put it towards something that would actually return something for you.  And that's what I would sit down and try to plan out for him.  But the reality is that he couldn't, I mean, he wasn't paying much attention to what I was saying to him, you know.

Q.   And just briefly, you were involved in the custody arrangement that brought the victim to Mr. Bourgeois's -- into

USCA5 4090

Mr. Bourgeois's custody.  Correct?

A.    Yes.

Q.    I know that you obviously did not intend for what happened to have happened.

A.    Oh clearly, no.  He came to me telling me that another, another issue came up.  And I think it -- I think maybe Texas may have picked up a child support, or maybe the mother of this particular child was receiving some sort of assistance from the State of Texas, or Texas may have picked up the support obligations and said, "Okay, who's the father?"  She named him.  He received notice.  I'm not sure if he was already placed on something, but I know he did come to me, letting me know that this is another issue I'm dealing with.  And so the bottom line, you know, he was telling me initially how Robin was completely unfaithful, when in actuality, it appears that Robin was, you know, doing the same thing he was.

        MS. BOOTH:  And again, Your Honor, I'm going to object to relevance.

        THE COURT:  Can you get to something here --

        MS. LARIN:  I'm trying.

        THE COURT:  -- that is relevant --

        MS. LARIN:  I'm trying to get there.

        THE COURT:  -- quickly?

        MS. LARIN:  Okay.

BY MS. LARIN:

USCA5 4091

Q.    And you had an occasion -- how did it come about that the custody arrangement was made?  Do you know?  Did you --

A.    Yes.

Q.    What did you do?

A.    He came to me.  I told him, "Well, there's an option.  You know, I'm not licensed in Texas, so I cannot go to Texas.  However, I can communicate with the mother to see whether or not she would be willing to work something out with you."  And that's exactly what I did.  He gave me that -- I believe he may have given me her telephone number.  I did call her, but I told him, I said, "I can only do a document here to where she would have comfort in knowing where her child would be, and that she would be able to --"

THE COURT:  I'm sorry.  You called the mother directly?

THE WITNESS:  Yes, I did.

THE COURT:  Knowing she was represented with the Attorney General?

THE WITNESS:  The mother was not represented with the Attorney General.

THE COURT:  Who was representing her when she filed suit?

THE WITNESS:  The mother didn't file suit, from what I understood.  That child support obligation, whenever the AG's office gets involved, their interest is tied to the child, not

to the mother.  And it's quite like in my state, or in Louisiana, because I currently do all --

THE COURT:  Whoa.

THE WITNESS:  -- the child support obligations here.

THE COURT:  Okay.

THE WITNESS:  But that, the idea was that she was saying that she wanted her payments --

THE COURT:  Didn't the Attorney General file suit?

THE WITNESS:  I have no -- I'm not sure.

MS. LARIN:  I believe, Your Honor, it was -- according to Mr. Brown, it was related to some Government assistance she was applying for.

THE COURT:  That's, in Texas.

MS. LARIN:  Yes, yes.

THE COURT:  When you owe, when you're getting Government assistance, the Attorney General makes you file an affidavit of who the father is, and they file on her behalf for child support.

MS. LARIN:  Oh.  I thought Mr. Brown said it was on the child's behalf.

THE COURT:  No, it's --

MS. LARIN:  It's on the mother's?

THE WITNESS:  Yeah, my appreciation, Your Honor, may I --

MS. LARIN:  Might be a state difference or something.

USCA5 4093

MS. BOOTH:  But it's not relevant to this.

THE COURT:  No, but I was just curious.

THE WITNESS:  Well, I mean part, if I might --

THE COURT:  Okay.  No, just wait for the questions, please, sir.

THE WITNESS:  Okay.

BY MS. LARIN:

Q.   And you spoke to Ms. Harrison, and can you just tell us briefly, and we're going to move on.

A.   She was -- okay.  I spoke with her, letting her know, I mean, that Alfred is a client of mine.  I said, you know, "Alfred" -- I think they had, I don't know if they had an arrangement that he was paying her or that she wanted $200 a month.  For some reason that number sticks out.  I made the arrangements, said, "Here's the deal.  He would like to go ahead and make whatever payments."  However, he also wanted to share time with his child.  And she was fine with him saying, okay, well, if he wanted to have the child during the summer, then that's perfectly fine.

I said, "Okay, well, all I'm going to do is draw this document up."  I said, "You have every right to go ahead and consult with whoever you want to consult with on your end."  I notarized Alfred's signature from this side right here, and I told him he'll have to get it to her.  And at that point, I didn't have any further contact with her.

USCA5 4094

Q.   Okay.  And then at some point you were brought to testify potentially as a witness at this trial by the Defense?

A.   I was.  I was here.  I was here.  Yes, yes, I was.

Q.   And did you ever meet with Mr. Tinker or Mr. Gilmore?

A.   No, I -- you asked me before, and the truth is, I don't know.  I knew that there was a gentleman here who everyone in the hotel was telling me had just gotten off, I guess he was a defense attorney who had just gotten a cop killer off.  That's what the people were telling me at the hotel.  I didn't have any interaction at that point.  I know I did speak with Mr. Gerald.

Q.   Bierbaum?

A.   Gerald Bierbaum.  I did speak with him.  But as far as speaking with the attorneys, I don't remember the direct conversation that I would have had with the attorneys.  I did speak with Gerald, though.

Q.   Okay.

        MS. LARIN:  Okay.  I pass the witness, Your Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Good afternoon.

A.   Good afternoon.

Q.   I should say evening.

        THE COURT:  Night.

USCA5 4095

MS. BOOTH:  Night.

BY MS. BOOTH:

Q.   So basically, if you were brought in here to testify at the trial, you could testify that he was overbearing.  Correct?

A.   He was.

Q.   That he was jealous of his wife.  Right?

A.   (No response.)

Q.   That -- right?

THE COURT:  I'm sorry.  Answer, please.

BY MS. BOOTH:

Q.   Yes or no.

A.   Yes.

THE COURT:  Sorry?

THE WITNESS:  Yes.

BY MS. BOOTH:

Q.   Yes?  That he had a bunch of children that he was not paying his child support on.  You could testify to that, too.  Right?

A.   Yes, that's another way to put it, yeah.

Q.   Yes.  You could testify that you represented him on a case where he beat the hell out of his mother-in-law.  Right?

A.   I did defend him on that charge also.

Q.   Okay.  And you could testify that he was charged in a case where, of destruction of property.  Right?

A.   He was, yes.

USCA5 4096

Q.   And so -- well, let me just ask you, you're a prosecutor, you're a lawyer?

A.   Yes.

Q.   You've probably tried many cases.  Right?

A.   I have.

Q.   Would you bring in a witness to testify that your Defendant, if he was saying that he was innocent, would you bring in witnesses to testify that, number one, he was jealous, overbearing, owed everybody child support, beat up his mother-in-law, and then he was, destroyed property?  Would you bring somebody in to testify to that?

A.   See, I have the benefit, honestly --

Q.   Would you?  Would you?  Just answer my question.

A.   I would, only because I had the benefit of knowing all of the details on all of those cases.  I mean, the issue with the mother-in-law --

Q.   Uh-huh.

A.   -- that wasn't --

Q.   So you're going to come in, when he's charged with a murder case, and you're going to try to say -- oh, didn't he hit her with a lamp and break it?  Wasn't she bruised tremendously on her shoulders?

A.   Yeah, see, that's --

     MS. LARIN:  Objection, Your Honor.  I feel like this might be berating a little bit.

USCA5 4097

THE COURT:  Take it down.

THE WITNESS:  Well, honestly, see, I --

THE COURT:  Go ahead.  Answer the question.

THE WITNESS:  That was not conclusively --

THE COURT:  Okay.

THE WITNESS:  That was not there.

THE COURT:  Okay.

THE WITNESS:  I mean, the evidence that the --

THE COURT:  Okay.  Answer the question "yes" or "no," if you can.

THE WITNESS:  Yeah.

BY MS. BOOTH:

Q.   Just "yes" or "no."  Would you bring somebody in to testify to all those things?

A.   If they were true, yeah.  I mean, whether -- there would be no sense in it.

THE COURT:  Was he convicted?

THE WITNESS:  No.

THE COURT:  Okay.

THE WITNESS:  No, he wasn't.  And that's the whole issue.

BY MS. BOOTH:

Q.   Well, are you going to testify he's jealous of his wife?

A.   Yeah.

Q.   You're going to testify that he owed everybody child

support?

A.    Yes.

Q.    You're going to testify that he didn't pay his child support.  You're going to testify that he's charged in two other offenses.

A.    Yes.

        THE COURT:  He's saying, nodding his head to all those things.

        THE WITNESS:  Yes, yes.

        MS. BOOTH:  Okay.

        THE WITNESS:  I'm saying "yes" as well.

        MS. BOOTH:  Okay.  I pass the witness, Your Honor.

        THE WITNESS:  Yeah.

        THE COURT:  Okay.  Anything else?

        MS. LARIN:  No, Your Honor.

        THE COURT:  Thank you.  I'm sorry?  You all really need to learn to stand up --

        MS. LARIN:  I'm sorry.

        THE COURT:  -- on your side.  Thank you.  You may stand down.

        THE WITNESS:  Thank you.

        MR. McHUGH:  Call Timothy Allen, Your Honor.

    (Witness sworn.)

        THE COURT:  Mr. Allen, you know I've appointed you a standby attorney that you've talked to.  Is that correct?

USCA5 4099

THE WITNESS:  Yes, ma'am.

THE COURT:  Would you like him standing by you, or out there?

THE WITNESS:  No, I'm all right.

THE COURT:  Okay.  Thank you, sir.

MR. McHUGH:  Mr. Allen, before I even ask you your name, I just want to let you know, please don't touch the microphone.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  That's unlikely.

MR. McHUGH:  If only you could lean into it.

THE COURT:  Thank you.

TIMOTHY ALLEN, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. McHUGH:

Q.   Could you state your name for the record?

A.   Timothy Lynn Allen.

Q.   Okay.  And Mr. Allen, are you presently incarcerated?

A.   Yes, sir.

Q.   Okay.  And where are you incarcerated?

A.   Three Rivers Medium FCI Facility in Three Rivers, Texas.

Q.   And that's a Federal --

A.   Federal prison.

Q.   -- Bureau of Prisons?  Okay.  And why are you incarcerated?  What was your charge?

USCA5 4100

A.    Felon in possession of firearm.

Q.    Okay.  So a 922(g)?

A.    Yes, sir.

Q.    Okay.  And I want to bring your attention to the summer of 2003.  Were you incarcerated at that time in the Nueces County Jail in Corpus Christi?

A.    Yes, sir.

Q.    Okay.  And was that also for the felon in possession charge?

A.    Yes, sir.

Q.    Why would you have been in a county facility at that time?

A.    I can't hear you.

Q.    Do you know why you were in a county facility for a charge?  Had it, was it county or was it a federal charge at that time?

A.    Oh, when I got arrested, it was just a felon in possession.  The Feds hadn't picked it up yet.

Q.    Okay.  And so subsequent to your arrest, was it adopted by the Feds?

A.    Yes, sir.

Q.    By the federal government?

A.    Yes, sir.

Q.    Okay.  Okay.  And so you were in the county facility in the summer of 2003, Nueces County.  Is that right?

A.    Yes, sir.

USCA5 4101

Q.   Okay.  During your time at the Nueces County prison, did you meet an inmate by the name of Alfred Bourgeois?

A.   Yes, sir.

Q.   Okay.  And did you have contact with him while you were in that prison?

A.   Yes, sir.

Q.   Okay.  And did you have conversations with him while you were in that prison?

A.   Yes, sir.

Q.   What was the nature of your contact?  Where would you meet him?

A.   We'd have little church services.  We'd get in there and talk about scriptures and stuff, you know, trying to --

Q.   Okay.

A.   -- give good information and stuff, mainly spiritual.

Q.   Okay.  Did Mr. Bourgeois, during the time that you spoke with him, during the summer of 2003, did he ever make any type of admissions to you about his case that he was incarcerated for?

A.   No, sir.

Q.   Okay.  During your time that you were incarcerated at the Nueces County prison the summer of 2003, did you also meet an individual by the name of Darrick Moore?

A.   Yes, sir.

Q.   Okay.  And did you also have daily conversations or, you

know, conversations with him on an interim basis while in

custody?

A.   Yes, sir.  We were in the same cubicle area.  We stayed in

the same cubicle area.

Q.   Okay.  And did he express to you any type of worry about

the sentence that he was --

          THE COURT:  I'm sorry.  Is Darrick Moore going to be

here?  I mean, how are we getting this in?

          MR. McHUGH:  Well, this goes to the Brady claim, Your

Honor.  It's not -- it's not as if this was a trial testimony,

as far as -- it goes to the Brady claim.

          THE COURT:  What is the Brady claim?

          MR. McHUGH:  That there were promises made to the

individuals that did testify at trial that was not disclosed.

And this is evidence of that.  So that's what this goes

towards.

          THE COURT:  The Government will have to --

          MS. SALINAS:  We would be objecting to anything he

would be saying about Mr. Moore or Mr. Longoria, Your Honor,

because it would be considered hearsay.

          MR. McHUGH:  Well, Your Honor --

          THE COURT:  Sustained.

          MR. McHUGH:  If I may respond?

          THE COURT:  Sustained.

          MR. McHUGH:  It goes to the state of mind of

USCA5 4103

Mr. Moore, which is highly relevant.  The Brady claim is not a claim that we would be asking to be admitted at trial.  It's a claim here in the 2255 context.  And Mr. Moore's state of mind is certainly circumstantial evidence as to this issue that the Government has denied, whether or not he was promised a deal.  And his statements to that effect, I think, are highly relevant to Your Honor's decision as to the merits of that claim.  And that's why we're offering it.  I'd ask that we be permitted to present the testimony.  And if the Court finds that it's inadmissible for some reason, the Court can just discard it.

THE COURT:  I just did.  Now move on.

MR. McHUGH:  Well, Your Honor, that was the -- he's here to testify as to, that Mr. Moore told him that he was --

THE COURT:  I'm sorry.  I'm not accepting that.  Thank you.

MR. McHUGH:  Can I --

THE COURT:  And you're not going to be able to testify to it.

MR. McHUGH:  Well, I didn't mean to -- can I make a proffer?

THE COURT:  Let me tell you this.  You do that one more time, and I may hold you in contempt.  This is several times you've done that.  You may not.  You may not testify.  And that's the way it goes.

MR. McHUGH:  May I make a proffer as to his

USCA5 4104

testimony, Your Honor?

THE COURT:  Thank you.  Are we finished with him?

MR. McHUGH:  If the Court is denying my --

THE COURT:  Okay.  You can stand down.  Call your next witness.

MR. WISEMAN:  Gerald Bierbaum.

MR. JIMENEZ:  May I be excused, Your Honor?

THE COURT:  Thank you, Mr. Jimenez.

GERALD BIERBAUM, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WISEMAN:

Q.  Good evening, Mr. Bierbaum.  Could you state your name for the record?

A.  I'm Gerald Bierbaum.

Q.  And I told you on the way up not to touch the microphone.

A.  Correct.

THE COURT:  Thank you, Mr. Wiseman.

MR. WISEMAN:  You're welcome, Your Honor.

BY MR. WISEMAN:

Q.  What do you do for a living, sir?

A.  I'm an Assistant Federal Defender for the District of Nevada.

Q.  And do you have a particular specialty there?

A.  I'm in the Capital Habeas Unit.

Q.  All right.  And that's the, a sister office of the office

USCA5 4105

I work for?

A.    Yeah.  I think yours is the CDO, but yeah.

Q.    We both work for Capital Habeas Units?

A.    Right.  Correct.

Q.    I want to direct your attention to the summer of 2003. How were you employed at that time?

A.    I was in private practice.  I was working as a mitigation specialist and as a lawyer.

Q.    And briefly describe your history as a mitigation specialist.  When did it start?  When did you become a lawyer and when did you go to full-time law practice?

A.    I started, I interned for the ACLU in Los Angeles on the death penalty project in 1994 to early '95.  I came back to Houston.  I grew up in Houston.  I came back to Houston, and I got hired at the Texas Resource Center in March of '95.  I think they were defunded in September of '95, and you know, everybody went their own way.  And then I started as a private investigator and mitigation specialist from probably like June of '96, maybe earlier '96, all the way through until I took the position as an Assistant Federal Defender in Nevada in August of '05.

Q.    And do you know a woman named Lisa Milstein?

A.    I do.

Q.    And how do you know her?

A.    She was -- she officed with Mike Charlton and myself from

USCA5 4106

1996 till about right around the time of the Bourgeois trial, maybe a little -- maybe a month or so after.

Q.   And did you have a business relationship with her?

A.   Yeah.  When she got appointed, or when she got hired to work up capital trials, I worked most of those trials with her, or writs.

Q.   And how did you and she divide your work on those cases?

A.   Largely, I had other cases, too.  I was working for a lady named Tina Frances, so my investigative services were largely owed to Tina Frances.  When Lisa got appointed or got a job, I would help her read the records, identify who to talk to, what to talk to them about, you know, help her decide where to send records requests, and kind of read and edit her reports largely.

Q.   And was that the arrangement that you -- well, withdrawn. Were you eventually authorized by this Court under the Criminal Justice Act to perform mitigation specialist services for Mr. Bourgeois?

A.   Yes.

Q.   And that would have been in, around the summer of 2003?

A.   Yes.

Q.   And at that time, were your arrangements with Ms. Milstein -- well, was she appointed as well?

A.   Yes.

Q.   And did you work that case, at least in theory, the way

you had worked your previous cases?

A.    It was, we were supposed to work it in that manner, yes.

Q.    I want to show you what's been previously marked as Petitioner's Exhibit 165.  You didn't create this document, did you?

A.    No.

Q.    Did you have a chance to review it before today?

A.    I've seen it.

Q.    Okay.

A.    I don't know that I reviewed it closely, but I've seen it.

Q.    What do you understand it to reflect?

A.    The progression of reports that were written and sent to either Mr. Gilmore or Dr. Cunningham or somebody, or maybe both of them, somebody on the team.

Q.    Okay.  And this date up on top here, did I show you the particular report that's referenced there?

A.    Yeah, I've seen that report.  I mean, I think I generated that report.

Q.    Okay.  Do you agree that that's the correct date?  Or was it 2003?

A.    No, I'm sure it was 2003.  I mean --

Q.    You weren't on the case in two thousand --

A.    No, I don't think -- no.

Q.    Did you interview Mr. Bourgeois along with Ms. Milstein shortly after being appointed?

USCA5 4108

A.    Yes.

Q.    And did you generate a memoranda about that interview?

A.    Yes, I believe I did.

Q.    And among other things, did you make any observations or write anything down about this coma that he claimed to have suffered?

A.    I'm sure I did.  If he had spoken about it, if it was of substance, we wrote it down.  I wrote it down.

Q.    And did you then tell or relate that fact to either Mr. Gilmore or Mr. Tinker?

A.    Sure.  All of our reports were forwarded to Mr. Gilmore and Mr. Tinker.  I believe they were e-mailed mostly to Mr. Gilmore, because Mr. Tinker didn't check his e-mail and didn't communicate in that way.

Q.    Did I also show you what's been marked as P-81, prior to your testimony today?

A.    I have seen that before, yes.

Q.    Okay.  The date of the invoice on these records is 2/20/04.  Do you recall when you first saw those records?

A.    I do.  We were up here, or I was up here, I think, to help decide who to subpoena for the punishment phase.  It might have been one trip before that.  And I found the parish hospital records on Mr. Gilmore's desk as I was making a phone call.

Q.    And do you recall when that would have been?

A.    I don't remember the date, no.

USCA5 4109

Q.   Okay.  Was it close in time to the trial proceedings?

A.   Yes.  Yes.  I mean, we had asked for the records ages before, and I was surprised that they were there, and we hadn't -- I hadn't seen them.

Q.   Just to be as precise as we can, was it during the guilt phase of the trial that you think you saw them?  Or was it later than that or earlier?

A.   I would --

Q.   Using the guilt phase as a reference point.

A.   I wasn't down here -- I would guess it was during the guilt phase.  I wasn't down here, I wasn't in the courtroom for the guilt phase.  I think Mr. Tenore was assisting during the guilt phase.

Q.   So it would have been late in the guilt phase?

A.   I would guess.

Q.   Were there any other instances of your seeing things for the first time after you -- well, did you ever think that Counsel had things relevant to the mitigation phase that you hadn't seen in a prompt fashion?

A.   Oh, surely.

Q.   Okay.  And can you tell the Court what instances that would be?

A.   The one that stands out the most, I think, was actually during the punishment phase, there was a psychological evaluation from Mr. Bourgeois's interview with the police, with

the Sheriff maybe in one of the parishes in Louisiana.  And that was something that we had, we had been going after that file and trying to collect all of his records, every record that we knew about, and I was surprised that that was on counsel table and we had never seen it.

Q.   And what was your understanding of -- well, describe for the Court the processes you understood of who would identify the records to be sought, whose responsibility you understood it to be to get them, and once they were received, how were they supposed to be distributed?

A.   Well, we were, I mean, Lisa and I largely identified which records might be available.  We had done many capital trials before.  And so I think I went through and searched and found the custodian of records' name and address for each entity that we were seeking records from.  It's my memory that I provided that to Deana, who was the paralegal in Mr. Gilmore's office, and she was going to, you know, actually issue the records requests or the subpoena, and some of them required money, and so she would issue them a check.  And then the records would come back to her office to be distributed to all of us.  I mean, that's how I thought it was going to work.

Q.   All right.  And so your understanding was it was not your responsibility to actually write the letters requesting the records?

A.   I think we had a discussion about that, and it was going

USCA5 4111

to flow through, because some of them required funds, you know, required records search checks and things like that. And it was my understanding it was going to flow through Mr. Gilmore's office, in order to keep a central repository of the records as well.

Q. Referring back to this packet of hospital records, P-81, are you aware if and when they were provided to Mark Cunningham?

A. If I didn't have them -- if I would have got them, I would have summarized them and sent them to them relatively quickly. So if Mr. Gilmore's office possessed them, you know, I don't know when they went to Mr. Cunningham or if they did.

Q. In creating such a summary, would you have made note of the 1993 motor vehicle accident wherein Mr. Bourgeois went to the hospital and complained that he hit his head on the steering wheel of his 18-wheeler?

A. Oh, absolutely. Yeah, because I remember he got, we picked up that he got sued in Louisiana over a similar accident, and that's in the chronology that we developed.

Q. And why would you have noted that?

A. Because it's a header injury -- a head injury, and it's, you know, could be causing neurological damage or -- I'm not a doctor, but you note every time something like that happens, and you provide it to your expert.

Q. And I take it from your answer that that's potential

USCA5 4112

mitigating evidence?

A.    Absolutely.

Q.    Were you aware of whether Dr. Weiner ever got those records?

A.    I don't believe he did, but I mean, once again, I didn't distribute them to him.

Q.    I want to put this summary, P-165, back up.  And I notice that in January, the interviews seem to stop being done by Milstein and begin to be done by Bierbaum, or Bierbaum and Milstein.  Do you have any recollection, and can you explain to the Court if you do, why that shift happened?

A.    I do have a recollection.  In the short form, the work wasn't getting done, and the quality of work wasn't getting done.  We weren't receiving the same quality of work that we had from Ms. Milstein in the past.

Q.    And --

A.    And on top of that, just the number of witnesses we had identified, probably half or two-thirds of them hadn't been spoken to yet.

Q.    And when did you first begin to notice that the work was not up to the standards you would come to expect?

A.    I would think in, you know, that early winter or late fall, right around that same time.

Q.    And what led you to the conclusion that the work was not up to standard?

USCA5 4113

A.   The interviews were far too brief, and you know, there wasn't enough detail.  The interview reports weren't detailed.  There wasn't follow-up.  It wasn't the same type work that we have done in the past.

Q.   And did you, do you recall Ms. Milstein having gone to New Orleans to do this investigation?

A.   She made a couple of trips that I didn't in the fall, or maybe one in the fall and one early winter, early December.

Q.   And that was the trips that produced these particular summaries?

A.   Yes.

Q.   Did you come to learn a reason or potential reason for this decline in her work?

A.   I did afterwards.  I didn't when this was going on.  If I would have known later on what I knew, we would have stopped and, you know, maybe replaced her or whatever.

Q.   Did you have a discussion with Ms. Milstein about this decline and the reasons for it?

A.   Around this time, we had several discussions about the interviews need to get done, and they need to be done appropriately, and we've got to get this data, and you know this thing is going to trial in March or February, or whenever it was.  You know, the urgency of the work was building.

Q.   And did she have a response for you about why the work hadn't been done?  Did she dispute it?

USCA5 4114

A.    She was -- no.  She was, at that time she was telling me that she had neurological problems and that she had had seizures and that she was going for medical tests, and you know, there were a series of different, I guess excuses is the best word.

Q.    And did you report this problem to either of the lawyers or to Dr. Cunningham?

A.    Well, it was -- I think it was fairly apparent from the interviews that were going out, you know, that we were going to shift gears, or that I was going to pick up and try to get the rest of it done myself.

THE COURT:  Well, who did you tell that to?  Did you tell anybody that she was having problems?

THE WITNESS:  No, I wouldn't tell anybody that she's having medical problems, no.

BY MR. WISEMAN:

Q.    Did you subsequently --

THE COURT:  Well, did you tell any of those, either of the attorneys that her work was not up to par?

THE WITNESS:  We had discussions that we, some of these people would, I think, be reinterviewed and that I would pursue the rest of it.  I don't know that --

THE COURT:  Who did you discuss that with?

THE WITNESS:  Either Mr. Gilmore or Mr. Tinker.

THE COURT:  Did you discuss it at all with

USCA5 4115

Dr. Cunningham?

THE WITNESS:  I had three telephone conversations with Dr. Cunningham, and he had pointed out some errors in some of the interview reports.

BY MR. WISEMAN:

Q.   Did you subsequently have a discussion with Ms. Milstein post-trial as to what was actually going on in her life?

A.   Subsequently, I would say probably late spring or early summer, she came into the office one morning when I was heading up to Polunsky, and she just looked just horrible.  And you know, I got my stuff and left, and I got out to the freeway and turned around and decided I had to come back and say something. So I -- I'm not her father or whatever, but I finally came back and told her, you know, that --

MS. BOOTH:  Your Honor, I'm going to object to any hearsay.

THE WITNESS:  Okay.

MS. BOOTH:  What he said to her certainly is admissible.  But any kind of conversation they had, this is hearsay.  Ms. Milstein could have been subpoenaed by the Defense if they wanted this information out.

THE COURT:  Sustained.

MR. WISEMAN:  Your Honor, I would submit that it is a statement against interest that Ms. Milstein's going to, that Mr. Bierbaum is going to reveal that she had broken the law.

USCA5 4116

THE COURT:  Okay.  You know what?

MR. WISEMAN:  And I don't want to go into detail obviously, but --

THE COURT:  You just did.

MR. WISEMAN:  Well, I --

THE COURT:  You know, and I'm going to warn you all one more time.  Do not testify in this case.

MR. WISEMAN:  I didn't mean to, and I apologize, Your Honor.

THE COURT:  One more time you do this, and there will be sanctions.

MR. WISEMAN:  Yes, Your Honor.  But my objection --

THE COURT:  So that is not happening.

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  So go on to something else.  You want Ms. Milstein here, you get her here.

MR. WISEMAN:  Well, how do --

THE COURT:  Her state of mind is not relevant here. Now, move on.

MR. WISEMAN:  Your Honor, if I could just ask, how can I make a response to a hearsay objection when I believe it's against penal interest without telling the Court what the alleged violation of the law is?  I'm not sure I -- I didn't mention the specific violation, but I'm not sure how I can possibly do that.

USCA5 4117

THE COURT:  Well, what relevance would it be anyway?

MR. WISEMAN:  Well, I would propose to the Court that this witness is going to tell the Court why the investigation wasn't getting done.  If the Court doesn't want to hear that, then I guess it's not relevant, but --

THE COURT:  Well, what is the relevance of it?

MR. WISEMAN:  As to why it wasn't getting done?

THE COURT:  Yes.  I mean, what is the relevance?

MR. WISEMAN:  Well, I assume that the Court --

THE COURT:  I mean, everybody's -- you know, several people have testified that the mitigation experts did not do their job.

MR. WISEMAN:  Right.  And I think -- I would think the Court is going to make some credibility findings about who is being truthful.

THE COURT:  Well, Ms. Milstein is not here.

MR. WISEMAN:  No, that's true --

THE COURT:  So I'm not going to make a credibility finding about her.  I can make one about him, however.

MR. WISEMAN:  Right.  But you can make a credibility finding about his relating the conversation he had that was against Ms. Milstein's penal interest.

THE COURT:  No.  I'm not -- this is ridiculous, Mr. Wiseman.  Move on.

MR. WISEMAN:  I think it's a legal argument, Your

USCA5 4118

Honor.

THE COURT:  I have just ruled.

MR. WISEMAN:  Okay.

THE COURT:  This is another one of your problems.  I have ruled.  Move on.  It is late at night.  I'm really tired of this.

MR. WISEMAN:  Yes, ma'am.

THE COURT:  So when I rule, I don't expect any more arguments.

BY MR. WISEMAN:

Q.    Mr. Bierbaum, do you recall any time in December of 2003 being contacted by Mr. Gilmore or Mr. Tinker with respect to a motion for continuance that they were in the process of putting together and filing with the Court?

A.    I don't recall that.  They could have talked to Ms. Milstein.

Q.    Do you recall having a discussion with either of them subsequent to the filing about whether you were going to be dropping all of your other work and focusing solely on this case because Judge Jack was not going to grant a continuance?

A.    I recall being informed that the case was going to go to trial in late February or early March, and being really concerned that the work hadn't been done.

Q.    Right.  Okay.  I appreciate that.  My specific question is, were you consulted by --

USCA5 4119

MS. BOOTH:  He answered, Your Honor.

MR. WISEMAN:  I have a different question.

MS. BOOTH:  He didn't like the answer.

MR. WISEMAN:  No, I have a different question.

THE COURT:  Okay.

BY MR. WISEMAN:

Q.   Were you consulted by Counsel with regard to whether you could drop all of your other work and focus solely on his case?

A.   I don't recall that.

Q.   Do you recall when Dr. Cunningham came to Corpus Christi for this case?

A.   I recall being aware that he was coming to Corpus Christi. I don't think I was here the first time he evaluated Mr. Bourgeois.

Q.   Okay.  I should have been more precise.  Were you here when he came here for his purported penalty phase testimony?

A.   Yes.

Q.   Do you recall when he got here in relation -- the penalty phase started on a Monday.  Do you recall when he got here?

A.   I think he got here Sunday afternoon, and I got here Sunday evening.

Q.   And do you recall any meeting taking place between Dr. Cunningham, yourself and the two defense team, two defense attorneys?

A.   I wasn't part of that meeting, no.

USCA5 4120

Q.   Do you know if such a meeting took place?

A.   I assume it did.  It was, I've heard reports about it, that --

Q.   And what was your understanding of what the result of that meeting was?

A.   That it was very brief, and the trial counsel wasn't really very aware of what Mr. Cunningham, Dr. Cunningham wanted to do.

        MS. BOOTH:  And Your Honor, and I want to know where -- he's testifying to what?  Did he see the meeting?  Did he speak to someone?  What's going on here?  He is asking for an impression.  Where is this coming from?

BY MR. WISEMAN:

Q.   That's my next question.  How do you know?

A.   Dr. Cunningham told me about the meeting.

Q.   And were you around on the day that trial counsel told Dr. Cunningham he wasn't going to testify?

A.   Yes.

Q.   Were you ever involved, or are you aware of any meeting ever between trial counsel and Dr. Weiner?

A.   I wasn't present for any meeting like that.

Q.   Do you know of any meeting?

A.   I don't know of any, no.  I don't recall any off the top of my head.

Q.   Were you -- just a moment.

USCA5 4121

MR. WISEMAN:  If I could just have a moment, Your Honor?

THE COURT:  Yes, sir.

(PAUSE.)

BY MR. WISEMAN:

Q.   Just one more area, Mr. Bierbaum.  In your interview with Mr. Bourgeois, interviews -- you did more than one, I take it?

A.   I think I interviewed him, formally interviewed him twice.

Q.   And in those interviews, did you ever learn from him that he claimed to have been abused as a child?

A.   During the second interview, he discussed that.

Q.   Okay.  And you related --

THE COURT:  I'm sorry.  I didn't hear the response.

THE WITNESS:  During that second interview, he discussed that.

THE COURT:  Okay.  Thank you.

BY MR. WISEMAN:

Q.   And did you relate that to trial counsel?

A.   I wrote a report, yeah.

THE COURT:  Can I ask what kind of abuse he described to you?

THE WITNESS:  He had been kind of the, the stepchild of the family.  His mom had picked on him, had made him, you know, clean up after everybody and wear the hand-me-down clothes, and she gave him beatings far more frequently than all

USCA5 4122

the other kids.  And it was, you know, from my memory, it was kind of open hand, kind of not spankings, but beatings as a child.

I remember specifically, I don't think it was -- he confirmed, and then somebody else had talked about how his mom used to have these really long fingernails, and she would pick his nose really hard until it was bleeding both inside and out.

BY MR. WISEMAN:

Q.   And did you hear similar reports from other lay witnesses that you had interviewed?

A.   Yes.

Q.   And did you share that with Counsel?

A.   Yeah, any time I interviewed somebody, I wrote a report and passed it along to either Counsel, or Counsel and the experts.

Q.   Do you have any recollection of the name Park Dietz in this case?

A.   I do.  I vaguely remember that either Mr. Tinker or Mr. Gilmore had mentioned that the state had been talking about calling Park Dietz.  I took that and went and collected a couple of his transcripts and just, you know, tried to have the material available for them to review, should we have to deal with him.

Q.   Did you ever see any written materials generated by Dr. Dietz, regarding this case?

USCA5 4123

A.   No.

Q.   Do you recall Counsel telling you anything about specifics that Dr. Dietz would come in here and rebut?

A.   No.

Q.   Do you recall any detail at all, other than name, the invocation of the name Park Dietz?

A.   No.

Q.   Do you recall any discussions with Counsel about their concerns about Park Dietz?

A.   I think we just weren't, you know, they weren't familiar with what he had to offer, who he was, or I think they were familiar with his reputation, but not his manner of testifying or subject area or --

Q.   Okay.

          MR. WISEMAN:  That's all I have.  Thank you, sir.

                    CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Hi, Mr. Bierbaum.

A.   Hello.

Q.   My name is Patti Hubert Booth.  And I want to ask you a few questions.  Okay?

A.   Okay.

Q.   Okay.  You were a lawyer back then when you were working with Ms. Milstein?

A.   Yes, sir -- yes, ma'am.

USCA5 4124

Q.   Okay.  And so -- and she wasn't.  Right?

A.   Correct.

Q.   Now, when you were working on this case, how many cases had you worked on with death penalty, in this kind of mitigation, when you took this case?

A.   How many capital trials had I worked on?

Q.   Uh-huh.

A.   Probably 15 or 20.  A bunch.

Q.   Okay.  So you were pretty much an expert.  Right?

A.   I was a mitigation specialist.  I wasn't, you know --

Q.   Okay.

A.   -- a trial expert.  I hadn't actually tried one.  I hadn't been a lawyer five years.

Q.   Okay.  And can you tell me what date it was that y'all finally turned over your product to the defense attorneys?

A.   I have -- I think we sent them an e-mail, just as they were being created.  I can't tell you that we turned over this report on that day, but I can tell you that as soon as I wrote the report and read it, we e-mailed it out to trial counsel.

Q.   So if I had an e-mail from you dated January the 30th of 2004, where you're sending Dr. Cunningham, here's a bunch of material for the Bourgeois case, okay, and we need to set up a meeting, would January the 30th have been the date that you turned over that information to Dr. -- and it looks like you copied John Gilmore and Douglas Tinker.  Could that have been

USCA5 4125

the day that you turned over the --

A.    Yes.  I mean, that's how we, that's how I distributed reports was through the e-mail.

Q.    Okay.  So those reports didn't get to those lawyers until January the 30th.  Right?

A.    I wouldn't be sure that they didn't get to Mr. Gilmore.  I would -- I think that was probably when we were given the green light to give stuff to Dr. Cunningham.

Q.    Okay.  Well, this says that it's going to Dr. Cunningham and it's going to John Gilmore.

A.    I would be, I would CC Mr. Gilmore and Mr. Tinker to show them what I'm sending to Dr. Cunningham.

Q.    Okay.  And so, and I want to ask you another question about, you testified that you -- you weren't here for the guilt/innocence phase.  Right?

A.    Correct.

Q.    So you came down for the death penalty part, and you came on that Monday.  Right?  I mean on that Sunday evening.

A.    I believe so, yes.

Q.    So that would have been March the 21st.  You know that date?

A.    I do not, no.

Q.    So was that the date -- when was it that you were at Mr. Gilmore's office and you saw those medical records on his desk?

USCA5 4126

A.    I came down -- I came down several times.

Q.    Uh-huh.

A.    Probably in that spring.  I came down maybe on the day they argued guilt to help decide who was going to be subpoenaed for the punishment phase.

Q.    Okay.  And that was after the trial was already over.

A.    I think it was the day they argued guilt.

Q.    Okay.  The day they argued guilt.

A.    It's the day before the subpoenas went out for the punishment phase.  We came down and ran through the list and decided who we were going to subpoena for the punishment phase.

Q.    Okay.  Now, tell me all the things that you did for this case.  How many people did you talk to and write a report on?

A.    Any witness I spoke to, I wrote a report on.  I mean, I don't have --

Q.    How many?

A.    I don't have a running tally.  I would guess between, I personally spoke to, I guess, between 15 to 20 maybe.

Q.    All right.  And would you consider your mitigation team there that you were working, did you consider yourself pretty much a high quality producer?

A.    We had been in the past, yes.

Q.    Okay.  And in fact, if you were a attorney that was doing a death penalty case, would you have hired you for a mitigation investigator?

USCA5 4127

A.    Yeah, I suppose.  I mean, I don't know.

Q.    Okay.  And would you expect to depend on your mitigation investigator to get the stuff to the attorney?

A.    If a mitigation -- usually trial counsel and a mitigation investigator sit down together and decide who's going to be interviewed, and then yeah, the mitigation person has got to go out and actually do the interview, write the report and send it.

Q.    And didn't that happen?  Didn't you sit down with Mr. Gilmore or Mr. Tinker, I don't know which one, and present them with a plan of what you had planned to do?  In fact, isn't that a Petitioner's exhibit?

A.    I don't know if it's a Petitioner's exhibit.  Yeah, initially, we usually start with an investigative plan.

Q.    All right.

A.    That was usually the first document that's created.

Q.    And do you remember when you did that?

A.    I do not.

Q.    Okay.  And you said you were a little disappointed with the way the reports were going.  Did you ever call Mr. Tinker or Mr. Gilmore, and say, "Look, you know, I'm really not happy with what Milstein's doing, and you know, her work is slipping. I'm sorry I haven't gotten this stuff to you.  I know it's late"?  Did you ever have that conversation with them?

A.    I had conversations with them.  I don't know if it had

USCA5 4128

that quality or that tenor but --

THE COURT:  With who?

MS. BOOTH:  With Mr. Gilmore and Mr. Tinker.

BY MS. BOOTH:

Q.   So they didn't know that you were having a problem.
Right?

A.   They didn't know what kind of problems she was having.

Q.   Okay.  Well, obviously it's your problem, too, because
you're working with her.  Right?

THE COURT:  They were a team.

MS. BOOTH:  They were a team.

BY MS. BOOTH:

Q.   I mean, you were a team.  Right?

A.   Well, yeah, there was a whole trial team involved, yes.

Q.   Yeah, but you were the team, you and Ms. Milstein.

THE COURT:  There was what involved?

THE WITNESS:  A whole trial team involved.

THE COURT:  Okay.

THE WITNESS:  There usually is in a capital case.

THE COURT:  Well, everybody needs to be informed,
don't they?

THE WITNESS:  Yes.

MS. BOOTH:  Well, you're a lawyer --

THE COURT:  Sorry?

THE WITNESS:  I'm sorry?

USCA5 4129

THE COURT:  Doesn't everybody need to be informed?

THE WITNESS:  Yes.

BY MS. BOOTH:

Q.    When did you present them with your final product, your trial notebook?

A.    I put it together -- I don't recall the date it went out. It was, I think it was maybe ten days before voir dire, a week before voir dire.  I don't recall the date it went out.

Q.    Ten days what?

A.    Before voir dire, or maybe a week before voir dire.  I don't recall the date it went out.

Q.    Okay.  So if voir dire began in February, February the 17th, so you would have gotten it to them February the 7th?

A.    Possibly.

Q.    So this date of finally getting the reports out on the 30th of January is not that far off.  Right?

A.    It's not that far from February 7th.

Q.    So you were hired in October and did not present a trial notebook or your product to the attorneys until around February the 7th?

A.    If that's the date that it shows that, you know, that's when the trial notebook was sent, that's when it was sent.

Q.    Okay.  Now, when you met with Mr. Bourgeois, okay, did he give you the names of people to go and talk to?

A.    Certainly.

USCA5 4130

Bierbaum - Cross

Q.   Okay.  And did he give you phone numbers and addresses where you could locate them?

A.   I don't recall if he gave me phone numbers and addresses or not.

Q.   Okay.  And you said you talked to him, what was it, four times?

A.   No, I talked to him several times.  I formally interviewed him and wrote reports twice.

Q.   Okay.  And when you would meet with him, did he give you issues that he wanted addressed?

A.   We had discussed his case.  He would probably talk about things that he was interested in, and we discussed his case and discussed the development of the mitigation and how that would work.

Q.   All right.  And he sent you to the different relatives that he wanted.  Right?

A.   We probably asked him who he grew up with and where he grew up and things like that, and we would listen to his familial background and takes note from that.

Q.   And how about Mr. Kerry Brown, his attorney, how did he get to him?

A.   We learned about him through, either through talking to, you know, his, one of the sisters or maybe even through Mr. Bourgeois.  I don't remember how I got his name, but --

Q.   Now, did you have a hard time when you spoke to

USCA5 4131

Bierbaum - Cross

Mr. Bourgeois about him giving you directions?  Was it -- was he clear when he spoke to you about who he wanted you to talk to and any other information he wanted you to look at?

A.   I don't recall having discussions like that with him.  I would sit and listen to him and have him tell me about his life story, where he grew up, how he grew up, the things that had happened to him, and I would take notes and kind of develop a plan from that.  I don't remember him telling me go see this --

THE COURT:  Who said he had names and phone numbers?

MS. BOOTH:  Mr. Gilmore and --

THE COURT:  Said that he gave names and phone numbers to Mr. Bierbaum, didn't he?  Do you remember that?

THE WITNESS:  I don't recall him -- I would have asked him for names of family members in discussing his background.  I don't recall sitting down saying -- I don't want to mislead the Court or anybody.  I don't recall sitting down saying, "Who should I go talk to," and listening to his answers.  That's not how that interview would work.

THE COURT:  Okay.  But did he give you phone numbers?

THE WITNESS:  It's very possible he did.

BY MS. BOOTH:

Q.   After you spoke to him and you got those things, did you go tell anybody, "I think he's retarded"?

A.   No, I don't recall saying that.

Q.   Okay.  And if you would have sat down with him -- I mean,

USCA5 4132

Bierbaum - Cross

you've done this how many times before this, 25 times before this?  If you would have sat down with him and had a conversation with him and thought he was retarded, would you have passed that message on to someone?

A.    What I would have done is probably suggested, you know, very strongly suggested we have him evaluated by either a neurologist or a neuropsychologist or something like that.  I mean, I'm not a doctor.  I don't get to say these guys are retarded or not.  And surprisingly or not, I've had clients that I thought were average before --

Q.    Okay.

A.    -- who weren't.  So I wouldn't have passed that judgment.

Q.    But you wouldn't have passed that information on to anyone that you had that feeling?

A.    I would have suggested that we get him evaluated in some manner.  I wouldn't have decided he was retarded or not, because I've been --

THE COURT:  Well, did you do that in this case?

THE WITNESS:  Did I ask that he be evaluated?

THE COURT:  Yes.

THE WITNESS:  I think we suggested that he needed to be evaluated.

BY MS. BOOTH:

Q.    No -- now, and why was that?

A.    Because --

Q. Not for mental retardation.

A. Right, because of the other signs of, neurological signs.

Q. Because of the accident that he reported to you he had. Right?

A. It was that and other --

Q. It was a head injury. Right?

MR. WISEMAN: Your Honor, can the witness answer the question?

THE COURT: Let -- yes.

MS. BOOTH: I'm sorry.

THE COURT: Ms. Booth, let him continue, please.

THE WITNESS: It was that and other things. I thought there were other signs of neurological dysfunction.

BY MS. BOOTH:

Q. All right. Did you think he was retarded?

A. I wouldn't have passed judgment on that. I mean, I --

THE COURT: Okay. This is, could you -- did you? Yes or no. You passed judgment on head injuries and other things.

THE WITNESS: No, I collected symptoms and decided that we should probably have him evaluated.

THE COURT: Well, I know. Did you collect any symptoms of mental retardation?

THE WITNESS: I don't remember noting any at that point.

USCA5 4134

THE COURT:  Okay.  I mean, that really was the question.

BY MS. BOOTH:

Q.   Now, Mr. Bierbaum, did you prepare a video that you gave to Mr. Tinker?

A.   Mr. Tinker gave me a big box of home videos, and we went and edited some of those together at a studio that he organized or that he provided, and we edited clips.  I watched all of those videos.

Q.   Right.

A.   And we edited those clips together into one big video.

Q.   And when you gave the finished product to Mr. Tinker, did he view it?

A.   I --

Q.   Did you see him view it?

A.   No, I didn't see him view it.

Q.   Did he ever give you any feedback on what he thought about --

MR. WISEMAN:  Your Honor, I don't know why the prosecution is screaming at the witness.

THE COURT:  Take it down, Ms. Booth.  You're right.

MS. BOOTH:  Thank you, Your Honor.  I'm just dramatic when I get hungry.

THE COURT:  Did you want a peanut butter break?

MS. BOOTH:  I need one, Judge.  I think I'd be much

nicer if I wasn't so hungry.

THE COURT:  Well, just don't gnaw on the witness.

MS. BOOTH:  Sorry, Mr. Bierbaum.

THE WITNESS:  That's all right.

MS. BOOTH:  But he seemed to be taking it well.  It only bothered Mr. Wiseman.

THE COURT:  Well --

MR. WISEMAN:  I'm a more sensitive fellow.

THE COURT:  It is a little loud for all of us.

BY MS. BOOTH:

Q.   Okay.  Mr. Bierbaum -- I forgot what I was going to ask you now.  Oh, the video, the video.  So you're the person that manufactured, that put those clips together?

A.   I went through, I looked at all of the home videos that were in the box that Mr. Tinker provided, and I identified the clips that were ultimately on the finished product.

Q.   And did Mr. Tinker give you any feedback about what he thought about that video?

A.   He thought the jury might be offended by it.

Q.   Do you remember what clips you put on it?

A.   I do not, no.

Q.   Okay.

A.   I remember it made me sick watching the shakiness of it over and over again.  It gave me huge vertigo.

THE COURT:  The what?

USCA5 4136

THE WITNESS:  The camera, it was a hand-held camera, and it would shake and bounce --

THE COURT:  Okay.

THE WITNESS:  -- constantly.

BY MS. BOOTH:

Q.   Do you know who was doing the videoing that was shaking when they were doing it?

A.   I think most of them were made by Mr. Bourgeois.  I think some of them were made by his wife or other persons in the family.

Q.   Well, if he was in the video speaking, and you could see his hands, obviously he wasn't doing the videoing.  Right?

A.   Well, yeah, they were home videos that were taken from his house that were of him and his family, I believe.

Q.   Did Mr. Bourgeois go over his theory of the case with you?

A.   I don't recall right off the top of my head.  I mean, yes, we discussed the case and what happened and the offense and all that.  I don't recall him, you know, getting down to a level of strategy in the courtroom or anything.

Q.   Okay.  But he maintained his innocence the entire time.

A.   Yes.

Q.   And did he blame his wife for the murder?

A.   Yes.

Q.   And was that consistent every single time you talked to him?

USCA5 4137

A.   No, there was nothing consistent every time I talked to him.

Q.   What?

A.   There was nothing consistent every time I talked to him.

Q.   So he changed his -- every time you talked to him, did he maintain his innocence?

A.   Yes.

Q.   And every time you talked to him, did he maintain that it was his wife that did it?

A.   To the best of my knowledge, it was a story that was similar to that.

THE COURT:   What do you mean?

THE WITNESS:   I mean, when you talk to Alfred, you would learn a little bit about this and a little bit about that.  And the next time you'd learn a little bit different about this and a little bit different about that.  So the things I learned from him weren't consistent, and it wasn't like other Defendants who would repeat the same stories every time you talk to them.  It wasn't that type of situation.

BY MS. BOOTH:

Q.   Well, did you feel like he was lying to you?

A.   Not necessarily.  I just think the stories were different.

THE COURT:   What does that mean when people tell you several different stories about the same event?

THE WITNESS:   It could mean a host of different

USCA5 4138

things.  It could mean they're not having clear memories.  It could mean they're not organizing things as you or somebody educated would.  It could mean, you know, that they've been thinking about it or they've been on the phone with somebody and heard a fact that now that's in the story you're getting now.  It could mean a lot of different things.

MS. BOOTH:  I don't have anything further, Your Honor.

MR. WISEMAN:  Just a few, Your Honor, and I'll --

THE COURT:  Yes, sir.

REDIRECT EXAMINATION

BY MR. WISEMAN:

Q.  Could his different stories be the product of a mental illness?

MS. BOOTH:  Your Honor, he's asking --

THE WITNESS:  I suppose they could.  I'm not an expert.

MS. BOOTH:  -- him to testify about a mental health issue.

THE COURT:  He just said --

MS. BOOTH:  Okay.

THE COURT:  -- he wasn't an expert.

MR. WISEMAN:  That's a good answer.

THE COURT:  I'll let Mr. Winestein testify.

MR. WISEMAN:  Wiseman.

USCA5 4139

THE COURT: I'm sorry. Mr. Wiseman.

MR. WISEMAN: Okay.

THE COURT: Too much Milstein.

BY MR. WISEMAN:

Q. How do you know if a person's mentally restarted? You, as a mitigation specialist.

A. A psychologist or a neuropsychologist tells me.

Q. Okay. And when you told Mr. Gilmore and Mr. Tinker about the coma from the 18-wheeler accident -- from the 3-wheeler accident back in November, is that something that you would then want to turn over to a neuropsychologist or a psychologist to evaluate?

A. Absolutely. I mean, that would make us go and ask, you know, all of the questions about neurological symptoms that, you know -- when you sit down and talk to somebody, you usually just try to get them to open up and try to get the information flowing. And you write it down the best you can in a coherent way.

If we suspect there's, or if I have reason to suspect there's neurological damage, I'll ask about the neurological type symptoms, did they have black outs, you know, could they remember things, did they function like other children. You know, so that would cause the interview, I would make sure that we covered those areas every time we talk to somebody, regardless of what else they were telling us about.

USCA5 4140

Q.   And if you turned this information over to a psychologist who suspected mental retardation, would that involve an additional investigation into deficits?

A.   Oh, it certainly should.

Q.   Okay.  And eventually Mr. Bourgeois was seen by a neuropsychologist, Dr. Weiner.  Right?

A.   I believe so.

Q.   Okay.  That happened during trial?

A.   Or shortly before.

Q.   Okay.  And do you recall that Dr. Weiner reported an IQ of 76, which he subsequently revised to 75 based on a --

            THE COURT:  Okay.  Mr. Wiseman, he's not an expert.

            MR. WISEMAN:  Okay.  I just want to know, if he had known about it, would he have made any recommendation to the defense team.

BY MR. WISEMAN:

Q.   When you saw Dr. Weiner's report -- did you see Dr. Weiner's report eventually?

A.   I believe I did.

Q.   Okay.  When you saw that IQ, did you tell anything or do anything relevant to the investigation?

A.   If I saw the IQ and it was 75 or 76, we would have been discussing mental retardation.

Q.   And do you have any understanding or explanation for why that discussion and investigation didn't happen?

USCA5 4141

A.    No.  I don't recall going back and looking at adaptive deficits or seeking out information about adaptive deficits.

Q.    Did the timing of the report in relationship to the trial, which was either about to start or had already started, did that influence the ability to conduct a full-blown mental retardation investigation?

A.    Yeah, it would have impacted it.  I mean, had we decided to pursue mental retardation, we could, we might could have stopped everything and reinterviewed everybody.  I don't know.

Q.    Okay.  Was time a factor?

A.    I mean, it would have been a very brief kind of cursory kind of investigation, but --

Q.    Was time a factor, is my question.

A.    Sure.

Q.    Just to be clear, would you have ever sent anything to Dr. Cunningham without first getting approval from one of the defense attorneys?

A.    No, because that would wind up being the basis of the expert's opinion, and that's open to the public.  And you know, the trial counsel's got to decide, or at least have some, you know, up or down on whether or not this information should go out.

Q.    All right.  So that was your understanding with Mr. Gilmore and Mr. Tinker?

A.    That was just a standard way of operating, that you know,

USCA5 4142

anything you send to an expert could wind up being the basis of an opinion, could be subject for cross-examination. Trial counsel should be aware of what's going out.

Q.   Okay.  Have you been on defense teams other than this one that, in your view, were dysfunctional?

A.   Sure.

Q.   And in those instances --

THE COURT:  I'm sorry.  Is he testifying this was a dysfunctional defense team?

MR. WISEMAN:  Oh, I didn't mean to suggest that.  I'm asking other than this case, and excluding --

THE COURT:  I thought that's what you were saying.

MR. WISEMAN:  Oh, I didn't mean to.  Leaving this case --

MS. BOOTH:  And Your Honor, how can he testify?  Is he an expert as to --

MR. WISEMAN:  You just said he was.

MS. BOOTH:  -- evaluating different defense teams? No, I never said he was a lawyer, he could give a review of a lawyer's team.  No, I never said that.  And I don't know how he could testify to that.

THE COURT:  Is that something you feel comfortable testifying about?

THE WITNESS:  I'm not sure what I'm being asked.

THE COURT:  Okay.

USCA5 4143

MR. WISEMAN:  May I maybe ask the question?

THE COURT:  Then go ahead.

MR. WISEMAN:  Thank you.

BY MR. WISEMAN:

Q.   If you've been on defense teams that were dysfunctional --

THE COURT:  Wait a minute.  Do you know what a dysfunctional defense team is?

THE WITNESS:  I know what a functional defense team is.  I know that we had achieved several life sentences on several different trials.

BY MR. WISEMAN:

Q.   Did you consider this --

MS. BOOTH:  Well, excuse me, Your Honor.  You cannot make an evaluation of a good defense lawyer based on the, if his client gets convicted or not, or what the penalty is or not.  That's in the jury's purview.  You can be the greatest lawyer in the world, win or lose.

MR. WISEMAN:  And I think, I totally agree with what Ms. Booth is saying.  Let me see if I can cut to the chase here.

MS. BOOTH:  How could he be an expert --

THE COURT:  Are you putting him up as some kind of expert in a legal team?

MR. WISEMAN:  I'm just asking his experience.  Ms. Booth was suggesting in her cross-examination questions

USCA5 4144

that somehow it was the mitigation specialist's fault that the work, the ultimate work product wasn't produced.  It's our position that it's Defense Counsel's job.  I'm simply asking this witness, in his experience, who pulls it together when things aren't working?

BY MR. WISEMAN:

Q.   Can you answer that question?

THE COURT:  Well, why would -- I'm sorry, but you're assuming something isn't working.

MR. WISEMAN:  Well, I'll ask that question.

BY MR. WISEMAN:

Q.   Did you think this was a functional defense team?

MS. BOOTH:  How could he answer that question, Your Honor?

MR. WISEMAN:  Well --

THE COURT:  I don't think he's qualified to do it, if that's what you're saying, so --

MS. BOOTH:  No.  He is not -- that's my objection.

THE COURT:  So move on to something else.

MR. WISEMAN:  Okay.

THE COURT:  That's kind of the ultimate issue for me, isn't it?

MR. WISEMAN:  I'm sorry?

THE COURT:  Isn't that kind of the ultimate issue for me?

USCA5 4145

MR. WISEMAN:  As a matter of law.  But as a matter of fact, I think --

THE COURT:  Okay.  Just go on, please.

MR. WISEMAN:  Well, you asked me a question.  I was just --

THE COURT:  No, please go on.

MR. WISEMAN:  Okay.

BY MR. WISEMAN:

Q.   Ms. Booth asked you about discussions of strategy with Mr. Bourgeois.  When you're dealing with a capital defendant preparing his mitigation case, do you typically -- you accept input, obviously, from that person.  Correct?

A.   Yes.

Q.   Okay.  Do you necessarily guide your mitigation investigation by the wishes of the capital defendant?

A.   Absolutely not.

Q.   And why not?

A.   More often than not, they're very damaged individuals. They have a lesser capacity to think things through.  It's just, you don't produce solid investigations by limiting yourself to their desires.

Q.   And did you think Mr. Bourgeois was that type of individual?

A.   To some degree.

MS. BOOTH:  He's already told us he can't testify,

because he's not a mental health specialist, on whether there's any symptoms of MR, if there was any inabilities.  I mean, he --

THE COURT:  So what is it you want him to say?

MR. WISEMAN:  If, in his estimation as a mitigation specialist, Mr. Bourgeois was a damaged individual whom he wouldn't rely on to guide his investigation.  Seems like a reasonable question.

THE COURT:  I thought he said he wasn't qualified to talk about damage or mental health or --

MR. WISEMAN:  Well, I don't think he can make a diagnosis, but he can tell, I think, or maybe we should ask him the difference between a high functioning or a damaged individual.

THE COURT:  You mean mental retardation?

MR. WISEMAN:  I didn't say that.

THE COURT:  Okay.  Well, that's what I'm hearing. But he said he couldn't, he didn't see any signs of that in Mr. Bourgeois.  So --

MR. WISEMAN:  Well, I don't want to argue with the Court about what the testimony was, but I --

THE COURT:  Did you see any, I thought you said you didn't see any signs of mental retardation in Mr. Bourgeois. Not that you're an expert.

THE WITNESS:  Yeah, I think I -- I thought I said

USCA5 4147

that I wouldn't have diagnosed him and that I would have pursued, had we been aware that that was an avenue of, that was an available avenue, we would have pursued some different investigation.

THE COURT:  Actually not.  Ms. Gano, you want to read that back -- play it back, when I asked him if he had any indication that Mr. Bourgeois was mentally retarded.  Any "symptoms," I think, was the word.

(PAUSE.)

COURT RECORDER:  I'm not exactly sure where that is, Your Honor.  Can I just start somewhere?

THE COURT:  Sure.  It's somewhere where Ms. Booth was examining.

COURT RECORDER:  Oh.

MS. BOOTH:  When I was loud.

COURT RECORDER:  Okay.

THE COURT:  Before the loud.

MR. WISEMAN:  That won't narrow it down.

THE COURT:  Well, there never was a before the loud.

(PAUSE.)

(Proceedings played back as follows:)

THE WITNESS:  -- "other signs of neurological dysfunction."

BY MS. BOOTH:

Q.   "All right.  Did you think he was retarded?

USCA5 4148

A.    "I wouldn't have passed judgment on that.  I mean, I --

THE COURT:  "Okay.  This is, could you -- did you?  Yes or no.  You passed judgment on head injuries and other things.

THE WITNESS:  "No, I collected symptoms and decided that we should probably have him evaluated.

THE COURT:  "Well, I know.  Did you collect any symptoms of mental retardation?

THE WITNESS:  "I don't remember" --

(Playback stopped.)

THE COURT:  That was it.

(Proceedings played back as follows:)

THE WITNESS:  -- "noting any at that point.

THE COURT:  "Okay.  I mean, that really was the question."

(Playback concluded.)

THE COURT:  Okay.

COURT RECORDER:  That's all.

THE COURT:  That's it.  He said, "I don't remember any."

MR. WISEMAN:  Right, "any signs or symptoms."

THE COURT:  Pardon?

MR. WISEMAN:  I think the answer was --

THE COURT:  "Any signs or symptoms."

MR. WISEMAN:  "Signs or symptoms," right.

USCA5 4149

THE COURT:  So what else would you be looking for?

MR. WISEMAN:  Well, you want me to answer?  Or can I ask him?  Mr. Bierbaum --

THE COURT:  I thought that kind of covered the gamut.

BY MR. WISEMAN:

Q.   Mr. Bierbaum, my questions are, I have two more questions for you, and hopefully no subparts.  Can you look at a person and necessarily tell if they're mentally retarded, you as a mitigation specialist?

A.   No.

Q.   All right.  Obviously some people you can look at and say, "Oh, my God, they're incredibly impaired.  We've got to do something.  He's drooling.  He's, can't utter a word."  Right?

A.   You can look at someone and identify Down syndrome or fetal alcohol syndrome or something like that.

Q.   Okay.  All right.  So in the absence of your ability --

THE COURT:  You can look at somebody and identify fetal alcohol syndrome?

THE WITNESS:  In the classic full-blown FAS, yes.  They have a depressed face, and their eyes are fuller -- farther apart, and they have no philtrum.  There are physical signs on a child that's less than four years old of fetal alcohol syndrome.

THE COURT:  So you are an expert in these things.

THE WITNESS:  No, but I know what to look for to hand

USCA5 4150

over to --

THE COURT:  Okay.

THE WITNESS:  -- mental health experts.

MR. WISEMAN:  Your Honor, I think there's some confusion in the use of the term "expert."  He's expert at what he does, but he's not an expert that testifies.

THE COURT:  Well, that remains to be seen.  But go ahead.

MR. WISEMAN:  Fine.  I think Ms. Booth said he was expert in what he does.

THE COURT:  I think I get to determine that, though.

MR. WISEMAN:  Well, you certainly do.  I just --

THE COURT:  Go ahead.

MR. WISEMAN:  If Ms. Booth says it, it must be so.

THE COURT:  Not necessarily.  I've disagreed with her on many occasions.

MR. WISEMAN:  Okay.

MS. BOOTH:  But I appreciate the compliments from Mr. Wiseman.

THE COURT:  That's true.

MR. WISEMAN:  So --

THE COURT:  You can actually get a copy of that transcript.

MS. BOOTH:  Yes, Your Honor.

BY MR. WISEMAN:

USCA5 4151

Q.   In the absence of outward signs of mental retardation, how do you, how do you figure it out?

A.   First, you have some kind of indicator, some kind of, you know, school performance, low IQ test, something, and then you kind of -- then I would kind of work backwards and do the investigation on adaptive deficits.  You know, was he able to function?  Was he able to count change?  Could he get from A to B?  Could he function independently as an adult?  Could he, did he do his chores?  Could he cook a meal?  Could he be trusted to go, when he was little, go to the store and get what he's asked for and bring back change.  Adaptive deficits are largely things that are failures to function.

Q.   Okay.

A.   And you kind of --

Q.   I think you said you saw an IQ score that would have caused you to suggest such an investigation in this case.

A.   Towards the end of the --

Q.   Of the case.

A.   Of the investigation, I believe.

Q.   Last question, which is how we got into this little mess here.  Did you think, leaving the MR aside, did you think Mr. Bourgeois was a high functioning individual, or did you think he was a damaged individual?

          MS. BOOTH:  Again, I'm going to object.

          THE COURT:  I don't understand what that means.

USCA5 4152

MR. WISEMAN:  Damaged?

THE COURT:  Yes.

BY MR. WISEMAN:

Q.   Do you think he suffered from mental health problems?

A.   I thought there were some mental health problems, but I'm not a psychologist.  I can't say it was this or that or that. I -- he had function poorer -- more poorly than other Defendants I had served.

Q.   Okay.

THE COURT:  In what fashion?

THE WITNESS:  Keeping information together, being able to tell coherent stories from one time to another, being able to --

THE COURT:  Mr. Gilmore said that he gave you actual, he had memorized phone numbers of witnesses that he wanted you to contact.

THE WITNESS:  Being able to -- well --

THE COURT:  Did he do that?

THE WITNESS:  If Mr. Gilmore says that, then possibly he did.  I don't remember that happening.

MR. WISEMAN:  No, I'm done.  That was your question.

THE COURT:  Okay.

MR. WISEMAN:  Thank you, sir.

RECROSS-EXAMINATION

BY MS. BOOTH:

USCA5 4153

Q.   So when was this you saw Wiener's -- I mean Dr. Weiner's neurological evaluation that --

A.   I want to say it was maybe when we came up to, or when I came up to help subpoena witnesses for the punishment phase.

Q.   Okay.  So it was already after the trial.

A.   I believe.  Or the trial was winding down.

Q.   And you were aware that an EEG had been done on Mr. Bourgeois and that it was normal.

A.   I vaguely remember that, sitting here now.

Q.   Okay.

A.   Yes.

        MS. BOOTH:  That's all I have, Your Honor.

        MR. WISEMAN:  I just have another hour.  No, I'm teasing.

        THE COURT:  Go right ahead.

        MR. WISEMAN:  We're done with this witness, Your Honor.

        THE COURT:  All right.  Thank you, sir.  You may stand down.  Call your next witness.

        MR. ABREU:  Your Honor, I am happy to say that our last witness is Mr. Alan Keel.

        THE COURT:  Okay.  Do you need me?

        MR. ABREU:  I will say that Mr. Dowd and I are going to be the only two, the two most reasonable people in this courtroom, and we've worked out an agreement, an agreement

USCA5 4154

that's going to speed us through this --

THE COURT:  Well, I appreciate that compliment.

MR. ABREU:  So -- how about you, Ms. Salinas?

MS. SALINAS:  I do.  Thank you so much.

MR. WISEMAN:  Can I --

THE COURT:  We're the unreasonable people.

MR. ABREU:  At this hour, everybody seems unreasonable, Your Honor.

MR. WISEMAN:  Your Honor, can I just alert the Court that we're going to have a couple of housekeeping matters, as far as exhibits?

THE COURT:  Such as?  Have you got the -- do you need to -- while you're waiting for this last one --

MR. WISEMAN:  Well, that's what I was going to -- we can do it now or we can do it later.  Looks like the witness is here.

THE COURT:  Is this a bite person?

MR. ABREU:  It's a p30 DNA person.

THE COURT:  Oh, okay good.  Thanks.

MR. ABREU:  Thank you.

MR. DOWD:  Judge, could we take about a 10-minute break?

THE COURT:  Yes.

MR. DOWD:  Thank you.

(Recess from 7:14 p.m. to 7:18 p.m.)

USCA5 4155

THE COURT:  What happened to Mr. Dowd?  Is he there?  Mr. Dowd, are you there?

MR. ROBERTS:  He's here.

THE COURT:  Okay.

MR. DOWD:  I'm ready, Your Honor.

THE COURT:  Would you administer the oath, Ms. Gano, please.

THE CLERK:  Yes, Your Honor.

(Stopping at 7:18:35 p.m.)

(TESTIMONY OF CHARLES ALAN KEEL PREVIOUSLY TRANSCRIBED.)

(Beginning at 8:23:25 p.m.)

MR. WISEMAN:  Your Honor, can we use this time --

THE COURT:  Yes.

MR. WISEMAN:  -- for some other stuff?

THE COURT:  Absolutely.

MR. WISEMAN:  First, on behalf of all of us, I want to say thank you to the Court and to the Court's staff for accommodating us in this way.

THE COURT:  You're welcome.

MR. WISEMAN:  Mr. Bourgeois --

THE COURT:  My time is your time.

MR. WISEMAN:  Yes.  Mr. Bourgeois also wanted me to thank the Court for permitting that visit yesterday.  It meant a lot to him.

We've got a number of exhibits.  P-37 through P-55 --

USCA5 4156

THE COURT: P-37 through P-55.

MR. WISEMAN: -- right, are all lay declarations that I would offer, not for the truth of the matter --

THE COURT: Ms. Booth?

MR. WISEMAN: But because the doctors relied upon them.

MS. BOOTH: Your Honor, they are full of hearsay. And I object to every single one of them.

MR. WISEMAN: Your Honor, I --

MS. BOOTH: They did not bring the witnesses here to testify, and they're just hoping to admit these hearsay statements without letting us have an opportunity to cross-examine them. And so I object to them.

MR. WISEMAN: I'm not sure Ms. Booth understood my application. I'm not offering them for the truth. The doctors relied on them, and I simply --

THE COURT: Well, if they're not truthful, then they didn't rely on good information.

MR. WISEMAN: Well, Your Honor, the other point here is that the Court, in our April 20th, 2010, argument on the scope of the hearing told us rather clearly to keep the number of lay witnesses to a minimum. I think we talked about four to six. We wound up calling seven. So I mean, if we called all of these people, we'd be here another week. And so we were trying to meet the Court's requirements as best we could,

USCA5 4157

time-wise.

THE COURT:  Well, that doesn't mean you can offer hearsay and get it admitted.

MR. WISEMAN:  No, no, but I'm not offering them for the truth.  In cases such as this, it is quite typical for doctors to rely on lay reports.  Obviously, I'm not suggesting that they are being offered for the truth, but when a -- if the doctor relied on them, I think the record should have some indication of what it is they're relying on.  That's all it is. It's not at all being offered for the truth of any of the matters asserted.

When we write briefs in this case, I think it's important to say, well, the doctor relied on this, and this says X, and if it's not in the record, then how can we make argument about what they relied on?

THE COURT:  What if it's not the truth?  Then what's the point?

MS. BOOTH:  And see, if they don't bring these witnesses, Your Honor, I don't get to find out -- in talking -- I have one witness we're going to bring tomorrow that said that's not what he said, that the declaration that was presented to him that he signed was not what he said.  So I don't know.  I haven't had an opportunity to speak to all these people.  I don't know.  And therefore, it's hearsay, and I object to it.

USCA5 4158

MR. WISEMAN:  Well, I don't really understand how it's hearsay if I'm not offering it for the truth, but that's another matter.

THE COURT:  Sustained.

MR. WISEMAN:  Yes, Your Honor.  A related application is we have P-110 --

THE COURT:  You know, Mr. Wiseman, on that matter --

MR. WISEMAN:  Yes.

THE COURT:  -- what the doctor says they relied upon is that.  I mean, this is just bolstering the doctor's testimony.  The doctor testified "I relied on these people saying these things."  They did, they testified to that, did they not?

MR. WISEMAN:  Oh, yes.  I mean --

THE COURT:  So that's that.  I mean, that's all you need, I would think.

MR. WISEMAN:  I just think it's a more --

THE COURT:  I'm not saying you, that you gave them false information, but we can't say it's true information, but the doctor's testimony speaks for itself.

MR. WISEMAN:  All right.  I just think it's a more efficient way to proceed, but I understand the Court's point.

Another application I have is with regard to P-110, the declaration of Brenda Goodman.  I also have a declaration from her, P-170, in which she indicates that she could not make

USCA5 4159

this hearing, although we had requested her to come, although we didn't subpoena her, because her husband --

THE COURT:  But I let people appear by deposition, you know.  You can do all those kind of things.

MR. WISEMAN:  All right.  I mean, I --

THE COURT:  And it would have been very efficient, you know, for you all to take these depositions of everybody, wherever they were.

MR. WISEMAN:  It's a rather late-breaking development.  But I would offer the explanatory declaration, as well as the --

THE COURT:  Would you like to take her deposition and supplement this record with it?

MR. WISEMAN:  Yes.

THE COURT:  As long as Mr. Bourgeois does not have to be there?

MR. WISEMAN:  He doesn't have to be there.

THE COURT:  Then you can do that.  Can you do it --

MS. BOOTH:  So does this mean the United States is going to have to go to Louisiana?

THE COURT:  No.

MR. WISEMAN:  No, this is --

UNIDENTIFIED SPEAKER:  It's Mitchell.

MS. BOOTH:  Oh, she's in Houston.  I'm just asking.

MR. WISEMAN:  Yes.

USCA5 4160

THE COURT:  You can do that by video deposition remotely.  I mean --

MR. WISEMAN:  You know what, I misspoke.

THE COURT:  -- Mr. Wiseman can do it in Philadelphia. You can be here, and you can do the whole thing by video.

MR. WISEMAN:  I misspoke, Your Honor.  It was Claudia Mitchell who lives in Houston, not Brenda Goodman.

THE COURT:  Where does Brenda Goodman live?

MS. BOOTH:  Brenda Goodman testified.

MR. WISEMAN:  Yeah, I'm not interested in Brenda Goodman.  I misspoke.

THE COURT:  Okay.

MR. WISEMAN:  It's Claudia Mitchell, who is in Houston.  And we'll take her deposition, and we'll notice --

THE COURT:  Can you do it by video conferencing, so everybody can be in their place, wherever they are?

MR. WISEMAN:  We will look into that and do as best we can, yes.

THE COURT:  Okay.  It just, it's so expensive to go --

MR. WISEMAN:  No, I --

THE COURT:  And I'll be glad to let you supplement the record.  And actually with any of these declarants, if you want to do the same thing.

MR. WISEMAN:  Oh.

USCA5 4161

THE COURT:  As long as they're subject to cross-examination.

MR. WISEMAN:  Sure.

THE COURT:  And nobody has to go to Louisiana to find them.

MR. WISEMAN:  Okay.

THE COURT:  Put them in a video conference center.

MR. WISEMAN:  All right.

THE COURT:  And do it.

MR. WISEMAN:  All right.  We'll speak with the Government about that.

THE COURT:  But I'm going to give you one -- I'm going to give you till November 15th to do that.

MR. WISEMAN:  Okay.  That's more than fair.

THE COURT:  To supplement the record.

MR. WISEMAN:  More than fair.  Thank you.

THE COURT:  I thought so.

MR. WISEMAN:  Yes.  A couple of exhibits I neglected, or we neglected -- actually, I think it's all me -- to offer. P-157 is the order appointing Dr. Weiner.  It's a part of the Court's record.

THE COURT:  Is the what?

MS. BOOTH:  No objection.

THE COURT:  P-157 is admitted.

MR. WISEMAN:  All right.  158 is one of the charts

USCA5 4162

that, about the WAIS scoring that the doctors referred to, and I should have offered it.

THE COURT:  Right.  Any objection to that, Ms. Booth?

MS. BOOTH:  No, Your Honor.

THE COURT:  P-158 is admitted.

MR. WISEMAN:  P-3 is a letter from Dr. Cunningham to John Gilmore, dated 2/25.  I believe we referred to it, and I neglected to offer it.

THE COURT:  Ms. Booth?

MS. BOOTH:  And what was that?  I'm sorry.

MR. WISEMAN:  P-3.

THE COURT:  P-3.

MS. BOOTH:  Written by Cunningham?

MR. WISEMAN:  Cunningham to Gilmore.

MS. BOOTH:  No problem.  No objection.

THE COURT:  P-3 is admitted.

MR. WISEMAN:  All right.  Just one more, a couple more things.  I shouldn't say one.  I'm really reluctant to ask this.  I was just wondering what the Court's intentions are with regard to Friday?  Is there going to be a Friday?

THE COURT:  There's going to be a Friday.

MR. WISEMAN:  Okay.  And are we going to be here on Friday?  I mean, that's fine.

THE COURT:  I thought I'd give -- I've given you three days.  I thought I'd give the Government two days.  I

suspect --

MR. WISEMAN:  Yes.

THE COURT:  -- that they're not going to need it.  So you have your rebuttal witnesses.  See if you can get together with them --

MR. WISEMAN:  Okay.

THE COURT:  -- about how much time they're going to need.

MR. WISEMAN:  So it's going to be some point on Friday.  We just have to make our plans.

THE COURT:  So that gives you a full week.  It will be -- it's going to be all of Friday.

MR. WISEMAN:  All of Friday.

THE COURT:  I will give you all of Friday.

MR. WISEMAN:  Okay.

THE COURT:  And I intended to give it to the Government, but then I figured that you need rebuttal.

MR. WISEMAN:  Okay.

MS. BOOTH:  Judge, I have a couple of things that --

THE COURT:  How many -- how much rebuttal, do you think?

MR. WISEMAN:  Oh, I'm not sure at this moment. Frankly, I was worried about getting our direct case on, so I really haven't been thinking about rebuttal.

THE COURT:  Well, you did it.

MR. WISEMAN:  We did it.  And that's great.  I've got a document on this flash drive that is from Dr. Estrada's file that shows the date that Ms. Booth retained him.  And how about if I print it out and offer it tomorrow as 171?

THE COURT:  That's fine.

MR. WISEMAN:  Okay.

THE COURT:  Now --

MR. WISEMAN:  The last thing I --

THE COURT:  Since it's 8:30 tonight -- I'm going to let you finish, but --

MR. WISEMAN:  Yeah.

THE COURT:  -- what time do y'all want to start back in the morning?

MR. WISEMAN:  It's up to the Government.

MS. BOOTH:  Oh, Judge, whatever time you need us here.  We're good.  We've got things to do if you want to start a little later, or we can be here whenever you want.

THE COURT:  Well, you've got a long way home and --

MS. BOOTH:  Yeah, I do.

THE COURT:  How about 9:00 o'clock?  Is your husband still here?

MS. BOOTH:  Yeah.

THE COURT:  I'm sorry, Ms. Booth.

MS. BOOTH:  I know.

THE COURT:  Okay.  Let's make it 9:00 o'clock.

USCA5 4165

MR. WISEMAN:  Okay.  Thank you.  That's all I have then.

THE COURT:  Anything further?

MS. BOOTH:  From the United States, Your Honor.

THE COURT:  Yes.

MS. BOOTH:  We're going to offer Government's Exhibit Number 73, which is the --

MR. WISEMAN:  Oh, we already offered that.

MS. BOOTH:  Okay.  Well --

MR. WISEMAN:  I mean, we offered that as --

THE COURT:  Government's 73 is admitted.

MS. BOOTH:  Government's 176, 177 -- oh, and it's 200.

MR. WISEMAN:  No objection to any of those.

THE COURT:  200 I admitted.  176 and 177 --

MS. BOOTH:  Yes.

THE COURT:  -- is admitted, Government.  Have we got all the exhibits before everybody leaves, Ms. Scotch?

THE CLERK:  I just need to check.

(PAUSE.)

THE COURT:  Ms. Scotch is going through the exhibits to make sure we have everything.

MS. BOOTH:  Mr. Roberts was asking if we get two days, then when does the rebuttal time come in?  And I said, "Well, that's Friday night, between 5:00 and 10:00."

USCA5 4166

THE COURT:  Yes.  I mean, I'm assuming that you're really not going to need two days.

MR. ROBERTS:  I'm thinking that's probably correct.

THE COURT:  So I'm going to give him what's left. And I will not go late Friday night.

MR. ROBERTS:  We'll stay longer Friday to, so they don't get extra time on their case.

THE COURT:  I think we'll be okay.  I think we should be okay, and still give them no more than two hours for rebuttal.

MR. ROBERTS:  Very good.

MR. WISEMAN:  And we may not have any, Your Honor.

THE COURT:  You may not have any, but you've got it anyway.  We can do it, you know, from 4:00 to 6:00 on Friday, if we're running late.

MR. DOWD:  Judge, I solved the mystery of the (inaudible.)

THE COURT:  Oh, okay.  Tell me.

MR. DOWD:  And this, I got this from --

THE COURT:  Are you all satisfied?

MR. ABREU:  I'll know when I get back to my room and look at my stack, Your Honor, but I was under the impression -- I must have misunderstood, potentially -- that there were written notes that someone was taking as this examination is proceeding forward that were not disclosed.

USCA5 4167

THE COURT:  Okay.

MR. ABREU:  My understanding is that this is what they were talking about.  A couple of the sheets I have seen.  One of them I'm not sure I have.  But I will check and I'll confer with Mr. Dowd and let the Court know.

THE COURT:  All right.  We're -- are we done?

MR. DOWD:  Yes, Your Honor.

THE COURT:  Did you give him a set of those?

MR. DOWD:  I'll make a copy downstairs.

THE COURT:  All right.  Thank you all very much.  You're excused.

(Proceedings concluded at 8:34 p.m.)

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Molly Carter                    November 5, 2010
Molly Carter                        Date

USCA5 4168

                              INDEX


PETITIONER'S WITNESSES:    DIRECT    CROSS    REDIRECT    RECROSS

GEORGE WALKER HOLDEN          7       17

JENNIFER VALDEZ             24       30

CHARLES MICHAEL BOWERS      33       37 (Voir Dire)

                           41       82       119

JOHN GILMORE              125      133       202

KERRY BROWN               230      247

TIMOTHY ALLEN             252

GERALD BIERBAUM           257      276       291        305



EXHIBITS:                                            RECEIVED

PX-3:  2/25/04 LETTER FROM CUNNINGHAM TO GILMORE . . . .    315

PX-21:  GEORGE W. HOLDEN CURRICULUM VITAE . . . . . . . .     8

PX-18:  12/19/03 LETTER FROM HOLDEN TO TINKER . . . . .     11

PX-18A:  11/21/03 LETTER FROM HOLDEN TO TINKER . . . . .      9

PX-19:  2/24/03 LETTER FROM HOLDEN TO TINKER . . . . . .     11

PX-20:  GEORGE W. HOLDEN DECLARATION . . . . . . . . . . .   16

PX-81:  HOSPITAL RECORDS, RIVER PARISHES HOSPITAL . . .    132

PX-82:  TINKER'S RESPONSE TO GOVERNMENT INTERROGS . . .    131

PX-83:  JOHN GILMORE DECLARATION . . . . . . . . . . . .   131

PX-96:  CHARLES MICHAEL BOWERS CURRICULUM VITAE . . . .     35

PX-116:  PHOTO OVERLAYS OF BITE MARKS . . . . . . . . . .    72

USCA5 4169

EXHIBITS:  (CONTINUED)                                    RECEIVED

PX-157:  ORDER APPOINTING DR. WEINER . . . . . . . . . .   314

PX-158:  CHART REGARDING WAIS TEST . . . . . . . . . . .   315

                   --------------------

GX-73:  INTERROGATORIES FOR DOUGLAS TINKER . . . . . . .   318

GX-172A:  APPENDIX TO DR. SENN 04/10 REPORT  . . . . . .   125

PX-176:  LETTER FROM BOURGEOIS TO BIERBAUM . . . . . . .   318

PX-177:  LETTER FROM BOURGEOIS TO BIERBAUM . . . . . . .   318

GX-178 to 200:  LETTERS FROM ALFRED BOURGEOIS TO GILMORE   147

GX-204:  4/23/07 SENN PRESENTATION . . . . . . . . . . .    45

USCA5 4170